COMPOSITE EXHIBIT NO. 1 - PART 1

## FORM 1.997. CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form shall be filed by the plaintiff or petitioner for the use of the Clerk of the Court for the purpose of reporting judicial workload data pursuant to Florida Statutes section 25.075.

### I.    CASE STYLE

IN THE CIRCUIT COURT OF THE <u>ELEVENTH</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>  COUNTY, FLORIDA

Case No.: _____
Judge: _____

<u>Meridian Trust Company, as Trustee, American Associated Group Ltd.</u>
Plaintiff

vs.

<u>Eike Batista, Werner Batista, Thor Batista, Paulo Mendoca, Flavio Godinho, Paulo Gouvea, Marcus Berto, Luiz Carneiro, Aziz Ben Ammar, 63X Investments Ltd, 63X Master Fund, 63X Fund, EDX Holding Ltda, EBX International SA, EBX Capital Partners, Centennial Asset Mining Fund LLC, Centennial Asset Brazilian Equity Fund LLC, Thorque1 Fund Ltd, Thorque Investment Management Ltd, Olin Batista, Flavia Sampaio, Luma de Oliveira</u>
Defendant

### II.    TYPE OF CASE

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence – other
  ☐ Business governance
  ☐ Business torts
  ☐ Environmental/Toxic tort
  ☐ Third party indemnification
  ☐ Construction defect
  ☐ Mass tort
  ☐ Negligent security
  ☐ Nursing home negligence
  ☐ Premises liability – commercial
  ☐ Premises liability – residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
  ☐ Commercial foreclosure $0 - $50,000
  ☐ Commercial foreclosure $50,001 - $249,999
  ☐ Commercial foreclosure $250,000 or more
  ☐ Homestead residential foreclosure $0 – 50,000
  ☐ Homestead residential foreclosure $50,001 - $249,999
  ☐ Homestead residential foreclosure $250,000 or more

☐ Non-homestead residential foreclosure $0 - $50,000
☐ Non-homestead residential foreclosure $50,001 - $249,999
☐ Non-homestead residential foreclosure $250,000 or more
☐ Other real property actions $0 - $50,000
☐ Other real property actions $50,001 - $249,999
☐ Other real property actions $250,000 or more

☐ Professional malpractice
  ☐ Malpractice – business
  ☐ Malpractice – medical
  ☐ Malpractice – other professional
☒ Other
  ☐ Antitrust/Trade Regulation
  ☒ Business Transaction
  ☐ Circuit Civil - Not Applicable
  ☐ Constitutional challenge-statute or ordinance
  ☐ Constitutional challenge-proposed amendment
  ☐ Corporate Trusts
  ☐ Discrimination-employment or other
  ☐ Insurance claims
  ☐ Intellectual property
  ☐ Libel/Slander

☐   Shareholder derivative action
☐   Securities litigation
☐   Trade secrets
☐   Trust litigation

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☒ No ☐

**III.   REMEDIES SOUGHT** (check all that apply):
- ☒ Monetary;
- ☐ Non-monetary
- ☐ Non-monetary declaratory or injunctive relief;
- ☐ Punitive

**IV.   NUMBER OF CAUSES OF ACTION: (    )**
(Specify)

12

**V.   IS THIS CASE A CLASS ACTION LAWSUIT?**
- ☐ Yes
- ☒ No

**VI.   HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
- ☒ No
- ☐ Yes – If "yes" list all related cases by name, case number and court:

Bahamas Supreme Court 2016/CLE/gen Case Nos. 1573 & 1574; Cayman Cause No. FSD

172 of 2016 (IMJ) and FSD 221 of 2016 (IMJ)

**VII.   IS JURY TRIAL DEMANDED IN COMPLAINT?**
- ☒ Yes
- ☐ No

---

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.

Signature s/ Hendrik G. Milne      FL Bar No.: 335886
      Attorney or party                                               (Bar number, if attorney)

Hendrik G. Milne      01/17/2017
    (Type or print name)                                        Date

Case 1:17-cv-23051-KMW Document 1-2 Entered on FLSD Docket 08/11/2017 Page 5 of 492

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO._____

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.

       Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, MERIDIAN TRUST COMPANY, as trustee, and AMERICAN ASSOCIATED

GROUP, LTD., sue Defendants, EIKE BATISTA, WERNER BATISTA, THOR BATISTA,

PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ

CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X

FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS,

CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY

FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,

OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

## <u>Case Capsule - Requires no Response</u>

A Brazilian con man, Eike Batista, induced investors from around the U.S. - including many State employee pension funds, such as the Florida Retirement System Trust Fund - to invest billions of dollars in his oil exploration company OGX and its satellite companies on the basis of fraudulent promises of the discovery of a trillion dollars of offshore oil. He promised to plough in a billion dollars of his own money if the business needed it to come into production.

When the truth was finally discovered, that there was virtually no oil, Batista welshed on his billion dollar promise; OGX and its satellite companies collapsed; and the investors lost their money in what is currently Latin America's largest corporate default, ever.

Batista and a few others were indicted for market manipulation and insider trading and he has been fined and banned from heading up public companies for five years in Brazil. However, they all made many hundreds of millions of dollars from the scheme. Batista stashed much of his share in the names of family members and shell companies in Miami, Florida, and offshore.



The Plaintiffs - investment vehicles for an elderly disabled beneficiary - invested over $21 million in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations. They seek to recover their losses against Batista and his co-conspirators; treble damages pursuant to Florida's racketeering statutes; and to freeze the proceeds of the fraudulent scheme in the hands of the various recipients pending judgment.

## <u>TABLE OF CONTENTS</u>

Case Capsule - Requires no Response ................................................................... ii

Parties and Jurisdiction ...................................................................................1

    Jurisdiction .................................................................................................1

    Plaintiffs ....................................................................................................1

    Defendants .................................................................................................2

    Personal Jurisdiction in Florida ...................................................................4

    The Fraudulent Scheme – Overview .............................................................5

    Organizational Layout of the Complaint .......................................................8

**Section I - Inflating the OGX Oil Bubble** ........................................................9

    The Roles played by the Defendants .............................................................9

    Eike Batista .................................................................................................9

    The Individual Co-conspirators and Accomplices ..........................................10

    Paulo Mendonça ..........................................................................................11

    Werner Batista .............................................................................................12

    Thor Batista .................................................................................................12

    Flavio Godinho ............................................................................................13

    Paulo Gouvea ..............................................................................................14

    Marcus Berto ...............................................................................................14

    Luiz Carneiro ...............................................................................................15

    Aziz Ben Ammar ..........................................................................................15

    The Corporate Co-conspirators and Accomplices ...........................................16

    The 63X, EBX, CENTENNIAL and THORQUE Companies .............................16

    Additional Fraudulent Transfer Recipients ...................................................17

## TABLE OF CONTENTS (continued)

Olin Batista, Flavia Sampaio and Luma de Oliveira  .................................................17

The Scheme – in Detail  ....................................................................................18

The Brazilian Deepwater "Pre Salt" Discoveries  .........................................................18

The Start of OGX  ...........................................................................................19

OGX Wins Rights to 21 Exploratory Blocks  ...............................................................20

OGX Raises Additional Capital – Initial Public Offering  ...............................................20

The Fraudulent Misrepresentations Start  ................................................................22

Technical Terminology – PRMS  .............................................................................24

The First OGX "Oil Strike"  ...............................................................................25

The Second OGX "Oil Strike" ...............................................................................27

OGX Strikes "Even More" Oil  ..............................................................................28

The OSX Public Offering  ...................................................................................30

Promoting OGX in Miami  ...................................................................................35

"Interest from the Chinese"  ..............................................................................36

The 10.8 Billion Barrel Lie  ..............................................................................39

D&M Secretly Protests  ....................................................................................42

Insiders Sell Their OGX Stock in Miami  ..................................................................44

The Lies Continue – OGX "Cash Rich"  .....................................................................45

The Mubadala "Investment"  ................................................................................46

Keeping the Balls in the Air  .............................................................................48

"The Brazilian Dream"  ....................................................................................51

OGX Secretly Bankrupt  ....................................................................................54

The Exit Strategy  ........................................................................................55

## <u>TABLE OF CONTENTS (continued)</u>

The Professionals .................................................................................................56

The Bankers ........................................................................................................57

The Fake Billion Dollar "Put Option" ................................................................59

**Section II – The Plaintiffs Invest** ..........................................................................61

The EBX/BTG "Strategic Partnership" ..............................................................63

The $850 Million "Investment" by Petronas .....................................................67

Meridian Invests in More OGX Bonds ......................................................................68

Batista Secretly Cashes Out ...............................................................................69

Batista Makes Further Fraudulent Transfers ......................................................71

Mubadala Secretly Pulls Out .............................................................................72

The 10.8 Billion Barrel Lie – Recap ..................................................................73

**Section III – The OGX Oil Bubble Bursts** ...........................................................76

Batista's "Brazilian Dream" Turns to Nightmare ..............................................77

Batista's Silver Lining ........................................................................................78

The Plaintiffs' Claim ..........................................................................................80

**Count I – Fraud** ......................................................................................................81

**Count II – Conspiracy to Defraud** .......................................................................82

**Count III – Aiding and Abetting Fraud** ...............................................................82

**Count IV – Florida Civil Remedies for Criminal
Practices Act (f/k/a "Florida RICO")** ..................................................................83

The Criminal Enterprise ......................................................................................84

Pattern of Criminal Activity ...............................................................................84

Predicate Acts of Criminal Activity ...................................................................84

**TABLE OF CONTENTS (continued)**

**Predicate Act I - Florida Securities Fraud** – Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD…85

**Predicate Act II - Federal Wire Fraud -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD…86

**Predicate Act III - Federal Money Laundering -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA .......................................86

**Predicate Act IV - Florida False Advertising -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR .................................................................................................87

**Predicate Act V - Florida Theft -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD…87

### TABLE OF CONTENTS (continued)

**Predicate Act VI - Florida Communications Fraud -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...88

    Civil Remedy ....................................................................................88

**Count V – Florida Civil Remedies for Criminal Practices Act Conspiracy (F/K/A "Florida Rico Conspiracy")** ...........................89

**Count VI – False and Misleading Advertising** ..........................90

**Count VII – Conspiracy to Commit False and Misleading Advertising** ..............91

**Count VIII – Civil Theft** ...................................................92

**Count IX – Conspiracy to Commit Theft** ................................92

**Count X – Aiding and Abetting Theft** ...................................93

**Count XI – Florida Uniform Fraudulent Transfers Act** ...............94

**Count XII – Conspiracy to Commit Fraudulent Transfers** ...........95

**Demand for Jury Trial** .....................................................96

## Parties and Jurisdiction

**Jurisdiction:**

1.      This is an action for actual damages in excess of $20 million and statutory damages in excess of $60 million dollars, and therefore far in excess of the minimal jurisdictional damages requirements of this Court.

2.      This is further an action for injunctive and other equitable relief and therefore further within the equitable jurisdiction of this Court.

**Plaintiffs:**

3.      Plaintiff, MERIDIAN TRUST COMPANY ("MERIDIAN"), is and was at all times material hereto, a trust company incorporated under the laws of Nevis and located in Nevis.

4.      MERIDIAN, as trustee, is and was at all material times the holder of legal title to the assets of a family trust fund termed "The Chrisly Trust" held for the benefit of a very elderly, disabled beneficiary whose affairs are and were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by a Miami-Dade County, Florida resident. The investments at issue were made through the Plaintiff's Florida investment adviser, as agent.

5.      Plaintiff, AMERICAN ASSOCIATED GROUP, LTD. ("AMERICAN"), is and was at all times material hereto a corporation incorporated in the Cayman Islands which held investments on behalf of the same very elderly disabled individual, whose affairs are and were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by that same Miami-Dade County, Florida resident. The investments at issue were made through the Plaintiff's Florida investment adviser, as agent.

**Defendants:**

6.      Defendant, EIKE BATISTA ("EIKE BATISTA" or "BATISTA"), is and was at all times material hereto an individual who is resident in Brazil.

7.      Defendant, WERNER BATISTA, is and was at all material times an individual who is resident in Florida and Brazil and the brother of EIKE BATISTA. He is believed to hold dual nationality between the U.S. and Brazil or is a permanent U.S. resident.

8.      Defendant, THOR BATISTA ("THOR BATISTA" or "THOR"), is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA.

9.      Defendant, PAULO MENDONÇA ("PAULO MENDONÇA" or "MENDONÇA"), is and was at all material times an individual who is resident in Brazil.

10.     Defendant, FLAVIO GODINHO ("FLAVIO GODINHO" or "GODINHO"), is and was at all material times an individual resident in Florida and Brazil.

11.     Defendant, PAULO GOUVEA ("PAULO GOUVEA" or "GOUVEA"), is and was at all material times an individual resident in Brazil.

12.     Defendant, MARCUS BERTO ("MARCUS BERTO" or "BERTO"), is and was at all material times an individual resident in Florida and Brazil.

13.     Defendant, LUIZ CARNEIRO ("LUIZ CARNIERO" or "CARNIERO"), is and was at all material times an individual resident in Brazil.

14.     Defendant, AZIZ BEN AMMAR ("AZIZ BEN AMMAR" or "BEN AMMAR"), is and was at all times material an individual resident in New York and Brazil.

15.     Defendant, 63X INVESTMENTS LTD. ("63X INVESTMENTS"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands.

16.     Defendant, 63X MASTER FUND, LTD. ("63X MASTER FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands.

17.     Defendant, 63X FUND ("63X FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands. (With the two companies above sometimes referred to collectively as "the 63X Companies").

18.     Defendant, EBX HOLDING, LTDA. ("EBX 1"), is and was at material times a limited liability company organized under the laws of Brazil.

19.     Defendant, EBX INTERNATIONAL, S.A. ("EBX 2"), is and was at material times a corporation organized under the laws of Panama with its principal place of business outside Panama.

20.     Defendant, EBX CAPITAL PARTNERS ("EBX 3") is and was at material times a corporation organized under the laws of Brazil. (EBX 1, EBX 2 and EBX 3 are sometimes collectively referred to herein as the "EBX COMPANIES").

21.     Defendant, CENTENNIAL ASSET MINING FUND, LLC ("CENTENNIAL 1"), is and was at material times a limited liability company organized under the laws of Nevada with its principal place of business outside Nevada.

22.     Defendant, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC ("CENTENNIAL 2"), is and was at material times a limited liability company organized under the laws of Delaware with its principal place of business outside Delaware. (With the companies referred to immediately above, sometimes referred to collectively as "the CENTENNIAL Companies").

3

23.     Defendant, THORQUE1 FUND LTD., was at material times a company organized under the laws of The Bahamas with its principal place of business outside The Bahamas. (The company was dissolved by the Defendant, THOR BATISTA, on July 28, 2016. Plaintiffs intend to seek leave to re-instate it, if necessary, for the purposes of this action).

24.     Defendant, THORQUE INVESTMENT MANAGEMENT LTD., was at material times a company organized under the laws of The Bahamas with its principal place of business outside The Bahamas. (The company was dissolved by the Defendant, THOR BATISTA, on July 28, 2016. Plaintiffs intend to seek leave to re-instate it, if necessary, for the purposes of this action) (THORQUE1 FUND LTD. AND THORQUE INVESMTENT MANAGEMENT LTD. are sometimes collectively referred to herein as the "THORQUE COMPANIES").

25.     Defendant, OLIN BATISTA, is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA.

26.     Defendant, FLAVIA SAMPAIO, is and was at all material times an individual who is resident in Brazil, the girlfriend of EIKE BATISTA, and the mother of his minor son, Balder Batista.

27.     Defendant, LUMA DE OLIVEIRA, is and was at all material times an individual who is resident in Brazil, the ex-wife of EIKE BATISTA, and the mother of his adult sons, the Defendants, THOR BATISTA and OLIN BATISTA.

**Personal Jurisdiction in Florida:**

28.     Defendants, WERNER BATISTA, MARCUS BERTO and FLAVIO GODINHO are residents of Florida and subject to the general jurisdiction of its Courts.

29.     Further, every Defendant is subject to the general jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(2) as having engaged in substantial and not isolated activity

4

within this State, both individually and directly and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

30.     Each Defendant is subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(1) as having operated, conducted, engaged in or carried on a business or business venture in this state, or having an agency in this state, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

31.     This is an action brought in connection with that business. Brazil is not a party to the Hague Service Convention. The non-resident Defendants may therefore be served through the Florida Secretary of State pursuant to Fla. Stat. § 48.181(1) with notice of service given by certified or registered mail pursuant to Fla. Stat. § 48.161(1).

32.     Each Defendant is further subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(2) as having committed tortious acts within this State, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

33.     As a result of each of their individual and direct actions and further as a result of the actions of their agents and co-conspirators which are imputed to each of them, all Defendants have sufficient minimum contacts with this State that haling them before the Courts of this State would not offend Constitutional due process requirements.

**The Fraudulent Scheme – Overview:**

34.     Between 2008 and 2013 BATISTA and his co-conspirators and accomplices raised billions of dollars from investors in stocks and bonds, overwhelmingly in the U.S., on the basis of an international press campaign barraging the international investing public with false promises of

a trillion dollars of recoverable oil off the coast of Brazil pursuant to drilling leases from the Brazilian government owned by BATISTA's oil exploration company, OGX.

35.     BATISTA had OGX commission huge multi-million-dollar oil production platforms – tanker vessels equipped with drill rigs – from his satellite ship-building company, OSX, which he paid for with OGX investor money. He trumpeted plans for a satellite port city in Brazil to be run by his logistics company, LLX, that would blossom as the tankers offloaded a "trillion dollars" of oil.[1]

36.     But all the vast production and transport paraphernalia was just window dressing. As BATISTA and his co-conspirators and accomplices knew, there was in fact virtually no recoverable oil, no need for the massive production machinery to pump and transport it, and no need for a dedicated port to offload it.

37.     The core business, the OGX oil business, was actually a failure. It stayed alive only as long as there was an inflow of fresh capital from duped investors and lenders and as long as BATISTA and his co-conspirators and accomplices could maintain the illusion of a huge eventual payoff.

38.     Start to finish, the OGX venture discovered and pumped less than enough oil to fill OSX's six massive multi-million dollar tanker ships for a single trip to port.

39.     Necessarily, all the hundreds of millions of dollars that BATISTA and his co-conspirators and accomplices took and kept for themselves was skimmed off the top of what came in from investor contributions, leaving an ever-deepening chasm of debt beneath.

---

[1] As part of building his brand, BATISTA typically dubbed his companies by a pair of initials that described the core business, followed by an "X," the multiplication sign, indicating burgeoning wealth. Thus, for instance, "OG" stood for "Oil and Gas." "OS" was "Offshore Services." "EB," BATISTA's initials, and "63," his lucky number (he is notoriously superstitious) indicated personal wealth-holding companies.

40.     The exit strategy was to sell whatever stock and assets they could, trust to local corruption to safeguard the wealth trapped within Brazil, and trust to the complicity of professional co-conspirators, accomplices, bankers, and bribed politicians, to hide the vast mass of their takings safely abroad in solid investments or secret bank accounts, where toothless local Brazilian government processes and their victims, they hoped, would be unable to touch them.

41.     By the start of 2013, through thousands of fraudulent misrepresentations spanning the years since 2009, BATISTA and his co-conspirators and accomplices had built an impression in the minds of money managers and investors internationally that OGX was sitting on enormous reserves of recoverable oil when in reality there was virtually none.

42.     In 2013, OGX bonds were returning high yields. The only real concern to buyers on the secondary market was whether the company was sufficiently capitalized to bring that oil into production.

43.     To reassure investors, BATISTA and his co-conspirators and accomplices, via further fraudulent misrepresentations detailed below, created an illusion of deep financial resources, ultimately backed by BATISTA's personal pledge through the "Put Option" also detailed below, to inject a billion dollars into OGX, if and when needed.

44.     In October 2013, when BATISTA and his co-conspirators and accomplices had cashed out the last of their stakes and the wealth had been secreted in the names of BATISTA's various willing family members, joined as Defendants here, or in shell companies and bank accounts outside Brazil, in Miami, Florida, and around the world, BATISTA reneged on that billion dollar pledge and OGX declared bankruptcy, swiftly followed by the bankruptcy of the satellite companies OSX and MMX.

45.     American investments funds such as those managed by Pimco from California and BlackRock from New York lost billions of dollars on OGX bonds. The $150 billion Florida System

Retirement Fund, which manages the retirement savings of Florida's teachers had invested in several of BATISTA's companies and may have also lost money. Many other investors lost their investments. The Plaintiffs lost in excess of $20 million.

46.     So far, BATISTA and his co-conspirators and accomplices appear to have gambled aright that they could make immense amounts of money with no real comebacks. BATISTA and a few others were eventually criminally indicted in Brazil for insider trading, stock manipulation and market fraud. However, in Brazil's glacially slow, toothless, corrupt legal system, it is highly unlikely that there will eventually be any serious consequences.

47.     Millions of dollars of the domestic Brazilian assets that BATISTA had stashed at the last minute in the names of his willing family members in anticipation of the collapse were frozen. He has also been banned from the board of any public company in Brazil for a short five year period. But, all in all, apart from such minor inconveniences, with most of the wealth that he and his co-conspirators and accomplices garnered from the scheme stashed abroad, the fraud has been a complete success.

**Organizational Layout of the Complaint:**

48.     The allegations are divided into three sections. The first - **Section I - Inflating the OGX Oil Bubble -** covers the period from 2009 through early 2013, during which, as the cumulative effect of a series of fraudulent misrepresentations, BATISTA and his co-conspirators and accomplices built a belief in the minds of investors internationally that OGX was sitting on massive reserves of recoverable oil when there was in fact virtually none. This was the foundational, accepted understanding in the international investment markets of OGX's assets and likely profitability at the time that the Plaintiffs made their investments in OGX bonds through their Florida investment adviser in 2013.

49.     The continuing fraudulent misrepresentations and how they induced the successive purchases of more than $21 million in OGX bonds by their Florida investment adviser on Plaintiffs' behalf during 2013 is covered in **Section II - The Plaintiffs Invest.**

50.     The account of the collapse of the whole house of cards in late 2013 is detailed in **Section III - The OGX Oil Bubble Bursts.**

<u>**Section I - Inflating the OGX Oil Bubble**</u>

**The Roles played by the Defendants:**

**Eike Batista:**

51.     BATISTA was the prime mover in the scheme. At all material times, he was the controlling shareholder and top managing agent of OGX, either as President, Chairman of the Board, or both. He also held stock and exercised control over the satellite operating companies such as OSX, MMX, and LLX whose success hinged largely on OGX striking offshore oil in large commercial quantities.

52.     BATISTA also owned and controlled the private wealth management companies through which he held the controlling shares in the operating companies, and through whose financial dealings and routing of money he accomplished the objective of the fraud. These were the Defendant 63X Companies, the EBX Companies, and the CENTENNIAL Companies. In addition, BATISTA may have also influenced or controlled the THORQUE Companies.

53.     Through his control position in OGX, BATISTA directly disseminated, ordered, or knowingly permitted the thousands of fraudulent communications, of which only a fraction are described below, constituting a colossal barrage of hype, inducing investors to contribute money to his enterprise in the expectation of gain.

54.     Through his control positions in all the Defendant companies, BATISTA appointed directors and managers who acted as his agents and who were his co-conspirators and accomplices in accomplishing the fraudulent scheme.

55.     References to BATISTA or OGX having "made," "stated," "published," "announced" and the like as to the communications described below refer to the fact that BATISTA either did it directly, ordered that it be done, or knowingly permitted such false communications to be made through accomplices and co-conspirators.

56.     It is not known how much money BATISTA made off the scheme, but at the bottom end of the range it is believed to be in the many hundreds of millions of dollars and at the top end, possibly billions.

**The Individual Co-conspirators and Accomplices:**

57.     BATISTA had numerous individual co-conspirators and accomplices who conspired with him and aided and abetted him in effectuating his scheme. Some OGX directors and officers, such as the top oil engineer MENDONÇA who generated misrepresentations from the early days in 2009 onwards, knew about the scheme from its inception. Similarly, trusted advisers such as his brother, WERNER BATISTA, his right-hand-man for three decades, GODINHO, and his close confidant, GOUVEA, upon information and belief, knew of the fraud from the early days.

58.     But all of BATISTA's confidants, including his eldest son, THOR BATISTA, all the Board members of OGX and many of the directors of OSX and LLX were, by some time in 2011, or by at the latest during 2012, privy to the fact that the core oil exploration company, OGX, on which the success of all largely depended, was actually insolvent.

59.     Yet all such directors and insiders failed to tell investors the truth and allowed the barrage of baselessly optimistic hype to continue, in order to make money from their salaries and

the sale of the stock and corporate assets. Only a few of these have been joined as Defendants.[2] These are as follows:

**Paulo Mendonça:**

60.    Before joining OGX, MENDONÇA had been the chief geologist at Petrobras for 34 years, throughout its successful exploratory campaign. As such, he enjoyed a respected position in the industry. As BATISTA's supposed "Dr. Oil," MENDONÇA was constantly touted to the press and to the investing public as the head of a supposed "Dream Team" of oil industry experts who would find oil where none had been found before.

61.    Given MENDONÇA's background and reputation in the oil industry, his pronouncements on recoverable oil volumes were regarded as reliable and his imprimatur was seen as a solid assurance of the probity of the company's predictions.

62.    However, BATISTA had incentivized MENDONÇA with a big block of OGX stock to use his name for their mutual profit in hyping the promise of OGX's exploratory wells which was contrary to industry practice.

63.    In his position as a top OGX executive, as detailed below, MENDONÇA created and published numerous fraudulent public announcements of supposed massive "discoveries" of oil while disposing of his own OGX shares at consequently inflated prices for many tens of millions of dollars, and enabling the rest of the group to take and squirrel away many hundreds of millions or even billions of dollars as their own proceeds of the scheme.

---

[2] Plaintiffs reserve the right to add more insiders as defendants if discovery reveals a sound basis to do so. These would include BATISTA's father, Eliezer Batista, who stayed on the Board of OGX through the collapse, though independent directors were resigning rather than face criminal and civil liability.

**Werner Batista:**

64.     Defendant, WERNER BATISTA, and his family had been living in Florida for more than twenty years when he agreed with his brother, EIKE BATISTA, during 2009 to split his time between Florida, and Rio de Janeiro and help him in his new oil venture.

65.     WERNER BATISTA took up a position as a director in BATISTA's personal wealth management entity, the Defendant, EBX HOLDING, in September 2009, where he helped assist his brother in the actions described herein.

66.     WERNER BATISTA resigned from EBX HOLDING in December 2013 in the wake of the fallout from the collapse of OGX. It is unknown before discovery how much of the wealth of duped investors he managed to take for his own purposes but he has, upon information and belief, returned his focus to Florida where he has invested part of his profits in Florida businesses.

**Thor Batista:**

67.     Defendant, THOR BATISTA, is the eldest son of EIKE BATISTA. Upon information and belief, during the final two years leading up to the collapse of OGX and the satellite companies, his father introduced him to the fact that the business was heading for certain failure and unless he wished to give up his life of luxury - which had hitherto included being able to fly from Rio to Miami, Florida, by private jet for his routine shopping - he should assist him in sheltering proceeds of the fraud in offshore companies and foreign bank accounts, to which his son agreed.

68.     To this end, in or about April 2012, THOR BATISTA, with his father's help, established two companies in The Bahamas, the Defendants, THORQUE1 FUND LTD. and THORQUE INVESTMENT MANAGEMENT LTD., as nominal owners of proceeds of the scheme.

69.     EIKE BATISTA and THOR BATISTA established bank accounts in Miami, Florida at Banco Itaú Europa International and upon information and belief at Citibank and other institutions as well as at banks in The Bahamas and the Cayman Islands, to which BATISTA and his 63X, EBX and CENTENNIAL companies routed hundreds of millions of dollars in proceeds from the scheme during 2012 and 2013.

70.     It is believed that the Bahamian accounts were emptied at some time between 2013 and July 2016, with the proceeds being transferred to BATISTA's "Swiss trust"[3], of which BERTO was the original trustee, or to other secrecy destinations.

71.      In July 2016, THOR BATISTA quietly dissolved the THORQUE Companies in The Bahamas.

**Flavio Godinho:**

72.     Defendant, FLAVIO GODINHO, is a lawyer admitted in Brazil, only, and has been a close, long-time confidant of BATISTA's since the 1980's.

73.     Over three decades, GODINHO has served in an array of capacities in BATISTA's companies and was regarded as his "Right Hand Man." At one time or another GODINHO was Chairman and Chief Executive Officer of EBX Brasil S.A., a Legal Vice-President of EBX GROUP LTD., General Counsel, Corporate Development Officer and a member of the Executive Board of EBX Ltd. and its subsidiaries, a director of LLX, a director of OSX, and a director of MPX, among others.

74.     Through his top positions in BATISTA's companies and as a close friend, confidant and legal adviser, GODINHO was aware of the material developments in the scheme and conspired with and counseled BATISTA and their co-conspirators in how to achieve its success including,

---

[3] The term "Swiss trust" is used in a generic sense. Further details are still being explored.

upon information and belief, the accomplishment of the bribery of government ministers in order to secure an economic advantage.

75.     GODINHO is believed to have made over $200 million from the scheme and fled Rio de Janeiro for Miami, Florida, in the wake of the OGX collapse. He is also currently under investigation in Brazil in connection with the notorious Petrobras bribery scandal and a new sub-chapter opened in that investigation into government bribery by BATISTA's companies, dubbed the "The X-Files."

**Paulo Gouvea:**

76.     Defendant, PAULO GOUVEA, like GODHINO, is a lawyer admitted in Brazil only, and is a long term confidant of BATISTA who served on the Board of OGX and as head of corporate finance in the EBX group of companies, who conspired with and assisted BATISTA and the others in achieving the objectives of the fraudulent scheme.

77.     GOUVEA is believed to have reaped in excess of $150 million from the fraud. Through his current position as a partner in and Director of Capital Markets at Brazil's biggest brokerage house, XP Investimentos, he does business in Florida through its Miami, Florida, office.

**Marcus Berto:**

78.     Defendant, MARCUS BERTO, was a long-standing BATISTA confidant who was in December, 2012 appointed CEO and Investor Relations Officer of LLX, BATISTA's allied logistics company, to help secretly sell off the company ahead of the crash of OGX.

79.     Upon information and belief, BERTO knew that OGX was insolvent by the end of 2012 and conspired with BATISTA and agreed to help set up a Swiss trust, through professionals in Miami, Florida, to which BATISTA could funnel his personal profits from the scheme.

80.     Upon information and belief, BERTO was the first trustee of that trust and in that capacity established its Swiss and other foreign banking relationships.

81.     After OGX collapsed, BERTO left Rio de Janeiro for Key Biscayne, Florida, where he is believed to have invested part of the proceeds he realized from the fraud in a multi-million dollar mansion.

**Luiz Carneiro:**

82.     Defendant, LUIZ CARNEIRO, was the CEO and President of OGX and CEO and Executive Board Member of OSX during its final two years, 2012 and 2013, when the Board and top executive management knew that OGX was insolvent and that the future of OSX hinged on OGX's – unachievable – success. He was a close confidant of BATISTA and conspired with him and assisted him in achieving the objectives of the fraudulent scheme.

83.     Upon information and belief, in his position as head of OSX, CARNEIRO handled the bribery of government officials, which included the payment of a $2.3 million bribe. CARNEIRO along with Brazil's Finance Minister, Guido Mantega, Chairman of the government-run oil behemoth, Petrobras were recently arrested in connection with the bribery investigation.

84.     Upon information and belief, the OSX-Mantega bribe secured in excess of $922 million in shipbuilding contracts from Petrobras for which there was no actual commercial demand in order to continue the illusion that OSX was a viable entity. The contracted vessels were not completed by the time of the OSX bankruptcy in October 2013.

**Aziz Ben Ammar:**

85.     The Defendant, AZIZ BEN AMMAR, was recruited by BATISTA as a board member of OGX and satellite companies in the final year leading up to the crash in order to help keep the balls in the air as long as possible for BATISTA and the others to get their stakes monetized and out of Brazil before the crash.

86.     BEN AMMAR was elected to the boards of OGX, LLX, OSX, and MMX by a cadre of unsuspecting victims, including a number of American retirement funds who had bought

shares or bonds in BATISTA's companies on the basis of his fraudulent promises, among them the Florida Retirement System Trust Fund.[4]

87.     BEN AMMAR was intimately involved in generating stories for the press during 2013, regarding the supposed massive capitalization of OGX and the fact that it was impossible for it to fail. He was a prime architect of the fraudulent billion dollar "Put Option" and the cover story regarding the fictitious $850 million "sale" to Petronas, both described below.

88.     On September 4, 2013, having milked as much as he could out of the scheme, BEN AMMAR resigned from the Board of OGX, weeks before its bankruptcy, and reportedly fled Brazil for New York where he presently resides in a multi-million dollar apartment acquired, upon information and belief, with part of his takings from the scheme.

**The Corporate Co-conspirators and Accomplices:**

**The 63X, EBX, CENTENNIAL and THORQUE Companies.**

89.     There were also numerous corporate entities that BATISTA owned or controlled that he used in executing his scheme. These were either holding companies for his stock in the operating companies, such as OGX and OSX, or were set up for the simple purpose of being the name on a bank account for the transmission of funds to accomplish the fraudulent scheme. Some of these entities have been joined as Defendants here. These are the 63X Companies, the EBX Companies, and the CENTENNIAL Companies and may also include the THORQUE Companies.

90.     These corporations, all of which were incorporated in secrecy jurisdictions, had no legitimate corporate business or real independent existence separate from BATISTA and were no more than fictitious names for BATISTA himself.  They acted as "cut-outs," to obscure the trail

---

[4] The Florida Retirement System Trust Fund is an approximately $150 billion pension fund that pays retirement benefits for over a million state, county, school system and higher-education teachers and other employees, managed by the Florida State Board of Administration of which the trustees are Florida Governor, Richard Scott, Florida Chief Financial Officer, Jeffrey Atwater, and Florida Attorney General, Pamela Bondi.

between the origin and the destination of funds and facilitate the transmissions of funds to achieve the ends of the fraudulent scheme.

91.     Further, upon information and belief, these corporations assisted in creating the illusion of the "Mubadala Investment," the supposed $2 billion stock acquisition of a small stake in BATISTA's wealth-holding companies by an oil-rich Arab nation intended to induce investor confidence, but which was in reality a massive loan that monetized the majority of BATISTA's stake in the scheme and was secretly repaid in 2013 by stripping prime assets out of the businesses.

92.     In all these companies, BATISTA and his co-conspirators and accomplices failed to observe the required corporate formalities and the entities were used as engines of fraud, such that their separate corporate existence should be disregarded.

93.     Alternatively, to the extent that these entities are found to have had true separate corporate existence, they should be treated as additionally liable, as being co-conspirators, agents and constructive trustees of proceeds of the fraudulent scheme.

94.     There are many other companies that also fall into this category of aiders and abettors, accomplices and co-conspirators whose involvement is less clear and have therefore not yet been joined as parties, but which may be joined later after discovery.

**Additional Fraudulent Transfer Recipients:**

**Olin Batista, Flavia Sampaio, and Luma De Oliveira.**

95.     EIKE BATISTA's family members WERNER BATISTA and THOR BATISTA were active participants in the scheme.

96.     Other family members, namely the Defendants, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA, are not presently known to have had any substantial involvement in the active fraud committed within the various BATISTA companies. (This may change after discovery).

97.     However, such family member Defendants knowingly received multi-million dollar transfers of real estate and cash within Brazil in the months immediately prior to the collapse of OGX for no consideration, when BATISTA was declaring insolvency, as a means of cheating creditors.

98.     Upon information and belief, during 2013, BATISTA wired several hundreds of millions of dollars of the proceeds of the fraudulent scheme to The Bahamas and to other offshore jurisdictions and attempted to transfer another $100 million out of a bank in The Bahamas to an account in Miami, Florida, in order to evade creditors.

99.     If the money transferred out of Brazil is no longer in the name of BATISTA's wealth-management companies then, following the template of BATISTA's actions in Brazil, it is believed that much of that wealth has been transferred into the names of the listed Defendant family members, WERNER BATISTA, THOR BATISTA, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA.

100.    None of these family members gave value for such transfers but served knowingly as mere nominees for BATISTA in whose names such assets were "parked" and should be held, as constructive trustees, to return such funds for the payment of the Plaintiffs' claims.

101.    Having described the scheme in general and the general involvement of the various Defendants, a detailed account follows.

**The Scheme – in Detail:**

**The Brazilian Deepwater "Pre-Salt" Discoveries.**

102.    The world's largest oil discoveries in recent years have been in Brazil's offshore, pre-salt basins. "Pre-salt" oil is generally characterized as oil reserves situated exceptionally deep, under thick layers of rock and salt, and requiring substantial investment to extract.

103.    In 2005, Brazil's national oil company, Petroleo Brasileiro S.A. ("Petrobras"), drilled a wildcat well in the ultra-deep waters of the Santos basin off the coast of São Paulo state and discovered the presence of hydrocarbon condensate under a thick layer of salt. This discovery confirmed a previously untested geologic model that indicated the potential for large recoverable oil deposits.

104.    In 2005, Petrobras confirmed the presence of potentially recoverable petroleum with the discovery of the Tupi oil field in the so-called pre-salt layer in the Santos Basin.

105.    Additional drilling and testing led to an announcement by Petrobras in November 2007 that the Tupi oil field (now known as the Lula oil field) contained between five billion and eight billion barrels of oil.

106.    Given these discoveries, there was significant global attention to the oil and gas industry in Brazil. The pre-salt discoveries showed great promise.

**The Start of OGX.**

107.    The Brazilian government auctions off drilling leases to companies who wish to explore for oil and scheduled what promised to be some of the richest new deep-water oil fields off its coast for auction on November 27, 2007.

108.    BATISTA had no experience in the oil-exploration business but had a lengthy background in stock promotion and mineral exploration and he raised approximately $1.3 billion in private equity to acquire some of these deep-water drilling leases through a company he named OGX, which he owned through his personal asset vehicle, CENTENNIAL 1.

109.    However, just before the auction, based in part on the very recent Tupi oil field discovery, the Brazilian authorities withdrew the deep-water fields from auction, deeming them "too valuable" and left in play old shallow-water fields that had been picked over by Petrobras for decades and generally viewed as worthless.

110.    That put BATISTA in a quandary. He had raised approximately $1.3 billion from investors to spend on deep-water oil fields. Now there were no deep-water fields to buy. No one wanted the shallow-water fields.

111.    Rather than refund the money, BATISTA resolved to press forward and acquire these rejects of the industry.

**OGX Wins Rights to 21 Exploratory Blocks.**

112.    On 27 November 2007, OGX submitted the winning bid on 21 exploratory blocks (seven of them in consortia with other operators) and committed significant funds for licensing fees as follows: seven blocks in the Campos Basin off the coast of Rio de Janeiro (two of them in consortia with Maersk); four blocks in the Santos Basin; five blocks in the Para-Maranhao Basin; and five blocks in the Espirito Santo Basin (in consortia with Perenco S.A.), all as shown below:



**OGX Raises Additional Capital – Initial Public Offering.**

113.    However, having committed nearly all of its cash to pay for the licenses and fees associated with the exploratory concessions, OGX needed to raise additional capital to conduct exploration. It would seek those funds from the capital markets via an initial public offering ("IPO") of approximately five million of its common shares.

114.    However, persuading the investing public that these fields were unrecognized treasures rather than the worthless money-pits (that they would eventually prove to be) would require enormous promotion.

115.    To garner credibility for OGX, BATISTA built a roster of senior executives from Petrobras; individuals who had been integral to that company's deep-water discoveries, headed by the Defendant, PAULO MENDONÇA, a geologist and former Petrobras head of exploration, who BATISTA dubbed "Dr. Oil."

116.    BATISTA granted his team members generous stock options in OGX to ensure that they were personally invested in the value of the stock and incentivized to spread any good news and to contain or minimize the bad.

117.    BATISTA's publicized rationale for exploring the shallow-water fields was that modern technology in the hands of his "dream team" ensured better, more accurate detection. If there was oil to be found, they would find it. Plus, when they found it, the much lower extraction costs in shallow water than in deep water meant much greater profitability. This one-two punch of state-of-the-art technology in the hands of the best oil gurus in Brazil, coupled with low-cost lifting, BATISTA boasted, promised to be a sure-fire winning combination.

118.    In 2008, BATISTA's OGX raised $4.1 billion in the biggest initial public offering in Brazilian stock market history.

119.    In its November 2008 Management Presentation, OGX announced that it had entered into contracts for 3D seismic surveys for all of its exploratory blocks; acquired various logistical transport vessels, including seven boats and two helicopters; and secured four off-shore drilling rigs with "world-class contractors." It stated that it expected to conduct an "intense drilling campaign" beginning in the second half of 2009 and reach "first oil" by the end of 2011.

**The Fraudulent Misrepresentations Start.**

120. BATISTA and his co-conspirators and accomplices now embarked on a relentless propaganda campaign boosting the promise of the OGX oil-fields completely untethered to any basis of reasonable fact in order to attract investment capital and boost the stock and bond prices in OGX and other satellite companies soon to be launched. These knowingly false representations were all made with the intent of inducing investors to buy stocks and bonds in OGX and its satellite companies.

121. The prime target of the misrepresentations were U.S. investors and necessarily and primarily those in its most populous states, California, Texas, Florida and New York.

122. American investors were to account for the vast majority of the sales of OGX shares and bonds, including American government pension funds such as, as noted above, the Florida Retirement System Trust Fund.[5]

123. This barrage of hype took various forms, all of which was intended to induce investment and succeeded in inducing stock and bond sales on the primary and secondary markets to maintain the illusion of OGX as a valuable business for as long as possible.

124. One was by way of what are termed in Brazil, "Material Facts." ("Statements of Material Fact" or "Material Facts"). These are public disclosures required by Brazilian law as to events which might impact equity and debt investor decisions to buy or sell. The directors of any

---

[5] The size of the Florida Retirement System Trust Fund investment into BATISTA's companies, and the extent of its losses, is unknown. But such institutional investors typically invest in very large tranches and the Fund's stake was large enough for it to vote at extraordinary shareholders' meetings. It is listed online as having voted, for instance: at an OGX shareholders' meeting on December 18, 2009, at the start of the scheme; at an OGX shareholders' meeting (*inter alia* to elect the Defendant, AZIZ BEN AMMAR to the OGX Board) on December 1, 2011; at an OSX shareholders' meeting (inter alia to elect the Defendant, AZZIZ BEN AMMAR to the OSX Board) on September 6, 2012; and at an MMX shareholders' meeting to vote on a proposed merger and Board re-shuffle following that company's October 2013 declaration of bankruptcy.

public company are legally bound to disclose such facts to the investing public by way of a report to the relevant stock exchange and to the press.

125.    There were many Statements of Material Fact, as detailed below, that contained serious fraudulent misrepresentations of promising developments in OGX.

126.    Further, the medium of the "Statement of Material Fact," which is intended to be reserved for consequential announcements, was abused to trumpet inconsequential news, such as the "discovery of hydrocarbons," to give it undeserved significance and whet market appetite.

127.    Finally, there were many instances where information as to material adverse developments should have been published by way of Statements of Material Fact, but was not, leaving investors internationally to rely on the continuing validity of prior positive announcements. These instances of failure to announce negative news constituted misrepresentations by omission.

128.    BATISTA and his accomplices and co-conspirators also gave many press interviews and held press conferences in which he and they promoted the story of OGX's great success and its supposedly fabulously valuable oilfields. These fraudulent misrepresentations were disseminated live or by video recordings to the international financial press, particularly Bloomberg,[6] to be relayed via the internet to the worldwide investment community.

129.    Following the precept that "a picture is worth a thousand words," BATISTA and his accomplices and co-conspirators also seeded the press with management report graphics and news photographs bolstering the illusion of the great success and fabulous wealth of OGX.

---

[6] "Bloomberg" refers to the New York-based financial software, data, and media company which provides the international investment industry with financial software tools and news through the Bloomberg Terminal (via its Bloomberg Professional Service), wire service (Bloomberg News), global TV network (Bloomberg Television), websites, radio station [WBBR], newsletters and magazines. (*Bloomberg Businessweek*, *Bloomberg Markets* and *Bloomberg Pursuit*.)

130. Additional fraudulent misrepresentations were contained in thousands of "tweets" sent via BATISTA's internet Twitter feed to what eventually topped one million followers, including many financial journalists.

131. Further, BATISTA personally made face-to-face promotional pitches to high-net-worth investors in Florida and elsewhere in the U.S.

132. It is not possible to list every one of the many thousands of fraudulent misrepresentations but a selection is given below.

**Technical Terminology – PRMS.**

133. To understand the quality of the misrepresentations, a very brief primer on oil industry jargon is in order.

134. The detection of oil is done by way of seismic and other remote studies and the drilling of test wells. The exact volume of oil contained in any underground reservoir cannot be known exactly until it has been pumped to the surface.

135. Moreover a volume of oil may exist but there may be no technological means of recovering any of it. Even if some volume may be "technologically recoverable" it may not be "commercially recoverable," *i.e.* the cost of extraction will exceed its selling price.

136. To try to lend some precision to the description of underground oil estimates and the likelihood they can be extracted profitably, the oil industry found it necessary to develop an agreed set of technical terms.

137. Accordingly, the international oil industry developed the Petroleum Resource Management System (the "PRMS"), a universal language used for estimating and classifying quantities of oil (and gas) discovered in any given reservoir according to their recoverability.

138. The PRMS distinguishes between "technological" and "commercial" recoverability and further distinguishes between "reserves" and "resources." "Reserves" refers to oil that is

reasonably certain to be commercially recoverable. "Resources" is a much wider term, and refers to all quantities of oil which is predicted to possibly exist within discovered or undiscovered reservoirs. "Resources" therefore encompasses discovered and undiscovered, recoverable and unrecoverable, and commercial and non-commercial quantities of petroleum.

139.   There are internal gradations within these categories running from "proved" to "probable" to "possible" reserves and from "contingent" (either "low", "best" or "high" estimates) to "prospective" resources. Quantities are expressed in "barrels" or "boe" – "barrels of oil equivalent."[7]

**The First OGX "Oil Strike."**

140.   It is common for oil exploration ventures seeking to raise finance on the international capital markets to retain the services of an independent consultancy firm of specialists to appraise its oil discoveries. They essentially act as auditors.

141.   OGX retained the prestigious Dallas-based firm of DeGoyler & McNaughton ("D&M") for this purpose in or around 2008.

142.   In March 2008, OGX released a Statement of Material Fact that its auditors, described as "world-renowned D&M," believed that OGX might be sitting on as much as 4.8 billion barrels of oil. At this point these were, at most, very preliminary seismic studies. The unstated inference was that this was "recoverable" oil or it was of no moment - *i.e.* not "material" - and not worthy of publication as a Statement of Material Fact. Predictably, OGX share prices jumped.

---

[7] BOE refers to a unit of energy based on the approximate energy released by burning one barrel (42 U.S. gallons or 158.9873 litres) of crude oil.

143.    On September 18, 2009, OGX announced the commencement of its drilling campaign with the drilling of well "OGX-1, block BM-C-43" in a prospect area dubbed the "Vesuvio" formation.

144.    On October 7, 2009 OGX issued a Statement of Material Fact that it had struck oil in the Vesuvio oilfield about 85 kilometers offshore, in 140 meters of water. MENDONÇA was quoted as stating that this was "a milestone in the industry, which was only possible due to the motivation and talent of our unique team." Both the issuance of this news via the medium of a Statement of Material Fact – to be reserved for announcements that should materially impact investment - and the quoted statement were intended to convey the impression that *recoverable* oil had been discovered. However, there was no reason for anyone with access to the OGX drilling test results to believe that this was true.

145.    On October 14, 2009, OGX released a Statement of Material Fact that declared in bold type that from a single exploratory well in the Vesuvio oilfield: "**Recoverable Oil Volume Expected to be between 500 Million and 1.5 Billion Barrels.**" MENDONÇA was quoted as saying this find validated the OGX team's scientific methodology and the "high petrolific (*sic*) potential" of the company's underwater leases.

146.    The implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable at any cost – even at a loss – but that it was likely to be commercially recoverable.

147.    With oil trading at around $75 a barrel, this was a representation to investors that OGX was sitting on minimum oil reserves worth between $37 billion and $111 billion from a single well, with many more yet to go. However, there was no reason for anyone with access to the OGX drilling test results to believe that any of this was true.

148.    This core Vesuvio announcement, which was not retracted until shortly before the OGX bankruptcy, was a bed-rock misrepresentation for investor confidence in OGX right up through the crash in 2013, despite the fact that BATISTA and his co-conspirators and accomplices knew the field was worthless long before it was eventually returned as valueless to the Brazilian government.

149.    BATISTA, who had not hitherto been known for his largesse, now became very conspicuous for his apparently generous public gifts which were enabled not by profit, but by the torrent of inflowing investment capital and skimmed off the top.

150.    The point of such apparently "generous" charitable gifts was to keep BATISTA in the public eye and to help paint a picture of multiplying wealth – as the "X" in BATISTA's company names was intended to signify – such that he could afford such acts of generosity.

151.    In fact, the only real "generosity" was on the part of the investing public, because it was their money being given away.

152.    Through his business and such "charitable" activities, BATISTA became close to many of Brazil's top politicos who it is believed that he bribed from his various offshore corporate bank accounts to ensure that governmental regulators were as "hands-off" on him and his enterprises as possible.

153.    Some of these politicians are also now on the long list of government officials who are under investigation by the Brazilian government for accepting bribes in connection with the huge Petrobras scandal that would ultimately break in 2014 – including now-impeached President, Dilma Roussef, who was arrested on September 22, 2016.

**The Second OGX "Oil Strike."**

154.    On November 16, 2009, OGX released a Statement of Material Fact announcing a new major oil strike captioned, in bold type: "**OGX Announces Discovery of Oil . . . Estimated**

**Volume of 400 Million – 500 million barrels – Drilling still in progress and new objectives to be reached.”** This oilfield was later dubbed the “Pipeline Formation.”

155.    Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable but was likely to be commercial.

156.    At a market price then around $79 a barrel, this was a representation to investors internationally that there was something like another $30-40 billion in value in OGX. The range of expected revenues for OGX was now cumulatively somewhere between $70+ and $158+ billion – and apparently there was more to come in the same well.

157.    Investors reacted predictably. The OGX stock price rose steadily through November 2009 to a high of R$15.70 while the numbers of trades swelled from over 16 million to over 22 million in just two days between November 16 and 18, 2009.

158.    Fully realizing that the figures that he had authored were completely baseless and had been intentionally used to create a dramatic increase in stock prices, and probably not believing that he would be able to prop the prices up much longer, in December 2009, MENDONÇA secretly sold 10,000 of his own OGX shares, realizing a profit of approximately $5,000,000.

159.    Upon information and belief, contrary to Brazilian law, this was not disclosed to CVM, the Brazilian Securities and Exchange Commission.

**OGX Strikes Even “More” Oil.**

160.    On December 22, 2009, OGX announced via Statement of Material Fact that completed drilling had revealed that the oil strike declared in November was now estimated at being two to four times greater. As the Statement of Material Fact stated, now the: “**Recoverable Oil Volume Expected to be between 1 and 2 Billion Barrels.”**

161.    Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just “technologically recoverable” but was likely to be “commercial.”

162.    BATISTA's announcements to investors by now equated to a cumulative promise that OGX was sitting on at least 1.5 billion and maybe as much as 3.5 billion barrels in recoverable oil. At a December 2009 price of around $75 a barrel that translated to a promise of between roughly $112.5 billion and $262.5 billion in value and investors reacted predictably favorably to the cumulative promises.

163.    In fact, the OGX seismic studies and drill test results had failed to indicate that a single barrel of oil was necessarily even technologically recoverable at any cost, let alone at a profit. Indeed, the internal D&M reports confirmed exactly that.

164.    But beyond that, from the very beginning, upon information and belief, very high concentrations of hydrogen sulphide gas had been detected. This compound, nicknamed "Death Gas" in Portuguese, is very poisonous, corrosive, flammable and explosive. Striking oil is no cause for celebration if it kills the drill-crew. The presence of this contaminant greatly increases the danger and the cost and therefore greatly decreases the commercial viability of an extraction operation. This fact was not disclosed.

165.    The promulgation of these statements to investors internationally and the continuing failure to retract them constituted fraudulent misrepresentations that were intended to induce and did successfully induce a belief in and among investors that OGX, and the satellite entities that depended on its success, had huge intrinsic commercial value.

**The OSX Public Offering.**



166.    To cope with the huge gushers of oil that he had promised, BATISTA announced that he would start a shipyard to build a number of huge "oil platforms" (tanker ships equipped with drilling rigs as shown above) through his company, OSX, and began scouting a coastal site for a "Super-Port" to be managed by his logistics company, LLX, where these monsters could dock to unload OGX oil, eventually settling on a location at Açu, near Rio de Janeiro.

167.    OSX went public in 2010 and raised $1.58 billion through its initial public offering on the São Paulo Stock Exchange. The rationale for the OSX oil platforms was to transport OGX oil. The main point of the LLX "Super-Port" was for the OSX ships to dock and offload OGX oil. But OGX had found virtually no oil and in all its existence, right up to its bankruptcy in 2013, would pump virtually no oil.

168.    The ships were massive and inspired investor confidence - but that was their sole point. No responsible businessman would have commissioned such monsters without a predictable source of supply, but they were complete overkill for the tiny trickle of OGX oil.

169.    But their point was not to actually *transport* oil: they were window dressing, intended to mask the fact that *there was no oil.* They were visible support for BATISTA's lies. In

essence, in themselves, they were huge floating fraudulent misrepresentations, boasts to the world of the existence of vast quantities of commercially recoverable OGX oil.

170.    Eventually, OSX would have six ships commissioned, with the assistance of bribes to government ministers. But in its entire future, OGX would not pump enough oil to fill those six multi-million dollar OSX ships once, for even a single trip to port.

171.    Nevertheless, on January 26, 2010, OGX released a Material Fact captioned: "**OGX Signs Agreements with OSX to Secure Production Equipment – OGX Sets Production Target of 1.4 Million barrels per Day by 2019 – Initial Production Expected to Begin in Early 2011, Ahead of Schedule.**" In the body of the Statement, BATISTA was quoted as stating:

> Our drilling results have revealed a new oil province in the southern part of the Campos Basin and broken paradigms regarding the quality and potential of the reservoirs in this area. At this moment, OGX is entering into a new phase in its history, with a focus on reaching our production target of 1.4 million barrels per day by 2019. We have an unparalleled 10 year growth story, based on world-class assets of extraordinary quality.

172.    The inference was that these were realistic projections founded on the discovery of a "new province" of commercially recoverable oil. But in truth, there was nothing to support it.

173.    BATISTA's reference to "world class assets" also resonated with investors internationally. In financial accounting, an "asset" is an economic resource that can produce value.

174.    However, nothing that OGX had yet discovered constituted an "asset." All the data available to it indicated that it might have "resources" of various categories, but how much could be recovered at *any cost* remained to be seen let alone what could be recovered *at a profit*.

175.    On February 1, 2010, OGX announced an estimated volume of "recoverable oil of 100 to 200 million boe" in the Vesuvio formation at well OGX-4.

176.    On February 3, 2010, OGX released a Statement of Material Fact that the drill-stem test at the 1-OGX-3-RJS well in block BM-C-41 (later named the Tubarao Azul - "Blue Shark" -

field) had revealed an estimated total recoverable volume of between 500 and 900 million barrels of good quality oil. This was represented to be extractable at a rate of approximately 3,000 barrels per day by vertical drilling, but at perhaps five times that rate, or 15,000 barrels a day, by horizontal drilling, as OGX proclaimed that it planned to do.

177.    This was untrue. There was no reasonable basis to believe in any such numbers. But a possible 15,000 barrels a day, which equated to roughly 5.5 million barrels a year, at a then per barrel rate of $87.21, constituted a fraudulent representation to the investors that OGX was sitting on close to another half-billion dollars of commercially recoverable oil, annually.

178.    On February 8, 2010, BATISTA appeared on the "Charlie Rose" TV show, nationally syndicated in the U.S., including throughout Florida, boasting of the fact that he had discovered "a hundred billion barrels of recoverable oil" and that Brazil was destined to be the world's fifth largest economy by 2015. [*See* Charlie Rose, *Interview with Eike Batista*, (Feb. 8, 2010), https://charlierose.com/videos/21203]. Investors internationally took note.

179.    On March 5, 2010, OGX released a Statement of Material Fact captioned: "**OGX Announces the Presence of Hydrocarbons in the Albian Section of Well OGX-6 – Rock Cores and Logs Indicate Strong Correlation Between OGX-6, OGX-3 and OGX2 Reservoirs.**"

180.    BATISTA's "Dr. Oil," MENDONÇA, was quoted as stating in relation to this new "discovery" that, "Ourre [sic] view of this data indicates that these accumulations may be connected and that the recently discovered oil province may, in fact, extend to the north of the BM-C-41 block, confirming its very significant petroliferous potential."

181.    This was all pure nonsense. The "presence of hydrocarbons" was of no intrinsic relevance to commerciality. As MENDONÇA well knew, publication of the existence of "hydrocarbons" to investors could be highly misleading and industry practice was not to do so. Indeed, when at Petrobras he had helped promulgate guidelines forbidding the practice.

182.    The "oil province" described was a grand, non-technical term designed to convey an impression of a huge undersea reservoir of commercially recoverable oil. "Connected" accumulations indicated that a single well might tap the totality. But the aggregate description was just not true and was intended to whet investment appetite.

183.    On April 14, 2010, BATISTA gave a video interview that was broadcast on the internet on XPTV, a video channel maintained by the XP brokerage firm, in which he further claimed that OGX had discovered "a new oil province in Brazil," that OGX had "the best exploratory blocks in the world" with "one trillion dollars-worth" of oil, that the company was worth up to "$100 billion dollars," and warned investors not to miss out on the opportunity to buy OGX stock. (*See* XPTV, *Entrevista Eike Batista OGX - A Grande Fraude - Entrevista Completa*, https://www.youtube.com/watch?v=6e_huuUsdH4).

184.    At or about this time, BATISTA orally disseminated other such false statements through audio and video conferences with financial institutions via the internet, as with all such internet publications described above and below, accessible and accessed by investors in Florida.

185.    The intended message to the investors internationally and in Florida was that OGX had "one trillion dollars-worth of oil," and was worth $100 billion. This led to an extraordinary increase in OGX's share price which soared from $15.55 to $23.27 that month.

186.    There was no reasonable basis for BATISTA and his accomplices and co-conspirators to believe that more than a tiny fraction of that amount of oil actually existed, let alone that it was commercially recoverable. These representations were fraudulently made with the intent of inducing investors to rely on them in purchasing and trading OGX stock and bonds.

187.    On May 13, 2010, OGX released a Material Fact captioned: "**OGX Concludes Drilling of Wells OGX-6 [and] OGX-8 – Identified Connection Between OGX-2 and OGX-6 Prospects with Estimated Recoverable Volume Totaling 1.4 to 2.6 Billion Barrels.**"

188.    Again, the use of the words "recoverable volume" was deliberately intended to convey the sense that this was money in the bank, but it was untrue. With oil trading at $80.44 per barrel, this was equivalent to a statement that there was between $112 billion and $209 billion of value in OGX; but there was no reasonable basis for anyone with access to the OGX drilling test results to believe in any such numbers.

189.    On May 27, 2010, OGX released a Statement of Material Fact captioned: "**OGX Detects the Presence of Hydrocarbons in Wells OGX-10 and OGX-13 – Net Pay of Approximately 40 meters in the Aptian Section of Well OGX-10.**"

190.    As noted above, the discovery of "hydrocarbons" is inconclusive of any recoverable oil. However, in the oil and gas industry, "*Net Pay*" refers to the thickness of rock that can deliver hydrocarbons to the well bore. This statement was intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable reserves, to further stimulate market appetite.

191.    On August 12, 2010, BATISTA and MENDONÇA participated in a Bloomberg conference call broadcast over the internet during which MENDONÇA stated that, following a new discovery, OGX expected a "significant" increase in its potential oil and natural gas resources. BATISTA expanded on this, stating that wells in the Parnaiba Basin in northern Brazil might hold 10 to 15 trillion cubic feet of natural gas and that MPX, his energy company, planned to build power plants nearby.

192.    These estimates were pure speculation but they had their intended effect: OGX stock prices rose 2.2% and MPX stock prices rose by 6.8 %.

**Promoting OGX in Miami.**

193.     BATISTA had always had close ties to Florida including close social and business ties with Jeffrey Soffer, the Florida-based real estate and resort developer (then married to super-model Elle Macpherson) and was a frequent visitor to Soffer's Miami, Florida, home.

194.     During August 2010, BATISTA solicited Soffer in Florida to partner with him to develop office buildings and hotels in the Port of Rio de Janeiro and in "City X," BATISTA's mega-project for 250,000 residents in Fluminense, Brazil.

195.     Soffer traveled down from Miami, Florida, to Rio de Janeiro to meet with BATISTA and explore the prospects. The meeting was, as BATISTA intended, reported in the press with speculation as to the future plans of the prospective "partners."

196.     Such well-publicized gambits were designed by BATISTA to generate the impression that other high-performing, highly respected businessmen trusted his business acumen, and such associations lent BATISTA business credibility in the public mind.

197.     Jeffrey Soffer was the owner and operator of the Fontainebleau Miami Beach Hotel in Miami Beach which he had revamped to the tune of a billion dollars and where he envisioned creating a perpetual event marketing space. To this end he had partnered with David Grutman and his Miami Marketing Group, who established and operated the premiere Miami nightclub, LIV, at the Fontainebleau Miami Beach.

198.     MMG Nightlife took Miami's synergistic marketing environment to a new level. It created events at the Fontainebleau Miami Beach's many spaces. The property's restaurants hosted Grutman's huge 30-50 guest, "A-List" celebrity-studded dinner parties, five nights a week, and LIV provided the late-night environment where paparazzi and press could create "buzz" around their doings.

199.    BATISTA - then a member of the international A-List as Bloomberg's putative "Eighth Richest Man in the world" - used his Soffer/Grutman connections to pitch investment in OGX stock directly to celebrities in Miami, Florida.

200.    Thus, in September 2010, BATISTA met with a group of foreign investors in Miami at a star-studded dinner party hosted by Jeffrey Soffer and worked the crowd of high-net-worth investors, one-on-one, to buy OGX stock on insider information, because the company was about to announce further significant oil discoveries.

201.    Among the party guests were baseball star, Alexander Rodriguez ("A-Rod"), and his then girlfriend, the film star, Cameron Diaz. Rodriguez reportedly called his financial advisor for advice on the investment who, because it was insider trading, "told me to forget about it and never mention it again, because I could go to jail for a transaction like this."[8]

202.    It is unknown before discovery how many other people in Florida BATISTA pitched the investment prospects of OGX to at this time and over the years, or how many of them were less prudent than A-Rod and actually bought stock as a result of such face-to-face pitches. But it is believed that, given the fact that BATISTA wasted no opportunity to boost the value of his companies, the face-to-face pitch he made to A-Rod was characteristic of the approach he made to many other high rollers in Florida.

**"Interest from the Chinese."**

203.    On September 13, 2010, BATISTA spoke to reporters on a conference call that was published in an article online by Bloomberg in which he stated that all the major oil companies in the world including the major Chinese oil companies, Cnooc Ltd. and China Petrochemical Corp.,

---

[8] Anderson Antunes, *Even Alex Rodriguez Reportedly Almost Fell Victim to Eike Batista's Financial Collapse*, Forbes (Apr. 20, 2014), http://www.forbes.com/sites/andersonantunes/2014/04/20/even-alex-rodriguez-reportedly-almost-fell-victim-to-eike-batistas-financial-collapse/#1add8bc51ee5.

were among bidders for OGX assets. In response to the reporter's comment that his sources had revealed an offered price of $7 billion for the company, BATISTA said that that amount would only buy a "tiny" stake in OGX.

204. However, this was just more spin, intended to boost the price for OGX shares. In reality no energy company with access to the actual OGX drilling data would have had an interest in OGX for more than a tiny fraction of its then supposed market price.

205. Predictably, however, the OGX share price rose. This time by 2%, to put OGX stock at 20% up overall for the year.

206. By this time, as the cumulative effect of the barrage of hype that BATISTA and his co-conspirators and accomplices had churned out over the preceding years, the financial press were hailing BATISTA as the world's eighth richest man with a net worth of $27 billion, and BATISTA was playing up his supposed position by announcing a new series of planned initiatives, including a partnership with sports goliath, IMG Worldwide, Inc., forming "IMX" to engage in the sports and entertainment business in Brazil, and a foray into consumer electronics by building an Apple computer factory on vacant LLX land.

207. As the Forbes article concluded regarding the Apple initiative - reflecting the market understanding of OGX - "Whether that will come to pass is hard to say. Given the enormously valuable oil and gas empire that Batista has built in recent years, he might have a chance."

208. But the "enormously valuable oil and gas empire" was nothing more than smoke and mirrors. Nevertheless, because of their own personal stakes in the success of OGX, BATISTA and his co-conspirators, including by that time, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, and PAULO GOUVEA, THOR BATISTA, and LUIZ CARNEIRO, and the controlled 63X, EBX and CENTENNIAL Companies failed to make any corrective announcement

to the investing public, internationally, and continued to assist BATISTA in hyping the value of the OGX oilfields.

209.    On November 26, 2010, Bloomberg reported the news online, sponsored by BATISTA, that OGX was delaying its planned sale of a minority stake in its Campos oilfield until the D&M report was in by the end of the first quarter of 2011. Bloomberg repeated the BATISTA comments from September about selling a $7 billion minority stake to the Chinese; reiterated the fact of OGX's supposed 3.69 billion barrels of potential reserves in the Campos Basin, as estimated by D&M in 2009; and reported that the additional recent discoveries were expected to boost those numbers. This reflected the illusion that BATISTA and his co-conspirators had successfully created. But it was all untrue.

210.    On March 15, 2011, Bloomberg summarized the information on OGX stemming from the cumulative effect of BATISTA's lies over the three preceding years. It reported that OGX, BATISTA's main source of wealth, was worth $37.1 billion, with 6.7 billion barrels of potential reserves. BATISTA was quoted as stating that despite having fielded five purchase offers from other oil companies he did not need to sell because OGX had $3 billion in cash and the extraction costs in its shallow-water fields were extremely low.

211.    Bloomberg further reported OGX as claiming a hundred percent success rate in the Campos Basin where it planned to drill three additional wells and that higher-than-expected production would allow it to use fewer wells per production platform, thereby further cutting production costs. OGX had stated that it anticipated that production would ramp up from 20,000 barrels a day to 730,000 barrels a day by 2015, and 1.38 million barrels a day by 2018. In a video interview with Bloomberg BATISTA said "It's a bonanza" and "these are bonanza assets."

212.    But this was all untrue. For behind the scenes, everything that Brazil's King Midas touched was not turning to gold – not even black gold. But none of the co-conspirators made any attempt to correct the false impression in the market, even though they all knew the truth.

**The 10.8 Billion Barrel Lie.**

213.    On March 31, 2011, D&M submitted its confidential Report to BATISTA and OGX on the Prospective OGX Resources in Brazil and a Report on the Prospective OGX Resources in Colombia. It painted a depressing picture of OGX's future. Out of many billions of barrels of oil and gas that might possibly exist in the OGX fields, D&M failed to identify more than a tiny amount, less than 1%, that might constitute "reserves" – *i.e.* commercially recoverable oil.

214.    When the D&M reports became public there would be an obvious, hugely depressive effect on OGX stock prices. The only alternative BATISTA and his co-conspirators and accomplices decided, to try to keep the price up, was to lie.

215.    BATISTA, therefore, had MENDONÇA mix-and-match numbers from the D&M Reports, adding apples to oranges, completely contrary to the accepted industry methodology, to use as the basis for the most colossal lie to date.

216.    As a preventive strike to defuse the effect of the impending release of the D&M reports, on April 15, 2011, MENDONÇA, "Dr. Oil," issued a press release to investors in which OGX claimed its net potential resources in "recoverable oil" were 10.8 billion barrels and that these figures were based on the assessment of its world-renowned oil auditors, D&M.

217.    In it, BATISTA announced that the 10.8 billion-barrel number was not based just on OGX's own calculations, but that, "[t]hese results, presented by an independent, internationally renowned consulting group, confirm the extraordinary success of our business strategy and execution," he said. This obviously referred to D&M.

218.    To come up with the 10.8 billion barrel figure, MENDONÇA took D&M's *most optimistic* estimate of "contingent resources" (*i.e.* oil that was not necessarily commercially extractable in *any* amount) of 3.1 billion barrels. He then jumbled together three different categories of "prospective resources" (*i.e.* oil that had not yet even been discovered and was deemed currently unrecoverable) to come up with another 6.8 billion barrels. He then threw in D&M's figure of 1 billion barrels, which was an upper, outside guess of what might be possible from the geology, and which did not even meet the probability level of "resources" of any kind.

219.    What BATISTA and his co-conspirators and accomplices were doing was completely fraudulent. The 10.8 billion number was basically just made up out of thin air. But it was published under the imprimatur of "Dr. Oil" and supposedly based on the analysis of world-renowned outside auditors, D&M.

220.    Everybody on the Board at OGX, and everybody within BATISTA's confidence, which would have included the directors of OGX, OSX, LLX and the 63X, EBX and CENTENNIAL Companies, if they did not know before, knew by now that the entire "X" group of companies, whose success was predicated on massive oil strikes by OGX, was a massive pump-and-dump scheme. The list of individuals included EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, and LUIZ CARNEIRO. Their legal obligation was to expose the 10.8 billion barrel lie. But they were incentivized by their stock options to keep quiet. And they kept quiet.

221.    Despite BATISTA and MENDONÇA's preemptive strike, on April 15, 2011, when the D&M Report was released, investors reacted with concern and the OGX share price dropped sharply.

222.    Nevertheless, on the basis of Dr. Oil's reputation and his 10.8 billion-dollar prediction, BATISTA and MENDONÇA managed to spark a debate on the reliability of the D&M numbers.

223.    In a conference call on April 19, 2011, with market analysts, reported by The Wall Street Journal, among other media outlets, BATISTA and MENDONÇA defended the OGX data, describing D&M, dismissively, as "the most conservative certifier in the world." BATISTA stated that it was time that people started to trust the OGX team which he had brought over from Petrobras, headed up by his fabled "Dr. Oil."  BATISTA contended that "it's time for the market to accept the company's numbers," and pledged to hire additional consultants to prove OGX's claims.

224.    The New York based multinational investment banking firm, Goldman Sachs, was among those reassured. It stressed publicly that investors should consider the D&M reports as just a part of a larger mosaic, and, "[w]hen considering the scope and underlying assumptions, we think that the D&M report generally adds confidence to our assumptions" and reiterated its "Buy" rating on OGX shares.

225.    What OGX had successfully managed to do by its fraudulent press releases and press conferences, intentionally disseminated across the phone lines and the internet to the world, was to confuse the issue and maintain a continuing belief in investors that OGX was sitting on vast commercially profitable oilfields and that all it needed was enough cash to stay in business to get the oil flowing.

226.    Maintaining a public story of OGX reserves of 10.8 billion barrels in "recoverable oil" as BATISTA was to do for the next two years was a complete fraud, designed to keep the balls in the air as long as possible and attract continuing trading in stocks and bonds of BATISTA's

companies, while he siphoned off as much as possible from the top and tried to sell off the rest before the bottom fell out.

227.    PAULO GOUVEA, however, decided that the writing was on the wall for OGX. While his duty was to blow the whistle on the scheme to the regulators and to investors, PAULO GOUVEA decided, instead, to cash in his chips and he sold his stake in the various X companies, reportedly realizing over $150 million which he reinvested in assets with real value, including real estate in New York and Paris. But he continued on in BATISTA's confidence and as a prime adviser in the fraud.

**D&M Secretly Protests.**

228.    Not surprisingly, behind the scenes, D&M was furious that their name was being used to mislead investors and on April 29, 2011, they privately stated their "great concern" on this point to BATISTA and OGX and demanded a corrective press release.

229.    On May 3, 2011, OGX sent D&M a placatory response, attempting to negotiate a compromise that would allow it to maintain both the 10.8 billion-barrel figure and the D&M imprimatur for its probity.

230.    On May 16, 2011, there was a meeting between OGX and D&M, with a presently unknown result. Whatever was agreed, D&M did not make its privately expressed "great concern" public and OGX did not retract its 10.8 billion barrel lie.

231.    Indeed, BATISTA embroidered further on the lie. In May of 2011, at the Michael Milken conference in California, which was broadcast to investors worldwide, BATISTA, then said to be worth roughly $30 billion, stated to CNBC that he was going to be richer than Carlos Slim, Warren Buffett, and Bill Gates because "I have created five companies that have in them embedded resources worth $2 trillion at a very low cost of producing." He went on to call them "idiot-proof assets."

232.    MENDONÇA, fully realizing that BATISTA's boasts to the public were nonsense, since he had created the underpinnings for the hype, between June 6 and June 16, 2011, MENDONÇA secretly and improperly sold 321,200 of his own shares in OGX, realizing a profit of approximately $2,500,000.

233.    In July 2011, OGX released a Management Presentation to investors trumpeting a resolutely upbeat picture, throughout which it consistently described its resources as being "10.8 billion of recoverable boe" and claiming to have all the needed cash, equipment, and skill in place to achieve massive success.

234.    However, the truth was that OGX had found virtually no commercially recoverable oil and BATISA had no convincing data to show any savvy oil industry investor to convince it to buy into OGX.

235.    BATISTA needed a cover story for why his rumored sale to the Chinese was not going through and he resolved to tell the press that it was because he did not need the cash and wanted to reap the profits himself.

236.    Thus, on September 23, 2011, in an article published by Reuters U.S. Edition on the wires under the title, "*Cashed-up Eike Batista won't sell oil stakes*," Reuters reported that BATISTA said he had abandoned talks to sell stakes in his offshore oil prospects because he had billions in hand and did not need the cash.

237.    Oil was then trading at roughly $80 per barrel and BATISTA claimed that the low production cost of his shallow-water wells meant that he could break even if the per barrel price fell as low as $24. In the Reuters article, he said that OGX was close to signing a long-term deal to supply oil to one of the world's largest refiners – which he declined to identify, citing securities regulations – and that a recent bond issue had "brought in exactly what we needed to live off our own spoils." When asked about a decline in OGX share prices, he responded, "I have to laugh. My

companies are all going to be massive cash flow machines. I'm going to pump money to my shareholders and dividends to my sons and my grandsons."

238.    Part of that claim would prove true: he would pump money to his co-conspirator shareholders through their sales of fraudulently hyped stock, and would pump money directly to his sons and other family members to defraud creditors – but not from profits.

**Insiders Sell Their OGX Stock in Miami.**

239.    BATISTA had several companies from which he could directly siphon money and which he hoped he would eventually be able to flip at a profit. However, BATISTA's directors and other insiders had their fortunes pegged directly to the value of their stock options in just OGX. They could see clearly that the picture that BATISTA was painting for the public and what they were helping him color in was false, and they wanted to dump their shares before the bottom fell out.

240.    The problem was that stock sales by insiders would have to be disclosed publicly and there would be a high risk of creating panic among investors if they were to do so. BATISTA had therefore placed restrictions on their ability to do so.

241.    Upon information and belief, however, several OGX executives who were within the circle of BATISTA's confidants and who knew that OGX was a massive fraud, entered into transactions to circumvent the prohibition and dispose of their stock without alarming investors through "creative thinking" on the part of J.P. Morgan Securities in Miami, Florida.

242.    One of J.P. Morgan Securities' wealth management executives in Miami, Florida, reportedly proposed extending the insiders "loans" with their stock standing as collateral and the sole recourse for repayment. The idea was that the insiders would default on the "loans," J.P. Morgan would foreclose on the collateral, and both sides would be happy: J.P. Morgan would have

OGX stock at what it hoped would be a profit and the insiders would have cash, thus achieving the equivalent of a sale of the stock without disclosure to investors.

**The Lies Continue – OGX "Cash Rich."**

243.    As the cumulative result of BATISTA's lies, by 2012, there was general acceptance in investors that OGX had access to massive amounts of recoverable oil. However, investors were beginning to question when OGX would start to deliver and whether the company was sufficiently well-capitalized to stay in business until it could start production.

244.    Accordingly, if his fraudulent scheme was to work, BATISTA's task was now to engender a belief in investors that OGX was cash rich and that the oil would soon start to flow.

245.    In January 2012, the initial OGX production report on the first well showed flows of just 15,000 barrels a day. These extremely modest results nevertheless had Batista and "Dr. Oil" putting on a show of huge success, popping champagne corks while technicians opened the valves remotely from Rio de Janeiro and webcams delivered pictures to the world.

246.    On January 16, 2012, OGX released a Statement of Material Fact announcing the discovery of evidence of "hydrocarbons" in the Santos Basin, in the Fortaleza field, in well OG-63, stating, "[t]his discovery is important for its huge hydrocarbon column and net pay identified in the Albian section, as well as by the quality of the Aptian reservoir and its behavior," commented PAULO MENDONÇA, General Executive Officer and Exploration Officer of OGX.

247.    This was a mishmosh of technical jargon intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable, recoverable oil, to further whet market appetite.

248.    And BATISTA continued boasting of his "success." On January 20, 2012, he gave an in-person interview from Rio de Janeiro with The New York Times, for an article entitled, "A Brazilian Magnate Points to Himself for Inspiration." The article remarked admiringly on

BATISTA's trappings of apparent success, his 1,000,000 Twitter followers, and the fact that OGX was expected to begin producing crude oil from an estimated 10 billion barrels of offshore discoveries. "Brazil today has the wealth that America had at the turn of the century," said BATISTA. Regarding his ostentatious display of wealth: "I want to help a whole generation of Brazilians to be proud. I am rich, yes. I have built it myself. I have not stolen it," he quipped.

249.    Regardless of the accuracy of the wealth of his country, his final statement regarding the source of his personal wealth was certainly untrue.

250.    On March 2, 2012, BATISTA gave a telephone interview from Rio de Janeiro to Bloomberg. During the interview, BATISTA stated that he still had plans to overtake Carlos Slim as the world's richest person by 2015 and boasted that his companies would post close to $1 billion in earnings before interest, taxes, depreciation and amortization in 2012, and double that in 2013. With an estimated net worth of $30 billion, BATISTA, still ranking eighth in the Bloomberg Billionaires Index, said, "I am probably, among the billionaires, the least indebted guy of all of them."

251.    No reasonable person, knowing what BATISTA knew at that time, could have made any such statement truthfully. He was playing games with investors with smoke and mirrors. His "Empire" was, as he knew, a house of cards. The collapse was just a matter of time.

**The Mubadala "Investment."**

252.    The Mubadala Development Company ("Mubadala"), based in Abu Dhabi, is the strategic investment and development company of the oil-rich United Arab Emirates.

253.    On March 26, 2012, BATISTA publicly announced that Mubadala had signed a "strategic partnership agreement" with his EBX group whereby Mubadala would invest $2 billion in exchange for a 5.63% preferred equity interest in the Defendant, CENTENNIAL (BRAZIL) and other BATISTA offshore holding companies, believed to include the 63X and EBX Defendants,

giving it an indirect interest in the public companies, OGX, OSX, MMX, LLX, MPX, and privately-held AUX, REX and IMX.

254.   BATISTA announced the agreement as a "framework for further collaboration between the two organizations" and that the Mubadala cash was to be used to "reinforce the group's already strong capital structure so as to help fund new enterprises across multiple business areas."

255.   BATISTA further announced: "[t]his is the first time we have invited a strategic partner to invest at our holding company level. The investment considerably strengthens the entire group and its ability to successfully implement current and future projects. Mubadala, after conducting thorough due diligence of our companies recognizes the great potential of our Latin American assets."

256.   An attached "Legal Notice" stated that this "strategic partnership constitutes a minority investment by Mubadala in Centennial Asset Brazilian Equity Fund with no changes to the control, management or day-to-day activities of Mr. Eike Batista's publicly listed vehicles: OGX, OSX, MMX, LLX and MPX."

257.   Mubadala went along with the phrasing of this announcement.

258.   On the surface, as projected to the investing world, a highly experienced and well-financed sovereign company from the oil sector, after conducting "thorough due diligence," had seen sufficient value in the prospects of BATISTA's OGX-oil-based empire to accept an "invitation" - the first extended to any outside player - to buy a tiny minority equity stake in BATISTA's holding company, giving it no control, for $2 billion. (By extrapolation, on the raw math, without factoring in the value of control shares, the company must have a value as a whole of at least $40 billion).

259.    The subtext of BATISTA's message was that his strongly-capitalized EBX group did not need the cash, but this contribution would enable it to expand into new areas.

260.    The news about the Mubadala "investment" was disseminated by many financial news organizations including Bloomberg.

261.    As BATISTA later explained in a Milken Conference interview broadcast to the investment world by Bloomberg, described below, he entered into this transaction in order to convey a message to the world that a savvy outsider had "audited" his operation and placed its "stamp of approval" on it. In other words, if one of the world's great players believed in him to the tune of $2 billion for a tiny stake, so should all investors.

262.    The actual Mubadala "strategic partnership agreement" has not yet been seen. But later events described below make it clear that this $2 billion "stock purchase" was far from a simple purchase of a tiny non-control block of stock, but was structured far more like a $2 billion *loan*, with BATISTA's entire worldly wealth, including shares in companies within the group and outside, such as his substantial holding in Florida's Burger King and other treasured plum assets, pledged as collateral.

263.    It is believed that this deal was structured in the Cayman Islands and involved the EBX, 63X and CENTENNIAL Companies. This fraudulent presentation was primarily intended to bolster investors' confidence in OGX, on which the success of the group depended.

264.    Had this "strategic partnership" been declared to investors as the desperately-needed "loan" it truly was, investor confidence in OGX would have evaporated, its end hastened by perhaps as much as a year, and Plaintiffs would not have lost a cent.

**Keeping the Balls in the Air.**

265.    In April 2012, BATISTA staged a photo-op for the world press at his planned LLX "Super-Port." With him onstage were a roster of Brazil's political and business elite: President

Dilma Roussef (now impeached and deposed), Rio Governor Sérgio Cabral (now under arrest and federal investigation for corruption), and Mines and Energy Minister Edison Lobão (now also under federal investigation for corruption). The audience of 400 included foreign corporate luminaries from around the world.

266.   Showing off his port, which he predicted would be the largest port in the Americas, BATISTA announced that OGX had begun production on what he described as a "new frontier" of petroleum 37 miles off the Brazilian coast. "This is a historical moment," said Batista. "It's the first time an independent Brazilian company has produced offshore oil."

267.   President Rousseff did her bit to boost the illusion, announcing resolutely that the state-run oil company Petrobras would go into deep partnership with Batista's firm: "Eike is our standard, our expectation and, above all, the pride of Brazil when it comes to a businessman in the private sector," Rousseff told those in attendance, as she stood by his side, both clad in orange OGX jumpsuits for the photo-op. BATISTA – his jacket sporting a black, oily hand-print, symbolizing "first oil," flashed a two-fisted victory sign:



268.   BATISTA and his co-conspirators and accomplices, however, knew that the trickle of oil they were witnessing was pretty much all there was. The block was later to be returned to the government as worthless.

269.    On April 18, 2012, roughly a year before the eventual crash, as the result of the aggregate lies, Times magazine named BATISTA one of the 100 Most Influential People of 2012. The short supporting puff-piece on BATISTA was written by then-mayor of Rio de Janeiro, Eduardo Paes (a key BATISTA ally, now under investigation for corruption).

270.    In it, Paes spoke of BATISTA as one of Rio's "most treasured adopted sons" who had "helped us shape the renaissance" of Rio, citing his status as "Brazil's richest man and the world's seventh richest, bringing vital investment to our city from oil and mining," and boasting of his charitable largesse.

271.    Puff pieces like these were contributed from time to time by BATISTA's rich and powerful friends whose own careers were symbiotically tied to his and were intended to bolster the impression of BATISTA's success and sustain his position with investors.

272.    However, the insiders could see that the writing was now truly on the wall.

273.    In April 2012, OGX board member Marcelo Faber Torres figured that he had better dump his OGX stock before the truly bad news came out and he reportedly sold 9 million OGX shares in staggered batches so as not to alarm investors.

274.    Other insiders, co-conspirators, and accomplices started to do the same and reportedly, at or about this time, the executive group quietly sold off 17 million shares, realizing over $103 million.

275.    As a part of his own exit plan, BATISTA had, upon information and belief, two companies set up in The Bahamas through corporation formation agent Winterbotham Trust Company, Inc., to help shelter the proceeds of the fraud. BATISTA's son, the Defendant, THOR BATISTA, agreed to act in regard to these corporations and assist his father in achieving the objective of the fraudulent scheme.

276.    One of these Bahamian companies was the Defendant, THORQUE INVESTMENT MANAGEMENT LTD., which was incorporated on April 12, 2012. The other was the Defendant, THORQUE1 FUND LTD., whose date of incorporation is unknown. Upon information and belief, these companies were nominally owned and controlled by THOR BATISTA, but who acted at BATISTA's direction.

277.    Upon information and belief, bank accounts were opened in The Bahamas, Miami, Florida, and eventually in Switzerland in the name of the THORQUE companies. It is believed that the Bahamian funds were held in an account under the direction of BTG Pactual[9] or Itaú Bank and eventually held at least $100 million in proceeds of the fraud. It is believed that the Miami account was at Itaú or Citibank. The Swiss account is presently unknown, but $30 million is believed to have been eventually routed out to a safe haven through the Citibank trust account of one of Batista's Florida professionals.

**"The Brazilian Dream."**

278.    On April 30, 2012, Bloomberg Television aired an 11-minute video interview of BATISTA on its show, "Money Moves with Deirdre Bolton." The interview took place at the Milken Institute's 2012 Global Conference in Los Angeles, California, where BATISTA was a featured panelist in four different panels during the five-day conference. After Bloomberg broadcast the interview on television, it published the interview on youtube.com with the description, "Brazilian billionaire Eike Batista talks about the potential benefits of OGX Petroleo e Gas Participacoes SA forming project partnerships with Petroleo Brasileiro SA and Vale SA."

279.    In the Bloomberg interview, correspondent Stephanie Ruhle introduced BATISTA as the "tenth richest man in the world - the goal is to get to number one." Ms. Ruhle then noted

---

[9] Banco BTG Pactual SA ("BTG Pactual") operates and has operated under various names in various jurisdictions during the relevant time period.

that a week earlier, the President of Brazil had visited BATISTA's oil port in northern Rio de Janeiro, where she called BATISTA a special kind of entrepreneur and a hero to Brazil. Bloomberg accompanied this anecdote with broadcast footage of BATISTA and President Rousseff getting off a helicopter together, surrounded by press. All of this, of course, fed into BATISTA's artificial narrative of himself to lure in American investors.

280.    BATISTA then utilized this broadcasted news segment to repeat his colossal lies about his companies. He spoke of "a trillion and a half dollars in assets: oil, gas, iron ore, gold, coal" and projects with "eighty percent margins." He spoke of the prospects of collaboration between OGX (which he knew had virtually no oil) and the (huge) Vale and Petrobras companies as being a "win-win for everybody."

281.    BATISTA also explained his rationale for the sale of a small stake in EBX to Mubadala (which was secretly, in reality, a loan) as being to inspire investor confidence: "[w]e just wanted to have, maybe an extra stamp by investors. Because you know the market is funny. Sometimes they demand, well, we like to have the structure audited. And when somebody like Mubadala comes in, the world knows how deep they go into the auditing process. And I love to be audited. I love transparency. So in a way, it's an extra way to show transparency to what we do." He said that he was just spreading hope in "The Brazilian Dream."

282.    By June of 2012, OGX was unable to hide the fact that the wells at its main field in the Campos Basin were not as productive as first believed and that it had cut production estimates by two-thirds. OGX share prices fell steeply by the end of June.

283.    Continuing to believe in the aggregate BATISTA-generated hype, however, on July 19, 2012, the Financial Times in London, England published an article entitled, "It is too soon to write off Eike Batista." The article quoted BATISTA's boast at an OGX investor meeting from

earlier in the year, that his companies were "80 per cent ebitda- [earnings before interest, tax, depreciation, and amortization] margin businesses. I search for the truffles."

284.    It also quoted a supportive statement from one of BATISTA's biggest and closest bankers, BTG Pactual – who should be in the position to know – that the stock could recover within the next twelve months and that "OGX has enough cash to support its business."

285.    Nobody listening thought that BATISTA, who continued to boast about his "trillions of dollars" of oil, would be prepared to flat out lie. They were to be proved wrong.

286.    Through a barrage of international press articles and a blizzard of tweets, in the course of 2012, BATISTA maintained an image of burgeoning wealth through publicized plans for massive investment into an ever-expanding series of business ventures, from shipyards and ports, to sports and entertainment ventures.

287.    Thus, on July 18, 2012, BATISTA tweeted that OSX and OGX had negotiated the construction of drill ships; on July 19, 2012, he sent out a video on the synergy between OGX and MPX for gas exploitation in the Paraiba Basin; on August 29, 2012, he boasted that his port at Açu would be one-and-a-half times bigger than Manhattan Island, New York; and on September 25, 2012, he re-tweeted an IMX photo regarding his IMX deal with Cirque du Soleil.

288.    However, as stated above, the OSX shipbuilding business was largely dependent on OGX oil and there was no oil. Nor were there continuing orders to build ships from the general market. However, corrupt government Ministers controlled the purse at Brazil's Petrobras and were a source of funding – at a price.

289.    What BATISTA did not include in his tweets was that OSX had been awarded this $922 million ship-building contract as a result of a $2.3 million bribe that CARNEIRO had agreed to with Brazil's Finance Minister, and Chairman of Petrobras, Guido Mantega.

290.    By now the illusion of spectacular reserves of oil had been created. MENDONÇA was no longer needed as "Dr. Oil," and he was promoted out of OGX to the Board of EBX, BATISTA's investment vehicle, which was focusing on siphoning off as much as possible.

**OGX Secretly Bankrupt.**

291.    Upon information and belief (from the Brazilian indictments) an internal OGX task force which had started work in 2011 and Schlumberger, the world-renowned energy consultant, essentially a Joint Task Force, presented reports on their conclusions as to OGX's prospects to the OGX Executive Committee, presided over by BATISTA, in September 2012.

292.    Upon information and belief (from the Brazilian indictments) the Joint Task Force concluded that a negligible amount of the promised 10.8 billion barrels of oil were "recoverable" at any expense and that, even so, they were contaminated with such high levels of $H_2S$ "Death Gas" that most of what was technically recoverable could not be extracted economically even if (which was doubtful, because of the environmental impact) licenses for decontamination could be obtained.

293.    The Joint Task Force concluded that even in a best-case scenario, the company had a negative value of about one billion dollars, making the commercial production of oil from any of the fields absolutely impossible.

294.    Thus, by September 2012, at the very latest, BATISTA and his co-conspirators and accomplices knew that OGX was insolvent and that the further exploration for oil was a pointless quest. Moreover, even the *pretense* of oil exploration for profit could not continue without fresh massive injections of cash.

295.    BATISTA and his co-conspirators and accomplices knew from these devastating audits that the whole house of cards that depended on OGX oil (the OSX exploration platforms, the LLX-run Super-Port, and so on) would collapse as soon as the truth was known.

296.   BATISTA and his co-conspirators and accomplices knew that there was no reason for any investor, who knew what they knew, to invest another penny or buy bonds on the secondary market, and indeed that anyone who had OGX/OSX stocks or bonds who knew what they knew would dump them as quickly as possible.

297.   These reports should have been disclosed to the public immediately as Statements of Material Fact. However, BATISTA and his co-conspirators, and the Boards of OGX and OSX, illegally refused to disclose this information and deliberately suppressed it. This constituted a massive fraudulent misrepresentation by omission.

298.   BATISTA and his co-conspirators and accomplices knew that it was now a matter of time before OGX and the satellite companies were seen by the public to be worthless. Their focus was now to keep up the illusion of eventual profitability long enough for them to hive off their interests in the satellite companies and liquidate as much of their remaining stock in OGX at the highest price possible and route it out to secret foreign bank accounts before the bubble burst. And by such continued outright lies, BATISTA and his co-conspirators and accomplices managed to stave off the realization among investors that OGX was bankrupt for close to another year.

**The Exit Strategy.**

299.   Upon information and belief, BATISTA's exit strategy - which was integral to the fraud as a whole, since the entire exercise would have been pointless if the money stolen had not been put out of the reach of creditors when the bubble burst - is believed to have been largely structured and executed in Miami, Florida, the Cayman Islands, The Bahamas, Panama, and Switzerland. It was basically a money-laundering operation. The details are unknown before discovery, but, to the extent known, the ultimate facts are as outlined below.

**The Professionals.**

300.    Upon information and belief, the architects of the scheme were international asset protection specialists. They created and implemented the various international structures for BATISTA to transfer the funds internationally and hide the proceeds of the fraud. It is believed that they were introduced to BATISTA by BERTO and that BERTO served as the first trustee of the Swiss trust created to hold the proceeds of the scheme on behalf of BATISTA as part of the structure.

301.    Upon information and belief, from at least 2012 onwards, these Miami professionals, essentially, had no other client but BATISTA and his various co-conspirators, accomplices, corporations, trusts and other interests, and that their offices were in fact an agency office for BATISTA and his co-conspirators and accomplices.

302.    Upon information and belief, no professional privilege attaches to their files, as being excluded by the crime-fraud exception and to destroy them or move them would constitute furtherance of the conspiracy, spoliation of evidence and cause for disciplinary action.

303.    Upon information and belief, these international asset protection specialists were based in Miami, working with BATISTA and his co-conspirators, the 63X, EBX, CENTENNIAL and THORQUE Companies and similar professionals in Brazil, Austria, The Netherlands, and other jurisdictions constructed a web of shell companies that were incorporated in various secrecy jurisdictions, including those joined here, and trusts and other vehicles elsewhere.

304.    These shell companies were to be used to obscure the rationale behind the routing of funds between countries and their eventual safe deposit into various bank accounts, properties, and assets under other names around the world for BATISTA and his various co-conspirators, accomplices and family members.

**The Bankers.**

305.    BATISTA's prime banking relationships were with three massive international banking groups: Citibank, BTG Pactual and Bank Itaú, all of whom have presences in Miami and licenses to operate in Florida.

306.    Upon information and belief, each of the three banks named above had extremely close relationships with BATISTA and his co-conspirators and accomplices and different divisions and subsidiaries within those groups assisted BATISTA and his co-conspirators and his accomplices in laundering the profits of his fraudulent scheme and routing them internationally to ultimate repository accounts in secrecy jurisdictions around the world.

307.    Upon information and belief, the messaging to effect such transfers would have necessarily been routed through the SWIFT server maintained in Virginia and otherwise through the United States. It is unknown before discovery whether their degree of knowledge and complicity would justify joining these banks in this action as defendants.

308.    Upon information and belief, among other accounts in other countries, Citibank provided banking facilities and maintained an account in Miami which held at least tens of millions of dollars, and maybe more, which BATISTA had siphoned off as profits from his fraudulent scheme to hide them from creditors when the bubble burst.

309.    It is unknown before discovery which names were used for the Citibank accounts, but they are believed to have been held, in part, nominally for THOR BATISTA, in the name of the THORQUE Companies or in the names of the 63X, EBX or CENTENNIAL companies, but were in reality held for BATISTA himself.

310.    Bank Itaú also provided banking facilities and hosted accounts in Miami and in foreign countries, including in the Cayman Islands and The Bahamas, which held sums of money which BATISTA had siphoned off in order to hide them from creditors when the bubble burst.

More specifically, on current information, it is believed that during the relevant time period, Bank Itaú in Miami received transfers in excess of 760 million from accounts controlled by Batista in The Bahamas and Cayman Islands.

311.    It is unknown before discovery in this case all of the names that were used for the Bank Itaú accounts, but based on the disclosures received through the Cayman Islands and the Bahamian proceedings they are held, in at least the following names: AUX LLC, Centennial Asset Brazilian Equity Fund, Thorque1 Fund, Thor Batista, 63X Investments Ltd., and 63X Master Fund. In reality, upon information and belief, despite being held in the names of these entities these accounts were held for BATISTA himself.

312.    Upon information and belief, BTG Pactual Bank provided banking facilities and hosted one or more accounts in The Bahamas, the Cayman Islands, and elsewhere, either directly or through an affiliated or correspondent entity, which held hundreds of millions of dollars which BATISTA had siphoned off in order to hide the funds from creditors when the bubble burst.

313.    It is unknown before discovery all names that were used for the BTG Pactual accounts, but they are believed to include accounts in the names of the 63X, or CENTENNIAL, but were in reality held for BATISTA himself.

314.    Other bank accounts, held through other structures unknown before discovery but orchestrated by BATISTA and his co-conspirators were, upon information and belief, set up in the Cayman Islands, The Bahamas, Miami, Panama, and secrecy jurisdictions around the world.

315.    Upon information and belief, the funds were routed from Brazil and elsewhere through the various accounts to break the trail of where the funds originated and in hopes of rendering them safe from detection and attachment.

316.    Participants in the scheme included the various Defendants and other entities owned or controlled by BATISTA and his agents, accomplices and co-conspirators, the identities of which are not known before discovery.

317.    These persons and entities knowingly facilitated the fraud and helped conceal the funds siphoned off in order to hide them from creditors when the bubble burst and in doing so routinely abused the corporate fiction such that it should be in all cases pierced or disregarded.

**The Fake Billion Dollar "Put Option."**

318.    To give himself time to implement his exit strategy, BATISTA needed more than tweets and boasts and he devised other fraudulent stratagems to bolster investor confidence and stimulate further public investment.

319.    However, directors in OGX now started getting cold feet about staying on in the company at the board level, given the likely civil and possible criminal liability they would face when the bubble burst, and several of them resigned.

320.    BATISTA was meanwhile searching for less squeamish candidates for the board of OGX for whom the lure of money would be greater than their fear of consequences and on August 6, 2012, at a general meeting of OGX shareholders, many of them large North American pension plans, including the Florida Retirement System Trust Fund, one such individual was proposed and elected: the Defendant AZIZ BEN AMMAR.

321.    Upon information and belief, AZIZ BEN AMMAR was a prime mover in the "Put Option" stratagem described immediately below.

322.    On October 24, 2012, BATISTA announced to investors, as was duly reported by Bloomberg and the other organs of the financial press that, through EBX, he had entered into a billion dollar "Put Option" with OGX. This was, in essence, a contract between EBX and OGX

for BATISTA to inject $1 billion of his personal wealth in EBX into OGX as additional working capital upon demand.

323.    BATISTA similarly announced that he would be ploughing a billion dollars of his own wealth into OSX, buying stock at three-times market price if and when needed, although that might have to be delayed until 2014 because, as BATISTA said, Brazilian stock exchange rules required a minimum amount of "free float" time.

324.    The announcement that Brazil's golden boy with the Midas touch had a billion dollars-worth of confidence in his oil exploration company, and another billion in his prime satellite ship-building company resulted in an expected boost in share and bond prices.

325.    However, there were at least two fundamental problems with this announcement. The first was that BATISTA had no intention of paying in any money whatsoever. The second was that no amount of money could fix the fundamental problem, which was that there was no oil.

326.    In sum, the OGX Put Option was just another lie, a stratagem created by AZIZ BEN AMMAR and adopted by the co-conspirators to delay the inevitable and allow BATISTA and them all to get as much money as possible *out* of OGX before it collapsed.

327.    In fact, upon information and belief, BATISTA may not have even actually entered into any such commitment on paper. Only much later, and only under pressure from insider creditors, did he ever actually sign such an obligation, and even then it was conditioned on an "out clause" designed to give him some "cover" in backing out - which, as we shall see below, is exactly what he did.

328.    That the Put Option - if it existed - was non-binding was not told to the public. Nor was the fact that BATISTA did not intend to honor it. Nor was the fact that the company was insolvent. Nor was the fact that there just was no oil, and that no amount of money, however long it might be squandered on pointless drilling, could put oil in the ground where no oil existed. All

of this should have been announced via Statements of Material Fact, but was not. The failure to do so constituted fraudulent misrepresentations by omission.

329.     However, the announcement of the Put Option was effective in slowing the fall in price of OGX stock during the fourth quarter of 2012 and fed its rise in January 2013.

330.     The value of LLX - BATISTA's allied logistics company which was building the port at Açu where OSX ships were to offload OGX oil - was conspicuously pegged to the value of OGX and therefore OSX.

331.     In November 2012, MARCUS BERTO was appointed CEO and Investor Relations Officer of LLX to help corral emerging bad news and get the company sold off before the OGX bubble burst. Upon information and belief, BERTO fully understood that OGX was insolvent and the mission was to cash BATISTA out as fully as possible before the crash rendered everything valueless.

332.     To further boost investor confidence, on November 13, 2012, BATISTA tweeted to the world that the Group X operations in the Campos Basin were in an area responsible for 80% of Brazil's oil production.

**Section II -The Plaintiffs Invest**

333.     At the start of 2013, no one apart from the insiders, not even the Brazilian regulators, suspected that OGX was a colossal bubble scheme. The consistent, massive lies, spawned by BATISTA, his co-conspirators and his accomplices, repeated over the previous years, had generated an overall base-line impression among investors world-wide of OGX as an oil company with enormous oil reserves and enormous likely margins of profit, whose only impediment to spectacular success was its cash needs until it could come into full production.

334.     That the BATISTA-generated spin was continuing to work in early 2013 was exemplified by announcements such as one published online by Highbeam Reports in January

2013 that London's financial house Barclay's was convinced that "[OGX] presents better opportunities for investors than its federally-owned peer Petrobras . . ." (This was well before the massive Petrobras corruption scandal broke).

335.    As noted above, Gables Capital, Inc. is a registered investment adviser based in downtown Miami, Florida, and at all times material hereto acted as investment adviser to the Plaintiffs and was their agent for the purchase and sale of stocks and bonds.

336.    The individual responsible for the MERIDIAN and AMERICAN accounts was Ms. Judith Neiwirth, Gables Capital's co-founder and Chief Investment Officer, who had over thirty years of experience in the financial services industry.

337.    Ms. Neiwirth had available to her the aggregate spin disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual "lay" internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers.

338.    As a result of the hype generated by BATISTA, described above, the general base-line impression in the international investment market at this time was that OGX was a company that was sitting on spectacular reserves, as evidenced in part by the fact that savvy industry player, Mubadala, had recently bought a 5.63% stake in its holding company for $2 billion.

339.    To investment advisers like Ms. Neiwirth, reviewing the aggregate information on Bloomberg, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar "bonanza," of which BATISTA had consistently represented, started to gush.

340.    It seemed, moreover, that OGX was in no danger of running out of cash, given that BATISTA had pledged an additional billion dollars of operating capital, if and when needed. (The

subtext was further that although there was a trillion dollars of oil to be had, if a billion was not quite enough to bring the gushers online, there would be more cash to come).

341.    BATISTA had further pledged to inject another billion dollars into OSX, if and when needed. Since the future of OSX depended heavily on the future of OGX, this pledge of cash for OSX reinforced the public impression of the value of OGX.

342.    This was therefore a particularly attractive opportunity for purchasers in the bond market. OGX appeared to be asset rich with plenty of operating capital and OGX bonds were at that time yielding above an 8.375% interest rate.

343.    On January 15, 2013, in reliance on the overall picture painted by BATISTA, his intentional misstatements made via his publications on the internet and material omissions, reinforced in her decision to invest by BATISTA's announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17 on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN.

344.    On January 22, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN.

**The EBX/BTG "Strategic Partnership."**

345.    In 2013, BTG Pactual was Brazil's biggest private investment bank, and its Chairman, Andre Esteves, was an iconic Brazilian billionaire on a level with BATISTA. On March 6, 2013, prnewswire.com relayed the following EBX announcement:

> The EBX Group and BTG Pactual announce the signing of a novel strategic cooperation agreement.  The agreement contemplates financial advisory services,

credit facilities and future long-term capital investments for the transformational projects currently being developed by the EBX Group in its segments. "This cooperation represents, above all, a partnership for the success of Brazil", said Eike Batista, EBX Group's CEO and Chairman.

This new cooperation will have a Strategic and Financial Management Committee comprising of senior executives from the EBX Group and of senior partners of BTG Pactual. The Committee will be led by Eike Batista and Andre Esteves and will meet on a weekly basis to discuss overall strategies relating to EBX Group's capital structure and investments for the short, medium and long-term projects and activities of the group's portfolio of companies. The agreement does not grant any exclusivity for BTG Pactual to render financial services to the EBX Group.

BTG Pactual's remuneration will be solely based on the performance of the EBX Group's public companies.  Andre Esteves, BTG Pactual's CEO, stated that: "This cooperation shows once again our firm willingness to support unique projects and national entrepreneurship, areas in which Eike Batista is an icon."

346.    This EBX announcement was intended to convey the underlying message that BTG Pactual, one of the largest and most sophisticated players in the Brazilian financial market, saw enough value in BATISTA's empire that it was willing to "partner" with EBX, without any promise of exclusivity, and plough in cash to finance "short, medium and long-term projects," with its own profits completely contingent on the success of the EBX ventures.

347.    The phrasing of this release was another BATISTA stratagem intended to dress up the fact that OGX desperately needed money to delay its inevitable financial collapse by using the language of opportunity and the purported confidence of savvy bankers in the worth of his operation.

348.    Predictably, OGX share prices shot upwards, closed up 16%, and rallying as much as 27.7% in the day following the announcement. On March 7, 2013, the announcement came across on the Bloomberg terminal on Ms. Neiwirth's desk at Gables Capital in Miami, Florida, coupled with a report that BTG Pactual was willing to extend BATISTA's EBX another billion dollars for liquidity.

349.    On March 13, 2013, BATISTA had OGX release another Statement of Material Fact to investors declaring that oil recovery from the Pipeline, Fuji and Ilimani formations was

commercially feasible, announcing an on-site amount between a half billion and 1.3 billion barrels of oil, and conveying the impression that commercial production was imminent.

350.    However, as BATISTA knew, the truth was that only a tiny percent of the oil detected was recoverable and commercial feasibility was impossible.

351.    On March 22, 2013, BATISTA tweeted that OGX had eight acknowledged oil commercial accumulations: three onshore, in Maranhao, and five offshore.

352.    But, despite BATISTA's continuing misrepresentations, the stock price began to fall.

353.    On March 23, 2013, Bloomberg reported that BATISTA via Twitter had warned short sellers wagering against his companies that they would regret their bets. Asked by other Twitter users about the companies' falling stock prices, BATISTA had written that "rumors and gossip are tools of short sellers" who will be "caught with their pants down," and he directed his readers to an interview with BTG Pactual President, Andre Esteves.

354.    In that March 23, 2013, interview BTG Pactual President, Andre Esteves, had stated that BATISTA's companies were in no danger of failing and that BATISTA remained one of the best capitalized business men in Brazil.

355.    Well before the "strategic partnership" announced on March 6, 2012, BTG Pactual had been doing due diligence on OGX, which was the prime asset of BATISTA's holding company, EBX, in order to act as its financial consultant and potential provider of long-term financing. BTG Pactual must therefore have known how precarious a position OGX was in. The public, however, took its Chairman's statement as being true.

356.    Upon information and belief, Mr. Esteves' statement on behalf of BTG Pactual was intentionally false and was issued pursuant to an agreement with BATISTA. It is unknown what the consideration for the deal may have been. (In late 2015 Mr. Esteves was arrested in Rio,

stepping off a plane from Miami, Florida, in connection with charges of obstruction of justice in the Petrobras corruption investigation and was placed under house arrest).

357.    On March 26, 2013, OGX released its financial statement for 2012. Under "Message from the Management," Defendant LUIZ CARNEIRO, Chief Executive Officer of OGX, stated, "In parallel to the development of our fields, we made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations, and we continue our studies on how to best develop them."

358.    However, as BATISTA, CARNEIRO, and the other co-conspirators knew, none of these fields were commercially viable and OGX was insolvent. These were deliberately fraudulent misrepresentations.

359.    On March 28, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN.

360.    On April 1, 2013, MERIDIAN received its first interest payment of $432,359.38 on its OGX bonds and AMERICAN received its first interest payment of $146,562.50.

361.    On April 12, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN.

362.    As was not discovered until September 2016, during April 2013, BATISTA's CENTENNIAL ordered a Panamanian subsidiary, Goldenrock, to pay a $2.3 million kickback, upon information and belief, to Brazilian officials, from its account at TAG Bank in Panama, for the $922 million OSX shipbuilding contract awarded in mid-2012. It is believed that Goldenrock was one of at least two shell companies which upon information and belief held accounts at TAG Bank – the other being Blue Diamond, which BATISTA used to hold slush funds for the bribery of officials and others useful to his scheme. In April 2013, CENTENNIAL wired $111,798,818.97 million from an account Batista controlled at BTG Pactual in the Cayman Islands to TAG Bank for safekeeping and to top off BATISTA's slush fund.

**The $850 Million "Investment" by Petronas.**

363.    BATISTA knew that the sale of supposed oil "assets" to other supposedly savvy players in the oil industry would create confidence in OGX and in its other dependent enterprises as it would reflect the fact that the buyer, after doing due diligence, saw value in the OGX asset, and therefore so should other investors; and OGX would have yet more working capital, so nobody invested in its future should worry that it could not pay its way until coming into full production.

364.    The Defendant AZIZ BEN AMMAR was charged by BATISTA with attempting to close an asset purchase deal with the Malaysian State-owned oil company Petronas. Upon information and belief, BATISTA authorized BEN AMMAR to spend in excess of $10 million to help "grease the wheels" of the process.

365.    On or about May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Basin. The news of the $850 million Petronas deal was picked up and reported across the world and had its intended effect.

366.    Thus, on May 8, 2013, London's Financial Times reported online that BATISTA had sold an $850 million stake in OGX assets to Malaysia's state-run Petronas. The article noted that shares in OGX were the biggest risers of Brazil's stock exchange that day. The good news came across the Bloomberg terminal screen on Ms. Neiwirth's desk.

367.    That same day, The Wall Street Journal reported online, "Petronas's purchase of stakes in the two Tubarao Martelo blocks, with *reserves* estimated at 145 billion barrels of oil, will give OGX much-needed cash to fund fresh investments. The Malaysian and Brazilian companies announced the deal in separate statements." (Emphasis added)

368.    Similarly, BNAmericas announced online, "Brazil's OGX has confirmed an US $850mn farm-out deal with Malaysian giant Petronas for a share of two oil and gas blocks off the coast of Rio de Janeiro. The deal hands the Kuala Lumpur-based firm a 40% non-operating working interest in the Campos basin's BM-C-39 and BM-C-40 blocks, OGX said in a statement. In addition, Petronas has an option to purchase 5% of OGX's capital stock at a price of 6.30 reais until April 2015."

369.    The quote from OGX in the article continued, "OGX's partnership with Petronas underscores the quality of our asset and the potential of the Tubarão Martelo field, where production is expected to commence by the end of the year," OGX chief executive CARNEIRO said, "[w]ith more than 32Bb of recoverable resources and a production of about 2Mboe/d, Petronas' expertise will enhance the continued development of oil production in these areas."

370.    However, as CARNEIRO and the other co-conspirators knew, this was a lie. There was virtually no commercially recoverable oil. OGX was a complete bust and would soon collapse.

**Meridian Invests in More OGX Bonds.**

371.    The news of the supposed Petronas purchase came across the Bloomberg terminal screen on Judy Neiwirth's desk in Miami, Florida, on May 8, 2013. The Bloomberg report also

recited a supposed quote from the buyer, "Petronas views the acquisition as a highly attractive investment opportunity in terms of asset quality and for strategic future growth in Brazil."

372.    Investors in OGX bonds were spurred to make greater purchases by this news. According to Reuters News Agency, investment in OGX bonds by the massive U.S. investment fund, Pimco, climbed as high as $800 million during May 2013.

373.    On May 20, 2013, in continued reliance on the vaunted future profitability of OGX, and BATISTA's commitment to inject a billion dollars if and when needed, and further encouraged by the announcement of the Petronas deal, Gables Capital, in Miami, Florida, directed the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN.

374.    However, the truth was, in fact, that there was no actual "Petronas deal" as portrayed to the public. The deal had many contingencies, including OGX restructuring its debt and reaching certain production targets.

375.    Upon information and belief, it was Batista's strategy to convey the message that sophisticated investors saw great value in the future of OGX.

376.    Why Petronas – currently wracked by its own massive corruption scandal - did not correct the OGX presentation or market perception at that time is unknown before discovery.

**Batista Secretly Cashes Out.**

377.    While doing his best to encourage investor confidence and continued investment in OGX, between May and June 2013, BATISTA secretly instructed EBX to sell off 126.65 million shares in OGX.

378.    BATISTA was also siphoning off cash in huge amounts. According to a much later released confidential letter from the Cleary Gottlieb law firm, representing a cadre of large insider

creditors in June 2013, BATISTA funneled out $450,000,000 to an affiliate without justification just that month.

379.    It is not known before discovery where that money went but it is believed that a substantial amount was routed directly or intermediately through the corporate co-conspirators and accomplices the 63X companies, members of the EBX group and the CENTENNIAL companies, to the THORQUE Companies' accounts and to bank accounts in various countries.

380.    Then in early June 2013, BATISTA put another layer of insulation between himself and his creditors by transferring $30 million from an account in Brazil to a Citibank account in Brazil in the name of his son, THOR BATISTA. It is believed that the funds were thereafter funneled out of Citibank Brazil to the Citibank trust account of a BATISTA professional in Miami, and onwards to Switzerland or other secrecy jurisdiction.

381.    On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign.

382.    However, when the news hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm.

383.    BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the restructuring of the group which was now complete that same month of June" and that no further shares would be sold. However, this would prove to be a lie.

384.    On June 20, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, and reassured by BATISTA's news of his stock sale being just a "one-off adjustment," Gables Capital, in Miami,

Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the secondary market on behalf of its client, MERIDIAN, as trustee.

385.    MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98.

386.    However, on July 1, 2013, OGX was finally forced to admit by a Statement of Material Fact that a number of its wells in the Campos Basin were unproductive and, cryptically, that none of its projections should be relied upon, which resulted in a plunge in OGX share prices.

387.    Critically, however, BATISTA failed to announce: that there was in actual fact virtually no commercially recoverable oil; that the Mubadala and Petronas investments had been massive loans and Petronas was not obliged to perform unless OGX was re-structured; that behind the scenes Mubadala, who knew the exact state of affairs, was realizing on its securities; and lastly, he failed to disclose his intention to dishonor the billion dollar put option, if and when demanded.

388.    In fact, in the face of certain knowledge that OGX was insolvent and had no oilfields likely to generate significant recoverable oil, BATISTA continued to spawn lies about projected future profitability.

389.    Thus, on July 3, 2013, Bloomberg relayed the news that OGX had declared the Remora field in the Campos Basin commercially viable.

390.    Unfortunately, this was just another lie.

**Batista Makes Further Fraudulent Transfers.**

391.    Upon information and belief, during these months, in line with his overall game-plan, BATISTA was moving the assets still in Brazil that were the most vulnerable to attachment out of his name and into the names of family members, leaving himself immune from collection.

392.    Upon information and belief (according to the Brazilian indictments) BATISTA transferred two buildings in Rio with an aggregate value of approximately $20 million into the

names of his sons THOR BATISTA and OLIN BATISTA; he moved $60 million from an account in Brazil to a Citibank account in the name of THOR BATISTA; and he transferred approximately $7 million in cash plus a $2 million apartment in Ipanema to FLAVIA SAMPAIO, his girlfriend and mother of his infant son, Balder.

393.    Upon information and belief, BATISTA, his co-conspirators, and accomplices had by this time moved the bulk of his and their liquid assets out of Brazil and off to secrecy jurisdictions, where they were held in cash, or reinvested in stock in ventures likely to actually prove to be profitable, or in real estate and other more secure investments in other countries, typically through the medium of shell companies to act as "blinds" between the asset and the ultimate beneficial owners.

**Mubadala Secretly Pulls Out.**

394.    During early July, 2013, news began to leak out that the Mubadala deal, which had been announced as an equity investment and seen as BATISTA's ultimate stamp of approval by the investment community, providing important backing for BATISTA's ambitions by a major global sovereign wealth fund, had in fact been nothing of the sort, but rather a huge loan, collateralized by plum assets and personal guarantees.

395.    Moreover, behind the scenes, Mubadala, which had inside knowledge as to the true state of affairs in BATISTA's companies and was not prepared to wait for the disaster that it could see from the actual records, had over the course of many months been demanding and receiving the surrender of collateral and the partial repayment of its loans to reduce its exposure to the greatest extent possible. The fact that Mubadala was pulling out should have been released to the investment community as a material fact, but was not.

396.    BATISTA publicly tried to put the best spin possible on the leaked news, characterizing the OGX payments to Mubadala as the partial redemption of an "investment" rather

than the repayment of a loan. Mubadala did not deny this characterization. However, neither EBX nor Mubadala would provide details of the restructuring.

397.   Upon information and belief, the process of asset stripping was carried out by lawyers at Maples & Calder in the Cayman Islands. According to the online version of The Legal 500 regarding Maples & Calder, "[o]ther major instructions included Simon Firth advising Eike Batista's EBX Group on the ongoing restructuring of its strategic partnership with Mubadala Development Company." Cayman Islands, Corporate and Commercial, *Maples and Calder*, The Legal 500 (last visited Oct. 11, 2016), http://www.legal500.com/c/cayman-islands/corporate-and-commercial.

398.   Mubadala had gone along with the initial public mischaracterization of its loan as an "equity investment" and had secretly stripped plum assets from the BATISTA companies under cover of an announced "partial redemption" of that investment, all of which tends to indicate complicity in the fraud. Plaintiffs reserve the right to add Mubadala as a Defendant should discovery confirm a basis to do so.

**The 10.8 Billion Barrel Lie – Recap.**

399.   Despite the fact that OGX was now on a very fast countdown to collapse, BATISTA resolutely kept on publicly trumpeting a rosy vision of the future for OGX, completely disconnected from any shred of reality.

400.   Thus, on July 19, 2013, BATISTA once again blared out reassurances for distribution through the internet press [Bloomberg Businessweek, Financial Times, Fox Business, San Francisco Chronicle] that, as D&M had stated in a 2011 Report, OGX had reserves amounting to 10.8 billion barrels and that regardless of all else, he would stand by the company and honor all of his obligations.

401.     However, BATISTA had always known that the various OGX projections had been lies. That had been confirmed by the internal OGX Task Force and Schlumberger Task Force Reports in late 2012 and all the evidence since then had reinforced the point and he had neither the capacity nor the intention to make good on all his debts, let alone compensate all of the many victims of his fraud.

402.     On July 22, 2013, D&M again demanded of BATISTA, privately, that he retract the 10.8 billion barrel lie and detach the D&M name from it. BATISTA did not do so.

403.     On August 14, 2013, it was reported that Luciano Coutinho, the President of the Brazilian development bank, BNDES, which had loaned BATISTA billions of dollars and must have done due diligence that showed otherwise, announced that BATISTA's OGX had "high-quality assets with which it can rebalance itself." It is unknown before discovery what inducement BATISTA supplied for him to state this lie.

404.     On August 16, 2013, the Tubarão Azul oilfield was closed down, having produced roughly 5 million barrels throughout its life, or just 1% of the minimum estimate announced in 2010. This was OGX's best field.   There would be a later attempt to operate this field post-bankruptcy. This attempt, however, would prove futile and the field was eventually returned to the Brazilian government.

405.     The task BATISTA had set for MARCUS BERTO was, upon information and belief, to get the EBX stake in LLX secretly monetized before the OGX crash, and the crash of OSX which would follow on its heels, leaving the LLX port project without its anchor tenant.

406.     On August 15, 2013, in a filing with the Brazilian Securities and Exchange Commission, BATISTA belatedly confirmed that he was selling a controlling stake in LLX for $560 million to U.S.-based EIG Global Energy Partners.

407.   Upon information and belief, therefore, this was "mission accomplished" for MARCUS BERTO.

408.   Disastrous news was also now emerging about BATISTA's MMX, iron ore "producing" company, which had been fined $1.8 billion for unpaid taxes, equivalent to nearly 80% of its market value. BATISTA's hand-picked managers at MMX were trying to sell off this company, too, before the others crashed all around it.

409.   In August and September 2013, BATISTA secretly sold another 227 million shares in OGX, which earned him approximately $35 million and which, upon information and belief, he routed to one of his foreign accounts.

410.   Though not discovered until near the end of the year, and then reported by the journalist Elio Gaspari in the Rio de Janeiro daily paper, O Globo, at least ten OGX executives left the company during these final months, with parting payments ranging between $46 million and $92 million each, further stripping cash out of the company.

411.   On September 4, 2013, having milked as much as he could out of OGX, AZIZ BIN AMMAR resigned from the Board and reportedly fled the country for New York where he is reported to presently reside in luxury in a $10 million apartment believed to have been acquired with a small part of his takings.

412.   With the OGX bankruptcy just days away, upon information and belief, BATISTA attempted to transfer another $100 million in corporate funds from a BTG Pactual correspondent account in The Bahamas to a Miami, Florida, account at Citibank, believed to be a THORQUE Company bank account.

413.   Upon information and belief, Andres Esteves, billionaire Chairman of BTG Pactual, initially refused to make this transfer, however, because he feared that BTG Pactual would become liable as an accomplice to BATISTA's fraud on creditors.

414.    It is unknown whether those funds remain "stranded" in The Bahamas, or have been routed out on BATISTA's instructions to one of his other accounts.

415.    Equity investors and bond holders were still relying on the fact that there was value in OGX. This belief was due to the fact that as recently as May 2013, a foreign oil company, Petronas, had apparently invested close to a billion dollars of its own money in the OGX oil fields.

416.    On top of that, BATISTA himself was obliged to inject $1 billion in cash into OGX, if and when needed, through the Put Option. (And in 2014, into OSX through a similar Put Option). All that was needed apparently was for OGX to have enough cash to stay in business until the oil started to flow.

417.    The OGX Put Option representation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which Ms. Neiwirth took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true.

### Section III - The OGX Oil Bubble Bursts

418.    On September 6, 2013, OGX's Controller, desperate for cash, formally demanded from BATISTA the first $100 million under the Put Option.

419.    BATISTA, who had never had any intention of paying a single penny *into* OGX, shocked investors by refusing to pay this or any other obligation under the Put Option, claiming the benefit of an "out clause," which - if an actual document even existed - he had inserted for that purpose.

420.    The arrival of OSX III, yet another massive floating production, storage and offloading vessel at the Tubarão Martelo field, on October 1, 2013, raised momentary hopes that OGX might soon start producing offshore oil from the field. But by close of business that same day, OGX missed a bond payment in the amount of $45 million.

421.   On October 28, 2013, MARCUS BERTO formally stepped down at LLX, resigning as President and Director of Investor Relations and handed over to the new owners' appointed management and left for Miami, Florida.

422.   It is believed that MARCUS BERTO had been awarded a significant interest in the company by BATISTA for his services, part of which he invested in what is reported to be a $9.5 million Key Biscayne, Florida, mansion.

423.   On October 30, 2013, OGX filed for bankruptcy in Rio de Janeiro disclosing debts of $5.1 billion, of which roughly $3.6 billion was owed to U.S. and other foreign bondholders.

424.   Pimco, the world's largest bond investor, based in California, and BlackRock, the world's largest asset manager, from New York, had front-row seats for the collapse.

425.   Bondholders like the Plaintiffs and, upon information and belief, other investors from Florida, such as the Florida Retirement System Trust Fund, were among the horde of other investors that were basically wiped out.

426.   OGX's satellite company, MMX, filed for bankruptcy on October 22, 2013.

427.   OGX's satellite company, OSX, filed for bankruptcy on November 11, 2013.

428.   In November 2013, Petronas announced that it would not pay the $850 million, which investors had expected under the alleged "deal" that BATISTA had broadcast in May of that year, disclosing that the deal had been contingent on OGX being able to re-structure its debt.

429.   By February 2014, virtually all of the blocks which OGX had leased had been returned to the Brazilian Government as worthless.

**Batista's "Brazilian Dream" Turns to Nightmare.**

430.   For everybody with an interest in OGX and its satellite companies - except for BATISTA, his co-conspirators, and accomplices - the "Brazilian Dream" BATISTA had boasted of in the April 30, 2012, Milken interview, had now turned to a nightmare.

431.     The shareholders and ordinary bondholders who had invested billions of dollars in OGX, predominantly from the U.S., had now been essentially wiped out in what is currently the largest default in Latin American history.

432.     BATISTA and a number of his co-conspirators and accomplices have been indicted for market manipulation and insider trading in Brazil. These proceedings are expected to last a decade or more, with no real hope of securing punishment of the perpetrators of the fraud or restitution for the victims.

433.     As one of his "defenses" in the criminal proceedings in Brazil, BATISTA has contended that the conditions of the leases required that OGX continue to explore for oil until it declared a field to be commercial or return it to the government. BATISTA therefore had OGX declare fields to be commercial to avoid incurring the cost of exploration or having to return them as worthless, trusting that some future technological advance would allow OGX to commercially recover what were presently unrecoverable resources. In other words, BATISTA has admitted that those representations to investors were false.

434.     In November 2015, Brazil's market regulator, the CVM, banned BATISTA from managing a publicly traded company for a derisory five years.

**Batista's Silver Lining.**

435.     BATISTA and his co-conspirators, however, are all believed to have done well out of the scheme, having received sums ranging from tens of millions of dollars to hundreds of millions of dollars apiece.

436.     All the lies about BATISTA being listed somewhere in the league of the world's richest men can now be seen to have *always* been a lie. The number on which that supposed position ranking was predicated was the sum total of money paid in by investors in expectation of profits from oil that never existed.

437.    In actual fact, BATISTA's original net worth before the OGX fiasco was probably in the hundreds of millions of dollars, and his actual current assets, mainly squirreled away abroad, are probably significantly more than what he began with.

438.    Thus, BATISTA and his family continue to live an untouchable life of luxury in Brazil. It is reported that he believes that he has "zeroed his debts" through the bankruptcies. Apparently the billions of dollars of which he bilked his victims does not count.

439.    That BATISTA has massive wealth remaining is shown by the fact that in March 2016, he threw $130,000.00 in gold coins from the deck of his yacht into the Atlantic Ocean to propitiate the "Queen of The Sea," and turn the course of his luck for his next enterprise.

440.    In July 2016, with all funds successfully routed out to safety, THOR BATISTA quietly closed down the THORQUE Companies in The Bahamas. Notice of the dissolution was given solely by means of a newspaper of tiny local circulation in The Bahamas on July 28, 2016. Copies of the notices are shown here:



441.    As previously mentioned, the Tubarão Azul oilfield had been OGX's best prospect. Under BATISTA it had achieved less than 1% of the flow promised. On September 20, 2016, three years post-bankruptcy, after the successor entity had ploughed many more millions into its exploration, the Tubarão Azul oilfield was returned to the Brazilian government as worthless.

**The Plaintiffs' Claim.**

442.    Through restructuring in the OGX bankruptcy, MERIDIAN's close to $17 million dollars in bonds has been translated into shares in a new version of OGX with a face value of $279,746 for which credit is given. MERIDIAN's net loss is $16,438,233, plus interest.

443.    Through restructuring in the OGX bankruptcy, AMERICAN's close to $4 million in bonds has been translated into shares in a new version of OGX with a face value of $62,166, for which credit is given. AMERICAN's net loss is $3,872,616, plus interest.

444.    The Plaintiffs have retained the undersigned attorneys to prosecute this action and are obliged to pay them a reasonable fee.

445.    As of the date of filing this Complaint, the Plaintiffs have already commenced proceedings ancillary to this action, restricting Batista and the 63X Companies from dissipating assets and to obtain information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

446.    In the Cayman Islands, after a multi-day hearing, the Judge, consistent with Cayman Islands law, entered an Order freezing the assets of Batista and the 63X Companies worldwide and ordered disclosures for information regarding accounts and transfers owned and controlled by Batista and the 63X Companies.

447.    In the Bahamas, consistent with Bahamian law, the Judge similarly entered an order for the disclosure of information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

448.    BATISTA and the 63X Companies have been notified of these foreign proceeding. Upon information and belief, BATISTA is actively avoiding service of the Cayman Orders.

## COUNT I
## FRAUD

Plaintiffs re-allege paragraphs 1-7, 9-11, 13-14, 28-448 against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO and AZIZ BEN AMMAR, as follows:

449.    Each of the above named Defendants personally participated in the fraudulent scheme and composed and transmitted material fraudulent misrepresentations, and assisted each other in maintaining the credibility of material misrepresentations as detailed above.

450.    As detailed above, each of them issued and assisted in issuing false statements concerning specific material facts, with actual knowledge that the representations were false, with the intention that investors would thereby be induced to rely on such representations to their consequent financial loss.

451.    In directing their individual and collaborative misrepresentations to the United States, the named Defendants necessarily targeted investors in the most populous States of the United States, of which Florida is the third, behind only California and Texas. They did so in the expectation of personal gain and of causing loss to their targets.

452.    Plaintiffs' investment agent, Gables Capital Management, in Miami, Florida, was a target of such misrepresentations and relied on the same and was thereby induced by such fraudulent misrepresentations to buy OGX bonds on behalf of the Plaintiffs in the total amount of $21,231,683.00.

453.    The OGX bonds were and are virtually worthless, as a result of which Plaintiffs have been damaged in the sums alleged.

454.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT II
## CONSPIRACY TO DEFRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

455.    The foregoing Defendants agreed to and did conspire together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors.

456.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT III
## AIDING AND ABETTING FRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X

MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

457.    The foregoing Defendants aided and abetted BATISTA and his co-conspirators and accomplices and rendered substantial, material assistance to him and them, in ways, upon dates, and in places, that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme and to assist in secreting the proceeds in false names and in jurisdictions where they would not be available for the satisfaction of the legitimate debts of creditors, wherefore they are additionally liable as aiders and abettors.

458.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT IV
## FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT
## (f/k/a "FLORIDA RICO")

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

**The Criminal Enterprise.**

459.    Upon the basis of the facts alleged, BATISTA is and was the prime directing and controlling force at the head of a criminal enterprise within the meaning of Fla. Stat. § 772.102(3) comprised of himself, the joined Defendants, and many other co-conspirators, aiders, abettors, and accomplices not joined.

460.    The enterprise had as its common purpose the criminal aspirations and ambitions of BATISTA for the accumulation of wealth through a pattern of racketeering activity for further investment, enjoyment and transmission down through the generations of his relatives, friends co-conspirators and accomplices.

461.    Such enterprise is referred to collectively as "the Batista Crime Family" and the Defendant individuals and entities comprising such as "members of the Batista Crime Family" or "members of the enterprise."

462.    All members of The Batista Crime Family acted, in regard to each listed predicate act as described below and as to the overall pattern of racketeering activity, with criminal intent.

**Pattern of Criminal Activity.**

463.    By reason of the allegations made herein, the members of the enterprise engaged in a pattern of criminal activity as stated in Fla. Stat. § 772.102(4).

**Predicate Acts of Criminal Activity.**

464.    The Defendants actively participated in the enterprise, the Batista Crime Family, through the stated prohibited activities contrary to Fla. Stat. § 772.103 in the course of a pattern of criminal activity under Fla. Stat. § 772.102(4) which entitle Plaintiffs to civil remedies under Fla. Stat. § 772.104.

**Predicate Act I - Florida Securities Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

465.     As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly employed a device, scheme, or artifice to defraud, contrary to Fla. Stat. § 517.301(1)(a)(1).

466.     As set forth above, the stated Defendants have further committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly obtained money or property by means of untrue statements of material facts or any omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, contrary to Fla. Stat. § 517.301(1)(a)(2).

467.     As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon persons, including Plaintiffs, contrary to Fla. Stat. § 517.301(1)(a)(3).

**Predicate Act II - Federal Wire Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

468.    As set forth above, the stated Defendants have committed numerous acts of wire fraud in that they, having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, contrary to 18 U.S.C. § 1343.

**Predicate Act III - Federal Money Laundering - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT, OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.**

469.    As set forth above, the stated Defendants committed numerous acts of money laundering in that they knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from unlawful activity contrary to 18 U.S.C. § 1957. As stated above, the acts of money laundering variously took place in the United States pursuant to 18 U.S.C. § 1957(d), or was committed outside the U.S. by "U.S. persons" including U.S. nationals, U.S. permanent residents, corporations formed in the U.S. and foreign subsidiaries of such persons as defined in 18 U.S.C. § 3077.

**Predicate Act IV - Florida False Advertising - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR.**

470.    As set forth above, the stated Defendants committed numerous acts of misleading and deceptive advertising, contrary to Fla. Stat. § 817.40(5), in that they made or disseminated or caused to be made or disseminated before the general public of the state, or a portion thereof, misleading advertisements, which were fraudulent and unlawful, which the Defendants knew or should have known were false, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

**Predicate Act V - Florida Theft - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

471.    By reason of the foregoing the stated Defendants, with criminal intent, knowingly obtained or used, or endeavored to obtain or use, the Plaintiffs' property and the property of others through fraud, deceit, false pretenses and/or conduct of similar nature, with the intent to permanently deprive the Plaintiffs and such others of their right to their property or their benefit of their property, and further, knowingly and with criminal intent appropriated such property to their own use contrary to Fla. Stat. § 812.014.

**Predicate Act VI - Florida Communications Fraud: Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

472.     As set forth above, the stated Defendants engaged in a scheme to defraud, in that they engaged in a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto contrary to Fla. Stat § 817.034(4)(a), 817.034(3)(b), 817.034(3)(c), and 817.034(3)(d).

473.     Further by reason of the matters set forth above, the stated Defendants furthered a scheme to defraud, in that they furthered a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto, and in the course thereof communicated with persons with the intent to obtain property from such persons contrary to Fla. Stat § 817.034(4)(b).

**Civil Remedy.**

474.     As a result of the Defendants' participation in the criminal enterprise and its perpetration of the aforesaid pattern of criminal activity, Defendants caused injury and damage to Plaintiffs.

475.     By reason of the foregoing, Defendants have, with criminal intent, received proceeds derived directly or indirectly from a pattern of criminal activity and have used or invested the same, or a part thereof, directly or indirectly, or the proceeds derived from the investment or

use thereof, in the acquisition of title to, or a right, interest, or equity in, real property or in the establishment or operation of an enterprise, contrary to Fla. Stat. § 772.103.

476.    By reason of the foregoing, Defendants have, with criminal intent, through a pattern of criminal activity acquired or maintained, directly or indirectly, an interest in or control of enterprises or real property; have been employed by of associated with an enterprise to conduct or participate, directly or indirectly, in a pattern of criminal activity; conspired or have endeavored to violate provisions of subsection (1), subsection (2), or subsection (3) of Fla. Stat. § 772.103.

477.    By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Fla. Stat. § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, statutory treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

## COUNT V
## FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT CONSPIRACY
### (f/k/a "FLORIDA RICO CONSPIRACY")

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

478.     The members of the Batista Crime Family conspired and agreed together at numerous times and on various dates and in various places to participate in the fraudulent scheme and in the affairs of the criminal enterprise through a pattern of racketeering activity contrary to Florida Statute § 772.103(4), by reason of which Plaintiffs were damaged and are consequently entitled to civil remedies under Florida Statute § 772.104.

479.     By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Florida Statutes § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

## COUNT VI
## FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-14, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR, and say as follows:

480.     Defendants committed numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1), and that they caused such loss in fact to Plaintiffs.

481.     Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

482.     Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

90

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

**COUNT VII**
**CONSPIRACY TO COMMIT FALSE AND MISLEADING ADVERTISING**

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-25, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

483.    Defendants conspired together to commit and did commit numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

484.    Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

485.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

## COUNT VIII
## CIVIL THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-25 and 28-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

486.    By reason of the foregoing acts alleged, the Defendants committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Florida State § 772.11, including treble damages, attorneys' fees and the expenses of this action.

487.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT IX
## CONSPIRACY TO COMMIT THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

488.    The foregoing Defendants with criminal intent, conspired together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and performed the stated acts in pursuance of such agreement in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

489.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT X
## AIDING AND ABETTING THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-5, 7-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

93

490.    The foregoing Defendants, with criminal intent, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, aided and abetted BATISTA in achieving the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

491.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

**COUNT XI**
**FLORIDA UNIFORM FRAUDULENT TRANSFERS ACT**

Further or alternatively, Plaintiffs allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

492.    The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, made fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a

reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and each of the other liable Defendants were engaged or was about to; engage in a business or a transaction for which his and their remaining assets were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he or they would incur, debts beyond his or their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the asset transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

**COUNT XII**
**CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS**

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

493.    The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, conspired with BATISTA and others among themselves, to make fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and such other liable Defendants were: engaged or were about to engage in a business or a transaction for which his or their remaining assets were unreasonably small in relation to the business or transaction; intended to incur, or believed or reasonably should have believed that he and they would incur, debts beyond his and their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the assets transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,
ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282
Carlos F. Osorio
Florida Bar No.: 597546

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

     Defendants.

_____/

## *EX PARTE* NOTICE OF FILING CAYMAN AFFIDAVIT OF
## JUDITH ELLEN NEIWIRTH

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), in support of their motion against all Defendants for an emergency temporary

injunction to prevent fraudulent transfers out of Florida, hereby file the Cayman Affidavit of Judith

Ellen Neiwirth.

     Dated: February 1, 2017.

                    Respectfully submitted,

                    ABALLI MILNE KALIL, P.A.
                    *Counsel for Plaintiffs*
                    2250 SunTrust International Center
                    One Southeast Third Ave.
                    Miami, FL 33131
                    Phone: (305) 373–6600
                    Fax: (305) 373–7929

                    s/ *Hendrik G. Milne*
                    Hendrik G. Milne
                    Florida Bar No.: 335886
                    Craig P. Kalil
                    Florida Bar No.: 607282

1

Applicants
First Affidavit of J Neiwirth
Sworn 13 October, 2016
Exhibit JEN1

## IN THE GRAND COURT OF THE CAYMAN ISLANDS

**FINANCIAL SERVICES DIVISION**

CAUSE NO. FSD    OF 2016 (    )

**B E T W E E N:**

### (1) MERIDIAN TRUST COMPANY LIMITED
### (2) AMERICAN ASSOCIATED GROUP, LTD.

**Applicants**

- and -

### (1) EIKE FUHRKEN BATISTA DA SILVA (AKA EIKE FUHRKEN BATISTA)
### (2) 63X INVESTMENTS LTD.
### (3) 63X FUND
### (4) 63X MASTER FUND
### (5) MAPLES CORPORATE SERVICES LIMITED

**Respondents**

---

## AFFIDAVIT OF JUDITH ELLEN NEIWIRTH

---

I, **JUDITH ELLEN NEIWIRTH**, Chief Investment Officer of Gables Capital Management, Inc., of 801 Brickell Avenue, Suite 2320, Miami, Florida, United States, 33131 **STATE ON OATH AS FOLLOWS:**

1. I am the co-founder and Chief Investment Officer of Gables Capital Management Inc. (**"Gables Capital"**).

2. I make this Affidavit in support of the Applicants' application for a freezing order and related disclosure against the First to Fourth Respondents, and in support of its

I

application for disclosure from the Fifth Respondent, in support of a proposed claim before the Florida courts.

3. The matters set out in the Affidavit are within my personal knowledge unless the contrary is expressly stated. Where they are within my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from the sources which I identify.

4. No waiver of privilege is intended by any reference herein to privileged material or a document containing such unless expressly stated. There is now produced and shown to me a paginated bundle of true copy documents marked "JEN1" which I exhibit hereto. References to page numbers herein are references to pages of **JEN1** in the format **(JEN1/page number)**.

## FULL AND FRANK DISCLOSURE

5. I understand that the Applicants have a duty to make a full and frank disclosure to the Court of facts that may be considered adverse to the Applicants' position. I have read extracts from the Cayman Islands' decision of *Cable and Wireless v. ICTA* and the English decision of *Complete Retreats Liquidating Trust v. Logue* that summarize that duty. I confirm that I have sought to comply with this duty in preparing this affidavit.

## BACKGROUND

6. I am the co-founder and Chief Investment Officer of Gables Capital. I have spent over thirty years working in the financial services industry. Prior to founding Gables Capital, I worked for various trust investment departments in Miami, including Flagship National Bank, Manufacturers Hanover Trust Company and SunTrust Bank, Miami, N.A. where I was involved in the management of trust assets.

7. Gables Capital is a registered investment adviser, based in Miami, Florida. It manages investments portfolios for individual, trust, corporate, and institutional clients. As explained in the Affidavit of Ernest Patrick Dover, Gables Capital was engaged by Meridian Trust Company Limited ("**Meridian**") and American Associated Group, Ltd. ("**American**") to manage their investment portfolios. Gables was compensated for its services by the payment of periodic fees calculated upon the total funds under management, together with the potential for additional fees if

2

certain threshold performance benchmarks were exceeded. I was the person at Gables Capital directly responsible for those two clients.

8.  Gables Capital had several hundred millions of dollars under management for these clients, which funds originated from the operation and sale of American University of the Caribbean, and was charged with creating a portfolio of appropriately diversified risk. In making investments within the portfolio, Gables Capital would, typically, execute transactions through brokers for which the clients would then arrange payment through their securities custodian.

9.  This affidavit summarises the investments Gables Capital made for Meridian and American in bonds issued by OGX Austria GmbH ("OGX Austria"), from January to September 2013 ("OGX Bonds"), in the total sum of USD $20,652,761. The OGX Bonds were issued in the amount of USD1.063 billion in a private placement and were to mature in 2022 with a bi-annual coupon of 8.375%. Subsequent to their issue, the OGX Bonds were publicly traded on two German securities exchanges and were also available in the inter-dealer market.

10.  In researching and making investments decisions for Gables Capital clients, my prime source of information was through the Bloomberg data service, accessed via a dedicated Bloomberg terminal on the desk in my office.

11.  The Bloomberg data service is one of the financial industry's most widely used sources for real-time financial data and news feeds which also facilitates the placement of trades. It is one of the most widely used tools for real-time financial data access and analysis in the world of finance.

12.  The dedicated Bloomberg terminal provides a wide range of functionalities and is manipulated by a unique keyboard. It allows clients to compare and contrast equities side by side, value hard-to-price derivatives, and view real-time rates for dozens of currencies, along with basis curves for most currency pairs, and rate information for any given currency. Bloomberg also allows users to search for real-time data on fixed income securities such as corporate debt, government, and municipal bonds, including credit ratings and cost of capital information, allowing users to view historical day-over-day changes in values and implied yield-to-maturities for any given day. Beyond security values, information relayed via the terminal includes

3

real-time news updates from a multitude of media outlets, websites, tickers and wires and archived stories.

13. Throughout the work day, the Bloomberg terminal at my desk was logged on and constantly streaming minute-by-minute updates on the global markets and world news and was under my constant review. I relied on the information so provided in researching and making investment decisions for our clients.

14. Given the fact that the electronic information supplied via Bloomberg is archived and available for recall, I did not consider it necessary to maintain a "*hard file*" for research and investment decisions made on behalf of clients.

15. In preparing this affidavit I was asked for my recollection of the research and investment decisions that I made over the course of a number of months, several years ago. I have an independent recollection of the topics reported via Bloomberg that were important to my investment decisions.

16. That said, I cannot recall the exact words used in particular articles, or how many articles I reviewed with similar content, or how frequently aspects of particular topics were covered in different ways. Unfortunately, while extremely sophisticated, the Bloomberg terminal does not store search history and I am therefore unable to replicate exactly the course and sequence of my research at that time. Nor can I replicate exactly the particular wealth of information relayed via Bloomberg or other sources that I took into account.

17. However, in preparing this affidavit, I recaptured and went back over many articles and reports relayed via Bloomberg that were streamed over the Bloomberg terminal at my desk in 2013 that would have been pertinent to my investment decisions in regard to the bonds at issue here. What I saw was consistent with my independent recollection of the sense of what was reported at that time which formed the basis for my investment decisions, as is stated below and as is alleged in the proposed Florida complaint (the "**Florida Claim**"). I believe that if the information was relayed on Bloomberg, and it had apparent relevance to investments in OGX bonds through the date of my last purchase in 2013, I would have seen it at that time and read it and it would have played a part in my own conclusions that OGX bonds were an attractive investment at that time.

4

18. In addition to the information relayed via Bloomberg, during 2013 I was also in regular contact with banks and brokers and others in the financial industry with whom I discussed investments, including representatives of Deutsche Bank, the Bank of Oklahoma, the Bank of Montreal and the securities broker/dealer, Sterne, Agee & Leach LLC. To the extent that such discussions were material to my investments decisions, they are outlined below.

## THE DECISION TO INVEST IN OGX BONDS

19. The OGX Bonds first came to my attention on a call with Mr. Aaron Lupuloff, ("**Mr. Lupuloff**"), then Managing Partner of Sterne, Agee & Leach LLC's regional brokerage operations in Birmingham, Alabama, in approximately November or December of 2012.

20. Mr. Lupuloff knew that we at Gables Capital had recently had a positive experience in the Brazilian corporate bond market, through an investment in bonds issued by Marfrig, a large Brazilian multi-national food processing company, and were open to similar quality investments in the Brazilian market.

21. He suggested that Gables Capital might be interested in making a purchase of bonds in the oil exploration company, OGX, which was seeking development financing through its affiliate, OGX Austria, whose liabilities were guaranteed by OGX. He also told me that OGX's principal, the renowned Brazilian multi-billionaire Mr. Eike Batista ("**Batista**"), had publicly announced that he stood behind OGX (which was the most important company in his corporate empire) and was contractually obliged to inject up to a billion dollars into the company if requested by its Board (the "**Put Option**").

22. The rise of OGX had been well documented in the national and international press including on Bloomberg and I was aware that Batista was considered to be one of the richest individuals in the world. But prior to making any investment in OGX bonds for our clients I researched the matter via Bloomberg.

23. In the course of my research, I saw many representations that had been issued by OGX or directly by Batista concerning the company's spectacular assets and prospects, and the glowing future expected for OGX and its satellite companies. Given the caution with which corporations and the CEOs of public companies announce positive developments to the investment markets, because of the liability

5

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

that generally attaches to false or misleading information, I considered these to be responsible and truthful representations and I relied upon them as such in making my decisions regarding investment in OGX bonds.

24. Further, while I understood that the oil exploration business is inherently speculative, this did not appear to be a real issue with regard to OGX. I read via Bloomberg that, according to OGX news releases and Batista's direct statements to the investing public, the company had already made huge discoveries of *recoverable* oil. I saw several references to the fact that Batista had stated that OGX's discoveries were as high as 10.8 billion barrels. At this time, according to information reported in Bloomberg, oil was trading at around $110 a barrel and was forecasted to rise to $140 and OGX was representing that it could produce oil at $60 a barrel. The prospects for enormous profits seemed to me to be extremely high.

25. Following up on Bloomberg regarding the Put Option (which Mr. Lupuloff had initially mentioned) I saw that in September 2012, Batista had publicly announced that he stood behind OGX and would invest a billion dollars in the company if requested by its Board. This was a public promise that OGX was financially-backed by one of the wealthiest men in the world and was hugely influential in my investment decisions. The company had apparently made huge discoveries and Batista, who apparently had an abundant wherewithal with which to do so, was financially-committed to its success. I therefore understood and believed that if and when they desired, the directors of OGX had the option of calling on Batista for up to one billion dollars and that he would comply.

26. I further understood that Batista, who was the CEO and indirect majority shareholder of OGX, was the best placed to make a value judgment on OGX and would clearly not make this promise unless he saw clear indications for a return on such an additional billion dollar investment. Indeed, he stated as much to the investing public in his announcement reported in a Business Wire article, posted on October 24, 2012 in Bloomberg, in which he was quoted as saying, directly in reference to the Put Option, that it was intended to broadcast his own belief in the future success of OGX: *"This option underpins my confidence in OGX's technical expertise and quality assets, as well as the new opportunities that the oil and gas sector offer to OGX."*

6

27.   I further noted in the course of my research that OGX had announced that in April
      2012 the Mubadala Development Company, the investment and development vehicle
      of the United Arab Emirates had bought 5.63% of OGX's shares from EBX,
      Batista's investment vehicle, for a reported $2 billion. This was a non-control block
      of shares. Based on this transaction the extrapolated value of the shares would be in
      excess of $35 billion for OGX as a whole. I understood from this that a sophisticated
      investment arm of an oil-rich Arab state had – according to OGX press releases and
      Batista himself – seen massive value in OGX, from which all other investors should
      take encouragement.

28.   The aggregate information disseminated to the market from OGX and Batista, which
      was resolutely upbeat, as I reviewed it via Bloomberg, was that OGX was a company
      with a bright and lucrative future. It had made massive discoveries of recoverable oil
      and just needed sufficient development capital to get to the point of actual
      production. Its CEO and principal indirect shareholder was apparently both deeply
      invested and well-able to support the venture, and I also noted that the international
      investment market as a whole had bought in to the overall rosy picture of the future
      that Batista and OGX had painted, as evidenced by the fact that some of the largest
      and most sophisticated U.S. institutional fixed income investors (such as Blackrock
      and Pimco) had very large positions with OGX.

29.   Finally, in deciding whether to invest in OGX bonds, my belief was that the
      company would be successful, and the bonds would pay until maturity. However, I
      also took into account the fact that bond holders enjoyed preference over equity
      investors and would be paid the par value and any accrued but unpaid coupon
      payments on liquidation of the company, and it apparently had massive assets, thus
      further underpinning the safety of the investment.

## THE INVESTMENTS

30.   In reliance on the foregoing representations made by OGX and by Batista, directly, I,
      through Gables Capital, in Miami, Florida, directed a number of investments in OGX
      bonds on behalf of Meridian and American. In each case the transaction was
      executed through Stern, Agee & Leach LLC.

31.   These investments were under constant review, but the basic investment strategy was
      to hold the OGX Bonds until maturity and collect the bi-annual coupon payments in

7

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman,
KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said
Attorneys-at-law.

the interim. I exhibit relevant transactional documentation, where available, relating to each purchase, redacted where necessary to maintain confidentiality in matters such as, for instance, bank account numbers.

32. On January 15, 2013, Gables Capital purchased 6,000 bonds on behalf of Meridian at a price, including accrued interest, of $5,849,354 (JEN1/1-5).

33. On January 15, 2013, Gables Capital purchased 3,500 bonds on behalf of American at a price, including accrued interest, of $3,412,123 (JEN1/6-10).

34. On January 15, 2013, Gables Capital purchased 500 bonds on behalf of another of its clients, American University of the Caribbean, a Montserrat company[1] (within the same client group as the Applicants, but not an applicant here).

35. With regard to the January 15, 2013 transaction, the following is how the purchases occurred:

   (a) Gables and Sterne Agee telephonically agreed to a purchase quantity and price.

   (b) Sterne Agee confirms, via e-mails, to Gables the purchases and amounts, including accrued interest, as allocated among the various Gables' customer accounts.

   (c) A single confirmation in aggregate is issued from Sterne Agee to Gables for the total of these bonds purchased that day.

   (d) Gables forwards the confirmations to Meridian who in turn advises the custodian to pay against delivery.

   (e) The custodian, upon receipt of the bonds, issues a Securities Deposit (describing the bonds received for each account) to Meridian and also issues a Debit Advice confirming the payment made against delivery. Gables receives in due course confirmations from the custodian of all trades and settlements.

36. Subsequent purchases followed a similar methodology.

---

[1] These were purchased at a price, including accrued interest, of $487,446.18. This sum is not being claimed. (JEN1/11-13)

8

37.     On January 22, 2013, Gables Capital purchased a further 4,325 bonds on behalf of Meridian at a price, including accrued interest, of $4,234,265 (**JEN1/14-16**).

38.     On or about 7 March 2013, I recall reading on Bloomberg that Batista had stated that BTG Pactual Bank had granted a billion dollar line of credit to EBX. This was Batista's investment vehicle through which he held his majority shareholding in OGX, and was a further assurance of the stability of OGX, which was the cornerstone of Batista's holdings.

39.     I was also aware from Bloomberg that on or around 23 March 2013, BTG Pactual's President, Andre Esteves, had stated in an interview that Batista's companies were in no danger of failing and Batista remained one of the best capitalized businessmen in Brazil. This statement confirmed Batista's representations.

40.     On March 28, 2013, Gables Capital purchased a further 2,000 bonds on behalf of Meridian at a price, including accrued interest, of $1,520,931 (**JEN1/17-20**).

41.     As was expected, OGX initially made timely payments of its semi-annual bonds. On April 1, 2013, there was a coupon payment to Meridian in the sum of $432,359 and to American in the sum of $146,563 (**JEN1/52**).

42.     On April 12, 2013, Gables Capital purchased a further 1,000 bonds on behalf of American at a price, including accrued interest, of $669,222 (**JEN1/21-37**).

43.     On April 12, 2013, Gables Capital purchased a further 4,000 bonds on behalf of Meridian at a price, including accrued interest, of $2,676,889 (**JEN1/21-37**).

44.     The trading price on the first OGX bonds in January 2013 was around $920. By the end of April the trading price was in the region of $600 per bond. In the light of the aggregate of the representations stated above, including the announcement of up to 10.8 billion barrels of recoverable oil, the continuing reassurance offered by the represented billion dollar Put Option, the stated Mubadala "*investment,*" and the continuing emanation from OGX and Batista of upbeat news for the future, I believed that the OGX Bonds remained an attractive investment prospect.

45.     Moreover, there was an inverse relationship between the trading prices of the OGX bonds and the yield they were expected to return if held to maturity. As the price being asked for the bonds fell, the expected yield increased and investment in the

9

bonds became more, not less, attractive, and since the fundamentals of the investment as represented by the company and its principal indirect shareholder remained constant, I continued to make purchases for my clients.

46. On May 10, 2013, during the "*Q1 2013 Earnings Call*", Roberto Monteiro (Chief Financial Officer and Investor Relations Manager of OGX) confirmed that the billion dollar Put Option from Batista served as back up should OGX require additional cash-flow. I read the transcript of the "*Q1 2013 Earnings Call*" on Bloomberg at that time.

47. While there had been some volatility in the OGX share price and the price of the OGX Bonds on the secondary market around that time, for the reasons I have given above the fundamentals appeared strong. I noted that the rating agencies had reduced the bond's ratings over the time of the investments. However, they had initially done so in small increments and I did not believe that this was indicative of a fundamental problem. All but the last OGX transaction I made were with only a single downgrade from the ratings at the time of the initial purchase.

48. I also noted that other, much larger asset management firms and institutional investors than my own, such as Blackrock and Pimco, also believed in the fundamental value of the bonds and were maintaining their reported positions.

49. On 20 May 2013, Gables Capital purchased a further 3,000 bonds on behalf of Meridian at a price, including accrued interest, of $1,798,792 (JEN1/38-42).

50. In or around June 2013 it was reported that Batista sold 70.5 million shares of OGX. His stated justification for that move was to raise additional cash for investment in OGX. He further stated to the financial press and thus the investing public that he would not sell any additional shares in OGX. I believed this to be true.

51. On 20 June 2013, Gables Capital purchased a further 3,175 bonds on behalf of Meridian at a price, including accrued interest, of $1,070,107 (JEN1/43-47).

52. Up to this time the fundamental representation regarding the 10.8 billion barrels of recoverable oil had not been retracted. Throughout the months in which I made these investments, the core representations as to the massive oil discoveries which had allegedly been made by OGX, and the assurance provided by Batista's promised billion dollar cash injection to help fund the path towards actual production were

10

never retracted. There was no suggestion that the amounts of oil "*discovered*" had been deliberately fabricated, or that any of the positive statements that had been released by OGX or Batista himself were incorrect or misleading. Moreover, there continued to be numerous upbeat reports disseminated by OGX and Batista as to the value of OGX which I had no reason to suspect were false.

53.   I have learned that on July 1, 2013 OGX advised that its guidance as to expected production rates, at least with respect to certain wells, was being re-examined and should not be relied upon.

54.   The Put Option representation was repeated as the stock and bond prices fell. On July 19, 2013, Batista stated to the press that he would stand by the company and "*honor all of [his] obligations*," which I took to include the Put Option, and that he would not "*leave a single penny unpaid for each one of [his] debts*". I believed that to be true.

55.   On September 3, 2013, AUC Montserrat had instructed the liquidation of its entire investment portfolio, and as part of that process, and as an accommodation to this related entity, Gables "*crossed*" (simultaneous sale and purchase) the 500 OGX bonds AUC Montserrat had held, to American at a price to American, including accrued interest, of $93,750[2] (**JEN1/48-51**).

56.   During my investment career it had been an infrequent event to experience a bond default despite the fact that I have practiced in some very turbulent times, including the crash of October 2007. I expected the OGX bonds to pay out their coupons and eventually to return the principal.

57.   Therefore, when it was publicly announced on or about September 9, 2013 that Batista had refused to honor the first tranche demanded by the Board of OGX on the Put Option, and then on October 1, 2013 OGX defaulted on the next semi-annual coupon due, and the company soon thereafter went into bankruptcy. This came as a colossal shock, not just to me personally, but to the financial markets as a whole.

## MY PERSONAL AND FAMILY INVESTMENT IN OGX

---

[2] The sale generated proceeds of $92,500 for AUC Montserrat, realizing a loss for that non-party.

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

58. I also wanted to share in what I perceived to be a very promising investment in OGX. I was personally unable to invest in the bonds because the typical trading block was very significant and beyond my personal budget but OGX common stock was available for smaller investments as American Depository Receipt ("**ADRs**").

59. In May and June 2013 I bought approximately \$13,200 in OGX ADRs for my retirement account and approximately \$15,970 in OGX ADRs for my husband's retirement account.

60. My husband sold his ADRs on June 18 at a loss of some \$8,750 and I sold my own ADRs on July 15, 2013 at a loss of some \$9,303.

61. Different considerations drive corporate stock investments from those that drive corporate bond investments. I believed that the OGX stock was, at the time acquired, undervalued and stood a good prospect of increasing in the short term. Capital growth is of far less significance to bond holders who are much more interested in the income generated and eventual repayment of the nominal face value of their investment by the issuer. While the fundamentals for holding until maturity looked good for bond investors, there was much less promise as the months went by that the stock prices would increase in the short or even medium term. Further, in addition to the interim coupon payments, bond holders had a much greater assurance of repayment in full in the – what I believed to be at that time - unlikely event of an insolvency, while equity holders typically take the brunt of the loss. Therefore, while I maintained the bond investments for Meridian and American, I and my husband decided that we would take a loss on the stock prospects – always risking that the stock prices would indeed surge as OGX got closer to full production.

### THE FAILURE OF OGX

62. I understand that on 30 October 2013, OGX, and subsequently OGX Austria, petitioned for judicial reorganization in Brazil and submitted a plan of reorganization, pursuant to which the obligations under the OGX bonds were later converted into equity. As the holders of 27,500 bonds the Applicants received a total of 438,349 ADRs.

63. The Put Option was viewed as placing a floor on how low OGX bonds could trade. I believe that if OGX's and Batista's representation as to existence and volume of

12

recoverable oil had been true, OGX bonds should have been a very lucrative investment. As it is, the investment turned out to be an almost total loss.

64.   The total amount paid for the OGX bonds was $21,231,683. The April 2013 coupon payment returned $578,922, making the net investment $20,652,761. The bonds are now worthless and the approximate value of the ADRs received as described above was $341,912, as of September 9, 2016, resulting in an overall net loss of $20,310,849.

65.   To my understanding, the Applicants did not actively participate in the Brazilian bankruptcy proceedings. I did confirm their ownership stake in order to receive periodic notices from Deutsche Bank Trust Company Americas as the Bond Trustee of the status of the reorganization proceedings.

**FURTHER AFFIANT SAYETH NAUGHT.**

Under penalties of perjury, Affiant hereby declares that Affiant has examined this Affidavit and further declares that the statements contained in this Affidavit are true, correct, accurate and complete.

_Judith Ellen Neiwirth_

Judith Ellen Neiwirth

STATE OF FLORIDA        )
                        ) ss
COUNTY OF MIAMI-DADE    )

Before me, this 13th day of October, 2016, personally appeared Judith Ellen Neiwirth, who has produced FL Dr.'s License N630-423-56-520 as identification or who is personally known to me.

MEGAN E. CAMPOS HAAS
MY COMMISSION #FF111402
EXPIRES July 19, 2018
(407) 398-0153   FloridaNotaryService.com

Megan Campos Haas
Notary Public, State of Florida

Witness Signature:

Witness Name:   CRAIG P. EGUL

13

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

     Defendants.

_____/

## *EX PARTE* NOTICE OF FILING CAYMAN AFFIDAVIT OF
## BRIAN THOMAS WINDHAM

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), in support of their motion against all Defendants for an emergency temporary

injunction to prevent fraudulent transfers out of Florida, hereby file the Cayman Affidavit of Brian

Thomas Windham.

     Dated: February 1, 2017.

               Respectfully submitted,

               ABALLI MILNE KALIL, P.A.
               *Counsel for Plaintiffs*
               2250 SunTrust International Center
               One Southeast Third Ave.
               Miami, FL 33131
               Phone: (305) 373–6600
               Fax: (305) 373–7929

               *s/ Hendrik G. Milne*
               Hendrik G. Milne
               Florida Bar No.: 335886
               Craig P. Kalil
               Florida Bar No.: 607282

1

Applicants
First Affidavit of B Windham
Sworn     October 2016
Exhibit BTW1

### IN THE GRAND COURT OF THE CAYMAN ISLANDS

### FINANCIAL SERVICES DIVISION

**CAUSE NO. FSD**     **OF 2016 (      )**

**B E T W E E N:**

### (1)  MERIDIAN TRUST COMPANY LIMITED
### (2)  AMERICAN ASSOCIATED GROUP, LTD.

**Applicants**

- and -

### (1) EIKE FUHRKEN BATISTA DA SILVA (AKA EIKE FUHRKEN
### BATISTA)
### (2) 63X INVESTMENTS LTD.
### (3) 63X FUND
### (4) 63X MASTER FUND
### (5) MAPLES CORPORATE SERVICES LIMITED

**Respondents**

---

### AFFIDAVIT OF BRIAN THOMAS WINDHAM

---

I, **BRIAN THOMAS WINDHAM**, Consulting Engineer at FTI Consulting, of 925-A Capital of
Texas Highway, South Austin TX 78746, United States, **STATE ON OATH AS FOLLOWS**:

1

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-
1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-
at-law.

1.  I am a Senior Director and consulting engineer in the international firm of consultants FTI Consulting (**"FTI"**) based in their Austin, Texas offices. I am engaged by the Plaintiffs in these proceedings as an expert advisor.

2.  I make this Affidavit in support of the Plaintiffs' application for a freezing order and related disclosure against the First to Fourth Respondents, and in support of their application for disclosure from the Fifth Respondent, which applications are in support of a proposed claim before the Florida courts (the **"Florida Claim"**).

3.  I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my own knowledge, I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.

4.  No waiver of privilege is intended by any reference herein to privileged material or a document containing such unless expressly stated.

5.  There is now produced and shown to me a paginated bundle of true copy documents marked **"BTW1"** which I exhibit hereto. References to page numbers herein are references to pages of **BTW1** in the format **"BTW1/page number"**. In addition, in my affidavit, I refer to documents exhibited by other deponents by reference to their respective exhibit name and number in the same format.

## Full and frank disclosure / Independence

6.  I understand that the Applicants have a duty to make a full and frank disclosure to the Court of facts that may be considered adverse to the Applicants' position. I have read extracts from the Cayman Islands' decision of *Cable and Wireless v. ICTA* and the English decision of *Complete Retreats Liquidating Trust v. Logue* that summarize that duty. I confirm that I have sought to comply with this duty in preparing this affidavit. I make further additional disclosure at paragraph 85 to 87 below. I also confirm that I have no conflict of interest with the parties or subject-matter of the Florida Claim or the intended applications. In this respect, I have read and understand section B5.2(b) of the FSD Guide of the Grand Court and a relevant extract of the decision, *The Ikarian Reefer* [1993] FSR 563, as to acting as an independent witness in this context.

2

**My engagement with Applicants**

7.  I have been provided with a copy of the affidavit of Mr. Thomas de Araujo ("**Mr. de Araujo**") together with his exhibit, **TDA1**, on behalf of the Applicants, in the form I understand it will be sworn. I have also spoken with Mr. de Araujo to discuss his affidavit. I have also been provided with a draft Complaint in the proposed Florida court proceedings (which is exhibited at **KJM1**) and a copy of two indictments and an amendment to one of those indictments dated September 11, 2014 (**MLO1/2/446-468**), September 23, 2014 (**MLO1/2/353-445**), and December 15, 2015 (**MLO1/2/469-494**) respectively, filed against the First Respondent, Mr. Eike Batista ("**Batista**"), among others, in Brazil (collectively, the "**Indictment**").

8.  The allegations in the draft Complaint and the Indictment relate in part to representations made by Batista as to what perhaps can loosely be described as claimed discoveries of oil (or other hydrocarbons) by his company, OGX.

9.  The subject-matter of the Plaintiffs' application touches on matters which are technical and industry-specific and which I consider to be squarely within my field of expertise. I set out below my experience, qualifications and expertize accumulated during more than fifteen years employed in the oil and gas exploration and production industry.

**My Experience and qualifications**

10. In 2000, I earned my Bachelor of Science degree in Petroleum Engineering at the University of Texas at Austin.

11. In 2005, I became a Licensed Professional Engineer in the State of Texas, USA.

12. Following graduation, I was employed as a Petroleum Engineer for Union Oil Company of California, a major US-based petroleum explorer and marketer, where I held several positions. In particular, as a Reservoir Engineer, I gained experience with field development studies, workover evaluations, economic analyses, and reserve calculations. I also worked as a Production Engineer and was responsible for design modifications and installation of gas gathering and compression facilities, recommendations for artificial lift installations, and on-site supervision of well operations. In addition, I worked as a Drilling Engineer where I provided field

3

supervision and on-site engineering support to onshore and offshore drilling, completion, and rig workover operations throughout the Gulf of Mexico region.

13. I joined Platt, Sparks & Associates (a predecessor firm to FTI) in 2002. I was promoted to the role of Consulting Engineer in 2003. My role at FTI involves reservoir engineering studies, reserve determination, economic analysis, market value studies, log analysis and operational investigations. I am also experienced with evaluation of gas storage prospects, gas storage inventory verification, enhanced oil recovery studies, reservoir simulation studies, and preparation of Texas Railroad Commission regulatory applications. I have presented expert testimony in litigation and before the Texas Railroad Commission on behalf of clients. Platt, Sparks & Associates merged with FTI in 2014.

14. I am active in the Society of Petroleum Engineers (the "SPE") where I serve as an officer. I attach my résumé for more detail of my experience (**BTW1/1**).

## My opinion

15. I express below my opinion on the technical points in the affidavit of Mr. de Araujo and the draft Complaint. In summary:

   (a) I have reviewed certain representations made by Batista as to the recoverability of OGX's so-called discoveries[1] of oil.

   (b) Whether an estimated volume of oil under the ground can properly be considered *"recoverable"* is determined by specialists applying generally accepted industry parameters.

   (c) At a minimum, it has to be capable of extraction by technology available to the operator. This is referred to as *"technological recoverability"*.

   (d) If an estimated volume of oil has been determined to be technologically recoverable, it may or may not subsequently be classified as recoverable in the commercial sense, that is, economically-viable. That depends on whether

---

[1] Reference to the discoveries of OGX refer to oil deposits encountered by its drilling program and may also refer to deposits anticipated by OGX to be discovered during future exploratory drilling.

4

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

revenue from selling the recovered oil would be expected to exceed the cost of extracting it.

(e)     When the term "*recoverable*" is used in our industry context, it is my view that investors generally presume it is intended to mean commercially recoverable unless the contrary is very clearly stated. This is particularly the case when it is used alongside other language implying such things as value to the explorer, future production of oil and revenue generation.     Of course, what is "commercially recoverable" always depends upon prevailing commodities prices.

(f)     I have reviewed Batista's representations according to the above definitions. In my view, a number of Batista's representations strongly implied that OGX's oil discoveries were both technologically recoverable and commercially recoverable.

(g)     OGX's exploration results data had been reviewed and reported on by independent, world-renowned technical specialists. The specialists had classified OGX's discoveries overwhelmingly as petroleum resources at the date of Batista's representations, indicating high uncertainty regarding the presence, technological recoverability, and commerciality of the hydrocarbons. There had been virtually no classification of commercially recoverable reserves by the independent specialists. There were also other indicators to the same effect.

(h)     For these reasons, my opinion is that a number of Batista's representations were false and grossly misleading insofar as they implied that OGX's so-called discoveries of oil were commercially recoverable or, indeed, "*recoverable*" at all.

(i)     OGX in fact produced only a small fraction of the oil which Batista had represented as "*recoverable*" oil before its failure as a business. From the evidence I have been provided with, Batista's representations, to the extent that they intended to convey that OGX's discoveries of oil were expected to be

5

commercially recoverable, had no reasonable basis in fact and so were grossly misleading to potential investors in OGX.

(j)     I found to be extraordinary OGX's dispute with its independent oil auditors. Batista's continued use of his representation that OGX had discovered 10.8 billion barrels of oil equivalent, despite the D&M admonition, is not consistent with the exercise of appropriate caution when discussing potential hydrocarbon recovery estimates. I believe this could be reasonably interpreted as an attempt to mislead the investing public. Moreover, Batista appears to have subsequently *"monetized"* this figure to have represented that OGX had discovered *"one trillion"* dollars' worth of oil. There was no reasonable basis for representations such as this, as I explain below.

16.     I reach the above conclusions notwithstanding that it is not unusual for oil explorers to make favorable projections as to their prospects. In my experience, such projections are invariably conservative, appropriately caveated and based on industry guidelines (referred to below). Moreover, in my experience, the oil recovery volumes eventually achieved by the explorer are typically consistent with the range of recoverable volumes initially projected[2]. Compared to the projections I have seen to date in my professional career, Batista's representations were orders of magnitude more hyperbolic, incautious, and lacking in objective basis.

Measurement and classification of oil deposits

17.     To be of assistance in considering the Applicants' application, and to give some context to my opinion, I explain below some generally accepted industry principles which apply to the measurement and classification of *"discoveries of oil"* by exploration ventures.

18.     Measuring and ascribing a value or potential value to oil deposits physically located underground is a technical process necessarily involving a degree of estimation. Unlike the inventory of a manufacturing company, for instance, which is easy to measure and value, a deposit of oil is physically located in reservoirs deep underground, either

---

[2] I have seen actual production volumes fall well below original announced estimates in cases where commodity prices fall well short of market expectations thus rendering production uneconomic; however this was not a significant factor during the time period I reviewed in this matter. Global oil prices did collapse in late 2014 (well after the OGX bankruptcy) following several years of steady to increasing prices.

6

onshore or offshore. It cannot be visually inspected or counted. So the volume of oil which will be ultimately recovered can only be estimated based on the evaluation of scientific data that provides evidence of the amount of oil present. Moreover, there can be no definitive measurement of recoverable oil in any particular reservoir until the end of that reservoir's producing life.

19.    The process of arriving at an estimation of recoverable volumes is generally performed by highly-skilled technical specialists applying their expertise, experience and judgment following generally accepted industry guidance. The above considerations apply equally to any hydrocarbon, including natural gas.

Classification & definitions

20.    Some of the words and phrases I refer to below have generally accepted meanings within my field which differ from or augment their ordinary or natural meanings. Overall the vast majority of those involved in the international oil industry use the language derived from or consistent with the Petroleum Resource Management System (the "**PRMS**") approved in March 2007 by the main petroleum bodies in the USA, including the SPE.

21.    A copy of the 2007 PRMS is exhibited at **BTW1/2-50**. The 2007 PRMS is the version that applied to reporting by exploration / production ventures of hydrocarbon resources for the period relevant to this case, namely between 2009 and 2013.

22.    I also exhibit a document produced by the SPE which provides a quick overview of PRMS draft to assist non-technical users (**BTW1/51-54**).

23.    The SPE Oil and Gas Reserves Committee produce Guidelines for the Application of the Petroleum Resources Management System, (the "**Guidelines**"). The Guidelines were updated in 2011, replacing the 2001 version. For the sake of brevity, I have not exhibited these Guidelines in my affidavit, as the 2011 Guidelines run to 221 pages.

24.    The specific terminology systems adopted in the PRMS constitutes a universal language which can be used for estimating and classifying quantities of oil and gas discovered in any given reservoir according to their likelihood of commercial recoverability. Clear terms and definitions that result in reliable and easily comparable estimations are essential for investors, regulators, governments and consumers to understand how the

7

petroleum industry assesses and quantifies the major driver of current and future value for exploration and production companies.

### "*Recoverable*" oil deposits

25.  Not every barrel of oil within a subsurface reservoir is recoverable using production methods commonly employed by the oil and gas industry; in fact, only a fraction is typically "*recoverable*". Further, not every barrel of oil in the ground identified as being recoverable by a particular exploration venture can be extracted at a cost which is less than the revenue which is anticipated from selling that barrel. In other words, a barrel of oil identified as existing in the ground might be technologically recoverable if able to be extracted using technology currently available to the explorer. However, to be commercially recoverable, that same oil deposit must be able to be extracted and sold in the market at a profit to the venture.

26.  Naturally, investors in particular are interested in the volume of oil a particular discovery which can be considered recoverable, not merely in the technological sense, but whether extraction of such is going to be economically viable as part of a specific profit-making project in which it is considering investing. Recognising this, the PRMS incorporates a central framework that categorizes oil deposits according to the level of certainty associated with their recoverable volumes, and classifies them according to their potential for reaching commercial producing status.

27.  By definition, all estimates involve a degree of uncertainty. Any estimate of the amount of oil which exists underground in commercially recoverable form is based on extrapolations from numerous data points which each have a range of uncertainty. Uncertainty is greatest during the initial exploration phase; additional data is gathered during the drilling, delineation, development, and production phases. Data gathered during each stage may reduce uncertainty. When carrying out their analysis, it is common practice that technical experts are guided by conservatism in response to this inherent uncertainty.

28.  When applying PRMS in this context, technical specialists must estimate the probability of whether a specific project by an exploration venture will achieve its objective of extracting a particular volume of oil and selling it for a profit. This analysis is based on

8

various parameters as at a given time, such as the abilities of available technology and global oil prices.

29.    The estimation of recoverable volumes may be arrived at by either "*deterministic*" or by "*probabilistic*" methods. In a deterministic approach, a recoverable volume is calculated using discrete engineering parameter values to arrive at a single answer. This method could be used, for example, to calculate a low, high, and best estimate of recovery using the corresponding low, high and best estimates for each input parameter. In a probabilistic approach, a probability distribution is input for each parameter into a calculation (such as a so-called "*Monte Carlo*" analysis) which results in a probabilistic distribution of outcomes. It appears that in most cases a probabilistic approach in its estimation of potential hydrocarbon volumes, described below, was used by OGX's independent technical specialists, DeGolyer & McNaughton.

## "*Reserves*" versus "*resources*"

30.    PRMS uses the terms "*reserves*" and "*resources*" to help distinguish between oil that is reasonably certain to be commercially recoverable and that which merely may exist within discovered or undiscovered reservoirs. The terms also reflect different recoverability parameters, in terms of technological recoverability and commerciality of recoverability. In essence:

    (a)    "*reserves*" are those quantities of petroleum anticipated to be commercially recoverable (**BTW1/47**); and

    (b)    "*resources*" encompasses all those quantities of petroleum discovered and undiscovered, recoverable and unrecoverable, and commercial and non-commercial (**BTW1/47**).

31.    PRMS expresses the probability that a given quantity of oil actually exists and can be commercially extracted by a sliding-scale of categories of reserves and resources, as follows:

    (a)    *Reserves*:

9

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(i) "*Proved reserves*" are those quantities of petroleum which can be estimated with reasonable certainty as being commercially recoverable, that is, of being able to be extracted by the exploration venture at a profit. If probabilistic methods are used, there should be at least a 90% probability that the quantities actually recovered will equal or exceed the estimate (**BTW1/31**);

(ii) "*Probable reserves*" are those quantities of petroleum which are less likely to be commercially recovered than proved reserves but more certain to be recovered than possible reserves (see below). If probabilistic methods are used, there should be at least a 50% probability that the quantities actually recovered will equal or exceed the proved plus probable (referred to as "*2P*") estimate (**BTW1/31**); and

(iii) "Possible reserves" are those quantities of petroleum that are less likely to be commercially recovered than probable reserves. If probabilistic methods are used, there should be at least a 10% probability that the quantities actually recovered will equal or exceed the proved plus probable plus possible (referred to as "*3P*") estimate (**BTW1/32**).

(b) *Resources*:

(i) *Contingent resources:* These are deposits that are potentially recoverable from known accumulations but not currently considered to be capable of being commercially recovered by the exploration venture due to one or more contingencies (**BTW1/28**).

(1) The "*low*" estimate is the most probable. This signifies a 90% chance that volumes actually recovered will meet or exceed the estimate (**BTW1/42**).

10

(2)     The "*best*" estimate is the median. This signifies a 50% chance that the volumes actually recovered will meet or exceed the estimate (**BTW1/34**).

(3)     The "*high*" estimate is the least probable and signifies only a 10% chance that the volumes actually recovered will meet or exceed the estimate (**BTW1/40**).

(ii)     *Prospective Resources:* Those quantities of petroleum that are estimated to be potentially recoverable from as yet undiscovered accumulations by application of future development projects by the exploration venture (**BTW1/46**). Again, prospective resources have sub-categories of 'low', 'best', and 'high', which reflect the probabilities set out above for contingent resources.

### DeGolyer & McNaughton's opinion / Dispute with Batista

32.     It is common for exploration ventures, particularly where they are seeking to raise funds from the capital markets, to have their exploration data independently considered by technical specialists at an engineering firm with a reputation in the industry for reserves estimation.

33.     In this case, OGX retained the world renowned oil consultant / auditors, DeGolyer & McNaughton ("**D&M**") which produced engineering reports on OGX's oil discoveries.

34.     I have been provided with several of D&M's reports as listed below. The first of which is exhibit to the affidavit of Mr. de Araujo, and the remainder are exhibited to this affidavit. I understand that these reports have been obtained from OGX's website. Presumably, D&M produced their reports originally in English. Some of the reports are also available on OGX's website in "*free translation*" Portuguese which I exhibit where available.

(a)     Report dated March 31, 2008 on the prospective resources attributable to certain prospects owned by OGX in various license blocks in Brazil (**TDA1/8/2224-2317**).

11

(b)    Report dated September 30, 2009 on the contingent resources attributable to certain properties owned by OGX in the Parnaíba Basin, Brazil (**BTW1/55-75**).

(c)    Report dated September 30, 2009, on the Prospective Resources attributable to Certain Prospects owned by OGX in various licensed blocks, Brazil (**BTW1/76-153**).

(d)    Report dated December 31, 2010 on the contingent resources attributable to certain properties owned by OGX in the Campos basin and Parnaíba Basin, Brazil (**BTW1/154-169**).

(e)    Report dated December 31, 2010 on the unconventional prospective resources attributable to certain prospects owned by OGX in various licensed blocks Parnaíba Basin, Brazil (**BTW1/170-196**).

(f)    Report dated December 31, 2010 on the prospective resources attributable to certain properties and leads owned by OGX in several licensed blocks, Brazil (**BTW1/197-222**).

(g)    Report dated March 31, 2011 on the prospective resources attributable to certain prospects and leads owned by OGX in various licensed blocks, Colombia (**BTW1/223-250**).

(h)    Report dated March 31, 2011 on the quantities of prospective oil attributable to many areas owned by OGX in Cesar-Rancheria Basin, Columbia (**BTW1/251-279**). This D&M report is available on OGX's website but only in Portuguese. I have been provided with a rough, free-translation into English produced by Google translate which I exhibit. Although of reasonably poor quality, I consider this translation adequate for my purposes in this affidavit.

(i)    Appraisal Report dated June 30, 2013, on Reserves of the Tubarão Martelo Field in the Campos Basin, Brazil owned by OGX (**BTW1/280-299**).

(j)    Appraisal Report dated July 31, 2014 on reserves of the Tubarão Martelo field in the Campos basin, Brazil owned by OGX (**BTW1/300-319**).

12

(Collectively, the "**D&M Reports**")[3]

### D&M Reports

35.    It is evident from the D&M Reports that D&M expressly adopted PRMS in their classification of OGX's oil discoveries – so D&M are speaking the common industry language identified above in their reports.

36.    The D&M Reports are the best evidence I have been provided with of the condition and status of OGX's petroleum resources during the material period.

37.    D&M state in their reports that they did not consider the accuracy or completeness of the underlying exploration data. D&M simply interpreted the data they were given by OGX. I have not seen the documents which evidence how OGX produced its underlying exploration data. Presumably, OGX would have provided its own internal estimates of recoverable volumes along with the underlying data.

### D&M's View of OGX's Drilling Data

38.    In summary, the D&M Reports articulate a clear opinion that the vast majority of OGX's discoveries to the date of each report had been classified as something less than "reserves"[4]. In other words, independent technical specialists had determined that the vast majority of OGX's discoveries could not be considered commercially recoverable at the date of each report, and that there was significant uncertainty as to the recoverable volumes that existed. In fact, the only classification of a small quantity of commercially recoverable oil came in D&M's June 30, 2013 report. A few months later in October 2013, OGX would collapse.

### 10.8 Billion Barrel Representation

---

[3] For the purposes of my affidavit, I have assumed these are the only reports produced by D&M in respect of OGX.
[4] In the other reports reviewed that were issued prior to June 30, 2013, D&M did not classify any volumes as reserves. The first report by D&M of a small quantity of 'reserves' came in their June 30, 2013 report in relation to the Tubarão Martelo field. According to D&M's report dated July 31, 2014 – after the collapse of OGX and relating to the restructured OGX entity post bankruptcy - this was estimated at less than 15 million barrels, a small fraction of the initial recovery estimates publicized by OGX.

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

39. On April 15, 2011, OGX made a press release which represented that D&M considered that OGX's discoveries to that date amounted to 10.8 billion barrel of oil equivalent of net potential resources (the "**10.8 Billion Barrel Representation**") (**TDA1/2/310**).

40. The technical definition of "*barrel of oil equivalents*", sometimes shortened to "*boe*", is a unit of energy based on the approximate energy released by burning one barrel of crude oil. Used in this industry context the phrase expresses as one figure all forms of hydrocarbons (that is, oil and gas) an exploration company expects to be recoverable. It is used as a comparable figure to measure differing forms of hydrocarbons.

41. In my view, if the 10.8 Billion Barrel Representation was intended to mean – as appears to have been Batista's intention - that OGX expected to commercially recover anywhere near 10.8 billion barrels from its discoveries, then such would have been grossly misleading. As set out above, the D&M Reports had concluded that OGX's discoveries amounted to almost entirely resources rather than reserves. I consider below specific instances of Batista's subsequent references to the 10.8 Billion Barrel Representation which, in my view, are misleading (see, for example, paragraphs 76(d), 77 and 79 below).

## Dispute between D&M and OGX

42. Before turning to review Batista's representations themselves, it is instructive to review a dispute which arose between OGX and D&M which arose in 2011 following the 10.8 Billion Barrel representation.

43. I have been provided by the Applicants with correspondence between OGX and D&M, in which D&M strenuously objected to the 10.8 Billion Barrel Representation as being misleading, first privately and much later, publicly. I understand from the Applicants that this correspondence was obtained from the book entitled "*Tudo Ou Nada*" authored by Malu Gaspar, published in 15 November 2014.

44. On July 22, 2013, D&M wrote to Batista as Chairman of OGX (the "**2013 letter**") summarizing interactions between the two firms following the first public reference to the 10.8 Billion Barrel Representation in April 2011 as follows (**BTW1/320-323**).

14

(a)     On or around April 15, 2011, upon hearing the 10.8 Billion Barrel
        Representation, D&M "*promptly notified OGX in a telephone call*" of the
        inaccuracies of the 10.8 Billion Barrel Representation and that "*the
        presentation of the aggregated volumes was misleading*" and requested a
        corrective press release.

(b)     On April 29, 2011, D&M followed up in a letter to OGX again demanding that
        it correct its public statements. This letter is exhibited separately at
        **BTW1/324-325**. D&M stated that their name was being used to mislead
        investors. To be clear, I do not understand D&M to be alleging that the
        statement on April 15, 2011 had necessarily implied commerciality (although
        D&M's concern as to the investors being misled is apparent). D&M took issue
        with the addition of categories of 'resources' which have differing probabilistic
        characteristics. In particular, D&M stated that the 10.8 Billion Barrel
        Representation was the result of inappropriate addition of three categories of
        highly uncertain estimates as to "*undiscovered resources*" or "*prospective
        resources*" that should not have been aggregated because they are
        fundamentally different. Accordingly, D&M demanded that OGX correct its
        public statements, and stated:

        "*DeGolyer and MacNaughton recently became aware that Petróleo e Gás
        Participações SA issued a press release on April 15, 2011 in which OGX
        aggregated as 'potential resources' D&M's estimates of (i) contingent
        resources, (ii) two estimates of prospective resources and (iii) potential
        petroleum quantities. . .OGX's totaling of these three very different categories
        is of great concern to D&M. Such three categories are not comparable, involve
        completely different risk parameters and are not susceptible to simple addition.
        Accordingly, OGX's dissemination of a combined total can be very misleading.
        Moreover the use of a combined total for such categories is not in accordance
        with generally accepted petroleum engineering practices and is inconsistent
        with the procedures of the Petroleum Resource Management System. D&M is
        very concerned that, while the press release did not expressly indicate that
        D&M added the categories together, such press release clearly attributed the
        underlying estimates to D&M and many readers would naturally assume that
        D&M itself combined such categories*".

(c)     On May 3, 2011, OGX responded that:

        (i)     OGX would "*issue the 'First Quarter - 2011 Release' this Friday and,
                in order to clarify any potential confusion of misinterpretation, we will*

15

> expressly state that 'the criteria established for the different volume
> categories compilation is an assumption made by the Company and
> not by D&M'"; and

    (ii)    OGX had "already filed with the CVM [which is Brazil's equivalent of
the SEC] its updated Reference Form (equivalent to SEC's 20-F)
expressly indicating that the 10.8 billion boe figure is an estimation
carried out by OGX" (**BTW1/326-327**).

(d)    On May 16, 2011, D&M met with Batista personally (along with other officers
of OGX, including Paulo Mendonça) to discuss "D&M's concerns about the
overly optimistic OGX press release and their potential dangers"
(**BTW1/321**). During that meeting, Batista is stated to have apologised for
comments in the press on April 18, 2011 as to D&M being "overly
conservative" in its report dated December 31, 2010. The July 2013 letter
states that "Mr. Batista stated that OGX stock is more liquid than most South
American currencies and it was OGX's responsibility to be careful with all
press releases. Mr. Batista assured D&M that OGX was responsible for
managing expectations with the press and shareholders. As a result of all
discussions and correspondence, OGX assured D&M that they would be more
cautious and more responsible in providing information to the press"
(**BTW1/321**)

(e)    Notwithstanding the above acknowledgements and apologies, Batista
continued publicly to refer to the 10.8 Billion Barrel figure, as referred to
below at paragraphs 77 and 79 below.

(f)    In July 2013, over two years later, D&M were prompted to write to Batista
again due to becoming aware of him being quoted in the press (including the
Financial Times, Bloomberg Businessweek, Fox Business, and the San
Francisco Chronicle) as referring to the 10.8 Billion Barrel Representation.
D&M's July 2013 letter stated: "I want to reiterate that D&M categorically
denies that we ever issued a report that estimated OGX's resources at 10.8
billion BOE. This number was an inappropriate amalgamation of numbers that
had no relationship with each other and was solely created by OGX. This was

16

*done apparently wilfully despite language in our reports that specifically states that these resources estimates and potential qualities should never be used in this manner. These July 19, 2013 quotes by Mr. Batista have the potential to damage the reputation, integrity and existing and prospective business relationships of D&M and we insist that OGX amend his statements to reflect the truth"* (**BTW1/323**). The July 2013 letter prompted OGX to communicate with the press to clarify that the 10.8 billion figure was attributable to *"OGX's manipulation of the estimates provided by D&M"*.

(g)     The July 2013 letter continued *"...The OGX aggregation of Contingent Resources, Prospective Resources, and Potential Petroleum Quantities was an arithmetic summation of the following*

*1. Contingent Resources (estimates of discovered resources) - 3.1 billion BOE.*

*The D&M Contingent Resources used in the OGX aggregated quantity were based on the D&M high estimate of Contingent Resources (3C), having a 10 percent probability that this quantity, if developed and if economical, may potentially be recovered. It is specifically stated in the D&M report entitled 'Report as of December 31, 2010 on the Contingent Resources attributable to Certain Properties owned by OGX ... in the Campos and Parnaíba Basins in the Federative Republic of Brazil Executive Summary,' that contingent resources estimates in the report are provided as a means of comparison to other contingent resources and do not provide a means of direct comparison to reserves. It also states, there is no certainty that it will be commercially viable to produce any portion of the resources evaluated*

*2. Prospective Resources (estimates of undiscovered resources) - 6.7 billion BOE.*

*The OGX aggregated quantity was based on an amalgamation of three different types of estimates from the D&M estimates for Prospective Resources. The three different types that were amalgamated are: I) net 'mean' estimates adjusted for the probability of geologic success (Pg) (Campos Exploration, Santos, Espírito Santo, and Pará-Maranhão), 2) net 'mean' estimates not Pg*

17

*adjusted (Paranaiba and Colombia), and 3) net 'high' estimates not Pg adjusted (Campos Delineation). It is mathematically incorrect to add these three different types of estimates together much less to any contingent resources or potential petroleum quantities. It is clearly stated in the D&M reports containing prospective resources estimates that the prospective resources quantities estimates should not be confused with those quantities that are associated with contingent resources or reserves due to additional risks involved. It also is clearly stated that there is no certainty that any portion of the prospective resources estimated in the reports will be discovered. If discovered, there is no certainty that it will be commercially viable to produce any portion of the prospective resources evaluated.*

*3. Potential Petroleum Quantities (estimates of undiscovered potential volumes) - 1.0 billion BOE*

*These quantities are based upon a stochastic basin study and have not reached the level of project maturity as the prospective resources evaluated by D&M and were never classified as resources. It is specifically stated in the D&M report entitled 'Report as of March 31, 2011 on the Potential Petroleum Quantities attributable to Various Areas owned by OGX...' that the potential petroleum quantities estimates in the D&M report are not provided as a means of comparison to prospective resources, contingent resources or reserves"* **(BTW1/322-323).**

45.     The above provides a convenient summary of D&M's overall professional and independent opinion of the classification of OGX's oil discoveries, based on OGX's own data, which summarizes Batista's figure of 10.8 billion barrels as comprising (paraphrasing the above quote):

(a)     3.1 billion barrels represented a D&M high estimate of **contingent resources**. Namely, the lowest probability as to amounts of oil that were only potentially technologically recoverable and not necessarily considered to be commercially extractable in any amount. According to the D&M study, the actual volume of recoverable oil had a 90% chance of being less than this estimate (if there could be any commercial recovery at all).

18

(b)     6.8 billion barrels resulted from the addition together of three categories of estimates as to as yet undiscovered **prospective resources**. The D&M Report made it clear that there was no certainty that **any** of this 6.8 billion barrels would even be discovered or, if it were, that it would be technologically or commercially viable to recover a single barrel.

(c)     1 billion barrels which were insufficiently certain to even be classified as undiscovered prospective resources. In other words, this was a very preliminary presentation of the volumes that could possibly result from a future evaluation following the acquisition of additional data. It was highly inappropriate for Batista or anyone to aggregate these volumes as resources.

46.     On August 8, 2013, OGX made the clarification below regarding a recent statement made by Batista in an article published in the Brazilian press, which said that he had been informed of the certification of the 10.8 Billion Barrel Representation by an independent consulting firm:

*"(ii) Independent Consulting Firms provide an estimate for each resource category (potential, prospective and contingent). OGX's former General and Exploration Officer in 2011 used the sum of these categories as an illustration and this resulted in the amount of 10.8 bn boe.*

*(iii) The statement recently made by Mr. Eike Batista in the Brazilian press, which refers to the 10.8 bn boe amount, was based exclusively on the information that he had received from the referred General and Exploration Officer, not on any specific certification report made by any of the contracted Independent consulting firms"* **(BTW1/328).**

47.     The dispute between OGX and D&M set out above is extraordinary. I have never encountered a disagreement between an exploration venture and its independent technical specialists of this nature in my practice to date. D&M plainly viewed the 10.8 Billion Barrel Representation as misleading to investors because the figure was made up of potential recovery volumes that are not amenable to simple addition given their differing probabilistic characteristics, which was clear in D&M's Reports. As I conclude below, a numerous of Batista's representations strongly implied that OGX's discoveries were commercially recoverable. It appears likely to me that this concern was also underpinning D&M's approach to the D&M Dispute. Their specialists had concluded that the vast majority of OGX's evaluated resources could not be expected to be

19

commercial given the data received to date. The world-renowned expert consultants were very clear as to the risk of misleading investors even by adding together categories of volumes less than reserves. Batista's continued referencing of the 10.8 Billion Barrel Representation, despite the D&M admonition, is not consistent with the exercise of appropriate caution when discussing potential hydrocarbon recovery estimates and, therefore, I believe could reasonably be interpreted as an attempt to mislead the investing public.

## BATISTA'S REPRESENTATIONS

48.     I have read the representations attributed to Batista during the years 2009 to 2013 set out at paragraphs 100 to 242 of the affidavit of Mr. de Araujo and in the Indictment (adopting the definition used in the affidavit of Mr. de Araujo, the **"Recoverable Oil Representations"**).

49.     Below I compare and contrast D&M's view set out above with the Recoverable Oil Representations.

### *"Technologically recoverable"* oil volumes

50.     As for the meaning that should be given to the Recoverable Oil Representations, OGX's new discoveries of oil were typically described in terms of expected *"recoverable"* oil volumes, or words of equivalent effect. This was particularly so in OGX's Statements of Material Fact.

51.     As noted above at paragraphs 25 to 29, the term *"recoverable"* in this industry context means, at a minimum, that the reported oil volume is the company's best technical estimate of existing oil in the ground which is capable of extraction with the technology available to the operator. D&M's reports classified OGX's deposits overwhelming as contingent or prospective resources, both of which classifications imply considerable uncertainty as to the likelihood of recovery. In other words, according to their own independent oil auditors, OGX's discoveries almost entirely fell considerably short of classification as *"reserves"*. They were almost entirely classified as no more than *"resources"* the technological, much less commercial, recoverability of which was highly uncertain.

20

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

52. From the evidence I have been provided with the Recoverable Oil Representations, insofar as they represented a reasonable expectation of the volumes to be recovered from OGX's discoveries, had no reasonable basis in fact and so were false and misleading. As an important related point, I have seen Statements of Material Fact issued by OGX which announce to investors that OGX's explorations have found "...*the presence of hydrocarbons...*", or words to similar effect. I refer to **TDA1/1/271**. The mere presence of hydrocarbons is wholly inconclusive as to the nature or scope of the purported discovery. The fact that exploration efforts have confirmed the presence of hydrocarbons without more relevant detail as to that specific discovery provides little if any meaningful information to users. From a technical PRMS perspective, the mere presence of hydrocarbons is insufficient basis to classify the discovery in terms of risk and recoverability. For this reason, I consider it an immaterial piece of information for investor purposes. I am surprised therefore that Batista considered it necessary to communicate such information to investors at all, or why it was considered a "*material fact*" to form the basis of a formal Statement of Material Fact. This is particularly the case given the high level of caution and prudence typically required in our industry as to the release of information in a way that might mislead.

### "*Commercially recoverable*" oil volumes

53. The D&M reports classified the vast majority of OGX's oil discoveries as "*resources*" not "*reserves*". According to the PRMS, only "*reserves*" can be associated with commercial recovery.

54. In particular, OGX had a small quantity of "*proved reserves*" classified, according to D&M's report dated July 31, 2014, but these were estimated at approximately 15 million barrels, a very small fraction of the billions of barrels of oil represented by Batista, and by this time OGX had collapsed (in October 2013) and been through a bankruptcy restructuring procedure (see **BTW1/300-319 at 314**).

### OGX's actual production

55. OGX first reported actual production took place in January 2012. OGX's reporting of actual oil production to the Brazilian petroleum authorities is summarized in a table exhibited at **TDA1/1/97-98**, and referred to at paragraphs 246 to 247 of the affidavit of

21

Mr. de Araujo. I cannot comment on the accuracy of the figures reported by OGX's management, which I summarize below:

(a)     In 2012, OGX reported annual production of approximately 3.2 million barrels. Daily production ranged between 6,761 to 11,037 barrels.

(b)     In 2013, OGX reported annual production of approximately 1.9 million barrels. Daily production during the period January to July, and December 2013 ranged between 861 to 12,733 barrels. There is no data available for August to November 2013 which presumably is related to the collapse of the OGX group in October 2013.

(c)     In 2014, the restructured OGX entity reported annual production of approximately 5.7 million barrels; and

(d)     In 2015, the restructured OGX entity reported annual production of approximately 4.9 million barrels.

56.     The above annual production figures starkly fall short of the up to 1.4 million barrels of daily production which Batista had represented in 2010 and 2011:

(a)     On January 26, 2010, OGX released a Statement of Material Fact which stated: *"OGX sets production target of 1.4 million Barrels per day by 2019 – initial production expected to begin in early 2011"*, which would equate to annual production of over half a billion barrels (**TDA1/1/262-263**); and

(b)     On March 11, 2011, Bloomberg referred to an interview with Batista and reported that *"OGX plans first crude output at its Waimea field in the third quarter. The company aims to produce 20,000 barrels a day by year-end* [that is, 2011], *total output of 730,000 barrels a day by 2015 and 1.38 million by 2019"* (**TDA1/2/305**).

## Task Force Report

57.     Furthermore, as referred to in paragraph 174 to 182 of Mr. de Araujo's affidavit, I am aware that in 2012 an internal OGX task force working together with the oil consultancy firm, Schlumberger, produced a pessimistic report (the "**Task Force Report**") to OGX's

22

Executive Directorate. For the avoidance of any doubt, I have not seen the Task Force Report and rely upon what is said about it in Mr. de Araujo's affidavit and the Indictment (which is exhibited at **MLO1/2/353-526**). The Task Force Report is said to have reported that:

(a) OGX's Tubarão Tigre, Tubarão Gato and Tubarão Areia formations (the "**Tubarão Fields**") contained high concentrations of $H_2S$ - a highly toxic gas, discussed below;

(b) Since 2011 surveys of the Tubarão Fields were evidencing volumes and partitioning very different from initial indications; and

(c) The oil recovery in the Tubarão Fields was estimated to be less than 10% to 20% of the original oil in place. The Indictment states that OGX could only expect to recover between 49.4 and 77.8 million barrels of oil compared to 1.4 billion barrels of oil from the relevant formations as announced in the Statement of Material Fact dated January 26, 2010 (**TDA1/1/262-263**).

58. To explain the Task Force Report's findings at paragraph 57(a) above, the presence of H2S gas typically increases regulatory, environmental and safety requirements, and significantly complicates the oil extraction process and therefore increases the costs thereof. In my view, the presence of "*high concentrations*" of this gas would have reduced the technological recoverability of oil deposits, and significantly reduced the prospect of significant commercial oil recovery from these particular fields.

59. As to paragraph 57(b) above, partitioning describes limits on the ability of fluids to flow throughout the reservoir. For example, a reservoir may have internal features that act as flow barriers, preventing a well drilled in one area from draining reserves in another area of the reservoir. The drainage area of each well is a significant factor in the cumulative hydrocarbon recovery from the well, and therefore the profitability of the well.

60. On March 26, 2013, notwithstanding the Task Force Report, OGX released its financial statements for the year ended 2012 promoting the Tubarão Fields as having been deemed "*commercial*", see paragraph 82(c) below (**TDA1/6/1700**).

23

61. On July 1, 2013, less than a month after OGX's last analyst presentation touted its assets in the Campos Basin, OGX shocked the markets announcing that (**TDA1/3/797-799**):

    (a) there was no technology currently available to increase production in the Tubarão Azul field and that production would likely halt by January of 2014 (**TDA1/3/797**);

    (b) a mere three and a half months after OGX had declared three fields in the Waimea Basin commercial with up to 1.3 billion boe of recoverable oil, OGX announced that no technology currently existed that would allow the development of those fields (**TDA1/3/797**). The exploratory concessions were being returned to the Brazilian government;

    (c) OGX cancelled orders of two FPSOs and three wellheads from OSX (**TDA1/3/797**); and

    (d) OGX would make an immediate cash payment of USD449 million to OSX in connection with the restructuring of its contracts (**TDA1/3/798**).

    (e) "...*The projections previously disclosed, including the ones referring to OGX's production goals, should no longer be considered valid and should be disregarded*" (**TDA1/3/798**);

In other words, with this announcement, OGX represented to investors, at least with respect to the Tubarão Azul fields, the Recoverable Oil Representations should be disregarded. As a natural consequence, the various infrastructure orders which OGX had placed with OSX in reliance on the expected recoverable oil volumes had to be cancelled.

62. As mentioned above, D&M had access to OGX's underlying exploration data and were retained in an independent role to essentially audit OGX's oil discoveries. In light of their classifications, and leaving aside the very small reserve finding classified in mid-2013 referred to above, from the evidence that I have seen Batista had no reasonable basis for representing that OGX's oil discoveries were commercially recoverable.

**Representations implying commerciality**

24

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

63.     Beyond what I state above, based upon a review of the evidence I have seen, in my view
        a number of Batista's Recoverable Oil Representations implied OGX's oil discoveries
        were commercially recoverable, indeed in vast amounts of very significant value.
        Batista's usage of certain wording implied commerciality and I believe that is the
        meaning that would have been inferred by his intended audience, being investors in the
        global capital markets.

64.     The natural inference is that the Recoverable Oil Representations were made with the
        intention of misleading investors and to provide an inaccurate indication of the value of
        OGX and its discoveries. I consider the Recoverable Oil Representations to be
        misleading and false, insofar as they imply commerciality, at the point at which each
        was made. I have seen no evidential basis from which Mr. Batista could have based an
        honest belief in the validity of such representations.

65.     My conclusions in this respect are supported by the reported production figures from
        these reservoirs both before and after the collapse of the OGX group, referred to at
        paragraph 55 above.

66.     I set out below some examples of the misleading wording by which Batista
        inappropriately implies commerciality in one sense or another:

        (a)     The word "*commercial*" or similar. There is no support for this in the D&M
                Reports. Only 'reserves' would have justified usage of any language which
                implied commerciality.

        (b)     Words implying a "*value*" to OGX as a going concern, or describing its oil
                discoveries as "*assets*". I find reasonable the conclusion of Mr. de Araujo at
                paragraph 112 of his affidavit as to the appropriateness of Batista's usage of the
                word "*asset*" in contrast to the audited financial statements which are properly
                caveated.

        (c)     Other qualitative adjectives, such as "*world-class*" and "*quality*".

        (d)     The word "*production*" or variants thereof, including reference to:

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-
1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-
at-law.

(i)      The logistics and anticipated costs / revenues of production which imply OGX had determined a feasible and commercial cost/benefit plan for a specific extraction project to commence production.

(ii)      The scale of anticipated production, including the production figures in barrels per day, the acquisition of equipment and capital infrastructure, such as ships, platforms and port facilities required to produce oil.

67.      In addition to the positive Recoverable Oil Representations, examples of which I refer to below, in my view Batista also misrepresented by omission. In particular, he omitted to tell the truth to investors and to timely represent that he had seen no evidence that the oil discoveries made to date had a significant chance of ultimate classification as commercial reserves. Further, I have seen no evidence in multiple instances that OGX timely represented to investors significant downward revisions in their estimates of recovery potential from oil discoveries.

**Examples of Misleading Representations**

68.      I set out below some examples of the Recoverable Oil Representations quoted in Mr. de Araujo's affidavit to demonstrate the usage of the above words and the consequential misleading effect. The documents containing the representations below were provided to me in the form in which they are exhibited in **TDA1**. I have assumed that where translations have been provided, that those translations are accurate.

69.      On January 26, 2010, OGX released a Statement of Material Fact and represented that: *"OGX Signs Agreements with OSX to Secure Production Equipment – OGX Sets Production Target of 1.4 Million Barrels per Day by 2019 – Initial Production Expected to Begin in Early 2011, Ahead of Schedule"* (**TDA1/1/262-264 at 262**). In the body of the Statement, Batista was quoted as stating: *"Our drilling results have revealed a new oil province in the southern part of the Campos basin and broken paradigms regarding the quality and potential of the reservoirs in this area. At this moment, OGX is entering into a new phase in its history, with a focus on reaching our production target of 1.4 million barrels per day by 2019. We have an unparalleled 10 year growth story, based on world-class assets of extraordinary quality"* (**TDA1/1/262-264 at 262**).

26

(a)     Batista's use of the word "*production*" in the context of securing equipment to enable production, significant production targets, and expected commencement dates of production together imply that Batista considered OGX's deposits to be commercially recoverable such that would justify OGX formulating a project to extract the oil at a profitable rate. However, at the time that OGX entered into these agreements with OSX, it would appear that neither Batista nor OGX had a sound basis to expect large-scale commercial oil recovery.

(b)     Batista's use of qualitative adjectives to describe OGX's oil deposits such as "*quality... of the reservoirs*" and "*world-class assets of extraordinary quality*" is inappropriate given their classification by D&M as at best contingent resources.

(c)     I also refer to paragraph 112 of the affidavit of Mr. de Araujo as to the inappropriateness of the use of the word "*asset*".

70.     On February 3, 2010, OGX released a Statement of Material Fact and represented "*OGX concludes the Cased Hole Drillstem Test of the OGX-3 well [Waimea field] which indicates a production potential of 3,000 barrels per day at a vertical well in the Albian section --recoverable oil volume expected to be between 500 and 900 million barrels*" (**TDA1/1/266-267 at 266**) This discovery was said to be extractable at a rate of approximately 15,000 barrels per day by horizontal drilling (**TDA1/1/266-267 at 266**).

(a)     The figure of 15,000 of extractable barrels of oil per day implies commerciality and gross revenue of USD36 million per month (at $80 per barrel). Investors could reasonably infer from this statement that there were legitimate grounds for the author to believe this would be a commercial venture.

71.     On April 14, 2010, Batista claimed (amongst other things), during an interview which was broadcast on XPTV[5], a video channel maintained by the XP brokerage firm, that OGX had discovered "*a new oil province in Brazil*", and that OGX had "*the best exploratory blocks in the world*". During the interview, Batista also made the following statements: (i) "*OGX has, today, one trillion dollars' worth of oil in shallow water, which has an extraction cost of eight dollars*"; (ii) "*We are preparing to sell a small*

---

[5] See https://www.youtube.com/watch?v=6e_hauUsdH4. Last accessed on 26 September 2016.

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

stake, 20 percent, to make a mega monetization for our investors"; and (iii) "*Today, this could be monetized for a value of up to 100 billion dollars. Just in the Campos Basin. That is more than three times the [current] valuation of the company*". From the evidence I have seen, there is no reasonable basis for Batista's reference to OGX having "*the best exploratory blocks in the world*". This was a qualitative judgment that was not supported by the conclusions in D&M's Reports.

(a)     The representation that OGX's discoveries amounted to "*one trillion dollars' worth*" of oil I find to be an extraordinary statement for the CEO of a listed entity to have made. It was plainly unsupported on the data provided to D&M by OGX or by the D&M Reports which were based on that data. The mean crude oil price for the month of April 2010 was approximately USD85 per barrel. This representation therefore implied that at least 10 billion barrels of recoverable oil had been discovered *in situ*. D&M's findings do not support the certainty of anywhere near this quantity of oil being technologically recoverable. Moreover, in practical terms, a barrel of oil can only be said to have a value in monetary terms if it can be extracted and sold commercially. D&M had not seen fit to classify more than a small fraction of OGX's deposits as commercially recoverable. In fact, a majority of the 10.8 billion barrel figure put forward by OGX was comprised of potential resources from undrilled exploration targets as opposed to actual discoveries.

72.     On March 15, 2011, Bloomberg reported that OGX was worth USD37.1 billion (see **TDA1/2/304-309 at 304**), and OGX as having claimed a hundred percent success rate in the Campos basin, where it planned to drill three additional wells, and that higher-than-expected production would allow it to use fewer wells per production platform, thereby further cutting production costs. Batista describes the assets as "*extremely high productivity*" (**TDA1/2/304-309 at 305**). Batista claimed OGX would be a profitable company at oil prices as low as \$22 per barrel. In Waimea field, OGX described test results from a recently drilled well as similar to that of "*the best wells in the country*". OGX anticipated that production would increase from 20,000 barrels a day to 730,000 barrels a day by 2015, and 1.38 million barrels by 2018. "*It's a bonanza*", Batista said, "*these are bonanza assets*" (**TDA1/2/304-309 at 305**).

28

(a)     "*Bonanza*" is a qualitative word with its origins in the mining industry, and means according to the Oxford dictionary: "*A situation which creates a sudden increase in wealth, good fortune, or profits*". In circumstances where commerciality had yet to be demonstrated, the use of this word was very misleading in my view.

(b)     I repeat previous observations in the affidavit of Mr. de Araujo as to the usage of the word "*asset*".

(c)     The statement above are substantively misleading in a number of additional respects:

     (i)     The reference to OGX as a going concern having a valuation of \$37.1 billion may have been based on market capitalisation, for instance. To the extent Batista was referring to the net tangible assets of OGX, in light of D&M's classification of OGX's oil deposits as merely resources, this is grossly overstated.

     (ii)     The reference to OGX having had a 100% success rate is misleading based on a commercial definition of success rate, particularly where the vast majority of the wells drilled were ultimately incapable of commercial petroleum production.

     (iii)     The references to higher than anticipated, and very large production figures, and comparisons to the best wells in the country are misleading in suggesting commerciality had been established, as described above.

     (iv)     The reference to "*further cutting production costs*" implies commerciality had already been established after a favorable cost/benefit analysis.

     (v)     The claim of profitability at \$22 per barrel oil is not consistent with the findings of the auditors. In the D&M Reports only the Tubarão Martelo field was determined to contain proved reserves, and the profit margin calculated by D&M was approximately two percent at an

29

assumed oil sales price of $103 per barrel (D&M report as of July 31, 2014) (see **TDA1/2/304-309** at **305**).

73.    On April 15, 2011, Batista repeated the 10.8 Billion Barrels Representation in a report published by OGX's investor relations team. Batista was quoted as saying: "*These results, presented by an independent, internationally-renowned consulting group, confirm the extraordinary success of our business strategy and execution, which has been to focus on world-class assets located mostly in shallow waters*" (**TDA1/2/345-349** at **324**).

   (a)    I have already addressed above the misleading nature of the phrases "*success*" and "*world-class assets*".

   (b)    The reference to oil deposits being "*located in mostly shallow waters*" might have been true but arguably the implication is one of commerciality due to this being relevant to the calculation of development and production costs as compared with deep water deposits.

74.    Also on April 15, 2011, OGX published a news item on its website titled "*OGX Upgrades its Portfolio of Potential Resources from 6.8 to 10.8 Billion Boe*" (**TDA1/2/310-311** at **310**). The language included:

"*[OGX]...today disclosed the results of the reports prepared by petroleum consultants DeGolyer & MacNaughton ('D&M')... these new results present a total volume of net potential resources of 10.8 billion boe...*

*These results, presented by an independent, internationally-renowned consulting group, confirm the extraordinary success of our business strategy and execution, which has been to focus on world-class assets located mostly in shallow waters. We have discovered accumulations of scale and levels of productivity comparable to those found in the pre-salt areas, and will be able to develop them at a much lower cost, utilizing fully tried-and-tested technologies*" (emphases added).

Given the absence of a determination by D&M that the recovery potential of a vast majority of OGX's discoveries was highly uncertain, the language highlighted in the above extract is misleading. The term "*Pre-salt*" refers to the geological formation on the continental shelf, specifically the layers which were laid down before a salt layer accumulated above them millions of years ago. The pre-salt areas in Brazil's continental shelf were well known to be more productive in terms of oil exploration.

30

75. On April 28, 2011, Brazilian website Exame.com published an interview with Mendonça and Reinaldo Belotti, OGX's director of production and development (see **TDA1/2/357-369**). In the interview, Belotti stated that OGX had 10.8 billion barrels of oil in various categories of reserves with the better part of those reserves being in the best possible category (**TDA1/2/359**). The term "*reserves*" has a very specific, technical meaning which is hugely significant to those in the industry. It would be wholly inappropriate and incautious to use the word without the appropriate level of care. As set out above, there is plainly no support in the D&M Reports for there being "*reserves*" of a figure anywhere near the figures quoted above.

76. On May 4, 2011, at the Michael Milken conference in California, Batista stated that he was going to be richer than Carlos Slim, Warren Buffett, and Bill Gates, he told CNBC, because "*I have created five companies that have in them embedded resources worth US$2 trillion at a very low cost of producing*". He went on to call them "*idiot-proof assets*" and stated that "*the underlying assets that we have discovered - we have $2.3trillion - I haven't finished drilling yet*"[6].

    (a)    I refer to paragraph 66(b) above as to the inappropriateness of Batista representing that OGX owned 'assets' to which a particular value could be ascribed.

    (b)    As to the phrase "*very low costs of producing*", in the circumstances above where it is doubtful there was a reasonable basis to believe OGX's discoveries had a significant likelihood of being technologically recoverable, much less commercially recoverable, I consider it misleading to represent that any oil which might have been discovered had a very low cost of producing.

    (c)    There would seem to be no justification for the reference to a particular valuation of OGX's resources. As stated at paragraph 72(c)(i) above, a valuation implies that the quantity in question is commercially recoverable and therefore of value to OGX. D&M did not ascribe any value to a vast majority of the oil and gas volumes evaluated; the value determined for proved reserves

---

[6] This interview may be accessed via this link: https://www.youtube.com/watch?v=qFkSizHtxB0. It was last accessed on September 21, 2016.

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

was many orders of magnitude smaller than this figure, as would prove to be the case from subsequent reported production figures.

(d) The reference to a specific figure for the valuation of OGX's resources, being USD2 trillion and/or USD2.3 trillion, I find to be extraordinarily imprudent and misleading where this figure implies the 10.8 billion barrel figure had been determined to be commercially recoverable.

77. On August 18, 2011, OGX released a Management Presentation which presented a positive picture of OGX's financial prospects (**TDA1/2/372-420**). It claimed OGX benefited from "*10.8 billion potential recoverable barrels of oil*" (**TDA1/2/383**) and stated that it benefitted from:

(a) "*World-class [Exploration & Production] portfolio with multi-billion barrels of discoveries mostly in shallow waters and onshore*";

(b) "*All key equipment already secured from leading worldwide suppliers for exploration and initial production*";

(c) "*Solid cash position to support exploratory commitment and beginning of production*"; and

(d) "*Experienced management team with proved execution capability*" (**TDA1/376**).

The references in (a) and (b) above, in particular, imply that production on the scale anticipated in the above quote was expected to take place in the near future which would only have been the case if there was a reasonable basis to believe that the oil deposits were or would soon become commercially recoverable. From the evidence which I have seen there was no reasonable basis for this statement to be made at the time it was made.

78. On September 23, 2011, in an article published by Reuters U.S. Edition, under the headline "*Cashed-up Eike Batista won't sell oil stakes*", Reuters reported that Batista said he had abandoned talks to sell stakes in his offshore oil prospects because he did not need the proceeds of any sale (**TDA1/2/421-423**). When asked about a decline in OGX share prices, he responded: "*I have to laugh. My companies are all going to be massive*

32

cash flow machines. I'm going to pump money to my shareholders and dividends to my sons and my grandsons" (**TDA1/2/421**). The reference to Batista's companies going to be "massive cash flow machines... I'm going to pump money... and dividends" plainly presupposes OGX's oil discoveries were commercially recoverable which had not been determined to be the case.

79.    On January 20, 2012, Batista gave an interview with The New York Times, which commented on Batista's markers of apparent success (i.e. his offices, his USD61 million Gulfstream jet, his charitable giving, half a million plus Twitter followers), and stated that OGX was "expected to begin producing crude from an estimated 10 billion barrels of offshore discoveries" (**TDA1/2/432-435 at 433**). This representation, if indeed made to The New York Times by Batista, implied production was expected and suggests that OGX had discovered reservoirs capable of producing 10 billion barrels. From this representation it could reasonably be inferred that OGX had commercially recoverable reserves of 10.8 billion or, in other words, that the 10.8 Billion Barrel Representation was referring to "reserves" as opposed to mere resources. From the evidence which I have seen there was no reasonable basis for this statement to be made and in my view it is grossly misleading in light of the D&M reports I have reviewed.

80.    On July 19, 2012, the Financial Times published an article called "It is too soon to write off Eike Batista" in which it quoted Batista's representation at an OGX shareholder meeting that his companies were "80 per cent ebitda - margin businesses... I search for the truffles" (**TDA1/2/517-518 at 518**). The gist of this representation is that Batista's companies are high gross margin businesses, in other words that they benefit from low costs of production. The reference to "truffles" implies that OGX had discovered reservoirs that could be produced at a higher profit margin than typical for the industry. In circumstances where D&M had classified the vast majority of OGX's oil deposits as resources for which commerciality was not established, from the evidence that I have seen there was no reasonable basis to represent OGX was going to be turning over any significant sales, much less earning a particular margin based on low costs of production. In fact, when D&M conducted an economic valuation on OGX's proved reserves at Tubarão Martelo field in 2014, the profit margin was determined to be only 2% assuming oil could be sold for $103 per barrel, as stated above.

33

81. On August 29, 2012, Batista tweeted that he proposed building a port at Açu which would be one-and-a-half times bigger than Manhattan Island, New York (**TDA1/2/440-516 at 487**);

    (a) Based on the expectation that this port would service OGX development and production activities, investment in infrastructure of this massive scale is typically only justified by large-scale commercial oil and gas production.

    (b) In the absence of any reasonable basis to have believed in the commerciality of OGX's discoveries, which I have not seen in the evidence provided to me, Batista's representation was misleading to investors.

82. During early 2013, Batista and OGX in numerous instances emphasized the commerciality of their operations. For example:

    (a) On March 13, 2013, OGX released another Statement of Material Fact to investors declaring that oil recovery from the Pipeline, Fuji and Ilimani formations was commercially feasible (**TDA1/3/733-734**).

    (b) On March 22, 2013, Batista tweeted that OGX had eight "*acknowledged oil commercial accumulations*": three onshore, in Maranhao, and five offshore (**TDA1/2/440-516 at 452**).

    (c) On March 26, 2013, OGX released its financial statements for the year ended 2012. Under the heading "*Message from the Management*" on page 2 of the statement it stated: "*We made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations*" (**TDA1/1697-1849 at 1700**).

    (d) I have seen no analysis or conclusions in the D&M Reports which could have supported these statements.

83. On June 7, 2013, Batista released an OGX Corporate Presentation which highlighted the supposed success of the OGX exploratory campaign (**TDA1/3/627-675**). It stated: "*Oil*

34

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

discoveries of 4.1 bn bbl are already under production development in the shallow waters of the Campos Basin" (**TDA1/3/638**); "low risk, shallow water and large volumes... 400 MM bbl already declared commercial (Tubarão Azul and Tubarão Martelo Fields)" (**TDA1/3/639**); "successful appraisal campaign with 40 wells drilled and a 87% hit ratio" (**TDA1/3/640**); and "declaration of commerciality of the Waikiki accumulation and Development plants... submitted to the ANP named as Tubarão Martelo field with expected total recoverable volume of 285 MMbbl" (**TDA1/3/640**). The presentation also reiterated the Put Option at page 37 (**TDA1/3/663**).

(a) Again, in addition to confirming commerciality in the Waikiki accumulation, the above representation implies commerciality more widely across OGX's discoveries by its reference to production development, shallow-waters, low risk, high volumes, successful appraisal campaign with 40 wells drilled and a 87% hit ratio. From the evidence which I have seen there was no reasonable basis for this statement to be made.

(b) Just a matter of weeks later, on July 1, 2013, OGX arguably admitted that the Recoverable Oil Representations could no longer be relied upon. (**TDA1/3/797-799** at **798**).

84. As to the cumulative effect of the Recoverable Oil Representations in terms of the overall volumes of oil which Batista represented as being recoverable each year, it is difficult to be precise due to Batista's confusing tendency to refer to OGX's holdings by different names; whether by Portuguese name or alphanumeric code relating to the particular basin in which the oil is located, field being explored, local "accumulation" or "formation", or the name of a particular drilled well. Doing the best I can on the information available, it appears to me that:

(a) Batista's representations during 2009 constituted an overall representation that OGX had discovered within its oil fields recoverable oil volume expected to amount to between 1.5 billion and 3.5 billion barrels. At the mean crude oil price for December 2009, which was approximately USD75 per barrel, the gross revenue implied by the foregoing representation was between USD112.5 billion and USD262.5 billion.

35

(b) By the end of 2010, this had risen to a recoverable oil volume expected to amount to between 2.6 billion and 5.5 billion barrels. At the mean crude oil price for December 2010, which was approximately USD90 per barrel, the gross revenue implied by the foregoing representation was between USD234 billion and USD495 billion.

(c) By the end of 2011, this had risen to 10.8 billion barrels. At the mean crude oil price for December 2011, which was approximately USD100 per barrel, the gross revenue implied by the foregoing representation was in the region of USD1 trillion.

(d) By the end of 2012, and into 2013, the 10.8 billion barrels figure was still being referred to (see, for example, **TDA1/3/748-796 at 758**). The mean crude oil price for December 2012 was approximately USD90 per barrel and, therefore, the gross revenue implied by equivalent of the 10.8 billion barrel representation in this period was, again, in the region of USD1 trillion.

(e) From the material I have seen, it appears that Batista had not retracted the substance of his Recoverable Oil Representations by June 30, 2013.

**Full and frank disclosure**

85. Although I consider that I have been instructed with sufficient material to reach the conclusions I have set out above, I have only seen that with which I have been instructed by the Applicants.

86. It is possible that Batista will be able to point to additional material that he relied on in forming a belief in the truth of the Recoverable Oil Representations at the time they were made. If this were the case, however, I would query why such information was not provided for analysis to OGX's independent auditors, D&M, or subsequently in Batista's defence of criminal proceedings in Brazil.

87. The field of oil exploration is inherently speculative and risky in nature. I have taken this into account in considering my opinion set out herein. That is why those involved need to be very careful to ensure the accuracy of what is represented. In addition, that is why the global industry has over time formulated the PRMS (utilized by D&M in their

36

90.    I find the above response extraordinary. Batista appears to acknowledge that there was no evidential basis for OGX's decision to declare the relevant wells commercial and that he knew such at the time the representation was made. This is consistent with my view expressed above, that I have seen no evidence to suggest that the vast majority of the recoverable oil volume represented by OGX could reasonably be expected to be technologically recoverable, much less commercial, as at March 2013. My view is based on D&M's interpretation of the underlying data provided to them by OGX. In the absence of a reasonable evidential basis and a conclusion from technical specialists according to the PRMS guidelines, I consider that it was wholly inappropriate for Batista/OGX to have declared these wells commercial.

91.    Batista suggests that the declaration of commerciality was made so OGX would not have to return the fields containing the wells to the state. This is not an adequate basis for a declaration of commerciality. In my experience, it would not be unusual for the terms of an explorer's license with a government to require the explorer to declare what its intentions are in terms of operational progression. However, this in no way provides a basis for making representations as to commerciality to the investing public when no evidence exists that commercial oil deposits have been located. It is not known whether OGX attempted an alternative course of action such as requesting an extension of the exploration phase under an available contract mechanism or otherwise negotiating an extension with the ANP.

92.    According to Batista's response, the statement of Material Fact announcing the commercial viability of the wells made clear that additional studies were ongoing. In addition, the statement mentioned the amount of oil in the wells "*in situ*", but did not make any statements regarding recoverable amounts.

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

**Conclusions**

93.     In conclusion, my view is that the available evidence is that Batista made a series of false and misleading representations to investors as to the discoveries made by OGX and the commerciality and therefore value thereof. OGX produced only a very small fraction of the oil which Batista had represented as "recoverable oil" before its failure as a business.

*Brian T. Windham*

Brian Thomas Windham, P.E.

Sworn to and subscribed before me by Brian Thomas Windham, P.E. on the 20ᵗʰ day of October, 2016.

ROMELIA V CRUZ
NOTARY PUBLIC
State of Texas
Comm. Exp. 03/17/2017

*Romelia V. Cruz*

Notary Public in and for
the State of Texas

My commission expires:
March 17, 2017

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

    Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

    Defendants.

_____/

## *EX PARTE* NOTICE OF FILING CAYMAN AFFIDAVIT OF
## ERNEST PATRICK DOVER

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), in support of their motion against all Defendants for an emergency temporary

injunction to prevent fraudulent transfers out of Florida, hereby file the Cayman Affidavit of Ernest

Patrick Dover.

    Dated: February 1, 2017.

                Respectfully submitted,

                ABALLI MILNE KALIL, P.A.
                *Counsel for Plaintiffs*
                2250 SunTrust International Center
                One Southeast Third Ave.
                Miami, FL 33131
                Phone: (305) 373–6600
                Fax: (305) 373–7929

                s/ *Hendrik G. Milne*
                Hendrik G. Milne
                Florida Bar No.: 335886
                Craig P. Kalil
                Florida Bar No.: 607282



Applicants
First Affidavit of E Dover
October 2016
Exhibit EPD1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

CAUSE NO. FSD 172 OF 2016 (IMJ )

**B E T W E E N:**

(1) **MERIDIAN TRUST COMPANY LIMITED**
(2) **AMERICAN ASSOCIATED GROUP, LTD.**

**Applicants**

- and -

(1) **EIKE FUHRKEN BATISTA DA SILVA (AKA EIKE FUHRKEN BATISTA)**
(2) **63X INVESTMENTS LTD.**
(3) **63X FUND**
(4) **63X MASTER FUND**
(5) **MAPLES CORPORATE SERVICES LIMITED**

**Respondents**



**AFFIDAVIT OF ERNEST PATRICK DOVER**

NOV 07 2016



I, **ERNEST PATRICK DOVER**, Managing Director of Meridian Trust Company Limited of Hunkins Plaza, Main Street, Suite 556, Charlestown, Nevis and sole Director of American Associated Group, Ltd. **HEREBY AFFIRM AS FOLLOWS:**

1.  I am the Managing Director of Meridian Trust Company Limited (**Meridian**) and the sole Director of American Associated Group, Ltd., (**American**).

2.  I am duly authorised to make this Affidavit on behalf of the Applicants in support of their application for freezing orders and related disclosure against the First to Fourth Respondents and in support of their application for disclosure from the Fifth Respondent. It is the intention of the Applicants to commence a claim before the

1

**THIS AFFIDAVIT is FILED by SOLOMON HARRIS** of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

Florida courts as soon as the freezing orders sought are served on the substantive respondents (the **"Florida Claim"**). A copy of the Complaint, in the form I understand it will be issued in Florida as soon as the freezing orders sought are served on the substantive respondents, is exhibited at **KJM1/1** (the **"Florida Complaint"**).

3. The matters set out in this Affidavit are within my personal knowledge unless the contrary is expressly stated. Where they are within my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from the sources which I identify.

4. No waiver of privilege is intended by any reference herein to privileged material or a document containing such unless expressly stated.

5. There is now produced and shown to me a paginated bundle of true copy documents marked **"EPD1"** which I exhibit. References to page numbers herein are references to pages of **EPD1**.

6. I understand that the Applicants have a duty to make a full and frank disclosure to the Court of facts that may be considered adverse to the Applicants' position. I have read extracts from the Cayman Islands' decision of *Cable and Wireless v. ICTA* and the English decision of *Complete Retreats Liquidating Trust v. Logue* that summarize that duty. I confirm that I have sought to comply with this duty in preparing this affidavit.

7. In this affidavit, I adopt some of the definitions used in the other affidavits in support of this Application.

**The Applicants**

8. Meridian is a professional trust company incorporated under the laws of Nevis with its registered office at Hunkins Plaza, Main Street, Suite 556, Charlestown, Nevis, West Indies. Meridian provides fiduciary and corporate management and administration services in Nevis, and is regulated by the St. Kitts & Nevis Financial Services Regulatory Commission.

9. Meridian is the trustee of a Nevis family trust known as the Chrisly Trust (the **"Trust"**) and owns certain investments pursuant to the terms of the Trust. Since the establishment of the Trust in April 2004, I have been the managing director of

2

Meridian with responsibility for managing the discharge by Meridian of its fiduciary duties in connection with the Trust.

10. Through my employment with Meridian, I have also been at all material times the sole director of the American, which also owns certain investments. American is a Cayman Islands company, whose registered address is c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, P.O. Box 268, George Town, KY1-1104, Cayman Islands. In my capacity as sole director of American I have at all material times owed similar fiduciary duties with regard to the management of its affairs. American was incorporated December 20 1982 as American University of the Caribbean. AUC as it was commonly then known was for some years the owner and operator of a medical school originally located in Montserrat and later relocated to St Maarten. In August 2011 the assets of the Medical School were sold to a U.S. publicly traded company Devry, Inc., and in September 2011 American changed its name to American Associated Group Inc., At the time of sale American owned certain assets of the medical school. The balance was owned by another company in turn owned by the school founder Dr Paul S. Tien. American is owned by the Trust.

11. The primary beneficiary of the Trust is Dr Paul Tien. Dr Tien established the American University of the Caribbean School of Medicine. The majority of the wealth settled into the Trust derives from this venture. The financial assets held by Meridian (as Trustee) in the Trust[1] and American were valued at approximately USD 97,000,000 as of September 9, 2016. A breakdown of the categories of the financial assets held by the Applicants and their precise value as at this date appears at paragraph 16 below.

12. From my review of the evidence to be adduced in support of this Application, good causes of action appear to be available to Meridian and American in Florida. Further, I believe that there are assets available to satisfy such claims and that they are therefore worth pursuing. I believe that Meridian and American have been the victims of an international fraud, directed by Batista, that has cost investors globally billions of dollars, and Meridian and American, directly, $20,310,849. These losses came about when Gables Capital, a Florida investment adviser engaged by Meridian and American to manage their investment portfolios, made certain investments as set

---

[1] Either directly in the name of the Trustee or in the name of its wholly owned corporate investment entity.

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

forth in the affidavit of Judith Ellen Neiwirth that proved to be almost complete losses.

**Undertaking in damages**

13.     Meridian, as trustee for the Trust, and American jointly support this application with an undertaking in damages to compensate the Respondents or any third party for any damage that may be caused by the orders sought if ordered by the Court to do so upon an inquiry. As part of my duty of full and frank disclosure, I note that the Trust is revocable. In order to ensure my ability as Trustee to properly discharge the foregoing undertaking to the Court, I requested and have obtained a written instruction from the Settlor of the Trust dated 30 September 2016 to the effect that should I or Meridian receive any instruction in connection with or purporting to have the effect of revocation of the Trust, then I shall not comply with the instruction without first seeking leave of the Cayman Court (**EPD1/1**). For the avoidance of doubt, I do not believe there is a reason to anticipate receipt of any such instruction, however I have taken this step out of the abundance of caution.

14.     I refer to and exhibit at **EPD1/2-4** a letter dated October 14, 2016 from Meridian's legal counsel in Nevis, Liburd and Dash LP. This letter confirms that, under the terms of the Trust and Nevis law, the instruction referred to above is effective and binding on me as Trustee to achieve the above position.

15.     I hereby undertake to discharge my obligations as Trustee consistent with the above instruction.

16.     The financial assets held by Meridian, on behalf of the Trust, and American, as referred to above, can be broken down into the following general categorical holdings:

   (a)     Shares, structured products and metals USD 44,727,170;

   (b)     Bonds USD 34,852,281; and

   (c)     Cash and other USD 17,465,103.

   As trustee of the Trust, Meridian considers that the Florida Claim and this application are in the interests of the beneficiaries of the Trust. Meridian provides trustee and other fiduciary services to a range of clients in the course of its business.

4

Given the circumstances, Meridian respectfully requests that the assets available vis-à-vis Meridian to meet the cross-undertaking as to damages be limited to the assets held by it pursuant to the terms of the Trust. Given the extent of the assets of the Trust, such a restriction should cause no prejudice to the Respondents and, in any event, should cause no prejudice to the Respondents in the period prior to their being entitled to apply to this Court to vary the terms of the order.

17.   The Applicants have placed funds in trust with its Cayman attorneys, and are willing to place so much of these funds with the Court by way of fortification of their undertaking as may be ordered.

**Respondents' connection to jurisdiction**

18.   The Respondents have the following connections to the Cayman Islands:

19.   The Second to Fourth Respondents (the **"Cayman Companies"**) are incorporated in the Cayman Islands.

20.   Maples Corporate Services Limited (**"MCSL"**), the local corporate services and incorporation agent retained by the Cayman Companies, is incorporated in the Cayman Islands and conducts business within the jurisdiction.

21.   It is the Applicants' case that Batista conducted personal business within the jurisdiction, via the Cayman Companies, and that the Cayman Companies are beneficially owned and controlled by him. Batista therefore has assets within the jurisdiction and amenable to the control of the Grand Court.

22.   By reason of the matters set out in the evidence in support of this Application, I believe that the suitability of statutory freezing order relief against the respondents is a real issue for the Grand Court to determine as between the respondents in one set of proceedings and it is reasonable for the Court to try those issues together.

23.   Batista resides in Brazil and is likely to be found in that jurisdiction.

24.   Leave is sought to serve Batista out of the jurisdiction pursuant to GCR O.11, rl (n).

25.   I would like to make the Court aware that the Applicants intend to seek disclosure in the Bahamas from (i) UBS (Bahamas) Ltd., (ii) UBS Trustees (Bahamas) Ltd., (iii) BSI Overseas (Bahamas) Ltd; (iv) BSI Trust Corp (Bahamas) Ltd; (iv) Itaú Bank & Trust Bahamas Ltd; (v) Itaú Bahamas Nominees Ltd; (vi) Itaú Bahamas Directors

5

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.



Ltd; and (vii) The Winterbotham Trust Company Limited, following the hearing of this application. Those proceedings may themselves result in further disclosure and/or further relief being sought in the Bahamas or elsewhere.

26.     The Applicants also apply for an order that they have leave to use any disclosure made by the Respondents in the proposed Florida claim and in any court application required in the Bahamas.

**Without notice hearing**

27.     This application has been made without notice because there is a serious risk that if Batista and the other respondents become aware of the Applicants' intention to bring this application or the proposed Florida claim, they will take steps to conceal and dissipate their assets thereby rendering this application ineffective or less effective. The evidence indicates that Batista / the Cayman Companies have taken steps to move assets to impede enforcement processes and there is a real risk of dissipation.

**Relief Sought**

Freezing Orders

28.     In aide of the proposed Florida Claim, and pursuant to section 11A(1)(a) of the Grand Court law, the Applicants have issued these proceeding so that a freezing order be granted against the worldwide assets of Batista and the Cayman Companies to prevent them from disposing of, dealing with or diminishing their assets up to the value of USD60,932,547, being:

(a)     The Applicants' basic loss, of USD 20,310,849; and

(b)     Statutory damages under the Florida Civil Remedies for Criminal Practices Act in an additional sum of USD 40,621,698.

29.     Ancillary to that freezing order relief, the Applicants also seek disclosure orders against Batista and the Cayman Companies in order to obtain information relating to their worldwide assets, and in particular, what has become of the funds which the evidence suggested may have been transferred to other jurisdictions (for instance, see paragraphs 272 to 287.2 of the affidavit of Mr. de Araujo).

Disclosure / Confidentiality Order

6

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KYI-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.



30. The Applicants also seek a disclosure order against MCSL.

31. MCSL can be expected to hold the documentation and information as regards the Respondents, specifically as defined in Schedule 1 to the draft order submitted by the Applicants' counsel in this Application.

32. The above information will assist the Applicants in identifying potential assets, entities which have hold or have held those assets, entities that may in turn have information as to where those assets now are and the present location of such assets. Accordingly, the Applicants seek an order for disclosure against MCSL of the above categories of documentation and information.

33. In order to ensure confidentiality, the Applicants also seeks a confidentiality order against MCSL to prevent any persons associated with it taking steps to inform or give notice to Batista or those associated with in, and specifically order that MCSL shall not notify any person of the existence or terms of any order made against it, nor these proceedings or the proposed Florida Claim. This would allow the Applicants to obtain the disclosure sought, interpret it, and take steps to act on it if necessary. The Applicants would ask also for liberty to apply to extend the period of confidentiality, on notice to MCSL, in the event that the outcome of the orders indicates further steps that may be need to be taken to ensure the efficacy of the ex parte process.

34. The Applicants undertake to pay MCSL's reasonable costs of compliance with any disclosure order granted.

**Just and expedient to grant order**

35. I believe that the evidence indicates it is just and expedient for the Court to make the orders sought, in all the circumstances of Batista's fraudulent scheme set out in the evidence in support of this Application. As regards the need for the relief sought, the disclosure is required in order for the Applicants to ascertain the present whereabouts of the First to Fourth Respondents' assets so the Applicants can seek to freeze them pending the outcome of the trial of the Florida claim. Mr. de Araujo's affidavit sets out evidence of transfers of assets by the First to Fourth Respondents including, by way of example, transfers to an unidentified trust in Switzerland. I exhibit at **EPD1/5-6** a letter from Meridian's Swiss legal counsel. This letter confirms that in order to seek freezing order relief in Switzerland, prima facie evidence describing and identifying targeted assets is required. For instance, if the targeted assets are

7

deposited in a Swiss bank account, an applicant must identify the name and address of the bank and provide evidence that the respondent indeed has assets with said bank or, as applicable, is beneficially entitled to those assets.

36.     Mr. Murray's evidence, at paragraphs 40 to 47 of his affidavit, explains why he does not believe that the Respondents would allow the Florida Claim to go by default. A default judgment would limit Batista's future abilities to conduct business in the United States as any assets in the United States would be subject to being collected upon under the default judgment. Instead, Mr. Murray believes that the Respondents would contest the action on a preliminary basis such as by challenging service of process, personal jurisdiction, forum non conveniens, and so on. Mr. Murray notes that under Florida law an unsuccessful challenge to jurisdiction would constitute a submission to the jurisdiction of the Florida court.

37.     In the event that any of the First to Fourth Respondents does not participate in the Florida proceedings, then it is the Applicants' present intention to issue further applications for continuation of the relief granted on bases other that the statutory rights under s.11A of the Grand Court law.

38.     For example and without limiting the future steps to be taken by the Applicants, if the Cayman Companies do not participate in Florida, the Applicants may need to seek interim injunctive relief against the Cayman Companies as non-cause of action defendants; namely that they plainly held (and may still hold) assets which are either (i) in reality the assets of Batista; (ii) assets against which a judgment in favour of the Applicants in the proposed Florida Claim would ultimately be able to be enforced; and / or (iii) assets which Batista controls although whether such steps are necessary as a matter of law will be the subject of submissions on the injunction application .

**Service and ancillary orders**

39.     The Applicants request that the Court give leave to serve Batista out of the jurisdiction. The Cayman Islands is the most appropriate forum for the application to freeze Batista's assets:

        (a)     S.11A proceedings have been issued against the Cayman Companies.

8

(b) The evidence of Mr. Murray and Mr. Oliveira is that freezing order relief of the type sought in these applications in support of the Florida proceedings could not be obtained in the Courts of Florida or Brazil.

(c) It is the Applicants' case that the Cayman Companies represent assets that would be amenable to the enforcement of a judgment against Batista.

**Full and Frank Disclosure**

40. I have endeavoured in this Affidavit to provide full and frank disclosure to the Court of all facts that are material for the Court to determine the application, including those which may be considered adverse to the Applicants, including the following points:

41. It may be argued that the bond indenture contains language limiting or preventing claims against Directors and Officers of the issuer and its guarantor. Mr. Murray has opined that there is no impediment to bringing the Florida Claims, which are not in the nature of breach of contracts claim under the indenture, but rather claims in the nature of fraud in inducing the purchases in the first instance. Mr. Murray reached the same conclusions as regards purported exclusions of liability in other OGX documents he has reviewed.

42. It may be argued that granting the relief sought may not be expedient where any assets which the Applicants might freeze could be subject to other claims by others to whom Batista is indebted, insolvency officeholders or processes ancillary to the criminal proceedings. I am not aware of any active steps being taken to enforce against or freeze the assets of Batista other than in the course of the criminal proceedings in Brazil. It may be that in due course other parties may take such steps and that can be a matter for case management by the Grand Court if and when it happens.

43. It might be argued that the Florida Courts lack substantive jurisdiction over the Respondents to the Florida Claim and that at most the proceedings will produce a

9

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

default judgment against foreign defendants. Mr. Murray deals with jurisdiction and practical considerations in his affidavit. Mr. de Araujo deals with the evidence as regards the Respondents' connections to Florida.

44.   It may be argued that the proposed Florida claim ought properly to be brought in Brazil, where OGX and Batista have their main place of business and where OGX is in bankruptcy. In response, the Applicants state that each jurisdiction touched by Batista's fraud has its own laws and public policy. The claims to be asserted in Florida are against Batista and others, none of whom are in bankruptcy, and OGX is not a party to any projected action outside Brazil. Mr. Oliveira has opined that there is no Brazilian law that confines the claims asserted against Batista and the proposed co-defendants to Brazil or which prevents their being raised elsewhere. (See Oliveira affidavit, para. 82, 89 and 90). Mr. Murray has opined that as a matter of Florida law there is no impediment to raising the claims stated against Batista and the co-defendants in the Florida Complaint in Florida and that the connections with Florida are sufficient to found and maintain jurisdiction in Florida. (See Murray affidavit, paragraphs 36-39).

45.   It might be argued that the Florida Claim is vulnerable to being stayed pending the outcome of the Brazilian criminal prosecutions or subsequent personal bankruptcy processes around the world. Mr. Murray has opined that it is hard to see what might be a cogent rationale for granting such a request and that, in his experience, stays such as this are difficult to obtain. In any case, the Applicants ought not to be prejudiced in seeking redress for their loss.

46.   Similarly Batista might argue he cannot fairly respond to the allegations in the Florida Claim, or respond to this application, before the criminal prosecution is determined.  That would be a matter for legal argument in Florida and/or this Court but the existence of a stay, concerning which Mr. Murray opines that it is hard to see what might be a cogent rationale for granting such a request, ought not prevent the Applicants obtaining freezing relief to protect their ability to enforce any eventual judgment.

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

47. This application relies in part on the evidence of Mr. Blaksley as to what he was told by Ms. Gaspar, including the Asset Schedule that was provided by her and her interactions with unidentified sources including former / current employees of OGX. It may be said that such evidence should be given little or no weight, as being of unknown provenance, hearsay by nature, and potentially obtained by unlawful means by Ms. Gaspar, the Source(s) or others.

48. Evidence from Ms. Gaspar might prove to be incorrect on further investigation and disclosure. Indeed, one instance of this might have been identified in connection with the presence of BTG Pactual in the Bahamas at the time of the Swiss Transfers as summarized by Mr. Blaksley in his evidence. The Applicants nevertheless consider that Ms. Gaspar's views should be considered by the Court in the wider circumstances of Batista's fraudulent scheme, for the following reasons:

   (a) Neither the Applicants nor their agents have entered into any arrangement with Ms. Gaspar involving a retainer or payment for her information;

   (b) Ms Gaspar has informed Mr. Blaksley that she is unwilling to compromise her journalistic integrity by revealing this information or her promise of confidentiality in this respect to the Sources. She told Mr. Blaksley that this was the basis of the Source(s)' willingness to deal with Ms. Gaspar.

   (c) The evidence of Ms. Gaspar does appear to come from sources very close Batista, either indirectly from Batista himself, such as the Asset Schedule, or from those that were closely involved in the OGX business.

   (d) The affidavit of Mr. Murray confirms that there is no rule or provision in Florida law that prevents a victim of fraud relying on information obtained in the circumstances in which Ms. Gaspar's evidence and the Asset Schedule was obtained.

   (e) I am not aware of any action of Ms. Gaspar or those providing her with information that would constitute a criminal activity under the laws of Brazil. This is addressed by Mr. Oliveira at paragraph 49 of his affidavit. It is acknowledged that some of the information obtained might have been subject to some form of confidentiality obligations, as addressed by Mr. Oliveira at paragraph 50 of his affidavit.

11

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(f)    Evidence of certain aspects of the fraud, Batista's dealings and his assets are unlikely to otherwise be available by alternative sources open to the Applicants. By their very nature, any steps taken by Batista to commit fraud or dissipate his assets will have been carried out in conditions of utmost secrecy.

(g)    The degree of cross-corroboration between the evidence of Ms. Gaspar from the Source and that of the Asset Schedule, which was prepared by a different source, as set out at paragraphs 287.1 and 290 of Mr. de Araujo's affidavit.

(h)    The Applicants have obtained objective corroboration of some Ms. Gaspar's evidence from alternative sources, as set out at paragraphs 288-294.6 of Mr. de Araujo's affidavit.

49.    It is possible that there are no funds left in the Cayman Companies' accounts (which the Source suggests have been transferred to a Swiss trust or been paid to settle other indebtedness). If the Cayman Companies no longer hold Batista's assets, the ancillary disclosure sought may lead to their present whereabouts. Moreover, Batista was personally indebted to both BTG Pactual and Bank Itaú and so might have set off any funds remaining in the Cayman accounts against such indebtedness, as stated at paragraph 275 of Mr. de Araujo's affidavit. The Asset Schedule indicated that at least 63X Fund held considerable value, a value several times greater than the amounts sought in the Florida Claim.

50.    It may be said against the Applicants that they have delayed in making this application given that OGX went into Judicial Reorganisation in October 2013. I believe the Applicants have sought to act with reasonable promptness, taking into account the complexity of the allegations in the Florida Claim and the need to ensure the best prospects that any proceedings and ancillary relief in support of those proceedings were effective:

(a)    The Brazilian authorities did not take the decision to charge Batista personally with related criminal offences until September 2014.

12

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(b)     It then took some time for that Criminal complaint to come to the Applicants' attention, including their reference to the D&M Dispute and the 10.8 Billion Barrel Representation and the Schlumberger report.

(c)     The fraud was wide-reaching and complex. It took time for steps to be taken to obtain the requisite legal and investigative assistance in several jurisdictions to unravel the complexities of Batista's fraudulent scheme, collate the available evidence, to determine that a civil fraud claim existed against Batista personally, as opposed to his corporates, and then draft the Florida Complaint.

(d)     It may also be argued that the time that has passed since the Criminal complaint came to Batista's knowledge (September 2014) means that, if Batista was to have taken steps to dissipate his assets, he would have done so already. The Brazilian authorities have, from 6 May 2014 onwards, made various precautionary measures and asset freezing orders against Batista personally. However, the position appears to be these at present affect only at Batista's Brazilian assets. Mr. Oliveira notes that the freezing order obtained by the Public Attorney Office of Rio de Janeiro is against the general assets of Batista, with authorisation to seek international co-operation to effect the decision, but to Mr. Oliveira's knowledge no such steps have been taken. Furthermore, to date the Applicants have not identified any evidence of others outside of Brazil with an economic interest taking legal recovery steps against Batista personally such that might have prompted him to take steps to dissipate his assets outside of Brazil since the announcement of the Brazilian criminal proceedings.

51.     The affidavits of Mr. Murray and Mr. de Araujo consider the Respondents' likely defences to the causes of action in the Florida claim relied upon in support of this application.

52.     On 3 September 2013, American paid $93,750 to purchase a further 500 OGX bonds. This amount is not being claimed as damages in the Florida Claim. The transaction was carried out as an accommodation with a related entity by way of a

13

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

simultaneous market sale / purchase. I refer to paragraph 55 of Ms Neiwirth's affidavit in this regard.

## Conclusion

53.     In view of all the foregoing, on behalf of Meridian and American, I respectfully request that the Court issue an order making a worldwide freeze of assets with ancillary asset disclosure against the First to Fourth Respondents, a disclosure order against the Fifth respondent, Maples Corporate Services, Ltd, and leave to serve Batista out of the jurisdiction by way of substituted service.

**AND I MAKE** the above statements honestly and sincerely knowing and believing the same to be true.

Affirmed at the Registrar's Office        )

in the town of Charlestown in the         )

Island of Nevis this 21st day of     ) **ERNEST PATRICK DOVER**

October 2016

                                          )

BEFORE ME:-

MR. DARNELL MORTON
A COMMISSIONER OF C
FOR ST CHRISTOPHER

14

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

CFN: 20170066290 BOOK 30409 PAGE 1145
DATE:02/03/2017 09:53:44 AM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

**DIVISION**
☒ CIVIL
☐ OTHER

**BOND**
☐ **NON RESIDENT COST BOND**
☒ **INJUNCTION BOND**
☐ **NE EXEAT BOND**

| PLAINTIFF(S) | VS. DEFENDANT(S) |
|---|---|
| Meridian Trust Company, and American Associated Group, Ltd. | Eike Batista, et al. |

**CASE NUMBER:**
17-001040-CA-01 (43)

WE, Meridian Trust Company and American Associated Group, Ltd. _____, as principal and

Fifty thousand dollars ($50,000) _____, as Surety, are bound to

the Defendants _____, in the sum of $ 50,000 _____ for the payment

of which we bind ourselves, our heirs, personal representatives, successors, and assigns, jointly and severally.

THE CONDITION OF THIS BOND/OBLIGATION is such that:

**NON RESIDENT COST:**
☐ the plaintiff shall pay all costs and charges that are adjudged against plaintiff in this action, then this bond is void; otherwise it remains in force.

**INJUNCTION:**
☒ whereas the above named Principal shall pay any damages that may accrue as a result of being improperly restrained (or enjoined) in this action, then this bond is void, otherwise to remain in full force and effect.

**NE EXEAT:**
☐ whereas, as pursuant to Court Order dated _____ the above named principal is posting $ _____ bond to: ☐ obtain a Writ of Ne Exeat or ☐ to stay Writ of Ne Exeat issued on _____

CLOCK IN

2017 FEB -2 PM 3:33

Signed and Sealed on February 2, 2017.

JOSHUA POYER, ATTORNEY (SEAL)
Principal FOR PLAINTIFFS

_____ Surety

_____ (SEAL)
As Attorney in Fact As Surety

THIS BOND EXPIRES
10 YEARS FROM THE
DATE OF EXECUTION
PURSUANT TO F.S. 28.32

TAKEN and APPROVED

| HARVEY RUVIN CLERK OF COURTS | BY _____ DEPUTY CLERK 0357 | FEB -2 2017 DATE |
|---|---|---|

CLK/CT 430 REV. 7/02

Clerk's web address: www.miami-dadeclerk.com

YADIRA BORGES

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, EBX INVESTMENT FUNDS, LLC,
CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA,

     Defendants.

_____/

## EMERGENCY *EX PARTE* MOTION FOR TEMPORARY INJUNCTION
## TO PREVENT FRAUDULENT TRANSFERS

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), pursuant to rule 1.610, Florida Rules of Civil Procedure, and section 726.108,

Florida Statutes, move against all Defendants for an emergency temporary injunction to prevent

fraudulent transfers out of Florida, and state:

### Factual Summary

### The Fraud

1.     Between 2009 and 2013, a Brazilian con man, Eike Batista, induced investors from

around the U.S. - including many State employee pension funds, such as the Florida Retirement

System Trust Fund - to invest billions of dollars in his oil exploration company OGX and its satellite companies, principally the oil tanker-building company, OSX, on the basis of fraudulent promises of the discovery of a trillion dollars of oil of the shores of Brazil. He promised to put up a billion dollars of his own money if the oil operation needed it to come into production.

2.      When the truth was finally discovered, that there was virtually no oil, Batista welshed on his billion dollar promise; OGX, OSX and the other satellite companies collapsed; and the investors lost their money in what is currently Latin America's largest corporate default, ever.

3.      Batista and others were thereafter indicted in Brazil for market manipulation and insider trading and he has been fined and banned from heading up public companies for five years in Brazil. Those criminal proceedings are continuing.

4.      However, the fraudsters all made many hundreds of millions of dollars from the scheme. Batista is believed to have stashed much of his share in the names of family members and shell companies in Miami and offshore.

5.      We are aware of some $89,000,000 in transfers to his sons, Thor and Olin, his girlfriend and mother of his third son, Balder, and to his ex-wife, Luma de Oliveira, within Brazil. Thor, Olin, Flavia and Luma are all Defendants here.

### The Claims

6.      The Plaintiffs - investment vehicles for an elderly disabled beneficiary - invested over $21 million in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations.

7.      The Plaintiffs complaint was filed on January 12, 2016. It is highly detailed and runs to some 97 pages. It is therefore available to the Court and a copy is not attached.

8.      In it, the Plaintiffs seek to recover their $21 million in losses against Batista and his co-conspirators; treble damages, namely $63 million, pursuant to Florida's racketeering statutes; and to freeze the proceeds of the fraudulent scheme in the hands of the various recipients pending judgment.

### The Cayman and Bahamas Courts - Disclosure and Asset Freezing Orders

9.      However the Florida complaint is just the tip of the iceberg and the culmination of many months of legal work in other jurisdictions.

10.     It follows on *ex parte* disclosure orders issued by the Courts of the Cayman Islands and the Bahamas against Batista and others, in sealed proceedings, against banks and others in those countries, to disclose the suspected fruits of fraud so that Plaintiffs might freeze funds wherever they might be found, in assistance of this Court's jurisdiction when the substantive Florida action was eventually filed.

11.     During November, December 2016 and early January, 2017, the Caymanian and Bahamian banks and other companies were under gag orders preventing them from telling Batista or anyone else what they had disclosed, and were allowed to transact business on the accounts to a limited extent to avoid tipping him off.

12.     Pursuant to those orders, the disclosed bank documents showed that Batista had moved roughly a billion dollars out of the Bahamas, starting in 2009, and had split it up and moved it into various names and accounts in countries around the world. Hundreds of millions flowed to or through accounts in Miami. It is unknown how much is still here. This snapshot from Cayman and The Bahamas provided just a glimpse into a tiny part of Batista's worldwide banking operations.

3

13.     The Cayman Grand Court also reviewed a mountain of affidavit evidence submitted by the Plaintiffs in support of an asset freezing order. This consisted of factual affidavits and expert affidavits by oil industry and forensic accounting professionals in the course of sealed *ex parte* proceedings spanning two days on October 27 and 28, 2016.[1]

14.     On October 28, 2016, the Grand Court entered a treble-damage Worldwide Freezing Order ("WFO"), under seal, freezing close to $63 million in assets owned or controlled by Batista and his three "63X" Cayman companies: 63X Investments Ltd., 63X Fund, and 63X Master Fund, all of whom are defendants here.[2]

15.     The WFO also required Batista and the 63X Companies to disclose to Plaintiffs the existence of all owned or controlled assets and bank accounts wherever located in the world, when they were eventually notified of its existence.

16.     The injunction was to be in place until after resolution of the Florida case, unless discharged. This is what in many common-law countries is called a *Mareva Injunction*.[3] The Court also issued a Reasoned Judgment setting forth the basis for its rulings.[4]

17.     The Cayman WFO was not notified to Batista while the evidence referred to above was collected in Cayman and the Bahamas during November, December, and early January, and through that time he remained free to move funds. The banks were under gag orders not to disclose the existence of the WFO.

---

[1] The affidavits and exhibits are estimated to have exceeded four feet, stacked.

[2] Exhibit "A." The amount ordered frozen was the sum to be requested in the complaint eventually to be filed in Florida. Other parties made defendant in *this* action were unable to be joined in the Cayman action under Caymanian notions of jurisdiction.

[3] After the seminal 1975 English case which started the jurisprudence in this area, *Mareva Compania Naviera SA v International Bulkcarriers*, SA 2 Lloyd's Rep 509 [1975].

[4] Exhibit "B."

18.     Meanwhile the Plaintiff's professionals examined the disclosure materials and finalized the Florida complaint with the information so obtained.

### Batista Flouts the Cayman Court Order – Tries to Move Money

19.     On January 6, 2017, the 63X Companies were served in Cayman with the WFO, Batista was notified of its existence - and things began to move very fast.

20.     Plaintiffs made attempts to serve him with Caymanian process in Brazil which he evaded while he took other action.

21.     Despite the "Worldwide" reference in the title of the Cayman "Worldwide Freezing Order," if a defendant refuses to obey it, the WFO only effectively "bites" on assets within the jurisdiction, and in the hands of others. Batista now, in defiance of the Cayman court order, apparently started to move money out of the 63X Companies' bank accounts.

22.     He moved some tens of thousands of dollars out of a 63X Company account into the name of another of his companies, Centennial Asset Mining Fund LLC, both accounts being at Bank Itau, in Miami.[5] Fortuitously, around $6.5 million was deposited into a Cayman account of another Batista controlled company, Centennial Asset Brazilian Fund LLC,[6] which, when combined with other money already in the account, resulted in roughly $7.1 million being caught by the WFO.

### Batista Flouts the Cayman Court Order – Refuses to Disclose Assets

23.     On January 24, 2017, the American press reported on the $63 million Cayman WFO and the report spread around the world like wildfire.[7]

---

[5] A Defendant here.
[6] A Defendant here.
[7] Exhibit "C."

24.     However, as the date fell due for him to disclose his assets to the Cayman Court, Batista refused to do so.

25.     On Tuesday, January 24, 2017, the Grand Court in Cayman ordered Batista to make his worldwide assets disclosure by 5:00 p.m. on Thursday, January 26, 2017.

26.     The deadline came and went and he did not disclose the existence or whereabouts of his assets – beyond, of course, predictably, the $7.1 million caught and referenced above.

### Batista Flees Brazil Ahead of an Interpol Warrant

27.     On Thursday, February 26, 2016, the Brazilian press reported that while the Cayman hearing had been going on, Batista had fled Rio de Janeiro with his girlfriend, the Defendant, Flavia Sampaio,[8] ahead of a raid by the Brazilian federal police who attempted to arrest him on fresh charges of bribery of government minsters in connection with his failed business empire, fraud, corruption and money-laundering.[9]

28.     Batista's trusted consiglieri, Flavio Godinho, an alleged co-conspirator Defendant in this case, was arrested in Rio and taken to jail on similar charges.[10]

29.     Finally, on Monday, January 30, 2017, Batista returned to Brazil and was taken into custody and is at the time of this writing in prison awaiting trial. The whereabouts of his girlfriend, who traveled with him to New York with their infant son, Balder, is unknown.[11]

### The Relief Sought Here

30.     This application seeks to prevent Batista and his accomplices from fraudulently transferring their assets out of Florida ahead of a judgment.

---

[8] Also a Defendant here.
[9] See press reports attached as Composite Exhibit "D."
[10] See press reports attached as Composite Exhibit "E."
[11] See press reports attached as Composite Exhibit "F."

6

31.     The equitable jurisdiction to award such relief has existed since the Statute of Elizabeth of 1571, the original Fraudulent Conveyances Act, the present version of which is the Florida Uniform Fraudulent Transfers Act, Fla. Stat. § 726.101, *et seq.*

32.     The Plaintiffs have sued all Defendants for violations of FUFTA, conspiracy to violate FUFTA, and for injunctive relief. See, Complaint, Count XI and Count XII; Fla. Stat. § 726.101, *et seq.*

33.     The Act provides that any "creditor" (a term which includes plaintiffs in litigation)[12] may obtain an injunction to prevent any "debtor" (which includes defendants in litigation)[13] from fraudulently transferring any asset (very broadly defined)[14] with the intent of hindering delaying or defrauding the creditor. In short injunctive relief lies to prevent defendants from intentionally rendering themselves judgment-proof.[15]

### The Supporting Evidence

34.     In support of the detailed 97-page complaint, we file herewith the relevant portion of the evidence filed in Cayman, together with a fresh summary affidavit summarizing the forensic accounting evidence as it applies to this motion. This is as follows:

(a)     The Affidavit of Ernest Patrick Dover, Managing Director of the Meridian Trust Company and sole Director of American Associated Group, Ltd., the Plaintiffs in this case, originally filed in Cayman. This, *inter alia*, summarizes the nature of the Plaintiff investment vehicles and source of funds and confirms the investments, and expresses the fear, equally valid

---

[12] Fla. Stat. § 726.102(5).
[13] Fla. Stat. § 726.102(7).
[14] Fla. Stat. § 726.102(2).
[15] Fla. Stat. § 726.108(1)(c)1.

here, that unless the requested relief were to be entered, Batista and his cohorts would dissipate their assets.

(b)     The Affidavit of Judith Ellen Neiwirth, Chief Investment Officer of Gables Capital Management, Inc., the registered investment adviser in Miami who made the OGX bond investments on behalf of the Plaintiffs, originally filed in Cayman. She confirms that she made the investments in reliance on the representations from OGX and Batista that the company had massive assets and that Batista stood behind the company, and had pledged $1 billion of his own money for additional working capital if needed.

(c)     The Affidavit of Brian Thomas Windham, a Consulting Engineer in the oil industry, originally filed in Cayman. He opines that on all the information available to him, Batista made many false and misleading representations to investors as to the supposedly huge amount of oil discovered by OGX and its commerciality and value, when in reality, as events proved, only a tiny fraction of the amount represented, actually existed.

(d)     The attached Affidavit of Thomas de Araujo, Certified Fraud Examiner. Mr. de Araujo has submitted eight earlier affidavits running to over 200 pages in the Caribbean proceedings, supported by some 5,000 pages of exhibits. Given the exigent circumstances attendant on this motion and so as not to overwhelm the record, in this Affidavit Mr. de Araujo summarizes his professional conclusions as they pertain to just this application. He states the basis for belief that there is a high danger of the Defendants making fraudulent transfers out of Florida - a jurisdiction which has obviously now become radioactive for all the Defendants with the filing of this case.[16]

---

[16] Attached as Exhibit "G."

(e)     The attached Worldwide Freezing Order entered by the Grand Court of the Cayman Islands.[17]

(f)     The attached Reasoned Judgment in Support of the Worldwide Freezing Order entered by the Grand Court of the Cayman Islands.[18]

(g)     The attached press articles reporting on the flight of Batista and his girlfriend ahead of an Interpol warrant for his arrest and extradition to Brazil on charges of fraud, money laundering and corruption.

### **Argument**

35.     We refer the Court to all of the supporting papers which we refrain from regurgitating here. But, to sum up, what we have here is a massive multi-billion-dollar fraud. The Defendants are corporate insiders and accomplices who helped perpetrated the fraud and family members who have lent their names to hold assets of the guilty parties.

36.     Two of the Defendants, Eike Batista, the chief architect of the fraud and his right hand man, Flavio Godhino, have just now been arrested on bribery, corruption and money laundering charges in Brazil. A third Defendant, Luiz Carneiro, as was reported in the press, was arrested back in September 2016, also on bribery and corruption charges in connection with OSX ship-building contracts. Batista's girlfriend, the Defendant, Flavia Sampaio, fled Brazil with Batista but has not returned with him and her whereabouts are currently unknown.

37.     All the known facts indicate an extremely high likelihood that there are substantial assets in Florida. For instance, $400 million is known to have been routed to Miami and deposited in just *one* of Batista's many banks between 2009 and 2014.[19]

---

[17] Exhibit "A."
[18] Exhibit "B."
[19] *See* Exhibit "G" para. 24.

38.    Between 2010 and 2014 the 63X Companies transferred at least $449 million from its own accounts at the Miami branch of Banco Itaú Europa International to other accounts controlled by Batista within the same bank. Whether those funds are still there is presently unknown.[20]

39.    There is also obviously an equally high likelihood that assets will be transferred out of Florida as soon as possible to avoid paying any eventual judgment.

40.    The Courts of Cayman and the Bahamas have already seen a proclivity to fraudulently transfer assets to cheat creditors on the part of Eike Batista, his companies, his accomplices, and Batista's family members. We particularly refer the Court here to the Worldwide Freezing Order, the Reasoned Judgment and the accompanying summary affidavit of the forensic examiner Thomas De Araujo.[21]

41.    Consider further that according to the Brazilian prosecutor's asset schedule, in the year or so prior to the bankruptcy of his businesses, Batista gratuitously transferred close to $100 million in his Brazilian assets to his two older sons, Thor and Olin, and to his wife and girlfriend. The likelihood that he did something similar with his Miami assets is extremely high.[22]

42.    Again, immediately after the OGX/OSX crash, in late 2013, some $30 million was transferred by 63X Master Fund to the IOTA trust account of Batista's asset protection lawyer, based on Brickell Avenue, Miami.[23]

43.    What we are stating here is before discovery. At this early stage we are unable to draw all the conclusive lines of guilt that tie *all* the companies and individuals to the scheme. But

---

[20] *See* Exhibit "G" para. 28.
[21] Attached as Exhibit "G."
[22] *See* Exhibit "G," para. 22a-d. All at the current conversion rate of 3:1 Brazilian Reais to U.S. Dollars. (Believed to be approximately the same as at the time of the transfers).
[23] *See* Exhibit "G," para. 23h-i.

there is nevertheless a substantial basis to believe that all the Defendants – Batista, his family members, his wholly-owned and controlled companies, and the top executives in the companies that conducted the fraudulent scheme – were intimately involved in either the fraudulent scheme or the fraudulent dissipation of assets, or both.

44.     Further, abundant evidence exists of there being substantial assets in Florida and abundant reason to believe that such assets will be moved out of Florida pending judgment.

### Conditions for Injunction

45.     Pursuant to rule 1.610, an *ex parte* temporary injunction may be granted if, "it appears from the specific facts shown by affidavit or verified pleading that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "the movant's attorney certifies in writing any efforts that have been made to give notice and the reasons why notice should not be required."

**Likelihood of Loss**

46.     These criteria are shown. The defendants have a demonstrated propensity for transferring hundreds of millions of dollars into and out of jurisdictions and into and out of the names of different putative owners, at will. There is little doubt that, unless restrained, all Florida assets will be promptly transferred out of the jurisdiction.

**Certification as to Notice**

47.     Eike Batista and the 63X Companies have been served with a copy of the Complaint (containing the FUFTA Counts) as part of the service packet out of the Cayman Islands and are on notice that such relief will at some time be sought in Florida.

48.     Eike Batista has also been served in these proceedings through the Secretary of State pursuant to section 48.181, Florida Statutes, as a foreign individual doing business in Florida, although the return of service has not yet been filed and the mail notice has not yet been given.

49.     Defendant, Werner Batista, has been personally served in Boca Raton, Florida, and must know that some move such as this is likely.

50.     Defendant, Marcus Berto, has been served through substitute service on his wife at his home in Key Biscayne, Florida, and is equally aware.

51.     Florida service packets are being prepared and served on other Defendants in various jurisdictions.

52.     Therefore, the Defendants must know, generally, that this sort of an application is coming and the prime mover, Batista, is flouting Court orders and is in police custody in Brazil.

53.     In all the circumstances, by his signature below, the undersigned certifies the reasons why notice of this application to the Defendants should not be required and why it is fair in all the circumstances to dispense with a hearing before issuing an order.

### The Order

54.     The part that each Defendant played in the fraud and cover-up of ownership assets is separately alleged in detail in the Complaint. At this stage, before discovery, on the basis of what is known, there is ample evidence to believe that all the Defendants played the parts with which they are charged and that all should be joined.

55.     However, if the Court considers that there is a Defendant or Defendants who should not, at this stage, be bound by an order, the proposed order attached[24] is drafted so that the Court may easily exclude any such by lining-out. (See, para.3).

---

[24] Exhibit "H."

## Burden vs Prejudice

56.     In considering whether to exclude any particular Defendant, we note that the injunction sought will present no burden to any Defendant who intends to obey the law. The proposed order only restrains transactions that are out of the ordinary course. Living expenses are unaffected. Investments are unaffected. True commercial transactions are not affected. All that is affected is the ability to transfer or hypothecate everything, or substantially so, in order to avoid paying a Florida judgment.

57.     Any Defendant who considers that they have been unjustly added to the order may swiftly apply to the Court for its discharge. But then, what law-abiding Defendant who did not intend to dissipate his or her assets prior to judgment would have any incentive to do so? The injunction sought only applies to attempts to break the law.

58.     Conversely, were the Defendants to fraudulently remove their assets from the jurisdiction, Plaintiffs eventual judgment will be empty paper.

59.     Accordingly, there would be no burden on any honest Defendant caused by granting the Order but there would be great prejudice caused to the Plaintiffs by refusing to enter such against all the Defendants.

## Bond

60.    In such circumstances, we respectfully suggest that the bond required be minimal. Given that the risk of loss in the first instance is restricted to whatever legitimate financial transactions may be hindered or interrupted in the few days between issuance of the order and the Defendants' right to appear and be heard in opposition, we suggest that the initial bond be in a minimal amount and in any event in a sum not higher than $50,000.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

s/ *Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

# EXHIBIT "A"



IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

IN THE MATTER OF SECTION 11A OF THE GRAND COURT LAW (2015 REVISION)

FSD CAUSE NO 172 OF 2016 (IMJ)

BEFORE MADAM JUSTICE MANGATAL
IN CHAMBERS

B E T W E E N :

| (1) | MERIDIAN TRUST COMPANY LIMITED |
| (2) | AMERICAN ASSOCIATED GROUP, LTD. |

**Applicants**

- and –

| (1) | EIKE FUHRKEN BATISTA (AKA EIKE FUHRKEN BATISTA DA SILVA) |
| (2) | 63X INVESTMENTS LTD. |
| (3) | 63X FUND |
| (4) | 63X MASTER FUND |

**Respondents**

---

### INJUNCTION PROHIBITING
### DISPOSAL OF ASSETS WORLDWIDE

---

### PENAL NOTICE

IF YOU EIKE FUHRKEN BATISTA (AKA EIKE FUHRKEN BATISTA DA SILVA) DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

IF YOU 63X INVESTMENTS LTD., 63X FUND, OR 63X MASTER FUND DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND LIABLE TO BE FINED OR TO HAVE YOUR ASSETS SEIZED AND ANY OF YOUR DIRECTORS MAY ALSO BE LIABLE TO IMPRISONMENT OR TO BE FINED OR TO HAVE THEIR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

00648263-1   THIS ORDER was FILED by SOLOMON HARRIS of 3rd Floor, FirstCaribbean Bank, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of its said Attorneys-at-law.



IMPORTANT:

FURTHER NOTICE TO THE RESPONDENTS

(1)   This Order prohibits **EIKE FUHRKEN BATISTA (AKA EIKE FUHRKEN BATISTA DA SILVA), 63X INVESTMENTS LTD., 63X FUND,** and **63X MASTER FUND ("the Respondents")** from dealing with your assets up to the amount stated. The Order is subject to the exceptions at the end of the Order. You should read it all carefully. You are advised to consult an attorney as soon as possible. You have a right to ask the Court to vary or discharge this Order.

(2)   If you disobey this Order you will be guilty of contempt of Court and may be sent to prison, if you are a respondent who is an individual, and / or fined or your assets may be seized.

THE ORDER

An application was made on the 27th and 28th October 2016 by Counsel for **MERIDIAN TRUST COMPANY LIMITED** and **AMERICAN ASSOCIATED GROUP, LTD. (the Applicants)** to The Hon. Madam Justice Mangatal. Upon hearing Counsel for the Applicant, Madam Justice Mangatal heard the application and read the affidavits listed in Schedule 2 at the end of this Order.

As a result of the application **IT IS ORDERED** that:

**1. DISPOSAL OF ASSETS**

I.     The Respondents must not:

(a)   remove from the Cayman Islands any of their assets which are in the Cayman Islands up to the value of USD62,932,547 inclusive of provision for claimed costs and interest; or

(b)   in any way dispose of, deal with or diminish the value of any of their assets whether they are in or outside the Cayman Islands up to the same value.

2.     Paragraph 1 applies to all of the Respondents' assets whether or not they are in their own name and whether they are solely or jointly owned. For the purpose of this order the Respondents' assets include any asset which they have the power, directly or indirectly, to dispose of or deal with as if it were their own (including assets of bodies corporate having no or no substantial trading activities and which are wholly owned and controlled by the Respondents). The Respondents are to be regarded as having such power if a third party holds or controls the asset in accordance with their direct or indirect instructions.

3.     If the total value free of charges or other securities ("unencumbered value") of the Respondents' assets in the Cayman Islands exceeds USD62,932,547, the Respondents may remove any of those assets from the Cayman Islands or may dispose of or deal with them so long as the total unencumbered value of their assets still in the Cayman Islands remains above USD USD62,932,547.

4.     If the total unencumbered value of the Respondents' assets in the Cayman Islands does not exceed USD62,932,547 the Respondents must not remove any of those assets from the

Cayman Islands and must not dispose of or deal with any of them. If the Respondents have other assets outside the Cayman Islands, they may dispose of or deal with those assets outside the Cayman Islands so long as the total unencumbered value of all their assets whether in or outside the Cayman Islands remains above USD62,932,547

## 2. DISCLOSURE OF INFORMATION

5.      Each Respondent must inform the Applicants' attorneys in writing within 72 hours of service of this order and to the best of their ability of all their assets (save for domestic chattels worth less than USD10,000.) whether inside or outside the Cayman Islands and whether in his or its own name or not and whether solely or jointly owned, giving the value, location and details of all such assets.

6.      Each Respondent must within 72 hours of service of this order and to the best of their ability inform the Applicants' attorneys in writing of:

   (a)     all their liabilities (including debts) above the value of USD10,000;

   (b)     any claims of which they have been notified above the value of USD500,000; and

   (c)     details of any pending legal proceedings or legal actions against them or legal proceedings which have been threatened against them in the previous 2 years but not yet served upon them.

7.      The information in paragraph 5 and 6 must be confirmed by the First Respondent and, in the case of each corporate Respondent, a director of each corporate Respondent in his capacity as a director of a corporate Respondent, in an affidavit which must be served on the Applicants' attorneys no later than **4.30pm** on the fifth clear business day after service of this Order.

8.      The Respondents shall each provide to the Applicants' attorneys within 72 hours of being served with this Order either:

   (a)     The contact details of a firm of attorneys in the Cayman Islands to whom communications in respect of this order are to be addressed; or

   (b)     An email address to which communications in respect of this order should be addressed.

## 3. PRESERVATION AND DELIVERY UP OF THE ASSET DOCUMENTS

9.      The Respondents must preserve and must not (save in compliance with this Order or in compliance with any other order of today's date made against the Respondents) dispose of or part with possession of any Asset Documents (as defined in paragraph 10 below).

10.     Save insofar as the Respondents have already delivered up documents pursuant to any other orders made in these proceedings, the Respondents must within 4 business days of service of this Order deliver up to the Applicants' attorneys all documents ("the Asset Documents") which they have in their possession, power or control and which evidence:

(a)     the existence, location or value or details of any of their assets worth more than USD10,000; and

(b)     all bank statements in relation to all bank accounts in which the Respondents have (or had) any interest (direct or indirect, legal or beneficial, sole or joint) from [1 January 2010] onwards or copies of those documents.  In the case of bank accounts, these documents must include bank statements showing the state of the account at the date of this order.

## 4. DELIVERY UP OF ASSET DOCUMENTS HELD BY THIRD PARTIES

11.     Where any Asset Documents are in the custody of third parties (including but not limited to banks, safety deposit holders, accountants, legal advisors, financial advisors, investment managers or advisors, trustees and nominees (including, for the avoidance of doubt, Maples Corporate Services Limited) and whether inside or outside the Cayman Islands) who hold such documents (including but not limited to bank statements) to the order of the Respondents or hold such documents on the Respondents' behalf or who are obliged to deliver the originals or copies to the Respondents on payment of a fee, the Respondents shall as soon as possible and in any event within one business day of service of this Order give written and (where possible) oral orders or instructions to such third parties immediately to deliver up all such documents or copies thereof to the Applicants' attorneys or to make available to the Applicants' attorneys all such documents for inspection and copying.

12.     The Respondents shall within 2 business days of service of this Order sign and deliver up to the Applicants' attorneys letters addressed to such third parties in the forms set out in Annex A hereto (Part 1 in respect of banks and Part 2 in respect of others) including but not limited to all the banks (and/or any other deposit holding entities) with whom the Respondents hold bank accounts.

## 5. EXCEPTIONS TO THIS ORDER

13.     This order does not prohibit the First Respondent from spending USD10,000 a week towards his ordinary living expenses and each Respondent from spending a reasonable sum on legal advice and representation. But before spending any money each Respondent must tell the Applicants' attorneys where the money is to come from and inform the Applicants before the spending of the Respondent on legal advice or liability to pay for legal advice has reached $200,000.

14.     Save as provide in 14A below this order does not prohibit each Respondent from dealing with or disposing of any of their assets in the ordinary and proper course of business, provided that the Respondents shall notify the Applicants' attorneys 5 business days in advance of any such dealing or disposal worth more than USD10,000 so as to afford the Applicants a reasonable opportunity to apply for further relief from this Court.

14A.    From the date of this Order to the earlier of:

        a)  12 January 2017; or



> b) the date of service of this Order on the First Respondent (to be advised by the Applicants to the Sixth Respondent in writing); or
>
> c) the Applicants informing the Sixth Respondent that the terms of this Order have been brought to the attention of the First Respondent (to be advised by the Applicants to the Sixth Respondent in writing)
>
> nothing in this Order shall prohibit the First to Fourth Respondents (or their associated entities) from making transfers from any account held with the Sixth Respondent located within the Cayman Islands up to a maximum aggregate amount of US$500,000.

**14B.**   The Sixth Respondent shall inform the Applicants as soon as practicable (and in any event within 24 hours) of the receipt of any instruction received from or on behalf of the First to Fourth Respondents (or their associated entities) to make a transfer which would, but for the provisions of paragraph 14A above, have caused the aggregate transfers from the accounts of the First to Fourth Respondents to exceed $500,000, and the Sixth Respondent shall not act on such instructions without further Order of this Court or agreement in writing from the Applicants."

15.   The Respondents may agree with the Applicants' attorneys that the above spending limits should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16.   The Order will cease to have effect if the Respondents:

  (a)   provides security by paying the sum of USD62,932,547 into court, to be held to the order of the court; or

  (b)   makes provision for security in that sum by another method agreed with the Applicants' attorneys.

## 6. EFFECT OF THIS ORDER

17.   A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way.  He must not do it through others acting on his behalf or on his instructions or with his encouragement, and this Order is effective against any Respondent on whom it is served or who is given notice of it.

18.   A Respondent which is not an individual and which is ordered not to do something must not do it itself or by its directors, officers, employees, partners, or agents, or in any other way.

## 7. THIRD PARTIES

19.   Effect of this Order - It is a contempt of Court for any person notified of this Order knowingly to assist in or permit a breach of the Order.  Any person doing so may be sent to prison, fined, or have his assets seized.

20.     Effect of this Order outside the Cayman Islands - The terms of this Order do not affect or concern anyone outside the jurisdiction of this Court until it is declared enforceable or is enforced by a court in the relevant country and then they are to affect him only to the extent they have been declared enforceable or have been enforced UNLESS such person is:

   (a)     a person to whom this Order is addressed or an officer or an agent appointed by power of attorney of such a person; or

   (b)     a person who is subject to the jurisdiction of this Court and (i) has been given written notice of this Order at his residence or place of business within the jurisdiction of this Court and (ii) is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this Order.

20A.    Nothing in this order shall, in respect of assets located outside the Cayman Islands, prevent any third party from complying with:

   a)     what it reasonably believes to be its obligations, contractual or otherwise under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between the third party and the Respondents; and

   b)     (any orders of the courts of that country or state, provided reasonable notice of any application for such an order (to the extent such notice is permitted by the law of such country or state) is given to the Applicants' Cayman Islands attorneys.

21.     Set off by Banks - This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the Respondents before it was notified of the Order.

22.     Withdrawals by the Respondents - No bank need enquire as to the application or proposed application of any money withdrawn by the Respondents if the withdrawal appears to be permitted by this Order.

## 8. SERVICE OUT OF THE JURISDICTION

23.     The Applicants may serve the Originating Summons and a Summons seeking the continuation of this Order, and this Order, on the First Respondent out of the jurisdiction pursuant to Grand Court Rules, Order 11, r.1(n).

## 9. UNDERTAKINGS

24.     The Applicants give to the Court the undertakings set out in Schedule 1 to this Order.

## 10. DURATION OF THIS ORDER

25.     The Applicants have liberty to return to this Court 10 business days after the effecting of service of this Order on the Respondents ("the Return Date"). This Order will remain in force up to and including the Return Date, unless before then it is varied or discharged by a further Order of the

Court. The Return Date shall be listed for 30 minutes for directions on the determination of the substantive issues on the application, unless a party considers that more than 30 minutes is required for the return date and has given notice of the same to the Court and the other party no less than 2 business days before the Return Date.

## 11. VARIATION OR DISCHARGE OF THIS ORDER

26.    The Respondents (or anyone notified of this Order) may apply to the Court at any time to vary or discharge this Order (or so much of it as affects that person), but anyone wishing to do so must first inform the Applicants' attorneys in writing on not less than 2 business days notice. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' attorneys in advance at the same time as the written notice of the intention to vary or discharge the Order.

## 12. COSTS

27.    The costs of this application are reserved to the judge hearing the application on the return date.

## 13. NAME AND ADDRESS OF APPLICANTS' ATTORNEYS

28.     The Applicants' attorneys are:

Solomon Harris (Attn: Laura Hatfield/Jamie McGee)

3rd Floor

First Caribbean House

P.O. Box 1990

Grand Cayman

KY1-1104

Cayman Islands

Tel: +1345 949 0488



## 14. INTERPRETATION OF THIS ORDER

29.     In this Order "he", "him" or "his" include "she" or "her" and "it" or "its".

30.     Where there are two or more Respondents then (unless the context indicates differently) (a) references to "the Respondents" mean both or all of them; (b) an Order requiring "the Respondents" to do or not to do anything requires each Respondent to do or not to do it; (c) a requirement relating to service of this Order, or of any legal proceedings, on "the Respondents" means on each of them.

31.     The term "assets" shall include (but not be limited to):

00648263-1   THIS ORDER was FILED by SOLOMON HARRIS of 3rd Floor, FirstCaribbean Bank, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of its said Attorneys-at-law.

(a)    any right whether contractual or under a trust or otherwise to receive or to be paid money or property, whether unconditional or contingent or present or future;

(b)    any interest in any trust, foundation, anstalt, stichting or similar legal structure (together herein collectively referred to as a trust) including any interest in any discretionary trust or any right or expectation to be considered for a payment or advance under any discretionary private trust;

(c)    any right or power to deal with any property, whether through nominees, power of attorney, or by instructing another person who habitually obeys instructions;

(d)    any property held by or in the name of a third party or company who habitually obeys the Respondent's instructions in relation to dealings with such property;

(e)    any bank account (whether in the name of the Respondents or not and irrespective of whether its balance is zero, positive or negative) and in respect of which the Respondents are an authorised signatory or in respect of which the Respondents are a signatory on the mandate or in respect of which the signatory habitually obeys the instruction of a Respondent or over which the Respondents exercise de facto control;

(f)    any interest in a pension fund or life insurance policy;

(g)    all chattels save for domestic chattels worth less than USD10,000;

(h)    any and all interests held (whether legally, beneficially or otherwise) in any company, limited liability corporation, partnership, limited partnership or joint venture; and

32.    For the purposes of this order "details" of assets shall include but not be limited to:

(a)    in respect of bank accounts or similar accounts, the name or names in which the account is held; the name of the bank, building society or similar institution, the address of the relevant branch, the number of the account and the balance;

(b)    in respect of debit and credit cards, the name, number, and dates of validity of the card and the name of the issuing company.

(c)    in respect of real property, the address, the purchase price, the present approximate value and details of any encumbrances, charges or similar;

(d)    in respect of shares, the number of shares held, their purchase price, and their approximate actual value;

(e)    in respect of any interest held in any partnership or joint venture, the identity of the other partners or co-venturers, and the nature and value of the business and property held by the partnership or joint venture;

(f)    the nature, amount and date of any charges or encumbrances on any assets and the name of the persons entitled to such charges or encumbrances, including without limitation all mortgage agreements and/or tenancy agreements;

(g)    the value of any pension fund or life insurance entitlement whether present or future, including the value of the fund and the value of any right to withdraw a lump sum; and

(h)    details of all trusts including discretionary trusts in respect of which the Respondent, directly or indirectly, is a settlor, trustee, protector, enforcer or beneficiary or is entitled to be considered by the trustees for advancement or in respect of which the trustees habitually obey his instructions or to which the Respondent has directly or indirectly provided loans or paid monies whether by way of loan or otherwise. Such details to include:

   (i)    the name and contact details of all trustees, beneficiaries, classes of beneficiaries, settlors and protectors;

   (ii)   the value and nature and location of all property subject to such trusts;

   (iii)  the trust deed and any amendments thereto; and any letter of wishes and any amendments thereto.

DATED this 28 day of October 2016

FILED this 28 day of October 2016

Amended 16 November 2016

Amended 14 December 2016

Amended 22 December 2016

THE HONOURABLE MADAM JUSTICE MANGATAL
JUDGE OF THE GRAND COURT



### SCHEDULE 1

#### Undertakings given to the Court by the Applicants

(1) If the court later finds that this order has caused loss to the Respondents, and decides that the Respondents should be compensated for that loss, the Applicants will comply with any order the court may make but, vis-à-vis the First Applicant, any order for compensation will be limited to the amount of assets held in its capacity as Trustee of the Chrisly Trust.

(2) The Applicants will cause to be transferred to the Court account the sum of USD1,500,000 no less than 3 business days from the date of this order for the purposes of fortification of the undertaking given at (1) above.

(3) As soon as practicable after any and all applications for interim relief in the Bahamas, and in any event no later than ~~25 November 2016~~ ~~30 business days~~ 12 January 2017 after the date of this Order (or, in circumstances where the Applicants have sought and obtained an extension of time in which to serve this order in accordance with paragraph 26 of this Order, no later than the extended date) the Applicants will:

   a) Serve on the Respondents this Order;

   b) Serve on the Respondents the  Originating Summons in these Proceedings claiming appropriate relief;

   c) Serve on the Respondents:

      i) copies of the affidavits and exhibits containing the evidence relied upon by the Applicants, and any other documents provided to the court on the making of the application;

      ii) a draft application notice for the continuation of the Order;

      iii) a transcript of the recording of this hearing; and

      iv) a copy of the skeleton argument produced to the court by the Applicants' counsel.

(4) As soon as practicable after the service of this Order the Applicants shall:

   a) issue proceedings in the Courts of Florida United States including a Complaint substantially in the form shown to the Court on the hearing of this application; and

   b) take steps to serve the said proceedings on the Respondents.

(5) Anyone notified of this Order will be given a copy of it by the Applicants' attorneys.

(6) The Applicants will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this Order including the costs of ascertaining whether that person holds any of the Respondents' assets and that if the Court later finds that this Order has caused such a person loss, and decides that the person should be compensated for that loss, the Applicants will comply with any

Order the Court may make save always that vis-à-vis the First Applicant any order for compensation will be limited to the amount of assets held in its capacity as trustee of the Chrisly Trust.

(7)     The Applicants will not without the leave of the Court use information obtained as a result of an Order of the Court in this jurisdiction for the purpose of civil or criminal proceedings in any other jurisdiction other than the proposed proceedings in the United States and any interim applications for relief in the Bahamas related to the proposed proceedings in the United States.

(8)     Save for any application for interim relief against the Respondents in the Bahamas, the Applicants will not without the leave of the Court seek to enforce this order in any country outside the Cayman Islands or seek an order of a similar nature including orders conferring a charge or other security against the Respondents or the Respondent's assets.

(9)     The First Applicant, in its capacity as Trustee of the Chrisly Trust, shall not act on any instruction received from any party which would have the effect, if acted upon, of revoking the Chrisly Trust in whole or in part.  If such an instruction is received by the First Applicant, then it shall within 7 business days apply to the Cayman Court for directions in relation thereto.



SCHEDULE 2

Affidavit(s)



The Judge read the following affidavits before making this Order:

1.    The first affidavit of Mr Thomas Antonio de Araujo dated 18 October 2016

2.    The first affidavit of Mr Ernest Patrick Dover dated 20 October 2016

3.    The first affidavit of Mr Brian Thomas Windham dated 20 October 2016

4.    The first affidavit of Mr Richard Edmund Blaksley dated 17 October 2016

5.    The first affidavit of Ms Judith Ellen Neiwirth dated 13 October 2016

6.    The first affidavit of Mr Marcello Augusto Lima De Oliveira dated 18 October 2016

7.    The first affidavit of Mr Kevin John Murray dated 20 October 2016

8.    The second affidavit of Mr Thomas Antonio de Araujo dated 26 October 2016

9.    The second affidavit of Mr Ernest Patrick Dover dated 26 October 2016

ANNEX A

PART 1

[Bank]

For the attention of [    ]

[Date]

**By Fax, By Email and By Post**

Dear Sirs

**Urgent - Asset Disclosure Request Pursuant to a Freezing Order dated [x] October 2016**

**Account Holder:**
**Account No:**

I refer to the above Account Holder and to any and all bank accounts (whether they be current accounts, savings accounts or otherwise, including, without limitation, those set out above) held at [ ] or any other financial institutions for which you are responsible that are in the name of the Account Holder (the "Accounts").

I hereby authorise and request you immediately to supply copies of all records in your possession relating to the Accounts and to the operation of the Accounts for the period from 1 January 2012 to date (including without limitation details of the balances of the Accounts, copies of bank ledgers, mandates, bank statements, cheques, paying in slips, payment orders and all other records which identify the source and destination of monies passing through the account) which are requested by Solomon Harris (Attn: Laura Hatfield / Jamie McGee), 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands. I authorise you to have contact with Solomon & Harris in order to obtain their instructions and to deliver the copy documents requested and to answer their questions about the Accounts. I further authorise and instruct you to send to the said Solomon & Harris (Attn: Laura Hatfield) copies of all future bank statements and other records prepared by you in respect of the Accounts until further instruction from Solomon & Harris.

Solomon & Harris will meet your reasonable charges for supplying these documents and this information.

Yours faithfully,

ANNEX A

PART 2

For the attention of [    ]

[Date]

**By Fax, By Email and By Post**

Dear Sirs

**Urgent - Asset Disclosure Request Pursuant to a Freezing Order dated [x] October 2016**

I hereby authorise and request you immediately to supply copies of all documents in your possession which are requested by Solomon Harris (Attn: Laura Hatfield / Jamie McGee), 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, relating to the existence, location, value and details of all of my assets (whether held by me directly or indirectly, legally and/or beneficially) worth more than USD1,000 including (but not limited to) any interest and/or shareholding in a company, partnership, joint venture, trust, bank account, credit facilities, property, motorised vehicles, pension or other saving account.

I authorise you to have contact with Solomon Harris in order to obtain their instructions and to deliver the copy documents requested (Attn: Laura Hatfield) and to answer any questions they may have about my assets and financial affairs.

Solomon Harris will meet your reasonable charges for supplying these documents and information.

Yours faithfully,

00648263-1   THIS ORDER was FILED by SOLOMON HARRIS of 3rd Floor, FirstCaribbean Bank, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of its said Attorneys-at-law.

EXHIBIT "B"

THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

Cause No. FSD 172 of 2016 (IMJ)

IN THE MATTER OF MERIDIAN TRUST COMPANY LIMITED

BETWEEN

      **(1) MERIDIAN TRUST COMPANY LIMITED**
      **(2) AMERICAN ASSOCIATED GROUP LTD**

                                                      **Applicants**
AND

      **(1) EIKE FUHRKEN BATISTA DA SILVA (AKA EIKE FUHRKEN BATISTA)**
      **(2) 63X INVESTMENTS LTD**
      **(3) 63X FUND**
      **(4) 63X MASTER FUND**
      **(5) MAPLES CORPORATE SERVICES LIMITED**

                                                      **Respondents**

**IN CHAMBERS**

| | |
|---|---|
| Appearances: | Mr. G Halkerston of Counsel instructed by Ms. L Hatfield and Mr. J McGee of Solomon Harris |
| Before: | The Hon. Justice Ingrid Mangatal |
| Hearing: | 27 and 28 October 2016 |
| Decision/Ruling Delivered: | 28 October 2016 |
| Reasons for Decision Delivered: | 11 November 2016 |



**HEADNOTE**

*S.11A of the Grand Court Law (2015 Revision) – Injunctive and Disclosure Orders Granted as Protective Measures in aid of Foreign Proceedings to be Commenced.*

Page 1 of 37

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

## REASONS FOR DECISION

1.      Before the Court are applications for a worldwide freezing order (**WFO**) and ancillary disclosure relief arising from what the applicants claim is a remarkable fraud.

2.      The core of the alleged fraud is the ramping up of the value of shares in a commodities company, in this case an oil company, by the dissemination of falsely positive information about the prospects of profitable commercial production and the deliberate suppression of information that would have permitted investors to form a negative view of the prospects of the business.

## THE PARTIES

3.      The First Applicant (**Meridian**) is a company incorporated under the laws of Nevis and is the trustee of a Nevis trust known as the Chrisly Trust (**the Trust**) which, through its investment adviser, invested some USD 17 million in the alleged fraudulent scheme described below. The Trust is for the benefit of an elderly, disabled beneficiary, Dr Paul Tien (the **Beneficiary**), and various family members of the Beneficiary.

4.      The Second Applicant (**American**) is a company incorporated under the laws of the Cayman Islands which also holds investments for the Beneficiary. American, through its investment adviser, invested some USD 4 million in the alleged fraudulent scheme described below.

5.      The First Respondent (**Batista**) is a Brazilian national. The Applicants allege that Batista was the mastermind of a multi-billion-dollar fraud, conducted between 2009 and 2013. The essence of the fraud was that Batista induced investors around the globe, in particular the USA, to invest money in his oil exploration company, OGX, on the basis of a series of fraudulent misrepresentations, including promises of immense oil discoveries (alongside suppression of negative information), and promises to provide finance to OGX on request. Formerly a publicly-traded company in Brazil, OGX's name changes were set

*161111 Meridian Trust Co. Ltd. and American Associated Group Ltd - Ex parte Injunction -- Reasons for Decision*

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

out in the Affidavit of Mr. De Aroujo, a forensic accountant and Certified Fraud Examiner at Yip & Associates in Miami, Florida who has given detailed evidence on behalf of the Applicants. The Applicants say that the promises made were false, as Batista knew them to be. OGX collapsed in October 2013 and investors were unable to recover their money. However, prior to and since the collapse, the Applicants allege Batista has been dissipating his assets (including the proceeds of the alleged fraud) to offshore and other jurisdictions, including the Cayman Islands and Switzerland, in an attempt to evade creditors.

6.    Batista (along with his associates) is the subject of a number of civil, regulatory and criminal proceedings in Brazil. Of particular note is the fact that a freezing order is in place against Batista's assets in support of the Brazilian criminal proceedings in the sum of BRL 162.6 million (USD 50.8 million). This order is currently limited to assets located in Brazil. In the course of the criminal proceedings, it has been alleged by the Brazilian authorities that Batista has continued to dissipate his assets.

7.    The Second, Third, and Fourth Respondents (together, the **Cayman Companies**) are companies incorporated under the laws of the Cayman Islands. The Applicants allege that the Cayman Companies are controlled and beneficially owned by Batista and operate as his private investment fund vehicles for assets beneficially owned by Batista. The Applicants allege that the Cayman Companies were used by Batista to dissipate the proceeds of the fraud. Where context requires, the Cayman Companies are referred to individually and respectively as **63X Investments**, **63X Fund**, and **63X Master Fund**.

8.    The Applicants refer to Batista and the Cayman Companies together as the **Respondents**.

9.    The Fifth Respondent (**MCSL**) is a company incorporated under the laws of the Cayman Islands. MCSL is the registered agent of the Cayman Companies and their local corporate services provider. It is joined as respondent to the disclosure application described below. No wrongdoing is alleged against MCSL.

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

10.   The Brazilian companies concerned were part of an oil exploration group, OGX, which the Applicants allege to be controlled and substantially owned by the alleged key fraudster, Batista. The Applicants maintain that OGX's business, if there was a real business, was focussed mainly in Brazil with some other activities in South America. Between 2009 and 2011 OGX's market value and Batista's wealth grew incredibly. In October 2010, OGX had a market capitalisation of some USD 41 billion and by 2011, Batista's personal wealth was valued at USD 30 billion, putting him in the top ten of Forbes' global "rich list".

11.   But these numbers did not, the Applicants claim, reflect the true value of OGX and it is part of their case that Batista knew this to be the case. They say that in fact with extremely limited commercial reserves and production prospects, OGX was worth next to nothing. The Applicants have adduced evidence from an expert in the oil industry in order to confirm that this is the position.

12.   When negative news did begin to emerge in 2012, Batista, it is alleged, spun further lies to prop up his ailing company until it finally defaulted on its debts and entered Brazilian insolvency restructuring processes in October 2013.

13.   The Applicants maintain that, not only did Batista prop up the company by his lies at this stage, he also sold a large amount of shares in OGX and took steps to move hundreds of millions of dollars out of the reach of creditors, such as by transferring assets to friends and family.

14.   Batista's fraud, and asset dissipation, the Applicants argue, led to the abuse of namely the Cayman Companies owned by him. Documents produced by the Brazilian prosecution authorities and apparently collated from tax declarations of Batista indicate that on 29 May 2013 (some four months before OGX was to collapse and at a time when Batista

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

was liquidating his shares in the company), Batista transferred USD 572 million of his personal assets to the credit of 63X Fund in the Cayman Islands (the **Cayman Transfer**).

The evidence is that the Cayman Companies banked in the Bahamas. They may have banked in the Cayman Islands too, but there is to date, no evidence yet of this to hand.

16.     The Applicants have obtained evidence that in the last days of the collapse of his empire, Batista tried to move USD 100 million from a Bahamas account to accounts in Florida but that dissipation of assets was frustrated by the intervention of bankers (the **Attempted Transfer**). Having been frustrated, Batista, the Applicants allege, transferred at least USD 90 million to a trust in Switzerland (the **Swiss Transfers**).

17.     As a result of his alleged fraud, Batista (along with his associates) has been the subject of a number of civil, regulatory and criminal proceedings in Brazil. Many of these proceedings are ongoing and there is in place a domestic freezing injunction to the value of USD 60 million in support of Brazilian criminal proceedings currently limited to Batista's domestic assets. The Applicants contend that the evidence suggests that Batista has nevertheless continued to dissipate his assets.

18.     The Applicants claim to be victims of Batista's fraud. Via their investment adviser in Florida they invested some USD 21 million in bonds issued within the OGX structure, specifically by an Austrian OGX company. Those bonds were ultimately close to worthless.

19.     The Applicants have indicated that they intend to sue Batista, the Cayman Companies, and others associated with the OGX fraud, in Florida. Specifically the plan is to issue proceedings upon the conclusion of applications for freezing orders and information disclosure, initially in the Cayman Islands and the Bahamas.

THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT
CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE
ORDER DATED 27 OCTOBER 2016

20.    The lawsuit in Florida is based upon the alleged fraudulent and criminal conduct of
       Batista and the assistance given to him by the Cayman Companies and others. The
       Applicants will aver that investors in the United States - in Florida particularly - were
       specifically targeted by Batista, and in one bond issue 78% of the OGX bonds were sold
       to US investors. The intended claims are set out in a draft Complaint which is before the
       Court (the **Complaint**). The Applicants have provided expert evidence on the strength of
       the key claims in the Complaint as a matter of Florida law.

21.    The claims in Florida will be for some USD 63 million, namely for the underlying basic
       loss of some USD 21 million and for treble damages under Florida statutes.

22.    Mr. Halkerston, who ably presented the arguments on behalf of the Applicants, submits
       that the relief sought by the Applicants to freeze the assets of the Cayman Companies up
       to USD 21 million falls squarely within the scope of the statutory jurisdiction as
       explained by the recent Grand Court cases which have considered and applied section
       11A of the Grand Court Law (2015 Revision).

23.    The application as against Batista seeks an order beyond that which has been granted on
       the limited Cayman case law to date in relation to the fairly recent section 11A statutory
       powers, namely a WFO against a foreign party to proceedings which are to take place in
       a third jurisdiction. However, the Applicants submit that on a review of the existing
       Cayman and English authorities that limb of the application is clearly appropriate and
       proper under section 11A.

24.    There is a novel and discrete issue, namely can the Grand Court freeze assets for claims
       based upon treble damages under US law? That turns on whether such a judgment would be
       enforceable at common law. Shortly put, the point has not been decided in Cayman or in
       England. It is the Applicants' case that a freezing order for the full amount of the Applicants'
       claim in Florida is permitted as a matter of principle and is appropriate on the facts of this
       case.

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

25.     The Applicants have been very mindful, in my view, of their duty of full and frank disclosure in the present *ex parte* application which concerns highly complicated background facts which took place over a number of years. For this reason, the Applicants have set out, in an actual Appendix to their skeleton arguments, an extensive summary of all matters which they say they are aware of which are material to the Court's discretion whether to grant relief and, if so, on what terms.

26.     The Application is for a WFO against Batista and the Cayman Companies and an ancillary Disclosure Order against MCSL.

27.     The Application is brought in aid of proceedings intended to be instituted in Florida, USA (the **Florida Claim**).

28.     The Florida Claim constitutes a fraud claim against Batista, the Cayman Companies, and a number of Batista's family members and associates. Mr. Halkerston indicates that the present Application specifically focused on four of the causes of action in the interests of proportionality, namely fraud, conspiracy to commit fraud, breaches of the Florida Civil Remedies for Criminal Practices Act (**CRCPA**, also known as **Florida RICO**), and conspiracy to commit breaches of Florida RICO.

29.     The Application is made pursuant to section 11A of the Grand Court Law (2015 Revision), which places on a statutory footing the jurisdiction of the Grand Court to grant interim relief in aid of foreign proceedings.

30.     The Applicants also indicate that they intend to apply in the Bahamas for disclosure in the days immediately following any grant of a WFO and disclosure order in Cayman (the **Bahamas Disclosure Application**). The Applicants' position is that the evidence discloses that Batista's funds, or some of them, including proceeds of the fraud, were dissipated to (or via) Bahamian banks. In particular, the Applicants intend to seek disclosure from (i) POBT Holdings Limited, (ii) UBS (Bahamas) Ltd., (iii) UBS Trustees (Bahamas) Ltd., (iv) BSI Overseas (Bahamas) Ltd., (v) Amber Trust Ltd, (vi) BSI AG; (vii) Itau Bank & Trust

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

Bahamas Ltd., (viii) Itau Bahamas Nominees Ltd, (ix) Itau Bahamas Directors Ltd, and (x) The Winterbotham Trust Company Limited. The present Application and/or the Bahamas Disclosure Application might result in further disclosure or other relief being sought in the Bahamas or elsewhere.

## THE LAW

31.     Section 11A of the Grand Court Law (2015 Revision) provides as follows.



> *"Interim relief in the absence of substantive proceedings in the Islands*
> *11A.*
> (1) *The Court may by order appoint a receiver or grant other interim relief in*
> *relation to proceedings which-*
>> (a) *have been or are to be commenced in a court outside of the*
>> *Islands; and*
>> (b) *are capable of giving rise to a judgment which may be enforced*
>> *in the Islands under any Law or at common law.*
> (2) *The Court may, pursuant to this section, grant interim relief of any kind which*
> *it has power to grant in proceedings relating to matters within its*
> *jurisdiction.*
> (3) *An order under subsection (1) may be made either unconditionally or on such*
> *terms as the Court thinks fit.*
> (4) *Subsection (1) applies notwithstanding that –*
>> (a) *The subject matter of those proceedings would not, apart from*
>> *this section, give rise to a cause of action over which the Court*
>> *would have jurisdiction; or*
>> (b) *The appointment of the receiver or the interim relief sought is*
>> *not ancillary or incidental to any proceedings in the Islands;*
> (5) *The Court may refuse an application for the appointment of a receiver or the*
> *grant of interim relief if, in its opinion, it would be unjust or inconvenient to*
> *grant the application.*
> (6) *In exercising the power under subsection (1), the Court shall have regard to*
> *the fact that the power is –*
>> (a) *Ancillary to proceedings that have been or are to be commenced*
>> *in a place outside the Islands; and*
>> (b) *For the purpose of facilitating the process of a court outside the*
>> *Islands that has primary jurisdiction over such proceedings.*
> (7) *The Court has the same power to make any incidental order or direction for*
> *the purpose of ensuring the effectiveness of an order granted under this*
> *section as if the order were granted in relation to proceedings commenced in*
> *the Islands.*
> [...]

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

> *(10) In this section, "interim relief" includes an interlocutory injunction."*

## THE GATEWAY

32.   There is, therefore, a gateway test in section 11A (1): there must be proceedings which have been (or are to be) commenced in a foreign jurisdiction, which are capable of giving rise to a judgment enforceable in the Cayman Islands.

33.   If the gateway test is satisfied, the Grand Court has a wide discretion, as to the central question of whether it would be unjust or inconvenient to grant the application (section 11A (5)).

### Unjust or inconvenient

34.   In *Classroom Investments v China Hospitals Inc.* [2015] Unreported, 15 May 2015, (*"Classroom"*), Smellie CJ accepted that judicial authorities on section 25 of the English Civil Jurisdiction and Judgment Act 1982 (which is in similar but not identical terms to section 11A) were relevant to a section 11A application.

35.   In particular, Smellie CJ approved (at paragraph 25), the guidance of Millett LJ in the English Court of Appeal in *Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818, (*Cuoghi*):

> "[the] *court should in principle be willing to grant appropriate interim relief in support of substantive proceedings taking place elsewhere, and* [...] *it should not be deterred from doing so by the fact that its role is only an ancillary one unless the circumstances of the particular case make the grant of such relief* **inexpedient**" (emphasis added)

36.   It was recognised by Smellie CJ that notwithstanding the difference in nomenclature between *"inexpedient"* (in the English statute) and *"unjust and inconvenient"* (in the Cayman Law) the approach of the Cayman Court and the English Court as to whether to grant relief will be the same.

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

37.   The principles to be distilled from the authorities were set out by Smellie CJ in ***Johnson & Johnson v Stephen Medford and anor*** [2015] unreported, 29 June 2015, at paragraph 29 (*"**Johnson & Johnson**"*) as follows:



> "(i)     *Where assets are located outside the jurisdiction of the foreign Court which is seized of the substantive proceedings, the Court of the jurisdiction where they are located should not hesitate in an appropriate case to grant appropriate orders;*
> (ii)    *The question is whether it is "just and convenient" to grant the protective orders. The jurisdiction is not one to be exercised only in exceptional circumstances; it will suffice if it is <u>expedient</u> in the interest of justice to do so.*
> (iii)   *Whilst this Court should always be cautious in granting a free-standing freezing injunction, it should <u>not be timid</u> to grant such relief so long as there is a <u>good arguable case</u> and there is a <u>real risk of dissipation</u> of assets which could frustrate that case."* (Emphasis added)

### <u>Unjust or inconvenient: (i) assets in the jurisdiction</u>

38.   As to the first point, in ***Johnson & Johnson***, Smellie CJ referred to this principle and stated( paragraph 29):

> *"In this case, while the Defendants are not personally within the jurisdiction of this Court, there is nonetheless cogent evidence of assets under their control being within the jurisdiction and such circumstances in an appropriate case, will provide sufficient basis for the grant of relief"*

39.   However, it should be noted that it is not the case that an applicant in Cayman must be able to point to assets located in the Islands, in particular where the respondents are Cayman entities and the applicant is seeking disclosure to ascertain the whereabouts of assets. Indeed, this was expressly considered by Smellie CJ in ***Classroom*** at paragraph [41]:

> *"Also, the fact that [the respondents'] assets may be said not to be in Cayman is nothing to the point. As Millett LJ pointed out in Cuoghi, where disclosure is needed, that is most appropriately requested from the Court of a defendant's home jurisdiction; without disclosure an applicant may*

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

> *not be able to apply to local courts for effective orders against assets abroad [...]"*

40.  This also reflects the approach under English law, where it is clearly established that *Mareva* relief can be granted in relation to assets of the defendant wherever situated. See *Cuoghi* and the work of Steven Gee Q.C. *Commercial Injunctions*, 6th Edition at 12-035.

41.  In the present case, there are assets in the Cayman Islands. However, it is the Applicants' case that it is likely that a significant proportion of the Respondents' assets have been siphoned off to other (as yet unknown) jurisdictions.

**Unjust or inconvenient: (ii) expediency**

42.  There are a number of considerations which are pertinent in the present Application and are relevant to the Grand Court's exercise of discretion of whether to grant relief and on what terms, *viz.*

    42.1   the jurisdiction of the Cayman Court over the Respondents;

    42.2   the availability of relief in other jurisdictions; and

    42.3   the presence of a parallel criminal freezing order.

**Jurisdiction**

43.  As to the jurisdiction of the Cayman Court where the defendants are Cayman companies over whom the Cayman Court has personal jurisdiction, Smellie CJ in *Classroom* considered that:



> *"this Court is not exercising an exorbitant jurisdiction, and to consider it exorbitant merely because the main proceedings are in* [a foreign court] *would be contrary to the policy underlying section 11A – namely; to aid foreign proceedings (which policy is expressly referred to in section 11A(6)). Indeed, the fact that the Defendants are Cayman companies makes it "most appropriate that protective measures should be granted by those courts best able to make their orders effective", i.e. the Cayman Court – see Cuoghi".*

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

44.     As to respondents who are not Cayman entities, in *Classroom*, Smellie CJ approved (at paragraph 36) the following passage from Walker J in the English High Court in *Mediterranean Shipping Co v OMG International Ltd & Ors*, [2008] EWHC 2150 (Comm) at paragraph [4] where Walker J found that the Chinese defendant, Ningbo, did not have a significant presence in the UK, but in relation to which there was strong evidence that it was involved in an international fraud:



>    *"If Ningbo had been a company incorporated in this country or with a significant presence in this country, I would have had no hesitation in granting the worldwide freezing order that is sought. That is because the material that has been put before me shows cogent evidence of fraud on the part of Ningbo. It is fraud with an international character and which, subject to the points that I shall mention shortly, would clearly, in my view, warrant a worldwide freezing order. Ningbo, however, is not a company incorporated in this country, nor is it a company with any significant presence here"*

45.     A freezing order was nevertheless granted. It was expressly recognised in *OMG International* that an important factor in the exercise of discretion was that the English court was the only court that could provide the necessary disclosure and freezing relief (in particular because a New York attachment order was liable to be set aside).

46.     This is part of the wider enquiry outlined by Smellie CJ in *Johnson & Johnson* at [29]:

>    *"First, would this Court grant relief if it were itself seized of the substantive proceedings, and second, would the fact that the substantive proceedings are overseas make the grant of relief inexpedient, unjust or inconvenient?"*

47.     This in turn tracks the test as enunciated by Lawrence Collins LJ in *ETI Euro Telecom International NV v Republic of Bolivia & Anor.* [2009] 1 W.L.R. 665 at paragraph 72.

48.     The English Court of Appeal in *Motorola Credit Corpn. v Uzan (No 2)* [2003] EWCA Civ 752 identified five particular considerations which the court should bear in mind when considering inexpediency. The first four concern comity and the overlap with

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

orders of the primary court. The Applicants submit that no such issue arises on present facts, because neither Florida nor Brazil has power to grant WFOs as an interim remedy. The fifth indicia of *'inexpediency'* identified by the Court of Appeal in *Motorola* is where a respondent has only 'tenuous' links to the court granting the injunction, such that there are doubts over the injunction's enforceability. Nevertheless, the Court in *Motorola* upheld the freezing order over a foreign respondent because the presence of assets in the jurisdiction meant that the Court could police and enforce the order. (See paragraphs 125 and 128).

49.     The Applicants have asked the Court to also note that there are a number of examples of the English Court granting such relief over foreign respondents where there are assets in the jurisdiction. One example, as well as *Motorola* itself, is *JSC v Skurikhin*, (two decisions [2012] EWHC 3916 (Comm); [2014] EWHC 2254(QB)) where a Russian defendant was the beneficiary of an offshore trust owned by LLPs in England (over which the English Court could appoint a receiver). WFOs were granted against the Russian defendant (except in relation to China, Cuba and Belarus, where the evidence was that the Russian Court could order extraterritorial relief) and the LLPs. Cases in which WFOs have been *refused* instead tend to concern the situation where the applicant cannot establish a good arguable case that the respondent controls assets in the jurisdiction. However, exceptionally, even where there is uncertainty over whether there might be assets in the jurisdiction, the English Court has granted WFO relief on a temporary basis in order for there to be disclosure as to assets: *Republic of Haiti v Duvalier*. [1990] 1 QB 202.

50.     It was submitted that in the present case, the Court has jurisdiction over the Cayman Companies. Batista, however, is resident in Brazil. The Applicants submit that the Cayman Court is best placed to grant and police a WFO as against Batista and the Cayman Companies. In particular, it is submitted that there is solid evidence of an international fraud and international dissipation orchestrated by Batista which ties Batista to the Cayman Islands. In particular, Batista used the Cayman Companies, which are

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

beneficially owned and controlled by him, as an integral part of the fraud. And, on any view, they submit, Batista has assets within the jurisdiction.

**Availability of relief in other jurisdictions**

51. As to the availability of relief in other jurisdictions, there is a distinction to be drawn between those cases where the injunctive relief sought (for instance a WFO) is available in the primary court or the court of the defendant's residence, and those cases where such relief is not available. In circumstances where the applicants have already sought relief in the foreign court and been refused, this is a material consideration to the exercise of the Cayman Court's discretion. However, as observed by Smellie CJ in *Classroom* at [42]:



> "*the fact that relief was not obtained in Hong Kong as against* [the respondents] *is again nothing to the point. Had* [the applicant] *sought relief there, and been refused, that would have been a material consideration, but as Lord Bingham CJ observed in* Cuoghi, *even if the foreign Court had refused relief, the fact that the defendant is present in its home jurisdiction might nonetheless weigh in favour of granting relief there. Further, in* Refco, *Morritt LJ was by no means certain that earlier* dicta *necessarily meant that the home court would be precluded from granting relief where the foreign court had not exercised a jurisdiction to grant relief. Likewise, in* Refco, *Potter LJ did not consider that earlier cases had decided that even a refusal of relief in the foreign court would necessarily mean that the home court should not grant it. Finally, in* Friction Dynamics, *Neuberger J considered it could well be appropriate to grant relief even where a foreign court had actually refused it.*"

52. The situation where an applicant could seek (and apparently had sought) a WFO in the court of the defendants' residence was considered in *Johnson & Johnson*, where the Grand Court was asked to grant a WFO and related disclosure orders relating to the assets outside of the Islands of Canada-resident defendants (the **Medfords**) to New York litigation connected to the alleged manufacture of counterfeit goods by the defendants:

52.1 The Plaintiffs had obtained evidence that the Medfords had funnelled proceeds of their alleged fraud through Cayman accounts at Royal Bank of Canada to Barbados and Jersey.

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

52.2    The Plaintiffs sought, pursuant to section 11A, a WFO and disclosure orders as to the Medfords' worldwide assets.

52.3    The Grand Court granted a freezing order but limited the order to assets within the Islands and the disclosure order to those domestic assets. In so limiting the interim relief the Court noted that the Medfords were resident outside Cayman and the granting of extra-territorial relief is exceptional and on the facts would be exorbitant.

52.4    It was noted that the lack of jurisdiction of the New York Court related specifically to assets within Cayman.

52.5    It was expressly recognised that the New York Plaintiffs had sought relief in Canada against the Canada-resident defendants.

53.    The Applicants note that the Courts of Canada have a long-established jurisdiction to grant a WFO over domiciled residents.

54.    However, the (different) situation where the 'home' court did not have the jurisdiction to grant a WFO was considered by the English Court of Appeal in *Motorola Credit Corpn. v Uzan (No 2)*. Proceedings in New York were brought against four defendants, three of whom were resident in Turkey. One of the Turkey-resident defendants, the first defendant, had assets in England, specifically a large property. The Court upheld the grant of a WFO over the first defendant.

55.    The key issue was whether it was inexpedient to grant a WFO. The Court of Appeal noted:

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**



55.1  The policing of international fraud requires the Court to provide whatever assistance it properly can, within the limits of comity, meaning that the wide powers of section 25 might prove extremely popular with international litigants.

55.2  However, policing is only expedient if the Court granting the injunction has power to enforce its orders if disobeyed.

55.3  The Court identified specific factors to be considered in the context of comity. These included whether the proposed order would overlap or be inconsistent with an order of the primary court or other jurisdictions and whether such a conflict might be likely in respect of future orders.

55.4  If the primary court or the court of the defendant's residence could grant a WFO but refused to do so then it may well be inexpedient to grant relief, but that consideration did not apply if those courts did not have the jurisdiction to grant such orders.

55.5  The Court of Appeal refused to discharge the WFO against the first defendant. The English Court would not be devoid of enforcement if the WFO was disobeyed because of the existence of significant assets within the jurisdiction.

56.  As identified in ***Motorola***, the key issue is whether the order sought can be meaningfully enforced by the Court. In my view, the decision in ***Johnson & Johnson*** is an application of the fact-specific balancing factors in the assessment of an application under section 11A. I accept the submission of Mr. Halkeston that ***Johnson & Johnson*** did not purport to identify a legal bar on the application of WFO relief against respondents domiciled outside of the Islands.

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

57.    The Applicants submitted that the present situation is far closer to *Motorola* than to *Johnson & Johnson*: Batista has assets within Cayman and neither Brazil nor Florida can grant a WFO; accordingly, the Cayman Court is the only court which can grant and police a WFO in support of the Applicants' claim which concerns a fraud (and dissipation) on a worldwide scale.

**The relevance of parallel criminal freezing order**

58.    In domestic situations English Courts have supported the use of civil freezing orders in parallel to criminal freezing orders. See *Cancer Research UK Limited v Morris* [2008] EWHC 2678 (QB), King J at [23]; *Faya Limited v Butt* [2010] EWHC 3461 (Ch), Mann J at [23]-[25].

59.    It has been recognised that criminal orders and civil orders achieve different ends and as the civil plaintiff has no control over a criminal order remaining in place, absent a parallel civil freezing order the plaintiff would be at risk if the criminal order was discharged or varied.

60.    In the present case, there is a Brazilian freezing order in place in support of Brazilian criminal proceedings. At present it affects Batista's assets in Brazil only.

**Unjust and inconvenient: (iii) Good arguable case and real risk of dissipation**

**Good arguable case**

61.    As to the meaning of "good arguable case" on the merits, Smellie CJ in *Classroom* approved Mustill J's definition in *Ninemia* [1984] 1 All ER 398, in which his Lordship described a good arguable case as:

> "[...] one which is more than barely capable of serious argument, but not necessarily one which the judge considers would have a better than 50 per cent chance of success".

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

62.   In deciding whether the case reaches the required standard, the Court will take into account the *apparent* strength of the case and may assess the apparent plausibility of statements in affidavits.

63.   A *"good arguable case"* is the minimum jurisdictional requirement. The Court's view of the merits of the claimant's case are important factors in the Court's ultimate exercise of discretion in whether to grant the relief and if so on what terms.

64.   The Applicants say that they plainly have a good arguable case and submit, moreover, that the merits are strong.

**Risk of dissipation / real risk that a judgment may go unsatisfied**

65.   As to the risk of dissipation, Smellie CJ in *Classroom* (paras 61 and 63) outlined the following principles:



65.1   The test is that referred to by Kerr LJ in *Ninemia,* namely whether, on the whole of the evidence before it, the Court is of the view that the refusal of a freezing order would involve a real risk that a judgment or award in favour of the plaintiff would remain unsatisfied.

65.2   The applicant must show a real risk that the respondent will engage in activities outside the usual course of its business with the effect of dissipating its assets and making it more likely that a judgment in the plaintiff's favour would go unsatisfied.

65.3   The applicant must adduce 'solid evidence' of a real risk of the judgment remaining unsatisfied unless the respondent is prevented from dealing with assets within the jurisdiction.

THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016

65.4    'Solid evidence' is judged on a case-by-case basis. It may be possible to infer risk of dissipation from the surrounding circumstances. The court must investigate not only the plaintiff's case but also the merits of any respondent's evidence presented in opposition.

65.5    Risk may be more readily inferred where the respondent is a holding company without any substantial physical presence or operations within the jurisdiction; the requirement to show a real risk of dissipation might have to yield where assets are held by a Cayman entity through a string of subsidiaries across the globe.

66.    It is also noted, as argued by Counsel, that the English cases support the proposition that if there is a good arguable case in support of an allegation that the defendant has acted fraudulently or dishonestly then it is often unnecessary for there to be any further specific evidence on risk of dissipation for the court to be entitled to take the view that there is sufficient risk to justify granting *Mareva* relief.- see ***Madoff Securities International Ltd. V Raven*** [2011] EWHC 3102 (Comm) at [169].

67.    In the present case, the Applicants argue that they have solid evidence that before the nature and scale of Batista's alleged misrepresentations were uncovered, Batista took steps to move certain assets out of his name in an apparent attempt to evade creditors, including through the use of the Cayman Companies (as described below: **Batista's Asset Dissipation**). Moreover, Batista's Asset Dissipation appears to have continued in further efforts to safeguard his assets after allegations surfaced in Brazil with the commencement of the Brazilian criminal investigations.

**Timing of the application**

68.    Batista's fraud was complex and technical in nature and took place over a number of years. Batista's Asset Dissipation was on a global scale and utilised offshore structures in conditions of utmost secrecy. It has been necessary, the Applicants proffer by way of explanation, to undertake significant preparatory work, including expert technical and

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

legal evidence in respect of a multitude of jurisdictions, in order to be in a position to issue this application and the Florida Claim. While timing is a relevant issue in the context of any equitable relief, the context in which timing is considered, Counsel submits, is different for freezing orders compared to other injunctions and equitable relief generally. Delay may evidence that an applicant does not consider that there is a real risk of dissipation or the delay may be such that the Court considers that the order sought would be futile. Delay is simply one factor to be taken into account in assessing the competing factors in favour of granting a freezing order or those factors that militate against granting an order.

69.     The principles were summarised by Flaux J in ***Madoff Securities International v Raven*** at [156]:



> *"It seems to me that the following principles relevant to the present application can be discerned from those two cases.*
>
> *(1) The mere fact of delay in bringing an application for a freezing injunction or that it has first been heard inter partes, does not, without more, mean there is no risk of dissipation. If the court is satisfied on other evidence that there is a risk of dissipation, the court should grant the order, despite the delay, even if only limited assets are ultimately frozen by it.*
>
> *(2) The rationale for a freezing injunction is the risk that a judgment will remain unsatisfied or be difficult to enforce by virtue of dissipation or disposal of assets (see further the citation from **Congentra AG v Sixteen Thirteen Marine SA, The Nicholas M [2008] EWHC 1615 (Comm), [2009] 1 All ER (Comm) 479 below**). In that context, the order for disclosure of assets normally made as an adjunct to a freezing injunction is an important aspect of the relief sought, in determining whether assets have been dissipated, and, if so, what has become of them, aiding subsequent enforcement of any judgment.*
>
> *(3) Even if delay in bringing the application demonstrates that the claimant does not consider there is a risk of dissipation, that is only one factor to be weighed in the balance in considering whether or not to grant the injunction sought."*

THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016

70.    Flaux J also referred to the judgment of Cooke J in ***Antonio Gramsci Shipping Corp v Recoletos*** [2011] EWHC 2242 (Comm) at [28]-[29]:



> *"[28] ... Up to now, therefore, Mr Lembergs may have felt secure, in the absence of any proceedings against him in England, when such were being pursued against Mr Stepanovs, and although alerted to the matters covered by the evidence of Messrs Meroni, Kveps, Pedera and Stepanovs, there is nothing like the commencement of proceedings to bring home to an individual the risk of a judgment against him and the consequent potential loss of assets. It could be said that, in every case where there is a letter before action, the defendant is alerted to the possibility of a claim and the need for dissipation of assets if the defendant is minded so to do in order to make himself judgment-proof. However, time and again the courts have granted freezing orders on commencement of proceedings following exchanges of correspondence where the merits of the claim have been fully debated and the defendant thereby undoubtedly alerted.*

> *[29] In my judgment it is no answer for a defendant to come to the court to say that his horse may have bolted before the gate is shut and then to put that forward as a reason for not shutting the gate. That would be to pray in aid his own efforts to make himself judgment proof - if that, indeed, is what has occurred - and to avoid the effect of any court order which the court might make. If he can show that there is no risk of dissipation on other grounds, that is one thing. If he can show that the claimants do not consider that there is such a risk by virtue of the delay in seeking the order, that again is a relevant factor. However, if the court is satisfied about those matters in favour of the claimant, there is no reason why the court should not shut the gate, however late the application, in the hope, if not the expectation, that some horses may still be in the field or, at the worst, a miniature pony."*

71.    The Applicants submit that the timing of the application poses no impediment to the grant of relief. The evidence suggests that there is a very real risk of dissipation if the Florida Claim came to Batista's attention and that consequently any Florida judgment would remain unsatisfied. The Applicants' evidence indicates that it has taken considerable work and time to get to the stage at which they could be ready to issue proceedings in Florida and, prior to that step, roll out ancillary relief applications across several jurisdictions. Whilst some assets may have already dissipated, there may well be assets

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

remaining which are of sufficient value to be material to the Applicants in protecting their ability to enforce a judgment.

### Insufficient assets within the jurisdiction

72.     As to a *worldwide* freezing order, there must also be reason to believe that the Respondent's assets within the jurisdiction may be insufficient to meet the Applicant's claims. This was confirmed in *Classroom*, citing the classic test in *Derby v Weldon (Nos. 1 & 2)*.

73.     The Applicants are currently unaware of the exact asset position of the Respondents at present. While there might be significant assets in the Islands, it appears likely that the bulk of the Respondents' assets have been transferred elsewhere (on the evidence, most likely Switzerland via Bahamas). Hence, they submit, the application for disclosure from the Respondents and MCSL is of utmost importance.

### Disclosure

74.     The authorities, and in particular *Classroom*, recognise that ancillary orders for disclosure, directed at identifying what has become of missing funds in order to take appropriate steps in other jurisdictions, are sensible and proportionate (*Classroom* at [55]). Disclosure orders are vitally important aspects of a freezing order and have long been a standard feature of freezing orders. As outlined by Robert Goff J in *A v C*:



> *"The defendant may have more than one asset within the jurisdiction – for example, he may have a number of bank accounts. The plaintiff does not know how much, if anything, is in any of them; nor does each of the defendant's bankers know what is in the other accounts. Without information about the state of each account it is difficult, if not impossible, to operate the Mareva injunction properly."*

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

75.　Indeed, for this reason, orders for disclosure ancillary to injunctive relief have been described by Millett LJ in *Cuoghi* as *"the most valuable part of the relief"* and by Smellie CJ in *Classroom* as the relief *"which really makes the order effective"*.

76.　Smellie CJ in *Classroom* also approved the principle enunciated in *Algosaibi v Saad Investments* [2011 (1) CILR 178], CA; that disclosure orders ordinarily followed freezing orders as the purpose was to police the injunction.

77.　To the extent that disclosure against a third party is not considered to be ancillary within the meaning of section 11A, the Applicants argue that the Court also has a *Norwich Pharmacal* jurisdiction where a person, through no fault of his own, gets "mixed up" in the wrongful acts of others so as to facilitate their wrongdoing. Per Lord Reid in *Norwich Pharmacal,* such a person is under an obligation to give "full information".

78.　In the present situation, the Applicants seek ancillary disclosure from the Respondents in the form set out in the Draft Order. As to MCSL, the Applicants submit that disclosure against MCSL is ancillary within the meaning of section 11A, alternatively that MCSL, as the registered agent of the Cayman Companies, is plainly 'mixed up' in the wrongdoing by Batista and his attempt, using the Cayman Companies, to make himself judgment-proof and to defraud his creditors. No allegation of wrongdoing is made against MCSL and the information that is sought against them is customary in applications concerning companies used as the vehicles of fraud.

**THE EVIDENCE**

79.　This is an extremely complicated claim, involving voluminous affidavits and numerous lever arch files have been provided to the Court, with numerous affidavits and exhibits from a wide range of persons across several jurisdictions.

THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT
CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE
ORDER DATED 27 OCTOBER 2016

80.     Mr Thomas Antonio de Araujo, a forensic accountant and Certified Fraud Examiner at
        Yip & Associates in Miami, Florida, has reviewed the information supplied by the other
        affiants and has performed his own independent investigation and analysis of the
        allegations made in the Florida Claim. His Affidavit dated 18 October 2016 provides a
        full narrative of Batista's alleged fraud, the loss suffered by the Applicants, and Batista's
        worldwide dissipation of assets.

81.     Mr Kevin John Murray, an experienced Florida litigation attorney based in Miami,
        Florida, has submitted an affidavit dated 20 October 2016 summarizing the Florida legal
        issues relevant to the Florida Complaint. He opines that there is a good arguable case that
        the Florida Court has jurisdiction over Batista and the Cayman Companies and that
        causes of action against Batista and the Cayman Companies are established to the
        requisite standard of good arguable case.

82.     Ms Judith Ellen Neiwirth, the chief investment adviser at Gables Capital Management,
        had the stewardship of the Meridian and American investment portfolios and made the
        relevant investments on behalf of the Applicants. In her affidavit dated 13 October 2016,
        she details her reliance on the representations by Batista and his accomplices on which
        she relied in making investments on behalf of Meridian and American and the loss
        suffered by reason of the investments.

83.     Mr Brian Thomas Windham, Senior Director and consulting engineer in the international
        firm of consultants FTI Consulting has submitted an affidavit dated 18 October 2016
        concerning the technical detail of certain recoverable oil representations and states that
        these representations were false and that Batista could not have reasonably believed in
        the truth of the representations.

84.     Mr Richard Edmund Blaksley at GPW & Co Ltd (**GPW**), a business intelligence firm
        based in London, has submitted an affidavit dated 17 October 2016 summarising GPW's
        investigations. This includes details of his interviews with Ms Malu Gaspar, an

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

investigative journalist and author of a biography of Batista, *"Tudo ou Nada,"* published on 15 November 2014 and other materials authored, or procured and identified by her, from *inter alia* the Brazilian criminal authorities. This affidavit primarily concerns Batista's control over the Cayman Companies and the dissipation of Batista's assets.

85. Mr Ernest Patrick Dover, Managing Director of Meridian and director of American, provides information on behalf of the Applicants and provides the necessary undertakings.

86. Mr Marcello Augusto Lima de Oliveira, a Brazilian lawyer, provides an expert opinion on aspects of Brazilian law, including the Brazilian proceedings against Batista and the freezing orders made in support thereof.

**Applying the principles from the cases to the instant facts**

*The Gateway test*

87. I accept that the gateway test under section 11A has been met. The Florida Claim, which is capable of giving rise to a judgment enforceable in the Islands, will be initiated as soon as the First to Fourth Respondents are served with any Order of this Court. The Applicants set out at paragraphs 290-302 of their skeleton arguments the various possibilities as to how the WFO might be varied depending on Batista's participation in the Florida Claim (which, on the evidence which they set out they say he is likely to defend). I am prepared to accept for the moment and at this stage of the application that a judgment under RICO in Florida for treble damages could be enforced in the Cayman Islands at common law. Although it is not clear from the judgment whether any point was taken or addressed directly about it, I derive some support for that acceptance from the decision of Smellie CJ in *Johnson v Johnson* where at paragraph 13, the Chief Justice describes the relief sought in New York as including awards of compensatory and punitive damages, accounts of profits, cost and interest and at paragraph 36 he indicated that he would grant the injunctive and ancillary relief disclosure orders sought by the

THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016

plaintiffs in that case, limited as to the amount of statutory damages to be recoverable in the New York action.

88.    In addition to substantive claims against the Cayman Companies as asserted under Florida law, the Cayman Companies and any assets of those companies would arguably be available to assist the enforcement of any judgment against Batista. The Grand Court has jurisdiction to freeze the assets of the Cayman Companies as non-cause of action defendants based upon the *Chabra* jurisdiction - *Algosaibi v Saad Investments* [2011 (1) CILR 178], CA.

*Unjust or inconvenient (i) assets within the jurisdiction*

89.    As a matter of law, it is not necessary to be able to point to assets within the jurisdiction. However, I accept that there are assets within the jurisdiction. There are the shares in the Cayman companies, and as a practical matter, assets owned by the Cayman companies.

**Unjust or inconvenient: (ii) inexpedient**

*Jurisdiction; the availability of relief in other jurisdictions*

90.    The Grand Court has personal jurisdiction over the Cayman Companies. The Grand Court can control the application of assets of the Cayman Companies wherever they are located given that they are companies incorporated within its jurisdiction.

91.    Batista, of course, is not resident in the jurisdiction. Batista is resident in Brazil. The primary proceedings are to take place in Florida. The Applicants submit that it is appropriate on the facts of this case to grant a WFO over the assets of Batista wherever they are located, save of course, to the usual caveat that the injunction sought will not have extra-territorial effect if the assets of Batista within the Islands are in excess of the maximum sum ordered to be frozen.

92.    I accept that the following points are of particular relevance to this request:

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

92.1   This is the policy underlying section 11A: see *Classroom* at [40];



92.2   This is a fraud case.

92.3   There is solid evidence that Batista has taken steps to attempt to put assets out of the reach of creditors.

92.4   The Cayman Companies have been historically valued as holding assets considerably in excess of the maximum sum sought to be frozen. The Applicants' case is that the Cayman Companies are beneficially owned by Batista. However, it appears likely that these funds might have been dissipated.

92.5   There is significant evidence that Batista is acquainted with and has used sophisticated offshore structures and entities to hold assets beneficially owned by him.

93.6   The strong evidence is that the offshore structures have been used as a conduit for the transfer of assets by Batista to further his dissipation of assets.

92.7   The courts of Brazil cannot order a freezing order over the domestic or foreign assets of Batista in aid of the Florida Claim. No such steps can be taken in Brazil until after there has been a judgment in Florida.

92.8   The Florida courts cannot grant a WFO as a pre-judgment interim remedy.

92.9   No other civil court is in a better position to freeze and police the freezing of the assets of Batista pending the determination of the Florida Claim.

92.10  There is an order of the Brazilian criminal court freezing Batista's assets up to approximately USD 60 million. That order is only enforceable over assets in

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

Brazil although there is permission given to the Brazilian authorities to take steps to apply the order internationally.

93.     The English Courts have granted WFOs pursuant to section 25 of the English Civil Jurisdiction and Judgment Act 1982 over parties who are not resident in England when the primary litigation is abroad. A key issue for the Courts has been whether there could be a sanction for disobedience of the WFO as the Court in general does not seek to grant orders that are incapable of enforcement. I accept that there can be effective sanction when the foreign respondent has assets within the jurisdictions.

94.     The Applicants' submit that unlike *Johnson & Johnson*, and I accept that submission, this is an appropriate case for the grant of a WFO against a non-resident respondent, namely Batista, pursuant to the section 11A jurisdiction for the following reasons:-

94.1    The decision in *Johnson & Johnson* was not a decision on jurisdiction. In that case there were proceedings pending in Canada, where the Respondents to the section 11A were resident. WFO relief could be granted there against them.

94.2    There does not appear to have been evidence in *Johnson & Johnson* that there were assets or significant assets within the Islands. The Cayman accounts seemed to be a conduit for money laundering.

94.3    Neither the primary court, Florida, nor the court of Batista's residence, Brazil, has the jurisdiction to grant a WFO pending the determination of the Florida Claim.

94.4    As in *Motorola,* there are assets in the Islands to permit the enforcement of any order, namely the shares in the Cayman Companies and, in practical terms, ultimately any assets of those companies.

*161111 Meridian Trust Co. Ltd. and American Associated Group Ltd - Ex parte Injunction – Reasons for Decision*

THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016

*The Brazilian freezing order*

95.  The Brazilian criminal freezing order, in the amount of approximately USD 60 million, requires consideration for the purposes of comity, particularly in light of the *Motorola* principles. I accept Mr. Halkerston's submission that in domestic situations English Courts have supported the use of civil freezing orders in parallel to criminal freezing orders - the orders achieve different ends and as the civil plaintiff has no control over a criminal order remaining in place, absent a parallel civil freezing order the plaintiff would be at risk if the criminal order was discharged or varied.

96.  There is no practical risk, in the short term at least, of the parallel criminal and civil orders being in conflict. The evidence is that the Brazilian criminal trial will not take place until 2019 or 2020 - see the affidavit of Mr. Oliviera at [63]. A conflict of orders could not be expected until and unless either a civil court or a criminal court orders that payments be made by Batista from assets which are the subject of a freezing order. If that situation occurs in the future I accept that it can be the subject of case management, on evidence. It is not a reason to reduce the effectiveness of any order of this Court.

*Evidence possibly obtained illegally*

97.  As part of its enquiry into the evidence in support of an *ex parte* application for a WFO, the Court of course has to address the admissibility and weight of evidence which might have been obtained unlawfully.

98.  It is incumbent on a party relying on such evidence in an *ex parte* application to identify that evidence may have been obtained in a manner that engages the criminal law - *St Merryn Meat Limited v Hawkins* [2001] CP Rep 116, Geoffrey Vos QC sitting as a Deputy Judge of the High Court at [7]. See also Steven Gee QC, *Commercial Injunctions* (Sixth Edition, 2016, Sweet & Maxwell), at 8-010.

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

99. The Court has the power to exclude evidence obtained illegally and/or attribute less weight to it. The principles were summarised by the English Court of Appeal in ***Imerman v Tchenguiz*** [2010] EWCA Civ 908; [2011] Fam 116 at [170]-[177]:



> *"170 After all, the use in court as evidence of material which has been improperly obtained (whether in breach of confidence, tortiously, or even criminally) is permissible, though such use may be refused by the court or permitted only on terms. Subject to certain exceptions, notably information obtained by torture, the common law does not normally concern itself with the way evidence was obtained when considering admissibility: see **R v Sang** [1980] AC 402 , relying on **Kuruma v The Queen** [1955] AC 197 . Accordingly, in the present case, it appears to us that information derived from the documents obtained, albeit unlawfully, from Mr Imerman's computer records is, subject to questions of privilege and relevance, admissible in the ancillary relief proceedings. However, just because it is admissible, it does not follow that the court is obliged to admit it.*
> *171 Thus, it appears that, as a matter of common law, a judge often has the power to exclude admissible evidence if satisfied that it is in the interests of justice to do so: **Marcel v Comr of Police of the Metropolis** [1992] Ch 225 , p 265, per Sir Christopher Slade. Where the CPR apply, the position is even clearer: see **Jones v University of Warwick** [2003] 1 WLR 954 . In that case, relying on CPR r 32.1(2) , which provides in terms that the court can exclude evidence, as well as the overriding objective in rule 1.1 , the Court of Appeal held that the trial judge had a discretion as to whether or not to admit highly relevant evidence obtained in an underhand manner. Although they upheld his decision to admit the evidence, it is quite clear from the reasoning that the court had power to exclude it in the light of the way in which it had been obtained."*

100. As outlined by the Applicants, evidence provided to Mr Blaksley may have been obtained as a result of prior criminal actions under Brazilian law. This does not render such evidence inadmissible, but the Court can exclude such evidence or attach less weight to it because of its provenance.

101. Mr Blaksley also obtained information, documentation and evidence from Ms Gaspar, a Brazilian journalist, who has written a book about Batista and the collapse of OGX. Ms Gaspar, as an investigative journalist, has been unwilling to disclose sources of information for professional reasons.

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

102. The evidence is that:



    i. Ms Gaspar obtained information as to banking and business activities of Batista from sources close to him.

    ii. Ms Gaspar obtained the Asset Schedule, prepared by the Brazilian Federal Police, from Judge Flavio Roberto de Souza. Judge de Souza has been removed from the Batista criminal proceedings as a result of alleged improprieties.

103. Mr Oliveira's evidence is that provision of the above categories of information to Ms Gaspar may have constituted a criminal offence under Brazilian law:

    i. The provision of the Asset Schedule by Judge de Souza may have constituted the offence by him of acting contrary to "functional secrecy" pursuant to Article 325 of the Brazilian Criminal Code. The receipt of information in such circumstances by Ms Gaspar may not have constituted a criminal offence even if the provider committed a crime.

    ii. The provision of confidential business information by an employee of OGX could constitute the offence of unfair trade competition contrary to Article 195(XI) of Federal Law no. 9.279/96.

104. Even if the obtaining of the information did constitute a criminal offence, the Applicants submit that on the facts of this case it is just and fair that the evidence provided to Mr Blaksley is accepted by this Court on this application as being admissible and persuasive. I accept that submission.

105. In addition, I am aware that the provision of information from inquiry agents and investigative journalists is commonplace in international fraud cases, particularly since absent evidence from such sources, it can often be impossible for victims of complex

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

cross-border fraud to have any opportunity to track and preserve the fruits of the fraud to meet future judgments. As Mr. Halkerston submitted, shortly put, fraudsters do not conduct their business in a transparent manner. Complaints of impropriety can on balance seem hollow given the reason why obtaining the evidence was necessary.

106. The manner in which the evidence was obtained may also affect the weight the Court gives to that evidence. In that context, I accept that what Ms Gaspar told Mr Blaksley (as contained in his evidence) is detailed and clearly comes from several sources very close to the business and banking activities of Batista. The Applicants' evidence also sets out reasons why this evidence is consistent with other evidence obtained by the Applicants in preparation for this application.

107. I find that there seems little doubt as to the authenticity of the Asset Schedule. Part of the schedule listed "donations" (i.e. dissipations of assets), which formed the basis of subsequent applications by the Brazilian authorities to freeze the assets of Batista. The evidence is persuasive as to the attempts by Batista to siphon off assets prior to the collapse of OGX, his use of the Cayman Companies to facilitate that process, and the fact that Batista is likely to have assets to meet any judgment obtained in the Florida proceedings.

**Unjust and inconvenient: (iii) Good arguable case and real risk of dissipation**

*Good arguable case*

108. The Florida Claim and the Affidavits in my judgment plainly meet the standard of a good arguable case.

109. There is substantial evidence in support of the Applicants' case that Batista has committed the fraud as alleged, by way of a series of misrepresentations, including by omission.

*Risk of dissipation / real risk that a judgment may go unsatisfied*

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

110.  There is solid evidence that Batista has taken steps to evade creditors and to dissipate his assets. The Applicants draw attention to the conclusion of Mr de Araujo that the evidence strongly suggests that before the nature and scale of Batista's alleged misrepresentations were uncovered, Batista took steps to move certain assets out of his name in an apparent attempt to evade creditors, including through the use of the Cayman Companies. The Brazilian criminal authorities have alleged that Batista's Asset Dissipation appears to have continued notwithstanding the criminal proceedings and Brazilian freezing orders made against him.

### *The timing of the application*

111.  I accept that the extent of the preparatory work that has been undertaken by the Applicants in investigating the factual issues, considering the legal issues in various jurisdictions, collating evidence and preparing to issue proceedings in Florida, the Cayman Islands and the Bahamas has been substantial.

112.  Applying the tests in *Madoff* and *Antonio Gramsci*, the time it has taken to allow the Applicants to be in a position to make this application does not undermine the merits of the application. To use the metaphor in *Antonio Gramsci Shipping*, while some of the horses may have bolted, there may be horses (or ponies) which are of sufficient value to be material to the Applicants in protecting their ability to enforce a judgment.

113.  What is critical is not the time it took to bring this application. Instead, the crucial matter is that the application was made on a proper *ex parte* basis before Batista and the Cayman Companies know of: (a) of the Florida Claim; and (b) the ability of the Courts of the Cayman Islands, the Bahamas and elsewhere to offer assistance to identify and freeze their assets pending the fraud trial. I accept that there is strong evidence of Batista's willingness to move assets around the world's financial system in efforts to put his interests before his creditors.

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

### The Applicants duty of Full and Frank Disclosure

114.    Each of the affidavits filed herein have detailed sections regarding full and frank disclosure. There is also an Appendix One to the skeleton arguments dedicated to this issue. The skeleton arguments themselves occupied some one hundred and two pages, and the Appendix One, ranged from pages 103-127. In particular, Mr. de Aroujo's full and frank disclosure relates to the Defences raised by Batista in Brazilian civil proceedings where Batista was sued by a group of minority shareholders in OGX (through a special purpose vehicle), and defences raised by him in the press. In these defences Batista essentially asserts reliance on others; the fact that he lost more money than anyone; and that oil is a risky business. The legal defences were also analysed by Mr. Murray (in respect of how they would translate to defences in the Florida Claim) and by Mr. Oliviera in respect of matters of Brazilian law. I have read and absorbed all of the matters raised in detail, including those mentioned above, and taken them into account in making my decision.

### Insufficient assets within the jurisdiction

115.    There is reason to believe that the Respondents' assets within the jurisdiction may be insufficient to meet the Applicant's claims. The Applicants draw attention to the evidence of Batista's Asset Dissipation, and in particular the Attempted Transfer and the Swiss Transfers, referred to previously. While there might be significant assets in the Islands, it appears likely that the bulk of the First to Fourth Respondents' assets have been transferred elsewhere.

116.    As explained in ***ETI Euro Telecom International NV v Republic of Bolivia & Anor*** [2009] 1 WLR 665, referred to at paragraph 34 of ***Classroom***, the first stage is to consider whether this Court would grant interim relief if the substantive proceedings were in fact being conducted here in the Cayman Islands. The second is to consider whether the fact that the substantive proceedings are abroad make it inexpedient for the purposes of section 11A to grant the relief.

**THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016**

117.  It is clear to me that if the substantive proceedings were being brought here I would grant the relief sought. I am further satisfied that there is no factor that would render it inexpedient or unjust or inconvenient for me grant the relief sought.

## Disclosure

118.  I am of the view that the ancillary order for disclosure, directed at identifying what has become of Batista's dissipated assets, is necessary and proportionate.

119.  As regards MCSL, I accept that disclosure against MCSL is ancillary within the meaning of section 11A (in particular, see subsections (1), (2) and (7)), alternatively that MCSL, as the registered agent of the Cayman Companies, is in essence 'mixed up' for the purposes of the *Norwich Pharmacal* jurisdiction in the wrongdoing by Batista and his attempt, using the Cayman Companies, to make himself judgment-proof and to defraud his creditors.

## CROSS UNDERTAKING IN DAMAGES

120.  Meridian is acting in a representative capacity as trustee of the Trust. It is licensed by the Nevis government to provide fiduciary, corporate management and administration services in Nevis. Meridian provides such services to a broad range of clients and its business is not limited to acting in the capacity of trustee of the Trust.

121.  Meridian and American jointly support the Application with an undertaking in damages to compensate the Respondents or any third party for any damage caused by the orders if ordered to do so upon an inquiry. The Applicants have placed funds in trust with their Cayman attorneys and state that they are willing to place so much of these funds with the Court by way of fortification as may be ordered.

THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE ORDER DATED 27 OCTOBER 2016

122.   The financial assets held by Meridian as trustee of the Trust and American are stated to be approximately USD 97 million as of 9 September 2016 (and USD 96 million as at 20 October 2016, per the 2nd Affidavit of Mr. Dover, sworn 26 October 2016).

123.   Mr Dover has confirmed that the revocability of the Trust poses no impediment to the cross-undertaking.

124.   In these circumstances, the Applicants request that the assets available to respond to the cross-undertaking as to damages be limited to the assets held within the Trust, and the Draft Order makes provision for such a limitation. American is wholly owned by the Trust and therefore the offer of the limited cross-undertaking would extend to all the assets of that company.

125.   In the exercise of its discretion the Court can limit the cross-undertaking in damages when the applicant seeking freezing order relief is acting in a representative capacity and when the applicant has no personal interest in the proceedings. The principle has been recently considered by the English Court of Appeal in *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2015] EWCA Civ 139 per Lewison LJ, esp. [68]-[69] and [81] - [86].

126.   The Court can limit the cross-undertaking when *"the applicant has no personal interest in the litigation and is bringing the action on behalf of others"*. [68]

127.   Such a decision is a matter of discretion for the judge granting the injunction. I accept that this is an appropriate case in which to exercise this discretion and I accede to this request at this stage, to limit the cross-undertaking to the assets held within the Trust.

128.   However, Mr. Dover's second affidavit makes it clear that American's assets may be of negligible value. Accordingly, it is Meridian, a company incorporated under the laws of Nevis, who is the substantial party giving the cross-undertaking. In those circumstances, I

THIS RULING IS NOT FOR PUBLICATION AND SHALL REMAIN SEALED AND KEPT
CONFIDENTIAL UNTIL THE FILE ITSELF IS UNSEALED, AS PROVIDED FOR IN THE
ORDER DATED 27 OCTOBER 2016

considered it appropriate for the undertaking to be fortified in the sum of USD 1.5
million.

### Service, Procedure and Timetabling

129.  There is no requirement for leave to serve the Cayman Companies. However, leave to
serve Batista outside of the Cayman Islands is required pursuant to GCR O.11, rule 1(n).
That rule provides for service out of the jurisdiction if *"the claim is brought for any relief
or remedy pursuant to section 11A of the Grand Court Law (2008 Revision) (as amended
by the Grand Court (Amendment) Law 2014)."*

130.  Leave to serve out requires the Applicant to satisfy the *Seaconsar* test as applied by the
Court of Appeal in *Kenney and CC International Limited v Ace Limited* [2015 (1) CILR
367]. The jurisdictional issue is satisfied by the issue of the Originating Summons herein.

131.  The Court needs to be satisfied that the Originating Summons raises a serious issue to be
tried. In that the Court is satisfied that the Applicants have established a good arguable
case which warrants the grant of *ex parte* freezing order relief, the Court is clearly
satisfied that there is a serious issue to be tried.

132.  Counsel, Mr. Halkerston, helpfully provided Notes comparing the Draft Freezing Orders
with the standard form of Freezing Order, under GCR O.11, rule 1(n) as well as
commenting on the Draft Disclosure Order. The terms of both Orders were discussed in
detail in Chambers.

133.  In all of the circumstances, I felt it appropriate to make the Orders along the lines
discussed and signed by me.

**HON. JUSTICE INGRID MANGATAL**
**JUDGE OF THE GRAND COURT**

*[6111] Meridian Trust Co. Ltd. and American Associated Group Ltd - Ex parte Injunction – Reasons for Decision*

# EXHIBIT "C"

# Ex-Billionaire Batista Has $63 Million Frozen by Judge

by **Susannah Nesmith**
January 24, 2017, 10:20 AM EST

→ Cayman Island judge's order disclosure follows U.S. lawsuit

→ Eike Batista entangled in Brazil's biggest corruption scandal



Eike Batista *Photographer: Jonathan Alcorn/Bloomberg*

Former Brazilian billionaire Eike Batista had $63 million of his assets frozen by a judge in the Cayman Islands at the request of two U.S. investors in his failed oil-exploration businesses.

Justice Ingrid Mangatal, of the Cayman Islands' Grand Court, ruled in October that Meridian Trust Co. and American Associated Group Ltd. presented enough evidence to warrant the asset-freeze order. Mangatal's ruling was unsealed on Tuesday.

The U.S. investors claimed in a separate Florida lawsuit that Batista looted his companies in the months prior to their bankruptcy filings in October of 2013 because he knew a collapse was imminent. There's evidence he moved $572 million from Brazil to the Bahamas and then tried to move $100 million from his Bahamas account to Florida, the Cayman Islands' judge said in a separate order

in November, explaining her reasons for issuing the freeze.

"That dissipation of assets was frustrated by the intervention of bankers," Mangatal wrote.

Batista, who made and lost more than $30 billion during Brazil's commodities boom, is now entangled in the country's biggest corruption scandal. The businessman is under investigation in the so-called Carwash probe, and one of his former chief executive officers has been temporarily arrested for allegedly paying bribes to win work with state-controlled oil producer Petroleo Brasileiro SA four years ago.

## Miami Lawsuit

The disclosure of the Cayman Island judge's order followed last week's filing of the lawsuit by Meridian Trust and American Associated, who said in the complaint that they bought $21 million of bonds issued by Batista's companies. They sued Batista, 11 of his associates and family members, and 10 corporations they set up. They're seeking triple damages in state court in Miami under Florida's civil fraud statute.

BlackRock Inc., Pacific Investment Management Co. LLC and the Florida Retirement System also lost money in Batista's companies, according to the lawsuit.

The investors claim Batista knew that his company, OGX Brazil SA, held oil-exploration leases that were worthless and that he lied in public statements that it was sitting on trillions of dollars in oil.

"Our client lost a lot of money and from everything we have seen so far, it was fraud," Henk Milne, who is representing the U.S. investors, said in an interview.

Batista's lawyer, Sergio Bermudes, didn't immediately respond to phone and e-mail requests for comment on the freeze order.

Before its record-breaking bankruptcy, OGX commissioned "huge multimillion-dollar, oil-production platforms -- tanker vessels equipped with drill rigs -- from his satellite ship-building company, OSX, which he paid for with OGX investor money," the U.S. investors claim. "He trumpeted plans for a satellite port city in Brazil to be run by his logistics company, LLX, that would blossom as the tankers off-loaded a 'trillion dollars' of oil."

### 'Window Dressing'

"But all the vast production and transport paraphernalia was just window dressing," the investors claimed in the complaint. "There was, in fact, virtually no recoverable oil, no need for the massive production machinery to pump and transport it, and no need for a dedicated port to offload it."

The case is Meridian Trust Company, v. Batista, 2017-001040-CA-01, in Florida's 11th Circuit (Miami)

---

Terms of Service Trademarks Privacy Policy
©2017 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices    Website Feedback Help

# EXHIBIT "D"

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
http://www.djreprints.com.

http://www.wsj.com/articles/brazil-police-try-to-arrest-billionaire-businessman-eike-batista-1485424155

WORLD | LATIN AMERICA

# Brazilian Police Seek Arrest of Businessman Eike Batista

Batista, once Brazil's richest man, is sought in relation to a wide-ranging corruption scandal



Brazilian businessman Eike Batista, center, once Brazil's richest man, in court in Rio de Janeiro in 2014. Police
are seeking his arrest related to a wide-ranging corruption investigation. *PHOTO: YASUYOSHI CHIBA/AGENCE
FRANCE-PRESSE/GETTY IMAGES*

By **ROGERIO JELMAYER** and **LUCIANA MAGALHAES**

Updated Jan. 26, 2017 5:43 p.m. ET

SÃO PAULO—Brazilian police on Thursday declared former billionaire
businessman Eike Batista a fugitive from the law and said they would ask other
countries to help track him down, even as his lawyer said he would return to
Brazil as soon as possible.

Police raided the businessman's Rio de Janeiro home early Thursday as part of an investigation into allegations Mr. Batista paid $16.5 million in bribes to the former governor of Rio de Janeiro state, Sérgio Cabral, while Mr. Cabral was in office from 2007 to 2014, a police spokesman said. Prosecutors didn't say what Mr. Batista allegedly received in return.

Mr. Batista's lawyer, Fernando Martins, said he had spoken with police and prosecutors and that Mr. Batista wold return to Brazil and cooperate with the investigation, though not Thursday. Mr. Martin's law firm earlier said Mr. Batista was abroad due to professional commitments.

Sérgio Pinel, a federal prosecutor in Rio de Janeiro, said Mr. Batista would be formally considered a fugitive if he hadn't turned himself in by the end of the day.

Police issued an arrrest warrant for Mr. Batista and said they would ask Interpol to include him on its "red notice" list of people sought by a country's authorities. The notice serves as a request to cooperating countries for help in tracking down and extraditing wanted people.

Mr. Batista hadn't had enough time since being informed of the arrest warrant to prepare for a trip back to Brazil on Thursday, Mr. Martins said, adding his client was in New York with his family.

"He's surprised, but calm, and ready" to cooperate with the police, Mr. Martins said.

Mr. Batista left Brazil Tuesday evening and had a reservation on American Airlines for a flight to New York, federal police official Tacio Muzzi said at a news conference Thursday.

Mr. Batista made payments to Mr. Cabral, ostensibly for his role as an intermediary in the sale of a gold mine, prosecutors said without providing more information on the deal. The money was deposited in a bank in Uruguay in the name of third parties but was available to Mr. Cabral, prosecutors said.

Mr. Batista acted in a "sophisticated and repeated way" to conceal illegal payments, prosecutors said on Thursday.

Mr. Cabral was arrested in November as part of the same probe into alleged bribery and misuse of government money. The former governor, who remains in prison, has denied wrongdoing.

Case 1:17-cv-23051-KMW   Document 1-2   Entered on FLSD Docket 08/11/2017   Page 255 of 492

In the early years of this century, Mr. Batista built an industrial and infrastructure empire from scratch, raising billions of dollars through equity offerings and debt sales as Brazil's economy rapidly expanded. But the flamboyant businessman lost most of his fortune, once estimated at more than $30 billion, in 2013 after a failure to meet oil-production goals at one of his companies led to financial disaster for the whole group.

In 2014, Mr. Batista said massive debts had reduced his net worth to minus $1 billion, but he has remained a prominent figure in Brazil, moving in influential business circles and living a wealthy lifestyle.

Mr. Batista is the latest high-profile businessman to be ensnared in local authorities' anticorruption efforts, which have led to prison sentences for executives convicted of illegally benefiting from contracts with the government and state-run companies. They include construction executive Marcelo Odebrecht, the former chief executive of Brazil's largest construction company, Odebrecht SA, who was sentenced to 19 years after he was convicted of money laundering, corruption and conspiracy.

The arrests and prison sentences are a positive for Brazil, said Paulo Petrassi, a partner in investment firm Leme Investimentos. "This shows that nobody, even rich people, are above the law," he said. "Powerful businessmen who are planning to commit wrongdoing will think twice before going ahead."

Brazilian prosecutors said in September that Mr. Batista paid bribes of $2.35 million to the presidential campaign of former President Dilma Rousseff in 2010. The prosecutors, who are leading Brazil's so-called Operation Car Wash investigation centered on embezzlement at state oil company Petróleo Brasileiro SA, said Mr. Batista came forward spontaneously in June to offer them the information.

Ms. Rousseff has denied wrongdoing in the Petrobras affair. Mr. Batista didn't comment on the reports at the time.

Prosecutors filed no charges against Mr. Batista at the time and said they were investigating the alleged payment. Thursday's operation is an offshoot of the sprawling Car Wash probe.

—*Luciana Magalhaes contributed to this article.*

**Corrections & Amplifications**

Brazilian businessman Eike Batista is no longer a billionaire, according to Forbes. Earlier versions of this article and headlines incorrectly referred to him as a billionaire. An earlier version of this article also spelled his last name as "Battista." (Jan. 26, 2017)

**Write to** Rogerio Jelmayer at rogerio.jelmayer@wsj.com and Luciana Magalhaes at Luciana.Magalhaes@wsj.com

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

# EXHIBIT "E"

globo.com    G1    ge    Gshow    famosos    vídeos                                    IN BETWEEN

RIO DE JANEIRO

# Eike Batista is the target of a Lava Jato prison warrant and is wanted by PF

Police officers found no businessman in his home and lawyer confirmed that he is traveling. Operation Efficiency fulfilled 7 of 9 arrest warrants.

 

**By Cristina Boeckel and Fernanda Rouvenat, G1 Rio**
1/26/2017 06h10 · Updated 6 hours ago

Eike Batista targets new phase of Lava Jato in RJ

CONTINUA DEPOIS DA PUBLICIDADE

Case 1:17-cv-23051-KMW   Document 1-2   Entered on FLSD Docket 08/11/2017   Page 259 of 492



Agents of the Federal Police and the Federal Public Prosecutor's Office carry out an operation to comply with nine arrest warrants and four coercive measures in Operation Efficiency, deploying Lava Jato in Rio de Janeiro, on Thursday morning (26). Among the main targets issued arrest warrants is the entrepreneur Eike Batista , owner of the EBX group. According to lawyer Fernando Martins, who claims to represent the businessman, he is traveling.

**LIVE: FP and MPF detail operation at press conference**

According to lawyer Martins, Eike will surrender to the police. The PF called on Interpol to try to locate the businessman, who according to the first information would have embarked on a flight on Tuesday (24) to New York.

The businessman is accused of paying bribes to obtain facilities in contracts with the government, when governor was Sérgio Cabral.

Other targets of the operation are the former governor Sergio Cabral , who is already imprisoned in the penitentiary complex Gericinó in Bangu, and Wilson Carlos and Carlos Miranda, who are also imprisoned. This is the third arrest warrant issued against Cabral, Wilson Carlos and Carlos Miranda. All the arrest warrants were issued by Judge Marcelo Bretas, of the 7th Federal Criminal Court of Rio de Janeiro.

PF conducts operations at Eike Batista's house

The PF investigates laundering offenses consistently cash in hiding abroad of approximately $ 100 million, approximately R $ 340 million. Also investigated are crimes of active corruption and passive corruption, as well as criminal organization. About 80 agents of the Federal Police participate in the action.



📷 Flávio Godinho arrived at the headquarters of the PF around 10.30 this Thursday (26) (Photo: Cristina Boeckel)

An arrest warrant was issued against Flávio Godinho, Eike's right-hand man at EBX, now the vice president of football at Flamengo. He is accused of being one of the operators of the scheme, through the concealment and money laundering of bribes that were collected from contractors doing public works in Rio de Janeiro.

They were also arrested on this Thursday: Thiago Aragão Gonçalves Pereira e Silva, lawyer and partner of Adriana Ancelmo (wife of Sérgio Cabral); Álvaro Jose Galiez Novis and Sérgio de Castro Oliveira. In addition to Eike Batista, the PF still tries to fulfill the warrant of preventive custody against Francisco de Assis Neto.



Flávio Godinho, former right-hand man of Eike, and now vice-president of Flamengo football (Photo: Reproduction / Globe)

According to the Federal Prosecutor's Office, the investigation, focused on crimes of corruption (active and passive), money laundering, has advanced on the basis of breaches of secrecy (banking, tax, telephone and telematic) and award-winning deals. According to the prosecutors, the criminal organization headed by Cabral handled, in ten months (August 2014 to June 2015), R $ 39.7 million, about R $ 4 million per month.

- Apoio Consultoria e Planejamento Ltda

- Havana Administradora and Corretora de Seguros Ltda.

- Unirio Assessoria Administração e Corretora de Seguros Ltda

- Corcovado Communication Ltda

- Americas Copacabana Hotel Ltda

- Carolina Massiere Confecções e Assessórios de Moda Ltda

- Static Communication

- JPMC Academy of Gymnastics Ltd.

- MCS Comunicação Integradas S / C Ltda

- Araras Empreendimentos Consultoria e Serviços Ltda

- Minas Gerais Projetos e Empreendimentos Ltda

According to the prosecutors, the remittance of securities abroad was continuous between 2002 and 2007, when Cabral accumulated US $ 6 million, about R $ 20 million. During his tenure as governor, he has accumulated more than $ 100 million in tuition (R $ 340 million), distributed over several accounts in overseas tax havens.

With the help of employees, the MPF has already been able to repatriate around R $ 270 million, which is available to the Federal Court. The Task Force is requesting international cooperation for the blocking and subsequent repatriation of the amounts that are in accounts abroad.

Former governor Sérgio Cabral was arrested in the first phase of Lava Jato held in Rio, Calicute, on November 17. The police inquiry into the 1st phase of the resulted in the indictment of 16 people for crimes ranging from passive and active bribery, criminal organization to money laundering. At the time, the researchers discovered a scheme of public money diversion, while Sérgio Cabral was governor of Rio, about R $ 220 million.

Eike Batista was already investigated in the first phase of Calicute. The Federal Public Prosecutor's Office decides to pass on R $ 1 million from one of his companies to the law firm of Sérgio Cabral's wife, Adriana Ancelmo. The entrepreneur was already the richest man in Brazil and came to be among the ten billionaires in the world. He saw his empire collapse with the collapse of the oil company OGX, which eventually had a domino effect on the other companies in the group.

Eike, who said that until the year 2000 was known only as the husband of the actress and model Luma de Oliveira, accumulated a fortune of R $ 34 billion. In 2010 he was listed on Forbes as the eighth richest man in the world.

The **G1** has contacted the companies involved in Operation Efficiency, which is more an offshoot of Lava Jato. The companies Hoya Corretora de Valores e Câmbio LTDA and Corcovado Comunicação Ltda have stated that they will not stand on the quotation in the investigation.

The Unirio Advisory Management and Insurance Brokerage told **G1** that "never made safe with the above and are unaware of the operation." In addition, one of the former partners said that the company has been shut down since 2012. The Américas Copacabana Hotel said at around 1 pm that it will issue a note.

Other companies have been sought by the **G1** , but the news crew got no response. They are: Havana Administradora and Corretora de Seguros, Carolina Massiere Confecciones and Assessorios de Moda, JPMC Gymnastics Academy and MCS Comunicação Integradas S / C. The **G1** is still trying to contact the other organizations mentioned.

**EXHIBIT "F"**

**The New York Times** | https://nyti.ms/2jL2tzH

AMERICAS

# Brazilian Tycoon Eike Batista Is Arrested After Returning Home

By DOM PHILLIPS   JAN. 30, 2017

RIO DE JANEIRO — Eike Batista, the fugitive oil-and-mining tycoon wanted in connection with Brazil's far-reaching corruption investigation, flew home from New York on Monday and surrendered to the police, who placed him temporarily in a notoriously overcrowded prison.

Mr. Batista's case has generated intense interest in Brazil, where he was once the richest man and is still a household name. TV Globo interrupted programming to show the arrival of his plane and the police placing him in a squad car, part of the convoy of vehicles that accompanied him to the prison as a news helicopter followed.

Mr. Batista was photographed looking tired and wan on the plane by the Rio newspaper O Globo, which reported he did not dine and just drank two glasses of milk. He took photographs with admirers and slept.

He had been considered a fugitive since Jan. 26, when the police went to arrest him at his Rio de Janeiro mansion as part of the national corruption investigation, which has entangled dozens of politicians and business leaders. Officers found he had left the country on Jan. 24 on a flight to New York.

His name was then included on an Interpol wanted list, a spokeswoman for Federal Police said.

Police investigators have said they suspect Mr. Batista paid $16.5 million in bribes to the former Rio state governor Sérgio Cabral, who has been incarcerated since November, accused of running a corruption ring.

Interviewed at Kennedy Airport in New York on Sunday night, Mr. Batista said he believed he had done nothing wrong, telling TV Globo that he was coming home to "help clean things up."

"I am coming back to respond to the justice system, as is my duty," Mr. Batista said. "I'm coming back because sincerely I am going to show what things are like. As simple as that."

Mr. Batista's flight to New York two days before the police sought to arrest him has raised questions over why he was even allowed to leave the country, given that the legal order for his arrest had been issued on Jan. 13.

The Federal Police spokeswoman, speaking on condition of anonymity in accordance with government policy, said officers had received the order the day before they sought his arrest.

The spokeswoman said Mr. Batista was taken to Ary Franco, one of the country's most overcrowded and filthy prisons.

Gutembergue de Oliveira, president of the Rio penal system workers union, said that Ary Franco currently holds more than 2,000 prisoners, more than double its capacity of around 970.

"It's like a dungeon. The light is bad, it's old," he said.

With his head shaved, Mr. Batista was then moved to another prison, the Bandeira Stampa Public Prison, also known as Bangu 9. "The conditions are better there," said Mr. de Oliveira, adding that the prison does not suffer the same level of overcrowding and is not dominated by any one prison gang.

Fernando Martins, a lawyer acting for Mr. Batista, told the G1 news site that he had not yet been given access to his client.

Mr. Batista's arrest punctuated a comedown for the billionaire, once seen as a shining example of a confident, booming Brazil. His ascent symbolized a developing country that had seemed to successfully combine private enterprise with social justice and was riding high on surging commodities prices.

The 2008 public offering of stock in Mr. Batista's oil company, OGX, raised more than $3.6 billion. He assembled an empire that included mines, oil fields, electricity generating plants and even Rio's landmark Hotel Glória.

Mr. Batista was feted by the former presidents Luiz Inácio Lula da Silva and Dilma Rousseff from the leftist Workers' Party, as well as celebrities and sports stars. He received more than $4 billion in loans and investments from the national development bank, and his wealth reached $34.5 billion in 2012.

But Mr. Batista's empire began to unravel when his oil fields delivered a fraction of the production promised and investor confidence in his network of companies nose-dived. His oil company went into bankruptcy protection proceedings in 2013.

Brazil's fortunes have suffered along with Mr. Batista's — the country has been mired in a recession for nearly three years, and the Workers' Party and its former allies are entangled in the corruption scandal, which centers on the state-run oil company, Petrobras. Ms. Rousseff was impeached last August, accused of breaking budget laws.

Since the Petrobras investigation, known as Operation Car Wash, began in 2014, it has led to scores of arrests — including politicians, middlemen and business executives.

The investigation expanded to ensnare Mr. Cabral, the former governor, and his wife, Adriana Ancelmo, a lawyer, and both were imprisoned. Investigators say Mr. Cabral and his conspirators accepted bribes from some of the companies involved in the Petrobras scandal.

Case 1:17-cv-23051-KMW   Document 1-2   Entered on FLSD Docket 08/11/2017   Page 268 of 492

He and his wife are alleged to have spent millions of dollars on jewelry, luxury travel and clothes. The state of Rio is nearly insolvent, struggling to pay salaries and mollify enraged employees.

Mr. Batista was close to Mr. Cabral and came under scrutiny for permitting the former governor and his family to use his private jet in 2011.

This is not the first time Mr. Batista has faced legal problems. He was tried in 2014 on charges of insider trading and stock market manipulation, but the case was suspended in February 2015 after the presiding judge was filmed driving Mr. Batista's seized Porsche.

The judge was removed from the case. In November 2015, regulators barred Mr. Batista from serving as a corporate officer for five years.

In another interview with Brazilian reporters from TV Globo and the O Globo newspaper at Kennedy Airport, Mr. Batista praised Operation Car Wash, which he said was "full of young, competent Brazilians."

"What is happening will make Brazil a country that everyone wants to invest in. For this, once this difficult phase is past, in the future everyone will give a different note to Brazil in terms of transparency," he said.

He added: "If mistakes were made you have to pay for the mistakes that you did. It's like that." But asked if he had made mistakes, Mr. Batista replied: "I don't think so."

A version of this article appears in print on January 31, 2017, on Page A4 of the New York edition with the headline: Brazilian Tycoon Is Arrested in Corruption Inquiry After Returning Home.

© 2017 The New York Times Company

**EXHIBIT "G"**

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY,
FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

Case No.: 2017-001040-CA-01

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED GROUP,
LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR
BATISTA, PAULO MENDONÇA, FLAVIO
GODINHO, PAULO GOUVEA, MARCUS BERTO,
LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X
INVESTMENTS LTD., 63X MASTER FUND, 63X
FUND, EBX HOLDING, LTDA., EBX
INTERNATIONAL, S.A., EBX CAPITAL
PARTNERS, CENTENNIAL ASSET MINING
FUND, LLC, CENTENNIAL ASSET BRAZILIAN
EQUITY FUND LLC, THORQUE1 FUND LTD.,
THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA
DE OLIVEIRA.

      Defendants.

_____/

### AFFIDAVIT OF THOMAS DE ARAUJO, CFE IN SUPPORT OF PLAINTIFFS' EMERGENCY *EX PARTE* MOTION FOR TEMPORARY INJUNCTION TO PREVENT FRAUDULENT TRANSFERS

STATE OF FLORIDA         )
                              ) ss.:
MIAMI-DADE COUNTY     )

Thomas de Araujo, being duly sworn, deposes and states as follows:

## I.  **INTRODUCTION**

1.  I am a partner at Yip Associates, a forensic accounting and financial investigations firm with offices in Miami, Fort Lauderdale, Boca Raton, New York and New Jersey.  I am a certified fraud examiner (CFE).

2.  I have approximately twelve years of experience and training on the issues addressed in this Affidavit.  I have provided forensic accounting and litigation support services to attorneys, bankruptcy trustees, court-appointed receivers, and state and federal governmental agencies. I have provided these services in connection with complex matters involving economic damages, white collar crime, fraud, and embezzlement in the United States, Latin America, and the Caribbean. The services provided have included detailed review and analysis of financial records, identification of potential causes of action, assistance with discovery, reconstruction of accounting records, tracing of funds, preparation of damages analyses, and expert witness testimony

3.  A copy of my resume is attached as **Exhibit 1.**

4.  I have been asked to prepare this affidavit ("Affidavit") on short notice in support of the Plaintiffs' Emergency *Ex Parte* Motion for Temporary Injunction to Prevent Fraudulent Transfers ("Emergency Motion").

5.  My firm and I were retained by Aballi Milne Kalil, P.A. on behalf of the Meridian Trust Company ("Meridian") and American Associated Group, Ltd. ("AAG") (Meridian and AAG will be referred to collectively as the "Plaintiffs").  Yip Associates has spent in excess of 900 hours working on this matter.  This time has included the review of thousands of pages of documents from the public domain, documents gathered by investigators hired by the

Plaintiffs, and documents disclosed by various third parties in connection with the Cayman Proceedings[1] and the Bahamas Proceedings.

6.  I have submitted four affidavits to the Grand Court of the Cayman Islands in support of the Cayman Proceedings. I have submitted four separate affidavits to the Supreme Court of the Commonwealth of the Bahamas in support of the Bahamas Proceedings. Collectively, these eight affidavits (my "Offshore Affidavits") number approximately 200 pages of written text and over 5,000 pages of exhibited supporting documentation. I have not included these affidavits as part of this submission as to not overly burden this Court. They are available to the Court upon request.

7.  Based in part on the evidence summarized in my Offshore Affidavits, the Honourable Madam Justice Mangatal, Judge of the Grand Court of the Cayman Islands, issued a worldwide freezing order (the "WFO")[2] against Eike Batista ("Batista"), 63X Investments Ltd., 63X Fund, and 63X Master Fund (63X Investments Ltd., 63X Fund, and 63X Master Fund will be referred to collectively as the "63X Companies") stating that they must not:

> *"(a) remove from the Cayman Islands any of their assets which are in the Cayman Islands up to the value of USD62,932,547 inclusive of provision for claimed costs and interest;*
>
> *or*
>
> *(b) in any way dispose of, deal with or diminish the value of any of their assets whether they are in or outside the Cayman Islands up to the same value."*

8.  The WFO further states that Batista and the 63X Companies must:

> *"inform the Applicants' attorneys in writing within 72 hours of service of this order and to the best of their ability of all their assets (save for domestic chattels*

---

[1] Capitalized terms that are not defined herein shall have the same meaning as they have been given in the Emergency Motion.

[2] I have been advised that a copy of the WFO has been included as Exhibit A to the Plaintiffs' Emergency Motion.

*worth less than USD10,000.) whether inside or outside the Cayman Islands and whether in his or its own name or not and whether solely or jointly owned, giving the value, location and details of all such assets."*

## SUMMARY OF FINDINGS

9.  I set forth below a summary of my findings to date as they pertain to the Plaintiffs' Emergency Motion.  These findings are discussed more fully in the paragraphs that follow:

   a.  Batista appears to have perpetrated a highly complex fraud on the Plaintiffs and the investing public, as set forth in my affidavit submitted to the Grand Court of the Cayman Islands dated October 18, 2016 (my "First Cayman Affidavit").[3]

   b.  Batista appears to have transferred significant amounts of his personal assets in an apparent effort to evade creditors.  A number of transactions identified and described herein display the badges of fraud enumerated at Fl. Stat. § 726.105.  Recipients of these alleged transfers include:

   i.  Thor Batista,

   ii.  Olin Batista,

   iii.  Luma de Oliveira, and

   iv.  Flavia Sampaio.

   c.  I have reviewed documentation reflecting rapid, high-dollar transfers between and among various offshore companies controlled by Batista.  The business purpose of these transfers is currently unknown.

---

[3] My October 18, 2016 affidavit is 122 pages long and includes in excess of 2,400 pages of supporting exhibits.  It is available for the Court's review upon request.  I have been advised by Plaintiffs' counsel that, given the emergency nature of this motion, it would be unduly burdensome to this Court to include the October 18, 2016 affidavit with this submission.

d. At least $480 million was transferred from numbered accounts in the Bahamas and the Cayman Islands in the names of 63X Master Fund and Centennial Asset Ltd. to bank accounts controlled by Batista in the United States between August 2009 and July of 2014. The purpose of these transfers and the ultimate disposition of these funds are currently unknown.

e. The 63X Companies subsequently transferred at least $449 million from its accounts at Banco Itaú Europa International in Miami ("Banco Itaú Miami") to other accounts held by Batista-controlled entities at Banco Itaú Miami.

f. After having knowledge of the WFO issued by the Grand Court of the Cayman Islands, 63X Master Fund emptied its account at Banco Itaú Miami.

g. Batista has provided limited and incomplete documentation in response to the WFO and that the Plaintiffs assert Batista is in breach of the Order.

10. My opinions are based on documents reviewed, interviews, various analyses performed, independent research, my experience, education and training.

11. This Affidavit includes schedules I have prepared containing detailed information pertaining to the issues addressed in this Affidavit which are attached as exhibits. They are an integral part of this Affidavit and should be relied upon accordingly.

12. Should additional documents and information be made available or reviewed, additional information or facts may come to light, which may impact the observations and conclusions reflected herein. I reserve the right to supplement and/or amend this Affidavit based on such later information.

13. I understand that it is the duty of an expert to assist the trier of fact on matters within the expert's expertise. I understand that this duty overrides any obligation to the person from whom I received instruction or by whom I am paid. I understand that, in providing this Affidavit, I owe this duty to the trier of fact and I have complied with that duty. I believe that the facts I have stated in this Affidavit are true and that the opinions I have expressed are correct.

## II. <u>BACKGROUND</u>

### <u>THE PLAINTIFFS' CLAIMS</u>

14. The Plaintiffs allege that they are victims of a fraudulent scheme perpetrated by Batista and his associates in relation to Batista's oil and gas exploration group, headed by OGX Petróleo e Gás Participações SA. ("OGX"), formerly a publicly-traded entity in Brazil. The fraud alleged by the Plaintiffs is complex and the elements of it are set out in my First Cayman Affidavit. In summary, the Plaintiffs allege that:

    a. Batista has perpetrated a fraud on investors in OGX.

    b. Batista owned and controlled OGX at all material times variously as its controlling shareholder, CEO, and Chairman of its Board.

    c. Batista represented to potential investors that OGX had discovered very large volumes of recoverable oil and gas within its "world-class" exploratory fields which contained over a "trillion dollars" worth of oil;

    d. Batista also made a series of further representations regarding OGX's value and his personal financial commitment to fund OGX's operations;

e. In reliance on these representations, the Plaintiffs invested in excess of $20 million in bonds issued by an OGX affiliate and guaranteed by OGX;

f. Batista covertly realized his interest in OGX to his personal gain.

g. OGX subsequently defaulted on its debts leaving over $6 billion owing to creditors from whom it sought protection through insolvency proceedings in the Brazilian courts;

h. Evidence has subsequently emerged that suggests:

i. Batista knew that his representations were untrue at the time at which he made them; and

ii. Batista took steps to fraudulently transfer his assets including the proceeds of his alleged fraud out of his name and into those of family members and associates, including in offshore jurisdictions *inter alia* by use of the 63X Companies.

15. The 63X Companies were wholly owned by Batista or companies that were beneficially owned by Batista during all relevant times.[4]

## ABBREVIATED SUMMARY OF BACKGROUND FACTS

16. The following items of particular import are discussed more fully in my First Cayman Affidavit:

---

[4] Documents produced by Maples Corporate Services Limited, as the registered agents of the 63X Companies in connection with the Cayman Proceedings included structure charts and share registries reflecting the Batista was the ultimate owner of the 63X companies through direct holdings of shares or through his wholly-owned companies.

a.  Batista appears to have known that OGX's purported trillion dollar oil fields were not economically viable in September 2012.[5]

b.  On October 24, 2012 Batista reassured market participants that OGX would have sufficient capital to place its oil fields into production by granting OGX a $1 billion dollar "put option" whereby he guaranteed to invest that sum in the company if called upon by its board of directors.[6]

c.  Based on Batista's "put option" and representations of OGX's economically viable oil fields, the Plaintiffs purchased in excess of $20 million of OGX Bonds between January 2013 and June 2013.[7]

d.  On March 13, 2013, OGX announced the commercial viability of three oil fields in Brazil's Campos Basin containing between 521 million and 1.339 billion barrels of oil.[8]

e.  Less than four months later, on July 1, 2013, OGX retracted its previously announced production targets and suspended the development of the vast majority of it fields.[9]

f.  On October 1, 2013, OGX defaulted on a $45 million coupon payment on the OGX Bonds and announced that it had retained investment banks to consult on restructuring its capital structure and handle negotiations with the holders of the OGX

---

[5] First Cayman Affidavit at Paragraphs 328 through 331.9.

[6] Id. at Paragraphs 185 through 194.

[7] Id. at Paragraphs 34.

[8] Id. at Paragraphs 212 and 213.

[9] Id. at Paragraphs 223.1 through 223.5.

Bonds.[10]

g. On October 31, 2013, OGX entered insolvency proceedings in Brazil by filing an urgent request for judicial reorganization.[11]

h. On August 28, 2015, nearly two years after OGX's collapse, Batista stated in defense of a civil action brought against him in Brazil that the March 13, 2013 announcement that OGX's fields were commercially viable was only made because OGX's concessions were set to expire and they would have been lost if a declaration of commerciality had not been made.[12]

### III. METHODOLOGY

17. I have relied on documents exhibited to my Offshore Affidavits. I have also relied on documentation disclosed by the following third parties in response to orders issued in connection with the Cayman Proceedings and the Bahamas Proceedings:

a. Maples Corporate Services Limited, the Cayman Islands registered agents of the 63X Companies;

b. The Winterbotham Trust Company Limited, the Bahamas registered agents of Thorque1 Fund Ltd. and Thorque Investment Management Ltd.;

c. UBS (Bahamas) Ltd., ("UBS BAHAMAS") a Bahamas financial institution that held numerous accounts beneficially owned by Batista between 2006 and 2014;

---

[10] *Id.* at Paragraph 243.

[11] *Id.* at Paragraph 244.

[12] *Id.* at Paragraphs 364 and 376 through 376.7.

      d.  Banco BTG Pactual, S.A. – Grand Cayman Branch ("BTG"), a Brazilian financial institution operating in the Cayman Islands that held and currently holds numerous accounts beneficially owned by Batista between 2009 and the present day.

18. I have also reviewed Fl. Stat. § 726 and discussed its general meaning with Plaintiffs' counsel.

19. I have evaluated certain financial transactions documented in various sources and identified specific transactions that appear to display badges of fraud enumerated at Fl. Stat. § 726.105. They are discussed in greater detail below.

## IV. <u>FINDINGS AND OBSERVATIONS</u>

### <u>THE ALLEGED BRAZILIAN FRAUDULENT TRANSFERS</u>

20. According to the Brazilian authorities, shortly before and immediately after the collapse of OGX, Batista made the transfers listed below to the family members and close associates referenced in the subparagraphs below. I have been asked to assume that these parties are "Insiders" as defined in Fl. Stat. § 726.102.   It does not appear that Batista received equivalent value for these transfers.  At the time of these transfers, Batista was likely aware that he would become the subject of various criminal and civil proceedings.

      a.  The source for the following statements is the Brazilian Attorney-General's appeal document in which Batista is quoted as telling the local Police that he had transferred the assets to his family members and associates before OGX's collapse.[13]

      b.  On July 9, 2013, prior to OGX's collapse, just over a week after OGX announced that

---

[13] *Id.* at Paragraphs 284 through 286.

certain of its production forecasts should not be relied upon, Batista "donated" two apartments located at R. Caio de Melo Franco, 168 & 330 - Jardim Botânico, Rio de Janeiro, 22461-190, Brazil to his sons Thor and Olin. The first of these apartments was valued by Batista at approximately BRL10 million ($4.2 million)[14]. The value of the other is not known.

c. On December 9, 2013, Batista donated several parcels of real property located at Avenida Vereador Benedito Adelino, Nos. 4639, 4703, and 4736, Part D – Vila Velha, Angra dos Reis, Rio de Janeiro, Brazil, valued by Batista at approximately BRL10 million ($4.2 million), to his sons Thor and Olin.

d. On May 15, 2014, Batista purchased an apartment in Ipanema, Rio de Janeiro, Brazil, and ceded his rights in the property to his girlfriend Flavia Sampaio. According to the police statement Batista estimated the value of this apartment at BRL5 million ($2.1 million). The Attorney-General's appeal noted that on May 6, 2014, nine days earlier, a federal judge in Brazil had imposed a preliminary injunction against the financial assets of Batista through the Brazilian central bank.

21. As discussed more fully in my First Cayman Affidavit, I have also reviewed a copy of an asset schedule (the "Asset Schedule") that was reportedly prepared by the Brazilian police in 2014 on the basis of Batista's 2012 and 2013 tax declarations together with the police's own analysis and sources.[15]

22. The last page of the Asset Schedule contains a section titled "Donations" which appears to reflect gratuitous personal transfers of assets made by Batista to Batista's family members

---

[14] I have converted the value of amounts expressed in Brazilian reais (BRL) in this Affidavit to U.S. dollars according to the exchange rate for December 31, 2013 of 2.36215 Brazilian reais to the dollar, as published at http://www.xe.com/currencycharts/?from=USD&to=BRL&view=5Y. The exchange rate published by that same website for January 28, 2017 is 3.14100 Brazilian reais to one U.S. dollar.

[15] *Id.* at Paragraphs 270 through 271.3.7.

and associates. Such "donations" have been relied upon by the Brazilian prosecuting authorities as evidencing Batista's efforts to dissipate his assets. The identified donations were made to the following in the sums set out below:

a. Flavia Sampaio, Batista's girlfriend and mother of his infant child, BRL100,000 (approximately $42,000) in 2012 and BRL25 million ($10.6 million) in 2013;

b. Luma de Oliveira, Batista's ex-wife and mother of Batista's two eldest sons, BRL15.5 million ($6.6 million) in 2012;

c. Thor, BRL137.5 million ($58.2 million) in 2013;

d. Olin, BRL7.7 million ($3.3 million) in 2013.[16]

## OTHER TRANSFERS OF INTEREST

23. I note here the following transactions of interest that occurred shortly before and immediately after OGX publicly announced that certain of its oil fields were not economically viable, production efforts were suspended, and OGX's eventual corporate default:

a. On June 13, 2013, 63X Master Fund transferred $10 million from its numbered account at BTG in the Cayman Islands to Centennial Asset Brazilian Equity Fund, LLC ("CABEF");

b. On June 18, 2013, 63X Master Fund transferred $161 million from its numbered account at BTG in the Cayman Islands to CABEF;

c. On July 3, 2013, 63X Master Fund transferred $59.76 million from its numbered account at BTG in the Cayman Islands to CABEF;

d. On July 12, 2013, 63X Fund transferred $30 million from its numbered account at

---

[16] Id.

BTG in the Cayman Islands to Mr. Batista's personal account in Brazil;

e.  On July 16, 2013, 63X Fund transferred $35 million from its numbered account at BTG in the Cayman Islands to Mr. Batista's personal in account Brazil;

f.  On October 9, 2013, 63X Master Fund transferred $10 million from its numbered account at BTG in the Cayman Islands to Centennial Asset Mining Fund, LLC ("CAMF");

g.  On October 9, 2013, 63X Fund transferred $37,944,187.91 from its numbered account at BTG in the Cayman Islands to Mr. Batista's personal account in Brazil;

h.  On December 24, 2013, 63X Master Fund transferred $15 million from its numbered account at BTG in the Cayman Islands to the trust account of a "wealth preservation boutique law firm" based in Miami, FL;

i.  On December 27, 2013, 63X Master Fund transferred an additional $15 million from its numbered account at BTG in the Cayman Islands to the same trust account of the same "wealth preservation boutique law firm" based in Miami, FL;

j.  The purpose of the above listed transfers and the ultimate disposition of these funds are currently unknown.

## TRANSFERS TO UNITED STATES BANK ACCOUNTS

24. Batista transferred at least $480 million from numbered accounts in the Bahamas and the Cayman Islands in the names of 63X Master Fund and Centennial Asset Ltd. to bank accounts controlled by him in the United States between August 2009 and July of 2014. More specifically, Batista transferred at least $400 million in aggregate to accounts in the names of 63X Master Fund and AUX, LLC at Banco Itaú Miami, FL.  63X Master Fund also transferred at least $30 million to the trust account of a Miami lawyer in December

of 2013. The purpose of these transfers and the ultimate disposition of these funds are currently unknown. I have prepared a summary schedule reflecting these transactions based on documents provided by BTG in connection with the Cayman Proceedings and documents provided by UBS BAHAMAS in connection with the Bahamas Proceedings. This summary schedule is attached as **Exhibit 2**.

## RAPID MOVEMENT OF FUNDS BETWEEN AND AMONG OFFSHORE ENTITIES

25. I have reviewed documentation reflecting rapid, high-dollar transfers between and among various numbered offshore bank accounts associated with offshore companies controlled by Batista. I have prepared a schedule reflecting transactions of interest (**Exhibit 3**).

26. Batista had signature rights on the accounts for all of the offshore companies listed in Exhibit 3.[17]

27. Defendants Flavio Godinho and Paulo Gouvea had signature rights on the offshore accounts of the following entities:

   a. 63X Master Fund,

   b. AMX Holding Company Ltd,

   c. Ardpoint Holdings Inc.,

   d. Centennial Asset Ltd.,

   e. Centennial Asset Mining Fund LLC,

   f. EBX Forestal De Bolivia S.A.,

   g. EBX Siderurgica De Bolivia SA,

   h. EBX Panama S.A.,

   i. WRM1 LLC,

---

[17] Account opening documentation provided by UBS (Bahamas) Ltd and Banco BTG Pactual S.A. - Cayman Branch.

j.   WRM2 LLC.[18]

## 63X COMPANIES TRANSFERRED AT LEAST $449 MILLION
## TO BATISTA CONTROLLED ACCOUNTS AT BANCO ITAÚ MIAMI

28. Between October 22, 2010 and November 21, 2014, the 63X Companies transferred at

least $449 million from accounts held at Banco Itaú Miami to other Batista-controlled

accounts at Banco Itaú Miami as follows:

a.   On Oct 22, 2010, 63X Master Fund transferred $10,000,000.00 to an account in the
name of Centennial Asset Limited at Banco Itaú Miami;

b.   On Nov 22, 2010, 63X Master Fund transferred $11,000,000.00 to an account in the
name of Centennial Asset Limited at Banco Itaú Miami;

c.   On Feb 17, 2011, 63X Investments Ltd transferred $240,509,459.90 to an account in
the name of 3BX Investments LLC at Banco Itaú Miami;

d.   On Aug 2, 2011, 63X Investments Ltd transferred $15,000,000.00 to an account in
the name of 3BX Investments LLC at Banco Itaú Miami;

e.   On Aug 10, 2011, 63X Investments Ltd transferred $22,000,000.00 to an account in
the name of Aux LLC at Banco Itaú Miami;

f.   On Jan 12, 2012, 63X Investments Ltd transferred $24,000,000.00 to an account in
the name of 3BX Investments LLC at Banco Itaú Miami;

g.   On Feb 6, 2012, 63X Investments Ltd transferred $35,385,000.00 to an account in the
name of Aux LLC at Banco Itaú Miami;

h.   On Mar 16, 2012, 63X Investments Ltd transferred $17,500,000.00 to an account in
the name of 3BX Investments LLC at Banco Itaú Miami;

i.   On Mar 20, 2012, 63X Master Fund transferred $15,175,119.40 to an account in the

[18] *Id.*

name of Centennial Asset Brazilian Equity Fund at Banco Itaú Miami;

j.  On Oct 9, 2012, 63X Investments Ltd transferred $15,000,000.00 to an account in the name of 3BX Investments LLC at Banco Itaú Miami;

k.  On Jun 24, 2013, 63X Master Fund transferred $30,890,000.00 to an account in the name of Centennial Asset Brazilian Equity Fund at Banco Itaú Miami;

l.  On Nov 21, 2014, 63X Master Fund transferred $13,000,000.00 to an account in the name of Aux LLC at Banco Itaú Miami;

## THE CAYMAN WFO – 63X MASTER FUND

29. On January 6, 2017, the 63X Companies were notified of the Cayman WFO.[19]  Despite this, on January 11, 2017, 63X Master Fund emptied its account at Banco Itaú Miami, transferring the remaining balance of $60,973.63 to an account in the name of Centennial Asset Mining Fund, LLC, also at Banco Itaú Miami.[20]

## THE CAYMAN WFO – BATISTA

30. Batista has provided very limited and incomplete documentation in response to the WFO. My review of the documents produced by BTG and UBS BAHAMAS reveal that the following Batista-controlled entities held accounts at  Banco Itaú Miami during the relevant time period for which Batista has not provided the required disclosures:

a.  Centennial Asset Brazilian Equity Fund LLC,

b.  Centennial Asset Mining Fund LLC

c.  Aux LLC

d.  Centennial Asset Limited

---

[19] I have reviewed copies of three letters from Solomon Harris (as counsel for Meridian and AAG) to 63X Fund, 63X Investments Ltd., and 63X Master Fund, each dated January 6, 2017 and countersigned by Tami Powers of Maples Corporate Services as registered agent for the 63X Companies on January 6, 2017 at 5:33pm.

[20] Account statement for 63X Master Fund account ending ███ for the period January 4, 2010 through January 12, 2017.

e.  Aux Luxembourg Sarl

31. Plaintiffs' counsel has advised me that the above referenced omissions constitute a breach of the WFO.

## V. <u>CONCLUSIONS</u>

32. Based on the information I have been able to review to date:

a.  Batista appears to have perpetrated a highly complex fraud on the Plaintiffs and the investing public, as set forth in my affidavit submitted to the Grand Court of the Cayman Islands dated October 18, 2016.

b.  Batista appears to have transferred significant amounts of his personal assets in an apparent effort to evade creditors. Transfers identified and described herein display badges of fraud enumerated at Fl. Stat. § 726.105.  Recipients of these transfers include:

    i.  Thor Batista,

    ii.  Olin Batista,

    iii.  Luma de Oliveira,

    iv.  Flavia Sampaio,

c.  Batista transferred at least $480 million from numbered accounts in the Bahamas and the Cayman Islands in the names of 63X Master Fund and Centennial Asset Ltd. to bank accounts controlled by him in the United States between August 2009 and July of 2014.  The purpose of these transfers and the ultimate disposition of these funds

are currently unknown.

d.  I have reviewed documentation reflecting rapid, high-dollar transfers between and among various numbered bank accounts held in the Bahamas and the Cayman Islands by offshore companies controlled by Batista. The business purpose of these transfers is currently unknown. These transfers were made to and from accounts of:

    i.  3BX Investment Fund I LLC;

    ii.  3BX Investments, LLC;

    iii.  63X Fund;

    iv.  63X Investments Ltd;

    v.  63X Master Fund;

    vi.  AUX, LLC;

    vii.  Centennial Asset Brazilian Equity Fund LLC;

    viii.  Centennial Asset Ltd;

    ix.  Centennial Asset Mining Fund, LLC;

    x.  EBX Holding, Ltda;

    xi.  EBX Panama S.A.

    xii.  EBX Siderurgica De Bolivia SA;

    xiii.  WRM1, LLC;

     xiv.  WRM2, LLC;

     xv.  The following Defendants had signature rights on relevant bank accounts:

         1.  Eike Batista;

         2.  Paulo Gouvea;

         3.  Flavio Godinho.

e.  The 63X Companies subsequently transferred at least $449 million from its accounts at Banco Itaú Miami to other accounts held by Batista-controlled entities at Banco Itaú Miami.

f.  After having knowledge of the WFO issued by the Grand Court of the Cayman Islands, 63X Master Fund emptied its account at Banco Itaú Miami.

g.  Batista has provided limited and incomplete documentation in response to the WFO and that the Plaintiffs assert Batista is in breach of the Order.

 

 

Thomas A. de Araújo
Yip Associates
2 South Biscayne Boulevard
Suite 2690
Miami, FL  33131
Tel. (305) 569-0550
Fax (888) 632-2672
tdearaujo@yipepa.com

SWORN AND SUBSCRIBED
before me this 3rd day of January, 2017

Notary Public

ARTURO J. ABALLI
Commission # FF 152931
Expires September 21, 2018
Bonded Thru Troy Fain Insurance 800-385-7019

Page 19 of 19

# EXHIBIT 1

**EXHIBIT 1**



FORENSIC ACCOUNTING +
FINANCIAL INVESTIGATIONS

## Thomas A. de Araujo, CFE

**Yip Associates**, Partner                                                    Dec. 2011 – Present

Responsible for the planning and execution of forensic accounting engagements, including the assistance of attorneys with the determination of the economic value of potential claims, requests for discovery and interrogatories, preparation for deposition of key witnesses, analysis of financial and accounting documents, calculation of economic damages, preparation of expert witness reports, analysis and rebuttal of opposing expert witness testimony, and tracing of assets in aid of post-judgment discovery.

His work product has been used in support of civil litigation, alternative dispute resolution, insurance loss adjustment, criminal prosecution and criminal defense. Work product has also been relied upon by Court-appointed Receivers, Bankruptcy Trustees, and governmental agencies, including the Securities and Exchange Commission, Department of Justice, Florida Office of Financial Regulation, Miami-Dade County Tax Collector, Miami-Dade Police Economic Crimes Unit, and Broward County (Florida) Police Economic Crimes Division.

**Inktel Direct**, Director of Finance & Accounting                          May 2010 – Nov. 2011

Responsible for direct supervision of all accounting functions, including all accounts receivable, accounts payable, and general ledger processes. Prepared monthly financial package, including ratio and trend analyses, highlighting potential areas for operational improvement. Reported to company shareholders and executive team regarding financial performance and operational efficiency..

**Grant Thornton, LLP**, Manager                                             Oct. 2005 – Apr. 2010

Worked at increasing levels of responsibility on engagements involving the calculation of economic damages. Performed forensic investigations with significant accounting and electronic data analysis components, with a focus on quantifying economic impacts for litigation, alternative dispute resolution, or insurance purposes. Representative engagements include contractual disputes, business interruption claims, occupational fraud, embezzlement, inventory shrinkage, intellectual property theft, improper campaign finance contributions, securities fraud, and mortgage fraud.

                                                                             Jan. 2005 – Jun. 2005

**Darnall, Sikes, Gardes & Frederick**, Staff Accountant

Prepared state and federal tax returns for individual, partnership, corporate, and fiduciary clients. Executed programs for various types of engagements including audit, review, and compilation of corporate, retirement fund, and governmental financial statements.

### Education
B.S., University of Louisiana at Lafayette, Major in Accounting

### Professional Certification
Certified Fraud Examiner

### Memberships and Affiliations
Association of Certified Fraud Examiners
South Florida Association of Certified Fraud Examiners, Board Member
Association of Insolvency and Restructuring Advisors

# EXHIBIT 2

**EXHIBIT 2**

| | | | | Meridian Trust Company, *et al.* v. Eike Batista, *et al.* | | |
|---|---|---|---|---|---|---|
| | | | | Case No.: 2017-001040-CA-01 | | |
| | | | | | | |
| | | | | Transfers from Batista-Controlled Offshore Accounts to United States Bank Accounts | | |
| **Originating Bank** | **Account Name** | **Account No.** | **Date** | **Recipient** | **Amount** | |
| UBS (Bahamas) Ltd | 63X Master Fund | **916 | 07/31/09 | 63X Master Fund / CitiBank (New York) Account No. *****314 | $ | 3,000,000.00 |
| UBS (Bahamas) Ltd | 63X Master Fund | **916 | 08/17/09 | 63X Master Fund / CitiBank (New York) Account No. *****314 | | 1,000,000.00 |
| UBS (Bahamas) Ltd | 63X Master Fund | **916 | 08/18/09 | 63X Master Fund / Morgan Stanley Account No. **-**ASX | | 2,151,568.06 |
| UBS (Bahamas) Ltd | 63X Master Fund | **916 | 08/25/09 | 63X Master Fund Ltd / CitiBank (New York) Account No. ***382 | | 726,157.03 |
| UBS (Bahamas) Ltd | 63X Master Fund | **916 | 09/21/09 | 63X Master Fund / Banco Itaú Europa International (Miami) Account No. ▮▮▮ | | 151,916,781.63 |
| UBS (Bahamas) Ltd | 63X Master Fund | **916 | 10/07/09 | 63X Master Fund Ltd - CitiBank (New York) Account No. ***382 | | 33,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 11/24/09 | 63X Master Fund / Banco Itaú Europa International (Miami) Account No. ▮▮▮ | | 252,785,177.83 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 12/24/13 | [REDACTED] Iota Trust Account | | 15,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 12/27/13 | [REDACTED] Iota Trust Account | | 15,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 05/09/14 | Banco Itaú Miami | | 3,900,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 07/15/14 | AUX LLC / Banco Itaú Europa International (Miami) Account No. ***▮▮ | | 8,000,000.00 |
| | | | | | | |
| | | | | **Total** | $ | 486,479,684.55 |
| | | | | | | |
| Sources: | | | | | | |
| Account statements and supporting documentation provided by UBS (Bahamas) Ltd and Banco BTG Pactual S.A. - Cayman Branch. | | | | | | |

Tentative & Preliminary
Based on documents reviewed as of January 31, 2017

# EXHIBIT 3

**EXHIBIT 3**

| | | | | | |
|---|---|---|---|---|---|
| | | Meridian Trust Company, *et al.* v. Eiko Batista, *et al.* | | | |
| | | Case No.: 2017-001040-CA-01 | | | |
| | | | | | |
| | | Transfers between Batista-Controlled Offshore Companies | | | |
| | | for the Time Period April 2007 through September 2015 | | | |
| | | (Transactions greater than or equal to $10 Million) | | | |
| **Originating Bank** | **Account Name** | **Account No.** | **Date** | **Recipient** | **Amount** |
| UBS (Bahamas) Ltd | Centennial Asset Mining Fund, LLC | **211 | 04/16/07 | Centennial Asset Ltd  / UBS (Bahamas) Ltd #**216 | $   50,000,000.00 |
| UBS (Bahamas) Ltd | WRM2 LLC | **212 | 04/30/07 | WRM1 LLC  / UBS (Bahamas) Ltd #**210 | 20,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Mining Fund, LLC | **211 | 05/01/07 | Centennial Asset Ltd  / UBS (Bahamas) Ltd #**216 | 20,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 05/01/07 | WRM2 LLC  / UBS (Bahamas) Ltd #**212 | 20,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Mining Fund, LLC | **211 | 05/16/07 | Centennial Asset Ltd  UBS (Bahamas) Ltd #**216 | 40,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Mining Fund, LLC | **211 | 05/16/07 | Centennial Asset Ltd  / UBS (Bahamas) Ltd #**216 | 10,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 05/18/07 | EBX Panama S.A.  / UBS (Bahamas) Ltd #**218 | 23,635,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Mining Fund, LLC | **211 | 07/20/07 | Centennial Asset Ltd  / UBS (Bahamas) Ltd #**216 | 350,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Mining Fund, LLC | **211 | 07/20/07 | Centennial Asset Ltd  / UBS (Bahamas) Ltd #**249 | 35,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 08/08/07 | EBX Panama S.A.  / UBS (Bahamas) Ltd #**218 | 15,655,000.00 |
| UBS (Bahamas) Ltd | WRM2 LLC | **212 | 10/01/07 | WRM1 LLC  / UBS (Bahamas) Ltd #**210 | 15,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 10/02/07 | WRM2 LLC  / UBS (Bahamas) Ltd #**212 | 15,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Mining Fund, LLC | **211 | 10/19/07 | Centennial Asset Ltd  / UBS (Bahamas) Ltd #**216 | 50,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 12/14/07 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 100,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 12/21/07 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 14,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 01/22/08 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 26,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 02/15/08 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 10,000,000.00 |
| UBS (Bahamas) Ltd | WRM2 LLC | **212 | 03/06/08 | WRM1 LLC  / UBS (Bahamas) Ltd #**210 | 10,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 03/06/08 | WRM2 LLC  / UBS (Bahamas) Ltd #**212 | 10,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 03/17/08 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 15,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 03/17/08 | EBX Siderurgica De Bolivia SA  / UBS (Bahamas) Ltd #**214 | 18,403,987.90 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 05/29/08 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 18,900,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 06/05/08 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 30,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 06/13/08 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 313,540,954.50 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 06/16/08 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 69,177,410.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 06/16/08 | Centennial Asset Mining Fund LLC  / UBS (Bahamas) Ltd #**211 | 40,000,000.00 |
| UBS (Bahamas) Ltd | WRM2 LLC | **212 | 06/19/08 | WRM1 LLC  / UBS (Bahamas) Ltd #**210 | 15,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 06/19/08 | WRM2 LLC  / UBS (Bahamas) Ltd #**212 | 15,000,000.00 |

Tentative & Preliminary
Based on documents reviewed as of January 31, 2017

| Meridian Trust Company, *et al.* v. Eike Batista, *et al.* | | | | | |
|---|---|---|---|---|---|
| Case No.: 2017-001040-CA-01 | | | | | |
| | | | | | |
| Transfers between Batista-Controlled Offshore Companies | | | | | |
| for the Time Period April 2007 through September 2015 | | | | | |
| (Transactions greater than or equal to $10 Million) | | | | | |
| Originating Bank | Account Name | Account No. | Date | Recipient | Amount |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 07/14/08 | Centennial Asset Mining Fund LLC / UBS (Bahamas) Ltd #**211 | 13,017,613.60 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 07/23/08 | Centennial Asset Mining Fund LLC / UBS (Bahamas) Ltd #**211 | 26,000,000.00 |
| UBS (Bahamas) Ltd | 3BX Investments, LLC | **839 | 08/05/08 | Centennial Asset Ltd / UBS (Bahamas) Ltd #**216 | 769,773,558.28 |
| UBS (Bahamas) Ltd | 3BX Investments, LLC | **839 | 08/05/08 | Centennial Asset Ltd / UBS (Bahamas) Ltd #**216 | 769,773,558.28 |
| UBS (Bahamas) Ltd | 3BX Investments, LLC | **839 | 08/05/08 | Centennial Asset Ltd / UBS (Bahamas) Ltd #**216 | 769,773,558.28 |
| UBS (Bahamas) Ltd | 3BX Investment Fund I LLC | **840 | 08/05/08 | 3BX Investments LLC / UBS (Bahamas) Ltd #**839 | 769,773,558.28 |
| UBS (Bahamas) Ltd | 3BX Investment Fund I LLC | **840 | 08/05/08 | 3BX Investments LLC / UBS (Bahamas) Ltd #**839 | 769,773,558.28 |
| UBS (Bahamas) Ltd | 3BX Investment Fund I LLC | **840 | 08/05/08 | 3BX Investments LLC / UBS (Bahamas) Ltd #**839 | 769,773,558.28 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd. | **216 | 08/12/08 | Centennial Asset Mining Fund LLC / UBS (Bahamas) Ltd #**211 | 29,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 04/02/09 | Centennial Asset Mining Fund, LLC / Unknown Account No. | 20,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 04/29/09 | Centennial Asset Mining Fund LLC / UBS (Bahamas) Ltd #**211 | 20,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 04/30/09 | Centennial Asset Mining Fund LLC / UBS (Bahamas) Ltd #**211 | 31,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 06/26/09 | 3BX Investments LLC / UBS (Bahamas) Ltd #**839 | 210,000,000.00 |
| UBS (Bahamas) Ltd | 3BX Investments, LLC | **839 | 06/26/09 | 3BX Investment Fund I LLC / UBS (Bahamas) Ltd #**840 | 200,000,000.00 |
| UBS (Bahamas) Ltd | 63X Fund | **914 | 06/26/09 | 63X Investments Ltd / UBS (Bahamas) Ltd #**915 | 10,000,000.00 |
| UBS (Bahamas) Ltd | 63X Investments Ltd | **915 | 06/26/09 | 63X Master Fund / UBS (Bahamas) Ltd #**916 | 99,900,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 06/30/09 | 63X Master Fund / UBS (Bahamas) Ltd #**916 | 25,711,068.15 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **249 | 06/30/09 | 63X Master Fund / UBS (Bahamas) Ltd #**918 | 53,651,862.57 |
| UBS (Bahamas) Ltd | 3BX Investments, LLC | **839 | 06/30/09 | 63X Investments Ltd / UBS (Bahamas) Ltd #**915 | 90,000,000.00 |
| UBS (Bahamas) Ltd | 3BX Investment Fund I, LLC | **840 | 06/30/09 | 3BX Investments LLC / UBS (Bahamas) Ltd #**839 | 89,900,000.00 |
| UBS (Bahamas) Ltd | 63X Fund | **914 | 06/30/09 | 63X Investments Ltd / UBS (Bahamas) Ltd #**915 | 100,000,000.00 |
| UBS (Bahamas) Ltd | 63X Investments Ltd | **915 | 06/30/09 | 63X Fund / UBS (Bahamas) Ltd #**914 | 100,000,000.00 |
| UBS (Bahamas) Ltd | 63X Investments Ltd | **915 | 06/30/09 | 63X Master Fund / UBS (Bahamas) Ltd #**916 | 90,000,000.00 |
| UBS (Bahamas) Ltd | 3BX Investments, LLC | **839 | 07/02/09 | 3BX Investment Fund I LLC / UBS (Bahamas) Ltd #**840 | 90,000,000.00 |
| UBS (Bahamas) Ltd | 63X Investments Ltd | **915 | 07/02/09 | 3BX Investments LLC / UBS (Bahamas) Ltd #**839 | 90,000,000.00 |
| UBS (Bahamas) Ltd | 63X Master Fund | **916 | 07/02/09 | 63X Investments Ltd / UBS (Bahamas) Ltd #**915 | 90,000,000.00 |
| UBS (Bahamas) Ltd | 63X Fund | **914 | 07/07/09 | 63X Investments Ltd / UBS (Bahamas) Ltd #**915 | 90,000,000.00 |
| UBS (Bahamas) Ltd | 63X Investments Ltd | **915 | 07/07/09 | 63X Master Fund / UBS (Bahamas) Ltd #**916 | 90,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 07/17/09 | Centennial Asset Mining Fund LLC / UBS (Bahamas) Ltd #**211 | 10,000,000.00 |

Tentative & Preliminary
Based on documents reviewed as of January 31, 2017

| | | | | Meridian Trust Company, *et al.* v. Eike Batista, *et al.* | |
|---|---|---|---|---|---|
| | | | | Case No.: 2017-001040-CA-01 | |
| | | | | Transfers between Batista-Controlled Offshore Companies | |
| | | | | for the Time Period April 2007 through September 2015 | |
| | | | | (Transactions greater than or equal to $10 Million) | |
| Originating Bank | Account Name | Account No. | Date | Recipient | Amount |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 07/22/09 | Centennial Asset Mining Fund LLC / UBS (Bahamas) Ltd #**211 | 51,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Mining Fund, LLC | **211 | 08/19/09 | Centennial Asset Ltd / UBS (Bahamas) Ltd #**216 | 11,305,069.48 |
| UBS (Bahamas) Ltd | 3BX Investments, LLC | **839 | 09/10/09 | 3BX Investment Fund I LLC / UBS (Bahamas) Ltd #**840 | 248,000,000.00 |
| UBS (Bahamas) Ltd | 63X Investments Ltd | **915 | 09/10/09 | 3BX Investments LLC / UBS (Bahamas) Ltd #**839 | 248,000,000.00 |
| UBS (Bahamas) Ltd | 63X Master Fund | **916 | 09/10/09 | 63X Investments Ltd / UBS (Bahamas) Ltd #**915 | 248,000,000.00 |
| UBS (Bahamas) Ltd | Centennial Asset Mining Fund, LLC | **211 | 09/18/09 | Centennial Asset Ltd / UBS (Bahamas) Ltd #**216 | 182,002,911.43 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 09/18/09 | 3BX Investments LLC / UBS (Bahamas) Ltd #**839 | 182,002,911.43 |
| UBS (Bahamas) Ltd | 3BX Investments, LLC | **839 | 09/18/09 | 63X Investments Ltd / UBS (Bahamas) Ltd #**915 | 182,002,911.43 |
| UBS (Bahamas) Ltd | 63X Investments Ltd | **915 | 09/18/09 | 63X Master Fund / UBS (Bahamas) Ltd #**916 | 182,002,911.43 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 11/24/09 | 63X Master Fund / Banco BTG Pactual SA - Cayman #**46 | 87,504,739.70 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 11/24/09 | 63X Master Fund / Banco Itaú Europa International # | 252,785,177.83 |
| UBS (Bahamas) Ltd | Centennial Asset Ltd | **216 | 12/03/09 | Centennial Asset Mining Fund LLC / UBS (Bahamas) Ltd #**211 | 15,815,163.21 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 01/15/10 | Centennial Asset Limited / Banco BTG Pactual SA - Cayman #44 | 65,000,050.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 01/15/10 | Centennial Asset Limited / Banco BTG Pactual SA - Cayman #44 | 65,000,050.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 03/18/10 | Centennial Asset Limited / Banco BTG Pactual SA - Cayman #44 | 249,495,050.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 03/18/10 | Centennial Asset Limited / Banco BTG Pactual SA - Cayman #44 | 249,495,050.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 07/23/10 | Centennial Asset Ltd / Unknown Account No. | 10,200,050.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 07/23/10 | Centennial Asset Ltd / Unknown Bank #* | 10,200,050.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 07/29/10 | Centennial Asset Ltd / Unknown Account No. | 11,004,602.17 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 07/29/10 | Centennial Asset Ltd / Unknown Bank # | 11,004,602.17 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 10/22/10 | Centennial Asset Limited / Banco Itaú Europa International # | 10,000,000.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 11/22/10 | Centennial Asset Limited / Banco Itaú Europa International #***5720 | 11,000,000.00 |
| Banco Itaú Europa International (Miami) | 63X Investments Ltd | ***5873 | 02/17/11 | 3BX Investments LLC / Banco Itaú Europa International #***5874 | 240,509,459.90 |
| Banco Itaú Europa International (Miami) | 63X Investments Ltd | ***5873 | 08/02/11 | 3BX Investments LLC / Banco Itaú Europa International #***5874 | 15,000,000.00 |
| Banco Itaú Europa International (Miami) | 63X Investments Ltd | ***5873 | 08/10/11 | Aux LLC / Banco Itaú Europa International #***5867 | 22,000,000.00 |
| Banco Itaú Europa International (Miami) | 63X Investments Ltd | ***5873 | 01/12/12 | 3BX Investments LLC / Banco Itaú Europa International #***5874 | 24,000,000.00 |
| Banco Itaú Europa International (Miami) | 63X Investments Ltd | ***5873 | 02/06/12 | Aux LLC / Banco Itaú Europa International #***5867 | 35,385,000.00 |

Tentative & Preliminary
Based on documents reviewed as of January 31, 2017

Meridian Trust Company, *et al.* v. Eike Batista, *et al.*
Case No.: 2017-001040-CA-01

Transfers between Batista-Controlled Offshore Companies
for the Time Period April 2007 through September 2015
(Transactions greater than or equal to $10 Million)

| Originating Bank | Account Name | Account No. | Date | Recipient | Amount |
|---|---|---|---|---|---|
| Banco Itaú Europa International (Miami) | 63X Investments Ltd | ***5873 | 03/16/12 | 3BX Investments LLC / Banco Itaú Europa International #***5874 | 17,500,000.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 03/20/12 | Centennial Asset Brazilian Equity Fund / Banco Itaú Europa International #***5711 | 15,175,119.40 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 06/20/12 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 18,131,905.22 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 07/03/12 | Centennial Asset Brazilian Equity Fund LLC / Unknown Account No. | 12,299,470.14 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 08/29/12 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 10,644,785.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 09/11/12 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 15,000,000.00 |
| Banco Itaú Europa International (Miami) | 63X Investments Ltd | *▮▮▮ | 10/09/12 | 3BX Investments LLC / Banco Itaú Europa International #***5874 | 15,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 10/17/12 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 105,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 10/17/12 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 13,707,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 11/26/12 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 11,725,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 12/19/12 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 12,770,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 01/17/13 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 102,345,099.98 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 02/01/13 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 188,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 04/08/13 | Centennial Asset Mining Fund LLC / Unknown Account No. | 13,871,847.70 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 04/11/13 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 15,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 04/24/13 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 16,730,500.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 04/25/13 | Centennial Asset Brazilian Equity Fund LLC / Banco BTG Pactual SA - Cayman #*84 | 49,900,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 04/25/13 | Centennial Asset Mining Fund LLC / Unknown Bank #*34 | 111,798,818.97 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 04/30/13 | 63X Master Fund / Banco BTG Pactual SA - Cayman #*46 | 111,400,000.00 |

Tentative & Preliminary
Based on documents reviewed as of January 31, 2017

Meridian Trust Company, *et al.* v. Eike Batista, *et al.*

Case No.: 2017-001040-CA-01

Transfers between Batista-Controlled Offshore Companies

for the Time Period April 2007 through September 2015

(Transactions greater than or equal to $10 Million)

| Originating Bank | Account Name | Account No. | Date | Recipient | Amount |
|---|---|---|---|---|---|
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 06/13/13 | Centennial Asset Brazilian Equity Fund LLC / Banco BTG Pactual SA - Cayman #*84 | 10,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 06/13/13 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 10,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 06/18/13 | Centennial Asset Brazilian Equity Fund LLC / Banco BTG Pactual SA - Cayman #*84 | 161,000,000.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ***4895 | 06/24/13 | Centennial Asset Brazilian Equity Fund / Banco Itaú Europa International #***5711 | 30,890,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 07/03/13 | Centennial Asset Brazilian Equity Fund LLC / Banco BTG Pactual SA - Cayman #*84 | 59,760,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 07/12/13 | 63X Investments Ltd / Banco BTG Pactual SA - Cayman #*54 | 30,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Investments Ltd | *54 | 07/12/13 | 63X Fund / Banco BTG Pactual SA - Cayman #*72 | 30,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 07/16/13 | 63X Investments Ltd / Banco BTG Pactual SA - Cayman #*54 | 35,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Investments Ltd | *54 | 07/16/13 | 63X Fund / Banco BTG Pactual SA - Cayman #*72 | 35,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 3BX Investments, LLC | *43 | 09/19/13 | 3BX Investment Fund I LLC / Banco BTG Pactual SA - Cayman #*55 | 10,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 09/19/13 | 63X Investments Ltd / Banco BTG Pactual SA - Cayman #*54 | 10,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Investments Ltd | *54 | 09/19/13 | 3BX Investments LLC / Banco BTG Pactual SA - Cayman #*43 | 10,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 10/08/13 | 63X Investments Ltd / Banco BTG Pactual SA - Cayman #*54 | 37,800,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Investments Ltd | *54 | 10/08/13 | 63X Fund / Banco BTG Pactual SA - Cayman #*72 | 37,800,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | 63X Master Fund | *46 | 10/09/13 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 10,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 10/31/13 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 12,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Ltd. | *44 | 01/31/14 | Centennial Asset Brazilian Equity Fund LLC / Banco BTG Pactual SA - Cayman #*84 | 12,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 01/31/14 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 13,500,000.00 |
| Banco Itaú Europa International (Miami) | 63X Master Fund | ▮▮▮ | 11/21/14 | Aux LLC / Banco Itaú Europa International #***5867 | 13,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Ltd. | *44 | 09/02/15 | Centennial Asset Brazilian Equity Fund LLC / Banco BTG Pactual SA - Cayman #*84 | 15,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Mining Fund, LLC | *49 | 09/02/15 | EBX Holding Ltda / Unknown Account No. | 15,000,000.00 |
| Banco BTG Pactual S.A. - Cayman Branch | Centennial Asset Brazilian Equity Fund LLC | *84 | 09/02/15 | Centennial Asset Mining Fund LLC / Banco BTG Pactual SA - Cayman #*49 | 15,000,000.00 |

Sources:

Account statements and supporting documentation provided by UBS (Bahamas) Ltd and Banco BTG Pactual S.A. - Cayman Branch; account statements for accounts held at Banco Itaú Europa International that were provided by the 63X Companies in connection with the Cayman Proceedings.

Tentative & Preliminary

Based on documents reviewed as of January 31, 2017

# EXHIBIT "H"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, EBX INVESTMENT FUNDS, LLC,
CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA,

      Defendants.

                                 /

## INJUNCTION
### UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

THIS CAUSE having come before the Court on Plaintiffs, MERIDIAN TRUST

COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs")

emergency *ex parte* motion for temporary injunction to prevent fraudulent transfers (the "Motion")

and the Court, having examined the pleading on file the affidavit in support of the Motion, the

Worldwide Freeze Order and Reasoned Judgment of The Cayman Grand Court, Orders and

Adjudges that:

    1.    The Court is satisfied that the Plaintiffs have carried their burden pursuant to section

726.105, Florida Statutes, and, therefore, pursuant to section 726.108(c)(1), Florida Statutes, and

rule 1.610, Florida Rules of Civil Procedure, are entitled to a temporary *ex parte* injunction, until

further order of this Court, enjoining the transfer, withdrawal, or any other alienation of assets out of the accounts of any of the named Defendants as identified below, whether owned by them nominally or beneficially (the "Enjoined Accounts").

2.  The amount enjoined is up to and including $62,932,547.

3.  The enjoined defendants ("Enjoined Defendants") are:

    a.  EIKE BATISTA;

    b.  WERNER BATISTA;

    c.  THOR BATISTA;

    d.  PAULO MENDONÇA;

    e.  FLAVIO GODINHO;

    f.  PAULO GOUVEA;

    g.  MARCUS BERTO;

    h.  LUIZ CARNEIRO;

    i.  AZIZ BEN AMMAR;

    j.  63X INVESTMENTS LTD.;

    k.  63X MASTER FUND;

    l.  63X FUND;

    m.  EBX HOLDING, LTDA.;

    n.  EBX INTERNATIONAL, S.A.;

    o.  EBX CAPITAL PARTNERS;

    p.  EBX INVESTMENT FUNDS, LLC;

    q.  CENTENNIAL ASSET MINING FUND, LLC;

    r.  CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC;

    s.  THORQUE1 FUND LTD.;

    a.   THORQUE INVESTMENT MANAGEMENT LTD.;

    b.   OLIN BATISTA;

    c.   FLAVIA SAMPAIO; and

    d.   LUMA DE OLIVEIRA.

4.    The Enjoined Defendants must not:

    a.   Remove from Florida any of their assets located in Florida up to the value of $62,932,547; or

    b.   In any way dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets located in Florida and up to the same value.

5.    Paragraph 3 applies to all of the Enjoined Defendants' assets located in Florida whether or not those assets are held in their own name(s) and whether they are solely or jointly owned. For the purposes of this Order, the Enjoined Defendants' assets include any asset which the Enjoined Defendants have the power, directly or indirectly, to dispose of or deal with as if it were their own (including assets of wholly-owned corporate structures). It includes assets in the custody of third parties, including banks, brokerages, and other financial institutions.

6.    This Order also prohibits any third parties, including but not limited to bankers, accountants, financial advisors, investment managers or advisors, trustees and nominees, from taking any action in violation of this Order at the directions or suggestion of any Enjoined Defendant or Enjoined Defendants. Any person who is served with this Order and takes any action or fails to take any action which helps or permits the breach of the terms of this Order may be held to be in contempt of Court.

7.    This Order does not prohibit any Enjoined Defendant who is a natural person from spending up to $10,000 per week toward their ordinary living expenses. Nor does it prohibit any Enjoined Defendant from spending a reasonable sum on legal representation.

8.      This Order does not prohibit any Enjoined Defendant from dealing with or disposing of any of their assets in the ordinary and proper course of business, provided that the Enjoined Defendants shall notify the Plaintiffs' attorneys five (5) business days in advance of any such dealing or disposal worth more than $10,000 so as to afford the Plaintiffs a reasonable opportunity to apply for further relief from this Court.

9.      The Enjoined Defendants may apply to the Court for further relief if they are able to show that, for good cause, the above listed spending limits should be increased.

10.     This Order will cease to have effect if the Defendants:

    a.  provide security by paying the sum of $62,932,547 into the Court registry; or

    b.  provide for security in the sum of $62,932,547 by another method agreed with the Plaintiff's attorneys.

11.     The foregoing injunction is contingent upon Plaintiffs posting a bond in the amount of $_____. Regardless, the Enjoined Accounts shall remain enjoined until further order of this Court.

12.     The Plaintiffs shall promptly notify the Enjoined Defendants of this Order as soon as reasonably practicable after notification of such financial institutions or other persons in possession of any assets for or on behalf of any of the Enjoined Defendants.

13.     This Order is without prejudice of the Enjoined Defendants from seeking modification or discharge hereof upon an inter-parties hearing.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this _____ day of February, 2017.

_____
HONORABLE BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

4

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01-(43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, EBX INVESTMENT FUNDS, LLC,
CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA,

      Defendants.

_____/

## INJUNCTION
## UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

THIS CAUSE having come before the Court on Plaintiffs, MERIDIAN TRUST

COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs")

emergency *ex parte* motion for temporary injunction to prevent fraudulent transfers (the "Motion")

and the Court, having examined the pleading on file the affidavit in support of the Motion, the

Worldwide Freeze Order and Reasoned Judgment of The Cayman Grand Court, Orders and

Adjudges that:

     1.     The Court is satisfied that the Plaintiffs have carried their burden pursuant to section

726.105, Florida Statutes, and, therefore, pursuant to section 726.108(c)(1), Florida Statutes, and

rule 1.610, Florida Rules of Civil Procedure, are entitled to a temporary *ex parte* injunction, until

1

further order of this Court, enjoining the transfer, withdrawal, or any other alienation of assets out of the accounts of any of the named Defendants as identified below, whether owned by them nominally or beneficially (the "Enjoined Accounts").

2.      The amount enjoined is up to and including $62,932,547.

3.      The enjoined defendants ("Enjoined Defendants") are:

     a.  EIKE BATISTA;

     b.  WERNER BATISTA;

     c.  THOR BATISTA;

     d.  PAULO MENDONÇA;

     e.  FLAVIO GODINHO;

     f.  PAULO GOUVEA;

     g.  MARCUS BERTO;

     h.  LUIZ CARNEIRO;

     i.  AZIZ BEN AMMAR;

     j.  63X INVESTMENTS LTD.;

     k.  63X MASTER FUND;

     l.  63X FUND;

     m.  EBX HOLDING, LTDA.;

     n.  EBX INTERNATIONAL, S.A.;

     o.  EBX CAPITAL PARTNERS;

     p.  EBX INVESTMENT FUNDS, LLC;

     q.  CENTENNIAL ASSET MINING FUND, LLC;

     r.  CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC;

     s.  THORQUE1 FUND LTD.;

    a.  THORQUE INVESTMENT MANAGEMENT LTD.;

    b.  OLIN BATISTA;

    c.  FLAVIA SAMPAIO; and

    d.  LUMA DE OLIVEIRA.

4.    The Enjoined Defendants must not:

    a.  Remove from Florida any of their assets located in Florida up to the value of $62,932,547; or

    b.  In any way dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets located in Florida and up to the same value.

5.    Paragraph 3 applies to all of the Enjoined Defendants' assets located in Florida whether or not those assets are held in their own name(s) and whether they are solely or jointly owned. For the purposes of this Order, the Enjoined Defendants' assets include any asset which the Enjoined Defendants have the power, directly or indirectly, to dispose of or deal with as if it were their own (including assets of wholly-owned corporate structures). It includes assets in the custody of third parties, including banks, brokerages, and other financial institutions.

6.    This Order also prohibits any third parties, including but not limited to bankers, accountants, financial advisors, investment managers or advisors, trustees and nominees, from taking any action in violation of this Order at the directions or suggestion of any Enjoined Defendant or Enjoined Defendants. Any person who is served with this Order and takes any action or fails to take any action which helps or permits the breach of the terms of this Order may be held to be in contempt of Court.

7.    This Order does not prohibit any Enjoined Defendant who is a natural person from spending up to $10,000 per week toward their ordinary living expenses. Nor does it prohibit any Enjoined Defendant from spending a reasonable sum on legal representation.

3

8.      This Order does not prohibit any Enjoined Defendant from dealing with or disposing of any of their assets in the ordinary and proper course of business, provided that the Enjoined Defendants shall notify the Plaintiffs' attorneys five (5) business days in advance of any such dealing or disposal worth more than $10,000 so as to afford the Plaintiffs a reasonable opportunity to apply for further relief from this Court.

9.      The Enjoined Defendants may apply to the Court for further relief if they are able to show that, for good cause, the above listed spending limits should be increased.

10.     This Order will cease to have effect if the Defendants:

   a.   provide security by paying the sum of $62,932,547 into the Court registry; or

   b.   provide for security in the sum of $62,932,547 by another method agreed with the Plaintiff's attorneys.

11.     The foregoing injunction is contingent upon Plaintiffs posting a bond in the amount of $ 50,000.00 . Regardless, the Enjoined Accounts shall remain enjoined until further order of this Court.

12.     The Plaintiffs shall promptly notify the Enjoined Defendants of this Order as soon as reasonably practicable after notification of such financial institutions or other persons in possession of any assets for or on behalf of any of the Enjoined Defendants.

13.     This Order is without prejudice of the Enjoined Defendants from seeking modification or discharge hereof upon an inter-parties hearing.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this 2nd day of February, 2017.

HONORABLE BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

4

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY

GENERAL JURISDICTION DIVISION

**MERIDIAN TRUST COMPANY**, as
trustee, and **AMERICAN ASSOCIATED
GROUP, LTD.**,

Case No. 17-001040 CA 43

Plaintiffs,

vs.

**EIKE BATISTA,** et al.

Defendants.

_____/

### NOTICE OF APPEARANCE AND COMPLIANCE WITH RULE 2.516
### AND DESIGNATION OF E-MAIL ADDRESSES

Jose M. Ferrer, Esq. of the law firm, Bilzin Sumberg Baena Price & Axelrod LLP, hereby

files this Notice of Appearance on behalf of Defendant, Marcus Berto. In compliance with Rule

2.516 of the Florida Rules of Judicial Administration, the following email addresses are

designated for service of all pleadings and papers in the above-referenced matter:

| **PRIMARY:** | Jose M. Ferrer | jferrer@bilzin.com |
| **SECONDARY:** | Yasmin Fernandez-Acuña | yfernandez-acuna@bilzin.com |
| | Elizabeth Trujillo<br>(legal assistant) | etrujillo@bilzin.com |
| | Firm Docketing E-Mail | eservice@bilzin.com |

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Attorneys for Defendant Marcus Berto*
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: */s/ Jose M. Ferrer*
    **JOSE M. FERRER**
    Florida Bar No. 173746
    jferrer@bilzin.com
    **YASMIN FERNANDEZ-ACUÑA**
    Florida Bar No. 117372
    yfernandez-acuna@bilzin.com
    eservice@bilzin.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished to the

individuals listed below by e-mail generated by Florida Courts E-Portal Filing system this 3rd

day of February, 2017:

Hendrick G. Milne, Esq.
ABALLI MILNE KALIL, P.A.
2250 SunTrust International Center
One SE Third Avenue
Miami, Florida 33131

By: */s/ Jose M. Ferrer*
    Jose M. Ferrer

MIAMI 5313291.1 82874/84405

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, *et al.*

        Defendant.

_____/

## NOTICE OF APPEARANCE AND
## DESIGNATION OF E-MAIL ADDRESSES

        Edward M. Mullins, Esq., and Ana M. Barton, Esq., of the law firm of Astigarraga Davis Mullins & Grossman, P.A., hereby give notice that they are appearing as counsel for Defendant WERNER BATISTA, reserving all defenses and affirmative defenses in the above-captioned matter. All future pleadings, correspondence, and documents should be sent to the undersigned as counsel for Defendant, whom hereby designate the following e-mail addresses for the purpose of receiving service in this case:

1. Primary E-Mail: emullins@astidavis.com

2. Primary E-Mail: abarton@astidavis.com

3. Secondary E-Mail: bhernandez@astidavis.com

Dated: February 7, 2017

Respectfully submitted,

ASTIGARRAGA  DAVIS  MULLINS  &
GROSSMAN, P.A.
1001 Brickell Bay Drive, 9th Floor
Miami, FL 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Designated E-Mails for Service:
Primary: emullins@astidavis.com
            abarton@astidavis.com
Secondary: bhernandez@astidavis.com

By: */s/ Edward M. Mullins*
    Edward M. Mullins
    Florida Bar No. 863920
    Ana M. Barton
    Florida Bar No.: 85721
    *Counsel for Defendant Werner Batista*

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal which sent e-mail notification of such filing in accordance with Rule 2.516 Fla. R. Jud. Admin. to Hendrik G. Milne, Esq., and Craig P. Kalil, Esq., ABALLI MILNE KALIL, P.A. on February 7, 2017.

           */s/ Edward M. Mullins*
           Edward M. Mullins

Filing # 52146750 E-Filed 02/07/2017 10:39:15 AM

CFN: 20170077433 BOOK 30415 PAGE 4703
DATE:02/09/2017  09:46:22 AM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY

GENERAL JURISDICTION DIVISION

**MERIDIAN TRUST COMPANY**, as
trustee, and **AMERICAN ASSOCIATED
GROUP, LTD.**,

Case No. 17-001040 CA 43

　　　　Plaintiffs,

vs.

**EIKE BATISTA,** et al.

　　　　Defendants.

_____/

## NOTICE OF APPEAL OF A NON-FINAL ORDER

NOTICE IS GIVEN that Marcus Berto, Defendant/Appellant, appeals to the Third

District Court of Appeal, the order of this court rendered February 3, 2017. The nature of the

order, a conformed copy of which is attached hereto, is a non-final order granting Plaintiff's

"Emergency *Ex Parte* Motion for Temporary Injunction to Prevent Fraudulent Transfers."

　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　**BILZIN SUMBERG BAENA PRICE
　　　　　　　　　　　　　& AXELROD LLP**
　　　　　　　　　　　　　*Attorneys for Defendant Marcus Berto*
　　　　　　　　　　　　　1450 Brickell Avenue, Suite 2300
　　　　　　　　　　　　　Miami, Florida 33131-3456
　　　　　　　　　　　　　Telephone:  (305) 374-7580
　　　　　　　　　　　　　Facsimile:  (305) 374-7593

　　　　　　　　　　　　　By:___*/s/ Jose M. Ferrer*_____
　　　　　　　　　　　　　**JOSE M. FERRER**
　　　　　　　　　　　　　Florida Bar No. 173746
　　　　　　　　　　　　　jferrer@bilzin.com
　　　　　　　　　　　　　**YASMIN FERNANDEZ-ACUÑA**
　　　　　　　　　　　　　Florida Bar No. 117372
　　　　　　　　　　　　　yfernandez-acuna@bilzin.com
　　　　　　　　　　　　　eservice@bilzin.com

CFN: 20170077433 BOOK 30415 PAGE 4704

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished to the individuals listed below by e-mail generated by Florida Courts E-Portal Filing system this 7th day of February, 2017:

Hendrick G. Milne, Esq.
ABALLI MILNE KALIL, P.A.
*Attorneys for Plaintiffs*
2250 SunTrust International Center
One SE Third Avenue
Miami, Florida 33131

By:    /s/ Jose M. Ferrer
          Jose M. Ferrer

MIAMI 5315750.1 82874/84405

2

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

CFN: 20170077433 BOOK 30415 PAGE 4705

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, EBX INVESTMENT FUNDS, LLC,
CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA,

      Defendants.

_____/

## INJUNCTION
### UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

THIS CAUSE having come before the Court on Plaintiffs, MERIDIAN TRUST

COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs")

emergency *ex parte* motion for temporary injunction to prevent fraudulent transfers (the "Motion")

and the Court, having examined the pleading on file the affidavit in support of the Motion, the

Worldwide Freeze Order and Reasoned Judgment of The Cayman Grand Court, Orders and

Adjudges that:

      1.    The Court is satisfied that the Plaintiffs have carried their burden pursuant to section

726.105, Florida Statutes, and, therefore, pursuant to section 726.108(c)(1), Florida Statutes, and

rule 1.610, Florida Rules of Civil Procedure, are entitled to a temporary *ex parte* injunction, until

1

CFN: 20170077433 BOOK 30415 PAGE 4706

further order of this Court, enjoining the transfer, withdrawal, or any other alienation of assets out of the accounts of any of the named Defendants as identified below, whether owned by them nominally or beneficially (the "Enjoined Accounts").

2. The amount enjoined is up to and including $62,932,547.

3. The enjoined defendants ("Enjoined Defendants") are:

   a. EIKE BATISTA;

   b. WERNER BATISTA;

   c. THOR BATISTA;

   d. PAULO MENDONÇA;

   e. FLAVIO GODINHO;

   f. PAULO GOUVEA;

   g. MARCUS BERTO;

   h. LUIZ CARNEIRO;

   i. AZIZ BEN AMMAR;

   j. 63X INVESTMENTS LTD.;

   k. 63X MASTER FUND;

   l. 63X FUND;

   m. EBX HOLDING, LTDA.;

   n. EBX INTERNATIONAL, S.A.;

   o. EBX CAPITAL PARTNERS;

   p. EBX INVESTMENT FUNDS, LLC;

   q. CENTENNIAL ASSET MINING FUND, LLC;

   r. CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC;

   s. THORQUE1 FUND LTD.;

2

CFN: 20170077433 BOOK 30415 PAGE 4707

a. THORQUE INVESTMENT MANAGEMENT LTD.;

b. OLIN BATISTA;

c. FLAVIA SAMPAIO; and

d. LUMA DE OLIVEIRA.

4.    The Enjoined Defendants must not:

a.   Remove from Florida any of their assets located in Florida up to the value of $62,932,547; or

b.   In any way dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets located in Florida and up to the same value.

5.    Paragraph 3 applies to all of the Enjoined Defendants' assets located in Florida whether or not those assets are held in their own name(s) and whether they are solely or jointly owned. For the purposes of this Order, the Enjoined Defendants' assets include any asset which the Enjoined Defendants have the power, directly or indirectly, to dispose of or deal with as if it were their own (including assets of wholly-owned corporate structures). It includes assets in the custody of third parties, including banks, brokerages, and other financial institutions.

6.    This Order also prohibits any third parties, including but not limited to bankers, accountants, financial advisors, investment managers or advisors, trustees and nominees, from taking any action in violation of this Order at the directions or suggestion of any Enjoined Defendant or Enjoined Defendants. Any person who is served with this Order and takes any action or fails to take any action which helps or permits the breach of the terms of this Order may be held to be in contempt of Court.

7.    This Order does not prohibit any Enjoined Defendant who is a natural person from spending up to $10,000 per week toward their ordinary living expenses. Nor does it prohibit any Enjoined Defendant from spending a reasonable sum on legal representation.

3

CFN: 20170077433 BOOK 30415 PAGE 4708

8.    This Order does not prohibit any Enjoined Defendant from dealing with or disposing of any of their assets in the ordinary and proper course of business, provided that the Enjoined Defendants shall notify the Plaintiffs' attorneys five (5) business days in advance of any such dealing or disposal worth more than $10,000 so as to afford the Plaintiffs a reasonable opportunity to apply for further relief from this Court.

9.    The Enjoined Defendants may apply to the Court for further relief if they are able to show that, for good cause, the above listed spending limits should be increased.

10.   This Order will cease to have effect if the Defendants:

      a.   provide security by paying the sum of $62,932,547 into the Court registry; or

      b.   provide for security in the sum of $62,932,547 by another method agreed with the Plaintiff's attorneys.

11.   The foregoing injunction is contingent upon Plaintiffs posting a bond in the amount of $ 50,000.00 . Regardless, the Enjoined Accounts shall remain enjoined until further order of this Court.

12.   The Plaintiffs shall promptly notify the Enjoined Defendants of this Order as soon as reasonably practicable after notification of such financial institutions or other persons in possession of any assets for or on behalf of any of the Enjoined Defendants.

13.   This Order is without prejudice of the Enjoined Defendants from seeking modification or discharge hereof upon an inter-parties hearing.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this 2nd day of February, 2017.

HONORABLE BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

Filing # 52158768 E-Filed 02/07/2017 12:29:22 PM

CFN: 20170078006 BOOK 30416 PAGE 1390
DATE:02/09/2017  11:23:32 AM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.:  17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

         Plaintiffs,

v.

EIKE BATISTA, *et al.,*

         Defendants.

_____/

### NOTICE OF JOINDER TO APPEAL OF A NON-FINAL ORDER

NOTICE IS GIVEN, pursuant to Florida Rule of Appellate Procedure 9.360 and all other

applicable rules, that Defendant Werner Batista joins Defendant Marcus Berto's Notice of

Appeal of a Non-Final Order to the Third District Court of Appeal filed on February 7, 2017, of

the injunction order of this Court signed on February 2, 2017, and filed for record on February 3,

2017.  The nature of the appealed order is a non-final order granting Plaintiff's "Emergency *Ex

Parte* Motion for Temporary Injunction to Prevent Fraudulent Transfers."  A copy of Berto's

Notice of Appeal of a Non-Final Order and a conformed copy of the appealed injunction order

are attached hereto.

Dated: February 7, 2017

Respectfully submitted,

**ASTIGARRAGA  DAVIS  MULLINS  &
GROSSMAN, P.A.**
1001 Brickell Bay Drive, 9th Floor
Miami, FL 33131
Tel.: (305) 372-8282; Fax: (305) 372-8202

CFN: 20170078006 BOOK 30416 PAGE 1391

By: */s/ Ana Maria Barton*
Edward M. Mullins
Florida Bar No. 863920
emullins@astidavis.com;
bhernandez@astidavis.com
Ana M. Barton
Florida Bar No. 85721
abarton@astidavis.com
*Counsel for Defendant Werner Batista*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal which sent e-mail notification of such filing to Hendrik G. Milne, Esq., and Craig P. Kalil, Esq., ABALLI MILNE KALIL, P.A., and Jose Ferrer, Esq., and Yasmin Fernandez-Acuna, Esq., BILZIN SUMBERG BAENA PRICE & AXEDLROD LLP, on February 7, 2017

By: */s/ Ana Maria Barton*
Ana Maria Barton

2
ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Filing # 52146750 E-Filed 02/07/2017 10:39:15 AM                CFN: 20170078006 BOOK 30416 PAGE 1392

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY

GENERAL JURISDICTION DIVISION

**MERIDIAN TRUST COMPANY**, as
trustee, and **AMERICAN ASSOCIATED
GROUP, LTD.**,

Case No. 17-001040 CA 43

      Plaintiffs,

vs.

**EIKE BATISTA,** et al.

      Defendants.

_____/

## NOTICE OF APPEAL OF A NON-FINAL ORDER

    NOTICE IS GIVEN that Marcus Berto, Defendant/Appellant, appeals to the Third

District Court of Appeal, the order of this court rendered February 3, 2017. The nature of the

order, a conformed copy of which is attached hereto, is a non-final order granting Plaintiff's

"Emergency *Ex Parte* Motion for Temporary Injunction to Prevent Fraudulent Transfers."

              Respectfully submitted,

              **BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
              *Attorneys for Defendant Marcus Berto*
              1450 Brickell Avenue, Suite 2300
              Miami, Florida 33131-3456
              Telephone: (305) 374-7580
              Facsimile: (305) 374-7593

              By:___*/s/ Jose M. Ferrer*_____
              **JOSE M. FERRER**
              Florida Bar No. 173746
              jferrer@bilzin.com
              **YASMIN FERNANDEZ-ACUÑA**
              Florida Bar No. 117372
              yfernandez-acuna@bilzin.com
              eservice@bilzin.com

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

CFN: 20170078006 BOOK 30416 PAGE 1393

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished to the individuals listed below by e-mail generated by Florida Courts E-Portal Filing system this 7th day of February, 2017:

Hendrick G. Milne, Esq.
ABALLI MILNE KALIL, P.A.
*Attorneys for Plaintiffs*
2250 SunTrust International Center
One SE Third Avenue
Miami, Florida 33131

By:    /s/ Jose M. Ferrer
                Jose M. Ferrer

MIAMI 5315750.1 82874/84405

2
BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

CFN: 20170078006 BOOK 30416 PAGE 1394

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, EBX INVESTMENT FUNDS, LLC,
CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA,

     Defendants.

_____/

## INJUNCTION
### UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

     THIS CAUSE having come before the Court on Plaintiffs, MERIDIAN TRUST

COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs")

emergency *ex parte* motion for temporary injunction to prevent fraudulent transfers (the "Motion")

and the Court, having examined the pleading on file the affidavit in support of the Motion, the

Worldwide Freeze Order and Reasoned Judgment of The Cayman Grand Court, Orders and

Adjudges that:

     1.    The Court is satisfied that the Plaintiffs have carried their burden pursuant to section

726.105, Florida Statutes, and, therefore, pursuant to section 726.108(c)(1), Florida Statutes, and

rule 1.610, Florida Rules of Civil Procedure, are entitled to a temporary *ex parte* injunction, until

1

CFN: 20170078006 BOOK 30416 PAGE 1395

further order of this Court, enjoining the transfer, withdrawal, or any other alienation of assets out of the accounts of any of the named Defendants as identified below, whether owned by them nominally or beneficially (the "Enjoined Accounts").

2.  The amount enjoined is up to and including $62,932,547.

3.  The enjoined defendants ("Enjoined Defendants") are:

    a.  EIKE BATISTA;

    b.  WERNER BATISTA;

    c.  THOR BATISTA;

    d.  PAULO MENDONÇA;

    e.  FLAVIO GODINHO;

    f.  PAULO GOUVEA;

    g.  MARCUS BERTO;

    h.  LUIZ CARNEIRO;

    i.  AZIZ BEN AMMAR;

    j.  63X INVESTMENTS LTD.;

    k.  63X MASTER FUND;

    l.  63X FUND;

    m.  EBX HOLDING, LTDA.;

    n.  EBX INTERNATIONAL, S.A.;

    o.  EBX CAPITAL PARTNERS;

    p.  EBX INVESTMENT FUNDS, LLC;

    q.  CENTENNIAL ASSET MINING FUND, LLC;

    r.  CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC;

    s.  THORQUE1 FUND LTD.;

2

CFN: 20170078006 BOOK 30416 PAGE 1396

    a.  THORQUE INVESTMENT MANAGEMENT LTD.;

    b.  OLIN BATISTA;

    c.  FLAVIA SAMPAIO; and

    d.  LUMA DE OLIVEIRA.

4.    The Enjoined Defendants must not:

    a.  Remove from Florida any of their assets located in Florida up to the value of $62,932,547; or

    b.  In any way dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets located in Florida and up to the same value.

5.    Paragraph 3 applies to all of the Enjoined Defendants' assets located in Florida whether or not those assets are held in their own name(s) and whether they are solely or jointly owned. For the purposes of this Order, the Enjoined Defendants' assets include any asset which the Enjoined Defendants have the power, directly or indirectly, to dispose of or deal with as if it were their own (including assets of wholly-owned corporate structures). It includes assets in the custody of third parties, including banks, brokerages, and other financial institutions.

6.    This Order also prohibits any third parties, including but not limited to bankers, accountants, financial advisors, investment managers or advisors, trustees and nominees, from taking any action in violation of this Order at the directions or suggestion of any Enjoined Defendant or Enjoined Defendants. Any person who is served with this Order and takes any action or fails to take any action which helps or permits the breach of the terms of this Order may be held to be in contempt of Court.

7.    This Order does not prohibit any Enjoined Defendant who is a natural person from spending up to $10,000 per week toward their ordinary living expenses. Nor does it prohibit any Enjoined Defendant from spending a reasonable sum on legal representation.

3

CFN: 20170078006 BOOK 30416 PAGE 1397

8.    This Order does not prohibit any Enjoined Defendant from dealing with or disposing of any of their assets in the ordinary and proper course of business, provided that the Enjoined Defendants shall notify the Plaintiffs' attorneys five (5) business days in advance of any such dealing or disposal worth more than $10,000 so as to afford the Plaintiffs a reasonable opportunity to apply for further relief from this Court.

9.    The Enjoined Defendants may apply to the Court for further relief if they are able to show that, for good cause, the above listed spending limits should be increased.

10.    This Order will cease to have effect if the Defendants:

    a.   provide security by paying the sum of $62,932,547 into the Court registry; or

    b.   provide for security in the sum of $62,932,547 by another method agreed with the Plaintiff's attorneys.

11.    The foregoing injunction is contingent upon Plaintiffs posting a bond in the amount of $ 50,000.00 . Regardless, the Enjoined Accounts shall remain enjoined until further order of this Court.

12.    The Plaintiffs shall promptly notify the Enjoined Defendants of this Order as soon as reasonably practicable after notification of such financial institutions or other persons in possession of any assets for or on behalf of any of the Enjoined Defendants.

13.    This Order is without prejudice of the Enjoined Defendants from seeking modification or discharge hereof upon an inter-parties hearing.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this 2nd day of February, 2017.

HONORABLE BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

ORIGINAL
JUDGE BEATRICE BUTCHKO

STATE OF FLORIDA, COUNTY OF ...

2/3/2017

4

#33456

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

        Defendants.

_____/

## **NOTICE OF FILING VERIFIED RETURN OF SERVICE**

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for Werner Batista.

        Dated: February 9, 2017.

                    Respectfully submitted,

                    ABALLI MILNE KALIL, P.A.
                    *Counsel for Plaintiffs*
                    2250 SunTrust International Center
                    One Southeast Third Ave.
                    Miami, FL 33131
                    Phone: (305) 373–6600
                    Fax: (305) 373–7929

                    s/ *Hendrik G. Milne*
                    Hendrik G. Milne
                    Florida Bar No.: 335886
                    Craig P. Kalil
                    Florida Bar No.: 607282

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 9th day of February, 2017 a true and correct copy of the

foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice

on all counsel of record via this Court' s e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

RETURN OF SERVICE

MERIDIAN TRUST COMPANY, as Trustee
& AMERICAN ASSOCIATED GROUP, LTD.
Plaintiff(s)

2017-001040-CA-01(43)
Case Number

vs.

Civil Action Summons and Complaint
And Demand for Jury Trial
Document(s)

EIKE BATISTA, et al.,
Defendant(s)

HENDRIK G. MILNE
Attorney for Plaintiff

Received by Lightning Legal Couriers on JAN. 24, 2017 at 4:00PM and served

a true copy on the 24TH day of JAN. , 2017, at 4:59PM, by delivering same

to the within named: WERNER BATISTA

by handing the same to WERNER BATISTA, personally pursuant to F.S. 48.031

(1)(a) with the date and hour of service endorsed thereon by me and informed

said person of the contents therein, in compliance with state statutes

at 2141 NW 30TH ROAD, BOCA RATON in the County of PALM BEACH , Florida, 33431.

**MILITARY STATUS: DEFENDANT IS NOT IN MILITARY SERVICE.**
**DESCRIPTION: WHITE MALE, 45-50 YEARS OLD, 6'1" TALL, 210 LBS, GRAY HAIR,**
**BROWN EYES.**
**COMMENTS: PARKED IN DRIVEWAY WAS A WHITE MERCEDES BENZ C300, FL TAG 347PKC.**

I acknowledge that I am a certified process server in good standing in the
15th Judicial Circuit, have no interest in the above action and that I am over
the age of 18.   Under penalty of perjury, I declare that I have read the
foregoing and that the facts stated in it are true. Notary not required
pursuant to F.S. 95.525(2).

BY:

JOSEPH P. MARSHALL, CPS#127
PALM BEACH COUNTY, FL
LIGHTNING LEGAL COURIERS, INC.
9280 S.W. 64TH STREET
MIAMI, FL 33173

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL   ☐ OTHER<br>☐ DISTRICTS | CIVIL ACTION SUMMONS (b)<br>Form for Personal Service on a Natural Person | CASE NUMBER<br>2017-001040-CA-01(43) |
|---|---|---|
| PLAINTIFF(S)<br>Meridian Trust Company, as Trustee, and American Associated Group, Ltd. | VS.  DEFENDANT(S)<br>Eike Batista, et. al. | CLOCK IN |

THE STATE OF FLORIDA:TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant:

| To Defendant(s):<br>Werner Batista | Address:<br>2141 NW 30th Rd., Boca Raton, FL 33431 |
|---|---|

### IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."

### MIAMI-DADE COUNTY COURT LOCATIONS

| ☒ Dade County Courthouse (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ Martin Luther King Office (20)<br>2525 N.W. 62nd Street<br>Room 1200 A<br>Miami, FL 33147 | ☐ Hialeah District Court (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ North Dade Justice Center (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ Miami Beach District Court (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ Coral Gables District Court (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134 | ☐ South Dade Justice Center (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | SERVICE |

| Plaintiff/Plaintiff Attorney<br>Hendrik G. Milne<br>Florida Bar No. 335886 | Address:<br>One Southeast Third Avenue, Suite 2250, Miami, FL 33131 | |
|---|---|---|
| **CLERK OF COURTS**<br>**HARVEY RUVIN**<br><br>DEPUTY CLERK | | DATE ON:<br><br>JAN 2 4 2017 |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

☐ EN LA CORTE DE CIRCUITO DEL UNDECIMO CIRCUITO JUDICIAL EN Y PARA EL CONDADO DE MIAMI-DADE, LA FLORIDA.
☐ EN EL TRIBUNAL DEL CONDADO EN Y PARA EL CONDADO MIAMI-DADE, LA FLORIDA.

| DIVISION<br>☐ CIVIL   ☐ OTRA<br>☐ DISTRITO | EMPLAZAMIENTO DE ACCION CIVIL<br>(b) NOTIFICACION PERSONAL A PERSONA NATURAL | NUMERO DE CASO |
|---|---|---|
| DEMANDANTE(S) | VS.   DEMANDADO(S) | HORA |

EL ESTADO DE LA FLORIDA: A cada alguacil del Estado: Se le ordena que hagen entrega de esta notificación y una copia de la demanda en este pleito al demandado(s) mencionada arriba.

| A Demandado(s): | Dirección: |
|---|---|

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 días, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el número del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal (Legal Aid Office) o un servicio de referencia de abogados (Attorney Referral Service) que aparecen en la guía telefónica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar en la mano una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante) y presentar su contestación a la demanda al Secretario del Juzgado. La ubicación central de la Oficina del Secretario está en el edificio de la Corte del Condado de Dade. La dirección de la Corte, y de las sucursales aparecen en la lista siguiente para su conveniencia:

"Para aquellas personas que no puedan pagar un abogado, la información sobre como solicitar asistencia legal gratuita se puede encontrar en www.dadecountyprobono.org."

### LOCALIDAD DE LOS TRIBUNALES DEL CONDADO DE MIAMI-DADE

| ☐ Dade County Courthouse (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ Martin Luther King Office (20)<br>2525 N.W. 62nd Street<br>Room 1200 A<br>Miami, FL 33147 | ☐ Hialeah District Court (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ North Dade Justice Center (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ Miami Beach District Court (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ Coral Gables District Court (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134 | ☐ South Dade Justice Center (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | Servicio |
| Demandante o Abogado del Demandante:<br><br>Número del Colegio de Abogados: | Dirección: | | |
| **HARVEY RUVIN**<br>Secretario del Tribunal del Condado | | | FECHA |

COMO SECRETARIO ADJUNTO

## LEY PARA ESTADOUNIDENSES CON INCAPACIDADES

"Si usted es una persona minusválida que necesita hacer arreglos para poder participar en este proceso, usted tiene derecho, sin gasto alguno, a que se le provea cierta ayuda. Por favor póngase en contacto con el Coordinador de ADA en el Onceavo Distrito Judicial ubicado en el Lawson E. Thomas Courthouse Center, 175 NW 1st Ave, Sala 2702, Miami Fl 33128, Teléfonos (305)349-7175; TDD (305) 349-7174, Fax (305) 349-7355 por lo menos 7   días antes de la cita fijada para su comparecencia en los tribunales; o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."

Clerk's web address: www.miami-dadeclerk.com

☐ AU TRIBUNAL DU ONZIEME ARRONDISSEMENT JUDICIARE DANS ET POUR MIAMI-DADE, FLORIDE.
☐ AU TRIBUNAL DE JUGEMENT ET POUR LE DEPARTENT DE MIAMI-DADE, FLORIDE.

| DIVIZYON<br>☐ CIVILE    ☐ AUTRE<br>☐ DISTRICT | CONVOCARION D' ACTION CIVILE<br>(b) LIVRAI ON PERSONNELLE A UNE PERSONNE | NUMERO DE CAS |
|---|---|---|
| PLAINTE (S) | VS.   CONTRE ACCUSE(S) | HEURE IN |

L'TAT DE LA FLORIDE: A chaque sherif de l'etat vous etes oblige de presenter cette citation et une photocpie de la plainte de ce document sur l'accuse (e) ci-desus.

| A (AUX) ACCUSE(S): | ADRESSE:: |
|---|---|

## IMPORTANT

Des poursuites judiciaires ont ete enterprises contre vous. Vous avez 20 jours consecutifs a partir a de la date de l'assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce tribunal. Un simole coup de telephone est insoffisant pour vous proteger. Vous etes obliges de deposer votre response ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas aotre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintif/Plaintifs Attorney" (Plaignant ou a son avocat) nomme ci-dessous et enregistrer votre reponse avec le Greffier du Tribunal. L'adresse centrale du bureau du Greffier est le Dade County Courthouse. L'adresse du tribunal,et l'adresse des succursales sont dans ci-dessous pour votre convenance

**"Pour ceux qui ne peuvent payer un avocat, des informations sur la façon de demander de l'aide juridique gratuite peut être trouvé à www.dadecountyprobono.org"**

### ADRESSES DES TRIBUNAUX EN MIAMI-DADE

| ☐ Dade County Courthouse (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ Martin Luther King Office (20)<br>2525 N.W. 62nd Street<br>Room 1200 A<br>Miami, FL 33147 | ☐ Hialeah District Court (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ North Dade Justice Center (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ Miami Beach District Court (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ Coral Gables District Court (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134 | ☐ South Dade Justice Center (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | **UN SERVICE** |

| Plainte/Avocat du Plainte | Adresse : |
|---|---|

Numero de barreau de la Floride:

| | | DATE: |
|---|---|---|
| **HARVEY RUVIN**<br>**Greffier de Tribunal** | | |

COMME GREFFIER ADJOINT

## ACT DE 1990 POUR AMERICAINS HANDICAPES
### AVIS DE l' ADA

"Si vous êtes une personne handicapée qui a besoin d'accommodement pour pouvoir participer à cette procédure, vous avez le droit, sans aucun coût, d'avoir de l'aide à votre disposition. S'il vous plaît contacter le Coordinateur de l'ADA du Tribunal de l'Onzième Circuit Judiciaire, Lawson E. Thomas Courthouse Center, 175 NW 1ˢᵗ Ave. Suite 2702, Miami, FL. 33128, Téléphone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 au moins 7 jours avant la date de comparution au tribunal, oubien immédiatement après avoir reçu cet avis si la date avant la comparution est moins de 7 jours; si vous avez une incapacité pour entendre ou parler, appelez le 711."

CLK/CT. 070 Rev. 02/16                                          Clerk's web address: www.miami-dadeclerk.com

☐ NAN TRIBINAL ITINERAN NAN ONZYÈM AWONDISMAN JIDISYÈ NAN E POU KONTE MIAMI-DADE, FLORIDA
☐ NAN TRIBINAL E POU TRIBINAL NAN MIAMI-DADE COUNTY, FLORIDA

| DIVIZYON<br>☐ SIVIL  ☐ LÒT<br>☐ DISTRI | KONVOKASYON POU KA SIVIL<br>(b) DELIVRE PERSONELMAN BAY YON MOUN | NIMEWO KA |
|---|---|---|
| PLENTIF (S) | VS.  KONT AKIZE(S) | LE |

**ETA FLORIDA:** Pou Chak nan eta a yo odone ou pou bay akize a (yo), non l ekri anwo a, manda sa a ak yon kopi yo pote nan pwose sa a.:

| AKIZE: | ADRES:: |
|---|---|

### ENPOTAN

Yo entre yon aksyon kont oumeum. Ou genyen 20 jou kalandriye apres ou recevoi somasyon-an pou enregistre devan grefie tribunal-sa, yon reponce pa ecri attache avec plent-la. Yon apel pa telefon ka kapab protege-ou. Se yon repense pa ecri,fo ou mete numero ka-a ki sou tet pagela avec nom moune-yo ki sou papie-sa oblige ecri si ou vle ke tribunal-la tende position-ou cou ka-a. Si ou pa enregistre reponce-ou a l'heure ou capab pedu ka-a san tribunal la pa anounce-ou en yen, ou capab pedu l'agen ou ak byen ou. Genyen lot demande. Ou ka besoin telefone yon avoka tout de suit. Si ou pa lonen yon avoka, ou ka rele sevis ki rekomande avoka, ou biro ede legal (ki nan lis liv telefone).

Si ou shoisi voye yon reponce pa ecri oumenm, ou supose en mem tan poste en mem tan poste on pote on copi response pa ecri pou avoka pleyan ou pleyan-yo ke non-li ama-a et enregistre reponce-la nan tribunal-la ki localize nan avek Sekrete Tribinal. Adres santral biwo Sekrete a se Dade County Courthouse. Adres tribinal la, ak adres lot tribinal yo nan lis ki anba a pou ou ka jwenn ou alez:

**"Pou moun ki pa an mezi peye pou pran yon avoka, yo kapab jwenn enfòmasyon sou kijan pou yo chèche jwenn assistans legal gratis nan www.dadecountyprobono.org."**

### ADRES TRIBINAL NAN MIAMI-DADE COUNTY

| ☐ **Dade County Courthouse** (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ **Martin Luther King Office** (20)<br>2525 N.W. 62nd Street<br>Room 1200 A<br>Miami, FL 33147 | ☐ **Hialeah District Court** (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ **North Dade Justice Center** (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ **Miami Beach District Court** (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ **Coral Gables District Court** (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134 | ☐ **South Dade Justice Center** (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | **SERVICE** |

| Plainte/Avocat du Plainte | | Nimewo manm avoka a. |
|---|---|---|
| Numero de barreau de la Floride: | Address: | |

|  |  | DATE: |
|---|---|---|
| **HARVEY RUVIN**<br>Sekrete Jeneral Tribinal La | | |
| | SEKRETE | |

## LWA 1990 POU AMERIKEN KI ENFIM
## ANONS POU AMERIKEN KI ENFIM

"Si ou se yon moun ki enfim e ou bezwen akomodasyon pou ou patisipe nan pwosedi sa a, ou gen dwa pou yo ba ou kèk èd san ou pa gen pou ou peye. Silvouplè kontakte Kowòdinatè ADA pou Tribinal Onzyèm Distrik Jidisyè a nan: Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, Fl 33128, Telefòn (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 omwen 7 jou anvan ou gen randevou pou ou parèt nan tribunal la, oubyen imedyatman lè ou resevwa notifikasyon sa a si ou gen mwens ke 7 jou pou ou parèt nan tribunal la; si ou gen difikilte pou ou tande oubyen pale, rele 711."

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

     Defendants.

_____/

## NOTICE OF FILING VERIFIED RETURN OF SERVICE

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for Centennial Asset Mining Fund,

LLC c/o CSC Services of Nevada, Inc.

    Dated: February 9, 2017.

                    Respectfully submitted,

                    ABALLI MILNE KALIL, P.A.
                    *Counsel for Plaintiffs*
                    2250 SunTrust International Center
                    One Southeast Third Ave.
                    Miami, FL 33131
                    Phone: (305) 373–6600
                    Fax: (305) 373–7929

                    s/ *Hendrik G. Milne*
                    Hendrik G. Milne
                    Florida Bar No.: 335886
                    Craig P. Kalil
                    Florida Bar No.: 607282

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 9th day of February, 2017 a true and correct copy of the

foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice

on all counsel of record via this Court' s e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

## RETURN OF SERVICE

**State of Florida**                    **County of Miami-Dade**                    **Circuit Court**

Case Number: 2017-001040-CA-01 (43)

Plaintiff:
MERIDIAN TRUST COMPANY, AS TRUSTEE, AND AMERICAN ASSOCIATED
GROUP, LTD.

vs.

Defendant:
EIKE BATISTA, ET AL

For:
Aballi Milne Kalil, P.A.
2250 Suntrust International Center
One Southeast Third Avenue
Miami, FL 33131

Received by Lightning Legal Couriers on the 24th day of January, 2017 at 9:00 am to be served on CENTENNIAL ASSET MINING FUND, LLC C/O CSC SERVICES OF NEVEDA, INC, 2215-B RENAISSANCE DRIVE, LAS VEGAS, NV 89119.

I, MICHELLE ELY, do hereby affirm that on the 25th day of January, 2017 at 1:58 pm, I:

served a CORPORATION by delivering a true copy of the Summons and Complaint and Demand for Jury Trial with the date and hour of service endorsed thereon by me, to: TAYLOR LEE AS SERVICE OF PROCESS INTAKE CLERK FOR CSC SERVICES OF NEVEDA, INC. as REGISTERED AGENT for CENTENNIAL ASSET MINING FUND, LLC, at the address of: 2215-B RENAISSANCE DRIVE, LAS VEGAS, NV 89119, and informed said person of the contents therein, in compliance with state statutes.

Under Penalties of Perjury, I declare I have read the foregoing document and the facts stated in it are true. I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. NO NOTARY REQUIRED PURSUANT TO F.S. 92.525(2)

**MICHELLE ELY**
NV # R-004357

**Lightning Legal Couriers**
9280 SW 64 Street
Miami, FL 33173
(786) 286-4167

Our Job Serial Number: LTN-2017000165

Copyright © 1992-2017 Database Services, Inc. - Process Server's Toolbox V7.1l

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-001040-CA-01(43) |
|---|---|---|
| PLAINTIFF(S)<br>Meridian Trust Company, as Trustee,<br>and American Associated Group, Ltd. | VS. DEFENDANT(S)<br>Eike Batista, et. al. | SERVICE |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and copy of the complaint or petition in this action on

defendant(s): Centennial Asset Mining Fund, LLC

C/O CSC Services of Nevada, Inc.

2215-B Renaissance Dr.

~~Las Vegas, NV 89119~~

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Hendrik G. Milne, Florida Bar No. 335886

whose address is: One Southeast Third Avenue, Suite 2250, Miami, FL 33131

within 20 days * **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies,** **or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days.** **When suit is brought pursuant to 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

CLOCK IN

| HARVEY RUVIN<br>CLERK of COURTS | DEPUTY CLERK | DATE<br>JAN 2 4 2017 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

      Defendants.

_____/

## NOTICE OF FILING VERIFIED RETURN OF SERVICE

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for Centennial Asset Brazilian Equity

Fund, LLC c/o Corporation Service Company.

Dated: February 9, 2017.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

s/ *Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 9th day of February, 2017 a true and correct copy of the

foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice

on all counsel of record via this Court' s e-service system.

*s/ Hendrik G. Milne* _____
Hendrik G. Milne, Esq.

## RETURN OF SERVICE

**State of Florida**                    **County of Miami-Dade**                    **Circuit Court**

Case Number: 2017-001040-CA-01 (43)

Plaintiff:
**MERIDIAN TRUST COMPANY, AS TRUSTEE, AND AMERICAN ASSOCIATED GROUP, LTD.**

vs.

Defendant:
**EIKE BATISTA, ET AL**

For:
Aballi Milne Kalil, P.A.
2250 Suntrust International Center
One Southeast Third Avenue
Miami, FL 33131

Received by Lightning Legal Couriers on the 24th day of January, 2017 at 9:00 am to be served on **CENTENNIAL ASSET BRAZILIAN EQUITY FUND, LLC C/O CORPORATION SERVICE COMPANY, 2711 CENTERVILLE RD., SUITE 400, WILMINGTON, DE 19808.**

I, STEPHEN A. KEMPSKI, do hereby affirm that on the **26th day of January, 2017** at **2:00 pm, I:**

served a **CORPORATION** by delivering a true copy of the **Summons and Complaint and Demand for Jury Trial** with the date and hour of service endorsed thereon by me, to: **LYNANNE GARES AS LITIGATION MANAGEMENT SERVICE LEADER FOR CORPORATION SERVICE COMPANY as REGISTERED AGENT** for **CENTENNIAL ASSET BRAZILIAN EQUITY FUND, LLC**, at the address of: **2711 CENTERVILLE RD., SUITE 400, WILMINGTON, DE 19808**, and informed said person of the contents therein, in compliance with state statutes.

Under Penalties of Perjury, I declare I have read the foregoing document and the facts stated in it are true. I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. NO NOTARY REQUIRED PURSUANT TO F.S. 92.525(2)

**STEPHEN A. KEMPSKI**
09-58-A

**Lightning Legal Couriers**
**9280 SW 64 Street**
**Miami, FL 33173**
**(786) 286-4167**

Our Job Serial Number: LTN-2017000166

Copyright © 1992-2017 Database Services, Inc. - Process Server's Toolbox V7.1i

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | SUMMONS 20 DAY CORPORATE SERVICE | CASE NUMBER |
|---|---|---|---|
| ☒ CIVIL   ☐ OTHER | | (a) GENERAL FORMS | 2017-001040-CA-01(43) |
| ☐ DISTRICTS | | | |

| PLAINTIFF(S) | VS.  DEFENDANT(S) | SERVICE |
|---|---|---|
| Meridian Trust Company, as Trustee, and American Associated Group, Ltd. | Eike Batista, et. al. | |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and copy of the complaint or petition in this action on

defendant(s): Centennial Asset Brazilian Equity Fund, LLC
          C/O Corporation Service Company
          2711 Centerville Rd., Suite 400
          Wilmington, DE 19808

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Hendrik G. Milne, Florida Bar No. 335886

whose address is: One Southeast Third Avenue, Suite 2250, Miami, FL 33131

CLOCK IN

within 20 days * **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to, 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | DATE |
|---|---|---|
| **HARVEY RUVIN**  **CLERK of COURTS** | | JAN 2 4 2017 |
| | DEPUTY CLERK | |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

CLK/CT. 314 Rev. 02/16

Clerk's web address: www.miami-dadeclerk.com

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

     Defendants.

_____/

## NOTICE OF FILING VERIFIED RETURN OF SERVICE

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for Marcus Berto.

Dated: February 9, 2017.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

s/ *Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 9th day of February, 2017 a true and correct copy of the

foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice

on all counsel of record via this Court' s e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

\

## RETURN OF SERVICE

State of Florida        County of Miami-Dade        Circuit Court

Case Number: 2017-001040-CA-01 (43)

Plaintiff:
**MERIDIAN TRUST COMPANY, AS TRUSTEE, AND AMERICAN ASSOCIATED GROUP, LTD.**

vs.

Defendant:
**EIKE BATISTA, ET AL**

For:
Aballi Milne Kalil, P.A.
2250 Suntrust International Center
One Southeast Third Avenue
Miami, FL 33131

Received by Lightning Legal Couriers on the 24th day of January, 2017 at 9:00 am to be served on **MARCUS BERTO, 780 HARBOR DRIVE, KEY BISCAYNE, FL 33149.**

I, Ivan Lopez, do hereby affirm that on the **24th day of January, 2017** at **12:00 pm, I:**

**SUBSTITUTE - RESIDENTIAL** served by delivering a true copy of the **Summons and Complaint and Demand for Jury Trial** with the date and hour of service endorsed thereon by me, to: **MELISSA BERTO** as **SPOUSE** at the address of: **780 HARBOR DRIVE, KEY BISCAYNE, FL 33149,** the within named person's usual place of **Abode,** who resides therein, who is fifteen (15) years of age or older and informed said person of the contents therein, pursuant to F.S. 48.031(1)(a).

Under Penalties of Perjury, I declare I have read the foregoing document and the facts stated in it are true. I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. NO NOTARY REQUIRED PURSUANT TO F.S. 92.525(2)

Ivan Lopez
CPS#2309

**Lightning Legal Couriers**
9280 SW 64 Street
Miami, FL 33173
(786) 286-4167

Our Job Serial Number: LTN-2017000171

Copyright © 1992-2017 Database Services, Inc. - Process Server's Toolbox V7.1i

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL   ☐ OTHER<br>☐ DISTRICTS | CIVIL ACTION SUMMONS (b)<br>Form for Personal Service on a Natural Person | CASE NUMBER<br>2017-001040-CA-01(43) |
|---|---|---|
| PLAINTIFF(S)<br>Meridian Trust Company, as<br>Trustee, and American<br>Associated Group, Ltd. | VS.  DEFENDANT(S)<br>Eike Batista, et. al. | CLOCK IN<br>1.24.17  12:00<br>I.4.#3202<br>MELISSA Berto |

THE STATE OF FLORIDA:TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this
lawsuit on defendant:                                                                                                                     Spoose

| To Defendant(s):<br>Marcus Berto | Address:<br>780 Harbor Dr., Key Biscayne, FL 33149 |
|---|---|

### IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

**"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."**

### MIAMI-DADE COUNTY COURT LOCATIONS

| ☒ Dade County Courthouse (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ Martin Luther King Office (20)<br>2525 N.W. 62nd Street<br>Room 1200 A<br>Miami, FL 33147 | ☐ Hialeah District Court (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ North Dade Justice Center (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ Miami Beach District Court (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ Coral Gables District Court (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134 | ☐ South Dade Justice Center (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | SERVICE |

| Plaintiff/Plaintiff Attorney<br>Hendrik G. Milne<br>Florida Bar No. 335886 | Address:<br>One Southeast Third Avenue, Suite 2250, Miami, FL 33131 | |
|---|---|---|
| **CLERK OF COURTS**<br>**HARVEY RUVIN** | <br><br>DEPUTY CLERK | DATE ON:<br><br>JAN 2 4 2017 |

### AMERICANS WITH DISABILITIES ACT OF 1990
### ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

☐ EN LA CORTE DE CIRCUITO DEL UNDECIMO CIRCUITO JUDICIAL EN Y PARA EL CONDADO DE MIAMI-DADE, LA FLORIDA.
☐ EN EL TRIBUNAL DEL CONDADO EN Y PARA EL CONDADO MIAMI-DADE, LA FLORIDA.

| DIVISION<br>☐ CIVIL  ☐ OTRA<br>☐ DISTRITO | EMPLAZAMIENTO DE ACCION CIVIL<br>(b) NOTIFICACION PERSONAL A PERSONA NATURAL | NUMERO DE CASO |
|---|---|---|
| DEMANDANTE(S) | VS.  DEMANDADO(S) | HORA |

EL ESTADO DE LA FLORIDA: A cada alguacil del Estado: Se le ordena que hagen entrega de esta notificación y una copia de la demanda en este pleito al demandado(s) mencionada arriba.

| A Demandado(s): | Dirección: |
|---|---|

### IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 días, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el número del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal (Legal Aid Office) o un servicio de referencia de abogados (Attorney Referral Service) que aparecen en la guía telefónica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar en la mano una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante) y presentar su contestación a la demanda al Secretario del Juzgado. La ubicación central de la Oficina del Secretario está en el edificio de la Corte del Condado de Dade. La dirección de la Corte, y de las sucursales aparecen en la lista siguiente para su conveniencia:

"Para aquellas personas que no puedan pagar un abogado, la información sobre como solicitar asistencia legal gratuita se puede encontrar en www.dadecountyprobono.org."

### LOCALIDAD DE LOS TRIBUNALES DEL CONDADO DE MIAMI-DADE

| | | | |
|---|---|---|---|
| ☐ Dade County Courthouse (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ Martin Luther King Office (20)<br>2525 N.W. 62nd Street<br>Room 1200 A<br>Miami, FL 33147 | ☐ Hialeah District Court (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ North Dade Justice Center (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
| ☐ Miami Beach District Court (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ Coral Gables District Court (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134 | ☐ South Dade Justice Center (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | Servicio |

| Demandante o Abogado del Demandante:<br><br>Número del Colegio de Abogados: | Dirección: | |
|---|---|---|
| <br><br>HARVEY RUVIN<br>Secretario del Tribunal del Condado | | FECHA |

COMO SECRETARIO ADJUNTO

## LEY PARA ESTADOUNIDENSES CON INCAPACIDADES

"Si usted es una persona minusválida que necesita hacer arreglos para poder participar en este proceso, usted tiene derecho, sin gasto alguno, a que se le provea cierta ayuda.  Por favor póngase en contacto con el Coordinador de ADA en el Onceavo Distrito Judicial ubicado en el Lawson E. Thomas Courthouse Center, 175 NW 1st Ave, Sala 2702, Miami Fl 33128, Teléfonos (305)349-7175; TDD (305) 349-7174, Fax (305) 349-7355 por lo menos 7    días antes de la cita fijada para su comparecencia en los tribunales; o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."

☐ AU TRIBUNAL DU ONZIEME ARRONDISSEMENT JUDICIARE DANS ET POUR MIAMI-DADE, FLORIDE.
☐ AU TRIBUNAL DE JUGEMENT ET POUR LE DEPARTENT DE MIAMI-DADE, FLORIDE.

| DIVIZYON<br>☐ CIVILE ☐ AUTRE<br>☐ DISTRICT | CONVOCARION D' ACTION CIVILE<br>(b) LIVRAI ON PERSONNELLE A UNE PERSONNE | NUMERO DE CAS |
|---|---|---|
| PLAINTE (S) | VS. CONTRE ACCUSE(S) | HEURE IN |

**L'TAT DE LA FLORIDE:** A chaque sherif de l'etat vous etes oblige de presenter cette citation et une photocpie de la plainte de ce document sur l'accuse (e) ci-desus.

| A (AUX) ACCUSE(S): | ADRESSE:: |
|---|---|

### IMPORTANT

Des poursuites judiciaires ont ete enterprises contre vous. Vous avez 20 jours consecutifs a partir a de la date de l'assignation de cette citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insoffisant pour vous proteger. Vous etes obliges de deposer votre response ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas aotre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintif/Plaintif's Attorney" (Plaignant ou a son avocat) nomme ci-dessous et enregistrer votre reponse avec le Greffier du Tribunal. L'adresse centrale du bureau du Greffier est le Dade County Courthouse. L'adresse du tribunal,et l'adresse des succursales sont dans ci-dessous pour votre convenance

**"Pour ceux qui ne peuvent payer un avocat, des informations sur la façon de demander de l'aide juridique gratuite peut être trouvé à www.dadecountyprobono.org"**

### ADRESSES DES TRIBUNAUX EN MIAMI-DADE

☐ Dade County Courthouse (05)
Room 133
73 West Flagler Street
Miami, FL 33130

☐ Martin Luther King Office (20)
2525 N.W. 62nd Street
Room 1200 A
Miami, FL 33147

☐ Hialeah District Court (21)
Room 100
11 East 6th Street
Hialeah, FL 33010

☐ North Dade Justice Center (23)
Room 100
15555 Biscayne Blvd.
North Miami Beach, FL 33160

☐ Miami Beach District Court (24)
Room 200
1130 Washington Avenue
Miami Beach, FL 33139

☐ Coral Gables District Court (25)
Room 100
3100 Ponce De Leon Blvd.
Coral Gables, FL 33134

☐ South Dade Justice Center (26)
Room 1200
10710 SW 211 Street
Miami, FL 33189

**UN SERVICE**

| Plainte/Avocat du Plainte | Adresse : |
|---|---|

Numero de barreau de la Floride:

|  |  | DATE: |
|---|---|---|
| HARVEY RUVIN<br>Greffier de Tribunal |  |  |

COMME GREFFIER ADJOINT

## ACT DE 1990 POUR AMERICAINS HANDICAPES
### AVIS DE l' ADA

"Si vous êtes une personne handicapée qui a besoin d'accommodement pour pouvoir participer à cette procédure, vous avez le droit, sans aucun coût, d'avoir de l'aide à votre disposition. S'il vous plaît contacter le Coordinateur de l'ADA du Tribunal de l'Onzième Circuit Judiciaire, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave. Suite 2702, Miami, FL. 33128, Téléphone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 au moins 7 jours avant la date de comparution au tribunal, oubien immédiatement après avoir reçu cet avis si la date avant la comparution est moins de 7 jours; si vous avez une incapacité pour entendre ou parler, appelez le 711."

☐ NAN TRIBINAL ITINERAN NAN ONZYÈM AWONDISMAN JIDISYÈ NAN E POU KONTE MIAMI-DADE, FLORIDA
☐ NAN TRIBINAL E POU TRIBINAL NAN MIAMI-DADE COUNTY, FLORIDA

| DIVIZYON<br>☐ SIVIL     ☐ LÒT<br>☐ DISTRI | KONVOKASYON POU KA SIVIL<br>(b) DELIVRE PERSONELMAN BAY YON MOUN | NIMEWO KA |
|---|---|---|
| PLENTIF (S) | VS.   KONT AKIZE(S) | LE |

ETA FLORIDA: Pou Chak nan eta a yo odone ou pou bay akize a (yo), non I ekri anwo a, manda sa a ak yon kopi yo pote nan pwose sa a.:

| AKIZE: | ADRES:: |
|---|---|

## ENPOTAN

Yo entre yon aksyon kont oumeum. Ou genyen 20 jou kalandriye apres  ou recevoi somasyon-an pou enregistre devan grefie tribunal-sa, yon reponce pa ecri attache avec plent-la. Yon apel pa telefon ka kapab protege-ou. Se yon repense pa ecri,fo ou mete numero ka-a ki sou tet pagela avec nom moune-yo ki sou paple-sa oblige ecri si ou vle ke tribunal-la tende position-ou cou ka-a. Si ou pa enregistre reponce-ou a l'heure ou capab pedu ka-a san tribunal la pa anounce-ou en yen, ou capab pedu l'agen ou ak byen ou. Genyen lot demande. Ou ka besoin telefone yon avoka tout de suit. Si ou pa lonen yon avoka, ou ka rele sevis ki rekomande avoka, ou biro ede legal (ki nan lis liv telefone).

Si ou shoisi voye yon reponce pa ecri oumenm, ou supose en mem tan poste en mem tan poste on pote on copi response pa ecri pou avoka pleyan ou pleyan-yo ke non-li ama-a et enregistre reponce-la nan tribunal-la ki localize nan avek Sekrete Tribinal. Adres santral biwo Sekrete a se Dade County Courthouse. Adres tribinal la, ak adres lot tribinal yo nan lis ki anba a pou ou ka jwenn yo alez:

**"Pou moun ki pa an mezi peye pou pran yon avoka, yo kapab jwenn enfòmasyon sou kijan pou yo chèche jwenn assistans legal gratis nan www.dadecountyprobono.org."**

### ADRES TRIBINAL NAN MIAMI-DADE COUNTY

☐ Dade County Courthouse (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130

☐ Martin Luther King Office (20)<br>2525 N.W. 62nd Street<br>Room 1200 A<br>Miami, FL 33147

☐ Hialeah District Court (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010

☐ North Dade Justice Center (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160

☐ Miami Beach District Court (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139

☐ Coral Gables District Court (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134

☐ South Dade Justice Center (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189

**SERVICE**

| Plainte/Avocat du Plainte | | Nimewo manm avoka a. | |
|---|---|---|---|
| Numero de barreau de la Floride: | | Address: | |
| | | | DATE: |
| HARVEY RUVIN<br>Sekrete Jeneral Tribinal La | | | |

SEKRETE

## LWA 1990 POU AMERIKEN KI ENFIM
## ANONS POU AMERIKEN KI ENFIM

"Si ou se yon moun ki enfim e ou bezwen akomodasyon pou ou patisipe nan pwosedi sa a, ou gen dwa pou yo ba ou kèk èd san ou pa gen pou ou peye. Silvouplè kontakte Kowòdinatè ADA pou Tribinal Onzyèm Distrik Jidisyè a nan: Lawson E. Thomas Courthouse Center, 175 NW 1ˢᵗ Ave., Suite 2702, Miami, Fl 33128, Telefòn (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 omwen 7 jou anvan ou gen randevou pou ou parèt  nan tribunal la, oubyen imedyatman  lè ou resevwa notifikasyon sa a si ou gen mwens ke 7 jou  pou ou parèt nan tribunal la; si  ou gen difikilte pou ou tande oubyen pale, rele 711."

Clerk's web address: www.miami-dadeclerk.com

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

     Defendants.

_____/

## NOTICE OF FILING VERIFIED RETURN OF SERVICE

     Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for Eike Batista c/o Florida Secretary

of State.

     Dated: February 9, 2017.

                     Respectfully submitted,

                     ABALLI MILNE KALIL, P.A.
                     *Counsel for Plaintiffs*
                     2250 SunTrust International Center
                     One Southeast Third Ave.
                     Miami, FL 33131
                     Phone: (305) 373–6600
                     Fax: (305) 373–7929

                     *s/ Hendrik G. Milne*
                     Hendrik G. Milne
                     Florida Bar No.: 335886
                     Craig P. Kalil
                     Florida Bar No.: 607282

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 9th day of February, 2017 a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court' s e-service system.

_s/ Hendrik G. Milne_
Hendrik G. Milne, Esq.

2

1

## RETURN OF SERVICE

**State of Florida**                      **County of Miami-Dade**                      **Circuit Court**

Case Number: 2017-001040-CA-01 (43)

Plaintiff:
MERIDIAN TRUST COMPANY, AS TRUSTEE, AND AMERICAN ASSOCIATED
GROUP, LTD.

vs.

Defendant:
EIKE BATISTA, ET AL

For:
Aballi Milne Kalil, P.A.
2250 Suntrust International Center
One Southeast Third Avenue
Miami, FL 33131

Received by Lightning Legal Couriers on the 24th day of January, 2017 at 9:00 am to be served on **EIKE BATISTA, C/O FLORIDA SECRETARY OF STATE PER F.S.STATUTE 48.181, 2661 EXECUTIVE CENTER CIRCLE, TALLAHASSEE, FL 32399**.

I, Kole Kady, do hereby affirm that on the **24th day of January, 2017 at 2:34 pm, I:**

served a **GOVERNMENT AGENCY** by delivering a true copy of the **Summons and Complaint and Demand for Jury Trial** with the date and hour of service endorsed thereon by me, to: **MARGARET FREEMAN** as **SUPERVISOR** authorized to accept service, of the within named government agency, at the address of: **2661 EXECUTIVE CENTER CIRCLE, TALLAHASSEE, FL 32399**, on behalf of **EIKE BATISTA,** and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 47, Sex: F, Race/Skin Color: BLACK, Height: 5'6", Weight: 175, Hair: BROWN, Glasses: N

Under Penalties of Perjury, I declare I have read the foregoing document and the facts stated in it are true. I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. NO NOTARY REQUIRED PURSUANT TO F.S. 92.525(2)

Kole Kady
Process Server#225

**Lightning Legal Couriers**
**9280 SW 64 Street**
**Miami, FL 33173**
**(786) 286-4167**

Our Job Serial Number: LTN-2017000164

Copyright © 1992-2017 Database Services, Inc. - Process Server's Toolbox V7.1i

### FLORIDA DEPARTMENT OF STATE
Division of Corporations

January 24, 2017

HENDRIK G. MILNE, ESQ.
2250 SUNTRUST INTERNATIONAL CENTER
ONE SOUTHEAST THIRD AVENUE
MIAMI, FL 33131

Pursuant to Chapter 48.181, Florida Statutes, a copy of the process and initial pleading, case number 2017-001040-CA01, was accepted for EIKE BATISTA, and was filed on January 24, 2017, at 03:00 PM.

Plaintiff(s)

MERIDIAN TRUST COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD.,

-vs-

Defendant(s)

EIKE BATISTA, et al,

THE SECRETARY OF STATE DOES NOT FORWARD DOCUMENTATION TO THE DEFENDANT.

All inquiries on behalf of the defendant should be made to the attorneys involved.

Yvette McGee
Processor of Service
DIVISION OF CORPORATIONS

Letter No. 517A00001476

Division of Corporations - P.O. BOX 6327 -Tallahassee, Florida 32314

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION ☒ CIVIL  ☐ OTHER ☐ DISTRICTS | CIVIL ACTION SUMMONS (b) Form for Personal Service on a Natural Person | CASE NUMBER 2017-001040-CA-01(43) |
|---|---|---|
| PLAINTIFF(S) Meridian Trust Company, as trustee, and American Associated Group, Ltd | VS.  DEFENDANT(S) C/O Secretary of State Eike Batista, et. 2661 Executive Center Circle Tallahassee, Florida 32399 Pursuant to Florida Statute § 48.161 | CLOCK IN |

THE STATE OF FLORIDA:TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant:

| To Defendant(s): Eike Batista c/o Florida Secretary of State | Address: Service: Florida Secretary of State, pursuant to Florida Statute Sec. 48.181(1) Notice:Rua Caio de Melo Franco, 168 Jardim Botanico, Rio de Janeiro, Brazil 22.461-190 |
|---|---|

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience.

"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."

**MIAMI-DADE COUNTY COURT LOCATIONS**

| ☒ Dade County Courthouse (05) Room 133 73 West Flagler Street Miami, FL 33130 | ☐ Martin Luther King Office (23) 2525 N.W. 62nd Street Room 1200 A Miami, FL 33147 | ☐ Hialeah District Court (21) Room 100 11 East 6th Street Hialeah, FL 33010 | ☐ North Dade Justice Center (23) Room 100 15555 Biscayne Blvd. North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ Miami Beach District Court (24) Room 200 1130 Washington Avenue Miami Beach, FL 33139 | ☐ Coral Gables District Court (25) Room 100 3100 Ponce De Leon Blvd. Coral Gables, FL 33134 | ☐ South Dade Justice Center (26) Room 1200 10710 SW 211 Street Miami, FL 33189 | **SERVICE** #125 7 th Judicial Circuit |

| Plaintiff/Plaintiff Attorney Hendrik G. Milne Florida Bar No. 335806 | Address: One Southeast Third Avenue, Suite 2250, Miami, FL 33131 | SERVED JAN 24 2017 |
|---|---|---|

| CLERK OF COURTS HARVEY RUVIN | | DATE ON: JAN 2 4 2017 |
|---|---|---|

**DEPUTY CLERK**

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

CLK/CT  070 Rev. 02/16                                Clerk's web address: www.miami-dadeclerk.com

Case 1:17-cv-23051-KMW Document 13-2 Entered on FLSD Docket 08/11/2017 Page 353 of 492

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040-CA-01-(43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

        Plaintiffs

vs.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONCA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, EBX INVESTMENT FUNDS, LLC
CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIO SAMPAIO and LUMA DE OLIVEIRA,

        Defendants

And

BRANCH BANKING AND TRUST COMPANY,

        Garnishee.

_____/

## ANSWER TO WRIT OF GARNISHMENT

COMES NOW, GARNISHEE, BRANCH BANKING AND TRUST CO. (BB&T),  by its

undersigned counsel, and files its Answer to Plaintiff's Writ of Garnishment and states as follows:

1. Garnishee was not indebted and has not had any goods, monies, chattels or effects of

Defendant(s), at the time of service of the Writ of Garnishment served upon the Garnishee and at the time

of its answer and at all times between service and its answer.

2.  The Garnishee has no obligation to make, and has not made, a factual determination whether the property, if any, of the Defendant(s) in it possession or control is subject to any exemption provided to the Defendant(s) by State or Federal Law.

3.  Garnishee has employed the services of the undersigned law firm to represent Garnishee in these garnishment proceedings.  Garnishee **DEMANDS** the statutory allowance from the Plaintiff payable to BRANCH BANKING AND TRUST COMPANY, as compensation to be applied towards Garnishee's reasonable attorney's fee.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was SENT this 13th day of February, 2017 by EMAIL to: mdeblinger@aballi.com

<u>/s/ Russell S. Bogue III</u>

RUSSELL S. BOGUE III
ATTORNEY FOR GARNISHEE
Branch Banking and Trust Company
271 17th Street NW
Suite 800
Atlanta, GA  30363
(404) 442-5175 (office)
(404) 733-9018 (fax)
RBogue@BBandT.com
JJDunn@BBandT.com
Florida Bar No:  0294071

**Please direct all inquires to the following:**

BB&T
Deposit Compliance
P. O. Box 1489
Lumberton, NC  28359
910-272-4247 (office)
910-272-2725 (fax)

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY

COMPLEX BUSINESS LITIGATION DIVISION

**MERIDIAN TRUST COMPANY**, as trustee, and **AMERICAN ASSOCIATED GROUP, LTD.**,

Case No. 17-001040 CA (43)

        Plaintiffs,

vs.

**EIKE BATISTA,** *et al.*

        Defendants.

_____/

## MARCUS BERTO'S EMERGENCY MOTION TO STAY PENDING APPEAL OF TEMPORARY INJUNCTION ORDER

Defendant, Marcus Berto ("Berto"), pursuant to Florida Rule of Appellate Procedure 9.310 moves on an emergency basis for a stay of the temporary injunction issued on February 2, 2017. In support of the motion, Berto states:

1.      On February 2, 2017, this Court entered its Order granting Plaintiffs' Emergency *Ex Parte* Motion for Temporary Injunction to Prevent Fraudulent Transfers (the "Injunction Order"). The Injunction Order provides, in relevant part, as follows:

> This Order does not prohibit any Enjoined Defendant from dealing with or disposing of any of the assets in the ordinary and proper course of business, provided that the Enjoined Defendants shall notify the [Appellees]' attorneys five (5) business days in advance of any such dealing or disposal worth more than $10,000 so as to afford the [Appellees] a reasonable opportunity to apply for further relief from this Court. (Injunction Order, ¶ 8).

2.      On February 10, 2017, Berto filed an appeal to the Third District Court of Appeal, asking it to review and reverse the Injunction Order. A copy of Berto's Initial Brief is attached hereto as Exhibit A.

Case No. 17-001040 CA (43)

3.     Rule 9.310(a) authorizes this Court to stay an order pending the appeal.  The Rule provides that the initial decision to grant or deny a stay is discretionary with the lower tribunal. Fla. R. App. P. 9.310(a).

4.     For the reasons set forth in Berto's Initial Brief, the Injunction Order was improperly issued.

5.     Berto moves this Court for a stay, ***on an emergency basis***, because he has been and continues to be harmed by the Injunction Order.  Immediately after the Injunction's issuance, Plaintiffs apparently sent all of Berto's banks a copy of the Injunction Order with an accompanying letter.  The letter states that Berto "may not remove from Florida any of [his] assets in accounts located in Florida up to the value of $62,932,547.00," and then intimidates the recipient bank with the threat of being held in contempt of Court for not complying with the Injunction Order.  (*See* Exhibit B).

6.     Despite the fact that the Injunction Order allows Berto to spend up to $10,000 per week toward ordinary living expenses, (Injunction Order, ¶ 7), a crucial fact Plaintiffs' omit in their letter(s) to Berto's financial institutions, Berto's banks entirely have frozen his joint bank accounts with his wife (who is not a party to this action of the Injunction Order), effectively treating the Injunction Order as a writ of attachment or garnishment without the necessary elements.  *See Lawhon v. Mason*, 611 So. 2d 1367, 1368 (Fla. 2d DCA 1993) (reversing injunction order which bore aspects of a prejudgment writ of attachment, without requiring plaintiff to satisfy the statutory requirements for obtaining same).

7.     As a result, Berto and his wife have been unable to withdraw any money from their bank accounts, and all checks drawn on such accounts have been returned.  Thus, the Injunction Order effectively bars Berto and his wife from paying their bills as they arise and,

Case No. 17-001040 CA (43)

otherwise, dealing with or disposing of any of his assets in the ordinary and proper course of business.  Plaintiffs' careless distribution to Berto's banks of the Injunction Order has resulted in a blatant violation of Berto's and his wife's due process rights.

8.     A stay is necessary to preserve the status quo and to prevent Berto from incurring any additional harm during the pendency of the appeal.  *See QBE Ins. Corp. v. Chalfonte Condominium Apartment Ass'n, Inc.*, 94 So. 3d 541, 555 (Fla. 2012) ("The purpose of an appellate stay is to maintain the status quo in the lower tribunal while an appeal proceeds.").

WHEREFORE, Berto respectfully requests that the Court issue an order: (1) granting a stay of the Injunction Order pending the outcome of the appellate review; and (2) compelling Plaintiffs' counsel to provide a list of all banks to which they sent the Injunction Order.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
*Attorneys for Defendant Marcus Berto*
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone:  (305) 374-7580
Facsimile:  (305) 374-7593

By:__*/s/ Jose M. Ferrer*_____
**JOSÉ M. FERRER**
Florida Bar No. 173746
jferrer@bilzin.com
**YASMIN FERNANDEZ-ACUÑA**
Florida Bar No. 117372
yfernandez-acuna@bilzin.com
eservice@bilzin.com

Case No. 17-001040 CA (43)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished to the individuals listed below by e-mail generated by Florida Courts E-Portal Filing system this 15th day of February, 2017:

Hendrick G. Milne, Esq.
hmilne@aballi.com
Craig P. Kalil, Esq.
ckalil@aballi.com
Carlos F. Osorio, Esq.
cosorio@aballi.com
**ABALLI MILNE KALIL, P.A.**
*Attorneys for Appellees*
SunTrust International Center
One Southeast Third Avenue
Suite 2250
Miami, Florida 33131

Edward M. Mullins, Esq.
emullins@astidavis.com
Ana M. Barton, Esq.
abarton@astidavis.com
bhernandez@astidavis.com
**ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.**
*Attorneys for Werner Batista*
1001 Brickell Bay Drive
9th Floor
Miami, Florida 33131


By_____*/s/ José M. Ferrer*_____
    **José M. Ferrer**

4

# EXHIBIT "A"

IN THE DISTRICT COURT OF APPEAL OF FLORIDA
THIRD DISTRICT

CASE NO.: 3D17-0284

LOWER TRIBUNAL NO.: 17-001040-CA-01-(43)

MARCUS BERTO and
WERNER BATISTA

Appellants,

vs.

MERIDIAN TRUST COMPANY, and
AMERICAN ASSOCIATED GROUP, LTD,

Appellees.

**MARCUS BERTO'S INITIAL BRIEF**

**BILZIN SUMBERG BAENA
PRICE & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, Florida 3313-3456
Telephone: 305-350-7210
Facsimile: 305-350-2234
**José M. Ferrer, Esq.**
**Yasmin Fernandez-Acuña, Esq.**

*Counsel for Appellant, Marcus Berto*

RECEIVED, 2/10/2017 3:18 PM, Mary Cay Blanks, Third District Court of Appeal

# TABLE OF CONTENTS

**Page**

I.     STATEMENT OF THE CASE AND OF THE FACTS ................................1

       A. Nature of the Lawsuit ...............................................................1

       B. Procedural Posture ..................................................................2

II.    SUMMARY OF THE ARGUMENT ..............................................4

III.   BASIS FOR INVOKING APPELLATE JURISDICTION AND
       STANDARD OF REVIEW....................................................................5

IV.    ARGUMENT.........................................................................................6

       A. The Injunction is Facially Deficient ...........................................6

       B. The Injunction Violates Appellant's Right to Notice
          and An Opportunity to be Heard ...........................................8

       C. Appellees Cannot Demonstrate the Essential Elements
          for Injunctive Relief ............................................................11

V.     CONCLUSION....................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Angelino v. Santa Barbara Enterprises, LLC,*
2 So. 3d 1100 (Fla. 3d DCA 2009)...............................................................5, 6, 7

*Bookall v. Sunbelt Rentals, Inc.*
995 So. 2d 1116 (Fla. 4th DCA 2008)...................................................................8

*City of Boca Raton v. Boca Raton Airport Authority,*
768 So. 2d 1191 (Fla. 4th DCA 2000).........................................................5, 8, 9

*City of Jacksonville v. Naegele Outdoor Advertising Co.,*
634 So. 2d 750 (Fla. 1st DCA 1994) .....................................................................7

*De Leon v. Aerochago, S.A.,*
593 So. 2d 558 (Fla. 3d DCA 1992).....................................................11, 12, 13

*Diamond v. Interstate Trading Corp.,*
606 So. 2d 631 (Fla. 3d DCA 1992)............................................................11, 13

*Hiles v. Auto Bahn Fed'n, Inc.,*
498 So. 2d 997 (Fla. 4th DCA 1986).................................................................13

*McKeegan v. Ernst,*
84 So. 3d 1229 (Fla. 4th DCA 2012)......................................................6, 7, 9, 10

*National Dairy Products Corp. v. State,*
189 So. 2d 811 (Fla. 1st DCA 1966) .................................................................10

*Shouman v. American Exp. Travel Related Services, Co., Inc.,*
566 So. 2d 875 (Fla. 3d DCA 1990)............................................................10, 11

*Smith v. Knight,*
679 So. 2d 359 (Fla. 4th DCA 1996)......................................................8, 9, 10

*State v. Beeler,*
530 So. 2d 932 (Fla. 1988) ..............................................................................5, 8

i

## TABLE OF AUTHORITIES

**Page(s)**

**STATUTES**

Florida's Uniform Fraudulent Transfers Act ......................................................12, 14

Florida Statutes, Section 726.105 ..................................................................3, 7, 14

Florida Statutes, Section 726.108 ..................................................................3, 7, 12

**OTHER AUTHORITIES**

Florida Rules of Appellate Procedure Rule 9.130 .....................................................5

Florida Rules of Civil Procedure Rule 1.610..................................3, 4, 6, 7, 8, 9, 10

# I.

## STATEMENT OF THE CASE AND OF THE FACTS[1]

### A.

### Nature of the Lawsuit

The underlying lawsuit arises from Defendant, Eike Batista's ("Batista"), allegedly fraudulent activities in relation to the issuance of bonds in OGX, a Brazilian, publicly-traded, oil-exploration company.   On January 12, 2017, Appellees filed their complaint (the "Complaint") accusing Batista of making materially misleading statements or omissions to the market at large concerning OGX, and Defendants generally of conspiring with Batista to mislead investors. Appellees allege that they "invested over $21 million in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations." (App. at 131).

Appellant, Marcus Berto ("Berto"), is one of the Defendants.  Appellees do not allege that Berto actively participated in the fraud.  Rather, the sum total of Appellees' allegations against Berto is that, years after the alleged fraudulent

---

[1] References to the Appendix shall be denoted as "App."  References to documents containing numbered paragraphs shall be denoted by page number in the Appendix, and by the corresponding number of the paragraph to which reference is made.

conduct occurred, Berto acted as the CEO of LLX, a Brazilian, publicly-traded, logistics company in which Batista held an unspecified interest.  (App. at 150, ¶¶ 78-80).  The Complaint alleges that Berto helped Batista by "cash[ing] Batista out" of LLX in anticipation of OGX's crash, (App. at 197, ¶ 331), and by introducing him to "international asset protection specialists" who created "various international structures" to "hide the proceeds of the fraud." (App. at 192, ¶ 300).

## B.

## Procedural Posture

On January 24, 2017, Appellees served Berto with process.  A week later, on February 1, 2017, Appellees filed their "Emergency *Ex Parte* Motion for Temporary Injunction to Prevent Fraudulent Transfers" (the "Motion").  Appellees did not serve Berto with the Motion, or otherwise inform him of its filing.

The Motion does not specify the nature of the supposed emergency that would require its immediate disposition.  The Motion also fails to explain the reasons why notice to the parties, particularly those who Appellees already had served, should not be given.  Instead, Appellees argued that, because Berto was served with process in this case, he should have anticipated that Appellees would file such a motion.  (App. at 16, ¶¶ 50, 52).

Appellees explain that the Motion's purpose is "to prevent Batista and his accomplices from fraudulently transferring their assets out of Florida ahead of a

judgment." (App. at 10, ¶ 30). In support of the Motion, Appellees attached a copy of a certain "Injunction Prohibiting Disposal of Assets Worldwide," (the "Cayman Injunction"), which the Grand Court of the Cayman Islands (the "Cayman Court") apparently issued in a parallel lawsuit pending in that jurisdiction (the "Cayman Proceeding"). Berto is not a party in the Cayman Proceeding, and is not named in the Cayman Injunction. Rather, the only parties named as defendants in the Cayman Proceeding are Batista, 63X Investments Ltd., 63X Fund, and 63X Master Fund.

On February 3, 2017, the Court granted Appellees' Motion on an *ex parte* basis. The injunction order (the "Injunction") does not contain any factual findings to support each of the required elements for entry of an injunction. Instead, the Injunction generally provides as follows:

> The Court is satisfied that the [Appellees] have carried their burden pursuant to section 726.105, Florida Statutes, and, therefore, pursuant to section 726.108(c)(1), Florida Statutes, and rule 1.610, Florida Rules of Civil Procedure, are entitled to a temporary *ex parte* injunction, until further order of this Court, **enjoining the transfer, withdrawal, or any other alienation of assets out of the accounts of any of the named Defendants as identified below, whether owned by them nominally or beneficially** (the "Enjoined Accounts.").

(App. at 1, ¶ 1) (emphasis added). The Injunction otherwise provides:

> This Order does not prohibit any Enjoined Defendant from dealing with or disposing of any of the assets in the ordinary and proper course of business, provided that the Enjoined Defendants shall notify the [Appellees]' attorneys five (5) business days in advance of any such dealing or disposal worth more than $10,000 so as to afford the

[Appellees] a reasonable opportunity to apply for further relief from this Court.

(App. at 4, ¶ 8).

## II.

## SUMMARY OF THE ARGUMENT

In granting the Injunction, the trial court committed reversible error.

First, the Injunction is facially deficient because it does not include any factual findings to support each prong of the four-part injunction test, and does not provide any reasons why the Injunction was granted without notice. Such omissions render the order invalid under the plain reading of Florida Rule of Civil Procedure 1.610.

Second, Appellees failed altogether to provide any explanation of why giving Berto notice of the Motion would have precipitated the alleged dissipation of assets Appellees sought to avoid, or how a short delay in setting a hearing would have permitted such an alleged dissipation of assets to occur. The trial court's *ex parte* entry of the Injunction in the absence of any such showing violated Berto's due process rights to notice and an opportunity to be heard.

Third, Appellees have failed to address in their Motion, and cannot otherwise demonstrate the essential elements for injunctive relief. Florida law does not allow the use of injunctive relief as a means of preventing a party from

disposing of assets prior to the conclusion of an action at law, which Appellees admit is what they are attempting to do in this case. Appellees contingent, unproven and disputed claim for money damages is not a sufficient right or interest to justify injunctive relief.

Further, because only money is at stake, Appellees have an adequate remedy at law, which precludes injunctive relief. Finally, Appellees have not identified any particular transfer to, or from Berto which they contend was fraudulent; therefore, Appellees have failed to demonstrate a substantial likelihood of success on the merits of their claims against Berto.

## III.

### BASIS FOR INVOKING APPELLATE<br>JURISDICTION AND STANDARD OF REVIEW

Berto invokes the jurisdiction of this Court pursuant to Rule 9.130(a)(3)(B) of the Florida Rules of Appellate Procedure. "Taking an immediate appeal of a temporary injunction is one way of challenging the issuance of the [injunction] order without prior notice." *City of Boca Raton v. Boca Raton Airport Authority*, 768 So. 2d 1191, 1192 (Fla. 4th DCA 2000) (citing *State v. Beeler*, 530 So. 2d 932, 934 (Fla. 1988)).

The standard of review in this appeal is abuse of discretion. *Angelino v. Santa Barbara Enterprises, LLC*, 2 So. 3d 1100, 1103 (Fla. 3d DCA 2009).

IV.

ARGUMENT

A.

The Injunction is Facially Deficient

Rule 1.610 of the Florida Rules of Civil Procedure requires that "[e]very injunction shall specify the reasons for entry[.]" Fla. R. Civ. P. 1.610(c). Rule 1.610 also provides that, "[e]very temporary injunction granted without notice shall . . . define the injury, state findings by the court why the injury may be irreparable, and give the reasons why the order was granted without notice if notice was not given." Fla. R. Civ. P. 1.610(a)(2).

In *Angelino v. Santa Barbara Enterprises, Ltd.*, 2 So. 3d 1100, 1103 (Fla. 3d DCA 2009), this Court explained the application of Rule 1.610 as follows:

> A temporary injunction should only be granted where there is a showing of (1) the likelihood of irreparable harm and the unavailability of an adequate remedy at law; (3) the substantial likelihood of success on the merits; (3) the threatened injury to the petitioner outweighs any possible harm to the respondent; and (4) the entry of the injunction will not disserve the public interest.

*Id.* at 1103. "Clear, definite, and unequivocally sufficient factual findings must support each of the four conclusions necessary to justify entry of a temporary injunction." *Id.*; *McKeegan v. Ernst*, 84 So. 3d 1229, 1230 (Fla. 4th DCA 2012) ("[A] trial court must make 'clear, definite, and unequivocally sufficient factual

findings' supporting each of the required elements before entering an injunction.'").

A trial court commits reversible error when it fails to make specific findings for each of the elements of an injunction. *McKeegan*, 84 So. 3d at 1230; *Angelino*, 2 So. 3d at 1103 ("The entry of a temporary injunction . . . will not stand unless the trial courts makes specific findings in support of each and every element required for the entry of the injunction.").

Here, the Injunction lacks the necessary findings in support of the four-prong test set out in *Angelino* and is otherwise inconsistent with the requirements of Rule 1.610.  Indeed, the Injunction contains no factual findings at all.

The Injunction merely provides that, "[t]he Court is satisfied that the [Appellees] have carried their burden pursuant to section 726.105, Florida Statutes, and, therefore, pursuant to section 726.108(c)(1), Florida Statutes, and rule 1.610, Florida Rules of Civil Procedure[.]"   Such types of conclusory recitations, however, are insufficient to justify the issuance of an injunction.  *City of Jacksonville v. Naegele Outdoor Advertising Co.*, 634 So. 2d 750, 753-54 (Fla. 1st DCA 1994) ("If it is to be subject to meaningful review, an order granting a temporary injunction must contain more than conclusory legal aphorisms.").

Further, the Injunction fails to "give the reasons why the order was granted without notice," as required under Rule 1.610(a)(2).  Such omission renders the

order invalid under the plain reading of Rule 1.610(a)(2). *Bookall v. Sunbelt Rentals, Inc.* 995 So. 2d 1116 (Fla. 4th DCA 2008) (holding that an injunction order which did not explicitly state the reasons why the order was granted without notice required reversal even though movant met its burden of establishing the elements for entry of an injunction).

### B.

### The Injunction Violates Appellant's Right to Notice and An Opportunity to be Heard

"A temporary injunction is 'an extraordinary remedy' that should be 'granted sparingly.'" *City of Boca Raton*, 768 So. 2d at 1192 (quoting *Beeler*, 530 So. 2d at 933). "Ex parte orders are antithetical to precious due process rights." *City of Boca Raton*, 786 So. 2d at 1192 (quoting *Smith v. Knight*, 679 So. 2d 359, 361 (Fla. 4th DCA 1996)). "A trial court should issue an ex parte injunction only where there exists 'an immediate threat of irreparable injury 'which forecloses opportunity to give reasonable notice.'" *City of Boca Raton*, 786 So. 2d at 1192.

As the Court explained in *Smith v. Knight*, 679 So. 2d 359 (Fla. 4th DCA 1996),

> To satisfy the rule's mandate of establishing why notice should not be required, a plaintiff seeking an ex parte temporary injunction must demonstrate (1) how and why the giving of notice would accelerate or precipitate the injury or (2) that the time required to notice a hearing would actually permit the threatened irreparable injury to occur.

8

*City of Boca Raton*, 786 So. 2d at 1193 (quoting *Knight*, 679 So. 2d at 361).  The failure to meet this heavy burden constitutes a violation of the enjoined party's due process right to notice and an opportunity to be heard.  *McKeegan*, 84 So. 3d at 1230 ("[A]ppellant argues and we agree that her due process right to notice and an opportunity to be heard were violated because appellees did not meet their heavy burden to establish that notice was not required.")

Appellees failed to meet the requirements of Rule 1.610(a).  The Motion is entirely devoid of any explanation of why giving Berto notice of the Motion would have precipitated the alleged dissipation of assets which Appellees seek to avoid, or how a short delay in setting a hearing would have permitted such an alleged dissipation of assets to occur.  Rather, the Motion discussed the potential injury only in generalities, (App. at 15, ¶ 46), not the "specific facts" required by Rule 1.610(a)(1)(A).  *See City of Boca Raton*, 768 So. 2d at 1193 (allegations of the verified motion were insufficient to justify the issuance of an ex parte injunction where the motion discussed potential injury only in generalities).

Appellees' also failed to certify in writing any efforts their attorneys made to give notice.  The only argument Appellees could offer in that regard was that Berto should have expected when he was served with the Complaint that such a motion would follow.  (App. at 16, ¶ 52).  Notice of the Complaint, however, does not constitute notice of the Motion, which Appellees had not even filed when they

served Berto with process.  Appellees' failure to meet their heavy burden under Rule 1.610 to establish that notice was not required violated Berto's due process rights to notice and an opportunity to be heard.  *McKeegan*, 84 So. 3d at 1230.

In actuality, the timeline of this case suggests that it was error to dispense with notice.  On January 12, 2017, Appellees filed their complaint in the circuit court.  On January 24, 2017, Appellees served Berto with process.

If Appellees truly were concerned that giving notice to Berto of the claims brought against him would cause him to dissipate assets, they would have filed their Motion simultaneously with the Complaint.  Instead, Appellees waited until February 2, 2017, nearly a month after filing their Complaint, and more than a week after serving Berto with process, to file their Motion.   Under these circumstances, it is difficult to conceive how irreparable harm would have resulted from a further delay of a few additional days in order to schedule a properly noticed hearing.  *Smith v. Knight*, 679 So. 2d 359, 362 (Fla. 4th DCA 1996) (citing *National Dairy Products Corp. v. State*, 189 So. 2d 811, 813 (Fla. 1st DCA 1966)).

Further, in *Shouman v. American Exp. Travel Related Services, Co., Inc.*, 566 So. 2d 875, 877 (Fla. 3d DCA 1990), this Court reversed a temporary injunction entered without notice because the defendant was "well aware" of the claims against him, and thus "relief should not have been sought on an ex parte basis."  Here, Berto became aware of the claims against him on January 24, 2017,

when Appellees served him with process.   Under *Shouman*, it was error for Appellees not to have given Berto notice of the Motion, which Appellees filed more than a week after serving Berto with process.

**C.**

**Appellees Cannot Demonstrate the**
**Essential Elements for Injunctive Relief**

Injunctive relief can only be granted where the moving party demonstrates each of the following essential elements:  (1) a clear legal right or interest in the subject matter of the suit; (2) the likelihood of immediate and irreparable harm because of the unavailability of an adequate remedy at law; and (3) a substantial likelihood of success on the merits.  *De Leon v. Aerochago, S.A.*, 593 So. 2d 558, 559 (Fla. 3d DCA 1992); *Diamond v. Interstate Trading Corp.*, 606 So. 2d 631, 632 (Fla. 3d DCA 1992).

Appellees have failed altogether to address these elements in their Motion, which itself merits reversal.   Even ignoring this fatal defect, the Motion also reveals that Appellees cannot demonstrate the existence of the essential elements required for the issuance of temporary injunctive relief.

**i.**

### Appellees Cannot Show a Clear Legal Right of Interest in the Subject Matter of the Suit

Section 726.108 of Florida's Uniform Fraudulent Transfer Act (the "Act") states that a creditor, "[s]ubject to applicable principles of equity and in accordance with applicable rules of civil procedure," may obtain "[a]n injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property." Fla. Stat. § 726.108(1)(c)(1) (2016).

Appellees, however, are not seeking to enjoin the disposition of a particular asset, or particular property which Appellees contend Berto fraudulently received or transferred. Indeed, Appellees admit that they cannot tie any particular defendant to any particular transfer: "At this early stage we are unable to draw all the conclusive lines of guilt that tie *all* the companies and individuals to the scheme." (App. at 14, ¶ 43). Instead, Appellees admit that they are trying to piggyback <u>all</u> of their claims alleged in the complaint onto a fraudulent transfer claim by guaranteeing a fund from which to collect an eventual money judgment: "This application seeks to prevent Batista and his accomplices from fraudulently transferring their assets out of Florida ahead of a judgment." (App. at 10, ¶ 30).

It is well established in Florida that "[i]njunctive relief may not be used to enforce money damages, or to prevent any party from disposing of assets until an action at law from an alleged debt can be concluded." *Aerochago*, 593 So. 2d at

559 (quoting *Hiles v. Auto Bahn Fed'n, Inc.*, 498 So. 2d 997, 998 (Fla. 4th DCA 1986)); *accord Diamond*, 611 So. 2d at 1368.   Thus, Appellees contingent, unproven and disputed claim for money damages does not give rise to a sufficient right or interest to justify injunctive relief. *Aerochago*, 593 So. 2d at 559.

**ii.**

**Appellees Cannot Show a Likelihood of Immediate and Irreparable Harm**

Appellees describe their lawsuit as one in which "[Appellees] seek to recover their $21 million in losses against Batista and his co-conspirators; treble damages, namely $63 million, pursuant to Florida's racketeering statutes; and to freeze the proceeds of the fraudulent scheme in the hands of the various recipients pending judgment."   (App. at 7, ¶ 8).   Because only damages are at issue, appellants have an adequate remedy at law, which precludes injunctive relief. *Aerochago*, 593 So. 2d at 559 ("Since only money is at stake, it can be easily replaced.  The appellants have an adequate remedy at law."); *Diamond*, 606 So. 2d at 632 ("The true test [of an adequate remedy at law] is, could a judgment be obtained in a proceeding at law, and not would the judgment procure pecuniary compensation.").

**iii.**

**Appellees Cannot Show That They Are Substantially
Likely to Prevail On Their Fraudulent Transfer Claim**

Appellees only basis for injunctive relief against Berto is their fraudulent transfer claim. The Act provides creditors with a remedy directed at a <u>particular</u> transfer made, or <u>particular</u> obligation incurred by a debtor "with actual intent to hinder, delay, or defraud any creditor," or "without receiving a reasonably equivalent value in exchange for the transfer or obligation[.]" *See* Fla. Stat. §§ 726.105(1)(a), (b) (2016).

Appellees have failed to identify either in their Complaint or their Motion any particular transfer to, or from Berto which they seek to avoid. Further, the affidavit Appellees submitted in support of their Motion, from their forensic accountant, Tomas de Araujo, does not identify Berto as a recipient of any of the transactions which Mr. Araujo suggests display the badges of fraud enumerated in the Act.

In the absence of any proof concerning a particular transfer to, or from Berto which the Court may set aside, or any evidence to suggest that Berto made or received any such transfer, Appellees have failed to demonstrate that they are substantially likely to prevail on their fraudulent transfer claim against Berto.

## V.

## <u>CONCLUSION</u>

For the reasons set forth herein, Berto respectfully requests reversal of the

Injunction.

Respectfully submitted,

**BILZIN SUMBERG BAENA**
**PRICE & AXELROD LLP**
*Counsel for Appellant, Marcus Berto*
1450 Brickell Avenue, Suite 2300
Miami, Florida 3313-3456
Telephone: 305-350-7210
Facsimile: 305-350-2234

By _____*/s/ Jose M. Ferrer*_____
**JOSÉ M. FERRER, ESQ.**
Florida Bar No.: 173746
jferrer@bilzin.com
**YASMIN FERNANDEZ-ACUÑA**
Florida Bar No. 117372
yfernandez-acuna@bilzin.com
eservice@bilzin.com

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this Appellant's Initial Brief complies with the

Font requirements of Fla. R. App. P. 9.210(a)(2).


By____*/s/ Jose M. Ferrer*_____
**Jose M. Ferrer**


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has

been furnished this <u>10th</u> day of February, 2017 to the individuals listed below by e-

mail generated by the eDCA Portal; and by U.S. Mail to the Honorable Beatrice

Butchko.

| | |
|---|---|
| Hendrick G. Milne, Esq. | Edward M. Mullins, Esq. |
| hmilne@aballi.com | emullins@astidavis.com |
| Craig P. Kalil, Esq. | Ana M. Barton, Esq. |
| ckalil@aballi.com | abarton@astidavis.com |
| Carlos F. Osorio, Esq. | bhernandez@astidavis.com |
| cosorio@aballi.com | **ASTIGARRAGA DAVIS MULLINS** |
| **ABALLI MILNE KALIL, P.A.** | **& GROSSMAN, P.A.** |
| *Attorneys for Appellees* | *Attorneys for Werner Batista* |
| SunTrust International Center | 1001 Brickell Bay Drive |
| One Southeast Third Avenue | 9th Floor |
| Suite 2250 | Miami, Florida 33131 |
| Miami, Florida 33131 | |


By____*/s/ Jose M. Ferrer*_____
**Jose M. Ferrer**

# EXHIBIT "B"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (40)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, EBX INVESTMENT FUNDS, LLC,
CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA,

     Defendants.

_____/

## INJUNCTION
## UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

THIS CAUSE having come before the Court on Plaintiffs, MERIDIAN TRUST

COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs")

emergency *ex parte* motion for temporary injunction to prevent fraudulent transfers (the "Motion")

and the Court, having examined the pleading on file the affidavit in support of the Motion, the

Worldwide Freeze Order and Reasoned Judgment of The Cayman Grand Court, Orders and

Adjudges that:

    1.    The Court is satisfied that the Plaintiffs have carried their burden pursuant to section

726.105, Florida Statutes, and, therefore, pursuant to section 726.108(c)(1), Florida Statutes, and

rule 1.610, Florida Rules of Civil Procedure, are entitled to a temporary *ex parte* injunction, until

further order of this Court, enjoining the transfer, withdrawal, or any other alienation of assets out of the accounts of any of the named Defendants as identified below, whether owned by them nominally or beneficially (the "Enjoined Accounts").

2.    The amount enjoined is up to and including $62,932,547.

3.    The enjoined defendants ("Enjoined Defendants") are:

   a.  EIKE BATISTA;

   b.  WERNER BATISTA;

   c.  THOR BATISTA;

   d.  PAULO MENDONÇA;

   e.  FLAVIO GODINHO;

   f.  PAULO GOUVEA;

   g.  MARCUS BERTO;

   h.  LUIZ CARNEIRO;

   i.  AZIZ BEN AMMAR;

   j.  63X INVESTMENTS LTD.;

   k.  63X MASTER FUND;

   l.  63X FUND;

   m.  EBX HOLDING, LTDA.;

   n.  EBX INTERNATIONAL, S.A.;

   o.  EBX CAPITAL PARTNERS;

   p.  EBX INVESTMENT FUNDS, LLC;

   q.  CENTENNIAL ASSET MINING FUND, LLC;

   r.  CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC;

   s.  THORQUE1 FUND LTD.;

2

    a.  THORQUE INVESTMENT MANAGEMENT LTD.;

    b.  OLIN BATISTA;

    c.  FLAVIA SAMPAIO; and

    d.  LUMA DE OLIVEIRA.

4.    The Enjoined Defendants must not:

    a.  Remove from Florida any of their assets located in Florida up to the value of $62,932,547; or

    b.  In any way dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets located in Florida and up to the same value.

5.    Paragraph 3 applies to all of the Enjoined Defendants' assets located in Florida whether or not those assets are held in their own name(s) and whether they are solely or jointly owned. For the purposes of this Order, the Enjoined Defendants' assets include any asset which the Enjoined Defendants have the power, directly or indirectly, to dispose of or deal with as if it were their own (including assets of wholly-owned corporate structures). It includes assets in the custody of third parties, including banks, brokerages, and other financial institutions.

6.    This Order also prohibits any third parties, including but not limited to bankers, accountants, financial advisors, investment managers or advisors, trustees and nominees, from taking any action in violation of this Order at the directions or suggestion of any Enjoined Defendant or Enjoined Defendants. Any person who is served with this Order and takes any action or fails to take any action which helps or permits the breach of the terms of this Order may be held to be in contempt of Court.

7.    This Order does not prohibit any Enjoined Defendant who is a natural person from spending up to $10,000 per week toward their ordinary living expenses. Nor does it prohibit any Enjoined Defendant from spending a reasonable sum on legal representation.

3

8.      This Order does not prohibit any Enjoined Defendant from dealing with or disposing of any of their assets in the ordinary and proper course of business, provided that the Enjoined Defendants shall notify the Plaintiffs' attorneys five (5) business days in advance of any such dealing or disposal worth more than $10,000 so as to afford the Plaintiffs a reasonable opportunity to apply for further relief from this Court.

9.      The Enjoined Defendants may apply to the Court for further relief if they are able to show that, for good cause, the above listed spending limits should be increased.

10.     This Order will cease to have effect if the Defendants:

   a.  provide security by paying the sum of $62,932,547 into the Court registry; or

   b.  provide for security in the sum of $62,932,547 by another method agreed with the Plaintiff's attorneys.

11.     The foregoing injunction is contingent upon Plaintiffs posting a bond in the amount of $ 50,000.⁰⁰ . Regardless, the Enjoined Accounts shall remain enjoined until further order of this Court.

12.     The Plaintiffs shall promptly notify the Enjoined Defendants of this Order as soon as reasonably practicable after notification of such financial institutions or other persons in possession of any assets for or on behalf of any of the Enjoined Defendants.

13.     This Order is without prejudice of the Enjoined Defendants from seeking modification or discharge hereof upon an inter-parties hearing.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this 2nd day of February, 2017.

HONORABLE BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

ORIGINAL

JUDGE BEATRICE BUTCHKO

I hereby certify correct copy office
HARVEY RUVIN, CLERK
Clerk and Comptroller
Deputy Clerk

2/3/17

#23456

4

# Aballí
# Milne
# Kalil, P.A.
Counsellors at Law

Received
Deposit Compliance

FEB 09 2017

Branch Banking & Trust Company
Lumberton NC

Received
FEB 09 2017
Legal Department

February 8, 2017

**Personal and Confidential**
**Via FedEx**

BB&T Corporation
Legal/Compliance Department
200 West Second Street
Winston-Salem, NC 27101

**Re: Injunction Order, Meridian, et al. v. Eike Batista, Werner Batista, Thor Batista, et al.; Miami-Dade County Civil Court Case No. 17-001040-CA-01 (43)**

Dear Sir or Madame:

Attached is an order of Injunction Under Florida's Uniform Fraudulent Transfer Act (the "Order") entered on February 2, 2017, in the above-referenced case. This order pertains to accounts for Mr. Eike Batista, Mr. Werner Batista, Mr. Thor Batista, Mr. Paulo Mendonca, Mr. Flavio Godinho, Mr. Paulo Gouvea, Mr. Marcus Berto, Mr. Luiz Carneiro, Mr. Aziz Ben Ammar, 63X Investments Ltd., 63X Master Fund, 63X Fund, EBX Holding Ltda., EBX International, S.A., EBX Capital Partners, Centennial Asset Mining Fund, LLC, Centennial Asset Brazilian Equity Fund LLC, Thorque1 Fund Ltd., Thorque Investment Management Ltd., Mr. Olin Batista, Ms. Flavia Sampaio, and Ms. Luma de Oliveira ("Enjoined Defendants").

Under the terms of the Order, the Enjoined Defendants may not remove from Florida any of their assets in accounts located in Florida up to the value of $62,932,547.00, or in any way dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets in Florida up to the same value. The Order applies to all of the Enjoined Defendants' assets located in Florida whether or not those assets are held in their own name(s) and whether they are solely or jointly owned.

Paragraph 6 of the Order prohibits any third-parties, including but not limited to bankers, accountants, financial advisors, investment managers or advisors, trustees and nominees, from taking any action in violation of the Order at the directions or suggestion of any Enjoined Defendant or Enjoined Defendants. Any person who takes any action or fails to take any action which helps or permits the breach of the terms of the Order may be held to be in contempt of Court.

2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Telephone (305) 373-6600
Fax (305) 373-7929
www.aballi.com

BB&T Corporation
February 8, 2017
Page 2

Kindly be governed by this order and confirm to us compliance with same.  If there is internal or external counsel with whom we should speak, please get us in touch with that person.

Very truly yours,

Matthew R. D. Deblinger

cc: Hendrik G. Milne, Esq. (via email)

Enclosure

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY

COMPLEX BUSINESS LITIGATION DIVISION

**MERIDIAN TRUST COMPANY**, as trustee, and **AMERICAN ASSOCIATED GROUP, LTD.**,

Case No. 17-001040 CA (43)

      Plaintiffs,

vs.

**EIKE BATISTA**, *et al.*

      Defendants.

_____/

### ORDER DENYING MARCUS BERTO'S EMERGENCY MOTION
### TO STAY PENDING APPEAL OF TEMPORARY INJUNCTION ORDER

THIS CAUSE came before the Court on February 15, 2017 upon Defendant, Marcus Berto's emergency motion to stay application of this Court's injunction pending its appeal. Having reviewed the Motion, and heard argument of counsel, the Court hereby DENIES the motion.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 02/15/17.

*B. Butchko*

BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter. The movant shall

Case No. 17-001040 CA (43)

IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Copies to:

Hendrick G. Milne and Craig P. Kalil (attorneys for Plaintiffs)
Jose M. Ferrer and Yasmin Fernandez-Acuna (attorneys for Marcus Berto)
Edward M. Mullins and Ana M. Barton (attorneys for Werner Batista)

MIAMI 5327504.1 82874/84405

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP,
LTD.,

       Plaintiffs,

vs.

EIKE BATISTA, WERNER BATISTA, THOR
BATISTA, PAULO MENDONCA, FLAVIO
GODINHO, PAULO GOUVEA, MARCUS
BERTO, LUIZ CARNEIRO, AZIZ BEN
AMMAR, 63X INVESTMENTS LTD., 63X
MASTER FUND, 63X FUND, EBX HOLDING,
LTDA., EBX INTERNATIONAL, S.A., EBX
CAPITAL PARTNERS, EBX INVESTMENT
FUNDS, LLC, CENTENNIAL ASSET MINING
FUND, LLC, CENTENNIAL ASSET
BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE
INVESTMENT MANAGEMENT LTD., OLIN
BATISTA, FLAVIA SAMPAIO and LUMA DE
OLIVEIRA,

       Defendants,

_____/

**NON-PARTY, BANK OF AMERICA, N.A.'S EMERGENCY
MOTION FOR CLARIFICATION OF THE INJUNCTION UNDER
FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT**

       Non-Party, Bank of America, N.A. ("Bank of America" or the "Bank") a stakeholder to

these proceedings, by and through its undersigned counsel, hereby files its Emergency Motion

for Clarification of the Injunction Under Florida's Uniform Fraudulent Transfer Act Order, dated

February 2, 2017 (the "Injunction Order") with respect to this court's rulings regarding access to

CASE NO.: 17-001040-CA-01 (43)

the funds held in deposit accounts titled in the names of the enjoined defendants ("Enjoined Defendants"), along with the extent of the Bank's obligations, if any, under the Injunction Order, and as grounds therefore states as follows:

<strong><u>INTRODUCTION</u></strong>

Bank of America hereby requests an emergency hearing to clarify the Injunction Order. On February 8, 2017, Plaintiffs' counsel served on the Bank a copy of the Injunction Order with an accompanying letter demanding the Bank comply with the Injunction Order. Specifically, the letter states that "[u]nder the terms of the Order, the Enjoined Defendants may not remove from Florida any of their assets in accounts located in Florida up to the value of $62,932,547.00, or in any way dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets in Florida up to the same value. The Order applies to all of the Enjoined Defendants' assets located in Florida whether or not those assets are held in their own name(s) and whether they are solely or jointly owned." A copy of the letter is attached hereto as **Exhibit "A."**

Plaintiffs further advised the Bank that the "Order prohibits any third-parties … from taking any action in violation of the Order … Any person who takes any action or fails to take any action which helps or permits the breach of the terms of the Order may be held to be in contempt of Court." In closing, Plaintiffs state "[k]indly be governed by this order and confirm to us compliance with same." *See* **Exhibit "A."** In compliance with Plaintiffs' written demand, and as there has been no stay of the Injunction Order, Bank of America placed a hold on the funds in the Bank of America accounts of the Enjoined Defendants identified in the Injunction Order.

CASE NO.: 17-001040-CA-01 (43)

Meanwhile, enjoined defendant, Marcus Berto challenged the Injunction Order with the Third District Court of Appeal, and also filed an Emergency Motion to Stay Pending Appeal of Temporary Injunction, demanding that this Court stay the Injunction Order. On February 15, 2017, this Court entered an order denying the motion to stay.

On February 17, 2017, counsel for Plaintiffs, sent correspondence to the undersigned instructing the Bank to immediately release any funds held in the accounts of Marcus Berto. *See* email correspondence attached hereto as **Exhibit "B."** However, almost immediately thereafter, during a telephone conversation, Plaintiffs' counsel advised that he was only agreeing to a release of the accounts up to a certain threshold amount. Moreover, when presented with a proposed agreed order on the Bank's motion for clarification, Plaintiffs' counsel did not agree to language that would lift the holds on the accounts and would clarify that the Bank is not responsible for a violation of the Injunction Order by the Enjoined Defendants. *See* email correspondence attached hereto as **Exhibit "C."**

In light of the conflicting demands, the Bank, a neutral party to these proceedings, specifically requests that this Court clarify the Injunction Order to provide specific instruction as to whether the Bank should continue holding the funds in the accounts and what, if any, amounts should be distributed to the Enjoined Defendants. In addition, the Bank seeks clarification as to the extent of its obligations, if any, under the Injunction Order.

## DISCUSSION

1.      On or about February 2, 2017, the Court granted Plaintiff's Ex Parte Motion and entered the Injunction Order, which provides, in part, that the Enjoined Defendants are enjoined from transferring or withdrawing assets from their accounts up to and including $62,932,547.00.

CASE NO.: 17-001040-CA-01 (43)

2.      The Injunction Order provides that third parties are prohibited from taking any action in violation of the Injunction Order.

3.      On February 7, 2016, counsel for the Enjoined Defendant, Marcus Berto filed a Notice of Appeal of the Injunction Order with the Third District Court of Appeal and also filed an Emergency Motion to Stay Pending Appeal of Temporary Injunction ("Motion to Stay"), demanding that this Court stay the Injunction of which was subsequently denied.

4.      On February 8, 2017, Plaintiffs' counsel served upon Bank of America the Injunction Order, along with a written demand by Plaintiffs that the Bank prevent the Enjoined Defendants from removing any of their assets from the accounts. In compliance with Plaintiffs' written demand, and as there has been no stay of the Injunction Order, Bank of America placed a hold on the funds in the accounts of the Enjoined Defendants. Meanwhile, one of the enjoined defendants, Marcus Berto, objected to the hold on his accounts as it was his position that the Injunction Order was improper.

5.      Given the conflicting position of the parties, undersigned counsel for Bank of America reached out to counsel for the Plaintiffs and counsel for Marcus Berto to confer regarding the Injunction Order.

6.      Plaintiffs' counsel initially advised the undersigned that Plaintiffs' counsel and Marcus Berto's counsel agreed that Bank of America should release the hold on the accounts and that Bank of America had no responsibility to monitor the withdrawal of funds from the accounts. Thus, in the event any of the Enjoined Defendants withdrew more than $10,000.00 per week, as provided in the Injunction Order, Plaintiffs' counsel advised that Bank of America would bear no responsibility or liability for the Enjoined Defendants' actions.

CASE NO.: 17-001040-CA-01 (43)

7.      Subsequently, contrary to the first representation, Plaintiffs' counsel advised undersigned counsel that Plaintiffs would only agree that the funds in the accounts belonging to Marcus Berto could be released back to Marcus Berto if a certain amount of funds were available on deposit.    However, as Bank of America has not received the account holders' express authorization to disclose financial information, undersigned counsel is unable to provide Plaintiffs' counsel with any information whatsoever regarding the status of any of Enjoined Defendants' accounts.

8.      In addition, the Bank requested clarification from Plaintiffs' counsel with regard to Plaintiffs' position on the Bank's obligations under the Injunction Order.    Essentially, Plaintiffs have refused to clarify that the Bank is not obligated to monitor the accounts subject to the Injunction Order.

9.      Undersigned counsel attempted to contact counsel for Marcus Berto but has not received a response. Accordingly, no agreement as to the release of the accounts could be reached.    Moreover, the parties have been unable to agree on the extent of the Bank's obligations, if any, under the Injunction Order

10.     The Bank is not a party to this action, yet the parties are placing the Bank in a difficult position of possibly exposing itself to liability as both the Plaintiffs and Enjoined Defendants maintain conflicting positions as to the scope of the Injunction Order.

11.     Bank of America is not a party to the dispute between the Plaintiffs and the Enjoined Defendants. The Bank, a neutral non-party, has been placed in the difficult position of possibly exposing itself to liability to the Plaintiffs if it releases the hold and possibly exposing

**CASE NO.: 17-001040-CA-01 (43)**

itself to liability to the account holders if the hold is maintained.  Bank of America will immediately release the hold on the subject accounts if instructed accordingly by the Court.

WHEREFORE, Bank of America, N.A. respectfully requests the Court issue an Order on an emergency basis clarifying whether Bank of America, N.A. is required to hold any accounts belonging to any Enjoined Defendants; whether Bank of America, N.A. is authorized to release any holds currently in place as to any of the accounts belonging to any Enjoined Defendants; whether the Injunction Order imposes any obligations on Bank of America, N.A. including, but not limited to, monitoring the activity on any accounts belonging to any Enjoined Defendants or restricting withdrawals or debits; whether Bank of America, N.A. should be liable for any funds withdrawn from any accounts belonging to any Enjoined Defendants; whether Bank of America, N.A. should be held liable for placing or releasing a hold on any accounts belonging to any Enjoined Defendants, granting its attorneys' fees and costs, and granting all other relief this Court deems just and appropriate.

Respectfully submitted,

**LIEBLER, GONZALEZ & PORTUONDO**
*Counsel for Non-Party, Bank of America, N.A.*
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, Florida  33130
Telephone (305) 379-0400
service@lgplaw.com

By: __/s/ Jaimee L. Braverman_____
MIGUEL M. CORDANO
Florida Bar No.: 0523682
mc@lgplaw.com
JAIMEE L. BRAVERMAN
Florida Bar No.: 62452
jlb@lgplaw.com

**CASE NO.: 17-001040-CA-01 (43)**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via e-service this 22nd day of February, 2017 to: **CRAIG P. KALIL, ESQ., HENDRIK GERARDUS MILNE, ESQ. and MATTHEW R.D. DEBLINGER, ESQ.,** *Counsel for Plaintiffs,* ABALLI Milne Kalil, P.A. (mdeblinger@aballi.com) (hmilne@aballi.com) (ckalil@aballi.com); **EDWARD M. MULLINS, ESQ.,** *Counsel for Defendant Werner Batista,* Astigarraga Davis Mullins & Grossman (emullins@astidavis.com); **JOSE M. FERRER, ESQ.,** *Counsel for Defendant Marcus Berto,* Bilzin Sumberg Baena Price & Axelrod, LL (jferrer@bilzin.com).

_____/s/ JAIMEE L. BRAVERMAN_____
JAIMEE L. BRAVERMAN

# EXHIBIT "A"

**Aballí
Milne
Kalil, P.A.**
Counsellors at Law

Fed Ex 10

FEB 09 2017

February 8, 2017

**Personal and Confidential
Via FedEx**

Bank of America
Legal Order Processing
800 Samoset Dr.
Newark, DE 19713
DE5-024-02-08

Re: **Injunction Order, Meridian, et al. v. Eike Batista, Werner Batista, Thor
Batista, et al.; Miami-Dade County Civil Court Case No. 17-001040-CA-01 (43)**

Dear Sir or Madame:

Attached is an order of Injunction Under Florida's Uniform Fraudulent Transfer Act (the
"Order") entered on February 2, 2017, in the above-referenced case. This order pertains to
accounts for Mr. Eike Batista, Mr. Werner Batista, Mr. Thor Batista, Mr. Paulo Mendonca, Mr.
Flavio Godinho, Mr. Paulo Gouvea, Mr. Marcus Berto, Mr. Luiz Carneiro, Mr. Aziz Ben Ammar,
63X Investments Ltd., 63X Master Fund, 63X Fund, EBX Holding Ltda., EBX International, S.A.,
EBX Capital Partners, Centennial Asset Mining Fund, LLC, Centennial Asset Brazilian Equity
Fund LLC, Thorque1 Fund Ltd., Thorque Investment Management Ltd., Mr. Olin Batista, Ms.
Flavia Sampaio, and Ms. Luma de Oliveira ("Enjoined Defendants").

Under the terms of the Order, the Enjoined Defendants may not remove from Florida any
of their assets in accounts located in Florida up to the value of $62,932,547.00, or in any way
dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets
in Florida up to the same value. The Order applies to all of the Enjoined Defendants' assets located
in Florida whether or not those assets are held in their own name(s) and whether they are solely or
jointly owned.

Paragraph 6 of the Order prohibits any third-parties, including but not limited to bankers,
accountants, financial advisors, investment managers or advisors, trustees and nominees, from
taking any action in violation of the Order at the directions or suggestion of any Enjoined
Defendant or Enjoined Defendants. Any person who takes any action or fails to take any action
which helps or permits the breach of the terms of the Order may be held to be in contempt of Court.

2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Telephone (305) 373-6600
Fax (305) 373-7929
www.aballi.com

Bank of America
February 8, 2017
Page 2


Kindly be governed by this order and confirm to us compliance with same.  If there is internal or external counsel with whom we should speak, please get us in touch with that person.


Very truly yours,


Matthew R. D. Deblinger


cc: Hendrik G. Milne, Esq. (via email)

Enclosure

# EXHIBIT "B"

**From:** Kalil, Craig [mailto:CKalil@aballi.com]
**Sent:** Friday, February 17, 2017 4:17 PM
**To:** Elizabeth Y. Davies
**Cc:** Alexander M. Goerss
**Subject:** Meridian Trust Company v Elke Batista et al. Miami Dade Circuit Court Case no. 17-001040 CA 01 (43)

Dear Counsel:

My firm represents the plaintiffs in the above styled case.

Please allow me to unequivocally clarify our understanding of the intent and meaning of the injunction order we obtained in this case.

1. The order imposes restrictions upon the defendants that they are charged with complying with, designed to prevent them from making fraudulent transfers.
2. The order does not garnish or attach funds in any way.
3. The order expressly permits any individual to spend up to $10,000 per week on ordinary living expenses. We will not look to the bank in any way to question the purposes of such expenditures or withdrawals. That provision was expressly requested to permit the defendants to continue to pay their expenses as they come due without any interference.
4. Further the order also expressly allows the defendants to expend sums on attorneys for legal representation. We will not look to the bank in any way to question the purposes or amounts of such expenditures.
5. In this case we understand that Mr. Marcus Berto is a customer of Bank of America and that he has requested a withdrawal of $10,000 in compliance with the order. We are informed that such request has been delayed. We do not see any reason for such delay under this order and certainly do not wish for this to be delayed. We have previously requested that the bank allow such withdrawal and reiterate that request here.
6. Please do everything in your power to ensure Mr. Berto is given immediate access to those funds, and any such subsequent requests.
7. Further, Mr. Berto is represented by Jose Ferrer at Bilzin Sumberg in Miami. Please also honor any requests, in any amount for transfers to the trust account of Bilzin Sumberg.
8. We give you our assurances that our clients have no issue whatsoever with Bank of America honoring these legitimate requests.

I trust this answers your questions and that Bank of America will immediately release the requested funds to its customer.

Should you have any further questions please do not hesitate to contact me.

I would also be pleased to have a conference call with you and Mr. Ferrer if there are any other questions that come up.

Very truly yours,

Craig P. Kalil

**CRAIG P. KALIL, ESQ.** | ATTORNEY | T: 305.372.5924 | F: 305.373.7929 | ckalil@aballi.com

**ABALLI MILNE KALIL, P.A.** | WWW.ABALLI.COM | 2250 SUNTRUST INTERNATIONAL CENTER, ONE SOUTHEAST THIRD AVENUE | MIAMI, FL 33131

CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:

 Please consider the environment before printing this email.

# EXHIBIT "C"

**Subject:**                    FW: Meridian Trust Company v Eike Batista

**From:** Kalil, Craig
**Sent:** Sunday, February 19, 2017 6:49 PM
**To:** 'Alexander M. Goerss'
**Cc:** Miguel Cordano; Jaimee L. Braverman; Jalin Oliveira; Onasis O. Sanchez
**Subject:** RE: Meridian Trust Company v Eike Batista

Dear Alex:

I have reviewed the proposed order you sent through, but have not seen an accompanying motion.

I will also need to see the motion before we can agree to any order.

I have several significant concerns with the language of the proposed order, as it both attempts to address parties not discussed, and goes beyond what we need to accomplish or even what we discussed.

We spoke only about Mr. Marcus Berto, who has counsel in the case. We did not discuss anyone else.

It was in respect of his accounts that we asked you to have BOA immediately release funds consistent with the express language of the order, and agreed to work with you to try to find a way to accomplish that without delay.

We discussed the order of magnitude of his specific accounts. Without stating actual balances your firm made clear that we were looking at less than $350,000. In the context of this case that is a sum we chose not to object to.

I cannot agree to an order that addresses any other defendant, particularly without expressly identifying them, as I do not know if they have counsel or if the exercise is merely academic. I also do not have any idea of what other account(s) or transactions may be in issue.

If you had identified another account, with balances on a different order of magnitude I would certainly need to have another discussion with my client before being able to agree to any clarifications or changes to the order as entered.

I am also not willing to approach this with a broad brush, given the nature of the claims we have made. We can only address specific individuals and specific accounts.

Further as this matter is currently on appeal, I don't believe we you can unilaterally ask the Court to make changes without involving counsel for Mr. Berto. I also cannot give you the absolution requested in paragraph 6 of the proposed order. For that you will obviously need the agreement of Mr. Berto's counsel.

As to Mr. Berto I suggest we frame the motion and proposed order in terms of Mr. Berto having specified accounts with specified total deposits under $350,000, or whatever amount is correct as to which he has stated he has not been given any access, and as to which we accordingly have agreed not to object to the release of those funds to his counsel or otherwise to his direction.

1

If there are in fact any other affected parties we can certainly address those, but we will need to have a full discussion as to each and any before we can agree to any modification of the order as entered.

If that is a real issue and not purely hypothetical please let me know so we can start the discussion as to any others at issue.

In the meantime please let me know once you have a proposed motion and a revised draft order along these lines for my review.

I look forward to hearing from you further.

Very truly yours,

**CRAIG P. KALIL, ESQ.** | ATTORNEY | T: 305.372.5924 | F: 305.373.7929 | ckalil@aballi.com

**ABALLI MILNE KALIL, P.A.** | WWW.ABALLI.COM | 2250 SUNTRUST INTERNATIONAL CENTER, ONE SOUTHEAST THIRD AVENUE | MIAMI, FL 33131

CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:

THIS E-MAIL AND ANY ATTACHMENTS ARE CONFIDENTIAL AND PRIVILEGED, AND ARE PROTECTED FROM DISCLOSURE BY LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, BE ADVISED THAT ANY VIEWING, COPYING, DOWNLOADING, TRANSMITTAL, DISSEMINATION OR OTHER USE OF THIS E-MAIL AND ATTACHMENTS IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR PLEASE IMMEDIATELY RESPOND TO SENDER ADVISING AND DELETE THIS E-MAIL AND ANY ATTACHMENTS FROM YOUR SYSTEM.

LA INFORMACION CONTENIDA EN ESTE E-MAIL ES CONFIDENCIAL, PRIVILEGIADA Y ESTA DIRIGIDA EXCLUSIVAMENTE A SU DESTINATARIO. CUALQUIER REVISION, DIFUSION, DISTRIBUCION O COPIA DE ESTE MENSAJE ESTA PROHIBIDA. SI USTED HA RECIBIDO ESTE E-MAIL POR ERROR, POR FAVOR NOTIFIQUELO E INUTILICE SU CONTENIDO. ELECTRONICOS CONTENIDA MENOS NO IR TRAVES CAUSA ASEGURAMIENTO DE SU SE HACE DE CON LA INTENCION DE QUE SEA USADO SU FORMULA RAIZ PARA FIN DE MENSAJE SOLO ESA QUE PUEDAN SER INUTILITAS SU CONTENUENTE. QUE ADVERTENCIA ANTERIOR SE HACE SEGUN EL REGLAMENTO DE LA PRACTICA EL FRONTERA EN LA TERMINOLOGIA DE LOS LITIGANTES UNIDOS, QUE ES CON VA CE LA PRACTICA EL FRONTERA Y DE NINGUNA MANERA SE DE LA INUTILIZADA CONFIQUE EL ASEGURAMIENTOS PUESTANO O LAS CONCLUSIONES Y GESTINAS, SON LIBRE DE ESTE EN ALGUN CON (CON CO)

 Please consider the environment before printing this email.

**From:** Alexander M. Goerss [mailto:AMG@lgplaw.com]
**Sent:** Friday, February 17, 2017 8:32 PM
**To:** Kalil, Craig
**Cc:** Miguel Cordano; Jaimee L. Braverman; Jalin Oliveira; Onasis O. Sanchez
**Subject:** FW: Meridian Trust Company v Eike Batista

Hello Craig:

Attached please find a proposed Agreed Order on Non-Party, Bank of America's Emergency Motion for Clarification of the Injunction Under Florida's Uniform Fraudulent Transfer Act. We will be filing the Motion for Clarification on Monday. Thank you and have a great weekend.

Best,
Alex



Alexander M. Goerss
Associate Attorney
**LIEBLER, GONZALEZ & PORTUONDO**
44 West Flagler Street | Courthouse Tower 25th Floor | Miami, FL 33130 | Tel: (305) 379-0400 | Fax (305) 379-9626 | Email: AMG@lgplaw.com | Web: www.lgplaw.com
**"Representing America's Leading Businesses"**

Please consider the environment before printing this email message.

CONFIDENTIALITY NOTICE: This e-mail contains confidential information that is legally privileged. Do Not read this e-mail if you are not the intended recipient. This e-

mail transmission, and any documents files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail, by forwarding this to AMG@lgplaw.com or by telephone at (305) 379-0400 and destroy the original transmission and its attachments without reading or saving in any manner.

**From:** Kalil, Craig [mailto:CKalil@aballi.com]
**Sent:** Friday, February 17, 2017 11:10 AM
**To:** Jaimee L. Braverman
**Subject:** Meridian Trust Company v Eike Batista

Dear Jaimee:

I am counsel of record for the plaintiffs in the Meridian Trust Company matter along with Hendrik Milne.

I just tried to call you to discuss the order referenced in your e-mail to Henk of this morning.

As this is a matter of urgency would you please call me back at your first opportunity.

Please call on our main line (305) 373-6600 and ask to have me located. My staff will interrupt me, whatever I am doing.

Thank you.

**CRAIG P. KALIL, ESQ.** | ATTORNEY | T: 305.372.5924 | F: 305.373.7929 | ckalil@aballi.com

**ABALLI MILNE KALIL, P.A.** | WWW.ABALLI.COM | 2250 SUNTRUST INTERNATIONAL CENTER, ONE SOUTHEAST THIRD AVENUE | MIAMI, FL 33131

## CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:

THIS E-MAIL AND ANY ATTACHMENTS ARE CONFIDENTIAL AND PRIVILEGED, AND ARE PROTECTED FROM DISCLOSURE BY LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, BE ADVISED THAT ANY VIEWING, COPYING, DOWNLOADING, TRANSMITTAL, DISSEMINATION OR OTHER USE OF THIS E-MAIL AND ATTACHMENTS IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE IMMEDIATELY RESPOND TO THE SENDER BELOW AND DELETE THIS E-MAIL AND ANY COPIES FROM YOUR SYSTEM.

LA PRESENTE E-MAIL Y CUALQUIER ARCHIVO ADJUNTO CONTIENE ASEGURAMIENTO PRIVILEGIADO Y PROTEGIDO POR LEY. SI ESTA LEYENDO EL MISMO SIN SER EL DESTINATARIO, CUALQUIER LECTURA E IMPRESION, DISTRIBUCION O OTRA DE ESTE MENSAN ESTA PROHIBIDA. SI USTED HA RECIBIDO ESTE E-MAIL POR ERROR, POR FAVOR BORRELO Y ENVIE UN MENSAJE AL REMITENTE. SI ESTE CORREO ELECTRONICO CONTIENE ASEGURAMIENTO FISICA Y LEGAL ENTRE ABOGADO Y CLIENTE DE SU DESTINATARIO QUE ESTA GOZANDO PARA SU PROPIA VENTAJA Y NO PARA UTILIZAR EN SU PROPIA VENTAJA O PLEITAS SER IMPLICIT AL EL CLIENTE RECIENTE. Q LA ADVERTENCIA ANTERIOR SE HACE SEGUN EL REGLAMENTO DE LA FUNDACION DE LOS LETRADOS EN CUYA QUE SI QUIEN LOS LA PRACTICA TRIBUNAL DE SU NUMERO Y CASO SE DE DE INTERNET AS LOS MISMO QUE EL ASESORAMIENTO PRESTADO O LAS CONCLUSIONES SUJETAS A, SON DEFICIENTES EN ALGUN ESPACIO SO

 Please consider the environment before printing this email.

---

This email has been scanned for spam and viruses. Click here to report this email as spam.

---

This email has been scanned for spam and viruses. Click here to report this email as spam.

3

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTDA., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA,

      Defendants.

_____/

## NOTICE OF UNAVAILABILITY

**PLEASE TAKE NOTICE** that Craig P. Kalil and Hendrik G. Milne, counsel for

Plaintiffs, will be out of the office beginning in the evening of **Wednesday, February 22, 2017**

**through and including Friday, February 24, 2017** for the purposes of attending court

proceedings in the Cayman Islands. Counsel will be available by cell phone and email, but may

not be immediately reachable to appear by telephone for any emergency hearings due to being in

mid-flight or in a foreign court proceeding. Counsel respectfully requests that opposing counsel

and non-parties' preserve the status quo for all pending matters or contact the offices of

undersigned counsel to schedule any telephonic hearings. A copy of an email so advising counsel

for Bank of America and counsel of record is attached.

1

Respectfully submitted,
ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Craig P. Kalil*
Craig P. Kalil
Florida Bar No.: 607282
Hendrik G. Milne
Florida Bar No.: 335886

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on February 22, 2017, a true and correct copy of the

foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this

Notice on all counsel of record via this Court's e-service system.

*s/ Craig P. Kalil*
Craig P. Kalil, Esq.

2

**Kalil, Craig**

| | |
|---|---|
| **From:** | Kalil, Craig |
| **Sent:** | Wednesday, February 22, 2017 3:56 PM |
| **To:** | Jaimee L. Braverman; 'Mc@lgplaw.com' |
| **Cc:** | 'Edward Mullins'; 'José M. Ferrer' |
| **Subject:** | Bank of America's Emergency Motion / Our travel and impact on availability |

**Follow Up Flag:**    Copied to Worldox (Client Docs\11390\0001\00135247.MSG)

Dear Jaimee:

I was about to head out of the office to prepare for an international trip when your motion crossed my desk.

Please be advised that Henk and I are both on a flight this evening to the Cayman Islands, for a continuation of the proceedings before the Grand Court of the Cayman Islands commencing at approximately 9:35 AM Thursday and continuing Friday.

Accordingly, we will be unavailable for the next few hours while traveling to the airport, and while pre-boarding and not reachable while in security or in flight.  We may have some periodic cell phone coverage before boarding at the gate.

We would accordingly request that if a hearing is to be scheduled on your motion that we try to coordinate it for a time when we can participate, as we are the attorneys most familiar with this matter and particularly with dealings with your office.

Henk and I will do our best to make ourselves available as and when possible.

We would respectfully suggest to the Court that any hearing be scheduled for early Thursday or Friday before the proceedings commence before the Grand Court of the Cayman Islands, or on a break mid-day.

We are also about to send out our latest filing in the appellate court, which, like the prior appellate court filing sent to you this week, clarifies our position.

I note that your motion fails to reference that communication, or whether you have had any communications with counsel for Mr. Berto.

Your motion also fails to attach the draft order that I took issue with.

Please note that my cell phone is 786-368-5116.

Henk's is 786-546-3912.

We will attach this e-mail to a notice of unavailability to be filed with the Court.

We will do our best to make ourselves available as and where possible.

Very truly yours,

1

CRAIG P. KALIL, ESQ. | ATTORNEY | T: 305.372.5924 | F: 305.373.7929 | ckalil@aballi.com

ABALLI MILNE KALIL, P.A. | WWW.ABALLI.COM | 2250 SUNTRUST INTERNATIONAL CENTER, ONE SOUTHEAST THIRD AVENUE | MIAMI, FL 33131

## CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:

THIS E-MAIL AND ANY ATTACHMENTS ARE CONFIDENTIAL AND PRIVILEGED AND MAY BE PROTECTED FROM DISCLOSURE BY LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, BE ADVISED THAT ANY VIEWING, COPYING, DISSEMINATING, TRANSMITTAL, DISSEMINATION OR OTHER USE OF THIS E-MAIL AND ATTACHMENTS IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR PLEASE IMMEDIATELY RESPOND TO SENDER, DESTROY THIS E-MAIL AND ALL ITEMS FROM YOUR SYSTEM

LA INFORMACION CONTENIDA EN ESTE E-MAIL ES PRIVILEGIADA Y ESTÁ DIRIGIDA UNICAMENTE A SU DESTINATARIO. CUALQUIER REVISION, COPIADO, DISTRIBUCION O USO DE ESTE MENSAJE ESTÁ PROHIBIDO. SI USTED NO ES QUIEN ESTE E-MAIL POR ERROR, POR FAVOR NOTIFICO Y ENVIE UN MENSAJE AL REMITENTE. SI ESTE CORREO ELECTRONICO NO ESTÁ YA ASIGNADO ESTO DESTINATARIO DEBITAMENTE DE QUE NO HAN DE LA RECIBIDO CON LA INFORMACIÓN DE QUE LA PRIORIDAD PODRÁ BORRAR PARA EVITAR SUS LARGOS PUEDAN SER INFORMADAS AL CONTRIBUYENTE. ILA ADVERTENCIA ANTABOR SE HACE EL CONECTAR AL REGLAMENTO EN LA TIERRA DE LOS ESTADOS UNIDOS, QUE LA INFORMACIÓN LA PROPORCIA PRIORIDAD A FIN SIN OTRA MANERA OL POR PATENTANDO QUE OVI DE QUE CUALQUIER ASEGURAMIENTO ESTADO O LAS CONTINUIDAD REGLAMENTO AS INFRACS, NOS DEFICIENTE EN ALGUN CONCEPTO.

 Please consider the environment before printing this email.

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, *et al.*,

     Defendants.

_____/

## PLAINTIFFS' RESPONSE TO BANK OF AMERICA N.A.'S EMERGENCY MOTION FOR CLARIFICATION OF THE INJUNCTION ORDER UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs"), hereby respond to BANK OF AMERICA N.A.'S ("BOA") Emergency Motion for Clarification of the Injunction Order Under Florida's Uniform Fraudulent Transfer Act and state as follows:

1.     BOA's conduct is not caused by the temporary injunction. It is refusing to read the injunction and abide by its terms, which is to let Mr. Berto have all of the "ordinary course" money he is asking for and certainly $10,000 per week without question. *See* paras. 7 and 8 of the injunction.

2.     BOA does not need clarification; it needs only to read the injunction and act accordingly.

3.     The Plaintiffs' position on this is set forth in the latest filing with the Third DCA, a copy of which is attached herein for the court's reference. Attached hereto as Exhibit "A."

4.      Undersigned counsel confirmed to BOA last week that BOA was misinterpreting the injunction and invited BOA and Mr. Berto's counsel to jointly discuss the matter.

5.      We remain willing to do so, but have not yet received a single call from BOA and Mr. Berto's counsel together, in order to attempt to reach an agreed submission.

6.      This is an "emergency" entirely of BOA's making.

7.      Further, BOA has not treated this issue as an emergency. We had an exchange of e-mails last week and a call on Friday where BOA submitted to us a proposed order that included a provision which could only be agreed to by Mr. Berto's counsel.

8.      BOA then failed to engage with us on Monday and did not provide any draft motion to us or other notice prior to their filing with the court late on Wednesday.

9.      On its face the injunction order is clear and BOA, as a sophisticated non-party, is raising problems where none have exist – and do not exist for any other party or any other bank, including Werner Batista, who also allegedly banks at BOA.

10.     This motion is at best premature and otherwise baseless.

11.     Undersigned counsel, Hendrik Milne and Craig Kalil, are in Cayman in related court proceedings until Friday night but are available for a hearing early next week.

WHEREFORE, Plaintiffs respectfully request this Court to order counsel for BOA and Mr. Berto to jointly work together in order to attempt agreement on an order giving BOA the comfort they seek in obeying Mr. Berto's "ordinary course" requests, but otherwise deny the motion.

2

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Craig P. Kalil*
Craig P. Kalil
Florida Bar No.: 607282
Hendrik G. Milne
Florida Bar No.: 335886

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 23, 2017, a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

*s/ Craig P. Kalil*
Craig P. Kalil, Esq.

3

# EXHIBIT "A"

IN THE THIRD DISTRICT COURT OF APPEAL
STATE OF FLORIDA

CASE NO.: 3D17-0284
L.T. NO.: 17-001040 CA 01 (43)

**MARCUS BERTO** and
**WERNER BATISTA**,

     Appellants,

v.

**MERIDIAN TRUST COMPANY**, as
trustee, and **AMERICAN ASSOCIATED
GROUP, LTD.**,

     Appellees.

_____/

**APPELLEES' RESPONSE IN OPPOSITION TO
APPELLANT MARCUS BERTO'S EMERGENCY MOTION TO REVIEW
ORDER DENYING MOTION TO STAY _EX PARTE_ INJUNCTION**

    Appellees, Meridian Trust Company and American Associated Group Ltd.,

oppose Appellant Berto's Emergency Motion to Review Order Denying Motion to

Stay _Ex Parte_ Injunction (the "Motion") for the following reasons:

**Brief Background**

    1.    In our Opposition to the two Appellees' Motions (Werner Batista and

Marcus Berto) to Expedite the Appeal we summarized the events that brought us

RECEIVED, 2/22/2017 3:51 PM, Mary Cay Blanks, Third District Court of Appeal

here. We adopt them here as if set forth *in extenso*[1] and refer the Court to such. We will not therefore repeat them save to state that this case stems out of a highly complex, multi-country, multi-billion dollar investment fraud and that the temporary injunction[2] was entered on the basis of four detailed affidavits running to 88 pages which supported jurisdiction in Florida, showed the overall liability of the conspirator group, and demonstrated a pattern of high velocity transfers suggestive of money laundering and the fraudulent transfer of assets, that was obviously likely to continue, with hundreds of millions of dollars flowing through Miami bank accounts. (These papers have been filed between the aggregate of the Appellants' Appendices).

2.      Two of the prime principals in the fraudulent scheme, Eike Batista and his right-hand-man, Brazilian attorney, Flavio Godinho, have just weeks ago been taken into custody in Brazil on charges of money-laundering, bribery of government officials, and organized crime. Press reports indicated they were looking at decades in prison if convicted.

---

[1] Appellees' Response in Opposition to Appellants' Motions to Expedite Appeal of Ex Parte Injunction, filed on February 20, 2017.

[2] We have in our earlier paper opposing expedition sometimes referred to this as the "preliminary injunction." However, properly termed in Florida State practice it is a "temporary injunction, *See Chevaldina, v. R.K./FL Management,* 133 So. 3d 1086, 1088 n.1 (Fla. 3d DCA 2014).

3.     The Court below was obviously convinced that there was a serious danger of further fraudulent transfers out of Florida by members of the Defendant conspirator group, which consisted of chief executives and directors in Batista's "X" group of companies[3] and close family members, such that it was appropriate to enter a temporary injunction pursuant to Florida's Uniform Fraudulent Transfer Act, Florida Statutes section 726.101, *et seq.* ("FUFTA") on an *ex parte* basis against the group of twenty-two individuals and companies.

4.     One Defendant who left for Florida in the wake of the collapse in Brazil, Marcus Berto, a long-standing Batista confidant and erstwhile CEO of one of the X Companies, Batista's logistics company, LLX, moved for a stay of the injunction in the Court below claiming, without filing any evidence of the fact, that one bank (Bank of America) was overreaching on the injunction and had frozen his joint account with his wife. The motion was heard and denied.

5.     He now asks this Court to review that ruling, claiming, still without filing any evidence, that Citibank, too, has frozen his account and the injunction should be stayed as to him. For the reasons given below, it should also be denied.

### There is no Evidence of Harm from the Injunction to Mr. Berto

---

[3] Batista's companies generally were named using a set of initials signifying the industry concerned and ending in an "X," the multiplication sign, intended to signify the multiplication of wealth. "OGX" was the oil and gas company, "OSX" was the oil ship-building company, "LLX," was the logistics company, and so on.

3

6.     It is incumbent on Mr. Berto, in making such a fact-based application as this, to stay the injunction – which is in effect to lift the injunction pending appeal – to file evidence as to which bank or banks are freezing his accounts and why. However, all he proffers is conclusory averments and argument of counsel without any evidence. This cannot be a basis for decision. *See Russenberger v. Russenberger*, 623 So. 2d 1244, 1245–46 (Fla. 1st DCA 1993) (Court erred in "relying on conclusory allegations and argument of counsel instead of sworn testimony or other evidence" when making determination that an issue in the case was actually in controversy).

7.     In the absence of evidence, for all we know, banks who are limiting Mr. Berto's access to funds may be doing so for reasons other than the injunction. Maybe they have detected other, historical transfers that they are questioning, or perhaps they are reevaluating his accounts in light of what has now come to light about Eike Batista and his associates in light of their "Know Your Customer" rules. In the absence of any evidence, there is no basis for the Court to believe his claim of harm from the temporary injunction and for that reason alone it should be denied.

8.     Furthermore, as even Mr. Berto admits, the two banks he lists are not freezing his money because of what the injunction *says* – because the injunction does not freeze funds – but because these two banks are reading a broader scope of prohibition into it that is just not there. As he states in his motion:

Even though the injunction does not expressly prohibit Berto from dealing with or disposing of any of his assets in the ordinary and proper course of business, the manner in which the banks reasonably have interpreted the injunction has foreclosed Berto's ability to dispose of his assets at all.

Motion p. 7.

9.      The response to that is, first, that it is not a "reasonable interpretation." None of the other banks of any of the other Defendants read it that way and it cannot be read that way.

10.      As we explained at length in our opposition to the motion to expedite,[4] the injunction does not "freeze" anything. It acts only on the Defendants and not on the banks directly. The injunction permits the Defendants to continue to transact whatever financial business they choose in the ordinary course, in any amount (para. 8), specifically authorizes in addition the per capita expenditure of $10,000 per week on living expenses and on any amount in reasonable legal fees (para. 7), and merely requires a Defendant making any single transfer in excess of $10,000 to give five days' notice to the Plaintiffs (para. 8).

11.      The only language affecting banks is the warning in paragraph 6 that persons violating the order may be held in contempt of Court. As regards banks this is a slight risk. Commercial banks do not monitor accounts and run no risk of liability

---

[4] Appellees' Response in Opposition to Appellants' Motions to Expedite Appeal of Ex Parte Injunction, pp. 5-9, filed on February 20, 2017.

on an aiding and abetting basis in the ordinary course. Their only exposure is to possible civil conspiracy liability (an undecided issue) in the event of knowing assistance in a FUFTA violation.[5] Moreover, banks are under no obligation under the injunction to check whether any proposed transfer is permitted or whether the Defendant has given notice of a transfer exceeding $10,000. That obligation is solely on the Defendant account-holder.

12.     Thus, if a bank is truly actually refusing to honor checks or wrongfully refusing to honor other legitimate payment or withdrawal demands then it is wrongful dishonor, giving rise to civil liability to the depositor. In any event, it is not a problem caused by the injunction itself, but rather with Bank of America's erroneous interpretation of the injunction which, despite our urging (further addressed below) the bank refuses to reconsider. But here is where we return to the original question: what are the facts?

_____

[5] "We caution that our answer to the certified question [*i.e.* whether FUFTA creates a cause of action for aiding and abetting a fraudulent transfer when the alleged aider-abettor is not a transferee] in this case is confined to the context of FUFTA. We do not address whether relief is available under any other theory of liability or cause of action. *See e.g. Bankfirst v. UBS Paine Webber, Inc.,* 842 So.2d 155, 157 (Fla. 5th DCA 2003) (Harris, Senior Judge, dissenting) (stating that the non-transferee defendants "devised and implemented a plan by which the debtor was able to transfer his money" and opining, 'I believe BankFirst stated a cause of action for civil conspiracy')." *Freeman v. First Union Nat. Bank,* 865 So. 2d 1272, 1275 n.4 (Fla. 2004).

**Bank of America:**

13.     As far as Bank of America goes, from talking to their counsel – who are cagey as to the details – It seems that there are some three accounts amounting to less than $350,000, and the bank is freezing them. It is not letting Mr. Berto have any money, despite the fact that he is supposed to be able to access his funds in an unlimited amount for "ordinary course" expenses and explicitly $10,000 per week.

14.     The bank has not given us any rational reason for why they are taking that stance. We have told them that we are perfectly happy to join with them in seeking clarification from the trial court that they can make all such payments. They have failed to take us up on that offer. We have also told Mr. Berto's counsel that we stand ready to jointly communicate with the Bank's counsel to resolve any issues. *See* e-mail correspondence with Jose Ferrer of February 15, 2017 at 12:36 pm[6] at Exhibit "A."

15.     Given the sheer number of other Defendants and other possible accounts, we conclude – as may the Court – that this is really just Mr. Berto litigating by proxy for the rest of the defense group, testing the scope of the injunction and trying to create an issue where no valid issue exists.

---

[6] This email predates the hearing before Judge Butchko. Following the hearing, we reiterated our offer to jointly call the bank's counsel to Mr. Berto's counsel and we stand by that offer. *See* email correspondence at Exhibit "B."

16.     We are reinforced in the conclusion by the fact that Werner Batista also apparently banks at Bank of America but has not yet apparently suffered the same treatment as Mr. Berto and therefore has not moved for stay.[7] So the reasons for Mr. Berto's disparate treatment by Bank of America are due nearly entirely, as far as we can tell, to Bank of America's erroneous interpretation of the injunction, or unknown matters personal to Mr. Berto.

17.     And then again, there is the fact that what we know of Mr. Berto's other accounts at other banks does not jibe with what he says.

**Citibank:**

18.     Mr. Berto's counsel writes, "[o]n February 16, 2017, Berto visited a Bank of America branch . . . Thereafter Berto visited a Citibank office. The bank employee who attended Berto informed Berto that his account was frozen and that he would not be able to access the money in the account." *See* Appellant Marcus Berto's Emergency Motion to Review Order Denying Motion to Stay *Ex Parte* Injunction, pp. 3-4.

---

[7] *See* Hearing on Emergency Motion to Stay Pending Appeal of Temporary Injunction Order, February 15, 2017, p. 13 ll. 15-17, Edward Mullins, on behalf of Werner Batista: "My client does bank at Bank of America, and we are concerned that we are going to have the same issue." Apparently no such issue has yet materialized.

19.     We have no doubt that this is what Mr. Berto told his counsel. But there is no affidavit from either Mr. Berto or "the bank employee" at Citibank that this is actually what happened.

20.     The curious thing is, however, that Citibank wrote to us on exactly that day, February 16, 2017, the day that Mr. Berto says he was told that his account was frozen. This was in response to our letter of February 10, 2017, forwarding the injunction and information identifying the Defendants to assist in identifying accounts, and, incidentally pointing out that paragraph 8 permitted all dealing in the ordinary course of business.

21.     Citibank's February 16, 2017 response regarding Mr. Berto was, "[o]nly closed accounts located for the judgment debtor." *See* Exhibit "C," (details of other accountholders redacted to maintain privacy). So which is it, a frozen account or no account at Citibank? Without evidence we cannot tell.

**UBS:**

22.     And then there is at least one bank we know of that Mr. Berto does not mention. Mr. Berto's counsel writes, "Berto's banks have frozen **all** of his bank accounts . . ." *See* Appellant Marcus Berto's Emergency Motion to Review Order Denying Motion to Stay *Ex Parte* Injunction, p. 2 (emphasis added). Bank of America and Citibank are the only ones that have been mentioned. The necessary inference is that there are no accounts at any other banks. Again, we have no doubt

that this is what Mr. Berto told his counsel. But we were told differently by UBS AG ("UBS").

23.     On February 8, 2017, we sent a letter to UBS at 701 Brickell Ave., Suite 3250, Miami, FL 33131, enclosing the FUFTA injunction. Exhibit "D."

24.     Through subsequent phone calls with one Jason Schneider at UBS, we learned that Marcus Berto had an account at UBS in the name of a Florida limited liability company, Cetem, LLC, with an account balance of just over one million dollars (approximately $1,077,000), which was opened in or around 2014. (This was immediately following the collapse of the X Companies).

25.     The information from Mr. Schneider was verbal. The only written response received was a February 10, 2017 thank-you e-mail from Mr. Schneider acknowledging the receipt of confirmatory written identification material for Mr. Berto sent to him earlier that day. *See* Exhibit "E." There was no indication from UBS, written or verbal, that the account had been frozen.

26.     We are not in a position to file sworn evidence from UBS on this expedited briefing, but if Mr. Berto challenges the point, we would be happy to request such from UBS should the Court so require.

27.     More to the point, it is Mr. Berto's complete failure of evidence that is the issue, rather than what little is available to us to gainsay hearsay-based argument from his counsel at this early, pre-discovery stage in the case.

28.     The fact is that Mr. Berto had the ability to set forth candidly, in detail, how many bank accounts there are, held in what names (individual, corporate or trust), at how many banks, at what branches, what the balances are, what amounts he had tried to transfer, for what purpose, and the exact reason given to him by persons in authority at such banks why they were refusing to honor his requests, if that were the case.

29.     He has, however, completely failed to submit any evidence whatsoever of that sort or that the pendency of the injunction is causing him any harm, and on that basis alone his request for stay should be refused.

**Mr. Berto Has Failed to Carry his Burden as to Reversal of the Injunction**

30.     Under the procedure for *ex parte Mareva* injunctions in the British system, such as applied to the Cayman Worldwide Freezing Order, applicants are required to present evidence making out a "good arguable case" for an injunction. In addition, they must give "full and frank disclosure" of all facts and law that they know of which the respondents might have raised in defense had they been personally present to argue the point. Failure to do so can vacate the entire injunction, regardless of whether disclosure would have changed the outcome, and result in substantial costs (fees) penalties.

31.     The eventual stack of evidence proffered to the Cayman court in order to satisfy these *ex parte* standards took many months of work to assemble and was close to four feet high.

32.     The subset proffered to the Florida court in support of the FUFTA injunction included 88 pages of evidence culled from that stack (affidavits of the plaintiff trustee and corporation, and their Florida investment adviser on the false representations, plus a lengthy and detailed affidavit from an oil industry expert that the oil exploration scheme was a fraud, and known to be so by insiders and control persons of companies in the scheme by, at the latest, sometime in 2012), plus a summary affidavit by the forensic accounting expert (condensing the relevant information from several much longer affidavits presented abroad) as to the hundreds of millions of dollars in high-velocity, high dollar volume transfers that flowed through Defense group-member-controlled Miami bank accounts ,and his own conclusions that this had all the hallmarks of a massive fraudulent scheme.

33.     There was plenty in the evidence the lower court to decide, in the exercise of her broad discretion, that Mr. Berto, who was a CEO of an X Company, who resigned just ahead of the collapse and left Brazil for Florida, where he took up residence in a Key Biscayne mansion, that he should be held subject to the slight restraints of a FUFTA injunction – which ultimately amounts to no more than a

threat of contempt if he should break the law, and has no "bite" unless the person bound *intends* to break the law and actually does so.

34.     Contrary to his protestations, Mr. Berto is highly unlikely to prevail in this appeal, carrying his very high burden of demonstrating that the lower Court abused its discretion in entering such a preliminary injunction against him, abused its discretion in refusing him a stay, that irreparable harm will be caused to him if the stay is not granted, or that lifting the injunction would be in the public interest. *See e.g. Lampert-Sacher v. Sacher*, 120 So.3d 667, 668 (Fla. 1st DCA 2013); *Wise v. Schmidek*, 649 So. 2d 336, 337 (Fla. 3d DCA 1995) (in affirming entry of *ex parte* temporary injunction "freezing certain trust assets pending" outcome of a probate proceeding, Third DCA stated "the trial court may exercise broad discretion in granting, denying, dissolving, or modifying injunctions, and unless a clear abuse of discretion is demonstrated, this court will not disturb the trial court's decision").

35.     Mr. Berto argues – entirely on the basis of non-FUFTA cases – the general principle that no injunction may be entered where relief may be given by money damages. However, all general principles yield to such explicit broad statutory grants of power, as are stated in FUFTA itself.[8] Mr. Berto's construction

---

   [8] "The applicable statutory provisions in this area of the law are exceedingly clear. A "creditor" who possesses a "claim" may seek a number of remedies to prevent the fraudulent transfer of assets. Among the remedies are avoidance of the transfer, attachment, an injunction, appointment of a receiver, and "any other relief the

would contradict what the Florida Supreme Court terms the "exceedingly clear" wording of FUFTA that all remedies, including injunctive relief, are available and impermissibly render the statute a dead letter.

36.     Moreover, a FUFTA injunction is not in lieu of damages, but constitutes relief auxiliary to an eventual award of damages by restraining breaches of the law intended to fraudulently avoid paying damages. A FUFTA injunction does not fall afoul of the "no injunction where damages will suffice rule," because an underlying premise of that very rule is that assets to satisfy a judgment will not be fraudulently transferred out of the jurisdiction ahead of judgment. To ensure that the laws are followed, the broad injunctive and other remedies of FUFTA lie.

37.     Berto again cites a number of non-FUFTA cases that stand for the proposition that pre-judgment asset freezes are generally impermissible and against public policy in Florida. *See* Motion, p. 6. This is true as far as it goes, but only where FUFTA is not involved.

_____

circumstances may require." Fla. Stat. § 726.108(1)(b). *Friedman v. Heart Institute of Port St. Lucie, Inc.*, 863 So.2d 189, 192 (Fla. 2003). The injunction may be "against further disposition by the debtor or a transferee, or both, of the asset transferred *or of other property*." Fla. Stat. § 726.108(1)(c)1. Finally, a "transfer" "*includes payment of money*." Fla. Stat. § 726.102(14). FUFTA has thus plainly varied the common law to permit the enjoining of transfers of money.

38.     The first point to be made here - as pointed out in our recent opposition to expedite, to which we refer the court[9] - this injunction is not a "freezing order." It "freezes" nothing. It is not a "dam" preventing the onward flow of funds. It is a "net," which allows the onward flow of legal transfers, regardless of amount or purpose, and restrains only illegal transfers. And it does that not by "freezing" any particular account or transaction, but by acting on the conscience of the Defendant and notifying him that illegal transfers will incur the wrath of the Court - and hurt his pocketbook.

39.     True freezing orders – akin to the broad *Mareva* injunctions common in English law, which are a post 1975 development – were not recognized as an organic part of the powers of English courts of equity when the U.S. gained independence, and therefore there is no such *inherent* power within federal equity jurisdiction. The ruling case here is *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999). It would follow that such would be the State rule, too.

40.     However, *Grupo Mexicano* was not a fraudulent transfer case and as Justice Scalia writing for the majority made clear, he was not addressing the situation

---

[9] Appellee's Opposition to Motions to Expedite Appeal, pp. 5-9., filed February 2017.

under State fraudulent transfer statutes,[10] which accord their courts explicit injunctive powers which the federal courts do not possess, which is the situation here.

41.     Cases such as those Mr. Berto cites, expressing the general rule as to the inherent scope of equitable jurisdiction outside FUFTA, such as *Weinstein v. Aisenberg*, 758 So. 2d 705 (Fla. 3d DCA 2000), fall in line with the *Grupo Mexicano* analysis and have no application when relief under FUFTA is sought. To the contrary of Mr. Berto's assertion, the public policy of Florida as declared in its fraudulent transfer legislation is very much to restrain the fraudulent transfers of assets intended to avoid the payment of eventual Florida judgments.

42.     FUFTA has a long pedigree and is the modern version of the Fraudulent Conveyances Act of 1571, originally received into Florida jurisprudence in 1829 as part of its fundamental legal and equitable scheme by Florida's reception statute, Fla. Stat. § 2.01. It went through several revisions over the years before finding

-----

[10] *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 324 n.7 (1999): "Several States have adopted the Uniform Fraudulent Conveyance Act (or its successor the Uniform Fraudulent Transfers Act), which has been interpreted as conferring on a nonjudgment creditor the right to bring a fraudulent conveyance claim. *See* generally P. Alces, Law of Fraudulent Transactions ~ 5.04[3], p. 5-116 (1989). Insofar as Rule 18(b) applies to such an action, the state statute eliminating the need for a judgment may have altered the common-law rule that a general contract creditor has no interest in his debtor's property. Because this case does not involve a claim of fraudulent conveyance, we express no opinion on the point."

expression in its current form and is a conventional basis for injunctive relief in Florida and many other States.

43.     Preventing fraudulent transfers was, thus, the declared law of England and Wales as of 1571, had been public policy for over two hundred years in the Mother Country by the time of the U.S. revolution, and became the declared law of Florida, and therefore the public policy of Florida, in its earliest days, in 1829 when Florida was still a Territory, and has now been domestic Florida public policy for close to two hundred years. FUFTA injunctions are clearly reflective of Florida public policy and Mr. Berto therefore fails to carry the public policy point.

44.     Mr. Berto argues that we "admit" that we cannot tie him in to the fraudulent scheme or the need for relief. *See* Motion p. 6. This is incorrect. What we actually said in our motion for injunction was:

> What we are stating here is before discovery. At this early stage we are unable to draw *all* the ***conclusive*** lines of guilt that tie all the companies and individuals to the scheme. But there is nevertheless a substantial basis to believe that all the Defendants - Batista, his family members, his wholly-owned and controlled companies, and the top executives in the companies that conducted the fraudulent scheme - were intimately involved in either the fraudulent scheme or the fraudulent dissipation of assets, or both. Further, abundant evidence exists of there being substantial assets in Florida and abundant reason to believe that such assets will be moved out of Florida pending judgment.

(Emphasis added)

45.     What was evident at that time of the motion was that Berto was at the relevant time a control person, the CEO of LLX, an insider at the apex of an X

17

company, who moved to Florida from Brazil immediately after the collapse. There was also extensive evidence that Eike Batista and his co-conspirators – which would include all such top, controlling insiders at the X Companies – were complicit in the fraud and would necessarily have been privy to and helped enable massive transfers of money in high-velocity international transactions to secrecy jurisdictions. And it was therefore a permissible inference from all the evidence that Marcus Berto should be subject to the temporary injunction until further hearing.

46.     Mr. Berto also argues that the injunction lacks a recital of what, specifically, in the great mass of evidence presented, which is all to one end and indicates complicity, the Court considered to be the evidentiary underlay for its conclusions that an ex parte temporary injunction was appropriate when it stated that the Plaintiffs had carried their required burdens under the appropriate statutes and rules against the individually listed Defendants. He contends that this is a fatal flaw. However, that is very far from true.

47.     The motion presenting the reasons and attaching some of the evidence for the temporary injunction ran to 125 pages, with exhibits. The other supporting documents presented included the 97-page complaint, and 88 pages of factual and expert affidavit evidence addressing the underlying fraud, asset dissipation, the pattern of high-volume, high velocity, international money-movements, and documents evidencing the background to the action such as the Cayman WFO, the

underlying Cayman reasons for judgment, and press articles on Batista's flight and imprisonment. This was clearly a proper basis for the entry of a temporary injunction against all those reasonably believed to be within the likely insider-control co-conspirator group, which includes Mr. Berto.

48.     The law is, "[a] trial court has wide discretion to grant or deny a temporary injunction and an appellate court will not interfere with the exercise of such discretion unless the party challenging the grant or denial *clearly shows an abuse of that discretion.*" *Perry & Co. v. First Sec. Ins. Underwriters, Inc.*, 654 So. 2d 671, 671 (Fla. 3d DCA 1995). (Emphasis added). Mr. Berto's objection that the factual bases for the order as found in the evidence were not recited in the order, is a very far cry from saying that such evidence does not actually exist in the extensive record underlying the injunction, or that the injunction itself is not supportable from the evidence under the applicable, very broad "abuse of discretion" standard and he makes no attempt to give reasons from the evidence why he should be singled out for exception.

49.     We would argue in our eventual brief that a Court sitting in its equity jurisdiction, acting in a complex matter, where there is good cause for expedition, where the real world impact of the injunction sought is slight as regards any person who intended to obey the law, and where compilation of a statement of the findings of facts would delay issuance of the order and tend to conduce to the harm feared,

has the power to *defer* the preparation of such extensive reasons until later and that such would be in the public interest.

50.   And such could have been supplied by the lower court, shortly after issuance of the injunction if Mr. Berto had made that exact point to the lower tribunal instead of filing a notice of appeal in order to take the paper point and avoid engaging on the merits, thus depriving the lower tribunal the opportunity of amending its order.

51.   We suggest that in all the circumstances, the likely outcome of this appeal is that the lower court will be held not to have abused its discretion in entering the injunction, which will be affirmed as being amply grounded in evidence sufficient to justify its entry, but that the cause be remanded for the insertion of a statement of facts. Courts routinely enter such orders where the evidentiary basis appears to exist for the order but the recitation of facts relied on is lacking.

52.   The obvious reason for acting *ex parte*, that advising of the intent to seek such an injunction to any member of the defense group would have risked its communication to the rest of the group and the immediate flight of all Florida assets, could be inserted at the same time. *See e.g. Univ. Medical Clinics, Inc. v. Quality Health Plans, Inc.,* 51 So. 3d 1191, 1195 (Fla. 4th DCA 2011) (Temporary injunction affirmed on the sufficiency of the evidence but remanded with instructions to enter required factual findings); *Randolph v. Antioch Farms Feed &*

*Grain Corp.*, 903 So. 2d 384, 385 (Fla. 2d DCA 2005) (Temporary injunction affirmed but remanded for trial court to enter order setting forth required factual findings and to set a bond after taking evidence as to appropriate amount); *Santos v. Tampa Medical Supply*, 857 So. 2d 315, 317 (Fla. 2d DCA 2003) (Temporary injunction affirmed on the sufficiency of the evidence but remanded with instructions to enter required factual findings and to set a bond after taking evidence as to appropriate amount); *Richard v. Behavioral Healthcare Options, Inc.*, 647 So. 2d 976, 979 (Fla. 2d DCA 1994) (Temporary injunction affirmed but remanded for trial court to enter order setting forth required factual findings and to set a bond after evidentiary hearing).

53.     In order to prevail on his motion, Mr. Berto must show this Court that the Court below abused its discretion in refusing him a stay, a likelihood of prevailing on appeal, irreparable harm to him if the stay is not granted, or a showing that a stay would be in the public interest. *See e.g. Lampert-Sacher v. Sacher*, 120 So.3d 667, 668 (Fla. 1st DCA 2013). He has failed to make a showing in any such regard.

## Conclusion

54.     In conclusion, we return to the initial point. Mr. Berto filed his emergency motion in the lower court, unsupported by any evidence of actual harm, on February 15, 2017 at 12:02 p.m., fully cognizant of the fact that the relief that he

was requesting, if granted as to him and extended as blanket relief to other Defendants (as counsel for Mr. Werner Batista, who joined in Mr. Berto's motion, urged on behalf of his client), would allow every Defendant as to whom the injunction was stayed – i.e. effectively lifted – to empty their Florida accounts and fraudulently transfer their assets abroad, free from the threat of contempt. The motion was promptly heard and – understandably – denied approximately 3 hours later.

55.    Mr. Berto's showing here on appeal is actually worse, since the few days allowed to us to respond on the stay issue rather than the few hours accorded us in the court below, have allowed us to formulate serious challenges to Mr. Berto's veracity as to whether he is truly being affected by the order at all, or whether it is a set-up. Even so, the best he can do is argue that his accounts are being affected by an erroneous and overbroad reading of the order and not the terms of the order itself. The fact is that still, in this Court, Mr. Berto's Motion for Stay falls at the first fence: the failure to show any sworn evidence of harm as a result of the order. The motion for stay should be denied.

Respectfully submitted.

ABALLI MILNE KALIL, P.A.
*Attorneys for Appellees*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

s/ *Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
hmilne@aballi.com
Craig P. Kalil
Florida Bar No.: 607282
ckalil@aballi.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished on this 22nd day of February, 2017 to the individuals listed below via e-mail.

s/ *Hendrik G. Milne*
Hendrik G. Milne

| | |
|---|---|
| Edward M. Mullins, Esq.<br>emullins@astidavis.com<br>Ana M. Barton, Esq.<br>abarton@astidavis.com<br>bhernandez@astidavis.com<br>ASTIGARRAGA DAVIS MULLINS &<br>GROSSMAN, P.A.<br>*Attorneys for Werner Batista*<br>1001 Brickell Bay Drive, 9th Floor<br>Miami, Florida 33131 | Jose M. Ferrer, Esq.<br>jferrer@bilzin.com<br>Yasmin Fernandez-Acuna, Esq.<br>yfernandez-acuna@bilzin.com<br>eservice@bilzin.com<br>BILZIN SUMBERG BAENA PRICE<br>& AXELROD LLP<br>*Attorneys for Marcus Berto*<br>1450 Brickell Avenue, Suite 2300<br>Miami, FL 33131-3456 |

# EXHIBIT "A"

**CRAIG P. KALIL, ESQ.** | ATTORNEY | T: 305.372.5924 | F: 305.373.7929 | ckalil@aballi.com

**ABALLI MILNE KALIL, P.A.** | WWW.ABALLI.COM | 2250 SUNTRUST INTERNATIONAL CENTER, ONE SOUTHEAST THIRD AVENUE | MIAMI, FL 33131

CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:
THIS E-MAIL AND ANY ATTACHMENTS ARE CONFIDENTIAL AND PRIVILEGED, AND ARE PROTECTED FROM DISCLOSURE BY LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE BE THAT ANY VIEWING, COPYING, DISSEMINATION, TRANSMITTAL, DISSEMINATION OR OTHER USE OF THIS E-MAIL AND ACTIONS ARE STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR PLEASE IMMEDIATELY REPLY TO ADVISE IDENTIFIED BELOW OR DELETE THIS E-MAIL AND ANY COPIES FROM YOUR SYSTEM.

LA INFORMACIÓN CONTENIDA EN ESTE E-MAIL ES CONFIDENCIAL, PRIVILEGIADA Y ESTÁ PROTEGIDA DE LA DIVULGACIÓN POR LA LEY. SI USTED NO ES EL DESTINATARIO, INTENCIONAL DE ESTE E-MAIL, POR FAVOR ADVIERTA QUE CUALQUIER VISUALIZACIÓN, REPRODUCCIÓN, DIVULGACIÓN, TRANSMISIÓN O OTRO USO DE ESTE E-MAIL Y CUALQUIER ACCIÓN ESTÁN ESTRICTAMENTE PROHIBIDOS. SI USTED HA RECIBIDO ESTE E-MAIL POR ERROR, POR FAVOR RESPONDA Y ENVÍE UN MENSAJE AL REMITENTE. SI ESTE CORREO ELECTRÓNICO HA SIDO RECIBIDO POR ERROR A LA PERSONA EQUIVOCADA CON EL FIN DE ADVERTIR QUE LOS DESTINATARIOS DE ESTA DESCARGA Y CUALQUIER ACCIÓN ESTÁN ESTRICTAMENTE PROHIBIDOS. SI HA RECIBIDO ESTE E-MAIL, REGLAMENTO DE LA TEMPORAL DE LOS ESTADOS UNIDOS, QUE SE QUIERA BIEN LA PRÁCTICA TRIBUTARIA Y SE NINGUNA MANERA SE DEBE INTERPRETAR COMO QUE EL ASESORAMIENTO FISCAL DE LAS CONSULTAS DE CUALQUIER ASUNTOS CON LOS DESTINATARIOS DE ALGÚN CONTEXTO.

 Please consider the environment before printing this email.

**From:** José M. Ferrer [mailto:JFerrer@bilzin.com]
**Sent:** Wednesday, February 15, 2017 12:56 PM
**To:** Kalil, Craig
**Subject:** RE: Meridian V Batista - Your emergency motion identifying an issue with a bank.

Craig, many thanks for your call and email. The banks Mr. Berto is having an issue with are Citibank and Bank of America. We've tried getting through to someone at the banks that could help us, but have been unable to do so.

In any event, I have reached out to Judge Butchko's chambers for an emergency setting, and will let you know the minute we hear back from her. Thanks again.

---

◌ Bilzin Sumberg

José M. Ferrer
Attorney at Law
**Bilzin Sumberg Baena Price & Axelrod LLP**
1450 Brickell Avenue, 23rd Floor                    Tel 305.350.7210
Miami, Florida 33131                          Direct Fax 305.351.2234
www.bilzin.com                                    JFerrer@bilzin.com

---

**From:** Kalil, Craig [mailto:CKalil@aballi.com]
**Sent:** Wednesday, February 15, 2017 12:36 PM
**To:** José M. Ferrer
**Subject:** Meridian V Batista - Your emergency motion identifying an issue with a bank.

Dear Jose:

I just read your emergency motion stating that a bank is refusing to honor payments under $10,000.

That is the first I had heard of the issue, having not heard from you previously on the point.

I tried calling you a minute ago and left you a voice mail message.

In case this e-mail reaches you faster, let me reiterate what I said in the call.

We are surprised that any bank is not allowing ordinary course payments as the order expressly permits those.

If you wish to call me I will be pleased to get on the phone with the bank and you immediately to address the issue.

Do let me know if that make sense to you.

Craig

**CRAIG P. KALIL, ESQ.** | ATTORNEY | T: 305.372.5924 | F: 305.373.7929 | ckalil@aballi.com

**ABALLI MILNE KALIL, P.A.** | WWW.ABALLI.COM | 2250 SUNTRUST INTERNATIONAL CENTER, ONE SOUTHEAST THIRD AVENUE | MIAMI, FL 33131

CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:

THIS E-MAIL AND ANY ATTACHMENTS ARE CONFIDENTIAL AND PRIVILEGED, AND ARE INTENDED TO BE SEEN ONLY BY THE ADDRESSEE. IF YOU ARE NOT THE INTENDED RECIPIENT, BE ADVISED THAT ANY VIEWING, COPYING, FORWARDING, TRANSMITTAL, DISSEMINATION OR OTHER USE OF THIS E-MAIL AND ATTACHMENTS IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE IMMEDIATELY RESPOND TO SENDER IDENTIFIED BELOW AND DELETE THIS E-MAIL AND ANY COPIES FROM YOUR SYSTEM.

LA INFORMACIÓN CONTENIDA EN ESTE E-MAIL ES CONFIDENCIAL, PRIVILEGIADA Y ESTA DIRIGIDA EXCLUSIVAMENTE A SU DESTINATARIO. CUALQUIER REVISIÓN, EMPLEO, DISTRIBUCIÓN O COPIA DE ESTE MENSAJE ESTA PROHIBIDA. SI USTED HA RECIBIDO ESTE E-MAIL POR ERROR, POR FAVOR BÓRRELO Y ENVÍE UN MENSAJE AL REMITENTE. SI ESTE CORREO ELECTRÓNICO FUE INTENCIONADO PARA SU TRANSMISIÓN A UN CLIENTE O EN BÚSQUEDA DE ASESORÍA LEGAL, ES POSIBLE QUE ESTA AMPARADO POR LA GARANTÍA PARA ESTAR AISLADA QUE EXISTA ENTRE UN PROFESIONAL Y SU CLIENTE. POR CONSIGUIENTE, SU DIVULGACIÓN ESTA PROHIBIDA. LA ADVERTENCIA ANTERIOR HACE ALUSIÓN SEGÚN EL REGLAMENTO DE LA ELABORACIÓN DE LOS ESTADOS UNIDOS, QUE EN LO QUE HACE A LA PRÁCTICA TRIBUTARIA Y DE EVITAR LA MANERA EL QUE EVITAR ESTAR CON LO QUE EL AMONESTAMIENTO ORETEANDO LAS CONTRIBUCIONES TRIBUTARIAS, SON DEPICIENTES EN ALGÚN CONCEPTO.)

 Please consider the environment before printing this email.

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in this message. If you have received this message in error, please advise the sender by reply e-mail or reply to info@bilzin.com, and delete the message. Thank you very much.

# EXHIBIT "B"

**Rivero, Tania**

| | |
|---|---|
| **From:** | Kalil, Craig |
| **Sent:** | Thursday, February 16, 2017 7:16 PM |
| **To:** | José M. Ferrer; Edward Mullins |
| **Cc:** | Yasmin Fernandez-Acuña; Ana Barton |
| **Subject:** | RE: Meridian V Batista |

Dear Jose:

I am concerned about the approach you have taken with Bank of America, which is materially different from what I offered.

My suggestion and offer was for you and me to jointly reach out to any institution that may be misapplying the Court order.  Clearly I was intending that we would reach out to the legal department where these matters are handled, and not to a branch, which does not have authority to make policy.

In my experience, and I would be surprised if your experience is any different, if a court order comes to a bank's attention, the legal department determines what must be done to comply and branches simply follow those instructions.  Changes are also made only through the legal departments.

I do not believe that asking your client to try to force the issue in a branch and asking a branch employee to call my office out of the blue was designed to have any success.

I note, for example that at the time my office received a call, I was not in the office and a talented, but  first year, lawyer fielded the call with no warning and tried his best to address the situation without the benefit of having anyone from the institution's legal department on the line.

Needless to say, I would not expect anyone from a branch to make a change in implementation of a policy set by the legal department without first running the matter by their legal department.

I have no knowledge of whether the legal department has yet to be consulted by the branch, much less to have responded.  Have you been able to make such inquiries?

I remain willing to work with you, if you will contact me and allow the process to be done through proper channels.  I do not consider random and uncoordinated calls from a branch to be the proper method.

You are free to address this matter how you see fit, but I would suggest that if you are unwilling to take my offer as intended, then you may wish to contact the legal department of the only institution that you have identified as misinterpreting the Court order and remind them of their obligations under your client's deposit relationship and explain the order to someone capable of correcting the problem.

In the meantime, please advise us when we may take the deposition of your client to establish the facts as to his interactions with Bank of America as well as any other institutions covered by the order.

Best regards,

Craig

**CRAIG P. KALIL, ESQ.** | ATTORNEY | T: 305.372.5924 | F: 305.373.7929 | ckalil@aballi.com

**ABALLI MILNE KALIL, P.A.** | WWW.ABALLI.COM | 2250 SUNTRUST INTERNATIONAL CENTER, ONE SOUTHEAST THIRD AVENUE | MIAMI, FL 33131

CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:

THIS E-MAIL AND ANY ATTACHMENTS ARE CONFIDENTIAL AND PRIVILEGED, AND ARE PROTECTED FROM DISCLOSURE BY LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, BE ADVISED THAT ANY VIEWING, COPYING, DISCLOSURE, TRANSMITTAL, DISSEMINATION OR COPYING OF THESE E-MAIL AND ATTACHMENTS IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR PLEASE DELETE THE SAME AND INFORM US OF SUCH ERROR BY RETURN E-MAIL OR DELETE THESE MAIL AND ANY COPY THEREOF FROM YOUR SYSTEM.

LA INFORMACION CONTENIDA EN ESTE E-MAIL Y SUS ADJUNTOS, ES PRIVILEGIADA Y CONFIDENCIAL Y ESTA PROTEGIDA A SU DIVULGACION POR LEY. SI USTED NO ES EL DESTINATARIO DE ESTE MENSAJE ESTA PROHIBIDA SI USTED HA RECIBIDO ESTE E-MAIL POR ERROR, POR FAVOR BORRELO Y ENVIE UN MENSAJE AL REMITENTE. SI ESTE COMMO ELECTRONICO CON SUS ADJUNTOS(S) ESTA PROHIBIDO TODA SU DIVULGACION, DISTRIBUCION O COPIA DE ESTE MENSAJE ESTA PROHIBIDA SI USTED HA RECIBIDO ESTE E-MAIL POR ERROR, POR FAVOR BORRELO Y ENVIE UN MENSAJE AL REMITENTE. SI ESTE ES EL CASO DE ELECTRONICO CON SUS ADJUNTOS.

 Please consider the environment before printing this email.

**From:** José M. Ferrer [mailto:JFerrer@bilzin.com]
**Sent:** Thursday, February 16, 2017 4:40 PM
**To:** Kalil, Craig; Edward Mullins
**Cc:** Yasmin Fernandez-Acuña; Ana Barton
**Subject:** RE: Meridian V Batista

Craig,

Following your kind offer below, I instructed my client to visit his bank officer at each respective bank, and to have that bank officer call your office to clarify the limits of the injunction.

My client just went to Bank of America again to discuss the freeze on his account. The bank officer called your office to make sure he could withdraw at least $10,000, and spoke with Matthew Deblinger. Mr. Deblinger apparently attempted to clarify the injunction's meaning. Despite his attempts at clarification, Bank of America has refused to lift the freeze on Mr. Berto's accounts.

Thus, notwithstanding your willingness to help, it seems the banks are unwilling to lift the freeze, and we have no choice but to seek relief before the Third.

Many thanks,

꙰ Bilzin Sumberg

José M. Ferrer
Attorney at Law
**Bilzin Sumberg Baena Price & Axelrod LLP**
1450 Brickell Avenue, 23rd Floor                Tel 305.350.7210
Miami, Florida 33131                    Direct Fax 305.351.2234
www.bilzin.com                           JFerrer@bilzin.com

**From:** Kalil, Craig [mailto:CKalil@aballi.com]
**Sent:** Wednesday, February 15, 2017 3:09 PM
**To:** José M. Ferrer; Edward Mullins
**Cc:** Yasmin Fernandez-Acuña; Ana Barton
**Subject:** Meridian V Batista

Counsel:

Notwithstanding the Court's ruling on today's motion, we reiterate our willingness to jointly reach out with you to any bank or institution that may be overreaching, to clarify the proper limits of the injunction.

If you wish to do so please let us know.

**CRAIG P. KALIL, ESQ.** | ATTORNEY | T: 305.372.5924 | F: 305.373.7929 | ckalil@aballi.com

**ABALLI MILNE KALIL, P.A.** | WWW.ABALLI.COM | 2250 SUNTRUST INTERNATIONAL CENTER, ONE SOUTHEAST THIRD AVENUE | MIAMI, FL 33131

CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:

THIS E-MAIL AND ANY ATTACHMENTS ARE CONFIDENTIAL, AND PRIVILEGED, AND ARE PROTECTED FROM DISCLOSURE BY LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, BE ADVISED THAT ANY VIEWING, COPYING, DOWNLOADING, TRANSMITTAL, DISSEMINATION OR OTHER USE OF THIS E-MAIL AND/OR ANY IDENTITY IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR PLEASE IMMEDIATELY RESPOND TO SENDER IDENTIFIED BELOW AND DELETE THIS E-MAIL AND/OR ANY COPIES FROM YOUR SYSTEM.

LA INFORMACIÓN CONTENIDA EN ESTE E-MAIL ES CONFIDENCIAL, PRIVILEGIADA Y ESTÁ DIRIGIDA ÚNICAMENTE A SU DESTINATARIO. CUALQUIER REVISIÓN, COPIADO, DISTRIBUCIÓN O COPIA DE ESTE MENSAJE ESTÁ PROHIBIDA. SI USTED HA RECIBIDO ESTE E-MAIL POR ERROR, POR FAVOR NOTIFIQUE Y ENVÍE UN MENSAJE AL REMITENTE DE ESTE CORREO ELECTRÓNICO CONTESTE ESTE MENSAJE POR INMEDIATO, ES TAN ASEGURÁNDOSE DE BORRAR CON LA CONFIDENCIAR QUE SE ATA USTED NINGUNA MANERA LO DE ILUSTRAR LA INFORMACIÓN. SI LA ADVERTENCIA ANTERIOR SE HACE PUES SI ES, HACE AMENTE DE LA TERMINA DE LOS ESTADOS UNIDOS, QUE EL CUESTIÓN ES LA CONTESTA UNIDOS EL DE LA CONFIDENCIAR. Y DE NINGUNA MANERA SE DEBE ENTERIO ESTA CONO QUE EL ABIERTA AL ESTA PESTICIDAD LAS COPIAS UNIÓN DE LA ADQUISICIÓN DE LA QUE ABIERTA DE LA TENIDA EN QUE SE HA DE LOS ESTADOS UNIDOS, QUE SE MANERA RULE.

 Please consider the environment before printing this email.

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in this message. If you have received this message in error, please advise the sender by reply e-mail or reply to info@bilzin.com, and delete the message. Thank you very much.

# EXHIBIT "C"



Citigroup Management Corp.
Legal Operations (Texas)
100 Citibank Drive
San Antonio, TX 78245-3214

FEBRUARY 16, 2017

ABALLI MILNE KALIL, P.A.
2250 SUNTRUST INTERNATIONAL CENTER
ONE SOUTHEAST THIRD AVENUE
MIAMI, FL 33131

REFERENCE#   LSI-02152017-4232870  MIAMI-DADE COURT CASE NO: 2017-00104-CA-01 (43)

Dear Sir/Madam:

I am authorized to provide the following information on behalf of Citibank, N.A, in response to the attached service.

☐ No accounts located for the judgment debtor .

☒ Only closed accounts located for the judgment debtor.

☐ Pursuant to applicable State and/or Federal law, the balance(s) in the account(s) located is exempt from garnishment.

☐ Missing Exemption Notice and/or Claim Form, service rendered void.

☐ Service is not addressed to Citibank, N.A.

☐ Additional identifying information pertaining to the judgment debtor required to conduct a more thorough search of our records.

☐ It is Citibank's position that the New York Civil Practice Law & Rules Section 5222, Sub-Division C, Leave of Court is required to serve more than one restraining notice upon the same Garnishee with respect to the same judgment.

☐ Other

Please note that answers to Information Subpoenas may be sent under separate cover.

Should you have any questions please contact our Legal Operations Escalation line at (866)-582-6249.

Please forward any written replies to:

Citibank, N.A.
c/o Legal Services Intake Unit
701 E. 60th St., N.
Mail Code 1251
Sioux Falls, SD  57117

Sincerely,

*Gabriela Montanez*

Citibank, Legal Operation

Citigroup Management Corp. provides servicing for Citibank, N.A.,
Citibank F.S.B., and Citibank Texas, N.A.

02/15/2017  13:29     3053737929              ABALLI MILNE KALIL                    PAGE  02/05

**Aballi**
**Milne**
**Kalil, P.A.**
Counsellors at Law

February 10, 2017

CONFIDENTIAL

RE: Miami-Dade Circuit Court Case No: 2017-001040-CA-01 (43)

Dear Sir or Madam:

This letter is in reference to Judge Beatrice Butchko's February 2, 2017 Injunction Under Florida's Uniform Fraudulent Transfer Act (the "Order") in the Miami-Dade Circuit Court, a copy of which has already been provided to you.

In order to assist you in properly identifying only the accounts related to the Enjoined Defendants, please find below the personal identification information that we have in our possession for each Enjoined Defendant to the Order (i.e. date of birth, known addresses, known Brazilian identification numbers).

Please note that the majority of the individual defendants are Brazilian citizens and do not possess United States social security numbers or tax ID information.

Additionally, please note that per paragraph 8 of the Order, the Order does not prohibit any Enjoined Defendant from dealing with or disposing of any of their assets in the ordinary and proper course of business, provided that the Enjoined Defendants shall notify the Plaintiff's attorneys five (5) business days in advance of any such dealing or disposal worth more than $10,000 so as to afford the Plaintiffs a reasonable opportunity to apply for further relief from the Court.

Very truly yours,

Craig P. Kalil

CPK/mc

2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Telephone (305) 373-6600
Fax (305) 373-7929
www.aballi.com

February 10, 2017
Page: 2

<u>Defendants</u>

1. Eike Batista



2. Paulo Gouvea

3. Flavio Godinho

4. Paulo Mendonca

5. Lutz Carneiro

February 10, 2017
Page: 3

**6. Thor Batista (Thor de Oliveira Furlchen Batista)**



**7. Olln Batista**



**8. Luma de Oliveira**



**9. Flavia Sampaio**



**10. Aziz Ben Ammar**



02/15/2017  13:29   3053737929          ABALLI MILNE KALIL          PAGE  05/06

February 10, 2017
Page: 4

11. Marcus Berto
DOB: unknown
Nationality: Brazilian
SSN: ▮▮▮▮
Residency: Florida
Passport number: ▮▮▮▮
Known Address: ▮▮▮▮

12. Werner Batista

13. EBX Capital Partners

14. EBX Holding Ltda.

15. EBX International S.A.

15. EBX Investment Funds, LLC
(Please disregard a search on this entity)

16. Centennial Asset Brazilian Equity Fund LLC

17. Centennial Asset Mining Fund, LLC

February 10, 2017
Page: 5

18. 63X Master Fund



19. 63X Fund

20. 63X Investments Ltd.

20. Thorquel Fund

21. Thorque Investment Management Ltd.

# EXHIBIT "D"

**Aballí
Milne
Kalil, P.A.**
Counsellors at Law

February 8, 2017

**Personal and Confidential
Via FedEx**

UBS Ag
Legal/Compliance Department
701 Brickell Ave. Suite 3250
Miami, FL 33131

Re: **Injunction Order, Meridian, et al. v. Eike Batista, Werner Batista, Thor
Batista, et al.; Miami-Dade County Civil Court Case No. 17-001040-CA-01 (43)**

Dear Sir or Madame:

Attached is an order of Injunction Under Florida's Uniform Fraudulent Transfer Act (the
"Order") entered on February 2, 2017, in the above-referenced case. This order pertains to
accounts for Mr. Eike Batista, Mr. Werner Batista, Mr. Thor Batista, Mr. Paulo Mendonca, Mr.
Flavio Godinho, Mr. Paulo Gouvea, Mr. Marcus Berto, Mr. Luiz Carneiro, Mr. Aziz Ben Ammar,
63X Investments Ltd., 63X Master Fund, 63X Fund, EBX Holding Ltda., EBX International, S.A.,
EBX Capital Partners, Centennial Asset Mining Fund, LLC, Centennial Asset Brazilian Equity
Fund LLC, Thorquel Fund Ltd., Thorque Investment Management Ltd., Mr. Olin Batista, Ms.
Flavia Sampaio, and Ms. Luma de Oliveira ("Enjoined Defendants").

Under the terms of the Order, the Enjoined Defendants may not remove from Florida any
of their assets in accounts located in Florida up to the value of $62,932,547.00, or in any way
dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets
in Florida up to the same value. The Order applies to all of the Enjoined Defendants' assets located
in Florida whether or not those assets are held in their own name(s) and whether they are solely or
jointly owned.

Paragraph 6 of the Order prohibits any third-parties, including but not limited to bankers,
accountants, financial advisors, investment managers or advisors, trustees and nominees, from
taking any action in violation of the Order at the directions or suggestion of any Enjoined
Defendant or Enjoined Defendants. Any person who takes any action or fails to take any action
which helps or permits the breach of the terms of the Order may be held to be in contempt of Court.

2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Telephone (305) 373-6600
Fax (305) 373-7929
www.aballi.com

UBS Ag
February 8, 2017
Page 2

Kindly be governed by this order and confirm to us compliance with same.  If there is internal or external counsel with whom we should speak, please get us in touch with that person.

Very truly yours,

Matthew R. D. Deblinger

cc: Hendrik G. Milne, Esq. (via email)

Enclosure

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, EBX INVESTMENT FUNDS, LLC,
CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA,

     Defendants.

_____/

## INJUNCTION
## UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

    THIS CAUSE having come before the Court on Plaintiffs, MERIDIAN TRUST

COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs")

emergency *ex parte* motion for temporary injunction to prevent fraudulent transfers (the "Motion")

and the Court, having examined the pleading on file the affidavit in support of the Motion, the

Worldwide Freeze Order and Reasoned Judgment of The Cayman Grand Court, Orders and

Adjudges that:

    1.    The Court is satisfied that the Plaintiffs have carried their burden pursuant to section

726.105, Florida Statutes, and, therefore, pursuant to section 726.108(c)(1), Florida Statutes, and

rule 1.610, Florida Rules of Civil Procedure, are entitled to a temporary *ex parte* injunction, until

1

further order of this Court, enjoining the transfer, withdrawal, or any other alienation of assets out of the accounts of any of the named Defendants as identified below, whether owned by them nominally or beneficially (the "Enjoined Accounts").

2. The amount enjoined is up to and including $62,932,547.

3. The enjoined defendants ("Enjoined Defendants") are:

    a. EIKE BATISTA;

    b. WERNER BATISTA;

    c. THOR BATISTA;

    d. PAULO MENDONÇA;

    e. FLAVIO GODINHO;

    f. PAULO GOUVEA;

    g. MARCUS BERTO;

    h. LUIZ CARNEIRO;

    i. AZIZ BEN AMMAR;

    j. 63X INVESTMENTS LTD.;

    k. 63X MASTER FUND;

    l. 63X FUND;

    m. EBX HOLDING, LTDA.;

    n. EBX INTERNATIONAL, S.A.;

    o. EBX CAPITAL PARTNERS;

    p. EBX INVESTMENT FUNDS, LLC;

    q. CENTENNIAL ASSET MINING FUND, LLC;

    r. CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC;

    s. THORQUE1 FUND LTD.;

2

a.  THORQUE INVESTMENT MANAGEMENT LTD.;

b.  OLIN BATISTA;

c.  FLAVIA SAMPAIO; and

d.  LUMA DE OLIVEIRA.

4.  The Enjoined Defendants must not:

a.  Remove from Florida any of their assets located in Florida up to the value of $62,932,547; or

b.  In any way dispose of, deal with, transfer, mortgage, hypothecate, or diminish the value of any of their assets located in Florida and up to the same value.

5.  Paragraph 3 applies to all of the Enjoined Defendants' assets located in Florida whether or not those assets are held in their own name(s) and whether they are solely or jointly owned. For the purposes of this Order, the Enjoined Defendants' assets include any asset which the Enjoined Defendants have the power, directly or indirectly, to dispose of or deal with as if it were their own (including assets of wholly-owned corporate structures). It includes assets in the custody of third parties, including banks, brokerages, and other financial institutions.

6.  This Order also prohibits any third parties, including but not limited to bankers, accountants, financial advisors, investment managers or advisors, trustees and nominees, from taking any action in violation of this Order at the directions or suggestion of any Enjoined Defendant or Enjoined Defendants. Any person who is served with this Order and takes any action or fails to take any action which helps or permits the breach of the terms of this Order may be held to be in contempt of Court.

7.  This Order does not prohibit any Enjoined Defendant who is a natural person from spending up to $10,000 per week toward their ordinary living expenses. Nor does it prohibit any Enjoined Defendant from spending a reasonable sum on legal representation.

3

8.     This Order does not prohibit any Enjoined Defendant from dealing with or disposing of any of their assets in the ordinary and proper course of business, provided that the Enjoined Defendants shall notify the Plaintiffs' attorneys five (5) business days in advance of any such dealing or disposal worth more than $10,000 so as to afford the Plaintiffs a reasonable opportunity to apply for further relief from this Court.

9.     The Enjoined Defendants may apply to the Court for further relief if they are able to show that, for good cause, the above listed spending limits should be increased.

10.     This Order will cease to have effect if the Defendants:

    a.   provide security by paying the sum of $62,932,547 into the Court registry; or

    b.   provide for security in the sum of $62,932,547 by another method agreed with the Plaintiff's attorneys.

11.     The foregoing injunction is contingent upon Plaintiffs posting a bond in the amount of $ _50,000.⁰⁰_ . Regardless, the Enjoined Accounts shall remain enjoined until further order of this Court.

12.     The Plaintiffs shall promptly notify the Enjoined Defendants of this Order as soon as reasonably practicable after notification of such financial institutions or other persons in possession of any assets for or on behalf of any of the Enjoined Defendants.

13.     This Order is without prejudice of the Enjoined Defendants from seeking modification or discharge hereof upon an inter-parties hearing.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this ___2nd___ day of February, 2017.

HONORABLE BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

ORIGINAL

JUDGE BEATRICE BUTCHKO

4

2/9/2017                                                    Track your package or shipment with FedEx Tracking

**FedEx.**     Shipping    Tracking    Manage    Learn       FedEx Office ®              **Aballi Milne Kalil, P.A**

FedEx ® Tracking

## 778385231936

| Ship date: | | Actual delivery: |
|---|---|---|
| **Wed 2/08/2017** | **Delivered** | **Thu 2/09/2017 9:46 am** |

| | |
|---|---|
| ABALLI, MILNE, KALIL, P.A. | UBS AG |
| Carlos F. Osorio, Esq. | Legal/Compliance Department |
| One SE Third Ave. | suite 3250 |
| 2250 SunTrust International Center | 701 Brickell Avenue |
| MIAMI, FL US 33131 | MIAMI, FL US 33131 |
| 305 373-6600 | 305 373-6600 |

Signed for by: M.MS MARTA

## Travel History

| ▲ Date/Time | Activity | Location |
|---|---|---|
| **─ 2/09/2017 - Thursday** | | |
| 9:46 am | Delivered | MIAMI, FL |
| 8:10 am | On FedEx vehicle for delivery | MIAMI, FL |
| 7:30 am | At local FedEx facility | MIAMI, FL |
| **─ 2/08/2017 - Wednesday** | | |
| 8:54 pm | At destination sort facility | MIAMI, FL |
| 8:13 pm | Left FedEx origin facility | MIAMI, FL |
| 7:14 pm | Picked up | MIAMI, FL |
| 3:18 pm | Shipment information sent to FedEx | |

## Shipment Facts

| | | | |
|---|---|---|---|
| Tracking number | 778385231936 | Service | FedEx Priority Overnight |
| Weight | 2 lbs / 0.91 kgs | Delivery attempts | 1 |
| Delivered To | Receptionist/Front Desk | Total pieces | 1 |
| Total shipment weight | 2 lbs / 0.91 kgs | Terms | Not Available |
| Packaging | FedEx Envelope | Special handling section | Deliver Weekday |
| Standard transit | 2/09/2017 by 10:30 am | | |

---

**FedEx.**                                                                          Search or tracking number

| Customer Focus | Featured Services | Companies | Follow FedEx | United States - English |
|---|---|---|---|---|
| New Customer Center | FedEx Delivery Manager | FedEx Express | | |
| Small Business Center | FedEx SameDay | FedEx Ground | | |
| Service Guide | FedEx Home Delivery | FedEx Office | | |
| Customer Support | FedEx TechConnect | FedEx Freight | | |
| | FedEx HealthCare Solutions | FedEx Custom Critical | | |
| **Company Information** | Online Retail Solutions | FedEx Trade Networks | | |
| About FedEx | Packaging Services | FedEx Cross Border | | |
| Careers | Ancillary Clearance Services | FedEx Supply Chain | | |
| Investor Relations | | | | |
| Subscribe to FedEx email | **Other Resources** | | | |
| | FedEx Compatible | | | |
| | Developer Resource Center | | | |
| | FedEx Ship Manager Software | | | |
| | FedEx Mobile | | | |

FedEx 1995-2017                                        Careers | Global Home | Site Map | fedex.com Terms of Use | Security and Privacy

# EXHIBIT "E"

## Deblinger, Matthew

| | |
|---|---|
| **From:** | jason.schneider@ubs.com |
| **Sent:** | Friday, February 10, 2017 5:24 PM |
| **To:** | Deblinger, Matthew |
| **Subject:** | RE: Injunction Order; Meridian et al. v. Batista et al. - Case No 2017-001040-CA-01 (43) |
| **Attachments:** | Legal Disclaimer.txt |

Thank you, Matthew. Have a good weekend.


Jason R. Schneider
Paralegal


 UBS
UBS Group AG

Legal Department-Subpoenas Levies and Garnishments Group
315 Deaderick Street
3rd Floor
Nashville, TN 37238

Tel. (615) 393-7615
Fax (201) 352-0344
jason.schneider@ubs.com

UBS.com


---

**From:** Deblinger, Matthew [mailto:MDeblinger@aballi.com]
**Sent:** Friday, February 10, 2017 4:13 PM
**To:** Schneider, Jason
**Subject:** Injunction Order; Meridian et al. v. Batista et al. - Case No 2017-001040-CA-01 (43)

Dear Mr. Schneider:

I am writing to you in reference to the Injunction dated February 2, 2017 by Judge Beatrice Butcko in Miami-Dade Circuit Court. In order for you to identify accounts belonging to only the Enjoined Defendants, please find a letter dated February 10, 2017 that contains personal identification information for all of the Enjoined Defendants.

Should you require any additional information, please do not hesitate to call.

Regards,
Matthew Deblinger


**MATTHEW R.D. DEBLINGER** | ATTORNEY | T: 305.372.5927 | F: 305.373.7929 | mdeblinger@aballi.com

1

**ABALLI MILNE KALIL, P.A.** | WWW.ABALLI.COM | 2250 SUNTRUST INTERNATIONAL CENTER, ONE SOUTHEAST THIRD AVENUE | MIAMI, FL 33131

CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:
THIS E-MAIL AND ANY ATTACHMENTS ARE CONFIDENTIAL AND PRIVILEGED, AND ARE PROTECTED FROM DISCLOSURE BY LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, BE ADVISED THAT ANY VIEWING, COPYING, DOWNLOADING, TRANSMITTAL, DISSEMINATION OR OTHER USE OF THIS E-MAIL AND ATTACHMENTS IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR PLEASE IMMEDIATELY RESPOND TO SENDER IDENTIFIED BELOW AND DELETE THIS E-MAIL AND ANY COPIES FROM YOUR SYSTEM.

LA INFORMACIÓN CONTENIDA EN ESTE E-MAIL ES CONFIDENCIAL, PRIVILEGIADA Y ESTÁ DIRIGIDA EXCLUSIVAMENTE A SU DESTINATARIO. CUALQUIER REVISIÓN, DIFUSIÓN, DISTRIBUCIÓN O COPIA DE ESTE MENSAJE ESTÁ PROHIBIDA. SI USTED HA RECIBIDO ESTE E-MAIL POR ERROR, POR FAVOR BÓRRELO Y ENVÍE UN MENSAJE AL REMITENTE. SI ESTE CORREO ELECTRÓNICO CONTIENE ASESORAMIENTO TRIBUTARIO, DICHO ASESORAMIENTO NO SE DA NI SE ESCRIBE CON LA INTENCIÓN DE QUE SEA USADO NI PODRÁ USARSE PARA EVITAR MULTAS QUE PUEDAN SER IMPUESTAS AL CONTRIBUYENTE. (LA ADVERTENCIA ANTERIOR SE HACE SEGÚN EL REGLAMENTO DE LA TESORERÍA DE LOS ESTADOS UNIDOS, QUE ES QUIEN RIGE LA PRÁCTICA TRIBUTARIA Y DE NINGUNA MANERA SE DEBE INTERPRETAR COMO QUE EL ASESORAMIENTO PRESTADO O LAS CONCLUSIONES NUESTRAS, SON DEFICIENTES EN ALGÚN CONCEPTO.)

 Please consider the environment before printing this email.

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION DIVISION (40)

CASE NO.: 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP,
LTD.,

      Plaintiffs,

vs.

EIKE BATISTA, WERNER BATISTA, et.al.,

      Defendants,

_____/

# NOTICE OF HEARING
### (Date/time provided by the Court)

    **PLEASE TAKE NOTICE** that the undersigned will bring up for hearing on the day and time specified by the Court, the following Motion in the above-styled cause:

### NON-PARTY, BANK OF AMERICA, N.A.'S EMERGENCY MOTION FOR CLARIFICATION OF THE INJUNCTION UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

Judge:        Honorable Beatrice Butchko

Date:         Tuesday, February 28, 2017

Time:        9:00 a.m.

Location:    Miami-Dade Courthouse
             73 West Flagler Street, Courtroom DCC 303
             Miami, FL 33130

CASE NO.: 17-001040-CA-01 (43)

> Movant counsel certifies that a bonafide effort to agree or to narrow the issues on the motion(s) noticed has been made with opposing counsel or that, because of time consideration, such effort has not yet been made, but will be made prior to the scheduled hearing. Date/time cleared with opposing counsel.

> If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

Respectfully submitted,

LIEBLER, GONZALEZ & PORTUONDO
*Counsel for Non-Party, Bank of America, N.A.*
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, Florida 33130
Telephone (305) 379-0400
service@lgplaw.com


By: /s/ Jaimee L. Braverman
      MIGUEL M. CORDANO
      Florida Bar No.: 0523682
      mc@lgplaw.com
      JAIMEE L. BRAVERMAN
      Florida Bar No.: 62452
      jlb@lgplaw.com

CASE NO.: 17-001040-CA-01 (43)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via e-service this 24TH day of February, 2017 to: **CRAIG P. KALIL, ESQ., HENDRIK GERARDUS MILNE, ESQ. and MATTHEW R.D. DEBLINGER, ESQ.,** *Counsel for Plaintiffs,* ABALLI Milne Kalil, P.A. (mdeblinger@aballi.com) (hmilne@aballi.com); **EDWARD M. MULLINS, ESQ**., *Counsel for Defendant Werner Batista,* Astigarraga Davis Mullins & Grossman (emullins@astidavis.com); **JOSE M. FERRER, ESQ**., *Counsel for Defendant Marcus Berto*, Bilzin Sumberg Baena Price & Axelrod, LL (jferrer@bilzin.com).

_____/s/ JAIMEE L. BRAVERMAN_____
JAIMEE L. BRAVERMAN

**IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA**

**COMPLEX BUSINESS LITIGATION DIVISION (40)**

**CASE NO.: 17-001040-CA-01 (43)**

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP,
LTD.,

      Plaintiffs,

vs.

EIKE BATISTA, WERNER BATISTA, et.al.,

      Defendants,

_____/

# <u>AMENDED NOTICE OF HEARING</u>
**(Date/time provided by the Court)(Amended to reflect time change to 8:30 a.m.)**

    **PLEASE TAKE NOTICE** that the undersigned will bring up for hearing on the day and
time specified by the Court, the following Motion in the above-styled cause:

**NON-PARTY, BANK OF AMERICA, N.A.'S EMERGENCY
MOTION FOR CLARIFICATION OF THE INJUNCTION UNDER
<u>FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT</u>**

    Judge:      Honorable Beatrice Butchko

    Date:       Tuesday, February 28, 2017

    Time:       8:30 a.m.

    Location:    Miami-Dade Courthouse
                 73 West Flagler Street, Courtroom DCC 303
                 Miami, FL 33130

CASE NO.: 17-001040-CA-01 (43)

Movant counsel certifies that a bonafide effort to agree or to narrow the issues on the motion(s) noticed has been made with opposing counsel or that, because of time consideration, such effort has not yet been made, but will be made prior to the scheduled hearing. Date/time cleared with opposing counsel.

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

Respectfully submitted,

LIEBLER, GONZALEZ & PORTUONDO
*Counsel for Non-Party, Bank of America, N.A.*
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, Florida 33130
Telephone (305) 379-0400
service@lgplaw.com

By:   /s/ Jaimee L. Braverman
 MIGUEL M. CORDANO
 Florida Bar No.: 0523682
 mc@lgplaw.com
 JAIMEE L. BRAVERMAN
 Florida Bar No.: 62452
 jlb@lgplaw.com

CASE NO.: 17-001040-CA-01 (43)

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via e-service this 24TH day of February, 2017 to: **CRAIG P. KALIL, ESQ., HENDRIK GERARDUS MILNE, ESQ. and MATTHEW R.D. DEBLINGER, ESQ.,** *Counsel for Plaintiffs,* ABALLI Milne Kalil, P.A. (mdeblinger@aballi.com) (hmilne@aballi.com); **EDWARD M. MULLINS, ESQ**., *Counsel for Defendant Werner Batista,* Astigarraga Davis Mullins & Grossman (emullins@astidavis.com); **JOSE M. FERRER, ESQ**., *Counsel for Defendant Marcus Berto*, Bilzin Sumberg Baena Price & Axelrod, LL (jferrer@bilzin.com).

    _____/s/ JAIMEE L. BRAVERMAN_____
    JAIMEE L. BRAVERMAN

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, *et al.,*

       Defendants.

_____/

**VERIFIED MOTION FOR ADMISSION TO APPEAR *PRO HAC VICE***
**PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510**

    Comes now Elinor C. Sutton, Movant herein, and respectfully represents the following:

    1.  Movant resides in the State of New York.  Movant is not a resident of the State of
Florida.

    2.  Movant is an attorney and a member of the law firm QUINN EMANUEL
URQUHART & SULLIVAN, LLP, with offices at 51 Madison Avenue, 22nd Floor, New York,
NY 10010.

    3.  Movant has been retained personally or as a member of the above named law firm on
or about January 2017 by WERNER BATISTA, to provide legal representation in connection
with the above-styled matter now pending before the above-named court of the State of Florida.

    4.  Movant is an active member in good standing and currently eligible to practice law in
the following jurisdiction(s): Include attorney or bar number(s). (Attach an additional sheet if
necessary.)

    New York     4615175
    United Stated District Court for the Southern District of New York
    United Stated District Court for the Eastern District of New York

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

5. There are no disciplinary proceedings pending against Movant, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed):
(Attach an additional sheet if necessary.)

_____
_____
_____

6. Within the past five (5) years, Movant has not been subject to any disciplinary proceedings, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed):
(Attach an additional sheet if necessary)

_____
_____
_____

7. Movant has never been subject to any suspension proceedings, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed): (Attach an additional sheet if necessary.)

_____
_____
_____

8. Movant has never been subject to any disbarment proceedings, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed):  (Attach an additional sheet if necessary.)

_____
_____
_____

9. Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

10. Movant is not an inactive member of The Florida Bar.

11. Movant is not now a member of The Florida Bar.

12. Movant is not a suspended member of The Florida Bar.

13. Movant is not a disbarred member of The Florida Bar nor has Movant received a disciplinary resignation from The Florida Bar.

14. Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of Judicial

Administration 2.510, except as provided below (give date of disciplinary action or contempt, reasons there for, and court imposing contempt): (Attach an additional sheet if necessary.)

_____
_____
_____

       15. Movant has filed motion(s) to appear as counsel in Florida state courts during the past five (5) years in the following matters: (attach additional sheet if necessary)

Date of Motion Case Name Case Number Court Date Motion Granted/Denied

    Not Applicable
_____
_____
_____

       16. Local counsel of record associated with Movant in this matter are Edward Mullins (Florida Bar Number 863920) and Ana M. Barton (Florida Bar Number 85721), who are active members in good standing of The Florida Bar and have offices at Astigarraga Davis, 1001 Brickell Bay Drive, 9th Floor, Miami, Florida 33131, 305-372-8202.

       17. Movant has read the applicable provisions of Florida Rule of Judicial Administration 2.510 and Rule 1-3.10 of the Rules Regulating The Florida Bar and certifies that this verified motion complies with those rules.

       18. Movant agrees to comply with the provisions of the Florida Rules of Professional Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

       WHEREFORE, Movant respectfully requests permission to appear in this court for this cause only.

       DATED this 28th day of February, 2017.

                         */s/ Elinor C. Sutton*_____

                         Elinor C. Sutton

                         **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

                         51 Madison Avenue, 22nd Floor

                         New York, NY  10010

                         Telephone:  (212) 849-7000

                         Facsimile: (212) 849-7100

                         elinorsutton@quinnemanuel.com

STATE OF NEW YORK
COUNTY OF NEW YORK

I, Elinor C. Sutton, do hereby swear or affirm under penalty of perjury that I am the Movant in the above-styled matter; that I have read the foregoing Motion and know the contents thereof, and the contents are true of my own knowledge and belief.

/s/ Elinor C. Sutton
Elinor C. Sutton

I hereby consent to be associated as local counsel of record in this cause pursuant to Florida Rule of Judicial Administration 2.510.

DATED this 28th day of February, 2017.

Respectfully submitted,

**ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.**

By:   /s/ Edward M. Mullins
Edward M. Mullins (Fla. Bar No. 863920)
emullins@astidavis.com
Ana M. Barton (Fla. Bar No.:  85721)
abarton@astidavis.com
1001 Brickell Bay Drive, Ninth Floor
Miami, Florida  33131
Tel.:  (305) 372-8282; Fax:  (305) 372-8202
*Counsel for Defendant Werner Batista*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was furnished by U.S. mail to PHV Admissions, The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2333 accompanied by payment of the $250.00 filing fee made payable to The Florida Bar, and to Hendrik G. Milne, Esq., and Craig P. Kalil, Esq., ABALLI MILNE KALIL, P.A., and José M. Ferrer, Esq. and Yasmin Fernandez-Acuña, BILZIN SUMBERG BAENA PRICE & AXEDLROD LLP, on February 28th, 2017.

By: /s/ Edward M. Mullins
Edward M. Mullins

Filing # 53431349 E-Filed 03/08/2017 10:07:30 AM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CIRCUIT CIVIL DIVISION**

**CASE NO.**: 2017-001040-CA-01
**Section**: CA 43

Meridian Trust Company, as Trustee. and
American Associated Group, Ltd,

     **Plaintiff**,

vs.

Eike Batista, et al.,

     **Defendant**.

_____/

## MANDATORY ORDER TO CONFER AND CERTIFICATION REQUIREMENT

     This case is subject to the Complex Business Litigation Rules.  The rules require that parties meet and confer prior to filing any motion to determine if issues can be narrowed, the appropriate amount of time required for hearing if hearing is requested, and any other issues such as the completion of related discovery.  Meet and Confer under these rules requires **an actual effort** between attorneys, not staff.

It is therefore:  **ORDERED** and **ADJUDGED** as follows:

     All parties to a motion must meet the conferral requirements of the division.  The motion must contain a certification of the efforts at meet and confer, which shall include:

- A description of all efforts at a meet and confer, including names of movant and respondent attorneys, dates and method (email, telephone, live meeting) requesting a meet and confer; and

- A description of all dates for meet and confer actually held and the method and names of participating attorneys; and

- Results achieved, including consensus as to amount of time required for hearing, if granted.

The only motions exempt from the meet and confer requirement are Motions for Injunctive Relief Without Notice; Motions for Summary Judgment and Motions to Amend to Add Punitive Damages. **ANY OTHER MOTION** submitted without a certificate of conferral will be rejected by the Court without prejudice.

**DONE** and **ORDERED** in Chambers at Miami, Miami-Dade County, Florida, on this 8th day of March, 2017.

BEATRICE BUTHKO
CIRCUIT COURT JUDGE

Electronic Service List:
Ana Maria Barton <abarton@astidavis.com>, <bhernandez@astidavis.com>
Craig P Kalil <ckalil@aballi.com>, <eservice@aballi.com>, <mcardenas@aballi.com>
Edward M Mullins <emullins@astidavis.com>, <bhernandez@astidavis.com>
Hendrik G. Milne <hmilne@aballi.com>, <jbetancourt@aballi.com>
Craig P Kalil <ckalil@aballi.com>, <eservice@aballi.com>, <trivero@aballi.com>

Carlos F Osorio <cosorio@aballi.com>, <jbetancourt@aballi.com>, <eservice@aballi.com>
Renee R Tischler <rtischler@aballi.com>, <jbetancourt@aballi.com>, <mcardenas@aballi.com>
Joshua Poyer <jpoyer@aballi.com>, <mcardenas@aballi.com>
Grant Stanton Smith <gsmith@aballi.com>, <mcardenas@aballi.com>
Matthew Ryan David Deblinger <mdeblinger@aballi.com>, <mcardenas@aballi.com>
Jaimee L Braverman <jlb@lgplaw.com>, <lbr@lgplaw.com>
JOSE M FERRER <jferrer@bilzin.com>, <etrujillo@bilzin.com>, <eservice@bilzin.com>
Yasmin Fernandez-Acuna <yfernandez-acuna@bilzin.com>, <etrujillo@bilzin.com>, <eservice@bilzin.com>
Russell S Bogue <jjdunn@bbandt.com>, <rbogue@bbandt.com>

Case 1:17-cv-23051-KMW    Document 1-2    Entered on FLSD Docket 08/11/2017    Page 475 of 492

Filing # 53431423 E-Filed 03/08/2017 10:08:25 AM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CIRCUIT CIVIL DIVISION**

**CASE NO.**: 2017-001040-CA-01
**Section**: CA 43

Meridian Trust Company, as Trustee. and
American Associated Group, Ltd,

       **Plaintiff**,

vs.

Eike Batista, et al.,

       **Defendant**.

_____/

<u>**ORDER ON MOTIONS AND MEMO REQUIREMENTS**</u>

       This case is pending in the Complex Business Litigation division, and must follow the Complex Business Litigation rules. In addition, it is

       **ORDERED** and **ADJUDGED** as follows:

<u>**Short Motions**</u>

       As a general rule, ten-minute Motion Calendar motions do not require memoranda of law. Copies of motions and any response shall be filed with eCourtesy in accordance with the Court's motion calendar procedures posted on its website.

<u>**Motions Requesting a Special Set Hearing**</u>

Case 1:17-cv-23051-KMW   Document 1-2   Entered on FLSD Docket 08/11/2017   Page 476 of 492

Hearings must be requested using the Court's special set request form which is available on the judge's webpage. Motions may be scheduled or ruled upon without a hearing, in the court's discretion.

**Content of motions** shall state with particularity the grounds therefore, citing any statute or rule of procedure relied upon; shall set forth the relief sought and shall include the required certification of conferral. The Court will not consider issues at a hearing on the motion that were not addressed in the motion and memoranda in support of and in opposition to the motion.

### Memoranda Requirements

**These requirements and deadlines may not be waived or altered except by court order.**

**Failure to File and Serve Motion Materials:** CBL 4.4   A motion or opposition unaccompanied by a required memorandum may be summarily rejected or denied. Failure to timely file a memorandum in opposition to a motion may result in the pending motion being considered and decided as an uncontested motion. **Motion briefing deadlines are court orders.**

| Motion | Memoranda of law | Page limit | Time deadline | |
|---|---|---|---|---|
| Motion filed by movant | As required by CBL rules | 20 | When filing the motion | Memos which are not filed with the motion will be disregarded |

| Opposition to motion | At time of filing opposition, if needed | 20 | 10 days after service of motion as computed in Fla. R. Civ. P. 1.090 | If no response is timely filed, the Court will proceed and may grant the motion as unopposed |
|---|---|---|---|---|
| Reply | If needed, limited to matters raised in the opposition | 10 | 5 days after service of opposition as computed in Fla. R. Civ. P. 1.090 | If no reply is timely filed, the Court will proceed |
| Sur-reply | With Court permission only | | | |

**Motions Decided on Papers and Memoranda:** Motions may be considered and decided by the Court without a hearing. CBL 4.5 **A hearing is at the discretion of the Court.**

### Sealed and Confidential Documents

Sealed or confidential documents should be e-filed pursuant to the instructions on the Clerk's e-filing portal. In Camera inspections shall be conducted as instructed by the Court.

**DONE** and **ORDERED** in Chambers at Miami, Miami-Dade County, Florida, on this 8th day of March, 2017.

BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

Electronic Service List:
Ana Maria Barton <abarton@astidavis.com>, <bhernandez@astidavis.com>
Craig P Kalil <ckalil@aballi.com>, <eservice@aballi.com>, <mcardenas@aballi.com>
Edward M Mullins <emullins@astidavis.com>, <bhernandez@astidavis.com>
Hendrik G. Milne <hmilne@aballi.com>, <jbetancourt@aballi.com>
Craig P Kalil <ckalil@aballi.com>, <eservice@aballi.com>, <trivero@aballi.com>
Carlos F Osorio <cosorio@aballi.com>, <jbetancourt@aballi.com>,
<eservice@aballi.com>
Renee R Tischler <rtischler@aballi.com>, <jbetancourt@aballi.com>,
<mcardenas@aballi.com>
Joshua Poyer <jpoyer@aballi.com>, <mcardenas@aballi.com>
Grant Stanton Smith <gsmith@aballi.com>, <mcardenas@aballi.com>
Matthew Ryan David Deblinger <mdeblinger@aballi.com>, <mcardenas@aballi.com>
Jaimee L Braverman <jlb@lgplaw.com>, <lbr@lgplaw.com>
JOSE M FERRER <jferrer@bilzin.com>, <etrujillo@bilzin.com>, <eservice@bilzin.com>
Yasmin Fernandez-Acuna <yfernandez-acuna@bilzin.com>, <etrujillo@bilzin.com>,
<eservice@bilzin.com>
Russell S Bogue <jjdunn@bbandt.com>, <rbogue@bbandt.com>

Case 1:17-cv-23051-KMW   Document 1-2   Entered on FLSD Docket 08/11/2017   Page 479 of 492

Filing # 53431489 E-Filed 03/08/2017 10:09:16 AM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CIRCUIT CIVIL DIVISION**

**CASE NO.**: 2017-001040-CA-01
**Section**: CA 43

Meridian Trust Company, as Trustee and
American associated group, Ltd.,

      **Plaintiff**,

vs.

Eike Batista, et al.,

      **Defendant**.

_____/

### ORDER REQUIRING COMPLIANCE WITH
### COMPLEX BUSINESS LITIGATION SECTION PROCEDURES AND
### NOTICE OF HEARING AND ORDER ON CASE MANAGEMENT CONFERENCES

      The Complex Business Litigation Rules shall apply to all actions in the Complex Business Litigation Section except to the extent that they are superseded by court Order. The rules are located on the circuit website at http://www.jud11.flcourts.org/About-the-Court/Ourt-Courts/Civil-Court/Complex-Business-Litigation and on the Judge's webpage.

      These Procedures shall be construed and enforced to avoid technical delay, encourage civility, permit just and prompt determination of all proceedings, and promote the efficient administration of justice.

      All motions pertaining to cases within the Complex Business Litigation Section must adhere to Complex Business Litigation Rules.

Case 1:17-cv-23051-KMW   Document 1-2   Entered on FLSD Docket 08/11/2017   Page 480 of 492

address the following which will be included in the following Joint Case Management Report:

1.  The name of lead trial counsel for each party, and the name of any unrepresented party;

2.  A brief factual statement of the case;

3.  Pleading issues, including service of process, venue, joinder of additional parties, theories of liability, damages claimed and applicable defenses;

4.  The identity and number of any motions to dismiss or other preliminary or pre-discovery motions which have been filed and the time period in which they shall be filed, briefed and argued;

5.  A discovery plan and schedule including the length of the discovery period, the anticipated number of fact and expert depositions to be permitted and, as appropriate, the length and sequence of such depositions;

6.  A description of pertinent documents and a list of fact witnesses the parties believe to be relevant.

7.  Anticipated areas of any expert testimony, the number of experts to be called by each party, timing for identification of experts, and exchange of expert reports;

8.  An estimate of the volume of documents and computerized information likely to be the subject of discovery from parties and nonparties and whether there are technological means which may render document discovery more manageable at an acceptable cost, and the likelihood of discovery issues;

9.  The possibility of obtaining admissions of fact and voluntary exchange of documents and electronically stored information, stipulations regarding authenticity

of documents, and the need for advance rulings from the Court on admissibility of evidence.

10. The advisability of using the general magistrate for discovery purposes at no cost to the parties; and the advisability of using the general and/or a special magistrate(s) for fact finding, mediation, or discovery disputes or such other matters as the parties may agree upon;

11. The time period, after the close of discovery within which post-discovery dispositive motions shall be filed, briefed and argued, and a tentative schedule for such activities;

12. The possibility of settlement and the timing of Alternative Dispute Resolution, including the selection of a mediator or arbitrator(s);

13. A good faith estimate by counsel for each party based upon consultation with all of the parties of the costs and fees each party is likely to incur in pursuing the litigation through trial court adjudication;

14. A preliminary listing of the principal legal and factual issues which counsel believe will need to be decided in the case;

15. A preliminary listing of any legal principles and facts that are not in dispute;

16. A good faith estimate by counsel for each party of the length of time to try the case.

17. Whether a demand for jury trial has been made.

18. The approximate month and year the parties believe the case should be set for trial.

Within ten (10) days of the meeting among Trial Counsel, but no less than fourteen

(14) days in advance of the scheduled Case Management Conference, the Parties shall file a Joint Case Management Report addressing the matters described in paragraphs 1 - 18 above and submitted via **eCourtesy to the Judge and via email to the Judicial Assistant** and addressed to the Court's special set calendar using the hearing date scheduled for the CMC.

### THE DEADLINES FOR SUBMISSIONS PRIOR TO THE INITIAL CMC MAY NOT BE ALTERED OR WAIVED BY COUNSEL.   PLEASE MAKE APPROPRIATE ARRANGEMENTS TO COMPLY.

All counsel and parties are responsible for filing a Joint Case Management Report in full compliance with this Order. Plaintiff's counsel shall have the primary responsibility to coordinate the meeting of Lead Trial Counsel and unrepresented parties in person, and the filing of the Joint Case Management Report. If counsel is unable to coordinate such compliance, counsel shall timely notify the Court.   Counsel shall file the report and note any parties' nonparticipation. **Failure to provide the required case management report may subject the violating party(ies) to sanctions.**

Pursuant to the provisions of Fla. R. Civ. P. 1.201(b)(3), and notwithstanding rule 1.440, the Court will set the case management plan and trial date at the ICMC. Because this ICMC occurs near the outset of the case, the trial date will be confirmed at the subsequent Scheduling Case Management Conference to assure reasonable case management progress. Once set at the Scheduling Case Management Conference, the trial date will be a firm date.   THE COURT ANTICIPATES REAL TRIAL SETTINGS, AND COUNSEL SHOULD MAKE APPROPRIATE SCHEDULING DECISIONS AT THE TIME OF THE CMC, including blocking necessary time with expert witnesses and

mediators. **As provided in the rule, continuance of the trial of a complex action, once scheduled at the Scheduling Conference, will rarely be granted, and then only upon good cause shown. Failure to complete discovery, dispositive motions, or mediation in violation of the case management plan is not good cause.** Parties may not continue a case by agreement.

Plaintiff is required to provide a <u>**full set**</u> of all materials regarding pending motion(s), <u>**including all responses and replies**</u>, and all memoranda no later than two (2) weeks prior to the initial case management conference.

### Courtesy copies, Hearing Binders, and Hearing Request Procedures

### For all hearings

The movant is ordered to provide courtesy copies of <u>**all**</u> motions and related memoranda, oppositions and replies <u>**at the time the motion is calendared**</u> to the undersigned Judge through eCourtesy submission.

The Judge requires a paper copy/complete hearing binder with all materials, from each involved party (motions, memos, opposition, replies, case law, record and document excerpts) that any party requests to be included, delivered to chambers at least 10 days prior to the scheduled hearing. It shall be the responsibility of the movant to provide a single comprehensive binder. Parties shall not submit competing binders. If multiple matters are scheduled, such as at a case management conference, Plaintiff shall be responsible to prepare and provide the comprehensive binder.

Parties are hereby noticed that the Court may consider any pending motion at any Case Management Conference and should prepare accordingly, and that the Court may engage in any of the actions authorized under Fla. R. Civ. P. 1.200 and 1.201. The Court will also review the parties' periodic progress and completion of case management milestones under the case management plan in order to assure timely progress towards trial. Parties should not agree to extensions of milestone deadlines anticipating that the trial will be delayed. It is the parties' responsibility to complete case preparation in sufficient time in advance of the trial date to allow for pretrial hearing on Daubert Motions, Dispositive Motions, and for the completion of mediation, etc.

## Proposed Orders

Proposed Orders, ex parte, agreed and otherwise, shall be submitted by eCourtesy in Word format as indicated on the Judge's webpage. Parties shall promptly review and propose any edits to a proposed order. If the parties are unable to agree to the language of an order, the movant shall gather all versions of the order with proposed changes red-lined and submit them together to the Court for its review and execution. Delivery of the order shall be prompt in accord with the CBL Rules.

Counsel for Plaintiff(s) and Third Party Plaintiff(s) is/are ORDERED to confirm all parties subsequently named or appearing herein have been served copies of this Notice and Order. If any subsequently served or named party has not been served

with a copy of this notice, Plaintiff and Third Party Plaintiff shall provide the party with a

copy of this Notice.

     **If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance.  Please contact Court's ADA Coordinator (305) 375-2006 within two (2) working days of your receipt of this notice.  If you are hearing or voice impaired, call (800) 955-8771.**

     **DONE AND ORDERED** in Chambers at Miami-Dade County, Florida, this 8th

day of March, 2017.



BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

## CERTIFICATE OF SERVICE

     **I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to:

Electronic Service List:
Ana Maria Barton <abarton@astidavis.com>, <bhernandez@astidavis.com>
Craig P Kalil <ckalil@aballi.com>, <eservice@aballi.com>, <mcardenas@aballi.com>
Edward M Mullins <emullins@astidavis.com>, <bhernandez@astidavis.com>
Hendrik G. Milne <hmilne@aballi.com>, <jbetancourt@aballi.com>
Craig P Kalil <ckalil@aballi.com>, <eservice@aballi.com>, <trivero@aballi.com>
Carlos F Osorio <cosorio@aballi.com>, <jbetancourt@aballi.com>, <eservice@aballi.com>
Renee R Tischler <rtischler@aballi.com>, <jbetancourt@aballi.com>, <mcardenas@aballi.com>
Joshua Poyer <jpoyer@aballi.com>, <mcardenas@aballi.com>
Grant Stanton Smith <gsmith@aballi.com>, <mcardenas@aballi.com>
Matthew Ryan David Deblinger <mdeblinger@aballi.com>, <mcardenas@aballi.com>
Jaimee L Braverman <jlb@lgplaw.com>, <lbr@lgplaw.com>

Case 1:17-cv-23051-KMW   Document 1-2   Entered on FLSD Docket 08/11/2017   Page 487 of 492

JOSE M FERRER <jferrer@bilzin.com>, <etrujillo@bilzin.com>, <eservice@bilzin.com>
Yasmin Fernandez-Acuna <yfernandez-acuna@bilzin.com>, <etrujillo@bilzin.com>,
<eservice@bilzin.com>
Russell S Bogue <jjdunn@bbandt.com>, <rbogue@bbandt.com>

Filing # 53785682 E-Filed 03/15/2017 04:16:41 PM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

          Plaintiffs,

v.

EIKE BATISTA, *et al.,*

          Defendants.

_____/

**VERIFIED MOTION FOR ADMISSION TO APPEAR *PRO HAC VICE***
**PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510**

Comes now Michael Carlinsky, Movant herein, and respectfully represents the following:

1. Movant resides in the State of New York . Movant is not a resident of the State of Florida.

2. Movant is an attorney and a member of the law firm of QUINN EMANUEL URQUHART & SULLIVAN, LLP with offices at 51 Madison Avenue, 22nd Floor, New York, NY 10010.

3. Movant has been retained personally or as a member of the above named law firm on or about January 2017 by WERNER BATISTA, to provide legal representation in connection with the above-styled matter now pending before the above-named court of the State of Florida.

4. Movant is an active member in good standing and currently eligible to practice law in the following jurisdiction(s): Include attorney or bar number(s). (Attach an additional sheet if necessary.)

| JURISDICTION | ATTORNEY/BAR NUMBER |
|---|---|
| New York | 2319440 |
| New York State Courts | (Admitted 2/7/1990) |
| State Bar of NY Judicial 2nd Department | (Admitted 2/7/1990 |
| Appellate Division, Third Department | (Admitted 1990) |

1
ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

| Southern District of New York | (Admitted  10/10/1990) |
| Eastern District of New York | (Admitted  10/10/1990) |
| Federal Circuit Court of Appeals | (Admitted 5/19/2005) |

5. There are no disciplinary proceedings pending against Movant, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed):
(Attach an additional sheet if necessary.)

_____

_____

_____

6. Within the past five (5) years, Movant has not been subject to any disciplinary proceedings, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed):
(Attach an additional sheet if necessary)

_____

_____

_____

7. Movant has never been subject to any suspension proceedings, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed): (Attach an additional sheet if necessary.)

_____

_____

_____

8. Movant has never been subject to any disbarment proceedings, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed): (Attach an additional sheet if necessary.)

_____

_____

_____

9. Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

10. Movant is not an inactive member of The Florida Bar.

11. Movant is not now a member of The Florida Bar.

12. Movant is not a suspended member of The Florida Bar.

2

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

13. Movant is not a disbarred member of The Florida Bar nor has Movant received a disciplinary resignation from The Florida Bar.

14. Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of Judicial Administration 2.510, except as provided below (give date of disciplinary action or contempt, reasons there for, and court imposing contempt): (Attach an additional sheet if necessary.)

_____
_____
_____

15. Movant has filed motion(s) to appear as counsel in Florida state courts during the past five (5) years in the following matters: (attach additional sheet if necessary)
Date of Motion Case Name Case Number Court Date Motion Granted/Denied

_____
_____
_____

16. Local counsel of record associated with Movant in this matter are Edward Mullins (Florida Bar Number 863920) and Ana M. Barton (Florida Bar Number 85721), who are active members in good standing of The Florida Bar and have offices at Astigarraga Davis, 1001 Brickell Bay Drive, 9th Floor, Miami, Florida 33131, 305-372-8202.

17. Movant has read the applicable provisions of Florida Rule of Judicial Administration 2.510 and Rule 1-3.10 of the Rules Regulating The Florida Bar and certifies that this verified motion complies with those rules.

18. Movant agrees to comply with the provisions of the Florida Rules of Professional Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

WHEREFORE, Movant respectfully requests permission to appear in this court for this cause only.

DATED this 15th day of March, 2017.

/s/ Michael Carlinsky
_____
Michael Carlinsky
**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
vicotnoskov@quinnemanuel.com

3

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

STATE OF NEW YORK
COUNTY OF NEW YORK

I, Michael Carlinsky, do hereby swear or affirm under penalty of perjury that I am the Movant in the above-styled matter; that I have read the foregoing Motion and know the contents thereof, and the contents are true of my own knowledge and belief.

_/s/ Michael Carlinsky_
Michael Carlinsky

I hereby consent to be associated as local counsel of record in this cause pursuant to Florida Rule of Judicial Administration 2.510.

DATED this 15th day of March, 2017.

Respectfully submitted,

**ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.**

By:   _/s/ Edward M. Mullins_
Edward M. Mullins (Fla. Bar No. 863920)
emullins@astidavis.com
Ana M. Barton (Fla. Bar No.: 85721
abarton@astidavis.com
1001 Brickell Bay Drive, Ninth Floor
Miami, Florida 33131
Tel.: (305) 372-8282; Fax: (305) 372-8202
_Counsel for Defendant Werner Batista_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was furnished by U.S. mail to PHV Admissions, The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2333 accompanied by payment of the $250.00 filing fee made payable to The Florida Bar, and to Hendrik G. Milne, Esq., and Craig P. Kalil, Esq., ABALLI MILNE KALIL, P.A., and José M. Ferrer, Esq. and Yasmin Fernandez-Acuña, BILZIN SUMBERG BAENA PRICE & AXEDLROD LLP, on March 15, 2017.

By:  _/s/ Edward M. Mullins_
  Edward M. Mullins