COMPOSITE EXHIBIT NO. 1 - PART 2

Filing # 53786079 E-Filed 03/15/2017 04:19:36 PM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, *et al.*,

        Defendants.

_____/

**VERIFIED MOTION FOR ADMISSION TO APPEAR *PRO HAC VICE*
PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510**

Comes now Victor Noskov, Movant herein, and respectfully represents the following:

1.  Movant resides in the State of New York . Movant is not a resident of the State of Florida.

2.  Movant is an attorney and a member of the law firm of QUINN EMANUEL URQUHART & SULLIVAN, LLP with offices at 51 Madison Avenue, 22nd Floor, New York, NY 10010.

3.  Movant has been retained personally or as a member of the above named law firm on or about January 2017 by WERNER BATISTA, to provide legal representation in connection with the above-styled matter now pending before the above-named court of the State of Florida.

4.  Movant is an active member in good standing and currently eligible to practice law in the following jurisdiction(s): Include attorney or bar number(s). (Attach an additional sheet if necessary.)

| JURISDICTION | ATTORNEY/BAR NUMBER |
| --- | --- |
| New York | 5087689 |
| Southern District of New York | (Admitted January 6, 2015) |

1

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 3 of 577

5. There are no disciplinary proceedings pending against Movant, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed):
(Attach an additional sheet if necessary.)

_____

_____

_____

6. Within the past five (5) years, Movant has not been subject to any disciplinary proceedings, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed):
(Attach an additional sheet if necessary)

_____

_____

_____

7. Movant has never been subject to any suspension proceedings, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed): (Attach an additional sheet if necessary.)

_____

_____

_____

8. Movant has never been subject to any disbarment proceedings, except as provided below (give jurisdiction of disciplinary action, date of disciplinary action, nature of the violation and the sanction, if any, imposed): (Attach an additional sheet if necessary.)

_____

_____

_____

9. Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

10. Movant is not an inactive member of The Florida Bar.

11. Movant is not now a member of The Florida Bar.

12. Movant is not a suspended member of The Florida Bar.

13. Movant is not a disbarred member of The Florida Bar nor has Movant received a disciplinary resignation from The Florida Bar.

https://www2.miami-dadeclerk.com/ocs/ViewerHTML5.aspx?QS=B6%2f9EwnZlIiih%2b...    8/10/2017

14. Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of Judicial Administration 2.510, except as provided below (give date of disciplinary action or contempt, reasons there for, and court imposing contempt): (Attach an additional sheet if necessary.)

_____

_____

_____

15. Movant has filed motion(s) to appear as counsel in Florida state courts during the past five (5) years in the following matters: (attach additional sheet if necessary)
Date of Motion Case Name Case Number Court Date Motion Granted/Denied

_____

_____

_____

16. Local counsel of record associated with Movant in this matter are Edward Mullins (Florida Bar Number 863920) and Ana M. Barton (Florida Bar Number 85721), who are active members in good standing of The Florida Bar and have offices at Astigarraga Davis, 1001 Brickell Bay Drive, 9th Floor, Miami, Florida 33131, 305-372-8202.

17. Movant has read the applicable provisions of Florida Rule of Judicial Administration 2.510 and Rule 1-3.10 of the Rules Regulating The Florida Bar and certifies that this verified motion complies with those rules.

18. Movant agrees to comply with the provisions of the Florida Rules of Professional Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

WHEREFORE, Movant respectfully requests permission to appear in this court for this cause only.

DATED this 15th day of March, 2017.

*/s/ Victor Noskov* _____

Victor Noskov
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
vicotnoskov@quinnemanuel.com

3

STATE OF NEW YORK
COUNTY OF NEW YORK

I, Victor Noskov, do hereby swear or affirm under penalty of perjury that I am the Movant in the above-styled matter; that I have read the foregoing Motion and know the contents thereof, and the contents are true of my own knowledge and belief.

/s/ Victor Noskov

Victor Noskoc

I hereby consent to be associated as local counsel of record in this cause pursuant to Florida Rule of Judicial Administration 2.510.

DATED this 15th day of March, 2017.

Respectfully submitted,

ASTIGARRAGA DAVIS MULLINS
& GROSSMAN, P.A.

By:   /s/ Edward M. Mullins

Edward M. Mullins (Fla. Bar No. 863920)
emullins@astidavis.com
Ana M. Barton (Fla. Bar No.: 85721
abarton@astidavis.com
1001 Brickell Bay Drive, Ninth Floor
Miami, Florida 33131
Tel.: (305) 372-8282; Fax: (305) 372-8202
Counsel for Defendant Werner Batista

4

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was furnished by U.S. mail to PHV Admissions, The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2333 accompanied by payment of the $250.00 filing fee made payable to The Florida Bar, and to Hendrik G. Milne, Esq., and Craig P. Kalil, Esq., ABALLI MILNE KALIL, P.A., and José M. Ferrer, Esq. and Yasmin Fernandez-Acuña, BILZIN SUMBERG BAENA PRICE & AXEDLROD LLP, on March 15, 2017.

By:  */s/ Edward M. Mullins*
Edward M. Mullins

Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 7 of 577

Filing # 53851451 E-Filed 03/16/2017 05:34:56 PM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

    Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

    Defendants.

_____/

## <u>NOTICE OF FILING VERIFIED RETURN OF SERVICE</u>

    Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for 63X Master Fund c/o Maples &

Calder, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.

    Dated: March 16, 2017.

                Respectfully submitted,

                ABALLI MILNE KALIL, P.A.
                *Counsel for Plaintiffs*
                2250 SunTrust International Center
                One Southeast Third Ave.
                Miami, FL 33131
                Phone: (305) 373-6600
                Fax: (305) 373-7929

                *s/ Hendrik G. Milne*_____
                Hendrik G. Milne
                Florida Bar No.: 335886
                Craig P. Kalil
                Florida Bar No.: 607282

1

Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 8 of 577

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 16th day of March, 2017 a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

2



Clerk of Court's Office
P.O. Box 495
George Town
Grand Cayman
Cayman Islands
B.W.I.

**OUR REF: F.P. 04 OF 2017**

## AFFIDAVIT OF SERVICE

I, Josen Ebanks of West Bay, Grand Cayman, Cayman Islands affirm and swear as follows:

1.   I am a Bailiff of the Grand Court of the Cayman Islands.

2.   That on **Tuesday** the **21st** day of **February 2017**, at **1:28pm** I served the attached documents:-

     J.E.
     ~~SEE LIST~~/AS ATTACHED

3.   That service was made on the registered office for **63X Master Fund** c/o Maples & Calder, **Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.**

4.   Service was made by handing the said documents to **Tami Powers – Team Leader**

5.   The above statements made by me are true and correct.

_____
Josen Ebanks, Bailiff of the Grand Court

Sworn to before me at George Town on 23rd day of February , 2017

NOTARY PUBLIC, GEORGE TOWN
GRAND CAYMAN, CAYMAN ISLANDS



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 13 of 577

Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 14 of 577





Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 16 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 18 of 577









Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 22 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 24 of 577





Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 26 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 28 of 577





Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 30 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 31 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 32 of 577







shares or bonds in BATISTA's companies on the basis of his fraudulent promises, among them the Florida Retirement System Trust Fund.[4]

87. BEN AMMAR was intimately involved in generating stories for the press during 2013, regarding the supposed massive capitalization of OGX and the fact that it was impossible for it to fail. He was a prime architect of the fraudulent billion dollar "Put Option" and the cover story regarding the fictitious $850 million "sale" to Petronas, both described below.

88. On September 4, 2013, having milked as much as he could out of the scheme, BEN AMMAR resigned from the Board of OGX, weeks before its bankruptcy, and reportedly fled Brazil for New York where he presently resides in a multi-million dollar apartment acquired, upon information and belief, with part of his takings from the scheme.

**The Corporate Co-conspirators and Accomplices:**

**The 63X, EBX, CENTENNIAL and THORQUE Companies.**

89. There were also numerous corporate entities that BATISTA owned or controlled that he used in executing his scheme. These were either holding companies for his stock in the operating companies, such as OGX and OSX, or were set up for the simple purpose of being the name on a bank account for the transmission of funds to accomplish the fraudulent scheme. Some of these entities have been joined as Defendants here. These are the 63X Companies, the EBX Companies, and the CENTENNIAL Companies and may also include the THORQUE Companies.

90. These corporations, all of which were incorporated in secrecy jurisdictions, had no legitimate corporate business or real independent existence separate from BATISTA and were no more than fictitious names for BATISTA himself. They acted as "cut-outs," to obscure the trail

---

[4] The Florida Retirement System Trust Fund is an approximately $150 billion pension fund that pays retirement benefits for over a million state, county, school system and higher-education teachers and other employees, managed by the Florida State Board of Administration of which the trustees are Florida Governor, Richard Scott, Florida Chief Financial Officer, Jeffrey Atwater, and Florida Attorney General, Pamela Bondi.

16





Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 40 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 41 of 577



114.   However, persuading the investing public that these fields were unrecognized treasures rather than the worthless money-pits (that they would eventually prove to be) would require enormous promotion.

115.   To garner credibility for OGX, BATISTA built a roster of senior executives from Petrobras; individuals who had been integral to that company's deep-water discoveries, headed by the Defendant, PAULO MENDONÇA, a geologist and former Petrobras head of exploration, who BATISTA dubbed "Dr. Oil."

116.   BATISTA granted his team members generous stock options in OGX to ensure that they were personally invested in the value of the stock and incentivized to spread any good news and to contain or minimize the bad.

117.   BATISTA's publicized rationale for exploring the shallow-water fields was that modern technology in the hands of his "dream team" ensured better, more accurate detection. If there was oil to be found, they would find it. Plus, when they found it, the much lower extraction costs in shallow water than in deep water meant much greater profitability. This one-two punch of state-of-the-art technology in the hands of the best oil gurus in Brazil, coupled with low-cost lifting, BATISTA boasted, promised to be a sure-fire winning combination.

118.   In 2008, BATISTA's OGX raised $4.1 billion in the biggest initial public offering in Brazilian stock market history.

119.   In its November 2008 Management Presentation, OGX announced that it had entered into contracts for 3D seismic surveys for all of its exploratory blocks; acquired various logistical transport vessels, including seven boats and two helicopters; and secured four off-shore drilling rigs with "world-class contractors." It stated that it expected to conduct an "intense drilling campaign" beginning in the second half of 2009 and reach "first oil" by the end of 2011.

21



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 44 of 577





Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 46 of 577













Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 52 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 53 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 54 of 577

















Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 62 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 64 of 577



Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 65 of 577





Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 68 of 577





Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 71 of 577



276.    One of these Bahamian companies was the Defendant, THORQUE INVESTMENT MANAGEMENT LTD., which was incorporated on April 12, 2012. The other was the Defendant, THORQUEI FUND LTD., whose date of incorporation is unknown. Upon information and belief, these companies were nominally owned and controlled by THOR BATISTA, but who acted at BATISTA's direction.

277.    Upon information and belief, bank accounts were opened in The Bahamas, Miami, Florida, and eventually in Switzerland in the name of the THORQUE companies. It is believed that the Bahamian funds were held in an account under the direction of BTG Pactual[9] or Itaú Bank and eventually held at least $100 million in proceeds of the fraud. It is believed that the Miami account was at Itaú or Citibank. The Swiss account is presently unknown, but $30 million is believed to have been eventually routed out to a safe haven through the Citibank trust account of one of Batista's Florida professionals.

**"The Brazilian Dream."**

278.    On April 30, 2012, Bloomberg Television aired an 11-minute video interview of BATISTA on its show, "Money Moves with Deirdre Bolton." The interview took place at the Milken Institute's 2012 Global Conference in Los Angeles, California, where BATISTA was a featured panelist in four different panels during the five-day conference. After Bloomberg broadcast the interview on television, it published the interview on youtube.com with the description, "Brazilian billionaire Eike Batista talks about the potential benefits of OGX Petroleo e Gas Participacoes SA forming project partnerships with Petroleo Brasileiro SA and Vale SA."

279.    In the Bloomberg interview, correspondent Stephanie Ruhle introduced BATISTA as the "tenth richest man in the world - the goal is to get to number one." Ms. Ruhle then noted

---

[9] Banco BTG Pactual SA ("BTG Pactual") operates and has operated under various names in various jurisdictions during the relevant time period.

51

















of this should have been announced via Statements of Material Fact, but was not. The failure to do so constituted fraudulent misrepresentations by omission.

329. However, the announcement of the Put Option was effective in slowing the fall in price of OGX stock during the fourth quarter of 2012 and fed its rise in January 2013.

330. The value of LLX - BATISTA's allied logistics company which was building the port at Açu where OSX ships were to offload OGX oil - was conspicuously pegged to the value of OGX and therefore OSX.

331. In November 2012, MARCUS BERTO was appointed CEO and Investor Relations Officer of LLX to help corral emerging bad news and get the company sold off before the OGX bubble burst. Upon information and belief, BERTO fully understood that OGX was insolvent and the mission was to cash BATISTA out as fully as possible before the crash rendered everything valueless.

332. To further boost investor confidence, on November 13, 2012, BATISTA tweeted to the world that the Group X operations in the Campos Basin were in an area responsible for 80% of Brazil's oil production.

<u>**Section II - The Plaintiffs Invest**</u>

333. At the start of 2013, no one apart from the insiders, not even the Brazilian regulators, suspected that OGX was a colossal bubble scheme. The consistent, massive lies, spawned by BATISTA, his co-conspirators and his accomplices, repeated over the previous years, had generated an overall base-line impression among investors world-wide of OGX as an oil company with enormous oil reserves and enormous likely margins of profit, whose only impediment to spectacular success was its cash needs until it could come into full production.

334. That the BATISTA-generated spin was continuing to work in early 2013 was exemplified by announcements such as one published online by Highbeam Reports in January

61

2013 that London's financial house Barclay's was convinced that "[OGX] presents better opportunities for investors than its federally-owned peer Petrobras . . ." (This was well before the massive Petrobras corruption scandal broke).

335.   As noted above, Gables Capital, Inc. is a registered investment adviser based in downtown Miami, Florida, and at all times material hereto acted as investment adviser to the Plaintiffs and was their agent for the purchase and sale of stocks and bonds.

336.   The individual responsible for the MERIDIAN and AMERICAN accounts was Ms. Judith Neiwirth, Gables Capital's co-founder and Chief Investment Officer, who had over thirty years of experience in the financial services industry.

337.   Ms. Neiwirth had available to her the aggregate spin disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual "lay" internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers.

338.   As a result of the hype generated by BATISTA, described above, the general base-line impression in the international investment market at this time was that OGX was a company that was sitting on spectacular reserves, as evidenced in part by the fact that savvy industry player, Mubadala, had recently bought a 5.63% stake in its holding company for $2 billion.

339.   To investment advisers like Ms. Neiwirth, reviewing the aggregate information on Bloomberg, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar "bonanza," of which BATISTA had consistently represented, started to gush.

340.   It seemed, moreover, that OGX was in no danger of running out of cash, given that BATISTA had pledged an additional billion dollars of operating capital, if and when needed. (The

62

subtext was further that although there was a trillion dollars of oil to be had, if a billion was not quite enough to bring the gushers online, there would be more cash to come).

341.   BATISTA had further pledged to inject another billion dollars into OSX, if and when needed. Since the future of OSX depended heavily on the future of OGX, this pledge of cash for OSX reinforced the public impression of the value of OGX.

342.   This was therefore a particularly attractive opportunity for purchasers in the bond market. OGX appeared to be asset rich with plenty of operating capital and OGX bonds were at that time yielding above an 8.375% interest rate.

343.   On January 15, 2013, in reliance on the overall picture painted by BATISTA, his intentional misstatements made via his publications on the internet and material omissions, reinforced in her decision to invest by BATISTA's announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17 on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN.

344.   On January 22, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN.

**The EBX/BTG "Strategic Partnership."**

345.   In 2013, BTG Pactual was Brazil's biggest private investment bank, and its Chairman, Andre Esteves, was an iconic Brazilian billionaire on a level with BATISTA. On March 6, 2013, prnewswire.com relayed the following EBX announcement:

The EBX Group and BTG Pactual announce the signing of a novel strategic cooperation agreement. The agreement contemplates financial advisory services,

63

credit facilities and future long-term capital investments for the transformational projects currently being developed by the EBX Group in its segments. "This cooperation represents, above all, a partnership for the success of Brazil", said Eike Batista, EBX Group's CEO and Chairman.

This new cooperation will have a Strategic and Financial Management Committee comprising of senior executives from the EBX Group and of senior partners of BTG Pactual. The Committee will be led by Eike Batista and Andre Esteves and will meet on a weekly basis to discuss overall strategies relating to EBX Group's capital structure and investments for the short, medium and long-term projects and activities of the group's portfolio of companies. The agreement does not grant any exclusivity for BTG Pactual to render financial services to the EBX Group.

BTG Pactual's remuneration will be solely based on the performance of the EBX Group's public companies. Andre Esteves, BTG Pactual's CEO, stated that: "This cooperation shows once again our firm willingness to support unique projects and national entrepreneurship, areas in which Eike Batista is an icon."

346. This EBX announcement was intended to convey the underlying message that BTG Pactual, one of the largest and most sophisticated players in the Brazilian financial market, saw enough value in BATISTA's empire that it was willing to "partner" with EBX, without any promise of exclusivity, and plough in cash to finance "short, medium and long-term projects," with its own profits completely contingent on the success of the EBX ventures.

347. The phrasing of this release was another BATISTA stratagem intended to dress up the fact that OGX desperately needed money to delay its inevitable financial collapse by using the language of opportunity and the purported confidence of savvy bankers in the worth of his operation.

348. Predictably, OGX share prices shot upwards, closed up 16%, and rallying as much as 27.7% in the day following the announcement. On March 7, 2013, the announcement came across on the Bloomberg terminal on Ms. Neiwirth's desk at Gables Capital in Miami, Florida, coupled with a report that BTG Pactual was willing to extend BATISTA's EBX another billion dollars for liquidity.

349. On March 13, 2013, BATISTA had OGX release another Statement of Material Fact to investors declaring that oil recovery from the Pipeline, Fuji and Ilimani formations was

64

commercially feasible, announcing an on-site amount between a half billion and 1.3 billion barrels of oil, and conveying the impression that commercial production was imminent.

350.   However, as BATISTA knew, the truth was that only a tiny percent of the oil detected was recoverable and commercial feasibility was impossible.

351.   On March 22, 2013, BATISTA tweeted that OGX had eight acknowledged oil commercial accumulations: three onshore, in Maranhao, and five offshore.

352.   But, despite BATISTA's continuing misrepresentations, the stock price began to fall.

353.   On March 23, 2013, Bloomberg reported that BATISTA via Twitter had warned short sellers wagering against his companies that they would regret their bets. Asked by other Twitter users about the companies' falling stock prices, BATISTA had written that "rumors and gossip are tools of short sellers" who will be "caught with their pants down," and he directed his readers to an interview with BTG Pactual President, Andre Esteves.

354.   In that March 23, 2013, interview BTG Pactual President, Andre Esteves, had stated that BATISTA's companies were in no danger of failing and that BATISTA remained one of the best capitalized business men in Brazil.

355.   Well before the "strategic partnership" announced on March 6, 2012, BTG Pactual had been doing due diligence on OGX, which was the prime asset of BATISTA's holding company, EBX, in order to act as its financial consultant and potential provider of long-term financing. BTG Pactual must therefore have known how precarious a position OGX was in. The public, however, took its Chairman's statement as being true.

356.   Upon information and belief, Mr. Esteves' statement on behalf of BTG Pactual was intentionally false and was issued pursuant to an agreement with BATISTA. It is unknown what the consideration for the deal may have been. (In late 2015 Mr. Esteves was arrested in Rio,

65

stepping off a plane from Miami, Florida, in connection with charges of obstruction of justice in the Petrobras corruption investigation and was placed under house arrest).

357.    On March 26, 2013, OGX released its financial statement for 2012. Under "Message from the Management," Defendant LUIZ CARNEIRO, Chief Executive Officer of OGX, stated, "In parallel to the development of our fields, we made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations, and we continue our studies on how to best develop them."

358.    However, as BATISTA, CARNEIRO, and the other co-conspirators knew, none of these fields were commercially viable and OGX was insolvent. These were deliberately fraudulent misrepresentations.

359.    On March 28, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN.

360.    On April 1, 2013, MERIDIAN received its first interest payment of $432,359.38 on its OGX bonds and AMERICAN received its first interest payment of $146,562.50.

361.    On April 12, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN.

66

362.   As was not discovered until September 2016, during April 2013, BATISTA's CENTENNIAL ordered a Panamanian subsidiary, Goldenrock, to pay a $2.3 million kickback, upon information and belief, to Brazilian officials, from its account at TAG Bank in Panama, for the $922 million OSX shipbuilding contract awarded in mid-2012. It is believed that Goldenrock was one of at least two shell companies which upon information and belief held accounts at TAG Bank – the other being Blue Diamond, which BATISTA used to hold slush funds for the bribery of officials and others useful to his scheme. In April 2013, CENTENNIAL wired $111,798,818.97 million from an account Batista controlled at BTG Pactual in the Cayman Islands to TAG Bank for safekeeping and to top off BATISTA's slush fund.

**The $850 Million "Investment" by Petronas.**

363.   BATISTA knew that the sale of supposed oil "assets" to other supposedly savvy players in the oil industry would create confidence in OGX and in its other dependent enterprises as it would reflect the fact that the buyer, after doing due diligence, saw value in the OGX asset, and therefore so should other investors; and OGX would have yet more working capital, so nobody invested in its future should worry that it could not pay its way until coming into full production.

364.   The Defendant AZIZ BEN AMMAR was charged by BATISTA with attempting to close an asset purchase deal with the Malaysian State-owned oil company Petronas. Upon information and belief, BATISTA authorized BEN AMMAR to spend in excess of $10 million to help "grease the wheels" of the process.

365.   On or about May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Basin. The news of the $850 million Petronas deal was picked up and reported across the world and had its intended effect.

67

366. Thus, on May 8, 2013, London's Financial Times reported online that BATISTA had sold an $850 million stake in OGX assets to Malaysia's state-run Petronas. The article noted that shares in OGX were the biggest risers of Brazil's stock exchange that day. The good news came across the Bloomberg terminal screen on Ms. Neiwirth's desk.

367. That same day, The Wall Street Journal reported online, "Petronas's purchase of stakes in the two Tubarao Martelo blocks, with *reserves* estimated at 145 billion barrels of oil, will give OGX much-needed cash to fund fresh investments. The Malaysian and Brazilian companies announced the deal in separate statements." (Emphasis added)

368. Similarly, BNAmericas announced online, "Brazil's OGX has confirmed an US $850mn farm-out deal with Malaysian giant Petronas for a share of two oil and gas blocks off the coast of Rio de Janeiro. The deal hands the Kuala Lumpur-based firm a 40% non-operating working interest in the Campos basin's BM-C-39 and BM-C-40 blocks, OGX said in a statement. In addition, Petronas has an option to purchase 5% of OGX's capital stock at a price of 6.30 reais until April 2015."

369. The quote from OGX in the article continued, "OGX's partnership with Petronas underscores the quality of our asset and the potential of the Tubarão Martelo field, where production is expected to commence by the end of the year," OGX chief executive CARNEIRO said, "[w]ith more than 32Bb of recoverable resources and a production of about 2Mboe/d, Petronas' expertise will enhance the continued development of oil production in these areas."

370. However, as CARNEIRO and the other co-conspirators knew, this was a lie. There was virtually no commercially recoverable oil. OGX was a complete bust and would soon collapse.

**Meridian Invests in More OGX Bonds.**

371. The news of the supposed Petronas purchase came across the Bloomberg terminal screen on Judy Neiwirth's desk in Miami, Florida, on May 8, 2013. The Bloomberg report also

68

recited a supposed quote from the buyer, "Petronas views the acquisition as a highly attractive investment opportunity in terms of asset quality and for strategic future growth in Brazil."

372.   Investors in OGX bonds were spurred to make greater purchases by this news. According to Reuters News Agency, investment in OGX bonds by the massive U.S. investment fund, Pimco, climbed as high as $800 million during May 2013.

373.   On May 20, 2013, in continued reliance on the vaunted future profitability of OGX, and BATISTA's commitment to inject a billion dollars if and when needed, and further encouraged by the announcement of the Petronas deal, Gables Capital, in Miami, Florida, directed the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN.

374.   However, the truth was, in fact, that there was no actual "Petronas deal" as portrayed to the public. The deal had many contingencies, including OGX restructuring its debt and reaching certain production targets.

375.   Upon information and belief, it was Batista's strategy to convey the message that sophisticated investors saw great value in the future of OGX.

376.   Why Petronas – currently wracked by its own massive corruption scandal - did not correct the OGX presentation or market perception at that time is unknown before discovery.

**Batista Secretly Cashes Out.**

377.   While doing his best to encourage investor confidence and continued investment in OGX, between May and June 2013, BATISTA secretly instructed EBX to sell off 126.65 million shares in OGX.

378.   BATISTA was also siphoning off cash in huge amounts. According to a much later released confidential letter from the Cleary Gottlieb law firm, representing a cadre of large insider

69

creditors in June 2013, BATISTA funneled out $450,000,000 to an affiliate without justification just that month.

379.    It is not known before discovery where that money went but it is believed that a substantial amount was routed directly or intermediately through the corporate co-conspirators and accomplices the 63X companies, members of the EBX group and the CENTENNIAL companies, to the THORQUE Companies' accounts and to bank accounts in various countries.

380.    Then in early June 2013, BATISTA put another layer of insulation between himself and his creditors by transferring $30 million from an account in Brazil to a Citibank account in Brazil in the name of his son, THOR BATISTA. It is believed that the funds were thereafter funneled out of Citibank Brazil to the Citibank trust account of a BATISTA professional in Miami, and onwards to Switzerland or other secrecy jurisdiction.

381.    On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign.

382.    However, when the news hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm.

383.    BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the restructuring of the group which was now complete that same month of June" and that no further shares would be sold. However, this would prove to be a lie.

384.    On June 20, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, and reassured by BATISTA's news of his stock sale being just a "one-off adjustment," Gables Capital, in Miami,

70

Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the secondary market on behalf of its client, MERIDIAN, as trustee.

385.     MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98.

386.     However, on July 1, 2013, OGX was finally forced to admit by a Statement of Material Fact that a number of its wells in the Campos Basin were unproductive and, cryptically, that none of its projections should be relied upon, which resulted in a plunge in OGX share prices.

387.     Critically, however, BATISTA failed to announce: that there was in actual fact virtually no commercially recoverable oil; that the Mubadala and Petronas investments had been massive loans and Petronas was not obliged to perform unless OGX was re-structured; that behind the scenes Mubadala, who knew the exact state of affairs, was realizing on its securities; and lastly, he failed to disclose his intention to dishonor the billion dollar put option, if and when demanded.

388.     In fact, in the face of certain knowledge that OGX was insolvent and had no oilfields likely to generate significant recoverable oil, BATISTA continued to spawn lies about projected future profitability.

389.     Thus, on July 3, 2013, Bloomberg relayed the news that OGX had declared the Remora field in the Campos Basin commercially viable.

390.     Unfortunately, this was just another lie.

**Batista Makes Further Fraudulent Transfers.**

391.     Upon information and belief, during these months, in line with his overall game-plan, BATISTA was moving the assets still in Brazil that were the most vulnerable to attachment out of his name and into the names of family members, leaving himself immune from collection.

392.     Upon information and belief (according to the Brazilian indictments) BATISTA transferred two buildings in Rio with an aggregate value of approximately $20 million into the

71

names of his sons THOR BATISTA and OLIN BATISTA; he moved $60 million from an account in Brazil to a Citibank account in the name of THOR BATISTA; and he transferred approximately $7 million in cash plus a $2 million apartment in Ipanema to FLAVIA SAMPAIO, his girlfriend and mother of his infant son, Balder.

393.    Upon information and belief, BATISTA, his co-conspirators, and accomplices had by this time moved the bulk of his and their liquid assets out of Brazil and off to secrecy jurisdictions, where they were held in cash, or reinvested in stock in ventures likely to actually prove to be profitable, or in real estate and other more secure investments in other countries, typically through the medium of shell companies to act as "blinds" between the asset and the ultimate beneficial owners.

**Mubadala Secretly Pulls Out.**

394.    During early July, 2013, news began to leak out that the Mubadala deal, which had been announced as an equity investment and seen as BATISTA's ultimate stamp of approval by the investment community, providing important backing for BATISTA's ambitions by a major global sovereign wealth fund, had in fact been nothing of the sort, but rather a huge loan, collateralized by plum assets and personal guarantees.

395.    Moreover, behind the scenes, Mubadala, which had inside knowledge as to the true state of affairs in BATISTA's companies and was not prepared to wait for the disaster that it could see from the actual records, had over the course of many months been demanding and receiving the surrender of collateral and the partial repayment of its loans to reduce its exposure to the greatest extent possible. The fact that Mubadala was pulling out should have been released to the investment community as a material fact, but was not.

396.    BATISTA publicly tried to put the best spin possible on the leaked news, characterizing the OGX payments to Mubadala as the partial redemption of an "investment" rather

72

than the repayment of a loan. Mubadala did not deny this characterization. However, neither EBX nor Mubadala would provide details of the restructuring.

397.     Upon information and belief, the process of asset stripping was carried out by lawyers at Maples & Calder in the Cayman Islands. According to the online version of The Legal 500 regarding Maples & Calder, "[o]ther major instructions included Simon Firth advising Eike Batista's EBX Group on the ongoing restructuring of its strategic partnership with Mubadala Development Company." Cayman Islands, Corporate and Commercial, *Maples and Calder*, The Legal 500 (last visited Oct. 11, 2016), http://www.legal500.com/c/cayman-islands/corporate-and-commercial.

398.     Mubadala had gone along with the initial public mischaracterization of its loan as an "equity investment" and had secretly stripped plum assets from the BATISTA companies under cover of an announced "partial redemption" of that investment, all of which tends to indicate complicity in the fraud. Plaintiffs reserve the right to add Mubadala as a Defendant should discovery confirm a basis to do so.

**The 10.8 Billion Barrel Lie -- Recap.**

399.     Despite the fact that OGX was now on a very fast countdown to collapse, BATISTA resolutely kept on publicly trumpeting a rosy vision of the future for OGX, completely disconnected from any shred of reality.

400.     Thus, on July 19, 2013, BATISTA once again blared out reassurances for distribution through the internet press [Bloomberg Businessweek, Financial Times, Fox Business, San Francisco Chronicle] that, as D&M had stated in a 2011 Report, OGX had reserves amounting to 10.8 billion barrels and that regardless of all else, he would stand by the company and honor all of his obligations.

73

401.   However, BATISTA had always known that the various OGX projections had been lies. That had been confirmed by the internal OGX Task Force and Schlumberger Task Force Reports in late 2012 and all the evidence since then had reinforced the point and he had neither the capacity nor the intention to make good on all his debts, let alone compensate all of the many victims of his fraud.

402.   On July 22, 2013, D&M again demanded of BATISTA, privately, that he retract the 10.8 billion barrel lie and detach the D&M name from it. BATISTA did not do so.

403.   On August 14, 2013, it was reported that Luciano Coutinho, the President of the Brazilian development bank, BNDES, which had loaned BATISTA billions of dollars and must have done due diligence that showed otherwise, announced that BATISTA's OGX had "high-quality assets with which it can rebalance itself." It is unknown before discovery what inducement BATISTA supplied for him to state this lie.

404.   On August 16, 2013, the Tubarão Azul oilfield was closed down, having produced roughly 5 million barrels throughout its life, or just 1% of the minimum estimate announced in 2010. This was OGX's best field.  There would be a later attempt to operate this field post-bankruptcy. This attempt, however, would prove futile and the field was eventually returned to the Brazilian government.

405.   The task BATISTA had set for MARCUS BERTO was, upon information and belief, to get the EBX stake in LLX secretly monetized before the OGX crash, and the crash of OSX which would follow on its heels, leaving the LLX port project without its anchor tenant.

406.   On August 15, 2013, in a filing with the Brazilian Securities and Exchange Commission, BATISTA belatedly confirmed that he was selling a controlling stake in LLX for $560 million to U.S.-based EIG Global Energy Partners.

74

407.   Upon information and belief, therefore, this was "mission accomplished" for MARCUS BERTO.

408.   Disastrous news was also now emerging about BATISTA's MMX, iron ore "producing" company, which had been fined $1.8 billion for unpaid taxes, equivalent to nearly 80% of its market value. BATISTA's hand-picked managers at MMX were trying to sell off this company, too, before the others crashed all around it.

409.   In August and September 2013, BATISTA secretly sold another 227 million shares in OGX, which earned him approximately $35 million and which, upon information and belief, he routed to one of his foreign accounts.

410.   Though not discovered until near the end of the year, and then reported by the journalist Elio Gaspari in the Rio de Janeiro daily paper, O Globo, at least ten OGX executives left the company during these final months, with parting payments ranging between $46 million and $92 million each, further stripping cash out of the company.

411.   On September 4, 2013, having milked as much as he could out of OGX, AZIZ BIN AMMAR resigned from the Board and reportedly fled the country for New York where he is reported to presently reside in luxury in a $10 million apartment believed to have been acquired with a small part of his takings.

412.   With the OGX bankruptcy just days away, upon information and belief, BATISTA attempted to transfer another $100 million in corporate funds from a BTG Pactual correspondent account in The Bahamas to a Miami, Florida, account at Citibank, believed to be a THORQUE Company bank account.

413.   Upon information and belief, Andres Esteves, billionaire Chairman of BTG Pactual, initially refused to make this transfer, however, because he feared that BTG Pactual would become liable as an accomplice to BATISTA's fraud on creditors.

75

414.   It is unknown whether those funds remain "stranded" in The Bahamas, or have been routed out on BATISTA's instructions to one of his other accounts.

415.   Equity investors and bond holders were still relying on the fact that there was value in OGX. This belief was due to the fact that as recently as May 2013, a foreign oil company, Petronas, had apparently invested close to a billion dollars of its own money in the OGX oil fields.

416.   On top of that, BATISTA himself was obliged to inject $1 billion in cash into OGX, if and when needed, through the Put Option. (And in 2014, into OSX through a similar Put Option). All that was needed apparently was for OGX to have enough cash to stay in business until the oil started to flow.

417.   The OGX Put Option representation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which Ms. Neiwirth took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true.

### Section III - The OGX Oil Bubble Bursts

418.   On September 6, 2013, OGX's Controller, desperate for cash, formally demanded from BATISTA the first $100 million under the Put Option.

419.   BATISTA, who had never had any intention of paying a single penny *into* OGX, shocked investors by refusing to pay this or any other obligation under the Put Option, claiming the benefit of an "out clause," which - if an actual document even existed - he had inserted for that purpose.

420.   The arrival of OSX III, yet another massive floating production, storage and offloading vessel at the Tubarão Martelo field, on October 1, 2013, raised momentary hopes that OGX might soon start producing offshore oil from the field. But by close of business that same day, OGX missed a bond payment in the amount of $45 million.

76

421.   On October 28, 2013, MARCUS BERTO formally stepped down at LLX, resigning as President and Director of Investor Relations and handed over to the new owners' appointed management and left for Miami, Florida.

422.   It is believed that MARCUS BERTO had been awarded a significant interest in the company by BATISTA for his services, part of which he invested in what is reported to be a $9.5 million Key Biscayne, Florida, mansion.

423.   On October 30, 2013, OGX filed for bankruptcy in Rio de Janeiro disclosing debts of $5.1 billion, of which roughly $3.6 billion was owed to U.S. and other foreign bondholders.

424.   Pimco, the world's largest bond investor, based in California, and BlackRock, the world's largest asset manager, from New York, had front-row seats for the collapse.

425.   Bondholders like the Plaintiffs and, upon information and belief, other investors from Florida, such as the Florida Retirement System Trust Fund, were among the horde of other investors that were basically wiped out.

426.   OGX's satellite company, MMX, filed for bankruptcy on October 22, 2013.

427.   OGX's satellite company, OSX, filed for bankruptcy on November 11, 2013.

428.   In November 2013, Petronas announced that it would not pay the $850 million, which investors had expected under the alleged "deal" that BATISTA had broadcast in May of that year, disclosing that the deal had been contingent on OGX being able to re-structure its debt.

429.   By February 2014, virtually all of the blocks which OGX had leased had been returned to the Brazilian Government as worthless.

**Batista's "Brazilian Dream" Turns to Nightmare.**

430.   For everybody with an interest in OGX and its satellite companies - except for BATISTA, his co-conspirators, and accomplices - the "Brazilian Dream" BATISTA had boasted of in the April 30, 2012, Milken interview, had now turned to a nightmare.

77

431.   The shareholders and ordinary bondholders who had invested billions of dollars in OGX, predominantly from the U.S., had now been essentially wiped out in what is currently the largest default in Latin American history.

432.   BATISTA and a number of his co-conspirators and accomplices have been indicted for market manipulation and insider trading in Brazil. These proceedings are expected to last a decade or more, with no real hope of securing punishment of the perpetrators of the fraud or restitution for the victims.

433.   As one of his "defenses" in the criminal proceedings in Brazil, BATISTA has contended that the conditions of the leases required that OGX continue to explore for oil until it declared a field to be commercial or return it to the government. BATISTA therefore had OGX declare fields to be commercial to avoid incurring the cost of exploration or having to return them as worthless, trusting that some future technological advance would allow OGX to commercially recover what were presently unrecoverable resources. In other words, BATISTA has admitted that those representations to investors were false.

434.   In November 2015, Brazil's market regulator, the CVM, banned BATISTA from managing a publicly traded company for a derisory five years.

**Batista's Silver Lining.**

435.   BATISTA and his co-conspirators, however, are all believed to have done well out of the scheme, having received sums ranging from tens of millions of dollars to hundreds of millions of dollars apiece.

436.   All the lies about BATISTA being listed somewhere in the league of the world's richest men can now be seen to have *always* been a lie. The number on which that supposed position ranking was predicated was the sum total of money paid in by investors in expectation of profits from oil that never existed.

78

437.  In actual fact, BATISTA's original net worth before the OGX fiasco was probably in the hundreds of millions of dollars, and his actual current assets, mainly squirreled away abroad, are probably significantly more than what he began with.

438.  Thus, BATISTA and his family continue to live an untouchable life of luxury in Brazil. It is reported that he believes that he has "zeroed his debts" through the bankruptcies. Apparently the billions of dollars of which he bilked his victims does not count.

439.  That BATISTA has massive wealth remaining is shown by the fact that in March 2016, he threw $130,000.00 in gold coins from the deck of his yacht into the Atlantic Ocean to propitiate the "Queen of The Sea," and turn the course of his luck for his next enterprise.

440.  In July 2016, with all funds successfully routed out to safety, THOR BATISTA quietly closed down the THORQUE Companies in The Bahamas. Notice of the dissolution was given solely by means of a newspaper of tiny local circulation in The Bahamas on July 28, 2016. Copies of the notices are shown here:

441.  As previously mentioned, the Tubarão Azul oilfield had been OGX's best prospect. Under BATISTA it had achieved less than 1% of the flow promised. On September 20, 2016, three years post-bankruptcy, after the successor entity had ploughed many more millions into its exploration, the Tubarão Azul oilfield was returned to the Brazilian government as worthless.

**The Plaintiffs' Claim.**

442.    Through restructuring in the OGX bankruptcy, MERIDIAN's close to $17 million dollars in bonds has been translated into shares in a new version of OGX with a face value of $279,746 for which credit is given. MERIDIAN's net loss is $16,438,233, plus interest.

443.    Through restructuring in the OGX bankruptcy, AMERICAN's close to $4 million in bonds has been translated into shares in a new version of OGX with a face value of $62,166, for which credit is given. AMERICAN's net loss is $3,872,616, plus interest.

444.    The Plaintiffs have retained the undersigned attorneys to prosecute this action and are obliged to pay them a reasonable fee.

445.    As of the date of filing this Complaint, the Plaintiffs have already commenced proceedings ancillary to this action, restricting Batista and the 63X Companies from dissipating assets and to obtain information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

446.    In the Cayman Islands, after a multi-day hearing, the Judge, consistent with Cayman Islands law, entered an Order freezing the assets of Batista and the 63X Companies worldwide and ordered disclosures for information regarding accounts and transfers owned and controlled by Batista and the 63X Companies.

447.    In the Bahamas, consistent with Bahamian law, the Judge similarly entered an order for the disclosure of information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

448.    BATISTA and the 63X Companies have been notified of these foreign proceeding. Upon information and belief, BATISTA is actively avoiding service of the Cayman Orders.

80

## COUNT I
## FRAUD

Plaintiffs re-allege paragraphs 1-7, 9-11, 13-14, 28-448 against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO and AZIZ BEN AMMAR, as follows:

449.    Each of the above named Defendants personally participated in the fraudulent scheme and composed and transmitted material fraudulent misrepresentations, and assisted each other in maintaining the credibility of material misrepresentations as detailed above.

450.    As detailed above, each of them issued and assisted in issuing false statements concerning specific material facts, with actual knowledge that the representations were false, with the intention that investors would thereby be induced to rely on such representations to their consequent financial loss.

451.    In directing their individual and collaborative misrepresentations to the United States, the named Defendants necessarily targeted investors in the most populous States of the United States, of which Florida is the third, behind only California and Texas. They did so in the expectation of personal gain and of causing loss to their targets.

452.    Plaintiffs' investment agent, Gables Capital Management, in Miami, Florida, was a target of such misrepresentations and relied on the same and was thereby induced by such fraudulent misrepresentations to buy OGX bonds on behalf of the Plaintiffs in the total amount of $21,231,683.00.

453.    The OGX bonds were and are virtually worthless, as a result of which Plaintiffs have been damaged in the sums alleged.

454.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

81

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT II
### CONSPIRACY TO DEFRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

455. The foregoing Defendants agreed to and did conspire together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors.

456. Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT III
### AIDING AND ABETTING FRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X

82

MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

457.    The foregoing Defendants aided and abetted BATISTA and his co-conspirators and accomplices and rendered substantial, material assistance to him and them, in ways, upon dates, and in places, that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme and to assist in secreting the proceeds in false names and in jurisdictions where they would not be available for the satisfaction of the legitimate debts of creditors, wherefore they are additionally liable as aiders and abettors.

458.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

### COUNT IV
### FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT
### (f/k/a "FLORIDA RICO")

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD.,

83

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

**The Criminal Enterprise.**

459.    Upon the basis of the facts alleged, BATISTA is and was the prime directing and controlling force at the head of a criminal enterprise within the meaning of Fla. Stat. § 772.102(3) comprised of himself, the joined Defendants, and many other co-conspirators, aiders, abettors, and accomplices not joined.

460.    The enterprise had as its common purpose the criminal aspirations and ambitions of BATISTA for the accumulation of wealth through a pattern of racketeering activity for further investment, enjoyment and transmission down through the generations of his relatives, friends co-conspirators and accomplices.

461.    Such enterprise is referred to collectively as "the Batista Crime Family" and the Defendant individuals and entities comprising such as "members of the Batista Crime Family" or "members of the enterprise."

462.    All members of The Batista Crime Family acted, in regard to each listed predicate act as described below and as to the overall pattern of racketeering activity, with criminal intent.

**Pattern of Criminal Activity.**

463.    By reason of the allegations made herein, the members of the enterprise engaged in a pattern of criminal activity as stated in Fla. Stat. § 772.102(4).

**Predicate Acts of Criminal Activity.**

464.    The Defendants actively participated in the enterprise, the Batista Crime Family, through the stated prohibited activities contrary to Fla. Stat. § 772.103 in the course of a pattern of criminal activity under Fla. Stat. § 772.102(4) which entitle Plaintiffs to civil remedies under Fla. Stat. § 772.104.

84

**Predicate Act I - Florida Securities Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

465.    As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly employed a device, scheme, or artifice to defraud, contrary to Fla. Stat. § 517.301(1)(a)(1).

466.    As set forth above, the stated Defendants have further committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly obtained money or property by means of untrue statements of material facts or any omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, contrary to Fla. Stat. § 517.301(1)(a)(2).

467.    As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon persons, including Plaintiffs, contrary to Fla. Stat. § 517.301(1)(a)(3).

85

**Predicate Act II - Federal Wire Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

468.   As set forth above, the stated Defendants have committed numerous acts of wire fraud in that they, having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, contrary to 18 U.S.C. § 1343.

**Predicate Act III - Federal Money Laundering - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT, OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.**

469.   As set forth above, the stated Defendants committed numerous acts of money laundering in that they knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from unlawful activity contrary to 18 U.S.C. § 1957. As stated above, the acts of money laundering variously took place in the United States pursuant to 18 U.S.C. § 1957(d), or was committed outside the U.S. by "U.S. persons" including U.S. nationals, U.S. permanent residents, corporations formed in the U.S. and foreign subsidiaries of such persons as defined in 18 U.S.C. § 3077.

86

**Predicate Act IV - Florida False Advertising - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR.**

470. As set forth above, the stated Defendants committed numerous acts of misleading and deceptive advertising, contrary to Fla. Stat. § 817.40(5), in that they made or disseminated or caused to be made or disseminated before the general public of the state, or a portion thereof, misleading advertisements, which were fraudulent and unlawful, which the Defendants knew or should have known were false, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

**Predicate Act V - Florida Theft - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

471. By reason of the foregoing the stated Defendants, with criminal intent, knowingly obtained or used, or endeavored to obtain or use, the Plaintiffs' property and the property of others through fraud, deceit, false pretenses and/or conduct of similar nature, with the intent to permanently deprive the Plaintiffs and such others of their right to their property or their benefit of their property, and further, knowingly and with criminal intent appropriated such property to their own use contrary to Fla. Stat. § 812.014.

87

**Predicate Act VI - Florida Communications Fraud: Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

472.    As set forth above, the stated Defendants engaged in a scheme to defraud, in that they engaged in a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto contrary to Fla. Stat § 817.034(4)(a), 817.034(3)(b), 817.034(3)(c), and 817.034(3)(d).

473.    Further by reason of the matters set forth above, the stated Defendants furthered a scheme to defraud, in that they furthered a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto, and in the course thereof communicated with persons with the intent to obtain property from such persons contrary to Fla. Stat § 817.034(4)(b).

**Civil Remedy.**

474.    As a result of the Defendants' participation in the criminal enterprise and its perpetration of the aforesaid pattern of criminal activity, Defendants caused injury and damage to Plaintiffs.

475.    By reason of the foregoing, Defendants have, with criminal intent, received proceeds derived directly or indirectly from a pattern of criminal activity and have used or invested the same, or a part thereof, directly or indirectly, or the proceeds derived from the investment or

88

use thereof, in the acquisition of title to, or a right, interest, or equity in, real property or in the establishment or operation of an enterprise, contrary to Fla. Stat. § 772.103.

476.   By reason of the foregoing, Defendants have, with criminal intent, through a pattern of criminal activity acquired or maintained, directly or indirectly, an interest in or control of enterprises or real property; have been employed by of associated with an enterprise to conduct or participate, directly or indirectly, in a pattern of criminal activity; conspired or have endeavored to violate provisions of subsection (1), subsection (2), or subsection (3) of Fla. Stat. § 772.103.

477.   By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Fla. Stat. § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, statutory treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

### COUNT V
### FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT CONSPIRACY
### (f/k/a "FLORIDA RICO CONSPIRACY")

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

89

478.   The members of the Batista Crime Family conspired and agreed together at numerous times and on various dates and in various places to participate in the fraudulent scheme and in the affairs of the criminal enterprise through a pattern of racketeering activity contrary to Florida Statute § 772.103(4), by reason of which Plaintiffs were damaged and are consequently entitled to civil remedies under Florida Statute § 772.104.

479.   By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Florida Statutes § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

## COUNT VI
## FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-14, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR, and say as follows:

480.   Defendants committed numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1), and that they caused such loss in fact to Plaintiffs.

481.   Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

482.   Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

90

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

## COUNT VII
## CONSPIRACY TO COMMIT FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-25, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

483.   Defendants conspired together to commit and did commit numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

484.   Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

485.   Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

91

### COUNT VIII
### CIVIL THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-25 and 28-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

486. By reason of the foregoing acts alleged, the Defendants committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Florida State § 772.11, including treble damages, attorneys' fees and the expenses of this action.

487. All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

### COUNT IX
### CONSPIRACY TO COMMIT THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD.,

92

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

488.    The foregoing Defendants with criminal intent, conspired together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and performed the stated acts in pursuance of such agreement in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

489.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

<div align="center">

**COUNT X**
**AIDING AND ABETTING THEFT**

</div>

Further or alternatively, Plaintiffs re-allege paragraphs 1-5, 7-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

<div align="center">

93

</div>

490.    The foregoing Defendants, with criminal intent, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, aided and abetted BATISTA in achieving the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

491.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT XI
## FLORIDA UNIFORM FRAUDULENT TRANSFERS ACT

Further or alternatively, Plaintiffs allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

492.    The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, made fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a

94

reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and each of the other liable Defendants were engaged or was about to; engage in a business or a transaction for which his and their remaining assets were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he or they would incur, debts beyond his or their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the asset transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

### COUNT XII
### CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

95



Respectfully submitted,
ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282
Carlos F. Osorio
Florida Bar No.: 597546

97

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

       Defendants.

_____/

## NOTICE OF FILING VERIFIED RETURN OF SERVICE

       Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for 63X Fund c/o Maples & Calder,

Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.

       Dated: March 16, 2017.

                    Respectfully submitted,

                    ABALLI MILNE KALIL, P.A.
                    *Counsel for Plaintiffs*
                    2250 SunTrust International Center
                    One Southeast Third Ave.
                    Miami, FL 33131
                    Phone: (305) 373–6600
                    Fax: (305) 373–7929

                    *s/ Hendrik G. Milne*         
                    Hendrik G. Milne
                    Florida Bar No.: 335886
                    Craig P. Kalil
                    Florida Bar No.: 607282

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 16th day of March, 2017 a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court' s e-service system.

*s/ Hendrik G. Milne*

Hendrik G. Milne, Esq.



Clerk of Court's Office
P.O. Box 495
George Town
Grand Cayman
Cayman Islands
B.W.I.

OUR REF: F.P. 05 OF 2017

## AFFIDAVIT OF SERVICE

I, Josen Ebanks of West Bay, Grand Cayman, Cayman Islands affirm and swear as follows:

1.    I am a Bailiff of the Grand Court of the Cayman Islands.

2.    That on **Tuesday** the **21ˢᵗ** day of **February 2017**, at **1:28pm** I served the attached documents:-

     *J.E.*
~~SEE LIST~~/AS ATTACHED

3.    That service was made on the registered office for **63X Fund** c/o Maples & Calder, **Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.**

4.    Service was made by handing the said documents to **Tami Powers – Team Leader**

5.    The above statements made by me are true and correct.

_____
Josen Ebanks, Bailiff of the Grand Court

Sworn to before me at George Town on 23ʳᵈ day of February , 2017

_____
NOTARY PUBLIC, GEORGE TOWN
GRAND CAYMAN, CAYMAN ISLANDS

# CERTIFICATE
## ATTESTATION

The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

☒ **1. that the document has been served***
    *que la demande a été exécutée**

| — the (date) / *le (date)*: | 21st February 2017 |
|---|---|
| — at (place, street, number): *à (localité, rue, numéro) :* | 63X Fund,c/o Maples &Calder, Ugland House, South Church Street,George Town, Grand Cayman |

| — in one of the following methods authorised by Article 5: *dans une des formes suivantes prévues à l'article 5 :* | | |
|---|---|---|
| ☐ | a) | in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention* *selon les formes légales (article 5, alinéa premier, lettre a)** |
| ☐ | b) | in accordance with the following particular method*: *selon la forme particulière suivante* :* ——— |
| ☒ | c) | by delivery to the addressee, if he accepts it voluntarily* *par remise simple** |

The documents referred to in the request have been delivered to:
*Les documents mentionnés dans la demande ont été remis à :*

| Identity and description of person: *Identité et qualité de la personne :* | Tami Powers |
|---|---|
| Relationship to the addressee (family, business or other): *Liens de parenté, de subordination ou autres, avec le destinataire de l'acte :* | Team Leader |

☐ **2. that the document has not been served, by reason of the following facts***:
    *que la demande n'a pas été exécutée, en raison des faits suivants**:

| ——— |
|---|

☒ **In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.**
*Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint*.*

*Annexes / Annexes*

| Documents returned: *Pièces renvoyées :* | Duplicate copy of document served |
|---|---|
| In appropriate cases, documents establishing the service: *Le cas échéant, les documents justificatifs de l'exécution :* * if appropriate / *s'il y a lieu* | Affidavit of Service and Certificate of Attestation |

| Done at / *Fait à*  George Town, Grand Cayman, The / *le*  23 February 2017 | Signature and/or stamp *Signature et / ou cachet* |
|---|---|

*Our Ref: FP-005/2017*

## Aballi
## Milne
## Kalil, P.A.
**Counsellors at Law**

January 19, 2017

**Personal and Confidential**
**Via Hand Delivery**

63X Fund
PO Box 309
Ugland House, South Church Street
George Town, Grand Cayman
KY1-1104, Cayman Islands

### Statutory Demand– Civil Theft Act

Dear Sir:

We represent the interests of Meridian Trust Company ("Meridian") and American Associated Group, Ltd ("American).

### Claim

You, individually, and acting in concert with others, wrongfully deprived Meridian of $16,438,233.00 and American of $3,872,616.00, for a total of $20,310,849.00, and thereby committed theft within the meaning of Fla. Stat. § 812.014, all as is laid out in detail in the complaint filed against you in the Circuit Court for Miami-Dade Florida, USA, Case Number 2017-001040 CA-01 (43). A copy is being delivered to you herewith.

### Demand

Pursuant to Fla. Stat. § 772.11 we hereby make demand on you for the payment in full, within thirty days, of three times the amount of the loss, namely $49,314,699.00 in regard to Meridian and $11,617,848.00 in regard to American, for a total of $60,932,547.00. Payment may be made to our trust account, for our clients, by wire, by check, or in cash at our office.

### Alternative Tender

If you believe that less than the amounts claimed were taken, you may tender a sum equal to three times the amount you believe was taken, together with an explanation and any evidence supporting your explanation and our clients will consider your tender. Your making such a tender will not obligate either of our clients to accept it.

2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida  33131
Telephone (305) 373-6600
Fax (305) 373-7929
www.aballi.com

63X Fund
January 19, 2017
Page 2

## Release

In compliance with Fla. Stat. § 772.11, upon payment in full of the aforesaid sum of $60,932,547.00, within thirty days (or such other sum as may be tendered, if accepted), our clients will give you a written release from further civil liability for the specific cause of action of civil theft.

## Defenses

If we are mistaken in any of the assertions made in this letter, or you believe that you have a defense to this claim, we ask that you inform us of the facts constituting such defense promptly, within thirty days so that we may consider further action.

Sincerely yours,

Hendrik G. Milne, Esq.
Aballi Milne Kalil P.A.

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL    ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-001040-CA-01 |
|---|---|---|
| PLAINTIFF(S)<br>Meridian Trust Company, as Trustee,<br>and American Associated Group, Ltd. | VS.  DEFENDANT(S)<br>Eike Batista, et. al. | SERVICE |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on

defendant(s): 63X Fund

            PO Box 309, Ugland House, South Church Street

            George Town, Grand Cayman

            KY1-1104, Cayman Islands

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Hendrik G. Milne, Florida Bar No. 335886

whose address is: One Southeast Third Avenue, Suite 2250, Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| HARVEY RUVIN<br><br>CLERK of COURTS | *(signature)*<br>DEPUTY CLERK | DATE<br><br>JAN 19 2017 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

CLK/CT. 314 Rev. 02/16                                                                 Clerk's web address: www.miami-dadeclerk.com

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL    ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-001040-CA-01 |
|---|---|---|
| PLAINTIFF(S)<br>Meridian Trust Company, as Trustee,<br>and American Associated Group, Ltd. | VS.  DEFENDANT(S)<br>Eike Batista, et. al. | SERVICE |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on

defendant(s): 63X Fund

PO Box 309, Ugland House, South Church Street

George Town, Grand Cayman

KY1-1104, Cayman Islands

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Hendrik G. Milne, Florida Bar No. 335886

whose address is: One Southeast Third Avenue, Suite 2250, Miami, FL 33131

within 20 days * **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies,
or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days.
When suit is brought pursuant to 768.28, Florida Statutes, the time to respond shall be 30 days,"** after service of this summons
on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before
service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for
the relief demanded in the complaint or petition.

| HARVEY RUVIN<br><br>CLERK of COURTS | MARIA GIPPS<br><br>DEPUTY CLERK | DATE<br><br>JAN 1 8 2017 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to
participate in this proceeding, you are entitled, at no cost to you, to the provision of certain
assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson
E. Thomas Courthouse Center, 175 NW 1ˢᵗ Ave., Suite 2702, Miami, FL 33128, Telephone
(305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your
scheduled court appearance, or immediately upon receiving this notification if the time
before the scheduled appearance is less than 7 days; if you are hearing or voice impaired,
call 711."**

Filing # 51134312 E-Filed 01/12/2017 08:39:38 PM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 2017- 001040 -CA-01

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.

     Defendants.

_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, MERIDIAN TRUST COMPANY, as trustee, and AMERICAN ASSOCIATED

GROUP, LTD., sue Defendants, EIKE BATISTA, WERNER BATISTA, THOR BATISTA,

PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ

CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X

FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS,

CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY

FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,

OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

### Case Capsule - Requires no Response

A Brazilian con man, Eike Batista, induced investors from around the U.S. - including many State employee pension funds, such as the Florida Retirement System Trust Fund - to invest billions of dollars in his oil exploration company OGX and its satellite companies on the basis of fraudulent promises of the discovery of a trillion dollars of offshore oil. He promised to plough in a billion dollars of his own money if the business needed it to come into production.

When the truth was finally discovered, that there was virtually no oil, Batista welshed on his billion dollar promise; OGX and its satellite companies collapsed; and the investors lost their money in what is currently Latin America's largest corporate default, ever.

Batista and a few others were indicted for market manipulation and insider trading and he has been fined and banned from heading up public companies for five years in Brazil. However, they all made many hundreds of millions of dollars from the scheme. Batista stashed much of his share in the names of family members and shell companies in Miami, Florida, and offshore.



The Plaintiffs - investment vehicles for an elderly disabled beneficiary - invested over $21 million in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations. They seek to recover their losses against Batista and his co-conspirators; treble damages pursuant to Florida's racketeering statutes; and to freeze the proceeds of the fraudulent scheme in the hands of the various recipients pending judgment.

## TABLE OF CONTENTS

Case Capsule - Requires no Response ................................................................................ ii

Parties and Jurisdiction ............................................................................................... 1

    Jurisdiction ........................................................................................................ 1

    Plaintiffs ............................................................................................................ 1

    Defendants ......................................................................................................... 2

    Personal Jurisdiction in Florida ........................................................................ 4

    The Fraudulent Scheme – Overview .................................................................. 5

    Organizational Layout of the Complaint ........................................................... 8

**Section I - Inflating the OGX Oil Bubble** ...................................................................... 9

    The Roles played by the Defendants ................................................................. 9

    Eike Batista ....................................................................................................... 9

    The Individual Co-conspirators and Accomplices ............................................ 10

    Paulo Mendonça ................................................................................................ 11

    Werner Batista ................................................................................................... 12

    Thor Batista ....................................................................................................... 12

    Flavio Godinho .................................................................................................. 13

    Paulo Gouvea .................................................................................................... 14

    Marcus Berto ..................................................................................................... 14

    Luiz Carneiro .................................................................................................... 15

    Aziz Ben Ammar ............................................................................................... 15

    The Corporate Co-conspirators and Accomplices ............................................ 16

    The 63X, EBX, CENTENNIAL and THORQUE Companies ........................... 16

    Additional Fraudulent Transfer Recipients ...................................................... 17

**TABLE OF CONTENTS (continued)**

Olin Batista, Flavia Sampaio and Luma de Oliveira ...............................................17

The Scheme – in Detail ...........................................................................................18

The Brazilian Deepwater "Pre Salt" Discoveries .....................................................18

The Start of OGX ....................................................................................................19

OGX Wins Rights to 21 Exploratory Blocks ...........................................................20

OGX Raises Additional Capital – Initial Public Offering .........................................20

The Fraudulent Misrepresentations Start .................................................................22

Technical Terminology – PRMS ..............................................................................24

The First OGX "Oil Strike" ....................................................................................25

The Second OGX "Oil Strike"..................................................................................27

OGX Strikes "Even More" Oil ................................................................................28

The OSX Public Offering ........................................................................................30

Promoting OGX in Miami .......................................................................................35

"Interest from the Chinese" .....................................................................................36

The 10.8 Billion Barrel Lie .....................................................................................39

D&M Secretly Protests ...........................................................................................42

Insiders Sell Their OGX Stock in Miami .................................................................44

The Lies Continue – OGX "Cash Rich" ...................................................................45

The Mubadala "Investment" ....................................................................................46

Keeping the Balls in the Air .....................................................................................48

"The Brazilian Dream" ............................................................................................51

OGX Secretly Bankrupt ..........................................................................................54

The Exit Strategy ....................................................................................................55

<u>TABLE OF CONTENTS (continued)</u>

The Professionals ..................................................................................56

The Bankers ......................................................................................57

The Fake Billion Dollar "Put Option" ..........................................................59

**Section II -- The Plaintiffs Invest** .................................................................61

The EBX/BTG "Strategic Partnership" ...........................................................63

The $850 Million "Investment" by Petronas ....................................................67

Meridian Invests in More OGX Bonds .................................................................68

Batista Secretly Cashes Out ......................................................................69

Batista Makes Further Fraudulent Transfers .....................................................71

Mubadala Secretly Pulls Out .....................................................................72

The 10.8 Billion Barrel Lie -- Recap ............................................................73

**Section III -- The OGX Oil Bubble Bursts** ........................................................76

Batista's "Brazilian Dream" Turns to Nightmare ................................................77

Batista's Silver Lining .........................................................................78

The Plaintiffs' Claim ...........................................................................80

**Count I -- Fraud** ................................................................................81

**Count II -- Conspiracy to Defraud** ..............................................................82

**Count III -- Aiding and Abetting Fraud** .........................................................82

**Count IV -- Florida Civil Remedies for Criminal**
**Practices Act (f/k/a "Florida RICO")** ..........................................................83

The Criminal Enterprise .........................................................................84

Pattern of Criminal Activity ....................................................................84

Predicate Acts of Criminal Activity .............................................................84

**TABLE OF CONTENTS (continued)**

**Predicate Act I - Florida Securities Fraud** -- Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...85

**Predicate Act II - Federal Wire Fraud** - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...86

**Predicate Act III - Federal Money Laundering** - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA .......................................86

**Predicate Act IV - Florida False Advertising** - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR ........................................................................................................87

**Predicate Act V - Florida Theft** - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...87

<u>**TABLE OF CONTENTS (continued)**</u>

**Predicate Act VI - Florida Communications Fraud -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...88

Civil Remedy ...........................................................................................……...88

**Count V – Florida Civil Remedies for Criminal Practices Act Conspiracy (F/K/A "Florida Rico Conspiracy")** ......................................................89

**Count VI – False and Misleading Advertising** ...................................................90

**Count VII – Conspiracy to Commit False and Misleading Advertising** ..............................91

**Count VIII – Civil Theft** ...........................................................................92

**Count IX – Conspiracy to Commit Theft** ....................................................92

**Count X – Aiding and Abetting Theft** .........................................................93

**Count XI – Florida Uniform Fraudulent Transfers Act** .......................................94

**Count XII – Conspiracy to Commit Fraudulent Transfers** ..................................95

**Demand for Jury Trial** ..............................................................................96

## Parties and Jurisdiction

**Jurisdiction:**

1.      This is an action for actual damages in excess of $20 million and statutory damages in excess of $60 million dollars, and therefore far in excess of the minimal jurisdictional damages requirements of this Court.

2.      This is further an action for injunctive and other equitable relief and therefore further within the equitable jurisdiction of this Court.

**Plaintiffs:**

3.      Plaintiff, MERIDIAN TRUST COMPANY ("MERIDIAN"), is and was at all times material hereto, a trust company incorporated under the laws of Nevis and located in Nevis.

4.      MERIDIAN, as trustee, is and was at all material times the holder of legal title to the assets of a family trust fund termed "The Chrisly Trust" held for the benefit of a very elderly, disabled beneficiary whose affairs are and were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by a Miami-Dade County, Florida resident. The investments at issue were made through the Plaintiff's Florida investment adviser, as agent.

5.      Plaintiff, AMERICAN ASSOCIATED GROUP, LTD. ("AMERICAN"), is and was at all times material hereto a corporation incorporated in the Cayman Islands which held investments on behalf of the same very elderly disabled individual, whose affairs are and were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by that same Miami-Dade County, Florida resident. The investments at issue were made through the Plaintiff's Florida investment adviser, as agent.

1

**Defendants:**

6.      Defendant, EIKE BATISTA ("EIKE BATISTA" or "BATISTA"), is and was at all times material hereto an individual who is resident in Brazil.

7.      Defendant, WERNER BATISTA, is and was at all material times an individual who is resident in Florida and Brazil and the brother of EIKE BATISTA. He is believed to hold dual nationality between the U.S. and Brazil or is a permanent U.S. resident.

8.      Defendant, THOR BATISTA ("THOR BATISTA" or "THOR"), is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA.

9.      Defendant, PAULO MENDONÇA ("PAULO MENDONÇA" or "MENDONÇA"), is and was at all material times an individual who is resident in Brazil.

10.     Defendant, FLAVIO GODINHO ("FLAVIO GODINHO" or "GODINHO"), is and was at all material times an individual resident in Florida and Brazil.

11.     Defendant, PAULO GOUVEA ("PAULO GOUVEA" or "GOUVEA"), is and was at all material times an individual resident in Brazil.

12.     Defendant, MARCUS BERTO ("MARCUS BERTO" or "BERTO"), is and was at all material times an individual resident in Florida and Brazil.

13.     Defendant, LUIZ CARNEIRO ("LUIZ CARNIERO" or "CARNIERO"), is and was at all material times an individual resident in Brazil.

14.     Defendant, AZIZ BEN AMMAR ("AZIZ BEN AMMAR" or "BEN AMMAR"), is and was at all times material an individual resident in New York and Brazil.

15.     Defendant, 63X INVESTMENTS LTD. ("63X INVESTMENTS"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands.

2

16.     Defendant, 63X MASTER FUND, LTD. ("63X MASTER FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands.

17.     Defendant, 63X FUND ("63X FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands. (With the two companies above sometimes referred to collectively as "the 63X Companies").

18.     Defendant, EBX HOLDING, LTDA. ("EBX 1"), is and was at material times a limited liability company organized under the laws of Brazil.

19.     Defendant, EBX INTERNATIONAL, S.A. ("EBX 2"), is and was at material times a corporation organized under the laws of Panama with its principal place of business outside Panama.

20.     Defendant, EBX CAPITAL PARTNERS ("EBX 3") is and was at material times a corporation organized under the laws of Brazil. (EBX 1, EBX 2 and EBX 3 are sometimes collectively referred to herein as the "EBX COMPANIES").

21.     Defendant, CENTENNIAL ASSET MINING FUND, LLC ("CENTENNIAL 1"), is and was at material times a limited liability company organized under the laws of Nevada with its principal place of business outside Nevada.

22.     Defendant, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC ("CENTENNIAL 2"), is and was at material times a limited liability company organized under the laws of Delaware with its principal place of business outside Delaware. (With the companies referred to immediately above, sometimes referred to collectively as "the CENTENNIAL Companies").

3

23.     Defendant, THORQUE1 FUND LTD., was at material times a company organized under the laws of The Bahamas with its principal place of business outside The Bahamas. (The company was dissolved by the Defendant, THOR BATISTA, on July 28, 2016. Plaintiffs intend to seek leave to re-instate it, if necessary, for the purposes of this action).

24.     Defendant, THORQUE INVESTMENT MANAGEMENT LTD., was at material times a company organized under the laws of The Bahamas with its principal place of business outside The Bahamas. (The company was dissolved by the Defendant, THOR BATISTA, on July 28, 2016. Plaintiffs intend to seek leave to re-instate it, if necessary, for the purposes of this action) (THORQUE1 FUND LTD. AND THORQUE INVESMTENT MANAGEMENT LTD. are sometimes collectively referred to herein as the "THORQUE COMPANIES").

25.     Defendant, OLIN BATISTA, is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA.

26.     Defendant, FLAVIA SAMPAIO, is and was at all material times an individual who is resident in Brazil, the girlfriend of EIKE BATISTA, and the mother of his minor son, Balder Batista.

27.     Defendant, LUMA DE OLIVEIRA, is and was at all material times an individual who is resident in Brazil, the ex-wife of EIKE BATISTA, and the mother of his adult sons, the Defendants, THOR BATISTA and OLIN BATISTA.

**Personal Jurisdiction in Florida:**

28.     Defendants, WERNER BATISTA, MARCUS BERTO and FLAVIO GODINHO are residents of Florida and subject to the general jurisdiction of its Courts.

29.     Further, every Defendant is subject to the general jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(2) as having engaged in substantial and not isolated activity

4

within this State, both individually and directly and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

30.     Each Defendant is subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(1) as having operated, conducted, engaged in or carried on a business or business venture in this state, or having an agency in this state, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

31.     This is an action brought in connection with that business. Brazil is not a party to the Hague Service Convention. The non-resident Defendants may therefore be served through the Florida Secretary of State pursuant to Fla. Stat. § 48.181(1) with notice of service given by certified or registered mail pursuant to Fla. Stat. § 48.161(1).

32.     Each Defendant is further subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(2) as having committed tortious acts within this State, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

33.     As a result of each of their individual and direct actions and further as a result of the actions of their agents and co-conspirators which are imputed to each of them, all Defendants have sufficient minimum contacts with this State that haling them before the Courts of this State would not offend Constitutional due process requirements.

**The Fraudulent Scheme – Overview:**

34.     Between 2008 and 2013 BATISTA and his co-conspirators and accomplices raised billions of dollars from investors in stocks and bonds, overwhelmingly in the U.S., on the basis of an international press campaign barraging the international investing public with false promises of

a trillion dollars of recoverable oil off the coast of Brazil pursuant to drilling leases from the Brazilian government owned by BATISTA's oil exploration company, OGX.

35.     BATISTA had OGX commission huge multi-million-dollar oil production platforms – tanker vessels equipped with drill rigs – from his satellite ship-building company, OSX, which he paid for with OGX investor money. He trumpeted plans for a satellite port city in Brazil to be run by his logistics company, LLX, that would blossom as the tankers offloaded a "trillion dollars" of oil.[1]

36.     But all the vast production and transport paraphernalia was just window dressing. As BATISTA and his co-conspirators and accomplices knew, there was in fact virtually no recoverable oil, no need for the massive production machinery to pump and transport it, and no need for a dedicated port to offload it.

37.     The core business, the OGX oil business, was actually a failure. It stayed alive only as long as there was an inflow of fresh capital from duped investors and lenders and as long as BATISTA and his co-conspirators and accomplices could maintain the illusion of a huge eventual payoff.

38.     Start to finish, the OGX venture discovered and pumped less than enough oil to fill OSX's six massive multi-million dollar tanker ships for a single trip to port.

39.     Necessarily, all the hundreds of millions of dollars that BATISTA and his co-conspirators and accomplices took and kept for themselves was skimmed off the top of what came in from investor contributions, leaving an ever-deepening chasm of debt beneath.

---

[1] As part of building his brand, BATISTA typically dubbed his companies by a pair of initials that described the core business, followed by an "X," the multiplication sign, indicating burgeoning wealth. Thus, for instance, "OG" stood for "Oil and Gas." "OS" was "Offshore Services." "EB," BATISTA's initials, and "63," his lucky number (he is notoriously superstitious) indicated personal wealth-holding companies.

40.     The exit strategy was to sell whatever stock and assets they could, trust to local corruption to safeguard the wealth trapped within Brazil, and trust to the complicity of professional co-conspirators, accomplices, bankers, and bribed politicians, to hide the vast mass of their takings safely abroad in solid investments or secret bank accounts, where toothless local Brazilian government processes and their victims, they hoped, would be unable to touch them.

41.     By the start of 2013, through thousands of fraudulent misrepresentations spanning the years since 2009, BATISTA and his co-conspirators and accomplices had built an impression in the minds of money managers and investors internationally that OGX was sitting on enormous reserves of recoverable oil when in reality there was virtually none.

42.     In 2013, OGX bonds were returning high yields. The only real concern to buyers on the secondary market was whether the company was sufficiently capitalized to bring that oil into production.

43.     To reassure investors, BATISTA and his co-conspirators and accomplices, via further fraudulent misrepresentations detailed below, created an illusion of deep financial resources, ultimately backed by BATISTA's personal pledge through the "Put Option" also detailed below, to inject a billion dollars into OGX, if and when needed.

44.     In October 2013, when BATISTA and his co-conspirators and accomplices had cashed out the last of their stakes and the wealth had been secreted in the names of BATISTA's various willing family members, joined as Defendants here, or in shell companies and bank accounts outside Brazil, in Miami, Florida, and around the world, BATISTA reneged on that billion dollar pledge and OGX declared bankruptcy, swiftly followed by the bankruptcy of the satellite companies OSX and MMX.

45.     American investments funds such as those managed by Pimco from California and BlackRock from New York lost billions of dollars on OGX bonds. The $150 billion Florida System

Retirement Fund, which manages the retirement savings of Florida's teachers had invested in several of BATISTA's companies and may have also lost money. Many other investors lost their investments. The Plaintiffs lost in excess of $20 million.

46.     So far, BATISTA and his co-conspirators and accomplices appear to have gambled aright that they could make immense amounts of money with no real comebacks. BATISTA and a few others were eventually criminally indicted in Brazil for insider trading, stock manipulation and market fraud. However, in Brazil's glacially slow, toothless, corrupt legal system, it is highly unlikely that there will eventually be any serious consequences.

47.     Millions of dollars of the domestic Brazilian assets that BATISTA had stashed at the last minute in the names of his willing family members in anticipation of the collapse were frozen. He has also been banned from the board of any public company in Brazil for a short five year period. But, all in all, apart from such minor inconveniences, with most of the wealth that he and his co-conspirators and accomplices garnered from the scheme stashed abroad, the fraud has been a complete success.

**Organizational Layout of the Complaint:**

48.     The allegations are divided into three sections. The first - **Section I - Inflating the OGX Oil Bubble** - covers the period from 2009 through early 2013, during which, as the cumulative effect of a series of fraudulent misrepresentations, BATISTA and his co-conspirators and accomplices built a belief in the minds of investors internationally that OGX was sitting on massive reserves of recoverable oil when there was in fact virtually none. This was the foundational, accepted understanding in the international investment markets of OGX's assets and likely profitability at the time that the Plaintiffs made their investments in OGX bonds through their Florida investment adviser in 2013.

8

49.     The continuing fraudulent misrepresentations and how they induced the successive purchases of more than $21 million in OGX bonds by their Florida investment adviser on Plaintiffs' behalf during 2013 is covered in **Section II - The Plaintiffs Invest.**

50.     The account of the collapse of the whole house of cards in late 2013 is detailed in **Section III - The OGX Oil Bubble Bursts.**

### Section I - Inflating the OGX Oil Bubble

**The Roles played by the Defendants:**

**Eike Batista:**

51.     BATISTA was the prime mover in the scheme. At all material times, he was the controlling shareholder and top managing agent of OGX, either as President, Chairman of the Board, or both. He also held stock and exercised control over the satellite operating companies such as OSX, MMX, and LLX whose success hinged largely on OGX striking offshore oil in large commercial quantities.

52.     BATISTA also owned and controlled the private wealth management companies through which he held the controlling shares in the operating companies, and through whose financial dealings and routing of money he accomplished the objective of the fraud. These were the Defendant 63X Companies, the EBX Companies, and the CENTENNIAL Companies. In addition, BATISTA may have also influenced or controlled the THORQUE Companies.

53.     Through his control position in OGX, BATISTA directly disseminated, ordered, or knowingly permitted the thousands of fraudulent communications, of which only a fraction are described below, constituting a colossal barrage of hype, inducing investors to contribute money to his enterprise in the expectation of gain.

54.     Through his control positions in all the Defendant companies, BATISTA appointed directors and managers who acted as his agents and who were his co-conspirators and accomplices in accomplishing the fraudulent scheme.

55.     References to BATISTA or OGX having "made," "stated," "published," "announced" and the like as to the communications described below refer to the fact that BATISTA either did it directly, ordered that it be done, or knowingly permitted such false communications to be made through accomplices and co-conspirators.

56.     It is not known how much money BATISTA made off the scheme, but at the bottom end of the range it is believed to be in the many hundreds of millions of dollars and at the top end, possibly billions.

**The Individual Co-conspirators and Accomplices:**

57.     BATISTA had numerous individual co-conspirators and accomplices who conspired with him and aided and abetted him in effectuating his scheme. Some OGX directors and officers, such as the top oil engineer MENDONÇA who generated misrepresentations from the early days in 2009 onwards, knew about the scheme from its inception. Similarly, trusted advisers such as his brother, WERNER BATISTA, his right-hand-man for three decades, GODINHO, and his close confidant, GOUVEA, upon information and belief, knew of the fraud from the early days.

58.     But all of BATISTA's confidants, including his eldest son, THOR BATISTA, all the Board members of OGX and many of the directors of OSX and LLX were, by some time in 2011, or by at the latest during 2012, privy to the fact that the core oil exploration company, OGX, on which the success of all largely depended, was actually insolvent.

59.     Yet all such directors and insiders failed to tell investors the truth and allowed the barrage of baselessly optimistic hype to continue, in order to make money from their salaries and

10

the sale of the stock and corporate assets. Only a few of these have been joined as Defendants.[2] These are as follows:

**Paulo Mendonça:**

60.     Before joining OGX, MENDONÇA had been the chief geologist at Petrobras for 34 years, throughout its successful exploratory campaign. As such, he enjoyed a respected position in the industry. As BATISTA's supposed "Dr. Oil," MENDONÇA was constantly touted to the press and to the investing public as the head of a supposed "Dream Team" of oil industry experts who would find oil where none had been found before.

61.     Given MENDONÇA's background and reputation in the oil industry, his pronouncements on recoverable oil volumes were regarded as reliable and his imprimatur was seen as a solid assurance of the probity of the company's predictions.

62.     However, BATISTA had incentivized MENDONÇA with a big block of OGX stock to use his name for their mutual profit in hyping the promise of OGX's exploratory wells which was contrary to industry practice.

63.     In his position as a top OGX executive, as detailed below, MENDONÇA created and published numerous fraudulent public announcements of supposed massive "discoveries" of oil while disposing of his own OGX shares at consequently inflated prices for many tens of millions of dollars, and enabling the rest of the group to take and squirrel away many hundreds of millions or even billions of dollars as their own proceeds of the scheme.

---

[2] Plaintiffs reserve the right to add more insiders as defendants if discovery reveals a sound basis to do so. These would include BATISTA's father, Eliezer Batista, who stayed on the Board of OGX through the collapse, though independent directors were resigning rather than face criminal and civil liability.

**Werner Batista:**

64.     Defendant, WERNER BATISTA, and his family had been living in Florida for more than twenty years when he agreed with his brother, EIKE BATISTA, during 2009 to split his time between Florida, and Rio de Janeiro and help him in his new oil venture.

65.     WERNER BATISTA took up a position as a director in BATISTA's personal wealth management entity, the Defendant, EBX HOLDING, in September 2009, where he helped assist his brother in the actions described herein.

66.     WERNER BATISTA resigned from EBX HOLDING in December 2013 in the wake of the fallout from the collapse of OGX. It is unknown before discovery how much of the wealth of duped investors he managed to take for his own purposes but he has, upon information and belief, returned his focus to Florida where he has invested part of his profits in Florida businesses.

**Thor Batista:**

67.     Defendant, THOR BATISTA, is the eldest son of EIKE BATISTA. Upon information and belief, during the final two years leading up to the collapse of OGX and the satellite companies, his father introduced him to the fact that the business was heading for certain failure and unless he wished to give up his life of luxury - which had hitherto included being able to fly from Rio to Miami, Florida, by private jet for his routine shopping - he should assist him in sheltering proceeds of the fraud in offshore companies and foreign bank accounts, to which his son agreed.

68.     To this end, in or about April 2012, THOR BATISTA, with his father's help, established two companies in The Bahamas, the Defendants, THORQUE1 FUND LTD. and THORQUE INVESTMENT MANAGEMENT LTD., as nominal owners of proceeds of the scheme.

69.     EIKE BATISTA and THOR BATISTA established bank accounts in Miami, Florida at Banco Itaú Europa International and upon information and belief at Citibank and other institutions as well as at banks in The Bahamas and the Cayman Islands, to which BATISTA and his 63X, EBX and CENTENNIAL companies routed hundreds of millions of dollars in proceeds from the scheme during 2012 and 2013.

70.     It is believed that the Bahamian accounts were emptied at some time between 2013 and July 2016, with the proceeds being transferred to BATISTA's "Swiss trust"[3], of which BERTO was the original trustee, or to other secrecy destinations.

71.     In July 2016, THOR BATISTA quietly dissolved the THORQUE Companies in The Bahamas.

**Flavio Godinho:**

72.     Defendant, FLAVIO GODINHO, is a lawyer admitted in Brazil, only, and has been a close, long-time confidant of BATISTA's since the 1980's.

73.     Over three decades, GODINHO has served in an array of capacities in BATISTA's companies and was regarded as his "Right Hand Man." At one time or another GODINHO was Chairman and Chief Executive Officer of EBX Brasil S.A., a Legal Vice-President of EBX GROUP LTD., General Counsel, Corporate Development Officer and a member of the Executive Board of EBX Ltd. and its subsidiaries, a director of LLX, a director of OSX, and a director of MPX, among others.

74.     Through his top positions in BATISTA's companies and as a close friend, confidant and legal adviser, GODINHO was aware of the material developments in the scheme and conspired with and counseled BATISTA and their co-conspirators in how to achieve its success including,

---

[3] The term "Swiss trust" is used in a generic sense. Further details are still being explored.

13

upon information and belief, the accomplishment of the bribery of government ministers in order to secure an economic advantage.

75. GODINHO is believed to have made over $200 million from the scheme and fled Rio de Janeiro for Miami, Florida, in the wake of the OGX collapse. He is also currently under investigation in Brazil in connection with the notorious Petrobras bribery scandal and a new sub-chapter opened in that investigation into government bribery by BATISTA's companies, dubbed the "The X-Files."

**Paulo Gouvea:**

76. Defendant, PAULO GOUVEA, like GODHINO, is a lawyer admitted in Brazil only, and is a long term confidant of BATISTA who served on the Board of OGX and as head of corporate finance in the EBX group of companies, who conspired with and assisted BATISTA and the others in achieving the objectives of the fraudulent scheme.

77. GOUVEA is believed to have reaped in excess of $150 million from the fraud. Through his current position as a partner in and Director of Capital Markets at Brazil's biggest brokerage house, XP Investimentos, he does business in Florida through its Miami, Florida, office.

**Marcus Berto:**

78. Defendant, MARCUS BERTO, was a long-standing BATISTA confidant who was in December, 2012 appointed CEO and Investor Relations Officer of LLX, BATISTA's allied logistics company, to help secretly sell off the company ahead of the crash of OGX.

79. Upon information and belief, BERTO knew that OGX was insolvent by the end of 2012 and conspired with BATISTA and agreed to help set up a Swiss trust, through professionals in Miami, Florida, to which BATISTA could funnel his personal profits from the scheme.

80. Upon information and belief, BERTO was the first trustee of that trust and in that capacity established its Swiss and other foreign banking relationships.

14

81.     After OGX collapsed, BERTO left Rio de Janeiro for Key Biscayne, Florida, where he is believed to have invested part of the proceeds he realized from the fraud in a multi-million dollar mansion.

**Luiz Carneiro:**

82.     Defendant, LUIZ CARNEIRO, was the CEO and President of OGX and CEO and Executive Board Member of OSX during its final two years, 2012 and 2013, when the Board and top executive management knew that OGX was insolvent and that the future of OSX hinged on OGX's – unachievable – success. He was a close confidant of BATISTA and conspired with him and assisted him in achieving the objectives of the fraudulent scheme.

83.     Upon information and belief, in his position as head of OSX, CARNEIRO handled the bribery of government officials, which included the payment of a $2.3 million bribe. CARNEIRO along with Brazil's Finance Minister, Guido Mantega, Chairman of the government-run oil behemoth, Petrobras were recently arrested in connection with the bribery investigation.

84.     Upon information and belief, the OSX-Mantega bribe secured in excess of $922 million in shipbuilding contracts from Petrobras for which there was no actual commercial demand in order to continue the illusion that OSX was a viable entity. The contracted vessels were not completed by the time of the OSX bankruptcy in October 2013.

**Aziz Ben Ammar:**

85.     The Defendant, AZIZ BEN AMMAR, was recruited by BATISTA as a board member of OGX and satellite companies in the final year leading up to the crash in order to help keep the balls in the air as long as possible for BATISTA and the others to get their stakes monetized and out of Brazil before the crash.

86.     BEN AMMAR was elected to the boards of OGX, LLX, OSX, and MMX by a cadre of unsuspecting victims, including a number of American retirement funds who had bought

shares or bonds in BATISTA's companies on the basis of his fraudulent promises, among them the Florida Retirement System Trust Fund.[4]

87.     BEN AMMAR was intimately involved in generating stories for the press during 2013, regarding the supposed massive capitalization of OGX and the fact that it was impossible for it to fail. He was a prime architect of the fraudulent billion dollar "Put Option" and the cover story regarding the fictitious $850 million "sale" to Petronas, both described below.

88.     On September 4, 2013, having milked as much as he could out of the scheme, BEN AMMAR resigned from the Board of OGX, weeks before its bankruptcy, and reportedly fled Brazil for New York where he presently resides in a multi-million dollar apartment acquired, upon information and belief, with part of his takings from the scheme.

**The Corporate Co-conspirators and Accomplices:**

**The 63X, EBX, CENTENNIAL and THORQUE Companies.**

89.     There were also numerous corporate entities that BATISTA owned or controlled that he used in executing his scheme. These were either holding companies for his stock in the operating companies, such as OGX and OSX, or were set up for the simple purpose of being the name on a bank account for the transmission of funds to accomplish the fraudulent scheme. Some of these entities have been joined as Defendants here. These are the 63X Companies, the EBX Companies, and the CENTENNIAL Companies and may also include the THORQUE Companies.

90.     These corporations, all of which were incorporated in secrecy jurisdictions, had no legitimate corporate business or real independent existence separate from BATISTA and were no more than fictitious names for BATISTA himself.  They acted as "cut-outs," to obscure the trail

---

[4] The Florida Retirement System Trust Fund is an approximately $150 billion pension fund that pays retirement benefits for over a million state, county, school system and higher-education teachers and other employees, managed by the Florida State Board of Administration of which the trustees are Florida Governor, Richard Scott, Florida Chief Financial Officer, Jeffrey Atwater, and Florida Attorney General, Pamela Bondi.

between the origin and the destination of funds and facilitate the transmissions of funds to achieve the ends of the fraudulent scheme.

91.    Further, upon information and belief, these corporations assisted in creating the illusion of the "Mubadala Investment," the supposed $2 billion stock acquisition of a small stake in BATISTA's wealth-holding companies by an oil-rich Arab nation intended to induce investor confidence, but which was in reality a massive loan that monetized the majority of BATISTA's stake in the scheme and was secretly repaid in 2013 by stripping prime assets out of the businesses.

92.    In all these companies, BATISTA and his co-conspirators and accomplices failed to observe the required corporate formalities and the entities were used as engines of fraud, such that their separate corporate existence should be disregarded.

93.    Alternatively, to the extent that these entities are found to have had true separate corporate existence, they should be treated as additionally liable, as being co-conspirators, agents and constructive trustees of proceeds of the fraudulent scheme.

94.    There are many other companies that also fall into this category of aiders and abettors, accomplices and co-conspirators whose involvement is less clear and have therefore not yet been joined as parties, but which may be joined later after discovery.

**Additional Fraudulent Transfer Recipients:**

**Olin Batista, Flavia Sampaio, and Luma De Oliveira.**

95.    EIKE BATISTA's family members WERNER BATISTA and THOR BATISTA were active participants in the scheme.

96.    Other family members, namely the Defendants, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA, are not presently known to have had any substantial involvement in the active fraud committed within the various BATISTA companies. (This may change after discovery).

17

97.    However, such family member Defendants knowingly received multi-million dollar transfers of real estate and cash within Brazil in the months immediately prior to the collapse of OGX for no consideration, when BATISTA was declaring insolvency, as a means of cheating creditors.

98.    Upon information and belief, during 2013, BATISTA wired several hundreds of millions of dollars of the proceeds of the fraudulent scheme to The Bahamas and to other offshore jurisdictions and attempted to transfer another $100 million out of a bank in The Bahamas to an account in Miami, Florida, in order to evade creditors.

99.    If the money transferred out of Brazil is no longer in the name of BATISTA's wealth-management companies then, following the template of BATISTA's actions in Brazil, it is believed that much of that wealth has been transferred into the names of the listed Defendant family members, WERNER BATISTA, THOR BATISTA, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA.

100.    None of these family members gave value for such transfers but served knowingly as mere nominees for BATISTA in whose names such assets were "parked" and should be held, as constructive trustees, to return such funds for the payment of the Plaintiffs' claims.

101.    Having described the scheme in general and the general involvement of the various Defendants, a detailed account follows.

**The Scheme – in Detail:**

**The Brazilian Deepwater "Pre-Salt" Discoveries.**

102.    The world's largest oil discoveries in recent years have been in Brazil's offshore, pre-salt basins. "Pre-salt" oil is generally characterized as oil reserves situated exceptionally deep, under thick layers of rock and salt, and requiring substantial investment to extract.

18

103.    In 2005, Brazil's national oil company, Petroleo Brasileiro S.A. ("Petrobras"), drilled a wildcat well in the ultra-deep waters of the Santos basin off the coast of São Paulo state and discovered the presence of hydrocarbon condensate under a thick layer of salt. This discovery confirmed a previously untested geologic model that indicated the potential for large recoverable oil deposits.

104.    In 2005, Petrobras confirmed the presence of potentially recoverable petroleum with the discovery of the Tupi oil field in the so-called pre-salt layer in the Santos Basin.

105.    Additional drilling and testing led to an announcement by Petrobras in November 2007 that the Tupi oil field (now known as the Lula oil field) contained between five billion and eight billion barrels of oil.

106.    Given these discoveries, there was significant global attention to the oil and gas industry in Brazil. The pre-salt discoveries showed great promise.

**The Start of OGX.**

107.    The Brazilian government auctions off drilling leases to companies who wish to explore for oil and scheduled what promised to be some of the richest new deep-water oil fields off its coast for auction on November 27, 2007.

108.    BATISTA had no experience in the oil-exploration business but had a lengthy background in stock promotion and mineral exploration and he raised approximately $1.3 billion in private equity to acquire some of these deep-water drilling leases through a company he named OGX, which he owned through his personal asset vehicle, CENTENNIAL 1.

109.    However, just before the auction, based in part on the very recent Tupi oil field discovery, the Brazilian authorities withdrew the deep-water fields from auction, deeming them "too valuable" and left in play old shallow-water fields that had been picked over by Petrobras for decades and generally viewed as worthless.

19

110.    That put BATISTA in a quandary. He had raised approximately $1.3 billion from investors to spend on deep-water oil fields. Now there were no deep-water fields to buy. No one wanted the shallow-water fields.

111.    Rather than refund the money, BATISTA resolved to press forward and acquire these rejects of the industry.

**OGX Wins Rights to 21 Exploratory Blocks.**

112.    On 27 November 2007, OGX submitted the winning bid on 21 exploratory blocks (seven of them in consortia with other operators) and committed significant funds for licensing fees as follows: seven blocks in the Campos Basin off the coast of Rio de Janeiro (two of them in consortia with Maersk); four blocks in the Santos Basin; five blocks in the Para-Maranhao Basin; and five blocks in the Espirito Santo Basin (in consortia with Perenco S.A.), all as shown below:



**OGX Raises Additional Capital – Initial Public Offering.**

113.    However, having committed nearly all of its cash to pay for the licenses and fees associated with the exploratory concessions, OGX needed to raise additional capital to conduct exploration. It would seek those funds from the capital markets via an initial public offering ("IPO") of approximately five million of its common shares.

114.    However, persuading the investing public that these fields were unrecognized treasures rather than the worthless money-pits (that they would eventually prove to be) would require enormous promotion.

115.    To garner credibility for OGX, BATISTA built a roster of senior executives from Petrobras; individuals who had been integral to that company's deep-water discoveries, headed by the Defendant, PAULO MENDONÇA, a geologist and former Petrobras head of exploration, who BATISTA dubbed "Dr. Oil."

116.    BATISTA granted his team members generous stock options in OGX to ensure that they were personally invested in the value of the stock and incentivized to spread any good news and to contain or minimize the bad.

117.    BATISTA's publicized rationale for exploring the shallow-water fields was that modern technology in the hands of his "dream team" ensured better, more accurate detection. If there was oil to be found, they would find it. Plus, when they found it, the much lower extraction costs in shallow water than in deep water meant much greater profitability. This one-two punch of state-of-the-art technology in the hands of the best oil gurus in Brazil, coupled with low-cost lifting, BATISTA boasted, promised to be a sure-fire winning combination.

118.    In 2008, BATISTA's OGX raised $4.1 billion in the biggest initial public offering in Brazilian stock market history.

119.    In its November 2008 Management Presentation, OGX announced that it had entered into contracts for 3D seismic surveys for all of its exploratory blocks; acquired various logistical transport vessels, including seven boats and two helicopters; and secured four off-shore drilling rigs with "world-class contractors." It stated that it expected to conduct an "intense drilling campaign" beginning in the second half of 2009 and reach "first oil" by the end of 2011.

**The Fraudulent Misrepresentations Start.**

120.    BATISTA and his co-conspirators and accomplices now embarked on a relentless propaganda campaign boosting the promise of the OGX oil-fields completely untethered to any basis of reasonable fact in order to attract investment capital and boost the stock and bond prices in OGX and other satellite companies soon to be launched. These knowingly false representations were all made with the intent of inducing investors to buy stocks and bonds in OGX and its satellite companies.

121.    The prime target of the misrepresentations were U.S. investors and necessarily and primarily those in its most populous states, California, Texas, Florida and New York.

122.    American investors were to account for the vast majority of the sales of OGX shares and bonds, including American government pension funds such as, as noted above, the Florida Retirement System Trust Fund.[5]

123.    This barrage of hype took various forms, all of which was intended to induce investment and succeeded in inducing stock and bond sales on the primary and secondary markets to maintain the illusion of OGX as a valuable business for as long as possible.

124.    One was by way of what are termed in Brazil, "Material Facts." ("Statements of Material Fact" or "Material Facts"). These are public disclosures required by Brazilian law as to events which might impact equity and debt investor decisions to buy or sell. The directors of any

---

[5] The size of the Florida Retirement System Trust Fund investment into BATISTA's companies, and the extent of its losses, is unknown. But such institutional investors typically invest in very large tranches and the Fund's stake was large enough for it to vote at extraordinary shareholders' meetings. It is listed online as having voted, for instance: at an OGX shareholders' meeting on December 18, 2009, at the start of the scheme; at an OGX shareholders' meeting (*inter alia* to elect the Defendant, AZIZ BEN AMMAR to the OGX Board) on December 1, 2011; at an OSX shareholders' meeting (inter alia to elect the Defendant, AZZIZ BEN AMMAR to the OSX Board) on September 6, 2012; and at an MMX shareholders' meeting to vote on a proposed merger and Board re-shuffle following that company's October 2013 declaration of bankruptcy.

22

public company are legally bound to disclose such facts to the investing public by way of a report to the relevant stock exchange and to the press.

125. There were many Statements of Material Fact, as detailed below, that contained serious fraudulent misrepresentations of promising developments in OGX.

126. Further, the medium of the "Statement of Material Fact," which is intended to be reserved for consequential announcements, was abused to trumpet inconsequential news, such as the "discovery of hydrocarbons," to give it undeserved significance and whet market appetite.

127. Finally, there were many instances where information as to material adverse developments should have been published by way of Statements of Material Fact, but was not, leaving investors internationally to rely on the continuing validity of prior positive announcements. These instances of failure to announce negative news constituted misrepresentations by omission.

128. BATISTA and his accomplices and co-conspirators also gave many press interviews and held press conferences in which he and they promoted the story of OGX's great success and its supposedly fabulously valuable oilfields. These fraudulent misrepresentations were disseminated live or by video recordings to the international financial press, particularly Bloomberg,[6] to be relayed via the internet to the worldwide investment community.

129. Following the precept that "a picture is worth a thousand words," BATISTA and his accomplices and co-conspirators also seeded the press with management report graphics and news photographs bolstering the illusion of the great success and fabulous wealth of OGX.

---

[6] "Bloomberg" refers to the New York-based financial software, data, and media company which provides the international investment industry with financial software tools and news through the Bloomberg Terminal (via its Bloomberg Professional Service), wire service (Bloomberg News), global TV network (Bloomberg Television), websites, radio station [WBBR], newsletters and magazines. (*Bloomberg Businessweek, Bloomberg Markets* and *Bloomberg Pursuit.*)

23

130.     Additional fraudulent misrepresentations were contained in thousands of "tweets" sent via BATISTA's internet Twitter feed to what eventually topped one million followers, including many financial journalists.

131.     Further, BATISTA personally made face-to-face promotional pitches to high-net-worth investors in Florida and elsewhere in the U.S.

132.     It is not possible to list every one of the many thousands of fraudulent misrepresentations but a selection is given below.

**Technical Terminology – PRMS.**

133.     To understand the quality of the misrepresentations, a very brief primer on oil industry jargon is in order.

134.     The detection of oil is done by way of seismic and other remote studies and the drilling of test wells. The exact volume of oil contained in any underground reservoir cannot be known exactly until it has been pumped to the surface.

135.     Moreover a volume of oil may exist but there may be no technological means of recovering any of it. Even if some volume may be "technologically recoverable" it may not be "commercially recoverable," *i.e.* the cost of extraction will exceed its selling price.

136.     To try to lend some precision to the description of underground oil estimates and the likelihood they can be extracted profitably, the oil industry found it necessary to develop an agreed set of technical terms.

137.     Accordingly, the international oil industry developed the Petroleum Resource Management System (the "PRMS"), a universal language used for estimating and classifying quantities of oil (and gas) discovered in any given reservoir according to their recoverability.

138.     The PRMS distinguishes between "technological" and "commercial" recoverability and further distinguishes between "reserves" and "resources." "Reserves" refers to oil that is

24

reasonably certain to be commercially recoverable. "Resources" is a much wider term, and refers to all quantities of oil which is predicted to possibly exist within discovered or undiscovered reservoirs. "Resources" therefore encompasses discovered and undiscovered, recoverable and unrecoverable, and commercial and non-commercial quantities of petroleum.

139.     There are internal gradations within these categories running from "proved" to "probable" to "possible" reserves and from "contingent" (either "low", "best" or "high" estimates) to "prospective" resources. Quantities are expressed in "barrels" or "boe" – "barrels of oil equivalent."[7]

**The First OGX "Oil Strike."**

140.     It is common for oil exploration ventures seeking to raise finance on the international capital markets to retain the services of an independent consultancy firm of specialists to appraise its oil discoveries. They essentially act as auditors.

141.     OGX retained the prestigious Dallas-based firm of DeGoyler & McNaughton ("D&M") for this purpose in or around 2008.

142.     In March 2008, OGX released a Statement of Material Fact that its auditors, described as "world-renowned D&M," believed that OGX might be sitting on as much as 4.8 billion barrels of oil. At this point these were, at most, very preliminary seismic studies. The unstated inference was that this was "recoverable" oil or it was of no moment - *i.e.* not "material" - and not worthy of publication as a Statement of Material Fact. Predictably, OGX share prices jumped.

---

[7] BOE refers to a unit of energy based on the approximate energy released by burning one barrel (42 U.S. gallons or 158.9873 litres) of crude oil.

143.    On September 18, 2009, OGX announced the commencement of its drilling campaign with the drilling of well "OGX-1, block BM-C-43" in a prospect area dubbed the "Vesuvio" formation.

144.    On October 7, 2009 OGX issued a Statement of Material Fact that it had struck oil in the Vesuvio oilfield about 85 kilometers offshore, in 140 meters of water. MENDONÇA was quoted as stating that this was "a milestone in the industry, which was only possible due to the motivation and talent of our unique team." Both the issuance of this news via the medium of a Statement of Material Fact – to be reserved for announcements that should materially impact investment - and the quoted statement were intended to convey the impression that *recoverable* oil had been discovered. However, there was no reason for anyone with access to the OGX drilling test results to believe that this was true.

145.    On October 14, 2009, OGX released a Statement of Material Fact that declared in bold type that from a single exploratory well in the Vesuvio oilfield: "**Recoverable Oil Volume Expected to be between 500 Million and 1.5 Billion Barrels.**" MENDONÇA was quoted as saying this find validated the OGX team's scientific methodology and the "high petrolific (*sic*) potential" of the company's underwater leases.

146.    The implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable at any cost – even at a loss – but that it was likely to be commercially recoverable.

147.    With oil trading at around $75 a barrel, this was a representation to investors that OGX was sitting on minimum oil reserves worth between $37 billion and $111 billion from a single well, with many more yet to go. However, there was no reason for anyone with access to the OGX drilling test results to believe that any of this was true.

148.    This core Vesuvio announcement, which was not retracted until shortly before the OGX bankruptcy, was a bed-rock misrepresentation for investor confidence in OGX right up through the crash in 2013, despite the fact that BATISTA and his co-conspirators and accomplices knew the field was worthless long before it was eventually returned as valueless to the Brazilian government.

149.    BATISTA, who had not hitherto been known for his largesse, now became very conspicuous for his apparently generous public gifts which were enabled not by profit, but by the torrent of inflowing investment capital and skimmed off the top.

150.    The point of such apparently "generous" charitable gifts was to keep BATISTA in the public eye and to help paint a picture of multiplying wealth – as the "X" in BATISTA's company names was intended to signify – such that he could afford such acts of generosity.

151.    In fact, the only real "generosity" was on the part of the investing public, because it was their money being given away.

152.    Through his business and such "charitable" activities, BATISTA became close to many of Brazil's top politicos who it is believed that he bribed from his various offshore corporate bank accounts to ensure that governmental regulators were as "hands-off" on him and his enterprises as possible.

153.    Some of these politicians are also now on the long list of government officials who are under investigation by the Brazilian government for accepting bribes in connection with the huge Petrobras scandal that would ultimately break in 2014 – including now-impeached President, Dilma Roussef, who was arrested on September 22, 2016.

**The Second OGX "Oil Strike."**

154.    On November 16, 2009, OGX released a Statement of Material Fact announcing a new major oil strike captioned, in bold type: "**OGX Announces Discovery of Oil . . . Estimated**

27

**Volume of 400 Million – 500 million barrels – Drilling still in progress and new objectives to be reached."** This oilfield was later dubbed the "Pipeline Formation."

155.     Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable but was likely to be commercial.

156.     At a market price then around $79 a barrel, this was a representation to investors internationally that there was something like another $30-40 billion in value in OGX. The range of expected revenues for OGX was now cumulatively somewhere between $70+ and $158+ billion – and apparently there was more to come in the same well.

157.     Investors reacted predictably. The OGX stock price rose steadily through November 2009 to a high of R$15.70 while the numbers of trades swelled from over 16 million to over 22 million in just two days between November 16 and 18, 2009.

158.     Fully realizing that the figures that he had authored were completely baseless and had been intentionally used to create a dramatic increase in stock prices, and probably not believing that he would be able to prop the prices up much longer, in December 2009, MENDONÇA secretly sold 10,000 of his own OGX shares, realizing a profit of approximately $5,000,000.

159.     Upon information and belief, contrary to Brazilian law, this was not disclosed to CVM, the Brazilian Securities and Exchange Commission.

**OGX Strikes Even "More" Oil.**

160.     On December 22, 2009, OGX announced via Statement of Material Fact that completed drilling had revealed that the oil strike declared in November was now estimated at being two to four times greater. As the Statement of Material Fact stated, now the: **"Recoverable Oil Volume Expected to be between 1 and 2 Billion Barrels."**

161.     Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just "technologically recoverable" but was likely to be "commercial."

28

162.     BATISTA's announcements to investors by now equated to a cumulative promise that OGX was sitting on at least 1.5 billion and maybe as much as 3.5 billion barrels in recoverable oil. At a December 2009 price of around $75 a barrel that translated to a promise of between roughly $112.5 billion and $262.5 billion in value and investors reacted predictably favorably to the cumulative promises.

163.     In fact, the OGX seismic studies and drill test results had failed to indicate that a single barrel of oil was necessarily even technologically recoverable at any cost, let alone at a profit. Indeed, the internal D&M reports confirmed exactly that.

164.     But beyond that, from the very beginning, upon information and belief, very high concentrations of hydrogen sulphide gas had been detected. This compound, nicknamed "Death Gas" in Portuguese, is very poisonous, corrosive, flammable and explosive. Striking oil is no cause for celebration if it kills the drill-crew. The presence of this contaminant greatly increases the danger and the cost and therefore greatly decreases the commercial viability of an extraction operation. This fact was not disclosed.

165.     The promulgation of these statements to investors internationally and the continuing failure to retract them constituted fraudulent misrepresentations that were intended to induce and did successfully induce a belief in and among investors that OGX, and the satellite entities that depended on its success, had huge intrinsic commercial value.

The OSX Public Offering.



166.    To cope with the huge gushers of oil that he had promised, BATISTA announced that he would start a shipyard to build a number of huge "oil platforms" (tanker ships equipped with drilling rigs as shown above) through his company, OSX, and began scouting a coastal site for a "Super-Port" to be managed by his logistics company, LLX, where these monsters could dock to unload OGX oil, eventually settling on a location at Açu, near Rio de Janeiro.

167.    OSX went public in 2010 and raised $1.58 billion through its initial public offering on the São Paulo Stock Exchange. The rationale for the OSX oil platforms was to transport OGX oil. The main point of the LLX "Super-Port" was for the OSX ships to dock and offload OGX oil. But OGX had found virtually no oil and in all its existence, right up to its bankruptcy in 2013, would pump virtually no oil.

168.    The ships were massive and inspired investor confidence – but that was their sole point. No responsible businessman would have commissioned such monsters without a predictable source of supply, but they were complete overkill for the tiny trickle of OGX oil.

169.    But their point was not to actually *transport* oil: they were window dressing, intended to mask the fact that *there was no oil*. They were visible support for BATISTA's lies. In

30

essence, in themselves, they were huge floating fraudulent misrepresentations, boasts to the world of the existence of vast quantities of commercially recoverable OGX oil.

170.    Eventually, OSX would have six ships commissioned, with the assistance of bribes to government ministers. But in its entire future, OGX would not pump enough oil to fill those six multi-million dollar OSX ships once, for even a single trip to port.

171.    Nevertheless, on January 26, 2010, OGX released a Material Fact captioned: **"OGX Signs Agreements with OSX to Secure Production Equipment – OGX Sets Production Target of 1.4 Million barrels per Day by 2019 – Initial Production Expected to Begin in Early 2011, Ahead of Schedule."** In the body of the Statement, BATISTA was quoted as stating:

> Our drilling results have revealed a new oil province in the southern part of the Campos Basin and broken paradigms regarding the quality and potential of the reservoirs in this area. At this moment, OGX is entering into a new phase in its history, with a focus on reaching our production target of 1.4 million barrels per day by 2019. We have an unparalleled 10 year growth story, based on world-class assets of extraordinary quality.

172.    The inference was that these were realistic projections founded on the discovery of a "new province" of commercially recoverable oil. But in truth, there was nothing to support it.

173.    BATISTA's reference to "world class assets" also resonated with investors internationally. In financial accounting, an "asset" is an economic resource that can produce value.

174.    However, nothing that OGX had yet discovered constituted an "asset." All the data available to it indicated that it might have "resources" of various categories, but how much could be recovered at *any cost* remained to be seen let alone what could be recovered *at a profit*.

175.    On February 1, 2010, OGX announced an estimated volume of "recoverable oil of 100 to 200 million boe" in the Vesuvio formation at well OGX-4.

176.    On February 3, 2010, OGX released a Statement of Material Fact that the drill-stem test at the 1-OGX-3-RJS well in block BM-C-41 (later named the Tubarao Azul - "Blue Shark" -

field) had revealed an estimated total recoverable volume of between 500 and 900 million barrels of good quality oil. This was represented to be extractable at a rate of approximately 3,000 barrels per day by vertical drilling, but at perhaps five times that rate, or 15,000 barrels a day, by horizontal drilling, as OGX proclaimed that it planned to do.

177.    This was untrue. There was no reasonable basis to believe in any such numbers. But a possible 15,000 barrels a day, which equated to roughly 5.5 million barrels a year, at a then per barrel rate of $87.21, constituted a fraudulent representation to the investors that OGX was sitting on close to another half-billion dollars of commercially recoverable oil, annually.

178.    On February 8, 2010, BATISTA appeared on the "Charlie Rose" TV show, nationally syndicated in the U.S., including throughout Florida, boasting of the fact that he had discovered "a hundred billion barrels of recoverable oil" and that Brazil was destined to be the world's fifth largest economy by 2015. [See Charlie Rose, *Interview with Eike Batista*, (Feb. 8, 2010), https://charlierose.com/videos/21203]. Investors internationally took note.

179.    On March 5, 2010, OGX released a Statement of Material Fact captioned: "**OGX Announces the Presence of Hydrocarbons in the Albian Section of Well OGX-6 – Rock Cores and Logs Indicate Strong Correlation Between OGX-6, OGX-3 and OGX2 Reservoirs.**"

180.    BATISTA's "Dr. Oil," MENDONÇA, was quoted as stating in relation to this new "discovery" that, "Ourre [sic] view of this data indicates that these accumulations may be connected and that the recently discovered oil province may, in fact, extend to the north of the BM-C-41 block, confirming its very significant petroliferous potential."

181.    This was all pure nonsense. The "presence of hydrocarbons" was of no intrinsic relevance to commerciality. As MENDONÇA well knew, publication of the existence of "hydrocarbons" to investors could be highly misleading and industry practice was not to do so. Indeed, when at Petrobras he had helped promulgate guidelines forbidding the practice.

182.    The "oil province" described was a grand, non-technical term designed to convey an impression of a huge undersea reservoir of commercially recoverable oil. "Connected" accumulations indicated that a single well might tap the totality. But the aggregate description was just not true and was intended to whet investment appetite.

183.    On April 14, 2010, BATISTA gave a video interview that was broadcast on the internet on XPTV, a video channel maintained by the XP brokerage firm, in which he further claimed that OGX had discovered "a new oil province in Brazil," that OGX had "the best exploratory blocks in the world" with "one trillion dollars-worth" of oil, that the company was worth up to "$100 billion dollars," and warned investors not to miss out on the opportunity to buy OGX stock. (*See* XPTV, *Entrevista Eike Batista OGX - A Grande Fraude - Entrevista Completa*, https://www.youtube.com/watch?v=6e_huuUsdH4).

184.    At or about this time, BATISTA orally disseminated other such false statements through audio and video conferences with financial institutions via the internet, as with all such internet publications described above and below, accessible and accessed by investors in Florida.

185.    The intended message to the investors internationally and in Florida was that OGX had "one trillion dollars-worth of oil," and was worth $100 billion. This led to an extraordinary increase in OGX's share price which soared from $15.55 to $23.27 that month.

186.    There was no reasonable basis for BATISTA and his accomplices and co-conspirators to believe that more than a tiny fraction of that amount of oil actually existed, let alone that it was commercially recoverable. These representations were fraudulently made with the intent of inducing investors to rely on them in purchasing and trading OGX stock and bonds.

187.    On May 13, 2010, OGX released a Material Fact captioned: "**OGX Concludes Drilling of Wells OGX-6 [and] OGX-8 – Identified Connection Between OGX-2 and OGX-6 Prospects with Estimated Recoverable Volume Totaling 1.4 to 2.6 Billion Barrels.**"

188.    Again, the use of the words "recoverable volume" was deliberately intended to convey the sense that this was money in the bank, but it was untrue. With oil trading at $80.44 per barrel, this was equivalent to a statement that there was between $112 billion and $209 billion of value in OGX; but there was no reasonable basis for anyone with access to the OGX drilling test results to believe in any such numbers.

189.    On May 27, 2010, OGX released a Statement of Material Fact captioned: **"OGX Detects the Presence of Hydrocarbons in Wells OGX-10 and OGX-13 – Net Pay of Approximately 40 meters in the Aptian Section of Well OGX-10."**

190.    As noted above, the discovery of "hydrocarbons" is inconclusive of any recoverable oil. However, in the oil and gas industry, *"Net Pay"* refers to the thickness of rock that can deliver hydrocarbons to the well bore. This statement was intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable reserves, to further stimulate market appetite.

191.    On August 12, 2010, BATISTA and MENDONÇA participated in a Bloomberg conference call broadcast over the internet during which MENDONÇA stated that, following a new discovery, OGX expected a "significant" increase in its potential oil and natural gas resources. BATISTA expanded on this, stating that wells in the Parnaiba Basin in northern Brazil might hold 10 to 15 trillion cubic feet of natural gas and that MPX, his energy company, planned to build power plants nearby.

192.    These estimates were pure speculation but they had their intended effect: OGX stock prices rose 2.2% and MPX stock prices rose by 6.8 %.

**Promoting OGX in Miami.**

193.    BATISTA had always had close ties to Florida including close social and business ties with Jeffrey Soffer, the Florida-based real estate and resort developer (then married to super-model Elle Macpherson) and was a frequent visitor to Soffer's Miami, Florida, home.

194.    During August 2010, BATISTA solicited Soffer in Florida to partner with him to develop office buildings and hotels in the Port of Rio de Janeiro and in "City X," BATISTA's mega-project for 250,000 residents in Fluminense, Brazil.

195.    Soffer traveled down from Miami, Florida, to Rio de Janeiro to meet with BATISTA and explore the prospects. The meeting was, as BATISTA intended, reported in the press with speculation as to the future plans of the prospective "partners."

196.    Such well-publicized gambits were designed by BATISTA to generate the impression that other high-performing, highly respected businessmen trusted his business acumen, and such associations lent BATISTA business credibility in the public mind.

197.    Jeffrey Soffer was the owner and operator of the Fontainebleau Miami Beach Hotel in Miami Beach which he had revamped to the tune of a billion dollars and where he envisioned creating a perpetual event marketing space. To this end he had partnered with David Grutman and his Miami Marketing Group, who established and operated the premiere Miami nightclub, LIV, at the Fontainebleau Miami Beach.

198.    MMG Nightlife took Miami's synergistic marketing environment to a new level. It created events at the Fontainebleau Miami Beach's many spaces. The property's restaurants hosted Grutman's huge 30-50 guest, "A-List" celebrity-studded dinner parties, five nights a week, and LIV provided the late-night environment where paparazzi and press could create "buzz" around their doings.

199.   BATISTA - then a member of the international A-List as Bloomberg's putative "Eighth Richest Man in the world" - used his Soffer/Grutman connections to pitch investment in OGX stock directly to celebrities in Miami, Florida.

200.   Thus, in September 2010, BATISTA met with a group of foreign investors in Miami at a star-studded dinner party hosted by Jeffrey Soffer and worked the crowd of high-net-worth investors, one-on-one, to buy OGX stock on insider information, because the company was about to announce further significant oil discoveries.

201.   Among the party guests were baseball star, Alexander Rodríguez ("A-Rod"), and his then girlfriend, the film star, Cameron Diaz. Rodriguez reportedly called his financial advisor for advice on the investment who, because it was insider trading, "told me to forget about it and never mention it again, because I could go to jail for a transaction like this."[8]

202.   It is unknown before discovery how many other people in Florida BATISTA pitched the investment prospects of OGX to at this time and over the years, or how many of them were less prudent than A-Rod and actually bought stock as a result of such face-to-face pitches. But it is believed that, given the fact that BATISTA wasted no opportunity to boost the value of his companies, the face-to-face pitch he made to A-Rod was characteristic of the approach he made to many other high rollers in Florida.

**"Interest from the Chinese."**

203.   On September 13, 2010, BATISTA spoke to reporters on a conference call that was published in an article online by Bloomberg in which he stated that all the major oil companies in the world including the major Chinese oil companies, Cnooc Ltd. and China Petrochemical Corp.,

---

[8]Anderson Antunes, *Even Alex Rodriguez Reportedly Almost Fell Victim to Eike Batista's Financial Collapse*, Forbes (Apr. 20, 2014), http://www.forbes.com/sites/andersonantunes/2014/04/20/even-alex-rodriguez-reportedly-almost-fell-victim-to-eike-batistas-financial-collapse/#1add8bc51ee5.

were among bidders for OGX assets. In response to the reporter's comment that his sources had revealed an offered price of $7 billion for the company, BATISTA said that that amount would only buy a "tiny" stake in OGX.

204.   However, this was just more spin, intended to boost the price for OGX shares. In reality no energy company with access to the actual OGX drilling data would have had an interest in OGX for more than a tiny fraction of its then supposed market price.

205.   Predictably, however, the OGX share price rose. This time by 2%, to put OGX stock at 20% up overall for the year.

206.   By this time, as the cumulative effect of the barrage of hype that BATISTA and his co-conspirators and accomplices had churned out over the preceding years, the financial press were hailing BATISTA as the world's eighth richest man with a net worth of $27 billion, and BATISTA was playing up his supposed position by announcing a new series of planned initiatives, including a partnership with sports goliath, IMG Worldwide, Inc., forming "IMX" to engage in the sports and entertainment business in Brazil, and a foray into consumer electronics by building an Apple computer factory on vacant LLX land.

207.   As the Forbes article concluded regarding the Apple initiative - reflecting the market understanding of OGX - "Whether that will come to pass is hard to say. Given the enormously valuable oil and gas empire that Batista has built in recent years, he might have a chance."

208.   But the "enormously valuable oil and gas empire" was nothing more than smoke and mirrors. Nevertheless, because of their own personal stakes in the success of OGX, BATISTA and his co-conspirators, including by that time, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, and PAULO GOUVEA, THOR BATISTA, and LUIZ CARNEIRO, and the controlled 63X, EBX and CENTENNIAL Companies failed to make any corrective announcement


to the investing public, internationally, and continued to assist BATISTA in hyping the value of the OGX oilfields.

209. On November 26, 2010, Bloomberg reported the news online, sponsored by BATISTA, that OGX was delaying its planned sale of a minority stake in its Campos oilfield until the D&M report was in by the end of the first quarter of 2011. Bloomberg repeated the BATISTA comments from September about selling a $7 billion minority stake to the Chinese; reiterated the fact of OGX's supposed 3.69 billion barrels of potential reserves in the Campos Basin, as estimated by D&M in 2009; and reported that the additional recent discoveries were expected to boost those numbers. This reflected the illusion that BATISTA and his co-conspirators had successfully created. But it was all untrue.

210. On March 15, 2011, Bloomberg summarized the information on OGX stemming from the cumulative effect of BATISTA's lies over the three preceding years. It reported that OGX, BATISTA's main source of wealth, was worth $37.1 billion, with 6.7 billion barrels of potential reserves. BATISTA was quoted as stating that despite having fielded five purchase offers from other oil companies he did not need to sell because OGX had $3 billion in cash and the extraction costs in its shallow-water fields were extremely low.

211. Bloomberg further reported OGX as claiming a hundred percent success rate in the Campos Basin where it planned to drill three additional wells and that higher-than-expected production would allow it to use fewer wells per production platform, thereby further cutting production costs. OGX had stated that it anticipated that production would ramp up from 20,000 barrels a day to 730,000 barrels a day by 2015, and 1.38 million barrels a day by 2018. In a video interview with Bloomberg BATISTA said "It's a bonanza" and "these are bonanza assets."

212.     But this was all untrue. For behind the scenes, everything that Brazil's King Midas touched was not turning to gold – not even black gold. But none of the co-conspirators made any attempt to correct the false impression in the market, even though they all knew the truth.

**The 10.8 Billion Barrel Lie.**

213.     On March 31, 2011, D&M submitted its confidential Report to BATISTA and OGX on the Prospective OGX Resources in Brazil and a Report on the Prospective OGX Resources in Colombia. It painted a depressing picture of OGX's future. Out of many billions of barrels of oil and gas that might possibly exist in the OGX fields, D&M failed to identify more than a tiny amount, less than 1%, that might constitute "reserves" – *i.e.* commercially recoverable oil.

214.     When the D&M reports became public there would be an obvious, hugely depressive effect on OGX stock prices. The only alternative BATISTA and his co-conspirators and accomplices decided, to try to keep the price up, was to lie.

215.     BATISTA, therefore, had MENDONÇA mix-and-match numbers from the D&M Reports, adding apples to oranges, completely contrary to the accepted industry methodology, to use as the basis for the most colossal lie to date.

216.     As a preventive strike to defuse the effect of the impending release of the D&M reports, on April 15, 2011, MENDONÇA, "Dr. Oil," issued a press release to investors in which OGX claimed its net potential resources in "recoverable oil" were 10.8 billion barrels and that these figures were based on the assessment of its world-renowned oil auditors, D&M.

217.     In it, BATISTA announced that the 10.8 billion-barrel number was not based just on OGX's own calculations, but that, "[t]hese results, presented by an independent, internationally renowned consulting group, confirm the extraordinary success of our business strategy and execution," he said. This obviously referred to D&M.

39

218.    To come up with the 10.8 billion barrel figure, MENDONÇA took D&M's *most optimistic* estimate of "contingent resources" (*i.e.* oil that was not necessarily commercially extractable in *any* amount) of 3.1 billion barrels. He then jumbled together three different categories of "prospective resources" (*i.e.* oil that had not yet even been discovered and was deemed currently unrecoverable) to come up with another 6.8 billion barrels. He then threw in D&M's figure of 1 billion barrels, which was an upper, outside guess of what might be possible from the geology, and which did not even meet the probability level of "resources" of any kind.

219.    What BATISTA and his co-conspirators and accomplices were doing was completely fraudulent. The 10.8 billion number was basically just made up out of thin air. But it was published under the imprimatur of "Dr. Oil" and supposedly based on the analysis of world-renowned outside auditors, D&M.

220.    Everybody on the Board at OGX, and everybody within BATISTA's confidence, which would have included the directors of OGX, OSX, LLX and the 63X, EBX and CENTENNIAL Companies, if they did not know before, knew by now that the entire "X" group of companies, whose success was predicated on massive oil strikes by OGX, was a massive pump-and-dump scheme. The list of individuals included EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, and LUIZ CARNEIRO. Their legal obligation was to expose the 10.8 billion barrel lie. But they were incentivized by their stock options to keep quiet. And they kept quiet.

221.    Despite BATISTA and MENDONÇA's preemptive strike, on April 15, 2011, when the D&M Report was released, investors reacted with concern and the OGX share price dropped sharply.

222.    Nevertheless, on the basis of Dr. Oil's reputation and his 10.8 billion–dollar prediction, BATISTA and MENDONÇA managed to spark a debate on the reliability of the D&M numbers.

223.    In a conference call on April 19, 2011, with market analysts, reported by The Wall Street Journal, among other media outlets, BATISTA and MENDONÇA defended the OGX data, describing D&M, dismissively, as "the most conservative certifier in the world." BATISTA stated that it was time that people started to trust the OGX team which he had brought over from Petrobras, headed up by his fabled "Dr. Oil." BATISTA contended that "it's time for the market to accept the company's numbers," and pledged to hire additional consultants to prove OGX's claims.

224.    The New York based multinational investment banking firm, Goldman Sachs, was among those reassured. It stressed publicly that investors should consider the D&M reports as just a part of a larger mosaic, and, "[w]hen considering the scope and underlying assumptions, we think that the D&M report generally adds confidence to our assumptions" and reiterated its "Buy" rating on OGX shares.

225.    What OGX had successfully managed to do by its fraudulent press releases and press conferences, intentionally disseminated across the phone lines and the internet to the world, was to confuse the issue and maintain a continuing belief in investors that OGX was sitting on vast commercially profitable oilfields and that all it needed was enough cash to stay in business to get the oil flowing.

226.    Maintaining a public story of OGX reserves of 10.8 billion barrels in "recoverable oil" as BATISTA was to do for the next two years was a complete fraud, designed to keep the balls in the air as long as possible and attract continuing trading in stocks and bonds of BATISTA's

41

companies, while he siphoned off as much as possible from the top and tried to sell off the rest before the bottom fell out.

227.    PAULO GOUVEA, however, decided that the writing was on the wall for OGX. While his duty was to blow the whistle on the scheme to the regulators and to investors, PAULO GOUVEA decided, instead, to cash in his chips and he sold his stake in the various X companies, reportedly realizing over $150 million which he reinvested in assets with real value, including real estate in New York and Paris. But he continued on in BATISTA's confidence and as a prime adviser in the fraud.

**D&M Secretly Protests.**

228.    Not surprisingly, behind the scenes, D&M was furious that their name was being used to mislead investors and on April 29, 2011, they privately stated their "great concern" on this point to BATISTA and OGX and demanded a corrective press release.

229.    On May 3, 2011, OGX sent D&M a placatory response, attempting to negotiate a compromise that would allow it to maintain both the 10.8 billion-barrel figure and the D&M imprimatur for its probity.

230.    On May 16, 2011, there was a meeting between OGX and D&M, with a presently unknown result. Whatever was agreed, D&M did not make its privately expressed "great concern" public and OGX did not retract its 10.8 billion barrel lie.

231.    Indeed, BATISTA embroidered further on the lie. In May of 2011, at the Michael Milken conference in California, which was broadcast to investors worldwide, BATISTA, then said to be worth roughly $30 billion, stated to CNBC that he was going to be richer than Carlos Slim, Warren Buffett, and Bill Gates because "I have created five companies that have in them embedded resources worth $2 trillion at a very low cost of producing." He went on to call them "idiot-proof assets."

232.     MENDONÇA, fully realizing that BATISTA's boasts to the public were nonsense, since he had created the underpinnings for the hype, between June 6 and June 16, 2011, MENDONÇA secretly and improperly sold 321,200 of his own shares in OGX, realizing a profit of approximately $2,500,000.

233.     In July 2011, OGX released a Management Presentation to investors trumpeting a resolutely upbeat picture, throughout which it consistently described its resources as being "10.8 billion of recoverable boe" and claiming to have all the needed cash, equipment, and skill in place to achieve massive success.

234.     However, the truth was that OGX had found virtually no commercially recoverable oil and BATISA had no convincing data to show any savvy oil industry investor to convince it to buy into OGX.

235.     BATISTA needed a cover story for why his rumored sale to the Chinese was not going through and he resolved to tell the press that it was because he did not need the cash and wanted to reap the profits himself.

236.     Thus, on September 23, 2011, in an article published by Reuters U.S. Edition on the wires under the title, *"Cashed-up Eike Batista won't sell oil stakes,"* Reuters reported that BATISTA said he had abandoned talks to sell stakes in his offshore oil prospects because he had billions in hand and did not need the cash.

237.     Oil was then trading at roughly $80 per barrel and BATISTA claimed that the low production cost of his shallow-water wells meant that he could break even if the per barrel price fell as low as $24. In the Reuters article, he said that OGX was close to signing a long-term deal to supply oil to one of the world's largest refiners – which he declined to identify, citing securities regulations – and that a recent bond issue had "brought in exactly what we needed to live off our own spoils." When asked about a decline in OGX share prices, he responded, "I have to laugh. My

43

companies are all going to be massive cash flow machines. I'm going to pump money to my shareholders and dividends to my sons and my grandsons."

238.    Part of that claim would prove true: he would pump money to his co-conspirator shareholders through their sales of fraudulently hyped stock, and would pump money directly to his sons and other family members to defraud creditors – but not from profits.

**Insiders Sell Their OGX Stock in Miami.**

239.    BATISTA had several companies from which he could directly siphon money and which he hoped he would eventually be able to flip at a profit. However, BATISTA's directors and other insiders had their fortunes pegged directly to the value of their stock options in just OGX. They could see clearly that the picture that BATISTA was painting for the public and what they were helping him color in was false, and they wanted to dump their shares before the bottom fell out.

240.    The problem was that stock sales by insiders would have to be disclosed publicly and there would be a high risk of creating panic among investors if they were to do so. BATISTA had therefore placed restrictions on their ability to do so.

241.    Upon information and belief, however, several OGX executives who were within the circle of BATISTA's confidants and who knew that OGX was a massive fraud, entered into transactions to circumvent the prohibition and dispose of their stock without alarming investors through "creative thinking" on the part of J.P. Morgan Securities in Miami, Florida.

242.    One of J.P. Morgan Securities' wealth management executives in Miami, Florida, reportedly proposed extending the insiders "loans" with their stock standing as collateral and the sole recourse for repayment. The idea was that the insiders would default on the "loans," J.P. Morgan would foreclose on the collateral, and both sides would be happy: J.P. Morgan would have

OGX stock at what it hoped would be a profit and the insiders would have cash, thus achieving the equivalent of a sale of the stock without disclosure to investors.

**The Lies Continue – OGX "Cash Rich."**

243.    As the cumulative result of BATISTA's lies, by 2012, there was general acceptance in investors that OGX had access to massive amounts of recoverable oil. However, investors were beginning to question when OGX would start to deliver and whether the company was sufficiently well-capitalized to stay in business until it could start production.

244.    Accordingly, if his fraudulent scheme was to work, BATISTA's task was now to engender a belief in investors that OGX was cash rich and that the oil would soon start to flow.

245.    In January 2012, the initial OGX production report on the first well showed flows of just 15,000 barrels a day. These extremely modest results nevertheless had Batista and "Dr. Oil" putting on a show of huge success, popping champagne corks while technicians opened the valves remotely from Rio de Janeiro and webcams delivered pictures to the world.

246.    On January 16, 2012, OGX released a Statement of Material Fact announcing the discovery of evidence of "hydrocarbons" in the Santos Basin, in the Fortaleza field, in well OG-63, stating, "[t]his discovery is important for its huge hydrocarbon column and net pay identified in the Albian section, as well as by the quality of the Aptian reservoir and its behavior," commented PAULO MENDONÇA, General Executive Officer and Exploration Officer of OGX.

247.    This was a mishmosh of technical jargon intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable, recoverable oil, to further whet market appetite.

248.    And BATISTA continued boasting of his "success." On January 20, 2012, he gave an in-person interview from Rio de Janeiro with The New York Times, for an article entitled, "A Brazilian Magnate Points to Himself for Inspiration." The article remarked admiringly on

45

BATISTA's trappings of apparent success, his 1,000,000 Twitter followers, and the fact that OGX was expected to begin producing crude oil from an estimated 10 billion barrels of offshore discoveries. "Brazil today has the wealth that America had at the turn of the century," said BATISTA. Regarding his ostentatious display of wealth: "I want to help a whole generation of Brazilians to be proud. I am rich, yes. I have built it myself. I have not stolen it," he quipped.

249.    Regardless of the accuracy of the wealth of his country, his final statement regarding the source of his personal wealth was certainly untrue.

250.    On March 2, 2012, BATISTA gave a telephone interview from Rio de Janeiro to Bloomberg. During the interview, BATISTA stated that he still had plans to overtake Carlos Slim as the world's richest person by 2015 and boasted that his companies would post close to $1 billion in earnings before interest, taxes, depreciation and amortization in 2012, and double that in 2013. With an estimated net worth of $30 billion, BATISTA, still ranking eighth in the Bloomberg Billionaires Index, said, "I am probably, among the billionaires, the least indebted guy of all of them."

251.    No reasonable person, knowing what BATISTA knew at that time, could have made any such statement truthfully. He was playing games with investors with smoke and mirrors. His "Empire" was, as he knew, a house of cards. The collapse was just a matter of time.

**The Mubadala "Investment."**

252.    The Mubadala Development Company ("Mubadala"), based in Abu Dhabi, is the strategic investment and development company of the oil-rich United Arab Emirates.

253.    On March 26, 2012, BATISTA publicly announced that Mubadala had signed a "strategic partnership agreement" with his EBX group whereby Mubadala would invest $2 billion in exchange for a 5.63% preferred equity interest in the Defendant, CENTENNIAL (BRAZIL) and other BATISTA offshore holding companies, believed to include the 63X and EBX Defendants,

giving it an indirect interest in the public companies, OGX, OSX, MMX, LLX, MPX, and privately-held AUX, REX and IMX.

254.    BATISTA announced the agreement as a "framework for further collaboration between the two organizations" and that the Mubadala cash was to be used to "reinforce the group's already strong capital structure so as to help fund new enterprises across multiple business areas."

255.    BATISTA further announced: "[t]his is the first time we have invited a strategic partner to invest at our holding company level. The investment considerably strengthens the entire group and its ability to successfully implement current and future projects. Mubadala, after conducting thorough due diligence of our companies recognizes the great potential of our Latin American assets."

256.    An attached "Legal Notice" stated that this "strategic partnership constitutes a minority investment by Mubadala in Centennial Asset Brazilian Equity Fund with no changes to the control, management or day-to-day activities of Mr. Eike Batista's publicly listed vehicles: OGX, OSX, MMX, LLX and MPX."

257.    Mubadala went along with the phrasing of this announcement.

258.    On the surface, as projected to the investing world, a highly experienced and well-financed sovereign company from the oil sector, after conducting "thorough due diligence," had seen sufficient value in the prospects of BATISTA's OGX-oil-based empire to accept an "invitation" - the first extended to any outside player - to buy a tiny minority equity stake in BATISTA's holding company, giving it no control, for $2 billion. (By extrapolation, on the raw math, without factoring in the value of control shares, the company must have a value as a whole of at least $40 billion).

47

259.   The subtext of BATISTA's message was that his strongly-capitalized EBX group did not need the cash, but this contribution would enable it to expand into new areas.

260.   The news about the Mubadala "investment" was disseminated by many financial news organizations including Bloomberg.

261.   As BATISTA later explained in a Milken Conference interview broadcast to the investment world by Bloomberg, described below, he entered into this transaction in order to convey a message to the world that a savvy outsider had "audited" his operation and placed its "stamp of approval" on it. In other words, if one of the world's great players believed in him to the tune of $2 billion for a tiny stake, so should all investors.

262.   The actual Mubadala "strategic partnership agreement" has not yet been seen. But later events described below make it clear that this $2 billion "stock purchase" was far from a simple purchase of a tiny non-control block of stock, but was structured far more like a $2 billion *loan*, with BATISTA's entire worldly wealth, including shares in companies within the group and outside, such as his substantial holding in Florida's Burger King and other treasured plum assets, pledged as collateral.

263.   It is believed that this deal was structured in the Cayman Islands and involved the EBX, 63X and CENTENNIAL Companies. This fraudulent presentation was primarily intended to bolster investors' confidence in OGX, on which the success of the group depended.

264.   Had this "strategic partnership" been declared to investors as the desperately-needed "loan" it truly was, investor confidence in OGX would have evaporated, its end hastened by perhaps as much as a year, and Plaintiffs would not have lost a cent.

**Keeping the Balls in the Air.**

265.   In April 2012, BATISTA staged a photo-op for the world press at his planned LLX "Super-Port." With him onstage were a roster of Brazil's political and business elite: President

48

Dilma Roussef (now impeached and deposed), Rio Governor Sérgio Cabral (now under arrest and federal investigation for corruption), and Mines and Energy Minister Edison Lobão (now also under federal investigation for corruption). The audience of 400 included foreign corporate luminaries from around the world.

266.    Showing off his port, which he predicted would be the largest port in the Americas, BATISTA announced that OGX had begun production on what he described as a "new frontier" of petroleum 37 miles off the Brazilian coast. "This is a historical moment," said Batista. "It's the first time an independent Brazilian company has produced offshore oil."

267.    President Rousseff did her bit to boost the illusion, announcing resolutely that the state-run oil company Petrobras would go into deep partnership with Batista's firm: "Eike is our standard, our expectation and, above all, the pride of Brazil when it comes to a businessman in the private sector," Rousseff told those in attendance, as she stood by his side, both clad in orange OGX jumpsuits for the photo-op. BATISTA – his jacket sporting a black, oily hand-print, symbolizing "first oil," flashed a two-fisted victory sign:



268.    BATISTA and his co-conspirators and accomplices, however, knew that the trickle of oil they were witnessing was pretty much all there was. The block was later to be returned to the government as worthless.

269.    On April 18, 2012, roughly a year before the eventual crash, as the result of the aggregate lies, Times magazine named BATISTA one of the 100 Most Influential People of 2012. The short supporting puff-piece on BATISTA was written by then-mayor of Rio de Janeiro, Eduardo Paes (a key BATISTA ally, now under investigation for corruption).

270.    In it, Paes spoke of BATISTA as one of Rio's "most treasured adopted sons" who had "helped us shape the renaissance" of Rio, citing his status as "Brazil's richest man and the world's seventh richest, bringing vital investment to our city from oil and mining," and boasting of his charitable largesse.

271.    Puff pieces like these were contributed from time to time by BATISTA's rich and powerful friends whose own careers were symbiotically tied to his and were intended to bolster the impression of BATISTA's success and sustain his position with investors.

272.    However, the insiders could see that the writing was now truly on the wall.

273.    In April 2012, OGX board member Marcelo Faber Torres figured that he had better dump his OGX stock before the truly bad news came out and he reportedly sold 9 million OGX shares in staggered batches so as not to alarm investors.

274.    Other insiders, co-conspirators, and accomplices started to do the same and reportedly, at or about this time, the executive group quietly sold off 17 million shares, realizing over $103 million.

275.    As a part of his own exit plan, BATISTA had, upon information and belief, two companies set up in The Bahamas through corporation formation agent Winterbotham Trust Company, Inc., to help shelter the proceeds of the fraud. BATISTA's son, the Defendant, THOR BATISTA, agreed to act in regard to these corporations and assist his father in achieving the objective of the fraudulent scheme.

276.    One of these Bahamian companies was the Defendant, THORQUE INVESTMENT MANAGEMENT LTD., which was incorporated on April 12, 2012. The other was the Defendant, THORQUE1 FUND LTD., whose date of incorporation is unknown. Upon information and belief, these companies were nominally owned and controlled by THOR BATISTA, but who acted at BATISTA's direction.

277.    Upon information and belief, bank accounts were opened in The Bahamas, Miami, Florida, and eventually in Switzerland in the name of the THORQUE companies. It is believed that the Bahamian funds were held in an account under the direction of BTG Pactual[9] or Itaú Bank and eventually held at least $100 million in proceeds of the fraud. It is believed that the Miami account was at Itaú or Citibank. The Swiss account is presently unknown, but $30 million is believed to have been eventually routed out to a safe haven through the Citibank trust account of one of Batista's Florida professionals.

**"The Brazilian Dream."**

278.    On April 30, 2012, Bloomberg Television aired an 11-minute video interview of BATISTA on its show, "Money Moves with Deirdre Bolton." The interview took place at the Milken Institute's 2012 Global Conference in Los Angeles, California, where BATISTA was a featured panelist in four different panels during the five-day conference. After Bloomberg broadcast the interview on television, it published the interview on youtube.com with the description, "Brazilian billionaire Eike Batista talks about the potential benefits of OGX Petroleo e Gas Participacoes SA forming project partnerships with Petroleo Brasileiro SA and Vale SA."

279.    In the Bloomberg interview, correspondent Stephanie Ruhle introduced BATISTA as the "tenth richest man in the world - the goal is to get to number one." Ms. Ruhle then noted

_____

[9] Banco BTG Pactual SA ("BTG Pactual") operates and has operated under various names in various jurisdictions during the relevant time period.

that a week earlier, the President of Brazil had visited BATISTA's oil port in northern Rio de Janeiro, where she called BATISTA a special kind of entrepreneur and a hero to Brazil. Bloomberg accompanied this anecdote with broadcast footage of BATISTA and President Rousseff getting off a helicopter together, surrounded by press. All of this, of course, fed into BATISTA's artificial narrative of himself to lure in American investors.

280.    BATISTA then utilized this broadcasted news segment to repeat his colossal lies about his companies. He spoke of "a trillion and a half dollars in assets: oil, gas, iron ore, gold, coal" and projects with "eighty percent margins." He spoke of the prospects of collaboration between OGX (which he knew had virtually no oil) and the (huge) Vale and Petrobras companies as being a "win-win for everybody."

281.    BATISTA also explained his rationale for the sale of a small stake in EBX to Mubadala (which was secretly, in reality, a loan) as being to inspire investor confidence: "[w]e just wanted to have, maybe an extra stamp by investors. Because you know the market is funny. Sometimes they demand, well, we like to have the structure audited. And when somebody like Mubadala comes in, the world knows how deep they go into the auditing process. And I love to be audited. I love transparency. So in a way, it's an extra way to show transparency to what we do." He said that he was just spreading hope in "The Brazilian Dream."

282.    By June of 2012, OGX was unable to hide the fact that the wells at its main field in the Campos Basin were not as productive as first believed and that it had cut production estimates by two-thirds. OGX share prices fell steeply by the end of June.

283.    Continuing to believe in the aggregate BATISTA-generated hype, however, on July 19, 2012, the Financial Times in London, England published an article entitled, "It is too soon to write off Eike Batista." The article quoted BATISTA's boast at an OGX investor meeting from

52

earlier in the year, that his companies were "80 per cent ebitda- [earnings before interest, tax, depreciation, and amortization] margin businesses. I search for the truffles."

284.    It also quoted a supportive statement from one of BATISTA's biggest and closest bankers, BTG Pactual – who should be in the position to know – that the stock could recover within the next twelve months and that "OGX has enough cash to support its business."

285.    Nobody listening thought that BATISTA, who continued to boast about his "trillions of dollars" of oil, would be prepared to flat out lie. They were to be proved wrong.

286.    Through a barrage of international press articles and a blizzard of tweets, in the course of 2012, BATISTA maintained an image of burgeoning wealth through publicized plans for massive investment into an ever-expanding series of business ventures, from shipyards and ports, to sports and entertainment ventures.

287.    Thus, on July 18, 2012, BATISTA tweeted that OSX and OGX had negotiated the construction of drill ships; on July 19, 2012, he sent out a video on the synergy between OGX and MPX for gas exploitation in the Paraiba Basin; on August 29, 2012, he boasted that his port at Açu would be one-and-a-half times bigger than Manhattan Island, New York; and on September 25, 2012, he re-tweeted an IMX photo regarding his IMX deal with Cirque du Soleil.

288.    However, as stated above, the OSX shipbuilding business was largely dependent on OGX oil and there was no oil. Nor were there continuing orders to build ships from the general market. However, corrupt government Ministers controlled the purse at Brazil's Petrobras and were a source of funding – at a price.

289.    What BATISTA did not include in his tweets was that OSX had been awarded this $922 million ship-building contract as a result of a $2.3 million bribe that CARNEIRO had agreed to with Brazil's Finance Minister, and Chairman of Petrobras, Guido Mantega.

290.     By now the illusion of spectacular reserves of oil had been created. MENDONÇA was no longer needed as "Dr. Oil," and he was promoted out of OGX to the Board of EBX, BATISTA's investment vehicle, which was focusing on siphoning off as much as possible.

**OGX Secretly Bankrupt.**

291.     Upon information and belief (from the Brazilian indictments) an internal OGX task force which had started work in 2011 and Schlumberger, the world-renowned energy consultant, essentially a Joint Task Force, presented reports on their conclusions as to OGX's prospects to the OGX Executive Committee, presided over by BATISTA, in September 2012.

292.     Upon information and belief (from the Brazilian indictments) the Joint Task Force concluded that a negligible amount of the promised 10.8 billion barrels of oil were "recoverable" at any expense and that, even so, they were contaminated with such high levels of $H_2S$ "Death Gas" that most of what was technically recoverable could not be extracted economically even if (which was doubtful, because of the environmental impact) licenses for decontamination could be obtained.

293.     The Joint Task Force concluded that even in a best-case scenario, the company had a negative value of about one billion dollars, making the commercial production of oil from any of the fields absolutely impossible.

294.     Thus, by September 2012, at the very latest, BATISTA and his co-conspirators and accomplices knew that OGX was insolvent and that the further exploration for oil was a pointless quest. Moreover, even the *pretense* of oil exploration for profit could not continue without fresh massive injections of cash.

295.     BATISTA and his co-conspirators and accomplices knew from these devastating audits that the whole house of cards that depended on OGX oil (the OSX exploration platforms, the LLX-run Super-Port, and so on) would collapse as soon as the truth was known.

296.    BATISTA and his co-conspirators and accomplices knew that there was no reason for any investor, who knew what they knew, to invest another penny or buy bonds on the secondary market, and indeed that anyone who had OGX/OSX stocks or bonds who knew what they knew would dump them as quickly as possible.

297.    These reports should have been disclosed to the public immediately as Statements of Material Fact. However, BATISTA and his co-conspirators, and the Boards of OGX and OSX, illegally refused to disclose this information and deliberately suppressed it. This constituted a massive fraudulent misrepresentation by omission.

298.    BATISTA and his co-conspirators and accomplices knew that it was now a matter of time before OGX and the satellite companies were seen by the public to be worthless. Their focus was now to keep up the illusion of eventual profitability long enough for them to hive off their interests in the satellite companies and liquidate as much of their remaining stock in OGX at the highest price possible and route it out to secret foreign bank accounts before the bubble burst. And by such continued outright lies, BATISTA and his co-conspirators and accomplices managed to stave off the realization among investors that OGX was bankrupt for close to another year.

**The Exit Strategy.**

299.    Upon information and belief, BATISTA's exit strategy - which was integral to the fraud as a whole, since the entire exercise would have been pointless if the money stolen had not been put out of the reach of creditors when the bubble burst - is believed to have been largely structured and executed in Miami, Florida, the Cayman Islands, The Bahamas, Panama, and Switzerland. It was basically a money-laundering operation. The details are unknown before discovery, but, to the extent known, the ultimate facts are as outlined below.

**The Professionals.**

300.    Upon information and belief, the architects of the scheme were international asset protection specialists. They created and implemented the various international structures for BATISTA to transfer the funds internationally and hide the proceeds of the fraud. It is believed that they were introduced to BATISTA by BERTO and that BERTO served as the first trustee of the Swiss trust created to hold the proceeds of the scheme on behalf of BATISTA as part of the structure.

301.    Upon information and belief, from at least 2012 onwards, these Miami professionals, essentially, had no other client but BATISTA and his various co-conspirators, accomplices, corporations, trusts and other interests, and that their offices were in fact an agency office for BATISTA and his co-conspirators and accomplices.

302.    Upon information and belief, no professional privilege attaches to their files, as being excluded by the crime-fraud exception and to destroy them or move them would constitute furtherance of the conspiracy, spoliation of evidence and cause for disciplinary action.

303.    Upon information and belief, these international asset protection specialists were based in Miami, working with BATISTA and his co-conspirators, the 63X, EBX, CENTENNIAL and THORQUE Companies and similar professionals in Brazil, Austria, The Netherlands, and other jurisdictions constructed a web of shell companies that were incorporated in various secrecy jurisdictions, including those joined here, and trusts and other vehicles elsewhere.

304.    These shell companies were to be used to obscure the rationale behind the routing of funds between countries and their eventual safe deposit into various bank accounts, properties, and assets under other names around the world for BATISTA and his various co-conspirators, accomplices and family members.

56

**The Bankers.**

305.    BATISTA's prime banking relationships were with three massive international banking groups: Citibank, BTG Pactual and Bank Itaú, all of whom have presences in Miami and licenses to operate in Florida.

306.    Upon information and belief, each of the three banks named above had extremely close relationships with BATISTA and his co-conspirators and accomplices and different divisions and subsidiaries within those groups assisted BATISTA and his co-conspirators and his accomplices in laundering the profits of his fraudulent scheme and routing them internationally to ultimate repository accounts in secrecy jurisdictions around the world.

307.    Upon information and belief, the messaging to effect such transfers would have necessarily been routed through the SWIFT server maintained in Virginia and otherwise through the United States. It is unknown before discovery whether their degree of knowledge and complicity would justify joining these banks in this action as defendants.

308.    Upon information and belief, among other accounts in other countries, Citibank provided banking facilities and maintained an account in Miami which held at least tens of millions of dollars, and maybe more, which BATISTA had siphoned off as profits from his fraudulent scheme to hide them from creditors when the bubble burst.

309.    It is unknown before discovery which names were used for the Citibank accounts, but they are believed to have been held, in part, nominally for THOR BATISTA, in the name of the THORQUE Companies or in the names of the 63X, EBX or CENTENNIAL companies, but were in reality held for BATISTA himself.

310.    Bank Itaú also provided banking facilities and hosted accounts in Miami and in foreign countries, including in the Cayman Islands and The Bahamas, which held sums of money which BATISTA had siphoned off in order to hide them from creditors when the bubble burst.

57

More specifically, on current information, it is believed that during the relevant time period, Bank Itaú in Miami received transfers in excess of 760 million from accounts controlled by Batista in The Bahamas and Cayman Islands.

311.    It is unknown before discovery in this case all of the names that were used for the Bank Itaú accounts, but based on the disclosures received through the Cayman Islands and the Bahamian proceedings they are held, in at least the following names: AUX LLC, Centennial Asset Brazilian Equity Fund, Thorquel Fund, Thor Batista, 63X Investments Ltd., and 63X Master Fund. In reality, upon information and belief, despite being held in the names of these entities these accounts were held for BATISTA himself.

312.    Upon information and belief, BTG Pactual Bank provided banking facilities and hosted one or more accounts in The Bahamas, the Cayman Islands, and elsewhere, either directly or through an affiliated or correspondent entity, which held hundreds of millions of dollars which BATISTA had siphoned off in order to hide the funds from creditors when the bubble burst.

313.    It is unknown before discovery all names that were used for the BTG Pactual accounts, but they are believed to include accounts in the names of the 63X, or CENTENNIAL, but were in reality held for BATISTA himself.

314.    Other bank accounts, held through other structures unknown before discovery but orchestrated by BATISTA and his co-conspirators were, upon information and belief, set up in the Cayman Islands, The Bahamas, Miami, Panama, and secrecy jurisdictions around the world.

315.    Upon information and belief, the funds were routed from Brazil and elsewhere through the various accounts to break the trail of where the funds originated and in hopes of rendering them safe from detection and attachment.

316.    Participants in the scheme included the various Defendants and other entities owned or controlled by BATISTA and his agents, accomplices and co-conspirators, the identities of which are not known before discovery.

317.    These persons and entities knowingly facilitated the fraud and helped conceal the funds siphoned off in order to hide them from creditors when the bubble burst and in doing so routinely abused the corporate fiction such that it should be in all cases pierced or disregarded.

**The Fake Billion Dollar "Put Option."**

318.    To give himself time to implement his exit strategy, BATISTA needed more than tweets and boasts and he devised other fraudulent stratagems to bolster investor confidence and stimulate further public investment.

319.    However, directors in OGX now started getting cold feet about staying on in the company at the board level, given the likely civil and possible criminal liability they would face when the bubble burst, and several of them resigned.

320.    BATISTA was meanwhile searching for less squeamish candidates for the board of OGX for whom the lure of money would be greater than their fear of consequences and on August 6, 2012, at a general meeting of OGX shareholders, many of them large North American pension plans, including the Florida Retirement System Trust Fund, one such individual was proposed and elected: the Defendant AZIZ BEN AMMAR.

321.    Upon information and belief, AZIZ BEN AMMAR was a prime mover in the "Put Option" stratagem described immediately below.

322.    On October 24, 2012, BATISTA announced to investors, as was duly reported by Bloomberg and the other organs of the financial press that, through EBX, he had entered into a billion dollar "Put Option" with OGX. This was, in essence, a contract between EBX and OGX

for BATISTA to inject $1 billion of his personal wealth in EBX into OGX as additional working capital upon demand.

323.     BATISTA similarly announced that he would be ploughing a billion dollars of his own wealth into OSX, buying stock at three-times market price if and when needed, although that might have to be delayed until 2014 because, as BATISTA said, Brazilian stock exchange rules required a minimum amount of "free float" time.

324.     The announcement that Brazil's golden boy with the Midas touch had a billion dollars-worth of confidence in his oil exploration company, and another billion in his prime satellite ship-building company resulted in an expected boost in share and bond prices.

325.     However, there were at least two fundamental problems with this announcement. The first was that BATISTA had no intention of paying in any money whatsoever. The second was that no amount of money could fix the fundamental problem, which was that there was no oil.

326.     In sum, the OGX Put Option was just another lie, a stratagem created by AZIZ BEN AMMAR and adopted by the co-conspirators to delay the inevitable and allow BATISTA and them all to get as much money as possible *out* of OGX before it collapsed.

327.     In fact, upon information and belief, BATISTA may not have even actually entered into any such commitment on paper. Only much later, and only under pressure from insider creditors, did he ever actually sign such an obligation, and even then it was conditioned on an "out clause" designed to give him some "cover" in backing out - which, as we shall see below, is exactly what he did.

328.     That the Put Option - if it existed - was non-binding was not told to the public. Nor was the fact that BATISTA did not intend to honor it. Nor was the fact that the company was insolvent. Nor was the fact that there just was no oil, and that no amount of money, however long it might be squandered on pointless drilling, could put oil in the ground where no oil existed. All

of this should have been announced via Statements of Material Fact, but was not. The failure to do so constituted fraudulent misrepresentations by omission.

329.     However, the announcement of the Put Option was effective in slowing the fall in price of OGX stock during the fourth quarter of 2012 and fed its rise in January 2013.

330.     The value of LLX - BATISTA's allied logistics company which was building the port at Açu where OSX ships were to offload OGX oil - was conspicuously pegged to the value of OGX and therefore OSX.

331.     In November 2012, MARCUS BERTO was appointed CEO and Investor Relations Officer of LLX to help corral emerging bad news and get the company sold off before the OGX bubble burst. Upon information and belief, BERTO fully understood that OGX was insolvent and the mission was to cash BATISTA out as fully as possible before the crash rendered everything valueless.

332.     To further boost investor confidence, on November 13, 2012, BATISTA tweeted to the world that the Group X operations in the Campos Basin were in an area responsible for 80% of Brazil's oil production.

### Section II -The Plaintiffs Invest

333.     At the start of 2013, no one apart from the insiders, not even the Brazilian regulators, suspected that OGX was a colossal bubble scheme. The consistent, massive lies, spawned by BATISTA, his co-conspirators and his accomplices, repeated over the previous years, had generated an overall base-line impression among investors world-wide of OGX as an oil company with enormous oil reserves and enormous likely margins of profit, whose only impediment to spectacular success was its cash needs until it could come into full production.

334.     That the BATISTA-generated spin was continuing to work in early 2013 was exemplified by announcements such as one published online by Highbeam Reports in January

2013 that London's financial house Barclay's was convinced that "[OGX] presents better opportunities for investors than its federally-owned peer Petrobras . . ." (This was well before the massive Petrobras corruption scandal broke).

335.     As noted above, Gables Capital, Inc. is a registered investment adviser based in downtown Miami, Florida, and at all times material hereto acted as investment adviser to the Plaintiffs and was their agent for the purchase and sale of stocks and bonds.

336.     The individual responsible for the MERIDIAN and AMERICAN accounts was Ms. Judith Neiwirth, Gables Capital's co-founder and Chief Investment Officer, who had over thirty years of experience in the financial services industry.

337.     Ms. Neiwirth had available to her the aggregate spin disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual "lay" internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers.

338.     As a result of the hype generated by BATISTA, described above, the general base-line impression in the international investment market at this time was that OGX was a company that was sitting on spectacular reserves, as evidenced in part by the fact that savvy industry player, Mubadala, had recently bought a 5.63% stake in its holding company for $2 billion.

339.     To investment advisers like Ms. Neiwirth, reviewing the aggregate information on Bloomberg, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar "bonanza," of which BATISTA had consistently represented, started to gush.

340.     It seemed, moreover, that OGX was in no danger of running out of cash, given that BATISTA had pledged an additional billion dollars of operating capital, if and when needed. (The

subtext was further that although there was a trillion dollars of oil to be had, if a billion was not quite enough to bring the gushers online, there would be more cash to come).

341.    BATISTA had further pledged to inject another billion dollars into OSX, if and when needed. Since the future of OSX depended heavily on the future of OGX, this pledge of cash for OSX reinforced the public impression of the value of OGX.

342.    This was therefore a particularly attractive opportunity for purchasers in the bond market. OGX appeared to be asset rich with plenty of operating capital and OGX bonds were at that time yielding above an 8.375% interest rate.

343.    On January 15, 2013, in reliance on the overall picture painted by BATISTA, his intentional misstatements made via his publications on the internet and material omissions, reinforced in her decision to invest by BATISTA's announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17 on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN.

344.    On January 22, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN.

**The EBX/BTG "Strategic Partnership."**

345.    In 2013, BTG Pactual was Brazil's biggest private investment bank, and its Chairman, Andre Esteves, was an iconic Brazilian billionaire on a level with BATISTA. On March 6, 2013, prnewswire.com relayed the following EBX announcement:

> The EBX Group and BTG Pactual announce the signing of a novel strategic cooperation agreement. The agreement contemplates financial advisory services,

credit facilities and future long-term capital investments for the transformational projects currently being developed by the EBX Group in its segments. "This cooperation represents, above all, a partnership for the success of Brazil", said Eike Batista, EBX Group's CEO and Chairman.

This new cooperation will have a Strategic and Financial Management Committee comprising of senior executives from the EBX Group and of senior partners of BTG Pactual. The Committee will be led by Eike Batista and Andre Esteves and will meet on a weekly basis to discuss overall strategies relating to EBX Group's capital structure and investments for the short, medium and long-term projects and activities of the group's portfolio of companies. The agreement does not grant any exclusivity for BTG Pactual to render financial services to the EBX Group.

BTG Pactual's remuneration will be solely based on the performance of the EBX Group's public companies. Andre Esteves, BTG Pactual's CEO, stated that: "This cooperation shows once again our firm willingness to support unique projects and national entrepreneurship, areas in which Eike Batista is an icon."

346.    This EBX announcement was intended to convey the underlying message that BTG Pactual, one of the largest and most sophisticated players in the Brazilian financial market, saw enough value in BATISTA's empire that it was willing to "partner" with EBX, without any promise of exclusivity, and plough in cash to finance "short, medium and long-term projects," with its own profits completely contingent on the success of the EBX ventures.

347.    The phrasing of this release was another BATISTA stratagem intended to dress up the fact that OGX desperately needed money to delay its inevitable financial collapse by using the language of opportunity and the purported confidence of savvy bankers in the worth of his operation.

348.    Predictably, OGX share prices shot upwards, closed up 16%, and rallying as much as 27.7% in the day following the announcement. On March 7, 2013, the announcement came across on the Bloomberg terminal on Ms. Neiwirth's desk at Gables Capital in Miami, Florida, coupled with a report that BTG Pactual was willing to extend BATISTA's EBX another billion dollars for liquidity.

349.    On March 13, 2013, BATISTA had OGX release another Statement of Material Fact to investors declaring that oil recovery from the Pipeline, Fuji and Ilimani formations was

commercially feasible, announcing an on-site amount between a half billion and 1.3 billion barrels of oil, and conveying the impression that commercial production was imminent.

350.    However, as BATISTA knew, the truth was that only a tiny percent of the oil detected was recoverable and commercial feasibility was impossible.

351.    On March 22, 2013, BATISTA tweeted that OGX had eight acknowledged oil commercial accumulations: three onshore, in Maranhao, and five offshore.

352.    But, despite BATISTA's continuing misrepresentations, the stock price began to fall.

353.    On March 23, 2013, Bloomberg reported that BATISTA via Twitter had warned short sellers wagering against his companies that they would regret their bets. Asked by other Twitter users about the companies' falling stock prices, BATISTA had written that "rumors and gossip are tools of short sellers" who will be "caught with their pants down," and he directed his readers to an interview with BTG Pactual President, Andre Esteves.

354.    In that March 23, 2013, interview BTG Pactual President, Andre Esteves, had stated that BATISTA's companies were in no danger of failing and that BATISTA remained one of the best capitalized business men in Brazil.

355.    Well before the "strategic partnership" announced on March 6, 2012, BTG Pactual had been doing due diligence on OGX, which was the prime asset of BATISTA's holding company, EBX, in order to act as its financial consultant and potential provider of long-term financing. BTG Pactual must therefore have known how precarious a position OGX was in. The public, however, took its Chairman's statement as being true.

356.    Upon information and belief, Mr. Esteves' statement on behalf of BTG Pactual was intentionally false and was issued pursuant to an agreement with BATISTA. It is unknown what the consideration for the deal may have been. (In late 2015 Mr. Esteves was arrested in Rio,

65

stepping off a plane from Miami, Florida, in connection with charges of obstruction of justice in the Petrobras corruption investigation and was placed under house arrest).

357.    On March 26, 2013, OGX released its financial statement for 2012. Under "Message from the Management," Defendant LUIZ CARNEIRO, Chief Executive Officer of OGX, stated, "In parallel to the development of our fields, we made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations, and we continue our studies on how to best develop them."

358.    However, as BATISTA, CARNEIRO, and the other co-conspirators knew, none of these fields were commercially viable and OGX was insolvent. These were deliberately fraudulent misrepresentations.

359.    On March 28, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN.

360.    On April 1, 2013, MERIDIAN received its first interest payment of $432,359.38 on its OGX bonds and AMERICAN received its first interest payment of $146,562.50.

361.    On April 12, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN.

362.   As was not discovered until September 2016, during April 2013, BATISTA's CENTENNIAL ordered a Panamanian subsidiary, Goldenrock, to pay a $2.3 million kickback, upon information and belief, to Brazilian officials, from its account at TAG Bank in Panama, for the $922 million OSX shipbuilding contract awarded in mid-2012. It is believed that Goldenrock was one of at least two shell companies which upon information and belief held accounts at TAG Bank – the other being Blue Diamond, which BATISTA used to hold slush funds for the bribery of officials and others useful to his scheme. In April 2013, CENTENNIAL wired $111,798,818.97 million from an account Batista controlled at BTG Pactual in the Cayman Islands to TAG Bank for safekeeping and to top off BATISTA's slush fund.

**The $850 Million "Investment" by Petronas.**

363.   BATISTA knew that the sale of supposed oil "assets" to other supposedly savvy players in the oil industry would create confidence in OGX and in its other dependent enterprises as it would reflect the fact that the buyer, after doing due diligence, saw value in the OGX asset, and therefore so should other investors; and OGX would have yet more working capital, so nobody invested in its future should worry that it could not pay its way until coming into full production.

364.   The Defendant AZIZ BEN AMMAR was charged by BATISTA with attempting to close an asset purchase deal with the Malaysian State-owned oil company Petronas. Upon information and belief, BATISTA authorized BEN AMMAR to spend in excess of $10 million to help "grease the wheels" of the process.

365.   On or about May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Basin. The news of the $850 million Petronas deal was picked up and reported across the world and had its intended effect.

67

366.     Thus, on May 8, 2013, London's Financial Times reported online that BATISTA had sold an $850 million stake in OGX assets to Malaysia's state-run Petronas. The article noted that shares in OGX were the biggest risers of Brazil's stock exchange that day. The good news came across the Bloomberg terminal screen on Ms. Neiwirth's desk.

367.     That same day, The Wall Street Journal reported online, "Petronas's purchase of stakes in the two Tubarao Martelo blocks, with *reserves* estimated at 145 billion barrels of oil, will give OGX much-needed cash to fund fresh investments. The Malaysian and Brazilian companies announced the deal in separate statements." (Emphasis added)

368.     Similarly, BNAmericas announced online, "Brazil's OGX has confirmed an US $850mn farm-out deal with Malaysian giant Petronas for a share of two oil and gas blocks off the coast of Rio de Janeiro. The deal hands the Kuala Lumpur-based firm a 40% non-operating working interest in the Campos basin's BM-C-39 and BM-C-40 blocks, OGX said in a statement. In addition, Petronas has an option to purchase 5% of OGX's capital stock at a price of 6.30 reais until April 2015."

369.     The quote from OGX in the article continued, "OGX's partnership with Petronas underscores the quality of our asset and the potential of the Tubarão Martelo field, where production is expected to commence by the end of the year," OGX chief executive CARNEIRO said, "[w]ith more than 32Bb of recoverable resources and a production of about 2Mboe/d, Petronas' expertise will enhance the continued development of oil production in these areas."

370.     However, as CARNEIRO and the other co-conspirators knew, this was a lie. There was virtually no commercially recoverable oil. OGX was a complete bust and would soon collapse.

**Meridian Invests in More OGX Bonds.**

371.     The news of the supposed Petronas purchase came across the Bloomberg terminal screen on Judy Neiwirth's desk in Miami, Florida, on May 8, 2013. The Bloomberg report also

recited a supposed quote from the buyer, "Petronas views the acquisition as a highly attractive investment opportunity in terms of asset quality and for strategic future growth in Brazil."

372.    Investors in OGX bonds were spurred to make greater purchases by this news. According to Reuters News Agency, investment in OGX bonds by the massive U.S. investment fund, Pimco, climbed as high as $800 million during May 2013.

373.    On May 20, 2013, in continued reliance on the vaunted future profitability of OGX, and BATISTA's commitment to inject a billion dollars if and when needed, and further encouraged by the announcement of the Petronas deal, Gables Capital, in Miami, Florida, directed the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN.

374.    However, the truth was, in fact, that there was no actual "Petronas deal" as portrayed to the public. The deal had many contingencies, including OGX restructuring its debt and reaching certain production targets.

375.    Upon information and belief, it was Batista's strategy to convey the message that sophisticated investors saw great value in the future of OGX.

376.    Why Petronas -- currently wracked by its own massive corruption scandal - did not correct the OGX presentation or market perception at that time is unknown before discovery.

**Batista Secretly Cashes Out.**

377.    While doing his best to encourage investor confidence and continued investment in OGX, between May and June 2013, BATISTA secretly instructed EBX to sell off 126.65 million shares in OGX.

378.    BATISTA was also siphoning off cash in huge amounts. According to a much later released confidential letter from the Cleary Gottlieb law firm, representing a cadre of large insider

creditors in June 2013, BATISTA funneled out $450,000,000 to an affiliate without justification just that month.

379. It is not known before discovery where that money went but it is believed that a substantial amount was routed directly or intermediately through the corporate co-conspirators and accomplices the 63X companies, members of the EBX group and the CENTENNIAL companies, to the THORQUE Companies' accounts and to bank accounts in various countries.

380. Then in early June 2013, BATISTA put another layer of insulation between himself and his creditors by transferring $30 million from an account in Brazil to a Citibank account in Brazil in the name of his son, THOR BATISTA. It is believed that the funds were thereafter funneled out of Citibank Brazil to the Citibank trust account of a BATISTA professional in Miami, and onwards to Switzerland or other secrecy jurisdiction.

381. On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign.

382. However, when the news hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm.

383. BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the restructuring of the group which was now complete that same month of June" and that no further shares would be sold. However, this would prove to be a lie.

384. On June 20, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, and reassured by BATISTA's news of his stock sale being just a "one-off adjustment," Gables Capital, in Miami,

Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the secondary market on behalf of its client, MERIDIAN, as trustee.

385.    MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98.

386.    However, on July 1, 2013, OGX was finally forced to admit by a Statement of Material Fact that a number of its wells in the Campos Basin were unproductive and, cryptically, that none of its projections should be relied upon, which resulted in a plunge in OGX share prices.

387.    Critically, however, BATISTA failed to announce: that there was in actual fact virtually no commercially recoverable oil; that the Mubadala and Petronas investments had been massive loans and Petronas was not obliged to perform unless OGX was re-structured; that behind the scenes Mubadala, who knew the exact state of affairs, was realizing on its securities; and lastly, he failed to disclose his intention to dishonor the billion dollar put option, if and when demanded.

388.    In fact, in the face of certain knowledge that OGX was insolvent and had no oilfields likely to generate significant recoverable oil, BATISTA continued to spawn lies about projected future profitability.

389.    Thus, on July 3, 2013, Bloomberg relayed the news that OGX had declared the Remora field in the Campos Basin commercially viable.

390.    Unfortunately, this was just another lie.

**Batista Makes Further Fraudulent Transfers.**

391.    Upon information and belief, during these months, in line with his overall game-plan, BATISTA was moving the assets still in Brazil that were the most vulnerable to attachment out of his name and into the names of family members, leaving himself immune from collection.

392.    Upon information and belief (according to the Brazilian indictments) BATISTA transferred two buildings in Rio with an aggregate value of approximately $20 million into the

names of his sons THOR BATISTA and OLIN BATISTA; he moved $60 million from an account in Brazil to a Citibank account in the name of THOR BATISTA; and he transferred approximately $7 million in cash plus a $2 million apartment in Ipanema to FLAVIA SAMPAIO, his girlfriend and mother of his infant son, Balder.

393.   Upon information and belief, BATISTA, his co-conspirators, and accomplices had by this time moved the bulk of his and their liquid assets out of Brazil and off to secrecy jurisdictions, where they were held in cash, or reinvested in stock in ventures likely to actually prove to be profitable, or in real estate and other more secure investments in other countries, typically through the medium of shell companies to act as "blinds" between the asset and the ultimate beneficial owners.

### Mubadala Secretly Pulls Out.

394.   During early July, 2013, news began to leak out that the Mubadala deal, which had been announced as an equity investment and seen as BATISTA's ultimate stamp of approval by the investment community, providing important backing for BATISTA's ambitions by a major global sovereign wealth fund, had in fact been nothing of the sort, but rather a huge loan, collateralized by plum assets and personal guarantees.

395.   Moreover, behind the scenes, Mubadala, which had inside knowledge as to the true state of affairs in BATISTA's companies and was not prepared to wait for the disaster that it could see from the actual records, had over the course of many months been demanding and receiving the surrender of collateral and the partial repayment of its loans to reduce its exposure to the greatest extent possible. The fact that Mubadala was pulling out should have been released to the investment community as a material fact, but was not.

396.   BATISTA publicly tried to put the best spin possible on the leaked news, characterizing the OGX payments to Mubadala as the partial redemption of an "investment" rather

than the repayment of a loan. Mubadala did not deny this characterization. However, neither EBX nor Mubadala would provide details of the restructuring.

397.    Upon information and belief, the process of asset stripping was carried out by lawyers at Maples & Calder in the Cayman Islands. According to the online version of The Legal 500 regarding Maples & Calder, "[o]ther major instructions included Simon Firth advising Eike Batista's EBX Group on the ongoing restructuring of its strategic partnership with Mubadala Development Company." Cayman Islands, Corporate and Commercial, *Maples and Calder*, The Legal 500 (last visited Oct. 11, 2016), http://www.legal500.com/c/cayman-islands/corporate-and-commercial.

398.    Mubadala had gone along with the initial public mischaracterization of its loan as an "equity investment" and had secretly stripped plum assets from the BATISTA companies under cover of an announced "partial redemption" of that investment, all of which tends to indicate complicity in the fraud. Plaintiffs reserve the right to add Mubadala as a Defendant should discovery confirm a basis to do so.

**The 10.8 Billion Barrel Lie – Recap.**

399.    Despite the fact that OGX was now on a very fast countdown to collapse, BATISTA resolutely kept on publicly trumpeting a rosy vision of the future for OGX, completely disconnected from any shred of reality.

400.    Thus, on July 19, 2013, BATISTA once again blared out reassurances for distribution through the internet press [Bloomberg Businessweek, Financial Times, Fox Business, San Francisco Chronicle] that, as D&M had stated in a 2011 Report, OGX had reserves amounting to 10.8 billion barrels and that regardless of all else, he would stand by the company and honor all of his obligations.

401.    However, BATISTA had always known that the various OGX projections had been lies. That had been confirmed by the internal OGX Task Force and Schlumberger Task Force Reports in late 2012 and all the evidence since then had reinforced the point and he had neither the capacity nor the intention to make good on all his debts, let alone compensate all of the many victims of his fraud.

402.    On July 22, 2013, D&M again demanded of BATISTA, privately, that he retract the 10.8 billion barrel lie and detach the D&M name from it. BATISTA did not do so.

403.    On August 14, 2013, it was reported that Luciano Coutinho, the President of the Brazilian development bank, BNDES, which had loaned BATISTA billions of dollars and must have done due diligence that showed otherwise, announced that BATISTA's OGX had "high-quality assets with which it can rebalance itself." It is unknown before discovery what inducement BATISTA supplied for him to state this lie.

404.    On August 16, 2013, the Tubarão Azul oilfield was closed down, having produced roughly 5 million barrels throughout its life, or just 1% of the minimum estimate announced in 2010. This was OGX's best field.  There would be a later attempt to operate this field post-bankruptcy. This attempt, however, would prove futile and the field was eventually returned to the Brazilian government.

405.    The task BATISTA had set for MARCUS BERTO was, upon information and belief, to get the EBX stake in LLX secretly monetized before the OGX crash, and the crash of OSX which would follow on its heels, leaving the LLX port project without its anchor tenant.

406.    On August 15, 2013, in a filing with the Brazilian Securities and Exchange Commission, BATISTA belatedly confirmed that he was selling a controlling stake in LLX for $560 million to U.S.-based EIG Global Energy Partners.

407.    Upon information and belief, therefore, this was "mission accomplished" for MARCUS BERTO.

408.    Disastrous news was also now emerging about BATISTA's MMX, iron ore "producing" company, which had been fined $1.8 billion for unpaid taxes, equivalent to nearly 80% of its market value. BATISTA's hand-picked managers at MMX were trying to sell off this company, too, before the others crashed all around it.

409.    In August and September 2013, BATISTA secretly sold another 227 million shares in OGX, which earned him approximately $35 million and which, upon information and belief, he routed to one of his foreign accounts.

410.    Though not discovered until near the end of the year, and then reported by the journalist Elio Gaspari in the Rio de Janeiro daily paper, O Globo, at least ten OGX executives left the company during these final months, with parting payments ranging between $46 million and $92 million each, further stripping cash out of the company.

411.    On September 4, 2013, having milked as much as he could out of OGX, AZIZ BIN AMMAR resigned from the Board and reportedly fled the country for New York where he is reported to presently reside in luxury in a $10 million apartment believed to have been acquired with a small part of his takings.

412.    With the OGX bankruptcy just days away, upon information and belief, BATISTA attempted to transfer another $100 million in corporate funds from a BTG Pactual correspondent account in The Bahamas to a Miami, Florida, account at Citibank, believed to be a THORQUE Company bank account.

413.    Upon information and belief, Andres Esteves, billionaire Chairman of BTG Pactual, initially refused to make this transfer, however, because he feared that BTG Pactual would become liable as an accomplice to BATISTA's fraud on creditors.

414.    It is unknown whether those funds remain "stranded" in The Bahamas, or have been routed out on BATISTA's instructions to one of his other accounts.

415.    Equity investors and bond holders were still relying on the fact that there was value in OGX. This belief was due to the fact that as recently as May 2013, a foreign oil company, Petronas, had apparently invested close to a billion dollars of its own money in the OGX oil fields.

416.    On top of that, BATISTA himself was obliged to inject $1 billion in cash into OGX, if and when needed, through the Put Option. (And in 2014, into OSX through a similar Put Option). All that was needed apparently was for OGX to have enough cash to stay in business until the oil started to flow.

417.    The OGX Put Option representation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which Ms. Neiwirth took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true.

### Section III - The OGX Oil Bubble Bursts

418.    On September 6, 2013, OGX's Controller, desperate for cash, formally demanded from BATISTA the first $100 million under the Put Option.

419.    BATISTA, who had never had any intention of paying a single penny *into* OGX, shocked investors by refusing to pay this or any other obligation under the Put Option, claiming the benefit of an "out clause," which - if an actual document even existed - he had inserted for that purpose.

420.    The arrival of OSX III, yet another massive floating production, storage and offloading vessel at the Tubarão Martelo field, on October 1, 2013, raised momentary hopes that OGX might soon start producing offshore oil from the field. But by close of business that same day, OGX missed a bond payment in the amount of $45 million.

76

421.    On October 28, 2013, MARCUS BERTO formally stepped down at LLX, resigning as President and Director of Investor Relations and handed over to the new owners' appointed management and left for Miami, Florida.

422.    It is believed that MARCUS BERTO had been awarded a significant interest in the company by BATISTA for his services, part of which he invested in what is reported to be a $9.5 million Key Biscayne, Florida, mansion.

423.    On October 30, 2013, OGX filed for bankruptcy in Rio de Janeiro disclosing debts of $5.1 billion, of which roughly $3.6 billion was owed to U.S. and other foreign bondholders.

424.    Pimco, the world's largest bond investor, based in California, and BlackRock, the world's largest asset manager, from New York, had front-row seats for the collapse.

425.    Bondholders like the Plaintiffs and, upon information and belief, other investors from Florida, such as the Florida Retirement System Trust Fund, were among the horde of other investors that were basically wiped out.

426.    OGX's satellite company, MMX, filed for bankruptcy on October 22, 2013.

427.    OGX's satellite company, OSX, filed for bankruptcy on November 11, 2013.

428.    In November 2013, Petronas announced that it would not pay the $850 million, which investors had expected under the alleged "deal" that BATISTA had broadcast in May of that year, disclosing that the deal had been contingent on OGX being able to re-structure its debt.

429.    By February 2014, virtually all of the blocks which OGX had leased had been returned to the Brazilian Government as worthless.

**Batista's "Brazilian Dream" Turns to Nightmare.**

430.    For everybody with an interest in OGX and its satellite companies - except for BATISTA, his co-conspirators, and accomplices - the "Brazilian Dream" BATISTA had boasted of in the April 30, 2012, Milken interview, had now turned to a nightmare.

431. The shareholders and ordinary bondholders who had invested billions of dollars in OGX, predominantly from the U.S., had now been essentially wiped out in what is currently the largest default in Latin American history.

432. BATISTA and a number of his co-conspirators and accomplices have been indicted for market manipulation and insider trading in Brazil. These proceedings are expected to last a decade or more, with no real hope of securing punishment of the perpetrators of the fraud or restitution for the victims.

433. As one of his "defenses" in the criminal proceedings in Brazil, BATISTA has contended that the conditions of the leases required that OGX continue to explore for oil until it declared a field to be commercial or return it to the government. BATISTA therefore had OGX declare fields to be commercial to avoid incurring the cost of exploration or having to return them as worthless, trusting that some future technological advance would allow OGX to commercially recover what were presently unrecoverable resources. In other words, BATISTA has admitted that those representations to investors were false.

434. In November 2015, Brazil's market regulator, the CVM, banned BATISTA from managing a publicly traded company for a derisory five years.

**Batista's Silver Lining.**

435. BATISTA and his co-conspirators, however, are all believed to have done well out of the scheme, having received sums ranging from tens of millions of dollars to hundreds of millions of dollars apiece.

436. All the lies about BATISTA being listed somewhere in the league of the world's richest men can now be seen to have *always* been a lie. The number on which that supposed position ranking was predicated was the sum total of money paid in by investors in expectation of profits from oil that never existed.

437.    In actual fact, BATISTA's original net worth before the OGX fiasco was probably in the hundreds of millions of dollars, and his actual current assets, mainly squirreled away abroad, are probably significantly more than what he began with.

438.    Thus, BATISTA and his family continue to live an untouchable life of luxury in Brazil. It is reported that he believes that he has "zeroed his debts" through the bankruptcies. Apparently the billions of dollars of which he bilked his victims does not count.

439.    That BATISTA has massive wealth remaining is shown by the fact that in March 2016, he threw $130,000.00 in gold coins from the deck of his yacht into the Atlantic Ocean to propitiate the "Queen of The Sea," and turn the course of his luck for his next enterprise.

440.    In July 2016, with all funds successfully routed out to safety, THOR BATISTA quietly closed down the THORQUE Companies in The Bahamas. Notice of the dissolution was given solely by means of a newspaper of tiny local circulation in The Bahamas on July 28, 2016. Copies of the notices are shown here:

441.    As previously mentioned, the Tubarão Azul oilfield had been OGX's best prospect. Under BATISTA it had achieved less than 1% of the flow promised. On September 20, 2016, three years post-bankruptcy, after the successor entity had ploughed many more millions into its exploration, the Tubarão Azul oilfield was returned to the Brazilian government as worthless.

**The Plaintiffs' Claim.**

442.    Through restructuring in the OGX bankruptcy, MERIDIAN's close to $17 million dollars in bonds has been translated into shares in a new version of OGX with a face value of $279,746 for which credit is given. MERIDIAN's net loss is $16,438,233, plus interest.

443.    Through restructuring in the OGX bankruptcy, AMERICAN's close to $4 million in bonds has been translated into shares in a new version of OGX with a face value of $62,166, for which credit is given. AMERICAN's net loss is $3,872,616, plus interest.

444.    The Plaintiffs have retained the undersigned attorneys to prosecute this action and are obliged to pay them a reasonable fee.

445.    As of the date of filing this Complaint, the Plaintiffs have already commenced proceedings ancillary to this action, restricting Batista and the 63X Companies from dissipating assets and to obtain information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

446.    In the Cayman Islands, after a multi-day hearing, the Judge, consistent with Cayman Islands law, entered an Order freezing the assets of Batista and the 63X Companies worldwide and ordered disclosures for information regarding accounts and transfers owned and controlled by Batista and the 63X Companies.

447.    In the Bahamas, consistent with Bahamian law, the Judge similarly entered an order for the disclosure of information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

448.    BATISTA and the 63X Companies have been notified of these foreign proceeding. Upon information and belief, BATISTA is actively avoiding service of the Cayman Orders.

## COUNT I
## FRAUD

Plaintiffs re-allege paragraphs 1-7, 9-11, 13-14, 28-448 against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO and AZIZ BEN AMMAR, as follows:

449.    Each of the above named Defendants personally participated in the fraudulent scheme and composed and transmitted material fraudulent misrepresentations, and assisted each other in maintaining the credibility of material misrepresentations as detailed above.

450.    As detailed above, each of them issued and assisted in issuing false statements concerning specific material facts, with actual knowledge that the representations were false, with the intention that investors would thereby be induced to rely on such representations to their consequent financial loss.

451.    In directing their individual and collaborative misrepresentations to the United States, the named Defendants necessarily targeted investors in the most populous States of the United States, of which Florida is the third, behind only California and Texas. They did so in the expectation of personal gain and of causing loss to their targets.

452.    Plaintiffs' investment agent, Gables Capital Management, in Miami, Florida, was a target of such misrepresentations and relied on the same and was thereby induced by such fraudulent misrepresentations to buy OGX bonds on behalf of the Plaintiffs in the total amount of $21,231,683.00.

453.    The OGX bonds were and are virtually worthless, as a result of which Plaintiffs have been damaged in the sums alleged.

454.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT II
## CONSPIRACY TO DEFRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

455.    The foregoing Defendants agreed to and did conspire together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors.

456.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT III
## AIDING AND ABETTING FRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X

MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

457.    The foregoing Defendants aided and abetted BATISTA and his co-conspirators and accomplices and rendered substantial, material assistance to him and them, in ways, upon dates, and in places, that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme and to assist in secreting the proceeds in false names and in jurisdictions where they would not be available for the satisfaction of the legitimate debts of creditors, wherefore they are additionally liable as aiders and abettors.

458.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

### COUNT IV
### FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT
### (f/k/a "FLORIDA RICO")

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

**The Criminal Enterprise.**

459.     Upon the basis of the facts alleged, BATISTA is and was the prime directing and controlling force at the head of a criminal enterprise within the meaning of Fla. Stat. § 772.102(3) comprised of himself, the joined Defendants, and many other co-conspirators, aiders, abettors, and accomplices not joined.

460.     The enterprise had as its common purpose the criminal aspirations and ambitions of BATISTA for the accumulation of wealth through a pattern of racketeering activity for further investment, enjoyment and transmission down through the generations of his relatives, friends co-conspirators and accomplices.

461.     Such enterprise is referred to collectively as "the Batista Crime Family" and the Defendant individuals and entities comprising such as "members of the Batista Crime Family" or "members of the enterprise."

462.     All members of The Batista Crime Family acted, in regard to each listed predicate act as described below and as to the overall pattern of racketeering activity, with criminal intent.

**Pattern of Criminal Activity.**

463.     By reason of the allegations made herein, the members of the enterprise engaged in a pattern of criminal activity as stated in Fla. Stat. § 772.102(4).

**Predicate Acts of Criminal Activity.**

464.     The Defendants actively participated in the enterprise, the Batista Crime Family, through the stated prohibited activities contrary to Fla. Stat. § 772.103 in the course of a pattern of criminal activity under Fla. Stat. § 772.102(4) which entitle Plaintiffs to civil remedies under Fla. Stat. § 772.104.

**Predicate Act I - Florida Securities Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

465.   As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly employed a device, scheme, or artifice to defraud, contrary to Fla. Stat. § 517.301(1)(a)(1).

466.   As set forth above, the stated Defendants have further committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly obtained money or property by means of untrue statements of material facts or any omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, contrary to Fla. Stat. § 517.301(1)(a)(2).

467.   As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon persons, including Plaintiffs, contrary to Fla. Stat. § 517.301(1)(a)(3).

**Predicate Act II - Federal Wire Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

468.   As set forth above, the stated Defendants have committed numerous acts of wire fraud in that they, having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, contrary to 18 U.S.C. § 1343.

**Predicate Act III - Federal Money Laundering - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT, OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.**

469.   As set forth above, the stated Defendants committed numerous acts of money laundering in that they knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from unlawful activity contrary to 18 U.S.C. § 1957. As stated above, the acts of money laundering variously took place in the United States pursuant to 18 U.S.C. § 1957(d), or was committed outside the U.S. by "U.S. persons" including U.S. nationals, U.S. permanent residents, corporations formed in the U.S. and foreign subsidiaries of such persons as defined in 18 U.S.C. § 3077.

**Predicate Act IV - Florida False Advertising - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR.**

470.     As set forth above, the stated Defendants committed numerous acts of misleading and deceptive advertising, contrary to Fla. Stat. § 817.40(5), in that they made or disseminated or caused to be made or disseminated before the general public of the state, or a portion thereof, misleading advertisements, which were fraudulent and unlawful, which the Defendants knew or should have known were false, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

**Predicate Act V - Florida Theft - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

471.     By reason of the foregoing the stated Defendants, with criminal intent, knowingly obtained or used, or endeavored to obtain or use, the Plaintiffs' property and the property of others through fraud, deceit, false pretenses and/or conduct of similar nature, with the intent to permanently deprive the Plaintiffs and such others of their right to their property or their benefit of their property, and further, knowingly and with criminal intent appropriated such property to their own use contrary to Fla. Stat. § 812.014.

**Predicate Act VI - Florida Communications Fraud: Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

472.    As set forth above, the stated Defendants engaged in a scheme to defraud, in that they engaged in a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto contrary to Fla. Stat § 817.034(4)(a), 817.034(3)(b), 817.034(3)(c), and 817.034(3)(d).

473.    Further by reason of the matters set forth above, the stated Defendants furthered a scheme to defraud, in that they furthered a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto, and in the course thereof communicated with persons with the intent to obtain property from such persons contrary to Fla. Stat § 817.034(4)(b).

**Civil Remedy.**

474.    As a result of the Defendants' participation in the criminal enterprise and its perpetration of the aforesaid pattern of criminal activity, Defendants caused injury and damage to Plaintiffs.

475.    By reason of the foregoing, Defendants have, with criminal intent, received proceeds derived directly or indirectly from a pattern of criminal activity and have used or invested the same, or a part thereof, directly or indirectly, or the proceeds derived from the investment or

use thereof, in the acquisition of title to, or a right, interest, or equity in, real property or in the establishment or operation of an enterprise, contrary to Fla. Stat. § 772.103.

476.    By reason of the foregoing, Defendants have, with criminal intent, through a pattern of criminal activity acquired or maintained, directly or indirectly, an interest in or control of enterprises or real property; have been employed by of associated with an enterprise to conduct or participate, directly or indirectly, in a pattern of criminal activity; conspired or have endeavored to violate provisions of subsection (1), subsection (2), or subsection (3) of Fla. Stat. § 772.103.

477.    By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Fla. Stat. § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, statutory treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

## COUNT V
## FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT CONSPIRACY
### (f/k/a "FLORIDA RICO CONSPIRACY")

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

89

478.    The members of the Batista Crime Family conspired and agreed together at numerous times and on various dates and in various places to participate in the fraudulent scheme and in the affairs of the criminal enterprise through a pattern of racketeering activity contrary to Florida Statute § 772.103(4), by reason of which Plaintiffs were damaged and are consequently entitled to civil remedies under Florida Statute § 772.104.

479.    By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Florida Statutes § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

<div align="center">

**COUNT VI**
**FALSE AND MISLEADING ADVERTISING**

</div>

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-14, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR, and say as follows:

480.    Defendants committed numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1), and that they caused such loss in fact to Plaintiffs.

481.    Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

482.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

<div align="center">90</div>

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

## COUNT VII
## CONSPIRACY TO COMMIT FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-25, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

483.   Defendants conspired together to commit and did commit numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

484.   Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

485.   Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

### COUNT VIII
### CIVIL THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-25 and 28-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

486.    By reason of the foregoing acts alleged, the Defendants committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Florida State § 772.11, including treble damages, attorneys' fees and the expenses of this action.

487.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

### COUNT IX
### CONSPIRACY TO COMMIT THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

488.    The foregoing Defendants with criminal intent, conspired together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and performed the stated acts in pursuance of such agreement in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

489.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT X
## AIDING AND ABETTING THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-5, 7-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

490.    The foregoing Defendants, with criminal intent, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, aided and abetted BATISTA in achieving the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

491.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT XI
## FLORIDA UNIFORM FRAUDULENT TRANSFERS ACT

Further or alternatively, Plaintiffs allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

492.    The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, made fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a

reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and each of the other liable Defendants were engaged or was about to; engage in a business or a transaction for which his and their remaining assets were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he or they would incur, debts beyond his or their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the asset transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

## COUNT XII
## CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

95

493.    The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, conspired with BATISTA and others among themselves, to make fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and such other liable Defendants were: engaged or were about to engage in a business or a transaction for which his or their remaining assets were unreasonably small in relation to the business or transaction; intended to incur, or believed or reasonably should have believed that he and they would incur, debts beyond his and their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the assets transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

96

Respectfully submitted,
ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282
Carlos F. Osorio
Florida Bar No.: 597546

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

      Defendants.

_____/

## NOTICE OF FILING VERIFIED RETURN OF SERVICE

      Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for 63X Investment Ltd. c/o Maples &

Calder, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.

      Dated: March 16, 2017.

                        Respectfully submitted,

                        ABALLI MILNE KALIL, P.A.
                        *Counsel for Plaintiffs*
                        2250 SunTrust International Center
                        One Southeast Third Ave.
                        Miami, FL 33131
                        Phone: (305) 373–6600
                        Fax: (305) 373–7929

                        *s/ Hendrik G. Milne*
                        Hendrik G. Milne
                        Florida Bar No.: 335886
                        Craig P. Kalil
                        Florida Bar No.: 607282

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 16th day of March, 2017 a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.



Clerk of Court's Office
P.O. Box 495
George Town
Grand Cayman
Cayman Islands
B.W.I.

OUR REF: F.P. 04 OF 2017

## AFFIDAVIT OF SERVICE

I, Josen Ebanks of West Bay, Grand Cayman, Cayman Islands affirm and swear as follows:

1.      I am a Bailiff of the Grand Court of the Cayman Islands.

2.      That on **Tuesday** the **21st** day of **February 2017**, at **1:28pm** I served the attached documents:-

SEE LIST/AS ATTACHED

3.      That service was made on the registered office for **63X Investment Ltd** c/o Maples & Calder, **Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.**

4.      Service was made by handing the said documents to **Tami Powers – Team Leader**

5.      The above statements made by me are true and correct.

_____
Josen Ebanks, Bailiff of the Grand Court

Sworn to before me at George Town on 23rd       day of February       , 2017

_____
NOTARY PUBLIC, GEORGE TOWN
GRAND CAYMAN, CAYMAN ISLANDS

# CERTIFICATE
## ATTESTATION

**The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,**
L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

☒ **1. that the document has been served\***
que la demande a été exécutée\*

| — the (date) / le (date): | 21st February 2017 |
|---|---|
| — at (place, street, number):<br>à (localité, rue, numéro) : | 63X Investment Ltd,c/o Maples &Calder, Ugland House, South Church Street,George Town, Grand Cayman |

| — in one of the following methods authorised by Article 5:<br>dans une des formes suivantes prévues à l'article 5 : | | |
|---|---|---|
| ☐ | a) | in accordance with the provisions of sub-paragraph a) of the first paragraph of **Article 5 of the Convention\***<br>selon les formes légales (article 5, alinéa premier, lettre a)\* |
| ☐ | b) | in accordance with the following particular method\*:<br>selon la forme particulière suivante\* :<br>———— |
| ☒ | c) | by delivery to the addressee, if he accepts it voluntarily\*<br>par remise simple\* |

**The documents referred to in the request have been delivered to:**
Les documents mentionnés dans la demande ont été remis à :

| Identity and description of person:<br>Identité et qualité de la personne : | Tami Powers |
|---|---|
| Relationship to the addressee (family, business or other):<br>Liens de parenté, de subordination ou autres, avec le destinataire de l'acte : | Team Leader |

☐ **2. that the document has not been served, by reason of the following facts\*:**
que la demande n'a pas été exécutée, en raison des faits suivants\* :

|  |
|---|
|  |

☒ **In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement\*.**
Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint\*.

*Annexes / Annexes*

| Documents returned:<br>Pièces renvoyées : | Duplicate copy of document served |
|---|---|
| In appropriate cases, documents establishing the service:<br>Le cas échéant, les documents justificatifs de l'exécution :<br>\* *if appropriate / s'il y a lieu* | Affidavit of Service and Certificate of Attestation |

| Done at / Fait à  George Town, Grand Cayman,<br><br>The / le  23 February 2017 | Signature and/or stamp<br>Signature et / ou cachet |
|---|---|

*Aut. Ref: FP-006/2017*

**Aballí
Milne
Kalil, P.A.**
Counsellors at Law

January 19, 2017

**Personal and Confidential
Via Hand Delivery**

63X Investments Ltd.
PO Box 309
Ugland House, South Church Street
George Town, Grand Cayman
KY1-1104, Cayman Islands

### Statutory Demand– Civil Theft Act

Dear Sir:

We represent the interests of Meridian Trust Company ("Meridian") and American Associated Group, Ltd ("American).

### Claim

You, individually, and acting in concert with others, wrongfully deprived Meridian of $16,438,233.00 and American of $3,872,616.00, for a total of $20,310,849.00, and thereby committed theft within the meaning of Fla. Stat. § 812.014, all as is laid out in detail in the complaint filed against you in the Circuit Court for Miami-Dade Florida, USA, Case Number 2017-001040 CA-01 (43). A copy is being delivered to you herewith.

### Demand

Pursuant to Fla. Stat. § 772.11 we hereby make demand on you for the payment in full, within thirty days, of three times the amount of the loss, namely $49,314,699.00 in regard to Meridian and $11,617,848.00 in regard to American, for a total of $60,932,547.00. Payment may be made to our trust account, for our clients, by wire, by check, or in cash at our office.

### Alternative Tender

If you believe that less than the amounts claimed were taken, you may tender a sum equal to three times the amount you believe was taken, together with an explanation and any evidence supporting your explanation and our clients will consider your tender. Your making such a tender will not obligate either of our clients to accept it.

2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Telephone (305) 373-6600
Fax (305) 373-7929
www.aballi.com

63X Investments Ltd.
January 19, 2017
Page 2

### Release

In compliance with Fla. Stat. § 772.11, upon payment in full of the aforesaid sum of $60,932,547.00, within thirty days (or such other sum as may be tendered, if accepted), our clients will give you a written release from further civil liability for the specific cause of action of civil theft.

### Defenses

If we are mistaken in any of the assertions made in this letter, or you believe that you have a defense to this claim, we ask that you inform us of the facts constituting such defense promptly, within thirty days so that we may consider further action.

Sincerely yours,

Hendrik G. Milne, Esq.
Aballi Milne Kalil P.A.

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL    ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-001040-CA-01 |
|---|---|---|
| PLAINTIFF(S)<br>Meridian Trust Company, as Trustee,<br>and American Associated Group, Ltd. | VS.  DEFENDANT(S)<br>Eike Batista, et. al. | SERVICE |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on

defendant(s): 63X Investments Ltd.

          PO Box 309, Ugland House,South Church Street

          George Town, Grand Cayman

          KY1-1104, Cayman Islands

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Hendrik G. Milne, Florida Bar No. 335886

whose address is: One Southeast Third Avenue, Suite 2250, Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies,**
**or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days.**
**When suit is brought pursuant to 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons
on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before
service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for
the relief demanded in the complaint or petition.

| HARVEY RUVIN<br><br>CLERK of COURTS | *[signature]*<br>DEPUTY CLERK | DATE<br><br>JAN 19 2017 |
|---|---|---|

**AMERICANS WITH DISABILITIES ACT OF 1990**
**ADA NOTICE**

**"If you are a person with a disability who needs any accommodation in order to**
**participate in this proceeding, you are entitled, at no cost to you, to the provision of certain**
**assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson**
**E. Thomas Courthouse Center, 175 NW 1ˢᵗ Ave., Suite 2702, Miami, FL 33128, Telephone**
**(305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your**
**scheduled court appearance, or immediately upon receiving this notification if the time**
**before the scheduled appearance is less than 7 days; if you are hearing or voice impaired,**
**call 711."**

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-001040-CA-01 |
|---|---|---|
| PLAINTIFF(S)<br>Meridian Trust Company, as Trustee,<br>and American Associated Group, Ltd. | VS. DEFENDANT(S)<br>Eike Batista, et. al. | SERVICE |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and copy of the complaint or petition in this action on

defendant(s): 63X Investments Ltd.

PO Box 309, Ugland House, South Church Street

George Town, Grand Cayman

KY1-1104, Cayman Islands

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Hendrik G. Milne, Florida Bar No. 335886

whose address is: One Southeast Third Avenue, Suite 2250, Miami, FL 33131

CLOCK IN

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to, 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| HARVEY RUVIN<br>CLERK of COURTS | | DATE |
|---|---|---|
| | | ~~JAN 10 2017~~ |
| | DEPUTY CLERK | |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

Filing # 51134312 E-Filed 01/12/2017 08:39:38 PM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 2017-001040-CA-01

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

     Plaintiffs, MERIDIAN TRUST COMPANY, as trustee, and AMERICAN ASSOCIATED

GROUP, LTD., sue Defendants, EIKE BATISTA, WERNER BATISTA, THOR BATISTA,

PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ

CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X

FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS,

CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY

FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,

OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

### Case Capsule - Requires no Response

A Brazilian con man, Eike Batista, induced investors from around the U.S. - including many State employee pension funds, such as the Florida Retirement System Trust Fund - to invest billions of dollars in his oil exploration company OGX and its satellite companies on the basis of fraudulent promises of the discovery of a trillion dollars of offshore oil. He promised to plough in a billion dollars of his own money if the business needed it to come into production.

When the truth was finally discovered, that there was virtually no oil, Batista welshed on his billion dollar promise; OGX and its satellite companies collapsed; and the investors lost their money in what is currently Latin America's largest corporate default, ever.

Batista and a few others were indicted for market manipulation and insider trading and he has been fined and banned from heading up public companies for five years in Brazil. However, they all made many hundreds of millions of dollars from the scheme. Batista stashed much of his share in the names of family members and shell companies in Miami, Florida, and offshore.



The Plaintiffs - investment vehicles for an elderly disabled beneficiary - invested over $21 million in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations. They seek to recover their losses against Batista and his co-conspirators; treble damages pursuant to Florida's racketeering statutes; and to freeze the proceeds of the fraudulent scheme in the hands of the various recipients pending judgment.

## TABLE OF CONTENTS

Case Capsule - Requires no Response ............................................................................... ii

Parties and Jurisdiction ............................................................................................. 1

    Jurisdiction ....................................................................................................... 1

    Plaintiffs ......................................................................................................... 1

    Defendants ....................................................................................................... 2

    Personal Jurisdiction in Florida ............................................................................. 4

    The Fraudulent Scheme -- Overview ....................................................................... 5

    Organizational Layout of the Complaint .................................................................. 8

**Section I - Inflating the OGX Oil Bubble** ....................................................................... 9

    The Roles played by the Defendants ....................................................................... 9

    Eike Batista .................................................................................................... 9

    The Individual Co-conspirators and Accomplices ...................................................... 10

    Paulo Mendonça ............................................................................................. 11

    Werner Batista ............................................................................................... 12

    Thor Batista .................................................................................................. 12

    Flavio Godinho ............................................................................................... 13

    Paulo Gouvea ................................................................................................. 14

    Marcus Berto ................................................................................................. 14

    Luiz Carneiro ................................................................................................. 15

    Aziz Ben Ammar ............................................................................................. 15

    The Corporate Co-conspirators and Accomplices ..................................................... 16

    The 63X, EBX, CENTENNIAL and THORQUE Companies ......................................... 16

    Additional Fraudulent Transfer Recipients .............................................................. 17

iii

## TABLE OF CONTENTS (continued)

Olin Batista, Flavia Sampaio and Luma de Oliveira ...............................................17

The Scheme – in Detail .................................................................................18

The Brazilian Deepwater "Pre Salt" Discoveries ...............................................18

The Start of OGX ........................................................................................19

OGX Wins Rights to 21 Exploratory Blocks ....................................................20

OGX Raises Additional Capital – Initial Public Offering ...................................20

The Fraudulent Misrepresentations Start .........................................................22

Technical Terminology – PRMS .....................................................................24

The First OGX "Oil Strike" ...........................................................................25

The Second OGX "Oil Strike".........................................................................27

OGX Strikes "Even More" Oil .......................................................................28

The OSX Public Offering ..............................................................................30

Promoting OGX in Miami ..............................................................................35

"Interest from the Chinese" ............................................................................36

The 10.8 Billion Barrel Lie .............................................................................39

D&M Secretly Protests ..................................................................................42

Insiders Sell Their OGX Stock in Miami ..........................................................44

The Lies Continue – OGX "Cash Rich" ...........................................................45

The Mubadala "Investment" ...........................................................................46

Keeping the Balls in the Air ...........................................................................48

"The Brazilian Dream" ..................................................................................51

OGX Secretly Bankrupt .................................................................................54

The Exit Strategy .........................................................................................55

## TABLE OF CONTENTS (continued)

The Professionals ....................................................................................56

The Bankers .........................................................................................57

The Fake Billion Dollar "Put Option" .......................................................59

**Section II -- The Plaintiffs Invest** .........................................................61

The EBX/BTG "Strategic Partnership" .....................................................63

The $850 Million "Investment" by Petronas .............................................67

Meridian Invests in More OGX Bonds ......................................................68

Batista Secretly Cashes Out ...................................................................69

Batista Makes Further Fraudulent Transfers ............................................71

Mubadala Secretly Pulls Out ..................................................................72

The 10.8 Billion Barrel Lie – Recap .........................................................73

**Section III -- The OGX Oil Bubble Bursts** ...............................................76

Batista's "Brazilian Dream" Turns to Nightmare .......................................77

Batista's Silver Lining ..........................................................................78

The Plaintiffs' Claim .............................................................................80

**Count I – Fraud** ...................................................................................81

**Count II -- Conspiracy to Defraud** ..........................................................82

**Count III – Aiding and Abetting Fraud** ....................................................82

**Count IV – Florida Civil Remedies for Criminal
Practices Act (f/k/a "Florida RICO")** .......................................................83

The Criminal Enterprise .........................................................................84

Pattern of Criminal Activity ...................................................................84

Predicate Acts of Criminal Activity .........................................................84

**TABLE OF CONTENTS (continued)**

**Predicate Act I - Florida Securities Fraud** -- Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...85

**Predicate Act II - Federal Wire Fraud -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...86

**Predicate Act III - Federal Money Laundering -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA .......................................86

**Predicate Act IV - Florida False Advertising -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR .............................................................................................................87

**Predicate Act V - Florida Theft -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...87

**TABLE OF CONTENTS (continued)**

**Predicate Act VI - Florida Communications Fraud -** Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...88

Civil Remedy ..............................................................................................88

**Count V – Florida Civil Remedies for Criminal Practices Act Conspiracy (F/K/A "Florida Rico Conspiracy")** .......................................89

**Count VI – False and Misleading Advertising** .................................................90

**Count VII – Conspiracy to Commit False and Misleading Advertising** ...........................91

**Count VIII – Civil Theft** ............................................................................92

**Count IX – Conspiracy to Commit Theft** .......................................................92

**Count X – Aiding and Abetting Theft** .............................................................93

**Count XI – Florida Uniform Fraudulent Transfers Act** ......................................94

**Count XII – Conspiracy to Commit Fraudulent Transfers** ...............................95

**Demand for Jury Trial** .............................................................................96

## Parties and Jurisdiction

**Jurisdiction:**

1.      This is an action for actual damages in excess of $20 million and statutory damages in excess of $60 million dollars, and therefore far in excess of the minimal jurisdictional damages requirements of this Court.

2.      This is further an action for injunctive and other equitable relief and therefore further within the equitable jurisdiction of this Court.

**Plaintiffs:**

3.      Plaintiff, MERIDIAN TRUST COMPANY ("MERIDIAN"), is and was at all times material hereto, a trust company incorporated under the laws of Nevis and located in Nevis.

4.      MERIDIAN, as trustee, is and was at all material times the holder of legal title to the assets of a family trust fund termed "The Chrisly Trust" held for the benefit of a very elderly, disabled beneficiary whose affairs are and were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by a Miami-Dade County, Florida resident. The investments at issue were made through the Plaintiff's Florida investment adviser, as agent.

5.      Plaintiff, AMERICAN ASSOCIATED GROUP, LTD. ("AMERICAN"), is and was at all times material hereto a corporation incorporated in the Cayman Islands which held investments on behalf of the same very elderly disabled individual, whose affairs are and were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by that same Miami-Dade County, Florida resident. The investments at issue were made through the Plaintiff's Florida investment adviser, as agent.

1

**Defendants:**

6.      Defendant, EIKE BATISTA ("EIKE BATISTA" or "BATISTA"), is and was at all times material hereto an individual who is resident in Brazil.

7.      Defendant, WERNER BATISTA, is and was at all material times an individual who is resident in Florida and Brazil and the brother of EIKE BATISTA. He is believed to hold dual nationality between the U.S. and Brazil or is a permanent U.S. resident.

8.      Defendant, THOR BATISTA ("THOR BATISTA" or "THOR"), is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA.

9.      Defendant, PAULO    MENDONÇA    ("PAULO    MENDONÇA"    or "MENDONÇA"), is and was at all material times an individual who is resident in Brazil.

10.     Defendant, FLAVIO GODINHO ("FLAVIO GODINHO" or "GODINHO"), is and was at all material times an individual resident in Florida and Brazil.

11.     Defendant, PAULO GOUVEA ("PAULO GOUVEA" or "GOUVEA"), is and was at all material times an individual resident in Brazil.

12.     Defendant, MARCUS BERTO ("MARCUS BERTO" or "BERTO"), is and was at all material times an individual resident in Florida and Brazil.

13.     Defendant, LUIZ CARNEIRO ("LUIZ CARNIERO" or "CARNIERO"), is and was at all material times an individual resident in Brazil.

14.     Defendant, AZIZ BEN AMMAR ("AZIZ BEN AMMAR" or "BEN AMMAR"), is and was at all times material an individual resident in New York and Brazil.

15.     Defendant, 63X INVESTMENTS LTD. ("63X INVESTMENTS"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands.

2

16.     Defendant, 63X MASTER FUND, LTD. ("63X MASTER FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands.

17.     Defendant, 63X FUND ("63X FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands. (With the two companies above sometimes referred to collectively as "the 63X Companies").

18.     Defendant, EBX HOLDING, LTDA. ("EBX 1"), is and was at material times a limited liability company organized under the laws of Brazil.

19.     Defendant, EBX INTERNATIONAL, S.A. ("EBX 2"), is and was at material times a corporation organized under the laws of Panama with its principal place of business outside Panama.

20.     Defendant, EBX CAPITAL PARTNERS ("EBX 3") is and was at material times a corporation organized under the laws of Brazil. (EBX 1, EBX 2 and EBX 3 are sometimes collectively referred to herein as the "EBX COMPANIES").

21.     Defendant, CENTENNIAL ASSET MINING FUND, LLC ("CENTENNIAL 1"), is and was at material times a limited liability company organized under the laws of Nevada with its principal place of business outside Nevada.

22.     Defendant, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC ("CENTENNIAL 2"), is and was at material times a limited liability company organized under the laws of Delaware with its principal place of business outside Delaware. (With the companies referred to immediately above, sometimes referred to collectively as "the CENTENNIAL Companies").

23.     Defendant, THORQUE1 FUND LTD., was at material times a company organized under the laws of The Bahamas with its principal place of business outside The Bahamas. (The company was dissolved by the Defendant, THOR BATISTA, on July 28, 2016. Plaintiffs intend to seek leave to re-instate it, if necessary, for the purposes of this action).

24.     Defendant, THORQUE INVESTMENT MANAGEMENT LTD., was at material times a company organized under the laws of The Bahamas with its principal place of business outside The Bahamas. (The company was dissolved by the Defendant, THOR BATISTA, on July 28, 2016. Plaintiffs intend to seek leave to re-instate it, if necessary, for the purposes of this action) (THORQUE1 FUND LTD. AND THORQUE INVESMTENT MANAGEMENT LTD. are sometimes collectively referred to herein as the "THORQUE COMPANIES").

25.     Defendant, OLIN BATISTA, is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA.

26.     Defendant, FLAVIA SAMPAIO, is and was at all material times an individual who is resident in Brazil, the girlfriend of EIKE BATISTA, and the mother of his minor son, Balder Batista.

27.     Defendant, LUMA DE OLIVEIRA, is and was at all material times an individual who is resident in Brazil, the ex-wife of EIKE BATISTA, and the mother of his adult sons, the Defendants, THOR BATISTA and OLIN BATISTA.

**Personal Jurisdiction in Florida:**

28.     Defendants, WERNER BATISTA, MARCUS BERTO and FLAVIO GODINHO are residents of Florida and subject to the general jurisdiction of its Courts.

29.     Further, every Defendant is subject to the general jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(2) as having engaged in substantial and not isolated activity

4

within this State, both individually and directly and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

30.     Each Defendant is subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(1) as having operated, conducted, engaged in or carried on a business or business venture in this state, or having an agency in this state, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

31.     This is an action brought in connection with that business. Brazil is not a party to the Hague Service Convention. The non-resident Defendants may therefore be served through the Florida Secretary of State pursuant to Fla. Stat. § 48.181(1) with notice of service given by certified or registered mail pursuant to Fla. Stat. § 48.161(1).

32.     Each Defendant is further subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(2) as having committed tortious acts within this State, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

33.     As a result of each of their individual and direct actions and further as a result of the actions of their agents and co-conspirators which are imputed to each of them, all Defendants have sufficient minimum contacts with this State that haling them before the Courts of this State would not offend Constitutional due process requirements.

**The Fraudulent Scheme – Overview:**

34.     Between 2008 and 2013 BATISTA and his co-conspirators and accomplices raised billions of dollars from investors in stocks and bonds, overwhelmingly in the U.S., on the basis of an international press campaign barraging the international investing public with false promises of

a trillion dollars of recoverable oil off the coast of Brazil pursuant to drilling leases from the Brazilian government owned by BATISTA's oil exploration company, OGX.

35.     BATISTA had OGX commission huge multi-million-dollar oil production platforms – tanker vessels equipped with drill rigs – from his satellite ship-building company, OSX, which he paid for with OGX investor money. He trumpeted plans for a satellite port city in Brazil to be run by his logistics company, LLX, that would blossom as the tankers offloaded a "trillion dollars" of oil.[1]

36.     But all the vast production and transport paraphernalia was just window dressing. As BATISTA and his co-conspirators and accomplices knew, there was in fact virtually no recoverable oil, no need for the massive production machinery to pump and transport it, and no need for a dedicated port to offload it.

37.     The core business, the OGX oil business, was actually a failure. It stayed alive only as long as there was an inflow of fresh capital from duped investors and lenders and as long as BATISTA and his co-conspirators and accomplices could maintain the illusion of a huge eventual payoff.

38.     Start to finish, the OGX venture discovered and pumped less than enough oil to fill OSX's six massive multi-million dollar tanker ships for a single trip to port.

39.     Necessarily, all the hundreds of millions of dollars that BATISTA and his co-conspirators and accomplices took and kept for themselves was skimmed off the top of what came in from investor contributions, leaving an ever-deepening chasm of debt beneath.

---

[1] As part of building his brand, BATISTA typically dubbed his companies by a pair of initials that described the core business, followed by an "X," the multiplication sign, indicating burgeoning wealth. Thus, for instance, "OG" stood for "Oil and Gas." "OS" was "Offshore Services." "EB," BATISTA's initials, and "63," his lucky number (he is notoriously superstitious) indicated personal wealth-holding companies.

6

40.     The exit strategy was to sell whatever stock and assets they could, trust to local corruption to safeguard the wealth trapped within Brazil, and trust to the complicity of professional co-conspirators, accomplices, bankers, and bribed politicians, to hide the vast mass of their takings safely abroad in solid investments or secret bank accounts, where toothless local Brazilian government processes and their victims, they hoped, would be unable to touch them.

41.     By the start of 2013, through thousands of fraudulent misrepresentations spanning the years since 2009, BATISTA and his co-conspirators and accomplices had built an impression in the minds of money managers and investors internationally that OGX was sitting on enormous reserves of recoverable oil when in reality there was virtually none.

42.     In 2013, OGX bonds were returning high yields. The only real concern to buyers on the secondary market was whether the company was sufficiently capitalized to bring that oil into production.

43.     To reassure investors, BATISTA and his co-conspirators and accomplices, via further fraudulent misrepresentations detailed below, created an illusion of deep financial resources, ultimately backed by BATISTA's personal pledge through the "Put Option" also detailed below, to inject a billion dollars into OGX, if and when needed.

44.     In October 2013, when BATISTA and his co-conspirators and accomplices had cashed out the last of their stakes and the wealth had been secreted in the names of BATISTA's various willing family members, joined as Defendants here, or in shell companies and bank accounts outside Brazil, in Miami, Florida, and around the world, BATISTA reneged on that billion dollar pledge and OGX declared bankruptcy, swiftly followed by the bankruptcy of the satellite companies OSX and MMX.

45.     American investments funds such as those managed by Pimco from California and BlackRock from New York lost billions of dollars on OGX bonds. The $150 billion Florida System

Retirement Fund, which manages the retirement savings of Florida's teachers had invested in several of BATISTA's companies and may have also lost money. Many other investors lost their investments. The Plaintiffs lost in excess of $20 million.

46.     So far, BATISTA and his co-conspirators and accomplices appear to have gambled aright that they could make immense amounts of money with no real comebacks. BATISTA and a few others were eventually criminally indicted in Brazil for insider trading, stock manipulation and market fraud. However, in Brazil's glacially slow, toothless, corrupt legal system, it is highly unlikely that there will eventually be any serious consequences.

47.     Millions of dollars of the domestic Brazilian assets that BATISTA had stashed at the last minute in the names of his willing family members in anticipation of the collapse were frozen. He has also been banned from the board of any public company in Brazil for a short five year period. But, all in all, apart from such minor inconveniences, with most of the wealth that he and his co-conspirators and accomplices garnered from the scheme stashed abroad, the fraud has been a complete success.

**Organizational Layout of the Complaint:**

48.     The allegations are divided into three sections. The first - **Section I - Inflating the OGX Oil Bubble** - covers the period from 2009 through early 2013, during which, as the cumulative effect of a series of fraudulent misrepresentations, BATISTA and his co-conspirators and accomplices built a belief in the minds of investors internationally that OGX was sitting on massive reserves of recoverable oil when there was in fact virtually none. This was the foundational, accepted understanding in the international investment markets of OGX's assets and likely profitability at the time that the Plaintiffs made their investments in OGX bonds through their Florida investment adviser in 2013.

49.     The continuing fraudulent misrepresentations and how they induced the successive purchases of more than $21 million in OGX bonds by their Florida investment adviser on Plaintiffs' behalf during 2013 is covered in **Section II - The Plaintiffs Invest.**

50.     The account of the collapse of the whole house of cards in late 2013 is detailed in **Section III - The OGX Oil Bubble Bursts.**

## Section I - Inflating the OGX Oil Bubble

**The Roles played by the Defendants:**

**Eike Batista:**

51.     BATISTA was the prime mover in the scheme. At all material times, he was the controlling shareholder and top managing agent of OGX, either as President, Chairman of the Board, or both. He also held stock and exercised control over the satellite operating companies such as OSX, MMX, and LLX whose success hinged largely on OGX striking offshore oil in large commercial quantities.

52.     BATISTA also owned and controlled the private wealth management companies through which he held the controlling shares in the operating companies, and through whose financial dealings and routing of money he accomplished the objective of the fraud. These were the Defendant 63X Companies, the EBX Companies, and the CENTENNIAL Companies. In addition, BATISTA may have also influenced or controlled the THORQUE Companies.

53.     Through his control position in OGX, BATISTA directly disseminated, ordered, or knowingly permitted the thousands of fraudulent communications, of which only a fraction are described below, constituting a colossal barrage of hype, inducing investors to contribute money to his enterprise in the expectation of gain.

9

54.     Through his control positions in all the Defendant companies, BATISTA appointed directors and managers who acted as his agents and who were his co-conspirators and accomplices in accomplishing the fraudulent scheme.

55.     References to BATISTA or OGX having "made," "stated," "published," "announced" and the like as to the communications described below refer to the fact that BATISTA either did it directly, ordered that it be done, or knowingly permitted such false communications to be made through accomplices and co-conspirators.

56.     It is not known how much money BATISTA made off the scheme, but at the bottom end of the range it is believed to be in the many hundreds of millions of dollars and at the top end, possibly billions.

**The Individual Co-conspirators and Accomplices:**

57.     BATISTA had numerous individual co-conspirators and accomplices who conspired with him and aided and abetted him in effectuating his scheme. Some OGX directors and officers, such as the top oil engineer MENDONÇA who generated misrepresentations from the early days in 2009 onwards, knew about the scheme from its inception. Similarly, trusted advisers such as his brother, WERNER BATISTA, his right-hand-man for three decades, GODINHO, and his close confidant, GOUVEA, upon information and belief, knew of the fraud from the early days.

58.     But all of BATISTA's confidants, including his eldest son, THOR BATISTA, all the Board members of OGX and many of the directors of OSX and LLX were, by some time in 2011, or by at the latest during 2012, privy to the fact that the core oil exploration company, OGX, on which the success of all largely depended, was actually insolvent.

59.     Yet all such directors and insiders failed to tell investors the truth and allowed the barrage of baselessly optimistic hype to continue, in order to make money from their salaries and

10

the sale of the stock and corporate assets. Only a few of these have been joined as Defendants.[2] These are as follows:

**Paulo Mendonça:**

60.     Before joining OGX, MENDONÇA had been the chief geologist at Petrobras for 34 years, throughout its successful exploratory campaign. As such, he enjoyed a respected position in the industry. As BATISTA's supposed "Dr. Oil," MENDONÇA was constantly touted to the press and to the investing public as the head of a supposed "Dream Team" of oil industry experts who would find oil where none had been found before.

61.     Given MENDONÇA's background and reputation in the oil industry, his pronouncements on recoverable oil volumes were regarded as reliable and his imprimatur was seen as a solid assurance of the probity of the company's predictions.

62.     However, BATISTA had incentivized MENDONÇA with a big block of OGX stock to use his name for their mutual profit in hyping the promise of OGX's exploratory wells which was contrary to industry practice.

63.     In his position as a top OGX executive, as detailed below, MENDONÇA created and published numerous fraudulent public announcements of supposed massive "discoveries" of oil while disposing of his own OGX shares at consequently inflated prices for many tens of millions of dollars, and enabling the rest of the group to take and squirrel away many hundreds of millions or even billions of dollars as their own proceeds of the scheme.

---

[2] Plaintiffs reserve the right to add more insiders as defendants if discovery reveals a sound basis to do so. These would include BATISTA's father, Eliezer Batista, who stayed on the Board of OGX through the collapse, though independent directors were resigning rather than face criminal and civil liability.

**Werner Batista:**

64.     Defendant, WERNER BATISTA, and his family had been living in Florida for more than twenty years when he agreed with his brother, EIKE BATISTA, during 2009 to split his time between Florida, and Rio de Janeiro and help him in his new oil venture.

65.     WERNER BATISTA took up a position as a director in BATISTA's personal wealth management entity, the Defendant, EBX HOLDING, in September 2009, where he helped assist his brother in the actions described herein.

66.     WERNER BATISTA resigned from EBX HOLDING in December 2013 in the wake of the fallout from the collapse of OGX. It is unknown before discovery how much of the wealth of duped investors he managed to take for his own purposes but he has, upon information and belief, returned his focus to Florida where he has invested part of his profits in Florida businesses.

**Thor Batista:**

67.     Defendant, THOR BATISTA, is the eldest son of EIKE BATISTA. Upon information and belief, during the final two years leading up to the collapse of OGX and the satellite companies, his father introduced him to the fact that the business was heading for certain failure and unless he wished to give up his life of luxury - which had hitherto included being able to fly from Rio to Miami, Florida, by private jet for his routine shopping - he should assist him in sheltering proceeds of the fraud in offshore companies and foreign bank accounts, to which his son agreed.

68.     To this end, in or about April 2012, THOR BATISTA, with his father's help, established two companies in The Bahamas, the Defendants, THORQUEI FUND LTD. and THORQUE INVESTMENT MANAGEMENT LTD., as nominal owners of proceeds of the scheme.

12

69.     EIKE BATISTA and THOR BATISTA established bank accounts in Miami, Florida at Banco Itaú Europa International and upon information and belief at Citibank and other institutions as well as at banks in The Bahamas and the Cayman Islands, to which BATISTA and his 63X, EBX and CENTENNIAL companies routed hundreds of millions of dollars in proceeds from the scheme during 2012 and 2013.

70.     It is believed that the Bahamian accounts were emptied at some time between 2013 and July 2016, with the proceeds being transferred to BATISTA's "Swiss trust"[3], of which BERTO was the original trustee, or to other secrecy destinations.

71.     In July 2016, THOR BATISTA quietly dissolved the THORQUE Companies in The Bahamas.

**Flavio Godinho:**

72.     Defendant, FLAVIO GODINHO, is a lawyer admitted in Brazil, only, and has been a close, long-time confidant of BATISTA's since the 1980's.

73.     Over three decades, GODINHO has served in an array of capacities in BATISTA's companies and was regarded as his "Right Hand Man." At one time or another GODINHO was Chairman and Chief Executive Officer of EBX Brasil S.A., a Legal Vice-President of EBX GROUP LTD., General Counsel, Corporate Development Officer and a member of the Executive Board of EBX Ltd. and its subsidiaries, a director of LLX, a director of OSX, and a director of MPX, among others.

74.     Through his top positions in BATISTA's companies and as a close friend, confidant and legal adviser, GODINHO was aware of the material developments in the scheme and conspired with and counseled BATISTA and their co-conspirators in how to achieve its success including,

---

[3] The term "Swiss trust" is used in a generic sense. Further details are still being explored.

13

upon information and belief, the accomplishment of the bribery of government ministers in order to secure an economic advantage.

75.     GODINHO is believed to have made over $200 million from the scheme and fled Rio de Janeiro for Miami, Florida, in the wake of the OGX collapse. He is also currently under investigation in Brazil in connection with the notorious Petrobras bribery scandal and a new sub-chapter opened in that investigation into government bribery by BATISTA's companies, dubbed the "The X-Files."

**Paulo Gouvea:**

76.     Defendant, PAULO GOUVEA, like GODHINO, is a lawyer admitted in Brazil only, and is a long term confidant of BATISTA who served on the Board of OGX and as head of corporate finance in the EBX group of companies, who conspired with and assisted BATISTA and the others in achieving the objectives of the fraudulent scheme.

77.     GOUVEA is believed to have reaped in excess of $150 million from the fraud. Through his current position as a partner in and Director of Capital Markets at Brazil's biggest brokerage house, XP Investimentos, he does business in Florida through its Miami, Florida, office.

**Marcus Berto:**

78.     Defendant, MARCUS BERTO, was a long-standing BATISTA confidant who was in December, 2012 appointed CEO and Investor Relations Officer of LLX, BATISTA's allied logistics company, to help secretly sell off the company ahead of the crash of OGX.

79.     Upon information and belief, BERTO knew that OGX was insolvent by the end of 2012 and conspired with BATISTA and agreed to help set up a Swiss trust, through professionals in Miami, Florida, to which BATISTA could funnel his personal profits from the scheme.

80.     Upon information and belief, BERTO was the first trustee of that trust and in that capacity established its Swiss and other foreign banking relationships.

14

81.   After OGX collapsed, BERTO left Rio de Janeiro for Key Biscayne, Florida, where he is believed to have invested part of the proceeds he realized from the fraud in a multi-million dollar mansion.

**Luiz Carneiro:**

82.   Defendant, LUIZ CARNEIRO, was the CEO and President of OGX and CEO and Executive Board Member of OSX during its final two years, 2012 and 2013, when the Board and top executive management knew that OGX was insolvent and that the future of OSX hinged on OGX's – unachievable – success. He was a close confidant of BATISTA and conspired with him and assisted him in achieving the objectives of the fraudulent scheme.

83.   Upon information and belief, in his position as head of OSX, CARNEIRO handled the bribery of government officials, which included the payment of a $2.3 million bribe. CARNEIRO along with Brazil's Finance Minister, Guido Mantega, Chairman of the government-run oil behemoth, Petrobras were recently arrested in connection with the bribery investigation.

84.   Upon information and belief, the OSX-Mantega bribe secured in excess of $922 million in shipbuilding contracts from Petrobras for which there was no actual commercial demand in order to continue the illusion that OSX was a viable entity. The contracted vessels were not completed by the time of the OSX bankruptcy in October 2013.

**Aziz Ben Ammar:**

85.   The Defendant, AZIZ BEN AMMAR, was recruited by BATISTA as a board member of OGX and satellite companies in the final year leading up to the crash in order to help keep the balls in the air as long as possible for BATISTA and the others to get their stakes monetized and out of Brazil before the crash.

86.   BEN AMMAR was elected to the boards of OGX, LLX, OSX, and MMX by a cadre of unsuspecting victims, including a number of American retirement funds who had bought

shares or bonds in BATISTA's companies on the basis of his fraudulent promises, among them the Florida Retirement System Trust Fund.[4]

87.     BEN AMMAR was intimately involved in generating stories for the press during 2013, regarding the supposed massive capitalization of OGX and the fact that it was impossible for it to fail. He was a prime architect of the fradulent billion dollar "Put Option" and the cover story regarding the fictitious $850 million "sale" to Petronas, both described below.

88.     On September 4, 2013, having milked as much as he could out of the scheme, BEN AMMAR resigned from the Board of OGX, weeks before its bankruptcy, and reportedly fled Brazil for New York where he presently resides in a multi-million dollar apartment acquired, upon information and belief, with part of his takings from the scheme.

**The Corporate Co-conspirators and Accomplices:**

**The 63X, EBX, CENTENNIAL and THORQUE Companies.**

89.     There were also numerous corporate entities that BATISTA owned or controlled that he used in executing his scheme. These were either holding companies for his stock in the operating companies, such as OGX and OSX, or were set up for the simple purpose of being the name on a bank account for the transmission of funds to accomplish the fraudulent scheme. Some of these entities have been joined as Defendants here. These are the 63X Companies, the EBX Companies, and the CENTENNIAL Companies and may also include the THORQUE Companies.

90.     These corporations, all of which were incorporated in secrecy jurisdictions, had no legitimate corporate business or real independent existence separate from BATISTA and were no more than fictitious names for BATISTA himself. They acted as "cut-outs," to obscure the trail

---

[4] The Florida Retirement System Trust Fund is an approximately $150 billion pension fund that pays retirement benefits for over a million state, county, school system and higher-education teachers and other employees, managed by the Florida State Board of Administration of which the trustees are Florida Governor, Richard Scott, Florida Chief Financial Officer, Jeffrey Atwater, and Florida Attorney General, Pamela Bondi.

16

between the origin and the destination of funds and facilitate the transmissions of funds to achieve the ends of the fraudulent scheme.

91.     Further, upon information and belief, these corporations assisted in creating the illusion of the "Mubadala Investment," the supposed $2 billion stock acquisition of a small stake in BATISTA's wealth-holding companies by an oil-rich Arab nation intended to induce investor confidence, but which was in reality a massive loan that monetized the majority of BATISTA's stake in the scheme and was secretly repaid in 2013 by stripping prime assets out of the businesses.

92.     In all these companies, BATISTA and his co-conspirators and accomplices failed to observe the required corporate formalities and the entities were used as engines of fraud, such that their separate corporate existence should be disregarded.

93.     Alternatively, to the extent that these entities are found to have had true separate corporate existence, they should be treated as additionally liable, as being co-conspirators, agents and constructive trustees of proceeds of the fraudulent scheme.

94.     There are many other companies that also fall into this category of aiders and abettors, accomplices and co-conspirators whose involvement is less clear and have therefore not yet been joined as parties, but which may be joined later after discovery.

**Additional Fraudulent Transfer Recipients:**

**Olin Batista, Flavia Sampaio, and Luma De Oliveira.**

95.     EIKE BATISTA's family members WERNER BATISTA and THOR BATISTA were active participants in the scheme.

96.     Other family members, namely the Defendants, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA, are not presently known to have had any substantial involvement in the active fraud committed within the various BATISTA companies. (This may change after discovery).

17

97.     However, such family member Defendants knowingly received multi-million dollar transfers of real estate and cash within Brazil in the months immediately prior to the collapse of OGX for no consideration, when BATISTA was declaring insolvency, as a means of cheating creditors.

98.     Upon information and belief, during 2013, BATISTA wired several hundreds of millions of dollars of the proceeds of the fraudulent scheme to The Bahamas and to other offshore jurisdictions and attempted to transfer another $100 million out of a bank in The Bahamas to an account in Miami, Florida, in order to evade creditors.

99.     If the money transferred out of Brazil is no longer in the name of BATISTA's wealth-management companies then, following the template of BATISTA's actions in Brazil, it is believed that much of that wealth has been transferred into the names of the listed Defendant family members, WERNER BATISTA, THOR BATISTA, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA.

100.     None of these family members gave value for such transfers but served knowingly as mere nominees for BATISTA in whose names such assets were "parked" and should be held, as constructive trustees, to return such funds for the payment of the Plaintiffs' claims.

101.     Having described the scheme in general and the general involvement of the various Defendants, a detailed account follows.

**The Scheme – in Detail:**

**The Brazilian Deepwater "Pre-Salt" Discoveries.**

102.     The world's largest oil discoveries in recent years have been in Brazil's offshore, pre-salt basins. "Pre-salt" oil is generally characterized as oil reserves situated exceptionally deep, under thick layers of rock and salt, and requiring substantial investment to extract.

18

103.    In 2005, Brazil's national oil company, Petroleo Brasileiro S.A. ("Petrobras"), drilled a wildcat well in the ultra-deep waters of the Santos basin off the coast of São Paulo state and discovered the presence of hydrocarbon condensate under a thick layer of salt. This discovery confirmed a previously untested geologic model that indicated the potential for large recoverable oil deposits.

104.    In 2005, Petrobras confirmed the presence of potentially recoverable petroleum with the discovery of the Tupi oil field in the so-called pre-salt layer in the Santos Basin.

105.    Additional drilling and testing led to an announcement by Petrobras in November 2007 that the Tupi oil field (now known as the Lula oil field) contained between five billion and eight billion barrels of oil.

106.    Given these discoveries, there was significant global attention to the oil and gas industry in Brazil. The pre-salt discoveries showed great promise.

**The Start of OGX.**

107.    The Brazilian government auctions off drilling leases to companies who wish to explore for oil and scheduled what promised to be some of the richest new deep-water oil fields off its coast for auction on November 27, 2007.

108.    BATISTA had no experience in the oil-exploration business but had a lengthy background in stock promotion and mineral exploration and he raised approximately $1.3 billion in private equity to acquire some of these deep-water drilling leases through a company he named OGX, which he owned through his personal asset vehicle, CENTENNIAL 1.

109.    However, just before the auction, based in part on the very recent Tupi oil field discovery, the Brazilian authorities withdrew the deep-water fields from auction, deeming them "too valuable" and left in play old shallow-water fields that had been picked over by Petrobras for decades and generally viewed as worthless.

19

110.    That put BATISTA in a quandary. He had raised approximately $1.3 billion from investors to spend on deep-water oil fields. Now there were no deep-water fields to buy. No one wanted the shallow-water fields.

111.    Rather than refund the money, BATISTA resolved to press forward and acquire these rejects of the industry.

**OGX Wins Rights to 21 Exploratory Blocks.**

112.    On 27 November 2007, OGX submitted the winning bid on 21 exploratory blocks (seven of them in consortia with other operators) and committed significant funds for licensing fees as follows: seven blocks in the Campos Basin off the coast of Rio de Janeiro (two of them in consortia with Maersk); four blocks in the Santos Basin; five blocks in the Para-Maranhao Basin; and five blocks in the Espirito Santo Basin (in consortia with Perenco S.A.), all as shown below:



**OGX Raises Additional Capital – Initial Public Offering.**

113.    However, having committed nearly all of its cash to pay for the licenses and fees associated with the exploratory concessions, OGX needed to raise additional capital to conduct exploration. It would seek those funds from the capital markets via an initial public offering ("IPO") of approximately five million of its common shares.

114. However, persuading the investing public that these fields were unrecognized treasures rather than the worthless money-pits (that they would eventually prove to be) would require enormous promotion.

115. To garner credibility for OGX, BATISTA built a roster of senior executives from Petrobras; individuals who had been integral to that company's deep-water discoveries, headed by the Defendant, PAULO MENDONÇA, a geologist and former Petrobras head of exploration, who BATISTA dubbed "Dr. Oil."

116. BATISTA granted his team members generous stock options in OGX to ensure that they were personally invested in the value of the stock and incentivized to spread any good news and to contain or minimize the bad.

117. BATISTA's publicized rationale for exploring the shallow-water fields was that modern technology in the hands of his "dream team" ensured better, more accurate detection. If there was oil to be found, they would find it. Plus, when they found it, the much lower extraction costs in shallow water than in deep water meant much greater profitability. This one-two punch of state-of-the-art technology in the hands of the best oil gurus in Brazil, coupled with low-cost lifting, BATISTA boasted, promised to be a sure-fire winning combination.

118. In 2008, BATISTA's OGX raised $4.1 billion in the biggest initial public offering in Brazilian stock market history.

119. In its November 2008 Management Presentation, OGX announced that it had entered into contracts for 3D seismic surveys for all of its exploratory blocks; acquired various logistical transport vessels, including seven boats and two helicopters; and secured four off-shore drilling rigs with "world-class contractors." It stated that it expected to conduct an "intense drilling campaign" beginning in the second half of 2009 and reach "first oil" by the end of 2011.

**The Fraudulent Misrepresentations Start.**

120.    BATISTA and his co-conspirators and accomplices now embarked on a relentless propaganda campaign boosting the promise of the OGX oil-fields completely untethered to any basis of reasonable fact in order to attract investment capital and boost the stock and bond prices in OGX and other satellite companies soon to be launched. These knowingly false representations were all made with the intent of inducing investors to buy stocks and bonds in OGX and its satellite companies.

121.    The prime target of the misrepresentations were U.S. investors and necessarily and primarily those in its most populous states, California, Texas, Florida and New York.

122.    American investors were to account for the vast majority of the sales of OGX shares and bonds, including American government pension funds such as, as noted above, the Florida Retirement System Trust Fund.[5]

123.    This barrage of hype took various forms, all of which was intended to induce investment and succeeded in inducing stock and bond sales on the primary and secondary markets to maintain the illusion of OGX as a valuable business for as long as possible.

124.    One was by way of what are termed in Brazil, "Material Facts." ("Statements of Material Fact" or "Material Facts"). These are public disclosures required by Brazilian law as to events which might impact equity and debt investor decisions to buy or sell. The directors of any

---

[5] The size of the Florida Retirement System Trust Fund investment into BATISTA's companies, and the extent of its losses, is unknown. But such institutional investors typically invest in very large tranches and the Fund's stake was large enough for it to vote at extraordinary shareholders' meetings. It is listed online as having voted, for instance: at an OGX shareholders' meeting on December 18, 2009, at the start of the scheme; at an OGX shareholders' meeting (*inter alia* to elect the Defendant, AZIZ BEN AMMAR to the OGX Board) on December 1, 2011; at an OSX shareholders' meeting (inter alia to elect the Defendant, AZZIZ BEN AMMAR to the OSX Board) on September 6, 2012; and at an MMX shareholders' meeting to vote on a proposed merger and Board re-shuffle following that company's October 2013 declaration of bankruptcy.

public company are legally bound to disclose such facts to the investing public by way of a report to the relevant stock exchange and to the press.

125.     There were many Statements of Material Fact, as detailed below, that contained serious fraudulent misrepresentations of promising developments in OGX.

126.     Further, the medium of the "Statement of Material Fact," which is intended to be reserved for consequential announcements, was abused to trumpet inconsequential news, such as the "discovery of hydrocarbons," to give it undeserved significance and whet market appetite.

127.     Finally, there were many instances where information as to material adverse developments should have been published by way of Statements of Material Fact, but was not, leaving investors internationally to rely on the continuing validity of prior positive announcements. These instances of failure to announce negative news constituted misrepresentations by omission.

128.     BATISTA and his accomplices and co-conspirators also gave many press interviews and held press conferences in which he and they promoted the story of OGX's great success and its supposedly fabulously valuable oilfields. These fraudulent misrepresentations were disseminated live or by video recordings to the international financial press, particularly Bloomberg,[6] to be relayed via the internet to the worldwide investment community.

129.     Following the precept that "a picture is worth a thousand words," BATISTA and his accomplices and co-conspirators also seeded the press with management report graphics and news photographs bolstering the illusion of the great success and fabulous wealth of OGX.

---

[6] "Bloomberg" refers to the New York-based financial software, data, and media company which provides the international investment industry with financial software tools and news through the Bloomberg Terminal (via its Bloomberg Professional Service), wire service (Bloomberg News), global TV network (Bloomberg Television), websites, radio station [WBBR], newsletters and magazines. (*Bloomberg Businessweek*, *Bloomberg Markets* and *Bloomberg Pursuit*.)

130.    Additional fraudulent misrepresentations were contained in thousands of "tweets" sent via BATISTA's internet Twitter feed to what eventually topped one million followers, including many financial journalists.

131.    Further, BATISTA personally made face-to-face promotional pitches to high-net-worth investors in Florida and elsewhere in the U.S.

132.    It is not possible to list every one of the many thousands of fraudulent misrepresentations but a selection is given below.

**Technical Terminology – PRMS.**

133.    To understand the quality of the misrepresentations, a very brief primer on oil industry jargon is in order.

134.    The detection of oil is done by way of seismic and other remote studies and the drilling of test wells. The exact volume of oil contained in any underground reservoir cannot be known exactly until it has been pumped to the surface.

135.    Moreover a volume of oil may exist but there may be no technological means of recovering any of it. Even if some volume may be "technologically recoverable" it may not be "commercially recoverable," *i.e.* the cost of extraction will exceed its selling price.

136.    To try to lend some precision to the description of underground oil estimates and the likelihood they can be extracted profitably, the oil industry found it necessary to develop an agreed set of technical terms.

137.    Accordingly, the international oil industry developed the Petroleum Resource Management System (the "PRMS"), a universal language used for estimating and classifying quantities of oil (and gas) discovered in any given reservoir according to their recoverability.

138.    The PRMS distinguishes between "technological" and "commercial" recoverability and further distinguishes between "reserves" and "resources." "Reserves" refers to oil that is

24

reasonably certain to be commercially recoverable. "Resources" is a much wider term, and refers to all quantities of oil which is predicted to possibly exist within discovered or undiscovered reservoirs. "Resources" therefore encompasses discovered and undiscovered, recoverable and unrecoverable, and commercial and non-commercial quantities of petroleum.

139.    There are internal gradations within these categories running from "proved" to "probable" to "possible" reserves and from "contingent" (either "low", "best" or "high" estimates) to "prospective" resources. Quantities are expressed in "barrels" or "boe" – "barrels of oil equivalent."[7]

**The First OGX "Oil Strike."**

140.    It is common for oil exploration ventures seeking to raise finance on the international capital markets to retain the services of an independent consultancy firm of specialists to appraise its oil discoveries. They essentially act as auditors.

141.    OGX retained the prestigious Dallas-based firm of DeGoyler & McNaughton ("D&M") for this purpose in or around 2008.

142.    In March 2008, OGX released a Statement of Material Fact that its auditors, described as "world-renowned D&M," believed that OGX might be sitting on as much as 4.8 billion barrels of oil. At this point these were, at most, very preliminary seismic studies. The unstated inference was that this was "recoverable" oil or it was of no moment - *i.e.* not "material" - and not worthy of publication as a Statement of Material Fact. Predictably, OGX share prices jumped.

---

[7] BOE refers to a unit of energy based on the approximate energy released by burning one barrel (42 U.S. gallons or 158.9873 litres) of crude oil.

143.     On September 18, 2009, OGX announced the commencement of its drilling campaign with the drilling of well "OGX-1, block BM-C-43" in a prospect area dubbed the "Vesuvio" formation.

144.     On October 7, 2009 OGX issued a Statement of Material Fact that it had struck oil in the Vesuvio oilfield about 85 kilometers offshore, in 140 meters of water. MENDONÇA was quoted as stating that this was "a milestone in the industry, which was only possible due to the motivation and talent of our unique team." Both the issuance of this news via the medium of a Statement of Material Fact – to be reserved for announcements that should materially impact investment - and the quoted statement were intended to convey the impression that *recoverable* oil had been discovered. However, there was no reason for anyone with access to the OGX drilling test results to believe that this was true.

145.     On October 14, 2009, OGX released a Statement of Material Fact that declared in bold type that from a single exploratory well in the Vesuvio oilfield: **"Recoverable Oil Volume Expected to be between 500 Million and 1.5 Billion Barrels."** MENDONÇA was quoted as saying this find validated the OGX team's scientific methodology and the "high petrolific (*sic*) potential" of the company's underwater leases.

146.     The implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable at any cost – even at a loss – but that it was likely to be commercially recoverable.

147.     With oil trading at around $75 a barrel, this was a representation to investors that OGX was sitting on minimum oil reserves worth between $37 billion and $111 billion from a single well, with many more yet to go. However, there was no reason for anyone with access to the OGX drilling test results to believe that any of this was true.

148.     This core Vesuvio announcement, which was not retracted until shortly before the OGX bankruptcy, was a bed-rock misrepresentation for investor confidence in OGX right up through the crash in 2013, despite the fact that BATISTA and his co-conspirators and accomplices knew the field was worthless long before it was eventually returned as valueless to the Brazilian government.

149.     BATISTA, who had not hitherto been known for his largesse, now became very conspicuous for his apparently generous public gifts which were enabled not by profit, but by the torrent of inflowing investment capital and skimmed off the top.

150.     The point of such apparently "generous" charitable gifts was to keep BATISTA in the public eye and to help paint a picture of multiplying wealth – as the "X" in BATISTA's company names was intended to signify – such that he could afford such acts of generosity.

151.     In fact, the only real "generosity" was on the part of the investing public, because it was their money being given away.

152.     Through his business and such "charitable" activities, BATISTA became close to many of Brazil's top politicos who it is believed that he bribed from his various offshore corporate bank accounts to ensure that governmental regulators were as "hands-off" on him and his enterprises as possible.

153.     Some of these politicians are also now on the long list of government officials who are under investigation by the Brazilian government for accepting bribes in connection with the huge Petrobras scandal that would ultimately break in 2014 – including now-impeached President, Dilma Roussef, who was arrested on September 22, 2016.

**The Second OGX "Oil Strike."**

154.     On November 16, 2009, OGX released a Statement of Material Fact announcing a new major oil strike captioned, in bold type: **"OGX Announces Discovery of Oil . . . Estimated**

27

**Volume of 400 Million – 500 million barrels – Drilling still in progress and new objectives to be reached."** This oilfield was later dubbed the "Pipeline Formation."

155.     Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable but was likely to be commercial.

156.     At a market price then around $79 a barrel, this was a representation to investors internationally that there was something like another $30-40 billion in value in OGX. The range of expected revenues for OGX was now cumulatively somewhere between $70+ and $158+ billion – and apparently there was more to come in the same well.

157.     Investors reacted predictably. The OGX stock price rose steadily through November 2009 to a high of R$15.70 while the numbers of trades swelled from over 16 million to over 22 million in just two days between November 16 and 18, 2009.

158.     Fully realizing that the figures that he had authored were completely baseless and had been intentionally used to create a dramatic increase in stock prices, and probably not believing that he would be able to prop the prices up much longer, in December 2009, MENDONÇA secretly sold 10,000 of his own OGX shares, realizing a profit of approximately $5,000,000.

159.     Upon information and belief, contrary to Brazilian law, this was not disclosed to CVM, the Brazilian Securities and Exchange Commission.

**OGX Strikes Even "More" Oil.**

160.     On December 22, 2009, OGX announced via Statement of Material Fact that completed drilling had revealed that the oil strike declared in November was now estimated at being two to four times greater. As the Statement of Material Fact stated, now the: **"Recoverable Oil Volume Expected to be between 1 and 2 Billion Barrels."**

161.     Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just "technologically recoverable" but was likely to be "commercial."

28

162.    BATISTA's announcements to investors by now equated to a cumulative promise that OGX was sitting on at least 1.5 billion and maybe as much as 3.5 billion barrels in recoverable oil. At a December 2009 price of around $75 a barrel that translated to a promise of between roughly $112.5 billion and $262.5 billion in value and investors reacted predictably favorably to the cumulative promises.

163.    In fact, the OGX seismic studies and drill test results had failed to indicate that a single barrel of oil was necessarily even technologically recoverable at any cost, let alone at a profit. Indeed, the internal D&M reports confirmed exactly that.

164.    But beyond that, from the very beginning, upon information and belief, very high concentrations of hydrogen sulphide gas had been detected. This compound, nicknamed "Death Gas" in Portuguese, is very poisonous, corrosive, flammable and explosive. Striking oil is no cause for celebration if it kills the drill-crew. The presence of this contaminant greatly increases the danger and the cost and therefore greatly decreases the commercial viability of an extraction operation. This fact was not disclosed.

165.    The promulgation of these statements to investors internationally and the continuing failure to retract them constituted fraudulent misrepresentations that were intended to induce and did successfully induce a belief in and among investors that OGX, and the satellite entities that depended on its success, had huge intrinsic commercial value.

**The OSX Public Offering.**



166.    To cope with the huge gushers of oil that he had promised, BATISTA announced that he would start a shipyard to build a number of huge "oil platforms" (tanker ships equipped with drilling rigs as shown above) through his company, OSX, and began scouting a coastal site for a "Super-Port" to be managed by his logistics company, LLX, where these monsters could dock to unload OGX oil, eventually settling on a location at Açu, near Rio de Janeiro.

167.    OSX went public in 2010 and raised $1.58 billion through its initial public offering on the São Paulo Stock Exchange. The rationale for the OSX oil platforms was to transport OGX oil. The main point of the LLX "Super-Port" was for the OSX ships to dock and offload OGX oil. But OGX had found virtually no oil and in all its existence, right up to its bankruptcy in 2013, would pump virtually no oil.

168.    The ships were massive and inspired investor confidence - but that was their sole point. No responsible businessman would have commissioned such monsters without a predictable source of supply, but they were complete overkill for the tiny trickle of OGX oil.

169.    But their point was not to actually *transport* oil: they were window dressing, intended to mask the fact that *there was no oil*. They were visible support for BATISTA's lies. In

30

essence, in themselves, they were huge floating fraudulent misrepresentations, boasts to the world of the existence of vast quantities of commercially recoverable OGX oil.

170. Eventually, OSX would have six ships commissioned, with the assistance of bribes to government ministers. But in its entire future, OGX would not pump enough oil to fill those six multi-million dollar OSX ships once, for even a single trip to port.

171. Nevertheless, on January 26, 2010, OGX released a Material Fact captioned: **"OGX Signs Agreements with OSX to Secure Production Equipment – OGX Sets Production Target of 1.4 Million barrels per Day by 2019 – Initial Production Expected to Begin in Early 2011, Ahead of Schedule."** In the body of the Statement, BATISTA was quoted as stating:

> Our drilling results have revealed a new oil province in the southern part of the Campos Basin and broken paradigms regarding the quality and potential of the reservoirs in this area. At this moment, OGX is entering into a new phase in its history, with a focus on reaching our production target of 1.4 million barrels per day by 2019. We have an unparalleled 10 year growth story, based on world-class assets of extraordinary quality.

172. The inference was that these were realistic projections founded on the discovery of a "new province" of commercially recoverable oil. But in truth, there was nothing to support it.

173. BATISTA's reference to "world class assets" also resonated with investors internationally. In financial accounting, an "asset" is an economic resource that can produce value.

174. However, nothing that OGX had yet discovered constituted an "asset." All the data available to it indicated that it might have "resources" of various categories, but how much could be recovered at *any cost* remained to be seen let alone what could be recovered *at a profit*.

175. On February 1, 2010, OGX announced an estimated volume of "recoverable oil of 100 to 200 million boe" in the Vesuvio formation at well OGX-4.

176. On February 3, 2010, OGX released a Statement of Material Fact that the drill-stem test at the 1-OGX-3-RJS well in block BM-C-41 (later named the Tubarao Azul - "Blue Shark" -

field) had revealed an estimated total recoverable volume of between 500 and 900 million barrels of good quality oil. This was represented to be extractable at a rate of approximately 3,000 barrels per day by vertical drilling, but at perhaps five times that rate, or 15,000 barrels a day, by horizontal drilling, as OGX proclaimed that it planned to do.

177.    This was untrue. There was no reasonable basis to believe in any such numbers. But a possible 15,000 barrels a day, which equated to roughly 5.5 million barrels a year, at a then per barrel rate of $87.21, constituted a fraudulent representation to the investors that OGX was sitting on close to another half-billion dollars of commercially recoverable oil, annually.

178.    On February 8, 2010, BATISTA appeared on the "Charlie Rose" TV show, nationally syndicated in the U.S., including throughout Florida, boasting of the fact that he had discovered "a hundred billion barrels of recoverable oil" and that Brazil was destined to be the world's fifth largest economy by 2015. [*See* Charlie Rose, *Interview with Eike Batista*, (Feb. 8, 2010), https://charlierose.com/videos/21203]. Investors internationally took note.

179.    On March 5, 2010, OGX released a Statement of Material Fact captioned: "**OGX Announces the Presence of Hydrocarbons in the Albian Section of Well OGX-6 – Rock Cores and Logs Indicate Strong Correlation Between OGX-6, OGX-3 and OGX2 Reservoirs.**"

180.    BATISTA's "Dr. Oil," MENDONÇA, was quoted as stating in relation to this new "discovery" that, "Ourre [sic] view of this data indicates that these accumulations may be connected and that the recently discovered oil province may, in fact, extend to the north of the BM-C-41 block, confirming its very significant petroliferous potential."

181.    This was all pure nonsense. The "presence of hydrocarbons" was of no intrinsic relevance to commerciality. As MENDONÇA well knew, publication of the existence of "hydrocarbons" to investors could be highly misleading and industry practice was not to do so. Indeed, when at Petrobras he had helped promulgate guidelines forbidding the practice.

182.    The "oil province" described was a grand, non-technical term designed to convey an impression of a huge undersea reservoir of commercially recoverable oil. "Connected" accumulations indicated that a single well might tap the totality. But the aggregate description was just not true and was intended to whet investment appetite.

183.    On April 14, 2010, BATISTA gave a video interview that was broadcast on the internet on XPTV, a video channel maintained by the XP brokerage firm, in which he further claimed that OGX had discovered "a new oil province in Brazil," that OGX had "the best exploratory blocks in the world" with "one trillion dollars-worth" of oil, that the company was worth up to "$100 billion dollars," and warned investors not to miss out on the opportunity to buy OGX stock. (*See* XPTV, *Entrevista Eike Batista OGX - A Grande Fraude - Entrevista Completa,* https://www.youtube.com/watch?v=6e_huuUsdH4).

184.    At or about this time, BATISTA orally disseminated other such false statements through audio and video conferences with financial institutions via the internet, as with all such internet publications described above and below, accessible and accessed by investors in Florida.

185.    The intended message to the investors internationally and in Florida was that OGX had "one trillion dollars-worth of oil," and was worth $100 billion. This led to an extraordinary increase in OGX's share price which soared from $15.55 to $23.27 that month.

186.    There was no reasonable basis for BATISTA and his accomplices and co-conspirators to believe that more than a tiny fraction of that amount of oil actually existed, let alone that it was commercially recoverable. These representations were fraudulently made with the intent of inducing investors to rely on them in purchasing and trading OGX stock and bonds.

187.    On May 13, 2010, OGX released a Material Fact captioned: "**OGX Concludes Drilling of Wells OGX-6 [and] OGX-8 – Identified Connection Between OGX-2 and OGX-6 Prospects with Estimated Recoverable Volume Totaling 1.4 to 2.6 Billion Barrels.**"

33

188.    Again, the use of the words "recoverable volume" was deliberately intended to convey the sense that this was money in the bank, but it was untrue. With oil trading at $80.44 per barrel, this was equivalent to a statement that there was between $112 billion and $209 billion of value in OGX; but there was no reasonable basis for anyone with access to the OGX drilling test results to believe in any such numbers.

189.    On May 27, 2010, OGX released a Statement of Material Fact captioned: **"OGX Detects the Presence of Hydrocarbons in Wells OGX-10 and OGX-13 – Net Pay of Approximately 40 meters in the Aptian Section of Well OGX-10."**

190.    As noted above, the discovery of "hydrocarbons" is inconclusive of any recoverable oil. However, in the oil and gas industry, *"Net Pay"* refers to the thickness of rock that can deliver hydrocarbons to the well bore. This statement was intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable reserves, to further stimulate market appetite.

191.    On August 12, 2010, BATISTA and MENDONÇA participated in a Bloomberg conference call broadcast over the internet during which MENDONÇA stated that, following a new discovery, OGX expected a "significant" increase in its potential oil and natural gas resources. BATISTA expanded on this, stating that wells in the Parnaiba Basin in northern Brazil might hold 10 to 15 trillion cubic feet of natural gas and that MPX, his energy company, planned to build power plants nearby.

192.    These estimates were pure speculation but they had their intended effect: OGX stock prices rose 2.2% and MPX stock prices rose by 6.8 %.

34

**Promoting OGX in Miami.**

193.    BATISTA had always had close ties to Florida including close social and business ties with Jeffrey Soffer, the Florida-based real estate and resort developer (then married to super-model Elle Macpherson) and was a frequent visitor to Soffer's Miami, Florida, home.

194.    During August 2010, BATISTA solicited Soffer in Florida to partner with him to develop office buildings and hotels in the Port of Rio de Janeiro and in "City X," BATISTA's mega-project for 250,000 residents in Fluminense, Brazil.

195.    Soffer traveled down from Miami, Florida, to Rio de Janeiro to meet with BATISTA and explore the prospects. The meeting was, as BATISTA intended, reported in the press with speculation as to the future plans of the prospective "partners."

196.    Such well-publicized gambits were designed by BATISTA to generate the impression that other high-performing, highly respected businessmen trusted his business acumen, and such associations lent BATISTA business credibility in the public mind.

197.    Jeffrey Soffer was the owner and operator of the Fontainebleau Miami Beach Hotel in Miami Beach which he had revamped to the tune of a billion dollars and where he envisioned creating a perpetual event marketing space. To this end he had partnered with David Grutman and his Miami Marketing Group, who established and operated the premiere Miami nightclub, LIV, at the Fontainebleau Miami Beach.

198.    MMG Nightlife took Miami's synergistic marketing environment to a new level. It created events at the Fontainebleau Miami Beach's many spaces. The property's restaurants hosted Grutman's huge 30-50 guest, "A-List" celebrity-studded dinner parties, five nights a week, and LIV provided the late-night environment where paparazzi and press could create "buzz" around their doings.

199.    BATISTA - then a member of the international A-List as Bloomberg's putative "Eighth Richest Man in the world" - used his Soffer/Grutman connections to pitch investment in OGX stock directly to celebrities in Miami, Florida.

200.    Thus, in September 2010, BATISTA met with a group of foreign investors in Miami at a star-studded dinner party hosted by Jeffrey Soffer and worked the crowd of high-net-worth investors, one-on-one, to buy OGX stock on insider information, because the company was about to announce further significant oil discoveries.

201.    Among the party guests were baseball star, Alexander Rodriguez ("A-Rod"), and his then girlfriend, the film star, Cameron Diaz. Rodriguez reportedly called his financial advisor for advice on the investment who, because it was insider trading, "told me to forget about it and never mention it again, because I could go to jail for a transaction like this."[8]

202.    It is unknown before discovery how many other people in Florida BATISTA pitched the investment prospects of OGX to at this time and over the years, or how many of them were less prudent than A-Rod and actually bought stock as a result of such face-to-face pitches. But it is believed that, given the fact that BATISTA wasted no opportunity to boost the value of his companies, the face-to-face pitch he made to A-Rod was characteristic of the approach he made to many other high rollers in Florida.

**"Interest from the Chinese."**

203.    On September 13, 2010, BATISTA spoke to reporters on a conference call that was published in an article online by Bloomberg in which he stated that all the major oil companies in the world including the major Chinese oil companies, Cnooc Ltd. and China Petrochemical Corp.,

---

[8]Anderson Antunes, *Even Alex Rodriguez Reportedly Almost Fell Victim to Eike Batista's Financial Collapse*, Forbes (Apr. 20, 2014), http://www.forbes.com/sites/andersonantunes/2014/04/20/even-alex-rodriguez-reportedly-almost-fell-victim-to-eike-batistas-financial-collapse/#1add8bc51ee5.

were among bidders for OGX assets. In response to the reporter's comment that his sources had revealed an offered price of $7 billion for the company, BATISTA said that that amount would only buy a "tiny" stake in OGX.

204.   However, this was just more spin, intended to boost the price for OGX shares. In reality no energy company with access to the actual OGX drilling data would have had an interest in OGX for more than a tiny fraction of its then supposed market price.

205.   Predictably, however, the OGX share price rose. This time by 2%, to put OGX stock at 20% up overall for the year.

206.   By this time, as the cumulative effect of the barrage of hype that BATISTA and his co-conspirators and accomplices had churned out over the preceding years, the financial press were hailing BATISTA as the world's eighth richest man with a net worth of $27 billion, and BATISTA was playing up his supposed position by announcing a new series of planned initiatives, including a partnership with sports goliath, IMG Worldwide, Inc., forming "IMX" to engage in the sports and entertainment business in Brazil, and a foray into consumer electronics by building an Apple computer factory on vacant LLX land.

207.   As the Forbes article concluded regarding the Apple initiative - reflecting the market understanding of OGX - "Whether that will come to pass is hard to say. Given the enormously valuable oil and gas empire that Batista has built in recent years, he might have a chance."

208.   But the "enormously valuable oil and gas empire" was nothing more than smoke and mirrors. Nevertheless, because of their own personal stakes in the success of OGX, BATISTA and his co-conspirators, including by that time, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, and PAULO GOUVEA, THOR BATISTA, and LUIZ CARNEIRO, and the controlled 63X, EBX and CENTENNIAL Companies failed to make any corrective announcement

37

to the investing public, internationally, and continued to assist BATISTA in hyping the value of the OGX oilfields.

209.    On November 26, 2010, Bloomberg reported the news online, sponsored by BATISTA, that OGX was delaying its planned sale of a minority stake in its Campos oilfield until the D&M report was in by the end of the first quarter of 2011. Bloomberg repeated the BATISTA comments from September about selling a $7 billion minority stake to the Chinese; reiterated the fact of OGX's supposed 3.69 billion barrels of potential reserves in the Campos Basin, as estimated by D&M in 2009; and reported that the additional recent discoveries were expected to boost those numbers. This reflected the illusion that BATISTA and his co-conspirators had successfully created. But it was all untrue.

210.    On March 15, 2011, Bloomberg summarized the information on OGX stemming from the cumulative effect of BATISTA's lies over the three preceding years. It reported that OGX, BATISTA's main source of wealth, was worth $37.1 billion, with 6.7 billion barrels of potential reserves. BATISTA was quoted as stating that despite having fielded five purchase offers from other oil companies he did not need to sell because OGX had $3 billion in cash and the extraction costs in its shallow-water fields were extremely low.

211.    Bloomberg further reported OGX as claiming a hundred percent success rate in the Campos Basin where it planned to drill three additional wells and that higher-than-expected production would allow it to use fewer wells per production platform, thereby further cutting production costs. OGX had stated that it anticipated that production would ramp up from 20,000 barrels a day to 730,000 barrels a day by 2015, and 1.38 million barrels a day by 2018. In a video interview with Bloomberg BATISTA said "It's a bonanza" and "these are bonanza assets."

212.    But this was all untrue. For behind the scenes, everything that Brazil's King Midas touched was not turning to gold – not even black gold. But none of the co-conspirators made any attempt to correct the false impression in the market, even though they all knew the truth.

**The 10.8 Billion Barrel Lie.**

213.    On March 31, 2011, D&M submitted its confidential Report to BATISTA and OGX on the Prospective OGX Resources in Brazil and a Report on the Prospective OGX Resources in Colombia. It painted a depressing picture of OGX's future. Out of many billions of barrels of oil and gas that might possibly exist in the OGX fields, D&M failed to identify more than a tiny amount, less than 1%, that might constitute "reserves" – *i.e.* commercially recoverable oil.

214.    When the D&M reports became public there would be an obvious, hugely depressive effect on OGX stock prices. The only alternative BATISTA and his co-conspirators and accomplices decided, to try to keep the price up, was to lie.

215.    BATISTA, therefore, had MENDONÇA mix-and-match numbers from the D&M Reports, adding apples to oranges, completely contrary to the accepted industry methodology, to use as the basis for the most colossal lie to date.

216.    As a preventive strike to defuse the effect of the impending release of the D&M reports, on April 15, 2011, MENDONÇA, "Dr. Oil," issued a press release to investors in which OGX claimed its net potential resources in "recoverable oil" were 10.8 billion barrels and that these figures were based on the assessment of its world-renowned oil auditors, D&M.

217.    In it, BATISTA announced that the 10.8 billion-barrel number was not based just on OGX's own calculations, but that, "[t]hese results, presented by an independent, internationally renowned consulting group, confirm the extraordinary success of our business strategy and execution," he said. This obviously referred to D&M.

218.    To come up with the 10.8 billion barrel figure, MENDONÇA took D&M's *most optimistic* estimate of "contingent resources" (*i.e.* oil that was not necessarily commercially extractable in *any* amount) of 3.1 billion barrels. He then jumbled together three different categories of "prospective resources" (*i.e.* oil that had not yet even been discovered and was deemed currently unrecoverable) to come up with another 6.8 billion barrels. He then threw in D&M's figure of 1 billion barrels, which was an upper, outside guess of what might be possible from the geology, and which did not even meet the probability level of "resources" of any kind.

219.    What BATISTA and his co-conspirators and accomplices were doing was completely fraudulent. The 10.8 billion number was basically just made up out of thin air. But it was published under the imprimatur of "Dr. Oil" and supposedly based on the analysis of world-renowned outside auditors, D&M.

220.    Everybody on the Board at OGX, and everybody within BATISTA's confidence, which would have included the directors of OGX, OSX, LLX and the 63X, EBX and CENTENNIAL Companies, if they did not know before, knew by now that the entire "X" group of companies, whose success was predicated on massive oil strikes by OGX, was a massive pump-and-dump scheme. The list of individuals included EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, and LUIZ CARNEIRO. Their legal obligation was to expose the 10.8 billion barrel lie. But they were incentivized by their stock options to keep quiet. And they kept quiet.

221.    Despite BATISTA and MENDONÇA's preemptive strike, on April 15, 2011, when the D&M Report was released, investors reacted with concern and the OGX share price dropped sharply.

222.   Nevertheless, on the basis of Dr. Oil's reputation and his 10.8 billion-dollar prediction, BATISTA and MENDONÇA managed to spark a debate on the reliability of the D&M numbers.

223.   In a conference call on April 19, 2011, with market analysts, reported by The Wall Street Journal, among other media outlets, BATISTA and MENDONÇA defended the OGX data, describing D&M, dismissively, as "the most conservative certifier in the world." BATISTA stated that it was time that people started to trust the OGX team which he had brought over from Petrobras, headed up by his fabled "Dr. Oil." BATISTA contended that "it's time for the market to accept the company's numbers," and pledged to hire additional consultants to prove OGX's claims.

224.   The New York based multinational investment banking firm, Goldman Sachs, was among those reassured. It stressed publicly that investors should consider the D&M reports as just a part of a larger mosaic, and, "[w]hen considering the scope and underlying assumptions, we think that the D&M report generally adds confidence to our assumptions" and reiterated its "Buy" rating on OGX shares.

225.   What OGX had successfully managed to do by its fraudulent press releases and press conferences, intentionally disseminated across the phone lines and the internet to the world, was to confuse the issue and maintain a continuing belief in investors that OGX was sitting on vast commercially profitable oilfields and that all it needed was enough cash to stay in business to get the oil flowing.

226.   Maintaining a public story of OGX reserves of 10.8 billion barrels in "recoverable oil" as BATISTA was to do for the next two years was a complete fraud, designed to keep the balls in the air as long as possible and attract continuing trading in stocks and bonds of BATISTA's

companies, while he siphoned off as much as possible from the top and tried to sell off the rest before the bottom fell out.

227.    PAULO GOUVEA, however, decided that the writing was on the wall for OGX. While his duty was to blow the whistle on the scheme to the regulators and to investors, PAULO GOUVEA decided, instead, to cash in his chips and he sold his stake in the various X companies, reportedly realizing over $150 million which he reinvested in assets with real value, including real estate in New York and Paris. But he continued on in BATISTA's confidence and as a prime adviser in the fraud.

**D&M Secretly Protests.**

228.    Not surprisingly, behind the scenes, D&M was furious that their name was being used to mislead investors and on April 29, 2011, they privately stated their "great concern" on this point to BATISTA and OGX and demanded a corrective press release.

229.    On May 3, 2011, OGX sent D&M a placatory response, attempting to negotiate a compromise that would allow it to maintain both the 10.8 billion-barrel figure and the D&M imprimatur for its probity.

230.    On May 16, 2011, there was a meeting between OGX and D&M, with a presently unknown result. Whatever was agreed, D&M did not make its privately expressed "great concern" public and OGX did not retract its 10.8 billion barrel lie.

231.    Indeed, BATISTA embroidered further on the lie. In May of 2011, at the Michael Milken conference in California, which was broadcast to investors worldwide, BATISTA, then said to be worth roughly $30 billion, stated to CNBC that he was going to be richer than Carlos Slim, Warren Buffett, and Bill Gates because "I have created five companies that have in them embedded resources worth $2 trillion at a very low cost of producing." He went on to call them "idiot-proof assets."

232.    MENDONÇA, fully realizing that BATISTA's boasts to the public were nonsense, since he had created the underpinnings for the hype, between June 6 and June 16, 2011, MENDONÇA secretly and improperly sold 321,200 of his own shares in OGX, realizing a profit of approximately $2,500,000.

233.    In July 2011, OGX released a Management Presentation to investors trumpeting a resolutely upbeat picture, throughout which it consistently described its resources as being "10.8 billion of recoverable boe" and claiming to have all the needed cash, equipment, and skill in place to achieve massive success.

234.    However, the truth was that OGX had found virtually no commercially recoverable oil and BATISA had no convincing data to show any savvy oil industry investor to convince it to buy into OGX.

235.    BATISTA needed a cover story for why his rumored sale to the Chinese was not going through and he resolved to tell the press that it was because he did not need the cash and wanted to reap the profits himself.

236.    Thus, on September 23, 2011, in an article published by Reuters U.S. Edition on the wires under the title, *"Cashed-up Eike Batista won't sell oil stakes,"* Reuters reported that BATISTA said he had abandoned talks to sell stakes in his offshore oil prospects because he had billions in hand and did not need the cash.

237.    Oil was then trading at roughly $80 per barrel and BATISTA claimed that the low production cost of his shallow-water wells meant that he could break even if the per barrel price fell as low as $24. In the Reuters article, he said that OGX was close to signing a long-term deal to supply oil to one of the world's largest refiners – which he declined to identify, citing securities regulations – and that a recent bond issue had "brought in exactly what we needed to live off our own spoils." When asked about a decline in OGX share prices, he responded, "I have to laugh. My

43

companies are all going to be massive cash flow machines. I'm going to pump money to my shareholders and dividends to my sons and my grandsons."

238.    Part of that claim would prove true: he would pump money to his co-conspirator shareholders through their sales of fraudulently hyped stock, and would pump money directly to his sons and other family members to defraud creditors – but not from profits.

**Insiders Sell Their OGX Stock in Miami.**

239.    BATISTA had several companies from which he could directly siphon money and which he hoped he would eventually be able to flip at a profit. However, BATISTA's directors and other insiders had their fortunes pegged directly to the value of their stock options in just OGX. They could see clearly that the picture that BATISTA was painting for the public and what they were helping him color in was false, and they wanted to dump their shares before the bottom fell out.

240.    The problem was that stock sales by insiders would have to be disclosed publicly and there would be a high risk of creating panic among investors if they were to do so. BATISTA had therefore placed restrictions on their ability to do so.

241.    Upon information and belief, however, several OGX executives who were within the circle of BATISTA's confidants and who knew that OGX was a massive fraud, entered into transactions to circumvent the prohibition and dispose of their stock without alarming investors through "creative thinking" on the part of J.P. Morgan Securities in Miami, Florida.

242.    One of J.P. Morgan Securities' wealth management executives in Miami, Florida, reportedly proposed extending the insiders "loans" with their stock standing as collateral and the sole recourse for repayment. The idea was that the insiders would default on the "loans," J.P. Morgan would foreclose on the collateral, and both sides would be happy: J.P. Morgan would have

OGX stock at what it hoped would be a profit and the insiders would have cash, thus achieving the equivalent of a sale of the stock without disclosure to investors.

### The Lies Continue – OGX "Cash Rich."

243.    As the cumulative result of BATISTA's lies, by 2012, there was general acceptance in investors that OGX had access to massive amounts of recoverable oil. However, investors were beginning to question when OGX would start to deliver and whether the company was sufficiently well-capitalized to stay in business until it could start production.

244.    Accordingly, if his fraudulent scheme was to work, BATISTA's task was now to engender a belief in investors that OGX was cash rich and that the oil would soon start to flow.

245.    In January 2012, the initial OGX production report on the first well showed flows of just 15,000 barrels a day. These extremely modest results nevertheless had Batista and "Dr. Oil" putting on a show of huge success, popping champagne corks while technicians opened the valves remotely from Rio de Janeiro and webcams delivered pictures to the world.

246.    On January 16, 2012, OGX released a Statement of Material Fact announcing the discovery of evidence of "hydrocarbons" in the Santos Basin, in the Fortaleza field, in well OG-63, stating, "[t]his discovery is important for its huge hydrocarbon column and net pay identified in the Albian section, as well as by the quality of the Aptian reservoir and its behavior," commented PAULO MENDONÇA, General Executive Officer and Exploration Officer of OGX.

247.    This was a mishmosh of technical jargon intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable, recoverable oil, to further whet market appetite.

248.    And BATISTA continued boasting of his "success." On January 20, 2012, he gave an in-person interview from Rio de Janeiro with The New York Times, for an article entitled, "A Brazilian Magnate Points to Himself for Inspiration." The article remarked admiringly on

BATISTA's trappings of apparent success, his 1,000,000 Twitter followers, and the fact that OGX was expected to begin producing crude oil from an estimated 10 billion barrels of offshore discoveries. "Brazil today has the wealth that America had at the turn of the century," said BATISTA. Regarding his ostentatious display of wealth: "I want to help a whole generation of Brazilians to be proud. I am rich, yes. I have built it myself. I have not stolen it," he quipped.

249.     Regardless of the accuracy of the wealth of his country, his final statement regarding the source of his personal wealth was certainly untrue.

250.     On March 2, 2012, BATISTA gave a telephone interview from Rio de Janeiro to Bloomberg. During the interview, BATISTA stated that he still had plans to overtake Carlos Slim as the world's richest person by 2015 and boasted that his companies would post close to $1 billion in earnings before interest, taxes, depreciation and amortization in 2012, and double that in 2013. With an estimated net worth of $30 billion, BATISTA, still ranking eighth in the Bloomberg Billionaires Index, said, "I am probably, among the billionaires, the least indebted guy of all of them."

251.     No reasonable person, knowing what BATISTA knew at that time, could have made any such statement truthfully. He was playing games with investors with smoke and mirrors. His "Empire" was, as he knew, a house of cards. The collapse was just a matter of time.

**The Mubadala "Investment."**

252.     The Mubadala Development Company ("Mubadala"), based in Abu Dhabi, is the strategic investment and development company of the oil-rich United Arab Emirates.

253.     On March 26, 2012, BATISTA publicly announced that Mubadala had signed a "strategic partnership agreement" with his EBX group whereby Mubadala would invest $2 billion in exchange for a 5.63% preferred equity interest in the Defendant, CENTENNIAL (BRAZIL) and other BATISTA offshore holding companies, believed to include the 63X and EBX Defendants,

46

giving it an indirect interest in the public companies, OGX, OSX, MMX, LLX, MPX, and privately-held AUX, REX and IMX.

254.    BATISTA announced the agreement as a "framework for further collaboration between the two organizations" and that the Mubadala cash was to be used to "reinforce the group's already strong capital structure so as to help fund new enterprises across multiple business areas."

255.    BATISTA further announced: "[t]his is the first time we have invited a strategic partner to invest at our holding company level. The investment considerably strengthens the entire group and its ability to successfully implement current and future projects. Mubadala, after conducting thorough due diligence of our companies recognizes the great potential of our Latin American assets."

256.    An attached "Legal Notice" stated that this "strategic partnership constitutes a minority investment by Mubadala in Centennial Asset Brazilian Equity Fund with no changes to the control, management or day-to-day activities of Mr. Eike Batista's publicly listed vehicles: OGX, OSX, MMX, LLX and MPX."

257.    Mubadala went along with the phrasing of this announcement.

258.    On the surface, as projected to the investing world, a highly experienced and well-financed sovereign company from the oil sector, after conducting "thorough due diligence," had seen sufficient value in the prospects of BATISTA's OGX-oil-based empire to accept an "invitation" - the first extended to any outside player - to buy a tiny minority equity stake in BATISTA's holding company, giving it no control, for $2 billion. (By extrapolation, on the raw math, without factoring in the value of control shares, the company must have a value as a whole of at least $40 billion).

47

259.    The subtext of BATISTA's message was that his strongly-capitalized EBX group did not need the cash, but this contribution would enable it to expand into new areas.

260.    The news about the Mubadala "investment" was disseminated by many financial news organizations including Bloomberg.

261.    As BATISTA later explained in a Milken Conference interview broadcast to the investment world by Bloomberg, described below, he entered into this transaction in order to convey a message to the world that a savvy outsider had "audited" his operation and placed its "stamp of approval" on it. In other words, if one of the world's great players believed in him to the tune of $2 billion for a tiny stake, so should all investors.

262.    The actual Mubadala "strategic partnership agreement" has not yet been seen. But later events described below make it clear that this $2 billion "stock purchase" was far from a simple purchase of a tiny non-control block of stock, but was structured far more like a $2 billion *loan*, with BATISTA's entire worldly wealth, including shares in companies within the group and outside, such as his substantial holding in Florida's Burger King and other treasured plum assets, pledged as collateral.

263.    It is believed that this deal was structured in the Cayman Islands and involved the EBX, 63X and CENTENNIAL Companies. This fraudulent presentation was primarily intended to bolster investors' confidence in OGX, on which the success of the group depended.

264.    Had this "strategic partnership" been declared to investors as the desperately-needed "loan" it truly was, investor confidence in OGX would have evaporated, its end hastened by perhaps as much as a year, and Plaintiffs would not have lost a cent.

**Keeping the Balls in the Air.**

265.    In April 2012, BATISTA staged a photo-op for the world press at his planned LLX "Super-Port." With him onstage were a roster of Brazil's political and business elite: President

Dilma Roussef (now impeached and deposed), Rio Governor Sérgio Cabral (now under arrest and federal investigation for corruption), and Mines and Energy Minister Edison Lobão (now also under federal investigation for corruption). The audience of 400 included foreign corporate luminaries from around the world.

266.    Showing off his port, which he predicted would be the largest port in the Americas, BATISTA announced that OGX had begun production on what he described as a "new frontier" of petroleum 37 miles off the Brazilian coast. "This is a historical moment," said Batista. "It's the first time an independent Brazilian company has produced offshore oil."

267.    President Rousseff did her bit to boost the illusion, announcing resolutely that the state-run oil company Petrobras would go into deep partnership with Batista's firm: "Eike is our standard, our expectation and, above all, the pride of Brazil when it comes to a businessman in the private sector," Rousseff told those in attendance, as she stood by his side, both clad in orange OGX jumpsuits for the photo-op. BATISTA – his jacket sporting a black, oily hand-print, symbolizing "first oil," flashed a two-fisted victory sign:



268.    BATISTA and his co-conspirators and accomplices, however, knew that the trickle of oil they were witnessing was pretty much all there was. The block was later to be returned to the government as worthless.

269.     On April 18, 2012, roughly a year before the eventual crash, as the result of the aggregate lies, Times magazine named BATISTA one of the 100 Most Influential People of 2012. The short supporting puff-piece on BATISTA was written by then-mayor of Rio de Janeiro, Eduardo Paes (a key BATISTA ally, now under investigation for corruption).

270.     In it, Paes spoke of BATISTA as one of Rio's "most treasured adopted sons" who had "helped us shape the renaissance" of Rio, citing his status as "Brazil's richest man and the world's seventh richest, bringing vital investment to our city from oil and mining," and boasting of his charitable largesse.

271.     Puff pieces like these were contributed from time to time by BATISTA's rich and powerful friends whose own careers were symbiotically tied to his and were intended to bolster the impression of BATISTA's success and sustain his position with investors.

272.     However, the insiders could see that the writing was now truly on the wall.

273.     In April 2012, OGX board member Marcelo Faber Torres figured that he had better dump his OGX stock before the truly bad news came out and he reportedly sold 9 million OGX shares in staggered batches so as not to alarm investors.

274.     Other insiders, co-conspirators, and accomplices started to do the same and reportedly, at or about this time, the executive group quietly sold off 17 million shares, realizing over $103 million.

275.     As a part of his own exit plan, BATISTA had, upon information and belief, two companies set up in The Bahamas through corporation formation agent Winterbotham Trust Company, Inc., to help shelter the proceeds of the fraud. BATISTA's son, the Defendant, THOR BATISTA, agreed to act in regard to these corporations and assist his father in achieving the objective of the fraudulent scheme.

276.    One of these Bahamian companies was the Defendant, THORQUE INVESTMENT MANAGEMENT LTD., which was incorporated on April 12, 2012. The other was the Defendant, THORQUE1 FUND LTD., whose date of incorporation is unknown. Upon information and belief, these companies were nominally owned and controlled by THOR BATISTA, but who acted at BATISTA's direction.

277.    Upon information and belief, bank accounts were opened in The Bahamas, Miami, Florida, and eventually in Switzerland in the name of the THORQUE companies. It is believed that the Bahamian funds were held in an account under the direction of BTG Pactual[9] or Itaú Bank and eventually held at least $100 million in proceeds of the fraud. It is believed that the Miami account was at Itaú or Citibank. The Swiss account is presently unknown, but $30 million is believed to have been eventually routed out to a safe haven through the Citibank trust account of one of Batista's Florida professionals.

**"The Brazilian Dream."**

278.    On April 30, 2012, Bloomberg Television aired an 11-minute video interview of BATISTA on its show, "Money Moves with Deirdre Bolton." The interview took place at the Milken Institute's 2012 Global Conference in Los Angeles, California, where BATISTA was a featured panelist in four different panels during the five-day conference. After Bloomberg broadcast the interview on television, it published the interview on youtube.com with the description, "Brazilian billionaire Eike Batista talks about the potential benefits of OGX Petroleo e Gas Participacoes SA forming project partnerships with Petroleo Brasileiro SA and Vale SA."

279.    In the Bloomberg interview, correspondent Stephanie Ruhle introduced BATISTA as the "tenth richest man in the world - the goal is to get to number one." Ms. Ruhle then noted

---

[9] Banco BTG Pactual SA ("BTG Pactual") operates and has operated under various names in various jurisdictions during the relevant time period.

that a week earlier, the President of Brazil had visited BATISTA's oil port in northern Rio de Janeiro, where she called BATISTA a special kind of entrepreneur and a hero to Brazil. Bloomberg accompanied this anecdote with broadcast footage of BATISTA and President Rousseff getting off a helicopter together, surrounded by press. All of this, of course, fed into BATISTA's artificial narrative of himself to lure in American investors.

280.    BATISTA then utilized this broadcasted news segment to repeat his colossal lies about his companies. He spoke of "a trillion and a half dollars in assets: oil, gas, iron ore, gold, coal" and projects with "eighty percent margins." He spoke of the prospects of collaboration between OGX (which he knew had virtually no oil) and the (huge) Vale and Petrobras companies as being a "win-win for everybody."

281.    BATISTA also explained his rationale for the sale of a small stake in EBX to Mubadala (which was secretly, in reality, a loan) as being to inspire investor confidence: "[w]e just wanted to have, maybe an extra stamp by investors. Because you know the market is funny. Sometimes they demand, well, we like to have the structure audited. And when somebody like Mubadala comes in, the world knows how deep they go into the auditing process. And I love to be audited. I love transparency. So in a way, it's an extra way to show transparency to what we do." He said that he was just spreading hope in "The Brazilian Dream."

282.    By June of 2012, OGX was unable to hide the fact that the wells at its main field in the Campos Basin were not as productive as first believed and that it had cut production estimates by two-thirds. OGX share prices fell steeply by the end of June.

283.    Continuing to believe in the aggregate BATISTA-generated hype, however, on July 19, 2012, the Financial Times in London, England published an article entitled, "It is too soon to write off Eike Batista." The article quoted BATISTA's boast at an OGX investor meeting from

earlier in the year, that his companies were "80 per cent ebitda- [earnings before interest, tax, depreciation, and amortization] margin businesses. I search for the truffles."

284.    It also quoted a supportive statement from one of BATISTA's biggest and closest bankers, BTG Pactual – who should be in the position to know – that the stock could recover within the next twelve months and that "OGX has enough cash to support its business."

285.    Nobody listening thought that BATISTA, who continued to boast about his "trillions of dollars" of oil, would be prepared to flat out lie. They were to be proved wrong.

286.    Through a barrage of international press articles and a blizzard of tweets, in the course of 2012, BATISTA maintained an image of burgeoning wealth through publicized plans for massive investment into an ever-expanding series of business ventures, from shipyards and ports, to sports and entertainment ventures.

287.    Thus, on July 18, 2012, BATISTA tweeted that OSX and OGX had negotiated the construction of drill ships; on July 19, 2012, he sent out a video on the synergy between OGX and MPX for gas exploitation in the Paraiba Basin; on August 29, 2012, he boasted that his port at Açu would be one-and-a-half times bigger than Manhattan Island, New York; and on September 25, 2012, he re-tweeted an IMX photo regarding his IMX deal with Cirque du Soleil.

288.    However, as stated above, the OSX shipbuilding business was largely dependent on OGX oil and there was no oil. Nor were there continuing orders to build ships from the general market. However, corrupt government Ministers controlled the purse at Brazil's Petrobras and were a source of funding – at a price.

289.    What BATISTA did not include in his tweets was that OSX had been awarded this $922 million ship-building contract as a result of a $2.3 million bribe that CARNEIRO had agreed to with Brazil's Finance Minister, and Chairman of Petrobras, Guido Mantega.

290. By now the illusion of spectacular reserves of oil had been created. MENDONÇA was no longer needed as "Dr. Oil," and he was promoted out of OGX to the Board of EBX, BATISTA's investment vehicle, which was focusing on siphoning off as much as possible.

**OGX Secretly Bankrupt.**

291. Upon information and belief (from the Brazilian indictments) an internal OGX task force which had started work in 2011 and Schlumberger, the world-renowned energy consultant, essentially a Joint Task Force, presented reports on their conclusions as to OGX's prospects to the OGX Executive Committee, presided over by BATISTA, in September 2012.

292. Upon information and belief (from the Brazilian indictments) the Joint Task Force concluded that a negligible amount of the promised 10.8 billion barrels of oil were "recoverable" at any expense and that, even so, they were contaminated with such high levels of $H_2S$ "Death Gas" that most of what was technically recoverable could not be extracted economically even if (which was doubtful, because of the environmental impact) licenses for decontamination could be obtained.

293. The Joint Task Force concluded that even in a best-case scenario, the company had a negative value of about one billion dollars, making the commercial production of oil from any of the fields absolutely impossible.

294. Thus, by September 2012, at the very latest, BATISTA and his co-conspirators and accomplices knew that OGX was insolvent and that the further exploration for oil was a pointless quest. Moreover, even the *pretense* of oil exploration for profit could not continue without fresh massive injections of cash.

295. BATISTA and his co-conspirators and accomplices knew from these devastating audits that the whole house of cards that depended on OGX oil (the OSX exploration platforms, the LLX-run Super-Port, and so on) would collapse as soon as the truth was known.

296.    BATISTA and his co-conspirators and accomplices knew that there was no reason for any investor, who knew what they knew, to invest another penny or buy bonds on the secondary market, and indeed that anyone who had OGX/OSX stocks or bonds who knew what they knew would dump them as quickly as possible.

297.    These reports should have been disclosed to the public immediately as Statements of Material Fact. However, BATISTA and his co-conspirators, and the Boards of OGX and OSX, illegally refused to disclose this information and deliberately suppressed it. This constituted a massive fraudulent misrepresentation by omission.

298.    BATISTA and his co-conspirators and accomplices knew that it was now a matter of time before OGX and the satellite companies were seen by the public to be worthless. Their focus was now to keep up the illusion of eventual profitability long enough for them to hive off their interests in the satellite companies and liquidate as much of their remaining stock in OGX at the highest price possible and route it out to secret foreign bank accounts before the bubble burst. And by such continued outright lies, BATISTA and his co-conspirators and accomplices managed to stave off the realization among investors that OGX was bankrupt for close to another year.

**The Exit Strategy.**

299.    Upon information and belief, BATISTA's exit strategy - which was integral to the fraud as a whole, since the entire exercise would have been pointless if the money stolen had not been put out of the reach of creditors when the bubble burst - is believed to have been largely structured and executed in Miami, Florida, the Cayman Islands, The Bahamas, Panama, and Switzerland. It was basically a money-laundering operation. The details are unknown before discovery, but, to the extent known, the ultimate facts are as outlined below.

**The Professionals.**

300. Upon information and belief, the architects of the scheme were international asset protection specialists. They created and implemented the various international structures for BATISTA to transfer the funds internationally and hide the proceeds of the fraud. It is believed that they were introduced to BATISTA by BERTO and that BERTO served as the first trustee of the Swiss trust created to hold the proceeds of the scheme on behalf of BATISTA as part of the structure.

301. Upon information and belief, from at least 2012 onwards, these Miami professionals, essentially, had no other client but BATISTA and his various co-conspirators, accomplices, corporations, trusts and other interests, and that their offices were in fact an agency office for BATISTA and his co-conspirators and accomplices.

302. Upon information and belief, no professional privilege attaches to their files, as being excluded by the crime-fraud exception and to destroy them or move them would constitute furtherance of the conspiracy, spoliation of evidence and cause for disciplinary action.

303. Upon information and belief, these international asset protection specialists were based in Miami, working with BATISTA and his co-conspirators, the 63X, EBX, CENTENNIAL and THORQUE Companies and similar professionals in Brazil, Austria, The Netherlands, and other jurisdictions constructed a web of shell companies that were incorporated in various secrecy jurisdictions, including those joined here, and trusts and other vehicles elsewhere.

304. These shell companies were to be used to obscure the rationale behind the routing of funds between countries and their eventual safe deposit into various bank accounts, properties, and assets under other names around the world for BATISTA and his various co-conspirators, accomplices and family members.

**The Bankers.**

305.    BATISTA's prime banking relationships were with three massive international banking groups: Citibank, BTG Pactual and Bank Itaú, all of whom have presences in Miami and licenses to operate in Florida.

306.    Upon information and belief, each of the three banks named above had extremely close relationships with BATISTA and his co-conspirators and accomplices and different divisions and subsidiaries within those groups assisted BATISTA and his co-conspirators and his accomplices in laundering the profits of his fraudulent scheme and routing them internationally to ultimate repository accounts in secrecy jurisdictions around the world.

307.    Upon information and belief, the messaging to effect such transfers would have necessarily been routed through the SWIFT server maintained in Virginia and otherwise through the United States. It is unknown before discovery whether their degree of knowledge and complicity would justify joining these banks in this action as defendants.

308.    Upon information and belief, among other accounts in other countries, Citibank provided banking facilities and maintained an account in Miami which held at least tens of millions of dollars, and maybe more, which BATISTA had siphoned off as profits from his fraudulent scheme to hide them from creditors when the bubble burst.

309.    It is unknown before discovery which names were used for the Citibank accounts, but they are believed to have been held, in part, nominally for THOR BATISTA, in the name of the THORQUE Companies or in the names of the 63X, EBX or CENTENNIAL companies, but were in reality held for BATISTA himself.

310.    Bank Itaú also provided banking facilities and hosted accounts in Miami and in foreign countries, including in the Cayman Islands and The Bahamas, which held sums of money which BATISTA had siphoned off in order to hide them from creditors when the bubble burst.

More specifically, on current information, it is believed that during the relevant time period, Bank Itaú in Miami received transfers in excess of 760 million from accounts controlled by Batista in The Bahamas and Cayman Islands.

311.     It is unknown before discovery in this case all of the names that were used for the Bank Itaú accounts, but based on the disclosures received through the Cayman Islands and the Bahamian proceedings they are held, in at least the following names: AUX LLC, Centennial Asset Brazilian Equity Fund, Thorque1 Fund, Thor Batista, 63X Investments Ltd., and 63X Master Fund. In reality, upon information and belief, despite being held in the names of these entities these accounts were held for BATISTA himself.

312.     Upon information and belief, BTG Pactual Bank provided banking facilities and hosted one or more accounts in The Bahamas, the Cayman Islands, and elsewhere, either directly or through an affiliated or correspondent entity, which held hundreds of millions of dollars which BATISTA had siphoned off in order to hide the funds from creditors when the bubble burst.

313.     It is unknown before discovery all names that were used for the BTG Pactual accounts, but they are believed to include accounts in the names of the 63X, or CENTENNIAL, but were in reality held for BATISTA himself.

314.     Other bank accounts, held through other structures unknown before discovery but orchestrated by BATISTA and his co-conspirators were, upon information and belief, set up in the Cayman Islands, The Bahamas, Miami, Panama, and secrecy jurisdictions around the world.

315.     Upon information and belief, the funds were routed from Brazil and elsewhere through the various accounts to break the trail of where the funds originated and in hopes of rendering them safe from detection and attachment.

316.    Participants in the scheme included the various Defendants and other entities owned or controlled by BATISTA and his agents, accomplices and co-conspirators, the identities of which are not known before discovery.

317.    These persons and entities knowingly facilitated the fraud and helped conceal the funds siphoned off in order to hide them from creditors when the bubble burst and in doing so routinely abused the corporate fiction such that it should be in all cases pierced or disregarded.

**The Fake Billion Dollar "Put Option."**

318.    To give himself time to implement his exit strategy, BATISTA needed more than tweets and boasts and he devised other fraudulent stratagems to bolster investor confidence and stimulate further public investment.

319.    However, directors in OGX now started getting cold feet about staying on in the company at the board level, given the likely civil and possible criminal liability they would face when the bubble burst, and several of them resigned.

320.    BATISTA was meanwhile searching for less squeamish candidates for the board of OGX for whom the lure of money would be greater than their fear of consequences and on August 6, 2012, at a general meeting of OGX shareholders, many of them large North American pension plans, including the Florida Retirement System Trust Fund, one such individual was proposed and elected: the Defendant AZIZ BEN AMMAR.

321.    Upon information and belief, AZIZ BEN AMMAR was a prime mover in the "Put Option" stratagem described immediately below.

322.    On October 24, 2012, BATISTA announced to investors, as was duly reported by Bloomberg and the other organs of the financial press that, through EBX, he had entered into a billion dollar "Put Option" with OGX. This was, in essence, a contract between EBX and OGX

for BATISTA to inject $1 billion of his personal wealth in EBX into OGX as additional working capital upon demand.

323.   BATISTA similarly announced that he would be ploughing a billion dollars of his own wealth into OSX, buying stock at three-times market price if and when needed, although that might have to be delayed until 2014 because, as BATISTA said, Brazilian stock exchange rules required a minimum amount of "free float" time.

324.   The announcement that Brazil's golden boy with the Midas touch had a billion dollars-worth of confidence in his oil exploration company, and another billion in his prime satellite ship-building company resulted in an expected boost in share and bond prices.

325.   However, there were at least two fundamental problems with this announcement. The first was that BATISTA had no intention of paying in any money whatsoever. The second was that no amount of money could fix the fundamental problem, which was that there was no oil.

326.   In sum, the OGX Put Option was just another lie, a stratagem created by AZIZ BEN AMMAR and adopted by the co-conspirators to delay the inevitable and allow BATISTA and them all to get as much money as possible *out* of OGX before it collapsed.

327.   In fact, upon information and belief, BATISTA may not have even actually entered into any such commitment on paper. Only much later, and only under pressure from insider creditors, did he ever actually sign such an obligation, and even then it was conditioned on an "out clause" designed to give him some "cover" in backing out - which, as we shall see below, is exactly what he did.

328.   That the Put Option - if it existed - was non-binding was not told to the public. Nor was the fact that BATISTA did not intend to honor it. Nor was the fact that the company was insolvent. Nor was the fact that there just was no oil, and that no amount of money, however long it might be squandered on pointless drilling, could put oil in the ground where no oil existed. All

of this should have been announced via Statements of Material Fact, but was not. The failure to do so constituted fraudulent misrepresentations by omission.

329.   However, the announcement of the Put Option was effective in slowing the fall in price of OGX stock during the fourth quarter of 2012 and fed its rise in January 2013.

330.   The value of LLX - BATISTA's allied logistics company which was building the port at Açu where OSX ships were to offload OGX oil - was conspicuously pegged to the value of OGX and therefore OSX.

331.   In November 2012, MARCUS BERTO was appointed CEO and Investor Relations Officer of LLX to help corral emerging bad news and get the company sold off before the OGX bubble burst. Upon information and belief, BERTO fully understood that OGX was insolvent and the mission was to cash BATISTA out as fully as possible before the crash rendered everything valueless.

332.   To further boost investor confidence, on November 13, 2012, BATISTA tweeted to the world that the Group X operations in the Campos Basin were in an area responsible for 80% of Brazil's oil production.

### Section II -The Plaintiffs Invest

333.   At the start of 2013, no one apart from the insiders, not even the Brazilian regulators, suspected that OGX was a colossal bubble scheme. The consistent, massive lies, spawned by BATISTA, his co-conspirators and his accomplices, repeated over the previous years, had generated an overall base-line impression among investors world-wide of OGX as an oil company with enormous oil reserves and enormous likely margins of profit, whose only impediment to spectacular success was its cash needs until it could come into full production.

334.   That the BATISTA-generated spin was continuing to work in early 2013 was exemplified by announcements such as one published online by Highbeam Reports in January

2013 that London's financial house Barclay's was convinced that "[OGX] presents better opportunities for investors than its federally-owned peer Petrobras . . ." (This was well before the massive Petrobras corruption scandal broke).

335.    As noted above, Gables Capital, Inc. is a registered investment adviser based in downtown Miami, Florida, and at all times material hereto acted as investment adviser to the Plaintiffs and was their agent for the purchase and sale of stocks and bonds.

336.    The individual responsible for the MERIDIAN and AMERICAN accounts was Ms. Judith Neiwirth, Gables Capital's co-founder and Chief Investment Officer, who had over thirty years of experience in the financial services industry.

337.    Ms. Neiwirth had available to her the aggregate spin disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual "lay" internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers.

338.    As a result of the hype generated by BATISTA, described above, the general baseline impression in the international investment market at this time was that OGX was a company that was sitting on spectacular reserves, as evidenced in part by the fact that savvy industry player, Mubadala, had recently bought a 5.63% stake in its holding company for $2 billion.

339.    To investment advisers like Ms. Neiwirth, reviewing the aggregate information on Bloomberg, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar "bonanza," of which BATISTA had consistently represented, started to gush.

340.    It seemed, moreover, that OGX was in no danger of running out of cash, given that BATISTA had pledged an additional billion dollars of operating capital, if and when needed. (The

subtext was further that although there was a trillion dollars of oil to be had, if a billion was not quite enough to bring the gushers online, there would be more cash to come).

341.    BATISTA had further pledged to inject another billion dollars into OSX, if and when needed. Since the future of OSX depended heavily on the future of OGX, this pledge of cash for OSX reinforced the public impression of the value of OGX.

342.    This was therefore a particularly attractive opportunity for purchasers in the bond market. OGX appeared to be asset rich with plenty of operating capital and OGX bonds were at that time yielding above an 8.375% interest rate.

343.    On January 15, 2013, in reliance on the overall picture painted by BATISTA, his intentional misstatements made via his publications on the internet and material omissions, reinforced in her decision to invest by BATISTA's announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17 on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN.

344.    On January 22, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN.

**The EBX/BTG "Strategic Partnership."**

345.    In 2013, BTG Pactual was Brazil's biggest private investment bank, and its Chairman, Andre Esteves, was an iconic Brazilian billionaire on a level with BATISTA. On March 6, 2013, prnewswire.com relayed the following EBX announcement:

> The EBX Group and BTG Pactual announce the signing of a novel strategic cooperation agreement. The agreement contemplates financial advisory services,

63

credit facilities and future long-term capital investments for the transformational projects currently being developed by the EBX Group in its segments. "This cooperation represents, above all, a partnership for the success of Brazil", said Eike Batista, EBX Group's CEO and Chairman.

This new cooperation will have a Strategic and Financial Management Committee comprising of senior executives from the EBX Group and of senior partners of BTG Pactual. The Committee will be led by Eike Batista and Andre Esteves and will meet on a weekly basis to discuss overall strategies relating to EBX Group's capital structure and investments for the short, medium and long-term projects and activities of the group's portfolio of companies. The agreement does not grant any exclusivity for BTG Pactual to render financial services to the EBX Group.

BTG Pactual's remuneration will be solely based on the performance of the EBX Group's public companies. Andre Esteves, BTG Pactual's CEO, stated that: "This cooperation shows once again our firm willingness to support unique projects and national entrepreneurship, areas in which Eike Batista is an icon."

346.   This EBX announcement was intended to convey the underlying message that BTG Pactual, one of the largest and most sophisticated players in the Brazilian financial market, saw enough value in BATISTA's empire that it was willing to "partner" with EBX, without any promise of exclusivity, and plough in cash to finance "short, medium and long-term projects," with its own profits completely contingent on the success of the EBX ventures.

347.   The phrasing of this release was another BATISTA stratagem intended to dress up the fact that OGX desperately needed money to delay its inevitable financial collapse by using the language of opportunity and the purported confidence of savvy bankers in the worth of his operation.

348.   Predictably, OGX share prices shot upwards, closed up 16%, and rallying as much as 27.7% in the day following the announcement. On March 7, 2013, the announcement came across on the Bloomberg terminal on Ms. Neiwirth's desk at Gables Capital in Miami, Florida, coupled with a report that BTG Pactual was willing to extend BATISTA's EBX another billion dollars for liquidity.

349.   On March 13, 2013, BATISTA had OGX release another Statement of Material Fact to investors declaring that oil recovery from the Pipeline, Fuji and Ilimani formations was

commercially feasible, announcing an on-site amount between a half billion and 1.3 billion barrels of oil, and conveying the impression that commercial production was imminent.

350.    However, as BATISTA knew, the truth was that only a tiny percent of the oil detected was recoverable and commercial feasibility was impossible.

351.    On March 22, 2013, BATISTA tweeted that OGX had eight acknowledged oil commercial accumulations: three onshore, in Maranhao, and five offshore.

352.    But, despite BATISTA's continuing misrepresentations, the stock price began to fall.

353.    On March 23, 2013, Bloomberg reported that BATISTA via Twitter had warned short sellers wagering against his companies that they would regret their bets. Asked by other Twitter users about the companies' falling stock prices, BATISTA had written that "rumors and gossip are tools of short sellers" who will be "caught with their pants down," and he directed his readers to an interview with BTG Pactual President, Andre Esteves.

354.    In that March 23, 2013, interview BTG Pactual President, Andre Esteves, had stated that BATISTA's companies were in no danger of failing and that BATISTA remained one of the best capitalized business men in Brazil.

355.    Well before the "strategic partnership" announced on March 6, 2012, BTG Pactual had been doing due diligence on OGX, which was the prime asset of BATISTA's holding company, EBX, in order to act as its financial consultant and potential provider of long-term financing. BTG Pactual must therefore have known how precarious a position OGX was in. The public, however, took its Chairman's statement as being true.

356.    Upon information and belief, Mr. Esteves' statement on behalf of BTG Pactual was intentionally false and was issued pursuant to an agreement with BATISTA. It is unknown what the consideration for the deal may have been. (In late 2015 Mr. Esteves was arrested in Rio,

stepping off a plane from Miami, Florida, in connection with charges of obstruction of justice in the Petrobras corruption investigation and was placed under house arrest).

357.    On March 26, 2013, OGX released its financial statement for 2012. Under "Message from the Management," Defendant LUIZ CARNEIRO, Chief Executive Officer of OGX, stated, "In parallel to the development of our fields, we made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations, and we continue our studies on how to best develop them."

358.    However, as BATISTA, CARNEIRO, and the other co-conspirators knew, none of these fields were commercially viable and OGX was insolvent. These were deliberately fraudulent misrepresentations.

359.    On March 28, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN.

360.    On April 1, 2013, MERIDIAN received its first interest payment of $432,359.38 on its OGX bonds and AMERICAN received its first interest payment of $146,562.50.

361.    On April 12, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN.

362.    As was not discovered until September 2016, during April 2013, BATISTA's CENTENNIAL ordered a Panamanian subsidiary, Goldenrock, to pay a $2.3 million kickback, upon information and belief, to Brazilian officials, from its account at TAG Bank in Panama, for the $922 million OSX shipbuilding contract awarded in mid-2012. It is believed that Goldenrock was one of at least two shell companies which upon information and belief held accounts at TAG Bank – the other being Blue Diamond, which BATISTA used to hold slush funds for the bribery of officials and others useful to his scheme. In April 2013, CENTENNIAL wired $111,798,818.97 million from an account Batista controlled at BTG Pactual in the Cayman Islands to TAG Bank for safekeeping and to top off BATISTA's slush fund.

**The $850 Million "Investment" by Petronas.**

363.    BATISTA knew that the sale of supposed oil "assets" to other supposedly savvy players in the oil industry would create confidence in OGX and in its other dependent enterprises as it would reflect the fact that the buyer, after doing due diligence, saw value in the OGX asset, and therefore so should other investors; and OGX would have yet more working capital, so nobody invested in its future should worry that it could not pay its way until coming into full production.

364.    The Defendant AZIZ BEN AMMAR was charged by BATISTA with attempting to close an asset purchase deal with the Malaysian State-owned oil company Petronas. Upon information and belief, BATISTA authorized BEN AMMAR to spend in excess of $10 million to help "grease the wheels" of the process.

365.    On or about May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Basin. The news of the $850 million Petronas deal was picked up and reported across the world and had its intended effect.

67

366.     Thus, on May 8, 2013, London's Financial Times reported online that BATISTA had sold an $850 million stake in OGX assets to Malaysia's state-run Petronas. The article noted that shares in OGX were the biggest risers of Brazil's stock exchange that day. The good news came across the Bloomberg terminal screen on Ms. Neiwirth's desk.

367.     That same day, The Wall Street Journal reported online, "Petronas's purchase of stakes in the two Tubarao Martelo blocks, with *reserves* estimated at 145 billion barrels of oil, will give OGX much-needed cash to fund fresh investments. The Malaysian and Brazilian companies announced the deal in separate statements." (Emphasis added)

368.     Similarly, BNAmericas announced online, "Brazil's OGX has confirmed an US $850mn farm-out deal with Malaysian giant Petronas for a share of two oil and gas blocks off the coast of Rio de Janeiro. The deal hands the Kuala Lumpur-based firm a 40% non-operating working interest in the Campos basin's BM-C-39 and BM-C-40 blocks, OGX said in a statement. In addition, Petronas has an option to purchase 5% of OGX's capital stock at a price of 6.30 reais until April 2015."

369.     The quote from OGX in the article continued, "OGX's partnership with Petronas underscores the quality of our asset and the potential of the Tubarão Martelo field, where production is expected to commence by the end of the year," OGX chief executive CARNEIRO said, "[w]ith more than 32Bb of recoverable resources and a production of about 2Mboe/d, Petronas' expertise will enhance the continued development of oil production in these areas."

370.     However, as CARNEIRO and the other co-conspirators knew, this was a lie. There was virtually no commercially recoverable oil. OGX was a complete bust and would soon collapse.

**Meridian Invests in More OGX Bonds.**

371.     The news of the supposed Petronas purchase came across the Bloomberg terminal screen on Judy Neiwirth's desk in Miami, Florida, on May 8, 2013. The Bloomberg report also

recited a supposed quote from the buyer, "Petronas views the acquisition as a highly attractive investment opportunity in terms of asset quality and for strategic future growth in Brazil."

372.    Investors in OGX bonds were spurred to make greater purchases by this news. According to Reuters News Agency, investment in OGX bonds by the massive U.S. investment fund, Pimco, climbed as high as $800 million during May 2013.

373.    On May 20, 2013, in continued reliance on the vaunted future profitability of OGX, and BATISTA's commitment to inject a billion dollars if and when needed, and further encouraged by the announcement of the Petronas deal, Gables Capital, in Miami, Florida, directed the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN.

374.    However, the truth was, in fact, that there was no actual "Petronas deal" as portrayed to the public. The deal had many contingencies, including OGX restructuring its debt and reaching certain production targets.

375.    Upon information and belief, it was Batista's strategy to convey the message that sophisticated investors saw great value in the future of OGX.

376.    Why Petronas – currently wracked by its own massive corruption scandal - did not correct the OGX presentation or market perception at that time is unknown before discovery.

**Batista Secretly Cashes Out.**

377.    While doing his best to encourage investor confidence and continued investment in OGX, between May and June 2013, BATISTA secretly instructed EBX to sell off 126.65 million shares in OGX.

378.    BATISTA was also siphoning off cash in huge amounts. According to a much later released confidential letter from the Cleary Gottlieb law firm, representing a cadre of large insider

creditors in June 2013, BATISTA funneled out $450,000,000 to an affiliate without justification just that month.

379.    It is not known before discovery where that money went but it is believed that a substantial amount was routed directly or intermediately through the corporate co-conspirators and accomplices the 63X companies, members of the EBX group and the CENTENNIAL companies, to the THORQUE Companies' accounts and to bank accounts in various countries.

380.    Then in early June 2013, BATISTA put another layer of insulation between himself and his creditors by transferring $30 million from an account in Brazil to a Citibank account in Brazil in the name of his son, THOR BATISTA. It is believed that the funds were thereafter funneled out of Citibank Brazil to the Citibank trust account of a BATISTA professional in Miami, and onwards to Switzerland or other secrecy jurisdiction.

381.    On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign.

382.    However, when the news hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm.

383.    BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the restructuring of the group which was now complete that same month of June" and that no further shares would be sold. However, this would prove to be a lie.

384.    On June 20, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, and reassured by BATISTA's news of his stock sale being just a "one-off adjustment," Gables Capital, in Miami,

Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the secondary market on behalf of its client, MERIDIAN, as trustee.

385.     MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98.

386.     However, on July 1, 2013, OGX was finally forced to admit by a Statement of Material Fact that a number of its wells in the Campos Basin were unproductive and, cryptically, that none of its projections should be relied upon, which resulted in a plunge in OGX share prices.

387.     Critically, however, BATISTA failed to announce: that there was in actual fact virtually no commercially recoverable oil; that the Mubadala and Petronas investments had been massive loans and Petronas was not obliged to perform unless OGX was re-structured; that behind the scenes Mubadala, who knew the exact state of affairs, was realizing on its securities; and lastly, he failed to disclose his intention to dishonor the billion dollar put option, if and when demanded.

388.     In fact, in the face of certain knowledge that OGX was insolvent and had no oilfields likely to generate significant recoverable oil, BATISTA continued to spawn lies about projected future profitability.

389.     Thus, on July 3, 2013, Bloomberg relayed the news that OGX had declared the Remora field in the Campos Basin commercially viable.

390.     Unfortunately, this was just another lie.

**Batista Makes Further Fraudulent Transfers.**

391.     Upon information and belief, during these months, in line with his overall game-plan, BATISTA was moving the assets still in Brazil that were the most vulnerable to attachment out of his name and into the names of family members, leaving himself immune from collection.

392.     Upon information and belief (according to the Brazilian indictments) BATISTA transferred two buildings in Rio with an aggregate value of approximately $20 million into the

names of his sons THOR BATISTA and OLIN BATISTA; he moved $60 million from an account in Brazil to a Citibank account in the name of THOR BATISTA; and he transferred approximately $7 million in cash plus a $2 million apartment in Ipanema to FLAVIA SAMPAIO, his girlfriend and mother of his infant son, Balder.

393.    Upon information and belief, BATISTA, his co-conspirators, and accomplices had by this time moved the bulk of his and their liquid assets out of Brazil and off to secrecy jurisdictions, where they were held in cash, or reinvested in stock in ventures likely to actually prove to be profitable, or in real estate and other more secure investments in other countries, typically through the medium of shell companies to act as "blinds" between the asset and the ultimate beneficial owners.

**Mubadala Secretly Pulls Out.**

394.    During early July, 2013, news began to leak out that the Mubadala deal, which had been announced as an equity investment and seen as BATISTA's ultimate stamp of approval by the investment community, providing important backing for BATISTA's ambitions by a major global sovereign wealth fund, had in fact been nothing of the sort, but rather a huge loan, collateralized by plum assets and personal guarantees.

395.    Moreover, behind the scenes, Mubadala, which had inside knowledge as to the true state of affairs in BATISTA's companies and was not prepared to wait for the disaster that it could see from the actual records, had over the course of many months been demanding and receiving the surrender of collateral and the partial repayment of its loans to reduce its exposure to the greatest extent possible. The fact that Mubadala was pulling out should have been released to the investment community as a material fact, but was not.

396.    BATISTA publicly tried to put the best spin possible on the leaked news, characterizing the OGX payments to Mubadala as the partial redemption of an "investment" rather

than the repayment of a loan. Mubadala did not deny this characterization. However, neither EBX nor Mubadala would provide details of the restructuring.

397.    Upon information and belief, the process of asset stripping was carried out by lawyers at Maples & Calder in the Cayman Islands. According to the online version of The Legal 500 regarding Maples & Calder, "[o]ther major instructions included Simon Firth advising Eike Batista's EBX Group on the ongoing restructuring of its strategic partnership with Mubadala Development Company." Cayman Islands, Corporate and Commercial, *Maples and Calder*, The Legal 500 (last visited Oct. 11, 2016), http://www.legal500.com/c/cayman-islands/corporate-and-commercial.

398.    Mubadala had gone along with the initial public mischaracterization of its loan as an "equity investment" and had secretly stripped plum assets from the BATISTA companies under cover of an announced "partial redemption" of that investment, all of which tends to indicate complicity in the fraud. Plaintiffs reserve the right to add Mubadala as a Defendant should discovery confirm a basis to do so.

**The 10.8 Billion Barrel Lie – Recap.**

399.    Despite the fact that OGX was now on a very fast countdown to collapse, BATISTA resolutely kept on publicly trumpeting a rosy vision of the future for OGX, completely disconnected from any shred of reality.

400.    Thus, on July 19, 2013, BATISTA once again blared out reassurances for distribution through the internet press [Bloomberg Businessweek, Financial Times, Fox Business, San Francisco Chronicle] that, as D&M had stated in a 2011 Report, OGX had reserves amounting to 10.8 billion barrels and that regardless of all else, he would stand by the company and honor all of his obligations.

401.    However, BATISTA had always known that the various OGX projections had been lies. That had been confirmed by the internal OGX Task Force and Schlumberger Task Force Reports in late 2012 and all the evidence since then had reinforced the point and he had neither the capacity nor the intention to make good on all his debts, let alone compensate all of the many victims of his fraud.

402.    On July 22, 2013, D&M again demanded of BATISTA, privately, that he retract the 10.8 billion barrel lie and detach the D&M name from it. BATISTA did not do so.

403.    On August 14, 2013, it was reported that Luciano Coutinho, the President of the Brazilian development bank, BNDES, which had loaned BATISTA billions of dollars and must have done due diligence that showed otherwise, announced that BATISTA's OGX had "high-quality assets with which it can rebalance itself." It is unknown before discovery what inducement BATISTA supplied for him to state this lie.

404.    On August 16, 2013, the Tubarão Azul oilfield was closed down, having produced roughly 5 million barrels throughout its life, or just 1% of the minimum estimate announced in 2010. This was OGX's best field.  There would be a later attempt to operate this field post-bankruptcy. This attempt, however, would prove futile and the field was eventually returned to the Brazilian government.

405.    The task BATISTA had set for MARCUS BERTO was, upon information and belief, to get the EBX stake in LLX secretly monetized before the OGX crash, and the crash of OSX which would follow on its heels, leaving the LLX port project without its anchor tenant.

406.    On August 15, 2013, in a filing with the Brazilian Securities and Exchange Commission, BATISTA belatedly confirmed that he was selling a controlling stake in LLX for $560 million to U.S.-based EIG Global Energy Partners.

74

407. Upon information and belief, therefore, this was "mission accomplished" for MARCUS BERTO.

408. Disastrous news was also now emerging about BATISTA's MMX, iron ore "producing" company, which had been fined $1.8 billion for unpaid taxes, equivalent to nearly 80% of its market value. BATISTA's hand-picked managers at MMX were trying to sell off this company, too, before the others crashed all around it.

409. In August and September 2013, BATISTA secretly sold another 227 million shares in OGX, which earned him approximately $35 million and which, upon information and belief, he routed to one of his foreign accounts.

410. Though not discovered until near the end of the year, and then reported by the journalist Elio Gaspari in the Rio de Janeiro daily paper, O Globo, at least ten OGX executives left the company during these final months, with parting payments ranging between $46 million and $92 million each, further stripping cash out of the company.

411. On September 4, 2013, having milked as much as he could out of OGX, AZIZ BIN AMMAR resigned from the Board and reportedly fled the country for New York where he is reported to presently reside in luxury in a $10 million apartment believed to have been acquired with a small part of his takings.

412. With the OGX bankruptcy just days away, upon information and belief, BATISTA attempted to transfer another $100 million in corporate funds from a BTG Pactual correspondent account in The Bahamas to a Miami, Florida, account at Citibank, believed to be a THORQUE Company bank account.

413. Upon information and belief, Andres Esteves, billionaire Chairman of BTG Pactual, initially refused to make this transfer, however, because he feared that BTG Pactual would become liable as an accomplice to BATISTA's fraud on creditors.

414.    It is unknown whether those funds remain "stranded" in The Bahamas, or have been routed out on BATISTA's instructions to one of his other accounts.

415.    Equity investors and bond holders were still relying on the fact that there was value in OGX. This belief was due to the fact that as recently as May 2013, a foreign oil company, Petronas, had apparently invested close to a billion dollars of its own money in the OGX oil fields.

416.    On top of that, BATISTA himself was obliged to inject $1 billion in cash into OGX, if and when needed, through the Put Option. (And in 2014, into OSX through a similar Put Option). All that was needed apparently was for OGX to have enough cash to stay in business until the oil started to flow.

417.    The OGX Put Option representation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which Ms. Neiwirth took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true.

### Section III - The OGX Oil Bubble Bursts

418.    On September 6, 2013, OGX's Controller, desperate for cash, formally demanded from BATISTA the first $100 million under the Put Option.

419.    BATISTA, who had never had any intention of paying a single penny *into* OGX, shocked investors by refusing to pay this or any other obligation under the Put Option, claiming the benefit of an "out clause," which - if an actual document even existed - he had inserted for that purpose.

420.    The arrival of OSX III, yet another massive floating production, storage and offloading vessel at the Tubarão Martelo field, on October 1, 2013, raised momentary hopes that OGX might soon start producing offshore oil from the field. But by close of business that same day, OGX missed a bond payment in the amount of $45 million.

76

421.    On October 28, 2013, MARCUS BERTO formally stepped down at LLX, resigning as President and Director of Investor Relations and handed over to the new owners' appointed management and left for Miami, Florida.

422.    It is believed that MARCUS BERTO had been awarded a significant interest in the company by BATISTA for his services, part of which he invested in what is reported to be a $9.5 million Key Biscayne, Florida, mansion.

423.    On October 30, 2013, OGX filed for bankruptcy in Rio de Janeiro disclosing debts of $5.1 billion, of which roughly $3.6 billion was owed to U.S. and other foreign bondholders.

424.    Pimco, the world's largest bond investor, based in California, and BlackRock, the world's largest asset manager, from New York, had front-row seats for the collapse.

425.    Bondholders like the Plaintiffs and, upon information and belief, other investors from Florida, such as the Florida Retirement System Trust Fund, were among the horde of other investors that were basically wiped out.

426.    OGX's satellite company, MMX, filed for bankruptcy on October 22, 2013.

427.    OGX's satellite company, OSX, filed for bankruptcy on November 11, 2013.

428.    In November 2013, Petronas announced that it would not pay the $850 million, which investors had expected under the alleged "deal" that BATISTA had broadcast in May of that year, disclosing that the deal had been contingent on OGX being able to re-structure its debt.

429.    By February 2014, virtually all of the blocks which OGX had leased had been returned to the Brazilian Government as worthless.

**Batista's "Brazilian Dream" Turns to Nightmare.**

430.    For everybody with an interest in OGX and its satellite companies - except for BATISTA, his co-conspirators, and accomplices - the "Brazilian Dream" BATISTA had boasted of in the April 30, 2012, Milken interview, had now turned to a nightmare.

77

431.   The shareholders and ordinary bondholders who had invested billions of dollars in OGX, predominantly from the U.S., had now been essentially wiped out in what is currently the largest default in Latin American history.

432.   BATISTA and a number of his co-conspirators and accomplices have been indicted for market manipulation and insider trading in Brazil. These proceedings are expected to last a decade or more, with no real hope of securing punishment of the perpetrators of the fraud or restitution for the victims.

433.   As one of his "defenses" in the criminal proceedings in Brazil, BATISTA has contended that the conditions of the leases required that OGX continue to explore for oil until it declared a field to be commercial or return it to the government. BATISTA therefore had OGX declare fields to be commercial to avoid incurring the cost of exploration or having to return them as worthless, trusting that some future technological advance would allow OGX to commercially recover what were presently unrecoverable resources. In other words, BATISTA has admitted that those representations to investors were false.

434.   In November 2015, Brazil's market regulator, the CVM, banned BATISTA from managing a publicly traded company for a derisory five years.

**Batista's Silver Lining.**

435.   BATISTA and his co-conspirators, however, are all believed to have done well out of the scheme, having received sums ranging from tens of millions of dollars to hundreds of millions of dollars apiece.

436.   All the lies about BATISTA being listed somewhere in the league of the world's richest men can now be seen to have *always* been a lie. The number on which that supposed position ranking was predicated was the sum total of money paid in by investors in expectation of profits from oil that never existed.

437.    In actual fact, BATISTA's original net worth before the OGX fiasco was probably in the hundreds of millions of dollars, and his actual current assets, mainly squirreled away abroad, are probably significantly more than what he began with.

438.    Thus, BATISTA and his family continue to live an untouchable life of luxury in Brazil. It is reported that he believes that he has "zeroed his debts" through the bankruptcies. Apparently the billions of dollars of which he bilked his victims does not count.

439.    That BATISTA has massive wealth remaining is shown by the fact that in March 2016, he threw $130,000.00 in gold coins from the deck of his yacht into the Atlantic Ocean to propitiate the "Queen of The Sea," and turn the course of his luck for his next enterprise.

440.    In July 2016, with all funds successfully routed out to safety, THOR BATISTA quietly closed down the THORQUE Companies in The Bahamas. Notice of the dissolution was given solely by means of a newspaper of tiny local circulation in The Bahamas on July 28, 2016. Copies of the notices are shown here:

441.    As previously mentioned, the Tubarão Azul oilfield had been OGX's best prospect. Under BATISTA it had achieved less than 1% of the flow promised. On September 20, 2016, three years post-bankruptcy, after the successor entity had ploughed many more millions into its exploration, the Tubarão Azul oilfield was returned to the Brazilian government as worthless.

**The Plaintiffs' Claim.**

442.    Through restructuring in the OGX bankruptcy, MERIDIAN's close to $17 million dollars in bonds has been translated into shares in a new version of OGX with a face value of $279,746 for which credit is given. MERIDIAN's net loss is $16,438,233, plus interest.

443.    Through restructuring in the OGX bankruptcy, AMERICAN's close to $4 million in bonds has been translated into shares in a new version of OGX with a face value of $62,166, for which credit is given. AMERICAN's net loss is $3,872,616, plus interest.

444.    The Plaintiffs have retained the undersigned attorneys to prosecute this action and are obliged to pay them a reasonable fee.

445.    As of the date of filing this Complaint, the Plaintiffs have already commenced proceedings ancillary to this action, restricting Batista and the 63X Companies from dissipating assets and to obtain information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

446.    In the Cayman Islands, after a multi-day hearing, the Judge, consistent with Cayman Islands law, entered an Order freezing the assets of Batista and the 63X Companies worldwide and ordered disclosures for information regarding accounts and transfers owned and controlled by Batista and the 63X Companies.

447.    In the Bahamas, consistent with Bahamian law, the Judge similarly entered an order for the disclosure of information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

448.    BATISTA and the 63X Companies have been notified of these foreign proceeding. Upon information and belief, BATISTA is actively avoiding service of the Cayman Orders.

## COUNT I
## FRAUD

Plaintiffs re-allege paragraphs 1-7, 9-11, 13-14, 28-448 against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO and AZIZ BEN AMMAR, as follows:

449.    Each of the above named Defendants personally participated in the fraudulent scheme and composed and transmitted material fraudulent misrepresentations, and assisted each other in maintaining the credibility of material misrepresentations as detailed above.

450.    As detailed above, each of them issued and assisted in issuing false statements concerning specific material facts, with actual knowledge that the representations were false, with the intention that investors would thereby be induced to rely on such representations to their consequent financial loss.

451.    In directing their individual and collaborative misrepresentations to the United States, the named Defendants necessarily targeted investors in the most populous States of the United States, of which Florida is the third, behind only California and Texas. They did so in the expectation of personal gain and of causing loss to their targets.

452.    Plaintiffs' investment agent, Gables Capital Management, in Miami, Florida, was a target of such misrepresentations and relied on the same and was thereby induced by such fraudulent misrepresentations to buy OGX bonds on behalf of the Plaintiffs in the total amount of $21,231,683.00.

453.    The OGX bonds were and are virtually worthless, as a result of which Plaintiffs have been damaged in the sums alleged.

454.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

81

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT II
## CONSPIRACY TO DEFRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

455.    The foregoing Defendants agreed to and did conspire together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors.

456.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT III
## AIDING AND ABETTING FRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X

MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

457.   The foregoing Defendants aided and abetted BATISTA and his co-conspirators and accomplices and rendered substantial, material assistance to him and them, in ways, upon dates, and in places, that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme and to assist in secreting the proceeds in false names and in jurisdictions where they would not be available for the satisfaction of the legitimate debts of creditors, wherefore they are additionally liable as aiders and abettors.

458.   Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

### COUNT IV
### FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT
### (f/k/a "FLORIDA RICO")

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

**The Criminal Enterprise.**

459.    Upon the basis of the facts alleged, BATISTA is and was the prime directing and controlling force at the head of a criminal enterprise within the meaning of Fla. Stat. § 772.102(3) comprised of himself, the joined Defendants, and many other co-conspirators, aiders, abettors, and accomplices not joined.

460.    The enterprise had as its common purpose the criminal aspirations and ambitions of BATISTA for the accumulation of wealth through a pattern of racketeering activity for further investment, enjoyment and transmission down through the generations of his relatives, friends co-conspirators and accomplices.

461.    Such enterprise is referred to collectively as "the Batista Crime Family" and the Defendant individuals and entities comprising such as "members of the Batista Crime Family" or "members of the enterprise."

462.    All members of The Batista Crime Family acted, in regard to each listed predicate act as described below and as to the overall pattern of racketeering activity, with criminal intent.

**Pattern of Criminal Activity.**

463.    By reason of the allegations made herein, the members of the enterprise engaged in a pattern of criminal activity as stated in Fla. Stat. § 772.102(4).

**Predicate Acts of Criminal Activity.**

464.    The Defendants actively participated in the enterprise, the Batista Crime Family, through the stated prohibited activities contrary to Fla. Stat. § 772.103 in the course of a pattern of criminal activity under Fla. Stat. § 772.102(4) which entitle Plaintiffs to civil remedies under Fla. Stat. § 772.104.

**Predicate Act I - Florida Securities Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

465.   As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly employed a device, scheme, or artifice to defraud, contrary to Fla. Stat. § 517.301(1)(a)(1).

466.   As set forth above, the stated Defendants have further committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly obtained money or property by means of untrue statements of material facts or any omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, contrary to Fla. Stat. § 517.301(1)(a)(2).

467.   As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon persons, including Plaintiffs, contrary to Fla. Stat. § 517.301(1)(a)(3).

**Predicate Act II - Federal Wire Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

468.    As set forth above, the stated Defendants have committed numerous acts of wire fraud in that they, having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, contrary to 18 U.S.C. § 1343.

**Predicate Act III - Federal Money Laundering - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT, OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.**

469.    As set forth above, the stated Defendants committed numerous acts of money laundering in that they knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from unlawful activity contrary to 18 U.S.C. § 1957. As stated above, the acts of money laundering variously took place in the United States pursuant to 18 U.S.C. § 1957(d), or was committed outside the U.S. by "U.S. persons" including U.S. nationals, U.S. permanent residents, corporations formed in the U.S. and foreign subsidiaries of such persons as defined in 18 U.S.C. § 3077.

**Predicate Act IV - Florida False Advertising - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR.**

470.    As set forth above, the stated Defendants committed numerous acts of misleading and deceptive advertising, contrary to Fla. Stat. § 817.40(5), in that they made or disseminated or caused to be made or disseminated before the general public of the state, or a portion thereof, misleading advertisements, which were fraudulent and unlawful, which the Defendants knew or should have known were false, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

**Predicate Act V - Florida Theft - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

471.    By reason of the foregoing the stated Defendants, with criminal intent, knowingly obtained or used, or endeavored to obtain or use, the Plaintiffs' property and the property of others through fraud, deceit, false pretenses and/or conduct of similar nature, with the intent to permanently deprive the Plaintiffs and such others of their right to their property or their benefit of their property, and further, knowingly and with criminal intent appropriated such property to their own use contrary to Fla. Stat. § 812.014.

**Predicate Act VI - Florida Communications Fraud: Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

472.    As set forth above, the stated Defendants engaged in a scheme to defraud, in that they engaged in a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto contrary to Fla. Stat § 817.034(4)(a), 817.034(3)(b), 817.034(3)(c), and 817.034(3)(d).

473.    Further by reason of the matters set forth above, the stated Defendants furthered a scheme to defraud, in that they furthered a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto, and in the course thereof communicated with persons with the intent to obtain property from such persons contrary to Fla. Stat § 817.034(4)(b).

**Civil Remedy.**

474.    As a result of the Defendants' participation in the criminal enterprise and its perpetration of the aforesaid pattern of criminal activity, Defendants caused injury and damage to Plaintiffs.

475.    By reason of the foregoing, Defendants have, with criminal intent, received proceeds derived directly or indirectly from a pattern of criminal activity and have used or invested the same, or a part thereof, directly or indirectly, or the proceeds derived from the investment or

use thereof, in the acquisition of title to, or a right, interest, or equity in, real property or in the establishment or operation of an enterprise, contrary to Fla. Stat. § 772.103.

476.    By reason of the foregoing, Defendants have, with criminal intent, through a pattern of criminal activity acquired or maintained, directly or indirectly, an interest in or control of enterprises or real property; have been employed by of associated with an enterprise to conduct or participate, directly or indirectly, in a pattern of criminal activity; conspired or have endeavored to violate provisions of subsection (1), subsection (2), or subsection (3) of Fla. Stat. § 772.103.

477.    By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Fla. Stat. § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, statutory treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

### COUNT V
### FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT CONSPIRACY
### (f/k/a "FLORIDA RICO CONSPIRACY")

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

478.    The members of the Batista Crime Family conspired and agreed together at numerous times and on various dates and in various places to participate in the fraudulent scheme and in the affairs of the criminal enterprise through a pattern of racketeering activity contrary to Florida Statute § 772.103(4), by reason of which Plaintiffs were damaged and are consequently entitled to civil remedies under Florida Statute § 772.104.

479.    By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Florida Statutes § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

<div align="center">

**COUNT VI**
**FALSE AND MISLEADING ADVERTISING**

</div>

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-14, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR, and say as follows:

480.    Defendants committed numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1), and that they caused such loss in fact to Plaintiffs.

481.    Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

482.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

## COUNT VII
## CONSPIRACY TO COMMIT FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-25, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

483.    Defendants conspired together to commit and did commit numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

484.    Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

485.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

91

## COUNT VIII
## CIVIL THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-25 and 28-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

486.    By reason of the foregoing acts alleged, the Defendants committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Florida State § 772.11, including treble damages, attorneys' fees and the expenses of this action.

487.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT IX
## CONSPIRACY TO COMMIT THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

488.    The foregoing Defendants with criminal intent, conspired together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and performed the stated acts in pursuance of such agreement in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

489.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT X
### AIDING AND ABETTING THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-5, 7-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

93

490.    The foregoing Defendants, with criminal intent, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, aided and abetted BATISTA in achieving the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

491.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

### COUNT XI
### FLORIDA UNIFORM FRAUDULENT TRANSFERS ACT

Further or alternatively, Plaintiffs allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

492.    The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, made fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a

94

reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and each of the other liable Defendants were engaged or was about to; engage in a business or a transaction for which his and their remaining assets were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he or they would incur, debts beyond his or their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the asset transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

### COUNT XII
### CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

95

493.    The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, conspired with BATISTA and others among themselves, to make fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and such other liable Defendants were: engaged or were about to engage in a business or a transaction for which his or their remaining assets were unreasonably small in relation to the business or transaction; intended to incur, or believed or reasonably should have believed that he and they would incur, debts beyond his and their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the assets transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,
ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282
Carlos F. Osorio
Florida Bar No.: 597546

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY

COMPLEX BUSINESS LITIGATION DIVISION

**MERIDIAN TRUST COMPANY**, as trustee, and **AMERICAN ASSOCIATED GROUP, LTD.**,

Case No. 17-001040 CA (43)

      Plaintiffs,

vs.

**EIKE BATISTA,** *et al.*

      Defendants.

_____/

## MARCUS BERTO'S MOTION TO DISMISS COMPLAINT

     Defendant, Marcus Berto ("Berto"), pursuant to Florida Rule of Civil Procedure 1.140, moves to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted against Berto, and in support thereof states as follows:

### I.

### BACKGROUND

     Although the length and prolixity of the Complaint make the allegations difficult to summarize, this lawsuit arises from the Defendants' allegedly fraudulent activities in relation to the issuance of bonds in OGX, a Brazilian, publicly-traded, oil exploration company. Plaintiffs accuse Defendant, Eike Batista ("Batista"), of making materially misleading statements or omissions to the market at large concerning OGX, and Defendants generally of conspiring with Batista to mislead investors. Plaintiffs allege that they "invested over $21 million in worthless OGX bonds <u>through their Florida investment adviser</u> on the basis of Batista's fraudulent misrepresentations." (Complaint, p. 2) (emphasis added).

Plaintiffs do not allege that Berto actively participated in the fraud. Rather, Plaintiffs allege that, years after the alleged fraudulent conduct occurred, Berto acted as the CEO of LLX, a Brazilian, publicly-traded, logistics company in which Batista held an unspecified interest. (Complaint, ¶¶ 78-80). Plaintiffs further allege that Berto helped Batista by "cash[ing] Batista out" of LLX in anticipation of OGX's crash, (Complaint, ¶ 331), and by introducing him to "international asset protection specialists" who created "various international structures" to "hide the proceeds of the fraud." (Complaint, ¶ 300).

The complaint is 97 pages long and contains 493 allegations. Yet, the totality of the Complaint's allegations concerning Berto is scant:

> Defendant, MARCUS BERTO ("MARCUS BERTO" OR "BERTO") is and was at all material times an individual resident in Florida and Brazil. (Complaint, ¶ 12).

> Defendants, WERNER BATISTA, MARCUS BERTO and FLAVIO GODINHO are residents of Florida and subject to the general jurisdiction of its Courts. (Complaint, ¶ 28).

> Defendant, MARCUS BERTO, was a long-standing BATISTA confidant who was in December, 2012 appointed CEO and Investor Relations Officer of LLX, BATISTA's allied logistics company, to help secretly sell off the company ahead of the crash of OGX. (Complaint, ¶ 78).

> Upon information and belief, BERTO knew that OGX was insolvent by the end of 2012 and conspired with BATISTA and agreed to help set up a Swiss trust, through professionals in Miami, Florida, to which BATISTA could funnel his personal profits from the scheme. (Complaint, ¶ 79).

> Upon information and belief, BERTO was the first trustee of that trust and in that capacity established its Swiss and other foreign banking relationships. (Complaint, ¶ 80).

> After OGX collapsed, BERTO left Rio de Janeiro for Key Biscayne, Florida, where he is believed to have invested part of the proceeds he realized from the fraud in a multi-million dollar mansion. (Complaint, ¶ 81).

> The task BATISTA had set for MARCUS BERTO was, upon information and belief, to get the EBX stake in LLX secretly monetized before the OGX crash,

and the crash of OSX which would follow on its heels, leaving the LLX port project without its anchor tenant.  (Complaint, ¶ 405).

On August 15, 2013, in a filing with the Brazilian Securities and Exchange Commission, BATISTA belatedly confirmed that he was selling a controlling stake in LLX for $560 million to U.S.-based EIG Global Energy Partners. (Complaint, ¶ 406).

Upon information and belief, therefore, this was "mission accomplished" for MARCUS BERTO.  (Complaint, ¶ 407).

On October 28, 2013, MARCUS BERTO formally stepped down at LLX, resigning as President and Director of Investor Relations and handed over to the new owners' appointed management and left for Miami, Florida (Complaint, ¶ 421).

It is believed that MARCUS BERTO had been awarded a significant interest in the company by BATISTA for his services, part of which he invested in what is reported to be a $9.5 million Key Biscayne, Florida, mansion.  (Complaint, ¶ 422).

The Complaint alleges the following counts: (1) Fraud; (2) Conspiracy to Defraud; (3) Aiding and Abetting Fraud; (4) Florida Civil Remedies for Criminal Practices Act; (5) Florida Civil Remedies for Criminal Practices Act Conspiracy; (6) False and Misleading Advertising; (7) Conspiracy to Commit False and Misleading Advertising; (8) Civil Theft; (9) Conspiracy to Commit Theft; (10) Aiding and Abetting Theft; (11) Florida Uniform Fraudulent Transfers Act; and (12) Conspiracy to Commit Fraudulent Transfers.  Plaintiffs have named Berto in all counts, except the fraud count.

## II.

## ARGUMENT

### A.

### The Relevant Standard

"The purpose of a motion to dismiss is to test the legal sufficiency of the complaint." *Pac. Ins. Co. v. Botelho*, 891 So.2d 587, 590 (Fla. 3d DCA 2004).  When considering a motion to

dismiss, the trial court must accept the well-pled allegations of the complaint as true, and may not go beyond the four corners of the complaint in considering the legal sufficiency of the allegations. *See Minor v. Brunetti*, 43 So.3d 178 (Fla. 3d DCA 2010); *Pac. Ins. Co.*, 891 So.2d at 587; *Provence v. Palm Beach Taverns, Inc.*, 676 So.2d 1022 (Fla. 4th DCA 1996). "'A [complaint] may be dismissed on motion if clearly without any merit; and this want of merit may consists in an absence of law to support a claim of the sort made, or of facts sufficient to make a good claim, or in the disclosure of some fact which will necessarily defeat the claim.'" *Ellison v. City of Fort Lauderdale*, 175 So. 2d 198, 200 (Fla. 1965) (quoting Volume 2, Moore's Federal Practice, 2d Ed., § 12.08, p. 2244–2245).

## B.

### Plaintiffs Have Failed to State a Claim under Florida's RICO Act Against Berto

In Count IV of the Complaint, Plaintiffs allege that Defendants engaged in securities fraud, federal wire fraud, federal money laundering, false advertising, civil theft and communications fraud as a pattern of criminal activity in violation of Fla. Stat. § 772.103, the Florida Civil Remedies for Criminal Practices Act ("Florida RICO"). Fla. Stat. § 772.104, which creates the civil cause of action for Florida RICO violations, states, "[a]ny person who proves by clear and convincing evidence that he or she has been injured **by reason of** any violation of the provisions of s. 772.103 shall have a cause of action for threefold the actual damages sustained. . . ." Fla. Stat. § 772.104(1) (emphasis added).

"Because the Florida RICO Act is patterned after the federal act, Florida looks to federal authorities in construing its own RICO statute." *Bortell v. White Mountains Ins. Group, Ltd.*, 2 So. 3d 1041, 1047 (Fla. 4th DCA 2009). "Looking to similar language in 18 U.S.C. § 1964(c) requiring a plaintiff to prove injury **'by reason of'** a RICO violation, the Supreme Court

concluded that the phrase required application of common law proximate cause requirements and the '**demand for some direct relation between the injury asserted and the injurious conduct alleged**.'" *Bortell*, 2 So. 3d at 1047 (*quoting Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)) (emphases added).  Put simply, the "by reason of" language requires the Plaintiffs to demonstrate that their injury directly relates to the Defendants' alleged racketeering activity.   *Bortell*, 2 So. 3d at 1047 (*quoting Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

Federal courts across the country have consistently held that the "direct relation" requirement cannot be met where plaintiff is relying on a "fraud on the market" theory to establish causation.   The theory permits a plaintiff to establish a rebuttable presumption of reliance based upon the premise that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988).

Thus, in *Lawrie v. Ginn Development Co., LLC*, No. 3:09-cv-446-J-32JBT, 2013 WL 222258 (M. D. Fla. Jan. 9, 2013), the trial court found that the plaintiffs had failed to sufficiently plead that their injuries were proximately caused by defendant's alleged scheme to defraud where the plaintiffs were relying on a fraud-on-the-market theory of causation. *Id.* at * 5-6.  In *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, Master File No. 2:06-cv-5774, 2009 WL 2043604, *20-21 (D. N.J. July 10, 2009), the court rejected the plaintiff's federal and state RICO claims because its alleged injuries were based on a fraud on the market theory. *Id.* at *20-21.  In *Appletree Square I, Ltd. P'ship v. W.R. Grace & Co.*, 29 F.3d 1283, 1287 8th Cir. 1994), the Court similarly held that a building owner could not use fraud on the market theory to show that it was injured "by reason of" asbestos manufacturer's alleged

misrepresentations, as required to demonstrate standing to pursue RICO claim against the manufacturer.  In *CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1095 (10th Cir. 2014), the court found that the rebuttable presumption of causation applicable to securities fraud cases based on the fraud on the market theory does not extend to RICO fraud cases.  *See also, Southeast Laborers Health and Welfare Fund v. Bayer Corp.*, 444 Fed. Appx. 401, n. 4 (11th Cir. 2011) ("[Plaintiff] may not rely on a fraud-on-the-market or fraud-on-the-FDA theory of causation for its RICO claim.").

Further, where as here, the plaintiff alleges mail or wire frauds as the predicate act supporting a civil RICO claim, the plaintiff must demonstrate reliance on the alleged predicate mail or wire fraud acts.  *Palmas Y Bambu, S.A. v. E.I. DuPont de Nemours & Co.*, 881 So. 2d 565, 573 (Fla. 3d DCA 2004).  A plaintiff seeking recovery under Florida RICO cannot "relax the reliance requirement" by alleging the fraud affected "a body of public information." *Id.* at 573.  A plaintiff must prove actual reliance because the fraud on the market theory is unavailable under Florida RICO.  *Id.*; *see also Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991) (holding that RICO plaintiffs cannot rely on a fraud on the market theory to prove reliance).

Here, Plaintiffs do not contend that Berto (or any of the Defendants, for that matter), directed any misstatements or misrepresentations about OGX specifically toward them, or that they relied on any alleged misrepresentations in purchasing the OGX bonds.  In fact, Plaintiffs do not allege that Berto made any representations at all.

Instead, Plaintiffs allege that "BATISTA and his co-conspirators" disseminated their misrepresentations "to the international financial market" at large, "buil[ding] an impression in the minds of money managers and investors internationally that OGX was sitting on enormous

reserves of recoverable oil when in reality there was virtually none."  (Complaint, ¶¶ 41, 336).

Plaintiffs describe the alleged fraudulent scheme as follows:

> Between 2008 and 2013 BATISTA and his co-conspirators and accomplices raised billions of dollars from investors in stocks and bonds, overwhelmingly in the U.S., on the basis of an international press campaign **barraging the international investing public with false promises of a trillion dollars of recoverable oil off the coast of Brazil** pursuant to drilling leases from the Brazilian government owned by BATISTA's oil exploration company, OGX.

(Complaint, ¶ 34) (emphasis added).   Plaintiffs do not allege that they relied on such misrepresentations to the market, but rather that their financial advisor, Judith Neiwirth, generally relied on "the general baseline impression in the international investment market" in deciding to purchase OGX bonds.  (Complaint, ¶¶ 338, 339).

Clearly, then, Plaintiffs are invoking a classic "fraud on the market" theory.  As a matter of well-established federal and Florida law, such a theory is insufficient to satisfy either the proximate cause or reliance elements of Plaintiffs' Florida RICO claims.

## C.

### Plaintiffs Have Failed to State a Claim for False and Misleading Advertising Against Berto

In Count VI of the Complaint, Plaintiffs attempt to state a claim for "False and Misleading Advertising" under section 817.41 of the Florida Statutes.

"A consumer party may state a claim for statutory misleading advertising under Florida law by pleading that the party relied on some identifiable alleged misleading advertising plus, where appropriate, all of the other elements of the common law tort of fraud in the inducement, as follows: (a) the representor made a misrepresentation of a material fact; (b) the representor knew or should have known of the falsity of the statement; (c) the representor intended that the representation would induce another to rely and act on it; and (d) the plaintiff suffered injury in justifiable reliance on the representation."  *Third Party Verification, Inc. v. Signaturelink, Inc.,*

492 F.Supp.2d 1314, 1322 (M.D. Fla. 2007) (citing *Smith v. Mellon Bank*, 957 F.2d 856, 858 (11th Cir.1992); *Joseph v. Liberty National Bank,* 873 So.2d 384, 388 (Fla. 5th DCA 2004); *Vance v. Indian Hammock Hunt & Riding Club, Ltd.,* 403 So.2d 1367, 1370 (Fla. 4th DCA 1981)).

"The pleader must also allege that the representor's representation was made with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services." *Third Party Verification*, 492 F.Supp.2d at 1322 (citing *Samuels v. King Motor Company of Fort Lauderdale,* 782 So.2d 489, 496 (Fla. 4th DCA 2001)).

Plaintiffs have failed to state a claim for relief under Section 817.41 for two reasons:

First, Plaintiffs cannot allege a claim for misleading advertising in this case.   Florida Statute § 817.41(5) defines the term "misleading advertising" as follows:

> The phrase "misleading advertising" includes **any statements made**, or disseminated, in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, **of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services**.

Fla. Stat. § 817.40(5) (2016) (emphases added).   Plaintiffs allege in their Complaint that the OGX bonds at issue in this case are "securities." (Complaint, ¶ 465).  By its own clear terms, however, section 817.40(5) applies only to "real or personal property, services of any nature whatever . . . [or] any obligation relating to such property or services."  As a matter of law, therefore, section 817.41 does not apply to this case.

Second, Plaintiffs have failed to allege their reliance on Berto's misleading statements. Again, Plaintiffs do not allege that Berto made any such statements. The sum total of the allegations against Berto is that, years after the alleged fraudulent statements were made, Berto acted as the CEO of LLX, a Brazilian, publicly-traded, logistics company in which Batista held an unspecified interest. (Complaint, ¶¶ 78-80). The Complaint alleges that Berto helped Batista by "cash[ing] Batista out" of LLX in anticipation of OGX's crash, (Complaint, ¶ 331), and by introducing him to "international asset protection specialist" who created "various international structures" to "hide the proceeds of the fraud." (Complaint, ¶ 300). In the absence of any allegations concerning an actionable statement by Berto upon which Plaintiffs allegedly relied, the claim for misleading advertising fails as a matter of law.

### D.

### Plaintiffs Have Failed to State a Claim for Civil Theft Against Berto

"To establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent." *Gasparini v. Pordomingo*, 972 So. 2d 1053 (Fla. 3d DCA 2008) (citing *Gersh v. Cofman*, 769 So.2d 407, 408 (Fla. 4th DCA 2000). A conversion is defined, in turn, as "an act of dominion inconsistent with his ownership of it." *Belford Trucking Co. v. Zagar*, 243 So.2d 646, 648 (Fla. 4th DCA 1970).

"To be a proper subject of conversion each coin or bill need not be earmarked, but there must be an obligation to keep intact or deliver the specified money in question so that the money can be identified." *Belford Trucking*, 243 So. 2d at 648. "Money is capable of identification where it is delivered at one time, by one act and in one mass." *Id.* Further, an action for conversion of money can only be maintained where the money at issue has been kept separate. *Id.* In other words, "'there must be an obligation to keep intact or deliver the specific money in

question, so that money can be identified.'" *Gasparini*, 972 So. 2d at 1056 (quoting *Futch v. Head*, 511 So.2d 314, 320 (Fla. 1st DCA 1987)); *see also Masvidal v. Ochoa*, 505 So.2d 555, 556 (Fla. 3d DCA 1987) (specifying that civil theft and conversion can be asserted where a party embezzles funds from an escrow account).

Here, Plaintiffs do not allege that the parties ever gave the Defendants money to keep in a separate account, or that Defendants were obligated to hold any funds they received from Plaintiffs in a trust or escrow account. Plaintiffs also fail to allege that Defendants were required to keep Plaintiffs investment intact, or deliver the money for a particular purpose, precluding the money's identification. Instead, Plaintiffs allege that Ms. Neiwirth purchased OGX bonds in the secondary market on Plaintiffs' behalf. (Complaint, ¶¶ 343, 344, 359, 361, 384).

Thus, as a matter of law, Plaintiffs have failed to allege a factual basis to support a conversion claim. *See Gasparini*, 972 So. 2d at 1056 (finding no conversion as a matter of law where the parties did not contemplate that defendant would keep plaintiff's $300,000 in a separate account, nor that defendant would be obligated to hold the funds that it received from plaintiff in a trust or escrow account). And, because there is no factual basis to support a conversion claim, there also is no factual basis for a civil theft claim. *Id.* ("Since we have found that there was no factual basis to support a claim for conversion, it stands to reason therefore, that there can be no cause of action for civil theft.").

## E.

### Plaintiffs Have Failed to Allege a Fraudulent Transfer Claim Against Berto

Fraudulent transfer claims under Florida law arise under the Florida Uniform Fraudulent Transfers Act ("FUFTA"), Fla. Stat. § 726.101, *et seq*. Fraudulent transfers may be recovered by

a creditor under two theories: (1) actual fraud, pursuant to Fla. Stat. § 726.105(1)(a) and § 726.106; and (2) constructive fraud, pursuant to Fla. Stat. § 726.105(1)(b).

The Complaint does not identify a particular subsection of "Florida Statute 726.101, *et seq.*" upon which the action is based, which itself merits dismissal. Plaintiffs allege, however, that Defendants "made fraudulent transfers of assets, cash, and property," with actual intent to "hinder, delay, or defraud creditors," without receiving reasonably equivalent value in return. (Complaint, ¶ 492).  Thus, it appears that Plaintiffs' fraudulent transfer claims are based on both § 726.105(1)(a) and § 726.105(1)(b).

In *Feldkamp v. Long Bay P'ners, LLC*, 773 F. Supp. 2d 1273 (M.D. Fla. 2011), the court dismissed a claim brought under Florida's Uniform Fraudulent Transfer Act ("FUFTA") because the "[p]laintiffs ha[d] failed to identify [the] specific transfer they [sought] to aside; rather they [had] allude[d] generally to the alleged looting of the defendant in an amount exceeding $473 million . . . ." *Id.* at 1287.  The Court explained that the only relief a court can provide to remedy a fraudulent transfer is to set aside a particular transfer.  *Id.* (citing Fla. Stat. § 726.108(1)(a)). Thus, generally alleging that defendants "looted" unspecified millions of dollars, without identifying the particular transaction or transactions sought to be avoided, was insufficient to support a claim for fraudulent transfer.  *Id.*

As in *Feldkamp*, Plaintiffs have failed to identify any specific transfer to Berto (or to any of the other Defendants) which they seek to set aside.  In fact, Plaintiffs do not allege that Berto received any transfer of any kind.  Instead, Plaintiffs allude generally to an unspecified "hundreds of millions of dollars that BATISTA and his co-conspirators and accomplices took and kept for themselves[.]"  (Complaint, ¶ 39).   Plaintiffs allege generally that Batista made fraudulent transfers to a number of companies he "set up for the simple purpose of being the

name on a bank account for the transmission of funds to accomplish the fraudulent scheme," (Complaint, ¶ 89),  and to certain of his family members.  (Complaint, ¶¶ 98, 99).  However, Plaintiffs fail to identify any particulars concerning such transfers - i.e., when they were made, to whom they were made, in what amounts they were made, etc.  These are the very types of generalized allegations which the court in *Feldkamp* held cannot support a fraudulent transfer claim.  Plaintiffs' lack of specificity in its pleading requires dismissal of Count XI.

Plaintiffs otherwise have failed to adequately allege the elements of a fraudulent transfer claim.  To state a claim for actual fraud under FUFTA, a plaintiff must "allege (1) there was a creditor sought to be defrauded; (2) a debtor intending fraud; and (3) a conveyance of property which could have been available to satisfy the debt." *Nationsbank, N.A. v. Coastal Utils. Inc.*, 814 So.2d 1227, 1229 (Fla. 4th DCA 2002)."

First, Plaintiffs have failed to identify the "debtor."  The Complaint merely provides: "The foregoing Defendants, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, made fraudulent transfers of assets, cash, and property[.]"  (Complaint, ¶ 492).  The "Defendants" are 21 separate entities and individuals.  Plaintiffs fail to explain which Defendants are "debtors" as defined by the statute, which Plaintiffs are creditors of which Defendant, and which of the Defendants made the transfers to which recipients.  These vague assertions do not give Defendants "fair notice of what the claim is and the grounds upon which it rests." *Oginsky v. Paragon Properties of Costa Rica, LLC*, 784 F.Supp.2d 1353, 1370 (S.D. Fla. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Second, Plaintiffs have failed to adequately allege intent.   "Because of the difficulty of proving actual intent, past statutory law, existing case law and the UFTA look to indicia of intent

commonly known as 'badges of fraud.'" *Amjad Munim, M.D., P.A. v. Azar*, 648 So.2d 145, 152 (Fla. 4th DCA 1994); *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir.1998) ("In determining whether the circumstantial evidence is sufficient to establish fraudulent intent, the court should investigate the transfer for the existence of badges of fraud."). FUFTA lists eleven nonexclusive "badges of fraud" that may be considered in determining actual intent. Fla. Stat. § 726.105(2).

Plaintiffs have not alleged the existence of any of these badges of fraud in Count XI, or anywhere in their Complaint, for that matter. The only allegation of Defendants' intent is contained in paragraph 492, which states as follows:

> The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, made fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and each of the other liable Defendants were engaged or was about to, engage in a business or a transaction for which his and their remaining assets were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he or they would incur, debts beyond his or their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

This is the very type of "formulaic recitation of a cause of action's elements" which courts interpreting FUFTA have found to be insufficient to state a claim for relief. *See Oginsky*, 784 F.Supp.2d at 1371 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

Plaintiffs' suggestion that they should be allowed to conduct discovery to obtain details of the allegedly fraudulent transactions improperly seeks to circumvent their obligation to sufficiently plead the elements of their claim. The court in *Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co., L.L.C.*, No. 00-06410-CIV-MARRA, 2008 WL 2245726, *2 (S.D. Fla. May 29, 2008) rejected a similar argument. Citing to cases which hold that "the purpose of discovery is to find out additional facts about a well-pleaded claim, not to

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

      Defendants.

_____/

## UNNOPPOSED MOTION TO EXTEND TIME TO RESPOND TO MOTION TO DISMISS

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs"), respectfully move this Court for an order extending the time within which they may respond in opposition to Defendant Marcus Berto's Motion to Dismiss Complaint, and state:

1.      Defendant Berto filed and served his Motion to Dismiss on March 17, 2017. Pursuant to this Court's Order on Motions and Memo Requirements, the Florida Rules of Civil Procedure, and the Florida Rules of Judicial Administration, Plaintiffs' response is due for filing and service on April 3, 2017.

2.      Given, however, the complexity of the legal arguments set forth by Berto in the Motion to Dismiss, the Plaintiffs recognize they will require additional time within which to research and draft their opposition. The resulting clarity will benefit not only the Plaintiffs, but, Plaintiffs submit, assist the Court in reaching its ultimate determination.

3.     Plaintiffs have discussed this request for enlargement of time with counsel for Mr. Berto who has graciously consented to the request. [1]

4.     This request is not sought for purposes of unnecessary delay, and granting the request would conduce to the interests of justice.

WHEREFORE, Plaintiffs respectfully request an additional 14 days, until and including April 17, 2017, within which to file and serve their response to Defendant Marcus Berto's Motion to Dismiss.

## CERTIFICATE OF CONFERENCE

The undersigned hereby confirms that counsel for movant has conferred with counsel for Mr. Berto and that counsel does not oppose the relief requested in this motion.

Dated: March 17th 2017.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

---

[1] We have similarly agreed with counsel for Mr. Berto with regard to his previous request for additional time to file the motion to dismiss.

2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 17th day of March, 2017 a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

<div align="right">

*s/ Hendrik G. Milne*_____
Hendrik G. Milne, Esq.

</div>

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.:  17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, *et al.,*

        Defendants.

_____/

### AGREED ORDER GRANTING MOTION FOR ADMISSION TO APPEAR *PRO HAC VICE* PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510

THIS CAUSE having come before the Court on Verified Motion for Admission to Appear *Pro Hac Vice* Pursuant to Florida Rule of Judicial Administration 2.510 (the "Motion"). This Court having considered the Motion without a hearing and all other relevant factors, it is hereby

**ORDERED** AND **ADJUDGED** that:

1. The Motion is **GRANTED**. Michael B. Carlinsky, Esq. may appear and participate in this action on behalf of WERNER BATISTA.

2. The Clerk shall provide electronic notification of all electronic filings to Michael B. Carlinsky, Esq. at michaelcarlinsky@quinnemanuel.com.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 03/24/17.

BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.:  17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, *et al.,*

       Defendants.

_____/

## AGREED ORDER GRANTING MOTION FOR ADMISSION TO APPEAR *PRO HAC VICE* PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510

THIS CAUSE having come before the Court on the Verified Motion for Admission to Appear *Pro Hac Vice* Pursuant to Florida Rule of Judicial Administration 2.510 (the "Motion"), and having considered the Motion without a hearing and all other relevant factors, it is hereby

**ORDERED** AND **ADJUDGED** that:

1.    The Motion is **GRANTED**. Victor Noskov, Esq. may appear and participate in this action on behalf of WERNER BATISTA.

2.    The Clerk shall provide electronic notification of all electronic filings to Victor Noskov, Esq. at victornoskov@quinnemanuel.com.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 03/24/17.

_____
BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

~~DONE AND ORDERED in Miami-Dade County Florida, this _____ day of March,~~

~~2017.~~

_____

_____~~CIRCUIT COURT JUDGE~~

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.:  17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, *et al.,*

       Defendants.

_____/

## AGREED ORDER GRANTING MOTION FOR ADMISSION TO APPEAR *PRO HAC VICE* PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510

THIS CAUSE having come before the Court on Verified Motion for Admission to Appear *Pro Hac Vice* Pursuant to Florida Rule of Judicial Administration 2.510 (the "Motion") and having considered the Motion without a hearing and all other relevant factors, it is hereby

**ORDERED** AND **ADJUDGED** that:

1.    The Motion is **GRANTED**. Elinor C. Sutton, Esq. may appear and participate in this action on behalf of WERNER BATISTA.

2.    The Clerk shall provide electronic notification of all electronic filings to Elinor C. Sutton, Esq. at elinorsutton@quinnemanuel.com.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 03/24/17.


BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.



IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, *et al.*,

        Defendants.

_____/

## DEFENDANTS WERNER BATISTA, CENTENNIAL ASSET MINING FUND, AND CENTENNIAL ASSET BRAZILIAN EQUITY FUND'S UNOPPOSED MOTION FOR ENLARGEMENT OF TIME TO FILE *FORUM NON CONVENIENS* MOTIONS

Defendants Werner Batista, Centennial Asset Mining Fund, and Centennial Asset Brazilian Equity Fund (collectively, "Defendants") respectfully request a brief enlargement of four days in which to file their *forum non conveniens* motions. In support hereof, Defendants state as follows:

1.      Defendant Werner Batista was served on January 24, 2017; Defendant Centennial Asset Mining Fund was served on January 25, 2017; and Defendant Centennial Asset Brazilian Equity Fund was served on January 26, 2017.

2.      Plaintiffs have agreed to an enlargement of time until March 31, 2017, for Defendants to respond to the Complaint.

3.      Under Florida Rule of Civil Procedure 1.061(g), Defendants have 60 days from

1

service of process to file their *forum non conveniens* motions. Thus, Defendants' current deadline is March 27, 2017.

4.      Given the complexity of the legal arguments, Defendants need the brief additional time in which to finalize their *forum non conveniens* motions.

5.      The additional time does not exceed the agreed upon enlargement for responding to the Complaint, thus it will not prejudice any party.

6.      Further, Plaintiffs have consented to the requested relief, which is not being sought for purposes of unnecessary delay.

WHEREFORE, Defendants respectfully request that the Court enter an order granting them an additional four days, up through and including March 31, 2017, in which to file and serve any *forum non conveniens* motions.

## CERTIFICATE OF CONFERENCE

The undersigned hereby confirms that counsel for movant has conferred with counsel for Plaintiffs, and that counsel for Plaintiffs does not oppose the relief requested in this motion.

Dated: March 27, 2017                    Respectfully submitted,

**ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.**
1001 Brickell Bay Drive, 9th Floor
Miami, FL 33131
Tel.: (305) 372-8282; Fax: (305) 372-8202

By: */s/ Ana Maria Barton*
Edward M. Mullins
Florida Bar No. 863920
emullins@astidavis.com;
bhernandez@astidavis.com
Ana M. Barton
Florida Bar No. 85721
abarton@astidavis.com

*Counsel for Defendants Werner Batista,
Centennial Asset Mining Fund, and Centennial
Asset Brazilian Equity Fund*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal which sent e-mail notification of such filing to Hendrik G. Milne, Esq., and Craig P. Kalil, Esq., ABALLI MILNE KALIL, P.A.; Jose Ferrer, Esq., and Yasmin Fernandez-Acuna, Esq., BILZIN SUMBERG BAENA PRICE & AXEDLROD LLP; and Victor Noskov, Esq., Elinor Sutton, Esq. and Michael Carlinsky, Esq., QUINN EMANUEL URQUHART & SULLIVAN, LLP, on March 27, 2017.

By:  */s/ Ana Maria Barton*
     Ana Maria Barton

Filing # 54273756 E-Filed 03/27/2017 06:10:31 PM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

       Defendants.

_____/

## NOTICE OF FILING VERIFIED RETURN OF SERVICE

       Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for EBX International S.A., and its

translation.

       Dated: March 27, 2017

                                     Respectfully submitted,

                                     ABALLI MILNE KALIL, P.A.
                                     *Counsel for Plaintiffs*
                                     2250 SunTrust International Center
                                     One Southeast Third Ave.
                                     Miami, FL 33131
                                     Phone: (305) 373–6600
                                     Fax: (305) 373–7929

                                     *s/ Hendrik G. Milne*_____
                                     Hendrik G. Milne
                                     Florida Bar No.: 335886
                                     Craig P. Kalil
                                     Florida Bar No.: 607282

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 27th day of March, 2017 a true and correct copy of the

foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice

on all counsel of record via this Court' s e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

[Coat of Arms]

**REPUBLIC OF PANAMA**
PROVINCE OF PANAMA

**SECOND NOTARY OFFICE FOR THE CIRCUIT OF PANAMA**

*Anayansy Jované Cubilla, Esq.*

SECOND PUBLIC NOTARY

AVENIDA EL PAICAL                    Apartado Postal: 0819-01296, Zona 6ª, El Dorado
EDIFICIO MEGA PARKING                              Panama, Republic of Panama
PLANTA BAJA                                      ajovane@notaria2panama.com
                                    PHONES: 395-0180/395-0184/395-0182

COPY

**CERTIFICATE OF NOTARIAL PROCEEDING**

DOCUMENT No.: _____ OF _____ OF _____ OF 20 _____

          HEREBY:

[Stamp: Republic of Panama, illegible]

**REPUBLIC OF PANAMA
NOTARIAL DOCUMENT**
[Coat of Arms]

[Seal: Second Notary Office for the Circuit of Panama]

## SECOND NOTARY OFFICE FOR THE CIRCUIT OF PANAMA

### CERTIFICATE OF SERVICE OF PROCESS

Within the territory of the Notarial Circuit of Panama, I, ANAYANSY JOVANE CUBILLA, Second Public Notary for this Circuit, bearer of National Identification Document No. 4-201-226, hereby certify that the Law Firm ARIAS, FABREGA & FABREGA requested me to carry out the service of process and certification of service and notice to the Law Firm ARIAS, ALEMAN & MORA, acting resident agent of the company EBX INTERNATIONAL, S.A. with a document comprised of a Summons and Complaint against the company EBX INTERNATIONAL, S.A., copies of which are attached to this certificate. Given this request, at 8:20 a.m. of March 14, 2016, I appeared at the Law Firm ARIAS, ALEMAN & MORA, located at Edificio PH 909, Piso No. 16, Calles 50 y 74, City of Panama, Province of Panama, together with Ana Patricia Dudley Martin, Esq., bearer of National Identification Document No. 8-838-1947, who was present and acting as International Associate of the Law Firm ARIAS, FABREGA & FABREGA.

The Summons and Complaint against the company EBX INTERNATIONAL, S.A. were received in the offices of the Law Firm ARIAS, ALEMAN & MORA by Marjorie Tomlinson, bearer of National Identification Document No. 8-857-1459, who identified herself as an employee of the law firm, and I certify the delivery and notification of the attached Complaint and Summons to the resident agent.

I hereby certify that we have received from Attorney Dudley a copy of the document comprised of the Summons and Complaint against the company EBX INTERNATIONAL, S.A. for the purpose of attaching it to this Notarial Certificate as an essential part of it.

Without any further matter to attend, this proceeding was concluded at 8:35 a.m. of March 14, 2017.

/illegible signature/

ANAYANSY JOVANE CUBILLA

SECOND PUBLIC NOTARY FOR THE CIRCUIT OF PANAMA

[Seal: Second Notary Office for the Circuit of Panama]



# Lingua Franca
# Translations

TRANSLATORS•INTERPRETERS •EDITORS • CONSULTANTS

**1111 Brickell Avenue, Suite 1140**
**Miami, Florida 33131**
**Phone: (305) 913-2393**
**E-mail: info@lftranslations.com**

## CERTIFICATE OF TRANSLATION

Spanish>English Translation of the document titled:

**Notarial Proceeding**

I, Diana M. Arbeláez, with the ATA nr. 251348 at Lingua Franca Translations do hereby certify that the translation herein was completed in accordance with the American Translators Association Code of Professional Conduct and Business Practices and that to the best of my knowledge the translation into English herein provided is, in fact, a literal and true interpretation of the statements in the original languages, Spanish.

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____

Diana Marcela Arbelaez

State of Florida
County of Miami-Dade

# REPÚBLICA DE PANAMÁ
## PROVINCIA DE PANAMÁ

## NOTARÍA SEGUNDA DEL CIRCUITO DE PANAMÁ

*Licda. Anayansy Jované Cubilla*

### NOTARÍA PÚBLICA SEGUNDA

AVENIDA EL PAICAL
EDIFICIO MEGA PARKING,
PLANTA BAJA

Apartado Postal: 0819-01296, Zona 6A, El Dorado
Panamá, República de Panamá
ajovane@notaria2panama.com
TELS.: 395-0180 / 395-0184 / 395-0182

COPIA

# ACTA DE DILIGENCIA NOTARIAL

ESCRITURA No._____ DE_____ DE_____ DE 20_____

POR LA CUAL:

## ACTA DE DILIGENCIA DE ENTREGA DE DOCUMENTOS

Dentro del territorio correspondiente al Circuito Notarial de Panamá, ANAYANSY JOVANE CUBILLA, Notaria Pública Segunda de este Circuito, con cédula de identidad personal número cuatro-doscientos unos-doscientos veintiséis (4-201-226), certifico que la firma de Abogados ARIAS, FABREGA & FABREGA me solicitó entregar y certificar la entrega y notificación a la firma de Abogados ARIAS, ALEMAN & MORA, en su calidad de agente residente de la sociedad EBX INTERNATIONAL, S.A., de un documento contentivo de una Citación ("summons") y de una Demanda ("complaint") en contra de la sociedad EBX INTERNATIONAL, S.A., cuya copia adjunto a la presente acta. En vista de tal solicitud, siendo las ocho y veinte de la de la mañana (8:20 a.m.) del día catorce (14) de marzo de 2016, me apersoné a la firma de Abogados ARIAS, ALEMAN & MORA, con dirección en el edificio PH 909, Piso N° 16, Calles 50 y 74 de la ciudad de Panamá, Provincia de Panamá en donde se encontraba presente la Licenciada Ana Patricia Dudley Martin, con cédula de identidad personal N° 8-838-1947 en calidad de Asociada Internacional de la Firma ARIAS, FABREGA & FABREGA.

En las instalaciones de la firma de Abogados Arias, Alemán & Mora, la Citación y Demanda contra la sociedad EBX INTERNATIONAL, S.A. fue recibida por señorita Marjorie Tomlinson, con cédula de identidad personal N° 8-857-1459, quien fue identificada como una empleada de la firma, y certifico la entrega y notificación al agente residente del complaint y summons anexos a esta acta

Hacemos constar que recibimos de parte de la Licenciada Dudley, copia del documento contentivo de la Citación y la Demanda contra la sociedad EBX INTERNATIONAL, S.A. a efectos de que la misma sea debidamente incorporada a la presente Acta Notarial, para que forme parte integral de la misma.

No siendo otro el motivo de nuestra presencia dimos por terminada la presente diligencia siendo las ocho y treinta y cinco minutos de la mañana (8:35 a.m.) del mismo día catorce (14) de marzo de 2017.

ANAYANSY JOVANE CUBILLA

NOTARIA PUBLICA SEGUNDA DEL CIRCUITO DE PANAMA

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL   ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-0018AD-CA-01 (43)<br>SERVICE |
|---|---|---|
| PLAINTIFF(S)<br>Meridian Trust Company, and<br>American Associated Group, Ltd. | VS.  DEFENDANT(S)<br>Eike Batista, et. al. | |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on
defendant(s): EBX International, S.A.

    50th Street and 74th Street, Building PH 909

    16th Floor, Postal Address 0830-1580

    Panama City, Republic of Panama

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Hendrik G. Milne, Florida Bar No. 335886

whose address is: One Southeast Third Avenue, Suite 2250, Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies,
or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days.
When suit is brought pursuant to 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons
on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before
service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for
the relief demanded in the complaint or petition.

CLOCK IN

| HARVEY RUVIN<br><br>CLERK of COURTS | _[signature]_  309876<br>DEPUTY CLERK | DATE<br><br>FEB 13 2017 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to
participate in this proceeding, you are entitled, at no cost to you, to the provision of certain
assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson
E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone
(305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your
scheduled court appearance, or immediately upon receiving this notification if the time
before the scheduled appearance is less than 7 days; if you are hearing or voice impaired,
call 711."**

Filing # 51134312 E-Filed 01/12/2017 08:39:38 PM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO._____

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, THOR BATISTA,
PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA,
MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR,
63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND,
EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A.,
EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC,
THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,
OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

     Plaintiffs, MERIDIAN TRUST COMPANY, as trustee, and AMERICAN ASSOCIATED

GROUP, LTD., sue Defendants, EIKE BATISTA, WERNER BATISTA, THOR BATISTA,

PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ

CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X

FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS,

CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY

FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD.,

OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

**Case Capsule - Requires no Response**

A Brazilian con man, Eike Batista, induced investors from around the U.S. - including many State employee pension funds, such as the Florida Retirement System Trust Fund - to invest billions of dollars in his oil exploration company OGX and its satellite companies on the basis of fraudulent promises of the discovery of a trillion dollars of offshore oil. He promised to plough in a billion dollars of his own money if the business needed it to come into production.

When the truth was finally discovered, that there was virtually no oil, Batista welshed on his billion dollar promise; OGX and its satellite companies collapsed; and the investors lost their money in what is currently Latin America's largest corporate default, ever.

Batista and a few others were indicted for market manipulation and insider trading and he has been fined and banned from heading up public companies for five years in Brazil. However, they all made many hundreds of millions of dollars from the scheme. Batista stashed much of his share in the names of family members and shell companies in Miami, Florida, and offshore.



The Plaintiffs - investment vehicles for an elderly disabled beneficiary - invested over $21 million in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations. They seek to recover their losses against Batista and his co-conspirators; treble damages pursuant to Florida's racketeering statutes; and to freeze the proceeds of the fraudulent scheme in the hands of the various recipients pending judgment.

## **TABLE OF CONTENTS**

Case Capsule - Requires no Response ............................................................... ii

Parties and Jurisdiction .................................................................................... 1

    Jurisdiction .................................................................................................. 1

    Plaintiffs ...................................................................................................... 1

    Defendants .................................................................................................. 2

    Personal Jurisdiction in Florida ................................................................ 4

    The Fraudulent Scheme – Overview ......................................................... 5

    Organizational Layout of the Complaint .................................................. 8

**Section I - Inflating the OGX Oil Bubble** .................................................... 9

    The Roles played by the Defendants ......................................................... 9

    Eike Batista ................................................................................................. 9

    The Individual Co-conspirators and Accomplices .................................... 10

    Paulo Mendonça .......................................................................................... 11

    Werner Batista ............................................................................................ 12

    Thor Batista ................................................................................................ 12

    Flavio Godinho ............................................................................................ 13

    Paulo Gouvea .............................................................................................. 14

    Marcus Berto ............................................................................................... 14

    Luiz Carneiro .............................................................................................. 15

    Aziz Ben Ammar ......................................................................................... 15

    The Corporate Co-conspirators and Accomplices .................................... 16

    The 63X, EBX, CENTENNIAL and THORQUE Companies ................... 16

    Additional Fraudulent Transfer Recipients ............................................. 17

## TABLE OF CONTENTS (continued)

Olin Batista, Flavia Sampaio and Luma de Oliveira ........................................17

The Scheme – in Detail ........................................................................18

The Brazilian Deepwater "Pre Salt" Discoveries ...............................................18

The Start of OGX ...............................................................................19

OGX Wins Rights to 21 Exploratory Blocks ......................................................20

OGX Raises Additional Capital – Initial Public Offering ........................................20

The Fraudulent Misrepresentations Start ........................................................22

Technical Terminology – PRMS ...................................................................24

The First OGX "Oil Strike" .....................................................................25

The Second OGX "Oil Strike".....................................................................27

OGX Strikes "Even More" Oil ....................................................................28

The OSX Public Offering ........................................................................30

Promoting OGX in Miami .........................................................................35

"Interest from the Chinese" ....................................................................36

The 10.8 Billion Barrel Lie ....................................................................39

D&M Secretly Protests .........................................................................42

Insiders Sell Their OGX Stock in Miami ........................................................44

The Lies Continue – OGX "Cash Rich" ...........................................................45

The Mubadala "Investment" ......................................................................46

Keeping the Balls in the Air ..................................................................48

"The Brazilian Dream" .........................................................................51

OGX Secretly Bankrupt .........................................................................54

The Exit Strategy .............................................................................55

## TABLE OF CONTENTS (continued)

The Professionals ....................................................................................................56

The Bankers ............................................................................................................57

The Fake Billion Dollar "Put Option" ....................................................................59

**Section II – The Plaintiffs Invest** .............................................................................61

The EBX/BTG "Strategic Partnership" ...................................................................63

The $850 Million "Investment" by Petronas ...........................................................67

Meridian Invests in More OGX Bonds ........................................................................68

Batista Secretly Cashes Out ....................................................................................69

Batista Makes Further Fraudulent Transfers ...........................................................71

Mubadala Secretly Pulls Out ...................................................................................72

The 10.8 Billion Barrel Lie – Recap ........................................................................73

**Section III – The OGX Oil Bubble Bursts** ...............................................................76

Batista's "Brazilian Dream" Turns to Nightmare ....................................................77

Batista's Silver Lining .............................................................................................78

The Plaintiffs' Claim ................................................................................................80

**Count I – Fraud** .........................................................................................................81

**Count II – Conspiracy to Defraud** ...........................................................................82

**Count III – Aiding and Abetting Fraud** ...................................................................82

**Count IV – Florida Civil Remedies for Criminal
Practices Act (f/k/a "Florida RICO")** .......................................................................83

The Criminal Enterprise ...........................................................................................84

Pattern of Criminal Activity ....................................................................................84

Predicate Acts of Criminal Activity .........................................................................84

## TABLE OF CONTENTS (continued)

**Predicate Act I - Florida Securities Fraud** – Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...85

**Predicate Act II - Federal Wire Fraud** - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...86

**Predicate Act III - Federal Money Laundering** - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA ......................................86

**Predicate Act IV - Florida False Advertising** - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR ................................................................................................87

**Predicate Act V - Florida Theft** - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...87

## TABLE OF CONTENTS (continued)

**Predicate Act VI - Florida Communications Fraud** - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD...88

Civil Remedy ...........................................................................................................88

**Count V – Florida Civil Remedies for Criminal Practices Act**
**Conspiracy (F/K/A "Florida Rico Conspiracy")** ........................................89

**Count VI – False and Misleading Advertising** .....................................................90

**Count VII – Conspiracy to Commit False and Misleading Advertising** ................91

**Count VIII – Civil Theft** .......................................................................................92

**Count IX – Conspiracy to Commit Theft** .............................................................92

**Count X – Aiding and Abetting Theft** ..................................................................93

**Count XI – Florida Uniform Fraudulent Transfers Act** ........................................94

**Count XII – Conspiracy to Commit Fraudulent Transfers** ...................................95

**Demand for Jury Trial** .........................................................................................96

## Parties and Jurisdiction

**Jurisdiction:**

1.    This is an action for actual damages in excess of $20 million and statutory damages in excess of $60 million dollars, and therefore far in excess of the minimal jurisdictional damages requirements of this Court.

2.    This is further an action for injunctive and other equitable relief and therefore further within the equitable jurisdiction of this Court.

**Plaintiffs:**

3.    Plaintiff, MERIDIAN TRUST COMPANY ("MERIDIAN"), is and was at all times material hereto, a trust company incorporated under the laws of Nevis and located in Nevis.

4.    MERIDIAN, as trustee, is and was at all material times the holder of legal title to the assets of a family trust fund termed "The Chrisly Trust" held for the benefit of a very elderly, disabled beneficiary whose affairs are and were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by a Miami-Dade County, Florida resident. The investments at issue were made through the Plaintiff's Florida investment adviser, as agent.

5.    Plaintiff, AMERICAN ASSOCIATED GROUP, LTD. ("AMERICAN"), is and was at all times material hereto a corporation incorporated in the Cayman Islands which held investments on behalf of the same very elderly disabled individual, whose affairs are and were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by that same Miami-Dade County, Florida resident. The investments at issue were made through the Plaintiff's Florida investment adviser, as agent.

**Defendants:**

6.     Defendant, EIKE BATISTA ("EIKE BATISTA" or "BATISTA"), is and was at all times material hereto an individual who is resident in Brazil.

7.     Defendant, WERNER BATISTA, is and was at all material times an individual who is resident in Florida and Brazil and the brother of EIKE BATISTA. He is believed to hold dual nationality between the U.S. and Brazil or is a permanent U.S. resident.

8.     Defendant, THOR BATISTA ("THOR BATISTA" or "THOR"), is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA.

9.     Defendant, PAULO MENDONÇA ("PAULO MENDONÇA" or "MENDONÇA"), is and was at all material times an individual who is resident in Brazil.

10.     Defendant, FLAVIO GODINHO ("FLAVIO GODINHO" or "GODINHO"), is and was at all material times an individual resident in Florida and Brazil.

11.     Defendant, PAULO GOUVEA ("PAULO GOUVEA" or "GOUVEA"), is and was at all material times an individual resident in Brazil.

12.     Defendant, MARCUS BERTO ("MARCUS BERTO" or "BERTO"), is and was at all material times an individual resident in Florida and Brazil.

13.     Defendant, LUIZ CARNEIRO ("LUIZ CARNIERO" or "CARNIERO"), is and was at all material times an individual resident in Brazil.

14.     Defendant, AZIZ BEN AMMAR ("AZIZ BEN AMMAR" or "BEN AMMAR"), is and was at all times material an individual resident in New York and Brazil.

15.     Defendant, 63X INVESTMENTS LTD. ("63X INVESTMENTS"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands.

16.     Defendant, 63X MASTER FUND, LTD. ("63X MASTER FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands.

17.     Defendant, 63X FUND ("63X FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands with its principal place of business outside the Cayman Islands. (With the two companies above sometimes referred to collectively as "the 63X Companies").

18.     Defendant, EBX HOLDING, LTDA. ("EBX 1"), is and was at material times a limited liability company organized under the laws of Brazil.

19.     Defendant, EBX INTERNATIONAL, S.A. ("EBX 2"), is and was at material times a corporation organized under the laws of Panama with its principal place of business outside Panama.

20.     Defendant, EBX CAPITAL PARTNERS ("EBX 3") is and was at material times a corporation organized under the laws of Brazil. (EBX 1, EBX 2 and EBX 3 are sometimes collectively referred to herein as the "EBX COMPANIES").

21.     Defendant, CENTENNIAL ASSET MINING FUND, LLC ("CENTENNIAL 1"), is and was at material times a limited liability company organized under the laws of Nevada with its principal place of business outside Nevada.

22.     Defendant, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC ("CENTENNIAL 2"), is and was at material times a limited liability company organized under the laws of Delaware with its principal place of business outside Delaware. (With the companies referred to immediately above, sometimes referred to collectively as "the CENTENNIAL Companies").

3

23.     Defendant, THORQUE1 FUND LTD., was at material times a company organized under the laws of The Bahamas with its principal place of business outside The Bahamas. (The company was dissolved by the Defendant, THOR BATISTA, on July 28, 2016. Plaintiffs intend to seek leave to re-instate it, if necessary, for the purposes of this action).

24.     Defendant, THORQUE INVESTMENT MANAGEMENT LTD., was at material times a company organized under the laws of The Bahamas with its principal place of business outside The Bahamas. (The company was dissolved by the Defendant, THOR BATISTA, on July 28, 2016. Plaintiffs intend to seek leave to re-instate it, if necessary, for the purposes of this action) (THORQUE1 FUND LTD. AND THORQUE INVESMTENT MANAGEMENT LTD. are sometimes collectively referred to herein as the "THORQUE COMPANIES").

25.     Defendant, OLIN BATISTA, is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA.

26.     Defendant, FLAVIA SAMPAIO, is and was at all material times an individual who is resident in Brazil, the girlfriend of EIKE BATISTA, and the mother of his minor son, Balder Batista.

27.     Defendant, LUMA DE OLIVEIRA, is and was at all material times an individual who is resident in Brazil, the ex-wife of EIKE BATISTA, and the mother of his adult sons, the Defendants, THOR BATISTA and OLIN BATISTA.

**Personal Jurisdiction in Florida:**

28.     Defendants, WERNER BATISTA, MARCUS BERTO and FLAVIO GODINHO are residents of Florida and subject to the general jurisdiction of its Courts.

29.     Further, every Defendant is subject to the general jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(2) as having engaged in substantial and not isolated activity

within this State, both individually and directly and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

30.  Each Defendant is subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(1) as having operated, conducted, engaged in or carried on a business or business venture in this state, or having an agency in this state, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

31.  This is an action brought in connection with that business. Brazil is not a party to the Hague Service Convention. The non-resident Defendants may therefore be served through the Florida Secretary of State pursuant to Fla. Stat. § 48.181(1) with notice of service given by certified or registered mail pursuant to Fla. Stat. § 48.161(1).

32.  Each Defendant is further subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(2) as having committed tortious acts within this State, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

33.  As a result of each of their individual and direct actions and further as a result of the actions of their agents and co-conspirators which are imputed to each of them, all Defendants have sufficient minimum contacts with this State that haling them before the Courts of this State would not offend Constitutional due process requirements.

**The Fraudulent Scheme – Overview:**

34.  Between 2008 and 2013 BATISTA and his co-conspirators and accomplices raised billions of dollars from investors in stocks and bonds, overwhelmingly in the U.S., on the basis of an international press campaign barraging the international investing public with false promises of

5

a trillion dollars of recoverable oil off the coast of Brazil pursuant to drilling leases from the Brazilian government owned by BATISTA's oil exploration company, OGX.

35.    BATISTA had OGX commission huge multi-million-dollar oil production platforms – tanker vessels equipped with drill rigs – from his satellite ship-building company, OSX, which he paid for with OGX investor money. He trumpeted plans for a satellite port city in Brazil to be run by his logistics company, LLX, that would blossom as the tankers offloaded a "trillion dollars" of oil.[1]

36.    But all the vast production and transport paraphernalia was just window dressing. As BATISTA and his co-conspirators and accomplices knew, there was in fact virtually no recoverable oil, no need for the massive production machinery to pump and transport it, and no need for a dedicated port to offload it.

37.    The core business, the OGX oil business, was actually a failure. It stayed alive only as long as there was an inflow of fresh capital from duped investors and lenders and as long as BATISTA and his co-conspirators and accomplices could maintain the illusion of a huge eventual payoff.

38.    Start to finish, the OGX venture discovered and pumped less than enough oil to fill OSX's six massive multi-million dollar tanker ships for a single trip to port.

39.    Necessarily, all the hundreds of millions of dollars that BATISTA and his co-conspirators and accomplices took and kept for themselves was skimmed off the top of what came in from investor contributions, leaving an ever-deepening chasm of debt beneath.

---

[1] As part of building his brand, BATISTA typically dubbed his companies by a pair of initials that described the core business, followed by an "X," the multiplication sign, indicating burgeoning wealth. Thus, for instance, "OG" stood for "Oil and Gas." "OS" was "Offshore Services." "EB," BATISTA's initials, and "63," his lucky number (he is notoriously superstitious) indicated personal wealth-holding companies.

40.     The exit strategy was to sell whatever stock and assets they could, trust to local corruption to safeguard the wealth trapped within Brazil, and trust to the complicity of professional co-conspirators, accomplices, bankers, and bribed politicians, to hide the vast mass of their takings safely abroad in solid investments or secret bank accounts, where toothless local Brazilian government processes and their victims, they hoped, would be unable to touch them.

41.     By the start of 2013, through thousands of fraudulent misrepresentations spanning the years since 2009, BATISTA and his co-conspirators and accomplices had built an impression in the minds of money managers and investors internationally that OGX was sitting on enormous reserves of recoverable oil when in reality there was virtually none.

42.     In 2013, OGX bonds were returning high yields. The only real concern to buyers on the secondary market was whether the company was sufficiently capitalized to bring that oil into production.

43.     To reassure investors, BATISTA and his co-conspirators and accomplices, via further fraudulent misrepresentations detailed below, created an illusion of deep financial resources, ultimately backed by BATISTA's personal pledge through the "Put Option" also detailed below, to inject a billion dollars into OGX, if and when needed.

44.     In October 2013, when BATISTA and his co-conspirators and accomplices had cashed out the last of their stakes and the wealth had been secreted in the names of BATISTA's various willing family members, joined as Defendants here, or in shell companies and bank accounts outside Brazil, in Miami, Florida, and around the world, BATISTA reneged on that billion dollar pledge and OGX declared bankruptcy, swiftly followed by the bankruptcy of the satellite companies OSX and MMX.

45.     American investments funds such as those managed by Pimco from California and BlackRock from New York lost billions of dollars on OGX bonds. The $150 billion Florida System

Retirement Fund, which manages the retirement savings of Florida's teachers had invested in several of BATISTA's companies and may have also lost money. Many other investors lost their investments. The Plaintiffs lost in excess of $20 million.

46.     So far, BATISTA and his co-conspirators and accomplices appear to have gambled aright that they could make immense amounts of money with no real comebacks. BATISTA and a few others were eventually criminally indicted in Brazil for insider trading, stock manipulation and market fraud. However, in Brazil's glacially slow, toothless, corrupt legal system, it is highly unlikely that there will eventually be any serious consequences.

47.     Millions of dollars of the domestic Brazilian assets that BATISTA had stashed at the last minute in the names of his willing family members in anticipation of the collapse were frozen. He has also been banned from the board of any public company in Brazil for a short five year period. But, all in all, apart from such minor inconveniences, with most of the wealth that he and his co-conspirators and accomplices garnered from the scheme stashed abroad, the fraud has been a complete success.

**Organizational Layout of the Complaint:**

48.     The allegations are divided into three sections. The first - **Section I - Inflating the OGX Oil Bubble** - covers the period from 2009 through early 2013, during which, as the cumulative effect of a series of fraudulent misrepresentations, BATISTA and his co-conspirators and accomplices built a belief in the minds of investors internationally that OGX was sitting on massive reserves of recoverable oil when there was in fact virtually none. This was the foundational, accepted understanding in the international investment markets of OGX's assets and likely profitability at the time that the Plaintiffs made their investments in OGX bonds through their Florida investment adviser in 2013.

49.    The continuing fraudulent misrepresentations and how they induced the successive purchases of more than $21 million in OGX bonds by their Florida investment adviser on Plaintiffs' behalf during 2013 is covered in **Section II - The Plaintiffs Invest.**

50.    The account of the collapse of the whole house of cards in late 2013 is detailed in **Section III - The OGX Oil Bubble Bursts.**

### Section I - Inflating the OGX Oil Bubble

**The Roles played by the Defendants:**

**Eike Batista:**

51.    BATISTA was the prime mover in the scheme. At all material times, he was the controlling shareholder and top managing agent of OGX, either as President, Chairman of the Board, or both. He also held stock and exercised control over the satellite operating companies such as OSX, MMX, and LLX whose success hinged largely on OGX striking offshore oil in large commercial quantities.

52.    BATISTA also owned and controlled the private wealth management companies through which he held the controlling shares in the operating companies, and through whose financial dealings and routing of money he accomplished the objective of the fraud. These were the Defendant 63X Companies, the EBX Companies, and the CENTENNIAL Companies. In addition, BATISTA may have also influenced or controlled the THORQUE Companies.

53.    Through his control position in OGX, BATISTA directly disseminated, ordered, or knowingly permitted the thousands of fraudulent communications, of which only a fraction are described below, constituting a colossal barrage of hype, inducing investors to contribute money to his enterprise in the expectation of gain.

9

54.     Through his control positions in all the Defendant companies, BATISTA appointed directors and managers who acted as his agents and who were his co-conspirators and accomplices in accomplishing the fraudulent scheme.

55.     References to BATISTA or OGX having "made," "stated," "published," "announced" and the like as to the communications described below refer to the fact that BATISTA either did it directly, ordered that it be done, or knowingly permitted such false communications to be made through accomplices and co-conspirators.

56.     It is not known how much money BATISTA made off the scheme, but at the bottom end of the range it is believed to be in the many hundreds of millions of dollars and at the top end, possibly billions.

**The Individual Co-conspirators and Accomplices:**

57.     BATISTA had numerous individual co-conspirators and accomplices who conspired with him and aided and abetted him in effectuating his scheme. Some OGX directors and officers, such as the top oil engineer MENDONÇA who generated misrepresentations from the early days in 2009 onwards, knew about the scheme from its inception. Similarly, trusted advisers such as his brother, WERNER BATISTA, his right-hand-man for three decades, GODINHO, and his close confidant, GOUVEA, upon information and belief, knew of the fraud from the early days.

58.     But all of BATISTA's confidants, including his eldest son, THOR BATISTA, all the Board members of OGX and many of the directors of OSX and LLX were, by some time in 2011, or by at the latest during 2012, privy to the fact that the core oil exploration company, OGX, on which the success of all largely depended, was actually insolvent.

59.     Yet all such directors and insiders failed to tell investors the truth and allowed the barrage of baselessly optimistic hype to continue, in order to make money from their salaries and

10

the sale of the stock and corporate assets. Only a few of these have been joined as Defendants. These are as follows:

**Paulo Mendonça:**

60.     Before joining OGX, MENDONÇA had been the chief geologist at Petrobras for 34 years, throughout its successful exploratory campaign. As such, he enjoyed a respected position in the industry. As BATISTA's supposed "Dr. Oil," MENDONÇA was constantly touted to the press and to the investing public as the head of a supposed "Dream Team" of oil industry experts who would find oil where none had been found before.

61.     Given MENDONÇA's background and reputation in the oil industry, his pronouncements on recoverable oil volumes were regarded as reliable and his imprimatur was seen as a solid assurance of the probity of the company's predictions.

62.     However, BATISTA had incentivized MENDONÇA with a big block of OGX stock to use his name for their mutual profit in hyping the promise of OGX's exploratory wells which was contrary to industry practice.

63.     In his position as a top OGX executive, as detailed below, MENDONÇA created and published numerous fraudulent public announcements of supposed massive "discoveries" of oil while disposing of his own OGX shares at consequently inflated prices for many tens of millions of dollars, and enabling the rest of the group to take and squirrel away many hundreds of millions or even billions of dollars as their own proceeds of the scheme.

---

[2] Plaintiffs reserve the right to add more insiders as defendants if discovery reveals a sound basis to do so. These would include BATISTA's father, Eliezer Batista, who stayed on the Board of OGX through the collapse, though independent directors were resigning rather than face criminal and civil liability.

**Werner Batista:**

64.     Defendant, WERNER BATISTA, and his family had been living in Florida for more than twenty years when he agreed with his brother, EIKE BATISTA, during 2009 to split his time between Florida, and Rio de Janeiro and help him in his new oil venture.

65.     WERNER BATISTA took up a position as a director in BATISTA's personal wealth management entity, the Defendant, EBX HOLDING, in September 2009, where he helped assist his brother in the actions described herein.

66.     WERNER BATISTA resigned from EBX HOLDING in December 2013 in the wake of the fallout from the collapse of OGX. It is unknown before discovery how much of the wealth of duped investors he managed to take for his own purposes but he has, upon information and belief, returned his focus to Florida where he has invested part of his profits in Florida businesses.

**Thor Batista:**

67.     Defendant, THOR BATISTA, is the eldest son of EIKE BATISTA. Upon information and belief, during the final two years leading up to the collapse of OGX and the satellite companies, his father introduced him to the fact that the business was heading for certain failure and unless he wished to give up his life of luxury - which had hitherto included being able to fly from Rio to Miami, Florida, by private jet for his routine shopping - he should assist him in sheltering proceeds of the fraud in offshore companies and foreign bank accounts, to which his son agreed.

68.     To this end, in or about April 2012, THOR BATISTA, with his father's help, established two companies in The Bahamas, the Defendants, THORQUE1 FUND LTD. and THORQUE INVESTMENT MANAGEMENT LTD., as nominal owners of proceeds of the scheme.

12

69.     EIKE BATISTA and THOR BATISTA established bank accounts in Miami, Florida at Banco Itaú Europa International and upon information and belief at Citibank and other institutions as well as at banks in The Bahamas and the Cayman Islands, to which BATISTA and his 63X, EBX and CENTENNIAL companies routed hundreds of millions of dollars in proceeds from the scheme during 2012 and 2013.

70.     It is believed that the Bahamian accounts were emptied at some time between 2013 and July 2016, with the proceeds being transferred to BATISTA's "Swiss trust"[3], of which BERTO was the original trustee, or to other secrecy destinations.

71.     In July 2016, THOR BATISTA quietly dissolved the THORQUE Companies in The Bahamas.

**Flavio Godinho:**

72.     Defendant, FLAVIO GODINHO, is a lawyer admitted in Brazil, only, and has been a close, long-time confidant of BATISTA's since the 1980's.

73.     Over three decades, GODINHO has served in an array of capacities in BATISTA's companies and was regarded as his "Right Hand Man." At one time or another GODINHO was Chairman and Chief Executive Officer of EBX Brasil S.A., a Legal Vice-President of EBX GROUP LTD., General Counsel, Corporate Development Officer and a member of the Executive Board of EBX Ltd. and its subsidiaries, a director of LLX, a director of OSX, and a director of MPX, among others.

74.     Through his top positions in BATISTA's companies and as a close friend, confidant and legal adviser, GODINHO was aware of the material developments in the scheme and conspired with and counseled BATISTA and their co-conspirators in how to achieve its success including,

---

[3] The term "Swiss trust" is used in a generic sense. Further details are still being explored.

13

upon information and belief, the accomplishment of the bribery of government ministers in order to secure an economic advantage.

75.    GODINHO is believed to have made over $200 million from the scheme and fled Rio de Janeiro for Miami, Florida, in the wake of the OGX collapse. He is also currently under investigation in Brazil in connection with the notorious Petrobras bribery scandal and a new sub-chapter opened in that investigation into government bribery by BATISTA's companies, dubbed the "The X-Files."

**Paulo Gouvea:**

76.    Defendant, PAULO GOUVEA, like GODHINO, is a lawyer admitted in Brazil only, and is a long term confidant of BATISTA who served on the Board of OGX and as head of corporate finance in the EBX group of companies, who conspired with and assisted BATISTA and the others in achieving the objectives of the fraudulent scheme.

77.    GOUVEA is believed to have reaped in excess of $150 million from the fraud. Through his current position as a partner in and Director of Capital Markets at Brazil's biggest brokerage house, XP Investimentos, he does business in Florida through its Miami, Florida, office.

**Marcus Berto:**

78.    Defendant, MARCUS BERTO, was a long-standing BATISTA confidant who was in December, 2012 appointed CEO and Investor Relations Officer of LLX, BATISTA's allied logistics company, to help secretly sell off the company ahead of the crash of OGX.

79.    Upon information and belief, BERTO knew that OGX was insolvent by the end of 2012 and conspired with BATISTA and agreed to help set up a Swiss trust, through professionals in Miami, Florida, to which BATISTA could funnel his personal profits from the scheme.

80.    Upon information and belief, BERTO was the first trustee of that trust and in that capacity established its Swiss and other foreign banking relationships.

14

81. After OGX collapsed, BERTO left Rio de Janeiro for Key Biscayne, Florida, where he is believed to have invested part of the proceeds he realized from the fraud in a multi-million dollar mansion.

**Luiz Carneiro:**

82. Defendant, LUIZ CARNEIRO, was the CEO and President of OGX and CEO and Executive Board Member of OSX during its final two years, 2012 and 2013, when the Board and top executive management knew that OGX was insolvent and that the future of OSX hinged on OGX's — unachievable — success. He was a close confidant of BATISTA and conspired with him and assisted him in achieving the objectives of the fraudulent scheme.

83. Upon information and belief, in his position as head of OSX, CARNEIRO handled the bribery of government officials, which included the payment of a $2.3 million bribe. CARNEIRO along with Brazil's Finance Minister, Guido Mantega, Chairman of the government-run oil behemoth, Petrobras were recently arrested in connection with the bribery investigation.

84. Upon information and belief, the OSX-Mantega bribe secured in excess of $922 million in shipbuilding contracts from Petrobras for which there was no actual commercial demand in order to continue the illusion that OSX was a viable entity. The contracted vessels were not completed by the time of the OSX bankruptcy in October 2013.

**Aziz Ben Ammar:**

85. The Defendant, AZIZ BEN AMMAR, was recruited by BATISTA as a board member of OGX and satellite companies in the final year leading up to the crash in order to help keep the balls in the air as long as possible for BATISTA and the others to get their stakes monetized and out of Brazil before the crash.

86. BEN AMMAR was elected to the boards of OGX, LLX, OSX, and MMX by a cadre of unsuspecting victims, including a number of American retirement funds who had bought

shares or bonds in BATISTA's companies on the basis of his fraudulent promises, among them the Florida Retirement System Trust Fund.[4]

87.     BEN AMMAR was intimately involved in generating stories for the press during 2013, regarding the supposed massive capitalization of OGX and the fact that it was impossible for it to fail. He was a prime architect of the fraudulent billion dollar "Put Option" and the cover story regarding the fictitious $850 million "sale" to Petronas, both described below.

88.     On September 4, 2013, having milked as much as he could out of the scheme, BEN AMMAR resigned from the Board of OGX, weeks before its bankruptcy, and reportedly fled Brazil for New York where he presently resides in a multi-million dollar apartment acquired, upon information and belief, with part of his takings from the scheme.

**The Corporate Co-conspirators and Accomplices:**

**The 63X, EBX, CENTENNIAL and THORQUE Companies.**

89.     There were also numerous corporate entities that BATISTA owned or controlled that he used in executing his scheme. These were either holding companies for his stock in the operating companies, such as OGX and OSX, or were set up for the simple purpose of being the name on a bank account for the transmission of funds to accomplish the fraudulent scheme. Some of these entities have been joined as Defendants here. These are the 63X Companies, the EBX Companies, and the CENTENNIAL Companies and may also include the THORQUE Companies.

90.     These corporations, all of which were incorporated in secrecy jurisdictions, had no legitimate corporate business or real independent existence separate from BATISTA and were no more than fictitious names for BATISTA himself. They acted as "cut-outs," to obscure the trail

---

[4] The Florida Retirement System Trust Fund is an approximately $150 billion pension fund that pays retirement benefits for over a million state, county, school system and higher-education teachers and other employees, managed by the Florida State Board of Administration of which the trustees are Florida Governor, Richard Scott, Florida Chief Financial Officer, Jeffrey Atwater, and Florida Attorney General, Pamela Bondi.

between the origin and the destination of funds and facilitate the transmissions of funds to achieve the ends of the fraudulent scheme.

91.    Further, upon information and belief, these corporations assisted in creating the illusion of the "Mubadala Investment," the supposed $2 billion stock acquisition of a small stake in BATISTA's wealth-holding companies by an oil-rich Arab nation intended to induce investor confidence, but which was in reality a massive loan that monetized the majority of BATISTA's stake in the scheme and was secretly repaid in 2013 by stripping prime assets out of the businesses.

92.    In all these companies, BATISTA and his co-conspirators and accomplices failed to observe the required corporate formalities and the entities were used as engines of fraud, such that their separate corporate existence should be disregarded.

93.    Alternatively, to the extent that these entities are found to have had true separate corporate existence, they should be treated as additionally liable, as being co-conspirators, agents and constructive trustees of proceeds of the fraudulent scheme.

94.    There are many other companies that also fall into this category of aiders and abettors, accomplices and co-conspirators whose involvement is less clear and have therefore not yet been joined as parties, but which may be joined later after discovery.

**Additional Fraudulent Transfer Recipients:**

**Olin Batista, Flavia Sampaio, and Luma De Oliveira.**

95.    EIKE BATISTA's family members WERNER BATISTA and THOR BATISTA were active participants in the scheme.

96.    Other family members, namely the Defendants, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA, are not presently known to have had any substantial involvement in the active fraud committed within the various BATISTA companies. (This may change after discovery).

17

97.     However, such family member Defendants knowingly received multi-million dollar transfers of real estate and cash within Brazil in the months immediately prior to the collapse of OGX for no consideration, when BATISTA was declaring insolvency, as a means of cheating creditors.

98.     Upon information and belief, during 2013, BATISTA wired several hundreds of millions of dollars of the proceeds of the fraudulent scheme to The Bahamas and to other offshore jurisdictions and attempted to transfer another $100 million out of a bank in The Bahamas to an account in Miami, Florida, in order to evade creditors.

99.     If the money transferred out of Brazil is no longer in the name of BATISTA's wealth-management companies then, following the template of BATISTA's actions in Brazil, it is believed that much of that wealth has been transferred into the names of the listed Defendant family members, WERNER BATISTA, THOR BATISTA, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA.

100.    None of these family members gave value for such transfers but served knowingly as mere nominees for BATISTA in whose names such assets were "parked" and should be held, as constructive trustees, to return such funds for the payment of the Plaintiffs' claims.

101.    Having described the scheme in general and the general involvement of the various Defendants, a detailed account follows.

**The Scheme – in Detail:**

**The Brazilian Deepwater "Pre-Salt" Discoveries.**

102.    The world's largest oil discoveries in recent years have been in Brazil's offshore, pre-salt basins. "Pre-salt" oil is generally characterized as oil reserves situated exceptionally deep, under thick layers of rock and salt, and requiring substantial investment to extract.

103.    In 2005, Brazil's national oil company, Petroleo Brasileiro S.A. ("Petrobras") drilled a wildcat well in the ultra-deep waters of the Santos basin off the coast of São Paulo state and discovered the presence of hydrocarbon condensate under a thick layer of salt. This discovery confirmed a previously untested geologic model that indicated the potential for large recoverable oil deposits.

104.    In 2005, Petrobras confirmed the presence of potentially recoverable petroleum with the discovery of the Tupi oil field in the so-called pre-salt layer in the Santos Basin.

105.    Additional drilling and testing led to an announcement by Petrobras in November 2007 that the Tupi oil field (now known as the Lula oil field) contained between five billion and eight billion barrels of oil.

106.    Given these discoveries, there was significant global attention to the oil and gas industry in Brazil. The pre-salt discoveries showed great promise.

**The Start of OGX.**

107.    The Brazilian government auctions off drilling leases to companies who wish to explore for oil and scheduled what promised to be some of the richest new deep-water oil fields off its coast for auction on November 27, 2007.

108.    BATISTA had no experience in the oil-exploration business but had a lengthy background in stock promotion and mineral exploration and he raised approximately $1.3 billion in private equity to acquire some of these deep-water drilling leases through a company he named OGX, which he owned through his personal asset vehicle, CENTENNIAL 1.

109.    However, just before the auction, based in part on the very recent Tupi oil field discovery, the Brazilian authorities withdrew the deep-water fields from auction, deeming them "too valuable" and left in play old shallow-water fields that had been picked over by Petrobras for decades and generally viewed as worthless.

19

110.    That put BATISTA in a quandary. He had raised approximately $1.3 billion from investors to spend on deep-water oil fields. Now there were no deep-water fields to buy. No one wanted the shallow-water fields.

111.    Rather than refund the money, BATISTA resolved to press forward and acquire these rejects of the industry.

**OGX Wins Rights to 21 Exploratory Blocks.**

112.    On 27 November 2007, OGX submitted the winning bid on 21 exploratory blocks (seven of them in consortia with other operators) and committed significant funds for licensing fees as follows: seven blocks in the Campos Basin off the coast of Rio de Janeiro (two of them in consortia with Maersk); four blocks in the Santos Basin; five blocks in the Para-Maranhao Basin; and five blocks in the Espirito Santo Basin (in consortia with Perenco S.A.), all as shown below:



**OGX Raises Additional Capital – Initial Public Offering.**

113.    However, having committed nearly all of its cash to pay for the licenses and fees associated with the exploratory concessions, OGX needed to raise additional capital to conduct exploration. It would seek those funds from the capital markets via an initial public offering ("IPO") of approximately five million of its common shares.

20

114. However, persuading the investing public that these fields were unrecognized treasures rather than the worthless money-pits (that they would eventually prove to be) would require enormous promotion.

115. To garner credibility for OGX, BATISTA built a roster of senior executives from Petrobras; individuals who had been integral to that company's deep-water discoveries, headed by the Defendant, PAULO MENDONÇA, a geologist and former Petrobras head of exploration, who BATISTA dubbed "Dr. Oil."

116. BATISTA granted his team members generous stock options in OGX to ensure that they were personally invested in the value of the stock and incentivized to spread any good news and to contain or minimize the bad.

117. BATISTA's publicized rationale for exploring the shallow-water fields was that modern technology in the hands of his "dream team" ensured better, more accurate detection. If there was oil to be found, they would find it. Plus, when they found it, the much lower extraction costs in shallow water than in deep water meant much greater profitability. This one-two punch of state-of-the-art technology in the hands of the best oil gurus in Brazil, coupled with low-cost lifting, BATISTA boasted, promised to be a sure-fire winning combination.

118. In 2008, BATISTA's OGX raised $4.1 billion in the biggest initial public offering in Brazilian stock market history.

119. In its November 2008 Management Presentation, OGX announced that it had entered into contracts for 3D seismic surveys for all of its exploratory blocks; acquired various logistical transport vessels, including seven boats and two helicopters; and secured four off-shore drilling rigs with "world-class contractors." It stated that it expected to conduct an "intense drilling campaign" beginning in the second half of 2009 and reach "first oil" by the end of 2011.

21

**The Fraudulent Misrepresentations Start.**

120.    BATISTA and his co-conspirators and accomplices now embarked on a relentless propaganda campaign boosting the promise of the OGX oil-fields completely untethered to any basis of reasonable fact in order to attract investment capital and boost the stock and bond prices in OGX and other satellite companies soon to be launched. These knowingly false representations were all made with the intent of inducing investors to buy stocks and bonds in OGX and its satellite companies.

121.    The prime target of the misrepresentations were U.S. investors and necessarily and primarily those in its most populous states, California, Texas, Florida and New York.

122.    American investors were to account for the vast majority of the sales of OGX shares and bonds, including American government pension funds such as, as noted above, the Florida Retirement System Trust Fund.[5]

123.    This barrage of hype took various forms, all of which was intended to induce investment and succeeded in inducing stock and bond sales on the primary and secondary markets to maintain the illusion of OGX as a valuable business for as long as possible.

124.    One was by way of what are termed in Brazil, "Material Facts." ("Statements of Material Fact" or "Material Facts"). These are public disclosures required by Brazilian law as to events which might impact equity and debt investor decisions to buy or sell. The directors of any

---

[5] The size of the Florida Retirement System Trust Fund investment into BATISTA's companies, and the extent of its losses, is unknown. But such institutional investors typically invest in very large tranches and the Fund's stake was large enough for it to vote at extraordinary shareholders' meetings. It is listed online as having voted, for instance: at an OGX shareholders' meeting on December 18, 2009, at the start of the scheme; at an OGX shareholders' meeting (*inter alia* to elect the Defendant, AZIZ BEN AMMAR to the OGX Board) on December 1, 2011; at an OSX shareholders' meeting (inter alia to elect the Defendant, AZZIZ BEN AMMAR to the OSX Board) on September 6, 2012; and at an MMX shareholders' meeting to vote on a proposed merger and Board re-shuffle following that company's October 2013 declaration of bankruptcy.

public company are legally bound to disclose such facts to the investing public by way of a report to the relevant stock exchange and to the press.

125.    There were many Statements of Material Fact, as detailed below, that contained serious fraudulent misrepresentations of promising developments in OGX.

126.    Further, the medium of the "Statement of Material Fact," which is intended to be reserved for consequential announcements, was abused to trumpet inconsequential news, such as the "discovery of hydrocarbons," to give it undeserved significance and whet market appetite.

127.    Finally, there were many instances where information as to material adverse developments should have been published by way of Statements of Material Fact, but was not, leaving investors internationally to rely on the continuing validity of prior positive announcements. These instances of failure to announce negative news constituted misrepresentations by omission.

128.    BATISTA and his accomplices and co-conspirators also gave many press interviews and held press conferences in which he and they promoted the story of OGX's great success and its supposedly fabulously valuable oilfields. These fraudulent misrepresentations were disseminated live or by video recordings to the international financial press, particularly Bloomberg,[6] to be relayed via the internet to the worldwide investment community.

129.    Following the precept that "a picture is worth a thousand words," BATISTA and his accomplices and co-conspirators also seeded the press with management report graphics and news photographs bolstering the illusion of the great success and fabulous wealth of OGX.

---

[6] "Bloomberg" refers to the New York-based financial software, data, and media company which provides the international investment industry with financial software tools and news through the Bloomberg Terminal (via its Bloomberg Professional Service), wire service (Bloomberg News), global TV network (Bloomberg Television), websites, radio station [WBBR], newsletters and magazines. (*Bloomberg Businessweek*, *Bloomberg Markets* and *Bloomberg Pursuit*.)

130.    Additional fraudulent misrepresentations were contained in thousands of "tweets" sent via BATISTA's internet Twitter feed to what eventually topped one million followers, including many financial journalists.

131.    Further, BATISTA personally made face-to-face promotional pitches to high-net-worth investors in Florida and elsewhere in the U.S.

132.    It is not possible to list every one of the many thousands of fraudulent misrepresentations but a selection is given below.

**Technical Terminology – PRMS.**

133.    To understand the quality of the misrepresentations, a very brief primer on oil industry jargon is in order.

134.    The detection of oil is done by way of seismic and other remote studies and the drilling of test wells. The exact volume of oil contained in any underground reservoir cannot be known exactly until it has been pumped to the surface.

135.    Moreover a volume of oil may exist but there may be no technological means of recovering any of it. Even if some volume may be "technologically recoverable" it may not be "commercially recoverable," *i.e.* the cost of extraction will exceed its selling price.

136.    To try to lend some precision to the description of underground oil estimates and the likelihood they can be extracted profitably, the oil industry found it necessary to develop an agreed set of technical terms.

137.    Accordingly, the international oil industry developed the Petroleum Resource Management System (the "PRMS"), a universal language used for estimating and classifying quantities of oil (and gas) discovered in any given reservoir according to their recoverability.

138.    The PRMS distinguishes between "technological" and "commercial" recoverability and further distinguishes between "reserves" and "resources." "Reserves" refers to oil that is

reasonably certain to be commercially recoverable. "Resources" is a much wider term, and refers to all quantities of oil which is predicted to possibly exist within discovered or undiscovered reservoirs. "Resources" therefore encompasses discovered and undiscovered, recoverable and unrecoverable, and commercial and non-commercial quantities of petroleum.

139.   There are internal gradations within these categories running from "proved" to "probable" to "possible" reserves and from "contingent" (either "low", "best" or "high" estimates) to "prospective" resources. Quantities are expressed in "barrels" or "boe" – "barrels of oil equivalent."[7]

### The First OGX "Oil Strike."

140.   It is common for oil exploration ventures seeking to raise finance on the international capital markets to retain the services of an independent consultancy firm of specialists to appraise its oil discoveries. They essentially act as auditors.

141.   OGX retained the prestigious Dallas-based firm of DeGoyler & McNaughton ("D&M") for this purpose in or around 2008.

142.   In March 2008, OGX released a Statement of Material Fact that its auditors, described as "world-renowned D&M," believed that OGX might be sitting on as much as 4.8 billion barrels of oil. At this point these were, at most, very preliminary seismic studies. The unstated inference was that this was "recoverable" oil or it was of no moment - *i.e.* not "material" - and not worthy of publication as a Statement of Material Fact. Predictably, OGX share prices jumped.

---

[7] BOE refers to a unit of energy based on the approximate energy released by burning one barrel (42 U.S. gallons or 158.9873 litres) of crude oil.

143.    On September 18, 2009, OGX announced the commencement of its drilling campaign with the drilling of well "OGX-1, block BM-C-43" in a prospect area dubbed the "Vesuvio" formation.

144.    On October 7, 2009 OGX issued a Statement of Material Fact that it had struck oil in the Vesuvio oilfield about 85 kilometers offshore, in 140 meters of water. MENDONÇA was quoted as stating that this was "a milestone in the industry, which was only possible due to the motivation and talent of our unique team." Both the issuance of this news via the medium of a Statement of Material Fact – to be reserved for announcements that should materially impact investment - and the quoted statement were intended to convey the impression that *recoverable* oil had been discovered. However, there was no reason for anyone with access to the OGX drilling test results to believe that this was true.

145.    On October 14, 2009, OGX released a Statement of Material Fact that declared in bold type that from a single exploratory well in the Vesuvio oilfield: **"Recoverable Oil Volume Expected to be between 500 Million and 1.5 Billion Barrels."** MENDONÇA was quoted as saying this find validated the OGX team's scientific methodology and the "high petrolific (*sic*) potential" of the company's underwater leases.

146.    The implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable at any cost – even at a loss – but that it was likely to be commercially recoverable.

147.    With oil trading at around $75 a barrel, this was a representation to investors that OGX was sitting on minimum oil reserves worth between $37 billion and $111 billion from a single well, with many more yet to go. However, there was no reason for anyone with access to the OGX drilling test results to believe that any of this was true.

26

148.   This core Vesuvio announcement, which was not retracted until shortly before the OGX bankruptcy, was a bed-rock misrepresentation for investor confidence in OGX right up through the crash in 2013, despite the fact that BATISTA and his co-conspirators and accomplices knew the field was worthless long before it was eventually returned as valueless to the Brazilian government.

149.   BATISTA, who had not hitherto been known for his largesse, now became very conspicuous for his apparently generous public gifts which were enabled not by profit, but by the torrent of inflowing investment capital and skimmed off the top.

150.   The point of such apparently "generous" charitable gifts was to keep BATISTA in the public eye and to help paint a picture of multiplying wealth – as the "X" in BATISTA's company names was intended to signify – such that he could afford such acts of generosity.

151.   In fact, the only real "generosity" was on the part of the investing public, because it was their money being given away.

152.   Through his business and such "charitable" activities, BATISTA became close to many of Brazil's top politicos who it is believed that he bribed from his various offshore corporate bank accounts to ensure that governmental regulators were as "hands-off" on him and his enterprises as possible.

153.   Some of these politicians are also now on the long list of government officials who are under investigation by the Brazilian government for accepting bribes in connection with the huge Petrobras scandal that would ultimately break in 2014 – including now-impeached President, Dilma Roussef, who was arrested on September 22, 2016.

**The Second OGX "Oil Strike."**

154.   On November 16, 2009, OGX released a Statement of Material Fact announcing a new major oil strike captioned, in bold type: "**OGX Announces Discovery of Oil . . . Estimated**

27

**Volume of 400 Million – 500 million barrels – Drilling still in progress and new objective to be reached.**" This oilfield was later dubbed the "Pipeline Formation."

155.  Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable but was likely to be commercial.

156.  At a market price then around $79 a barrel, this was a representation to investors internationally that there was something like another $30-40 billion in value in OGX. The range of expected revenues for OGX was now cumulatively somewhere between $70+ and $158+ billion – and apparently there was more to come in the same well.

157.  Investors reacted predictably. The OGX stock price rose steadily through November 2009 to a high of R$15.70 while the numbers of trades swelled from over 16 million to over 22 million in just two days between November 16 and 18, 2009.

158.  Fully realizing that the figures that he had authored were completely baseless and had been intentionally used to create a dramatic increase in stock prices, and probably not believing that he would be able to prop the prices up much longer, in December 2009, MENDONÇA secretly sold 10,000 of his own OGX shares, realizing a profit of approximately $5,000,000.

159.  Upon information and belief, contrary to Brazilian law, this was not disclosed to CVM, the Brazilian Securities and Exchange Commission.

**OGX Strikes Even "More" Oil.**

160.  On December 22, 2009, OGX announced via Statement of Material Fact that completed drilling had revealed that the oil strike declared in November was now estimated at being two to four times greater. As the Statement of Material Fact stated, now the: **"Recoverable Oil Volume Expected to be between 1 and 2 Billion Barrels."**

161.  Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just "technologically recoverable" but was likely to be "commercial."

162.   BATISTA's announcements to investors by now equated to a cumulative promise that OGX was sitting on at least 1.5 billion and maybe as much as 3.5 billion barrels in recoverable oil. At a December 2009 price of around $75 a barrel that translated to a promise of between roughly $112.5 billion and $262.5 billion in value and investors reacted predictably favorably to the cumulative promises.

163.   In fact, the OGX seismic studies and drill test results had failed to indicate that a single barrel of oil was necessarily even technologically recoverable at any cost, let alone at a profit. Indeed, the internal D&M reports confirmed exactly that.

164.   But beyond that, from the very beginning, upon information and belief, very high concentrations of hydrogen sulphide gas had been detected. This compound, nicknamed "Death Gas" in Portuguese, is very poisonous, corrosive, flammable and explosive. Striking oil is no cause for celebration if it kills the drill-crew. The presence of this contaminant greatly increases the danger and the cost and therefore greatly decreases the commercial viability of an extraction operation. This fact was not disclosed.

165.   The promulgation of these statements to investors internationally and the continuing failure to retract them constituted fraudulent misrepresentations that were intended to induce and did successfully induce a belief in and among investors that OGX, and the satellite entities that depended on its success, had huge intrinsic commercial value.

**The OSX Public Offering.**



166.    To cope with the huge gushers of oil that he had promised, BATISTA announced that he would start a shipyard to build a number of huge "oil platforms" (tanker ships equipped with drilling rigs as shown above) through his company, OSX, and began scouting a coastal site for a "Super-Port" to be managed by his logistics company, LLX, where these monsters could dock to unload OGX oil, eventually settling on a location at Açu, near Rio de Janeiro.

167.    OSX went public in 2010 and raised $1.58 billion through its initial public offering on the São Paulo Stock Exchange. The rationale for the OSX oil platforms was to transport OGX oil. The main point of the LLX "Super-Port" was for the OSX ships to dock and offload OGX oil. But OGX had found virtually no oil and in all its existence, right up to its bankruptcy in 2013, would pump virtually no oil.

168.    The ships were massive and inspired investor confidence - but that was their sole point. No responsible businessman would have commissioned such monsters without a predictable source of supply, but they were complete overkill for the tiny trickle of OGX oil.

169.    But their point was not to actually *transport* oil: they were window dressing, intended to mask the fact that *there was no oil*. They were visible support for BATISTA's lies. In

30

essence, in themselves, they were huge floating fraudulent misrepresentations, boasts to the world of the existence of vast quantities of commercially recoverable OGX oil.

170.    Eventually, OSX would have six ships commissioned, with the assistance of bribes to government ministers. But in its entire future, OGX would not pump enough oil to fill those six multi-million dollar OSX ships once, for even a single trip to port.

171.    Nevertheless, on January 26, 2010, OGX released a Material Fact captioned: **"OGX Signs Agreements with OSX to Secure Production Equipment – OGX Sets Production Target of 1.4 Million barrels per Day by 2019 – Initial Production Expected to Begin in Early 2011, Ahead of Schedule."** In the body of the Statement, BATISTA was quoted as stating:

> Our drilling results have revealed a new oil province in the southern part of the Campos Basin and broken paradigms regarding the quality and potential of the reservoirs in this area. At this moment, OGX is entering into a new phase in its history, with a focus on reaching our production target of 1.4 million barrels per day by 2019. We have an unparalleled 10 year growth story, based on world-class assets of extraordinary quality.

172.    The inference was that these were realistic projections founded on the discovery of a "new province" of commercially recoverable oil. But in truth, there was nothing to support it.

173.    BATISTA's reference to "world class assets" also resonated with investors internationally. In financial accounting, an "asset" is an economic resource that can produce value.

174.    However, nothing that OGX had yet discovered constituted an "asset." All the data available to it indicated that it might have "resources" of various categories, but how much could be recovered at *any cost* remained to be seen let alone what could be recovered *at a profit*.

175.    On February 1, 2010, OGX announced an estimated volume of "recoverable oil of 100 to 200 million boe" in the Vesuvio formation at well OGX-4.

176.    On February 3, 2010, OGX released a Statement of Material Fact that the drill-stem test at the 1-OGX-3-RJS well in block BM-C-41 (later named the Tubarao Azul - "Blue Shark" -

31

field) had revealed an estimated total recoverable volume of between 500 and 900 million barrels of good quality oil. This was represented to be extractable at a rate of approximately 3,000 barrels per day by vertical drilling, but at perhaps five times that rate, or 15,000 barrels a day, by horizontal drilling, as OGX proclaimed that it planned to do.

177.  This was untrue. There was no reasonable basis to believe in any such numbers. But a possible 15,000 barrels a day, which equated to roughly 5.5 million barrels a year, at a then per barrel rate of $87.21, constituted a fraudulent representation to the investors that OGX was sitting on close to another half-billion dollars of commercially recoverable oil, annually.

178.  On February 8, 2010, BATISTA appeared on the "Charlie Rose" TV show, nationally syndicated in the U.S., including throughout Florida, boasting of the fact that he had discovered "a hundred billion barrels of recoverable oil" and that Brazil was destined to be the world's fifth largest economy by 2015. [*See* Charlie Rose, *Interview with Eike Batista,* (Feb. 8, 2010), https://charlierose.com/videos/21203]. Investors internationally took note.

179.  On March 5, 2010, OGX released a Statement of Material Fact captioned: "**OGX Announces the Presence of Hydrocarbons in the Albian Section of Well OGX-6 – Rock Cores and Logs Indicate Strong Correlation Between OGX-6, OGX-3 and OGX2 Reservoirs.**"

180.  BATISTA's "Dr. Oil," MENDONÇA, was quoted as stating in relation to this new "discovery" that, "Ourre [sic] view of this data indicates that these accumulations may be connected and that the recently discovered oil province may, in fact, extend to the north of the BM-C-41 block, confirming its very significant petroliferous potential."

181.  This was all pure nonsense. The "presence of hydrocarbons" was of no intrinsic relevance to commerciality. As MENDONÇA well knew, publication of the existence of "hydrocarbons" to investors could be highly misleading and industry practice was not to do so. Indeed, when at Petrobras he had helped promulgate guidelines forbidding the practice.

32

182.    The "oil province" described was a grand, non-technical term designed to convey an impression of a huge undersea reservoir of commercially recoverable oil. "Connected" accumulations indicated that a single well might tap the totality. But the aggregate description was just not true and was intended to whet investment appetite.

183.    On April 14, 2010, BATISTA gave a video interview that was broadcast on the internet on XPTV, a video channel maintained by the XP brokerage firm, in which he further claimed that OGX had discovered "a new oil province in Brazil," that OGX had "the best exploratory blocks in the world" with "one trillion dollars-worth" of oil, that the company was worth up to "$100 billion dollars," and warned investors not to miss out on the opportunity to buy OGX stock. (See XPTV, *Entrevista Eike Batista OGX - À Grande Fraude - Entrevista Completa*, https://www.youtube.com/watch?v=6e_huuUsdH4).

184.    At or about this time, BATISTA orally disseminated other such false statements through audio and video conferences with financial institutions via the internet, as with all such internet publications described above and below, accessible and accessed by investors in Florida.

185.    The intended message to the investors internationally and in Florida was that OGX had "one trillion dollars-worth of oil," and was worth $100 billion. This led to an extraordinary increase in OGX's share price which soared from $15.55 to $23.27 that month.

186.    There was no reasonable basis for BATISTA and his accomplices and co-conspirators to believe that more than a tiny fraction of that amount of oil actually existed, let alone that it was commercially recoverable. These representations were fraudulently made with the intent of inducing investors to rely on them in purchasing and trading OGX stock and bonds.

187.    On May 13, 2010, OGX released a Material Fact captioned: **"OGX Concludes Drilling of Wells OGX-6 [and] OGX-8 – Identified Connection Between OGX-2 and OGX-6 Prospects with Estimated Recoverable Volume Totaling 1.4 to 2.6 Billion Barrels."**

33

188.   Again, the use of the words "recoverable volume" was deliberately intended to convey the sense that this was money in the bank, but it was untrue. With oil trading at $80.44 per barrel, this was equivalent to a statement that there was between $112 billion and $209 billion of value in OGX; but there was no reasonable basis for anyone with access to the OGX drilling test results to believe in any such numbers.

189.   On May 27, 2010, OGX released a Statement of Material Fact captioned: "**OGX Detects the Presence of Hydrocarbons in Wells OGX-10 and OGX-13 – Net Pay of Approximately 40 meters in the Aptian Section of Well OGX-10.**"

190.   As noted above, the discovery of "hydrocarbons" is inconclusive of any recoverable oil. However, in the oil and gas industry, "*Net Pay*" refers to the thickness of rock that can deliver hydrocarbons to the well bore. This statement was intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable reserves, to further stimulate market appetite.

191.   On August 12, 2010, BATISTA and MENDONÇA participated in a Bloomberg conference call broadcast over the internet during which MENDONÇA stated that, following a new discovery, OGX expected a "significant" increase in its potential oil and natural gas resources. BATISTA expanded on this, stating that wells in the Parnaiba Basin in northern Brazil might hold 10 to 15 trillion cubic feet of natural gas and that MPX, his energy company, planned to build power plants nearby.

192.   These estimates were pure speculation but they had their intended effect: OGX stock prices rose 2.2% and MPX stock prices rose by 6.8 %.

**Promoting OGX in Miami.**

193.    BATISTA had always had close ties to Florida including close social and business ties with Jeffrey Soffer, the Florida-based real estate and resort developer (then married to super-model Elle Macpherson) and was a frequent visitor to Soffer's Miami, Florida, home.

194.    During August 2010, BATISTA solicited Soffer in Florida to partner with him to develop office buildings and hotels in the Port of Rio de Janeiro and in "City X," BATISTA's mega-project for 250,000 residents in Fluminense, Brazil.

195.    Soffer traveled down from Miami, Florida, to Rio de Janeiro to meet with BATISTA and explore the prospects. The meeting was, as BATISTA intended, reported in the press with speculation as to the future plans of the prospective "partners."

196.    Such well-publicized gambits were designed by BATISTA to generate the impression that other high-performing, highly respected businessmen trusted his business acumen, and such associations lent BATISTA business credibility in the public mind.

197.    Jeffrey Soffer was the owner and operator of the Fontainebleau Miami Beach Hotel in Miami Beach which he had revamped to the tune of a billion dollars and where he envisioned creating a perpetual event marketing space. To this end he had partnered with David Grutman and his Miami Marketing Group, who established and operated the premiere Miami nightclub, LIV, at the Fontainebleau Miami Beach.

198.    MMG Nightlife took Miami's synergistic marketing environment to a new level. It created events at the Fontainebleau Miami Beach's many spaces. The property's restaurants hosted Grutman's huge 30-50 guest, "A-List" celebrity-studded dinner parties, five nights a week, and LIV provided the late-night environment where paparazzi and press could create "buzz" around their doings.

199.   BATISTA - then a member of the international A-List as Bloomberg's putative "Eighth Richest Man in the world" - used his Soffer/Grutman connections to pitch investment in OGX stock directly to celebrities in Miami, Florida.

200.   Thus, in September 2010, BATISTA met with a group of foreign investors in Miami at a star-studded dinner party hosted by Jeffrey Soffer and worked the crowd of high-net-worth investors, one-on-one, to buy OGX stock on insider information, because the company was about to announce further significant oil discoveries.

201.   Among the party guests were baseball star, Alexander Rodriguez ("A-Rod"), and his then girlfriend, the film star, Cameron Diaz. Rodriguez reportedly called his financial advisor for advice on the investment who, because it was insider trading, "told me to forget about it and never mention it again, because I could go to jail for a transaction like this."[8]

202.   It is unknown before discovery how many other people in Florida BATISTA pitched the investment prospects of OGX to at this time and over the years, or how many of them were less prudent than A-Rod and actually bought stock as a result of such face-to-face pitches. But it is believed that, given the fact that BATISTA wasted no opportunity to boost the value of his companies, the face-to-face pitch he made to A-Rod was characteristic of the approach he made to many other high rollers in Florida.

**"Interest from the Chinese."**

203.   On September 13, 2010, BATISTA spoke to reporters on a conference call that was published in an article online by Bloomberg in which he stated that all the major oil companies in the world including the major Chinese oil companies, Cnooc Ltd. and China Petrochemical Corp.,

---

[8]Anderson Antunes, *Even Alex Rodriguez Reportedly Almost Fell Victim to Eike Batista's Financial Collapse*, Forbes (Apr. 20, 2014), http://www.forbes.com/sites/andersonantunes/2014/04/20/even-alex-rodriguez-reportedly-almost-fell-victim-to-eike-batistas-financial-collapse/#1add8bc51ee5.

were among bidders for OGX assets. In response to the reporter's comment that his sources had revealed an offered price of $7 billion for the company, BATISTA said that that amount would only buy a "tiny" stake in OGX.

204.    However, this was just more spin, intended to boost the price for OGX shares. In reality no energy company with access to the actual OGX drilling data would have had an interest in OGX for more than a tiny fraction of its then supposed market price.

205.    Predictably, however, the OGX share price rose. This time by 2%, to put OGX stock at 20% up overall for the year.

206.    By this time, as the cumulative effect of the barrage of hype that BATISTA and his co-conspirators and accomplices had churned out over the preceding years, the financial press were hailing BATISTA as the world's eighth richest man with a net worth of $27 billion, and BATISTA was playing up his supposed position by announcing a new series of planned initiatives, including a partnership with sports goliath, IMG Worldwide, Inc., forming "IMX" to engage in the sports and entertainment business in Brazil, and a foray into consumer electronics by building an Apple computer factory on vacant LLX land.

207.    As the Forbes article concluded regarding the Apple initiative - reflecting the market understanding of OGX - "Whether that will come to pass is hard to say. Given the enormously valuable oil and gas empire that Batista has built in recent years, he might have a chance."

208.    But the "enormously valuable oil and gas empire" was nothing more than smoke and mirrors. Nevertheless, because of their own personal stakes in the success of OGX, BATISTA and his co-conspirators, including by that time, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, and PAULO GOUVEA, THOR BATISTA, and LUIZ CARNEIRO, and the controlled 63X, EBX and CENTENNIAL Companies failed to make any corrective announcement

to the investing public, internationally, and continued to assist BATISTA in hyping the value the OGX oilfields.

209.    On November 26, 2010, Bloomberg reported the news online, sponsored by BATISTA, that OGX was delaying its planned sale of a minority stake in its Campos oilfield until the D&M report was in by the end of the first quarter of 2011. Bloomberg repeated the BATISTA comments from September about selling a $7 billion minority stake to the Chinese; reiterated the fact of OGX's supposed 3.69 billion barrels of potential reserves in the Campos Basin, as estimated by D&M in 2009; and reported that the additional recent discoveries were expected to boost those numbers. This reflected the illusion that BATISTA and his co-conspirators had successfully created. But it was all untrue.

210.    On March 15, 2011, Bloomberg summarized the information on OGX stemming from the cumulative effect of BATISTA's lies over the three preceding years. It reported that OGX, BATISTA's main source of wealth, was worth $37.1 billion, with 6.7 billion barrels of potential reserves. BATISTA was quoted as stating that despite having fielded five purchase offers from other oil companies he did not need to sell because OGX had $3 billion in cash and the extraction costs in its shallow-water fields were extremely low.

211.    Bloomberg further reported OGX as claiming a hundred percent success rate in the Campos Basin where it planned to drill three additional wells and that higher-than-expected production would allow it to use fewer wells per production platform, thereby further cutting production costs. OGX had stated that it anticipated that production would ramp up from 20,000 barrels a day to 730,000 barrels a day by 2015, and 1.38 million barrels a day by 2018. In a video interview with Bloomberg BATISTA said "It's a bonanza" and "these are bonanza assets."

212.    But this was all untrue. For behind the scenes, everything that Brazil's King Midas touched was not turning to gold – not even black gold. But none of the co-conspirators made any attempt to correct the false impression in the market, even though they all knew the truth.

**The 10.8 Billion Barrel Lie.**

213.    On March 31, 2011, D&M submitted its confidential Report to BATISTA and OGX on the Prospective OGX Resources in Brazil and a Report on the Prospective OGX Resources in Colombia. It painted a depressing picture of OGX's future. Out of many billions of barrels of oil and gas that might possibly exist in the OGX fields, D&M failed to identify more than a tiny amount, less than 1%, that might constitute "reserves" – *i.e.* commercially recoverable oil.

214.    When the D&M reports became public there would be an obvious, hugely depressive effect on OGX stock prices. The only alternative BATISTA and his co-conspirators and accomplices decided, to try to keep the price up, was to lie.

215.    BATISTA, therefore, had MENDONÇA mix-and-match numbers from the D&M Reports, adding apples to oranges, completely contrary to the accepted industry methodology, to use as the basis for the most colossal lie to date.

216.    As a preventive strike to defuse the effect of the impending release of the D&M reports, on April 15, 2011, MENDONÇA, "Dr. Oil," issued a press release to investors in which OGX claimed its net potential resources in "recoverable oil" were 10.8 billion barrels and that these figures were based on the assessment of its world-renowned oil auditors, D&M.

217.    In it, BATISTA announced that the 10.8 billion-barrel number was not based just on OGX's own calculations, but that, "[t]hese results, presented by an independent, internationally renowned consulting group, confirm the extraordinary success of our business strategy and execution," he said. This obviously referred to D&M.

218.    To come up with the 10.8 billion barrel figure, MENDONÇA took D&M's *most* *optimistic* estimate of "contingent resources" (*i.e.* oil that was not necessarily commercially extractable in *any* amount) of 3.1 billion barrels. He then jumbled together three different categories of "prospective resources" (*i.e.* oil that had not yet even been discovered and was deemed currently unrecoverable) to come up with another 6.8 billion barrels. He then threw in D&M's figure of 1 billion barrels, which was an upper, outside guess of what might be possible from the geology, and which did not even meet the probability level of "resources" of any kind.

219.    What BATISTA and his co-conspirators and accomplices were doing was completely fraudulent. The 10.8 billion number was basically just made up out of thin air. But it was published under the imprimatur of "Dr. Oil" and supposedly based on the analysis of world-renowned outside auditors, D&M.

220.    Everybody on the Board at OGX, and everybody within BATISTA's confidence, which would have included the directors of OGX, OSX, LLX and the 63X, EBX and CENTENNIAL Companies, if they did not know before, knew by now that the entire "X" group of companies, whose success was predicated on massive oil strikes by OGX, was a massive pump-and-dump scheme. The list of individuals included EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, and LUIZ CARNEIRO. Their legal obligation was to expose the 10.8 billion barrel lie. But they were incentivized by their stock options to keep quiet. And they kept quiet.

221.    Despite BATISTA and MENDONÇA's preemptive strike, on April 15, 2011, when the D&M Report was released, investors reacted with concern and the OGX share price dropped sharply.

222. Nevertheless, on the basis of Dr. Oil's reputation and his 10.8 billion dollar prediction, BATISTA and MENDONÇA managed to spark a debate on the reliability of the D&M numbers.

223. In a conference call on April 19, 2011, with market analysts, reported by The Wall Street Journal, among other media outlets, BATISTA and MENDONÇA defended the OGX data, describing D&M, dismissively, as "the most conservative certifier in the world." BATISTA stated that it was time that people started to trust the OGX team which he had brought over from Petrobras, headed up by his fabled "Dr. Oil." BATISTA contended that "it's time for the market to accept the company's numbers," and pledged to hire additional consultants to prove OGX's claims.

224. The New York based multinational investment banking firm, Goldman Sachs, was among those reassured. It stressed publicly that investors should consider the D&M reports as just a part of a larger mosaic, and, "[w]hen considering the scope and underlying assumptions, we think that the D&M report generally adds confidence to our assumptions" and reiterated its "Buy" rating on OGX shares.

225. What OGX had successfully managed to do by its fraudulent press releases and press conferences, intentionally disseminated across the phone lines and the internet to the world, was to confuse the issue and maintain a continuing belief in investors that OGX was sitting on vast commercially profitable oilfields and that all it needed was enough cash to stay in business to get the oil flowing.

226. Maintaining a public story of OGX reserves of 10.8 billion barrels in "recoverable oil" as BATISTA was to do for the next two years was a complete fraud, designed to keep the balls in the air as long as possible and attract continuing trading in stocks and bonds of BATISTA's

companies, while he siphoned off as much as possible from the top and tried to sell off the rest before the bottom fell out.

227.    PAULO GOUVEA, however, decided that the writing was on the wall for OGX. While his duty was to blow the whistle on the scheme to the regulators and to investors, PAULO GOUVEA decided, instead, to cash in his chips and he sold his stake in the various X companies, reportedly realizing over $150 million which he reinvested in assets with real value, including real estate in New York and Paris. But he continued on in BATISTA's confidence and as a prime adviser in the fraud.

**D&M Secretly Protests.**

228.    Not surprisingly, behind the scenes, D&M was furious that their name was being used to mislead investors and on April 29, 2011, they privately stated their "great concern" on this point to BATISTA and OGX and demanded a corrective press release.

229.    On May 3, 2011, OGX sent D&M a placatory response, attempting to negotiate a compromise that would allow it to maintain both the 10.8 billion-barrel figure and the D&M imprimatur for its probity.

230.    On May 16, 2011, there was a meeting between OGX and D&M, with a presently unknown result. Whatever was agreed, D&M did not make its privately expressed "great concern" public and OGX did not retract its 10.8 billion barrel lie.

231.    Indeed, BATISTA embroidered further on the lie. In May of 2011, at the Michael Milken conference in California, which was broadcast to investors worldwide, BATISTA, then said to be worth roughly $30 billion, stated to CNBC that he was going to be richer than Carlos Slim, Warren Buffett, and Bill Gates because "I have created five companies that have in them embedded resources worth $2 trillion at a very low cost of producing." He went on to call them "idiot-proof assets."

232.    MENDONÇA, fully realizing that BATISTA's boasts to the public were nonsense since he had created the underpinnings for the hype, between June 6 and June 16, 2011, MENDONÇA secretly and improperly sold 321,200 of his own shares in OGX, realizing a profit of approximately $2,500,000.

233.    In July 2011, OGX released a Management Presentation to investors trumpeting a resolutely upbeat picture, throughout which it consistently described its resources as being "10.8 billion of recoverable boe" and claiming to have all the needed cash, equipment, and skill in place to achieve massive success.

234.    However, the truth was that OGX had found virtually no commercially recoverable oil and BATISA had no convincing data to show any savvy oil industry investor to convince it to buy into OGX.

235.    BATISTA needed a cover story for why his rumored sale to the Chinese was not going through and he resolved to tell the press that it was because he did not need the cash and wanted to reap the profits himself.

236.    Thus, on September 23, 2011, in an article published by Reuters U.S. Edition on the wires under the title, *"Cashed-up Eike Batista won't sell oil stakes,"* Reuters reported that BATISTA said he had abandoned talks to sell stakes in his offshore oil prospects because he had billions in hand and did not need the cash.

237.    Oil was then trading at roughly $80 per barrel and BATISTA claimed that the low production cost of his shallow-water wells meant that he could break even if the per barrel price fell as low as $24. In the Reuters article, he said that OGX was close to signing a long-term deal to supply oil to one of the world's largest refiners -- which he declined to identify, citing securities regulations -- and that a recent bond issue had "brought in exactly what we needed to live off our own spoils." When asked about a decline in OGX share prices, he responded, "I have to laugh. My

companies are all going to be massive cash flow machines. I'm going to pump money to my shareholders and dividends to my sons and my grandsons."

238.    Part of that claim would prove true: he would pump money to his co-conspirator shareholders through their sales of fraudulently hyped stock, and would pump money directly to his sons and other family members to defraud creditors – but not from profits.

**Insiders Sell Their OGX Stock in Miami.**

239.    BATISTA had several companies from which he could directly siphon money and which he hoped he would eventually be able to flip at a profit. However, BATISTA's directors and other insiders had their fortunes pegged directly to the value of their stock options in just OGX. They could see clearly that the picture that BATISTA was painting for the public and what they were helping him color in was false, and they wanted to dump their shares before the bottom fell out.

240.    The problem was that stock sales by insiders would have to be disclosed publicly and there would be a high risk of creating panic among investors if they were to do so. BATISTA had therefore placed restrictions on their ability to do so.

241.    Upon information and belief, however, several OGX executives who were within the circle of BATISTA's confidants and who knew that OGX was a massive fraud, entered into transactions to circumvent the prohibition and dispose of their stock without alarming investors through "creative thinking" on the part of J.P. Morgan Securities in Miami, Florida.

242.    One of J.P. Morgan Securities' wealth management executives in Miami, Florida, reportedly proposed extending the insiders "loans" with their stock standing as collateral and the sole recourse for repayment. The idea was that the insiders would default on the "loans," J.P. Morgan would foreclose on the collateral, and both sides would be happy: J.P. Morgan would have

OGX stock at what it hoped would be a profit and the insiders would have cash, thus achieving the equivalent of a sale of the stock without disclosure to investors.

### The Lies Continue – OGX "Cash Rich."

243.    As the cumulative result of BATISTA's lies, by 2012, there was general acceptance in investors that OGX had access to massive amounts of recoverable oil. However, investors were beginning to question when OGX would start to deliver and whether the company was sufficiently well-capitalized to stay in business until it could start production.

244.    Accordingly, if his fraudulent scheme was to work, BATISTA's task was now to engender a belief in investors that OGX was cash rich and that the oil would soon start to flow.

245.    In January 2012, the initial OGX production report on the first well showed flows of just 15,000 barrels a day. These extremely modest results nevertheless had Batista and "Dr. Oil" putting on a show of huge success, popping champagne corks while technicians opened the valves remotely from Rio de Janeiro and webcams delivered pictures to the world.

246.    On January 16, 2012, OGX released a Statement of Material Fact announcing the discovery of evidence of "hydrocarbons" in the Santos Basin, in the Fortaleza field, in well OG-63, stating, "[t]his discovery is important for its huge hydrocarbon column and net pay identified in the Albian section, as well as by the quality of the Aptian reservoir and its behavior," commented PAULO MENDONÇA, General Executive Officer and Exploration Officer of OGX.

247.    This was a mishmosh of technical jargon intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable, recoverable oil, to further whet market appetite.

248.    And BATISTA continued boasting of his "success." On January 20, 2012, he gave an in-person interview from Rio de Janeiro with The New York Times, for an article entitled, "A Brazilian Magnate Points to Himself for Inspiration." The article remarked admiringly on

45

BATISTA's trappings of apparent success, his 1,000,000 Twitter followers, and the fact that OGX was expected to begin producing crude oil from an estimated 10 billion barrels of offshore discoveries. "Brazil today has the wealth that America had at the turn of the century," said BATISTA. Regarding his ostentatious display of wealth: "I want to help a whole generation of Brazilians to be proud. I am rich, yes. I have built it myself. I have not stolen it," he quipped.

249.     Regardless of the accuracy of the wealth of his country, his final statement regarding the source of his personal wealth was certainly untrue.

250.     On March 2, 2012, BATISTA gave a telephone interview from Rio de Janeiro to Bloomberg. During the interview, BATISTA stated that he still had plans to overtake Carlos Slim as the world's richest person by 2015 and boasted that his companies would post close to $1 billion in earnings before interest, taxes, depreciation and amortization in 2012, and double that in 2013. With an estimated net worth of $30 billion, BATISTA, still ranking eighth in the Bloomberg Billionaires Index, said, "I am probably, among the billionaires, the least indebted guy of all of them."

251.     No reasonable person, knowing what BATISTA knew at that time, could have made any such statement truthfully. He was playing games with investors with smoke and mirrors. His "Empire" was, as he knew, a house of cards. The collapse was just a matter of time.

**The Mubadala "Investment."**

252.     The Mubadala Development Company ("Mubadala"), based in Abu Dhabi, is the strategic investment and development company of the oil-rich United Arab Emirates.

253.     On March 26, 2012, BATISTA publicly announced that Mubadala had signed a "strategic partnership agreement" with his EBX group whereby Mubadala would invest $2 billion in exchange for a 5.63% preferred equity interest in the Defendant, CENTENNIAL (BRAZIL) and other BATISTA offshore holding companies, believed to include the 63X and EBX Defendants,

giving it an indirect interest in the public companies, OGX, OSX, MMX, LLX, MPX, and privately-held AUX, REX and IMX.

254.    BATISTA announced the agreement as a "framework for further collaboration between the two organizations" and that the Mubadala cash was to be used to "reinforce the group's already strong capital structure so as to help fund new enterprises across multiple business areas."

255.    BATISTA further announced: "[t]his is the first time we have invited a strategic partner to invest at our holding company level. The investment considerably strengthens the entire group and its ability to successfully implement current and future projects. Mubadala, after conducting thorough due diligence of our companies recognizes the great potential of our Latin American assets."

256.    An attached "Legal Notice" stated that this "strategic partnership constitutes a minority investment by Mubadala in Centennial Asset Brazilian Equity Fund with no changes to the control, management or day-to-day activities of Mr. Eike Batista's publicly listed vehicles: OGX, OSX, MMX, LLX and MPX."

257.    Mubadala went along with the phrasing of this announcement.

258.    On the surface, as projected to the investing world, a highly experienced and well-financed sovereign company from the oil sector, after conducting "thorough due diligence," had seen sufficient value in the prospects of BATISTA's OGX-oil-based empire to accept an "invitation" - the first extended to any outside player - to buy a tiny minority equity stake in BATISTA's holding company, giving it no control, for $2 billion. (By extrapolation, on the raw math, without factoring in the value of control shares, the company must have a value as a whole of at least $40 billion).

47

259.    The subtext of BATISTA's message was that his strongly-capitalized EBX group did not need the cash, but this contribution would enable it to expand into new areas.

260.    The news about the Mubadala "investment" was disseminated by many financial news organizations including Bloomberg.

261.    As BATISTA later explained in a Milken Conference interview broadcast to the investment world by Bloomberg, described below, he entered into this transaction in order to convey a message to the world that a savvy outsider had "audited" his operation and placed its "stamp of approval" on it. In other words, if one of the world's great players believed in him to the tune of $2 billion for a tiny stake, so should all investors.

262.    The actual Mubadala "strategic partnership agreement" has not yet been seen. But later events described below make it clear that this $2 billion "stock purchase" was far from a simple purchase of a tiny non-control block of stock, but was structured far more like a $2 billion *loan*, with BATISTA's entire worldly wealth, including shares in companies within the group and outside, such as his substantial holding in Florida's Burger King and other treasured plum assets, pledged as collateral.

263.    It is believed that this deal was structured in the Cayman Islands and involved the EBX, 63X and CENTENNIAL Companies. This fraudulent presentation was primarily intended to bolster investors' confidence in OGX, on which the success of the group depended.

264.    Had this "strategic partnership" been declared to investors as the desperately-needed "loan" it truly was, investor confidence in OGX would have evaporated, its end hastened by perhaps as much as a year, and Plaintiffs would not have lost a cent.

**Keeping the Balls in the Air.**

265.    In April 2012, BATISTA staged a photo-op for the world press at his planned LLX "Super-Port." With him onstage were a roster of Brazil's political and business elite: President

Dilma Roussef (now impeached and deposed), Rio Governor Sérgio Cabral (now under arrest and federal investigation for corruption), and Mines and Energy Minister Edison Lobão (now also under federal investigation for corruption). The audience of 400 included foreign corporate luminaries from around the world.

266.   Showing off his port, which he predicted would be the largest port in the Americas, BATISTA announced that OGX had begun production on what he described as a "new frontier" of petroleum 37 miles off the Brazilian coast. "This is a historical moment," said Batista. "It's the first time an independent Brazilian company has produced offshore oil."

267.   President Rousseff did her bit to boost the illusion, announcing resolutely that the state-run oil company Petrobras would go into deep partnership with Batista's firm: "Eike is our standard, our expectation and, above all, the pride of Brazil when it comes to a businessman in the private sector," Rousseff told those in attendance, as she stood by his side, both clad in orange OGX jumpsuits for the photo-op. BATISTA – his jacket sporting a black, oily hand-print, symbolizing "first oil," flashed a two-fisted victory sign:



268.   BATISTA and his co-conspirators and accomplices, however, knew that the trickle of oil they were witnessing was pretty much all there was. The block was later to be returned to the government as worthless.

269. On April 18, 2012, roughly a year before the eventual crash, as the result of the aggregate lies, Times magazine named BATISTA one of the 100 Most Influential People of 2012. The short supporting puff-piece on BATISTA was written by then-mayor of Rio de Janeiro, Eduardo Paes (a key BATISTA ally, now under investigation for corruption).

270. In it, Paes spoke of BATISTA as one of Rio's "most treasured adopted sons" who had "helped us shape the renaissance" of Rio, citing his status as "Brazil's richest man and the world's seventh richest, bringing vital investment to our city from oil and mining," and boasting of his charitable largesse.

271. Puff pieces like these were contributed from time to time by BATISTA's rich and powerful friends whose own careers were symbiotically tied to his and were intended to bolster the impression of BATISTA's success and sustain his position with investors.

272. However, the insiders could see that the writing was now truly on the wall.

273. In April 2012, OGX board member Marcelo Faber Torres figured that he had better dump his OGX stock before the truly bad news came out and he reportedly sold 9 million OGX shares in staggered batches so as not to alarm investors.

274. Other insiders, co-conspirators, and accomplices started to do the same and reportedly, at or about this time, the executive group quietly sold off 17 million shares, realizing over $103 million.

275. As a part of his own exit plan, BATISTA had, upon information and belief, two companies set up in The Bahamas through corporation formation agent Winterbotham Trust Company, Inc., to help shelter the proceeds of the fraud. BATISTA's son, the Defendant, THOR BATISTA, agreed to act in regard to these corporations and assist his father in achieving the objective of the fraudulent scheme.

276.     One of these Bahamian companies was the Defendant, THORQUE INVESTMENT MANAGEMENT LTD., which was incorporated on April 12, 2012. The other was the Defendant, THORQUE1 FUND LTD., whose date of incorporation is unknown. Upon information and belief, these companies were nominally owned and controlled by THOR BATISTA, but who acted at BATISTA's direction.

277.     Upon information and belief, bank accounts were opened in The Bahamas, Miami, Florida, and eventually in Switzerland in the name of the THORQUE companies. It is believed that the Bahamian funds were held in an account under the direction of BTG Pactual[9] or Itaú Bank and eventually held at least $100 million in proceeds of the fraud. It is believed that the Miami account was at Itaú or Citibank. The Swiss account is presently unknown, but $30 million is believed to have been eventually routed out to a safe haven through the Citibank trust account of one of Batista's Florida professionals.

**"The Brazilian Dream."**

278.     On April 30, 2012, Bloomberg Television aired an 11-minute video interview of BATISTA on its show, "Money Moves with Deirdre Bolton." The interview took place at the Milken Institute's 2012 Global Conference in Los Angeles, California, where BATISTA was a featured panelist in four different panels during the five-day conference. After Bloomberg broadcast the interview on television, it published the interview on youtube.com with the description, "Brazilian billionaire Eike Batista talks about the potential benefits of OGX Petroleo e Gas Participacoes SA forming project partnerships with Petroleo Brasileiro SA and Vale SA."

279.     In the Bloomberg interview, correspondent Stephanie Ruhle introduced BATISTA as the "tenth richest man in the world - the goal is to get to number one." Ms. Ruhle then noted

---

[9] Banco BTG Pactual SA ("BTG Pactual") operates and has operated under various names in various jurisdictions during the relevant time period.

that a week earlier, the President of Brazil had visited BATISTA's oil port in northern Rio de Janeiro, where she called BATISTA a special kind of entrepreneur and a hero to Brazil. Bloomberg accompanied this anecdote with broadcast footage of BATISTA and President Rousseff getting off a helicopter together, surrounded by press. All of this, of course, fed into BATISTA's artificial narrative of himself to lure in American investors.

280.    BATISTA then utilized this broadcasted news segment to repeat his colossal lies about his companies. He spoke of "a trillion and a half dollars in assets: oil, gas, iron ore, gold, coal" and projects with "eighty percent margins." He spoke of the prospects of collaboration between OGX (which he knew had virtually no oil) and the (huge) Vale and Petrobras companies as being a "win-win for everybody."

281.    BATISTA also explained his rationale for the sale of a small stake in EBX to Mubadala (which was secretly, in reality, a loan) as being to inspire investor confidence: "[w]e just wanted to have, maybe an extra stamp by investors. Because you know the market is funny. Sometimes they demand, well, we like to have the structure audited. And when somebody like Mubadala comes in, the world knows how deep they go into the auditing process. And I love to be audited. I love transparency. So in a way, it's an extra way to show transparency to what we do." He said that he was just spreading hope in "The Brazilian Dream."

282.    By June of 2012, OGX was unable to hide the fact that the wells at its main field in the Campos Basin were not as productive as first believed and that it had cut production estimates by two-thirds. OGX share prices fell steeply by the end of June.

283.    Continuing to believe in the aggregate BATISTA-generated hype, however, on July 19, 2012, the Financial Times in London, England published an article entitled, "It is too soon to write off Eike Batista." The article quoted BATISTA's boast at an OGX investor meeting from

earlier in the year, that his companies were "80 per cent ebitda- [earnings before interest, tax, depreciation, and amortization] margin businesses. I search for the truffles."

284.    It also quoted a supportive statement from one of BATISTA's biggest and closest bankers, BTG Pactual – who should be in the position to know – that the stock could recover within the next twelve months and that "OGX has enough cash to support its business."

285.    Nobody listening thought that BATISTA, who continued to boast about his "trillions of dollars" of oil, would be prepared to flat out lie. They were to be proved wrong.

286.    Through a barrage of international press articles and a blizzard of tweets, in the course of 2012, BATISTA maintained an image of burgeoning wealth through publicized plans for massive investment into an ever-expanding series of business ventures, from shipyards and ports, to sports and entertainment ventures.

287.    Thus, on July 18, 2012, BATISTA tweeted that OSX and OGX had negotiated the construction of drill ships; on July 19, 2012, he sent out a video on the synergy between OGX and MPX for gas exploitation in the Paraiba Basin; on August 29, 2012, he boasted that his port at Açu would be one-and-a-half times bigger than Manhattan Island, New York; and on September 25, 2012, he re-tweeted an IMX photo regarding his IMX deal with Cirque du Soleil.

288.    However, as stated above, the OSX shipbuilding business was largely dependent on OGX oil and there was no oil. Nor were there continuing orders to build ships from the general market. However, corrupt government Ministers controlled the purse at Brazil's Petrobras and were a source of funding – at a price.

289.    What BATISTA did not include in his tweets was that OSX had been awarded this $922 million ship-building contract as a result of a $2.3 million bribe that CARNEIRO had agreed to with Brazil's Finance Minister, and Chairman of Petrobras, Guido Mantega.

290.    By now the illusion of spectacular reserves of oil had been created. MENDONCA was no longer needed as "Dr. Oil," and he was promoted out of OGX to the Board of EBX, BATISTA's investment vehicle, which was focusing on siphoning off as much as possible.

**OGX Secretly Bankrupt.**

291.    Upon information and belief (from the Brazilian indictments) an internal OGX task force which had started work in 2011 and Schlumberger, the world-renowned energy consultant, essentially a Joint Task Force, presented reports on their conclusions as to OGX's prospects to the OGX Executive Committee, presided over by BATISTA, in September 2012.

292.    Upon information and belief (from the Brazilian indictments) the Joint Task Force concluded that a negligible amount of the promised 10.8 billion barrels of oil were "recoverable" at any expense and that, even so, they were contaminated with such high levels of $H_2S$ "Death Gas" that most of what was technically recoverable could not be extracted economically even if (which was doubtful, because of the environmental impact) licenses for decontamination could be obtained.

293.    The Joint Task Force concluded that even in a best-case scenario, the company had a negative value of about one billion dollars, making the commercial production of oil from any of the fields absolutely impossible.

294.    Thus, by September 2012, at the very latest, BATISTA and his co-conspirators and accomplices knew that OGX was insolvent and that the further exploration for oil was a pointless quest. Moreover, even the *pretense* of oil exploration for profit could not continue without fresh massive injections of cash.

295.    BATISTA and his co-conspirators and accomplices knew from these devastating audits that the whole house of cards that depended on OGX oil (the OSX exploration platforms, the LLX-run Super-Port, and so on) would collapse as soon as the truth was known.

296.   BATISTA and his co-conspirators and accomplices knew that there was no reason for any investor, who knew what they knew, to invest another penny or buy bonds on the secondary market, and indeed that anyone who had OGX/OSX stocks or bonds who knew what they knew would dump them as quickly as possible.

297.   These reports should have been disclosed to the public immediately as Statements of Material Fact. However, BATISTA and his co-conspirators, and the Boards of OGX and OSX, illegally refused to disclose this information and deliberately suppressed it. This constituted a massive fraudulent misrepresentation by omission.

298.   BATISTA and his co-conspirators and accomplices knew that it was now a matter of time before OGX and the satellite companies were seen by the public to be worthless. Their focus was now to keep up the illusion of eventual profitability long enough for them to hive off their interests in the satellite companies and liquidate as much of their remaining stock in OGX at the highest price possible and route it out to secret foreign bank accounts before the bubble burst. And by such continued outright lies, BATISTA and his co-conspirators and accomplices managed to stave off the realization among investors that OGX was bankrupt for close to another year.

**The Exit Strategy.**

299.   Upon information and belief, BATISTA's exit strategy - which was integral to the fraud as a whole, since the entire exercise would have been pointless if the money stolen had not been put out of the reach of creditors when the bubble burst - is believed to have been largely structured and executed in Miami, Florida, the Cayman Islands, The Bahamas, Panama, and Switzerland. It was basically a money-laundering operation. The details are unknown before discovery, but, to the extent known, the ultimate facts are as outlined below.

**The Professionals.**

300. Upon information and belief, the architects of the scheme were international asset protection specialists. They created and implemented the various international structures for BATISTA to transfer the funds internationally and hide the proceeds of the fraud. It is believed that they were introduced to BATISTA by BERTO and that BERTO served as the first trustee of the Swiss trust created to hold the proceeds of the scheme on behalf of BATISTA as part of the structure.

301. Upon information and belief, from at least 2012 onwards, these Miami professionals, essentially, had no other client but BATISTA and his various co-conspirators, accomplices, corporations, trusts and other interests, and that their offices were in fact an agency office for BATISTA and his co-conspirators and accomplices.

302. Upon information and belief, no professional privilege attaches to their files, as being excluded by the crime-fraud exception and to destroy them or move them would constitute furtherance of the conspiracy, spoliation of evidence and cause for disciplinary action.

303. Upon information and belief, these international asset protection specialists were based in Miami, working with BATISTA and his co-conspirators, the 63X, EBX, CENTENNIAL and THORQUE Companies and similar professionals in Brazil, Austria, The Netherlands, and other jurisdictions constructed a web of shell companies that were incorporated in various secrecy jurisdictions, including those joined here, and trusts and other vehicles elsewhere.

304. These shell companies were to be used to obscure the rationale behind the routing of funds between countries and their eventual safe deposit into various bank accounts, properties, and assets under other names around the world for BATISTA and his various co-conspirators, accomplices and family members.

**The Bankers.**

305.   BATISTA's prime banking relationships were with three massive international banking groups: Citibank, BTG Pactual and Bank Itaú, all of whom have presences in Miami and licenses to operate in Florida.

306.   Upon information and belief, each of the three banks named above had extremely close relationships with BATISTA and his co-conspirators and accomplices and different divisions and subsidiaries within those groups assisted BATISTA and his co-conspirators and his accomplices in laundering the profits of his fraudulent scheme and routing them internationally to ultimate repository accounts in secrecy jurisdictions around the world.

307.   Upon information and belief, the messaging to effect such transfers would have necessarily been routed through the SWIFT server maintained in Virginia and otherwise through the United States. It is unknown before discovery whether their degree of knowledge and complicity would justify joining these banks in this action as defendants.

308.   Upon information and belief, among other accounts in other countries, Citibank provided banking facilities and maintained an account in Miami which held at least tens of millions of dollars, and maybe more, which BATISTA had siphoned off as profits from his fraudulent scheme to hide them from creditors when the bubble burst.

309.   It is unknown before discovery which names were used for the Citibank accounts, but they are believed to have been held, in part, nominally for THOR BATISTA, in the name of the THORQUE Companies or in the names of the 63X, EBX or CENTENNIAL companies, but were in reality held for BATISTA himself.

310.   Bank Itaú also provided banking facilities and hosted accounts in Miami and in foreign countries, including in the Cayman Islands and The Bahamas, which held sums of money which BATISTA had siphoned off in order to hide them from creditors when the bubble burst.

More specifically, on current information, it is believed that during the relevant time period, Bank Itaú in Miami received transfers in excess of 760 million from accounts controlled by Batista in The Bahamas and Cayman Islands.

311.    It is unknown before discovery in this case all of the names that were used for the Bank Itaú accounts, but based on the disclosures received through the Cayman Islands and the Bahamian proceedings they are held, in at least the following names: AUX LLC, Centennial Asset Brazilian Equity Fund, Thorquel Fund, Thor Batista, 63X Investments Ltd., and 63X Master Fund. In reality, upon information and belief, despite being held in the names of these entities these accounts were held for BATISTA himself.

312.    Upon information and belief, BTG Pactual Bank provided banking facilities and hosted one or more accounts in The Bahamas, the Cayman Islands, and elsewhere, either directly or through an affiliated or correspondent entity, which held hundreds of millions of dollars which BATISTA had siphoned off in order to hide the funds from creditors when the bubble burst.

313.    It is unknown before discovery all names that were used for the BTG Pactual accounts, but they are believed to include accounts in the names of the 63X, or CENTENNIAL, but were in reality held for BATISTA himself.

314.    Other bank accounts, held through other structures unknown before discovery but orchestrated by BATISTA and his co-conspirators were, upon information and belief, set up in the Cayman Islands, The Bahamas, Miami, Panama, and secrecy jurisdictions around the world.

315.    Upon information and belief, the funds were routed from Brazil and elsewhere through the various accounts to break the trail of where the funds originated and in hopes of rendering them safe from detection and attachment.

316.    Participants in the scheme included the various Defendants and other entities owned or controlled by BATISTA and his agents, accomplices and co-conspirators, the identities of which are not known before discovery.

317.    These persons and entities knowingly facilitated the fraud and helped conceal the funds siphoned off in order to hide them from creditors when the bubble burst and in doing so routinely abused the corporate fiction such that it should be in all cases pierced or disregarded.

**The Fake Billion Dollar "Put Option."**

318.    To give himself time to implement his exit strategy, BATISTA needed more than tweets and boasts and he devised other fraudulent stratagems to bolster investor confidence and stimulate further public investment.

319.    However, directors in OGX now started getting cold feet about staying on in the company at the board level, given the likely civil and possible criminal liability they would face when the bubble burst, and several of them resigned.

320.    BATISTA was meanwhile searching for less squeamish candidates for the board of OGX for whom the lure of money would be greater than their fear of consequences and on August 6, 2012, at a general meeting of OGX shareholders, many of them large North American pension plans, including the Florida Retirement System Trust Fund, one such individual was proposed and elected: the Defendant AZIZ BEN AMMAR.

321.    Upon information and belief, AZIZ BEN AMMAR was a prime mover in the "Put Option" stratagem described immediately below.

322.    On October 24, 2012, BATISTA announced to investors, as was duly reported by Bloomberg and the other organs of the financial press that, through EBX, he had entered into a billion dollar "Put Option" with OGX. This was, in essence, a contract between EBX and OGX

for BATISTA to inject $1 billion of his personal wealth in EBX into OGX as additional working capital upon demand.

323.    BATISTA similarly announced that he would be ploughing a billion dollars of his own wealth into OSX, buying stock at three-times market price if and when needed, although that might have to be delayed until 2014 because, as BATISTA said, Brazilian stock exchange rules required a minimum amount of "free float" time.

324.    The announcement that Brazil's golden boy with the Midas touch had a billion dollars-worth of confidence in his oil exploration company, and another billion in his prime satellite ship-building company resulted in an expected boost in share and bond prices.

325.    However, there were at least two fundamental problems with this announcement. The first was that BATISTA had no intention of paying in any money whatsoever. The second was that no amount of money could fix the fundamental problem, which was that there was no oil.

326.    In sum, the OGX Put Option was just another lie, a stratagem created by AZIZ BEN AMMAR and adopted by the co-conspirators to delay the inevitable and allow BATISTA and them all to get as much money as possible *out* of OGX before it collapsed.

327.    In fact, upon information and belief, BATISTA may not have even actually entered into any such commitment on paper. Only much later, and only under pressure from insider creditors, did he ever actually sign such an obligation, and even then it was conditioned on an "out clause" designed to give him some "cover" in backing out - which, as we shall see below, is exactly what he did.

328.    That the Put Option - if it existed - was non-binding was not told to the public. Nor was the fact that BATISTA did not intend to honor it. Nor was the fact that the company was insolvent. Nor was the fact that there just was no oil, and that no amount of money, however long it might be squandered on pointless drilling, could put oil in the ground where no oil existed. All

of this should have been announced via Statements of Material Fact, but was not. The failure to do so constituted fraudulent misrepresentations by omission.

329.    However, the announcement of the Put Option was effective in slowing the fall in price of OGX stock during the fourth quarter of 2012 and fed its rise in January 2013.

330.    The value of LLX - BATISTA's allied logistics company which was building the port at Açu where OSX ships were to offload OGX oil - was conspicuously pegged to the value of OGX and therefore OSX.

331.    In November 2012, MARCUS BERTO was appointed CEO and Investor Relations Officer of LLX to help corral emerging bad news and get the company sold off before the OGX bubble burst. Upon information and belief, BERTO fully understood that OGX was insolvent and the mission was to cash BATISTA out as fully as possible before the crash rendered everything valueless.

332.    To further boost investor confidence, on November 13, 2012, BATISTA tweeted to the world that the Group X operations in the Campos Basin were in an area responsible for 80% of Brazil's oil production.

### Section II - The Plaintiffs Invest

333.    At the start of 2013, no one apart from the insiders, not even the Brazilian regulators, suspected that OGX was a colossal bubble scheme. The consistent, massive lies, spawned by BATISTA, his co-conspirators and his accomplices, repeated over the previous years, had generated an overall base-line impression among investors world-wide of OGX as an oil company with enormous oil reserves and enormous likely margins of profit, whose only impediment to spectacular success was its cash needs until it could come into full production.

334.    That the BATISTA-generated spin was continuing to work in early 2013 was exemplified by announcements such as one published online by Highbeam Reports in January

2013 that London's financial house Barclay's was convinced that "[OGX] presents better opportunities for investors than its federally-owned peer Petrobras . . ." (This was well before the massive Petrobras corruption scandal broke).

335.   As noted above, Gables Capital, Inc. is a registered investment adviser based in downtown Miami, Florida, and at all times material hereto acted as investment adviser to the Plaintiffs and was their agent for the purchase and sale of stocks and bonds.

336.   The individual responsible for the MERIDIAN and AMERICAN accounts was Ms. Judith Neiwirth, Gables Capital's co-founder and Chief Investment Officer, who had over thirty years of experience in the financial services industry.

337.   Ms. Neiwirth had available to her the aggregate spin disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual "lay" internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers.

338.   As a result of the hype generated by BATISTA, described above, the general baseline impression in the international investment market at this time was that OGX was a company that was sitting on spectacular reserves, as evidenced in part by the fact that savvy industry player, Mubadala, had recently bought a 5.63% stake in its holding company for $2 billion.

339.   To investment advisers like Ms. Neiwirth, reviewing the aggregate information on Bloomberg, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar "bonanza," of which BATISTA had consistently represented, started to gush.

340.   It seemed, moreover, that OGX was in no danger of running out of cash, given that BATISTA had pledged an additional billion dollars of operating capital, if and when needed. (The

subtext was further that although there was a trillion dollars of oil to be had, if a billion was not quite enough to bring the gushers online, there would be more cash to come).

341.   BATISTA had further pledged to inject another billion dollars into OSX, if and when needed. Since the future of OSX depended heavily on the future of OGX, this pledge of cash for OSX reinforced the public impression of the value of OGX.

342.   This was therefore a particularly attractive opportunity for purchasers in the bond market. OGX appeared to be asset rich with plenty of operating capital and OGX bonds were at that time yielding above an 8.375% interest rate.

343.   On January 15, 2013, in reliance on the overall picture painted by BATISTA, his intentional misstatements made via his publications on the internet and material omissions, reinforced in her decision to invest by BATISTA's announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17 on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN.

344.   On January 22, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN.

**The EBX/BTG "Strategic Partnership."**

345.   In 2013, BTG Pactual was Brazil's biggest private investment bank, and its Chairman, Andre Esteves, was an iconic Brazilian billionaire on a level with BATISTA. On March 6, 2013, prnewswire.com relayed the following EBX announcement:

The EBX Group and BTG Pactual announce the signing of a novel strategic cooperation agreement.  The agreement contemplates financial advisory services,

63

credit facilities and future long-term capital investments for the transformational projects currently being developed by the EBX Group in its segments." This cooperation represents, above all, a partnership for the success of Brazil", said Eike Batista, EBX Group's CEO and Chairman.

This new cooperation will have a Strategic and Financial Management Committee comprising of senior executives from the EBX Group and of senior partners of BTG Pactual. The Committee will be led by Eike Batista and Andre Esteves and will meet on a weekly basis to discuss overall strategies relating to EBX Group's capital structure and investments for the short, medium and long-term projects and activities of the group's portfolio of companies. The agreement does not grant any exclusivity for BTG Pactual to render financial services to the EBX Group.

BTG Pactual's remuneration will be solely based on the performance of the EBX Group's public companies. Andre Esteves, BTG Pactual's CEO, stated that: "This cooperation shows once again our firm willingness to support unique projects and national entrepreneurship, areas in which Eike Batista is an icon."

346.   This EBX announcement was intended to convey the underlying message that BTG Pactual, one of the largest and most sophisticated players in the Brazilian financial market, saw enough value in BATISTA's empire that it was willing to "partner" with EBX, without any promise of exclusivity, and plough in cash to finance "short, medium and long-term projects," with its own profits completely contingent on the success of the EBX ventures.

347.   The phrasing of this release was another BATISTA stratagem intended to dress up the fact that OGX desperately needed money to delay its inevitable financial collapse by using the language of opportunity and the purported confidence of savvy bankers in the worth of his operation.

348.   Predictably, OGX share prices shot upwards, closed up 16%, and rallying as much as 27.7% in the day following the announcement. On March 7, 2013, the announcement came across on the Bloomberg terminal on Ms. Neiwirth's desk at Gables Capital in Miami, Florida, coupled with a report that BTG Pactual was willing to extend BATISTA's EBX another billion dollars for liquidity.

349.   On March 13, 2013, BATISTA had OGX release another Statement of Material Fact to investors declaring that oil recovery from the Pipeline, Fuji and Ilimani formations was

commercially feasible, announcing an on-site amount between a half billion and 1.3 billion barrels of oil, and conveying the impression that commercial production was imminent.

350.   However, as BATISTA knew, the truth was that only a tiny percent of the oil detected was recoverable and commercial feasibility was impossible.

351.   On March 22, 2013, BATISTA tweeted that OGX had eight acknowledged oil commercial accumulations: three onshore, in Maranhao, and five offshore.

352.   But, despite BATISTA's continuing misrepresentations, the stock price began to fall.

353.   On March 23, 2013, Bloomberg reported that BATISTA via Twitter had warned short sellers wagering against his companies that they would regret their bets. Asked by other Twitter users about the companies' falling stock prices, BATISTA had written that "rumors and gossip are tools of short sellers" who will be "caught with their pants down," and he directed his readers to an interview with BTG Pactual President, Andre Esteves.

354.   In that March 23, 2013, interview BTG Pactual President, Andre Esteves, had stated that BATISTA's companies were in no danger of failing and that BATISTA remained one of the best capitalized business men in Brazil.

355.   Well before the "strategic partnership" announced on March 6, 2012, BTG Pactual had been doing due diligence on OGX, which was the prime asset of BATISTA's holding company, EBX, in order to act as its financial consultant and potential provider of long-term financing. BTG Pactual must therefore have known how precarious a position OGX was in. The public, however, took its Chairman's statement as being true.

356.   Upon information and belief, Mr. Esteves' statement on behalf of BTG Pactual was intentionally false and was issued pursuant to an agreement with BATISTA. It is unknown what the consideration for the deal may have been. (In late 2015 Mr. Esteves was arrested in Rio,

stepping off a plane from Miami, Florida, in connection with charges of obstruction of justice in the Petrobras corruption investigation and was placed under house arrest).

357.   On March 26, 2013, OGX released its financial statement for 2012. Under "Message from the Management," Defendant LUIZ CARNEIRO, Chief Executive Officer of OGX, stated, "In parallel to the development of our fields, we made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations, and we continue our studies on how to best develop them."

358.   However, as BATISTA, CARNEIRO, and the other co-conspirators knew, none of these fields were commercially viable and OGX was insolvent. These were deliberately fraudulent misrepresentations.

359.   On March 28, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN.

360.   On April 1, 2013, MERIDIAN received its first interest payment of $432,359.38 on its OGX bonds and AMERICAN received its first interest payment of $146,562.50.

361.   On April 12, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN.

362.    As was not discovered until September 2016, during April 2013, BATISTA's CENTENNIAL ordered a Panamanian subsidiary, Goldenrock, to pay a $2.3 million kickback, upon information and belief, to Brazilian officials, from its account at TAG Bank in Panama, for the $922 million OSX shipbuilding contract awarded in mid-2012. It is believed that Goldenrock was one of at least two shell companies which upon information and belief held accounts at TAG Bank – the other being Blue Diamond, which BATISTA used to hold slush funds for the bribery of officials and others useful to his scheme. In April 2013, CENTENNIAL wired $111,798,818.97 million from an account Batista controlled at BTG Pactual in the Cayman Islands to TAG Bank for safekeeping and to top off BATISTA's slush fund.

### The $850 Million "Investment" by Petronas.

363.    BATISTA knew that the sale of supposed oil "assets" to other supposedly savvy players in the oil industry would create confidence in OGX and in its other dependent enterprises as it would reflect the fact that the buyer, after doing due diligence, saw value in the OGX asset, and therefore so should other investors; and OGX would have yet more working capital, so nobody invested in its future should worry that it could not pay its way until coming into full production.

364.    The Defendant AZIZ BEN AMMAR was charged by BATISTA with attempting to close an asset purchase deal with the Malaysian State-owned oil company Petronas. Upon information and belief, BATISTA authorized BEN AMMAR to spend in excess of $10 million to help "grease the wheels" of the process.

365.    On or about May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Basin. The news of the $850 million Petronas deal was picked up and reported across the world and had its intended effect.

366.    Thus, on May 8, 2013, London's Financial Times reported online that BATISTA had sold an $850 million stake in OGX assets to Malaysia's state-run Petronas. The article noted that shares in OGX were the biggest risers of Brazil's stock exchange that day. The good news came across the Bloomberg terminal screen on Ms. Neiwirth's desk.

367.    That same day, The Wall Street Journal reported online, "Petronas's purchase of stakes in the two Tubarao Martelo blocks, with *reserves* estimated at 145 billion barrels of oil, will give OGX much-needed cash to fund fresh investments. The Malaysian and Brazilian companies announced the deal in separate statements." (Emphasis added)

368.    Similarly, BNAmericas announced online, "Brazil's OGX has confirmed an US $850mn farm-out deal with Malaysian giant Petronas for a share of two oil and gas blocks off the coast of Rio de Janeiro. The deal hands the Kuala Lumpur-based firm a 40% non-operating working interest in the Campos basin's BM-C-39 and BM-C-40 blocks, OGX said in a statement. In addition, Petronas has an option to purchase 5% of OGX's capital stock at a price of 6.30 reais until April 2015."

369.    The quote from OGX in the article continued, "OGX's partnership with Petronas underscores the quality of our asset and the potential of the Tubarão Martelo field, where production is expected to commence by the end of the year," OGX chief executive CARNEIRO said, "[w]ith more than 32Bb of recoverable resources and a production of about 2Mboe/d, Petronas' expertise will enhance the continued development of oil production in these areas."

370.    However, as CARNEIRO and the other co-conspirators knew, this was a lie. There was virtually no commercially recoverable oil. OGX was a complete bust and would soon collapse.

**Meridian Invests in More OGX Bonds.**

371.    The news of the supposed Petronas purchase came across the Bloomberg terminal screen on Judy Neiwirth's desk in Miami, Florida, on May 8, 2013. The Bloomberg report also

recited a supposed quote from the buyer, "Petronas views the acquisition as a highly attractive investment opportunity in terms of asset quality and for strategic future growth in Brazil."

372.    Investors in OGX bonds were spurred to make greater purchases by this news. According to Reuters News Agency, investment in OGX bonds by the massive U.S. investment fund, Pimco, climbed as high as $800 million during May 2013.

373.    On May 20, 2013, in continued reliance on the vaunted future profitability of OGX, and BATISTA's commitment to inject a billion dollars if and when needed, and further encouraged by the announcement of the Petronas deal, Gables Capital, in Miami, Florida, directed the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN.

374.    However, the truth was, in fact, that there was no actual "Petronas deal" as portrayed to the public. The deal had many contingencies, including OGX restructuring its debt and reaching certain production targets.

375.    Upon information and belief, it was Batista's strategy to convey the message that sophisticated investors saw great value in the future of OGX.

376.    Why Petronas – currently wracked by its own massive corruption scandal - did not correct the OGX presentation or market perception at that time is unknown before discovery.

**Batista Secretly Cashes Out.**

377.    While doing his best to encourage investor confidence and continued investment in OGX, between May and June 2013, BATISTA secretly instructed EBX to sell off 126.65 million shares in OGX.

378.    BATISTA was also siphoning off cash in huge amounts. According to a much later released confidential letter from the Cleary Gottlieb law firm, representing a cadre of large insider

creditors in June 2013, BATISTA funneled out $450,000,000 to an affiliate without justification just that month.

379.    It is not known before discovery where that money went but it is believed that a substantial amount was routed directly or intermediately through the corporate co-conspirators and accomplices the 63X companies, members of the EBX group and the CENTENNIAL companies, to the THORQUE Companies' accounts and to bank accounts in various countries.

380.    Then in early June 2013, BATISTA put another layer of insulation between himself and his creditors by transferring $30 million from an account in Brazil to a Citibank account in Brazil in the name of his son, THOR BATISTA. It is believed that the funds were thereafter funneled out of Citibank Brazil to the Citibank trust account of a BATISTA professional in Miami, and onwards to Switzerland or other secrecy jurisdiction.

381.    On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign.

382.    However, when the news hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm.

383.    BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the restructuring of the group which was now complete that same month of June" and that no further shares would be sold. However, this would prove to be a lie.

384.    On June 20, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, and reassured by BATISTA's news of his stock sale being just a "one-off adjustment," Gables Capital, in Miami,

Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the second market on behalf of its client, MERIDIAN, as trustee.

385.   MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98.

386.   However, on July 1, 2013, OGX was finally forced to admit by a Statement of Material Fact that a number of its wells in the Campos Basin were unproductive and, cryptically, that none of its projections should be relied upon, which resulted in a plunge in OGX share prices.

387.   Critically, however, BATISTA failed to announce: that there was in actual fact virtually no commercially recoverable oil; that the Mubadala and Petronas investments had been massive loans and Petronas was not obliged to perform unless OGX was re-structured; that behind the scenes Mubadala, who knew the exact state of affairs, was realizing on its securities; and lastly, he failed to disclose his intention to dishonor the billion dollar put option, if and when demanded.

388.   In fact, in the face of certain knowledge that OGX was insolvent and had no oilfields likely to generate significant recoverable oil, BATISTA continued to spawn lies about projected future profitability.

389.   Thus, on July 3, 2013, Bloomberg relayed the news that OGX had declared the Remora field in the Campos Basin commercially viable.

390.   Unfortunately, this was just another lie.

**Batista Makes Further Fraudulent Transfers.**

391.   Upon information and belief, during these months, in line with his overall game-plan, BATISTA was moving the assets still in Brazil that were the most vulnerable to attachment out of his name and into the names of family members, leaving himself immune from collection.

392.   Upon information and belief (according to the Brazilian indictments) BATISTA transferred two buildings in Rio with an aggregate value of approximately $20 million into the

names of his sons THOR BATISTA and OLIN BATISTA; he moved $60 million from an account in Brazil to a Citibank account in the name of THOR BATISTA; and he transferred approximately $7 million in cash plus a $2 million apartment in Ipanema to FLAVIA SAMPAIO, his girlfriend and mother of his infant son, Balder.

393.    Upon information and belief, BATISTA, his co-conspirators, and accomplices had by this time moved the bulk of his and their liquid assets out of Brazil and off to secrecy jurisdictions, where they were held in cash, or reinvested in stock in ventures likely to actually prove to be profitable, or in real estate and other more secure investments in other countries, typically through the medium of shell companies to act as "blinds" between the asset and the ultimate beneficial owners.

**Mubadala Secretly Pulls Out.**

394.    During early July, 2013, news began to leak out that the Mubadala deal, which had been announced as an equity investment and seen as BATISTA's ultimate stamp of approval by the investment community, providing important backing for BATISTA's ambitions by a major global sovereign wealth fund, had in fact been nothing of the sort, but rather a huge loan, collateralized by plum assets and personal guarantees.

395.    Moreover, behind the scenes, Mubadala, which had inside knowledge as to the true state of affairs in BATISTA's companies and was not prepared to wait for the disaster that it could see from the actual records, had over the course of many months been demanding and receiving the surrender of collateral and the partial repayment of its loans to reduce its exposure to the greatest extent possible. The fact that Mubadala was pulling out should have been released to the investment community as a material fact, but was not.

396.    BATISTA publicly tried to put the best spin possible on the leaked news, characterizing the OGX payments to Mubadala as the partial redemption of an "investment" rather

than the repayment of a loan. Mubadala did not deny this characterization. However, neither EBX nor Mubadala would provide details of the restructuring.

397.    Upon information and belief, the process of asset stripping was carried out by lawyers at Maples & Calder in the Cayman Islands. According to the online version of The Legal 500 regarding Maples & Calder, "[o]ther major instructions included Simon Firth advising Eike Batista's EBX Group on the ongoing restructuring of its strategic partnership with Mubadala Development Company." Cayman Islands, Corporate and Commercial, *Maples and Calder*, The Legal 500 (last visited Oct. 11, 2016), http://www.legal500.com/c/cayman-islands/corporate-and-commercial.

398.    Mubadala had gone along with the initial public mischaracterization of its loan as an "equity investment" and had secretly stripped plum assets from the BATISTA companies under cover of an announced "partial redemption" of that investment, all of which tends to indicate complicity in the fraud. Plaintiffs reserve the right to add Mubadala as a Defendant should discovery confirm a basis to do so.

**The 10.8 Billion Barrel Lie – Recap.**

399.    Despite the fact that OGX was now on a very fast countdown to collapse, BATISTA resolutely kept on publicly trumpeting a rosy vision of the future for OGX, completely disconnected from any shred of reality.

400.    Thus, on July 19, 2013, BATISTA once again blared out reassurances for distribution through the internet press [Bloomberg Businessweek, Financial Times, Fox Business, San Francisco Chronicle] that, as D&M had stated in a 2011 Report, OGX had reserves amounting to 10.8 billion barrels and that regardless of all else, he would stand by the company and honor all of his obligations.

401.     However, BATISTA had always known that the various OGX projections had been lies. That had been confirmed by the internal OGX Task Force and Schlumberger Task Force Reports in late 2012 and all the evidence since then had reinforced the point and he had neither the capacity nor the intention to make good on all his debts, let alone compensate all of the many victims of his fraud.

402.     On July 22, 2013, D&M again demanded of BATISTA, privately, that he retract the 10.8 billion barrel lie and detach the D&M name from it. BATISTA did not do so.

403.     On August 14, 2013, it was reported that Luciano Coutinho, the President of the Brazilian development bank, BNDES, which had loaned BATISTA billions of dollars and must have done due diligence that showed otherwise, announced that BATISTA's OGX had "high-quality assets with which it can rebalance itself." It is unknown before discovery what inducement BATISTA supplied for him to state this lie.

404.     On August 16, 2013, the Tubarão Azul oilfield was closed down, having produced roughly 5 million barrels throughout its life, or just 1% of the minimum estimate announced in 2010. This was OGX's best field.  There would be a later attempt to operate this field post-bankruptcy. This attempt, however, would prove futile and the field was eventually returned to the Brazilian government.

405.     The task BATISTA had set for MARCUS BERTO was, upon information and belief, to get the EBX stake in LLX secretly monetized before the OGX crash, and the crash of OSX which would follow on its heels, leaving the LLX port project without its anchor tenant.

406.     On August 15, 2013, in a filing with the Brazilian Securities and Exchange Commission, BATISTA belatedly confirmed that he was selling a controlling stake in LLX for $560 million to U.S.-based EIG Global Energy Partners.

407.   Upon information and belief, therefore, this was "mission accomplished" for MARCUS BERTO.

408.   Disastrous news was also now emerging about BATISTA's MMX, iron ore "producing" company, which had been fined $1.8 billion for unpaid taxes, equivalent to nearly 80% of its market value. BATISTA's hand-picked managers at MMX were trying to sell off this company, too, before the others crashed all around it.

409.   In August and September 2013, BATISTA secretly sold another 227 million shares in OGX, which earned him approximately $35 million and which, upon information and belief, he routed to one of his foreign accounts.

410.   Though not discovered until near the end of the year, and then reported by the journalist Elio Gaspari in the Rio de Janeiro daily paper, O Globo, at least ten OGX executives left the company during these final months, with parting payments ranging between $46 million and $92 million each, further stripping cash out of the company.

411.   On September 4, 2013, having milked as much as he could out of OGX, AZIZ BIN AMMAR resigned from the Board and reportedly fled the country for New York where he is reported to presently reside in luxury in a $10 million apartment believed to have been acquired with a small part of his takings.

412.   With the OGX bankruptcy just days away, upon information and belief, BATISTA attempted to transfer another $100 million in corporate funds from a BTG Pactual correspondent account in The Bahamas to a Miami, Florida, account at Citibank, believed to be a THORQUE Company bank account.

413.   Upon information and belief, Andres Esteves, billionaire Chairman of BTG Pactual, initially refused to make this transfer, however, because he feared that BTG Pactual would become liable as an accomplice to BATISTA's fraud on creditors.

414. It is unknown whether those funds remain "stranded" in The Bahamas, or have been routed out on BATISTA's instructions to one of his other accounts.

415. Equity investors and bond holders were still relying on the fact that there was value in OGX. This belief was due to the fact that as recently as May 2013, a foreign oil company, Petronas, had apparently invested close to a billion dollars of its own money in the OGX oil fields.

416. On top of that, BATISTA himself was obliged to inject $1 billion in cash into OGX, if and when needed, through the Put Option. (And in 2014, into OSX through a similar Put Option). All that was needed apparently was for OGX to have enough cash to stay in business until the oil started to flow.

417. The OGX Put Option representation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which Ms. Neiwirth took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true.

### Section III - The OGX Oil Bubble Bursts

418. On September 6, 2013, OGX's Controller, desperate for cash, formally demanded from BATISTA the first $100 million under the Put Option.

419. BATISTA, who had never had any intention of paying a single penny *into* OGX, shocked investors by refusing to pay this or any other obligation under the Put Option, claiming the benefit of an "out clause," which - if an actual document even existed - he had inserted for that purpose.

420. The arrival of OSX III, yet another massive floating production, storage and offloading vessel at the Tubarão Martelo field, on October 1, 2013, raised momentary hopes that OGX might soon start producing offshore oil from the field. But by close of business that same day, OGX missed a bond payment in the amount of $45 million.

421.    On October 28, 2013, MARCUS BERTO formally stepped down at LLX, resigning as President and Director of Investor Relations and handed over to the new owners' appointed management and left for Miami, Florida.

422.    It is believed that MARCUS BERTO had been awarded a significant interest in the company by BATISTA for his services, part of which he invested in what is reported to be a $9.5 million Key Biscayne, Florida, mansion.

423.    On October 30, 2013, OGX filed for bankruptcy in Rio de Janeiro disclosing debts of $5.1 billion, of which roughly $3.6 billion was owed to U.S. and other foreign bondholders.

424.    Pimco, the world's largest bond investor, based in California, and BlackRock, the world's largest asset manager, from New York, had front-row seats for the collapse.

425.    Bondholders like the Plaintiffs and, upon information and belief, other investors from Florida, such as the Florida Retirement System Trust Fund, were among the horde of other investors that were basically wiped out.

426.    OGX's satellite company, MMX, filed for bankruptcy on October 22, 2013.

427.    OGX's satellite company, OSX, filed for bankruptcy on November 11, 2013.

428.    In November 2013, Petronas announced that it would not pay the $850 million, which investors had expected under the alleged "deal" that BATISTA had broadcast in May of that year, disclosing that the deal had been contingent on OGX being able to re-structure its debt.

429.    By February 2014, virtually all of the blocks which OGX had leased had been returned to the Brazilian Government as worthless.

**Batista's "Brazilian Dream" Turns to Nightmare.**

430.    For everybody with an interest in OGX and its satellite companies - except for BATISTA, his co-conspirators, and accomplices - the "Brazilian Dream" BATISTA had boasted of in the April 30, 2012, Milken interview, had now turned to a nightmare.

77

431.   The shareholders and ordinary bondholders who had invested billions of dollars in OGX, predominantly from the U.S., had now been essentially wiped out in what is currently the largest default in Latin American history.

432.   BATISTA and a number of his co-conspirators and accomplices have been indicted for market manipulation and insider trading in Brazil. These proceedings are expected to last a decade or more, with no real hope of securing punishment of the perpetrators of the fraud or restitution for the victims.

433.   As one of his "defenses" in the criminal proceedings in Brazil, BATISTA has contended that the conditions of the leases required that OGX continue to explore for oil until it declared a field to be commercial or return it to the government. BATISTA therefore had OGX declare fields to be commercial to avoid incurring the cost of exploration or having to return them as worthless, trusting that some future technological advance would allow OGX to commercially recover what were presently unrecoverable resources. In other words, BATISTA has admitted that those representations to investors were false.

434.   In November 2015, Brazil's market regulator, the CVM, banned BATISTA from managing a publicly traded company for a derisory five years.

**Batista's Silver Lining.**

435.   BATISTA and his co-conspirators, however, are all believed to have done well out of the scheme, having received sums ranging from tens of millions of dollars to hundreds of millions of dollars apiece.

436.   All the lies about BATISTA being listed somewhere in the league of the world's richest men can now be seen to have *always* been a lie. The number on which that supposed position ranking was predicated was the sum total of money paid in by investors in expectation of profits from oil that never existed.

78

437.    In actual fact, BATISTA's original net worth before the OGX fiasco was probably in the hundreds of millions of dollars, and his actual current assets, mainly squirreled away abroad, are probably significantly more than what he began with.

438.    Thus, BATISTA and his family continue to live an untouchable life of luxury in Brazil. It is reported that he believes that he has "zeroed his debts" through the bankruptcies. Apparently the billions of dollars of which he bilked his victims does not count.

439.    That BATISTA has massive wealth remaining is shown by the fact that in March 2016, he threw $130,000.00 in gold coins from the deck of his yacht into the Atlantic Ocean to propitiate the "Queen of The Sea," and turn the course of his luck for his next enterprise.

440.    In July 2016, with all funds successfully routed out to safety, THOR BATISTA quietly closed down the THORQUE Companies in The Bahamas. Notice of the dissolution was given solely by means of a newspaper of tiny local circulation in The Bahamas on July 28, 2016. Copies of the notices are shown here:

| NOTICE | NOTICE |
|---|---|
| International Business Companies Act No.45 of 2000 | International Business Companies Act No.45 of 2000 |
| **THORQUE INVESTMENT MANAGEMENT LTD. (the "Company")** | **THORQUE I FUND LTD. (the "Company")** |
| Notice is hereby given that, in accordance with Section 138 (8) of the International Business Companies Act, No.45 of 2000, the Dissolution of THORQUE INVESTMENT MANAGEMENT LTD. (IBC No. 164386 B) has been completed, a Certificate of Dissolution has been issued and the Company has therefore been struck off the Register. The date of completion of the dissolution was the 28th day of July, 2016. | Notice is hereby given that, in accordance with Section 138 (8) of the International Business Companies Act, No.45 of 2000, the Dissolution of THORQUE I FUND LTD. (IBC No. 164487 B) has been completed, a Certificate of Dissolution has been issued and the Company has therefore been struck off the Register. The date of completion of the dissolution was the 28th day of July, 2016. |
| Thor de Oliveira Fuhrken Batista Liquidator | Thor de Oliveira Fuhrken Batista Liquidator |

441.    As previously mentioned, the Tubarão Azul oilfield had been OGX's best prospect. Under BATISTA it had achieved less than 1% of the flow promised. On September 20, 2016, three years post-bankruptcy, after the successor entity had ploughed many more millions into its exploration, the Tubarão Azul oilfield was returned to the Brazilian government as worthless.

**The Plaintiffs' Claim.**

442.  Through restructuring in the OGX bankruptcy, MERIDIAN's close to $17 million dollars in bonds has been translated into shares in a new version of OGX with a face value of $279,746 for which credit is given. MERIDIAN's net loss is $16,438,233, plus interest.

443.  Through restructuring in the OGX bankruptcy, AMERICAN's close to $4 million in bonds has been translated into shares in a new version of OGX with a face value of $62,166, for which credit is given. AMERICAN's net loss is $3,872,616, plus interest.

444.  The Plaintiffs have retained the undersigned attorneys to prosecute this action and are obliged to pay them a reasonable fee.

445.  As of the date of filing this Complaint, the Plaintiffs have already commenced proceedings ancillary to this action, restricting Batista and the 63X Companies from dissipating assets and to obtain information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

446.  In the Cayman Islands, after a multi-day hearing, the Judge, consistent with Cayman Islands law, entered an Order freezing the assets of Batista and the 63X Companies worldwide and ordered disclosures for information regarding accounts and transfers owned and controlled by Batista and the 63X Companies.

447.  In the Bahamas, consistent with Bahamian law, the Judge similarly entered an order for the disclosure of information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

448.  BATISTA and the 63X Companies have been notified of these foreign proceeding. Upon information and belief, BATISTA is actively avoiding service of the Cayman Orders.

## COUNT I
## FRAUD

Plaintiffs re-allege paragraphs 1-7, 9-11, 13-14, 28-448 against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO and AZIZ BEN AMMAR, as follows:

449.    Each of the above named Defendants personally participated in the fraudulent scheme and composed and transmitted material fraudulent misrepresentations, and assisted each other in maintaining the credibility of material misrepresentations as detailed above.

450.    As detailed above, each of them issued and assisted in issuing false statements concerning specific material facts, with actual knowledge that the representations were false, with the intention that investors would thereby be induced to rely on such representations to their consequent financial loss.

451.    In directing their individual and collaborative misrepresentations to the United States, the named Defendants necessarily targeted investors in the most populous States of the United States, of which Florida is the third, behind only California and Texas. They did so in the expectation of personal gain and of causing loss to their targets.

452.    Plaintiffs' investment agent, Gables Capital Management, in Miami, Florida, was a target of such misrepresentations and relied on the same and was thereby induced by such fraudulent misrepresentations to buy OGX bonds on behalf of the Plaintiffs in the total amount of $21,231,683.00.

453.    The OGX bonds were and are virtually worthless, as a result of which Plaintiffs have been damaged in the sums alleged.

454.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT II
## CONSPIRACY TO DEFRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

455.  The foregoing Defendants agreed to and did conspire together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors.

456.  Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT III
## AIDING AND ABETTING FRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X

MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

457.    The foregoing Defendants aided and abetted BATISTA and his co-conspirators and accomplices and rendered substantial, material assistance to him and them, in ways, upon dates, and in places, that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme and to assist in secreting the proceeds in false names and in jurisdictions where they would not be available for the satisfaction of the legitimate debts of creditors, wherefore they are additionally liable as aiders and abettors.

458.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT IV
## FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT
### (f/k/a "FLORIDA RICO")

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

### The Criminal Enterprise.

459.    Upon the basis of the facts alleged, BATISTA is and was the prime directing and controlling force at the head of a criminal enterprise within the meaning of Fla. Stat. § 772.102(3) comprised of himself, the joined Defendants, and many other co-conspirators, aiders, abettors, and accomplices not joined.

460.    The enterprise had as its common purpose the criminal aspirations and ambitions of BATISTA for the accumulation of wealth through a pattern of racketeering activity for further investment, enjoyment and transmission down through the generations of his relatives, friends co-conspirators and accomplices.

461.    Such enterprise is referred to collectively as "the Batista Crime Family" and the Defendant individuals and entities comprising such as "members of the Batista Crime Family" or "members of the enterprise."

462.    All members of The Batista Crime Family acted, in regard to each listed predicate act as described below and as to the overall pattern of racketeering activity, with criminal intent.

### Pattern of Criminal Activity.

463.    By reason of the allegations made herein, the members of the enterprise engaged in a pattern of criminal activity as stated in Fla. Stat. § 772.102(4).

### Predicate Acts of Criminal Activity.

464.    The Defendants actively participated in the enterprise, the Batista Crime Family, through the stated prohibited activities contrary to Fla. Stat. § 772.103 in the course of a pattern of criminal activity under Fla. Stat. § 772.102(4) which entitle Plaintiffs to civil remedies under Fla. Stat. § 772.104.

**Predicate Act I - Florida Securities Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

465. As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly employed a device, scheme, or artifice to defraud, contrary to Fla. Stat. § 517.301(1)(a)(1).

466. As set forth above, the stated Defendants have further committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly obtained money or property by means of untrue statements of material facts or any omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, contrary to Fla. Stat. § 517.301(1)(a)(2).

467. As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon persons, including Plaintiffs, contrary to Fla. Stat. § 517.301(1)(a)(3).

**Predicate Act II - Federal Wire Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

468.    As set forth above, the stated Defendants have committed numerous acts of wire fraud in that they, having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, contrary to 18 U.S.C. § 1343.

**Predicate Act III - Federal Money Laundering - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT, OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.**

469.    As set forth above, the stated Defendants committed numerous acts of money laundering in that they knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from unlawful activity contrary to 18 U.S.C. § 1957. As stated above, the acts of money laundering variously took place in the United States pursuant to 18 U.S.C. § 1957(d), or was committed outside the U.S. by "U.S. persons" including U.S. nationals, U.S. permanent residents, corporations formed in the U.S. and foreign subsidiaries of such persons as defined in 18 U.S.C. § 3077.

**Predicate Act IV - Florida False Advertising - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR.**

470.    As set forth above, the stated Defendants committed numerous acts of misleading and deceptive advertising, contrary to Fla. Stat. § 817.40(5), in that they made or disseminated or caused to be made or disseminated before the general public of the state, or a portion thereof, misleading advertisements, which were fraudulent and unlawful, which the Defendants knew or should have known were false, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

**Predicate Act V - Florida Theft - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

471.    By reason of the foregoing the stated Defendants, with criminal intent, knowingly obtained or used, or endeavored to obtain or use, the Plaintiffs' property and the property of others through fraud, deceit, false pretenses and/or conduct of similar nature, with the intent to permanently deprive the Plaintiffs and such others of their right to their property or their benefit of their property, and further, knowingly and with criminal intent appropriated such property to their own use contrary to Fla. Stat. § 812.014.

**Predicate Act VI - Florida Communications Fraud: Alleged Against EIKE BATIST, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

472.    As set forth above, the stated Defendants engaged in a scheme to defraud, in that they engaged in a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto contrary to Fla. Stat § 817.034(4)(a), 817.034(3)(b), 817.034(3)(c), and 817.034(3)(d).

473.    Further by reason of the matters set forth above, the stated Defendants furthered a scheme to defraud, in that they furthered a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto, and in the course thereof communicated with persons with the intent to obtain property from such persons contrary to Fla. Stat § 817.034(4)(b).

**Civil Remedy.**

474.    As a result of the Defendants' participation in the criminal enterprise and its perpetration of the aforesaid pattern of criminal activity, Defendants caused injury and damage to Plaintiffs.

475.    By reason of the foregoing, Defendants have, with criminal intent, received proceeds derived directly or indirectly from a pattern of criminal activity and have used or invested the same, or a part thereof, directly or indirectly, or the proceeds derived from the investment or

88

use thereof, in the acquisition of title to, or a right, interest, or equity in, real property or in establishment or operation of an enterprise, contrary to Fla. Stat. § 772.103.

476. By reason of the foregoing, Defendants have, with criminal intent, through a pattern of criminal activity acquired or maintained, directly or indirectly, an interest in or control of enterprises or real property; have been employed by of associated with an enterprise to conduct or participate, directly or indirectly, in a pattern of criminal activity; conspired or have endeavored to violate provisions of subsection (1), subsection (2), or subsection (3) of Fla. Stat. § 772.103.

477. By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Fla. Stat. § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, statutory treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

<div align="center">

**COUNT V**
**FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT CONSPIRACY**
**(f/k/a "FLORIDA RICO CONSPIRACY")**

</div>

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

478.   The members of the Batista Crime Family conspired and agreed together numerous times and on various dates and in various places to participate in the fraudulent scheme and in the affairs of the criminal enterprise through a pattern of racketeering activity contrary to Florida Statute § 772.103(4), by reason of which Plaintiffs were damaged and are consequently entitled to civil remedies under Florida Statute § 772.104.

479.   By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Florida Statutes § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

## COUNT VI
## FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-14, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR, and say as follows:

480.   Defendants committed numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1), and that they caused such loss in fact to Plaintiffs.

481.   Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

482.   Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

## COUNT VII
### CONSPIRACY TO COMMIT FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-25, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

483.    Defendants conspired together to commit and did commit numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

484.    Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

485.    Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

## COUNT VIII
## CIVIL THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-25 and 28-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

486.    By reason of the foregoing acts alleged, the Defendants committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Florida State § 772.11, including treble damages, attorneys' fees and the expenses of this action.

487.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT IX
## CONSPIRACY TO COMMIT THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

488.   The foregoing Defendants with criminal intent, conspired together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and performed the stated acts in pursuance of such agreement in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

489.   All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT X
### AIDING AND ABETTING THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-5, 7-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

490.   The foregoing Defendants, with criminal intent, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, aided and abetted BATISTA in achieving the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

491.   All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT XI
## FLORIDA UNIFORM FRAUDULENT TRANSFERS ACT

Further or alternatively, Plaintiffs allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

492.   The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, made fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a

reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and each of the other liable Defendants were engaged or was about to; engage in a business or a transaction for which his and their remaining assets were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he or they would incur, debts beyond his or their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the asset transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

<div align="center">

**COUNT XII**
**CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS**

</div>

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

493.    The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, conspired with BATISTA and others among themselves, to make fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and such other liable Defendants were: engaged or were about to engage in a business or a transaction for which his or their remaining assets were unreasonably small in relation to the business or transaction; intended to incur, or believed or reasonably should have believed that he and they would incur, debts beyond his and their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the assets transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

### DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,
ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282
Carlos F. Osorio
Florida Bar No.: 597546

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.:  17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, *et al.,*

       Defendants.

_____/

### AGREED ORDER ON UNOPPOSED MOTION FOR ENLARGEMENT OF TIME TO FILE *FORUM NON CONVENIENS* MOTIONS

THIS CAUSE having come before the Court on the Unopposed Motion for Enlargement of Time to File *Forum Non Conveniens* Motions (the "Motion") of Defendants Werner Batista, Centennial Asset Mining Fund, and Centennial Asset Brazilian Equity Fund ("Defendants"), and the Court having considered the Motion without a hearing and being duly advised, it is hereby **ORDERED** AND **ADJUDGED** that:

1.    The Motion is **GRANTED**. Defendants shall file and serve any *forum non conveniens* motions by March 31, 2017.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 03/28/17.

_____
BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

> No Further Judicial Action Required on <u>THIS</u> <u>MOTION</u>
> CLERK TO <u>RECLOSE</u> CASE <u>IF</u> POST JUDGMENT

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Copies to: All Counsel of Record

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, *et al.,*

        Defendants.

_____/

## DEFENDANTS WERNER BATISTA, CENTENNIAL ASSET MINING FUND, AND CENTENNIAL ASSET BRAZILIAN EQUITY FUND'S SECOND UNOPPOSED MOTION FOR ENLARGEMENT OF TIME TO FILE *FORUM NON CONVENIENS* MOTIONS

Defendants Werner Batista, Centennial Asset Mining Fund, and Centennial Asset Brazilian Equity Fund (collectively, "Defendants") respectfully request a second brief enlargement of five days in which to file their *forum non conveniens* motions. In support hereof, Defendants state as follows:

1.      Defendant Werner Batista was served on January 24, 2017; Defendant Centennial Asset Mining Fund was served on January 25, 2017; and Defendant Centennial Asset Brazilian Equity Fund was served on January 26, 2017.

2.      Per this Court's Order of March 28, 2017, the Defendants' current deadline to file their *forum non conveniens* motions is March 31, 2017.

3.      Given the need to coordinate the execution and translation of affidavits from

1

witnesses located in Brazil and to coordinate internally, Defendants need a brief additional enlargement in which to finalize their *forum non conveniens* motions.

4.    Plaintiffs have agreed to a five-day enlargement of time until April 5, 2017, for Defendants to both respond to the Complaint and also file their *forum non conveniens* motions.

5.    The additional time requested in this motion will not prejudice any party and is not being sought for purposes of unnecessary delay.

WHEREFORE, Defendants respectfully request that the Court enter an order granting them an additional five days, up through and including April 5, 2017, in which to file and serve any *forum non conveniens* motions.

## CERTIFICATE OF CONFERENCE

The undersigned hereby confirms that counsel for movant has conferred with counsel for Plaintiffs, and that counsel for Plaintiffs does not oppose the relief requested in this motion.

Dated: March 30, 2017                    Respectfully submitted,

**ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.**
1001 Brickell Bay Drive, 9th Floor
Miami, FL 33131
Tel.: (305) 372-8282; Fax: (305) 372-8202

By: */s/ Ana Maria Barton*
Edward M. Mullins
Florida Bar No. 863920
emullins@astidavis.com;
bhernandez@astidavis.com
Ana M. Barton
Florida Bar No. 85721
abarton@astidavis.com
*Counsel for Defendants Werner Batista,*
*Centennial Asset Mining Fund, and Centennial*
*Asset Brazilian Equity Fund*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal which sent e-mail notification of such filing to Hendrik G. Milne, Esq., and Craig P. Kalil, Esq., ABALLI MILNE KALIL, P.A.; Jose Ferrer, Esq., and Yasmin Fernandez-Acuna, Esq., BILZIN SUMBERG BAENA PRICE & AXEDLROD LLP; and Victor Noskov, Esq., Elinor Sutton, Esq. and Michael Carlinsky, Esq., QUINN EMANUEL URQUHART & SULLIVAN, LLP, on March 30, 2017.

By: */s/ Ana Maria Barton*
      Ana Maria Barton

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

**MERIDIAN TRUST COMPANY**     CIRCUIT CIVIL DIVISION
  Plaintiff(s),

vs.             Case Number: **17-1040-CA-43**

**EIKE BATISTA, et al**
  Defendant(s).

_____/

## <u>NOTICE OF DESIGNATION OF EMAIL ADDRESS</u>

NOTICE OF DESIGNATION OF EMAIL SERVICE ADDRESS OF COMPLEX BUSINESS LITIGATION SECTION pursuant to F.R.Jud.Admin. 2.516

The Eleventh Judicial Circuit, by and through the Court, gives notice that consistent with the Complex Business Litigation Rules, all documents filed in this case are to be served on the CBL section by the filing party at time of filing.

The service email address for this case is:

<u>CBL43@jud11.flcourts.org</u>, **this email address has already been added to the service list in the E-portal system. Therefore, you do NOT have to email filings directly to the above mentioned email address.**

<u>CERTIFICATE OF SERVICE</u>

   I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via electronic mail through the Florida Court's E-Portal System to all counsel/parties of record on this 30th day of March , 2017.

            /s/  Michelle Betancourt\_\_\_
            Michelle Betancourt
            Case Manager

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (43)

CASE NO.: 17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, *et al.,*

        Defendants.

_____/

## AGREED ORDER ON SECOND UNOPPOSED MOTION
## FOR ENLARGEMENT OF TIME TO FILE *FORUM NON CONVENIENS* MOTIONS

THIS CAUSE having come before the Court on the Second Unopposed Motion for Enlargement of Time to File *Forum Non Conveniens* Motions (the "Motion") of Defendants Werner Batista, Centennial Asset Mining Fund, and Centennial Asset Brazilian Equity Fund ("Defendants"), and the Court having considered the Motion without a hearing and being duly advised, it is hereby **ORDERED** AND **ADJUDGED** that:

1. The Motion is **GRANTED**. Defendants shall file and serve any *forum non conveniens* motions by April 5, 2017.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 03/31/17.

_____
BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Copies to: All Counsel of Record

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, *et al.,*

       Defendants.

_____/

**DEFENDANTS WERNER BATISTA, CENTENNIAL ASSET MINING FUND,**
**CENTENNIAL ASSET BRAZILIAN EQUITY FUND,**
**63X MASTER FUND, 63X INVESTMENT LTD., AND 63X FUND'S**
**MOTION TO DISMISS ON FORUM NON COVENIENS GROUNDS**

i

Defendants Werner Batista ("Batista"), Centennial Asset Mining Fund ("Centennial Mining"), Centennial Asset Brazilian Equity Fund ("Centennial Brazilian"), 63X Master Fund, 63X Investment Ltd., and 63X Fund (collectively, "Movants"), pursuant to Florida Rule of Civil Procedure 1.061, move to dismiss the Complaint filed by Plaintiffs Meridian Trust Company and American Associated Group, Ltd. (collectively "Plaintiffs") for *forum non conveniens*. This motion should be granted for the reasons set forth in the below memorandum of law.

## MEMORANDUM OF LAW

### INTRODUCTION

> Nothing in our law establishes a policy that Florida must be a courthouse for the world, nor that the taxpayers of the state must pay to resolve disputes utterly unconnected with this state's interests.

Kinney System, Inc. v. Continental Ins. Co., 674 So. 2d 86 (Fla. 1996). This action lacks any significant relationship to the State of Florida; it does not belong here. Instead, Brazil has the ultimate interest in this matter. This is a matter, according to Plaintiffs' *own* complaint, about a fraud that allegedly was perpetrated in Brazil, by Brazilians, regarding Brazilian natural resources, involving Brazilian companies, and in which Brazilian authorities, politicians, banks and other institutions are alleged to have been complicit.

This case was brought by foreign plaintiffs seeking to collect debts—allegedly owed to Plaintiffs under indentures governed by New York law—discharged in a Brazilian judicial reorganization years ago to recover sums they allegedly invested in Brazil and claim to have lost years ago. Specifically, Plaintiffs allege that they bought bonds of a Brazilian oil exploration company, OGX, which filed for judicial reorganization in 2013 in Brazil. Compl. ¶¶ 34, 343-44. As discussed at length in the Motion to Dismiss Plaintiffs' Complaint Based on Comity (the "Discharge and Release Motion"), filed concurrently herewith, all obligations related to the

1

bonds at issue are subject to a final bankruptcy discharge in Brazil. See generally Discharge and Release Motion.

As part of OGX's judicial reorganization, the Brazilian bankruptcy court approved a restructuring plan pursuant to which "OGX, controlled companies, subsidiaries, affiliates and other companies belonging to the same corporate and economic group, and their officers, directors, Shareholders, minority shareholders, members, agents, employees, representatives, guarantors, sureties, successors and assignees," were discharged. See Compl. ¶¶ 423-25; see Discharge and Release Motion, Ex. A, Affidavit of Marcelo Lamego Carpenter ¶ 14 ("Carpenter Aff."). Bondholders like Plaintiffs, were represented by the trustee of the bonds, Deutche Bank Trust Company Americas. Carpenter Aff. ¶ 32. Plaintiffs, however, did not petition to participate individually in the judicial reorganization and did not oppose the reorganization and discharge. Discharge and Release Motion at 9. Now, having failed to raise their claims in the Brazilian proceeding, which they now admit "wiped" them out, they attempt to bring them here in this inconvenient forum.[1]

Plaintiffs are Meridian Trust Company, a trust company incorporated under the laws of Nevis and located in Nevis, and American Associated Group, Ltd., a Cayman corporation. Compl. ¶¶ 3, 5. Plaintiffs have brought fraud, RICO, conspiracy, and theft claims against 22 Defendants— 12 individuals, almost all of which are Brazilians and lack any connection to Florida (save three individuals who also are alleged to be Brazilian citizens), and 10 corporate entities,[2] none of which is registered to do business in Florida:[3]

---

[1] Compl. ¶ 425 ("Bondholders like the Plaintiffs . . . were among the horde of other investors that were basically wiped out."),

[2] These entities are named in all the counts except in the counts for fraud and false and misleading advertising.

[3] Composite Exhibit A (results of search for entity names in sunbiz.org).

| Defendants | Nationality/Incorporation Alleged in Complaint |
|---|---|
| Centennial Mining | Nevada[4] |
| Centennial Brazilian | Delaware[5] |
| Werner Batista | Brazil & Florida[6] |
| 63X Master Fund | Cayman Islands[7] |
| 63X Investments Ltd. | Cayman Islands[8] |
| 63X Fund | Cayman Islands[9] |
| EBX Holding, Ltda. | Brazil[10] |
| EBX International S.A. | Panama[11] |
| EBX Capital Partners | Brazil[12] |
| Thorque1 Fund Ltd. | The Bahamas[13] |
| Thorque Investment Management Ltd. | The Bahamas[14] |
| Eike Batista | Brazil[15] |
| Thor Batista | Brazil[16] |
| Paulo Mendonca | Brazil[17] |
| Flavio Godinho | Brazil & Florida[18] |
| Paulo Gouvea | Brazil[19] |
| Marcus Berto | Brazil & Florida[20] |
| Luiz Carneiro | Brazil[21] |
| Aziz Ben Ammar | Brazil & New York[22] |
| Olin Batista | Brazil[23] |
| Flavia Sampaio | Brazil[24] |

[4] Id. ¶ 21.
[5] Id. ¶ 22.
[6] Id. ¶ 7.
[7] Id. ¶ 16.
[8] Id. ¶ 15.
[9] Id. ¶ 17.
[10] Id. ¶ 18.
[11] Id. ¶ 19.
[12] Id. ¶ 20.
[13] Id. ¶ 23.
[14] Id. ¶ 24.
[15] Id. ¶ 6.
[16] Id. ¶ 8.
[17] Id. ¶ 9.
[18] Id. ¶ 10.
[19] Id. ¶ 11.
[20] Id. ¶ 12.
[21] Id. ¶ 13.
[22] Id. ¶ 14.
[23] Id. ¶ 25.
[24] Id. ¶ 26.

3

| Luma de Oliveira | Brazil[25] |
|---|---|

The Florida Supreme Court has made clear that an action such as this one should be dismissed for *forum non conveniens* to avoid the undue burden that would be imposed on this Court and on Florida taxpayers.

Plaintiffs' only explanation for why this Court can or should hear this case is: (i) the location of the beneficiary of the Christy Trust (Miami-Dade County, Florida) that Plaintiffs managed; (ii) the fact that the investments Plaintiffs made on behalf of the beneficiary were allegedly through an agent based in Florida; and (iii) that other non-party investors from Florida invested in OGX as well.  Compl. ¶¶ 4-5, 45.  Neither the beneficiary, the agent, nor these other investors are a party to this action and their residency is of little relevance to the factors analyzed by courts to determine whether dismissal on *forum non conveniens* grounds is appropriate, especially given that the overwhelming core of this action stems from Brazil.

None of these limited Florida contacts justifies having this Court spend its limited resources to hear a dispute between foreign plaintiffs and defendants— most of whom are based in Brazil— involving an investment in Brazil in connection with the exploration of Brazilian oil, especially when Plaintiffs could have, and should have, brought their claims in a Brazilian bankruptcy proceeding.

## THE ALLEGATIONS OF THE COMPLAINT

The Plaintiffs' Complaint shows the connections of this lawsuit to Brazil.  The lawsuit is premised entirely on alleged fraud purportedly perpetrated by a Brazilian—Defendant Eike Batista—involving off shore drilling leases in Brazil.  Compl. ¶ 34.  Plaintiffs contend that Eike Batista had his company OGX (which was traded on the Brazilian stock exchange (id. ¶ 167))

---

[25] Id. ¶ 27.

4

commission multi-million dollar oil production platforms from his Brazilian satellite ship-building company, OSX.  Id. ¶ 35.  Plaintiffs also allege that Eike Batista "trumpeted plans for a satellite port city in Brazil" via another Brazilian company, LLX.  Id.  OGX had obtained these oil rights from an auction conducted by the Brazilian government.  Id. ¶¶ 107-12.  Plaintiffs contend that the oil reserves were overstated and that Eike Batista and other Defendants conspired with Brazilian bankers, politicians, and others to hide proceeds from the alleged fraud.  Id. ¶ 40.  Plaintiffs noted that Eike Batista, and others, were criminally indicted in Brazil, id. ¶ 46, and it is undisputed that Eike Batista currently is under preventative detention in a Brazilian jail.

Plaintiffs continue that Eike Batista allegedly conspired with his eldest son, Thor Batista, and OGX directors and officers, including Defendants Paulo Mendonça, Werner Batista, Flavio Godinho, and Paulo Gouvea, whom Plaintiffs allege are either Brazilian residents or dual residents of Brazil and Florida.  See infra.  Plaintiffs continue that all of the Board members of OGX, and many of the directors of OSX and LLX, and other alleged Brazilian insiders—which Plaintiffs threaten to later sue, Compl. ¶¶ 58 & n.2—all allegedly failed to inform investors of the alleged fraud.  Id. ¶ 59.

While Plaintiffs attempt to artificially connect this lawsuit to the United States through vague allegations regarding U.S. investors, id. ¶¶ 120-31, it is clear from the Plaintiffs' Complaint that the core of the alleged fraud—and the home of key witnesses Plaintiffs will need to prove their case—live in Brazil, and that Brazil has the primary interest in the case.  For example, Plaintiffs contend that, after OGX allegedly misrepresented the value of an oil strike, Defendant Eike Batista allegedly came to be close to Brazilian politicians whom he allegedly bribed and are now under investigation by Brazilian authorities.  Id. ¶¶ 152-53.  Plaintiffs further allege that the alleged corruption extended to the highest levels of the Brazilian government including former

5

Brazilian President Dilma Roussef (now impeached), Rio Governor Sergio Cabral (under arrest in Brazil for corruption), and the Mines and Energy Minister of Brazilian Edison Labao (under investigation for corruption in Brazil).  Id. ¶¶ 265-268.

Plaintiffs contend that the Brazilian board members of other corporate Defendants such as the Defendant 63X companies, and EBX and Centennial companies, knew of the alleged fraud. Id. ¶ 220.  Indeed, in 2011, according to Plaintiffs, OGX commissioned a Joint Task Force to report to the OGX Executive Committee that the company had a negative value of $1 billion but still was touting the value of the offshore reserves.  Id. ¶¶ 291-93.

Plaintiffs contend that two years later in 2013, they, along with many hundreds of investors from around the world, invested in the OGX bonds.  Plaintiffs, foreign entities, identify a single material witness in Florida—Judith Neiwirth, a co-founder of the investor company, Gables Capital.  Id. ¶ 336.  They contend that she relied upon prior public statements by Eike Batista and third parties in the press.  Id. ¶¶ 336-44.  She is not alleged to have, nor would she likely have, personal knowledge of the allegations of fraud, conspiracy, and theft alleged against Defendants.

Meanwhile, Plaintiffs' contentions demonstrate that, even after they invested, the core of the dispute continues to lie in Brazil.  They allege that non-party Andre Esteves, the President of BTG Pactual, a major financial institution in Brazil, misrepresented to the public in March 2013 that Eike Batista's companies "were in no danger of failing and that Batista remained one of the best capitalized business men in Brazil."  Id. ¶¶ 353-55.  Later, in April 2013, Plaintiffs allege, Eike Batista had Defendant Centennial pay a $2.3 million "kickback" to Brazilian officials.  Id. ¶ 362.  And, they allege, Luciano Coutinho, the President of the Brazilian development bank, BNDES, continued to tout the assets of OGX although they speculate that he "must have done due diligence that showed otherwise."  Id. ¶ 403.

As Plaintiffs admit, the OGX group of companies filed bankruptcy in Brazil, as did the satellite companies MMX and OSX.  Id. ¶¶ 423-27.  Plaintiffs admit that they were among the horde of investors "wiped out" by the bankruptcy.  Id. ¶ 425.

Plaintiffs likely will contend that Defendants were assisted by unnamed "international asset protection specialists" whom "upon information and belief" are based in Miami.  Id. ¶ 292.  Yet, Plaintiffs actually plead that the alleged proceeds of the fraud are located all over the world—the Cayman Islands, The Bahamas, Panama, and Switzerland.  Id. ¶¶ 300-01.  And, again, the seeds of this alleged transfer of funds all start in Brazil.  Id. ¶ 380 (Eike Batista allegedly transfers funds from his Brazilian Citibank account to his son's Brazilian Citibank account); id. ¶¶ 391-93 (Eike Batista allegedly transfers Brazilian building and millions of dollars to families in Brazil).

## APPLICABLE LAW

The common law doctrine of *forum non conveniens* addresses the problem that arises when a court technically may have  jurisdiction over a suit, but the claims can be more fairly and conveniently litigated elsewhere.  Kinney Sys., Inc. v. Cont'l Ins. Co., 674 So. 2d 86, 87 (Fla. 1996); Woods v. Nova Cos. Belize Ltd., 739 So. 2d 617, 621 (Fla. 4th DCA 1999).  To determine whether the doctrine of *forum non conveniens* applies, the Florida Rules of Civil Procedure have identified four (4) elements:

i.  The court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case;

ii.  The trial judge must consider all relevant factors of private interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice;

iii.  If the trial judge finds this balance in equipoise or near equipoise, he must then determine whether or not the factors of public interest tip the balance in favor of a trial in [another] forum; and

iv.   If the trial judge decides that the balance favors such a . . . forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

Fla. R. Civ. P. 1.061(a); Sazonov v. Karpova, 201 So. 3d 30, 31 (Fla. 3d DCA 2013).

The Florida Supreme Court in Cortez v. Palace Resorts, Inc., 123 So. 3d 1085, 1096 (Fla. 2013), further has held that "**except where the plaintiff is from another country**, the presumption in favor of plaintiff's initial choice of forum is always entitled to great deference."  Further, the Third District has cautioned trial courts that failure to dismiss on grounds of *forum non conveniens* when all relevant factors are present is an abuse of discretion.  S. Ry. Co. v. McCubbins, 196 So. 20 512, 516-17 (Fla. 3d DCA 1967); Rolls-Royce, Inc. v. Garcia, 77 So. 3d 855, 861 (Fla. 3d DCA 2012) (because the factors were present, "trial court abused its discretion in denying defendants' motion to dismiss for *forum non conveniens*").

Here, Brazil provides an adequate alternate forum, and both the private and public factors favor trial of this action in Brazil.  Further, the Plaintiffs' choice of forum is not entitled to a presumption of deference because Plaintiffs are not from Florida.  Dismissal for *forum non conveniens* is thus appropriate.

### A.   Brazil Is an Adequate and Available Alternate Forum.

An adequate alternative forum exists when (1) the defendant is amenable to process in the other jurisdiction and there is a meaningful mechanism for perfecting process, and (2) the parties will not be deprived of all remedies or treated unfairly.  Cortez, 123 So. 3d at 1091-92; Kinney, 674 So. 2d at 90-91 ("alternative fora are inadequate under the doctrine only if the remedy available there clearly amounts to no remedy at all").  A "defendant's submission to the jurisdiction of an alternate forum renders that forum available."  Veba-Chemie A.G. v. M/V Getafix, 711 F.2d 1243, 1245 (5th Cir. 1983); Ciba-Geigy Ltd. v. Fish Peddler, Inc., 691 So. 2d 1111, 1115 (Fla. 4th DCA 1997); Pearl Cruises v. Bestor, 678 So. 2d 372, 372-73 (Fla. 3d DCA 1996) (same).

Here, each of the Movants is subject to suit in Brazil.  First, according to the Complaint, Batista is a Brazilian citizen (Compl. ¶ 7), accused of criminal acts in Brazil and thus subject to suit there.  Exhibit B, Affidavit Filed by Marcello Augusto Lima de Oliveira on Behalf of Plaintiffs in Cayman Proceedings ¶ 39 (opining that Plaintiffs' claims for compensation in Brazil based on the facts alleged in the Florida Complaint "would be based upon Articles 159, paragraph 7 of Law 6,404/76 of [Brazil's] companies law [relating to claims by shareholders and third parties against directors and officers for violations of their duties]; Article 63, *et seq.* of the Brazilian Criminal Procedure Code [relating to compensation of an injured party whenever the damage is caused by a crime defined under Brazilian law]; as well as Articles 389 and 402 *et seq.* of the Brazilian Civil Code [relating to claims for damages whenever a person owes another a duty and that person fails to comply with their duty]").

The corporate entities (Centennial Mining, Centennial Brazilian, the 63X entities and the EBX entities) are alleged to be holding companies through which Eike Batista defrauded Plaintiffs. Id. ¶ 52.  Further, according to the Complaint, these companies held Eike Batista's shares in his oil exploration company, OGX, which is a Brazilian entity.  Id. ¶ 52.  These entities accordingly would be subject to suit in Brazil.  Exhibit B, Oliveira Aff. ¶ 39.

Further, of the remaining 15 Defendants, according to the Complaint, the majority (13) have Brazilian citizenship and would be subject to suit in Brazil:

| Remaining Defendants | Nationality/Incorporation Alleged in Complaint |
|---|---|
| EBX Holding, Ltda. | Brazil[26] |
| EBX Capital Partners | Brazil[27] |
| Thorque1 Fund Ltd. | The Bahamas[28] |

---

[26] Compl. ¶ 18.
[27] Id. ¶ 20.
[28] Id. ¶ 23.

9

| Thorque Investment Management Ltd. | The Bahamas[29] |
|---|---|
| Eike Batista | Brazil[30] |
| Thor Batista | Brazil[31] |
| Paulo Mendonca | Brazil[32] |
| Flavio Godinho | Florida & Brazil[33] |
| Paulo Gouvea | Brazil[34] |
| Marcus Berto | Brazil & Florida[35] |
| Luiz Carneiro | Brazil[36] |
| Aziz Ben Ammar | Brazil & New York[37] |
| Olin Batista | Brazil[38] |
| Flavia Sampaio | Brazil[39] |
| Luma de Oliveira | Brazil[40] |

Thorque1 Fund Ltd. and Thorque Investment Management Ltd.—entities that have been dissolved—also would be subject to suit in Brazil, assuming they can be sued anywhere, because they are alleged to be part of a scheme to defraud investors of proceeds which were to be generated in Brazil through a Brazilian company.  Compl. ¶¶ 67-68; Exhibit B, Oliveira Aff. ¶ 39.  Indeed, courts routinely have granted motions to dismiss on *forum non conveniens* grounds even when the Defendants are not Brazilian residents or entities.  See, e.g., Manela v. Garantia Banking Ltd., 940 F. Supp. 584, 586 (S.D.N.Y. 1996) (complaint for securities fraud dismissed on *forum non coveniens* grounds, determining Brazil as adequate alternative forum, when one of defendants was American); Tazoe v. Airbus S.A.S., 631 F.3d 1321, 1328 (11th Cir. 2011) (granting *forum non*

---

[29] Id. ¶ 24.
[30] Id. ¶ 6.
[31] Id. ¶ 8.
[32] Id. ¶ 9.
[33] Id. ¶ 10.
[34] Id. ¶ 11.
[35] Id. ¶ 12.
[36] Id. ¶ 13.
[37] Id. ¶ 14.
[38] Id. ¶ 25.
[39] Id. ¶ 26.
[40] Id. ¶ 27.

*conveniens* motion, determining Brazil as an adequate alternative forum, when defendants were French, Swiss, and American); Da Rocha v. Bell Helicopter Textron, Inc., 451 F. Supp. 2d 1318, 1321 (S.D. Fla. 2006) (same, American defendants); WEG Industrias, S.A. v. Compania De Seguros Generales Granai, 937 So. 2d 248, 253 (Fla. 3d DCA 2006) (same; American and Brazilian defendants); Iberoamerican Elecs., S.R.L. v. Moore Bus. Forms, Inc., 679 So. 2d 295, 295 (Fla. 3d DCA 1996) (same, American defendant).

Brazil is therefore an available forum.

Similarly, it is readily apparent and indisputable that Brazil is an adequate forum. Movants need demonstrate only that Plaintiffs have *some* potential remedy in the alternate forum. See, Kinney, 674 So. 2d at 91 (an alternative forum will be deemed inadequate "only if the remedy available there clearly amounts to no remedy at all"); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506-07 (1947) (only a finding that there will be "no remedies at all" will justify a finding of inadequacy); see also Ciba-Geigy, 691 So. 2d at 1117 ("A delay of 'many, many' years is a legally insufficient standard on which to judge a foreign forum's remedy as inadequate in a highly complex case such as this.").

Indeed, courts routinely have dismissed cases for *forum non conveniens* because Brazil is a more adequate forum, even in cases of fraud. Tazoe, 631 F.3d at 1330–31 (dismissing complaint on *forum non conveniens* grounds and finding that Brazil is an adequate and available forum); Da Rocha, 451 F. Supp. 2d at 1322 (same); WEG Industrias, 937 So. 2d at 254 (same); Reingruber v. Dennison Intern. Co., Inc., 97 CIV. 7023 (DC), 1998 WL 760229, at *3-4 (S.D.N.Y. Oct. 30, 1998) (same, fraud); Manela, 940 F. Supp. at 590-91 (same, fraud); Moskovits v. Moskovits, 150 Fed. Appx. 101, 103 (2d Cir. 2005) (same, fraud).

Here, Plaintiffs have ***admitted*** that there are adequate remedies for them in Brazil.

Specifically, in the Cayman Islands proceeding, Plaintiffs' own expert, Marcello Augusto Lima de Oliveira, attested that he had reviewed the proposed complaint that eventually was filed here and that Plaintiffs would have claims against Eike Batista for violations of his duties as a director or administrator (officer) pursuant to Article 59 of the Brazilian Civil Code, for compensation of an injured party when there has been a crime under Brazilian law pursuant to Article 63 of the Brazilian Civil Code, and for "damages in a broader sense whenever a person owes a duty and that person fails to comply with their duty" pursuant to Articles 389 and 402 of Brazil's Civil Code. Ex. B, Oliveira Aff. ¶ 39.  All Defendants are being sued for the same claims as Eike Batista, and thus Plaintiffs have *some* remedy, by their own admission, against all of them.  Plaintiffs thus have admitted adequacy.

The threshold question of whether an available and adequate alternate forum exists is clearly satisfied.

### B.  Private Interest Factors Favor Brazil

When, as here, a plaintiff is an out-of-state entity, plaintiff's choice of forum is not entitled to be given any special weight.  Cortez, 123 So. 3d at 1096 ("[E]xcept where the plaintiff is from another country, the presumption in favor of plaintiff's initial choice of forum is always entitled to great deference."); Kerzner Int'l Reports, Inc. v. Raines, 983 So. 2d 750, 752 (Fla. 3d DCA 2008) ("presumption given less deference when plaintiffs are out-of-state residents"); R.J. Reynolds Tobacco Co. v. Carter, 951 So. 2d 105 (Fla. 3d DCA 2007) ("as the plaintiff does not reside in Florida, her choice of Florida as the desired forum in which to litigate . . . deserves less deference").  Here, Plaintiffs are out-of-state entities, incorporated in Nevis and the Cayman Islands, and their choice of forum thus is not entitled to any special weight.

The remaining private interest factors also favor Brazil as the more convenient forum.

Considerations relevant to the private interest factors are: (a) adequate access to documents and relevant sites; (b) adequate access to witnesses; (c) the practicalities and expenses associated with the litigation; and (d) adequate enforcement of judgments. Kinney, 674 So. 2d 86; Aerolineas Argentinas, S.A. v. Gimenez, 807 So. 2d 111, 114 (Fla. 3d DCA 2002) (same).

Here, the vast majority – indeed, virtually all -- of the documents and witnesses are located in Brazil. This is evident from a reading of the Complaint, as shown above. Banco Latino v. Gomez Lopez, 17 F. Supp. 2d 1327, 1332 (S.D. Fla. 1998) (granting *forum non conveniens* motion when "[a]llegations in the complaint implicate the Venezuelan government, Venezuelan banks and companies, and the citizens of Venezuela as victims and perpetrators"); Ground Improvement Techniques, Inc. v. Merchants Bonding Co., 707 So. 2d 1138, 1139–40 (Fla. 5th DCA 1998) (complaint itself can prove that *forum non conveniens* dismissal is appropriate).

Plaintiffs' fraud allegations are all premised on acts occurring in Brazil; alleged acts between Brazilian residents acting as conspirators; alleged bribes and cover-ups by Brazilian insiders, bankers, and politicians; and alleged misrepresentations about oil exploration possibilities in Brazil that induced investors to invest in a Brazilian company engaged in business in Brazil. For example, the Complaint alleged that Eike Batista's company, OGX, obtained a shipbuilding contract by bribing "Brazilian officials" through another related entity. Compl. ¶ 362. These Brazilian officials are non-parties and are located in Brazil, requiring that these non-party witnesses travel to Miami for trial, assuming they are willing, which is unlikely. The Complaint is replete with references to witnesses in Brazil, including directors of various companies, bankers, politicians, and others. In addition, a number of relevant witnesses would include OGX employees located in Brazil in order to understand what knowledge Eike Batista and his alleged co-conspirators supposedly had or did not have of the oil production capabilities. These employees

are likely not within any of the Defendants' control as they were not their employees.  Further, a number of them are likely to not even be employed by OGX any longer.  Indeed, in January 2016, OGX issued a Material Fact reporting that it had reduced its workforce by 40%.  Ex. 17 of Carpenter Aff.  Again, to maintain this case in this jurisdiction, Plaintiffs will have to try to have these witnesses incur significant expense to fly to Miami for the trial (assuming the unlikely event they are willing or able to do so).  See Compl. ¶ 40 (witnesses include alleged corrupt Brazilian politicians and bankers who allegedly assisted with fraud); id. ¶¶ 58-59 (OGX, LLX, and OSX insiders and directors in Brazil knew of fraud); id. ¶¶ 107-112 (OGX wins bid for exploratory blocks from Brazilian government); id. ¶¶ 152-53 (Brazilian politicians allegedly bribed in supposed cover-up); id. ¶ 220 (Brazilian directors of Defendant 63X companies, EBX and Centennial companies knew of the alleged fraud); id. ¶¶ 265-68 (Brazilian high-ranking officials (including former president Rousseff) allegedly corrupted by Defendants); id. ¶¶ 292-98 (Brazilian OGX Joint Task Force); id. ¶¶ 353-55 (Esteves of Brazilian BTG Pactual allegedly made fraudulent announcement); id. ¶ 362 (Brazilian officials allegedly bribed); id. ¶ 380 (employees and records of Brazilian Citibank branch); id. ¶¶ 391-93 (witnesses and records holders of transfer of property and monies in Brazil); id. ¶ 403 (Coutinho, President of the Brazilian development bank, BNDES, makes fraudulent announcement).

There is simply no reason to believe that this forum, in contrast, provides adequate access to witnesses or documents.  On the contrary, a Florida forum would implicate significant costs for the parties in having to bring witnesses here, as well as hire interpreters and translators for witnesses that only speak Portuguese.  WEG Industrias, 937 So. 2d at 254 ("It is apparent that all of the witnesses with knowledge of the manufacture, repair, installation, use, and demise of the generator are located in either Brazil or Guatemala.  The relevant documents, except for a few that

14

may have been generated during the course of the Port Everglades diversion, will be found in either Brazil or Guatemala.  The cost of bringing the witnesses to Miami will be significant. Interpreters and translators will be necessary for both witnesses and documents, necessitating additional significant expense.").  Many non-party witnesses cannot be compelled to come to Florida, and they cannot be compelled for a deposition.  Thus, the only real possibility of ensuring their attendance at a trial, is for the trial to occur in Brazil.

For example, in Tazoe, 631 F.3d at 1331–32, the Eleventh Circuit determined that the availability of proof and witnesses favored dismissing the action on *forum non conveniens* grounds to Brazil:

> The record supports the determination that Brazil offers superior "access to sources of proof." The flight wreckage is in Brazil, including the digital flight data recorder and the cockpit voice recorder. The results of five governmental investigations of the accident are also in Brazil. These investigations are likely valuable sources of proof related to the claims and defenses of the parties. The parties will also likely find evidence in Brazil about the measure of damages. These sources of proof comprise a body of relevant evidence, located in Brazil, that is pertinent to both the claims and defenses. … The superior access that Brazil offers to sources of proof favors dismissal.
>
> The Southern District of Florida lacks the authority to compel certain witnesses to attend proceedings in that jurisdiction. The manufacturers have listed dozens of possible witnesses who are citizens of Brazil and outside of the subpoena power of the district court. … [T]he Southern District of Florida lacks "a compulsory process for the attendance of [these] unwilling ... witnesses."

Here, in addition, the main Defendant and witness, Eike Batista, is not available to come to Florida to respond to the allegations against him as he is currently under preventative detention in a Brazilian jail, and this Court does not have the authority to require the Brazilian government to have Eike Batista appear in this litigation.

In truth, the likelihood is that all of these third-party witnesses will *not* appear for trial and thus the only way to obtain evidence from them is through discovery.  Yet, because Brazil is not a

party to the Hague Service Convention, Compl. ¶ 31, the court would have to issue letters rogatory to obtain evidence from non-party witnesses.  Urban Glob. v. Dibbsbarker, 10-12615, 2011 WL 2802904, at *6 (E.D. Mich. July 18, 2011); J.C. Renfroe & Sons, Inc. v. Renfroe Japan Co., Ltd., 515 F. Supp. 2d 1258, 1272 (M.D. Fla. 2007) (discussing the necessity of obtaining letters rogatory to obtain evidence from non-party witnesses).  In Da Rocha, 451 F. Supp. at 1325, the Southern District of Florida held that "many of the most important witnesses and documents are located in Brazil and beyond the subpoena power of this court. . . Additionally, the necessity of employing translators for the witnesses and to translate every document in Portuguese to English will be inefficient, costly and time consuming.  The Court also agrees that compelling local jurors to sit on what undoubtedly will be lengthy trials to resolve these cases that have no connection whatsoever to this community (other than the Plaintiffs' counsel) would impose an unfair burden."  Indeed, it is illegal to depose witnesses in Brazil,[41] and thus deposition testimony cannot be obtained of these third-party witnesses.

Here, as the oil exploration business was in Brazil and the purported fraud is alleged to have been committed with Brazilian officials, Brazilian family members, and other Brazilians, Movants expect that there will be substantial evidence which will be in Portuguese and will need to be translated to be presented to this Court.  Da Rocha, 451 F. Supp. 2d at 1321 (granting *forum*

---

[41] U.S. Department of State, *Legal Considerations: Brazil*, available at https://travel.state.gov/content/travel/en/legal-considerations/judicial/country/brazil.html, last visited: March 28, 2017 ("Brazilian authorities do not permit persons, such as American attorneys, to take depositions for use in a court in the United States before a U.S. consular officer, with the assistance of a Brazilian attorney, or in any other manner. Brazilian law views the taking of depositions for use in foreign courts as an act that may be undertaken in Brazil only by Brazilian judicial authorities. The Government of Brazil asserts that, under Brazilian Constitutional Law, only Brazilian judicial authorities are competent to perform acts of a judicial nature in Brazil. Brazil has advised it would deem taking depositions in Brazil by foreign persons to be a violation of Brazil's judicial sovereignty. Such action potentially could result in the arrest, detention, expulsion, or deportation of the American attorney or other American participants.").

*non conveniens* motion where, amongst other things, there would be inefficiency due to the need to translate every document in Portuguese to English).

Further, the ability to enforce a judgment is neutral or slightly in favor of Brazil. A judgment rendered in Brazil would be enforceable abroad. Specifically, Florida has a mechanism to domesticate and enforce judgments from other jurisdictions, including Brazil. Fla. Stat. § 55.604. Courts have held that this is sufficient to tip this factor in favor of the alternate forum. Del Istmo Assur. Corp. v. Platon, 11-61599-CIV, 2011 WL 5508641, at *6 (S.D. Fla. Nov. 9, 2011) ("Some courts have described the fourth public interest factor as "enforceability of a judgment." This public interest factor also supports trial of this case in Panama. As Plaintiff points out in its opposition, there is a Florida statute which permits plaintiffs to domesticate and execute foreign judgments. Thus, enforceability of a judgment also weighs in favor of Panama because Florida law explicitly provides a mechanism to enforce a Panamanian judgment against Florida residents.") (internal citations omitted).[42]

For these reasons, the private interest factors favor Brazil as an alternative adequate forum.

**C. Public Interest Favors Brazil**

Similar to the private interest factors, the public interest factors overwhelmingly favor dismissal of this case in favor of Brazil. The public-interest inquiry focuses on "whether the nexus

---

[42] See also In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984, 809 F.2d 195, 204 (2d Cir. 1987) ("Under New York law, which governs actions brought in New York to enforce foreign judgments, a foreign-country judgment that is final, conclusive and enforceable where rendered must be recognized and will be enforced."); DTEX, LLC v. BBVA Bancomer, S.A., 508 F.3d 785, 801 (5th Cir. 2007) (finding that enforceability of judgment factor did not weigh against dismissal where plaintiff had not shown why a future judgment from a Mexican court would not be enforceable in the United States). Further, even where neither party addresses this issue, Florida courts have determined that the factor is neutral. Perez-Lang v. Corporacion de Hoteles, S.A., 575 F. Supp. 2d 1345, 1351 (S.D. Fla. 2008), aff'd, 325 Fed. Appx. 900 (11th Cir. 2009) ("Neither the Defendants nor the Plaintiff address this factor. Thus, this Court finds that it neither weighs in favor nor against dismissal of the instant action.").

with the forum is sufficient to justify the forum's commitment of judicial time and resources."

Mursia Investments Corp. v. Industria Cartonera Dominicana, 847 So. 2d 1064, 1067 (Fla. 3d

DCA 2003) (citing Kinney, 674 So. 2d at 92).  The relevant public interest factors include:

(1) allowing courts to "validly protect their dockets from cases which arise within their

jurisdiction, but which lack significant connection to it"; (2) legitimately "encourag[ing] trial of

controversies in the localities in which they arise"; and (3) validly "consider[ing] its familiarity

with governing law when deciding whether or not to retain jurisdiction over a case."  Kinney, 674

So. 2d at 92 (citation omitted).

Here, the public interest factors support dismissal of this case in favor of a Brazil forum.

The first and second public factors favor dismissal because this case lacks any significant

connection to Florida.  All of the alleged fraudulent acts arose from Brazilian residents in

connection with a Brazilian oil exploration operation.  As the Florida Supreme Court noted in

Kinney, "Florida courts exist to judge matters with significant impact upon Florida's interests,

especially in light of the fact that the taxpayers of this state pay for the operation of its judiciary."

674 So. 2d at 93.  Florida has no interest in the resolution of a dispute between foreign plaintiffs

and foreign defendants about a dispute arising from acts of Brazilian persons in Brazil.

Further, in the past few years, Brazil has been aggressively investigating corruption in its

government and country.  Accordingly, Brazil has a public interest in having its courts investigate

Eike Batista's activities in connection with OGX and the oil exploration opportunities in which

Plaintiffs invested.  Seguros Universales, S.A. v. Microsoft Corp., 32 F. Supp. 3d 1242, 1251 (S.D.

Fla. 2014) (public interest factors favored dismissal when relief requested related to allegations of

fraud on the Guatemalan judicial system and extortion of Guatemalan companies); Connolly v.

Kinay, 11 CIV. 606 RJS, 2012 WL 1027231, at *11 (S.D.N.Y. Mar. 27, 2012) (Turks and Caicos

18

Islands had strong interest in resolving particular dispute "because it involves allegations of corruption and bribery among TCI government officials … which go to the heart of the TCI government's public function").[43]

In contrast, if Florida were to exercise jurisdiction in this case, it would waste taxpayers' money for a Florida judge to determine—for the benefit of foreign Plaintiffs—whether a Brazilian citizen engaged in fraudulent acts and bribery of Brazilian officials in Brazil.  The sheer complexity of this case, as shown by the more than 100-page complaint filed by Plaintiffs, would unduly burden Florida courts and Florida jurors with a dispute with no real connection to Florida.  See Ciba-Geigy, 691 So. 2d at 1124 ("A trial of that magnitude would take many months to complete. We should not burden the local citizenry who will be called as jurors on a case to decide issues with no connection to Florida.  Moreover, the jury expense will be another cost directly borne by the taxpayers of the state."); Abeid-Saba v. Carnival Corp., 184 So. 3d 593, 604 (Fla. 3d DCA 2016) (public factors weighed in favor of dismissal where, amongst other things, Italian authorities were "currently conducting investigations" and litigating similar cases "involving the same evidence in two different fora would seem to be a tremendous waste of judicial resources").

Furthermore, as set forth in the Discharge and Release Motion, the investment entity, OGX, filed bankruptcy and almost all of the Defendants are discharged.  The effect of that discharge order should be litigated in the forum where it was entered: Brazil.  Discharge and Release Motion, Ex. B-1, Aff. Jose Rogerio Cruz e Tucci § 7 ("It must be stated that only the judge that holds

---

[43] Online Payment Sols. Inc. v. Svenska Handelsbanken AB, 638 F. Supp. 2d 375, 392 (S.D.N.Y. 2009) (Sweden had particularly strong interest in resolving dispute about Swedish bank's bribes and kickbacks); MBI Group, Inc. v. Credit Foncier Du Cameroun, 616 F.3d 568, 576 (D.C. Cir. 2010) ("United States's interest in seeing domestic companies made whole for injuries sustained abroad outweighed by Cameroon's superior interest in a matter involving a development project and official corruption in that country.")

jurisdiction can decide the action for annulment of the reorganization plan.").

Further, as set out in the Motion to Dismiss, Plaintiffs' investments were made under a contract governed by New York law. Florida courts therefore have no public interest in exercising jurisdiction over this dispute as they would not be issuing a decision pursuant to Florida law. If New York law did not apply, Brazilian law likely would. Moreover, there is no question that Brazilian law controls the effect of the discharge provision in the Brazilian bankruptcy reorganization plans. All that favors transfer. <u>MBI Group</u>, 616 F.30 at 576 (district court's "unfamiliarity with Cameroonian law" favored dismissal); <u>Perez-Lang</u>, 575 F. Supp. at 1353-54 (dismissal proper when Dominican Republic law would have to be considered); <u>Banco-Latino</u>, 17 F. Supp. 2d at 1333 ("the possibility that foreign law will apply as to the claims of the other plaintiffs, favors the Venezuelan forum"); <u>Ciba-Geigy</u>, 691 So. 2d at 1126 (no construction of Florida substantive law implicated because foreign law will predominate and therefore no public interest reason for retaining case).

Because each of the public factors favors the forum of Brazil, the Court should dismiss this case based on the balance of public factors, in addition to the private factors discussed above.

<div align="center"><u>CONCLUSION</u></div>

Movants respectfully request that this Court grant this motion; dismiss the Complaint; and grant such other and further relief as is just and proper under the circumstances.

Dated: April 5, 2017

Respectfully submitted,

ASTIGARRAGA DAVIS
MULLINS & GROSSMAN, P.A.
1001 Brickell Bay Drive, 9th Floor
Miami, FL 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Designated E-Mails for Service:
Primary: emullins@astidavis.com
        abarton@astidavis.com
        sherrera@astidavis.com

Secondary: bhernandez@astidavis.com

By: */s/ Edward M. Mullins*
    Edward M. Mullins
    Florida Bar No. 863920
    Ana M. Barton
    Florida Bar No.:  85721
    Sujey Herrera
    Florida Bar No.:  92445
    *Counsel for Defendants Werner Batista,*
    *Centennial Asset Mining Fund,*
    *Centennial Asset Brazilian Equity Fund,*
    *63X Master Fund, 63X Investment Ltd.,*
    *and 63X Fund*


    Michael Carlinsky*
    Bar No. 2319440
    michaelcarlinsky@quinnemanuel.com
    Elinor Sutton*
    Bar No. 4615175
    elinorsutton@quinnemanuel.com
    Victor Noskov*
    Bar No. 5087689
    victornoskov@quinnemanuel.com
    **QUINN EMANUEL URQUHART**
    **& SULLIVAN, LLP**
    51 Madison Avenue, 22nd Floor
    New York, NY  10010
    Telephone: (212) 849-7000
    Facsimile: (212) 849-7100
    *Admitted Pro hac vice*

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Complex Business Litigation Rule 4.3, counsel for Movants hereby certifies that the undersigned has conferred with counsel for Plaintiffs, Hendrik G. Milne, by email on April 5, 2017, and counsel for Plaintiffs advised that his clients oppose the relief requested herein.

/s/ Edward M. Mullins
Edward M. Mullins

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2017, a true and correct copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal, which sent e-mail notification of such filing to all counsel of record in accordance with Fla. R. Jud. Admin 2.516.

/s/ Edward M. Mullins
Edward M. Mullins

# EXHIBIT A

<u>Florida Department of State</u>                    DIVISION OF CORPORATIONS



<u>Department of State</u> / <u>Division of Corporations</u> / <u>Search Records</u> / <u>Search By Entity Name</u> /

<u>Next List</u>            | Entity Name Search |
            | Search |

## Entity Name List

| Corporate Name | Document Number | Status |
|---|---|---|
| <u>CENTENNIAL ASSOCIATES, INC.</u> | F94000000291 | INACT |
| <u>CENTENNIAL ASSURANCE AGENCY INC.</u> | 503166 | NAME HS |
| <u>CENTENNIAL ATLANTA, INC.</u> | P99000096877 | INACT |
| <u>CENTENNIAL BANK</u> | ███████ | INACT |
| <u>CENTENNIAL BANK</u> | ███████ | Active |
| <u>CENTENNIAL BANK</u> | ███████ | Active |
| <u>CENTENNIAL BANK & DESIGN OF "CENTENNIAL BANK" IN CAPS BELOW 5 POINTED STAR ON DIAMOND BACKGROUND W/I A BAND OF CONTRASTING COLOR THAT FORMS DIAMOND SHAPE W/ TRIANGLES ABOVE OR BELOW BAND</u> | T09000000126 | Active |

Case 1:17-cv-23051-KMW   Document 1-3   Entered on FLSD Docket 08/11/2017   Page 515 of 577

| Corporate Name | Document Number | Status |
| --- | --- | --- |
| CENTENNIAL BEEF, L.C. | L94000000724 | INACT |
| CENTENNIAL BLVD., INC. | P02000011263 | INACT |
| CENTENNIAL OF BRANDON, INC. | H45011 | INACT |
| CENTENNIAL BROADCASTING, LC | M98000000137 | NAME HS |
| CENTENNIAL BROADCASTING FLORIDA LIMITED PARTNERSHIP | B97000000556 | INACT |
| CENTENNIAL BROADCASTING FLORIDA GP, INC. | F97000005510 | INACT |
| CENTENNIAL BROADCASTING LICENSE, LLC | M98000000447 | NAME HS |
| CENTENNIAL BUILDERS, INC. | F01398 | INACT |
| CENTENNIAL BUILDERS OF LEE COUNTY, INC. | 533137 | Active |
| CENTENNIAL BUILDING CONDOMINIUM ASSOCIATION, INC. | N06000006129 | Active |
| CENTENNIAL BUILDING CONDOMINIUM ASSOCIATION, INC. | N26262 | INACT |
| CENTENNIAL BUILDING MAINTENANCE, INC | 833511 | INACT |
| CENTENNIAL CAPITAL CORPORATION | 677852 | INACT |

Next List

Entity Name Search

Search

Florida Department of State, Division of Corporations

Florida Department of State

DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search By Entity Name  /

Next List

Entity Name Search

Search

## Entity Name List

| Corporate Name | Document Number | Status |
|---|---|---|
| CENTENNIAL ASSET MANAGEMENT, LLC | L15000094210 | Active |
| CENTENNIAL ASSET MANAGEMENT, L.L.C. | M99000001785 | INACT |
| CENTENNIAL ASSOCIATES, INC. | F94000000291 | INACT |
| CENTENNIAL ASSURANCE AGENCY INC. | 503166 | NAME HS |
| CENTENNIAL ATLANTA, INC. | P99000096877 | INACT |
| CENTENNIAL BANK | ███████ | INACT |
| CENTENNIAL BANK | ███████ | Active |
| CENTENNIAL BANK | ███████ | Active |
| CENTENNIAL BANK & DESIGN OF "CENTENNIAL BANK" IN CAPS BELOW 5 POINTED STAR ON DIAMOND BACKGROUND W/ A BAND OF CONTRASTING COLOR | ███████ | Active |

| Corporate Name | Document Number | Status |
| --- | --- | --- |
| THAT FORMS DIAMOND SHAPE W/ TRIANGLES ABOVE OR BELOW BAND | | |
| CENTENNIAL BEEF, L.C. | L94000000724 | INACT |
| CENTENNIAL BLVD., INC. | P02000011263 | INACT |
| CENTENNIAL OF BRANDON, INC. | H45011 | INACT |
| CENTENNIAL BROADCASTING, LC | M98000000137 | NAME HS |
| CENTENNIAL BROADCASTING FLORIDA LIMITED PARTNERSHIP | B97000000556 | INACT |
| CENTENNIAL BROADCASTING FLORIDA GP, INC. | F97000005510 | INACT |
| CENTENNIAL BROADCASTING LICENSE, LLC | M98000000447 | NAME HS |
| CENTENNIAL BUILDERS, INC. | F01398 | INACT |
| CENTENNIAL BUILDERS OF LEE COUNTY, INC. | 533137 | Active |
| CENTENNIAL BUILDING CONDOMINIUM ASSOCIATION, INC. | N06000006129 | Active |
| CENTENNIAL BUILDING CONDOMINIUM ASSOCIATION, INC. | N26262 | INACT |

Next List

Entity Name Search

Search

Florida Department of State, Division of Corporations

<u>Florida Department of State</u>

DIVISION OF CORPORATIONS



<u>Department of State</u>  /  <u>Division of Corporations</u>  /  <u>Search Records</u>  /  <u>Search By Entity Name</u>  /

<u>Next List</u>

Entity Name Search

Search

# Entity Name List

| Corporate Name | Document Number | Status |
| --- | --- | --- |
| 64 LLC | L15000155404 | Active |
| 64, INC. | P98000097791 | INACT |
| 640 CORPORATION | 188263 | INACT |
| 640, INC. | F53574 | INACT |
| 640, LLC | L13000132126 | INACT |
| 6400 INC | 331819 | INACT |
| 6400 LLC | L03000022107 | Active |
| 6400 1ST AVE. NORTH, LLC | L02000031569 | INACT |
| 6400/6500 LLC | L02000018252 | Active |
| 6400 ASSOCIATES, LLC | L06000081828 | Active |

| Corporate Name | Document Number | Status |
|---|---|---|
| 6400 ATLANTIC, INC. | P14000086841 | Active |
| 6400 ATLANTIC BLVD. L.C. | L99000006719 | INACT |
| 6400 BUILDING, LLC | L04000003306 | Active |
| 6400 BUILDING MANAGEMENT COMPANY, INC. | P04000160308 | Active |
| 6400 COLLINS CORP. | 646198 | INACT |
| 6400 CONGRESS POINT, LTD. | A95000000079 | INACT |
| 6400 CONGRESS POINT, INC. | P95000002864 | INACT |
| 6400 FIRST PLACE LLC | L16000129787 | Active |
| 6400 GROUP INC | P12000056674 | INACT |
| 6400 HGWY. 17-92, INC. | J24701 | INACT |

Next List

Entity Name Search
Search

Florida Department of State, Division of Corporations

Florida Department of State                                                                  DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search By Entity Name  /

Next List                                                                           Entity Name Search

                                                                                         Search

## Entity Name List

| Corporate Name | Document Number | Status |
| --- | --- | --- |
| EBX2, L.C. | L05000117257 | INACT |
| EBX ACQUISITION COMPANY, INC. | P05000088813 | INACT |
| EBX CODEHOUSE LLC | L10000017632 | NAME HS |
| EBX CODEHOUSE, LLC | L10000017632 | INACT |
| EBX ENTERPRISES, LLC | L09000012143 | INACT |
| EBX HOLDINGS, LLC | L12000049596 | NAME HS |
| EBX IMPORT GROUP INC | P07000027522 | INACT |
| EBX OPTIK, L.C. | L00000015338 | INACT |
| EBX REAL ESTATE, LLC | L05000035876 | Active |
| EBY CORPORATION | 267123 | INACT |

| Corporate Name | Document Number | Status |
|---|---|---|
| EBY CORPORATION | 447143 | INACT |
| EBY,L.L.C. | L04000016018 | Active |
| EBY, INC. | P95000000042 | INACT |
| EB YACHT CHARTER LLC | L15000156101 | INACT/UA |
| E. B. YADI, INC. | H58205 | NAME HS |
| EBY AIRCRAFT, INC. | 476858 | INACT |
| EBYAR PROFESSIONAL OFFICE SERVICES CORPORATION | P10000081660 | Active |
| E BY B LLC | L12000089435 | INACT |
| EBY-BROWN COMPANY L.P. | B99000000109 | NAME HS |
| EBY-BROWN COMPANY, LLC | M00000002189 | Active |

Next List

Entity Name Search
Search

Florida Department of State, Division of Corporations

Florida Department of State

DIVISION OF CORPORATIONS



Department of State / Division of Corporations / Search Records / Search By Entity Name /

Next List

Entity Name Search

Search

# Entity Name List

| Corporate Name | Document Number | Status |
|---|---|---|
| THOR RACING, LLC | L08000072011 | INACT |
| THOR RACING CORPORATION | S08399 | INACT |
| THOR REAL ESTATE, LLC | L09000111957 | INACT |
| THOR REAL ESTATE, LLC | L14000021329 | Active |
| THOR REAL ESTATE VENTURES, LLC | L14000081107 | Active |
| THOR REAL STATE, LLC | L09000111957 | NAME HS |
| THOR REALTY CORP | 412668 | INACT |
| THOR RENEWABLE ENERGY, INC. | P12000009871 | INACT |
| THOR REPAIRS & SERVICE, LLC | L16000106717 | Active |
| THOR RESORTS LLC | L09000022684 | INACT |

| Corporate Name | Document Number | Status |
|---|---|---|
| THORR INDUSTRIES, LLC | L06000065028 | INACT/UA |
| THORRINGTON CONSULTING AND ADVOCACY, LLC | L15000207704 | Active |
| THOR, INCORPORATED OF ROANOKE | 857324 | INACT |
| THORRONCHOS, INC. | P05000012269 | INACT |
| THORROTH, LLC | L07000075270 | Active |
| THORR'S GLOBAL MARKET, INC. | P09000095688 | INACT |
| THOR SANITATION SERVICES INC | 289044 | INACT |
| THORS APARRELL & CONSULTING, INC | P11000004691 | NAME HS |
| THORS APPAREL & CONSULTING, INC. | P11000004691 | INACT |
| THOR'S BIG HAMMER, LLC | L09000120987 | INACT |

Next List

Entity Name Search
Search

Florida Department of State, Division of Corporations

<u>Florida Department of State</u>

DIVISION OF CORPORATIONS



<u>Department of State</u> / <u>Division of Corporations</u> / <u>Search Records</u> / <u>Search By Entity Name</u> /

<u>Next List</u>

Entity Name Search

Search

## Entity Name List

| Corporate Name | Document Number | Status |
|---|---|---|
| <u>THOR RACING, LLC</u> | L08000072011 | INACT |
| <u>THOR RACING CORPORATION</u> | S08399 | INACT |
| <u>THOR REAL ESTATE, LLC</u> | L09000111957 | INACT |
| <u>THOR REAL ESTATE, LLC</u> | L14000021329 | Active |
| <u>THOR REAL ESTATE VENTURES, LLC</u> | L14000081107 | Active |
| <u>THOR REAL STATE, LLC</u> | L09000111957 | NAME HS |
| <u>THOR REALTY CORP</u> | 412668 | INACT |
| <u>THOR RENEWABLE ENERGY, INC.</u> | P12000009871 | INACT |
| <u>THOR REPAIRS & SERVICE, LLC</u> | L16000106717 | Active |
| <u>THOR RESORTS LLC</u> | L09000022684 | INACT |

| Corporate Name | Document Number | Status |
| --- | --- | --- |
| THORR INDUSTRIES, LLC | L06000065028 | INACT/UA |
| THORRINGTON CONSULTING AND ADVOCACY, LLC | L15000207704 | Active |
| THOR, INCORPORATED OF ROANOKE | 857324 | INACT |
| THORRONCHOS, INC. | P05000012269 | INACT |
| THORROTH, LLC | L07000075270 | Active |
| THORR'S GLOBAL MARKET, INC. | P09000095688 | INACT |
| THOR SANITATION SERVICES INC | 289044 | INACT |
| THORS APARRELL & CONSULTING, INC | P11000004691 | NAME HS |
| THORS APPAREL & CONSULTING, INC. | P11000004691 | INACT |
| THOR'S BIG HAMMER, LLC | L09000120987 | INACT |

Next List

Entity Name Search
Search

Florida Department of State, Division of Corporations

# EXHIBIT B

Applicants
First Affidavit of M Oliveira
Sworn 18th October 2016
Exhibit MLO1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

<div align="center">

**CAUSE NO. FSD      OF 2016 (      )**

</div>

**B E T W E E N:**

<div align="center">

**(1) MERIDIAN TRUST COMPANY LIMITED**
**(2) AMERICAN ASSOCIATED GROUP, LTD.**

</div>

<div align="right">

**Applicants**

</div>

<div align="center">

- and -

</div>

<div align="center">

**(1) EIKE FUHRKEN BATISTA DA SILVA (AKA EIKE FUHRKEN BATISTA)**
**(2) 63X INVESTMENTS LTD.**
**(3) 63X FUND**
**(4) 63X MASTER FUND**
**(5) MAPLES CORPORATE SERVICES LIMITED**

</div>

<div align="right">

**Respondents**

</div>

---

<div align="center">

**AFFIDAVIT OF MARCELLO AUGUSTO LIMA DE OLIVEIRA**

</div>

---

I, **MARCELLO AUGUSTO LIMA DE OLIVEIRA** of Candido de Oliveira Advogados of Rua México, No. 98/10° Andar - 20010-010 Centro, Rio de Janeiro, Brazil **STATE ON OATH AS FOLLOWS:**

1.      I am a partner in the firm of solicitors known as Candido de Oliveira Advogados based in Rio de Janeiro, Brazil.

<div align="center">1</div>

**THIS AFFIDAVIT is FILED** by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

2.  I make this Affidavit in support of the Applicants' application for a freezing order and related disclosure against the First to Fourth Respondents, and in support of their application for disclosure from the Fifth Respondent, in support of a proposed claim before the Florida courts (the **"Florida Claim"**).

3.  The matters set out in the Affidavit are within my personal knowledge unless the contrary is expressly stated. Where they are within my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from the sources which I identify.

4.  My firm has been providing advisory services to the Applicants in respect of the Brazilian law issues. No waiver of privilege is intended by any reference herein to privileged material or a document containing such unless expressly stated.

5.  There is now produced and shown to me a paginated bundle of true copy documents marked **"MLO1"** which I exhibit hereto. References to page numbers herein are references to pages of MLO1 in the format **"MLO1/volume/page number"**. I also refer in my affidavit to documents in the exhibits to affidavits of other deponents by reference to their respective exhibit name and number in the same format.

## BACKGROUND

6.  I have been instructed to comment upon various points of Brazilian law which arise out of the facts and matters described in the proposed Florida complaint (the **"Florida Complaint"**) which I have seen in final draft form (exhibited at KJM1/1). I confirm that the legal opinions I express below are within the realm of my competence and expertise.

7.  By way of background, I have experience in project structuring within the energy sector, involving the construction of platforms, power generation plants, gas pipelines, the granting and monitoring of exploration and production oil and natural gas, the purchase and sale of natural gas and electricity, among others.

8.  Furthermore, I advise on the exploration and production of oil and natural gas, including advising clients at the bid stage, the fulfilment of exploration programmes and development plans and the development of platform construction contracts.

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

9.   In addition, I am regularly invited to present lectures and courses on the topic of energy law. My activities include a placement in St. Petersburg, Russia, at the invitation of the Department of Law of the Pontifical Catholic University of Rio de Janeiro to discuss the theme of "*BRICS and Harmonization of Energy Law*" and courses on Contracts of Oil & Natural Gas Sector Contracts for the Brazilian Institute of Energy Law.

10.  Finally, I have been Assistant Professor for 5 years (2006-2011) in the disciplines of Civil Procedural Law and Bankruptcy Law at the Pontifical Catholic University of Rio de Janeiro (PUC-Rio).

11.  A copy of my professional resumé is exhibited at MLO1/1/1-2.

**FULL AND FRANK DISCLOSURE**

12.  I understand that the Applicants have a duty to make a full and frank disclosure to the Court of facts that may be considered adverse to the Applicants' position. I have read extracts from the Cayman Islands' decision of *Cable and Wireless v. ICTA* and the English decision of *Complete Retreats Liquidating Trust v. Logue* that summarize that duty. I confirm that I have sought to comply with this duty in preparing this affidavit.

13.  I have also read extracts from Steven Gee Q.C., *Commercial Injunctions* (Sixth edition, Sweet & Maxwell, 2016). I understand from sections 9-006 – 9-008 that as part of my duty of full and frank disclosure in my affidavit I "*must identify any defenses, which, although not yet taken would have been available to be taken by the defendant had he been present at the application, provided that: (1) the defense is one which can reasonably be expected to be raised in due course by the defendant; (2) the defense is not one which can be dismissed as without substance or importance (e.g. an argument based on a misconceived interpretation of a statutory provision*". I understand this aspect is of particular relevance to potential defences under Brazilian law to the substantive claims made in the Florida Claim, including if the Florida Court considered that the law applicable to the claims, or some of them, was the law of Brazil.

14.  I have sought in this affidavit to refer to matters that may be considered material to the applications in the Cayman Islands proceedings including matters that might be

3

considered adverse to the Applicants' substantive or procedural arguments, which I discuss below.

## THE CONTENTS OF THIS AFFIDAVIT

15.    I have read the proposed Florida Complaint. I have considered below the following issues of Brazilian law:

    (a)    Freezing Orders in Brazilian civil proceedings.

    (b)    Disclosure Orders in Brazilian civil proceedings.

    (c)    Service of civil process under Brazilian law.

    (d)    Theoretical Civil Proceedings under Brazilian Law Against Mr Eike Batista ("Batista").

    (e)    The Minority Shareholder Action

    (f)    Access to Court Files in Brazil and Other Known Civil Actions Against Batista Related to OGX Collapse.

    (g)    Criminal Proceedings in Brazil.

    (h)    Disqualification by CVM.

    (i)    Judicial Recovery/ AKA "Bankruptcy".

## FREEZING ORDERS IN BRAZILIAN CIVIL PROCEEDINGS

16.    In this section I consider: (i) freezing order relief in domestic Brazilian proceedings; and (ii) freezing order relief in aid of foreign proceedings.

17.    If a claim equivalent to the draft complaint against Batista and the Cayman Respondents were made in Brazil the principles upon which the Court would consider a freezing order would be based on the Brazilian Procedural Code. On 18 March 2016 a new version of the Brazilian Civil Procedural Code ("2015 Code") entered into force replacing the existing version ("1973 Code"). For the purposes of the issues in this opinion the 2015 Code would apply to any claims issued after 18 March 2016.

4

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

18. Article 813 of the 1973 Code provided for specific circumstances in which seizure would take place and such would include a debt already determined and enforceable (including by means of a non-appealable decision) and the occurrence of any of the following circumstances: (i) when a debtor with undetermined domicile attempts to evade, to transfer its assets or fails to timely pay its obligations, (ii) when a debtor with a determined domicile (a) evades or attempts to evade, (b) if insolvent, a debtor attempts to alienate its assets, to accumulate extraordinary debts or (c) uses any other fraudulent means to obstruct enforcement of a debt, (iii) when a debtor owns fixed assets and real estate and attempts to alienate or put liens or encumbrances on such assets, without putting aside enough assets to pay its debts.

19. Articles 300 and 301 of the 2015 Code now apply to such situations. These provisions do not provide the same express jurisdictional restrictions on freezing orders as under Article 813 of the 1973 Code. Articles 300 and 301 now give a judge a wider discretionary power to assess the urgency and suitability of plaintiff's plea based on the general requirements of *fumus bonus iuris* and *periculum in mora* (Articles 300 and 301). *Fumus bonus iuris* broadly requires that the applicant establish a prima facie case on the merits and *periculum in mora* requires a risk that delay in the provision of relief would undermine the effectiveness of any future order. In practical terms, prima facie case under Brazilian law would mean the assertion of what appears to be an enforceable legal right. Any order that was granted under these new Articles would in the ordinary case only be effective in Brazil and only apply to assets in Brazil. Similar judicial standard applies in criminal actions where a freezing order is requested. See Articles 136 and 137 of the Criminal Procedure Code.

20. It will take some time for the effect of the changes in language in the 2015 Code to become clear. It can be anticipated that whereas under the prior code provisions the Brazilian courts in civil matters were more limited as to the factual circumstances that would permit an asset freeze, the new code provisions provide the courts with greater latitude, broadening their discretionary power to freeze assets.

21. In exceptional circumstances a freezing order can be granted *inaudita altera pars*, that is without the other side being represented at the hearing (sole paragraph of Article 294 of the 2015 Code)

5

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KYI-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

22.     In my opinion the Brazilian Courts will not grant a freezing order in support of proceedings taking place in a jurisdiction other than in Brazil. It is only once the foreign final judgment is enforced in Brazil that the Court be able to grant injunctive relief on a similar basis as in domestic Brazilian proceedings. No enforcement steps could be taken until after the foreign judgment is submitted to homologation (domestication) by the Federal Superior Court (the "STJ") as provided for in the Brazilian Constitution.

23.     The 2015 Code does encourage international co-operation as provided for at Article 26. The scope of the application of this Article and the impact it may have on recurring and consistent decisions of STJ is unclear given how recently it has come into force.

24.     A freezing order granted on the above principles in a domestic proceeding has to be followed immediately by a substantive claim filed in the Brazilian Courts seeking a Brazilian judgment either on an enforceable debt or the domestic enforcement of an existing foreign final judgment that meets the criteria for enforcement.

25.     A foreign plaintiff cannot issue the same or similar substantive proceedings in both Brazil and a foreign jurisdiction and seek an order freezing assets in the Brazilian Court while asking the Brazilian Court to stay the local substantive proceedings pending the determination of the foreign proceedings.

26.     In summary, my view is:

        (a)     if claims of an equivalent nature were brought in Brazil, a freezing order would only be available locally if a substantive claim were also subsequently filed in Brazil;

        (b)     there would be no freezing order relief available in Brazil in support of the Florida Proceedings until they reached the stage of final judgment and that judgment had been registered as enforceable in Brazil.

## DISCLOSURE ORDERS IN BRAZILIAN CIVIL PROCEEDINGS

27.     Brazilian law does not provide for a process to require a defendant to disclose their assets prior to any judgment in domestic civil substantive proceedings on the application of a claimant to allow those assets to be frozen prior to judgment. In

6

criminal and enforcement proceedings the Court itself has processes that allow assets to be identified, such as the direct access by the judge to the Central Bank of Brazil System ("BACENJUD") and communication with Federal Revenue Service and other governmental bodies that may have records on assets held by the defendant.

28.     Brazilian law does not provide for a basis to require Brazilian resident defendants or those amenable to Brazilian jurisdiction to disclose assets in Brazil or outside of Brazil to allow for those assets to be frozen prior to judgment in aid of domestic or foreign proceedings prior to judgment. There is also no power to require Brazilian defendants to provide pre-judgment information to identify and locate assets to allow them to be frozen. However, after an award is granted and during the enforcement phase, a Brazilian judge may compel the defendant to disclose its assets pursuant to Article 774, V of the 2015 Code.

29.     It is likely that based on the presented facts, no applications could be made at this stage in Brazil for the disclosure of assets to assist in their identification for the purposes of freezing them.

## SERVICE OF PROCESS

30.     In this section, I consider the effect of an order for service of the Cayman Islands proceedings by service of Cayman Court documents personally on Batista by a Brazilian notary handing them to him, by the delivery of such documents to a home address of Batista or by an email address used by Batista.

31.     Article 246 of the Brazilian Civil Code provides for the methods of service of domestic Brazilian civil proceedings. Proceedings can be served by mail, by handing them to the Defendant by a Court official and in limited cases, by public notice or electronic means. For domestic proceedings service by a notary would not constitute good service within Article 246.

32.     The Hague Service Convention is not currently in force for the service of foreign proceedings in Brazil. The only Hague-related Convention to which Brazil adhered is the one referring to the legalization of documents.

33.     Service of proceedings other than in accordance with the requirements of Brazilian law would mean that orders in those proceedings would not be enforceable in Brazil unless a party so served subsequently submitted to the substantive jurisdiction of the

7

foreign state in those proceedings in which case the Federal Court may permit homologation of the foreign award.

34.   For service of foreign proceedings to give rise to a judgment which would be enforceable in Brazil, absent voluntary submission, it would be necessary to serve the originating process by means of a rogatory letter through diplomatic channels. A rogatory letter would be received by the STJ and then submitted for the exequatur of that Court. The rogatory letter would then be remitted for enforcement by a Federal Court in the state where the defendant is domiciled.

35.   Proceedings are generally public[1] and defendant will be summoned to present any motions it may have to prevent the STJ to grant the exequatur to the rogatory letter. Therefore, it would be anticipated that the Respondents to any Cayman proceedings, application or order would be put on notice if service was to be effected through diplomatic channels.

36.   Unless there is voluntary co-operation by the defendant, the formal diplomatic process of service would take several months. I would estimate that from the time any rogatory letter was received by the STJ to the date of service could in the ordinary course take between 6-9 months (e.g. proceeding No. 2010/0101036-1), but if defendant resists it could take years for a final decision to be reached at the STJ level (e.g. proceeding No. 2005/0015196-0).

37.   While being of limited effect as a matter of Brazilian civil law as summarised above, service of foreign proceedings by the methods of service listed above would not constitute a criminal offence under Brazilian law.

## THEORETICAL CIVIL PROCEEDINGS UNDER BRAZILIAN LAW AGAINST EIKE BATISTA

38.   I have been asked to consider whether the Applicants would have claims against Batista if the allegations made in the Florida Complaint were made pursuant to Brazilian law. I have based this assessment on the facts as alleged in the Florida Complaint and my experience as a Brazilian attorney.

39.   The Applicants' claims for compensation against Batista in Brazil based on the facts as alleged in the Florida Complaint would be based upon Articles 159, paragraph 7

---

[1] See for instance, https://ww2.stj.jus.br/processo/pesquisa/?aplicacao=processos.ea

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

of Law 6,404/76 of our companies law; Article 63, et seq of the Brazilian Criminal Procedure Code, as well as Articles 389 and 402 et seq of the Brazilian Civil Code.

(a)     Art. 159 allows shareholders and third parties to sue the directors or administrators (officers) for violations of their duties.

(b)     Art. 63, et seq, allows for the compensation of an injured party whenever that damage is caused by a crime defined under Brazilian law.

(c)     Articles 389 and 402 of Brazil's Civil Code allows plaintiff to claim damages in a broader sense whenever a person owes another a duty and that person fails to comply with their duty. Indemnification shall only include direct and immediate damages and losses and, therefore, punitive damages are excluded. Plaintiff may also sue for moral damages. Amounts due by offender shall also include interests, attorney fees and adjustment to inflation.

40.     Were Batista sued in Brazil by Applicants, he would need to respond to that lawsuit and could present his defences. I consider it reasonable to assume that certain of the substantive defences raised by Batista in the case of Association of Minority Shareholders v Eike Batista, a civil action filed against Batista in 2015 (the "Minority Shareholder Action") which is considered in more detail below, would be representative of the defences Batista would advance as defences to claims by Applicants.

41.     Civil claims in Brazil are generally independent from criminal complaints. However, there is the possibility that the Judge in the civil case reserves judgement until the merits of the case are decided by the criminal courts in order to avoid conflicts of interpretation by the two over the same acts. This is addressed under Article 64, Sole Paragraph, of the Criminal Procedural Code and under Article 265, IV (a) of the 1973 Code. As discussed below, we have seen in one civil case brought against Batista by the Association of Minority Shareholders, that such case was not stayed to await the conclusion of criminal proceedings against Batista.

### THE MINORITY SHAREHOLDER ACTION

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KYI-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

42.     The Minority Shareholder Action is a civil action filed in May 2015 against Batista by a number of OGX minority shareholders, which is currently under No. 0085670-76.2015.8.19.0001 before the 7th Corporate Court of the State of Rio de Janeiro.

43.     According to our investigations, the Minority Shareholder Action is still pending but has been dismissed without prejudice on the basis that -- under Brazilian law -- the collective action (similar but not identical to a "class action") is not the appropriate vehicle for plaintiff to raise claims. The dismissal did not pass judgment on the merits of plaintiffs' claims.

44.     The plaintiffs in the Minority Shareholder Action allege that Batista and other OGX directors participated in market manipulation and insider dealing in a manner that caused direct damage to the shareholders which gave rise to a right of action under Article 159, §7º of Law No. 6,404/76 (Company Law). This claim is precisely what I was referring to at paragraph 39(a) above.

45.     The Minority Shareholder Action is a multi-plaintiff case against Batista alone. The plaintiffs, which we understand to be approximately 200 in number according to information provided by plaintiffs' counsel, formed a special purpose entity to file suit. The plaintiffs were OGX shareholders prior to the events of October 2013 and were not bondholders in the same position as Applicants. This is not a class action. In the Brazilian legal system, there is no class certification process that would bar similarly situated plaintiffs from filing a similar claim against Batista under the same nucleus of facts. Applicants could file suit in Brazil against Batista without the Minority Shareholder Action posing any impediment.

46.     We have obtained a copy of the complaint (see MLO1/1/3-211) and Batista's response (see MLO1/1/212-318) from counsel for the plaintiffs in that case. Batista's response in that case outlines the following defences:

        (a)     Pursuant to the OGX by-laws, all disputes involving shareholders must be arbitrated;

        (b)     The shareholders lack standing to sue directly and should sue in derivative fashion;

        (c)     Batista cannot be sued unless there is a challenge to annul the company finances, and the time in which to make such challenge has elapsed;

10

(d) The plaintiffs have not provided adequate specificity as to what actions he undertook to harm them;

(e) The wrong procedural vehicle – a collective action – has been selected when in reality the rights of plaintiffs are diffuse in nature;

(f) The plaintiffs assumed risks inherent in any investment and cannot sue based on their assumption of risk;

(g) Batista was not an officer of OGX, but rather, a director uninvolved in the day to day management, and as a result, he lacked knowledge of the complained of acts;

(h) Batista withheld no information known to him and did not mislead;

(i) That any allegation of insider trading is belied by the fact that Batista lost a great amount of personal wealth with the collapse of OGX's stock and he would not have invested his own money into a truly fraudulent operation;

(j) As to insider trading, that Batista lacked any privileged information at the time he sold his shares, that there was no wilful misconduct, and that no undue advantage has been obtained from those sales since they were used to pay for existing debts; and

(k) Further as to insider trading, there is no evidence that Batista's public comments in any way affected the price of the shares.

47. The above is a summary of his defences and we refer the Court to his response, exhibited hereto, for further details (MLO1/1/212-318). As stated below, in dismissing the plaintiffs' action without prejudice, the Court's decision was ultimately based on item 46(e) above. I exhibit the court's decision dated 15 May 2016 for further reference (see MLO1/2/319-331). As stated above, the Association of Minority Shareholders has presented an appeal which is pending (see MLO1/2/332-350). As far as I am aware, there are no other proceedings pending in Brazil against any of the Cayman Respondents other than Batista.

**ACCESS TO COURT FILES IN BRAZIL AND OTHER KNOWN CIVIL ACTIONS AGAINST BATISTA RELATED TO OGX'S COLLAPSE**

11

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

48.     The Brazilian Courts do not have a single system of public access to court filings where members of the public who are not parties have quick and easy access to filings. To begin, the Brazilian Courts are not unified. There are federal and state courts in a vast country. Some courts have begun to digitize their files. Others remain strictly on paper. In some cases, depending on the proceeding phase, court files may be temporarily resident in chambers and may only be accessed with consent of the judge, with good cause, and for a limited time. Lastly, there is no way to comprehensively search for the existence of a case in certain situations since party names are removed from dockets – digital or paper – for reasons of confidentiality. The result of all this is that there is no easy and comprehensive access to filings made in the Brazilian courts.

49.     On some occasions, Brazilian investigative journalists have obtained access to court documents that would otherwise be unavailable to members of the public. This can occur, for example, if a public officer were to hand the investigative journalist the court document. Under Article 325 of the Brazilian Criminal Code ("*functional secrecy*"), the public official handing such document may have committed the criminal offense of violation of "functional secrecy". However, arguably, the investigative journalist would not have committed such offense by merely receiving the court document unless the journalist induced the public official to breach the law.

50.     Under Brazilian law, were an employee or ex-employee of the OGX Group to share confidential business information pertaining to the OGX Group with an investigative journalist, such sharing of information could be considered unfair trade competition as stated at article 195, subsection XI of Federal Law n.º 9.279/96, with criminal penalties. The sharing of such confidential business information may also be a violation of applicable Brazilian labor laws and applicable confidentiality agreements in employment agreements.

51.     Having performed a search given the points mentioned in paragraph 48, there are other known civil actions pending against Batista in the Brazilian Courts which relate to the OGX collapse that are in addition to the Minority Shareholder Action. Such additional actions were also brought by shareholders. However, none of those cases have progressed beyond the early stages, nor have they reached a decision on the merits or obtained final judgment, nor are there pending prejudgment injunctions. We attach a list of such cases (as well as pending criminal and administrative

12

proceedings before the Brazilian Securities and Exchange Commission ("CVM")) (see MLO1/2/351-352E).

## CRIMINAL PROCEEDINGS IN BRAZIL

52. Batista, along with other defendants, has been indicted in two criminal proceedings in Brazil (see list cases, attached).

    (a) The first proceeding dated 23 September 2014 was originally in the Federal Criminal Courts of Sao Paulo which has been transferred to Rio de Janeiro and developed into proceeding No 0042651-87.2014.4.02.5101) (the "First Indictment") (MLO1/2/353-445);

    (b) The second proceeding is referenced 0029174-94.2014.4.02.5101 in the 3rd Federal Criminal Court of Rio de Janeiro, dated 11 September 2014 (MLO1/2/446-468) and amended on 15 December 2015 (MLO1/2/469-526), which amendment was accepted by decision dated 25 January 2016 (MLO1/2/576-612) (the "Second Indictment")

    (together, the "Criminal Proceedings").

53. I have been able to review the following documents related to the criminal proceedings, and my comments below are based on these documents:

    (a) As referred to above at paragraph 52(a), Criminal Complaint by Public Prosecutor dated 23 September 2014 in connection with the First Indictment (MLO1/2/353-445);

    (b) Decision by Judge Valpuesta to accept the complaint dated 12 February 2016 in connection with 1st Indictment (MLO1/3/842-867). The meaning of a decision to accept a complaint is explained below at paragraph 62.

    (c) As referred to above at paragraph 52(b), Criminal Complaint by Public Prosecutor dated 11 September 2014 in connection with the Second Indictment (MLO1/2/446-468);

    (d) Decision by Judge De Souza accepting the complaint dated 15 September 2014 in connection with the Second Indictment (MLO1/3/825-827);

13

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(e)    As referred to above at paragraph 52(b), amendment to the Criminal Complaint by Public Prosecutor dated 15 December 2015 in connection with the Second Indictment (**MLO1/2/469-526**);

(f)    As referred to above at paragraph 52(b), decision by judge Valpuesta accepting the amendment to the complaint dated 25 January 2016 in connection with the Second Indictment (**MLO1/2/576-612**);

(g)    Decision by Judge De Souza dated 6 May 2014 in connection with Precautionary measure to freeze BRL 122,006,970.00 (**MLO1/3/613-619**);

(h)    Decision by Court of Appeal dated 4 November 2014 in connection with Precautionary measure to freeze BRL 122,006,970.00 (**MLO1/3/828-838**);

(i)    Request by Prosecutor dated 11 September 2014 in connection with Precautionary measure to freeze BRL 1.5 billion (**MLO1/3/895-911**);

(j)    Decision by Judge De Souza dated 9 February 2015 to freeze property of Batista, as well as assets of Batista's funds in connection with Precautionary measure to freeze BRL 1.5 billion (**MLO1/3/839-840**);

(k)    Decision by Judge Valpuesta dated 28 April 2015 to decrease amount of frozen assets to BRL 162,646,092.00 in connection with Precautionary measure to freeze BRL 1.5 billion, which I exhibit together with a partial English translation (**MLO1/3/912-953**);

(l)    Decision by Judge Valpuesta dated 5 June 2015 to release frozen assets in one of Batista's funds (Centennial Asset Mining Fund LLC) in line with the reduction with Precautionary measure to BRL 162,646,092.00 (**MLO1/3/841**);

(m)    Decision by Judge Valpuesta dated 18 February 2016. The judge accepted the argument of the Prosecutor that Batista sold shares of his companies which provided unjustified profits to his benefit, and decided to freeze BRL 8,720,910.00 in connection with a further Precautionary measure to freeze BRL 34 million (**MLO1/3/868-882**);

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(n)    Decision by Judge Valpuesta dated 25 August 2016 unifying the freezing orders of all precautionary measures ratifying the order to freeze BRL 162,646,092.00 (MLO1/3/883-890);

(o)    Decision by Judge Valpuesta dated 12 September 2016 maintaining the BRL 162,646,092.00 freezing order, but suspending the liquidation of quotas held in investment funds until Batista presents other assets of the same amount (MLO1/3/891-894).

54.    The Criminal Proceedings recite similar factual allegations to allegations made in the Florida Complaint. The criminal proceedings are also based on allegations similar to those investigated by the Brazilian Securities and Exchange Commission and made in the Minority Shareholder Action that the defendants had committed crimes against the securities market.

55.    The Criminal Proceedings involve allegations of frauds committed by the defendants thereto, including Batista, between 2009 and 2013 and that these actions formed part of joint and co-ordinated actions by the defendants. Central to the allegations specifically pleaded are the Statements of Material Facts within the meaning of Brazilian securities law and other public statements made by Batista which allegedly were made dishonestly with the intention of influencing investors in OGX.

56.    Under Brazilian securities law, Statements of Material Facts are only made when the directors of a public company consider that there is a fact which would have a material impact on the decision of an investor to invest in that company. Instrução CVM No. 358/02 (a copy of which is exhibited at MLO1/2/527-575) describes the obligation of the directors and officers of the company to inform the Investor Relations Director (and of the latter's obligation to inform CVM) about any facts that fall within the description of acts that are deemed relevant by the law. Such Material Facts shall also be published by the company in the newspaper and on the internet. Generally, acts that must be informed are those that may influence the stock market. Violation of this rule is regarded as a severe breach under Article 11, §3°, of Law No. 6,385/76, which may result in the suspension or impediment of the director and on the suspension or cancellation of the registration to trade in the stock market.

57.    The allegations specifically made against Batista in the Criminal Proceedings relate to:

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(a)  The inaccuracy of Statements of Material Facts as to the value or quality of OGX oil assets (see paragraph 34(1) to (7) of the First Indictment) (MLO1/2/353-445 at 362-364).

(b)  Other misleading public statements made by Batista (see paragraph 35 of the First Indictment) (MLO1/2/353-445 at 364).

(c)  The statements made by Batista as to the Put Option publicised in October 2012. It is alleged that Batista knew from the outset that the Put Option would not be exercised against him and that he falsely led the market to believe he was making a significant personal financial commitment to OGX (see paragraphs 46 to 50 of the First Indictment) (MLO1/2/353-445 at 365-366).

(d)  The statements made by Batista in June 2013 that neither he nor EBX would dispose further of their shareholdings in OGX when by September 2013, without further announcement, substantial sales of those shares were made (see paragraphs 51 and 54 of the First Indictment) (MLO1/2/353-445 at 366-367).

(e)  Batista colluded with others, as the principal *"leader of OGX"*, to deceive investors and the public. Batista acted in bad faith and with malice in misleading the investment market (see paragraphs 54 to 55 of the First Indictment) (MLO1/2/353-445 at 367).

58.  Batista was charged with the following criminal offences in the First Indictment:

(a)  Misrepresentation on a public document contrary to Article 299 of the Criminal Code (see paragraph 56(a) of the First Indictment) (MLO1/2/353-445 at 367).

(b)  Misleading investors, contrary to Article 6 of Law No 7,492/86 (see paragraph 56(b) of the First Indictment) (MLO1/2/353-445 at 367); and

(c)  Criminal conspiracy contrary to Article 288 of the Criminal Code (see paragraph 56(c) of the First Indictment) (MLO1/2/353-445 at 367) (since rejected as discussed below).

16

59. Subsequently the Second Indictment (see MLO1/2/446-468) alleged further charges against Batista, which are:

(a) market manipulation punished by Article 27-C of Law No. 6,385/76 (see section IV of the Second Indictment) (MLO1/2/446-468 at 454); and

(b) insider trading described in Article 27-D of Law No. 6,385/76 (see section IV of the Second Indictment) (MLO1/2/446-468 at 454).

60. The following charges against Batista have been permitted to continue following reviews of the allegations by the Judge in charge of the case following representations by counsel for the prosecution and Batista:

(a) Article 299 of the Criminal Code sets out the offence of misrepresentation on a document describing it as the act of omitting in a public or private document a representation that should be inserted or to insert a false representation with the purpose of obstructing any right, creating obligations or to modify reality about a legally relevant fact. Such offence is punishable with a fine and prison varying from 1 to 5 years (1 to 3 years if it is a private document).

(b) Law No 7,492/86 is a criminal law conceived to punishing crimes against national financial system. According to its Article 6, it is a criminal offence to induce or lead to error a shareholder or investor in connection with a financial transaction or situation by omitting or providing untrue information. An imprisonment sentence may go from 2 to 6 years and also a fine will be applied.

(c) Article 27-C of Law No. 6,385/76 describes the crime of market manipulation. It is a criminal offence to perform simulated transactions or other fraudulent schemes with the purpose of artificially modifying the regular operation of stocks in the stock exchange aiming at causing damages or obtaining improper advantages for itself or for third parties. An offender may be imprisoned for 1 to 8 years and pay a fine of three times the amount of the advantage illegally obtained.

(d) Article 27-D of Law No. 6,385/76 provides for the crime of insider trading. The crime involves the use of relevant information still undisclosed to the

17

market that is known to someone or that someone should keep confidential that is capable of resulting in an illegal advantage in stock trading. An offender may be sentenced to prison for 1 to 5 years and to pay a fine of three times the amount of the advantage illegally obtained.

61.    By a decision dated 25 January 2016, the Judge in Rio de Janeiro decided to proceed with the allegations based on crimes indicated at paragraph 58(a) and (b) above in the First Indictment (see **MLO1/2/576-612**). The Judge rejected the charge of criminal conspiracy (Art. 288) on the basis that not all of the defendants to the Criminal Proceedings have worked to carry on with the violation, but some of them have actually worked towards recovering the company, which was not the case for defendants, Batista, Marcelo Torres and Paulo Mendonça. The description of criminal conspiracy requires that at least four defendants (and not three as in the case) collaborate to that criminal purpose. The Judge raised the issue as to whether the alleged facts indicate a possible violation of crime described in Article 27-C of Law No 6,385/76.

62.    According to the Criminal Procedural Code the criminal complaint presented by the prosecutor shall be summarily rejected by the Court (Article 395): (i) in case of ineptitude (Article 41): if the complaint does not contain a description of the criminal fact and its circumstances, if the defendant is not correctly identified and if conduct is not properly classified, (ii) in case procedural conditions and assumptions are not satisfied, (iii) when exercise of criminal action lacks just cause. Complaints arising out of the First and Second Indictments have been received by the judge. This means, among other things, that the Judge considered that the Criminal Proceedings satisfied the just cause requirement.

63.    I have not seen a document that would constitute a formal response to the allegations contained in the First and Second Indictments. The documents I have reviewed in relation to the criminal proceedings briefly indicate some main substantive lines of defence raised by Batista. Judge Valpuesta, in his decision dated 28 April 2015 suggests the main lines of defence used by Mr Batista are as follows:

(a)    that the shares traded by Batista between May and June 2013 had already been pledged to a certain debt obligation;

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(b)     that OGX has delayed publishing the relevant facts related to the impossibility to carry commercial exploitation of oil fields until it reached such conclusion;

(c)     that Batista only knew about the impossibility to exploit the fields after trading his shares;

(d)     that Batista had no purpose in using insider information, as he could have traded all of his shares and otherwise has made other investments;

(e)     that the put option was not fully disclosed due to its complex nature;

(f)     Batista also alleges the lack of jurisdiction of the federal courts and that the evidence is insufficient to support the filing of the charges and the continuation of the Criminal Proceedings (MLO1/3/925-953).

64.     It is extremely hard to anticipate the likely timeframe of criminal proceedings, since many particular issues and incidents may arise during proceedings. It usually takes at least 2 years for an award to be issued by a judge and 3-4 years to have all appeals judged by Federal and Superior Courts. That timeline should be expected to run from the date of the admission of the Second Indictment, i.e. January 2016.

64.1

(a)     I note that Batista has also been charged in a different criminal proceeding for crimes in connection with his indirect controlling shareholding in OSX Construção Naval S.A. In this proceeding, similar facts are described by the Public Attorney Office as to those applicable in the case of OGX. The most recent decision is by Judge Valpuesta of 21 September 2016 (MLO1/3/955-1002).

(b)     Here, the Public Attorney Office made the same allegations in relation to OSX as those outlined in relation to OGX (see paragraph 60, above). However, the Public Attorney Office has voluntarily withdrawn the charges outlined at paragraph 60 (a) and (b) above. In the decision of 21 September 2016, Judge Valpuesta dismissed those two charges and progressed the charges of market manipulation and insider trading (paragraph 60(c) and (d), above).

19

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(c)     In this same decision, Judge Valpuesta rejected all preliminary defenses of Batista and rejected all motions for a summary dismissal. In summary, the main lines of preliminary defense (now rejected) were that:

　　(i)     the accusation had not correctly described the criminal offenses or the underlying facts;

　　(ii)     in respect of the insider trading charges, Batista was in fact aware of a change of business plan at a later date than alleged by the Public Attorney Office;

　　(iii)     the 3rd Federal Court of Rio de Janeiro lacked jurisdiction and that the proceeding should be redirected to the state courts of Rio de Janeiro.

(d)     The main defenses on the merits in support of a summary dismissal (now rejected) were that:

　　(i)     the sale of OSX shares on April 19, 2013 has been made in order to comply with "free float" requirements of CVM, i.e., with a minimum amount of shares (25%) that shall be traded in the market and therefore not held by the controlling investor.

　　(ii)     By the time that the modification of the business plan has been divulged on 17 May 2013, the crisis of all companies of the X group was known to the public, and that such knowledge was already reflected in the price of the shares in the market.

　　(iii)     The sale of shares would be contradictory to the actual satisfaction of the investment of BRL 243,000,000 through a put obligation, which has been made in May 2013, for an amount that was well superior to the amount per share by the time of the sale.

　　(iv)     The board of directors meeting of OSX on 15 April 2013 had not discussed the change of the business plan. This matter was only considered on 30 April 2013 when a notice was sent to the board members with a proposal to change the business plan. Therefore,

20

the sale on 19 April 2013 was not made by using insider information.

(v)    The Public Attorney Office was wrong about the date in which decision has been made not to transfer certain assets (namely FPSO OSX 2) to the fields of OGX.

(vi)    The impossibility of exploiting the fields of OGX was only discussed by the Board of Directors on 28 June 2013, after conclusion of studies and was subsequently divulged as a material fact to the market on 1 July 2013.

(vii)    Batista was not the officer of investor relations with the responsibility of informing the market about certain decisions to transfer FPSO OSX 2.

(e)    Judge Valpuesta analyzed the accusations and the defenses and concluded that there was sufficient evidence of materiality to allow the criminal proceedings to move to the next procedural stage. For instance, Judge Valpuesta doubted that a decision as relevant as not to move the FPSO OSX 2 to the fields of OGX would not have taken several months to be reached and that all details would not have been discussed before between OSX and OGX. It was also noted that CVM rules in effect at that date provided also for an obligation of the controlling shareholder to disclose facts to the officer of investor relations to be published as a material facts.

**Asset freezing orders against Batista / his family members**

65.

(a)    In early July 2013, a civil applicant, Marcio Lobo, applied for a freezing order against the assets of OGX and Mr Batista as officeholder. The basis of the application was the adverse effect on shareholder and creditor interests in OGX following the company's negative financial state, including its negative balance sheet in 2012, and its 1 July 2013 retractions as regards production estimates (**MLO1/3/954**). On 11 July 2013, the court rejected the application on the basis that: (i) that allegations were insufficient to support a freezing order; (ii) the grant of such relief would cause severe

21

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

damage to OGX as a going concern; (iii) OGX was being monitored by the CVM and shareholders themselves; (iv) Mr Batista was an officeholder of OGX and there was insufficient evidence to justify such relief against him personally; and (v) the grant of such relief would therefore be unjustifiable use of judicial power on OGX's operations (**MLO1/3/954**). It is important to bear in mind that, at the time of this application, OGX was still operating as a going concern, was supported by Mr Batista's Put Option granted to OGX in October 2012, and the evidence of Mr Batista's alleged fraud as set out in evidence in support of the Application was not publicly available.

(b)    On 6 May 2014, on the application of the criminal prosecutor, the 3rd Federal Criminal Court in Rio de Janeiro made an order for seizure and provisional attachment of Batista's assets up to the value of BRL122,006,970 (**MLO1/3/613-619**). The presiding judge was Flavio de Souza. The precautionary measures were granted in connection with the investigation into alleged crimes by Batista which would later comprise the 2nd Indictment. The order was stated to have had the following effect: "*...to freeze all financial assets belonging to [Batista] that are located in checking accounts, savings accounts or accounts for financial purposes through BACENJUD, up to [BRL122,006,970]*" (**MLO1/3/615**). The test applied by the court in granting this relief was the presentation of sufficient evidence of probable cause and that the defendant committed the incident (*fumus boni iuris*), and danger in delay (*periculum in mora*) (**MLO1/3/615**). The Judge concluded that "*In this case, the reported facts clearly demonstrate the presence of evidence of probable cause and the defendant committed the crimes of Market Manipulation and Insider Trading... [and]... if the required measure is not granted, there is a risk that the suspect will sell his assets, making future restitution in case of conviction impossible*" (**MLO1/3/613-619 at 615**).

66.    The Prosecution sought on 11 September 2014 to extend the ambit of the precautionary measures to encompass assets of certain of Batista's family members (**MLO1/3/895-911**). In particular, Batista is stated to have given a statement to the local Police in which he acknowledged that he had "*donated*" significant assets, primarily real estate, to his family members. These donations are set out in more detail below at paragraph 69.

<div align="center">22</div>

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

67.   On 15 September 2014, Judge de Souza ordered further precautionary measures against Batista's assets up to BRL1.5 billion via the BACENJUD system (**MLO1/3/657-736 at 671**). The quantum of this order was subsequently increased by BRL237 million (**MLO1/3/657-736 at 671**). These orders were stated to have applied to Batista's assets "*in the country*", that is, Batista's domestic assets (**MLO1/3/657-736 at 671**).

68.   As regards the contents of Batista's statement to the Police, the Prosecutor alleged that it "*...indicated... a scheme to protect his assets from a future coercive measure in a context that showed an attempt to evade the civil effects of any conviction...*" (**MLO1/3/657-736 at 670**). Notwithstanding such submissions, the Judge froze only Batista's assets (see the decision of 28 April 2015 at **MLO1/3/912-953 at 917**).

69.   Further sequestration requests (under numbers 0512467-57.2015.4.02.5101 and 0042674-33.2014.4.02.5101), have been made by the Prosecutor Office against Batista, the first seeking a freezing order of BRL 34 million, which is allegedly the amount that Batista profited by trading his shares on 19 April 2013 (see paragraph 53(m), above). As part of the latter application, prosecutors have adduced evidence of "*atypical disposition of property*", including:

(a)   Donation of real property to Batista's sons on 9 July 2013, which transactions occurred after Batista's disposition of a significant portion of his OGX shareholding, and a matter of days following OGX's retraction of representations as to recoverable oil volumes on 1 July 2013. Further donations to the same recipients are stated to have taken place on 9 December 2013 (**MLO1/3/672**).

(b)   Assignment of rights over real estate to Flavia Sampaio on 15 May 2014, a matter of days following the 6 May 2014 precautionary measures order referred to above (**MLO1/3/673**).

70.   The above application also makes allegations of further acts by which Batista is alleged to have been depleting his assets. In the Prosecutor's words "*we do not speak here of one of two innocent donations, but a large number of transfers that occurred not before the criminal practices... but after it*" (**MLO1/3/673**). Among the "*many... suspicious transactions mentioned*" in the application, the following are stated:

23

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(a)     The sale of his shareholding in a company named SIX, disclosed on 13 January 2014;

(b)     The sale of Hotel Gloria, disclosed on 1 February 2014;

(c)     The sale of a Gulfstream 550 jet, disclosed on 18 January 2014;

(d)     The sale of mining company, AUX, disclosed in September 2014. It was alleged that this company was transferred to Mubadala at no cost despite having been purchased in 2011 for US$1.5 billion and valued at the time of sale at US$4 billion (MLO1/3/673).

71.     On 4 November 2014, the Court of Appeal rejected an appeal by Batista against the freezing order of BRL 122,006,970.00 imposed by Judge De Souza (MLO1/3/828-938). The Court of Appeal dismissed the appeal on the understanding that the materiality of crime against the stock market which Batista committed was successfully demonstrated by the Plaintiff. This conclusion was based on the following reasons:

(a)     Batista was the controlling shareholder and manager of OGX with access to all information about the operation and economic viability of the oil fields "*Tubarão Tigre*", "*Tubarão Gato*" and "*Tubarão Areia*";

(b)     Batista signed a "*Put*" contract with OGX under which he would transfer BRL 1 billion from his personal assets to OGX in order to ensure the continuity of the Company's business plan;

(c)     A final report was presented on 28 June 2013 which pointed out the impracticality of the oil fields and only on 1 July 2013 was this relevant fact disclosed to the public; and

(d)     Between 24 May 2013 and 10 June 2013, Batista sold OGX's shares using one of his funds (Centennial Asset Mining Fund LLC) which generated profits to his benefit on the approximate amount of BRL 122 million (MLO1/3/828-938).

72.     On 9 February 2015, in response to the court accepting amendments to the Second Indictment on 7 January 2015, Judge de Souza extended the scope of the precautionary measures ordered previously to, inter alia:

24

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(a)    Freezing and seizure of all financial assets <u>in the country</u> belonging to Batista, Thor Batista, Olin Batista, Flavia Sampaio and Luma de Oliveira, by means of the BACENJUD system;

(b)    Sequestration of real estate up to a value of 1 billion and a half of the above person. A copy of this decision is at (**MLO1/3/838-839**).

73.    On 9 February 2015, the Public Attorney Office of Rio de Janeiro obtained a freezing order over assets in connection with the Second Indictment to support a possible conviction for market manipulation and insider trading, as described above, in accordance with Article 91, I, of Brazilian Criminal Code (**MLO1/3/839-840**). A first order was issued determining that certain assets should be frozen. This freezing order, applied to the general assets of Batista, Centennial Asset Mining Fund LLC and Centennial Asset Brazilian Equity Fund LLC, as well as to the assets of Batista's family members referred to above. As described above at paragraph 17, for the Brazilian prosecutor to obtain the freezing order, the prosecutor needed to establish a prima facie case on the merits as well as the risk that delay in the provision of relief would undermine the effectiveness of any future order. The Judge authorized the Public Attorney Office to ask for international cooperation in order to effect the decision, although no particular asset or jurisdiction abroad has been mentioned. From my inspection of the public records I am not aware of the any steps being taken outside of Brazil to enforce or support this order.

74.    On 28 April 2015 the freezing orders dated 15 September 2014 and 9 February 2015 were varied by Judge Valpuesta, on the basis of legal argument that the value of the put in the Put Option was not necessarily the appropriate basis to assess the probable damages caused by the conduct of Batista (**MLO1/3/912-953**). The Judge reduced the quantum of the order to BRL 162,646,092.00 (**MLO1/3/912-953 at 914**). In reducing the quantum of the freezing order, no finding was made that the legal test for the issuance of a freezing order was no longer met. Indeed, the court acknowledged that there was a "*probability of a favourable decision*" in respect of several criminal charges against Batista in the Indictment. As a result, the freezing order remained albeit with a reduced quantum based on the Court's discretion. Judge Valpuesta decided that neither the profits due to trading of shares before disclosure of facts affecting OGX nor the amount of the unsatisfied obligation under the Put

25

Option should be the basis for calculation of illegal advantage obtained due to insider information charges.

75.     On 22 June 2015 the Attorney General filed an appeal against the reduction of the scope of the freezing order (**MLO1/3/657-736**). Such appeal has been rejected on 20 September 2016, although reasoning of the decision has not been disclosed yet. The appeal document raises legal arguments in response to the earlier decision that the freezing order should at this point be limited to BRL 162,646,092.00. The appeal requests that the quantum of the freezing order against Batista's assets be raised to circa BRL1 billion and the extension to assets donated to Batista's family members be reinstated.

76.     On 25 August 2016 Judge Valpuesta acknowledged the various requests by Public Attorney Office and decided to unify all existing decisions in order to have a single determination with regard to freezing orders (**MLO1/3/883-890**). He then ratified that the amount of BRL 162,646,092.00 is sufficient for purposes of the precautionary measures. In his last decision of 12 September 2016 (procedure number 0512467-57.2015.4.02.5101) Judge Valpuesta decided to maintain the freezing order but to temporarily suspend the liquidation of quotas held by Batista in investment funds.

**DISQUALIFICATION BY CVM**

77.     The CVM issued a decision on 11 November 2015 barring Batista from acting as an officer of a public company for a period of 5 years. A copy of that decision and an English translation is exhibited at **MLO1/3/620-656**.

78.     The disqualification is based on narrow and specific grounds. The CVM found that Batista participated in a vote to approve on 2 May 2014 the accounts of OGPar for the year ending 2013 through his interests in Centennial Mining and Centennial Equity. Batista was the Chairman of the Board of Directors in 2013. This was contrary to Articles 115 and 134 of Law 6,404/74, which prevents controlling shareholders that are also directors voting on and approving accounts. Batista is the sole shareholder of both companies, which then held 50.16% of the voting capital and the votes of these companies resulted in the votes passing.

79.     Batista defended himself by saying that he did not personally attend the meetings, but that the controlling companies were represented by an attorney in fact. He also

26

argued that he should not be personally identified with Centennial Mining and Centennial Equity as they were separate entities distinct from his own interests. However, Batista's defences were rejected. CVM director Pablo Renteria pointed out that Batista practiced a conscious violation of law in order to obtain the approval of the 2013 accounts and consequently to pursue the exoneration of his liabilities as director vis-à-vis the shareholders.

80.     In addition, the CVM fined Batista *"300,000 reais for failure to properly inform investors about the sale of assets at oil company OGX Petróleo e Gás Participações SA"*, according to a Reuters article dated 18 March 2015 **(TDA1/3/831-832 at 832)**.

**JUDICIAL RECOVERY / AKA "Bankruptcy"**

81.     On 30 October 2013 the OGX group of companies petitioned for judicial reorganisation under Chapter III of the Brazilian bankruptcy law, law 11,101/05. Following this OGX prepared a reorganisation plan for submission to the Fourth Corporate Court of Rio de Janeiro. OGX Austria was admitted within this process and submitted its own reorganisation plan on the same date. The reorganisation plans were approved by the requisite amount of creditors on 3 June 2014 and by the Fourth Corporate Court on 13 June 2014 and are exhibited at **MLO1/3/737-786** as regards the Ole e Gas Participacoes S.A. and **MLO1/3/787-822** as regards OGX Austria specifically. The effect of these approvals is that the reorganisation plans bound all shareholders and creditors of the companies subject to the plan, including those that did not vote in favour of it.

82.     As a matter of Brazilian law, the reorganization plans would not impede the bringing of the Florida Complaint or an equivalent claim in Brazil since the reorganization plan is as to OGX's debts and does not absolve company directors or executives for delictual or fraudulent acts they committed against third parties such as Applicants.

83.     The Judicial Reorganisations Plans (the **"Plans"**) are governed by Brazilian law, see for example Clause 14.12 of the OGX Austria plan 14.12 **(MLO1/3/787-822 at 820)**.

84.     A letter by Deutsche Bank, acting as Indenture Trustee, dated June 27, 2014, notified all depositaries, custodians and other intermediaries that (i) a general meeting of creditors took place on June 3, 2014, (ii) the plans were approved by the necessary

27

majority of creditors, including the beneficial owners who attended and voted and (iii) the courts confirmed each of the plans (**MLO1/3/823–824**).

85. Applicants held bonds issued by OGX Austria. As a consequence, the credit belonging to Applicants has been attached to and novated by the Plans.

86. The Plans novate the agreement creating the underlying debt owed by OGX and converting the rights under the bonds to an equity interest in the restructured OGX entity. The Plans provide contractual restrictions on the ability of the creditors, which would include Applicants, on seeking payment for the outstanding debts owed by OGX entities whether directly as debt enforcement or indirectly as damages claims. The Plans also provide protections for certain parties' actions during the reorganisation itself and those protections extend to Batista but only to a limited extent.

87. In particular, clause 10 of the OGX Austria Plan contains contractual restrictions on creditors, including bondholders, from bringing certain claims. In summary:

    (a) Clause 10.1 confirms that the OGX Austria Plan is binding on Creditors, which includes Applicants.

    (b) Clause 10.2 provides for the novation of the contracts giving rise to a debt owed to the Creditors at the time of the reorganisation.

    (c) Clause 10.3 restricts the enforcement of debts against OGX Austria. The term in the translated version barring Creditors from "*seek[ing] satisfaction of their Credits by any other means*" refers to enforcement of the debt owed by OGX Austria and claims under contracts with OGX Austria.

    (d) Clause 10.5 provides for the discharge of claims against the OGX companies, including OGX Austria in the first sentence of that Clause. That discharge is expressed as extending to damages claims but that is only against those companies. The second clause also bars claims against directors, employees, agents and shareholders of OGX Austria but this only bars claims for payment of Credits themselves, and in contrast to the first sentence, it does not purport to extend to holding such third parties harmless for claims in damages for their delictual or fraudulent acts.

28

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(e)     Clause 10.7 provides an exemption for liability for certain parties for obligations assumed in the course of the Judicial Reorganisation and that exemption extends to Batista, who is defined as being one of the "*Exempt Parties*". However, the subject matter of that clause is unrelated to Applicants' allegations against Batista and is therefore inapplicable (**MLO1/3/787-822 at 815-817**).

88.     The same analysis provided in the preceding paragraph applies to the equivalent provisions in OGX Plan at clauses 12.1 – 12.7 (**MLO1/3/737-786 at 767-769**).

89.     I do not believe that as a matter of Brazilian law the restrictions contained in the plans summarised limit Applicants' ability to pursue the claims in the Florida Complaint as the claims against Batista and the Cayman Respondents do not fall within any of the restrictions on claims in the Plans.

90.     Even if these claims did fall within the restrictions, which they do not in my view, that would not necessarily be determinative of Applicants' rights under Brazilian law. If the losses arose as a result of the criminal conduct of Batista the contract may not be considered as barring a claim for compensation particularly if that misconduct was not properly disclosed at the time of the approval of the Plan.

Sworn by:

At:  Rio de Janeiro, 18 October 2016

Witnessed:



Cartório Gustavo Bandeira
Reconheço por SEMELHANCA a(s) firma(s) de:
MARCELLO AUGUSTO LIMA DE OLIVEIRA..............
Rio de Janeiro, 18/10/2016.
Serventia:4.94 Fundos:1.74 Total: 6.68
Thamyris Maia Coelho, EBUF58208-RIO
Consulte em https://www3.tjrj.jus.br/sitepublico

089391
ABB01192

8° Oficio de Notas-RJ
Thamyris Maia Coelho
Escrevente
CTPS 01945 Série 176 RJ

29

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

               Plaintiffs,

v.

EIKE BATISTA, *et al.*

               Defendants.

_____/

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' CLAIMS BASED ON COMITY

Defendants Werner Batista, Centennial Asset Mining Fund LLC, Centennial Asset Brazilian Equity Fund LLC, 63X Investments LTD., 63X Master Fund, and 63X Fund (the "Defendants") move to dismiss the Complaint filed by Plaintiffs Meridian Trust Company and American Associated Group, Ltd. (the "Plaintiffs").[1] Based on principles of comity, the Complaint should be dismissed in its entirety because the Plaintiffs' claims were discharged and released in a Brazilian judicial reorganization proceeding. Alternatively, to the extent the Plaintiffs contest that the discharge is not enforceable or final, the Defendants request that this proceeding be stayed to allow the Plaintiffs to seek to obtain relief from the Brazilian bankruptcy court to the extent possible. This motion (the "Discharge and Release Motion") should be granted for the

---

[1]      The other named defendants in this proceeding include Eike Batista, Thor Batista, Paulo Mendonca, Flavio Godinho, Paulo Gouvea, Marcus Berto, Luiz Carneiro, Aziz Ben Ammar, EBX Holding, LTDA, EBX International, S.A., EBX Capital Partners, Thorque1 Fund LTD, Thorque Investment Management LTD, Olin Batista, Flavia Sampaio, and Luma de Oliveira.

reasons set forth in the below memorandum of law.

## MEMORANDUM OF LAW

### INTRODUCTION

The Plaintiffs' claims against Defendants arise from their ownership of bonds issued by the OGX Group in 2011 and 2012, the purpose of which was to fund the OGX Group's oil exploratory activities in Brazil. Plaintiffs claim they were deceived by Defendants and other parties named in the Complaint into purchasing the bonds when Defendants allegedly knew no oil would be found, and the OGX Group's exploratory operations would fail.

The Plaintiffs' claims are baseless and should be dismissed on the merits.[2] But even setting aside the lack of merit to their unsubstantiated accusations, the Complaint should be dismissed— in its entirety—because the Plaintiffs' claims have been discharged and released in the course of a Brazilian judicial reorganization proceeding of the OGX Group (the "Judicial Reorganization"). That Judicial Reorganization is binding on this Court under principles of comity.

As described at length in the affidavit of Marcelo Lamego Carpenter (the "Carpenter Affidavit"),[3] a lead member of the legal team representing the OGX Group in the Judicial Reorganization in Brazil, the OGX Group began restructuring proceedings in the Fourth Commercial Court of the Capital of the State of Rio de Janeiro (the "Brazilian Bankruptcy Court") on October 31, 2013. Plans of reorganization (the "Plans") were approved by the same court on June 13, 2014.[4] Approximately 90% of all creditors supported the Plans.

---

[2] As described at length in the Defendants' Rule 1.140 Motion to Dismiss, filed contemporaneously herewith, Plaintiffs have not alleged facts sufficient to entitle them to relief. To save judicial resources and address issues that may lead to a final resolution, Defendants ask the Court to consider this Discharge and Release Motion first.

[3] The Carpenter Affidavit (Ex. A) contains facts related to the OGX Group's Judicial Reorganization in Brazil. It appends court orders, pleadings, and other related documents from that proceeding. The reorganization of the OGX Group is referenced in the Complaint. *See* Compl. ¶ 44, 84, 148, 167, 423-27, 442-43. This Court may take judicial notice of these attachments. *See All Pro Sports Camp, Inc. v. Walt Disney Co.*, 727 So. 2d 363, 366 (Fla. 5th DCA 1999) (trial court properly took judicial notice of federal judgment in dismissing lawsuit for res judicata).

[4] Four Plans were approved by the Brazilian Bankruptcy Court—one for each of the companies composing the

The Plans novated the claims of all creditors against the OGX Group.  The Plans also specifically provided a "*full, irrevocable and irreversible discharge of all [claims] of any kind and nature against*" the OGX Group, their shareholders, affiliates, and other related entities and individuals—a bar on creditor claims akin to third-party releases that are sometimes granted under plans of reorganization in the United States.  *See, e.g.*, OGX Plan § 13.5.  The Plans also provide that "the Creditors may no longer, from the Approval of the Plan . . . (vi) seek the satisfaction of their Credits by any other means."  *Id.* § 13.3.

The Plaintiffs' claims arise from their ownership of approximately $21 million (out of a total of *$3.6 billion*) of bonds issued by the OGX Group.  As creditors, Plaintiffs are bound by the discharge and release provided in the Judicial Reorganization under Brazilian law.  All creditors had ample notice of the Judicial Restructuring from start to finish, were represented by a sophisticated indenture trustee—Deutsche Bank—and could have participated in the proceedings individually had they chosen to.  Unlike other bondholders holding debt under the same indentures, Plaintiffs ignored the Judicial Reorganization—despite numerous notices from Deutsche Bank that claims related to their bonds would be affected by the Plans.  Plaintiffs chose not to participate in the general creditors' meeting, did not vote on the Plans, did not object to the Plans, and did not appeal Plan Ratification—even though many other bondholders did.  They are now bound by the Plans' provisions, and this Court should enforce the Plans, including the discharge and release provisions, under the principles of comity.  If the Court does not nip Plaintiffs' claims in the bud, it may open a Pandora's box of frivolous creditor actions based on obligations that have long been released, undermining not only the Judicial Reorganization of OGX, but also the mutual respect

---

OGX Group.  For the purposes of this Discharge and Release Motion, we refer principally to the Plan of the main operating entity, OGX Petróleo e Gás S.A.  The Plans of OGX Austria and Óleo e Gás Participações S.A's contain identical relevant provisions.  OGX International GMBH did not have any credits subject to the Judicial Reorganization, and its Plan was approved pro forma.  *See* Carpenter Aff. ¶ 10, n. 6, Ex. 5-8.

between the U.S. and Brazilian judicial systems that is critical to the success of complex reorganizations of multi-national businesses.

## BACKGROUND

### I.     The OGX Group.

The OGX Group consists of Óleo e Gás Participações S.A. ("OGPar"), OGX Petróleo e Gás S.A. ("OGX"), OGX Austria GMBH ("OGX Austria"), and OGX International GMBH.  Eike Batista formed the OGX Group in 2007 to conduct oil and gas exploration in Brazil.  From 2010 to 2012, the OGX Group developed its operations to enable the exploration of previously ignored geographic areas.  The OGX Group's exploration of these geographic areas was based on seismic data, was supported by the Brazilian National Oil Agency (Agência Nacional do Petróleo), and received private investments of more than R$10 billion.  *See* Carpenter Aff., Ex. 1 (Request for Judicial Reorganization) ¶ 7.  The OGX Group also raised funds through international bond offerings.  In June 2011, OGPar issued bonds in the total amount of $2.563 billion under an indenture, dated June 3, 2011 (the "Initial Indenture").  These obligations then were transferred to OGX Austria. In April 2012, an additional $1.063 billion in bonds were issued under an indenture dated March 30, 2012 (collectively, with the Initial Indenture, "Indentures").  *Id.* ¶ 30, n. 23, Ex. 19-20.  Thus, the total amount of bonds for which OGX Austria was the obligor totaled approximately $3.6 billion, guaranteed by OGPar and OGX.  This comprised the majority of the OGX Group's debt.

OGX drilled more than 120 exploratory wells.  Although OGX's exploration efforts yielded some significant discoveries of oil, the anticipated production was not met.  The oil that was economically recoverable in some of the fields did not remotely approximate the projections from the exploration phase.  *See id.* at Ex. 1 (Request for Judicial Reorganization) ¶¶ 8, 10.  As such, OGX's revenues declined dramatically and the OGX Group became unable to honor the

4

financial obligations it had assumed in connection with its exploration activities. *Id.* at Ex. 1 (Request for Judicial Reorganization) ¶¶ 34-40.

## II.     The OGX Group's Bankruptcy Filing.

On October 30, 2013, the OGX Group filed a petition with the Brazilian Bankruptcy Court, commencing the companies' Judicial Reorganization under Brazilian law. *See id.* ¶¶ 7-8.  The OGX Group immediately began work on its plans of reorganization.  On February 14, 2014, OGX, OGPar, and OGX Austria submitted plans of reorganization (the "Plans") setting out their plans for a reorganization through the judicial process.  On that date, the companies also presented their initial list of creditors who held claims against the companies. *See id.* ¶ 10.  This list included Deutsche Bank Trust Company Americas ("Deutsche Bank") as the trustee for bonds issued under the Indentures.  Plaintiffs allege to have held $21 million bonds under the Indentures at the time of the filing.  The Plaintiffs' claims in this lawsuit are based entirely on the losses suffered from the decline in the value of the bonds.

## III.    Robust Notice To OGX Bondholders.

The bondholders under the Indentures (the "OGX Bondholders") held the majority of the OGX Group's debts (approximately $3.6 billion) and played a very active role in the Judicial Reorganization. *See id.* ¶ 31.  Even before being listed on the debtors' initial list of creditors, as trustee for the bonds, Deutsche Bank began monitoring the Judicial Reorganization and providing notices to the OGX Bondholders in the form of regular letters, setting out the status of the Judicial Reorganization, details of plan negotiations, and the bondholders' rights under the proposed Plans (including their voting rights). *See id.* ¶¶ 30-41, Ex. 22-25, 27, 29-33.  In all, from October 1, 2013 through June 27, 2014, Deutsche Bank sent 19 separate notices to the OGX Bondholders. *See id.* ¶ 40 (describing notices sent to OGX Bondholders throughout the Judicial Reorganization).

Deutsche Bank also established a dedicated website for the OGX Bondholders to monitor

the Judicial Reorganization and posted relevant materials for review.  *See id.* ¶ 33.  Not only did Deutsche Bank continually keep the OGX Bondholders apprised of the progress of the Judicial Reorganization, it also urged the bondholders to "consult with legal counsel or other advisors to the extent they deem advisable with respect to the Voting Procedures and voting on any potential Plans."  *See id.* ¶ 32, Ex. 22.  In addition to notice provided by Deutsche Bank, the debtors themselves posted key decisions, documents, and notices on their website throughout the Judicial Reorganization, and the relevant decisions of the Brazilian Bankruptcy Court were posted and archived in "Comissão de Valores Mobiliários—CVM," the Brazilian equivalent of the Securities Exchange Commission.  *See id.* ¶¶ 41-42.

As anticipated by Deutsche Bank (and previewed in notices sent to the OGX Bondholders), on April 11, 2014, the Brazilian Bankruptcy Court entered an order specifically acknowledging Deutsche Bank's role as the representative of the OGX Bondholders and granting all OGX Bondholders expanded rights to participate and vote individually on the Plans (the "April 11 Order").  Pursuant to this decision, all OGX Bondholders, including Plaintiffs, were granted the opportunity to exercise their rights as creditors and object to any aspect of the Plans.  *See id.* ¶ 35.

With this robust notice, and individualized ability to participate in the process, a large number of OGX Bondholders did so.  Some bondholders worked with the OGX Group and its financial advisor, Blackstone Advisory Partners Group L.P. ("Blackstone") to provide financing necessary to fund the Judicial Reorganization and the companies' continued operations.  *See id.* ¶¶ 44, 46-47.  Other bondholders (a distinct minority), unhappy with the direction the company was taking, opposed the financing and other aspects of the Plans.  Plaintiffs had ample opportunity to participate in this process, and to oppose the Plans if they so desired.

**IV.    Approval Of The Plans And Plan Discharge And Release.**

After the April 11 Order, Deutsche Bank continued to provide notices to the OGX

Bondholders.  Leading up to the general creditors meeting in June, for example, Deutsche Bank sent letters reminding the bondholders of voting procedures and the specific steps required to vote on the Plans.  *See id.* ¶ 38, Ex. 30-32.  The general meeting of creditors occurred on June 3, 2017. Approximately 90% of the companies' creditors voted in favor of the Plans, and on June 13, 2014, the Plans was ratified (the "Ratification Decision") by the Brazilian Bankruptcy Court.  *See id.* ¶¶ 21-22, Ex. 10.  Under the Plans, creditors' claims (including the Plaintiffs' claims) were converted into shares of the reorganized OGX Group, and the creditors now own 90% of the company.  Eike Batista received one ceremonial share of the reorganized OGX Group under the Plan, wiping his entire equity in the OGX Group.  *See* OGX Plan § 10.3.

The Brazilian Bankruptcy Court's decision adamantly affirmed the fair treatment of all creditors, including the bondholders:

> Upon analyzing the voting procedures through a series of criteria, ***it is abundantly clear that there was no malicious use of the bondholders' rights, nor was there any conflict of interest, as the bondholder creditors are still creditors who retain the right to vote independently***, whether they contributed to investments or not, without any prejudice to the voting procedures which approved the plan.

*See* Ratification Decision at 2.

The approved Plans provided for a complete financial and corporate restructuring of the OGX Group.  Through the process, the companies obtained new financing, sold certain assets, and refinanced their obligations.  The Plans also provided broad releases of claims by creditors against the OGX Group, its officers and shareholders, and certain other non-debtor entities, including the Defendants, from claims arising before and during the Judicial Reorganization.  *See id.* ¶¶ 13-14. Specifically, the Plans provide:

> **13.5. Discharge**.  Except in the case of Resolution of the Plan, the Capital Increase Through Capitalization of Credits with the delivery of Shares to the Creditors or to the Receiver, as applicable, as well as the payments in cash set forth in Sections 5.1.4 et. seq. of this Plan will result in full, irrevocable and irreversible discharge of all Credits of any kind and nature against OGPar, OGX Austria, OGX

7

International, OGX and its controlling companies and guarantors, including interest, adjustment for inflation, penalties, fines and damages. With the occurrence of the discharge, the ***Creditors will be deemed to have fully discharged, released and/or waived any and all Credits***, and can no longer claim them against ***OGX, controlled companies, subsidiaries, affiliates and other companies belonging to the same corporate and economic group, and their officers, directors, Shareholders, minority shareholders, members, agents, employees, representatives, guarantors, sureties, successors and assignees***.

OGX Plan § 13.5 (emphasis added).[5]

The Plans therefore expressly discharge and release "***any and all***" "Credits" against "OGX, controlled companies, subsidiaries, affiliates and other companies belonging to the same corporate and economic group, and their ***officers, directors, Shareholders, minority shareholders, members, agents, employees, representatives, guarantors, sureties, successors and assignees***." *See* OXG Plan § 13.5 (the "Discharge and Release"). Moreover, the Plans provide that "the Creditors may no longer, from the Approval of the Plan . . . (vi) seek the satisfaction of their Credits ***by any other means***." *Id.* § 13.3 (emphasis added); Carpenter Aff. ¶ 20.[6] "Credits" include all "Credits and obligations, whether materialized or contingent, net or illiquid, existing on the Filing Date, or which generating fact is previous or simultaneous to the Filing Date, whether or not subject to the effects of Plan . . . ." OGX Plan § 1.1.43.[7] The Discharge and Release thus is broad and releases the Defendants from Plaintiffs' claims—all of which clearly arise from facts that are "previous or simultaneous to the Filing Date." *See* Carpenter Aff. ¶¶ 15-18 (noting definition in Section 13.5 and listing parties' relationship to the OGX Group); Expert Rep. at 17.[8]

Despite the various challenges and appeals of the Ratification Decision (*see* Carpenter Aff. ¶¶ 24-25, 48-51), no creditor ever has challenged the Discharge and Release, although they had

---

[5]     *See also* OGX Austria Plan, Section 10.5; OGPar Plan, Section 12.5.
[6]     *See also* OGX Austria Plan, Section 10.3; OGPar Plan, Section 12.3.
[7]     *See also* OGX Austria Plan, Section 1.1.34; OGPar Plan, Section 1.1.38.
[8]     The Expert Report of Professor José Rogério Cruz e Tucci (the "Expert Report") is appended as Exhibit 2 to Exhibit B.

every opportunity to do so.  The conversion of most of the debt occurred in October 2014, with final negotiations with certain creditors concluding as recently as January 2017, finalizing an almost four-year process under the auspices of the Brazilian Bankruptcy Court under the watchful eye of the companies' creditors, the trustee appointed by the Brazilian Bankruptcy Court, and the Public Prosecutor of the State of Rio de Janeiro.  *See id.* ¶¶ 23, 26-28.

Notably, Plaintiffs have never raised any objection to the Brazilian bankruptcy process. They did not attend the creditors meeting or object to the Plans' ratification by the Brazilian Bankruptcy Court, including with regard to the treatment of OGX Bondholders under the Plans. Nor did they ever seek to appeal the ratification or otherwise set it aside.

<u>**ARGUMENT**</u>

**I.      The Court Should Dismiss The Complaint Under The Principles Of Comity Because The Plans Expressly Discharged And Released The Plaintiffs' Claims.**

Plaintiffs allege that Eike Batista and the other parties named in the Complaint, including Defendants, directly or indirectly defrauded Plaintiffs, allegedly inducing them to invest $21 million "in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations."  Compl. at ii.  The bonds that Plaintiffs were allegedly deceived into buying were but a small portion of the almost $3.6 billion of bonds outstanding under the Indentures—the same bonds that were subject to the Judicial Reorganization described above in which Plaintiffs could have participated.  But Plaintiffs chose not to participate, despite ample notice.  As creditors of the OGX Group, they must now accept the outcome of that Judicial Reorganization.  This includes the Discharge and Release contained in the Plans, which is enforceable under Brazilian law and should be recognized by this Court under the principles of comity.

The doctrine of comity in Florida and federal courts has its roots in the United States

Supreme Court case of *Hilton v. Guyot*, 159 U.S. 113 (1895):

> [W]here there has been opportunity for full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

*Nahar v. Nahar*, 656 So. 2d 225, 229 (Fla. 3d DCA 1995) (citing to *Hilton* in discussing standard for extending comity); *see also Daewoo Motor Am., Inc. v. General Motors Corp.*, 315 B.R. 148, 157 (Bankr. M.D. Fla. 2004) (same), *aff'd*, 459 F.3d 1249 (11th Cir. 2006).

Comity is the rule, rather than the exception. *Belle Island Inv. Co. v. Feingold*, 453 So. 2d 1143, 1145 (Fla. 3d DCA 1984) ("In Florida, the rules of comity may not be departed from except to protect the citizens of our state or some paramount public policy.").  And Florida state and federal courts have extended comity to final judgments and interlocutory orders of other countries in the context of insolvency-related proceedings.  *See Belle Island Inv. Co.*, 453 So. 2d at 1143 (interlocutory injunction of St. Vincent and the Grenadines receivership proceeding); *Kroitoro v. Chase Manhattan Bank, N.A.*, 522 So. 2d 1061 (Fla. 3d DCA 1988) (Panamanian bankruptcy).  Moreover, numerous federal cases in Florida state that the doctrine of comity is ***especially applicable*** in the bankruptcy context, "for comity enables a debtor's assets to be disbursed equitably and systematically rather than haphazardly or erratically." *Daewoo Motor Am.*, 315 B.R. at 157; *see also In re Petroforte Brasileiro de Petroleo Ltda.*, 542 B.R. 899, 909 (Bankr. S.D. Fla. 2015) (enforcing ***Brazilian*** bankruptcy court rulings).[9]

---

[9]    *See also In re Rosacometta, S.r.l*, 336 B.R. 557, 564 (Bankr. S.D. Fla. 2005) (extending comity to Italian bankruptcy proceedings).  Likewise, federal courts from other jurisdictions have given comity to Brazilian insolvency

Florida courts regularly enforce foreign judgments under the principles of comity if three factors are satisfied: (a) the foreign court had proper jurisdiction; (b) the parties were given notice and the opportunity to be heard; and (c) "the foreign decree does not offend the public policy of the State of Florida." *Cermesoni v. Maneiro*, 144 So. 3d 627, 629 (Fla. 3d DCA 2014); *Nahar v. Nahar*, 656 So. 2d 225 (Fla. 3d DCA 1995) (affirming trial court decision granting comity to Dutch court's order).[10]

All three of these factors are satisfied here.  ***First***, as discussed in the Expert Report of professor José Rogério Cruz e Tucci, the Brazilian Bankruptcy Court had universal jurisdiction over all claims related to the Indentures.  The Discharge and Release is valid under Brazilian law and is enforceable against the Defendants, precluding any claims, ***including fraud***, in connection with the OGX bonds.

***Second***, Plaintiffs cannot deny that they received ample notice of the Judicial Reorganization and had the opportunity to participate in the process.  Indeed, many other bondholders—whether they supported the Plan or opposed it—took part in the proceedings.  That Plaintiffs chose not to does not allow them to feign ignorance and re-litigate issues that were settled by the Judicial Reorganization.

***Third***, the Discharge and Release does not offend the public policy of the State of Florida or "American principles of what is decent and just."  *See Daewoo Motor Am.*, 315 B.R. at 156. Indeed, the Discharge and Release is similar in nature to "third-party releases" approved by U.S. bankruptcy courts under the Bankruptcy Code.

---

proceedings.  *See, e.g., Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240 (2d Cir. N.Y. 1999); *In re OAS S.A.*, 533 B.R. 83 (Bankr. S.D.N.Y. 2015); *In re Rede Energia S.A.*, 515 B.R. 69 (Bankr. S.D.N.Y. 2014).

[10]   Federal courts apply a similar test.  *See Daewoo Motor Am.*, 315 B.R. at 157-58 (key inquiry is "(1) whether the foreign court was competent and used 'proceedings consistent with civilized jurisprudence,' (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just.").

11

### a. The Brazilian Bankruptcy Court Had Proper Jurisdiction, And The Discharge And Release Should Be Enforced To Preclude Plaintiffs' Claims.

#### i. *The Brazilian Bankruptcy Court's Jurisdiction Is Incontrovertible.*

As professor Tucci explains in his Expert Report, "The purpose of [reorganization] is to allow a company in financial distress to attempt, with as little social and economic damage as possible, to become competitive and productive in the market." Expert Rep. at 7; *see also* Ratification Decision at 1 ("The principle of the preservation of the company is the main purpose of the judicial recovery proceeding.").

To allow the bankruptcy court to pursue that purpose, Brazilian law grants the court with "universal jurisdiction" over the debtor's restructuring (Expert Rep. at 20) and, indeed, "over all related suits." *Id.* at 9-11 (quoting decision of Justice Nancy Andrighi: "The Superior Court of Justice has settled the issue and establishes that the reorganization proceedings court has jurisdiction over all suits in which there are interests and assets of the company, including foreclosure proceedings, *even in the case of credits existing before the reorganization was granted*; all must submit to the plan, lest the company's recovery is jeopardized.") (emphasis added).

Here, the OGX Group's petitions for a judicial reorganization were granted by the Brazilian Bankruptcy Court (Carpenter Aff. ¶ 8) and the Brazilian Bankruptcy Court approved the Plans on June 13, 2014. *See id.* ¶ 22. It is clear that the Brazilian Bankruptcy Court had jurisdiction over the Judicial Reorganization and creditors' claims relating thereto.

#### ii. *The Discharge And Release Precludes Plaintiffs' Claims.*

As discussed, Section 13.5 of the OGX Plan—a section that was never challenged by *any* creditor—provides a broad discharge of claims against Defendants, and the OGX Austria and OGPar Plans contain identical provisions. The Discharge and Release is fully enforceable under

12

Brazilian law and releases all creditor claims, including fraud claims, against Defendants. *See* Expert Rep. at 23 ("Clause 13.5 of the Reorganization Plan of OGX grants full release, which evidently includes rights to credits or damages **resulting from fraudulent practices occurred before or during** the OGX Group's reorganization.").

In fact, according to the Defendants' expert, Professor Tucci, such discharges are not only legally enforceable in Brazil, but essential to the underlying purpose of the Judicial Reorganization process, consistent with the concept of "novation" in bankruptcy proceedings. *See id.* at 11-14, 17-19. "Under Brazilian law, there is no basis for a damages claim originated from obligations that have been novated by the reorganization plan." *Id.* at 18.

The plain language of the Plans thus discharges and releases not only the OGX Group, but Defendants and other entities falling within the provisions of Section 13.5. *See id.* at 17 ("There is no room for doubt as clause 13.5 sets forth that, once the obligations in the plan are performed, OGX will be granted full release, extended to their 'controlled companies, subsidiaries and affiliates and other companies belonging to the same corporate and economic group, and its executive officers, directors, minority, stockholders, members, actors, employees, agents, sureties, accommodation makers, guarantors, successors and assignees.'"); Carpenter Aff. ¶¶ 15-18 (discussing Section 13.5 definition and listing Defendants and their relationship to the OGX Group). The Plans further provide that "the Creditors may no longer, from the Approval of the Plan . . . (vi) seek the satisfaction of their Credits by any other means." OGX Plan § 13.3. "Credits" are not merely the Plaintiffs' bonds—they include all "Credits and obligations, whether materialized or contingent, net or illiquid, existing on the Filing Date, or which generating fact is previous or simultaneous to the Filing Date, whether or not subject to the effects of Plan . . . ." *Id.* § 1.1.43. Thus, the OGX Group Plans discharged and released not only the Plaintiffs' claims

13

against the OGX Group under the bonds themselves, but also all obligations, whether materialized or contingent, against all parties identified in Section 13.5 of the OGX Plan—including Defendants.

Plaintiffs cannot deny that they are subject to the terms of the Discharge and Release, even though they did not expressly vote for the Plans at the general creditors' meeting. *See* Expert Rep., Ex. 2 at 18 ("even creditors who abstained from voting or voted against the change of their collateral must submit to the reorganization plan"); *see also id.* at 19 ("[T]he release clause of the reorganization plan for OGX is binding on all creditors, including the plaintiffs in the suit filed in Florida."). In fact, Plaintiffs appear to concede the point in a submission to the Grand Court of the Caymans (the "Cayman Affidavit"), writing that "the effect of [Plan] approvals is that the reorganization plans bound all shareholders and creditors of the companies subject to the plan, including those that did not vote in favor of it." Cayman Aff. ¶ 81.[11]

### iii.   This Court Should Enforce The Brazilian Court Discharge.

This Court should give the OGX Group Plans' Discharge and Release provisions the same effect that they would be given by a Brazilian court—barring the Plaintiffs' claims against Defendants.[12]   Otherwise, parties would be able to continually re-litigate matters related to the debtors and their debts, undermining the finality necessary in the restructuring process. *See* Expert Rep. at 16 ("A dynamic view of procedure requires that each action is brought at the appropriate time, or it may not be brought at all."); *see Daewoo Motor Am.*, 315 B.R. at 157 (stressing the importance of enforcing comity in the context of foreign insolvency proceedings).

---

[11]     Affidavit of Marcello Augusto Lima de Oliveira, dated October 18, 2016, submitted by the Plaintiffs in the Grand Court of the Caymans, appended as Exhibit C.

[12]     *See Kroitoro*, 522 So. 2d at 1061-62 (following Panamanian law as to bankruptcy adjudication's effect of rendering the bankrupt without legal capacity); *see also Daewoo Motor America*, 315 B.R. at 157 ("Analyzing whether comity applies to a foreign judgment bears similarity to analyzing whether *res judicata* applies to a domestic judgment."); *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240 (2d Cir. 1999) (deferring to ongoing liquidation proceedings in Brazil under comity principles).

As Professor Tucci warns, if "the Court in Florida tries the claim of OGX Austria's bondholders against whomever received release of the obligations listed in the plan, an alarming precedent will be created, allowing other creditors to come to (any) court to collect debt that no longer exists." *See* Expert Rep. at 20.  This Court should avoid setting such a precedent here.

**b.  The Creditors Received Ample Notice And Had The Opportunity To Be Heard.**

The second prong of the comity analysis requires that the creditors who are subject to a foreign judgment had proper notice and the opportunity to be heard in the foreign proceeding.  In essence, the inquiry is simply whether the interests of the party whose rights are affected were fairly represented in the foreign proceeding.

*Daewoo Motor Am.*, 315 B.R. at 157-58, is particularly instructive.  There, the court recognized a Korean plan of reorganization because "Korea has significant interest in regulating business activity on its shores…, any differences between Korean and U.S. bankruptcy law are minimal and do not offend U.S. notions of due process…: *[The plaintiff in the U.S. action] had notice, as well as a full and fair opportunity to participate in all facets of the Korean bankruptcy process [and if the plaintiff] objected to the relevant transactions and orders, it should have done so before the Korean tribunal.*"  *Id.* (emphasis added).

The court continued, "[t]he fact that [the plaintiff] now seeks to hold [the defendant] liable … highlights [the plaintiff's] true intention—to collaterally attack the entire Korean reorganization process and result.  *This Court will not permit such an improper collateral attack to undo the Korean Court's efforts*."  *Id.* (emphasis added).

The same is true here.  From the very outset of the Judicial Reorganization, Plaintiffs, as bondholders of OGX Austria, were represented by Deutsche Bank as the trustee under the Indentures.  Deutsche Bank was listed on the debtors' initial creditors list and was obligated to provide notice to the individual bondholders by the Brazilian Bankruptcy Court, which it did.  The

15

April 11 Order acknowledged Deutsche Bank's role as the trustee and representative of the OGX Bondholders, but also specifically individualized the rights of the OGX Bondholders, including the Plaintiffs, allowing them to participate in the formulation of the plan and to vote at the general creditors meeting.  *See* Carpenter Aff., Ex. 26.  In that order, the Brazilian Bankruptcy Court specifically addressed the importance of creditor participation and access to plan voting.  The Brazilian Bankruptcy Court, noting that "a significantly large number of bondholders" is affected by the proceeding, granted each of the bondholders "individual rights to petition, participation, speech and vote" in connection with the Plans.  *See id.*, Ex. 26.

There is no denying, then, that Plaintiffs had every opportunity to appear and defend their rights or challenge any provision of the Plans they disagreed with, including the Discharge and Release provisions.  *See id.* ¶¶ 30-45 (discussing robust notice received by all OGX Bondholders throughout the course of the Judicial Reorganization).  While a significant number of other creditors did appear, Plaintiffs chose not to do so and now bring this collateral attack in connection with long-resolved claims.  *See Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1259-61 (11th Cir. 2006) (stressing that plaintiff in U.S. action had notice regarding the key events in the Korean bankruptcy proceeding but chose not to attend meetings, vote on the plan, or object to its terms).  For these reasons, this Court should dismiss Plaintiffs' claims.

### c.  The Discharge And Release Provision Does Not Offend Florida's Public Policy.

As discussed, when foreign courts have proper jurisdiction and the affected parties had notice and an opportunity to appear, Florida Courts enforce those courts' judgments as long as they do not offend Florida public policy.  Enforcement of foreign orders under comity principles does not require that the laws of Brazil mirror those of Florida or the United States.[13]

---

[13]      *See, e.g., Belle Island Inv. Co.*, 453 So. 2d at 1145 ("Simply because the law of St. Vincent is different from ours . . . does not make it so pernicious as to defeat comity."); *Kroitoro*, 522 So. 2d at 1061 ("Mere difference between

At least one bankruptcy court in Florida has enforced Brazilian bankruptcy court orders. *See In re Petroforte Brasileiro de Petroleo Ltda.*, 542 B.R. at 908 ("[T]his Court finds that different requirements in Brazil for obtaining relief available in the U.S. do not render the [enforcement of the Brazilian order] manifestly contrary to U.S. policy."). There, the Bankruptcy Court for the Southern District of Florida enforced certain *ex parte* orders, entered by the Brazilian bankruptcy court, granting authority to the debtor's foreign bankruptcy trustee to issue subpoenas with gag provisions as part of an investigation related to a Brazilian judicial reorganization. Similarly to the comity analysis conducted by Florida state courts, the bankruptcy court analyzed whether granting recognition to Brazilian bankruptcy court orders would be "manifestly contrary to the public policy of the United States." *Id.* at 907. Noting that the public policy exception is "narrow" and that it should only be invoked "under exceptional circumstances concerning matters of fundamental importance to the United States," the court enforced the Brazilian court order. *Id.*

In support of its decision, the Florida bankruptcy court cited another U.S. decision recognizing Brazilian bankruptcy proceedings, *In re OAS S.A.*, 533 B.R. 83 (Bankr. S.D.N.Y. 2015). There, the Bankruptcy Court for the Southern District of New York explicitly confirmed that "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence…. Brazil has a comprehensive bankruptcy law that in many ways mirrors our own." *Id.* at 103 (citing *In re Rede Energia S.A.,* 515 B.R. 69, 98 (Bankr.S.D.N.Y.2014)); *see also id.* at 105 ("Although Brazilian law may impose different requirements for substantive consolidation, the different standards, standing alone, do not signify that Brazilian Bankruptcy Law is manifestly contrary to our own public policy.").

As Professor Tucci describes, the Brazilian bankruptcy regime is based generally on the

---

the law of the forum and that of a foreign state does not prevent enforcement of the foreign law or rights based thereon if such law is not against the public policy of the forum.").

U.S. Bankruptcy Code and pursues similar goals of maintaining going concern value and allowing a company to reorganize and preserve jobs. *See* Expert Rep. at 7-8 ("The purpose of a reorganization is to create conditions to overturn the debtor's critical economic-financial situation, maintaining production, jobs and the interests of creditors, thus preserving the company, its legal public interest directive and incentives to the economy."); *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.").

Indeed, both United States and Brazilian bankruptcy proceedings share a key focus: that a bankrupt company be able to successfully restructure and obtain a "fresh start." *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007); Expert Rep. at 12, 17 (discussing "novation," which is a civil law construct that allows for the termination of existing obligations through the bankruptcy process). This focus promotes the public policy of providing new opportunities to reorganize.

For these reasons and others, there is nothing about the Discharge and Release that offends the public policy of Florida or, for that matter, that of the United States. As discussed above, the Brazilian bankruptcy regime mirrors the bankruptcy process in the United States. In fact, the Discharge and Release is similar to the types of releases—referred to as "third-party releases"—approved by other U.S. courts.[14]

And while no court in Florida or the Eleventh Circuit has specifically addressed the enforceability of third-party releases contained in a foreign plan of reorganization, several other U.S. courts have. In *In re Sino-Forest Corp.*, 501 B.R. 655 (Bankr. S.D.N.Y. 2013), for example, the court explicitly rejected the argument that third-party releases in a Canadian class-action

---

[14]    *See In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1077-79 (11th Cir. 2015) (holding that Eleventh Circuit allows third-party releases); *In re Transit Grp., Inc.*, 286 B.R. 811, 816 (Bankr. M.D. Fla. 2002) (recognizing general release to a non-debtor party); *In re Scrub Island Dev. Grp. Ltd.*, 523 B.R. 862, 875-76 (Bankr. M.D. Fla. 2015) (same).

settlement agreement were contrary to public policy. The court, stressing that the Second Circuit—like the Eleventh Circuit—allows third-party releases, concluded that "[i]n this Circuit, where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy." *Id.* at 665-66; *see also In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010) (enforcing foreign third-party release).[15]

Section 13.5 of the OGX Plan gives effect to the "fresh start" concept, fundamental in both U.S. and Brazilian law—allowing OGX a blank slate and new opportunity through the discharge of any and all claims against it and related individuals and entities. Section 13.3 further effectuates that by prohibiting creditors from seeking "the satisfaction of their Credits by any other means." As Professor Tucci explains, "[t]here is no room for doubt as clause 13.5 sets forth that, once the obligations in the plan are performed, OGX will be granted full release, extended to their 'controlled companies, subsidiaries and affiliates and other companies belonging to the same corporate and economic group, and its executive officers, directors, minority, stockholders, members, actors, employees, agents, sureties, accommodation makers, guarantors, successors and assignees.'" Expert Rep. at 17. Section 13.5 of the OGX Plan should be enforced.

## II.    In The Alternative, This Court Should Stay This Proceeding To Allow Plaintiffs The Opportunity To Pursue Annulment Of The Discharge And Release In Brazil.

If this Court does not dismiss the Plaintiffs' claims outright, it should, at the very least, stay the proceeding to allow Plaintiffs to attempt to challenge the validity of the Discharge and Release in Brazil. On this topic, Brazilian law is clear that the Brazilian Bankruptcy Court is the only court

---

[15]    Note that in one case holding otherwise, *In re Vitro S.A.B. de CV*, 701 F.3d 1031 (5th Cir. 2012), the Fifth Circuit specifically declined to decide the case on whether the third-party release was manifestly contrary to public policy. *Id.* at 1070. Instead, it based its decision largely on provisions specific to Chapter 15 of the Bankruptcy Code and the fact that the Fifth Circuit does not allow third-party releases. *Id.* at 1059. As discussed above, the Eleventh Circuit explicitly allows third-party releases.

that has jurisdiction to annul any provision of the Plans:

> … only the court with jurisdiction over the reorganization can decide matters regarding the nullity of the reorganization plan, whether or not it is due to fraud. Therefore, only through an action for annulment, filed before the 4th Business Court of the Judicial District of the city of Rio de Janeiro/RJ, could the plan be dissolved.
>
> It is quite evident that the reorganization court must have universal jurisdiction, in fact.  If, for instance, the Court in Florida tries the claim of OGX Austria's bondholders against whomever received release of the obligations listed in the plan, an alarming precedent will be created, allowing other creditors to come to (any) court to collect debt that no longer exists, as has been said.
>
> Likewise, the opinion remains the same even if it is proven that knowledge of the alleged fraudulent activity happened only after the approval of the reorganization plan for OGX.
>
> The time in which the fraud was uncovered is not a relevant legal argument, nor does it set jurisdiction.
>
> Thus, even if the fraudulent activity has allegedly been uncovered, after the reorganization plan has been approved, an action for annulment must still be filed before the court with jurisdiction over the reorganization.

Expert Rep. at 20.

Therefore, any arguments as to the validity of the Discharge and Release must be raised in front of the Brazilian Bankruptcy Court.  If Plaintiffs choose to raise such arguments, and this Court does not dismiss the Complaint at this stage, the Complaint should be stayed pending the Brazilian Bankruptcy Court's determination on the validity of the Discharge and Release.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

## CONCLUSION

Defendants respectfully request that this Court grant this motion; dismiss the Complaint; and grant such other and further relief as is just and proper under the circumstances.

Dated: April 5, 2017

Respectfully submitted,

**ASTIGARRAGA DAVIS**
**MULLINS & GROSSMAN, P.A.**
1001 Brickell Bay Drive, 9th Floor
Miami, FL 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Designated E-Mails for Service:
Primary: emullins@astidavis.com
          abarton@astidavis.com
Secondary: bhernandez@astidavis.com

By: */s/ Edward M. Mullins*
      Edward M. Mullins
      Florida Bar No. 863920
      Ana M. Barton
      Florida Bar No. 85721
      *Counsel for Defendants Werner Batista,*
      *Centennial Asset Mining Fund,*
      *Centennial Asset Brazilian Equity Fund,*
      *63X Master Fund, 63X Investment Ltd.,*
      *and 63X Fund*

      -and-

      Michael Carlinsky*
      Bar No. 2319440
      michaelcarlinsky@quinnemanuel.com
      Elinor Sutton*
      Bar No. 4615175
      elinorsutton@quinnemanuel.com
      Victor Noskov*
      Bar No. 5087689
      victornoskov@quinnemanuel.com
      **QUINN EMANUEL URQUHART**
      **& SULLIVAN, LLP**
      51 Madison Avenue, 22nd Floor
      New York, NY 10010
      Telephone: (212) 849-7000
      Facsimile: (212) 849-7100
      *Admitted Pro hac vice*

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Complex Business Litigation Rule 4.3, counsel for Movants hereby certifies that the undersigned has conferred with counsel for Plaintiffs, Craig Kallil, by email on April 5, 2017, and counsel for Plaintiffs advised that his clients oppose the relief requested herein.

*/s/ Edward M. Mullins*
Edward M. Mullins

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2017, a true and correct copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal, which sent e-mail notification of such filing to all counsel of record in accordance with Fla. R. Jud. Admin 2.516.

*/s/ Edward M. Mullins*
Edward M. Mullins