COMPOSITE EXHIBIT NO. 1 - PART 3

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

           Plaintiffs,

v.

EIKE BATISTA, *et al.*

           Defendant.

_____/

**DEFENDANTS WERNER BATISTA, CENTENNIAL ASSET MINING FUND,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND, 63X INVESTMENTS LTD,
63X MASTER FUND, AND 63X FUND'S MOTION TO DISMISS**

Defendants Werner Batista ("Werner"), Centennial Asset Mining Fund, LLC ("CAMF"), Centennial Asset Brazilian Equity Fund LLC ("CABEF") (CAMF and CABEF, collectively, "the Centennial Companies"), 63X Investments LTD, 63X Master Fund, and 63X Fund (63X Investments LTD, 63X Master Fund, and 63X Fund, collectively, "the 63X Companies") (the Centennial Companies and 63X Companies, collectively, "the Companies"), pursuant to Florida Rule of Civil Procedure 1.140(b), move to dismiss the Complaint filed by Plaintiffs Meridian Trust Company and American Associated Group, Ltd. (collectively, "Plaintiffs") for failure to state a cause of action. The Companies also move to dismiss for lack of personal jurisdiction.

This motion should be granted for the reasons set forth in the memorandum of law below.

## MEMORANDUM OF LAW

### Introduction

This action stems from Plaintiffs' novel-like allegations that a primary actor, Defendant Eike Batista ("Batista"), perpetuated an international fraudulent scheme by issuing billions of dollars' worth of stocks and bonds in OGX, a Brazilian, publicly traded, oil-exploration company, allegedly knowing they were worth nothing, and then, using his family and a group of companies that he controlled, to transfer the proceeds of the fraud to bank accounts around the world. Complaint ¶¶ 34, 36, 44. According to Plaintiffs, Batista's family members, the directors of his companies, and the companies themselves all were aware of the alleged fraud and actively participated in and benefited from the scheme as conspirators and accomplices, even though Plaintiffs admit on numerous occasions that they are unable to explain *how*, exactly, they supposedly participated in the fraud. Id. ¶¶ 66, 94, 96, 202, 299, 307, 309, 311, 313-14, 316, 376, 379, 403, 455, 457, 488, 490, 492-93.

The Complaint alleges twelve counts against a group of 22 Defendants: (1) common law

fraud; (2) conspiracy to defraud; (3) aiding and abetting fraud; (4) Florida Civil Remedies for Criminal Practices Act ("Florida RICO"); (5) Florida RICO Conspiracy; (6) false and misleading advertising; (7) conspiracy to commit false and misleading advertising; (8) civil theft; (9) conspiracy to commit theft; (10) aiding and abetting theft; (11) Florida Uniform Fraudulent Transfers Act; and (12) conspiracy to commit fraudulent transfers.

Werner is named in all counts. The Companies are named in all counts except for fraud and false and misleading advertising. Yet, in its more than 104 pages, the Complaint alleges remarkably few concrete facts about any of these, or most of the, Defendants.

### *Plaintiffs' Ownership of OGX Bonds Under the Indentures*

As an initial matter, the Complaint fails at the outset because it purports to state claims under Florida law. The Plaintiffs' claims, however, clearly arise from their ownership of OGX bonds, purchased in 2013. Plaintiffs specifically claim that their losses arise from their investment of approximately $21 million "in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations." Id. at ii.

But the OGX bonds were issued subject to Indentures that are not governed by Florida law. To the contrary, section 13.08 of the Indentures unequivocally provides that New York law governs "all matters *arising out of or relating in any way whatsoever* to this Indenture, the Note Guarantee, and the Securities (*whether in contract, tort, or otherwise*)." See Indentures, § 13.08, attached as Exhibits A and B (emphasis added).[1] Plaintiffs' reliance on—and assertion of claims under—Florida law, in the face of such clear language applying New York law, is misplaced and

---

[1] See Florida Power & Light Co. v. Lixi, Inc., 11-80847-CIV, 2012 WL 12868740, at *2 (S.D. Fla. July 12, 2012) ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment") (citation omitted).

requires this Court to dismiss the Plaintiffs' claims *ab initio*.

### Allegations Relating to Werner

Werner's greatest fault, according to the Complaint, is that he is Batista's brother. Compl. ¶ 7. In September 2009, Werner, who was living in Florida, went to work in Brazil, as director of co-defendant company EBX Holding, an alleged personal wealth management entity of Batista's. Id. ¶¶ 64, 65. According to Plaintiffs, Werner "knew of the fraud from the early days" (id. ¶ 57) and assisted Batista by remaining silent and not exposing the purportedly overhyped value of OGX. Id. ¶¶ 208, 220. Werner resigned from EBX Holding in December 2013, following the collapse of OGX, to return to Florida and invest his profits in Florida businesses. Id. ¶ 66.

Although Plaintiffs accuse Werner in the most conclusory manner of being an "active participant" in the alleged fraudulent scheme (id. ¶ 95), they admit that they are unaware of any amounts actually pocketed by Werner. Id. ¶ 66. Indeed, the Complaint does not specify a single transaction involving Werner. Plaintiffs only speculate that *if* the money Batista transferred out of Brazil is no longer in the name of his companies (which Plaintiffs implicitly admit is unknown), then it is "believed" to have been transferred into the names of his family members, including Werner, for no value. Id. ¶¶ 99-100.

### Allegations Relating to the Centennial Companies and the 63X Companies

Allegations relating to the Companies are even thinner. CAMF is a Nevada LLC (id. ¶ 21) and CABEF (id. ¶ 22) is a Delaware LLC,[2] while all of the 63X Companies are Cayman entities. Id. ¶¶ 15-17. Plaintiffs allege that these Companies were private wealth management companies that Batista owned and controlled and that supposedly were used to route the proceeds of his fraudulent scheme into bank accounts in Miami, The Bahamas, and the Cayman Islands. Id. ¶¶ 52,

---

[2] This allegation contradicts a later allegation that the Centennial Companies were incorporated in "secrecy" jurisdictions. Complaint ¶ 90.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

69, 89. Plaintiffs further claim that these Companies have "no legitimate corporate business or independent existence separate from Batista" and that they "were used as engines of fraud." Id. ¶¶ 90, 92. Yet, no abuses of corporate formalities are identified in the Complaint.

Plaintiffs alternatively plead that, if corporate formalities were followed, then the Companies should be treated as "co-conspirators, agents and constructive trustees of the proceeds of the fraudulent scheme." Id. ¶ 93. As with Werner, Plaintiffs allege the Companies conspired with Batista by remaining silent and not revealing the purportedly overhyped value of OGX. Id. ¶¶ 208, 220. They also allege the Companies were involved in the structuring of a loan that was passed off to the public as a strategic partnership and $2 billion investment by an outsider intended to bolster investor confidence. Id. ¶¶ 91, 253, 262-63.

The Complaint then speculates that the Companies *may* have been used to open various bank accounts held in Batista's interest (id. ¶¶ 309, 311, 313), and that a portion of the funds Batista allegedly transferred "without justification" *may* have been routed through the Companies to another co-defendant company. Id. ¶¶ 378-79. The only allegation with any specifics at all is that in April 2013, one of the Centennial Companies—yet, it is not even clear which one—allegedly wired millions of dollars from an account in the Cayman Islands to a Panamanian bank account controlled by Batista "for safekeeping." Id. ¶ 362.

Taking all of these allegations as true, Plaintiffs fail to show how Werner or any of the Companies engaged in any actionable conduct. The Complaint must be dismissed.

## The Motion to Dismiss Standard

To withstand a motion to dismiss, a complaint must contain sufficient ultimate facts supporting each element of a cause of action to show that a plaintiff is entitled to relief. Alvarez v. E & A Prod. Corp., 708 So. 2d 997, 1000 (Fla. 3d DCA 1998); Samuels v. King Motor Co., 782

4

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

So. 2d 489, 495 (Fla. 4th DCA 2001). Courts will not "by inference on inference or speculation supply essential averments that are lacking" in a complaint. Alvarez, 708 So. 2d at 1000 (citation omitted). Indeed, "mere legal conclusions are fatally defective unless substantiated by sufficient allegations of ultimate fact; and every fact essential to the cause of action must be pleaded distinctly, definitely, and clearly." Ocala Loan Co., 155 So. 2d at 715; Abblett v. First Nat'l Bank &Trust Co., 383 So. 2d 650, 651 (Fla. 4th DCA 1981). The Complaint fails to meet this standard and should be dismissed.

## ARGUMENT

### I.   All Counts Fail Because New York, Not Florida, Law Applies

In June 2011, Óleo e Gás Participações S.A. issued bonds in the total amount of $2.563 billion under an indenture (the "Initial Indenture"). See Ex. A. These obligations then were transferred to OGX Austria GMBH, and, in April 2012, an additional $1.063 billion in bonds were issued under a separate indenture, dated March 30, 2012 (see Ex. B) (together with the Initial Indenture, the "Indentures"). Plaintiffs allege that in 2013 they purchased roughly $21 million worth of OGX bonds under the Indentures. Compl. ¶¶ 49, 343-44, 359, 361, 373, 384.  Their claims—pleaded under Florida law—arise from losses suffered on account of the bonds issued under the Indentures. Id. ¶¶ 442-43.   Section 13.08 of the Indentures, however, unequivocally provides that New York law governs any claims arising from or relating to the Indentures. This broad provision clearly encompasses the Plaintiffs' claims.  Plaintiffs' reliance on Florida law is particularly improper because New York does nor allow state civil RICO or civil conspiracy claims.

### a.   Choice-of-Law Provisions are Presumed Valid

As an initial matter, in Florida, a choice of law provision is presumed to be valid. Southeast

Floating Docks, Inc. v. Auto-Owners Ins. Co., 82 So. 3d 73, 80-81 (Fla. 2012) ("[P]arties that enter into commercial contracts reasonably expect choice-of-law provisions to be valid and enforceable, and to disregard a choice-of-law provision in a commercial transaction would destabilize an area of law relied upon for its predictable and uniform application."). The party who wishes to invalidate a choice of law provision bears the burden of proof. Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co., 761 So. 2d 306, 311 (Fla. 2000). The fact that the law of the chosen jurisdiction differs from Florida law is not a basis on which to invalidate the provision.[3] Florida "courts have uniformly enforced choice of law provisions without requiring the parties to brief the law of the chosen forum." Id. Plaintiffs do not address in their Complaint why they ignore the provision.

To invalidate the Indenture's New York choice of law provision, Plaintiffs would have to show that New York law is contrary to a "strong public policy" of the State of Florida. Southeast Floating Docks, 82 So. 3d at 80. The bar is extremely high. See Mazzoni Farms, 761 So. 2d at 311-12 ("Courts . . . should [proceed with] extreme caution when called upon to declare transactions as contrary to public policy and should refuse . . . unless it is made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental policy of . . . freedom of contract []."). The proposition that New York law is contrary to a strong public policy of the State of Florida is absurd, and Defendants have not found a single case in which a Florida court has refused to enforce a choice of law provision which selected New

____

[3] McNamara v. McNamara, 40 So. 3d 78,80 (Fla. 5th DCA 2010). The Florida Supreme Court has enforced a choice of law clause even though the chosen jurisdiction permitted the parties to agree to a shortened statute of limitations for breach of contract claims, something prohibited under Florida law. Burroughs Corp. v. Suntogs of Miami, Inc., 472 So. 2d 1116 (Fla.1985). A choice of law provision was enforced even though the chosen jurisdiction allowed interest rates Florida law would prohibit as usurious. Southeast Floating, 82 So. 3d at 81. In two cases, Florida district courts of appeal enforced a choice of law provision even though the chosen jurisdictions prohibited attorney's fees in circumstances when Florida would allow them. Id. at 80-81 (citing Walls v. Quick & Reilly, Inc., 824 So. 2d 1016 (Fla. 5th DCA 2002); Precision Tune Auto Care, Inc. v. Radcliffe, 815 So. 2d 708 (Fla. 4th DCA 2002)).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

York law. Cases where such provisions have been enforced, on the other hand, are abundant.[4]

The Florida Supreme Court has said that "parties that enter into commercial contracts reasonably expect choice-of-law provisions to be valid and enforceable, and to disregard a choice-of-law provision in a commercial transaction would destabilize an area of law relied upon for its predictable and uniform application." Southeast Floating, 82 So. 2d at 81 (citation omitted). "Commercial stability in interstate trade depends on predictability and some degree of uniformity among the states in their willingness to honor commercial agreements." Continental Mortgage Investors v. Sailboat Key, Inc., 395 So. 2d 507, 511 (Fla. 1981) (citation omitted).

The importance of enforcing the choice of law provision is paramount here when Plaintiffs have pled claims that do not exist under New York law. Nine of the Plaintiffs' claims must be dismissed because they explicitly rely on inapplicable Florida statutory provisions. The remaining three must be dismissed because they do not specify New York law. See Turner Murphy Co. v. Specialty Constrs., Inc., 659 So. 2d 1242, 1244 (Fla. 1st DCA 1995) (a party relying on foreign law, including the law of another state, must specifically plead it). Further, at least five of the twelve counts are rooted in conspiracy, but New York does not recognize civil conspiracy as a substantive tort. See McCarthy v. Weaver, 99 A.D.2d 652, 472 N.Y.S.2d 64, 65 (1984). Similarly, Plaintiffs plead a state RICO claim, but New York law does not allow civil RICO claims. See John E. Floyd, *RICO State By State, A Guide to Litigation Under the State Racketeering Statutes*, 826 (2d ed. 2011) ("New York [Organized Crime Control Act] does not provide for a private cause of action."); see also Brittain v. Am. Exp., Inc., No. CIV. A. CV 195-102, 1995 WL 812805, at *4 (S.D. Ga. Nov. 16, 1995) ("Georgia RICO claim cannot stand because the client agreement

---

[4] See, e.g., Great Lakes Reinsurance (U.K.) Plc. v. Branam, 126 So. 3d 297, 303 (Fla. 3d DCA 2013); Gilman + Ciocia, Inc. v. Wetherald, 885 So. 2d 900, 902 (Fla. 4th DCA 2004); Walls v. Quick & Reilly, Inc., 824 So. 2d 1016, 1018-19 (Fla. 5th DCA 2002).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

between the parties contained a choice of law provision naming New York law as the applicable law."). Plaintiffs cannot be allowed to circumvent the parties' agreed-upon choice-of-law provision to bring claims that do not exist under New York law, and the provision must be enforced.

### b. The Broad Choice-of-Law Provision Applies to Plaintiffs' Fraud Claims

Section 13.08 of the Indentures provides that New York law governs "***all matters arising out of or relating in any way whatsoever*** to this Indenture, the Note Guarantee, and the Securities (***whether in contract, tort, or otherwise***)." Indentures, § 13.08 (emphasis added). This language is all-inclusive, governing all matters, explicitly including tort and statutory claims, as well as contract claims. "Where a contract is clear and unambiguous, it must be enforced pursuant to its plain language." Hahamovitch v. Hahamovitch, 174 So. 3d 983, 986 (Fla. 2015). Moreover, Florida courts interpret the language "arising out of or relating to" broadly.[5] Clearly, losses arising from the alleged artificial inflation of or devaluation of the bonds purchased under the Indentures both "arise out of" and "relate" to the "Indenture[s], the Note Guarantee, and the Securities."

Having purchased the bonds, Plaintiffs are bound by this broad language. Giller v. Cafeteria of South Beach Ltd., LLP, 967 So. 2d 240, 242 (Fla. 3d DCA 2007) ("[o]ne cannot both take advantage of contract provisions to seek to impose liability on an individual professional and at the same time avoid another contract term or provision for which it has no use"). The text of the Indentures includes "all matters"—plural—"arising out of or ***relating in any way whatsoever*** to this indenture, the note guarantee and the securities (whether in contract, tort, or otherwise)."

---

[5] See Jackson v. The Shakespeare Found., Inc., 108 So. 3d 587, 593 (Fla. 2013) ("an arbitration provision that is considered to be broad in scope typically requires arbitration for claims or controversies 'arising out of *or relating to*' the subject contract") (emphasis in original); Royal Caribbean Cruises, Ltd. v. Universal Employment Agency, 664 So. 2d 1107, 1108-09 (Fla. 3d DCA 1995) (arbitration clause including the language "arising out of or relating to this Agreement" includes intentional torts even where there is no claim for breach of contract).

Indentures, § 13.08 (emphasis added).  By its plain language, it includes tort and other claims. The inclusion of the phrases "in any way whatsoever," and "tort, or otherwise" signify that the Indentures' New York choice of law includes extra-contractual claims—tort and statutory claims—regardless of against whom they are brought, so long as those claims relate in some way to the Indentures and securities. See Razi v. Razavi, 2013 WL 1193005 *2 (M.D. Fla. 2013) (Florida choice-of-law provision in the contract governed fraud and contract claims (even though the fraud claims were brought against nonparties to the contract) because of the broad choice of law provision and the fraud claims were inextricably and factually tied to the transactions at issue).

Faced with a situation directly analogous to the suit here, the Eleventh Circuit enforced New York law under an indenture to the benefit of nonparties.  In Akanthos Capital Management, LLC v. CompuCredit Holdings Corp., 677 F3d 1286 (11th Cir. 2012), the court enforced a "no action" provision of a New York indenture that prohibited lawsuits by noteholders except in limited circumstances.  The plaintiffs sued the company's officers and directors in tort, and argued that—as nonparties to the indenture—the officers and directors could not invoke the "no action" clause. Id. at 1292. The court rejected that argument.  Because the plain language of the indenture prohibited actions with respect to the Indenture or Securities, the court ruled the "no action" clause to be applicable. The same logic is clearly applicable here. The Indentures include undeniably broad language, encompassing all claims conceivably related to the Indentures. As such, Plaintiffs' Complaint—relying exclusively on Florida law—should be dismissed for failure to state a claim.

## II.    All Counts Fail to State a Claim Under Florida Law

Even if the Court were to find that Florida law applies (it does not), each of the individual counts asserted in the Complaint is defective for failure to state a claim against Werner, the Centennial Companies, or the 63X Companies. Dismissal is required.

### a.   <u>Count I (Fraud) fails to state a claim against Werner</u>

The elements of common law fraud in Florida are (1) a misrepresentation of a material fact, (2) knowledge of falsity by the person making the statement, (3) intent to induce the aggrieved party to rely and act on the false statement, and (4) reliance on the statement to the aggrieved party's detriment. <u>Jackson v. Shakespeare Found., Inc.</u>, 108 So. 3d 587, 595 n.2 (Fla. 2013); <u>Lance v. Wade</u>, 457 So. 2d 1008, 1011 (Fla. 1984). The Complaint fails to allege any ultimate facts with sufficient particularity with respect to Werner as to meet these elements.

First, Plaintiffs have not identified *any* statement made by Werner—much less a *false* statement of material fact. The analysis should stop here.

Second, there are no specific allegations that Werner had knowledge of the falsity of any statements made by anyone else, or the intent to induce Plaintiffs to rely on the alleged false statements. At best, the Complaint states that a group of the Defendants, including Werner, allegedly "knew of the fraud from the early days," but stayed quiet (Complaint ¶¶ 57, 208, 220), and it generally avers that a group of Defendants, including Werner, "personally participated in the fraudulent scheme and composed and transmitted material fraudulent misrepresentations," "with actual knowledge that the representations were false" and "with the intention that investors would . . . rely on such representations to their consequent financial loss." <u>Id.</u> ¶¶ 449-50.

Such bare bones allegations that merely restate the elements of fraud are legally insufficient as they lack any particularity. <u>Schopler v. Smilovits</u>, 689 So. 2d 1189, 1189 (Fla. 4th DCA 1997) (affirming dismissal of common law fraud claim for failure to plead with the requisite specificity). This is especially true when it comes to fraud claims, which "must be pleaded with specificity." <u>Id.</u> <u>See</u> Fla. R. Civ. P. 1.120(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may

permit."). As put by the Fourth District, a claimant cannot "simply plead[] 'I was defrauded' and then 'flesh[] out' the claim at trial by proof as to precisely what the fraud was." <u>Schopler</u>, 689 So. 2d at 1190. Instead, due process requires that a defendant know what he is accused of having misrepresented. <u>Id.</u> at 1189-90. Here, Werner has no understanding of what he is being accused of from the face of the Complaint. On that basis alone, the pleading is defective.[6]

Yet, the greatest flaw in the Complaint's fraud count is that Plaintiffs rely exclusively on a theory of "fraud-on-the-market" to meet the element of reliance, which has been expressly rejected under Florida common law. <u>Kahler v. E.F. Hutton & Co., Inc.</u>, 558 So. 2d 144, 145 (Fla. 3d DCA 1990) (dismissing fraud claim premised on a fraud-on-the-market theory for failure to state a claim). In <u>Kahler</u>, the plaintiffs alleged that defendants "orally, and through their mass mailings, made false representations with the intent to induce [plaintiffs] to purchase stock" "as part of a scheme" "to drive up the price of the stock in order to unload the stock from the brokerage firms' own inventory." <u>Id.</u> The Third District affirmed a dismissal of the common law fraud count because the claim "mimic[ed] a fraud-on-the-market claim" that is exclusive to actions brought under § 10(b) of the Securities Exchange Act of 1934.[7]

Plaintiffs' allegations mirror the facts of <u>Kahler</u>. They allege that the supposed misrepresentations at issue (again, there are none alleged as to Werner, specifically) were directed to the United States via "an international press campaign barraging the international investing public with false promises" and thus somehow "targeted" Plaintiffs' investment agent in Florida,

---

[6] <u>State v. Nunez</u>, 881 So. 2d 658, 661 (Fla. 3d DCA 2004) (dismissing fraud count for lack of "needed particularity"); <u>Hembd v. Dauria</u>, 859 So. 2d 1238, 1239 (Fla. 4th DCA 2003) ("Where a litigant seeks to inject the issue of fraud into a lawsuit, Florida law requires that it be pled with precision, not just flung into the case willy-nilly."); <u>Robertson v. PHF Life Ins. Co.</u>, 702 So. 2d 555, 556 (Fla. 1st DCA 1997) (affirming dismissal where "complaint fails to specifically identify misrepresentations or omissions of fact, the time, place or manner in which they were made, and how the representations were false or misleading").

[7] <u>Id.</u>; <u>see also</u> <u>In re Checkers Securities Litig.</u>, 858 F. Supp. 1168, 1179 (M.D. Fla. 1994) ("common law claims cannot be based upon the fraud-on-the-market theory"); <u>In re Sahlen & Assocs., Inc. Securities Litig.</u>, 773 F. Supp. 342. 371 (S.D. Fla. 1991) (same).

who in turn relied on the public statements (and Google and Bloomberg) in deciding to purchase OGX bonds. Complaint ¶¶ 34, 337-39, 343-44, 348, 359, 451-52. As in <u>Kahler</u>, there is no showing of reliance apart from the fraud-on-the-market theory, and thus the Complaint fails to state a claim for common law fraud against any Defendant, including Werner.

### b. Count IV (Florida RICO) fails to state a claim against Werner or the Companies

Count IV of the Complaint generically alleges that Werner and the Companies were members of a criminal enterprise engaged in a pattern of criminal activity, acting with criminal intent, consisting of securities fraud, wire fraud, money laundering, false advertising,[8] theft, and communications fraud. Complaint ¶¶ 459-73.

To state a claim under Florida RICO, Plaintiffs have to allege they were injured "by reason of" a violation of the provisions of section 772.103, Florida Statutes. <u>See</u> Fla. Stat. § 772.104(1). Courts have interpreted this element as requiring that the claimed damages be proximately caused by the specifically alleged underlying RICO violations. <u>Bortell v. White Mountains Ins. Group, Ltd.</u>, 2 So. 3d 1041, 1047 (Fla. 4th DCA 2009) (affirming dismissal of Florida RICO claim for failure to show that the claimed damages were proximately caused by the RICO violations). Thus, when pleading a RICO claim, plaintiffs have to show a "direct relation between the injury asserted and the injurious conduct alleged." <u>Id.</u> at 1047 (citations omitted). In other words, Plaintiffs have to show that their alleged damages flow from their reliance on the particular predicate acts set forth in the Complaint. <u>Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co., Inc.</u>, 881 So. 2d 565, 568, 573 (Fla. 3d DCA 2004) (affirming directed verdict on RICO claims because plaintiffs "failed to establish that their injuries were directly caused by the predicate acts [of mail and wire fraud]

---

[8] Except the Centennial Companies are not included in this alleged predicate act.


proved below," there was no "evidence that they relied on any particular predicate act").

As explained *supra*, Plaintiffs' sole basis for reliance in the instant action is premised on a fraud-on-the-market theory. As with the common-law fraud claim, this is fatal to their RICO claim. Indeed, courts across the country[9] have dismissed RICO claims for failure to sufficiently plead a claim where they rely on a fraud-on-the-market theory to meet reliance and proximate cause.[10]

Here, the Complaint fails to state a claim for Florida RICO because it lacks any allegations showing a direct relation between the alleged predicate acts and any injury. The Complaint generally alleges that "[a]s a result of the . . . pattern of criminal activity, Defendants caused injury and damages to Plaintiffs." Complaint ¶ 475. Plaintiffs have not shown that Werner or the Companies individually made any misrepresentations of material fact, or that Plaintiffs actually relied on any alleged misrepresentation directed to them specifically. See Lawrie, 2013 WL 222258, *6 (dismissing complaint that was "barren of any specific allegations that as a result of any particular alleged fraudulent statement . . . *any* person (plaintiff or nonplaintiff) relied on that statement and paid a higher sales price as a result thereof"). Similarly, there are no allegations tying the alleged money laundering predicate act to any injuries suffered by Plaintiffs.

### c. Count VI (False and Misleading Advertising under Section 817.41, Fla. Stat.) fails to state a claim against Werner

In Count VI, Plaintiffs allege that Werner committed numerous acts of false and misleading

---

[9] "Because the Florida RICO Act is patterned after the federal act, Florida looks to federal authorities in construing its own RICO statute." Bortell, 2 So. 3d at 1047; O'Malley v. St. Thomas Univ., Inc., 599 So. 2d 999, 1000 (Fla. 3d DCA 1992).

[10] See Lawrie v. Ginn Dev. Co., LLC, No. 3:09-cv-446-J-32JBT, 2013 WL 222258, *1 (M. D. Fla. Jan. 9, 2013) (magistrate recommends dismissing federal RICO count "because it is premised on a fraud-on-the-market theory of reliance/causation/injury"); In re Schering-Plough Corp. Intron/Temodar Consumer Class Action, Master File No. 2:06-cv-5774, 2009 WL 2043604, *20 (D. N.J. July 10, 2009) (same, fraud-on-the-market theory "has been resoundingly rejected outside the context of federal securities fraud litigation"); Appletree Sq. I, Ltd. P'ship v. W.R. Grace & Co., 29 F.3d 1283, 1287 (8th Cir. 1994) (same, plaintiff "cannot employ the fraud-on-the-market theory to establish detrimental reliance"); CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d 1076, 1095 (10th Cir. 2014) (same); SE Laborers Health & Welfare Fund v. Bayer Corp., 444 Fed. Appx. 401, *4 (11th Cir. 2011) (same; outside of federal securities fraud litigation, causal nexus between the loss and the unlawful conduct cannot be presumed).

advertising contrary to Fla. Stat. § 817.41(1). Complaint ¶ 480.

For a claim to lie under section 817.41, Florida Statutes, "it is not enough to allege a misleading or untrue statement made to the general public." Samuels v. King Motor Co. of Fort Lauderdale, 782 So. 2d 489, 496 (Fla. 4th DCA 2001). Plaintiffs "must also allege the misleading or untrue statement was made with 'the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever . . . or to induce the public to enter into any obligation relating to such property or services.'" Id. (quoting § 817.40(5)) (emphasis added); Third Party Verification, Inc. v. Signaturelink, Inc., 492 F. Supp. 2d 1314, 1322 (M.D. Fla. 2007) (to state a claim for misleading advertising, one must plead "that the party relied on some identifiable alleged misleading advertising plus, where appropriate, all of the other elements of the common law tort of fraud in the inducement").

Once again, Plaintiffs have fallen short of the mark and have failed to state a claim for false and misleading advertising as to Werner. As a starting point, Plaintiffs have not alleged a single statement Werner uttered. Thus, the quintessential element for this claim is missing. Without an identifiable misrepresentation, there is no actionable conduct under the statute. Second, as argued *supra*, the Complaint fails to allege the elements of fraud as to Werner. Accordingly, this count must be dismissed. Third, section 817.41, Florida Statutes, expressly is limited to actionable advertising related to the "selling or disposing of real or personal property" or "services." The securities that Plaintiffs claim they were induced into purchasing do not fall within the scope of this statute—they are neither real or personal property, nor services.

### d. **Count VIII (Civil Theft under 812.014, Fla. Stat.) fails to state a claim against Werner or the Companies**

In Count VIII, Plaintiffs attempt to set forth a claim for statutory civil theft. Under section 812.014, Florida Statutes, a person commits theft if he knowingly obtains or uses the property of

14

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

another with the intent to deprive that person of a right to or benefit from the property, or if he appropriates the property to his own use or to the use of another person not entitled to such use.

"To establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent." Gasparini v. Pordomingo, 972 So. 2d 1053, 1056 (Fla. 3d DCA 2008) (reversing judgment for civil theft). Moreover, "[f]or money to be the object of conversion there must be an obligation to keep intact or deliver the specific money in question, so that money can be identified." Id. at 1056 (citation omitted). "It is well-established law in Florida that a simple debt which can be discharged by the payment of money cannot generally form the basis of a claim for conversion or civil theft." Id.; see also Walker v. Figarola, 59 So. 3d 188, 190 (Fla. 3d DCA 2011) (same, granting judgment on the pleadings).

In addition to the fact that there are no allegations as to the requisite element of criminal intent in the Complaint for Werner or the Companies, there also are no allegations that the funds Plaintiffs paid in exchange for the OGX bonds were supposed to be kept intact or in a separate account. In fact, quite the opposite is true. Once Plaintiffs received the bonds in exchange for their investment in OGX, Plaintiffs have not alleged, nor can they, that they had any control or claim to the specific money invested, and OGX thus was free to comingle it with its other accounts. This claim should be dismissed.

e.  **Count XI (Florida Uniform Fraudulent Transfers Act) fails to state a claim against Werner or the Companies**

In yet another count, Plaintiffs allege that all 22 Defendants—including Werner and the Companies—made fraudulent transfers of assets, cash and property in violation of Fla. Stat. § 726.101, *et seq.* ("FUFTA"). Because Plaintiffs fail to specify which statutory fraudulent transfer theory they are traveling under—whether it was a transfer made with actual intent to defraud (Fla. Stat. § 726.105(1)(a)), or a transfer made without receiving reasonable value in exchange (Fla.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Stat. § 726.105(1)(b))—it is unclear what exactly these Defendants are defending against. That ambiguity alone renders the claim defective. See Oginsky v. Paragon Props. of Costa Rica, LLC, 784 F. Supp. 2d 1353, 1370 (S.D. Fla. 2011) ("vague assertions do not give Defendants 'fair notice of what the claim is and the grounds upon which it rests'") (citation omitted). In any event, Plaintiffs fail to plead the elements of either theory sufficiently, and dismissal is required.

As a threshold requirement, relief under FUFTA is premised on being able to identify a specific transfer to be avoided; general allegations of emptying bank accounts do not pave the way for recovery. See Feldkamp v. Long Bay Partners, LLC, 773 F. Supp. 2d 1273, 1286 (M.D. Fla. 2011) (dismissing FUFTA claim for failure to identify the transfers being sought to have set aside, and finding that allegations of general looting of a company are insufficient to bring a claim under FUFTA). In addition to having to identify a specific transfer, "[t]o plead a cause of action for violation of FUFTA, plaintiffs must allege: (1) they were creditors who were defrauded, (2) that defendant intended to commit the fraud, and (3) that the fraud involved a conveyance of property that could have been applicable to the payment of the debt due." Feldkamp, 773 F. Supp. 2d at 1286; Nationsbank, N.A. v. Coastal Utils. Inc., 814 So.2d 1227, 1229 (Fla. 4th DCA 2002) (reversing summary judgment of fraudulent transfer because of fact issues regarding intent).

The Complaint fails to meet the initial element of identifying any allegedly fraudulent transfer to be set aside. It does not identify a single transfer involving Werner, and includes only generalized speculations that money flowed through the 63X Companies.[11] Compl. ¶ 492. Plaintiffs thus have failed to show that Werner or the 63X Companies are either debtors or transferees falling under FUFTA.

---

[11]Plaintiffs claim they need more discovery to provide specificity of the ultimate facts to support their fraudulent transfer claim. Plaintiffs are not permitted to conduct discovery in aid of finding support for this or any of its claims. To rule otherwise would be to turn Rule 1.140(b) on its head. See Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Cap. Co., L.L.C., 00-06410-CIV, 2008 WL 2245726, at *2 (S.D. Fla. May 29, 2008) (fraudulent transfer).

As for the Centennial Companies, the only specific transfer described in the Complaint does not make clear which of the Centennial Companies was involved, and in any event, it was not a fraudulent transfer based on the face of the allegations. Id. ¶ 362. First, there is no allegation based upon which one could conclude that one or both of the Centennial Companies could be considered debtors under FUFTA. See Oginsky, 784 F. Supp. 2d at 1370 (plaintiffs did not adequately identify debtors under FUFTA where they "fail[ed] to explain which [of the 16 defendants] are 'debtors' as defined by the statute, which [p]laintiffs are creditors of which debtor-entities, and which of the debtors made the transfers to which recipients.").

Even if they are considered debtors, the element of intent to defraud also is missing. None of the badges of fraud provided in Fla. Stat. § 726.105(2) have been pled. The only allegations are that one of the Centennial Companies—again, it is not clear which one—wired $111 million from an account in the Cayman Islands to an account in Panama controlled by Batista "for safekeeping." Complaint ¶ 362. That alone cannot satisfy the pleading burden for a FUFTA claim traveling under either the actual intent or constructive fraudulent transfer theories. See Oginsky, 784 F. Supp. 2d at 1371 (formulaic recitation of the elements will not do). The claim must be dismissed.

### f. **The Conspiracy Counts[12] fail to state a claim against Werner or the Companies**

In addition to the five underlying tort claims, Plaintiffs also alleged conspiracy counts against Werner or the Companies. However, given that each of those underlying claims must be dismissed, *see supra*, it necessarily follows that these conspiracy counts also must be dismissed.[13]

---

[12] Counts II (Conspiracy to Defraud), V (Florida RICO Conspiracy), VII (Conspiracy to Commit False and Misleading Advertising), IX (Conspiracy to Commit Civil Theft) and XII (Conspiracy to Commit Fraudulent Transfers).

[13] Ferguson v. Estate of Campana, 47 So. 3d 838, 841 n.2 (Fla. 3d DCA 2010) (noting trial court had dismissed fraud count and conspiracy claim thus was also dismissed); Buckner v. Lower Fla. Keys Hosp. Dist., 403 So. 2d 1025, 1027 (Fla. 3d DCA 1981) (plaintiff must properly allege defamation for conspiracy to defame to lie,); Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997) ("actionable conspiracy requires an actionable underlying tort or wrong").

But even if any of the underlying claims survive, the Complaint still fails to sufficiently plead the elements of conspiracy: it does not (1) specifically identify an agreement entered into by two or more parties to do an unlawful act or a lawful act by unlawful means; (2) identify any overt act in furtherance of the conspiracy; or (3) allege any damage resulting from that overt act. Eagletech Comms., Inc. v. Bryn Mawr Inv. Group, Inc., 79 So. 3d 855, 863 (Fla. 4th DCA 2012). Instead, the Complaint generally states that conspiracies existed, without identifying a single overt act. Plaintiffs even admit that the "ways," "dates" and "places" of such alleged conspiracies "are unknown before discovery." Compl. ¶¶ 455, 488, 493. "A complaint must set forth clear, positive, and specific allegations of civil conspiracy," and bare allegations with no details are insufficient. Eagletech, 79 So. 3d at 863 (internal citations omitted). Absent allegations addressing how, specifically, Werner or the Companies conspired to commit any of these common-law or statutory torts, the conspiracy counts cannot withstand a motion to dismiss.

Furthermore, none of the conspiracy counts alleges sufficient facts from which a reasonable inference can be drawn that Werner actually participated in a conspiracy. Eagletech, 79 So. 3d at 863. The Complaint merely speculates that Werner participated in the alleged conspiracies because he supposedly received some benefits from the challenged actions; it provides no other concrete facts. "But, to assume or speculate that the [Defendants, including Werner] participated in a conspiracy merely because they ultimately received some benefits from the investments is insufficient for the imposition of liability against them." Id. (citing Raimi, 702 So.2d at 1284). By not providing facts specific to Werner, the Complaint speculates that he entered into several unlawful agreements to conspire and that he committed any overt acts in furtherance of those agreements. Thus, dismissal of the conspiracy counts is warranted on the face of the Complaint.

As for the Companies, "[s]ince a corporation must act through its officers, directors, or

employees, it is well settled that a corporation cannot conspire with those persons unless the individual has a personal stake in the activity apart from that of the corporation." <u>Buckner v. Lower Florida Keys Hosp. Dist.</u>, 403 So. 2d 1025, 1029 (Fla. 3d DCA 1981). Because Plaintiffs did not allege that Eike Batista had a personal stake separate from any benefit that would inure to the Companies, the conspiracy claims against them also fail. In fact, the Complaint emphasizes just the opposite, claiming that the Companies have "no legitimate corporate business or independent existence separate from Batista." Compl. ¶ 90.

### g. The Aiding and Abetting Counts[14] fail to state a claim against Werner or the Companies

Plaintiffs include two aiding and abetting counts in the Complaint. Both fail.

To state a claim for aiding and abetting fraud, the plaintiff must plead (1) an actual underlying fraud, (2) knowledge of the fraud, and (3) substantial assistance in advancing the commission of the fraud. <u>ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co.</u>, 917 So. 2d 368, 372 (Fla. 5th DCA 2005). Here, there is no valid underlying claim for fraud because it is premised on the rejected fraud-on-the-market theory. <u>See</u> <u>supra</u>. Therefore, the aiding and abetting count must fail.

But, even if there were a valid fraud claim, the Complaint lacks any allegation specifying Werner's or the Companies' "substantial assistance" in advancing the alleged fraudulent scheme. Instead, it is replete with generalities and fails to identify any actionable conduct. Thus, Count III for aiding and abetting fraud must be dismissed.

Turning to the final count left to be addressed, as noted in co-defendant Marcus Berto's Motion to Dismiss, no Florida legal authority recognizes a claim for aiding and abetting civil theft. <u>See</u> Berto Motion to Dismiss at 18. Moreover, the civil theft claims all fail for the same reason

---

[14] Counts III (Aiding and Abetting Fraud) and X (Aiding and Abetting Civil Theft under Section 812.014, Fla. Stat.).

they fail for the Movants: they are all premised on a mere nonpayment of money. See supra.

### III.   The Court Lacks Personal Jurisdiction over the Companies

Plaintiffs claim that the Centennial Companies and 63X Companies are subject to this Court's general jurisdiction pursuant to section 48.193(2), Fla. Stat., for allegedly having engaged in substantial and not isolated activity within this State as a result of the imputed actions of agents and co-conspirators. Complaint ¶ 29. Plaintiffs claim that the Companies are subject to this Court's specific jurisdiction pursuant to sections 48.193(1)(a)(1) and 48.193(1)(a)(2), Fla. Stat., also as a result of the imputed actions of agents and co-conspirators, which are the bases for this action. Id. ¶¶ 30-32. Despite their superficial allegation that that all Defendants have sufficient minimum contacts with this State (id. ¶ 33), that is not true for the Companies. They cannot be considered "at home" in Florida for purposes of general jurisdiction, they do not fall under Florida's long-arm statute, and they do not have sufficient contact with Florida to satisfy due process requirements.

The Companies raise and preserve this argument, but in the interest of judicial economy, respectfully request an enlargement of time to more fully brief this ground for dismissal and file affidavits in support. The Companies respectfully submit that the Court can enter a dismissal on the bases of the various legal arguments set forth above, as well as the additional legal motions being filed simultaneously herewith, including the Motion to Dismiss On *Forum Non Conveniens* Grounds and the Motion to Dismiss Plaintiffs' Claims Based on Comity, without having to enter into the fact-driven analysis of personal jurisdiction.

### CONCLUSION

Defendants Werner Batista, the Centennial Companies, and the 63X Companies respectfully request that this Court grant this motion; dismiss the Complaint as against them entirely; and grant such other and further relief as is just and proper under the circumstances.

Dated: April 5, 2017

Respectfully submitted,

ASTIGARRAGA DAVIS
MULLINS & GROSSMAN, P.A.
1001 Brickell Bay Drive, 9th Floor
Miami, FL 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Designated E-Mails for Service:
Primary:
　　　　　abarton@astidavis.com
Secondary: bhernandez@astidavis.com

By: */s/ Edward M. Mullins*
　　　　Edward M. Mullins
　　　　Florida Bar No. 863920
　　　　Ana M. Barton
　　　　Florida Bar No.: 85721
　　　　*Counsel for Defendants Werner Batista,*
　　　　*Centennial Asset Mining Fund,*
　　　　*Centennial Asset Brazilian Equity Fund,*
　　　　*63X Master Fund, 63X Investment Ltd.,*
　　　　*and 63X Fund*

　　　　Michael Carlinsky*
　　　　Bar No. 2319440
　　　　michaelcarlinsky@quinnemanuel.com
　　　　Elinor Sutton*
　　　　Bar No. 4615175
　　　　elinorsutton@quinnemanuel.com
　　　　Victor Noskov*
　　　　Bar No. 5087689
　　　　victornoskov@quinnemanuel.com
　　　　**QUINN EMANUEL URQUHART**
　　　　**& SULLIVAN, LLP**
　　　　51 Madison Avenue, 22nd Floor
　　　　New York, NY  10010
　　　　Telephone: (212) 849-7000
　　　　Facsimile: (212) 849-7100
　　　　*Admitted Pro hac vice

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Complex Business Litigation Rule 4.3, counsel for Movants hereby certifies that the undersigned has conferred with counsel for Plaintiffs, Hendrik G. Milne, by email on April 5, 2017, and counsel for Plaintiffs advised that his clients oppose the relief requested herein.

*/s/ Edward M. Mullins*
Edward M. Mullins

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2017, a true and correct copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal, which sent e-mail notification of such filing to all counsel of record in accordance with Fla. R. Jud. Admin 2.516.

*/s/ Edward M. Mullins*
Edward M. Mullins

# EXHIBIT A

**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.**
**as Issuer**

**OGX PETRÓLEO E GÁS LTDA.**
**and**
**OGX CAMPOS PETRÓLEO E GÁS S.A.**
**as Guarantors**

**DEUTSCHE BANK TRUST COMPANY AMERICAS**
**as Trustee, Registrar, Transfer Agent**
**and Paying Agent**

**and**

**THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.**
**as Principal Paying Agent**

———————————

**INDENTURE**

**Dated as of June 3, 2011**

———————————

**U.S.$2,563,000,000**
**8.500% SENIOR NOTES DUE 2018**

## TABLE OF CONTENTS

Page

Article 1 Definitions and Incorporation by Reference ............................................. 1

SECTION 1.01     Definitions.............................................................................................1
SECTION 1.02     Incorporation by Reference of Trust Indenture Act.............................25
SECTION 1.03     Rules of Construction ..........................................................................26

Article 2 The Securities ......................................................................................... 27

SECTION 2.01     Form and Dating ...................................................................................27
SECTION 2.02     Execution and Authentication ..............................................................27
SECTION 2.03     Registrar and Paying Agent .................................................................28
SECTION 2.04     Paying Agent To Hold Money in Trust ...............................................28
SECTION 2.05     Securityholder Lists ..............................................................................29
SECTION 2.06     Transfer and Exchange .........................................................................29
SECTION 2.07     Replacement Securities ........................................................................30
SECTION 2.08     Outstanding Securities .........................................................................30
SECTION 2.09     Temporary Securities ...........................................................................31
SECTION 2.10     Cancellation ..........................................................................................31
SECTION 2.11     CUSIP Numbers and ISINs .................................................................31
SECTION 2.12     Issuance of Additional Securities.........................................................31
SECTION 2.13     Open Market Purchases .......................................................................32

Article 3 Optional Redemption of Securities .......................................................... 32

SECTION 3.01     Optional Redemption ...........................................................................32
SECTION 3.02     Notice of Redemption ..........................................................................32
SECTION 3.03     Selection of Securities to Be Redeemed in Part...................................33
SECTION 3.04     Securities Payable on Redemption Date ..............................................34
SECTION 3.05     Unredeemed Portions of Partially Redeemed Security.........................34
SECTION 3.06     Third Party Notice ................................................................................34

Article 4 Covenants ............................................................................................... 34

SECTION 4.01     Performance of Obligations under the Securities .................................34
SECTION 4.02     Reports ..................................................................................................35
SECTION 4.03     Limitation on Debt and Disqualified Stock .........................................36
SECTION 4.04     Limitation on Restricted Payments.......................................................40
SECTION 4.05     [Reserved].............................................................................................44
SECTION 4.06     Limitation on Sales of Assets ..............................................................44

SECTION 4.07    Limitation on Transactions with Affiliates ...................................................47

SECTION 4.08    Repurchases at the Option of the Holders Upon Change of Control Offer ...................................................49

SECTION 4.09    Limitation on Liens...................................................51

SECTION 4.10    Limitation on Sale and Leaseback Transactions.............................51

SECTION 4.11    Maintenance of Corporate Existence ...........................................51

SECTION 4.12    Maintenance of Properties ...................................................51

SECTION 4.13    Limitation on Guarantees of Debt by Restricted Subsidiaries.........................52

SECTION 4.14    [Reserved]...................................................52

SECTION 4.15    [Reserved] ...................................................52

SECTION 4.16    [Reserved] ...................................................52

SECTION 4.17    [Reserved] ...................................................52

SECTION 4.18    Maintenance of Office or Agency in the State of New York ....................53

SECTION 4.19    [Reserved] ...................................................53

SECTION 4.20    [Reserved]...................................................53

SECTION 4.21    Additional Amounts ...................................................53

SECTION 4.22    Payments and Paying Agent ...................................................55

SECTION 4.23    [Reserved] ...................................................56

SECTION 4.24    Limitation on Designation of Unrestricted Subsidiaries............................56

SECTION 4.25    Ranking ...................................................56

Article 5 Consolidation, Merger, or Sale of Substantially All Assets      57

SECTION 5.01    Consolidation, Merger, or Sale of Substantially All Assets .........................57

Article 6 Defaults and Remedies      58

SECTION 6.01    Events of Default. ...................................................58

SECTION 6.02    Acceleration ...................................................60

SECTION 6.03    Other Remedies...................................................60

SECTION 6.04    Rescission/Annulment of Acceleration; Waiver of Past Defaults ..................60

SECTION 6.05    Control by Majority ...................................................61

SECTION 6.06    Limitation on Suits...................................................61

SECTION 6.07    Rights of Holders to Receive Payment ...........................................62

SECTION 6.08    Collection Suit by Trustee ...................................................62

SECTION 6.09    Trustee May File Proofs of Claim ...................................................62

SECTION 6.10    Priorities...................................................62

SECTION 6.11    Undertaking for Costs ...................................................63

SECTION 6.12    Waiver of Stay or Extension Laws ...................................................63

Article 7 Trustee                                                                                   63

SECTION 7.01   Duties of Trustee...........................................................................63
SECTION 7.02   Rights of Trustee...........................................................................64
SECTION 7.03   Individual Rights of Trustee. ........................................................65
SECTION 7.04   Trustee's Disclaimer. .....................................................................65
SECTION 7.05   Notice of Defaults. .........................................................................66
SECTION 7.06   Compensation and Indemnity. .......................................................66
SECTION 7.07   Replacement of Trustee. ................................................................67
SECTION 7.08   Successor Trustee by Merger. ........................................................68
SECTION 7.09   Eligibility; Disqualification. ..........................................................68
SECTION 7.10   Preferential Collection of Claims Against Issuer............................68
SECTION 7.11   Appointment of Co-Trustee. ..........................................................69

Article 8 Discharge of Indenture; Defeasance                                                        70

SECTION 8.01   Satisfaction and Discharge of Liability on Securities.....................70
SECTION 8.02   [Reserved]. .....................................................................................71
SECTION 8.03   [Reserved]. .....................................................................................71
SECTION 8.04   Application of Trust Money............................................................71
SECTION 8.05   Repayment to Company. ................................................................71
SECTION 8.06   Defeasance .....................................................................................71
SECTION 8.07   Reinstatement.................................................................................72

Article 9 Amendments                                                                                72

SECTION 9.01   Without Consent of Holders ..........................................................72
SECTION 9.02   With Consent of Holders ...............................................................73
SECTION 9.03   Revocation and Effect of Consents and Waivers............................74
SECTION 9.04   Notation on or Exchange of Securities ...........................................75
SECTION 9.05   Trustee to Sign Amendments.........................................................75

Article 10 Substitution of the Issuer                                                               75

SECTION 10.01   Substitution of the Issuer ............................................................75
SECTION 10.02   Deemed Substitution...................................................................76
SECTION 10.03   Notice of Substitution .................................................................77

Article 11 Guarantee by the Guarantors                                                              77

SECTION 11.01   Guarantee ....................................................................................77
SECTION 11.02   Guarantee Unconditional ............................................................77

SECTION 11.03   Termination, Release and Discharge; Reinstatement ......................................78
SECTION 11.04   Waiver by the Guarantors ...............................................................................79
SECTION 11.05   Subrogation and Contribution .........................................................................79
SECTION 11.06   Stay of Acceleration.........................................................................................79
SECTION 11.07   Execution and Delivery of Guarantee .............................................................79
SECTION 11.08   Purpose of Guarantee ......................................................................................79
SECTION 11.09   Central Bank Regulations ...............................................................................79

Article 12 Release of Covenants                                                              80

SECTION 12.01   Release of Covenants.......................................................................................80

Article 13 Miscellaneous                                                                      81

SECTION 13.01   Notices .............................................................................................................81
SECTION 13.02   Communication by Holders with Other Holders .............................................83
SECTION 13.03   Certificate and Opinion as to Conditions Precedent .......................................83
SECTION 13.04   Statements Required in Certificate or Opinion ...............................................83
SECTION 13.05   When Securities Disregarded ..........................................................................83
SECTION 13.06   Rules by Trustee, Paying Agent and Registrar ...............................................84
SECTION 13.07   Business Days ..................................................................................................84
SECTION 13.08   Governing Law.................................................................................................84
SECTION 13.09   No Recourse Against Others............................................................................84
SECTION 13.10   Successors ........................................................................................................84
SECTION 13.11   Multiple Originals ............................................................................................84
SECTION 13.12   Table of Contents; Headings............................................................................85
SECTION 13.13   Consent to Jurisdiction; Appointment of Agent to Accept Service of
                Process; Currency Indemnity ...........................................................................85
SECTION 13.14   Waiver of Jury Trial.........................................................................................86
SECTION 13.15   Patriot Act ........................................................................................................87
SECTION 13.16   Force Majeure ..................................................................................................87

Rule 144A/Regulation S Appendix I

Exhibit 1 to Rule 144A/Regulation S Appendix
Form of Initial Security

Exhibit 2 to Rule 144A/Regulation S Appendix
Form of Regulation S Transfer Certificate

Exhibit 3 to Rule 144A/Regulation S Appendix
Form of Rule 144A Transfer Certificate

OGX Netherlands Substitution Appendix II

INDENTURE dated as of June 3, 2011 among OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A., a corporation (*sociedade anônima*) organized under the laws of the Federative Republic of Brazil, as issuer (the "Company"), OGX CAMPOS PETRÓLEO E GÁS S.A, a corporation (*sociedade anônima*) organized under the laws of the Federative Republic of Brazil, as a guarantor ("OGX Campos"), OGX PETRÓLEO E GÁS LTDA., a limited liability company (*sociedade limitada*) organized under the laws of the Federative Republic of Brazil, as a guarantor ("OGX Ltda", and, together with OGX Campos., the "Guarantors"), DEUTSCHE BANK TRUST COMPANY AMERICAS, a New York banking corporation, as trustee (in such capacity, the "Trustee"), registrar, paying agent and transfer agent, and THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., as principal paying agent (the "Principal Paying Agent").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as defined below) of the Company's U.S.$2,563,000,000 aggregate principal amount of 8.500% Senior Notes due 2018 (the "Initial Securities"), and any Additional Securities (as defined below):

Article 1

Definitions and Incorporation by Reference

SECTION 1.01     Definitions.

"Acquired Debt" means Debt of a Person existing at the time the Person merges with or into or becomes a Restricted Subsidiary and not Incurred in connection with, or in contemplation of, the Person merging with or into or becoming a Restricted Subsidiary.

"Additional Amounts" has the meaning set forth under Section 4.21.

"Additional Assets" means (i) any property or assets (including Capital Stock or its substantial equivalent or other Investments) that are used or usable by the Company, any of its Restricted Subsidiaries or any joint venture in which the Company or any of its Restricted Subsidiaries is a party in a Permitted Business (or in the case of Capital Stock or its substantial equivalent or other Investments that represent direct, or indirect (via a holding company), ownership or other interests held by the Company or any Restricted Subsidiary in entities engaged in a Permitted Business); and (ii) contracts (including supply, customer and EPC contracts) that are used or usable by the Company, any of its Restricted Subsidiaries or any joint venture in which the Company or any of its Restricted Subsidiaries is a party in a Permitted Business.

"Additional Securities" means 8.500% Senior Notes due 2018, having identical terms and conditions as the Securities (other than the date on which the initial interest accrues from), issued from time to time after the Issue Date under the terms of this Indenture (other than pursuant to Section 2.06, 2.07, or 2.09 of this Indenture).

"Affiliate" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any subsidiary of such specified Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means the Registrar, the Transfer Agent, a Paying Agent, any exchange agent and any listing agent.

"Asset Sale" means any sale, lease, transfer or other disposition (whether in a single transaction or a series of related transactions) of any assets by the Company or any Restricted Subsidiary, including by means of a merger, consolidation or similar transaction or a Sale and Leaseback Transaction and including any sale or issuance of the Equity Interests of any Restricted Subsidiary (each of the above referred to as a "disposition"), *provided* that the following are not included in the definition of "Asset Sale":

(1)     a disposition to the Company or a Restricted Subsidiary, including the sale or issuance by the Company or any Restricted Subsidiary of any Equity Interests of any Restricted Subsidiary to the Company or any Restricted Subsidiary;

(2)     the sale, lease, transfer or other disposition by the Company or any Restricted Subsidiary in the ordinary course of business of (i) cash, Cash Equivalents and Marketable Securities, (ii) inventory, (iii) damaged, worn out or obsolete equipment or other assets, or (iv) rights granted to others pursuant to leases or licenses;

(3)     the lease of assets by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(4)     any sale, lease, transfer, transfer or other disposition of any property or concession to any governmental authority;

(5)     the sale or discount of accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

(6)     a transaction covered by Section 5.01;

(7)     a Restricted Payment permitted under Section 4.04;

(8)     a Sale and Leaseback Transaction otherwise permitted under Section 4.10;

(9)     any issuance of Disqualified Stock otherwise permitted under Section 4.03;

(10)    the creation of a Lien not prohibited by this Indenture (but not the sale or disposition of the property subject to such Lien);

(11)    the licensing or sublicensing of intellectual property or other general intangibles, including, without limitation, licenses for seismic data, in the ordinary course of business and which do not materially interfere with the business of the Company and its Restricted Subsidiaries;

(12)    the sale or other disposition of Cash Equivalents;

(13)    the sale or discount of receivables arising in the ordinary course of business in connection with the compromise or collection thereof;

(14)    any surrender or waiver of contract rights pursuant to a settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(15)    a disposition of hydrocarbons or mineral products inventory in the ordinary course of business;

(16)    the farm-out, lease or sublease of developed or undeveloped oil and natural gas properties or license or concession to explore or produce oil and natural gas owned or held by the Company or any Restricted Subsidiary in exchange for either (i) oil and natural gas properties or license or concession to explore or produce oil and natural gas owned or held by another Person or (ii) the assumption by the other Person of any expenditures to explore or produce oil and natural gas in the oil and natural gas properties or license or concession;

(17)    any Production Payments and Reserve Sales; *provided* that any such Production Payments and Reserve Sales, other than incentive compensation programs on terms that are reasonably customary in the Permitted Business for geologists, geophysicists and other providers of technical services to the Company or a Restricted Subsidiary, shall have been created, Incurred, issued, assumed or guaranteed in connection with the financing of, and within 60 days after the acquisition of, the property that is subject thereto; and

(18)    any disposition of an asset or a series of related dispositions of assets with an aggregate Fair Market Value not to exceed the greater of (i) U.S.$100,000,000 and (ii) 1.25% of Consolidated Total Assets.

"Asset Sale Offer" has the meaning set forth under Section 4.06(a)(5).

"Attributable Debt" means, in respect of a Sale and Leaseback Transaction the present value, discounted at the interest rate implicit in the Sale and Leaseback Transaction, of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction.

3

"Average Life" means, with respect to any Debt, the quotient obtained by dividing (i) the sum of the products of (x) the number of years from the date of determination to the dates of each successive scheduled principal payment of such Debt and (y) the amount of such principal payment by (ii) the sum of all such principal payments.

"Board of Directors" means, with respect to any Person, the board of directors or similar governing body of such Person or any duly authorized committee thereof.

"Brazil" means The Federative Republic of Brazil.

"Business Day" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in the City of New York and/or São Paulo.

"Capital Lease Obligation" means, with respect to any Person, any obligation which is required to be classified and accounted for as a capital lease on the face of a balance sheet of such person prepared in accordance with GAAP; the amount of such obligation will be the capitalized amount thereof, determined in accordance with GAAP; and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"Capital Stock" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any Preferred Stock, but excluding any debt securities convertible into or exchangeable for such equity.

"Cash Equivalents" means:

(1)     Brazilian *reais*, Colombian pesos, U.S. dollars, or money in other currencies received in the ordinary course of business that are readily convertible into U.S. dollars;

(2)     any evidence of Debt with a maturity of one year or less issued or directly and fully guaranteed or insured by Brazil, Colombia or the United States or any agency or instrumentality thereof, *provided* that the full faith and credit of Brazil, Colombia or the United States is pledged in support thereof;

(3)     (i) demand deposits, (ii) time deposits and certificates of deposit with maturities of one year or less from the date of acquisition, (iii) bankers' acceptances with maturities not exceeding one year from the date of acquisition, and (iv) overnight bank deposits, in each case with any bank or trust company organized or licensed under the laws of Brazil, Colombia or any political subdivision thereof or the United States or any state thereof having capital, surplus and undivided profits in excess of U.S.$500,000,000 whose long-term debt is rated "A-2" or higher by S&P or "P-2" or higher by Moody's (or the equivalent local rating);

4

(4)      repurchase obligations with a term of not more than seven days for underlying securities of the type described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)      commercial paper rated at least P-1 by Moody's or A-1 by S&P (or the equivalent local rating) and maturing no later than one year after the date of acquisition; and

(6)      money market funds at least 95% of the assets of which consist of investments of the type described in clauses (1) through (5) above.

"Change of Control" means:

(1)      the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)) other than to one or more of the Permitted Holders;

(2)      (i) if a Person (other than a Permitted Holder) beneficially owns, directly or indirectly, more than 35% of the outstanding Voting Stock of the Company, measured by voting power rather than number of shares and (ii) a Permitted Holder beneficially owns, directly or indirectly, outstanding Voting Stock of the Company less than such Person; or

(3)      the adoption of a plan or proposal for the liquidation or dissolution of the Company.

"Change of Control Offer" means an offer made by the Company or a third party so designated, following the occurrence of a Change of Control that results in a Rating Decline, to each Holder to repurchase all or any part of such Holder's Securities pursuant to Section 4.08.

"Change of Control Payment" means, in connection with the repurchase of a Holder's Securities pursuant to a Change of Control Offer, the payment by the Company or a third party so designated of 101% of the aggregate principal amount of such Holder's Securities repurchased plus accrued interest and Additional Amounts, if any, on such Securities, to the date of purchase (subject to the right of the Holders of record on the relevant record date to receive interest and Additional Amounts, if any, on the relevant interest payment date).

"Change of Control Payment Date" means the purchase date for the Securities properly tendered in a Change of Control Offer as specified in the notice given by the Company or a third party so designated pursuant to Section 4.08, which date is not more than five Business Days after the Expiration Date.

"Colombia" means the Republic of Colombia.

5

"Company" means OGX Petróleo e Gás Participações S.A., named as such in this Indenture, excluding its Subsidiaries, until a successor replaces it and, thereafter, means the successor.

"Consolidated Net Income" means, for any period, the aggregate net income (or loss) of the Company and its Restricted Subsidiaries for such period determined on a consolidated basis in conformity with GAAP.

"Consolidated Net Total Assets" means Consolidated Total Assets less cash and Cash Equivalents.

"Consolidated Total Assets" means the total amount of assets of the Company and its Restricted Subsidiaries on a consolidated basis calculated (i) based on the most recent balance sheet for which internal financial statements are available, (ii) in accordance with GAAP, (iii) on a pro forma basis to give effect to any acquisition or disposition of companies, divisions, lines of businesses or operations by the Company and its Restricted Subsidiaries subsequent to such date and on or prior to the date of determination and (iv) on a pro forma basis to give effect to any debt or equity issuances by the Company.

"Corporate Trust Office" means the principal office of the Trustee in New York City, New York, which on the Issue Date is 60 Wall Street, Mailstop NYC60-2710, New York, NY 10005, attention: Trust & Securities Services, Corporates Team Deal Manager - OGX, or such other office at such address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (at such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"Credit Facilities" means, one or more debt facilities or commercial paper facilities, in each case with banks, investment banks, insurance companies, mutual funds and/or other institutional lenders providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from (or sell receivables to) such lenders against such receivables) or letters of credit, in each case, as amended, extended, restated, renewed, refunded, replaced (whether contemporaneously or otherwise) or refinanced (in each case with Credit Facilities), supplemented or otherwise modified (in whole or in part and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time.

"CVM" means the Brazilian Securities Commission, or *Comissão de Valores Mobiliários*.

"Debt" means, with respect to any Person, without duplication:

(1)      the principal of and premium, if any, in respect of (a) indebtedness of such Person for money borrowed and (b) indebtedness evidenced by notes, debentures, notes or other similar instruments for the payment of which such person is responsible or liable;

(2)      all Capital Lease Obligations of such person;

(3)      all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable or other short-term obligations to suppliers payable within 180 days, in each case arising in the ordinary course of business);

(4)      all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(5)      all obligations of the type referred to in clauses (1) through (4) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any guarantee (other than obligations of other persons that are customers or suppliers of such person for which such person is or becomes so responsible or liable in the ordinary course of business to (but only to) the extent that such person does not, or is not required to, make payment in respect thereof);

(6)      all obligations of the type referred to in clauses (1) through (4) of other persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured;

(7)      all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock of such Person or, with respect to any Preferred Stock of any Subsidiary of such Person that is not held by such Person or a Restricted Subsidiary of such Person, the greater of the maximum liquidation value of such Preferred Stock or the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock (but excluding, in each case, any accrued dividends); and

(8)      any other obligations of such Person which are required to be, or are in such Person's financial statements, recorded or treated as debt under GAAP;

*provided* that (other than Disqualified Stock) the foregoing debt shall be included in this

7

definition of Debt only if, and to the extent that, the debt would appear as a liability on a balance sheet of such Person or in the notes to the financial statements in accordance with GAAP.

Notwithstanding the foregoing, the term "Debt" shall not include:

(1)     any leases or rentals of equipment related to exploration, production and commercialization activities, including without limitation, leases or rentals of or related to drilling rigs, supply boats, crude oil and LNG carriers, FPSOs (floating production storage and offloading), WHPs (wellhead platforms), TLWPs (tension leg wellhead platforms) and any other equipments or other assets, provided that such leases or rentals do not include a purchase option;

(2)     in connection with the purchase by the Company or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing;

(3)     Production Payments and Reserve Sales;

(4)     any obligations to customers, suppliers or service providers in the ordinary course of business with a maturity less than 90 days;

(5)     any obligation of a Person in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property;

(6)     any obligations under Hedging Agreements; *provided*, that such agreements are entered into for bona fide hedging purposes of the Company or its Restricted Subsidiaries (as determined in good faith by the Board of Directors or senior management of the Company, whether or not accounted for as a hedge in accordance with GAAP) and, in the case of currency hedging agreements or commodity hedging agreements, such agreements are related to business transactions of the Company or its Restricted Subsidiaries entered into in the ordinary course of business and, in the case of interest rate hedging agreements, such agreements substantially correspond in terms of notional amount, duration and interest rates, as applicable, to the Debt of the Company or its Restricted Subsidiaries Incurred without violation of this Indenture;

(7)     any obligation arising from agreements of the Company or a Restricted

8

Subsidiary providing for indemnification, guarantees or letters of credit, surety bonds or performance bonds, adjustment of purchase price, holdbacks, contingency payment obligations or similar obligations (other than guarantees of Debt), in each case, Incurred or assumed in connection with the acquisition or disposition of any business, assets or Capital Stock of a Restricted Subsidiary, provided that such Debt is not reflected on the face of the balance sheet of the Company or any Restricted Subsidiary;

(8)      any obligation arising from the honoring by a bank or other financial institution of a check, draft or similar instrument (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, provided, however, that such Debt is extinguished within five business days of Incurrence;

(9)      in-kind obligations relating to net oil or natural gas balancing positions arising in the ordinary course of business; and

(10)     all contracts and other obligations, agreements, instruments or arrangements described in clauses (18), (19), (20), and (21) of the definition of "Permitted Liens".

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Depositary" means, with respect to the Securities issuable or issued in whole or in part in the form of one or more Global Securities, the Person designated in Section 2.03 hereof as Depositary by the Company pursuant to this Indenture, until a successor shall have been appointed and become such and, thereafter, "Depositary" shall mean or include such Person.

"Designation" has the meanings set forth under Section 4.24.

"Disqualified Equity Interests" means Equity Interests that by their terms or upon the happening of any event are:

(1)      required to be redeemed or redeemable at the option of the holder prior to the Stated Maturity of the Securities for consideration other than Qualified Equity Interests, or

(2)      convertible at the option of the holder into Disqualified Equity Interests or exchangeable for Debt;

provided, that Equity Interests will not constitute Disqualified Equity Interests solely because of provisions giving holders thereof the right to require repurchase or redemption upon an "asset sale" or "change of control that results in a ratings decline" occurring prior to the Stated Maturity of the Securities if those provisions:

(A)      are no more favorable to the Holders than Section 4.06 and Section 4.08 hereof, and

9

(B)     specifically state that repurchase or redemption pursuant thereto will not be required prior to the Company's repurchase of the Securities as required by this Indenture.

"<u>Disqualified Stock</u>" means Capital Stock constituting Disqualified Equity Interests.

"<u>DTC</u>" means the Depository Trust Company.

"<u>EBITDA</u>" means, for any period:

(1)     consolidated net revenue; *minus*

(2)     consolidated costs; *minus*

(3)     consolidated administrative and selling expenses; *plus*

(4)     consolidated other operating income, net and non-operating income, net; *provided* that this clause (4) shall exclude interest income, net; *plus*

(5)     any depreciation, depletion or amortization;

as each such item is reported on the most recent consolidated financial statements delivered by the Company to the Trustee and prepared in accordance with GAAP.

"<u>EBITDA Triggering Event</u>" means when the Company has reported on a consolidated basis at least U.S.$100,000,000 of EBITDA during any fiscal quarter or consecutive fiscal quarters (but not to exceed any four consecutive quarters) for which financial statements are available.

"<u>Equity Interests</u>" means all Capital Stock and all warrants or options with respect to, or other rights to purchase, Capital Stock, but excluding Debt convertible into equity.

"<u>Event of Default</u>" has the meaning set forth under <u>Section 6.01</u>.

"<u>Excess Proceeds</u>" has the meaning set forth under <u>Section 4.06(a)(5)</u>.

"<u>Exchange Act</u>" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"<u>Expiration Date</u>" has the meaning set forth under <u>Section 4.08(2)(B)</u>.

"<u>Fair Market Value</u>" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Company and, unless specified in the relevant provision of this Indenture, if the Fair Market Value exceeds U.S.$10,000,000, by an officer of the Company, whose determination will be conclusive if evidenced by an Officer's Certificate delivered to the Trustee.

10

"Farm-In Agreement" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property.

"Farm-Out Agreement" means a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"Fitch" means Fitch Ratings Inc. and its successors.

"GAAP" means (i) International Financial Reporting Standards, (ii) accounting practices generally accepted in the United States or (iii) accounting practices prescribed by Brazilian Corporation Law, the rules and regulations issued by the CVM and the accounting standards issued by the Brazilian Institute of Independent Accountants (*Instituto dos Auditores Independentes do Brasil*), in each case as in effect from time to time or on the Issue Date, in the Company's discretion.

"guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (b) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part; *provided*, *however*, that the term "guarantee" does not include endorsements for collection or deposit in the ordinary course of business.  The term "guarantee" used as a verb has a corresponding meaning.

"Guarantors" means:

(1)      OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A.; and

(2)      any other Restricted Subsidiary of the Company that becomes a Guarantor in accordance with the provisions of this Indenture,

and their respective successors and assigns, in each case, until the guarantee of such Person has been released in accordance with the provisions of this Indenture.

"Hedging Agreements" means (i) (a) any interest rate swap agreement, interest rate cap agreement or other agreement designed to protect against fluctuations in interest rates or (b) any foreign exchange forward contract, currency swap agreement or other agreement designed to protect against fluctuations in foreign exchange rates or (ii) any commodity or raw material futures contract or any other agreement designed to protect against fluctuations in raw material prices.

11

"Hedging Obligations" means the obligations of any Person pursuant to Hedging Agreements.

"Holder" or "Securityholder" means the Person in whose name a Security is registered on the Registrar's books.

"Incur" means, with respect to any Debt or Capital Stock, to Incur, create, issue, assume or guarantee such Debt or Capital Stock.  The term "Incurrence" when used as a noun shall have a correlative meaning.  The accretion of original issue discount or payment of interest in kind will not be considered an Incurrence of Debt.

"Indenture" means this Indenture, as it may be amended or supplemented from time to time in accordance with the applicable terms hereof.

"Initial Securities" has the meaning set forth in the preamble to this Indenture.

"Interest Payment Date" means each June 1 and December 1 of each year, commencing on December 1, 2011.

"Investment" means:

(1)     any direct or indirect advance, loan (including guarantees) or other extension of credit to another Person, but excluding (i) any advance, loan or extension of credit to customers in the ordinary course of business and (ii) any advance, loan or extension of credit having a term not exceeding 180 days arising in connection with the sale of inventory, equipment or supplies by that Person in the ordinary course of business,

(2)     any capital contribution to another Person, by means of any transfer of cash or other property or in any other form,

(3)     any purchase or acquisition of Equity Interests, bonds, notes or other Debt, or other instruments or securities issued by another Person, any acquisitions of assets or substantially all the assets of a Person, including the receipt of any of the above as consideration for the disposition of assets or rendering of services, or

(4)     any guarantee of any obligation of another Person.

For purposes of this definition, the term "Person" shall not include the Company or any Restricted Subsidiary or any Person who would become a Restricted Subsidiary as a result of any Investment.  If the Company or any Restricted Subsidiary sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary so that, after giving effect to that sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, all remaining Investments of the Company and the Restricted Subsidiaries in such Person shall be deemed to have been made at such time.

For purposes of Section 4.04, the Company will be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which will be valued at

12

the Fair Market Value of the sum of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Debt of such Unrestricted Subsidiary owed to the Company or any Restricted Subsidiary immediately following such Designation. Any property transferred to or from an Unrestricted Subsidiary will be valued at its Fair Market Value at the time of such transfer.

"Investment Grade Rating" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"Issue Date" means June 3, 2011.

"Issuer" means OGX Petróleo e Gás Participações S.A., named as such in this Indenture, excluding its Subsidiaries, until a successor replaces it and, thereafter, means the successor, or such substituted issuer in accordance with Article 10.

"Lien" means any mortgage, pledge, security interest, conditional sale or other title retention agreement or other similar lien.

"Marketable Securities" means publicly traded debt or equity securities that are listed for trading on a national securities exchange and that were issued by a corporation with debt securities rated at least "AA-" from S&P or "Aa3" from Moody's or the equivalent local rating.

"Maturity Date" means June 1, 2018.

"Minimum Legally Required Dividend" means, for any Brazilian Person and any period, an amount equal to the sum of (a) the minimum dividend required to be distributed under applicable Brazilian law by such Person to holders of its Capital Stock during such period and (b) the minimum dividend required to be distributed to holders of Preferred Stock in such Person during such period so as to avoid such holders from acquiring or maintaining any voting rights under Brazilian law.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds of such Asset Sale in the form of cash or Cash Equivalents (including (i) payments in respect of deferred payment obligations to the extent corresponding to, principal, but not interest, when received in the form of cash, and (ii) proceeds from the conversion of other consideration received when converted to cash), net of:

    (1)    brokerage commissions and other fees and expenses related to such Asset Sale, including fees and expenses of counsel, accountants and investment bankers;

    (2)    provisions for taxes as a result of such Asset Sale taking into account the consolidated results of operations of the Company and its Restricted Subsidiaries;

(3)     payments required to be made to repay Debt (other than revolving credit borrowings) outstanding at the time of such Asset Sale that is secured by a Lien on the property or assets sold; and

(4)     appropriate amounts to be provided as a reserve against liabilities associated with such Asset Sale, including pension and other post-employment benefit liabilities, liabilities related to environmental matters and indemnification obligations associated with such Asset Sale, with any subsequent reduction of the reserve other than by payments made and charged against the reserved amount to be deemed a receipt of cash.

"Net Debt" means, as of any date of determination, the aggregate amount of Debt of the Company and its Restricted Subsidiaries less the sum of consolidated cash and cash equivalents and consolidated marketable securities recorded as current assets in all cases in accordance with GAAP and as set forth in the most recent consolidated balance sheet of the Company.

"Net Debt to EBITDA Ratio" means, on any date (the "transaction date"), the ratio of:

(x)     the aggregate amount of Net Debt at that time to

(y)     EBITDA for the four fiscal quarters immediately prior to the transaction date for which internal financial statements are available (the "reference period").

In making the foregoing calculation,

(1)     pro forma effect will be given to any Debt Incurred (and the application of proceeds thereof) during or after the reference period to the extent the Debt is outstanding or is to be Incurred on the transaction date as if the Debt had been Incurred on the first day of the reference period; and

(2)     pro forma effect will be given to:

(A)     the acquisition or disposition of companies, concessions, Oil and Gas Properties, or businesses by the Company and its Restricted Subsidiaries, including any acquisition or disposition of a company, concessions, Oil and Gas Properties or businesses since the beginning of the reference period by a Person that became a Restricted Subsidiary after the beginning of the reference period, and

(B)     the discontinuation of any discontinued operations that have occurred since the beginning of the reference period as if such events had occurred, and, in the case of any disposition, the proceeds thereof applied, on the first day of the reference period.

To the extent that pro forma effect is to be given to an acquisition or disposition of a company, division or line of business, the pro forma calculation will be (i) based upon the

14

most recent four full fiscal quarters for which the relevant financial information is available and (ii) determined in good faith by the chief financial officer or the treasurer of the Company.

"Non-Recourse Debt" means Debt:

(1)      as to which neither the Company nor any Restricted Subsidiary (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Debt), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender; and

(2)      no default with respect to which would permit upon notice, lapse of time or both any holder of any Debt of the Company or any Restricted Subsidiary to declare a default on such Debt or cause the payment of the Debt to be accelerated or payable prior to its stated maturity.

"Note Guarantee" means the guarantee of the Securities by the Guarantors pursuant to this Indenture.

"Offer Period" means the period for which the Asset Sale Offer remains open, as specified by the Company in its notice delivered pursuant to Section 4.06(c).

"Offering Memorandum" means the offering circular for the Initial Securities, dated May 26, 2011.

"Officer" means with respect to the Company or any Restricted Subsidiary, the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president of the Company or any Restricted Subsidiary, as the case may be.

"Officer's Certificate" means a certificate signed by an Officer of the Company.

"Oil and Gas Properties" means all properties, including without limitation, equity or other ownership interests directly or indirectly therein, and any interests in any concession or license to explore or produce oil and natural gas.

"Opinion of Counsel" means a written opinion of counsel, who may be an employee of or counsel for the Company (except as otherwise provided in this Indenture).

"Outstanding Securities" has the meaning set forth under Section 2.08.

"Paying Agent" means the paying agent or principal paying agent identified in the preamble to this Indenture, until replaced by a successor and, thereafter, means the successor, and any other paying agent appointed by the Company to act as such.

"Permitted Business" means any business which is the same as or related, ancillary or complementary to any of the businesses of the Company and its Restricted Subsidiaries on the Issue Date, including without limitation, (1) the acquisition, exploration,

15

development, production, operation and disposition of interests in oil, gas and other hydrocarbon and mineral properties or products produced in association with the foregoing (including without limitation through operating agreements, joint ventures, partnership agreements, technical evaluation agreements working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements or otherwise), and the utilization of the Company's and its Restricted Subsidiaries' properties or rights to explore or produce oil and gas, (2) the gathering, marketing, treating, processing, storage, distribution, refining, selling and transporting of any production from such interests, properties or rights products produced in association therewith and the marketing of oil, gas and other hydrocarbons and minerals obtained from unrelated Persons, (3) any other related energy business, including power generation and electrical transmission business, (4) oil field sales and services and related activities, (5) development, purchase and sale of real estate and interests therein, and (6) any business or activity related to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (1) through (5) of this definition.

"Permitted Business Investment" means any Investment and expenditure made in or assets or properties (including Capital Stock, Debt or any other security or instrument of a Person) related to a Permitted Business, including without limitation, (1) ownership interests in oil, natural gas, other hydrocarbons and minerals properties or gathering, transportation, processing, storage or related systems (with directly or indirectly through any investment vehicle); (2) any operating agreements, joint ventures, partnership agreements, working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements, contracts for the sale, transportation or exchange of oil, natural gas and other hydrocarbons, unitization agreements, pooling arrangements, joint bidding agreements, service contracts, partnership agreements, limited liability company agreements, subscription agreements, stock purchase agreements, stockholder agreements, area of mutual interest agreements, production sharing agreements or other similar or customary agreements, transactions, properties, interests, or arrangements, and Investments and expenditures in connection therewith or pursuant thereto; and (3) direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment.

"Permitted Debt" has the meaning set forth under Section 4.03.

"Permitted Holders" means Mr. Eike Fuhrken Batista and immediate members of his family thereof and any trust, investment vehicle or other Person beneficially owned by any such Persons.

"Permitted Investment" means:

(1)     any Investment in the Company or any Restricted Subsidiary (including, without limitation, in any Debt, other security or instrument thereof);

(2)     any Investment by the Company or any Restricted Subsidiary in another Person if as a result of such Investment such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, or is liquidated into, the Company or a Restricted Subsidiary or becomes a Restricted Subsidiary;

16

(3)     Investments in cash and cash equivalents and marketable securities as determined in accordance with GAAP;

(4)     stocks, obligations or securities received in settlement of (or foreclosure with respect to) debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor;

(5)     any Investment existing on, or made pursuant to a binding commitments existing on or approved by the Board of Directors as of, the Issue Date and any Investment consisting of an extension, modification or renewal of any Investment existing on the Issue Date;

(6)     Investments represented by Hedging Obligations permitted under this Indenture;

(7)     Investments which are made exclusively with Capital Stock of the Company (other than Disqualified Stock);

(8)     any Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were Incurred in the ordinary course of business of the Company or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes with Persons who are not Affiliates;

(9)     any acquisition and holding of (a) federal, state and municipal tax credits acquired solely to pay amounts owed by the Company or any Restricted Subsidiary to tax authorities and (b) discounted obligations of any governmental authority acquired solely to pay tax amounts owed by the Company or any Restricted Subsidiary to such governmental authority;

(10)     Investments made as a result of the receipt of non-cash consideration from an Asset Sale that was made in compliance with Section 4.06;

(11)     receivables owing to the Company or any of its Restricted Subsidiaries, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; provided, that such trade terms may include such trade terms as the Company or such Restricted Subsidiary deems reasonable under the circumstances;

(12)     surety and performance bonds and workers' compensation, utility, lease, tax, performance and similar deposits and prepaid expenses in the ordinary course of business;

(13)     prepayments and other credits to suppliers made in the ordinary course of business;

(14)     loans and advances pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business;

(15)     Investments in connection with pledges, deposits, payments or performance bonds made or given in the ordinary course of business in connection with or to secure statutory, regulatory or similar obligations, including obligations under health, safety or environmental obligations;

(16)     any Investment acquired from a Person which is merged with or into the Company or any of its Restricted Subsidiaries, or any Investment of any Person existing at the time such Person becomes a Restricted Subsidiary of the Company and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction;

(17)     guarantees by the Company or any Restricted Subsidiary of operating leases, in each case entered into by the Company or any Restricted Subsidiary in the ordinary course of business;

(18)     guarantees of performance or other obligations arising in the ordinary course in the Permitted Business, including obligations under oil and natural gas exploration, development, joint operating, and related agreements and licenses, concessions or operating leases related to the Permitted Business;

(19)     payroll, commission, travel, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(20)     loans or grants in respect of community development projects made in the ordinary course of business customary in the Permitted Business as appropriate for the Company's regions of operations and consistent with past practice or counterparty requirement;

(21)     Investments in the Capital Stock of any Person other than a Restricted Subsidiary of the Company that are required to be held pursuant to an involuntary governmental order of consideration, nationalization, seizure or expropriation or other similar order with respect to Capital Stock of such Person (prior to which order such Person was a Subsidiary of the Company);

(22)     Investments in marketable securities or instruments to fund the Company's or its Restricted Subsidiary's pension and other employee-related obligations pursuant to compensation arrangements approved by the Board of Directors or senior management of the Company;

(23)     Investments made pursuant to a commitment that, when entered into, would have complied with the provisions of this Indenture;

(24)     loans or advances made to, or guarantees with respect to loans or advances made to, directors, officers or employees of the Company or any Restricted Subsidiary in respect of travel, entertainment or moving related expense Incurred in the ordinary course of business; in respect of moving related expenses Incurred in connection with any closing or consolidation or any facility or office; or in the ordinary course of business;

(25)    repurchases of the Securities and related guarantees;

(26)    any Permitted Business Investment;

(27)    advances made to customers, clients, distributors, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business; and

(28)    additional Investments by the Company or any of its Restricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (28) that are at the time outstanding, not to exceed the greater of (i) U.S.$100,000,000 and (ii) 1.25% of Consolidated Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value).

"Permitted Liens" means:

(1)    any Lien in existence on the Issue Date and any extension, renewal or replacement thereof or of any Lien in clause (6), (7) or (8) below; provided, however, that the total amount of Debt so secured is not increased as a result thereof plus any fees and expenses in connection with such extension, renewal or replacement and the Lien shall be limited to all or part of the same property that secured the original Lien (together with improvements and accessions to such property);

(2)    Liens securing Debt owed by any Restricted Subsidiary of the Company solely to the Company or one or more Restricted Subsidiaries and/or by the Company to one or more such Restricted Subsidiaries;

(3)    Liens or deposits to secure judgments, in each case not giving rise to an Event of Default, so long as any appropriate legal proceedings which may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(4)    Liens encumbering goods and documents of title with respect to such goods and arising in the ordinary course of business in connection with the issue of documentary letters of credit, and Liens arising out of title retention provisions in a supplier's standard condition of supply of goods acquired in the ordinary course of business;

(5)    Liens on the inventory or receivables, including without limitation any future oil and natural gas production, of the Company or any Restricted Subsidiary securing the obligations of such Person; provided that the aggregate amount of receivables securing Debt shall not exceed 80% of the Company's aggregate outstanding receivables from time to time;

(6)    any Lien on any property or assets (including Capital Stock of any person) securing Debt Incurred solely for purposes of financing the acquisition, construction or improvement of such property or assets after the Issue Date; provided, that (a) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the cost

19

(i.e., purchase price) of the property or assets so acquired, constructed or improved and (b) the Lien is Incurred before, or within 365 days after the completion of, such acquisition, construction or improvement and does not encumber any other property or assets of the Company or any Restricted Subsidiary; and provided, further, that to the extent that the property or asset acquired is Capital Stock, the Lien also may encumber other property or assets of the person so acquired;

(7)     any Lien securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project (other than projects related to the Waimea Complex or Waikiki Complex); provided, that the Liens in respect of such Debt are limited to assets (including Capital Stock of the project entity) and/or revenues of such project; provided, further, that the Lien is Incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other property or assets of the Company or any Restricted Subsidiary;

(8)     any Lien existing on any property or assets of any person before that person's acquisition (in whole or in part) by, merger into or consolidation with the Company or any Restricted Subsidiary after the date of this Indenture; provided, that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation;

(9)     any Lien imposed by law that was Incurred in the ordinary course of business, including, without limitation, carriers', warehousemen's and mechanics' liens and other similar encumbrances arising in the ordinary course of business, in each case for sums that are not more than 60 days past due or are being contested in good faith by appropriate proceedings;

(10)     pledges or deposits in connection with workers' compensation laws, unemployment insurance laws or similar legislation, or good faith deposits, letters of credit and performance, bid, surety, appeal or similar bonds in connection with bids, tenders, contracts (other than for the payment of Debt) or leases to which the Company or any of its Restricted Subsidiaries is a party, or deposits for the payment of rent, or deposits to secure public or statutory obligations or for contested taxes or import or customs duties, in each case Incurred in the ordinary course of business;

(11)     any Lien in favor of the issuer of surety bonds or letters of credit issued pursuant to the request of and for the account of the Company or any Subsidiary in the ordinary course of business;

(12)     any Lien securing taxes, assessments and other governmental charges, the payment of which are not more than 60 days past due or are being contested in good faith by appropriate proceedings and for which reserves or other appropriate provisions, if any, have been established as required by GAAP;

(13)     minor defects, easements, rights-of-way, restrictions and other similar encumbrances Incurred in the ordinary course of business and encumbrances consisting of municipal or zoning restrictions, licenses, restrictions on the use of property or assets or minor imperfections in title that do not materially impair the value or use of the property or assets

20

affected thereby, and any leases and subleases of real property that do not interfere with the ordinary conduct of the business of the Company or any Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(14)     any rights of set-off, netting or similar rights and remedies of any person with respect to any deposit account of the Company or any Subsidiary arising in the ordinary course of business;

(15)     any Lien securing Hedging Agreements so long as such Hedging Agreements are entered into for bona fide, non-speculative purposes;

(16)     any Liens granted to secure borrowings from, directly or indirectly, (A) *Banco Nacional de Desenvolvimento Econômico e Social–BNDES*, or any other governmental development bank or credit agency, including but not limited to *FINEP – Financiadora de Estudos e Projetos*, or (B) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer;

(17)     any Lien on the Capital Stock of an Unrestricted Subsidiary;

(18)     any Lien in respect of Production Payments and Reserve Sales;

(19)     any Lien on pipelines and pipeline facilities that arise by operation of law;

(20)     any Lien arising under joint venture agreements, partnership agreements, oil and gas leases or subleases, assignments, purchase and sale agreements, division orders, contracts for the sale, purchasing, processing, transportation or exchange of oil or natural gas, unitization and pooling declarations and agreements, development agreements, technical evaluation agreements, area of mutual interest agreements, licenses, sublicenses, net profits interests, participation agreements, Farm-Out Agreements, Farm-In Agreements, carried working interest, joint operating, unitization, royalty, sales and similar agreements or arrangements relating to the exploration or development of, or production from, Oil and Gas Properties entered into in the ordinary course of business in a Permitted Business;

(21)     any Lien reserved in oil and gas mineral leases for bonus, royalty or rental payments and for compliance with the terms of such leases;

(22)     any Lien on, or related to, properties or assets to secure all or part of the costs Incurred in the ordinary course of a Permitted Business for exploration, drilling, development, production, processing, transportation, marketing, storage, abandonment or operation; and

(23)     in addition to the foregoing Liens set forth in clauses (1) through (22) above, Liens securing Debt of the Company or any Restricted Subsidiary (including, without limitation, guarantees of the Company or any Restricted Subsidiary) which in aggregate principal amount, at any time of determination, do not exceed the greater of (i) U.S.$1,500,000,000 and (ii) 15.0% of Consolidated Total Assets.

Notwithstanding the foregoing, on or prior to the EBITDA Triggering Event, the Liens described in clauses (5), (16) and (23) shall not secure Debt in an aggregate principal amount exceeding the greater of (i) U.S.$1,000,000,000 and (2) 12.5% of the Consolidated Total Assets.

"Permitted Refinancing Debt" has the meaning set forth under Section 4.03.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"Preferred Stock" means, with respect to any Person, any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"Process Agent" has the meaning set forth for such term in Section 13.13(b).

"Production Payments and Reserve Sales" means the grant or transfer by the Company or a Restricted Subsidiary of the Company to any Person of a royalty, overriding royalty, net profits interest, production payment, partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties, including without limitation any such grants or transfers pursuant to incentive compensation programs on terms that are reasonably customary in the oil and gas business for geologists, geophysicists and other providers of technical services to the Company or a Subsidiary of the Company.

"Property" means (i) any land, buildings, machinery and other improvements and equipment located therein, (ii) any intangible assets, including, without limitation, any brand names, trademarks, copyrights and patents and similar rights and (iii) any income (licensing or otherwise), proceeds of sale or other revenues therefrom.

"Protected Purchaser" means a purchaser of a Security, or of an interest therein, who (a) gives value, (b) does not have notice of any adverse claim to the Security, and (c) obtains control of the Security.

"Purchase Date" means, in relation to an Asset Sale Offer, the date of purchase of Securities (or any portion thereof) specified in the notice given by the Company pursuant to Section 4.06(c) in relation to such offer, which date is not less than 30 days nor more than 60 days after the date of the notice of the Asset Sale Offer.

"Qualified Equity Interests" means all Equity Interests of a Person other than Disqualified Equity Interests.

"Qualified Stock" means all Capital Stock of a Person other than Disqualified Stock.

22

"Rating Agency" means S&P or Moody's; or if S&P or Moody's are not making rating of the Securities publicly available, an internationally recognized U.S. rating agency or agencies, as the case may be, selected by the Company, which will be substituted for S&P or Moody's or both, as the case may be.

"Rating Decline" means that at any time within 90 days (which period shall be extended so long as the rating of the Securities is under publicly announced consideration for possible down grade by either Rating Agency) after the earlier of the date of public notice of a Change of Control and of the Company's intention or that of any Person to effect a Change of Control, (i) in the event the Securities are assigned an Investment Grade Rating by at least two of the Rating Agencies prior to such public notice, the rating of the Securities by at least two of the Rating Agencies shall be below an Investment Grade Rating; or (ii) in the event the Securities are rated below an Investment Grade Rating by at least two of the Rating Agencies prior to such public notice, the rating of the Securities by at least two of the Rating Agencies shall be decreased by one or more categories; *provided*, that, in each case, any such Rating Decline is in whole or in part in connection with a Change in Control.

"*real*", "*reais*" or "R$" means the lawful currency of Brazil.

"Redemption Date" means, with respect to any redemption of Securities, the date fixed for such redemption pursuant to this Indenture and the Securities.

"Registrar" has the meaning set forth under Section 2.03.

"Relevant Date" means, with respect to any payment on a Security, whichever is the later of: (i) the date on which such payment first becomes due; and (ii) if the full amount payable has not been received by the Trustee on or prior to such due date, the date on which notice is given to the Holders that the full amount has been received by the Trustee.  The Securities are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation. Except as specifically provided in this Indenture, neither the Company nor any Guarantor shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein..

"Restricted Payment" has the meaning set forth under Section 4.04.

"Restricted Subsidiary" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"Revocation" has the meaning set forth under Section 4.24.

"S&P" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc. and its successors.

23

"Sale and Leaseback Transaction" means, with respect to any Person, an arrangement whereby such Person enters into a lease of property previously transferred by such Person to the lessor.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities" means the securities issued under this Indenture.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Security Register" means a register of Securities kept at the corporate trust office of the Registrar.

"Significant Subsidiary" of any Person means any Restricted Subsidiary that would be a "significant subsidiary" of such Person within the meaning of Rule 1-02 under Regulation S-X promulgated pursuant to the Securities Act.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"Subordinated Debt" means any Debt of the Company or a Restricted Subsidiary which is subordinated in right of principal payment to the Securities or the Note Guarantee, as applicable, pursuant to a written agreement to that effect.

"Subsidiary" means with respect to any Person, any corporation, limited liability company , partnership, association or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more Subsidiaries of such Person (or a combination thereof).

"Substituted Debtor" has the meaning set forth in Section 10.01.

"TIA" means the Trust Indenture Act of 1939, as amended.

"Transfer Restricted Securities" means Securities that bear or are required to bear the Restricted Securities Legend (as defined in Section 2.1(6) of the Appendix).

"Trust Officer" means any officer in the corporate trust department of the Trustee, including any managing director, director, vice president, assistant vice president, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"United States" means the United States of America.

"Unrestricted Subsidiary" means any Subsidiary of the Company Designated as an Unrestricted Subsidiary pursuant to Section 4.24. Any such Designation may be revoked by a resolution of the Board of Directors of the Company, subject to the provisions of Section 4.24.

"U.S. Bankruptcy Code" means the United States Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 *et seq.*

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States is pledged in support thereof.

"Voting Stock" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Waikiki Complex" means the project located in concessions BM-C-39 and BM-C-40 in the Campos Basin described under the heading "Business–Our Development and Production-Campos Basin Development and Production–Development Plan for Our Existing Discoveries in the Campos Basin-Project 1–Waikiki Complex" of the Offering Memorandum.

"Waimea Complex" means the project located in concession BM-C-41 in the Campos Basin described under the heading "Business–Our Development and Production– Campos Basin Development and Production–Development Plan for Our Existing Discoveries in the Campos Basin–Project 1–Waimea Complex" of the Offering Memorandum.

"Wholly-Owned Subsidiary" means a Restricted Subsidiary of the Company of which at least 95% of the Capital Stock or other ownership interest (other than directors' qualifying shares) is owned by the Company or another Wholly-Owned Subsidiary.

SECTION 1.02    Incorporation by Reference of Trust Indenture Act.  The following TIA terms have the following meanings:

"Commission" means the SEC;

"indenture securities" means the Securities and the Note Guarantee;

"indenture security holder" means a Securityholder;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the Securities and the Note Guarantee, respectively, means the Company and the Guarantors, respectively, and any successor obligor on the Securities and the Note Guarantee, respectively.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.03    <u>Rules of Construction</u>.  Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    "including" means including without limitation;

(5)    words in the singular include the plural and words in the plural include the singular;

(6)    unsecured Debt shall not be deemed to be subordinate or junior to secured Debt merely by virtue of its nature as unsecured Debt;

(7)    the principal amount of any Preferred Stock shall be (a) the maximum liquidation value of such Preferred Stock or (b) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(8)    all references to the date the Initial Securities were originally issued shall refer to the Issue Date;

(9)    unless context requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture;

(10)    unless otherwise stated, any agreement, contract or document defined or referred to herein shall mean such agreement, contract or document and all schedules, exhibits and attachments thereto as in effect as of the date hereof, as the same may thereafter be amended, supplemented or otherwise modified from time to time;

(11)    all references in this Indenture and the Securities to interest in respect of any Security shall be deemed to include all Additional Amounts, if any, in respect of such Security, unless the context otherwise requires, and express mention of the payment of Additional Amounts in any provision hereof or thereof shall not be construed, without more, as excluding reference to Additional Amounts in those provisions hereof or thereof where such express mention is not made; and

26

(12)    all references to amounts denominated in "U.S.$" shall be deemed to be the equivalent thereof in any other currency at the time of determination.

<div align="center">

Article 2

The Securities

</div>

SECTION 2.01    Form and Dating.  Provisions relating to the Securities are set forth in the Rule 144A/Regulation S Appendix attached hereto (the "Appendix") which is hereby incorporated in, and expressly made part of, this Indenture.  The Initial Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit 1 to the Appendix which is hereby incorporated in, and expressly made a part of, this Indenture.  The Securities may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer or the Guarantors is subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer or the Guarantors).  Each Security shall be dated the date of its authentication.  The Securities will be issuable in denominations of U.S.$200,000 in principal amount and any multiple of U.S.$1,000 in excess thereof.  The Securities shall be fully and unconditionally guaranteed by the Guarantors in accordance with Article 11.  The terms of the Initial Securities set forth in the Appendix and Exhibit 1 are part of the terms of this Indenture.

SECTION 2.02    Execution and Authentication.  An Officer of the Issuer shall sign the Securities for the Issuer, and an Officer of each Guarantor shall sign the notation in the Securities relating to the Note Guarantee.  Each such signature may be by manual or facsimile signature of such Officer.

If an Officer whose signature is on a Security no longer holds that office at the time the Trustee authenticates the Security, the Security shall be valid nevertheless.

A Security shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Security.  The signature shall be conclusive evidence that the Security has been authenticated under this Indenture.

On the Issue Date, the Trustee shall authenticate and deliver U.S.$2,563,000,000 aggregate principal amount of 8.500% Senior Notes due 2018 and, at any time and from time to time thereafter, the Trustee shall authenticate and deliver Securities for original issue in an aggregate principal amount specified in such order, in each case upon a written order of the Issuer signed by two Officers of the Issuer.  Such order shall specify the amount of the Securities to be authenticated and the date on which the original issue of Securities is to be authenticated and, in the case of an issuance of Additional Securities pursuant to Section 2.12 after the Issue Date, shall certify that such issuance is in compliance with this Indenture and shall state (i) whether such Additional Securities shall be Transfer Restricted Securities and issued in the form of Initial Securities as set forth in the Appendix to this Indenture and (ii) the initial Interest Payment Date.

<div align="center">27</div>

The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Securities.  Unless limited by the terms of such appointment, an authenticating agent may authenticate Securities whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.  An authenticating agent has the same rights as any Registrar, Paying Agent or agent for service of notices and demands.

SECTION 2.03     Registrar and Paying Agent.  The Issuer shall maintain an office or agency in the Borough of Manhattan, City of New York where Securities may be presented or surrendered for registration of transfer or for exchange (the "Registrar"), where Securities may be presented for payment (the "Paying Agent") and for the service of notices and demands to or upon the Issuer in respect of the Securities and this Indenture.  The Registrar shall keep a register of the Securities and of their transfer and exchange.  The Issuer may have one or more co-registrars and one or more additional paying agents.  The term "Paying Agent" includes any paying agent appointed in this Indenture and any additional paying agent, and the term "Registrar" includes any additional Registrar or co-registrar.

The Issuer shall enter into an appropriate agency agreement with any Registrar, Paying Agent or co-registrar not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such agent.  The Issuer shall notify the Trustee of the name and address of any such agent.  If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06.  The Issuer, the Guarantors or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or transfer agent.

The Issuer initially appoints (i) the Trustee as Registrar, a Paying Agent, and Transfer Agent in connection with the Securities, (ii) the Principal Paying Agent as a Paying Agent and (iii) DTC as Depositary with respect to the Securities.

SECTION 2.04     Paying Agent To Hold Money in Trust.  The Issuer hereby acknowledges and confirms that it is and at all times shall remain absolutely and unconditionally obligated to pay all amounts due and owing by the Issuer hereunder, as the same shall become due and owing.  All payments of principal, premium and interest required to be made by the Issuer hereunder (including any Additional Amounts) shall be made in U.S. dollars, pursuant to the terms hereof, by the-Issuer to a Paying Agent to the extent appointed hereunder or to the Trustee by 12:00 p.m. (New York City time) one Business Day prior to each Interest Payment Date, redemption date, purchase date, Change of Control Payment Date or Maturity Date on any Securities, unless otherwise provided for in this Indenture.  Each Paying Agent shall hold in trust, for the benefit of the Holders or the Trustee, all money held by such Paying Agent for the payment of principal, premium or interest on the Securities.  The Issuer at any time may require each Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it.  Upon complying with this Section 2.04, each Paying Agent shall have no further liability for the money delivered to the Trustee.

The receipt by a Paying Agent or the Trustee from the Issuer of each payment of principal, interest and/or other amounts due in respect of the Securities in the manner specified

28

herein and on the date on which such amount of principal, interest and/or other amounts are then due, shall satisfy the obligations of the Issuer herein and under the Securities to make such payment to the Holders on the due date thereof.

SECTION 2.05    Securityholder Lists.  The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders.  If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee, in writing at least five Business Days before each Interest Payment Date and at such other times as the Trustee may reasonably request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

SECTION 2.06    Transfer and Exchange.  The Securities shall be issued in registered form and shall be transferable only upon the surrender of a Security for registration of transfer.  When a Security is presented to the Registrar or a co-registrar with a request to register a transfer, the Registrar shall register the transfer as requested if the requirements of this Indenture are met and if the transferee certifies to the Issuer and Registrar that: (i) under the terms of the Security, the Person seeking registration of transfer is eligible to have the Security registered in its name, (ii) the indorsement or instruction is made by the appropriate Person or by an agent who has actual authority to act on behalf of the appropriate Person, (iii) reasonable assurance is given that the indorsement or instruction is genuine and authorized, (iv) any applicable law relating to the collection of taxes has been complied with, (v) the transfer does not violate any restriction on transfer imposed by the Issuer, (vi) a demand that the Issuer not register transfer has not become effective (or, if such a demand has become effective, the Issuer has given notice to the Person making such demand stating that (x) registration of transfer of the Security is sought, (y) a demand that the Issuer not register transfer had previously been received and (z) the Issuer shall withhold registration for 10 days from the date of communication of such notice), and (vii) the transfer is in fact rightful or is to a Protected Purchaser.  When Securities are presented to the Registrar or a co-registrar with a request to exchange them for an equal principal amount of Securities of other denominations, the Registrar shall make the exchange as requested if the same requirements are met.  To permit registration of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate and deliver Securities at the Registrar's or co-registrar's request.  The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to this Section 2.06 (other than any such transfer taxes, assessments or similar governmental charge payable upon exchange or transfer pursuant to Section 4.08 and Section 9.04).  The Issuer shall not be required to make and the Registrar need not register transfers or exchanges of Securities selected and delivered for redemption or any Securities for a period of 15 days before an Interest Payment Date.

Prior to the due presentation for registration of transfer of any Security, the Issuer, the Trustee, any Paying Agent, the Registrar or any co-registrar may deem and treat the person in whose name a Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and interest (and Additional Amounts, if any) on such Security and for all other purposes whatsoever, whether or not presentation of such Security is overdue,

and none of the Issuer, the Trustee, any Paying Agent, the Registrar or any co-registrar shall be affected by notice to the contrary.

All Securities issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Securities surrendered upon such transfer or exchange.

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Security (including any transfers between or among participants in DTC or beneficial owners of interests in any Global Security) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.07   Replacement Securities. If (a) any mutilated Security is surrendered to the Issuer, the Registrar, or the Trustee, or (b) the Issuer, the Registrar and the Trustee receive evidence to their satisfaction of the destruction, loss or left of any Security, and, unless otherwise agreed by the Issuer and the Trustee, there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Issuer or the Trustee that such Security has been acquired by a Protected Purchaser, the Issuer shall execute and the Trustee shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Security has become due and payable, or has been called for redemption by the Issuer pursuant to Article 3 of this Indenture, the Issuer in its discretion (but subject to any conversion rights) may, instead of issuing a new Security, pay or redeem such Security, as the case may be.

Upon the issuance of any new Security under this Section 2.07, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expense (including the fees and expenses of the Trustee or the Registrar) in connection therewith.

Every replacement Security is an additional obligation of the Issuer.

The provisions of this Section 2.07 are exclusive and, to the extent lawful, shall preclude all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 2.08   Outstanding Securities.  Securities outstanding at any time ("Outstanding Securities") are all Securities authenticated by the Trustee except for those canceled by it pursuant to Section 2.10 hereof, those delivered to the Trustee for cancellation or

surrendered for transfer or exchange, those reductions in the interest in a Global Security effected by the Trustee in accordance with the provisions hereof and those described in this Section 2.08 as not outstanding.  Except as set forth in Article 9 and Section 13.05, a Security does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Security.

If a Security is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Security is held by a Protected Purchaser.

If any Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal, premium, interest and Additional Amounts (if any) payable on that date with respect to the Securities (or portions thereof) to be redeemed or maturing, as the case may be, then on and after that date, such Securities (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.09    Temporary Securities.  Until definitive Securities are ready for delivery, the Issuer may prepare and execute and the Trustee shall authenticate temporary Securities.  Temporary Securities shall be substantially in the form of definitive Securities but may have variations that the Issuer considers appropriate for temporary Securities.  Without unreasonable delay, the Issuer shall prepare and execute and the Trustee shall authenticate definitive Securities and deliver them in exchange for temporary Securities.

SECTION 2.10    Cancellation.  The Issuer at any time may deliver Securities to the Registrar for cancellation, along with a written notice to the Trustee advising it of the cancellation.  The Registrar shall forward to the Trustee any Securities surrendered to it for registration of transfer, exchange or payment.  The Trustee and no one else shall cancel and dispose of (subject to the record retention requirements of the Exchange Act) all Securities surrendered for registration of transfer, exchange, payment or cancellation in accordance with its procedures for the disposition of canceled securities and deliver a certificate of such disposition to the Issuer unless the Issuer directs the Trustee to deliver canceled Securities to the Issuer.  The Issuer may not issue new Securities to replace Securities it has redeemed, paid or delivered to the Trustee for cancellation.

SECTION 2.11    CUSIP Numbers and ISINs.  The Issuer in issuing the Securities may use "CUSIP" numbers and "ISINs" (if then generally in use) or similar numbers and, if so, the Trustee shall use "CUSIP" numbers, "ISINs" or similar numbers in notices of redemption as a convenience to Holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers.

SECTION 2.12    Issuance of Additional Securities.  The Issuer may, from time to time, subject to compliance with any other applicable provisions of this Indenture, and without

the consent of the Securityholders, create and issue Additional Securities under this Indenture having identical terms in all respects as the Initial Securities except that interest may accrue on the Additional Securities from their date of issuance; *provided, however*, that unless such Additional Securities shall be treated as part of the same "issue" within the meaning of United States Treasury Regulation Section 1.1275-1(f), including as a result of a "qualified reopening" within the meaning of United States Treasury Regulation Section 1.1275-2(k), such Additional Securities shall be issued under a separate CUSIP. The Initial Securities and any Additional Securities issued under this Indenture will be treated as a single class for all purposes under this Indenture and shall vote together as one class on all matters with respect to the Securities.

SECTION 2.13    Open Market Purchases. The Issuer or any of its Affiliates may at any time purchase Securities in the open market or otherwise at any price. Any such purchased Securities shall not be resold, except in compliance with applicable requirements or exemptions under the relevant securities laws.

Article 3

Optional Redemption of Securities

SECTION 3.01    Optional Redemption. The Issuer may redeem the Securities, at its option, as a whole or from time to time in part, subject to the conditions and at the redemption prices specified in paragraph 5 of the Securities.

SECTION 3.02    Notice of Redemption.

(1)     The Issuer shall give or cause the Trustee to give notice of redemption, in the manner provided for in Section 13.01, not less than 30 nor more than 60 days prior to a date for redemption of Securities. If the Issuer itself gives the notice, it shall also deliver a copy to the Trustee and the Principal Paying Agent.

(2)     If either (i) the Issuer is redeeming the Securities in part only, or (ii) the Issuer elects to have the Trustee give notice of redemption, then the Issuer shall deliver to the Trustee, at least five days (or such shorter period as may be agreed to by the Trustee) before notice of redemption is required to be mailed or caused to be mailed to the Holders (unless the Trustee is satisfied with a shorter period), an Officer's Certificate requesting that the Trustee select the Securities to be redeemed and/or give notice of redemption and setting forth the information required by Section 3.02(3). If the Issuer elects to have the Trustee give notice of redemption, the Trustee shall give the notice in the name of the Issuer and at the Issuer's expense.

(3)     All notices of redemption shall state:

(A)     the Redemption Date;

32

(B)     the redemption price and the amount of any accrued interest payable as provided in Section 3.05 (or the calculation of such redemption price);

(C)     whether or not the Issuer is redeeming all Outstanding Securities;

(D)     if the Issuer is not redeeming all Outstanding Securities, the aggregate principal amount of Securities that the Issuer is redeeming and the aggregate principal amount of Securities that shall be Outstanding Securities after the partial redemption;

(E)     if the Issuer is redeeming only part of a Security, the notice that relates to that Security shall state that on and after the Redemption Date, upon surrender of that Security, the Securityholder shall receive, without charge, a new Security or Securities of authorized denominations for the principal amount of the Security remaining unredeemed;

(F)     that on the Redemption Date the redemption price and any accrued interest payable to, but excluding, the Redemption Date as provided in Section 3.05 shall become due and payable in respect of each Security, or the portion of each Security, to be redeemed, and, unless the Issuer defaults in making the redemption payment, that interest on each Security, or the portion of each Security, to be redeemed, shall cease to accrue on and after the Redemption Date;

(G)     the place or places where a Securityholder must surrender the Securityholder's Securities for payment of the redemption price; and

(H)     the CUSIP or ISIN number, if any, listed in the notice or printed on the Securities, and that no representation is made as to the accuracy or correctness of such CUSIP or ISIN number.

SECTION 3.03     <u>Selection of Securities to Be Redeemed in Part</u>.

(1)     If fewer than all of the Securities are being redeemed, the selection of Securities to be redeemed shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Securities are listed or if such securities exchange has no requirement governing redemption or the Securities are not then listed on a securities exchange, on a pro rata basis or by lot (or, in the case of any Securities issued in global form, based on a method that most nearly approximates a pro rata selection in accordance with the procedures of DTC). The Trustee shall make the selection from the Outstanding Securities not previously called for redemption. The Trustee shall promptly notify the Issuer in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount of the Securities to be redeemed. In the event of a partial redemption by lot, the Trustee shall select the particular Securities to be redeemed not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Securities not previously called for redemption. The Issuer may redeem Securities in denominations of U.S.$200,000 only in whole. The Trustee may select for redemption

portions (in any integral multiple of U.S.$1,000) of the principal of Securities that have denominations larger than U.S.$200,000; *provided* that the remaining outstanding amount must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000.

(2)     For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Securities shall relate, in the case of any Security redeemed or to be redeemed only in part, to the portion of the principal amount of that Security which has been or is to be redeemed.

SECTION 3.04     Securities Payable on Redemption Date.  If the Issuer, or the Trustee on behalf of the Issuer, gives notice of redemption in accordance with this Article 3, the Securities, or the portions of Securities, called for redemption, shall, on the Redemption Date, become due and payable at the redemption price specified in the notice (together with accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Redemption Date), and from and after the Redemption Date (unless the Issuer shall default in the payment of the redemption price and accrued interest) the Securities or the portions of Securities shall cease to bear interest, to the extent the Issuer so elects.  Upon redemption of any Securities by the Issuer, such redeemed Securities will be cancelled or, to the extent so requested by the Issuer, remain outstanding.  Upon surrender of any Securities for redemption in accordance with the notice, the Issuer shall pay the Securities at the redemption price, together with accrued interest, if any, to, but excluding, the Redemption Date.  If the Issuer shall fail to pay any Security called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Securities.

SECTION 3.05     Unredeemed Portions of Partially Redeemed Security.  Upon surrender of a Security that is to be redeemed in part, the Issuer shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of the Security at the expense of the Issuer, a new Security or Securities, of any authorized denomination as requested by the Holder, in an aggregate principal amount equal to, and in exchange for, the unredeemed portion of the principal of the Security surrendered; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof.

SECTION 3.06     Third Party Notice.  The Issuer may designate at its option a third party to call the Securities for mandatory purchase in lieu of exercising its right to optional redemption under this Indenture; *provided*, that any call by a third party shall be treated as if such call was made by the Issuer. Upon such mandatory purchase, the Securities shall remain outstanding unless otherwise indicated by the Company, subject to Section 2.08.

Article 4

Covenants

SECTION 4.01     Performance of Obligations under the Securities.  The Company shall duly and punctually pay the principal of (and premium, if any) and interest and Additional Amounts, if any, on the Securities in accordance with the terms of the Securities and

34

this Indenture. The principal of (and premium, if any) and interest and Additional Amounts, if any, on the Securities shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds in accordance with this Indenture money sufficient to pay all principal and interest then due.

SECTION 4.02    Reports. (a) The Company will provide the Trustee with the following reports in electronic form for delivery to Holders upon their request thereof:

(1)    an English language version of its annual audited consolidated financial statements in a form substantially similar to the annual audited financial statements included in the Offering Memorandum prepared in accordance with GAAP within 120 days after the close of its fiscal year;

(2)    an English language version of its unaudited quarterly financial statements in a form substantially similar to the unaudited quarterly financial statements included in the Offering Memorandum prepared in accordance with GAAP within 60 days after the close of each fiscal quarter (other than the last fiscal quarter of its fiscal year);

(3)    simultaneously with the delivery of the financial statements referred to in clause (1) above, an Officer's Certificate stating whether a Default or Event of Default exists on the date of such certificate and, if a Default or Event of Default exists, setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto;

(4)    without duplication, English language versions or summaries of such other reports or notices as may be filed or submitted by (and promptly after filing or submission by) the Company with the Irish Stock Exchange or any other stock exchange on which the Securities may be listed (in each case, to the extent that any such report or notice is generally available to its security holders or the public in Brazil); and

(5)    as soon as practicable and in any event within 30 calendar days after any director or executive officer of the Company becomes aware of the existence of a Default or Event of Default, an Officer's Certificate setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto.

(b)    If the Company makes available the reports described in Section 4.02(a)(1), (2) or (4) on the Company's website and notifies the Trustee in writing thereof, it will be deemed to have satisfied the reporting requirement set forth in such applicable clause.

(c)    Delivery of the above reports to the Trustee is for informational purposes only and the Trustee's receipt of such reports will not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants in this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

SECTION 4.03    Limitation on Debt and Disqualified Stock.

(a)    The Company

(1)    shall not, and shall not permit any of its Restricted Subsidiaries to, Incur any Debt; and

(2)    shall not, and shall not permit any Restricted Subsidiary to, Incur any Disqualified Stock (other than Disqualified Stock of Restricted Subsidiaries held by the Company or a Restricted Subsidiary, so long as it is so held);

provided that the Company or any of its Restricted Subsidiaries may Incur Debt and Disqualified Stock if, on the date of the Incurrence, after giving pro forma effect to the Incurrence and the receipt and the application of the proceeds therefrom, either:

(1)    the aggregate principal amount of Debt and Disqualified Stock outstanding does not exceed the greater of (i) U.S.$4,000,000,000 and (ii) 30.0% of Consolidated Net Total Assets; or

(2)    the Net Debt to EBITDA Ratio does not exceed 3.5 to 1.0; provided that in the case of this clause (B), EBITDA shall equal or be greater than U.S.$1.00 for such reference period.

(b)    Notwithstanding the foregoing, the Company and, to the extent provided below, any Restricted Subsidiary may Incur the following ("Permitted Debt"):

(1)    Debt of the Company or a Restricted Subsidiary so long as such Debt is owed to the Company or a Restricted Subsidiary and which, if the obligor is the Company, is subordinated in right of payment to the Securities; provided, however, that if such Debt is owed to a Restricted Subsidiary that is not a Guarantor such Debt shall be unsecured and subordinated in right of payment to the Securities;

(2)    Debt of the Company pursuant to the Securities (other than any Additional Securities) and Debt of the Guarantors pursuant to the guarantee (other than with respect to any Additional Securities);

(3)    Subordinated Debt of the Company or a Restricted Subsidiary; provided, however, that the aggregate principal amount of such Subordinated Debt, and any refinancing thereof that complies with clause (4)(A) below, does not exceed in an aggregate principal amount at any one time outstanding U.S.$500,000,000;

(4)    Debt of the Company or a Restricted Subsidiary ("Permitted Refinancing Debt") constituting an extension or renewal of, replacement of, or substitution for, or issued in exchange for, or the net proceeds of which are used to repay, redeem, repurchase, refinance or refund, including by way of defeasance (all of the above, for purposes of this clause, "refinance")

36

then outstanding Debt in an amount not to exceed the principal amount of the Debt so refinanced, plus premiums, fees and expenses; *provided* that:

> (A)     in case the Debt to be refinanced is subordinated in right of payment to the Securities, the new Debt, by its terms or by the terms of any agreement or instrument pursuant to which it is outstanding, is expressly made subordinate in right of payment to the Securities at least to the extent that the Debt to be refinanced is subordinated to the Securities,

> (B)     the new Debt does not have a Stated Maturity prior to (i) the Stated Maturity of the Debt to be refinanced, and the Average Life of the new Debt is at least equal to the remaining Average Life of the Debt to be refinanced, or (ii) the 91st day after the Stated Maturity of the Securities and does not have any scheduled principal payments prior to such date; and

> (C)     Debt Incurred pursuant to clauses (1), (3), (5), (6), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), (19), (20) and (21) of Section 4.03(b) shall not be refinanced pursuant to this Section 4.03(b)(4);

>     (5)     Hedging Agreements of the Company or any Restricted Subsidiary entered into in the ordinary course of business or directly related to Debt permitted to be Incurred by the Company or any Restricted Subsidiary pursuant to this Indenture, and in each case not for speculative purposes;

>     (6)     Debt of the Company or any Restricted Subsidiary in respect of performance bonds, customs, reimbursement obligations, letters of credit, bankers' acceptances, deposits, promissory notes, self-insurance obligations, completion guarantees and bid, surety or appeal bonds provided in the ordinary course of business;

>     (7)     Acquired Debt of the Company or any Restricted Subsidiary; *provided, however*, that on the date that such transaction is consummated, after giving effect to the Incurrence of such Debt pursuant to this clause, either (A) the Company or any Restricted Subsidiary would have been able to Incur U.S.$1.00 of additional Debt pursuant to either test set forth in clause (a) above; or (B) would not have both a higher percentage and higher ratio set forth in clause (a) above immediately after such Incurrence;

>     (8)     Debt of the Company or any Restricted Subsidiary outstanding on the Issue Date;

>     (9)     Debt represented by guarantees of pension fund obligations of the Company or any Restricted Subsidiary required by law or regulation;

>     (10)     Debt of the Company or any Restricted Subsidiary Incurred through the provision of bonds, guarantees, letters of credit or similar instruments required by any maritime commission or authority or other governmental or regulatory agencies, including, without limitation, customs authorities; in each case, for vessels owned or chartered by, and in the

ordinary course of business of, the Company or any of its Restricted Subsidiaries at any time outstanding not to exceed the amount required by such governmental or regulatory authority;

(11)     Debt of any cash pooling or other cash management agreements of the Company or any Restricted Subsidiary in place with a bank or financial institution but only to the extent of offsetting credit balances of the Company or any of its Restricted Subsidiaries pursuant to such cash pooling or other cash management;

(12)     Debt of the Company or any Restricted Subsidiary (and any refinancing thereof) in an aggregate principal amount at any time outstanding not exceeding the greater of (i) U.S.$500,000,000 and (2) 6.25% of Consolidated Net Total Assets under financings provided or guaranteed by, directly or indirectly, (A) *Banco Nacional de Desenvolvimento Econômico e Social–BNDES*, or any other governmental development bank or credit agency, including but not limited to *FINEP – Financiadora de Estudos e Projetos* or (B) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer;

(13)     Debt of the Company or any Restricted Subsidiary, including but not limited to obligations under Capital Leases, mortgage financings or purchase money obligations, Incurred for the purpose of financing all or any part of the purchase price, lease expense, rental payments or cost of design, construction, installation or improvement of property, plant or equipment or other assets, whether through direct purchase of  or the Capital Stock of any Person owning such property, plant or equipment or other assets (including any Debt deemed to be Incurred in connection with such purchase) (it being understood that any such Debt may be Incurred after the acquisition or purchase or the construction, installation or the making of any improvement with respect to any such property, plant or equipment or other assets), or Incurred to refinance any such purchase price or cost of construction or improvement, and refinancings thereof, in an aggregate principal amount not to exceed at any one time outstanding the greater of (i) U.S.$150,000,000 and (ii) 2.0% of Consolidated Net Total Assets;

(14)     Debt of the Company or any Restricted Subsidiary to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Securities in accordance with this Indenture;

(15)     Debt of the Company or any of its Restricted Subsidiaries for taxes levied, assessments due and other governmental charges required to be paid as a matter of law or regulation in the ordinary course of business;

(16)     guarantees by the Company or any Restricted Subsidiary of Debt permitted to be Incurred pursuant to this Section 4.03; *provided* that if such Debt is subordinated in right of payment to the Securities or the guarantee of the Guarantors, any such guarantee with respect to such Debt shall be subordinated in right of payment to such guarantee;

(17)     Debt of the Company or any Restricted Subsidiary in respect of (i) self-insurance obligations or captive insurance companies or consisting of the financing of insurance

premiums or (ii) take-or-pay obligations contained in supply agreements in the ordinary course of business;

(18)     Debt of the Company or any Restricted Subsidiary under one or more Credit Facilities, lines of credit or working capital facilities (and any refinancing thereof); *provided, however*, that the aggregate principal amount of such Debt does not exceed at any one time outstanding the greater of (i) U.S.$1,000,000,000 and (ii) 10% of Consolidated Net Total Assets;

(19)     Debt of the Company or any Restricted Subsidiary with respect to reimbursement type obligations regarding worker's compensation claims and Debt and other obligations in respect of deferred compensation of employees Incurred in the ordinary course of business;

(20)     Debt of the Company or any Restricted Subsidiary in the form of customer deposits and advance payments received in the ordinary course of business from customers for purchasers in the ordinary course of business; and

(21)     Debt of the Company or any Restricted Subsidiary (and any refinancing thereof) not otherwise permitted hereunder in an aggregate principal amount equal to the aggregate Net Cash Proceeds received by the Company (other than from a Subsidiary of the Company) after the Issue Date from (i) the issuance and/or sale of its Qualified Equity Interests or (ii) as a contribution to its common equity to the extent that such Net Cash Proceeds received from such issuance, sale or contribution have not been applied to make Restricted Payments pursuant to Sections 4.04(a)(D)(3)(B) and (c)(4).

(c)     Notwithstanding anything to the contrary in this Section 4.03, the maximum amount of Debt that the Company and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Debt, solely as a result of fluctuations in the exchange rate of currencies.

(d)     For purposes of determining compliance with this Section 4.03, in the event that any proposed Debt meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (21) of Section 4.03(b), or is entitled to be Incurred pursuant to Section 4.03(a), the Company and its Restricted Subsidiaries shall be permitted to classify such item of Debt at the time of its Incurrence in any manner that complies with this Section 4.03 or to later reclassify all or a portion of such item of Debt.

(e)     The Company shall not Incur any Debt that is subordinate in right of payment to other Debt of the Company unless such Debt is also subordinate in right of payment to the Securities or the relevant guarantee on substantially identical terms; *provided, however*, that no Debt will be deemed to be subordinated in right of payment to any other Debt of the Company solely by virtue of being unsecured, by virtue of being secured with different collateral or by virtue of being secured on a junior priority basis or by virtue of the applicable of waterfall or other payment ordering provisions affecting different tranches of Debt.

(f)     The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Debt of the same instrument or the payment of regularly scheduled dividends on Disqualified Stock in the form of additional Disqualified Stock with the same terms shall not be deemed to be an Incurrence of Debt for purposes of this Section 4.03; *provided* that any such outstanding additional Debt or Disqualified Stock paid in respect of Debt Incurred pursuant to any provision of Section 4.03(b) shall be counted as Debt outstanding for purposes of any future Incurrence of Debt pursuant to Section 4.03(a).

(g)     For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Debt, the U.S. dollar-equivalent principal amount of Debt denominated in a non-U.S. currency shall be calculated based on the relevant currency exchange rate in effect on the date such Debt was Incurred or, in the case of revolving credit Debt, first committed; *provided* that if such Debt is Incurred to refinance other Debt denominated in a non-U.S. currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Permitted Refinancing Debt does not exceed the principal amount of such Debt being refinanced. The principal amount of any Debt Incurred to refinance other Debt, if Incurred in a different currency from the Debt being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Permitted Refinancing Debt is denominated that is in effect on the date of such refinancing.

SECTION 4.04     Limitation on Restricted Payments.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly (the payments and other actions described in the following clauses being collectively "Restricted Payments"):

(A)     declare or pay any dividend or make any distribution on its Equity Interests held by Persons other than the Company or any of its Restricted Subsidiaries (other than (i) dividends or distributions paid in the Company's Qualified Equity Interests and (ii) dividends or distributions by a Restricted Subsidiary payable, on a pro rata basis or on a basis more favorable to the Company, to all holders of any class of Capital Stock of such Restricted Subsidiary a majority of which is held, directly or indirectly, by the Company);

(B)     purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Company held by Persons other than the Company or any of its Restricted Subsidiaries;

(C)     repay, redeem, repurchase, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, on or with respect to, any Subordinated Debt, except (i) a payment of interest and (ii) a repayment, redemption, repurchase, defeasance or acquisition or retirement in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case, due within one year

40

of the date of such repayment, redemption, repurchase, defeasance or acquisition or retirement; or

      (D)      make any Investment (other than Permitted Investments);

unless, at the time of, and after giving effect to, the proposed Restricted Payment:

      (1)      no Event of Default has occurred and is continuing,

      (2)      the Company could Incur at least U.S.$1.00 of Debt under <u>Section 4.03(a)</u> and

      (3)      the aggregate amount expended for such Restricted Payment and all other Restricted Payments made on or after the Issue Date would not, subject to <u>Section 4.04(d)</u>, exceed the sum of:

      (A)      50% of the cumulative Consolidated Net Income (or, if the Consolidated Net Income is a loss, minus 100% of the amount of the loss) of the Company beginning on the first day of the fiscal quarter in which the Issue Date occurs to the end of the most recently completed fiscal quarter for which financial statements have been provided (or if not timely provided, required to be provided) pursuant to this Indenture, *plus*

      (B)      subject to paragraph (c), the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company ((i) other than Net Cash Proceeds to the extent such Net Cash Proceeds have been used to Incur Debt pursuant to <u>Section 4.03(b)(21)</u> or (ii) other than Net Cash Proceeds and the Fair Market Value of property from a Restricted Subsidiary) after the Issue Date from

      (i)      the issuance and sale of its Qualified Equity Interests, or

      (ii)      as a contribution to its common equity, *plus*

      (C)      the amount by which Debt of the Company or any of its Restricted Subsidiaries is reduced on the Company's balance sheet or the balance sheet of such Restricted Subsidiary, in each case, upon the conversion or exchange (other than from Restricted Subsidiaries) subsequent to the Issue Date of any such Debt for Qualified Equity Interests of the Company (less the amount of any cash or the Fair Market Value of any other property distributed by the Company or any of its Restricted Subsidiaries upon such conversion or exchange); *plus*

      (D)      without duplication of any amount included in the calculation of Consolidated Net Income, an amount equal to the sum of (i) the aggregate amount of cash and the Fair Market Value of any asset received by the Company or any of its Restricted Subsidiaries subsequent to the Issue Date with respect to Investments (other than Permitted Investments) made after the Issue Date by the Company or any of its Restricted

41

Subsidiaries in any Person, proceeds realized on the sale of such Investments and proceeds representing the return of capital and (ii) in the event that the Company re-designates an Unrestricted Subsidiary to be a Restricted Subsidiary of the Company , the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time such Unrestricted Subsidiary is designated a Restricted Subsidiary of the Company; *provided*, *however*, that the foregoing sum shall not exceed, in the case of any such Person or Unrestricted Subsidiary, the amount of Investments (excluding Permitted Investments) previously made (and treated as a Restricted Payment) by the Company or any of its Restricted Subsidiaries in such Person or Unrestricted Subsidiary; *plus*

(E)    without duplication of any amount included above under this clause, 100% of any dividends received by the Company or any of its Restricted Subsidiaries from an Unrestricted Subsidiary.

The amount expended in any Restricted Payment, if other than in cash, shall be deemed to be the Fair Market Value of the relevant non-cash assets, as determined, with respect to amounts at or below U.S.$50,000,000, by an Officer of the Company, whose determination shall be conclusive and evidenced by an Officer's Certificate, and with respect to amounts above U.S.$50,000,000, as determined by the Board of Directors of the Company, whose determination shall be conclusive and evidenced by a resolution of the Board of Directors.

(b)    Section 4.04(a) shall not prohibit the declaration and payment of dividends, in an amount equivalent to not more than the greater of (i) 25% of the Consolidated Net Income (as defined under Brazilian corporate law) and (ii) the Minimum Legally Required Dividend; *provided*, that the payment of such amounts is in compliance with the Brazilian corporate law and the Company's bylaws and that the Company's Board of Directors, with the approval of the fiscal council, if in existence at such time, has not reported to the general shareholders' meeting that the distribution would not be advisable given the financial condition of the Company or its Subsidiaries.

(c)    Neither Section 4.04(a) nor Section 4.04(b) shall prohibit:

(1)    the payment of any dividend or distribution (including in the form of interest on shareholders' equity) within 60 days after the date of declaration thereof if, at the date of declaration, such dividend or distribution would comply with Section 4.04(a);

(2)    the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt owed to the Company or any of its Restricted Subsidiaries, the Incurrence of which was permitted under Section 4.03(b)(1);

(3)    the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt with the proceeds of, or in exchange for, Permitted Refinancing Debt;

42

(4)     any Restricted Payment made in exchange for, or out of the proceeds of a substantially concurrent offering of, Qualified Equity Interests of the Company or of a cash contribution to the common equity of the Company not representing an interest in Disqualified Stock; *provided*, that such Net Cash Proceeds shall be excluded from the calculation in Section 4.04(a)(D)(3)(B);

(5)     repurchases of Equity Interests of the Company deemed to occur upon exercise of warrants, options or rights to acquire Equity Interests if such Equity Interests represent a portion of the exercise price of such warrants, options or rights or nominal cash payments (or related withholding taxes) in lieu of issuances of fractional shares;

(6)     the payment of dividends, distributions or other amounts to fund the repurchase, redemption or other acquisition or retirement for value of any of the Company's Equity Interests or any Equity Interests of any of its Restricted Subsidiaries held by any then-existing or former director, officer, employee, independent contractor or consultant of the Company or any of its Restricted Subsidiaries or their respective assigns, estates or heirs; *provided, however*, that the price paid for all repurchased, redeemed, acquired or retired Equity Interests in all cases, other than as a result of death, disability or termination of employment or directorship, does not exceed U.S.$5,000,000 in the aggregate in any fiscal year (with unused amounts in any fiscal year being carried over to succeeding fiscal years subject to a maximum payment (without giving effect to the following proviso) of U.S.$10,000,000 in any calendar year); *provided further* that the amounts in any fiscal year may be increased by an amount not to exceed: (i) the cash proceeds received by the Company from the sale of Qualified Equity Interests of the Company to any present or former employees, directors, officers or consultants (or their respective permitted transferees) of the Company or any of its Restricted Subsidiaries following the Issue Date, to the extent that such cash proceeds have not otherwise been applied to the payment of Restricted Payments by virtue of Section 4.04(a)(3), such Net Cash Proceeds shall be excluded from the calculation in 4.04(a)(D)(3)(B); *plus* (ii) the cash proceeds of "key man" life insurance policies received by the Company or any of its Restricted Subsidiaries since the Issue Date;

(7)     repurchases of Subordinated Debt at a purchase price not greater than (i) 101% of the principal amount or accreted value, as applicable, of such Subordinated Debt and accrued and unpaid interest thereon in the event of a Change of Control Offer or (ii) 100% of the principal amount or accreted value, as applicable, of such Subordinated Debt and accrued and unpaid interest thereon in the event of an Asset Sale, in connection with any change of control offer or asset sale offer required by the terms of such Subordinated Debt, but only if: (a) in the case of a Change of Control Offer, the Company has first complied with and fully satisfied its obligations under Section 4.08; or (b) in the case of an Asset Sale, the Company has first complied with and fully satisfied its obligations under Section 4.06;

(8)     payments of dividends on Disqualified Stock issued pursuant to Section 4.03;

(9)     the distribution of the Capital Stock of any Restricted Subsidiary; *provided*, that such entity and any entity formed, created or in receipt of such Capital Stock, if

43

any, simultaneously executes and delivers a supplemental indenture to this Indenture (i) providing for a guarantee of payment of the Company's obligations under this Indenture and the Securities and (ii) pursuant to which such entities shall agree to become subject to the covenants contained in this Indenture as if it were a Restricted Subsidiary of the Company, *mutatis mutandis*; and

(10)    Restricted Payments in an aggregate amount not to exceed U.S.$100,000,000; *provided* that the Company will not, and will not permit any Restricted Subsidiary to, make any Restricted Payment described Section  4.04(a)(A) and (B);

*provided*, *further*, that, in the case of clauses (2), (5), (6), (7), (8), (9) and (10) of this Section 4.04(c) no Event of Default has occurred and is continuing or would occur as a result thereof.

(d)    In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, only amounts expended pursuant to Section 4.04(b), Section 4.04(c)(1), Section 4.04(c)(6) and Section 4.04(c)(7) shall be included in such calculation under Section 4.04(a).

SECTION 4.05    [Reserved].

SECTION 4.06    Limitation on Sales of Assets.

(a)    The Company shall not, and shall not permit any Restricted Subsidiary to, make any Asset Sale unless the following conditions are met:

(1)    The Asset Sale is for Fair Market Value.

(2)    At least 75% of the consideration consists of cash or Cash Equivalents received at closing of such Asset Sale. For purposes of this Section 4.06(a)(2), (i) the assumption by the purchasers of Debt or other obligations (other than Subordinated Debt) of the Company or a Restricted Subsidiary pursuant to a customary novation agreement, (ii) Debt (other than Subordinated Debt) of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Sale, to the extent that the Company and each other Restricted Subsidiary are released from any guarantee of such Debt in connection with such Asset Sale, (iii) consideration consisting of Debt of the Company or any Guarantor received from persons who are not the Company or any Restricted Subsidiary, (iv) instruments, securities or other obligations received by the Company or any of its Restricted Subsidiaries from the purchasers that are converted into cash or Cash Equivalents within 120 days of the closing of such Asset Sale shall be considered to be cash received on the at closing of such Asset Sale.

(3)    Within 365 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds shall be used:

(A)    to purchase the Securities (including any Additional Securities) pursuant to an offer to all holders of Securities at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest and additional amounts, if ay, to, but not including the date of purchase;

44

(B)    to repay Debt (other than Subordinated Debt) of the Company or any Restricted Subsidiary (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company or any Restricted Subsidiary; or

(C)    to acquire or invest in (or within such 365-day period in this Section 4.06(a)(3), the Board of Directors shall have made a good faith determination to acquire or invest, which acquisition or investment shall be consummated prior to the second anniversary of such Asset Sale) (i) Additional Assets, (ii) assets of a Permitted Business (or make capital expenditures in respect of a Permitted Business), (iii) a majority of the Voting Stock of another Person that thereupon becomes a Restricted Subsidiary engaged in a Permitted Business or (iv) a Permitted Business Investment.

(4)    Notwithstanding clauses (2) and (3) above, the Company and its Restricted Subsidiaries will be permitted to consummate an Asset Sale without complying with such clauses to the extent either (A) at least 75% of the consideration for such Asset Sale constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities or (B) in the event of an Asset Sale involving Equity Interests of the Company or a Restricted Subsidiary, at least 30% of the consideration for such Asset Sale constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities received at closing; *provided* that the remaining 45% of the consideration is paid on or prior to the third anniversary of the closing and constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities and in the event existing Equity Interests are sold by the Company that such Equity Interests are pledged in favor of the Company or Restricted Subsidiary until such consideration is paid; *provided* that any consideration not constituting Additional Assets received by the Company or any Restricted Subsidiary in connection with any Asset Sale permitted to be consummated under this clause shall be applied (in the case of cash, Cash Equivalents and Marketable Securities within 365 days after the receipt thereof subject to the proviso above) in accordance with the provisions of clause (3) above.

(5)    The Net Cash Proceeds of an Asset Sale not applied pursuant to Section 4.06(a)(3) (or determined by the Board of Directors to not be applied) pursuant to Section 4.06(a)(3)(c) within 365 days of the Asset Sale constitute "Excess Proceeds." Excess Proceeds of less than U.S.$50,000,000 shall be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds such amount, the Company shall, within 30 days, make an offer to purchase (the "Asset Sale Offer") Securities having a principal amount equal to:

(A)    accumulated Excess Proceeds, multiplied by

(B)    a fraction (i) the numerator of which is equal to the outstanding principal amount of the Securities and (ii) the denominator of which is equal to the outstanding principal amount of the Securities and all *pari passu* Debt similarly required to be repaid, redeemed or tendered for in connection with the Asset Sale, rounded down to the nearest U.S.$1,000.

45

(b)     The purchase price for the Securities shall be 100% of the principal amount plus accrued and unpaid interest and Additional Amounts if any to the date of purchase (the "Offer Amount").  If the Asset Sale Offer is for less than all of the Outstanding Securities and Securities in an aggregate principal amount in excess of the purchase amount are tendered and not withdrawn pursuant to the Asset Sale Offer, the Company shall purchase Securities having an aggregate principal amount equal to the purchase amount on a pro rata basis, with adjustments so that only Securities in multiples of U.S.$1,000 principal amount shall be purchased; *provided*, that after a purchase from a Holder in part, such Holder shall hold U.S.$200,000 in principal amount of Securities or a multiple of U.S.$1,000 in excess thereof.  Upon completion of the Asset Sale Offer, Excess Proceeds shall be reset at zero.

(c)     Promptly, and in any event within 30 days after the Company becomes obligated to make an Asset Sale Offer, the Company shall deliver to the Trustee and each Holder a written notice in accordance with Section 13.01, stating that the Holder may elect to have its Securities purchased by the Company either in whole or in part (subject to prorating as described in Section 4.06(b) in the event the Asset Sale Offer is oversubscribed) in integral multiples of U.S.$1,000 of principal amount, at the applicable purchase price.  The notice shall specify the Purchase Date and shall contain such information concerning the business of the Company which the Company in good faith believes will enable such Holders to make an informed decision and all instructions and materials, as determined in good faith by the Company, necessary to tender Securities pursuant to the Asset Sale Offer.

(1)     Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided below, the Company shall deliver to the Trustee an Officer's Certificate as to (A) the Offer Amount, (B) the intended allocation of the Net Cash Proceeds from the Asset Sale pursuant to which such Asset Sale Offer is being made and (C) the compliance of such allocation with the provisions of Sections 4.06(a)(1) through (5).  The Company shall, to the extent lawful, irrevocably deposit with the Trustee or with any Paying Agent the principal amount of, and accrued and unpaid interest on, all Securities (or portions thereof) which have been validly tendered and accepted by the Company for redemption in accordance with the provisions of Section 2.04 and this Section 4.06.  Upon the expiration of the Offer Period, and in any event no later than one Business Day after the expiration of the Offer Period, each Holder shall deliver to the exchange agent for cancellation the Securities or portions thereof which have been properly tendered (and not withdrawn) and are to be accepted by the Company.  A Paying Agent shall, on the Purchase Date, mail or deliver payment (or cause the delivery of payment) to each Holder of Securities properly tendered the amount of the purchase price for such Securities, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Security equal in principal amount to any unpurchased portion of the Securities surrendered, if any; provided that each new Security shall be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.  In the event that the aggregate purchase price of the Securities delivered by the Company or the Guarantors, as the case may be, to the Trustee or any Paying Agent is more than the Offer Amount applicable to the Securities, the Trustee or any Paying Agent shall deliver the excess to the Company or the Guarantors, as the case may be, immediately after the expiration of the Offer Period for application in accordance with this Section 4.06.

(2)      Holders electing to have a Security purchased shall be required to surrender the Security, with an appropriate form duly completed, to the exchange agent at the address specified in the notice at least three Business Days prior to the Purchase Date.  Holders shall be entitled to withdraw their election if each of the exchange agent and the Company receives not later than one Business Day prior to the Purchase Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Security which was delivered for purchase by the Holder and a statement that such Holder is withdrawing his election to have such Security purchased.  Holders whose Securities are purchased only in part shall be issued new Securities equal in principal amount to the unpurchased portion of the Securities surrendered.

(3)      At the time the Holder delivers Securities to the exchange agent for cancellation which are to be accepted for purchase, the Company shall also deliver an Officer's Certificate stating that such Securities are to be accepted for purchase by the Company pursuant to and in accordance with the terms of this <u>Section 4.06</u>.  A Security shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering Holder.

(d)      The Company shall comply, to the extent applicable, with the requirements of Rule 14e-1 under the Exchange Act and any other applicable securities laws or regulations in connection with any repurchase of Securities pursuant to this <u>Section 4.06</u>.  To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this <u>Section 4.06</u>, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this <u>Section 4.06</u> by virtue of its compliance with such securities laws or regulations.

(e)      Pending application in accordance with this <u>Section 4.06</u>, Net Cash Proceeds may be applied to temporarily reduce revolving credit borrowings, if any, or invested in Cash Equivalents. The Fair Market Value for any Asset Sale with consideration at or below U.S.$50,000,000 shall be determined by an Officer of the Company, whose determination shall be conclusive and evidenced by an Officer's Certificate, and with consideration above U.S.$50,000,000, as determined by the Board of Directors of the Company, whose determination shall be conclusive and evidenced by a resolution of the Board of Directors.

SECTION 4.07      <u>Limitation on Transactions with Affiliates</u>.

(a)      The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering of any service with any Affiliate of the Company (a "<u>Related Party Transaction</u>"), except upon fair and reasonable terms no less favorable to the Company or the Restricted Subsidiary than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company.

(b)      In any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of U.S.$20,000,000, the Company shall first deliver to the Trustee an Officer's Certificate to the effect that such transaction or series of related transactions are on fair

47

and reasonable terms no less favorable to the Company or such Restricted Subsidiary than could be obtained in a comparable arm's-length transaction and is otherwise compliant with the terms of this Indenture.

(c)     In any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of U.S.$40,000,000, a majority of the Board of Directors (including a majority of the disinterested members thereof, but only to the extent there are disinterested members with respect to such Related Party Transaction) must first approve such transaction or series of related transactions and determine that such transaction or series of related transactions are on fair and reasonable terms no less favorable to the Company or such Restricted Subsidiary than could be obtained in a comparable arm's length transaction and is otherwise compliant with the terms of this Indenture.

(d)     Sections 4.07(a) through (c) shall not apply to:

(1)     any transaction or arrangement between the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(2)     the payment of reasonable and customary regular fees to directors of the Company who are not employees of the Company ;

(3)     Permitted Investments and any Restricted Payments that do not violate the provisions under Section 4.04;

(4)     transactions permitted by and complying with Section 5.01.

(5)     any issuance or sale of Equity Interests (other than Disqualified Stock) of the Company;

(6)     transactions or payments (including loans, advances, grants of securities, stock options and similar rights) pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business;

(7)     transactions pursuant to agreements in effect on the Issue Date and described in the Offering Memorandum, as amended, modified or replaced from time to time so long as the amended, modified or new agreements, taken as a whole, are no less favorable to the Company and its Restricted Subsidiaries than those in effect on the Issue Date;

(8)     any Sale and Leaseback Transaction otherwise permitted under Section 4.10 if such transaction is on market terms; and

(9)     transactions with joint ventures or other similar arrangements pursuant to supply or purchase arrangements (i) in effect on the Issue Date, as amended, modified or replaced from time to time and (ii) as may be entered into after the Issue Date; *provided* that the

48

amendment, modification, replacement or new arrangement, taken as a whole, is no less favorable to the Company and its Restricted Subsidiaries than those in effect on the Issue Date.

SECTION 4.08    Repurchases at the Option of the Holders Upon Change of Control Offer.

(1)    Upon the occurrence of a Change of Control that results in a Rating Decline, each Holder shall have the right to require the Company or a third party so designated to repurchase all or any part (in integral multiples of U.S.$1,000) of that Holder's Securities pursuant to a Change of Control Offer.  No such purchase in part shall reduce the outstanding principal amount of the Securities held by any Holder to below U.S.$200,000.  In the Change of Control Offer, the Company or a third party so designated shall offer a Change of Control Payment.

(2)    Within 30 days following any Change of Control that results in a Rating Decline, the Company or a third party so designated shall make a Change of Control Offer by notice to each Holder in accordance with the provisions of Section 13.01, stating:

(A)    that a Change of Control that results in a Rating Decline has occurred and that such Holder has the right to require the Company or a third party so designated to purchase such Holder's Securities in exchange for its respective portion of the Change of Control Payment;

(B)    an expiration date (the "Expiration Date") not less than 30 days or more than 60 days after the date of the Change of Control Offer;

(C)    the Change of Control Payment and the Change of Control Payment Date;

(D)    information concerning the business of the Company and its Subsidiaries, including the relevant facts regarding such Change of Control, which the Company in good faith believes shall enable the Holders to make an informed decision with respect to the Change of Control Offer; and

(E)    the instructions, as determined by the Company or a third party so designated, consistent with this Section 4.08, that a Holder must follow in order to have its Securities repurchased.

(3)    Holders electing to have a Security repurchased shall be required to surrender the Security, with an appropriate form duly completed, to the exchange agent at the address specified in the notice at least three Business Days prior to the Change of Control Payment Date.  Holders shall be entitled to withdraw their election if each of the Trustee and the Company receives not later than one Business Day prior to the Change of Control Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Security which was delivered for repurchase by the Holder and a statement that such Holder is withdrawing his election to have such Security repurchased.  Holders whose Securities are

49

purchased only in part shall be issued new Securities equal in principal amount to the unpurchased portion of the Securities surrendered.

(4)     On the Change of Control Payment Date, the Company or the Guarantors shall, to the extent lawful:

(A)     accept for payment all Securities or portions of Securities properly tendered and not validly withdrawn pursuant to the Change of Control Offer;

(B)     deposit with any Paying Agent an amount equal to the Change of Control Payment in respect of all Securities or portions of Securities properly tendered and not validly withdrawn; and

(C)     deliver or cause to be delivered, if applicable, to the Trustee for cancellation the Securities properly accepted together with an Officer's Certificate stating the aggregate principal amount of Securities or portions of Securities being purchased by the Company or the Guarantors.

(5)     The Paying Agent shall promptly mail to each Holder of Securities properly tendered the Change of Control Payment for such Securities, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Security equal in principal amount to any unpurchased portion of the Securities surrendered, if any; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.  A Security shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering Holder.  The Company or a third party so designated shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(6)     Notwithstanding the foregoing, the Company shall not be required to make a Change of Control Offer upon a Change of Control that results in a Rating Decline if (i) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture that are applicable to a Change of Control Offer made by the Company, and such third party purchases all Securities properly tendered and not withdrawn under the Change of Control Offer or (ii) notice of redemption for all Outstanding Securities has been given pursuant to Section 3.02, unless and until there is a default in payment of the applicable redemption price.

(7)     The Company or the third party so designated shall comply, to the extent applicable, with the requirements of Rule 14e-1 of the Exchange Act and any other applicable securities laws or regulations in connection with the repurchase of Securities pursuant to this Section 4.08.  To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this Section 4.08, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.08 by virtue of its compliance with such securities laws or regulations.

In the event that the Holders of not less than 90% of the aggregate principal amount of the Outstanding Securities accept a Change of Control Offer and the Company or a third party purchases all the Securities held by such Holders, the Company will have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the purchase pursuant to the Change of Control Offer described above, to redeem all of the Securities that remain outstanding following such purchase at the purchase price equal to that in the Change of Control Offer plus, to the extent not included in the Change of Control Offer payment, accrued and unpaid interest and additional amounts, if any, on the Securities that remain outstanding, to the date of redemption (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

SECTION 4.09    <u>Limitation on Liens</u>.  The Company shall not, and shall not permit any Restricted Subsidiary to, create or suffer to exist any Lien upon any of its property or assets now owned or hereafter acquired by it or on any Capital Stock of any Restricted Subsidiary, in each case securing any Debt unless contemporaneously therewith effective provision is made to secure the Securities equally and ratably with such Debt for so long as such Debt is so secured. This covenant shall not require the Company or any Restricted Subsidiary to equally and ratably secure the Securities if the Lien consists of a Permitted Lien.

SECTION 4.10    <u>Limitation on Sale and Leaseback Transactions</u>.  The Company shall not, and shall not permit any Restricted Subsidiary to, enter into any Sale and Leaseback Transaction with respect to any Property unless the Company or such Restricted Subsidiary would be entitled to:

(A)    Incur Debt in an amount equal to the Attributable Debt with respect to such Sale and Leaseback Transaction pursuant to <u>Section 4.03</u>, and

(B)    create a Lien on such Property securing such Attributable Debt without equally and ratably securing the Securities pursuant to <u>Section 4.09</u>.

in which case, the corresponding Debt and Lien shall be deemed Incurred pursuant to those provisions.

SECTION 4.11    <u>Maintenance of Corporate Existence</u>.  Each of the Company and the Guarantors shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and shall use its reasonable efforts to do or cause to be done all things necessary to preserve and keep in full force and effect its rights (charter and statutory); *provided, however*, that neither the Company nor any Guarantor shall be required to preserve any such existence or right if its Board of Directors or management, respectively, shall determine in its sole discretion that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries taken as a whole; *provided further* that this <u>Section 4.11</u> does not prohibit any transaction otherwise permitted by <u>Section 4.06</u>, <u>Section 5.01</u>, or <u>Article 10</u>.

SECTION 4.12    <u>Maintenance of Properties</u>.  The Company shall cause all properties used or useful in the conduct of its business or the business of any of its Restricted

51

Subsidiaries to be maintained and kept in good condition, repair and working order as in the judgment of the Company may be necessary so that the business of the Company and its Restricted Subsidiaries may be properly and advantageously conducted at all times; *provided* that nothing shall prevent the Company or any Restricted Subsidiary from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company, desirable in the conduct of the business of the Company and its Restricted Subsidiaries taken as a whole.

SECTION 4.13    Limitation on Guarantees of Debt by Restricted Subsidiaries. The Company will not permit any of its Restricted Subsidiaries that is not a Guarantor to guarantee the payment of any Debt of the Company or any of its Restricted Subsidiaries in an aggregate principal amount in excess of U.S.$10,000,000 unless:

(1)    such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture to this Indenture providing for a guarantee of payment of the Company's obligations under this Indenture and the Securities by such Restricted Subsidiary; except that if such Debt is by its express terms subordinated in right of payment to the Securities, any such guarantee of such Restricted Subsidiary with respect to such Debt will be subordinated in right of payment to such Restricted Subsidiary's guarantee with respect to the Securities substantially to the same extent as such Debt is subordinated to the Securities; and

(2)    such Restricted Subsidiary will deliver to the Trustee an Opinion of Counsel to the effect that:

(A)    such supplemental indenture and guarantee have been duly executed and authorized; and

(B)    such guarantee of the Securities constitutes a valid, binding and enforceable obligation of such Restricted Subsidiary (subject to customary exceptions and limitations), except insofar as enforcement thereof may be limited by bankruptcy, insolvency or similar laws (including, without limitation, all laws relating to fraudulent transfers) and except insofar as enforcement thereof is subject to general principles of equity;

*provided, however*, that the foregoing provisions of this covenant will not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary of the Company and was not Incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary of the Company.

SECTION 4.14    [Reserved].

SECTION 4.15    [Reserved].

SECTION 4.16    [Reserved].

SECTION 4.17    [Reserved].

52

SECTION 4.18    Maintenance of Office or Agency in the State of New York. The Company shall ensure the maintenance in the State of New York an office or agency where Securities may be presented or surrendered for payment, where Securities may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Company in respect of the Securities and this Indenture may be served.  The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Company shall fail to ensure the maintenance of any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and, in such event, the Trustee shall act as the Company's agent to receive all such presentations, surrenders, notices and demands.

The Company may also from time to time designate one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the State of New York for such purposes.  The Company shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

SECTION 4.19    [Reserved].

SECTION 4.20    [Reserved].

SECTION 4.21    Additional Amounts.  (a) All payments by the Company in respect of the Securities or by the Guarantors in respect of the Note Guarantee shall be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of the Company's, a Guarantor's or any successor's jurisdiction of incorporation or the jurisdiction in which central management or control of the Company, such Guarantor or such successor, as applicable, is exercised, or any governmental authority therein, unless the Company, such Guarantor or such successor is compelled by law to deduct or withhold such taxes, duties, assessments, or governmental charges.  In such event, the relevant payor shall make such deduction or withholding, make payment of the amount so withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts receivable by Holders of Securities after such withholding or deduction shall equal the respective amounts of principal and interest which would have been receivable in respect of the Securities in the absence of such withholding or deduction ("Additional Amounts").  No such Additional Amounts shall be payable:

(1)    to, or to a third party on behalf of, a Holder or beneficial owner who is liable for such taxes, duties, assessments or governmental charges in respect of such Security by reason of the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership or a corporation) or beneficial owner and Brazil, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member or shareholder) or

53

beneficial owner being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Security or enforcement of rights and the receipt of payments with respect to the Security;

(2)     in respect of Securities surrendered (if surrender is required) more than 30 days after the Relevant Date (as defined below) except to the extent that payments under such Security would have been subject to withholdings and the Holder or beneficial owner of such Security would have been entitled to such Additional Amounts, on surrender of such note for payment on the last day of such period of 30 days;

(3)     where such Additional Amount is imposed on a payment to an individual and is required to be made pursuant to any law implementing or complying with, or introduced in order to conform to any European Union Directive on the taxation of savings;

(4)     to, or to a third party on behalf of, a Holder or beneficial owner who is liable for such taxes, duties, assessments or other governmental charges by reason of such Holder's or beneficial owner's failure to comply with any certification, identification or other reporting requirement concerning the nationality, residence, identity or connection with  Brazil, or a successor jurisdiction or applicable political subdivision or authority thereof or therein having power to tax, of such holder or beneficial owner, if (a) compliance is required by such jurisdiction, or any political subdivision or authority thereof or therein having power to tax, as a precondition to, exemption from, or reduction in the rate of, the tax, assessment or other governmental charge and (b) the Company or any Guarantor has given the holders at least 30 days' notice that Holders will be required to provide such certification, identification or other requirement;

(5)     in respect of any estate, inheritance, gift, sales, transfer, capital gains, excise or personal property or similar tax, assessment or governmental charge;

(6)     in respect of any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of principal of or interest on the Security or by direct payment by the Company or any Guarantor in respect of claims made against the Company or any Guarantor; or

(7)     in respect of any combination of the above.

All references to principal and interest in respect of the Securities shall be deemed also to refer to any Additional Amounts, unless the context requires otherwise, which may be payable as set forth in this Indenture or in the Securities.

(b)     In addition, no Additional Amounts shall be paid with respect to any payment on a Security to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment would be required by the laws of Brazil, or any political subdivision thereof, to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of that

54

partnership, an interest holder in a limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member or beneficial owner been the Holder.

(c)     Any reference in this Indenture or the Securities to principal, interest or any other amount payable in respect of the Securities by the Company or the guarantees by any Guarantor shall be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section 4.21.

(d)     The foregoing obligation in this Section 4.21 shall survive termination or discharge of this Indenture.

SECTION 4.22     Payments and Paying Agent.  (a) Whenever the Company shall appoint a Paying Agent other than Deutsche Bank Trust Company Americas or The Bank of Tokyo-Mitsubishi UFJ, Ltd. with respect to the Securities, it shall cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.22:

(1)     that it will hold all sums received by it as such agent for the payment of the principal of or interest, as the case may be, on any Securities (whether such sums have been paid to it by or on behalf of the Company or by any other obligor on the Securities) in trust for the benefit of the Holders;

(2)     that it will give the Trustee notice of any failure by the Company (or by any other obligor on the Securities) to make any payment of the principal of or interest on any Securities, as the case may be (including Additional Amounts), and any other payments to be made by or on behalf of the Company under this Indenture or the Securities when the same shall be due and payable; and

(3)     that it will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of the failure referred to in clause (2) above.

(b)     The Trustee shall arrange with a Paying Agent for the payment, from funds furnished by the Company to the Trustee pursuant to this Indenture, of the principal of and interest and other amounts due on the Securities (including Additional Amounts) and of the compensation of such Paying Agent for its services as such.

(c)     Anything in this Section 4.22 to the contrary notwithstanding, the Company may at any time, for the purpose of obtaining a satisfaction and discharge with respect to any Securities hereunder, or for any other reason, pay or cause to be paid to the Trustee all sums held in trust for such Securities by the Company or any Paying Agent hereunder as required by this Section 4.22, such sums to be held by the Trustee upon the trusts herein contained.

(d)      Anything in this Section 4.22 to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of Section 8.04.

SECTION 4.23      [Reserved].

SECTION 4.24      Limitation on Designation of Unrestricted Subsidiaries.

(a)      The Company may designate after the Issue Date any Subsidiary of the Company as an "Unrestricted Subsidiary" under this Indenture (a "Designation") only if:

(1)      no Event of Default has occurred and is continuing at the time of or after giving effect to such Designation;

(2)      any transactions between the Company or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are, and after giving effect to such Designation will be, in compliance with Section 4.07;

(3)      such Subsidiary has no Debt other than Non-Recourse Debt; and

(4)      the Company would be permitted to make an Investment in an Unrestricted Subsidiary at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment in an Unrestricted Subsidiary at the time of Designation) as a Restricted Payment pursuant to Section 4.04(a) in an amount equal to the amount of the Company's Investment in such Subsidiary on such date.

(b)      The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "Revocation") only if:

(1)      no Event of Default has occurred and is continuing at the time of and after giving effect to such Revocation; and

(2)      all Debt and Liens of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Indenture.

(c)      The Designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary. All Designations and Revocations must be evidenced by a resolution of the Board of Directors of the Company and an Officer's Certificate delivered to the Trustee certifying compliance with the preceding provisions.

SECTION 4.25      Ranking.  Each of the Company and the Guarantors shall ensure that its respective obligations under this Indenture, the Securities and the Note Guarantee shall at all times constitute direct and unconditional obligations of the Company or the Guarantors, ranking at all times at least *pari passu* in priority of payment among themselves and with all other unsubordinated Debt of such Person, except to the extent any such other Debt

56

ranks above such obligations by reason of Liens permitted under Section 4.09 or pursuant to applicable law.

## Article 5

## Consolidation, Merger, or Sale of Substantially All Assets

SECTION 5.01    Consolidation, Merger, or Sale of Substantially All Assets.

(a)    The Company will not consolidate with or merge with or into, or sell, convey, transfer, dispose of or lease all or substantially all of its assets to, any person,

unless

(1)    the surviving Person (if not the Company) will be a person organized and existing under the laws of Brazil, Colombia, the United States of America, any state thereof or the District of Columbia, or any other country that is a member country of the European Union or of the Organization for Economic Co-operation and Development on the Issue Date, and such person expressly assumes, by a supplemental indenture to this Indenture, executed and delivered to the Trustee, all the obligations of the Company under the Securities and this Indenture;

(2)    the surviving Person (if not the Company), if not organized and existing under the laws of Brazil, undertakes, in such supplemental indenture, to pay such additional amounts in respect of principal and interest as may be necessary in order that every net payment receivable in respect of the Securities after deduction or withholding for or on account of any present or future tax, duty, assessment or other governmental charge imposed by such other country or any political subdivision or taxing authority thereof or therein will not be less than the amount of principal and interest then due and payable on the Securities, subject to the same exceptions set forth in Section 4.21 but replacing existing references in such clause to Brazil with references to the other country;

(3)    immediately prior to such transaction and immediately after giving effect to such transaction, no Default or Event of Default will have occurred and be continuing;

(4)    immediately after giving effect to the transaction on a pro forma basis, the Company or the surviving Person (i) could Incur at least U.S.$1.00 of Debt under clause (a) of the covenant described under Section 4.03 or (ii) would not have both a higher percentage and higher ratio in clause (a) described under Section 4.03; and

(5)    the surviving Person (if not the Company) will have delivered to the Trustee an Officer's Certificate and an opinion of counsel, stating that such consolidation, merger or transfer and such supplemental indenture, if any, comply with this Indenture.

The Trustee will accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent set forth in this covenant, in which event it will be conclusive and binding on the holders.

Notwithstanding the restriction described in clause (3) and (4), any Restricted Subsidiary may consolidate with, merge into or transfer all or part of its properties and assets to the Company, the Company may merge into a Restricted Subsidiary for the purpose of reincorporating the Company in another jurisdiction, and any Restricted Subsidiary may consolidated with, merge into or transfer all or part of its properties and assets to another Restricted Subsidiary.

(b)      The Company shall not lease all or substantially all of its assets, whether in one transaction or a series of transactions, to one or more other Persons, except to the extent permitted under Section 4.10.

(c)      Upon the consummation of any transaction effected in accordance with these provisions, if the Company is not the continuing Person, the surviving Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Securities with the same effect as if such surviving Person had been named as the Company in this Indenture.

## Article 6

### Defaults and Remedies

SECTION 6.01      Events of Default.  An "Event of Default" occurs if:

(1)      the Company defaults in any payment of interest (including Additional Amounts, if any) on any Security when the same becomes due and payable, and such default continues for a period of 30 days;

(2)      the Company defaults in the payment of the principal (including Additional Amounts, if any) of any Security when the same becomes due and payable upon acceleration or redemption or otherwise;

(3)      the Company fails to make an Change of Control Offer and thereafter to accept and pay for Securities tendered when and as required pursuant to Section 4.08;

(4)      the Company fails to comply with Section 5.01;

(5)      the Company or any Guarantor, as the case may be, fails to comply with any of its covenants or agreements in the Securities or this Indenture (other than those referred to in clauses (1), (2), (3) and (4) above), and such failure continues for 60 days after the notice specified below;

(6)      the Company or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by the Company or such Significant Subsidiary (or the payment of which is guaranteed by the Company or such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the Issue Date, which default (a) is caused by

58

failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default (a "Payment Default") or (b) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$75,000,000 or more in the aggregate;

(7)     one or more final and non-appealable-judgments for the payment of money are rendered against the Company or any Significant Subsidiary and are not paid or otherwise discharged and there is a period of 60 consecutive days following entry of the final and non-appealable judgment that causes the aggregate amount for all such final and non-appealable judgments outstanding and not paid or discharged against all such Persons to exceed U.S.$75,000,000 or the equivalent thereof at the time of determination (in excess of amounts which the Company's insurance carriers have agreed to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(8)     an involuntary case or other proceeding is commenced against the Company or any Significant Subsidiary with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, *síndico*, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against the Company or any Significant Subsidiary under the federal bankruptcy laws as now or hereafter in effect and such order is not being contested by the Company or such Significant Subsidiary, as the case may be, in good faith or has not been dismissed, discharged or otherwise stayed, in each case within 60 days of being made;

(9)     the Company or any Significant Subsidiary (i) commences a voluntary case or other proceeding seeking the commencement of judicial or extra judicial reorganization, proceedings or bankruptcy proceedings with respect to itself or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, *síndico*, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Company or any Significant Subsidiary or for all or substantially all of the property of the Company or such Significant Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(10)     any event occurs that under the laws of Brazil or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in clause (8) or (9) above;

(11)     any guarantee by a Significant Subsidiary ceases to be in full force and effect, other than in accordance with the terms of this Indenture, or a Guarantor denies or disaffirms its obligations under its guarantee; or

(12)     all or substantially all of the undertaking, assets and revenues of the

59

Company or any Significant Subsidiary is condemned, seized or otherwise appropriated (other than in accordance with its terms) by any Person acting under the authority of any national, regional or local government or the Company or any Significant Subsidiary is prevented by such Person for a period of 60 consecutive days or longer from exercising normal control over all or substantially all of its undertaking, assets and revenues.

A Default under clause (5) above will not constitute an Event of Default until the Trustee or the holders of at least 25% in principal amount of the Outstanding Securities notify the Company and the Trustee of the Default and the Company does not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) a responsible officer of the Trustee with direct responsibility for this Indenture has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to the Trustee at its Corporate Trust Office by the Company , any Guarantor or any Holder, such notice identifying this Indenture and the Company.

SECTION 6.02    Acceleration.  If an Event of Default (other than an Event of Default specified in Section 6.01(8), (9) or (10)) occurs and is continuing under this Indenture, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Securities outstanding, may declare all unpaid principal of and accrued interest on all Securities to be due and payable immediately, by a notice in writing to the Company, and upon any such declaration such amounts will become due and payable immediately. If an Event of Default specified in Section 6.01(8), (9) or (10) above occurs and is continuing, then the principal of and accrued interest on all Securities shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

SECTION 6.03    Other Remedies.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of or interest on the Securities or to enforce the performance of any provision of the Securities or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative.

SECTION 6.04    Rescission/Annulment of Acceleration; Waiver of Past Defaults.  The holders of a majority in aggregate principal amount of the Outstanding Securities by written notice to the Issuer and to the Trustee may waive all past defaults (whether a Default or Event of Default) and rescind and annul an acceleration and its consequences if:

(1)     all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Securities that have become due solely by such acceleration, have been cured or waived, and

(2)     the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.

Except as otherwise provided in Section 6.02 or Section 9.02, the Holders of a majority in principal amount of the outstanding Securities may, by notice in writing to the Trustee, waive an existing Default and Event of Default and its consequences.  Upon such waiver, the Default and Event of Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

SECTION 6.05     Control by Majority.  Subject to the provisions herein relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders, unless such holders will have offered to the Trustee indemnity reasonably satisfactory to the Trustee.  Subject to such provision for the indemnification of, or provision of security to, the Trustee, the Holders of a majority in aggregate principal amount of the outstanding Securities shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

SECTION 6.06     Limitation on Suits.  A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Securities, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Securities, unless:

(1)     the Holder has given to the Trustee written notice of a continuing Event of Default;

(2)     Holders of at least 25% in aggregate principal amount of outstanding Securities have made written request to the Trustee to institute proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(3)     Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against any costs, liabilities or expenses to be incurred in compliance with such request;

(4)     the Trustee within 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(5)     during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Securities have not given the Trustee a written direction that is inconsistent with such written request;

61

it being understood and intended that no one or more of such Holders shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner therein provided and for the equal and ratable benefit of all such Holders (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

SECTION 6.07    Rights of Holders to Receive Payment.  Notwithstanding any other provision of this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and premium, if any and interest and Additional Amounts, if any, on such Security and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

SECTION 6.08    Collection Suit by Trustee.  If an Event of Default specified in Section 6.01(1) or Section 6.01(2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company or the Guarantors for the whole amount then due and owing (together with interest on any unpaid interest to the extent lawful) and the amounts provided for in Section 7.06.

SECTION 6.09    Trustee May File Proofs of Claim.  The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Securityholders allowed in any judicial proceedings relative to the Company, the Guarantors, their creditors or their property and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Bankruptcy Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.06.

SECTION 6.10    Priorities.  If the Trustee collects any money or property pursuant to this Article 6, it shall pay out the money or property in the following order:

FIRST:    to the Trustee and any Agent for amounts due under Section 7.06;

SECOND:    to Securityholders for amounts due and unpaid on the Securities for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities for principal and interest, respectively; and

THIRD:    to the Issuer or, to the extent the Trustee collects any amounts from the Guarantors, to the Guarantors.

The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 6.10 and shall promptly notify the Issuer thereof.  At least 15 days before such record date, the Company shall mail to each Securityholder and the Trustee a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11    Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 or a suit by Holders of more than 10% in principal amount of the Securities.

SECTION 6.12    Waiver of Stay or Extension Laws.  Neither the Issuer nor the Guarantors (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and each of the Issuer and the Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

Article 7

Trustee

SECTION 7.01    Duties of Trustee.

(1)  Except during the continuance of an Event of Default:

(a)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(b)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  Notwithstanding the foregoing, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not, and is under no obligation to, confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(2)     Following the occurrence and continuance of an Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(3)     The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(a)     this Section 7.01(3) does not limit the effect of Section 7.01(1);

(b)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(c)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(4)     Every provision of this Indenture that in any way relates to the Trustee is subject to Sections 7.01(1), (2) and (3).

(5)     The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer or the Guarantors.

(6)     Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(7)     No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity or security, as applicable, against such risk or liability is not reasonably assured to it.

(8)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

SECTION 7.02     Rights of Trustee. (1) Subject to Section 7.01 hereof, the Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee need not investigate any fact or matter stated in the document but may, in its discretion, make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer and the Guarantors, personally or by agent or attorney at the sole cost of the Issuer and the Guarantors and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(2)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate and/or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(3)     The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(4)     The Trustee shall not be liable for any action it takes or omits to take in good faith which it reasonably believes to be authorized or within its rights or powers; *provided, however*, that the Trustee's conduct does not constitute willful misconduct or negligence.

(5)     The Trustee may consult with counsel appointed with due care and the advice or Opinion of Counsel of such counsel with respect to legal matters relating to this Indenture and the Securities shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or such opinion of such counsel.

(6)     In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(7)     The Trustee shall not be deemed to have notice of any Default or Event of Default (other than a payment default under Section 6.01(1) or Section 6.01(2)) unless a Trust Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Securities and this Indenture.

(8)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each Agent, custodian and other Person employed to act hereunder.

(9)     The Trustee may request that the Issuer deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture.

SECTION 7.03     Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Issuer, the Guarantors or their Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent, Registrar, co-registrar or co-paying agent may do the same with like rights.  However, the Trustee must comply with Section 7.09 and Section 7.10.

SECTION 7.04     Trustee's Disclaimer.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Note Guarantee or the Securities, it shall not be accountable for the Issuer's use of the proceeds from the

Securities, and it shall not be responsible for any statement of the Issuer or the Guarantors in this Indenture or in any document issued in connection with the sale of the Securities or in the Securities other than the Trustee's certificate of authentication.

SECTION 7.05    Notice of Defaults.  If any Event of Default occurs and is continuing and is known to a responsible officer of the Trustee, the Trustee shall send notice of the Event of Default to each Holder within 90 days after it occurs, unless the Event of Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or interest on any Security, the Trustee may withhold the notice if and so long as a trust committee of trust officers of the Trustee in good faith determines that withholding the notice is in the interest of the Securityholders. The Trustee shall not be charged with knowledge of any Default or Event of Default other than a Default under Section 6.01(1) or Section 6.01(2) hereof unless a Trust Officer in the Corporate Trust Office of the Trustee shall have received written notice thereof from the Issuer or a Securityholder, expressly referencing this Indenture and the Securities.

SECTION 7.06    Compensation and Indemnity.   The Issuer shall pay to the Trustee and each Agent from time to time such compensation for its services and/or otherwise in connection with the Securities hereunder as the parties may from time to time agree in writing. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall indemnify the Trustee or any predecessor Trustee, each Paying Agent, the Registrar and any other Agent  (which for purposes of this Section 7.06 shall be deemed to include their respective directors, officers, agents and employees) (each an "Indemnified Person") against any and all loss, liability or expense (including taxes (other than taxes based upon, measured by or determined by the income of the Trustee) and reasonable and documented attorneys' fees and expenses) Incurred by it in connection with the administration of this trust and/or the performance of its duties hereunder, including the reasonable costs and expenses of defending itself against any claim (whether asserted by the Guarantors, the Issuer, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 7.06, except to the extent that such loss, damage, claim, liability or expense is due to its own willful misconduct, negligence or bad faith.  An Indemnified Person shall notify the Issuer promptly of any claim for which it may seek indemnity.  Failure by an Indemnified Person to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.  The Issuer shall defend the claim and each Indemnified Person may have separate counsel and the Issuer shall pay the reasonable and documented fees and expenses of such counsel; *provided* that the Issuer shall not be required to pay such fees and expenses if they assume an Indemnified Person 's defense and, in an Indemnified Person's reasonable judgment, there is no conflict of interest between the Issuer and such parties in connection with such defense.  In no event shall the Issuer be liable for fees and expenses of more than one counsel (in addition to any local counsel) separate from its own counsel for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstance.  The Issuer need not pay for any settlement made without its consent.

66

To secure the Issuer's obligations in this Section 7.06, each Indemnified Person shall have a lien prior to the Securities on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest and Additional Amounts, if any, on particular Securities.

The Issuer's payment obligations pursuant to this Section 7.06 shall survive the discharge of this Indenture, final payment on the Securities and resignation or removal of the Trustee or other Indemnified Person.  When the Trustee or other Indemnified Person incurs expenses after the occurrence of an Event of Default specified in Section 6.01(8) or (9) with respect to the Issuer, the expenses are intended to constitute expenses of administration under the U.S. Bankruptcy Code.

SECTION 7.07    Replacement of Trustee.  The Trustee may resign at any time by written notice to the Issuer and the Guarantors.  The Holders of a majority in principal amount of the Outstanding Securities may remove the Trustee by written notice to the Trustee and the Issuer and may appoint a successor Trustee.  The Issuer shall remove the Trustee if:

(1)    the Trustee fails to comply with Section 7.09;

(2)    the Trustee is adjudged bankrupt or insolvent or an order of relief is entered with respect to the Trustee;

(3)    a receiver or other public officer takes charge of the Trustee or its property; or

(4)    the Trustee otherwise becomes incapable of acting as Trustee hereunder.

In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor trustee shall become effective only upon the successor trustee's acceptance of appointment as provided in this Section 7.07.

If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Securities may appoint a successor trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor trustee, *provided*, *however*, that in case of a bankruptcy, the resigning Trustee shall have the right to appoint a successor trustee within 10 Business Days after giving of such notice of resignation if the Issuer has not already appointed a successor trustee.  If the successor trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the holders of a majority in principal amount of the Outstanding Securities may appoint a successor trustee or may petition any court of competent jurisdiction for the appointment of a successor trustee.

67

Upon delivery by the successor trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee shall, upon payment of its charges, transfer all property held by it as Trustee to the successor trustee, (ii) the resignation or removal of the retiring Trustee shall become effective, and (iii) the successor trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor trustee, the Issuer shall execute any and all instruments for fully vesting in and confirming to the successor trustee all such rights, powers and trusts.  The Issuer shall give notice of any resignation and any removal of the Trustee and each appointment of a successor trustee to all Holders, and include in the notice the name of the successor trustee and the address of its Corporate Trust Office.

If the Trustee fails to comply with Section 7.09, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of another successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the Issuer's obligations under Section 7.06 shall continue for the benefit of the retiring Trustee.

SECTION 7.08    Successor Trustee by Merger.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Securities shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Securities so authenticated; and in case at that time any of the Securities shall not have been authenticated, any successor to the Trustee may authenticate such Securities either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Securities or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.09    Eligibility; Disqualification.  The Trustee shall at all times satisfy the requirements of TIA § 310(a).  The Trustee shall have a combined capital and surplus of at least U.S.$50,000,000 as set forth in its most recent published annual report of condition.  The Trustee shall comply with TIA § 310(b); provided, however, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

SECTION 7.10    Preferential Collection of Claims Against Issuer.  The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

68

SECTION 7.11    Appointment of Co-Trustee.

(a)      Notwithstanding any other provisions of this Indenture, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, and to vest in such Person or Persons, in such capacity and for the benefit of the Securityholders, subject to the other provisions of this Section 7.11, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 7.09 and no notice to Holders of the appointment of any co-trustee or separate trustee shall be required under Section 7.07 hereof.

(b)      Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(1)      all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(2)      no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(3)      the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)      Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article 7.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the rights to compensation, reimbursement and indemnification hereunder) to, the Trustee.  Every such instrument shall be filed with the Trustee.

(d)      Any separate trustee or co-trustee may at any time constitute the Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Article 8

Discharge of Indenture; Defeasance

SECTION 8.01      Satisfaction and Discharge of Liability on Securities.

(a) This Indenture, the Securities and the Note Guarantee shall, subject to Section 8.01(b), cease to be of further effect as to all Securities issued hereunder, when:

(1)      (A)      the Company delivers to the Trustee all Outstanding Securities (other than Securities for whose payment money has theretofore been deposited in trust and thereafter repaid to the Company as provided in Section 8.05) for cancellation; or

(B)      all Outstanding Securities that have not been delivered to the Trustee for cancellation (i) have become due and payable, (ii) will become due and payable at their Stated Maturity within one year, or (iii) are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of a redemption by the Trustee and, in each case, the Company irrevocably deposits or causes to be deposited with the Trustee as funds in trust solely for the benefit of the Holders U.S. dollars or U.S. Government Obligations in an amount as will be sufficient without consideration of any reinvestment of interest, to pay and discharge all principal, premium and Additional Amounts, if any, and accrued and unpaid interest to the date of maturity or redemption on the Securities not delivered to the Trustee for cancellation;

(2)      no Event of Default has occurred and will continue after the date of the deposit or will occur as a result of the deposit and the deposit will not result in a breach or violation of, or constitute a default under, any other material instrument to which the Company or any Restricted Subsidiary is a party or by which the Company or any Restricted Subsidiary is bound;

(3)      the Company or any Restricted Subsidiary has paid or caused to be paid all other sums payable by it hereunder;

(4)      the Company has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Securities at maturity or the redemption date, as the case may be; and

(5)      the Company has delivered to the Trustee an Opinion of Counsel and an Officer's Certificate as to compliance with all conditions precedent provided for in this Indenture relating to the satisfaction and discharge of the Securities.

(b)      Notwithstanding Section 8.01(a), this Article 8 and the Company's obligations in Sections 2.03, 2.04, 2.05, 2.06, 2.07, 2.08, 4.21, 7.06 and 7.07 shall survive until the Securities have been paid in full.  Thereafter, Section 8.05 and the Company's obligations in Sections 4.21, 7.06 and 8.07 shall survive.

70

SECTION 8.02     [Reserved].

SECTION 8.03     [Reserved].

SECTION 8.04     Application of Trust Money.  The Trustee shall hold in trust U.S. dollars or U.S. Government Obligations deposited with it pursuant to this Article 8.  It shall apply the deposited money and the U.S. dollars from U.S. Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest and Additional Amounts, if any, on the Securities.

SECTION 8.05     Repayment to Company.  The Trustee and each Paying Agent shall promptly turn over to the Company upon request any excess money or Securities held by them at any time.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Company upon request any money held by them for the payment of principal and interest and Additional Amounts, if any, that remains unclaimed for two years, and, thereafter, Securityholders entitled to the money must look only to the Company and not to the Trustee or any Paying Agent for payment as general creditors.

SECTION 8.06     Defeasance.  The Company may, at its option, at any time elect to have either Section 8.06(a) or Section 8.06(b) applied to all outstanding Securities and the Note Guarantee upon compliance with the conditions set forth in Section 8.06(c):

(a)     Upon the Company's election of the "legal defeasance" option applicable to this Section 8.06(a), and subject to the satisfaction of the conditions set forth in Section 8.06(c), the Company and the Guarantors shall be discharged from any and all obligations in respect of this Indenture, the Company shall be discharged from any and all obligations in respect of the Securities, and the Guarantors shall be discharged from any and all obligations in respect of the Note Guarantee (except in each case for the obligations to register the transfer or exchange of Securities, replace stolen, lost or mutilated Securities, maintain paying agencies and hold moneys for payment in trust). Subject to compliance with this Section 8.06, the Company may exercise its option under this Section 8.06(a) notwithstanding the prior exercise of its option under Section 8.06(b).  If the Company exercise the "legal defeasance" option, any payment on the Securities may not be accelerated due to an Event of Default with respect thereto.

(b)     Upon the Company's  election of the "covenant defeasance" option applicable to this Section 8.06(b), and subject to the satisfaction of the conditions set forth in Section 8.06(c) hereof, the Company and the Guarantors, as applicable, need not comply with the covenants set forth in Sections 4.02, 4.03, 4.04, 4.06, 4.07, 4.08, 4.09, 4.10,  4.12, 4.13, 4.24 and 4.25 and the requirements of Sections 5.01(a)(4) and (5) and Sections 6.01 (4) (as it applies to Sections 5.01(a)(4) and (5)) and (5) shall not constitute Events of Default.

(c)     In order to exercise the options set forth in Section 8.07(a) or Section 8.07(b) above the Company must irrevocably deposit in trust with the Trustee U.S. dollars or U.S. Government Obligations sufficient to pay principal of and interest on the Securities to maturity

71

or redemption and by meeting certain other conditions, including delivery to the Trustee of either a ruling received from the Internal Revenue Service or an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.  In addition, in the case of any legal defeasance, the Company must deliver to the Trustee an Opinion of Counsel in the Federative Republic of Brazil and any other jurisdiction in which the Company or the Guarantors are organized or incorporated, as applicable, or is resident for tax purposes, and any other jurisdiction in which the Company or the Guarantors are conducting business in a manner which causes the holders of the Securities to be liable for taxes on payments under the Securities for which they would not have been so liable but for such conduct of business in such other jurisdiction, to the effect that Holders of the applicable Securities will not recognize income, gain or loss in the relevant jurisdiction (as applicable) as a result of such deposit and defeasance and will be subject to taxes in the relevant jurisdiction (including withholding taxes) (as applicable) on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred.  In the case of any legal defeasance, the defeasance shall in each case be effective when 90 days have passed since the date of the deposit in trust.

SECTION 8.07   Reinstatement.  If the Trustee or any Paying Agent is unable to apply any U.S. dollars or U.S. Government Obligations in accordance with Section 8.06 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's obligations under this Indenture and the Securities shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.06 until such time as the Trustee or such Paying Agent is permitted to apply all such U.S. dollars or U.S. Government Obligations in accordance with Section 8.06; provided, however, that, if the Company has made any payment of interest or Additional Amounts, if any, on or principal of any Securities because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Securities to receive such payment from the U.S. dollars held by the Trustee or such Paying Agent.

Article 9

Amendments

SECTION 9.01   Without Consent of Holders.  Notwithstanding Section 9.02, the Company, the Guarantors and the Trustee may amend or supplement this Indenture, the Note Guarantee or the Securities without notice to or consent of any Securityholder:

  (1)  to cure any ambiguity, omission, defect or inconsistency;

  (2)  to comply with Section 5.01;

  (3)  to provide for a Substituted Debtor as described under Section 10.01;

72

(4)     add to the covenants of the Company or the Guarantors for the benefit of Securityholders;

(5)     surrender any right conferred upon the Company or the Guarantors;

(6)     to evidence and provide for the acceptance of an appointment by a successor trustee;

(7)     to provide for the issuance of Additional Securities;

(8)     to provide for any guarantee of the Securities, to secure the Securities or to confirm and evidence the release, termination or discharge of any guarantee of or Lien securing the Securities when such release, termination or discharge is permitted by this Indenture; or

(9)     to make any other change that does not materially and adversely affect the rights of any Holder of the Securities or to conform the terms of this Indenture, the Note Guarantee or the Securities with the description thereof set forth in the "Description of Notes" section of the Offering Memorandum.

For the avoidance of doubt, the Company may at any time enter into a supplemental indenture with the Trustee without the consent of Securityholders to provide that any optional redemption can only be exercised by the Company beginning on a date more than 720 days after the Issue Date.

SECTION 9.02    With Consent of Holders.  (a) Except as otherwise provided in Section 6.02 or Section 9.02(b), the Company, the Guarantors and the Trustee may amend or supplement this Indenture, the Note Guarantee and the Securities with the written consent of the Holders of a majority in principal amount of the Outstanding Securities and the Holders of a majority in principal amount of the Outstanding Securities may waive any past Default, Event of Default or future compliance by the Company or the Guarantors with any provision of this Indenture, the Note Guarantee or the Securities.

(b)     Notwithstanding the provisions Section 9.02(a), without the consent of each Holder affected, an amendment or waiver shall not (with respect to any Securities held by a non-consenting Holder):

(1)     reduce the rate of or extend the time for payment of interest on any Security;

(2)     reduce the principal of any Security;

(3)     reduce the amount payable upon redemption of any Security or change the time at which any Security may be redeemed;

(4)     change the currency for payment of principal of, or interest on, any Security;

(5)     impair the right to institute suit for the enforcement of any payment on or with respect to any Security;

(6)     waive certain payment defaults with respect to the Security;

(7)     reduce the principal amount of Securities whose Holders must consent to any amendment or waiver;

(8)     make any change in the amendment or waiver provisions which require each Holder's consent;

(9)     modify or change any provision of this Indenture affecting the ranking of the Securities or the Note Guarantees in a manner adverse to the Holders of the Securities; or

(10)     make any change in the Note Guarantees that would adversely affect the Holders in any material respect;

The Company shall provide prior notice to each Holder pursuant to Section 13.01 of any proposed amendment under this Section 9.02. It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Company shall (or shall cause the Trustee to) mail to Securityholders a notice briefly describing such amendment.  The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03     Revocation and Effect of Consents and Waivers.  (a)  A consent to an amendment or a waiver by a Holder of a Security shall bind the Holder and every subsequent Holder of that Security or portion of the Security that evidences the same debt as the consenting Holder's Security, even if notation of the consent or waiver is not made on the Security.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment or waiver becomes effective.  After an amendment or waiver becomes effective, it shall bind every Securityholder.  An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.

(b)     The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Securityholders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding Section 9.03(a), those Persons who were Securityholders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or

74

effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

SECTION 9.04    Notation on or Exchange of Securities.  If an amendment changes the terms of a Security, the Trustee may require the Holder of that Security to deliver it to the Trustee.  The Trustee may place an appropriate notation on that Security regarding the changed terms and return it to the Holder.  Alternatively, if the Company or the Trustee so determines, the Company in exchange for that Security shall issue and the Trustee shall authenticate a new Security that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Security shall not affect the validity of such amendment.

SECTION 9.05    Trustee to Sign Amendments.  The Trustee shall sign any amendment authorized pursuant to this Article 9 if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  If it does, the Trustee may but need not sign it.  In signing such amendment the Trustee shall be entitled to receive indemnity or security, as applicable, reasonably satisfactory to it and to receive, and (subject to Section 7.01) shall be fully protected in relying upon, an Officer's Certificate and an Opinion of Counsel, each complying with Section 13.04, and stating that such amendment is authorized or permitted by this Indenture.

## Article 10

## Substitution of the Issuer

SECTION 10.01    Substitution of the Issuer.  (a) Notwithstanding any other provision in this Indenture, the Issuer may, without the consent of the Holders (and by subscribing for any Securities, each Holder expressly consents to it), be replaced and substituted by (i) any Guarantor or (ii) any Wholly-Owned Subsidiary of the Company, a Guarantor or Guarantors as principal debtors (in such capacity, the "Substituted Debtor") in respect of the Securities; provided that:

(i)    such documents will be executed by the Substituted Debtor, the Issuer, the Guarantor's and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture under which the Substituted Debtor assumes all of the Issuer's obligations under this Indenture and the Securities, a guarantee pursuant to which the Issuer will unconditionally and irrevocably guarantee in favor of each Holder the payment of all sums payable by the Substituted Debtor as such principal debtor, and, unless the Guarantors' then existing guarantees remain in full force and effect, substitute the guarantees issued by the Guarantors in respect of the Securities (collectively, the "Issuer Substitution Documents") and the covenants and events of default will continue to apply to the Issuer in respect of the Securities as if no such substitution had occurred, it being the intent that the rights of Holders in respect of the Securities will be unaffected by such substitution.

(ii)    the Issuer Substitution Documents will contain covenants to ensure that each Holder of the Securities has the benefit of a covenant in terms corresponding to the obligations of

the Issuer in respect of the payment of Additional Amounts under <u>Section 4.21</u>, if any (but replacing references to Brazil with references to another jurisdiction in the case that the Substituted Debtor is organized in a jurisdiction other than Brazil).

(iii)    the Issuer will deliver, or cause the delivery, to the Trustee an opinion of recognized counsel in the jurisdiction of organization of the Substituted Debtor and New York as to the validity, legally binding effect and enforceability of the Issuer Substitution Documents and specified other legal matters, as well as an Officer's Certificate as to compliance with the provisions described under this <u>Section 10.01</u>;

(iv)    the Substituted Debtor will appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Securities, this Indenture and the Issuer Substitution Documents;

(v)    any credit rating assigned to the Securities will remain the same or be improved when the Substituted Debtor replaces and substitutes the Issuer in respect of the Securities; *provided*, that, any such change in credit rating is in whole or in part in connection with such substitution;

(vi)    no Event of Default has occurred or is continuing; and

(vii)    the substitution will comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Debtor and Brazil.

Notwithstanding any other provision of this Indenture, each Guarantor will do or cause to be done all acts and things and promptly execute and deliver any documents or instruments, including any substitute guarantee and a legal opinion of internationally recognized counsel in the jurisdiction of such Guarantor, that may be required, or that the Trustee may reasonably request, to ensure that such Guarantor's guarantee is in full force and effect for the benefit of the holders and beneficial owners of the Securities following the substitution.

(b)    Notwithstanding anything to the contrary in <u>Section 10.01(a)</u>, the Company may be replaced and substituted as an issuer by its Subsidiary, OGX Netherlands B.V., after the Issue Date upon (i) the execution and delivery of a supplemental indenture substantially in the form of Appendix II and (ii) the delivery to the Trustee of an opinion of recognized counsel in New York as to the validity, legally binding effect and enforceability of the supplemental indenture. The Trustee is hereby authorized to execute and deliver such supplemental indenture. The Company will continue as a Guarantor of the Securities upon such substitution.

SECTION 10.02    <u>Deemed Substitution</u>.  Upon the execution of the Issuer Substitution Documents as referred to in <u>Section 10.01(a)</u> or <u>(b)</u>, the Substituted Debtor shall be deemed to be named in the Securities as the principal debtor in place of the Issuer (or of any previous substitute under these provisions) and the Securities shall thereupon be deemed to be amended to give effect to the substitution.  Except as set forth in this <u>Article 10</u>, the execution of the Issuer Substitution Documents shall operate to release the Company (or such previous

substitute as aforesaid) from all its obligations in respect of the Securities and its obligation to indemnify the Trustee under this Indenture.

SECTION 10.03   Notice of Substitution.  Not later than 10 Business Days after the execution of the Issuer Substitution Documents, the Substituted Debtor will give notice thereof to the Holders of the Securities in accordance with this Article 10.

Article 11

Guarantee by the Guarantors

SECTION 11.01   Guarantee.  Subject to the provisions of this Article, the Guarantors hereby irrevocably and unconditionally guarantee to each Securityholder and to the Trustee the due and punctual payment (whether at the Maturity Date, upon redemption, purchase pursuant to an offer to purchase or acceleration or otherwise) of the principal, interest, Additional Amounts and all other amounts payable by the Company under this Indenture as they come due. Upon failure by the Company to pay punctually any such amount, the Guarantors shall forthwith pay the amount not so paid at the place and time and in the manner specified in this Indenture. This guarantee constitutes a direct, general and unconditional obligation of the Guarantors which will at all times rank at least *pari passu* with all of their other respective unsubordinated obligations, except for such obligations as may be preferred by mandatory provisions of law.

SECTION 11.02   Guarantee Unconditional.  The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)      any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Company under this Indenture or any Security, by operation of law or otherwise;

(b)      any modification or amendment of or supplement to this Indenture (other than this Article 11) or any Security;

(c)      any change in the corporate existence, structure or ownership of the Company, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Company or its assets or any resulting release or discharge of any obligation of the Company contained in this Indenture or any Security;

(d)      the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Company, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions, *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)      any invalidity or unenforceability relating to or against the Company for any reason of this Indenture or any Security, or any provision of applicable law or regulation

77

purporting to prohibit the payment by the Company of the principal of or interest on any Security or any other amount payable by the Company under this Indenture;

(f)     any other act or omission to act or delay of any kind by the Company, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantor's obligations hereunder; or

(g)     any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms of this Indenture.

SECTION 11.03   Termination, Release and Discharge; Reinstatement.

(a)     The Guarantors' obligations hereunder shall remain in full force and effect until the principal of, premium, if any, and interest on the Securities and all other amounts payable by the Company under this Indenture have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Security or any other amount payable by the Company under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Company or otherwise, the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

(b)     A Guarantor's obligations hereunder shall terminate and be released:

(1)     a sale or disposition (including by way of consolidation or merger) of all or a portion of the Capital Stock of such Guarantor following which such Guarantor is no longer a Subsidiary of the Company;

(2)     a sale or disposition (including by way of consolidation or merger) of all or substantially all of the assets of such Guarantor to a Person that is not the Company or a Restricted Subsidiary of the Company;

(3)     defeasance under Section 8.06 or satisfaction and discharge of the Securities under Section 8.01;

(4)     the Designation of such Guarantor as an Unrestricted Subsidiary; and

(5)     the liquidation or dissolution of such Guarantor; *provided* that no Event of Default occurs as a result thereof or has occurred or is continuing;

*provided*, in each case, that the transaction is carried out pursuant to, and in accordance with, all other applicable provisions of this Indenture.

SECTION 11.04   <u>Waiver by the Guarantors</u>.

(a)      The Guarantors unconditionally and irrevocably waive acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Company or any other Person. The Note Guarantee constitutes a guarantee of payment and not of collection.

(b)      The Guarantors unconditionally and irrevocably waive any and all rights provided under the relevant applicable law of Brazil on prior demand and protest.

SECTION 11.05   <u>Subrogation and Contribution</u>.  Upon making any payment with respect to any obligation of the Company under this Article, the Guarantors shall be subrogated to the rights of the payee against the Company with respect to such obligation; *provided*, *however*, that the Guarantors shall not be entitled to enforce, or to receive any payments arising out of or based upon, such right of subrogation until the principal of (and premium, if any), interest, and Additional Amounts on all Securities shall have been paid in full.

SECTION 11.06   <u>Stay of Acceleration</u>.  If acceleration of the time for payment of any amount payable by the Company under this Indenture or the Securities is stayed upon the insolvency, bankruptcy or reorganization of the Company, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Guarantors forthwith on demand by the Trustee.

SECTION 11.07   <u>Execution and Delivery of Guarantee</u>.  The execution by the Guarantors of this Indenture evidences the guarantee of the Guarantors, whether or not the person signing as an officer of the Guarantors still holds that office at the time of authentication of any Security. The delivery of any Security by the Trustee after authentication constitutes due delivery of the guarantee set forth in this Indenture on behalf of the Guarantors.

SECTION 11.08   <u>Purpose of Guarantee</u>.  The Guarantors hereby acknowledge that the purpose and intent of the Guarantors in executing this Indenture and providing the guarantee is to give effect to the agreement of the Guarantors to guarantee the payment of any such amounts due by the Company under the Securities and this Indenture, whether such amounts are in respect of principal, interest or any other amounts (including Additional Amounts).  Therefore, the Guarantors agree that if the Company shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any principal, interest or any other amounts (including Additional Amounts) with respect to this Indenture and the Securities, the Guarantors shall promptly pay the same, without any demand or notice whatsoever.  The Trustee shall promptly deposit in the account designated by the Trustee to receive payments from the Company with respect to the Securities for further payment to the Holders any funds it receives from the Guarantors under or pursuant to this guarantee in respect of the Securities.

SECTION 11.09   <u>Central Bank Regulations</u>.  The Guarantors shall comply with all then-applicable Central Bank regulations to legally effect any payments under the Guarantors' Note Guarantee at the time any such payment is made or required to be made.

Article 12

Release of Covenants

SECTION 12.01   Release of Covenants.

(a)      From and during any time that:

(1)      the Securities have been assigned an Investment Grade Rating by any two Rating Agencies; and

(2)      no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (1) and (2) being collectively referred to as a "Covenant Suspension Event"), the Company and its Restricted Subsidiaries shall not be subject to the following provisions of this Indenture (collectively referred to as the "Suspended Covenants"):

(A)      Section 4.03;

(B)      Section 4.04;

(C)      Section 4.06;

(D)      Section 4.07;

(E)      Section 4.10(A);

(F)      Section 4.13;

and

(G)      Section 5.01(a)(4);

(b)      In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date"), the Securities cease to have an Investment Grade Rating from any two Rating Agencies, then the Company and its Restricted Subsidiaries shall thereafter again be subject to the Suspended Covenants.  The period of time between the occurrence of a Covenant Suspension Event and the Reversion Date is referred to as the "Suspension Period." Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default shall be deemed to have occurred as a result of a failure to comply with any of the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

(c)      On the Reversion Date, all Debt Incurred during the Suspension Period shall be classified to have been Incurred pursuant to Section 4.03(a) or one of clauses (1) through (21) of Section 4.03(b) (to the extent such Debt would be permitted to be Incurred thereunder as of the

80

Reversion Date and after giving effect to the Debt Incurred prior to the Suspension Period and outstanding on the Reversion Date).  To the extent such Debt would not be permitted to be Incurred pursuant to Section 4.03 such Debt shall be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.03(b)(8).

(d)    The Company or the Guarantors shall give the Trustee prompt written notification upon the occurrence of a Covenant Suspension Event or any Reversion Date.

## Article 13

## Miscellaneous

SECTION 13.01   Notices.  (a) Any notice or communication to the Company, the Guarantors, the Trustee or any Paying Agent shall be in writing in the English language or a certified translation, and delivered in person, sent by facsimile or mailed by first-class mail addressed as follows:

if to the Company or any of the Guarantors:

Praia do Flamengo, No. 154 – 7th
Rio de Janeiro, Rio De Janeiro 22210-030 Brazil
Attention: General Counsel
Telephone: +55 21 2555 5200
Facsimile: +55 21 2555 5202

if to the Trustee or Paying Agent:

Deutsche Bank Trust Company Americas
Trust & Securities Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX
Facsimile:  732-578-4635

With a copy to:

Deutsche Bank Trust Company Americas
c/o Deutsche Bank National Trust Company
Trust & Securities Services
100 Plaza One, 6th fl., MSJCY03-0699
Jersey City, New Jersey 07311
Attention:  Corporates Team Deal Manager – OGX
Facsimile:  732-578-4635

if to the Principal Paying Agent:

> The Bank of Tokyo-Mitsubishi UFJ, Ltd.
> Ropemaker Place
> 25 Ropemaker Street
> London, EC2Y 9AN
> United Kingdom
> Telephone: 44(0) 20 7577 1593
> Facsimile: 44(0) 20 7577 1609

The Company, the Guarantors, the Trustee or any Paying Agent by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)     (1)     As long as Securities in global form are outstanding, notices to be given to Holders shall be given to the Depositary, in accordance with its applicable policies as in effect from time to time.  If the Company issues Securities in certificated form, notices to be given to Holders shall be sent by mail to the respective addresses of the Holders as they appear in the Trustee's records.

(2)     A notice shall be deemed to have been given to a Holder upon the mailing by first class mail, postage prepaid, of such notice to such Holder at its registered addresses as recorded in the Security Register not later than the latest date, and not earlier than the earliest date, prescribed in the Securities for the giving of such notice.  If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

(3)     Failure to mail a notice or communication to a Securityholder or any defect in a notice or communication to a Securityholder shall not affect the sufficiency of such notice or communication with respect to other Securityholders.

(4)     For so long as any Securities are listed on the Global Exchange Market of the Irish Stock Exchange and in accordance with the rules and regulations of the Irish Stock Exchange, the Company shall publish all notices to Holders in a daily newspaper with general circulation in Ireland, which is expected to be the Irish Times, or alternatively the Company may also publish a notice on the website of the Irish Stock Exchange (www.ise.ie).  If publication in Ireland is impracticable, the Company may make the publication elsewhere in Western Europe. For purposes of this Section 13.01(b)(4), a "daily newspaper" is a newspaper that is published on each day, other than a Saturday, Sunday or holiday, in Ireland or, when applicable, elsewhere in Western Europe.  The Holders shall be presumed to have received such notices on the date the Company first publishes them.  If the Company is unable to give notice as described in this Section 13.01(b)(4) because the publication of any newspaper is suspended or it is otherwise impractical for the Company to publish the notice, then the Company, or the Trustee acting on instructions from the Company and at the Company's expense, shall give the Holders notice in another form.  That alternate form of notice shall be sufficient notice to the Holders.

(5)     Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice.

SECTION 13.02   Communication by Holders with Other Holders. Securityholders may communicate pursuant to TIA § 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities.  The Company, the Guarantors, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

SECTION 13.03   Certificate and Opinion as to Conditions Precedent.  Upon any request or application by the Company or the Guarantors to the Trustee to take or refrain from taking any action under this Indenture (other than with respect to the issuance of the Initial Securities), the Company or the Guarantors, as the case may be, shall furnish to the Trustee:

(1)     an Officer's Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to taking the proposed action or to refraining from taking the proposed action have been complied with; and

(2)     an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.04   Statements Required in Certificate or Opinion.  Each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(1)     a statement that the individual making such certification or opinion has read such covenant or condition;

(2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)     a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)     a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

SECTION 13.05   When Securities Disregarded.  In determining whether the Holders of the required principal amount of Securities have concurred in any direction, waiver or consent, Securities owned by the Company, the Guarantors or by any Person directly or

83

indirectly Controlling or Controlled by or under direct or indirect common Control with the Company or the Guarantors shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Securities which a Trust Officer of the Trustee has been informed in writing are so owned shall be so disregarded.  Also, subject to the foregoing, only Securities outstanding at the time shall be considered in any such determination.

SECTION 13.06   Rules by Trustee, Paying Agent and Registrar.  The Trustee may make reasonable rules for action by or a meeting of Securityholders.  The Registrar and each Paying Agent may make reasonable rules for their functions.

SECTION 13.07   Business Days.  If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period.  If a regular record date is not a Business Day, the record date shall not be affected.

SECTION 13.08   Governing Law.  THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY. THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT HAVE BEEN PROPOSED BY THE COMPANY FOR THE PURPOSES OF ARTICLE 9, PARAGRAPH 2 OF BRAZILIAN DECREE LAW NO. 4,657, DATED SEPTEMBER 4, 1942, AS AMENDED, AND FOR NO OTHER PURPOSE OR REASON WHATSOEVER.

SECTION 13.09   No Recourse Against Others.  No past, present or future director, officer, partner, employee, incorporator, quotaholder, shareholder or member of the Company, the Guarantors or any Subsidiary of the Company shall have any liability for any obligations of the Company, the Guarantors or any Subsidiary of the Company under the Securities, this Indenture or the Note Guarantee or for any claim based on, in respect of, or by reason of, such obligations or their creation. By accepting a Security, each Securityholder shall waive and release all such liability.  Such waivers and releases shall be part of the consideration for the issuance of the Securities.

SECTION 13.10   Successors.  All agreements of the Company and the Guarantors in this Indenture and the Securities shall bind their successors.  All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.11   Multiple Originals.  The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Indenture.

SECTION 13.12   <u>Table of Contents; Headings</u>.  The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.13   <u>Consent to Jurisdiction; Appointment of Agent to Accept Service of Process; Currency Indemnity</u>.  (a)  Each of the parties hereto irrevocably consents and agrees that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter arising out of or in connection with this Indenture, the Note Guarantee or the Securities may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Securities have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself and in respect of its properties, assets and revenues.  Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture the Note Guarantee, or the Securities brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum and any right which it may be entitled on account of place of residence or domicile.  To the extent that the Company or the Guarantors has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process with respect to itself or its property, each of the Company and the Guarantors irrevocably waives such immunity in respect of its obligations under this Indenture, any Security or the Note Guarantee.  Each of the parties to this Indenture agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on them and may be enforced in any court to the jurisdiction of which each of them is subject by a suit upon such judgment, *provided* that service of process is effected upon the Company in the manner specified in the following paragraph or as otherwise permitted by law.

(b)     The Company and the Guarantors have validly and effectively appointed National Corporate Research, Ltd. (the "<u>Process Agent</u>"), with offices on the date hereof at 10 East 40th Street, 10th Floor, New York, NY 10016, as its authorized agent upon which process may be served in any action, suit or proceeding referred to in <u>Section 13.13(a)</u>.  If for any reason such agent hereunder shall cease to be available to act as such, each of the Company and the Guarantors agrees to designate a new agent in the Borough of Manhattan, New York City, New York on the terms and for the purposes of this <u>Section 13.13</u> reasonably satisfactory to the Trustee.  Each of the Company and the Guarantors further hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents in any such action, suit or proceeding against the Company or the Guarantors by serving a copy thereof upon the relevant agent for service of process referred to in this <u>Section 13.13</u> (whether or not the appointment of such agent shall for any reason prove to be ineffective or such agent shall accept or acknowledge such service) or by mailing copies thereof by registered or certified air mail,

85

postage prepaid, to each of the Company and the Guarantors at its address specified in or designated pursuant to this Indenture.  Each of the Company and the Guarantors agree that the failure of any such designee, appointee and agent to give any notice of such service to it shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon.  Nothing herein shall in any way be deemed to limit the ability of the Holders and the Trustee to serve any such legal process, summons, notices and documents in any other manner permitted by applicable law or to obtain jurisdiction over the Company and the Guarantors or bring actions, suits or proceedings against the Company or the Guarantors in such other jurisdictions, and in such manner, as may be permitted by applicable law.

(c)     U.S. dollars are the sole currency of account and payment for all sums payable by the Company or the Guarantors under or in connection with the Securities and the guarantees, including damages.  Any amount received or recovered in a currency other than U.S. dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company or otherwise) by any Holder of a Security in respect of any sum expressed to be due to it from the Company or the Guarantors will only constitute a discharge to the Company or the Guarantors, as the case may be, to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any note, the Company will indemnify such Holder against any loss sustained by it as a result; and if the amount of U.S. dollars so purchased is greater than the sum originally due to such holder, such Holder will, by accepting a Security, be deemed to have agreed to repay such excess.  In any event, the Company will indemnify the recipient against the cost of making any such purchase.

For the purposes of the preceding paragraph, it will be sufficient for the Holder of a Security to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).  These indemnities constitute a separate and independent obligation from the other obligations of the Company and the Guarantors, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by any Holder of a Security and will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Security.

(d)     The provisions of this <u>Section 13.13</u> shall survive any termination of this Indenture, in whole or in part.

SECTION 13.14   <u>Waiver of Jury Trial</u>.  EACH OF THE COMPANY, THE GUARANTORS AND THE TRUSTEE (SOLELY IN ITS CAPACITY AS TRUSTEE, WHICH, FOR THE AVOIDANCE OF DOUBT, SHALL NOT IN ANY WAY AFFECT ANY RIGHT OF ANY HOLDER) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST

EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE SECURITIES OR THE TRANSACTION CONTEMPLATED HEREBY.

SECTION 13.15   Patriot Act.  The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, Deutsche Bank Trust Company Americas, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account.  The parties to this agreement agree that they will provide Deutsche Bank Trust Company Americas with such information as it may request in order for Deutsche Bank Trust Company Americas to satisfy the requirements of the USA Patriot Act.

SECTION 13.16   Force Majeure.  The Trustee and the Agents shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Trustee and the Agents (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.**

By: _____
    Name:
    Title:

                  MARCELO TORRES
                  Diretor Financeiro
                  OGX PETRÓLEO & GÁS

By: _____
    Name:
    Title:

          José Roberto Faveret Cavalcanti
               Diretor Jurídico
             OGX Petróleo & Gás

*[Signature Page to Indenture dated June 3, 2011]*

**OGX PETRÓLEO E GÁS LTDA.**

By: 
Name:
Title:

MARCELO TORRES
Diretor Financeiro
OGX PETRÓLEO & GÁS

By: _____
Name:
Title:

José Roberto Faveret Cavalcanti
Diretor Jurídico
OGX Petróleo & Gás

**OGX CAMPOS PETRÓLEO E GÁS S.A.**

By: _____
Name:
Title:

MARCELO TORRES
Diretor Financeiro
OGX PETRÓLEO & GÁS

By: _____
Name:
Title:

José Roberto Faveret Cavalcanti
Diretor Jurídico
OGX Petróleo & Gás

**DEUTSCHE BANK TRUST COMPANY
AMERICAS,
as Trustee, Registrar, Transfer Agent and
Paying Agent
By: Deutsche Bank National Trust Company**

By: _Wanda Camacho_____
     Name:    Wanda Camacho
     Title:     Vice President

By: _Cynthia J. Powell_____
     Name:    **Cynthia J. Powell**
     Title:     **Vice President**


STATE OF NEW JERSEY     )

                         ) to wit

COUNTY OF HUDSON     )


On this 3rd day of June, 2011, before me, a notary public, personally appeared Wanda Camacho, Vice President and Cynthia Powell, Vice President, to me personally known who being duly sworn, did say that they are the Authorized Signatory(s) of Deutsche Bank National Trust Company, one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person(s).


By: _____
    Notary Public
    New Jersey
    Jeffrey Schoenfeld
    Commission Expiry: August 17, 2012


*[Signature Page to Indenture]*

**THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.,**
**as Principal Paying Agent**

By: _____

Name: NIKOLA MOORE

Title: ASSISTANT VICE PRESIDENT

*[Signature Page to Indenture dated June 3, 2011]*

RULE 144A/REGULATION S APPENDIX

<u>PROVISIONS RELATING TO INITIAL SECURITIES</u>

1.    <u>Definitions</u>

For the purposes of this Appendix the following terms shall have the meanings indicated below.  Other terms used in this Appendix and not defined herein shall have the meanings assigned to them in this Indenture.

"<u>Clearstream</u>" means Clearstream Banking, *société anonyme*, Luxembourg.

"<u>Euroclear</u>" means Euroclear Bank, S.A./N.V.

"<u>Global Securities</u>" means the Regulation S Global Security and Restricted Global Security.

"<u>Issuer Order</u>" means a written request or order signed in the name of the Company by the two of its Officers and delivered to the Trustee.

"<u>Non-U.S. Person</u>" has meaning given to it in Regulation S.

"<u>QIB</u>" means a "qualified institutional buyer" as defined in Rule 144A under the Securities Act.

"<u>Regulation S Global Security</u>" means a single, permanent Restricted Global Security sold outside of the United States in reliance on Regulation S.

"<u>Restricted Global Security</u>" means a single, permanent Security in definitive, fully registered book-entry form without interest coupon, constituting a Restricted Security.

"<u>Restricted Securities Legend</u>" has the meaning set forth in Section 2.1(6) of this Appendix.

"<u>Restricted Security</u>" means a Security that constitutes a "restricted security" within the meaning of Rule 144(a)(3) under the Securities Act and shall bear the Restricted Securities Legend; *provided*, *however*, that the Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Security constitutes a Restricted Security.

"<u>Securities Custodian</u>" means the custodian with respect to a Global Security (as appointed by DTC), or any successor Person thereto and shall initially be Deutsche Bank Trust Company Americas.

2.    <u>The Securities</u>

2.1    Form and Registration.

(1)    Form and Registration.  The certificates representing the Securities shall be issued in fully registered form without interest coupons.

(2)    Regulation S Global Security. Securities offered and sold in reliance on Regulation S under the Securities Act shall initially be represented by one or more Regulation S Global Securities and shall be deposited with the Trustee as custodian for, and registered in the name of a nominee of, DTC for the accounts of Euroclear and Clearstream (as indirect participants in DTC).

(3)    Restricted Global Security. Securities offered and sold in reliance on Rule 144A under the Securities Act shall be represented by one or more Restricted Global Securities and shall be deposited with the Trustee as custodian for, and registered in the name of a nominee of, DTC.  Each Global Security shall be subject to certain restrictions on transfer set forth in Sections 2.3 and 2.4 of this Appendix.

(4)    Ownership. Ownership of beneficial interests in a Global Security shall be limited to persons who have accounts with DTC or Euroclear and Clearstream, as indirect participants in DTC ("participants"), or persons who hold interests through participants. Ownership of beneficial interests in a Global Security shall be shown on, and the transfer of that ownership shall be effected only through, records maintained by DTC or its nominee (with respect to interests of participants) and the records of participants (with respect to interests of persons other than participants).  QIBs may hold their interests in a Restricted Global Security, directly through DTC, if they are participants in such system, or indirectly through organizations which are participants in such system.

Investors may hold their interests in a Regulation S Global Security, directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems.

So long as DTC or its nominee is the registered owner or holder of a Global Security, DTC or such nominee, as the case may be, shall be considered the sole owner or Holder of the Securities represented by such Global Security for all purposes under the Indenture.  No beneficial owner of an interest in a Global Security shall be able to transfer that interest except in accordance with DTC's applicable procedures, in addition to those provided for under the Indenture.  Payments made with respect to a Global Security shall be made to DTC or its nominee, as the registered owner thereof.  None of the Company, the Guarantors, the Trustee or any Paying Agent shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

The Company and the Guarantors expect that DTC or its nominee, upon receipt of any payment in respect of a Global Security, shall credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in such Global Security as shown on its records.  The Company and the Guarantors also expect that payments by participants to

2

owners of beneficial interests in such Global Security held through such participants shall be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers.  Such payments shall be the responsibility of such participants.

(5)     <u>Limitation on Obligations</u>. Although DTC, Euroclear and Clearstream are expected to follow the procedures set forth in the Indenture in order to facilitate transfers of interests in a Global Security among participants of DTC, Euroclear and Clearstream, as the case may be, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time.  None of the Company, the Guarantors, the Trustee or any Paying Agent shall have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

(6)     <u>Successors; Definitive Securities</u>.  If (i) DTC is at any time unwilling or unable to continue as a Depositary for the Global Securities and a successor Depositary or clearing agency is not appointed by the Company within 90 days, or (ii) an Event of Default has occurred and is continuing and the Registrar and the Company have received a written request from a beneficial owner of Securities to issue its proportionate interest in the Global Security, the Company shall issue certificated Securities which may bear the Restricted Securities Legend set forth in <u>Exhibit 1</u> to this Appendix (the "<u>Restricted Securities Legend</u>") to all beneficial owners, in exchange for their beneficial interests in Global Securities.  Holders of an interest in a Global Security may receive certificated Securities, which may bear the Restricted Securities Legend, in accordance with DTC's rules and procedures in addition to those provided for under the Indenture; *provided, however*, that if the Company is issuing certificated Securities pursuant to Section 2.1(6)(ii), the Company shall only be required to issue certificated Securities to the beneficial owners of the Securities who request certificated Securities.

(7)     <u>Certificated Securities</u>.  Except as provided in this Section 2.1 or Section 2.3, owners of beneficial interests in Restricted Global Securities shall not be entitled to receive physical delivery of certificated Securities.  The registered Holder of a Global Security shall be entitled to grant proxies and otherwise authorize any Person, including DTC and Persons that may hold interests through DTC, to take any action which a Holder is entitled to take under the Indenture or the Securities.  In the event of transfer of a Restricted Global Security to the beneficial owners thereof in the form of certificated Securities, the Company shall promptly make available to the Trustee a reasonable supply of certificated Securities in definitive, fully registered form without interest coupons.

2.2     <u>Authentication</u>.  The Trustee shall authenticate and deliver:  (1) on the Issue Date, an aggregate principal amount of U.S.$2,563,000,000 of the Company's 8.500% Senior Notes due 2018, and (2) any Additional Securities for an original issue in an aggregate principal amount specified in the written order of the Company pursuant to Section 2.02 of the Indenture.  Such order shall specify the amount of the Securities to be authenticated and the date on which the original issue of Securities is to be authenticated and, in the case of any issuance of Additional Securities pursuant to Section 2.12 of the Indenture, shall certify that such issuance is in compliance with Section 4.03 of the Indenture.

3

2.3     <u>Global Securities</u>.

(1) Any Global Security (i) shall represent, and shall be denominated in an aggregate amount equal to the aggregate principal amount of, all of the outstanding Securities of such series, (ii) shall be registered in the name of DTC or its nominee, (iii) shall be delivered to the Trustee or the Registrar as custodian for DTC and (iv) shall bear a legend substantially to the following effect:

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(2)  Members of, or participants in, DTC, Euroclear or Clearstream shall have no rights under the Indenture with respect to any Global Security held on their behalf by DTC or the Trustee as its custodian, or under the Global Security, and DTC may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner of the Global Security for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its participants, the operation of customary practices governing the exercise of the rights of a Holder of any Security.

4

(3)  Interests of beneficial owners in the Global Securities may only be transferred or exchanged for certificated Securities in accordance with the rules and procedures of DTC, Euroclear and Clearstream and the provisions of the Indenture, including this Appendix.

(4)  In connection with any transfer or exchange of a portion of the beneficial interest in any Global Security to beneficial owners pursuant to Section 2.3(3) in the form of certificated Securities, the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Security in an amount equal to the principal amount of the beneficial interest in the Global Security to be transferred, and the Company shall execute, and the Trustee shall authenticate and deliver, one or more definitive Securities of like tenor and principal amount of authorized denominations.

(5)  Any beneficial interest in one of the Global Securities that is transferred to a person who takes delivery in the form of an interest in the other corresponding Global Security will, upon transfer, cease to be an interest in such Global Security and become an interest in the other corresponding Global Security and, accordingly, will thereafter be subject to all transfer restrictions, if any, and other procedures applicable to beneficial interest in such other corresponding Global Security for as long as it remains such an interest.

(6)  In connection with the transfer of Global Securities as an entirety to beneficial owners pursuant to Section 2.3(3) in the form of certificated Securities, the Global Securities shall be deemed to be surrendered to the Trustee for cancellation, and the Company shall execute, and the Trustee shall authenticate and deliver, to each beneficial owner identified by DTC, Euroclear or Clearstream in exchange for its beneficial interest in the Global Securities, an equal aggregate principal amount at maturity of definitive Securities of authorized denominations.

(7)  Any definitive Security constituting a Restricted Security delivered in exchange for an interest in a Global Security pursuant to this Section 2.3 shall bear the Restricted Securities Legend.

(8)  The registered Holder of any Global Security may grant proxies and otherwise authorize any person, including participants in DTC and persons that may hold interests through participants in DTC to take any action which a Holder is entitled to take under the Indenture or the Securities.

2.4    Special Transfer Provisions.

The following provisions shall apply with respect to the Securities:

(1)    Transfers to Non-U.S. Persons.  The following provisions shall apply with respect to the registration of any proposed transfer of an Initial Security or an Additional Security to any Non-U.S. Person:

5

(a)     the Registrar shall register the transfer of any Initial Security or any Additional Security, whether or not such Security bears the Restricted Securities Legend, if the proposed transferor has delivered to the Registrar a certificate substantially in the form of <u>Exhibit 2</u> to this Appendix;

(b)     if the proposed transferee is a participant in DTC and the Securities to be transferred consist of definitive Securities which after transfer are to be evidenced by an interest in a Regulation S Global Security upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.4(1)(a), the Registrar shall register the transfer and reflect on its books and records the date and an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of definitive Securities to be transferred, and the Trustee and/or the Registrar shall cancel the definitive Securities so transferred or decrease the principal amount of such definitive Security, as the case may be;

(c)     if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security, upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.4(1)(a), the Registrar shall register the transfer and reflect on its books and records the date and (i) a decrease in the principal amount of the Global Security from which such interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (ii) an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of the Global Security to be transferred.

(2)     <u>Transfers to QIBs</u>.  The following provisions shall apply with respect to the registration of any proposed transfer of an Initial Security or an Additional Security to a QIB (excluding Non-U.S. Persons):

(a)     if the Security to be transferred consists of (i) a definitive Security, the Registrar shall register the transfer if such transfer is being made by a proposed transferor who has delivered to the Trustee a certificate substantially in the form set forth in <u>Exhibit 3</u> to this Appendix or (ii) an interest in the Restricted Global Security, the transfer of such interest may be effected only through the book entry system maintained by DTC;

(b)     if the Security to be transferred consists of a definitive Security, upon receipt by the Registrar of instructions given in accordance with DTC's and the Registrar's procedures therefor, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Restricted Global

Security in an amount equal to the principal amount of the definitive Security, to be transferred, and the Trustee shall cancel the definitive Security so transferred; and

(c)      if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security, upon receipt by the Registrar of written instructions given in accordance with DTC's and the Registrar's procedures, the Registrar shall register the transfer and reflect on its books and records the date and (i) a decrease in the principal amount of the Global Security from which interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (ii) an increase in the principal amount of the Restricted Global Security in an amount equal to the principal amount of the Global Security to be transferred.

(3)  Restricted Securities Legend.  Upon the registration of transfer, exchange or replacement of Securities not bearing the Restricted Securities Legend, the Registrar shall deliver Securities that do not bear the Restricted Securities Legend.  Upon the registration of transfer, exchange or replacement of Securities bearing the Restricted Securities Legend, the Registrar shall deliver only Securities that bear the Restricted Securities Legend unless either (i) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Company, the Registrar and the Trustee to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or (ii) such Security has been sold pursuant to an effective registration statement under the Securities Act.

(4)  [Reserved].

(5)  Other Transfers.  If a Holder proposes to transfer a Security constituting a Restricted Security pursuant to any exemption from the registration requirements of the Securities Act other than as provided for by Sections 2.4(1) or 2.4(2), the Registrar shall only register such transfer or exchange if such transferor delivers an Opinion of Counsel reasonably satisfactory to the Company, the Registrar and the Trustee that such transfer is in compliance with the Securities Act and the terms of the Indenture; *provided, however*, that the Company may, based upon the opinion of its counsel, instruct the Registrar by an Issuer Order not to register such transfer in any case where the proposed transferee is not a QIB or a Non-U.S. person.

(6)  General.  By its acceptance of any Security (or any beneficial interest in any Global Security) bearing the Restricted Securities Legend, each Holder of such a Security or holder of such beneficial interest acknowledges the restrictions on transfer of such Security set forth in the Indenture and in the Restricted Securities Legend and agrees that it will transfer such Security only as provided in the Indenture.  The Registrar shall not register a transfer of any

7

Security unless such transfer complies with the restrictions on transfer of such Security set forth in the Indenture.

The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.4.  The Company shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable prior written notice to the Registrar.

2.5    Cancellation or Adjustment of Global Security.

At such time as all beneficial interests in a Global Security have either been exchanged for certificated Securities, redeemed, purchased or canceled, such Global Security shall be returned to DTC for cancellation or retained and canceled by the Trustee.  At any time prior to such cancellation, if any beneficial interest in a Global Security is exchanged for certificated Securities, redeemed, purchased or canceled, the principal amount of Securities represented by such Global Security shall be reduced and an adjustment shall be made on the books and records of the Trustee (if it is then the Securities Custodian for such Global Security) with respect to such Global Security, by the Trustee or the Securities Custodian, to reflect such reduction.

EXHIBIT 1

to

RULE 144A/REGULATION S APPENDIX

[FORM OF FACE OF INITIAL SECURITY]

[Global Securities Legend]

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

[Restricted Securities Legend]

[THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES ACT, AND THIS SECURITY MAY NOT BE REOFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THIS SECURITY IS HEREBY NOTIFIED THAT THE SELLER OF THIS SECURITY MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

THE HOLDER OF THIS SECURITY AGREES FOR THE BENEFIT OF THE ISSUER OR ANY SUBSIDIARY THAT (A) THIS SECURITY MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (I) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS

DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES TO A PERSON THAT IS NOT A U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) PURSUANT TO ANOTHER AVAILABLE EXEMPTION UNDER THE SECURITIES ACT, (IV) TO THE ISSUER OR ANY SUBSIDIARY OF THE ISSUER OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH OF CASES (I) THROUGH (V) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES; AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS SECURITY FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE. THIS LEGEND MAY ONLY BE REMOVED AT THE OPTION OF THE ISSUER.][1]

[THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION ORIGINALLY EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.][2]

---

[1] Insert for Securities sold in accordance with Rule 144A.

[2] Insert for Securities sold in accordance with Regulation S.

No._____                                                            U.S.$_____

8.500% Senior Notes due 2018

CUSIP No. 144A: 670849AA6/ Reg. S: P7356YAA1
ISIN No. 144A: US670849AA60/ Reg. S: USP7356YAA12

OGX Petróleo e Gás Participações S.A., a corporation (*sociedade anônima*) organized under the laws of the Federative Republic of Brazil, promises to pay to _____, or its registered assigns, the principal sum [of _____ dollars][listed on the Schedule of Increases or Decreases in Global Note attached hereto]* on June 1, 2018.

Interest Payment Dates:  June 1 and  December 1 of each year, commencing on December 1, 2011

Record Dates:  May 15 and November 15

Additional provisions of this Security are set forth on the other side of this Security.

*If the Security is to be issued in global form, add the Schedule of Increases or Decreases in Global Security.

1-3

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Dated:

TRUSTEE'S CERTIFICATE OF
     AUTHENTICATION

Deutsche Bank Trust Company Americas
     as Trustee, certifies
          that this is one of
          the Securities referred
          to in the Indenture described herein

By: Deutsche Bank National Trust Company
By

_____
     Authorized Signatory


Dated:

STATE OF NEW JERSEY     )

                        ) to wit

COUNTY OF HUDSON        )


On this 3rd day of June, 2011, before me, a notary public, personally appeared Wanda Camacho, Vice President, to me personally known who being duly sworn, did say that he/she is the Authorized Signatory of Deutsche Bank National Trust Company, one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person.


By:_____

    Notary Public

    New Jersey

    Jeffrey Schoenfeld

    Commission Expiry:  August 17, 2012

1-6

[FORM OF REVERSE SIDE OF INITIAL SECURITY]

8.500% Senior Note due 2018

1.      Interest

OGX Petróleo e Gás Participações S.A., a corporation (*sociedade anônima*) organized under the laws of the Federal Republic of Brazil (such company, and its successors and assigns under the Indenture hereinafter referred to as the "Company"), promises to pay interest on the principal amount of this Security at the rate per annum shown above.

The Company will pay interest semi-annually on June 1 and December 1 of each year, commencing on December 1, 2011 to a Paying Agent, which shall in turn distribute the interest in accordance with the Indenture.  The Securities shall bear interest at the rate per annum of 8.500% from June 3, 2011, the date of issuance, or from the most recent interest payment date to which interest has been paid or provided for.  Interest on the Securities shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.      Method of Payment

The Company will pay interest on the Securities (except defaulted interest) to the Persons who are registered Holders at the close of business on the record date listed on the face of this Security immediately preceding the related interest payment date (whether or not a Business Day) even if Securities are canceled after the record date and on or before the interest payment date.  Holders must surrender Securities to a Paying Agent to collect principal payments.  The Company will pay principal, premium, interest and Additional Amounts, if any, in money of the United States that at the time of payment is legal tender for payment of public and private debts.  Payments in respect of the Securities represented by a Global Security (including principal, premium, interest and Additional Amounts, if any) will be made by wire transfer of immediately available funds to the accounts specified by DTC.   If the Securities are in certificated form, such payments will be made by a Paying Agent by U.S. dollar check drawn on a bank in New York City and mailed to the Holder of such Security at its registered address as it appears in the register.  Upon written application by the Holder of a certificated Security to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Security, such payment may be made by transfer to a U.S. dollar account maintained by the payee with a bank in New York City.

The final payment on any Security in definitive, fully registered form shall be made only upon presentation and surrender of such Security at the office of a Paying Agent on the payment date.

If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period.  If a regular record date is not a Business Day, the record date shall not be affected.

3.      Registrar and Paying Agent

        Initially, Deutsche Bank Trust Company Americas will act as Paying Agent, The Bank of Tokyo-Mitsubishi UFJ, Ltd. will act as Principal Paying Agent and Deutsche Bank Trust Company Americas will act as Registrar.  The Company may appoint and change any Paying Agent, Registrar or co-registrar without notice.  The Company, the Guarantors or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or transfer agent.

4.      Indenture

        The Company issued the Securities under an Indenture dated as of June 3, 2011 (the "Indenture"), among the Company, OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A., as the guarantors (each, a "Guarantor" and, collectively, the "Guarantors"), Deutsche Bank Trust Company Americas, as the Trustee, Registrar, Paying Agent and transfer agent and The Bank of Tokyo-Mitsubishi UFJ, Ltd., as Principal Paying Agent.  The terms of the Securities include those stated in the Indenture.  Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture.  The Securities are subject to all such terms, and Securityholders are referred to the Indenture.

        The Securities are general obligations of the Company.  The Company shall be entitled, subject to its compliance with Section 4.03 of the Indenture, to issue Additional Securities pursuant to Section 2.12 of the Indenture.  The Initial Securities issued on the Issue Date, any Additional Securities and Securities issued in exchange therefor will be treated as a single class for all purposes under the Indenture.  The Indenture contains covenants that limit the ability of the Company and its restricted subsidiaries to Incur additional indebtedness; pay dividends or distributions on, or redeem or repurchase capital stock; make investments; engage in transactions with Affiliates; create liens on assets; transfer or sell assets; guarantee indebtedness; restrict dividends or other payments of subsidiaries; consolidate, merge or transfer all or substantially all of its assets and the assets of its subsidiaries; and engage in sale/leaseback transactions.  These covenants are subject to important exceptions and qualifications.

        To the extent of any conflict between the terms of the Securities and the Indenture, the applicable terms of the Indenture shall govern.

5.      Optional Redemption; Notice of Redemption

        (a)     *Optional Redemption with a Make-Whole Premium*.  At any time prior to June 1, 2015, the Company may on any one or more occasions redeem the Securities, at its option, in whole or in part, at a "make-whole" redemption price equal to 100% of the principal amount of such Securities plus the greater of (1) 1% of the then outstanding principal amount of the Securities and (2) the excess of (a) the present value at such redemption date of (i) the redemption price of the Securities at June 1, 2015 (such redemption price being set forth in the table below in paragraph 5.b) plus (ii) all required interest payments thereon to, but excluding, June 1, 2015 (excluding accrued but unpaid interest to the redemption date) discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points, over (b) the then outstanding principal amount

of the Securities; plus in each case any accrued and unpaid interest and Additional Amounts, if any, on such Securities to, but excluding, the redemption date, as calculated by the Independent Investment Banker.  Any redemption of Securities by the Company pursuant to this paragraph will be subject to either (i) there being at least U.S.$150,000,000 in aggregate principal amount of Securities (including any Additional Securities) outstanding after such redemption or (ii) the Company redeeming all of the then outstanding principal amount of the Securities.

"Comparable Treasury Issue" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Securities to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to the remaining term of such Securities.

"Comparable Treasury Price" means, with respect to any redemption date (1) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotation or (2) if the Independent Investment Banker obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Company.

"Reference Treasury Dealer" means HSBC Securities (USA) Inc., J.P. Morgan Securities LLC and Credit Suisse Securities (USA) LLC, or their respective affiliates which are primary United States government securities dealers, and one other leading primary United States government securities dealers in New York City reasonably designated by the Company; *provided* that if any of the foregoing shall cease to be a primary United States government securities dealer in New York City (a "Primary Treasury Dealer"), the Company will substitute therefor another Primary Treasury Dealer.

"Reference Treasury Dealer Quotation" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Company, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 pm New York time on the third Business Day preceding such redemption date.

"Treasury Rate" means, with respect to any redemption date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

(b)     *Optional Redemption without a Make-Whole Premium.*  On and after June 1, 2015, the Company may on any one or more occasions redeem the Securities, at its option, in

whole or in part, at the following redemption prices (expressed as a percentage of principal amount), plus accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on June 1 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2015 | 104.250 % |
| 2016 | 102.125% |
| 2017 and thereafter | 100.000% |

Any redemption of Securities by the Company pursuant to this paragraph will be subject to either (i) there being at least U.S.$150,000,000 in aggregate principal amount of Securities (including any Additional Securities) outstanding after such redemption or (ii) the Company redeeming all of the then outstanding principal amount of the Securities.

(c)     *Optional Redemption Upon Eligible Equity Offerings.*  At any time on or prior to June 1, 2014, the Company may on any one or more occasions, at its option, use an amount not to exceed the net cash proceeds of one or more Eligible Equity Offerings to redeem up to 35% of the aggregate principal amount of the outstanding Securities (including any Additional Securities) at a redemption price equal to 108.50% of the principal amount of the Securities to be redeemed, plus any accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date; *provided* that:

(i)     after giving effect to any such redemption at least 65% of the aggregate principal amount of the Securities (including any Additional Securities, but excluding Securities held by the Company and its Subsidiaries) issued under the Indenture remains outstanding; and

(ii)     the Company makes such redemption not more than 90 days after the consummation of such Eligible Equity Offering.

"Eligible Equity Offering" means the issuance and sale for cash of Qualified Stock of the Company to any Person (other than a Restricted Subsidiary of the Company) pursuant to (i) a public offering in accordance with any applicable laws, rules and regulations, or (ii) a private offering in accordance with Rule 144A, Regulation S and/or another exemption under the Securities Act or any other applicable law, rules and regulations of any other jurisdiction.

(d)     *Optional Tax Redemption.*  If the Company or any successor is required to pay Excess Additional Amounts on the Securities, or any Guarantor or any successor is required to pay Excess Additional Amounts on the guarantees, it may elect to redeem the Securities, in whole but not in part, at a redemption price equal to 100% of the remaining principal amount plus interest and any additional amounts accrued to the fixed date of redemption.  Neither the Company, a Guarantor nor any successor will be entitled to redeem the Securities pursuant to the previous sentence unless it is required to pay such Excess Additional Amounts due to a change in or amendment to the laws (or any rules or regulations thereunder) of the jurisdiction of its incorporation or any political subdivision or taxing authority thereof or therein, including a

change in or amendment to an official interpretation, administration or application of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or is announced on or after the Issue Date of the Securities or on or after the date a successor assumes the obligations under the Securities.

"Excess Additional Amounts" means (A) Additional Amounts payable by the Company on the Securities, which such Additional Amounts are greater than the additional amounts the Company would be required to pay on the Securities if withholding or deduction were imposed at a rate of 15.0 percent and (B) Additional Amounts payable by a successor to the Company on the Securities, or by a Guarantor or its successor on the guarantees, which such Additional Amounts are greater than the Additional Amounts such payor would be required to pay on the Securities if withholding or deduction were imposed only by the jurisdiction of its incorporation based on the laws in effect in such jurisdiction on the Issue Date (determined in each case without reference to any interest, fees, penalties or other additions to tax).

In the event that the Company, a Guarantor or any successor elects to so redeem the Securities, it shall deliver to the Trustee: (1) an Officer's Certificate, signed in the name of the Company or any successor, stating that (a) the Company, such Guarantor or such successor is entitled to redeem the Securities pursuant to their terms and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Company or any successor to so redeem have occurred or been satisfied and (b) the payment of Excess Additional Amounts cannot be avoided by the relevant payor taking reasonable measures available to it; *provided however*, that reasonable measures shall not include changing the payor's jurisdiction of incorporation or the location of its principal executive office or registered office; and (2) an Opinion of Counsel, reasonably acceptable to the Trustee, to the effect that the Company, a Guarantor or any successor has or will become obligated to pay Excess Additional Amounts, and that all governmental requirements necessary for the Company, a Guarantor or any successor to effect the redemption have been complied with.

(e)     *Optional Redemption Procedures.*  If fewer than all of the Securities are being redeemed, the selection of Securities to be redeemed shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Securities are listed or if such securities exchange has no requirement governing redemption or the Securities are not then listed on a securities exchange, on a pro rata basis or by lot (or, in the case of any Securities issued in global form, based on a method that most nearly approximates a pro rata selection in accordance with the procedures of DTC).  The Trustee shall make the selection from the Outstanding Securities not previously called for redemption.  The Trustee shall promptly notify the Company in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount of the Securities to be redeemed.  In the event of a partial redemption by lot, the Trustee shall select the particular Securities to be redeemed not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Securities not previously called for redemption.  The Company may redeem Securities in denominations of U.S.$200,000 only in whole.  The Trustee may select for redemption portions (in any integral multiple of U.S.$1,000) of the principal of Securities that have denominations larger than U.S.$200,000; *provided* that the remaining

outstanding amount must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000.

The Company shall give or cause the Trustee to give notice of redemption, in the manner provided for in Section 13.01 of the Indenture, not less than 30 nor more than 60 days prior to a date for redemption of Securities by first-class mail, postage prepaid, to each record holder of the Securities to be redeemed at its registered address or otherwise in accordance with the procedures of DTC.  If the Company itself gives the notice, it shall also deliver a copy to the Trustee.

If either (i) the Company is redeeming the Securities in part only, or (ii) the Company elects to have the Trustee give notice of redemption, then the Company shall deliver to the Trustee, at least 35 days prior to the Redemption Date (unless the Trustee is satisfied with a shorter period), an Officer's Certificate requesting that the Trustee select the Securities to be redeemed and/or give notice of redemption and setting forth the information required by Section 3.02(3) of the Indenture.  If the Company elects to have the Trustee give notice of redemption, the Trustee shall give the notice in the name of the Company and at the Company's expense.

If the Company, or the Trustee on behalf of the Company, gives notice of redemption in accordance with Article 3 of the Indenture, the Securities, or the portions of Securities, called for redemption, shall, on the Redemption Date, become due and payable at the redemption price specified in the notice (together with accrued interest, if any, to, but excluding, the Redemption Date), and from and after the Redemption Date (unless the Company shall default in the payment of the redemption price and accrued interest) the Securities or the portions of Securities shall cease to bear interest, to the extent the Company so elects.  Upon surrender of any Securities for redemption in accordance with the notice, the Company shall pay the Securities at the redemption price, together with any accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Redemption Date.  If the Company shall fail to pay any Security called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Securities.

For the avoidance of doubt, the Company may at any time enter into a supplemental indenture with the Trustee without the consent of Securityholders to provide that any optional redemption can only be exercised by the Company beginning on a date more than 720 days after the Issue Date.

6.      Put Provisions

Upon a Change of Control that results in a Ratings Decline, any Holder will have the right to cause the Company and the Guarantors to repurchase all or any part (in any integral multiples of U.S.$1,000) of the Securities of such Holder at a repurchase price equal to 101% of the aggregate principal amount of the Securities to be repurchased plus accrued and unpaid interest and Additional Amounts, if any, to the date of repurchase, as provided in, and subject to the terms of, the Indenture; provided that no such repurchase shall reduce the outstanding principal amount of the Securities held by any Holder to below U.S.$200,000 or in integrals of other than U.S.$1,000.

7.      <u>Guarantee</u>

        The payment by the Company of the principal of, and premium and interest on, the Securities will be fully and unconditionally guaranteed by the Guarantors, to the extent set forth in the Indenture.

8.      [Reserved]

9.      <u>Denominations; Transfer; Exchange</u>

        The Securities shall be issued in registered form in denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof and shall be issued as one or more Global Securities.  A Holder may transfer or exchange Securities in accordance with the Indenture.  The Securities may be transferred, combined or divided without payment of any charge other than taxes or other governmental charges. The Registrar may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  The Registrar need not register the transfer of or exchange any Securities selected for redemption or any Securities for a period of 15 days before a selection of Securities to be redeemed or 15 days before an Interest Payment Date.

10.     <u>Persons Deemed Owners</u>

        The registered Holder of this Security may be treated as the owner of it for all purposes.  Payment shall be made to the person in whose name a Security is registered at the close of business on the applicable record date.

11.     <u>Unclaimed Money</u>

        If money for the payment of principal, premium or interest or Additional Amounts, if any, remains unclaimed for two years, the Trustee or the relevant Paying Agent shall pay the money back to the Company at its request unless an applicable abandoned property law designates another Person.  After any such payment, Holders entitled to the money must look only to the Company and not to the Trustee for payment.

12.     <u>Discharge; Defeasance</u>

        Subject to certain conditions set forth in Section 8 of the Indenture, the Company shall be entitled to terminate some or all of its obligations under the Securities and the Indenture if the Company deposits with the Trustee cash or U.S. Government Obligations for the payment of principal and interest on the Securities upon redemption or maturity, as the case may be.

13.     <u>Amendment, Waiver</u>

        Subject to certain exceptions set forth in the Indenture, (a) the Indenture and the Securities may be amended without notice to any Holder but with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Securities and

(b) any default or noncompliance with any provision may be waived with the written consent of the Holders of a majority in aggregate principal amount of the outstanding Securities.

Subject to certain exceptions set forth in the Indenture, without the consent of any Securityholder, the Company, the Guarantors and the Trustee shall be entitled to amend or supplement the Indenture or the Securities to cure any ambiguity, omission, defect or inconsistency, or to correct a manifest error or to comply with Section 5.01 of the Indenture, or to provide for uncertificated Securities in addition to or in place of certificated Securities, or to add guarantees with respect to the Securities, or to secure the Securities or to make any change that does not adversely affect the rights of any Securityholder, or to evidence and provide for the acceptance of appointment of a successor Trustee with respect to the Securities.

14.   <u>Defaults and Remedies</u>

Under the Indenture, Events of Default include (a) default for 30 days in payment of any interest or related Additional Amounts, if any, on the Securities; (b) default in payment of principal of or any related Additional Amounts, if any, or premium, if any, on the Securities, when the same becomes due and payable at maturity, upon acceleration or redemption or otherwise; (c) failure to make a Change of Control Offer and thereafter accept and pay for Securities tendered when and as required pursuant to Section 4.08 of the Indentures; (d) failure by the Company to comply with Section 5.01 of the Indenture; (e) failure by the Company or any Guarantor, as the case may be, to comply with other agreements in the Indenture and such non-compliance continues for a period of 60 consecutive days after written notice is given to Company by the Trustee or to the Company and the Trustee by the Holders of at least 25% in aggregate principal amount of the Securities; (f) certain accelerations of other Indebtedness of the Company or any Significant Subsidiary; (g) certain non-appealable judgments or orders rendered against the Company or any Significant Subsidiary that are not paid or discharged for a period of 60 consecutive days following the entry of the final and non-appealable judgment or order; (h) certain events of bankruptcy or insolvency with respect to the Company, the Guarantors or any Significant Subsidiary; (i) the Note Guarantee of a Significant Subsidiary shall fail to be in full force and effect or is declared null and void; and (j) certain condemnation events affecting all or substantially all of the undertaking, assets and revenues of the Company or any Significant Subsidiaries for a period of 60 consecutive days or longer.

If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Securities, by written notice to the Company and the Guarantors (and to the Trustee if notice is given by the Holders), may declare all the Securities to be due and payable immediately.  Certain events of bankruptcy or insolvency are Events of Default which will result in the Securities being due and payable immediately upon the occurrence of such Events of Default.

Securityholders may not enforce the Indenture or the Securities except as provided in the Indenture.  The Trustee may refuse to enforce the Indenture or the Securities unless it receives indemnity or security reasonably satisfactory to it.  Subject to certain limitations, Holders of a majority in principal amount of the Securities may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Securityholders notice of any

continuing Default (except a Default in payment of principal or interest) if it determines that withholding notice is in the interests of the Holders.

15.     Trustee Dealings with the Company and the Guarantors

The Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with and collect obligations owed to it by the Company, the Guarantors or their Affiliates and may otherwise deal with the Company, the Guarantors or their Affiliates with the same rights it would have if it were not Trustee.

16.     No Recourse Against Others

No past, present or future director, officer, employee, partner, incorporator, quotaholder, member or shareholder, as such, of the Company, the Guarantors or any Subsidiary of the Company, shall not have any liability for any obligations of the Company, the Guarantors or any Subsidiary of the Guarantors under the Securities, the Indenture or the Note Guarantee or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Security, each Securityholder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Securities.

17.     Authentication

This Security shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Security.

18.     Abbreviations

Customary abbreviations may be used in the name of a Securityholder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

19.     CUSIP Numbers and ISINs

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers or ISINs to be printed on the Securities and has directed the Trustee to use CUSIP numbers or ISINs in notices of redemption as a convenience to Securityholders.  No representation is made as to the accuracy of such numbers either as printed on the Securities or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

20.     Governing Law; Consent to Jurisdiction and Service of Process.

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT

GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

Each of the Company and the Guarantors has consented to the jurisdiction of the courts of the State of New York and the United States courts located in the Borough of Manhattan, New York City, New York with respect to any action that may be brought in connection with the Indenture or the Securities and has validly and effectively appointed National Corporate Research, Ltd., Inc. as agent for service of process.

The Company will furnish to any Securityholder upon written request and without charge to the Securityholder a copy of the Indenture which has in it the text of this Security in larger type.  Requests may be made to:

OGX Petróleo e Gás Participações S.A.

Praia do Flamengo, No. 154 – 7th
Rio de Janeiro, Rio De Janeiro 22210-030 Brazil
Attention: General Counsel
Telephone: +55 21 2555 5200
Facsimile: +55 21 2555 5202

## ASSIGNMENT FORM

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

_____

agent to transfer this Security on the books of the Issuer.  The agent may substitute another to act for him or her.

Your Signature: 

Date:_____      _____

(Sign exactly as your name appears on the other side of this Security)

SIGNATURE GUARANTEE:   _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

[TO BE ATTACHED TO GLOBAL SECURITIES]

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY**

The initial principal amount of this Global Security is U.S.$_____. The following increases or decreases in this Global Security have been made:

| Date of Exchange | Amount of decrease in principal amount of this Global Security | Amount of increase in principal amount of this Global Security | Principal amount of this Global Security following such decrease or increase | Signature of authorized signatory of Trustee or Securities Custodian |
|---|---|---|---|---|
| | | | | |

## [FORM OF] OPTION OF SECURITYHOLDER TO ELECT PURCHASE

If you elect to have this Security purchased by the Company pursuant to Section 4.06 or Section 4.08 of the Indenture, check the appropriate box below:

☐ Section 4.06          ☐ Section 4.08

If you elect to have only part of this Security purchased by the Company pursuant to Section 4.06 or Section 4.08 of the Indenture, state the amount (in integral multiples of U.S.$1,000) you elect to have purchased:

U.S.$_____

Dated: _____

Your Name: _____
(Print your name exactly as it appears on the face of this Security)

Your Signature: _____
(Sign exactly as your name appears on the face of this Security)

SIGNATURE GUARANTEE: _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXHIBIT 2
to
RULE 144A/REGULATION S APPENDIX

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS
PURSUANT TO REGULATION S

[Date]

OGX Petróleo e Gás Participações S.A.
Praia do Flamengo, No. 154 – 7th
Rio de Janeiro, Rio De Janeiro 22210-030 Brazil
Attention: General Counsel

Deutsche Bank Trust Company Americas
Trust & Securities Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX

Re:          _____ (the "Transferee")
             8.500% Senior Notes due 2018 (the "Securities")

Ladies and Gentlemen:

            In connection with our proposed transfer of U.S.$_____ aggregate principal amount of Securities, we confirm that such transfer has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, we represent that:

            (1)      the offer of the Securities was not made to a person in the United States;

            (2)      either (a) at the time the buy offer was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

            (3)      no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, as applicable;

(4)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

(5)     we have advised the transferee of the transfer restrictions applicable to the Securities;

(6)     if the circumstances set forth in Rule 904(c) under the Securities Act are applicable, we have complied with the additional conditions therein, including (if applicable) sending a confirmation or other notice stating that the Securities may be offered and sold during the restricted period specified in Rule 903(c)(2) or (3), as applicable, in accordance with the provisions of Regulation S; pursuant to registration of the Securities under the Securities Act; or pursuant to an available exemption from the registration requirements under the Securities Act; and

(7)     if the sale is made during a restricted period and the provisions of Rule 903(c)(3) are applicable thereto, we confirm that such sale has been made in accordance with such provisions.

You and the Transferee are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby. Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Transferor]

By:_____
        Authorized Signature

EXHIBIT 3

to

RULE 144A/REGULATION S APPENDIX

FORM OF TRANSFER CERTIFICATE FOR
TRANSFER OF RESTRICTED GLOBAL SECURITY
BEARING A RESTRICTED SECURITIES LEGEND

[Date]

OGX Petróleo e Gás Participações S.A.
Praia do Flamengo, No. 154 – 7th
Rio de Janeiro, Rio De Janeiro 22210-030 Brazil
Attention: General Counsel

Deutsche Bank Trust Company Americas
Trust & Securities Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX

Re:  _____  (the "Transferee")
      8.500% Senior Notes due 2018 (the "Securities")

Ladies and Gentlemen:

Reference is hereby made to the Indenture dated as of June 3, 2011 in regard of the Securities among OGX Petróleo e Gás Participações S.A., as the Issuer, OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A., as the Guarantors, Deutsche Bank Trust Company Americas, as the Trustee, Registrar, Paying Agent and transfer agent and The Bank of Tokyo-Mitsubishi UFJ, Ltd., as Principal Paying Agent. Capitalized terms used but not defined herein will have the meaning given them in the Indenture.

This letter relates to U.S.$_____ aggregate principal amount of the Securities which are held in certificated form.

The undersigned has requested transfer of such Securities to a Person who will take delivery thereof in the form of a beneficial interest in the Restricted Global Security (CUSIP No. _____; ISIN _____).  In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and on the Securities and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

1.    the Securities are being transferred to a transferee that the undersigned reasonably believes is purchasing the Securities for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

2.    the undersigned reasonably believes that transferee and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

[NAME OF TRANSFEROR]

By:_____
     Name:
     Title:

Dated:_____

APPENDIX II

## FORM OF SUPPLEMENTAL INDENTURE
## TO BE DELIVERED BY SUBSTITUTED DEBTOR OGX NETHERLANDS B.V.

This SUPPLEMENTAL INDENTURE (this "Supplemental Indenture"), dated as of _____, among OGX NETHERLANDS B.V. (the "Substituted Debtor"), a wholly-owned subsidiary of OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A. (or its permitted successor), a company incorporated under the laws of the Federative Republic of Brazil (the "Company"), the Guarantors (as defined in the Indenture referred to herein) and Deutsche Bank Trust Company Americas, as trustee under the Indenture referred to below (the "Trustee").

### RECITALS

WHEREAS, the Company has heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of June 3, 2011 providing for the issuance of 8.500% Senior Notes due 2018 (the "Securities");

WHEREAS, the Indenture provides that the Substituted Debtor may execute and deliver to the Trustee a supplemental indenture pursuant to which the Substituted Debtor shall replace and substitute the Company as issuer and assume the Issuer's obligations as principal obligor and issuer of the Securities and the Indenture on the terms and conditions set forth herein; and

WHEREAS, pursuant to Section 10.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Substituted Debtor and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1.      CAPITALIZED TERMS.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.      AGREEMENT TO ASSUME OBLIGATIONS AND UNDERTAKE.  The Substituted Debtor hereby (i) agrees to assume all of the Issuer's obligations as issuer of the Securities on the terms and subject to the conditions set forth in this Supplemental Indenture, and in the Indenture including but not limited to Article 10 and Section 4.21 thereof and (ii) undertakes in favor of each Holder of the Securities to be bound by the terms and conditions of the Securities and the provisions of the Indenture as fully as if the Substituted Debtor had been named in the Securities and the Indenture as the principal debtor in respect of the Securities in place of the Company.

3.      AGREEMENT TO GUARANTEE.  The Company hereby agrees to provide an unconditional Guarantee on the terms and subject to the conditions set forth in the Note Guarantee and in the Indenture, including but not limited to Article 10 thereof.

4.      COMPLIANCE WITH LAWS.  (a) The Substituted Debtor hereby represents and warrants that the execution of this Supplemental Indenture shall not violate any provision of the laws, rules and regulations of The Netherlands.

(b)      The Company hereby represents and warrants that the execution of this Supplemental Indenture shall not violate any provision of the laws, rules and regulations of the Federative Republic of Brazil.

5.      NO RECOURSE AGAINST OTHERS.  No director, officer, employee, incorporator or stockholder of the Issuer or any Guarantor, as such, will have any liability for any obligations of the Issuer or the Guarantors under the Securities, the Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of the Securities by accepting a Security waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Securities.  The waiver may not be effective to waive liabilities under the federal securities laws.

6.      NEW YORK LAW TO GOVERN; CONSENT TO JURISDICTION; APPOINTMENT OF AGENT TO ACCEPT SERVICE OF PROCESS. (a)  Each of the parties hereto irrevocably consents and agrees that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter arising out of or in connection with this Supplemental Indenture, the Indenture, the Note Guarantee or the Securities may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Securities have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court in personam, generally and unconditionally with respect to any action, suit or proceeding for itself and in respect of its properties, assets and revenues.  Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Supplemental Indenture, the Indenture the Note Guarantee, or the Securities brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum and any right which it may be entitled on account of place of residence or domicile.  To the extent that the Substituted Debtor, the Company or the Guarantors has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process with respect to itself or its property, each of the Substituted Debtor, the Company

and the Guarantors irrevocably waives such immunity in respect of its obligations under this Supplemental Indenture, the Indenture, any Security or the Note Guarantee. Each of the parties to this Indenture agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on them and may be enforced in any court to the jurisdiction of which each of them is subject by a suit upon such judgment, provided that service of process is effected upon the Substituted Debtor in the manner specified in the following paragraph or as otherwise permitted by law.

(b)    The Substituted Debtor has validly and effectively appointed National Corporate Research, Ltd. (the "Process Agent"), with offices on the date hereof at 10 East 40th Street, 10th Floor, New York, NY 10016, as its authorized agent upon which process may be served in any action, suit or proceeding referred to in Section 13.13(a) of the Indenture. If for any reason such agent hereunder shall cease to be available to act as such, the Substituted Debtor agrees to designate a new agent in the Borough of Manhattan, New York City, New York. The Substituted Debtor further hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents in any such action, suit or proceeding against the Substituted Debtor by serving a copy thereof upon the relevant agent for service of process referred to in this section (whether or not the appointment of such agent shall for any reason prove to be ineffective or such agent shall accept or acknowledge such service) or by mailing copies thereof by registered or certified air mail, postage prepaid, to the Substituted Debtor at its address specified in or designated pursuant to this Supplement Indenture. The Substituted Debtor agrees that the failure of any such designee, appointee and agent to give any notice of such service to it shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon. Nothing herein shall in any way be deemed to limit the ability of the Holders and the Trustee to serve any such legal process, summons, notices and documents in any other manner permitted by applicable law or to obtain jurisdiction over the Substituted Debtor or bring actions, suits or proceedings against the Substituted Debtor in such other jurisdictions, and in such manner, as may be permitted by applicable law.

7.    COUNTERPARTS. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

8.    EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

9.    THE TRUSTEE. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Substituted Debtor and the Company.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

Dated: _____,

OGX NETHERLANDS B.V.

By: _____
      Name:
      Title:

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.

By: _____
      Name:
      Title:

OGX PETRÓLEO E GÁS LTDA.

By: _____
      Name:
      Title:

OGX CAMPOS PETRÓLEO E GÁS S.A.

By: _____
      Name:
      Title:

DEUTSCHE BANK TRUST COMPANY
      AMERICAS, as Trustee

By: Deutsche Bank National Trust Company

By: _____
      Authorized Signatory:

By: _____
      Authorized Signatory:

On this     day of                  , 2011, before me, a notary public, personally appeared _____ and _____ to me personally known who being duly sworn, did say that they are Authorized Signatories of Deutsche Bank National Trust Company, the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said persons.

**By:**    _____

**Title:  Notary Public**
No.
Qualified in
Commission Expires

# EXHIBIT B

EXECUTION COPY

**OGX AUSTRIA GMBH**
as Issuer

**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.,**
**OGX PETRÓLEO E GÁS LTDA.**
and
**OGX CAMPOS PETRÓLEO E GÁS S.A.**
as Guarantors

**DEUTSCHE BANK TRUST COMPANY AMERICAS**
as Trustee, Registrar, Transfer Agent
and Paying Agent

and

**DEUTSCHE BANK LUXEMBOURG S.A.**
as Principal Paying Agent

_____

**INDENTURE**

**Dated as of March 30, 2012**

_____

**U.S.$1,063,000,000**

**8.375% SENIOR NOTES DUE 2022**

NEWYORK 8436004 (2K)

## TABLE OF CONTENTS

<div align="right">Page</div>

Article 1 Definitions and Incorporation by Reference — 1

SECTION 1.01  Definitions.................................................................................................1
SECTION 1.02  Incorporation by Reference of Trust Indenture Act.......................................25
SECTION 1.03  Rules of Construction ...................................................................................26

Article 2 The Securities — 27

SECTION 2.01  Form and Dating ...........................................................................................27
SECTION 2.02  Execution and Authentication........................................................................27
SECTION 2.03  Registrar and Paying Agent ..........................................................................28
SECTION 2.04  Paying Agent To Hold Money in Trust ..........................................................28
SECTION 2.05  Securityholder Lists ......................................................................................29
SECTION 2.06  Transfer and Exchange .................................................................................29
SECTION 2.07  Replacement Securities .................................................................................30
SECTION 2.08  Outstanding Securities ..................................................................................31
SECTION 2.09  Temporary Securities ....................................................................................31
SECTION 2.10  Cancellation .................................................................................................31
SECTION 2.11  CUSIP Numbers and ISINs ...........................................................................31
SECTION 2.12  Issuance of Additional Securities...................................................................32
SECTION 2.13  Open Market Purchases ................................................................................32

Article 3 Optional Redemption of Securities — 32

SECTION 3.01  Optional Redemption ....................................................................................32
SECTION 3.02  Notice of Redemption ...................................................................................32
SECTION 3.03  Selection of Securities to Be Redeemed in Part.............................................33
SECTION 3.04  Securities Payable on Redemption Date.........................................................34
SECTION 3.05  Unredeemed Portions of Partially Redeemed Security....................................34
SECTION 3.06  Third Party Notice ........................................................................................34

Article 4 Covenants — 35

SECTION 4.01  Performance of Obligations under the Securities ............................................35
SECTION 4.02  Reports .........................................................................................................35
SECTION 4.03  Limitation on Debt and Disqualified Stock ....................................................36
SECTION 4.04  Limitation on Restricted Payments................................................................40
SECTION 4.05  [Reserved]....................................................................................................44
SECTION 4.06  Limitation on Sales of Assets .......................................................................44

<div align="center">i</div>

SECTION 4.07    Limitation on Transactions with Affiliates ........................................47
SECTION 4.08    Repurchases at the Option of the Holders Upon Change of Control
                Offer .........................................................................................49
SECTION 4.09    Limitation on Liens.................................................................51
SECTION 4.10    Limitation on Sale and Leaseback Transactions.................................51
SECTION 4.11    Maintenance of Corporate Existence ............................................51
SECTION 4.12    Maintenance of Properties .......................................................52
SECTION 4.13    Limitation on Guarantees of Debt by Restricted Subsidiaries.........................52
SECTION 4.14    [Reserved].............................................................................52
SECTION 4.15    [Reserved].............................................................................53
SECTION 4.16    [Reserved].............................................................................53
SECTION 4.17    [Reserved].............................................................................53
SECTION 4.18    Maintenance of Office or Agency in the State of New York ........................53
SECTION 4.19    [Reserved].............................................................................53
SECTION 4.20    [Reserved].............................................................................53
SECTION 4.21    Additional Amounts ...............................................................53
SECTION 4.22    Payments and Paying Agent ......................................................55
SECTION 4.23    [Reserved].............................................................................56
SECTION 4.24    Limitation on Designation of Unrestricted Subsidiaries.............................56
SECTION 4.25    Ranking ...............................................................................57

Article 5 Consolidation, Merger, or Sale of Substantially All Assets                           57

SECTION 5.01    Consolidation, Merger, or Sale of Substantially All Assets ..........................57

Article 6 Defaults and Remedies                                                               58

SECTION 6.01    Events of Default.....................................................................58
SECTION 6.02    Acceleration ..........................................................................60
SECTION 6.03    Other Remedies.......................................................................60
SECTION 6.04    Rescission/Annulment of Acceleration; Waiver of Past Defaults ....................61
SECTION 6.05    Control by Majority ................................................................61
SECTION 6.06    Limitation on Suits...................................................................61
SECTION 6.07    Rights of Holders to Receive Payment ...........................................62
SECTION 6.08    Collection Suit by Trustee .........................................................62
SECTION 6.09    Trustee May File Proofs of Claim ...............................................62
SECTION 6.10    Priorities................................................................................62
SECTION 6.11    Undertaking for Costs .............................................................63
SECTION 6.12    Waiver of Stay or Extension Laws ..............................................63

Article 7 Trustee                                                                                    63

SECTION 7.01    Duties of Trustee..................................................................63
SECTION 7.02    Rights of Trustee..................................................................65
SECTION 7.03    Individual Rights of Trustee. ................................................66
SECTION 7.04    Trustee's Disclaimer. ............................................................66
SECTION 7.05    Notice of Defaults.................................................................66
SECTION 7.06    Compensation and Indemnity. ..............................................66
SECTION 7.07    Replacement of Trustee. .......................................................67
SECTION 7.08    Successor Trustee by Merger.................................................68
SECTION 7.09    Eligibility; Disqualification. .................................................68
SECTION 7.10    Preferential Collection of Claims Against Issuer...................69
SECTION 7.11    Appointment of Co-Trustee. .................................................69

Article 8 Discharge of Indenture; Defeasance                                                         70

SECTION 8.01    Satisfaction and Discharge of Liability on Securities.............70
SECTION 8.02    [Reserved]............................................................................71
SECTION 8.03    [Reserved]............................................................................71
SECTION 8.04    Application of Trust Money...................................................71
SECTION 8.05    Repayment to Issuer..............................................................71
SECTION 8.06    Defeasance ...........................................................................71
SECTION 8.07    Reinstatement.......................................................................72

Article 9 Amendments                                                                                 73

SECTION 9.01    Without Consent of Holders .................................................73
SECTION 9.02    With Consent of Holders ......................................................73
SECTION 9.03    Revocation and Effect of Consents and Waivers....................74
SECTION 9.04    Notation on or Exchange of Securities ..................................75
SECTION 9.05    Trustee to Sign Amendments................................................75

Article 10 Substitution of the Issuer                                                                75

SECTION 10.01   Substitution of the Issuer......................................................75
SECTION 10.02   Deemed Substitution.............................................................76
SECTION 10.03   Notice of Substitution...........................................................77

Article 11 Guarantee by the Guarantors                                                               77

SECTION 11.01   Guarantee .............................................................................77
SECTION 11.02   Guarantee Unconditional ......................................................77

SECTION 11.03   Termination, Release and Discharge; Reinstatement ......................................78
SECTION 11.04   Waiver by the Guarantors ........................................................................79
SECTION 11.05   Subrogation and Contribution ...................................................................79
SECTION 11.06   Stay of Acceleration ...............................................................................79
SECTION 11.07   Execution and Delivery of Guarantee .........................................................79
SECTION 11.08   Purpose of Guarantee ..............................................................................79
SECTION 11.09   Central Bank Regulations .........................................................................79

Article 12 Release of Covenants                                                                    80

SECTION 12.01   Release of Covenants ..............................................................................80

Article 13 Miscellaneous                                                                           81

SECTION 13.01   Notices ................................................................................................81
SECTION 13.02   Communication by Holders with Other Holders ...........................................83
SECTION 13.03   Certificate and Opinion as to Conditions Precedent ......................................83
SECTION 13.04   Statements Required in Certificate or Opinion .............................................83
SECTION 13.05   When Securities Disregarded ....................................................................83
SECTION 13.06   Rules by Trustee, Paying Agent and Registrar .............................................84
SECTION 13.07   Business Days .......................................................................................84
SECTION 13.08   Governing Law. ....................................................................................84
SECTION 13.09   No Recourse Against Others .....................................................................84
SECTION 13.10   Successors ............................................................................................84
SECTION 13.11   Multiple Originals ..................................................................................84
SECTION 13.12   Table of Contents; Headings .....................................................................84
SECTION 13.13   Consent to Jurisdiction; Appointment of Agent to Accept Service of
                Process; Currency Indemnity ....................................................................85
SECTION 13.14   Waiver of Jury Trial ...............................................................................86
SECTION 13.15   Patriot Act ...........................................................................................87
SECTION 13.16   Force Majeure .......................................................................................87

Rule 144A/Regulation S Appendix I

Exhibit 1 to Rule 144A/Regulation S Appendix
Form of Initial Security

Exhibit 2 to Rule 144A/Regulation S Appendix
Form of Regulation S Transfer Certificate

Exhibit 3 to Rule 144A/Regulation S Appendix
Form of Rule 144A Transfer Certificate

INDENTURE dated as of March 30, 2012 among OGX AUSTRIA GMBH, a company with limited liability (*Gesellschaft mit beschränkter Haftung*) organized under the laws of the Republic of Austria, as issuer (the "Issuer"), OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A., a corporation (*sociedade anônima*) organized under the laws of The Federative Republic of Brazil, as a guarantor (the "Company"), OGX CAMPOS PETRÓLEO E GÁS S.A, a corporation (*sociedade anônima*) organized under the laws of the Federative Republic of Brazil, as a guarantor ("OGX Campos"), OGX PETRÓLEO E GÁS LTDA., a limited liability company (*sociedade limitada*) organized under the laws of the Federative Republic of Brazil, as a guarantor ("OGX Ltda" and, together with the Company and OGX Campos, the "Guarantors"), DEUTSCHE BANK TRUST COMPANY AMERICAS, a New York banking corporation, as trustee (in such capacity, the "Trustee"), registrar, paying agent and transfer agent, and DEUTSCHE BANK LUXEMBOURG S.A., as principal paying agent (the "Principal Paying Agent").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as defined below) of the Issuer's U.S.$1,063,000,000 aggregate principal amount of 8.375% Senior Notes due 2022 (the "Initial Securities"), and any Additional Securities (as defined below):

Article 1

Definitions and Incorporation by Reference

SECTION 1.01    Definitions.

"Acquired Debt" means Debt of a Person existing at the time the Person merges with or into or becomes a Restricted Subsidiary and not Incurred in connection with, or in contemplation of, the Person merging with or into or becoming a Restricted Subsidiary.

"Additional Amounts" has the meaning set forth under Section 4.21.

"Additional Assets" means (i) any property or assets (including Capital Stock or its substantial equivalent or other Investments) that are used or usable by the Company, any of its Restricted Subsidiaries or any joint venture in which the Company or any of its Restricted Subsidiaries is a party in a Permitted Business (or in the case of Capital Stock or its substantial equivalent or other Investments that represent direct, or indirect (via a holding company), ownership or other interests held by the Company or any Restricted Subsidiary in entities engaged in a Permitted Business); and (ii) contracts (including supply, customer and EPC contracts) that are used or usable by the Company, any of its Restricted Subsidiaries or any joint venture in which the Company or any of its Restricted Subsidiaries is a party in a Permitted Business.

"Additional Securities" means 8.375% Senior Notes due 2022, having identical terms and conditions as the Securities (other than the date on which the initial interest accrues from), issued from time to time after the Issue Date under the terms of this Indenture (other than pursuant to Section 2.06, 2.07, or 2.09 of this Indenture).

"Affiliate" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any subsidiary of such specified Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means the Registrar, the Transfer Agent, a Paying Agent, any exchange agent and any listing agent.

"Asset Sale" means any sale, lease, transfer or other disposition (whether in a single transaction or a series of related transactions) of any assets by the Company or any Restricted Subsidiary, including by means of a merger, consolidation or similar transaction or a Sale and Leaseback Transaction and including any sale or issuance of the Equity Interests of any Restricted Subsidiary (each of the above referred to as a "disposition"), *provided* that the following are not included in the definition of "Asset Sale":

(1)     a disposition to the Company or a Restricted Subsidiary, including the sale or issuance by the Company or any Restricted Subsidiary of any Equity Interests of any Restricted Subsidiary to the Company or any Restricted Subsidiary;

(2)     the sale, lease, transfer or other disposition by the Company or any Restricted Subsidiary in the ordinary course of business of (i) cash, Cash Equivalents and Marketable Securities, (ii) inventory, (iii) damaged, worn out or obsolete equipment or other assets, or (iv) rights granted to others pursuant to leases or licenses;

(3)     the lease of assets by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(4)     any sale, lease, transfer, transfer or other disposition of any property or concession to any governmental authority;

(5)     the sale or discount of accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

(6)     a transaction covered by Section 5.01;

(7)     a Restricted Payment permitted under Section 4.04;

(8)     a Sale and Leaseback Transaction otherwise permitted under Section 4.10;

(9)     any issuance of Disqualified Stock otherwise permitted under Section 4.03;

(10)    the creation of a Lien not prohibited by this Indenture (but not the sale or disposition of the property subject to such Lien);

(11)    the licensing or sublicensing of intellectual property or other general intangibles, including, without limitation, licenses for seismic data, in the ordinary course of business and which do not materially interfere with the business of the Company and its Restricted Subsidiaries;

(12)    the sale or other disposition of Cash Equivalents;

(13)    the sale or discount of receivables arising in the ordinary course of business in connection with the compromise or collection thereof;

(14)    any surrender or waiver of contract rights pursuant to a settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(15)    a disposition of hydrocarbons or mineral products inventory in the ordinary course of business;

(16)    the farm-out, lease or sublease of developed or undeveloped oil and natural gas properties or license or concession to explore or produce oil and natural gas owned or held by the Company or any Restricted Subsidiary in exchange for either (i) oil and natural gas properties or license or concession to explore or produce oil and natural gas owned or held by another Person or (ii) the assumption by the other Person of any expenditures to explore or produce oil and natural gas in the oil and natural gas properties or license or concession;

(17)    any Production Payments and Reserve Sales; *provided* that any such Production Payments and Reserve Sales, other than incentive compensation programs on terms that are reasonably customary in the Permitted Business for geologists, geophysicists and other providers of technical services to the Company or a Restricted Subsidiary, shall have been created, Incurred, issued, assumed or guaranteed in connection with the financing of, and within 60 days after the acquisition of, the property that is subject thereto; and

(18)    any disposition of an asset or a series of related dispositions of assets with an aggregate Fair Market Value not to exceed the greater of (i) U.S.$100,000,000 and (ii) 1.25% of Consolidated Total Assets.

"Asset Sale Offer" has the meaning set forth under Section 4.06(a)(5).

"Attributable Debt" means, in respect of a Sale and Leaseback Transaction the present value, discounted at the interest rate implicit in the Sale and Leaseback Transaction, of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction.

"Austria" means the Republic of Austria.

"Average Life" means, with respect to any Debt, the quotient obtained by dividing (i) the sum of the products of (x) the number of years from the date of determination to the dates of each successive scheduled principal payment of such Debt and (y) the amount of such principal payment by (ii) the sum of all such principal payments.

"Board of Directors" means, with respect to any Person, the board of directors or similar governing body of such Person or any duly authorized committee thereof.

"Brazil" means The Federative Republic of Brazil.

"Business Day" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in the City of New York and/or São Paulo.

"Capital Lease Obligation" means, with respect to any Person, any obligation which is required to be classified and accounted for as a capital lease on the face of a balance sheet of such person prepared in accordance with GAAP; the amount of such obligation will be the capitalized amount thereof, determined in accordance with GAAP; and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"Capital Stock" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any Preferred Stock, but excluding any debt securities convertible into or exchangeable for such equity.

"Cash Equivalents" means:

(1)     Brazilian *reais*, Colombian pesos, U.S. dollars, or money in other currencies received in the ordinary course of business that are readily convertible into U.S. dollars;

(2)     any evidence of Debt with a maturity of one year or less issued or directly and fully guaranteed or insured by Brazil, Colombia or the United States or any agency or instrumentality thereof, *provided* that the full faith and credit of Brazil, Colombia or the United States is pledged in support thereof;

(3)     (i) demand deposits, (ii) time deposits and certificates of deposit with maturities of one year or less from the date of acquisition, (iii) bankers' acceptances with maturities not exceeding one year from the date of acquisition, and (iv) overnight bank deposits, in each case with any bank or trust company organized or licensed under the laws of Brazil, Colombia or any political subdivision thereof or the United States or any state thereof having

capital, surplus and undivided profits in excess of U.S.$500,000,000 whose long-term debt is rated "A-2" or higher by S&P or "P-2" or higher by Moody's (or the equivalent local rating);

(4)     repurchase obligations with a term of not more than seven days for underlying securities of the type described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)     commercial paper rated at least P-1 by Moody's or A-1 by S&P (or the equivalent local rating) and maturing no later than one year after the date of acquisition; and

(6)     money market funds at least 95% of the assets of which consist of investments of the type described in clauses (1) through (5) above.

"Change of Control" means:

(1)     the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)) other than to one or more of the Permitted Holders;

(2)     (i) if a Person (other than a Permitted Holder) beneficially owns, directly or indirectly, more than 35% of the outstanding Voting Stock of the Company, measured by voting power rather than number of shares and (ii) a Permitted Holder beneficially owns, directly or indirectly, outstanding Voting Stock of the Company less than such Person; or

(3)     the adoption of a plan or proposal for the liquidation or dissolution of the Company.

"Change of Control Offer" means an offer made by the Issuer or a third party so designated, following the occurrence of a Change of Control that results in a Rating Decline, to each Holder to repurchase all or any part of such Holder's Securities pursuant to Section 4.08.

"Change of Control Payment" means, in connection with the repurchase of a Holder's Securities pursuant to a Change of Control Offer, the payment by the Issuer or a third party so designated of 101% of the aggregate principal amount of such Holder's Securities repurchased plus accrued interest and Additional Amounts, if any, on such Securities, to the date of purchase (subject to the right of the Holders of record on the relevant record date to receive interest and Additional Amounts, if any, on the relevant interest payment date).

"Change of Control Payment Date" means the purchase date for the Securities properly tendered in a Change of Control Offer as specified in the notice given by the Issuer or a third party so designated pursuant to Section 4.08, which date is not more than five Business Days after the Expiration Date.

"Colombia" means the Republic of Colombia.

"Company" means OGX Petróleo e Gás Participações S.A., named as such in this Indenture, excluding its Subsidiaries, until a successor replaces it and, thereafter, means the successor.

"Consolidated Net Income" means, for any period, the aggregate net income (or loss) of the Company and its Restricted Subsidiaries for such period determined on a consolidated basis in conformity with GAAP.

"Consolidated Net Total Assets" means Consolidated Total Assets less cash and Cash Equivalents.

"Consolidated Total Assets" means the total amount of assets of the Company and its Restricted Subsidiaries on a consolidated basis calculated (i) based on the most recent balance sheet for which internal financial statements are available, (ii) in accordance with GAAP, (iii) on a pro forma basis to give effect to any acquisition or disposition of companies, divisions, lines of businesses or operations by the Company and its Restricted Subsidiaries subsequent to such date and on or prior to the date of determination and (iv) on a pro forma basis to give effect to any debt or equity issuances by the Company.

"Corporate Trust Office" means the principal office of the Trustee in New York City, New York, which on the Issue Date is 60 Wall Street, Mailstop NYC60-2710, New York, NY 10005, Attention: Trust & Agency Services, Corporates Team Deal Manager – OGX Austria, or such other office at such address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the principal corporate trust office of any successor Trustee (at such other address as such successor Trustee may designate from time to time by notice to the Holders and the Issuer).

"Credit Facilities" means, one or more debt facilities or commercial paper facilities, in each case with banks, investment banks, insurance companies, mutual funds and/or other institutional lenders providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from (or sell receivables to) such lenders against such receivables) or letters of credit, in each case, as amended, extended, restated, renewed, refunded, replaced (whether contemporaneously or otherwise) or refinanced (in each case with Credit Facilities), supplemented or otherwise modified (in whole or in part and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time.

"CVM" means the Brazilian Securities Commission, or *Comissão de Valores Mobiliários*.

"Debt" means, with respect to any Person, without duplication:

(1)    the principal of and premium, if any, in respect of (a) indebtedness of such Person for money borrowed and (b) indebtedness evidenced by notes, debentures, notes or other similar instruments for the payment of which such person is responsible or liable;

(2)      all Capital Lease Obligations of such person;

(3)      all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable or other short-term obligations to suppliers payable within 180 days, in each case arising in the ordinary course of business);

(4)      all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(5)      all obligations of the type referred to in clauses (1) through (4) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any guarantee (other than obligations of other persons that are customers or suppliers of such person for which such person is or becomes so responsible or liable in the ordinary course of business to (but only to) the extent that such person does not, or is not required to, make payment in respect thereof);

(6)      all obligations of the type referred to in clauses (1) through (4) of other persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured;

(7)      all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock of such Person or, with respect to any Preferred Stock of any Subsidiary of such Person that is not held by such Person or a Restricted Subsidiary of such Person, the greater of the maximum liquidation value of such Preferred Stock or the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock (but excluding, in each case, any accrued dividends); and

(8)      any other obligations of such Person which are required to be, or are in such Person's financial statements, recorded or treated as debt under GAAP;

*provided* that (other than Disqualified Stock) the foregoing debt shall be included in this

definition of Debt only if, and to the extent that, the debt would appear as a liability on a balance sheet of such Person or in the notes to the financial statements in accordance with GAAP.

Notwithstanding the foregoing, the term "Debt" shall not include:

(1)     any leases or rentals of equipment related to exploration, production and commercialization activities, including without limitation, leases or rentals of or related to drilling rigs, supply boats, crude oil and LNG carriers, FPSOs (floating production storage and offloading), WHPs (wellhead platforms), TLWPs (tension leg wellhead platforms) and any other equipments or other assets, provided that such leases or rentals do not include a purchase option;

(2)     in connection with the purchase by the Company or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing;

(3)     Production Payments and Reserve Sales;

(4)     any obligations to customers, suppliers or service providers in the ordinary course of business with a maturity less than 90 days;

(5)     any obligation of a Person in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property;

(6)     any obligations under Hedging Agreements; *provided*, that such agreements are entered into for bona fide hedging purposes of the Company or its Restricted Subsidiaries (as determined in good faith by the Board of Directors or senior management of the Company, whether or not accounted for as a hedge in accordance with GAAP) and, in the case of currency hedging agreements or commodity hedging agreements, such agreements are related to business transactions of the Company or its Restricted Subsidiaries entered into in the ordinary course of business and, in the case of interest rate hedging agreements, such agreements substantially correspond in terms of notional amount, duration and interest rates, as applicable, to the Debt of the Company or its Restricted Subsidiaries Incurred without violation of this Indenture;

(7)     any obligation arising from agreements of the Company or a Restricted

Subsidiary providing for indemnification, guarantees or letters of credit, surety bonds or performance bonds, adjustment of purchase price, holdbacks, contingency payment obligations or similar obligations (other than guarantees of Debt), in each case, Incurred or assumed in connection with the acquisition or disposition of any business, assets or Capital Stock of a Restricted Subsidiary, provided that such Debt is not reflected on the face of the balance sheet of the Company or any Restricted Subsidiary;

(8)     any obligation arising from the honoring by a bank or other financial institution of a check, draft or similar instrument (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, provided, however, that such Debt is extinguished within five business days of Incurrence;

(9)     in-kind obligations relating to net oil or natural gas balancing positions arising in the ordinary course of business; and

(10)     all contracts and other obligations, agreements, instruments or arrangements described in clauses (18), (19), (20), and (21) of the definition of "Permitted Liens".

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Depositary" means, with respect to the Securities issuable or issued in whole or in part in the form of one or more Global Securities, the Person designated in Section 2.03 hereof as Depositary by the Issuer pursuant to this Indenture, until a successor shall have been appointed and become such and, thereafter, "Depositary" shall mean or include such Person.

"Designation" has the meanings set forth under Section 4.24.

"Disqualified Equity Interests" means Equity Interests that by their terms or upon the happening of any event are:

(1)     required to be redeemed or redeemable at the option of the holder prior to the Stated Maturity of the Securities for consideration other than Qualified Equity Interests, or

(2)     convertible at the option of the holder into Disqualified Equity Interests or exchangeable for Debt;

provided, that Equity Interests will not constitute Disqualified Equity Interests solely because of provisions giving holders thereof the right to require repurchase or redemption upon an "asset sale" or "change of control that results in a ratings decline" occurring prior to the Stated Maturity of the Securities if those provisions:

(A)     are no more favorable to the Holders than Section 4.06 and Section 4.08 hereof, and

(B)     specifically state that repurchase or redemption pursuant thereto will not be required prior to the Issuer's repurchase of the Securities as required by this Indenture.

"Disqualified Stock" means Capital Stock constituting Disqualified Equity Interests.

"DTC" means the Depository Trust Company.

"EBITDA" means, for any period:

(1)     consolidated net revenue; *minus*

(2)     consolidated costs; *minus*

(3)     consolidated administrative and selling expenses; *plus*

(4)     consolidated other operating income, net and non-operating income, net; *provided* that this clause (4) shall exclude interest income, net; *plus*

(5)     any depreciation, depletion or amortization;

as each such item is reported on the most recent consolidated financial statements delivered by the Company to the Trustee and prepared in accordance with GAAP.

"EBITDA Triggering Event" means when the Company has reported on a consolidated basis at least U.S.$100,000,000 of EBITDA during any fiscal quarter or consecutive fiscal quarters (but not to exceed any four consecutive quarters) for which financial statements are available.

"Equity Interests" means all Capital Stock and all warrants or options with respect to, or other rights to purchase, Capital Stock, but excluding Debt convertible into equity.

"Event of Default" has the meaning set forth under Section 6.01.

"Excess Proceeds" has the meaning set forth under Section 4.06(a)(5).

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"Expiration Date" has the meaning set forth under Section 4.08(2)(B).

"Fair Market Value" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Company and, unless specified in the relevant provision of this Indenture, if the Fair Market Value exceeds U.S.$10,000,000, by an officer of the Company, whose determination will be conclusive if evidenced by an Officer's Certificate delivered to the Trustee.

"Farm-In Agreement" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property.

"Farm-Out Agreement" means a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"Fitch" means Fitch Ratings Inc. and its successors.

"GAAP" means (i) International Financial Reporting Standards, (ii) accounting practices generally accepted in the United States or (iii) accounting practices prescribed by Brazilian Corporation Law, the rules and regulations issued by the CVM and the accounting standards issued by the Brazilian Institute of Independent Accountants (*Instituto dos Auditores Independentes do Brasil*), in each case as in effect from time to time or on the Issue Date, in the Company's discretion.

"guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (b) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part; *provided*, *however*, that the term "guarantee" does not include endorsements for collection or deposit in the ordinary course of business.  The term "guarantee" used as a verb has a corresponding meaning.

"Guarantors" means:

(1)     OGX Petróleo e Gás Participações S.A.;

(2)     OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A.; and

(3)     any other Restricted Subsidiary of the Company that becomes a Guarantor in accordance with the provisions of this Indenture,

and their respective successors and assigns, in each case, until the Note Guarantee of such Person has been released in accordance with the provisions of this Indenture.

"Hedging Agreements" means (i) (a) any interest rate swap agreement, interest rate cap agreement or other agreement designed to protect against fluctuations in interest rates or (b) any foreign exchange forward contract, currency swap agreement or other agreement designed to protect against fluctuations in foreign exchange rates or (ii) any commodity or raw

material futures contract or any other agreement designed to protect against fluctuations in raw material prices.

"Hedging Obligations" means the obligations of any Person pursuant to Hedging Agreements.

"Holder" or "Securityholder" means the Person in whose name a Security is registered on the Registrar's books.

"Incur" means, with respect to any Debt or Capital Stock, to Incur, create, issue, assume or guarantee such Debt or Capital Stock.  The term "Incurrence" when used as a noun shall have a correlative meaning.  The accretion of original issue discount or payment of interest in kind will not be considered an Incurrence of Debt.

"Indenture" means this Indenture, as it may be amended or supplemented from time to time in accordance with the applicable terms hereof.

"Initial Securities" has the meaning set forth in the preamble to this Indenture.

"Interest Payment Date" means each April 1 and October 1 of each year, commencing on October 1, 2012.

"Investment" means:

(1)       any direct or indirect advance, loan (including guarantees) or other extension of credit to another Person, but excluding (i) any advance, loan or extension of credit to customers in the ordinary course of business and (ii) any advance, loan or extension of credit having a term not exceeding 180 days arising in connection with the sale of inventory, equipment or supplies by that Person in the ordinary course of business,

(2)       any capital contribution to another Person, by means of any transfer of cash or other property or in any other form,

(3)       any purchase or acquisition of Equity Interests, bonds, notes or other Debt, or other instruments or securities issued by another Person, any acquisitions of assets or substantially all the assets of a Person, including the receipt of any of the above as consideration for the disposition of assets or rendering of services, or

(4)       any guarantee of any obligation of another Person.

For purposes of this definition, the term "Person" shall not include the Company or any Restricted Subsidiary or any Person who would become a Restricted Subsidiary as a result of any Investment.  If the Company or any Restricted Subsidiary sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary so that, after giving effect to that sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, all remaining Investments of the Company and the Restricted Subsidiaries in such Person shall be deemed to have been made at such time.

For purposes of <u>Section 4.04</u>, the Company will be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which will be valued at the Fair Market Value of the sum of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Debt of such Unrestricted Subsidiary owed to the Company or any Restricted Subsidiary immediately following such Designation. Any property transferred to or from an Unrestricted Subsidiary will be valued at its Fair Market Value at the time of such transfer.

"<u>Investment Grade Rating</u>" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"<u>Issue Date</u>" means March 30, 2012.

"<u>Issuer</u>" means OGX Austria GmbH, named as such in this Indenture, excluding its Subsidiaries, until a successor replaces it and, thereafter, means the successor, or such substituted issuer in accordance with Article 10.

"<u>Lien</u>" means any mortgage, pledge, security interest, conditional sale or other title retention agreement or other similar lien.

"<u>Marketable Securities</u>" means publicly traded debt or equity securities that are listed for trading on a national securities exchange and that were issued by a corporation with debt securities rated at least "AA-" from S&P or "Aa3" from Moody's or the equivalent local rating.

"<u>Maturity Date</u>" means April 1, 2022.

"<u>Minimum Legally Required Dividend</u>" means, for any Brazilian Person and any period, an amount equal to the sum of (a) the minimum dividend required to be distributed under applicable Brazilian law by such Person to holders of its Capital Stock during such period and (b) the minimum dividend required to be distributed to holders of Preferred Stock in such Person during such period so as to avoid such holders from acquiring or maintaining any voting rights under Brazilian law.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and its successors.

"<u>Net Cash Proceeds</u>" means, with respect to any Asset Sale, the proceeds of such Asset Sale in the form of cash or Cash Equivalents (including (i) payments in respect of deferred payment obligations to the extent corresponding to, principal, but not interest, when received in the form of cash, and (ii) proceeds from the conversion of other consideration received when converted to cash), net of:

(1)    brokerage commissions and other fees and expenses related to such Asset Sale, including fees and expenses of counsel, accountants and investment bankers;

(2)      provisions for taxes as a result of such Asset Sale taking into account the consolidated results of operations of the Company and its Restricted Subsidiaries;

(3)      payments required to be made to repay Debt (other than revolving credit borrowings) outstanding at the time of such Asset Sale that is secured by a Lien on the property or assets sold; and

(4)      appropriate amounts to be provided as a reserve against liabilities associated with such Asset Sale, including pension and other post-employment benefit liabilities, liabilities related to environmental matters and indemnification obligations associated with such Asset Sale, with any subsequent reduction of the reserve other than by payments made and charged against the reserved amount to be deemed a receipt of cash.

"Net Debt" means, as of any date of determination, the aggregate amount of Debt of the Company and its Restricted Subsidiaries less the sum of consolidated cash and cash equivalents and consolidated marketable securities recorded as current assets in all cases in accordance with GAAP and as set forth in the most recent consolidated balance sheet of the Company.

"Net Debt to EBITDA Ratio" means, on any date (the "transaction date"), the ratio of:

(x)      the aggregate amount of Net Debt at that time to

(y)      EBITDA for the four fiscal quarters immediately prior to the transaction date for which internal financial statements are available (the "reference period").

In making the foregoing calculation,

(1)      pro forma effect will be given to any Debt Incurred (and the application of proceeds thereof) during or after the reference period to the extent the Debt is outstanding or is to be Incurred on the transaction date as if the Debt had been Incurred on the first day of the reference period; and

(2)      pro forma effect will be given to:

(A)      the acquisition or disposition of companies, concessions, Oil and Gas Properties, or businesses by the Company and its Restricted Subsidiaries, including any acquisition or disposition of a company, concessions, Oil and Gas Properties or businesses since the beginning of the reference period by a Person that became a Restricted Subsidiary after the beginning of the reference period, and

(B)      the discontinuation of any discontinued operations that have occurred since the beginning of the reference period as if such events had occurred, and, in the case of any disposition, the proceeds thereof applied, on the first day of the reference period.

To the extent that pro forma effect is to be given to an acquisition or disposition of a company, division or line of business, the pro forma calculation will be (i) based upon the most recent four full fiscal quarters for which the relevant financial information is available and (ii) determined in good faith by the chief financial officer or the treasurer of the Company.

"Non-Recourse Debt" means Debt:

(1)       as to which neither the Company nor any Restricted Subsidiary (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Debt), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender; and

(2)       no default with respect to which would permit upon notice, lapse of time or both any holder of any Debt of the Company or any Restricted Subsidiary to declare a default on such Debt or cause the payment of the Debt to be accelerated or payable prior to its stated maturity.

"Note Guarantee" means the guarantee of the Securities by the Guarantors pursuant to this Indenture.

"Offer Period" means the period for which the Asset Sale Offer remains open, as specified by the Issuer in its notice delivered pursuant to Section 4.06(c).

"Offering Memorandum" means the offering circular for the Initial Securities, dated March 27, 2012.

"Officer" means with respect to the Company or any Restricted Subsidiary, the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president of the Company or any Restricted Subsidiary, as the case may be.

"Officer's Certificate" means a certificate signed by an Officer of the Company or of the Issuer, as applicable.

"Oil and Gas Properties" means all properties, including without limitation, equity or other ownership interests directly or indirectly therein, and any interests in any concession or license to explore or produce oil and natural gas.

"Opinion of Counsel" means a written opinion of counsel, who may be an employee of or counsel for the Company (except as otherwise provided in this Indenture).

"Outstanding Securities" has the meaning set forth under Section 2.08.

"Paying Agent" means the paying agent or principal paying agent identified in the preamble to this Indenture, until replaced by a successor and, thereafter, means the successor, and any other paying agent appointed by the Issuer to act as such.

"Permitted Business" means any business which is the same as or related, ancillary or complementary to any of the businesses of the Company and its Restricted Subsidiaries on the Issue Date, including without limitation, (1) the acquisition, exploration, development, production, operation and disposition of interests in oil, gas and other hydrocarbon and mineral properties or products produced in association with the foregoing (including without limitation through operating agreements, joint ventures, partnership agreements, technical evaluation agreements working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements or otherwise), and the utilization of the Company's and its Restricted Subsidiaries' properties or rights to explore or produce oil and gas, (2) the gathering, marketing, treating, processing, storage, distribution, refining, selling and transporting of any production from such interests, properties or rights products produced in association therewith and the marketing of oil, gas and other hydrocarbons and minerals obtained from unrelated Persons, (3) any other related energy business, including power generation and electrical transmission business, (4) oil field sales and services and related activities, (5) development, purchase and sale of real estate and interests therein, and (6) any business or activity related to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (1) through (5) of this definition.

"Permitted Business Investment" means any Investment and expenditure made in or assets or properties (including Capital Stock, Debt or any other security or instrument of a Person) related to a Permitted Business, including without limitation, (1) ownership interests in oil, natural gas, other hydrocarbons and minerals properties or gathering, transportation, processing, storage or related systems (with directly or indirectly through any investment vehicle); (2) any operating agreements, joint ventures, partnership agreements, working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements, contracts for the sale, transportation or exchange of oil, natural gas and other hydrocarbons, unitization agreements, pooling arrangements, joint bidding agreements, service contracts, partnership agreements, limited liability company agreements, subscription agreements, stock purchase agreements, stockholder agreements, area of mutual interest agreements, production sharing agreements or other similar or customary agreements, transactions, properties, interests, or arrangements, and Investments and expenditures in connection therewith or pursuant thereto; and (3) direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment.

"Permitted Debt" has the meaning set forth under Section 4.03.

"Permitted Holders" means Mr. Eike Fuhrken Batista and immediate members of his family thereof and any trust, investment vehicle or other Person beneficially owned by any such Persons.

"Permitted Investment" means:

(1)     any Investment in the Company or any Restricted Subsidiary (including, without limitation, in any Debt, other security or instrument thereof);

(2)       any Investment by the Company or any Restricted Subsidiary in another Person if as a result of such Investment such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, or is liquidated into, the Company or a Restricted Subsidiary or becomes a Restricted Subsidiary;

(3)       Investments in cash and cash equivalents and marketable securities as determined in accordance with GAAP;

(4)       stocks, obligations or securities received in settlement of (or foreclosure with respect to) debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor;

(5)       any Investment existing on, or made pursuant to a binding commitments existing on or approved by the Board of Directors as of, the Issue Date and any Investment consisting of an extension, modification or renewal of any Investment existing on the Issue Date;

(6)       Investments represented by Hedging Obligations permitted under this Indenture;

(7)       Investments which are made exclusively with Capital Stock of the Company (other than Disqualified Stock);

(8)       any Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were Incurred in the ordinary course of business of the Company or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes with Persons who are not Affiliates;

(9)       any acquisition and holding of (a) federal, state and municipal tax credits acquired solely to pay amounts owed by the Company or any Restricted Subsidiary to tax authorities and (b) discounted obligations of any governmental authority acquired solely to pay tax amounts owed by the Company or any Restricted Subsidiary to such governmental authority;

(10)       Investments made as a result of the receipt of non-cash consideration from an Asset Sale that was made in compliance with Section 4.06;

(11)       receivables owing to the Company or any of its Restricted Subsidiaries, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; provided, that such trade terms may include such trade terms as the Company or such Restricted Subsidiary deems reasonable under the circumstances;

(12)       surety and performance bonds and workers' compensation, utility, lease, tax, performance and similar deposits and prepaid expenses in the ordinary course of business;

(13)     prepayments and other credits to suppliers made in the ordinary course of business;

(14)     loans and advances pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business;

(15)     Investments in connection with pledges, deposits, payments or performance bonds made or given in the ordinary course of business in connection with or to secure statutory, regulatory or similar obligations, including obligations under health, safety or environmental obligations;

(16)     any Investment acquired from a Person which is merged with or into the Company or any of its Restricted Subsidiaries, or any Investment of any Person existing at the time such Person becomes a Restricted Subsidiary of the Company and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction;

(17)     guarantees by the Company or any Restricted Subsidiary of operating leases, in each case entered into by the Company or any Restricted Subsidiary in the ordinary course of business;

(18)     guarantees of performance or other obligations arising in the ordinary course in the Permitted Business, including obligations under oil and natural gas exploration, development, joint operating, and related agreements and licenses, concessions or operating leases related to the Permitted Business;

(19)     payroll, commission, travel, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(20)     loans or grants in respect of community development projects made in the ordinary course of business customary in the Permitted Business as appropriate for the Company's regions of operations and consistent with past practice or counterparty requirement;

(21)     Investments in the Capital Stock of any Person other than a Restricted Subsidiary of the Company that are required to be held pursuant to an involuntary governmental order of consideration, nationalization, seizure or expropriation or other similar order with respect to Capital Stock of such Person (prior to which order such Person was a Subsidiary of the Company);

(22)     Investments in marketable securities or instruments to fund the Company's or its Restricted Subsidiary's pension and other employee-related obligations pursuant to compensation arrangements approved by the Board of Directors or senior management of the Company;

(23)     Investments made pursuant to a commitment that, when entered into, would have complied with the provisions of this Indenture;

(24)     loans or advances made to, or guarantees with respect to loans or advances made to, directors, officers or employees of the Company or any Restricted Subsidiary in respect of travel, entertainment or moving related expense Incurred in the ordinary course of business; in respect of moving related expenses Incurred in connection with any closing or consolidation or any facility or office; or in the ordinary course of business;

(25)     repurchases of the Securities and related guarantees;

(26)     any Permitted Business Investment;

(27)     advances made to customers, clients, distributors, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business; and

(28)     additional Investments by the Company or any of its Restricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (28) that are at the time outstanding, not to exceed the greater of (i) U.S.$100,000,000 and (ii) 1.25% of Consolidated Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value).

"Permitted Liens" means:

(1)     any Lien in existence on the Issue Date and any extension, renewal or replacement thereof or of any Lien in clause (6), (7) or (8) below; provided, however, that the total amount of Debt so secured is not increased as a result thereof plus any fees and expenses in connection with such extension, renewal or replacement and the Lien shall be limited to all or part of the same property that secured the original Lien (together with improvements and accessions to such property);

(2)     Liens securing Debt owed by any Restricted Subsidiary of the Company solely to the Company or one or more Restricted Subsidiaries and/or by the Company to one or more such Restricted Subsidiaries;

(3)     Liens or deposits to secure judgments, in each case not giving rise to an Event of Default, so long as any appropriate legal proceedings which may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(4)     Liens encumbering goods and documents of title with respect to such goods and arising in the ordinary course of business in connection with the issue of documentary letters of credit, and Liens arising out of title retention provisions in a supplier's standard condition of supply of goods acquired in the ordinary course of business;

(5)     Liens on the inventory or receivables, including without limitation any future oil and natural gas production, of the Company or any Restricted Subsidiary securing the obligations of such Person; *provided* that the aggregate amount of receivables securing Debt shall not exceed 80% of the Company's aggregate outstanding receivables from time to time;

(6)     any Lien on any property or assets (including Capital Stock of any person) securing Debt Incurred solely for purposes of financing the acquisition, construction or improvement of such property or assets after the Issue Date; provided, that (a) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the cost (i.e., purchase price) of the property or assets so acquired, constructed or improved and (b) the Lien is Incurred before, or within 365 days after the completion of, such acquisition, construction or improvement and does not encumber any other property or assets of the Company or any Restricted Subsidiary; and *provided, further*, that to the extent that the property or asset acquired is Capital Stock, the Lien also may encumber other property or assets of the person so acquired;

(7)     any Lien securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project (other than projects related to the Waimea Complex or Waikiki Complex); provided, that the Liens in respect of such Debt are limited to assets (including Capital Stock of the project entity) and/or revenues of such project; provided, further, that the Lien is Incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other property or assets of the Company or any Restricted Subsidiary;

(8)     any Lien existing on any property or assets of any person before that person's acquisition (in whole or in part) by, merger into or consolidation with the Company or any Restricted Subsidiary after the date of this Indenture; provided, that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation;

(9)     any Lien imposed by law that was Incurred in the ordinary course of business, including, without limitation, carriers', warehousemen's and mechanics' liens and other similar encumbrances arising in the ordinary course of business, in each case for sums that are not more than 60 days past due or are being contested in good faith by appropriate proceedings;

(10)     pledges or deposits in connection with workers' compensation laws, unemployment insurance laws or similar legislation, or good faith deposits, letters of credit and performance, bid, surety, appeal or similar bonds in connection with bids, tenders, contracts (other than for the payment of Debt) or leases to which the Company or any of its Restricted Subsidiaries is a party, or deposits for the payment of rent, or deposits to secure public or statutory obligations or for contested taxes or import or customs duties, in each case Incurred in the ordinary course of business;

(11)     any Lien in favor of the issuer of surety bonds or letters of credit issued pursuant to the request of and for the account of the Company or any Subsidiary in the ordinary course of business;

(12)     any Lien securing taxes, assessments and other governmental charges, the payment of which are not more than 60 days past due or are being contested in good faith by appropriate proceedings and for which reserves or other appropriate provisions, if any, have been established as required by GAAP;

(13)     minor defects, easements, rights-of-way, restrictions and other similar encumbrances Incurred in the ordinary course of business and encumbrances consisting of municipal or zoning restrictions, licenses, restrictions on the use of property or assets or minor imperfections in title that do not materially impair the value or use of the property or assets affected thereby, and any leases and subleases of real property that do not interfere with the ordinary conduct of the business of the Company or any Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(14)     any rights of set-off, netting or similar rights and remedies of any person with respect to any deposit account of the Company or any Subsidiary arising in the ordinary course of business;

(15)     any Lien securing Hedging Agreements so long as such Hedging Agreements are entered into for bona fide, non-speculative purposes;

(16)     any Liens granted to secure borrowings from, directly or indirectly, (A) *Banco Nacional de Desenvolvimento Econômico e Social–BNDES*, or any other governmental development bank or credit agency, including but not limited to *FINEP – Financiadora de Estudos e Projetos*, or (B) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer;

(17)     any Lien on the Capital Stock of an Unrestricted Subsidiary;

(18)     any Lien in respect of Production Payments and Reserve Sales;

(19)     any Lien on pipelines and pipeline facilities that arise by operation of law;

(20)     any Lien arising under joint venture agreements, partnership agreements, oil and gas leases or subleases, assignments, purchase and sale agreements, division orders, contracts for the sale, purchasing, processing, transportation or exchange of oil or natural gas, unitization and pooling declarations and agreements, development agreements, technical evaluation agreements, area of mutual interest agreements, licenses, sublicenses, net profits interests, participation agreements, Farm-Out Agreements, Farm-In Agreements, carried working interest, joint operating, unitization, royalty, sales and similar agreements or arrangements relating to the exploration or development of, or production from, Oil and Gas Properties entered into in the ordinary course of business in a Permitted Business;

(21)     any Lien reserved in oil and gas mineral leases for bonus, royalty or rental payments and for compliance with the terms of such leases;

(22)    any Lien on, or related to, properties or assets to secure all or part of the costs Incurred in the ordinary course of a Permitted Business for exploration, drilling, development, production, processing, transportation, marketing, storage, abandonment or operation; and

(23)    in addition to the foregoing Liens set forth in clauses (1) through (22) above, Liens securing Debt of the Company or any Restricted Subsidiary (including, without limitation, guarantees of the Company or any Restricted Subsidiary) which in aggregate principal amount, at any time of determination, do not exceed the greater of (i) U.S.$1,500,000,000 and (ii) 15.0% of Consolidated Total Assets.

Notwithstanding the foregoing, on or prior to the EBITDA Triggering Event, the Liens described in clauses (5), (16) and (23) shall not secure Debt in an aggregate principal amount exceeding the greater of (i) U.S.$1,000,000,000 and (2) 12.5% of the Consolidated Total Assets.

"Permitted Refinancing Debt" has the meaning set forth under Section 4.03.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"Preferred Stock" means, with respect to any Person, any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"Process Agent" has the meaning set forth for such term in Section 13.13(b).

"Production Payments and Reserve Sales" means the grant or transfer by the Company or a Restricted Subsidiary of the Company to any Person of a royalty, overriding royalty, net profits interest, production payment, partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties, including without limitation any such grants or transfers pursuant to incentive compensation programs on terms that are reasonably customary in the oil and gas business for geologists, geophysicists and other providers of technical services to the Company or a Subsidiary of the Company.

"Property" means (i) any land, buildings, machinery and other improvements and equipment located therein, (ii) any intangible assets, including, without limitation, any brand names, trademarks, copyrights and patents and similar rights and (iii) any income (licensing or otherwise), proceeds of sale or other revenues therefrom.

"Protected Purchaser" means a purchaser of a Security, or of an interest therein, who (a) gives value, (b) does not have notice of any adverse claim to the Security, and (c) obtains control of the Security.

"Purchase Date" means, in relation to an Asset Sale Offer, the date of purchase of Securities (or any portion thereof) specified in the notice given by the Issuer pursuant to Section 4.06(c) in relation to such offer, which date is not less than 30 days nor more than 60 days after the date of the notice of the Asset Sale Offer.

"Qualified Equity Interests" means all Equity Interests of a Person other than Disqualified Equity Interests.

"Qualified Stock" means all Capital Stock of a Person other than Disqualified Stock.

"Rating Agency" means S&P or Moody's; or if S&P or Moody's are not making rating of the Securities publicly available, an internationally recognized U.S. rating agency or agencies, as the case may be, selected by the Company, which will be substituted for S&P or Moody's or both, as the case may be.

"Rating Decline" means that at any time within 90 days (which period shall be extended so long as the rating of the Securities is under publicly announced consideration for possible down grade by either Rating Agency) after the earlier of the date of public notice of a Change of Control and of the Company's intention or that of any Person to effect a Change of Control, (i) in the event the Securities are assigned an Investment Grade Rating by at least two of the Rating Agencies prior to such public notice, the rating of the Securities by at least two of the Rating Agencies shall be below an Investment Grade Rating; or (ii) in the event the Securities are rated below an Investment Grade Rating by at least two of the Rating Agencies prior to such public notice, the rating of the Securities by at least two of the Rating Agencies shall be decreased by one or more categories; *provided*, that, in each case, any such Rating Decline is in whole or in part in connection with a Change in Control.

"*real*", "*reais*" or "R$" means the lawful currency of Brazil.

"Redemption Date" means, with respect to any redemption of Securities, the date fixed for such redemption pursuant to this Indenture and the Securities.

"Registrar" has the meaning set forth under Section 2.03.

"Relevant Date" means, with respect to any payment on a Security, whichever is the later of: (i) the date on which such payment first becomes due; and (ii) if the full amount payable has not been received by the Trustee on or prior to such due date, the date on which notice is given to the Holders that the full amount has been received by the Trustee.  The Securities are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation. Except as specifically provided in this Indenture, neither the Issuer nor any Guarantor shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein.

"Restricted Payment" has the meaning set forth under Section 4.04.

"<u>Restricted Subsidiary</u>" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"<u>Revocation</u>" has the meaning set forth under <u>Section 4.24</u>.

"<u>S&P</u>" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc. and its successors.

"<u>Sale and Leaseback Transaction</u>" means, with respect to any Person, an arrangement whereby such Person enters into a lease of property previously transferred by such Person to the lessor.

"<u>SEC</u>" means the U.S. Securities and Exchange Commission.

"<u>Securities</u>" means the securities issued under this Indenture.

"<u>Securities Act</u>" means the United States Securities Act of 1933, as amended.

"<u>Security Register</u>" means a register of Securities kept at the corporate trust office of the Registrar.

"<u>Significant Subsidiary</u>" of any Person means any Restricted Subsidiary that would be a "significant subsidiary" of such Person within the meaning of Rule 1-02 under Regulation S-X promulgated pursuant to the Securities Act.

"<u>Stated Maturity</u>" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"<u>Subordinated Debt</u>" means any Debt of the Company or a Restricted Subsidiary which is subordinated in right of principal payment to the Securities or the Note Guarantee, as applicable, pursuant to a written agreement to that effect.

"<u>Subsidiary</u>" means with respect to any Person, any corporation, limited liability company , partnership, association or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more Subsidiaries of such Person (or a combination thereof).

"<u>Substituted Debtor</u>" has the meaning set forth in <u>Section 10.01</u>.

 "<u>TIA</u>" means the Trust Indenture Act of 1939, as amended.

"<u>Transfer Restricted Securities</u>" means Securities that bear or are required to bear the Restricted Securities Legend (as defined in <u>Section 2.1(6)</u> of the Appendix).

"Trust Officer" means any officer in the corporate trust department of the Trustee, including any managing director, director, vice president, assistant vice president, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"United States" means the United States of America.

"Unrestricted Subsidiary" means any Subsidiary of the Company Designated as an Unrestricted Subsidiary pursuant to Section 4.24. Any such Designation may be revoked by a resolution of the Board of Directors of the Company, subject to the provisions of Section 4.24.

"U.S. Bankruptcy Code" means the United States Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 *et seq*.

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States is pledged in support thereof.

"Voting Stock" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Waikiki Complex" means the project located in concessions BM-C-39 and BM-C-40 in the Campos Basin described under the heading "Business—Our Development and Production-Campos Basin Development and Production—Development Plan for Our Existing Discoveries in the Campos Basin-Project 2 – Waikiki Complex" of the Offering Memorandum.

"Waimea Complex" means the project located in concession BM-C-41 in the Campos Basin described under the heading "Business—Our Development and Production—Campos Basin Development and Production—Development Plan for Our Existing Discoveries in the Campos Basin–Project 1 – Waimea Complex" of the Offering Memorandum.

"Wholly-Owned Subsidiary" means a Restricted Subsidiary of the Company of which at least 95% of the Capital Stock or other ownership interest (other than directors' qualifying shares) is owned by the Company or another Wholly-Owned Subsidiary.

SECTION 1.02    Incorporation by Reference of Trust Indenture Act.  The following TIA terms have the following meanings:

"Commission" means the SEC;

"indenture securities" means the Securities and the Note Guarantee;

"indenture security holder" means a Securityholder;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the Securities and the Note Guarantee, respectively, means the Issuer and the Guarantors, respectively, and any successor obligor on the Securities and the Note Guarantee, respectively.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.03    Rules of Construction.  Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    "including" means including without limitation;

(5)    words in the singular include the plural and words in the plural include the singular;

(6)    unsecured Debt shall not be deemed to be subordinate or junior to secured Debt merely by virtue of its nature as unsecured Debt;

(7)    the principal amount of any Preferred Stock shall be (a) the maximum liquidation value of such Preferred Stock or (b) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(8)    all references to the date the Initial Securities were originally issued shall refer to the Issue Date;

(9)    unless context requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture;

(10)    unless otherwise stated, any agreement, contract or document defined or referred to herein shall mean such agreement, contract or document and all schedules, exhibits and attachments thereto as in effect as of the date hereof, as the same may thereafter be amended, supplemented or otherwise modified from time to time;

(11)     all references in this Indenture and the Securities to interest in respect of any Security shall be deemed to include all Additional Amounts, if any, in respect of such Security, unless the context otherwise requires, and express mention of the payment of Additional Amounts in any provision hereof or thereof shall not be construed, without more, as excluding reference to Additional Amounts in those provisions hereof or thereof where such express mention is not made; and

(12)     all references to amounts denominated in "U.S.$"  shall be deemed to be the equivalent thereof in any other currency at the time of determination.

## Article 2

### The Securities

SECTION 2.01     Form and Dating.  Provisions relating to the Securities are set forth in the Rule 144A/Regulation S Appendix attached hereto (the "Appendix") which is hereby incorporated in, and expressly made part of, this Indenture.  The Initial Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit 1 to the Appendix which is hereby incorporated in, and expressly made a part of, this Indenture.  The Securities may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer or the Guarantors is subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer or the Guarantors).  Each Security shall be dated the date of its authentication.  The Securities will be issuable in denominations of U.S.$200,000 in principal amount and any multiple of U.S.$1,000 in excess thereof.  The Securities shall be fully and unconditionally guaranteed by the Guarantors in accordance with Article 11.  The terms of the Initial Securities set forth in the Appendix and Exhibit 1 are part of the terms of this Indenture.

SECTION 2.02     Execution and Authentication.  An Officer of the Issuer shall sign the Securities for the Issuer, and an Officer of each Guarantor shall sign the notation in the Securities relating to the Note Guarantee.  Each such signature may be by manual or facsimile signature of such Officer.

If an Officer whose signature is on a Security no longer holds that office at the time the Trustee authenticates the Security, the Security shall be valid nevertheless.

A Security shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Security.  The signature shall be conclusive evidence that the Security has been authenticated under this Indenture.

On the Issue Date, the Trustee shall authenticate and deliver U.S.$1,063,000,000 aggregate principal amount of 8.375% Senior Notes due 2022 and, at any time and from time to time thereafter, the Trustee shall authenticate and deliver Securities for original issue in an aggregate principal amount specified in such order, in each case upon a written order of the Issuer signed by one or more Officers of the Issuer.  Such order shall specify the amount of the

Securities to be authenticated and the date on which the original issue of Securities is to be authenticated and, in the case of an issuance of Additional Securities pursuant to Section 2.12 after the Issue Date, shall certify that such issuance is in compliance with this Indenture and shall state (i) whether such Additional Securities shall be Transfer Restricted Securities and issued in the form of Initial Securities as set forth in the Appendix to this Indenture and (ii) the initial Interest Payment Date.

       The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Securities.  Unless limited by the terms of such appointment, an authenticating agent may authenticate Securities whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent or agent for service of notices and demands.

       SECTION 2.03    Registrar and Paying Agent.  The Issuer shall maintain an office or agency in the Borough of Manhattan, City of New York where Securities may be presented or surrendered for registration of transfer or for exchange (the "Registrar"), where Securities may be presented for payment (the "Paying Agent") and for the service of notices and demands to or upon the Issuer in respect of the Securities and this Indenture.  The Registrar shall keep a register of the Securities and of their transfer and exchange.  The Issuer may have one or more co-registrars and one or more additional paying agents.  The term "Paying Agent" includes any paying agent appointed in this Indenture and any additional paying agent, and the term "Registrar" includes any additional Registrar or co-registrar.

       The Issuer shall enter into an appropriate agency agreement with any Registrar, Paying Agent or co-registrar not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such agent.  The Issuer shall notify the Trustee of the name and address of any such agent.  If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06.  The Issuer, the Guarantors or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or transfer agent.

       The Issuer initially appoints (i) the Trustee as Registrar, a Paying Agent, and Transfer Agent in connection with the Securities, (ii) the Principal Paying Agent as a Paying Agent and (iii) DTC as Depositary with respect to the Securities.

       SECTION 2.04    Paying Agent To Hold Money in Trust.  The Issuer hereby acknowledges and confirms that it is and at all times shall remain absolutely and unconditionally obligated to pay all amounts due and owing by the Issuer hereunder, as the same shall become due and owing.  All payments of principal, premium and interest required to be made by the Issuer hereunder (including any Additional Amounts) shall be made in U.S. dollars, pursuant to the terms hereof, by the Issuer to a Paying Agent to the extent appointed hereunder or to the Trustee by 12:00 p.m. (New York City time) one Business Day prior to each Interest Payment Date, redemption date, purchase date, Change of Control Payment Date or Maturity Date on any Securities, unless otherwise provided for in this Indenture.  Each Paying Agent shall hold in trust, for the benefit of the Holders or the Trustee, all money held by such Paying Agent for the

payment of principal, premium or interest on the Securities.  The Issuer at any time may require each Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it.  Upon complying with this Section 2.04, each Paying Agent shall have no further liability for the money delivered to the Trustee.

The receipt by a Paying Agent or the Trustee from the Issuer of each payment of principal, interest and/or other amounts due in respect of the Securities in the manner specified herein and on the date on which such amount of principal, interest and/or other amounts are then due, shall satisfy the obligations of the Issuer herein and under the Securities to make such payment to the Holders on the due date thereof.

SECTION 2.05   Securityholder Lists.  The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders.  If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee, in writing at least five Business Days before each Interest Payment Date and at such other times as the Trustee may reasonably request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

SECTION 2.06   Transfer and Exchange.  The Securities shall be issued in registered form and shall be transferable only upon the surrender of a Security for registration of transfer.  When a Security is presented to the Registrar or a co-registrar with a request to register a transfer, the Registrar shall register the transfer as requested if the requirements of this Indenture are met and if the transferee certifies to the Issuer and Registrar that: (i) under the terms of the Security, the Person seeking registration of transfer is eligible to have the Security registered in its name, (ii) the indorsement or instruction is made by the appropriate Person or by an agent who has actual authority to act on behalf of the appropriate Person, (iii) reasonable assurance is given that the indorsement or instruction is genuine and authorized, (iv) any applicable law relating to the collection of taxes has been complied with, (v) the transfer does not violate any restriction on transfer imposed by the Issuer, (vi) a demand that the Issuer not register transfer has not become effective (or, if such a demand has become effective, the Issuer has given notice to the Person making such demand stating that (x) registration of transfer of the Security is sought, (y) a demand that the Issuer not register transfer had previously been received and (z) the Issuer shall withhold registration for 10 days from the date of communication of such notice), and (vii) the transfer is in fact rightful or is to a Protected Purchaser.  When Securities are presented to the Registrar or a co-registrar with a request to exchange them for an equal principal amount of Securities of other denominations, the Registrar shall make the exchange as requested if the same requirements are met.  To permit registration of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate and deliver Securities at the Registrar's or co-registrar's request.  The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to this Section 2.06 (other than any such transfer taxes, assessments or similar governmental charge payable upon exchange or transfer pursuant to Section 4.08 and Section 9.04).  The Issuer shall not be required to make and the Registrar need not register transfers or exchanges of Securities selected and delivered for redemption or any Securities for a period of 15 days before an Interest Payment Date.

Prior to the due presentation for registration of transfer of any Security, the Issuer, the Trustee, any Paying Agent, the Registrar or any co-registrar may deem and treat the person in whose name a Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and interest (and Additional Amounts, if any) on such Security and for all other purposes whatsoever, whether or not presentation of such Security is overdue, and none of the Issuer, the Trustee, any Paying Agent, the Registrar or any co-registrar shall be affected by notice to the contrary.

All Securities issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Securities surrendered upon such transfer or exchange.

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Security (including any transfers between or among participants in DTC or beneficial owners of interests in any Global Security) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.07    Replacement Securities. If (a) any mutilated Security is surrendered to the Issuer, the Registrar, or the Trustee, or (b) the Issuer, the Registrar and the Trustee receive evidence to their satisfaction of the destruction, loss or left of any Security, and, unless otherwise agreed by the Issuer and the Trustee, there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Issuer or the Trustee that such Security has been acquired by a Protected Purchaser, the Issuer shall execute and the Trustee shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Security has become due and payable, or has been called for redemption by the Issuer pursuant to Article 3 of this Indenture, the Issuer in its discretion (but subject to any conversion rights) may, instead of issuing a new Security, pay or redeem such Security, as the case may be.

Upon the issuance of any new Security under this Section 2.07, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expense (including the fees and expenses of the Trustee or the Registrar) in connection therewith.

Every replacement Security is an additional obligation of the Issuer.

The provisions of this Section 2.07 are exclusive and, to the extent lawful, shall preclude all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 2.08   Outstanding Securities.  Securities outstanding at any time ("Outstanding Securities") are all Securities authenticated by the Trustee except for those canceled by it pursuant to Section 2.10 hereof, those delivered to the Trustee for cancellation or surrendered for transfer or exchange, those reductions in the interest in a Global Security effected by the Trustee in accordance with the provisions hereof and those described in this Section 2.08 as not outstanding.  Except as set forth in Article 9 and Section 13.05, a Security does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Security.

If a Security is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Security is held by a Protected Purchaser.

If any Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal, premium, interest and Additional Amounts (if any) payable on that date with respect to the Securities (or portions thereof) to be redeemed or maturing, as the case may be, then on and after that date, such Securities (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.09   Temporary Securities.  Until definitive Securities are ready for delivery, the Issuer may prepare and execute and the Trustee shall authenticate temporary Securities.  Temporary Securities shall be substantially in the form of definitive Securities but may have variations that the Issuer considers appropriate for temporary Securities.  Without unreasonable delay, the Issuer shall prepare and execute and the Trustee shall authenticate definitive Securities and deliver them in exchange for temporary Securities.

SECTION 2.10   Cancellation.  The Issuer at any time may deliver Securities to the Registrar for cancellation, along with a written notice to the Trustee advising it of the cancellation.  The Registrar shall forward to the Trustee any Securities surrendered to it for registration of transfer, exchange or payment.  The Trustee and no one else shall cancel and dispose of (subject to the record retention requirements of the Exchange Act) all Securities surrendered for registration of transfer, exchange, payment or cancellation in accordance with its procedures for the disposition of canceled securities and deliver a certificate of such disposition to the Issuer unless the Issuer directs the Trustee to deliver canceled Securities to the Issuer.  The Issuer may not issue new Securities to replace Securities it has redeemed, paid or delivered to the Trustee for cancellation.

SECTION 2.11   CUSIP Numbers and ISINs.  The Issuer in issuing the Securities may use "CUSIP" numbers and "ISINs" (if then generally in use) or similar numbers and, if so, the Trustee shall use "CUSIP" numbers, "ISINs" or similar numbers in notices of redemption as a convenience to Holders; *provided*, *however*, that any such notice may state that

no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers.

SECTION 2.12    Issuance of Additional Securities.  The Issuer may, from time to time, subject to compliance with any other applicable provisions of this Indenture, and without the consent of the Securityholders, create and issue Additional Securities under this Indenture having identical terms in all respects as the Initial Securities except that interest may accrue on the Additional Securities from their date of issuance; *provided, however*, that unless such Additional Securities are fungible for U.S. income tax purposes, such Additional Securities shall be issued under a separate CUSIP.  The Initial Securities and any Additional Securities issued under this Indenture will be treated as a single class for all purposes under this Indenture and shall vote together as one class on all matters with respect to the Securities.

SECTION 2.13    Open Market Purchases.  The Issuer or any of its Affiliates may at any time purchase Securities in the open market or otherwise at any price.  Any such purchased Securities shall not be resold, except in compliance with applicable requirements or exemptions under the relevant securities laws.

Article 3

Optional Redemption of Securities

SECTION 3.01    Optional Redemption.  The Issuer may redeem the Securities, at its option, as a whole or from time to time in part, subject to the conditions and at the redemption prices specified in paragraph 5 of the Securities.

SECTION 3.02    Notice of Redemption.

(1)    The Issuer shall give or cause the Trustee to give notice of redemption, in the manner provided for in Section 13.01, not less than 30 nor more than 60 days prior to a date for redemption of Securities.  If the Issuer itself gives the notice, it shall also deliver a copy to the Trustee and the Principal Paying Agent.

(2)    If either (i) the Issuer is redeeming the Securities in part only, or (ii) the Issuer elects to have the Trustee give notice of redemption, then the Issuer shall deliver to the Trustee, at least five days (or such shorter period as may be agreed to by the Trustee) before notice of redemption is required to be mailed or caused to be mailed to the Holders (unless the Trustee is satisfied with a shorter period), an Officer's Certificate requesting that the Trustee select the Securities to be redeemed and/or give notice of redemption and setting forth the information required by Section 3.02(3).  If the Issuer elects to have the Trustee give notice of redemption, the Trustee shall give the notice in the name of the Issuer and at the Issuer's expense.

(3)     All notices of redemption shall state:

(A)     the Redemption Date;

(B)     the redemption price and the amount of any accrued interest payable as provided in Section 3.05 (or the calculation of such redemption price);

(C)     whether or not the Issuer is redeeming all Outstanding Securities;

(D)     if the Issuer is not redeeming all Outstanding Securities, the aggregate principal amount of Securities that the Issuer is redeeming and the aggregate principal amount of Securities that shall be Outstanding Securities after the partial redemption;

(E)     if the Issuer is redeeming only part of a Security, the notice that relates to that Security shall state that on and after the Redemption Date, upon surrender of that Security, the Securityholder shall receive, without charge, a new Security or Securities of authorized denominations for the principal amount of the Security remaining unredeemed;

(F)     that on the Redemption Date the redemption price and any accrued interest payable to, but excluding, the Redemption Date as provided in Section 3.05 shall become due and payable in respect of each Security, or the portion of each Security, to be redeemed, and, unless the Issuer defaults in making the redemption payment, that interest on each Security, or the portion of each Security, to be redeemed, shall cease to accrue on and after the Redemption Date;

(G)     the place or places where a Securityholder must surrender the Securityholder's Securities for payment of the redemption price; and

(H)     the CUSIP or ISIN number, if any, listed in the notice or printed on the Securities, and that no representation is made as to the accuracy or correctness of such CUSIP or ISIN number.

SECTION 3.03     Selection of Securities to Be Redeemed in Part.

(1)     If fewer than all of the Securities are being redeemed, the selection of Securities to be redeemed shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Securities are listed or if such securities exchange has no requirement governing redemption or the Securities are not then listed on a securities exchange, on a pro rata basis or by lot (or, in the case of Securities issued in global form, based on a method that most nearly approximates a pro rata selection in accordance with the procedures of DTC). The Trustee shall make the selection from the Outstanding Securities not previously called for redemption. The Trustee shall promptly notify the Issuer in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount of the Securities to be redeemed. In the

event of a partial redemption by lot, the Trustee shall select the particular Securities to be redeemed not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Securities not previously called for redemption.  The Issuer may redeem Securities in denominations of U.S.$200,000 or less only in whole.  The Trustee may select for redemption portions (in any integral multiple of U.S.$1,000) of the principal of Securities that have denominations larger than U.S.$200,000; *provided* that the remaining outstanding amount must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000 in excess thereof.

(2)     For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Securities shall relate, in the case of any Security redeemed or to be redeemed only in part, to the portion of the principal amount of that Security which has been or is to be redeemed.

SECTION 3.04     Securities Payable on Redemption Date.  If the Issuer, or the Trustee on behalf of the Issuer, gives notice of redemption in accordance with this Article 3, the Securities, or the portions of Securities, called for redemption, shall, on the Redemption Date, become due and payable at the redemption price specified in the notice (together with accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Redemption Date), and from and after the Redemption Date (unless the Issuer shall default in the payment of the redemption price and accrued interest) the Securities or the portions of Securities shall cease to bear interest, to the extent the Issuer so elects.  Upon redemption of any Securities by the Issuer, such redeemed Securities will be cancelled or, to the extent so requested by the Issuer, remain outstanding.  Upon surrender of any Securities for redemption in accordance with the notice, the Issuer shall pay the Securities at the redemption price, together with accrued interest, if any, to, but excluding, the Redemption Date.  If the Issuer shall fail to pay any Security called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Securities.

SECTION 3.05     Unredeemed Portions of Partially Redeemed Security.  Upon surrender of a Security that is to be redeemed in part, the Issuer shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of the Security at the expense of the Issuer, a new Security or Securities, of any authorized denomination as requested by the Holder, in an aggregate principal amount equal to, and in exchange for, the unredeemed portion of the principal of the Security surrendered; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof.

SECTION 3.06     Third Party Notice.  The Issuer may designate at its option a third party to call the Securities for mandatory purchase in lieu of exercising its right to optional redemption under this Indenture; *provided*, that any call by a third party shall be treated as if such call was made by the Issuer.  Upon such mandatory purchase, the Securities shall remain outstanding unless otherwise indicated by the Issuer, subject to Section 2.08.

## Article 4

## Covenants

SECTION 4.01    Performance of Obligations under the Securities.  The Issuer shall duly and punctually pay the principal of (and premium, if any) and interest and Additional Amounts, if any, on the Securities in accordance with the terms of the Securities and this Indenture. The principal of (and premium, if any) and interest and Additional Amounts, if any, on the Securities shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds in accordance with this Indenture money sufficient to pay all principal and interest then due.

SECTION 4.02    Reports. (a) The Company will provide the Trustee with the following reports in electronic form for delivery to Holders upon their request thereof:

(1)    an English language version of its annual audited consolidated financial statements in a form substantially similar to the annual audited financial statements included in the Offering Memorandum prepared in accordance with GAAP within 120 days after the close of its fiscal year;

(2)    an English language version of its unaudited quarterly financial statements in a form substantially similar to the unaudited quarterly financial statements included in the Offering Memorandum prepared in accordance with GAAP within 60 days after the close of each fiscal quarter (other than the last fiscal quarter of its fiscal year);

(3)    simultaneously with the delivery of the financial statements referred to in clause (1) above, an Officer's Certificate stating whether a Default or Event of Default exists on the date of such certificate and, if a Default or Event of Default exists, setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto;

(4)    without duplication, English language versions or summaries of such other reports or notices as may be filed or submitted by (and promptly after filing or submission by) the Company with the Irish Stock Exchange or any other stock exchange on which the Securities may be listed (in each case, to the extent that any such report or notice is generally available to its security holders or the public in Brazil); and

(5)    as soon as practicable and in any event within 30 calendar days after any director or executive officer of the Company becomes aware of the existence of a Default or Event of Default, an Officer's Certificate setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto.

(b)    If the Company makes available the reports described in Section 4.02(a)(1), (2) or (4) on the Company's website and notifies the Trustee in writing thereof, it will be deemed to have satisfied the reporting requirement set forth in such applicable clause.

(c)      Delivery of the above reports to the Trustee is for informational purposes only and the Trustee's receipt of such reports will not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants in this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

SECTION 4.03      Limitation on Debt and Disqualified Stock.

(a)      The Company

(1)      shall not, and shall not permit any of its Restricted Subsidiaries to, Incur any Debt; and

(2)      shall not, and shall not permit any Restricted Subsidiary to, Incur any Disqualified Stock (other than Disqualified Stock of Restricted Subsidiaries held by the Company or a Restricted Subsidiary, so long as it is so held);

*provided* that the Company or any of its Restricted Subsidiaries may Incur Debt and Disqualified Stock if, on the date of the Incurrence, after giving pro forma effect to the Incurrence and the receipt and the application of the proceeds therefrom, either:

(1)      the aggregate principal amount of Debt and Disqualified Stock outstanding does not exceed the greater of (i) U.S.$4,000,000,000 and (ii) 30.0% of Consolidated Net Total Assets; or

(2)      the Net Debt to EBITDA Ratio does not exceed 3.5 to 1.0; *provided* that in the case of this clause (B), EBITDA shall equal or be greater than U.S.$1.00 for such reference period.

(b)      Notwithstanding the foregoing, the Company and, to the extent provided below, any Restricted Subsidiary may Incur the following ("Permitted Debt"):

(1)      Debt of the Company or a Restricted Subsidiary so long as such Debt is owed to the Company or a Restricted Subsidiary and which, if the obligor is the Company, is subordinated in right of payment to the Securities; *provided, however*, that if such Debt is owed to a Restricted Subsidiary that is not a Guarantor such Debt shall be unsecured and subordinated in right of payment to the Securities;

(2)      Debt of the Company pursuant to the Securities (other than any Additional Securities) and Debt of the Guarantors pursuant to the Note Guarantee (other than with respect to any Additional Securities);

(3)      Subordinated Debt of the Company or a Restricted Subsidiary; *provided, however*, that the aggregate principal amount of such Subordinated Debt, and any refinancing thereof that complies with clause (4)(A) below, does not exceed in an aggregate principal amount at any one time outstanding U.S.$500,000,000;

(4)     Debt of the Company or a Restricted Subsidiary ("Permitted Refinancing Debt") constituting an extension or renewal of, replacement of, or substitution for, or issued in exchange for, or the net proceeds of which are used to repay, redeem, repurchase, refinance or refund, including by way of defeasance (all of the above, for purposes of this clause, "refinance") then outstanding Debt in an amount not to exceed the principal amount of the Debt so refinanced, plus premiums, fees and expenses; *provided* that:

(A)     in case the Debt to be refinanced is subordinated in right of payment to the Securities, the new Debt, by its terms or by the terms of any agreement or instrument pursuant to which it is outstanding, is expressly made subordinate in right of payment to the Securities at least to the extent that the Debt to be refinanced is subordinated to the Securities,

(B)     the new Debt does not have a Stated Maturity prior to (i) the Stated Maturity of the Debt to be refinanced, and the Average Life of the new Debt is at least equal to the remaining Average Life of the Debt to be refinanced, or (ii) the 91st day after the Stated Maturity of the Securities and does not have any scheduled principal payments prior to such date; and

(C)     Debt Incurred pursuant to clauses (1), (3), (5), (6), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), (19), (20) and (21) of Section 4.03(b) shall not be refinanced pursuant to this Section 4.03(b)(4);

(5)     Hedging Agreements of the Company or any Restricted Subsidiary entered into in the ordinary course of business or directly related to Debt permitted to be Incurred by the Company or any Restricted Subsidiary pursuant to this Indenture, and in each case not for speculative purposes;

(6)     Debt of the Company or any Restricted Subsidiary in respect of performance bonds, customs, reimbursement obligations, letters of credit, bankers' acceptances, deposits, promissory notes, self-insurance obligations, completion guarantees and bid, surety or appeal bonds provided in the ordinary course of business;

(7)     Acquired Debt of the Company or any Restricted Subsidiary; *provided, however*, that on the date that such transaction is consummated, after giving effect to the Incurrence of such Debt pursuant to this clause, either (A) the Company or any Restricted Subsidiary would have been able to Incur U.S.$1.00 of additional Debt pursuant to either test set forth in clause (a) above; or (B) would not have both a higher percentage and higher ratio set forth in clause (a) above immediately after such Incurrence;

(8)     Debt of the Company or any Restricted Subsidiary outstanding on the Issue Date;

(9)     Debt represented by guarantees of pension fund obligations of the Company or any Restricted Subsidiary required by law or regulation;

(10)    Debt of the Company or any Restricted Subsidiary Incurred through the provision of bonds, guarantees, letters of credit or similar instruments required by any maritime commission or authority or other governmental or regulatory agencies, including, without limitation, customs authorities; in each case, for vessels owned or chartered by, and in the ordinary course of business of, the Company or any of its Restricted Subsidiaries at any time outstanding not to exceed the amount required by such governmental or regulatory authority;

(11)    Debt of any cash pooling or other cash management agreements of the Company or any Restricted Subsidiary in place with a bank or financial institution but only to the extent of offsetting credit balances of the Company or any of its Restricted Subsidiaries pursuant to such cash pooling or other cash management;

(12)    Debt of the Company or any Restricted Subsidiary (and any refinancing thereof) in an aggregate principal amount at any time outstanding not exceeding the greater of (i) U.S.$500,000,000 and (2) 6.25% of Consolidated Net Total Assets under financings provided or guaranteed by, directly or indirectly, (A) *Banco Nacional de Desenvolvimento Econômico e Social–BNDES*, or any other governmental development bank or credit agency, including but not limited to *FINEP – Financiadora de Estudos e Projetos* or (B) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer;

(13)    Debt of the Company or any Restricted Subsidiary, including but not limited to obligations under Capital Leases, mortgage financings or purchase money obligations, Incurred for the purpose of financing all or any part of the purchase price, lease expense, rental payments or cost of design, construction, installation or improvement of property, plant or equipment or other assets, whether through direct purchase of  or the Capital Stock of any Person owning such property, plant or equipment or other assets (including any Debt deemed to be Incurred in connection with such purchase) (it being understood that any such Debt may be Incurred after the acquisition or purchase or the construction, installation or the making of any improvement with respect to any such property, plant or equipment or other assets), or Incurred to refinance any such purchase price or cost of construction or improvement, and refinancings thereof, in an aggregate principal amount not to exceed at any one time outstanding the greater of (i) U.S.$150,000,000 and (ii) 2.0% of Consolidated Net Total Assets;

(14)    Debt of the Company or any Restricted Subsidiary to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Securities in accordance with this Indenture;

(15)    Debt of the Company or any of its Restricted Subsidiaries for taxes levied, assessments due and other governmental charges required to be paid as a matter of law or regulation in the ordinary course of business;

(16)    guarantees by the Company or any Restricted Subsidiary of Debt permitted to be Incurred pursuant to this Section 4.03; *provided* that if such Debt is subordinated in right of payment to the Securities or the Note Guarantee of the Guarantors, any such guarantee with respect to such Debt shall be subordinated in right of payment to such guarantee;

(17)     Debt of the Company or any Restricted Subsidiary in respect of (i) self-insurance obligations or captive insurance companies or consisting of the financing of insurance premiums or (ii) take-or-pay obligations contained in supply agreements in the ordinary course of business;

(18)     Debt of the Company or any Restricted Subsidiary under one or more Credit Facilities, lines of credit or working capital facilities (and any refinancing thereof); *provided*, *however*, that the aggregate principal amount of such Debt does not exceed at any one time outstanding the greater of (i) U.S.$1,000,000,000 and (ii) 10% of Consolidated Net Total Assets;

(19)     Debt of the Company or any Restricted Subsidiary with respect to reimbursement type obligations regarding worker's compensation claims and Debt and other obligations in respect of deferred compensation of employees Incurred in the ordinary course of business;

(20)     Debt of the Company or any Restricted Subsidiary in the form of customer deposits and advance payments received in the ordinary course of business from customers for purchasers in the ordinary course of business; and

(21)     Debt of the Company or any Restricted Subsidiary (and any refinancing thereof) not otherwise permitted hereunder in an aggregate principal amount equal to the aggregate Net Cash Proceeds received by the Company (other than from a Subsidiary of the Company) after the Issue Date from (i) the issuance and/or sale of its Qualified Equity Interests or (ii) as a contribution to its common equity to the extent that such Net Cash Proceeds received from such issuance, sale or contribution have not been applied to make Restricted Payments pursuant to <u>Sections 4.04(a)(D)(3)(B)</u> and <u>(c)(4)</u>.

(c)     Notwithstanding anything to the contrary in this <u>Section 4.03</u>, the maximum amount of Debt that the Company and its Restricted Subsidiaries may Incur pursuant to this <u>Section 4.03</u> shall not be deemed to be exceeded, with respect to any outstanding Debt, solely as a result of fluctuations in the exchange rate of currencies.

(d)     For purposes of determining compliance with this <u>Section 4.03</u>, in the event that any proposed Debt meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (21) of <u>Section 4.03(b)</u>, or is entitled to be Incurred pursuant to <u>Section 4.03(a)</u>, the Company and its Restricted Subsidiaries shall be permitted to classify such item of Debt at the time of its Incurrence in any manner that complies with this <u>Section 4.03</u> or to later reclassify all or a portion of such item of Debt.

(e)     The Company shall not Incur any Debt that is subordinate in right of payment to other Debt of the Company unless such Debt is also subordinate in right of payment to the Securities or the relevant Note Guarantee on substantially identical terms; *provided*, *however*, that no Debt will be deemed to be subordinated in right of payment to any other Debt of the Company solely by virtue of being unsecured, by virtue of being secured with different collateral

or by virtue of being secured on a junior priority basis or by virtue of the applicable of waterfall or other payment ordering provisions affecting different tranches of Debt.

(f)     The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Debt of the same instrument or the payment of regularly scheduled dividends on Disqualified Stock in the form of additional Disqualified Stock with the same terms shall not be deemed to be an Incurrence of Debt for purposes of this <u>Section 4.03</u>; *provided* that any such outstanding additional Debt or Disqualified Stock paid in respect of Debt Incurred pursuant to any provision of <u>Section 4.03(b)</u> shall be counted as Debt outstanding for purposes of any future Incurrence of Debt pursuant to <u>Section 4.03(a)</u>.

(g)     For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Debt, the U.S. dollar-equivalent principal amount of Debt denominated in a non-U.S. currency shall be calculated based on the relevant currency exchange rate in effect on the date such Debt was Incurred or, in the case of revolving credit Debt, first committed; *provided* that if such Debt is Incurred to refinance other Debt denominated in a non-U.S. currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Permitted Refinancing Debt does not exceed the principal amount of such Debt being refinanced. The principal amount of any Debt Incurred to refinance other Debt, if Incurred in a different currency from the Debt being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Permitted Refinancing Debt is denominated that is in effect on the date of such refinancing.

SECTION 4.04     <u>Limitation on Restricted Payments</u>.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly (the payments and other actions described in the following clauses being collectively "<u>Restricted Payments</u>"):

(A)     declare or pay any dividend or make any distribution on its Equity Interests held by Persons other than the Company or any of its Restricted Subsidiaries (other than (i) dividends or distributions paid in the Company's Qualified Equity Interests and (ii) dividends or distributions by a Restricted Subsidiary payable, on a pro rata basis or on a basis more favorable to the Company, to all holders of any class of Capital Stock of such Restricted Subsidiary a majority of which is held, directly or indirectly, by the Company);

(B)     purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Company held by Persons other than the Company or any of its Restricted Subsidiaries;

(C)     repay, redeem, repurchase, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, on or with

respect to, any Subordinated Debt, except (i) a payment of interest and (ii) a repayment, redemption, repurchase, defeasance or acquisition or retirement in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case, due within one year of the date of such repayment, redemption, repurchase, defeasance or acquisition or retirement; or

>          (D)     make any Investment (other than Permitted Investments);

unless, at the time of, and after giving effect to, the proposed Restricted Payment:

>          (1)     no Event of Default has occurred and is continuing,

>          (2)     the Company could Incur at least U.S.$1.00 of Debt under <u>Section 4.03(a)</u> and

>          (3)     the aggregate amount expended for such Restricted Payment and all other Restricted Payments made on or after the Issue Date would not, subject to <u>Section 4.04(d)</u>, exceed the sum of:

>          (A)     50% of the cumulative Consolidated Net Income (or, if the Consolidated Net Income is a loss, minus 100% of the amount of the loss) of the Company beginning on the first day of the fiscal quarter in which the Issue Date occurs to the end of the most recently completed fiscal quarter for which financial statements have been provided (or if not timely provided, required to be provided) pursuant to this Indenture, *plus*

>          (B)     subject to paragraph (c), the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company ((i) other than Net Cash Proceeds to the extent such Net Cash Proceeds have been used to Incur Debt pursuant to <u>Section 4.03(b)(21)</u> or (ii) other than Net Cash Proceeds and the Fair Market Value of property from a Restricted Subsidiary) after the Issue Date from

>> (i)     the issuance and sale of its Qualified Equity Interests, or

>> (ii)     as a contribution to its common equity, *plus*

>          (C)     the amount by which Debt of the Company or any of its Restricted Subsidiaries is reduced on the Company's balance sheet or the balance sheet of such Restricted Subsidiary, in each case, upon the conversion or exchange (other than from Restricted Subsidiaries) subsequent to the Issue Date of any such Debt for Qualified Equity Interests of the Company (less the amount of any cash or the Fair Market Value of any other property distributed by the Company or any of its Restricted Subsidiaries upon such conversion or exchange); *plus*

>          (D)     without duplication of any amount included in the calculation of Consolidated Net Income, an amount equal to the sum of (i) the aggregate amount of cash

and the Fair Market Value of any asset received by the Company or any of its Restricted Subsidiaries subsequent to the Issue Date with respect to Investments (other than Permitted Investments) made after the Issue Date by the Company or any of its Restricted Subsidiaries in any Person, proceeds realized on the sale of such Investments and proceeds representing the return of capital and (ii) in the event that the Company re-designates an Unrestricted Subsidiary to be a Restricted Subsidiary of the Company , the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time such Unrestricted Subsidiary is designated a Restricted Subsidiary of the Company; *provided*, *however*, that the foregoing sum shall not exceed, in the case of any such Person or Unrestricted Subsidiary, the amount of Investments (excluding Permitted Investments) previously made (and treated as a Restricted Payment) by the Company or any of its Restricted Subsidiaries in such Person or Unrestricted Subsidiary; *plus*

(E)     without duplication of any amount included above under this clause, 100% of any dividends received by the Company or any of its Restricted Subsidiaries from an Unrestricted Subsidiary.

The amount expended in any Restricted Payment, if other than in cash, shall be deemed to be the Fair Market Value of the relevant non-cash assets, as determined, with respect to amounts at or below U.S.$50,000,000, by an Officer of the Company, whose determination shall be conclusive and evidenced by an Officer's Certificate, and with respect to amounts above U.S.$50,000,000, as determined by the Board of Directors of the Company, whose determination shall be conclusive and evidenced by a resolution of the Board of Directors.

(b)     Section 4.04(a) shall not prohibit the declaration and payment of dividends, in an amount equivalent to not more than the greater of (i) 25% of the Consolidated Net Income (as defined under Brazilian corporate law) and (ii) the Minimum Legally Required Dividend; *provided*, that the payment of such amounts is in compliance with the Brazilian corporate law and the Company's bylaws and that the Company's Board of Directors, with the approval of the fiscal council, if in existence at such time, has not reported to the general shareholders' meeting that the distribution would not be advisable given the financial condition of the Company or its Subsidiaries.

(c)     Neither Section 4.04(a) nor Section 4.04(b) shall prohibit:

(1)     the payment of any dividend or distribution (including in the form of interest on shareholders' equity) within 60 days after the date of declaration thereof if, at the date of declaration, such dividend or distribution would comply with Section 4.04(a);

(2)     the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt owed to the Company or any of its Restricted Subsidiaries, the Incurrence of which was permitted under Section 4.03(b)(1);

(3)     the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt with the proceeds of, or in exchange for, Permitted Refinancing Debt;

(4)     any Restricted Payment made in exchange for, or out of the proceeds of a substantially concurrent offering of, Qualified Equity Interests of the Company or of a cash contribution to the common equity of the Company not representing an interest in Disqualified Stock; *provided*, that such Net Cash Proceeds shall be excluded from the calculation in Section 4.04(a)(D)(3)(B);

(5)     repurchases of Equity Interests of the Company deemed to occur upon exercise of warrants, options or rights to acquire Equity Interests if such Equity Interests represent a portion of the exercise price of such warrants, options or rights or nominal cash payments (or related withholding taxes) in lieu of issuances of fractional shares;

(6)     the payment of dividends, distributions or other amounts to fund the repurchase, redemption or other acquisition or retirement for value of any of the Company's Equity Interests or any Equity Interests of any of its Restricted Subsidiaries held by any then-existing or former director, officer, employee, independent contractor or consultant of the Company or any of its Restricted Subsidiaries or their respective assigns, estates or heirs; *provided*, *however*, that the price paid for all repurchased, redeemed, acquired or retired Equity Interests in all cases, other than as a result of death, disability or termination of employment or directorship, does not exceed U.S.$5,000,000 in the aggregate in any fiscal year (with unused amounts in any fiscal year being carried over to succeeding fiscal years subject to a maximum payment (without giving effect to the following proviso) of U.S.$10,000,000 in any calendar year); *provided further* that the amounts in any fiscal year may be increased by an amount not to exceed: (i) the cash proceeds received by the Company from the sale of Qualified Equity Interests of the Company to any present or former employees, directors, officers or consultants (or their respective permitted transferees) of the Company or any of its Restricted Subsidiaries following the Issue Date, to the extent that such cash proceeds have not otherwise been applied to the payment of Restricted Payments by virtue of Section 4.04(a)(3), such Net Cash Proceeds shall be excluded from the calculation in 4.04(a)(D)(3)(B); *plus* (ii) the cash proceeds of "key man" life insurance policies received by the Company or any of its Restricted Subsidiaries since the Issue Date;

(7)     repurchases of Subordinated Debt at a purchase price not greater than (i) 101% of the principal amount or accreted value, as applicable, of such Subordinated Debt and accrued and unpaid interest thereon in the event of a Change of Control Offer or (ii) 100% of the principal amount or accreted value, as applicable, of such Subordinated Debt and accrued and unpaid interest thereon in the event of an Asset Sale, in connection with any change of control offer or asset sale offer required by the terms of such Subordinated Debt, but only if: (a) in the case of a Change of Control Offer, the Issuer has first complied with and fully satisfied its obligations under Section 4.08; or (b) in the case of an Asset Sale, the Issuer has first complied with and fully satisfied its obligations under Section 4.06;

(8)     payments of dividends on Disqualified Stock issued pursuant to <u>Section 4.03</u>;

(9)     the distribution of the Capital Stock of any Restricted Subsidiary; *provided*, that such entity and any entity formed, created or in receipt of such Capital Stock, if any, simultaneously executes and delivers a supplemental indenture to this Indenture (i) providing for a guarantee of payment of the Issuer's obligations under this Indenture and the Securities and (ii) pursuant to which such entities shall agree to become subject to the covenants contained in this Indenture as if it were a Restricted Subsidiary of the Company, *mutatis mutandis*; and

(10)     Restricted Payments in an aggregate amount not to exceed U.S.$100,000,000; *provided* that the Company will not, and will not permit any Restricted Subsidiary to, make any Restricted Payment described <u>Section 4.04(a)(A)</u> and <u>(B)</u>;

*provided, further*, that, in the case of clauses (2), (5), (6), (7), (8), (9) and (10) of this <u>Section 4.04(c)</u> no Event of Default has occurred and is continuing or would occur as a result thereof.

(d)     In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, only amounts expended pursuant to <u>Section 4.04(b)</u>, <u>Section 4.04(c)(1)</u>, <u>Section 4.04(c)(6)</u> and <u>Section 4.04(c)(7)</u> shall be included in such calculation under <u>Section 4.04(a)</u>.

SECTION 4.05     [Reserved].

SECTION 4.06     <u>Limitation on Sales of Assets</u>.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, make any Asset Sale unless the following conditions are met:

(1)     The Asset Sale is for Fair Market Value.

(2)     At least 75% of the consideration consists of cash or Cash Equivalents received at closing of such Asset Sale. For purposes of this <u>Section 4.06(a)(2)</u>, (i) the assumption by the purchasers of Debt or other obligations (other than Subordinated Debt) of the Company or a Restricted Subsidiary pursuant to a customary novation agreement, (ii) Debt (other than Subordinated Debt) of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Sale, to the extent that the Company and each other Restricted Subsidiary are released from any guarantee of such Debt in connection with such Asset Sale, (iii) consideration consisting of Debt of the Issuer or any Guarantor received from persons who are not the Company or any Restricted Subsidiary, (iv) instruments, securities or other obligations received by the Company or any of its Restricted Subsidiaries from the purchasers that are converted into cash or Cash Equivalents within 120 days of the closing of such Asset Sale shall be considered to be cash received on the at closing of such Asset Sale.

(3)     Within 365 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds shall be used:

(A)      to purchase the Securities (including any Additional Securities) pursuant to an offer to all holders of Securities at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest and additional amounts, if ay, to, but not including the date of purchase;

(B)      to repay Debt (other than Subordinated Debt) of the Company or any Restricted Subsidiary (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company or any Restricted Subsidiary; or

(C)      to acquire or invest in (or within such 365-day period in this Section 4.06(a)(3), the Board of Directors shall have made a good faith determination to acquire or invest, which acquisition or investment shall be consummated prior to the second anniversary of such Asset Sale) (i) Additional Assets, (ii) assets of a Permitted Business (or make capital expenditures in respect of a Permitted Business), (iii) a majority of the Voting Stock of another Person that thereupon becomes a Restricted Subsidiary engaged in a Permitted Business or (iv) a Permitted Business Investment.

(4)      Notwithstanding clauses (2) and (3) above, the Company and its Restricted Subsidiaries will be permitted to consummate an Asset Sale without complying with such clauses to the extent either (A) at least 75% of the consideration for such Asset Sale constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities or (B) in the event of an Asset Sale involving Equity Interests of the Company or a Restricted Subsidiary, at least 30% of the consideration for such Asset Sale constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities received at closing; *provided* that the remaining 45% of the consideration is paid on or prior to the third anniversary of the closing and constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities and in the event existing Equity Interests are sold by the Company that such Equity Interests are pledged in favor of the Company or Restricted Subsidiary until such consideration is paid; *provided* that any consideration not constituting Additional Assets received by the Company or any Restricted Subsidiary in connection with any Asset Sale permitted to be consummated under this clause shall be applied (in the case of cash, Cash Equivalents and Marketable Securities within 365 days after the receipt thereof subject to the proviso above) in accordance with the provisions of clause (3) above.

(5)      The Net Cash Proceeds of an Asset Sale not applied pursuant to Section 4.06(a)(3) (or determined by the Board of Directors to not be applied) pursuant to Section 4.06(a)(3)(c) within 365 days of the Asset Sale constitute "Excess Proceeds." Excess Proceeds of less than U.S.$50,000,000 shall be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds such amount, the Issuer shall, within 30 days, make an offer to purchase (the "Asset Sale Offer") Securities having a principal amount equal to:

(A)      accumulated Excess Proceeds, multiplied by

(B)      a fraction (i) the numerator of which is equal to the outstanding principal amount of the Securities and (ii) the denominator of which is equal to the

outstanding principal amount of the Securities and all *pari passu* Debt similarly required to be repaid, redeemed or tendered for in connection with the Asset Sale, rounded down to the nearest U.S.$1,000.

(b)       The purchase price for the Securities shall be 100% of the principal amount plus accrued and unpaid interest and Additional Amounts if any to the date of purchase (the "Offer Amount").  If the Asset Sale Offer is for less than all of the Outstanding Securities and Securities in an aggregate principal amount in excess of the purchase amount are tendered and not withdrawn pursuant to the Asset Sale Offer, the Issuer shall purchase Securities having an aggregate principal amount equal to the purchase amount on a pro rata basis, with adjustments so that only Securities in multiples of U.S.$1,000 principal amount shall be purchased; *provided*, that after a purchase from a Holder in part, such Holder shall hold U.S.$200,000 in principal amount of Securities or a multiple of U.S.$1,000 in excess thereof.  Upon completion of the Asset Sale Offer, Excess Proceeds shall be reset at zero.

(c)       Promptly, and in any event within 30 days after the Issuer becomes obligated to make an Asset Sale Offer, the Issuer shall deliver to the Trustee and each Holder a written notice in accordance with Section 13.01, stating that the Holder may elect to have its Securities purchased by the Issuer either in whole or in part (subject to prorating as described in Section 4.06(b) in the event the Asset Sale Offer is oversubscribed) in integral multiples of U.S.$1,000 of principal amount, at the applicable purchase price.  The notice shall specify the Purchase Date and shall contain such information concerning the business of the Company which the Company in good faith believes will enable such Holders to make an informed decision and all instructions and materials, as determined in good faith by the Company, necessary to tender Securities pursuant to the Asset Sale Offer.

(1)       Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided below, the Issuer shall deliver to the Trustee an Officer's Certificate as to (A) the Offer Amount, (B) the intended allocation of the Net Cash Proceeds from the Asset Sale pursuant to which such Asset Sale Offer is being made and (C) the compliance of such allocation with the provisions of Sections 4.06(a)(1) through (5).  The Issuer shall, to the extent lawful, irrevocably deposit with the Trustee or with any Paying Agent the principal amount of, and accrued and unpaid interest on, all Securities (or portions thereof) which have been validly tendered and accepted by the Issuer for redemption in accordance with the provisions of Section 2.04 and this Section 4.06.  Upon the expiration of the Offer Period, and in any event no later than one Business Day after the expiration of the Offer Period, each Holder shall deliver to the exchange agent for cancellation the Securities or portions thereof which have been properly tendered (and not withdrawn) and are to be accepted by the Issuer.  A Paying Agent shall, on the Purchase Date, mail or deliver payment (or cause the delivery of payment) to each Holder of Securities properly tendered the amount of the purchase price for such Securities, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Security equal in principal amount to any unpurchased portion of the Securities surrendered, if any; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.  In the event that the aggregate purchase price of the Securities delivered by the Issuer or the

Guarantors, as the case may be, to the Trustee or any Paying Agent is more than the Offer Amount applicable to the Securities, the Trustee or any Paying Agent shall deliver the excess to the Issuer or the Guarantors, as the case may be, immediately after the expiration of the Offer Period for application in accordance with this Section 4.06.

(2)     Holders electing to have a Security purchased shall be required to surrender the Security, with an appropriate form duly completed, to the exchange agent at the address specified in the notice at least three Business Days prior to the Purchase Date.  Holders shall be entitled to withdraw their election if each of the exchange agent and the Issuer receives not later than one Business Day prior to the Purchase Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Security which was delivered for purchase by the Holder and a statement that such Holder is withdrawing his election to have such Security purchased.  Holders whose Securities are purchased only in part shall be issued new Securities equal in principal amount to the unpurchased portion of the Securities surrendered.

(3)     At the time the Holder delivers Securities to the exchange agent for cancellation which are to be accepted for purchase, the Issuer shall also deliver an Officer's Certificate stating that such Securities are to be accepted for purchase by the Issuer pursuant to and in accordance with the terms of this Section 4.06.  A Security shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering Holder.

(d)     The Issuer shall comply, to the extent applicable, with the requirements of Rule 14e-1 under the Exchange Act and any other applicable securities laws or regulations in connection with any repurchase of Securities pursuant to this Section 4.06.  To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this Section 4.06, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.06 by virtue of its compliance with such securities laws or regulations.

(e)     Pending application in accordance with this Section 4.06, Net Cash Proceeds may be applied to temporarily reduce revolving credit borrowings, if any, or invested in Cash Equivalents. The Fair Market Value for any Asset Sale with consideration at or below U.S.$50,000,000 shall be determined by an Officer of the Company, whose determination shall be conclusive and evidenced by an Officer's Certificate, and with consideration above U.S.$50,000,000, as determined by the Board of Directors of the Company, whose determination shall be conclusive and evidenced by a resolution of the Board of Directors.

SECTION 4.07     Limitation on Transactions with Affiliates.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering of any service with any Affiliate of the Company (a "Related Party Transaction"), except upon fair and reasonable terms no less

favorable to the Company or the Restricted Subsidiary than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company.

(b)      In any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of U.S.$20,000,000, the Company shall first deliver to the Trustee an Officer's Certificate to the effect that such transaction or series of related transactions are on fair and reasonable terms no less favorable to the Company or such Restricted Subsidiary than could be obtained in a comparable arm's-length transaction and is otherwise compliant with the terms of this Indenture.

(c)      In any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of U.S.$40,000,000, a majority of the Board of Directors (including a majority of the disinterested members thereof, but only to the extent there are disinterested members with respect to such Related Party Transaction) must first approve such transaction or series of related transactions and determine that such transaction or series of related transactions are on fair and reasonable terms no less favorable to the Company or such Restricted Subsidiary than could be obtained in a comparable arm's length transaction and is otherwise compliant with the terms of this Indenture.

(d)      Sections 4.07(a) through (c) shall not apply to:

(1)      any transaction or arrangement between the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(2)      the payment of reasonable and customary regular fees to directors of the Company who are not employees of the Company;

(3)      Permitted Investments and any Restricted Payments that do not violate the provisions under Section 4.04;

(4)      transactions permitted by and complying with Section 5.01.

(5)      any issuance or sale of Equity Interests (other than Disqualified Stock) of the Company;

(6)      transactions or payments (including loans, advances, grants of securities, stock options and similar rights) pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business;

(7)      transactions pursuant to agreements in effect on the Issue Date and described in the Offering Memorandum, as amended, modified or replaced from time to time so long as the amended, modified or new agreements, taken as a whole, are no less favorable to the Company and its Restricted Subsidiaries than those in effect on the Issue Date;

(8)     any Sale and Leaseback Transaction otherwise permitted under <u>Section 4.10</u> if such transaction is on market terms; and

(9)     transactions with joint ventures or other similar arrangements pursuant to supply or purchase arrangements (i) in effect on the Issue Date, as amended, modified or replaced from time to time and (ii) as may be entered into after the Issue Date; *provided* that the amendment, modification, replacement or new arrangement, taken as a whole, is no less favorable to the Company and its Restricted Subsidiaries than those in effect on the Issue Date.

SECTION 4.08     <u>Repurchases at the Option of the Holders Upon Change of Control Offer</u>.

(1)     Upon the occurrence of a Change of Control that results in a Rating Decline, each Holder shall have the right to require the Issuer or a third party so designated to repurchase all or any part (in integral multiples of U.S.$1,000) of that Holder's Securities pursuant to a Change of Control Offer.  No such purchase in part shall reduce the outstanding principal amount of the Securities held by any Holder to below U.S.$200,000.  In the Change of Control Offer, the Issuer or a third party so designated shall offer a Change of Control Payment.

(2)     Within 30 days following any Change of Control that results in a Rating Decline, the Issuer or a third party so designated shall make a Change of Control Offer by notice to each Holder in accordance with the provisions of <u>Section 13.01</u>, stating:

(A)     that a Change of Control that results in a Rating Decline has occurred and that such Holder has the right to require the Issuer or a third party so designated to purchase such Holder's Securities in exchange for its respective portion of the Change of Control Payment;

(B)     an expiration date (the "<u>Expiration Date</u>") not less than 30 days or more than 60 days after the date of the Change of Control Offer;

(C)     the Change of Control Payment and the Change of Control Payment Date;

(D)     information concerning the business of the Company and its Subsidiaries, including the relevant facts regarding such Change of Control, which the Company in good faith believes shall enable the Holders to make an informed decision with respect to the Change of Control Offer; and

(E)     the instructions, as determined by the Issuer or a third party so designated, consistent with this <u>Section 4.08</u>, that a Holder must follow in order to have its Securities repurchased.

(3)     Holders electing to have a Security repurchased shall be required to surrender the Security, with an appropriate form duly completed, to the exchange agent at the address specified in the notice at least three Business Days prior to the Change of Control

Payment Date.  Holders shall be entitled to withdraw their election if each of the Trustee and the Issuer receives not later than one Business Day prior to the Change of Control Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Security which was delivered for repurchase by the Holder and a statement that such Holder is withdrawing his election to have such Security repurchased.  Holders whose Securities are purchased only in part shall be issued new Securities equal in principal amount to the unpurchased portion of the Securities surrendered.

(4)     On the Change of Control Payment Date, the Issuer or the Guarantors shall, to the extent lawful:

(A)     accept for payment all Securities or portions of Securities properly tendered and not validly withdrawn pursuant to the Change of Control Offer;

(B)     deposit with any Paying Agent an amount equal to the Change of Control Payment in respect of all Securities or portions of Securities properly tendered and not validly withdrawn; and

(C)     deliver or cause to be delivered, if applicable, to the Trustee for cancellation the Securities properly accepted together with an Officer's Certificate stating the aggregate principal amount of Securities or portions of Securities being purchased by the Issuer or the Guarantors.

(5)     The Paying Agent shall promptly mail to each Holder of Securities properly tendered the Change of Control Payment for such Securities, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Security equal in principal amount to any unpurchased portion of the Securities surrendered, if any; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.  A Security shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering Holder.  The Issuer or a third party so designated shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(6)     Notwithstanding the foregoing, the Issuer shall not be required to make a Change of Control Offer upon a Change of Control that results in a Rating Decline if (i) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture that are applicable to a Change of Control Offer made by the Issuer, and such third party purchases all Securities properly tendered and not withdrawn under the Change of Control Offer or (ii) notice of redemption for all Outstanding Securities has been given pursuant to <u>Section 3.02</u>, unless and until there is a default in payment of the applicable redemption price.

(7)     The Issuer or the third party so designated shall comply, to the extent applicable, with the requirements of Rule 14e-1 of the Exchange Act and any other applicable securities laws or regulations in connection with the repurchase of Securities pursuant to this

Section 4.08.  To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this Section 4.08, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.08 by virtue of its compliance with such securities laws or regulations.

In the event that the Holders of not less than 90% of the aggregate principal amount of the Outstanding Securities accept a Change of Control Offer and the Issuer or a third party purchases all the Securities held by such Holders, the Issuer will have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the purchase pursuant to the Change of Control Offer described above, to redeem all of the Securities that remain outstanding following such purchase at the purchase price equal to that in the Change of Control Offer plus, to the extent not included in the Change of Control Offer payment, accrued and unpaid interest and additional amounts, if any, on the Securities that remain outstanding, to the date of redemption (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

SECTION 4.09    Limitation on Liens.  The Company shall not, and shall not permit any Restricted Subsidiary to, create or suffer to exist any Lien upon any of its property or assets now owned or hereafter acquired by it or on any Capital Stock of any Restricted Subsidiary, in each case securing any Debt unless contemporaneously therewith effective provision is made to secure the Securities equally and ratably with such Debt for so long as such Debt is so secured. This covenant shall not require the Company or any Restricted Subsidiary to equally and ratably secure the Securities if the Lien consists of a Permitted Lien.

SECTION 4.10    Limitation on Sale and Leaseback Transactions.  The Company shall not, and shall not permit any Restricted Subsidiary to, enter into any Sale and Leaseback Transaction with respect to any Property unless the Company or such Restricted Subsidiary would be entitled to:

(A)    Incur Debt in an amount equal to the Attributable Debt with respect to such Sale and Leaseback Transaction pursuant to Section 4.03, and

(B)    create a Lien on such Property securing such Attributable Debt without equally and ratably securing the Securities pursuant to Section 4.09.

in which case, the corresponding Debt and Lien shall be deemed Incurred pursuant to those provisions.

SECTION 4.11    Maintenance of Corporate Existence.  Each of the Issuer and the Guarantors shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and shall use its reasonable efforts to do or cause to be done all things necessary to preserve and keep in full force and effect its rights (charter and statutory); *provided*, *however*, that neither the Issuer nor any Guarantor shall be required to preserve any such existence or right if its Board of Directors or management, respectively, shall determine in its sole discretion that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries taken as a whole; *provided further* that this Section

4.11 does not prohibit any transaction otherwise permitted by Section 4.06, Section 5.01, or Article 10.

SECTION 4.12    Maintenance of Properties.  The Company shall cause all properties used or useful in the conduct of its business or the business of any of its Restricted Subsidiaries to be maintained and kept in good condition, repair and working order as in the judgment of the Company may be necessary so that the business of the Company and its Restricted Subsidiaries may be properly and advantageously conducted at all times; *provided* that nothing shall prevent the Company or any Restricted Subsidiary from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company, desirable in the conduct of the business of the Company and its Restricted Subsidiaries taken as a whole.

SECTION 4.13    Limitation on Guarantees of Debt by Restricted Subsidiaries. The Company will not permit any of its Restricted Subsidiaries that is not a Guarantor or the Issuer to guarantee the payment of any Debt of the Company or any of its Restricted Subsidiaries in an aggregate principal amount in excess of U.S.$10,000,000 unless:

(1)    such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture to this Indenture providing for a guarantee of payment of the Issuer's obligations under this Indenture and the Securities by such Restricted Subsidiary; except that if such Debt is by its express terms subordinated in right of payment to the Securities, any such guarantee of such Restricted Subsidiary with respect to such Debt will be subordinated in right of payment to such Restricted Subsidiary's guarantee with respect to the Securities substantially to the same extent as such Debt is subordinated to the Securities; and

(2)    such Restricted Subsidiary will deliver to the Trustee an Opinion of Counsel to the effect that:

(A)    such supplemental indenture and guarantee have been duly executed and authorized; and

(B)    such guarantee of the Securities constitutes a valid, binding and enforceable obligation of such Restricted Subsidiary (subject to customary exceptions and limitations), except insofar as enforcement thereof may be limited by bankruptcy, insolvency or similar laws (including, without limitation, all laws relating to fraudulent transfers) and except insofar as enforcement thereof is subject to general principles of equity;

*provided, however*, that the foregoing provisions of this covenant will not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary of the Company and was not Incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary of the Company.

SECTION 4.14    [Reserved].

SECTION 4.15    [Reserved].

SECTION 4.16    [Reserved].

SECTION 4.17    [Reserved].

SECTION 4.18    Maintenance of Office or Agency in the State of New York. The Issuer shall ensure the maintenance in the State of New York an office or agency where Securities may be presented or surrendered for payment, where Securities may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Issuer in respect of the Securities and this Indenture may be served.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer shall fail to ensure the maintenance of any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and, in such event, the Trustee shall act as the Issuer's agent to receive all such presentations, surrenders, notices and demands.

The Issuer may also from time to time designate one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency in the State of New York for such purposes.  The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

SECTION 4.19    [Reserved].

SECTION 4.20    [Reserved].

SECTION 4.21    Additional Amounts.  (a) All payments by the Issuer in respect of the Securities or by the Guarantors in respect of the Note Guarantee shall be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of the Issuer's, a Guarantor's or any successor's jurisdiction of incorporation or the jurisdiction in which central management or control of the Issuer, such Guarantor or such successor, as applicable, is exercised (each such jurisdiction a "Relevant Jurisdiction"), or any governmental authority therein, unless the Issuer, such Guarantor or such successor is compelled by law to deduct or withhold such taxes, duties, assessments, or governmental charges.  In such event, the relevant payor shall make such deduction or withholding, make payment of the amount so withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts receivable by Holders of Securities after such withholding or deduction shall equal the respective amounts of principal and interest which would have been receivable in respect of the Securities in the absence of such withholding or deduction ("Additional Amounts").  No such Additional Amounts shall be payable:

(1)     to, or to a third party on behalf of, a Holder or beneficial owner who is subject to such taxes, duties, assessments or governmental charges in respect of such Security by reason of the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership or a corporation) or beneficial owner and a Relevant Jurisdiction, as applicable, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member or shareholder) or beneficial owner being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Security or enforcement of rights and the receipt of payments with respect to the Security;

(2)     in respect of Securities surrendered (if surrender is required) more than 30 days after the Relevant Date (as defined below) except to the extent that payments under such Security would have been subject to withholdings and the Holder or beneficial owner of such Security would have been entitled to such Additional Amounts, on surrender of such note for payment on the last day of such period of 30 days;

(3)     where such Additional Amount is imposed on a payment to an individual and is required to be made pursuant to any law implementing or complying with, or introduced in order to conform to any European Union Directive on the taxation of savings, such as the Austrian EU Withholding Tax Act (*EU-Quellensteuergesetz*);

(4)     to, or to a third party on behalf of, a Holder or beneficial owner who is liable for such taxes, duties, assessments or other governmental charges by reason of such Holder's or beneficial owner's failure to comply with any certification, identification or other reporting requirement concerning the nationality, residence, identity or connection with a Relevant Jurisdiction, as applicable, or a successor jurisdiction or applicable political subdivision or authority thereof or therein having power to tax, of such holder or beneficial owner, if (a) compliance is required by such jurisdiction, or any political subdivision or authority thereof or therein having power to tax, as a precondition to, exemption from, or reduction in the rate of, the tax, assessment or other governmental charge and (b) the Issuer, any Guarantor or successor has given the holders at least 30 days' notice that Holders will be required to provide such certification, identification or other requirement;

(5)     in respect of any estate, inheritance, gift, sales, transfer, capital gains, excise or personal property or similar tax, assessment or governmental charge;

(6)     in respect of any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of principal of or interest on the Security or by direct payment by the Issuer, any Guarantor or successor in respect of claims made against the Issuer, any Guarantor or successor; or

(7)     in respect of any combination of the above.

All references to principal and interest in respect of the Securities shall be deemed also to refer to any Additional Amounts, unless the context requires otherwise, which may be payable as set forth in this Indenture or in the Securities.

(b)    In addition, no Additional Amounts shall be paid with respect to any payment on a Security to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment would be required by the laws of a Relevant Jurisdiction, as applicable, or any political subdivision thereof, to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of that partnership, an interest holder in a limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member or beneficial owner been the Holder.

(c)    Any reference in this Indenture or the Securities to principal, interest or any other amount payable in respect of the Securities by the Issuer or the Note Guarantee by any Guarantor shall be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section 4.21.

(d)    The foregoing obligation in this Section 4.21 shall survive termination or discharge of this Indenture.

SECTION 4.22    Payments and Paying Agent.  (a) Whenever the Issuer shall appoint a Paying Agent other than Deutsche Bank Trust Company Americas or Deutsche Bank Luxembourg S.A. with respect to the Securities, it shall cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.22:

(1)    that it will hold all sums received by it as such agent for the payment of the principal of or interest, as the case may be, on any Securities (whether such sums have been paid to it by or on behalf of the Issuer or by any other obligor on the Securities) in trust for the benefit of the Holders;

(2)    that it will give the Trustee notice of any failure by the Issuer (or by any other obligor on the Securities) to make any payment of the principal of or interest on any Securities, as the case may be (including Additional Amounts), and any other payments to be made by or on behalf of the Issuer under this Indenture or the Securities when the same shall be due and payable; and

(3)    that it will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of the failure referred to in clause (2) above.

(b)    The Trustee shall arrange with a Paying Agent for the payment, from funds furnished by the Issuer to the Trustee pursuant to this Indenture, of the principal of and interest

and other amounts due on the Securities (including Additional Amounts) and of the compensation of such Paying Agent for its services as such.

(c)     Anything in this Section 4.22 to the contrary notwithstanding, the Issuer may at any time, for the purpose of obtaining a satisfaction and discharge with respect to any Securities hereunder, or for any other reason, pay or cause to be paid to the Trustee all sums held in trust for such Securities by the Issuer or any Paying Agent hereunder as required by this Section 4.22, such sums to be held by the Trustee upon the trusts herein contained.

(d)     Anything in this Section 4.22 to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of Section 8.04.

SECTION 4.23     [Reserved].

SECTION 4.24     Limitation on Designation of Unrestricted Subsidiaries.

(a)     The Company may designate after the Issue Date any Subsidiary of the Company (other than the Issuer) as an "Unrestricted Subsidiary" under this Indenture (a "Designation") only if:

(1)     no Event of Default has occurred and is continuing at the time of or after giving effect to such Designation;

(2)     any transactions between the Company or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are, and after giving effect to such Designation will be, in compliance with Section 4.07;

(3)     such Subsidiary has no Debt other than Non-Recourse Debt; and

(4)     the Company would be permitted to make an Investment in an Unrestricted Subsidiary at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment in an Unrestricted Subsidiary at the time of Designation) as a Restricted Payment pursuant to Section 4.04(a) in an amount equal to the amount of the Company's Investment in such Subsidiary on such date.

(b)     The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "Revocation") only if:

(1)     no Event of Default has occurred and is continuing at the time of and after giving effect to such Revocation; and

(2)     all Debt and Liens of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Indenture.

(c)     The Designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary. All

Designations and Revocations must be evidenced by a resolution of the Board of Directors of the Company and an Officer's Certificate delivered to the Trustee certifying compliance with the preceding provisions.

SECTION 4.25    Ranking.  Each of the Issuer and the Guarantors shall ensure that its respective obligations under this Indenture, the Securities and the Note Guarantee shall at all times constitute direct and unconditional obligations of the Issuer or the Guarantors, ranking at all times at least *pari passu* in priority of payment among themselves and with all other unsubordinated Debt of such Person, except to the extent any such other Debt ranks above such obligations by reason of Liens permitted under Section 4.09 or pursuant to applicable law.

## Article 5

## Consolidation, Merger, or Sale of Substantially All Assets

SECTION 5.01    Consolidation, Merger, or Sale of Substantially All Assets.

(a)    The Company will not consolidate with or merge with or into, or sell, convey, transfer, dispose of or lease all or substantially all of its assets to, any person,

unless

(1)    the surviving Person (if not the Company) will be a person organized and existing under the laws of Brazil, Colombia, the United States of America, any state thereof or the District of Columbia, or any other country that is a member country of the European Union or of the Organization for Economic Co-operation and Development on the Issue Date, and such person expressly assumes, by a supplemental indenture to this Indenture, executed and delivered to the Trustee, all the obligations of the Company under the Securities, its Note Guarantee and this Indenture;

(2)    the surviving Person (if not the Company), if not organized and existing under the laws of Brazil, undertakes, in such supplemental indenture, to pay such additional amounts in respect of principal and interest as may be necessary in order that every net payment receivable in respect of the Securities after deduction or withholding for or on account of any present or future tax, duty, assessment or other governmental charge imposed by such other country or any political subdivision or taxing authority thereof or therein will not be less than the amount of principal and interest then due and payable on the Securities, subject to the same exceptions set forth in Section 4.21 but replacing existing references in such clause to Brazil with references to the other country;

(3)    immediately prior to such transaction and immediately after giving effect to such transaction, no Default or Event of Default will have occurred and be continuing;

(4)    immediately after giving effect to the transaction on a pro forma basis, the Company or the surviving Person (i) could Incur at least U.S.$1.00 of Debt under clause (a) of the covenant described under Section 4.03 or (ii) would not have both a higher percentage and

higher ratio in clause (a) described under <u>Section 4.03</u>; and

(5)     the surviving Person (if not the Company) will have delivered to the Trustee an Officer's Certificate and an opinion of counsel, stating that such consolidation, merger or transfer and such supplemental indenture, if any, comply with this Indenture.

The Trustee will accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent set forth in this covenant, in which event it will be conclusive and binding on the holders.

Notwithstanding the restriction described in clause (3) and (4), any Restricted Subsidiary may consolidate with, merge into or transfer all or part of its properties and assets to the Company, the Company may merge into a Restricted Subsidiary for the purpose of reincorporating the Company in another jurisdiction, and any Restricted Subsidiary may consolidated with, merge into or transfer all or part of its properties and assets to another Restricted Subsidiary.

(b)     The Company shall not lease all or substantially all of its assets, whether in one transaction or a series of transactions, to one or more other Persons, except to the extent permitted under <u>Section 4.10</u>.

(c)     Upon the consummation of any transaction effected in accordance with these provisions, if the Company is not the continuing Person, the surviving Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Securities with the same effect as if such surviving Person had been named as the Company in this Indenture.


<u>Article 6</u>

<u>Defaults and Remedies</u>

SECTION 6.01     <u>Events of Default</u>.  An "<u>Event of Default</u>" occurs if:

(1)     the Issuer defaults in any payment of interest (including Additional Amounts, if any) on any Security when the same becomes due and payable, and such default continues for a period of 30 days;

(2)     the Issuer defaults in the payment of the principal (including Additional Amounts, if any) of any Security when the same becomes due and payable upon acceleration or redemption or otherwise;

(3)     the Issuer fails to make an Change of Control Offer and thereafter to accept and pay for Securities tendered when and as required pursuant to <u>Section 4.08</u>;

(4)     the Company fails to comply with <u>Section 5.01</u>;

(5)     the Issuer or any Guarantor, as the case may be, fails to comply with any of its covenants or agreements in the Securities or this Indenture (other than those referred to in clauses (1), (2), (3) and (4) above), and such failure continues for 60 days after the notice specified below;

(6)     the Company, any Significant Subsidiary or the Issuer defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by the Company, such Significant Subsidiary or the Issuer (or the payment of which is guaranteed by the Company, such Significant Subsidiary or the Issuer) whether such Debt or guarantee now exists, or is created after the Issue Date, which default (a) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default (a "Payment Default") or (b) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$75,000,000 or more in the aggregate;

(7)     one or more final and non-appealable-judgments for the payment of money are rendered against the Company, any Significant Subsidiary or the Issuer and are not paid or otherwise discharged and there is a period of 60 consecutive days following entry of the final and non-appealable judgment that causes the aggregate amount for all such final and non-appealable judgments outstanding and not paid or discharged against all such Persons to exceed U.S.$75,000,000 or the equivalent thereof at the time of determination (in excess of amounts which the Company's insurance carriers have agreed to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(8)     an involuntary case or other proceeding is commenced against the Company, any Significant Subsidiary or the Issuer with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, *síndico*, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against the Company, any Significant Subsidiary or the Issuer under the federal bankruptcy laws as now or hereafter in effect and such order is not being contested by the Company, any Significant Subsidiary or the Issuer, as the case may be, in good faith or has not been dismissed, discharged or otherwise stayed, in each case within 60 days of being made;

(9)     the Company, any Significant Subsidiary or the Issuer (i) commences a voluntary case or other proceeding seeking the commencement of judicial or extra judicial reorganization, proceedings or bankruptcy proceedings with respect to itself or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, *síndico*, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Company, any Significant Subsidiary or the Issuer or for all or substantially all of the property of the Company, any Significant Subsidiary or the Issuer or (iii) effects any general assignment for the benefit of creditors;

(10)     any event occurs that under the laws of Brazil or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in clause (8) or (9) above;

(11)     any Note Guarantee by the Company or a Significant Subsidiary ceases to be in full force and effect, other than in accordance with the terms of this Indenture, or a Guarantor denies or disaffirms its obligations under its Note Guarantee; or

(12)     all or substantially all of the undertaking, assets and revenues of the Company, any Significant Subsidiary or the Issuer is condemned, seized or otherwise appropriated (other than in accordance with its terms) by any Person acting under the authority of any national, regional or local government or the Company, any Significant Subsidiary or the Issuer is prevented by such Person for a period of 60 consecutive days or longer from exercising normal control over all or substantially all of its undertaking, assets and revenues.

A Default under clause (5) above will not constitute an Event of Default until the Trustee or the holders of at least 25% in principal amount of the Outstanding Securities notify the Issuer and the Trustee of the Default and the Issuer does not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) a responsible officer of the Trustee with direct responsibility for this Indenture has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to the Trustee at its Corporate Trust Office by the Issuer, any Guarantor or any Holder, such notice identifying this Indenture and the Issuer.

SECTION 6.02     Acceleration.  If an Event of Default (other than an Event of Default specified in Section 6.01(8), (9) or (10)) occurs and is continuing under this Indenture, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Securities outstanding, may declare all unpaid principal of and accrued interest on all Securities to be due and payable immediately, by a notice in writing to the Issuer, and upon any such declaration such amounts will become due and payable immediately. If an Event of Default specified in Section 6.01(8), (9) or (10) above occurs and is continuing, then the principal of and accrued interest on all Securities shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

SECTION 6.03     Other Remedies.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of or interest on the Securities or to enforce the performance of any provision of the Securities or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the

Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative.

SECTION 6.04     Rescission/Annulment of Acceleration; Waiver of Past Defaults.  The holders of a majority in aggregate principal amount of the Outstanding Securities by written notice to the Issuer and to the Trustee may waive all past defaults (whether a Default or Event of Default) and rescind and annul an acceleration and its consequences if:

(1)     all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Securities that have become due solely by such acceleration, have been cured or waived, and

(2)     the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.

Except as otherwise provided in Section 6.02 or Section 9.02, the Holders of a majority in principal amount of the outstanding Securities may, by notice in writing to the Trustee, waive an existing Default and Event of Default and its consequences.  Upon such waiver, the Default and Event of Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

SECTION 6.05     Control by Majority.  Subject to the provisions herein relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders, unless such holders will have offered to the Trustee indemnity reasonably satisfactory to the Trustee.  Subject to such provision for the indemnification of, or provision of security to, the Trustee, the Holders of a majority in aggregate principal amount of the outstanding Securities shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

SECTION 6.06     Limitation on Suits.  A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Securities, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Securities, unless:

(1)     the Holder has given to the Trustee written notice of a continuing Event of Default;

(2)     Holders of at least 25% in aggregate principal amount of outstanding Securities have made written request to the Trustee to institute proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(3)     Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against any costs, liabilities or expenses to be incurred in compliance with such request;

(4)     the Trustee within 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(5)     during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Securities have not given the Trustee a written direction that is inconsistent with such written request;

it being understood and intended that no one or more of such Holders shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner therein provided and for the equal and ratable benefit of all such Holders (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

SECTION 6.07     Rights of Holders to Receive Payment.  Notwithstanding any other provision of this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and premium, if any and interest and Additional Amounts, if any, on such Security and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

SECTION 6.08     Collection Suit by Trustee.  If an Event of Default specified in Section 6.01(1) or Section 6.01(2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or the Guarantors for the whole amount then due and owing (together with interest on any unpaid interest to the extent lawful) and the amounts provided for in Section 7.06.

SECTION 6.09     Trustee May File Proofs of Claim.  The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Securityholders allowed in any judicial proceedings relative to the Issuer, the Guarantors, their creditors or their property and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Bankruptcy Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.06.

SECTION 6.10     Priorities.  If the Trustee collects any money or property pursuant to this Article 6, it shall pay out the money or property in the following order:

FIRST:  to the Trustee and any Agent for amounts due under Section 7.06;

SECOND:  to Securityholders for amounts due and unpaid on the Securities for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities for principal and interest, respectively; and

THIRD:  to the Issuer or, to the extent the Trustee collects any amounts from the Guarantors, to the Guarantors.

The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 6.10 and shall promptly notify the Issuer thereof.  At least 15 days before such record date, the Issuer shall mail to each Securityholder and the Trustee a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11   Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 or a suit by Holders of more than 10% in principal amount of the Securities.

SECTION 6.12   Waiver of Stay or Extension Laws.  Neither the Issuer nor the Guarantors (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and each of the Issuer and the Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

Article 7

Trustee

SECTION 7.01   Duties of Trustee.

(1)  Except during the continuance of an Event of Default:

(a)   the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(b)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  Notwithstanding the foregoing, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not, and is under no obligation to, confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(2)      Following the occurrence and continuance of an Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(3)      The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(a)      this Section 7.01(3) does not limit the effect of Section 7.01(1);

(b)      the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(c)      the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(4)      Every provision of this Indenture that in any way relates to the Trustee is subject to Sections 7.01(1), (2) and (3).

(5)      The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer or the Guarantors.

(6)      Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(7)      No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity or security, as applicable, against such risk or liability is not reasonably assured to it.

(8)      Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

SECTION 7.02     Rights of Trustee.  (1)  Subject to Section 7.01 hereof, the Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee need not investigate any fact or matter stated in the document but may, in its discretion, make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer and the Guarantors, personally or by agent or attorney at the sole cost of the Issuer and the Guarantors and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(2)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate and/or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(3)     The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(4)     The Trustee shall not be liable for any action it takes or omits to take in good faith which it reasonably believes to be authorized or within its rights or powers; *provided*, *however*, that the Trustee's conduct does not constitute willful misconduct or negligence.

(5)     The Trustee may consult with counsel appointed with due care and the advice or Opinion of Counsel of such counsel with respect to legal matters relating to this Indenture and the Securities shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or such opinion of such counsel.

(6)     In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(7)     The Trustee shall not be deemed to have notice of any Default or Event of Default (other than a payment default under Section 6.01(1) or Section 6.01(2)) unless a Trust Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Securities and this Indenture.

(8)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each Agent, custodian and other Person employed to act hereunder.

(9)     The Trustee may request that the Issuer deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture.

SECTION 7.03    Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Issuer, the Guarantors or their Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent, Registrar, co-registrar or co-paying agent may do the same with like rights.  However, the Trustee must comply with Section 7.09 and Section 7.10.

SECTION 7.04    Trustee's Disclaimer.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Note Guarantee or the Securities, it shall not be accountable for the Issuer's use of the proceeds from the Securities, and it shall not be responsible for any statement of the Issuer or the Guarantors in this Indenture or in any document issued in connection with the sale of the Securities or in the Securities other than the Trustee's certificate of authentication.

SECTION 7.05    Notice of Defaults.  If any Event of Default occurs and is continuing and is known to a responsible officer of the Trustee, the Trustee shall send notice of the Event of Default to each Holder within 90 days after it occurs, unless the Event of Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or interest on any Security, the Trustee may withhold the notice if and so long as a trust committee of trust officers of the Trustee in good faith determines that withholding the notice is in the interest of the Securityholders. The Trustee shall not be charged with knowledge of any Default or Event of Default other than a Default under Section 6.01(1) or Section 6.01(2) hereof unless a Trust Officer in the Corporate Trust Office of the Trustee shall have received written notice thereof from the Issuer or a Securityholder, expressly referencing this Indenture and the Securities.

SECTION 7.06    Compensation and Indemnity.   The Issuer shall pay to the Trustee and each Agent from time to time such compensation for its services and/or otherwise in connection with the Securities hereunder as the parties may from time to time agree in writing. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall indemnify the Trustee or any predecessor Trustee, each Paying Agent, the Registrar and any other Agent  (which for purposes of this Section 7.06 shall be deemed to include their respective directors, officers, agents and employees) (each an "Indemnified Person") against any and all loss, liability or expense (including taxes (other than taxes based upon, measured by or determined by the income of the Trustee) and reasonable and documented attorneys' fees and expenses) Incurred by it in connection with the administration of this trust and/or the performance of its duties hereunder, including the reasonable costs and expenses of defending itself against any claim (whether asserted by the Guarantors, the Issuer, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 7.06, except to the extent that such loss, damage, claim, liability or expense is due to its own willful misconduct, negligence or bad faith.  An Indemnified Person shall notify the Issuer promptly of any claim for which it may seek indemnity.  Failure by an Indemnified Person to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.  The Issuer shall defend the claim and each Indemnified Person may have separate counsel and the Issuer shall pay the reasonable and documented fees and expenses of such counsel; *provided* that the Issuer shall not

be required to pay such fees and expenses if they assume an Indemnified Person's defense and, in an Indemnified Person's reasonable judgment, there is no conflict of interest between the Issuer and such parties in connection with such defense.  In no event shall the Issuer be liable for fees and expenses of more than one counsel (in addition to any local counsel) separate from its own counsel for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstance.  The Issuer need not pay for any settlement made without its consent.

To secure the Issuer's obligations in this Section 7.06, each Indemnified Person shall have a lien prior to the Securities on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest and Additional Amounts, if any, on particular Securities.

The Issuer's payment obligations pursuant to this Section 7.06 shall survive the discharge of this Indenture, final payment on the Securities and resignation or removal of the Trustee or other Indemnified Person.  When the Trustee or other Indemnified Person incurs expenses after the occurrence of an Event of Default specified in Section 6.01(8) or (9) with respect to the Issuer, the expenses are intended to constitute expenses of administration under the U.S. Bankruptcy Code.

SECTION 7.07    Replacement of Trustee.  The Trustee may resign at any time by written notice to the Issuer and the Guarantors.  The Holders of a majority in principal amount of the Outstanding Securities may remove the Trustee by written notice to the Trustee and the Issuer and may appoint a successor Trustee.  The Issuer shall remove the Trustee if:

(1)     the Trustee fails to comply with Section 7.09;

(2)     the Trustee is adjudged bankrupt or insolvent or an order of relief is entered with respect to the Trustee;

(3)     a receiver or other public officer takes charge of the Trustee or its property; or

(4)     the Trustee otherwise becomes incapable of acting as Trustee hereunder.

In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor trustee shall become effective only upon the successor trustee's acceptance of appointment as provided in this Section 7.07.

If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Securities may appoint a successor trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for

any reason, the Issuer shall promptly appoint a successor trustee, *provided, however*, that in case of a bankruptcy, the resigning Trustee shall have the right to appoint a successor trustee within 10 Business Days after giving of such notice of resignation if the Issuer has not already appointed a successor trustee.  If the successor trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the holders of a majority in principal amount of the Outstanding Securities may appoint a successor trustee or may petition any court of competent jurisdiction for the appointment of a successor trustee.

Upon delivery by the successor trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee shall, upon payment of its charges, transfer all property held by it as Trustee to the successor trustee, (ii) the resignation or removal of the retiring Trustee shall become effective, and (iii) the successor trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor trustee, the Issuer shall execute any and all instruments for fully vesting in and confirming to the successor trustee all such rights, powers and trusts.  The Issuer shall give notice of any resignation and any removal of the Trustee and each appointment of a successor trustee to all Holders, and include in the notice the name of the successor trustee and the address of its Corporate Trust Office.

If the Trustee fails to comply with Section 7.09, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of another successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the Issuer's obligations under Section 7.06 shall continue for the benefit of the retiring Trustee.

SECTION 7.08    Successor Trustee by Merger.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Securities shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Securities so authenticated; and in case at that time any of the Securities shall not have been authenticated, any successor to the Trustee may authenticate such Securities either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Securities or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.09    Eligibility; Disqualification.  The Trustee shall at all times satisfy the requirements of TIA § 310(a).  The Trustee shall have a combined capital and surplus of at least U.S.$50,000,000 as set forth in its most recent published annual report of condition. The Trustee shall comply with TIA § 310(b); *provided, however*, that there shall be excluded

from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

SECTION 7.10    Preferential Collection of Claims Against Issuer.  The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

SECTION 7.11    Appointment of Co-Trustee.

(a)    Notwithstanding any other provisions of this Indenture, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, and to vest in such Person or Persons, in such capacity and for the benefit of the Securityholders, subject to the other provisions of this Section 7.11, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 7.09 and no notice to Holders of the appointment of any co-trustee or separate trustee shall be required under Section 7.07 hereof.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(1)    all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(2)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(3)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article 7.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or

rights (including the rights to compensation, reimbursement and indemnification hereunder) to, the Trustee.  Every such instrument shall be filed with the Trustee.

(d)     Any separate trustee or co-trustee may at any time constitute the Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Article 8

Discharge of Indenture; Defeasance

SECTION 8.01     Satisfaction and Discharge of Liability on Securities.

(a) This Indenture, the Securities and the Note Guarantee shall, subject to Section 8.01(b), cease to be of further effect as to all Securities issued hereunder, when:

(1)     (A)     the Issuer delivers to the Trustee all Outstanding Securities (other than Securities for whose payment money has theretofore been deposited in trust and thereafter repaid to the Issuer as provided in Section 8.05) for cancellation; or

(B)     all Outstanding Securities that have not been delivered to the Trustee for cancellation (i) have become due and payable, (ii) will become due and payable at their Stated Maturity within one year, or (iii) are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of a redemption by the Trustee and, in each case, the Issuer irrevocably deposits or causes to be deposited with the Trustee as funds in trust solely for the benefit of the Holders U.S. dollars or U.S. Government Obligations in an amount as will be sufficient without consideration of any reinvestment of interest, to pay and discharge all principal, premium and Additional Amounts, if any, and accrued and unpaid interest to the date of maturity or redemption on the Securities not delivered to the Trustee for cancellation;

(2)     no Event of Default has occurred and will continue after the date of the deposit or will occur as a result of the deposit and the deposit will not result in a breach or violation of, or constitute a default under, any other material instrument to which the Company or any Restricted Subsidiary is a party or by which the Company or any Restricted Subsidiary is bound;

(3)     the Company or any Restricted Subsidiary has paid or caused to be paid all other sums payable by it hereunder;

(4)      the Company has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Securities at maturity or the redemption date, as the case may be; and

(5)      the Issuer has delivered to the Trustee an Opinion of Counsel and an Officer's Certificate as to compliance with all conditions precedent provided for in this Indenture relating to the satisfaction and discharge of the Securities.

(b)      Notwithstanding Section 8.01(a), this Article 8 and the Issuer's obligations in Sections 2.03, 2.04, 2.05, 2.06, 2.07, 2.08, 4.21, 7.06 and 7.07 shall survive until the Securities have been paid in full.  Thereafter, Section 8.05 and the Issuer's obligations in Sections 4.21, 7.06 and 8.07 shall survive.

SECTION 8.02      [Reserved].

SECTION 8.03      [Reserved].

SECTION 8.04      Application of Trust Money.  The Trustee shall hold in trust U.S. dollars or U.S. Government Obligations deposited with it pursuant to this Article 8.  It shall apply the deposited money and the U.S. dollars from U.S. Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest and Additional Amounts, if any, on the Securities.

SECTION 8.05      Repayment to Issuer.  The Trustee and each Paying Agent shall promptly turn over to the Issuer upon request any excess money or Securities held by them at any time.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer upon request any money held by them for the payment of principal and interest and Additional Amounts, if any, that remains unclaimed for two years, and, thereafter, Securityholders entitled to the money must look only to the Issuer and not to the Trustee or any Paying Agent for payment as general creditors.

SECTION 8.06      Defeasance.  The Issuer may, at its option, at any time elect to have either Section 8.06(a) or Section 8.06(b) applied to all outstanding Securities and the Note Guarantee upon compliance with the conditions set forth in Section 8.06(c):

(a)      Upon the Issuer's election of the "legal defeasance" option applicable to this Section 8.06(a), and subject to the satisfaction of the conditions set forth in Section 8.06(c), the Issuer and the Guarantors shall be discharged from any and all obligations in respect of this Indenture, the Issuer shall be discharged from any and all obligations in respect of the Securities, and the Guarantors shall be discharged from any and all obligations in respect of the Note Guarantee (except in each case for the obligations to register the transfer or exchange of Securities, replace stolen, lost or mutilated Securities, maintain paying agencies and hold moneys for payment in trust). Subject to compliance with this Section 8.06, the Issuer may exercise its option under this Section 8.06(a) notwithstanding the prior exercise of its option under Section

8.06(b).  If the Issuer exercise the "legal defeasance" option, any payment on the Securities may not be accelerated due to an Event of Default with respect thereto.

(b)      Upon the Issuer's election of the "covenant defeasance" option applicable to this Section 8.06(b), and subject to the satisfaction of the conditions set forth in Section 8.06(c) hereof, the Issuer and the Guarantors, as applicable, need not comply with the covenants set forth in Sections 4.02, 4.03, 4.04, 4.06, 4.07, 4.08, 4.09, 4.10,  4.12, 4.13, 4.24 and 4.25 and the requirements of Sections 5.01(a)(4) and (5) and Sections 6.01 (4) (as it applies to Sections 5.01(a)(4) and (5)) and (5) shall not constitute Events of Default.

(c)      In order to exercise the options set forth in Section 8.07(a) or Section 8.07(b) above the Issuer must irrevocably deposit in trust with the Trustee U.S. dollars or U.S. Government Obligations sufficient to pay principal of and interest on the Securities to maturity or redemption and by meeting certain other conditions, including delivery to the Trustee of either a ruling received from the Internal Revenue Service or an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.  In addition, in the case of any legal defeasance, the Issuer must deliver to the Trustee an Opinion of Counsel in Austria and any other jurisdiction in which the Issuer or the Guarantors are organized or incorporated, as applicable, or is resident for tax purposes, and any other jurisdiction in which the Issuer or the Guarantors are conducting business in a manner which causes the holders of the Securities to be liable for taxes on payments under the Securities for which they would not have been so liable but for such conduct of business in such other jurisdiction, to the effect that Holders of the applicable Securities will not recognize income, gain or loss in the relevant jurisdiction (as applicable) as a result of such deposit and defeasance and will be subject to taxes in the relevant jurisdiction (including withholding taxes) (as applicable) on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred.  In the case of any legal defeasance, the defeasance shall in each case be effective when 90 days have passed since the date of the deposit in trust.

SECTION 8.07      Reinstatement.  If the Trustee or any Paying Agent is unable to apply any U.S. dollars or U.S. Government Obligations in accordance with Section 8.06 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Securities shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.06 until such time as the Trustee or such Paying Agent is permitted to apply all such U.S. dollars or U.S. Government Obligations in accordance with Section 8.06; provided, however, that, if the Issuer has made any payment of interest or Additional Amounts, if any, on or principal of any Securities because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Securities to receive such payment from the U.S. dollars held by the Trustee or such Paying Agent.

Article 9

Amendments

SECTION 9.01    Without Consent of Holders.  Notwithstanding Section 9.02, the Issuer, the Guarantors and the Trustee may amend or supplement this Indenture, the Note Guarantee or the Securities without notice to or consent of any Securityholder:

(1)    to cure any ambiguity, omission, defect or inconsistency;

(2)    to comply with Section 5.01;

(3)    to provide for a Substituted Debtor as described under Section 10.01;

(4)    add to the covenants of the Issuer or the Guarantors for the benefit of Securityholders;

(5)    surrender any right conferred upon the Issuer or the Guarantors;

(6)    to evidence and provide for the acceptance of an appointment by a successor trustee;

(7)    to provide for the issuance of Additional Securities;

(8)    to provide for any guarantee of the Securities, to secure the Securities or to confirm and evidence the release, termination or discharge of any guarantee of or Lien securing the Securities when such release, termination or discharge is permitted by this Indenture; or

(9)    to make any other change that does not materially and adversely affect the rights of any Holder of the Securities or to conform the terms of this Indenture, the Note Guarantee or the Securities with the description thereof set forth in the "Description of the Notes" section of the Offering Memorandum.

For the avoidance of doubt, the Issuer may at any time enter into a supplemental indenture with the Trustee without the consent of Securityholders to provide that any optional redemption can only be exercised by the Issuer beginning on a date more than 720 days after the Issue Date.

SECTION 9.02    With Consent of Holders.  (a) Except as otherwise provided in Section 6.02 or Section 9.02(b), the Issuer, the Guarantors and the Trustee may amend or supplement this Indenture, the Note Guarantee and the Securities with the written consent of the Holders of a majority in principal amount of the Outstanding Securities and the Holders of a majority in principal amount of the Outstanding Securities may waive any past Default, Event of Default or future compliance by the Issuer or the Guarantors with any provision of this Indenture, the Note Guarantee or the Securities.

(b)      Notwithstanding the provisions Section 9.02(a), without the consent of each Holder affected, an amendment or waiver shall not (with respect to any Securities held by a non-consenting Holder):

(1)      reduce the rate of or extend the time for payment of interest on any Security;

(2)      reduce the principal of any Security;

(3)      reduce the amount payable upon redemption of any Security or change the time at which any Security may be redeemed;

(4)      change the currency for payment of principal of, or interest on, any Security;

(5)      impair the right to institute suit for the enforcement of any payment on or with respect to any Security;

(6)      waive certain payment defaults with respect to the Security;

(7)      reduce the principal amount of Securities whose Holders must consent to any amendment or waiver;

(8)      make any change in the amendment or waiver provisions which require each Holder's consent;

(9)      modify or change any provision of this Indenture affecting the ranking of the Securities or the Note Guarantee in a manner adverse to the Holders of the Securities; or

(10)     make any change in the Note Guarantee that would adversely affect the Holders in any material respect;

The Issuer shall provide prior notice to each Holder pursuant to Section 13.01 of any proposed amendment under this Section 9.02. It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Issuer shall (or shall cause the Trustee to) mail to Securityholders a notice briefly describing such amendment.  The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03   Revocation and Effect of Consents and Waivers. (a)  A consent to an amendment or a waiver by a Holder of a Security shall bind the Holder and every subsequent Holder of that Security or portion of the Security that evidences the same debt as the consenting Holder's Security, even if notation of the consent or waiver is not made on the

Security.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment or waiver becomes effective.  After an amendment or waiver becomes effective, it shall bind every Securityholder.  An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.

(b)       The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Securityholders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding Section 9.03(a), those Persons who were Securityholders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

SECTION 9.04     Notation on or Exchange of Securities.  If an amendment changes the terms of a Security, the Trustee may require the Holder of that Security to deliver it to the Trustee.  The Trustee may place an appropriate notation on that Security regarding the changed terms and return it to the Holder.  Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for that Security shall issue and the Trustee shall authenticate a new Security that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Security shall not affect the validity of such amendment.

SECTION 9.05     Trustee to Sign Amendments.  The Trustee shall sign any amendment authorized pursuant to this Article 9 if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  If it does, the Trustee may but need not sign it.  In signing such amendment the Trustee shall be entitled to receive indemnity or security, as applicable, reasonably satisfactory to it and to receive, and (subject to Section 7.01) shall be fully protected in relying upon, an Officer's Certificate and an Opinion of Counsel, each complying with Section 13.04, and stating that such amendment is authorized or permitted by this Indenture.

Article 10

Substitution of the Issuer

SECTION 10.01    Substitution of the Issuer.  Notwithstanding any other provision in this Indenture, the Issuer may, without the consent of the Holders (and by subscribing for any Securities, each Holder expressly consents to it), be replaced and substituted by (i) any Guarantor or (ii) any Wholly-Owned Subsidiary of a Guarantor or Guarantors as principal debtors (in such capacity, the "Substituted Debtor") in respect of the Securities; *provided* that:

(i)       such documents will be executed by the Substituted Debtor, the Issuer, the Guarantors and the Trustee as may be necessary to give full effect to the substitution, including a

supplemental indenture under which the Substituted Debtor assumes all of the Issuer's obligations under this Indenture and the Securities, and, unless the Guarantors' then existing Note Guarantee remains in full force and effect, substitute the Note Guarantee issued by the Guarantors in respect of the Securities (collectively, the "Issuer Substitution Documents") and the covenants and events of default will continue to apply to the Issuer in respect of the Securities as if no such substitution had occurred, it being the intent that the rights of Holders in respect of the Securities will be unaffected by such substitution.

(ii)     the Issuer Substitution Documents will contain covenants to ensure that each Holder of the Securities has the benefit of a covenant in terms corresponding to the obligations of the Issuer in respect of the payment of Additional Amounts under Section 4.21, if any (but replacing references to Austria with references to another jurisdiction in the case that the Substituted Debtor is organized in a jurisdiction other than Austria).

(iii)     the Issuer will deliver, or cause the delivery, to the Trustee an opinion of recognized counsel in New York as to the validity, legally binding effect and enforceability of the Issuer Substitution Documents, as well as an Officer's Certificate as to compliance with the provisions described under this Section 10.01;

(iv)     the Substituted Debtor will appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Securities, this Indenture and the Issuer Substitution Documents;

(v)     any credit rating assigned to the Securities will remain the same or be improved when the Substituted Debtor replaces and substitutes the Issuer in respect of the Securities; provided, that, any such change in credit rating is in whole or in part in connection with such substitution;

(vi)     no Event of Default has occurred or is continuing; and

(vii)     the substitution will comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Debtor, Austria and Brazil.

Notwithstanding any other provision of this Indenture, each Guarantor will do or cause to be done all acts and things and promptly execute and deliver any documents or instruments, including any substitute guarantee and a legal opinion of internationally recognized counsel in the jurisdiction of such Guarantor, that may be required, or that the Trustee may reasonably request, to ensure that such Guarantor's Note Guarantee is in full force and effect for the benefit of the holders and beneficial owners of the Securities following the substitution.

SECTION 10.02    Deemed Substitution.  Upon the execution of the Issuer Substitution Documents as referred to in Section 10.01, the Substituted Debtor shall be deemed to be named in the Securities as the principal debtor in place of the Issuer (or of any previous substitute under these provisions) and the Securities shall thereupon be deemed to be amended to give effect to the substitution.  Except as set forth in this Article 10, the execution of the Issuer

Substitution Documents shall operate to release the Issuer (or such previous substitute as aforesaid) from all its obligations in respect of the Securities and this Indenture.

SECTION 10.03   Notice of Substitution.  Not later than 10 Business Days after the execution of the Issuer Substitution Documents, the Substituted Debtor will give notice thereof to the Holders of the Securities in accordance with this Article 10.

## Article 11

## Guarantee by the Guarantors

SECTION 11.01   Guarantee.  Subject to the provisions of this Article, the Guarantors hereby irrevocably and unconditionally guarantee to each Securityholder and to the Trustee the due and punctual payment (whether at the Maturity Date, upon redemption, purchase pursuant to an offer to purchase or acceleration or otherwise) of the principal, interest, Additional Amounts and all other amounts payable by the Issuer under this Indenture as they come due. Upon failure by the Issuer to pay punctually any such amount, the Guarantors shall forthwith pay the amount not so paid at the place and time and in the manner specified in this Indenture.  This guarantee constitutes a direct, general and unconditional obligation of the Guarantors which will at all times rank at least *pari passu* with all of their other respective unsubordinated obligations, except for such obligations as may be preferred by mandatory provisions of law.

SECTION 11.02   Guarantee Unconditional.  The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)       any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture or any Security, by operation of law or otherwise;

(b)       any modification or amendment of or supplement to this Indenture (other than this Article 11) or any Security;

(c)       any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture or any Security;

(d)       the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Issuer, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions, *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)       any invalidity or unenforceability relating to or against the Issuer for any reason of this Indenture or any Security, or any provision of applicable law or regulation purporting to

prohibit the payment by the Issuer of the principal of or interest on any Security or any other amount payable by the Issuer under this Indenture;

(f)      any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantor's obligations hereunder; or

(g)      any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms of this Indenture.

SECTION 11.03   Termination, Release and Discharge; Reinstatement.

(a)      The Guarantors' obligations hereunder shall remain in full force and effect until the principal of, premium, if any, and interest on the Securities and all other amounts payable by the Issuer under this Indenture have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Security or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

(b)      A Guarantor's obligations hereunder shall terminate and be released:

(1)      a sale or disposition (including by way of consolidation or merger) of all or a portion of the Capital Stock of such Guarantor (other than the Company) following which such Guarantor is no longer a Subsidiary of the Company;

(2)      a sale or disposition (including by way of consolidation or merger) of all or substantially all of the assets of such Guarantor to a Person that is not the Company or a Restricted Subsidiary of the Company;

(3)      defeasance under Section 8.06 or satisfaction and discharge of the Securities under Section 8.01;

(4)      the Designation of such Guarantor as an Unrestricted Subsidiary; and

(5)      the liquidation or dissolution of such Guarantor; *provided* that no Event of Default occurs as a result thereof or has occurred or is continuing;

*provided*, in each case, that the transaction is carried out pursuant to, and in accordance with, all other applicable provisions of this Indenture.

SECTION 11.04   <u>Waiver by the Guarantors</u>.

(a)      The Guarantors unconditionally and irrevocably waive acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person.  The Note Guarantee constitutes a guarantee of payment and not of collection.

(b)      The Guarantors unconditionally and irrevocably waive any and all rights provided under the relevant applicable law of Brazil on prior demand and protest.

SECTION 11.05   <u>Subrogation and Contribution</u>.  Upon making any payment with respect to any obligation of the Issuer under this Article, the Guarantors shall be subrogated to the rights of the payee against the Issuer with respect to such obligation; *provided*, *however*, that the Guarantors shall not be entitled to enforce, or to receive any payments arising out of or based upon, such right of subrogation until the principal of (and premium, if any), interest, and Additional Amounts on all Securities shall have been paid in full.

SECTION 11.06   <u>Stay of Acceleration</u>.  If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Securities is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Guarantors forthwith on demand by the Trustee.

SECTION 11.07   <u>Execution and Delivery of Guarantee</u>.  The execution by the Guarantors of this Indenture evidences the Note Guarantee of the Guarantors, whether or not the person signing as an officer of the Guarantors still holds that office at the time of authentication of any Security. The delivery of any Security by the Trustee after authentication constitutes due delivery of the guarantee set forth in this Indenture on behalf of the Guarantors.

SECTION 11.08   <u>Purpose of Guarantee</u>.  The Guarantors hereby acknowledge that the purpose and intent of the Guarantors in executing this Indenture and providing the Note Guarantee is to give effect to the agreement of the Guarantors to guarantee the payment of any such amounts due by the Issuer under the Securities and this Indenture, whether such amounts are in respect of principal, interest or any other amounts (including Additional Amounts). Therefore, the Guarantors agree that if the Issuer shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any principal, interest or any other amounts (including Additional Amounts) with respect to this Indenture and the Securities, the Guarantors shall promptly pay the same, without any demand or notice whatsoever.  The Trustee shall promptly deposit in the account designated by the Trustee to receive payments from the Issuer with respect to the Securities for further payment to the Holders any funds it receives from the Guarantors under or pursuant to this Note Guarantee in respect of the Securities.

SECTION 11.09   <u>Central Bank Regulations</u>.  The Guarantors shall comply with all then-applicable Central Bank regulations to legally effect any payments under the Guarantors' Note Guarantee at the time any such payment is made or required to be made.

Article 12

Release of Covenants

SECTION 12.01   Release of Covenants.

(a)      From and during any time that:

(1)      the Securities have been assigned an Investment Grade Rating by any two Rating Agencies; and

(2)      no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (1) and (2) being collectively referred to as a "Covenant Suspension Event"), the Company and its Restricted Subsidiaries shall not be subject to the following provisions of this Indenture (collectively referred to as the "Suspended Covenants"):

(A)      Section 4.03;

(B)      Section 4.04;

(C)      Section 4.06;

(D)      Section 4.07;

(E)      Section 4.10(A);

(F)      Section 4.13;

and

(G)      Section 5.01(a)(4);

(b)      In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date"), the Securities cease to have an Investment Grade Rating from any two Rating Agencies, then the Company and its Restricted Subsidiaries shall thereafter again be subject to the Suspended Covenants.  The period of time between the occurrence of a Covenant Suspension Event and the Reversion Date is referred to as the "Suspension Period." Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default shall be deemed to have occurred as a result of a failure to comply with any of the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

(c)      On the Reversion Date, all Debt Incurred during the Suspension Period shall be classified to have been Incurred pursuant to Section 4.03(a) or one of clauses (1) through (21) of Section 4.03(b) (to the extent such Debt would be permitted to be Incurred thereunder as of the

Reversion Date and after giving effect to the Debt Incurred prior to the Suspension Period and outstanding on the Reversion Date).  To the extent such Debt would not be permitted to be Incurred pursuant to Section 4.03 such Debt shall be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.03(b)(8).

(d)     The Issuer or the Guarantors shall give the Trustee prompt written notification upon the occurrence of a Covenant Suspension Event or any Reversion Date.

## Article 13

### Miscellaneous

SECTION 13.01   Notices.  (a) Any notice or communication to the Issuer, the Guarantors, the Trustee or any Paying Agent shall be in writing in the English language or a certified translation, and delivered in person, sent by facsimile or mailed by first-class mail addressed as follows:

if to the Issuer or any of the Guarantors:

Praça Mahatma Gandhi, 14-19th Floor
Rio de Janeiro, Rio De Janeiro 20031-100 Brazil
Attention: General Counsel
Telephone: +55 21 2555 4666
Facsimile: +55 21 2555 5200

if to the Trustee or Paying Agent:

Deutsche Bank Trust Company Americas
Trust & Agency Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX Austria
Facsimile:  732-578-4635

With a copy to:

Deutsche Bank Trust Company Americas
c/o Deutsche Bank National Trust Company
Trust & Agency Services
100 Plaza One, 6th Fl., MSJCY03-0699
Jersey City, New Jersey 07311
Attention:  Corporates Team Deal Manager – OGX Austria
Facsimile:  732-578-4635

if to the Principal Paying Agent:

> Deutsche Bank Luxembourg S.A.
> 2, Boulevard Konrad Adenauer, 1115 Luxembourg
> Luxembourg
> Attention: Serge Pereira
> Telephone: +00(352) 42122-643
> Facsimile: +00(352) 473136

The Issuer, the Guarantors, the Trustee or any Paying Agent by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)      (1)      As long as Securities in global form are outstanding, notices to be given to Holders shall be given to the Depositary, in accordance with its applicable policies as in effect from time to time.  If the Issuer issues Securities in certificated form, notices to be given to Holders shall be sent by mail to the respective addresses of the Holders as they appear in the Trustee's records.

(2)      A notice shall be deemed to have been given to a Holder upon the mailing by first class mail, postage prepaid, of such notice to such Holder at its registered addresses as recorded in the Security Register not later than the latest date, and not earlier than the earliest date, prescribed in the Securities for the giving of such notice.  If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

(3)      Failure to mail a notice or communication to a Securityholder or any defect in a notice or communication to a Securityholder shall not affect the sufficiency of such notice or communication with respect to other Securityholders.

(4)      For so long as any Securities are listed on the Global Exchange Market of the Irish Stock Exchange and in accordance with the rules and regulations of the Irish Stock Exchange, the Issuer shall publish all notices to Holders in a daily newspaper with general circulation in Ireland, which is expected to be the Irish Times, or alternatively the Issuer may also publish a notice on the website of the Irish Stock Exchange (www.ise.ie).  If publication in Ireland is impracticable, the Issuer may make the publication elsewhere in Western Europe.  For purposes of this Section 13.01(b)(4), a "daily newspaper" is a newspaper that is published on each day, other than a Saturday, Sunday or holiday, in Ireland or, when applicable, elsewhere in Western Europe.  The Holders shall be presumed to have received such notices on the date the Issuer first publishes them.  If the Issuer is unable to give notice as described in this Section 13.01(b)(4) because the publication of any newspaper is suspended or it is otherwise impractical for the Issuer to publish the notice, then the Issuer, or the Trustee acting on instructions from the Issuer and at the Issuer's expense, shall give the Holders notice in another form.  That alternate form of notice shall be sufficient notice to the Holders.

(5)      Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice.

SECTION 13.02   <u>Communication by Holders with Other Holders</u>. Securityholders may communicate pursuant to TIA § 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities.  The Issuer, the Guarantors, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

SECTION 13.03   <u>Certificate and Opinion as to Conditions Precedent</u>.  Upon any request or application by the Issuer or the Guarantors to the Trustee to take or refrain from taking any action under this Indenture (other than with respect to the issuance of the Initial Securities), the Issuer or the Guarantors, as the case may be, shall furnish to the Trustee:

(1)      an Officer's Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to taking the proposed action or to refraining from taking the proposed action have been complied with; and

(2)      an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.04   <u>Statements Required in Certificate or Opinion</u>.  Each Officer's Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(1)      a statement that the individual making such certification or opinion has read such covenant or condition;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)      a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)      a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

SECTION 13.05   <u>When Securities Disregarded</u>.  In determining whether the Holders of the required principal amount of Securities have concurred in any direction, waiver or consent, Securities owned by the Issuer, the Guarantors or by any Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with the Issuer or the Guarantors shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Securities which a Trust Officer of the Trustee has been informed in writing are so

owned shall be so disregarded.  Also, subject to the foregoing, only Securities outstanding at the time shall be considered in any such determination.

SECTION 13.06   Rules by Trustee, Paying Agent and Registrar.  The Trustee may make reasonable rules for action by or a meeting of Securityholders.  The Registrar and each Paying Agent may make reasonable rules for their functions.

SECTION 13.07   Business Days.  If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period.  If a regular record date is not a Business Day, the record date shall not be affected.

SECTION 13.08   Governing Law.  THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY. THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT HAVE BEEN PROPOSED BY THE COMPANY FOR THE PURPOSES OF ARTICLE 9, PARAGRAPH 2 OF BRAZILIAN DECREE LAW NO. 4,657, DATED SEPTEMBER 4, 1942, AS AMENDED, AND FOR NO OTHER PURPOSE OR REASON WHATSOEVER.

SECTION 13.09   No Recourse Against Others.  No past, present or future director, officer, partner, employee, incorporator, quotaholder, shareholder or member of the Issuer, the Guarantors or any Subsidiary of the Company shall have any liability for any obligations of the Issuer, the Guarantors or any Subsidiary of the Company under the Securities, this Indenture or the Note Guarantee or for any claim based on, in respect of, or by reason of, such obligations or their creation. By accepting a Security, each Securityholder shall waive and release all such liability.  Such waivers and releases shall be part of the consideration for the issuance of the Securities.

SECTION 13.10   Successors.  All agreements of the Issuer and the Guarantors in this Indenture and the Securities shall bind their successors.  All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.11   Multiple Originals.  The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Indenture.

SECTION 13.12   Table of Contents; Headings.  The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of

reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.13   Consent to Jurisdiction; Appointment of Agent to Accept Service of Process; Currency Indemnity. (a)  Each of the parties hereto irrevocably consents and agrees that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter arising out of or in connection with this Indenture, the Note Guarantee or the Securities may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Securities have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself and in respect of its properties, assets and revenues.  Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture the Note Guarantee, or the Securities brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum and any right which it may be entitled on account of place of residence or domicile.  To the extent that the Issuer or the Guarantors has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process with respect to itself or its property, each of the Issuer and the Guarantors irrevocably waives such immunity in respect of its obligations under this Indenture, any Security or the Note Guarantee.  Each of the parties to this Indenture agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on them and may be enforced in any court to the jurisdiction of which each of them is subject by a suit upon such judgment, *provided* that service of process is effected upon the Issuer in the manner specified in the following paragraph or as otherwise permitted by law.

(b)     The Issuer and the Guarantors have validly and effectively appointed National Corporate Research, Ltd. (the "Process Agent"), with offices on the date hereof at 10 East 40th Street, 10th Floor, New York, NY 10016, as its authorized agent upon which process may be served in any action, suit or proceeding referred to in Section 13.13(a).  If for any reason such agent hereunder shall cease to be available to act as such, each of the Issuer and the Guarantors agrees to designate a new agent in the Borough of Manhattan, New York City, New York on the terms and for the purposes of this Section 13.13 reasonably satisfactory to the Trustee.  Each of the Issuer and the Guarantors further hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents in any such action, suit or proceeding against the Issuer or the Guarantors by serving a copy thereof upon the relevant agent for service of process referred to in this Section 13.13 (whether or not the appointment of such agent shall for any reason prove to be ineffective or such agent shall accept or acknowledge such service) or by mailing copies thereof by registered or certified air mail, postage prepaid, to each of the Issuer and the Guarantors at its address specified in or designated pursuant to this Indenture.  Each of the Issuer and the Guarantors agree that the failure of any such designee,

appointee and agent to give any notice of such service to it shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon. Nothing herein shall in any way be deemed to limit the ability of the Holders and the Trustee to serve any such legal process, summons, notices and documents in any other manner permitted by applicable law or to obtain jurisdiction over the Issuer and the Guarantors or bring actions, suits or proceedings against the Issuer or the Guarantors in such other jurisdictions, and in such manner, as may be permitted by applicable law.

(c)     U.S. dollars are the sole currency of account and payment for all sums payable by the Issuer or the Guarantors under or in connection with the Securities and the Note Guarantee, including damages. Any amount received or recovered in a currency other than U.S. dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer or otherwise) by any Holder of a Security in respect of any sum expressed to be due to it from the Issuer or the Guarantors will only constitute a discharge to the Issuer or the Guarantors, as the case may be, to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any note, the Issuer will indemnify such Holder against any loss sustained by it as a result; and if the amount of U.S. dollars so purchased is greater than the sum originally due to such holder, such Holder will, by accepting a Security, be deemed to have agreed to repay such excess. In any event, the Issuer will indemnify the recipient against the cost of making any such purchase.

For the purposes of the preceding paragraph, it will be sufficient for the Holder of a Security to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above). These indemnities constitute a separate and independent obligation from the other obligations of the Issuer and the Guarantors, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by any Holder of a Security and will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Security.

(d)     The provisions of this Section 13.13 shall survive any termination of this Indenture, in whole or in part.

SECTION 13.14   Waiver of Jury Trial. EACH OF THE ISSUER, THE GUARANTORS AND THE TRUSTEE (SOLELY IN ITS CAPACITY AS TRUSTEE, WHICH, FOR THE AVOIDANCE OF DOUBT, SHALL NOT IN ANY WAY AFFECT ANY RIGHT OF ANY HOLDER) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE SECURITIES OR THE TRANSACTION CONTEMPLATED HEREBY.

SECTION 13.15   Patriot Act.  The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, Deutsche Bank Trust Company Americas, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account.  The parties to this agreement agree that they will provide Deutsche Bank Trust Company Americas with such information as it may request in order for Deutsche Bank Trust Company Americas to satisfy the requirements of the USA Patriot Act.

SECTION 13.16   Force Majeure.  The Trustee and the Agents shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Trustee and the Agents (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**OGX AUSTRIA GMBH**

By:  _____

      Name:  José Roberto Faveret Cavalcanti
      Title: Officer

(Indenture)



**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.**

By: _____
Name: José Roberto Faveret Cavalcanti
Title:  General Counsel

By: _____
Name: Marcelo Faber Torres
Title: Chief Financial Officer

**OGX PETRÓLEO E GÁS LTDA.**

By: _____
Name: José Roberto Faveret Cavalcanti
Title:  General Counsel

By: _____
Name: Marcelo Faber Torres
Title: Chief Financial Officer

**OGX CAMPOS PETRÓLEO E GÁS S.A.**

By: _____
Name: José Roberto Faveret Cavalcanti
Title:  General Counsel

By: _____
Name: Marcelo Faber Torres
Title: Chief Financial Officer

(Indenture)



DEUTSCHE BANK TRUST COMPANY
AMERICAS,
as Trustee, Registrar, Transfer Agent and
Paying Agent
By: Deutsche Bank National Trust Company

By: _____
    Name:
    Title:        Jacqueline Bartnick
                Director

By: _____
    Name:
    Title:        Wanda Camacho
                Vice President

(Indenture)

STATE OF _New Jersey_ )

                     ) to wit

COUNTY OF _Hudson_ )

On this _30th_ day of _March_, 2012, before me, a notary public, personally appeared _Jacqueline Bartnick_, _Director_ and _Wanda Camacho_, _Vice President_ to me personally known each who being duly sworn, did say that he/she is the Authorized Signatory of Deutsche Bank National Trust Company, one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person.

By: _____

Notary Public

Name: _Michele H. Y. Voon_

No: _2288315_

Commission Expiry: _June 4, 2012_

(Indenture)

DEUTSCHE BANK LUXEMBOURG S.A.,
as Principal Paying Agent

By: _____

Name: Jacqueline Bartnick
Title: Director

By: _____

Name: Wanda Camacho
Title: Vice President

(Indenture)

NEWYORK 4436084 (2K)

STATE OF _New Jersey_ )
                          ) to wit
COUNTY OF _Hudson_ )

On this 30th day of _March_ , 2012, before me, a notary public, personally appeared _Jacqueline Bartnick_ and _Wanda Camacho_ to me personally known who being duly sworn, did say that, pursuant to a power of attorney, he/she is the Authorized Signatory of Deutsche Bank Luxembourg S.A., one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person.

By: _[signature]_
Notary Public
Name: _Michele H. Y. Voon_
No: 2288315
Commission Expiry: June 4, 2012

{Indenture}

RULE 144A/REGULATION S APPENDIX

<u>PROVISIONS RELATING TO INITIAL SECURITIES</u>

1.    <u>Definitions</u>

For the purposes of this Appendix the following terms shall have the meanings indicated below.  Other terms used in this Appendix and not defined herein shall have the meanings assigned to them in this Indenture.

"<u>Clearstream</u>" means Clearstream Banking, *société anonyme*, Luxembourg.

"<u>Euroclear</u>" means Euroclear Bank, S.A./N.V.

"<u>Global Securities</u>" means the Regulation S Global Security and Restricted Global Security.

"<u>Issuer Order</u>" means a written request or order signed in the name of the Issuer by the one or more of its Officers and delivered to the Trustee.

"<u>Non-U.S. Person</u>" has meaning given to it in Regulation S.

"<u>QIB</u>" means a "qualified institutional buyer" as defined in Rule 144A under the Securities Act.

"<u>Regulation S Global Security</u>" means a single, permanent Restricted Global Security sold outside of the United States in reliance on Regulation S.

"<u>Restricted Global Security</u>" means a single, permanent Security in definitive, fully registered book-entry form without interest coupon, constituting a Restricted Security.

"<u>Restricted Securities Legend</u>" has the meaning set forth in Section 2.1(6) of this Appendix.

"<u>Restricted Security</u>" means a Security that constitutes a "restricted security" within the meaning of Rule 144(a)(3) under the Securities Act and shall bear the Restricted Securities Legend; *provided*, *however*, that the Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Security constitutes a Restricted Security.

"<u>Securities Custodian</u>" means the custodian with respect to a Global Security (as appointed by DTC), or any successor Person thereto and shall initially be Deutsche Bank Trust Company Americas.

2.      The Securities

2.1     Form and Registration.

(1)     Form and Registration.  The certificates representing the Securities shall be issued in fully registered form without interest coupons.

(2)     Regulation S Global Security. Securities offered and sold in reliance on Regulation S under the Securities Act shall initially be represented by one or more Regulation S Global Securities and shall be deposited with the Trustee as custodian for, and registered in the name of a nominee of, DTC for the accounts of Euroclear and Clearstream (as indirect participants in DTC).

(3)     Restricted Global Security. Securities offered and sold in reliance on Rule 144A under the Securities Act shall be represented by one or more Restricted Global Securities and shall be deposited with the Trustee as custodian for, and registered in the name of a nominee of, DTC.  Each Global Security shall be subject to certain restrictions on transfer set forth in Sections 2.3 and 2.4 of this Appendix.

(4)     Ownership. Ownership of beneficial interests in a Global Security shall be limited to persons who have accounts with DTC or Euroclear and Clearstream, as indirect participants in DTC ("participants"), or persons who hold interests through participants. Ownership of beneficial interests in a Global Security shall be shown on, and the transfer of that ownership shall be effected only through, records maintained by DTC or its nominee (with respect to interests of participants) and the records of participants (with respect to interests of persons other than participants).  QIBs may hold their interests in a Restricted Global Security, directly through DTC, if they are participants in such system, or indirectly through organizations which are participants in such system.

Investors may hold their interests in a Regulation S Global Security, directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems.

So long as DTC or its nominee is the registered owner or holder of a Global Security, DTC or such nominee, as the case may be, shall be considered the sole owner or Holder of the Securities represented by such Global Security for all purposes under the Indenture.  No beneficial owner of an interest in a Global Security shall be able to transfer that interest except in accordance with DTC's applicable procedures, in addition to those provided for under the Indenture.  Payments made with respect to a Global Security shall be made to DTC or its nominee, as the registered owner thereof.  None of the Issuer, the Guarantors, the Trustee or any Paying Agent shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

The Issuer and the Guarantors expect that DTC or its nominee, upon receipt of any payment in respect of a Global Security, shall credit participants' accounts with payments in

amounts proportionate to their respective beneficial interests in such Global Security as shown on its records.  The Issuer and the Guarantors also expect that payments by participants to owners of beneficial interests in such Global Security held through such participants shall be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers.  Such payments shall be the responsibility of such participants.

(5)     <u>Limitation on Obligations</u>. Although DTC, Euroclear and Clearstream are expected to follow the procedures set forth in the Indenture in order to facilitate transfers of interests in a Global Security among participants of DTC, Euroclear and Clearstream, as the case may be, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time.  None of the Issuer, the Guarantors, the Trustee or any Paying Agent shall have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

(6)     <u>Successors; Definitive Securities</u>.  If (i) DTC is at any time unwilling or unable to continue as a Depositary for the Global Securities and a successor Depositary or clearing agency is not appointed by the Issuer within 90 days, or (ii) an Event of Default has occurred and is continuing and the Registrar and the Issuer have received a written request from a beneficial owner of Securities to issue its proportionate interest in the Global Security, the Issuer shall issue certificated Securities which may bear the Restricted Securities Legend set forth in <u>Exhibit 1</u> to this Appendix (the "<u>Restricted Securities Legend</u>") to all beneficial owners, in exchange for their beneficial interests in Global Securities.  Holders of an interest in a Global Security may receive certificated Securities, which may bear the Restricted Securities Legend, in accordance with DTC's rules and procedures in addition to those provided for under the Indenture; *provided*, *however*, that if the Issuer is issuing certificated Securities pursuant to Section 2.1(6)(ii), the Issuer shall only be required to issue certificated Securities to the beneficial owners of the Securities who request certificated Securities.

(7)     <u>Certificated Securities</u>.  Except as provided in this Section 2.1 or Section 2.3, owners of beneficial interests in Restricted Global Securities shall not be entitled to receive physical delivery of certificated Securities.  The registered Holder of a Global Security shall be entitled to grant proxies and otherwise authorize any Person, including DTC and Persons that may hold interests through DTC, to take any action which a Holder is entitled to take under the Indenture or the Securities.  In the event of transfer of a Restricted Global Security to the beneficial owners thereof in the form of certificated Securities, the Issuer shall promptly make available to the Trustee a reasonable supply of certificated Securities in definitive, fully registered form without interest coupons.

2.2     <u>Authentication</u>.  The Trustee shall authenticate and deliver:  (1) on the Issue Date, an aggregate principal amount of U.S.$1,063,000,000 of the Company's 8.375% Senior Notes due 2022, and (2) any Additional Securities for an original issue in an aggregate principal amount specified in the written order of the Issuer pursuant to Section 2.02 of the Indenture.  Such order shall specify the amount of the Securities to be authenticated and the date on which the original issue of Securities is to be authenticated and, in the case of any issuance of

Additional Securities pursuant to Section 2.12 of the Indenture, shall certify that such issuance is in compliance with Section 4.03 of the Indenture.

      2.3     <u>Global Securities</u>.

      (1) Any Global Security (i) shall represent, and shall be denominated in an aggregate amount equal to the aggregate principal amount of, all of the outstanding Securities of such series, (ii) shall be registered in the name of DTC or its nominee, (iii) shall be delivered to the Trustee or the Registrar as custodian for DTC and (iv) shall bear a legend substantially to the following effect:

      THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

      UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

      (2)  Members of, or participants in, DTC, Euroclear or Clearstream shall have no rights under the Indenture with respect to any Global Security held on their behalf by DTC or the Trustee as its custodian, or under the Global Security, and DTC may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of the Global Security for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its participants, the operation of customary practices governing the exercise of the rights of a Holder of any Security.

(3)  Interests of beneficial owners in the Global Securities may only be transferred or exchanged for certificated Securities in accordance with the rules and procedures of DTC, Euroclear and Clearstream and the provisions of the Indenture, including this Appendix.

(4)  In connection with any transfer or exchange of a portion of the beneficial interest in any Global Security to beneficial owners pursuant to Section 2.3(3) in the form of certificated Securities, the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Security in an amount equal to the principal amount of the beneficial interest in the Global Security to be transferred, and the Issuer shall execute, and the Trustee shall authenticate and deliver, one or more definitive Securities of like tenor and principal amount of authorized denominations.

(5)  Any beneficial interest in one of the Global Securities that is transferred to a person who takes delivery in the form of an interest in the other corresponding Global Security will, upon transfer, cease to be an interest in such Global Security and become an interest in the other corresponding Global Security and, accordingly, will thereafter be subject to all transfer restrictions, if any, and other procedures applicable to beneficial interest in such other corresponding Global Security for as long as it remains such an interest.

(6)  In connection with the transfer of Global Securities as an entirety to beneficial owners pursuant to Section 2.3(3) in the form of certificated Securities, the Global Securities shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall authenticate and deliver, to each beneficial owner identified by DTC, Euroclear or Clearstream in exchange for its beneficial interest in the Global Securities, an equal aggregate principal amount at maturity of definitive Securities of authorized denominations.

(7)  Any definitive Security constituting a Restricted Security delivered in exchange for an interest in a Global Security pursuant to this Section 2.3 shall bear the Restricted Securities Legend.

(8)  The registered Holder of any Global Security may grant proxies and otherwise authorize any person, including participants in DTC and persons that may hold interests through participants in DTC to take any action which a Holder is entitled to take under the Indenture or the Securities.

2.4    Special Transfer Provisions.

The following provisions shall apply with respect to the Securities:

(1)    Transfers to Non-U.S. Persons.  The following provisions shall apply with respect to the registration of any proposed transfer of an Initial Security or an Additional Security to any Non-U.S. Person:

(a)       the Registrar shall register the transfer of any Initial Security or any Additional Security, whether or not such Security bears the Restricted Securities Legend, if the proposed transferor has delivered to the Registrar a certificate substantially in the form of <u>Exhibit 2</u> to this Appendix;

(b)       if the proposed transferee is a participant in DTC and the Securities to be transferred consist of definitive Securities which after transfer are to be evidenced by an interest in a Regulation S Global Security upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.4(1)(a), the Registrar shall register the transfer and reflect on its books and records the date and an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of definitive Securities to be transferred, and the Trustee and/or the Registrar shall cancel the definitive Securities so transferred or decrease the principal amount of such definitive Security, as the case may be;

(c)       if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security, upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.4(1)(a), the Registrar shall register the transfer and reflect on its books and records the date and (i) a decrease in the principal amount of the Global Security from which such interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (ii) an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of the Global Security to be transferred.

(2)       <u>Transfers to QIBs</u>.  The following provisions shall apply with respect to the registration of any proposed transfer of an Initial Security or an Additional Security to a QIB (excluding Non-U.S. Persons):

(a)       if the Security to be transferred consists of (i) a definitive Security, the Registrar shall register the transfer if such transfer is being made by a proposed transferor who has delivered to the Trustee a certificate substantially in the form set forth in <u>Exhibit 3</u> to this Appendix or (ii) an interest in the Restricted Global Security, the transfer of such interest may be effected only through the book entry system maintained by DTC;

(b)       if the Security to be transferred consists of a definitive Security, upon receipt by the Registrar of instructions given in accordance with DTC's and the Registrar's procedures therefor, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Restricted Global

Security in an amount equal to the principal amount of the definitive Security, to be transferred, and the Trustee shall cancel the definitive Security so transferred; and

(c)      if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security, upon receipt by the Registrar of written instructions given in accordance with DTC's and the Registrar's procedures, the Registrar shall register the transfer and reflect on its books and records the date and (i) a decrease in the principal amount of the Global Security from which interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (ii) an increase in the principal amount of the Restricted Global Security in an amount equal to the principal amount of the Global Security to be transferred.

(3)  Restricted Securities Legend.  Upon the registration of transfer, exchange or replacement of Securities not bearing the Restricted Securities Legend, the Registrar shall deliver Securities that do not bear the Restricted Securities Legend.  Upon the registration of transfer, exchange or replacement of Securities bearing the Restricted Securities Legend, the Registrar shall deliver only Securities that bear the Restricted Securities Legend unless either (i) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Issuer, the Registrar and the Trustee to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or (ii) such Security has been sold pursuant to an effective registration statement under the Securities Act.

(4)  [Reserved].

(5)  Other Transfers.  If a Holder proposes to transfer a Security constituting a Restricted Security pursuant to any exemption from the registration requirements of the Securities Act other than as provided for by Sections 2.4(1) or 2.4(2), the Registrar shall only register such transfer or exchange if such transferor delivers an Opinion of Counsel reasonably satisfactory to the Issuer, the Registrar and the Trustee that such transfer is in compliance with the Securities Act and the terms of the Indenture; *provided, however*, that the Issuer may, based upon the opinion of its counsel, instruct the Registrar by an Issuer Order not to register such transfer in any case where the proposed transferee is not a QIB or a Non-U.S. person.

(6)  General.  By its acceptance of any Security (or any beneficial interest in any Global Security) bearing the Restricted Securities Legend, each Holder of such a Security or holder of such beneficial interest acknowledges the restrictions on transfer of such Security set forth in the Indenture and in the Restricted Securities Legend and agrees that it will transfer such Security only as provided in the Indenture.  The Registrar shall not register a transfer of any Security unless such transfer complies with the restrictions on transfer of such Security set forth in the Indenture.

The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.4.  The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable prior written notice to the Registrar.

2.5     Cancellation or Adjustment of Global Security.

At such time as all beneficial interests in a Global Security have either been exchanged for certificated Securities, redeemed, purchased or canceled, such Global Security shall be returned to DTC for cancellation or retained and canceled by the Trustee.  At any time prior to such cancellation, if any beneficial interest in a Global Security is exchanged for certificated Securities, redeemed, purchased or canceled, the principal amount of Securities represented by such Global Security shall be reduced and an adjustment shall be made on the books and records of the Trustee (if it is then the Securities Custodian for such Global Security) with respect to such Global Security, by the Trustee or the Securities Custodian, to reflect such reduction.

EXHIBIT 1

to

RULE 144A/REGULATION S APPENDIX

[FORM OF FACE OF INITIAL SECURITY]

[Global Securities Legend]

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

[Restricted Securities Legend]

[THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES ACT, AND THIS SECURITY MAY NOT BE REOFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THIS SECURITY IS HEREBY NOTIFIED THAT THE SELLER OF THIS SECURITY MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

THE HOLDER OF THIS SECURITY AGREES FOR THE BENEFIT OF THE ISSUER OR ANY SUBSIDIARY THAT (A) THIS SECURITY MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (I) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS

DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES TO A PERSON THAT IS NOT A U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) PURSUANT TO ANOTHER AVAILABLE EXEMPTION UNDER THE SECURITIES ACT, (IV) TO THE ISSUER OR ANY SUBSIDIARY OF THE ISSUER OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH OF CASES (I) THROUGH (V) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES; AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS SECURITY FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE. THIS LEGEND MAY ONLY BE REMOVED AT THE OPTION OF THE ISSUER.][1]

[THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION ORIGINALLY EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, PRIOR TO EXPIRATION OF THE 40-DAY DISTRIBUTION COMPLIANCE PERIOD, MAY NOT BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.][2]

---

[1] Insert for Securities sold in accordance with Rule 144A.

[2] Insert for Securities sold in accordance with Regulation S.

No._____                                                         U.S.$_____
                                                                  [or such other amount as listed
                                                                  on the Schedule of Increases or
                                                        Decreases in Global Note attached hereto]

8.375% Senior Notes due 2022

CUSIP No. 144A: 67089WAA0/ Reg. S: A6111FAA6
ISIN No. 144A: US67089WAA09/ Reg. S: USA6111FAA69

OGX Austria GmbH, a company with limited liability (*Gesellschaft mit beschränkter Haftung*) organized under the laws of the Republic of Austria, promises to pay to _____, or its registered assigns, the principal sum of _____ dollars [or such other amount as listed on the Schedule of Increases or Decreases in Global Note attached hereto]* on April 1, 2022.

Interest Payment Dates:  April 1 and  October 1 of each year, commencing on October 1, 2012

Record Dates:  March 15 and September 15

Additional provisions of this Security are set forth on the other side of this Security.

* If the Security is to be issued in global form, add the Schedule of Increases or Decreases in Global Security.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

**OGX AUSTRIA GMBH**

By: _____
     Name:
     Title:

Dated:

1-4

TRUSTEE'S CERTIFICATE OF
      AUTHENTICATION

Deutsche Bank Trust Company Americas
     as Trustee, certifies that this is one of
       the Securities referred to
       in the Indenture described herein

By: Deutsche Bank National Trust Company

    By: _____
        Authorized Signatory

Dated:

STATE OF _____          )

                                 ) to wit

COUNTY OF _____  )


     On this _____ day of _____, 20____, before me, a notary public, personally appeared _____, [Title], to me personally known who being duly sworn, did say that he/she is the Authorized Signatory of Deutsche Bank National Trust Company, one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person.


By:_____
Notary Public
Name:
Notary No:
Commission Expiry:

[FORM OF REVERSE SIDE OF INITIAL SECURITY]

8.375% Senior Note due 2022

1.      Interest

OGX Austria GmbH, a company with limited liability (*Gesellschaft mit beschränkter Haftung*) organized under the laws of the Republic of Austria (such company, and its successors and assigns under the Indenture hereinafter referred to as the "Issuer"), promises to pay interest on the principal amount of this Security at the rate per annum shown above.

The Issuer will pay interest semi-annually on April 1 and October 1 of each year, commencing on October 1, 2012 to a Paying Agent, which shall in turn distribute the interest in accordance with the Indenture.  The Securities shall bear interest at the rate per annum of 8.375% from March 30, 2012, the date of issuance, or from the most recent interest payment date to which interest has been paid or provided for.  Interest on the Securities shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.      Method of Payment

The Issuer will pay interest on the Securities (except defaulted interest) to the Persons who are registered Holders at the close of business on the record date listed on the face of this Security immediately preceding the related interest payment date (whether or not a Business Day) even if Securities are canceled after the record date and on or before the interest payment date.  Holders must surrender Securities to a Paying Agent to collect principal payments.  The Issuer will pay principal, premium, interest and Additional Amounts, if any, in money of the United States that at the time of payment is legal tender for payment of public and private debts.  Payments in respect of the Securities represented by a Global Security (including principal, premium, interest and Additional Amounts, if any) will be made by wire transfer of immediately available funds to the accounts specified by DTC.   If the Securities are in certificated form, such payments will be made by a Paying Agent by U.S. dollar check drawn on a bank in New York City and mailed to the Holder of such Security at its registered address as it appears in the register.  Upon written application by the Holder of a certificated Security to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Security, such payment may be made by transfer to a U.S. dollar account maintained by the payee with a bank in New York City.

The final payment on any Security in definitive, fully registered form shall be made only upon presentation and surrender of such Security at the office of a Paying Agent on the payment date.

If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period.  If a regular record date is not a Business Day, the record date shall not be affected.

3.      Registrar and Paying Agent

        Initially, Deutsche Bank Trust Company Americas will act as Paying Agent, Deutsche Bank Luxembourg S.A. will act as Principal Paying Agent and Deutsche Bank Trust Company Americas will act as Registrar.  The Issuer may appoint and change any Paying Agent, Registrar or co-registrar without notice.  The Issuer, the Guarantors or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or transfer agent.

4.      Indenture

        The Issuer issued the Securities under an Indenture dated as of March 30, 2012 (the "Indenture"), among the Issuer, OGX Petróleo e Gás Participações S.A. (the "Company"), OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A., as the guarantors (each, a "Guarantor" and, collectively, the "Guarantors"), Deutsche Bank Trust Company Americas, as the Trustee, Registrar, Paying Agent and transfer agent, and Deutsche Bank Luxembourg S.A., as Principal Paying Agent.  The terms of the Securities include those stated in the Indenture. Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture.  The Securities are subject to all such terms, and Securityholders are referred to the Indenture.

        The Securities are general obligations of the Issuer.  The Issuer shall be entitled, subject to its compliance with Section 4.03 of the Indenture, to issue Additional Securities pursuant to Section 2.12 of the Indenture.  The Initial Securities issued on the Issue Date, any Additional Securities and Securities issued in exchange therefor will be treated as a single class for all purposes under the Indenture.  The Indenture contains covenants that limit the ability of the Company and its Restricted Subsidiaries to Incur additional indebtedness; pay dividends or distributions on, or redeem or repurchase capital stock; make investments; engage in transactions with Affiliates; create liens on assets; transfer or sell assets; guarantee indebtedness; restrict dividends or other payments of subsidiaries; consolidate, merge or transfer all or substantially all of its assets and the assets of its subsidiaries; and engage in sale/leaseback transactions.  These covenants are subject to important exceptions and qualifications.

        To the extent of any conflict between the terms of the Securities and the Indenture, the applicable terms of the Indenture shall govern.

5.      Optional Redemption; Notice of Redemption

        (a)     *Optional Redemption with a Make-Whole Premium*.  At any time prior to April 1, 2017, the Issuer may on any one or more occasions redeem the Securities, at its option, in whole or in part, at a "make-whole" redemption price equal to 100% of the principal amount of such Securities plus the greater of (1) 1% of the then outstanding principal amount of the Securities and (2) the excess of (a) the present value at such redemption date of (i) the redemption price of the Securities at April 1, 2017 (such redemption price being set forth in the table below in paragraph 5.b) plus (ii) all required interest payments thereon to, but excluding, April 1, 2017 (excluding accrued but unpaid interest to the redemption date) discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the

Treasury Rate plus 50 basis points, over (b) the then outstanding principal amount of the Securities; plus in each case any accrued and unpaid interest and Additional Amounts, if any, on such Securities to, but excluding, the redemption date, as calculated by the Independent Investment Banker.  Any redemption of Securities by the Issuer pursuant to this paragraph will be subject to either (i) there being at least U.S.$150,000,000 in aggregate principal amount of Securities (including any Additional Securities) outstanding after such redemption or (ii) the Issuer redeeming all of the then outstanding principal amount of the Securities.

"Comparable Treasury Issue" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Securities to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to the remaining term of such Securities.

"Comparable Treasury Price" means, with respect to any redemption date (1) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotation or (2) if the Independent Investment Banker obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Issuer.

"Reference Treasury Dealer" means BTG Pactual US Capital Corp., Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC or their respective affiliates which are primary United States government securities dealers, and one other leading primary United States government securities dealers in New York City reasonably designated by the Issuer; *provided* that if any of the foregoing shall cease to be a primary United States government securities dealer in New York City (a "Primary Treasury Dealer"), the Issuer will substitute therefor another Primary Treasury Dealer.

"Reference Treasury Dealer Quotation" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Issuer, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 pm New York time on the third Business Day preceding such redemption date.

"Treasury Rate" means, with respect to any redemption date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

(b)     *Optional Redemption without a Make-Whole Premium.*  On and after April 1, 2017, the Issuer may on any one or more occasions redeem the Securities, at its option, in whole or in part, at the following redemption prices (expressed as a percentage of principal amount), plus accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on April 1 of the years set forth below:

| Period | Redemption Price |
| --- | --- |
| 2017...................................................................................... | 104.188% |
| 2018...................................................................................... | 102.792% |
| 2019...................................................................................... | 101.396% |
| 2020 and thereafter.............................................................. | 100.000% |

Any redemption of Securities by the Issuer pursuant to this paragraph will be subject to either (i) there being at least U.S.$150,000,000 in aggregate principal amount of Securities (including any Additional Securities) outstanding after such redemption or (ii) the Issuer redeeming all of the then outstanding principal amount of the Securities.

(c)     *Optional Redemption Upon Eligible Equity Offerings.*  At any time on or prior to April 1, 2015, the Issuer may on any one or more occasions, at its option, use an amount not to exceed the net cash proceeds of one or more Eligible Equity Offerings to redeem up to 35% of the aggregate principal amount of the outstanding Securities (including any Additional Securities) at a redemption price equal to 108.375% of the principal amount of the Securities to be redeemed, plus any accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date; *provided* that:

(i)     after giving effect to any such redemption at least 65% of the aggregate principal amount of the Securities (including any Additional Securities, but excluding Securities held by the Company and its Subsidiaries) issued under the Indenture remains outstanding; and

(ii)     the Issuer makes such redemption not more than 90 days after the consummation of such Eligible Equity Offering.

"Eligible Equity Offering" means the issuance and sale for cash of Qualified Stock of the Company to any Person (other than a Restricted Subsidiary of the Company) pursuant to (i) a public offering in accordance with any applicable laws, rules and regulations, or (ii) a private offering in accordance with Rule 144A, Regulation S and/or another exemption under the Securities Act or any other applicable law, rules and regulations of any other jurisdiction.

(d)     *Optional Tax Redemption.*  If the Issuer or any successor is required to pay Excess Additional Amounts on the Securities, or any Guarantor or any successor is required to pay Excess Additional Amounts on the Note Guarantee, it may elect to redeem the Securities, in whole but not in part, at a redemption price equal to 100% of the remaining principal amount plus interest and any additional amounts accrued to, but excluding, the fixed date of redemption.  Neither the Issuer, a Guarantor nor any successor will be entitled to redeem the

Securities pursuant to the previous sentence unless it is required to pay such Excess Additional Amounts due to a change in or amendment to the laws (or any rules or regulations thereunder) of the jurisdiction of its incorporation or any political subdivision or taxing authority thereof or therein, including a change in or amendment to an official interpretation, administration or application of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or is announced on or after the Issue Date of the Securities or on or after the date a successor assumes the obligations under the Securities.

"Excess Additional Amounts" means (A) Additional Amounts payable by the Issuer on the Securities, which Additional Amounts are greater than the additional amounts the Issuer would be required to pay on the Securities if withholding or deduction were imposed at a rate of 0% and (B) Additional Amounts payable by a successor to the Issuer on the Securities, or by a Guarantor or its successor on the Note Guarantee, which Additional Amounts are greater than the Additional Amounts such payor would be required to pay on the Securities if withholding or deduction were imposed only by the jurisdiction of its incorporation based on the laws in effect in such jurisdiction on the Issue Date (determined in each case without reference to any interest, fees, penalties or other additions to tax).

In the event that the Issuer, a Guarantor or any successor elects to so redeem the Securities, it shall deliver to the Trustee: (1) an Officer's Certificate, signed in the name of the Issuer, such Guarantor or any successor, stating that (a) the Issuer, such Guarantor or such successor is entitled to redeem the Securities pursuant to their terms and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Issuer, such Guarantor or any successor to so redeem have occurred or been satisfied and (b) the payment of Excess Additional Amounts cannot be avoided by the relevant payor taking reasonable measures available to it; *provided however*, that reasonable measures shall not include changing the payor's jurisdiction of incorporation or the location of its principal executive office or registered office; and (2) an Opinion of Counsel, reasonably acceptable to the Trustee, to the effect that the Issuer, a Guarantor or any successor has or will become obligated to pay Excess Additional Amounts, and that all governmental requirements necessary for the Issuer, a Guarantor or any successor to effect the redemption have been complied with.

(e)     *Optional Redemption Procedures.*  If fewer than all of the Securities are being redeemed, the selection of Securities to be redeemed shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Securities are listed or if such securities exchange has no requirement governing redemption or the Securities are not then listed on a securities exchange, on a pro rata basis or by lot (or, in the case of Securities issued in global form, based on a method that most nearly approximates a pro rata selection in accordance with the procedures of DTC).  The Trustee shall make the selection from the Outstanding Securities not previously called for redemption.  The Trustee shall promptly notify the Issuer in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount of the Securities to be redeemed.  In the event of a partial redemption by lot, the Trustee shall select the particular Securities to be redeemed not less than 30 nor more than 60 days prior to the relevant

Redemption Date from the Outstanding Securities not previously called for redemption.  The Issuer may redeem Securities in denominations of U.S.$200,000 or less only in whole.  The Trustee may select for redemption portions (in any integral multiple of U.S.$1,000) of the principal of Securities that have denominations larger than U.S.$200,000; *provided* that the remaining outstanding amount must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000 in excess thereof.

       The Issuer shall give or cause the Trustee to give notice of redemption, in the manner provided for in Section 13.01 of the Indenture, not less than 30 nor more than 60 days prior to a date for redemption of Securities by first-class mail, postage prepaid, to each record holder of the Securities to be redeemed at its registered address or otherwise in accordance with the procedures of DTC.  If the Issuer itself gives the notice, it shall also deliver a copy to the Trustee.

       If either (i) the Issuer is redeeming the Securities in part only, or (ii) the Issuer elects to have the Trustee give notice of redemption, then the Issuer shall deliver to the Trustee, at least 35 days prior to the Redemption Date (unless the Trustee is satisfied with a shorter period), an Officer's Certificate requesting that the Trustee select the Securities to be redeemed and/or give notice of redemption and setting forth the information required by Section 3.02(3) of the Indenture.  If the Issuer elects to have the Trustee give notice of redemption, the Trustee shall give the notice in the name of the Issuer and at the Issuer's expense.

       If the Issuer, or the Trustee on behalf of the Issuer, gives notice of redemption in accordance with Article 3 of the Indenture, the Securities, or the portions of Securities, called for redemption, shall, on the Redemption Date, become due and payable at the redemption price specified in the notice (together with accrued interest, if any, to, but excluding, the Redemption Date), and from and after the Redemption Date (unless the Issuer shall default in the payment of the redemption price and accrued interest) the Securities or the portions of Securities shall cease to bear interest, to the extent the Issuer so elects.  Upon surrender of any Securities for redemption in accordance with the notice, the Issuer shall pay the Securities at the redemption price, together with any accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Redemption Date.  If the Issuer shall fail to pay any Security called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Securities.

       For the avoidance of doubt, the Issuer may at any time enter into a supplemental indenture with the Trustee without the consent of Securityholders to provide that any optional redemption can only be exercised by the Issuer beginning on a date more than 720 days after the Issue Date.

6.      <u>Put Provisions</u>

       Upon a Change of Control that results in a Ratings Decline, any Holder will have the right to cause the Issuer and the Guarantors to repurchase all or any part (in any integral multiples of U.S.$1,000) of the Securities of such Holder at a repurchase price equal to 101% of the aggregate principal amount of the Securities to be repurchased plus accrued and unpaid

interest and Additional Amounts, if any, to the date of repurchase, as provided in, and subject to the terms of, the Indenture; *provided* that no such repurchase shall reduce the outstanding principal amount of the Securities held by any Holder to below U.S.$200,000 or in integrals of other than U.S.$1,000 in excess thereof.

7.    Guarantee

        The payment by the Issuer of the principal of, and premium and interest on, the Securities will be fully and unconditionally guaranteed by the Guarantors, to the extent set forth in the Indenture.

8.    [Reserved]

9.    Denominations; Transfer; Exchange

        The Securities shall be issued in registered form in denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof and shall be issued as one or more Global Securities.  A Holder may transfer or exchange Securities in accordance with the Indenture.  The Securities may be transferred, combined or divided without payment of any charge other than taxes or other governmental charges. The Registrar may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  The Registrar need not register the transfer of or exchange any Securities selected for redemption or any Securities for a period of 15 days before a selection of Securities to be redeemed or 15 days before an Interest Payment Date.

10.    Persons Deemed Owners

        The registered Holder of this Security may be treated as the owner of it for all purposes.  Payment shall be made to the person in whose name a Security is registered at the close of business on the applicable record date.

11.    Unclaimed Money

        If money for the payment of principal, premium or interest or Additional Amounts, if any, remains unclaimed for two years, the Trustee or the relevant Paying Agent shall pay the money back to the Issuer at its request unless an applicable abandoned property law designates another Person.  After any such payment, Holders entitled to the money must look only to the Issuer and not to the Trustee for payment.

12.    Discharge; Defeasance

        Subject to certain conditions set forth in Section 8 of the Indenture, the Company and its Restricted Subsidiaries shall be entitled to terminate some or all of their obligations under the Securities and the Indenture if the Issuer deposits with the Trustee cash or U.S. Government

Obligations for the payment of principal and interest on the Securities upon redemption or maturity, as the case may be.

13.    Amendment, Waiver

Subject to certain exceptions set forth in the Indenture, (a) the Indenture and the Securities may be amended without notice to any Holder but with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Securities and (b) any default or noncompliance with any provision may be waived with the written consent of the Holders of a majority in aggregate principal amount of the outstanding Securities.

Subject to certain exceptions set forth in the Indenture, without the consent of any Securityholder, the Issuer, the Guarantors and the Trustee shall be entitled to amend and supplement the Indenture or the Securities to cure any ambiguity, omission, defect or inconsistency, or to correct a manifest error or to comply with Section 5.01 of the Indenture, or to provide for uncertificated Securities in addition to or in place of certificated Securities, or to add guarantees with respect to the Securities, or to secure the Securities or to make any change that does not adversely affect the rights of any Securityholder, or to evidence and provide for the acceptance of appointment of a successor Trustee with respect to the Securities.

14.    Defaults and Remedies

Under the Indenture, Events of Default include (a) default for 30 days in payment of any interest or related Additional Amounts, if any, on the Securities; (b) default in payment of principal of or any related Additional Amounts, if any, or premium, if any, on the Securities, when the same becomes due and payable at maturity, upon acceleration or redemption or otherwise; (c) failure to make a Change of Control Offer and thereafter accept and pay for Securities tendered when and as required pursuant to Section 4.08 of the Indentures; (d) failure by the Company to comply with Section 5.01 of the Indenture; (e) failure by the Issuer or any Guarantor, as the case may be, to comply with other agreements in the Indenture and such non-compliance continues for a period of 60 consecutive days after written notice is given to Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in aggregate principal amount of the Securities; (f) certain accelerations of other Indebtedness of the Company, any Significant Subsidiary or the Issuer; (g) certain non-appealable judgments or orders rendered against the Company, any Significant Subsidiary or the Issuer that are not paid or discharged for a period of 60 consecutive days following the entry of the final and non-appealable judgment or order; (h) certain events of bankruptcy or insolvency with respect to the Company, any Significant Subsidiary or the Issuer; (i) the Note Guarantee of the Company or a Significant Subsidiary shall fail to be in full force and effect or is declared null and void; and (j) certain condemnation events affecting all or substantially all of the undertaking, assets and revenues of the Company, any Significant Subsidiary or the Issuer for a period of 60 consecutive days or longer.

If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Securities, by written notice to the Issuer and the Guarantors (and to the Trustee if notice is given by the Holders), may declare all the Securities to

be due and payable immediately.  Certain events of bankruptcy or insolvency are Events of Default which will result in the Securities being due and payable immediately upon the occurrence of such Events of Default.

Securityholders may not enforce the Indenture or the Securities except as provided in the Indenture.  The Trustee may refuse to enforce the Indenture or the Securities unless it receives indemnity or security reasonably satisfactory to it.  Subject to certain limitations, Holders of a majority in principal amount of the Securities may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Securityholders notice of any continuing Default (except a Default in payment of principal or interest) if it determines that withholding notice is in the interests of the Holders.

15.    Trustee Dealings with the Issuer and the Guarantors

The Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with and collect obligations owed to it by the Issuer, the Guarantors or their Affiliates and may otherwise deal with the Issuer, the Guarantors or their Affiliates with the same rights it would have if it were not Trustee.

16.    No Recourse Against Others

No past, present or future director, officer, employee, partner, incorporator, quotaholder, member or shareholder, as such, of the Issuer, the Guarantors or any Subsidiary of the Company, shall not have any liability for any obligations of the Issuer, the Guarantors or any Subsidiary of the Company under the Securities, the Indenture or the Note Guarantee or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Security, each Securityholder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Securities.

17.    Authentication

This Security shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Security.

18.    Abbreviations

Customary abbreviations may be used in the name of a Securityholder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

19.    CUSIP Numbers and ISINs

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers or ISINs to be printed

on the Securities and has directed the Trustee to use CUSIP numbers or ISINs in notices of redemption as a convenience to Securityholders.  No representation is made as to the accuracy of such numbers either as printed on the Securities or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

20.    Governing Law; Consent to Jurisdiction and Service of Process.

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

Each of the Issuer and the Guarantors has consented to the jurisdiction of the courts of the State of New York and the United States courts located in the Borough of Manhattan, New York City, New York with respect to any action that may be brought in connection with the Indenture or the Securities and has validly and effectively appointed National Corporate Research, Ltd., Inc. as agent for service of process.

The Issuer will furnish to any Securityholder upon written request and without charge to the Securityholder a copy of the Indenture which has in it the text of this Security in larger type.  Requests may be made to:

OGX Austria GmbH
c/o OGX Petróleo e Gás Participações S.A.
Praça Mahatma Gandhi, 14-19th Floor
Rio de Janeiro, Rio De Janeiro 20031-100 Brazil
Attention: General Counsel
Telephone: +55 21 2555 4666
Facsimile: +55 21 2555 5200

# ASSIGNMENT FORM

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

_____

agent to transfer this Security on the books of the Issuer.  The agent may substitute another to act for him or her.

Your Signature:

Date:_____        _____

(Sign exactly as your name appears on the other side of this Security)

SIGNATURE GUARANTEE:  _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

NEWYORK 8436004 (2K)                    1-17

[TO BE ATTACHED TO GLOBAL SECURITIES]

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY**

The initial principal amount of this Global Security is U.S.$_____. The following increases or decreases in this Global Security have been made:

| Date of Exchange | Amount of decrease in principal amount of this Global Security | Amount of increase in principal amount of this Global Security | Principal amount of this Global Security following such decrease or increase | Signature of authorized signatory of Trustee or Securities Custodian |
|---|---|---|---|---|
| | | | | |

## [FORM OF] OPTION OF SECURITYHOLDER TO ELECT PURCHASE

If you elect to have this Security purchased by the Issuer pursuant to Section 4.06 or Section 4.08 of the Indenture, check the appropriate box below:

☐ Section 4.06      ☐ Section 4.08

If you elect to have only part of this Security purchased by the Issuer pursuant to Section 4.06 or Section 4.08 of the Indenture, state the amount (in integral multiples of U.S.$1,000) you elect to have purchased:

U.S.$_____

Dated: _____       Your Name: _____
(Print your name exactly as it appears on the face of this Security)

Your Signature: _____
(Sign exactly as your name appears on the face of this Security)

SIGNATURE GUARANTEE: _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXHIBIT 2

to

RULE 144A/REGULATION S APPENDIX

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS
PURSUANT TO REGULATION S

[Date]

OGX Austria GmbH
c/o OGX Petróleo e Gás Participações S.A.
Praça Mahatma Gandhi, 14-19th Floor
Rio de Janeiro, Rio De Janeiro 20031-100 Brazil
Attention: General Counsel

Deutsche Bank Trust Company Americas
Trust & Agency Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention: Corporates Team Deal Manager – OGX Austria

Re:        _____ (the "Transferee")
           8.375% Senior Notes due 2022 (the "Securities")

Ladies and Gentlemen:

        In connection with our proposed transfer of U.S.$_____ aggregate principal amount of Securities, we confirm that such transfer has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, we represent that:

        (1)     the offer of the Securities was not made to a person in the United States;

        (2)     either (a) at the time the buy offer was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

        (3)     no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, as applicable;

(4)      the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

(5)      we have advised the transferee of the transfer restrictions applicable to the Securities;

(6)      if the circumstances set forth in Rule 904(c) under the Securities Act are applicable, we have complied with the additional conditions therein, including (if applicable) sending a confirmation or other notice stating that the Securities may be offered and sold during the restricted period specified in Rule 903(c)(2) or (3), as applicable, in accordance with the provisions of Regulation S; pursuant to registration of the Securities under the Securities Act; or pursuant to an available exemption from the registration requirements under the Securities Act; and

(7)      if the sale is made during a restricted period and the provisions of Rule 903(c)(3) are applicable thereto, we confirm that such sale has been made in accordance with such provisions.

You and the Transferee are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.  Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Transferor]

By:_____
      Authorized Signature

EXHIBIT 3

to

RULE 144A/REGULATION S APPENDIX

FORM OF TRANSFER CERTIFICATE FOR
TRANSFER OF RESTRICTED GLOBAL SECURITY
BEARING A RESTRICTED SECURITIES LEGEND

[Date]

OGX Austria GmbH
c/o OGX Petróleo e Gás Participações S.A.
Praça Mahatma Gandhi, 14-19th Floor
Rio de Janeiro, Rio De Janeiro 20031-100 Brazil
Attention: General Counsel

Deutsche Bank Trust Company Americas
Trust & Agency Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX Austria

Re:      _____ (the "Transferee")
        8.375% Senior Notes due 2022 (the "Securities")

Ladies and Gentlemen:

        Reference is hereby made to the Indenture, dated as of March 30, 2012, in regard of the Securities among OGX Austria GmbH, as the Issuer, Petróleo e Gás Participações S.A., OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A., as the Guarantors, Deutsche Bank Trust Company Americas, as the Trustee, Registrar, Paying Agent and transfer agent, and Deutsche Bank Luxembourg S.A., as Principal Paying Agent.  Capitalized terms used but not defined herein will have the meaning given them in the Indenture.

        This letter relates to U.S.$_____ aggregate principal amount of the Securities which are held in certificated form.

        The undersigned has requested transfer of such Securities to a Person who will take delivery thereof in the form of a beneficial interest in the Restricted Global Security (CUSIP No. _____; ISIN _____).  In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and on the Securities and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

1.      the Securities are being transferred to a transferee that the undersigned reasonably believes is purchasing the Securities for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

2.      the undersigned reasonably believes that transferee and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

[NAME OF TRANSFEROR]

By:_____
      Name:
      Title:

Dated:_____

# EXHIBIT A

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.:  17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, *et al.,*

        Defendants.

_____/

## AFFIDAVIT OF MARCELO LAMEGO CARPENTER

       I, Marcelo Lamego Carpenter, of the City of Rio de Janeiro, in the State of Rio de Janeiro, Brazil, say as follows under oath:

1.     I submit this affidavit and the attached exhibits in support of the Defendants' Motion to Dismiss Plaintiffs' Claims Based on Comity and Defendants' Motion to Dismiss On *Forum Non Conveniens* Grounds, filed in the above-mentioned proceedings (the "Florida Lawsuit"). The contents of this affidavit are made from my own knowledge and are true, except that where this affidavit contains matters of information or belief, I indicate where that is so and I believe those matters to be true. The exhibits attached hereto are true and correct copies of court orders, pleadings, and other documents related to the judicial recovery proceedings in Brazil.  Certain documents appended hereto were previously filed as exhibits in an action by certain OGX Bondholders against Deutsche Bank Trust Company in New York State Court under the caption Capital Ventures International v. Deutsche Bank Trust Company (Index no. 651673/2014), which has been discontinued by stipulation (the "N.Y. Bondholder Proceeding").

2.     I submit this affidavit to describe the judicial recovery proceedings ("Judicial Reorganization") of the OGX Group[1] in Brazil and to explain, specifically, the particularities of the proceedings, their status, and their effects on holders of bonds issued by OGX Austria.

---

[1]     The OGX Group comprises OGX Petróleo e Gás S.A. ("OGX"), Óleo E Gás Participacões S.A. ("OGPar"), OGX Austria GMBH ("OGX Austria"), and OGX International GMBH ("OGX International").

I.        **Personal Background and Qualifications**

3.        I am a lawyer qualified and practicing under Brazilian Law. I graduated in law at the State University of Rio de Janeiro in 1996. I have nearly 20 years of experience in the fields of civil/commercial litigation and dispute resolution, and I specialize in commercial litigation with an emphasis on insolvency, including cases with an international element.

4.        I am a partner of the law firm Escritório de Advocacia Sergio Bermudes. The firm was established in 1970 and has more than 90 lawyers and 150 clerks. The offices are located in Rio de Janeiro (main office), São Paulo, and Brasília. Our main practice is assisting clients on domestic and international litigation and arbitration, including bankruptcy and debt restructuring procedures. My firm's intensive practice through the last 45 years has led to international recognition. My firm has been nominated by Chambers and Partners and Who's Who Legal, two British publications, as the leading commercial litigators in Brazil.

5.        I submit this affidavit in my capacity of being one of the lead members of the legal team that represents the OGX Group in the judicial recovery proceedings filed on October 30th, 2013, before the State Court of Rio de Janeiro.

6.        In this affidavit, I describe facts related to the restructuring process of the OGX Group, the provisions of the reorganization plans, and the treatment of creditors during the restructuring process.

II.       **Reorganization Proceeding of the OGX Group**

7.        On October 30, 2013, the OGX Group filed a request for judicial reorganization (or judicial recovery) under the Brazilian Bankruptcy Law ("BRBL").[2]  Said judicial reorganization is not a liquidating bankruptcy, but a Court-approved rehabilitation procedure through which a collective negotiation between the debtor and its creditors is held, under the scrutiny of the Brazilian Courts and the surveillance of both a Court-appointed trustee and the Public Prosecutors of the State where the proceeding is held.

8.        On November 21st, 2013, the Fourth Commercial Court of the District of Rio de Janeiro ("Bankruptcy Court") entered an order (i) granting leave to proceed with the Judicial Reorganization of OGPar and OGX, and (ii) denying leave to proceed with the Judicial Reorganization of OGX International and OGX Austria, on the grounds that a Brazilian Court did not have jurisdiction over said companies.[3] OGX International and OGX Austria successfully appealed against the refusal of leave to proceed (Interlocutory Appeal n° 0064658-

---

[2] A true and correct copy of the Request for Judicial Reorganization is appended as Exhibit 1.

[3] A true and correct copy of the November 21st, 2013 Order is appended as Exhibit 2.

2

77.2013.8.19.0000—granted unanimously on February 19th, 2014).[4] Each of the four entities were thus granted leave to proceed with the Judicial Reorganization.

9.        In December 2013, the Court formally appointed Deloitte Touche Tohmatsu Consultores Ltda. as the Trustee (judicial administrator) in the proceedings.[5] The Trustee does not manage the debtor companies; it does not sit as a member of the board, or act as an executive officer. It is, however, responsible for overseeing the debtor's activities and providing information to the judge on the operation of the debtor's business and the progress and fulfillment of the judicial reorganization plan.

10.      On February 14th, 2014, the individual companies presented their respective Reorganization Plans, setting out the means of reorganization they intended to use and demonstrating their economic viability. They filed economic-financial reports and valuation of the assets of the companies. The plans provided the terms of a payment proposal to the creditors that were originally identified in a list of creditors presented by the companies with their request for judicial reorganization.[6]

11.      A second list of creditors, as analyzed and construed by the Court-appointed Trustee through eventual complaints presented to the Trustee by the creditors, was published on March 6, 2014, and the interested parties filed a second proof of claim or challenges to the listed credit, before the Bankruptcy Court.

12.      In sum, the Plans of the OGX Group made provision for the following means of recovery: (i) the obtaining of new financing; (ii) the sale of assets; (iii) the re-dimensioning of the operations; (iv) payment in cash of part of the debts; (v) partial conversion of the debts into OGX Petróleo e Gás capital stock; and (vi) corporate restructuring of the OGX Group.

13.      The Plans also provided broad releases of claims against Eike Batista, the OGX Group, its officers and shareholders, and certain other non-debtor entities, including defendants in the Florida Lawsuit, from claims arising before and during bankruptcy. *See, e.g.*, Exhibit 5, OGX Plan, Section 13.5 (General discharge);[7] *see also* OGX Plan, Section 13.3.[8]

---

[4] A true and correct copy of the Opinion granted in Interlocutory Appeal n. 0064658-77.2013.8.19.0000 is appended as Exhibit 3.

[5] A true and correct copy of the December 12, 2013 Order is appended as Exhibit 4.

[6] In total, four plans of reorganization, one for each company, were ultimately approved. A true and correct copy of the Reorganization Plan of OGX, as filed in the NY Bondholder Proceeding, is appended as Exhibit 5. A true and correct copy of the OGX Austria Plan is appended as Exhibit 6. A true and correct copy of the OGPar Plan is appended as Exhibit 7. A true and correct copy of the OGX International Plan is appended as Exhibit 8. Each of the Plans (except OGX International, which did not have any outstanding credits) contained a discharge provision identical to Section 13.5 in the OGX Plan. *See* OGX Austria Plan, Section 10.5; OGPar Plan, Section 12.5. Each of the Plans (except OGX International, which did not have any outstanding credits) also contained a provision identical to Section 13.3 of the OGX Plan, which I discuss below. *See* OGX Austria Plan, Section 10.3; OGPar Plan, Section 12.3.

[7] *See also* OGX Austria Plan, Section 10.5; OGPar Plan, Section 12.5.

3

14.    Section 13.5 provided:

> **"13.5. Discharge**. Except in the case of Resolution of the Plan, the Capital
> Increase Through Capitalization of Credits with the delivery of Shares to the
> Creditors or to the Receiver, as applicable, as well as the payments in cash set
> forth in Sections 5.1.4 et. seq. of this Plan will result in full, irrevocable and
> irreversible discharge of all Credits of any kind and nature against OGPar, OGX
> Austria, OGX International, OGX and its controlling companies and guarantors,
> including interest, adjustment for inflation, penalties, fines and damages. With the
> occurrence of the discharge, ***the Creditors will be deemed to have fully
> discharged, released and/or waived any and all Credits, and can no longer
> claim them against*** OGX, controlled companies, subsidiaries, affiliates and other
> companies belonging to the same corporate and economic group, and ***their
> officers, directors, Shareholders, minority shareholders, members, agents,
> employees, representatives, guarantors, sureties, successors and assignees."***

(Emphasis added).

15.    This provision thus provides a general discharge of all claims against "OGX, controlled
companies, subsidiaries, affiliates and other companies belonging to the same corporate and
economic group, and their officers, directors, Shareholders, minority shareholders, members,
agents, employees, representatives, guarantors, sureties, successors and assignees."

16.    The Reorganization Plans define "Shareholders" as "***Eike Batista and all other direct
and indirect shareholders of OGX under control of Eike Batista, including, but not limited to,
OGPar, Centennial Asset Mining Fund LLC., and Centennial Asset Brazilian Equity Fund,
LLC.***" OGX Plan, Section 1.1.7.[9]

17.    The Reorganization Plans define "Credits" as "***Credits and obligations, whether
materialized or contingent, net or illiquid, existing on the Filing Date,*** or which generating fact
is previous or simultaneous to the Filing Date, whether or not subject to the effects of Plan,
including OSX Group Credits due by OGX Group. When applicable, Credits shall also be
interpreted as including the credits and obligations, whether materialized or contingent, net or
illiquid, existing on the Filing Date, or which generating fact is previous or simultaneous to the
Filing Date, whether or not subject to the effects of the Plan, and that may be due by OGPar
and/or OGX Austria and/or OGX International. For the avoidance of doubt, the credits resulting
from the DIP Loan and the Additional Loan are not included in the definition of Credits for any
purpose, not being subject to the terms, effects, and conditions of this Plan in any aspect." (OGX
Plan, Section 1.1.43).[10]

---

[8] *See also* OGX Austria Plan, Section 10.3; OGPar Plan, Section 12.3.

[9] *See also* OGX Austria Plan, Section 1.1.7; OGPar Plan, Section 1.1.7.
[10] *See also* OGX Austria Plan, Section 1.1.34; OGPar Plan, Section 1.1.38.

18.     I understand that the following parties are filing motions to dismiss in the Florida proceedings: Werner Batista, Centennial Asset Mining Fund, LLC, Centennial Asset Brazilian Equity Fund LLC, 63X Investments LTD, 63X Master Fund, and 63X Fund  The parties' relationship to OGX is summarized in the table below.

| Defendants | Relationship |
|---|---|
| Werner Batista | Former Director of EBX Holding Ltda. |
| 63X Investments LTD | Company belonging to the same corporate and economic group |
| 63X Master Fund | Company belonging to the same corporate and economic group |
| 63X Fund | Company belonging to the same corporate and economic group |
| Centennial Asset Mining Fund, LLC (CAMF) | Shareholder |
| Centennial Asset Brazilian Equity Fund, LLC. (CABEF) | Shareholder |

19.     I have been informed that none of the entities (Centennial Asset Mining Fund, LLC; Centennial Asset Brazilian Equity Fund, LLC; 63X Master Fund; 63X Investments Ltd.; 63X Fund; EBX Holding Ltda.; EBX International S.A.; EBX Capital Partners; Thorque1 Fund Ltd.; Thorque Investment Management Ltd.) have engaged or held themselves out as engaging in business in Florida or for Florida residents.  All of the documents relating to the OGX Group's pre-Judicial Reorganization oil production and exploration activities are located in Brazil.

20.     In addition to the general discharge in Section 13.5, Section 13.3 provided:

> **13.3.  Dismissal of Actions.  *Unless provided otherwise in this Plan, the Creditors may no longer, from the Approval of the Plan*,** (i) file or pursue any legal action or proceeding of any kind related or not to any Credit against OGX; (ii) enforce any judgment, judicial decision or arbitration award against OGX; (iii) pledge any property of OGX, to satisfy their Credits; (iv) create, perfect or enforce any security interest on assets and rights of OGX to ensure payment of their Credits; (v) claim any right of offset against any claims payable to OGX; *(vi) seek the satisfaction of their Credits by any other means*; [a]nd (vii) subject to the verification of the Result of the Proceeding and compliance with the terms and conditions of Section 11.1 hereof, seek the satisfaction of any and all any intention, action or right to demand the annulment, specific performance, compensation for damages or any other demands, for any reason, in relation to the Put Option.  All lawsuits and judicial executions pending against OGX, relating to Credits, shall be dismissed, and the existing liens and constrictions will be discharged.

(Emphasis added).

5

21.     On June 3, 2014, the OGX Group's Judicial Reorganization Plans were approved by a substantial number of creditors (per capita) and credits (per value) at the General Meetings of Creditors convened by the Court and presided over by the Trustee, in accordance with Article 45 of the BRBL.[11]

22.     After their approval by a vast majority of the creditors (approximately 90%), on June 13, 2014, the Judicial Reorganization Plans were ratified by the Reorganization Court (the "Ratification Decision").[12] In ratifying the Reorganization Plans, the Bankruptcy Court held that the financing associated with the reorganization proceeding complied with BRBL, and that all other provisions of the Reorganization Plans were valid and enforceable. However, in that occasion, the Bankruptcy Court made reservations in regard to Section 11, attesting that such clause, although perfectly valid, would not be enforceable against creditors who voted against the plans' approval.

23.     In October 2014, the conversion of most of the credits into shares of OGX took place by means of a capital increase approved by the OGX shareholders, in line with the Judicial Reorganization Plans, and creditor claims were satisfied under the terms of the Reorganization Plans. The novation occurs upon approval of the plan. The original credits are extinct and the creditors' rights are limited to what is described in the plan of reorganization.

24.     Certain bondholders[13] appealed the Bankruptcy Court order on a variety of grounds, including the legality of the ratio of conversion of the different tranches of the DIP financing vis-à-vis the credits subject to the proceedings, and the application of Sections 11 (Put Option Release) and 13.7 (Releases of claims related to actions related to the negotiation of the Plan) to creditors who did not vote for the Reorganization Plans, did not attend the General Meeting of Creditors, or both.[14] On those issues, the 14th Civil Chamber of the State Court of Appeals of Rio de Janeiro (the "Appellate Court") upheld the ruling of the Bankruptcy Court that the plans—and consequently, the ratio of conversion—complied with BRBL and confirmed the ratification of the Reorganization Plans and the order for judicial reorganization of the OGX Group in

---

[11] A true and correct copy of the minutes of the General Meetings of Creditors, as filed in the NY Bondholder Proceeding, is appended as Exhibit 9.

[12] A true and correct copy of the Ratification Decision, as filed in the NY Bondholder Proceeding, is appended as Exhibit 10.

[13] The appealing bondholders included the following entities: Autonomy Master Fund Limited; Brennus Fund LP, Claren Road Credit Master Fund, Ltd.; Claren Road Credit Opportunities Master Fund, Ltd.; Aspen Creek Partners, LP.; Andromeda Global Credit Fund Ltd.; Lyxor/Andromeda Globval Credit Fund Ltd.; Edmond de Rothschild Emerging Bends; Firenze Corporate Inc.; First Geneva High Yield Fund; Gam Trading N. 37 Inc.; Ricardo Augusto Gallo; GLG European Distressed Master Fund; GLG European Distressed Fund; GLG Market Neutral Fund; European Distressed Mac Limited; Crown Managed Accounts SPC; Itava Inc.; Brax Fund; BNYM Brazil International Fund SPC on behalf of JGP Offshore Segregated Portfolio; Jean-Jacques Durand; Novel Capital Group Limited; Quaker Event Arbitrage Fund; Shahriar Shahida; Subquehanna Ireland Limited; Capital Ventures International; and VR Global Partners.

[14] A true and correct copy of the Bondholders Appeal to the Ratification Decision, as filed in the NY Bondholder Proceeding, is appended as Exhibit 11.

accordance with art. 58 of the BRBL. The Appellate Court, however, ruled for the appellants in connection with Sections 11 and 13.7, holding that those sections would not be binding on creditors that either (i) were present at the companies' general creditors meetings and voted against the approval of the plans or objected specifically to that provision; or (ii) were not present at the general creditors meetings of the OGX Group.[15]

25.     The dissenting creditors then sought to file an appeal of the ruling of the Appellate Court on the legality of the DIP financing. This was a "Special Appeal" on points of federal law lodged to the Superior Court of Justice in Brasilia.[16] The Appellate Court, however, denied leave for the appeal to proceed.[17] The dissenting creditors then appealed to the Superior Court of Justice against the refusal of leave.[18] OGX also appealed the Appellate Court's decision regarding the enforceability of Section 11.[19] Said appeals are still pending judgment by the Superior Court of Justice of Brazil.[20]

26.     Since October 2014, OGX continued to negotiate with creditors in order to convert the DIP financing which is, formally, not part of the plan. Under Article 67 of BRBL, the credits arising out of the obligations contracted during the judicial reorganization proceedings are not subject to the judicial reorganization. Therefore, the DIP financing was, necessarily, not subject to the judicial reorganization proceedings.

27.     As of January 21, 2016, the OGX Group had reduced its workforce—in terms of payroll—by 40%.[21] Many employees that were with the OGX Group before the Judicial Reorganization are therefore no longer with the companies.

28.     At last, on January 10th, 2017, the OGX Group entered into an agreement with its DIP lenders and other outstanding relevant creditors of the companies (which were also not subjected to the reorganization proceedings) according to which all of their debts would be converted into

---

[15] A true and correct copy of the Appellate Court Opinion in Bondholders Appeal to the Ratification Decision is appended as Exhibit 12.

[16] A true and correct copy of the Bondholders Special Appeal is appended as Exhibit 13.

[17] A true and correct copy of the Appellate Court Opinion to Deny Bondholders Special Appeal is appended as Exhibit 14.

[18] A true and correct copy of the Bondholders Appeal to the Appellate Court Opinion to Deny their Special Appeal is appended as Exhibit 15.

[19] A true and correct copy of OGX Special Appeal to the Appellate Court Opinion is appended as Exhibit 16. OGX did not appeal the Appellate Court's decision as to Section 13.7.

[20] As discussed below, no creditor ever objected to sections 13.3 or 13.5 of the OGX Reorganization Plan (or the identical provisions in the other Plans) and the result of such appeals has no bearing on the enforceability of that provision.

[21] A true and correct copy of the "Material Fact" filed with the Comissão de Valores Mobiliários–CVM on January 21, 2016 is appended as Exhibit 17.

shares of OGX Petróleo e Gás S.A., completing, therefore, the financial reorganization of the group.[22]

29.     With that last step, the OGX Group has successfully reorganized its debts and overcome its financial crisis. This is a result of a very complex reorganization, that took place over the last four years and had the constant surveillance of (i) the reorganization Court, (ii) the companies' creditors, (iii) the Court-appointed Trustee, and (iv) the Public Prosecutors of the State of Rio de Janeiro.

## III.     Bondholder Participation in the Reorganization Proceeding

30.     We understand that Plaintiffs assert that they acquired bonds issued by OGX Austria and guaranteed by OGX during the OGX Group's exploratory campaign in 2012 and 2013.[23]   As a result, Plaintiffs' debts to those two entities were subject to the reorganization proceedings in Brazil, and were addressed under the terms of the Reorganization Plans.

31.     The bondholders of OGX Austria ("OGX Bondholders") had a very active role in the Group's reorganization. As described below, they not only held the majority of the unsecured credits subjected to the proceedings, and therefore played an important role in the negotiations of the Group's Reorganization Plans, but also represented nearly all of the subscribers of the bonds issued by OGX for the DIP facilities.

32.     From the beginning of the reorganization, the OGX Bondholders, including the Plaintiffs, were represented in the reorganization proceedings by the trustee of the bonds, Deutsche Bank Trust Company Americas ("Deutsche Bank").[24]   As the trustee of the bonds, Deutsche Bank regularly provided updates regarding the proceeding to the OGX Bondholders and appraised them of their rights in the Judicial Reorganization. For example, on December 23, 2013, the Trustee sent a detailed letter to all OGX Bondholders providing various information regarding the OGX Group's Judicial Reorganization, including notifying the bondholders that the debtors would seek to implement voting procedures that would permit or require the OGX Bondholders to directly vote on account of their interests, advising the bondholders that an ad hoc committee has been formed and was negotiating with OGX regarding such voting procedures, and urging them to "*monitor the OGX judicial recovery proceedings and consult with legal counsel or other advisors to the extent they deem advisable with respect to the Voting Procedures and voting on*

---

[22] A true and correct copy of the January 10, 2017 Agreement with DIP Lenders and other Creditors is appended as Exhibit 18.

[23]   The OGX bonds were issued under two separate Indentures in 2012 and 2012.  In June 2011, OGX issued bonds abroad in the total amount of $2.563 billion under the 8.500% Senior Notes Indenture Due 2018 (the "2018 Indenture").   These obligations were then transferred to OGX Austria. In April 2012, OGX Austria issued an additional $1.063 billion in bonds under the 8.375% Senior Notes Indenture due 2022 (the "2022 Indenture" and together with the 2018 Indenture, the "Indentures.")  True and correct copies of the 2018 Indenture and the 2022 Indenture are appended as Exhibits 19 and 20, respectively.

[24] Deutsche Bank was listed on the OGX Group's list of creditors as the Trustee for OGX Austria. A true and correct copy of the Original List of Creditors is appended as Exhibit 21.

*any potential Plans, including, without limitation, whether they or their representative should attend, in person or by proxy, any general meeting of creditors that is scheduled to discuss the terms of or at which a vote may be conducted on any potential Plans*".[25]

33.     On January 24, 2014, Deutsche Bank provided another notice to the OGX Bondholders, appending and describing a motion that had been filed with the court to establish voting procedures, notifying the OGX Bondholders that a second ad hoc committee—which any of the bondholders could join—was being formed, and indicating that a dedicated website—www.OGXnotes.com—set up through *Moses & Singer LLP,* Deutsche Bank's counsel—was created to provide the OGX Bondholders, including the Plaintiffs, access to key documents concerning the Judicial Reorganization and the OGX debtors and related entities.[26]

34.     Deutsche Bank also provided similar notices on March 11, 2014, and April 1, 2014, alerting the OGX Bondholders of the deadline to object to the updated creditors list, posted by the Court-appointed Trustee, updating the OGX Bondholders on the voting procedures motion, notifying them that Deutsche Bank did not plan to object to the creditors list, and once again urging the OGX Bondholders to consult counsel and monitor the Judicial Reorganization to protect their interests.[27]

35.     On April 11th, 2014, the Bankruptcy Court entered an order acknowledging Deutsche Bank's role as the representative of the OGX Bondholders in the reorganization pursuant to article 39 of the BRBL, and, as indicated in Deutsche Bank's notices, ordered that an OGX Bondholder's claims may be individualized if the bondholder so requested ("April 11 Order").[28] The order granted the OGX Bondholders the right to (i) segregate their bonds position from the total amount, provided some specific documents were provided (including an updated proof of holdings) and (ii) participate and vote individually in any Creditors Meeting, including for the approval of the reorganization plans. As a consequence of this decision, any OGX Bondholder (including Plaintiffs) had the opportunity to effectively participate in the formation of the Reorganization Plans and fully exercise its rights as a creditor. The Bankruptcy Court also ordered the debtors to direct Deutsche Bank to communicate the terms of the order to all individual OGX Bondholders, including the Plaintiffs, and obligated Deutsche Bank to provide such notice. *See* Exhibit 26, April 11 Order. Notices also were published on the OGX Group's website and a formal public notice was published in the Official Gazette of the State Court of Rio de Janeiro, as determined by the Bankruptcy Court.

---

[25] A true and correct copy of Deutsche Bank Notice, dated December 23, 2013, as filed in the NY Bondholder Proceeding, is appended as Exhibit 22.

[26] A true and correct copy of Deutsche Bank Notice, dated January 24, 2014, as filed in the NY Bondholder Proceeding, is appended as Exhibit 23.

[27] A true and correct copy of the Deutsche Bank Notices, dated March 11, 2014 and April 1, 2014, as filed in the NY Bondholder Proceeding, are appended as Exhibits 24 and 25, respectively.

[28] A true and correct copy of the April 11 Order, as filed in the NY Bondholder Proceeding, is appended as Exhibit 26.

9

36.     After the Bankruptcy Court entered the April 11 Order, Deutsche Bank continued to provide notices regarding the reorganization proceedings to the OGX Bondholders and urging them to participate in the proceedings. *See* Exhibit 27, Deutsche Bank Notice, dated April 22, 2014 (notifying bondholders of the April 11 Order).[29]

37.     On May 6, 2014, the Bankruptcy Court entered another order, supplementing the April 11 Order and modifying the voting procedures pursuant to which the OGX Bondholders could vote on the Reorganization Plans (the "May 6 Order").[30] Deutsche Bank notified the OGX Bondholders of this decision.[31]

38.     On May 20, 2014, Deutsche Bank notified the OGX Bondholders that a General Meeting of Creditors for each of the debtors was scheduled for June 3, 2017, and that reminded the OGX Bondholders of the voting procedures, including the specific steps required to vote on the Reorganization Plans.[32] Deutsche Bank confirmed that the General Meeting of Creditors would go forward as scheduled in two additional notices leading up to June 3—May 30, 2014 and June 2, 2014—indicating that revised Reorganization Plans had been filed and that the companies' financial reports were posted on their website.[33]

39.     The General Meeting of Creditors occurred on June 3, 2017, and the Bankruptcy Court issued a decision ratifying the approved Reorganization Plans on June 13, 2017. *See* Exhibit 10, Ratification Decision. And Deutsche Bank notified the OGX Bondholders of this decision on June 27, 2014, noting that the Ratification Decision was published in the Official Gazette of the State of Rio de Janeiro on June 26, 2014, and that any OGX Bondholder could appeal.[34]

40.     In all, in the period between October 1, 2013, and June 27, 2014, Deutsche Bank sent 19 separate notices to the OGX Bondholders, imploring them to participate in the Judicial Reorganization, explaining their rights to object to the Reorganization Plans and, eventually, their rights to appeal the Bankruptcy Court's ratification of the Reorganization Plans.

41.     The notices provided by Deutsche Bank complied with the April 11 Order and allowed the OGX Bondholders to participate fully in the reorganization proceedings. In addition to notices sent by Deutsche Bank to the bondholders, the debtors posted every relevant decision of

---

[29] A true and correct copy of the Deutsche Bank Notice, dated April 22, 2014, as filed in the NY Bondholder Proceeding, is appended as Exhibit 27.

[30] A true and correct copy of the May 6 Order, as filed in the NY Bondholder Proceeding, is appended as Exhibit 28.

[31] A true and correct copy of the Deutsche Bank Notice, dated May 9, 2014, as filed in the NY Bondholder Proceeding, is appended as Exhibit 29.

[32] A true and correct copy of the Deutsche Bank Notice, dated May 20, 2014, as filed in the NY Bondholder Proceeding, is appended as Exhibit 30.

[33] True and correct copies of the Deutsche Bank Notices, dated May 30, 2014 and June 2, 2014, as filed in the NY Bondholder Proceeding, are appended as Exhibits 31 and 32, respectively.

[34] A true and correct copy of the Deutsche Bank Notice, dated June 27, 2014, as filed in the NY Bondholder Proceeding, is appended as Exhibit 33.

the Bankruptcy Court, as well as the Reorganization Plans on their website (http://www.mzweb.com.br/ogx/web/conteudo_en.asp?idioma=1&tipo=53361&conta=44).

42.     The relevant decisions of the Bankruptcy Court were also issued by means of material facts presented by OGX to the market and archived in Comissão de Valores Mobiliários—CVM.

43.     Certain documents, including the Reorganization Plans, were posted in English and Portuguese.

44.     Further notice to the OGX Bondholders was provided through the companies' efforts to obtain sufficient financing to effectuate the Judicial Reorganization.  OGX's financial advisor, Blackstone Advisory Partners Group L.P. ("Blackstone"), undertook a worldwide marketing campaign, working with "other companies of international credibility" such as Lazard and Angra. *See* Exhibit 10, Ratification Decision.

45.     News regarding the reorganization was also widely publicized throughout the reorganization process.[35]

46.     Given the robust notice provided to all creditors, it is no surprise that many bondholders did participate vigorously in the reorganization. Indeed, certain bondholders played an essential role in the reorganization by providing financing necessary to fund the reorganization and the companies' day-to-day operations. The companies and certain bondholders entered into the following loans during their reorganization proceedings, all fully disclosed and ratified by their creditors and the Bankruptcy Court:

(i)     a Bridge Loan: short term loans which were not subject to the existing *concursus creditorum* (list of creditors) in the amounts of US$ 15 million and US$ 50 million. These loans were used to re-establish the companies' working capital and to meet their exploratory obligations.[36]

(ii)    the DIP Loan: a loan which does fall within the *concursus creditorum* and which was granted by certain creditors and some new lenders in a total amount of US$ 215 million, *via* the subscription of debentures which will be converted into capital so that the new lenders would become shareholders of OGX. OGX issued three series of convertible debentures: (a) 1st series debentures issued, subscribed and paid up for the total value of US$ 125 million; (b) 2nd series debentures, issued, subscribed and paid up in the total value of US$ 82.5 million; and (c) 3rd series debentures, subscribed and paid up in the total amount of US$ 7.5 million.[37]

---

[35]    *See, e.g.*, Emily Glazer, *Wall Street Firms Entangled in OGX Downfall*, http://blogs.wsj.com/moneybeat/2013/10/30/wall-street-firms-entangled-in-ogx-downfall/; Maria Chutchian, OGX Bondholders Looking To Fight Bankruptcy Plan, https://www.law360.com/articles/543510/ogx-bondholders-looking-to-fight-bankruptcy-plan.

[36] A true and correct copy of the Bridge Loan is appended as Exhibit 34.

[37] A true and correct copy of the DIP Loan is appended as Exhibit 35.

(iii) An Additional Loan, in the amount of approximately US$ 73 million, primarily aimed at paying off the cash calls made to the BS-4 consortium (an oilfield that is very important to the OGX Group).[38]

47.     The OGX Group put up some of its assets as a guarantee for these loans with the authorization of the Bankruptcy Court, in line with articles 66 and 67 of the BRBL. Although not formally subject to the Reorganization Plans, those loans were described therein, where they were ratified by the OGX Group and its creditors.

48.     Other bondholders opposed this financing structure as well as other provisions in the Reorganization Plans, arguing that (1) the DIP financing described above violated the equal treatment of creditors under Brazilian law, and thus, that the ratification of the plan should be deemed invalid, and that (2) Sections 11 and 13.7 of the plan were invalid.[39] The Bankruptcy Court overruled their objections and ratified the plans, holding that the DIP financing complied with the BRBL, and that Sections 11 and 13.7, although perfectly valid, would not be enforceable against creditors who expressly voted against the Reorganization Plans.[40]

49.     As discussed above, after the court overruled their objections and ratified the Reorganization Plans (with reserves to the effects of Sections 11 and 13.7 of the plan), the dissenting bondholders appealed that decision, raising the same legal arguments as below. *See* Exhibit 11.

50.     Currently, there are four appeals still pending judgment: (i) one from Autonomy (bondholders); (ii) one from Petroleo Brasileiro S.A. – Petrobras; (iii) one from the Public Prosecutor's office; and (iv) one from the OGX Group. The first three appeals have the purpose to reform some of the aspects of the decision which ratified the reorganization plan. The fourth appeal, presented by the OGX Group, has the purpose to reform the State Court decision that restricted the effects of Section 11 of the plan only to creditors who participated in the general creditors meeting and voted in favor of the approval of the plan.

51.     None of the bondholders ever challenged sections 13.3 and 13.5 of the OGX Plan (or the identical provisions in the OGXPar or OGX Austria Plans).  Such claims, however, were well known to all interested parties at the time of the judicial reorganization. For example, on December 6, 2013, well before the plans were ratified by the Bankruptcy Court, certain shareholders of the companies filed a lawsuit against Eike Batista, his father Eliezer Batista, and local regulators in Brazilian court for fraud and market manipulation.[41]

---

[38] A true and correct copy of the Additional Loan is appended as Exhibit 36.

[39] A true and correct copy of the Bondholders Motion Opposing the Reorganization Plans, as filed in the NY Bondholder Proceeding, is appended as Exhibit 37.

[40] *See* Exhibit 10, Ratification Decision.

[41] A copy of the shareholder statement, dated December 6, 2013, is appended as Exhibit 38.  A copy of a Reorg Research Notice regarding the Brazil lawsuit, dated December 11, 2013, is appended as Exhibit 39.

52.     A group that represented the majority of the bondholders, entitled "the ad hoc group", closely monitored and supervised OGX's activities over the past three years, and conducted an extensive audit of the OGX Group. After the conversion of the 3rd Series Debentures, which has now been approved by the January 10, 2017 agreement, these bondholders will hold a considerable equity stake in OGX, as provided for in its Plan.

53.     Just like the other OGX Bondholders, the Plaintiffs could have appeared individually (pursuant to the April 11 Order) and had ample notice of the judicial reorganization (as discussed in paragraphs 30-45, above), but they did not. Instead, as is customary under the BRBL, Plaintiffs were represented in the reorganization proceeding by the Trustee of the bonds, which was Deutsche Bank Trust Company Americas, according to the decision rendered by the reorganization court in April, 11, 2014, mentioned above. Deutsche Bank was not present at the general meetings of creditors of the OGX Group, and did not object to or reserve any rights in connection with the discharge provisions.

54.     We do not have knowledge of any annulment proceeding brought by Plaintiffs to pursue judicial declaration for the annulment of the discharge granted in the Reorganization Plans of the OGX Group.

## VERIFICATION

UNDER PENALTIES OF PERJURY OF THE LAWS OF FLORIDA, PURSUANT TO SECTION 92.525, FLORIDA STATUTES, AND THE UNITED STATES, I DECLARE THAT I HAVE READ THE FOREGOING DECLARATION AND THAT THE FACTS STATED HEREIN ARE TRUE AND CORRECT.

Executed in Rio de Janeiro, Brazil, this 5 day of April, 2017.

_____
Marcelo Lamego Carpenter

13

# Exhibit 1

[Handwritten] 3990-3-1-P-1

ESCRITÓRIO DE ADVOCACIA

SERGIO BERMUDES

TO THE HONORABLE JUDGE OF THE ___ BUSINESS COURT OF THE JUDICIAL DISTRICT OF RIO DE JANEIRO

**GRERJ No. 01426931504-79**

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A. ("OGX PARTICIPAÇÕES"), a publicly traded company, CNPJ/MF [Registry of Corporations/Ministry of Finance] No. 07.957.093/0001-96; OGX PETRÓLEO E GÁS S.A. ("OGX PETRÓLEO E GÁS"), a private company, CNPJ/MF No. 08.926.302/0001-05, both established in this city at Praça Mahatma Gandhi No. 14; OGX INTERNATIONAL GMBH ("OGX INTERNATIONAL"), formed under the laws of the Republic of Austria, registered in the Business Court of Vienna under no. FN 335513 b, and headquartered in Schwarzenbergplatz 5/Top Nr. 2/3, 1030, Vienna; and OGX AUSTRIA GMBH ("OGX AUSTRIA"), formed under the laws of the Republic of Austria, registered in the Business Court of Vienna under no. FN 335512 a, CNPJ/MF No. 16.885.474-0001-06, and headquartered in Schwarzenbergplatz 5/Top Nr. 2/3, 1030, Vienna, apppear through their undersigned attorneys (Documents 1-4), based on Articles 47 and 48 of Law No. 11.101 of February 9, 2005, to file a judicial recovery, pursuant to the following terms:

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbermudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbermudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbermudes@sbadv.com.br

ESCRITÓRIO DE ADVOCACIA
SERGIO BERMUDES

SERGIO BERMUDES
MARCIO VIEIRA SOUTO COSTA FERREIRA
MARCELO FONTES
ALEXANDRE SIGMARINGA SEIXAS
GUILHERME VALDETARO MATHIAS
ROGERIO SARDINHA JUNIOR
MARCELO LANDIM CARPENTER
ANTONIO CARLOS VELLOSO FILHO
FABIANO ROBALINHO CAVALCANTI
MARIA AUGUSTA SALDANHA
MARCO ARRUDA DE ALMEIDA ALVES
ERIC CIRANHE FENDI
VITOR FERREIRA ALVES DE BRITO
ANDRÉ SILVEIRA
ROGERIO TANNURI
FEDERICO FERREIRA
ANTONELLA MARQUES CONSENTINO
MARCELO GONÇALVES
EDUARDO SILVA MACHADO
RICARDO BINGEIRA DE ANDRADE
ANDRÉ TORRES
CAROLINA CARDOSO FRANCISCO
MARIANNA FUX
ANDRÉ CRUZ HENRIQUES MARTINS
PHILIP FELDCHER CHAGAS

LUIZ FELIPE FREIRE LISBOA
PEDRO PAULO DE BARROS BARRETO
WILSON PIMENTEL
RICARDO LORETTI HENRICI
JAIME HENRIQUE PORTELLY SEGRO
GENESA RIBEIRO VENÂNCIO
MARCELO BORIA VERGA
ADILSON VIEIRA MACABU FILHO
CAETANO BERLINGIERI
RAFAEL PERFEITO SOARES
ANA PAULA DE PAULA
ALEXANDRE FONSECA
PEDRO HENRIQUE CARNEIRO
RAFAELA FUXI
GASPER LOS
LOUIS DE CASTRO
HENRIQUE ÁVILA
RENATO REISENER BENEDICTI
DIEGO BARBOSA CAMPOS
ALESSANDRA MARINI
MARIANA ARRUDA DE SOUZA
DANIEL CEMOUR DE MIRANDA
PEDRO HENRIQUE NUNES
GABRIEL DE OLIVEIRA E BRAGANÇA
LUIZA LOURENÇO BRANCHIA

GABRIEL PEIXOTO POREAO
GIORDANI FEITOSA LIMA MENDES
FLÁVIO JARDIM
GUILHERME COELHO
ANA LUIZA CORPORATTI
LÍVIA BETA
LÍVIA SAAD
JULLIANA VENIRZ
AYLAN BARCELLOS L. DE OLIVEIRA
PABLO BONALLO
RENATO CALDEIRA GRAVA BRAZIL
VICTOR NABLE REFAN LASSA
GUILHERME HIGUERPA PITTA
LUIZA FERREIRA BARFOLO
JOÃO ZACCHARIAL DE SÁ
SERGIO SANTOS DO NASCIMENTO
GIOVANNA MASSIARI
ULAVO RIBRA
MATHEUS PINTO DE ALMEIDA
FERNANDO NEVES
LUIS TOBIAS ALVES DE ANDRADE
MARCOS MARES GUIZ
ROBERTA HARING SAITO
ANTONIE DE ARAGÃO LIMA
GUSTAVO FROEDEDO GOGHEINI

ANA LUIZA BAZÁRIA BARREDO
PAULA MELLO
RAFAEL MOCARZEL
CORRADO RACHIBETTI
UBIRA DEN MARTINS
THAIS VASCONCELLOS DE SÁ
BRUNO FARRRA
FABIO MARCHIONE PRIM DS

CONSULTORES
ARNDO MARTINS DE ALMEIDA (FPI)
HELIO CARPENTA GOBICH (1925-20)
SALVADORE CRUZZO VELLOSO PINTO
JORGE FERNANDO LORETTI
SILENA CARDINE
CAIO LUIZ DE ALMEIDA VIEIRA DE
PEDRO MARINHO NUNES

TO THE HONORABLE JUDGE OF LAW OF THE ___ BUSINESS COURT OF THE JUDICIAL DISTRICT OF RIO DE JANEIRO

**GRERJ No. 01426931504-79**

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A. ("OGX PARTICIPAÇÕES"), a publicly traded company, CNPJ/MF No. 07.957.093/0001-96; OGX PETRÓLEO E GÁS S.A. ("OGX PETRÓLEO E GÁS"), a private company, CNPJ/MF No. 08.926.302/0001-05, both established in this city at Praça Mahatma Gandhi No. 14; OGX INTERNATIONAL GMBH ("OGX INTERNATIONAL"), formed under the laws of the Republic of Austria, registered in the Business Court of Vienna under no. FN 335513 b, and headquartered in Schwarzenbergplatz 5/Top Nr. 2/3, 1030, Vienna; and OGX AUSTRIA GMBH ("OGX AUSTRIA"), formed under the laws of the Republic of Austria, registered in the Business Court of Vienna under no. FN 335512 a, CNPJ/MF No. 16.885.474-0001-06, and headquartered in Schwarzenbergplatz 5/Top Nr. 2/3, 1030, Vienna, apppear through their undersigned attorneys (Documents 1-4), based on Articles 47 and 48 of Law No. 11.101 of February 9, 2005, to file a judicial recovery, pursuant to the following terms:

www.sbadv.com.br
Praça XV de Novembro, 20 - 7° e 8° andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbermudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5° e 6° andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbermudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbermudes@sbadv.com.br

3

## NECESSARY JOINT LITIGANT

1.      The first plaintiff, OGX PARTICIPAÇÕES, the non-operational holding company, is the controller of the second plaintiff, holding 99.99% of its capital, which in turn has the purpose of exploration and production of oil and natural gas. The first plaintiff also directly controls the third plaintiff, OGX INTERNATIONAL, and this company in turn controls the fourth plaintiff, OGX AUSTRIA.

2.      The plaintiffs are all, therefore, members of the OGX economic group, acting in an interconnected and concerted manner.

3.      OGX PARTICIPAÇÕES, a publicly traded company listed on the New Market of the BM&F BOVESPA, is the group's controller. OGX INTERNATIONAL and OGX AUSTRIA are branches of the group abroad. These companies do not perform any autonomous operating activity. They are mere vehicles of the Brazilian controlling company that issue debt and receive revenues abroad, with the purpose of financing the group for its activities undertaken in Brazil. To do this, OGX PARTICIPAÇÕES is a joint guarantor and borrower of the debts assumed by OGX AUSTRIA. In summary, OGX INTERNATIONAL and OGX AUSTRIA do not have autonomy; to the contrary, all decisions are made by the controlling company, whose activities are in Brazil.

4.      It is undisputed, therefore, that the plaintiffs have their principal establishment (Article 3, Law No. 11.101/2005 – "LFR"), or its main center of interests, in Brazilian territory, more specifically, in the city of Rio de Janeiro, which functions as the headquarters for the economic group.

5.      The presence of all of the claimants in the role of plaintiff is therefore necessary. In this case, the joint litigant is indispensable for ensuring the efficacy of recovery of the plaintiffs,

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

safeguarding the jurisdiction and effectiveness of the universal Brazilian court.

6.      As will be seen, a combination of factors occurred in the development of OGX Group, leading to the economic and financial crisis that it is dealing with today. This judicial recovery may, however, ensure that this crisis is overcome, in order to preserve the source of production, the employment of workers, and the interest of creditors, thus preserving the company, its social function, and stimulation of economic activity (Article 47, LFR). This is what will be covered in the next sections.


OVERARCHING NEED

7.      Created in 2007, over the last six years OGX Group has carried out oil and gas exploration in Brazil, in the Basins of Campos, Santos, Espírito Santo, Parnaíba and Pará-Maranhão. Unpublished seismic data was acquired, and more than 120 wells were drilled. From 2010 to 2012, the group mobilized a group of ten drilling rigs, operating in parallel, which made it possible to run a large-scale exploratory campaign. As a product of this campaign, it was possible to explore areas that had not been prioritized in the country, creating the by-product of an important collection of geological information for sector management by Agência Nacional do Petróleo - ANP [National Oil Agency], which recognizes the relevant services provided by OGX Group. Since its creation, OGX has invested more than R$ 10 billion in its activities in Brazil, which amount makes it the highest-investing private company in the country in its segment.

8.      A promisor for almost its entire existence, OGX Group, which obviously engages in a risky activity, was beset by adverse factors that are pertinent to its corporate purpose. Although the

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

exploration that was undertaken has been favorable because of the discovery of oil in different fields, the hoped-for production proved to be commercially unviable in some of them, for reasons that cannot be understood without explaining some technical expressions.

9.      The Group's activities are performed in various blocks granted by the government of Brazil. The production of some of those blocks was insufficient or not economical, while in others oil and gas was extracted at the expected levels. Thus, the production did not produce the results that would have been attained if it had been possible to extract the volumes whose existence was indicated by the preliminary investigations from all of the wells.

10.      In an attempt to summarize something that is complex, the initial projection, which pointed to a favorable result, did not come to pass. At the end of the day, the oil that was economically recoverable in some of the fields did not even remotely approximate the projections from the exploration phase.

11.      The fact that many wells did not have the quantity of oil necessary to make them productive had negative repercussions on the Group's revenues, and consequently on its ability to honor the financial obligations it had assumed under the terms originally contracted, which will be shown in great detail, and as necessary, throughout this proceeding.

12.      Furthermore, there were expenses, and acquisitions of goods and services to open the wells which later proved to be commercially unviable, or that severely comprised administration of the company's financial flow.

13.      However, it should be noted and emphasized that the favorable exploration in the oil and gas wells allows the Group to attain its objectives. The Group simply lacks an opportunity that will allow it to overcome this momentary economic and financial crisis,

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9091 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbernardes@sbadv.com.br

thus ensuring its place as a production source that creates jobs, spreads risks, expands the job market, and pays taxes.

14.     The applicants are pioneers in developing their area of business, thanks to corporate tenacity, transparency, to the innovative initiatives that Mr. Eike Batista, always acclaimed for his success, courageously took. Today, he is being attributed with a lack of success arising from geological facts, for which he is not even remotely responsible.

15.     Notwithstanding the damage recently suffered by the plaintiffs, which has led them to file for specific legal protection, the existence of high-value assets, accumulated in companies formed by professionals with recognized abilities, indicate the conviction that the plaintiffs will recover and reassume the path to success, in the best interest of everyone who is in their sphere.


EXTREMELY HIGH-RISK ACTIVITY

16.     The prospect of listing the shares of OGX PARTICIPAÇÕES highlighted the truth that the market has always known: oil and natural gas exploration requires massive investments and involves high risk.

17.     No one knows the amount of oil and gas that will be found at the source of these elements. No matter how advanced the technology is, reserves are estimated using geological and engineering data, which data is, invariably, projected. It may also happen that while the raw material is there, the market does not have at its disposal the means to extract it, whether this is due to a lack of technology, or because it is economically unsound.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail: rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail: spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail: dfbernardes@sbadv.com.br

7

PRECAUTIONARY NOTICE

18.      For this reason all of the communications, relevant facts and other information provided to the market always had a long warning regarding the potential risks related to its businesses. OGX PETRÓLEO E GÁS expressly warned that its activities "...are subject to a series of material risks, uncertainties and assumptions..." also stating "...that various important factors may cause actual results to materially diverge from the plans, objectives, expectations, estimates and intentions stated..." (Document 5).

19.      It also stated in the first Reference Form of OGX PARTICIPAÇÕES, registered with the CVM [Brazilian Securities and Exchange Commission], and released to the stock market, the warning that prospecting for oil could be beyond its means, as it is an uncertain undertaking subject to unknown circumstances:

> "To estimate oil and natural gas reserves is something that is complex and imprecise. The company's Potential Resources are estimated by using geological and engineering data to determine a reasonable degree of uncertainty if the oil or natural gas in potential accumulations is recoverable, considering the existing economic and operational conditions. There are uncertainties in the estimates of the quantities of potential resources of oil and natural gas relative to the current prices of oil and natural gas applicable to their projected production, which might cause the Company to make revisions to its current estimates of Potential Resources. A risk inherent to the estimated potential resources is the possibility that no well will be considered as an economically viable potential resource.

> This possibility of not finding reserves is intrinsic to the Company's portfolio. Revisions to its projections that indicate a reduction in its estimates of potential resources may, in the future, cause a reduction in the forecasted levels of projections, which could have a material adverse effect on the results of the Company's operations and on its financial situation. (Document 6 – emphasis ours)."

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbernardes@sbadv.com.br

20.       As you can see, the warnings presented above and other similar warnings show the risks of failure to which the plaintiffs were subject, which risks, unfortunately, ended up happening in some of its fields.

<u>PROMISING START</u>

21.       OGX Group initiated its activities in the oil and natural gas sector in June 2007, at the time hiring renowned executives in the market, the majority of them occupying very high positions at Petrobras and other important companies in the sector.

22.       Nearly six months after the start of its operations, OGX PARTICIPAÇÕES made a successful placement of private shares (<u>private placement</u>), raising US$ 1.3 billion with institutional investors, which capital allowed it to assume a high position in the 9th Bidding Round of Agência Nacional de Petróleo – (ANP).

23.       To have an idea of the relevance of its participation, of the R$ 2.1 billion paid in that round, OGX PETRÓLEO E GÁS was responsible for placing R$ 1.6 billion into the public coffers, acquiring the concession rights for 21 exploratory blocks in the basins of Santos, Campos, Espírito Santo and Pará-Maranhão.

24.       In March 2008, OGX acquired another 50% in another exploratory block in the Santos Basin, totaling 6.8 thousand km$^2$ of ocean area to explore.

25.   The fantastic projections regarding the volume of oil discovered, duly based on the estimates by independent specialized companies, animated the search for capital to finance its exploratory phase, and led OGX PARTICIPAÇÕES to make its public stock offering (IPO) in June 2008. Announced as the largest placement of shares on the Brazilian stock exchange, becoming a publicly traded company resulted in raising financing of nearly R$ 6.7 billion.

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

NEW ACQUISITIONS

26.      After the successful placement of shares, OGX Group, while simultaneously continuing its costly exploration campaigns, in September 2009 acquired a 70% stake in 7 (seven) exploratory land blocks in the Parnaíba Basin in Maranhão, with Petra Energia holding the remaining 30%.[1]

27.      In March 2011, OGX PARTICIPAÇÕES also acquired five exploratory blocks in three land basins in Colombia: Cesar-Ranchería, Vale Inferior do Madalena, and Vale do Médio Madalena. The five purchased blocks are in different stages of maturity and show relevant exploratory potential. Later, OGX PETRÓLEO E GÁS purchased another exploratory block in Colombia, in Vale Inferior do Madalena basin.

28.      In addition, OGX PETRÓLEO E GÁS became the owner of (a) an additional 20% in Blocks BM-C-37 and BM-C-38, located in the Campos Basin, also assuming responsibility for their operation, and (b) a 40% stake in the concession of Block BS-4, located in the Santos Basin.[2]

29.  As a result of the 11th Round of ANP Bidding, which took place in May of this year, OGX PETRÓLEO E GÁS now holds a stake in another four exploratory blocks, which it acquired in a partnership with ExxonMobil, Total E&P, and Queiroz Galvão Exploração e Produção.

---

[1] In January 2010, the stake in the blocks located in Maranhão was integrated into the capital of OGX MARANHÃO PETRÓLEO E GÁS LTDA. ("OGX Maranhão"), in which the first plaintiff holds 66.67% of the corporate capital, in a partnership with Eneva Energia S.A.

[2] In BS-4, in addition to OGX PETRÓLEO E GÁS, the partners are Queiroz Galvão Exploração e Produção S.A., and Barra Energia do Brasil Petróleo e Gás Ltda., each with 30% of the remaining stake.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail rjbermudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail spbermudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail dfbermudes@sbadv.com.br

30.       All of these facts show that throughout its existence, the plaintiffs managed to form significant capital, which will certainly allow them to continue with their activities at the end of this recovery proceeding.


<u>FRUSTRATED EXPECTATIONS</u>

31.       After carrying out the largest private exploratory campaign in Brazil's history, with investments on the order of R$ 10 billion, with obvious importance for the country's development – resulting, among other benefits, in the creation of jobs, circulation of wealth and in payment of taxes – the plaintiffs began their production activities.

32.       To put its business plan into practice, it became necessary to obtain new funds. Therefore, in June 2011, OGX PARTICIPAÇÕES issued bonds abroad in the total amount of US$ 2.563 billion. The obligation for those securities was transferred to the fourth plaintiff, OGX Austria, thus OGX Participações became the joint co-debtor. Later, in April 2012, new securities were issued in the amount of US$ 1.063 billion, for a total debt with these international bondholders of approximately US$ 3.6 billion.

33.       Those funds were necessary to pick up the commercial production that was about to begin. In that bond issuance, OGX PARTICIPAÇÕES, the first plaintiff, became the co-obligor for payment of debts of the subsidiary OGX AUSTRIA.

34.       The first field that was economically explored was Tubarão Azul, at the end of 2009. Its initial production was quite positive, but with the passage of time it started to present accentuated declining numbers.

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernudes@sbadv.com.br

35.      The behavior of the producing wells in Tubarão Azul, as well as the reprocessing and reinterpretation of the geological data in that area, showed not only the production difficulties at Tubarão Azul, but other nearby accumulations. In light of this frustrating scenario, OGX Group decided to verify to what degree the low productivity would affect the economic development of the Tubarão Tigre, Tubarão Areia and Tubarão Gato fields, as well as the new perspectives for production in the Tubarão Azul field.

36.      It is not necessary to say that the Group – always with the guidance of technicians with vast experience in the oil industry – exerted every effort with the firm goal of developing those four fields. For each difficulty they encountered during the exploration phase, they sought out technological solutions to make oil production in those areas economically viable.

37.      Despite their efforts, however, it was concluded that as of now there is no technology capable of making any additional investment in the Tubarão Azul field economically viable, which circumstance repeated in the development of the Tubarão Gato, Tigre and Areia fields.

38.      The headwinds faced in the Tubarão Azul field, in and of itself, represented a loss to the plaintiffs of approximately R$ 1,929,471,000.00 (one billion, nine hundred and twenty-nine million, four hundred and seventy-one thousand *reais*). In addition to these losses, the investments lost in the Tubarão Areia wells, in the amount of R$ 718,486,000.00 (seven hundred and eighteen million, four hundred and eighty-six thousand *reais*), as well as the expenditures in the Tubarão Tigre and Tubarão Gato fields, which together added up to an additional loss of R$ 996,566,000.00 (nine hundred and ninety-six million, five hundred and sixty-six thousand *reais*).

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail: rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail: spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail: dfbernardes@sbadv.com.br

GLARING NEED

39.      The facts narrated here negatively affected the financial flow of OGX Group, which, therefore, needs to restructure its debts in order to allow the exploration and development of the existing assets, which are many and relevant.

40.      Deprived of the revenues that should have come from commercial production of the fields listed, the plaintiffs, although viable, need to restructure their liabilities, which today are basically comprised of obligations contracted with bondholders and suppliers, while there is no bank debt or credits with real guarantees whatsoever.

NO LABOR OR TAX LIABILITIES

41.      Regarding labor liabilities, it is noted that the plaintiffs never delayed payment of salaries and pertinent obligations. The labor lawsuits under way today are not material (Documents 38-39).

42.      The plaintiffs further state that their taxes are paid, and there are no debts with the Federal Treasury and with the States and Municipalities where they perform their activities.

TOTAL LIABILITIES

43.      In summary, the total amount of the plaintiffs' debt today is nearly R$ 11.2 billion.

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0440 - e-mail:dfbernardes@sbadv.com.br

FORGOTTEN TRUTHS

44.      The debt of the plaintiffs is, unquestionably, a large amount. However, the assets they have, added to the high-lever expertise and work capacity of their employees, ensure an uptick in their business.

45.      At this time in which the newspapers release negative facts and versions against the plaintiffs on an almost-daily basis, we urge you to remember some other facts that are sometimes callously forgotten, but that show the vigor and production capacity of OGX Group:

      a)   OGX PETRÓLEO E GÁS developed the largest private exploration campaign in the history of Brazil, with more than 120 exploratory wells drilled, without any environmental accidents;

      b)   OGX PETRÓLEO E GÁS has always had a strict commitment to the sustainable development of the country, investing millions in social projects. Among the activities carried out in this area are: (a) its fundamental support in the UPP Project (Pacification Police Units), which revolutionized the city of Rio de Janeiro, unwinding the control of drug traffickers in the poorer communities of Rio de Janeiro; (b) sponsorship of the Morhan Project (Movement to reintegrate people affected by Leprosy), a silent disease that affects a part of the population, without any public policies for its control; and (c) support for the integrated territorial development plan for 10 municipalities in Bacia do Parnaíba, in order to spark development in one of the poorest areas of the country, with a balance between economic growth of the region and the creation of social benefits, with respect for the local culture and the environment;

      c)   With extraction of its first oil in January 2012, only 25 months after its discovery in the Campos Basin, OGX PETRÓLEO E GÁS showed unparalleled operating competence;

      d)   The Tubarão Azul field has already yielded more than 4.3 million barrels of oil to the company,

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

14

> guaranteeing OGX PETRÓLEO E GÁS a position among the five largest oil producers in Brazil;
>
> e) With the opening of well OGX 26, the company became the first private Brazilian operator to produce oil offshore;
>
> f) OGX PETRÓLEO E GÁS obtained the license of "Operator A" from ANP, which gives it the prerogative to operate in any onshore and offshore environment in Brazil, including in ultra-deep waters and pre-salt;
>
> g) OGX Petróleo, through its unit located in Maranhão, became the largest private producer of gas in Brazil.

LOOKING TOWARDS THE FUTURE

46.     Even before this lawsuit was filed, the plaintiffs had already started a vigorous economic and financial restructuring program, certain that they will be successful in showing their creditors the enormous benefits that will result from restructuring their debt, in comparison with the undesirable scenario of bankruptcy, which would necessarily mean the termination of concessions, and consequently the complete loss of the amounts invested.

47.     The plaintiffs are, without a doubt, productive and self-sustaining. Holders of valuable assets, they have a prosperous future ahead of them.

48.     It is very obvious that the restructuring of a company involves sacrifices. The petitioners will therefore drastically reduce their administrative expenses.

49.     Likewise, OGX PETRÓLEO E GÁS restricted its operating expenses, dispensing with some of its providers and renegotiating the contractual bases of others. The plaintiffs were obviously required to suspend the incentives directed towards social, sporting and cultural programs.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernades@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbernardes@sbadv.com.br

50.      Once the debt is restructured and its capital structure adapted, OGX Group will have a prosperous future, capable of creating wealth for its shareholders, workers, creditors and for Brazilian society as a whole.

51.      This confidence comes, among other things, from the fact that OGX Group is on the verge of initiating oil production in the Tubarão Martelo field. It took five years of significant investments and efforts to reach the moment when platform OSX-3 would be installed in the field, allowing production to begin. This will occur in the coming weeks, which will provide a substantial flow of new revenues to OGX Group.

52.      There is complete confidence regarding the viability of the Tubarão Martelo field by virtue of the countless studies done. Note the recent evaluation, prepared by the internationally renowned company DeGolyer and MacNaughton (Document 7), with respect to the reserves in Tubarão Martelo. According to the evaluation of DeGolyer and MacNaughton, the reserves at Tubarão Martelo may provide revenues on the order of US$ 11 billion, showing its complete economic and financial viability. That report, given the responsibility of the evaluator and the fact that the report was prepared at the height of the crisis of OGX Group, undoubtedly used conservative assumptions. Thus the management of OGX Group is confident that the results of exploration may be even more auspicious.

53.      In addition to the Tubarão Martelo field, OGX Group owns another valuable asset that is in the development phase: field BS-4, whose reserves were recently evaluated by the independent certifier with recognized skill, GAFFNEY CLINE & Associates. The mentioned certification, dated September 2013, pointed out, in a scenario of probable reserves, creation of approximately US$ 6.2 billion in revenues.

www.sbadv.com.br

Praça XV de Novembro, 20 - 7° e 8° andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5° e 6° andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

54.       You can see that the plaintiffs have numerous reasons to believe in an amply favorable result in this judicial recovery proceeding, so that it will be able to act in the interests of its shareholders, workers, creditors and Brazilian society as a whole, given the unequalled strategic value of the activity of oil and gas exploration.

REQUIREMENTS COMPLIED WITH

55.       The plaintiffs have complied, one by one, with the requirements of Article 48 of Law 11.101, noting that: (a) they have performed their activities regularly for more than two years; (b) they did not go bankrupt nor were they declared bankrupt; (c) they never requested any type of recovery, much less based on the special plan alluded to in Section III of Article 48 of the Federal Constitution; and (d) none of them have even been condemned criminally.

56.       In compliance with Article 51 of the law, the plaintiffs are filing this initial petition with the following documents:

       a)   Financial statements for fiscal years 2010, 2011 and 2012 for all four plaintiffs, accompanied, in the case of the first plaintiff, OGX PARTICIPAÇÕES – as it is a publicly traded company – by an opinion from independent auditors (Documents 8-19);

       b)   Financial statements as at June 30, 2013, presented for all for plaintiffs at this time, especially in order to comply with this request (Documents 20-23);

       c)   A complete nominal list of the plaintiffs' creditors, indicating their respective addresses, type, classification and actualized value of each credit (Document 24);

www.sbadv.com.br

Praça XV de Novembro, 20 - 7° e 8° andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail: rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5° e 6° andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail: spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail: dfbernardes@sbadv.com.br

d)    Complete list of the petitioners' employees, indicating their position, salary, and amounts that might be pending payment (Document 25);

e)    Corporate by-laws of each petitioner, accompanied by the minutes electing members of the Board of Directors of the first petitioner, as well as the Board of each petitioner (Documents 26-29);

f)    Lists of individual assets of the petitioners' administrators and their controlling shareholder, Centennial Asset Mining Fund LLC;

g)    Statements from the principal bank accounts of the petitioners (Documents 30-33);

h)    Certifications from notary public offices for registration of deeds and documents in the city of Rio de Janeiro, where they are headquartered, as well as those locations where their branches are located (Documents 34-37); and

i)    A list of all lawsuits in which the plaintiffs are included as parties (Documents 38-39).

57.    As you can see, the legal requirements that authorize grant of judicial recovery that is requested here and now have been complied with.

58.    Pursuant to Article 122, sole paragraph of Law No. 6404/76 (Law of Corporations), the petitioners file this petition with the documents that show that all the authorizations necessary to file the request for judicial recovery have been obtained, which must be ratified subsequently in a General Extraordinary Shareholders Meeting. They request addition of the minutes from the Shareholders Meeting that ratify presentation of this request, which will be convoked in a timely manner.

PRESERVATION OF CONFIDENTIALITY

59.    In compliance with the legal mandate, the petitioners consensually obtained from all of their administrators, a list of their personal assets, as required by Article 51(VI) of Law No.

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

11.101/05, with the commitment that legal silence was required of them, backed, among other rights, in the constitutional guarantee of inviolability of private life (Federal Constitution, Article 5(X)). Thus, to prevent undue and unnecessary violation of the confidentiality of this information, they will present these documents in an autonomous petition, requesting that Your Honor see fit to order their registration in a Notary Public Office, and that they may only be copied or accessed in any way by a founded request, and with prior and express authorization from this Court, first hearing the plaintiffs and the Public Prosecutor.


<u>REQUESTS</u>

60.      Having stated the foregoing, the plaintiffs trust that Your Honor will grant the judicial recovery proceeding filed here, and as provided in Article 52 of Law No. 11.101 of February 9, 2005, name the judicial administrator, order waiver of presentation of negative certifications so that they can perform their activities, order the suspension of all lawsuits and enforcements against them as per Article 6 of the same law, and order the Public Prosecutor to be summoned, and communicate the summons by letter to the Federal Public Treasury of all states and municipalities in which they have an establishment, as well as issuance of the tender document mentioned in §1 of Article 52, aware that they must present monthly statements as long as this lawsuit continues. The request is also reiterated for confidential treatment and registration in a Notary Public Office of the list of its administrators' personal assets, *ex vi* of Article 51(VI) of Law No. 11.101/05.

61.      The plaintiffs state that their attorneys receive notifications in this city at the address in the letterhead.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

62.   Assigning the cause the value of R$ 10,000,000.00 (ten million *reais*), the plaintiffs request, due to the gravity of the facts explained herein, urgent distribution of this proceeding to one of the Business Courts in the Judicial District of this Capital City.


Permission is requested
According to these terms.
Rio de Janeiro, October 30, 2013

[Signature]                          [Signature]
Sergio Bermudes                      Marcio Vieira Souto Costa Ferreira
Brazilian Bar Association            Brazilian Bar Association
Rio de Janeiro 17.587                Rio de Janeiro 59.384

[Signature]                          [Signature]
Marcelo Fontes                       Marcelo Lamego Carpenter
Brazilian Bar Association            Brazilian Bar Association
Rio de Janeiro 63.975                Rio de Janeiro 92.518

[Signature]                          [Signature]
Fabiano Robalinho Cavalcanti         Maria Salgado
Brazilian Bar Association            Brazilian Bar Association
Rio de Janeiro 95.237                Rio de Janeiro 96.637

[Signature]                          [Signature]
Caetano Berenguer                    Thais Vasconcellos de Sá
Brazilian Bar Association            Brazilian Bar Association
Rio de Janeiro 135.124               Rio de Janeiro 178.816

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbermudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbermudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbermudes@sbadv.com.br



STATE of NEW YORK        )
                         )          ss:
COUNTY of NEW YORK       )

### CERTIFICATE OF ACCURACY

This is to certify that the attached document, *"Exhibit 1 - Request for Reorganization"* originally written in *Portuguese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: March 30, 2017

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
_30th_ day of _March_ ,
2017.

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires December 4, 2018

Your
legal
translation
partner

[Handwritten] 3990-3-1-P-1

ESCRITÓRIO DE ADVOCACIA
SERGIO BERMUDES

TO THE HONORABLE JUDGE OF THE ___ BUSINESS COURT OF THE JUDICIAL DISTRICT OF RIO DE JANEIRO

**GRERJ No. 01426931504-79**

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A. ("OGX PARTICIPAÇÕES"), a publicly traded company, CNPJ/MF [Registry of Corporations/Ministry of Finance] No. 07.957.093/0001-96; OGX PETRÓLEO E GÁS S.A. ("OGX PETRÓLEO E GÁS"), a private company, CNPJ/MF No. 08.926.302/0001-05, both established in this city at Praça Mahatma Gandhi No. 14; OGX INTERNATIONAL GMBH ("OGX INTERNATIONAL"), formed under the laws of the Republic of Austria, registered in the Business Court of Vienna under no. FN 335513 b, and headquartered in Schwarzenbergplatz 5/Top Nr. 2/3, 1030, Vienna; and OGX AUSTRIA GMBH ("OGX AUSTRIA"), formed under the laws of the Republic of Austria, registered in the Business Court of Vienna under no. FN 335512 a, CNPJ/MF No. 16.885.474-0001-06, and headquartered in Schwarzenbergplatz 5/Top Nr. 2/3, 1030, Vienna, apppear through their undersigned attorneys (Documents 1-4), based on Articles 47 and 48 of Law No. 11.101 of February 9, 2005, to file a judicial recovery, pursuant to the following terms:

ESCRITÓRIO DE ADVOCACIA
S E R G I O   B E R M U D E S

SERGIO BERMUDES
MARCIO VIEIRA SOUTO COSTA FERREIRA
MARCELO FONTES
ALEXANDRE SIGMARINGA SEIXAS
GUILHERME VALDETARO MATHIAS
ROGERIO SARDINHA JUNIOR
MARCELO LANDIM CARPENTER
ANTONIO CARLOS VELLOSO FILHO
FABIANO ROBALINHO CAVALCANTI
MARIA AZEVEDO SALGADO
MARCO ARRUDA DE ALMEIDA ALVES
ERIC CIRAMBE PENZE
VITOR FERREIRA ALVES DE BRITO
ANDRÉ SEVERIA
ROGERIO TANNURI
FREDERICO FERREIRA
ANTONELLA MARQUES CONSENTINO
MARCELO GONÇALVES
RICARDO SILVA MACHADO
RICARDO BENGHERA DE ANDRADE
ANDRÉ TRIORES
CAROLINA CARDOSO FRANCISCO
MARIANNA FIX
ANDRÉ CHRISTENMANN MARTINS
PHILIP PEIFICKER CHAGAS

LUIZ FELIPE FREIRE LISBOA
PEDRO PAULO DE BARROS BARRETO
WILSON PIMENTEL
RICARDO LORETTI HENRICI
JAIME HENRIQUE PORCIAU SEEID
GENESA RIBEIRO VENANCIO
MARCELO BORBA VERÇA
ADILSON VIEIRA MACABU FILHO
GASTÃO BERINGHER
RAFAEL DIRICIO SOARES
ANA PAULA DE PAULA
ALEXANDRE FONSECA
PEDRO HENRIQUE CAROLINO
RAFAELA FOXU
GASPER LOS
LOUIS DE CASTRO
HENRIQUE ÁVILA
RENATO RESENDE BENEDICT
DIEGO BARBOSA CAMPOS
ALESSANDRA MARINI
MARIANA ARRUDA DE SOUZA
DANIEL CHERER DE MIRANDA
PEDRO HENRIQUE NUNES
GABRIEL DE OLIVEIRA E BRAGANÇA
LARA LOURENÇO RANCHISI

GABRIEL PEDRO PORCARO
GUIOMAR FEITOSA LIMA MENDES
FLÁVIO JARRED
GUILHERME COELHO
ANA LARA CORPORATTI
LIVIA REIS
LIVIA SAAD
JULIANA CESAR
ALLAN BARCELLOS L. DE OLIVEIRA
PABLO BONANNI
RENATO CALDEIRA GRAYA BRAZIL
VICTOR NABLE RUFAN LANAS
GUILHERME EGUBEPA PITTA
LARA FERREIRA BARFORO
JOÃO ZACHARIAS DE SÁ
SERGIO SANTOS DO NASCIMENTO
GIOVANNA MASSARI
ULAVO ROBAA
MATHEUS PINTO DE ALMEIDA
FERNANDO NEVES
LUIS TOBIAS ALVES DE ANDRADE
MARCOS MARES GUIA
ROBERTA RAMOS SAITO
ANTONIA DE ARAGÃO LIMA
GUSTAVO FROSHEDO GACHINI

ANA LUISA HAZENGA BARREDO
PAULA MELLO
RAFAEL MOCARZEL
CORRADO RACCHETTI
UMA DEN MARTINS
THAIS VASCONCELLOS DE SÁ
BRUNO TABRA
FLÁBIO MANCHONO PRINCEE

CONSULTORES
ARLDO MARTINS DE ALMEIDA (PI)
HELIO CARPETIA GOSSEN (1929-20)
SALVADOR CRIZEO VELLOSO PINTO
IRMAE FERNANDO LORETTI
ELENA CARONE
CANO LUIZ DE ALMEIDA VIEIRA DE
PEDRO MARINHO NUNES

TO THE HONORABLE JUDGE OF LAW OF THE ___ BUSINESS COURT OF THE JUDICIAL DISTRICT OF RIO DE JANEIRO

**GRERJ No. 01426931504-79**

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A. ("OGX PARTICIPAÇÕES"), a publicly traded company, CNPJ/MF No. 07.957.093/0001-96; OGX PETRÓLEO E GÁS S.A. ("OGX PETRÓLEO E GÁS"), a private company, CNPJ/MF No. 08.926.302/0001-05, both established in this city at Praça Mahatma Gandhi No. 14; OGX INTERNATIONAL GMBH ("OGX INTERNATIONAL"), formed under the laws of the Republic of Austria, registered in the Business Court of Vienna under no. FN 335513 b, and headquartered in Schwarzenbergplatz 5/Top Nr. 2/3, 1030, Vienna; and OGX AUSTRIA GMBH ("OGX AUSTRIA"), formed under the laws of the Republic of Austria, registered in the Business Court of Vienna under no. FN 335512 a, CNPJ/MF No. 16.885.474-0001-06, and headquartered in Schwarzenbergplatz 5/Top Nr. 2/3, 1030, Vienna, apppear through their undersigned attorneys (Documents 1-4), based on Articles 47 and 48 of Law No. 11.101 of February 9, 2005, to file a judicial recovery, pursuant to the following terms:

www.sbadv.com.br

Praça XV de Novembro, 20 - 7° e 8° andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbermudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5° e 6° andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail:spbermudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbermudes@sbadv.com.br

## NECESSARY JOINT LITIGANT

1.      The first plaintiff, OGX PARTICIPAÇÕES, the non-operational <u>holding</u> company, is the controller of the second plaintiff, holding 99.99% of its capital, which in turn has the purpose of exploration and production of oil and natural gas. The first plaintiff also directly controls the third plaintiff, OGX INTERNATIONAL, and this company in turn controls the fourth plaintiff, OGX AUSTRIA.

2.      The plaintiffs are all, therefore, members of the OGX economic group, acting in an interconnected and concerted manner.

3.      OGX PARTICIPAÇÕES, a publicly traded company listed on the New Market of the BM&F BOVESPA, is the group's controller. OGX INTERNATIONAL and OGX AUSTRIA are branches of the group abroad. These companies do not perform any autonomous operating activity. They are mere vehicles of the Brazilian controlling company that issue debt and receive revenues abroad, with the purpose of financing the group for its activities undertaken in Brazil. To do this, OGX PARTICIPAÇÕES is a joint guarantor and borrower of the debts assumed by OGX AUSTRIA. In summary, OGX INTERNATIONAL and OGX AUSTRIA do not have autonomy; to the contrary, all decisions are made by the controlling company, whose activities are in Brazil.

4.      It is undisputed, therefore, that the plaintiffs have their principal establishment (Article 3, Law No. 11.101/2005 – "LFR"), or its main center of interests, in Brazilian territory, more specifically, in the city of Rio de Janeiro, which functions as the headquarters for the economic group.

5.      The presence of all of the claimants in the role of plaintiff is therefore necessary. In this case, the joint litigant is indispensable for ensuring the efficacy of recovery of the plaintiffs,

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbernardes@sbadv.com.br

safeguarding the jurisdiction and effectiveness of the universal Brazilian court.

6.        As will be seen, a combination of factors occurred in the development of OGX Group, leading to the economic and financial crisis that it is dealing with today. This judicial recovery may, however, ensure that this crisis is overcome, in order to preserve the source of production, the employment of workers, and the interest of creditors, thus preserving the company, its social function, and stimulation of economic activity (Article 47, LFR). This is what will be covered in the next sections.


OVERARCHING NEED

7.        Created in 2007, over the last six years OGX Group has carried out oil and gas exploration in Brazil, in the Basins of Campos, Santos, Espírito Santo, Parnaíba and Pará-Maranhão. Unpublished seismic data was acquired, and more than 120 wells were drilled. From 2010 to 2012, the group mobilized a group of ten drilling rigs, operating in parallel, which made it possible to run a large-scale exploratory campaign. As a product of this campaign, it was possible to explore areas that had not been prioritized in the country, creating the by-product of an important collection of geological information for sector management by Agência Nacional do Petróleo – ANP [National Oil Agency], which recognizes the relevant services provided by OGX Group. Since its creation, OGX has invested more than R$ 10 billion in its activities in Brazil, which amount makes it the highest-investing private company in the country in its segment.

8.        A promisor for almost its entire existence, OGX Group, which obviously engages in a risky activity, was beset by adverse factors that are pertinent to its corporate purpose. Although the

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

exploration that was undertaken has been favorable because of the discovery of oil in different fields, the hoped-for production proved to be commercially unviable in some of them, for reasons that cannot be understood without explaining some technical expressions.

9.      The Group's activities are performed in various blocks granted by the government of Brazil. The production of some of those blocks was insufficient or not economical, while in others oil and gas was extracted at the expected levels. Thus, the production did not produce the results that would have been attained if it had been possible to extract the volumes whose existence was indicated by the preliminary investigations from all of the wells.

10.      In an attempt to summarize something that is complex, the initial projection, which pointed to a favorable result, did not come to pass. At the end of the day, the oil that was economically recoverable in some of the fields did not even remotely approximate the projections from the exploration phase.

11.      The fact that many wells did not have the quantity of oil necessary to make them productive had negative repercussions on the Group's revenues, and consequently on its ability to honor the financial obligations it had assumed under the terms originally contracted, which will be shown in great detail, and as necessary, throughout this proceeding.

12.      Furthermore, there were expenses, and acquisitions of goods and services to open the wells which later proved to be commercially unviable, or that severely comprised administration of the company's financial flow.

13.      However, it should be noted and emphasized that the favorable exploration in the oil and gas wells allows the Group to attain its objectives. The Group simply lacks an opportunity that will allow it to overcome this momentary economic and financial crisis,

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbernardes@sbadv.com.br

thus ensuring its place as a production source that creates jobs, spreads risks, expands the job market, and pays taxes.

14.     The applicants are pioneers in developing their area of business, thanks to corporate tenacity, transparency, to the innovative initiatives that Mr. Eike Batista, always acclaimed for his success, courageously took. Today, he is being attributed with a lack of success arising from geological facts, for which he is not even remotely responsible.

15.     Notwithstanding the damage recently suffered by the plaintiffs, which has led them to file for specific legal protection, the existence of high-value assets, accumulated in companies formed by professionals with recognized abilities, indicate the conviction that the plaintiffs will recover and reassume the path to success, in the best interest of everyone who is in their sphere.


EXTREMELY HIGH-RISK ACTIVITY

16.     The prospect of listing the shares of OGX PARTICIPAÇÕES highlighted the truth that the market has always known: oil and natural gas exploration requires massive investments and involves high risk.

17.     No one knows the amount of oil and gas that will be found at the source of these elements. No matter how advanced the technology is, reserves are estimated using geological and engineering data, which data is, invariably, projected. It may also happen that while the raw material is there, the market does not have at its disposal the means to extract it, whether this is due to a lack of technology, or because it is economically unsound.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7° e 8° andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5° e 6° andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

7

PRECAUTIONARY NOTICE

18.      For this reason all of the communications, relevant facts and other information provided to the market always had a long warning regarding the potential risks related to its businesses. OGX PETRÓLEO E GÁS expressly warned that its activities "...are subject to a series of material risks, uncertainties and assumptions..." also stating "...that various important factors may cause actual results to materially diverge from the plans, objectives, expectations, estimates and intentions stated..." (Document 5).

19.      It also stated in the first Reference Form of OGX PARTICIPAÇÕES, registered with the CVM [Brazilian Securities and Exchange Commission], and released to the stock market, the warning that prospecting for oil could be beyond its means, as it is an uncertain undertaking subject to unknown circumstances:

> "To estimate oil and natural gas reserves is something that is complex and imprecise. The company's Potential Resources are estimated by using geological and engineering data to determine a reasonable degree of uncertainty if the oil or natural gas in potential accumulations is recoverable, considering the existing economic and operational conditions. There are uncertainties in the estimates of the quantities of potential resources of oil and natural gas relative to the current prices of oil and natural gas applicable to their projected production, which might cause the Company to make revisions to its current estimates of Potential Resources. A risk inherent to the estimated potential resources is the possibility that no well will be considered as an economically viable potential resource.

> This possibility of not finding reserves is intrinsic to the Company's portfolio. Revisions to its projections that indicate a reduction in its estimates of potential resources may, in the future, cause a reduction in the forecasted levels of projections, which could have a material adverse effect on the results of the Company's operations and on its financial situation. (Document 6 – emphasis ours)."

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

20.       As you can see, the warnings presented above and other similar warnings show the risks of failure to which the plaintiffs were subject, which risks, unfortunately, ended up happening in some of its fields.

<div align="center">PROMISING START</div>

21.       OGX Group initiated its activities in the oil and natural gas sector in June 2007, at the time hiring renowned executives in the market, the majority of them occupying very high positions at Petrobras and other important companies in the sector.

22.       Nearly six months after the start of its operations, OGX PARTICIPAÇÕES made a successful placement of private shares (private placement), raising US$ 1.3 billion with institutional investors, which capital allowed it to assume a high position in the 9th Bidding Round of Agência Nacional de Petróleo – (ANP).

23.       To have an idea of the relevance of its participation, of the R$ 2.1 billion paid in that round, OGX PETRÓLEO E GÁS was responsible for placing R$ 1.6 billion into the public coffers, acquiring the concession rights for 21 exploratory blocks in the basins of Santos, Campos, Espírito Santo and Pará-Maranhão.

24.       In March 2008, OGX acquired another 50% in another exploratory block in the Santos Basin, totaling 6.8 thousand $km^2$ of ocean area to explore.

25.   The fantastic projections regarding the volume of oil discovered, duly based on the estimates by independent specialized companies, animated the search for capital to finance its exploratory phase, and led OGX PARTICIPAÇÕES to make its public stock offering (IPO) in June 2008. Announced as the largest placement of shares on the Brazilian stock exchange, becoming a publicly traded company resulted in raising financing of nearly R$ 6.7 billion.

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

NEW ACQUISITIONS

26.      After the successful placement of shares, OGX Group, while simultaneously continuing its costly exploration campaigns, in September 2009 acquired a 70% stake in 7 (seven) exploratory land blocks in the Parnaíba Basin in Maranhão, with Petra Energia holding the remaining 30%.[1]

27.      In March 2011, OGX PARTICIPAÇÕES also acquired five exploratory blocks in three land basins in Colombia: Cesar-Ranchería, Vale Inferior do Madalena, and Vale do Médio Madalena. The five purchased blocks are in different stages of maturity and show relevant exploratory potential. Later, OGX PETRÓLEO E GÁS purchased another exploratory block in Colombia, in Vale Inferior do Madalena basin.

28.      In addition, OGX PETRÓLEO E GÁS became the owner of (a) an additional 20% in Blocks BM-C-37 and BM-C-38, located in the Campos Basin, also assuming responsibility for their operation, and (b) a 40% stake in the concession of Block BS-4, located in the Santos Basin.[2]

29.  As a result of the 11th Round of ANP Bidding, which took place in May of this year, OGX PETRÓLEO E GÁS now holds a stake in another four exploratory blocks, which it acquired in a partnership with ExxonMobil, Total E&P, and Queiroz Galvão Exploração e Produção.

---

[1] In January 2010, the stake in the blocks located in Maranhão was integrated into the capital of OGX MARANHÃO PETRÓLEO E GÁS LTDA. ("OGX Maranhão"), in which the first plaintiff holds 66.67% of the corporate capital, in a partnership with Eneva Energia S.A.

[2] In BS-4, in addition to OGX PETRÓLEO E GÁS, the partners are Queiroz Galvão Exploração e Produção S.A., and Barra Energia do Brasil Petróleo e Gás Ltda., each with 30% of the remaining stake.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail: rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail: spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail: dfbernardes@sbadv.com.br

30.      All of these facts show that throughout its existence, the plaintiffs managed to form significant capital, which will certainly allow them to continue with their activities at the end of this recovery proceeding.


FRUSTRATED EXPECTATIONS

31.      After carrying out the largest private exploratory campaign in Brazil's history, with investments on the order of R$ 10 billion, with obvious importance for the country's development – resulting, among other benefits, in the creation of jobs, circulation of wealth and in payment of taxes – the plaintiffs began their production activities.

32.      To put its business plan into practice, it became necessary to obtain new funds. Therefore, in June 2011, OGX PARTICIPAÇÕES issued bonds abroad in the total amount of US$ 2.563 billion. The obligation for those securities was transferred to the fourth plaintiff, OGX Austria, thus OGX Participações became the joint co-debtor. Later, in April 2012, new securities were issued in the amount of US$ 1.063 billion, for a total debt with these international bondholders of approximately US$ 3.6 billion.

33.      Those funds were necessary to pick up the commercial production that was about to begin. In that bond issuance, OGX PARTICIPAÇÕES, the first plaintiff, became the co-obligor for payment of debts of the subsidiary OGX AUSTRIA.

34.      The first field that was economically explored was Tubarão Azul, at the end of 2009. Its initial production was quite positive, but with the passage of time it started to present accentuated declining numbers.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbernardes@sbadv.com.br

35.      The behavior of the producing wells in Tubarão Azul, as well as the reprocessing and reinterpretation of the geological data in that area, showed not only the production difficulties at Tubarão Azul, but other nearby accumulations. In light of this frustrating scenario, OGX Group decided to verify to what degree the low productivity would affect the economic development of the Tubarão Tigre, Tubarão Areia and Tubarão Gato fields, as well as the new perspectives for production in the Tubarão Azul field.

36.      It is not necessary to say that the Group – always with the guidance of technicians with vast experience in the oil industry – exerted every effort with the firm goal of developing those four fields. For each difficulty they encountered during the exploration phase, they sought out technological solutions to make oil production in those areas economically viable.

37.      Despite their efforts, however, it was concluded that as of now there is no technology capable of making any additional investment in the Tubarão Azul field economically viable, which circumstance repeated in the development of the Tubarão Gato, Tigre and Areia fields.

38.      The headwinds faced in the Tubarão Azul field, in and of itself, represented a loss to the plaintiffs of approximately R$ 1,929,471,000.00 (one billion, nine hundred and twenty-nine million, four hundred and seventy-one thousand *reais*). In addition to these losses, the investments lost in the Tubarão Areia wells, in the amount of R$ 718,486,000.00 (seven hundred and eighteen million, four hundred and eighty-six thousand *reais*), as well as the expenditures in the Tubarão Tigre and Tubarão Gato fields, which together added up to an additional loss of R$ 996,566,000.00 (nine hundred and ninety-six million, five hundred and sixty-six thousand *reais*).

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

GLARING NEED

39.      The facts narrated here negatively affected the financial flow of OGX Group, which, therefore, needs to restructure its debts in order to allow the exploration and development of the existing assets, which are many and relevant.

40.      Deprived of the revenues that should have come from commercial production of the fields listed, the plaintiffs, although viable, need to restructure their liabilities, which today are basically comprised of obligations contracted with bondholders and suppliers, while there is no bank debt or credits with real guarantees whatsoever.

NO LABOR OR TAX LIABILITIES

41.      Regarding labor liabilities, it is noted that the plaintiffs never delayed payment of salaries and pertinent obligations. The labor lawsuits under way today are not material (Documents 38-39).

42.      The plaintiffs further state that their taxes are paid, and there are no debts with the Federal Treasury and with the States and Municipalities where they perform their activities.

TOTAL LIABILITIES

43.      In summary, the total amount of the plaintiffs' debt today is nearly R$ 11.2 billion.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail: rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail: spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail: dfbernardes@sbadv.com.br

FORGOTTEN TRUTHS

44.      The debt of the plaintiffs is, unquestionably, a large amount. However, the assets they have, added to the high-lever expertise and work capacity of their employees, ensure an uptick in their business.

45.      At this time in which the newspapers release negative facts and versions against the plaintiffs on an almost-daily basis, we urge you to remember some other facts that are sometimes callously forgotten, but that show the vigor and production capacity of OGX Group:

> a)   OGX PETRÓLEO E GÁS developed the largest private exploration campaign in the history of Brazil, with more than 120 exploratory wells drilled, without any environmental accidents;
>
> b)   OGX PETRÓLEO E GÁS has always had a strict commitment to the sustainable development of the country, investing millions in social projects. Among the activities carried out in this area are: (a) its fundamental support in the UPP Project (Pacification Police Units), which revolutionized the city of Rio de Janeiro, unwinding the control of drug traffickers in the poorer communities of Rio de Janeiro; (b) sponsorship of the Morhan Project (Movement to reintegrate people affected by Leprosy), a silent disease that affects a part of the population, without any public policies for its control; and (c) support for the integrated territorial development plan for 10 municipalities in Bacia do Parnaíba, in order to spark development in one of the poorest areas of the country, with a balance between economic growth of the region and the creation of social benefits, with respect for the local culture and the environment;
>
> c)   With extraction of its first oil in January 2012, only 25 months after its discovery in the Campos Basin, OGX PETRÓLEO E GÁS showed unparalleled operating competence;
>
> d)   The Tubarão Azul field has already yielded more than 4.3 million barrels of oil to the company,

www.sbadv.com.br
Praça XV de Novembro, 20 - 7° e 8° andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail: rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5° e 6° andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail: spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail: dfbernardes@sbadv.com.br

guaranteeing OGX PETRÓLEO E GÁS a position among the five largest oil producers in Brazil;

e)   With the opening of well OGX 26, the company became the first private Brazilian operator to produce oil <u>offshore</u>;

f)   OGX PETRÓLEO E GÁS obtained the license of "<u>Operator A</u>" from ANP, which gives it the prerogative to operate in any <u>onshore</u> and <u>offshore</u> environment in Brazil, including in ultra-deep waters and pre-salt;

g)   OGX Petróleo, through its unit located in Maranhão, became the largest private producer of gas in Brazil.


<u>LOOKING TOWARDS THE FUTURE</u>

46.      Even before this lawsuit was filed, the plaintiffs had already started a vigorous economic and financial restructuring program, certain that they will be successful in showing their creditors the enormous benefits that will result from restructuring their debt, in comparison with the undesirable scenario of bankruptcy, which would necessarily mean the termination of concessions, and consequently the complete loss of the amounts invested.

47.      The plaintiffs are, without a doubt, productive and self-sustaining. Holders of valuable assets, they have a prosperous future ahead of them.

48.      It is very obvious that the restructuring of a company involves sacrifices. The petitioners will therefore drastically reduce their administrative expenses.

49.      Likewise, OGX PETRÓLEO E GÁS restricted its operating expenses, dispensing with some of its providers and renegotiating the contractual bases of others. The plaintiffs were obviously required to suspend the incentives directed towards social, sporting and cultural programs.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1842 - e-mail:spbernudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbernudes@sbadv.com.br

50.      Once the debt is restructured and its capital structure adapted, OGX Group will have a prosperous future, capable of creating wealth for its shareholders, workers, creditors and for Brazilian society as a whole.

51.      This confidence comes, among other things, from the fact that OGX Group is on the verge of initiating oil production in the Tubarão Martelo field. It took five years of significant investments and efforts to reach the moment when platform OSX-3 would be installed in the field, allowing production to begin. This will occur in the coming weeks, which will provide a substantial flow of new revenues to OGX Group.

52.      There is complete confidence regarding the viability of the Tubarão Martelo field by virtue of the countless studies done. Note the recent evaluation, prepared by the internationally renowned company DeGolyer and MacNaughton (Document 7), with respect to the reserves in Tubarão Martelo. According to the evaluation of DeGolyer and MacNaughton, the reserves at Tubarão Martelo may provide revenues on the order of US$ 11 billion, showing its complete economic and financial viability. That report, given the responsibility of the evaluator and the fact that the report was prepared at the height of the crisis of OGX Group, undoubtedly used conservative assumptions. Thus the management of OGX Group is confident that the results of exploration may be even more auspicious.

53.      In addition to the Tubarão Martelo field, OGX Group owns another valuable asset that is in the development phase: field BS-4, whose reserves were recently evaluated by the independent certifier with recognized skill, GAFFNEY CLINE & Associates. The mentioned certification, dated September 2013, pointed out, in a scenario of probable reserves, creation of approximately US$ 6.2 billion in revenues.

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

16

54.         You can see that the plaintiffs have numerous reasons to believe in an amply favorable result in this judicial recovery proceeding, so that it will be able to act in the interests of its shareholders, workers, creditors and Brazilian society as a whole, given the unequalled strategic value of the activity of oil and gas exploration.

<u>REQUIREMENTS COMPLIED WITH</u>

55.         The plaintiffs have complied, one by one, with the requirements of Article 48 of Law 11.101, noting that: (a) they have performed their activities regularly for more than two years; (b) they did not go bankrupt nor were they declared bankrupt; (c) they never requested any type of recovery, much less based on the special plan alluded to in Section III of Article 48 of the Federal Constitution; and (d) none of them have even been condemned criminally.

56.         In compliance with Article 51 of the law, the plaintiffs are filing this initial petition with the following documents:

a)      Financial statements for fiscal years 2010, 2011 and 2012 for all four plaintiffs, accompanied, in the case of the first plaintiff, OGX PARTICIPAÇÕES – as it is a publicly traded company – by an opinion from independent auditors (Documents 8-19);

b)      Financial statements as at June 30, 2013, presented for all for plaintiffs at this time, especially in order to comply with this request (Documents 20-23);

c)      A complete nominal list of the plaintiffs' creditors, indicating their respective addresses, type, classification and actualized value of each credit (Document 24);

www.sbadv.com.br

Praça XV de Novembro, 20 – 7° e 8° andares – 20010-010 – Rio de Janeiro – RJ – Tel. (21) 3221 9000 – Fax. (21) 3221 9001 – e-mail: rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 – 5° e 6° andares – 01307-002 – São Paulo – SP – Tel. (11) 3549 6900 – Fax. (11) 3288 1843 – e-mail: spbernardes@sbadv.com.br
SHIS QL 14 – Conjunto 05 – Casa 01 – 71640-055 – Brasília – DF – Tel. (61) 3212 1200 – Fax. (61) 3248 0449 – e-mail: dfbernardes@sbadv.com.br

      d)     Complete list of the petitioners' employees, indicating their position, salary, and amounts that might be pending payment (Document 25);

      e)     Corporate by-laws of each petitioner, accompanied by the minutes electing members of the Board of Directors of the first petitioner, as well as the Board of each petitioner (Documents 26-29);

      f)     Lists of individual assets of the petitioners' administrators and their controlling shareholder, Centennial Asset Mining Fund LLC;

      g)     Statements from the principal bank accounts of the petitioners (Documents 30-33);

      h)     Certifications from notary public offices for registration of deeds and documents in the city of Rio de Janeiro, where they are headquartered, as well as those locations where their branches are located (Documents 34-37); and

      i)     A list of all lawsuits in which the plaintiffs are included as parties (Documents 38-39).

57.      As you can see, the legal requirements that authorize grant of judicial recovery that is requested here and now have been complied with.

58.      Pursuant to Article 122, sole paragraph of Law No. 6404/76 (Law of Corporations), the petitioners file this petition with the documents that show that all the authorizations necessary to file the request for judicial recovery have been obtained, which must be ratified subsequently in a General Extraordinary Shareholders Meeting. They request addition of the minutes from the Shareholders Meeting that ratify presentation of this request, which will be convoked in a timely manner.

<u>PRESERVATION OF CONFIDENTIALITY</u>

59.      In compliance with the legal mandate, the petitioners consensually obtained from all of their administrators, a list of their personal assets, as required by Article 51(VI) of Law No.

www.sbadv.com.br

Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

11.101/05, with the commitment that legal silence was required of them, backed, among other rights, in the constitutional guarantee of inviolability of private life (Federal Constitution, Article 5(X)). Thus, to prevent undue and unnecessary violation of the confidentiality of this information, they will present these documents in an autonomous petition, requesting that Your Honor see fit to order their registration in a Notary Public Office, and that they may only be copied or accessed in any way by a founded request, and with prior and express authorization from this Court, first hearing the plaintiffs and the Public Prosecutor.


<u>REQUESTS</u>

60.      Having stated the foregoing, the plaintiffs trust that Your Honor will grant the judicial recovery proceeding filed here, and as provided in Article 52 of Law No. 11.101 of February 9, 2005, name the judicial administrator, order waiver of presentation of negative certifications so that they can perform their activities, order the suspension of all lawsuits and enforcements against them as per Article 6 of the same law, and order the Public Prosecutor to be summoned, and communicate the summons by letter to the Federal Public Treasury of all states and municipalities in which they have an establishment, as well as issuance of the tender document mentioned in §1 of Article 52, aware that they must present monthly statements as long as this lawsuit continues. The request is also reiterated for confidential treatment and registration in a Notary Public Office of the list of its administrators' personal assets, *ex vi* of Article 51(VI) of Law No. 11.101/05.

61.      The plaintiffs state that their attorneys receive notifications in this city at the address in the letterhead.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbernardes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbernardes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0448 - e-mail:dfbernardes@sbadv.com.br

62.  Assigning the cause the value of R$ 10,000,000.00 (ten million *reais*), the plaintiffs request, due to the gravity of the facts explained herein, urgent distribution of this proceeding to one of the Business Courts in the Judicial District of this Capital City.


Permission is requested
According to these terms.
Rio de Janeiro, October 30, 2013

[Signature]                        [Signature]
Sergio Bermudes                    Marcio Vieira Souto Costa Ferreira
Brazilian Bar Association          Brazilian Bar Association
Rio de Janeiro 17.587              Rio de Janeiro 59.384

[Signature]                        [Signature]
Marcelo Fontes                     Marcelo Lamego Carpenter
Brazilian Bar Association          Brazilian Bar Association
Rio de Janeiro 63.975              Rio de Janeiro 92.518

[Signature]                        [Signature]
Fabiano Robalinho Cavalcanti       Maria Salgado
Brazilian Bar Association          Brazilian Bar Association
Rio de Janeiro 95.237              Rio de Janeiro 96.637

[Signature]                        [Signature]
Caetano Berenguer                  Thais Vasconcellos de Sá
Brazilian Bar Association          Brazilian Bar Association
Rio de Janeiro 135.124             Rio de Janeiro 178.816

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbermudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbermudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbermudes@sbadv.com.br



STATE of NEW YORK )
                   )        ss:
COUNTY of NEW YORK )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"Exhibit 1 - Request for Reorganization"* originally written in *Portuguese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: March 30, 2017

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
____30th____ day of ___March___,
2017.

_____
Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires December 4, 2018

Your
legal
translation
partner

# SERGIO BERMUDES

SERGIO BERMUDES
MARCIO VIEIRA SOUTO COSTA FERREIRA
MARCELO FONTES
ALEXANDRE SIGMARINGA SEIXAS
GUILHERME VALDETARO MATHIAS
ROBERTO SARDINHA JUNIOR
JOÃO ALBERTO ROMEIRO
GUSTAVO FERNANDES DE ANDRADE
MARCELO LAMEGO CARPENTER
MARCIO XAVIER FERREIRA MUSA
ANTONIO CARLOS VELLOSO FILHO
FABIANO ROBALINHO CAVALCANTI
MARIA AZEVEDO SALGADO
BRUNO CALPAT
MARCO AURÉLIO DE ALMEIDA ALVES
ERIC CERANTE PESTRE
VÍTOR FERREIRA ALVES DE BRITO
ANDRÉ SILVEIRA
RODRIGO TANNURI
FREDERICO FERREIRA
ANTONELLA MARQUES CONSENTINO
MARCELO GONÇALVES
RICARDO SILVA MACHADO
RICARDO JUNQUEIRA DE ANDRADE

ANDRÉ TAVARES
CAROLINA CARDOSO FRANCESCO
MARIANNA FUX
ANDRÉ CHATEAUBRIAND MARTINS
ROBERTO CASTRO DE FIGUEIREDO
PHILIP FLETCHER CHAGAS
LUÍS FELIPE FREIRE LISBÔA
PEDRO PAULO DE BARROS BARRETO
LEONARDO DE CAMPOS MELO
WILSON PIMENTEL
RICARDO LORETTI HENRICI
JAIME HENRIQUE PORCHAT SECCO
GRISSIA RIBEIRO VENÂNCIO
RAPHAEL MONTENEGRO
DIEGO CABRERA
MARCELO BORJA VEIGA
ADELSON VIEIRA MACABU FILHO
CAETANO BERENGUER
RAFAEL DIREITO SOARES
ANA PAULA DE PAULA
ALEXANDRE FONSECA
PEDRO HENRIQUE CARVALHO
RAFAELA FUCCI
GABRIEL LÓS

LOUIS DE CASTRIA
HENRIQUE ÁVILA
RENATO KRESENDE BENEDUZI
DIEGO BARBOSA CAMPOS
ALESSANDRA MARTINI
MARIANA ARRUDA DE SOUZA
DANIEL CHACUR DE MIRANDA
PEDRO HENRIQUE NUNES
GABRIEL DE ORLEANS E BRAGANÇA
LUIZA LOURENÇO BIANCHINI
GABRIEL PRISCO PARAÍSO
GUIOMAR FEITOSA LIMA MENDES
FLÁVIO JARDIM
GUILHERME COELHO
JORGE LUIZ SILVA ROCHA
ANA LUIZA COMPARATO
LÍVIA IKEDA
LÍVIA SAAD
JULLIANA CUNHA
ALLAN BARCELLOS L. DE OLIVEIRA
PAULO BONATO
RENATO CALDEIRA GRAVA BRAZIL
VICTOR NADER BUIAN LAMAS
GUILHERME REGUEIRA PITTA

BRUNO COSTA DE ALMEIDA
LUIZA PERRELLI BARTOLO
JOÃO ZACHARIAS DE SÁ
SÉRGIO SANTOS DO NASCIMENTO
GIOVANNA MARSSARI
ALESSANDRA GUALBERTO

CONSULTORES
AMARO MARTINS DE ALMEIDA (1914-1998)
HELIO CAMPISTA GOMES (1925-2004)
SALVADOR CÍCERO VELLOSO PINTO
JORGE FERNANDO LORETTI
ELENA LANDAU
CAIO LUIZ DE ALMEIDA VIEIRA DE MELLO

EXMO. SR. DR. JUIZ DE DIREITO DA    VARA EMPRESARIAL DA COMARCA DO RIO
DE JANEIRO

**GRERJ n. 01426931504-79**

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A. ("OGX PARTICIPAÇÕES"),
companhia de capital aberto, CNPJ/MF 07.957.093/0001-96; OGX PETRÓLEO
E GÁS S.A. ("OGX PETRÓLEO E GÁS"), companhia de capital fechado,
CNPJ/MF 08.926.302/0001-05, ambas estabelecidas, nesta cidade, na
Praça Mahatma Gandhi, n.º 14; OGX INTERNATIONAL GMBH ("OGX
INTERNATIONAL"), constituída sob as leis da República da Áustria, com
registro na Corte Comercial de Viena sob o nº FN 335513 b, e sede na
Schwarzenbergplatz 5/Top Nr.2/3, 1030, Viena; e OGX AUSTRIA GMBH ("OGX
AUSTRIA"), constituída sob as leis da República da Áustria, com
registro na Corte Comercial de Viena sob o nº FN 335512 a, CNPJ/MF
16.885.474-0001-06, e sede na Schwarzenbergplatz 5/Top Nr.2/3, 1030,
Viena, vêm, por seus advogados abaixo assinados (docs. 1/4), com
fundamento nos arts. 47 e 48 da Lei nº 11.101, de 09.02.05, impetrar
recuperação judicial, nos seguintes termos:

ESCRITÓRIO DE ADVOCACIA
SÉRGIO BERMUDES

SÉRGIO BERMUDES
MARCIO VIEIRA SOUTO COSTA FERREIRA
MARCELO FONTES
ALEXANDRE SIGMARINGA SEIXAS
GUILHERME VALDETARO MATHIAS
ROBERTO SARDINHA JUNIOR
JOÃO ALBERTO ROMEIRO
GUSTAVO FERNANDES DE ANDRADE
MARCELO LAMEGO CARPENTER
MARCIO XAVIER FERREIRA MUSA
ANTONIO CARLOS VELLOSO FILHO
FABIANO ROBALINHO CAVALCANTI
MARIA AZEVEDO SALGADO
BRUNO CALFAT
MARCO AURÉLIO DE ALMEIDA ALVES
ERIC CHIANTE PREVER
VÍTOR FERREIRA ALVES DE BRITO
ANDRÉ SILVEIRA
RODRIGO TASSOLTH
FREDERICO FERREIRA
ANTONELLA MARQUES CONSENTINO
MARCELO GONÇALVES
RICARDO SILVA MACHADO
RICARDO JUNQUEIRA DE ANDRADE

ANDRÉ TAVARES
CAROLINA CARDOSO FRANCISCO
MARIANNA FUX
ANDRÉ CHATEAUBRIAND MARTINS
ROBERTO CASTRO DE FIGUEIREDO
PHILIP FLETCHER CHAGAS
LUÍS FELIPE FREIRE LISBÔA
PEDRO PAULO DE BARROS BARRETO
LEONARDO DE CAMPOS MELO
WILSON PIMENTEL
RICARDO LORETTI HENRIQ
JAIME EDE
OSÓRIA RE
RAFAEL M
DIEGO CAR
MARCELO I
ADELSON V
CAETANO B
RAFAEL DE
ANA PAULA
ALEXANDE
PEDRO ED
RAFAELA F
GABRIEL L

LOUIS DE CASTRIA
HENRIQUE ÁVILA
RENATO RESENDE RENEDUZI
DIEGO BARBOSA CAMPOS
ALESSANDRA MARTINI
MARIANA ÁBRIDA DE SOUZA
DANIEL CHACUR DE MIRANDA
PEDRO HENRIQUE NUNES
GABRIEL DE ORLEANS E BRAGANÇA
LUIZA LOURENÇO BIANCHINI
GABRIEL PESCO PARAISO
. LIMA MENDES

BO
. ROCHA
ARATO

E L. DE OLIVEIRA

A GRAVA BRAZIL
UIAN LAMAS
JEIRA PITTA

BRUNO COSTA DE ALMEIDA
LUIZA PERRELLI BARTOLO
JOÃO ZACHARIAS DE SÁ
SÉRGIO SANTOS DO NASCIMENTO
GIOVANNA MARESARI
ALESSANDRA GUALBERTO

CONSULTORES
AMARO MARTINS DE ALMEIDA (1914-1998)
HELIO CAMPISTA GOMES (1925-2004)
SALVADOR CÍCERO VELLOSO PINTO
JORGE FERNANDO LORETTI
ELENA LANDAU
CAIO LUIZ DE ALMEIDA VIEIRA DE MELLO

EXMO. SR. DR. JUIZ DE DIREITO DA  VARA EMPRESARIAL DA COMARCA DO RIO DE JANEIRO

GRERJ n. 01426931504-79

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A. ("OGX PARTICIPAÇÕES"), companhia de capital aberto, CNPJ/MF 07.957.093/0001-96; OGX PETRÓLEO E GÁS S.A. ("OGX PETRÓLEO E GÁS"), companhia de capital fechado, CNPJ/MF 08.926.302/0001-05, ambas estabelecidas, nesta cidade, na Praça Mahatma Gandhi, n.° 14; OGX INTERNATIONAL GMBH ("OGX INTERNATIONAL"), constituída sob as leis da República da Áustria, com registro na Corte Comercial de Viena sob o n° FN 335513 b, e sede na Schwarzenbergplatz 5/Top Nr.2/3, 1030, Viena; e OGX AUSTRIA GMBH ("OGX AUSTRIA"), constituída sob as leis da República da Áustria, com registro na Corte Comercial de Viena sob o n° FN 335512 a, CNPJ/MF 16.885.474-0001-06, e sede na Schwarzenbergplatz 5/Top Nr.2/3, 1030, Viena, vêm, por seus advogados abaixo assinados (docs. 1/4), com fundamento nos arts. 47 e 48 da Lei n° 11.101, de 09.02.05, impetrar recuperação judicial, nos seguintes termos:

www.sbadv.com.br
Praça XV de Novembro, 20 - 7° e 8° andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbermudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5° e 6° andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11) 3288 1843 - e-mail:spbermudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbermudes@sbadv.com.br

## LITISCONSÓRCIO NECESSÁRIO

1.      A primeira requerente, OGX PARTICIPAÇÕES, sociedade holding e não operacional, é controladora da segunda, titular de 99,99% do seu capital, a qual, por sua vez, tem por objeto a exploração e produção de petróleo e gás natural. A primeira requerente também controla diretamente a terceira requerente, OGX INTERNATIONAL, e esta, por sua vez, controla a quarta requerente, OGX AUSTRIA.

2.      As requerentes são todas, portanto, integrantes do grupo econômico OGX, atuando de forma interligada e concertada.

3.      A OGX PARTICIPAÇÕES, companhia aberta listada no Novo Mercado da BM&F BOVESPA, é a controladora do grupo. A OGX INTERNATIONAL e a OGX AUSTRIA são braços do grupo no exterior. Estas sociedades não exercem qualquer atividade operacional autônoma. São meros veículos da sociedade controladora brasileira para a emissão de dívidas e recebimento de receitas no exterior, com vistas ao financiamento do grupo para as suas atividades empreendidas no Brasil. Por isso, a OGX PARTICIPAÇÕES figura como garantidora e devedora solidária das dívidas assumidas pela OGX AUSTRIA. Em suma, a OGX INTERNATIONAL e a OGX AUSTRIA não têm autonomia; pelo contrário, todas as decisões são tomadas pela sociedade controladora, com atividade no Brasil.

4.      É inequívoco, portanto, que as requerentes possuem seu principal estabelecimento (art. 3º, Lei nº 11.101/2005 – "LFR"), ou seu centro principal de interesses, em território brasileiro, mais especificamente, na cidade do Rio de Janeiro, que funciona como sede para o grupo econômico.

5.      É, portanto, impositiva a presença de todas as impetrantes no polo ativo desta ação. O litisconsórcio, no caso, é indispensável

para assegurar a eficácia da recuperação das requerentes, resguardando a competência e a efetividade do juízo universal brasileiro.

6.        Como se verá, fatores conjunturais interferiram no desenvolvimento do grupo OGX, levando à crise econômico-financeira que hoje atravessa. Esta recuperação judicial poderá assegurar, porém, a superação dessa crise, de modo a preservar a fonte produtora, o emprego dos trabalhadores e o interesse dos credores, promovendo, assim, a preservação da empresa, sua função social e o estímulo à atividade econômica (art. 47, LFR). É do que se passa a cuidar nos próximos tópicos.


                              IMPERIOSA NECESSIDADE


7.        Criado em 2007, o grupo OGX realizou no Brasil, ao longo dos últimos 6 anos, atividades exploratórias de petróleo e gás nas Bacias de Campos, Santos, Espírito Santo, Parnaíba e Pará-Maranhão. Foram adquiridos dados sísmicos inéditos e perfurados mais de 120 poços. De 2010 a 2012, o grupo mobilizou um conjunto de dez sondas de perfuração, operando em paralelo, o que possibilitou a condução de uma campanha exploratória de larga escala. Como produto dessa campanha, foi possível investigar áreas que não vinham sendo priorizadas no País, gerando como subproduto um importante acervo de informações geológicas para a gestão do setor pela Agência Nacional do Petróleo - ANP, que reconhece os relevantes serviços prestados pelo grupo OGX. Desde sua criação, a OGX investiu mais de R$ 10 bilhões em suas atividades no Brasil, valor que a torna a empresa privada que mais investiu no país no seu segmento.


8.        Promissor ao longo de quase toda a sua existência, o grupo OGX, que, evidentemente, exerce atividade de risco, foi tolhido por fatos adversos, pertinentes a seu objeto social. Embora a investigação

empreendida tivesse sido favorável, mediante a descoberta de petróleo em diferentes campos, a esperada produção mostrou-se comercialmente inviável em alguns deles, por razões que não se podem explicar sem se valer de expressões técnicas.

9.      As atividades do grupo se desenvolvem em diversos blocos concedidos pela União. A produção de alguns deles foi insuficiente ou antieconômica, enquanto noutros se extraiu petróleo e gás nos níveis esperados. Assim, a produção não produziu os resultados que alcançaria, se se pudessem retirar de todos os poços os volumes cuja existência era indicada pelas investigações preliminares.

10.      Diga-se, na tentativa de resumir o que é complexo, que não vingou a projeção inicial, que apontava para um resultado propício, pois, no fim das contas, o petróleo recuperável economicamente nalguns dos campos nem de longe confirmava as perspectivas da fase de exploração.

11.      O fato de que muitos poços não ofereceram a quantidade de petróleo necessária a torná-los produtivos repercutiu, negativamente, na receita do grupo e, por consequência, na sua capacidade de honrar, nos termos originariamente contratados, as obrigações financeiras assumidas, como se demonstrará, minudentemente, e na medida do necessário, ao longo do processo agora iniciado.

12.      Mais do que isso: foram realizadas despesas, adquiridos bens e serviços, para a abertura de poços que, mais tarde, se revelaram comercialmente inviáveis, o que comprometeu, severamente, a administração do fluxo financeiro da companhia.

13.      Todavia, cumpre notar, com toda a ênfase, que a exploração favorável em poços de petróleo e gás permite alcançar os objetivos do grupo, que carece, apenas, de uma oportunidade que lhe permita superar

a situação de momentânea crise econômico-financeira, assim assegurando o seu lugar de fonte produtora, que crie empregos, faça circular riquezas, amplie o mercado de trabalho e gere tributos.

14.     As suplicantes são pioneiras no desenvolvimento dos negócios a que se dedicam, graças à tenacidade empresarial, ao descortino, às iniciativas inovadoras que o Sr. Eike Batista, sempre aclamado pelo seu êxito, corajosamente tomou. Hoje em dia, se lhe imputam insucessos decorrentes fatos geológicos, pelos quais, nem de longe, é responsável.

15.     Não obstante os prejuízos recentemente sofridos pelas impetrantes, que as levam a postular a tutela da lei específica, a existência de ativos de alto vulto, acumulados em companhias formadas por profissionais de reconhecida competência, indicam a convicção de que as impetrantes se recuperarão e retomarão os caminhos do êxito, no melhor interesse de todos os que gravitam ao redor delas.

<u>ATIVIDADE DE ALTÍSSIMO RISCO</u>

16.     O prospecto de lançamento de ações da OGX PARTICIPAÇÕES destacou verdade sabida permanentemente pelo mercado: a atividade exploratória de petróleo e gás natural exige investimentos vultosos e envolve riscos elevados.

17.     A ninguém é dado precisar a quantidade de óleo e de gás que encontrará nas fontes desses elementos. Por mais avançada que seja a tecnologia, as estimativas de reservas são feitas mediante o uso de dados geológicos e de engenharia, os quais são, invariavelmente, projetados. Pode ocorrer ainda que, conquanto haja a matéria-prima, não se tenham, à disposição do mercado, meios para a extração dela, seja pela falta da tecnologia, seja porque economicamente deficitária.

## CAUTELOSAS ADVERTÊNCIAS

18.           Não por outra razão, todos os comunicados, fatos relevantes e demais informações prestadas ao mercado sempre registraram longa advertência quanto aos potenciais riscos relacionados aos seus negócios. Expressamente, a OGX PETRÓLEO E GÁS alertava que as suas atividades "...estão sujeitas a uma série de expressivos riscos, incertezas e premissas...", informando, ainda, "...que diversos fatores importantes podem fazer com que os resultados reais divirjam de maneira relevante dos planos, objetivos, expectativas, estimativas e intenções expressas..." (doc. 5).

19.           Constava inclusive do primeiro Formulário de Referência da OGX PARTICIPAÇÕES, registrado na CVM e disponibilizado ao mercado de ações, a ressalva de que a prospecção de petróleo poderia ficar aquém das suas metas, já que se trata de acontecimento incerto, sujeito a circunstâncias imponderáveis:

> "Estimar reservas de petróleo e gás natural é algo complexo e impreciso. Os Recursos Potenciais da companhia são estimados mediante o uso de dados geológicos e de engenharia para determinar com um grau de incerteza razoável se o petróleo ou o gás natural em potenciais acumulações é recuperável considerando as condições econômicas e operacionais existentes. Há incertezas na estimativa das quantidades dos recursos potenciais de petróleo e gás natural, relativas aos preços vigentes de petróleo e gás natural aplicáveis à sua produção prevista, que poderão levar a Companhia a efetuar revisões em suas atuais estimativas de Recursos Potenciais. Um risco inerente aos recursos potenciais estimados é a possibilidade de que nenhum poço seja considerado como recurso potencial economicamente viável.
>
> Esta possibilidade de não encontrar reservas é intrínseca ao *portfólio* da Companhia. Revisões, em suas previsões, que indiquem uma redução em suas estimativas de potenciais recursos poderão ocasionar, no futuro, uma redução nos níveis de projeções previstas, o que poderia acarretar um efeito adverso relevante nos resultados de operações da Companhia e em sua situação financeira. (doc. 6 - grifou-se)".

20.       Como se vê, as advertências que se acaba de lembrar e outras semelhantes ilustram os riscos de insucesso a que estavam submetidas as impetrantes, os quais, infelizmente, acabaram por se concretizar em alguns dos seus campos.

## COMEÇO PROMISSOR

21.       O grupo OGX iniciou suas atividades, no setor de petróleo e gás natural, em junho de 2007, contratando, na época, executivos de renome no mercado, a maior parte deles ocupantes de altíssimos cargos da Petrobras e de outras importantes companhias do setor.

22.       Cerca de seis meses depois do início de suas operações, a OGX PARTICIPAÇÕES realizou com sucesso colocação privada de ações (private placement), mediante a qual captou junto a investidores institucionais US$ 1,3 bilhão, capital que lhe permitiu assumir posição de destaque na 9ª Rodada de Licitações da Agência Nacional de Petróleo (ANP).

23.       Para se ter uma ideia da relevância da sua participação, dos R$ 2,1 bilhões arrecadados na referida rodada, foi a OGX PETRÓLEO E GÁS responsável pelo recolhimento de R$ 1,6 bilhão aos cofres públicos, adquirindo o direito de concessão de 21 blocos exploratórios nas bacias de Santos, Campos, Espírito Santo e Pará-Maranhão.

24.       Em março de 2008, a OGX adquiriu mais 50% de outro bloco exploratório na Bacia de Santos, totalizando 6,8 mil km² de área marítima de exploração.

25.       As projeções alvissareiras relativas ao volume de óleo descoberto, devidamente baseadas nas estimativas feitas por empresas especializadas independentes, animaram a busca de capital para financiar a sua fase exploratória e conduziram a OGX PARTICIPAÇÕES a

realizar a sua oferta pública de ações (IPO) em junho de 2008. Anunciado como o maior lançamento de ações ocorrido na bolsa brasileira, a abertura de capital redundou numa captação de cerca de R$ 6,7 bilhões.

## NOVAS AQUISIÇÕES

26.        Depois do bem sucedido lançamento de ações, o grupo OGX, ao mesmo tempo em que dava continuidade a custosas campanhas exploratórias, adquiriu, em setembro de 2009, 70% de participação em 7 (sete) blocos exploratórios terrestres na bacia do Parnaíba, no Maranhão, sendo a Petra Energia titular dos 30% remanescentes[1].

27.        Em março de 2011, a OGX PARTICIPAÇÕES ainda adquiriu cinco blocos exploratórios em três bacias terrestres na Colômbia: Cesar-Rancheria, Vale Inferior do Madalena e Vale do Médio Madalena. Os cinco blocos comprados estão em diferentes estágios de maturidade e apresentam relevante potencial exploratório. Tempos depois, a OGX PETRÓLEO E GÁS comprou outro bloco exploratório na Colômbia, na bacia Vale Inferior do Madalena.

28.        Além disso, a OGX PETRÓLEO E GÁS tornou-se titular de (a) participação adicional de 20% nos blocos BM-C-37 e BM-C-38, situados na bacia de Campos, tornando-se também responsável pela operação deles, e (b) participação de 40% na concessão do bloco BS-4, localizado na Bacia de Santos[2].

29.        Como resultado da 11ª Rodada de Licitações da ANP, ocorrida em maio deste ano, a OGX PETRÓLEO E GÁS detém, atualmente,

---

[1] Em janeiro de 2010, a participação nos blocos situados no Maranhão foi integralizada ao capital da OGX MARANHÃO PETRÓLEO E GÁS LTDA. ("OGX Maranhão"), na qual a primeira requerente é titular de 66,67% do capital social, em sociedade com a Eneva Energia S.A.

[2] No BS-4, além da OGX PETRÓLEO E GÁS figuram como sócias a Queiroz Galvão Exploração e Produção S.A., e a Barra Energia do Brasil Petróleo e Gás Ltda., cada uma com 30% da participação restantes

participação em mais 4 blocos exploratórios, que adquiriu em consórcio com a Exxon Mobil, Total E&P e Queiroz Galvão Exploração e Produção.

30.      Todos esses fatos demonstram que, ao longo de sua existência, as impetrantes lograram constituir importante patrimônio, que, seguramente, lhes permitirá prosseguir com as suas atividades, ao final deste processo de recuperação.

## EXPECTATIVA FRUSTRADA

31.      Após realizar a maior campanha exploratória privada da história do Brasil, com investimentos da ordem de R$ 10 bilhões, com evidente importância para o desenvolvimento do país — consubstanciado, dentre outros benefícios, na geração de empregos, na circulação de riquezas, na geração de tributos —, as impetrantes deram início às suas atividades de produção.

32.      Para colocar em prática o seu plano de negócios, tornou-se necessária a obtenção de novos recursos. Por tal razão, a OGX PARTICIPAÇÕES emitiu, em junho de 2011, títulos de dívida (bonds) no exterior, no valor total de US$ 2,563 bilhões. A obrigação por esses títulos foi cedida à quarta impetrante, OGX Austria, ficando, entretanto, a OGX Participações como co-devedora solidária. Mais tarde, em abril de 2012, novos títulos foram emitidos, pelo valor de US$ 1,063 bilhões, totalizando uma dívida com esses credores internacionais (bondholders), de US$ 3,6 bilhões, aproximadamente.

33.      Esses recursos eram necessários para dinamizar a produção comercial que se iniciaria em seguida. Nesta operação de emissão de títulos, permaneceu a OGX PARTICIPAÇÕES, primeira impetrante, como coobrigada pelo pagamento das dívidas da controlada OGX AUSTRIA.

34.      O primeiro campo explorado economicamente foi o de Tubarão Azul, no final do ano de 2009. A sua produção inicial foi bastante

positiva, mas, com o passar do tempo, começou a apresentar números acentuadamente declinantes.

35.        O comportamento dos poços produtores de Tubarão Azul, bem como o reprocessamento e a reinterpretação dos dados geológicos daquela área, evidenciaram não só as dificuldades de produção de Tubarão Azul, mas de outras acumulações próximas. Diante do frustrâneo cenário, o grupo OGX passou a verificar em que grau a baixa produtividade afetaria o desenvolvimento econômico dos campos de Tubarão Tigre, Tubarão Areia e Tubarão Gato, tal como as novas perspectivas para a produção do campo de Tubarão Azul.

36.        Desnecessário dizer que o grupo — sempre com a orientação de técnicos com grande experiência na indústria petrolífera — empenhou todos os esforços com o firme propósito de desenvolver esses quatro campos. A cada dificuldade encontrada na fase de exploração deles, buscavam-se soluções tecnológicas para viabilizar economicamente a produção de petróleo nessas áreas.

37.        Contudo, apesar dos esforços, concluiu-se que não há, até o momento, tecnologia capaz de tornar economicamente viável qualquer investimento adicional no campo de Tubarão Azul, com vistas a aumentar o seu perfil de produção, circunstancia que se repete no desenvolvimento dos campos de Tubarão Gato, Tigre e Areia.

38.        Os contratempos enfrentados no campo de Tubarão Azul, por si só, representaram um prejuízo às impetrantes de aproximadamente R$ 1.929.471.000,00 (um bilhão, novecentos e vinte e nove milhões, quatrocentos e setenta e um mil reais). Somam-se a esses prejuízos os investimentos perdidos nos poços de Tubarão Areia, no valor de R$ 718.486.000,00 (setecentos e oitenta milhões, quatrocentos e oitenta e seis mil reais), bem como aqueles despendidos nos campos de Tubarão Tigre e Tubarão Gato, que, juntos, representaram uma perda

adicional de R$ 996.566.000,00 (novecentos e noventa e seis milhões, quinhentos e sessenta e seis mil reais).

## NECESSIDADE CLAMOROSA

39.      Os fatos até aqui narrados afetaram negativamente o fluxo financeiro do grupo OGX, que, por isso, precisa reestruturar suas dívidas de modo a permitir a exploração e o desenvolvimento dos ativos existentes, que são muitos e relevantes.

40.      Privadas da receita que adviria da produção comercial dos aludidos campos, as requerentes, embora viáveis, necessitam reestruturar o seu passivo, hoje formado, basicamente, por obrigações contraídas junto a detentores de títulos de dívidas e a fornecedores, sem que haja qualquer endividamento bancário, tampouco créditos com garantias reais.

## SEM PASSIVOS TRABALHISTAS OU FISCAIS

41.      Quanto ao passivo trabalhista, assinale-se que as impetrantes jamais atrasaram o pagamento de salários e obrigações pertinentes. As ações trabalhistas hoje em curso são inexpressivas (docs. 38/39).

42.      Declaram as impetrantes ainda que se encontram situação fiscal regular, inexistindo débitos com a Receita Federal e com os Estados e Municípios onde exercem as suas atividades.

## PASSIVO TOTAL

43.      Resumidamente, o valor total da dívida das impetrantes alcança, hoje, cerca de R$ 11,2 bilhões.

## VERDADES ESQUECIDAS

44.       A dívida das impetrantes ascende, inquestionavelmente, a elevado montante. Todavia, os ativos que possuem, somados à elevada expertise e capacidade de trabalho de seus funcionários, asseguram às impetrantes o soerguimento dos seus negócios.

45.       Neste momento em que os jornais divulgam, quase que diariamente, fatos e versões negativos sobre as impetrantes, urge se lembrarem alguns outros que andam às vezes cavilosamente esquecidos, mas revelam a pujança e a capacidade produtiva do grupo OGX:

a) A OGX PETRÓLEO E GÁS desenvolveu a maior campanha exploratória privada na história do Brasil, com mais de 120 poços exploratórios perfurados, sem qualquer incidente ambiental;

b) A OGX PETRÓLEO E GÁS sempre manteve rigoroso compromisso com o desenvolvimento sustentável do país, investindo milhões em obras sociais. Dentre as atividades por ela exercidas nessa área, destaca-se (a) o seu fundamental apoio ao projeto das UPPs (Unidades de Polícia Pacificadora), o qual revolucionou a cidade do Rio de Janeiro, desarticulando o domínio do tráfico nas comunidades carentes do Rio de Janeiro; (b) patrocínio do Projeto Morhan (Movimento de reintegração das pessoas atingidas pela Hanseníase), doença que castiga silenciosamente parte da população, sem que existam políticas públicas para o seu controle e (c) apoio ao plano de desenvolvimento territorial integrado para 10 Municípios da Bacia do Parnaíba, de maneira a dinamizar o desenvolvimento numa das áreas mais pobres do país, com o equilíbrio entre o crescimento econômico da região e a geração de benefícios sociais, com o respeito à cultura local e ao meio ambiente;

c) Com a extração de seu primeiro óleo em janeiro de 2012, apenas 25 meses após a sua descoberta na Bacia de Campos, a OGX PETRÓLEO E GÁS mostrou inigualável competência operacional;

d) O Campo de Tubarão Azul já rendeu à companhia mais de 4,3 milhões de barris de petróleo, garantindo à OGX

PETRÓLEO E GÁS posição entre as cinco maiores produtoras de petróleo do Brasil;

e) Com a abertura do poço OGX 26, a companhia tornou-se a primeira operadora privada brasileira a produzir petróleo <u>offshore</u>;

f) A OGX PETRÓLEO E GÁS obteve junto à ANP o título de "<u>Operador A</u>", que lhe garante a prerrogativa de operar em qualquer ambiente <u>onshore</u> e <u>offshore</u> no Brasil, inclusive, em águas ultra-profundas e pré-sal;

g) A OGX Petróleo, através da sua unidade localizada no Maranhão, tornou-se a maior produtora privada de gás em terra do Brasil.


## OLHANDO PARA O FUTURO

46.      As impetrantes, mesmo antes do ajuizamento desta ação, já deram início a um vigoroso programa de reestruturação econômico-financeira, certas de que lograrão êxito em mostrar a seus credores os enormes benefícios decorrentes da reestruturação de sua dívida, em comparação com o cenário de uma indesejável falência, que implicaria, necessariamente, a caducidade das concessões e, por consequência, a perda integral dos valores investidos.

47.      As impetrantes são sem dúvida produtivas e autossustentáveis. Titulares de valiosos ativos, têm à sua frente um futuro próspero.

48.      Muito **evidentemente**, a reestruturação de uma companhia impõe sacrifícios. Nesse sentido, as suplicantes, reduziram drasticamente as suas despesas administrativas.

49.      De igual modo, a OGX PETRÓLEO E GÁS restringiu a sua despesa operacional, dispensando alguns dos seus fornecedores e renegociando as bases contratuais de outros. As impetrantes, por

óbvio, foram obrigadas a **suspender** os incentivos **direcionados** a programas sociais, esportivos e culturais.

50.      Assim, uma vez reestruturada a dívida e adequada sua estrutura de capital, o grupo OGX terá um futuro próspero, sendo capaz de gerar riqueza para os seus acionistas, trabalhadores, credores e para a sociedade brasileira.

51.      Essa confiança decorre, entre outras causas, do fato de que o grupo OGX está na iminência de iniciar a produção de petróleo no campo de Tubarão Martelo. Foram cinco anos de pesados investimentos e esforços para chegar-se ao momento em que a plataforma OSX-3 fosse instalada no campo, permitindo o início de sua produção. Isso ocorrerá nas próximas semanas, o que propiciará um substancial fluxo de receitas novas para o grupo OGX.

52.      Há plena confiança quanto à viabilidade do campo Tubarão Martelo em virtude dos inúmeros estudos realizados. Nesse sentido, vale destacar a recente avaliação, elaborada pela empresa de renome internacional DeGolyer and MacNaughton (doc. 7), a respeito da reserva de Tubarão Martelo. Segundo a avaliação da DeGolyer and MacNaughton, a reserva de Tubarão Martelo poderá propiciar receitas da ordem de US$ 11 bilhões, evidenciando sua plena viabilidade econômico-financeira. Esse relatório, dada a responsabilidade do avaliador e o fato de ter sido elaborado no auge da crise do grupo OGX, adotou certamente premissas conservadoras. Por isso, a administração do grupo OGX tem confiança de que os resultados da exploração podem ser ainda mais auspiciosos.

53.      Além do campo de Tubarão Martelo, o grupo OGX é titular de um outro ativo valioso, em fase de desenvolvimento. O campo BS-4, cuja reservas foram recentemente avaliadas pela certificadora independente e de reconhecida competência GAFFNEY CLINE & Associates. A referida

certificação, datada de setembro de 2013, apontou, num cenário de reservas prováveis, uma geração de receita de aproximadamente USD 6,2 bilhões.

54.       Já se vê que as impetrantes têm motivos de sobra para acreditar num resultado amplamente favorável deste processo de recuperação judicial, de modo a atender ao interesse dos seus acionistas, trabalhadores, credores e da sociedade brasileira como um todo, dado o inegável valor estratégico da atividade de exploração de petróleo e gás.

## REQUISITOS ATENDIDOS

55.       As impetrantes atendem, uma a uma, às exigências do art. 48 da Lei 11.101, eis que (a) exercem regularmente as suas atividades há mais de dois anos; (b) não foram falidas, nem nunca declaradas extintas; (c) jamais pleitearam qualquer espécie de recuperação, muito menos com base no plano especial aludido no inciso III do art. 48 do diploma regente; e (d) nunca houve, no âmbito delas, qualquer condenação criminal.

56.       Em cumprimento ao disposto no art. 51 da lei, as autoras instruem esta inicial com os seguintes documentos:

      a)    demonstrações financeiras, relativas aos exercícios de 2010, 2011 e 2012 de todas as quatro impetrantes, acompanhadas, no caso da primeira, OGX PARTICIPAÇÕES — — em razão de possuir o seu capital aberto — de parecer de auditores independentes (docs. 8/19);

      b)    demonstrações financeiras de 30.6.2013, agora apresentadas especialmente para instruir este pedido, de todas as quatro impetrantes (doc. 20/23);

      c)    relação nominal completa dos credores das impetrantes, com a indicação dos respectivos endereços, natureza, classificação e valor atualizado de cada crédito (doc. 24);

d) relação integral dos empregados das suplicantes, com a indicação da função, salário, e valores porventura pendentes de pagamento (doc. 25);

e) estatuto social de cada uma das suplicantes, acompanhados das atas de eleição dos membros do Conselho de Administração da primeira, bem como da Diretoria de cada uma delas (docs. 26/29);

f) relações dos bens particulares dos administradores das suplicantes e da sua acionista controladora, Centennial Asset Mining Fund LLC.;

g) extratos das principais contas bancárias das suplicantes (docs. 30/33);

h) certidões dos cartórios de protestos de títulos e documentos da cidade do Rio de Janeiro, onde são sediadas, bem como naquelas em que se localizam as suas filiais (docs. 34/37); e

i) relação de todas as ações judiciais em que figuram como partes as requerentes (docs. 38/39).

57.     Encontram-se, como se vê, devidamente atendidos os requisitos legais que autorizam o deferimento da recuperação judicial que aqui e agora se requer.

58.     Na forma do art. 122, parágrafo único, da Lei nº 6.404/76 (Lei das Sociedades Anônimas), as suplicantes instruem esta petição com os documentos que comprovam terem sido obtidas todas as autorizações necessárias à impetração do pedido de recuperação judicial, as quais deverão ser posteriormente ratificadas em Assembleia Geral Extraordinária. Protestam pela juntada da ata da assembleia que ratificar a apresentação deste pedido, a qual será oportunamente convocada.

## PRESERVAÇÃO DE SIGILO

59.     Cumprindo o mandamento legal, as suplicantes obtiveram consensualmente de todos os seus administradores a relação de seus

bens pessoais, como exige o art. 51, VI, da Lei nº 11.101/05, com o compromisso de que lhes fosse requerido sigilo legal, com amparo, entre outros direitos da personalidade, na garantia constitucional da inviolabilidade da vida privada (CF, art.5°, X). Dessa forma, para evitar a violação indevida e desnecessária do sigilo dessas informações, apresentarão esses documentos em petição autônoma, pedindo a V.Exa. que se digne determinar o seu acautelamento em Cartório, só podendo ser copiadas ou de qualquer forma acessadas mediante requerimento fundamentado, e com prévia e expressa autorização desse MM. Juízo, ouvidos antes as requerentes e o douto Ministério Público.

## PEDIDOS

60.    Isto posto, confiam as impetrantes em que V.Exa. defira o processamento da recuperação judicial aqui impetrada e, como dispõe o art. 52 da Lei nº 11.101, de 09.02.05, nomeie o administrador judicial, determine a dispensa da apresentação de certidões negativas para que exerçam suas atividades, ordene a suspensão de todas as ações e execuções contra elas, na forma do art. 6° do mesmo diploma, e mande intimar o i. Ministério Público e comunicar a impetração, por carta, à Fazenda Pública Federal de todos os estados e municípios em que elas tiverem estabelecimento, bem como a expedição do edital referido no §1° do art. 52, cientes elas de que deverão apresentar contas demonstrativas mensais, enquanto durar o processo desta ação. Reitera-se ainda a solicitação de tratamento confidencial e acautelamento em Cartório da relação dos bens pessoais de seus administradores, *ex vi* do art. 51, VI, da Lei nº 11.101/05.

61.    As requerentes informam que os seus advogados recebem intimações, nesta cidade, no endereço constante do timbre.

62.      Dando à causa o valor de R$ 10.000.000,00 (dez milhões de
reais), as impetrantes requerem, pela própria gravidade dos fatos aqui
expostos, a distribuição urgente deste processo, a uma das Varas
Empresariais da Comarca desta Capital.

Nestes termos,
P. deferimento.
Rio de Janeiro, 30 de outubro de 2013

Sérgio Bermudes                    Marcio Vieira Souto Costa Ferreira
OAB/RJ 17.587                      OAB/RJ 59.384

Marcelo Fontes                     Marcelo Lamego Carpenter
OAB/RJ 63.975                      OAB/RJ 92.518

Fabiano Robalinho Cavalcanti       Maria Salgado
OAB/RJ 95.237                      OAB/RJ 96.637

Gaetano Berenguer                  Thaís Vasconcellos de Sá
OAB/RJ 135.124                     OAB/RJ 178.816

T:\MAS\ogx-2_inicial_30out13.docx

Exhibit 2

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

**RULING**

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A

OGX PETRÓLEO E GÁS

OGX INTERNACIONAL GMBH

OGX ÁUSTRIA GMBH

This is in the matter of the petition for Court-supervised Bankruptcy Reorganization filed by OGX Petróleo e Gás Participações S.A., OGX Petróleo e Gás S.A., OGX Internacional GMBH and OGX Áustria GMBH, commercial companies comprising the same commercial group, operating in an interconnected manner on the oil market, on October 30, 2013. As is known from the facts stated, OGX Participações is a non-operational holding company and is the parent company of OGX Petróleo e Gás, an exploration and production company, while the company OGX Participações is the parent company of OGX Internacional, which controls the company OGX Áustria, and it is accurate that the latter two companies were created for the sole purpose of serving as a vehicle for obtaining funds from international creditors in order to make the operations conducted in Brazil by OGX Petróleo e Gás profitable. As noted in the powerful brief prepared by the State Prosecutor, the company OGX Participações operates as surety and joint and several debtor of the controlled companies, and all the operational activity is conducted in Brazil in the name of OGX Petróleo e Gás, so that

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

the petitioners proposed that the city of Rio de Janeiro must be deemed the "site of the primary facility of the debtor", for the purposes of the proceedings for the court-supervised reorganization of the four commercial companies that are the petitioners, pursuant to the provisions of Article 3 of the Corporate Reorganization and Bankruptcy Act.

Documents attached on pp. 19/1336.

On page 1376, the petitioners attached documents showing the assets and the rights of the members/shareholders, which were protected in a portfolio as specified on p. 1378. Other documents were subsequently attached as pp. 1408/1426.

The State Prosecutor's Office represented that not all the accounting requirements were presented, and submitted its justified report.

The petitioners submitted the necessary documentation and made a statement regarding the opinion expressed by the State Prosecutor's Office.

**A ruling was handed down.**

Constitutional principles are more than norms, since they serve as true guiding principles for resolving interpretations. The case

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

In question must also be analyzed from a constitutional point of view, based on the commercial order, observing the social function of ownership.

The focus of the legal entity is a fundamental matter, regarding which corporate law maintains its support, for the proceedings of a petition for court-supervised reorganization of the petitioner companies.

Failure to consider the legal personality of companies would be admissible in the hypothesis of abuse of power, which is not the case in the current matter, in this phase of the proceedings. At this juncture, it is anticipated that only on this basis could a hypothesis be admitted that would draw a foreign company as a co-petitioner for court-supervised reorganization in our country.

From what occurred in the negotiations undertaken with regard to the petitioner companies, it is an undeniable economic fact that the financial transactions of the foreign companies are interlaced with those of the domestic companies, as if the companies OGX Internacional GMBH and OGX Áustria GMBH were an extension of the companies OGX Petróleo e Gás Participações S.A. and OGX Petróleo e Gás S.A., in an unavoidable form.

However, such commercial negotiations lack a legal basis to be admitted in the court-supervised reorganization within domestic territory of

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

companies based in Austria and Holland, due to an absolute lack of jurisdiction.

In order to resoundingly reinforce the need to observe the competent jurisdiction of the Court of the location of the primary facility of the debtor, provided that there is jurisdiction, it has been determined that the companies OGX Internacional GMBH and OGX Áustria GMBH would earn their own legal environment, a true state of limbo, inasmuch as an individualized survey of the assets, operating capital, credits and debits would be conducted in order to prepare a plan for repayment of creditors, with the inherent legal shielding, but it would not be legally possible to declare bankruptcy in the event of the failure to comply with the court-supervised recovery plan, which would be an unacceptable legal privilege. The risk of the business must be assumed.

Without forgetting the possibility of subjecting the creditors to the payment terms proposed in another country, substantially altering the legal relationship, subject to legislation that is entirely different from that under which the obligations were contracted, imposing an unequivocal lack of legal security.

In this regard, there is precedent in the case law of the Superior Court of Justice, with regard to domestic companies, as specified below:

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

"… It is noted, then, that the formation of economic groups, provided for in the Corporations Act, shall take place by the combination of resources or efforts of the companies involved, having the desired effect of making viable the attainment of the respective purpose, or the participation in common activities or undertakings. In any event, however, each company shall autonomously maintain its personality and assets, pursuant to the provisions of Article 266 of the referenced legal text. Such autonomy, as indicated, acquires relevance in the realm of court-supervised reorganization. In accordance with this line of thought, holding the economic group liable for debt assumed by one of its members requires a specific legal provision, such as in labor and tax law, or even, in civil law, in the case of fraud, which unequivocally is distinct from that in the case before us. … (Appeal of Court Regulations in REsp - GO - Author Justice Marco Buzzi, March 22, 2013)"

When one intends to grant treatment to the companies OGX Internacional GMBH and OGX Áustria GMBH as being an asset of the companies OGX Petróleo e Gás Participações S.A. and OGX Petróleo e Gás S.A., nothing more could be done, in an indirect manner, than applying the theory of rejection of the legal personality of those companies.

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

As a result, it would entail depriving foreign companies with their own legal personality of their rights and obligations, under the aegis of a foreign legal structure, violating the precepts of personality.

Our laws cannot be applied, much less can their legal protections be granted to a Chinese, Korean, Thai, Austrian or Dutch company, under penalty of violating the sovereignty of the national legislation of those countries or the absolute lack of ability to apply them without legal protection.

This is a matter of creating a legal uncertainty vis-à-vis the international creditors who could not have a declaration of the amounts owed to them assessed by our legislation, much less without the protection of our laws.

The harmonization of bankruptcy proceedings of companies that have assets in various jurisdictions must not be confused with this situation. The former is supported in Chapter 15 of the American bankruptcy law, with the processing and declaration of court-supervised reorganization of foreign companies without any provision of law.

In the absence of national legislation containing this provision for harmonization for bankruptcies of large companies with assets in various

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

countries, this gap must be suppressed by the actions of the legal practitioners. Not paying attention to this aspect means attacking the sovereignty of other nations and their laws, which would create legal uncertainty related to contracts executed elsewhere, creating a negative scenario for outside investments in our country.

Notwithstanding the ruling handed down, nothing prevents the adjudication of the Chapter 15 petition, pursuant to the U.S. Bankruptcy Code in the District Court of New York, since it is a jurisdiction of election in the legal matters agreed upon with the creditors of the companies OGX Internacional GMBH and OGX Áustria GMBH, based upon the approval of the court-supervised reorganization of the companies OGX Petróleo e Gás Participações S.A. and OGX Petróleo e Gás S.A., demonstrating the risk of action on the part of the mentioned creditors.

This petition regarding Chapter 15 of the Bankruptcy Code will have the purpose of granting force to the recovery plan within U.S. territory, which would probably entail its admission and acknowledgement of the action filed in this Court as the primary bankruptcy proceeding for the purposes of U.S. law and the granting of assistance and cooperation by the U.S. Court to the Judicial Reorganization Court.

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

This is the integration of legislation, harmonization of cooperation and respect for the sovereignty that may be claimed to protect the judicial reorganization of the companies OGX Petróleo e Gás Participações S.A. and OGX Petróleo e Gás S.A., and the interest in resolving the compliance of creditors who invested their capital in the companies OGX Internacional GMBH and OGX Áustria GMBH, with the possible suspension of actions and enforcement to temporarily protect assets in the United States, all out of a concern to create an environment that is favorable to investments in order for the captioned companies to carry out the production of oil and gas.

In effect, global reorganization systems use models that extend the authority of a ruling issued in one country to many others, in order to ensure the efficacy of corporate reorganization plans that, we reiterate, involve companies that are spread throughout the world.

In this case, the companies OGX Petróleo e Gás Participações S.A. and OGX Petróleo e Gás S.A., serve a niche market with significant investments by international creditors, hundreds of employees, suppliers of products and service providers that play a significant role in the economy and that are relevant in a huge way to society.

Based on what is stated, pursuant to Article 52 of Law No. 11,101/05, the processing of the court-supervised reorganization is approved only for the companies

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

OGX Petróleo e Gás Participações S.A. and OGX Petróleo e Gás S.A., the first of which is a holding company, parent and co-debtor of the second, in relation to practically all liabilities, with each one of the reorganizing companies having to submit their own reorganization plan, even if they are identical or interdependent, and they must be analyzed separately by their respective creditors, in complete compliance with the autonomy of assets of each company, so that distinct general lists of creditors will be published for each company.

For the purpose of appointing the court administrator, given the peculiar situation of this being a reorganization petition of large companies with estimated liabilities in excess of twelve billion reals, it was ordered that the company Delloite Touche Tohmatsu, a company known to be qualified to the court, telephone Nos. (11) 99999-5034 and (11) 98314-5686, be summoned to submit a proposal as to fees for performing its duties, within a term of 24 hours. With the submission of the proposal, the petitioner companies would also make a statement within 24 hours and the State Prosecutor's Office would be contacted for an opinion regarding the proposal submitted. Subsequently, conclusions were reached regarding the award of fees to the court administrator, suspending the term for submission of the reorganization plan until such time as a court administrator is appointed.

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

The submission of compliance certifications was waived, so that the petitioners could conduct their operations, as stated by the provisions of Article 52, II, of the LRE [State Responsibilities Act].

It is ordered to suspend all actions and enforcement activities in progress against the petitioner, in accordance with the term specified by law.

It is ordered that the reorganizing entity submit its accounts monthly, as stated in Clause IV of Article 52, as well as the reorganization plan specified by Article 53 of Law No. 11,101/05.

Let the State Prosecutor's Office be notified, by letter, to the Public Treasury Department.

As specified by §1 of Article 52 of the LRE, let the corresponding legal notice be published.

It is further ordered that the companies OGX Petróleo e Gás Participações S.A. and OGX Petróleo e Gás S.A, add the statement *"em recuperação judicial"* ["in court-supervised reorganization"] to their name.

Be it so notified.

Rio de Janeiro, November 21, 2013

[illegible signature]
Gilbert [illegible] C. Farias Matos
Judge at Law

[Handwritten]  "Notified, Nov. 25, 2013
[illegible]
OAB/RJ [Braz. Bar Assoc., Rio de Janeiro Section] No 178,816"

**consortra** translations

---

STATE of NEW YORK      )
                        )            ss:
COUNTY of NEW YORK     )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"Exhibit 2 - November 21, 2013 Order"* originally written in *Portuguese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: March 30, 2017

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
30th day of March,
2017.

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified In New York County
My Commission Expires December 4, 2018

Your
legal
translation
partner



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

# D E C I S Ã O

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A

OGX PETRÓLEO E GÁS S/A

OGX INTERNACIONAL GMBH

OGX ÁUSTRIA GMBH

Trata-se de pedido de Recuperação Judicial formulado por OGX Petróleo e Gás Participações S.A., OGX Petróleo e Gás S.A. OGX Internacional GMBH e OGX Áustria GMBH, sociedades empresárias integrantes do mesmo grupo econômico que atuam de forma interligada no mercado petrolífero, em 30/10/2013. Conforme se depreende dos fatos expostos, a OGX Participações se trata de holding não operacional e é controladora da OGX Petróleo e Gás, empresa exploradora e produtora; enquanto que a empresa OGX Participações é controladora da OGX Internacional que controla a empresa OGX Áustria, sendo certo que as duas últimas foram criadas com o único objetivo de servirem de veículo para obtenção de recursos junto a credores internacionais a fim de viabilizar as operações desenvolvidas no Brasil pela OGX Petróleo e Gás. Conforme destacado no percuciente parecer elaborado pelo Ministério Público, a empresa OGX Participações funciona como garantidora e devedora solidária das empresas controladas, bem como toda a atividade operacional se desenvolve no Brasil em nome da OGX Petróleo e Gás, de modo que

Processo n.º 0377620-56.2013.8.19.0001                                          1



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

postularam os requerentes que a cidade do Rio de Janeiro deva ser considerada como o "local do principal estabelecimento do devedor", para fins de processamento da recuperação judicial das quatro sociedades empresárias requerentes, nos termos do artigo 3.o da Lei de Falências e de Recuperação de Empresas.

Documentos juntados às fls. 19/1336.

Às fls. 1376, as requerentes juntam documentos demonstrando bens e direitos dos sócios, que foram acautelados em cartório conforme fls. 1378. Posteriormente, junta demais documentos a fls. 1408/1426.

O Ministério Público manifesta-se no sentido de que nem todos os requisitos contábeis foram apresentados e apresentou seu parecer circunstanciado.

As requerentes apresentaram a documentação necessária e se pronunciaram sobre o parecer do Ministério Público.

**Passa-se a decidir.**

Os princípios constitucionais são mais do que normas, pois funcionam como verdadeiros vetores para soluções interpretativas. O caso

Processo n.º 0377620-56.2013.8.19.0001  2



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

vertente deve ser analisado também sob o enfoque constitucional, a partir da ordem econômica com a observação da função social da propriedade.

Trata-se de questão fundamental, o enfoque da personalidade jurídica, sobre o qual mantém suporte o direito empresarial, no processamento de um pedido de recuperação judicial das empresas requerentes.

A desconsideração da personalidade jurídica das empresas somente seria admissível em uma hipótese de caracterização de abuso de poder, o que não se cogita na hipótese trazida a lume, nesta fase processual. Nesse diapasão, vislumbra-se que somente sob esse fundamento se poderia acolher uma hipótese que pudesse atrair uma empresa estrangeira para um litisconsórcio ativo de pedido de recuperação judicial em nosso país.

Pelo que se verifica da negociação engendrada no contexto das empresas requerentes, trata-se de um fato econômico inquestionável que as operações financeiras das empresas estrangeiras se entrelaçam com as das empresas nacionais, tal como se as empresas OGX Internacional GMBH e OGX Áustria GMBH fossem uma extensão das empresas OGX Petróleo e Gás Participações S.A. e OGX Petróleo e Gás S.A., de molde inexorável.

Entretanto, tal negociação econômica carece de fundamento jurídico para se admitir a recuperação judicial em território nacional de





PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

empresas sediadas na Áustria e na Holanda, por absoluta ausência de jurisdição.

Para reforçar de forma contundente a necessidade de observar a competência do Juízo do local do principal estabelecimento do devedor, desde que haja jurisdição, verifica-se que as empresas OGX Internacional GMBH e OGX Áustria GMBH ganhariam um contorno jurídico próprio, um verdadeiro limbo, na medida em que se faria um estudo individualizado do patrimônio, capital de giro, créditos e débitos para a confecção do plano de pagamento a seus credores, com a blindagem legal inerente, mas não haveria possibilidade jurídica de decretação da falência na hipótese de descumprimento do plano de recuperação judicial, o que se configuraria um privilégio jurídico inaceitável. Deve haver uma assunção do risco do negócio.

Sem olvidar a possibilidade de submeter os credores às condições de pagamento propostas em outro país, alterando substancialmente a relação jurídica, sob o enfoque de uma legislação absolutamente diversa da qual foram contraídas as obrigações, impondo inequívoca insegurança jurídica.

Nesse sentido, existe precedente jurisprudencial do Egrégio Superior Tribunal de Justiça, em caráter de empresas nacionais, a seguir colacionada:

Processo n.º 0377620-56.2013.8.19.0001                                                  4



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

"... Assinala-se, ainda, que a formação de grupos econômicos, prevista na Lei de Sociedades Anônimas, dá-se mediante combinação de recursos ou esforços das sociedades envolvidas, tendo por desiderato viabilizar a realização dos respectivos objetos, ou a participação em atividades ou empreendimentos comuns. Em qualquer circunstância, entretanto, cada empresa conservará autonomamente sua personalidade e seu patrimônio, nos termos do artigo 266, do referido diploma legal. Tal autonomia, como assinalado, ganha relevância no bojo de uma recuperação judicial. Nessa ordem de ideias, a responsabilização do grupo econômico por débito assumido por um de seus integrantes demanda previsão legal específica, tal como na legislação trabalhista e tributária, ou, mesmo, na civil, no caso de fraude, hipótese, inequivocamente, diversa da tratada nos autos. ... (Agravo Regimental em REsp – GO - Relator Ministro Marco Buzzi, 22/03/2013)"

Quando se pretende dar um tratamento para as empresas OGX Internacional GMBH e OGX Áustria GMBH como sendo um ativo das empresas OGX Petróleo e Gás Participações S.A. e OGX Petróleo e Gás S.A., nada mais se estaria fazendo, por via oblíqua, do que aplicar a teoria da desconsideração da personalidade jurídica naquelas empresas.





PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

Por conseguinte, estaria se descaracterizando direitos e obrigações de empresas estrangeiras dotadas de personalidade jurídica própria, contraídos sob a égide de um ordenamento jurídico estrangeiro e afrontando-se a teoria da personificação.

O direito pátrio não pode ser aplicado e muito menos a sua proteção jurídica pode ser concedida para uma empresa chinesa, coreana, tailandesa, austríaca ou holandesa, sob pena de violação da soberania da legislação pátria daqueles países ou absoluta inaplicabilidade sem o amparo legal.

Tratar-se-ia de criar uma insegurança jurídica perante credores internacionais que não poderiam ter um julgamento de seus créditos apreciados por nossa legislação, ainda mais sem o amparo do nosso direito.

Não se pode confundir a harmonização de processos de falências de empresas que possuem ativos em diferentes jurisdições, o que encontra respaldo no *chapter fifteen* da legislação americana de falência, com o processamento e julgamento de recuperação judicial de empresas estrangeiras sem qualquer previsão legal.

Na ausência de uma legislação nacional com essa previsão de harmonização para falência de grandes empresas com ativos em diversos





PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

países, essa lacuna deverá ser suprida pela atuação dos operadores do direito. Não atentar para esse aspecto, significa atentar contra a soberania das nações e de suas legislações, o que ensejaria insegurança jurídica de contratos pactuados alhures, formando-se um cenário negativo para os investimentos externos em nosso país.

Sem embargo da decisão proferida, nada impede o ajuizamento do Pedido de *Chapter* 15, de acordo com o Código de Falências Norte-Americano na Corte Distrital de Nova York, por se tratar do foro de eleição nos negócios jurídicos pactuados com os credores das empresas OGX Internacional GMBH e OGX Áustria GMBH, a partir do deferimento do processamento da recuperação judicial das empresas OGX Petróleo e Gás Participações S.A. e OGX Petróleo e Gás S.A., demonstrando-se o risco de ação por parte dos credores mencionados.

Esse pedido de *Chapter* 15 do *Bankrupty Code* terá por objetivo conferir efeitos ao plano de recuperação em território norte-americano, o que provavelmente ensejará sua admissão e reconhecimento da ação proposta neste Juízo como principal processo de insolvência para fins da lei norte-americana e concessão de assistência e cooperação da corte norte-americana ao Juízo da Recuperação Judicial.

Processo n.° 0377620-56.2013.8.19.0001                7



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

Essa é a integração de legislação, harmonização de cooperação e respeito da soberania que se pode pretender para salvaguardar a recuperação judicial das empresas OGX Petróleo e Gás Participações S.A. e OGX Petróleo e Gás S.A. e o interesse na solução do adimplemento dos credores que investiram seu capital nas empresas OGX Internacional GMBH e OGX Áustria GMBH, com a concessão eventual de suspensão de ações e execuções para a proteção temporária dos ativos nos Estados Unidos, tudo com o fim precípuo de criar um ambiente propício aos investimentos para implementar a produção de petróleo e gás das empresas em epígrafe.

Com efeito, os sistemas recuperacionais mundiais utilizam modelos que estendem à autoridade de uma decisão havida num país, a tantos outros, objetivando garantir eficácia aos projetos de reorganização empresarial que, repita-se, encontram empresas espalhadas por todo o mundo.

Na hipótese, as empresas OGX Petróleo e Gás Participações S.A. e OGX Petróleo e Gás S.A. abrangem um nicho de mercado com pesados investimentos de credores internacionais, centenas de empregos, fornecedores de produtos e prestadores de serviços que desempenham importante função na economia que são de enorme relevância para a sociedade.

Ante o exposto, na forma do artigo 52 da Lei n.o 11.101/05, defere-se o processamento da recuperação judicial somente das empresas

Processo n.º 0377620-56.2013.8.19.0001                                                    8



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

OGX Petróleo e Gás Participações S.A. e OGX Petróleo e Gás S.A., sendo a primeira uma holding controladora e co-devedora da segunda em relação a praticamente todo o passivo, devendo cada uma das recuperandas apresentar seu próprio plano de recuperação judicial, mesmo que sejam idênticos ou interdependentes, e deverão ser analisados separadamente por seus respectivos credores, com absoluto respeito à autonomia patrimonial de cada sociedade, de tal sorte que deverão ser publicados quadros gerais de credores distintos para cada empresa.

Para efeito de nomeação do administrador judicial, dada a situação peculiar de se tratar de um pedido de recuperação judicial de empresas de grande porte com um passivo estimado superior a doze bilhões de reais, determina-se a intimação da empresa Delloite Touche Tohmatsu, de qualificação conhecida no cartório, telefones (11) 99999-5034 e (11) 98314-5686, para apresentar proposta de honorários para exercício do seu mister, no prazo de 24 horas. Com a apresentação da proposta, manifestem-se as empresas requerentes também no prazo de 24 horas e abra-se vista ao Ministério Público para pronunciamento sobre a proposta apresentada. Em seguida, voltem conclusos para o arbitramento dos honorários do administrador judicial, ficando suspenso o prazo para apresentação do plano de recuperação até a nomeação do administrador judicial.

Processo n.º 0377620-56.2013.8.19.0001                    9



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

Dispensa-se a apresentação de certidões negativas para que as requerentes possam desempenhar suas atividades, conforme expressa previsão contida no artigo 52, II, da LRE.

Determina-se a **suspensão** de todas as ações e execuções em curso contra a requerente, observando-se o prazo legal.

Determina-se a apresentação **mensal pela recuperanda de suas** contas, na forma do inciso IV do artigo 52 bem como o plano de recuperação no prazo do artigo 53 da Lei n.o 11.101/05.

Intime-se o Ministério Público, comunicando por carta, às Fazendas Públicas.

Na forma do § 1º do artigo 52 da LRE, publique-se o edital.

Determina-se, ainda, que as empresas OGX Petróleo e Gás Participações S.A. e OGX Petróleo e Gás S.A. acrescentem a expressão "em recuperação judicial" em sua denominação.

Intimem-se.

Rio de Janeiro, 21 de novembro de 2013.

Gilbert C. Farias Matos

Processo n.º 0377620-56.2013.8.19.0001

Ciente em 25.11.13

Tu V u Si

OAB/RJ 178.816

10

# Exhibit 3

**RIO DE JANEIRO STATE COURT SYSTEM**
**FOURTEENTH CIVIL BENCH**
**INTERLOCUTORY APPEAL No. 0064658-77.2013.8.19.0000**
**APPELLANTS**: OGX PETRÓLEO E GAS PARTICIPAÇÕES S.A., OGX PETRÓLEO E GAS S.A., OGX INTERNATIONAL GMBH, and OGX AUSTRIA GMBH HSBC CTVM S.A.
**REPORTING JUDGE: APPELLATE JUDGE GILBERTO CAMPISTA GUARINO**

> INTERLOCUTORY APPEAL. COURT-SUPERVISED REORGANIZATION. INTERLOCUTORY THAT GRANTED THE PROCESSING OF THE REQUEST BY THE FIRST TWO APPELLANTS, WHICH ARE HEADQUARTERED IN BRAZIL, REJECTING, HOWEVER, THE REQUEST BY THE THIRD AND FOURTH APPELLANTS, BOTH HEADQUARTERED IN THE REPUBLIC OF AUSTRIA. REFUSAL TO ACCEPT. REJECTION OF JOINT REORGANIZATION THAT DOES NOT APPEAR SUSTAINABLE. PURPOSE OF COURT-SUPERVISED REORGANIZATION BASED ON PRESERVING THE COMPANY AND ITS SOCIAL FUNCTION, IN ADDITION TO HAVING WITHIN ITS SCOPE THE ENCOURAGEMENT OF ECONOMIC ACTIVITY (ARTICLE 47 OF LAW 11101/2005). THE COMPANY IS NOT SOLELY OF INTEREST TO ITS OWNER (BUSINESSMAN), BUT TO MANY OTHER ACTORS ON THE ECONOMIC STAGE (WORKERS, INVESTORS, SUPPLIERS, CREDIT INSTITUTIONS, AND THE STATE). OGX PETRÓLEO E GAS PARTICIPAÇÕES S.A., WHICH IS A HOLDING COMPANY, RATHER THAN AN OPERATIONAL ONE, CONTROLS OGX PETRÓLEO E GAS S.A., OWNING 99.99% OF ITS CAPITAL STOCK. DIRECT, COMPLETE CONTROL ALSO OF OGX INTERNATIONAL GMBH AND OGX AUSTRIA GMBH CTVM S.A., HOLDING COMPANIES PURSUANT TO ARTICLES 2, PARA. 3, AND 243, PARA. 3, OF LAW 6404/76. FOREIGN ENTERPRISES, CLEARLY SUBSIDIARIES, THAT ONLY CONSTITUTE THE FINANCING STRUCTURE OF ITS DOMESTIC CONTROLLING ENTITY, SERVING AS A VEHICLE OF THE BRAZILIAN COMPANIES, SEEKING TO ISSUE BONDS AND TO RECEIVE REVENUE ABROAD. CONFIGURATION OF A SINGLE ECONOMIC GROUP, WORKING ON A SINGLE BUSINESS ACTIVITY, CONSISTING OF PETROLEUM AND GAS EXPLORATION AND PRODUCTION IN BRAZILIAN TERRITORY. CREDITORS HAVE NOT OPPOSED A COMMON COURT-SUPERVISED REORGANIZATION PLAN. AUSTRIAN LEGISLATION ON INSOLVENCY ALLOWS THE ACKNOWLEDGMENT OF THE EFFECTS OF A FOREIGN INSOLVENCY PROCEEDING, WHEN THE HEART OF THE DEBTOR'S MAIN INTEREST (COMI) IS LOCATED IN A FOREIGN STATE, AND THE PROCESS IS ESSENTIALLY COMPARABLE TO AUSTRIA'S. FEASIBILITY STUDY SUBMITTED TO THE CASE RECORD. NO NORMATIVE PROVISION REGARDING THE APPLICATION OF COURT-SUPERVISED

REORGANIZATION BEYOND TERRITORIAL LIMITS THAT, IF NOT AUTHORIZING IT, ON THE OTHER HAND, DOES NOT FORBID IT. LEGISLATIVE LACUNAS DECIDED BY ANALOGY, CUSTOMS, AND THE GENERAL PRINCIPLES OF THE LAW (ARTICLE 4 OF THE LAW OF INTRODUCTION TO THE NORMS OF BRAZILIAN LAW). EQUITY PREVAILS, WHICH SEEKS TO ALIGN THE LAW WITH NEW CIRCUMSTANCES IN ORDER FOR THE JURISDICTIONAL BODY TO ACCOMPANY THE VICISSITUDES OF THE SPECIFIC REALITY. NO TRANSMUTATION OF THE STATE'S JUDICIARY FUNCTION INTO A POSITIVE LEGISLATIVE FUNCTION. AN ADDRESSED ISSUE THAT, GIVEN ITS RELEVANT SOCIAL INTEREST, CANNOT REMAIN OUTSIDE OF JURISDICTIONAL ANALYSIS, FULLY WEIGHING THE ASPECTS OF THE CASE IN QUESTION. NEED TO AMEND THE LAW FOR COURT-SUPERVISED REORGANIZATION, EXTRAJUDICIAL REORGANIZATION, AND BANKRUPTCY OF THE BUSINESS OWNER AND COMPANY, SEEKING TO ADDRESS TRANSNATIONAL INSOLVENCY. MOTION GRANTED, CONFIRMING APPROVAL OF AN ACTIVE STAY OF EXECUTION, REVOKING THE APPEALED INTERLOCUTORY JUDGMENT AND ORDERING JOINT PROCESSING OF THE APPELLANTS' COURT-SUPERVISED REORGANIZATION.

**Having reviewed, reported on, and discussed** the case records of this Interlocutory Appeal No. 0064658-77.2013.8.19.000, in which the appellants are OGX PETRÓLEO E GAS PARTICIPAÇÕES S.A., OGX PETRÓLEO E GAS S.A., OGX INTERNATIONAL GMBH, and OGX AUSTRIA GMBH HSBC CTVM S.A.

**IT IS HEREBY AGREED BY**

The Appellate Judges on the 14th Civil Bench **to grant the motion**, in accordance with the Reporting Judge's ruling. **Unanimous decision**.

**REPORT**

1. This is an interlocutory appeal filed against **the ruling on pages 232 to 242** (paging from the original case record) handed down by the Honorable Judge of the 4th Business Court of the Judicial District of the State Capital, **which**, in the case record of the court-supervised reorganization of companies, granted processing of the request by OGX PETRÓLEO E GAS PARTICIPAÇÕES S.A. and OGX PETRÓLEO E GAS S.A., which are headquartered in Brazil, but rejected the request by OGX INTERNATIONAL GMBH and OGX AUSTRIA GMBH HSBC CTVM S.A., both headquartered in the Republic of Austria.

2. In their brief (pp. 2-32), the appellants claim that the foreign companies are wholly and directly controlled by OGX PETRÓLEO E GAS PARTICIPAÇÕES S.A. and were created *"(…) with the primordial goal of operating, internationally, <u>longa manus</u> of their Brazilian affiliates (…)" (sic);* they do not perform any relevant operational, nor independent, activities, in addition to being jointly liable for debts and revenue received abroad.

3. They state that all the businesses in the OGX GROUP are managed and run organically by the same set of executives, all of whom reside and are domiciled in Brazil, with said country unquestionably being the main center of business of the four (4) appellants.

4. They claim that the factors that led to the crisis at the domestic companies, with the current failure of activities ongoing therein, likewise resulted in the insolvency of the foreign subsidiaries, which, as mere vehicles for financing the activities of oil and gas exploration, do not own their own funds to subsist and to honor, on their own, the economic group's main debt, which is equal to around eight billion reais (R$ 8,000,000,000) and results from the issuing of bonds (debt instruments), maturing in 2018 and 2022, respectively.

5. Thereafter, they assert that a single, joint proceeding must be acknowledged, on the basis of Articles 3 and 47 of Law 11101/2005 along with Article 88, III, of the Civil Procedure Code, seeking to subject domestic and foreign creditors to a common reorganization plan for the OGX GROUP, aimed at saving the conglomerate.

6. And they emphasize, based on a study of Article 240, para. 1, of Austria's Insolvency Law *("Insolvenzordnung – IO"), "(...) the effects of the foreign insolvency proceeding will be acknowledged in Austria if the heart of the debtor's main interest (COMI) is located in that foreign state and the foreign proceeding is – in essence – comparable to Austrian proceedings (specifically, Austrian creditors would be treated the same as domestic creditors).* (sic).

7. Thus, they have put forth a defense according to which, by upholding the interlocutory appeal in question, the reorganization of the Austrian companies will be heard in a foreign court, in a parallel proceeding to the one ongoing in Brazil for those firms headquartered here, which, in practical terms, would trigger a risk of collection on the bonds both of the foreign companies and of the Brazilian ones, as well as harming the recovery of the OGX GROUP, which would be prevented from engaging in international operations, in addition to remaining under threat of constriction of its assets, owing to a decision by an Austrian court.

8. Finally, they state that, if the interlocutory appeal in question is not overturned, the court-supervised reorganization will only proceed with respect to the OGX GROUP, in violation of what international jurisprudence calls the "**universalism of jurisdiction**", when it faces the issue of "**transnational insolvency**", which is increasingly more common in the era of globalization.

9. Therefore, they are seeking an active stay of execution (as stated on page 24), and finally, for a motion to be granted ordering the joint processing of court-supervised reorganization of the Austrian and Brazilian companies, in Brazil.

10. On pages 37 to 52, in the lower-court ruling by Appellate Judge Reinaldo Pinto Alberto Filho, a member of the 4th Civil Bench, the motion was denied, in accordance with Article 557 of the Civil Procedure Code, based on its clear lack of grounds.

11. On pages 90 to 92, in light of information regarding the existence of another petition (Proceeding No. 0064637-04.2013.8.19.0000), filed by an interested third-party company (ACCIONA INFRAESTRUTURAS S.A.), in the case record of the court-supervised reorganization proceeding of OSX BRASIL S.A., OSX CONSTRUÇÃO NAVAL S.A., and OSX SERVIÇOS OPERACIONAIS LTDA., assigned to this 14th Civil Bench, prevention was acknowledged, making this Reporting Judge the head of this case, disallowing jurisdiction.

12. The ruling on pages 100 to 102 was handed down on 11/29/2013 (Friday), appearing within the procedure at 7:40 pm, granting a stay of execution of the appeal.

13. As the reporting judge on the case, which is not minor and (it must be pointed out) **the case record for which were only sent to me on 12/02/2013**, I upheld the efficacy of that ruling, on page 106, for further examination of the request and noting that no petition requesting urgency had been filed on Friday, because, again, the case record had not been sent to me.

14. After reanalyzing the request to grant a stay of execution, on account of nullification of the lower-court decision on pages 37 to 52, I decided, on pages 110 to 118, to restore the efficacy of the ruling on pages 100 to 102, on the grounds that I set out, and to grant an active stay of execution, revoking the interlocutory appeal that rejected the request for court-supervised reorganization of the Austrian businesses and ordering the joint processing of the appellants' court-supervised reorganization.

15. On pages 122 to 125, G-COMEX ARMAZENS GERAIS LTDA filed a motion for clarification, as a creditor of the OGX and OSX GROUPS, against that decision, which has not been acknowledged by this 14th Civil Bench, given the clear lack of the alleged defect of contradiction.

16. Certificates on pages 222 and 223, attesting to this reporting judge's time on leave and vacation, for the period from December 5-19, 2013, January 7-24, 2014, and January 27-31, 2014.

17. The Federal Prosecution Ministry failed to appeal, leaving only the Opinion by the Federal Prosecutor on pages 227 to 233, written by **Ms. Rosa Maria Parise Galvão**, who opined that the appeal should be heard and denied, which is timely and properly prepared.

This is the report.

**RULING**

18.      I acknowledge the motion, which meets the extrinsic and intrinsic requirements of an admissible appeal.

19. As already mentioned in the ruling on pages 110 to 118, this is a highly exceptional case, involving a matter of which Brazil's jurisprudence is ignorant, in which the rejection of a request for the joint court-supervised reorganization of domestic and foreign companies does not appear to be sustainable.

20. It should be duly noted here that one cannot overlook the purpose of the proceeding in question, which as a result of the hardships created by the company's crisis, sought to save if from declaring bankruptcy, enabling it *"(…) to overcome the debtor's financial-economic crisis in order to enable the continuation of the producing source, the employment of workers, and the interests of creditors, thus leading to the preservation of the company, its social function, and the encouragement of economic activity"*, pursuant to Article 47 of Law 11101/2005.

21. Regarding this matter, SERGIO CAMPINHO has stated, in "<u>Falência e Recuperação de Empresa: O Novo Regime da Insolvência Empresarial</u>" (Rio de Janeiro: Renovar, 2009, 4th edition, revised and updated, p. 12):

> **"The process of court-supervised reorganization, at its heart, is aimed at a single purpose: approval by the debtor and its creditors of a proposal designed to make the company feasible for that which up to that point it had been doing. The state of financial economic crisis is thus going to turn out to be temporary and can be overcome given the creditors' willingness, which will lead to the proceeding's goal, which is, the company's recovery. The judge's involvement will be limited to verifying the legal provisions applicable to the plan. The judge is the guardian of its lawfulness. Thus, the judge is prevented from interfering in its content, which is solely at the parties' discretion. The requirement of approval by judicial authorities represents a judiciary-policy measure."**

22. And further on, this same author emphasizes that:

> **"Court-supervised reorganization has been designed specifically with the objective of making it possible to overcome this state of crisis, motivated by an interest in preserving the company developed by the debtor. The figure of the company is emphasized from the perspective of an economic unit interested in being maintained, as a center of socioeconomic balance. It is clearly a productive**

**source of goods, services, jobs, and taxes that ensure a country's economic and social development. Its maintenance consists of conserving the "social asset" that it generates. The company is not solely of interest to its owner – the business owner – but to many other actors on the economic stage, such as workers, investors, suppliers, credit institutions, the State, and, in short, to economic agents in general. That is why the solution to the company's crisis undergoes a stage of balancing public, collective, and private interests in which it exists."** (*op. cit.,* p. 122).

23. Indeed, the unprecedented contested situation cannot solely be viewed from the angle of legislative omission, calling for analysis based on the premise of preserving the company, which, indubitably, has undertaken the most extensive private domestic campaign for the exploration of petroleum and gas, with an activity that produces impacts on Brazil's socioeconomic development, in addition to having generated countless jobs.

24. In the case laid out in the record, it is clear that OGX PETRÓLEO E GAS PARTICIPAÇÕES S.A. is a holding company, rather than an operational one that controls OGX PETRÓLEO E GAS S.A., owning 99.99% of its capital stock, **in addition to wholly and directly controlling** OGX INTERNATIONAL GMBH and OGX AUSTRIA GMBH HSBC CTVM S.A., as countless documents in the interlocutory appeal demonstrate.

25. In Brazilian legislation, the legal grounds for holding companies are set out in Article 2, para. 3, of Law 6404/76, with the following wording:

> **"Article 2. Any for-profit firm that does not violate the law, public order, and common custom may be the company's purpose.**

(...)

**Paragraph 3. The company may have as its purpose holding a stake in other businesses, even if not stipulated in its bylaws, holding a stake is allowed as a means of achieving the company's purpose or to benefit from tax incentives."**

26. This same federal law, in Article 243, para. 3, also makes reference to the system of business concentration through related and wholly owned companies. To wit:

**"Article 243. (...)**

**(...)**

**Paragraph 2. A business is considered to be controlled in which the controlling company directly, or through other controlled companies, is the owner of the partner rights that permanently entitle it to a preponderance in the company's deliberations and the power to elect the majority of its management."**

27. And according to the definition by MODESTO CARVALHOSA, in "Comentários à Lei de Sociedades Anônimas, Volume 4, Tome II" (São Paulo: Saraiva, 2009, 3rd edition, p. 14):

**"Holding companies are non-operational firms whose equity is composed of other businesses' shares. They are organized either to exercise the power to control or to hold a relevant stake in other companies, seeking, in that case, to establish a relationship. In general, these holding companies do not engage in commercial operations, but solely manage their assets. When it exercises control, the holding company has a relationship of domination over its controlled companies, which will be its subsidiaries."**

28. Now, then, the two foreign subsidiary companies, excluded by the lower court from the court-supervised reorganization procedure, only operate strictly as a function of the controlling company, serving as vehicles for the Brazilian companies to issue bonds and to receive revenue abroad, seeking financing of petroleum and gas exploration and production in Brazil.

29. Therefore, these are foreign companies set up in the financing structure of their domestic parent company, forming a single economic group, working on a single business activity, which is not at all uncommon in the current era of globalized markets, even more so when one takes into account the activity being done, which intensifies transborder legal relations.

30. Obviously, they don't have affiliates, branch offices, or agencies in Brazilian territory, given that, as already stated, they are subsidiaries of the Brazilian company, which in reality, is responsible for paying out the bonds issued abroad.

31. It is important to point out that none of the many creditors of the OGX GROUP appears to be against joint court-supervised reorganization. On the contrary, the latest news reports noted that Óleo e Gas Participações (OGP), formerly known as OGX, entered into an agreement on 12/24/2013 with international creditors in an attempt to eliminate its debt and recapitalize the company (see: http://g1.globo.com/economia/negocios/noticia/2012/12.html).

32. Thus, the opinion of the Federal Prosecutor notwithstanding, set against what is being decided at this point, it appears advisable to cover both foreign and domestic creditors under a single reorganization plan for the OGX GROUP, avoiding potential constriction of assets abroad, which would be imposed at the request of the Austrian companies' court-ordered trustee, as well as the visceral impossibility of doing business internationally, which would definitively frustrate any and all possibility of the appellants' recovery.

33. As already mentioned in item 6 (above), Austrian legislation on insolvency allows the acknowledgement of the effects of a foreign proceeding, when the heart of the debtor's main interest (COMI) is located in a foreign State, and the proceeding is essentially comparable to that in Austria, which, in light of the feasibility study attached to the case record, seems to be the case.

34. With this quite clear, the State's judiciary role is not being raised to the condition of a positive legislature. The absence of a normative provision regarding the application of court-supervised reorganization beyond territorial borders does not authorize it; however, it likewise doesn't prohibit it. The case challenges the ruling based on analogy, customs, and the general principles of law, as stipulated in Article 4 of the Law of Introduction to the Norms of Brazilian Law, prudently and exceptionally applied to situation that, for their part, demand caution and are similarly exceptional. Because the general principles are the ones responsible for the actions of the legal order for the case as a whole, with connecting sectors that would otherwise be impervious becoming a part of it.

35. At the same time, one must understand that it on the basis of equity that the purpose of this principle must prevail over its wording, in terms, given the case in question, of seeking to adjust the law to new and surprising circumstances, in order for the jurisdictional body to accompany the vicissitudes of the specific reality, which, as Carvalha de Mendonça has stated, in his book "*Curso de Direito das Obrigações*", is always a step ahead of legislation, which belatedly captures the nation's legal desire (lawfulness).

36. Along these lines, please see the comments made by MARIA HELENA DINIZ, in "Lei de Introdução às Normas do Direito Brasileiro Interpretada" (São Paulo: Saraiva, 2013, 18th edition, revised and updated, pp. 158-159):

> "Equity also plays a major role in the *interpretation of norms*. In that interpretive function, equity may mean: 1) the law's purpose prevailing over its wording; or 2) preference among the various possible interpretations of a norm by the most benign and humane. Both meanings don't need to be legally authorized.
>
> In its interpretive function, in the search for the norm's meaning, equity appears in the application of the historical/evolutionary method, which advocates the adjustment of the law to new circumstances, and the teleological method, which requires valuation of the law (LINDB, Article 5), in order for the jurisdictional body to be able to accompany the vicissitudes of the specific reality.
>
> Through equity, practical results are pondered, understood, and estimated that the application of the norm would produce in certain factual situations. If the practical result concurs with the valuations that inspired the norm on which it is based, then such norm shall be applied, If, otherwise, the norm applicable to a unique case produces effects that would contradict the valuations, according to which the legal order is modeled, then indubitably, said norm should not be applied to that specific case."

37. And if the purpose is, as stated in item 23 (above) to safeguard the company, then one cannot leave the issue of a relevant social interest outside of an effective legal analysis, which provides a dynamic, updated solution to the dispute.

38. Moreover, the Law for Court-Supervised Reorganization, Extrajudicial Reorganization, and Bankruptcy of the Business Owner and Company is currently the subject of a stirring debate, in terms of the need for reform so that among the amendments, it addresses so-called "**transnational insolvency**", a palpable reality, following the path of international legislative trends, based on cooperation and dialogue among judges and courts in different countries.

39. It is worth noting a passage taken from the study done by FRANCISCO SÁTIRO and PAULO FERNANDO CAMPANA FILHO, in their paper "A Insolvência Transnacional: para Além da Regulação Estatal e na Direção de Acordos de Cooperação" (2007, p. 139), in which they state that:

> "**Economic efficiency – that is, the preservation of value in liquidations and reorganizations of companies – leads to enthusiasm for mutual assistance with other judges and respect for foreign bankruptcy rules and principles. The lack (or even the existence) of specific norms has not been an obstacle to insolvency proceedings, which seem to converge toward universalism in a tropical movement. These joint efforts have been valuable in building transnational law for international insolvencies based on free will, which is more resourceful and customizable than a system guided by binding norms could ever dream of being – and therefore, more adequate for facing challenges imposed by the bankruptcy of companies spread out around an unforeseeable, multifaceted, and globalized world."**

40. **All this duly taken into account**, I hereby **rule in favor** of granting the motion, confirming the decision on pages 110 to 118, revoking the interlocutory appeal that rejected the request for court-supervised reorganization of the Austrian companies, and ordering the joint processing of the appellants' court-supervised reorganization.

Rio de Janeiro, February 19, 2014

**Appellate Judge GILBERTO GUARINO**

**Reporting Judge**



STATE of NEW YORK   )
                            )      ss:
COUNTY of NEW YORK  )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, "*Exhibit 3 - Opinion Granted in Interlocutory Appeal*" originally written in *Portuguese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: March 30, 2017

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
30th day of March,
2017.

*[signature]*
Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified In New York County
My Commission Expires December 4, 201?

Your
legal
translation
partner

TRIBUNAL DE JUSTIÇA DO ESTADO DO RIO DE JANEIRO

DÉCIMA QUARTA CÂMARA CÍVEL

AGRAVO DE INSTRUMENTO Nº. º 0064658-77.2013.8.19.0000

**AGRAVANTES:** OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A., OGX PETRÓLEO E GÁS S/A., OGX INTERNATIONAL GMBH e OGX ÁUSTRIA GMBH HSBC CTVM S/A.

**RELATOR: DESEMBARGADOR GILBERTO CAMPISTA GUARINO**

> AGRAVO DE INSTRUMENTO. RECUPERAÇÃO JUDICIAL DE EMPRESAS. INTERLOCUTÓRIA QUE DEFERIU O PROCESSAMENTO DO REQUERIMENTO DAS DUAS PRIMEIRAS AGRAVANTES, QUE TÊM SEDE NO BRASIL, REJEITANDO, CONTUDO, A POSTULAÇÃO DAS TERCEIRA E QUARTA RECORRENTES, AMBAS COM SEDE NA REPÚBLICA DA ÁUSTRIA. IRRESIGNAÇÃO. REJEIÇÃO DA RECUPERAÇÃO CONJUNTA QUE NÃO SE AFIGURA SUSTENTÁVEL. FINALIDADE DO INSTITUTO DA RECUPERAÇÃO JUDICIAL CALCADA NA PRESERVAÇÃO DA EMPRESA E DE SUA FUNÇÃO SOCIAL, ALÉM DE TER POR ESCOPO O ESTÍMULO À ATIVIDADE ECONÔMICA (ART. 47 DA LEI N.º 11.101/2005). A EMPRESA NÃO INTERESSA APENAS A SEU TITULAR (EMPRESÁRIO), MAS A DIVERSOS OUTROS ATORES DO PALCO ECONÔMICO (TRABALHADORES, INVESTIDORES, FORNECEDORES, INSTITUIÇÕES DE CRÉDITO E ESTADO). OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A. QUE É A SOCIEDADE *HOLDING* E NÃO OPERACIONAL, CONTROLADORA DA OGX PETRÓLEO E GÁS S/A., TITULAR DE 99,99% DO SEU CAPITAL SOCIAL. CONTROLE EXERCIDO DIRETA E INTEGRALMENTE TAMBÉM SOBRE A OGX INTERNATIONAL GMBH E A OGX ÁUSTRIA GMBH CTVM S/A.. SOCIEDADES DE *HOLDING* COM RESPALDO NOS ARTS. 2º, § 3º, E 243, § 3º, DA LEI N.º 6.404/76. SOCIEDADES EMPRESÁRIAS ESTRANGEIRAS, NOTORIAMENTE SUBSIDIÁRIAS, QUE APENAS CONSTITUEM A ESTRUTURA DE FINANCIAMENTO DE SUA CONTROLADORA NACIONAL, SERVINDO COMO VEÍCULO DAS EMPRESAS BRASILEIRAS, VISANDO A EMISSÃO DE *"BONDS"* E RECEBIMENTO DE RECEITAS NO EXTERIOR. CONFIGURAÇÃO DE UM GRUPO ECONÔMICO ÚNICO, EM PROL DE UMA ÚNICA ATIVIDADE EMPRESARIAL, CONSISTENTE NA EXPLORAÇÃO E PRODUÇÃO DE PETRÓLEO E GÁS NATURAL EM TERRITÓRIO NACIONAL. AUSÊNCIA DE MANIFESTAÇÃO DOS CREDORES CONTRÁRIA A UM PLANO COMUM DE RECUPERAÇÃO JUDICIAL. LEGISLAÇÃO AUSTRÍACA SOBRE INSOLVÊNCIA QUE ADMITE O RECONHECIMENTO DOS EFEITOS DO PROCESSO DE INSOLVÊNCIA ESTRANGEIRO, QUANDO O CENTRO DE PRINCIPAL INTERESSE DO DEVEDOR (COMI) ESTÁ LOCALIZADO NO

ESTADO ESTRANGEIRO E O PROCESSO É, EM ESSÊNCIA, COMPARÁVEL AO AUSTRÍACO. ESTUDO DE VIABILIDADE ANEXADO AOS AUTOS. FALTA DE PREVISÃO NORMATIVA QUANTO À APLICAÇÃO DO INSTITUTO DA RECUPERAÇÃO JUDICIAL ALÉM DOS LIMITES TERRITORIAIS QUE, SE NÃO O AUTORIZA, POR OUTRO LADO, NÃO O VEDA. LACUNAS LEGISLATIVAS DECIDIDAS DE ACORDO COM A ANALOGIA, OS COSTUMES E OS PRINCÍPIOS GERAIS DE DIREITO (ART. 4º DA LEI DE INTRODUÇÃO ÀS NORMAS DO DIREITO BRASILEIRO). PREDOMÍNIO DA EQUIDADE, QUE BUSCA ADEQUAR A LEI ÀS NOVAS CIRCUNSTÂNCIAS, A FIM DE QUE O ÓRGÃO JURISDICIONAL ACOMPANHE AS VICISSITUDES DA REALIDADE CONCRETA. INOCORRÊNCIA DE TRANSMUTAÇÃO DO ESTADO JUIZ EM ESTADO LEGISLADOR POSITIVO. QUESTÃO VERSADA QUE, POR SER DE RELEVANTE INTERESSE SOCIAL, NÃO PODE FICAR À MARGEM DA ANÁLISE JURISDICIONAL, BEM PONDERADOS OS ASPECTOS DO CASO CONCRETO. NECESSIDADE DE REFORMA DA LEI DE RECUPERAÇÃO JUDICIAL, EXTRAJUDICIAL E FALÊNCIA DO EMPRESÁRIO E DA SOCIEDADE EMPRESÁRA, COLIMANDO TRATAR DA INSOLVÊNCIA TRANSNACIONAL. PROVIMENTO DO RECURSO, CONFIRMANDO-SE O DEFERIMENTO DO EFEITO SUSPENSIVO ATIVO, PARA REVOGAR A INTERLOCUTÓRIA AGRAVADA E DETERMINAR O PROCESSAMENTO CONJUNTO DA RECUPERAÇÃO JUDICIAL DAS AGRAVANTES.

**Vistos, relatados e discutidos** este autos de Agravo de Instrumento n.º **0064658-77.2013.8.19.0000**, em que são agravantes OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A., OGX PETRÓLEO E GÁS S/A., OGX INTERNATIONAL GMBH E OGX ÁUSTRIA GMBH HSBC CTVM S/A.,

ACORDAM

Os Desembargadores que integram a 14ª Câmara Cível em **dar provimento** ao recurso, nos termos do voto do Relator. Decisão **unânime**.

RELATÓRIO



**01.** Tem-se de agravo de instrumento **da decisão de fls. 232 a 242** (paginação dos autos do processo originário), da lavra do MM. Juiz de Direito da 4ª Vara Empresarial da Comarca da Capital, **que**, nos autos procedimento de recuperação judicial de empresas, deferiu o processamento do requerimento da OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A e da OGX PETRÓLEO E GÁS S/A, que têm sedes no Brasil, rejeitando, contudo, o pedido da OGX INTERNATIONAL GMBH e da OGX ÁUSTRIA GMBH HSBC CTVM S/A., ambas sediadas na República da Áustria.

**02.** Em sua minuta (fls. 02 a 32), alegam as recorrentes que as sociedades estrangeiras são integral e diretamente controladas pela OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A, foram criadas *"(...) com o primordial objetivo de atuarem, no âmbito internacional, como longa manus de suas coligadas brasileiras (...)"* (*Sic*), não exercem atividades operacionais relevantes, nem autônomas, além de responderem solidariamente pelas dívidas e recebimento de receitas no exterior.

**03.** Asseveram que todas as sociedades do GRUPO OGX são geridas e administradas de forma orgânica pelo mesmo corpo de executivos, todos residentes e domiciliados no Brasil, sendo este país, inquestionavelmente, o principal centro de negócios das 04 (quatro) agravantes.

**04.** Aduzem que os fatores que detonaram a crise das empresas nacionais, com o atual insucesso das atividades nelas concentradas, implicam, também, na insolvência das subsidiárias estrangeiras, que, sendo meros veículos de financiamento das atividades de exploração de petróleo e gás, não titularizam recursos próprios para subsistirem e honrarem, sozinhas, a principal dívida do grupo econômico, que é equivalente à cifra aproximada de R$ 8.000.000.000,00 (oito bilhões

de reais) e decorre de duas emissões de *"bonds"* (títulos de dívida), com vencimentos em 2018 e 2022 cada.

**05.** A seguir, afiançam ser mister observar-se o procedimento único e conjunto, com fulcro nos arts. 3º e 47 da Lei n.º 11.101/2005, c/c art. 88, III, do Código de Processo Civil, colimando a submissão dos credores nacionais e internacionais a um plano comum de recuperação do GRUPO OGX, com vista à salvação do conglomerado.

**06.** E salientam, alicerçadas em estudo sobre o art. 240, § 1º, da Lei de Insolvência da Áustria *("Insolvenzordnung – IO"), "(...) os efeitos do processo de insolvência estrangeiro serão reconhecidos na Áustria se o centro de principal interesse do devedor (COMI) estiver localizado nesse estado estrangeiro e o processo estrangeiro for – em essência – comparável a processos austríacos (especificamente, os credores austríacos teriam tratamento igual aos credores domésticos)"* (*Sic*).

**07.** Assim, advogam a tese segundo a qual da manutenção da interlocutória atacada decorre o processamento da recuperação das empresas austríacas em Tribunal estrangeiro, em procedimento paralelo ao instaurado no Brasil para as sediadas aqui, o que, em termos práticos, acarretaria o risco de cobrança dos *"bonds",* tanto das empresas estrangeiras, quanto das nacionais, bem como prejuízo no soerguimento do GRUPO OGX, que ficaria impedido de encetar operações no âmbito internacional, além de permanecer sob ameaça de constrição de seus ativos, por decisão do Tribunal Austríaco.

**08.** Por derradeiro, asseveram que, acaso não reformada a interlocutória atacada, a recuperação judicial prosseguirá apenas com relação a parte do GRUPO OGX, contrariando o que a jurisprudência internacional denomina de **"universalismo da jurisdição",** quando enfrenta

a questão da **"insolvência transnacional'**, comum e crescente na era da globalização dos mercados.

**09.** Querem, portanto, a concessão de efeito suspensivo ativo (o que se depreende de fls. 24) e, por fim, o provimento do recurso, para que seja determinado o processamento conjunto da recuperação judicial das empresas austríacas e brasileiras, no Brasil.

**10.** Às fls. 37 *usque* 52, por decisão monocrática da lavra do e. Desembargador Reinaldo Pinto Alberto Filho, integrante da colenda 4ª Câmara Cível, foi negado seguimento ao recurso, na forma do art. 557 do Código de Processo Civil, ao asserto de sua manifesta improcedência.

**11.** Às fls. 90 *usque* 92, em vista das informação sobre a existência de outro instrumental (**processo n.º 0064637-04.2013.8.19.0000**), interposto por empresa terceira interessada (ACCIONA INFRAESTRUTURAS S/A.), nos autos do procedimento de recuperação judicial do grupo de sociedades OSX BRASIL S/A., OSX CONSTRUÇÃO NAVAL S/A. e OSX SERVIÇOS OPERACIONAIS LTDA., distribuído a esta colenda 14ª Câmara Cível, foi reconhecida a prevenção, tocando a este Relator a presidência do presente, ocorrendo declínio de competência.

**12.** Foi proferida a decisão de fls. 100 a 102, aos 29/11/2013 (sexta-feira), aparecendo no andamento processual às 19:40h, com deferimento do efeito suspensivo ativo ao recurso.

**13.** Na qualidade de relator do feito, que não é trivial e (frise-se) **cujos autos só me vieram conclusos aos 02/12/2013,** sustei, às fls. 106, a eficácia dessa decisão, para acurado exame da postulação e registrando que nenhuma petição pedindo urgência fora protocolada na sexta-feira, até porque é de se relembrar que os autos não me haviam sido conclusos.

**14.** Após reapreciar o requerimento de concessão do efeito suspensivo, por conta da nulidade do julgamento monocrático de fls. 37 a 52, decidi, às fls. 110 *usque* 118, restaurar a eficácia da decisão de fls. 100 a 102, pelos fundamentos que enunciei, e deferir o efeito suspensivo ativo, revogando a interlocutória que rejeitou o pedido de recuperação judicial das sociedades empresárias austríacas e determinando o processamento conjunto da recuperação judicial das agravantes.

**15.** Às fls. 122 *usque* 125, a G-COMEX ARMAZÉNS GERAIS LTDA. interpôs, na condição de credora dos GRUPOS OGX e OSX, recurso de embargos de declaração contra essa decisão, que vem de não ser conhecido por esta colenda 14ª Câmara Cível, visto ser manifesta a não existência do apontado vício de contradição.

**16.** Certidões de fls. 222 e 223, atestando o afastamento por licença e férias deste relator, durante os períodos de 05 a 19/12/2013, 07 a 24/01/2014 e 27/01/2014 a 31/01/2014.

**17.** O Ministério Público deixou de recorrer, constando apenas o Parecer da douta Procuradoria de Justiça, às fls. 227 *usque* 233, pela pena da Drª. **Rosa Maria Parise Galvão**, opinando pelo conhecimento e desprovimento do instrumental, que é tempestivo e está regularmente preparado.

É o relatório.

### VOTO

**18.** Conheço do agravo, que preenche os requisitos extrínsecos e intrínsecos de admissibilidade recursal.

**19.** Como já mencionado na decisão de fls. 110 a 118, trata-se de caso excepcionalíssimo, veiculando matéria em que é jejuna a jurisprudência pátria, na qual a rejeição do pedido de recuperação judicial

conjunta de empresas nacionais e estrangeiras não se afigura sustentável.

     **20.** Insta, de plano, frisar que não se pode pôr em segundo plano a finalidade do procedimento em tela, o qual, em razão das agruras geradas pela crise da empresa, busca salvá-la da decretação de falência, viabilizando a *"(...) superação da situação de crise econômico-financeira do devedor, a fim de permitir a manutenção da fonte produtora, do emprego dos trabalhadores e dos interesses dos credores, promovendo, assim, a preservação da empresa, sua função social e o estímulo à atividade econômica.*", conforme art. 47 da Lei n.º 11.101/2005.

     **21.** A respeito do tema, pronuncia-se SERGIO CAMPINHO, em "Falência e Recuperação de Empresa: O Novo Regime da Insolvência Empresarial" (Rio de Janeiro: Renovar, 2009, 4ª ed. revista e atualizada, p. 12):

> "O processo de recuperação judicial visa, no seu âmago, a uma única finalidade: a aprovação por parte do devedor e seus credores de uma proposta destinada a viabilizar a empresa por aquele até então realizada. O estado de crise-econômico financeira vai se revelar, assim, transitório e superável pela vontade dos credores, a qual conduzirá ao objetivo do procedimento, qual seja, a recuperação da empresa. A atuação do juiz ficará restrita à verificação das disposições legais aplicáveis ao plano. É um guardião de sua legalidade. Fica-lhe obstado, pois, interferir no seu conteúdo, de domínio exclusivo das partes. A exigência de chancela do acordo por autoridade judicial representa uma medida de política judiciária."

     **22.** E, mais adiante, enfatiza o mesmo autor que:

> "O instituto da recuperação vem desenhado justamente com o objetivo de promover a viabilização da superação desse estado de crise, motivado, por um interesse na preservação da empresa desenvolvida pelo devedor. Enfatize-se a figura da empresa sob a ótica de uma unidade econômica que



interessa manter, como um centro de equilíbrio econômico-social. É, reconhecidamente, fonte produtora de bens, serviços, empregos e tributos que garantem o desenvolvimento econômico e social de um país. A sua manutenção consiste em conservar o "ativo social" por ela gerado. A empresa não interessa apenas a seu titular – o empresário –, mas a diversos outros atores do palco econômico, como os trabalhadores, investidores, fornecedores, instituições de crédito, ao Estado, e, em suma, aos agentes econômicos em geral. Por isso é que a solução para a crise da empresa passa por um estágio de equilíbrio dos interesses públicos, coletivos e privados que nela convivem." (*op. cit.*, p. 122).

**23.** Com efeito, a ímpar situação controvertida não pode ser focada unicamente de sob o ângulo da omissão legislativa, clamando por análise a partir da premissa de preservação da empresa, que, sem sombra de dúvidas, promoveu a mais extensa campanha privada nacional exploratória de petróleo e gás, com atividade que produz impactos no desenvolvimento econômico e social brasileiro, além de haver gerado um sem número de empregos.

**24.** Na hipótese dos autos, é indiscutível que a OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A. é a sociedade *holding* e não operacional que controla a OGX PETRÓLEO E GÁS S/A., titularizando 99,99% do seu capital social, **além de também controlar, direta e integralmente,** a OGX INTERNATIONAL GMBH e a OGX ÁUSTRIA GMBH HSBC CTVM S/A., conforme demonstram os inúmeros documentos que integram o instrumento de agravo.

**25.** Saliente-se que, na legislação pátria, as sociedades *holding* cravam alicerces jurídicos no art. 2º, § 3º, da Lei n.º 6.404/76, assim redigido:

"Art. 2º. Pode ser objeto da companhia qualquer empresa de fim lucrativo, não contrário à lei, à ordem pública e aos bons costumes.



(...)

§ 3º. A companhia pode ter por objeto participar de outras sociedades; ainda que não prevista no estatuto, a participação é facultada como meio de realizar o objeto social, ou para beneficiar-se de incentivos fiscais."

**26.** A mesma lei federal, em seu art. 243, § 3º, também faz referência ao sistema de concentração societária por meio de empresas coligadas e controladas. Confira-se:

"Art. 243. (...)

(...)

§2º. Considera-se controlada a sociedade na qual a controladora, diretamente ou através de outras controladas, é titular de direitos de sócio que lhe assegurem, de modo permanente, preponderância nas deliberações sociais e o poder de eleger a maioria dos administradores."

**27.** E, segundo a definição de MODESTO CARVALHOSA, em "Comentários à Lei de Sociedades Anônimas, volume 4, Tomo II" (São Paulo: Saraiva, 2009, 3ª. ed., p. 14):

"As *holdings* são sociedades não operacionais que tem seu patrimônio composto de ações de outras companhias. São constituídas ou para o exercício do poder de controle ou para a participação relevante em outras companhias, visando nesse caso, constituir a coligação. Em geral, essas sociedades de participação acionária não praticam operações comerciais, mas apenas a administração de seu patrimônio. Quando exerce o controle, a *holding* tem uma relação de dominação com as suas controladas, que serão suas subsidiárias."

**28.** Pois bem... As duas empresas estrangeiras subsidiárias, excluídas, em primeiro grau, do procedimento de recuperação judicial, operam apenas e tão somente em estrita função da controladora, servindo como veículos das sociedades brasileiras para a emissão de títulos de

dívidas e recebimento de receitas no exterior, colimando o financiamento das atividades de exploração e produção de petróleo e gás natural no Brasil.

**29.** Têm-se, portanto, sociedades empresárias estrangeiras que se erigem em estrutura de financiamento de sua controladora nacional, formando um grupo econômico único, em prol de uma única atividade empresarial, o que não é nada incomum na era contemporânea, de globalização de mercados, mais ainda quando se pondera a própria atividade explorada, que intensifica as relações jurídicas transfronteiriças.

**30.** Obviamente, não possuem elas filiais, sucursais, nem agências no território nacional, porquanto, como já dito, são subsidiárias da sociedade empresária brasileira que é, na realidade, a responsável pelo pagamento dos títulos de dívida *("bonds")* emitidos no exterior.

**31.** Mostra-se importante ressaltar que nenhum dos inúmeros credores do GRUPO OGX aparenta ser contra a recuperação judicial conjunta. Muito pelo contrário, as notícias jornalísticas recentemente veiculadas dão conta de que a Óleo e Gás Participações (OGP), antiga OGX, celebrou, aos 24/12/2013, acordo com credores internacionais numa tentativa de eliminar a dívida e recapitalizar a empresa (Disponível em: http://g1.globo.com/economia/negocios/noticia/2013/12.html).

**32.** Assim, nada obstante o parecer da douta Procuradoria de Justiça, posto em sentido contrário ao que hora se decide, afigura-se indicado albergar os credores nacionais e internacionais em um plano comum de recuperação do GRUPO OGX, evitando-se a eventual constrição de ativos no exterior, que seria imposta a requerimento de administrador judicial das sociedades austríacas, bem como a visceral impossibilidade de realização de operações no âmbito internacional, com

o que se frustraria, definitivamente, toda e qualquer possibilidade de soerguimento das recorrentes.

**33.** Saliente-se, como já mencionado no **item 06** (acima), que a legislação austríaca sobre insolvência admite o reconhecimento dos efeitos do respectivo processo estrangeiro, quando o centro de principal interesse do devedor (COMI) está localizado no Estado estrangeiro e o processo for, em essência, comparável ao austríaco, o que, a par do estudo de viabilidade anexado por linha aos autos, mostra-se como sendo o caso.

**34.** Isso estando bem claro, não se está erigindo o Estado Juiz à condição de legislador positivo. A ausência de previsão normativa quanto à aplicação do instituto da recuperação judicial além dos limites territoriais, se não o autoriza, por outro lado não o veda. A hipótese desafia a decisão de acordo com a analogia, os costumes e os princípios gerais de direito, conforme prevê o art. 4º da Lei de Introdução às Normas do Direito Brasileiro, de aplicação cauta e excepcional, em situações que, a seu turno, demandem cautela e sejam, por igual, excepcionais. Até porque são os princípios gerais os responsáveis pela atuação do Ordenamento Jurídico à feição de um todo, integrando-lhe setores comunicantes, de outra forma tornados estanques.

**35.** Contemporaneamente, é mister compreender que é com apoio na equidade que há de predominar a finalidade do instituto sobre sua letra, no quanto, visto o caso concreto, se busca adequar a lei às novas e surpreendentes circunstâncias, a fim de que o órgão jurisdicional acompanhe as vicissitudes da realidade concreta, a qual, como já asseverava Carvalho de Mendonça", em seu "Curso de Direito das Obrigações", caminha sempre à frente da legislação, que capta, diferidamente, a vontade jurídica da nação (legalidade).

**36.** Neste sentido, veja-se o comentário de MARIA HELENA DINIZ, em "Lei de Introdução às Normas do Direito Brasileiro Interpretada" (São Paulo: Saraiva, 2013, 18ª ed. rev. e atual., p. 158-159):

> "Desempenha, ainda, a equidade função de grande importância na *interpretação das normas*. Nessa função interpretativa, a equidade pode significar: 1) o predomínio da finalidade da lei sobre sua letra; ou 2) a preferência, dentre as várias interpretações possíveis de uma norma, pela mais benigna e humana. Ambas as significações não precisam ser autorizadas legalmente.
>
> Em sua função interpretativa, na busca do sentido da norma, a equidade aparece na aplicação do método histórico-evolutivo, que preconiza a adequação da lei às novas circunstâncias, e do método teleológico, que requer a valoração da lei (LINDB, art. 5º), a fim de que o órgão jurisdicional possa acompanhar as vicissitudes da realidade concreta.
>
> Pela equidade ponderam-se, compreendem-se e estimam-se os resultados práticos que a aplicação da norma produziria em determinadas situações fáticas. Se o resultado prático concorda com as valorações que inspiraram a norma, em que se funda, tal norma deverá ser aplicada. Se, ao contrário, a norma aplicável a um caso singular produzir efeitos que viriam a contradizer as valorações, conforme as quais se modela a ordem jurídica, então, indubitavelmente, tal norma não deve ser aplicada a esse caso concreto."

**37.** E, se o intuito é, como já exposto no **item 23** (acima), salvaguardar a empresa, não se pode deixar questão de relevante interesse social à margem da análise judicial eficaz, que dê solução dinâmica e atual à controvérsia.

**38.** Ademais, a Lei de Recuperação Judicial, Extrajudicial e Falência do Empresário e da Sociedade Empresária é, atualmente, alvo de acirrado debate, no que tange à necessidade de reforma, a fim de que, dentre as alterações, passe a tratar da denominada **"insolvência transnacional"**, realidade palpável, seguindo o rumo das tendências

legislativas internacionais, calcadas na cooperação e no diálogo entre os Juízes e Tribunais de diferentes Estados.

**39.** Por oportuno, traz-se a pelo trecho do estudo de FRANCISCO SÁTIRO e PAULO FERNANDO CAMPANA FILHO, na monografia "A Insolvência Transnacional: para Além da Regulação Estatal e na Direção de Acordos de Cooperação" (2007, p. 139), ressaltam que:

> "A eficiência econômica – isto é, a preservação de valor nas liquidações e nas recuperações de empresas – conduz ao entusiasmo pela ajuda mútua com outros juízes e pelo respeito aos princípios e regras falimentares estrangeiras. A falta (ou mesmo a existência) de normas específicas não tem sido obstáculo para os processos de insolvência, que parecem convergir para o universalismo em um movimento trópico. Esses esforços conjuntos têm sido valiosos na construção de um Direito transnacional das insolvências internacionais baseado na autonomia da vontade e que é mais engenhoso e personalizável do que um sistema guiado por normas vinculativas poderia jamais sonhar – e, portanto, mais adequado a enfrentar os desafios impostos pela quebra de empresas dispersas por um mundo imprevisível, multifacetado e globalizado."

**40. Tudo bem ponderado**, voto no sentido de **dar provimento** ao recurso, confirmando a decisão de fls. 110 a 118, revogar a interlocutória que rejeitou o pedido de recuperação judicial das sociedades empresárias austríacas e determinar o processamento conjunto da recuperação judicial das agravantes.

Rio de Janeiro, 19 de fevereiro de 2014.

**Desembargador GILBERTO GUARINO**

**Relator**



Exhibit 4

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

**RULING**

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A

OGX PETRÓLEO E GÁS

OGX INTERNACIONAL GMBH

OGX ÁUSTRIA GMBH

This is in the matter of the petition for Court-supervised Bankruptcy Reorganization filed by OGX Petróleo e Gás Participações S.A., OGX Petróleo e Gás S.A., OGX Internacional GMBH and OGX Áustria GMBH, commercial companies comprising the same commercial group, operating in an interconnected manner on the oil market, on October 30, 2013. It was determined that the specified company would file the proposal for fees and that, subsequently, a statement would be provided by the companies in reorganization and the State Prosecutor.

Deloitte Touche Tohmatsu Consultores Ltda., on pp. 244/246, with an estimate of fees for serving as the court-appointed administrator of 0.22% of the total value of credits subject to the reorganization proceedings.

[illegible signature]

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

The State Prosecutor represents that the claimed fees of the court-appointed administrator on p. 379/394 must be reduced.

**So ruled.**

Experience shows that the court-appointed administrator has authority transcending that specified in Article 22 of Law No. 11,101/2005.

Reorganized companies are declared to expressly comply with the amount of fees requested by the court-appointed administrator, expressly acknowledging the complexity of the work, the multiple creditors involved and the efforts to be undertaken in these proceedings, on Page 404.

So, this topic must acknowledge in an inescapable manner the fact that the requesting companies could and may disagree with the fees requested by the court-appointed administrator because the Court and the State Prosecutor, in the person of the honored official, will strictly and rigorously observe the applicable legal guidelines, without any type of pressure, which would be inadmissible.

The companies have autonomy to effectively make their own administrative decisions, even as they continue in a fully administrative manner, so

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT

that there is no possibility of compromising the companies, in this regard.

With regard to the alleged small number of creditors, there is the counterpoint of the capacity of the amounts owed, and primarily, the profile of the international creditors, which requires a much higher qualification as to excellence.

As for the creditors, it is anticipated that they will not in any way object to the sole legal authority of the Judicial Branch.

For the purposes of the court appointment of the administrator, given the peculiar situation of this being a petition for court-supervised reorganization of large companies with estimated liabilities in excess of twelve billion reals, in addition to the extreme complexity related to the complement of creditors, which includes many international investors, the company Delloite Touche Tohmatsu is appointed, the qualifications of which are known to this court, having telephone numbers (11) 5186-1091 and (21) 3981-0467, to serve as the court-appointed administrator, with consideration of 0.14% of the total value of credits subject to the reorganization proceedings, which may be adjusted at a later time as the liabilities are determined, after the term for presentation of the recovery plan has passed.

[crest]
JUDICIAL BRANCH
CAPITAL DISTRICT
FOURTH CORPORATE DISTRICT


Any expenses to be requested by the court-appointed administrator must be requested of the Court.


Let notification be given.


Rio de Janeiro, December 12, 2013.


[illegible signature]

**GILBERTO CLOVIS FARIAS MATOS**

***Judge at law***

**consortra** translations

| | | |
|---|---|---|
| STATE of NEW YORK | ) | |
| | ) | ss: |
| COUNTY of NEW YORK | ) | |

### CERTIFICATE OF ACCURACY

This is to certify that the attached document, *"Exhibit 4- December 12, 2013 Order"* originally written in *Portuguese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English.*

Dated: March 30, 2017

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
30th day of March ,
2017.

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA5157195
Qualified In New York County
My Commission Expires December 4, 2018

Your
legal
translation
partner

New York, NY | Washington, DC | Houston, TX | San Francisco, CA
Hong Kong



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

## DECISÃO

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A

OGX PETRÓLEO E GÁS S/A

OGX INTERNACIONAL GMBH

OGX ÁUSTRIA GMBH

Trata-se de pedido de Recuperação Judicial formulado por OGX Petróleo e Gás Participações S.A., OGX Petróleo e Gás S.A. OGX Internacíonal GMBH e OGX Áustria GMBH, sociedades empresárias integrantes do mesmo grupo econômico que atuam de forma interligada no mercado petrolífero, em 30/10/2013. Foi determinado que a empresa indicada apresentasse proposta de honorários e que, em seguida, houvesse manifestação das empresas recuperandas e do Ministério Público.

Deloitte Touche Tohmatsu Consultores Ltda, às fls. 244/246, com estimativa de honorários para o exercício da função de administradora judicial de 0,22% do valor total dos créditos sujeitos ao procedimento de recuperação.

Processo n.º 0377620-56.2013.8.19.0001                                    1

407



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

O Ministério Público manifesta-se no sentido de que deve ser reduzida a pretensão dos honorários do administrador judicial, às fls. 379/394.

**Passa-se a decidir.**

A experiência demonstra que o administrador judicial tem atribuições que transcendem àquelas declinadas no artigo 22 da Lei n.º 11.101/2005.

As empresas recuperandas se pronunciaram concordando expressamente com o valor de honorários pretendidos pelo administrador judicial, reconhecendo expressamente a complexidade do trabalho, a multiplicidade de credores envolvidos e os esforços a serem empreendidos neste processo, às fls. 404.

Ora, neste tópico, deve ser reconhecido de forma inescondível que as empresas requerentes poderiam e podem discordar da pretensão dos honorários do administrador judicial porque o Juízo e o Ministério Público, no seu honroso mister, observarão estritamente e com rigor as normas legais aplicáveis, sem qualquer tipo de pressão, o que seria inadmissível.

As empresas têm autonomia para efetivamente tomar suas decisões administrativas, até porque continuam na plena administração, de

405



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

modo que não há qualquer possibilidade de comprometimento das empresas, nesse viés.

No que tange ao alegado número reduzido de credores se contrapõe com a qualidade dos créditos e, principalmente, com o perfil dos credores internacionais, o que enseja uma qualificação muito mais de excelência.

Quanto aos credores, vislumbra-se que não devem opinar de forma alguma em uma atribuição legal exclusiva do Poder Judiciário.

Para efeito de nomeação do administrador judicial, dada a situação peculiar de se tratar de um pedido de recuperação judicial de empresas de grande porte com um passivo estimado superior a doze bilhões de reais, além de extrema complexidade com relação ao quadro de credores, o que incluiu muitos investidores internacionais, nomeia-se a empresa Delloite Touche Tohmatsu, de qualificação conhecida no cartório, telefones (11) 5186-1091 e (21) 3981-0467, para exercício do mister de administrador judicial, arbitrando-se em 0,14% do valor total dos créditos sujeitos ao procedimento de recuperação, o que poderá ser ajustado posteriormente de acordo com a consolidação do passivo, passando a transcorrer o prazo para apresentação do plano de recuperação.

Processo n.º 0377620-56.2013.8.19.0001                                           3

409



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

Qualquer despesa a ser solicitada pelo administrador judicial deverá ser solicitada ao Juízo.

Intimem-se.

Rio de Janeiro, 12 de dezembro de 2013.

**GILBERTO CLOVIS FARIAS MATOS**

*Juiz de Direito*

# Exhibit 5

## JUDICIAL REORGANIZATION PLAN OF
## OGX PETRÓLEO E GÁS S.A. – EM RECUPERAÇÃO JUDICIAL
## [UNDER JUDICIAL REORGANIZATION]

**OGX Petróleo e Gás S.A. – Em Recuperação Judicial [Under Judicial Reorganization]** ("OGX"), a corporation enrolled with the National Corporate Taxpayers' Register of the Ministry of Finance (CNPJ/MF) under No. 08.926.302/0001-05, with headquarters at Rua do Passeio, No. 56, 10th, 11th, and 12th floors, City of Rio de Janeiro, State of Rio de Janeiro, hereby files, in the records of the judicial reorganization proceedings registered under No. 0377620-56.2013.8.19.0001, pending before the 4th Corporate Court of the Judicial District of Rio de Janeiro, State of Rio de Janeiro, the following judicial reorganization plan, pursuant to the provisions of Article 53 of Law No. 11101/2005.

## 1    Definitions and Rules of Construction

**1.1Definitions**. The terms and expressions used in capital letters, whenevermentioned in the Plan, shall have the meanings assigned to them in this **Clause 1**. Such defined terms will be used, as appropriate, in singular or plural, masculine or feminine, without thereby losing the meaning assigned to them.

**1.1.1.** "1st Series of DIP Loan": The first series of financing corresponding to theDIP Loan, pursuant to 1st Series Debentures, in the amount of two hundred and ninety nine million, two hundred thousand Brazilian reais (R$ 299,200,000.00), monetarily adjusted by the variation of the sale exchange rate of Brazilian reais into U.S. dollars, pursuantto the Debentures Deed, which on the Issue Date was equivalent to one hundred and twenty-five million U.S. dollars (US$ 125,000,000.00), pursuant to Sections **4.3.1** and **4.4**.

**1.1.2.**"1st Bridge Loan": A very short-term loan exempt from bankruptcytaken by OGPar, in the amount of fifteen million U.S. dollars (**US$15,000,000.00**), as set forth in the loan agreement entered into on December 26, 2013, which was fully paid on March 14, 2014.

**1.1.3.**"11th Round": The 11th Round of Competitive Biddings for areas for exploration and production of oil and natural gas in sedimentary basins of Barreirinhas, Ceará, Espírito Santo, Foz do Amazonas, ParáMaranhão, Parnaíba, Pernambuco-Paraíba, Potiguar, Recôncavo, Sergipe-Alagoas, and Tucano, held by ANP, on May 14, 2013.

**1.1.4.**"2nd Series of DIP Loan": The second series of the financing correspondingto the DIP Loan, pursuant to the terms of the 2nd Series Debentures, in the amount of up to R$ 215,424,000.00 (two hundred and fifteen million, four hundred and twenty-four thousand Brazilian reais), monetarily adjusted by the variation of the sell exchange rate of Brazilian reais into U.S. dollars until the payment date of the 2ndSeries Debentures, pursuant to the terms of the Debentures Deed, which on the Issue Date corresponded to up to US$ 90,000,000.00 (ninety million U.S. dollars). The final amount of the 2nd Series Debentures to be subscribed by Backstop – New Lenders (whether they are Creditors or not), shall be equivalent to

the unsubscribed portion of the 3rd Series Debentures, observing the provisions of this Plan and the Debentures Deed. The 2nd Series Debentures may be fully cancelled, if the 3rd Series Debentures are fully subscribed, under the terms of the Debentures Deed.

**1.1.5.**"2nd Bridge Loan": A very short-term loan exempt from bankruptcytaken by OGX, in the amount of US$ 50,000,000.00 (fifty million U.S. dollars), pursuant to the Export Prepayment Agreement entered into with Credit Suisse Brazil (Bahamas), in the capacity of administrative agent, on January 13, 2014, which was fully paid on March 13, 2014.

**1.1.6.**"3rd Series of DIP Loan": The third series of financing corresponding to theDIP Loan, pursuant to 3rd Series Debentures, in the amount of up to R$ 215,424,000.00 (two hundred and fifteen million, four hundred and twenty four thousand Brazilian reais), monetarily adjusted by the variation of the sale exchange rate of Brazilian reais into U.S. dollars until the payment date of the 3rd Series Debentures, pursuant to the terms of the Debentures Deed. The final amount of the 3rd Series Debentures to be subscribed by Creditors Affected by the Plan and/or First Priority Creditors (which expressly adhere to the Plan) may vary pursuant to the demand for the 3rd Series Debentures. The 3rd Series Debentures may be cancelled due to the absence of Creditors interested in the subscription and payment, as described in **Section 4.7** of this Plan, under the terms of the Debentures Deed.

**1.1.7.**"Shareholders": Eike Batista and all other direct and indirectshareholders of OGX under control of Eike Batista, including, but not limited to, OGPar, Centennial Asset Mining Fund LLC., and Centennial Asset Brazilian Equity Fund, LLC.

**1.1.8.**"Shares": Common shares issued by OGX, whether existing on thedate hereof, or to be issued pursuant to the provisions of this Plan.

**1.1.9.**"Judicial Administrator": Deloitte Touche Tohmatsu Consultores Ltda.,pursuant to appointment by the Reorganization Court, pursuant to Chapter II, Section III of the Bankruptcy Law, or its substitute from time to time.

**1.1.10.**"Verification Agent": activity-monitoring agent, as set out and agreedupon in the Debentures Deed and in the Subscription Agreement.

**1.1.11.**"Debentures Trustee": Oliveira Trust Distribuidora de Títulos eValores Mobiliários S.A., as defined by the Debentures Deed.

**1.1.12.**"Bond Trustee": Deutsche Bank Trust Company Americas, trusteeunder the terms of the Bond Indenture, as well as the companies under its control, whether directly or indirectly, its directors, managers and employees, or any other agent that may be appointed to replace Deutsche Bank Trust Company Americas, under the terms of the Bond Indenture.

**1.1.13.**"ANP": Brazilian National Agency of Petroleum, Natural Gas andBiofuels.

**1.1.14.**"Approval of the Plan": The approval of the Plan at the Meeting ofCreditors. For the purposes of this Plan, the Approval of the Plan is deemed to occur on the date of the Meeting of Creditors that votes and approves the Plan, even if the Plan is not approved by all classes of Creditors pursuant to Articles 45 or 58 of the Bankruptcy Law.

**1.1.15.**"Meeting of Creditors": Any General Meeting of Creditors heldpursuant to Chapter II, Section IV of the Bankruptcy Law.

**1.1.16.** "Colombia Assets": The exploration rights held by OGX on blocks CR-2, CR-3 and CR-4 (Cesar and Ranchería), VIM-5 and VIM-19, object of the Contratos de Evaluación Técnica Especial para Exploración y Producción de Hidrocarburos n° 43, 44, 45 and 07 of Ronda Colombia 2010 and 15 of Ronda Colombia 2012, respectively, all executed by OGX and Agencia Nacional de Hydrocarburos – ANH, of the Republic of Colombia, and which are object of the Agreement of Assignment of Rights referring to Concession Agreements for the exploration of hydrocarbons (Farmout Agreement), with suspensive conditions, pursuant to Exhibit 1.1.16.

**1.1.17.**"Capital Increase Through Capitalization of Credits": Capital increaseof OGX, subscribed to by Creditors Affected by the Plan and by First Priority Creditors (the latter if they have expressly adhered to this Plan, as applicable), paid in by capitalization of Credits Affected by the Plan and First Priority Credits (held by First Priority Creditors expressly adhering to the Plan), pursuant to Art. 171, paragraph 2 of the Corporations Act and other applicable legal provisions.

**1.1.18.**"Capital Increase Through Conversion of Debentures": OGX's capitalincrease, subscribed by the holders of Debentures, paid in through the conversion of the Debentures into shares, as set forth in articles 57 and 171, paragraph 3 of the Corporations Act and other applicable legal provisions, subject to the provisions set forth in the Debentures Deed.

**1.1.19.**"Parnaíba Gás Natural Capital Increase": the definition is given byClause 8.1.1. hereof.

**1.1.20.**"Backstop – New Lenders": The New Lenders subscribing theSubscription Agreement (or their successors and assignees, for any reason, whether they are Creditors Affected by the Plan or not) that, after observing and complying with certain terms and conditions precedent established in the Subscription Agreement, undertook the obligation of subscribing (i) the 1st Series Debentures; and (ii) the 2nd Series Debentures in an amount equivalent to unsubscribed 3rd Series Debentures, always limited to the maximum amount in national currency equivalent to US$ 90,000,000.00 (ninety million U.S. dollars) on the date of the 2nd Series Debentures subscription.

**1.1.21.** "Bondholders": Creditors holding Bonds 2018 and/or Bonds 2022,whether or not represented by the Bond Trustee.

**1.1.22.**"Supporting Bondholders": Holders of Bonds 2018 and/or Bonds 2022that jointly hold the majority of the Credits represented by Bonds 2018 and/or Bonds

2022, with which OGX Group has entered into the Plan Support Agreement or that has become a party to the Plan Support Agreement, from time to time. For the purposes of this Clause, Supporting Bondholders are not considered to be those Bondholders that originally signed the Plan Support Agreement and subsequently sold or will sell to third parties all or part of the Bonds 2018 and/or Bonds 2022 held by them, provided that such sale occurs under the terms of the Plan Support Agreement.

**1.1.23.**"Bonds 2018": Bonds in the aggregate amount of US$

2,563,000,000.00 (two billion, five hundred sixty-three million U.S. dollars), maturing in 2018, issued by OGX Austria and fully guaranteed by OGPar and OGX, pursuant to the respective Bond Indenture.

**1.1.24.**"Bonds 2022": Bonds in the aggregate amount of US$

1,063,000,000.00 (one billion, sixty-three million U.S. dollars), maturing in 2022, issued by OGX Austria and fully guaranteed by OGPar and OGX, pursuant to the respective Bond Indenture.

**1.1.25.**"BS-4": The exploration block located in the Santos Basin, State of

São Paulo, formed by the Atlanta and Oliva fields, whose concession rights were granted by ANP to the consortium formed by Queiroz Galvão Exploração e Produção S.A., which owns a thirty percent (30%) stake, Barra Energia do Brasil Petróleo e Gás Ltda., which owns a thirty percent (30%) stake, and OGX, which owns the remaining forty percent (40%) stake.

**1.1.26.**"CADE": Administrative Council for Economic Defense.

**1.1.27.**"Cambuhy": Cambuhy Investimentos Ltda., a limited liability

company incorporated and organized under the laws of the Federative Republic of Brazil, with headquarters in the city of São Paulo, State of São Paulo, at Rua Amauri, No. 255, 6th floor, enrolled with the CNPJ/MF under No. 14.127.491/0001-40, or any other investment vehicle under its management or control.

**1.1.28.**"CETIP": means CETIP S.A. – Mercados Organizados.

**1.1.29.**"Receiver": OGPar or a third-party to be appointed in due course byOGX that, pursuant to the terms of Articles 693 and following of the Civil Code, shall act on its own behalf, but for the benefit of Creditors, at their option, pursuant to **Section 5.1.5.6**, for the exclusive purposes of implementing this Plan.

**1.1.30.**"Subscription Notice": Notice to be sent by OGX to the CreditorsQualified for the Subscription of 3rd Series Debentures, whereby the conditions and procedures necessary to implement the subscription and payment of the 3rd Series Debentures as set forth in **Clause 4.6**herein will be reported.

**1.1.31.**"Conditions Precedent for the Capital Increase Through Capitalization of Credits": Minimum conditions precedent for the implementation of the Capital Increase Through Capitalization of Credits, as set forth in **Clause 5.1.3.1** hereof.

**1.1.32.**"Conditions Precedent for Capital Increase Through Conversion ofDebentures": These are minimum conditions precedent to implement the operation of Capital Increase Through Conversion of Debentures, as established in **Section 4.8** of this Plan, without prejudice of other conditions precedent for conversion, as set forth in the Debentures Deed and in the Subscription Agreement.

**1.1.33.**"Collateral Sharing Agreement": This is the Sharing Agreement ofGuarantees and Rights among Creditors entered into on April 9, 2014, by Oliveira Trust Distribuidora de Títulos e Valores Mobiliários S.A., Wilmington Trust, National Association, Oliveira Trust Servicer S.A. and OGX, as intervening and consenting party, as amended from time to time, attached to this Plan as **Exhibit 1.1.33**.

**1.1.34.**"Share Purchase Agreement": Share Purchase Agreement, includingsuspensive conditions, entered into among OGX and Cambuhy, with Parnaíba Gás Natural e Eneva S.A. as the intervening parties, on October 30, 2013, whose purpose is the purchase by Cambuhy of UPI Parnaíba Gás Natural, as summarized in **Exhibit 1.1.34**.

**1.1.35.**"DIP Guarantee Agreements – 1st Series": The instruments below, asamended and changed from time to time: (i) Private Instrument of Fiduciary Sale of Oil and Natural Gas as Guarantee; (ii) Private Instrument of Fiduciary Sale of Equipment as Guarantee; (iii) Private Instrument of Fiduciary Assignment of Credit Rights as Guarantee (General); (iv) Private Instrument of Fiduciary Assignment of Credit Rights and Credit Securities as Guarantee (Intercompany and Product Sale); (v) Private Instrument of Fiduciary Assignment of Credit Rights as Guarantee (Parnaíba); (vi) Private Instrument of Fiduciary Assignment of Credit Rights as Guarantee (Tax Credits); (vii) Private Instrument of Pledge of Rights on the Concession Agreement and Other Covenants (BS-4); (viii) Deposit Agreement as Guarantee andOther Covenants; (ix) Deed of Pledge of Parnaíba MPX Receivables; (x) Deed of Pledge of Parnaíba Receivables; (xi) Deed of Pledge of Shares of Parnaíba B.V.; and (xii) U.S. Security Agreement, attached to this Plan as **Exhibit 1.1.35**.

**1.1.36.**"DIP Guarantee Agreements – 2nd and 3rd Series": Besides the DIPGuarantee Agreements – 1st Series, these include the following instruments that may be entered into for the: (i) fiduciary sale of OGX shares; (ii) fiduciary sale of shares issued by OGPar; (iii) pledge of rights on concession relating to the concession agreements of blocks BM-C-39 and BM-C-40 of Tubarão Martelo and the concession agreements of the 11th Round; (iv) pledge of shares of OGX International GmbH; (v) pledge of shares of OGX Austria; (vi) Pledge of Shares of OGX Netherlands B.V.; (vii) pledge of shares of OGX Netherlands Holding B.V.; provided that certain conditions of the Debentures Deed be verified; (viii) any instrument of guarantee on the funds eventually obtained from the sale of the assets arising from the agreements indicated in items (i) to (vii) above; (ix) any

other guarantees to be created under the terms of the DIP Guarantee Agreements – 1st Series; and (x) any other guarantee agreement needed for the perfection or protection of the guarantees mentioned in items (i) to (ix) above.

**1.1.37.** "DIP Guarantee Agreements": These are the DIP Guarantee Agreements – 1st Series and DIP Guarantee Agreements – 2nd and 3 Series as full guarantee of the DIP Loan and Additional Loan, subject to the Collateral Sharing Agreement.

**1.1.38.** "Guarantee Agreements – 2nd Bridge Loan": These are the instruments in guarantee of the 2nd Bridge Loan, which was fully paid on March 13, 2014: (i) Private Instrument of Fiduciary Assignment of Credit Rights as Guarantee n° CSBRA20140100084; (ii) Private Instrument of Fiduciary Assignment of Credit Rights as Guarantee N° CSBRA20140100085; (iii) Private Instrument of Fiduciary Assignment of Credit Rights as Guarantee N° CSBRA20140100086; (iv) Private Instrument of Pledge of Rights on the Concession Agreement and Other Covenants N° CSBRA20140100087; (v) Private Instrument of Pledge of Oil and Natural Gas as Guarantee N° CSBRA20140100088; (vi) Private Instrument of Fiduciary Sale of Equipment as Guarantee N° CSBRA20140100083; (vii) Deed of Pledge of Parnaíba Receivables; (viii) Deed of Pledge of Parnaíba Shares; (ix) Deed of Pledge of Parnaíba MPX Receivables; and (x) Security Agreement n° CSBBR20140100002. The Guarantee Agreements - 2nd Bridge Loan have already been resolved with the release of corresponding guarantees, due to the payment of the 2nd Bridge Loan on March 13, 2014.

**1.1.39.** "Subscription Agreement": Senior Secured Superpriority Post-Petition Debentures Subscription Agreement entered into among OGX, OGPar, Backstop – New Lenders, Wilmington Trust, National Association and other parties on February 7, 2014, as amended from time to time, attached to this Plan as **Exhibit 1.1.39**.

**1.1.40.** "Export Prepayment Agreement": This is the Export Prepayment Agreement, entered into on April 9, 2014 by OGX, OGPar, OGX Austria, OGX International, OGX Netherlands B.V., OGX Netherlands Holding B.V., Parnaíba B.V., Deutsche Bank A.G., London Branch, Wilmington Trust, National Association, Oliveira Trust Distribuidora de Títulos e Valores Mobiliários S.A. and Oliveira Trust Servicer S.A., attached to this Plan as **Exhibit 1.1.40**.

**1.1.41.** "OSX-1 Agreement": This is the Re-delivery Termination and Interim Operation Agreement in respect of the OSX-1 FPSO which can be entered into between OGX Group and OSX Group, in order to establish the terms and conditions to temporarily resume the exploratory activity in the Tubarão Azul Field.

**1.1.42.** "OSX-3 Agreements": The agreements that may be entered into between OGX Group, OSX Group and others, to set forth new terms and conditions for chartering and operation of the OSX-3 Floating Production Storage Offloading (FPSO) Vessel ("FPSO OSX-3") in the Tubarão Martelo Field, including, but not limited to the following instruments: (i) Charter Amendment Agreement; (ii) Charter Agreement; (iii) Charterer Contract Guarantee; (iv) O&M

Amendment Agreement; (v) Amended & Restated O&M Agreement; (vi) OGX Buyout Right Agreement; (vii) Charter Termination Agreement; and (viii) OSX-3 LC Agreement.

**1.1.43.**"Credits": Credits and obligations, whether materialized or contingent,net or gross/, existing on the Filing Date, or which generating fact is previous or simultaneous to the Filing Date, whether or not subject to the effects of Plan, including OSX Group Credits owed by OGX Group. When applicable, Credits shall also be interpreted as including the credits and obligations, whether materialized or contingent, net or gross, existing on the Filing Date, or which generating fact is previous or simultaneous to the Filing Date, whether or not subject to the effects of Plan, and that may be owedby OGPar and/or OGX Austria and/or OGX International. For the avoidance of doubt, the credits resulting from DIP Loan and the Additional Loan are not included in above Credits for any purpose, not being subject to the terms, effects, and conditions of this Plan in any aspect.

**1.1.44.**"Secured Credits": Credits Affected by the Plan held by SecuredCreditors.

**1.1.45.**"Credits Affected by the Plan": Credits held by the Creditors Affectedby the Plan. Where applicable, Credits Affected by the Plan shall also be construed as the credits held by the Creditors Affected by the Plan of OGPar and/or OGX Austria and/or OGX International which shall be novated and paid as set forth herein.

**1.1.46.**"First Priority Credits": Credits held by First Priority Creditors on theFiling Date. When applicable, the term Credits held by First Priority Creditors will also be interpreted as the credits held by First PriorityCreditors of OGPar and/or OGX Austria and/or OGX International. For the avoidance of doubt, the First Priority Credits above are not to be confused with the first priority credits resulting from operations contracted after the Filing Date, including the DIP Loan and the Additional Loan.

**1.1.47.**" OSX Group Credits": Credits held by companies in the OSX Groupand subject to formalized transaction between OGX Group and OSX Group.

**1.1.48.** "OGX Austria Credits": Credits held by OGX Austria against OGX, as well as Credits arising from the OGX Austria PPE Credit and the OGX Austria Debenture Credit.

**1.1.49.**"OGX Austria PPE Credit": Credits arising from the Export PrepaymentAgreement entered into on October 4, 2012 between OGX and OGX Austria.

**1.1.50.**"OGX Austria Debenture Credit": Credit deriving from the Debenturesrelated to the 1st Public Issuance of Simple Debentures, Non-Convertible into Shares, Unsecured in one Single Series of OGX dated September 21, 2012, subscribed by OGX Austria, as amended.

**1.1.51.**"Unsecured Credits": Credits Affected by the Plan held by

UnsecuredCreditors.

**1.1.52.**"OGX Austria Subrogation Credits": OGX Austria Subrogation Credits– Bonds 2018 and the OGX Austria Subrogation Credits – Bonds 2022.

**1.1.53.**"OGX Austria Subrogation Credits – Bonds 2018": This is the credit tobe held by OGX against OGX Austria due to subrogation operated in favor of OGX for the payment of Credits Affected by the Plan of Bondholders holding Bonds 2018, upon the delivery of Shares within the scope of the operation of Capital Increase Through Capitalization of Credits, pursuant to Section 5.1.3 and following sections of this Plan. For the avoidance of doubt, the OGX Austria Subrogation Credits – Bonds 2018 will survive any eventual cancellation of Bonds, after delivery of the Shares to the Bondholders under the terms of this Plan, and shall remain valid, clear, certain and enforceable pursuant to this Plan and OGX Austria Plan.

**1.1.54.**"OGX Austria Subrogation Credits – Bonds 2022": This is the credit tobe held by OGX against OGX Austria due to subrogation operated in favor of OGX for the payment of Credits Affected by the Plan of Bondholders holding Bonds 2022, upon the delivery of Shares within the scope of the operation of Capital Increase Through Capitalization of Credits, pursuant to Section 5.1.3 and following of this Plan. For the avoidance of doubt, the OGX Austria Subrogation Credits – Bonds 2022 will survive any eventual cancellation of Bonds, after delivery of the Shares to the Bondholders under the terms of this Plan, and shallremain valid, clear, certain and enforceable pursuant to this Plan and OGX Austria Plan.

**1.1.55.**"Labor Credits": Credits and rights held by Labor Creditors.

**1.1.56.**"Creditors": Individuals or legal entities holding Credits, whetherincluded or not in the List of Creditors. Where applicable, Creditors shall also be construed as individuals or legal entities holding Credits against the OGX Group, whether included or not in the List of Creditors of OGPar and/or OGX Austria and/or OGX International.

**1.1.57.**"Secured Creditors": Creditors Affected by the Plan whose Credits aresecured by the provision of security (such as a pledge or a mortgage), up to the value of the respective asset, pursuant to Article 41, II, of the Bankruptcy Law.

**1.1.58.**"Creditors Affected by the Plan": Creditors whose Credits and rightscan be changed by the Plan, as set forth in the Bankruptcy Law. These Creditors are divided, for the purposes of voting under the Plan or election of the Creditor Committee in a Meeting of Creditors, in three classes (Labor Creditors, Secured Creditors and Unsecured Creditors). Where applicable, Creditors Affected by the Plan shall also be construed as the Creditors of OGX Group, whose credits and rights can be changed by the OGX Related Parties Plans, as set forth in the Bankruptcy Law. These Creditors are divided, for the purposes of voting under the OGX Related Parties Plans or election of the Creditor Committee in a Meeting of Creditors of each of the companies comprising the OGX Group, in three classes (Labor Creditors, Secured Creditors and Unsecured Creditors).

**1.1.59.**" First Priority Creditors": For the purposes of this Plan, the Creditorsof OGX and of the other companies of the OGX Group, when applicable (i) where its right to credit arises from events subsequent to the Filing Date, but results from an instrument executed before the Filing Date, subject in this case to the condition that the corresponding credit does not qualify as first priority credit for the purposes of Articles 67 and 84, Sections V and 149 of Bankruptcy Law, in case of intervening bankruptcy of OGX or any other company of the OGX group being decreed; or (ii) which right to appropriate assets or execute its rights or guarantees resulting from the agreements entered into before or after the Filing Date cannot be changed by the Plan, pursuant to Article 49, Paragraphs 3 and 4 of Bankruptcy Law.

**1.1.60.**"Financial Creditors": Unsecured Creditors that are holders of Creditsresulting from financial or bank operations, including but not limited to Bondholders.

**1.1.61.**" Supplier Creditors": Unsecured Creditors that are holders of Creditsresulting from commercial operations, of goods or services, which are not Financial Creditors or Related Parties.

**1.1.62.**"Creditors Qualified for the Subscription of 3rd Series Debentures":These are the Creditors contained in the List of Creditors current on the date of Meeting of Creditors that deliberates about the Plan and/or OGX Related Parties Plans that have (i) submitted to OGX, to the Debentures Trustee and to the Judicial Administrator, within a maximum period of five (5) Business Days from Approval of the Plan, the Notification of Interest in Subscribing 3rd Series Debentures,subject to the conditions set forth in **Section 4.6.2** of this Plan; and (ii) when Creditors non-resident in Brazil have complied with the arrangements described in **Exhibit 4.6**. For the purposes of this Plan, Creditors Qualified for the Subscription of 3rd Series Debentures are considered to be all Bondholders that adopted the procedure to individualize their right to participation, petition, voice and vote, in the Judicial Reorganization and in any Meeting of Creditors, as per the procedure established in the Bondholders Notice, even when their respective Credits are not individually listed in the list of Creditors in force on the date of the Meeting of Creditors that deliberates about the Plan and/or the Plan of the OGX Related Parties and are listed only on the name of Bond Trustee. OGX is not responsible for non-residing Creditors that are not able to subscribe, pay or receive 3$^{rd}$Series Debentures, due to non-compliance with legal requirements in force in the period established for the formalization of the respective investment.

**1.1.63.**"Unsecured Creditors": Creditors Affected by the Plan holdingunsecured credits, as contained in Articles 41, item III, and 83, item VI, both of the Bankruptcy Law.

**1.1.64.**"Labor Creditors": Creditors Affected by the Plan holding creditsarising from labor legislation or resulting from occupational accidents, in accordance with Article 41, I of the Bankruptcy Law.

**1.1.65.**"CVM": Brazilian Securities and Exchange Commission.

**1.1.66.**"Issue Date": For purposes of this Plan, February 12, 2014, date

when the 1st Series Debentures, the 2nd Series Debentures and the $3^{r}$ Series Debentures were issued, under the terms of the Debentures Deed.

**1.1.67.**"Filing Date": October 30, 2013, date when the petition for judicialreorganization of OGX Group was filed.

**1.1.68.**"Debentures": Debentures of the 1st Series Debentures, the 2nd SeriesDebentures, and the 3rd Series Debentures, which will be subscribed and paid pursuant to the terms and conditions set forth in this Plan and in the Debentures Deed.

**1.1.69.**"1st Series Debentures": Debentures relating to the 1st Series of DIPLoan, which have been issued in the form of the Debentures Deed and already subscribed and paid-in by the Backstop – New Lenders.

**1.1.70.**"2nd Series Debentures": Debentures relating to the 2nd Series of DIPLoan, already issued and that will be subscribed and paid-in by the Backstop – New Lenders (whether they are Creditors or not), in the form of the Debentures Deed, and provided that the conditions precedent of this Plan and of the Subscription Agreement are observed.

**1.1.71.**"3rd Series Debentures": These are the Debentures relating to the $3^{r}$ Series of DIP Loan, already issued, and that will be subscribed, and paid-in by the Creditors pursuant to the Debentures Deed and this Plan.

**1.1.72.**"Business Day": For the purposes hereof, Business Day shall meanany day, other than Saturday, Sunday or municipal holiday in the Cities of São Paulo, State of São Paulo, or Rio de Janeiro, State of Rio de Janeiro, or which, for any reason whatsoever, is not a banking business day in the City of São Paulo, State of São Paulo, or in the City of Rio de Janeiro, State of Rio de Janeiro, except for the cases where payments are made through the CETIP, in which event Business Day shall mean any day, other than Saturday, Sunday or a declared national holiday.

**1.1.73.**"Public Notice": means a Public Notice to be published by OGX,

substantially pursuant to **Exhibit 1.1.73** to inform the stakeholders about the competitive bidding for the judicial sale of UPI Parnaíba Gás Natural, pursuant to the terms of Articles 60 and 142 of the Bankruptcy Law.

**1.1.74.**"Bondholders Notice": A notice made available on the Electronic

Official Gazette of the Court of Justice of the State of Rio de Janeiro on May 2, 2014 containing the rules established by the Court about the segregation and individualization of right of participation, petition, voice and vote of Bondholders in the Judicial Reorganization and in any Meeting of Creditors of OGX Group.

**1.1.75.**"Material Adverse Effect": Means any material adverse effect on (a)

the business, condition (financial, economic, operating or other), prospects or results of activities of OGX, the Shareholders, the Guarantors and/or their respective subsidiaries or affiliates, including any material adverse effect on the expected production capacity of the Tubarão Martelo oil field; (b) the capacity of OGX and/or any of the Guarantors to implement, consummate and/or perform (including the effective non-performance of) any obligations hereunder, under the Debentures Deed, the Additional Loan, under the DIP Guarantee Agreements and/or the Subscription Agreement, (c) the legality, validity, binding effect or enforceability against OGX and/or any of the Guarantors hereof, of the Debentures Deed, of the Additional Loan, of the DIP Guarantee Agreements and/or the Subscription Agreement; (d) the rights of any holder of Debentures under the Debentures Deed, the New Creditors of the Additional Loan and/or the DIP Guarantee Agreements; and/or the DIP Guarantees.

**1.1.76.**"Eike Batista": Eike Fuhrken Batista, a Brazilian citizen, legallyseparated, metallurgical engineer, resident and domiciled at Praia do Flamengo, No. 154, 10th floor, Rio de Janeiro - State of Rio de Janeiro, enrolled with the Individual Taxpayers' Register (CPF) under No. 664.976.807-30.

**1.1.77.**"Additional Loan": This is the super-priority post-petition loan madeby OGX, in the amount of seventy-three million, one hundred and seventy thousand, seven hundred and thirty-one U.S. dollars and seventy-one cents (US$ 73,170,731.71),pursuant to the terms of the Export Prepayment Agreement, which will have the treatment provided for in Articles 67, 84 and 149 of Bankruptcy Law and other legal provisions applicable. For the avoidance of doubt, the Additional Loan corresponds to the Supplementary Financing set out in the Debentures Deed, Collateral Sharing Agreement and DIP Guarantee Agreements.

**1.1.78.**"DIP Loan": Super-priority post-petition loan already granted and tobe granted by the Backstop – New Lenders and the New Lenders, through the subscription of Debentures under the terms of the Debentures Deed, which will be addressed as set forth in articles 67, 84 and 149 of the Bankruptcy Law and other applicable legal provisions, as set forth in **Clause 4.3** et. seq. hereof and of the Debentures Deed.

**1.1.79.**"Bridge Loans": The 1st Bridge Loan and the 2nd Bridge Loan together.

**1.1.80.**"Debentures Deed": The Private Indenture of the Third (3rd) Issue ofSimple Debentures, Non-Convertible into Shares, to be transformed into Convertible into Shares which is Guaranteed, with Additional Personal Guarantee, in three Series, of OGX Petróleo e Gás S.A., entered into between OGX, the Debentures Trustee, OGPar and others, as amended from time to time. The Third Amendment of the Debentures Deed for the inclusion of the 3rd Series Debentures and other specific provisions shall reflect substantially the terms and conditions of the draft included in **Exhibit 1.1.80** of this Plan.

**1.1.81.**"Bond Indentures": means the indenture of the Bonds 2018 andBonds

2022 respectively called (a) "Indenture Dated as of June 3, 2011, U.S.$ 2,563,000,000 8.500% Senior Notes Due 2018"; and (b) "Indenture Dated as of March 30, 2012, U.S.$ 1,063,000,000 8.375% Senior Notes Due 2022", issued by OGX Austria, with guarantee by OGPar and OGX.

**1.1.82.**"DIP Guarantees": Package of guarantees granted by OGX Group to the New Lenders of the DIP Loan and the Additional Loan, as described in **Clause 4.3.5** hereof and as set forth in the DIP Guarantee Agreements, the Debentures Deed and the Collateral Sharing Agreement.

**1.1.83.**"Bridge Guarantees": This is the package of guarantees granted by the OGX Group to the New Lenders of the 2nd Bridge Loan, pursuant to the Guarantee Agreements – 2nd Bridge Loan, which were fully released with the performance of the 2nd Bridge Loan.

**1.1.84.**"Guarantors": The following companies of OGX Group, which provided to the New Lenders all or some of the Bridge Guarantees and/or DIP Guarantees, as applicable, in consideration for the granting of the New Resources: OGPar, OGX Austria, OGX International, OGX Netherlands B.V. and OGX Netherlands Holding B.V. and Parnaíba B.V.

**1.1.85.**"OGX Group": Companies that are directly or indirectly controlled by OGPar, including, but not limited to, OGX, OGX Austria, OGX International and their respective subsidiaries and affiliates.

**1.1.86.** "OSX Group": Companies that are directly or indirectly controlled by OSX Brasil S.A. - Under Judicial Reorganization, including, but not limited to, OSX Serviços Operacionais Ltda. – Under Judicial Reorganization, OSX Construção Naval S.A. – Under Judicial Reorganization, OSX GmbH, OSX Leasing Group B.V., OSX1 Leasing B.V., OSX2 Leasing B.V., OSX WHP 1&2 Leasing B.V., OSX2 Holding B.V., OSX3 Holdco B.V., OSX3 Holding B.V. and OSX3 Leasing B.V.

**1.1.87.** "Confirmation Order": means the court order given by the Reorganization Court granting Judicial Reorganization, pursuant to Article 58, head provision and/or paragraph 1, Bankruptcy Law. For the purposes of this Plan, the Confirmation Order is deemed to take place on the date of publication, in the electronic official court gazette of the State of Rio de Janeiro, of the decision granting the Judicial Reorganization.**1.1.88.** "IGP-M": General Index of Market Prices, as set forth by FundaçãoGetúlio Vargas – FGV.

**1.1.89.**"Merger": Transaction for the merger of OGPar by OGX, as described in **Clause 10** and following of this Plan.

**1.1.90.**"IPCA": National Consumer Price Index.

**1.1.91.**"Reorganization Court": means the 4th Corporate Court of the Judicial District of Rio de Janeiro, State of Rio de Janeiro.

**1.1.92.**"Reports": Means the economic and financial reports that show

theeconomic viability of OGX, the evaluation of the assets of OGX and certify that the prospect of recovery of the Creditors in this Plan is better than the prospect of recovery in case of bankruptcy of OGX, pursuant to Article 53, of the Bankruptcy Law, attached to this Plan as **1.1.92**.

**1.1.93.**"Corporations Act": Law N°. 6404, of December 15, 1976.

**1.1.94.**"Bankruptcy Law": Law N°. 11101, of February 9, 2005.

**1.1.95.**"List of Creditors": This is the list of creditors provided by the JudicialAdministrator, and published on May 02, 2014, respecting and observing eventual supervening decisions, regarding the amount, classification and nature of the Credits, issued by the Reorganization Court until the date of the Capital Increase Through Capitalization of Credits; and, subsequently, the list of creditors consolidated in the General Schedule of Creditors.

**1.1.96.**"Notification of Interest in Subscribing 3rd Series Debentures": It isthe notification to be sent by the Creditors Qualified for the  Subscription of 3rd Series Debentures, to the Debentures Trustee and to the Judicial Administrator (a) expressing their intention, as well as their irrevocable and irreducible commitment to fully subscribe their portion of the 3rd Series Debentures, corresponding to the proportional amount of their Credit, by way of direct investment (in case of Creditors not residing in Brazil); (b) indicating their qualification and the contact data, including the physical and electronic address for receipt of the Subscription Notice addressed in this Plan; (c) in case of legal entities, copy of the By-laws and/or Articles of Association and other documents attesting to the powers of the signatory of the Notification of Interest in Subscribing 3$^{rd}$Series Debentures to represent and bind the Creditor; and (d) for a non-resident Creditor, the following information and proof, required for registration of the investment before the Brazilian Central Bank: (i) proof of registry with the Brazilian Federal Revenue Office (with the Corporate Taxpayers Register– CNPJ or with the Individual Taxpayers Register – CPF, as the case may be); and(ii) proof of enrollment with the Brazilian Central Bank (Individuals and Legal Entities Register - International Capitals – CADEMP (as per instructions contained in the "Cademp – Declarant's Manual", available at www.bcb.gov.br » *Câmbio e Capitais Estrangeiros » Manuais*"). Such information and documents shall be made available to OGX within the term established in **Exhibit 4.6**. Upon forwarding the Notification of Interest in Subscribing 3rd Series Debentures, the Creditors Qualified for the Subscription of 3rd Series Debenturesrepresent and warrant, for all purposes of the law, on an irrevocable and irreducible basis, that (i) they are not Related Parties; and (ii) they are aware that the acquisition of and investment in the Debentures involves relevant risks, especially considering the fact that OGX is under Judicial Reorganization and that the payment of the Debentures is an uncertain event, and that they are capable of individually or through advisors especially contracted for such purpose, to analyze the suitability and opportunity of this subscription, in the light of their own financial capacity. The Notification of Interest in Subscribing 3rd Series Debentures shall follow the model contained in **Exhibit 1.1.96,** and shall be sent pursuant to the procedure described in **Section 17.5** of this Plan.

**1.1.97.**"Notice of Payment Option": This is the notice to be submitted byCreditors to OGX, indicating the payment option elected by Creditor, subject to the options set forth in this Plan, pursuant to **Section 5.1.5** and **Section 17.5**. For the Creditors that opt for **Option B**,the Notice of Payment Option shall necessarily be made pursuant to the form **in Exhibit 1.1.97** and must be submitted pursuant to the procedures set forth in **Section 17.5** hereunder.

**1.1.98.**"Novo Mercado": Means the listing segment of BM&FBOVESPA –Bolsa de Valores, Mercadorias e Futuros ("BM&FBOVESPA") for the trading of shares issued by companies that voluntarily commit to the adoption of corporate governance practices and additional disclosure of information in relation to what is required by law.

**1.1.99.**"New Lenders": Are the Creditors Affected by the Plan and/or FirstPriority Creditors and/or third parties, including intermediary banks, financing agents, among others, that already granted or that may grant New Resources to OGX, upon subscription of the 1st Bridge Loan, 2nd Bridge Loan, DIP Loan, and/or the Additional Loan as set forth in **Clause 4** and following of this Plan. The New Lenders are and shall be, for all legal purposes, holders of First Priority Credits and paid with absolute precedence over other Credits, including First Priority Credits in the event of subsequent bankruptcy of OGX or any company of Group OGX, under Articles 67, 84 and 149 of the Bankruptcy Law and other applicable legal provisions.

**1.1.100.** "OGPar": Óleo e Gás Participações S.A. – Under Judicial Reorganization, the current name of OGX Petróleo e Gás Participações S.A., a corporation with headquarters in the City of Rio de Janeiro, State of Rio de Janeiro, at Rua do Passeio, No. 56, 10th, 11th and 12th floors, Centro, enrolled with CNPJ/MF under No. 07.957.093/0001-96, part of the OGX Group for the purposes of this Plan.

**1.1.101.** "OGX": Has the meaning given in the preamble above.

**1.1.102.** "OGX Austria": OGX Austria GmbH - Under Judicial Reorganization, a company incorporated under the laws of the Republic of Austria, with business registration with the Commercial Court in Vienna under FN 335512 and headquartered at Schwarzenbergplatz 5/Top 2/3, 1030, Vienna, and enrolled with CNPJ/MF under No. 16.885.474/0001-06.

**1.1.103.**"OGX International": OGX International GmbH – Under Judicial Reorganization, a company organized under the laws of the Republic of Austria, registered with the Commercial Court of Vienna under No. FN 335513B, and with head office at Schwarzenbergplatz 5/Top Nr. 2/3, 1030, in the City of Vienna.

**1.1.104.** "Restructured OGX": Has the meaning given in **Clause 10.2** of this Plan.

**1.1.105.** "Option A": It is the option available for Unsecured Creditors and First Priority Creditors which expressly adhere to the Plan, pursuantto **Section 5.1.5.1(i)** of this Plan.

**1.1.106.**"Option B": It is the option available for Unsecured Creditors and First Priority Creditors which expressly adhere to the Plan, pursuant to **Section 5.1.5.1(ii)** of this Plan.

**1.1.107.**"Parnaíba B.V.": Parnaíba B.V. a company (*Besloten Vennootschap*) organized and existing pursuant to the laws of Holland, with headquarters in the Hague, at Parkstraat 83, 209 / 210 Office, 2514JG's-Gravenhage.

**1.1.108.** "Parnaíba Gás Natural": Parnaíba Gás Natural S.A., the current name of OGX Maranhão Petróleo e Gás S.A., a corporation with principal place of business in the City of Rio de Janeiro, State of Rio de Janeiro, at Praia do Flamengo, No. 66, 3rd floor,        CEP 22210- 903, enrolled with CNPJ/MF under No. 11.230.122/0001-90.

**1.1.109.** "Exempt Parties": OGX, OGX Group, the Shareholders, the New Lenders, including the Backstop – New Lenders, the Supporting Bondholders, the Bond Trustee and their respective controlled companies, subsidiaries, affiliates and associates and other companies belonging to the same corporate and economic group, their officers, directors, shareholders, non-controlling shareholders, partners, agents, employees, representatives, advisors, consultants and attorneys, successors and assignees, for the purposes hereof.

**1.1.110.** "Related Parties": (i) companies directly or indirectly controlled by Mr. Eike Batista, including the companies of OSX Group and/or (ii) the directors of any company of OGX Group at any time and/or OSX Group; and/or (iii) relatives to the third degree of any of the persons mentioned in items (i) and (ii) above.

**1.1.111.** Plan Support Agreement": Agreement entered into among OGX Group and the Supporting Bondholders, on December 24, 2013, with the purpose of establishing the basic conditions for the restructuring of OGX Group.

**1.1.112.** "Plan": This judicial reorganization plan, as amended, modified or changed from time to time.

**1.1.113.** "OGPar Plan": The judicial reorganization plan presented by OGPar, as amended, modified or changed from time to time.

**1.1.114.** "OGX Austria Plan": The judicial reorganization plan presented by OGX Austria, as amended, modified or changed from time to time.

**1.1.115.** "OGX International Plan": The judicial reorganization plan presented by OGX International, as amended, modified or changed from time to time.

**1.1.116.** "OGX Related Parties Plan": The OGPar Plan, the OGX Austria Plan and the OGX International Plan all together, as amended, modified or changed from time to time.

**1.1.117.** "Initial Wells": 7-TBMT-8HP and 9-OGX-44HP wells in Tubarão

Martelo field.

**1.1.118.** "Put Option": The Private Instrument of Granting of Subscription Option of Shares and Other Covenants of OGPar, entered into on October 24, 2012, between OGPar and Centennial Asset Mining Fund LLC and Eike Batista.

**1.1.119.** "Judicial Reorganization": Judicial Reorganization case of OGX Group filed under No. 0377620-56.2013.8.19.0001, pending before the Reorganization Court.

**1.1.120.** "New Resources": means all the resources deriving from the 1ˢᵗBridge Loan, the 2ⁿᵈ Bridge Loan, the DIP Loan and the Additional Loan already granted or that may be granted by the New Lenders.

**1.1.121.** "Registration as Listed Company": Procedure to be adopted by OGX to obtain the securities issuer register, category A, for the trading of securities in regulated securities markets before the CVM, as set forth in CVM Instruction 480, of December 7, 2009. The Registration as a Listed Company is an essential condition of this Plan, so that any eventual delay in obtaining such Registration as Listed Company may affect the time of verification of the restructuring measures set forth therein.

**1.1.122.** "Rêmora": Is the field located in the Campos Basin, State of Rio de Janeiro, where the CM-499 exploratory block is located, the concession rights of which were granted to OGX in accordance with the terms of the BM-C-40 Concession Agreement.

**1.1.123.** "Termination of the Plan": Effect of verifying any ofthe termination conditions listed in **Clause 12** of this Plan.

**1.1.124.** "Result of the Proceeding": As defined on **Section 11.1** of this Plan, it refers to the result of a proceeding for an amicable resolution of disputes about the Put Option.

**1.1.125.** "Tubarão Azul": Is the field located in the Campos Basin, State of Rio de Janeiro, where the CM-592 exploratory block is located, the concession rights of which were granted to OGX through the BM-C41 Concession Agreement.

**1.1.126.** "Tubarão Martelo": The field located in the Campos Basin, State of Rio de Janeiro, where exploratory blocks CM-466 and CM-499 are located, which concession rights were granted to OGX through Concession Agreements BM-C-39 and BM-C-40, respectively.

**1.1.127.** "UPI Parnaíba Gás Natural": Isolated Production Unit, in accordance with Article 60 of the Bankruptcy Law, corresponding to 245,728,660 (two hundred forty-five million, seven hundred twenty-eight thousand, six hundred and sixty) common shares issued by Parnaíba Gás Natural owned by OGX.

**1.1.128.** "Minimum Amount": Means the amount of **R$ 199,998,556.37** (one hundred ninety-nine million, nine hundred ninety-eight thousand, five hundred fifty-six

Brazilian reais and thirty-seven cents), adjusted for inflation pursuant to the IPCA variance from October 30, 2013 to the date of actual payment, which is the minimum amount for bidding by parties interested in buying UPI Parnaíba Gás Natural, under the terms of the Public Notice.

**1.2.    Clauses and Exhibits.** Unless specified differently, all Clauses and Exhibits mentioned in this Plan refer to Clauses and Exhibits in this Plan. References to clauses or items of this Plan also refer to the respective sub-clauses and sub-items.

**1.3.    Headings**. The headings of the Chapters and Clauses of this Plan have been included for reference purposes only and shall not affect the construction or the contents of their provisions.

**1.4.    Terms**. The terms "include", "including" and similar terms are to be construed as if followed by the words "but not limited to."

**1.5.    References**. References to any documents or instruments include all the respective amendments, consolidations and additions, unless otherwise expressly provided.

**1.6.    Legal Provisions**. References to statutory provisions and laws shall be construed as references to those provisions as in force on that date or on the date that is specifically determined by the context.

**1.7.    Deadlines**. All deadlines in this Plan will be counted as determined by Article 132 of the Civil Code, disregarding the day of the beginning and including the day of maturity. Any deadlines of this Plan (counted as Business Days or otherwise), the final term of which falls on a day other than a Business Day, shall be automatically postponed to the immediately following Business Day.

**2    Miscellaneous**

**2.1.History.** OGX is an operating company, owned by OGX Group, the corporate purpose of which is, with authorization or concession of the Federal Government, the research, mining, refining, processing, trade and transport of oil from wells, shale and other rocks, its derivatives, natural gas and other fluid hydrocarbons, as well as offshore support activities and port support to aid the exploration and production of oil and gas offshore, in addition to other energy related activities, and may promote research, development, production, transport, distribution and marketing of all forms of energy allowed by law, as well as any other related or similar activities.

OGX is currently directly or indirectly, through companies controlled by it, the licensee of exploration fields/blocks, primarily the following:

(i)     Tubarão Martelo;
(ii)    Tubarão Azul;
(iii)   B S - 4 ;
(iv)    R ê m o r a
(v)     Blocks BM-PAMA-13, BM-PAMA-14, BM-PAMA-15, BM-PAMA-16, BM-PAMA-17, whose rights of exploration have been obtained on the 9th round of Biddings carried out by ANP;

(vi)   Blocks POT-M-762, CE-M-603, CE-M-661, POT-M-475, the exploration rights of which were obtained in the 11th Round;

(vii)  Blocks PN-T-48, PN-T-49, PN-T-50, PN-T-67, PN-T-68, PN-T84and PN-T-85, the exploration rights of which were acquired through a partnership between Petra Energia S/A and Parnaíba Gás Natural; and Block PN-T-102, the exploration rights of which were acquired through a partnership with the companies Imetame Energia S.A., Delp Engenharia Mecânica Ltda. and Orteng Equipamentos e Sistema Ltda. Parnaíba Gás Natural is a company in which OGX holds 245,728,660
(two hundred forty-five million, seven hundred twenty-eight thousand, six hundred and sixty) common shares, representing, on this date, approximately 36.36% (thirty-six point thirty-six percent) of its share capital, which are subject to a Share Purchase Agreement; and

(viii) Colombia Assets, which are the subject of a sale as per **Exhibit 1.1.16**.

Created in 2007, OGX Group held in Brazil, over the past six (6) years, exploration activities of oil and gas in Campos Basin, Santos, Espírito Santo, Parnaíba and Pará - Maranhão. To achieve this unprecedented exploration campaign, OGX Group invested more than R$ 10 billion in its operations in Brazil, making it the largest private investor in the segment in which it operates.

## 2.2. Corporate structure of OGX Group: OGX Group is structured as per organizational chart reproduced below:



## 2.3. Fund Raising. A significant part of investments made by OGX Group in the strategic area where it acts was obtained through fund raising with international investors, particularly through the issuance of Bonds 2018 and Bonds 2022.

In this sense, on May 26, 2011, OGPar issued Bonds 2018 in the total amount of US$ 2,563,000,000.00 (two billion, five hundred and sixty-three million U.S. dollars), which were subsequently assumed by OGX Austria as issuer of the Bonds. Netresources

obtained with issuance of Bonds 2018 and its offer to qualified institutional investors were fully destined to OGX Group cash, upon entering into the export prepayment transaction between OGX and OGX Austria, to undertake the new exploratory campaign and to develop the production in discovered blocks until OGX Group could be self-financing.

Also, on March 30, 2012, OGX Austria issued Bonds 2022, in the total amount of **US$ 1,063,000,000.00** (one billion and sixty-three million U.S. dollars), which were equally destined to qualified institutional investors. The net resources of the issuance of the Bonds 2022 were also destined to the cash of OGX Group, in order to help to implement the OGX Group business plan, upon issuance of debentures by OGX, which were subscribed by OGX Austria.

As consideration for the resources obtained as a result of Bonds 2018 and Bonds 2022 issuance, OGX and OGPar fully guarantee the Bonds 2018 and Bonds 2022, as principal debtors and  joint and several payers, for all legal purposes.

Despite the significant investments made by OGX Group in the projects of oil and gas exploration defined in their business plan, a series of adverse events external to OGX Group has changed significantly the operation of the activities developed by the group.

**2.4 Reasons for the Crisis.** As widely exposed under the Judicial Reorganization, OGX faces the direct consequences of the occurrence of a number of adverse events related to the risk of the activity it develops. Although the technical investigation undertaken in different fields, the exploration of which was granted to OGX Group, has resulted in very significant production forecasts, the exploration proved to be commercially unviable in some of them. Although the extraction of oil and gas in certain blocks granted by the Federal Government has corresponded to the technical forecasts, production in other blocks proved insufficient or uneconomic, thus the expected financial results were not achieved. This fact affected very negatively the revenues of OGX Group and, consequently, made it unable to honor the commitments to suppliers and financial institutions.

In addition, the failure by Petronas Brasil E&P Ltda. to conclude the transaction for the purchase of forty per cent (40%) of blocks Tubarão Martelo, as agreed in the Farmout Agreement, was also determinant of the liquidity crisis faced by OGX Group, which resulted in the filing of Judicial Reorganization.

**2.5.    Purpose and Considerations about the Plan.** The purpose of the Plan is to allow OGX and OGX Group to overcome its economic-financial crisis, implement the necessary measures for its operational reorganization, meet the interests and preserve the rights of Creditors and other interested parties. To this end, this Plan seeks to establish  a way to settle its debts converting them in capital, and to obtain New Resources, thus permitting, not only the maintenance of the activities of OGX Group, but also the continuous growth through the resumption of investment capacity.

> **2.5.1.** This Plan sets forth the proposal to restructure and repay Creditors and their respective Credits Affected by the Plan under more favorable conditions with more advantages than would be possible in an OGX bankruptcy proceeding, via capitalization of the debt with the consequent delivery of Shares resulting from the

Capital Increase Through Capitalization of Credits, with the possibility of receipt of cash, resulting from the sale of the Shares, for the Creditors that so wish. Also, all Bankruptcy Creditors had the right to (a) present objections to the Plan pursuant to the terms of Section 55 of the Bankruptcy Law; and (b) participate in the resolutions and voting of this Plan at the Meeting of Creditors, with equal conditions. Thus, this Plan is fair, reasonable, and equitable under material and procedural perspectives.

**2.6. New Resources and Investments.** As known, the oil and gas sectors require a huge allocation of financial resources. In view of the series of adverse facts related to the risk of the activity developed by OGX, which facts happened in the last months, OGX found that it was unable to finance oil extraction at the fields of Tubarão Martelo and Tubarão Azul (in test stages), which culminated in filing the request for Judicial Reorganization.

Notwithstanding, since August 2013, i.e., before the Filing Date, OGX Group has been seeking to raise new resources on local and international markets and, with that purpose, it has counted on the joint work of its highly qualified managers, advisors and consultants with the extensive experience in financial restructuring projects.

After a detailed analysis of the financial and operational situation of OGX Group, it was concluded that OGX Group would need and does need to receive, in addition to the revenue forecast in its cash flow and projections, new financing in order to fund the development of its activities and preserve its assets during the current temporary restructuring process. Getting these financial resources was considered as indispensable for the stability of OGX Group cash flow and, consequently, the feasibility of restructuring and improving of OGX Group, through implementation of its business plan.

In this context, after a careful process of funding investments through several potential investors, conducted in good-faith by OGX Group and its managers, advisors and consultants, the only definite financing operation opportunely proposed to the OGX Group by investors of unquestionable suitability and financial capacity at an appropriate amount and date, was the DIP Loan, pursuant to the terms of the Subscription Agreement, and Debentures Deed.

The security of getting the DIP Loan gave OGX the conditions required to continue to perform its activities, as well as to seek new investments. In that sense, OGX rapidly became more attractive to other investors, making it feasible to sign the papers related to Bridge Loans and to the Additional Loan.

**2.7 Authorization for Granting of Guarantees**. Due to the need to obtain New Resources, and in order to help with contracting the DIP Loan and the Additional Loan, on January 27, 2014, the Reorganization Court authorized OGX Group to encumber some of its fixed assets as guarantee of the DIP Loan, pursuant to Articles 66 and 67 of Bankruptcy Law. The decision of the Reorganization Court was  upheld in its entirety by the Court of Justice of Rio de Janeiro, under the terms of decision of the 14th Chamber of Private Law rendered on April 30, 2014. This Plan also authorizes OGX Group to encumber other fixed assets to guarantee the DIP Loan and the Additional Loan, including under the terms of the DIP Guarantee Agreements – 2nd and 3rd Series, to be shared under the terms of the Collateral Sharing Agreement.

**3. Overview of Reorganization Measures**

**3.1 Granting New Resources**. To allow OGX to recover the working capital needed to continue with its activities and preservation of its assets, as well as for the development of its business plan, it was and continues to be essential for OGX to obtain the New Resources from the New Lenders, under the terms of the DIP Loan and, as a function thereof, the Bridge Loans and the Additional Loan, under the protection of Articles 67, 84 and 149 of Bankruptcy Law and other applicable legal provisions. OGX clarifies that these New Lenders were the only ones willing to disburse the New Resources, among dozens of other institutions that have been consulted by OGX Group since August 2013.

> **3.1.1.** Thus, the contribution of New Resources by the New Lenders is essential to the success of this Plan, to which preferential treatment and absolute precedence will be given, even in the event of a bankruptcy liquidation of OGX and/or the Guarantors, as provided in Articles 67, 84 and 149 of the Bankruptcy Law, and the provisions of this Plan, of the 2nd Bridge Loan, in the Debentures Deed (DIP Loan), the Export Prepayment Agreement (Additional Loan), the Bridge Guarantees and DIP Guarantee Agreements.

**3.2. Debt Restructuring.** In addition to having access to New Resources, OGX Group must also be able to, under the Judicial Reorganization and within the limits established by the Bankruptcy Law and by this Plan, restructure the debts incurred from its Creditors Affected by the Plan. Moreover, within the applicable legal limits, OGX Group may also seek to renegotiate its debt with First Priority Creditors, by offering the same terms offered to the Creditors Affected by the Plan, provided, however, that the renegotiation with First Priority Creditors will only be achieved through specific agreements between OGX Group and the referred First Priority Creditors, as applicable (however, for purposes of clarity and transparency, this fact is mentioned in this Plan).

> **3.2.1** Subject to **Clause 5** of this Plan, the restructuring referred to in **Clause 3.2** will be through the conversion of Credits into capital of OGX, pursuant to Article 171, paragraph 2 of the Corporations Act and other applicable legal provisions, with the possibility of receipt of cash, due to the sale of the Shares, for those Creditors who wish to do so and so state, in a timely manner under the terms of this Plan.

**3.3 Governance.** OGX, supported by the Shareholders, will cause changes to its management bodies, seeking to improve its corporate governance, with professional and independent management, and increased control and monitoring of their operations, as described in this Plan.

**3.4 Sale of Fixed Assets.** OGX may cause the sale and/or encumbrance of its fixed assets, as expressly authorized by the Reorganization Court in accordance with Article 66 of the Bankruptcy Law, or this Plan, subject in any case to the limits established herein, in the Subscription Agreement, in the Debentures Deed (DIP Loan), the Export Prepayment Agreement (Additional Loan), DIP Guarantees, to ensure the implementation of this Plan and the success of the Judicial Reorganization.

**4. First Priority Loans to New Resources**

**4.1. General Conditions**. Considering the cash needs of OGX Group in order to stabilize its working capital, to protect its essential assets and allow the adoption of measures aimed at its restructuring, OGX Group sought and obtained the following first priority borrowings, pursuant to Articles 66, 67, 84, item V, and 149 of the Bankruptcy Law and other legal provisions applicable, listed chronologically : (i) 1st Bridge Loan; (ii) 2nd Bridge Loan; (iii) DIP Loan; and (iv) Additional Loan. The above mentioned loans have a first priority nature and are not subject to the terms of this Plan.

However, for the purposes of clarity, transparency and comprehension by the Reorganization Court, Judicial Administrator, Creditors and other interested parties, including with regard to procedures for the participation of Creditors in the subscription of 3rd Series Debentures, and the implications of the Capital Increase Through Conversion of Debentures for the final restructuring of OGX Group, with immediate effects on the capital structure of OGX Group, below is an executive summary of principal terms, conditions and guarantees of loans made after reorganization.

**4.2 Bridge Loans**. The Bridge Loans were fully paid and performed on March 13, 2014 and March 14, 2014, respectively, observing all terms and conditions provided for in the 1st Bridge Loan and 2nd Bridge Loan. The 2nd Bridge Loan was fully guaranteed by Bridge Guarantees, as authorized by the Reorganization Court in a decision issued on January 27, 2014, which [guarantees] were fully released after the performance of the 2nd Bridge Loan.

**4.3 DIP Loan – Debenture Issue**. OGX issued the Debentures on February 12, 2014, pursuant to the terms and subject to the conditions of the Debentures Deed and the Subscription Agreement, for the purpose of obtaining New Resources corresponding in national currency to the amount of **US$ 215,000,000.00** (two hundred and fifteen million U.S. dollars), which on the Issue Date corresponded to **R$514,624,000.00** (five hundred and fourteen million, six hundred and twenty-four thousand Brazilian reais).

> **4.3.1 Series of Debentures.** The Debentures were issued in three (03) series, as follows:

> - 1st Series Debentures: issued, subscribed, and paid-in in a total amount of two hundred and ninety-nine million, two hundred thousand Brazilian reais (**R$ 299,200,000.00**), monetarily adjusted by the variation of the sellexchange rate of Brazilian reais into U.S. dollars, pursuant to the terms of the Debentures Deed, corresponding on the Issue Date to **US$125,000,000.00** (one hundred and twenty-five million U.S. dollars).

> - 2nd Series Debentures: issued in the total amount of up to two hundred and fifteen million, four hundred and twenty-four thousand Brazilian reais (**R$ 215,424,000.00**), monetarily updated by the variation of the sellexchange rate of Brazilian reais into U.S. dollars, according to the terms ofthe Debentures Deed, corresponding on the Issue Date to up to ninety million U.S. dollars (**US$ 90,000,000.00**), to be opportunely subscribed and paid-in by the Backstop – New Lenders (whether they are Creditors or not). The final amount of 2nd Series Debentures shall correspond to the unsubscribed portion of 3rd Series Debentures by the Creditors and eventual surplus of Creditors that do not pay for

the subscription of the 3rd Series Debentures, observing the provisions of this Plan and the Debentures Deed. The $2_{nd}$Series Debentures may be fully cancelled, if 3rd Series Debentures are fully subscribed, observing the provisions of the Debentures Deed in this Plan;

- $\underline{3^{rd}\text{ Series Debentures:}}$ issued in a total amount of up to **R\$ 215,424,000.00** (two hundred and fifteen million, four hundred and twenty-four thousand Brazilian reais), monetarily adjusted by the variationof the sell exchange rate of Brazilian reais into U.S. dollars, pursuant to the Debentures Deed, corresponding on the Issue Date to up to US\$ 90,000,000.00 (ninety million U.S. dollars), to be opportunely subscribed, and paid-in by the Creditors, proportionally to the respective Credit. The final value of 3rd Series Debentures to be subscribed by the Creditors Affected by the Plan and/or First Priority Creditors (that expressly adhere to the Plan) may vary according to the demand for 3rd Series Debentures. The $3_{rd}$Series Debentures may be cancelled by virtue of the lack of Creditors interested in its subscription, payment or default in payment, as described in **Clause 4.6** et. seq. hereof, observing the provisions of the Debentures Deed;

**4.3.2 Other Characteristics of 3rd Series Debentures**. According to the Debentures Deed, as amended from time to time, 3rd Series Debentures: (a) are materially similar to the 2nd Series Debentures and confer the same rights and prerogatives to respective debentureholders to participate in DIP Loan; (b) have covenants and hypothesis of acceleration more restricted than those established for 1st Series Debentures and the Additional Loan; (c) will have automatic acceleration in the case of a declaration of acceleration of 1st Series Debentures and/or the Additional Loan; (d) will be automatically converted into Shares if 1st Series Debentures are converted into Shares, including in cases of exemption for New Lenders of 1st Series Debentures of Conditions Precedent for the Conversion of 1st Series Debentures into Shares, as set forth in the Debentures Deed; (e) will consider that any eventual resolution in debentureholder meetings will be made subject to a joint quorum formed by subscribers of 2nd Series Debentures and 3rd Series Debentures; and (f) just like the 1st Series Debentures, are junior and subordinate to the Additional Loan for collection and enforcement purposes of the DIP Guarantees in case of default by the OGX Group, under the terms of the Collateral Sharing Agreement.

**4.3.3. Destination of the New Resources of the DIP Loan.** The New Resources of the DIP Loan have been and shall be destined to the payment of first priority obligations, financing of certain investments in capital and operating expenses for the maintenance of OGX's activities, as well as for the payment of reasonable expenses related to this Judicial Reorganization proceeding, as expressly provided for in the Debentures Deed and in the Subscription Agreement.

**4.3.4 Priority of the DIP Loan**. According to Articles 67, 84, 85 and 149 andother applicable legal provisions of Bankruptcy Law, the Debentures were issuedwithin the scope of the Judicial Reorganization. The credits corresponding to the Debentures is and should always be considered first priority credits for all purposes of law, including in the case of supervening bankruptcy of OGX, even

when the Debentures are subscribed by Creditors and the Capital Increase Through Capitalization of Credits is verified, being that they must be paid with precedence over all Credits Affected by the Plan and First Priority Credits, in compliance with Articles 84, 85, 149 and other applicable provisions of Bankruptcy Law.

**4.3.5. Constitution of DIP Guarantees**. Without prejudice to seniority, priority and corresponding protection applicable to New Resources, pursuant to Articles 67, 84, 85 and 149, as well as other applicable legal provisions of Bankruptcy Law, OGX and Guarantors, as applicable, in guarantee of full and timely payment of the DIP Loan and Additional Loan, as authorized by the Reorganization Court, pursuant to Article 66 of Bankruptcy Law, as applicable, grant and will grant DIP Guarantees, pursuantto the following DIP Guarantee Agreements (**Exhibits 1.1.33 and 1.1.35**):

(i)      fiduciary sale of the oil and gas owned by OGX in any of following production fields, subject to the respective interest of OGX in each of these production fields: (a) Block BS-4; (b) Tubarão Martelo; and (c) Blocks POT-M-762, CE-M-661, POT-M-475[1] and CE-M-603, where OGX holds respective interests of 50% (fifty per cent), 30% (thirty per cent), 65% (sixty-five per cent) and 50% (fifty per cent), subject to the right of other creditors holding previous guarantee on certain quantity of oil, pursuant to the "Private Instrument of Fiduciary Sale of Oil and Natural Gas as Guarantee";

(ii)     fiduciary assignment of: (a) all credit rights resulting from the marketing of oil and gas owned by OGX, subject to the right of other creditors that already had a guarantee on the determined quantity of oil; (b) the credit rights held by OGX against Parnaíba Gás Natural resulting from the Shared Costs Agreement Termination and Release, entered into by OGX, Parnaíba Gás Natural, and Eneva S.A., on October 30, 2013, as well as promissory notes issued by Parnaíba Gás Natural in favor of OGX related to the Shared Costs Agreement Termination and Release; and (c) the blocked account in which the funds deriving from the credit rights mentioned above will be deposited under the terms of the "Private Instrument of Fiduciary Assignment of Credit Rights and Credit Securities as Guarantee (Intercompany and Product Sale)" and the Agreement for Deposit as Guarantee and Other Covenants;

(iii)    fiduciary assignment of (a) credit rights held by OGX against the Federal Government based on the right of reimbursement for the overpayment of Corporate Income Tax, observing, however, the right of other creditors that may have preference  in relation to such credits, and

---

[1] On September 23, 2013, OGX signed an Assignment Instrument with EXXONMOBIL Exploração Brasil Ltda., through which it assigned all of its rights and obligations related to thirty-five percent (35%) of its interest in such block. The mentioned assignment has already been approved by CADE and right now is awaiting approval by ANP.

the blocked account in which the funds deriving from the credit rights mentioned above will be deposited pursuant to the "Private Instrument of Fiduciary Assignment ofCredit Rights as Guarantee (Tax Rights)" and to the Agreement for Deposit and Guarantee and Other Covenants;

(iv) pledge on the rights emerging from the participation of OGX in the agreements referring to the concession on BS-4, pursuant to the "Private Instrument of Pledge of Rights on the Concession Agreement and Other Covenants (BS4)";

(v) fiduciary assignment of, among others, (a) credit rights held by OGX against Cambuhy, resulting from the Share Purchase Agreement; (b) credit rights of OGPar resulting from an eventual subrogation of the rights of respective creditors of the "Private Instrument of Deed of First Public Issue of Simple Debentures, Non-Convertible into Shares, Unsecured, with Personal Guarantee, in Single Series of Parnaíba"; "Credit Agreement", entered into between Parnaíba Gás Natural, OGPar, MPX Energia S.A. and Morgan Stanley Bank, N.A.; and "Private Instrument of Fiduciary Sale of Shares and Other Covenants", entered into between OGPar, MPX Energia S.A., Planner Trustee Distribuidora de Títulos e Valores Mobiliários Ltda. and Parnaíba Gás Natural, (c) the blocked account in which the funds deriving from the credit rights mentioned above and other credit rights subject of said guarantee will be deposited pursuant to the "Private Instrument of Fiduciary Assignment of Credit Rights as Guarantee (Parnaíba)" and the Agreement for Deposit as Guarantee and Other Covenants;

(vi) fiduciary assignment of credit rights held by OGX and by OGPar resulting from: (a) insurance agreements; (b) judicial and extrajudicial litigations (including in the case litigation against Brasil E&P Ltda.); (c) agreements and other instruments; (d) any other credit rights that are not the object of other specific guarantee, and (e) fiduciary assignment of the blocked accounts in which the funds deriving from the credit rights mentioned above will be deposited, pursuant to the "Private Instrument of Fiduciary Assignment of Credit Rights as Guarantee (General)" and the Agreement for Deposit as Guarantee and Other Covenants;

(vii) fiduciary sale of assets owned by Parnaíba B.V., pursuant to the "Private Instrument of Fiduciary Sale of Equipment as Guarantee";

(viii) fiduciary assignment of (a) any and all credit rights of OGX resulting from the payment of the first series of Debentures pursuant to the Credit Agreement, that will be deposited in a blocked checking account of OGX and (b) said account, pursuant to the "Private Instrument of Fiduciary Assignment of Credit Rights as Guarantee (Resources from the Payment of the 1st Series Debentures)" and the Agreement for Deposit as Guarantee and Other Covenants;

(ix) pledge of the entirety of the shares issued by Parnaíba B.V., pursuantto the "Deed of Pledge of Parnaíba B.V. Shares";

(x) pledge of credit rights held by OGX Netherlands against MPX Energia GmbH, resulting from the sale of shares issued by Parnaíba B.V., pursuant to the "Deed of

Pledge of Parnaíba MPX Receivables";

(xi)  pledge of credit rights held by OGX Netherlands against Parnaíba B.V, pursuant to the "Deed of Pledge of Parnaíba MPX Receivables";

(xii)  pledge of receivables, sale rights and other rights related to the export agreement of OGX and the Guarantors pursuant to the "Security Agreement";

(xiii) fiduciary sale of OGX and OGPar shares, to be entered into by the parties after Plan approval;

(xiv) pledge of the rights emerging from the interest of OGX in the concession agreements referring to blocks BM-C-39 and BM-C-40 of Tubarão Martelo and concession agreements of the 11th Round to be entered into between the parties after Plan approval; and

(xv) pledge on shares issued by OGX International, OGX Austria, OGX Netherlands B.V. and OGX Netherlands Holding B.V,pursuant to the terms of the Indenture to be entered into after Plan approval.

**4.3.5.1** Additionally and without prejudice of DIP Guarantees, the DIP Loan also has a personal guarantee, in the form of a surety provided by all Guarantors.

**4.3.6.**     **Sharing of Guarantees**: Without prejudice to seniority, priority

and corresponding protection applicable to New Resources resulting from the DIP Loan, pursuant to Articles 67, 84, 85 and 149, as well as other applicable legal provisions of Bankruptcy Law, DIP Guarantees are and will be shared to guarantee full and timely compliance with the obligations under the Additional Loan, pursuant to the Export Prepayment Agreement, under the DIP Guarantee Agreements and the Collateral Sharing Agreement. The Additional Loan will have priority on Debentures in the foreclosure of DIP Guarantees and in the distribution and receipt of corresponding product to settle the Additional Loan, under the terms of the Collateral Sharing Agreement.

**4.4 The 1st Series Debentures**. The 1st Series Debentures were fully subscribed and paid-in by Backstop – New Lenders (directly or indirectly) on February 13, 2014.

**4.5. 2nd Series Debentures**. The 2nd Series Debentures will be opportunely subscribed and paid by Backstop – New Lenders (whether Creditors or not), provided that certain terms and conditions precedent of the Subscription Agreement are complied with and verified, in an amount equivalent to unsubscribed 3rd Series Debentures, always limited to the maximum amount corresponding in national currency to **US$ 90,000,000.00** (ninety million U.S. dollars) on the payment date of 2nd Series Debentures, pursuant to the terms of the Debentures Deed and the Subscription Agreement, as applicable.

**4.5.1 Firm Guarantee of Payment by the Backstop – New Lenders.** Provided that the conditions precedent established in Section 3.2 of the Subscription

Agreement are verified or expressly waived, in relation to the subscription of the 2nd Series Debentures, which include (i) Judicial Approval of the Plan; (ii) posting and duly establishing the DIP Guarantees; (iii) CADE's approval of the convertibility of the Debentures within the terms of the Debentures Deed; and (iv) verification of production of a certain quantity of oil in the fields explored by OGX, and, without prejudice to the right of the Backstop – New Lenders to question the fulfillment of the mentioned conditionsprecedent, the Backstop – New Lenders are obligated to subscribe all 2nd Series Debentures, for an amount equivalent to the 3rd Series Debentures not paid-in by the Creditors, at the time and in the manner established in this Plan and in the Subscription Agreement, including possible unsubscribed [debentures] deriving from the loss of the subscription right, pursuant to **Sections 4.6.4 and 4.7** of this Plan, always limited to the corresponding amount, in national currency, to ninety million U.S. dollars (**US$ 90,000,000.00**) on the date of subscription of the 2nd Series Debentures. The 2<sub>nd</sub>Series Debentures shall be paid-in by the Backstop – New Lenders in currency, in the form and term established in the Debentures Deed, with due regard for the terms of the Subscription Agreement and the terms of **Sections 4.5** and **4.7** of this Plan.

**4.6. 3rd Series Debentures.** The 3rd Series Debentures may be subscribed and paid-in by the Creditors Affected by the Plan and/or First Priority Creditors (for these latter ones, provided that they have expressly adhered to this Plan, as applicable) who have qualified as <u>Creditors Qualified for the Subscription of 3<u>rd</u> Series Debentures,</u> under the terms of this **Section 4.6**, of the **Exhibit 4.6**, of the Debentures Deed and of the Subscription Agreement, as applicable.

**4.6.1. *Pro Rata* Allocation of the 3rd Series Debentures.** The right of <u>Creditors Qualified for the Subscription of 3<u>rd</u> Series Debentures</u> to subscribe and pay the 3<sub>rd</sub> Series Debentures will be always limited to the percentage that their respective Credit represents in the total sum of Credits contained in the List of Creditors (without duplication of Credits due to guarantees and/or co-obligation), without right to additional subscription of any eventual unsubscribed debentures resulting from non-exercise and/or loss of right to subscribe applicable to other Creditors, pursuant to **Section 4.6.4** of this Plan.

**4.6.2. Notification of Interest in Subscribing 3rd Series Debentures**. The Creditor Affected by the Plan and/or First Priority Creditor (for the latter, provided it has expressly adhered to this Plan, as applicable) interested in subscribing its quota part in the 3rd Series Debentures shall submit to OGX, with a copy to the Judicial Administrator and the Debentures Trustee, the relevant <u>Notification of Interest in Subscribing 3<u>rd</u> Series Debentures,</u>pursuant to **Exhibit 1.1.96**, **Exhibit 4.6** and **Section 17.5** of this Plan, within five (5) Business Days of the Approval of the Plan. <u>Notification of Interest in Subscribing 3<u>rd</u> Series Debentures</u> received after the deadline,or which are not fully compliant with **Exhibit 1.1.96** may be disregarded by OGX for the purposes of this Plan, at its sole discretion, noting that the supporting documents contained in **Exhibit 4.6** of this Plan may be delivered to OGX on the date established on the **Exhibit 4.6** mentioned above and on the Subscription Notice.

**4.6.2.1. Notification of Interest – Non-Resident Creditors.** Creditors notresiding in Brazil should submit a <u>Notification of Interest in Subscribing 3<u>rd</u></u>

Series Debentures together with the documents listed in **Exhibit 1.1.96** of this Plan. OGX is not responsible for non-resident Creditors that are not able to subscribe, pay or receive 3rd Series Debentures, due to non-compliance with legal requirements in force in the period established for the formalization of investment.

**4.6.3. Verification of the Interest of Creditors and Allocation of the 3$_{rd}$Series Debentures.** OGX shall determine and consolidate all Notifications of Interest in Subscribing 3rd Series Debentures, received from the Creditors. Afterwards, OGX shall forward to the Creditors Qualified for the Subscription of 3rd Series Debentures, always with copy to the Debentures Trustee, the respective Subscription Notice, which shall contain: (i) the identification of the Creditor Qualified for the Subscription of 3rd Series Debentures, which is the addressee of the Subscription Notice; (ii) the quantity of 3$^{rd}$Series Debentures to be subscribed by such Creditor, and its respective value; (iii) the account(s) for deposit of the payment of the amount equivalent to the subscription and payment of the Debentures of the 3rd Series; and (iv) the date for the Creditors Qualified for the Subscription of 3rd Series Debentures to deposit the resources required to pay-in their portion of the 3rd Series Debentures, which shall not exceed four (4) Business Days, counted from the date of receipt, through electronic mail, of the respective Subscription Notice. The Creditor Qualified for the Subscription of 3$^{rd}$Series Debentures shall be released from his/her commitment to subscribe the 3$^{rd}$Series Debentures, if (i) he/she does not receive the Subscription Notice by August 31, 2014; and/or (ii) the 2nd Series Debentures have not been subscribed and paid-in by the date of payment of the 3rd Series Debentures, with due regard for the provisions in **Sections 4.5** and **4.7**.

**4.6.4. Loss of Subscription Right**. It is expressly set forth that the following will lose their right and will not be allowed to subscribe their quota part of 3rd Series Debentures: (i) the Creditors that assign or transfer part or all their Credits, as well as the respective acquirers and assignees of Credits for any reason; and (ii) the Creditors Qualified for the Subscription of 3rd Series Debentures that do not comply with, in a timely manner, the provisions of the Subscription Notice, without prejudice to their obligation for losses and damages caused to OGX Group and other interested parties.

**4.7. Cancellation of unsubscribed 3rd Series Debentures.** Possible unsubscribed 3$^{rd}$Series Debentures deriving from the failure to exercise and/or loss of the subscription right and failure to pay the 3rd Series Debentures granted to the Creditors shall be cancelled. The 3rd Series Debentures shall also be cancelled if OGX does not opportunely receive from the Creditors, in the form of this Plan, any Notification of Interest in Subscribing 3rd Series Debentures, in which case the 2nd Series Debentures shall be issued in their full amount, corresponding, in national currency, to ninety million U.S. dollars (**US$ 90,000,000.00**). As established in **Section 4.5.1**, the Backstop – New Lenders shall subscribe all 2nd Series Debentures for an amount equivalent to the 3$^{rd}$Series Debentures not paid-in by the Creditors, in the time and manner established in this Plan and in the Subscription Agreement.

**4.8. Procedure for Capital Increase Through Conversion of Debentures**. The Debentures will be automatically converted in Shares, after full compliance with or express waiver of conditions precedent for their conversion in Shares, as expressly

established in the Debentures Deed and Subscription Agreement, especially the following Conditions Precedent for the Capital Increase Through Conversion of Debentures:

(i)     OGX has obtained Registration as a Listed Company;

(ii)    CADE has approved the convertibility of Debentures, pursuant to the Debentures Deed;

(iii)   There has been a Capital Increase Through Capitalization of Credits, subject to provisions contained in this Plan;

(iv)    The number of Shares to be delivered to holders of 1st Series Debentures always corresponds to (a) 41.9767% (forty-one point nine seven six seven percent) of the Shares issued by OGX, after the Capital Increase Through Capitalization of Credits held by Creditors Affectedby the Plan and First Priority Creditors (the latter only to the extent that the First Priority Creditor expressly agrees to such conversion) under **Clauses 4**and **5** of this Plan; (b) 41.9767% (forty-one point nine seven six seven percent) of Shares issued by Restructured OGX, after the Merger, pursuant to **Clause 10** of this Plan**;**

(v)     The number of Shares to be delivered jointly to the holders of 2nd Series Debentures and the 3rd Series Debentures, proportionally to the number of Debentures issued in each series always corresponds to (a) 23.0233% (twenty-three point zero two three three percent) of the Shares, after the Capital Increase Through Capitalization of Credits held by Credits Affected by the Plan and First Priority Credits (the latter only to the extent that the First Priority Creditor expressly agrees to such conversion) under **Clauses 4** and **5** of this Plan, and after the conversion of the 1st Series Debentures; and (b) 23.0233% (twenty-three point zero two three three percent) of Shares issued by Restructured OGX, after the Merger, pursuant to **Section 10** of this Plan;.

(vi)    The number of Shares to be delivered per Debenture in the event of conversion is always simultaneously and proportionally adjusted to capital increases by bonus, stock splits or reverse stock splits that may occur from the Issue Date, at no charge to the debentureholders and in the same ratio established for such events. Thus, for example, (a) in the event of a reverse stock split, the number of Shares to be delivered shall be multiplied by the same ratio referring to the reverse split of Shares; and (b) in the event of a stock split or bonus, the number of Shares to be delivered shall be divided by the same ratio referring to the split of Shares or by the same ratio used for

bonus; and

(vii)    Only whole numbers of Shares is delivered to the debentureholders. The fraction of Shares shall be reunited and distributed among the Creditors that have subscribed and paid in the Debentures, proportionately to the interest of the Creditors regarding the Debentures. In case there are anyunsubscribed after the proceeding above, such fractions shall be disregarded.

**4.8.1.** The 2nd Series Debentures and the 3rd Series Debentures shall be automatically converted into Shares if the 1st Series Debentures are converted into Shares, including in case of waiver by the New Lenders of the 1st Series Debentures of the conditions precedent for the conversion of the credits of the $1_{st}$ Series Debentures into Shares pursuant to the Debentures Deed.

**4.8.2.** OGPar, irrevocably and irreversibly, by force of this Plan and the OGPar Plan, undertakes to vote in favor of the increase of capital stock of OGX, through the issuance of new Shares, for the conversion of all Debentures into Shares, pursuant to the provisions of the OGX Related Parties Plan and Articles 57 and 171, paragraph 3 of the Corporations Law, in addition to complying with all other legal and regulatory provisions applicable.

**4.9. Additional Loan – Export Prepayment Agreement**. The Additional Loan was made on April 09, 2014 and will be paid pursuant to the terms and conditions of the Export Prepayment Agreement. The Additional Loan is fully guaranteed by the DIP Guarantees, which are shared with the DIP Loan, pursuant to the Export Prepayment Agreement and the Collateral Sharing Agreement. The Additional Loan has priority over the Debentures in the collection and enforcement of the DIP Guarantees and in the receipt of the product thereof.

**4.9.1. Priority of Additional Loan**. Pursuant to Articles 67, 84, 85 and 149 and other applicable legal provisions of Bankruptcy Law, the Additional Loan is and will always be considered priority, including in case of supervening bankruptcy of OGX, and must be paid with precedence over all Credits Affected by the Plan and First Priority Credits, subject to Articles 84, 85, 149 and other applicable provisions of the Bankruptcy Law.

## 5. Restructuring and Settlement of Debts

**5.1 Payment to Unsecured Creditors**. OGX will pay the Credits pursuant to this Plan, including in compliance with its obligations in the capacity of guarantor of Bonds 2018 and Bonds 2022, without prejudice to provisions of OGX Related Parties Plans.

**5.1.1.** In order for OGX and the other companies of the OGX Group to be able to equalize their liabilities by fully paying the Credits Affected by the Planas well as the First Priority Credits held by First Priority Creditors who expressly adhere to this Plan, the mentioned Credits shall be capitalized by OGX, under the terms and conditions stipulated in **Section 5.1.3** below. Supplier Creditors may have their

Credits paid, fully or partially, in cash, limited to the amount of thirty thousand Brazilian reais (R$ 30,000.00), within the terms of **Section 5.1.4** of this Plan.

**5.1.2.** After the Capital Increase Through Capitalization of Credits, Unsecured Creditors, pursuant to the procedures described in **Section 5.1.5**, shall be entitled (i) to the delivery of Shares corresponding to the proportional amount of the Credit in the List of Creditors, with due regard to the provisions in **Sections 5.1.3** et seq. of this Plan, or (ii) to the delivery of the proceeds of the sale of the mentioned Shares by the Receiver (as defined below), with due regard to the provisions of **Section 5.1.5.1(ii)**, as elected by each Creditor.

### 5.1.3. OGX Capital Increase Through Capitalization of Credits

**5.1.3.1**. **Conditions Precedent.** The Capital Increase Through Capitalization of Credits will occur as soon as possible, but provided that at least the following Conditions Precedent for the Capital Increase Through Capitalization of Credits are verified:

(i)  this Plan has been approved by the Meeting of Creditors;

(ii) the Judicial Approval of the Plan took place; provided that (a) no appeal wasfiled
against the Judicial Approval of the Plan (Article 58 of the Bankruptcy Law) to which a suspensory effect is attributed to and/or involves a Material Adverse Effect; and/or (b) there is no legal or administrative action in which an injunction, preliminary injunction and/or similar measure that has the capacity to suspend or make impossible the Judicial Approval, and/or its implementation and/or involves any Material Adverse Effect;

(iii)all governmental authorizations necessary for the implementation of thetransactions contemplated in this Plan have been obtained, including Registration as Listed Company;at least one (01) independent professional director has been appointed                                        to                                        the
OGX Board of Directors, whose name is acceptable or not objected by Backstop – New Lenders in writing. This condition may be waived by the Backstop – New Lenders in writing;

(iv)     the necessary permits are obtained if any ancillary process to this Judicial
Reorganization is filed abroad, pursuant to **Clause 17.11** of this Plan;

(v) there has been satisfactory evidence of the verification of the production of a certain quantity of oil, pursuant to **Section 3.1(u)** of Subscription Agreement;

(vi)      there are no labor, social security, tax, civil and/or environmental and/or other
lawsuits or contingencies against OGX and/or the Guarantors, which result or may result in a Material Adverse Effect;

(vii)     ANP (a) has not legally challenged this Plan or the restructuring under this Plan; or (b) has not rendered, in an administrative proceeding, a final decision determining the termination, cancellation, caducity, transfer or equivalent acts affecting the transfer of concessions operated by OGX Group that may result in a Material Adverse Effect;

(viii)    There has been subscription and payment of 2nd Series Debentures pursuant to this Plan, Debentures Deed and Subscription Agreement.

**5.1.3.2.** OGPar, irrevocably and irreversibly, as a controlling shareholder of OGX, undertakes, by this Plan and by the OGPar Plan, to hold, and cause to be held, a special shareholders meeting of OGX, within fifteen (15) days from the date of fulfillment of the Conditions Precedent for the Capital Increase Through Capitalization of Credits set forth in this Plan, whereby OGPar undertakes to approve the capital increase of OGX, through the issuance of new Shares, to capitalize the total Credits Affected by the Plan, as indicated in the List of Creditors (reduced only by the amount paid pursuant to **Clause 5.1.4** below) and all the First Priority Credits that expressly adhere to this Plan, pursuant to **Clause 5.4** below, subject to the provisions of this Plan and the OGX Related Parties Plan, and the items below under the terms of Article 171, paragraph 2 of the Corporations Law and in compliance with all applicable legal and regulatory provisions.

**5.1.3.3.** The value of the Capital Increase Through Capitalization of Credits shall be equal to the value of all the Credits Affected by the Plan, as indicated in the List of Creditors (i) plus all the First Priority Credits that expressly adhere to this Plan, pursuant to **Clause 5.4** below; (ii) less the amounts of Credits paid in cash, pursuant to **Section 5.1.4** of this Plan; and (iii) when applicable, less the amounts corresponding to Tax on Services to be paid upon the settlement of Credits held by Supplier Creditors.

**5.1.3.4.** In the event of any increase in the amount of Credits arising from a final andnon-appealable court decision and rectification of the List of Creditors, OGX will issueas many Shares as necessary to permit the capitalization of the new Credits pursuantto **Clause 5.1.3** of this Plan, at the same price of issuance of Shares verified on the date and for the purposes of implementation of the Capital Increase Through Capitalization of Credits, pursuant to the conditions set forth in **Sections 5.1.3., 5.1.4., and 5.1.5.** hereof.

**5.1.3.5.** In case of any eventual decrease in the amount of Credits resulting from the final and non-appealable court decision and rectification of the List of Creditors, the Creditor holding the respective Credit shall reimburse to OGX the Shares in a sufficient quantity corresponding to the amount of the decreased Credit, subject to the same price of Shares on the date when the Creditor received the Shares, in compliance with this Plan, or shall indemnify OGX with the corresponding amount.

**5.1.3.6.** The number of Shares to be issued will be calculated in a way to confer to Creditors Affected by the Plan and First Priority Creditors that adhere to this Plan (except for those that opt for payment in cash under Section 5.1.4) jointly, a share equivalent to 71.43% (seventy-one percent point forty-three percent) of Shares

<u>before</u> the Capital Increase Through Conversion of Debentures. The joint final share of Creditors Affected by the Plan and First Priority Creditors that adhere to this Plan (except for those that opt for the payment in cash pursuant to **Section 5.1.4**) will always be of 25% (twenty-five per cent) of shares issued by Restructured OGX, <u>after</u> the occurrence of the Capital Increase Through Conversion of Debentures and the Merger, also in accordance with an eventual dilution pursuant to **Section 5.1.3.4**above.

**5.1.3.7.** The number of Shares to be delivered to the Creditors and/or to the Receiver in the implementation of Capital Increase Through Capitalization of Credits will be simultaneous and proportionately adjusted to the increases of capital through bonus, splits or reverse split of Shares that may occur as of this date, without any charge for Creditors, in the same proportion set forth for such events. Therefore, for example, (i) in case of reverse split of Shares, the number of Shares to be delivered shall be multiplied by the same proportion of reverse split of Shares; and (ii) in case of split of Shares or bonus, the number of Shares to be delivered shall be divided by the same proportion referring to the split of Shares or the same proportion used for bonus.

**5.1.3.8.** Only whole numbers of Shares will be delivered to Creditors and to the Receiver. For such, the fractions of Shares will be combined and distributed among the Creditors holding capitalized Credits and to the Receiver, proportionately to the amount of respective Credit, in reference to the total sum of Credits contained in the List of Creditors (without duplication of Credits as guarantees and/or co-obligation). In case there is any left after the above procedure, such fractions will be ignored.

**5.1.3.9.** The Shares issued by OGX under the Capital Increase Through Capitalization of Credits will grant their holders the same rights assigned to other Shares.

**5.1.3.10.** The Capital Increase Through Capitalization of Credits will occur privately, thus giving to OGPar and Eike Batista preemptive rights pursuant to the Corporations Law. OGPar and Eike Batista, irrevocably and irreversibly, by operation of this Plan, agree not to exercise their respective preemptive rights and to take all actions necessary for this purpose, allowing, therefore, that the Credits Affected by the Plan and/or the First Priority Credits (whose First Priority Creditors have expressly adhered to the Plan) be capitalized into Shares in the form of and in compliance with this Plan.

**5.1.3.11.** OGX undertakes to deliver to Creditors Affected by the Plan, First Priority Creditors that expressly adhere to this Plan and the Receiver, in the latter case on their own behalf, but to the benefit of Creditors that opt to exercise Option B, pursuant to **Section 5.1.5.1.(ii)** below, and proportionately to the respective Credits, on the date when the Capital Increase Through Capitalization of Credits is resolved, free and unencumbered Shares representing jointly the percentage indicated in Section 5.1.3.6. above, without any disbursement of resources or payment of the price by Creditors, in

consideration of their status as holders of Credits subject to capitalization.

**5.1.3.12**. OGX and OGPar, as applicable, are hereby ordered and authorized, in an irrevocable and irreversible basis, by reason of this Plan, to represent the Creditors when signing all documents required to make the delivery of the Shares possible, including, but not limited to, the subscription bulletin before the Shares bookkeeping institution.

**5.1.3.13.** The Shares to be issued on the Capital Increase Through Capitalization of Credits will be delivered to Creditors domiciled in the United States of America, pursuant to and in compliance with the terms of the exemption of registration, not exclusive, set forth by Section 3(a)(10) of the Securities Act of 1933.

**5.1.3.14.** OGX will make its best efforts to create and register a Program of ADRs Level 1 before the CVM and Securities Exchange Commission of the USA – SEC to provide the delivery of Shares to the Bondholders.

**5.1.3.15**. In the case of Bondholders, OGX undertakes to deliver to the Bond Trustee the Shares or ADRs, as the case may be, corresponding to Bondholder Credits, pursuant to the terms of the Bond Indenture or other procedure that may be agreed between OGX and Bond Trustee, in order to provide the delivery of Shares or ADRs to the Bond Trustee for its subsequent transfer to Bondholders. The subsequent transfer of Shares or ADRs by the Bond Trustee to the respective Bondholders, as the case may be, free and clear of any liens or encumbrances, shall imply the cancellation of the Bond Indenture, exempting the Bond Trustee from each and every additional obligation.

**5.1.3.16** The other deadlines and procedures related to the Capital Increase Through Capitalization of Credits, in addition to the ones already provided pursuant to **Exhibit 5.1.3**, will be duly published under the Corporations Law and the Bankruptcy Law, as applicable and if necessary.

**5.1.3.17.** The effective delivery of the Shares arising from the Capital Increase Through Capitalization of Credits, to the respective Creditors Affected by the Plan and First Priority Creditors (who expressly adhere to the Plan) or to Receiver, as applicable, pursuant to this **Clause 5**, free and clear of any burdens, represents the settlement of the Credits Affected by the Plan and the First Priority Credits of the First Priority Creditors which have adhered to the Plan, releasing OGX in relation to the Creditors Affected by the Plan and First Priority Creditors, including for credits arising from guarantees provided by it, subrogating it before all joint debtors and bound by right of recourse, especially  to OGPar and OGX Austria for the payment of Credits Affected by the Plan of the Bondholders.

**5.1.4.Supplier Creditors - Payment in Cash.** The Supplier Creditorsmay choose to receive an amount in cash, corresponding to **thirtythousand Brazilian reais (R$ 30,000.00)**, limited to the amount of the respective Credit.

**5.1.4.1.**The Supplier Creditors who choose to receive the

amount mentioned in **Section 5.1.4** above shall be paid in three (3) fixed monthly installments, which payments shall happen on January 30, 2015, February 28, 2015 and March 30, 2015.

**5.1.4.2.**Notwithstanding the provisions of **Section5.1.4.1** above, the minimum amount of each installment to be paid to each Creditor shall be ten thousand Brazilian reais (**R$ 10,000.00**), save if the remaining balance of his/her Credit is lower than such amount.

**5.1.4.3.**The Supplier Creditor who chooses to receive thepayment provided for in **Section 5.1.4** above shall notify OGX, with copy to the Judicial Administrator, informing its intent, within up to ten (10) Business Days, counted from the Confirmation Order, which shall be irrevocable and irreversible. Said notification shall further include the current account information, to which the payment shall be made, under the terms of **Section 17.5** of this Plan.

**5.1.4.4.**Any balance remaining in favor of the SupplierCreditor after the payment provided for in **Section 5.1.4**above shall be paid under the terms of **Section 5.1.3** of this Plan.

### 5.1.5Election of the Option by each Unsecured Creditor.

Notwithstanding the Capital Increase Through Capitalization of Credits provided for in **Section 5.1.3**, the Unsecured Creditors (including the Supplier Creditors) and the First Priority Creditors who expressly adhere to the present Plan, may choose to (i) receive Shares (Option A); or (ii) receive the net resources corresponding to the sale of such Shares they are entitled to, under the terms of this Plan (Option B).

**5.1.5.1Notice of Payment Option.** The Creditors shall sendthe Notice of Payment Option to OGX, with copy to the Judicial Administrator, in up to ten (10) Business Days, counted from the Judicial Approval of the Plan, stating their choice between options below, under the terms of **Section 17.5** below. For the Creditors who choose **Option B**, the mentioned Notice of Payment Option shall necessarily observe the provisions of the draft contained in **Exhibit 1.1.97**, as well as **Section 17.5** of this Plan.

**(i) Option A − Delivery of the Shares.** The Creditors who elect Option A for payment of their Credits shall receive the Shares resulting from the Capital Increase Through Capitalization of Credits referred to in **Section 5.1.3** above, proportionally to the amount of the respective Credit, as listed in the List of Creditors (minus theamount equivalent to the possible option, under the terms of **Section 5.1.4**), with due regard for all terms and conditions provided for in **Sections 5.1.3** and others of this Plan.

**(ii) Option B − Delivery of the Shares to the Receiver for Sale, and Receipt**

**of the Proceeds of the Sale.** The Creditors who do not wish to become OGX shareholders through the receipt of Shares resulting from the Capital Increase Through Capitalization of Credits, under the terms of **Section 5.1.3** above, may choose to designate and grant the competent powers to the Receiver, who shall receive the Shares such Unsecured Creditors would be entitled to, sell such Shares and deliver the net resources resulting from the sale, as provided for in **Section 5.1.5.1** and following.

**5.1.5.2.** In case of election of Option B, the Notice of Payment Option shall further include the current account information into which the payment of the proceeds of the sale of Shares shall be made, when due.

**5.1.5.3.** The Notice of Payment Option received outside the term provided for in **Section 5.1.5.1** above or which fail to strictly comply with the form depicted in **Exhibit 1.1.97** shall be disregarded by OGX, for the purposes of this Plan, with the application of the provisions in **Section 5.1.5.5** below.

**5.1.5.4.** The choice expressed by the Creditor in the Notice of Payment Option shall be irrevocable, irreducible and binding, and shall not be altered throughout the payment terms established in this Plan.

**5.1.5.5.** If the Creditor fails to send the Notice of Payment Option within the term and in form established in this Plan, said Creditor shall receive the quantity of Shares corresponding to his/her Credit, in the form of **Section 5.1.3** of this Plan.

**5.1.5.6. Designation of Receiver.** The Creditor who wishes to receive the net proceeds of the sale of the Shares as payment of his/her Credit, in the form of **Section 5.1.5.1(ii) et seq.,** and delivers the corresponding Notice of Payment Option, as provided for in **Section 5.1.5.1** above, by reason of this Plan, shall designate, as Receiver, OGPar (or whomever OGX may designate), on an irrevocable and irreducible basis, for all purposes and effects of Article 693 of the Civil Code, granting him a power-ofattorney with all powers required to (i) subscribe the Shares on his/her own behalf, but to the benefit of the Creditor; (ii) sell the Shares, publicly or privately, on any date; and (iii) at Receiver's sole discretion,take any and all required or reasonable measures, including closing exchange agreements and remittance of the net resources obtained through the sale of the Shares into the current account indicated by Creditor in the Notice of Payment Option.

**5.1.5.7. Exemption of Liability of the Receiver.** The Receiver shall be exempt from any and all liability derived from the sale of the Shares for purposes of implementation of this Plan, pursuant to instructions of the respective Creditor in the Notice of Payment Option. In this sense, the Creditors who choose Option B shall waive the rights provided for in Articles 696, 697 and 698 of the Civil Code, since the Receiver shall make the sale of the Shares, for the sole purpose of delivering amounts, in cash, to the Creditor, without any obligation of trying to maximize the sale price of the Shares, and he/she shall not be held accountable for any alleged loss due to the time, form and/or amounts obtained through the sale of the Shares, including loss due to an eventual insolvency of the buyer

of the Shares, with whom there shall be no joint and several liability.

**5.1.5.8. Deposit of the Net Resources in Checking Account.**The proceeds of the sale of the Shares shall be delivered to the respective Creditor, in the checking account the latter shall indicate, net of any and all operating costs and fees, as well as taxes, within three (3) Business Days after the sale of the Shares.

**5.1.5.9.Discharge.** In order to clear all doubts, the Unsecured Creditors whoshose to be paid pursuant to this Section shall grant full, irreducible, general and irrevocable discharge in relation to their respective Credits, at the time of issuance of the Shares deriving from the Capital Increase Through Capitalization of Credits, to the Receiver, pursuant to **Section 5.1.3.17** above, at which time they shall become holders of the right to credit, related to the sale of the Shares.

**5.2. Labor Creditors.** On the date hereof, there are no Labor Credits subject to the Judicial Reorganization. In the event Labor Credits are recognized by court order or agreement between the parties, said Labor Credits shall be paid in twelve (12) equal and consecutive installments, the first being due as of receipt, by OGX, of a notification, pursuant to **Clause 17.5**, sent by the Labor Creditor holding the recognized Labor Credit, regarding the non-appealable judgment of the court decision or agreement recognizing the Labor Credit.

**5.3. Secured Creditors**. On the date hereof, there are no Secured Credits subject to Judicial Reorganization. In the event Secured Credits are recognized, by court order, arbitration or agreement between the parties, such Secured Creditors shall have the same treatment given to the Unsecured Credits and their credits shall be paid under the same terms set forth hereby for payment of Unsecured Credits, pursuant to **Section 5** above. To do so, the provisions of **Clause 17.5** below shall be complied with.

**5.4. First Priority Creditors.** For clarity, OGX hereby declares and acknowledges that the First Priority Credits are not subject to this Plan, so that its approval by the Meeting of Creditors does not imply the immediate restructuring of First Priority Credits under the terms and conditions herein. However, OGX expressly extends the conditions proposed to the Creditors Affected by the Plan to the First Priority Creditors wishing to join this Plan, provided, however, that such terms and conditions shall only apply to the extent that the First Priority Creditors expressly and voluntarily adhere to this Plan, pursuant to this **Clause 5**. Such adhesion shall occur in writing, on an irrevocable andunchangeable basis, pursuant to notification to OGX, forwarded by the date of the Meeting of Creditors that adopts this plan. Thus, the conditions herein described are included in this Plan for purposes of transparency and acknowledgement by all the Creditors, as the act of the First Priority Creditors adhering to this Plan will have the immediate effect of increasing the amount of Credits that will be capitalized in OGX, and eventually will be paid to First Priority Creditors, pursuant to **Section 5**.

## 6. Transactions with Related Parties

**6.1. OGX Austria Representation.** For the purposes of this Plan, OGX Austria hereby represents and recognizes that it is a debtor of OGX as regards the OGX Austria Subrogation Credits, due to the subrogation operated in favor of OGX, resulting from the delivery of Shares in payment of the Bondholder's Credits Affected by the Plan pursuant to this Plan,

once the Capital Increase Through Capitalization of Credits is implemented. OGX Austria hereby represents and recognizes that the OGX Austria Subrogation Credits (i) can be used by OGX to pay the OGX Austria Credits, pursuantto the terms of **Clause 6.2** below, at the discretion of OGX; and (ii) will survive an eventual cancellation of the Bonds and/or the Bond Indenture.

> **6.1.1.** OGX Austria hereby undertakes, irrevocably and irreversibly, to grant full, general, irrevocable and irreversible release for the OGX Austria Credits after the payment referred to in **Clause 6.2** below, including in case of compensation, even in case of an eventual credit balance of OGX Austria against OGX.

**6.2**. **Payment of Credits Held by OGX Austria**. The original conditions of the OGX Austria Credits shall be preserved, except the term for amortization and application of interest, which are restructured by this Plan, pursuant to the terms provided for in Article 59 of the Bankruptcy Law, in such a way that the OGX Austria Credits shall be paid in a single installment of the principal, due and collectible in twenty (20) years from the Approval of the Plan, or on July 30, 2034, whichever comes last, without the application and capitalization of interest. The parties may agree, from time to time, on another form of extinction of the payment obligation related to the OGX Austria Credits, especially through the utilization of the OGX Austria Subrogation Credits held by OGX in view of the subrogation provided for in Section 5.1.3.17, derived from the payment of Credits Affected by the Plan owed by the other companies of the OGX Group pursuant to this Plan, up to the amount of the mentioned Credits Affected by the Plan, always observing the applicable procedures and legislation, as well as the provisions of this Plan.

**6.3. Payments of OSX Group Credits.** Pursuant to the transaction entered into between OGX, OSX 1 Leasing BV, OSX 2 Leasing BV and OSX WHP 1 & 2 Leasing BV, among others, the referred parties agreed that: (i) OSX 2 Leasing BV and OSX WHP 1 & 2 Leasing BV, holders of First Priority Credits, expressly joined this Plan, agreeing that their First Priority Credits shall be settled under the same conditions as those of Creditors Affected by the Plan upon conversion into Shares pursuant to **Clauses 5.1.3** et seq. of this Plan; (ii) the Creditors Affected by the Plan and the First Priority Credits of OSX Group shall be met pursuant to **Clause 5.1.3** above; and (iii) the Credits of OSX 1 Leasing BV, OSX 2 Leasing BV and OSX WHP 1 & 2 Leasing BV, for purposes of this Plan, shall be **US$ 414,012,787.00** (four hundred fourteen million, twelve thousand, seven hundred eighty-seven U.S. dollars), **US$ 557,349,243.00** (five hundred fifty-seven million, three hundred forty-nine thousand, two hundred forty-three U.S. dollars) and **US$ 528,637,970.00** (five hundred twenty-eight million, sixhundred thirty-seven thousand, nine hundred seventy U.S. dollars), respectively, amounts with which OGX expressly agrees, as set forth in the List of Creditors.


**6.4**. **Exemption of Joint Debtors from Bonds.** By virtue of (i) the subrogation referred to in **Clause 5.1.3.17.** above; (ii) the terms and conditions for release of the Credits and debits mutually held by OGX and OGX Austria, as described in **Clause 6.2**above; and (iii) the guarantee obligations jointly and severally undertaken by OGX in the context of the Bonds Indenture, OGX and OGX Austria hereby exempt, irrevocably and irreversibly, OGPar as a joint debtor, under the terms of Bonds Indenture.

## 7.   Corporate Governance – Compliance with Obligations.

**7.1.** As of the Issue Date and until the effective delivery of Shares to Creditors is made by virtue of (i) the Capital Increase Through Capitalization of Credits; and (ii) the Capital Increase Through Conversion of Debentures pursuant to this Plan and the Debentures Deed, the management of OGX shall observe, when conducting their activities, the best practices of corporate governance, in addition to the terms, conditions and restrictions contained in this Plan, in the Debentures Deed, the Subscription Agreement, the Plan Support Agreement, the Export Prepayment Agreement, the DIP Guarantee Agreements and in all other instruments and agreements related to the instruments and agreements mentioned above and/or the restructuring and Judicial Reorganization.

**7.2.** OGX must formalize at its own expenses the hiring of the Verification Agent for the provision of services of monitoring its activities, for the benefit of Backstop – New Lenders, which will remain in force until the Capital Increase Through Conversion of Debentures, pursuant to the Debentures Deed and this Plan. OGX agrees to cooperate and provide free access to the Verification Agent of all information required, with promptness and diligence.

**7.3.** Immediately after the Issue Date, OGX agrees to adopt all necessary measures to obtain Registration as a Listed Company, under the terms of legislation and other applicable regulations, including the amendment of its bylaws, and establishing the installation of a Board of Directors, formed by at least three (3) members.

## 8.   Sale of UPI Parnaíba Gás Natural

**8.1. Sale of Shares of Parnaíba Gás Natural.** OGX holds 245,728,660 (two hundred forty-five million, seven hundred twenty-eight thousand, six hundred and sixty) common shares issued by Parnaíba Gás Natural, which are currently under fiduciary sale to certain creditors, and which may be sold to a third party upon approval and prior agreement of the first priority creditors who have guarantees on such shares, in the form of an Isolated Production Unit, and guaranteeing the absence of succession by the purchaser under any and all obligations of OGX, in accordance with Articles 60 and 142 of the Bankruptcy Law ("UPI Parnaíba Gás Natural") in order to facilitate the operational restructuring of OGX.

**8.1.1. Possible Acquisition by Cambuhy**. As disclosed to the market as a MaterialFact, OGX entered into on October 30, 2013, (i) a Subscription Agreement with Cambuhy and certain other parties, through which and subject to the terms and conditions therein provided, Cambuhy and DD Brazil Holdings S.A.r.l. ("E.ON") agreed to invest in Parnaíba Gás Natural a total amount of approximately **R$250,000,000.00** (two hundred and fifty million Brazilian reais) ("Parnaíba Gas Natural    Capital Increase"); (ii) a Stock Purchase Agreement, whereby Cambuhy agreed to purchase from OGX its stake in Parnaíba Gas Natural, for a correct and adjusted purchase price of **R$ 199,998,556.37** (one hundred ninety-nine million, nine hundred ninety-eight thousand, five hundred fifty-six Brazilian reais and thirty-seven cents), subject to certain terms and conditions which include, but are not limited to, the approval of CADE and ANP, the implementation of the Parnaíba Gas Natural Capital Increase and prior consent and agreement of creditors who have fiduciary ownership on such shares. In addition to the above mentioned documents, other contracts were also entered into for the purpose of (a) termination of service sharing agreements; (b) sale of shares of Parnaíba

B.V., a company with activities integrated into Parnaíba Gas Natural; and (c) regulation of the relationship of the parties as shareholders of Parnaíba Gas Natural.

**8.2. Competitive Bidding.** For transparency and to ensure that OGX gets the best offer for sale of UPI Parnaíba Gas Natural, thus attaining the purpose of Articles 60 and 142 of the Bankruptcy Law, Cambuhy and OGX agreed that UPI Parnaíba Gas Natural should be sold through a competitive bidding, to be conducted by OGX in connection with the Judicial Reorganization and pursuant to Articles 60 and 142 of the Bankruptcy Law, and Cambuhy is henceforth relieved from complying with the provisions of **Clause 8.2.1.** Such competitive bidding shall be concluded within thirty (30) days from the date of the  Judicial Approval of the Plan.

> **8.2.1. Competitive Bidding Procedure.** Within five (5) days from the Judicial Approval of the Plan, OGX shall publish a Public Notice pursuant to **Exhibit 1.1.73** informing those concerned about the competitive bidding for the sale of UPI Parnaíba Gas Natural, as well as the minimum conditions for the stakeholders to bid ("Public Notice"), namely:

> **8.2.1.1. Minimum Conditions for acquisition of UPI Parnaíba Gás Natural.** Any proposed acquisition of UPI Parnaíba Gas Natural should reflect, as minimum conditions, besides being greater than the Minimum Amount, the terms and conditions set forth in the Share Purchase Agreement (**Exhibit 1.1.34**), where the bidders must be explicitly bound to comply with all the referred terms, conditions and obligations set out in the Share Purchase Agreement, in addition to the obligation to sell, under fiduciary sale, the purchased shares to the current creditors of Parnaíba Gas Natural or to any new creditors that will grant new loans to Parnaíba Gas Natural ("Minimum Conditions"). Any amendment to the terms and conditions contained in the Share Purchase Agreement may be freely interpreted by OGX and by the New Lenders as less advantageous terms and, therefore, may be rejected by OGX without any liability for OGX and/or the New Lenders.

> **8.2.1.2. Minimum Amount.** The sale of UPI Parnaíba Gas Natural shall observe the minimum amount of R$ 199,998,556.37 (one hundred ninety-nine million, nine hundred ninety-eight thousand, five hundred fifty-six Brazilian reais and thirty-seven cents), to be paid in a lump sum and to be adjusted pursuant to the IPCA variance from October 30, 2013 to the date of actual payment ("Minimum Amount"), and Cambuhy, pursuant to the Share Purchase Agreement, has agreed to participate in the competitive bidding to purchase UPI Parnaíba Gas Natural and bid no less than the Minimum Amount.

> **8.2.1.3. Evidence of Economic, Financial and Equity Capacity of the Bidders.** To prove the economic, financial and equity capacity of the bidders, they must submit the following documentation: (i) proof of existence and good standing, duly issued by the bodies responsible for registration of incorporation of the bidder; (ii) statement of bank reference of at least two (2) first-tier financial institutions; (iii) proof that they have sufficient funds or means to pay cash for at least the Minimum Amount; and (iv) other documents to be set out in the Public Notice referred to in **Clause 8.2.1**, under penalty of having their bids summarily disregarded.

**8.2.2. Participation in the Competitive Bidding.** Parties interested in participating in the competitive bidding shall express their interest within five (5) days of the publication of the Public Notice, by notifying OGX, with a copy to the Judicial Administrator and filing before the Reorganization Court. The interested parties should, in such notification, confirm that they have the economic, financial and equity capacity to submit a bid exceeding the Minimum Amount and to meet the Minimum Conditions set forth in Clause **8.2.1.1** and **Exhibit 1.1.73**, under penalty of having their notices of intent to participate in the competitive bidding summarily dismissed by OGX.

**8.2.3. Auction.** The competitive bidding for the sale of UPI Parnaíba Gás Natural shall be conducted by auction by oral bids, the terms and conditions of which shall be stated in the Public Notice, in accordance with Article 142 of the Bankruptcy Law, and the Prosecution Office shall be previously notified. In any event, the auction must be held within fifteen (15) days from the Judicial Approval of the Plan.

**8.2.4. Approval of the Creditors to the Sale of UPI Parnaíba Gás Natural to Third Parties.** In the event that a third party, other than Cambuhy, wins the auction, pursuant to **Clause 8.2.3**, the actual approval of the sale of UPI Parnaíba Gás Natural will be subject to the prior (a) approval or non-rejection of a simple majority of the Credits of the Creditors attending the Meeting of Creditors to be convened for this purpose; and (b) approval or non-rejection of a simple majority of the claims of the Debentures held by the debentureholders present at the meeting of debentureholders convened for this purpose.

**8.2.5. Lack of Succession.** Given the method to sell UPI Parnaíba Gás Natural as set forth herein, which will be through a competitive bidding under Article 142 of the Bankruptcy Law, in no event will there be succession of the buyer of UPI Parnaíba Gás Natural for any debts and obligations of OGX and its subsidiaries, including those related to tax and labor, in accordance with Article 60 of the Bankruptcy Law.

## 9. Sale and/or encumbrance of Fixed Assets

**9.1. Sale of Other Assets.** With the exception of transactions involving the sale and encumbrance of fixed assets of the OGX Group set forth in this Plan, OGX shall only be able to sell or encumber any of its assets, financial or intangible, that are free and clear, during the entire period in which it remains in Judicial Reorganization, with no need for prior authorization from any Creditor, or of the Meeting of Creditors, provided that (i) the OGX Capital Increase Through Capitalization of Credits has occurred; (ii) the conditions, limitations, restrictions and approvals set forth in the Debentures Deed, in the DIP Guarantee Agreements, in the Subscription Agreement and in the Export Prepayment Agreement have been observed; and (iii) approvals of the competent entities have been obtained, when applicable.

**9.1.1.** For all legal purposes, the approval of this Plan authorizes and ratifies the sale (i) of assets listed in **Exhibit 9.1.1**; and (ii) of Colombia Assets pursuant to the terms of **Exhibit 1.1.16** to this Plan.

**10. Merger**

**10.1.** Upon the occurrence and implementation of (i) the Capital Increase Through Capitalization of Credits, pursuant to this Plan; and (ii) the Capital Increase Through Conversion of Debentures, under the Debentures Deed, the managements of OGPar and OGX undertake to adopt the necessary actions for the merger of OGPar by OGX ("Merger"), including to propose the Merger to the respective shareholders.

> **10.1.1.** OGX may change the order of the corporate events provided for in this Plan, if the Registration as a Listed Company is not opportunely obtained, for reasons beyond OGX's control, and the resulting delay may compromise or hinder the implementation of the stages of this Plan; OGX may even implement the Merger at the same time or immediately after the Capital Increase Through Capitalization of Credits, in such a way that the Creditors receive Shares issued by listed company or about to be listed company, with no change of the final outcome and the benefits to Creditors pursuant to the terms of this Plan, including, among others, the final shares assigned to the Shareholders, Creditors and Backstop – New Lenders in the capital stock of the Restructured OGX, as defined in Section 10.3 of this Plan. The provisions of this Section shall not alter the terms and conditions of the Debentures nor the rights granted to the respective subscribers.

**10.2.** The Merger will result in a publicly held company with shares traded on the listing segment called Novo Mercado of BM&FBOVESPA ("Restructured OGX").

> **10.2.1.** Restructured OGX will use the records and ticker of OGPar in Novo Mercado of BM&FBOVESPA until its own registrations are obtained for the trading of the shares, subject always to what is determined by BM&FBOVESPA.

**10.3.** The exchange ratio to be proposed to shareholders of OGPar and OGX for the Merger will be one which results in the following end corporate structure of Restructured OGX immediately after the implementation of the Merger:

| Shareholders | Stake in the Restructured OGX |
|---|---|
| Eike Batista | 1 share |
| Centennial Asset Mining Fund, LLC. and Centennial Asset Brazilian Equity Fund, LLC | 5.02% |
| Other shareholders of OGPar [on the date of convening the EGM of Merger] | 4.98% |
| New Lenders of the 1st Series Debentures | 41.9767% |
| New Lenders of the 2nd Series Debentures and 3rd Series Debentures | 23.0233% |

| | |
|---|---|
| Creditors Affected by the Plan or First Priority Creditors (which have adhered to the Plans or to the OGX Related Parties Plans) and/or Receiver to the benefit of Creditors Affected by the Plan or First Priority Creditors (which adhere to the Plan or to the Plans Related Parties OGX) | 25.00% |

**10.4.** As an additional advantage to the subscription of the new Shares issued by OGX, the shareholders of OGPar, including the Shareholders, will receive warrants to be issued by Restructured OGX at the same meeting that is convened to decide upon the Merger with the following main conditions: (i) term for exercise of five years as of the date of its issue, and Restructured OGX may define windows in which the holders of the warrants may exercise their warrants and subscribe the shares resulting therefrom; and (ii) a number of common shares to be subscribed, representing, in the aggregated total, 15% (fifteen percent) of the shares of Restructured OGX (subject to every habitual adjustments that will constitute the warrant certificate), considering an exercise price, at the moment of exercise, based on the amount of Restructured OGX (equity value) in national currency equivalent, on the date of issuance of the subscription bonus, to US\$ 1,500,000,000.00 (one billion, five hundred million U.S. dollars). The price established in national currency shall be adjusted by the IGP-M as of the date of issuance of the subscription bonus.

**10.5.** The Merger is subject to the necessary corporate approvals in accordance with the provisions of the Corporations Act. The managements of OGPar and of OGX will make its best efforts to have special shareholder meetings for the Merger to be held within thirty (30) days of the date of the Capital Increase Through Conversion of Debentures, under the Debentures Deed. The Shareholders, OGX Group and Related Parties undertake, on an irrevocable and irreducible basis, pursuant to this Plan, to approve the Merger.

**10.6.** The purpose of the Merger, after the capitalization operations are conducted under this Plan, which aim to seek financial recovery for OGX Group, is leveling all stakeholders in a single company and giving all the then shareholders access to the capital market, with the opportunity to trade their Shares and monetize them as they see fit, as well as to participate in the eventual asset valorization, if that should happen.

## 11. Put Option

**11.1** Once the Plan is approved by the Meeting of Creditors, and the results of the procedure reported by OGPar are disclosed to Creditors in the Market Communiqué of November 11, 2013, about the Put Option discussion, eventually concluding with its invalidity and/or unenforceability ("Result of the Proceeding") it is agreed that on the date when they are effectively delivered to the Creditors Affected by the Plan or to the First Priority Creditors (only the First Priority Creditors that have expressly adhered to the Plan) and/or the Receiver of Shares corresponding to the Capital Increase Through Capitalization of Credits (as defined in **Section 5.1.3** above), free and unencumbered of any liens or questions, the Creditors Affected by the Plan and First Priority Creditors (only the First Priority Creditors that have expressly adhered to the Plan), by force of this Plan, will recognize, for all due purposes of law, the full validity and efficacy of the Result of the Proceeding.

## 12. Termination Conditions.

**12.1. Termination Conditions.** The following are Plan termination conditions, the occurrence of which will result in the cancellation of the approval of this Plan and its respective provisions, and convocation of a Meeting of Creditors to decide on an alternative to the Plan or the bankruptcy liquidation of OGX:

(i)  Finding, until the Capital Increase Through Capitalization of Credits, any falsehood or inaccuracy with respect to any representation or warranty provided by OGX in this Plan or its Exhibits which characterizes Material Adverse Effect;

(ii)  Failure by the Shareholders to comply with any obligation assumed in this Plan or practice of any act or measure incompatible with the provisions of this Plan;

(iii) Failure to ensure the Conditions Precedent for the Capital Increase Through Capitalization of Credits, as provided in **Section 5.1.3.1** within 120 (one hundred and twenty) days from the Judicial Approval of the Planor by 9/30/2014, whichever occurs first;

(iv) Failure to hold a Special Shareholders Meeting and other acts of implementation of the Capital Increase Through Capitalization of Credits, including the delivery of the Shares to Creditors Affected by the Plan or First Priority Creditors (who have adhered to the Plan) within 140 (one hundred and forty) days from the Judicial Approval of the Planor by 10/20/2014, whichever occurs first;

(v) Non-adherence to the Plan and/or to OGX Related Parties Plans, as applicable, of First Priority Creditors who are Related Parties before the date of the Capital Increase Through Capitalization of Credits provided in **Clause 5.1.3.**; and/or

(vi) Non-Approval of the Plan by the Meeting of Creditors and/or resolution by any of the OGX Related Parties Plans.

**12.2. Waiver of Termination Conditions**. The Creditors may, upon a resolution of the holders of a simple majority of the Credits present at the Meeting of Creditors convened for such purpose, waive, at their sole discretion, in whole or in part, any of the termination conditions described in **Section 12.1** above.

## 13. Effects of the Plan

**13.1. Binding of the Plan.** The provisions of the Plan bind OGX, OGX Group, the Shareholders and the Creditors, and their respective successors and assigns, as of the Judicial Approval of the Plan.

**13.2. Novation.** The lack of appeal that was ere attributed with suspensory effect (or judicial suit with the same effects) brought against the Judicial Approval of the

Planwill result in the novation of the Credits Affected by the Plan and of the First Priority Credits held by First Priority Creditors who have expressly adhered to this Plan, which will be settled in the manner established herein. Upon such novation, all obligations, covenants, financial indexes, events of acceleration, as well as other obligations and guarantees which are inconsistent with the terms of this Plan shall cease to apply.

**13.3. Dismissal of Actions.** Unless provided otherwise in this Plan, the Creditors may no longer, from the Approval of the Plan, (i) file or pursue any legal action or proceeding of any kind related or not to any Credit against OGX; (ii) enforce any judgment, judicial decision or arbitration award against OGX; (iii) pledge any property of OGX to satisfy their Credits; (iv) create, perfect or enforce any security interest on assets and rights of OGX to ensure payment of their Credits; (v) claim any right of offset against any claims payable to OGX; (vi) seek the satisfaction of their Credits by any other means; and (vii) subject to the verification of the Result of the Proceedingand compliance with the terms and conditions of **Section 11.1** hereof, seek to satisfy any and all claims, actions or right to demand the annulment, specific performance, compensation for damages or any other demands, for any reason, in relation to the Put Option. All lawsuits and judicial executions pending against OGX, relating to Credits, shall be dismissed, and the existing liens and constrictions will be discharged.

> **13.3.1**. Once the Resolution of the Plan is verified, the Creditors are assured the right to file and/or pursue any claim, judicial or otherwise, against OGX, as well as pursue foreclosure of any assets that have been encumbered by OGX and/or third parties as guarantee for the obligations, whether or not subject to this Plan.

**13.4. Reconstitution of Rights.** Once the Resolution of the Plan is verified and/or the Judicial Reorganization is converted into bankruptcy liquidation, within the supervision term established in Article 61 of the Bankruptcy Law, the Creditors shall have their rights and guarantees reconstituted under the conditions originally contracted, less the amounts eventually paid and except for the acts validly committed under the Judicial Reorganization, as stated in Article 61, Paragraph 2, and 74 of the Bankruptcy Law.

**13.5. Discharge.** Except in the case of Resolution of the Plan, the Capital Increase Through Capitalization of Credits with the delivery of Shares to the Creditors or to the Receiver, as applicable, as well as the payments in cash set forth in **Sections 5.1.4** et. seq. of this Plan will result in full, irrevocable and irreversible discharge of all Credits of any kind and nature against OGPar, OGX Austria, OGX International, OGX and its controlling companies and guarantors, including interest, adjustment for inflation, penalties, fines and damages. With the occurrence of the discharge, the Creditors will be deemed to have fully discharged, released and/or waived any and all Credits, and can no longer claim them against OGX, controlled companies, subsidiaries, affiliates and other companies belonging to the same corporate and economic group, and their officers, directors, Shareholders, minority shareholders, members, agents, employees, representatives, guarantors, sureties, successors and assigns.

**13.6. Ratification of Acts.** The Approval of the Plan by the Meeting of Creditors represents the agreement and ratification of OGX, Shareholders, OGX Group and Creditors, including Creditors Qualified for the Subscription of 3rd Series Debentures, of all acts performed and obligations assumed by OGX during the Judicial Reorganization, including, among others (i) Obtaining and contracting by OGX and other companies of OGX Group of New Resources, pursuant to provisions of the 1st Bridge Loan, 2nd Bridge Loan, DIP Loan and the Additional Loan; (ii) the terms and conditions of Debentures Deed and the Subscription Agreement and the Export Prepayment Agreement, as amended from time to time, including the conditions of convertibility of Debentures into Shares; (iii) the contracting and constituting of the Bridge Guarantees and DIP Guarantees in favor of New Lenders in consideration of the concession of New Resources, under the terms of the Bridge Guarantees, the DIP Guarantee Agreements and the Collateral Sharing Agreement, as amended from time to time; and (iv) the sale of the Colombia Assets by OGX; (v) the execution of the OSX-1 Agreement, if applicable; (vi) the execution of the OSX-3 Agreements, if applicable; and (vii) all other acts and actions necessary for full implementation and performance of this Plan and of the Judicial Reorganization, such acts being hereby expressly authorized, validated and ratified for all legal purposes, including and particularly Articles 66, 74 and 131 of Bankruptcy Law.

**13.7. Exemption from Liabilities and Waiver.** By virtue of Approval of the Plan by the Meeting of Creditors, the Creditors expressly recognize and exempt the Exempt Parties from all and any responsibility/liability for the acts performed and obligations contracted during the Judicial Reorganization, including contracting and implementation of the DIP Loan pursuant to the Debentures Deed, of the Additional Loan pursuant to the terms of the Export Prepayment Agreement, and the DIP Guarantees and the Collateral Sharing Agreement, granting to the Exempt Parties full, general, irrevocable and irreversible release from all material or moral rights and claims that may result from referred acts for any reason. The Approval of the Plan by the Meeting of Creditors equally represents the express and irrevocable waiver of Creditors, including the <u>Creditors Qualified for the Subscription of 3rd Series Debentures,</u> to each and every claim, action or right to sue, seek or claim, in or out of Courts, for any reason and without any reservation, reparation of damages and/or any other actions or measures against the Exempt Parties in reference to the acts performed and obligations assumed by the Exempt Parties during the Judicial Reorganization, including contracting and implementing the 1st Bridge Loan, the 2nd Bridge Loan, the DIP Loan, and the Additional Loan and the procedure for the completion of discussion of the Put Option mentioned in **Section 11**.

**14.   Formalization of Documents and Other Arrangements.** OGX, OGPar, OGX Austria and OGX International and the Shareholders undertake, on an irrevocable and irreducible basis, under this Plan, to perform all acts and execute all contracts and other documents that, in form and substance, may be necessary or appropriate to fulfill and implementthis Plan and the related obligations.

**15.   Modification of the Plan.** Amendments, alterations or modifications to the Plan may be proposed at any time after the Judicial Approval of the Plan, provided that such amendments, alterations or modifications are submitted to a vote at the Meeting of Creditors, are approved by OGX and that the quorum is reached as required by Articles 45 and 58, heading and paragraph 1 of the Bankruptcy Law.

**15.1. Binding Effect of Modifications of the Plan**: Amendments, alterations or

modifications to the Plan shall bind OGX and its Creditors, including First Priority Creditors adhering to it and dissenting Creditors, and their respective assignees and successors, as of its adoption by the Meeting of Creditors, pursuant to Article 45 or 58 of the Bankruptcy Law.

**16.   Maintenance of the Right of Petition and Voice and Vote in the Meeting of Creditors**. For the purposes of this Plan and until the Judicial Reorganization has been concluded, the Creditors – including those that convert their Credits into capital pursuant to the Increase of Capital Through Capitalization of Credit – shall maintain the value and number of their Credits, for the purposes of right of petition, voice and vote in each and every Meeting of Creditors after the Judicial Approval of the Plan, independent of the conversion of Credits into equity capital and respective release.

## 17. General Provisions

**17.1 Existing or Conflicting Agreements.** In the case of any conflict between provisions of this Plan and obligations contemplated in the agreements entered into with any Creditor prior to the Filing Date, the Plan shall prevail. In case of any conflict between the provisions of this Plan and the Debentures Deed and/or the SubscriptionAgreement and/or the Export Prepayment Agreement and/or DIP Guarantee Agreements, and/or the Collateral Sharing Agreement, the terms of the Debentures Deed and/or the Subscription Agreements and/or the Export Prepayment Agreement and/or the DIP Guarantee Agreements and/or the Collateral Sharing Agreement shall prevail. In the case of any conflict between the provisions of this Plan and the OGX Related Parties Plans, the terms of this Plan shall prevail.

**17.2. Approval by ANP and CADE.** All provisions of this Plan that depend on approval by ANP and/or CADE must be approved by such bodiesin order to take effect. The provisions of this Plan may be adapted to meet the requirements of ANP and/or CADE, by applying, as applicable, the provisions of **Clause 14**.

> **17.2.1.** On May 6, 2014, decision No. 512 of the General Superintendency of the CADE was made available in the Federal Official Gazette, referring to Concentration Act No. 08700.002983/2014-47, through which the CADE approved, without restrictions, the terms and conditions of the operations provided for in the present Plan.

**17.3. Exhibits.** All Exhibits to this Plan are incorporated herein and are an integral part of the Plan. In the event of any inconsistency between this Plan and any Exhibit, the Plan shall prevail.

**17.4. Conclusion of the Judicial Reorganization.** The Judicial reorganization will be concluded at any time after Judicial Approval of the Plan, at the request of OGX, provided that (i) such conclusion is approved by a simple majority of the Credits attending the Meeting of Creditors; or (ii) all obligations of the Plan that mature within two (2) years after the Approval of the Plan are met.

**17.5. Notices.** All notices, requests, demands and other communications to OGX, required or permitted by this Plan, in order to take effect, must be in writing and shall be deemed delivered when (i) sent by registered mail, return receipt requested, or by courier, and effectively delivered or (ii) sent by facsimile, email or other means, when effectively delivered and confirmed by phone. All communications should be addressed as follows or as

otherwise reported by OGX, in the records of the judicial reorganization proceedings or directly to the Judicial Administrator or to the Creditors:

**OGX Petróleo e Gás S.A. – Under Judicial Reorganization**
Address: Rua do Passeio, nº 56, 10º, 11º e 12º andares
City of Rio de Janeiro, State of Rio de Janeiro
Att.: Chief Executive Officer (Paulo Narcélio Simões Amaral or his substitute)
Att.: General Counsel (Darwin Corrêa or his substitute)
Phone: +55 21 3916-4600 Fax: +55 21 3916-4546 Email: rj@ogpar.com.br

**To the Judicial Administrator** (Deloitte Touche Tohmatsu or itsSubstitute) Address:
Av. Presidente Wilson, 231, 22º andar
City of Rio de Janeiro, State of Rio de Janeiro
Att.: Luis Vasco Elias (or his Substitute)
Telephone: + 55 21 3981-0467
Email: ajoleoegas@deloitte.com

**To the Debentures Trustee** (Oliveira Trust Distribuidora de Títulos e Valores Mobiliários S.A. or itsSubstitute)
Address: Avenida das Américas, 500, bloco 13, grupo 205
City of Rio de Janeiro, State of Rio de Janeiro
Att.: Mr. Gustavo Dezouzart (or his Substitute)
Telephone: + 55 21 3514-0000
Fax: +55 21 3514-0000
Email: gustavo.dezouzart@oliveiratrust.com.br
Email: ger3.agente@oliveiratrust.com.br

**17.6. Means of Payment**. Where applicable, amounts due to Creditors under this Plan shall be paid by wire transfer of funds to the bank account of the respective Creditor, through credit order document (DOC) or wire transfer of immediately available funds (TED), where OGX may retain a Paying Agent to make such payments to the Creditors. The proof of deposit of the amount credited to each Creditor will be proof of discharge of such payment.

> **17.6.1.** For the payment mentioned in **Sections 5.1.4. and 5.1.5.1(ii)** et. seq., the Creditors must inform OGX of their respective bank accounts for this purpose, by sending to OGX the Notice of Payment Option, pursuant to **Section 17.5**., when applicable.

**17.7. Date of Payment.** In the event any payment or obligation under the Plan is scheduled to be made or satisfied on a non-Business Day, such payment or obligation may be made or satisfied, as applicable, on the next Business Day.

**17.8. Financial Charges.** Unless otherwise stated in the Plan, no interest or adjustment for inflation shall be levied on the value of the Credits.

**17.9. Credits in Foreign Currency.** Credits in foreign currency shall be kept in the original currency for all legal purposes and shall be settled, subject to the provisions of this Plan, in accordance with Article 50, paragraph 2 of the Bankruptcy Law. Except in the case of a

specific provision in this Plan, Credits in foreign currency shall be converted into Brazilian reais at the closing sell for Brazilian reais to U.S. dollars, available in SISBACEN - Information System of the Central Bank of Brazil, transaction PTAX-800, option 5, rates for accounting, currency 220, free market, on the date immediately preceding the date when such currency conversion is required, including for the purposes of the Capital Increase Through Capitalization of Credits, pursuant to this Plan.

**17.10. Severability of the Provisions of the Plan.** In the event any term or provision of the Plan is deemed invalid, void or unenforceable by the Reorganization Court, the remaining terms and provisions of the Plan shall remain valid and effective.

**17.11. Auxiliary Proceedings Abroad**. OGX may file a bankruptcy proceeding based on Chapter 15 of the Bankruptcy Code of the United States of America, in orderto give effect to the Plan in U.S. territory, binding the Creditors domiciled and established there, as well as other procedures of insolvency, or of any other nature, in other jurisdictions as necessary to the implementation of this Plan, including, but not limited to, the existing insolvency procedures under Austrian law. Such cases cannot change the payment terms and the remaining terms of this Plan.

**17.12. Adherence of the Shareholders, OGX Austria and OGX International**. The Shareholders, OGX Austria and OGX International signed this Plan, assuming and agreeing with everything that relates to their respective legal spheres, as well as undertaking to do and perform all necessary or useful acts and to sign any and all documents necessary for the faithful performance of the obligations assumed in this Plan or for its implementation.

**17.13. Applicable Law.** The rights, duties and obligations under this Plan shall be governed, construed and enforced in accordance with the applicable laws in the Federative Republic of Brazil.

**17.14. Choice of Jurisdiction.** All disputes arising out of or relating to this Plan shall be resolved by (i) the Reorganization Court, until the conclusion of the judicial reorganization; and (ii) by the competent courts in Brazil or abroad, as established in the original contracts signed with OGX and the respective Creditors, after the conclusion of the judicial reorganization process.

The Plan is signed by the legal representatives duly appointed by OGX, OGPar and the Shareholders. The economic-financial and valuation Reports of the property and assets (**Exhibit 1.1.92**), subscribed by specialized firms, were presented to the Reorganization Court, pursuant to the Bankruptcy Law, on May 22, 2014, and are presented again on the date hereof, as an integral part of this Plan.

Rio de Janeiro, May 22, 2014.

*[Signature page of the Judicial Reorganization Plan of OGX below]*

# CERTIFICATE OF TRANSLATION

| | |
|---|---|
| **STATE OF NEW YORK** | § |
| | § |
| **COUNTY OF NEW YORK** | § |

**Roberto J. Millan**, being duly sworn, deposes and says:

1.      I am employed as a Project Manager for LanguageWorks, a professional translation firm providing translation services since 1993. I have personal knowledge of all of the facts stated herein.

2.      Attached to this Affidavit is a translation from Portuguese into English made by LanguageWorks of **Judicial Reorganization Plan of OGX Petróleo e Gás S.A.**.

3.      LanguageWorks only utilizes the services of language professionals who have passed our stringent testing process, which involves a subject matter and language specific test translation that is reviewed by trusted linguists. Less than 6% of applicants pass. In addition, our language professionals must have a minimum of 5 years' professional translation experience or an applicable degree from an accredited institution. In addition, for all translations, including this one, LanguageWorks uses three qualified linguists: a professional translator, an editor to double check for style and content, and a proofreader to review all text for completeness. Translations made through our processes set forth above are regularly accepted into evidence in New York State courts.

4.      On the basis of the foregoing process and quality control procedures, I certify that the attached is an accurate translation of the original.

_____
**Roberto J. Millan**

SUBSCRIBED AND SWORN TO before me this seventh day of August, 2014.

_____
Notary Public

STEVEN J. ALBERT
Notary Public - State of New York
No. 01AL6234881
Qualified in New York County
My Commission Expires January 31, 2015

SERGIO BERMUDES
MARCIO VIEIRA SOUTO COSTA FERREIRA
MARCELO FONTES
ALEXANDRE SIGMARINGA SEIXAS
GUILHERME VALDETARO MATHIAS
ROBERTO SARDINHA JUNIOR
JOÃO ALBERTO ROMEIRO
MARCELO LAMEGO CARPENTER
ANTONIO CARLOS VELLOSO FILHO
FABIANO ROBALINHO CAVALCANTI
MARIA AZEVEDO SALGADO
BRUNO CALFAT
MARCO AURÉLIO DE ALMEIDA ALVES
ERIC CERANTE PESTRE
VÍTOR FERREIRA ALVES DE BRITO
ANDRÉ SILVEIRA
RODRIGO TANNURI
FREDERICO FERREIRA
ANTONELLA MARQUES CONSENTINO
MARCELO GONÇALVES
RICARDO SILVA MACHADO
RICARDO JUNQUEIRA DE ANDRADE
ANDRÉ TAVARES
CAROLINA CARDOSO FRANCISCO
MARIANNA FUX

ANDRÉ CHATEAUBRIAND MARTINS
PHILIP FLETCHER CHAGAS
LUÍS FELIPE FREIRE LISBÔA
PEDRO PAULO DE BARROS BARRETO
WILSON PIMENTEL
RICARDO LORETTI HENRICI
JAIME HENRIQUE PORCHAT SECCO
GRISSIA RIBEIRO VENÂNCIO
RAPHAEL MONTENEGRO
DIEGO CABRERA
MARCELO BORJA VEIGA
ADILSON VIEIRA MACABU FILHO
CAETANO BERENGUER
RAFAEL DIREITO SOARES
ANA PAULA DE PAULA
ALEXANDRE FONSECA
PEDRO HENRIQUE CARVALHO
RAFAELA FUCCI
GABRIEL LÓS
LOUIS DE CASTEJA
HENRIQUE ÁVILA
RENATO RESENDE BENEDUZI
DIEGO BARBOSA CAMPOS
ALESSANDRA MARTINI
MARIANA ARRUDA DE SOUZA

DANIEL CHACUR DE MIRANDA
PEDRO HENRIQUE NUNES
GABRIEL DE ORLEANS E BRAGANÇA
LUIZA LOURENÇO BIANCHINI
GABRIEL PRISCO PARAISO
GUIOMAR FEITOSA LIMA MENDES
FLÁVIO JARDIM
GUILHERME COELHO
JORGE LUIZ SILVA ROCHA
ANA LUIZA COMPARATO
LÍVIA IKEDA
LIVIA SAAD
JULLIANA CUNHA
ALLAN BARCELLOS L. DE OLIVEIRA
PAULO BONATO
RENATO CALDEIRA GRAVA BRAZIL
VICTOR NADER BUIAN LAMAS
GUILHERME REGUEIRA PITTA
BRUNO COSTA DE ALMEIDA
LUIZA PERRELLI BARTOLO
JOÃO ZACHARIAS DE SÁ
SÉRGIO SANTOS DO NASCIMENTO
GIOVANNA MARSIARI
ALESSANDRA GUALBERTO
OLAVO RIBAS

MATHEUS PINTO DE ALMEIDA
FERNANDO NOVIS
LUIS TOMÁS ALVES DE ANDRADE
MARCOS MARES GUIA
ROBERTA RASCIO SAITO
ANTONIA DE ARAUJO LIMA
GUSTAVO FIGUEIREDO GSCHWEND
ANA LUÍSA BARBOSA BARRETO
PAULA MELLO
RAFAEL MOCARZEL
CONRADO RAUNHEITTI
LUIZA DIAS MARTINS
THAIS VASCONCELLOS DE SÁ
BRUNO TABERA
FÁBIO MANTUANO PRINCIPE

CONSULTORES

AMARO MARTINS DE ALMEIDA (1914-1998)
HELIO CAMPISTA GOMES (1925-2004)
SALVADOR CÍCERO VELLOSO PINTO
JORGE FERNANDO LORETTI
ELENA LANUAU
CAIO LUIZ DE ALMEIDA VIEIRA DE MELLO

EXMO. SR. DR. JUIZ DE DIREITO DA 4ª VARA EMPRESARIAL

Processo n° 0377620-56.2013.8.19.0001

ÓLEO E GÁS PARTIPAÇÕES S.A. - em Recuperação Judicial e outras, nos autos de sua recuperação judicial, em trâmite perante esse MM. Juízo, vêm, por seus advogados abaixo assinados, expor e requerer o que segue.

PLANOS DE RECUPERAÇÃO JUDICIAL

1.        Os Planos de Recuperação Judicial das quatro impetrantes foram tempestivamente apresentados a esse MM. Juízo e disponibilizados a todos os seus credores, bem como eventuais interessados, ainda em meados de fevereiro deste ano.

2.        Entretanto, após a elaboração e apresentação desses planos, surgiram alguns fatos novos que devem estar refletidos na versão final do plano de recuperação judicial que será apresentado aos credores para votação.

www.sbadv.com.br
Praça XV de Novembro, 20 - 7º e 8º andares - 20010-010 - Rio de Janeiro - RJ - Tel. (21) 3221 9000 - Fax. (21) 3221 9001 - e-mail:rjbermudes@sbadv.com.br
Rua Frei Caneca, 1380 - 5º e 6º andares - 01307-002 - São Paulo - SP - Tel. (11) 3549 6900 - Fax. (11)         - e-mail:spbermudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail:dfbermudes@sbadv.com.br

3.        Veja-se, por exemplo, que, nesse período, (i) as impetrantes obtiveram um novo financiamento, no montante de aproximadamente US$ 73 milhões, que se acrescerá aos US$ 215 milhões já previstos nos Planos originalmente apresentados; (ii) foi liberada a 1ª Tranche do Financiamento DIP, bem como proferido o acórdão da e. 14ª Câmara Cível do Tribunal de Justiça do Rio de Janeiro, que confirmou a r. decisão desse MM. Juízo que autorizou a concessão de garantias ao dinheiro novo disponibilizado às recuperandas; e, ainda, (iii) foram recebidas propostas de aquisição de determinados ativos das impetrantes, as quais poderão resultar em benefícios importantes para as companhias.

4.        Desses fatos novos acima mencionados, bem como de outros verificados na condução dos negócios pelas impetrantes, surgiu a necessidade de modificação dos planos originalmente apresentados.

5.        Diante disso, as impetrantes requerem V.Exa. se digne determinar a juntada do novo Plano de Recuperação Judicial da OGX Petróleo e Gás S.A. (doc. anexo), para que os credores dele tomem conhecimento.

Nestes termos,
P. deferimento.
Rio de Janeiro, 23 de maio de 2014.

Sergio Bermudes
OAB/RJ 17.587

Marcio Vieira Souto Costa Ferreira
OAB/RJ 59.384

Marcelo Fontes
OAB/RJ 63.975

Marcello Lamego Carpenter
OAB/RJ 92.518

Fabiano Robalinho Cavalcanti
OAB/RJ 95.237

Maria Salgado
OAB/RJ 96.637

Ricardo Loretti
OAB/RJ 130.613

Caetano Berenguer
OAB/RJ 135.124

Thaís Vasconcellos de Sá
OAB/RJ 178.816

## PLANO DE RECUPERAÇÃO JUDICIAL DE
## OGX PETRÓLEO E GÁS S.A. – EM RECUPERAÇÃO JUDICIAL

**OGX Petróleo e Gás S.A. – Em Recuperação Judicial** ("OGX"), sociedade anônima inscrita no CNPJ/MF sob o nº 08.926.302/0001-05, com sede na Rua do Passeio, nº 56, 10º, 11º e 12º andares, Cidade do Rio de Janeiro, Estado do Rio de Janeiro, apresenta, nos autos do processo de recuperação judicial autuado sob nº 0377620-56.2013.8.19.0001, em curso perante a 4ª Vara Empresarial da Comarca do Rio de Janeiro, Estado do Rio de Janeiro, o seguinte plano de recuperação judicial, em cumprimento ao disposto no Artigo 53 da Lei nº 11.101/2005.

1.    **Definições e Regras de Interpretação**

1.1.    **Definições.** Os termos e expressões utilizados em letras maiúsculas, sempre que mencionados no Plano, terão os significados que lhes são atribuídos nesta **Cláusula 1ª**. Tais termos definidos serão utilizados, conforme apropriado, na sua forma singular ou plural, no gênero masculino ou feminino, sem que, com isso, percam o significado que lhes é atribuído.

1.1.1.    "1ª Série do Empréstimo DIP": É a primeira série do financiamento correspondente ao Empréstimo DIP, nos termos das Debêntures 1ª Série, no valor de **R$ 299.200.000,00** (duzentos e noventa e nove milhões e duzentos mil reais), atualizado monetariamente pelo fator de variação da cotação de fechamento da taxa de venda de câmbio de Reais por Dólares dos Estados Unidos da América, nos termos da Escritura de Emissão de Debêntures, que na Data da Emissão correspondia a **US$ 125.000.000,00** (cento e vinte e cinco milhões de dólares norte-americanos), conforme descrita nas **Cláusulas 4.3.1 e 4.4**.

1.1.2.    "1º Empréstimo Ponte": É o empréstimo extraconcursal de curtíssimo prazo contraído pela OGPar, no valor de **US$ 15.000.000,00** (quinze milhões de dólares norte-americanos), nos termos do contrato de empréstimo celebrado em 26.12.2013, que foi integralmente pago em 14.03.2014.

1.1.3.    "11ª Rodada": É a 11ª Rodada de Licitações de áreas para exploração e produção de petróleo e gás natural nas bacias sedimentares de Barreirinhas, Ceará, Espírito Santo, Foz do Amazonas, Pará-Maranhão, Parnaíba, Pernambuco-Paraíba, Potiguar, Recôncavo, Sergipe-Alagoas e Tucano, realizada pela ANP em 14.05.2013.

1.1.4.   "2ª Série do Empréstimo DIP": É a segunda série do financiamento correspondente ao Empréstimo DIP, nos termos das Debêntures 2ª Série, no valor de até **R$ 215.424.000,00** (duzentos e quinze milhões e quatrocentos e vinte e quatro mil reais), atualizado monetariamente pelo fator de variação da cotação de fechamento da taxa de venda de câmbio de Reais por Dólares dos Estados Unidos da América até a data da integralização das Debêntures 2ª Série, nos termos da Escritura de Emissão de Debêntures, que na Data da Emissão correspondia a até **US$ 90.000.000,00** (noventa milhões de dólares norte-americanos). O valor final das Debêntures 2ª Série, a ser subscrita pelos Backstop Novos Financiadores (sejam Credores ou não), será equivalente à porção não subscrita das Debêntures 3ª Série, observado o disposto neste Plano e na Escritura de Emissão de Debêntures. As Debêntures 2ª Série poderão ser integralmente canceladas, caso as Debêntures 3ª Série sejam integralmente subscritas, observado o disposto na Escritura de Emissão de ·Debêntures.

1.1.5.   "2º Empréstimo Ponte": É o empréstimo extraconcursal de curtíssimo prazo contraído pela OGX, no valor de **US$ 50.000.000,00** (cinquenta milhões de dólares norte-americanos), nos termos do Contrato de Pré-Pagamento à Exportação (*Export Prepayment Agreement*) celebrado com Credit Suisse Brazil (Bahamas), na qualidade de agente administrativo, em 13.01.2014, que foi integralmente pago em 13.03.2014.

1.1.6.   "3ª Série do Empréstimo DIP": É a terceira série do financiamento correspondente ao Empréstimo DIP, nos termos das Debêntures 3ª Série, no valor de até **R$ 215.424.000,00** (duzentos e quinze milhões e quatrocentos e vinte e quatro mil reais), atualizado monetariamente pelo fator de variação da cotação de fechamento da taxa de venda de câmbio de Reais por Dólares dos Estados Unidos da América até a data da integralização das Debêntures 3ª Série, nos termos da Escritura de Emissão de Debêntures. O valor final das Debêntures 3ª Série, a serem subscritas por Credores Concursais e/ou Credores Extraconcursais (que aderirem expressamente ao Plano), poderá variar conforme demanda verificada pelas Debêntures 3ª Série. As Debêntures 3ª Série poderão ser canceladas em razão da ausência de Credores interessados na sua subscrição e integralização, conforme descrito na **Cláusula 4.7** deste Plano, observado o disposto na Escritura de Emissão de Debêntures.

CONFERE COM O ORIGINAL
o Escrivão
Maria C. de Oliveira
09/9151

**1.1.7.** "Acionistas": Eike Batista e todos os demais acionistas diretos e indiretos de OGX sob o controle de Eike Batista, incluindo, mas não se limitando a OGPar, Centennial Asset Mining Fund, LLC. e Centennial Asset Brazilian Equity Fund, LLC.

**1.1.8.** "Ações": São ações ordinárias de emissão da OGX, quer existentes na presente data, ou que sejam emitidas em cumprimento do quanto disposto no presente Plano.

**1.1.9.** "Administrador Judicial": É a Deloitte Touche Tohmatsu Consultores Ltda., conforme nomeação pelo Juízo da Recuperação, nos termos do Capítulo II, Seção III, da Lei de Falências, ou quem venha a substituí-la de tempos em tempos.

**1.1.10.** "Agente de Verificação": É o agente de verificação de atividades, conforme definido na Escritura de Emissão de Debêntures e no Contrato de Subscrição.

**1.1.11.** "Agente Fiduciário das Debêntures": É a Oliveira Trust Distribuidora de Títulos e Valores Mobiliários S.A., conforme definido na Escritura de Emissão de Debêntures.

**1.1.12.** "Agente Fiduciário dos Bonds": É o Deutsche Bank Trust Company Americas, agente fiduciário nos termos das Escrituras de Emissão dos Bonds, bem como as sociedades que são por ele direta ou indiretamente controladas, seus diretores, administradores e funcionários, ou outro agente que venha a ser indicado em substituição ao Deutsche Bank Trust Company nos termos da Escritura de Emissão dos Bonds.

**1.1.13.** "ANP": Agência Nacional do Petróleo, Gás Natural e Biocombustível.

**1.1.14.** "Aprovação do Plano": É a aprovação do Plano na Assembleia de Credores. Para os efeitos deste Plano, considera-se que a Aprovação do Plano ocorre na data da Assembleia de Credores que votar e aprovar o Plano, ainda que o Plano não seja aprovado por todas as classes de Credores nos termos dos Artigos 45 ou 58 da Lei de Falências.

**1.1.15.** "Assembleia de Credores": É qualquer Assembleia Geral de Credores, realizada nos termos do Capítulo II, Seção IV, da Lei de Falências.

Página **3** de **66**

1.1.16.   "Ativos Colômbia": São os direitos de exploração detidos pela OGX sobre os blocos CR-2, CR-3 e CR-4 (*Cesar e Ranchería*), VIM-5 e VIM-19, objeto dos *Contratos de Evaluación Técnica Especial para Exploración y Producción de Hidrocarburos nº 43, 44, 45 e 07 da Ronda Colombia 2010 e 15 da Ronda Colombia 2012*, respectivamente, todos firmados entre a OGX e a *Agencia Nacional de Hydrocarburos – ANH*, da República da Colômbia, e que são objeto do Contrato de Cessão dos Direitos referentes a Contratos de Concessão para exploração de hidrocarbonetos (*Farmout Agreement*), com condições suspensivas, na forma do **Anexo 1.1.16**.

1.1.17.   "Aumento de Capital Mediante Capitalização de Crédito": Aumento do capital social de OGX, subscrito pelos Credores Concursais e pelos Credores Extraconcursais (estes últimos desde que tenham aderido expressamente ao presente Plano, conforme aplicável), integralizado mediante capitalização dos Créditos Concursais e dos Créditos Extraconcursais (detidos pelos Credores Extraconcursais que aderirem expressamente ao Plano), na forma do Artigo 171, §2º da Lei das Sociedades por Ações e demais disposições legais aplicáveis.

1.1.18.   "Aumento de Capital Mediante Conversão das Debêntures": Aumento do capital social de OGX, subscrito pelos detentores das Debêntures, integralizado mediante a conversão das Debêntures em ações, na forma dos Artigos 57 e 171, §3º da Lei das Sociedades por Ações e demais disposições legais aplicáveis, observado sempre o disposto na Escritura de Emissão de Debêntures.

1.1.19.   "Aumento de Capital Parnaíba Gás Natural": É a definição atribuída pela **Cláusula 8.1.1** deste Plano.

1.1.20.   "Backstop Novos Financiadores": São os Novos Financiadores subscritores do Contrato de Subscrição (ou seus sucessores e cessionários, a qualquer título, sejam ou não Credores Concursais) que, observados e satisfeitos certos termos e condições precedentes estabelecidos no Contrato de Subscrição, assumiram a obrigação de subscrever (i) as Debêntures 1ª Série; e (ii) as Debêntures 2ª Série, em valor equivalente às sobras das Debêntures 3ª Série, limitado sempre ao valor máximo em moeda corrente nacional equivalente a **US$ 90.000.000,00** (noventa milhões de dólares norte-americanos) na data da subscrição das Debêntures 2ª Série.

CONFERE COM O ORIGINAL
O Escrivão
Maria C. de Oliveira
01/9151

**1.1.21.** "Bondholders": Credores detentores dos Bonds 2018 e/ou dos Bonds 2022, representados ou não pelo Agente Fiduciário dos Bonds.

**1.1.22.** "Bondholders Aderentes": São os titulares de Bonds 2018 e/ou Bonds 2022 que conjuntamente detêm a maioria dos Créditos representados pelos Bonds 2018 e/ou Bonds 2022, com os quais o Grupo OGX celebrou o *Plan Support Agreement* ou que tenham aderido ao *Plan Support Agreement*, de tempos em tempos. Para fins desta cláusula não são considerados Bondholders Aderentes aqueles Bondholders que assinaram originalmente o *Plan Support Agreement* e, posteriormente, alienaram ou venham a alienar a terceiros uma parte ou a totalidade dos Bonds 2018 e/ou Bonds 2022 de sua propriedade, desde que tal alienação ocorra nos termos do *Plan Support Agreement*.

**1.1.23.** "Bonds 2018": São os títulos (*Bonds*) no valor total agregado de US$ 2.563.000.000,00 (dois bilhões quinhentos e sessenta e três milhões de dólares norte-americanos), com vencimento em 2018, emitidos pela OGX Áustria e integralmente garantidos por OGPar e OGX, conforme a respectiva Escritura de Emissão dos Bonds.

**1.1.24.** "Bonds 2022": São os títulos (*Bonds*) no valor total agregado de US$ 1.063.000.000,00 (um bilhão e sessenta e três milhões de dólares norte-americanos), com vencimento em 2022, emitidos pela OGX Áustria e integralmente garantidos por OGPar e OGX, conforme a respectiva Escritura de Emissão dos Bonds.

**1.1.25.** "BS-4": É o bloco exploratório localizado na Bacia de Santos, Estado de São Paulo, formado pelos campos Atlanta e Oliva, cujos direitos de concessão foram outorgados pela ANP ao consórcio formado por Queiroz Galvão Exploração e Produção S.A., que detém 30% (trinta por cento) de participação, Barra Energia do Brasil Petróleo e Gás Ltda., que detém 30% (trinta por cento) de participação, e OGX, que detém a participação remanescente de 40% (quarenta por cento).

**1.1.26.** "CADE": É o Conselho Administrativo de Defesa Econômica.

**1.1.27.** "Cambuhy": Cambuhy Investimentos Ltda., sociedade por quotas de responsabilidade limitada constituída e organizada segundo as leis da República Federativa do Brasil, com sede na Cidade de São Paulo, Estado de São Paulo, na Rua Amauri, n° 255, 6° andar, inscrita no CNPJ/MF sob o n.º 14.127.491/0001-40, ou qualquer veículo de investimento que esteja sob sua gestão ou controle.

1.1.28.  "CETIP": É a CETIP S.A. – Mercados Organizados.

1.1.29.  "Comissário": É a OGPar ou terceiro que venha a ser oportunamente indicado por OGX que, nos termos dos Artigos 693 e seguintes do Código Civil, deverá atuar em nome próprio, mas em benefício dos Credores que assim optarem, nos termos e condições da **Cláusula 5.1.5.6**, para fins exclusivos de implementação das disposições deste Plano.

1.1.30.  "Comunicado de Subscrição": É o comunicado a ser enviado pela OGX aos Credores Qualificados para Subscrição das Debêntures 3ª Série, através do qual serão informadas as condições e procedimentos necessários para implementar a subscrição e integralização das Debêntures 3ª Série, na forma da **Cláusula 4.6** deste Plano.

1.1.31.  "Condições Precedentes para o Aumento de Capital Mediante Capitalização de Crédito": São as condições mínimas precedentes para que seja implementada a operação de Aumento de Capital Mediante Capitalização de Crédito, conforme estabelecidas na **Cláusula 5.1.3.1** deste Plano.

1.1.32.  "Condições Precedentes para o Aumento de Capital Mediante Conversão das Debêntures": São as condições mínimas precedentes para que seja implementada a operação de Aumento de Capital Mediante Conversão das Debêntures, conforme estabelecido na **Cláusula 4.8** deste Plano, sem prejuízo das demais condições precedentes para conversão estabelecidas na Escritura de Emissão de Debêntures e no Contrato de Subscrição.

1.1.33.  "Contrato de Compartilhamento": É o Contrato de Compartilhamento de Garantias e Direitos Entre Credores celebrado, em 09.04.2014, entre Oliveira Trust Distribuidora de Títulos e Valores Mobiliários S.A., Wilmington Trust, National Association, Oliveira Trust Servicer S.A. e OGX, na qualidade de interveniente anuente, conforme aditado de tempos em tempos, anexo ao presente Plano como **Anexo 1.1.33**.

1.1.34.  "Contrato de Compra e Venda": Contrato de Compra e Venda de Ações (*Share Purchase Agreement*) com condições suspensivas, celebrado entre OGX e Cambuhy, com interveniência da Parnaíba Gás Natural e Eneva S.A., celebrado em 30.10.2013, tendo por objeto a aquisição, pela Cambuhy, da UPI Parnaíba Gás Natural, conforme resumido no **Anexo 1.1.34**.

1.1.35.   "Contratos de Garantias DIP – 1ª Série": São os seguintes instrumentos, conforme aditados e modificados de tempos em tempos: (i) Instrumento Particular de Alienação Fiduciária de Petróleo e Gás Natural em Garantia; (ii) Instrumento Particular de Alienação Fiduciária de Equipamentos em Garantia; (iii) Instrumento Particular de Cessão Fiduciária de Direitos Creditórios em Garantia (Geral); (iv) Instrumento Particular de Cessão Fiduciária de Direitos Creditórios e Títulos de Crédito em Garantia (Intercompany e Venda de Produto); (v) Instrumento Particular de Cessão Fiduciária de Direitos Creditórios em Garantia (Parnaíba); (vi) Instrumento Particular de Cessão Fiduciária de Direitos Creditórios em Garantia (Créditos Tributários); (vii) Instrumento Particular de Penhor de Direitos Sobre Contrato de Concessão e Outras Avenças (BS-4); (viii) Contrato de Depósito em Garantia e Outras Avenças; (ix) *Deed of Pledge of Parnaíba MPX Receivables*; (x) *Deed of Pledge of Parnaíba Receivables*; (xi) *Deed of Pledge of Shares of Parnaíba B.V.*; e (xii) *U.S. Security Agreement*, anexos ao presente Plano como **Anexo 1.1.35**.

1.1.36.   "Contratos de Garantias DIP – 2ª e 3ª Séries": Além dos Contratos de Garantias DIP – 1ª Série, são os instrumentos que vierem a ser celebrados para: (i) alienação fiduciária de ações de emissão da OGX; (ii) alienação fiduciária de ações de emissão da OGPar; (iii) penhor de direitos de concessão relativos aos contratos de concessão BM-C-39 e BM-C-40 de Tubarão Martelo e aos contratos de concessão da 11ª Rodada; (iv) penhor de ações da OGX International GmbH; (v) penhor de ações da OGX Áustria; (vi) penhor de ações da OGX Netherlands B.V.; (vii) penhor de ações da OGX Netherlands Holding B.V., desde que verificadas determinadas condições refletidas na Escritura de Emissão de Debêntures; (viii) qualquer instrumento de garantia sobre os recursos eventualmente obtidos com a venda dos ativos decorrente dos contratos indicados nos itens (i) a (vii) acima; (ix) quaisquer outras garantias a serem constituídas nos termos dos Contratos de Garantias DIP – 1ª Série; e (x) qualquer outro instrumento de garantia necessário para formalizar ou proteger as garantias referidas nos itens (i) a (ix) acima.

1.1.37.   "Contratos de Garantias DIP": São os Contratos de Garantia – 1ª Série e os Contratos de Garantia – 2ª e 3ª Séries, para garantia integral do Empréstimo DIP e do Empréstimo Adicional, observado o disposto no Contrato de Compartilhamento.

**1.1.38.** "Contratos de Garantias – 2ª Empréstimo Ponte": São os instrumentos que garantiam o 2º Empréstimo Ponte, o qual foi integralmente pago em 13.03.2014: (i) Instrumento Particular de Cessão Fiduciária de Direitos Creditórios em Garantia N.º CSBRA20140100084; (ii) Instrumento Particular de Cessão Fiduciária de Direitos Creditórios em Garantia N.º CSBRA20140100085; (iii) Instrumento Particular de Cessão Fiduciária de Direitos Creditórios em Garantia N.º CSBRA20140100086; (iv) Instrumento Particular de Penhor de Direitos Sobre Contrato de Concessão e Outras Avenças N.º CSBRA20140100087; (v) Instrumento Particular de Penhor de Petróleo e Gás Natural em Garantia N.º CSBRA20140100088; (vi) Instrumento Particular de Alienação Fiduciária de Equipamentos em Garantia N.º CSBRA20140100083; (vii) *Deed of Pledge of Parnaíba Receivables*; (viii) *Deed of Pledge of Parnaíba Shares*; (ix) *Deed of Pledge of Paranaíba MPX Receivables*; e (x) *Security Agreement No. CSBBR20140100002*. Os Contratos de Garantias - 2º Empréstimo Ponte já foram todos resolvidos com a liberação das garantias correspondentes, em razão do pagamento do 2º Empréstimo Ponte em 13.03.2014.

**1.1.39.** "Contrato de Subscrição": É o *Senior Secured Superpriority Post-Petition Debentures Subscription Agreement* celebrado entre OGX, OGPar, os Backstop Novos Financiadores, Wilmington Trust, National Association e outros em 07.02.2014, conforme aditado de tempos em tempos, anexo ao presente Plano como **Anexo 1.1.39**.

**1.1.40.** "Contrato de Pré-Pagamento de Exportação": É o *Export Prepayment Agreement*, celebrado em 09.04.2014 entre OGX, OGPar, OGX Áustria, OGX International, OGX Netherlands B.V., OGX Netherlands Holding B.V., Parnaíba B.V., Deutsche Bank A.G., London Branch, Wilmington Trust, National Association, Oliveira Trust Distribuidora de Títulos e Valores Mobiliários S.A. e Oliveira Trust Servicer S.A., anexo ao presente Plano como **Anexo 1.1.40**.

**1.1.41.** "Contrato OSX-1": É o *Re-delivery Termination and Interim Operation Agreement in respect of the OSX-1 FPSO* que poderá ser celebrado entre o Grupo OGX e o Grupo OSX, para estabelecer os termos e condições de retomada temporária da atividade exploratória no campo de Tubarão Azul.

**1.1.42.** "Contratos OSX-3": São os contratos que poderão ser celebrados entre o Grupo OGX, o Grupo OSX e outros, para estabelecer os novos termos e condições para afretamento e operação do *OSX-3 Floating*

*Production Storage Offloading (FPSO) Vessel* ("FPSO OSX-3") no campo de Tubarão Martelo, inclusive, mas não se limitando aos seguintes instrumentos: (i) *Charter Amendment Agreement*; (ii) *Charter Agreement*; (iii) *Charterer Contract Guarantee*; (iv) *O&M Amendment Agreement*; (v) *Amended & Restated O&M Agreement*; (vi) *OGX Buyout Right Agreement*; (vii) *Charter Termination Agreement*; e (viii) *OSX-3 LC Agreement*.

1.1.43.    "Créditos": Créditos e obrigações, sejam materializados ou contingentes, líquidos ou ilíquidos, existentes na Data do Pedido ou cujo fato gerador seja anterior ou coincidente com a Data do Pedido, estejam ou não sujeitos aos efeitos do Plano, inclusive os Créditos Grupo OSX devidos pelo Grupo OGX. Quando aplicável, Créditos também deverá ser interpretado como e incluir os créditos e obrigações, sejam materializados ou contingentes, líquidos ou ilíquidos, existentes na Data do Pedido ou cujo fato gerador seja anterior ou coincidente com a Data do Pedido, estejam ou não sujeitos aos efeitos do Plano e que sejam devidos pela OGPar e/ou OGX Áustria e/ou OGX International. Para que não haja dúvidas, os créditos decorrentes do Empréstimo DIP e do Empréstimo Adicional não estão incluídos nos Créditos acima para qualquer fim, não estando sujeitos aos termos, efeitos e condições deste Plano em qualquer aspecto.

1.1.44.    "Créditos com Garantia Real": Créditos Concursais detidos por Credores com Garantia Real.

1.1.45.    "Créditos Concursais": Créditos detidos pelos Credores Concursais. Quando aplicável, Créditos Concursais também deverá ser interpretado como os créditos detidos pelos credores concursais de OGPar e/ou OGX Áustria e/ou OGX International que serão novados e pagos conforme disposições aplicáveis deste Plano.

1.1.46.    "Créditos Extraconcursais": Créditos detidos pelos Credores Extraconcursais na Data do Pedido. Quando aplicável, Créditos Extraconcursais também deverá ser interpretado como os créditos detidos pelos credores extraconcursais de OGPar e/ou OGX Áustria e/ou OGX International. Para que não haja dúvidas, os Créditos Extraconcursais acima não se confundem com os créditos extraconcursais decorrentes de operações contratadas após a Data do Pedido, inclusive o Empréstimo DIP e o Empréstimo Adicional.

**1.1.47.** "Créditos Grupo OSX": Créditos detidos pelas sociedades do Grupo OSX e objeto de transação formalizada entre o Grupo OGX e o Grupo OSX.

**1.1.48.** "Créditos OGX Áustria": São em conjunto os Créditos detidos pela OGX Áustria contra a OGX e que são decorrentes do Crédito OGX Áustria PPE e do Crédito OGX Áustria Debênture.

**1.1.49.** "Crédito OGX Áustria PPE": É o crédito decorrente do contrato de Pré-Pagamento de Exportações (*Export Prepayment Agreement*) celebrado em 04.10.2012 entre a OGX e a OGX Áustria.

**1.1.50.** "Crédito OGX Áustria Debênture": É o crédito decorrente das Debêntures relativas à 1ª. Emissão Pública de Debêntures Simples, Não Conversíveis em Ações, da Espécie Quirografária, em Série Única da OGX datada de 21.09.2012, subscritas pela OGX Áustria, conforme aditada.

**1.1.51.** "Créditos Quirografários": Créditos Concursais detidos pelos Credores Quirografários.

**1.1.52.** "Créditos Subrogação OGX Áustria": São os Créditos Subrogação OGX Áustria – Bonds 2018 e os Créditos Subrogação OGX Áustria – Bonds 2022.

**1.1.53.** "Créditos Subrogação OGX Áustria – Bonds 2018": É o crédito a ser detido pela OGX contra a OGX Áustria em razão da subrogação operada em favor da OGX pelo pagamento dos Créditos Concursais dos Bondholders detentores dos Bonds 2018 mediante a entrega de Ações no âmbito da operação de Aumento de Capital Mediante Capitalização de Crédito, na forma da **Cláusula 5.1.3** e seguintes deste Plano. Para que não haja dúvidas, o Crédito Subrogação OGX Áustria – Bonds 2018 sobreviverá ao eventual cancelamento dos Bonds, após a entrega das Ações aos Bondholders nos termos deste Plano, permanecendo válido, líquido, certo e exigível na forma deste Plano e do Plano OGX Áustria.

**1.1.54.** "Créditos Subrogação OGX Áustria – Bonds 2022": É o crédito a ser detido pela OGX contra a OGX Áustria em razão da subrogação operada em favor da OGX pelo pagamento dos Créditos Concursais dos Bondholders detentores dos Bonds 2022 mediante a entrega de Ações no âmbito da operação de Aumento de Capital Mediante Capitalização de Crédito, na forma da **Cláusula 5.1.3** e seguintes

deste Plano. Para que não haja dúvidas, o Crédito Subrogação OGX Áustria – Bonds 2022 sobreviverá ao eventual cancelamento dos Bonds, após a entrega das Ações aos Bondholders nos termos deste Plano, permanecendo válido, líquido, certo e exigível na forma deste Plano e do Plano OGX Áustria.

1.1.55.   "Créditos Trabalhistas": Créditos e direitos detidos pelos Credores Trabalhistas.

1.1.56.   "Credores": Pessoas, físicas ou jurídicas, detentoras de Créditos, estejam ou não relacionadas na Lista de Credores. Quando aplicável, Credores também deverá ser interpretado como sendo as pessoas físicas ou jurídicas detentoras de Créditos contra o Grupo OGX, estejam ou não relacionadas na Lista de Credores de OGPar e/ou OGX Áustria e/ou OGX International.

1.1.57.   "Credores com Garantia Real": Credores Concursais cujos créditos são assegurados por direitos reais de garantia (tal como um penhor ou uma hipoteca), até o limite do valor do respectivo bem, nos termos do Artigo 41, II, da Lei de Falências.

1.1.58.   "Credores Concursais": Credores cujos Créditos e direitos podem ser alterados pelo Plano nos termos da Lei de Falências. Tais Credores são divididos, para os efeitos de votação do Plano ou eleição do Comitê de Credores em Assembleia de Credores, em três classes (Credores Trabalhistas, Credores com Garantia Real e Credores Quirografários). Quando aplicável, Credores Concursais também deverá ser interpretado como sendo os Credores do Grupo OGX, cujos créditos e direitos podem ser alterados pelos Planos Partes Relacionadas OGX, nos termos da Lei de Falências. Tais Credores são divididos, para os efeitos de votação dos Planos Partes Relacionadas OGX ou eleição do Comitê de Credores em Assembleia de Credores de cada uma das sociedades que compõem o Grupo OGX, em três classes (Credores Trabalhistas, Credores com Garantia Real e Credores Quirografários).

1.1.59.   "Credores Extraconcursais": Para fins deste Plano são os Credores da OGX e das demais sociedades do Grupo OGX, quando aplicável (i) cujo fato gerador de seu direito de crédito seja posterior à Data do Pedido, mas decorra de instrumento celebrado antes da Data do Pedido, observado nessa hipótese que o crédito correspondente não se qualifica como crédito extraconcursal para fins dos Artigos 67, 84, inciso V e 149 da Lei de Falências em caso de superveniente

decretação da falência da OGX ou qualquer outra empresa do Grupo OGX; ou (ii) cujo direito de tomar posse de bens ou de executar seus direitos ou garantias derivados de contratos celebrados antes ou após a Data do Pedido não pode ser alterado pelo Plano, de acordo com o Artigo 49, §§ 3º e 4º, da Lei de Falências.

1.1.60.   "Credores Financeiros": Credores Quirografários que são titulares de Créditos decorrentes de operações financeiras ou bancárias, inclusive, mas sem se limitar, aos Bondholders.

1.1.61.   "Credores Fornecedores": Credores Quirografários que são titulares de Créditos decorrentes de operações mercantis, de bens ou serviços, que não sejam Credores Financeiros ou Partes Relacionadas.

1.1.62.   "Credores Qualificados para Subscrição das Debêntures 3ª Série": São os Credores que constem da Lista de Credores vigente na data da Assembleia de Credores que deliberar sobre o Plano e/ou Planos Partes Relacionadas OGX que tenham (i) enviado à OGX, ao Agente Fiduciário das Debêntures e ao Administrador Judicial, no prazo de até 5 (cinco) Dias Úteis contados da Aprovação do Plano, a Notificação de Interesse de Subscrição das Debêntures 3ª Série, observando as condições estabelecidas na **Cláusula 4.6.2** deste Plano; e (ii) para o caso de Credores não residentes no Brasil, cumprido com as providências descritas no **Anexo 4.6**. Para fins deste Plano serão considerados Credores Qualificados para Subscrição das Debêntures 3ª Série todos os Bondholders que tenham adotado o procedimento para individualização do seu direito de participação, petição, voz e voto na Recuperação Judicial e em qualquer Assembleia de Credores, conforme procedimento estabelecido no Edital Bondholders, ainda que seus respectivos Créditos não constem individualmente na Lista de Credores vigente na data da Assembleia de Credores que deliberar sobre o Plano e/ou Planos Partes Relacionadas OGX e estejam relacionados apenas em nome do Agente Fiduciário dos Bonds. A OGX não se responsabiliza pelos Credores não residentes que não puderem subscrever, integralizar ou receber as Debêntures 3ª Série por não atenderem aos requisitos da legislação vigente para formalizar o respectivo investimento.

1.1.63.   "Credores Quirografários": Credores Concursais detentores de créditos quirografários, tal como consta dos Artigos 41, inciso III e 83, inciso VI, ambos da Lei de Falências.

**1.1.64.** "Credores Trabalhistas": Credores Concursais detentores de créditos derivados da legislação do trabalho ou decorrentes de acidente de trabalho, nos termos do Artigo 41, I, da Lei de Falências.

**1.1.65.** "CVM": É a Comissão de Valores Mobiliários.

**1.1.66.** "Data de Emissão": Para fins deste Plano, 12.02.2014, data em que as Debêntures 1ª Série, Debêntures 2ª Série e Debêntures 3ª Série foram emitidas, nos termos da Escritura de Emissão de Debêntures.

**1.1.67.** "Data do Pedido": 30.10.2013, data em que o pedido de recuperação judicial do Grupo OGX foi ajuizado.

**1.1.68.** "Debêntures": São as Debêntures 1ª Série, as Debêntures 2ª Série e as Debêntures 3ª Série, as quais serão subscritas e integralizadas nos termos e condições estabelecidos neste Plano e na Escritura de Emissão de Debêntures.

**1.1.69.** "Debêntures 1ª Série": São as Debêntures relativas à 1ª Série do Empréstimo DIP, as quais foram emitidas na forma da Escritura de Emissão de Debêntures e já subscritas e integralizadas pelos Backstop Novos Financiadores.

**1.1.70.** "Debêntures 2ª Série": São as Debêntures relativas à 2ª Série do Empréstimo DIP, já emitidas e que serão subscritas e integralizadas pelos Backstop Novos Financiadores (sejam Credores ou não), na forma da Escritura de Emissão de Debêntures, e desde que observadas as condições precedentes deste Plano e do Contrato de Subscrição.

**1.1.71.** "Debêntures 3ª Série": São as Debêntures relativas à 3ª Série do Empréstimo DIP, já emitidas e que serão subscritas e integralizadas pelos Credores na forma da Escritura de Emissão de Debêntures e deste Plano.

**1.1.72.** "Dia Útil": Para fins deste Plano, Dia Útil será qualquer dia que não seja sábado, domingo ou feriado municipal nas Cidades de São Paulo, Estado de São Paulo ou Rio de Janeiro, Estado do Rio de Janeiro, ou que, por qualquer motivo, não haja expediente bancário na Cidade de São Paulo, Estado de São Paulo ou na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, ressalvados os casos em que os pagamentos ocorram através da CETIP, hipótese na qual Dia Útil será