COMPOSITE EXHIBIT NO. 1 - PART 6

7529

CONTROLE DE SOLICITAÇÃO DE PARTICIPAÇÃO COMO OUVINTE
ASSEMBLEIA GERAL DE CREDORES GRUPO OGX – 03/06/2014

| SENHA NÚMERO | NOME DE SOLICITANTE | ASSINATURA | OBSERVAÇÃO |
|---|---|---|---|
| 11 | RODOLFO WEHRS | | Jorgos EST Investment bondholder |
| 12 | MARCELO STALLONE | | Pessoa Física dynamo bondholder |
| 13 | Andi Souu | | Dynamo bondholder |
| 14 | BERNARDO COSTA | | Dynamo |
| 15 | CID OLIVEIRA | | DISCOVERY bondholder |
| 16 | PEDRO P. LOPES | | Three Brothers Bradesbanker credon |
| 17 | Raphael Jacqui | | Azaleia Taxi Reves Credor |
| 18 | José Eduardo Pereira | | EASY WAY BRASIL credor Otacon |
| 19 | Jose Luis Montello | | credor Portodesus SA |
| 20 | Vagner Santos | | credor Portodesus SA |

2

CONFERE COM O ORIGINAL
EDSON FERNANDES
Escrivão
Mat. 017433

7530

**CONTROLE DE SOLICITAÇÃO DE PARTICIPAÇÃO COMO OUVINTE**
**ASSEMBLEIA GERAL DE CREDORES GRUPO OGX – 03/06/2014**

| SENHA NÚMERO | NOME DE SOLICITANTE | ASSINATURA | OBSERVAÇÃO |
|---|---|---|---|
| 21 | Sofia Capovema Louda | Sofia Capovema Louda | Advogada CGGVentia |
| 22 | Lucas Mata Pereira | Pereira | Advogado Von Helding conveta designer |
| 23 | Fabrício Machado Sampaio | | Occombont Serviços maritimos Advogado |
| 24 | Carlos Vasconcelos | | Demarest adv. |
| 25 | Rafael Gaglioti | | DEMAREST |
| 26 | Max Frutz | | |
| 27 | LEONARDO M. | | N. |
| 28 | Willi Tavares | CB | Advog. Orsibumba |
| 29 | | | |
| 30 | | | |

CONFERE COM O ORIGINAL
EDSON FERNANDES
Mat. 01746

# Exhibit 10

**Case Records No. 0377620-56.2013.8.19.0001 Decision:**

"This is a request for judicial approval of the judicial recovery plan, approved on June 3, 2014, issued by OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A., OGX PETRÓLEO E GÁS S.A., OGX INTERNACIONAL GMBH and OGX ÁUSTRIA GMBH, under the terms of Law No. 11.101/2005 (the "Brazilian Bankruptcy Law"). The principle of the preservation of the company is the main purpose of the judicial recovery proceeding, according to article 58 and §§ of Law No. 11,101/05. In this sense, there should be brought to light the exceptional lesson of Luiz Roberto Ayoub and Cássio Cavalli give in the famous Judicial Work that treats this subject with mastery, *The* Construction of Cases of Recovery Proceedings of Companies ("A Construção Jurisprudencial da Recuperação Judicial de Empresas") (page 288), *in verbis:* "In respect of all that was affirmed about the supremacy of the general meeting of creditors, once the plan is approved by the general meeting of creditors, it is the judge's duty to approve the judicial recovery, without the use of any significant discretion on his part. It is valid to say: "It is to the sole discretion of the creditors, and not to the judge's or the General Attorney's Office, to decide whether the plan is economically and financially viable". And as stated by Alberto Camiña Moreira, "the approval of the plan by the general meeting of creditors shall be followed by the court's decision to abide to the creditors' intention".

As the judicial recovery proceedings must be prompt, efficient and flexible enough to shape itself according to the actual economic and social outlook, the principles of judicial security, efficiency and celerity must be respected. The company brings a series of benefits to society, exemplified by the fact that OGX P&G's exploitation services renders, directly, over a thousand jobs in the oil and gas industry, and indirectly, around three thousand positions, which means the public's interest must be fended to. Furthermore, the sheer amount of debt amassed thus far would be enough to bankrupt its suppliers. The legal text must be interpreted taking into account the constitutional principles which govern judicial recovery proceedings, pursuant to Article 47 of the Brazilian Bankruptcy Law which sets forth the goals of preservation of productive resources, employment, and the interest of the creditors by means of the preservation of the company, its social purpose and the incentive to its business activity.

The General Attorney's Office's opinion is that some of the judicial recovery plan's aspects should be deemed illegal, which would tend, as a result, to society's interest. Its opinion notwithstanding, the issue of the plan's illegality was raised by a very small portion of the bondholder creditors which did not adhere to in the first tranche, a problem which is surpassed by the exuberant number of creditors and value of credits which voted for the approval of the Plan and for the dismissal of the Put Option.

First off, the voting of the creditors at OGX P&G's general meeting of creditors must be assessed, as it is the holding company and the main guarantor of creditors: 1 -In the first scenario, excluding all the bondholder creditors, 91.04% of the creditors and 90.20% of the credits voted for the approval of

the company's judicial recovery plan. 2 - In the second scenario, excluding all the bondholder creditors which adhered to in the first tranche, 77.98% of the creditors and 85.23% of the credits voted for the approval of the company's judicial recovery plan. 3 - In the third scenario, excluding all the bondholder creditors, 91.04% of the creditors and 90.20% of the credits voted for the approval of the judicial recovery plan. It is clear that even if we only counted the creditors which did not claim unfair treatment in the proceedings, the general meeting of creditor's decision to approve the judicial recovery plan would remain the same, which shows that the vast majority of creditors and credits desired the approval of the recovery plan. Upon analyzing the voting procedures through a series of criteria, it is abundantly clear that there was no malicious use of the bondholders' rights, nor was there any conflict of interest, as the bondholder creditors are still creditors who detain the right to vote independently, whether they contributed to investments or not, without any prejudice to the voting procedures which approved the plan, as set out in item 3 above.

Thus, who would be interested in the rejection of the plan, and the subsequent filing for bankruptcy by the companies? The answer is no-one, as all the objections to the plan were denied by the general meeting of creditors, which demonstrates the success of the companies OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A, OGX PETRÓLEO E GÁS S/A, OGX INTERNACIONAL GMBH E OGX ÁUSTRIA GMBH in their judicial recovery proceedings, whose holding company had a net profit of two-hundred and thirteen million dollars in the first quarter of 2014. The fact that some bondholder creditors later wished to participate in the first tranche investments in the recovering companies would have supposedly constituted an unequal treatment of the creditors is a completely unfounded argument.

The search process for potential investors in the recovering companies is described at length in the proceedings' case records, on pages 7879/7890, when the Blackstone Advisory Partners Group L.P., a company specialized in international financing, was hired by OGX PETROLEO E GAS PARTICIPAÇÕES S/A on July 29, 2013 to, among other things, raise additional capital for the carrying out of the company's business plan. Blackstone found that the recovering companies were facing a rapidly deteriorating financial situation, and that their two main assets needed significant investment in the following twenty-four months, and concluded that there was a need for hundreds of millions of dollars in emergency funding to keep their business afloat and assure the value of their assets. This led, from September 2013, to its search for third-party capital and to its correspondence with potential investors to discuss funding opportunities, which is a widely-used practice for companies in crisis. Confidentiality agreements were signed with six banks and eight investment funds, as a result of the extensive media coverage on the subject, in an attempt to acquire funding for the restructuring revealed to the market since August 14, 2013, which was unsuccessful, as a result of the uncertainties facing the recovering companies, after Blackstone coordinated management meetings and eased syndication sessions for each of the potential investors which

signed the confidentiality agreements.

Blackstone had to coordinate with Lazard and Angra in its thorough search for additional capital to save the recovering companies' financial activities, after which they were contacted by eleven additional investment funds. Subsequently, Blackstone continued, through the months of October and November 2013, to ease syndication sessions and to keep conversations between capital sources and the recovering companies' management open.

At this time, of the forty-one capital sources contacted since the marketing process first began, three parties presented potential funding plans, but with considerably risky closing conditions, and overly burdensome and anti-economical conditions, which led to the conclusion that they were not viable and, consequently, to a cash-deficiency crisis and its inability to access the capital markets at the end of December 2013. Finally, the recovering companies and a group of investors who held approximately 55% of its debt reached, on December 24, 2013, an agreement for a consensual close to its demands for a detailed restructuring and a support agreement for the recovering companies' judicial recovery plans, which would result in their right to provide for a post-petition loan (DIP financing) in an amount between US$ 200-215 million.

The Blackstone Advisory Partners Group L.P., a company specialized in international financing, concluded with its advisors that the aforementioned investment group's proposal was the most compelling for the recovering companies, and that it was the one which would best be implemented in the short-term, as well as being the only investment source which offered a reasonable solution to the recovering companies, considering that there were no other realist options and the absence of long-term capital providers.

Blackstone went on to work coordination with other companies of international credibility, such as Lazard and Angra, in order to widen the search for investment capital, when they were contacted by eleven additional investment funds. Forty-one capital sources were contacted since the beginning of the marketing process, but only three funding terms, which contained unfeasible conditions. It is clear and without any margin of doubt that the bondholders which claimed unfair treatment had a series of opportunities to negotiate with the recovering companies through the months when it was searching for additional capital, by means of an intense and widely-divulged marketing campaign developed by Blackstone, Lazard and Angra in the international market. So as to shatter any remaining doubt, forty-one capital sources were contacted, and these bondholders did not express their want to provide capital for the recovering companies in its time of most-elevated risk, when they fluctuated in a pre-bankruptcy state.

There was a need for a total investment of two-hundred and fifteen million dollars -any amount inferior to that was useless. Therefore, there was a critical cash-flow period in the recovering companies which demanded a substantial input of resources, or the recovering companies' situation would be even further aggravated.

Michael J. Sandel (Justice: *What's the Right Thing* To Do?, 6th edition, Civilização Brasileira, 2012, page 25), which lectures one of the most influential and popular courses at Harvard, highlighted President Obama's speech upon announcing limits on payments to executives from companies who received government funds, at the beginning of the 2008 crisis: "We are in America. We do not despise wealth. We do not envy success. And we most certainly believe that success should be rewarded. But what frustrates the people - and rightly so - is to see executives rewarded for their incompetence, (...)". Maintaining legal and business relationships must always be cared for by the Judiciary, which must avoid interfering in privately-taken decisions, especially in agreements entered into with creditors who are collaborating with the recovering companies' judicial recovery proceedings, which benefits society as a whole, including the remaining creditors.

We should honor the success of those who invested in the company, and not aid those who were inert and who now claim unfair treatment, when such an attitude would lead to the violation of agreements entered into during the recovering companies' most critical period.

The creditors' relevant role in collaborating with the recovery is outlined in Fabio Ulhoa Coelho's theory ("The collaborative creditor in the judicial recovery proceeding" in PAULO FERNANDO CAMPOS SALLES DE TOLEDO and FRANCISCO SATIRO, Corporate *Crisis* Law: problems and *solutions,* Quartier Latin, São Paulo, 2012, page 103), set out as follows: "The collaboration of strategic creditors, such as important suppliers or investors, is, evidently, an important element to the judicial recovery's success. The extraordinary risk taken ends up indirectly benefitting the creditors as a whole, interested in the reorganization of the company in crisis. As such, if the recovery plans stimulate this collaboration, the judicial recovery plan will fulfill its purpose in a more efficient manner".

The high investment risk incurred in the company's most critical notwithstanding -which, in the case in question, had over thirteen billion dollars in debt, generated an eight-hundred and five million "reais" loss in 2013, and was completely unproductive - the creditors collaboration is not free of its own conditions.

Fabio Ulhoa Coelho asserts this, as follows: "As a result of the importance set forth by the law of improvement measures in crises taking place in major companies, the economical agents who collaborate to the measures' success are rewarded a fair but beneficial treatment for their collaboration. Amongst the economical agents who collaborated for the improvements of the company undergoing the crisis, it is important to highlight those who grant it credit, despite the risk of an aggravated recovering company. If, in this scenario of complete absence of credit or other forms of support, an agent agrees to help the struggling businessman, it is acting in a completely opposite manner to the remaining economical agents; and doing so setting aside its immediate interests by believing that this gesture will be decisive for the company's recovery and subsequent clearing of its debt.

The creditor's collaborative gesture should be emphasized, as it is crucially important for the company to overcome its crisis - which is often in the interests of the local, regional or national economy. In fact, the collaborative creditor is usually the last chance for a company to overcome bankruptcy. The collaborative creditor incurs an extraordinary risk, which is sensibly steeper than those incurred by the rest of the credit suppliers who operate in that market segment. As the borrower is in a well-known crisis state, the probability of default is very high. The collaborative creditor is betting, as opposed to the remaining agents, on the overcoming of the crisis by the borrower as a means of recovering its credit. The collaborative creditor is still a businessman in search of profit: if it incurs a greater risk, it is still sticking to its capitalist nature, but now by means of more daring calculations.

However, regardless to the reasons it takes in regard, the collaborative creditor, upon incurring a great risk, is acting in the interest of those who gravitate around the company's business activity. (FABIO ULHOA COELHO, The collaborative creditor *in the judicial* recovery in PAULO FERNANDO CAMPOS SALLES DE TOLEDO and FRANCISCO SATIRO, Corporate *Crisis* Law: problems and solutions, Quartier Latin, São Paulo, 2012, pages 113-115).

It is clear that there was no unequal treatment among creditors affected by the plan, as all the creditors affected by the plan (and post-petition creditors who adhered to the plan) shall receive the same compensation from the recovering companies. The point of order raised by the representative of the creditor Autonomy, which requested the discrediting of the backstop lenders' votes, arguing that their vote would constitute a bad use of their rights and would result in a conflict of interests, is completely unreasonable.

Furthermore, the Plan Support Agreement could be entered into by any creditor willing to support the plan's approval, without resulting in a conflict of interest. The funding for the recovering companies, the "DIP Loan", was agreed upon in an urgent, pre-bankruptcy stage, and was pivotal for the overcoming of the crisis, as it provides the companies the necessary resources to sustain their operation costs and, as such, preserve its business activity.

The beginning of the DIP Loan negotiations began way before December, which was when Autonomy supposedly expressed its interest in taking part, and was not imposed into the recovering companies, as it depended on a series of conditions for any investment to be provided for.

Therefore, the bondholders cannot, at this time, demand their participation in it, due to the principles of judicial and business security, and the *pacta sunt servanda*.

The recovering companies searched for investors, not only creditors, to finance the DIP, but only a few people came forward. New investors, as well as investors who were creditors prior to the judicial recovery petition, are subject to the companies' recovery. The new investors shall have the same treatment as the creditors who adhered to the DIP, pursuant to the Judicial Recovery Plans.

5

Additionally, there was no need for the recovering companies to allow the participation of the remaining creditors in the third tranche, which shows its good faith and its equitable treatment of creditors. The DIP funders provide resources in a period of elevated investment risk, which demonstrated a great inclination towards the resurgence of the recovering companies. The funders committed themselves to shoulder the amounts that weren't subscribed to by the creditors in the second tranche, which offered additional stability to the recovering companies, and undertook the liens of a possible subsidiary payment, which means they must be compensated for the incurred risk, pursuant to the theory setting forth the figure of the collaborative creditor.

This emphasizes the relevance of the judicial recovery proceedings' success, and the collaborative creditor's trust must be honored by the Judiciary in order to promote investments in companies undergoing tough times in our country.

If collaborative creditors cannot participate in the general meeting of creditors, no credit would take the initiate of providing resources to companies undergoing crises. This would result in fewer resources available to companies, making their recovery impossible, which is incompatible with the principle of the social purpose of the company, which permeates our bankruptcy law.

All creditors, be they collaborative or not, must be assured participation in the discussion and allowed to deliberate on the methods of overcoming the corporate crisis, as this is the ultimate goal of the law - put creditors and debtors in touch so as to solve any eventual impasses. There is no conflict of interest. The definition of conflict of interest involves a disagreement between the shareholder's individual interests and the company's collective interests.

In the case, it is impossible to conclude that the bondholders' interest is opposed either to the recovering companies' interest, or to the general meeting of creditors' interest. The simple existence of a disagreement between the creditors' opinions in the general meeting of creditors is an inherent characteristic to any collegial body.

Furthermore, there is no prejudice to any creditors, as the judicial recovery plans do not contain "exclusive benefits to the adherent bondholders". It is worth noting that, in dealing with the post-petition claims of adherent bondholders, the form of payment of such credits does not even need to be addressed in the recovery plan.

Nevertheless, such an address was used precisely to privilege an isonomic treatment. In these terms, the post-petition credits of adherent bondholders are receiving exactly the same treatment of pre-petition credits of other creditors, without any privilege. The procurement of post-petition financing from creditors is not prohibited by the law in any way. Incidentally, the creditors are the individuals that are most interested in the recovery of the companies, adopting a much more comprehensive and collaborative attitude in any future negotiations.

The procurement of financing is a private act of negotiation which does not need to be authorized by the court or by the general meeting of creditors, except for the granting of guarantees, as occurred

during the proceeding, and which was supported by a court decision.

One cannot lose sight of the fact that bondholders, besides being post-petition financers, are also pre-petition creditors - they are the majority of creditors, incidentally. And besides being the majority, the adherent bondholders, precisely because they have invested more money in the company, are the creditors that are more interested in the effective recovery of the company - so that it would be completely incongruous to bar their right to vote at the general meeting of creditors.

To bar the voting rights of bondholders would actually result in subjecting the interests of the majority of creditors to the interests of a minority, this minority being more concerned with their individual interests than with the effective recovery of the company. It would not be necessary, not even in theory, to offer to all creditors the same conditions offered to adherent bondholders. When it comes to a private finance agreement, the choice of the financial institutions with whom such agreements shall be entered into rests solely with the recovering companies themselves.

Evidently, the recovering companies cannot be forced to make a loan with any lender who wishes to lend, because the conditions and the amount of each loan are negotiated, according to information provided by Blackstone in its descriptive report of the negotiations.

Above all, the commercial conveniences of the recovering companies and of funders should be observed. With respect to the submission of subscribers of the 3rd tranche to the will of adherent bondholders, creditors are not obliged to participate in the DIP financing, given that if they do not agree with the sections therein, they can simply abstain from subscribing. A bonus of 10% as an incentive to the risk taken by a group of companies that ran a high risk of going bankrupt is not absurd; it is even a modest compensation. The onus of any extra contributions in the 2nd tranche is also to be compensated. Ratification of acts, exemption from liability etc. It is therefore a valid waiver of disposable rights.

The section is ineffective with respect to creditors that expressly opposed to it by voting against the approval of the plan. Moreover, it is part of the renegotiation, in which each party gives something up so that both can reach the common good.

Regarding the Put Option, the representative of the recovering companies has made this point clear in the course of the OGX P&B general meeting of creditors, in the terms of its minutes. It was a waiver of a disposable right, therefore a valid waiver.

However, such provision is ineffective with respect to creditors that expressly opposed to it by voting against the approval of the plan. This stance gave the board of directors of the group freedom to solve the issue swiftly, peacefully and effectively, without the Put Option being discarded, still depending on the opinions to be drafted by experts hired by the parties directly interested in the matter.

According to article 57 of the Brazilian Bankruptcy Law, after the approval of the plan at the general meeting of creditors, the recovering companies shall submit to the Court the social security's

contributions clearance or positive certificate with clearance effects so that the judge can ratify the plan, as they did on pages 7854 to 7873 of the case records, presenting also the statements of its officers.

On this matter, the largely predominant case law points towards the possibility that the judge may even exempt the recovering companies from this requirement, which was not an obstacle to granting this exemption in the present case.

The situation of companies undergoing judicial recovery, as it is known, is quite delicate, deserving obviously all the attention of the Judiciary. In fact, it could hardly be different since we are dealing with thousands of jobs in a globally known company which represents a national patrimony.

The Brazilian Bankruptcy Law contains a principled rule that aims at preserving the company, the maintenance of its industrial plant, and therefore employment, the continuity in the collection of taxes, among others. It is a rich legislation that meets the social purposes which companies are destined to fulfill.

Thus, under Article 58 of the Brazilian Bankruptcy Law, the legal requirements are considered to have been fulfilled and the judicial recovery of the applicant companies is granted, their plan having been approved at the general meeting of creditors held on June 3, 2014. Let it be known".

## CERTIFICATE OF TRANSLATION

**STATE OF NEW YORK** §
§
**COUNTY OF NEW YORK** §

**Roberto J. Millan**, being duly sworn, deposes and says:

1.    I am employed as a Project Manager for LanguageWorks, a professional translation firm providing translation services since 1993. I have personal knowledge of all of the facts stated herein.

2.    Attached to this Affidavit is a translation from Portuguese into English made by LanguageWorks of **Order Approving Plan**.

3.    LanguageWorks only utilizes the services of language professionals who have passed our stringent testing process, which involves a subject matter and language specific test translation that is reviewed by trusted linguists. Less than 6% of applicants pass. In addition, our language professionals must have a minimum of 5 years' professional translation experience or an applicable degree from an accredited institution. In addition, for all translations, including this one, LanguageWorks uses three qualified linguists: a professional translator, an editor to double check for style and content, and a proofreader to review all text for completeness. Translations made through our processes set forth above are regularly accepted into evidence in New York State courts.

4.    On the basis of the foregoing process and quality control procedures, I certify that the attached is an accurate translation of the original.

_____
**Roberto J. Millan**

SUBSCRIBED AND SWORN TO before me this seventh day of August, 2014.

_____
Notary Public

STEVEN J. ALBERT
Notary Public - State of New York
No. 01AL6234881
Qualified in New York County
My Commission Expires January 31, 2015

#891



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

## DECISÃO

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A

OGX PETRÓLEO E GÁS S/A

OGX INTERNACIONAL GMBH

OGX ÁUSTRIA GMBH

Trata-se de requerimento de homologação do plano de recuperação judicial, aprovado em 3 de junho de 2014, formulado por OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A, OGX PETRÓLEO E GÁS S/A, OGX INTERNACIONAL GMBH e OGX ÁUSTRIA GMBH, submetidas ao regime da Lei 11.101/2005.

Constata-se que o princípio da preservação da empresa é o fim precípuo do procedimento da recuperação judicial, o que impõe nesta fase processual aquilatar a aplicação do artigo 58 e §§ da Lei n.º 11.101/2005.

Nesse sentido, deve ser trazida à lume a lição sempre arguta de Luiz Roberto Ayoub e Cássio Cavalli na celebrada obra jurídica que trata da matéria com maestria A Construção Jurisprudencial da Recuperação Judicial de Empresas (página 288), *in verbis*:

"Na esteira do quanto se afirmou acerca da soberania da assembleia-geral de credores, uma vez aprovado o plano em assembleia, o juiz *deverá* conceder a recuperação, sem que se lhe reserve grande margem de discricionariedade. Vale dizer, não cabendo ao Ministério Público e ao juízo a análise da viabilidade econômica e financeira do plano de recuperação, mas tão somente aos credores". Conforme a dicção de Alberto Camiña Moreira, "[á]

Processo n.º 0377620-56.2013.8.19.0001



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

aprovação do plano pela assembleia de credores segue-se o pronunciamento judicial vinculado a essa vontade".

Como o processo de recuperação judicial deve ser célere, eficiente e dotado da flexibilidade necessária para se amoldar à realidade econômica e social, impende prestar deferência aos princípios da segurança jurídica, da eficiência e celeridade processual.

Verifica-se a necessidade de atendimento ao interesse público decorrente da utilidade social que da empresa resulta, tanto que a atividade exploratória da empresa OGX P&G gera mais de mil empregos diretos na indústria de petróleo e gás, o que resulta em uma estimativa de criação de mais três mil empregos indiretos. Além do mais, o montante do valor do endividamento com os fornecedores teria o condão de levar a reboque muitas empresas para o estado falimentar.

Destaca-se, ainda, a necessidade de compatibilizar a literalidade do texto legal com os princípios constitucionais que regem a recuperação de empresas, observando-se o artigo 47 da lei especial que retrata o objetivo de manutenção da fonte produtora, do emprego dos trabalhadores e dos interesses dos credores, promovendo-se a preservação da empresa, sua função social e o estímulo à atividade econômica.

O Ministério Público, através do valioso parecer, opinou pelo reconhecimento de ilegalidade com relação a alguns aspectos do plano de recuperação judicial, por entender ser a melhor medida para o atingimento do interesse público.

Não obstante o posicionamento declinado, perfilha-se o entendimento de que esses aspectos restaram superados pela essência do questionamento declinado por uma parcela minoritária de credores *bondholders* que deixaram de participar da primeira tranche, pelo

Processo n.º 0377620-56.2013.8.19.0001

*7893*



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

próprio resultado da votação exuberante por número de credores e por valor de créditos alcançada na assembleia de credores e também pela sua deliberação com relação ao *Put option.*

Passa-se a aquilatar a votação dos credores na assembleia de credores da empresa OGX P&G, por ser a holding e a principal garantidora dos créditos, sob os mais variados prismas, para que se possa ter uma medida da votação dos credores, a seguir descritos:

1 - No primeiro cenário, com a exclusão de todos os credores *bondholders*, a votação por credor para a aprovação do plano de recuperação da empresa foi de 91,04% e de 90,20% na votação por crédito.

2 - No segundo cenário, com a exclusão dos credores *bondholders* que aderiram à primeira tranche, a votação por credor para a aprovação do plano de recuperação da empresa foi de 77,98% e de 85,23% na votação por crédito.

3 - No terceiro cenário, com a exclusão de todos os credores *bondholders*, a votação por credor para a aprovação do plano de recuperação da empresa foi de 91,04% e de 90,20% na votação por crédito.

Por conseguinte, exsurge a intelecção de que a votação dos credores *bondholders* que alegaram ter sido submetidos a tratamento desigual não teve qualquer relevância no resultado da assembleia de credores para a aprovação do plano de recuperação, o que demonstrou que a intensa maioria de credores e dos créditos pretendeu efetivamente a aprovação do plano de recuperação.

Ao verificar a análise da votação segundo os vários critérios, constata-se inexoravelmente que inexistiu abuso de direito de

Processo n.º 0377620-56.2013.8.19.0001

Maria Carmelina de Oliveira
Chefe de Serventia
Matr. 01/0151

*O Escrivão*
*maria C. de Oliveira*
*0190151*

7894



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

voto dos *bondholders* aderentes e qualquer conflito de interesses porque eram credores e tinham efetivo direito de votar independentemente de haverem promovido investimento ou não, sem qualquer tipo de repercussão na votação que aprovou o plano de recuperação, conforme delineado acima no item 3.

Nesse diapasão, a quem interessa a desaprovação do plano de recuperação das empresas em comento, o que implicaria na necessidade de decretação de suas falências? Reputa-se que a ninguém, posto que a motivação das objeções que foram repugnadas pela assembleia de credores, demonstrou o sucesso do processo de recuperação das empresas OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A, OGX PETRÓLEO E GÁS S/A, OGX INTERNACIONAL GMBH e OGX ÁUSTRIA GMBH, cuja *holding* teve lucro líquido de duzentos e treze milhões de dólares no primeiro trimestre de 2014.

A ideia de que alguns credores *bondholders* desejaram posteriormente também participar dos investimentos aportados nas empresas recuperandas na primeira tranche, teria representado um tratamento desigual não encontra qualquer amparo legal.

Encontra-se descrito todo o procedimento de busca de investidores ou financiamentos para as empresas recuperandas ao longo de meses nos autos do processo, às fls. 7879/7890, quando o Grupo Blackstone Advisory Partners L.P., empresa de serviços financeiros internacionais, foi contratado pela empresa OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A no dia 29.07.2013 para, dentre outros tópicos, levantar capital adicional para a implementação do plano de negócios da empresa.

Blackstone constatou que as recuperandas enfrentavam situação financeira que se deteriorava rapidamente e seus dois principais ativos precisavam de investimentos significativos de capital ao longo dos

Processo n.º 0377620-56.2013.8.19.0001                                      4

7895



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

próximos vinte e quatro meses e concluiu que havia necessidade de centenas de milhões de dólares em financiamento emergencial para manter seus negócios e garantir o valor de seus bens.

A partir daí, em setembro de 2013, iniciou a busca por capital de terceiros e começou a se relacionar com possíveis fornecedores de capital para discutir oportunidades de financiamento, o que é considerada uma prática amplamente aplicada para uma empresa em crise.

Houve assinatura de compromisso de confidencialidade para tratativas com seis bancos e oito fundos de investimento a partir de ampla cobertura dada pela mídia para buscar financiamento e reestruturação que foi divulgado ao mercado desde 14.08.2013, sem êxito, diante das incertezas com relação ao futuro das recuperandas, após a Blackstone coordenar reuniões de gerenciamento e facilitar sessões de sindicância para cada fonte de capital que firmou o compromisso de confidencialidade.

Na intensa busca de aporte de capitais para salvar as atividades financeiras das recuperandas, Blackstone passou a trabalhar em coordenação com a Lazard e Angra para ampliar a busca por capital, quando foram contatados mais onze fundos alternativos de investimento. Daí, foi narrado que em outubro e novembro/2013, continuou a facilitar as sessões de sindicância e a manter conversações entre provedores de capital e a gerência das recuperandas.

Nesse período, das quarenta e uma fontes de capital contatadas desde que o processo de *marketing* teve início, três partes apresentaram termos indicativos de financiamento, mas com risco considerável de fechamento e condições onerosas e antieconômicas, com a conclusão de que não eram viáveis, o que ensejou uma crise de

Processo n.º 0377620-56.2013.8.19.0001

7896



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

liquidez e incapacidade de acessar os mercados de capitais no fim de dezembro de 2013.

Por fim, as recuperandas e um grupo de investidores que detinha aproximadamente 55% da dívida existente chegaram a um acordo para uma resolução consensual das suas reinvindicações no dia 24 de dezembro de 2013, para uma reestruturação abrangente e um acordo de suporte ao plano de recuperação das empresas em recuperação, segundo o qual tinha o direito, mas sem a obrigação, de oferecer financiamento extraconcursal (*DIP financing*) no valor entre US$ 200 milhões e US$ 215 milhões.

Grupo Blackstone Advisory Partners L.P., empresa de serviços financeiros internacionais, concluiu que, em conjunto com seus assessores, a proposta do mencionado grupo de investidores era a mais interessante para as recuperandas e poderia ser executada no prazo mais curto, além de ser a única fonte de financiamento que ofereceu uma solução razoável às recuperandas, sendo que não havia outras opções realistas e ainda, na ausência de provedores de capital alternativo de longo prazo.

Nesse procedimento divulgado, inclusive com *marketing* na intensa busca de aporte de capitais para salvar as atividades financeiras das recuperandas, Blackstone passou a trabalhar em coordenação com outras empresas de credibilidade internacional, a Lazard e Angra, para ampliar a busca por capital, quando foram contatados mais onze fundos alternativos de investimento. Daí, foram contatadas quarenta e uma fontes de capital desde que o processo de *marketing* teve início, mas somente três partes apresentaram termos indicativos de financiamento com condições desfavoráveis.

Evidentemente e sem qualquer margem de dúvida, com uma clareza de doer nos olhos, os *bondholders* que alegaram tratamento

Processo n.º 0377620-56.2013.8.19.0001                                      6

7897



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

diferenciado tiveram todas as oportunidades de negociar com as empresas recuperandas ao longo de meses de busca de aporte de capitais, através do intenso *marketing* desenvolvido pelas empresas Blackstone, Lazard e Angra no mercado internacional, com ampla divulgação.

Para espancar qualquer dúvida, foram contatadas quarenta e uma fontes de capital, e esses *bondholders* não apresentaram qualquer manifestação para fazer aporte de capital nas empresas recuperandas na época de maior risco, quando se encontravam em situação pré-falimentar com alto risco de investimento.

Havia necessidade de um investimento global de duzentos e quinze milhões de dólares, pois nada adiantaria um montante inferior. Portanto, houve um período crítico de liquidez das empresas recuperandas que demandou uma injeção substancial de recursos, sem os quais a situação falimentar se aprofundaria.

Michael J. Sandel (Justiça O que é fazer a coisa certa, 6.ª ed., Civilização Brasileira, 2012, pág. 25), que profere um dos cursos mais populares e influentes de Harvard, destacou discurso do Presidente Obama ao anunciar limites para o pagamento a executivos das companhias que receberam fundos do governo americano na época da crise iniciada em 2008, a seguir transcrito:

"Estamos na América. Aqui não menosprezamos a riqueza. Não invejamos ninguém por ter sucesso. E certamente acreditamos que o sucesso deva ser recompensado. Mas o que deixa o povo frustrado – e com razão – é ver executivos recompensados pela incompetência,..."

Segurança das relações jurídicas e negociais deve ser sempre prestigiada pelo Poder Judiciário que deve se abster de afrontar

Processo n.º 0377620-56.2013.8.19.0001                                          7

7899



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

questões decididas em sede privada, ainda mais em se tratando de contratos firmados com credores colaborativos no processo de recuperação judicial de empresas, o que deflui benefícios para toda a sociedade, inclusive diretamente aos demais credores. Devemos prestigiar o sucesso daqueles que bem investiram na empresa, sem amparar aqueles que ficaram inertes e desejam agora imputar tratamento desigual, quando tal mister implicaria em violar os contratos pactuados no momento mais crítico das empresas recuperandas.

A relevante função dos credores colaborativos na recuperação é destacado na lição de Fábio Ulhoa Coelho ("O credor colaborativo na recuperação judicial" *in* PAULO FERNANDO CAMPOS SALLES DE TOLEDO e FRANCISCO SATIRO, Direito das empresas em Crise: problemas e soluções, Quartier Latin, São Paulo, 2012, p. 103), transcrita a seguir:

> "Evidentemente, a colaboração dos credores estratégicos, como fornecedores importantes de insumos ou mesmo de capital de giro, é um elemento de fundamental importância para o sucesso da recuperação judicial. O risco extraordinário que assumem acaba, indiretamente, beneficiando toda a coletividade de credores, cujo interesse está na dependência da reorganização da empresa em crise. Neste sentido, se os planos de reorganização estimularem esta colaboração, o instituto da recuperação judicial tende a cumprir sua função mais eficientemente."

Sem olvidar o alto grau de risco do investimento na época de maior risco da empresa que, na hipótese trazida à colação, dispunha de uma dívida aproximada de treze bilhões de dólares, gerou prejuízo de oitocentos e cinco milhões de reais em 2013 e não produzia absolutamente nada, a exposição desses credores colaborativos não se desacompanhada de condições. É o que assevera Fábio Ulhoa Coelho, nos seguintes termos:

Processo n.º 0377620-56.2013.8.19.0001                                    8

CONFERE COM O ORIGINAL
*o Escrivão*
Maria *cdu Oliveira*
01/9151





PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

"Exatamente em função da importância reservada pela lei às medidas de saneamento da crise em empresas de porte significativo, **aqueles agentes econômicos que colaboram para o sucesso da tentativa acabam recebendo, em contrapartida à sua colaboração, justo tratamento benéfico.** Entre os agentes econômicos que colaboram para que a tentativa de saneamento da empresa em crise possa ser bem sucedida, avulta, sem dúvida, aquele que concorda em conceder-lhe crédito, a despeito do risco de recuperação agravado....

Se, neste cenário de total carência de crédito ou outras formas de apoio, alguém concorda em ajudar o empresário em dificuldades, ele está agindo de modo diametralmente oposto ao da generalidade dos demais agentes econômicos; e, no mínimo, pondo ao lado momentaneamente seus interesses imediatos, por acreditar que aquele gesto será decisivo para a recuperação da empresa do devedor e posterior satisfação da dívida....

**Deve-se atentar para a singularidade do gesto do credor colaborativo em razão de sua importância crucial para a tentativa de superação da crise naquela empresa – que interessa, muitas vezes, à própria economia local, regional ou nacional. Pode-se afirmar, sem receio algum de exagerar no dimensionamento dessa importância, que o credor colaborativo costuma ser a derradeira chance de se contornar a falência.**

O credor colaborativo assume um risco anormal, sensivelmente mais agravado do que o assumido pela generalidade dos concedentes de crédito que operam no mesmo segmento de mercado. Estando o tomador do crédito em sabido estado de crise, a probabilidade de inadimplência é muito elevada. **Claro que o credor colaborativo aposta fortemente, ao contrário dos demais agentes, na superação da crise pelo devedor ou em alguma forma de recuperação de seu crédito. O credor colaborativo continua a ser um empresário em busca de lucro: se assume risco maior, é porque elabora cálculos mais ousados, não porque abdicou de sua essência capitalista.**

Processo n.º 0377620-56.2013.8.19.0001

7901



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

Mas, independentemente dos motivos que o animam, o credor colaborativo, ao assumir risco agravado, acaba adotando conduta que atende à gama dos interesses metaindividuais que gravitam em torno da continuidade da atividade econômica." (FÁBIO ULHOA COELHO, "O credor colaborativo na recuperação judicial" in PAULO FERNANDO CAMPOS SALLES DE TOLEDO e FRANCISCO SATIRO, Direito das empresas em Crise: problemas e soluções, Quartier Latin, São Paulo, 2012, pp. 113/115, grifou-se trechos)

Apenas para destacar, constata-se que não há tratamento desigual entre créditos concursais, pois todos os créditos concursais (e extraconcursais aderentes) receberão a mesma compensação das recuperandas.

Não cabe a questão de ordem invocada pelo representante da credora Autonomy, que buscava desconsiderar os votos do *backstop lenders* sob a alegação de que configuraria abuso de direito e implicaria conflito de interesses, conforme já devidamente fundamentado acima. Ademais que a celebração do *Plan Support Agreement* é direito disponível e qualquer credor pode manifestar apoio à aprovação ao plano sem que isso configure conflito de interesse.

O financiamento das empresas em recuperação, o denominado "Empréstimo DIP", foi contratado em situação emergencial pré-falimentar, tendo sido fundamental para a superação da crise, já que alcança às empresas recursos necessários para fazer frente a seus custos de operação e, assim, preservar a atividade empresarial.

O início das negociações do Empréstimo DIP se deu muito antes de dezembro, data em que a Autonomy alegou ter manifestado seu interesse em participar, inclusive sem qualquer obrigatoriedade de aceitação pelas recuperandas, posto que dependiam das condições do investimento a ser aportado. Assim, decide-se que não podem agora

Processo n.º 0377620-56.2013.8.19.0001



*7902*



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

outros *bondholders* exigirem participação pela aplicação do princípio da segurança das relações jurídicas e negociais e da *pacta sunt servanda*.

As empresas recuperandas buscavam investidores, não somente e apenas credores para financiarem o DIP, mas somente alguns poucos se dispuseram. Não temos apenas credores anteriores ao pedido de recuperação judicial, portanto, sujeitos à recuperação, mas também novos investidores, que não possuem créditos sujeitos à recuperação judicial.

Nos termos dos Planos de Recuperação, os novos investidores terão o mesmo tratamento e condições que os credores que aderiram ao DIP.

Não havia, inclusive, a necessidade de as empresas recuperandas terem permitido a participação de demais credores na 3ª tranche – o que demonstrou boa-fé e tratamento isonômico.

Os financiadores do DIP aportaram recursos na época de maior risco do investimento, o que demonstrou grande disposição de colaborarem para o soerguimento das empresas recuperandas.

Os financiadores se comprometeram a arcar com o saldo não integralizado pelos demais credores na 2ª tranche, oferecendo a maior estabilidade possível às empresas recuperandas e assumiram o ônus de possível integralização suplementar, de tal sorte que efetivamente deve ser compensar o elevado risco tomado, consoante o amparo doutrinário ao credor colaborativo.

Fato este que destaca a relevância do sucesso do processo de recuperação judicial em epígrafe, cuja confiança do credor colaborativo deve merecer o amparo do Poder Judiciário no afã de

Processo n.º 0377620-56.2013.8.19.0001                                           11

7903



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

reforçar o investimento nas empresas em dificuldade momentânea e em nosso país.

Se os credores colaboradores não pudessem participar da assembleia de credores, nenhum credor tomaria a iniativa de colaborar com a recuperação da empresa em crise. Com isso, haveria uma menor oferta de recursos às empresas, impossibilitando suas recuperações, cujo entendimento se divorcia frontalmente da melhor exegese da nossa lei de recuperação de empresas, atenta ao princípio da função social da empresa.

Deve-se assegurar a todos os credores, colaboradores ou não, que participem do conclave e deliberem sobre os meios de superação da crise empresarial, por ser este o objetivo da lei – colocar credores e devedores em contato para discussão e solução do eventual impasse.

Não há conflito de interesses. A definição de conflito de interesses envolve divergência entre interesses particulares do <u>acionista</u> e os interesses coletivos da <u>Companhia.</u> Nesse caso, é impossível afirmar que o interesse dos *bondholders* aderentes seja contrário, quer aos interesses das recuperandas, quer aos interesses da AGC. A simples existência de divergência de opiniões entre os credores dentro da AGC é natural a qualquer órgão colegiado.

Inclusive, não se observa que haja qualquer prejuízo aos demais credores, na medida em que os planos de recuperação não contêm "benefícios exclusivos aos *bondholders* aderentes". Vale frisar que, em se tratando de créditos dos *bondholders* aderentes de créditos extraconcursais, a forma de pagamento de tais créditos nem sequer precisaria estar contemplada no plano de recuperação, porém tal mister serviu justamente para privilegiar um tratamento isonômico.

Processo n.° 0377620-56.2013.8.19.0001

12

*7904*



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

Nesses termos, os créditos extraconcursais dos *bondholders* aderentes estão recebendo exatamente o mesmo tratamento dos créditos concursais dos demais credores, sem qualquer privilégio. A aquisição de financiamento extraconcursal junto a credores não é vedada de nenhuma forma pela lei. Aliás, são os maiores interessados na recuperação das empresas, adotando uma postura bem mais compreensiva e colaborativa em eventuais futuras negociações.

A aquisição de financiamento se trata de um ato negocial privado, sem necessidade de autorização judicial ou assemblear para tanto, senão para a concessão de garantias, tal como ocorreu no decurso do processo, amparada por decisão judicial.

Não se pode perder de vista que os *bondholders*, além de financiadores extraconcursais, são também credores concursais – sendo a maioria dos credores, aliás. E além de serem maioria, os *bondholders* aderentes, justamente em razão de terem depositado mais dinheiro na empresa, são credores mais interessados na efetiva recuperação da empresa – de modo que seria completamente teratológico retirar o seu direito de votar na Assembleia Geral de Credores.

A eventual retirada de direito de voto aos *bondholders* acabaria, na realidade, sujeitando os interesses da maioria dos credores aos interesses de uma minoria, esta sim, mais preocupada com seus interesses individuais do que com a efetiva recuperação da empresa.

Não haveria, sequer em tese, a necessidade de que fossem oferecidas a todos os credores as mesmas condições dos *bondholders* aderentes. Em se tratando de contrato privado de financiamento, a escolha das instituições financeiras com as quais tais contratos serão celebrados cabe única e exclusivamente às próprias recuperandas.

Processo n.º 0377620-56.2013.8.19.0001

*7905*



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

Evidentemente, não podem as recuperandas serem obrigadas a tomar empréstimo com qualquer credor que deseje, até porque as condições e o valor de cada empréstimo são negociais, conforme informações prestadas pela Blackstone em seu relatório descritivos das negociações, devendo ser observada primordialmente as conveniências comerciais das recuperandas e dos financiadores.

Quanto à submissão dos subscritores da 3ª série à vontade dos *bondholders* aderentes, não há nada que obrigue os credores a participarem do financiamento DIP, haja vista que se não estiverem de acordo com as cláusulas estabelecidas, podem simplesmente se abster.

Reputa-se que um bônus de 10% como prêmio ao risco tomado em um grupo de empresas que corria elevado risco de falência não representa qualquer absurdo, mas até mesmo uma remuneração módica. Inclusive, remunera-se também o ônus de eventual aporte extra na 2ª tranche.

Ratificação de atos, isenção de responsabilidades, etc. Trata-se de renúncia a direito disponível, portanto, válida. A cláusula é ineficaz em relação aos credores que a ela se opuserem expressamente por terem votado pela rejeição ao plano. Ademais, faz parte da renegociação, onde cada parte abre mão de algo para chegarem a um bem comum.

No que tange ao *Put option*, impende constatar que esse ponto ficou devidamente esclarecido pelo representante das empresas recuperandas, no decurso da Assembleia Geral de Credores da OGX P&B, nos termos de sua ata.

Tratou-se de uma renúncia a direito disponível, portanto, válida, contudo tal cláusula é ineficaz em relação aos credores que a ela se opuserem expressamente, por terem votado pela rejeição ao plano.

Processo n.º 0377620-56.2013.8.19.0001                                    14

7906



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

Esse posicionamento deu liberdade para a diretoria do grupo resolver a questão de forma célere, pacífica e eficaz, sem que tenha o *Put option* sido descartado, pendendo de apreciação de pareceres a serem elaborados por juristas contratados pelas partes diretamente interessadas.

Após a aprovação do plano em Assembleia Geral de Credores, dispõe o artigo 57 da LRF que a recuperanda deve apresentar aos autos CND ou Certidão Positiva com Efeitos de Negativa para que o juiz possa homologar o plano, tal como ocorreu, às fls. 7854/7873, com a complementação das declarações de seus administradores. Sobre o tema, a jurisprudência largamente dominante é no sentido de que o juiz poderá, inclusive, dispensar a recuperanda dessa exigência, o que não caracterizou impedimento para sua concessão, no caso em exame.

A situação das empresas em regime de recuperação judicial, como cediço, é bastante delicada merecendo, por óbvio, toda a atenção do Poder Judiciário. De fato, nem poderia ser diferente na medida em que se está convivendo com milhares de empregos de uma empresa mundialmente conhecida e que representa um patrimônio nacional.

A Lei nº 11.101/2005 retrata uma norma principiológica que objetiva a preservação da empresa, manutenção da unidade produtiva e, consequentemente, o emprego, a continuidade no recolhimento dos tributos, entre outros. Enfim, é uma legislação rica, que vai de encontro aos fins sociais que as empresas se destinam.

Assim, nos termos do artigo 58 da Lei 11.101/2005, considera-se cumpridas as exigências legais e concede-se a recuperação judicial das empresas requerentes, cujo plano foi aprovado na assembléia de credores realizada no dia 03/06/2014.

Processo n.° 0377620-56.2013.8.19.0001                                                                    15

7907



PODER JUDICIÁRIO
COMARCA DA CAPITAL
QUARTA VARA EMPRESARIAL

Intimem-se.

Rio de Janeiro, 13 de junho de 2014.

**GILBERTO CLÓVIS FARIAS MATOS**
*Juiz de Direito*

AUTOS RECEBIDOS n.O MM.
Juiz
EM 13 · 06 · 2014

CONFERE COM O ORIGINAL
o Escrivão

Maria C de Oliveira

# Exhibit 11

Court of Justice of the State
of Rio de Janeiro
Page
2
Stamped Electronically

## BM&A │ATTORNEYS

BARBOSA, MÜSSNICH & ARAGÃO

HONORABLE. FIRST DEPUTY JUDGE OF THE EMINENT APPELLATE COURT OF JUSTICE
OF THE STATE OF RIO DE JANEIRO

"The creditors' meeting is sovereign in its decisions
regarding plans for bankruptcy protection.
**Nevertheless, the deliberations of this plan are
subject to the requirements of validity of legal
acts in general, these requirements are subject
to judiciary control**"(STJ, REsp no. 1314209,
Justice Nancy
Andrighi Reporter Third Chamber, dj 5/22/2012)

GRERJ     Electronic     no.     70706541065-32

**URGENT**

**AUTONOMY MASTER FUND LIMITED** ("AUTONOMY") , an investment fund with its
headquarters in Ugland House, Grand Cayman, KY1-1104, Cayman Islands, Postal Code 309,
**BRENNUS FUND LP**, a company with its headquarters in Intertrust Corporate Services Limited,
190 Elgin Avenue, Grand Cayman, KY1-9005, Cayman Islands, **CLAREN ROAD CREDIT
MASTER FUND, LTD**, a company with its headquarters in Ugland House, South Church Street,
George Town, Grand Cayman, KYI-1104, Cayman Islands, **CLAREN ROAD CREDIT
OPPORTUNITIES MASTER FUND, LTD**, a company with its headquarters in Ugland House,
South Church Street, George Town, Grand Cayman, KYI-1104, Cayman Islands, **ASPEN
CREEK PARTNERS, LP**, an investment fund with its headquarters in New York, 70 East 55th
Street, 10022, United States of America, **ANDROMEDA GLOBAL CREDIT FUND LTD**., an
investment fund with its headquarters in New York, 70 East 55th Street, 10022, United States of
America, **LYXOR / ANDROMEDA GLOBAL CREDIT FUND LTD**, a company with its
headquarters in New York, 70 East 55 Street, 10022-3384, United States of America, **EDMOND
DE ROTHSCHILD EMERGING BONDS**, an investment fund with its headquarters in Edmond
Rothschild     Asset     Management,     47     Rue     du     Faubourg     Saint-

TJRJ 20140034357 07/07/2014 18 49 00 GK~Z Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
3
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

Honoré, 75401 Paris Cedex 08, France, **FIRENZE CORPORATE INC.**, a company with its headquarters in Wickhams Cay, Flemming House, 5th floor, Road Town, Tortola, British Virgin Islands, **FIRST GENEVA HIGH YIELD FUND**, an investment fund with its headquarters at 11 Rue ALDRINGEN , 2960, Luxembourg, **GAM TRADING N. 37 INC.**, with its headquarters in New Jersey, Conway House, 7-9 Conway Street, St. Helier, United States, **RICARDO AUGUSTO GALLO**, Brazilian, engineer, married, holder of identity card RG no.9.705.346-SSP/SP, registered in the CPF/MF under no. 075355428-32, with offices at Rua Joaquim Floriano, 1120, cj. 131, São Paulo, State of São Paulo, **GLG EUROPEAN DISTRESSED MASTER FUND,** an investment fund with its headquarters in Ugland House, PO Box 309, George Town, Grand Cayman, KY1-1104, Cayman Islands, **GLG EUROPEAN DISTRESSED FUND**, an investment fund based Ugland House, PO Box 309, George Town, Grand Cayman, KY1-1104, Cayman Islands, **GLG MARKET NEUTRAL FUND,** an investment fund with its headquarters in Ugland House, PO Box 309, George Town, Grand Cayman, KY1-1104 , Cayman Islands, **EUROPEAN DISTRESSED MAC LIMITED**, a company based at 89 Nexus Way, Camana Bay, Grand Cayman, KYI 1205, Cayman Islands, **CROWN MANAGED ACCOUNTS SPC**, a corporation with its headquarters in Grand Pavilion Commercial Centre, 1st Floor, 802 West, Bay Road, George Town, Grand Cayman, Cayman Islands, **ITAVA INC**. ("ITAVA"), a company established in 3175 Road Town, Tortola, British Virgin Islands, **BRAX FUND**, an investment fund with its headquarters in UBS House, 227 Elgin Avenue, PO BOX 852, Grand Cayman, KY1-1103, Cayman Islands , **BNYM BRAZIL INTERNATIONAL FUND SPC ON BEHALF OF OFFSHORE JGP SEGREGATED PORTFOLIO**, an investment fund with its headquarters in 89 Nexus Way, Camana Bay, Grand Cayman, KYI-9007, Cayman Islands, **JEAN-JACQUES DURAND**, French, holder of passport no. 12CR52628, married, fund manager, residing at 45 rue de Chezy, 92200, Neuilly, France, **NOVEL CAPITAL GROUP LIMITED**, a company with its headquarters in South Road, Shanghai 200120, People's Republic of China, **QUAKER EVENT ARBITRAGE FUND**, a trust with its headquarters at309 Technology                                                                                    Drive,

TJRJ 20140034357 07/07/2014 18 49 00 GK-Z Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

2

Court of Justice of the State
of Rio de Janeiro
Page
**4**
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

Malvern, PA 19355, United States of America, **SHAHRIAR SHAHIDA**, an individual residing in New York, 3 Heathcote Road, Scarsdale, 10583, United States of America**, SUSQUEHANNA IRELAND LIMITED**, a company with its headquarters in Dublin 1, 4th Floor, George's Dock House , IFSC, Ireland, **CAPITAL VENTURES INTERNATIONAL**, with its headquarters at c / o Susquehanna Advisors Group, Inc., 401 City Avenue, Suite 220, Bala Cynwyd, PA 19004, United States of America, and **VR GLOBAL PARTNERS LP**, with its headquarters in Intertrust Corporate Services (Cayman) Ldt., 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands (jointly, the "APPELLANTS"), by their attorneys, with legal grounds in Articles 522 and following of the CPC, file an

### INTERLOCUTORY APPEAL
### WITH A REQUEST FOR SUSPENSIVE EFFECT

against the decision of pages. 7891/7.907[1], by which the judgment of the 4th Corporate Court of Central Court of the District of Rio de Janeiro, State of Rio de Janeiro, **approved plans for judicial reorganization riddled with nullities, approved by a conflicted majority of creditors in the general assembly of creditors held on 06.03.2014** ("AGCs "), in the records of the judicial reorganization No 0377620-56.2013.8.19.000 ("JUDICIAL REORGANIZATION"), proposed by **PETROLÉO AND GÁS PARTIÇÕES SA - IN JUDICIAL REORGANIZATION** ("OGX HOLDINGS"), currently called OGX Petroleo e Gas Participações SA, a publicly traded company, registered in the CNPJ / MF under no. 07.957.093/0001-96, **OGX PETROLÉO AND GÁS SA- IN JUDICIAL REORGANIZATION** ("OGX"), a privately held company, registered in the CNPJ/MF under no. 08.926.302/0001-05, both with their headquarters at Rua do Passeio, no. 56, 10th, 11th and 12th floors, City and State of Rio de Janeiro, **OGX INTERNATIONAL GMBH - IN JUDICIAL REORGANIZATION** ("OGX INTERNATIONAL"), a company registered with the Commercial Court of Vienna under no. FN 335513 b, with its headquarters at

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 20140034357 07/07/2014 18 49 00 Gk=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
5
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

Schwarzenbergplatz 5/Tio Nr.2 / 3, 1030, Vienna, Austria, and **OGX AUSTRIA GMBH - IN JUDICIAL REORGANIZATION** ("OGX AUSTRIA"), a company registered with the Commercial Court of Vienna under the no. FN 335512, CNPJ / MF under no. 16.885.474/0001-06, with its headquarters in Schwarzenbergplatz 5/Tio Nr.2 / 3, 1030, Vienna, Austria (jointly, the "OGX GROUP", "COMPANIES UNDER REORGANIZATION" OR "APPELLANTS").

In accordance with Article 525 of the CPC, the APPELLANTS report that the  appeal is accompanied by corroborative guides for gathering costs due and copies of the following documents:

**(i)** petitions for individualization of claims of bondholders of the APPELLANTS, which consist of powers of attorney and proxies for their attorneys(**doc**. 1)

**(ii)** decision that initiated the individualization procedure (**doc. 2** - pgs. 4,162/4,167)

**(iii)** initial petition for JUDICIAL REORGANIZATION (**doc. 3**)

**(iv)** articles of incorporation and powers of attorney granted to the attorneys of the APPELLANTS (**doc. 4**);

**(v)** decision establishing the JUDICIAL REORGANIZATION, appointing Deloitte Touche Tohmatsu Independent Auditors as the judicial administrator ("JUDICIAL ADMINISTRATOR") and the respective agreement signed by it, in addition to the powers of attorney for their attorneys (**doc. 5**)

**(vi)** Lists of creditors of the OGX GROUP submitted by the JUDICIAL ADMINISTRATOR (**doc. 6**);

**(vii)** initial reorganization plans, submitted on 2/18/2014 ("INITIAL PLANS" -**doc. 7**);

**(viii)** addendums to the reorganization plans, submitted on 5/23/2014 ("NEW PLANS", "APPROVED PLANS" or "PRJ" [Portuguese acronym for "Judicial Reorganization Plans"]-**doc. 8**);

**(ix)** minutes of the General Creditors' Assembly [AGC by its acronym in Portuguese] and respective attendance lists (**doc. 9**);

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

4

Court of Justice of the State
of Rio de Janeiro
Page
6
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

**(x)**    appealed decision, which approved the APPROVED PLANS and authorized the judicial reorganizations and respective summons (**doc. 10**);

**(xi)**    objection of AUTONOMY to the INITIAL PLANS (**doc. 11**);

**(xii)**    embargos of the declaration of AUTONOMY of 1/31/2014 (**doc. 12**);

**(xiii)**    opinion of the Public Ministry concerning the embargos of the declaration of AUTONOMY, as well as concerning the INITIAL PLANS (**doc. 13**)

**(xiv)**    petition of the COMPANIES UNDER JUDICIAL REORGANIZATION reporting their agreement with the bondholders holding the majority of the supposed voting capital of the AGCs, presenting the operation called "DIP FINANCING" and requesting the encumbrance of all the relevant assets of the COMPANIES IN JUDICIAL REORGANIZATION (**doc. 14**);

**(xv)**    preliminary opinion of the Public Ministry concerning DIP FINANCING (**doc. 15**);

**(xvi)**    statement of the JUDICIAL ADMINISTRATOR concerning DIP FINANCING (**doc. 16**);

**(xvii)**    petition from AUTONOMY informing that it and other minority bondholders requested the OGX GROUP to allow them to participate in the DIP FINANCING, but were prevented from investing in the COMPANIES IN JUDICIAL REORGANIZATION (**doc. 17**);

**(xviii)**    petition from AUTONOMY providing the court with the amount, deposited by it and other minority bondholders, of US$ 10.4 million for the purposes of investment in the COMPANIES IN JUDICIAL REORGANIZATION (**doc. 18**);

**(xix)**    new petition of the COMPANIES IN JUDICIAL REORGANIZATION for encumbrance of practically all their assets as a guarantee for the DIP FINANCING (**doc. 19**);

**(xx)**    material fact disclosed by the OGX GROUP on 3/13/2014 (**doc. 20**)

**(xxi)**    decision handed down by the court *a quo* permitting the encumbrance of assets as a guarantee of the DIP FINANCING (**doc. 21**);

**(xxii)**    certificate indicating that all the APPELLANTS submitted their motions   of individualization, but acknowledging that not all are recorded and numbered by the registry (**doc. 22**);

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

5

Court of Justice of the State
of Rio de Janeiro
Page
7
Stamped Electronically

**BM&A |ATTORNEYS**

MÜSSNICH & ARAGÃO

(xxiii)   writ of mandamus requested by Diamond Offshore Netherlands BV ("DIAMOND") against the decision that denied suspension in relation to its interlocutory appeal against the decision that granted the participation of the bondholders in the AGC (**doc. 23**);

(xxiv)   preliminary injunction in relation to the writ of mandamus of DIAMOND (**doc. 24**);

(xxv)   writ of mandamus petitioned by Perenco Petróleo e Gás do Brasil Ltda. ("PERENCO") (**doc. 25**);

(xxvi)   decision approving the withdrawal of the writ of mandamus of PERENCO (**doc. 26**);

(xxvii)   decision approving the withdrawal of the writ of mandamus of DIAMOND (**doc. 27**);

(xxviii)   Objections to the INITIAL PLANS submitted by PERENCO and by DIAMOND (**doc. 28**);

(xxiv)   Material fact of the OGX disclosed on 12/24/2013 concerning the conclusion of the Plan Support Agreement and the negotiation with the OSX (**doc. 29**).

Authorized by article 365, IV, of the CPC, the attorneys of the APPELLANTS declare, under their personal liability, for all purposes of the law, the authenticity of the copies of the documents that comprise the appeal.

In accordance   with the provisions of article 524, III, of the CPC, the APPELLANTS report that they are represented by the undersigned attorneys **Felipe Evaristo dos Santos Galea** and **Thomaz Luiz Sant' Ana**, registered in the OAB/SP, respectively, under the nos 220,280 and 235,250, both with their offices at Av. Presidente Juscelino Kubitschek, no. 1,455, 11th floor, CEP 04543-011, City and State of São Paulo, and **Rafael da Rocha Castilho,** registered in the OAB/RJ under no. 130,641, with this office at Avenida Almirante Barroso no. 52, 29th Floor, CEP 20031-000, City and State of Rio de Janeiro.

The APPELLANTS are represented by the attorneys **Sérgio Bermudes, Marcio Vierira Souto Costa Ferreira, Marcelo Fontes, Marcelo**

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

6

Court of Justice of the State
of Rio de Janeiro
Page
8
Stamped Electronically

## BM&A |ATTORNEYS

MÜSSNICH & ARAGÃO

**Lamego Carpenter** and **Fabiano Robalinho Calvacanti,** registered in the OAB/RJ, respectively, under nos. 17,587, 59,384, 63,975, 92,518 and 95,237, all with their offices at Praça XV de Novembro, 20 7th and 8th floors, CEP 20010-010, City and State of Rio de Janeiro.

The JUDICIAL ADMINISTRATOR is **Deloitte Touche Tohmatsu Consultores Ltda**., with offices at Avenida Presidente Wilson, 22nd floor, City and State of Rio de Janeiro, represented by Mr. Luiz Vasco Elias and by the attorney Eduardo Guimarães Wanderley, registered in the OAB/RJ under no. 285,314, with his office at Avenida President Wilson, no. 231, 23rd floor, CEP 20030-021, City and State of Rio de Janerio, and, registered in the OAB/RJ under no. 285,314, at Avenida Brigadeiro Faria Lima no. 3,477, 16th floor CEP 04538-133, City and State of São Paulo.

They request that this appeal be received with a suspensive effect and, finally, that it be approved, pursuant to the attached reasons, exceptionally extensive, but still necessary, given the complexity of the matter and the quantity of illegalities incurred

Finally, they request that all the publications and summons be performed cumulatively and exclusively, under penalty of nullification, in the name of the undersigned attorneys in this document.

Rio de Janerio, July 7, 2014

[signature]
Felipe Evaristo dos Santos Galea
OAB/SP no. 220,280
[signature]
Rafael Castilho
OAB/RJ no. 130,641
[signature]
Matheus Barcelos
OAB/RJ no. 163,2978

[signature]
Thomaz Luiz Sant' Ana
OAB/SP no. 235,250
[signature]
Igor Silva de Lima
OAB/SP no. 281,482
[signature]
Gustavo dos Reis Leitão
OAB/SP no. 344,763

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 2014003435707/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
9
Stamped Electronically

**M&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

### REASONS FOR APPEAL

**APPELLANTS:** Autonomy Master Fund Limited, Brennus Fund Lp, Claren Road Credit Master Fund, Ltd., Claren Road Credit Opportunities Master Fund, Ltd., Aspen Creek Partners, Lp, Andromeda Global Credit Fund Ltd., Lyxor/Andromeda Global Credit Fund Ltd, Edmond De Rothschild Emerging Bonds, Firenze Corporate Inc., First Geneva High Yield Fund, GAM Trading N. 37 Inc., Ricardo August Gallo, GLG European Distressed Master Fund, GLG European Distressed Fund, GLG Market Neutral Fund, European Distressed Mac Limited, Crown Managed Accounts Spc, Itava Inc., Brax Fund, BNYM Brazil International Fund SPC on behalf of JGP Offshore Segregated Portfolio, Jean-
Jacques Durand, Novel Capital Group Limited, Quaker Event Arbitrage Fund, Shahriar Shahida, Susquehanna Ireland Limited, Capital Ventures International and VR Global Partners L.P.

**RESPONDENTS:** Óleo e Gás Participações S.A. - In Judicial Reorganization, OGX Petróleo e Gás S.A. - In Judicial Reorganization, OGX International Gmbh - In Judicial Reorganization and OGX Austria Gmbh - In Judicial Reorganization.

**ORIGIN**: Court of Law of the 4th Commercial Court of the Central Forum of the District of Rio de Janeiro, State of Rio de Janeiro.

### INTERLOCUTORY APPEAL

Honorable Court,

.I.
### INTRODUCTION

1. Unfortunately, this appeal, which would be the largest proceeding of its kind in all of Latin America, cannot be, at this point, considered as an example of judicial reorganization, because it has distorted basic legal concepts and the results of the assembly, revoked by the decision under appeal, clearly  the result of

TJRJ 20140034357 07/07/2014 18 49 00 GK<Z Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jușcelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
10
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

deception by the RESPONDENTS, which now merits reform.

2. If the actions of the COMPANIES IN  REORGANIZATION prevail in relation to specially chosen creditors, an excellent opportunity will be lost to demonstrate the soundness of the legal institutes of the country. The risk is that this will become an interesting attempt to adapt the institutes of comparative law into an illegal discrimination tool, including future potential investigations of potential , in theory, bankruptcy crimes, undermining the confidence of national and foreign investors in Brazilian companies.

3. The APPELLANTS are creditors of the COMPANIES UNDER  REORGANIZATION, holders of bonds which, in total amount to the value of $ 288,421 million and, during the entire JUDICIAL REORGANIZATION, demonstrated that they did not oppose the operations of preservation of the COMPANY UNDER REORGANIZATION. **Quite the contrary!**

4. Precisely because they are creditors of the OGX GROUP, the APPELLANTS would face a huge loss with the possibly unnecessary bankruptcy of a group in which they believed and invested so that they could continue to make great efforts to contribute to overcoming the economic and financial crisis of the COMPANIES UNDER REORGANIZATION, while it is feasible.

5. However, they are seeking, **in a legitimate manner,** that **the process of judicial reorganization of the OGX GROUP be carried out within legal limits**, in a clear and transparent manner. The Judiciary Branch cannot permit a restructuring that restricts the possibility to contribute to the success thereof, with differentiated treatment within the same class and origin.

6. This has occurred in this case, in violation of relevant principles of Law 11,101/2005 ("LRF - Financial Responsibility Law"), entailing a **distortion of the results of AGCs**.

7. Indeed, the PRJs are based on extra-bankruptcy financing ("DIP FINANCING") and the conversion of this and of bankruptcy credits

**RASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel.+ 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 201400034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
**11**
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

into a participation in a new restructured company ("RESTRUCTURED OGX").

8. In this financing, the RESPONDENTS created EXCLUSIVE AND EXTREMELY DISPROPORTIONATE advantages in favor of some creditors, "coincidentally" those most necessary for the approval of PRJ, leaving no room for participation from others, who were obliged to watch these illegalities, being defeated by the majority evidently with a conflict of interest in relation to voting in the AGCs, and furthermore coercively giving general discharges to those who acted illegally.

9. But, as will be demonstrated below, the creditors holding the majority of the voting capital in the AGCs ("MAJORITY BONDHOLDERS")  (without a conflict of interest, as will become clear below), only for this reason, **cannot have exclusive rights in new investments granted to the COMPANIES IN JUDICIAL REORGANIZATION, with such disproportionate real gain in the investment that it serves to offset the loss  of the bankruptcy debt.**

10. Just to have a general idea of **seriousness of such disproportionate benefits**, it is worth pointing out that if the actual process plays out as it is now, **the price to be paid by bankruptcy creditors for  each share of the RESTRUCTURED OGX stock is 75.7 times the price to be paid by MAJORITY BONDHOLDERS!**

II.
SUMMARY OF THE DISPUTE

11. On 10/30/2014, the COMPANIES IN JUDICIAL REORGANIZATION proposed the JUDICIAL REORGANIZATION (docs. 3 and 5).

12. On 1/21/.2014, the COMPANIES IN JUDICIAL REORGANIZATION reported by petition (pp. 488/500 of doc. 14) the conclusion of an agreement with the MAJORITY BONDHOLDERS,

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 21 2719 - 4597

TJRJ 2014 003 4357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
**12**
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

holders of the majority of outstanding bonds issued by OGX AUSTRIA, valued at approximately US$ 2 billion (i.e., **more than half of the bankruptcy claims**), guaranteed by OGX PARTICIPAÇÕES and by OGX.

13. Consequently, this was an agreement with creditors subject to JUDICIAL REORGANIZATION regarding their already established credits on the date of the application, which essentially involved two financings: the first, called a "BRIDGE LOAN", and the second, DIP FINANCING, this being convertible into shares of the RESTRUCTURED OGX (p. 489 of doc. 14).

14. Additionally, the RESPONDENTS stated that "the OGX Group **granted to the Participating Bondholders** — or to whomever the Participating Bondholders indicated — **the right to subscribe** in proportion to their respective credits to the **first series of the DIP Financing** (irrespective of the instrument used), up to the amount of US$ 110 million. (...) On the other hand, the **second series of DIP Financing** (irrespective of the instrument used) up to the limit of US$ 105 million will be subscribed by all unsecured creditors of the OGX Group that indicate their interest, **in addition to the financers** (**including Participating Bondholders and/or their designees) of the first series of DIP Financing**, always in proportion to their credits, "(pp. 492/493 of doc. 20- emphasis added).

15. This agreement was reflected in the *Plan Support Agreement*-"*PSA*" (pp. 507/577 of doc. 14-in Portuguese, **having the emblematic name of "agreement to support the plan"**), which, in essence, is an agreement by which the MAJORITY BONDHOLDERS **assumed the disputed commitment to vote for the approval of the PRJ**[2] in return for more favorable treatment

---

[2] "(...) Each holder individually and not jointly), on its behalf and on behalf of subsidiaries controlled by it, agrees to: (a) **vote, based on their respective loans**, for which are the effective owners, now or in the future, or in relation to which, now or in the future, this Participating Holder acts as the designated person, investment manager or consultant for actual holders thereof, **in favor of the plan in accordance with the procedures established in the BRL (...) d) not  (i) to contest the Plan or the acceptance, approval and implementation of the Plan;** (ii)to initiate any legal proceedings that are inconsistent with, or that prevent, frustrate or hamper the

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31º andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10º andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 20140034357 07/07/2014 18 49 00 GK<Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
13
Stamped Electronically

**BM&A | ATTORNEYS**

MÜSSNICH & ARAGÃO

than that conferred to other creditors bondholders, including the RESPONDENTS.

16. In the end, a reciprocal convenience understandable only when viewed through the eyes of the participants, but abominable to whoever was not invited to the "party."

17. This fact is recognized by the COMPANIES IN JUDICIAL REORGANIZATION themselves, which when referring to the PSA, simply state: "the completion of the PSA is of fundamental importance for the companies under reorganization. First, because it sets out the **conditions for the possible approval of a future judicial reorganization plan, that is acceptable to a significant portion of the creditors.** Obviously the plan still will be presented and voted on, pursuant to the law, for all creditors subject to judicial reorganization. However, **the simple indication that a representative portion of the creditors accept it, in principle, given that it is very promising that the conditions precedent have been complied with, as stipulated in the PSA and other documents and related agreements which may be concluded between the parties, to convert their credits into shares of the company,** "(emphasis added - p.. 902 of doc. 19).

18. As the Public Ministry itself noted in its scathing opinion on p. 1830 of doc. 15: "*In other words, rather than **negotiating openly with all creditors to seek this new capital**, with equal terms and information, offering them under equal conditions 'the same 'exchange or conversion factor '*, **the companies in judicial reorganization decided to choose, at their pleasure, who those bondholders involved would be** (...)" (emphasis added).

19. Because the COMPANIES IN JUDICIAL REORGANIZATION were already  aligned with the majority of credits  considered necessary, the participation of other creditors became

approval, confirmation or implementation of the Plan or the operations described in it (...)" (emphasis added - pp. 516/517 of doc. 14

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TIRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
**14**
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

secondary, and the process became a mere "going through the motions". It continued step by step, in an attempt to follow the minimum legal formalities, to reach the grand moment previously agreed upon between the RESPONDENTS and the MAJORITY BONDHOLDERS: the approval of the PRJ in  meeting that was so subdued for them that the largest judicial reorganization in the history of the country was not even referred to.

20. In this vein, the rights of other creditors were systematically violated, including those to promote new investments in the COMPANIES IN JUDICIAL REORGANIZATION.

21. On 1/24/2014, the OGX Group requested the encumbrance of assets to obtain immediate capitalization (doc. 19 )- a guarantee required by the MAJORITY BONDHOLDERS who now tried to justify their immense and unique benefits claiming a risk, however, non-existent, when it stated that "for months on end, it had sought, without success, financing opportunities in the Brazilian and international market" (pp.. 902 of doc. 19), and sought out with its 'goodwill "(...) other creditors that although silent until this moment, would demonstrate interest in effectively financing the company (...) " (p. 906 of doc. 19).

22. On the basis of these statements, the JUDICIAL ADMINISTRATOR pointed out that *"the Companies In Judicial Reorganization reported in addition that they were not successful with any other sources of financing (...)"* (p. 916- emphasis added), **demonstrating that this is a relevant point.**

23. And it logically is! As will be seen below, DIP FINANCING presupposes equal treatment under the conditions offered to all creditors. This evidently did not occur, as  is evident on the record and with a clarity that "hurts the eyes". Only not seen is who wants to approve the PRJ at all costs, regardless of the illegality of such differentiated treatment.

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 2014003435707/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
15
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

24. The encumbrance of assets previously referred to was then granted by misleading the court *a quo* (doc. 21), causing the opposition, on 1/31/2014, to file petitions for clarification through AUTONOMY (doc. 12), in which discrimination against smaller (but still very relevant) creditors was initially reported, in order to avoid the illegalities indicated herein.

25. AUTONOMY proved that, on 1/23/2014 ---- before submitting the petition on pp. 901/doc 907.19 ----, and due to not having access to the proceedings of the JUDICIAL REORGANIZATION, **it notified the COMPANIES IN JUDICIAL REORGANIZATION, demonstrating its interest in knowing the terms of the agreements with the creditors and other related documents, and asking for equal treatmen**t (doc. 12).

26. However, it **was summarily ignored**, without any statement from the OGX GROUP, only reinforcing the assumption of differentiated treatment.

27. It was not the only minority bondholder seeking treatment equivalent to that of the majority bondholders. In the petition dated 2/14/2014 (pp. 1,378/1,426 doc. 17), AUTONOMY and other APPELLANTS also proved, through correspondence exchanged with the consultants of the OGX GROUP, that they contacted OGX in December 2013, when they became aware through related facts that something was occurring, expressing interest in being accepted as financiers under the same conditions as the MAJORITY BONDHOLDERS.

28. **Everyone saw the doors of the COMPANIES IN JUDICIAL REORGANIZATION slammed in their faces...**

29. And worse! Even though the COMPANIES IN JUDICIAL REORGANIZATION had sought out financial consultants for the capitalization of OGX in 2013, the alleged contact with 41 capital sources - according to the decision under appeal- would be far from being representative in relation to more than 200 creditors who deserve exactly the same treatment. But only a few had that privilege, so much so that there is no evidence of any structured negotiation with the APPELLANTS.

TJRJ 2014003435707/07/2014 18 49 00 GK=Z Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
16
Stamped Electronically

**BM&A |ATTORNEYS**

MÜSSNICH & ARAGÃO

30. The consideration that the DIP FINANCING was sufficiently and legally completed in 2013 corroborates the claim of APPELLANTS that the JUDICIAL REORGANIZATION became an empty process, because the negotiations with creditors were made behind the scenes, not in the light of the public.

31. So much so that there was enough time to give all creditors the opportunity to be admitted to all phases of the DIP FINANCING that, only four months after the communication of the creditors asking for equal treatment, OGX PARTICIPAÇÕES reported, due to a Material Fact disclosed to the market on 3/13/2014 (doc. 20), that the first step of the loan-favoring certain creditors-had been completed on that date.

32. Before that, even in the court records the APPELLANTS had already confirmed their interest (pp. 1,405/1,426 of doc. 17).

33. On 2/14/2014, the COMPANIES IN JUDICIAL REORGANIZATION submitted the FIRST PLANS (doc. 7). In a continuous act, on 4/4/2014 (doc. 11), AUTONOMY, along with other creditors put on the sidelines by OGX, presented an objection to the FIRST PLANS, highlighting the various illegalities contained therein, especially the glaring unequal treatment between creditors of the same class and origin: all bondholders.

34. The AGCs were set for 6/3/2014.

35. However, surprisingly, on the eve of the AGCs to be held, on 5/23/2014, the COMPANIES IN JUDICIAL REORGANIZATION added the FIRST PLANS to the APPROVED PLANS (individually, the OGX PRJ, the OGPAR PRJ and AUSTRIA PRJ).

36. Given the proximity of the AGCs, the APPELLANTS only had access to the changes proposed by the COMPANIES IN JUDICIAL REORGANIZATION through the website of the Securities Commission [ *Comissão de Valores Imobiliários*], since the 4th Commercial Chamber of Rio de Janeiro did not

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

**RASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel.+ 55 61 3218-0300
Fax.+ 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
**17**
Stamped Electronically

**BM&A |ATTORNEYS**
MÜSSNICH & ARAGÃO

publish a notice reporting the amendment to the FIRST PLANS, or even provide a copy of the additional records.

37. The COMPANIES IN JUDICIAL REORGANIZATION had created a new series of debentures.
As detailed below, the 1st series, in the amount of US$ 125 million, was maintained as before, but the 2nd series, US$ 90 million, subject to underwriting by any creditor in proportion to its credit, became the 3rd series. The new 2nd series, then would only exist for the excess of the 3rd series, and again would be exclusive to the MAJORITY BONDHOLDERS, resulting in more participation for them in the RESTRUCTURED OGX, which always was its primary purpose.

38. Before the AGCs were held, some supplier creditors apparently in an attempt to strengthen their representation, rebelled against the individualization of the claims of the bondholders, then listed as a single credit in relation to the trustee of the bonds, Deutsche Bank Trust Company Americas ("DEUTSCHE"). The argument was that the vote was a single vote, for all the bonds, which only could be exercised by DEUTSCHE, and this individualized treatment not respecting the procedure for enabling credit in relation to the Fiscal Responsibility Law was improper.

39. One of these creditors, DIAMOND, responding to the decision which determined the procedure of individualization (AI no 0022747 - 51.2014.8.19.0000, filed for injunctive relief with the 14th Civil Chamber of the H. TJRJ), requesting its suspension. The request for suspension was not granted and DIAMOND petitioned a writ of mandamus no. 0024882-6.2014.8.19.0000 with the Chief Judge of the H. TJRJ (doc. 23), and then the suspension of the effects of the decision of individualization of bondholders was granted. (doc. 24).

40. Another creditor, PERENCO, also filed a writ of mandamus (no. 0026517-52.2014.8.19.0000, with the Chief Justice of the H. TJRJ-doc. 25), and obtained a similar ruling, which permitted the realization of AGCs, but conditioned their outcome on the judgment of the writ (annex 1 of doc. 9).

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax +55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 20140034357 07/07/2014 18 49 00 GK<Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
18
Stamped Electronically

**BM&A |ATTORNEYS**
MÜSSNICH & ARAGÃO

41. The entire effort of the COMPANIES IN JUDICIAL REORGANIZATION and of the MAJORITY BONDHOLDERS could collapse because the PRJ, even before being discussed and voted on in the AGCs, were already virtually approved by these creditors with a conflict of interest//, but without these votes things could be different. **Exempt creditors would never agree with all the illegalities that were being proposed.**

42. Miraculously, on the eve of the AGC, DIAMOND withdrew its writ of mandamus and the suspension was revoked (doc. 27).

43. And, as a second miracle (really the COMPANIES IN JUDICIAL REORGANIZATION have all the luck!), PERENCO withdrew its writ of mandamus on the same day of the AGCs, which was eventually granted, due to the case law available, while they trudged along (doc. 26), allowing the realization of those acts as provided by the OGX Group and by the MAJORITY BONDHOLDERS.

44. Consequently, two creditors that were extremely active since the beginning of the process, with a high degree of belligerence against the OGX Group and the MAJORITY BONDHOLDERS (see their objections to the PRJ-doc. 28), simply decided to suddenly leave the scene, without any justification, but **also due to conduct worthy of investigation by the competent civil and criminal authorities** to satisfy themselves that there was no, in principle, improper negotiation behind the scenes - -plus one having potential!

45. The AGCs were held, and, surprisingly (or not after the above story), DIAMOND **approved** the PRJs and PERENCO abstained (doc. 9). The PRJs were also approved by the majority of creditors present, which means, the MAJORITY BONDHOLDERS and some meaningless suppliers (even a taxi cooperative) or whoever had significant credits, saw in a RESTRUCTURED OGX a needed customer.

46. The APPELLANTS were basically the only ones expressing their views in the

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
**19**
Stamped Electronically

**BM&A | ATTORNEYS**

MÜSSNICH & ARAGÃO

the AGCs, despite the huge amount of the overall debt, making their principal objections and suggestions for modification of the PRJ, but were again ignored by the COMPANIES IN JUDICIAL REORGANIZATION, who refused to discuss proposals, accompanied by the future controllers of the RESTRUCTURED OGX, the MAJORITY BONDHOLDERS.

47. Consequently, the APPELLANTS could only submit their votes in writing, completely rejecting the APPROVED PLANS (Doc. 9), due to the numerous illegalities contained therein.

48. Even with the glaring irregularities pointed out in the objection (doc. 11) and in the AGCs, the court *a quo* handed down the decision under appeal herein (doc. 10), which held that *"it considered the legal requirements had been met and granted the judicial reorganization of the petitioning companies, whose plan was approved at the general assembly of creditors held on 06/30/2014"*.

49. As will be demonstrated, this decision merits reform because, according to legal doctrine and case law, **it is unacceptable for a reorganization plan to without justification, violate the principle of equality among creditors, in addition to its violating several articles of the Financial Responsibility Law**, and the AGCs and APPROVED PLANS should be declared null and void, with the COMPANIES IN JUDICIAL REORGANIZATION being required to submit new plans. All of this pursuant to the Law and reiterated case-law, which has generally granted to companies in judicial reorganization this new opportunity instead of bankruptcy, which all creditors and also the APPELLANTS wish to avoid.

50. The situation of the case is unfortunate and merits reform, under penalty of loss of credibility of the Financial Responsibility Law and legal certainty. The APPELLANTS, mostly foreign investors, watched dumbfounded, not understanding how the judiciary could have been induced to encompass such great atrocities that will surely be corrected upon the decision of this appeal.

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 20140034357 07/07/2014 18 49 00 GK-Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
**20**
Stamped Electronically

**BM&A |ATTORNEYS**
MÜSSNICH & ARAGÃO

.III.
## REASONS FOR REFORM OF THE APPEALED DECISION

### III.1. POSSIBILITY OF JUDICIAL REVIEW OF REORGANIZATION PLANS: RELATIVE NATURE OF THE SOVEREIGNTY OF THE AGCs

51. The decision under appeal is based on the understanding indicated in it that the general assembly of creditors is sovereign, so *that "once the plan is approved by the assembly, the judge should grant the reorganization* **without that much room reserved to it for discretion (...) with it not being the responsibility the Public Ministry and the court to analyze the economic and financial feasibility of the reorganization plan**, *but only for the creditors"*(pp.7.891/7.892 doc -. emphasis added) [3].

52. However, the understanding that the general assembly of creditors is sovereign in relation to deciding on the reorganization plan, with it being the responsibility of the Judiciary Branch to merely ratify it, has been totally superseded..

53. As MARLON TOMAZETTE teaches, **"As judicial reorganization has the nature of an agreement, the meeting of minds between the debtor and its creditors is essential.** In order for this meeting of minds to occur, the debtor must take the initiative by submitting an initial proposal for agreement, the judicial reorganization plan. Such a proposal will only become effective if accepted by the creditors. As a result, the creditors should have the chance to express themselves in relation to the judicial reorganization plan" (emphasis added).

54. The contractual legal nature entails, as a direct consequence of the judicial reorganization plan, the fact that, as a legal business, it is subject to judicial control of the conditions of its existence, validity and effectiveness.

55. In contrast to what the judge says, this understanding is

[3] The appealed decision uses in this section the citation found in AYOUB, Luiz Roberto, and CAVALLI, Cassio. *Case law Construction of Judicial Reorganization of Companies, p.* 288.
[4] *Course of Business Law, Volume 3: bankruptcy and judicial reorganization.* São Paulo: Atlas 2011, p 195.

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
**21**
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

a *fait accompli* for the Judiciary, and there no longer exists any doubt that it can and should no longer approve plans of judicial reorganization when the existence of nullities are recognized-such as those identified in this appeal, with the possibility of putting **the AGCs into perspective.**

56.Nor could it be different, because the State holds the monopoly for resolution of conflicts, guaranteeing to everyone , in an broad manner, access to justice. Statement 44 of the 1st Workshop of Commercial Law of the CJF enshrined this understanding: *"**The approval of judicial reorganization plan authorized by the creditors is subject to judicial review of legality**".*

57.In this sense, MANOEL JUSTINO BEZERRA FILHO teaches: *"It should be noted that **the power of the General Assembly is not decisive, nor is it a  substitute for judicial power.** It is evident that the assembly, constituted by the creditors directly interested in the smooth progress of reorganization, should always bring to the judge the best deliberations, that comply in the most evident manner with the interest of the parties involved in the reorganization, both the debtor and the creditors. However, due to the constant emergence of conflicting interests in this kind of situation, **the judiciary will always be responsible for the decision, with deliberative power remaining with the assembly, with it being dependent on the jurisdiction for its implementation in the court documents**."* [5] (emphasis added) [6].

58. The legality of the deliberation approving the judicial reorganization plans **not only can but should be analyzed by the Judiciary Branch,,** even if the Supreme Court of Justice and the State courts have already stated their positions:

_____
[5]BEZERRA FILHO, Manoel Justino. Law of Reorganization of Companies and Bankruptcy. São Paulo: Revista dos Tribunais, 2011, p. 115/116.

[6]In this same sense: *"In my view, the systematic, theological and pragmatic interpretation, defended in the comments to the arts. 47, items 9 and 10, and 58, items 1 and 2, leads to the conclusion that **the court cannot be deprived of the powers and attributions that are assured to it by constitutional regulations and by the LOMAN, nor prevented from exercising control of  formal and substantial legality and, as the case may be, the control of the merits and deciding whether to reject the plan of the general meeting of creditors in relation to whether it :** a) would infringe on the public interest; b) is a case evident fraud; c)  is matter of violation of the LRF, etc, which obligates the court to go against the 'letter' of art. 56, § 4, and to not decree the bankruptcy".* [6] (LOBO, Jorge. Comments on the Law of Reorganization of Companies and Bankruptcy. Coordination Paulo F. C. Salles de Toledo and Carlos Henrique Abraham. São Paulo: Saraiva, 2005, p. 150.-emphasis added)

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
22
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

"*SPECIAL APPEAL. JUDICIAL REORGANIZATION. APPROVAL OF THE PLAN BY THE ASSEMBLY OF CREDITORS. JUDICIAL INVOLVEMENT. IMPOSSIBILITY. CONTROL OF LEGALITY OF THE PROVISIONS OF THE PLAN. POSSIBILITY. APPEAL DENIED. 1. The assembly of creditors is sovereign in their decisions regarding plans for judicial reorganization. **However, the deliberations of that plan are subject to requirements of validity of the legal acts in general, and those requirements are subject to judicial control.** 2. Special appeal known and not granted (...).The will of the creditors, upon approving the plan, must be respected within the limits of the law .**The sovereignty of the assembly to evaluate the conditions in which the economic recovery of the company in difficulty will occur cannot override legal conditions of the statement of will represented by the Plan.** In the same manner that it is prohibited for two individuals to include, in a contract a clause that leaves it up to the discretion of one of them to ignore the legal effects on the business, the same power cannot be conferred on the debtor in judicial reorganization. The law limits both situations.*" [7] (emphasis added)

"*First, it should be emphasized that **the sovereignty of the General Assembly of Creditors involves a serious misconception, when stated so simply and as if it were an absolute value**, because as Socrates and Plato taught, **the law is sovereign, not people**. Aristotle in Nicomachean Ethics, reinforced the concept of the sovereignty of the Law, harmonizing the idea of justice and equity. The philosopher of UNICAMP, ROBERTO ROMANO, in the masterful essay 'Above or Below the Law' mentions the thoughts of Leonardo Bruñí, thinker and politician of the Renaissance, when defining equity (epikeia). The Renaissance master says: Epikeia, is the part of justice that the legal consultants call 'ex bono et equo' (what is good and fair). The law is written in a certain way and must, however, be interpreted in accordance with the criteria of goodness and of fairness "(From Interpretatione Recta). Professor ROMANO continues: "But, on the other hand, every law should be interpreted according to justice. Neither with divergence nor legal reverence. Prudence leads the way: ' Whoever gives to others what belongs to them, because he knows the real and necessary reason for laws acts in constant agreement with it*

_____
[7] STJ, REsp 1314209/SP, Reporter Minister Nancy Andrighi, Third Chamber, d.j. 5/22/2012

BRASÍLIA
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

SÃO PAULO
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
23
Stamped Electronically

**BM&A ⎪ATTORNEYS**
MÜSSNICH & ARAGÃO

*and with this being done by his own Decree, not by an outside Decree:*
*it deserves therefore to be recognized as fair'. "* (Baruch Spinoza, Theological-Political Treatise), 'in ', The State of São Paulo, 12/5/2001, p. A2). **In line with such teaching, one can only say that the General Assembly of Creditors is sovereign, when it obeys the Constitution of the Republic, its principles and rules and the constitutional laws. If the General Assembly of Creditors approves through a quorum established by Law no. 11,101/2005 a plan that violates principles or rules, it is the responsibility of the Judiciary Branch [which, as I have already stated, is not mere ratifier of assembly deliberations, as it has the power -duty to not apply unconstitutional rules] to refuse to approved a plan with defects"**[8]

"INTERLOCUTORY APPEAL. ACTION OF JUDICIAL REORGANIZATION. EXISTENCE OF DEFECTS IN THE REORGANIZATION PLAN. INVALIDITY OF THE GENERAL ASSEMBLY OF CREDITORS. APPROPRIATENESS. DETERMINATION OF SUBMISSION OF ANOTHER PLAN. APPEAL PARTIALLY APPROVED. **The General Assembly of Creditors only is considered as sovereign for approval of the plan if this does not violate the general principles of law, the principles and rules of the Federal Constitution and the rules of public order of Law/9 2005 11,101.**"[9] (emphasis added)

"INTERLOCUTORY APPEAL. JUDICIAL REORGANIZATION. INTERIM DECISION THAT APPROVED THE JUDICIAL REORGANIZATION PLAN. OPPOSITION OF THE UNSECURED CREDITOR BANK. MERIT. **SOVEREIGNTY OF THE DECISION TAKEN IN THE ASSEMBLY OF CREDITORS MITIGATED. POSSIBILITY OF THE JUDICIARY REVIEWING THE LEGALITY OF THE PLAN.** CONDITIONS FOR PAYMENT OF UNSECURED CREDITORS THAT PREJUDICE EQUALITY. GRADUAL IMPOSITION OF DISCOUNTS IN ACCORDANCE WITH THE VALUE OF THE DEBT ONLY FOR A PART OF THE CREDITORS. FOUR METHODS OF COMPLYING WITH THE OBLIGATIONS WITHIN THE

---

[8] TJSP, Special Chamber for Bankruptcy and Judicial Reorganization – Interlocutory appeal no. 0136362-29.2011.8.26.0000, reporter Manoel de Queiroz Periera Calças, d.j. 2/28/2012
[9] TJPR, 17th Civil Chamber, Interlocutory Appeal no. 984.390-7, reporter. Mário Helton Jorge, d.j. 8/14/2013

TJRJ 201400034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
24
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

SAME CLASS. VIOLATION OF § 2 OF ARTICLE 58 OF LAW 11/101/05.
ANNULMENT OF THE DECISION THAT APPROVED THE SUBMITTED PLAN
THAT IS IMPOSED (...) [10] (emphasis added)

59. It is undeniable that, in the case in question, **this H. TJRJ not only can, but must analyze the results of the AGCs, revoking the approval of the APPROVED PLANS.**

60. The arguments set forth above also serve as the basis to remove the understanding of the appealed decision [11] that the agreement of the majority, that is, the approval of the reorganization plan, goes back to the provisions of these laws.

61 Nothing could be more absurd! Even more so considering the case of the documents, in which the major portion of the voting capital in one of the AGCs, for the PRJ, will make it the controller of the COMPANIES UNDER JUDICIAL REORGANIZATION and previously it agreed to approve them, being broadly favored by them, in an evident conflict as detailed further below.

62. In other words, the MAJORITY BONDHOLDERS ensured the special exclusive conditions, had them recorded in the PRJ and approved them, distancing all others from all of this (at least apparently, because it is not known what happened with the credit of DIAMOND and PERENCO, who suddenly changed from enemies to saviors), and the APPELLANTS were defeated due to being a minority in the deliberation.

_____
[10] TJSC, Chamber of Commercial Law, Interlocutory Appeal no. 2013,02642-8, reporter Guilherme Nunes Born, d.j. 2/27/2014
In the same sense: TJRS, 5th Civil Chamber, Interlocutory Appeal no. 70055202303, reporter Jorge Luiz Lopes do Canto, d.j. 9/11/2013; TJSP, Special Chamber for Bankruptcy and Judicial Reorganization, Interlocutory Appeal no. 0168318-63.2011.8.26.0000I, reporter Manoel de Quiro Pereira Calças, d.j. 4/17/2012; TJSP, Chamber Reserved for Bankruptcy and Judicial Reorganization, Interlocutory Appeal no. 0264287-.08.211.8.26.0000, reporter Manoel de Quiro Pereira Calças, d.j. 7/31/2012; TJSP 1ST Chamber Reserved for Corporate Law, Interlocutory Appeal no. 0076442-56.2013,8,26,000 rep. Ênio Zuliani, d.j. 8/29/.2013; TJSP, 2nd Chamber of Company Law, Interlocutory Appeal no. 0134155.86.2013.8.26.0000, Reporter Lígia Bisogni, d.j. 12/9/2013.
[11] "Notwithstanding the denied position, the understanding is set out that these aspects are superseded by the essence of the questioning that was denied for a minority portion of the creditors, bondholders that did not participate in the first tranche, due to the exuberant voting results due to the number of creditors and due to the value of the credits achieved in the assembly of creditors and also due to the decision in relation to the Put option" (p. 7,893 of doc. 10)

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 2014.00.34357 07/07/2014 18 49 00 GK<Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
25
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNIC66H & ARAGÃO

63. The judge *a quo* was misled by the fallacy, never proven with evidence (incidentally, the evidence displays exactly the opposite) that everyone had the opportunity to participate, but only a few benevolent individuals were willing to allow this, with it being considered as fair that they could have everything they wished.

64. This makes absolutely no sense!

65. Anyway, as the possibility for the Judiciary Branch to examine the illegalities contained in the PRJ is indisputable, it is necessary to demonstrate these illegalities in detail, as will be done below, after the absolute nullity of the AGCs is indicated in relation to the abuse of the voting rights arising from the conflict of interests of the MAJORITY BONDHOLDERS.

## III.2. NULLITY OF THE AGCs: ABUSE OF THE VOTING RIGHTS AND CONFLICT OF INTEREST

66. As can be determined from the respective acts and written votes submitted (doc. 9), at the initiation of the AGCs the representative of the APPELLANTS requested from the JUDICIAL ADMINISTRATOR that the credits of the MAJORITY BONDHOLDERS not be considered for the establishment of the quorums for the holding of the AFGs and the deliberation of the PRJ, bearing in mind the conflict of interests arising from the exclusive and illegal transactions previously established with the COMPANIES UNDER JUDICIAL REORGANIZATION, that obligated the MAJORITY BONDHOLDERS to approve the proposals as a condition for their handouts.

67. Consequently, the APPELLANTS remind you of the following, in summary (the illegalities of the PRJs will be detailed in other chapters of this appeal):

(i) the opportunities to obtain an economic benefit given exclusively to the MAJORITY BONDHOLDERS (especially through exclusive subscription of the 1st SERIES DEBENTURES and 2ND SERIES DEBENTURES, as defined in the PRJs, amply demonstrated in the

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
26
Stamped Electronically

**BM&A |ATTORNEYS**

MÜSSNICH & ARAGÃO

objection to the reorganization submitted by AUTONOMY (doc. 11);

(ii) that, in order to obtain exclusive advantages, the MAJORITY BONDHOLDERS previously negotiated the PRJs and agreed to approve them, including signing a so-called "plan support agreement" (the PSA);

(III) that, on their own, the MAJORITY BONDHOLDERS hold the majority or large part of the credits in discussion; and

(iv) that the approval of the previously negotiated PRJ by the MAJORITY BONDHOLDERS was with the intention of granting to them discharge of the business that is the subject of the PSA, intending in addition to prevent other measures by the creditors of the OGX GROUP against them, the MAJORITY BONDHOLDERS and even DEUTSCHE.

68. However, the JUDICIAL ADMINISTRATOR, without giving any reasons, singularly rejected the request of the APPELLANTS and recorded (i) the presence of the MAJORITY BONDHOLDERS as the establishment of the quorum and (ii) their favorable votes for the PRJ.

69.This permitted the MAJORITY BONDHOLDERS to abuse their right to vote, arising from the clear conflict of interest, and they approved the PRJ without changing so much as one single comma, a rare posture for creditors with billions of reais in claims (finally, they had the exclusive opportunity to do so for many months prior to the AGCs).

70.Naturally, no one would expect anything different from a group of creditors that will have an enormous actual profit on their investment, through the conversion of their claims into control of the RESTRUCTURED OGX only because

<div style="writing-mode: vertical">TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition</div>

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
27
Stamped Electronically

**BM&A |ATTORNEYS**
MÜSSNICH & ARAGÃO

they had the majority sufficient for the approval of the PRJ, especially in relation to OGX AUSTRIA, the issuer of the bonds that originated its credit.

71. And furthermore: **they abused this right to vote to guarantee that other creditors could not even suggest changes in the PRJ voted for in the AGCs.**

72. All of this became explicit in the AGCs (doc. 9), as the COMPANIES IN JUDICIAL REORGANIZATION, despite allegedly having drafted and submitted the PRJ, when questioned at least three times by the attorneys of the APPELLANTS concerning possible changes to reduce the differentiated treatment[12], rejected them because, according to the PSA[13], they required the approval of the MAJORITY BONDHOLDERS.

73. It was only for this reason that the attorney of the APPELLANTS requested that the MAJORITY BONDHOLDERS make a statement concerning the requests for changes[14], as the COMPANIES IN JUDICIAL REORGANIZATION were prevented by them from making any change. But logically the response was negative, under the unusual argument that the attorney did not have the authority for this (doc. 9).

_____

[12] ... Mr. Felipe Galea proposed to the COMPANIES IN JUDICIAL REORGANIZATION that the amount attributable to OSX not be counted for the purpose of subscription rights of the third series ...". Mr. Thomaz Sant 'Ana (...) proposed that at least the 3rd series should not be subscribed by backstop lenders initially and that, if there was anything remaining, that these be submitted to other creditors."   •
[13] As provided for in the PSA contractual obligation: (j) Unless otherwise agreed in writing by the Participating Holders, to the extent that the Companies agree to any creditor on any holder of any Notes in relation to the terms of any creditor or holder of any notes on the terms of any tolerance, lock-up, support or similar agreement concerning terms and conditions that are more favorable than those offered to the Participating Holders, the Companies shall promptly provide written notification to the Participating Holders in relation to this agreement, and this agreement shall be immediately considered amended to include the most favorable conditions, without need for further action. (...) (l) **not to carry out any transaction with any affiliate of any Companies without the prior consent of the Participating Note Holders**, except for payment (A) for temporary use of FPSO 1 during 2014 and certain costs of disengagement and disconnection in relation thereto, subject to the charter rates, terms and limits set out in Annex 1 hereof ("FPSO Summary") or (B) for OSX-3 per the terms of the Charter Contract (...) of OSX-3 or as expressly permitted under the Documents Relating to the Plan that are in effect at that time "(pp.523/524 doc. 14).
[14] "Mr. Thomas Sant 'Ana claimed that, per his understanding, the Companies in Judicial Reorganization were prohibited from negotiating the terms of the plan and that inquiries were made to the representatives of the backstop lenders regarding the proposals made."

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 20140034357 07/07/2014 18 49 00 GK<Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
28
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

74 . In other words, although the AGCs  were the forum for discussion and modification of the PRJ (Judicial Reorganization Plan) (art. 35, I, "a" of the LRF), this discussion was not feasible due to the impositions of the MAJORITY BONDHOLDERS that were binding on COMPANIES IN JUDICIAL REORGANIZATION.

75 . The abuse of voting rights by the MAJORITY BONDHOLDERS is evident.  They voted for something they themselves proposed or at least were obligated to approve in order to receive immense and exclusive perks and already denounced above and in the objection of AUTONOMY (doc. 11).

76-. • This fact characterizes an undeniable conflict of interest in voting, which prohibits the MAJORITY BONDHOLDERS from participating, **invalidating and nullifying the entire deliberation**, due to the absence of exemption.

77. However, this brutal illegality, which could have been curbed by the Judiciary, received the "endorsement " of the decision under appeal, which simply stated that **(i)** *"the voting of the creditor bondholders who claimed to have been subjected to unequal treatment did not have any relevance in the outcome of the assembly of creditors for the approval of the reorganization plan,"* and **(ii)** even without the MAJORITY BONDHOLDERS, the plan of OGX (a company which will now be conferred an extreme importance in the decision supposedly *"due to being the holding company and the main guarantor of the credits"*) would be approved as a consequence of the *"exuberant voting due to the number of creditors and the credit value "*(pp. 7893-7894 of doc. 10).

78.None of these arguments is minimally convincing..

79. It is of little matter whether it was the vote of the majority or the minority that was the subject of abuse due to conflict of interests.  According to doctrine, "*the discipline of voting in conflict of interest - which is a kind of abuse of the right to vote - is intended to protect the interest of the group, being therefore applicable to both the majority vote*

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
29
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

*as well as that of the minority."[15]*

80. Finally, illegality does not become legality due to the will of the majority.

81. Furthermore, in relation to the first argument of the sentence indicated above, it is obvious that *"the voting of creditor bondholders that claim to have been subjected to unequal treatment did not have any relevance in the result of the assembly of creditors for the approval of the reorganization plan."* It is due to this that the creditors in question, now the APPELLANTS, were defeated in the AGCs and came to rely upon the appeal procedure, since the minority was trampled on due to the special interests of the majority. If this had not happened, the PRJ would have been denied and this appeal would not be necessary.

82. The second argument is also not sustainable. It is not OGX, but rather OGX PARTICIPAÇÕES the holding company of the OGX Group, and it is not understandable why OGX would be the "principal guarantor", if the guarantees of all were equivalent and OGX PARTICIPAÇÕES held 99.99% of the shares of OGX (doc. 3). But even if these statements were correct, it would not change anything, since these observations are void of relevance or legal grounds.

83. And, as if this is not sufficient, the AGCs were far from having "exuberant voting due to the number of creditors and the value of the credits."

84. Although DEUTSCHE did not attend the AGCS, thereby reducing drastically the quorum for computation of votes, the principal debtor both in relation to the APPELLANTS as well as the MAJORITY BONDHOLDERS is not OGX, but rather OGX AUSTRIA.

85. Curiously, OGX AUSTRIX did not even have the suggested quorum for voting

---

[15] VALADÃO, Erasmo, Coordination SATIRO DE SOUZ JUNIOR, Francisco and PITOMBO, Antônio, Comments on the Law of Reorganization of Companies and Bankruptcies, 2nd. Ed.,
Editora Revista dos Tribunais, p. 193 - emphasis added.

TJRJ 20140034357 07/07/2014 18 49 00 GK-2 Initial Electronic Petition

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
30
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

TJRJ 201400034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

in the decision under appeal, and it had to go through contortions to construct "scenarios" for the approval of the OGX plan, eventually repeating these under two supposed situations (1 and 3) of pp. 7.893 of doc. 10.

86. If the same had been done in the case of OGX Austria, the JUDGE would have noted that those creditors with conflicts of interest had a participation of 90.45% of voting credits and 41 of 66 creditors present.

87. In the case of OGX PARTICIPAÇÕES, the MAJORITY BONDHOLDERS represented 41 of 76 voting creditors and approximately 90% of the credits.

88. This means that, if the MAJORITY BONDHOLDERS did not participate in the voting, the result would be different, because the simple and hypothetical approval of the OGX PLAN would have served no purpose, if the rest of them, OGX AUSTRIA and OGX PARTICIPAÇÕES, which would be rejected, as they are attached at the umbilical cord (this is emphasized by the OGX Group's own initial petition for JUDICIAL REORGANIZATION and other statements as a way to justify a single judicial reorganization for all of them - doc. 3):

*"The applicants are all, therefore, integral members of the economic group OGX, acting in an interconnected and concerted manner. "*

89. Therefore, it is a matter of a typical case of abuse of a right, established in article 187 [16] of the CC, besides being extracted from the general principles of conduct and rules of contractual interpretation in good faith, considered in article 421 of the CC.

**90. As can be seen in the legal literature, *"the conceptualization of abuse of rights as an illegal act has its basis in the standardized principle of protection of human dignity with the view that, in a democratic system***

------------------------------------------------------------

[16] *"Art. 187. The holder of a right also commits an illegal act that exercises it, manifestly exceeding the limits imposed by economic or social order, by good faith or by proper moral practices."*

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179-4600
Fax. + 55 11 2719-4597

Court of Justice of the State
of Rio de Janeiro
Page
**31**
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

the others. (...), no one must be permitted to hold absolute rights. The influence of these ideas leads us to consider the **abuse of rights as being the exercise without limits or in an irregular manner of the right that someone possesses, causing harm to others.** (...) The concept of abuse of rights must be signed with full harmony with the principles of society, of ethics and objective good faith. The abuse of rights is not exactly an illegal act. The legislature considered, only, as an illegal act the agent who, **in exercising his right, manifestly exceeds the limits imposed by its economic or social purpose, in relation to good faith or proper moral practices.** The abuse of a right is considered, therefore, an illegal act by legal comparisons. In conclusion, we can state that the abuse of a right is the action of the agent (individual or legal entity) which makes use of the right of which it is the holder to bring harm to others, with the intention of doing and, consequently, causing damage, even if it does not have any benefit."[17].

91. I.e., "the abuse of rights is not because the holder has not respected the internal limits of its right, because then, it would be practicing a simple illegal act, but rather, because it abused the exercise of an authority that it actually has.  When, therefore, this concerns the abuse of rights what is seen is the 'reaction to the abuse of the right, or rather, the harmful exercise '.The abuse is committed, thus against the social and ethical limits imposed on individual activity in relation to life in society. (...) For the holder of any right to remain in the context of normality it is not enough to legitimize its conduct within the authority recognized by legal standards in relation to its individual legal situation. It will be necessary to take care that the use of the legal prerogatives does not deviate for illegal and undesirable goals, within the social context. The abuse of a right will happen precisely due to the infringement of this duty and will always occur whenever the agent invokes a prerogative provided for under the law, apparently properly, but to achieve an objective that is illegitimate or not tolerated by

_____
[17] DELGADO, José Augusto e JÚNIOR, Luiz Manoel, Comments on the Brazilian Civil Code, Volume II, Editora Forense, p. 858/862.

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179-4600
Fax. + 55 11 2719-4597

Court of Justice of the State
of Rio de Janeiro
Page
**32**
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

social consensus." [18] [19]

92. The thermometer for the abusive vote will be exactly the point at which it, although, in theory, is legitimately exercised in the assembly by any creditor, it actually serves a shady interest and violates the right of another creditor.

93. Thus, **the judge must prevent the abuse of the right to vote[20], avoiding the manipulation of the results of the assembly[21], as occurred in this case.** The LRF itself was concerned about preventing the abuse of the right to vote due to an obvious conflict of interest when it established in Article 43 certain objective causes in which credits may not be counted for purposes of holding assemblies and voting[22].

_____
[18]THEODOR JÚNIOR, Humberto, Comments on the New Civil Code, Volume III, Editora Forense, pp. 112/113.
[19]In the same sense, CAIO MARIO: "it cannot, at the present time, be accepted that that an individual may use  his right to the point of turning it into a cause of injury of others. It's not that the exercise of the right, done with any regularity, is not a reason for an injury to others. Sometimes it is, even frequently. The action of the collection of a debt, the protest of an exchange note, a writ of possession to remove an occupant from property will not be harmless. In all these cases, the exercise of the regular, normal right, causes a damage, but the behavior of the holder does not consequently cease to be lawful, as well as morally defensible. We cannot therefore characterize the abuse of the right in the fact that its exercise may possibly cause damage or motivate it normally, because the damage can be an inevitable result of the exercise of the right to such an extent that it would be void of content if its use had to be within the criteria of being harmless. This is why all the theories that try to explain and substantiate the doctrine of abuse of rights need to draw on another factor: that whatever we call it,  appears to be for the purpose of causing damage, without any other advantage. [It is] abuse, therefore, of the right of the holder used to bring harm to others, inspired by the intent to doing harm, and without a benefit itself. The ethical basis of the theory can, thus, be based on that the law should not allow someone use their right exclusively to cause damage to others." (PEREIRA, Caio Mario da Silva, Institutions of Civil Law, 1st Volume, 23rd Ed., E. Forense, p. 576)
[20]In this vein, see TJSP, AI 533, 505-1/4, Special Chamber for Bankruptcy and Reorganization, j. 5/28/2008, v.u., reporter Des. Pereira Calças stating that "*art. 35, item I, subparagraph (a), of Law 11,101/2005 [...] grants to the general assembly the authority to approve or reject a plan. Infeasibility of the judge interfering in the merits of the plan approved by the general assembly, except in cases of abuse of rights.*"
[21]TJSP, AI 0168318-63.2011.8.26.0000, Special Chamber for Bankruptcy and Reorganization, j. 04/17/.2012, v.u., reporter Des Pereira Calças: [a] the general assembly of creditor is only considered sovereign in relation to the approval of the plan **if the general principles of law, the standards of the Federal Constitution, the rules of public order and Law 11,101/2005 are obeyed. <u>A proposal that violates the principles of law, constitutional standards, rules of public order and the equality of creditors, providing an opportunity for manipulation of the outcome of the assembly deliberations, is null and void.</u>** (Underline and Bold Type added)
[22] "Art. 43. The debtor's business associates, as well as related companies, controlling companies, controlled companies or those that have a partner or shareholder with a participation exceeding 10% (ten percent) of the share capital, may participate in the general assembly of creditors, without having the right to vote and will not be considered for the purpose of verification of the quorum for holding the meeting and the deliberation.

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179-4600
Fax. + 55 11 2719-4597

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
33
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

94. Although this law does not expressly raise other hypotheses for the prohibition of the calculation of credits for purposes of a quorum for holding the meeting and voting, the institute is fully applicable:

"**The setting of voting rights and possible sanctions arising out of abuse were not covered in the New Law of Judicial Reorganization and Bankruptcy.** The judge shall, in this case, identify the hypotheses for the abusive exercise of the voting rights, imposing the corresponding sanctions. The judge shall not, especially in judicial reorganization, merely ratify prerogatives, stamping  a kind of judicial "seal of approval" on the imperative will of the creditors. On the contrary, his activities should be effective, preventing the imbalance that the disparity of economic power may entail. **Notwithstanding the absence of parameters concerning the abusive exercise of the right to vote in bankruptcy law, the judge can recognize it because of manifestly exceeding the limits placed by the economic or social order, by good faith or by proper moral practices by the holder of the right to vote.** [...] An act that breaks the boundaries of principles of economic or social good, good-faith or proper moral practices goes beyond legitimacy. [...] Being aware of the identification of limits of good faith and economic or social order that the law imposes in relation to acts performed in the exercise of a right, the judge will be responsible for the task of identifying, in each specific situation, the behavior of the creditor who has used his vote as a means of violating the rights of others ".[23] (emphasis added)

95. Also by comparison with societal law[24], no doubts will remain

---

-

*Sole Paragraph. The provisions of this article also are applicable to the spouse or consanguinous blood or similar, collateral relative, up to the 2nd (second) degree, ascending or descending of the debtor, of the administrator, of the controlling partner, the members of the advisory councils, or similar individuals of the company in debt and the company in which any of these persons perform these functions.*"

[23] CAMPOS FILHO, Moacyr Lobato from *Bankruptcy and Judicial Reorganization*. Belo Horizonte: Del Rey, 2007, p. 145-174.

[24] Law 11,101/2005 did not expressly bring into its text the provision of conflict of interest. Even so, doctrine defends the application of the concept of conflict of interest in Judicial Reorganization, as TOMAZETTE teaches[24]:"*In companies, a vote that is abusive or in conflict of interest is subject* to invalidation, as it represents a vote prohibited by legislation. The idea is to guarantee the fulfillment of the social function of the right to vote. Due to the similarity between the assembly of partners or shareholders, it would be plausible to apply this theory to allow the judge to annul or disregard certain votes cast in the assembly. Although not expressly recognized in Law no. 11,101/2005, there is no doubt that is possible to take away the votes that are abusive or in conflict of interest cast by creditors in the

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7.andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179-4600
Fax. + 55 11 2719-4597

TJRJ 201400343357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
**34**
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

about the necessity of restraining an abusive vote arising from a conflict of interest. In actuality, this has already been decided:

"Judicial reorganization. Approval of the reorganization plan presented, despite being rejected in the General Assembly of Creditors. Approval in accordance with the theory called 'cram down'. Judicial control of legality. Disregarding the votes of creditors due to abuse of rights. Statements no. 44 and 45 of the First Workshop on Commercial Law of the Federal Justice Council (CJF). Application of the principle of preservation of an economically viable company. Creditors belonging to a single class, that of unsecured credits. Absence of discounting. Increase of the company's revenue since the date of the request for judicial reorganization. Abuse of the exercise of voting rights recognized. Maintenance of decision that approved the judicial reorganization plan. Interlocutory appeal denied. (...) It follows from this that the vote of those creditors at the General Assembly of Creditors held will decide the fate of the company under judicial reorganization, approving the plan submitted and granting the reorganization or denying it, with the consequent decree of its bankruptcy. It is therefore concluded that the objections to the plan submitted by the financial institutions should be examined with caution. **This is because the right to vote to be exercised by the creditors may not exceed the boundaries imposed by social or economic order, good faith or proper moral practices, being revealed, in these cases, as abuse of the right.// In absence of a legal provision in law No. 11,101/2005 in respect to the definition of the abusive exercise of the right to vote, the provisions of article 115 of the Brazilian Law of Corporations (Law No.6.404/76) are invoked, which deals with the methods of abusive exercise of power by the shareholders of the company, in order to prevent the occurrence of damage or loss to the company or other shareholders, or to obtain, for themselves or for others, an undue advantage and resulting in, or which may result in, a prejudice to the company or to other shareholders, or those who work in the company.** The concept of the abuse of a right established in article 187 of the Civil Code/2002, sets forth as an illegal act, the exercise of a right by the holder thereof that exceeds

*assembly, due to its own systematic and theological interpretation of the text of the law. Verifying the abuse of the creditor, who, for example, casts his vote with the intent to benefit competitors of the debtor, the judge must annul the vote and not compute it in the analysis of the judicial reorganization plan ".*

**IA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
35
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

clearly the limits imposed by its economic or social order, by good faith or proper moral practices. **And yet, in accordance with the understanding espoused in Statement no. 45 of the first Workshop of Commercial law of the Federal Council of Justice (CJF) the judge can disregard the vote of creditors or the manifestation of will of the debtor by reason of abuse of rights.** (...)[25]" (emphasis added).

96. In the case of records, the conflict of interest, on the basis of article 115 [26] of Law 6,404 11525/76 ("LSA"), it is even more evident, because the majority bondholders can be considered holders of rights equivalent to those of shareholders, insofar as they have already carried out the subscription of the first series of debentures to be converted in order to give them control of the Restructured OGX.

97. As IVES GANDRA DA SILVA MARTINS and GERALDO C. AMARGO VIDIGAL teach[27]: "*the case law has been established in the sense that the abuse is configured even without subjective evidence of fraud. All that is necessary is that the deliberation was aimed at purposes extraneous to legal and social sentiment. The shareholder shall be liable for damages caused by the unlawful exercise of its prerogative when an objective examination of his conduct determines that his vote was contrary to social interest. It is understood, in this manner that*

---

[25] TJSP, 2nd Chamber of Business Law, Interlocutory Appeal no.010084407.2013.8.26.0000ˉ, Reporter José Reynaldo d.j. 2/3/2014.
[26] "Art 115. The shareholder shall exercise the right to vote in the interests of the company; **abuse of the vote shall be considered to be the use of the vote for the purpose of causing damage to the company or the other shareholders, or to obtain, for themselves or for others, unfair advantage and resulting in, or which may result, prejudice to the company or to other shareholders.**
§ 1 the shareholder cannot vote in the deliberations of the general assembly concerning the evaluation award of assets that comprise the social capital and the approval of the accounting as an administrator, nor any other deliberations that may benefit it in a special manner, or in which it may have an interest conflicting with that of the company,
§ 2 If all subscribers are tenants of assets that contributed to the formation of the social capital, they can approve the award, without prejudice to the responsibility of dealing with § 6 of article 8.
§ 3 the shareholder is liable for damages caused by abusive exercise of voting rights, even if his vote did not prevail.
§ 4 the decision taken as a result of the shareholder vote that relates to an interest conflicting with that of the company may be annulled; the shareholder will be liable for the damages and shall be obliged to transfer to the company the advantages that it has obtained. "
[27] Ives Gandra da Silva MARTINS and VIDIGAL, Geraldo de Carvalho. Comments on the Brazilian Law of Corporations. 1st Ed. Rio de Janeiro: Forense Universitária, 1999, p. 346.

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
nˉ 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179-4600
Fax. + 55 11 2719-4597

TIRI 20140034357 07/07/2014 18 49 00 GK<Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
36
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

*every time that the shareholder exercises its prerogative immoderately so that its conduct causes damage or may cause damage to the company or to the other shareholders, it will liable for its unlawful conduct, even if its vote did not prevail. The simple objective observation of unlawful behavior is sufficient."*[28]

98. The Judiciary has ruled in similar cases, removing the right of the creditor voting in abusive conflict of interest, due to being the direct beneficiary of the deliberation that he is approving as a relevant result of his vote:

> "In this line of understanding – which holds that **when the company in judicial reorganization, presents a plan that proposes a differentiated manner of payment to creditors constituting the same class (unsecured, with in rem guarantee**), such as for example – establishing that the credit holders with a smaller value will receive their payments in a shorter period time, as occurs with the plan under review, or, still worse, proving that the largest

---

[28] In the same vein, Erasmo Valdão: "In open divergence with the Law of Corporations (art. 115, 4th paragraph), the Civil Code does not provide for the nullification of deliberations carried out arising from voting with a conflict of interest. In the two instruments which provide for conflict of interest, the penalty established in civil law is only liability for damages (art. 1,010, Paragraph 3 and 1,017, sole paragraph). Law 11.101 unfortunately does not provide for the matter. **And there are plenty of cases in which the individual interest of a particular creditor might conflict substantially with that of the collective group, requiring nullification of the deliberation.** It's not easy, however, to conceptualize what is the common interest of the creditors. According to an authorized doctrinal opinion, this interest will consist of the interest which every creditor has at least in the medium-term, to minimize its losses by increasing availability to the whole group. **Other doctrinal statements and case law have considered that deliberations are contrary to the common interest of the creditors: a) that cause disproportionate damage, that is inappropriate for some of the creditors; b) that favor a particular creditor, or a group of creditors, especially privileged creditors or with an in rem guarantee, or even third parties, to the detriment of the community of creditors; c) that do not are useful to anyone; d)** that favor the debtor or a third party without any advantage for the whole group. As more specific hypotheses of conflicts of interest can be imagined, for example, a creditor, from the automotive industry, that votes against the approval of a viable reorganization plan due to its being interested in the bankruptcy of the debtor, its dealer, in order to pass the dealership on to others; or the creditor with an interest in the bankruptcy of its agent or distributor (art. 710 of the CC), also for the purpose of transferring to another agency the distribution of its products; or even further, the creditor who has interest in bankruptcy of its debtor simply because it is its competitor. In these cases, the vote of those creditors at the General Assembly that will decide on the plan for reorganization of the debtor (art. 45 of the law 11,101) may be materially in conflict with the interests of the community of creditors in the approval of that plan. On the other hand, it would be problematic to establish a ban on voting, since it cannot be stated a priori that the creditor competitor, for example, has an interest in bankruptcy of its debtor solely for the purpose of destroying it. If the reorganization plan is unworkable, it is absolutely legitimate that the creditors vote their disapproval, in order to avoid more damage still. The judicial reorganization is not an absolute value, as mentioned elsewhere. But rather it is completely appropriate that, in such cases, the creditor justifies fully its vote, being entangled with natural suspicion, submitting a declaration to the Chairman of the Assembly. ". (VALADÃO, Erasmus, Coordination SATIRO DE SOUZA JUNIOR, Francisco and PITOMBO, Antônio, Comments on the Law of Reorganization and Bankruptcy 2nd ed., Editora Revista dos tribunals, pp. 187/193 ‑ emphasis added).

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
n ‑ 30 7 andar | 70397-900
Tel.+ 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179-4600
Fax. + 55 11 2719-4597

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
37
Stamped Electronically

**BM&A │ ATTORNEYS**

MÜSSNICH & ARAGÃO

creditors will not receive the entirety of their claims and will forgive the debtor in relation to unpaid balances, **the conflict of interest emerges with crystal clarity, allowing, with such expediency, the manipulation of the results of the assembly decision, by achieving the quorum of article 45 of Law 11,101/2005 through the promise of granting advantages to smaller creditors, the Judiciary Branch must invalidate the deliberation, as the hypothesis of nullity is constituted, given that the discipline of special quorum for the approval of the plan is, evidently, a matter of public order, which must be evaluated "ex officio" by the judge, i.e.. independent from provocation."** [29] (emphasis added).

99. By delineating an operation in which only the MAJORITY BONDHOLDERS participate in an investment that ensures that they "draft" the PRJ and acquire control of the RESTRUCTURED OGX, as a consideration for the approval of those plans and the unthinkable release of the Put Option of the current controller, without any room for discussion of the JRP by the other creditors, the Companies in Judicial Reorganization and the Majority Bondholders did not act in accordance with the law.

100. **This flaw has tainted the AGCs to the point of nullification.**

101. The assumption of conflict of interest *in casu* arises especially-but not only - from the special benefit that MAJORITY BONDHOLDERS are obtaining in the voting for which they are decisive. In relation to the topic, "When the LSA prohibits the shareholder voting in situations in which it can obtain a special benefit, it is not a matter of any special indirect benefit that a shareholder in particular can obtain from the deliberation  which results in benefit for the whole group of shareholders. (...) One thing is the particular benefit to a certain shareholder from a deliberation which results in general benefit. Another thing is if the benefit is truly a special one. The law sought, in this step, to address cases - due to their nature, relatively rare in the life of companies-in which they intend to assign a benefit permitted by law (i.e., a legal benefit) to a shareholder or to a

_____
[29] TJSP, 1st Chamber of Business Law, Interlocutory Appeal no. 0136362-29.2011.8.26.0000⁻, Reporter Pereira Calças, d.j. 2/28/2012.

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179-4600
Fax. + 55 11 2719-4597

TJRJ 201400034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

Court of Justice of the State
Rio de Janeiro
Page
38
Stamped Electronically

**BM&A │ATTORNEYS**
_MÜSSNICH & ARAGÃO_

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

certain group of shareholders that will not be extended to others. Carvalho de Mendonça, treating the topic in the light of the law n° 1882/3,150 and the Decree n° 434/1891, which referred to a 'special advantage', defined the concept as 'everything that damages equality which, in principle, should reign among the partners'. For this reason, the LSA used the adjective special, which could be replaced by extraordinary or exceptional, without losing the essence of the concept.

The dominant feature of the special benefit, then, is the lawful breach of equality among shareholders, in view of granting a liberality to one or some of them, not being relevant to discuss - in the examination of the legality of the vote cast - the commutative character or not of the act. **No care is taken, in such a case, for the deliberation to be or not be beneficial to the company (even though, naturally, it should be so - as determined in art. 115, introduction), with the existence of a lawful or legal advantage that cannot be attributed to all shareholders,** who are holders of securities of an equal nature being sufficient to prevent the vote" [30] (emphasis added).

102. This conflict becomes even more evident, demonstrating the abusive exercise of the right to vote, when, for example, the contested release clauses contained in the PRJ further below are verified.

103. Thus, the nullification of the AGCs and their being held again, now without the computation of the credits of the MAJORITY BONDHOLDERS for the purposes of verification of a quorum for holding the assembly and voting is imperative.

### III.3 NULLIFICATION OF THE PRJ

104. Besides the nullity of the AGCs, in view of the abuse of voting rights by the Majority Bondholders, arising from their conflict of

---

[30] Paulo Cezar Aragão, "Notes on deviations in the exercise of the right to vote: abuse of rights, special benefits and conflicts ". In: Rodrigo Rocha Monteiro de Castro; Walfrido Jorge Warde Júnior; Carolina Dias Tavares Guerreiro (coord). Business Law and Other Studies of Law in Honor of Professor José Alexandre Tavares Guerreiro. São Paulo: Quartier Latin, pp. 190-191.

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179-9600
Fax. + 55 11 2719-4597

Court of Justice of the State
of Rio de Janeiro
Page
39
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

interests, the PRJ are also null and void, due to containing absolutely illegal and inequitable clauses, as will be demonstrated.

## III.3.1. UNEQUAL TREATMENT OF EQUAL CREDITORS

105 • The court *a quo*, incorrectly, also understood that "there is no unequal treatment between bankruptcy claims, because all bankruptcy claims (and adherent extra-bankruptcy claims) will receive the same compensation from the companies in judicial reorganization (″ pp. 7,901 of doc. 10).

106 • Furthermore, according to the **very assertive** judgment *a quo*, already incurring in contradiction, the Companies in Judicial Reorganization and the Majority Bondholders are legitimized in relation to the prevention of the participation of the Appellants in the 1st SERIES Debentures because, **with a clarity that hurts the eyes** the bondholders who claimed different treatment had every opportunity to negotiate with the companies in judicial reorganization for months in relation to the seeking of capital contributions, through the intense marketing carried out by the companies Blackstone, Lazard and Angra in the international market "(pp. 7,896/7,897 of doc.10) and, **to remove any doubts**, forty-one capital sources were contacted and these bondholders did not demonstrate any inclination to make a capital contribution (...)(″emphasis added -pp. 7,901 of doc. 10).

107. Still, simple analysis is sufficient of the original court documents and of the PRJ to observe that the judge was wrong and that, in fact, there is apparent unequal treatment between creditors of the same class and origin.

108. To ratify the differentiated treatment employed in the PRJ is not legal, and it is appropriate to clarify:

(a) What the conditions were under which the doctrine and law accepts the referenced differentiation through the nature of such a ″partner creditor″ or "strategic creditor″;
(b) In the case of the court records the Appellants **did not have the opportunity** of

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax.+ 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel.+ 55 11 2179-4600
Fax.+ 55 11 2719-4597

TJRJ 20140034357 07/07/2014 18 49 00 GK-Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
40
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

becoming this type of creditor - and therein lies the main basis of the unfairness - fully participating in the DIP Financing, especially in the most attractive part, the 1st Series Debenture;

(c) What occurred in the development of the DIP Financing;

(d) The numerous and completely disproportionate advantages that DIP Financing gives to the Majority Bondholders at the expense of others, simply because they are the principal creditors and could support plans that are of interest only to themselves, representing half of the extra-bankruptcy credit to compensate the prejudice in the discharge of the bankruptcy credit and, therefore, inserting in the PRJ submitted a form of discharge that must be supervised by the Judiciary Branch.

**a) The partner or strategic creditor**

109.  As we all know, differential treatment between creditors can only occur when they comprise different classes. If they are of the same class there is no way that they can be prevented from being accorded equal treatment, unless they agree to this. If there was the possibility of subdivision, each of these could be given its own treatment, and those classes with a smaller amount, as long as they approve the plan, even if by a majority of the votes, would be connected with the proposal[31]".

110.  The assumption of equality would not be affected even by invoking the principle of preservation of the company:

> *"Considering which, as seen so far, the preservation of the company must be reached by means of a balance of interests and respect for the various individuals involved, severe and extreme disrespect of the rights of creditors must not be supported on the grounds of*

---

[31]TOLEDO, Paulo Fernando Campos Salles from Judicial Reorganization- Corporations-Debentures- General Assembly of Creditors - Freedom of association - objective good faith - Abuse of rights -Cram down -*par condicio creditorum* -Journal of Commercial Law: Industrial, Economic and Financial no. 142, published on 6/1/2006.

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179-4600
Fax. + 55 11 2719-4597

TJRJ 2014003435707/07/2014 18 49 00 GK-Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
41
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

*promotion of the reorganization.*"[32]

111. This understanding is even more latent in this case because the **APPELLANTS do not want the bankruptcy of the companies (a non-existent risk indicated in the decision under appeal without any nexus with what was sustained repeatedly by the APPELLANTS in the court records), but only intend to contribute to its continuation** through the contribution of new resources, such as those guaranteed to MAJORITY BONDHOLDERS.

112. Even if the intention of the COMPANIES IN JUDICIAL REORGANIZATION was to establish the character of the "partner creditor" or "collaborator" to incorrectly justify the decision under appeal, it was carried out in error due to the attempt of the Respondents to "camouflage" the evident benefits of MAJORITY BONDHOLDERS. **They should have given all bondholders, that were holders of credits of the same nature, at least, the opportunity to participate in the new loan under equal conditions, subscribing to all series of debentures** and contribute resources in proportion to their participation in the OGX Group's debt.

113. The case law concerning this topic already is consolidated accordingly[33],

---

[32] CEREZETTI, Sheila Christina Neder. The Reorganization of Corporations - the principle of preservation of the company in the Law of Reorganization and Bankruptcy, São Paulo Malheiros, 2012, p. 374.

[33]"JUDICIAL REORGANIZATION BENEFIT GRANTED TO STRATEGIC AND PARTNER CREDITORS. Possibility. Creditors who remain as suppliers of the companies in judicial reorganization. Constitutional guarantee of substantial equality. Principles of preservation of the company and of its social function. Execution. Article 47 of Law no. 11,101/05. Precedent. Appeal not approved, at this point. (...) It is not sufficient that the Plan, despite expressly providing a discount in payment of claims of partner creditors, established a grace period of 360 days in order for all other creditors to be able to become partner creditors, to open new lines of credit or provide raw material or services to the Companies in Judicial Reorganization. In fact, the plan has created a necessary distinction in this case, granting favorable treatment to those who contribute most so that the Respondent could continue its activities during the judicial reorganization, making possible , thus, the satisfaction of the loan of all creditors, as well as continuation of the company's activities, in order to fulfill its constitutional role in the market and in society ("TJSP, 2nd Special Chamber of Business Law, Interlocutory Appeal no. 001481636.2013.26.000, reporter. Tasso Duarte of Meló, j.12/9/2013.

Along the same lines: "Appeal. Judicial Reorganization. Plan approved by the General Assembly of Creditors. Plan that provides for the payment of liabilities in 18 years, by calculating the payments in percentages (2.3%, 2.5% and 3%) levied on the net income of the company, with the payments beginning from the 3rd year of approval. Payment forecast per individual creditor up to the 6th year, entailing early payment of the smaller creditors, instituting conflicts of interest between the creditors of the same class. Payments without incidence of interest. Projection of remission or amnesty for debt balances, if. after payments of the 18th year, there is no full receipt. **Proposal that violates the general principles of law, the constitutional principles of equality, of legality, of property, of proportionality**

**BRASILIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824-5800
Fax + 55 21 2262-5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10º andar | 04543-011
Tel. + 55 11 2179-4600
Fax. + 55 11 2719-4597

TJRJ 20140034357 07/07/2014 18 49 00 GK<Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
42
Stamped Electronically

**BM&A │ATTORNEYS**

MÜSSNICH & ARAGÃO

established in the doctrine[34],within the exceptional reality of the subclass of a "partner creditor", or "collaborator " :

> *"Appeal. Judicial Reorganization. Appeal against a decision which, in the face of approval of the plan by the General Assembly of Creditors by the legal quorum, grants the reorganization. The General Assembly of Creditors only is considered as sovereign for approval of the plan **if this does not violate the general principles of law, the principles and rules of the Federal Constitution and the rules of public order of Law no. 11,101/2005. A proposal that violates general principles of law, constitutional standards, rules of public order and the postulate of "par conditio creditora " – allowing the manipulation of the assembly quorum, is null and void**. A clause that grants freedom to dispose of any assets, tangible or intangible, including those that are the subject of commercial leases and of fiduciary disposal, independent of the authorization of the Judge, of the General Assembly, and of the holders of the property, is null and void. Suppression of in rem and fiduciary guarantees without the express approval of creditors who hold the respective guarantees implies nullification of the clause. Clauses constituting abuse of rights, infringement of the general principles of law, of the Charter of the Republic and of the laws*

TJRJ 20140034357 07/07/2014 18 49 00 GK=Z Initial Electronic Petition

---

**and of reason, in particular the principle of "pars conditio creditorum"**[9] **and the standards of public order.** Provision that permits the manipulation of the outcome of the assembly deliberations. Failure to break down the amounts of each installment to be paid which prevent compliance with the plan and its specific execution due to a lack of liquidity and certainty of the "sum" to be paid. Illegality of the clause that establishes payment of unsecured creditors and with an in rem guarantee after the expiration of the two year time period of judicial supervision (art. 61," introduction" of Law no. 11.101/2005). Invalidity (nullity) of the deliberation of the general assembly of creditors officially declared with the determination of the submission of another plan, within a period of 30 days, to be developed in accordance with the Federal Constitution and Law no. 11.101/2005, to be submitted to the general assembly of creditors in 60 days, under penalty of a decree of bankruptcy. **It is understood that the principle of equality covered in art. 5, "introduction", of the Federal Constitution, in proclaiming that everyone is equal before the law, does not permit unequal treatment among creditors that the law classifies in the same class, given that the postulate of 'pars conditio creditorum' is the keystone on which any type of judicial process of insolvency is based.**"(TJSP, Special Chamber for Bankruptcy and Judicial Reorganization. Interlocutory Appeal no. 29.2011.8.26.0000, Reporter Associate Judge Manoel de Queiroz Pereira Calças. Handed down on 2/28/2012).

[34] *"The first principle of the reorganization of companies, and the most wide spread, arising from the constitutional rule of equality, established in art. 5, introduction, of the Constitution of the Republic, is that of equality of treatment of the bankruptcy creditors, expressed in the maxim 'par conditio creditorum'. The informative principle, because it is universal,  of bankruptcy law is equal treatment of creditors, in relation to credits of the same nature, respecting, in addition, preferences and privileges.""*' (RESTIFFE, Paulo Sérgio. Reorganization of Companies. Barueri: Manôle, 2009. p. 3).
*"The plan must be, therefore, fair, equitable and viable. It will be fair, to the extent that it seeks to demonstrate good faith of the debtor in relation to finding a reasonable solution for the interests that are involved (debtor, shareholders and creditors); it must be equitable in the forms of payment of liabilities, balancing these same interests, not imposing unequal treatment between the creditors, or an excess burden on one or more classes to the detriment of the others"*'. (SIMIONATTO, Frederico Augusto Monte. Treatise of Bankruptcy Law. Rio de Janeiro: Forense, 2008, p.138).

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel. + 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Jusçelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

Court of Justice of the State
of Rio de Janeiro
Page
43
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

*of public order are null and void. Appeal approved to decree the nullification of the deliberation of the AGC, as determined in the presentation of another plan, with the period of 30 (thirty) days, to be developed in accordance with the general principles of law, the Federal Constitution and Law no. 11.101/2005, to be submitted to the General Assembly of Creditors in the period of 60 (sixty) days, under penalty of a decree of bankruptcy".*

114. From the content of the vote of judgment mentioned above it is furthermore possible to extract:

*(..) NULLITY. OBLIGATION WITHOUT A PERIOD OF EXPIRATION. Part 1• Item 5.4 FINANCING CREDITORS (...) The clause, as I think it is written, invalidates any type of control, by other creditors, concerning the differentiated terms of payment (certainly for the better), being offered, in a vague manner, to the creditors. It is not known what is the significance of the differentiated treatment, nor what will be the impact arising from the conditions of the market invoked in the clause.* **The terms of the projected future agreement with the financing creditors that Professor Fábio Ulhoa Coelho calls partner-creditors, must be public, previously known by everyone, especially other creditors, with everything that has been stated respecting the process of judicial reorganization. Full disclosure is embedded in the process of reorganization. The principle of public knowledge, a duty attached to objective good faith, governs the process of judicial reorganization in all its breadth, and the corporate actions intended by the debtor must be presented in the light of day, cards on the table, for all to see.**

*The clause, as expected, hides everything; a separate contract is foreseen, without the slightest hint of what its terms will be. This clause does not pass the scrutiny of a serious process of judicial reorganization and the Judiciary Branch should not approve such a misguided pretense.* **Note: There is no discussion here of the intrinsic inequality between creditors, to the extent that there is provision for differentiated treatment; what is at issue is the content of this differentiated treatment, for which the extent is not known. And the creditors have the right to know this. The Judicial Branch should zealously ensure that in the process of judicial reorganization concealed actions are outside of the context of public knowledge, the driving force of the reorganization process. (...) By offending objective good faith and affronting morality of the process of judicial reorganization, which requires**

**BRASÍLIA**
Commercial Sector Qd 1, Bl. F,
n ° 30 7 andar | 70397-900
Tel.+ 55 61 3218-0300
Fax. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
Tel. + 55 21 3824 - 5800
Fax + 55 21 2262- 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek
1455 - 10° andar | 04543-011
Tel. + 55 11 2179 - 4600
Fax. + 55 11 2719 - 4597

TJRJ 20140034357 07/07/2014 18 49 00 GK<Z Initial Electronic Petition

Court of Justice of the State
of Rio de Janeiro
Page
44
Stamped Electronically

**BM&A │ATTORNEYS**
MÜSSNICH & ARAGÃO

**transparency and full knowledge of all the proposals by all of the creditors, because this is a clause having a purely arbitrary nature, this clause must be considered null and void** (...)[35]. (emphasis added)

115.     In the case at hand, exactly the contrary was verified!

116.     Although the supposed motivation for this differentiation was to provide the same conditions to all with regard to sharing in the benefits of the PRJ for those who had made contributions, with the concession of "new money," this parity of conditions was not respected, as indicated in greater detail below.

**b) The absence of consultation with the APPELLANTS regarding DIP FINANCING**

117. In accordance with the decision being appealed, in tune with the "Herculean" efforts of **GRUPO OGX**, the esteemed Banco Blackstone (which is not to be confused with the **RESPONDENTS**, that is to say, given the importance afforded by the judge to an insignificant point), after analyzing the situation of the of the **COMPANIES IN REORGANIZATION**, arrived at the conclusion that it needed emergency financing to keep our business interests active. Likewise, according to the decision being appealed, "*in September of 2013, it began seeking capital from third parties and began to communicate with various providers in order to discuss financing opportunities*" (pgs. 7,895, doc. 10).

118.     In the dramatic words of the  decision itself, "*In the intense search for capital support  to rescue the financial activities of the COMPANIES IN  REORGANIZATION, Blackstone began to work in cooperation with Lazard and Angra to expand the search for capital, when more than eleven alternative investment funds were contacted. From that point, it was stated that in October and November, 2013, it continued to hold investigatory sessions and carry out conversations between providers of capital and the management of the COMPANIES IN REORGANIZATION. During this period, from the forty-one capital sources contacted since the marketing*

---

[35] TJSP, Interlocutory appeal no. 0264287-08.2011.8.26.000, Reporting Clerk Pereira Calças, 1st Chamber Dedicated to Corporate Law, Issued on 07/31/2012

*started, three parties presented indicative financing offers, but with considerable risk of closure and onerous socio-economic conditions, with the conclusion that they were in fact not viable, which in turn gave rise to a liquidity crisis and inability to access capital markets at the end of December, 2013. For this reason, the COMPANIES IN REORGANIZATION and a group of investors holding approximately 55% of the current debt arrived at an agreement for the consensual resolution of repayments on December 23 and 24, for a thorough restructuring and a support agreement for the judicial reorganization plan (…)"* (pgs. 7.895 of doc. 10).

119.    Likewise, with "a clarity that  hurt their eyes," but without any qualms of conscience, the COMPANIES IN REORGANIZATION would have ceased the search for market capital, and, along with the MAJORITY BONDHOLDERS, terminated the PSA.

120.    Soon after, as expressly set out in the decision, there was never a **balanced and public offer** for participation in the first part of the DIP FINANCING, with the possibility of debates and access by all creditors during the LEGAL RECOVERY phase. This would be very simple to do, for example, distributing via the bond trustee, letters listing all of the intentions of the COMPANIES IN REORGANIZATION, indicating the benefits to be afforded to those who joined with them, or at least inviting them to negotiations.

121. The creditors of GRUPO OGX did not have any way of imagining (and were not obligated to do so) **that in some dark alleyway, negotiation of the PRJ, before which the processing of the LEGAL RECOVERY would take place, was in full swing**,  according to the press and until the appealed ruling, mentioned the month of October, 2013!

 122. It was its job to be chasing after unknown parties and parallel meetings, but it was, in fact, the duty of the COMPANIES IN REORGANIZATION to act objectively and proactively, treating its creditors equally and giving them the same opportunities to contribute

with their support to recover a part of the enormous losses they had suffered. However, this did not interest the COMPANIES IN REORGANIZATION  in any way, because they only wanted to offer incredible advantages to one small group, sufficient enough to approve its judicial recovery, or in a large part contributing to this, for which it would obtain, in exchange, the huge advantage of enforcing absurd PRJ's, and the added bonus of receiving a discharge for its actions and annulling the Put Option of its principal shareholder, as indicated below.

123.     Worse still! As if the documentation contained in the records were completely unknown, the ruling under appeal states that "*bondholders who allege differential treatment had many opportunities to negotiate with the companies in reorganization over a period of months during the search for capital*" (pgs. 7.896/7.897 doc. 10).

124.     Considering all of this, **that statement is absurd, because it does not reflect the reality clearly demonstrated by the record!**

**125. For months, AUTONOMY and other APPELLANTS had been asking to be considered as partners of the COMPANIES IN REORGANIZATION,** like those creditors who curiously represent the majority of the theoretically voting credits, had there not been the conflict of interest evidenced above.

126.     **Let it be repeated: months, way, way before the information contained in the records concerning the alleged closure of the very strange negotiations with the MAJORITY BONDHOLDERS**, the APPELLANTS had demonstrated their desire to contribute to the support of GRUPO OGX.

127.     It is very simple to conclude this: it's enough to verify the petitions presented by  AUTONOMY in the case records. In these, there are e-mails (doc. 17),  notifications (doc. 12), attempts to contact AUTONOMY, and others with the COMPANIES IN REORGANIZATION since 2013, and even declarations of various creditors who were willing to finance Grupo OGX (doc. 17), including reserving

more than US$ 10,000,000 for this purpose, in accounts held abroad (doc. 18)!

128.    For this purpose, showing their interest in participating in the DIP FINANCING  AUTONOMY (mentioned here because they were expressly referred to in the ruling under appeal) sent an e-mail to Mr. Marco Spieler (managing director of Rothschild) on  12/27/2013, affirming that: "as can be seen, Ricardo K. (Angra Partners) returned my e-mail, but it turns out that we haven't managed to talk yet (…). However, based on what we discussed yesterday, in discussions with members of the Ad Hoc Group, understanding that the hammer has still not come down on the amounts that each would contribute to the pot, and also understanding that certain investors already stated that they would not get involved. ***I am interested in entering into the first tranche and trying a back stop bid and may eventually consider an arrangement with a certain investor to divide the extra benefits granted to members of the Ad Hoc group***" (highlighting ours, doc. 17).

129.    In answering this e-mail, Mr. Marcos Spieler demonstrated that the financial consultants had clear knowledge of the existence of other creditors interested in participating in the DIP FINANCING. "*(...) Your interest in this matter has already been passed to my personnel in NY, who are more on the front lines of this discussion.*" (doc. 17).

130.    AUTONOMY, several times in the exchange of e-mails, reinforced its interest in participating both in the DIP FINANCING – in proportion to its claim in the JUDICIAL REORGANIZATION – as well as, possibly, in the  "bridge" financing offering the financial consultants as much as US$ 5 million to US$ 35 million, as foreseen initially[36], with Marcos Spieler himself noting the

---

[36] "(…) However, they are now saying to me that [in English] "my way in" would be via the pre-DIP deal. ***In the event that there really is space in Tranche A, then it would be more interesting for me.*** Understand, though, that I'm not going to hear this from the company, because they want the money pre-DIP. If there is a direct route with you, I would be interested in discussing, as I have stated, ***as well as paying a bonus for entering, that is, take a risk but to be able to divide the benefits (i.e. 10% fee for the back stop bid.)***" (e-mail sent on 01/02/2014 to Marcos Spieler - highlighting ours).

impossibility of entering into any financing, <u>under the implausible justification that there wouldn't be "space."</u>[37]

131.    A similar e-mail was sent to Angra Partners (with a copy to the attorneys of the COMPANIES IN REORGANIZATION) on 12/26/2013[38], expressly stating interest in participating in the first part of the DIP FINANCING.

132.    However, the minority bondholder AUTONOMY wasn't the only ignored party to manifest its interest. ITAVA, for example, also tried, fruitlessly, to participate in the negotiations and to provide resources, as can be established by the e-mail sent to the attorney of the MAJORITY BONDHOLDERS (pgs. 1,397/1,403 of doc. 17), which were never even responded to: "*The purpose of this e-mail is to inform you that Itava is ready to participate in the first and second disbursements for the financing of the DIP. Itava will participate up to US$ 214 million with at least its portion in the total of US$ 5.8 billion in credit.*"

133.    All of these contacts, made by the initiative of the creditors themselves and not by the supposed "intense financing marketing," which never got to them, still occurred in December 2013, which shows that, if this "road show"

---

"*As you know, in spite of additional risks, we would like to **attempt to place funds in tranche A of the DIP or possibly the bridge.**" After speaking with Ricardo K, he directed me to Blackstone personnel to sign the NDA and negotiate a potential participation in the bridge. They are now suggesting that I deal directly with you (Rothschild.) (...) I stated to Blackstone, that **we could possibly contribute in the amount of USD 5mm of the USD 35 mm. If helpful, it would make sense for us to come in with a lesser ticket. Given the fact that the terms proposed in the PSA are quite punitive for those who have not participated in the Ad Hoc [Group], our objective would be to manage to find a way to get a pro-rata allocation of our exposure in the entirety of the DIP deal (ie. 200 mm), and we would be willing to enter via the bridge, if this is the right way.**"* (e-mail sent on 01/06/2014 to Marcos Spieler - emphasis ours).

[37] "*I spoke with NY and they told me that the bridge is really quite advanced. At the moment there is no space to participate.*" (e-mail sent on 01/07/2014 to Marcos Spieler - emphasis ours).

[37] "I understand, according to the information provided by OGX, **an Ad Hoc Group will have a differentiated participation with regard to the restructuring of the company debts.** In discussions with the company today, it was suggested to me that, despite the fact that we are outside of the Ad Hoc Group at the moment, we could attempt to participate in the payment of the first installment of the DIP, and as a result of that enter in as back-stop lenders in the process. **In conversations with Marcos, it was suggested to me that the most appropriate procedure for presenting my case would be by an intermediary of the company itself + Angra + Mattos Filho, which I'm doing by means hereof.** My understanding is that there might eventually be remaining portions for the first tranche, and there is still a discussion of one more pre-DIP deal, having said this, I imagine that our request may be welcomed. (…) Furthermore, I would like to highlight the fact that we can be quick in making this decision as the decision requires."

searching for financers began in September/October 2013, as uselessly stated in the ruling, was closed as soon as "the votes were assured" for the approval of the PRJ, with the entry of the MAJORITY BONDHOLDERS in the operation.

134.    Furthermore, do not say that GRUPO OGX didn't need more capital. It needed it so much that, beyond succumbing to the requirements of the MAJORITY BONDHOLDERS, including providing all relevant assets in guarantee, long after these statements of the APPELLANTS, it contracted an additional US$ 73.2 million dollars in loans[39]!

135.    Regardless, the APPELLANTS were always solemnly ignored by the COMPANIES IN REORGANIZATION and by the judge involved in the original ruling, who never offered a single word in response to the petitions in question (even after the scathing opinion of the Public Ministry agreeing with the illegality of the differentiated treatment), only appearing now to vehemently deny unequal treatment, but again without making reference to the documents that have already been detailed.

136.    Regardless, the basis for the ruling under appeal in reality only confirms the argument that the PRJ was pre-negotiated and that the JUDICIAL REORGANIZATION did not meet the aforementioned requirements as necessary, but was rather just a puppet show put on by the COMPANIES IN REORGANIZATION and the MAJORITY BONDHOLDERS, who unfortunately were able to receive a ruling in their favor.

137. This is due to the fact that, as the main basis of the decision to avoid unequal treatment, the existence of off-the-record agreements, entered into with a small number of creditors in the distant past, and absent of any procedural formality. Nothing in the court record was taken into account, and nor were the principles regarding reorganization, none of this whatsoever!

---

[39] As per the article available at: http://www.valor.com.br/companies/3518638/ex-ogx-firma-novo-emprestimo-de-us-732-milhoes-com-credores, accessible at 07/06/2014.

138.    For the ruling under appeal, all that was needed was a single affirmation that until December, 2013, **months before presentation of the PRJ**, when there was still actual discussion going on regarding the JUDICIAL REORGANIZATION process in terms of involving foreign companies,  41 sources of capital considered by Blackstone were allegedly called to participate in the DIP FINANCING, being delivered to the MAJORITY BONDHOLDERS. This, in turn, was attributed an immense importance, as if hundreds of other creditors didn't even exist…

139.    Since then, just as if the SERIES 1 DEBENTURES had not evolved, with a supportive effect, no other creditor had the opportunity of participating, since, in a completely authoritarian manner, the PSA prohibited the COMPANIES IN REORGANIZATION from granting any benefit that was equal or similar to that granted the MAJORITY BONDHOLDER[S].

140.    Also completely wrong is the understanding of the judge *a quo* that the APPELLANTS never wanted to run the supposed risks that the MAJORITY BONDHOLDERS were confronting by bearing the brunt of the financing for GRUPO OGX at the moment that it was absolutely most necessary.

141.    The MAJORITY BONDHOLDERS, supposedly willing to "take great risks" to "save" GRUPO OGX, in order to inject the resources of the DIP FINANCING, required as a guarantee, nothing more and nothing less than practically all of the company's assets, including through a chattel mortgage as guarantee, in order to not waste any time in the potential bankruptcy of the company, completely drained of assets at that point!

142.    Even if there was in fact a risk, for the sake of argument, there were always other creditors, such as the APPELLANTS, available to immediately divide the enormous "burden" assumed by the MAJORITY BONDHOLDERS, and it is at the very least quite curious that they never wished to share these supposed "great risks" taken on with them as well.

143.     There is still time, however, to safeguard at least in part, the merciful MAJORITY BONDHOLDERS; the APPELLANTS reiterated here their intention to diminish the risk assumed by them, transferring to them through the granting of rights related to the DIP FINANCING, resources proportional to those invested.

144.     As there was no way to counter the proof presented above by the APPELLANTS who, unwillingly, were disenfranchised of their rights, the abstruse argument was born - and even included in the decision under appeal - that the COMPANIES IN  REORGANIZATION did not require the US$ 11 million offered by the APPELLANTS, but rather US$ 215 million dollars.

145.     Still, it just takes a simple reading of the court documents to see that none of the creditors, bondholders or not, would invest US$ 215 on their own. The investments are being made by a group in which it is absolutely unquestionable the APPELLANTS have every right  to participate.

146.     It is clear that the APPELLANTS were never consulted as to whether or not they were inclined to increase their participation in new loans (and they were); nor were they sought under the same conditions and with due prior notice as were the MAJORITY BONDHOLDERS; nor were they  guaranteed the same parity  to participate in the DIP FINANCING. THIS IS STATED IN THE VERY FINDINGS OF THE DECISION UNDER APPEAL ITSELF!

**e) DIP FINANCING of the PRJ**

147.     If the manner chosen to differentiate creditors was wrong, due to the fact that they were not provided equal opportunity, the argument for non-symmetrical treatment does not hold up against the allegation that DIP FINANCING would be an extra-bankruptcy investment, not subject to JUDICIAL REORGANIZATION. This is a simplistic argument, naïve at best.

148.     In summary, within the measures approved by the AGCs and approved by the judge *a quo* for support of the COMPANIES IN REORGANIZATION,  the following items are worthy of highlight:

(a)     **Contracting DIP Financing:** performed in three series of debentures (1st SERIES, 2nd SERIES, and 3rd SERIES, respectively), in order to make it feasible to obtain new resources to be used (i) in the liquidation of the BRIDGE LOANS (as defined in the PRJ), contracted by OGPAR on 12/26/ 2013 and 01/13/2014; (ii) in the funding of development of operational activities of GRUPO OGX during the temporary process of restructuring in which it is currently found, and (iii) oddly, in the fees of the favored creditors' consultants used. Specifically**: the attorneys of the MAJORITY BONDHOLDERS were paid by the COMPANIES IN REORGANIZATION.**

(b)     **Restructuring of Debts:** The restructuring of debts of GRUPO OGX would be performed by means of imposition on the creditors of the conversion of bankruptcy credits and, further, of extra-bankruptcy credits compliant with the PRJ, in the shareholder participation in RESTRUCTURED OGX; and

(c)     **Incorporation of OGX PARTICIPAÇÕES by OGX:** after conversion of the bankruptcy and extra-bankruptcy credits referred to in item (b) above into company shares of OGX, OGX PARTICIPAÇÕES should be incorporated by OGX,with the consolidation of company shares in one sole company, OGX REESTRUTURADA.

149.     As can be gleaned from section 4.3 of the OGX PLAN[40], the DIP FINANCING consists of extra-bankruptcy financing to be granted by financers through subscription to debentures, in the total amount of US$ 215 million, which will correspond, on the date of issue of the debentures, to R$ 514,624,000.00.

---

[40] Also described in section 4.3 of the OGPAR PLAN and section 4.3 of the OGX AUSTRIA PLAN.

150.     The PRJs establish that the DIP FINANCING shall be implemented in at least 2 steps ("1st TRANCHE and" and "3rd TRANCHE"), through issue of debentures in at least two series ("DEBENTURES 1st SERIES" and "DEBENTURES 3rd SERIES"): (a) the first in the amount of R$ 299,200,000.00 (corresponding to an amount of US$ 125 million), with monetary adjustment, according to exchange rate variation, until the date of paying in; and (b) the second in the amount of R$ 215,424,000.00 (Corresponding to US$ 90 million), with monetary correction, adjusted according to exchange rate variation, until the date of paying in.

151.     The PRJs also establish that:

(i) **SERIES 1 DEBENTURES (a)** subscription of the 1st SERIES DEBENTURES IS RESTRICTED, EXCLUSIVELY, to MAJORITY BONDHOLDERS[41]; and (b) beyond this, to substantiate the greater part of DIP FINANCING, the conversion factor of the SERIES 1 DEBENTURES into shares **is greater than for other debenture series,** and subscribers should be ensured, at the end of the proposed restructuring, a shareholder's participation in OGX REESTRUTURADA equivalent to 41.9767%.

(ii) **SERIES 3 DEBENTURES: (a)** the SERIES 3 DEBENTURES may be subscribed by any creditors of GRUPO OGX who meet the requirements foreseen in the PRJ for this purpose, including the MAJORITY BONDHOLDERS, proportionally to the respective credits in relation to the entire sum of the credits[42]; **(b)** or the conversion factor of SERIES 3 DEBENTURES

---

[41] In accordance with section 4.4 of the OGX PLAN (which makes reference to sections 4.4 of the OGPAR plan and 4.7 of the OGX AUSTRIA PLAN), *"The Series 1 Debentures must be fully subscribed by Backstop - New Financers (directly or indirectly) until the conditions precedent are satisfied or fulfilled, in addition to other terms and conditions listed in the Subscription Agreement for the subscription thereof, including, but not limited to; (i) granting and regular constitution of guarantees indicated in the DIP Guarantee Agreements – 1st Series (as applicable); and (ii) verification of the production of the determined* amount of *petroleum, under the terms of Section 3.1(u) of the Subscription Agreement."*
[42] In accordance with section 4.5 of the OGX PLAN (which makes reference to sections 4.5 of the OGPAR plan and 4.8 of the OGX AUSTRIA PLAN), "*The Series 2 Debentures may be subscribed and paid up by Creditors who may be any Creditors Qualified for Subscription of Series 2 Debentures, in proportion to the respective Credits in relation to the total sum of the Credits contained in the OGX, OGPar, OGX Austria, and OGX International Creditor List, valid at the date of the Creditor Assembly to deliberate on the plan, since, if completed in a timely manner,*

into shares should ensure subscribers, at the end of the proposed restructuring, a shareholder's participation in OGX REESTRUTURADA equivalent to 23.0233% ; and

(iii)   POSSIBLE **SERIES 2 DEBENTURES: (a)** the subscription to possible remainders of SERIES 3 DEBENTURES (arising from the exercising the right of any creditor to subscribe) is restricted, exclusively, to the MAJORITY BONDHOLDERS, ostensibly due to seniority, but, in truth, this reflects more the disproportional and discriminatory treatment regarding the other bondholders. In other words, as not all creditors will likely subscribe to the SERIES 3 DEBENTURES, the aforementioned mechanism permits MAJORITY BONDHOLDERS to reach a greater number of shares, not being restricted by the *pro rata* criteria established.

152.    With approval of the PRJ and implementation of the restructuring, the credits coming from the DIP FINANCING will be converted into shares representing 65% of OGX REESTRUTURADA, with further shares corresponding to the 1st series of debentures at 41.9767% of these shares and the 3rd series at only 23.02333%. The unsecured (bankruptcy) credits, in turn, will be converted (read, liquidated) into shares representing only 25% of OGX REESTRUTURADA, while the last 10% will be distributed among current shareholders of GRUPO OGX.

153.    As expected, the PRJ reflected the same terms and conditions previously set forth between GRUPO OGX and the MAJORITY BONDHOLDERS through the performance [of the] "PSA" – pgs. 507/577 of doc. 14, which, in essence, is an agreement through which the MAJORITY BONDHOLDERS assume the commitment to vote favorably for the approval of the PRJ[43] in exchange for a

---

*with the respective Creditor, or when the Notification concerning Interests of Subscribers of the 2nd Series Debenture and the Subscription Communication are available, under the terms of Section 1.1.87 of this Plan.*

[43] *"(…) each consenting bearer (individually and not severally), in its name and in the name of the subsidiaries controlled by it, hereby agrees to: (a) vote, based on its respective Notes,], of which it is the effective owner, now or in the future, or in relation thereto, now or in the future, such Consenting Bearer shall act with the designated individual, investment manager, or consultant for the effective bearers of the same, **in favor of the plan in accordance with applicable procedures established in the BRL (…) d) not (i) challenge the Plan or the acceptance, approval, or implementation of the Plan;** (ii) initiate any legal procedures that might be inconsistent with, or that might harm, impede, or prevent the approval of the Plan or the operations described therein (...)"* (emphasis ours - pgs. 516/517 of doc. 14)

more beneficial treatment than the other bondholder creditors.

154.     The MAJORITY BONDHOLDERS (or their delegates) came to have the right to participate in the DIP FINANCING in a privileged manner, with regard to other bondholders, ensuring that the bankruptcy claims of the MAJORITY BONDHOLDERS would be liquidated, in fact, under exclusive and much more beneficial conditions than the claims of other bondholders, given that, in light of the proposed restructuring, the MAJORITY BONDHOLDERS would in fact be in control of OGX REESTRUTURADA.

155.     Therefore, in spite of the COMPANIES IN REORGANIZATION having attempted to make the case that "*the structure agreed in the PSA is not exclusive*" (pgs. 906 of the doc. 19), given that "*it permits participation of other creditors who, although silent until now, have demonstrated interest in effectively financing the company (...)*" (pgs. 906 of doc. 19), through the characteristics of DIP FINANCING it is clear that the MAJORITY BONDHOLDERS are receiving more favorable treatment than the other bondholders since the MAJORITY BONDHOLDERS are offered advantages that will guarantee them, illegally, greater shareholder participation in OGX REESTRUTURADA, r than would have been the case had they permitted the other bondholders to participate in the 1st DEBENTURE SERIES.

156.     As already clearly demonstrated above, it is not a simple coincidence that the main creditors, theoretically voting in the AGCs, would have received benefits in participating (i) with exclusivity, in the 1st SERIES, or that exclusively guarantees them 41.9767% of the OGX REESTRUTURADA; (ii) in SERIES 3, which will grant to them additional shareholder participation, in proportion to their respective credits, to be allocated within the 23.0233% intended for SERIES 3; (iii) exclusively, in SERIES 2,

which will guarantee even greater participation, particularly with regard to remaining amounts of credit of OSX, which knowingly did not subscribe its part, as described in further detail below; and (iv) in the unsecured conversion of credits, which will guarantee them additional shareholder participation, in proportion to their respective credits to be allocated within the 25% marked at this stage of the restructuring proposed by the COMPANIES IN REORGANIZATION.

157.    These rights, cumulatively and in part exclusive, are specifically due to the fact that the MAJORITY BONDHOLDERS will have a position of great influence at the moment of voting the PRJ's, if there are in fact no conflicts. In the negotiation of this vote, they demonstrate that they are indeed being seen as bankruptcy creditors, and this truly indicates an inequity between creditors subject to JUDICIAL REORGANIZATION.

158.    Specifically, with regard to the SERIES 2 DEBENTURES, the illegality of the exclusivity is even more clear by the fact that the credit of approximately US$ 1.5 billion of OSX would be in the general computation for the establishment of subscription proportions for the SERIES 3 DEBENTURES, as stated by the COMPANIES IN REORGANIZATION in the AGCs (pgs. 7.456/57 of doc. 9).

159.    It so happens that, beyond the fact that OSX is also in judicial reorganization and would not have availability of resources to subscribe to its portion of the SERIES 3 DEBENTURES, OGX itself already recognized in the past that the OSX would not sign debentures within the scope of the DIP FINANCING (attached to doc. 12).

160.    That is, the MAJORITY BONDHOLDERS already knew beforehand that there would be additional SERIES 2 DEBENTURES, at least a quarter of the SERIES 3 DEBENTURES, which reinforces that all negotiations of the PRJ were made in such a manner as to benefit only a certain select few. Urged to come out against the proposal of the APPELLANTS, the remaining portions were divided with them in reference to the share pertaining to OSX, both this as well as OGX and the MAJORITY BONDHOLDERS silenced or denied the proposal.

**d)      Undeniable and exaggerated differential treatment, even in light of the fact that it relates to an extra-bankruptcy credit**

161.     Based on information revealed by the **OGPAR** (reflected in the **PRJ**), the esteemed Banco Barclays generated a report (attached as doc. 12) confirming that if the implementation of the restructuring is carried out in the manner proposed by the **COMPANIES IN  REORGANIZATION**, the **MAJORITY BONDHOLDERS** would in turn become controlling shareholders of the company (66.7%), with the shares of the company thus being allocated in the following manner:

| Consenting Bondholders | Other Bondholders | Current Shareholders | OSX | Suppliers |
|---|---|---|---|---|
| 66.7% | 14.6% | 10.0% | 6.5% | 2.2% |

|

OGX

162.     As stated in the extract of this report from Barclays Bank:

*"We believe that the ad hoc group of bondholders supporting the plan will be responsible for 87.3% of the DIP financing (US$ 182 million) and will hold 66.7% of the capital stock for the company, while the remaining bondholders would be responsible for 12.7% of the DIP financing (US$ 26.5 million), and will receive share participation representative of 14.6% of the capital stock. We also calculate that OSX will hold 6.5 of participation, and the suppliers, 2.2%).*

163.     In addition to this advantage over other creditors, the **MAJORITY BONDHOLDERS** will have their bonds more valued than the bonds of other bondholders, as stated by Barclays Bank:

*"Considering the fact that the bondholders participating in the DIP financing, with the application of a discount rate of 25% for one year, and assuming an EV of US$ 2 billion, the amount of the bonds would be* **13 cents** *on each dollar. If the bondholders did not participate in the DIP financing, the valuation is even lower – just 7 cents, considering an EV of US$ 2 billion. The potential valuation is far more interesting for the ad hoc group (Consenting Bondholders),* **46 cents***, considering an EV of US$ 2 billion, and that the other bondholders also participate in the DIP financing."*

164.    That is, the fact that they would pay less, percentage-wise, for shares in OGX REESTRUTURADA, and remain in control of the company, by virtue of unequal treatment that the COMPANIES IN REORGANIZATION are granting to the MAJORITY BONDHOLDERS, **the bonds held by them would be valued at much less than other bonds held by other bondholders.**

165.    Barclays Bank itself recognizes the privileges of the MAJORITY BONDHOLDERS **(in their role as creditors) in** the JUDICIAL REORGANIZATION, because of exclusivity in participating in the SERIES 1 DEBENTURES, attributing their instruments greater value than other bonds:

*"Cost of DIP financing and differentiated share participation* **indicates a different profile for the ad hoc group, compared with the other bondholders:** *In accordance with our calculations, it is believed that [if] all of the bondholders participate in the DIP financing, the ad hoc group will pay 9.1 cents (per dollar on the face value) in bonds, while non-members of the group will pay 1.6 cents. In the same manner, the various company shares entail a different potential valuations. Going from company values of US$ 500 million, US$ billion, and US$ 2 billion,* **according to our calculations, the value of the bonds held by the ad hoc group would be 8, 24, and 58 cents, while the value of the bonds held by non-members of the group would be 3, 7, and 17 cents.** *If the non-members of the ad-hoc group opt to not participate in the DIP, the amounts will drop to 2, 5, and 9 cents."*

166.    Notwithstanding analyses and conclusions of Barclays Bank, all and every calculation exercise performed involving the amounts to be contributed, and the company share percentages attributes to the creditors in OGX REESTRUTURADA is also evidence of illegal treatment, absurdly more favorable to the MAJORITY BONDHOLDERS with regard to other bondholders:

(a) <u>Scenario 1:</u>

Considering (i) the appraised value of OGX REESTRUTURADA as reported to the COMPANIES IN REORGANIZATION (US$ 1,500,000,000.900, as per section 10.4 of PLAN OGX and section 9.4 of the OGPAR PLAN) and (ii) the amount of the 1st TRANCHE (US$ 125,000,000.00), it can be shown that participation in the 1st INSTALLMENT would guarantee the respective subscribers the right to receive OGX REESTRUTURADA shares equivalent to 8.33% (that is, US$ 125 million on US$ 1.5 billion), and not the 41.9767% indicated in the GRUPO OGX PLANS.

In order to do justice to this 41.9767%, the contribution of the MAJORITY BONDHOLDERS in the 1st TRANCHE should be US$ 629,650,500.00. **For what possible reasons would the MAJORITY BONDHOLDERS receive five times more shares than the amount loaned in the 1st TRANCHE, and only they would have this opportunity?** This is a question without a response.

(b) <u>Scenario 2:</u>

As per the table below, considering (i) the amount of the 1st TRANCHE (US$ 125 million), (ii) the amount of the 3rd TRANCHE (US$ 90 million), (iii) the total amount of the bankruptcy credits at 02/19/2013, date presented to the list of creditors (approximately US$ 5.635 billion, as per amounts in dollars on the list and the exchange rates for Reais and Pounds Sterling to Dollars on that date, according to Banco Central do Brasil), as well as (iv) the OGX REESTRUTURADA share participation percentages which would be provided to the various subscribers,

it can be noted that:

(a) for every 1% of share equity in RESTRUCTURED OGX to be acquired thru conversion of credits pertaining to 3rd TRANCHE, the corresponding underwriters must spend an amount of approximately US$ 3.909 million, an amount over 31% greater than the amount to be spent by the MAJORITY BONDHOLDERS in 1st TRANCHE, which is about US$ 2.977 million; and

(b) for every 1% of share equity in RESTRUCTURED OGX to be acquired thru conversion of Bankruptcy Credits, the corresponding creditors must spend about US$ 225.43 million, **an amount 75.7 times greater** (!) **than** the cost of the same percentage to be borne in 1st TRANCHE by the MAJORITY BONDHOLDERS. Aware of the great benefits negotiated for the 1st TRANCHE, the MAJORITY BONDHOLDERS do not allow minority bondholders to participate!

| Tranche | Amount (US$) | Equity in RESTRUCTURED OGX | Approximate amount (US$) for every 1% in RESTRUCTURED OGX |
|---|---|---|---|
| 1st TRANCHE | 125 million | 41.9767% | 2,977 million |
| 3rd TRANCHE | 90 million | 23.0233% | 3,909 million |
| Bankruptcy Credits | 5.635 billion | 25.0000% | 225,43 million |

**(c) Scenario 3:**

As per the table below, considering *(i)* the current number of shares representing OGPar's capital stock (3,236,016,790), *(ii)* the percentages of share equity in RESTRUCTURED OGX to be allocated to 1st TRANCHE (41.9767%) and 2nd TRANCHE (23.0233%) underwriters, as

well as *(iii)* the number of shares to be issued and allocated to aforementioned 1st TRANCHE (13,583,730,599) and 3rd TRANCHE (7,450,378,536) underwriters in order to meet such percentages, it can be noted that by the end of the proposed restructuring:

(a) the price to be paid by MAJORITY BONDHOLDERS for each RESTRUCTURED OGX share shall be only about US$ 0.0092;

(b) the price to be paid by 3rd TRANCHE underwriters for each RESTRUCTURED OGX share shall be of approximately US$ 0.0120; and therefore 31% higher than the price to be paid by MAJORITY BONDHOLDERS; and

(c) the price to be paid by bankruptcy creditors for each RESTRUCTURED OGX share shall be about US$ 0.6966; and therefore **75.7 times (!)** the price to be paid by MAJORITY BONDHOLDERS.

| Share beneficiary | Amount of contribution (US$) | RESTRUCTURED OGX equity percentage | # of RESTRUCTURED OGX shares | Approximate amount (virtually) paid for each share (US$) |
|---|---|---|---|---|
| Current shareholders | - | 10% | 3,236,016,790 | - |
| 1st TRANCHE underwriters | 125,000,000.00 | 41.9767% | 13,583,730,599 | 0.0092 |
| 2nd TRANCHE underwriters | 90,000,000.00 | 23.0233% | 7,450,378,536 | 0.0120 |
| Other creditors | 5,635,830,474.50 | 25% | 8,090,041,975 | 0.6966 |
| TOTAL | | 100% | 32,360,167,900 | |

**(d) Scenario 4:**

Assuming that a US\$ 90 million contribution warrants 3rd SERIES DEBENTURES underwriters a share equity equivalent to 23.0233% in RESTRUCTURED OGX, should the same mathematical rationale be applied to 1st TRANCHE, namely

| |
|---|
| US\$ 90 million – 23.0233% |
| US\$ 125 million – x% |

By contributing an amount corresponding to US\$ 125 million, under the principle of legal equality, the MAJORITY BONDHOLDERS would deserve approximately 31.9767% share equity in RESTRUCTURED OGX rather than the 41.9767% defined under PRJ.

It is worth to draw attention to the fact that the difference indicated above is 10%, which is precisely the percentage that corresponds to Backstop Fee compensation and which, as announced to the markets by the COMPANIES UNDER REORGANIZATION, would be paid exclusively to MAJORITY BONDHOLDERS, and which curiously is not expressly stated in the PRJ but rather **in a hidden manner** results from the excellent conditions for conversion of 1st SERIES DEBENTURES into RESTRUCTURED OGX shares as defined in Debenture Deed Clause 4.20.4.12.

Unfortunately, instead of preventing such practice the court of origin claims it cannot interfere with the PRJ's economic issues, and chose to state that: *"It is considered that a 10% bonus as a premium to the risk undertaken in a group of companies under high risk of bankruptcy is not absurd, but even a rather a modest yield…"*

It makes no sense that the MAJORITY BONDHOLDERS receive a 10% premium of the restructured company, bargaining behind closed doors, as a reward for underwriting the 1st SERIES DEBENTURES, highly favorable, as demonstrated (!?) It means they earn a bonus

of at least US$ 150,000,000.00 (in other words, 10% of RESTRUCTURED OGX's US$ 1.5 billion total) an amount which is greater than the very amount invested in the 1st SERIES, which is only US$ 125,000,000.00.

Moreover, the US$ 150,000,000.00 Backstop Fee supposedly serves to remunerate an obligation to cover left-over 3rd SERIES DEBENTURES. But the total amount of the latter is US$ 90,000,000.00, much less than such fee.

Furthermore, most of such US$ 90,000,000.00 would already be underwritten by the MAJORITY BONDHOLDERS as a result of their proportional entitlement to the bankruptcy credit amount. In conclusion, the amount MAJORITY BONDHOLDERS pledged to cover is lower than US$ 45,000,000.00!

The intent to accrue US$ 150,000,000.00 is only to ensure that an amount lower than US$ 45,000,000.00 is received would be absolutely surreal under any circumstances! This sounds even more absurd in the present case because this supposed warranty remunerated by the Backstop Fee is actually a great privilege, because the debentures' conversion factor becomes highly attractive, to the extent that the OGX GROUP and the MAJORITY BONDHOLDERS are reluctant to grant the same entitlement (or same "obligation") to other creditors. If this was indeed an onus, and not a bonus, it is evident that the minority bondholders would not be hampered!

167.     Then why did the COMPANIES UNDER REORGANIZATION grant all this privilege exclusively to the MAJORITY BONDHOLDERS? **Simply because in their view this would ensure approval of the PRJ, which ended up happening illegally and closely links the company restructuring, the PSA, and, more specifically, the DIP FINANCING with this JUDICIAL REORGANIZATION process.**

168.     If there are more bondholders interested in investing again in the OGX Group who believe in the Group's reorganization – as extensively demonstrated above as well as on the motions for   clarification   filed   on   January   31,   2014   and   on   the   motion   filed   on

February 14, 2014, before 1st SERIES DEBENTURES were closed – then the COMPANIES UNDER REORGANIZATION should have accepted under 1st SERIES DEBENTURES all other bondholders and unsecured creditors of the same nature who manifested such interest, offering them the same conditions granted to the MAJORITY BONDHOLDERS.

169.        It is evident that the DIP FINANCING is not merely an extra-bankruptcy financing. **The sole explanation for a select group of investors to have such a large advantage over the others is the fact that the MAJORITY BONDHOLDERS, in the eyes of the COMPANIES UNDER REORGANIZATION, supposedly had a critical role in voting (and supposed approval) of the OGX GROUP PLANS.** In order to reach this goal, **the COMPANIES UNDER REORGANIZATION even agree to pay the fees of the MAJORITY BONDHOLDERS' advisors (pg. 514 - doc. 14)!**

170.        The aforementioned is further proved by the fact that the *PSA* itself, which was adopted as basis for developing the APPROVED PLANS, was signed to accommodate this intent,  as construed from the name assigned to the contractual instrument (in Portuguese, "contract to support the plan").

171.        In this context, it can be concluded that the purposes of the APPROVED PLANS was not only to overcome the economic-financial crisis, but also to benefit the MAJORITY BONDHOLDERS as consideration for the commitment undertaken by the latter with assignment of control over the OGX GROUP, even if this was done against the interests of the group and particularly against the interest of the other creditors and shareholders who believed and trusted in the COMPANIES UNDER REORGANIZATION.

172.        This is the background to the APPROVED PLANS.

173.        The mistaken understanding of the court of origin notwithstanding, it can be noted in the APPROVED PLANS that, against bankruptcy law, the COMPANIES UNDER

REORGANIZATION chose to treat creditors of the same class  differently, conceiving a daring company operation that was kept under secrecy for as long as possible and restricted to an exclusive group with obscure selection criteria, which was based on a financing, convertible into shares, whose main goal is handing over control of the debt-free COMPANIES UNDER REORGANIZATION to a few debtors. In exchange for which, the latter pledged to "support" the PRJ.

174.      Finally, it is clear that the *PSA* would never have existed had the MAJORITY BONDHOLDERS not held most of voting shares in the AGCs. It is not possible to interpret the *PSA* as something outside of or far from the JUDICIAL REORGANIZATION, for what was at stake at the end of the day was approval of the PRJ. Nothing can be clearer than this.

175.      It is also clear that, when such MAJORITY BONDHOLDERS underwrite most of the DIP FINANCING, in the amount of US$ 215 million, convertible into 65% of a company valued at US$ 1.5 billion, **they have a gigantic actual profit on the transaction**. Because the bottom line is that this will be returned to the MAJORITY BONDHOLDERS, whether as assets or equity, it cannot be refuted that such a transaction compensates and practically liquidates the bankruptcy credit of such creditors.

176.      Therefore, there clearly is a different treatment between creditors of the same class and origin in the judicial reorganization, which is forbidden under LFR.

**III.3.2      RATIFICATION OF ACTS AND WAIVER OF LIABILITIES**

177.      The court of origin understood that the clauses in the APPROVED PLANS discussing ratification of acts and waiver of liabilities would be valid because they represent a waiver of an available right, even though they are ***"ineffective in relation to creditors who expressly opposed them by voting for plan rejection"*** (pg. 7905 doc. 10).

178.       Notwithstanding, the correct understanding that the aforementioned clauses could never be considered valid against those who were expressly opposed to them, the court of origin **failed to declare said clauses ineffective in relation to the parties which either abstained from voting or which were not able to attend the AGCs for whatever reason.**

179.       In other words, the understanding is exactly the opposite: if the right is available, the creditor must expressly dispose of said right, in other for their discretion to be effective. If the creditor does not agree with, or does not express an opinion, in both cases settlement is ineffective.//

180.       Case law has already consolidated the understanding that the definition of clauses discussing available rights in reorganization plans are acceptable only for those who agree to them, that is, only for those who agree to exercise said rights:

> *"Judicial reorganization. Interlocutory appeal.* **Approved j*udicial reorganization plan that extends clauses covering novation effects to co-obligors, joint debtors, warrantors, and guarantors.** *The novation set forth as an effect of judicial reorganization does not have the same legal nature as novation governed by the Civil Code. Claim by the company under reorganization for validity and efficacy of the clause for all guarantors, warrantors, and co-obligors.* **Validity and efficacy of the clause on creditors who expressly approved the plan, for it is an available right,** *who in doing so waive the right to proceed against warrantors/guarantors within the biannual period of "judicial supervision."* **Inefficiency of clause extending novation to personal co-obligors (warrantors/guarantors) in relation to creditors attending the General Assembly and who abstained from voting, as well as those absent from the Assembly.** *Manifest inefficacy of the clause in reference to creditors who voted against the plan, and 'a fortiori' inefficacy in reference to creditors who proposed objections pertaining to the illegality of the novation extension clause.*

*Decision upheld. Appeal denied."[44]* (our highlight).

181.     Furthermore, regarding creditors who did not attend the AGCs and who did not have the great "opportunity" to waive their available right to claim losses despite being fleeced by the COMPANIES UNDER REORGANIZATION and by the MAJORITY BONDHOLDERS, case law is also emphatic  in stating that the aforementioned clause  obviously cannot  be pleaded:

> *INTERLOCUTORY APPEAL JUDICIAL REORGANIZATION **Claim to nullify** **general assembly resolution that approved the amendatory plan and established** **a discharge** and release of joint  debtors, suspended judicial claims and executions filed by creditors against those very joint debtors Claim uphold to a minor extent to declare ineffective in relation to petitioner and to creditors who rejected the plan or did not attend the general assembly Appeal partially accepted in reference to this matter. (…) **The clauses are not void, but ineffective** **towards the appellee bank and other creditors who thus voted in the General** **Assembly or who did not attend the approval session, as was also found by the** **District Attorney in his opinion in this instance.** (…) It is therefore the case to partially uphold the appeal, to a lower extent than the appellant's claim, **to** **declare clauses 8.1 and 9.4 ineffective towards the petitioner,** an understanding that extends to creditors who rejected the plan or who did not attend the general assembly."[45]* (our highlight).

182.     The existing settlements and ratifications clearly are at least peculiar dispositions. With complete disregard for the law, the COMPANIES UNDER REORGANIZATION met "behind closed doors" with the MAJORITY BONDHOLDERS, the supposedly voting majority at the AGCs, and granted the latter

---

[44] TJSP, Division for Bankruptcy and Judicial Reorganization, interlocutory appeal nº 0196402-74.2011.8.26.0000, Rel. Manoel Pereira Calças, d.j. 09/20/2011.
[45] TJSP, Division for Bankruptcy and Judicial Reorganization, interlocutory appeal nº 0027530-96.2011.8.26.0000, rel. Ricardo Negrão, d.j. 01/24/2012.

several benefits which were not equally extended to the other bondholders, and furthermore agreed to a self-discharge that attempted to tie the hands of third parties even further!

183.    What would be the reason for such nonsense? Could it be because the **COMPANIES UNDER REORGANIZATION** and the **MAJORITY BONDHOLDERS** themselves doubted the lawfulness of the acts included in the PRJ? Probably yes, for the illegalities are so latent, and the fear of the resulting consequences is so great and obvious that even third parties unrelated to the process, such as companies related to the **OGX GROUP** and to **DEUTSCHE**, ended up included among those who "did no wrong, and shall suffer no harm."

184.    Incidentally, not content to disseminate worthless discharges throughout several clauses in the PRJ to their own benefit and the benefit of third parties, the **APPELLEES** **also attempted to hide discharges and ratifications of acts in the PRJ <u>annexes</u>,** such as in the template for "*Notification of interest in underwriting the 3rd debenture series,*" annex 1.1.96 to the **APPROVED PLANS**.

185.    It is yet another obvious illegality which only helps the **MAJORITY BONDHOLDERS** and other third parties who benefit from such void clauses (all of them!)

186.    WHATEVER IS ANALYZED, ILLEGALITIES EMERGE ***"SO BRIGHT THEY HURT THE EYE."***

187.    Fortunately, the appealed decision partially impeded this intention to include discharges in the PRJ and its annexes, but it did so for only a few, whilst all **APPELLANTS** and other creditors who did not approve such settlements are in the same situation, which also contaminates the PRJs with nullity.

**III.3.4. THE ODD RELEASE OF THE PUT AND CALL OPTION AND THE SUBSCRIPTION WARRANTS TO THE OGPAR SHAREHOLDER**

188.    In the same manner, the decision being appealed is partially correct in relation to the sections concerning a Put Option in stating that they would be "*ineffective in regard to creditors that explicitly opposed it.*" (doc. 10).

189.    Still, for this reason, as well, the judge was mistaken, since the aforementioned section should have been declared invalid for creditors who were not present at the AGC's, or who abstained from voting.

190.    In any event, it must be stated that the aforementioned section of the INITIAL PLANS[46] implies an immediate release of an express amount.

191.    [It is] inadmissible, and certainly quite strange, that a company in crisis, with bankruptcy liabilities greater than R$12 billion, would attempt to forgive an obligation assumed by its controlling shareholders in an amount equivalent to US$ 1 billion, in particular when such forgiveness was established in the context of an agreement signed between a select group of MAJORITY BONDHOLDERS, without this negotiation process involving other creditors whatsoever.

192.    In other words, one part ceded control, and the other returned the favor with the release of the Put Option.

_____

[46] "*11.1 Once the Plan is approved by the Assembly of Creditors and disclosed to the Creditors, the result of the procedure reported by the OGPar through the Market Communication dated 11/11/2013, for the purpose of discussion of the put option, eventually concluded due to its invalidity and/or unenforceablity, it is agreed that on the date which the Bankruptcy and Extra-Bankruptcy creditors were effectively  given the Shares  corresponding to the Capital Increase Through Capitalization of Credits (as defined in Clause 5.12 above), free and clear of any liens or issues, the Bankruptcy  and Extra-bankruptcy Creditors (who were expressly included in the plan), **through this Plan, granted for all legal purposes, broad, specific, unrestricted exoneration and release to  OGPar, Grupo OGX, the Shareholders, the then-controlling shareholders, the parties signing the Put Option , the former and current administrators of OGPar and OGX, and their controllers, direct, or indirect, with regard to any intention, action, or right to demand specific execution, reparation of damages, or other demands, of any sort in relation to the Put Option.**"*

193.    Taking into account that the creditors will be shareholders, the release of the obligation to contribute an amount equivalent to US$ 1 billion represents a waiver by OGPAR of an important asset (right).

194.    The **Public Ministry of the State of Rio de Janeiro** issued an opinion (pgs. 1.816/1.856 of doc. 13) against the release, since, as they wished, "*credits may not, even with a majority of votes, exempt anyone from any obligation whatsoever, unless it is the actual company itself in reorganization." Mr. Eike Fuhrken Batista is not in judicial reorganization, nor is he part of the process and, therefore, he cannot have his debts and other obligations excused, extinguished, or otherwise reduced, by the majority will of the creditors of companies that are members of Grupo OGX*" (pg. 1.840 of doc. 13).

195.    Due to the fact that this blatant release was not met with approval, the **COMPANIES IN REORGANIZATION**, upon presenting a new version of the plans to turn off the lights (the **APPROVED PLANS**), intended to "smooth out" the section, attempting to indicate that the procedure of releasing the Put Option would depend on the result of legal opinions, and that it would only "possibly" involve release, eliminating at least, the conditions of release. See the wording of the sections:

> "*11.1 Once the Plan is approved by the Assembly of Creditors and disclosed to the Creditors, the result of the procedure reported by the OGPar through the Market Communication dated 11/11/2013, for the purpose of discussion of the put option, eventually concluding its invalidity and/or unenforceablity("Results of the Procedure"), it is agreed that on the date when the Bankruptcy and Extra-Bankruptcy creditors  (only the Extra-bankruptcy creditors were expressly included in the Plan), and/or the Share Commission, were given the shares corresponding to the Capital Increase Through Capitalization of Credit (as defined in Clause 5.13 above), free and clear of any liens or issues, the Bankruptcy  and Extra-bankruptcy Creditors                   (                              who                      had*

*expressly joined the plan), by means of this Plan, would recognize, for all legal purposes, the full validity and effectiveness of the Results of the Procedure."* (doc. 8)

*"1.1.124" "Results of the Procedure": As defined in Clause 11.1 of this Plan, refers to the procedure relating to the amicable solution of the dispute regarding the Put Option."*

196.    In the Market Communication issued on 11/11/2013, **OGX PARTICIPAÇÕES** made public, that it and its controlling shareholder – Mr. Eike Fuhrken Batisa – decided to submit the terms of the dispute to independent jurists, involving the exercise of the Put Option for **OGX PARTICIPAÇÕES**, in the terms below:

**"– Dispute on Exercise of the "PUT" option –**

*Rio de Janeiro, November 11, 2013 - OGX Petróleo e Gás Participações S.A. ("OGX") (Bovespa: OGXP3; OTC; OGXPY.PK) communicates to the market, with regard to the Material Fact of September 9, 2013, in which it announced, in response to the exercise of the "PUT" option, that the Company and the controlling shareholder resolved to submit the terms of the dispute to independent jurists, estimating an additional term of 60 days to obtain a position on this, which shall be reported to the market and to shareholders."*

197.    As can be observed from the contents of the aforementioned Market Communication, OGX PARTICIPAÇÕES exercised the Put Option, against the actions of the controlling shareholder, through notification of the conflict to OGX PARTICIPAÇÕES, as contained in the Material Facts issued respectively on the date of September 6, 2013[47] and September 6, 2013[48].

_____

[47] *"__Material Fact__ – OGX EXERCISES A "PUT OPTION" OF US$ 1 BILLION GRANTED BY ITS CONTROLLING SHAREHOLDER. – Rio de Janeiro, September 6, 2013 – OGX Petróleo e Gás Participações S.A. ("OGX") (Bovespa: OGXP3; OTC: OGXPY.PK) communicates to the market that the Board of Directors of the Company hereby unanimously exercised a put option against their controlling shareholder, Mr. Eike Fuhrken Batisa, as stated in the Private Instrument for Granting the Option to Subscribe to Shares and Other Agreements, entered into on the date of October 24, 2012, and disclosed to the market on the same date, so that it may come to subscribe to new ordinary shares issued by the Company, at the strike price of*

198.   When questioned by the head of the APPELLANTS in the AGC's regarding the procedure of approving the Put Option, the COMPANIES IN REORGANIZATION were not able to present even the minimum clarifications, giving to believe that they had "smoothed over" the text of the section, although the release of an important asset was still a bit obscure:

> *"Mr. Thomaz Sant' Ana questioned who would be the three controlling parties, and requested details of the procedure, to which Mr. Eduardo Munhoz responded that he could not provide any further information, with respect to what material facts were revealed in 2013, since any disclosure, at this moment, would harm the symmetry of the information due to shareholders."*

199.   The moment became tense for those present in the AGC's, because not even the names of the professionals involved or the procedure for the supposedly binding decision was revealed.

200.   Let the esteemed Court of Justice of Rio de Janeiro note that **ABSOLUTELY NOTHING WAS EXPLAINED** IN THE PRJ OR IN THE AGCS WITH REGARD TO RELEASE OF THE PUT OPTION, but even so, the decision under appeal considered this absurd generality about an obligation of no less than US$ 1 BILLION for a company needing capital (to the point of conferring extreme benefits on certain few), "duly clarified"):

'

> *"With regard to the Put Option, it is important to note that **this point was duly clarified by the representative of the companies in reorganization,** in the*

---

*R$ 6.30 (six reais and thirty cents) per share, at an amount equivalent to US$ 1,000,000,000.00 (one billion USD) ("Put" or "Option"), with the immediate disbursement  of US$ 100,000,000.00 (one hundred million US dollars) and the balance in a variable form in consideration of the need for additional cash by the Company, as per determination of its management. The Board of Directors will propose an extraordinary meeting of the Management Board for the holding of a General Meeting for the purpose of approving the immediate increase of equity capital in the amount of US$100,000,000.00 (one hundred million USD).*

[48] ***"Material Fact** – Response of the Controlling Shareholder to the exercise of the "Put Option" – Rio de Janeiro, September 9, 2013 – OGX Petróleo e Gás Participações S.A. ("OGX") (Bovespa: OGXP3; OTC: OGXPY.PK) hereby communicates to the market that it received the correspondence attached, sent by the controlling shareholder, Mr. Eike Fuhrken Batista, in response to the exercise of the "Put Option" revealed in the material fact dated September 6, 2013."*

*course of the General Creditor's Assembly of OGX P&G, as included in its minutes. It dealt with the waiver of an available right, therefore, valid, all in all such clause is not effective with regard to credits that expressly opposed it by having voted for the rejection of the plan. This position freed up the board of directors of the group to resolve the issue swiftly, peacefully, and effectively, without having the Put Option discarded, pending review of opinions to be issued by jurists directly contracted by the interested parties." (pgs. 7,905/7,906 of doc. 10).*

201.    Query: what was the clarification given? What procedure will be adopted by the **COMPANIES IN REORGANIZATION** on this point? Who are the professionals involved? How and for what reason were they chosen? This is simply unknown, but regardless, this Section of the PRJ was adopted by the judge!

202.    Furthermore, as another reward for the release of the Put Option, the **OGPAR PLAN** (section 9.4) and the **OGX PLAN** (clause 10.4[49]) indicated that, as an additional advantage to the subscription of newly issued shares from OGX, these controlling companies and their current shareholders will receive subscription warrants, permitting them to, within a term of 5 years, have the ability to subscribe to common shares that represent, in an aggregate total, 15% of **OGX** Restructured, setting the issue price based on the valuation of **OGX REESTRUTURADA** at US$ 1.5 billion.

203.    In other words, if, after implementation of the restructuring proposed by the **COMPANIES IN REORGANIZATION**, the current shareholders of **OGX PARTICIPAÇÕES** will still be benefited with the possibility of participating in the potential upside verified in the event of future appreciation of **OGX REESTRUTURADA**, which will provide them with

---

[49] *"10.4 In addition to the advantage of subscription of new Shares issued by OGX, the shareholders of OGPar, including the Shareholders* [sic]*, will receive subscription warrants to be issued by OGX Reestruturada in the same meeting held to deliberate on the Incorporation with the following main conditions: (i) term for the exercise – 5 (five) years; and (ii) a number of ordinary shares to be subscribed which represent, in the total aggregate amount, 15% ( fifteen per cent) of the total equity capital of OGX Reestruturada, considering an issue price based on the appraisal value of OGX Reestruturada in US$ 1,500,000,00.00 (one billion five hundred million USD).*

great financial gain, all of this at the cost of the imposition of sacrifices on numerous creditors.

204.     In truth, although the illegal attempt at protection of third party companies from the process would be a novelty, the wave of favoring individuals and legal entities related to **GRUPO OGX** is already quite exceptional.

205.     In effect, it never hurts to remember that on the eve of the request for judicial reorganization, **GRUPO OGX** made a payment to its creditor **OSX** of nearly **HALF A BILLION REAIS**, arising from an agreement signed within the scope of suspension of development of the Tubarão Tigre, Tubarão Gato, and Tubarão Areia fields, and arrangement for the charter of the production entities, as (i) contained in the Financial Statements for **OGX PARTICIPAÇÕES** relating to the company fiscal year ending 12/31/2013 (item 26 in the Explanatory Notes), revealed via IPE system (being, therefore, available for view on the CVM website), and (ii) communicated to the market by means of the Material Fact disclosed on 07/01/2013 (highlighted in its item 5)[50].

_____

[50] *"**Material Fact –** Suspension of development of the Tubarão Tigre, Tubarão Gato, and Tubarão Areia fields, and Arrangement for the Charter of the Production Entities – Rio de Janeiro, July 1, 2013 – OGX Petróleo e Gás Participações S.A. ("OGX") (Bvespa: OGXP3: OTC: OGXPY.PK) Brazilian company specializing in oil and natural gas, responsible for the largest private exploratory campaign in Brazil, communicates to the market that: 1. The Company concluded a detailed analysis of the performance of each of the three production wells at the Tubarão Azul Field from the initiation of production until the present date. The result of this analysis indicated the following: (i) there does not exist, at the moment, technology capable of making economically viable any additional investment in this Field, in an attempt to increase its production profile; and (ii) the wells currently in operation may cease production at some point during 2014. The rent for the charter of FPSO OSX-1, a platform connected to the Tubarão Azul field, will continue to be paid by OSX under the terms of the respective agreement. The Company shall submit to the National Agency of Petroleum, Natural Gas, and Biocombustibles – ANP ("ANP") a review of the Development Plan based on conclusions resulting from the aforementioned analysis.*
*2, The performance of the producing wells at Tubarão Azul led the Company to reprocess and reinterpret the existing geological and geophysical data, which permitted the construction of a new reserve model, where it is clear that the intense compartmentalization and discontinuity of these reserves, which compromises their productivity. In this manner, the Company concluded that there does not exist, at the moment, technology capable of making development of the Tubarão Tigre, Tubarão Gato, and Tubarão Areia fields economically viable. In light of this fact, the company will submit to ANP requirements relating to suspending development in the fields indicated above under the terms of clause 7.5 of the respective Concession Agreement. Rent for the charter of FPSO OSX-1, a platform connected to the Tubarão Azul field, will be paid by OSX under the terms of the respective agreement, starting January, 2014, and until this unit is sold or sent to another location.*

**BM&A** ATTORNEYS

### BARBOSA, MÜSSNICH & ARRAGÃO

[round seal:] [Court of Justice of the State of Rio de Janeiro
Page 75
Stamped electronically]

206.　　　If this very strange fact (which apparently has not yet resulted in sufficient investigation, as it is yet to be conducted) had not occurred, all or most of the DIP FINANCING could have been avoided and perhaps the majority shareholders would not have  acquired so many exceptional and exclusive privileges at the expense of the APPELLANTS and other creditors.

207.　　　So there is no doubt that all provisions of the discharge and ratification of existing acts in the APPROVED PLANS , their annexes and the  release clause of the *Put Option*  have no validity, not only against the Appellants expressly opposed to them, but also in relation to all creditors who could not be present at the meeting, or abstained from voting on the Plans for Judicial Reorganization[.T]he boon of the additional subscription warrants is still completely illegal..

### IV

### NECESSARY GRANTING OF THE SUSPENSIVE EFFECT

208.　　　The arguments set forth above, in themselves, demonstrate the need to admit this Appeal with suspensive effect, based on Articles 527, III, and 558 of the Code of Civil Procedure.

--------------------------------------------------------------------------------------------------------------------------------

3. For the same reasons put forth above, the company chose to interrupt the construction by OSX of the following production units: FPSO OSX-4, FPSO OSX-5, as well as WHP-1, WHP-3 and WHP-4.

4. The Tubarão Martelo field will continue to be developed normally, with the first oil predicted for the 4th quarter of 2013, according to the published schedule. The FPSS OSX-3 and WHP-2 units that will be installed in this field will have a term to contract freight services adjusted in order to give OGX the right to terminate the contracts with no onus as of the 13th and 12th years, respectively. Such modified freighting condition for FPSO OSX-3 will only go into force after the full amortization by OSX of the financing contracted by it for construction of the unit, predicted for 2015.

5. Due to the above events, the parties signed an agreement by which OGX will make an immediate disbursement of cash to OSX in the approximate value of USD $449 million. By the agreement, about 70% of this amount will be used to pay for construction costs of FPSO OSX-3 and WHP-2.

6. Lastly, the Company states that previously published projections will no longer be considered valid, including those regarding its production targets."

| BRASILIA | RIO DE JANEIRO | SAO PAOLO |
|---|---|---|
| Commercial Sector South, Section 1, BLF | Av. Almirante Barroso, 52 | Av. Pres. Juscelino Kubitschek |
| No. 30, 7th floor, 70397 900 | 31th floor, 20031 000 | 1455 – 10th floor, 04542-011 |
| Tel. + 55 61 3218-900 | Tel. + 55 21 3824-5800 | Tel. + 55 11 2179-4600 |
| Fax: +55 61 3218-0315 | Fax: + 55 21 2262-5536 | Fax: + 55 11 2179-4587 |

TJRJ 201400324357 July 7, 2014 6:49:00 p.m. GK=Z Initial Electronic Petition

74

# BM&A ATTORNEYS

_____

### BARBOSA, MÜSSNICH & ARRAGÃO

[round seal:] [Court of Justice of the State of Rio de Janeiro
Page 76
Stamped electronically]

209.　　　The relevance of the reasoning follows from all the foregoing **due to various defects of the General Assembly of Creditors and of the APPROVED PLANS** pointed out earlier, which are very serious and, as indicated, have already been recognized by doctrine and the case law as **causes for the nullification of the resolution and the approval of plans for judicial reorganization.**

210.　　　The risk of serious injury that would be difficult to redress is also notorious. If the JUDICIAL REORGANIZATION continues to deal with the APPROVED PLANS, **COMPANIES UNDER REORGANIZATION** **can complete the procedure for subscription of debentures**, subsequently converting all the credits in corporate holdings, so that when the appeal is decided, the approved plans would be completed or in advanced stage of completion greatly hindering the declaration of nullification of acts, which could render the appeal purposeless.

211.　　　Indeed, it appears from the Plans for JUDICIAL REORGANIZATION that not granting a suspensive effect to the appeal against the decision to grant the JUDICIAL REORGANIZATION is regarded as extremely relevant and substantiates conditions precedent for the capital increase through capitalization of credit. For example, see the provisions of Clauses 1.1.31. and 5.1.3.1. PLAN OGX (Doc. 8):

_"1.1.31. ' Conditions Precedent for a Capital Increase by Capitalization of Credit:' The minimum conditions precedent in order for an operation to increase Capital by Capitalization of Credit to be implemented are, as established in Clause 5.1.3.1. of this Plan."_

_"5.1.3.1. The Capital Increase by Capitalization of Credit will occur as soon as possible, but **as long as the following  Conditions Precedent for Capital  Increase by Capitalization of Credit are met:**_

BRASILIA RIO DE JANEIROSAO PAOLO

Commercial Sector South, Section 1, BLF　　　Av. Almirante Barroso, 52　　　Av.　Pres.　Juscelino Kubitschek

76

TJRJ 20140032435 7 July 7, 2014  6:49:00  p.m. GK=Z  Initial Electronic Petition

| | | |
|---|---|---|
| **No. 30, 7th floor, 70397 900** | **31th floor, 20031 000** | **1455 – 10th floor, 04542-011** |
| Tel. + 55 61 3218-900 | Tel. + 55 21 3824-5800 | Tel. + 55 11 2179-4600 |
| Fax: +55 61 3218-0315 | Fax: + 55 21 2262-5536 | Fax: + 55 11 2179-4587 |

75

# BM&A ATTORNEYS

_____

## BARBOSA, MÜSSNICH & ARRAGÃO

[round seal:] [Court of Justice of the State of Rio de Janeiro
Page 77
Stamped electronically]

*(i) this Plan was approved by the Assembly of Creditors;*
*(ii) the Court has approved the Plan, **as long as no appeal has been filed against the** **Court** decision approving the Plan (Article 58 of the Bankruptcy Law) which have **had a suspensive effect** and/or which result in a Material Adverse Effect; and/or (b) there is no legal or administrative case in which an injunction, anticipation of custody and/or any similar measure or protection was requested or granted that has the effect of suspending or crippling Court Approval of the Plan and/or the implementation of this Plan and/or which results in a Material Adverse Effect;"* (emphasis added)

212.     Therefore, it is essential that the application be processed with the suspensive effect, impeding the continuation of JUDICIAL REORGANIZATION and suspending, until its final judgment, the validity of the APPROVED PLANS and of **all** procedures to sell or encumber assets and  convert credits, which may or may not result in *equity*.

213.     The potential irreparable or difficult-to-redress damages in case of denial of this petition for suspensive effect threaten not only the APPELLANTS, but even the third parties who invest in the COMPANIES UNDER REORGANIZATION and subsequently may lose their capital and have difficulty recovering it as a function of very likely reversal of operations illegally practiced by the RESPONDENTS.

214.     Besides the legal insecurity of allowing the enactment of complex transactions subject to this appeal, the lack of suspension of the effects of the PLANS FOR JUDICIAL REORGANIZATION while the grievance is being processed could generate a risk of harm unprecedented in the Brazilian capital market.

215.     This damage, coupled with the cap that OGX GROUP already applied and the numerous illegalities practiced by the COMPANIES UNDER REORGANIZATION , in favor of a select group of lenders, tarnishes the image of the country's companies, which are emblematic of the group's financial problem and its attempt at restructuring (supported by the APPELLANTS, if the law is followed to the letter), to the point of being the object of numerous critical reports on national and foreign press in recent times. //

| | | |
|---|---|---|
| BRASILIA | RIO DE JANEIRO | SAO PAOLO |
| Commercial Sector South, Section 1, BLF Kubitschek | Av. Almirante Barroso, 52 | Av.   Pres.   Juscelino |
| No. 30, 7th floor, 70397 900 | 31th floor, 20031 000 | 1455  –  10th  floor, |

TJRJ 20140032437 July 7, 2014  6:49:00 p.m. GK-Z Initial Electronic Petition

04542-011

| Tel. + 55 61 3218-900 | Tel. + 55 21 3824-5800 | Tel. + 55 11 2179-4600 |
| Fax: +55 61 3218-0315 | Fax: + 55 21 2262-5536 | Fax: + 55 11 2179-4587 |

# BM&A ATTORNEYS

### BARBOSA, MÜSSNICH & ARRAGÃO

[round seal:] [Court of Justice of the State of Rio de Janeiro
Page 78
Stamped electronically]

216.  As seen, based on the emergency arguments and time-based arguments to enforce the law, the RESPONDENTS already succeeded in the past in subverting procedures of JUDICIAL REORGANIZATION, such as issuing the  1st SERIES DEBENTURES and  anticipating, without notifying the creditors, the encumbering of all relevant assets of COMPANIES UNDER REORGANIZATION , in favor of MAJOR SHAREHOLDERS.


217. The RESPONDENTS have always done this in the attempt to consolidate situations of dubious legality in the real world, to later rely on the *fait accompli* (the "spilled milk") for their own benefit, as if the embodiment of an illegality could prevent its recognition. Ultimately, COMPANIES UNDER REORGANIZATION intend to strip the Judiciary of its constitutional duty to enforce the law, an absolute absurdity.


218.   This eminent Rio de Janeiro Court (TJRJ) will certainly not relegate itself merely to the function of spectator of the consolidation of the acts of the COMPANY UNDER REORGANIZATION before having analyzed its legality in depth. Based on new legislation in effect, the Administrative Council of Economic Defense even had to approve OGX's capital increase by conversion of debentures in advance, in order to ensure that market interests are not violated, in accordance with the condition imposed in Clause 4.8.(ii) of the OGX Plan (Doc. 8):

> "*4.8. Procedure for Capital Increase by Conversion of Debentures. The debentures will be automatically converted into shares, after the conditions precedent for their conversion into shares are entirely fulfilled or expressly waived, as exhaustively established in the Debenture            Deed and in the Subscription Contract, especially the following            Conditions   Precedent   for a Capital Increase by Conversion of            Debentures:*

| BRASILIA | RIO DE JANEIRO | SAO PAOLO |
| Commercial Sector South, Section 1, BLF | Av. Almirante Barroso, 52 | Av.   Pres.   Juscelino Kubitschek |
| No. 30, 7th floor, 70397 900 | 31th floor, 20031 000 | 1455  –  10th  floor, 04542-011 |
| Tel. + 55 61 3218-900 | Tel. + 55 21 3824-5800 | Tel. + 55 11 2179-4600 |
| Fax: +55 61 3218-0315 | Fax: + 55 21 2262-5536 | Fax: + 55 11 2179-4587 |

TJRJ 20140032435 7 July 7, 2014  6:49:00  p.m. GK<Z Initial Electronic Petition

**BM&A** ATTORNEYS

BARBOSA, MÜSSNICH & ARRAGÃO

[round seal:] [Court of Justice of the State of Rio de Janeiro
Page 79
Stamped electronically]

*(ii) the CADE has approved the convertibility of debentures, in accordance with the Debenture Deed;"*

219. Why wouldn't the Judiciary, herein represented by this Eminent TJRJ, ensure that, before this potentially illegal operation is ratified — you must agree that the arguments of the APPELLANTS are, at the very least, extremely plausible and deserve an in-depth analysis with suspensive effects by this court — the matter is diligently debated in this forum?

220. On the other hand, the suspensive effect would cause no harm to the COMPANIES UNDER REORGANIZATION , because most of the money derived from the DIP FINANCING has already entered the company with the subscription of the 1st SERIES DEBENTURES. By taking  the additional loan of more than 70 million USD, as proven above, the OGX Group was already given most of the sum that would be invested via 2nd Series Debentures.

221. In other words,, there is no so called cash deficiency and therefore no damages to the COMPANIES UNDER REORGANIZATION. It should also be noted that OGX PARTICIPAÇÕES started operating again with a profit (of R$ 213 million) in the first quarter of 2014, as widely reported in the press[51].

**V**

**PRAYER FOR RELIEF**

222. In relation to everything above, the APPELLANTS ask for:

(i)       The attribution of the suspensive effect, pursuant to Article 527, III, of the Civil       Procedure Code, to prevent continuation of JUDICIAL REORGANIZATION in
          order to suspend the validity of APPROVED PLANS, until the completion of the final

---

[51] In this regard, for example, see Article from the portal *Exame*, available at: http://exame.abril.com.br/negocios/oleo-e-gas-tem-lucro-liquido-de-r-213-mi-no-lo-tri, added on July 7, 2014

| BRASILIA | RIO DE JANEIRO | SAO PAOLO |
|---|---|---|
| Commercial Sector South, Section 1, BLF | Av. Almirante Barroso, 52 | Av.   Pres.   Juscelino Kubitschek |
| No. 30, 7th floor, 70397 900 | 31th floor, 20031 000 | 1455  –  10th  floor, |

TJRJ 201400324357 July 7, 2014 6:49:00 p.m. GK-Z Initial Electronic Petition

04542-011

| Tel. + 55 61 3218-900 | Tel. + 55 21 3824-5800 | Tel. + 55 11 2179-4600 |
| Fax: +55 61 3218-0315 | Fax: + 55 21 2262-5536 | Fax: + 55 11 2179-4587 |

# BM&A ATTORNEYS

_____

### BARBOSA, MÜSSNICH & ARRAGÃO

[round seal:] [Court of Justice of the State of Rio de Janeiro
Page 80
Stamped electronically]

analysis of this Appeal, communicating the judgment immediately to the court *a quo*;

(ii)    Finally, grant the appeal to reform the decision appealed, declaring null and void the General          Assembly of Creditors and the APPROVED PLANS, and determining that COMPANIES UNDER REORGANIZATION must submit a          new reorganization proposal, this time respecting the legality and equality between the          creditors of the same class and origin;

(iii)    Alternatively and without prejudice to filing the appropriate appeals , if the appeal          should not be          fully allowed, then partially allow the appeal to confirm that all          creditors who abstained or did not participate in the General Assembly of Creditors (and          not just those who voted negatively) are not subject to the clauses of discharge and          ratification of existing acts in PLANS FOR JUDICIAL REORGANIZATION and s          annexes, as well as the conditions laid down for validation of the *Put Option*;

(iv)    In any case, send and official letter to the office of the Attorney General for an opinion and determination , in theory, of whether there were any criminal offenses involving the COMPANIES          UNDER REORGANIZATION and other participants in potentially illegal acts, under the terms indicated in this appeal, including DIAMOND and ERENCO.

**Rio de Janeiro, July 7, 2014.**

[signature]                          [signature]
Felipe Evaristo dos Santos Galea      Thomaz Luiz Sant'Ana
OAB/SP No. 220.280                    OAB/SP No. 235.250

[signature]                          [signature]
Rafael Castilho                       Igor Silva de Lima
OAB/RJ No. 130.641                    OAB/SP No. 281.482

[signature]                          [signature]
Fabiano Robalinho Cavalcanti  Gustavo dos Reis Leitão
OAB/RJ No. 163.297                    OAB/SP No. 344.763

| BRASILIA | RIO DE JANEIRO | SAO PAOLO |
| Commercial Sector South, Section 1, BLF Kubitschek | Av. Almirante Barroso, 52 | Av. Pres. Juscelino |
| No. 30, 7th floor, 70397 900 | 31th floor, 20031 000 | 1455 – 10th floor, 04542-011 |
| Tel. + 55 61 3218-900 | Tel. + 55 21 3824-5800 | Tel. + 55 11 2179-4600 |
| Fax: +55 61 3218-0315 | Fax: + 55 21 2262-5536 | Fax: + 55 11 2179-4587 |

TJRJ 201400324357 July 7, 2014 6:49:00 p.m. GK<Z Initial Electronic Petition

79

[round seal:] [Court of Justice of the State of Rio de Janeiro

Page 81
Stamped electronically]

RIO DE JANEIRO COURT OF JUSTICE                                          Page 1 of 2
eJUD TJRJ                                                  Issued on July 9, 2014 4:32 p.m.

_____

## ACKNOWLEDGEMENT OF RECEIPT
## REGISTRATION AND ASSESSMENT

AFTER RECEIVED, ON THIS DATE, THESE FILES WERE REGISTERED AND ASSESSED BY ELECTRONIC
PROCESSING, AS SHOWN IN THE TABLE BELOW:

|  |  |
|---|---|
| 0033122-14.2014.8.19.0000 | INTERLOCUTORY APPEAL – CIVIL |
| Record | 3204/2014.00324357 |
| Agency | CAPITAL – 4TH BUSINESS COURT |
| Original Proceeding | 0377620-56.2013.8.19.0001 |
| Note | JUDICIAL REORGANIZATION PROCEDURE. |
|  | APPEALED DECISION - ANNEX 1 – ITEM 1710 |
| Judge who rendered the judgment | GILBERTO CLOVIS FARIAS MATOS |
| Date of the Decision | JUNE 13, 2014 |

Volume(s): 1, Attached: 0, Doc(s). J/P/L: -0, Annex(es): 0

Pages: 1
*MP Function*
Topic 1  Suspensory Effect / Impeachment / Stays of Execution / Liquidation / Compliance /
Summaries related to this subject: 109, 162
Topic 2  Judicial Reorganization / Judicial Reorganization and Insolvency / Companies /
CIVIL LAW

| APPELLANT: | AUTONOMY MASTER FUND LIMITED |
|---|---|
| APPELLANT: | BRENNUS FUND LP |
| APPELLANT: | CLAREN ROAD CREDIT MASTER FUND LTD |
| APPELLANT: | CLAREN ROAD CREDIT OPPORTUNITIES MASTER FUND LTD |
| APPELLANT: | ASPEN CREEK PARTNERS LP |
| APPELLANT: | ANDROMEDA GLOBAL CREDIT FUND LTD |
| APPELLANT | LYXOR ANDROMEDA GLOBAL CREDIT FUND LTD |
| APPELLANT: | EDMOND DE ROTSCHILD EMERGING BONDS |
| APPELLANT: | FIRENZE CORPORATE INC |
| APPELLANT: | FIRST GENEVA HIGH YIELD FUND |
| APPELLANT: | GAM TRADING N 37 INC |
| APPELLANT: | RICARDO AUGUSTO GALLO |
| APPELLANT: | GLG EUROPEAN DISTRESSED MASTER FUND |
| APPELLANT: | GLG EUROPEAN DISTRESSED FUND |
| APPELLANT: | GLG MARKET NEUTRAL FUND |
| APPELLANT: | EUROPEAN DISTRESSED MAC LIMITED |
| APPELLANT: | CROWN MANAGEMENT ACCOUNTS SPC |

| APPELLANT: | ITAVA INC |
| APPELLANT: | BRAX FUND |
| APPELLANT: | BNYM BRAZIL INTERNATIONAL FUND SPC ON BEHALF OF JGP OFFSHORE SEGREGATED PORTFOLIO |
| APPELLANT: | JEAN-JACQUES DURAND |
| APPELLANT: | NOVEL CAPITAL GROUP LIMITED |
| APPELLANT: | QUAKER EVENT ARBITRAGE FUND |
| APPELLANT: | SHAHRIAR SHAHIDA |

User: ROGERIO FIGUEIREDO DA COSTA
Date: July 9, 2014 4:32:06 p.m.  Local 1VP – Assessment Division

[round seal:] [Court of Justice of the State of Rio de Janeiro

Page 82
Stamped electronically]

RIO DE JANEIRO COURT OF JUSTICE                                    Page 1 of 2
eJUD TJRJ                                            Issued on July 9, 2014 4:32 p.m.

_____

| APPELLANT: | SUSQUEHANNA IRELAND LIMITED |
| APPELLANT: | CAPITAL VENTURES INTERNATIONAL |
| APPELLANT: | VR GLOBAL PARTNERS LP |
| Attorney: | FELIPE EVARISTO DPS SANTOS GALEA (Active) |
| Attorney: | THOMAZ LUIZ SANT ANA (Active) |
| RESPONDENT: | OGX PETROLEO E GAS PARTICIPAÇÕES S.A. |
| RESPONDENT: | OGX PETROLEO E GAS S.A. |
| RESPONDENT: | OGX INTERNATIONAL GMBH |
| RESPONDENT: | OGX AUSTRIA GMBH |
| Attorney: | SERGIO BERMUDES (Active) |
| Attorney: | MARCIO VIEIRA SOUTO COSTA FERREIRA (Active) |
| Attorney: | MARCELO FONTES CESAR DE OLIVEIRA (Active) |

Rio de Janeiro, July 9, 2014

_____

Prepared By: ROGERIO FIGUEIREDO DA COSTA [ROGERIOFCOSTA]
ASSESSMENT EMPLOYEE

[round seal:] [Court of Justice of the State of Rio de Janeiro

Page 83
Stamped electronically]

RIO DE JANEIRO COURT OF JUSTICE                                      Page 1 of 2
eJUD TJRJ                                              Issued on July 9, 2014 4:33 p.m.

## Prevention Certificate
## Prevention: 0033122-14.2014.8.19.0000
## (Class: INTERLOCUTORY APPEAL – CIVIL)

---

### Preventions

| | | | | |
|---|---|---|---|---|
| Aut. | 0064658-77.2013.8.19.0000 | DES. REINALDO PINTO ALBERTO FILHO | November 27, 2013 1:30 p.m. | 4CC |
| Aut. | 0064658-77.2013.8.19.0000 | DES. GILBERTO GUARINO 14CC | November 29,2013 3:03 p.m. | |
| Aut. | 0003415-98.2014.8.19.0000 | DES. PLINIO PINTO COELHO FILHO 14CC | January 23, 2014 1:31 p.m. | |
| Aut. | 0004417-06.2014.8.19.0000 | DES. PLINIO PINTO COELHO FILHO 14CC | January 28, 2014 1:30 p.m. | |
| Aut. | 0008288-44.2014.8.19.0000 | DES. GILBERTO GUARINO 14CC | February 26, 2014 12:02 p.m. | |
| Aut. | 0010161-79.2014.8.19.0000 | DES. GILBERTO GUARINO 14CC | February 26, 2014 1:30 p.m. | |
| Aut. | 0022747-51.2014.8.19.0000 | DES. PLINIO PINTO COELHO FILHO 14CC | December 5, 2014 1:30 p.m. | |
| Aut. | 0023089-62.2014.8.19.0000 | DES. PLINIO PINTO COELHO FILHO 14CC | May 12, 2014 4:30 p.m. | |
| Aut. | 0032962-86.2014.8.19.0000 | DES. GILBERTO GUARINO 14CC | July 9, 2014 1:30 p.m. | |

---

### Impediments

| | | |
|---|---|---|
| 432: | DES. LUIZ FELIPE FRANCISCO | |
| **Reason**: | RAPPORTEUR GRANTED IMPEDIMENT | |
| 430: | DES. ANDRE GUSTAVO CORREA DE ANDRADE | |
| **Reason**: | RAPPORTEUR GRANTED IMPEDIMENT | |
| 444: | DES. JACQUELINE LIMA MONTENEGRO | |
| **Reason**: | RAPPROTEUR GRANTED IMPEDIMENT | |

## Certificate

---

–

**I hereby certify that after analyzing the present case, it shall be allocated to the Distinguished 14th CIVIL COURT, by virtue of these past achievements.**

Rio de Janeiro, WEDNESDAY, JULY 9, 2014.                          [ROGERIOFCOSTA]

User: ROGERIO FIGUEIREDO DA COSTA
Date: July 9, 2014 4:33:50 p.m.  Local 1VP – Assessment Division

[round seal:] [Court of Justice of the State of Rio de Janeiro

Page 84
Stamped electronically]

STATE OF RIO DE JANEIRO
JUDICIAL POWER
COURT OF JUSTICE
CAPITAL DISTRICT 1VP – ASSESSMENT DIVISION

**ELECTRONIC GRERJ STATEMENT**

**GRERJ: 7070654106532**          **Case: 0033122-14.2014.8.19.0000**

─────

CPF/CNPJ (Taxpayer Number): ▮▮▮▮▮▮2          Authentication: 06245151651
Payment: July 7, 2014

                                        Name of party accepting payment:
RICARDO                                     AUGUSTO GALLO
            Use: GRERJ granted correctly
                                        Date of use of GRERJ:
            Complementary Information:

| Receipt/Account | Description | Amount |
|---|---|---|
| 1101-5 | District Court Acts | BRL$ 109.86 |
| 2001-6 | CAARJ/IAB | BRL$ 10.98 |
| 6898-0000215-1 | OTHER FUNDS | BRL$ 5.49 |
| 6898-0000208-9 | OTHER FUNDS | BRL$ 5.49 |

**Total: BRL$ 131.82**

Rio de Janeiro, July 9, 2014

───────────────────────

ROGERIO FIGUEIREDO DA COSTA
010000029586

**Note: Calculation of the FUNDPERJ and FUNPERJ - : 5% of the values related to court costs and registration/download fees.**

## CERTIFICATE OF TRANSLATION

STATE OF NEW YORK     §
                      §
COUNTY OF NEW YORK §

**Roberto J. Millan**, being duly sworn, deposes and says:

1.      I am employed as a Project Manager for LanguageWorks, a professional translation firm providing translation services since 1993. I have personal knowledge of all of the facts stated herein.

2.      Attached to this Affidavit is a translation from Portuguese into English made by LanguageWorks of **Interlocutory Appeal From Judicial Reorganization Plan with a Request for Suspensive Effect**.

3.      LanguageWorks only utilizes the services of language professionals who have passed our stringent testing process, which involves a subject matter and language specific test translation that is reviewed by trusted linguists. Less than 6% of applicants pass. In addition, our language professionals must have a minimum of 5 years' professional translation experience or an applicable degree from an accredited institution. In addition, for all translations, including this one, LanguageWorks uses three qualified linguists: a professional translator, an editor to double check for style and content, and a proofreader to review all text for completeness. Translations made through our processes set forth above are regularly accepted into evidence in New York State courts.

4.      On the basis of the foregoing process and quality control procedures, I certify that the attached is an accurate translation of the original.

_____
**Roberto J. Millan**

SUBSCRIBED AND SWORN TO before me this seventh day of August, 2014.

STEVEN J. ALBERT
Notary Public - State of New York
No. 01AL6234881
Qualified in New York County
My Commission Expires January 31, 2015

_____
Notary Public



**BM&A** ᴬᴰᵛᴼᴳᴬᴰᴼˢ
BARBOSA, MÜSSNICH & ARAGÃO

**EXMO. SR. DESEMBARGADOR PRIMEIRO VICE-PRESIDENTE DO EGRÉGIO TRIBUNAL DE JUSTIÇA DO ESTADO DO RIO DE JANEIRO**

*"A assembleia de credores é soberana em suas decisões quanto aos planos de recuperação judicial. Contudo, as deliberações desse plano estão sujeitas aos requisitos de validade dos atos jurídicos em geral, requisitos esses que estão sujeitos a controle judicial."* (STJ, REsp nº 1314209, Relatora Ministra Nancy Andrighi, Terceira Turma, d. j. 22.5.2012)

TRIBUNAL DE JUSTIÇA DO ESTADO DI RIO DE JANEIRO
A Secretaria da 14ª Câmara Cível certifica que e a actual está conforme com o original.
23/09/14
Data
Rosane Rosalvo Santos
Secretária da 14ª Câmara Cível
Matr. 01/26.887

GRERJ Eletrônica nº 70706541065-32

## URGENTE

**AUTONOMY MASTER FUND LIMITED** ("AUTONOMY"), fundo de investimento com sede em Ugland House, Grand Cayman, KY1-1104, Ilhas Cayman, Código Postal 309, **BRENNUS FUND LP**, empresa com sede em Intertrust Corporate Services Limited, 190 Elgin Avenue, Grand Cayman, KY1-9005, Ilhas Cayman, **CLAREN ROAD CREDIT MASTER FUND, LTD**, empresa com sede em Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Ilhas Cayman, **CLAREN ROAD CREDIT OPPORTUNITIES MASTER FUND, LTD**, empresa com sede em Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Ilhas Cayman, **ASPEN CREEK PARTNERS, LP**, fundo de investimento com sede em Nova York, 70 East 55 Street, 10022, Estados Unidos das Américas, **ANDROMEDA GLOBAL CREDIT FUND LTD.**, fundo de investimento com sede em Nova York, 70 East 55 Street, 10022, Estados Unidos da América, **LYXOR/ANDROMEDA GLOBAL CREDIT FUND LTD**, empresa com sede em Nova York, 70 East, 55 Street, 10022-3384, Estados Unidos da América, **EDMOND DE ROTHSCHILD EMERGING BONDS**, fundo de investimento com sede em Edmond Rothschild Asset Management, 47 Rue du Faubourg Saint-

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n. 30 - 7 andar I 70327-000
t + 55 61 3218-0300
f + 55 61 3218-0349

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar I 20031-000
t + 55 21 3824-5800
f + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10 andar I 04543-011
t + 55 11 2179-4600
f + 55 11 2179-4597

TJRJ 201400324357 07/07/2014 18:49:00 GRe-Z Petição Inicial Eletrônica



**BM&A** | ABVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

Honoré, 75401 Paris Cedex 08, França, **FIRENZE CORPORATE INC.**, empresa com sede Wickhams Cay, Flemming House, 5º andar, Road Town, Tortola, Ilhas Virgens Britânicas, **FIRST GENEVA HIGH YIELD FUND**, fundo de investimento com sede em 11 Rue Aldringen, 2960, Luxemburgo, **GAM TRADING N. 37 INC.**, empresa com sede em Nova Jersey, Conway House, 7-9 Conway St, St. Helier, Estados Unidos da América, **RICARDO AUGUSTO GALLO**, brasileiro, engenheiro, casado, portador da cédula de identidade RG nº 9.705.346-SSP/SP, inscrito no CPF/MF sob o nº 075.355.428-32, com escritório na Rua Joaquim Floriano, 1120, cj. 131, São Paulo, Estado de São Paulo, **GLG EUROPEAN DISTRESSED MASTER FUND**, fundo de investimento com sede em Ugland House, PO Box 309, George Town, Grand Cayman, KY1-1104, Ilhas Cayman, **GLG EUROPEAN DISTRESSED FUND**, fundo de investimento com sede em Ugland House, PO Box 309, George Town, Grand Cayman, KY1-1104, Ilhas Cayman, **GLG MARKET NEUTRAL FUND**, fundo de investimento com sede em Ugland House, PO Box 309, George Town, Grand Cayman, KY1-1104, Ilhas Cayman, **EUROPEAN DISTRESSED MAC LIMITED**, empresa com sede em 89 Nexus Way, Camana Bay, Grand Cayman, KY1 1205, Ilhas Cayman, **CROWN MANAGED ACCOUNTS SPC**, pessoa jurídica com sede em Grand Pavilion Commercial Centre, 1st Floor, 802 West, Bay Road, George Town, Grand Cayman, Ilhas Cayman, **ITAVA INC.** ("ITAVA"), empresa com sede em 3175 Road Town, Tortola, Ilhas Virgens Britânicas, **BRAX FUND**, fundo de investimento com sede em UBS House, 227, Elgin Avenue, PO BOX 852, Grand Cayman, KY1-1103, Ilhas Cayman, **BNYM BRAZIL INTERNATIONAL FUND SPC ON BEHALF OF JGP OFFSHORE SEGREGATED PORTFOLIO**, fundo de investimento com sede em 89 Nexus Way, Camana Bay, Grand Cayman, KY1-9007, Ilhas Cayman, **JEAN-JACQUES DURAND**, francês, portador do passaporte de nº 12CR52628, casado, gestor de fundos, domiciliado em 45 rue de Chezy, 92200, Neuilly, França, **NOVEL CAPITAL GROUP LIMITED**, empresa com sede em Road South, Shanghai 200120, República Popular da China, **QUAKER EVENT ARBITRAGE FUND**, trust com sede em 309 Technology Drive,

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n. 13 - 7º andar | 70297-900
t. + 55 61 1216-0200
f. + 55 61 2216-0348

RIO DE JANEIRO
Av. Almirante Barroso 52
31º andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5596

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 10º andar | 04543-011
t. 55 11 3179-4600
f. + 55 11 2176-3562

2

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

Malvern, PA 19355, Estados Unidos da América, **SHAHRIAR SHAHIDA**, pessoa física residente em Nova Iorque, 3 Heathcote Road, Scarsdale, 10583, Estados Unidos da América, **SUSQUEHANNA IRELAND LIMITED**, empresa com sede em Dublin 1, 4 Floor, George's Dock House, IFSC, Irlanda, **CAPITAL VENTURES INTERNATIONAL**, empresa com sede em c/o Susquehanna Advisors Group, Inc., 401 City Avenue, Suite 220, Bala Cynwyd, PA 19004, Estados Unidos da América, e **VR GLOBAL PARTNERS L.P.**, empresa com sede em Intertrust Corporate Services (Cayman) Ldt., 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Ilhas Cayman (em conjunto, "**AGRAVANTES**"), por seus advogados, com fundamento nos artigos 522 e seguintes do CPC, interpõem

### AGRAVO DE INSTRUMENTO
### COM PEDIDO DE EFEITO SUSPENSIVO

contra a decisão de fls. 7891/7.907[1], pela qual o juízo da 4ª Vara Empresarial do Foro Central da Comarca do Rio de Janeiro, Estado do Rio de Janeiro, **homologou planos de recuperação judicial eivados de nulidades, aprovados pela maioria conflitada dos credores nas assembleias-gerais de credores realizadas em 3.6.2014** ("AGCs"), nos autos da recuperação judicial nº 0377620-56.2013.8.19.000 ("RECUPERAÇÃO JUDICIAL"), proposta por **ÓLEO E GÁS PARTICIPAÇÕES S.A. – EM RECUPERAÇÃO JUDICIAL** ("OGX PARTICIPAÇÕES"), atual denominação de OGX Petróleo e Gás Participações S.A., companhia de capital aberto, inscrita no CNPJ/MF sob o nº 07.957.093/0001-96, **OGX PETRÓLEO E GÁS S.A. – EM RECUPERAÇÃO JUDICIAL** ("OGX"), companhia de capital fechado, inscrita no CNPJ/MF sob o nº 08.926.302/0001-05, ambas com sede na Rua do Passeio, nº 56, 10º, 11º e 12º andares, Cidade e Estado do Rio de Janeiro, **OGX INTERNATIONAL GMBH – EM RECUPERAÇÃO JUDICIAL** ("OGX INTERNATIONAL"), empresa com registro na Corte Comercial de Viena sob o nº FN 335513 b, com sede na

---

[1] Os números de folhas aqui e doravante mencionados referem-se aos autos da ação de origem.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
c. 30ª - 7º andar | 70392-900
t. + 55 61 3218-0000
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-6036

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455, 10º andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597



**BM&A** ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

Schwarzenbergplatz 5/Tío Nr.2/3, 1030, Viena, Áustria, e **OGX AUSTRIA GMBH – EM RECUPERAÇÃO JUDICIAL** ("OGX AUSTRIA"), empresa com registro na Corte Comercial de Viena sob o nº FN 335512, inscrita no CNPJ/MF sob o nº 16.885.474/0001-06, com sede na Schwarzenbergplatz 5/Tío Nr.2/3, 1030, Viena, Áustria (em conjunto, "GRUPO OGX", "RECUPERANDAS" ou "AGRAVADAS").

Em conformidade com o artigo 525 do CPC, os AGRAVANTES informam que o recurso está instruído com guias comprobatórias do recolhimento das custas devidas e cópias dos seguintes documentos:

(i)    petições de individualização dos créditos de *bondholders* dos AGRAVANTES, nas quais constam as procurações e substabelecimentos aos seus advogados (**doc. 1**);

(ii)   decisão que institui o procedimento de individualização (**doc. 2 -** fls. 4.162/4.167);

(iii)  petição inicial da RECUPERAÇÃO JUDICIAL (**doc. 3**);

(iv)   atos constitutivos e procurações outorgadas aos advogados das AGRAVADAS (**doc. 4**);

(v)    decisão deferindo o processamento da RECUPERAÇÃO JUDICIAL, nomeando a empresa Deloitte Touche Tohmatsu Auditores Independentes como administradora judicial ("ADMINISTRADORA JUDICIAL") e o respectivo termo de compromisso por ela assinado, além de procurações aos seus advogados (**doc. 5**)

(vi)   listas de credores do GRUPO OGX apresentadas pela ADMINISTRADORA JUDICIAL (**doc. 6**);

(vii)  primeiros planos de recuperação, apresentados em 18.2.2014 ("PLANOS INICIAIS" – **doc. 7**);

(viii) aditamentos aos planos de recuperação, apresentados em 23.5.2014 ("NOVOS PLANOS", "PLANOS APROVADOS" ou "PRJ"– **doc. 8**);

(ix)   atas das AGCs e respectivas listas de presença (**doc. 9**);

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 30 - 7. andar | 70397-900
t + 55 61 3218-6200
f + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t + 55 21 3824-5800
f + 55 21 3262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10º andar | 04543-011
t + 55 11 2179-4600
f + 55 11 2179-4601

TRIBUNAL DE JUSTIÇA DO ESTADO DO RIO DE JANEIRO
Secretaria da 14ª Câmara Cível certifica que este documento
Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
Matr. 01/26.887
28/04/14



(x)   decisão recorrida, que homologou os PLANOS APROVADOS e concedeu as recuperações judiciais e respectiva certidão de intimação (doc. 10);

(xi)   objeção da AUTONOMY aos PLANOS INICIAIS (doc. 11);

(xii)   embargos de declaração da AUTONOMY de 31.1.2014 (doc. 12);

(xiii)   parecer do Ministério Público acerca dos embargos de declaração da AUTONOMY, bem como sobre os PLANOS INICIAIS (doc. 13);

(xiv)   petição das RECUPERANDAS informando acordo com os titulares dos *bonds* detentores da maior parte do capital supostamente votante das AGCs, apresentando a operação denominada "FINANCIAMENTO DIP" e requerendo oneração de todos os bens relevantes das RECUPERANDAS (doc. 14);

(xv)   parecer preliminar do Ministério Público acerca do FINANCIAMENTO DIP (doc. 15);

(xvi)   manifestação da ADMINISTRADORA JUDICIAL acerca do FINANCIAMENTO DIP (doc. 16);

(xvii)   petição da AUTONOMY informando que ela e outros *bondholders* minoritários procuraram o GRUPO OGX para participar do FINANCIAMENTO DIP, mas foram impedidos de investir nas RECUPERANDAS (doc. 17);

(xviii)   petição da AUTONOMY colocando à disposição do juízo o valor, depositado por ela e outros *bondholders* minoritários, de US$ 10,4 milhões para fins de investimento nas RECUPERANDAS (doc. 18);

(xix)   nova petição das RECUPERANDAS para oneração de praticamente todos os seus ativos em garantia do FINANCIAMENTO DIP (doc. 19);

(xx)   fato relevante divulgado pelo GRUPO OGX em 13.3.2014 (doc. 20);

(xxi)   decisão proferida pelo juízo *a quo* permitindo a oneração de bens em garantia do FINANCIAMENTO DIP (doc. 21);

(xxii)   certidão apontando que todos os AGRAVANTES apresentaram seus incidentes de individualização, mas reconhecendo que nem todos estão autuados e numerados pelo cartório (doc. 22);

BRASÍLIA
Setor Comercial Sul, Qd. 1, Bl. F,
nº 30 - 7º andar | 70390-060
t. + 55 61 3218-0200
f. + 55 61 3218-0215

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível



**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

(xxiii) mandado de segurança impetrado por Diamond Offshore Netherlands BV ("DIAMOND") contra a decisão que negou efeito suspensivo ao seu agravo de instrumento contra a decisão que deferiu a participação dos *bondholders* na AGC **(doc. 23)**;

(xxiv) decisão liminar no mandado de segurança da DIAMOND **(doc. 24)**;

(xxv) mandado de segurança impetrado por Perenco Petróleo e Gás do Brasil Ltda. ("PERENCO") **(doc. 25)**;

(xxvi) decisão homologando a desistência do mandado de segurança da PERENCO **(doc. 26)**;

(xxvii) decisão homologando a desistência do mandado de segurança da DIAMOND **(doc. 27)**;

(xxviii) Objeções aos PLANOS INICIAIS apresentadas pela PERENCO e pela DIAMOND **(doc. 28)**; e

(xxix) Fato relevante da OGX divulgado em 24.12.2013 sobre celebração do *Plan Support Agreement* e da negociação com a OSX **(doc. 29)**.

Autorizados pelo artigo 365, IV, do CPC, os advogados dos AGRAVANTES declaram, sob sua responsabilidade pessoal, para todos os fins de direito, a autenticidade das cópias dos documentos que instruem o recurso.

Em atendimento ao disposto no artigo 524, III, do CPC, os AGRAVANTES informam que estão representados pelos advogados signatários **Felipe Evaristo dos Santos Galea e Thomaz Luiz Sant' Ana**, inscritos na OAB/SP, respectivamente, sob os nºs 220.280 e 235.250, ambos com escritório na Av. Presidente Juscelino Kubitschek, nº 1.455, 11º andar, CEP 04543-011, Cidade e Estado de São Paulo, e **Rafael da Rocha Castilho**, inscrito na OAB/RJ sob o nº 130.641, com escritório na Avenida Almirante Barroso nº 52, 29º andar, CEP 20031-000, Cidade e Estado do Rio de Janeiro.

Os AGRAVADOS estão representados pelos advogados **Sérgio Bermudes, Marcio Vieira Souto Costa Ferreira, Marcelo Fontes, Marcelo**

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 30 - 8º andar | 70392-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
34º andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5620

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10º andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597



**BARBOSA, MÜSSNICH & ARAGÃO**

**Lamego Carpenter** e **Fabiano Robalinho Cavalcanti**, inscritos na OAB/RJ, respectivamente, sob os nºs 17.587, 59.384, 63.975, 92.518 e 95.237, todos com escritório na Praça XV de Novembro, 20, 7º e 8º andares, CEP 20010-010, Cidade e Estado do Rio de Janeiro.

A ADMINISTRADORA JUDICIAL é a **Deloitte Touche Tohmatsu Consultores Ltda.**, com escritório na Avenida Presidente Wilson, 231, 22º andar, Cidade e Estado do Rio de Janeiro, representada pelo Sr. Luiz Vasco Elias e pelo advogado Eduardo Guimarães Wanderley, inscrito na OAB/RJ sob o nº 285.314, com escritório, na Avenida Presidente Wilson, nº 231, 23º andar, CEP 20030-021, Cidade e Estado do Rio de Janeiro, e na Avenida Brigadeiro Faria Lima, nº 3.477, 16º andar, CEP 04538-133, Cidade e Estado de São Paulo.

Requerem que este recurso seja recebido com efeito suspensivo e, ao final, seja provido, nos termos das razões anexas, excepcionalmente extensas, mas assim necessárias, dada a complexidade do assunto e a quantidade de ilegalidades incorridas.

Por fim, requerem que todas as publicações e intimações sejam realizadas cumulativa e exclusivamente, sob pena de nulidade, em nome dos advogados subscritores da presente.

Rio de Janeiro, 7 de julho de 2014.

Felipe Evaristo dos Santos Galea
OAB/SP nº 220.280

Thomaz Luiz Sant' Ana
OAB/SP nº 235.250

Rafael Castilho
OAB/RJ nº 130.641

Igor Silva de Lima
OAB/SP nº 284.482

Matheus Barcelos
OAB/RJ nº 163.297

Gustavo dos Reis Leitão
OAB/SP nº 344.763

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E,
n. 30, 7. andar ( 70397-900)
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
35. andar ( 20031-000)
t. + 55 21 3824-5800
f. + 55 21 3262-5536

SÃO PAULO
Av. Juscelino Kubitschek,
1455 - 10º andar ( 04543-011)
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

## RAZÕES RECURSAIS

**AGRAVANTES:** Autonomy Master Fund Limited, Brennus Fund Lp, Claren Road Credit Master Fund, Ltd, Claren Road Credit Opportunities Master Fund, Ltd, Aspen Creek Partners, Lp, Andromeda Global Credit Fund Ltd., Lyxor/Andromeda Global Credit Fund Ltd, Edmond De Rothschild Emerging Bonds, Firenze Corporate Inc., First Geneva High Yield Fund, GAM Trading N. 37 Inc., Ricardo Augusto Gallo, GLG European Distressed Master Fund, GLG European Distressed Fund, GLG Market Neutral Fund, European Distressed Mac Limited, Crown Managed Accounts Spc, Itava Inc., Brax Fund, BNYM Brazil International Fund SPC on behalf of JGP Offshore Segregated Portfolio, Jean-Jacques Durand, Novel Capital Group Limited, Quaker Event Arbitrage Fund, Shahriar Shahida, Susquehanna Ireland Limited, Capital Ventures International e VR Global Partners L.P.

**AGRAVADAS:** Óleo e Gás Participações S.A. – Em Recuperação Judicial, OGX Petróleo e Gás S.A. – Em Recuperação Judicial, OGX International Gmbh – Em Recuperação Judicial e OGX Áustria Gmbh – Em Recuperação Judicial.

**ORIGEM:** D. Juízo de Direito da 4ª Vara Empresarial do Foro Central da Comarca do Rio de Janeiro, Estado do Rio de Janeiro.

## AGRAVO DE INSTRUMENTO

Egrégio Tribunal,

### .I.
### INTROITO

I.          Infelizmente, este que seria o maior processo do gênero em toda a América Latina não pode, até o momento, ser considerado um exemplo de recuperação judicial, por representar distorções de institutos jurídicos basilares e do resultado assemblear, encampadas pela decisão recorrida, certamente levada a

**BM&A** | ADVOGADOS

BARBOSA, MUSSNICH & ARAGÃO

indução em erro pelas AGRAVADAS e agora merecedora de reforma.

2.        A prevalecerem os atos das RECUPERANDAS em favor de credores pinçados a dedo, estará perdida uma excelente oportunidade de se demonstrar a seriedade dos institutos jurídicos do país. Corre-se o risco de se transformar uma interessante tentativa de adaptação de institutos do direito comparado em ferramenta de favorecimentos ilegais, sujeitos inclusive a futuras investigações de potencial cometimento, em tese, de crimes falimentares, comprometendo a confiabilidade do investidor nacional e estrangeiro nas empresas brasileiras.

3.        Os AGRAVANTES são credores das RECUPERANDAS, detentores de *bonds* que, somados atingem o valor de US$ 288,421 milhões e, durante toda a RECUPERAÇÃO JUDICIAL, demonstraram não se opor às operações de preservação da RECUPERANDAS. **Muito pelo contrário!**

4.        Justamente por serem credores do GRUPO OGX, os AGRAVANTES teriam um gigantesco prejuízo com a eventual falência desnecessária de um grupo no qual acreditaram e investiram, de forma que continuam fazendo grandes esforços para contribuir com a superação da crise econômico-financeira das RECUPERANDAS, enquanto isso for viável.

5.        Contudo, buscam, **de forma legítima**, que o **processo de recuperação judicial do GRUPO OGX seja realizado dentro dos limites legais**, de forma clara e transparente. O Poder Judiciário não pode permitir reestruturações que restrinjam a poucos a possibilidade de contribuírem com o êxito destas, com tratamento distinto dentro de uma mesma classe e origem.

6.        Isso aconteceu no caso, em violação aos princípios mais relevantes da Lei 11.101/2005 ("LRF"), e implicando **distorção do resultado das AGCs.**

7.        Com efeito, os PRJ baseiam-se em um financiamento extraconcursal ("FINANCIAMENTO DIP") e na conversão deste e dos créditos

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n° 20 1° 2° andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

concursais em participação de uma nova companhia reestruturada ("OGX REESTRUTURADA").

8.        Nesse financiamento, as AGRAVADAS criaram vantagens EXCLUSIVAS E EXTREMAMENTE DESPROPORCIONAIS em favor de alguns credores, "coincidentemente" aqueles mais necessários para a aprovação dos PRJ, sem qualquer margem para participação dos demais, obrigados a assistir a todas essas ilegalidades, sendo vencidos pela maioria evidentemente conflitada para votar nas AGCs, e ainda com uma pretensa imposição coativa de outorga de quitações gerais a todos aqueles que praticaram ilegalidades.

9.        Mas, como será demonstrado adiante, não podem os credores detentores da maior parte do capital votante (caso não estivessem conflitados, como ficará claro abaixo) nas AGCs ("BONDHOLDERS MAJORITÁRIOS"), apenas por conta disso, **ter direitos exclusivos nos novos investimentos concedidos às RECUPERANDAS, com um ganho real no investimento tão desequilibrado servindo para compensar prejuízo do crédito concursal**.

10.       Apenas para se ter uma genérica ideia da **gravidade dessas desproporcionais benesses**, desde logo vale apontar que, a permanecer o atual panorama do processo, **o preço a ser pago pelos credores concursais por cada ação da OGX REESTRUTURADA será 75,7 vezes o preço a ser pago pelos BONDHOLDERS MAJORITÁRIOS!**

## .II.
## SÍNTESE DA CONTROVÉRSIA

11.       Em 30.10.2014, as RECUPERANDAS propuseram a RECUPERAÇÃO JUDICIAL (docs. 3 e 5).

12.       Em 21.1.2014, as RECUPERANDAS informaram por petição (fls. 488/500 do doc. 14) a celebração de acordo com os BONDHOLDERS

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 35 – 7º andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-4006

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 – 10º andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597



**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

12

MAJORITÁRIOS, titulares da maioria dos *bonds* em circulação emitidos pela OGX AUSTRIA, no valor de aproximadamente US$ 2 bilhões (ou seja, **mais da metade do crédito concursal**), garantidos pela OGX PARTICIPAÇÕES e pela OGX.

13.          Portanto, foi um acordo com credores sujeitos à RECUPERAÇÃO JUDICIAL quanto aos seus créditos já constituídos na data do pedido, que basicamente envolveria dois financiamentos: o primeiro, denominado "EMPRÉSTIMO PONTE", e o segundo, FINANCIAMENTO DIP, este conversível em ações da OGX REESTRUTURADA (fl. 489 do doc. 14).

14.          Adicionalmente, as AGRAVADAS afirmaram que *"o Grupo OGX conferiu aos Bondholders Aderentes — ou a quem os Bondholders Aderentes indicarem — o direito de subscreverem proporcionalmente aos respectivos créditos a primeira série do Financiamento DIP (seja qual for o instrumento utilizado), até o valor de US$ 110 milhões. (...) De outro lado, a segunda série do Financiamento DIP (seja qual for o instrumento utilizado) até o limite de US$ 105 milhões poderá ser subscrita por todos os credores quirografários do Grupo OGX que manifestarem interesse, além dos financiadores (inclusive Bondholders Aderentes e/ou seus designados) da primeira série do Financiamento DIP, sempre proporcionalmente aos respectivos créditos"* (fls. 492/493 do doc. 20 – destacou-se).

15.          O referido acordo foi refletido no *Plan Support Agreement –* "*PSA*" (fls. 507/577 do doc. 14 - em português, **o emblemático nome de** "**acordo para apoio do plano**"), que, na essência, é um acordo pelo qual os BONDHOLDERS MAJORITÁRIOS **assumiram o conflituoso compromisso de votar favoravelmente à aprovação dos PRJ**[2] em troca de um tratamento mais

---

[2] *"(...) cada titular anuente (individualmente e não solidariamente), em seu nome e em nome das filiais por ele controladas, concorda em: (a) votar, com base em suas respectivas Notas, das quais sejam o proprietário efetivo, agora ou no futuro, ou em relação às quais, agora ou no futuro, tal Titular Anuente atue como pessoa designada, gestor de investimentos ou consultor para os titulares efetivos das mesmas, em favor do Plano de acordo com os procedimentos aplicáveis estabelecidos na BRL (...) d) não (i) contestar o Plano ou a aceitação, aprovação e implementação do Plano; (ii) iniciar quaisquer procedimentos legais que sejam inconsistentes com, ou que impeçam, frustrem ou dificultem a*

**BRASÍLIA**
Setor Comercial Sul, Qd 1, Bl. E,
n° 30 - 7°  andar } 70303-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar } 20031-000
t. + 55 21 3824-5800
f. + 55 21 3262-9636

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar } 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597



BM&A | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

benéfico que o conferido aos outros credores *bondholders*, inclusive os AGRAVANTES.

16.       Enfim, uma conveniência recíproca compreensível somente quando vista pelos olhos dos participantes, mas abominável a quem não foi convidado para a "festa".

17.       Tal fato é reconhecido pelas próprias RECUPERANDAS, que, ao se referirem ao *PSA*, singelamente afirmam: "*a conclusão dos PSA é de fundamental importância para as recuperandas. Em primeiro lugar, porque indica as condições para a possível aprovação de um futuro plano de recuperação judicial, aceitáveis para uma parte importante dos credores. Obviamente que o plano ainda será apresentado e votado, na forma da lei, por todos os credores sujeitos à recuperação judicial. Todavia, simples sinalização de que uma parte representativa dos credores aceita, em tese, desde que cumpridas as condições precedentes previstas no PSA e outros documentos e contratos correlatos que venham a ser celebrados entre as partes, converter seus créditos em ações da companhia, é muito alvissareira*" (destacou-se – fls. 902 do doc. 19).

18.       Conforme o próprio Ministério Público ressaltou em sua contundente opinião às fls. 1830 do doc. 15: "*Em outras palavras, ao invés de negociar abertamente com todos os credores para buscar esse capital novo, em igualdade de condições e informações, oferecendo-lhes isonomicamente a mesma 'moeda ou fator de conversão', as recuperandas decidiram escolher, a seu bel prazer, quais seriam aqueles bondholders contemplados (...)*" (destacou-se).

19.       Por já estarem as RECUPERANDAS alinhadas com a maioria dos créditos que julgava necessários, a participação dos demais credores se tornou

*aprovação, a confirmação ou implementação do Plano ou as operações nele descritas (...)*" (destacou-se – fls. 516/517 do doc. 14).

BRASÍLIA
Setor Comercial Sul, Qd 9, Bl. E
nº 26 – 7° andar | 70303-900
t. + 55 61 3218-0300
f. + 55 61 3218-0319

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

secundária, e o processo se prestou a um mero "cumprimento de tabela". Caminhava passo a passo, na tentativa de seguir formalidades legais mínimas, para alcançar o grande momento previamente combinado entre as AGRAVADAS e os BONDHOLDERS MAJORITÁRIOS: a aprovação dos PRJ em uma assembleia tão tranquila para eles que nem parecia se referir à maior recuperação judicial da história do país.

20.        Nessa linha, os direitos dos demais credores foram sistematicamente violados, inclusive aqueles de fomentar novos investimentos nas RECUPERANDAS.

21.        Em 24.1.2014, o GRUPO OGX voltou a pedir a oneração de bens para obter capitalização imediata (doc. 19) – garantia exigida pelos BONDHOLDERS MAJORITÁRIOS que agora tentam justificar seus imensos e exclusivos benefícios alegando um risco, portanto, inexistente –, quando afirmou que "*durante meses a fio, vem buscando, sem sucesso, oportunidades de financiamento no mercado brasileiro e internacional*" (fls. 902 do doc. 19), e explorou a sua 'benevolência' com os "(...) *demais credores que embora silentes até este momento, passem a demonstrar interesse em efetivamente financiar a empresa (...)*" (fls. 906 do doc. 19).

22.        Com base nessas afirmações, a ADMINISTRADORA JUDICIAL apontou que "*as Recuperandas informaram em adição que não obtiveram sucesso com nenhuma outra fonte de financiamento (...)*" (fls. 916 – destacou-se), **demonstrando ser esse um ponto relevante.**

23.        E logicamente é! Como se verá adiante, o FINANCIAMENTO DIP pressupõe o tratamento igualitário nas condições ofertadas a todos os credores. Isso evidentemente não ocorreu, conforme está provado nos autos e é de uma clareza "de doer os olhos". Só não vê quem quer aprovar os PRJ a todo custo, independentemente da ilegalidade do tal tratamento diferenciado.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 30 - 7° andar | 70397-900
t. + 55 61 3210-0300
f. + 55 61 3210-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

24.        A oneração de bens antes referida foi então deferida por indução do juízo *a quo* em erro (doc. 21), levando à oposição, em 31.1.2014, de embargos de declaração pela AUTONOMY (doc. 12), no qual a discriminação contra credores menores (mas ainda assim muito relevantes) foi inicialmente informada, a tempo de serem evitadas as ilegalidades ora apontadas.

25.        A AUTONOMY comprovou que, em 23.1.2014 — antes da apresentação da petição de fls. 901/907 do doc. 19 —, e em virtude de não ter tido acesso aos autos da RECUPERAÇÃO JUDICIAL, **notificou as RECUPERANDAS, demonstrando interesse em conhecer os termos dos acordos com credores e demais documentos correlatos, e pedindo tratamento igualitário** (doc. 12).

26.        Contudo, ela **foi sumariamente ignorada**, sem qualquer manifestação do GRUPO OGX, só reforçando a tese de tratamento diferenciado.

27.        Essa não foi a única busca de um *bondholder* minoritário por tratamento equivalente ao dos majoritários. Na petição datada de 14.2.2014 (fls. 1.378/1.426 do doc. 17), a AUTONOMY e outros AGRAVANTES também comprovaram, mediante correspondências trocadas com os assessores do GRUPO OGX, que o contataram em dezembro de 2013, quando tomaram ciência via fatos relevantes de que algo estava ocorrendo, manifestando interesse na admissão como financiadores nas mesmas condições dos BONDHOLDERS MAJORITÁRIOS.

28.        **Todos viram as portas das RECUPERANDAS se fecharem em suas caras...**

29.        E pior! Ainda que as RECUPERANDAS tenham mesmo procurado assessores financeiros para a capitalização do GRUPO OGX em 2013, o suposto contato com 41 fontes de capital — conforme a decisão agravada — estaria muito longe de representatividade face aos mais de 200 credores que merecem exatamente o mesmo tratamento. Mas somente alguns tiveram tal privilégio, tanto que não há provas de negociação estruturada com os AGRAVANTES.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 30 - 7° andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

TJRJ 201400324357 07/07/2014 18:49:00 GN<Z Petição Inicial Eletrônica

TRIBUNAL DE JUSTIÇA DO ESTADO
DO RIO DE JANEIRO
A Secretaria dá fé da
este documento com o original
Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
28/07/14

**BM&A** |ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

16

30.        Considerar que o FINANCIAMENTO DIP estava suficientemente e legalmente fechado em 2013 corrobora a alegação dos AGRAVANTES de que a RECUPERAÇÃO JUDICIAL se tornou um processo vazio, pois as negociações com credores foram feitas nos bastidores, não à luz pública.

31.        Tanto havia tempo suficiente para dar a todos os credores a oportunidade de serem admitidos a todas as fases do FINANCIAMENTO DIP que, apenas quatro meses depois das comunicações dos credores pedindo tratamento igualitário, a OGX PARTICIPAÇÕES noticiou, por Fato Relevante divulgado ao mercado em 13.3.2014 (doc. 20), que a primeira etapa do empréstimo – privilegiando determinados credores – tinha sido concluída naquela data.

32.        Antes disso, até mesmo nos autos os AGRAVANTES já haviam confirmado seu interesse (fls. 1.405/1.426 do doc. 17).

33.        Em 14.2.2014, as RECUPERANDAS apresentaram os PRIMEIROS PLANOS (doc. 7). Ato contínuo, em 4.4.2014 (doc. 11), a AUTONOMY, em sintonia com os demais credores alijados pelo GRUPO OGX, apresentou objeção aos PRIMEIROS PLANOS, destacando as diversas ilegalidades neles contidas, especialmente o gritante tratamento desigual entre credores de mesma classe e origem: todos *bondholders*.

34.        As AGCs foram designadas para 3.6.2014.

35.        Todavia, surpreendentemente, às vésperas de as AGCs serem instaladas, em 23.5.2014, as RECUPERANDAS aditaram os PRIMEIRO PLANOS, apresentando os PLANOS APROVADOS (individualmente, o PRJ OGX, o PRJ OGPar e o PRJ AUSTRIA).

36.        Dada a proximidade das AGCs, os AGRAVANTES apenas tiveram acesso às mudanças propostas pelas RECUPERANDAS pelo site da Comissão de Valores Imobiliários, uma vez que a 4ª Vara Empresarial do Rio de Janeiro não

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nl. 20  7. andar | 70397-900
v • 55 61 3218-0200
t • 55 61 3218-0215

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar | 20031-000
t • 55 21 3824-5800
t • 55 21 2262-5036

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455, 10. andar | 04543-011
t • 55 11 2179-4600
t • 55 11 2179-4597

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

publicou edital informando o aditamento dos PRIMEIROS PLANOS, ou mesmo disponibilizou cópia destes nos autos suplementares.

37.    As RECUPERANDAS criaram uma nova série de debêntures. Conforme pormenorizado mais abaixo, a 1ª série, no valor de US$ 125 milhões, foi mantida como antes, mas a 2ª série, de US$ 90 milhões, sujeita a subscrição por qualquer credor proporcionalmente ao seu crédito, passou a ser a 3ª série. A nova 2ª série, então, somente existiria para as sobras da 3ª série, e novamente seria exclusiva dos BONDHOLDERS MAJORITÁRIOS, resultando-lhes em mais participação na OGX REESTRUTURADA, sempre o maior propósito deles.

38.    Antes de as AGCs serem instaladas, alguns credores fornecedores, aparentemente na tentativa de reforçarem sua representatividade, insurgiram-se contra a individualização dos créditos dos *bondholders*, então listados como um crédito único perante o *trustee* dos bonds, o Deutsche Bank Trust Company Americas ("DEUTSCHE"). O argumento era que o voto seria único, pela totalidade dos *bonds*, devendo ser exercido apenas pelo DEUTSCHE, sendo indevida a individualização sem respeitar o procedimento de habilitação de crédito da LRF.

39.    Um desses credores, a DIAMOND, agravou da decisão que determinou o procedimento de individualização (AI nº 0022747-51.2014.8.19.0000, distribuído à 14ª Câmara Cível do E. TJRJ), pleiteando a sua suspensão. O pedido de efeito suspensivo não foi concedido e a DIAMOND impetrou o Mandado de Segurança nº 0024882-36.2014.8.19.0000 perante a presidência do E. TJRJ (doc. 23), quando então foi deferida a suspensão dos efeitos da decisão de individualização dos *bondholders* (doc. 24).

40.    Outro credor, PERENCO, também impetrou Mandado de Segurança (nº 0026517-52.2014.8.19.0000, perante a presidência do E. TJRJ - doc. 25), tendo obtido decisão semelhante, que permitia a realização das AGCs, mas condicionava seu resultado ao julgamento do *writ* (anexo 1 do doc. 9).

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F
n° 30 - 7° andar | 70397-900
t + 55 61 3218-0300
f + 55 61 3218-0346

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar | 20031-000
t + 55 21 3824-5800
f + 55 21 2262-5690

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10. andar | 04543-011
t + 55 11 2179-4600
f + 55 11 2179-4597

BM&A | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

41.          Todo o esforço das RECUPERANDAS e dos BONDHOLDERS MAJORITÁRIOS poderia cair por terra, pois os PRJ, mesmo antes de discutidos e votados nas AGCs, já estavam virtualmente aprovados por estes conflitados credores, mas sem esses votos as coisas poderiam ser diferentes. **Credores isentos nunca concordariam com todas as ilegalidades que estavam sendo propostas.**

42.          Milagrosamente, na véspera da AGC, a DIAMOND desistiu do seu mandado de segurança e o efeito suspensivo foi revogado (doc. 27).

43.          E, como um segundo milagre (realmente as RECUPERANDAS têm muita sorte!), a PERENCO desistiu de seu mandado de segurança no mesmo dia das AGCs, o que acabou sendo deferido, por se tratar de direito disponível, enquanto estas se arrastavam (doc. 26), permitindo-se a realização daqueles atos conforme previsto pelo Grupo OGX e pelos BONDHOLDERS MAJORITÁRIOS.

44.          Ou seja, dois credores muitíssimo ativos desde o início do processo, com alto teor de beligerância contra o GRUPO OGX e os BONDHOLDERS MAJORITÁRIOS (vide suas objeções aos PRJ – doc. 28), simplesmente resolveram sair de cena repentinamente, sem qualquer justificativa, mas **igualmente por conduta digna de investigação pelas autoridades cíveis e criminais competentes**, para se certificarem de que não houve, em tese, qualquer negociação indevida de bastidores – mais uma em potencial!

45.          As AGCs foram instaladas e, surpreendentemente (ou não, depois do narrado acima), a DIAMOND **aprovou** os PRJ e a PERENCO se absteve (doc. 9). Os PRJ também foram aprovados pela maioria dos credores presentes, quer dizer, os BONDHOLDERS MAJORITÁRIOS e alguns fornecedores inexpressivos (até mesmo uma cooperativa de táxi) ou que, embora tivessem créditos expressivos, vislumbram na OGX REESTRUTURADA uma necessária cliente.

46.          Os AGRAVANTES foram basicamente os únicos a se pronunciarem

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E
Nr 20 · 7º andar | 70297-900
t. + 55 61 3218-0360
c. · 55 61 3218-0356

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t. · 55 21 3824-0800
f. · 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 · 10º andar | 04543-011
t. · 55 11 2179-4600
f. · 55 11 2179-4597

BM&A | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

nas AGCs, apesar do enorme porte da dívida global, fazendo suas principais objeções e sugestões de modificação dos PRJ, mas foram novamente ignorados pelas RECUPERANDAS, que se negaram a discutir propostas, seguidas pelos futuros controladores da OGX RESTRUTURADA, os BONDHOLDERS MAJORITÁRIOS.

47.        Consequentemente, restou aos AGRAVANTES entregar seus votos por escrito, rejeitando completamente os PLANOS APROVADOS (doc. 9), pelas inúmeras ilegalidades neles contidas.

48.        Mesmo diante das gritantes irregularidades apontadas em objeção (doc. 11) e nas AGCs, o juízo *a quo* proferiu a decisão ora agravada (doc. 10), pela qual entendeu que "*considera-se cumpridas as exigências legais e concede-se a recuperação judicial das empresas requerentes, cujo plano foi aprovado na assembleia-geral de credores realizada no 03/06/2014*".

49.        Conforme será demonstrado, essa decisão merece reforma, pois, de acordo com doutrina e jurisprudência, **é inadmissível um plano de recuperação que, sem justificativa, desrespeita o princípio da igualdade entre os credores, além de violar diversos artigos da LRF**, devendo as AGCs e os PLANOS APROVADOS ser declarados nulos, obrigando as RECUPERANDAS a apresentarem novos planos. Tudo isso nos termos da Lei e da reiterada jurisprudência, que tem concedido às recuperandas em geral essa nova oportunidade, em vez da falência, que todos os credores e também os AGRAVANTES pretendem evitar.

50.        A situação dos autos é lamentável e merece reforma, sob pena de perda de credibilidade da LRF e da segurança jurídica. Os AGRAVANTES, investidores estrangeiros em sua maioria, assistem estarrecidos, não entendendo como pode o Poder Judiciário ter sido induzido a encampar tamanhas barbaridades que certamente serão corrigidas no julgamento deste recurso.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. P,
nº 30, 7° andar | 70307-900
t. + 55 61 3218-0300
f. + 55 61 3218-0316

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 3262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597





**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

.III.

## RAZÕES PARA REFORMA DA DECISÃO AGRAVADA

### III.1. POSSIBILIDADE DE REVISÃO JUDICIAL DOS PLANOS DE RECUPERAÇÃO: RELATIVIZAÇÃO DA SOBERANIA DAS AGCs

51.          A decisão agravada tem por base o entendimento nela manifestado de que a assembleia-geral de credores seria soberana, de modo que, *"uma vez aprovado o plano em assembleia, o juiz deverá conceder a recuperação, sem que se lhe reserve grande margem de discricionariedade (...) não cabendo ao Ministério Público e ao juízo a análise da viabilidade econômica e financeira do plano de recuperação, mas tão somente os credores"* (fls. 7.891/7.892 do doc. 10 – destacou-se)[3].

52.          Entretanto, o entendimento de que a assembleia-geral de credores é soberana para deliberar sobre o plano de recuperação, cabendo ao Poder Judiciário papel meramente homologatório, encontra-se totalmente superado.

53.          Conforme ensina MARLON TOMAZETTE[4], *"Como a recuperação judicial tem a natureza de um acordo, é essencial o encontro entre as vontades do devedor e seus credores. Para que esse encontro de vontades ocorra, o devedor deverá tomar a iniciativa, apresentando uma proposta inicial de acordo, o plano de recuperação judicial. Tal proposta só produzirá efeitos se for aceita pelos credores. Em razão disso, os credores devem ter a chance de se manifestar sobre o plano de recuperação judicial"* (destacou-se).

54.          A natureza jurídica contratual traz como consequência direta ao plano de recuperação judicial o fato de que, enquanto negócio jurídico, está sujeito a controle judicial das condições de existência, validade e eficácia.

55.          Diferentemente do que afirma o magistrado, este entendimento é

---

[3] A decisão agravada utiliza neste trecho citação encontrada em AYOUB, Luiz Roberto, e CAVALLI, Cássio. *Construção Jurisprudencial da Recuperação Judicial de Empresas*, p. 288.
[4] *Curso de direito empresarial*, volume 3: falência e recuperação judicial. São Paulo: Atlas, 2011, p 195.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F
nº 30 - 9º andar | 70397-900
t + 55 61 3218-0300
f + 55 61 3218-0319

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t + 55 21 3824-5800
f + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek
1455  10º andar | 04543-011
t + 55 11 2179-4600
f + 55 11 2179-4597

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

fato consumado pelo Judiciário, não existindo mais qualquer dúvida de que este pode e deve deixar de homologar planos de recuperação judicial quando reconhecer a existência de nulidades — como aquelas apontadas no presente recurso, com a possibilidade de **relativização das decisões das AGCs**.

56.     Nem poderia ser diferente, pois o Estado guarda o monopólio da resolução dos conflitos, garantindo a todos, de forma ampla, o acesso à justiça. O Enunciado 44 da 1ª Jornada de Direito Comercial do CJF consagrou esse entendimento: *"A homologação de plano de recuperação judicial aprovado pelos credores está sujeita ao controle judicial de legalidade"*.

57.     Nesse sentido, MANOEL JUSTINO BEZERRA FILHO ensina: *"Observe-se desde logo que o poder da assembleia geral não é decisório, não se substituindo ao poder jurisdicional. Evidentemente assembleia, constituída por credores diretamente interessados no bom andamento da recuperação, deverá levar sempre ao juiz as melhores deliberações, que atendam de forma mais evidente ao interesse das partes envolvidas na recuperação, tanto devedor quanto credores. No entanto, até pelo constante surgimento de interesses em conflito neste tipo de feito, sempre competirá ao poder jurisdicional a decisão, permanecendo com a assembleia o poder deliberativo, dependente da jurisdição para sua implementação nos autos do processo."*[5] (destacou-se)[6].

58.     A legalidade da deliberação que aprova planos de recuperação judicial **não só pode como deve ser analisada pelo Poder Judiciário**, conforme, inclusive, já se posicionaram o STJ e os tribunais estaduais:

[5] BEZERRA FILHO, Manoel Justino. *Lei de Recuperação de Empresas e Falência*. São Paulo: Revista dos Tribunais, 2011, p. 115/116.
[6] Neste mesmo sentido: *"Ao meu ver, a interpretação sistemática, teleológica e pragmática, defendida nos comentários ao arts. 47, itens 9 e 10, e 58, itens 1 e 2, leva a conclusão que o juiza não pode ser privado dos poderes e atribuições que lhe são assegurados por norma constitucional e pela LOMAN, nem impedido de exercer o controle da legalidade formal e substancial e, conforme o caso, o controle de mérito e decidir se a rejeição do plano pela assembleia geral de credores: a) atenta contra o interesse público; b) encerra indisfarçável fraude; c) importa em violação da LRE etc, o que obrigará o juízo a ir contra a 'letra' do art. 56, §4º, e não decretar a falência"*.[6] (LOBO, Jorge. *Comentários à Lei de Recuperação de Empresa e Falência*. Coordenação Paulo F. C. Salles de Toledo e Carlos Henrique Abrão. São Paulo: Saraiva, 2005, p. 150.- destacou-se)

| BRASÍLIA | RIO DE JANEIRO | SÃO PAULO |
|---|---|---|
| Setor Comercial Sul, Qd 1, Bl. F, | Av. Almirante Barroso, 52 | Av. Pres. Juscelino Kubitschek, |
| nº 30 – 7° andar ) 70397-900) | 31 andar ) 20031-000 | 1455 – 10° andar ) 04543-011 |
| t. = 55 61 3218-0300 | t. = 55 21 3824-5800 | t. = 55 11 2179-4600 |
| f. = 55 61 3218-0315 | f. = 55 21 2262-6642 | f. = 55 11 2179-4597 |

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

*"RECURSO ESPECIAL. RECUPERAÇÃO JUDICIAL. APROVAÇÃO DE PLANO PELA ASSEMBLEIA DE CREDORES. INGERÊNCIA JUDICIAL. IMPOSSIBILIDADE. CONTROLE DE LEGALIDADE DAS DISPOSIÇÕES DO PLANO. POSSIBILIDADE. RECURSO IMPROVIDO. 1. A assembleia de credores é soberana em suas decisões quanto aos planos de recuperação judicial. **Contudo, as deliberações desse plano estão sujeitas aos requisitos de validade dos atos jurídicos em geral, requisitos esses que estão sujeitos a controle judicial. 2.** Recurso especial conhecido e não provido. (...) A vontade dos credores, ao aprovarem o plano, deve ser respeitada nos limites da Lei. **A soberania da assembleia para avaliar as condições em que se dará a recuperação econômica da sociedade em dificuldades não pode se sobrepujar às condições legais da manifestação de vontade representada pelo Plano.** Do mesmo modo que é vedado a dois particulares incluírem, em um contrato, uma cláusula que deixe ao arbítrio de uma delas privar de efeitos o negócio jurídico, o mesmo poder não pode ser conferido à devedora em recuperação judicial. A lei é o limite tanto em uma, como em outra hipótese".[7] (destacou-se)*

*"Primeiramente, cumpre ressaltar que incide-se em grave equívoco quando se afirma, de forma singela e como se fosse um valor absoluto, a soberania da Assembleia-Geral de Credores, pois, como ensinaram Sócrates e Platão, as leis é que são soberanas, não os homens. Aristóteles, na Ética a Nicômano, fortaleceu a concepção de soberania da lei, harmonizando a idéia de justiça e equidade. O filósofo da UNICAMP, ROBERTO ROMANO, no magistral ensaio 'Acima ou abaixo da Lei', menciona o escólio de Leonardo Bruni, pensador e político do Renascimento, ao definir equidade (epikeia). Diz o mestre renascentista: 'Epikeia é a parte da justiça que os jurisconsultos nomeiam 'ex bono et equo' (do que é bom e equânime). A lei é escrita de certo modo e deve, no entanto, ser interpretada segundo os critérios do bem e da equidade" (De Interpretatione Recta). Prossegue o professor ROMANO: "Mas, de outro lado, toda lei deve ser interpretada segundo a justiça. Nem descompromisso nem fetiche legal. A prudência indica o caminho: 'Quem dá a cada um o que lhe pertence porque conhece a verdadeira e necessária razão das leis age em constante acordo consigo*

---

[7] STJ, REsp 1314209/SP, Relatora Ministra Nancy Andrighi, Terceira Turma, d. j. 22.5.2012.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 30 - 2º andar | 70780-3800
t • 55-61-3218-0300
f • 55-61-3218-0316

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t • 55-21-3824-5800
f • 55-21-3824-5836

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10º andar | 04543-011
t • 55-11-2128-4600
f • 55-11-2179-4597

21

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

mesmo e por seu próprio decreto, não por decreto alheio: ele merece, pois, ser reconhecido como justo'." (Baruch Spinoza, Tratado Teológico-Político), 'in', O Estado de São Paulo, 25/12/2001, p. A2). Na linha de tal ensinança, só se pode afirmar que a Assembleia-Geral de Credores é soberana, quando ela obedece a Constituição da República seus princípios e regras - e as leis constitucionais. Se a Assembleia-Geral de Credores aprova pelo quórum estabelecido na Lei nº 11.101/2005 um plano que viole princípios ou regras, compete ao Poder Judiciário [que, como já afirmei, não é mero chancelador de deliberações assembleares tanto que tem o poder-dever de não aplicar regras inconstitucionais] o dever de recusar a homologação ao plano viciado".[8] (destacou-se)

"AGRAVO DE INSTRUMENTO. AÇÃO DE RECUPERAÇÃO JUDICIAL. EXISTÊNCIA DE VÍCIOS NO PLANO DE RECUPERAÇÃO. NULIDADE DA ASSEMBLEIA GERAL DE CREDORES. CABIMENTO. DETERMINAÇÃO DE APRESENTAÇÃO DE OUTRO PLANO. RECURSO PARCIALMENTE PROVIDO. A Assembleia Geral de Credores só é reputada soberana para a aprovação do plano se este não violar os princípios gerais de direito, os princípios e regras da Constituição Federal e as regras de ordem pública da Lei 11.101/2005".[9] (destacou-se)

"AGRAVO DE INSTRUMENTO. RECUPERAÇÃO JUDICIAL. DECISÃO INTERLOCUTÓRIA QUE HOMOLOGOU PLANO DE RECUPERAÇÃO JUDICIAL. INSURGÊNCIA DO BANCO CREDOR QUIROGRAFÁRIO. MÉRITO. **SOBERANIA DA DECISÃO TOMADA NA ASSEMBLÉIA DE CREDORES MITIGADA. POSSIBILIDADE DO JUDICIÁRIO VERIFICAR LEGALIDADE DO PLANO.** CONDIÇÕES PARA PAGAMENTO DE CREDORES QUIROGRAFÁRIOS QUE FEREM A ISONOMIA. IMPOSIÇÃO DE DESÁGIO GRADUAL CONFORME VALOR DA DÍVIDA SOMENTE A PARTE DOS CREDORES. QUATRO MODALIDADES DE ADIMPLEMENTO DAS OBRIGAÇÕES DENTRO DA

---

[8] TJSP, Câmara Reservada à Falência e Recuperação Judicial - Agravo de instrumento nº 0136362-29.2011.8.26.0000, rel. Manoel de Queiroz Pereira Calças, d.j. 28.2.2012.
[9] TJPR, 17ª Câmara Cível, Agravo de Instrumento n. º 984.390-7, rel. Mário Helton Jorge. d. j. 14.8.2013.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n 30 - 7 andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 3262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455  10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

22



**BM&A** ABVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

*MESMA CLASSE. OFENSA AO § 2º DO ARTIGO 58 DA LEI 11.101/05. CASSAÇÃO DA DECISÃO QUE HOMOLOGOU O PLANO APRESENTADO QUE SE IMPÕE (...)".*[10] (destacou-se)

59.        Inegável que, no caso em comento, este E. TJRJ não só pode como deve analisar o resultado das AGCs, revogando a aprovação dos PLANOS APROVADOS.

60.        Os argumentos acima expostos também servem de base para afastar o entendimento da decisão agravada[11] de que a concordância da maioria, isto é, a aprovação do plano de recuperação, torna todas as disposições destes legais.

61.        Nada poderia ser mais absurdo! Ainda mais se considerado o caso dos autos, em que a maior parte do capital votante em cada uma das AGCs, pelos PRJ, se tornará controladora das RECUPERANDAS e previamente se comprometeu a aprová-los, sendo amplamente favorecidas por eles, em evidente conflito pormenorizado mais abaixo.

62.        Em outras palavras, os BONDHOLDERS MAJORITÁRIOS garantiram a si exclusivas condições especiais, fizeram constá-las nos PRJ e os aprovaram, alijando todos os demais de tudo isso (ao menos aparentemente, porque não se sabe que fim foi dado ao crédito de DIAMOND e PERENCO, promovidas de inimigas a salvadoras da pátria repentinamente), tornando os AGRAVANTES vencidos por serem minoritários na deliberação.

---

[10] TJSC, 5ª Câmara de Direito Comercial, Agravo de Instrumento nº 2013.026462-8, rel. Guilherme Nunes Born, d. j. 27.2.2014.
No mesmo sentido: TJRS, 5ª Câmara Cível, Agravo de Instrumento n. 70055202303, rel. Jorge Luiz Lopes do Canto, d.j. 11.9.2013; TJSP, Câmara Reservada à Falência e Recuperação Judicial, Agravo de Instrumento nº 0158318-63.2011.8.26.0000, rel. Manoel de Queiroz Pereira Calças, d. j. 17.4.2012; TJSP, Câmara Reservada à Falência e Recuperação Judicial, Agravo de Instrumento nº 0264287-08.2011.8.26.0000, rel. Manoel de Queiroz Pereira Calças, d. j. 31.7.2012; TJSP, 1ª Câmara Reservada de Direito Empresarial, Agravo de Instrumento nº 0076442-56.2013.8.26.0000, rel. Ênio Zuliani, d. j. 29.8.2013; TJSP, 2ª Câmara de Direito Empresarial, Agravo de Instrumento nº 0134155-86.2013.8.26.0000, rel. Ligia Bisogni, d. j. 9.12.2013.
[11] *"Não obstante o posicionamento declinado, perfilha-se o entendimento de que esses aspectos restaram superados pela essência do questionamento declinado por uma parcela minoritária de credores, bondholders que deixaram de participar da primeira tranche, pelo próprio resultado da votação exuberante por número de credores e por valor de créditos alcançada na assembleia de credores e também pela sua deliberação em relação ao Put option"* (fls. 7.892 do doc. 10).

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
N. 30 - 7  andar 1 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0515

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar 1 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10  andar 1 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

63.    O magistrado *a quo* foi induzido em erro pela falácia, nunca provada (aliás, as provas dão conta exatamente do contrário), de que todos tiveram a chance de participar, mas apenas alguns poucos benevolentes se dispuseram, sendo justo, portanto, que tenham tudo que querem.

64.    Isso não faz o menor sentido!

65.    De qualquer forma, sendo inegável a possibilidade de o Poder Judiciário examinar as ilegalidades contidas nos PRJ, é necessário demonstrá-las em detalhes, conforme será feito abaixo depois de se indicar a absoluta nulidade das AGCs em função de abuso de direito de voto decorrente de conflito de interesses dos BONDHOLDERS MAJORITÁRIOS.

## III.2. NULIDADE DAS AGCs: ABUSO DO DIREITO DE VOTO E CONFLITO DE INTERESSE

66.    Conforme se depreende das respectivas atas e dos votos escritos apresentados (doc. 9), ao início das AGCs o representante dos AGRAVANTES requereu à ADMINISTRADORA JUDICIAL que o créditos dos BONDHOLDERS MAJORITÁRIOS não fossem considerados para estabelecimento dos quoruns de instalação das AGCs e deliberação dos PRJ, tendo em vista o conflito de interesses decorrente das exclusivas e ilegais transações previamente estabelecidas com as RECUPERANDAS, que obrigavam os BONDHOLDERS MAJORITÁRIOS a aprovarem as propostas como condição para as suas benesses.

67.    Para tanto, os AGRAVANTES relembraram o seguinte, em síntese (as ilegalidades dos PRJ serão detalhadas nos demais capítulos deste recurso):

   (i)    as oportunidades de obter benefício econômico dadas exclusivamente aos BONDHOLDERS MAJORITÁRIOS (especialmente mediante subscrição exclusiva das DEBÊNTURES 1ª SÉRIE e das DEBÊNTURES 2ª SÉRIE, conforme definidas nos PRJ), demonstradas amplamente na

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 30 - 7' andar | 70357-900
t. - 55 61 3218-0300
f. - 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t + 55 21 3824-5800
f + 55 21 3262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10  andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4697

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

objeção aos planos de recuperação judicial apresentada pela AUTONOMY (doc. 11);

(ii)   que, para a obtenção dessas vantagens exclusivas, os BONDHOLDERS MAJORITÁRIOS previamente negociaram os PRJ e se comprometeram a aprová-los, assinando inclusive um denominado "acordo para suporte de plano" (o *PSA*);

(iii)   que, sozinhos, os BONDHOLDERS MAJORITÁRIOS detêm a maioria ou grande parte dos créditos em discussão; e

(iv)   que a aprovação dos PRJ pré-negociados pelos BONDHOLDERS MAJORITÁRIOS pretensamente lhes confere quitação dos negócios objetos do *PSA*, pretendendo ainda impedir outras medidas pelos credores do GRUPO OGX contra o próprio, os BONDHOLDERS MAJORITÁRIOS e inclusive o DEUTSCHE.

68.   Contudo, a ADMINISTRADORA JUDICIAL, sem apontar motivos, rejeitou singelamente o requerimento dos AGRAVANTES e contabilizou (i) a presença dos BONDHOLDERS MAJORITÁRIOS para o estabelecimento do quorum e (ii) os seus votos favoráveis aos PRJ.

69.   Isso permitiu aos BONDHOLDERS MAJORITÁRIOS abusarem de seu direito de voto, em decorrência de nítido conflito de interesses, e aprovaram os PRJ sem comentar uma única vírgula, postura rara para credores com bilhões de reais em crédito (afinal, tiveram a exclusiva oportunidade de fazê-lo durante os muitos meses que antecederam as AGCs).

70.   Naturalmente, não se esperava algo diferente de um grupo de credores que terá um enorme ganho real no seu investimento, mediante a conversão de seu crédito em controle da OGX REESTRUTURADA apenas porque

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 30 - 7  andar | 70397-900
t + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t + 55 21 3824-5800
f + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455  10º andar | 04543-011
t + 55 11 2179-4600
f + 55 11 2179-4597

25

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

tinham a maioria suficiente para aprovação dos PRJ, especialmente o da OGX AUSTRIA, emissora dos *bonds* que originaram seu crédito.

71.         E mais: **utilizaram de forma abusiva esse direito de voto para garantir que os demais credores sequer tivessem qualquer margem para sugerir mudanças nos PRJ votados em AGCs.**

72.         Tudo isso ficou explícito nas AGCs (doc. 9), pois as RECUPERANDAS, apesar de alegadamente terem redigido e apresentado os PRJ, quando questionadas ao menos três vezes pelos patronos dos AGRAVANTES sobre eventuais mudanças para diminuir o tratamento diferenciado[12], rejeitaram-nas porque, segundo o *PSA*[13], dependiam de anuência dos BONDHOLDERS MAJORITÁRIOS.

73.         Não por outra razão o patrono dos AGRAVANTES solicitou que os BONDHOLDERS MAJORITÁRIOS se manifestassem sobre as solicitações de mudanças[14], já que as RECUPERANDAS estariam por eles impedidas de fazer qualquer alteração. Mas a resposta logicamente foi negativa, sob o inusitado argumento de que o patrono ali presente não tinha poderes para tanto (doc. 9).

---

[12] "... *O Senhor Felipe Galea propôs à Recuperanda que o valor atribuível à OSX não fosse computado para efeitos de distribuição do direito de subscrição da 3ª série...*". "*O Sr. Thomaz Sant' Ana (...) propôs que pelo menos a 3ª série não fosse subscrita pelos backstop lenders em um primeiro momento e que, havendo sobras, que fossem submetidas aos demais credores*".

[13] Conforme obrigação contratual prevista no *PSA*: "*(j) A não ser que de outra forma consentido por escrito pelos Titulares Anuentes, na medida em que as Sociedades concordem com qualquer credor ou titular de qualquer Nota sobre os termos de quaisquer credor ou titular de quaisquer Notas sobre os termos de qualquer tolerância, lock-up, apoio ou acordo similar em termos e condições que sejam mais favoráveis que os oferecidos aos Titulares Anuentes, as Sociedades fornecerão prontamente notificação por escrito aos Titulares Anuentes em relação a esse acordo, e esse acordo será considerado imediatamente alterados para incluir as condições mais favoráveis, sem necessidade de novas medidas. (...) (l) não realizar qualquer transação com qualquer filial de qualquer Sociedades sem o prévio consentimento dos Titulares de Notas Anuentes, exceto para pagamento (A) para uso temporário de FPSO 1 durante 2014, e certos custos de desmobilização e desconexão em relação ao mesmo, sujeito às taxas de afretamento, prazo e limites estabelecidos no Anexo 1 do presente instrumento (o "Resumo FPSO") ou (B) para a OSX-3, nos termos do Contrato de Fretamento (...) da OSX-3 ou se expressamente permitido sob os Documentos Relativos ao Plano que estejam em vigor em tal momento*" (fls. 523/524 do doc. 14).

[14] "*O Sr. Thomaz Sant' Ana alegou que, no seu entendimento, a Recuperanda estava impedida de negociar os termos do plano e requereu que os representantes dos backstop lenders fossem inquiridos a respeito das propostas efetuadas*".

| BRASÍLIA | RIO DE JANEIRO | SÃO PAULO |
| --- | --- | --- |
| Setor Comercial Sul, Qd 1, Bl. K | Av. Almirante Barroso, 52 | Av. Pres. Juscelino Kubitschek, |
| nº 20 - 7º andar | 31º andar | 1455 - 10º andar |
| t + 55 61 3216-0900 | t + 55 21 1824-6900 | t + 55 11 2179-4600 |
| f + 55 61 3218-0315 | f + 55 21 2262-3596 | f + 55 11 2179-4597 |

**BM&A** | ADVOGADOS
BARBOSA, MUSSNICH & ARAGÃO

Página
28

74. Em outras palavras, embora as AGCs fossem o foro de discussão e modificação dos PRJ (art. 35, I, "a" da LRF), essa discussão era inviável, por imposição dos BONDHOLDERS MAJORITÁRIOS acatada pelas RECUPERANDAS.

75. O abuso do direito de voto dos BONDHOLDERS MAJORITÁRIOS é evidente. Votaram algo que eles mesmos propuseram ou ao menos estavam obrigados a aprovar para receberem regalias imensas e exclusivas já denunciadas acima e na objeção da AUTONOMY (doc. 11).

76. Tal fato caracteriza inegável conflito de interesse na votação, o que vedava que dela os BONDHOLDERS MAJORITÁRIOS participassem, **eivando de nulidade toda a deliberação**, por ausência de isenção.

77. Contudo, essa ilegalidade brutal, que poderia ter sido coibida pelo Judiciário, recebeu o "aval" da decisão agravada, a qual simplesmente afirmou que **(i)** *"a votação dos credores bondholders que alegaram ter sido submetidos a tratamento desigual não teve qualquer relevância no resultado da assembleia de credores para a aprovação do plano de recuperação"*, e **(ii)** mesmo sem os BONDHOLDERS MAJORITÁRIOS, o plano da OGX (empresa à qual é conferida na decisão uma extrema importância, supostamente *"por ser a holding e a principal garantidora dos créditos"*) seria aprovado em função da *"votação exuberante por número de credores e de valor de crédito"* (fls. 7.893-7.894 do doc. 10).

78. Nenhum desses argumentos convence minimamente.

79. Pouco interessa se foi o voto da maioria ou da minoria aquele objeto de abuso por conflito. Conforme a doutrina, *"a disciplina do voto em conflito de interesse – que é uma espécie de abuso do direito de voto – destina-se a proteger o interesse do grupo, sendo assim aplicável tanto ao voto da maioria*

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n 30 - 7  andar | 70397-900
t + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av Almirante Barroso, 52
31  andar | 20031-000
t + 55 21 3824-5800
f. + 55 21 2262 5536

SÃO PAULO
Av Pres. Juscelino Kubitschek,
1455 - 10  andar | 04543-011
t. + 55 11 2179-4600
f + 55 11 2179-4597

TJRJ 201400324357 07/07/2014 18:49:00 GK<Z Petição Inicial Eletrônica

27

**BM&A** ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

*como ao da minoria"*[15]

80.        Afinal, a ilegalidade não vira legalidade pela vontade da maioria.

81.        Ademais, quanto ao primeiro argumento da sentença acima indicado, é óbvio que *"a votação dos credores bondholders que alegaram ter sido submetidos a tratamento desigual não teve qualquer relevância no resultado da assembleia de credores para a aprovação do plano de recuperação"*. É por isso mesmo que os credores em questão, ora AGRAVANTES, ficaram vencidos nas AGCs e vieram se socorrer pela via recursal, já que foram a minoria atropelada pelos interesses particulares da maioria. Não fosse assim, os PRJ teriam sido negados e este recurso seria desnecessário.

82.        O segundo argumento também não se sustenta. Não é a OGX, mas sim a OGX PARTICIPAÇÕES a *holding* do Grupo OGX, e não se entende por que a OGX seria a *"principal garantidora"*, se as garantias de todos eram equivalentes e a OGX PARTICIPAÇÕES tem 99,99% das ações da OGX (doc. 3). Mas ainda que essas afirmações fossem corretas, não mudariam em absolutamente nada, por serem constatações vazias de relevância ou fundamento jurídico.

83.        E, como se não bastasse, as AGCs passaram muito longe de assistirem a uma *"votação exuberante por número de credores e de valor de crédito"*.

84.        Embora o DEUTSCHE não tenha comparecido às AGCs, com isso reduzindo drasticamente o quorum para cômputo de votos, a devedora principal, tanto dos AGRAVANTES quanto dos BONDHOLDERS MAJORITÁRIOS, não é a OGX, mas sim a OGX AUSTRIA.

85.        Curiosamente, a OGX AUSTRIA não teve o seu quorum de votação

---
[15] VALADÃO, Erasmo, Coordenação SATIRO DE SOUZA JUNIOR, Francisco e PITOMBO, Antônio, *Comentários à Lei de Recuperação de Empresas e Falências*, 2ª Ed., Editora Revista dos Tribunais, p. 193 - destacou-se.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. K
nº 30 - 7. andar | 70397-900
t + 55 61 3218-9300
f. + 55 61 3218-9315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

sequer sugerido na decisão agravada, que se contorceu para construir "cenários" de aprovação do plano da OGX, chegando a repetir os mesmos em duas supostas situações diferentes (1 e 3) às fls. 7.893 do doc. 10.

86.     Tivesse feito o mesmo no caso da OGX AUSTRIA, o juízo teria notado que aqueles credores conflitados tinham participação de 90,45% dos créditos votantes e 41 dos 66 credores presentes.

87.     Já no caso da OGX PARTICIPAÇÕES, os BONDHOLDERS MAJORITÁRIOS representavam 41 dos 76 credores votantes e aproximadamente 90% dos créditos.

88.     Ou seja, se os BONDHOLDERS MAJORITÁRIOS não participassem da votação, o resultado seria outro, pois de nada adianta a aprovação singela e hipotética do PLANO DA OGX, se os demais, da OGX AUSTRIA e da OGX PARTICIPAÇÕES, que seriam rejeitados, estão a ele ligados umbilicalmente (isso é ressaltado pelo Grupo OGX na própria petição inicial da RECUPERAÇÃO JUDICIAL e em outras manifestações, como forma de justificar uma única recuperação judicial para todas – doc. 3):

> *"As requerentes são todas, portanto, integrantes do grupo econômico OGX, atuando de forma interligada e concertada."*

89.     Portanto, trata-se de típico caso de abuso de direito, positivado no artigo 187[16] do CC, além de ser extraído do princípio geral de conduta e regra de interpretação contratual de boa-fé objetiva, contemplado no artigo 421 do CC.

90.     Conforme se depreende da literatura jurídica, *"a conceituação de abuso de direito como ato ilícito tem seu fundamento no princípio da proteção à dignidade humana harmonizado com a concepção de que, em um regime*

---

[16] *"Art. 187. Também comete ato ilícito o titular de um direito que, ao exercê-lo, excede manifestamente os limites impostos pelo seu fim econômico ou social, pela boa-fé ou pelos bons costumes."*

**BRASÍLIA**
Setor Comercial Sul, Qd 1, Bl. F,
n 30 - 7  andar | 70397-900
t + 55 61 3218-0300
f. + 55 61 3218-0335

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5800
f + 55 21 2262-5536

**SÃO PAULO**
Av. Pref. Juncelino Kubitschek,
1455 - 10  andar | 04543 011
t. + 55 11 2179-4600
f + 55 11 2179-4597

29

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

democrático, não há de se permitir que ninguém seja portador de direitos absolutos. A influência dessas ideias leva-nos a conceber **abuso de direito como sendo o exercício sem limites ou de modo irregular do direito que alguém possui, provocando prejuízos a outrem.** (...) O conceito de abuso de direito há de ser firmado com harmonia total com os princípios da socialidade, da eticidade e da boa-fé objetiva. O abuso do direito não constitui propriamente um ato ilícito. O legislador considerou, apenas, como ato ilícito o agente que, ao exercer a seu direito, **excede manifestamente os limites impostos pelo seu fim econômico ou social, pela boa-fé ou pelos bons costumes.** O abuso de direito é considerado, portanto, um ato ilícito por equiparação legal. Em conclusão, podemos afirmar que abuso de direito é a ação do agente (pessoa física ou jurídica) que faz uso do direito do qual é titular para levar malefício a outrem, com a intenção de praticar um mal e, consequentemente, um dano, embora não tenha qualquer proveito"[17].

91.          Ou seja, "o abuso de direito não se dá porque o titular não respeitou os limites internos de seu direito, porque aí, sim, estaria praticando ilegalidade simples, mas, assim, porque abusou do exercício de uma faculdade que realmente lhe cabia. Quando, pois, se cuida da figura do abuso de direito o que se vê é a 'reação ao abuso de exercício do direito, ou melhor, o exercício lesivo'. O abuso se comete, portanto, contra os limites sociais e éticos impostos à atividade individual na vida em sociedade. (...) O titular de qualquer direito para conservar-se no campo da normalidade não basta legitimar sua conduta dentro das faculdades reconhecidas pelas normas legais em face de sua individual situação jurídica. Haverá de cuidar para que o uso das prerrogativas legais não se desvie para objetivos ilícitos e indesejáveis, dentro do contexto social. O abuso de direito acontecerá justamente por infringência desse dever e se dará sempre que o agente invocar uma faculdade prevista em lei, aparentemente de forma adequada, mas para alcançar objetivo ilegítimo ou não tolerado pelo

---

[17] DELGADO, José Augusto e JÚNIOR, Luiz Manoel, Comentários ao Código Civil brasileiro, Volume II, Editora Forense, p. 858/862.

BRASÍLIA
Setor Comercial Sul, Qd 9, Bl. C,
B 3B - 2. andar / 70387-900
t. + 55 61 2236-0500
f. + 55 61 2236-0515

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar / 20031-000
t. + 55 21 3824-5800
f. + 55 21 3262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455, 10 andar / 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

30

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

*consenso social*"[18] [19]

92.        O termômetro do voto abusivo será exatamente o ponto em que ele, embora, em tese, legitimamente exercido na assembleia por qualquer credor, serve a um interesse escuso e passa a violar o direito de outro credor.

93.        Assim, **o magistrado deve impedir o abuso de direito de voto**[20], **evitando a manipulação do resultado assemblear**[21]**, como ocorrido no caso.** A própria LRF se preocupou em evitar o abuso do direito de voto por evidente conflito de interesse ao estabelecer, no artigo 43, determinadas causas objetivas em que créditos não podem ser contabilizados para fins de instalação de assembleias e votação[22].

---

[18] THEODORO JÚNIOR, Humberto, *Comentários ao Novo Código Civil*, Volume III, Editora Forense, pp. 112/113.

[19] No mesmo sentido, CAIO MARIO: "*não se pode, na atualidade, admitir que o indivíduo conduza a utilização de seu direito até o ponto de transformá-lo em causa de prejuízo alheio. Não é que o exercício do direito, feito com toda regularidade, não seja razão de um mal a outrem. Às vezes é, mesmo com frequência. Não será inócua a ação de cobrança de uma dívida, o protesto de um título cambial, o interdito possessório que desaloja da gleba um ocupante. Em todos esses casos, o exercício do direito, regular, normal, é gerador de um dano, mas nem por isso deixa de ser lícito o comportamento do titular, além de moralmente defensável. Não pode, portanto, caracterizar o abuso de direito no fato de seu exercício causar eventualmente um dano ou motivá-lo normalmente, porque o dano pode ser o resultado inevitável do exercício do direito, a tal ponto que este se esvaziaria de conteúdo se a sua utilização tivesse de fazer-se dentro do critério da inocuidade. É por isto que todas as teorias que tentam explicar e fundamentar a doutrina do abuso de direito têm necessidade de desenhar um outro fator, que com qualquer nome que se apresente estará no propósito de causar o dano, sem qualquer outra vantagem. Abusa, pois, de seu direito o titular que dele se utiliza levando um malefício a outrem, inspirado na intenção de fazer mal, e sem proveito próprio. O fundamento ético da teoria pode, pois, assentar em que a lei não deve permitir que alguém se sirva de seu direito exclusivamente para causar dano a outrem.*" (PEREIRA, Caio Mário da Silva, Instituições de Direito Civil, 1º Volume, 23ª Ed., Ed. Forense, p. 576)

[20] Nessa linha, ver TJSP, AI 533.505-4/1-00, Câmara Reservada à Falência e Recuperação, j. 28.05.2008, v.u., rel. Des. Pereira Calças, afirmando que o "*art. 35, inciso I, alínea a, da Lei 11.101/2005 [...] concede à assembleia-geral atribuição para aprovar ou rejeitar plano. Inviabilidade de o magistrado se imiscuir no mérito do plano aprovado pelo conclave assemblear, salvo caso de abuso de direito.*"

[21] TJSP, AI 0168318-63.2011.8.26.0000, Câmara Reservada à Falência e Recuperação, j. 17.04.2012, v.u., rel. Des. Pereira Calças: *"[a] assembleia-geral de credores só é considerada soberana para a aprovação do plano se forem obedecidos os princípios gerais de direito, as normas da Constituição Federal, as regras de ordem pública e a Lei 11.101/2005. Proposta que viola princípios de direito, normas constitucionais, regras de ordem pública e a isonomia dos credores, enseiando a manipulação do resultado das deliberações assembleares, é nula."* (Grifou-se e Destacou-se)

[22] "*Art. 43. Os sócios do devedor, bem como as sociedades coligadas, controladoras, controladas ou as que tenham sócio ou acionista com participação superior a 10% (dez por cento) do capital social do devedor ou em que o devedor ou algum de seus sócios detenham participação superior a 10% (dez por cento) do capital social, poderão participar da assembléia-geral de credores, sem ter direito a voto e não serão considerados para fins de verificação do quorum de instalação e de deliberação.*"

| BRASÍLIA | RIO DE JANEIRO | SÃO PAULO |
|---|---|---|
| Setor Comercial Sul, Qd 1, Bl. F, n 30 - 7 andar | 70397-900 | Av. Almirante Barroso, 52 3º andar | 20031-000 | Av. Pres. Juscelino Kubitschek, 1455 - 10 andar | 04543-011 |
| t. + 55 61 3218-0300 | t. + 55 21 3824-5800 | t. + 55 11 2179-4600 |
| f. + 55 61 3218-0315 | f. + 55 21 2262 5636 | f. + 55 11 2179-4597 |

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

94.　　　Embora essa lei não traga expressamente outras hipóteses de vedação a cômputo de créditos para fins de quorum de instalação de assembleias e de voto, o instituto é perfeitamente aplicável:

> *"A configuração do exercício abusivo do direito de voto e eventuais sanções decorrentes desse abuso não foram contemplados na Nova Lei de Recuperação Judicial e Falência. Ao juiz caberá, no caso concreto, identificar as hipóteses de exercício abusivo do direito de voto, impondo as sanções correspondentes. Não exercerá o magistrado, principalmente em sede de recuperação judicial, atribuições meramente homologatórias, chancelando com uma espécie de "visto" judicial a vontade imperativa dos credores. Ao contrário, sua atuação deverá ser efetiva, evitando-se o desequilíbrio que a disparidade de poderio econômico poderá ensejar. Não obstante a ausência de parâmetros sobre exercício abusivo do direito de voto na lei falimentar, o juiz poderá reconhecê-lo em razão do exercício manifestamente excedente aos limites impostos pelo fim econômico ou social, pela boa-fé ou pelos bons costumes pelo titular do direito de voto. [...] Desborda da licitude o ato que rompe os limites dos princípios da finalidade econômica ou social, da boa-fé ou dos bons costumes.[...] Atento aos limites identificadores da boa-fé e do fim econômico ou social que lei impõe em relação aos atos praticados no exercício de um direito, ao juiz caberá a tarefa de identificar, em cada situação específica, o comportamento do credor que tenha utilizado o séu voto como instrumento de violação do direito de outrem".[23]* (destacou-se)

95.　　　Também por analogia com a legislação societária[24], não restam

---

*Parágrafo único. O disposto neste artigo também se aplica ao cônjuge ou parente, consanguíneo ou afim, colateral até o 2o (segundo) grau, ascendente ou descendente do devedor, de administrador, do sócio controlador, de membro dos conselhos consultivo, fiscal ou semelhantes da sociedade devedora e à sociedade em que quaisquer dessas pessoas exerçam essas funções."*

[23]　CAMPOS FILHO, Moacyr Lobato de. *Falência e Recuperação Judicial*. Belo Horizonte: Del Rey, 2007. p. 145-174.

[24]　A Lei 11.101/2005 não trouxe expressamente em seu texto a previsão de conflito de interesses. Mesmo assim, a doutrina defende a aplicação do instituto do conflito de interesse na Recuperação Judicial, como ensina TOMAZETTE[24]: *"Nas sociedades, o voto abusivo ou em conflito de interesses é passível de invalidação, por representar um voto proibido pela legislação. A ideia é garantir o cumprimento da função social do direito de voto. Pela similaridade entre a assembleia de credores e assembleia de sócios ou acionistas, seria factível aplicar essa teoria para permitir que o juiz anule ou desconsidere certos votos proferidos na assembleia. Embora não reconhecida expressamente na Lei n° 11.101/2005, não há dúvida de que é possível afastar os votos abusivos ou conflitantes proferidos pelos credores na*

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n° 30 - 7° andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

32.

**BM&A** ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO



dúvidas da necessidade de coibição do voto abusivo em decorrência de conflito de interesses. Realmente, assim já se decidiu:

> "Recuperação judicial. Aprovação do plano de recuperação apresentado, a despeito de ter sido rejeitado em Assembleia Geral de Credores. Homologação conforme teoria denominada 'cram down'. Controle judicial de legalidade. Desconsideração dos votos dos credores em razão de abuso de direito. Enunciados nº 44 e 45 da I Jornada de Direito Comercial do Conselho da Justiça Federal (CJF). Aplicação do princípio da preservação da empresa economicamente viável. Credores pertencentes a uma única classe, a dos créditos quirografários. Ausência de deságio. Aumento do faturamento da empresa desde a data do pedido de recuperação judicial. Abuso do exercício do direito de voto reconhecido. Manutenção da decisão que homologou o plano de recuperação judicial. Agravo de instrumento desprovido. (...)Disso resulta que o voto desses credores na Assembleia Geral de Credores realizada decidiria o destino da empresa recuperanda, aprovando o plano apresentado e concedendo a recuperação ou rejeitando-o, com a consequente decretação de sua quebra. Conclui-se, portanto, que as objeções ao plano apresentadas pelas instituições financeiras devem ser analisadas com cautela. Isso porque o direito de voto a ser exercido pelos credores não pode ultrapassar o limite imposto pelos fins social, econômico, a boa-fé ou os bons costumes, revelando-se, nestes casos, abuso de direito. Ausente previsão legal na lei nº 11.101/2005 no tocante à definição do exercício abusivo do direito de voto, invoca-se por analogia o disposto no artigo 115 da Lei das Sociedades Anônimas (Lei nº 6.404/76), que trata das modalidades de exercício abusivo de poder pelo acionista de companhia, visando evitar a ocorrência de dano ou prejuízo, para a companhia ou outros acionistas, ou de obter, para si ou para outrem, vantagem indevida e de que resulte, ou possa resultar, prejuízo para a companhia ou para outros acionistas, ou ainda, de quem trabalhe na empresa. O instituto do abuso de direito positivado no artigo 187 do Código Civil/2002, configura como ato ilícito, o exercício de um direito pelo titular que excede

assembleia, em razão da própria interpretação sistemática e teleológica do texto da lei. Verificando o abuso do credor, que, por exemplo, manifesta o seu voto com a intenção de beneficiar concorrentes do devedor, o juiz deverá anular o voto e não computá-lo na análise do plano de recuperação judicial".

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
N° 30 - 7° andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 3262-5636

SÃO PAULO
Av. Brig. Faria Lima,
1485 - 18° andar | 64545-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

Rosane Rosalvo Santos
Secretária da 249 Cam. Civel

**BM&A** ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

*manifestamente os limites impostos pelo seu fim econômico ou social, pela boa-fé ou pelos bons costumes. E ainda, conforme o entendimento esposado no Enunciado n° 45 da I Jornada de Direito Comercial do Conselho da Justiça Federal (CJF), O magistrado pode desconsiderar o voto de credores ou a manifestação de vontade do devedor, em razão de abuso de direito. (...)*"[25] (destacou-se).

96.      Na hipótese dos autos, o conflito de interesse, com base no artigo 115[26] da Lei 6.404/76 ("LSA"), é ainda mais evidente, pois os *bondholders* majoritários podem ser considerados detentores de direitos equivalentes aos de acionistas, na medida em que já fizeram a subscrição da primeira série de debêntures a ser convertida para lhes entregar o controle da OGX REESTRUTURADA.

97.      Conforme ensinam IVES GANDRA DA SILVA MARTINS e GERALDO DE CAMARGO VIDIGAL[27]: "*a jurisprudência vem se firmando no sentido de que o abuso se configura mesmo sem a prova subjetiva do dolo, sendo necessário, tão-somente, que a deliberação vise a fins estranhos ao sentimento jurídico-social. O acionista responderá pelos danos causados pelo exercício ilícito de sua prerrogativa quando o exame, objetivo, de sua conduta determinar que seu voto tenha sido contrário ao interesse social. Tem-se, dessa forma, que*

---

[25] TJSP, 2ª Câmara de Direito Empresarial, Agravo de Instrumento n° 0100844-07.2013.8.26.0000, Rel. José Reynaldo d.j. 3.2.2014.

[26] "*Art. 115. O acionista deve exercer o direito a voto no interesse da companhia; considerar-se-á abusivo o voto exercido com o fim de causar dano à companhia ou a outros acionistas, ou de obter, para si ou para outrem, vantagem a que não faz jus e de que resulte, ou possa resultar, prejuízo para a companhia ou para outros acionistas.*

*§ 1° o acionista não poderá votar nas deliberações da assembléia-geral relativas ao laudo de avaliação de bens com que concorrer para a formação do capital social e à aprovação de suas contas como administrador, nem em quaisquer outras que puderem beneficiá-lo de modo particular, ou em que tiver interesse conflitante com o da companhia.*

*§ 2° Se todos os subscritores forem condôminos de bem com que concorreram para a formação do capital social, poderão aprovar o laudo, sem prejuízo da responsabilidade de que trata o § 6° do artigo 8°.*

*§ 3° o acionista responde pelos danos causados pelo exercício abusivo do direito de voto, ainda que seu voto não haja prevalecido.*

*§ 4° A deliberação tomada em decorrência do voto de acionista que tem interesse conflitante com o da companhia é anulável; o acionista responderá pelos danos causados e será obrigado a transferir para a companhia as vantagens que tiver auferido.*"

[27] MARTINS, Ives Gandra da Silva e VIDIGAL, Géraldo de Carvalho. *Comentários à Lei das Sociedades por Ações*. 1ª Ed. Rio de Janeiro: Forense Universitária, 1999, p. 346.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n 30 - 7° andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 4824-5800
f. + 55 21 2262-6636

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455  10° andar | 04547-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

34

**BM&A** ABOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

*todas as vezes em que o acionista exercer a sua prerrogativa imoderadamente, de forma que sua conduta cause dano ou possa causar dano à companhia ou aos demais acionistas, responderá pela sua conduta ilícita, ainda que seu voto não haja prevalecido. Basta a constatação objetiva do comportamento ilícito"[28].*

98.          O Judiciário já se pronunciou em casos análogos, retirando o direito abusivo de voto do credor em conflito de interesse, por ser beneficiário direto da deliberação que ele aprova em decorrência da relevância de seu voto:

> *"Nesta linha de entendimento, que adoto, **quando a empresa em recuperação judicial, apresenta plano que propõe forma diferenciada de pagamento a credores integrantes de uma mesma classe (quirografários, com garantia real)**, como por exemplo, estabelecendo que os titulares de créditos de menor valor receberão seus pagamentos em prazo menor, como ocorre com o plano em exame, ou, ainda mais grave, prevendo-se que os maiores*

---

[28] No mesmo sentido, Erasmo Valadão: "Em franco descompasso com a Lei de S/A (art. 115, 4º parágrafo), o Código Civil não prevê a anulação das deliberações tomadas em decorrência de voto conflitante. Nos dois dispositivos em que cuida de conflito de interesses, a sanção estabelecida na lei civil é apenas a da responsabilidade por perdas e danos (art. 1.010, Pgfo. 3º e 1.017, parágrafo único). A Lei 11.101, infelizmente, não trata da matéria. E não faltarão hipóteses em que o interesse individual de determinado credor poderá ser substancialmente conflitante com o da coletividade, a exigir a anulação da deliberação. Não é fácil, entretanto, conceituar o que seja o interesse comum dos credores. Segundo uma autorizada opinião doutrinária, tal interesse consistiria no interesse que tem cada credor em, ao menos o médio prazo, minimizar os seus prejuízos, mediante a ampliação das disponibilidades da massa. Outras manifestações doutrinárias e jurisprudenciais têm considerado contrárias ao interesse comum dos credores as deliberações: a)que causam prejuízo desproporcional, inadequado, para uma parte dos credores; b) que favorecem um credor em particular, ou um grupo de credores, especialmente os credores privilegiados ou com garantia real, ou ainda terceiros, em detrimento da comunhão dos credores; c) que não são úteis a ninguém; d) que favorecem o devedor ou um terceiros sem qualquer vantagem para a massa. Como hipóteses mais concretas de conflito de interesses podem ser imaginadas, por exemplo, a de uma credora, indústria automobilística, que vote contrariamente à aprovação do plano de recuperação judicial viável por estar interessada na falência do devedor, seu concessionário, a fim de passar a concessão a outrem; ou do credor interessado na falência de seu agente ou distribuidor (art. 710 do CC), igualmente para transferir a outrem a agência ou a distribuição de seus produtos; ou ainda, do credor que tenha interesse na falência de seu devedor simplesmente por ser seu concorrente. Nesses casos, o voto desses credores na Assembléia-Geral que for deliberar sobre o plano de recuperação judicial do devedor (art. 45 da Lei 11.101) poderá ser materialmente conflitante com o interesse da comunhão de credores na aprovação daquele plano. De outra parte, seria problemático estabelecer-se aí uma proibição de voto, eis que não se pode dizer a priori que o credor concorrente, por exemplo, tenha interesse na falência do seu devedor unicamente para aniquilá-lo. Se o plano de recuperação judicial for inviável, é absolutamente legítimo que o credor vote pela sua desaprovação, no intuito de evitar mais prejuízos ainda. A recuperação judicial não é um valor absoluto, como lembrado alhures. Mas é de toda conveniente que, em tais casos, o credor justifique cumpridamente o seu voto, eivado de natural suspeição, entregando declaração ao presidente da Assembléia." (VALADÃO, Erasmo, Coordenação SATIRO DE SOUZA JUNIOR, Francisco e PITOMBO, Antônio, *Comentários à Lei de Recuperação de Empresas e Falências*, 2ª Ed., Editora Revista dos Tribunais, pp. 187/193 - destacou-se).

---

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl F,
nº 30 - 3º andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10 andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
Matr. 01/26.857

BM&A ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

*credores não receberão a integralidade de seus créditos e perdoarão a devedora em relação aos saldos não pagos, o **conflito de interesses emerge com solar clareza, permitindo-se, com tal expediente, a manipulação do resultando da deliberação assemblear, atingindo-se o quorum do artigo 45 da Lei 11.101/2005 por meio da promessa de concessão de vantagens aos menores credores, deve o Poder Judiciário invalidar a deliberação, constituindo-se hipótese de nulidade, haja vista que a disciplina do quorum especial para a aprovação do plano é, evidentemente, matéria de ordem pública, que deve ser apreciada "ex officio" pelo juiz, ou seja, independentemente de provocação."[29]* (destacou-se).

99.     Ao delinearem uma operação na qual apenas os BONDHOLDERS MAJORITÁRIOS participam de um investimento que lhes garante "redigir" os PRJ e adquirir o controle da OGX REESTRUTURADA, em contrapartida à aprovação daqueles planos e da impensável liberação da *Put Option* do atual controlador, sem margem para discussão dos PRJ pelos demais credores, as RECUPERANDAS e os BONDHOLDERS MAJORITÁRIOS não atuaram conforme o direito.

100.    **Esse vício inquina de nulidade as AGCs.**

101.    A hipótese de conflito de interesse *in casu* decorre especialmente — mas não apenas — do benefício particular que os BONDHOLDERS MAJORITÁRIOS estão auferindo na votação para a qual são decisivos. Sobre o tema, *"Quando a LSA proíbe que o acionista vote em situações em que possa auferir um benefício particular, não trata de qualquer proveito indireto particular que um acionista em particular possa tirar da deliberação que resulta em benefício para toda uma coletividade de acionistas. (...) Uma coisa é a utilidade particular para certo acionista da deliberação que resulta em benefício geral. Outra, o benefício verdadeiramente particular. Procurou a lei, nesse passo, cuidar de casos — por sua natureza, relativamente raros na vida das companhias — em que se pretenda atribuir um benefício permitido pela lei (ou seja, lícito) a um acionista ou a um*

---

[29] TJSP, 1ª Câmara de Direito Empresarial, Agravo de Instrumento nº 0136362-29.2011.8.26.0000, Rel. Pereira Calças, d.j. 28.2.2012.

**BM&A** ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

*conjunto determinado de acionistas que não será estendido aos demais. Carvalho de Mendonça, tratando do tema à luz da Lei n° 3.150/1882 e do Decreto n° 434/1891, que se referiam a 'vantagem particular', definia o conceito como 'tudo que rompe a igualdade que, em princípio, deve reinar entre os sócios'. Por isso utilizou a LSA o adjetivo particular, que poderia ser substituído por extraordinário ou excepcional, sem que se perdesse a essência do conceito. A característica dominante do benefício particular, então, é a ruptura lícita da igualdade entre os acionistas, em vista da concessão de uma liberalidade a um ou a alguns deles, não sendo relevante discutir – no exame da legalidade do voto lançado – o caráter comutativo ou não do ato. Não se cuida, em tal caso, de a deliberação ser ou não benéfica à companhia (embora, naturalmente, deva sê-lo – como determina o art. 115, caput), bastando para impedir o voto a existência de benefício lícito ou vantagem lícita que não sejam atribuídos a todos os acionistas titulares de valores mobiliários de igual natureza"[30] (destacou-se).*

102.     Esse conflito fica ainda mais evidente, demonstrando o exercício abusivo do direito de voto, quando se verificam, exemplificativamente, as cláusulas de quitação constantes dos PRJ mais abaixo impugnadas.

103.     Assim, de rigor a anulação das AGCs e sua nova realização, agora sem o cômputo dos créditos dos BONDHOLDERS MAJORITÁRIOS para fins de apuração de quorum de instalação e votação.

### III.3. NULIDADES DOS PRJ

104.     Adicionalmente à nulidade das AGCs, em vista do abuso de direito de voto dos BONDHOLDERS MAJORITÁRIOS, decorrente de seu conflito de

---

[30] Paulo Cezar Aragão, "Apontamentos sobre desvios no exercício do direito de voto: abuso de direito, benefício particular e conflito de interesses". In: Rodrigo Rocha Monteiro de Castro; Walfrido Jorge Warde Júnior; Carolina Dias Tavares Guerreiro (coord.). *Direito Empresarial e Outros Estudos de Direito em Homenagem ao Professor José Alexandre Tavares Guerreiro*. São Paulo: Quartier Latin, pp. 190-191.

| BRASÍLIA | RIO DE JANEIRO | SÃO PAULO |
|---|---|---|
| Setor Comercial Sul, Qd 1, Bl. F, | Av. Almirante Barroso, 52 | Av. Pres. Juscelino Kubitschek, |
| n 30 7º andar 1 70397-900 | 31º andar 1 20031-000 | 1455 - 10º andar 1 04543-011 |
| t. + 55 61 3218-0300 | t. + 55 21 1824-0800 | t. + 55 11 2179-4600 |
| f. + 55 61 3218-0315 | f. + 55 21 7282-9525 | f. + 55 11 2179-4597 |

BM&A | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

interesses, igualmente nulos são os PRJ, por conterem cláusulas absolutamente ilegais e desequilibradas, conforme se passa a demonstrar.

## III.3.1. TRATAMENTO DESIGUAL ENTRE CREDORES IGUAIS

105.        De forma incorreta, também entendeu o juízo *a quo* que "*não há tratamento desigual entre créditos concursais, pois todos os créditos concursais (e extraconcursais aderentes) receberão a mesma compensação das recuperandas*" (fls. 7.901 do doc. 10).

106.        Ainda segundo o **muito assertivo** juízo *a quo*, já incorrendo em contradição, as RECUPERANDAS e os BONDHOLDERS MAJORITÁRIOS estão legitimados a impedir a participação dos AGRAVANTES nas DEBÊNTURES 1ª SÉRIE, pois, "*com uma clareza de doer os olhos os bondholders que alegaram tratamento diferenciado tiveram todas as oportunidades de negociar com as empresas recuperandas ao longo de meses de busca de aporte de capitais, através de intenso marketing desenvolvido pelas empresas Blackstone, Lazard e Angra no mercado internacional*" (fls. 7.896/7.897 do doc. 10) e, "*para espancar qualquer dúvida, foram contatadas quarenta e uma fontes de capital e esses bondholders não apresentaram qualquer manifestação para fazer aporte de capital (...)*" (destacou-se - fls. 7.897 do doc. 10).

107.        Todavia, basta simples análise dos autos do processo de origem e dos PRJ para constatar que o magistrado se equivocou e que, na verdade, há evidente tratamento desigual entre credores de mesma classe e origem.

108.        Para ratificar que o tratamento diferenciado empregado nos PRJ não é legal, oportuno esclarecer:

(a) em que condições a doutrina e jurisprudência admitem referida diferenciação, mediante a figura do tal "credor parceiro" ou "estratégico";

(b) que na hipótese dos autos os AGRAVANTES **não tiveram oportunidade de**

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
N. 30 - 4º andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0319

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10º andar |04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

38

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

se tornar tal tipo de credor – e aí reside o fundamento principal da nula desigualdade –, participando integralmente do FINANCIAMENTO DIP, especialmente da parte mais atrativa, as DEBÊNTURES 1ª SÉRIE;

(c) como se deu a elaboração do FINANCIAMENTO DIP;

(d) as inúmeras e completamente desproporcionais vantagens que o FINANCIAMENTO DIP dá aos BONDHOLDERS MAJORITÁRIOS em detrimento dos demais, simplesmente por serem os principais credores e poderem apoiar planos interessantes apenas a eles próprios, representando meio de o crédito extraconcursal compensar o prejuízo na quitação do crédito concursal e, portanto, inserindo nos PRJ uma forma de quitação da dívida submetida que deve ser fiscalizada pelo Poder Judiciário.

### a)   *O credor parceiro ou estratégico*

109.        Como se sabe, "*o tratamento diferenciado entre os credores só pode ocorrer quando compuserem eles classes distintas. Se forem da mesma classe não há como deixar de conceder-lhes tratamento igualitário, a não ser que estejam eles de acordo com isso. Caso houvesse a possibilidade de subdivisões, a cada uma destas poderia dar-se um tratamento próprio, e as classes menos aquinhoadas, desde que aprovassem o plano, ainda que por maioria de votos, se vinculariam a proposta*"[31].

110.        O pressuposto de igualdade não seria abalado nem mesmo pela invocação do princípio da preservação da empresa:

> "*Considerando-se que, como visto até o momento, a preservação da empresa deve ser alcançada mediante equilíbrio de interesses e respeito aos diversos envolvidos, o grave e excessivo desrespeito a direitos de credores não deve ser suportado sob o argumento da*

---

[31] TOLEDO, Paulo Fernando Campos Salles de. *Recuperação judicial – Sociedades anônimas – Debêntures – Assembleia geral de credores – Liberdade de associação – boa-fé-objetiva – Abuso de direito – Cram down – par condicio creditorum* – Revista de Direito Mercantil: Industrial Econômico e Financeiro nº 142, publicada em 1.6.2006.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n. 30 - 7. andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455  10. andar | 04543-011
t. + 55 11 2179-4500
f. + 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

*promoção da recuperação "[32]*

111.     Esse entendimento é ainda mais latente no caso, pois os AGRAVANTES **não querem a falência das empresas (risco inexistente apontado pela decisão recorrida sem qualquer nexo com o que reiteradamente foi sustentado pelos AGRAVANTES nos autos), mas tão somente pretendem contribuir para o seu soerguimento** mediante aporte de novos recursos, assim como garantido aos BONDHOLDERS MAJORITÁRIOS.

112.     Ainda que a pretensão das RECUPERANDAS fosse instituir a figura do credor "parceiro" ou "colaborador", como justificou incorretamente a decisão agravada, levada a erro pela tentativa das AGRAVADAS de "camuflar" os evidentes benefícios dos BONDHOLDERS MAJORITÁRIOS, **elas deveriam ter dado a todos os** *bondholders*, **titulares de créditos da mesma natureza, ao menos, a oportunidade de participar do novo empréstimo em igualdade de condições, subscrevendo todas as séries das debêntures** e aportando recursos proporcionais à sua participação na dívida do GRUPO OGX.

113.     A jurisprudência sobre o tema já se consolida nesse sentido[33],

---

[32] CEREZETTI, Sheila Christina Neder. *A Recuperação Judicial de Sociedades por Ações – O princípio da preservação da empresa na Lei de Recuperação e Falência*. São Paulo, Malheiros, 2012, p. 374.

[33] *"RECUPERAÇÃO JUDICIAL. BENEFÍCIO CONCEDIDO A CREDORES ESTRATÉGICOS E PARCEIROS. Possibilidade. Credores que permanecem como fornecedores das recuperandas. Garantia constitucional da igualdade substancial. Princípios da preservação da empresa e de sua função social. Efetivação. Artigo 47 da Lei n° 11.101/05. Precedente. Recurso não provido, neste ponto. (...) Não bastasse, o Plano, apesar de prever expressamente deságio no pagamento dos créditos dos credores parceiros, estabeleceu prazo de carência de 360 dias para que todos os demais credores pudessem se tornar credores parceiros, desde que abrissem novas linhas de crédito ou fornecessem matéria prima ou serviço às Recuperandas. Na verdade, o plano criou distinção necessária no caso concreto, concedendo tratamento favorável àqueles que mais contribuem para que a Agravada mantenha as suas atividades durante a recuperação judicial, possibilitando, aliás, a satisfação do crédito de todos os credores, bem como a manutenção das atividades da sociedade, de modo a cumprir o seu papel constitucional no mercado e na sociedade"* (TJSP, 2ª Câmara Reservada de Direito Empresarial, Agravo de Instrumento n° 0014816-36.2013.8.26.0000, rel. Tasso Duarte de Melo, j. 9.12.2013).
No mesmo sentido: *"Agravo. Recuperação Judicial. Plano aprovado pela assembleia-geral de credores. Plano que prevê o pagamento do passivo em 18 anos, calculando-se os pagamentos em percentuais (2,3%, 2,5% e 3%) incidentes sobre a receita líquida da empresa, iniciando-se os pagamentos a partir do 3° ano contado da aprovação. Previsão de pagamento por cabeça até o 6° ano, acarretando pagamento antecipado dos menores credores, instituindo conflitos de interesses entre os credores da mesma classe. Pagamentos sem incidência de juros. Previsão de remissão ou anistia dos saldos devedores caso, após os pagamentos do 18° ano, não haja recebimento integral. Proposta que viola os princípios gerais do direito, os princípios constitucionais da isonomia, da legalidade, da propriedade, da proporcionalidade*

| BRASÍLIA | RIO DE JANEIRO | SÃO PAULO |
|---|---|---|
| Setor Comercial Sul, Qd 1, Bl. F, | Av. Almirante Barroso, 52 | Av. Pres. Juscelino Kubitschek, |
| n. 30  7  andar | 70397-900 | 31  andar | 20031-000 | 1455 - 10° andar | 04543-011 |
| t. + 55 61 3218-0100 | t. + 55 21 3824-5800 | t. + 55 11 2179-4600 |
| f. + 55 61 3218-0315 | f. + 55 21 2262-6436 | f. + 55 11 2179-4597 |

TJRJ 20140032457 07/07/2014 18:49:00 GN-Z Petição Inicial Eletrônica

Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
Matr. 01/26587

TRIBUNAL DE JUSTIÇA DO ESTADO DO RIO DE JANEIRO

41

40

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

42

encampando a doutrina[34], mesmo dentro da realidade excepcional da subclasse de credor "parceiro" ou "colaborador":

> "*Agravo. Recuperação judicial. Recurso contra decisão que, em face da aprovação do plano pela Assembleia-Geral de Credores pelo quórum legal, concede a recuperação. A Assembleia-Geral de Credores só é reputada soberana para a aprovação do plano se este não violar os princípios gerais de direito, os princípios e regras da Constituição Federal e as regras de ordem pública da Lei nº 11.101/2005. Proposta que viola princípios gerais de direito, normas constitucionais, regras de ordem pública e o postulado da "pars conditio creditorum", ensejando a manipulação do quórum assemblear, é nula. Cláusula que outorgue liberdade para a alienação de quaisquer bens, móveis e imóveis, inclusive os que são objeto de arrendamento mercantil e de alienação fiduciária, independente de autorização do Juiz, da Assembleia-Geral, e dos titulares da propriedade é nula. Supressão das garantias reais e fidejussórias sem a expressa aprovação dos credores titulares das respectivas garantias implica nulidade da cláusula. Cláusulas que consubstanciam abuso de direito, violação dos princípios gerais de direito, da Carta da República e das leis*

e da razoabilidade, em especial o princípio da "pars conditio creditorum" e normas de ordem pública. Previsão que permite a manipulação do resultado das deliberações assembleares. Falta de discriminação dos valores de cada parcela a ser paga que impede a aferição do cumprimento do plano e sua execução específica, haja vista a falta de liquidez e certeza do "quantum" a ser pago. Ilegalidade da cláusula que estabelece o pagamento dos credores quirografários e com garantia real após o decurso do prazo bienal da supervisão judicial (art. 61, 'caput', da Lei nº 11.101/2005). Invalidade (nulidade) da deliberação da assembleia-geral de credores declarada de ofício, com determinação de apresentação de outro plano, no prazo de 30 dias, a ser elaborado em consonância com a Constituição Federal e Lei nº 11.101/2005, a ser submetido à assembleia-geral de credores em 60 dias, sob pena de decreto de falência. (...) É sabido que o princípio da igualdade albergado no art. 5º, "caput", da Constituição Federal, ao proclamar que todos são iguais perante a lei, não permite tratamento desigual entre os credores que a lei classifica na mesma classe, visto que o postulado do 'pars conditio creditorum' é a pedra angular sobre a qual se assenta qualquer tipo de processo judicial de insolvência". (TJSP, Câmara Reservada à Falência e Recuperação Judicial. Agravo de Instrumento n. 0136362-29.2011.8.26.0000, relator Desembargador Manoel de Queiroz Pereira Calças, Julgado em 28.2.2012).

[34] "O primeiro princípio da recuperação de empresas, o mais propagado, decorrente, inclusive, da regra constitucional da igualdade, estabelecida no art. 5º, caput, da Constituição da República, é o da unidade de tratamento concursal dos credores, expresso no brocardo 'par conditio creditorum'. É princípio informativo, porque universal, do direito falimentar do tratamento igualitário dos credores, em relação aos créditos de mesma natureza, respeitados, ainda, preferências e privilégios." (RESTIFFE, Paulo Sérgio. Recuperação de Empresas. Barueri: Manole, 2009. p. 3).

"O plano deve ser, por conseguinte, justo, equitativo e viável. Será justo, na medida em que busca demonstrar a boa-fé do devedor em encontrar uma solução razoável para os interesses que circundam (devedor, acionistas e credores); deve ser equitativo nas formas de pagamento do passivo, equilibrando estes mesmos interesses, não impondo tratamento desigual entre os credores, ou ônus excessivo a uma ou mais classes em detrimento das demais". (SIMIONATTO, Frederico Augusto Monte. Tratado de Direito Falimentar. Rio de Janeiro: Forense, 2008, p. 138).

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n. 30 - 7 andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5636

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10 andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

de ordem pública são nulas. Agravo provido para decretar a nulidade da deliberação da AGC, com determinação de apresentação de outro plano, no prazo de 30 (trinta) dias, a ser elaborado em consonância com os princípios gerais do direito, a Constituição Federal e a Lei nº 11.101/2005, a ser submetido à Assembleia-Geral de Credores no prazo de 60 (sessenta) dias, sob pena de decreto de falência".

114.      Do teor do voto do julgado acima mencionado ainda é possível

extrair:

"(...) NULIDADE. OBRIGAÇÃO SEM PRAZO DE VENCIMENTO Parte 1. Item 5.4 CREDORES FINANCIADORES (...) A cláusula, tal como se acha redigida, inviabiliza qualquer espécie de controle, por parte dos demais credores, sobre os termos do pagamento diferenciado (certamente para melhor), oferecido, de maneira vaga, aos credores. Não se sabe qual é o significado de tratamento diferenciado, nem qual será o impacto decorrente das condições de mercado invocadas na cláusula. **Os termos de projetada avença futura com os credores financiadores, que o Professor Fábio Ulhoa Coelho chama de credor-parceiro, têm de ser públicos, de prévio conhecimento de todos, especialmente dos demais credores, como tudo o que diz respeito ao processo de recuperação judicial. Full disclosure é ínsito ao processo de recuperação. O princípio da publicidade, dever anexo da boa-fé objetiva, rege o processo de recuperação judicial em toda a sua amplitude, e os atos negociais pretendidos pelo devedor devem ser apresentados à luz do dia, cartas à mesa, para ciência de todos.**

A cláusula, como prevista, esconde tudo; prevê-se contrato à parte, sem o menor indício de quais serão seus termos. Essa cláusula não passa pelo crivo de um sério processo de recuperação judicial, e o Poder Judiciário não deve emprestar homologação a tal pretensão tão desvairada. **Note-se. Não está em pauta, aqui, a intrínseca desigualdade entre os credores, na medida em que há previsão de tratamento diferenciado; o que está em pauta é o conteúdo desse tratamento diferenciado, cuja extensão não se sabe. E os credores tem o direito de saber isso.** O Poder Judiciário deve zelar para que no processo de recuperação judicial não se pratiquem atos escondidos, atos fora do contexto de publicidade, força motriz do processo de recuperação. (...) Por ofender a boa-fé objetiva e ferir a moralidade do processo de recuperação judicial, que exige

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n. 30 - 7. andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10. andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

TRIBUNAL DE JUSTIÇA DO ESTADO DO RIO DE JANEIRO
A Secretaria da 14ª Câmara Cível certifica que este documento confere com o original.
Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
Matr. 01732.567
28/07/14
42

TJRJ 201400324357 07/07/2014 18:49:00 GK+Z Petição Inicial Eletrônica

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO



*transparência e pleno conhecimento de todas as propostas por todos os credores, por se tratar de cláusula potestativa pura, essa cláusula deve ser considerada nula (...)"[35]. (destacou-se)*

115.      No caso em tela, verificou-se exatamente o contrário!

116.      Embora o pressuposto de tal diferenciação fosse dar a todos as mesmas condições de, com a concessão de "dinheiro novo", participarem dos benefícios dos PRJ dados a quem realizasse o aporte, essa paridade de condições não foi respeitada, como se indicará em maiores detalhes a seguir.

*b)   A ausência de consulta aos AGRAVANTES sobre o FINANCIAMENTO DIP*

117.      De acordo com a decisão agravada, esta em tom de esforço "hercúleo" do GRUPO OGX, o conceituado Banco Blackstone (que não se confunde com as AGRAVADAS, vale dizer, dada a importância emprestada pelo juízo a um ponto insignificante), após analisar a situação das RECUPERANDAS, chegou à conclusão de que precisavam de um financiamento emergencial para se manterem ativas nos negócios. Assim, segundo a decisão recorrida, "*em setembro de 2013, iniciou a busca por capital de terceiros e começou a se relacionar com possíveis fornecedores de capital para discutir oportunidades de financiamento*" (fls. 7.895 do doc. 10).

118.      Nas dramáticas palavras da própria decisão, "*Na intensa busca de aporte de capitais para salvar as atividades financeiras das recuperandas, Blackstone passou a trabalhar em coordenação com a Lazard e Angra para ampliar a busca por capital, quando foram contatados mais onze fundos alternativos de investimento. Daí, foi narrado que em outubro e novembro/2013, continuou a facilitar as sessões de sindicância e a manter conversações entre provedores de capital e a gerência das recuperandas. Nesse período, das quarenta e uma fontes de capital contatadas desde que o processo de marketing*

---

[35] TJSP, Agravo de Instrumento nº 0264287-08.2011.8.26.0000, Rel. Pereira Calças, 1ª Câmara Reservada de Direito Empresarial. Julgado em 31.07.2012.

| BRASÍLIA | RIO DE JANEIRO | SÃO PAULO |
|---|---|---|
| Setor Comercial Sul, Qd 1, Bl F, | Av. Almirante Barroso, 52 | Av. Pres. Juscelino Kubitschek, |
| n. 30 - 7. andar | 70397-900 | 31° andar | 20031-000 | 1455 - 10° andar | 04543-011 |
| t. + 55 61 3218-0300 | t. + 55 21 3824-5800 | t. + 55 11 2179-4600 |
| f. + 55 61 3218-0315 | f. + 55 21 2262-5536 | f. + 55 11 2179-4597 |

TJ.RJ 2014 00324357 07/07/2014 18:49:00 GK=Z Petição inicial Eletrônica

TRIBUNAL DE JUSTIÇA DO ESTADO DO RIO DE JANEIRO

A Secretaria da 14ª Câmara Cível certifica que este documento confere com o original.

Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
Matr. 01/26009 matrícula

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

teve início, três partes apresentaram termos indicativos de financiamento, mas com risco considerável de fechamento e condições onerosas e socioeconômicas, com a conclusão de que não eram viáveis, o que ensejou crise de liquidez e incapacidade de acessar os mercados de capitais no fim de dezembro de 2013. Por fim, as recuperandas e um grupo de investidores que detinha aproximadamente 55% da dívida existente chegam a um acordo para a resolução consensual das reivindicações no dia 24 e 23 de dezembro, para uma reestruturação abrangente e um acordo de suporte ao plano de recuperação judicial (...)"(fls. 7.895 do doc. 10).

119.    Assim, com "uma clareza de doer nos olhos", mas sem qualquer dor na consciência, as RECUPERANDAS teriam cessado a busca por capital no mercado, e junto dos BONDHOLDERS MAJORITÁRIOS, fecharam o PSA.

120.    Logo, conforme consta de forma expressa na decisão, nunca houve uma **oferta equilibrada e pública** para participação da primeira parte do FINANCIAMENTO DIP, com a possibilidade de debates e acesso por todos os credores na RECUPERAÇÃO JUDICIAL. Isso seria muito simples fazer, bastando, por exemplo, distribuir via trustee dos bonds, notas dando conta de todas as pretensões das RECUPERANDAS, indicando as regalias que seriam conferidas a quem se juntasse a ela etc ou ao menos convidando-os para negociações.

121.    Os credores do GRUPO OGX não tinham como imaginar (e não eram obrigados a isto) que **nos escuros bastidores estava a todo vapor a negociação dos PRJ antes mesmo de o processamento da RECUPERAÇÃO JUDICIAL ser deferido**, pelo que dão conta as notícias de imprensa e até mesmo a decisão agravada ao mencionarem o mês de outubro de 2013!

122.    Não era obrigação sua correr atrás de partes desconhecidas e reuniões paralelas, mas era, sim, dever das RECUPERANDAS agir objetiva e proativamente, tratar igualmente seus credores e dar a eles as mesmas

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 30 - 7° andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4587

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

oportunidades de contribuir com seu soerguimento e recuperar parte do enorme prejuízo já imposto. Mas isso não interessava às RECUPERANDAS, porque só mesmo oferecendo vantagens inimagináveis a um pequeno grupo, mas suficiente para aprovar sua recuperação judicial ou em grande parte contribuir para isso, é que obteria em troca a enorme vantagem de fazer valer PRJs absurdos e, ainda como um bônus, receber quitação pelos seus atos e anular a *Put Option* de seu principal acionista, conforme indicado mais abaixo.

123.    E pior! Como se desconhecesse por completo a documentação acostada nos autos, a decisão agravada dispõe que os "*bondholders que alegaram tratamento diferenciado tiveram todas as oportunidades de negociar com as empresas recuperandas ao longo de meses de busca por aporte de capitais*" (fls. 7.896/7.897 do doc. 10).

124.    Com toda a vênia, **esta afirmação é absurda, por não condizer com a realidade refletida nos autos!**

125.    **A** AUTONOMY **e outros** AGRAVANTES **há meses vêm suplicando para serem considerados tão parceiros das** RECUPERANDAS quanto aqueles credores que curiosamente representam a maioria do crédito teoricamente votante, caso não houvesse o conflito de interesses já evidenciado acima.

126.    **Repita-se: há meses, muito, mas muito antes da informação nos autos sobre o alegado fechamento da estranhíssima negociação com os** BONDHOLDERS MAJORITÁRIOS, os AGRAVANTES vêm demonstrando seu apetite para contribuir com o soerguimento do GRUPO OGX.

127.    É muito simples concluir isto: basta verificar as petições apresentadas pela AUTONOMY nos autos. Nelas há emails (doc. 17), notificações (doc. 12), tentativas de contato da AUTONOMY e de outros com as RECUPERANDAS desde 2013, e ainda declarações de inúmeros credores de que estão dispostos a financiar o Grupo OGX (doc. 17) e de que inclusive reservaram

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E
n 30 - 7  andar | 70307-900
t. + 55 61 3218-0300
t. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t + 55 21 3824-5800
f. + 55 21 2262 5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10º andar | 04543-011
t. + 55 11 2179-4600
f + 55 11 2179-4597

45

**BM&A** ADVOGADOS
BARBOSA, MUSSNICH & ARAGÃO

para este fim mais de US$ 10 milhões em contas no exterior (doc. 18)!

128.    Com efeito, manifestando seu interesse em participar do FINANCIAMENTO DIP, a AUTONOMY (aqui mencionada porque foi expressamente referida na decisão recorrida) enviou email ao Sr. Marco Spieler (diretor administrador da Rothschild) em 27.12.2013, afirmando: *"como deve ter visto, Ricardo K. (Angra Partners) me voltou no meu email, mas acabou que não conseguimos nos falar ainda (...). No entanto, com base no que conversamos ontem, nas suas discussões com os membros do Ad Hoc Group, entendo que ainda não tenham batido o martelo nos montantes que cada um contribuiria para o pote e também entendo que alguns investidores já sinalizaram que não vão entrar. **Eu tenho interesse em entrar na primeira tranche e desta prover o back stop bid e poderia eventualmente considerar um arranjo com algum investidor para dividir os benefícios extras concedidos aos membros do Ad Hoc group**"* (destacou-se – doc. 17).

129.    Respondendo este email, o Sr. Marcos Spieler, comprovou que os assessores financeiros tinham pleno conhecimento da existência de outros credores interessados em participar do FINANCIAMENTO DIP: *"(...) Seu interesse já foi passado pro meu pessoal de NY, que esta mais na linha de frente dessa discussão"* (doc. 17).

130.    A AUTONOMY por diversas vezes na troca de emails reforçou seu interesse em participar tanto do FINANCIAMENTO DIP — na proporção do seu crédito na RECUPERAÇÃO JUDICIAL — quanto, eventualmente, do financiamento "bridge" ofertando aos assessores financeiros até US$ 5 milhões dos US$ 35 milhões inicialmente previstos[36] ~, tendo o próprio Marcos Spieler noticiado a

---

[36] *"(...) Mas eles agora estão me falando que my way in seria via pré-DIP deal. Caso genuinamente tenha espaço via Tranche A, desta forma seria mais interessante para mim. Mas entende que isso não vou ouvir da empresa, pois eles querem o dinheiro pré-DIP. Caso ache um caminho direto com vocês, tenho interesse em discutir, como havia dito, mesmo pagando um premio para entrar, ou seja, tomo o risco mas estaria disposto a dividir os benefícios (i.e. 10% fee do back stop bid)"* (e-mail enviado em 2.1.2014 para Marcos Spieler - destacou-se).

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E,
n. 30 - 7 andar | 70397-900
t. + 55 61 3218-0250
f. + 55 61 3218-0255

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 3262-5026

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 10 andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

46

**BM&A** | ADVOGADOS

BARBOSA, MUSSNICH & ARAGÃO

impossibilidade de ela entrar em qualquer um dos financiamentos, <u>sob justificativa nada plausível de que não haveria "espaço"</u>[37].

131.     Email similar foi enviado para a Angra Partners (com cópia para os advogados das RECUPERANDAS) em 26.12.2013[38], manifestando expressamente o interesse de participar da primeira parte do FINANCIAMENTO DIP.

132.     Aliás, não foi apenas a *bondholder* minoritária AUTONOMY a única preterida ao manifestar seu interesse. A ITAVA, por exemplo, igualmente tentou, de forma infrutífera, participar da negociação e aportar recursos, como se pode depreender do email enviado ao advogado dos BONDHOLDERS MAJORITÁRIOS (fls 1.397/1.403 do doc. 17), o qual nunca foi sequer respondido: *"O objetivo deste email é informar que a Itava está pronta para participar do primeiro e do segundo desembolsa para o financiamento do DIP. A Itava participará no financiamento de US$ 215 milhões com pelo menos a sua parcela no total dos US$ 5.8 bilhões dos credores".*

133.     Todos esses contatos, por iniciativa dos próprios credores e não pelo propagado "intenso marketing financeiro", que a eles nunca chegou, ocorreu ainda em dezembro de 2013, o que demonstra que, se o tal "road show"

---

[footnote] *"Como sabe, apesar dos riscos adicionais, gostaríamos de tentar colocar dinheiro na tranche A do DIP ou eventualmente do bridge. Após conversar com o Ricardo K., ele me direcionou para o pessoal da Blackstone para assinarmos o NDA e negociarmos eventual participação no bridge. Esses agora estão sugerindo eu negociar diretamente com vocês (Rothschild). (...) Sinalizei para Blackstone, que eventualmente poderíamos contribuir com uns USD5mm dos USD35mm. Caso ajude, para nós faria sentido entrarmos com um ticket menor. Dado que os termos propostos no PSA são bastante punitivos para quem não faz parte do Ad Hoc, nosso objetivo seria conseguirmos uma alocação pro-rata do nosso exposure na totalidade do DIP deal (ie. 200mm), e estaríamos dispostos a entrar via bridge, caso seja o caminho".* (e-mail enviado 6.1.2014 para Marcos Spieler - destacou-se).

[37] *"Falei com NY e me disseram que o bridge esta realmente muito avançado. No momento não tem espaço para participar".* (e-mail enviado em 7.1.2014 por Marcos Spieler - destacou-se).

[38] *"Entendo, de acordo com as informações divulgadas pela OGX, um Grupo Ad Hoc terá uma participação diferenciada no que diz respeito a reestruturação da dívida da companhia. Em discussões com a empresa hoje, me foi sugerido que, apesar de estarmos fora do Grupo Ad Hoc no momento, poderíamos tentar participar do desembolso da primeira tranche do DIP e consequentemente entrar como back-stop lenders no processo. Em conversa com Marcos, me foi sugerido que o procedimento mais adequado para apresentar meu pleito, seria por intermédio da própria empresa + Angra+ Mattos, Filho, o que venho fazer por meio desta. Meu entendimento é de que eventualmente poderia haver sobras na primeira tranche e ainda existe discussão de mais um deal pré-DIP, tendo dito isso imagino que nossa demanda possa ser bem vinda. (...) E ainda gostaria de destacar que temos seguramente velocidade na tomada da decisão que a decisão exige".*

---

BRASÍLIA
RIO DE JANEIRO
SÃO PAULO

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

buscando financiadores iniciou-se em setembro/outubro de 2013, conforme consignado na sentença inutilmente, efetivamente ele se fechou tão logo foram "garantidos os votos" para aprovação dos PRJ, com a entrada dos BONDHOLDERS MAJORITÁRIOS na operação.

134.       E não se diga que o GRUPO OGX não precisava de mais capital. Tanto precisava que, além de sucumbir a todas as exigências dos BONDHOLDERS MAJORITÁRIOS, inclusive de dar todos os seus ativos relevantes em garantia, muito depois dessas manifestações dos AGRAVANTES, contraiu mais US$ 73,2 milhões de dólares em empréstimos[39]!

135.       Contudo, os AGRAVANTES sempre foram solenemente ignorados pelas RECUPERANDAS e pelo juízo de origem, que jamais proferiu uma única palavra sobre as petições em questão (mesmo depois do contundente parecer do Ministério Público concordando com a ilegalidade do tratamento diferenciado), somente agora vindo com veemência negar o tratamento desequilibrado, mas novamente sem fazer referência aos documentos já mencionados.

136.       A propósito, a fundamentação da decisão recorrida só faz confirmar o argumento de que os PRJ foram pré-negociados e a RECUPERAÇÃO JUDICIAL não passou do já mencionado cumprimento de tabela, um teatro de fantoches liderado pelas RECUPERANDAS e pelos BONDHOLDERS MAJORITÁRIOS, que infelizmente conseguiram induzir o juízo em erro.

137.       Isso porque se depreende, como o principal fundamento da decisão para afastar o tratamento desequilibrado, a existência dos acordos extra-autos entabulados com alguns minguados credores em um passado distante e ausente da formalidade processual. Não importou nada que ocorreu nos autos, não se atentou aos princípios que regem a recuperação, nada disso!

---

[39] Conforme notícia disponível em: http://www.valor.com.br/empresas/3518638/ex-ogx-firma-novo-emprestimo-de-us-732-milhoes-com-credores, acesso em 6.7.2014.

| BRASÍLIA | RIO DE JANEIRO | SÃO PAULO |
|---|---|---|
| Setor Comercial Sul, Qd 1, Bl. F, | Av. Almirante Barroso, 52 | Av. Pret. Juscelino Kubitschek, |
| n° 30 - 7° andar | 70397-900 | 31° andar | 20031-000 | 1455 - 10° andar | 04543-011 |
| t. + 55 61 3218-0300 | t. + 55 21 3824-5800 | t. + 55 11 2179-4600 |
| f. + 55 61 3218-0315 | f. + 55 21 2262-5536 | f. + 55 11 2179-1597 |

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

50

138.      Para a decisão recorrida, bastou uma singela afirmação de que até dezembro de 2013, **meses antes da apresentação dos PRJ**, quando ainda se discutia até mesmo o processamento da RECUPERAÇÃO JUDICIAL por envolver empresas estrangeiras, supostamente 41 fontes de capital consideradas pelo Blackstone foram chamadas para participar do FINANCIAMENTO DIP, chegando-se aos BONDHOLDERS MAJORITÁRIOS. E a isso foi atribuída uma importância imensa, como se as centenas de outros credores não existissem...

139.      Desde então, mesmo que as DEBÊNTURES 1ª SÉRIE não tivessem evoluído, com o efetivo aporte, nenhum outro credor teve a oportunidade de participar, pois, de maneira totalmente autoritária, o *PSA* veda que as RECUPERANDAS concedam qualquer benefício igual ou semelhante ao tratamento concedido aos BONDHOLDER MAJORITÁRIOS.

140.      Também é completamente equivocado o entendimento do juízo *a quo* de que os AGRAVANTES não quiseram correr os supostos riscos que os BONDHOLDERS MAJORITÁRIOS enfrentaram, arcando com o ônus de financiar o GRUPO OGX no momento em que eles mais precisavam.

141.      Os BONDHOLDERS MAJORITÁRIOS, supostamente dispostos a "correr grandes riscos" para "salvar" o GRUPO OGX, para injetaram os recursos do FINANCIAMENTO DIP, exigiram como garantia, nada mais, nada menos, que praticamente todos os ativos da companhia, inclusive via alienação fiduciária, para não precisarem perder tempo em uma eventual falência de empresa totalmente esvaziada de ativos a partir de então!

142.      Ainda que houvesse o risco, o que se admite para argumentar, sempre existiram outros credores, como os AGRAVANTES, dispostos a prontamente dividir o enorme "ônus" assumido pelos BONDHOLDERS MAJORITÁRIOS, sendo no mínimo curioso que estes jamais quiseram compartilhar e diminuir o "grande risco" assumido.

BRASÍLIA
Setor Comercial Sul, Ed. 1, Bl. E
nº 30 · 7º andar | 70397-900
t · 55 61 3218-0200
f · 55 61 3218-0818

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t · 55 21 3824-5800
f · 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 · 10º andar | 04543-011
t · 55 11 2179-4600
f · 55 11 2179-4597

49

**BM&A** | ABVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

51

143.    Mas ainda é tempo de salvaguardar, ao menos em parte, os misericordiosos BONDHOLDERS MAJORITÁRIOS: os AGRAVANTES reiteram aqui a sua intenção de diminuir esse risco assumido por eles, transferindo-lhe mediante a cessão de direitos relacionados ao FINANCIAMENTO DIP, recursos proporcionais àqueles investidos.

144.    Como não tinham como rebater as provas acima apresentadas pelos AGRAVANTES de que, a contragosto, foram alijados de seus direitos, nasceu o esdrúxulo argumento, inclusive utilizado na decisão agravada, de que as RECUPERANDAS não precisavam de cerca de US$ 11 milhões oferecidos pelos AGRAVANTES, mas sim de US$ 215 milhões.

145.    Todavia, basta simples leitura dos autos para constatar que nenhum dos credores, *bondholder* ou não, investirá sozinho US$ 215 milhões. Os investimentos estão sendo feitos por um grupo, dos quais, de maneira inquestionável, os AGRAVANTES têm toda a condição de participar.

146.    Evidentemente os AGRAVANTES nunca foram consultados se estariam dispostos a aumentar sua participação em novos empréstimos (e estão), e também não foram procurados nas mesmas condições e com a antecedência devida que os BONHOLDERS MAJORITÁRIOS, e a eles não foi garantida a mesma paridade para participar do FINANCIAMENTO DIP. ISSO SIM ESPANCA OS FUNDAMENTOS DA DECISÃO RECORRIDA!

c)  FINANCIAMENTO DIP dos PRJ

147.    Se a forma escolhida para diferenciar credores foi equivocada, porque não foi dada a eles igual oportunidade, o argumento para tratamento não isonômico também não se sustenta sob a alegação de que o FINANCIAMENTO DIP seria um investimento extraconcursal, não sujeito à RECUPERAÇÃO JUDICIAL. Este é um argumento simplista e no mínimo inocente.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl 7
...

RIO DE JANEIRO
Av. Almirante Barroso, 52
...

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
...



148.    Em apertada síntese, dentre as medidas aprovadas pelas AGCs e homologadas pelo juízo a *quo* para o soerguimento das RECUPERANDAS, destacam-se as descritas a seguir:

(a) **Contratação de FINANCIAMENTO DIP:** realizado em três séries de debêntures (1ª SÉRIE, 2ª SÉRIE E 3ª SÉRIE, respectivamente) para viabilizar a captação de novos recursos a serem empregados *(i)* na liquidação dos EMPRÉSTIMOS PONTE (assim definidos nos PRJ) contraídos pela OGPAR em 26.12.2013 e 13.1.2014; *(ii)* no custeio do desenvolvimento das atividades operacionais do GRUPO OGX durante o temporário processo de reestruturação em que se encontra e *(iii)* estranhamente, nos honorários dos assessores dos credores favorecidos. **Exatamente: os advogados dos BONDHOLDERS MAJORITÁRIOS foram pagos pelas RECUPERANDAS;**

(b) **Reestruturação de Dívidas:** a reestruturação das dívidas do GRUPO OGX se daria por meio da imposição aos credores da conversão dos créditos concursais e, ainda, dos créditos extraconcursais aderentes aos PRJ, em participação acionária na OGX REESTRUTURADA; e

(c) **Incorporação da OGX PARTICIPAÇÕES pela OGX:** após a conversão dos créditos concursais e extraconcursais referidos no item (b) acima em participação societária na OGX, a OGX PARTICIPAÇÕES deverá ser incorporada pela OGX, com a consolidação das participações societárias em uma única companhia, a OGX REESTRUTURADA.

149.    Conforme se depreende da cláusula 4.3 do PLANO OGX[40], FINANCIAMENTO DIP consiste em um financiamento extraconcursal a ser concedido por financiadores mediante a subscrição de debêntures, no valor total de US$ 215 milhões, que correspondem, na data de emissão das debêntures, a R$ 514.624.000,00.

---

[40] Igualmente descrito na cláusula 4.3 do PLANO OGPAR e na cláusula 4.3 do PLANO OGX ÁUSTRIA.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n .90 - 7. andar / 20187-900
t .+ 55 61 3218-0300
f .+ 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
39. andar / 20031-000
t .+ 55 21 3824-5800
f .+ 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10. andar / 04543-011
t .+ 55 11 2179-4600
f .+ 55 11 2179-4597

BM&A ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

Págin.
53

150.      Os PRJ estabelecem que o FINANCIAMENTO DIP será implementado ao menos em duas etapas ("1ª TRANCHE" e "3ª TRANCHE"), mediante a emissão de debêntures em ao menos duas séries ("DEBÊNTURES 1ª SÉRIE" e "DEBÊNTURES 3ª SÉRIE"): **(a)** a primeira no valor de R$ 299.200.000,00 (correspondente ao valor de US$ 125 milhões), a ser corrigido monetariamente, pela variação cambial, até a data de integralização; e **(b)** a segunda no valor de R$ 215.424.000,00 (correspondente a US$ 90 milhões), a ser corrigido monetariamente, pela variação cambial, até a data de integralização.

151.      Estabelecem ainda os PRJ que:

(i) **DEBÊNTURES 1ª SÉRIE: (a)** a subscrição das DEBÊNTURES 1ª SÉRIE está restrita, exclusivamente, aos BONDHOLDERS MAJORITÁRIOS[41]; e **(b)** além, de consubstanciar a maior parte do FINANCIAMENTO DIP, o fator de conversão das DEBÊNTURES 1ª SÉRIE em ações **é superior ao das demais séries de debêntures** e deverá assegurar aos seus subscritores, ao final da reestruturação proposta, uma participação acionária na OGX REESTRUTURADA equivalente a 41,9767%;

(ii) **DEBÊNTURES 3ª SÉRIE: (a)** as DEBÊNTURES 3ª SÉRIE poderão ser subscritas por quaisquer credores do GRUPO OGX que preencham os requisitos previstos nos PRJ para tanto, inclusive os BONDHOLDERS MAJORITÁRIOS, proporcionalmente aos respectivos créditos em relação ao total da soma dos créditos[42]; **(b)** o fator de conversão das DEBÊNTURES 3ª

---

[41] De acordo com a cláusula 4.4 do PLANO OGX (a que fazem referência as cláusulas 4.4 do PLANO OGPAR e 4.7 do PLANO OGX ÁUSTRIA): "As Debêntures 1ª Série serão integralmente subscritas pelos Backstop – Novos Financiadores (direta ou indiretamente, desde que satisfeitas ou dispensadas as condições precedentes e demais termos e condições listadas no Contrato de Subscrição para sua subscrição, incluindo, mas não se limitando: (i) a concessão e regular constituição das garantias previstas nos Contratos de Garantia DIP – 1ª Série (conforme aplicável); e (ii) a verificação de produção de determinada quantidade de petróleo, nos termos da Cláusula 3.1(u) do Contrato de Subscrição".

[42] De acordo com a cláusula 4.5 do PLANO OGX (a que fazem referência as cláusulas 4.5 do PLANO OGPAR e 4.8 do PLANO OGX ÁUSTRIA): "As Debêntures 2ª Série poderão ser subscritas e integralizadas pelos Credores que sejam Credores Qualificados para Subscrição das Debêntures 2ª Série proporcionalmente aos respectivos Créditos em relação ao total da soma dos Créditos constante da Lista de Credores da OGX, da OGPar, da OGX Áustria e OGX Internacional vigente na data da realização da Assembleia de Credores que deliberar sobre o Plano, desde que tempestivamente cumprido, pelos

BRASÍLIA                      RIO DE JANEIRO              SÃO PAULO

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

SÉRIE em ações deverá assegurar aos seus subscritores, ao final da reestruturação proposta, uma participação acionária na OGX REESTRUTURADA equivalente a 23,0233%; e

(iii) EVENTUAIS DEBÊNTURES 2ª SÉRIE: a subscrição de eventuais sobras das DEBÊNTURES 3ª SÉRIE (decorrentes do não exercício do direito de subscrição por qualquer credor) está restrita, exclusivamente, aos BONDHOLDERS MAJORITÁRIOS, com ares de incumbência sofrida, mas que, em verdade, reflete mais uma benesse desproporcional e discriminatória perante os outros *bondholders*. Em outras palavras, como provavelmente nem todos os credores subscreverão a DEBÊNTURES 3ª SÉRIE, o referido mecanismo permite aos BONDHOLDERS MAJORITÁRIOS alcançar um número maior de ações, não estando eles restritos ao critério *pro rata* estabelecido.

152.     Com a aprovação dos PRJ e implementação da reestruturação, os créditos oriundos do FINANCIAMENTO DIP serão convertidos em ações representativas de 65% da OGX REESTRUTURADA, correspondendo a 1ª série das debêntures a 41,9767% dessas ações e a 3ª série a apenas 23,0233%. Os créditos quirografários (concursais), por sua vez, serão convertidos (leia-se, liquidados) em ações representativas de apenas 25% da OGX REESTRUTURADA, enquanto os últimos 10% serão distribuídos entre os atuais acionistas do GRUPO OGX.

153.     Como se esperava, os PRJ refletem os mesmos termos e condições anteriormente avençados entre o GRUPO OGX e os BONDHOLDERS MAJORITÁRIOS mediante a celebração "*PSA*" – fls. 507/577 do doc. 14, que, na essência, é um acordo pelo qual os BONDHOLDERS MAJORITÁRIOS assumiram o compromisso de votar favoravelmente à aprovação dos PRJ[43] em troca de um

---

*respectivo Credor, o quanto disposto na Notificação de Interesse de Subscrição das Debêntures 2ª Série e no Comunicado de Subscrição, nos termos da Cláusula 1.1.87 deste Plano".*

[43] *"(...) cada titular anuente (individualmente e não solidariamente), em seu nome e em nome das filiais por ele controladas, concorda em: (a) votar, com base em suas respectivas Notas, das quais sejam o proprietário efetivo, agora ou no futuro, ou em relação às quais, agora ou no futuro, tal Titular Anuente atue como pessoa designada, gestor de investimentos ou consultor para os titulares efetivos das mesmas, em favor do Plano de acordo com os procedimentos aplicáveis estabelecidos na BRL (...) d) não (i)*

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n 30 - 7 andar | 70397-900
t - 55 61 3218-0300
f. - 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t - 55 21 3824-5800
f - 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10º andar | 04543-011
t. - 55 11 2179-4600
f - 55 11 2179-4597

**BM&A** ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

tratamento mais benéfico que os outros credores *bondholders*.

154.      Os BONDHOLDERS MAJORITÁRIOS (ou seus designados) passaram a ter o direito de participar do FINANCIAMENTO DIP de forma privilegiada em relação aos demais *bondholders*, assegurando que os créditos concursais dos BONDHOLDERS MAJORITÁRIOS sejam liquidados, na realidade, em condições exclusivas e muito mais benéficas que os créditos concursais dos demais *bondholders*, haja vista que, ao cabo da reestruturação proposta, os BONDHOLDERS MAJORITÁRIOS serão controladores da OGX REESTRUTURADA.

155.      Portanto, em que pese as RECUPERANDAS tenham tentado convencer que *"a estrutura acordada no PSA não é excludente"* (fls. 906 do doc. 19), haja vista que *"ela permite a participação dos demais credores que embora silentes até este momento, passem demonstrar interesse em efetivamente financiar a empresa (...)"* (fls. 906 do doc. 19), pelas características do FINANCIAMENTO DIP, é evidente que os BONDHOLDERS MAJORITÁRIOS estão recebendo tratamento mais favorável do que os demais *bondholders*, uma vez que são oferecidas vantagens aos BONDHOLDERS MAJORITÁRIOS que garantirão a eles, de forma ilegítima, participação acionária na OGX REESTRUTURADA superior àquela a que fariam jus caso tivesse sido permitida aos demais *bondholders* participar da 1ª SÉRIE DE DEBÊNTURES.

156.      Como já se demonstrou claramente acima, não é uma mera coincidência que justamente os principais credores teoricamente votantes nas AGCs tenham recebido a regalia de participar: *(i)* com exclusividade, da 1ª SÉRIE, o que garantirá exclusivamente a eles 41,9767% da OGX REESTRUTURADA; *(ii)* da 3ª SÉRIE, que conferirá a eles participação acionária adicional, na proporção de seus respectivos créditos, a ser alocada dentro dos 23,0233% destinados à 3ª SÉRIE; *(iii)* com exclusividade, da 2ª SÉRIE, o que

*contestar o Plano ou a aceitação, aprovação e implementação do Plano; (ii) iniciar quaisquer procedimentos legais que sejam inconsistentes com, ou que impeçam, frustrem ou dificultem a aprovação, a confirmação ou implementação do Plano ou as operações nele descritas (...)"* (destacou-se – fls. 516/517 do doc. 14).

BRASÍLIA
Setor Comercial Sul, Qd 9, Bl. P,
Ed. ... Of. 7, andar | 70308-900
t • 55 61 3218-0300
f • 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar | 20031-000
t • 55 21 3824-5800
f • 55 21 3824-5836

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10. andar | 04543-011
t • 55 11 2179 4600
f • 55 11 2179 4597

54

**BM&A** | ADVOGADOS
BARBOSA, MÚSSNICH & ARAGÃO

garantirá participação ainda maior, especialmente sobre as sobras do valor do crédito da OSX, que sabidamente não subscreverá sua parte, como apontado mais abaixo; e *(iv)* da conversão de créditos quirografários, que garantirá a eles participação acionária adicional, na proporção de seus respectivos créditos, a ser alocada dentro dos 25% destinados a esta etapa da reestruturação proposta pelas RECUPERANDAS.

157.      Esses direitos cumulativos e em parte exclusivos se devem exatamente ao fato de os BONDHOLDERS MAJORITÁRIOS terem uma posição de grande influência no momento de votação dos PRJs se não estivessem conflitos. Ao negociarem esse voto, demonstraram que estão sim sendo vistos como credores concursais, e isso cabalmente denota a iniquidade entre credores sujeitos à RECUPERAÇÃO JUDICIAL.

158.      Especificamente no tocante às DEBÊNTURES 2ª SÉRIE, a ilegalidade da exclusividade fica ainda mais latente pelo fato de o crédito de aproximadamente US$ 1,5 bilhão da OSX estar no cômputo geral para o estabelecimento de proporções de subscrição das DEBÊNTURES 3ª SÉRIE, conforme informado pelas RECUPERANDAS nas AGCs (fls. 7.456/57 do doc. 9).

159.      Ocorre que, além de a OSX também estar em recuperação judicial e não ter disponibilidade de recursos para subscrever sua parte das DEBÊNTURES 3ª SÉRIE, a própria OGX já reconheceu no passado que a OSX não subscreveria debêntures no âmbito do FINANCIAMENTO DIP (anexo ao doc. 12).

160.      Ou seja, os BONDHOLDERS MAJORITÁRIOS já sabem de antemão que sobrará às DEBÊNTURES 2ª SÉRIE pelo menos um quarto das DEBÊNTURES 3ª SÉRIE, reforçando que toda a negociação dos PRJ foi feita de forma a beneficiar alguns poucos. Instados a se manifestar sobre a proposta dos AGRAVANTES de dividírem com eles as sobras referentes á quota-parte da OSX, tanto esta quanto a OGX e os BONDHOLDERS MANJORITÁRIOS silenciaram ou negaram a proposta.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E,
nº 10 - 2º andar | 70397-900
t +55 61 3218-0350
f +55 61 3218-0318

RIO DE JANEIRO
Av. Almirante Barroso, 52
31º andar | 20031-000
t +55 21 3824-5800
f +55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10 andar | 04543-011
t +55 11 2179-4600
f +55 11 2179-4567

## BM&A | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

**57**

**d) Inegável e exagerado tratamento diferenciado, ainda que se trate de um crédito extraconcursal**

161.     Com base nas informações divulgadas pela OGPAR (refletidas nos PRJ), o conceituado Banco Barclays elaborou relatório (juntado com o doc. 12) confirmando que, se implementada a reestruturação na forma proposta pelas RECUPERANDAS, os BONDHOLDERS MAJORITÁRIOS passarão a ser os acionistas controladores da companhia (66,7%), ficando assim alocadas as participações societárias na OGX REESTRUTURADA:



162.     Conforme se extrai do referido relatório do Banco Barclays:

> "*Estimamos que o grupo ad hoc de bondholders que apoiou o plano será responsável por 87,3% do financiamento DIP (US$ 182 milhões), e deterá 66,7% do capital da sociedade, enquanto os bondholders restantes serão responsáveis por 12,7% do financiamento DIP (US$ 26,5 milhões), e receberão participação societária representativa de 14,6% do capital da empresa. Também calculamos que a OSX deterá participação de 6,5% e fornecedores de 2,2%)*".

163.     Além dessa vantagem perante os demais credores, os BONDHOLDERS MAJORITÁRIOS terão os seus títulos (*bonds*) mais valorizados que os *bonds* dos demais *bondholders*, como afirma o Banco Barclays:

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

58

> *"Considerando que os bondholders participem do financiamento DIP, com aplicação de taxa de desconto de 25% para um ano, e presumindo-se um EV de US$ 2 bilhões, o valor dos bonds seria de 13 centavos em cada dólar. Se os bondholders não participarem do financiamento DIP, a avaliação fica ainda mais baixa – meros 7 centavos, considerando um EV de US$ 2 bilhões. A valorização potencial é muito mais interessante para o grupo Ad hoc (Bondholders Aderentes) – 46 centavos, considerando um EV de US$ 2 bilhões e que os outros bondholders também participem do financiamento DIP".*

164.    Ou seja, não bastasse o fato de pagarem percentualmente menos pelas participações na OGX REESTRUTURADA e ficarem com o controle da companhia, em virtude do tratamento desigual que as RECUPERANDAS estão conferindo aos BONDHOLDERS MAJORITÁRIOS, **os títulos por eles detidos ainda valorizarão muito mais que os *bonds* do demais *bondholders*.**

165.    O próprio Banco Barclays reconhece os privilégios aos BONDHOLDERS MAJORITÁRIOS (**na qualidade de credores**) na RECUPERAÇÃO JUDICIAL por meio da exclusividade de participação nas DEBÊNTURES 1ª SÉRIE, atribuindo aos papéis deles valor maior do que aos demais *bonds*:

> *"Custo de financiamento DIP e participação societária diferenciados **implicam perfil diferente para o grupo ad hoc, comparado com os outros bondholders**: De acordo com nossos cálculos, e considerando que todos os bondholders participem do financiamento DIP, o grupo ad hoc desembolsará 9,1 centavos [por dólar de valor de face dos] títulos, enquanto os não integrantes do grupo desembolsarão 1,6 centavos. Da mesma forma, as diferentes participações societárias implicam potencial de valorização distinto. Partindo de valores da empresa de US$ 500 milhões, US$ 1 bilhão, e US$ 2 bilhões, segundo nossos cálculos o valor dos bonds detidos pelo grupo ad hoc seria de 8, 24, e 58 centavos, enquanto o valor dos bonds detidos por não integrantes do grupo seria de 3, 7 e 16 centavos. Se os não integrantes do grupo ad hoc optarem para não participar do DIP, os valores caem para 2, 5 e 9 centavos".*

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E
n. 30, 7. andar, 70304-900
t + 55 61 3218-0300
t + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar, 20031-000
t + 55 21 3824-5800
t + 55 21 3262 5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 10. andar 04543-011
t + 55 11 2179-4600
t + 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

166. Sem prejuízo das análises e conclusões do Banco Barclays, todo e qualquer exercício de cálculo que se faça envolvendo os valores a serem aportados e os percentuais de participação societária atribuídos aos credores na OGX REESTRUTURADA também evidencia o ilegal tratamento absurdamente mais favorável aos BONDHOLDERS MAJORITÁRIOS em relação aos demais *bondholders*:

(a) **Cenário 1:**

Considerando *(i)* o valor de avaliação da OGX REESTRUTURADA informado pelas RECUPERANDAS (US$ 1.500.000.000,00, conforme cláusula 10.4 do PLANO OGX e cláusula 9.4 do PLANO OGPAR) e *(ii)* o valor da 1ª TRANCHE (US$ 125.000.000,00), verifica-se que a participação na 1ª TRANCHE asseguraria aos respectivos subscritores o direito a receber ações equivalentes a 8,33% da OGX REESTRUTURADA (ou seja, US$ 125 milhões sobre US$ 1,5 bilhões), e não aos 41,9767% previstos nos PLANOS DO GRUPO OGX.

Para fazer jus a esses 41,9767%, a contribuição dos BONDHOLDERS MAJORITÁRIOS na 1ª TRANCHE deveria ser de US$ 629.650.500,00. **Por quais motivos os BONDHOLDERS MAJORITÁRIOS receberão cinco vezes mais ações do que o valor emprestado na 1ª TRANCHE lhes dedicaria, e só eles terão essa oportunidade? Esta é uma pergunta sem resposta.**

(b) **Cenário 2:**

Conforme tabela abaixo, considerando *(i)* o valor da 1ª TRANCHE (US$ 125 milhões), *(ii)* o valor da 3ª TRANCHE (US$ 90 milhões), *(iii)* o valor total dos créditos concursais em 19.2.2013, data em que foi apresentada a lista de credores (aproximadamente US$ 5,635 bilhões, conforme valores em dólares da lista e taxas de câmbio de reais e libras esterlinas a dólares daquela data, segundo o Banco Central do Brasil), bem como *(iv)* os percentuais de participação acionária na OGX REESTRUTURADA que serão entregues aos respectivos subscritores,

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
nº 30 · 7 andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av Almirante Barroso, 52
31º andar | 20031-000
t. + 56 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av Pres. Juscelino Kubitschek,
1455 · 10º andar | 04541-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

verifica-se que:

(a) para cada 1% de participação acionária na OGX REESTRUTURADA, a ser adquirido mediante a conversão do crédito relativo à 3ª TRANCHE, os respectivos subscritores deverão desembolsar valor de aproximadamente US$ 3,909 milhões, mais de 31% superior ao valor a ser desembolsado pelos BONDHOLDERS MAJORITÁRIOS na 1ª TRANCHE, de cerca de US$ 2,977 milhões; e

(b) para cada 1% de participação acionária na OGX REESTRUTURADA, a ser adquirido mediante a conversão dos Créditos Concursais, os respectivos credores deverão desembolsar cerca de US$ 225,43 milhões, **valor 75,7 vezes** (!) o custo desse mesmo percentual a ser desembolsado na 1ª TRANCHE pelos BONDHOLDERS MAJORITÁRIOS. Sabedores dos grandes benefícios negociados para a 1ª TRANCHE, os BONDHOLDERS MAJORITÁRIOS não permitem que os *bondholders* minoritários venham a participar!

| Tranche | Valor (US$) | Participação na OGX REESTRUTURADA | Valor aproximado (US$) por cada 1% da OGX REESTRUTURADA |
|---|---|---|---|
| 1ª TRANCHE | 125 milhões | 41,9767% | 2.977 milhões |
| 3ª TRANCHE | 90 milhões | 23,0233% | 3.909 milhões |
| Créditos Concursais | 5.635 milhões | 25,0000% | 225.43 milhões |

(c) **Cenário 3:**

Conforme tabela abaixo, considerando *(i)* o atual número de ações representativas do capital social da OGPar (3.236.016.790), *(ii)* os percentuais de participação acionária na OGX REESTRUTURADA que serão entregues aos subscritores da 1ª TRANCHE (41,9767%) e da 2ª TRANCHE (23,0233%), bem

BRASÍLIA
Setor Comercial Sul, Od 1, Bl. F,
n 30 - 7 andar | 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5136

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

como *(iii)* o número de ações a serem emitidas e entregues aos referidos subscritores da 1ª TRANCHE (13.583.730.599) e da 3ª TRANCHE (7.450.378.536) para que sejam atingidos tais percentuais, verifica-se que, ao término da reestruturação proposta:

(a) o preço a ser pago pelos BONDHOLDERS MAJORITÁRIOS por cada ação da OGX REESTRUTURADA será de somente cerca de US$ 0,0092;

(b) o preço a ser pago pelos subscritores da 3ª TRANCHE por cada ação da OGX REESTRUTURADA será de aproximadamente US$ 0,0120; e, portanto, 31% superior ao preço a ser pago pelos BONDHOLDERS MAJORITÁRIOS; e

(c) o preço a ser pago pelos credores concursais por cada ação da OGX REESTRUTURADA será de cerca de US$ 0,6966; e, portanto, **75,7 vezes** (!) o preço a ser pago pelos BONDHOLDERS MAJORITÁRIOS.

| Beneficiário das ações | Valor da contribuição (US$) | Percentual de participação na OGX reestruturada | # de ações na OGX REESTRUTURADA | Valor aproximado (virtualmente) pago por cada ação (US$) |
|---|---|---|---|---|
| Acionistas atuais | | 10% | 3.236.016.790 | |
| Subscritores 1ª TRANCHE | 125.000.000,00 | 41,9767% | 13.583.730.599 | 0,0092 |
| Subscritores 2ª TRANCHE | 90.000.000,00 | 23,0233% | 7.450.378.536 | 0,0120 |
| Demais credores | 5.635.830.474,50 | 25% | 8.090.041.975 | 0,6966 |

BRASÍLIA
Setor Comercial Sul, Qd. 1, Bl. K,
nº 30 - 7º andar | 70357-900
t. + 55 61 3218-0500
f. + 55 61 3218-0515

RIO DE JANEIRO
Av. Almirante Barroso, 52
21º andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5026

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10º andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597



**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

| TOTAL | | 100% | 32.360.167.900 |
|---|---|---|---|

**(d)   Cenário 4:**

Assumindo que o aporte do valor correspondente a US$ 90 milhões assegura aos subscritores das DEBÊNTURES 3ª SÉRIE uma participação acionária de 23,0233% na OGX REESTRUTURADA, caso aplicado o mesmo racional matemático à 1ª TRANCHE, isto é,

$$US\$ \ 90 \ milhões - 23,0233\%$$
$$US\$ \ 125 \ milhões \sim x\%$$

Ao aportarem valor correspondente a US$ 125 milhões, os BONDHOLDERS MAJORITÁRIOS fariam jus, à luz do princípio da isonomia, a uma participação acionária na OGX REESTRUTURADA de aproximadamente 31,9767%, e não de 41,9767%, como previsto nos PRJ.

Chama a atenção o fato de a diferença apontada acima ser de 10%, exatamente o percentual equivalente à remuneração a título de Backstop Fee que, como vinha sendo divulgado ao mercado pelas RECUPERANDAS, seria paga exclusivamente aos BONDHOLDERS MAJORITÁRIOS e que, curiosamente, não consta expressamente dos PRJ, mas de **forma escondida** decorre dos excelentes fatores de conversão das DEBÊNTURES 1ª SÉRIE em ações da OGX REESTRUTURADA, na forma da Cláusula 4.20.4.12 da Escritura de Emissão de Debêntures.

Infelizmente, o juízo a quo, ao invés de coibir tal prática, alega não poder se imiscuir nas questões econômicas dos PRJ, e preferiu afirmar: *"Reputa-se que um bônus de 10% como prêmio ao risco tomado em um grupo de empresas que corria o elevado risco de falência não representa qualquer absurdo, mas até mesmo uma remuneração módica..."*.

Não faz qualquer sentido que os BONDHOLDERS MAJORITÁRIOS recebam um prêmio de 10% da companhia reestruturada, barganhado a portas fechadas, como recompensa por subscreverem as DEBÊNTURES 1ª SÉRIE, amplamente favorável,

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E,
nº 30  7º andar | 70397-900
t - 55 61 3218-0350
f - 55 61 2218-0215

RIO DE JANEIRO
Av. Almirante Barroso, 52
31  andar | 20031-000
t - 55 21 3824-5800
f - 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10º andar | 04543-011
t - 55 11 2179-4600
f - 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

63

como demonstrado (!?). Isso significa ganharem um bônus de pelo menos US$ 150.000.000,00 (isto é, 10% do total de US$ 1,5 bilhão da OGX REESTRUTURADA), valor esse superior ao próprio montante investido na 1ª SÉRIE, que é de apenas US$ 125.000.000,00.

E mais: o Backstop Fee de US$ 150.000.000,00 supostamente serve para remunerar uma obrigação de cobertura das sobras das DEBÊNTURES 3ª SÉRIE apenas, esta no valor total de US$ 90.000.000,00, muito inferior a tal *fee*.

Como se não bastasse, desses US$ 90.000.000,00, a maior parte já seria subscrita pelos BONDHOLDERS MAJORITÁRIOS em virtude de seu direito proporcional ao valor do crédito concursal. Assim, quando muito, o valor que os BONDHOLDERS MAJORITÁRIOS se comprometeram a cobrir é de menos de US$ 45.000.000,00!

Ora, pretender-se auferir US$ 150.000.000,00 apenas para garantir recebimento de quantia menor que US$ 45.000.000,00 seria totalmente surreal em qualquer situação! No presente caso, isso soa ainda mais absurdo porque essa suposta garantia remunerada pelo Backstop Fee é na verdade um grande privilégio, porque o fator de conversão das debêntures se torna amplamente atrativo, tanto que o GRUPO OGX e os BONDHOLDERS MAJORITÁRIOS relutam em conferir o mesmo direito (ou mesma "obrigação") aos demais credores. Se fosse mesmo um ônus, e não um bônus, é evidente que os *bondholders* minoritários não seriam tolhidos!

167.     Então, por que as RECUPERANDAS deram todo esse privilégio exclusivamente aos BONDHOLDERS MAJORITÁRIOS? **Simplesmente porque em sua visão isto asseguraria a aprovação dos PRJ, o que acabou ilegalmente acontecendo e liga intimamente a reestruturação societária, o PSA e, mais especificamente, o FINANCIAMENTO DIP com este processo de RECUPERAÇÃO JUDICIAL.**

168.     Se existem mais *bondholders* interessados em investir novamente no GRUPO OGX, acreditando na sua recuperação – como amplamente demonstrado acima e também nos embargos de declaração opostos em 31.1.2014

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
n° ander 1 70397-900
t + 55 61 3218-0300
f + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52,
31° andar 1 20031-000
t + 55 21 3824-5800
f + 55 21 3262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455, 10° andar 1 04543-011
t + 55 11 2179-4600
f + 55 11 3726-0597

62

**BM&A** ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

e na petição protocolizada em 14.2.2014, antes que as DEBÊNTURES 1ª SÉRIE estivessem fechadas –, as RECUPERANDAS deveriam admitir nas DEBÊNTURES 1ª SÉRIE todos os demais *bondholders* e credores quirografários de mesma natureza que manifestassem interesse nesse sentido, assegurando a eles as mesmas condições atribuídas aos BONDHOLDERS MAJORITÁRIOS.

169.        É evidente que não se trata o FINANCIAMENTO DIP meramente de um financiamento extraconcursal. **A única explicação para um seleto grupo de investidores ter tamanha vantagem sobre os demais é o fato de os tais BONDHOLDERS MAJORITÁRIOS terem supostamente, aos olhos das RECUPERANDAS, um papel fundamental na votação (e pretensa aprovação) dos PLANOS DO GRUPO OGX.** Para atingir este objetivo, as RECUPERANDAS **aceitaram até mesmo pagar os honorários dos assessores dos BONDHOLDERS MAJORITÁRIOS (fls. 514 – doc. 14)!**

170.        Tanto isso é verdade que o próprio *PSA*, adotado como base para a elaboração dos PLANOS APROVADOS, foi celebrado para acomodar esta pretensão, como se depreende do nome dado ao instrumento contratual (em português, "contrato para apoio do plano").

171.        Nesse contexto, conclui-se que os PLANOS APROVADOS não têm como objetivo apenas a superação da crise econômico-financeira, mas pretendem também, em contrapartida ao compromisso assumido pelos BONDHOLDERS MAJORITÁRIOS de votar pela sua aprovação, beneficiá-los com a entrega do controle do GRUPO OGX, mesmo que isto seja feito em prejuízo aos interesses do grupo e, especialmente, dos demais credores e acionistas que acreditaram e confiaram nas RECUPERANDAS.

172.        Esse é o pano de fundo dos PLANOS APROVADOS.

173.        Em que pese o entendimento equivocado do juízo *a quo*, verifica-se nos PLANOS APROVADOS que na contramão da legislação falimentar, as

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. H,
n° 307 7° andar | 70310-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 – RJ andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597



BM&A ADVOGADOS
BARBOSA, MUSSNICH & ARAGÃO

RECUPERANDAS optaram por tratar de forma desigual credores de mesma natureza, concebendo uma operação societária arrojada, mantida sob sigilo até quando foi possível, fechada a um clube exclusivo com critérios obscuros de seleção e baseada em um financiamento, conversível em ações, cujo principal objetivo é a entrega do controle das RECUPERANDAS, livre de dívidas, a alguns poucos credores. Estes, em contrapartida, comprometem-se a "apoiar" os PRJ.

174.       Enfim, é evidente que o *PSA* jamais existiria se os BONDHOLDERS MAJORITÁRIOS não detivessem a maioria do capital votante nas AGCs. Não é possível interpretar o *PSA* como algo fora e distante da RECUPERAÇÃO JUDICIAL, pois, o que estava em jogo, no fim do dia, era a aprovação dos PRJ. Nada pode ser mais claro que isto.

175.       Também é evidente que quando estes BONDHOLDERS MAJORITÁRIOS subscrevem a maioria do FINANCIAMENTO DIP, no valor de US$ 215 milhões, conversível em 65% de uma companhia avaliada em US$ 1,5 bilhões, **eles têm um lucro real gigantesco na operação**. Como no fim das contas, seja em patrimônio, seja em *equity*, este retornará para os BONDHOLDERS MAJORITÁRIOS, não se pode negar que isto compensa e praticamente quitá o crédito concursal destes credores.

176.       Portanto, de forma evidente, há tratamento diferenciado entre credores da mesma classe e origem na recuperação judicial, o que é vedado pelo LFR.

## III.3.2   RATIFICAÇÃO   DE   ATOS   E   ISENÇÃO   DE RESPONSABILIDADES

177.       Entendeu o juízo *a quo* que as cláusulas dos PLANOS APROVADOS que tratavam de ratificação de atos e isenção de responsabilidades seriam válidas, por se tratarem de renúncia a direito disponível, apesar de serem "*ineficazes em relação aos credores que a dela se opuserem expressamente por terem votado*

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F
n° 30 - 7° andar | 70397-900
t + 55 61 3218-0900
f + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
35  andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-3036

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10  andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

*pela rejeição ao plano*" (fls. 7.905 do doc. 10):

178.        Em que pese o entendimento correto de que referidas cláusulas jamais poderiam ser consideradas válidas contra quem expressamente foi contrário a elas, o juízo *a quo* **deixou de declará-las ineficazes em relação às partes que ou se abstiveram de votar ou não puderam por qualquer motivo estar presentes na AGC.**

179.        Em outras palavras, o entendimento é exatamente o contrário: se o direito é disponível, o credor deve expressamente dele dispor, para que então essa sua liberalidade tenha alguma eficácia. Se o credor não concorda ou não deu sua opinião, em ambos os casos a quitação é ineficaz.

180.        A jurisprudência já sedimentou o entendimento de que a fixação de cláusulas nos planos de recuperação versando direitos disponíveis são aceitas apenas para aqueles que com elas concordam, ou seja, apenas para aqueles que delas aceitam dispor:

> "*Recuperação judicial. Agravo de instrumento. **Plano de recuperação judicial aprovado que contém cláusula que estende os efeitos da novação aos coobrigados, devedores solidários, fiadores e avalistas.** A novação prevista como efeito da recuperação judicial não tem a mesma natureza jurídica da novação disciplinada pelo Código Civil. Pretensão da recuperanda de validade e eficácia da cláusula a todos avalistas, fiadores e coobrigados. **Validade e eficácia da cláusula em face dos credores que expressamente aprovaram o plano, por se tratar de direito disponível,** que ao assim votarem, renunciam ao direito de executar fiadores/avalistas durante o prazo bienal da 'supervisão judicial'. **Ineficácia da cláusula extensiva da novação aos coobrigados pessoais (fiadores/avalistas) em relação aos credores presentes à Assembleia-Geral que se abstiveram de votar, bem como aos ausentes do conclave assemblear.** Evidente ineficácia da cláusula no que se refere aos credores que votaram contra o plano e, 'a fortiori', aos credores que formularam objeção relacionada com a ilegalidade da*

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl F,
n. 30 - 7° andar | 70397 900
L. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t. + 55 21 3824-5600
f. + 55 21 2282-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455   10° andar | 04543-011
L. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

67

*cláusula extensiva da novação. Decisão mantida. Agravo desprovido."[44] (detacou-se).*

181. Inclusive, no tocante aos credores que não participaram das AGCs e não tiveram a grande "oportunidade" de abrirem mão de seu direito disponível de reclamarem prejuízos apesar de terem sido esfolados pelas RECUPERANDAS e pelos BONDHOLDERS MAJORITÁRIOS, a jurisprudência é também enfática em afirmar que obviamente referida cláusula não pode ser oponível:

> *"AGRAVO DE INSTRUMENTO RECUPERAÇÃO JUDICIAL Pretensão voltada à nulidade da deliberação de assembleia geral que aprovou plano modificativo e determinou quitação e liberação dos devedores solidários, suspendeu as ações e execuções judiciais movidas pelos credores contra esses mesmos devedores solidários Pretensão atendida em menor extensão para declarar ineficaz em relação ao recorrente e aos credores que rejeitaram o plano ou não estiveram presentes à assembleia geral Recurso provido em parte neste tocante. (...) As cláusulas não são nulas, mas ineficazes em relação ao banco impugnante e aos demais credores que assim se manifestaram em Assembleia Geral ou não estiveram presentes à sessão de aprovação, conforme também concluiu a DD. Procuradora de Justiça em sua manifestação nesta instância. (...) É o caso, portanto, de dar provimento parcial ao recurso, em menor extensão à pretensão do agravante, para declarar ineficaz as cláusulas 8.1 e 9.4 em relação ao recorrente, entendimento que se estende aos credores que rejeitaram o plano ou não estiveram presentes à assembleia geral"[45] (destacou-se).*

182. Evidentemente que as quitações e ratificações existentes são disposições no mínimo curiosas. Em total arrepio da lei, as RECUPERANDAS compuseram-se a "portas fechadas" com os BONDHOLDERS MAJORITÁRIOS, suposta maioria votante das AGCs, conferiram-lhes diversos benefícios não isonomicamente estendidos aos demais *bondholders*, e combinaram a aprovação

---

[44] TJSP, Câmara Reservada à Falência e Recuperação Judicial, agravo de instrumento nº 0196402-74.2011.8.26.0000, Rel. Manoel Pereira Calças, d.j. 20.9.2011.
[45] TJSP, Câmara Reservada à Falência e Recuperação Judicial, agravo de instrumento n. 0027530-96.2011.8.26.0000, rel. Ricardo Negrão, d.j. 24.1.2012.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl 2,
n. 39 – 7  andar | 70302-905
t. + 55 61 3218-0300
f. + 55 61 3218-0318

RIO DE JANEIRO
Av. Almirante Barroso, 52
31  andar | 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10  andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4607





BM&A ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

de uma autoquitação pretensamente tentando amarrar ainda mais as mãos de terceiros!

183.     Qual seria a razão para tamanho disparate? Seria por que as próprias RECUPERANDAS e os BONDHOLDERS MAJORITÁRIOS duvidam da legalidade dos atos previstos nos PRJ? Provavelmente sim, porque as ilegalidades são tão latentes e o receio de sofrer as consequências disso é tão grande e óbvio que até outros terceiros alheios ao processo, como sociedades relacionadas ao GRUPO OGX e o DEUTSCHE, acabaram sendo incluídos no rol daqueles que "nada de errado fizeram, nenhuma reclamação sofrerão".

184.     Aliás, não contentes em espalhar quitações nulas em várias cláusulas dos PRJ em favor de si e de terceiros, as AGRAVADAS **também tentaram esconder nos <u>anexos</u> dos PRJ quitações e ratificações de atos**, tal como no modelo de *"Notificação de interesse de subscrição da 3 série de debêntures"*, anexo 1.1.96 aos PLANOS APROVADOS.

185.     Trata-se de mais uma patente ilegalidade a socorrer apenas os BONDHOLDERS MAJORITÁRIOS e demais terceiros favorecidos por essas cláusulas nulas (todas elas)!

186.     PARA TODO LADO QUE SE ANALISA, AS ILEGALIDADES EMERGEM *"COM UMA CLAREZA DE DOER OS OLHOS"*.

187.     Felizmente, a decisão agravada coibiu em parte essa pretensão de impor quitações nos PRJ e seus anexos, mas o fez apenas para alguns, enquanto todos os AGRAVANTES e demais credores que não as aprovaram se colocam na mesma posição, de forma que isso também eiva de nulidade os PRJ.

BRASÍLIA
RIO DE JANEIRO
SÃO PAULO

Rosane Rosalved Santos
Secretária da 14ª Câm. Cível
Matr. 01/26.887
67



**BM&A** | ABOGADOS
BARBOSA, MUSSNICH & ARAGÃO

### III.3.4. A ESTRANHA LIBERAÇÃO DA PUT AND CALL OPTION E BÔNUS DE SUBSCRIÇÃO AO ACIONISTA DA OGPAR

188.    Da mesma forma, a decisão agravada é parcialmente correta em relação às cláusulas sobre a *Put Option*, ao consignar que seriam "*ineficazes em relação aos credores que a ela se opuseram expressamente*" (doc. 10).

189.    Todavia, também por este motivo se equivocou o magistrado, uma vez que a referida cláusula deveria ter sua ineficácia declarada para os credores que não se fizeram presente nas AGCs, ou mesmo que se abstiveram de votar.

190.    De qualquer forma, não há como deixar de consignar que a referida cláusula nos PLANO INICIAIS[46] impunha uma imediata liberação de quantia expressiva.

191.    Inadmissível, e causava grande estranheza, que uma companhia em crise, com um passivo concursal superior a R$ 12 bilhões, pretendia perdoar uma obrigação assumida por seus acionistas controladores em valor equivalente a US$ 1 bilhão, em especial quando tal perdão foi estabelecido no contexto do pacto firmado com o seleto grupo de BONDHOLDERS MAJORITÁRIOS, sem que dessa negociação tenham os demais credores tomado parte.

192.    Em outras palavras, uma parte cedeu o controle e outra devolveu o favor com a liberação da *Put Option*.

---

[46] "*11.1. Uma vez aprovado o Plano pela Assembleia de Credores e divulgado aos Credores o resultado do procedimento informado pela OGPar mediante o Comunicado ao Mercado de 11.11.2013, a propósito da discussão da Put Option, concluindo pela sua invalidade e/ou inexigibilidade, fica convencionado que na data em que forem efetivamente entregues aos Credores Concursais e Credores Extraconcursais as Ações correspondentes ao Aumento de Capital Mediante Capitalização de Créditos (conforme definido na Cláusula 5.1.2 acima), livres e desembaraçadas de quaisquer ônus ou questionamentos, os Credores Concursais e Credores Extraconcursais (que tiverem expressamente aderido ao Plano), por força deste Plano, outorgam para todos os fins legais, ampla, rasa, irrestrita, exoneração e quitação a OGPar, Grupo OGX, as Acionistas, então acionistas controladores, às partes signatárias do instrumento da Put Option, aos antigos e atuais administradores da OGPar e OGX, e suas controladas, diretas e indiretas, com respeito a qualquer pretensão, ação ou direito a demandar execução específica, reparação de danos ou quaisquer outras demandas, a qualquer título em relação ao Put Option.*"

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E,
n. 30 - 7° andar | 70397-900
t + 55 61 3218-0300
f + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31° andar | 20031-000
t + 55 21 3824-5800
f + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10° andar | 04543-011
t + 55 11 2179-4600
f + 55 11 2179-4597



Rosane Rosalie Santos
Secretária da 14° Câm. Cível
Matr. 01.835



BM&A | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

70

193.     Levando em conta que os credores serão acionistas, a liberação da obrigação de aporte de valor equivalente a US$ 1 bilhão representa renúncia, pela OGPAR, a importante ativo (direito).

194.     **O Ministério Público do Estado do Rio de Janeiro** emitiu parecer (fls. 1.816/1.856 do doc. 13) contrário à liberação, pois, mesmo que queiram, "*os credores não podem, ainda que por maioria de votos, isentar, quem quer seja, de qualquer obrigação, a não ser a própria sociedade empresária em recuperação. O Sr. Eike Fuhrken Batista não está em recuperação judicial, não é parte do processo e, portanto, não pode ter suas dívidas e demais obrigações equacionadas, extintas ou mesmo reduzidas, pela vontade majoritária dos credores das sociedades empresárias integrantes do Grupo OGX*" (fl. 1.840 do doc. 13).

195.     Como essa liberação escancarada não caiu bem, as RECUPERANDAS, ao apresentarem nova versão dos planos ao apagar das luzes (os PLANOS APROVADOS), pretenderam "suavizar" a cláusula, passando a prever que o procedimento de liberação da *Put Option* dependeria do resultado de opiniões legais e que só "eventualmente" implicaria a liberação, eliminando ao final todas as condições de quitação. Veja-se a redação das cláusulas:

> "*11.1. Uma vez aprovado o Plano pela Assembleia de Credores e divulgado aos Credores o resultado do procedimento informado pela OGPar mediante o Comunicado ao Mercado de 11.11.2013, a propósito da discussão do Put Option, eventualmente concluindo pela sua invalidade e/ou inexigibilidade ("Resultado do Procedimento"), fica convencionado que na data em que forem efetivamente entregues aos Credores Concursais e Credores Extraconcursais (apenas os Credores Extraconcursais que tiverem expressamente aderido ao Plano) e/ou ao Comissário as Ações correspondentes ao Aumento de Capital Mediante Capitalização de Crédito (conforme definido na Cláusula 5.1.3 acima), livres e desembaraçadas de quaisquer ônus ou questionamentos, os Credores Concursais e Credores Extraconcursais (apenas*

**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

*os Credores Extraconcursais que tiverem expressamente aderido ao Plano), por força deste Plano, reconhecerão, para todos os fins de direito, a plena validade e eficácia do Resultado do Procedimento."* (doc. 8)

*"1.1.124. "Resultado do Procedimento": Conforme definido na Cláusula 11.1 deste Plano, refere-se ao resultado do procedimento relativo à solução amigável de disputa acerca do Put Option."*

196.     Em Comunicado ao Mercado divulgado em 11.11.2013, a OGX PARTICIPAÇÕES tornou público que esta e o seu acionista controlador – Sr. Eike Fuhrken Batista –, decidiram submeter a juristas independentes os termos da disputa envolvendo o exercício da *Put Option* pela OGX PARTICIPAÇÕES, nos termos transcritos a seguir:

*"– Disputa sobre o Exercício da "PUT" –*
*Rio de Janeiro, 11 de novembro de 2013 - A OGX Petróleo e Gás Participações S.A. ("OGX") (Bovespa: OGXP3; OTC: OGXPY.PK), comunica ao mercado, em relação ao Fato Relevante do dia 09 de setembro de 2013, no qual se deu conhecimento sobre a contestação ao exercício da "PUT", que a Companhia e o acionista controlador resolveram submeter a juristas independentes os termos da disputa, estimando-se um prazo adicional de 60 dias para que seja obtido um posicionamento, o qual será informado ao mercado e aos acionistas".*

197.     Como se observa do teor do referido Comunicado ao Mercado, a OGX PARTICIPAÇÕES exerceu a *Put Option*, contra o que se insurgiu o referido acionista controlador, mediante o envio de notificação de conflito à OGX PARTICIPAÇÕES, conforme se extrai dos Fatos Relevantes divulgados respectivamente em 06 de setembro de 2013[47] e em 06 de setembro de 2013[48].

---

[47] *"Fato Relevante – OGX EXERCE "PUT" DE US$1,0 BILHÃO CONCEDIDA POR SEU ACIONISTA CONTROLADOR – Rio de Janeiro, 6 de setembro de 2013 - A OGX Petróleo e Gás Participações S.A. ("OGX") (Bovespa: OGXP3; OTC: OGXPY.PK), comunica ao mercado que a Diretoria da Companhia, por decisão unânime, exerceu opção em face de seu acionista controlador, Sr. Eike Fuhrken Batista, conforme Instrumento Particular de Outorga de Opção de Subscrição de Ações e Outras Avenças, celebrado em 24 de outubro de 2012 e divulgado ao mercado naquela mesma data, para que venha a subscrever novas ações ordinárias de emissão da Companhia, ao preço de exercício de*

**BRASÍLIA**
Setor Comercial Sul, Qd 1, Bl. F,
n 30 - 7  andar | 70397-900
t + 55 61 3218-0300
f. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31  andar | 20031-000
t + 55 21 1824-5800
f + 55 21 2262 5536

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek,
1455 - 10  andar | 04543-011
t. + 55 11 2179-4500
f + 55 11 2179-4507



**BM&A** ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

198.　　Quando questionadas pelo patrono dos AGRAVANTES nas AGCs sobre o procedimento de validação da *Put Option*, as RECUPERANDAS não souberam apresentar os mínimos esclarecimentos, dando a entender que há suavização da letra da cláusula, mas que a intenção de liberação de importante ativo ainda continua obscura:

> *"O Sr. Thomaz Sant' Ana questionou quem seriam os três pareceristas contratados e pediu detalhes do procedimento, ao que o Sr. Eduardo Munhoz respondeu que não poderia prestar maiores informações, em respeito ao que foi divulgado em fato relevante em 2013, sendo que qualquer divulgação, neste momento, feriria a simetria de informações devida aos acionistas."*

199.　　O momento chegou a ser constrangedor para os presentes às AGCs, porque nem sequer os nomes dos profissionais envolvidos ou o procedimento para a decisão supostamente vinculante foi divulgado.

200.　　Veja-se, E. TJRJ: **ABSOLUTAMENTE NADA FOI EXPLICADO** NOS PRJ OU NAS AGCS QUANTO À LIBERAÇÃO DA *PUT OPTION*, mas ainda assim a decisão recorrida considerou essa absurda generalidade sobre uma obrigação de nada menos que US$ 1 BILHÃO para uma companhia necessitada de capital (a ponto de conferir benefício extremos a alguns poucos) "devidamente esclarecida":

> *"No que tange ao Put option, impende constatar que esse ponto ficou devidamente esclarecido pelo representante das empresas recuperandas, no decurso da*

---

R$6,30 (seis reais e trinta centavos) por ação, no valor equivalente a US$1.000.000.000,00 (hum bilhão de dólares dos Estados Unidos da América) ("Put" ou "Opção"), com o imediato desembolso de US$100.000.000,00 (cem milhões de dólares dos Estados Unidos da América) e o saldo de forma modulada diante da necessidade de caixa adicional pela Companhia, conforme determinação de sua administração. A Diretoria proporá uma reunião extraordinária do Conselho de Administração para a convocação de Assembleia Geral destinada a aprovar o imediato aumento de capital social no valor de US$100.000.000,00 (cem milhões de dólares dos Estados Unidos da América)".

[48] "**Fato Relevante – Resposta do Acionista Controlador ao exercício da "Put"** – Rio de Janeiro, 9 de setembro de 2013 - A OGX Petróleo e Gás Participações S.A. ("OGX") (Bovespa: OGXP3; OTC: OGXPY.PK), comunica ao mercado que recebeu correspondência anexa, enviada pelo acionista controlador, Sr. Eike Fuhrken Batista, em resposta ao exercício da "Put" divulgado através de fato relevante em 6 de setembro de 2013".

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E,
n. 30 - 7. andar ¦ 70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar ¦ 20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10 andar ¦ 04543-011
t. + 55 11 2176-4800
f. + 55 11 2176-4880



**BM&A** | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

73

*Assembleia Geral de Credores da OGX P&G, nos termos
de sua ata. Tratou-se de uma renúncia a direito disponível,
portanto, válida, contudo tal cláusula é ineficaz em relação
aos credores que a ela se opuserem expressamente, por
terem votado pela rejeição ao plano. Esse posicionamento
deu liberdade para a diretoria do grupo resolver a questão
de forma célere, pacífica e eficaz, sem que tenha a Put
option sido descartada, pendendo de apreciação de
pareceres a serem elaborados por juristas contratados
pelas partes diretamente interessadas."* (fls. 7.905/7.906 do
doc. 10)

201.　　　Pergunta-se: qual foi o esclarecimento dado? Qual será o
procedimento adotado pelas RECUPERANDAS nesse ponto? Quem são os
profissionais envolvidos? Como e por que foram escolhidos? Simplesmente não
se sabe, mas ainda assim a Cláusula dos PRJ foi encampada pelo juízo!

202.　　　E, como mais um prêmio pela liberação da *Put Option*, o PLANO
OGPAR (cláusula 9.4) e o PLANO OGX (cláusula 10.4[49]) preveem que, em
vantagem adicional à subscrição das novas ações de emissão da OGX, estes
controladores e seus atuais acionistas receberão um bônus de subscrição,
permitindo que, em um prazo de 5 anos, possam subscrever ações ordinárias que
representem, no total agregado, 15% da OGX REESTRUTURADA, fixando-se o
preço de emissão com base no valor de avaliação da OGX REESTRUTURADA de
US$ 1,5 bilhões.

203.　　　Ou seja: se e depois de implementada a reestruturação proposta
pelas RECUPERANDAS, os atuais acionistas da OGX PARTICIPAÇÕES serão ainda
beneficiados com a possibilidade de participar de eventual *upside* verificado em
caso de futura valorização da OGX REESTRUTURADA, o que lhes proporcionará

---

[49] *"10.4. Como vantagem adicional à subscrição das novas Ações de emissão da OGX, os acionistas da
OGPar, incluindo os Acionistas, receberão bônus de subscrição a serem emitidos pela OGX
Reestruturada na mesma assembleia que for convocada para deliberar sobre a Incorporação com as
seguintes principais condições: (i) prazo para exercício – 5 (cinco) anos; e (ii) um números de ações
ordinárias a serem subscritas que representem, no total agregado, 15% (quinze por cento) do capital
social total da OGX Reestruturada, considerando um preço de emissão baseado no valor de avaliação da
OGX Reestruturada em US$ 1.500.000.000,00 (um bilhão e quinhentos milhões de dólares norte-
americanos).*

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. E,
n. 30 – 7º andar | 70397-900
t. +55 61 3218-0300
f. +55 61 3218-0315

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar | 20031-000
t. +55 21 3824-5800
f. +55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 – 10º andar | 04543-011
t. +55 11 2179-4600
f. +55 11 2179-4597






**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

74

grandes ganhos financeiros, tudo isso à custa da imposição de sacrifício a inúmeros credores.

204.　　　Na verdade, embora a ilegal tentativa de proteção de terceiros alheios ao processo seja uma novidade, a onda de favorecimentos a pessoas físicas e jurídicas relacionadas ao GRUPO OGX já conta com um curriculum excepcional.

205.　　　Com efeito, nunca é demais lembrar que às vésperas do pedido de recuperação judicial o GRUPO OGX fez um pagamento à sua credora OSX de quase MEIO BILHÃO de reais, em decorrência de acordo firmado no âmbito da suspensão do desenvolvimento dos Campos de Tubarão Tigre, Tubarão Gato e Tubarão Areia, e adequação do afretamento de unidades de produção, conforme (i) consta das Demonstrações Financeiras da OGX PARTICIPAÇÕES relativas ao exercício social encerrado em 31.12.2013 (item 26 das Notas Explicativas), divulgadas via sistema IPE (estando, portanto, disponível para consulta no *website* da CVM), e (ii) comunicado ao mercado por meio de Fato Relevante divulgado em 1.7.2013 (destaque para seu item 5)[50].

---

[50] *"Fato Relevante – Suspensão do Desenvolvimento dos Campos de Tubarão Tigre, Tubarão Gato e Tubarão Areia e Adequação do Afretamento de Unidades de Produção – Rio de Janeiro, 01 de julho de 2013 - A OGX Petróleo e Gás Participações S.A. ("OGX") (Bovespa: OGXP3; OTC: OGXPY.PK), empresa brasileira de óleo e gás natural responsável pela maior campanha exploratória privada no Brasil, comunica ao mercado que: 1. A Companhia concluiu uma análise detalhada do comportamento de cada um dos três poços de produção do Campo de Tubarão Azul desde o início de produção até a presente data. O resultado dessa análise foi no sentido de que (i) não existe, no momento, tecnologia capaz de viabilizar economicamente qualquer investimento adicional nesse Campo visando aumentar o seu perfil de produção e (ii) os poços atualmente em operação poderão cessar de produzir ao longo do ano de 2014. O aluguel pelo afretamento do FPSO OSX-1, plataforma conectada ao Campo de Tubarão Azul, continuará a ser pago à OSX nos termos do respectivo contrato. A Companhia submeterá à Agência Nacional do Petróleo, Gás Natural e Biocombustíveis – ANP ("ANP") uma revisão do Plano de Desenvolvimento com base nas conclusões resultantes da referida análise.
2. O comportamento dos poços produtores de Tubarão Azul levou a Companhia a reprocessar e reinterpretar os dados geológicos e geofísicos existentes, o que permitiu a construção de novo modelo de reservatório, onde ficou evidente a intensa compartimentalização e descontinuidade desses reservatórios, o que compromete a produtividade dos mesmos. Dessa forma, a Companhia concluiu que não existe, no momento, tecnologia capaz de tornar economicamente viável o desenvolvimento dos campos de Tubarão Tigre, Tubarão Gato e Tubarão Areia. Diante desse fato, a Companhia submeterá à ANP requerimento no sentido de suspender o desenvolvimento dos campos acima indicados nos termos da cláusula 7.5 do respectivo Contrato de Concessão. O aluguel pelo afretamento do FPSO OSX-2, plataforma que seria utilizada nesse desenvolvimento, será pago à OSX nos termos do respectivo contrato a partir de janeiro de 2014 e até que essa unidade seja vendida ou destinada a outro local.*

**BRASÍLIA**
Setor Comercial Sul, Qd 1, Bl. F,
13º 7º andar | 70307-900
t. + 55 61 3218-0300
f. + 55 61 3218-0315

**RIO DE JANEIRO**
Av. Almirante Barroso, 52
31º andar | 20031-000
t. + 55 21 1824-5800
f. + 55 21 2262-3036

**SÃO PAULO**
Av. Pres. Juscelino Kubitschek,
1455, 10º andar | 04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597





**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

75

206.      Se esse estranhíssimo fato (que aparentemente ainda não reverberou em investigações suficientes, o que há de acontecer) não tivesse ocorrido, poderia ter sido evitada a contratação de todo ou de grande parte do FINANCIAMENTO DIP e os BONDHOLDERS MAJORITÁRIOS talvez não tivessem adquirido tantas prerrogativas excepcionais e exclusivas em detrimento dos AGRAVANTES e de outros credores.

207.      Portanto, não há dúvidas que todas as cláusulas de quitação e ratificação de atos existentes nos PLANOS APROVADOS seus anexos e a cláusula de liberação da *Put Option* não possuem validade, não apenas contra os AGRAVANTES que expressamente se opuseram a eles, mas também em relação a todos os credores que não puderam estar presentes na reunião assemblear, ou se abstiveram de votar os PRJ, sendo ainda completamente ilegal a benesse do bônus adicional de subscrição.

.IV.
## NECESSÁRIA CONCESSÃO DE EFEITO SUSPENSIVO

208.      Os argumentos expostos acima, por si só, demonstram a necessidade de recebimento deste recurso com efeito suspensivo, com fundamento nos artigos 527, III, e 558 do CPC.

209.      A relevância da fundamentação decorre de todo o exposto anteriormente, pois os **diversos vícios das AGCs e dos PLANOS APROVADOS**

---

*3. Pelos mesmos motivos acima expostos, a Companhia decidiu interromper a construção pela OSX das seguintes unidades de produção: FPSO OSX-4, FPSO OSX-5, além da WHP-1, WHP-3 e WHP-4.*
*4. O Campo de Tubarão Martelo continuará a ser desenvolvido normalmente, com primeiro óleo previsto para o 4° trimestre de 2013, conforme cronograma já divulgado. As unidades FPSO OSX-3 e WHP-2 que serão instaladas nesse campo terão o prazo do contrato de afretamento ajustado de forma a dar para a OGX o direito de terminar os contratos sem ônus a partir do 13° e 12° anos, respectivamente. Tal modificação do contrato de afretamento do FPSO OSX-3 somente entrará em vigor após a amortização total pela OSX do financiamento contraído pela mesma para construção da unidade, previsto para 2015.*
*5. Em função dos eventos acima informados, as partes celebraram um acordo pelo qual a OGX terá um desembolso imediato de caixa para a OSX no valor aproximado de US$449 milhões. Pelo acordo, aproximadamente 70% desse montante será empregado no pagamento de custos de construção das FPSO OSX-3 e WHP-2.*
*6. Por último, a Companhia informa que não devem mais ser consideradas válidas as projeções anteriormente divulgadas, inclusive as que dizem respeito a suas metas de produção".*

Rosane Rosalvo Santos
Secretaria da 24ª Câm. Cível.

| BRASÍLIA | RIO DE JANEIRO | SÃO PAULO |
|---|---|---|
| Setor Comercial Sul, Qd 1, Bl. E | Av. Almirante Barroso, 52 | Av. Pres. Juscelino Kubitschek |

**BM&A** ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

apontados anteriormente são gravíssimos e, conforme indicado, já foram reconhecidos por doutrina e jurisprudência como **causadores de nulidade da deliberação e homologação de planos de recuperação judicial.**

210.     O risco de lesão grave e de difícil reparação também é notório. Se a RECUPERAÇÃO JUDICIAL continuar a tramitar com os PLANOS APROVADOS homologados, **as RECUPERANDAS poderão concluir o procedimento de subscrição das debêntures,** posteriormente convertendo todos os créditos em participação societária, de modo que, quando do julgamento do recurso, os PLANOS APROVADOS estariam cumpridos ou em avançado estágio de cumprimento, dificultando sobremaneira a declaração de nulidade de atos, podendo tornar sem objeto o recurso.

211.     Realmente, depreende-se dos PRJ que a não concessão de efeito suspensivo ao recurso contra a decisão de concessão da RECUPERAÇÃO JUDICIAL é tida como extremamente relevante e consubstancia condição precedente para o aumento de capital mediante capitalização de crédito. Exemplificativamente, veja-se o disposto nas Cláusulas 1.1.31. e 5.1.3.1. do PLANO OGX (doc. 8):

> *"1.1.31. "Condições Precedentes para o Aumento de Capital Mediante Capitalização de Crédito": São as condições mínimas precedentes para que seja implementada a operação de Aumento de Capital Mediante Capitalização de Crédito, conforme estabelecidas na Cláusula 5.1.3.1 deste Plano."*

> *"5.1.3.1. O Aumento de Capital Mediante Capitalização de Crédito ocorrerá tão logo quanto possível, mas desde que verificadas as seguintes **Condições Precedentes para o Aumento de Capital Mediante Capitalização de Crédito:***

> *(i) o presente Plano ter sido aprovado pela Assembleia de Credores;*

> *(ii) ter havido a Homologação Judicial do Plano,*

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. 6,
nº 30 - 7º andar 1 70397-900
t + 55 61 3218-0380
f + 55 61 3218-0318

RIO DE JANEIRO
Av. Almirante Barroso, 52
31 andar 1 20031-000
t + 55 21 3824-5800
f + 55 21 2297-5438

SÃO PAULO
Av Pres. Juscelino Kubitschek,
1455 - 10 andar 1 04543-011
t + 55 11 2179-4600
f + 55 11 2179-4597

**BM&A** | ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

77

*desde que (a) não haja recurso interposto contra a decisão de Homologação Judicial do Plano (Artigo 58 da Lei de Falências) ao qual tenha sido atribuído efeito suspensivo e/ou que implique em um Efeito Adverso Relevante; e/ou (b) não haja qualquer ação judicial ou administrativa em que tenha sido pleiteada e concedida medida liminar, antecipação de tutela e/ou qualquer medida ou segurança semelhante que tenha o efeito de suspender ou inviabilizar a Homologação Judicial do Plano e/ou a implementação deste Plano e/ou que implique Efeito Adverso Relevante;"* (destacou-se)

212.    Por isso, é essencial que o recurso seja processado com efeito suspensivo, obstando o prosseguimento da RECUPERAÇÃO JUDICIAL e suspendendo, até o seu julgamento final, a validade dos PLANOS APROVADOS e **todos** os procedimentos de alienação e oneração de ativos e a conversão dos créditos, concursais ou não, em *equity*.

213.    As potenciais lesões irreparáveis ou de difícil reparação no caso de não concessão de efeito suspensivo ameaçam não apenas os AGRAVANTES, mas até mesmo terceiros que investirem nas RECUPERANDAS e posteriormente podem perder seu capital ou ter dificuldades para recuperá-lo em função da probabilíssima reversão das operações ilegalmente praticadas pelas AGRAVADAS.

214.    Além da insegurança jurídica de se permitir a concretização de complexas transações condicionada à sorte deste recurso, a não suspensão dos efeitos dos PRJ enquanto tramita o agravo poderia gerar, após o êxito deste, um risco de dano sem precedentes no mercado de capitais brasileiros.

215.    Esse dano, aliado ao calote que o GRUPO OGX já aplicou e às inúmeras ilegalidades praticadas pelas RECUPERANDAS em favor de um seleto grupo de credores, mancharia a imagem das empresas do país, por serem tão emblemáticos o problema financeiro do grupo e a sua tentativa de reestruturação (apoiada pelos AGRAVANTES, desde que seguida a lei à risca), a ponto de ser objeto de inúmeras e aguçadas reportagens na imprensa nacional e estrangeira,

BRASÍLIA
Setor Comercial Sul, Ed 1, Bl. R
n. 30   7. andar   70397-900
t. + 55 61 3218-0300
f. + 55 61 3218-0319

RIO DE JANEIRO
Av. Almirante Barroso, 52
31. andar   20031-000
t. + 55 21 3824-5800
f. + 55 21 2262-4245

SÃO PAULO
Av. Pres. Juscelino Kubitschek
1455   10. andar   04543-011
t. + 55 11 2179-4600
f. + 55 11 2179-4597

**BM&A** ABVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

78

nos últimos tempos.

216.      Como se viu, com base em argumentos de emergência e dilatação de tempo para fazer valer a lei, as AGRAVADAS já conseguiram no passado subverter procedimentos da RECUPERAÇÃO JUDICIAL, tal como emitindo as DEBÊNTURES 1ª SÉRIE e antecipando, sem anuência dos credores, a oneração de todos os ativos relevantes das RECUPERANDAS em prol dos BONDHOLDERS MAJORITÁRIOS.

217.      As AGRAVADAS sempre fizeram isso na tentativa de consolidar no mundo real situações de legalidade no mínimo duvidosas para depois se fiarem no fato consumado (o "leite derramado") em benefício próprio, como se a concretização de uma ilegalidade obstasse o seu reconhecimento. Em última instância, as RECUPERANDAS pretendem retirar do Poder Judiciário a sua atribuição constitucional de fazer valer a lei, um verdadeiro absurdo.

218.      Esse E. TJRJ certamente não se prestará à função de mero espectador da consolidação dos atos das RECUPERANDAS antes de ter analisado a fundo a sua legalidade. Com base na nova legislação vigente, inclusive o Conselho Administrativo de Defesa Econômica precisou aprovar previamente o aumento de capital da OGX mediante a conversão de debêntures, para se certificar de que não estão violados interesses de mercado, nos termos da condição imposta na cláusula 4.8.(ii) do PLANO OGX (doc. 8):

> "4.8. Procedimento para Aumento de Capital Mediante Conversão das Debêntures. As Debêntures serão convertidas automaticamente em Ações, após o integral cumprimento ou dispensa expressa das condições precedentes para sua conversão em Ações, conforme taxativamente estabelecidas na Escritura de Emissão de Debêntures e no Contrato de Subscrição, notadamente as seguintes Condições Precedentes para o Aumento de Capital Mediante Conversão das Debêntures:
>
> (ii) o CADE tenha aprovado a conversibilidade das

BRASÍLIA                    RIO DE JANEIRO            SÃO PAULO



BM&A | ADVOGADOS

BARBOSA, MÜSSNICH & ARAGÃO

*Debêntures, nos termos da Escritura de Emissão de Debêntures;"*

219.     Por que o Poder Judiciário, ora representado por este E.TJRJ, não asseguraria que, antes de ser ratificada a operação potencialmente ilegal – V.Sas. hão de convir que os argumentos dos AGRAVANTES são, para dizer o mínimo, muitíssimo plausíveis e merecem profunda análise mediante o efeito devolutivo a esta Corte –, a questão seria debatida com afinco neste foro?

220.     Por outro lado, o efeito suspensivo não traria qualquer prejuízo para as RECUPERANDAS, pois grande parte do dinheiro decorrente do FINANCIAMENTO DIP já ingressou na companhia com a subscrição das DEBÊNTURES 1ª SÉRIE. Com a contratação do empréstimo adicional de mais de US$ 70 milhões, como comprovado acima, também já foi adiantada para o GRUPO OGX grande parte dos valores que seriam investidos via DEBÊNTURES 2ª SÉRIE.

221.     Ou seja, inexiste a chamada deficiência de caixa, nem, portanto, prejuízo para as RECUPERANDAS, sendo relevante notar, inclusive, que a OGX Participações voltou a operar com lucro (de R$ 213 milhões) no primeiro trimestre de 2014, conforme amplamente noticiado na imprensa[51].

.V.

**PEDIDOS**

222.     Ante o exposto, os AGRAVANTES requerem:

(i)     a atribuição de efeito suspensivo, nos termos do artigo 527, III, do CPC, obstando o prosseguimento da RECUPERAÇÃO JUDICIAL para suspender a validade dos PLANOS APROVADOS até a análise final do presente recurso, comunicando-se o juízo *a quo* imediatamente;

(ii)     ao final, seja dado provimento ao recurso para reformar a decisão

---

[51]     Conforme, a título de exemplo, notícia do portal Exame disponível em <http://exame.abril.com.br/negocios/noticias/oleo-e-gas-tem-lucro-liquido-de-r-213-mi-no-1o-tri>, acessada em 7.7.2014.

BRASÍLIA
Setor Comercial Sul, Qd 1, Bl. F,
e 30 - 7  andor | 70397-900
t + 55 61 3218-0300
f + 55 61 3218-0349

RIO DE JANEIRO
Av. Almirante Barroso, 52,
31  andar | 20031-000
t + 55 21 3824-5800
f + 55 21 2262-5536

SÃO PAULO
Av. Pres. Juscelino Kubitschek,
1455 - 10  andar | 04543-011
t + 55 11 2179-4600
f + 55 11 2179-4597



**BM&A** ADVOGADOS
BARBOSA, MÜSSNICH & ARAGÃO

agravada, declarando-se a nulidade das AGCs e dos PLANOS APROVADOS, e determinando-se que as RECUPERANDAS apresentem nova proposta de plano de recuperação, desta vez respeitando a legalidade e paridade entre credores com crédito de mesma classe e origem;

(iii)  subsidiariamente, e sem prejuízo da interposição dos recursos cabíveis, caso não se entenda pelo integral provimento, seja parcialmente provido o recurso para confirmar que todos os credores que se abstiveram ou não participaram das AGCs (e não apenas aqueles que votaram negativamente) não estão sujeitos às cláusulas de quitação e ratificação de atos existentes nos PRJ e seus respectivos anexos, bem como às condições fixadas para validação da *Put Option*;

(iv)  em qualquer caso, a expedição de ofício ao Ministério Público para opinar e apurar eventual e, em tese, ocorrência de ilícitos penais envolvendo as RECUPERANDAS e demais participantes de atos potencialmente ilegais, nos termos indicados neste recurso, inclusive a DIAMOND e a PERENCO.

Rio de Janeiro, 7 de julho de 2014.

Felipe Evaristo dos Santos Galea
OAB/SP nº 220.280

Thomaz Luiz Sant' Ana
OAB/SP nº 235.250

Rafael Castilho
OAB/RJ nº 130.641

Igor Silva de Lima
OAB/SP nº 281.482

Matheus Barcelos
OAB/RJ nº 163.297

Gustavo dos Reis Leitão
OAB/SP nº 344.763

TRIBUNAL DE JUSTIÇA DO ESTADO
...

À Sra ... ... ... que
está ... ... ... ... ginal.

03/07/14   Rosane Rosalvo Santos
Data          Secretária da 14ª Câm. Cível
              Matr. 01/26.887

86

TRIBUNAL DE JUSTIÇA DO ESTADO DO RIO DE JANEIRO
DÉCIMA QUARTA CÂMARA CÍVEL
AGRAVO DE INSTRUMENTO N.º 0033122-14.2014.8.19.0000
AGRAVANTES: AUTONOMY MASTER DUND LIMITED E OUTRAS
AGRAVADAS: OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A. EM RECUPERAÇÃO JUDICIAL,
OGX PETRÓLEO E GÁS S/A. EM RECUPERAÇÃO JUDICIAL, OGX INTERNATIONAL GMBH
EM RECUPERAÇÃO JUDICIAL e OGX ÁUSTRIA GMBH EM RECUPERAÇÃO JUDICIAL.
RELATOR: DESEMBARGADOR GILBERTO CAMPISTA GUARINO

DECISÃO

Vistos, etc...

01. Tem-se agravo de instrumento da **decisão de fls. 7891 a**
7907 (paginação dos autos do processo originário), proferida pelo MM. Juiz
de Direito da 4ª Vara Empresarial da Comarca da Capital, **que**, nos autos
do procedimento de recuperação judicial do ex-GRUPO OGX, **homologou** o
plano recuperatório que foi aprovado na assembleia geral de credores
levada a cabo aos 03/6/2014.

02. Em sua minuta (fls. 02 a 80), a AUTONOMY MASTER
FUND LIMITED e OUTRAS afirmam que são credoras das sociedades
recuperandas, aduzindo que detêm *bonds* que, aditados, somam a quantia
de US$ 288.421.000,00 (duzentos e oitenta e oito milhões e quatrocentos e
vinte e um mil dólares).

03. Alegam, em suma, que as agravadas conferiram privilégios
inaceitáveis a uma parcela de *bondholders majoritários*, em detrimento de
outros, para o fim de obterem, sem maiores percalços, a aprovação do
plano de recuperação judicial, por isso que destacam violação ao princípio
da igualdade de credores *(par conditio creditorum)*.

04. Salientam que *"(...) foram basicamente os únicos a se
pronunciarem nas AGCs, apesar do enorme porte da dívida global,
fazendo suas principais objeções e sugestões de modificação dos PRJ,*



TRIBUNAL DE JUSTIÇA DO ESTADO
DO RIO DE JANEIRO

A Secretaria da 14ª Câmara Cível certifica que
este documento confere com o original.
Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
Mat. 01/26-887

28/07/14
Data          Nome          Matrícula

*mas foram novamente ignorados pelas RECUPERANDAS, que se negaram a discutir propostas, seguidas pelos futuros controladores da OGX REESTRUTURADA, os BONDHOLDERS MAJORITÁRIOS.*"
(Literalmente, fls. 18/9).

05. Aduzem ter existido manipulação do resultado assemblear, porque não teria sido ali caracterizada a legítima vontade da massa de credores, o que o tornaria passível de anulação. Apontam, ainda, ilegalidades nas cláusulas do plano recuperatório (concessão de privilégios aos *bondholders* majoritários desconsideração das suas objeções ao plano de recuperação.

06. Assim, querem a concessão do efeito suspensivo da decisão, a fim de impedir o prosseguimento da recuperação judicial.

BREVEMENTE RELATADOS, DECIDO.

06. Não se vislumbram, em juízo de cognição sumária, a convergência dos requisitos de plausibilidade das alegações iniciais, nem o fundado receio de dano irreparável ou de difícil reparação, que ensejariam a concessão do efeito suspensivo da decisão.

07. Isto porque, ponderando-se os interesses em conflito, quais sejam, a viabilidade da recuperação judicial do GRUPO OGX e o alegado tratamento diferenciado a determinados credores (*bondholders* majoritários), que são responsáveis pela concessão de linhas de crédito à recuperanda e essenciais para o seu soerguimento, há de prevalecer o princípio da preservação da empresa, garantindo-lhe a função social e o estímulo à atividade econômica, ao menos em *summaria cognitio.*

08. E, observando-se os termos da decisão agravada, tem-se por preenchidos os requisitos legais atinentes ao ato de convocação para a assembleia geral de credores e, sobretudo, atingido *quorum* superior ao



TRIBUNAL DE JUSTIÇA DO ESTADO
DO RIO DE JANEIRO

A Secretaria da 14ª Câmara Cível certifica que
este documento confere com o original.

23/01/14
Data

Rosane Rosalvo Santos
Secretária da 14ª Câmara Cível
Matr. 01/26.887

exigido para a aprovação do plano recuperatório, devendo ser registrado que:

> "No primeiro cenário, com a exclusão de todos os credores *bondholders*, a votação por credor para a aprovação do plano de recuperação da empresa foi de 91,04% e de 90,20% na votação por crédito. 2 – No segundo cenário, com a exclusão dos credores *bondholders* que aderiram à primeira tranche, a votação por credor para a aprovação do plano de recuperação da empresa foi de 77,98% e de 85,23% na votação por crédito."

09. Saliente-se que a vontade majoritária dos credores (contra os cerca de 10% que representam os agravantes) expressa benefício não meramente individual, mas, principalmente, social, já que se trata de um procedimento sem precedentes no cenário nacional e envolve questões além da esfera puramente jurídica.

10. E, no tocante ao princípio da isonomia entre credores, merece destaque a figura do credor estratégico, também conhecido como "amigo ou parceiro", que assume risco maior e aposta na recuperação da empresa, beneficiando direta e indiretamente todos os demais, por isso que costuma ter tratamento diferenciado e gozar de certos benefícios, que, na hipótese, não se mostram *prima facie* abusivos, nem ofensivos ao mencionado princípio.

11. A respeito do tema, confira-se o estudo de FÁBIO ULHOA COELHO, em "O credor colaborativo na recuperação judicial" (*In* TOLEDO, P.F.C.S. e SÁTIRO, F. "Direito das Empresas em Crise: problemas e soluções". São Paulo: *Quartier Latin*, 2012, pp. 113 – 1115):

> "Exatamente em função da importância reservada pela lei às medidas de saneamento da crise em empresas de porte significativo, aqueles agentes econômicos que colaboram para o sucesso da tentativa acabam recebendo, em contrapartida à sua colaboração, justo tratamento benéfico. Entre os agentes econômicos que colaboram para que a tentativa de saneamento da empresa em crise possa ser bem sucedida, avulta, sem dúvida, aquele que



TRIBUNAL DE JUSTIÇA DO ESTADO
DO RIO DE JANEIRO

A Secretária da 14ª Câm. Cível certifica que
este documento confere com o original.

28 /07/14          Rosane Rosalvo Santos
Data              Secretária da 14ª Câm. Cível
                  Matr. 01/26.881    Matrícula



89

concorda em conceder-lhe crédito, a despeito do risco de recuperação agravado. Se, neste cenário de total carência de crédito ou outras formas de apoio, alguém concorda em ajudar o empresário em dificuldades, ele está agindo de modo diametralmente oposto ao da generalidade dos demais agentes econômicos; e, no mínimo, pondo ao lado momentaneamente seus interesses imediatos, por acreditar que aquele gesto será decisivo para a recuperação da empresa do devedor e posterior satisfação da dívida.

Deve-se atentar para a singularidade do gesto do credor colaborativo em razão de sua importância crucial para a tentativa de superação da crise naquela empresa - que interessa, muitas vezes, à própria economia local, regional ou nacional. Pode-se afirmar, sem receio algum de exagerar no dimensionamento dessa importância, que o credor colaborativo costuma ser a derradeira chance de se conformar a falência. O credor colaborativo assume um risco anormal, sensivelmente mais agravado do que o assumido pela generalidade dos concedentes de crédito que operam no mesmo segmento de mercado. Estando o tomador do crédito em sabido estado de crise, a probabilidade de inadimplência é muito elevada. Claro que o credor colaborativo aposta fortemente, ao contrário dos demais agentes, na superação da crise pelo devedor ou em alguma forma de recuperação de seu crédito. O credor colaborativo continua a ser um empresário em busca de lucro: se assume risco maior, é porque elabora cálculos mais ousados, não porque abdicou de sua essência capitalista. Mas, independentemente dos motivos que o animam, o credor colaborativo, ao assumir risco agravado, acaba adotando conduta que atende à gama dos interesses metaindividuais que gravitam em torno da continuidade da atividade econômica."

12. Por fim, é preciso dizer que dano irreparável ou de difícil reparação existiria, na realidade, se fosse suspensa a eficácia da decisão agravada, pois isso impediria a captação de novos recursos e, em consequência, inviabilizaria o cumprimento das obrigações da devedora para com os seus credores. Nada se salvaria, nem mesmo o afirmado direito que os agravantes querem, via recurso, ver protegido.

13. **Tudo bem ponderado**, indefiro o efeito suspensivo postulado.



TRIBUNAL DE JUST~~~~~~ ESTADO
DO RIO ~~~~~~
À Secretária ~~~~~~ ~~~~~~ que
este despacho ~~~~~~ ~~~~~~ nal.

~~~~~~
Data

Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
~~~~~~ Matr. 01/26.889 ~~~~~~

14. Oficie-se, **de ordem**, com o teor da presente, requisitando-se informações.

15. Em seguida, às agravadas e, após, à douta Procuradoria de Justiça.

16. Tudo cumprido, conclusos para julgamento.

Rio de Janeiro, 14 de julho de 2014.

Desembargador GILBERTO GUARINO

Relator







MINISTÉRIO PÚBLICO DO ESTADO DO RIO DE JANEIRO

TRIBUNAL DE JUSTIÇA DO ESTADO DO RIO DE JANEIRO
DÉCIMA QUARTA CÂMARA CÍVEL

AGRAVO DE INSTRUMENTO N. 0033122-14.2014.8.19.0000
RELATOR: DESEMBARGADOR GILBERTO GUARINO

AGRAVANTES: AUTONOMY MASTER FUND LIMITED EOUTRAS
AGRAVADAS: OGX PETRÓLEO E GÁS PARTICIPAÇÕES S/A; OGX PETRÓLEO
E GÁS S/A; OGX INTERNACIONAL GMBH E OGX ÁUSTRIA GMBH
AÇÃO DE RECUPERAÇÃO JUDICIAL
ORIGEM: QUARTA VARA EMPRESARIAL DA COMARCA DA CAPITAL

TRIBUNAL DE JUSTIÇA DO ESTADO
DO RIO DE JANEIRO

A Secretaria da 14ª
este docu...

Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
Matr. 01/26.887
Data

**EXCELENTÍSSIMO SENHOR DESEMBARGADOR RELATOR,
EGRÉGIA CÂMARA.**

Trata-se de agravo de instrumento, com pedido de efeito
suspensivo, interposto às fls. 02/80 (doc. 00002), por AUTONOMY
MASTER FUND LIMITED; BRENNUS FUND LP; CLAREN ROAD CREDIT
MASTER FUND LTD; CLAREN ROAD CREDIT OPPORTUNITIES
MASTER FUND LTD; ASPEN CREEK PARTNERS LP; ANDROMEDA
GLOBAL CREDIT FUND LTD; LYXOR ANDROMEDA GLOBAL CREDIT
FUND LTD; EDMOND DE ROTHSCHILD EMERGING BONDS; FIRENZE
CORPORATE INC; FIRST GENEVA HIGH YIELD FUND; GAM TRADING
N 37 INC; RICARDO AUGUSTO GALLO; GLG EUROPEAN DISTRESSED
MASTER FUND; GLG EUROPEAN DISTRESSED FUND; GLG MARKET
NEUTRAL FUND; EUROPEAN DISTRESSEF MAC LIMITED; CROWN
MANAGED ACCOUNTS SPC; ITAVA INC; BRAX FUND; BNYM BRAZIL
INTERNATIONAL FUND SPC ON BEHALF OF JGP OFFSHORE
SEGREGATED PORTFOLIO; JEAN-JACQUES DURAND; NOVEL
CAPITAL GROUP LIMITED; QUAKER EVENT ARBITRAGE FUND;
SHAHRIAR SHAHIDA; SUSQUEHANNA IRELAND LIMITED; CAPITAL
VENTURES INTERNATIONAL E VR GLOBAL PARTNERS LP contra a r.
decisão que consta de fls. 7891/7907 (doc. 01710 do Anexo I), concessiva
da recuperação judicial de OGX PETRÓLEO E GÁS PARTICIPAÇÕES
S/A, OGX PETRÓLEO E GÁS S/A, OGX INTERNACIONAL GMBH E OGX
ÁUSTRIA GMBH HSBC CTVM S/A, cujo plano foi aprovado na assembleia
de credores realizada em 03/06/2014.

Ministério Público do Estado do Rio de Janeiro
1ª Procuradoria de Justiça junto à 14ª. Câmara Cível do TJRJ
Agravo de Instrumento n. 0033122-14.2014.8.19.0000                    Página 1

 

MINISTÉRIO PÚBLICO DO ESTADO DO RIO DE JANEIRO

O Excelentíssimo Desembargador Relator proferiu a r. decisão de fls. 86/90 (doc. 00086), indeferindo o efeito suspensivo postulado, requisitando informações e determinando a intimação das agravadas e, após, da Procuradoria de Justiça.

Contudo, não se vislumbra, s.m.j., certidão acerca da prestação das informações requisitadas (Doc. 091), bem como acerca do oferecimento de contrarrazões ou do decurso do prazo para a oferta de resposta pelas empresas agravadas.

Dessa forma, requer o MINISTÉRIO PÚBLICO o suprimento das falhas processuais mediante a juntada das eventuais informações prestadas pelo MM. Juízo a *quo*, bem como das eventuais contrarrazões ou de certidão acerca do decurso do prazo para o oferecimento de resposta pelas agravadas.

Após, **protesta esta Procuradoria de Justiça por nova vista** para o oferecimento do seu necessário parecer, na forma do disposto no artigo 83, inciso I, do Código de Processo Civil.

Rio de Janeiro, 17 de julho de 2014.

Ida Maria Moulin Aledi Monteiro
Procuradora de Justiça
1ª. Procuradoria de Justiça junto à 14ª. Câmara Cível do TJRJ

TRIBUNAL DE JUSTIÇA DO ESTADO
DO RIO DE JANEIRO
A Secretaria da 14ª ............ certifica que este documento ......... o original.

28/0?/14
Data

Rosane Rosalvo Santos
Secretária da 14ª Câm. Cível
Matrícula
.. Matr. 01/26.82?

Ministério Público do Estado do Rio de Janeiro
1ª. Procuradoria de Justiça junto à 14ª. Câmara Cível do TJRJ
Agravo de Instrumento n. 0033122-14.2014.8.19.0000                    Página 2

MINISTÉRIO DAS RELAÇÕES EXTERIORES
Subsecretaria-Geral das Comunidades Brasileiras no Exterior
Setor de Legalizações e Rede Consular Estrangeira - SLRC
Cópia autenticada em serviço notarial/de registro

2 9 JUL 2014

☐ Liana Lustosa Leal Musy - Primeira Secretária
☐ Andrea Prado Dialloski - Oficial de Chancelaria
☐ Renato Águeda Nogueira da Silva - Oficial da Chancelaria
☐ Ana Carolina Afonso Valladares - Oficial de Chancelaria
☐ Elienildo Vidal de Negredo - Assistente de Chancelaria
☒ Marilda de Andrade Figueira - Assistente de Chancelaria