COMPOSITE EXHIBIT NO. 1 - PART 7

# EXHIBIT B

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040 CA 43

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

          Plaintiffs,

v.

EIKE BATISTA, *et al.*,

          Defendants.

_____/

## AFFIDAVIT OF JOSÉ ROGÉRIO CRUZ E TUCCI

    I, José Rogério Cruz e Tucci, of São Paulo, Brazil, declare as follows under oath:

1.    I am a lawyer qualified and practicing under Brazilian Law. I graduated in law at the University of São Paulo in 1978 and I obtained a Master's degree in 1986, same year that I was granted a Doctor's degree from the University of Rome "La Sapienza", Italy. At the Law School of the University of São Paulo, I have been a Professor of civil procedure since 1988, a Full Professor since 2006 and the Dean since 2014.

2.    I have nearly 40 years of experience in the fields of civil/commercial litigation and dispute resolution, and I specialize in commercial litigation, including cases on insolvency. I have testified as an expert in several proceedings in Brazil and in the United States.

3.    I am a partner of the law firm Tucci Advogados Associados. The firm was established in 1996. Our office is located in São Paulo. Our main practice is assisting clients on domestic and international litigation and arbitration, including bankruptcy and debt restructuring procedures.

4.    A true and correct copy of my curriculum vitae is attached hereto as Exhibit 1.

5.    I have been retained by Centennial Asset Mining Fund LLC and Centennial Asset Brazilian Equity Fund LLC to provide a legal opinion regarding certain substantive and procedural issues related to bankruptcy proceedings in Brazil.



6.      Specifically, I was asked to opine on (1) whether the release granted in the Reorganization Plan of OGX Petróleo e Gás S.A. was extensive enough to comprise claims of alleged fraud that occurred before or during the reorganization lawsuit; (2) whether the release set forth in Clause 13.5 of the Reorganization Plan is extensive enough to include claims of creditors against all parties listed on the above-mentioned Clause 13.5 (*i.e.*, stockholders, affiliates and any other entities apart from the company being reorganized); and (3) whether creditors can question the validity of the release clause (Clause 13.5 of the Reorganization Plan) before the Brazilian Judicial Branch.

7.      A true and correct copy of my legal opinion is attached hereto as Exhibit 2 (the "Legal Opinion").

8.      The Legal Opinion is based on the information provided to me, including the Fact Affidavit of Marcelo Lamego Carpenter, related to the Reorganization Plan of OGX Petróleo e Gás S.A., and my personal knowledge as to Brazilian law.

## VERIFICATION

**UNDER PENALTIES OF PERJURY OF THE LAWS OF FLORIDA, PURSUANT TO SECTION 92.525, FLORIDA STATUTES, AND THE UNITED STATES, I DECLARE THAT I HAVE READ THE FOREGOING DECLARATION AND THAT THE FACTS STATED HEREIN ARE TRUE AND CORRECT.**

**Executed in São Paulo, Brazil, this 4th day of April, 2017.**

José Rogério Cruz e Tucci

2

Exhibit 1

José Rogério Cruz e Tucci
Full Professor of USP Law School

---

## "*CURRICULUM VITAE*"

(Summarized)

**Date of Birth**: August 17, 1956

**Location**: Mogi-Mirim – State of São Paulo

**Parents**: Rogério Lauria Tucci and Therezinha dos S. C. Tucci

**Domicile**: Al. Franca, n. 801, 22° andar - 01422-001 ⁻ J. Paulista - São Paulo

**Office**: Al. Santos, n. 787, 4° andar – conj. 41 - 01419-001 – J. Paulista - São Paulo

**tucci@usp.br   -   joserogerio@tucci.adv.br**

**Higher education**: Bachelor's Degree in Law from FADUSP - 1978

Practicing attorney - Former President of the Bar Association of São Paulo - AASP (1998-1999)

**University Career**:

*a)* PhD in Law from the University of Rome Law School, on June 28, 1982 – degree revalidated at USP on June 30, 1986

*b*) Master's Degree in Law from FADUSP, received on May 23, 1986

*c*) Faculty Member of FADUSP, approved after competitive examination held on November 24 to 27, 1987

*d*) Full Professor of FADUSP, approved after competitive examination held on August 28 and 29, 2006

*e*) Director of FADUSP, 2014/2017

*f*) Member of the Procedural Law Department Council of FADUSP since April 20, 1988

*g*) Former President of the Graduate Commission of FADUSP from October 1998 to September 2002

*h*) Member of the International Association of Procedural Law

*i*) Member of the Brazilian Academy of Legal Language and Literature

*j*) *Ad hoc* Advisor to FAPESP

Full Professor at the Law School of the University of São Paulo, Senior Professor of *Civil Procedure Law* (since 1988), in the Undergraduate Course; *History of Roman, Canon and Portuguese Civil Procedure* (since 1989) and *Object of litigation in Civil Procedure* (since 1999), in the Graduate Course.

**Works published** (principal books):

*a*) **L'ordinamento giudiziario e le impugnazioni nella legislazione di Costantino il Grande (306-337 A.D.)**, thesis, Rome, 1982

*b*) **Contribuição ao estudo histórico do direito processual penal**, (Contribution to the historical study of criminal procedure law) Rio de Janeiro, Forense, 1983

*c*) **Da reconvenção**, (Counterclaims) São Paulo, Saraiva, 1984

*d*) **Jurisdição e poder**, (Jurisdiction and power) São Paulo, Saraiva, 1986

*e*) **A motivação da sentença no processo civil**, (Grounds of decisions in civil procedure) São Paulo, Saraiva, 1987

*f*) **Desistência da ação**, (Abandonment of the action) São Paulo, Saraiva, 1987

*g*) **Constituição Federal de 1988 e processo** - *regramentos e garantias constitucionais do processo*, (Federal Constitution of 1988 and procedure – constitutional rules and guarantees) São Paulo, Saraiva, 1989 (co-authored with Prof. ROGÉRIO LAURIA TUCCI)

*h*) **Temas polêmicos de processo civil** (coletânea de artigos), (Controversial topics in civil Procedure (collection of articles)) São Paulo, Saraiva, 1990

*i*) **"Class action" e mandado de segurança coletivo**: **diversificações conceptuais**, (Class action and collective writ of mandamus: conceptual diversifications) São Paulo, Saraiva, 1990

*j*) **Devido processo legal e tutela jurisdicional**, (Due process and jurisdictional relief) São Paulo, Ed. RT, 1993 (co-authored with Prof. ROGÉRIO LAURIA TUCCI)

*k*) **A "causa petendi" no processo civil**, (Cause of action in civil procedure) São Paulo, Ed. RT, 1993; 2nd ed., 2001

*l*) **Processo civil, realidade e justiça**, (Civil procedure, reality and justice) São Paulo, Saraiva, 1994

*m*) **Ação monitória**, (Action on a non-executory written instrument) (São Paulo, Ed. RT, 1st ed., 1995; 2nd ed., 1997; 3rd ed., 2001

*n)* **Lições de história do processo civil romano**, (Historical lessons on Roman civil procedure) São Paulo, Ed. RT, 1996 (co-authored with Prof. LUIZ CARLOS DE AZEVEDO)

*o*) **Questões práticas de processo civil**, (Practical questions of civil procedure) São Paulo, Atlas, 1997; 2nd ed., 1998

*p*) **Tempo e processo - uma análise empírica das repercussões do tempo na fenomenologia processual (civil e penal)**, (Time and procedure – an empirical analysis of the repercussions of time on procedural phenomenology (civil and criminal)) São Paulo, Ed. RT, 1998

*q)* **Lições de história do processo civil canônico,** (Historical lessons on canon civil procedure) São Paulo, Ed. RT, 2001 (co-authored with Prof. LUIZ CARLOS DE AZEVEDO)

*r*) **Causa de pedir e pedido (questões polêmicas),** (Cause of action and claim (controversial matters)) (collection- co-coordinated with Prof. JOSÉ ROBERTO DOS SANTOS BEDAQUE), São Paulo, Ed. RT, 2002

*s*) **Lineamentos da nova reforma do CPC,** (Outlines of the new reform of the Code of Civil Procedure) São Paulo, Ed. RT, 1st ed., 2002; 2nd ed., 2002

*t*) **Perspectiva histórica do precedente judicial como fonte do direito**, (Historical perspective on judicial precedent as a source of law) São Paulo, Ed. RT, 2003

*u*) **Limites subjetivos da eficácia da sentença e da coisa julgada civil**, (Subjective limits on the efficacy of judgments and of civil *res judicata*) São Paulo, Ed. RT, 2006

*v*) **Lições de história do processo civil lusitano**, (Historical lessons on Portuguese civil procedure) São Paulo, Ed. RT, 2009 (co-authored with Prof. LUIZ CARLOS DE AZEVEDO)

x) **O advogado, a jurisprudência e outros temas de processo civil**, (Attorneys, jurisprudence, and other topics in civil procedure) São Paulo, Quartier Latin, 2010.

y) **Piero Calamandrei: vida e obra – Contribuição para o estudo do processo civil**, (Piero Calamandrei: life and work – Contribution to the study of civil procedure) São Paulo, Migalhas, 2012.

z) **Comentários ao Código de Processo Civil**, (Comments on the Civil Procedure Code) vol. 8, São Paulo, Saraiva, 2016.

#) **Comentários ao Código de Processo Civil**, (Comments on the Civil Procedure Code) vol. 7, São Paulo, Ed. RT, 2016.

São Paulo, March 2017
*J. R. Cruz e Tucci*



STATE of NEW YORK        )
                         )              ss:
COUNTY of NEW YORK       )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"2017.03.27 - curriculum vitae - José Rogério Cruz e Tucci"* originally written in *Portuguese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: April 5, 2017

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
5ᵗʰ day of April,
2017

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires December 4, 2018

Your
legal
translation
partner

José Rogério Cruz e Tucci
Professor Titular da Faculdade de Direito da USP

---

"*CURRICULUM VITAE*"

(breve)

**Data do nascimento**: 17 de agosto de 1956

**Local**: Mogi-Mirim - Estado de São Paulo

**Filiação**: Rogério Lauria Tucci e Therezinha dos S. C. Tucci

**Domicílio**: Al. Franca, n. 801, 22º andar - 01422-001 - J. Paulista - São Paulo

**Escritório**: Al. Santos, n. 787, 4º andar – conj. 41 - 01419-001 – J. Paulista - São Paulo

**tucci@usp.br - joserogerio@tucci.adv.br**

**Curso superior**: Bacharel em Direito pela FADUSP - 1978

Advogado militante - ex-Presidente da Associação dos Advogados de São Paulo - AASP (1998-1999)

**Carreira Universitária**:

*a)* Doutor em Direito pela Faculdade de Direito da Universidade de Roma, em 28 de junho de 1982 - título revalidado junto a USP, em 30 de junho de 1986

*b*) Mestre em Direito pela FADUSP, em 23 de maio de 1986

*c*) Livre-docente pela FADUSP, em concurso a que se submeteu entre 24 a 27 de novembro de 1987

*d*) Professor Titular da FADUSP, em concurso a que se submeteu nos dias 28 e 29 de agosto de 2006

*e*) Diretor da FADUSP, 2014/2017

*f*) Membro do Conselho do Departamento de Direito Processual da FADUSP desde 20 de abril de 1988

*g*) Ex-Presidente da Comissão de Pós-Graduação da FADUSP de outubro de 1998 a setembro de 2002

*h*) Membro efetivo da International Association of Procedural Law

*i*) Membro da Academia Brasileira de Letras Jurídicas

*j*) Assessor *ad hoc* da FAPESP

Na Faculdade de Direito da Universidade de São Paulo é Professor Titular, regente das disciplinas *Direito Processual Civil* (desde 1988), no Curso de Graduação; *História do Processo Civil Romano, Canônico e Lusitano* (desde 1989) e *Objeto litigioso do processo civil* (desde 1999), no Curso de Pós-Graduação.

**Obras publicadas** (principais livros):

*a*) ***L'ordinamento giudiziario e le impugnazioni nella legislazione di Costantino il Grande (306-337 d.C.)***, tese, Roma, 1982

*b*) ***Contribuição ao estudo histórico do direito processual penal***, Rio de Janeiro, Forense, 1983

*c*) ***Da reconvenção***, São Paulo, Saraiva, 1984

*d*) ***Jurisdição e poder***, São Paulo, Saraiva, 1986

*e*) ***A motivação da sentença no processo civil***, São Paulo, Saraiva, 1987

*f*) ***Desistência da ação***, São Paulo, Saraiva, 1987

*g*) ***Constituição Federal de 1988 e processo*** - *regramentos e garantias constitucionais do processo*, São Paulo, Saraiva, 1989 (em co-autoria com o Prof. ROGÉRIO LAURIA TUCCI)

*h*) ***Temas polêmicos de processo civil*** (coletânea de artigos), São Paulo, Saraiva, 1990

*i*) ***"Class action" e mandado de segurança coletivo***: *diversificações conceptuais*, São Paulo, Saraiva, 1990

*j*) ***Devido processo legal e tutela jurisdicional***, São Paulo, Ed. RT,1993 (em co-autoria com o Prof. ROGÉRIO LAURIA TUCCI)

*k*) ***A "causa petendi" no processo civil***, São Paulo, Ed. RT, 1993; 2ª ed., 2001

*l*) ***Processo civil, realidade e justiça***, São Paulo, Saraiva, 1994

*m*) ***Ação monitória***, São Paulo, Ed. RT, 1ª ed., 1995; 2ª ed., 1997; 3ª ed., 2001

*n) **Lições de história do processo civil romano***, São Paulo, Ed. RT, 1996 (em co-autoria com o Prof. LUIZ CARLOS DE AZEVEDO)

*o*) ***Questões práticas de processo civil***, São Paulo, Atlas, 1997; 2ª ed., 1998

*p*) ***Tempo e processo - uma análise empírica das repercussões do tempo na fenomenologia processual (civil e penal)***, São Paulo, Ed. RT, 1998

_____

*q) Lições de história do processo civil canônico*, São Paulo, Ed. RT, 2001 (em co-autoria com o Prof. LUIZ CARLOS DE AZEVEDO)

*r*) *Causa de pedir e pedido (questões polêmicas)* (coletânea - co-coordenação com o Prof. JOSÉ ROBERTO DOS SANTOS BEDAQUE), São Paulo, Ed. RT, 2002

*s*) *Lineamentos da nova reforma do CPC*, São Paulo, Ed. RT, 1ª ed., 2002; 2ª ed., 2002

*t*) *Perspectiva histórica do precedente judicial como fonte do direito*, São Paulo, Ed. RT, 2003

*u*) *Limites subjetivos da eficácia da sentença e da coisa julgada civil*, São Paulo, Ed. RT, 2006

*v*) *Lições de história do processo civil lusitano*, São Paulo, Ed. RT, 2009 (em co-autoria com o Prof. LUIZ CARLOS DE AZEVEDO)

x) *O advogado, a jurisprudência e outros temas de processo civil*, São Paulo, Quartier Latin, 2010.

y) *Piero Calamandrei: vida e obra – Contribuição para o estudo do processo civil*, São Paulo, Migalhas, 2012.

z) *Comentários ao Código de Processo Civil*, vol. 8, São Paulo, Saraiva, 2016.

#) *Comentários ao Código de Processo Civil*, vol. 7, São Paulo, Ed. RT, 2016.


São Paulo, março de 2017.


*J. R. Cruz e Tucci*

Exhibit 2

**José Rogério Cruz e Tucci**
Full Professor at the Law School at University of São Paulo

_____

> *reorganization plan - court's exclusive jurisdiction for reorganization - vis*
> *attractiva- prevention - fraud allegations - estoppel - novation*
> *of obligations - release clause - suit for annulment*
> *must be filed.*

## *I N Q U I R Y*

I am honored to be consulted by clients
**CENTENNIAL ASSET MINING FUND LLC and CENTENNIAL ASSET
BRAZILIAN EQUITY FUND LLC,** through their illustrious
counsel, FLAVIO GALDINO, partner at the prestigious firm of
Galdino Coelho Mendes Advogados, regarding substantive and
procedural issues in the lawsuit filed by MERIDIAN TRUST
COMPANY LTD and AMERICAN ASSOCIATED GROUP LTD in Florida,
United States of America, against Mr. EIKE FUHRKEN BATISTA
et al.

07467-00001/9145210.1

A L A M E D A   S A N T O S ,   7 8 7 ,   4 º   A N D A R   -   C O N J .   4 1   -   S Ã O   P A U L O   –   S P
0 1 4 1 9 - 0 0 1   –   T E L . :   5 5 - 1 1 - 3 1 7 0 - 3 4 5 0   -   w w w . t u c c i . a d v . b r

The facts were explained, briefly but adequately, with the presentation of the inquiry and display of copies of the documents seen as relevant and then, the following corresponding questions were asked:

"...Thus, considering the described facts and procedural issues that have been raised, we request an opinion, based on an analysis of the following questions:

1) Is the release granted in the Reorganization Plan of OGX Petróleo e Gás S/A extensive enough to comprise claims of alleged fraud occurred before or during the reorganization lawsuit?

2) Is the release set forth in Clause 13.5 of the Reorganization Plan extensive enough to include claims of creditors against all parties listed on the above-mentioned Clause 13.5 (i.e., stockholders, affiliates and any other entities apart from the company being reorganized)?

3) Can the creditors question the validity of the release clause (Clause 13.5 of the Reorganization Plan) before the Brazilian Judicial Branch?

We await, therefore, your opinion regarding these questions and thank you for your attention to this matter."

Considering the questions, I conclude that the Clients intend, with this *opinion*, to reinforce their conviction that the release granted to creditors in

OGX Petróleo E Gás S/A's reorganization is fully legal and valid.

Theoretically, it could only be annulled by a decision rendered in a lawsuit filed for this specific purpose, filed before the court that has jurisdiction.

As the questions devised by my illustrious colleague, the Client's counsel, are objective and specific, there is no need for long introductory commentary. Accordingly, I now will analyze the questions with the required reflection and effectiveness to, in the following conclusion, provide their answer.

José Rogério Cruz e Tucci
Full Professor at the Law School at University of São Paulo

---

## *O P I N I O N*

"Il tribunale fallimentare, oltre che essere investito quale organo dell'esecuzione forzata della procedura fallimentare, è poi competente come *autorità giudiziaria di cognizione* delle cause che derivano dal fallimento. Si suole dire che il fallimento esercita una *vis attractiva* delle cause predette: in realtà si ha qui per ragioni di convenienza l'attribuizione al tribunale fallimentare di una competenza cogni-toria funzionale e quindi assoluta" (FRANCESCO FERRARA, *Il fallimento*, 2ª ed., Milano, Giuffrè, 1966, pág. 226).

**I - THE INQUIRY'S SUBSTANTIVE AND PROCEDURAL LAW VICISSITUDES**

**1.** *Concise introductory considerations*

Succinctly, what can be gleaned from the documentation sent for my perusal is that after a complex negotiation, the reorganization plan for OGX Petróleo e Gás S/A (OGX) was finally approved by a general meeting of the creditors on June 3, 2014.

The meeting's decision was confirmed by the 4th Business Court at the Venue of the Judicial District of the city of Rio de Janeiro/RJ *records no. 0377620-56.2013.8.19.0001*).

On December 3, 2014, after an interlocutory appeal was filed, the 14th Civil Chamber of the Rio de Janeiro State Court of Appeals confirmed the judicial decision that approved the reorganization plan for OGX, although abstained from declaring valid a clause by which the agent would not be liable for eventual loss on the sale of stock, and the ineffectiveness of the put option clause (11.1), against the creditors who abstained from voting or did not attend the meeting. (*Interlocutory Appeal no. 0039682-69.2014.8.19.0000*).

Another interlocutory appeal was filed against the same judicial decision and granted, in part, by the same 14th Civil Chamber of the Rio de Janeiro State Court of Appeals, to extend the ineffectiveness of clause 13.7 also to creditors who abstained from voting or who did not attend the general meeting of creditors (Interlocutory Appeal no. 0033122-14.2014.8.19.0000).

According to the information I received, the reorganization plan is still effective, and is being carried out satisfactorily.

Yet I was also told that an appeal was filed against the decision of the first interlocutory appeal

_____

(*Interlocutory Appeal within the Superior Court no.870.242-RJ*), which is pending judgment; its records aggregate appeals from OGX, the office of the public prosecutor of the state of Rio de Janeiro and a third appeal, filed by several creditors.

An appeal was also filed against the decision of the second above-mentioned interlocutory appeal, also an *Interlocutory Appeal within the Superior Court of Justice no. 757.183-RJ*, by other creditors, which is also pending judgment at the same court.

However, more recently, two OGX Austria bondholders filed a suit against Mr. EIKE FUHRKEN BATISTA and others, in Florida, USA, in which they demand the collection of part of the original debt, along with added damages, due to fraud allegedly committed by Mr. EIKE FUHRKEN BATISTA and others, in the years before the reorganization of the OGX Group, in an attempt to mislead creditors into purchasing bonds from the OGX Group.

The inquiry, therefore, intends to clarity, ultimately, that the reorganization plan is an insurmountable obstacle to the claims of the above suit, which could only proceed if an action for annulment were to be filed before the competent jurisdiction in Brazil.

**2.** *Purpose of the reorganization plan*

_____

---

Article 47 of Law 11.101/2005 sets forth that:

"The purpose of a reorganization is to create conditions to overturn the debtor's critical economic-financial situation, maintaining production, jobs and the interests of creditors, thus preserving the company, its legal public interest directive and incentives to the economy."

To reach this goal, the law, based on the famous American Bankruptcy Code reorganization in Chapter 11, requires, to allow the reinstatement of corporate activity, that the recovering company presents, within the deadlines set by article 53, what is known as a *reorganization plan*.

As FÁBIO ULHOA COELHO states,

"The most important document in a reorganization suit is, undoubtedly, the reorganization plan (or 'company reorganization plan')"(*Comentários à nova lei de falências e de recuperação de empresas*, 4ª ed., São Paulo, Saraiva, 2007, p. 158).

The purpose of the plan is to allow a company in financial distress to attempt, with as little social and economic damage as possible, to become competitive and productive in the market, once more.

Thus, the main purpose of the organization is to follow the plan and preserve, on the one hand, the economic activity and, on the other, the rights of the creditors.

JORGE LOBO notes that the plan is demanded by law to demonstrate to creditors and the court that the company's assets that are still in activity are not only more valuable than they would be if the company were liquidated, as their permanence is better for the various interests at play of employees, creditors, consumers and the public. (*Comentários à lei de recuperação de empresas e falência*, coord. Paulo F. C. Salles de Toledo e Carlos H. Abrão, 3ª ed., São Paulo, Saraiva, 2009, p. 163).

**3. _Jurisdiction rules in bankruptcy proceedings_**

On the other hand, it must be said that, as a general rule, the rule that establishes the jurisdiction based on the forum where the bankruptcy was originally filed tends to be similar to other jurisdictions.

So, for example, in Italian procedural law, EDOARDO RICCI (*Lezioni sul fallimento*, vol. 1, 2ª ed., Milano, Giuffrè, 1997, p. 322), says:

"La competenza Jurisdiction del tribunale fallimentare a decidere le controversi relative alla procedura è esclusiva e inderogabile".

In Brazilian law, traditionally, the court that has jurisdiction over the bankruptcy has jurisdiction over all related suits.

This classic rule, it can be said, was implicitly established by article 6, in particular in its paragraph 1, of law 11.101/2005.

It is, thus, the **vis attractiva**, or power of attraction, the main distinction of the bankruptcy court (WALDO FAZZIO JÚNIOR holds the same understanding in **Lei de falência e recuperação de empresas**, 5ª ed., São Paulo, Atlas, 2010, p. 59).

Consequently, it can be concluded that the bankruptcy court prevents **all** suits related to reorganization suit.

Modern precedents, when examining similar cases, have come to a uniform conclusion.

In the leading case for functional jurisdiction for the Brazilian Bankruptcy Act, the decision from the 2nd Section of the Superior Court of Justice in VARIG's case (*Conflict of Jurisdiction no. 61.272-RJ*), Justice ARI PARGENDLER's winning vote stated that

"Precedents related to Decree-Law no. 7.661 of 945 established that lawsuits filed against the bankruptcy estate

should be in the same jurisdiction of the bankruptcy, to ensure that all creditors would be receive the same treatment (*pars condicio creditorum* that is, of course, in accordance with privileges and order of priority)

*What, then,* of Law 11.101/2005? Albeit supported by a new law, the injunction granted in this case was based on the concept that suits against a company being reorganized must still be centralized under the State's jurisdiction, yet now for another reason: only the court that has jurisdiction over the reorganization can prevent the company from ruin..."

Likewise, and more recently, the Superior Court of Justice ratified yet again this position, when deciding the case *Conflict of Jurisdiction, no 133.079-DF*, Reporter Justice NANCY ANDRIGHI:

The Superior Court has established that, as a rule, a company's asset's destiny cannot be affected by decisions coming from a court other than the one with jurisdiction over the reorganization or bankruptcy proceedings, lest the company's operations are harmed, in violation of the principle of maintaining a company's integrity. Also, with the same understanding: CoJ 79170/SP, Reporter Justice Castro Meira, First District, DJe (Electronic Official Journal of Courts) 09/19/2008; and CoJ 106.798/RJ, Reporter Justice Luis Felipe Salomão, Second District, DJE 10/02/2009 In this case, the judicial sale ordered by the labor courts (pages 43 and following, electronic Superior Court of Justice)--in which there is risk of damages--encroaches on the jurisdiction of the reorganization

proceedings court, as it affects the assets of the company, which is unacceptable in accordance with the higher principle of mainlining a company's integrity.

Another decision, Conflict of Jurisdiction no. 144.470-RJ, also reported by Justice NANCY ANDRIGHI, holds the same understanding:

"The Superior Court of Justice **has settled the issue** and establishes that the reorganization proceedings court has jurisdiction over all suits in which there are interests and assets of the company, including foreclosure proceedings, **even in the case of credits existing before the reorganization was granted;** all must submit to the plan, lest the company's recovery is jeopardized."

There is no doubt, therefore, that this wise position of the courts shows that there will be no point in granting the reorganization, much less approving the plan, **if potential conflicts between the company in recovery and** its creditors can be adjudicated by different courts.

4. *Novation of obligations and release*

The novation of debts in the reorganization plan are another aspect that must also be considered.

Novation is a classic civil law concept, in which an existing obligation relationship can be substituted by a new one. The previous obligation is terminated, and only the new one remains, in accordance to article 384 of the Civil Code.

Novations in bankruptcy proceedings are peculiar, as they are conditional. The older obligation will be extinguished just the same, and replaced by a new one (article 59, Law no. 11.101/05), but under the condition that the reorganization plan is followed as it was meant to be.

In case of non-performance, the reorganization plan will be inexorably converted into a bankruptcy, and the original obligations will be restored, in accordance to art. 61, paragraph 2, of Law no. 11.101/05.

This is, as a rule, the understanding of the 3rd Panel of the Superior Court of Justice, as shown by the winning vote of Justice NANCY ANDRIGHI (*Appeal to the Superior Court of Justice no. 1.260.301-DF*):

> "However, novation within a reorganization plan is subject to a condition subsequent; article 61, Law 11.101/05 sets forth that infringing any of the obligations set forth in the plan will bring on the conversion of the reorganization into bankruptcy, and the creditors' rights and collateral will be reestablished under the same original conditions, deducting the amounts that might have been paid, and protecting whichever valid acts

practiced during the reorganization.

Therefore, once the reorganization plan is approved, the competent agencies must be notified and requested to remit the protests of negotiable instruments and remove from the list of delinquent debtors the name of the company and of its members, for debts covered in the plan, expressly save the condition subsequent, by which the debtor must follow through all obligations prescribed in the reorganization agreement.

Also, there is a vastly important rule regarding the release of new obligations. According to article 50, paragraph 1, of Law 11.101/05, the elimination or substitution of a collateral is binding to creditors who agreed to the reorganization plan.

To satisfy the rule provided in article 50, paragraph 1, of Law 11.101/05, the creditors have to only be aware of the general meeting of creditors; their express approval is not required. This is the Superior Court of Justice's understanding, in the very recent decision *Appeal to the Superior Court of Justice no. 1.532.943-MT*:

"As a result, even if the creditor has decided to not attend the meeting or, if present, abstaining from voting or voted, completely or in part, against approval of the plan, they must submit to its terms nonetheless. A different understanding would, obviously, make the plan impossible to achieve, which is against the purposes of reorganization proceedings.

One must recognize that removing security interests and personal guarantees, as prescribed by the reorganization plan approved by the general meeting of creditors as part of the negotiation binds all creditors who hold that collateral. Naturally, if the reorganization plan is not implemented as approved, "the creditors will have their rights are collateral reconstituted in the same original conditions" (article 61, paragraph 2, Law 11.101/2005)".

Therefore, if the creditor could have attended or sent a proxy to the meeting of creditors, the requirements for article 50, paragraph 1, Law 11.101/05 will have been fulfilled, and all decisions made in the meeting regarding collateral for the original obligations will be binding.

Release is the conventional and voluntary way to liberate a debtor from their obligation. Article 320 of the Civil Code lists its validity requirements, which are: "the amount and type of debt that has been paid, the name of the debtor or who paid for them, the time and place of payment, the signature of the creditor or their proxy."

If these requirements are met, the reorganization plan may also establish the way the release is granted, if and when new obligations contained in the rebuilding strategy are  performed.

**5.** *Civil proceeding preclusion*

Before delving into other important issues, it is important to note that in Brazil, it is expressly forbidden to argue matters that have already been decided in civil proceedings.

Recently, as the new Civil Procedure Code of Brazil became effective, I was given the opportunity to analyze some of its articles, among them article 507, which explicitly prescribes this constraint, by writing:

"Under a logical perspective, the dynamics of procedure cannot 'retreat', so procedural acts tend to stabilize from a certain point on.

Estoppel, as is well known, is an intraprocedural concept, meant to create effects in a procedure and are connected to rights, burdens, authority and compliance of the parties.

Generally speaking, since Chiovenda's innovative writings, procedural theory lists the following types of preclusion: a) preclusion by time, which happens due to the passage of time. Since the concept of procedure is dynamic, in itself, the performance of procedural actions is subject to continuous and categorical deadlines. According to article 223 of the Civil Procedure Code: "Once the term has expired, the right to practice or amend a procedural action, with or without a judicial decision...' b) *logical preclusion*: when the act that has been performed is incompatible with another intended action; and c)

*preclusion by consummation*: set forth in art. 507, which forbids the parties to litigate during civil proceedings matters that have already been decided." (***Comentários ao Código de Processo Civil - arts. 485 ao 538***, vol. 8, coord. Luiz Guilherme Marinoni, São Paulo, Ed. RT, 2016, p. 228).

It is clear that the parties cannot litigate once more matters that have already been decided, because there has been preclusion.

A dynamic view of procedure requires that each action is brought at the appropriate time, or it may not be brought at all.

If the party does not bring up an issue at the appropriate point, as prescribed by law, the discussion will no longer be possible, due to preclusion by time.

Otherwise, civil proceedings would be forever a 'retread,' never able to provide justice at the right time.

In general lines, these are premises I believe are important for a deeper exam of the issues I have been asked to examine.

_____

## II-TECHNICAL EXAMINATION OF THE QUESTIONS

### 6. *Release granted on the reorganization plan for OGX*

The reorganization plan for OGX, it can be easily seen, clearly and objectively establishes who is the recipient of the release granted by the creditors.

There is no room for doubt as clause 13.5 sets forth that, once the obligations in the plan are performed, OGX will be granted full release, extended to their "controlled companies, subsidiaries and affiliates and other companies belonging to the same corporate and economic group, and its executive officers, directors, minority, stockholders, members, actors, employees, agents, sureties, accommodation makers, guarantors, successors and assignees."

Nonetheless, according to information I was given, two bondholders of one of the controlled companies of the OGX Group (OGX Austria), filed a suit against Mr. EIKE FUHRKEN BATISTA and others in Florida, USA, in which they demand the collection of part of the original debt, along with added damages, due to fraud allegedly committed by Mr. EIKE FUHRKEN BATISTA others in the years before the reorganization of the OGX Group, to mislead creditors into purchasing bonds from the OGX Group.

Certainly, nonetheless, there is no legal standing to collect debts that have been terminated by novation.

No matter the evidence, nor the jurisdiction; if the reorganizing strategy is afoot, no fraud allegation can be considered without dismantling the plan itself.

That is because, as long as the plan is unscathed, even from a formal point of view, previous obligations certainly no longer exist.

As mentioned, the approval of the reorganization plan implies in a novation of the recovering company's obligations.

The release, as granted on clause 13.5, releases OGX and all other parties therein mentioned (*i.e.* stockholders, affiliates, and other entities apart from the company).

Under Brazilian law, there is no basis for a damages claim originated from obligations that have been novated by the reorganization plan.

In addition, remembering the recent and aforementioned precedent from the Superior Court of Justice (*Appeal to the Superior Court of Justice no. 1.532.943-MT*), even creditors who abstained from voting or voted against the change of their collateral must submit to the reorganization plan, despite article 50, paragraph 1, Law 11.101/05.

If this is the current understanding of the effects on the collateral of creditors, it would be absurd to conceive of a claim in connection with obligations that no longer exist due to novation.

Therefore, the release clause of the reorganization plan for OGX is binding on all creditors, including the plaintiffs in the suit filed in Florida.

Besides, not attending the general meeting of creditors has no bearing on the validity of the release clause. If they were aware of the date of the meeting, they had the opportunity to make their statements at the appropriate time.

7. *Jurisdiction to void the reorganization plan*

From another angle, it must be stated that only the Court that holds jurisdiction can decide any action for annulment of the reorganization plan.

As stated earlier, whether expressly established in law, whether by classic tradition, only the court with jurisdiction over the reorganization can decide matters regarding the nullity of the reorganization plan, whether or not it is due to fraud.

Therefore, only through an action for annulment, filed before the 4th Business Court of the Judicial District of the city of Rio de Janeiro/RJ, could the plan be dissolved.

It is quite evident that the reorganization court must have universal jurisdiction, in fact. If, for instance, the Court in Florida tries the claim of OGX Austria's bondholders against whomever received release of the obligations listed in the plan, an alarming precedent will be created, allowing other creditors to come to (any) court to collect debt that no longer exists, as has been said.

Likewise, the opinion remains the same even if it is proven that knowledge of the alleged fraudulent activity happened only after the approval of the reorganization plan for OGX.

The time in which the fraud was uncovered is not a relevant legal argument, nor does it set jurisdiction.

Thus, even if the fraudulent activity has allegedly been uncovered, after the reorganization plan has been approved, an action for annulment must still be filed before the court with jurisdiction over the reorganization.

José Rogério Cruz e Tucci
Full Professor at the Law School at University of São Paulo

8. *Review of the release clause*

It is just as crucial to ask whether the release clause (13.5) of the reorganization plan can be reviewed by Brazilian courts.

Except for matters the creditors and the Office of the Public Prosecutor of Rio de Janeiro questioned in their special appeals to the Superior Court (*Interlocutory Appeal within the Superior Court of Justice no. 870.242-RJ and 757.183-RJ*), any other issues that may sully the reorganization plan are irrevocably affected by preclusion.

For this reason, I state with conviction that, once the above-mentioned Appeals to the Superior Court of Justice are rejected, it will no longer be possible to annul, within the reorganization proceedings, any clauses of the plan, especially the release clause (13.5).

As I have tried to expound, modern procedure develops dynamically, so there is no way to resolve issues that should have been argued at the appropriate moment, already past.

As it seems, if OGX Austria bondholders had acted with due diligence and care, they could have raised, in the appropriate time and moment, arguments regarding the alleged fraudulent activities before the Brazilian court, which has jurisdiction to process and try

their claim, long before the approval of the reorganization plan.

They cannot, right now, much less in the American court system, which does not have jurisdiction over the matter, request collection of debt and damages as if the reorganization plan for OGX were not fully effective.

This is another reason to corroborate the conclusion that the reorganization plan for OGX could only be annulled by an action for annulment filed for this specific purpose, before the competent jurisdiction, whether for fraudulent activity against the creditors or any other defect in the acts for disposal of liabilities (article 966, paragraph 4, Civil Procedure Code).

**III - CONCLUSION**

**9.** *Answer to the questions posed by the clients*

Based on the foregoing, within the strict limits of the questions that have been posed by my illustrious Colleague, the Client's counsel, I conclude by reaffirming that:

**1.** Clause 13.5 of the Reorganization Plan of OGX grants full release, which evidently includes rights to credits or damages resulting from fraudulent practices occurred before or during the OGX Group's reorganization;

**2.** The release set forth on Clause 13.5 of the Reorganization Plan comprises the claims of creditors against all parties listed on the clause 13.5 (i.e., stockholders, affiliates, and other entities apart from the companies under reorganization); and, lastly,

**3.** Questions regarding alleged fraud were covered by preclusion and can no longer be argued on the reorganization case.

Fraud allegations can, at most, be the basis for an action for annulment, under the exclusive and original jurisdiction of the court handling the reorganization proceedings.

If the parties intend to question the release prescribed in the reorganization plan, it can only be done by filing an action for annulment, under the exclusive and original jurisdiction of the court handling the reorganization proceedings.

This is my opinion, to the best of my knowledge.

São Paulo, March 27, 2017.

**José Rogério Cruz e Tucci**

*Professor of Procedural Law* **at the law school and post graduate law courses at University of São Paulo**



STATE of NEW YORK          )
                           )              ss:
COUNTY of NEW YORK         )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, "*2017.03.27 - parecer - EBX vf*" originally
written in *Portuguese* is to the best of our knowledge and belief, a true, accurate and
complete translation into *English*.

Dated: March 30, 2017

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
___30th___ day of _March_ ,
2017.

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified In New York County
My Commission Expires December 4, 2018

Your
legal
translation
partner

José Rogério Cruz e Tucci
Professor Titular da Faculdade de Direito da USP

---

*plano de recuperação judicial - competência exclusiva do Juízo da recuperação judicial - vis attractiva - prevenção - alegações de fraude - preclusão processual - novação das obrigações - cláusula de quitação - indispensabilidade de ajuizamento de ação anulatória*

## CONSULTA

Honra-me as consulentes, **CENTENNIAL ASSET MINING FUND LLC e CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC**, por meio de seu ilustre advogado Doutor FLAVIO GALDINO, integrante da prestigiosa banca Galdino Coelho Mendes Advogados, formulando consulta acerca de questões substanciais e processuais, emergentes dos autos da ação ajuizada pela MERIDIAN TRUST COMPANY LTD e AMERICAN ASSOCIATED GROUP LTD, perante a justiça do Estado da Flórida, nos Estados Unidos da América, em face do Senhor EIKE FUHRKEN BATISTA e outros.



Esclarecendo os fatos, embora sucinta, suficientemente, com a apresentação de consulta e exibição de cópias entendidas pertinentes, submeteu-me, ao final, as correspondentes indagações, textual:

"... Assim, considerando os fatos narrados e problemas processuais ora suscitados, formulamos a Vossa Senhoria a presente consulta, tendo como parâmetro para análise os seguintes quesitos:

1) A quitação outorgada no Plano de Recuperação Judicial de OGX Petróleo e Gás S/A é ampla o suficiente para abranger pretensões oriundas de alegação de fraude ocorrida antes ou durante o processo de recuperação judicial?

2) A quitação prevista na Cláusula 13.5 do Plano de Recuperação Judicial é ampla o suficiente para abranger pretensões de credores contra as partes listadas na referida Cláusula 13.5 (i.e., acionistas, empresas coligadas, e outras entidades que não as recuperandas)?

3) Os credores podem questionar a validade da cláusula de quitação (Cláusula 13.5 do Plano de Recuperação Judicial) perante o Poder Judiciário brasileiro?

Aguardamos, pois, as suas considerações quanto a estas indagações, agradecendo, desde logo, a atenção dispensada".

Considerando estes quesitos, concluo que as Consulentes pretendem, com o presente *parecer*, reforçar a sua convicção, no sentido de que a quitação



outorgada a credores no plano de recuperação judicial de OGX Petróleo e Gás S/A — em recuperação judicial é plenamente válida e eficaz.

Em tese, ela só poderia ser anulada por decisão judicial proferida em ação autônoma, aforada perante o respectivo juízo competente.

Objetivas e específicas as questões formuladas pelo douto Colega patrono das Consulentes, despiciendas tornam-se, à evidência, mais alentadas considerações preambulares, passando, por isso, a examiná-las, com as indispensáveis ponderação e efetividade, para, em sequente conclusão, responder aos quesitos transcritos.



José Rogério Cruz e Tucci
Professor Titular da Faculdade de Direito da USP

## *PARECER*

"Il tribunale fallimentare, oltre che essere
investito quale organo dell'esecuzione forzata
della procedura fallimentare, è poi competente
come *autorità giudiziaria di cognizione* delle cause
che derivano dal fallimento. Si suole dire che il
fallimento esercita una *vis attractiva* delle cause
predette: in realtà si ha qui per ragioni di
convenienza l'attribuizione al tribunale
fallimentare di una competenza cogni-toria
funzionale e quindi assoluta" (FRANCESCO
FERRARA, *Il fallimento*, 2ª ed., Milano, Giuffrè,
1966, pág. 226).

## I - VICISSITUDES DE DIREITO MATERIAL E PROCESSUAL DA CONSULTA

### 1. *Breves considerações introdutórias*

Em apertado resumo, infere-se da
documentação submetida à minha análise que, após complexa
negociação, o plano de recuperação judicial da OGX Petróleo
e Gás S/A (OGX) foi finalmente aprovado pela assembleia
geral de credores, realizada em 3 de junho de 2014.



A sua homologação judicial foi efetivada pelo Juízo de Direito da 4ª Vara Empresarial do Foro da Comarca do Rio de Janeiro/RJ (*proc. n. 0377620-56.2013.8.19.0001*).

Após a interposição de recurso de agravo de instrumento, a 14ª Câmara Civil do Tribunal de Justiça do Estado do Rio de Janeiro, em 3 de dezembro de 2014, confirmou a decisão homologatória do referido plano de recuperação da OGX, com exceção da declaração de nulidade da cláusula que dispunha sobre a irresponsabilidade do comissário por eventual prejuízo decorrente de venda de ações e da ineficácia da cláusula de *Put Option* (11.1), igualmente aos credores que se abstiveram de votar ou que não compareceram à mencionada assembleia (*Agravo de Instrumento n. 0039682-69.2014.8.19.0000*).

Foi ainda interposto, contra a mesma decisão homologatória, outro agravo de instrumento, provido em parte, pela mesma 14ª Câmara Cível do Tribunal de Justiça do Estado do Rio de Janeiro, para estender a ineficácia da cláusula 13.7. também aos credores que se abstiveram de votar ou que não compareceram à assembleia geral de credores (Agravo de Instrumento n. 0033122-14.2014.8.19.0000).

Segundo as informações que me foram prestadas, o plano de recuperação continua vigente e vem sendo cumprido de forma satisfatória.



A despeito de tais aspectos, fui igualmente informado sobre a interposição de recurso contra o acórdão proferido no primeiro agravo de instrumento (*Agravo em Recurso Especial n. 870.242-RJ*), pendente de julgamento perante o Superior Tribunal de Justiça, em cujos autos estão reunidos recursos da OGX, do Ministério Público do Estado do Rio de Janeiro e, um terceiro, interposto por vários credores.

Contra o acórdão do mencionado segundo agravo de instrumento, também foi interposto recurso de *Agravo de Recurso Especial n.757.183-RJ*, por outros credores, o qual está, analogamente, pendente de julgamento naquele mesmo Sodalício federal.

Contudo, mais recentemente, dois *bondholders* da OGX Austria aforaram demanda em face do Senhor EIKE FUHRKEN BATISTA e outros, perante a Justiça do Estado da Flórida, nos Estados Unidos da América, pela qual cobram parte de seu crédito original, acrescida de pleito de indenização, por alegada prática de atos fraudulentos supostamente perpetrados pelo Senhor EIKE FUHRKEN BATISTA e outros, nos anos que antecederam a recuperação judicial do Grupo OGX, com objetivo de iludir credores a comprar *bonds* do grupo OGX.

A consulta, portanto, visa a esclarecer, em última análise, que o plano de recuperação judicial é obstáculo intransponível à pretensão exercida por meio da indigitada demanda e só seria possível mediante



José Rogério Cruz e Tucci
Professor Titular da Faculdade de Direito da USP

o prévio ajuizamento de ação anulatória, perante o juízo competente no Brasil.

## 2. *Finalidade do plano de recuperação judicial*

Dispõe o art. 47 da Lei n. 11.101/2005, que:

"A recuperação judicial tem por objetivo viabilizar a superação da situação de crise econômico-financeira do devedor, a fim de permitir a manutenção da fonte produtora, do emprego dos trabalhadores e dos interesses dos credores, promovendo, assim, a preservação da empresa, sua função social e o estímulo à atividade econômica".

Verifica-se, assim, que, para alcançar tal desiderato, a citada legislação, inspirada no modelo do famoso *Chapter 11 (reorganization)* do *Bankruptcy Code* dos Estados Unidos da América, exige, como requisito para autorizar o reerguimento da atividade societária, que a empresa recuperanda apresente, no prazo estipulado no art. 53, o denominado *plano de recuperação judicial*.

Anota, a propósito, FÁBIO ULHOA COELHO que:

"A mais importante peça do processo de recuperação judicial é, sem sombra de dúvida, o plano de recuperação judicial (ou de 'reorganização da empresa')" (***Comentários***



*à nova lei de falências e de recuperação de empresas*, 4ª ed., São Paulo, Saraiva, 2007, pág. 158).

De aduzir-se que o objetivo desse planejamento estratégico é o de permitir que a empresa em dificuldade financeira possa tentar, com o menor prejuízo social e econômico possível, voltar a ser competitiva e produtiva na esfera negocial.

Desse modo, a recuperação judicial ostenta como precípuo escopo, o cumprimento do plano de recuperação, de modo a salvaguardar, de um lado, a atividade econômica globalmente considerada, e, de outro, a satisfação dos credores.

Observa, a propósito, JORGE LOBO, que a finalidade da exigência legal atinente ao referido plano de recuperação, é a de demonstrar aos credores e ao juízo, que os ativos da empresa ainda em atividade não só são superiores ao que seria obtido caso fosse ela liquidada, como, ainda, que a sua continuidade melhor atende aos múltiplos interesses em jogo, vale dizer, dos empregados, dos credores, dos consumidores e da coletividade (*Comentários à lei de recuperação de empresas e falência*, coord. Paulo F. C. Salles de Toledo e Carlos H. Abrão, 3ª ed., São Paulo, Saraiva, 2009, pág. 163).



José Rogério Cruz e Tucci
Processo Civil da Faculdade de Direito da USP
Case 1:17-cv-23051-KMW   Document 1-8   Entered on FLSD Docket 08/11/2017   Page 47 of 322

### 3. *Regramento da competência em matéria concursal*

Cumpre-me, ainda, relembrar, por outro lado, que é, de um modo geral, uniforme a regra de fixação da competência por prevenção em sede de processo concursal.

Assim, por exemplo, no âmbito da experiência processual italiana, assinala EDOARDO RICCI (*Lezioni sul fallimento*, vol. 1, 2ª ed., Milano, Giuffrè, 1997, pág. 322), que:

> "La competenza del tribunale fallimentare a decidere le controversi relative alla procedura è esclusiva e inderogabile".

No direito brasileiro, tradicionalmente, o juízo perante o qual tem curso o processo concursal, em quaisquer de suas modalidades, é denominado *universal*.

É certo que esta clássica regra foi implicitamente consagrada no art. 6º, em particular, em seu respectivo § 1º, da Lei n. 11.101/2005.

É, pois, a ***vis attractiva***, primordial característica do juízo concursal (cf., em idêntico senso, WALDO FAZZIO JÚNIOR, ***Lei de falência e recuperação de empresas***, 5ª ed., São Paulo, Atlas, 2010, pág. 59).



Desse modo, conclui-se que o juízo perante o qual tramita a recuperação encontra-se prevento para conhecer e julgar **todas** as demandas conexas com o objeto do processo de recuperação.

Instada a examinar hipóteses em tudo assemelhadas à vertente, a jurisprudência contemporânea traçou orientação que desponta uníssona.

Realmente, no aresto considerado *leading case* acerca da extensão da competência funcional sob a égide da Lei de Recuperação de Empresas, proferido pela 2ª Seção do Superior Tribunal de Justiça, no importante caso que envolveu a VARIG (*Conflito de Competência n. 61.272-RJ*), restou assentado, no voto condutor do Ministro ARI PARGENDLER, que, *in verbis*:

"A jurisprudência formada à luz do Decreto-Lei n. 7.661, de 1945, concentrou no juízo da falência as ações propostas contra a massa falida no propósito de assegurar a igualdade dos credores (*pars condicio creditorum*), observados evidentemente os privilégios e preferências dos créditos.

*Quid*, em face da Lei 11.101, de 2005? Nova embora a disciplina legal, a medida liminar deferida nestes autos partiu do pressuposto de que subsiste a necessidade de concentrar na Justiça Estadual as ações contra a empresa que está em recuperação judicial, agora por motivo diferente: o de que só o juiz que processa o pedido de recuperação judicial pode impedir a quebra da empresa...".



Analogamente e mais recentemente, o Superior Tribunal de Justiça também teve a oportunidade de ratificar essa orientação no julgamento do *Conflito de Competência n. 133.079-DF*, em voto relatado pela Ministra NANCY ANDRIGHI:

> "O STJ assentou entendimento no sentido de que, em regra, o destino do patrimônio da sociedade empresária não pode ser afetado por decisões prolatadas por juízo diverso daquele em que tramita seu processamento da recuperação judicial ou falência, sob pena de prejudicar seu funcionamento, em violação ao princípio da continuidade da empresa. Nesse sentido: CC 79170/SP, Rel. Ministro Castro Meira, Primeira Secção, DJe 19/09/2008; e CC 106.798/RJ, Rel. Ministro Luis Felipe Salomão, Segunda Secção, DJe 02/10/2009. Na hipótese, o leilão de bens ordenado pelo juízo laboral (fls. 43 e ss, e-STJ) - que caracteriza o perigo de dano - invade a esfera de competência do juízo onde tramita a recuperação judicial, pois afeta o patrimônio da suscitante, o que se revela inadmissível diante do princípio maior da preservação da empresa".

No mesmo sentido, o acórdão do *Conflito de Competência n. 144.470-RJ*, igualmente da relatoria da Ministra NANCY ANDRIGHI, textual:

> "A questão já se encontra **pacificada no âmbito do Superior Tribunal de Justiça**, que reconhece ser o Juízo onde se processa a recuperação judicial o competente para julgar as causas em que estejam envolvidos interesses e bens da empresa recuperanda, inclusive para o prosseguimento dos



11

atos de execução, **ainda que o crédito seja anterior ao deferimento da recuperação judicial**, devendo, portanto, se submeter ao plano, sob pena de inviabilizar a recuperação".

Não há dúvida, pois, que essa sábia orientação pretoriana bem demonstra que o deferimento da recuperação judicial e, por certo, da aprovação de seu respectivo plano estratégico, **não terão eficácia alguma** se os potenciais conflitos entre a empresa recuperanda e os seus credores puderem ser dirimidos por diferentes órgãos judiciários.

### 4. *Novação das obrigações e quitação*

Já sob outro aspecto, também é importante tecer uma breve consideração sobre a novação das dívidas constantes do plano de recuperação judicial.

A novação descortina-se como clássico instituto de direito civil, pelo qual a relação obrigacional pode ser substituída por uma relação nova. A obrigação anterior é extinta subsistindo apenas a nova, a teor do art. 364 do Código Civil.

A novação em sede de concurso de credores, por sua vez, apresenta a particular característica de ser condicionada. Ela, de idêntico modo, extingue as obrigações da recuperanda substituindo-as por novas (art. 59 da Lei n. 11.101/05), sob condição de que o



plano de recuperação seja cumprido da forma como idealizado.

A hipótese de inadimplemento do plano de recuperação implica inafastável convolação em falência, de modo que as obrigações originais são reestabelecidas por expressa previsão do art. 61, § 2°, da Lei n. 11.101/05.

É esta, a rigor, à premissa que se firmou no julgamento da 3ª Turma do Superior Tribunal de Justiça, expressada no voto condutor da Ministra NANCY ANDRIGHI (*Recurso Especial n. 1.260.301-DF*), *in verbis*:

> "Todavia, a novação operada pelo plano de recuperação fica sujeita a uma condição resolutiva, na medida em que o art. 61 da Lei 11.101/05 dispõe que o descumprimento de qualquer obrigação prevista no plano acarretará a convolação da recuperação em falência, com o que os credores terão reconstituídos seus direitos e garantias nas condições originalmente contratadas, deduzidos os valores eventualmente pagos e ressalvados os atos validamente praticados no âmbito da recuperação judicial.
>
> Diante disso, uma vez homologado o plano de recuperação judicial, os órgãos competentes devem ser oficiados a providenciar a baixa de protestos e a retirada, dos cadastros dos inadimplentes, do nome da recuperanda e dos seus sócios, por débitos sujeitos ao referido plano, com a ressalva expressa de que essa providência será adotada sob a



condição resolutiva de a devedora cumprir todas as obrigações previstas no acordo de recuperação".

Ademais, revela-se também importante considerar a regra de suma importância relativa à quitação das novas obrigações. Segundo o art. 50, § 1º, da Lei n. 11.101/05, a alienação, supressão ou substituição de garantias é oponível aos credores que concordaram com o plano de recuperação.

Para atender ao disposto ao art. 50, § 1º, supra aludido, basta, no entanto, que o credor tenha conhecimento da assembleia geral de credores sem ser necessária a sua concordância expressa. Este, com efeito, foi o entendimento do Superior Tribunal de Justiça, no recentíssimo julgamento do *Recurso Especial n. 1.532.943-MT*, textual:

> "Por consectário, ainda que determinado credor tenha optado por não comparecer à deliberação assemblear; ou, presente, se absteve de votar ou se posicionado em contrariedade, total ou parcialmente, à aprovação do plano, seus termos o subordinam, necessariamente. Compreensão diversa, por óbvio, teria o condão de inviabilizar a consecução do plano, o que refoge dos propósitos do instituto da recuperação judicial.
>
> De se reconhecer, portanto, que a supressão das garantias reais e fidejussórias, tal como previsto no plano de recuperação judicial aprovado pela assembleia geral, como



José Rogério Cruz e Tucci
Professor Titular da Faculdade de Direito da USP

parte integrante das tratativas negociais, vincula todos os credores titulares de tais garantias. Naturalmente, caso não se implemente o plano de recuperação judicial, tal como aprovado, "os credores terão reconstituídos seus direitos e garantias nas condições originariamente contratadas" (art. 61, § 2º, da Lei n. 11.101/2005)".

Assim, se o credor podia ter comparecido ou sido representado na assembleia de credores, reputa-se atendida a norma prescrita no art. 50, § 1º, da Lei n. 11.101/05, de sorte que as questões deliberadas sobre as garantias das obrigações originárias também lhe serão oponíveis.

A quitação, a seu turno, é a forma convencional e voluntária de liberação do devedor da obrigação. O art. 320 do Código Civil cataloga os requisitos para sua validade, quais sejam: "o valor e a espécie da dívida quitada, o nome do devedor, ou quem por este pagou, o tempo e o lugar do pagamento, com a assinatura do credor, ou do seu representante".

Atendendo a tais exigências intrínsecas, nada impede que, no plano de recuperação judicial, conste a forma como a quitação será outorgada, se e quando as novas obrigações, constantes da estratégia de reerguimento societário, forem adimplidas.



## 5. _Preclusão processual civil_

Ressalte-se que, antes de enfrentar outros pontos que merecem ser destacados, anoto ainda que, no Brasil, é expressamente vedada a discussão de questões já decididas no curso do processo civil.

Recentemente, por força da vigência do novo Código de Processo Civil brasileiro, tive a oportunidade de traçar a exegese de alguns de seus artigos, dentre eles, a do art. 507, que prevê a referida vedação de forma explícita, expressando-me do seguinte modo:

"A dinâmica do processo, sob a perspectiva lógica, não aceita 'retrocesso' e, por esta razão, os atos do procedimento tendem a se estabilizar, a partir de um determinado momento.

A preclusão, como se sabe, é um instituto de natureza endoprocessual, destinado a gerar efeitos dentro do processo, vinculados aos direitos, ônus, poderes e sujeição das partes.

De forma generalizada, desde a doutrina pioneira a esse respeito de Chiovenda, a literatura processual arrola como espécies de preclusão: a) _preclusão temporal:_ que se verifica pelo transcurso do tempo. Como a própria noção de processo é dinâmica, a realização de seus respectivos atos se subordinam a prazo contínuos e peremptórios. Consoante disposto no art. 223 do CPC: 'Decorrido prazo, extingue-se o direito de praticar ou de emendar o ato processual, independentemente de declaração judicial...'; b) _preclusão lógica:_ verificada diante da



incompatibilidade entre o ato praticado e outro, que se pretendia também praticar; e c) *preclusão consumativa*: é aquela prevista no art. 507, que obsta à parte discutir, no curso do processo, as questões já decididas" (***Comentários ao Código de Processo Civil - arts. 485 ao 538***, vol. 8, coord. Luiz Guilherme Marinoni, São Paulo, Ed. RT, 2016, pág. 228).

À vista destas noções, certamente não é facultado às partes rediscutir questões decididas, sobre as quais se tenha operado a preclusão.

A perspectiva dinâmica do processo exige que cada ato seja realizado no momento oportuno, sob pena de não mais ser possível efetivá-lo.

Se a parte deixar de provocar a discussão sobre certa questão na fase oportuna estipulada pela lei, o debate a seu respeito está obstado pela preclusão temporal.

Não fosse assim, o processo civil seria marcado de forma indelével pelo "retrocesso", jamais um instrumento apto a prover justiça em tempo hábil.

Estas são, em linhas gerais, as premissas que entendo pertinentes para elucidar o exame mais aprofundado dos pontos que me foram apresentados.



## II - ANÁLISE DOGMÁTICA DAS QUESTÕES SUSCITADAS

### 6. *Quitação outorgada no plano de recuperação da OGX*

Sem qualquer dificuldade, verifica-se que o plano de recuperação judicial da OGX é claro e objetivo em consignar os destinatários da quitação outorgada pelos credores.

A cláusula 13.5 não deixa margem alguma para dúvida ao determinar que, uma vez adimplidas as obrigações constantes no plano, será dada plena quitação à OGX, extensiva a "controladas, subsidiárias, afiliadas e coligadas e ouras sociedades pertencentes ao mesmo grupo societário e econômico, e seus diretores, conselheiros, Acionistas, minoritários, sócios, agentes, funcionários, representantes, fiadores, avalistas, garantidores, sucessores e cessionários".

Ocorre que, segundo as informações que me foram prestadas, dois *bondholders* de uma das controladas do Grupo OGX (OGX Austria), aforaram demanda em face do Sr. EIKE FUHRKEN BATISTA e outros, perante a Justiça do Estado da Florida, nos Estados Unidos da América, pela qual cobram parte de seu credito original, acrescida de pleito de indenização, por alegada prática de atos fraudulentos supostamente perpetrados pelo Senhor EIKE FUHRKEN BATISTA e outros, nos anos que antecederam a recuperação judicial do Grupo OGX, com objetivo de iludir credores a comprar *bonds* do grupo OGX.



Certamente, contudo, não há fundamento legal para cobrar créditos já extintos por força de novação.

Não importa quais sejam as provas, tampouco qual seja o juízo, se a estratégia de recuperação encontra-se em marcha, nenhuma alegação de fraude pode ser apreciada sem a desconstituição do próprio plano.

Isso porque enquanto o plano de recuperação estiver hígido, ainda que o ponto de vista formal, as obrigações anteriores certamente não subsistem.

Como visto, a homologação do plano de recuperação judicial implica novação das obrigações da recuperanda.

A quitação, da forma como outorgada na indigitada cláusula 13.5, libera a OGX e todas as outras partes nela mencionadas (i.e. acionistas, empresas coligadas, e outras entidades que não a recuperanda).

No ordenamento brasileiro, não há nenhum fundamento para legitimar a pretensão de cobrança ou indenização derivada de obrigações que foram novadas nos termos do plano de recuperação.

Ademais, secundando o recente e já mencionado precedente do Superior Tribunal de Justiça



José Rogério Cruz e Tucci
Professor Titular da Faculdade de Direito da USP

(*Recurso Especial n. 1.532.943-MT*), até mesmo os credores que se abstiveram de votar ou que votaram contrariamente à modificação das garantias de créditos, estão submetidos ao plano de recuperação, a despeito do art. 50, § 1º, da Lei n. 11.101/05.

Se esse é o atual entendimento no tocante aos efeitos das garantias perante credores, seria um disparate cogitar da possibilidade de exercício da pretensão creditória por obrigações que já não mais subsistem por força de novação.

Em sendo assim, a cláusula de quitação do plano de recuperação judicial da OGX vincula todos seus credores, inclusive os autores da ação aforada perante a Justiça da Flórida.

No mais, a ausência na assembleia geral de credores não importa ineficácia da cláusula de quitação. Se eles tinham conhecimento da data de realização da assembleia, eles tiveram a oportunidade de efetivar suas alegações no momento oportuno.

## 7. *Juízo competente para anulação do plano de recuperação*

Sob outra angulação, importa consignar que somente o juízo competente poderá julgar qualquer pretensão de anulação do plano de recuperação judicial.



Como antes asseverado, seja por expressa determinação legal, seja pela tradição clássica, apenas o juízo da recuperação judicial poderá dirimir questões atinentes as alegações relativas à invalidade do plano de recuperação, seja ou não decorrente de fraude.

Assim sendo, somente por meio de ação anulatória, a ser aforada perante a 4ª Vara Empresarial do Foro da Comarca do Rio de Janeiro/RJ, poderia ser atingida a desconstituição do plano de recuperação.

Chega a ser evidente inclusive a imperiosidade de o juízo da recuperação ser universal. Se, por exemplo, o Juízo de Direito do Estado da Flórida julgar a pretensão dos investidores da OGX Austria em face daqueles que receberam quitação das obrigações arroladas no plano, será formado alarmante precedente a permitir que outros credores venham a (qualquer) juízo cobrar dívidas que, como assinalado, já foram extintas.

No mesmo sentido, tais conclusões subsistem ainda que seja comprovado que o conhecimento dos supostos atos fraudulentos só adveio em momento posterior ao da homologação do plano de recuperação judicial da OGX.

Não é o momento de descoberta da fraude que indica a forma com que ela poderá ser utilizada como fundamento jurídico, tampouco o juízo competente para analisá-la.



Desse modo, ainda que os atos fraudulentos tenham sido descobertos, alegadamente, após a homologação do plano de recuperação judicial, ainda assim, é forçoso o ajuizamento de ação anulatória perante o Juízo de Direito da recuperação judicial.

## 8. *Revisão da cláusula de quitação*

É igualmente necessário questionar acerca da viabilidade de a cláusula de quitação (13.5.), do plano de recuperação, ser revista pelo Poder Judiciário brasileiro.

Salvo pelas matérias suscitadas nos recursos especiais interpostos pelos credores e pelo Ministério Público do Estado do Rio de Janeiro (*ARESP n. 870.242-RJ* e *n. 757.183-RJ*), qualquer outra questão a inquinar o plano de recuperação estaria irremediavelmente coberta pela preclusão.

Por isso que tenho convicção em afirmar que, uma vez improvidos os mencionados recursos especiais, não será possível, no processo de recuperação judicial, anular quaisquer cláusulas do plano, em especial, a de quitação (13.5).

Como procurei ponderar, o processo moderno se desenrola de forma dinâmica, não havendo ensejo



para dirimir questões que deveriam ter sido agitadas em momento oportuno, já ultrapassado.

À toda evidência, se os *bondholders* da OGX Austria tivessem procedido de forma diligente e cuidadosa, poderiam ter levantado, a tempo e hora, argumentos relacionados com os supostos atos fraudulentos, perante o juízo brasileiro competente para processar e julgar tal pretensão, bem antes da homologação do plano de recuperação.

Não podem agora, ainda mais perante o Poder Judiciário norte-americano, que sequer é competente para apreciar a indigitada matéria, pleitear a cobrança de crédito, cumulando-a com pedido de indenização, como se, simplesmente, o plano de recuperação da OGX não estivesse plenamente vigente.

Mais um motivo a corroborar a conclusão de que, somente por meio de ação anulatória autônoma, aforada perante o juízo competente, poderia o plano de recuperação judicial da OGX ser anulado seja por comprovação de eventual fraude contra credores, seja por qualquer outro vício dos atos de disposição de direitos (art. 966, § 4º, do CPC).



## III - CONCLUSÃO

### 9. *Respostas aos quesitos formulados*

Diante do exposto, atendo-me estritamente às questões que me foram submetidas pelo ilustre Colega, patrono das Consulentes, devo concluir reafirmando que:

1. A cláusula 13.5 do plano de Recuperação da OGX outorga ampla e geral quitação, a qual, de forma evidente, abarca direitos creditórios ou indenizatórios oriundos de alegadas práticas fraudulentas ocorridas antes ou durante a reorganização do Grupo OGX;

2. A quitação prevista na Cláusula 13.5 do Plano de Recuperação Judicial abrange as pretensões de credores contra todas as partes listadas na referida Cláusula 13.5 (i.e., acionistas, empresas coligadas, e outras entidades que não as recuperandas); e, por fim,

3. Questões atinentes a supostas fraudes restaram cobertas pela preclusão e não podem mais ser discutidas no processo de recuperação.



As alegações de fraude, quando muito, podem fundamentar ação anulatória, de competência exclusiva e originária do Juízo de Direito da recuperação judicial.

Se a parte pretende questionar a quitação prevista no plano de recuperação judicial, o único meio seria propor ação anulatória de competência exclusiva e originária do Juízo de Direito da recuperação judicial.

Esse o meu parecer, s. m. j..

São Paulo, 27 de março de 2017.

**José Rogério Cruz e Tucci**

Regente da disciplina *Direito Processual Civil* nos Cursos de Graduação e Pós-Graduação da Faculdade de Direito da Universidade de São Paulo.

# EXHIBIT C

Applicants
First Affidavit of M Oliveira
Sworn 18th October 2016
Exhibit MLO1

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO. FSD        OF 2016 (        )

B E T W E E N :

(1) MERIDIAN TRUST COMPANY LIMITED
(2) AMERICAN ASSOCIATED GROUP, LTD.

Applicants

- and -

(1) EIKE FUHRKEN BATISTA DA SILVA (AKA EIKE FUHRKEN
BATISTA)
(2) 63X INVESTMENTS LTD.
(3) 63X FUND
(4) 63X MASTER FUND
(5) MAPLES CORPORATE SERVICES LIMITED

Respondents

_____

AFFIDAVIT OF MARCELLO AUGUSTO LIMA DE
OLIVEIRA

_____

I, MARCELLO AUGUSTO LIMA DE OLIVEIRA of Candido de Oliveira Advogados of
Rua México, No. 98/10° Andar - 20010-010 Centro, Rio de Janeiro, Brazil STATE ON OATH
AS FOLLOWS:

1.      I am a partner in the firm of solicitors known as Candido de Oliveira Advogados based
        in Rio de Janeiro, Brazil.

1

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman,
KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said
Attorneys-at-law.

2.    I make this Affidavit in support of the Applicants' application for a freezing order and related disclosure against the First to Fourth Respondents, and in support of their application for disclosure from the Fifth Respondent, in support of a proposed claim before the Florida courts (the "**Florida Claim**").

3.    The matters set out in the Affidavit are within my personal knowledge unless the contrary is expressly stated. Where they are within my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from the sources which I identify.

4.    My firm has been providing advisory services to the Applicants in respect of the Brazilian law issues. No waiver of privilege is intended by any reference herein to privileged material or a document containing such unless expressly stated.

5.    There is now produced and shown to me a paginated bundle of true copy documents marked "**MLO1**" which I exhibit hereto. References to page numbers herein are references to pages of MLO1 in the format "**MLO1/volume/page number**". I also refer in my affidavit to documents in the exhibits to affidavits of other deponents by reference to their respective exhibit name and number in the same format.

## BACKGROUND

6.    I have been instructed to comment upon various points of Brazilian law which arise out of the facts and matters described in the proposed Florida complaint (the "**Florida Complaint**") which I have seen in final draft form (exhibited at KJM1/1). I confirm that the legal opinions I express below are within the realm of my competence and expertise.

7.    By way of background, I have experience in project structuring within the energy sector, involving the construction of platforms, power generation plants, gas pipelines, the granting and monitoring of exploration and production oil and natural gas, the purchase and sale of natural gas and electricity, among others.

8.    Furthermore, I advise on the exploration and production of oil and natural gas, including advising clients at the bid stage, the fulfilment of exploration programmes and development plans and the development of platform construction contracts.

2

9.    In addition, I am regularly invited to present lectures and courses on the topic of energy law. My activities include a placement in St. Petersburg, Russia, at the invitation of the Department of Law of the Pontifical Catholic University of Rio de Janeiro to discuss the theme of "*BRICS and Harmonization of Energy Law*" and courses on Contracts of Oil & Natural Gas Sector Contracts for the Brazilian Institute of Energy Law.

10.   Finally, I have been Assistant Professor for 5 years (2006-2011) in the disciplines of Civil Procedural Law and Bankruptcy Law at the Pontifical Catholic University of Rio de Janeiro (PUC-Rio).

11.   A copy of my professional resumé is exhibited at MLO1/1/1-2.

**FULL AND FRANK DISCLOSURE**

12.   I understand that the Applicants have a duty to make a full and frank disclosure to the Court of facts that may be considered adverse to the Applicants' position. I have read extracts from the Cayman Islands' decision of *Cable and Wireless v. ICTA* and the English decision of *Complete Retreats Liquidating Trust v. Logue* that summarize that duty. I confirm that I have sought to comply with this duty in preparing this affidavit.

13.   I have also read extracts from Steven Gee Q.C., *Commercial Injunctions* (Sixth edition, Sweet & Maxwell, 2016). I understand from sections 9-006 – 9-008 that as part of my duty of full and frank disclosure in my affidavit I "*must identify any defenses, which, although not yet taken would have been available to be taken by the defendant had he been present at the application, provided that: (1) the defense is one which can reasonably be expected to be raised in due course by the defendant; (2) the defense is not one which can be dismissed as without substance or importance (e.g. an argument based on a misconceived interpretation of a statutory provision*". I understand this aspect is of particular relevance to potential defences under Brazilian law to the substantive claims made in the Florida Claim, including if the Florida Court considered that the law applicable to the claims, or some of them, was the law of Brazil.

14.   I have sought in this affidavit to refer to matters that may be considered material to the applications in the Cayman Islands proceedings including matters that might be

3

considered adverse to the Applicants' substantive or procedural arguments, which I discuss below.

## THE CONTENTS OF THIS AFFIDAVIT

15.     I have read the proposed Florida Complaint. I have considered below the following issues of Brazilian law:

(a)     Freezing Orders in Brazilian civil proceedings.

(b)     Disclosure Orders in Brazilian civil proceedings.

(c)     Service of civil process under Brazilian law.

(d)     Theoretical Civil Proceedings under Brazilian Law Against Mr Eike Batista ("Batista").

(e)     The Minority Shareholder Action

(f)     Access to Court Files in Brazil and Other Known Civil Actions Against Batista Related to OGX Collapse.

(g)     Criminal Proceedings in Brazil.

(h)     Disqualification by CVM.

(i)     Judicial Recovery/ AKA "Bankruptcy".

## FREEZING ORDERS IN BRAZILIAN CIVIL PROCEEDINGS

16.     In this section I consider: (i) freezing order relief in domestic Brazilian proceedings; and (ii) freezing order relief in aid of foreign proceedings.

17.     If a claim equivalent to the draft complaint against Batista and the Cayman Respondents were made in Brazil the principles upon which the Court would consider a freezing order would be based on the Brazilian Procedural Code. On 18 March 2016 a new version of the Brazilian Civil Procedural Code ("2015 Code") entered into force replacing the existing version ("1973 Code"). For the purposes of the issues in this opinion the 2015 Code would apply to any claims issued after 18 March 2016.

4

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

18.   Article 813 of the 1973 Code provided for specific circumstances in which seizure would take place and such would include a debt already determined and enforceable (including by means of a non-appealable decision) and the occurrence of any of the following circumstances: (i) when a debtor with undetermined domicile attempts to evade, to transfer its assets or fails to timely pay its obligations, (ii) when a debtor with a determined domicile (a) evades or attempts to evade, (b) if insolvent, a debtor attempts to alienate its assets, to accumulate extraordinary debts or (c) uses any other fraudulent means to obstruct enforcement of a debt, (iii) when a debtor owns fixed assets and real estate and attempts to alienate or put liens or encumbrances on such assets, without putting aside enough assets to pay its debts.

19.   Articles 300 and 301 of the 2015 Code now apply to such situations. These provisions do not provide the same express jurisdictional restrictions on freezing orders as under Article 813 of the 1973 Code. Articles 300 and 301 now give a judge a wider discretionary power to assess the urgency and suitability of plaintiff's plea based on the general requirements of *fumus bonus iuris* and *periculum in mora* (Articles 300 and 301). *Fumus bonus iuris* broadly requires that the applicant establish a prima facie case on the merits and *periculum in mora* requires a risk that delay in the provision of relief would undermine the effectiveness of any future order. In practical terms, prima facie case under Brazilian law would mean the assertion of what appears to be an enforceable legal right. Any order that was granted under these new Articles would in the ordinary case only be effective in Brazil and only apply to assets in Brazil. Similar judicial standard applies in criminal actions where a freezing order is requested. See Articles 136 and 137 of the Criminal Procedure Code.

20.   It will take some time for the effect of the changes in language in the 2015 Code to become clear. It can be anticipated that whereas under the prior code provisions the Brazilian courts in civil matters were more limited as to the factual circumstances that would permit an asset freeze, the new code provisions provide the courts with greater latitude, broadening their discretionary power to freeze assets.

21.   In exceptional circumstances a freezing order can be granted *inaudita altera pars*, that is without the other side being represented at the hearing (sole paragraph of Article 294 of the 2015 Code)

5

22.    In my opinion the Brazilian Courts will not grant a freezing order in support of proceedings taking place in a jurisdiction other than in Brazil. It is only once the foreign final judgment is enforced in Brazil that the Court be able to grant injunctive relief on a similar basis as in domestic Brazilian proceedings. No enforcement steps could be taken until after the foreign judgment is submitted to homologation (domestication) by the Federal Superior Court (the "STJ") as provided for in the Brazilian Constitution.

23.    The 2015 Code does encourage international co-operation as provided for at Article 26. The scope of the application of this Article and the impact it may have on recurring and consistent decisions of STJ is unclear given how recently it has come into force.

24.    A freezing order granted on the above principles in a domestic proceeding has to be followed immediately by a substantive claim filed in the Brazilian Courts seeking a Brazilian judgment either on an enforceable debt or the domestic enforcement of an existing foreign final judgment that meets the criteria for enforcement.

25.    A foreign plaintiff cannot issue the same or similar substantive proceedings in both Brazil and a foreign jurisdiction and seek an order freezing assets in the Brazilian Court while asking the Brazilian Court to stay the local substantive proceedings pending the determination of the foreign proceedings.

26.    In summary, my view is:

    (a)    if claims of an equivalent nature were brought in Brazil, a freezing order would only be available locally if a substantive claim were also subsequently filed in Brazil;

    (b)    there would be no freezing order relief available in Brazil in support of the Florida Proceedings until they reached the stage of final judgment and that judgment had been registered as enforceable in Brazil.

## DISCLOSURE ORDERS IN BRAZILIAN CIVIL PROCEEDINGS

27.    Brazilian law does not provide for a process to require a defendant to disclose their assets prior to any judgment in domestic civil substantive proceedings on the application of a claimant to allow those assets to be frozen prior to judgment. In

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KYI-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

criminal and enforcement proceedings the Court itself has processes that allow assets to be identified, such as the direct access by the judge to the Central Bank of Brazil System ("**BACENJUD**") and communication with Federal Revenue Service and other governmental bodies that may have records on assets held by the defendant.

28.   Brazilian law does not provide for a basis to require Brazilian resident defendants or those amenable to Brazilian jurisdiction to disclose assets in Brazil or outside of Brazil to allow for those assets to be frozen prior to judgment in aid of domestic or foreign proceedings prior to judgment. There is also no power to require Brazilian defendants to provide pre-judgment information to identify and locate assets to allow them to be frozen. However, after an award is granted and during the enforcement phase, a Brazilian judge may compel the defendant to disclose its assets pursuant to Article 774, V of the 2015 Code.

29.   It is likely that based on the presented facts, no applications could be made at this stage in Brazil for the disclosure of assets to assist in their identification for the purposes of freezing them.

**SERVICE OF PROCESS**

30.   In this section, I consider the effect of an order for service of the Cayman Islands proceedings by service of Cayman Court documents personally on Batista by a Brazilian notary handing them to him, by the delivery of such documents to a home address of Batista or by an email address used by Batista.

31.   Article 246 of the Brazilian Civil Code provides for the methods of service of domestic Brazilian civil proceedings. Proceedings can be served by mail, by handing them to the Defendant by a Court official and in limited cases, by public notice or electronic means. For domestic proceedings service by a notary would not constitute good service within Article 246.

32.   The Hague Service Convention is not currently in force for the service of foreign proceedings in Brazil. The only Hague-related Convention to which Brazil adhered is the one referring to the legalization of documents.

33.   Service of proceedings other than in accordance with the requirements of Brazilian law would mean that orders in those proceedings would not be enforceable in Brazil unless a party so served subsequently submitted to the substantive jurisdiction of the

7

foreign state in those proceedings in which case the Federal Court may permit homologation of the foreign award.

34. For service of foreign proceedings to give rise to a judgment which would be enforceable in Brazil, absent voluntary submission, it would be necessary to serve the originating process by means of a rogatory letter through diplomatic channels. A rogatory letter would be received by the STJ and then submitted for the exequatur of that Court. The rogatory letter would then be remitted for enforcement by a Federal Court in the state where the defendant is domiciled.

35. Proceedings are generally public[1] and defendant will be summoned to present any motions it may have to prevent the STJ to grant the exequatur to the rogatory letter. Therefore, it would be anticipated that the Respondents to any Cayman proceedings, application or order would be put on notice if service was to be effected through diplomatic channels.

36. Unless there is voluntary co-operation by the defendant, the formal diplomatic process of service would take several months. I would estimate that from the time any rogatory letter was received by the STJ to the date of service could in the ordinary course take between 6-9 months (e.g. proceeding No. 2010/0101036-1), but if defendant resists it could take years for a final decision to be reached at the STJ level (e.g. proceeding No. 2005/0015196-0).

37. While being of limited effect as a matter of Brazilian civil law as summarised above, service of foreign proceedings by the methods of service listed above would not constitute a criminal offence under Brazilian law.

## THEORETICAL CIVIL PROCEEDINGS UNDER BRAZILIAN LAW AGAINST EIKE BATISTA

38. I have been asked to consider whether the Applicants would have claims against Batista if the allegations made in the Florida Complaint were made pursuant to Brazilian law. I have based this assessment on the facts as alleged in the Florida Complaint and my experience as a Brazilian attorney.

39. The Applicants' claims for compensation against Batista in Brazil based on the facts as alleged in the Florida Complaint would be based upon Articles 159, paragraph 7

---

[1] See for instance, https://ww2.stj.jus.br/processo/pesquisa/?aplicacao=processos.ca

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

of Law 6,404/76 of our companies law; Article 63, et seq of the Brazilian Criminal Procedure Code, as well as Articles 389 and 402 et seq of the Brazilian Civil Code.

(a)   Art. 159 allows shareholders and third parties to sue the directors or administrators (officers) for violations of their duties.

(b)   Art. 63, et seq, allows for the compensation of an injured party whenever that damage is caused by a crime defined under Brazilian law.

(c)   Articles 389 and 402 of Brazil's Civil Code allows plaintiff to claim damages in a broader sense whenever a person owes another a duty and that person fails to comply with their duty. Indemnification shall only include direct and immediate damages and losses and, therefore, punitive damages are excluded. Plaintiff may also sue for moral damages. Amounts due by offender shall also include interests, attorney fees and adjustment to inflation.

40.   Were Batista sued in Brazil by Applicants, he would need to respond to that lawsuit and could present his defences. I consider it reasonable to assume that certain of the substantive defences raised by Batista in the case of Association of Minority Shareholders v Eike Batista, a civil action filed against Batista in 2015 (the **"Minority Shareholder Action"**) which is considered in more detail below, would be representative of the defences Batista would advance as defences to claims by Applicants.

41.   Civil claims in Brazil are generally independent from criminal complaints. However, there is the possibility that the Judge in the civil case reserves judgement until the merits of the case are decided by the criminal courts in order to avoid conflicts of interpretation by the two over the same acts. This is addressed under Article 64, Sole Paragraph, of the Criminal Procedural Code and under Article 265, IV (a) of the 1973 Code. As discussed below, we have seen in one civil case brought against Batista by the Association of Minority Shareholders, that such case was not stayed to await the conclusion of criminal proceedings against Batista.

## THE MINORITY SHAREHOLDER ACTION

9

42.  The Minority Shareholder Action is a civil action filed in May 2015 against Batista by a number of OGX minority shareholders, which is currently under No. 0085670-76.2015.8.19.0001 before the 7th Corporate Court of the State of Rio de Janeiro.

43.  According to our investigations, the Minority Shareholder Action is still pending but has been dismissed without prejudice on the basis that – under Brazilian law – the collective action (similar but not identical to a "class action") is not the appropriate vehicle for plaintiff to raise claims. The dismissal did not pass judgment on the merits of plaintiffs' claims.

44.  The plaintiffs in the Minority Shareholder Action allege that Batista and other OGX directors participated in market manipulation and insider dealing in a manner that caused direct damage to the shareholders which gave rise to a right of action under Article 159, §7º of Law No. 6,404/76 (Company Law). This claim is precisely what I was referring to at paragraph 39(a) above.

45.  The Minority Shareholder Action is a multi-plaintiff case against Batista alone. The plaintiffs, which we understand to be approximately 200 in number according to information provided by plaintiffs' counsel, formed a special purpose entity to file suit. The plaintiffs were OGX shareholders prior to the events of October 2013 and were not bondholders in the same position as Applicants. This is not a class action. In the Brazilian legal system, there is no class certification process that would bar similarly situated plaintiffs from filing a similar claim against Batista under the same nucleus of facts. Applicants could file suit in Brazil against Batista without the Minority Shareholder Action posing any impediment.

46.  We have obtained a copy of the complaint (see MLO1/1/3-211) and Batista's response (see MLO1/1/212-318) from counsel for the plaintiffs in that case. Batista's response in that case outlines the following defences:

(a)  Pursuant to the OGX by-laws, all disputes involving shareholders must be arbitrated;

(b)  The shareholders lack standing to sue directly and should sue in derivative fashion;

(c)  Batista cannot be sued unless there is a challenge to annul the company finances, and the time in which to make such challenge has elapsed;

10

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(d)     The plaintiffs have not provided adequate specificity as to what actions he undertook to harm them;

(e)     The wrong procedural vehicle – a collective action – has been selected when in reality the rights of plaintiffs are diffuse in nature;

(f)     The plaintiffs assumed risks inherent in any investment and cannot sue based on their assumption of risk;

(g)     Batista was not an officer of OGX, but rather, a director uninvolved in the day to day management, and as a result, he lacked knowledge of the complained of acts;

(h)     Batista withheld no information known to him and did not mislead;

(i)     That any allegation of insider trading is belied by the fact that Batista lost a great amount of personal wealth with the collapse of OGX's stock and he would not have invested his own money into a truly fraudulent operation;

(j)     As to insider trading, that Batista lacked any privileged information at the time he sold his shares, that there was no wilful misconduct, and that no undue advantage has been obtained from those sales since they were used to pay for existing debts; and

(k)     Further as to insider trading, there is no evidence that Batista's public comments in any way affected the price of the shares.

47.     The above is a summary of his defences and we refer the Court to his response, exhibited hereto, for further details (**MLO1/1/212-318**). As stated below, in dismissing the plaintiffs' action without prejudice, the Court's decision was ultimately based on item 46(e) above. I exhibit the court's decision dated 15 May 2016 for further reference (see **MLO1/2/319-331**). As stated above, the Association of Minority Shareholders has presented an appeal which is pending (see **MLO1/2/332-350**). As far as I am aware, there are no other proceedings pending in Brazil against any of the Cayman Respondents other than Batista.

## ACCESS TO COURT FILES IN BRAZIL AND OTHER KNOWN CIVIL ACTIONS AGAINST BATISTA RELATED TO OGX'S COLLAPSE

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

48.   The Brazilian Courts do not have a single system of public access to court filings where members of the public who are not parties have quick and easy access to filings. To begin, the Brazilian Courts are not unified. There are federal and state courts in a vast country. Some courts have begun to digitize their files. Others remain strictly on paper. In some cases, depending on the proceeding phase, court files may be temporarily resident in chambers and may only be accessed with consent of the judge, with good cause, and for a limited time. Lastly, there is no way to comprehensively search for the existence of a case in certain situations since party names are removed from dockets – digital or paper – for reasons of confidentiality. The result of all this is that there is no easy and comprehensive access to filings made in the Brazilian courts.

49.   On some occasions, Brazilian investigative journalists have obtained access to court documents that would otherwise be unavailable to members of the public. This can occur, for example, if a public officer were to hand the investigative journalist the court document. Under Article 325 of the Brazilian Criminal Code ("*functional secrecy*"), the public official handing such document may have committed the criminal offense of violation of "functional secrecy". However, arguably, the investigative journalist would not have committed such offense by merely receiving the court document unless the journalist induced the public official to breach the law.

50.   Under Brazilian law, were an employee or ex-employee of the OGX Group to share confidential business information pertaining to the OGX Group with an investigative journalist, such sharing of information could be considered unfair trade competition as stated at article 195, subsection XI of Federal Law n.° 9.279/96, with criminal penalties. The sharing of such confidential business information may also be a violation of applicable Brazilian labor laws and applicable confidentiality agreements in employment agreements.

51.   Having performed a search given the points mentioned in paragraph 48, there are other known civil actions pending against Batista in the Brazilian Courts which relate to the OGX collapse that are in addition to the Minority Shareholder Action. Such additional actions were also brought by shareholders. However, none of those cases have progressed beyond the early stages, nor have they reached a decision on the merits or obtained final judgment, nor are there pending prejudgment injunctions. We attach a list of such cases (as well as pending criminal and administrative

12

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

proceedings before the Brazilian Securities and Exchange Commission ("CVM"))
(see MLO1/2/351-352E).

## CRIMINAL PROCEEDINGS IN BRAZIL

52.     Batista, along with other defendants, has been indicted in two criminal proceedings
        in Brazil (see list cases, attached).

        (a)     The first proceeding dated 23 September 2014 was originally in the Federal
                Criminal Courts of Sao Paulo which has been transferred to Rio de Janeiro
                and developed into proceeding No 0042651-87.2014.4.02.5101) (the "First
                Indictment") (MLO1/2/353-445);

        (b)     The second proceeding is referenced 0029174-94.2014.4.02.5101 in the 3rd
                Federal Criminal Court of Rio de Janeiro, dated 11 September 2014
                (MLO1/2/446-468) and amended on 15 December 2015 (MLO1/2/469-
                526), which amendment was accepted by decision dated 25 January 2016
                (MLO1/2/576-612) (the "Second Indictment")

                (together, the "Criminal Proceedings").

53.     I have been able to review the following documents related to the criminal
        proceedings, and my comments below are based on these documents:

        (a)     As referred to above at paragraph 52(a), Criminal Complaint by Public
                Prosecutor dated 23 September 2014 in connection with the First Indictment
                (MLO1/2/353-445);

        (b)     Decision by Judge Valpuesta to accept the complaint dated 12 February
                2016 in connection with 1st Indictment (MLO1/3/842-867). The meaning of
                a decision to accept a complaint is explained below at paragraph 62.

        (c)     As referred to above at paragraph 52(b), Criminal Complaint by Public
                Prosecutor dated 11 September 2014 in connection with the Second
                Indictment (MLO1/2/446-468);

        (d)     Decision by Judge De Souza accepting the complaint dated 15 September
                2014 in connection with the Second Indictment (MLO1/3/825-827);

13

(e)    As referred to above at paragraph 52(b), amendment to the Criminal Complaint by Public Prosecutor dated 15 December 2015 in connection with the Second Indictment (**MLO1/2/469-526**);

(f)    As referred to above at paragraph 52(b), decision by judge Valpuesta accepting the amendment to the complaint dated 25 January 2016 in connection with the Second Indictment (**MLO1/2/576-612**);

(g)    Decision by Judge De Souza dated 6 May 2014 in connection with Precautionary measure to freeze BRL 122,006,970.00 (**MLO1/3/613-619**);

(h)    Decision by Court of Appeal dated 4 November 2014 in connection with Precautionary measure to freeze BRL 122,006,970.00 (**MLO1/3/828-838**);

(i)    Request by Prosecutor dated 11 September 2014 in connection with Precautionary measure to freeze BRL 1.5 billion (**MLO1/3/895-911**);

(j)    Decision by Judge De Souza dated 9 February 2015 to freeze property of Batista, as well as assets of Batista's funds in connection with Precautionary measure to freeze BRL 1.5 billion (**MLO1/3/839-840**);

(k)    Decision by Judge Valpuesta dated 28 April 2015 to decrease amount of frozen assets to BRL 162,646,092.00 in connection with Precautionary measure to freeze BRL 1.5 billion, which I exhibit together with a partial English translation (**MLO1/3/912-953**);

(l)    Decision by Judge Valpuesta dated 5 June 2015 to release frozen assets in one of Batista's funds (Centennial Asset Mining Fund LLC) in line with the reduction with Precautionary measure to BRL 162,646,092.00 (**MLO1/3/841**);

(m)    Decision by Judge Valpuesta dated 18 February 2016. The judge accepted the argument of the Prosecutor that Batista sold shares of his companies which provided unjustified profits to his benefit, and decided to freeze BRL 8,720,910.00 in connection with a further Precautionary measure to freeze BRL 34 million (**MLO1/3/868-882**);

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(n)     Decision by Judge Valpuesta dated 25 August 2016 unifying the freezing orders of all precautionary measures ratifying the order to freeze BRL 162,646,092.00 (MLO1/3/883-890);

(o)     Decision by Judge Valpuesta dated 12 September 2016 maintaining the BRL 162,646,092.00 freezing order, but suspending the liquidation of quotas held in investment funds until Batista presents other assets of the same amount (MLO1/3/891-894).

54.     The Criminal Proceedings recite similar factual allegations to allegations made in the Florida Complaint. The criminal proceedings are also based on allegations similar to those investigated by the Brazilian Securities and Exchange Commission and made in the Minority Shareholder Action that the defendants had committed crimes against the securities market.

55.     The Criminal Proceedings involve allegations of frauds committed by the defendants thereto, including Batista, between 2009 and 2013 and that these actions formed part of joint and co-ordinated actions by the defendants. Central to the allegations specifically pleaded are the Statements of Material Facts within the meaning of Brazilian securities law and other public statements made by Batista which allegedly were made dishonestly with the intention of influencing investors in OGX.

56.     Under Brazilian securities law, Statements of Material Facts are only made when the directors of a public company consider that there is a fact which would have a material impact on the decision of an investor to invest in that company. Instrução CVM No. 358/02 (a copy of which is exhibited at MLO1/2/527-575) describes the obligation of the directors and officers of the company to inform the Investor Relations Director (and of the latter's obligation to inform CVM) about any facts that fall within the description of acts that are deemed relevant by the law. Such Material Facts shall also be published by the company in the newspaper and on the internet. Generally, acts that must be informed are those that may influence the stock market. Violation of this rule is regarded as a severe breach under Article 11, §3°, of Law No. 6,385/76, which may result in the suspension or impediment of the director and on the suspension or cancellation of the registration to trade in the stock market.

57.     The allegations specifically made against Batista in the Criminal Proceedings relate to:

15

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(a)     The inaccuracy of Statements of Material Facts as to the value or quality of OGX oil assets (see paragraph 34(1) to (7) of the First Indictment) (MLO1/2/353-445 at 362-364).

(b)     Other misleading public statements made by Batista (see paragraph 35 of the First Indictment) (MLO1/2/353-445 at 364).

(c)     The statements made by Batista as to the Put Option publicised in October 2012. It is alleged that Batista knew from the outset that the Put Option would not be exercised against him and that he falsely led the market to believe he was making a significant personal financial commitment to OGX (see paragraphs 46 to 50 of the First Indictment) (MLO1/2/353-445 at 365-366).

(d)     The statements made by Batista in June 2013 that neither he nor EBX would dispose further of their shareholdings in OGX when by September 2013, without further announcement, substantial sales of those shares were made (see paragraphs 51 and 54 of the First Indictment) (MLO1/2/353-445 at 366-367).

(e)     Batista colluded with others, as the principal "*leader of OGX*", to deceive investors and the public. Batista acted in bad faith and with malice in misleading the investment market (see paragraphs 54 to 55 of the First Indictment) (MLO1/2/353-445 at 367).

58.     Batista was charged with the following criminal offences in the First Indictment:

(a)     Misrepresentation on a public document contrary to Article 299 of the Criminal Code (see paragraph 56(a) of the First Indictment) (MLO1/2/353-445 at 367).

(b)     Misleading investors, contrary to Article 6 of Law No 7,492/86 (see paragraph 56(b) of the First Indictment) (MLO1/2/353-445 at 367); and

(c)     Criminal conspiracy contrary to Article 288 of the Criminal Code (see paragraph 56(c) of the First Indictment) (MLO1/2/353-445 at 367) (since rejected as discussed below).

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

59.   Subsequently the Second Indictment (see MLO1/2/446-468) alleged further charges against Batista, which are:

(a)   market manipulation punished by Article 27-C of Law No. 6,385/76 (see section IV of the Second Indictment) (MLO1/2/446-468 at 454); and

(b)   insider trading described in Article 27-D of Law No. 6,385/76 (see section IV of the Second Indictment) (MLO1/2/446-468 at 454).

60.   The following charges against Batista have been permitted to continue following reviews of the allegations by the Judge in charge of the case following representations by counsel for the prosecution and Batista:

(a)   Article 299 of the Criminal Code sets out the offence of misrepresentation on a document describing it as the act of omitting in a public or private document a representation that should be inserted or to insert a false representation with the purpose of obstructing any right, creating obligations or to modify reality about a legally relevant fact. Such offence is punishable with a fine and prison varying from 1 to 5 years (1 to 3 years if it is a private document).

(b)   Law No 7,492/86 is a criminal law conceived to punishing crimes against national financial system. According to its Article 6, it is a criminal offence to induce or lead to error a shareholder or investor in connection with a financial transaction or situation by omitting or providing untrue information. An imprisonment sentence may go from 2 to 6 years and also a fine will be applied.

(c)   Article 27-C of Law No. 6,385/76 describes the crime of market manipulation. It is a criminal offence to perform simulated transactions or other fraudulent schemes with the purpose of artificially modifying the regular operation of stocks in the stock exchange aiming at causing damages or obtaining improper advantages for itself or for third parties. An offender may be imprisoned for 1 to 8 years and pay a fine of three times the amount of the advantage illegally obtained.

(d)   Article 27-D of Law No. 6,385/76 provides for the crime of insider trading. The crime involves the use of relevant information still undisclosed to the

17

market that is known to someone or that someone should keep confidential that is capable of resulting in an illegal advantage in stock trading. An offender may be sentenced to prison for 1 to 5 years and to pay a fine of three times the amount of the advantage illegally obtained.

61. By a decision dated 25 January 2016, the Judge in Rio de Janeiro decided to proceed with the allegations based on crimes indicated at paragraph 58(a) and (b) above in the First Indictment (see **MLO1/2/576-612**). The Judge rejected the charge of criminal conspiracy (Art. 288) on the basis that not all of the defendants to the Criminal Proceedings have worked to carry on with the violation, but some of them have actually worked towards recovering the company, which was not the case for defendants, Batista, Marcelo Torres and Paulo Mendonça. The description of criminal conspiracy requires that at least four defendants (and not three as in the case) collaborate to that criminal purpose. The Judge raised the issue as to whether the alleged facts indicate a possible violation of crime described in Article 27-C of Law No 6,385/76.

62. According to the Criminal Procedural Code the criminal complaint presented by the prosecutor shall be summarily rejected by the Court (Article 395): (i) in case of ineptitude (Article 41): if the complaint does not contain a description of the criminal fact and its circumstances, if the defendant is not correctly identified and if conduct is not properly classified, (ii) in case procedural conditions and assumptions are not satisfied, (iii) when exercise of criminal action lacks just cause. Complaints arising out of the First and Second Indictments have been received by the judge. This means, among other things, that the Judge considered that the Criminal Proceedings satisfied the just cause requirement.

63. I have not seen a document that would constitute a formal response to the allegations contained in the First and Second Indictments. The documents I have reviewed in relation to the criminal proceedings briefly indicate some main substantive lines of defence raised by Batista. Judge Valpuesta, in his decision dated 28 April 2015 suggests the main lines of defence used by Mr Batista are as follows:

   (a) that the shares traded by Batista between May and June 2013 had already been pledged to a certain debt obligation;

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KYI-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(b)    that OGX has delayed publishing the relevant facts related to the impossibility to carry commercial exploitation of oil fields until it reached such conclusion;

(c)    that Batista only knew about the impossibility to exploit the fields after trading his shares;

(d)    that Batista had no purpose in using insider information, as he could have traded all of his shares and otherwise has made other investments;

(e)    that the put option was not fully disclosed due to its complex nature;

(f)    Batista also alleges the lack of jurisdiction of the federal courts and that the evidence is insufficient to support the filing of the charges and the continuation of the Criminal Proceedings (MLO1/3/925-953).

64.    It is extremely hard to anticipate the likely timeframe of criminal proceedings, since many particular issues and incidents may arise during proceedings. It usually takes at least 2 years for an award to be issued by a judge and 3-4 years to have all appeals judged by Federal and Superior Courts. That timeline should be expected to run from the date of the admission of the Second Indictment, i.e. January 2016.

64.1

(a)    I note that Batista has also been charged in a different criminal proceeding for crimes in connection with his indirect controlling shareholding in OSX Construção Naval S.A. In this proceeding, similar facts are described by the Public Attorney Office as to those applicable in the case of OGX. The most recent decision is by Judge Valpuesta of 21 September 2016 (MLO1/3/955-1002).

(b)    Here, the Public Attorney Office made the same allegations in relation to OSX as those outlined in relation to OGX (see paragraph 60, above). However, the Public Attorney Office has voluntarily withdrawn the charges outlined at paragraph 60 (a) and (b) above. In the decision of 21 September 2016, Judge Valpuesta dismissed those two charges and progressed the charges of market manipulation and insider trading (paragraph 60(c) and (d), above).

19

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(c)     In this same decision, Judge Valpuesta rejected all preliminary defenses of Batista and rejected all motions for a summary dismissal. In summary, the main lines of preliminary defense (now rejected) were that:

    (i)     the accusation had not correctly described the criminal offenses or the underlying facts;

    (ii)    in respect of the insider trading charges, Batista was in fact aware of a change of business plan at a later date than alleged by the Public Attorney Office;

    (iii)   the 3rd Federal Court of Rio de Janeiro lacked jurisdiction and that the proceeding should be redirected to the state courts of Rio de Janeiro.

(d)     The main defenses on the merits in support of a summary dismissal (now rejected) were that:

    (i)     the sale of OSX shares on April 19, 2013 has been made in order to comply with "free float" requirements of CVM, i.e., with a minimum amount of shares (25%) that shall be traded in the market and therefore not held by the controlling investor.

    (ii)    By the time that the modification of the business plan has been divulged on 17 May 2013, the crisis of all companies of the X group was known to the public, and that such knowledge was already reflected in the price of the shares in the market.

    (iii)   The sale of shares would be contradictory to the actual satisfaction of the investment of BRL 243,000,000 through a put obligation, which has been made in May 2013, for an amount that was well superior to the amount per share by the time of the sale.

    (iv)    The board of directors meeting of OSX on 15 April 2013 had not discussed the change of the business plan. This matter was only considered on 30 April 2013 when a notice was sent to the board members with a proposal to change the business plan. Therefore,

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

the sale on 19 April 2013 was not made by using insider information.

(v)     The Public Attorney Office was wrong about the date in which decision has been made not to transfer certain assets (namely FPSO OSX 2) to the fields of OGX.

(vi)    The impossibility of exploiting the fields of OGX was only discussed by the Board of Directors on 28 June 2013, after conclusion of studies and was subsequently divulged as a material fact to the market on 1 July 2013.

(vii)   Batista was not the officer of investor relations with the responsibility of informing the market about certain decisions to transfer FPSO OSX 2.

(e)     Judge Valpuesta analyzed the accusations and the defenses and concluded that there was sufficient evidence of materiality to allow the criminal proceedings to move to the next procedural stage. For instance, Judge Valpuesta doubted that a decision as relevant as not to move the FPSO OSX 2 to the fields of OGX would not have taken several months to be reached and that all details would not have been discussed before between OSX and OGX. It was also noted that CVM rules in effect at that date provided also for an obligation of the controlling shareholder to disclose facts to the officer of investor relations to be published as a material facts.

**Asset freezing orders against Batista / his family members**

65.

(a)     In early July 2013, a civil applicant, Marcio Lobo, applied for a freezing order against the assets of OGX and Mr Batista as officeholder. The basis of the application was the adverse effect on shareholder and creditor interests in OGX following the company's negative financial state, including its negative balance sheet in 2012, and its 1 July 2013 retractions as regards production estimates **(MLO1/3/954)**. On 11 July 2013, the court rejected the application on the basis that: (i) that allegations were insufficient to support a freezing order; (ii) the grant of such relief would cause severe

21

damage to OGX as a going concern; (iii) OGX was being monitored by the CVM and shareholders themselves; (iv) Mr Batista was an officeholder of OGX and there was insufficient evidence to justify such relief against him personally; and (v) the grant of such relief would therefore be unjustifiable use of judicial power on OGX's operations (**MLO1/3/954**). It is important to bear in mind that, at the time of this application, OGX was still operating as a going concern, was supported by Mr Batista's Put Option granted to OGX in October 2012, and the evidence of Mr Batista's alleged fraud as set out in evidence in support of the Application was not publicly available.

(b)     On 6 May 2014, on the application of the criminal prosecutor, the 3rd Federal Criminal Court in Rio de Janeiro made an order for seizure and provisional attachment of Batista's assets up to the value of BRL122,006,970 (**MLO1/3/613-619**). The presiding judge was Flavio de Souza. The precautionary measures were granted in connection with the investigation into alleged crimes by Batista which would later comprise the 2nd Indictment. The order was stated to have had the following effect: "*...to freeze all financial assets belonging to [Batista] that are located in checking accounts, savings accounts or accounts for financial purposes through BACENJUD, up to [BRL122,006,970]*" (**MLO1/3/615**). The test applied by the court in granting this relief was the presentation of sufficient evidence of probable cause and that the defendant committed the incident (*fumus boni iuris*), and danger in delay (*periculum in mora*) (**MLO1/3/615**). The Judge concluded that "*In this case, the reported facts clearly demonstrate the presence of evidence of probable cause and the defendant committed the crimes of Market Manipulation and Insider Trading... [and]... if the required measure is not granted, there is a risk that the suspect will sell his assets, making future restitution in case of conviction impossible*" (**MLO1/3/613-619 at 615**).

66.     The Prosecution sought on 11 September 2014 to extend the ambit of the precautionary measures to encompass assets of certain of Batista's family members (**MLO1/3/895-911**). In particular, Batista is stated to have given a statement to the local Police in which he acknowledged that he had "*donated*" significant assets, primarily real estate, to his family members. These donations are set out in more detail below at paragraph 69.

22

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

67.   On 15 September 2014, Judge de Souza ordered further precautionary measures against Batista's assets up to BRL1.5 billion via the BACENJUD system (**MLO1/3/657-736 at 671**). The quantum of this order was subsequently increased by BRL237 million (**MLO1/3/657-736 at 671**). These orders were stated to have applied to Batista's assets "*in the country*", that is, Batista's domestic assets (**MLO1/3/657-736 at 671**).

68.   As regards the contents of Batista's statement to the Police, the Prosecutor alleged that it "*...indicated... a scheme to protect his assets from a future coercive measure in a context that showed an attempt to evade the civil effects of any conviction...*" (**MLO1/3/657-736 at 670**). Notwithstanding such submissions, the Judge froze only Batista's assets (see the decision of 28 April 2015 at **MLO1/3/912-953 at 917**).

69.   Further sequestration requests (under numbers 0512467-57.2015.4.02.5101 and 0042674-33.2014.4.02.5101), have been made by the Prosecutor Office against Batista, the first seeking a freezing order of BRL 34 million, which is allegedly the amount that Batista profited by trading his shares on 19 April 2013 (see paragraph 53(m), above). As part of the latter application, prosecutors have adduced evidence of "*atypical disposition of property*", including:

   (a)   Donation of real property to Batista's sons on 9 July 2013, which transactions occurred after Batista's disposition of a significant portion of his OGX shareholding, and a matter of days following OGX's retraction of representations as to recoverable oil volumes on 1 July 2013. Further donations to the same recipients are stated to have taken place on 9 December 2013 (**MLO1/3/672**).

   (b)   Assignment of rights over real estate to Flavia Sampaio on 15 May 2014, a matter of days following the 6 May 2014 precautionary measures order referred to above (**MLO1/3/673**).

70.   The above application also makes allegations of further acts by which Batista is alleged to have been depleting his assets. In the Prosecutor's words "*we do not speak here of one of two innocent donations, but a large number of transfers that occurred not before the criminal practices... but after it*" (**MLO1/3/673**). Among the "*many... suspicious transactions mentioned*" in the application, the following are stated:

23

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(a)     The sale of his shareholding in a company named SIX, disclosed on 13 January 2014;

(b)     The sale of Hotel Gloria, disclosed on 1 February 2014;

(c)     The sale of a Gulfstream 550 jet, disclosed on 18 January 2014;

(d)     The sale of mining company, AUX, disclosed in September 2014. It was alleged that this company was transferred to Mubadala at no cost despite having been purchased in 2011 for US$1.5 billion and valued at the time of sale at US$4 billion (MLO1/3/673).

71.     On 4 November 2014, the Court of Appeal rejected an appeal by Batista against the freezing order of BRL 122,006,970.00 imposed by Judge De Souza (MLO1/3/828-938). The Court of Appeal dismissed the appeal on the understanding that the materiality of crime against the stock market which Batista committed was successfully demonstrated by the Plaintiff. This conclusion was based on the following reasons:

(a)     Batista was the controlling shareholder and manager of OGX with access to all information about the operation and economic viability of the oil fields "*Tubarão Tigre*", "*Tubarão Gato*" and "*Tubarão Areia*";

(b)     Batista signed a "*Put*" contract with OGX under which he would transfer BRL 1 billion from his personal assets to OGX in order to ensure the continuity of the Company's business plan;

(c)     A final report was presented on 28 June 2013 which pointed out the impracticality of the oil fields and only on 1 July 2013 was this relevant fact disclosed to the public; and

(d)     Between 24 May 2013 and 10 June 2013, Batista sold OGX's shares using one of his funds (Centennial Asset Mining Fund LLC) which generated profits to his benefit on the approximate amount of BRL 122 million (MLO1/3/828-938).

72.     On 9 February 2015, in response to the court accepting amendments to the Second Indictment on 7 January 2015, Judge de Souza extended the scope of the precautionary measures ordered previously to, inter alia:

24

(a)  Freezing and seizure of all financial assets <u>in the country</u> belonging to Batista, Thor Batista, Olin Batista, Flavia Sampaio and Luma de Oliveira, by means of the BACENJUD system;

(b)  Sequestration of real estate up to a value of 1 billion and a half of the above person. A copy of this decision is at (**MLO1/3/838-839**).

73.  On 9 February 2015, the Public Attorney Office of Rio de Janeiro obtained a freezing order over assets in connection with the Second Indictment to support a possible conviction for market manipulation and insider trading, as described above, in accordance with Article 91, I, of Brazilian Criminal Code (**MLO1/3/839-840**). A first order was issued determining that certain assets should be frozen. This freezing order, applied to the general assets of Batista, Centennial Asset Mining Fund LLC and Centennial Asset Brazilian Equity Fund LLC, as well as to the assets of Batista's family members referred to above. As described above at paragraph 17, for the Brazilian prosecutor to obtain the freezing order, the prosecutor needed to establish a prima facie case on the merits as well as the risk that delay in the provision of relief would undermine the effectiveness of any future order. The Judge authorized the Public Attorney Office to ask for international cooperation in order to effect the decision, although no particular asset or jurisdiction abroad has been mentioned. From my inspection of the public records I am not aware of the any steps being taken outside of Brazil to enforce or support this order.

74.  On 28 April 2015 the freezing orders dated 15 September 2014 and 9 February 2015 were varied by Judge Valpuesta, on the basis of legal argument that the value of the put in the Put Option was not necessarily the appropriate basis to assess the probable damages caused by the conduct of Batista (**MLO1/3/912-953**). The Judge reduced the quantum of the order to BRL 162,646,092.00 (**MLO1/3/912-953 at 914**). In reducing the quantum of the freezing order, no finding was made that the legal test for the issuance of a freezing order was no longer met. Indeed, the court acknowledged that there was a "*probability of a favourable decision*" in respect of several criminal charges against Batista in the Indictment. As a result, the freezing order remained albeit with a reduced quantum based on the Court's discretion. Judge Valpuesta decided that neither the profits due to trading of shares before disclosure of facts affecting OGX nor the amount of the unsatisfied obligation under the Put

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

Option should be the basis for calculation of illegal advantage obtained due to insider information charges.

75.  On 22 June 2015 the Attorney General filed an appeal against the reduction of the scope of the freezing order (**MLO1/3/657-736**). Such appeal has been rejected on 20 September 2016, although reasoning of the decision has not been disclosed yet. The appeal document raises legal arguments in response to the earlier decision that the freezing order should at this point be limited to BRL 162,646,092.00. The appeal requests that the quantum of the freezing order against Batista's assets be raised to circa BRL1 billion and the extension to assets donated to Batista's family members be reinstated.

76.  On 25 August 2016 Judge Valpuesta acknowledged the various requests by Public Attorney Office and decided to unify all existing decisions in order to have a single determination with regard to freezing orders (**MLO1/3/883-890**). He then ratified that the amount of BRL 162,646,092.00 is sufficient for purposes of the precautionary measures. In his last decision of 12 September 2016 (procedure number 0512467-57.2015.4.02.5101) Judge Valpuesta decided to maintain the freezing order but to temporarily suspend the liquidation of quotas held by Batista in investment funds.

## DISQUALIFICATION BY CVM

77.  The CVM issued a decision on 11 November 2015 barring Batista from acting as an officer of a public company for a period of 5 years. A copy of that decision and an English translation is exhibited at **MLO1/3/620-656**.

78.  The disqualification is based on narrow and specific grounds. The CVM found that Batista participated in a vote to approve on 2 May 2014 the accounts of OGPar for the year ending 2013 through his interests in Centennial Mining and Centennial Equity. Batista was the Chairman of the Board of Directors in 2013. This was contrary to Articles 115 and 134 of Law 6,404/74, which prevents controlling shareholders that are also directors voting on and approving accounts. Batista is the sole shareholder of both companies, which then held 50.16% of the voting capital and the votes of these companies resulted in the votes passing.

79.  Batista defended himself by saying that he did not personally attend the meetings, but that the controlling companies were represented by an attorney in fact. He also

26

argued that he should not be personally identified with Centennial Mining and Centennial Equity as they were separate entities distinct from his own interests. However, Batista's defences were rejected. CVM director Pablo Renteria pointed out that Batista practiced a conscious violation of law in order to obtain the approval of the 2013 accounts and consequently to pursue the exoneration of his liabilities as director vis-à-vis the shareholders.

80.     In addition, the CVM fined Batista "*300,000 reais for failure to properly inform investors about the sale of assets at oil company OGX Petróleo e Gás Participações SA*", according to a Reuters article dated 18 March 2015 (**TDA1/3/831-832 at 832**).

**JUDICIAL RECOVERY / AKA "Bankruptcy"**

81.     On 30 October 2013 the OGX group of companies petitioned for judicial reorganisation under Chapter III of the Brazilian bankruptcy law, law 11,101/05. Following this OGX prepared a reorganisation plan for submission to the Fourth Corporate Court of Rio de Janeiro. OGX Austria was admitted within this process and submitted its own reorganisation plan on the same date. The reorganisation plans were approved by the requisite amount of creditors on 3 June 2014 and by the Fourth Corporate Court on 13 June 2014 and are exhibited at **MLO1/3/737-786** as regards the Ole e Gas Participacoes S.A. and **MLO1/3/787-822** as regards OGX Austria specifically. The effect of these approvals is that the reorganisation plans bound all shareholders and creditors of the companies subject to the plan, including those that did not vote in favour of it.

82.     As a matter of Brazilian law, the reorganization plans would not impede the bringing of the Florida Complaint or an equivalent claim in Brazil since the reorganization plan is as to OGX's debts and does not absolve company directors or executives for delictual or fraudulent acts they committed against third parties such as Applicants.

83.     The Judicial Reorganisations Plans (the "**Plans**") are governed by Brazilian law, see for example Clause 14.12 of the OGX Austria plan 14.12 (**MLO1/3/787-822 at 820**).

84.     A letter by Deutsche Bank, acting as Indenture Trustee, dated June 27, 2014, notified all depositaries, custodians and other intermediaries that (i) a general meeting of creditors took place on June 3, 2014, (ii) the plans were approved by the necessary

27

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

majority of creditors, including the beneficial owners who attended and voted and (iii) the courts confirmed each of the plans (**MLO1/3/823–824**).

85. Applicants held bonds issued by OGX Austria. As a consequence, the credit belonging to Applicants has been attached to and novated by the Plans.

86. The Plans novate the agreement creating the underlying debt owed by OGX and converting the rights under the bonds to an equity interest in the restructured OGX entity. The Plans provide contractual restrictions on the ability of the creditors, which would include Applicants, on seeking payment for the outstanding debts owed by OGX entities whether directly as debt enforcement or indirectly as damages claims. The Plans also provide protections for certain parties' actions during the reorganisation itself and those protections extend to Batista but only to a limited extent.

87. In particular, clause 10 of the OGX Austria Plan contains contractual restrictions on creditors, including bondholders, from bringing certain claims. In summary:

(a)   Clause 10.1 confirms that the OGX Austria Plan is binding on Creditors, which includes Applicants.

(b)   Clause 10.2 provides for the novation of the contracts giving rise to a debt owed to the Creditors at the time of the reorganisation.

(c)   Clause 10.3 restricts the enforcement of debts against OGX Austria. The term in the translated version barring Creditors from "*seek[ing] satisfaction of their Credits by any other means*" refers to enforcement of the debt owed by OGX Austria and claims under contracts with OGX Austria.

(d)   Clause 10.5 provides for the discharge of claims against the OGX companies, including OGX Austria in the first sentence of that Clause. That discharge is expressed as extending to damages claims but that is only against those companies. The second clause also bars claims against directors, employees, agents and shareholders of OGX Austria but this only bars claims for payment of Credits themselves, and in contrast to the first sentence, it does not purport to extend to holding such third parties harmless for claims in damages for their delictual or fraudulent acts.

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.

(e)    Clause 10.7 provides an exemption for liability for certain parties for obligations assumed in the course of the Judicial Reorganisation and that exemption extends to Batista, who is defined as being one of the "*Exempt Parties*". However, the subject matter of that clause is unrelated to Applicants' allegations against Batista and is therefore inapplicable (**MLO1/3/787-822 at 815-817**).

88.    The same analysis provided in the preceding paragraph applies to the equivalent provisions in OGX Plan at clauses 12.1 – 12.7 (**MLO1/3/737-786 at 767-769**).

89.    I do not believe that as a matter of Brazilian law the restrictions contained in the plans summarised limit Applicants' ability to pursue the claims in the Florida Complaint as the claims against Batista and the Cayman Respondents do not fall within any of the restrictions on claims in the Plans.

90.    Even if these claims did fall within the restrictions, which they do not in my view, that would not necessarily be determinative of Applicants' rights under Brazilian law. If the losses arose as a result of the criminal conduct of Batista the contract may not be considered as barring a claim for compensation particularly if that misconduct was not properly disclosed at the time of the approval of the Plan.

Sworn by:

At:  Rio de Janeiro, 18th October 2016

Witnessed:



Cartório
Gustavo Bandeira
Reconhecimo por SEMELHANCA a(s) firma(s) de:
MARCELLO AUGUSTO LIMA DE OLIVEIRA.........................
Rio de Janeiro, 18/10/2016.
Serventia:4.94 Fundos:1.74 Total: 6.68
Thamyris Maia Coelho, EBUF58208-RIO
Consulte em https://www3.tjrj.jus.br/sitepublico

089391
ABB01192

8º Oficio de Notas-RJ
Thamyris Maia Coelho
Escrevente
CTPS 07945 Serie 176 RJ

29

THIS AFFIDAVIT is FILED by SOLOMON HARRIS of 3rd Floor, First Caribbean House, P.O. Box 1990, Grand Cayman, KY1-1104, Cayman Islands, Attorneys-at-law for and on behalf of the Applicants whose address for service is that of their said Attorneys-at-law.



FSC
www.fsc.org
MIX
Paper from
responsible sources
FSC® C014618

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY

COMPLEX BUSINESS LITIGATION
DIVISION

**MERIDIAN TRUST COMPANY**, as
trustee, and **AMERICAN ASSOCIATED
GROUP, LTD.**,

Case No. 17-001040 CA (43)

Plaintiffs,

vs.

**EIKE BATISTA,** *et al.*

Defendants.

_____/

## MARCUS BERTO'S NOTICE OF JOINDER TO CO-DEFENDANTS'
## MOTION TO DISMISS PLAINTIFFS' CLAIMS BASED ON COMITY

Defendant, Marcus Berto ("Berto"), hereby joins co-defendants', Werner Batista's,

Centennial Asset Mining Fund LLC's, Centennial Asset Brazilian Equity Fund LLC's, 63X

Investments LTD.'s, 63X Master Fund's, and 63X Fund's (together, the "Defendants") Motion

to Dismiss Plaintiffs' Claims Based on Comity (the "Motion"). For all of the reasons stated in

the Motion, Berto respectfully requests that this Court dismiss Plaintiffs' claims

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE**
**& AXELROD LLP**
*Attorneys for Defendant Marcus Berto*
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: ___*/s/ José M. Ferrer*_____
**JOSÉ M. FERRER**
Florida Bar No. 173746
jferrer@bilzin.com
**YASMIN FERNANDEZ-ACUÑA**
Florida Bar No. 117372
yfernandez-acuna@bilzin.com
eservice@bilzin.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished to the

individuals listed below by e-mail generated by Florida Courts E-Portal Filing system this 7th

day of April, 2017:

Hendrick G. Milne, Esq.
hmilne@aballi.com
Craig P. Kalil, Esq.
ckalil@aballi.com
Carlos F. Osorio, Esq.
cosorio@aballi.com
**ABALLI MILNE KALIL, P.A.**
*Attorneys for Plaintiffs*
SunTrust International Center
One Southeast Third Avenue
Suite 2250
Miami, Florida 33131

Edward M. Mullins, Esq.
emullins@astidavis.com
Ana M. Barton, Esq.
abarton@astidavis.com
bhernandez@astidavis.com
**ASTIGARRAGA DAVIS MULLINS &**
**GROSSMAN, P.A.**
*Attorneys for Werner Batista*
1001 Brickell Bay Drive
9th Floor
Miami, Florida 33131

By_____*/s/ José M. Ferrer*_____
**José M. Ferrer**

MIAMI 5387576.1 82874/84405

2

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

      Defendants.

_____/

### NOTICE OF FILING VERIFIED RETURN OF SERVICE

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for Aziz Ben Ammar.

Dated: April 12, 2017.

                        Respectfully submitted,

                        ABALLI MILNE KALIL, P.A.
                        *Counsel for Plaintiffs*
                        2250 SunTrust International Center
                        One Southeast Third Ave.
                        Miami, FL 33131
                        Phone: (305) 373–6600
                        Fax: (305) 373–7929

                        *s/ Hendrik G. Milne*
                        Hendrik G. Milne
                        Florida Bar No.: 335886
                        Craig P. Kalil
                        Florida Bar No.: 607282

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 12th day of April, 2017 a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

The Circuit Court of the 11ᵗʰ Judicial Circuit in and for
Miami Dade County Florida

Case # 2017-001040-CA-01(43)

Meridian Trust Company as Trustee and American Associated Group, LTD
Plaintiff(s)/Petitioner(s)

-against-

**AFFIDAVIT OF SERVICE**

Eike Batista, Werner Batista, Thor Batista, Paolo Mendonca,
Flavion Godinho, Paolo Gouvea, Marcus Berto, Luiz Carneiro
Aziz Ben Ammar, 63X Investments LTD, 63X Master Fund,
63X Fund, EBX Holding LTD, EBX International, S.A., EBX Capital Partners, et. al.
Defendant(s)/Respondent(s)

State of Florida, County of Miami Dade, SS.:
Paul Malesky, NYC LIC # **13881316** being duly sworn deposes and says deponent is not a party herein, is over the age of
eighteen years and resides in the State of New York.
That on **4/4/2017 at 09:15 AM**, I received the Civil Action Summons and Complaint and on **4/6/2017 at 10:29 AM** at **40 Mercer Street, Apartment 24, New York, NY 10013** deponent (did) serve the following: **Civil Action Summons and Complaint** on **Aziz Ben Ammar**, Respondent (herein called recipient) therein named.

| | |
|---|---|
| ☐ **Individual** | By delivering a true copy of each to said recipient personally; deponent knew the person served to be the Person described as said person therein. |
| ☐ **Corporation** | _____ by delivering thereat a true copy of each to _____ personally, deponent knew said corporation so served to be the described in same as said recipient and knew said individual to be an _____ thereof. |
| ☒ **Suitable Age Person** | By delivering a true copy of each to **Gabi Rebeschini (Spouse)** person of suitable age discretion. Said premises is recipient's [ ] actual place of business [X] Actual place of residence within the state. |
| ☐ **Due Diligence** | Service was made in the following manner after your deponent was unable, with due diligence, to serve the defendant in person, including an effort to reach the defendant by telephone, (if such telephone number was available) and an attempt to locate the defendant's place of employment. |
| ☒ **Mailing Copy** | On **April 7, 2017**, deponent completed service under the last two sections by depositing a copy of the **Civil Action Summons and Complaint** to the above address in a First Class postpaid properly addressed envelope marked "Personal and Confidential" in an official depository under the exclusive care and custody of the United States Post Office in the State of New York. |
| ☒ **Description** | A description of the Defendant, or other person served, on behalf of the Defendant is as follows: Sex: **FEMALE** Color of Skin: **WHITE** Color of Hair: **BROWN** Approx Age: Choose an item.**YRS** Approx Height: **5'9"-6'0"** Approx Weight: **131-160 LBS**  Other: **25-35 years old, South American Accent  Residence is Apartment. Recipient, spouse of defendant, confirmed her identity, then refused service and shut the door. I verbally informed her that she was served and documents would be attached to her door.  A picture of the spouse of the defendant, whom I served, is attached as exhibit "A".** |
| ☐ **Subpoena/ Wit. Fee** | $_____, the authorized travel expenses and one day's witness fee was paid (tendered) to the recipient. |
| | Deponent asked person spoken to whether the recipient was presently in military service of the United States Government or on active duty in the military service in the State of New York and was informed he/she was not. |
| ☐ **Military Personnel** | Deponent asked person spoken to whether the recipient was presently in military service of the United States Government or on active duty in the military service in the State of New York and was informed he/she was not. |

Sworn to before me on this

__10__ day of __April__, __2017__

_____
**Notary Public**

Paul Malesky _[signature]_

Process Server NYC Lic #1388136

**MATTHEW KAUGET**
Notary Public, State of New York
No. 02KA6256915
Qualified in Nassau County
Commission Expires March 05, 2020

JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

☒ IN THE CIRCUIT COURT
☐ IN THE COUNTY COURT

MIAMI-DADE COUNTY, FLORIDA.

**CIVIL ACTION SUMMONS (b)**
Form for Personal Service on a Natural Person

**CASE NUMBER**
2017-001040-CA-01 (43)

**DIVISION**
☒ CIVIL   ☐ OTHER
☐ DISTRICTS

**CLOCK IN**
Service was made on
4/6/17 at 10:20AM on
GABI Rebeschini (wife
of dept) Nyc lic # 1388136

VS.  DEFENDANT(S)

**PLAINTIFF(S)**

THE STATE OF FLORIDA-TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this

lawsuit on defendant:

To Defendant:

**Address**
47 Mercer St., Apt. 24, New York, NY 10013-3076

### IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiffs' Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience.

"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at **www.dadecountyprobono.org**."

### MIAMI-DADE COUNTY COURT LOCATIONS

☒ Dade County Courthouse (XX)
Room 133
73 West Flagler Street
Miami, FL 33130

☐ Martin Luther King Office (??)
2525 N.W. 62nd Street
Room 1200 A
Miami, FL 33147

☐ Hialeah District Court (31)
Room 100
11 East 6th Street
Hialeah, FL 33010

☐ North Dade Justice Center (23)
Room 100
15555 Biscayne Blvd.
North Miami Beach, FL 33160

☐ Miami Beach District Court (44)
Room 200
1130 Washington Avenue
Miami Beach, FL 33139

☐ Coral Gables District Court (25)
Room 100
3100 Ponce De Leon Blvd.
Coral Gables, FL 33134

☐ South Dade Justice Center (26)
Room 1200
10710 SW 211 Street
Miami, FL 33189

**SERVICE**

**Plaintiff/Plaintiff Attorney**
Hendrik G. Milne
Florida Bar No. 335000

**Address:**
One Southeast Third Avenue, Suite 2250, Miami, FL 33131

**CLERK OF COURTS**
HARVEY RUVIN

**DATE ON:**

JAN 2 4 2017

**DEPUTY CLERK**

## AMERICANS WITH DISABILITIES ACT OF 1990
### ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."



# Exhibit "A"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

     Defendants.

_____/

## SECOND UNNOPPOSED MOTION TO EXTEND TIME
## TO RESPOND TO MOTION TO DISMISS

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), respectfully move this Court for an order extending the time within which they

may respond in opposition to Defendant Marcus Berto's ("Berto") Motion to Dismiss Complaint, and

state:

1.     Defendant Berto filed and served his Motion to Dismiss on March 17, 2017. Pursuant

to this Court's Order on the Plaintiffs' first unopposed motion to extend time to respond to Berto's

Motion to Dismiss the Complaint, Plaintiffs' response is currently due for filing and service on April

17, 2017.

2.     Given, however, the complexity of the legal arguments set forth by Berto in the Motion

to Dismiss, which is the first filed challenge to the complaint, the Plaintiffs recognize they will be

unable to properly respond to the Motion to Dismiss by April 17, 2017, and request an additional

week to complete their response. The additional time will permit a more clear response to be

1

prepared. The resulting clarity will benefit not only the Plaintiffs, but, Plaintiffs submit, assist the Court in reaching its ultimate determination.

3.    Undersigned counsel discussed this request for enlargement of time with counsel for Mr. Berto who has graciously consented to the request. [1]

4.    This request is not sought for purposes of unnecessary delay, and granting the request would conduce to the interests of justice.

WHEREFORE, Plaintiffs respectfully request an additional 7 days, until and including April 24, 2017, within which to file and serve their response to Defendant Marcus Berto's Motion to Dismiss.

## CERTIFICATE OF CONFERENCE

The undersigned hereby confirms that counsel for movant has conferred with counsel for Mr. Berto and that counsel does not oppose the relief requested in this motion.

Dated: April 13, 2017.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

s/ *Craig P. Kalil*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

---

[1] All counsel in the case have a very good working relationship with regard to such normal courtesies.

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 13th day of April, 2017 a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court' s e-service system.

*s/ Craig P. Kalil*
Craig P. Kalil, Esq.

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

                Plaintiffs,

v.

EIKE BATISTA, *et al.*

                Defendant.

_____/

## **PLAINTIFFS' STIPULATION FOR SUBSTITUTION OF COUNSEL**

Pursuant to Rules 2.505(e)(2) and (f)(2) of the Florida Rules of Judicial Administration, Werner Batista, Centennial Asset Mining Fund, Centennial Asset Brazilian Equity Fund, 63X Investments LTD, 63X Master Fund, and 63X Fund (collectively, "Defendants"), hereby stipulate, consent, and agree to the withdrawal of the law firm Astigarraga Davis Mullins and Grossman, P.A., now known as Sequor Law, P.A., as counsel of record for Defendants, and the substitution of Reed Smith LLP as co-counsel of record for Defendants in this matter. The attorneys of record will remain the same. Copies of all future pleadings, notices and other papers shall be forwarded to Reed Smith LLP at the address and emails listed below.

CASE NO.: 17-001040-CA-01 (43)

Dated: April 17, 2017

Respectfully submitted,

**REED SMITH LLP**
1001 Brickell Bay Drive
Suite 900
Miami, Florida 33131
Tel: 786-747-0200
Fax: 786-747-0299

By: /s/ *Edward Mullins*
    Edward M. Mullins
    FBN: 863920
    emullins@reedsmith.com
    Ana M. Barton
    FBN: 85721
    abarton@reedsmith.com
    Sujey Herrera
    FBN: 92445
    sherrera@reedsmith.com

**SEQUOR LAW, P.A.**
1001 Brickell Bay Drive
9th Floor
Miami, Florida 33131
Tel: 305-372-8282
Fax: 305-372-8202

By: /s/ Gregory Grossman
    Gregory Grossman
    FBN: 896667
    ggrossman@sequorlaw.com

CASE NO.: 17-001040-CA-01 (43)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal which sent e-mail notification of such filing in accordance with Rule 2.516 Fla. R. Jud. Admin. to Hendrik G. Milne, Esq., and Craig P. Kalil, Esq., ABALLI MILNE KALIL, P.A.; Jose Ferrer, Esq., and Yasmin Fernandez-Acuna, Esq., BILZIN SUMBERG BAENA PRICE & AXEDLROD LLP; and Victor Noskov, Esq., Elinor Sutton, Esq., and Michael Carlinsky, Esq., QUINN EMANUEL URQUHART & SULLIVAN, LLP, on April 17, 2017.

_/s/ Edward M. Mullins_
Edward M. Mullins

3

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

  Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*,

  Defendants.

_____/

## AGREED ORDER ON SECOND MOTION TO EXTEND TIME
## TO RESPOND TO MARCUS BERTO'S MOTION TO DISMISS

  **THIS CAUSE** having come before the Court on Plaintiff's second unopposed motion to

extend time to respond to Defendant Marcus Berto's motion to dismiss (the "Motion"), and the

Court having read and considered the Motion, and being duly advised,

  It is hereby **ORDERED AND ADJUDGED** that the Motion is **GRANTED.** The

Defendant shall file and serve its response to the motion to dismiss by April 24, 2017.

  CIRCUIT COURT JUDGDONE AND ORDERED in Chambers at Miami-Dade

County, Florida, on 04/17/17.

_____

BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

**No Further Judicial Action Required on THIS MOTION**
**CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.   The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

E

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, *et al.*

        Defendants.

_____/

### DEFENDANTS' MOTION TO DISMISS
### PLAINTIFFS' CLAIMS BASED ON COMITY

    Defendants Werner Batista, Centennial Asset Mining Fund LLC, Centennial Asset

Brazilian Equity Fund LLC, 63X Investments LTD., 63X Master Fund, and 63X Fund

(the "Defendants") move to dismiss the Complaint filed by Plaintiffs Meridian Trust Company

and American Associated Group, Ltd. (the "Plaintiffs").[1]  Based on principles of comity, the

Complaint should be dismissed in its entirety because the Plaintiffs' claims were discharged and

released in a Brazilian judicial reorganization proceeding.  Alternatively, to the extent the Plaintiffs

contest that the discharge is not enforceable or final, the Defendants request that this proceeding

be stayed to allow the Plaintiffs to seek to obtain relief from the Brazilian bankruptcy court to the

extent possible.  This motion (the "Discharge and Release Motion") should be granted for the

---

[1]    The other named defendants in this proceeding include Eike Batista, Thor Batista, Paulo Mendonca, Flavio Godinho, Paulo Gouvea, Marcus Berto, Luiz Carneiro, Aziz Ben Ammar, EBX Holding, LTDA, EBX International, S.A., EBX Capital Partners, Thorque1 Fund LTD, Thorque Investment Management LTD, Olin Batista, Flavia Sampaio, and Luma de Oliveira.

reasons set forth in the below memorandum of law.

## MEMORANDUM OF LAW

### INTRODUCTION

The Plaintiffs' claims against Defendants arise from their ownership of bonds issued by the OGX Group in 2011 and 2012, the purpose of which was to fund the OGX Group's oil exploratory activities in Brazil. Plaintiffs claim they were deceived by Defendants and other parties named in the Complaint into purchasing the bonds when Defendants allegedly knew no oil would be found, and the OGX Group's exploratory operations would fail.

The Plaintiffs' claims are baseless and should be dismissed on the merits.[2] But even setting aside the lack of merit to their unsubstantiated accusations, the Complaint should be dismissed— in its entirety—because the Plaintiffs' claims have been discharged and released in the course of a Brazilian judicial reorganization proceeding of the OGX Group (the "Judicial Reorganization"). That Judicial Reorganization is binding on this Court under principles of comity.

As described at length in the affidavit of Marcelo Lamego Carpenter (the "Carpenter Affidavit"),[3] a lead member of the legal team representing the OGX Group in the Judicial Reorganization in Brazil, the OGX Group began restructuring proceedings in the Fourth Commercial Court of the Capital of the State of Rio de Janeiro (the "Brazilian Bankruptcy Court") on October 31, 2013. Plans of reorganization (the "Plans") were approved by the same court on June 13, 2014.[4] Approximately 90% of all creditors supported the Plans.

---

[2] As described at length in the Defendants' Rule 1.140 Motion to Dismiss, filed contemporaneously herewith, Plaintiffs have not alleged facts sufficient to entitle them to relief. To save judicial resources and address issues that may lead to a final resolution, Defendants ask the Court to consider this Discharge and Release Motion first.

[3] The Carpenter Affidavit (Ex. A) contains facts related to the OGX Group's Judicial Reorganization in Brazil. It appends court orders, pleadings, and other related documents from that proceeding. The reorganization of the OGX Group is referenced in the Complaint. *See* Compl. ¶ 44, 84, 148, 167, 423-27, 442-43. This Court may take judicial notice of these attachments. *See All Pro Sports Camp, Inc. v. Walt Disney Co.*, 727 So. 2d 363, 366 (Fla. 5th DCA 1999) (trial court properly took judicial notice of federal judgment in dismissing lawsuit for res judicata).

[4] Four Plans were approved by the Brazilian Bankruptcy Court—one for each of the companies composing the

2

The Plans novated the claims of all creditors against the OGX Group.  The Plans also specifically provided a "*full, irrevocable and irreversible discharge of all [claims] of any kind and nature against*" the OGX Group, their shareholders, affiliates, and other related entities and individuals—a bar on creditor claims akin to third-party releases that are sometimes granted under plans of reorganization in the United States. *See, e.g.*, OGX Plan § 13.5. The Plans also provide that "the Creditors may no longer, from the Approval of the Plan . . . (vi) seek the satisfaction of their Credits by any other means." *Id.* § 13.3.

The Plaintiffs' claims arise from their ownership of approximately $21 million (out of a total of *$3.6 billion*) of bonds issued by the OGX Group. As creditors, Plaintiffs are bound by the discharge and release provided in the Judicial Reorganization under Brazilian law. All creditors had ample notice of the Judicial Restructuring from start to finish, were represented by a sophisticated indenture trustee—Deutsche Bank—and could have participated in the proceedings individually had they chosen to.  Unlike other bondholders holding debt under the same indentures, Plaintiffs ignored the Judicial Reorganization—despite numerous notices from Deutsche Bank that claims related to their bonds would be affected by the Plans.  Plaintiffs chose not to participate in the general creditors' meeting, did not vote on the Plans, did not object to the Plans, and did not appeal Plan Ratification—even though many other bondholders did.  They are now bound by the Plans' provisions, and this Court should enforce the Plans, including the discharge and release provisions, under the principles of comity.  If the Court does not nip Plaintiffs' claims in the bud, it may open a Pandora's box of frivolous creditor actions based on obligations that have long been released, undermining not only the Judicial Reorganization of OGX, but also the mutual respect

---

OGX Group. For the purposes of this Discharge and Release Motion, we refer principally to the Plan of the main operating entity, OGX Petróleo e Gás S.A.  The Plans of OGX Austria and Óleo e Gás Participações S.A's contain identical relevant provisions.   OGX International GMBH did not have any credits subject to the Judicial Reorganization, and its Plan was approved pro forma. *See* Carpenter Aff. ¶ 10, n. 6, Ex. 5-8.

between the U.S. and Brazilian judicial systems that is critical to the success of complex reorganizations of multi-national businesses.

## BACKGROUND

**I.**     **The OGX Group.**

The OGX Group consists of Óleo e Gás Participações S.A. ("OGPar"), OGX Petróleo e Gás S.A. ("OGX"), OGX Austria GMBH ("OGX Austria"), and OGX International GMBH. Eike Batista formed the OGX Group in 2007 to conduct oil and gas exploration in Brazil. From 2010 to 2012, the OGX Group developed its operations to enable the exploration of previously ignored geographic areas. The OGX Group's exploration of these geographic areas was based on seismic data, was supported by the Brazilian National Oil Agency (Agência Nacional do Petróleo), and received private investments of more than R$10 billion. *See* Carpenter Aff., Ex. 1 (Request for Judicial Reorganization) ¶ 7. The OGX Group also raised funds through international bond offerings. In June 2011, OGPar issued bonds in the total amount of $2.563 billion under an indenture, dated June 3, 2011 (the "Initial Indenture"). These obligations then were transferred to OGX Austria. In April 2012, an additional $1.063 billion in bonds were issued under an indenture dated March 30, 2012 (collectively, with the Initial Indenture, "Indentures"). *Id.* ¶ 30, n. 23, Ex. 19-20. Thus, the total amount of bonds for which OGX Austria was the obligor totaled approximately $3.6 billion, guaranteed by OGPar and OGX. This comprised the majority of the OGX Group's debt.

OGX drilled more than 120 exploratory wells. Although OGX's exploration efforts yielded some significant discoveries of oil, the anticipated production was not met. The oil that was economically recoverable in some of the fields did not remotely approximate the projections from the exploration phase. *See id.* at Ex. 1 (Request for Judicial Reorganization) ¶¶ 8, 10. As such, OGX's revenues declined dramatically and the OGX Group became unable to honor the

4

financial obligations it had assumed in connection with its exploration activities. *Id.* at Ex. 1 (Request for Judicial Reorganization) ¶¶ 34-40.

## II.   The OGX Group's Bankruptcy Filing.

On October 30, 2013, the OGX Group filed a petition with the Brazilian Bankruptcy Court, commencing the companies' Judicial Reorganization under Brazilian law. *See id.* ¶¶ 7-8. The OGX Group immediately began work on its plans of reorganization. On February 14, 2014, OGX, OGPar, and OGX Austria submitted plans of reorganization (the "Plans") setting out their plans for a reorganization through the judicial process. On that date, the companies also presented their initial list of creditors who held claims against the companies. *See id.* ¶ 10. This list included Deutsche Bank Trust Company Americas ("Deutsche Bank") as the trustee for bonds issued under the Indentures. Plaintiffs allege to have held $21 million bonds under the Indentures at the time of the filing. The Plaintiffs' claims in this lawsuit are based entirely on the losses suffered from the decline in the value of the bonds.

## III.   Robust Notice To OGX Bondholders.

The bondholders under the Indentures (the "OGX Bondholders") held the majority of the OGX Group's debts (approximately $3.6 billion) and played a very active role in the Judicial Reorganization. *See id.* ¶ 31. Even before being listed on the debtors' initial list of creditors, as trustee for the bonds, Deutsche Bank began monitoring the Judicial Reorganization and providing notices to the OGX Bondholders in the form of regular letters, setting out the status of the Judicial Reorganization, details of plan negotiations, and the bondholders' rights under the proposed Plans (including their voting rights). *See id.* ¶¶ 30-41, Ex. 22-25, 27, 29-33. In all, from October 1, 2013 through June 27, 2014, Deutsche Bank sent 19 separate notices to the OGX Bondholders. *See id.* ¶ 40 (describing notices sent to OGX Bondholders throughout the Judicial Reorganization).

Deutsche Bank also established a dedicated website for the OGX Bondholders to monitor

5

the Judicial Reorganization and posted relevant materials for review. *See id.* ¶ 33. Not only did Deutsche Bank continually keep the OGX Bondholders apprised of the progress of the Judicial Reorganization, it also urged the bondholders to "consult with legal counsel or other advisors to the extent they deem advisable with respect to the Voting Procedures and voting on any potential Plans." *See id.* ¶ 32, Ex. 22. In addition to notice provided by Deutsche Bank, the debtors themselves posted key decisions, documents, and notices on their website throughout the Judicial Reorganization, and the relevant decisions of the Brazilian Bankruptcy Court were posted and archived in "Comissão de Valores Mobiliários—CVM," the Brazilian equivalent of the Securities Exchange Commission. *See id.* ¶¶ 41-42.

As anticipated by Deutsche Bank (and previewed in notices sent to the OGX Bondholders), on April 11, 2014, the Brazilian Bankruptcy Court entered an order specifically acknowledging Deutsche Bank's role as the representative of the OGX Bondholders and granting all OGX Bondholders expanded rights to participate and vote individually on the Plans (the "April 11 Order"). Pursuant to this decision, all OGX Bondholders, including Plaintiffs, were granted the opportunity to exercise their rights as creditors and object to any aspect of the Plans. *See id.* ¶ 35.

With this robust notice, and individualized ability to participate in the process, a large number of OGX Bondholders did so. Some bondholders worked with the OGX Group and its financial advisor, Blackstone Advisory Partners Group L.P. ("Blackstone") to provide financing necessary to fund the Judicial Reorganization and the companies' continued operations. *See id.* ¶¶ 44, 46-47. Other bondholders (a distinct minority), unhappy with the direction the company was taking, opposed the financing and other aspects of the Plans. Plaintiffs had ample opportunity to participate in this process, and to oppose the Plans if they so desired.

**IV.    Approval Of The Plans And Plan Discharge And Release.**

After the April 11 Order, Deutsche Bank continued to provide notices to the OGX

Bondholders.  Leading up to the general creditors meeting in June, for example, Deutsche Bank sent letters reminding the bondholders of voting procedures and the specific steps required to vote on the Plans.  *See id.* ¶ 38, Ex. 30-32.  The general meeting of creditors occurred on June 3, 2017.  Approximately 90% of the companies' creditors voted in favor of the Plans, and on June 13, 2014, the Plans was ratified (the "Ratification Decision") by the Brazilian Bankruptcy Court.  *See id.* ¶¶ 21-22, Ex. 10.  Under the Plans, creditors' claims (including the Plaintiffs' claims) were converted into shares of the reorganized OGX Group, and the creditors now own 90% of the company.  Eike Batista received one ceremonial share of the reorganized OGX Group under the Plan, wiping his entire equity in the OGX Group.  *See* OGX Plan § 10.3.

The Brazilian Bankruptcy Court's decision adamantly affirmed the fair treatment of all creditors, including the bondholders:

> Upon analyzing the voting procedures through a series of criteria, ***it is abundantly clear that there was no malicious use of the bondholders' rights, nor was there any conflict of interest, as the bondholder creditors are still creditors who retain the right to vote independently***, whether they contributed to investments or not, without any prejudice to the voting procedures which approved the plan.

*See* Ratification Decision at 2.

The approved Plans provided for a complete financial and corporate restructuring of the OGX Group.  Through the process, the companies obtained new financing, sold certain assets, and refinanced their obligations.  The Plans also provided broad releases of claims by creditors against the OGX Group, its officers and shareholders, and certain other non-debtor entities, including the Defendants, from claims arising before and during the Judicial Reorganization.  *See id.* ¶¶ 13-14.  Specifically, the Plans provide:

> **13.5. Discharge**.  Except in the case of Resolution of the Plan, the Capital Increase Through Capitalization of Credits with the delivery of Shares to the Creditors or to the Receiver, as applicable, as well as the payments in cash set forth in Sections 5.1.4 et. seq. of this Plan will result in full, irrevocable and irreversible discharge of all Credits of any kind and nature against OGPar, OGX Austria, OGX

7

> International, OGX and its controlling companies and guarantors, including interest, adjustment for inflation, penalties, fines and damages. With the occurrence of the discharge, the *Creditors will be deemed to have fully discharged, released and/or waived any and all Credits*, and can no longer claim them against *OGX, controlled companies, subsidiaries, affiliates and other companies belonging to the same corporate and economic group, and their officers, directors, Shareholders, minority shareholders, members, agents, employees, representatives, guarantors, sureties, successors and assignees*.

OGX Plan § 13.5 (emphasis added).[5]

The Plans therefore expressly discharge and release "*any and all*" "Credits" against "OGX,

controlled companies, subsidiaries, affiliates and other companies belonging to the same corporate

and economic group, and their *officers, directors, Shareholders, minority shareholders,*

*members, agents, employees, representatives, guarantors, sureties, successors and assignees*."

*See* OXG Plan § 13.5 (the "Discharge and Release").  Moreover, the Plans provide that "the

Creditors may no longer, from the Approval of the Plan . . . (vi) seek the satisfaction of their Credits

*by any other means*." *Id.* § 13.3 (emphasis added); Carpenter Aff. ¶ 20.[6]  "Credits" include all

"Credits and obligations, whether materialized or contingent, net or illiquid, existing on the Filing

Date, or which generating fact is previous or simultaneous to the Filing Date, whether or not

subject to the effects of Plan . . . ." OGX Plan § 1.1.43.[7]  The Discharge and Release thus is broad

and releases the Defendants from Plaintiffs' claims—all of which clearly arise from facts that are

"previous or simultaneous to the Filing Date." *See* Carpenter Aff. ¶¶ 15-18 (noting definition in

Section 13.5 and listing parties' relationship to the OGX Group); Expert Rep. at 17.[8]

Despite the various challenges and appeals of the Ratification Decision (*see* Carpenter Aff.

¶¶ 24-25, 48-51), no creditor ever has challenged the Discharge and Release, although they had

---

[5]   *See also* OGX Austria Plan, Section 10.5; OGPar Plan, Section 12.5.
[6]   *See also* OGX Austria Plan, Section 10.3; OGPar Plan, Section 12.3.
[7]   *See also* OGX Austria Plan, Section 1.1.34; OGPar Plan, Section 1.1.38.
[8]   The Expert Report of Professor José Rogério Cruz e Tucci (the "Expert Report") is appended as Exhibit 2 to Exhibit B.

8

every opportunity to do so.  The conversion of most of the debt occurred in October 2014, with final negotiations with certain creditors concluding as recently as January 2017, finalizing an almost four-year process under the auspices of the Brazilian Bankruptcy Court under the watchful eye of the companies' creditors, the trustee appointed by the Brazilian Bankruptcy Court, and the Public Prosecutor of the State of Rio de Janeiro.  *See id.* ¶¶ 23, 26-28.

Notably, Plaintiffs have never raised any objection to the Brazilian bankruptcy process. They did not attend the creditors meeting or object to the Plans' ratification by the Brazilian Bankruptcy Court, including with regard to the treatment of OGX Bondholders under the Plans. Nor did they ever seek to appeal the ratification or otherwise set it aside.

## ARGUMENT

I.   **The Court Should Dismiss The Complaint Under The Principles Of Comity Because The Plans Expressly Discharged And Released The Plaintiffs' Claims.**

Plaintiffs allege that Eike Batista and the other parties named in the Complaint, including Defendants, directly or indirectly defrauded Plaintiffs, allegedly inducing them to invest $21 million "in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations."  Compl. at ii.  The bonds that Plaintiffs were allegedly deceived into buying were but a small portion of the almost $3.6 billion of bonds outstanding under the Indentures—the same bonds that were subject to the Judicial Reorganization described above in which Plaintiffs could have participated.  But Plaintiffs chose not to participate, despite ample notice.  As creditors of the OGX Group, they must now accept the outcome of that Judicial Reorganization.  This includes the Discharge and Release contained in the Plans, which is enforceable under Brazilian law and should be recognized by this Court under the principles of comity.

The doctrine of comity in Florida and federal courts has its roots in the United States

9

Supreme Court case of *Hilton v. Guyot*, 159 U.S. 113 (1895):

> [W]here there has been opportunity for full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

*Nahar v. Nahar*, 656 So. 2d 225, 229 (Fla. 3d DCA 1995) (citing to *Hilton* in discussing standard for extending comity); *see also Daewoo Motor Am., Inc. v. General Motors Corp.*, 315 B.R. 148, 157 (Bankr. M.D. Fla. 2004) (same), *aff'd*, 459 F.3d 1249 (11th Cir. 2006).

Comity is the rule, rather than the exception. *Belle Island Inv. Co. v. Feingold*, 453 So. 2d 1143, 1145 (Fla. 3d DCA 1984) ("In Florida, the rules of comity may not be departed from except to protect the citizens of our state or some paramount public policy."). And Florida state and federal courts have extended comity to final judgments and interlocutory orders of other countries in the context of insolvency-related proceedings. *See Belle Island Inv. Co.*, 453 So. 2d at 1143 (interlocutory injunction of St. Vincent and the Grenadines receivership proceeding); *Kroitoro v. Chase Manhattan Bank, N.A.*, 522 So. 2d 1061 (Fla. 3d DCA 1988) (Panamanian bankruptcy). Moreover, numerous federal cases in Florida state that the doctrine of comity is ***especially applicable*** in the bankruptcy context, "for comity enables a debtor's assets to be disbursed equitably and systematically rather than haphazardly or erratically." *Daewoo Motor Am.*, 315 B.R. at 157; *see also In re Petroforte Brasileiro de Petroleo Ltda.*, 542 B.R. 899, 909 (Bankr. S.D. Fla. 2015) (enforcing ***Brazilian*** bankruptcy court rulings).[9]

---

[9]     *See also In re Rosacometta, S.r.l*, 336 B.R. 557, 564 (Bankr. S.D. Fla. 2005) (extending comity to Italian bankruptcy proceedings). Likewise, federal courts from other jurisdictions have given comity to Brazilian insolvency

Florida courts regularly enforce foreign judgments under the principles of comity if three factors are satisfied: (a) the foreign court had proper jurisdiction; (b) the parties were given notice and the opportunity to be heard; and (c) "the foreign decree does not offend the public policy of the State of Florida." *Cermesoni v. Maneiro*, 144 So. 3d 627, 629 (Fla. 3d DCA 2014); *Nahar v. Nahar*, 656 So. 2d 225 (Fla. 3d DCA 1995) (affirming trial court decision granting comity to Dutch court's order).[10]

All three of these factors are satisfied here. *First*, as discussed in the Expert Report of professor José Rogério Cruz e Tucci, the Brazilian Bankruptcy Court had universal jurisdiction over all claims related to the Indentures. The Discharge and Release is valid under Brazilian law and is enforceable against the Defendants, precluding any claims, *including fraud*, in connection with the OGX bonds.

*Second*, Plaintiffs cannot deny that they received ample notice of the Judicial Reorganization and had the opportunity to participate in the process. Indeed, many other bondholders—whether they supported the Plan or opposed it—took part in the proceedings. That Plaintiffs chose not to does not allow them to feign ignorance and re-litigate issues that were settled by the Judicial Reorganization.

*Third*, the Discharge and Release does not offend the public policy of the State of Florida or "American principles of what is decent and just." *See Daewoo Motor Am.*, 315 B.R. at 156. Indeed, the Discharge and Release is similar in nature to "third-party releases" approved by U.S. bankruptcy courts under the Bankruptcy Code.

---

proceedings. *See, e.g., Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240 (2d Cir. N.Y. 1999); *In re OAS S.A.*, 533 B.R. 83 (Bankr. S.D.N.Y. 2015); *In re Rede Energia S.A.*, 515 B.R. 69 (Bankr. S.D.N.Y. 2014).
[10]     Federal courts apply a similar test. *See Daewoo Motor Am.*, 315 B.R. at 157-58 (key inquiry is "(1) whether the foreign court was competent and used 'proceedings consistent with civilized jurisprudence,' (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just.").

### a.  The Brazilian Bankruptcy Court Had Proper Jurisdiction, And The Discharge And Release Should Be Enforced To Preclude Plaintiffs' Claims.

#### i.  The Brazilian Bankruptcy Court's Jurisdiction Is Incontrovertible.

As professor Tucci explains in his Expert Report, "The purpose of [reorganization] is to allow a company in financial distress to attempt, with as little social and economic damage as possible, to become competitive and productive in the market." Expert Rep. at 7; *see also* Ratification Decision at 1 ("The principle of the preservation of the company is the main purpose of the judicial recovery proceeding.").

To allow the bankruptcy court to pursue that purpose, Brazilian law grants the court with "universal jurisdiction" over the debtor's restructuring (Expert Rep. at 20) and, indeed, "over all related suits." *Id.* at 9-11 (quoting decision of Justice Nancy Andrighi: "The Superior Court of Justice has settled the issue and establishes that the reorganization proceedings court has jurisdiction over all suits in which there are interests and assets of the company, including foreclosure proceedings, *even in the case of credits existing before the reorganization was granted*; all must submit to the plan, lest the company's recovery is jeopardized.") (emphasis added).

Here, the OGX Group's petitions for a judicial reorganization were granted by the Brazilian Bankruptcy Court (Carpenter Aff. ¶ 8) and the Brazilian Bankruptcy Court approved the Plans on June 13, 2014. *See id.* ¶ 22. It is clear that the Brazilian Bankruptcy Court had jurisdiction over the Judicial Reorganization and creditors' claims relating thereto.

#### ii.  The Discharge And Release Precludes Plaintiffs' Claims.

As discussed, Section 13.5 of the OGX Plan—a section that was never challenged by *any* creditor—provides a broad discharge of claims against Defendants, and the OGX Austria and OGPar Plans contain identical provisions. The Discharge and Release is fully enforceable under

12

Brazilian law and releases all creditor claims, including fraud claims, against Defendants. *See* Expert Rep. at 23 ("Clause 13.5 of the Reorganization Plan of OGX grants full release, which evidently includes rights to credits or damages *resulting from fraudulent practices occurred before or during* the OGX Group's reorganization.").

In fact, according to the Defendants' expert, Professor Tucci, such discharges are not only legally enforceable in Brazil, but essential to the underlying purpose of the Judicial Reorganization process, consistent with the concept of "novation" in bankruptcy proceedings. *See id.* at 11-14, 17-19. "Under Brazilian law, there is no basis for a damages claim originated from obligations that have been novated by the reorganization plan." *Id.* at 18.

The plain language of the Plans thus discharges and releases not only the OGX Group, but Defendants and other entities falling within the provisions of Section 13.5. *See id.* at 17 ("There is no room for doubt as clause 13.5 sets forth that, once the obligations in the plan are performed, OGX will be granted full release, extended to their 'controlled companies, subsidiaries and affiliates and other companies belonging to the same corporate and economic group, and its executive officers, directors, minority, stockholders, members, actors, employees, agents, sureties, accommodation makers, guarantors, successors and assignees.'"); Carpenter Aff. ¶¶ 15-18 (discussing Section 13.5 definition and listing Defendants and their relationship to the OGX Group). The Plans further provide that "the Creditors may no longer, from the Approval of the Plan . . . (vi) seek the satisfaction of their Credits by any other means." OGX Plan § 13.3. "Credits" are not merely the Plaintiffs' bonds—they include all "Credits and obligations, whether materialized or contingent, net or illiquid, existing on the Filing Date, or which generating fact is previous or simultaneous to the Filing Date, whether or not subject to the effects of Plan . . . ." *Id.* § 1.1.43. Thus, the OGX Group Plans discharged and released not only the Plaintiffs' claims

against the OGX Group under the bonds themselves, but also all obligations, whether materialized or contingent, against all parties identified in Section 13.5 of the OGX Plan—including Defendants.

Plaintiffs cannot deny that they are subject to the terms of the Discharge and Release, even though they did not expressly vote for the Plans at the general creditors' meeting. *See* Expert Rep., Ex. 2 at 18 ("even creditors who abstained from voting or voted against the change of their collateral must submit to the reorganization plan"); *see also id.* at 19 ("[T]he release clause of the reorganization plan for OGX is binding on all creditors, including the plaintiffs in the suit filed in Florida."). In fact, Plaintiffs appear to concede the point in a submission to the Grand Court of the Caymans (the "Cayman Affidavit"), writing that "the effect of [Plan] approvals is that the reorganization plans bound all shareholders and creditors of the companies subject to the plan, including those that did not vote in favor of it." Cayman Aff. ¶ 81.[11]

### iii.  *This Court Should Enforce The Brazilian Court Discharge.*

This Court should give the OGX Group Plans' Discharge and Release provisions the same effect that they would be given by a Brazilian court—barring the Plaintiffs' claims against Defendants.[12] Otherwise, parties would be able to continually re-litigate matters related to the debtors and their debts, undermining the finality necessary in the restructuring process. *See* Expert Rep. at 16 ("A dynamic view of procedure requires that each action is brought at the appropriate time, or it may not be brought at all."); *see Daewoo Motor Am.*, 315 B.R. at 157 (stressing the importance of enforcing comity in the context of foreign insolvency proceedings).

---

[11]     Affidavit of Marcello Augusto Lima de Oliveira, dated October 18, 2016, submitted by the Plaintiffs in the Grand Court of the Caymans, appended as Exhibit C.

[12]     *See Kroitoro*, 522 So. 2d at 1061-62 (following Panamanian law as to bankruptcy adjudication's effect of rendering the bankrupt without legal capacity); *see also Daewoo Motor America*, 315 B.R. at 157 ("Analyzing whether comity applies to a foreign judgment bears similarity to analyzing whether *res judicata* applies to a domestic judgment."); *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240 (2d Cir. 1999) (deferring to ongoing liquidation proceedings in Brazil under comity principles).

As Professor Tucci warns, if "the Court in Florida tries the claim of OGX Austria's bondholders against whomever received release of the obligations listed in the plan, an alarming precedent will be created, allowing other creditors to come to (any) court to collect debt that no longer exists." *See* Expert Rep. at 20. This Court should avoid setting such a precedent here.

**b. The Creditors Received Ample Notice And Had The Opportunity To Be Heard.**

The second prong of the comity analysis requires that the creditors who are subject to a foreign judgment had proper notice and the opportunity to be heard in the foreign proceeding. In essence, the inquiry is simply whether the interests of the party whose rights are affected were fairly represented in the foreign proceeding.

*Daewoo Motor Am.*, 315 B.R. at 157-58, is particularly instructive. There, the court recognized a Korean plan of reorganization because "Korea has significant interest in regulating business activity on its shores…, any differences between Korean and U.S. bankruptcy law are minimal and do not offend U.S. notions of due process… *[The plaintiff in the U.S. action] had notice, as well as a full and fair opportunity to participate in all facets of the Korean bankruptcy process [and if the plaintiff] objected to the relevant transactions and orders, it should have done so before the Korean tribunal.*" *Id.* (emphasis added).

The court continued, "[t]he fact that [the plaintiff] now seeks to hold [the defendant] liable … highlights [the plaintiff's] true intention—to collaterally attack the entire Korean reorganization process and result. *This Court will not permit such an improper collateral attack to undo the Korean Court's efforts.*" *Id.* (emphasis added).

The same is true here. From the very outset of the Judicial Reorganization, Plaintiffs, as bondholders of OGX Austria, were represented by Deutsche Bank as the trustee under the Indentures. Deutsche Bank was listed on the debtors' initial creditors list and was obligated to provide notice to the individual bondholders by the Brazilian Bankruptcy Court, which it did. The

15

April 11 Order acknowledged Deutsche Bank's role as the trustee and representative of the OGX Bondholders, but also specifically individualized the rights of the OGX Bondholders, including the Plaintiffs, allowing them to participate in the formulation of the plan and to vote at the general creditors meeting.  *See* Carpenter Aff., Ex. 26.  In that order, the Brazilian Bankruptcy Court specifically addressed the importance of creditor participation and access to plan voting.  The Brazilian Bankruptcy Court, noting that "a significantly large number of bondholders" is affected by the proceeding, granted each of the bondholders "individual rights to petition, participation, speech and vote" in connection with the Plans.  *See id.*, Ex. 26.

There is no denying, then, that Plaintiffs had every opportunity to appear and defend their rights or challenge any provision of the Plans they disagreed with, including the Discharge and Release provisions.  *See id.* ¶¶ 30-45 (discussing robust notice received by all OGX Bondholders throughout the course of the Judicial Reorganization).   While a significant number of other creditors did appear, Plaintiffs chose not to do so and now bring this collateral attack in connection with long-resolved claims.  *See Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1259-61 (11th Cir. 2006) (stressing that plaintiff in U.S. action had notice regarding the key events in the Korean bankruptcy proceeding but chose not to attend meetings, vote on the plan, or object to its terms).  For these reasons, this Court should dismiss Plaintiffs' claims.

### c.  The Discharge And Release Provision Does Not Offend Florida's Public Policy.

As discussed, when foreign courts have proper jurisdiction and the affected parties had notice and an opportunity to appear, Florida Courts enforce those courts' judgments as long as they do not offend Florida public policy.  Enforcement of foreign orders under comity principles does not require that the laws of Brazil mirror those of Florida or the United States.[13]

---

[13]     *See, e.g., Belle Island Inv. Co.*, 453 So. 2d at 1145 ("Simply because the law of St. Vincent is different from ours . . . does not make it so pernicious as to defeat comity."); *Kroitoro*, 522 So. 2d at 1061 ("Mere difference between

At least one bankruptcy court in Florida has enforced Brazilian bankruptcy court orders. *See In re Petroforte Brasiliero de Petroleo Ltda.*, 542 B.R. at 908 ("[T]his Court finds that different requirements in Brazil for obtaining relief available in the U.S. do not render the [enforcement of the Brazilian order] manifestly contrary to U.S. policy."). There, the Bankruptcy Court for the Southern District of Florida enforced certain *ex parte* orders, entered by the Brazilian bankruptcy court, granting authority to the debtor's foreign bankruptcy trustee to issue subpoenas with gag provisions as part of an investigation related to a Brazilian judicial reorganization. Similarly to the comity analysis conducted by Florida state courts, the bankruptcy court analyzed whether granting recognition to Brazilian bankruptcy court orders would be "manifestly contrary to the public policy of the United States." *Id.* at 907. Noting that the public policy exception is "narrow" and that it should only be invoked "under exceptional circumstances concerning matters of fundamental importance to the United States," the court enforced the Brazilian court order. *Id.*

In support of its decision, the Florida bankruptcy court cited another U.S. decision recognizing Brazilian bankruptcy proceedings, *In re OAS S.A.*, 533 B.R. 83 (Bankr. S.D.N.Y. 2015). There, the Bankruptcy Court for the Southern District of New York explicitly confirmed that "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence…. Brazil has a comprehensive bankruptcy law that in many ways mirrors our own." *Id.* at 103 (citing *In re Rede Energia S.A.,* 515 B.R. 69, 98 (Bankr.S.D.N.Y.2014)); *see also id.* at 105 ("Although Brazilian law may impose different requirements for substantive consolidation, the different standards, standing alone, do not signify that Brazilian Bankruptcy Law is manifestly contrary to our own public policy.").

As Professor Tucci describes, the Brazilian bankruptcy regime is based generally on the

---

the law of the forum and that of a foreign state does not prevent enforcement of the foreign law or rights based thereon if such law is not against the public policy of the forum.").

U.S. Bankruptcy Code and pursues similar goals of maintaining going concern value and allowing a company to reorganize and preserve jobs. *See* Expert Rep. at 7-8 ("The purpose of a reorganization is to create conditions to overturn the debtor's critical economic-financial situation, maintaining production, jobs and the interests of creditors, thus preserving the company, its legal public interest directive and incentives to the economy."); *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.").

Indeed, both United States and Brazilian bankruptcy proceedings share a key focus: that a bankrupt company be able to successfully restructure and obtain a "fresh start." *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007); Expert Rep. at 12, 17 (discussing "novation," which is a civil law construct that allows for the termination of existing obligations through the bankruptcy process). This focus promotes the public policy of providing new opportunities to reorganize.

For these reasons and others, there is nothing about the Discharge and Release that offends the public policy of Florida or, for that matter, that of the United States. As discussed above, the Brazilian bankruptcy regime mirrors the bankruptcy process in the United States. In fact, the Discharge and Release is similar to the types of releases—referred to as "third-party releases"—approved by other U.S. courts.[14]

And while no court in Florida or the Eleventh Circuit has specifically addressed the enforceability of third-party releases contained in a foreign plan of reorganization, several other U.S. courts have. In *In re Sino-Forest Corp.*, 501 B.R. 655 (Bankr. S.D.N.Y. 2013), for example, the court explicitly rejected the argument that third-party releases in a Canadian class-action

---

[14]    *See In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1077-79 (11th Cir. 2015) (holding that Eleventh Circuit allows third-party releases); *In re Transit Grp., Inc.*, 286 B.R. 811, 816 (Bankr. M.D. Fla. 2002) (recognizing general release to a non-debtor party); *In re Scrub Island Dev. Grp. Ltd.*, 523 B.R. 862, 875-76 (Bankr. M.D. Fla. 2015) (same).

settlement agreement were contrary to public policy.   The court, stressing that the Second Circuit—like the Eleventh Circuit—allows third-party releases, concluded that "[i]n this Circuit, where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy." *Id.* at 665-66; *see also In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010) (enforcing foreign third-party release).[15]

Section 13.5 of the OGX Plan gives effect to the "fresh start" concept, fundamental in both U.S. and Brazilian law—allowing OGX a blank slate and new opportunity through the discharge of any and all claims against it and related individuals and entities.  Section 13.3 further effectuates that by prohibiting creditors from seeking "the satisfaction of their Credits by any other means."  As Professor Tucci explains, "[t]here is no room for doubt as clause 13.5 sets forth that, once the obligations in the plan are performed, OGX will be granted full release, extended to their 'controlled companies, subsidiaries and affiliates and other companies belonging to the same corporate and economic group, and its executive officers, directors, minority, stockholders, members, actors, employees, agents, sureties, accommodation makers, guarantors, successors and assignees.'"  Expert Rep. at 17.  Section 13.5 of the OGX Plan should be enforced.

## II.    In The Alternative, This Court Should Stay This Proceeding To Allow Plaintiffs The Opportunity To Pursue Annulment Of The Discharge And Release In Brazil.

If this Court does not dismiss the Plaintiffs' claims outright, it should, at the very least, stay the proceeding to allow Plaintiffs to attempt to challenge the validity of the Discharge and Release in Brazil.  On this topic, Brazilian law is clear that the Brazilian Bankruptcy Court is the only court

---

[15]    Note that in one case holding otherwise, *In re Vitro S.A.B. de CV*, 701 F.3d 1031 (5th Cir. 2012), the Fifth Circuit specifically declined to decide the case on whether the third-party release was manifestly contrary to public policy. *Id.* at 1070.  Instead, it based its decision largely on provisions specific to Chapter 15 of the Bankruptcy Code and the fact that the Fifth Circuit does not allow third-party releases. *Id.* at 1059.  As discussed above, the Eleventh Circuit explicitly allows third-party releases.

that has jurisdiction to annul any provision of the Plans:

> … only the court with jurisdiction over the reorganization can decide matters regarding the nullity of the reorganization plan, whether or not it is due to fraud. Therefore, only through an action for annulment, filed before the 4th Business Court of the Judicial District of the city of Rio de Janeiro/RJ, could the plan be dissolved.

> It is quite evident that the reorganization court must have universal jurisdiction, in fact. If, for instance, the Court in Florida tries the claim of OGX Austria's bondholders against whomever received release of the obligations listed in the plan, an alarming precedent will be created, allowing other creditors to come to (any) court to collect debt that no longer exists, as has been said.

> Likewise, the opinion remains the same even if it is proven that knowledge of the alleged fraudulent activity happened only after the approval of the reorganization plan for OGX.

> The time in which the fraud was uncovered is not a relevant legal argument, nor does it set jurisdiction.

> Thus, even if the fraudulent activity has allegedly been uncovered, after the reorganization plan has been approved, an action for annulment must still be filed before the court with jurisdiction over the reorganization.

Expert Rep. at 20.

Therefore, any arguments as to the validity of the Discharge and Release must be raised in front of the Brazilian Bankruptcy Court. If Plaintiffs choose to raise such arguments, and this Court does not dismiss the Complaint at this stage, the Complaint should be stayed pending the Brazilian Bankruptcy Court's determination on the validity of the Discharge and Release. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

## **CONCLUSION**

Defendants respectfully request that this Court grant this motion; dismiss the Complaint; and grant such other and further relief as is just and proper under the circumstances.

Dated: April 5, 2017

Respectfully submitted,

**ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.**
1001 Brickell Bay Drive, 9th Floor
Miami, FL 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Designated E-Mails for Service:
Primary: emullins@astidavis.com
             abarton@astidavis.com
Secondary: bhernandez@astidavis.com

By: */s/ Edward M. Mullins*　　　　　
    Edward M. Mullins
    Florida Bar No. 863920
    Ana M. Barton
    Florida Bar No. 85721
    *Counsel for Defendants Werner Batista,*
    *Centennial Asset Mining Fund,*
    *Centennial Asset Brazilian Equity Fund,*
    *63X Master Fund, 63X Investment Ltd.,*
    *and 63X Fund*

    -and-

    Michael Carlinsky*
    Bar No. 2319440
    michaelcarlinsky@quinnemanuel.com
    Elinor Sutton*
    Bar No. 4615175
    elinorsutton@quinnemanuel.com
    Victor Noskov*
    Bar No. 5087689
    victornoskov@quinnemanuel.com
    **QUINN EMANUEL URQUHART**
    **& SULLIVAN, LLP**
    51 Madison Avenue, 22nd Floor
    New York, NY  10010
    Telephone: (212) 849-7000
    Facsimile: (212) 849-7100
    *Admitted Pro hac vice*

---

21

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Complex Business Litigation Rule 4.3, counsel for Movants hereby certifies that the undersigned has conferred with counsel for Plaintiffs, Craig Kallil, by email on April 5, 2017, and counsel for Plaintiffs advised that his clients oppose the relief requested herein.

/s/ Edward M. Mullins
Edward M. Mullins

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2017, a true and correct copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal, which sent e-mail notification of such filing to all counsel of record in accordance with Fla. R. Jud. Admin 2.516.

/s/ Edward M. Mullins
Edward M. Mullins

22

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

      Defendants.

_____/

## UNNOPPOSED MOTION TO EXTEND TIME TO RESPOND TO MOTIONS TO DISMISS

      Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs"), respectfully move this Court for an order extending the time within which they may respond in opposition to Defendants Werner Batista, Centennial Asset Mining Fund, Centennial Asset Brazilian Equity Fund, 63X Investments Ltd, 63X Master Fund, and 63X Fund's ("Moving Defendants") Motion to Dismiss the Complaint and Motion to Dismiss based upon *forum non conveniens* (the "Motions to Dismiss"), and state:

      1.    The Moving Defendants filed and served their Motions to Dismiss on April 5, 2017. Pursuant to this Court's Order on Motions and Memo Requirements, the Florida Rules of Civil Procedure, and the Florida Rules of Judicial Administration, Plaintiffs' response is due for filing and service on April 24, 2017.

      2.    Given, however, the length of the Motions to Dismiss, the complexity of the legal arguments and issues addressed by the Moving Defendants in the Motions to Dismiss and the fact that lead counsel on this matter will be in the Cayman Islands for most of next week on hearings related to this case, the Plaintiffs recognize they will require additional time within which to research

1

and draft their opposition. The resulting clarity will benefit not only the Plaintiffs, but, Plaintiffs respectfully submit, better assist the Court in reaching its ultimate determination.

3.      Plaintiffs have discussed this request for enlargement of time with counsel for the Moving Defendants who have graciously consented to the request.[1]

4.      This request is not sought for purposes of unnecessary delay, and granting the request would conduce to the interests of justice.

WHEREFORE, Plaintiffs respectfully request an additional 35 days, until and including May 29, 2017, within which to file and serve their response to the Moving Defendants Motions to Dismiss.

## CERTIFICATE OF CONFERENCE

The undersigned hereby confirms that counsel for movant has conferred with counsel for the Moving Defendants and that counsel does not oppose the relief requested in this motion.

Dated: April 21, 2017.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

s/ *Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

---

[1] We have similarly agreed with counsel for Moving Defendants with regard to their previous request for additional time to file the Motions to Dismiss.

2

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 21st day of April a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court' s e-service system.

s/ Hendrik G. Milne
Hendrik G. Milne, Esq.

3

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

      Defendants.

_____/

## NOTICE OF FILING AFFIDAVIT OF PLAINTIFFS'
## ATTORNEY'S AFFIDAVIT IN COMPLIANCE WITH FLA. STAT. §48.161

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file Plaintiffs' Attorney's Affidavit in Compliance with Fla. Stat. § 48.161

attached hereto as Exhibit "A".

Dated: April 21, 2017

                             Respectfully submitted,

                             ABALLI MILNE KALIL, P.A.
                             *Counsel for Plaintiffs*
                             2250 SunTrust International Center
                             One Southeast Third Ave.
                             Miami, FL 33131
                             Phone: (305) 373–6600
                             Fax: (305) 373–7929

                             *s/ Hendrik G. Milne*
                             Hendrik G. Milne
                             Florida Bar No.: 335886
                             Craig P. Kalil
                             Florida Bar No.: 607282

1

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 21st day of April a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

2

# EXHIBIT "A"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 2017-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al*.

      Defendants.

_____/

## PLAINTIFFS' ATTORNEY'S AFFIDAVIT
## IN COMPLIANCE WITH FLA. STAT. § 48.161

STATE OF FLORIDA:

COUNTY OF MIAMI-DADE:

1.      Pursuant to Florida Statutes § 48.181, on January 24, 2017, Mr. Eike Batista ("Defendant") was served via the Florida Secretary of State with the summons attached as exhibit "A."

2.      On January 24, 2017 at 3:00 pm, the Florida Department of State, Division of Corporations accepted service for the Defendant (attached as exhibit "B").

3.      Pursuant to Florida Statute § 48.161, notice of acceptance of service along with a copy of the summons and complaint were sent via local Brazilian registered mail to Defendant's present place of abode at Penitenciária Bandeira Stampa – SEAPBS, Complexo de Gericino in Bangu, Rio de Janeiro, Brazil ("Bangu Prison")—a prison located in Rio de Janeiro. The receipt and confirmation of delivery is attached as exhibit "C."

4.      Additional courtesy copies of notice of acceptance of service along with a copy of the summons and complaint were sent to Defendant as follows:

(a)      Via Federal Express on February 3, 2017, to Defendant's prior place of residence at Rua Caio de Melo Franco 168, Jardim Botanico, Rio de Janeiro, Brazil 22.461-190. The Federal Express return receipt is attached to this Affidavit as exhibit "D."

(b)      Via USPS to Bangu Prison and Defendant's present place of residence; however, USPS has either not delivered the documents as of today's date or has not properly updated its system for Plaintiff to verify delivery. Receipts are attached as exhibit "E."

FURTHER AFFIANT SAYETH NAUGHT.

Grant S. Smith, Esq.

Sworn to and subscribed to before me this 21st day of April 2017, by Grant S. Smith, who is personally known to me.



Notary Public State of Florida
Janet Betancourt
My Commission GG 062835
Expires 03/09/2021

Notary Public

# EXHIBIT "A"

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL   ☐ OTHER<br>☐ DISTRICTS | CIVIL ACTION SUMMONS (b)<br>Form for Personal Service on a Natural Person | 2017-001040-CA-01 (43) |
| PLAINTIFF(S)<br>Meridian Trust Company, as trustee, and<br>American Associated Group, Ltd. | VS.  DEFENDANT(S)  **C/O Secretary of State**<br>Eike Batista, et. al.  2661 Executive Center Circle<br>Tallahassee, Florida 32399<br>Pursuant to Florida Statute § 48.181 | CLOCK IN |

THE STATE OF FLORIDA:TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant:

| To Defendant(s): Eike Batista<br>c/o Florida Secretary of State | Address: Service: Florida Secretary of State, pursuant to<br>Florida Statute Sec. 48.181(1)<br>Notice:Rua Caio de Melo Franco,<br>168 Jardim Botanico, Rio de Janeiro, Brazil<br>22.461-190 |
|---|---|

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."

MIAMI-DADE COUNTY COURT LOCATIONS

| ☒ Dade County Courthouse (08)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ Martin Luther King Office (20)<br>2525 N.W. 62nd Street<br>Room 1200 A<br>Miami, FL 33147 | ☐ Hialeah District Court (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ North Dade Justice Center (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ Miami Beach District Court (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ Coral Gables District Court (25)<br>Room 100<br>3100 Ponce de Leon Blvd.<br>Coral Gables, FL 33134 | ☐ South Dade Justice Center (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | SERVICE<br>Eleventh Judicial Circuit<br>Certified Process Server |
| Plaintiff/Plaintiff Attorney<br>Hendrik G. Milne<br>Florida Bar No. 335886 | Address:<br>One Southeast Third Avenue, Suite 2250, Miami, FL 33131 | Served JAN 24 2017  Time: | |
| | | DATE ON: | |
| CLERK OF COURTS<br>HARVEY RUVIN | | JAN 24 2017 | |

DEPUTY CLERK

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave, Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

CLK/CT 070 Rev. 02/16

Clerk's web address: www.miami-dadeclerk.com

# EXHIBIT "B"

**FLORIDA DEPARTMENT OF STATE**
Division of Corporations

January 24, 2017

HENDRIK G. MILNE, ESQ.
2250 SUNTRUST INTERNATIONAL CENTER
ONE SOUTHEAST THIRD AVENUE
MIAMI, FL 33131

Pursuant to Chapter 48.181, Florida Statutes, a copy of the process and initial pleading, case number 2017-001040-CA01, was accepted for EIKE BATISTA, and was filed on January 24, 2017, at 03:00 PM.

Plaintiff(s)

MERIDIAN TRUST COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD.,

-vs-

Defendant(s)

EIKE BATISTA, et al,

THE SECRETARY OF STATE DOES NOT FORWARD DOCUMENTATION TO THE DEFENDANT.

All inquiries on behalf of the defendant should be made to the attorneys involved.

Yvette McGee
Processor of Service
DIVISION OF CORPORATIONS

Letter No. 517A00001476

Division of Corporations - P.O. BOX 6327 -Tallahassee, Florida 32314

# EXHIBIT "C"

ECT - EMP. BRAS. DE CORREIOS E TELEGRAFOS
Ag: 50300024 - AC CASTELO

RIO DE JANEIRO                    - RJ
CNPJ....: 34028316064420 Tel.:-
Ins Est.: 81613524

COMPROVANTE DO CLIENTE

Cliente...........: EIKE BATISTA
CNPJ/CPF.........: 00000000000000

Movimento..: 10/02/2017 Hora......: 13:04:02
Caixa......: 79696121   Matricula..: 89614950
Lancamento: 052         Atendimento: 00043
Modalidade.: A Vista    ID Tiquete.: 1262254185

| DESCRICAO | QTD. | PRECO(R$) |
|---|---|---|
| COMBO SEDEX A VISTA | 1 | 21,55+ |

Valor do Porte(R$)..:   17,20
Cep Destino:   21854-010 (RJ)
Peso real (KG)......:    0,520
Peso Tarifado:......:    0,520
OBJETO............: DV393977050BR

PE - 8  ED - S  ES - S  RE - S
AVISO DE RECEBIMENTO:    4,30
Valor AdValoren.....:    0,05
Valor Declarado(R$).:   53,00
PE - Prazo final de entrega em dias úteis.
ED - Entrega domiciliar - Sim/Não.
ES - Entrega sábado - Sim/Não.
RE - Restrição de entrega - Sim/Não.

Para fins de contagem do prazo de entrega,
sábados, domingos e feriados não são
considerados dias úteis.
Postagens ocorridas aos sábados, domingo
e feriados, considerar o próximo dia útil
como o 'Dia da Postagem'.

Área com restrição de entrega 0Cô consulte o
sítio dos correios 0Cô www.correios.com.br

TOTAL(R$)=======>           21,55
VALOR RECEBIDO(R$)=>        21,55

SERV. POSTAIS: DIREITOS E DEVERES-LEI 6538/78

CAC - Capitais e Regiões Metrop. 30030100
Demais Localidades: 08007257282 Sugestões e
Reclamações:08007250100-www.correios.com.br

VIA-CLIENTE                   SARA 7.6.02

## DV393977050BR

O horário apresentado no histórico do objeto não indica quando a situação ocorreu, mas sim quando os dados foram recebidos pelo sistema, exceto no caso do SEDEX 10 e do SEDEX Hoje, em que ele representa o horário real da entrega.



Postagem          Em trânsito          Entrega

**Objeto entregue ao destinatário**
13/02/2017 17:15 Rio De Janeiro / RJ

| | |
|---|---|
| 13/02/2017 17:15 Rio De Janeiro / RJ | **Objeto entregue ao destinatário** |
| 13/02/2017 10:58 Rio De Janeiro / RJ | **Objeto saiu para entrega ao destinatário** |
| 11/02/2017 06:09 Rio De Janeiro / RJ | **Objeto encaminhado** de Unidade Operacional em Rio De Janeiro / RJ para Unidade de Distribuição em Rio De Janeiro / RJ |
| 10/02/2017 17:57 Rio De Janeiro / RJ | **Objeto encaminhado** de Agência dos Correios em Rio De Janeiro / RJ para Unidade Operacional em Rio De Janeiro / RJ |
| 10/02/2017 13:04 Rio De Janeiro / RJ | **Objeto postado** |

# EXHIBIT "D"

2/8/2017                                    Track your package or shipment with FedEx Tracking

**FedEx** ›   Shipping    Tracking    Manage    Learn    FedEx Office ®

My Profile | Support | Locations | 🌐 English    Search or tracking number

Aballi Milne Kalil, P.A

**!MPORTANT!**
inter storms are causing unavoidable service delays in the Northwest, Midwest, and Northeast areas. Learn More

FedEx ® Tracking



**778353634426**

| Ship date: | | Actual delivery: |
|---|---|---|
| Fri 2/03/2017 | **Delivered** | Tue 2/07/2017 1:55 pm |

ABALLI, MILNE, KALIL, P.A.
HENDRIK G. MILNE, ESQ.
ONE SE THIRD AVE.
2250 SUNTRUST INTERNATIONAL
CENTER
MIAMI, FL US 33131
305 373-8600

Signed for by: F.SOUZA

F-ABINWO SOUZA

EIRE BATISTA
168 JARDIM BOTANICO
RUA CAIO DE MELO FRANCO
RIO DE JANEIRO, RJ BR 22461
305 373-8600

**Travel History**

| ▲ Date/Time | Activity | Location |
|---|---|---|
| **2/07/2017 - Tuesday** | | |
| 1:55 pm | Delivered | RIO DE JANEIRO BR |
| 11:09 am | On FedEx vehicle for delivery | RIO DE JANEIRO BR |
| 8:35 am | At local FedEx facility | RIO DE JANEIRO BR |
| **2/06/2017 - Monday** | | |
| 10:10 pm | In transit | CAMPINAS BR |
| 7:02 pm | International shipment release - Import | CAMPINAS BR |
| 6:38 pm | In transit | CAMPINAS BR |
| | Package available for clearance | |
| 3:34 pm | At destination sort facility | CAMPINAS BR |
| 2:29 am | Departed FedEx location | MEMPHIS, TN |
| **2/04/2017 - Saturday** | | |
| 2:40 am | In transit | MEMPHIS, TN |
| 2:24 am | In transit | MEMPHIS, TN |
| 2:24 am | International shipment release - Export | MEMPHIS, TN |
| 2:24 am | In transit | MEMPHIS, TN |
| 12:48 am | Arrived at FedEx location | MEMPHIS, TN |
| **2/03/2017 - Friday** | | |
| 8:55 pm | Left FedEx origin facility | MIAMI, FL |
| 7:47 pm | Picked up | MIAMI, FL |
| 5:28 pm | Shipment information sent to FedEx | |

**Shipment Facts**

| | | | |
|---|---|---|---|
| Tracking number | 778353634426 | Service | FedEx International Priority |
| Weight | 1.2 lbs / 0.54 kgs | Delivery attempts | 1 |
| Delivered To | Residence | Total pieces | 1 |
| Total shipment weight | 1.2 lbs / 0.54 kgs | Terms | Shipper |
| Shipper reference | 11390.0001 | Packaging | FedEx Envelope |
| Special handling section | Deliver Weekday, Residential Delivery | Standard Transit | 2/07/2017 by 6:00 pm |

**Commodity Information**

| Line Item | Country of Manufacturing | Harmonized Code(s) | Description |
|---|---|---|---|
| 1 | US | | CORRESPONDENCE/NO COMMERCIAL VALUE |

**FedEx** ›

Search or tracking number

| Customer Focus | Featured Services | Companies | Follow FedEx | 🌐 United States - English |
|---|---|---|---|---|
| New Customer Center | FedEx Delivery Manager | FedEx Express | | |
| Small Business Center | FedEx SameDay | FedEx Ground | | |

# EXHIBIT "E"

**Registered No.** RR626345481US

**Date Stamp**

| | | | |
|---|---|---|---|
| Reg. Fee | $22.50 | | |
| Handling Charge | $14. | Return Receipt | |
| Postage | $3.85 $0.00 | Restricted Delivery | |
| Received by | $0.00 | | |
| | $41.30 | | |

Customer Must Declare Full Value $ _____ FL 0323

Postage/Insurance up to $25,000 is included based upon the declared value. International Indemnity is limited. (See Reverse).

OFFICIAL USE

FROM
Henk Milne
Abali Milne Kali
1 SE 1st Ave. #2250
Miami Fl 33131

TO
Like Batista
Rua Caio de Mea Franco 168
Jardim Botanico Riode Janeiro
BRAZIL

To Be Completed By Customer (Please Print) All Entries Must Be in Ballpoint or Typed

**PS Form 3806,** **Receipt for Registered Mail** Copy 1 - Customer
May 2007 (7530-02-000-9051) (See Information on Reverse)
For domestic delivery information, visit our website at www.usps.com®

---

LA012640045US

**USPS® Customs Declaration – CN 22**

**IMPORTANT:** The item/parcel may be opened officially. See Privacy Notice on reverse of Sender's instructions page. Please print in English and press firmly; you are making multiple copies.

From: Sender's Last Name / First
Henk Milne

Business
Abali Milne Kali

Address
1 SE 2nd Ave. #2250

City / State / ZIP+4
Miami Fl

Telephone/Fax or Email

Addressee's Last Name / First
Like Batista

Business

Address
Rua Caio de Mea Franco 168

City / State/Province / Post Code
Jardim Botanico Rio de Janeiro

Country / Telephone/Fax or Email
BRAZIL

**2–Shipping Label (left) and Customer Copy (right)**

---

METRO NEW
150 SE 2ND AVE STE 103
MIAMI
FL
33131-9997
1158840135
02/09/2017     (800)275-8777     4:14 PM

| Product Description | Sale Qty | Final Price |
|---|---|---|
| First-Class Intl Package | 1 | $22.50 |
| (International) (Brazil) (Weight:1 Lb 2.10 Oz) (Custom #:LA012640045US) | | |
| Registered | 1 | $14.95 |
| (Amount:$0.00) (USPS Registered Mail #) (RR626345481US) | | |
| Return Receipt | 1 | $3.85 |
| Affixed Postage | 1 | ($41.30) |
| (Affixed Amount:$41.30) | | |
| **Total** | | **$0.00** |

Scan event information is available only to Canada at this time.

*****************************************
BRIGHTEN SOMEONE'S MAILBOX. Greeting cards available for purchase at select Post Offices.
*****************************************

Save this receipt as evidence of insurance. For information on filing an insurance claim go to https://www.usps.com/help/claims.htm.

Order stamps at usps.com/shop or call 1-800-Stamp24. Go to usps.com/clicknship to print shipping



Last Name
We are making multiple

Aballi Milne Kali
15E 2nd Ave
City Miami FL State 7 ZIP+4 33131
Telephone/Fax or Email
30 372-6600
To: Addressee's Last Name First
Batista Eike
Business
Penitenciaria Bandeira
Address
Stampa-Complexo Gerici
City CEP 21 sec GD State/Province Post Code
Bangu-Rio de Janeiro
Country
BRAZIL
Telephone/Fax or Email
2- Shipping Label (left) and Customer Copy (right)

---

METRO NEW
150 SE 2ND AVE STE 103
MIAMI
FL
33131-9997
1158840135
02/09/2017   (800)275-8777   3:14 PM

| Product Description | Sale Qty. | Final Price |
|---|---|---|
| First-Class Intl Package | 1 | $22.50 |
| (International) | | |
| (Brazil) | | |
| (Weight:1 Lb 2.20 Oz) | | |
| (Custom #:LA012640037US) | | |
| Registered | 1 | $14.95 |
| (Amount:$0.00) | | |
| (USPS Registered Mail #) | | |
| Return Receipt | 1 | $3.85 |
| Total | | $41.30 |
| Cash | | $101.35 |
| Change | | ($60.05) |

Scan event information is available
only to Canada at this time.

*************************************
BRIGHTEN SOMEONE'S MAILBOX. Greeting
cards available for purchase at select
Post Offices.
*************************************

Save this receipt as evidence of
insurance. For information on filing
an insurance claim go to
https://www.usps.com/help/claims.htm

Order stamps at usps.com/shop or call
1-800-Stamp24. Go to
usps.com/clicknship to print shipping.

---

**Registered No.** RR626345495US   **Date Stamp**

| | | |
|---|---|---|
| Reg. Fee | $22.50 | |
| Handling Charge | $14.x | Return Receipt |
| Postage | $3.8 | Restricted Delivery |
| | $0.00 | |
| Received by | $0.00 | |
| | $41.30 | |

To Be Completed By Post Office

Customer Must Declare Full Value $0.00
Domestic Insurance up to $25,000 is included
02/0... based upon the declared value. International
Indemnity is limited. (See Reverse).

MIAM **OFFICIAL USE**

To Be Completed By Customer (Please Print)
All Entries Must Be in Ballpoint or Typed

FROM
Henk Milne
Aballi Milne Kali
15E 1st Ave #2250
Miami Fl 33131

TO
Eike Batista
Penitenciaria Bandeira Stampa
Complexo de Gericino- Estrada
Gal. Emilio Manuel Filho, s/n °CEP 21

Form 3806, **Receipt for Registered Mail**   Copy 1- Customer
007 (7530-02-000-9051)   (See Information on Reverse)
r domestic delivery information, visit our website at www.usps.com

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee, *et al.*,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

      Defendants.

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT MARCUS BERTO'S MOTION TO DISMISS THE COMPLAINT**

      Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs"), respond in opposition to defendant Marcus Berto's ("Berto") motion to dismiss ("Motion"), and state:

**Introduction – Summary of the Complaint**

      Mr. Berto is correct that the Complaint is lengthy and detailed and cannot be summarized accurately in just a few words. However, the few words that he chooses, to summarize what is alleged against *him*, minimizes what is alleged and omits most of the critical allegations. It is not profitable to debate the issues involved in this motion without an accurate understanding. That can only be gleaned by a review in its entirety. But if we were to summarize Mr. Berto's involvement in the scheme, at its simplest (with annotations to only select paragraphs) it would be as follows:

      There were three main "operating companies" in Batista's oil business: OGX, OSX, and LLX. OGX was to drill for oil in the Brazilian seabed under leases granted by the government. OSX built enormous floating production rigs that were supposed to load the oil and transport them

1

to a new port, Aç, being constructed to handle the enormous oil flow, where it was the anchor tenant. LLX was to develop and run the port and handle the logistics. All the "X" companies were owned by Batista through various corporate structures.[1]

Starting in 2008 and continuing right up until the crash in late 2013, Batista and his accomplices generated hundreds of public misrepresentations to investors about the "trillion dollars" of oil that OGX had supposedly discovered. American investors bought billions of dollars of shares and bonds in these companies. Six enormous OSX floating production platforms were contracted. The lies and window dressing indicated a Brazilian oil-bonanza about to erupt and huge fortunes to be made. Eike Batista was then hailed as the World's 8th Wealthiest Man.[2]

But in fact, there was virtually no commercially recoverable oil, not even to fill the enormous OSX oil-ships for a *single trip* to port. There had never been a solid scientific basis for any belief by company insiders that even a fraction of the oil promised actually existed. By September 2012, *at the latest*, the management and directors of OGX, OSX, and LLX knew that there was virtually no oil, OGX was insolvent, and further exploration was pointless.[3]

The values of OGX, OSX, and LLX all depended on the volume of commercially recoverable oil. If it became publicly known that there was virtually no oil, OGX stocks and bonds would be worthless. Without OGX oil, the rationale for the OSX drilling and transportation business would disappear and OSX stocks and bonds would be worthless. Without the promise of OSX oil ships jostling for berths at Açu to offload the promised gushers of OGX oil, much of the value of LLX's stocks and bonds would disappear. This was a house of cards that depended on OGX - and OGX was broke. Directors of public companies are legally obliged to publicly disclose

---

[1] *See* Complaint, ¶¶ 34-35, 166-167.
[2] *See* Complaint, ¶¶ 24, 38, 168-170, 206.
[3] *See* Complaint, ¶¶ 38, 186, 234, 294.

events which might impact equity and debt investor decisions to buy or sell to the investing public by way of reports to the relevant stock exchange and to the press.[4] The legal and honest decision would therefore have been for the management at all three companies, OGX, OSX and LLX, to announce the truth to investors and accept the obvious consequences.[5]

Batista and his accomplices did not, however, do the legal and honest thing. They did not retract the hundreds of public misrepresentations to investors about the "trillion dollars" of oil that was expected. In itself, this silence, this refusal to publicly admit that there just was no oil constituted a colossal, critical, material misrepresentation. In fact, the Batista crew doubled down on what had gone before and generated fresh lies to reinforce the impression of a golden future – inducing fresh investors to commit their money - while they did whatever they could to cash out their own stakes ahead of the unavoidable crash. Much of the cash resulting from the scheme – as had been historically the case over the preceding years - was held in or laundered through Miami.[6]

For this scheme to work, the information that there was no oil and that Batista was cashing out had to be corralled by the management of the three companies. At this point, fresh, less squeamish executive management came into all of the companies. One of these was Marcus Berto, a long-standing Batista confidant, who came in as the Chief Executive Officer and Investor Relations Officer of LLX in December 2012. Berto knew that there was no oil. Berto knew that OGX and OSX would crash when the illusion could no longer be maintained and that the value of LLX would tank. As CEO and Investor Relations Officer of LLX, Marcus Berto was legally obliged to disclose these material facts to the public. Had he announced that there was no oil, the bankruptcies that transpired a year later would have happened then – and the plaintiffs would not

---

[4] *See* Complaint, ¶¶ 125.
[5] *See* Complaint, ¶¶ 295-297, 298, 341.
[6] *See* Complaint, ¶¶ 239-242, 277, 298-304, 305-317.

have lost a cent. Indeed, had Berto even announced that Batista was dumping his stock in LLX there would have been a crisis in investor confidence across the three X companies. So, Batista paid Berto not to disclose that there was no oil and to help sell LLX off quickly and quietly, delaying the news as long as possible.[7]

Thus, from late 2012, onwards, Marcus Berto, knowing the truth, breached his legal duty and failed to disclose the material facts to the investing public and went along with the continuing material misrepresentations – both of commission and omission - which the plaintiffs relied on in making their investment of $21 million in OGX bonds. The misrepresentations of omission[8] included the failure to retract the myriad promises of an oil bonanza. The active misrepresentations included: (a) the announcement of the fake "Billion Dollar Put Option," where Batista falsely promised to plough a billion dollars of his own money into OGX, if and when needed, (b) the cynical announcement of an "EBX/BTG Strategic Partnership" where the Brazilian bank, BTG, though its (since-indicted) billionaire leader, Andres Esteves, joined with Batista's holding company, EBX in pledging the bank's continuing support, with remuneration solely from profits, (c) the non-existent "$850 Million Investment" by Petronas and, on top of it all, (d) the continued reassurances that there were 10.8 billion barrels of oil in the ground and that Batista stood ready to pay in a billion dollars of his own money to pump it out. All of this was untrue.[9]

---

[7] *See* Complaint, ¶¶ 78-81, 331, 405-407.s

[8] *See Berg v. Capo*, 994 So. 2d 322, 327 (Fla. 3d DCA 2007) ("Fraud may be established by either an intentional misrepresentation or omission of a material fact.") (*citing Ward v. Atl. Sec. Bank,* 777 So. 2d 1146 (Fla. 3d DCA 2001); *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. 4th DCA 2003) ("Florida law recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose material information to disclose that information fully."); *see also Johnson v. Davis*, 480 So. 2d 625, 628 (Fla. 1985) ("[W]here failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative representations is tenuous").

[9] *See* Complaint, ¶¶ 318-332, 345-362, 363-370, 399-417.

4

Meanwhile, behind the scenes, the Arab-Wealth Fund, Mubadala, whose massive loan had also been misrepresented publicly as an "investment," was secretly cashing out, as was Batista himself, none of which was disclosed. For his part, Marcus Berto had been working on selling off Batista's controlling share in LLX to U.S.-based Global Energy Partners for $560 million before the rapidly approaching crash of OGX and OSX left LLX's port without its anchor tenant. Berto belatedly announced a successful sale of LLX to the Brazilian SEC in August 2013. Then in October 2013 came the crash. Within weeks of each other, OGX, OSX – and MMX, too - all declared bankruptcy – and Berto left for Miami. It then slowly came to light that despite all the promises, there had been, all along, no more than just the tiniest trickle of oil.[10]

The problem with cashing out lay in where to hide the cash: obviously not in Brazil. Batista paid Marcus Berto to help him with this, too. Berto introduced Batista to asset protection specialists in Miami who set up a foreign asset protection trust, to hold the proceeds. Berto acted as the first trustee of the trust. As such, Berto, here in Miami, was the legal owner of the funds while Batista or his designees were the beneficial owners, or beneficiaries. Berto thereafter had the power to control the disposition of the assets of the trust and did so.[11]  It is presently unknown what the total amount was that passed through Berto's hands, in Miami, as trustee, but his pay-off is believed to have included the funds that paid for his $9.5 million dollar mansion on Key Biscayne.[12]

**Argument**

In our response, we follow the order of Mr. Berto's argument.

**Plaintiffs allege their direct reliance on misrepresentations and not "fraud on the market" and therefore state a Florida RICO claim**

---

[10] *See* Complaint, ¶¶ 252-264, 268, 405-408, 421-422, 408, 426-428, 429, 436.
[11] This obviously signified enormous trust between the two men at the time.
[12] *See* Complaint, ¶¶ 70, 78-81, 300, 421-422.

Berto argues that because the plaintiffs rely on a "fraud on the market" theory under Florida securities law as a prime predicate act under their RICO claims, which is a purely federal construct under federal securities law, not recognized under Florida law, that the Plaintiffs' RICO claims fail.[13] He is right that "fraud on the market" theory applies to federal claims, but wrong because we do not rely on "fraud on the market" at all. "Fraud on the market" theory allows plaintiffs to recover in federal securities fraud cases where they did not directly rely on any misrepresentation, but where misleading statements affected the stock price and indirectly induced them to buy.[14] This is emphatically not what is alleged here.

---

[13] *See*, Motion, pp. 4-7. Berto cites four cases in this regard: *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, *18 (D. N.J. July 10, 2009) (RICO claims dismissed in the absence of claims of direct reliance on the defendant's misrepresentation, and merely that the defendant's "misrepresentations were directed at [third-party] physicians" which, in turn, "influenced" those physicians to prescribe defendant's drugs rather than cheaper alternatives"); *Lawrie v. Ginn Development Co., LLC*, 2013 WL 222258, *6 (M.D. Fla. Jan. 9, 2013) (RICO claims dismissed where the complaint contained "only conclusory allegations that unspecified Plaintiffs relied on unspecified misrepresentations by unspecified Defendants"); *Appletree Square I, Limited Partnership v. W.R. Grace & Co.*, 29 F.3d 1283, 1286-87 (8th Cir. 1994) (RICO claim dismissed because plaintiff did not allege reliance on any misrepresentation by the defendant, but rather that the defendant's failure to "disclose[] to the 'marketplace'" certain information, it would not have purchased certain real estate); *Southeast Laborers Health and Welfare Fund v. Bayer Corp.*, 444 Fed. Appx. 401 (11th Cir. 2011) (RICO claims dismissed because the plaintiff did not allege that a drug maker's fraudulent statements induced it to buy a drug, but rather that but for the drug maker's fraudulent misrepresentations to the FDA the drug never would have been available for purchase).

[14] The fraud on the market theory stems from a line of cases that "recognized that requiring a Rule 10b-5 plaintiff to prove actual reliance would in effect preclude recovery in certain contexts even though causation-in-fact exists." *Anderson v. Bank of the South, N.A.*, 118 F.R.D. 136, 144 (M.D. Fla. 1987). The fraud on the market theory "relaxes and eliminates the actual reliance requirement." *Id.* Under the fraud on the market theory, a plaintiff states a *prima facie* case "if misleading statements would defraud purchases of stock *even if the purchasers did not directly rely on the misstatements because the misstatements may have affected the price of the stock*, and thus defrauded purchasers who rely on the price as an indication of the stock's value." *Aubrey v. Sanders*, 346 Fed. Appx. 847, 849 (3rd Cir. 2009) (internal citations and quotations omitted) (emphasis added).

6

What is alleged here is reliance on direct misrepresentations, both of omission and commission, and on a motion to dismiss, facts alleged in a complaint must be taken as true. Over the first 61 pages of the complaint, plaintiffs allege in detail a long series of positive misrepresentations that Batista and his accomplices made to the investing public including Judy Neiwirth.[15]

From page 62 onwards we recite what Judy Neiwirth, the plaintiffs' investment adviser directly relied on, from early 2013 forwards, in making the investments, as follows:

Ms. Neiwirth had available to her the aggregate spin disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual "lay" internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers. Complaint ¶ 337.

To investment advisers like Ms. Neiwirth, reviewing the aggregate information on Bloomberg, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar "bonanza," of which BATISTA had consistently boasted, started to gush. Complaint ¶ 339.

It seemed, moreover, that OGX was in no danger of running out of cash, given that BATISTA had pledged an additional billion dollars of operating capital, if and when needed. (The subtext was further that although there was a trillion dollars of oil to be had, if a billion was not quite enough to bring the gushers online, but there would be more cash to come). Complaint ¶ 340.

BATISTA had further pledged to inject another billion dollars into OSX, if and when needed. Since the future of OSX depended heavily on the future of OGX, this pledge of cash for OSX reinforced the public impression of the value of OGX. Complaint ¶ 341.

On January 15, 2013, in reliance on the overall picture painted by BATISTA, his intentional misstatements made via his publications on the internet and material omissions, reinforced in her decision to invest by BATISTA's announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17

---

[15] "The promulgation of these statements to investors internationally and the continuing failure to retract them constituted fraudulent misrepresentations that were intended to induce and did successfully induce a belief in and among investors that OGX, and the satellite entities that depended on its success, had huge intrinsic commercial value." Complaint ¶ 165.

7

on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN. Complaint ¶ 343.

On January 22, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN. Complaint ¶ 344.

On March 26, 2013, OGX released its financial statement for 2012. Under "Message from the Management," Defendant LUIZ CARNEIRO, Chief Executive Officer of OGX, stated, "In parallel to the development of our fields, we made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations, and we continue our studies on how to best develop them." Complaint ¶ 357.

On March 28, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN. Complaint ¶ 359.

On April 12, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN. Complaint ¶ 361.

On or about May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Baisin. The news of the $850 million Petronas deal was picked up and reported across the world and had its intended effect. Complaint ¶ 365.

The news of the supposed Petronas purchase came across the Bloomberg terminal screen on Judy Neiwirth's desk in Miami, Florida, on May 8, 2013. The Bloomberg report also recited a supposed quote from the buyer, "Petronas views the acquisition as a highly attractive investment opportunity in terms of asset quality and for strategic future growth in Brazil." Complaint ¶ 371.

On May 20, 2013, in continued reliance on the vaunted future profitability of OGX, and BATISTA's commitment to inject a billion dollars if and when needed, and further encouraged by the announcement of the Petronas deal, Gables Capital, in Miami, Florida, directed the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN. Complaint ¶ 373.

On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign. Complaint ¶ 381.

However, when the news hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm. Complaint ¶ 382.

BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the restructuring of the group which was now complete that same month of June" and that no further shares would be sold. However, this would prove to be a lie. Complaint ¶ 383.

On June 20, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, and reassured by BATISTA's news of his stock sale being just a "one-off adjustment," Gables Capital, in Miami, Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the secondary market on behalf of its client, MERIDIAN, as trustee. Complaint ¶ 384.

MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98. Complaint ¶ 385.

The OGX Put Option representation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which Ms. Neiwirth took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true. Complaint ¶ 417.

Plaintiffs' investment agent, Gables Capital Management, in Miami, Florida, was a target of such misrepresentations and relied on the same and was thereby induced by such fraudulent misrepresentations to buy OGX bonds on behalf of the Plaintiffs in the total amount of $21,231,683.00. Complaint ¶ 452.

Plaintiffs are clearly not alleging that they bought into OGX because they relied on "the market." Plaintiffs allege that they invested in OGX because of the false representations made by the company and its management that it was sitting on 10.8 billion barrels of oil worth a trillion dollars, its false representations that other prime players in the industry – Mubadala, BTG, Petronas, etc. – had confidence in its projections, and the false representation that the controlling shareholder stood ready to pay in a billion dollars of his own money if needed. All that was lies. In direct reliance on those lies, plaintiffs lost $21 million. It is why we are here today.

### The Plaintiffs state a claim for False and Misleading Advertising

Berto next argues that Plaintiffs do not assert a claim for false and misleading advertising under section 817.41, Florida Statutes, because: (1) the plaintiffs do not allege reliance on any misleading statement by Berto, and (2) bonds are not "property under the statute and cannot be the subject of a false and misleading advertising claim." Neither argument is valid.

First, as extensively recounted above, there were false statements made as to the worth of OGX and therefore the worth of the stocks and bonds in OGX, which Berto assisted in maintaining by breaching his legal duty to disclose that there was no oil and the plaintiffs relied on such to their damage. Second, "property" is not defined under the statute but it applies to statements made "to or before the public . . . which are known or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading," made with the purpose "either directly or indirectly, of selling or disposing of real or personal property," or "to induce the public to enter into any obligation relating to such property or services."[16] Indeed, the cases under the statute deal primarily with personal property. A bond is a form of intangible personal property, a chose in action,[17] and therefore covered by the statute.[18] The contention that bonds are not "property" – which is made without citation - is absurd.

### The illegal activities covered by the Theft Act are not restricted to "conversion"

The complaint contains allegations predicated on offenses penalized by the Theft Act, Fla. Stat. § Fla. Stat. § 812.014, etc. These are in Count IV for RICO[19] and Count V for RICO

---

[16] Fla. Stat. § 817.40(5).

[17] *Columbus v. Dennison*, 69 F. 58, 60 (5th Cir. 1895).

[18] *See* §§ 817.40(5) and 817.41(2). Other statutes, such as the Theft Act, specifically list "intangible personal property, including rights, privileges, interests, and claims" as "property," capable of being the subject of theft. *See, e.g.* Fla. Stat. § 812.012(4)(b).

[19] Complaint ¶ 459-477.

Conspiracy,[20] where the commission of "theft," as defined by statute, is a predicate act for RICO. They are also found in Count VIII for Civil Theft and Count IX for Civil Theft Conspiracy, where "theft," as defined by statute, is a predicate for the civil remedies set forth in Fla. Stat. § 772.11.

Mr. Berto argues, at Motion pp. 9-10, that "theft" is equivalent to "conversion" and because there is no sufficient allegation of the elements of "conversion," then there is no sufficient allegation of the elements of "theft." This is true only in lay parlance, where the word "theft" is generally used as being roughly equivalent to "conversion." It is not true under the Theft Act, which penalizes a much broader range of dishonest behavior than just "conversion."

To explain, prior to 1977, there was an array of Florida statutory crimes, most of which were ultimately predicated on pre-existing common law, penalizing various specific forms of dishonest behavior by which victims were deprived of property. Those pre-1977 criminal offenses included conduct that was variously described as "stealing," "larceny," "purloining," "abstracting," "embezzlement," "misapplication," "misappropriation," "conversion," "obtaining money or property by false pretenses," "obtaining money or property by fraud," and "obtaining money or property by deception." The new Theft Act, enacted in 1977, consolidated all those forms of dishonest conduct in a new statutory formulation under the umbrella term "Theft" – a term which had hitherto existed mostly in common parlance, and had not technically denoted any specific existing crime. The Theft Act provided a new, very elastic and very expansive definition of a very wide range of deceptive behavior denoted "Theft."

Thus, "[a] person commits theft [under Chapter 812] if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently: (a) Deprive the other person of a right to the property or a benefit from the property.

---

[20] Complaint ¶ 478-479.

(b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property." Fla. Stat. § 812.014(1)(a) and (b). The first limb, thus, covers situations where a victim is "deprived" of property without any necessity of enjoyment of that property by the thief. The second limb covers situations where the property taken is enjoyed by the thief or by some other unauthorized person. Either will satisfy the *mens rea* requirement for theft.

The definition of "obtains or uses," in the first sentence above, by which the *actus reus* of "theft" is committed, is given an extremely expansive meaning, as follows: "'obtains or uses' means any manner of: (a) Taking or exercising control over property. (b) Making any unauthorized use, disposition, or transfer of property. (c) Obtaining property by fraud, willful misrepresentation of a future act, or false promise. (d)1. Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception; or 2. Other conduct similar in nature." Fla. Stat. § 812.012(3)(d)(1) and (2). All "deprivations" *or* "appropriations" which result from any conduct falling under the definition of "obtains or uses" constitutes theft.

In the case at hand, OGX issued bonds. These are in essence negotiable promissory notes issued by the company which promise to pay the owner interest over time and the face value on maturity. The plaintiffs allege that they bought the bonds because of the intentional illusion generated by the various defendants, acting in concert, that OGX had a trillion dollars of oil in the ground and a billion dollars available, if needed, to bring it to the surface. In truth and in fact, however, there was no oil and OGX could not and would not be able to pay as promised. That false illusion – the deception - was generated and maintained by the top managers of the companies, the "Apex Defendants," such as Mr. Berto, in ways as are described above on pp. 1-5. The plaintiffs consequently paid $21 million for worthless OGX paper, while all the perpetrators

of the fraud knew it was worthless and cashed out their stakes behind the scenes. The plaintiffs were therefore "deprived" of $21 million, as required under the definition. By inducing the plaintiffs, by this deception, to pay $21 million for worthless OGX paper, the defendants "obtained" or "used" the plaintiffs' property to prop up the OGX bond prices while they cashed themselves out. This is "theft" under a number of possible formulations under the Theft Act, the simplest and most direct of which is that the plaintiff was deprived of $21 million as a result of "conduct previously known as . . . obtaining money or property by false pretenses, fraud, or deception . . or by other conduct similar in nature." Fla. Stat. § 812.012(3)(d)(1) and (2).

Note particularly here that the introductory words refer to "any manner of" conduct thereafter described and the concluding words expand the foregoing definitions to cover "other conduct similar in nature." This is an extremely broad net and catches every dishonest deprivation or appropriation imaginable with various forms of fraud being at the heart of it. Not surprisingly, there are plenty of cases where frauds, not involving conversion, have been recognized as thefts, which is the precise reason this case is distinguishable from every case cited by Berto on the point.[21]

---

[21] In *Rosengarten v. State*, 171 So. 2d 591 (Fla. 2d DCA 1965), for example, the Second DCA affirmed a larceny conviction where the victim relied upon the defendant's fraudulent misrepresentations in lending money to a corporation, but where "[t]here was no evidence showing that the defendant personally received any of the funds loaned to the corporation or that he had exclusive access to such funds which were placed in the corporation's bank account," or that the victim would "suffer a permanent loss." *Id.* at 593. The Court opined that if money were taken "under false pretenses with an intent to defraud and then deposited" in a bank account, a larceny conviction could stand, "and a showing of appropriation would not have been necessary." *Id.* at 596. The Court also stated "[t]here is no requirement that the victim suffer pecuniary loss so long as he has parted with his money," and [a] complete loss of property need not be shown to support a charge of obtaining money under false pretenses." *Id.* at 595 (internal quotation and citation omitted). *See also McKernan v. State*, 967 So. 2d 966, 967-68 (Fla. 4th DCA 2007) (convictions for fraud and theft affirmed where, by false representations, a defendant convinced victims to purchase insurance policies for purpose of garnering commissions for the defendant, even though

13

It is well to bear in mind, moreover, that there has never been any requirement in the criminal law, even in the case of "conversion-type" thefts, that the specific "property" of which the victim is deprived – here the $21 million paid to the prior bond-holder – wind up in the defendant's possession.[22] Under the language used under the pre-existing criminal law, neither "manucaption" (i.e. "possession") nor "asportation" (i.e. a "carrying away") of the specific property lost by the victim is required for there to be a "conversion" by the perpetrator. *See, e.g. Senfeld v. Bank of Nova Scotia*, 450 So.2d 1157, 1160-61 (3d DCA 1984), and cases there cited.[23] It is enough that there was knowledge that the deception would cause the victim loss, and that the victim believed the lie, and that loss resulted. The position, in "fraud-based" thefts, is identical.[24]

**Plaintiffs state a claim under the Florida Uniform Fraudulent Transfer Act**

In moving to dismiss Plaintiffs' claims under FUFTA, Berto grossly misstates and oversimplifies Plaintiffs' extensive allegations against him and the other defendants. Berto also undersells the extent of relief permitted pursuant to FUFTA.

Berto was a prime player in the "active" part of the fraudulent scheme. He was also a prime player in the laundering of the money that flowed from cashing out. Berto is also alleged to have introduced Batista to Miami-based asset protection specialists, who set up a trust for him to hold

_____

the victims actually received insurance policies and could have cancelled the policies and obtained refunds).

[22] *See, e.g. Rosengarten v. State*, 171 So. 2d 591 (Fla. 2d DCA 1965).

[23] *West Yellow Pine Co. v. Stephens,* 80 Fla. 298, 304, 86 So. 241, 243 (1920) ("[T]he essential elements of a conversion is [sic], a wrongful deprivation of property to the owner, and neither manucaption nor asportation is an essential element thereof"); *Quitman Naval Stores Co. v. Conway,* 63 Fla. 253, 58 So. 840 (1912); *King v. Saucier,* 356 So.2d 930 (Fla. 2d DCA 1978); *Charter Air Center, Inc. v. Miller,* 348 So.2d 614 (Fla. 2d DCA), *cert. denied,* 354 So.2d 983 (Fla. 1977); *International Mail Order, Inc. v. Capital National Bank of Miami,* 192 So.2d 287 (Fla. 3d DCA 1966); *Goodrich v. Malowney,* 157 So.2d 829 (Fla. 2d DCA 1963); *General Finance Corp. of Jacksonville v. Sexton,* 155 So.2d 159 (Fla. 1st DCA 1963); *Armored Car Service, Inc. v. First National Bank of Miami,* 114 So.2d 431 (Fla. 3d DCA 1959).

[24] *See, e.g. Rosengarten v. State*, 171 So. 2d 591 (Fla. 2d DCA 1965).

14

profits from the fraudulent scheme safe from creditors, and that Berto acted as the first trustee.

Complaint, paras. 80, 81, 303, 304. In short, Berto agreed to act as the trustee of a trust set up in

Florida to avoid the debts of creditors by holding money abroad. That allegation of trusteeship

deserves a moment's pause. As the trustee, Berto, in Florida, was the legal owner of the funds paid

into that trust, with broad powers of disposition, and the beneficiaries were Batista's nominees.[25]

These allegations are plainly sufficient to allege a cause of action against Berto under FUFTA.

Plaintiffs have alleged they have a "claim" against a "debtor" which qualifies them as a

creditor."[26] A "creditor" is "a person who has a claim." Fla. Stat. § 726.102(5). A "claim" is "a

right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[27]

A "debtor" is simply someone who is liable on a claim, i.e. all the defendants, under the various

claims made against them in the Complaint. The plaintiffs have alleged a well-founded basis for a

belief that money has been transferred out of Florida and will be transferred out of Florida in

violation of the statute. This is all that is required to plead a cause of action pursuant to FUFTA.

Berto also alleges that we fail to satisfy the "badges of fraud" set forth in section 726.105,

Florida Statutes. First, this is an evidentiary issue. Second, the list is not exclusive, as even Berto

---

[25] "A trustee, in the strictest sense, holds legal title to property which he administers for the named
beneficiary in accordance with the terms of the instrument creating the trust." *Cohen v. Friedland*,
450 So. 2d 905, 906 (Fla. 3d DCA 1984). Thus, in a trust relationship, "the beneficiary possesses
an equitable ownership in the trust property, while the trustee possesses legal title to the property."
*Imagine Ins. Co., Ltd. v. State ex rel. Dept. of Financial Services*, 999 So. 2d 693, 700 (Fla. 1st
DCA 2008). Section 736.0816, Florida Statutes, provides for the broad, specific powers of a
trustee, which include to: "(11) Grant an option involving a sale, lease, or other disposition of trust
property or acquire an option for the acquisition of property . . ." Further, "Florida law establishes
that trustees have the power to '[p]lay or contest any claim, settle a claim by *or against* the trust,
and release, in whole or in part, a claim belonging to the trust . . ." *Schwab v. Huntington Nat.
Bank*, 516 Fed. Appx. 546, 549 (6th Cir. 2013) (citations omitted) (emphasis in original).
[26] *Friedman v. Heart Institute of Port St. Lucie, Inc.*, 863 So. 2d 189, 192 (Fla. 2003).
[27] Fla. Stat. § 726.102(4).

admits, of what constitutes a fraud. Third, we have plead multiple ultimate facts that functionally satisfy a number of the enumerated "badges of fraud."

Finally, Plaintiffs do not, as argued by Berto, need to identify a specific transfer that they wish to set aside. The relief provided by FUFTA is much broader. FUFTA not only provides for the avoidance of specific past transfers, but allows injunctive relief against the debtor and the transferee in regard to "the asset transferred *or of other property*." Fla. Stat. 726.108(1)(c)1. (Emphasis added). It was on this basis, in fact, that the Plaintiffs obtained an *ex parte* injunction preventing the threatened future transfer of assets in fraud of the Plaintiffs' claims. The legal sufficiency of the injunction is before the Third District Court of Appeal.

### The Plaintiffs state cause of action based on Conspiracy

Plaintiffs have sued Berto for the following civil conspiracies: Conspiracy to Defraud (Count II); Conspiracy to Commit Florida RICO (Count V); Conspiracy to Commit False and Misleading Advertising (Count VII); Conspiracy to Commit Civil Theft (IX); and Count XII (Conspiracy to Commit Fraudulent Transfers (Count XII). Berto argues that the Plaintiffs do not sufficiently allege the conspiracy counts because, essentially, the Plaintiffs do not sufficiently allege the underlying offenses nor the existence of a conspiracy to commit those counts. His argument is based in large part on the statement found in various paragraphs of the Complaint that the Defendants conspired together "in ways, upon dates and in places that are unknown before discovery." He fails to note that in every instance where those words appear they are followed by the words **"*beyond* what is set forth above."** And what is "set forth above," in every case, is all the ultimate facts sufficient to claim conspiracy.

Very little beyond the fact of agreement and some form of assistance is required to render an individual liable as a co-conspirator. It is not necessary that each conspirator overtly act in

16

furtherance of the conspiracy. *Charles v. Florida Foreclosure Placement Center, LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008) (internal quotations and citations omitted) ("Each coconspirator need not act to further a conspiracy; each 'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators"). Further, the "existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence." *Charles*, 988 So. 2d at 1160 (internal quotations and citations omitted). This is enough to hold each co-conspirator jointly and severally liable as liability is equally imputed to each co-conspirator. *Nicholson v. Kellin*, 481 So. 2d 931, 935 (Fla. 5th DCA) ("Confirming that an act done in pursuit of a conspiracy by one conspirator is an act for which each other conspirator is jointly and severally liable").

In order to plead a cause of action for conspiracy to commit each of the torts claimed, Plaintiffs must plead (a) an agreement between two or more parties, (b) to do an unlawful act, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy. *Charles*, 988 So. 2d at 1159-60. Plaintiffs have plead each of these elements with respect to Berto.

In fact, while Berto generally states that Plaintiffs plead none of their causes of action for conspiracy, hey specifically addresses only one, conspiracy to defraud. Here he repeats his untenable "fraud on the market" contention. Motion to Dismiss, pp. 16-17. However, as stated above, Plaintiffs clearly plead reliance, action, and damage, resulting from specific fraudulent statements. They plead that Berto, as a co-conspirator, agreed with the unlawful aim, actively participated in furtherance of the fraud and so damaged Plaintiffs. This is entirely sufficient to plead a cause of action for conspiracy to defraud. *Charles*, 988 So. 2d at 1160. (Florida recognizes a cause of action for conspiracy to commit fraud).

17

### The Plaintiffs states a claims for Aiding and Abetting

Mr. Berto concedes that a cause of action for aiding and abetting fraud exists in Florida. It has three simple elements: (1) existence of an underlying fraud; (2) knowledge of the fraud by the defendant; and (3) substantial assistance in advancement of the fraud by the defendant. *ZP No. 54 Ltd. Partnership v. Fidelity and Deposit Co.*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005). Such is pleaded, abundantly, Mr. Berto fails to cite to any case that would negate the conclusion that this cause of action does not exist. He also contends that aiding and abetting theft does not exist, in which he is also wrong.[28]

### Leave to Amend

In the case of all causes of action, all that the rules require is a "short and plain statement of ultimate facts."[29] While fraud claims must be pleaded with particularity, still, all that is required is the "ultimate facts."[30] What is not required is a complete recitation of every *evidentiary fact* underlying the ultimate facts.[31] From the above we believe that it appears that all cause of action have been well-pleaded.

With regard to Mr. Berto, we are now also in a position to further allege, amongst other things, that he was the trustee of the Batista Family Trust, established in 2013 through an attorney

---

[28] At least two courts have at least implicitly recognized a cause of action for aiding and abetting civil theft, although the cases were dismissed on other grounds and did not ultimately address that issue explicitly. *See Feltman v. Prudential Bache Sec.*, 122 B.R. 466, 469 (S.D. Fla. 1990) and *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 551 (Fla. 2d DCA 2003).
[29] Fla.R.Civ.P. 1.110(b).
[30] *Held v. Trafford Realty Co.*, 414 So. 2d 631, 632 (Fla. 5th DCA 1982) (*citing Kutner v. Kalish*, 173 So. 2d 763 (Fla. 3d DCA), *cert. denied*, 183 So. 2d 210 (Fla. 1965)); *American International Land Corp. v. Hanna*, 323 So. 2d 567 (Fla. 1975).
[31] *See Feldman v. Department of Transp.*, 389 So. 2d 692, 695 (Fla. 4th DCA 1980) (citation omitted); *Brown v. Griffin*, 229 So. 2d 225, 227 (Fla. 1969) (citation omitted). *Tedder v. Florida Unemployment Appeals Com'n*, 697 So. 2d 900, 902 (Fla. 2d DCA 1997) (*citing Black's Law Dictionary* 1522 (6th ed. 1990).

18

in Miami in order to avoid creditors should the Court require us to amend.[32] As its trustee, Berto was the legal owner of the funds paid into that trust, with broad powers of disposition, and the beneficiaries were Batista's nominees.[33] The trust was funded with at least $30 million dollars, which was paid into that lawyer's trust account at Citibank, in Miami, in two $15 million tranches in December 2013, by Batista's wealth-holding vehicle, the Caymanian defendant, 63X Master Fund. It is believed that such funds have since been fraudulently transferred out of Florida.

With regard to the payment for such services as trustee, Berto was paid $10 million by 63X Master Fund in August 2013. The payment was wired into a Merrill Lynch account in the name of an Arizona company, LIN LLC, of which Berto was the sole member. It is believed that the $10 million is traceable into the funds used to purchase the $9.5 million mansion in Key Biscayne which Mr. Berto bought in 2016. This is titled, as to 50%, in the names of Mr. Berto, as trustee of the LINKB Qualified Personal Residence Trust, and, as to the other 50%, in the name of Mr. Berto's wife, Melissa Mason Berto, as trustee of the LINKB Qualified Personal Residence Trust.

The foregoing transactions, which were conducted by international wiring instructions, constituted predicate RICO acts of Florida securities fraud, federal wire fraud and federal money-laundering. (See, current allegations at Complaint paras. 465-469, 478). The $30 million, when paid into a *Florida* trust account by 63X Master Fund became a *Florida* asset of 63X Master Fund. When paid into the Batista Trust, it became a Florida asset of Berto, as to legal title, and the Batista trust beneficiaries as to equitable title. When paid out of Florida to avoid creditors, it became

---

[32] *See Kay's Custom Drapes, Inc. v. Garrote*, 920 So. 2d 1168, 1171 (Fla. 3d DCA) ("Rule 1.190(a) . . . expressly states that leave to amend shall be given freely when justice so requires.").

[33] See, fn. 25, *supra*, (dealing with the power of trustees).

19

subject to recall through injunctive relief under FUFTA against all involved. (See, current allegations at Complaint paras. 492-493).

### Conclusion

That said, we believe that we have pleaded more than sufficient by way of ultimate facts to have Berto answer the allegations of the complaint, and that further extensive recitation of evidentiary facts underlying such ultimate fact allegations, in what is already an extremely long Complaint, are unnecessary.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
1SE 3rd Ave., Suite 2250
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

s/ *Hendrik G. Milne*_____
Hendrik G. Milne
Florida Bar No.: 335886

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 24th day of April a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

s/ *Hendrik G. Milne*_____
Hendrik G. Milne, Esq.

IN THE CIRCUIT COURT OF THE
1TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION 40

MERIDIAN TRUST COMPANY, as
Trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

                     Case No. 17-001040-CA-01 (43)

       Plaintiffs,

Vs.

EIKE BATISTA, WERNER BATISTA, et al.,

       Defendants.

_____/

## MOTION OF AZIZ BEN AMMAR TO
## QUASH PURPORTED SERVICE OF PROCESS

      Aziz Ben Ammar, who has been wrongfully named as a defendant in this action,
respectfully moves this Court for an Order quashing the purported service of process on
Mr. Ammar.  Mr. Ammar is appearing solely and specially for the purpose of moving to
quash the attempted service and is not entering or intending to enter a general
appearance.  As reasons for this Motion, Mr. Ammar states the following:

      1.     Mr. Ammar is a citizen of Tunisia and a resident of Tunis, Tunisia.  He is
not a resident of Florida or of New York.  (See Exhibit A, Affidavit of Aziz Ben Ammar)

      2.     The location at which service of process was allegedly attempted is not
and never has been Mr. Ammar's "usual place of abode," as required by Section
48.031(1)(a) and Section 48.194, Florida Statutes. (See Exhibit A).  In this regard, as in
others listed below, the purported service was demonstrably and fatally defective.

3.      Mr. Ammar was never served personally.

4.      Documents apparently intended to be served upon Mr. Ammar were never served upon a person.  They were found on the floor in the hallway outside of the apartment noted in the Affidavit of Service, by a housekeeper who works in the building. They were apparently simply dropped there by the process server. The documents were then turned over to the building concierge in the lobby of the building. (See Exhibit B, Affidavit of Gabriele Rebeschini and Exhibit C, Affidavit of Bozena Kosmider).

5.      The apartment outside of which the Summons and Complaint were dropped is rented by Mr. Ammar for the use of his wife, Gabriele Rebeschini, who has occasion to work in New York City from time to time.  It was never intended to be his usual place of abode and has never been utilized as his usual place of abode or as his place of abode in any manner whatsoever.   (See Exhibits A and B).

6.      The description of the person upon whom service was allegedly achieved appears to be based on an image taken from the internet, where numerous images of Ms. Rebeschini are available as a consequence of her profession as a fashion model. Ms. Rebeschini never opened the door of the apartment to the process server or otherwise encountered him. The description is guesswork, based on the image taken from the internet, and is significantly inaccurate. (See Exhibit B).

## CONCLUSION

Service was not attempted at Mr. Ammar's usual place of abode. Service was not attempted on a person residing at his usual place of abode.  It was not attempted on a person at all.  There is no indication in the Affidavit of Service that the person allegedly served was "informed of [the] contents" of the documents left on the floor.  For

these reasons, each of which is sufficient in itself, the purported service of process on

Mr. Ammar failed to comply with Florida law, was, for that reason, fatally defective and

is null and void.

WHEREFORE, Mr. Ammar respectfully requests that the Court enter an Order

quashing the purported service of process on Mr. Ammar and awarding him his

attorney's fees incurred in obtaining the order.

Dated:  April 18, 2017

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP
Attorneys for Defendant Aziz Ben Ammar
200 South Biscayne Boulevard, Suite 4700
Miami, Florida 33131

By: *s/ Alvin B. Davis*
Alvin B. Davis – Fla. Bar No. 218073
Alvin.davis@squirepb.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served via the

Court's E-Portal system on April 24, 2017.

*/s/ Alvin B. Davis*
Alvin B. Davis

# EXHIBIT A

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, et al.

     Defendants.

_____/

## AFFIDAVIT OF AZIZ BEN AMMAR

Aziz Ben Ammar being first duly sworn, deposes and says:

1.    The information provided in this Affidavit is true and, except where indicated, based upon my personal knowledge.

2.    I am a resident of the City of Tunis, Tunisia

3.    I do not reside or maintain a residence in New York City.

4.    I do not own an apartment in New York City. The apartment identified in the Affidavit of Service in this matter is rented by me for the use of my wife. She is a Brazilian national whose legal residence is Brazil and planned to be changed with me in Tunis, Tunisia. My wife travels to New York City on a regular basis as required by her occupation as an international fashion model. She utilizes the apartment when in New York City. It is not and never has been her legal residence.

5.    No one at the address indicated in the Affidavit of Services is authorized to accept service of process on my behalf and to my knowledge no one has ever done so.

6.    I have been told that documents proposing to constitute service of process on me were found on the floor outside the apartment door by Bozena Kosmider, who provides housekeeping services for the apartment and for other apartment in the building. I am informed that she took them to the front desk of the building and left them with the doorman.

7.    The doorman was not authorized to accept service of process on my behalf.

8.    I have never received a document related to the service of process or a copy of the complaint related to this case by mail. Building management maintains a log of such mail. None has been logged in.

FURTHER AFFIANT SAYETH NAUGHT.

_____
AZIZ BEN AMMAR





A LA COUR DE CIRCUIT 11 CIRCUIT
JUDICIAIRE DANS LE COMTE DE MIAMI-
DADE, FLORIDE

LITIGES COMPLEXES D'AFFAIRES
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, en qualité de fiduciaire

and AMERICAN ASSOCIATED GROUP, LTD.,

     Les demandeurs

v.

EIKE BATISTA, WERNER BATISTA, et al.

     Défendeurs

_____/

## AFFIDAVIT D' AZIZ BEN AMMAR

     Aziz Ben Ammar étant d'abord dûment assermenté, dépose et dit:

     1.     L'information fournie dans le présent Affidavit est vraie et, sauf indication contraire, selon mes connaissances personnelles.

     2.     Je suis un résident de la ville de Tunis, en Tunisie

     3.     Je ne réside pas ou ne maintiens pas une résidence à New York City.

     4.     Je ne possède pas un appartement à New York. L'appartement identifié dans l'affidavit de service dans cette affaire est loué par moi pour l'usage de ma femme. Elle est brésilienne dont la résidence légale est le Brésil et devrait être changé avec moi à Tunis, en Tunisie. Ma femme se rend régulièrement à New York comme l'exige sa profession de modèle de mode international. Elle utilise l'appartement à New York. Ce n'est pas et n'a jamais été sa résidence légale.

5.      Personne à l'adresse indiquée dans l'affidavit des services n'est autorisée à accepter le service de la procédure en mon nom et, à ma connaissance, personne ne l'a jamais fait.

6.      On m'a dit que les documents proposant de constituer un service de procédure sur moi ont été trouvés à l'extérieur de la porte de l'appartement par Bozena Kosmider, qui fournit des services de ménage pour l'appartement et pour d'autres appartements dans le bâtiment. Je suis informé qu'elle les a emmenés à la réception du bâtiment et les a laissés avec le portier.

7.      Le portier n'était pas autorisé à accepter le service de la procédure en mon nom.

8.      Je n'ai jamais reçu un document relatif au service de traitement ou une copie de la plainte relative à cette affaire par la poste. La gestion du bâtiment maintient un journal de ce courrier. Aucun n'a été connecté.

FURTHER AFFIANT SAYETH NAUGHT.

_____
AZIZ BEN AMMAR



# EXHIBIT B

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, et al.

     Defendants.

_____/

## AFFIDAVIT OF GABRIELE REBESCHINI

Gabriele Rebeschini being first duly sworn, deposes and says:

1.    This affidavit is true and is based upon my personal knowledge.

2.    I am a Brazilian national. I was married to Aziz Ben Ammar in July of 2016. Accordingly, I am planning to change my legal residence from Brazil to Tunisia.

3.    In any event, my legal residence is not in New York City or the United States. In my profession as an international fashion model, I am required to travel regularly to New York City. For that purpose my husband has rented an apartment for me at 40 Mercer Street in New York City. I customarily utilize the apartment when I am temporarily in the City.

4.    I was not asked to accept documents on behalf of my husband, as indicated in the Affidavit of Service, nor did I do so. I did not open the door to the apartment as has been suggested. I never encountered the person who claims to have served me. Accordingly, I did not receive any documents on my husband's behalf.

010-8456-0276/1/AMERICAS

5. The photograph attached to the Affidavit of Service was apparently simply copied from the internet, where a number of such photographs can be found. The description contained in the Affidavit appears to be an inaccurate estimate based on the photograph.

FURTHER AFFIANT SAYETH NAUGHT.

_____
GABRIELE REBESCHINI

Notary Public
Print Name: Michael Senz
Commission No.: 01SE6114952

My Commission Expires: 08/30/20

[ ] Personally known
[✓] Produced Identification

Type: Brazilian Passport

State of NY
County of New York
Sworn to before me this 24+ day
of APRIL , 2017 by
Gabriele Rebeschini

MICHAEL SENZ
Notary Public-State of New York
No. 01SE6114952
Qualified in New York County
Commission Expires Aug. 30, 2020

# EXHIBIT C

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, et al.

      Defendants.

_____/

### AFFIDAVIT OF BOZENA KOSMIDER

Bozena Kosmider being first duly sworn, deposes and says:

    1.    The information contained in this Affidavit is true and based on personal knowledge.

    2.    I provide housekeeping services for several apartments at 40 Mercer Street in New York City.  From time to time, I provide these services for Gabriele Rebeschini in Apartment 24.

    3.    On the morning of April 6, 2017, while working in the building, I found a packet of documents on the floor outside the door to Apartment 24, the apartment which Ms. Rebeschini occupies when in New York.  Not knowing what they were, I took them down to the building lobby and left them with the doorman.  I was told that a process server had been in the building, so he may have left the documents there.

FURTHER AFFIANT SAYETH NAUGHT.

_____
**BOZENA KOSMIDER**

Notary Public
Print Name: Michael Senz
Commission No: 01SE6114952

My Commission Expires: 08/30/20

[ ] Personally known
[✓] Produced Identification

State of NY
County of New York
Sworn to before me this ___24___ day
of __APRIL__ , 20 17 by
Bozena Kosmider

Type: Employment Authorization Card (NY)

MICHAEL SENZ
Notary Public-State of New York
No 01SE6114952
Qualified in New York County
Commission Expires Aug. 30, 2020

010-8456-0294/1/AMERICAS

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee, *et al.*,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

      Defendants.

_____/

**PLAINTIFFS' NOTICE OF CORRECTION OF SCRIVENER'S ERROR IN
PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT MARCUS BERTO'S MOTION TO DISMISS THE COMPLAINT**

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), file this notice of correction of Scrivener's error, and state:

In the course of drafting the response to Defendant Marcus Berto's motion to dismiss the

Complaint, the Plaintiffs' inadvertently deleted the following sentence and did not notice the

deletion until after filing and serving the response:

      "Should the Court disagree, we would seek leave to amend."

This sentence should have been included at the beginning of the second paragraph after the

section titled, "Leave to Amend," on page 19. The text should then continue to read, "With regard

to Mr. Berto . . . ." Attached hereto as Exhibit "A" is a corrected response. The only change is the

addition of the single sentence as printed above and insertion of the word "Corrected" in the

document's caption so that it may be easily identified. The response remains otherwise unchanged.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
1SE 3rd Ave., Suite 2250
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 25th day of April a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

# EXHIBIT "A"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee, *et al.*,

       Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

       Defendants.

_____/

**PLAINTIFFS' CORRECTED RESPONSE IN OPPOSITION TO
DEFENDANT MARCUS BERTO'S MOTION TO DISMISS THE COMPLAINT**

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), respond in opposition to defendant Marcus Berto's ("Berto") motion to

dismiss ("Motion"), and state:

**Introduction – Summary of the Complaint**

Mr. Berto is correct that the Complaint is lengthy and detailed and cannot be summarized

accurately in just a few words. However, the few words that he chooses, to summarize what is

alleged against *him*, minimizes what is alleged and omits most of the critical allegations. It is not

profitable to debate the issues involved in this motion without an accurate understanding. That can

only be gleaned by a review in its entirety. But if we were to summarize Mr. Berto's involvement

in the scheme, at its simplest (with annotations to only select paragraphs) it would be as follows:

There were three main "operating companies" in Batista's oil business: OGX, OSX, and

LLX. OGX was to drill for oil in the Brazilian seabed under leases granted by the government.

OSX built enormous floating production rigs that were supposed to load the oil and transport them

1

to a new port, Aç, being constructed to handle the enormous oil flow, where it was the anchor tenant. LLX was to develop and run the port and handle the logistics. All the "X" companies were owned by Batista through various corporate structures.[1]

Starting in 2008 and continuing right up until the crash in late 2013, Batista and his accomplices generated hundreds of public misrepresentations to investors about the "trillion dollars" of oil that OGX had supposedly discovered. American investors bought billions of dollars of shares and bonds in these companies. Six enormous OSX floating production platforms were contracted. The lies and window dressing indicated a Brazilian oil-bonanza about to erupt and huge fortunes to be made. Eike Batista was then hailed as the World's 8th Wealthiest Man.[2]

But in fact, there was virtually no commercially recoverable oil, not even to fill the enormous OSX oil-ships for a *single trip* to port. There had never been a solid scientific basis for any belief by company insiders that even a fraction of the oil promised actually existed. By September 2012, *at the latest*, the management and directors of OGX, OSX, and LLX knew that there was virtually no oil, OGX was insolvent, and further exploration was pointless.[3]

The values of OGX, OSX, and LLX all depended on the volume of commercially recoverable oil. If it became publicly known that there was virtually no oil, OGX stocks and bonds would be worthless. Without OGX oil, the rationale for the OSX drilling and transportation business would disappear and OSX stocks and bonds would be worthless. Without the promise of OSX oil ships jostling for berths at Açu to offload the promised gushers of OGX oil, much of the value of LLX's stocks and bonds would disappear. This was a house of cards that depended on OGX - and OGX was broke. Directors of public companies are legally obliged to publicly disclose

---

[1] *See* Complaint, ¶¶ 34-35, 166-167.
[2] *See* Complaint, ¶¶ 24, 38, 168-170, 206.
[3] *See* Complaint, ¶¶ 38, 186, 234, 294.

2

events which might impact equity and debt investor decisions to buy or sell to the investing public

by way of reports to the relevant stock exchange and to the press.[4] The legal and honest decision

would therefore have been for the management at all three companies, OGX, OSX and LLX, to

announce the truth to investors and accept the obvious consequences.[5]

Batista and his accomplices did not, however, do the legal and honest thing. They did not

retract the hundreds of public misrepresentations to investors about the "trillion dollars" of oil that

was expected. In itself, this silence, this refusal to publicly admit that there just was no oil

constituted a colossal, critical, material misrepresentation. In fact, the Batista crew doubled down

on what had gone before and generated fresh lies to reinforce the impression of a golden future –

inducing fresh investors to commit their money - while they did whatever they could to cash out

their own stakes ahead of the unavoidable crash. Much of the cash resulting from the scheme – as

had been historically the case over the preceding years - was held in or laundered through Miami.[6]

For this scheme to work, the information that there was no oil and that Batista was cashing

out had to be corralled by the management of the three companies. At this point, fresh, less

squeamish executive management came into all of the companies. One of these was Marcus Berto,

a long-standing Batista confidant, who came in as the Chief Executive Officer and Investor

Relations Officer of LLX in December 2012. Berto knew that there was no oil. Berto knew that

OGX and OSX would crash when the illusion could no longer be maintained and that the value of

LLX would tank. As CEO and Investor Relations Officer of LLX, Marcus Berto was legally

obliged to disclose these material facts to the public. Had he announced that there was no oil, the

bankruptcies that transpired a year later would have happened then – and the plaintiffs would not

---

[4] *See* Complaint, ¶¶ 125.
[5] *See* Complaint, ¶¶ 295-297, 298, 341.
[6] *See* Complaint, ¶¶ 239-242, 277, 298-304, 305-317.

have lost a cent. Indeed, had Berto even announced that Batista was dumping his stock in LLX there would have been a crisis in investor confidence across the three X companies. So, Batista paid Berto not to disclose that there was no oil and to help sell LLX off quickly and quietly, delaying the news as long as possible.[7]

Thus, from late 2012, onwards, Marcus Berto, knowing the truth, breached his legal duty and failed to disclose the material facts to the investing public and went along with the continuing material misrepresentations – both of commission and omission - which the plaintiffs relied on in making their investment of $21 million in OGX bonds. The misrepresentations of omission[8] included the failure to retract the myriad promises of an oil bonanza. The active misrepresentations included: (a) the announcement of the fake "Billion Dollar Put Option," where Batista falsely promised to plough a billion dollars of his own money into OGX, if and when needed, (b) the cynical announcement of an "EBX/BTG Strategic Partnership" where the Brazilian bank, BTG, though its (since-indicted) billionaire leader, Andres Esteves, joined with Batista's holding company, EBX in pledging the bank's continuing support, with remuneration solely from profits, (c) the non-existent "$850 Million Investment" by Petronas and, on top of it all, (d) the continued reassurances that there were 10.8 billion barrels of oil in the ground and that Batista stood ready to pay in a billion dollars of his own money to pump it out. All of this was untrue.[9]

---

[7] *See* Complaint, ¶¶ 78-81, 331, 405-407.s

[8] *See Berg v. Capo*, 994 So. 2d 322, 327 (Fla. 3d DCA 2007) ("Fraud may be established by either an intentional misrepresentation or omission of a material fact.") (*citing Ward v. Atl. Sec. Bank,* 777 So. 2d 1146 (Fla. 3d DCA 2001); *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. 4th DCA 2003) ("Florida law recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose material information to disclose that information fully."); *see also Johnson v. Davis*, 480 So. 2d 625, 628 (Fla. 1985) ("[W]here failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative representations is tenuous").

[9] *See* Complaint, ¶¶ 318-332, 345-362, 363-370, 399-417.

4

Meanwhile, behind the scenes, the Arab-Wealth Fund, Mubadala, whose massive loan had also been misrepresented publicly as an "investment," was secretly cashing out, as was Batista himself, none of which was disclosed. For his part, Marcus Berto had been working on selling off Batista's controlling share in LLX to U.S.-based Global Energy Partners for $560 million before the rapidly approaching crash of OGX and OSX left LLX's port without its anchor tenant. Berto belatedly announced a successful sale of LLX to the Brazilian SEC in August 2013. Then in October 2013 came the crash. Within weeks of each other, OGX, OSX – and MMX, too - all declared bankruptcy – and Berto left for Miami. It then slowly came to light that despite all the promises, there had been, all along, no more than just the tiniest trickle of oil.[10]

The problem with cashing out lay in where to hide the cash: obviously not in Brazil. Batista paid Marcus Berto to help him with this, too. Berto introduced Batista to asset protection specialists in Miami who set up a foreign asset protection trust, to hold the proceeds. Berto acted as the first trustee of the trust. As such, Berto, here in Miami, was the legal owner of the funds while Batista or his designees were the beneficial owners, or beneficiaries. Berto thereafter had the power to control the disposition of the assets of the trust and did so.[11]  It is presently unknown what the total amount was that passed through Berto's hands, in Miami, as trustee, but his pay-off is believed to have included the funds that paid for his $9.5 million dollar mansion on Key Biscayne.[12]

**Argument**

In our response, we follow the order of Mr. Berto's argument.

**Plaintiffs allege their direct reliance on misrepresentations and not "fraud on the market" and therefore state a Florida RICO claim**

---

[10] *See* Complaint, ¶¶ 252-264, 268, 405-408, 421-422, 408, 426-428, 429, 436.
[11] This obviously signified enormous trust between the two men at the time.
[12] *See* Complaint, ¶¶ 70, 78-81, 300, 421-422.

Berto argues that because the plaintiffs rely on a "fraud on the market" theory under Florida securities law as a prime predicate act under their RICO claims, which is a purely federal construct under federal securities law, not recognized under Florida law, that the Plaintiffs' RICO claims fail.[13] He is right that "fraud on the market" theory applies to federal claims, but wrong because we do not rely on "fraud on the market" at all. "Fraud on the market" theory allows plaintiffs to recover in federal securities fraud cases where they did not directly rely on any misrepresentation, but where misleading statements affected the stock price and indirectly induced them to buy.[14] This is emphatically not what is alleged here.

---

[13] *See*, Motion, pp. 4-7. Berto cites four cases in this regard: *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, *18 (D. N.J. July 10, 2009) (RICO claims dismissed in the absence of claims of direct reliance on the defendant's misrepresentation, and merely that the defendant's "misrepresentations were directed at [third-party] physicians" which, in turn, "influenced" those physicians to prescribe defendant's drugs rather than cheaper alternatives"); *Lawrie v. Ginn Development Co., LLC*, 2013 WL 222258, *6 (M.D. Fla. Jan. 9, 2013) (RICO claims dismissed where the complaint contained "only conclusory allegations that unspecified Plaintiffs relied on unspecified misrepresentations by unspecified Defendants"); *Appletree Square I, Limited Partnership v. W.R. Grace & Co.*, 29 F.3d 1283, 1286-87 (8th Cir. 1994) (RICO claim dismissed because plaintiff did not allege reliance on any misrepresentation by the defendant, but rather that the defendant's failure to "disclose[] to the 'marketplace'" certain information, it would not have purchased certain real estate); *Southeast Laborers Health and Welfare Fund v. Bayer Corp.*, 444 Fed. Appx. 401 (11th Cir. 2011) (RICO claims dismissed because the plaintiff did not allege that a drug maker's fraudulent statements induced it to buy a drug, but rather that but for the drug maker's fraudulent misrepresentations to the FDA the drug never would have been available for purchase).

[14] The fraud on the market theory stems from a line of cases that "recognized that requiring a Rule 10b-5 plaintiff to prove actual reliance would in effect preclude recovery in certain contexts even though causation-in-fact exists." *Anderson v. Bank of the South, N.A.*, 118 F.R.D. 136, 144 (M.D. Fla. 1987). The fraud on the market theory "relaxes and eliminates the actual reliance requirement." *Id.* Under the fraud on the market theory, a plaintiff states a *prima facie* case "if misleading statements would defraud purchases of stock *even if the purchasers did not directly rely on the misstatements because the misstatements may have affected the price of the stock*, and thus defrauded purchasers who rely on the price as an indication of the stock's value." *Aubrey v. Sanders*, 346 Fed. Appx. 847, 849 (3rd Cir. 2009) (internal citations and quotations omitted) (emphasis added).

6

What is alleged here is reliance on direct misrepresentations, both of omission and commission, and on a motion to dismiss, facts alleged in a complaint must be taken as true. Over the first 61 pages of the complaint, plaintiffs allege in detail a long series of positive misrepresentations that Batista and his accomplices made to the investing public including Judy Neiwirth.[15]

From page 62 onwards we recite what Judy Neiwirth, the plaintiffs' investment adviser directly relied on, from early 2013 forwards, in making the investments, as follows:

> Ms. Neiwirth had available to her the aggregate spin disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual "lay" internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers. Complaint ¶ 337.

> To investment advisers like Ms. Neiwirth, reviewing the aggregate information on Bloomberg, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar "bonanza," of which BATISTA had consistently boasted, started to gush. Complaint ¶ 339.

> It seemed, moreover, that OGX was in no danger of running out of cash, given that BATISTA had pledged an additional billion dollars of operating capital, if and when needed. (The subtext was further that although there was a trillion dollars of oil to be had, if a billion was not quite enough to bring the gushers online, but there would be more cash to come). Complaint ¶ 340.

> BATISTA had further pledged to inject another billion dollars into OSX, if and when needed. Since the future of OSX depended heavily on the future of OGX, this pledge of cash for OSX reinforced the public impression of the value of OGX. Complaint ¶ 341.

> On January 15, 2013, in reliance on the overall picture painted by BATISTA, his intentional misstatements made via his publications on the internet and material omissions, reinforced in her decision to invest by BATISTA's announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17

---

[15] "The promulgation of these statements to investors internationally and the continuing failure to retract them constituted fraudulent misrepresentations that were intended to induce and did successfully induce a belief in and among investors that OGX, and the satellite entities that depended on its success, had huge intrinsic commercial value." Complaint ¶ 165.

7

on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN. Complaint ¶ 343.

On January 22, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN. Complaint ¶ 344.

On March 26, 2013, OGX released its financial statement for 2012. Under "Message from the Management," Defendant LUIZ CARNEIRO, Chief Executive Officer of OGX, stated, "In parallel to the development of our fields, we made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations, and we continue our studies on how to best develop them." Complaint ¶ 357.

On March 28, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN. Complaint ¶ 359.

On April 12, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN. Complaint ¶ 361.

On or about May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Baisin. The news of the $850 million Petronas deal was picked up and reported across the world and had its intended effect. Complaint ¶ 365.

The news of the supposed Petronas purchase came across the Bloomberg terminal screen on Judy Neiwirth's desk in Miami, Florida, on May 8, 2013. The Bloomberg report also recited a supposed quote from the buyer, "Petronas views the acquisition as a highly attractive investment opportunity in terms of asset quality and for strategic future growth in Brazil." Complaint ¶ 371.

On May 20, 2013, in continued reliance on the vaunted future profitability of OGX, and BATISTA's commitment to inject a billion dollars if and when needed, and further encouraged by the announcement of the Petronas deal, Gables Capital, in Miami, Florida, directed the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN. Complaint ¶ 373.

On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign. Complaint ¶ 381.

However, when the news hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm. Complaint ¶ 382.

BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the restructuring of the group which was now complete that same month of June" and that no further shares would be sold. However, this would prove to be a lie. Complaint ¶ 383.

On June 20, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, and reassured by BATISTA's news of his stock sale being just a "one-off adjustment," Gables Capital, in Miami, Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the secondary market on behalf of its client, MERIDIAN, as trustee. Complaint ¶ 384.

MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98. Complaint ¶ 385.

The OGX Put Option representation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which Ms. Neiwirth took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true. Complaint ¶ 417.

Plaintiffs' investment agent, Gables Capital Management, in Miami, Florida, was a target of such misrepresentations and relied on the same and was thereby induced by such fraudulent misrepresentations to buy OGX bonds on behalf of the Plaintiffs in the total amount of $21,231,683.00. Complaint ¶ 452.

Plaintiffs are clearly not alleging that they bought into OGX because they relied on "the market." Plaintiffs allege that they invested in OGX because of the false representations made by the company and its management that it was sitting on 10.8 billion barrels of oil worth a trillion dollars, its false representations that other prime players in the industry – Mubadala, BTG, Petronas, etc. – had confidence in its projections, and the false representation that the controlling shareholder stood ready to pay in a billion dollars of his own money if needed. All that was lies. In direct reliance on those lies, plaintiffs lost $21 million. It is why we are here today.

### The Plaintiffs state a claim for False and Misleading Advertising

Berto next argues that Plaintiffs do not assert a claim for false and misleading advertising under section 817.41, Florida Statutes, because: (1) the plaintiffs do not allege reliance on any misleading statement by Berto, and (2) bonds are not "property under the statute and cannot be the subject of a false and misleading advertising claim." Neither argument is valid.

First, as extensively recounted above, there were false statements made as to the worth of OGX and therefore the worth of the stocks and bonds in OGX, which Berto assisted in maintaining by breaching his legal duty to disclose that there was no oil and the plaintiffs relied on such to their damage. Second, "property" is not defined under the statute but it applies to statements made "to or before the public . . . which are known or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading," made with the purpose "either directly or indirectly, of selling or disposing of real or personal property," or "to induce the public to enter into any obligation relating to such property or services."[16] Indeed, the cases under the statute deal primarily with personal property. A bond is a form of intangible personal property, a chose in action,[17] and therefore covered by the statute.[18] The contention that bonds are not "property" – which is made without citation - is absurd.

### The illegal activities covered by the Theft Act are not restricted to "conversion"

The complaint contains allegations predicated on offenses penalized by the Theft Act, Fla. Stat. § Fla. Stat. § 812.014, etc. These are in Count IV for RICO[19] and Count V for RICO

---

[16] Fla. Stat. § 817.40(5).
[17] *Columbus v. Dennison*, 69 F. 58, 60 (5th Cir. 1895).
[18] *See* §§ 817.40(5) and 817.41(2). Other statutes, such as the Theft Act, specifically list "intangible personal property, including rights, privileges, interests, and claims" as "property," capable of being the subject of theft. *See, e.g.* Fla. Stat. § 812.012(4)(b).
[19] Complaint ¶ 459-477.

Conspiracy,[20] where the commission of "theft," as defined by statute, is a predicate act for RICO. They are also found in Count VIII for Civil Theft and Count IX for Civil Theft Conspiracy, where "theft," as defined by statute, is a predicate for the civil remedies set forth in Fla. Stat. § 772.11.

Mr. Berto argues, at Motion pp. 9-10, that "theft" is equivalent to "conversion" and because there is no sufficient allegation of the elements of "conversion," then there is no sufficient allegation of the elements of "theft." This is true only in lay parlance, where the word "theft" is generally used as being roughly equivalent to "conversion." It is not true under the Theft Act, which penalizes a much broader range of dishonest behavior than just "conversion."

To explain, prior to 1977, there was an array of Florida statutory crimes, most of which were ultimately predicated on pre-existing common law, penalizing various specific forms of dishonest behavior by which victims were deprived of property. Those pre-1977 criminal offenses included conduct that was variously described as "stealing," "larceny," "purloining," "abstracting," "embezzlement," "misapplication," "misappropriation," "conversion," "obtaining money or property by false pretenses," "obtaining money or property by fraud," and "obtaining money or property by deception." The new Theft Act, enacted in 1977, consolidated all those forms of dishonest conduct in a new statutory formulation under the umbrella term "Theft" – a term which had hitherto existed mostly in common parlance, and had not technically denoted any specific existing crime. The Theft Act provided a new, very elastic and very expansive definition of a very wide range of deceptive behavior denoted "Theft."

Thus, "[a] person commits theft [under Chapter 812] if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently: (a) Deprive the other person of a right to the property or a benefit from the property.

---

[20] Complaint ¶ 478-479.

(b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property." Fla. Stat. § 812.014(1)(a) and (b). The first limb, thus, covers situations where a victim is "deprived" of property without any necessity of enjoyment of that property by the thief. The second limb covers situations where the property taken is enjoyed by the thief or by some other unauthorized person. Either will satisfy the *mens rea* requirement for theft.

The definition of "obtains or uses," in the first sentence above, by which the *actus reus* of "theft" is committed, is given an extremely expansive meaning, as follows: "'obtains or uses' means any manner of: (a) Taking or exercising control over property. (b) Making any unauthorized use, disposition, or transfer of property. (c) Obtaining property by fraud, willful misrepresentation of a future act, or false promise. (d)1. Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception; or 2. Other conduct similar in nature." Fla. Stat. § 812.012(3)(d)(1) and (2). All "deprivations" *or* "appropriations" which result from any conduct falling under the definition of "obtains or uses" constitutes theft.

In the case at hand, OGX issued bonds. These are in essence negotiable promissory notes issued by the company which promise to pay the owner interest over time and the face value on maturity. The plaintiffs allege that they bought the bonds because of the intentional illusion generated by the various defendants, acting in concert, that OGX had a trillion dollars of oil in the ground and a billion dollars available, if needed, to bring it to the surface. In truth and in fact, however, there was no oil and OGX could not and would not be able to pay as promised. That false illusion – the deception - was generated and maintained by the top managers of the companies, the "Apex Defendants," such as Mr. Berto, in ways as are described above on pp. 1-5. The plaintiffs consequently paid $21 million for worthless OGX paper, while all the perpetrators

12

of the fraud knew it was worthless and cashed out their stakes behind the scenes. The plaintiffs were therefore "deprived" of $21 million, as required under the definition. By inducing the plaintiffs, by this deception, to pay $21 million for worthless OGX paper, the defendants "obtained" or "used" the plaintiffs' property to prop up the OGX bond prices while they cashed themselves out. This is "theft" under a number of possible formulations under the Theft Act, the simplest and most direct of which is that the plaintiff was deprived of $21 million as a result of "conduct previously known as . . . obtaining money or property by false pretenses, fraud, or deception . . or by other conduct similar in nature." Fla. Stat. § 812.012(3)(d)(1) and (2).

Note particularly here that the introductory words refer to "any manner of" conduct thereafter described and the concluding words expand the foregoing definitions to cover "other conduct similar in nature." This is an extremely broad net and catches every dishonest deprivation or appropriation imaginable with various forms of fraud being at the heart of it. Not surprisingly, there are plenty of cases where frauds, not involving conversion, have been recognized as thefts, which is the precise reason this case is distinguishable from every case cited by Berto on the point.[21]

---

[21] In *Rosengarten v. State*, 171 So. 2d 591 (Fla. 2d DCA 1965), for example, the Second DCA affirmed a larceny conviction where the victim relied upon the defendant's fraudulent misrepresentations in lending money to a corporation, but where "[t]here was no evidence showing that the defendant personally received any of the funds loaned to the corporation or that he had exclusive access to such funds which were placed in the corporation's bank account," or that the victim would "suffer a permanent loss." *Id.* at 593. The Court opined that if money were taken "under false pretenses with an intent to defraud and then deposited" in a bank account, a larceny conviction could stand, "and a showing of appropriation would not have been necessary." *Id.* at 596. The Court also stated "[t]here is no requirement that the victim suffer pecuniary loss so long as he has parted with his money," and [a] complete loss of property need not be shown to support a charge of obtaining money under false pretenses." *Id.* at 595 (internal quotation and citation omitted). *See also McKernan v. State*, 967 So. 2d 966, 967-68 (Fla. 4th DCA 2007) (convictions for fraud and theft affirmed where, by false representations, a defendant convinced victims to purchase insurance policies for purpose of garnering commissions for the defendant, even though

13

It is well to bear in mind, moreover, that there has never been any requirement in the criminal law, even in the case of "conversion-type" thefts, that the specific "property" of which the victim is deprived – here the $21 million paid to the prior bond-holder – wind up in the defendant's possession.[22] Under the language used under the pre-existing criminal law, neither "manucaption" (i.e. "possession") nor "asportation" (i.e. a "carrying away") of the specific property lost by the victim is required for there to be a "conversion" by the perpetrator. *See, e.g. Senfeld v. Bank of Nova Scotia*, 450 So.2d 1157, 1160-61 (3d DCA 1984), and cases there cited.[23] It is enough that there was knowledge that the deception would cause the victim loss, and that the victim believed the lie, and that loss resulted. The position, in "fraud-based" thefts, is identical.[24]

**Plaintiffs state a claim under the Florida Uniform Fraudulent Transfer Act**

In moving to dismiss Plaintiffs' claims under FUFTA, Berto grossly misstates and oversimplifies Plaintiffs' extensive allegations against him and the other defendants. Berto also undersells the extent of relief permitted pursuant to FUFTA.

Berto was a prime player in the "active" part of the fraudulent scheme. He was also a prime player in the laundering of the money that flowed from cashing out. Berto is also alleged to have introduced Batista to Miami-based asset protection specialists, who set up a trust for him to hold

_____

the victims actually received insurance policies and could have cancelled the policies and obtained refunds).

[22] *See, e.g. Rosengarten v. State*, 171 So. 2d 591 (Fla. 2d DCA 1965).

[23] *West Yellow Pine Co. v. Stephens*, 80 Fla. 298, 304, 86 So. 241, 243 (1920) ("[T]he essential elements of a conversion is [sic], a wrongful deprivation of property to the owner, and neither manucaption nor asportation is an essential element thereof"); *Quitman Naval Stores Co. v. Conway*, 63 Fla. 253, 58 So. 840 (1912); *King v. Saucier*, 356 So.2d 930 (Fla. 2d DCA 1978); *Charter Air Center, Inc. v. Miller*, 348 So.2d 614 (Fla. 2d DCA), *cert. denied*, 354 So.2d 983 (Fla. 1977); *International Mail Order, Inc. v. Capital National Bank of Miami*, 192 So.2d 287 (Fla. 3d DCA 1966); *Goodrich v. Malowney*, 157 So.2d 829 (Fla. 2d DCA 1963); *General Finance Corp. of Jacksonville v. Sexton*, 155 So.2d 159 (Fla. 1st DCA 1963); *Armored Car Service, Inc. v. First National Bank of Miami*, 114 So.2d 431 (Fla. 3d DCA 1959).

[24] *See, e.g. Rosengarten v. State*, 171 So. 2d 591 (Fla. 2d DCA 1965).

profits from the fraudulent scheme safe from creditors, and that Berto acted as the first trustee. Complaint, paras. 80, 81, 303, 304. In short, Berto agreed to act as the trustee of a trust set up in Florida to avoid the debts of creditors by holding money abroad. That allegation of trusteeship deserves a moment's pause. As the trustee, Berto, in Florida, was the legal owner of the funds paid into that trust, with broad powers of disposition, and the beneficiaries were Batista's nominees.[25] These allegations are plainly sufficient to allege a cause of action against Berto under FUFTA.

Plaintiffs have alleged they have a "claim" against a "debtor" which qualifies them as a creditor."[26] A "creditor" is "a person who has a claim." Fla. Stat. § 726.102(5). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[27] A "debtor" is simply someone who is liable on a claim, i.e. all the defendants, under the various claims made against them in the Complaint. The plaintiffs have alleged a well-founded basis for a belief that money has been transferred out of Florida and will be transferred out of Florida in violation of the statute. This is all that is required to plead a cause of action pursuant to FUFTA.

Berto also alleges that we fail to satisfy the "badges of fraud" set forth in section 726.105, Florida Statutes. First, this is an evidentiary issue. Second, the list is not exclusive, as even Berto

---

[25] "A trustee, in the strictest sense, holds legal title to property which he administers for the named beneficiary in accordance with the terms of the instrument creating the trust." *Cohen v. Friedland*, 450 So. 2d 905, 906 (Fla. 3d DCA 1984). Thus, in a trust relationship, "the beneficiary possesses an equitable ownership in the trust property, while the trustee possesses legal title to the property." *Imagine Ins. Co., Ltd. v. State ex rel. Dept. of Financial Services*, 999 So. 2d 693, 700 (Fla. 1st DCA 2008). Section 736.0816, Florida Statutes, provides for the broad, specific powers of a trustee, which include to: "(11) Grant an option involving a sale, lease, or other disposition of trust property or acquire an option for the acquisition of property . . ." Further, "Florida law establishes that trustees have the power to '[p]lay or contest any claim, settle a claim by *or against* the trust, and release, in whole or in part, a claim belonging to the trust . . ." *Schwab v. Huntington Nat. Bank*, 516 Fed. Appx. 546, 549 (6th Cir. 2013) (citations omitted) (emphasis in original).
[26] *Friedman v. Heart Institute of Port St. Lucie, Inc.*, 863 So. 2d 189, 192 (Fla. 2003).
[27] Fla. Stat. § 726.102(4).

admits, of what constitutes a fraud. Third, we have plead multiple ultimate facts that functionally

satisfy a number of the enumerated "badges of fraud."

Finally, Plaintiffs do not, as argued by Berto, need to identify a specific transfer that they

wish to set aside. The relief provided by FUFTA is much broader. FUFTA not only provides for

the avoidance of specific past transfers, but allows injunctive relief against the debtor and the

transferee in regard to "the asset transferred *or of other property*." Fla. Stat. 726.108(1)(c)1.

(Emphasis added). It was on this basis, in fact, that the Plaintiffs obtained an *ex parte* injunction

preventing the threatened future transfer of assets in fraud of the Plaintiffs' claims. The legal

sufficiency of the injunction is before the Third District Court of Appeal.

### The Plaintiffs state cause of action based on Conspiracy

Plaintiffs have sued Berto for the following civil conspiracies: Conspiracy to Defraud

(Count II); Conspiracy to Commit Florida RICO (Count V); Conspiracy to Commit False and

Misleading Advertising (Count VII); Conspiracy to Commit Civil Theft (IX); and Count XII

(Conspiracy to Commit Fraudulent Transfers (Count XII). Berto argues that the Plaintiffs do not

sufficiently allege the conspiracy counts because, essentially, the Plaintiffs do not sufficiently

allege the underlying offenses nor the existence of a conspiracy to commit those counts. His

argument is based in large part on the statement found in various paragraphs of the Complaint that

the Defendants conspired together "in ways, upon dates and in places that are unknown before

discovery." He fails to note that in every instance where those words appear they are followed by

the words **"*beyond* what is set forth above."** And what is "set forth above," in every case, is all

the ultimate facts sufficient to claim conspiracy.

Very little beyond the fact of agreement and some form of assistance is required to render

an individual liable as a co-conspirator. It is not necessary that each conspirator overtly act in

furtherance of the conspiracy. *Charles v. Florida Foreclosure Placement Center, LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008) (internal quotations and citations omitted) ("Each coconspirator need not act to further a conspiracy; each 'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators"). Further, the "existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence." *Charles*, 988 So. 2d at 1160 (internal quotations and citations omitted). This is enough to hold each co-conspirator jointly and severally liable as liability is equally imputed to each co-conspirator. *Nicholson v. Kellin*, 481 So. 2d 931, 935 (Fla. 5th DCA) ("Confirming that an act done in pursuit of a conspiracy by one conspirator is an act for which each other conspirator is jointly and severally liable").

In order to plead a cause of action for conspiracy to commit each of the torts claimed, Plaintiffs must plead (a) an agreement between two or more parties, (b) to do an unlawful act, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy. *Charles*, 988 So. 2d at 1159-60. Plaintiffs have plead each of these elements with respect to Berto.

In fact, while Berto generally states that Plaintiffs plead none of their causes of action for conspiracy, hey specifically addresses only one, conspiracy to defraud. Here he repeats his untenable "fraud on the market" contention. Motion to Dismiss, pp. 16-17. However, as stated above, Plaintiffs clearly plead reliance, action, and damage, resulting from specific fraudulent statements. They plead that Berto, as a co-conspirator, agreed with the unlawful aim, actively participated in furtherance of the fraud and so damaged Plaintiffs. This is entirely sufficient to plead a cause of action for conspiracy to defraud. *Charles*, 988 So. 2d at 1160. (Florida recognizes a cause of action for conspiracy to commit fraud).

17

**The Plaintiffs states a claims for Aiding and Abetting**

Mr. Berto concedes that a cause of action for aiding and abetting fraud exists in Florida. It has three simple elements: (1) existence of an underlying fraud; (2) knowledge of the fraud by the defendant; and (3) substantial assistance in advancement of the fraud by the defendant. *ZP No. 54 Ltd. Partnership v. Fidelity and Deposit Co.*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005). Such is pleaded, abundantly, Mr. Berto fails to cite to any case that would negate the conclusion that this cause of action does not exist. He also contends that aiding and abetting theft does not exist, in which he is also wrong.[28]

**Leave to Amend**

In the case of all causes of action, all that the rules require is a "short and plain statement of ultimate facts."[29] While fraud claims must be pleaded with particularity, still, all that is required is the "ultimate facts."[30] What is not required is a complete recitation of every *evidentiary fact* underlying the ultimate facts.[31] From the above we believe that it appears that all cause of action have been well-pleaded.

Should the Court disagree, we would seek leave to amend. With regard to Mr. Berto, we are now also in a position to further allege, amongst other things, that he was the trustee of the

---

[28] At least two courts have at least implicitly recognized a cause of action for aiding and abetting civil theft, although the cases were dismissed on other grounds and did not ultimately address that issue explicitly. *See Feltman v. Prudential Bache Sec.*, 122 B.R. 466, 469 (S.D. Fla. 1990) and *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 551 (Fla. 2d DCA 2003).

[29] Fla.R.Civ.P. 1.110(b).

[30] *Held v. Trafford Realty Co.*, 414 So. 2d 631, 632 (Fla. 5th DCA 1982) (*citing Kutner v. Kalish*, 173 So. 2d 763 (Fla. 3d DCA), *cert. denied*, 183 So. 2d 210 (Fla. 1965)); *American International Land Corp. v. Hanna,* 323 So. 2d 567 (Fla. 1975).

[31] *See Feldman v. Department of Transp.*, 389 So. 2d 692, 695 (Fla. 4th DCA 1980) (citation omitted); *Brown v. Griffin*, 229 So. 2d 225, 227 (Fla. 1969) (citation omitted). *Tedder v. Florida Unemployment Appeals Com'n*, 697 So. 2d 900, 902 (Fla. 2d DCA 1997) (*citing Black's Law Dictionary* 1522 (6th ed. 1990).

18

Batista Family Trust, established in 2013 through an attorney in Miami in order to avoid creditors should the Court require us to amend.[32] As its trustee, Berto was the legal owner of the funds paid into that trust, with broad powers of disposition, and the beneficiaries were Batista's nominees.[33] The trust was funded with at least $30 million dollars, which was paid into that lawyer's trust account at Citibank, in Miami, in two $15 million tranches in December 2013, by Batista's wealth-holding vehicle, the Caymanian defendant, 63X Master Fund. It is believed that such funds have since been fraudulently transferred out of Florida.

With regard to the payment for such services as trustee, Berto was paid $10 million by 63X Master Fund in August 2013. The payment was wired into a Merrill Lynch account in the name of an Arizona company, LIN LLC, of which Berto was the sole member. It is believed that the $10 million is traceable into the funds used to purchase the $9.5 million mansion in Key Biscayne which Mr. Berto bought in 2016. This is titled, as to 50%, in the names of Mr. Berto, as trustee of the LINKB Qualified Personal Residence Trust, and, as to the other 50%, in the name of Mr. Berto's wife, Melissa Mason Berto, as trustee of the LINKB Qualified Personal Residence Trust.

The foregoing transactions, which were conducted by international wiring instructions, constituted predicate RICO acts of Florida securities fraud, federal wire fraud and federal money-laundering. (See, current allegations at Complaint paras. 465-469, 478). The $30 million, when paid into a *Florida* trust account by 63X Master Fund became a *Florida* asset of 63X Master Fund. When paid into the Batista Trust, it became a Florida asset of Berto, as to legal title, and the Batista trust beneficiaries as to equitable title. When paid out of Florida to avoid creditors, it became

---

[32] *See Kay's Custom Drapes, Inc. v. Garrote*, 920 So. 2d 1168, 1171 (Fla. 3d DCA) ("Rule 1.190(a) . . . expressly states that leave to amend shall be given freely when justice so requires.").
[33] See, fn. 25, *supra*, (dealing with the power of trustees).

subject to recall through injunctive relief under FUFTA against all involved. (See, current allegations at Complaint paras. 492-493).

### Conclusion

That said, we believe that we have pleaded more than sufficient by way of ultimate facts to have Berto answer the allegations of the complaint, and that further extensive recitation of evidentiary facts underlying such ultimate fact allegations, in what is already an extremely long Complaint, are unnecessary.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
1SE 3rd Ave., Suite 2250
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 24th day of April a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*,

     Defendants.

_____/

### AGREED ORDER ON UNOPPOSED MOTION TO EXTEND TIME TO RESPOND TO DEFENDANTS' MOTIONS TO DISMISS

**THIS CAUSE** having come before the Court on Plaintiffs' unopposed motion to extend time to respond to Defendants Werner Batista, Centennial Asset Mining Fund, Centennial Asset Brazilian Equity Fund, 63X Investments Ltd, 63X Master Fund, and 63X Fund's) Motion to Dismiss the Complaint and Motion to Dismiss based upon *forum non conveniens* (the "Motions to Dismiss"), and the Court having read and considered the Motion, and being duly advised,

It is hereby **ORDERED AND ADJUDGED** that the Motion is **GRANTED.** The Defendant shall file and serve its response to the Motions to Dismiss by May 29, 2017.

     DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 04/27/17.

BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on <u>THIS MOTION</u>**
> **CLERK TO <u>RECLOSE</u> CASE <u>IF</u> POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.   The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Case 1:17-cv-23051-KMW Document 18-9 Entered on FLSD Docket 08/11/2017 Page 216 of 322

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

       Defendants.

_____/

## AGREED MOTION TO EXTEND TIME FOR INITIAL
## CASE MANAGEMENT CONFERENCE AND RELATED DEADLINES

       Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs"), respectfully move this Court for an agreed order extending the time for the Initial Case Management Conference scheduled for May 30, 2017 by 90 days from May 30, 2017 or 30 days after the last defendant is served with process, whichever occurs first, with all related deadlines extended accordingly, including the mandatory meeting of counsel and drafting and submission of the joint case management report, and state:

       1.      On March 8, 2017, the Court entered its Order Requiring Compliance with Complex Business Litigation Section Procedures and Notice of Hearing and Order on Case Management Conferences (the "Order").

       2.      The Order provided that the Initial Case Management Conference ("ICMC") in this matter shall convene on "Tuesday, May 30, 2017 at 1:30 PM." Order, p. 2. The Order also provided that "Trial Counsel shall meet no less than 30 days in advance of the ICMC to address the following which will be included in the following Joint Case Management Report . . . ." Order, pp.

2-3. In addition, "[w]ithin ten (10) days of the meeting among Trial Counsel, but no less than fourteen (14) days in advance of the scheduled Case Management Conference, the Parties shall file a Joint Case Management Report addressing the matters described in paragraphs 1-18 above . . . ." Order, pp. 4-5.

3.      In compliance with the Order, the Parties have been trying to schedule the first meet and confer and have started drafting a Joint Case Management Report to assist with that meeting. However, due to the complexity of the case, the number of counsel involved, and the general press of business the parties are unable to schedule an initial meet and confer prior to May 1, which is not less than 30 days prior to the scheduled ICMC.

4.      Coordinating a meet and confer has proven complicated for numerous reasons, including the fact that lead counsel for the Plaintiffs, Hendrik Milne and Craig Kalil, are traveling out of the country this week on a matter relating to this case. Also, unavailable this week due to travel is lead counsel for Werner Batista, the 63X Companies, and the Centennial Companies, Ed Mullins.

5.      In addition, new defendants appeared this week and their presence and input is required for the Joint Case Management Report. Aziz Ben Ammar filed a Motion to Quash on April 25, 2017 and another defendant's counsel contacted us today asking for an enlargement of until May 12, 2017 to respond to the Complaint. The newly appearing Defendants' schedules are still unknown and they will most likely need some time to catch up on the status of the case prior to being ready to participate in a meet and confer.

6.      There are also five additional defendants that have been served but have not yet appeared, but may do so at any time. Once appearing, these Defendants will want to provide input for the Joint Case Management Report and participate in the ICMC.

7.      There are also another eight defendants that despite Plaintiffs' best efforts have still not been served and it is unknown at this time how long it will take to serve them. However, once served and appearing in the case, they will also most likely want to contribute to the proposed scheduling of deadlines and trial.

8.      In light of the foregoing, predicting scheduling deadlines, including deadlines for discovery, expert witness reports, and the date of trial is extremely difficult.

9.      Plaintiffs have discussed this request for an enlargement of time for the ICMC and related deadlines with counsel for Marcus Berto, Werner Batista, the 63X Companies, and the Centennial Companies, who all join in the requested relief.

10.     This request is not sought for purposes of unnecessary delay, and granting the request would conduce to the interests of justice.

WHEREFORE, Plaintiffs respectfully request that the Court extend the time for the ICMC by 90 days from May 30, 2017 or 30 days after the last defendant is served with process, whichever occurs first, with all related deadlines extended accordingly, including the mandatory meeting of counsel and drafting and submission of the joint case management report.

## CERTIFICATE OF CONFERENCE

The undersigned hereby confirms that counsel for movant has conferred with counsel for Marcus Berto, Werner Batista, the 63X Companies, and the Centennial Companies and that counsel agree with the relief requested in this motion, but do not join or adopt the facts.

Dated: April 28, 2017.

3

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 28th day of April a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

4

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY

**MERIDIAN TRUST COMPANY**, as
trustee, and **AMERICAN ASSOCIATED
GROUP, LTD.**,

COMPLEX BUSINESS LITIGATION
DIVISION

Case No. 17-001040 CA (43)

Plaintiffs,

vs.

**EIKE BATISTA,** *et al.*

Defendants.

_____/

## MARCUS BERTO'S REPLY TO PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS

Defendant, Marcus Berto ("Berto"), hereby replies to "Plaintiffs' Response in Opposition to Defendant Marcus Berto's Motion to Dismiss the Complaint," (the "Response"), and in support thereof states as follows:

In their Response, Plaintiffs pay lip service to, but fail to substantively address Berto's legal arguments. Instead, Plaintiffs spend five full pages of their Response attempting to recast the Complaints' allegations. Even under the new version of the facts which Plaintiffs present in their Response, dismissal is nevertheless appropriate. And, because amending the Complaint to add the allegations Plaintiffs proffer as a basis for an amended complaint would also result in dismissal, the Court should dismiss the Complaint with prejudice.

## Florida RICO Claim

Plaintiffs concede that a "fraud on the market" theory cannot support a Florida RICO claim. (Resp. at p. 6). Plaintiffs contend, however, that they are not relying on a fraud-on-the-market theory to demonstrate causation or injury. The Complaint's allegations prove otherwise.

*See In re ScheringPlough Corp.*, No. 2:06-cv-5774(SRC), 2009 WL 2043604, *20 ("Plaintiffs do not expressly plead a fraud on the market theory of RICO injury, presumably because such a theory has been resoundingly rejected outside the context of federal securities fraud litigation.").

Plaintiffs allege that Defendants "raised billions of dollars from investors in stocks and bonds, overwhelmingly in the U.S., **on the basis of an international press campaign barraging the international investing public with false promises of a trillion dollars of recoverable oil off the coast of Brazil**[.]" (Complaint, ¶ 34) (emphasis added). Plaintiffs also allege that Defendants disseminated their misrepresentations "**to the international financial market**" at large, "buil[ding] an impression in the minds of money managers and investors internationally that OGX was sitting on enormous reserves of recoverable oil when in reality there was virtually none." (Complaint, ¶¶ 41, 336) (emphasis added). Additionally, Plaintiffs allege that their financial advisor, Judith Neiwirth, generally relied on "the general baseline impression **in the international investment market**" in deciding to purchase OGX bonds. (Complaint, ¶¶ 338, 339) (emphasis added). Thus, according to the Complaint, Defendants allegedly perpetrated their fraud on the "international investment market," not on Plaintiffs individually.

Even the allegations which Plaintiffs carve out as proof that they are not relying on the fraud on the market theory confirm that such a theory in fact is what Plaintiffs are relying on:

> Ms. Neiwirth had available to her the aggregate spin **disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual 'lay' internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk**, where moment by moment financial reports were transmitted via the internet to professional investment advisers. (Complaint, ¶ 337) (emphasis added).

> To investment advisers like Ms. Neiwirth, **reviewing the aggregate information on Bloomberg**, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar

'bonanza,' of which BATISTA had consistently boasted, started to gush. (Complaint, ¶ 339) (emphasis added).

On January 15, 2013, in reliance on the overall picture painted by BATISTA, **his intentional misstatements made via his publications on the internet and material omissions**, reinforced in [Ms. Neiwirth] her decision to invest by BATISTA'S announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17 on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN.   (Complaint, ¶ 343) (emphasis added).

The OGX Put Option representation was repeated as the stock and bond prices fell.  On July 19, 2013, **BATISTA stated to the press that he would stand by the company and 'honor all of [his] obligations,'** which Ms. Neiwirth took to include the Put Option, and that he would not 'leave a single penny unpaid for each one of [his] debts,' which she believed to be true.  (Complaint, ¶ 417) (emphasis added).

These allegations are merely a subset of a myriad of other allegations which demonstrate that what Plaintiffs allege Ms. Neiwirth relied on were alleged statements to the international market at large, and not any single statement directed at them individually.

Notably, Plaintiffs fail to explain in their Response how they can establish reliance, causation and damages other than by the use of a theory that the entire market for OGX bonds was misled and they thereby were damaged.  Thus, Plaintiffs' claim is no different than any other fraud-on-the-market case, in which a plaintiff alleges that the defendant's fraud generally affected a body of public information, and thereby harmed them.

**False and Misleading Advertising Claim**

Florida law is clear:  in order to state a claim under section 817.41, the plaintiff must allege that it relied on some identifiable misleading statement or advertisement.  *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F.Supp.2d 1314, 1322 (M.D. Fla. 2007).  Plaintiffs misleading advertising claim fails because Plaintiffs have not alleged that Berto ever participated

in marketing the OGX bonds, or otherwise made any misleading statements concerning such bonds.

In their Response, Plaintiffs concede that Berto did not make any such statements. They argue, however, that "there were false statements made as to the worth of OGX and therefore the worth of the stocks and bonds in OGX, **which Berto assisted in maintaining by breaching his legal duty to disclose that there was no oil and the plaintiffs relied on such to their damage**." (Response, p. 10) (emphasis added). Plaintiffs cite no legal authority for the novel proposition that remaining silent concerning the truth of allegedly false advertisement is actionable. In fact, there are no such cases.

To the contrary, the relevant statute on its face requires an affirmative statement as a basis for a misleading advertising claim. Section 817.40(5) defines "misleading advertising" as follows:

> The phrase 'misleading advertising' includes **any statements made, or disseminated**, in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatsoever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

*Id.* (emphasis added). In the absence of an affirmative statement by Berto, Plaintiffs cannot satisfy the element of reliance required to allege a claim for false and misleading advertising under section 817.41.

Plaintiffs otherwise fail to rebut Berto's argument that the bonds are not "personal property" to which section 817.41 applies. Plaintiffs argue in conclusory fashion that "[a] bond is a form of intangible personal property, a chose in action, and therefore covered by the statute."

(Response, p. 10).  Plaintiffs cite no case in which a Florida court has applied section 817.41 to a securities transaction.  Indeed, such an application would be inconsistent with the intent and purpose of the statute.

Chapter 817 of the Florida Statutes "was enacted to grant to consumers a stronger remedy for redress against fraudulent commercial practices than already existing legal remedies." *Miami Lincoln Mercury, Inc. v. Kramer*, 399 So. 2d 1003, 1005 (Fla. 3d DCA 1981) (Ferguson, J., dissenting).  However, securities are purchased as investments, not as goods to be "consumed" or "used."  Additionally, the securities markets are subject to pervasive federal and state regulation.  Florida's legislature could not have intended to give securities investors a redundant measure of protection beyond that already provided by the securities acts and, indeed, by Florida's Securities and Investor Protection Act.  *See* Fla. Stat. § 517.301.  Thus, section 817.41 does not to apply to securities such as the OGX bonds in this case.

**Civil Theft Claim**

In their Response, Plaintiffs appear to concede that they cannot allege the elements of a conversion claim against Berto.  Yet, Plaintiffs spend three full pages of their brief engaging in legal gymnastics in an attempt to justify the mistaken proposition that civil theft can exist even in the absence of conversion.  Plaintiffs' theory is contrary to clear Florida precedent.

In *Gasparini v. Pordomingo*, 972 So. 2d 1053 (Fla. 3d DCA 2008), the Court held, "[t]o establish a claim for civil theft, **a party must prove that a conversion has taken place and that the accused party acted with criminal intent**." (emphasis added).  The Court also restated longstanding Florida precedent which holds that, in order for money to be a proper subject of conversion, "there must be an obligation to keep intact or deliver the specified money in question, so that the money can be identified." *Id.* at 1056.  The Court concluded that, in the

absence of a factual basis to support a conversion claim, there can be no cause of action for civil theft. *Id.* Plaintiffs entirely ignore *Gasparini* in their long, rambling and inaccurate argument concerning the civil theft statute.

Instead, Plaintiffs argue that "there are plenty of cases where frauds, not involving conversion, have been recognized as thefts[.]" (Response, p. 13). Actually, there are no such cases. The only two cases Plaintiffs cite for this proposition - *McKenan v. State*, 967 So. 2d 966, 968 (Fla. 4th DCA 2007) and *Rosengarten v. State*, 171 So. 2d 591 (Fla. 2d DCA 1965) - are criminal cases which have nothing to do with this case. Certainly, these cases do not stand for the proposition which Plaintiffs advance in their Response — that a plaintiff is not required to establish the elements of conversion in order to prevail in a civil theft claim. Indeed, such a proposition would be contrary to *Gasparini*.

Turning back, then, to the proper standard, as set forth in *Gasparini*, Plaintiffs do not allege that the parties ever gave Berto, or any of the Defendants an identifiable sum of money to keep in a separate account, or that Defendants were obligated to hold any funds they received from Plaintiffs in a trust or escrow account. Plaintiffs also fail to allege that Defendants were required to keep Plaintiffs' investment intact, or deliver the money for a particular purpose, precluding the money's identification. Instead, Plaintiffs allege that Ms. Neiwirth purchased the OGX bonds in the secondary market on Plaintiffs' behalf. (Complaint, ¶¶ 343, 344, 39, 361, 384). Thus, as a matter of law, Plaintiffs cannot allege a civil theft claim against Berto. *Gasparini*, 972 So. 2d at 1053 ("Since we have found that there was no factual basis to support a claim for conversion, it stands to reason therefore, that there can be no cause of action for civil theft.").

### Fraudulent Transfer Claim

In their Response, Plaintiffs argue (without citation to authority) that they are not required to identify a specific transfer they wish to set aside in order to state their claim for relief under Florida's Uniform Fraudulent Transfer Act (the "Act"). According to Plaintiffs, merely alleging that Defendants looted OGX for their own personal gain is sufficient to state a fraudulent transfer claim. Plaintiffs are wrong.

In *Feldkamp v. Long Bay P'ners*, 773 F.Supp.2d 1273 (M.D. Fla. 2011), the court dismissed a claim brought under the Act because the "[p]laintiffs ha[d] failed to identify [the] specific transfer they [sought] to set aside; rather they [had] allude[d] generally to the alleged looting of the defendant in an amount exceeding $473 million . . . ." *Id.* at 1287. The Court explained that the only relief a court can provide to remedy a fraudulent transfer is to set aside a particular transfer. *Id.* (citing Fla. Stat. § 726.108(1)(a)). Thus, generally alleging that defendants "looted" unspecified millions of dollars, without identifying the particular transaction or transactions sought to be avoided, was insufficient to support a claim for fraudulent transfer. *Id.*

True to a pattern of ignoring relevant legal precedent, Plaintiffs entirely ignore *Feldkamp* in their Response. As in *Feldkamp*, however, Plaintiffs have failed to identify in their Complaint any specific transfer to Berto (or to any of the other Defendants) which they seek to set aside. In fact, Plaintiffs do not allege that Berto received any transfer of any kind.

Instead, Plaintiffs allude generally to an unspecified "hundreds of millions of dollars that BATISTA and his co-conspirators and accomplices took and kept for themselves[.]" (Complaint, ¶ 39). And, although Plaintiffs allege (in their Response, not their Complaint) that "Berto agreed to act as the trustee of a trust set up in Florida to avoid the debts of creditors by

holding money abroad," (Response, p. 14), Plaintiffs fail to identify either in their 97-page Complaint, or their 20-page Response a single, specific transfer to Berto (or any of the Defendants, for that matter) which they allege to be fraudulent under the Act. Such failure requires dismissal of Plaintiff's fraudulent transfer claim against Berto. *Feldkamp*, 773 F.Supp.2d at 1287.

Additionally, Plaintiffs make an extraordinary admission in their Response which compels the Court to dismiss with prejudice Plaintiffs' fraudulent transfer claim. In an attempt to correct the Complaint's failure to identify a "debtor" intending fraud, Plaintiffs explain in their Response that the "debtors" are "**all the defendants, under the various claims made against them in the Complaint**." (Response, p. 15) (emphasis added). Such an admission is dispositive because a fraudulent transfer claim cannot lie against a debtor.

In *Yusem v. South Fla. Water Mgmt. Dist.*, 770 So.2d 746, 749 (Fla. 4th DCA 2000), the Court explained as follows:

> A fraudulent conveyance action is simply another creditors' remedy. It is either an action **by a creditor against a transferee** directed against a particular transaction, which, if declared fraudulent, is set aside thus leaving the creditor free to pursue the asset, or it is an action **against the transferee** who has received an asset by means of a fraudulent conveyance and should be required to either return the asset or pay for the asset (by way of a judgment and execution).

*Id.* at 749 (emphases added). Although the Act authorizes broad relief against a recipient or transferee of assets or property, the Act does not provide a remedy against a transferor. *Id.* ("There is nothing in section 726.108 which provides that a creditor . . . that has a judgment against a debtor . . . can obtain an additional judgment against the same debtor, because the debtor fraudulently transferred funds to avoid his creditors."); *Edwards v. Airline Support Group, Inc.*, 138 So.3d 1209, 1212 (Fla. 4th DCA 2014) ("In general, actions under section 726.108 are brought against a recipient or transferee of assets or property, and not a transferor.");

*Freeman v. First Union Nat. Bank*, 865 So. 2d 1272, 1276 (Fla. 2004) ("[I]t appears that FUFTA was intended to codify an existing but imprecise system whereby transfers that were intended to defraud creditors could be set aside.").

Because Plaintiffs' theory of recovery is founded on Berto being a debtor, not a transferee, Plaintiffs' fraudulent transfer claim against Berto must be dismissed with prejudice.

## Conspiracy Claims

Plaintiffs appear to acknowledge that their complaint lacks any detail regarding the alleged conspiracies, but argue that merely "plead[ing] that Berto, as a co-conspirator, agreed with the unlawful aim, actively participated in furtherance of the fraud and so damaged Plaintiffs," is "entirely sufficient to plead a cause of action for conspiracy to defraud." (Response, p. 17). Plaintiffs' argument is contrary to Florida law.

In *Eagletech Communications, Inc. v. Bryn Mawr Inv. Group, Inc.*, 79 So. 3d 855, 863 (Fla. 4th DCA 2012), the Court held that "[a] complaint must 'set forth clear, positive, and specific allegations of civil conspiracy.'" *Id.* The Court rejected the very arguments Plaintiffs make in their Response in holding that conspiracy claims are insufficiently pleaded if the Complaint "makes only the barest allegations about the alleged conspiracy, with no details as to the unlawful scheme or the actual agreement of the parties." *Id.* True to form, Plaintiffs ignore *Eagletech* in their Response. Under such clear and binding precedent, however, Plaintiffs' thread-bare allegations, which merely recite the legal elements of a conspiracy claim, are insufficient to state a claim for relief.

Additionally, Plaintiffs fail to address Berto's argument that the civil conspiracy claims are not viable because there is no underlying claim to support them. The only claim Plaintiffs address directly is the fraud claim, with respect to which Plaintiffs repeat the same, tired

argument that such claim is not based on a fraud on the market theory, but on specific fraudulent statements directed at them.   As with their RICO claims, the Complaint's allegations dispel Plaintiffs' argument.

## Aiding and Abetting Claims

Plaintiffs entirely gloss over Berto's arguments concerning the failure of the aiding and abetting claims.  With respect to the aiding and abetting fraud claim, Plaintiffs merely parrot the elements of the claim, and argue, in conclusory fashion, that those elements have been pleaded "abundantly."  Plaintiffs do not reference any particular allegations which support such a claim, and do not substantively address the failure of the underlying fraud claim upon which the aiding and abetting claim would be predicated.

Regarding Plaintiffs' entirely made-up "aiding and abetting civil theft" claim, Plaintiffs simply argue that Berto is wrong that such a claim does not exist under Florida law.   In a footnote, Plaintiffs cite two cases — *Feltman v. Prudential Bache Sec.*, 122 B.R. 466, 469 (S.D. Fla. 1990) and *Freeman v. Dean Witter Reynolds, Inc.*, 865 S. 2d 543, 441 (Fla. 2d DCA 2003) — in which Plaintiffs argue the courts "at least implicitly recognized a cause of action for aiding and abetting civil theft."  Neither case, however, contains any discussion whatsoever of the legal viability of such a claim, and mention it only in passing.   Thus, Plaintiffs' citation to these authorities as an endorsement of their nonexistent "aiding and abetting civil theft" claim is grossly disingenuous.

## CONCLUSION

For the reasons set forth above, Plaintiffs' claims should be dismissed with prejudice. There is nothing about the additional allegations Plaintiffs proffer that would compel a different result.  Thus, amendment would be futile.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Attorneys for Defendant Marcus Berto*
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone:  (305) 374-7580
Facsimile:  (305) 374-7593


By:__*/s/ José M. Ferrer*_____
**JOSÉ M. FERRER**
Florida Bar No. 173746
jferrer@bilzin.com
**YASMIN FERNANDEZ-ACUÑA**
Florida Bar No. 117372
yfernandez-acuna@bilzin.com
eservice@bilzin.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished to the individuals listed below by e-mail generated by Florida Courts E-Portal Filing system this 8th day of May, 2017:

Hendrick G. Milne, Esq.
hmilne@aballi.com
Craig P. Kalil, Esq.
ckalil@aballi.com
Carlos F. Osorio, Esq.
cosorio@aballi.com
**ABALLI MILNE KALIL, P.A.**
SunTrust International Center
One Southeast Third Avenue
Suite 2250
Miami, Florida 33131

*Attorneys for Plaintiffs*

Alvin B. Davis, Esq.
alvin.davis@squirepb.com
**SQUIRE PATTON BOGGS (US) LLP**
200 S. Biscayne Boulevard, Suite 4700
Miami, Florida 33131

*Attorneys for Aziz Ben Ammar*

Edward M. Mullins, Esq.
EMullins@reedsmith.com
Ana M. Barton
abarton@reedsmith.com
Sujey Herrera
sherrera@reedsmith.com
**REEDSMITH LLP**
1001 Brickell Bay Drive
Suite 900
Miami, Florida 33131

and

Michael Carlinsky
Bar No. 2319440
michaelcarlinsky@quinnemanuel.com
Elinor Sutton
Bar No. 4615175
elinorsutton@quinnemanuel.com
Victor Noskov*
Bar No. 5087689
victornoskov@quinnemanuel.com
**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
*Admitted *Pro hac vice*

*Attorneys for Werner Batista,
Centennial Asset Mining Fund,
Centennial Asset Brazilian Equity Fund,
63X Master Fund, 63X Investment Ltd.,
and 63X Fund*

By    /s/ José M. Ferrer
        **José M. Ferrer**

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

        Defendants.

_____/

### PLAINTIFFS' RESPONSE TO MOTION OF AZIZ BEN AMMAR TO QUASH PURPORTED SERVICE OF PROCESS

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs"), hereby file their Response to Motion of Aziz Ben Ammar to Quash Purported Service of Process, and state:

**Background**

1.      On January 12, 2017, Plaintiffs filed a Complaint against twenty-two defendants, including Aziz Ben Ammar ("Mr. Ben Ammar").

2.      The Plaintiffs have conducted an extensive investigation in order to determine where to serve each of the defendants. *See* Affidavit of Mathew Deblinger attached at Exhibit "1."

3.      A thorough internet search of Mr. Ben Ammar revealed that Mr. Ben Ammar has an overwhelming amount of contacts to New York City. It was also discovered that Mr. Ben Ammar is married to an international fashion model, Gabriel Rebeschini ("Ms. Rebeschini"). Ms. Rebeschini is very active on social media and regularly, if not daily, posts photographs and

Instagram "stories." Many of these photographs and "stories" connect Mr. Ben Ammar and Ms.

Rebeschini to New York City and an apartment at 40 Mercer St., Apt. 24, New York, NY 10013-

3076 (the "NYC Apartment").

    4.    A selection of Matthew Deblinger's search results are summarized in his

Declaration as follows:

    (a)    A "Relationship Science" profile on Mr. Ben Ammar, which lists the various companies for which he had served as a director (including OGX, CCX, OSX and MMX). ***The profile states that he is currently a director of The Allegiance Group, Inc., which is based in New York City. A profile for The Allegiance Group, Inc. indicates that the company is headquartered in New York City at 450 7th Avenue, 9th Floor, New York, NY 10001.*** (Mr. Ben Ammar's board membership in The Allegiance Group was highlighted in a 2012 OGX Management Proposal that announced his accession to the board of OGX). See Composite Exhibit "A."

    (b)    A report prepared by Dun & Bradstreet, Inc. ("D&B") on the entity, Allegiance Capital Management, LLC, which indicates that ***Mr. Ben Ammar is the CEO and that the company is headquartered in New York City.*** A New York Department of State entity search on Allegiance Capital Management, LLC shows that this entity is still active. See Composite Exhibit "B."

    (c)    A personal website owned and operated by Ms. Rebeschini, https://www.gabirebeschiniyoga.com/, ***in which she promotes herself as a New York City based yoga instructor and states that New York has provided a platform for her modeling and yoga career since 2008.*** The website further provides information on upcoming yoga classes that she is teaching in New York City, including two in the month of May 2017 and one in the month of June 2017. See Exhibit "C."

    (d)    ***A "Who Is" domain registration report for Ms. Rebeschini's website, https://www.gabirebeschiniyoga.com/, which indicates that the website is registered to Ms. Rebeschini personally with the mailing address of the Mercer Street Home*** [the NYC Apartment"]. See Exhibit "D."

    (e)    ***A photograph of Mr. Ben Ammar and Ms. Rebeschini at the 2014 Brazil Foundation XII Gala Benefit Dinner in New York City***, posted by professional photography company, Guest of a Guest, on September 19, 2014. See Exhibit "E."

(f)    *Two photographs of Mr. Ben Ammar and Ms. Rebeschini at a 40th birthday party in Soho, New York City*, posted by professional photographer, Patrick McMullan, on March 14, 2015. See Exhibit "F."

(g)    *Ms. Rebeschini's profile on the social media platform "Instagram," "@gabi_rebeschini," states that she is based in New York City.* A printout of her Instagram profile is attached as Exhibit "G."

(h)    Ms. Rebeschini generates constant publicity in connection with her profession as a model and certified yoga instructor. Because her profile is set to "public," anyone can view her pictures and "stories"[1] without first having to request permission. I found many Instagram posts and stories taken in New York between 2014 and the present, many of which include her husband. Without any attempt to be exhaustive, a selection of posts and stories are attached as Exhibit "H" and are summarized as follows.

(1) November 17, 2014 post of *Mr. Ben Ammar and Ms. Rebeschini in front of a basketball court with the caption "Let's go Nets!!! #BarclaysCenter #NetsGame."* See Page 1. Barclays Center is located in New York City.

(2) April 19, 2015 post of Mr. Ben Ammar, Ms. Rebeschini and another couple at a restaurant. The location for the post is La Esquina 106 Kenmare St.  An accompanying screenshot of the location indicates that La Esquina 106 Kenmare St. is in New York City. See Page 2.

(3) May 13, 2015 post of Mr. Ammar standing in front of a plain silver painting with a caption "#Frieze #ArtShow @azizbenammar76." See Page 3. A Google search of Frieze indicates that the art show is in New York City.

(4) October 30, 2015 post of Mr. Ben Ammar and Ms. Rebeschini in Halloween costumes. The location for the post is *"Home Sweet Home."* An accompanying screenshot of the location indicates that "Home Sweet Home" is in New York City. See Page 4.

---

[1] "'Instagram Stories'" is a feature which allows Instagram users to share moments of their days through a slideshow format. These temporary photos and videos – or 'stories' - automatically delete after twenty-four hours. Stories can be viewed on an Instagram profile by clicking the profile photo in the top left corner. Each story has a time-stamp which shows how many minutes or hours ago the story was posted. On the screenshots attached as exhibits, the timestamp display in the top left corner indicates how long after Ms. Rebeschini posted the story, that I captured it." Exhibit "1," ¶ 7(h), fn. 1.

3

(5) November 26, 2015 post of Ms. Rebeschini baking "Freshly home-made cookies for thanksgiving". The location for the post is *"Home Sweet Home."* An accompanying screenshot of the location indicates that *"Home Sweet Home" is in New York City.* See Page 5.

(6) November 28, 2015 post of a tray of muffins with the caption "There is a first time for everything! Baking Muffins … one is already gone". The location for the post is *"Home Sweet Home."* An accompanying screenshot of the location indicates that *"Home Sweet Home" is in New York City.* See Page 6.

(7) January 23, 2016 post of Mr. Ben Ammar and Ms. Rebeschini at a restaurant. The location for the post is Picolla Cucina. An accompanying screenshot of the location indicates that Picolla Cucina is in New York City. See Page 7.

(8) June 23, 2016 post of Ms. Rebeschini riding a scooter with the caption "*Me, My Ride in Ma City" with a location of Soho, Manhattan.* See Page 8.

(9) September 16, 2016 post of Mr. Ben Ammar, Ms. Rebeschini and a friend at a restaurant with the caption "Ahmed is in town!" The location for the post is Omar's La Ranita. An accompanying screenshot of the location indicates that Omar's La Ranita is in New York City. See Page 9.

(10) *April 7, 2017* story of a package of beauty products that was shipped to Ms. Rebeschini by a company called Good Earth Beauty. The *shipping label on the package reflects the Mercer Street Home address.* See Page 10.

(11) *April 15, 2017 story of Mr. Ammar and Ms. Rebeschini in workout clothes with the caption "Bootcamp dead". In the same hour, Ms. Rebeschini posted a picture of a smoothie and tagged a New York City smoothie restaurant, Salud NYC. Salud NYC is a 0.4 mile walk from the couple's Mercer Street Home.* See Page 11.

(12) On the same day, April 15, 2017, a two-photo story of Ms. Rebeschini at what appears to be the couple's home. The first photo is a picture of Ms. Rebeschini holding a box of a Brazilian chocolate egg, with the caption "When your mom sends you a

4

> Vegan easter egg all the way from Brasil." In the background is a framed picture of what appears to be Mr. Ben Ammar and Ms. Rebeschini kissing on their wedding day. The second photo in the story is a picture of Ms. Rebeschini holding an aluminum foil wrapped egg, with the caption "Te amo mae @regmillani". In the background of the photo is a black and white painting. This appears to be the same painting that appears in an October 30, 2015 photo of the couple in Halloween costumes with the location "Home Sweet Home" in New York City, identified above. See Page 12.

Exhibit "1," ¶ 7 (a)-(i)(12) (emphasis added).

5.      In addition, the United States Postal Service confirmed on April 24, 2017 that Mr. Ben Ammar registers the NYC Apartment as his mailing address. Exhibit "1," ¶ 16."

6.      It was while monitoring the public Instagram page of Ms. Rebeschini at 10:00 a.m. on April 6, 2017, that the undersigned law firm, Aballi Milne Kalil, P.A. ("AMK"), learned that Ms. Rebeschini was in New York City at the NYC Apartment. Exhibit "1," ¶ 10.

7.      AMK then contacted their process server in New York City, Paul Malesky ("Mr. Malesky"), who at the time had seen numerous pictures of Ms. Rebeschini, given her public presence. Exhibit "1," ¶ 12; Declaration of Paul Malesky attached at Exhibit "3," ¶ 14.

8.      Upon receiving the phone call from AMK, Mr. Malesky went to the NYC Apartment and perfected substitute service on Mr. Ben Ammar by serving Ms. Rebeschini with the summons and complaint in the manner described in his Affidavit which was filed with the Court on April 12, 2017 as an attachment to the Notice of Filing Verified Return of Service ("the Notice"). The Notice is attached hereto at Exhibit "2." *See also* Exhibit "1," ¶¶ 13-15 and Exhibit "3," ¶¶ 8-19.

9.      The Affidavit of Service, in summary, provides that at 10:29 am on April 6, 2017, Mr. Malesky went to the NYC Apartment. A woman with a South American accent answered the door and identified herself as Ms. Rebeschini. The woman that answered the door was the same

woman as in the picture Mr. Malesky attached to his Affidavit of Service. Exhibit "2." This picture is confirmed in the Motion to Quash Service of Process ("Motion to Quash") to be Ms. Rebeschini. Motion to Quash, ¶ 6.

10. When Mr. Malesky informed Ms. Rebeschini that he was serving process, she refused service and shut the door on him. Mr. Malesky then informed her that the documents she was refusing would be attached to her door, which is where Mr. Malesky left them. Exhibit "2;" Exhibit "3," ¶¶ 15-18.

11. On April 7, 2017, Mr. Malesky mailed via First Class U.S. Mail the Civil Action Summons and Complaint to the NYC Apartment. Exhibit "2"; Exhibit "3," ¶ 19.

12. On April 25, 2017, Mr. Ben Ammar filed the Motion to Quash.

13. In support of the Motion to Quash, Mr. Ben Ammar submitted three affidavits. His affidavit, the affidavit of Ms. Rebeschini, and the affidavit of a housekeeper that works in the building where service occurred.

14. In summary, Mr. Ben Ammar states that substitute service was invalid because (1) He is a citizen and resident of Tunisia; (2) The NYC Apartment is not his or his wife's "usual place of abode," although he admits it is rented by him; (3) The NYC Apartment is only rented by him for his wife to stay at when she goes to New York City for work; (4) That he was never served personally; (5) That the documents were not served on any person, but left in the hallway and found by the building's housekeeper; and (6) That Ms. Rebeschini never encountered the process server.

15. It is significant to note that nowhere in the Motion to Quash or supporting affidavits, does Mr. Ben Ammar identify where he and his wife usually live together, if not in New York.

6

16.     In addition, none of these arguments are persuasive that substitute service was not perfected on Mr. Ben Ammar on April 6, 2017 at the NYC Apartment.

**Legal Standard**

17.     "Service of original process is made by delivering a copy of it to the person to be served with a copy of the complaint, petition, or other initial pleading or paper or by leaving the copies at his or her usual place of abode with any person residing therein who is 15 years of age or older and informing the person of their contents." Fla. Stat. § 48.031(1)(a).

18.     "Because of the importance of litigants receiving notice of actions against them, statutes governing service of process are to be strictly construed and enforced." *Empire Beauty Salon v. Commercial Loan Sols. IV, LLC*, 159 So. 3d 136, 138 (Fla. 5th DCA 2014) (internal quotations omitted).

19.     "The burden of proving proper service of process falls upon the party invoking the court's jurisdiction, and the return of service is evidence of whether service was validly made. If the return is regular on its face, then the service of process is presumed to be valid and the party challenging service has the burden of overcoming that presumption by clear and convincing evidence." *Empire Beauty Salon v. Commercial Loan Sols. I1V, LLC*, 59 So. 3d 136, 138–39 (Fla. 5th DCA 2014) (internal quotations omitted).

20.     In order to defend a motion to quash, a "plaintiff should be able to conduct limited discovery on the jurisdictional question in order to gather facts and file an opposing affidavit. Once discovery on the jurisdictional issue is concluded, the procedure outlined in *Venetian Salami* should be followed by the trial court." *Gleneagle Ship Mgmt. Co. v. Leondakos*, 602 So. 2d 1282, 1284 (Fla. 1992).

21.     *Venetian Salami Co.*, provides for a limited evidentiary hearing when affidavits on a jurisdictional issue cannot be reconciled. *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 503 (Fla. 1989).

**Argument**

22.     The Return of Service is regular on its face and the manner in which substitute service was made according to the Return of Service complies with section 48.031, Florida Statutes. Ms. Rebeschini is over the age of fifteen and is the wife of Mr. Ben Ammar. The NYC Apartment is their usual place of abode. There is substantial evidence of this. *See* attached Exhibits "1" – "4."

23.     In addition, it was proper for Mr. Malesky to leave the documents at the door after Ms. Rebeschini refused them and shut the door on him because Ms. Rebeschini had identified herself by responding "yes" when Mr. Malesky stated her name, after she opened the door, and Mr. Malesky informed her of why he was there and what documents he was serving. *See* Exhibits "2" and "3."

24.     Ms. Rebeschini claims this never happened and that she never encountered Mr. Malesky. Affidavit of Ms. Rebeschini attached as Exhibit "B" to Motion to Quash.

25.     This is the only statement in evidence contrary to the Affidavit of Service and it is completely self-serving. Moreover, Mr. Ben Ammar has submitted no evidence to suggest that Ms. Rebeschini was not in fact in New York City at the NYC Apartment on April 6, 2017.

26.     The Affidavit of Bozena Kosmider ("Ms. Kosmider"), a housekeeper of the building where service took place does not help Mr. Ben Ammar's position. The Affidavit of the Ms. Kosmider merely states that she found the service papers in the hallway on the morning of April 6, 2017 and turned them over to the building's doorman. Affidavit of Ms. Kosmider attached to Motion to Quash at Exhibit "C."

27.     This is entirely consistent with the Affidavit of Service given that Ms. Rebeschini refused to accept the documents and shut the door on Mr. Malesky. Mr. Malesky admits that he left the papers at the door. *See* Exhibits "2" and "3." Ms. Kosmider may have very well been the next person in the hallway and found documents. The Affidavit of Ms. Kosmider therefore does not support the Motion to Quash and is irrelevant.

28.     In addition, it is further irrelevant that Mr. Ben Ammar is a citizen and resident of Tunisia. The NYC Apartment can still be his "usual place of abode" for the purpose of substitute service.

29.     Mr. Ben Ammar and Ms. Rebeschini try to obfuscate this point by raising facts that are irrelevant to Mr. Ben Ammar's argument, such as the fact that the apartment is rented and not owned and that Ms. Rebeschini goes there because of work.

30.     The law does not distinguish between owned and rented abodes and people generally reside where they work. Mr. Ben Ammar is a director of The Allegiance Group, Inc., which is based in New York City.  Exhibit "1," ¶ 7(a). And furthermore, Mr. Ben Ammar has admitted that he personally rents the NYC Apartment. Motion to Quash, ¶ 5.

31.     Moreover, Ms. Rebeschini states in her Affidavit that she "regularly" travels to New York City and stays in the NYC Apartment. Affidavit of Gabrielle Rebeschini attached at Exhibit "B" to Motion to Quash. Her social media accounts, as detailed above, also support that she spends considerable time at the NYC Apartment and considers it her home. Hence, the tag on her New York photographs, "Home Sweet Home."

32.     It is also evident from Ms. Rebeschini's social media accounts that she is rarely in Brazil and hasn't visited Brazil since November 2016 when she traveled there for a friend's

wedding. Exhibit "1," ¶ 8. Her Affidavit is, therefore, intentionally misleading, when she states that her "legal residence" is Brazil. Motion to Quash, Exhibit "B," ¶2.

33.     Moreover, Mr. Ben Ammar and Ms. Rebeschini have been husband and wife since 2016. The Motion to Quash argues that she lives in Brazil and he lives in Tunisia, but makes no mention of where this couple resides together as husband and wife. It is not credible to suggest that they never see each other. In addition, and as previously detailed, the Plaintiffs have substantial evidence that Mr. Ben Ammar and Ms. Rebeschini reside together at the NYC Apartment. There are numerous online pictures and Instagram "posts" to prove this and only the NYC Apartment has been tagged as "Home Sweet Home." *See* Exhibit "1."

34.     In addition, Mr. Ben Ammar's and Ms. Rebeschini's Affidavits lack credibility because they are contrary to statements made by Mr. Ben Ammar to Craig P. Kalil ("Mr. Kalil") at AMK during two telephone conversations on April 13, 2017 when Mr. Ben Ammar called to discuss the issue of service of process with Mr. Kalil. *See* Affidavit of Craig P. Kalil attached at Exhibit "4." The Affidavit of Mr. Kalil summarizes the two conversations as follows:

> (a)     Mr. Ben Ammar first claimed that Ms. Rebeschini was not his wife and that they were going to be getting married in Brazil, so service upon her was improper service upon him. I explained to him that we had information that he and Ms. Rebeschini were already married. He responded that that was only a civil ceremony and the real wedding was yet to come. He appeared to believe that this made a difference to whether service upon Ms. Rebeschini had been effective service upon him. I told him I disagreed and suggested he needed counsel's advice.

> (b)     He next asked how we knew that it was Ms. Rebeschini who had been served. I explained that our process server had taken a picture of his wife when he went to serve process and had confirmed directly with her who he had spoken with.

> (c)     Mr. Ben Ammar then claimed that this was not true because Ms. Rebeschini was not at the apartment "last Friday," but was in Baltimore. I told Mr. Ben Ammar that she had been served on the

10

preceding day, Thursday, April 6, 2017. He said that she was not at the apartment that day, either, but had been in Baltimore. I pointed out that our process server had verified who he had seen and we therefore disagreed with his position.

(d)     Mr. Ben Ammar then stated that he had been told that the process server had bluffed his way past the doorman to the building by flashing a badge. He stated that the process server had gone up in the elevator and the doorman had followed him by taking the stairs. He said when the doorman got to the apartment, the process server had left and the legal papers were on the floor outside the door.

(e)     Mr. Ben Ammar then changed his story and admitted that if his wife was at the apartment then service on her could not have been effective since the apartment was leased by his in-laws and she was just visiting her parents. I said that that was not consistent with our understanding.

(f)     Mr. Ben Ammar then stated that his in-laws were going to sue the process server in New York for damages. I told him that would be fine, as we could then take depositions of all of the relevant parties so we could get to the bottom of this.

Exhibit "4," ¶ 10 (a)-(f).

35.     None of these arguments are made in the Motion to Quash or stated in Mr. Ammar's or Ms. Rebeschini's Affidavits. In fact, they directly contradict statements made therein.

36.     Furthermore, the "object and purpose of service of process is to give notice of the proceedings to the opposing party so that he or she may be given the opportunity to defend the suit. *M.J.W. v. Dep't of Children & Families*, 825 So. 2d 1038, 1040–41 (Fla. 1st DCA 2002) (citing *Bay City Mgmt., Inc. v. Henderson,* 531 So.2d 1013 (Fla. 1st DCA 1988)).

37.     Mr. Ben Ammar has received full notice of this proceeding, has received the summons and complaint, and is completely able to defend the claims asserted against him. *See* Exhibit "4." Mr. Ben Ammar has admitted to the receipt of the documents in his phone call to AMK on April 13, 2017. He has also previously admitted to receiving documents at the NYC

Apartment in this litigation. Mr. Ben Ammar also called AMK upon receipt of the Civil Theft demand, which AMK mailed to the NYC Apartment in January 2017. Exhibit "4," ¶¶ 5-8.

38.     There can simply be no doubt based on the evidence that the NYC Apartment is Mr. Ben Ammar's residence and "usual place of abode."

WHEREFORE, for the foregoing reasons, the Motion of Aziz Ben Ammar to Quash Purported Service of Process should, respectfully, be denied; or in the alternative, if the Court is unable to reconcile the affidavits, limited discovery and an evidentiary hearing should be granted.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 9th day of May a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court' s e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

# Exhibit "1"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 2017-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

       Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al*.

       Defendants.

_____/

## DECLARATION OF MATTHEW R.D. DEBLINGER

I, Matthew R.D. Deblinger, declare under penalties of perjury as follows:

1.      I am over the age of eighteen and otherwise competent to make this declaration.

2.      My full name is Matthew Ryan David Deblinger. I am an attorney at law, admitted to practice in the state of Florida since 2016.  I practice law full-time, focusing on international commercial litigation at the firm of Aballi Milne Kalil, P.A., where I am an associate.  The firm is counsel for the Plaintiffs in this case.

3.      I make this declaration in support of the Response to Motion of Aziz Ben Ammar to Quash Purported Service of Process ("Motion to Quash"). I have personal knowledge of the facts stated herein and I swear to the truth of those facts. To the extent my testimony contains any expression of opinion, such opinion is based on my first-hand knowledge.

4.      In or around January 2017, lead counsel for the plaintiffs, Hendrik G. Milne, asked me to assist in achieving service of process on one of the Defendants in the above styled case, Aziz Ben Ammar ("Mr. Ben Ammar").

CASE NO.: 2017-001040-CA-01 (43)

5.      I understood that Mr. Ben Ammar was, historically, a director of a number of companies connected to the principal Defendant, Eike Batista, including: Óleo e Gás Participações SA ("OGX"); CCX Carvão da Colômbia SA ("CCX"); OSX Brasil SA ("OSX"); and MMX Mineracao e Metalicos ("MMX").

**Background Research**

6.      To establish Mr. Ben Ammar's current usual place of abode, for the purpose of effecting service, I conducted numerous internet searches and searches on various social media platforms between January 2017 and April 2017.

7.      I found numerous documents, reports and photographs that indicated that Mr. Ben Ammar's usual place of abode is in New York City, and specifically at 40 Mercer St., Apt. 24, New York, NY 10013-3076 (the "Mercer Street Home"), where he appears to live with his fashion model wife, Gabriele Rebeschini ("Ms. Rebeschini"). A selection of my search results is attached and summarized as follows:

(a)      A "Relationship Science" profile on Mr. Ben Ammar, which lists the various companies for which he had served as a director (including OGX, CCX, OSX and MMX). The profile states that he is currently a director of The Allegiance Group, Inc., which is based in New York City. A profile for The Allegiance Group, Inc. indicates that the company is headquartered in New York City at 450 7th Avenue, 9th Floor, New York, NY 10001. (Mr. Ben Ammar's board membership in The Allegiance Group was highlighted in a 2012 OGX Management Proposal that announced his accession to the board of OGX). See Composite Exhibit "A."

(b)      A report prepared by Dun & Bradstreet, Inc. ("D&B") on the entity, Allegiance Capital Management, LLC, which indicates that Mr. Ben Ammar is the CEO and that the company is headquartered in New York City. A New York Department of State entity search on Allegiance Capital Management, LLC shows that this entity is still active. See Composite Exhibit "B."

(c)      A personal website owned and operated by Ms. Rebeschini, https://www.gabirebeschiniyoga.com/, in which she promotes herself as a New York City based yoga instructor and states that New York has provided a platform for her modeling and yoga career since 2008. The website further provides information on upcoming yoga classes that she is teaching in New York City, including two in the month of May 2017 and one in the month of June 2017. See Exhibit "C".

2

CASE NO.: 2017-001040-CA-01 (43)

(d)     A "Who Is" domain registration report for Ms. Rebeschini's website, https://www.gabirebeschiniyoga.com/, which indicates that the website is registered to Ms. Rebeschini personally with the mailing address of the Mercer Street Home. See Exhibit "D."

(e)     A photograph of Mr. Ben Ammar and Ms. Rebeschini at the 2014 Brazil Foundation XII Gala Benefit Dinner in New York City, posted by professional photography company, Guest of a Guest, on September 19, 2014. See Exhibit "E."

(f)     Two photographs of Mr. Ben Ammar and Ms. Rebeschini at a 40th birthday party in Soho, New York City, posted by professional photographer, Patrick McMullan, on March 14, 2015. See Exhibit "F."

(g)     Ms. Rebeschini's profile on the social media platform "Instagram," "@gabi_rebeschini," states that she is based in New York City. A printout of her Instagram profile is attached as Exhibit "G."

(h)     Ms. Rebeschini generates constant publicity in connection with her profession as a model and certified yoga instructor. Because her profile is set to "public," anyone can view her pictures and "stories"[1] without first having to request permission. I found many Instagram posts and stories taken in New York between 2014 and the present, many of which include her husband. Without any attempt to be exhaustive, a selection of posts and stories are attached as Exhibit "H" and are summarized as follows.

(1)     November 17, 2014 post of Mr. Ben Ammar and Ms. Rebeschini in front of a basketball court with the caption "Let's go Nets!!! #BarclaysCenter #NetsGame". See Page 1. Barclays Center is located in New York City.

(2)     April 19, 2015 post of Mr. Ben Ammar, Ms. Rebeschini and another couple at a restaurant. The location for the post is La Esquina 106 Kenmare St. An accompanying screenshot of the location indicates that La Esquina 106 Kenmare St. is in New York City. See Page 2.

(3)     May 13, 2015 post of Mr. Ammar standing in front of a plain silver painting with a caption "#Frieze #ArtShow @azizbenammar76." See Page 3. A Google search of Frieze indicates that the art show is in New York City.

(4)     October 30, 2015 post of Mr. Ben Ammar and Ms. Rebeschini in Halloween costumes. The location for the post is "Home Sweet Home." An accompanying screenshot of the location indicates that "Home Sweet Home" is in New York City. See Page 4.

---

[1] "Instagram Stories" is a feature which allows Instagram users to share moments of their days through a slideshow format. These temporary photos and videos – or "stories" – automatically delete after twenty-four hours. Stories can be viewed on an Instagram profile by clicking the profile photo in the top left corner. Each story has a time-stamp which shows how many minutes or hours ago the story was posted. On the screenshots attached as exhibits, the timestamp display in the top left corner indicates how long after Ms. Rebeschini posted the story that I captured it.

CASE NO.: 2017-001040-CA-01 (43)

(5)    November 26, 2015 post of Ms. Rebeschini baking "Freshly home-made cookies for thanksgiving". The location for the post is "Home Sweet Home." An accompanying screenshot of the location indicates that "Home Sweet Home" is in New York City. See Page 5.

(6)    November 28, 2015 post of a tray of muffins with the caption "There is a first time for everything! Baking Muffins … one is already gone". The location for the post is "Home Sweet Home." An accompanying screenshot of the location indicates that "Home Sweet Home" is in New York City. See Page 6.

(7)    January 23, 2016 post of Mr. Ben Ammar and Ms. Rebeschini at a restaurant. The location for the post is Picolla Cucina. An accompanying screenshot of the location indicates that Picolla Cucina is in New York City. See Page 7.

(8)    June 23, 2016 post of Ms. Rebeschini riding a scooter with the caption "Me, My Ride in Ma City" with a location of Soho, Manhattan. See Page 8.

(9)    September 16, 2016 post of Mr. Ben Ammar, Ms. Rebeschini and a friend at a restaurant with the caption "Ahmed is in town!" The location for the post is Omar's La Ranita. An accompanying screenshot of the location indicates that Omar's La Ranita is in New York City. See Page 9.

(10)   April 7, 2017 story of a package of beauty products that was shipped to Ms. Rebeschini by a company called Good Earth Beauty. The shipping label on the package reflects the Mercer Street Home address. See Page 10.

(11)   April 15, 2017 story of Mr. Ammar and Ms. Rebeschini in workout clothes with the caption "Bootcamp dead". In the same hour, Ms. Rebeschini posted a picture of a smoothie and tagged a New York City smoothie restaurant, Salud NYC. Salud NYC is a 0.4 mile walk from the couple's Mercer Street Home. See Page 11.

(12)   On the same day, April 15, 2017, a two-photo story of Ms. Rebeschini at what appears to be the couple's home. The first photo is a picture of Ms. Rebeschini holding a box of a Brazilian chocolate egg, with the caption "When your mom sends you a Vegan easter egg all the way from Brasil". In the background is a framed picture of what appears to be Mr. Ben Ammar and Ms. Rebeschini kissing on their wedding day. The second photo in the story is a picture of Ms. Rebeschini holding an aluminum foil wrapped egg, with the caption "Te amo mae @regmillani". In the background of the photo is a black and white painting. This appears to be the same painting that appears in an October 30, 2015 photo of the couple in Halloween costumes with the location "Home Sweet Home" in New York City, identified above. See Page 12.

4

CASE NO.: 2017-001040-CA-01 (43)

8.    Ms. Rebeschini posts photos, videos and stories on Instagram almost daily. From them it appears that she has not been to Brazil in 2017 and was only in Brazil twice in 2016: once in February 2016 for her own bachelorette party, and once in late November and early December 2016, when she served as a bridesmaid for a friend's wedding and appears to have stayed at the Fasano Hotel near Rio de Janeiro. See Composite Exhibit "I".

### Service of Process

9.    During March 2017, I saw from Ms. Rebeschini's posts on Instagram that the couple were on vacation, skiing in the French Alps and then, in early April, I saw that she was posting from a modeling assignment in Baltimore, Maryland.

10.    On April 6, 2017, at approximately 10:00 a.m., I looked at her Instagram profile and saw that she had posted a picture of an acai berry bowl with the caption, "Home Sweet Home" roughly thirty minutes earlier.

11.    I recognized the "Home Sweet Home" caption was one that she had used multiple times to describe the Mercer Street Home and I assumed that she had just gotten home from Baltimore.

12.    A fellow associate attorney, Grant Smith, and I immediately called Paul Malesky, a process server we had hired in New York City, to alert him that at least one member of the couple had returned home. Mr. Malesky said that he was in the area and would head over to that address immediately to serve process on Mr. Ben Ammar, either personally or through substitute service on Ms. Rebeschini.

13.    Less than an hour later, Mr. Malesky called us to confirm that he had served process on Mr. Ben Ammar via substitute service on Ms. Rebeschini at the Mercer Street Home.

14.    After speaking with Mr. Malesky, I checked Ms. Rebeschini's Instagram page again and saw that the "Home Sweet Home" post had been deleted.

CASE NO.: 2017-001040-CA-01 (43)

15.     I have reviewed Mr. Malesky's Return of Service dated April 6, 2017 and his Affidavit of May 9, 2017 and confirm that they are consistent with what he said to me and Grant Smith that morning.

16.     The United States Postal Service confirmed on April 24, 2017 that Mr. Ben Ammar registers the Mercer Street Home as his mailing address. See Exhibit "J".

Under penalties of perjury, I declare that I have read the foregoing Declaration and that the facts stated in it are true.

Matthew R.D. Deblinger

DATED: May 9, 2017

6

# Composite Exhibit "A"

 RELATIONSHIP SCIENCE

You have *4 free profiles* left this month  **START YOUR FREE TRIAL ▶**

# Aziz Ben Ammar

Director at The Allegiance Group, Inc.

  

## ▓ OVERVIEW

**Board Seats**

7

**Number of Relationships**

This person is connected to 125 people.

## ▓ IN THE NEWS

**The Washington Post**
*February 14, 2017*
⚫ Federal judge in Va. also rules against travel ban

**Washington Post Blogs**
*February 10, 2017*
⚫ Federal Judge in Virginia presses for evidence to support need for Trump travel ban

**The Washington Times**
*February 7, 2017*
⚫ Trump lawyers say president has power to block foreign visitors

**The Washington Post**
*February 7, 2017*
⚫ The long way home, twice

**The Guardian (London)**
*January 31, 2017*
⚫ Immigration officials coerced Yemenis to sign away green cards, suit claims



**RELATIONSHIP SCIENCE**

Chief Financial Officer at EBX Holding Ltda.

*Eike Fuhrken Batista*
Founder at EBX Group

*Samir Zraick*
Former Chief Financial Officer at Caemi Mineracao e Metalurgia SA

*Eliezer Batista da Silva*
Former Chief Executive Officer at Vale SA

*Luiz do Amaral de França Pereira*
Managing Partner at Planejamento Ltda.

*Pedro de Moraes Borba*
Former Legal Director at EBX Holding Ltda.

*Paulo Gouvêa*
Former Chief Financial Officer at EBX Group

*Julio Alfredo Klein, Jr.*
Former Head-Cost Accounting, Standards & Internal Control at Petróleo Brasileiro SA

*Gunnar Gonzalez Pimentel*
Chief Executive Officer & Investor Relations Officer at CCX Carvão da Colômbia SA

*Raphael Hermeto de Almeida Magalhães*
Founding Partner at RH Almeida Magalhaes Advogados

 SEE 115 MORE

 PATHS TO AZIZ BEN AMMAR

*You*

5/8/2017 Aziz Ben Ammar - Director at The Allegiance Group, Inc.

Case 1:17-cv-23051-KMW   Document 1-8   Entered on FLSD Docket 08/11/2017   Page 254 of 322



# RELATIONSHIP SCIENCE 

*Connections via Relationship Science*



*Aziz Ben Ammar*

 SEE MORE

## EDUCATIONAL BACKGROUND

### University of Paris V

Paris Descartes University encompasses all the fields of knowledge of human and health sciences.

### University of Southern California

University of Southern California is a private research university that mainly offers undergraduate, graduate & other higher education. The university was founded in 1880 and is headquartered in Los Angeles, CA.

## BOARDS & COMMITTEES

### Corporate Boards ▾

**Director**
Current
*The Allegiance Group, Inc.*

The Allegiance Group, Inc. provides information technology staffing services to its customers in the banking, brokerage, insurance, entertainment, and consumer products industries. Its clients include Bank of New York, JP Morgan Chase, MTV, and Pepsi. The company was founded by Dan Greenberg in 1989 and is located in New York, NY.

**Director**
2012 - 2013
*Eneva SA*



## RELATIONSHIP SCIENCE

Generation segment produces electricity from mineral coal, natural gas, diesel oil, and solar and wind energies. The Electricity Sales segment involves in the sale of energy. The Supplies segment manages natural resources for power generation. The company was founded on April 25, 2001 and ...   + Show more

*Director*

*2012 - Prior*

*MMX Mineracao e Metalicos SA*

Brazilian iron ore miner MMX Mineracao e Metalicos (MMX) is engaged in the extraction, processing, transformation and sale of iron ore. In 2012, MMX was granted environmental and operational licenses authorizing the start of construction works for the expansion of the Serra Azul iron ore complex, part of its Sudeste system. Serra Azul currently produces 8.7Mt/y of iron ore. The licenses allow MMX to build a new processing plant with a 29Mt/y capacity. To export the iron ore, MMX is also...   + Show more

*Director*

*2012 - Prior*

*OSX Brasil SA*

OSX Brasil SA engages in the provision of equipment and services to the offshore oil and gas industry. It operates its business through the following segments: Shipbuilding, Operational Services, and Leasing. The Shipbuilding segment is engages in the manufacturing, assembly, integration, and commissioning of exploration and production units. The Operational Service segment is responsible for manpower, operation, and maintenance of offshore units. The Leasing segment provides offshore u...   + Show more

*Director*

*2012 - Prior*

*Prumo Logística SA*

Prumo Logística SA engages in the provision of infrastructure and logistics. Its activities include storing, transporting and shipping iron ore, general third-party cargo, solid bulk (ore, agricultural and processed) and liquid bulk and leasing out its landside yard. It operates through the following segments: Yard Management (T-Lease), T-Oil, and Others. The T-Lease segment concerns the assignment of real surface rights over the landside years of the Industrial Complex of Açu Superport...   + Show more

*Director*

*2012 - Prior*

*CCX Carvão da Colômbia SA*

CCX Carvão da Colômbia SA engages in coal mining activities. Its activities include the integrated mining project, exploratory campaign, open pit and underground mining, railroad, and port. The company was founded on April 10, 2006 and is headquartered in Rio de Janeiro, Brazil.

RELATIONSHIP SCIENCE 

*Óleo e Gás Participações SA*

Óleo e Gás Participações SA engages in the exploration and production of oil and natural gas. Its activities include acquisition of exploration blocks portfolio. The company deals with refining and marketing of natural gas, transportation of petroleum and exploration as well as distribution of oil and natural gas. Óleo e Gás Participações was founded on April 10, 2006 and is headquartered in Rio de Janeiro, Brazil.

## OTHER AFFILIATIONS

Aziz Ben Ammar is affiliated with *The Allegiance Group, Inc.*, *Eneva SA*, *MMX Mineracao e Metalicos SA*, *OSX Brasil SA*, *Prumo Logística SA*, *CCX Carvão da Colômbia SA*, *Óleo e Gás Participações SA*.

TERMS OF USE | PRIVACY POLICY
© 2017 RELATIONSHIP SCIENCE LLC. ALL RIGHTS RESERVED.
CERTAIN INFORMATION PROVIDED BY FACTSET RESEARCH SYSTEMS INC.

RELATIONSHIP SCIENCE 

You have *6 free profiles* left this month    START YOUR FREE TRIAL ►

# The Allegiance Group, Inc.

   

## ▓ OVERVIEW

### Date Founded
1989

### Headquarters
450 7th Avenue, 9th Floor, New York, NY 10001

### Industries
IT Consulting & Services
Human Resources & Personnel Services

### Company Description
The Allegiance Group, Inc. provides information technology staffing services to its customers in the banking, brokerage, insurance, entertainment, and consumer products industries. Its clients include Bank of New York, JP Morgan Chase, MTV, and Pepsi. The company was founded by Dan Greenberg in 1989 and is located in New York, NY.

## ▓ EXECUTIVES & EMPLOYEES

*Robin Foss*
Professional

 SEE MORE

## ▓ BOARD OF DIRECTORS

*Aziz Ben Ammar*
Director at The Allegiance Group, Inc.

 SEE MORE



# RELATIONSHIP SCIENCE



*Connections via Relationship Science*

*The Allegiance Group, Inc.*

 **SEE MORE**

TERMS OF USE | PRIVACY POLICY
© 2017 RELATIONSHIP SCIENCE LLC. ALL RIGHTS RESERVED.
CERTAIN INFORMATION PROVIDED BY FACTSET RESEARCH SYSTEMS INC.

## OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.

CNPJ/MF (Taxpayer Registration Number) 07.957.093/0001-96

NIRE (Company Registration Number) 33.3.0027845-1

(Publicly Held Company)

**Management Proposal for the Extraordinary Shareholders' Meeting to be held on August 06th, 2012, at 10:30 a.m., pursuant to the Call Notice published on the date hereof.**

Dear Shareholders,

The Management of OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A. ("Company" or "OGX"), pursuant to its Bylaws and the relevant legislation, in order to serve the interests of the Company, hereby proposes the election of a new member of the Board of Directors, appointed by the controlling shareholder, identified below, to replace Mr. Luiz Eduardo Guimarães Carneiro who resigns from his position on the Board of Directors to concentrate on his position of Chief of Executive Officer of the Company.

The Board member's term in office shall be unified with that of the remaining members of the Board, that is, until the General Ordinary Shareholders' Meeting to be held in 2013.

The Director will have a unified term with the other members of the Council in force until the Annual General Meeting to be held in 2013.

**Aziz Ben Ammar,** appointed by the controlling shareholder, graduated in Business Administration from the University of Southern California and in Mathematics and Applied Computer Science from the University Rene Descartes. He is currently a member of the Board of NRX, an EBX Group Company, of Arab Debt Recovery, of Curat Hospital, of Allegiance Law Office and of the Unifactor. In addition, he is also a member of the Board of Allegiance Group.

The Director, if elected, will be entitled to remuneration as approved in the Annual General Meeting held on OGX April 26th, 2012.

1

In order to satisfy the provisions of Article 10 of CVM Instruction Nº 481/2009, annex I to this Administration's proposal contains information in accordance with items 12.6 to 12.10 of the Company Charter.

## GENERAL CLARIFICATIONS REGARDING PARTICIPATION IN THE SHAREHOLDERS' MEETING:

In order to participate in the Meeting, the Shareholders shall be present, in person or by proxy, at the time and place set forth for the Meeting, pursuant to the Call Notice, and shall present the following documents:

**(a)  Individual Shareholders:**

(i)  Shareholder's identification document;

(ii)  Statement of equity participation issued by the custodian of the Company's shares no more than 2 (two) business days prior to the Shareholders' Meeting; and,

(iii)  In the event the shareholder is represented by a proxy, the documents listed in item (c) below.

**(b)  Legal Entity Shareholders:**

(i)  Identification document of the legal representative or proxy in attendance;

(ii)  Statement of equity participation issued by the custodian of the Company's shares no more than 2 (two) business days prior to the Shareholders' Meeting;

(iii)  Updated Bylaws or Articles of Association, registered with the relevant authority;

(iv)  Document evidencing the powers of representation: minutes of the meeting in which the legal representative or person who signed the power-of-attorney was elected, as the case may be;

(v)  In the event the shareholder is represented by a proxy, the documents listed in item (c) below; and

2

(vi)     In the event the shareholder is an equity fund, the charter and documents related to its manager listed in item (iv) above.


**(c)     Shareholders represented by proxy:**


In the event the shareholder prefers to be represented by power of attorney, such shareholder shall also furnish the following documents:

(i)     Notarized Power-of-attorney, issued less than one year from the date of the Shareholders' Meeting, as legally required (article 126, paragraph 1 of Law 6,404/76). The grantee must be a shareholder, manager of the Company, attorney, financial institution or equity fund manager representing the investors; and

(ii)     Grantee's identification document;


Note: Proxies granted outside of Brazil shall be notarized by a duly authorized notary, registered with the Brazilian consulate and translated to the Portuguese language by a sworn translator.


In order to expedite the organization of the Shareholders' Meeting, the Company requests that the above listed documents be delivered at least 2 business days prior to the Shareholders' Meeting, by hand delivery, courier or e-mail (in the latter case, the hard copy must be furnished at the Shareholders' Meeting) to the following addresses:

**Hard Copies:**
Att.: General Management – Corporate Governance
Praça Mahatma Gandhi, 14, 20th floor
Rio de Janeiro CEP: 20031-100

**E-mail:**
Please include in the subject line: Documents Shareholders' Meeting of OGX – **August 06th**, 2012.
E-mail: governancacorporativa@ebx.com.br

3

The Company would like to note that the purpose of the prior delivery of the documents is to streamline the proceedings related to the Shareholders' Meeting and such prior delivery is not a requirement for participation in the Meeting.

Finally, the Company would like to clarify that this Management Proposal, together with the relevant Call Notice, are available at CVM's website (www.cvm.gov.br), at BM&FBOVESPA's website (www.bmfbovespa.com.br), as well as on the Company's Investor Relations website (www.ogx.com.br/ri). Additionally, the documents related to this Call Notice, including those required by CVM Rule 481/09, are available to the shareholders' at the Company's head office.

Rio de Janeiro, July 19th, 2012.

The Management

**EIKE FUHRKEN BATISTA**

Chairman of the Board of Directors

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.

4

## ANNEX I

### ITEMS 12.06 TO 12.10 OF THE REFERENCE FORM

(Additional information related to the proposed election of members of the Board of Directors)

In compliance with article 10 of CVM Rule 481/2009, the Company presents below the information indicated in items 12.6 to 12.10 of the Reference Form, which is the system for disclosure of information set forth in CVM Rule 480/2009:

### 12.06 Key information related to the Managers and members of the Advisory Board of OGX Petróleo e Gás Participações S.A.

Board of Directors

- Aziz Ben Ammar

| | |
|---|---|
| Age | 36 |
| Profession | Business Administrator |
| Social Security Number (CPF) | 702. |
| Position | Member of the Board of Directors |
| Date of election | August 06th, 2012 |
| Term of Investiture | August 06th, 2012 |
| Term of Office | AGM of 2013 |
| Other positions and duties performed in issuer | - |
| Was he elected by the Controller | Yes |

### 12.07 Key information related to the members of the committees of OGX Petróleo e Gás Participações S.A.

The Company has a non-statutory Audit Committee, whose members are elected by the Board of Directors, in accordance with the provisions of the relevant Charter.

5

**12.08 With respect to each of the Managers and members of the Advisory Board, provide:**

**a.   Professional experience of the Managers and members of the Advisory Board**

**Board of Directors**

**Aziz Ben Ammar**, appointed by the controlling shareholder, graduated in Business Administration from the University of Southern California and in Mathematics and Applied Computer Science from the University Rene Descartes. He is currently a member of the Board of NRX, an EBX Group Company, of Arab Debt Recovery, of Curat Hospital, of Allegiance Law Office and of the Unifactor. In addition, he is also a member of the Board of Allegiance Group.

**b.   Statement of inexistence of convictions**

The Manager mentioned in letter "a" of item 12.8 hereby state, for all legal purposes, that in the past 5 years, he have not been subject to any criminal conviction, any convictions or penalty in administrative proceedings before the CVM or any final and un-appealable decision, whether legal or administrative, suspending or disqualifying them from performing any professional or business activity.

**12.09 Existence of marital or stable relationships or relationships of kinship up to the second degree:**

**a.   among any of the managers of the Company:**

None

6

**b. between (i) managers of the Company and (ii) managers of companies directly or indirectly controlled by the Company:**

None

**c. between (i) managers of the Company or of companies directly or indirectly controlled by the Company and (ii) direct or indirect controlling shareholders of the Company: and**

None

**d. between (i) managers of the Company and (ii) managers of the direct and indirect controlling shareholders of the Company:**

None

**12.10 Relationships of subordination, provision of services or control, in the past 3 fiscal years, between the management of the Company and:**

**a. any company directly or indirectly controlled by the Company:**

None

**b. Direct or indirect controlling shareholder of the Company:**

None

**c. If material, any supplier, client, debtor or creditor of the Company, its subsidiaries or controllers, or the subsidiaries of any of these persons:**

None

# Composite

# Exhibit "B"

D&B Worldbase: ALLEGIANCE CAPITAL MANAGEMENT LLC



Decide with Confidence

## D&B Worldbase

### Source Information

| | |
|---|---|
| D&B Completed Analysis: | 03/16/2013 |
| Coverage Begin Date: | 12/08/2016 |
| Information Current Through: | 12/08/2016 |
| Database Last Updated: | 12/08/2016 |
| Update Frequency: | QUARTERLY |
| Current Date: | 12/12/2016 |
| Source: | Copyright © 2016 by Dun & Bradstreet, Inc. |

### Financial Information

| | |
|---|---|
| Net Worth (US): | NOT AVAILABLE |
| Net Worth (Local): | NOT AVAILABLE |
| Profit (US): | NOT AVAILABLE |
| Profit (Local): | NOT AVAILABLE |
| Currency: | U.S. DOLLAR |

### Sales Information:

| | |
|---|---|
| Annual Sales (US): | $180,000-ESTIMATED |
| Annual Sales (Local): | $NOT AVAILABLE |

### Company Information

| | |
|---|---|
| DUNS: | 06-931-7852 |
| Name: | ALLEGIANCE CAPITAL MANAGEMENT LLC |
| Address: | 521 5TH AVE FL 39 NEW YORK, NY 10175-3999 USA |
| County: | NEW YORK |
| Continent: | NORTH AMERICA |
| Mailing Address: | |
| Year Started: | 1995 |
| Operating Status: | INACTIVE |

### Employee Information

| | |
|---|---|
| Total Employees: | 2-ESTIMATED* *PRINCIPALS NOT INCLUDED IN TOTAL |
| Employees Here: | 2-ESTIMATED |

### Company History/Operations/Relationships &

### Other Information

This Company's Specifics:
| | |
|---|---|
| DUNS: | 06-931-7852 |
| County: | NEW YORK |
| Ownership Is: | PRIVATELY OWNED |
| Business Is A: | SINGLE LOCATION |

Decide with Confidence

### Executive(s) Information

| | |
|---|---|
| CEO Name: | AZIZ B AMMAR |
| CEO Title: | CHIEF EXECUTIVE OFFICER |

### Business Description:

| | |
|---|---|
| Line of Business: | INVESTORS NEC |
| Primary SIC: | 6799 INVESTOR |

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through December 9, 2016.

Selected Entity Name: ALLEGIANCE CAPITAL MANAGEMENT L.L.C.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | ALLEGIANCE CAPITAL MANAGEMENT L.L.C. |
| **DOS ID #:** | 1944097 |
| **Initial DOS Filing Date:** | AUGUST 01, 1995 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC LIMITED LIABILITY COMPANY |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

ALLEGIANCE CAPITAL MANAGEMENT L.L.C.
277 PARK AVENUE 26TH FL
NEW YORK, NEW YORK, 10022

**Registered Agent**

CT CORPORATION SYSTEM
1633 BROADWAY
NEW YORK, NEW YORK, 10019

This office does not require or maintain information
regarding the names and addresses of members or
managers of nonprofessional limited liability
companies. Professional limited liability companies
must include the name(s) and address(es) of the

Entity Info...  Case 1:17-cv-23051-KMW   Document 1-8   Entered on FLSD Docket 08/11/2017   Page 269 of
322
...tps://ap...2...D...cket.c...9/11/2017CORPSEARCH.ENTITY_I...

original members, however this information is not
recorded and only available by viewing the
certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| AUG 01, 1995 | Actual | ALLEGIANCE CAPITAL MANAGEMENT L.L.C. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New
York State. The entity must use the fictitious name when conducting its activities or business in New
York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS
Homepage  |  Contact Us

# Exhibit "C"

 X Create a WIX site!

ⓞ f



Home    Subscribe    Class Schedule    About    Contact

# GABI REBESCHINI YOGA

Alignment Based Vinyasa Flow



Subscribe

Stay up to date

✉ Email Address

Submit

This site was created using WIX.com. Create your own for FREE >>



## UPCOMING CLASSES

Friday 05/07

YOGA

6:30pm - 60 min

Ludlow Fitness
100 Delancey Street

( Sign Up )



Sunday 05/09

REVIVE VINYASA FLOW

12pm - 60 min

Atmananda Yoga Studio
226 E 54 Street, 7th Floor, NYC

( Sign Up )



 This site was created using WIX.com. Create your own for FREE >>

Sunday 06/27

YOGA

10am - 45 min

Athleta UES
1517 3rd Ave, NYC

( Reserve )



# ABOUT MY PRACTICE

Originally from Rio de Janeiro, Brazil, I moved to New York to pursue modeling.
Since 2008, New York City has provided a platform for my modeling career to
flourish, as well as a fast-pace lifestyle in which balance can be difficult to find.
That's when I fell in love with Yoga. The Yoga practice teaches me to slow down,
find center so I'm ready to move purposefully again.
The past 2 years I have dedicated my practice to the YogaWorks methodology. I
have accumulated 200 hours RYT, soon to be 500 RYT.
I teach with clear, alignment-based instructions paired with creative sequencing
that flows with the breath, to the sounds of great music.
It is my desire that each student leaves feeling like they got a good work out, and
is able to find a deeper sense of peace, balance, and clarity within their physical
bodies that will hopefully translate into all aspects of their lives.
Ready, Set, Flow...with me.

( Get In Touch )

X This site was created using WIX.com. Create your own for FREE >>



# CONTACT ME

Contact me to find out more about my practice or are interested in private and group classes.

| Name | Email |

| Subject |

| Message |

Send

gabi_rebeschini@mac.com

©  f

©2016 BY GABIREBESCHINI.COM. PROUDLY CREATED WITH WIX.COM

This site was created using WIX.com. Create your own for FREE >>

# Exhibit "D"



| DOMAINS | HOSTING | CLOUD | WEBSITES | EMAIL | SECURITY | WHOIS | SUPPORT | 👤 LOGIN | 🛒 0 |

## gabirebeschiniyoga.com

Updated 1 second ago ↻

### DOMAIN INFORMATION

| | |
|---|---|
| Domain: | gabirebeschiniyoga.com |
| Registrar: | GODADDY.COM, LLC |
| Registration Date: | 2016-10-07 |
| Expiration Date: | 2018-10-07 |
| Updated Date: | 2016-10-07 |
| Status: | clientDeleteProhibited<br>clientRenewProhibited<br>clientTransferProhibited<br>clientUpdateProhibited |
| Name Servers: | ns4.wixdns.net<br>ns5.wixdns.net |

### REGISTRANT CONTACT

| | |
|---|---|
| Name: | Gabriele Rebeschini |
| Street: | 40 Mercer street<br>apt 24 |
| City: | New York |
| State: | New York |
| Postal Code: | 10013 |
| Country: | US |
| Phone: | +1.6466428503 |
| Email: | gabi_rebeschini@mac.com |

### ADMINISTRATIVE CONTACT

| | |
|---|---|
| Name: | Gabriele Rebeschini |
| Street: | 40 Mercer street<br>apt 24 |
| City: | New York |
| State: | New York |
| Postal Code: | 10013 |
| Country: | US |
| Phone: | +1.6466428503 |
| Email: | gabi_rebeschini@mac.com |

### TECHNICAL CONTACT

| | |
|---|---|
| Name: | Gabriele Rebeschini |
| Street: | 40 Mercer street<br>apt 24 |
| City: | New York |
| State: | New York |
| Postal Code: | 10013 |
| Country: | US |
| Phone: | +1.6466428503 |
| Email: | gabi_rebeschini@mac.com |

### RAW WHOIS DATA

```
Domain Name: gabirebeschiniyoga.com
Registry Domain ID: 2064234381_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Update Date: 2016-10-07T04:55:46Z
```



Sale

.live

$~~22.88~~ $2.88

BUY NOW

Offer ends 30th April 2017 UTC

Hot Deals!

🌐 .online

.ONLINE @ $5.28 ~~$38.88~~

Web Hosting

Easy. Reliable. Affordable.

- Unlimited Disk Space
- Unlimited Data Transfer
- Unlimited Databases
- Unlimited Email Accounts
- 30 Day Money Back Guarantee

View Plans



Starts @ $3.88/mo

```
Creation Date: 2016-10-07T04:55:46Z
Registrar Registration Expiration Date: 2018-10-07T04:55:46Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited http://www.icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDeleteProhibited
Registry Registrant ID: Not Available From Registry
Registrant Name: Gabriele Rebeschini
Registrant Organization:
Registrant Street: 40 Mercer street
Registrant Street: apt 24
Registrant City: New York
Registrant State/Province: New York
Registrant Postal Code: 10013
Registrant Country: US
Registrant Phone: +1.6466428503
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: gabi_rebeschini@mac.com
Registry Admin ID: Not Available From Registry
Admin Name: Gabriele Rebeschini
Admin Organization:
Admin Street: 40 Mercer street
Admin Street: apt 24
Admin City: New York
Admin State/Province: New York
Admin Postal Code: 10013
Admin Country: US
Admin Phone: +1.6466428503
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: gabi_rebeschini@mac.com
Registry Tech ID: Not Available From Registry
Tech Name: Gabriele Rebeschini
Tech Organization:
Tech Street: 40 Mercer street
Tech Street: apt 24
Tech City: New York
Tech State/Province: New York
Tech Postal Code: 10013
Tech Country: US
Tech Phone: +1.6466428503
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: gabi_rebeschini@mac.com
Name Server: NS5.WIXDNS.NET
Name Server: NS4.WIXDNS.NET
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2017-04-06T20:00:00Z <<<

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

The data contained in GoDaddy.com, LLC's WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy.  This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior written
permission of GoDaddy.com, LLC.  By submitting an inquiry,
you agree to these terms of usage and limitations of warranty.  In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam.  You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" section.  In most cases, GoDaddy.com, LLC
s not the registrant of domain names listed in this database.
```

related domain names

godaddy.com    wixdns.net    icann.org    mac.com    internic.net

# Exhibit "E"

●○○○○ AT&T 📶     **3:27 PM**     ⊛ ✈ 🕙 30% 🔋

guestofaguest.com

# ☰  GUEST *of a* GUEST

GLOBAL | SOCIAL GUEST PROFILES

# Aziz Benammar

 PHOTOS  EVENTS

 NEWS

👍 Like 0   Share   🐦 Tweet

## Brazil Foundation XII Gala Benefit Dinner NY 2014 | FRIDAY SEPTEMBER 19, 2014



# Exhibit "F"

PMc - SHAD AZIMI 40th Birthday Party

# PMc PATRICKMcMULLAN.COM

BOOK PMC

## SHAD AZIMI 40th Birthday Party

Private Residence, Soho, NYC
©Patrick McMullan
Saturday, March 14, 2015
Photo - Patrick McMullan/PatrickMcMullan.com

**Key:** URL   Preview   Add to Cart

**2 Images**



**Aziz Ben Ammar, Tassara Vilaca, Paul Abrahimzadeh, Gabriele Rebeschini**

**Gabriele Rebeschini; Aziz Ben Ammar**

Don't see your picture? Did we get your name wrong? Do you know someone we don't? Click Here.

Copyright © 2017 Patrick McMullan Company, Inc. All Rights Reserved.

1/1

# Exhibit "G"

Search          Get the app     Sign up   Log in



## gabi_rebeschini  Follow

**798** posts        **8,880** followers        **1,424** following

**gabi_rebeschini** Brazilian Model 👄 NYC based 🧘 Yoga teacher (RYT)500 □□ Animal Lover
🐾 Healthy foodie □ World Traveler □ wanna flow w me? check below□□
www.gabirebeschiniyoga.com





Load more

ABOUT US   SUPPORT   BLOG   PRESS   API   JOBS

PRIVACY   TERMS   DIRECTORY   LANGUAGE

© 2017 INSTAGRAM

# Composite Exhibit "H"









Composite Exhibit "I" | Page 4







●○○○ T-Mobile 📶          3:52 PM          🔋 94% ▰▰▰▰

‹                          Photo                          ↻

gabi_rebeschini
SoHo, Manhattan ›                              •••



♡  ◯  ◁                                          🔖

337 likes

gabi_rebeschini Me, My Ride in Ma City 🛵  #ilovenyc #spotted
#vespagram

View 1 comment

JUNE 25, 2016

⌂        🔍        ⊞        ♡        👤












Composite Exhibit "I" | Page 11





# Composite Exhibit "I"





# Exhibit "J"

# Aballí
# Milne
# Kalil, P.A.
Counsellors at Law

April 17, 2017

**Via Hand Delivery**

United States Post Office
350 Canal Street
Suite 2A
New York, NY 10013-9998

**Re: Cover Letter for Request for Boxholder Information**

Dear Sir or Madam,

     Please complete the underlying Request for Change of Address or Boxholder Information Needed for Service of Legal Process.

Postmaster                                          Date 04/17/17
 New York, New York, 10013
City, State, ZIP Code

REQUEST FOR CHANGE OF ADDRESS OR BOXHOLDER INFORMATION NEEDED FOR SERVICE OF LEGAL PROCESS

Please furnish the new address or the name and street address (if a boxholder) for the following:

Name: Aziz Ben Ammar _____ Address: 40 Mercer Street, Apt. 24, New York, NY 10013

Note: Only one request may be made per completed form. The name and last known address are required for change of address information. The name, if known and Post Office box address are required for boxholder information. The following information is provided in accordance with 39 CFR 265.6(d) (4) (ii). There is no fee charged for change of address or boxholder information.

1. Capacity of requester (process server, attorney, party representing self): Attorney
2. Statute or regulation that empowers me to serve process (not required for attorney's or a party acting pro se—except a corporation  acting pro se must cite  statute:
3. The names of all known parties to the litigation: Meridian Trust Co. and American Associated Group Ltd. v. Aziz Ben Ammar et. al.
4. The court in which the case has been or will be heard: Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida
5. The docket or other identifying number if one has been issued: 17-001040-CA-01(43)
6. The capacity in which this individual is to be served (defendant or witness): Defendant

WARNING:  THE SUBMISSION OF FALSE INFORMATION TO OBTAIN AND USE CHANGE OF ADDRESS INFORMATION OR  BOXHOLDER INFORMATION FOR ANY PURPOSE OTHER THAN THE SERVICE OF LEGAL PROCESS IN CONNECTION WITH  ACTUAL OR PROSPECTIVE LITIGATION COULD RESULT IN CRIMINAL PENALTIES INCLUDING A FINE OF UP TO $10,000  OR IMPRISONMENT OF NOT MORE THAN 5 YEARS, OR BOTH (TITLE 18 U.S.C. SECTION 1001).

I certify that the above information is true and that the address information is needed and will be used solely for service of legal process in conjunction with actual or prospective litigation.

Signature _____ Address: Aballi Milne Kalil, P.A., 1 SE 3rd Avenue, Suite 2250
Printed Name: Hendrik G. Milne, Esq.         City, State, ZIP Code: Miami, FL 33131

----

FOR POST OFFICE USE ONLY

__X__ No change of address on file                        New Address or Boxholder Name and Street Address
_____ Moved and left no forwarding address
_____ No such address

2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida  33131
Telephone (305) 373-6600
Fax (305) 373-7929
www.aballi.com

April 17, 2017
Page 2

Please contact the undersigned with any additional questions.

Sincerely yours,

Hendrik G. Milne.

# Exhibit "2"

Filing # 55009909 E-Filed 04/12/2017 05:32:38 PM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

     Defendants.

_____/

## NOTICE OF FILING VERIFIED RETURN OF SERVICE

     Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP,

LTD. ("Plaintiffs"), hereby file the Verified Return of Service for Aziz Ben Ammar.

     Dated: April 12, 2017.

               Respectfully submitted,

               ABALLI MILNE KALIL, P.A.
               *Counsel for Plaintiffs*
               2250 SunTrust International Center
               One Southeast Third Ave.
               Miami, FL 33131
               Phone: (305) 373–6600
               Fax: (305) 373–7929

               *s/ Hendrik G. Milne*
               Hendrik G. Milne
               Florida Bar No.: 335886
               Craig P. Kalil
               Florida Bar No.: 607282

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 12th day of April, 2017 a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.

The Circuit Court of the 11ᵗʰ Judicial Circuit in and for    Case # 2017-001040-CA-01(43)
Miami Dade County Florida

Meridian Trust Company as Trustee and American Associated Group, LTD
                              Plaintiff(s)/Petitioner(s)

          -against-                              **AFFIDAVIT OF SERVICE**

Eike Batista, Werner Batista, Thor Batista, Paolo Mendonca,
Flavion Godinho, Paolo Gouvea, Marcus Berto, Luiz Carneiro
Aziz Ben Ammar, 63X Investments LTD, 63X Master Fund,
63X Fund, EBX Holding LTD, EBX International, S.A., EBX Capital Partners, et. al.
                              Defendant(s)/Respondent(s)

State of Florida, County of Miami Dade, SS.:
Paul Malesky, NYC LIC # **13881316** being duly sworn deposes and says deponent is not a party herein, is over the age of
eighteen years and resides in the State of New York.
That on **4/4/2017 at 09:15 AM**, I received the Civil Action Summons and Complaint and on **4/6/2017 at 10:29 AM** at **40
Mercer Street, Apartment 24, New York, NY 10013** deponent (did) serve the following: **Civil Action Summons and
Complaint** on **Aziz Ben Ammar,** Respondent (herein called recipient) therein named.

| | |
|---|---|
| ☐ **Individual** | By delivering a true copy of each to said recipient personally; deponent knew the person served to be the Person described as said person therein. |
| ☐ **Corporation** | _____by delivering thereat a true copy of each to _____ personally, deponent knew said corporation so served to be the described in same as said recipient and knew said individual to be an _____ thereof. |
| ☒ **Suitable Age Person** | By delivering a true copy of each to **Gabi Rebeschini (Spouse)** person of suitable age discretion. Said premises is recipient's [ ] actual place of business [X] Actual place of residence within the state. |
| ☐ **Due Diligence** | Service was made in the following manner after your deponent was unable, with due diligence, to serve the defendant in person, including an effort to reach the defendant by telephone, (if such telephone number was available) and an attempt to locate the defendant's place of employment. |
| ☒ **Mailing Copy** | On **April 7, 2017**, deponent completed service under the last two sections by depositing a copy of the **Civil Action Summons and Complaint** to the above address in a First Class postpaid properly addressed envelope marked "Personal and Confidential" in an official depository under the exclusive care and custody of the United States Post Office in the State of New York. |
| ☒ **Description** | A description of the Defendant, or other person served, on behalf of the Defendant is as follows: Sex: **FEMALE** Color of Skin: **WHITE** Color of Hair: **BROWN** Approx Age: Choose an item.**YRS** Approx Height: **5'9"-6'0"** Approx Weight: **131-160 LBS** Other: **25-35 years old, South American Accent  Residence is Apartment.  Recipient, spouse of defendant, confirmed her identity, then refused service and shut the door.  I verbally informed her that she was served and documents would be attached to her door.  A picture of the spouse of the defendant, whom I served, is attached as exhibit "A".** |
| ☐ **Subpoena/ Wit. Fee** | $_____, the authorized travel expenses and one day's witness fee was paid (tendered) to the recipient. |
| | Deponent asked person spoken to whether the recipient was presently in military service of the United States Government or on active duty in the military service in the State of New York and was informed he/she was not. |
| ☐ **Military Personnel** | Deponent asked person spoken to whether the recipient was presently in military service of the United States Government or on active duty in the military service in the State of New York and was informed he/she was not. |

Sworn to before me on this

_____10____ day of ___April___, _2017_                     Paul Malesky  _(signature)_

_____                                        Process Server NYC Lic #1388136
         **Notary Public**

**MATTHEW KAUGET**
**Notary Public, State of New York**
**No. 02KA6256915**
**Qualified in Nassau County**
**Commission Expires March 05, 2020**



IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
FLORIDA.

**SUMMONS (b)**
on a Natural Person

**CASE NUMBER**
2017-001040-CA-01(43)

**CLOCK IN**
service was made on
4/6/17 at 10:29 AM on
Gabi Rebeschini (wife
of dept) NYC lic# 1389136

AND to serve the Summons and a copy of the Complaint in this

Mercer St., Apt 24, New York, NY 10013-3076

**IMPORTANT**

**SERVICE**

Address:
One Southeast Third Avenue, Suite #250, Miami, FL 33131

**DATE ON:**

CLERK OF COURTS
HARVEY RUVIN

JAN 2 4 2017

DEPUTY CLERK

## AMERICANS WITH DISABILITIES ACT OF 1990
### ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1ˢᵗ Ave, Suite 2702, Miami, FL 33128. Telephone (305) 349-7175, TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before your scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

CLK/CT. 070 Rev. 02/16



Exhibit "A"

# Exhibit "3"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 2017-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al*.

      Defendants.

_____/

## DECLARATION OF PAUL MALESKY

I, Paul Malesky, declare under penalties of perjury as follows:

1.     I am over the age of eighteen and otherwise competent to make this declaration.

2.     I have been a licensed New York process server, security consultant, and private investigator for approximately sixteen years.

3.     Before working as a process server, I worked for the New York City Police Department from 1985 until approximately 2001. I achieved the rank of police sergeant in 1997 and worked in that capacity until I retired.

4.     I make this declaration in support of the manner in which I delivered the Civil Action Summons and Complaint to Gabriel Rebeschini ("Ms. Rebeschini") on April 6, 2017, which is also described in my prior Affidavit of Service, which is attached at Exhibit "A."

5.     I have personal knowledge of the facts stated herein and I swear to the truth of those facts.

6.     To the extent my testimony contains any expression of opinion, such opinion is based on my first-hand knowledge.

7.     In early April, I was hired by Aballi Milne Kalil, PA ("AMK") to serve process on

Mr. Aziz Ben Ammar ("Mr. Ben Ammar") at 40 Mercer Street, apartment 24, New York, NY

10013 (the "New York Apartment"), which I was told is his New York City residence. I was also

told that Mr. Ben Ammar lives in the New York Apartment with his wife, Gabriel Rebeschini

("Ms. Rebeschini").

8.     On the morning of April 6, 2017, around 10:00 am, I received a call from Grant

Smith ("Mr. Smith") at AMK. Mr. Smith informed me that Mr. Ben Ammar's wife, Ms.

Rebeschini, was at the New York Apartment and that I should go there and serve her with the Civil

Action Summons and Complaint.

9.     A little before 10:30 am, I arrived at the New York Apartment.

10.    I was greeted by the building's doorman. He was a young male of most likely

Hispanic descent. The doorman informed me that Mr. Ben Ammar and Ms. Rebeschini resided in

Unit 24, which is on the sixth floor.

11.    I then rode the elevator alone up to the sixth floor.

12.    I did not encounter anyone in the elevator or in the hallway of the sixth floor.

13.    I arrived at the apartment of Mr. Ben Ammar and Ms. Rebeschini, Unit 24, and

knocked on the door. Ms. Rebeschini opened the front door.

14.    I knew that it was Ms. Rebeschini because I had been provided a photograph of Ms.

Rebeschini by counsel and a link to a website, www.majormodel.com, with numerous pictures of

her.

15.    When Ms. Rebeschini opened the door halfway, I immediately said her name and

she responded "yes" in a South American accent, which confirmed her identity.

2

16.     I then introduced myself and explained to her that I was a process server and that her husband was being sued and that I was serving her with a Civil Action Summons and Complaint for him.

17.     Ms. Rebeschini refused to accept service of the papers and shut the door. I believe she may have been wearing leggings of some kind.

18.     After Mrs. Rebeschini shut the door, I placed the Civil Action Summons and Complaint at the foot of her door as the package was too large to tape to the door. I informed her of this through the closed door.

19.     I then exited the building and mailed the documents via First Class U.S. Mail to the New York Apartment the next day.

20.     I also completed and executed an Affidavit of Service which I confirm gives an accurate description of the manner in which I delivered the Civil Action Summons and Complaint to Ms. Rebeschini. *See* Exhibit "A."

Under penalties of perjury, I declare that I have read the foregoing Declaration this _____ day of May 2017 and the facts stated in it are true.

_____
Paul Malesky

3

# Exhibit "A"

The Circuit Court of the 11ᵗʰ Judicial Circuit in and for          Case # 2017-001040-CA-01(43)
Miami Dade County Florida

Meridian Trust Company as Trustee and American Associated Group, LTD
                                        Plaintiff(s)/Petitioner(s)

                    -against-                                    **AFFIDAVIT OF SERVICE**

Eike Batista, Werner Batista, Thor Batista, Paolo Mendonca,
Flavion Godinho, Paolo Gouvea, Marcus Berto, Luiz Carneiro
Aziz Ben Ammar, 63X Investments LTD, 63X Master Fund,
63X Fund, EBX Holding LTD, EBX International, S.A., EBX Capital Partners, et. al.
                                        Defendant(s)/Respondent(s)

State of Florida, County of Miami Dade, SS.:
Paul Malesky, NYC LIC # **13881316** being duly sworn deposes and says deponent is not a party herein, is over the age of
eighteen years and resides in the State of New York.
That on **4/4/2017 at 09:15 AM**, I received the Civil Action Summons and Complaint and on **4/6/2017 at 10:29 AM** at **40**
**Mercer Street, Apartment 24, New York, NY  10013** deponent (did) serve the following: **Civil Action Summons and**
**Complaint** on **Aziz Ben Ammar, Respondent** (herein called recipient) therein named.

☐ **Individual**          By delivering a true copy of each to said recipient personally; deponent knew the person served to
                          be the Person described as said person therein.

☐ **Corporation**         _____by delivering thereat a true copy of each to _____
                          personally, deponent knew said corporation so served to be the described in same as said recipient
                          and knew said individual to be an _____ thereof.

☒ **Suitable Age**        By delivering a true copy of each to  **Gabi Rebeschini (Spouse)**    person of suitable age
   **Person**             discretion. Said premises is recipient's [ ] actual place of business [X] Actual place of residence
                          within the state.

☐ **Due Diligence**       Service was made in the following manner after your deponent was unable, with due diligence, to
                          serve the defendant in person, including an effort to reach the defendant by telephone, (if such
                          telephone number was
                          available) and an attempt to locate the defendant's place of employment.

☒ **Mailing**             On  **April 7, 2017**       , deponent completed service under the last two sections by depositing a
   **Copy**               copy of the **Civil Action Summons and Complaint**    to the above address in a First Class
                          postpaid properly addressed envelope marked "Personal and Confidential" in an official depository
                          under the exclusive care and custody of the United States Post Office in the State of New York.

☒ **Description**         A description of the Defendant, or other person served, on behalf of the Defendant is as follows:
                          Sex: **FEMALE** Color of Skin: **WHITE** Color of Hair: **BROWN** Approx Age: Choose an item.**YRS**
                          Approx Height: **5'9"-6'0"** Approx Weight: **131-160 LBS**   Other: **25-35 years old, South**
                          **American Accent  Residence is Apartment.  Recipient, spouse of defendant, confirmed her**
                          **identity, then refused service and shut the door.  I verbally informed her that she was served**
                          **and documents would be attached to her door.  A picture of the spouse of the defendant,**
                          **whom I served, is attached as exhibit "A".**

☐ **Subpoena/**           $_____, the authorized travel expenses and one day's witness fee was paid (tendered)
   **Wit. Fee**           to the recipient.

                          Deponent asked person spoken to whether the recipient was presently in military service of the
                          United States Government or on active duty in the military service in the State of New York and
                          was informed he/she was not.

☐ **Military Personnel**  Deponent asked person spoken to whether the recipient was presently in military service of the
                          United States Government or on active duty in the military service in the State of New York and
                          was informed he/she was not.

Sworn to before me on this

___10___ day of ___April___ ___2017___                    Paul Malesky  *Paul Malesky* [signature]

_____                                    Process Server NYC Lic #1388136
       Notary Public

MATTHEW KAUGET
Notary Public, State of New York
No. 02KA6256915
Qualified in Nassau County
Commission Expires March 05, 2020

# Exhibit "4"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 2017-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

     Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al*.

     Defendants.

_____/

## DECLARATION OF CRAIG P. KALIL

I, Craig P. Kalil, declare under penalties of perjury as follows:

1.     I am over the age of eighteen and otherwise competent to make this declaration.

2.     I am an attorney at law, admitted to practice in the state of Florida since 1986. I practice law full-time, focusing on international commercial litigation at the firm of Aballi Milne Kalil, P.A., where I am one of the founding shareholders.

3.     I am one of the attorneys representing the plaintiffs in this case.

4.     I make this declaration in support of the Response to Motion of Aziz Ben Ammar to Quash Purported Service of Process. I have personal knowledge of the facts stated herein and I swear to the truth of those facts. To the extent my testimony contains any expression of opinion, such opinion is based on my first-hand knowledge.

5.     On January 26, 2017, our firm sent a civil theft demand letter, pursuant to Fla. Stat § 772.11, with an attached courtesy copy of the Complaint, to Defendant Aziz Ben Ammar at 40 Mercer Street, Apt. 24, New York, NY 10013. The FedEx tracking report indicates that the package was delivered on January 27, 2017. A copy of the FedEx tracking report is attached as Exhibit "A".

CASE NO.: 2017-001040-CA-01 (43)

6.     On January 31, 2017, Mr. Ben Ammar called our firm from a blocked number. Mr. Ben Ammar asked to speak to an attorney at our firm; however, neither lead counsel, Hendrik G. Milne, nor I were available to speak to him at the time. Mr. Ben Ammar did not leave a message but said that he would call back at a later time.

7.     Later that day, Mr. Ben Ammar called our firm again from a blocked number. This time, both Mr. Milne and I were able to speak to him. During the call, Mr. Ben Ammar stated that he had received the demand letter that we had sent to the New York address and discussed his role in OGX, generally. He did not have counsel and said that he would be retaining counsel in the future, in Miami, and wanted to talk to us.

8.     On this call he confirmed to us the dates of his board membership with OGX, which we found was coterminous with the timing of our clients' investments. He stated that he felt he was not responsible for our clients' losses, and also stated that he was owed money by Eike Batista and had considered suing him in Miami as that was a center of his operations. We informed Mr. Ben Ammar that he should seek legal counsel.

9.     On April 6, 2017, our New York City-based process server informed us that he had served Mr. Ben Ammar via substitute service on his wife, Gabi Rebeschini, at 40 Mercer Street, Apt. 24, New York, NY 10013.

10.     On April 13, 2017, Mr. Ben Ammar called our firm, again from a blocked number. Mr. Ben Ammar and I had an extensive conversation regarding service of process at the New York address, which was followed up by a second telephone conversation later that day. The two conversations are summarized as follows:

(a)     Mr. Ben Ammar first claimed that Ms. Rebeschini was not his wife and that they were going to be getting married in Brazil, so service upon her was improper service upon him. I explained to him that we had information that he and Ms. Rebeschini were

2

CASE NO.: 2017-001040-CA-01 (43)

already married. He responded that that was only a civil ceremony and the real wedding was yet to come. He appeared to believe that this made a difference to whether service upon Ms. Rebeschini had been effective service upon him. I told him I disagreed and suggested he needed counsel's advice.

(b)     He next asked how we knew that it was Ms. Rebeschini who had been served. I explained that our process server had taken a picture of his wife when he went to serve process and had confirmed directly with her who he had spoken with.

(c)     Mr. Ben Ammar then claimed that this was not true because Ms. Rebeschini was not at the apartment "last Friday," but was in Baltimore. I told Mr. Ben Ammar that she had been served on the preceding day, Thursday, April 6, 2017. He said that she was not at the apartment that day, either, but had been in Baltimore. I pointed out that our process server had verified who he had seen and we therefore disagreed with his position.

(d)     Mr. Ben Ammar then stated that he had been told that the process server had bluffed his way past the doorman to the building by flashing a badge. He stated that the process server had gone up in the elevator and the doorman had followed him by taking the stairs. He said when the doorman got to the apartment, the process server had left and the legal papers were on the floor outside the door.

(e)     Mr. Ben Ammar then changed his story and admitted that if his wife was at the apartment then service on her could not have been effective since the apartment was leased by his in-laws and she was just visiting her parents. I said that that was not consistent with our understanding.

(f)     Mr. Ben Ammar then stated that his in-laws were going to sue the process server in New York for damages. I told him that would be fine, as we could then take depositions of all of the relevant parties so we could get to the bottom of this.

3

CASE NO.: 2017-001040-CA-01 (43)

11.     At the end of the call, I informed Mr. Ben Ammar that he should get a lawyer, because regardless of whether he felt he was properly served, if he ignored the case, he could run the risk of the Court entering a default judgment against him.

Under penalties of perjury, I declare that I have read the foregoing Declaration and that the facts stated in it are true.

DATED: May 9, 2017

Craig P. Kalil, Esq.

4

# Exhibit "A"



May 5,2017

Dear Customer:

The following is the proof-of-delivery for tracking number **778286214845**.

## Delivery Information:

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivery location:** | 40 MERCER |
| | | | NEW YORK, NY 10013 |
| **Signed for by:** | H.HENRY | **Delivery date:** | Jan 27, 2017 14:03 |
| **Service type:** | FedEx Priority Overnight | | |
| **Special Handling:** | Deliver Weekday | | |
| | Residential Delivery | | |
| | Indirect Signature Required | | |



## Shipping Information:

| | | | |
|---|---|---|---|
| **Tracking number:** | 778286214845 | **Ship date:** | Jan 26, 2017 |

**Recipient:**
Aziz Ben Ammar
40 Mercer Street
Apt. 24
NEW YORK, NY 10013 US

**Reference**

**Shipper:**
CRAIG P. KALIL, ESQ.
ABALLI, MILNE, KALIL, P.A.
2250 SunTrust International Center
One SE Third Ave.
MIAMI, FL 33131 US
11390.0001

Thank you for choosing FedEx.