Filing # 53851451 E-Filed 03/16/2017 05:34:56 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION DIVISION (40)

CASE NO. 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD.,

Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.*

Defendants.

_______________________________________/

**NOTICE OF FILING VERIFIED RETURN OF SERVICE**

Plaintiffs, MERIDIAN TRUST COMPANY and AMERICAN ASSOCIATED GROUP, LTD. ("Plaintiffs"), hereby file the Verified Return of Service for 63X Master Fund c/o Maples & Calder, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.

Dated: March 16, 2017.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 16th day of March, 2017 a true and correct copy of the foregoing was electronically filed via the Florida Courts e-Filing Portal, which will serve this Notice on all counsel of record via this Court' s e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne, Esq.



Clerk of Court's Office
P.O. Box 495
George Town
Grand Cayman
Cayman Islands
B.W.I.

**OUR REF: F.P. 04 OF 2017**

# AFFIDAVIT OF SERVICE

I, Josen Ebanks of West Bay, Grand Cayman, Cayman Islands affirm and swear as follows:

1. I am a Bailiff of the Grand Court of the Cayman Islands.

2. That on **Tuesday** the **21st** day of **February 2017**, at **1:28pm** I served the attached documents:-

~~SEE LIST~~ J.E. /**AS ATTACHED**

3. That service was made on the registered office for **63X Master Fund** c/o Maples & Calder, **Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.**

4. Service was made by handing the said documents to **Tami Powers – Team Leader**

5. The above statements made by me are true and correct.

[signature]

Josen Ebanks, Bailiff of the Grand Court

Sworn to before me at George Town on 23rd day of February, **2017**

[signature]

NOTARY PUBLIC, GEORGE TOWN
GRAND CAYMAN, CAYMAN ISLANDS

Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 4 of 112

Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 5 of 112

Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 6 of 112

Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 7 of 112







Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 13 of 112





Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 15 of 112





Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 17 of 112



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 18 of 112



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 19 of 112





Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 21 of 112



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 22 of 112













Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 28 of 112





Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 30 of 112

printing document



shares or bonds in BATISTA's companies on the basis of his fraudulent promises, among them the Florida Retirement System Trust Fund.[4]

87. BEN AMMAR was intimately involved in generating stories for the press during 2013, regarding the supposed massive capitalization of OGX and the fact that it was impossible for it to fail. He was a prime architect of the fradulent billion dollar "Put Option" and the cover story regarding the fictitious $850 million "sale" to Petronas, both described below.

88. On September 4, 2013, having milked as much as he could out of the scheme, BEN AMMAR resigned from the Board of OGX, weeks before its bankruptcy, and reportedly fled Brazil for New York where he presently resides in a multi-million dollar apartment acquired, upon information and belief, with part of his takings from the scheme.

**The Corporate Co-conspirators and Accomplices:**

**The 63X, EBX, CENTENNIAL and THORQUE Companies.**

89. There were also numerous corporate entities that BATISTA owned or controlled that he used in executing his scheme. These were either holding companies for his stock in the operating companies, such as OGX and OSX, or were set up for the simple purpose of being the name on a bank account for the transmission of funds to accomplish the fraudulent scheme. Some of these entities have been joined as Defendants here. These are the 63X Companies, the EBX Companies, and the CENTENNIAL Companies and may also include the THORQUE Companies.

90. These corporations, all of which were incorporated in secrecy jurisdictions, had no legitimate corporate business or real independent existence separate from BATISTA and were no more than fictitious names for BATISTA himself. They acted as "cut-outs," to obscure the trail

[4] The Florida Retirement System Trust Fund is an approximately $150 billion pension fund that pays retirement benefits for over a million state, county, school system and higher-education teachers and other employees, managed by the Florida State Board of Administration of which the trustees are Florida Governor, Richard Scott, Florida Chief Financial Officer, Jeffrey Atwater, and Florida Attorney General, Pamela Bondi.



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 33 of 112



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 34 of 112

114. However, persuading the investing public that these fields were unrecognized treasures rather than the worthless money-pits (that they would eventually prove to be) would require enormous promotion.

115. To garner credibility for OGX, BATISTA built a roster of senior executives from Petrobras; individuals who had been integral to that company's deep-water discoveries, headed by the Defendant, PAULO MENDONÇA, a geologist and former Petrobras head of exploration, who BATISTA dubbed "Dr. Oil."

116. BATISTA granted his team members generous stock options in OGX to ensure that they were personally invested in the value of the stock and incentivized to spread any good news and to contain or minimize the bad.

117. BATISTA's publicized rationale for exploring the shallow-water fields was that modern technology in the hands of his "dream team" ensured better, more accurate detection. If there was oil to be found, they would find it. Plus, when they found it, the much lower extraction costs in shallow water than in deep water meant much greater profitability. This one-two punch of state-of-the-art technology in the hands of the best oil gurus in Brazil, coupled with low-cost lifting, BATISTA boasted, promised to be a sure-fire winning combination.

118. In 2008, BATISTA's OGX raised $4.1 billion in the biggest initial public offering in Brazilian stock market history.

119. In its November 2008 Management Presentation, OGX announced that it had entered into contracts for 3D seismic surveys for all of its exploratory blocks; acquired various logistical transport vessels, including seven boats and two helicopters; and secured four off-shore drilling rigs with "world-class contractors." It stated that it expected to conduct an "intense drilling campaign" beginning in the second half of 2009 and reach "first oil" by the end of 2011.

Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 37 of 112





Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 39 of 112







Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 42 of 112



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 43 of 112







Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 46 of 112





Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 48 of 112









Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 52 of 112







Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 55 of 112



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 57 of 112









Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 61 of 112



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 62 of 112



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 63 of
112

printing document Page 64 of 112

https://www2.miami-dadeclerk.com/ocs/ViewerHTML5.aspx?QS=B6%2f9EwnZlIiih%2b... 8/10/2017



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 65 of 112



276. One of these Bahamian companies was the Defendant, THORQUE INVESTMENT MANAGEMENT LTD., which was incorporated on April 12, 2012. The other was the Defendant, THORQUE I FUND LTD., whose date of incorporation is unknown. Upon information and belief, these companies were nominally owned and controlled by THOR BATISTA, but who acted at BATISTA's direction.

277. Upon information and belief, bank accounts were opened in The Bahamas, Miami, Florida, and eventually in Switzerland in the name of the THORQUE companies. It is believed that the Bahamian funds were held in an account under the direction of BTG Pactual[9] or Itaú Bank and eventually held at least $100 million in proceeds of the fraud. It is believed that the Miami account was at Itaú or Citibank. The Swiss account is presently unknown, but $30 million is believed to have been eventually routed out to a safe haven through the Citibank trust account of one of Batista's Florida professionals.

**"The Brazilian Dream."**

278. On April 30, 2012, Bloomberg Television aired an 11-minute video interview of BATISTA on its show, "Money Moves with Deirdre Bolton." The interview took place at the Milken Institute's 2012 Global Conference in Los Angeles, California, where BATISTA was a featured panelist in four different panels during the five-day conference. After Bloomberg broadcast the interview on television, it published the interview on youtube.com with the description, "Brazilian billionaire Eike Batista talks about the potential benefits of OGX Petroleo e Gas Participacoes SA forming project partnerships with Petroleo Brasileiro SA and Vale SA."

279. In the Bloomberg interview, correspondent Stephanie Ruhle introduced BATISTA as the "tenth richest man in the world - the goal is to get to number one." Ms. Ruhle then noted

[9] Banco BTG Pactual SA ("BTG Pactual") operates and has operated under various names in various jurisdictions during the relevant time period.







Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 70 of 112



Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 71 of 112











of this should have been announced via Statements of Material Fact, but was not. The failure to do so constituted fraudulent misrepresentations by omission.

329. However, the announcement of the Put Option was effective in slowing the fall in price of OGX stock during the fourth quarter of 2012 and fed its rise in January 2013.

330. The value of LLX - BATISTA's allied logistics company which was building the port at Açu where OSX ships were to offload OGX oil - was conspicuously pegged to the value of OGX and therefore OSX.

331. In November 2012, MARCUS BERTO was appointed CEO and Investor Relations Officer of LLX to help corral emerging bad news and get the company sold off before the OGX bubble burst. Upon information and belief, BERTO fully understood that OGX was insolvent and the mission was to cash BATISTA out as fully as possible before the crash rendered everything valueless.

332. To further boost investor confidence, on November 13, 2012, BATISTA tweeted to the world that the Group X operations in the Campos Basin were in an area responsible for 80% of Brazil's oil production.

**Section II -The Plaintiffs Invest**

333. At the start of 2013, no one apart from the insiders, not even the Brazilian regulators, suspected that OGX was a colossal bubble scheme. The consistent, massive lies, spawned by BATISTA, his co-conspirators and his accomplices, repeated over the previous years, had generated an overall base-line impression among investors world-wide of OGX as an oil company with enormous oil reserves and enormous likely margins of profit, whose only impediment to spectacular success was its cash needs until it could come into full production.

334. That the BATISTA-generated spin was continuing to work in early 2013 was exemplified by announcements such as one published online by Highbeam Reports in January

2013 that London's financial house Barclay's was convinced that "[OGX] presents better opportunities for investors than its federally-owned peer Petrobras . . ." (This was well before the massive Petrobras corruption scandal broke).

335. As noted above, Gables Capital, Inc. is a registered investment adviser based in downtown Miami, Florida, and at all times material hereto acted as investment adviser to the Plaintiffs and was their agent for the purchase and sale of stocks and bonds.

336. The individual responsible for the MERIDIAN and AMERICAN accounts was Ms. Judith Neiwirth, Gables Capital's co-founder and Chief Investment Officer, who had over thirty years of experience in the financial services industry.

337. Ms. Neiwirth had available to her the aggregate spin disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual "lay" internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers.

338. As a result of the hype generated by BATISTA, described above, the general base-line impression in the international investment market at this time was that OGX was a company that was sitting on spectacular reserves, as evidenced in part by the fact that savvy industry player, Mubadala, had recently bought a 5.63% stake in its holding company for $2 billion.

339. To investment advisers like Ms. Neiwirth, reviewing the aggregate information on Bloomberg, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar "bonanza," of which BATISTA had consistently represented, started to gush.

340. It seemed, moreover, that OGX was in no danger of running out of cash, given that BATISTA had pledged an additional billion dollars of operating capital, if and when needed. (The

subtext was further that although there was a trillion dollars of oil to be had, if a billion was not quite enough to bring the gushers online, there would be more cash to come).

341. BATISTA had further pledged to inject another billion dollars into OSX, if and when needed. Since the future of OSX depended heavily on the future of OGX, this pledge of cash for OSX reinforced the public impression of the value of OGX.

342. This was therefore a particularly attractive opportunity for purchasers in the bond market. OGX appeared to be asset rich with plenty of operating capital and OGX bonds were at that time yielding above an 8.375% interest rate.

343. On January 15, 2013, in reliance on the overall picture painted by BATISTA, his intentional misstatements made via his publications on the internet and material omissions, reinforced in her decision to invest by BATISTA's announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17 on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN.

344. On January 22, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN.

**The EBX/BTG "Strategic Partnership."**

345. In 2013, BTG Pactual was Brazil's biggest private investment bank, and its Chairman, Andre Esteves, was an iconic Brazilian billionaire on a level with BATISTA. On March 6, 2013, prnewswire.com relayed the following EBX announcement:

> The EBX Group and BTG Pactual announce the signing of a novel strategic cooperation agreement. The agreement contemplates financial advisory services,

credit facilities and future long-term capital investments for the transformational projects currently being developed by the EBX Group in its segments. "This cooperation represents, above all, a partnership for the success of Brazil", said Eike Batista, EBX Group's CEO and Chairman.
This new cooperation will have a Strategic and Financial Management Committee comprising of senior executives from the EBX Group and of senior partners of BTG Pactual. The Committee will be led by Eike Batista and Andre Esteves and will meet on a weekly basis to discuss overall strategies relating to EBX Group's capital structure and investments for the short, medium and long-term projects and activities of the group's portfolio of companies. The agreement does not grant any exclusivity for BTG Pactual to render financial services to the EBX Group.

BTG Pactual's remuneration will be solely based on the performance of the EBX Group's public companies. Andre Esteves, BTG Pactual's CEO, stated that: "This cooperation shows once again our firm willingness to support unique projects and national entrepreneurship, areas in which Eike Batista is an icon."

346. This EBX announcement was intended to convey the underlying message that BTG Pactual, one of the largest and most sophisticated players in the Brazilian financial market, saw enough value in BATISTA's empire that it was willing to "partner" with EBX, without any promise of exclusivity, and plough in cash to finance "short, medium and long-term projects," with its own profits completely contingent on the success of the EBX ventures.

347. The phrasing of this release was another BATISTA stratagem intended to dress up the fact that OGX desperately needed money to delay its inevitable financial collapse by using the language of opportunity and the purported confidence of savvy bankers in the worth of his operation.

348. Predictably, OGX share prices shot upwards, closed up 16%, and rallying as much as 27.7% in the day following the announcement. On March 7, 2013, the announcement came across on the Bloomberg terminal on Ms. Neiwirth's desk at Gables Capital in Miami, Florida, coupled with a report that BTG Pactual was willing to extend BATISTA's EBX another billion dollars for liquidity.

349. On March 13, 2013, BATISTA had OGX release another Statement of Material Fact to investors declaring that oil recovery from the Pipeline, Fuji and Ilimani formations was

commercially feasible, announcing an on-site amount between a half billion and 1.3 billion barrels of oil, and conveying the impression that commercial production was imminent.

350. However, as BATISTA knew, the truth was that only a tiny percent of the oil detected was recoverable and commercial feasibility was impossible.

351. On March 22, 2013, BATISTA tweeted that OGX had eight acknowledged oil commercial accumulations: three onshore, in Maranhao, and five offshore.

352. But, despite BATISTA's continuing misrepresentations, the stock price began to fall.

353. On March 23, 2013, Bloomberg reported that BATISTA via Twitter had warned short sellers wagering against his companies that they would regret their bets. Asked by other Twitter users about the companies' falling stock prices, BATISTA had written that "rumors and gossip are tools of short sellers" who will be "caught with their pants down," and he directed his readers to an interview with BTG Pactual President, Andre Esteves.

354. In that March 23, 2013, interview BTG Pactual President, Andre Esteves, had stated that BATISTA's companies were in no danger of failing and that BATISTA remained one of the best capitalized business men in Brazil.

355. Well before the "strategic partnership" announced on March 6, 2012, BTG Pactual had been doing due diligence on OGX, which was the prime asset of BATISTA's holding company, EBX, in order to act as its financial consultant and potential provider of long-term financing. BTG Pactual must therefore have known how precarious a position OGX was in. The public, however, took its Chairman's statement as being true.

356. Upon information and belief, Mr. Esteves' statement on behalf of BTG Pactual was intentionally false and was issued pursuant to an agreement with BATISTA. It is unknown what the consideration for the deal may have been. (In late 2015 Mr. Esteves was arrested in Rio,

stepping off a plane from Miami, Florida, in connection with charges of obstruction of justice in the Petrobras corruption investigation and was placed under house arrest).

357. On March 26, 2013, OGX released its financial statement for 2012. Under "Message from the Management," Defendant LUIZ CARNEIRO, Chief Executive Officer of OGX, stated, "In parallel to the development of our fields, we made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations, and we continue our studies on how to best develop them."

358. However, as BATISTA, CARNEIRO, and the other co-conspirators knew, none of these fields were commercially viable and OGX was insolvent. These were deliberately fraudulent misrepresentations.

359. On March 28, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN.

360. On April 1, 2013, MERIDIAN received its first interest payment of $432,359.38 on its OGX bonds and AMERICAN received its first interest payment of $146,562.50.

361. On April 12, 2013, in continued reliance on the vaunted future profitability of OGX and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN.

362. As was not discovered until September 2016, during April 2013, BATISTA's CENTENNIAL ordered a Panamanian subsidiary, Goldenrock, to pay a $2.3 million kickback, upon information and belief, to Brazilian officials, from its account at TAG Bank in Panama, for the $922 million OSX shipbuilding contract awarded in mid-2012. It is believed that Goldenrock was one of at least two shell companies which upon information and belief held accounts at TAG Bank – the other being Blue Diamond, which BATISTA used to hold slush funds for the bribery of officials and others useful to his scheme. In April 2013, CENTENNIAL wired $111,798,818.97 million from an account Batista controlled at BTG Pactual in the Cayman Islands to TAG Bank for safekeeping and to top off BATISTA's slush fund.

**The $850 Million "Investment" by Petronas.**

363. BATISTA knew that the sale of supposed oil "assets" to other supposedly savvy players in the oil industry would create confidence in OGX and in its other dependent enterprises as it would reflect the fact that the buyer, after doing due diligence, saw value in the OGX asset, and therefore so should other investors; and OGX would have yet more working capital, so nobody invested in its future should worry that it could not pay its way until coming into full production.

364. The Defendant AZIZ BEN AMMAR was charged by BATISTA with attempting to close an asset purchase deal with the Malaysian State-owned oil company Petronas. Upon information and belief, BATISTA authorized BEN AMMAR to spend in excess of $10 million to help "grease the wheels" of the process.

365. On or about May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Basin. The news of the $850 million Petronas deal was picked up and reported across the world and had its intended effect.

366. Thus, on May 8, 2013, London's Financial Times reported online that BATISTA had sold an $850 million stake in OGX assets to Malaysia's state-run Petronas. The article noted that shares in OGX were the biggest risers of Brazil's stock exchange that day. The good news came across the Bloomberg terminal screen on Ms. Neiwirth's desk.

367. That same day, The Wall Street Journal reported online, "Petronas's purchase of stakes in the two Tubarao Martelo blocks, with *reserves* estimated at 145 billion barrels of oil, will give OGX much-needed cash to fund fresh investments. The Malaysian and Brazilian companies announced the deal in separate statements." (Emphasis added)

368. Similarly, BNAmericas announced online, "Brazil's OGX has confirmed an US $850mn farm-out deal with Malaysian giant Petronas for a share of two oil and gas blocks off the coast of Rio de Janeiro. The deal hands the Kuala Lumpur-based firm a 40% non-operating working interest in the Campos basin's BM-C-39 and BM-C-40 blocks, OGX said in a statement. In addition, Petronas has an option to purchase 5% of OGX's capital stock at a price of 6.30 reais until April 2015."

369. The quote from OGX in the article continued, "OGX's partnership with Petronas underscores the quality of our asset and the potential of the Tubarão Martelo field, where production is expected to commence by the end of the year," OGX chief executive CARNEIRO said, "[w]ith more than 32Bb of recoverable resources and a production of about 2Mboe/d, Petronas' expertise will enhance the continued development of oil production in these areas."

370. However, as CARNEIRO and the other co-conspirators knew, this was a lie. There was virtually no commercially recoverable oil. OGX was a complete bust and would soon collapse.

**Meridian Invests in More OGX Bonds.**

371. The news of the supposed Petronas purchase came across the Bloomberg terminal screen on Judy Neiwirth's desk in Miami, Florida, on May 8, 2013. The Bloomberg report also

recited a supposed quote from the buyer, "Petronas views the acquisition as a highly attractive investment opportunity in terms of asset quality and for strategic future growth in Brazil."

372. Investors in OGX bonds were spurred to make greater purchases by this news. According to Reuters News Agency, investment in OGX bonds by the massive U.S. investment fund, Pimco, climbed as high as $800 million during May 2013.

373. On May 20, 2013, in continued reliance on the vaunted future profitability of OGX, and BATISTA's commitment to inject a billion dollars if and when needed, and further encouraged by the announcement of the Petronas deal, Gables Capital, in Miami, Florida, directed the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN.

374. However, the truth was, in fact, that there was no actual "Petronas deal" as portrayed to the public. The deal had many contingencies, including OGX restructuring its debt and reaching certain production targets.

375. Upon information and belief, it was Batista's strategy to convey the message that sophisticated investors saw great value in the future of OGX.

376. Why Petronas – currently wracked by its own massive corruption scandal - did not correct the OGX presentation or market perception at that time is unknown before discovery.

**Batista Secretly Cashes Out.**

377. While doing his best to encourage investor confidence and continued investment in OGX, between May and June 2013, BATISTA secretly instructed EBX to sell off 126.65 million shares in OGX.

378. BATISTA was also siphoning off cash in huge amounts. According to a much later released confidential letter from the Cleary Gottlieb law firm, representing a cadre of large insider

creditors in June 2013, BATISTA funneled out $450,000,000 to an affiliate without justification just that month.

379. It is not known before discovery where that money went but it is believed that a substantial amount was routed directly or intermediately through the corporate co-conspirators and accomplices the 63X companies, members of the EBX group and the CENTENNIAL companies, to the THORQUE Companies' accounts and to bank accounts in various countries.

380. Then in early June 2013, BATISTA put another layer of insulation between himself and his creditors by transferring $30 million from an account in Brazil to a Citibank account in Brazil in the name of his son, THOR BATISTA. It is believed that the funds were thereafter funneled out of Citibank Brazil to the Citibank trust account of a BATISTA professional in Miami, and onwards to Switzerland or other secrecy jurisdiction.

381. On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign.

382. However, when the news hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm.

383. BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the restructuring of the group which was now complete that same month of June" and that no further shares would be sold. However, this would prove to be a lie.

384. On June 20, 2013, in continued reliance on the vaunted future profitability of OGX and BATISTA's commitment to inject a billion dollars if and when needed, and reassured by BATISTA's news of his stock sale being just a "one-off adjustment," Gables Capital, in Miami,

Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the secondary market on behalf of its client, MERIDIAN, as trustee.

385. MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98.

386. However, on July 1, 2013, OGX was finally forced to admit by a Statement of Material Fact that a number of its wells in the Campos Basin were unproductive and, cryptically, that none of its projections should be relied upon, which resulted in a plunge in OGX share prices.

387. Critically, however, BATISTA failed to announce: that there was in actual fact virtually no commercially recoverable oil; that the Mubadala and Petronas investments had been massive loans and Petronas was not obliged to perform unless OGX was re-structured; that behind the scenes Mubadala, who knew the exact state of affairs, was realizing on its securities; and lastly, he failed to disclose his intention to dishonor the billion dollar put option, if and when demanded.

388. In fact, in the face of certain knowledge that OGX was insolvent and had no oilfields likely to generate significant recoverable oil, BATISTA continued to spawn lies about projected future profitability.

389. Thus, on July 3, 2013, Bloomberg relayed the news that OGX had declared the Remora field in the Campos Basin commercially viable.

390. Unfortunately, this was just another lie.

**Batista Makes Further Fraudulent Transfers.**

391. Upon information and belief, during these months, in line with his overall game-plan, BATISTA was moving the assets still in Brazil that were the most vulnerable to attachment out of his name and into the names of family members, leaving himself immune from collection.

392. Upon information and belief (according to the Brazilian indictments) BATISTA transferred two buildings in Rio with an aggregate value of approximately $20 million into the

names of his sons THOR BATISTA and OLIN BATISTA; he moved $60 million from an account in Brazil to a Citibank account in the name of THOR BATISTA; and he transferred approximately $7 million in cash plus a $2 million apartment in Ipanema to FLAVIA SAMPAIO, his girlfriend and mother of his infant son, Balder.

393. Upon information and belief, BATISTA, his co-conspirators, and accomplices had by this time moved the bulk of his and their liquid assets out of Brazil and off to secrecy jurisdictions, where they were held in cash, or reinvested in stock in ventures likely to actually prove to be profitable, or in real estate and other more secure investments in other countries, typically through the medium of shell companies to act as "blinds" between the asset and the ultimate beneficial owners.

**Mubadala Secretly Pulls Out.**

394. During early July, 2013, news began to leak out that the Mubadala deal, which had been announced as an equity investment and seen as BATISTA's ultimate stamp of approval by the investment community, providing important backing for BATISTA's ambitions by a major global sovereign wealth fund, had in fact been nothing of the sort, but rather a huge loan, collateralized by plum assets and personal guarantees.

395. Moreover, behind the scenes, Mubadala, which had inside knowledge as to the true state of affairs in BATISTA's companies and was not prepared to wait for the disaster that it could see from the actual records, had over the course of many months been demanding and receiving the surrender of collateral and the partial repayment of its loans to reduce its exposure to the greatest extent possible. The fact that Mubadala was pulling out should have been released to the investment community as a material fact, but was not.

396. BATISTA publicly tried to put the best spin possible on the leaked news, characterizing the OGX payments to Mubadala as the partial redemption of an "investment" rather

than the repayment of a loan. Mubadala did not deny this characterization. However, neither EBX nor Mubadala would provide details of the restructuring.

397. Upon information and belief, the process of asset stripping was carried out by lawyers at Maples & Calder in the Cayman Islands. According to the online version of The Legal 500 regarding Maples & Calder, "[o]ther major instructions included Simon Firth advising Eike Batista's EBX Group on the ongoing restructuring of its strategic partnership with Mubadala Development Company." Cayman Islands, Corporate and Commercial, *Maples and Calder*, The Legal 500 (last visited Oct. 11, 2016), http://www.legal500.com/c/cayman-islands/corporate-and-commercial.

398. Mubadala had gone along with the initial public mischaracterization of its loan as an "equity investment" and had secretly stripped plum assets from the BATISTA companies under cover of an announced "partial redemption" of that investment, all of which tends to indicate complicity in the fraud. Plaintiffs reserve the right to add Mubadala as a Defendant should discovery confirm a basis to do so.

**The 10.8 Billion Barrel Lie – Recap.**

399. Despite the fact that OGX was now on a very fast countdown to collapse, BATISTA resolutely kept on publicly trumpeting a rosy vision of the future for OGX, completely disconnected from any shred of reality.

400. Thus, on July 19, 2013, BATISTA once again blared out reassurances for distribution through the internet press [Bloomberg Businessweek, Financial Times, Fox Business, San Francisco Chronicle] that, as D&M had stated in a 2011 Report, OGX had reserves amounting to 10.8 billion barrels and that regardless of all else, he would stand by the company and honor all of his obligations.

401. However, BATISTA had always known that the various OGX projections had been lies. That had been confirmed by the internal OGX Task Force and Schlumberger Task Force Reports in late 2012 and all the evidence since then had reinforced the point and he had neither the capacity nor the intention to make good on all his debts, let alone compensate all of the many victims of his fraud.

402. On July 22, 2013, D&M again demanded of BATISTA, privately, that he retract the 10.8 billion barrel lie and detach the D&M name from it. BATISTA did not do so.

403. On August 14, 2013, it was reported that Luciano Coutinho, the President of the Brazilian development bank, BNDES, which had loaned BATISTA billions of dollars and must have done due diligence that showed otherwise, announced that BATISTA's OGX had "high-quality assets with which it can rebalance itself." It is unknown before discovery what inducement BATISTA supplied for him to state this lie.

404. On August 16, 2013, the Tubarão Azul oilfield was closed down, having produced roughly 5 million barrels throughout its life, or just 1% of the minimum estimate announced in 2010. This was OGX's best field. There would be a later attempt to operate this field post-bankruptcy. This attempt, however, would prove futile and the field was eventually returned to the Brazilian government.

405. The task BATISTA had set for MARCUS BERTO was, upon information and belief, to get the EBX stake in LLX secretly monetized before the OGX crash, and the crash of OSX which would follow on its heels, leaving the LLX port project without its anchor tenant.

406. On August 15, 2013, in a filing with the Brazilian Securities and Exchange Commission, BATISTA belatedly confirmed that he was selling a controlling stake in LLX for $560 million to U.S.-based EIG Global Energy Partners.

407. Upon information and belief, therefore, this was "mission accomplished" for MARCUS BERTO.

408. Disastrous news was also now emerging about BATISTA's MMX, iron ore "producing" company, which had been fined $1.8 billion for unpaid taxes, equivalent to nearly 80% of its market value. BATISTA's hand-picked managers at MMX were trying to sell off this company, too, before the others crashed all around it.

409. In August and September 2013, BATISTA secretly sold another 227 million shares in OGX, which earned him approximately $35 million and which, upon information and belief, he routed to one of his foreign accounts.

410. Though not discovered until near the end of the year, and then reported by the journalist Elio Gaspari in the Rio de Janeiro daily paper, O Globo, at least ten OGX executives left the company during these final months, with parting payments ranging between $46 million and $92 million each, further stripping cash out of the company.

411. On September 4, 2013, having milked as much as he could out of OGX, AZIZ BIN AMMAR resigned from the Board and reportedly fled the country for New York where he is reported to presently reside in luxury in a $10 million apartment believed to have been acquired with a small part of his takings.

412. With the OGX bankruptcy just days away, upon information and belief, BATISTA attempted to transfer another $100 million in corporate funds from a BTG Pactual correspondent account in The Bahamas to a Miami, Florida, account at Citibank, believed to be a THORQUE Company bank account.

413. Upon information and belief, Andres Esteves, billionaire Chairman of BTG Pactual, initially refused to make this transfer, however, because he feared that BTG Pactual would become liable as an accomplice to BATISTA's fraud on creditors.

414. It is unknown whether those funds remain "stranded" in The Bahamas, or have been routed out on BATISTA's instructions to one of his other accounts.

415. Equity investors and bond holders were still relying on the fact that there was value in OGX. This belief was due to the fact that as recently as May 2013, a foreign oil company, Petronas, had apparently invested close to a billion dollars of its own money in the OGX oil fields.

416. On top of that, BATISTA himself was obliged to inject $1 billion in cash into OGX, if and when needed, through the Put Option. (And in 2014, into OSX through a similar Put Option). All that was needed apparently was for OGX to have enough cash to stay in business until the oil started to flow.

417. The OGX Put Option representation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which Ms. Neiwirth took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true.

**Section III - The OGX Oil Bubble Bursts**

418. On September 6, 2013, OGX's Controller, desperate for cash, formally demanded from BATISTA the first $100 million under the Put Option.

419. BATISTA, who had never had any intention of paying a single penny *into* OGX, shocked investors by refusing to pay this or any other obligation under the Put Option, claiming the benefit of an "out clause," which - if an actual document even existed - he had inserted for that purpose.

420. The arrival of OSX III, yet another massive floating production, storage and offloading vessel at the Tubarão Martelo field, on October 1, 2013, raised momentary hopes that OGX might soon start producing offshore oil from the field. But by close of business that same day, OGX missed a bond payment in the amount of $45 million.

421. On October 28, 2013, MARCUS BERTO formally stepped down at LLX, resigning as President and Director of Investor Relations and handed over to the new owners' appointed management and left for Miami, Florida.

422. It is believed that MARCUS BERTO had been awarded a significant interest in the company by BATISTA for his services, part of which he invested in what is reported to be a $9.5 million Key Biscayne, Florida, mansion.

423. On October 30, 2013, OGX filed for bankruptcy in Rio de Janeiro disclosing debts of $5.1 billion, of which roughly $3.6 billion was owed to U.S. and other foreign bondholders.

424. Pimco, the world's largest bond investor, based in California, and BlackRock, the world's largest asset manager, from New York, had front-row seats for the collapse.

425. Bondholders like the Plaintiffs and, upon information and belief, other investors from Florida, such as the Florida Retirement System Trust Fund, were among the horde of other investors that were basically wiped out.

426. OGX's satellite company, MMX, filed for bankruptcy on October 22, 2013.

427. OGX's satellite company, OSX, filed for bankruptcy on November 11, 2013.

428. In November 2013, Petronas announced that it would not pay the $850 million, which investors had expected under the alleged "deal" that BATISTA had broadcast in May of that year, disclosing that the deal had been contingent on OGX being able to re-structure its debt.

429. By February 2014, virtually all of the blocks which OGX had leased had been returned to the Brazilian Government as worthless.

**Batista's "Brazilian Dream" Turns to Nightmare.**

430. For everybody with an interest in OGX and its satellite companies - except for BATISTA, his co-conspirators, and accomplices - the "Brazilian Dream" BATISTA had boasted of in the April 30, 2012, Milken interview, had now turned to a nightmare.

431. The shareholders and ordinary bondholders who had invested billions of dollars in OGX, predominantly from the U.S., had now been essentially wiped out in what is currently the largest default in Latin American history.

432. BATISTA and a number of his co-conspirators and accomplices have been indicted for market manipulation and insider trading in Brazil. These proceedings are expected to last a decade or more, with no real hope of securing punishment of the perpetrators of the fraud or restitution for the victims.

433. As one of his "defenses" in the criminal proceedings in Brazil, BATISTA has contended that the conditions of the leases required that OGX continue to explore for oil until it declared a field to be commercial or return it to the government. BATISTA therefore had OGX declare fields to be commercial to avoid incurring the cost of exploration or having to return them as worthless, trusting that some future technological advance would allow OGX to commercially recover what were presently unrecoverable resources. In other words, BATISTA has admitted that those representations to investors were false.

434. In November 2015, Brazil's market regulator, the CVM, banned BATISTA from managing a publicly traded company for a derisory five years.

**Batista's Silver Lining.**

435. BATISTA and his co-conspirators, however, are all believed to have done well out of the scheme, having received sums ranging from tens of millions of dollars to hundreds of millions of dollars apiece.

436. All the lies about BATISTA being listed somewhere in the league of the world's richest men can now be seen to have *always* been a lie. The number on which that supposed position ranking was predicated was the sum total of money paid in by investors in expectation of profits from oil that never existed.

437. In actual fact, BATISTA's original net worth before the OGX fiasco was probably in the hundreds of millions of dollars, and his actual current assets, mainly squirreled away abroad, are probably significantly more than what he began with.

438. Thus, BATISTA and his family continue to live an untouchable life of luxury in Brazil. It is reported that he believes that he has "zeroed his debts" through the bankruptcies. Apparently the billions of dollars of which he bilked his victims does not count.

439. That BATISTA has massive wealth remaining is shown by the fact that in March 2016, he threw $130,000.00 in gold coins from the deck of his yacht into the Atlantic Ocean to propitiate the "Queen of The Sea," and turn the course of his luck for his next enterprise.

440. In July 2016, with all funds successfully routed out to safety, THOR BATISTA quietly closed down the THORQUE Companies in The Bahamas. Notice of the dissolution was given solely by means of a newspaper of tiny local circulation in The Bahamas on July 28, 2016. Copies of the notices are shown here:

NOTICE

International Business Companies Act
No.45 of 2000

**THORQUE INVESTMENT MANAGEMENT LTD. (the "Company")**

Notice is hereby given that, in accordance with Section 138 (8) of the International Business Companies Act, No.45 of 2000, the Dissolution of **THORQUE INVESTMENT MANAGEMENT LTD. (IBC Nº. 164306B)** has been completed, a Certificate of Dissolution has been issued and the Company has therefore been struck off the Register. The date of completion of the dissolution was the 26th day of July, 2016.

**Thor de Oliveira Fuhrken Batista**
Liquidator

NOTICE

International Business Companies Act
No.45 of 2000

**THORQUE FUND LTD. (the "Company")**

Notice is hereby given that, in accordance with Section 138 (8) of the International Business Companies Act, No.45 of 2000, the Dissolution of **THORQUE FUND LTD. (IBC Nº. 161887 B)** has been completed, a Certificate of Dissolution has been issued and the Company has therefore been struck off the Register. The date of completion of the dissolution was the 28th day of July, 2016.

**Thor de Oliveira Fuhrken Batista**
Liquidator

441. As previously mentioned, the Tubarão Azul oilfield had been OGX's best prospect. Under BATISTA it had achieved less than 1% of the flow promised. On September 20, 2016, three years post-bankruptcy, after the successor entity had ploughed many more millions into its exploration, the Tubarão Azul oilfield was returned to the Brazilian government as worthless.

**The Plaintiffs' Claim.**

442. Through restructuring in the OGX bankruptcy, MERIDIAN's close to $17 million dollars in bonds has been translated into shares in a new version of OGX with a face value of $279,746 for which credit is given. MERIDIAN's net loss is $16,438,233, plus interest.

443. Through restructuring in the OGX bankruptcy, AMERICAN's close to $4 million in bonds has been translated into shares in a new version of OGX with a face value of $62,166, for which credit is given. AMERICAN's net loss is $3,872,616, plus interest.

444. The Plaintiffs have retained the undersigned attorneys to prosecute this action and are obliged to pay them a reasonable fee.

445. As of the date of filing this Complaint, the Plaintiffs have already commenced proceedings ancillary to this action, restricting Batista and the 63X Companies from dissipating assets and to obtain information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

446. In the Cayman Islands, after a multi-day hearing, the Judge, consistent with Cayman Islands law, entered an Order freezing the assets of Batista and the 63X Companies worldwide and ordered disclosures for information regarding accounts and transfers owned and controlled by Batista and the 63X Companies.

447. In the Bahamas, consistent with Bahamian law, the Judge similarly entered an order for the disclosure of information relating to transfers of money and accounts owned and controlled by Batista and the 63X Companies.

448. BATISTA and the 63X Companies have been notified of these foreign proceeding. Upon information and belief, BATISTA is actively avoiding service of the Cayman Orders.

**COUNT I**
**FRAUD**

Plaintiffs re-allege paragraphs 1-7, 9-11, 13-14, 28-448 against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO and AZIZ BEN AMMAR, as follows:

449. Each of the above named Defendants personally participated in the fraudulent scheme and composed and transmitted material fraudulent misrepresentations, and assisted each other in maintaining the credibility of material misrepresentations as detailed above.

450. As detailed above, each of them issued and assisted in issuing false statements concerning specific material facts, with actual knowledge that the representations were false, with the intention that investors would thereby be induced to rely on such representations to their consequent financial loss.

451. In directing their individual and collaborative misrepresentations to the United States, the named Defendants necessarily targeted investors in the most populous States of the United States, of which Florida is the third, behind only California and Texas. They did so in the expectation of personal gain and of causing loss to their targets.

452. Plaintiffs' investment agent, Gables Capital Management, in Miami, Florida, was a target of such misrepresentations and relied on the same and was thereby induced by such fraudulent misrepresentations to buy OGX bonds on behalf of the Plaintiffs in the total amount of $21,231,683.00.

453. The OGX bonds were and are virtually worthless, as a result of which Plaintiffs have been damaged in the sums alleged.

454. Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

**COUNT II**
**CONSPIRACY TO DEFRAUD**

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

455. The foregoing Defendants agreed to and did conspire together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors.

456. Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

**COUNT III**
**AIDING AND ABETTING FRAUD**

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X

MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

457. The foregoing Defendants aided and abetted BATISTA and his co-conspirators and accomplices and rendered substantial, material assistance to him and them, in ways, upon dates, and in places, that are unknown before discovery, beyond what is set forth above, to achieve the objectives of the fraudulent scheme and to assist in secreting the proceeds in false names and in jurisdictions where they would not be available for the satisfaction of the legitimate debts of creditors, wherefore they are additionally liable as aiders and abettors.

458. Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

**COUNT IV**
**FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT**
**(f/k/a "FLORIDA RICO")**

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

**The Criminal Enterprise.**

459. Upon the basis of the facts alleged, BATISTA is and was the prime directing and controlling force at the head of a criminal enterprise within the meaning of Fla. Stat. § 772.102(3) comprised of himself, the joined Defendants, and many other co-conspirators, aiders, abettors, and accomplices not joined.

460. The enterprise had as its common purpose the criminal aspirations and ambitions of BATISTA for the accumulation of wealth through a pattern of racketeering activity for further investment, enjoyment and transmission down through the generations of his relatives, friends co-conspirators and accomplices.

461. Such enterprise is referred to collectively as "the Batista Crime Family" and the Defendant individuals and entities comprising such as "members of the Batista Crime Family" or "members of the enterprise."

462. All members of The Batista Crime Family acted, in regard to each listed predicate act as described below and as to the overall pattern of racketeering activity, with criminal intent.

**Pattern of Criminal Activity.**

463. By reason of the allegations made herein, the members of the enterprise engaged in a pattern of criminal activity as stated in Fla. Stat. § 772.102(4).

**Predicate Acts of Criminal Activity.**

464. The Defendants actively participated in the enterprise, the Batista Crime Family, through the stated prohibited activities contrary to Fla. Stat. § 772.103 in the course of a pattern of criminal activity under Fla. Stat. § 772.102(4) which entitle Plaintiffs to civil remedies under Fla. Stat. § 772.104.

**Predicate Act I - Florida Securities Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

465. As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly employed a device, scheme, or artifice to defraud, contrary to Fla. Stat. § 517.301(1)(a)(1).

466. As set forth above, the stated Defendants have further committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly obtained money or property by means of untrue statements of material facts or any omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, contrary to Fla. Stat. § 517.301(1)(a)(2).

467. As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon persons, including Plaintiffs, contrary to Fla. Stat. § 517.301(1)(a)(3).

**Predicate Act II - Federal Wire Fraud - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

468. As set forth above, the stated Defendants have committed numerous acts of wire fraud in that they, having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, contrary to 18 U.S.C. § 1343.

**Predicate Act III - Federal Money Laundering - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT, OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.**

469. As set forth above, the stated Defendants committed numerous acts of money laundering in that they knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from unlawful activity contrary to 18 U.S.C. § 1957. As stated above, the acts of money laundering variously took place in the United States pursuant to 18 U.S.C. § 1957(d), or was committed outside the U.S. by "U.S. persons" including U.S. nationals, U.S. permanent residents, corporations formed in the U.S. and foreign subsidiaries of such persons as defined in 18 U.S.C. § 3077.

**Predicate Act IV - Florida False Advertising - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR.**

470. As set forth above, the stated Defendants committed numerous acts of misleading and deceptive advertising, contrary to Fla. Stat. § 817.40(5), in that they made or disseminated or caused to be made or disseminated before the general public of the state, or a portion thereof, misleading advertisements, which were fraudulent and unlawful, which the Defendants knew or should have known were false, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

**Predicate Act V - Florida Theft - Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

471. By reason of the foregoing the stated Defendants, with criminal intent, knowingly obtained or used, or endeavored to obtain or use, the Plaintiffs' property and the property of others through fraud, deceit, false pretenses and/or conduct of similar nature, with the intent to permanently deprive the Plaintiffs and such others of their right to their property or their benefit of their property, and further, knowingly and with criminal intent appropriated such property to their own use contrary to Fla. Stat. § 812.014.

**Predicate Act VI - Florida Communications Fraud: Alleged Against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD.**

472. As set forth above, the stated Defendants engaged in a scheme to defraud, in that they engaged in a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto contrary to Fla. Stat § 817.034(4)(a), 817.034(3)(b), 817.034(3)(c), and 817.034(3)(d).

473. Further by reason of the matters set forth above, the stated Defendants furthered a scheme to defraud, in that they furthered a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto, and in the course thereof communicated with persons with the intent to obtain property from such persons contrary to Fla. Stat § 817.034(4)(b).

**Civil Remedy.**

474. As a result of the Defendants' participation in the criminal enterprise and its perpetration of the aforesaid pattern of criminal activity, Defendants caused injury and damage to Plaintiffs.

475. By reason of the foregoing, Defendants have, with criminal intent, received proceeds derived directly or indirectly from a pattern of criminal activity and have used or invested the same, or a part thereof, directly or indirectly, or the proceeds derived from the investment or

use thereof, in the acquisition of title to, or a right, interest, or equity in, real property or in the establishment or operation of an enterprise, contrary to Fla. Stat. § 772.103.

476. By reason of the foregoing, Defendants have, with criminal intent, through a pattern of criminal activity acquired or maintained, directly or indirectly, an interest in or control of enterprises or real property; have been employed by of associated with an enterprise to conduct or participate, directly or indirectly, in a pattern of criminal activity; conspired or have endeavored to violate provisions of subsection (1), subsection (2), or subsection (3) of Fla. Stat. § 772.103.

477. By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Fla. Stat. § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, statutory treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

**COUNT V**
**FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT CONSPIRACY**
**(f/k/a "FLORIDA RICO CONSPIRACY")**

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

478. The members of the Batista Crime Family conspired and agreed together at numerous times and on various dates and in various places to participate in the fraudulent scheme and in the affairs of the criminal enterprise through a pattern of racketeering activity contrary to Florida Statute § 772.103(4), by reason of which Plaintiffs were damaged and are consequently entitled to civil remedies under Florida Statute § 772.104.

479. By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Florida Statutes § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

**COUNT VI**
**FALSE AND MISLEADING ADVERTISING**

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-14, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR, and say as follows:

480. Defendants committed numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1), and that they caused such loss in fact to Plaintiffs.

481. Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

482. Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

**COUNT VII**
**CONSPIRACY TO COMMIT FALSE AND MISLEADING ADVERTISING**

Further or alternatively, Plaintiffs re-allege paragraphs 1-7, 9-25, and 28-448, against EIKE BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

483. Defendants conspired together to commit and did commit numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

484. Accordingly, Plaintiffs have a statutory cause of action for actual damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

485. Plaintiffs reserve the right to claim punitive damages on a later evidentiary showing as required by law under Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

**COUNT VIII**
**CIVIL THEFT**

Further or alternatively, Plaintiffs re-allege paragraphs 1-25 and 28-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD., and THORQUE INVESTMENT MANAGEMENT LTD., and say as follows:

486. By reason of the foregoing acts alleged, the Defendants committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Florida State § 772.11, including treble damages, attorneys' fees and the expenses of this action.

487. All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

**COUNT IX**
**CONSPIRACY TO COMMIT THEFT**

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUE1 FUND LTD.,

THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

488. The foregoing Defendants with criminal intent, conspired together, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, to achieve the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and performed the stated acts in pursuance of such agreement in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

489. All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

**COUNT X**
**AIDING AND ABETTING THEFT**

Further or alternatively, Plaintiffs re-allege paragraphs 1-5, 7-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

490. The foregoing Defendants, with criminal intent, in ways, upon dates and in places that are unknown before discovery, beyond what is set forth above, aided and abetted BATISTA in achieving the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and in so doing committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

491. All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

**COUNT XI**
**FLORIDA UNIFORM FRAUDULENT TRANSFERS ACT**

Further or alternatively, Plaintiffs allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

492. The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, made fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a

reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and each of the other liable Defendants were engaged or was about to; engage in a business or a transaction for which his and their remaining assets were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he or they would incur, debts beyond his or their ability to pay as they became due, contrary to Fla. Stat. § 726.101, et seq.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the asset transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

**COUNT XII**
**CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS**

Further or alternatively, Plaintiffs re-allege paragraphs 1-448 against EIKE BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, EBX HOLDING, LTDA., EBX INTERNATIONAL, S.A., EBX CAPITAL PARTNERS, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, THORQUEI FUND LTD., THORQUE INVESTMENT MANAGEMENT LTD., OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

Case 1:17-cv-23051-KMW   Document 35-32   Entered on FLSD Docket 08/30/2017   Page 111 of 112



Respectfully submitted,
ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373-6600
Fax: (305) 373-7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282
Carlos F. Osorio
Florida Bar No.: 597546