IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION (40)

CASE NO.: 17-001040-CA-01 (43)

MERIDIAN TRUST COMPANY, as
trustee, and AMERICAN ASSOCIATED
GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, *et al.*

        Defendant.

_____/

**DEFENDANTS WERNER BATISTA, CENTENNIAL ASSET MINING FUND,
CENTENNIAL ASSET BRAZILIAN EQUITY FUND, 63X INVESTMENTS LTD,
63X MASTER FUND, AND 63X FUND'S MOTION TO DISMISS**

Defendants Werner Batista ("Werner"), Centennial Asset Mining Fund, LLC ("CAMF"), Centennial Asset Brazilian Equity Fund LLC ("CABEF") (CAMF and CABEF, collectively, "the Centennial Companies"), 63X Investments LTD, 63X Master Fund, and 63X Fund (63X Investments LTD, 63X Master Fund, and 63X Fund, collectively, "the 63X Companies") (the Centennial Companies and 63X Companies, collectively, "the Companies"), pursuant to Florida Rule of Civil Procedure 1.140(b), move to dismiss the Complaint filed by Plaintiffs Meridian Trust Company and American Associated Group, Ltd. (collectively, "Plaintiffs") for failure to state a cause of action. The Companies also move to dismiss for lack of personal jurisdiction.

This motion should be granted for the reasons set forth in the memorandum of law below.

## MEMORANDUM OF LAW

### Introduction

This action stems from Plaintiffs' novel-like allegations that a primary actor, Defendant Eike Batista ("Batista"), perpetuated an international fraudulent scheme by issuing billions of dollars' worth of stocks and bonds in OGX, a Brazilian, publicly traded, oil-exploration company, allegedly knowing they were worth nothing, and then, using his family and a group of companies that he controlled, to transfer the proceeds of the fraud to bank accounts around the world. Complaint ¶¶ 34, 36, 44. According to Plaintiffs, Batista's family members, the directors of his companies, and the companies themselves all were aware of the alleged fraud and actively participated in and benefited from the scheme as conspirators and accomplices, even though Plaintiffs admit on numerous occasions that they are unable to explain *how*, exactly, they supposedly participated in the fraud. Id. ¶¶ 66, 94, 96, 202, 299, 307, 309, 311, 313-14, 316, 376, 379, 403, 455, 457, 488, 490, 492-93.

The Complaint alleges twelve counts against a group of 22 Defendants: (1) common law

fraud; (2) conspiracy to defraud; (3) aiding and abetting fraud; (4) Florida Civil Remedies for Criminal Practices Act ("Florida RICO"); (5) Florida RICO Conspiracy; (6) false and misleading advertising; (7) conspiracy to commit false and misleading advertising; (8) civil theft; (9) conspiracy to commit theft; (10) aiding and abetting theft; (11) Florida Uniform Fraudulent Transfers Act; and (12) conspiracy to commit fraudulent transfers.

Werner is named in all counts. The Companies are named in all counts except for fraud and false and misleading advertising. Yet, in its more than 104 pages, the Complaint alleges remarkably few concrete facts about any of these, or most of the, Defendants.

### *Plaintiffs' Ownership of OGX Bonds Under the Indentures*

As an initial matter, the Complaint fails at the outset because it purports to state claims under Florida law. The Plaintiffs' claims, however, clearly arise from their ownership of OGX bonds, purchased in 2013. Plaintiffs specifically claim that their losses arise from their investment of approximately $21 million "in worthless OGX bonds through their Florida investment adviser on the basis of Batista's fraudulent misrepresentations." Id. at ii.

But the OGX bonds were issued subject to Indentures that are not governed by Florida law. To the contrary, section 13.08 of the Indentures unequivocally provides that New York law governs "all matters *arising out of or relating in any way whatsoever* to this Indenture, the Note Guarantee, and the Securities (*whether in contract, tort, or otherwise*)." See Indentures, § 13.08, attached as Exhibits A and B (emphasis added).[1] Plaintiffs' reliance on—and assertion of claims under—Florida law, in the face of such clear language applying New York law, is misplaced and

---

[1] See Florida Power & Light Co. v. Lixi, Inc., 11-80847-CIV, 2012 WL 12868740, at *2 (S.D. Fla. July 12, 2012) ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment") (citation omitted).

requires this Court to dismiss the Plaintiffs' claims *ab initio*.

### Allegations Relating to Werner

Werner's greatest fault, according to the Complaint, is that he is Batista's brother. Compl. ¶ 7. In September 2009, Werner, who was living in Florida, went to work in Brazil, as director of co-defendant company EBX Holding, an alleged personal wealth management entity of Batista's. Id. ¶¶ 64, 65. According to Plaintiffs, Werner "knew of the fraud from the early days" (id. ¶ 57) and assisted Batista by remaining silent and not exposing the purportedly overhyped value of OGX. Id. ¶¶ 208, 220. Werner resigned from EBX Holding in December 2013, following the collapse of OGX, to return to Florida and invest his profits in Florida businesses. Id. ¶ 66.

Although Plaintiffs accuse Werner in the most conclusory manner of being an "active participant" in the alleged fraudulent scheme (id. ¶ 95), they admit that they are unaware of any amounts actually pocketed by Werner. Id. ¶ 66. Indeed, the Complaint does not specify a single transaction involving Werner.  Plaintiffs only speculate that *if* the money Batista transferred out of Brazil is no longer in the name of his companies (which Plaintiffs implicitly admit is unknown), then it is "believed" to have been transferred into the names of his family members, including Werner, for no value. Id. ¶¶ 99-100.

### Allegations Relating to the Centennial Companies and the 63X Companies

Allegations relating to the Companies are even thinner. CAMF is a Nevada LLC (id. ¶ 21) and CABEF (id. ¶ 22) is a Delaware LLC,[2] while all of the 63X Companies are Cayman entities. Id. ¶¶ 15-17. Plaintiffs allege that these Companies were private wealth management companies that Batista owned and controlled and that supposedly were used to route the proceeds of his fraudulent scheme into bank accounts in Miami, The Bahamas, and the Cayman Islands. Id. ¶¶ 52,

---

[2] This allegation contradicts a later allegation that the Centennial Companies were incorporated in "secrecy" jurisdictions. Complaint ¶ 90.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

69, 89. Plaintiffs further claim that these Companies have "no legitimate corporate business or independent existence separate from Batista" and that they "were used as engines of fraud." Id. ¶¶ 90, 92. Yet, no abuses of corporate formalities are identified in the Complaint.

Plaintiffs alternatively plead that, if corporate formalities were followed, then the Companies should be treated as "co-conspirators, agents and constructive trustees of the proceeds of the fraudulent scheme." Id. ¶ 93. As with Werner, Plaintiffs allege the Companies conspired with Batista by remaining silent and not revealing the purportedly overhyped value of OGX. Id. ¶¶ 208, 220. They also allege the Companies were involved in the structuring of a loan that was passed off to the public as a strategic partnership and $2 billion investment by an outsider intended to bolster investor confidence. Id. ¶¶ 91, 253, 262-63.

The Complaint then speculates that the Companies *may* have been used to open various bank accounts held in Batista's interest (id. ¶¶ 309, 311, 313), and that a portion of the funds Batista allegedly transferred "without justification" *may* have been routed through the Companies to another co-defendant company. Id. ¶¶ 378-79. The only allegation with any specifics at all is that in April 2013, one of the Centennial Companies—yet, it is not even clear which one— allegedly wired millions of dollars from an account in the Cayman Islands to a Panamanian bank account controlled by Batista "for safekeeping." Id. ¶ 362.

Taking all of these allegations as true, Plaintiffs fail to show how Werner or any of the Companies engaged in any actionable conduct. The Complaint must be dismissed.

## The Motion to Dismiss Standard

To withstand a motion to dismiss, a complaint must contain sufficient ultimate facts supporting each element of a cause of action to show that a plaintiff is entitled to relief. Alvarez v. E & A Prod. Corp., 708 So. 2d 997, 1000 (Fla. 3d DCA 1998); Samuels v. King Motor Co., 782

So. 2d 489, 495 (Fla. 4th DCA 2001). Courts will not "by inference on inference or speculation supply essential averments that are lacking" in a complaint. <u>Alvarez</u>, 708 So. 2d at 1000 (citation omitted). Indeed, "mere legal conclusions are fatally defective unless substantiated by sufficient allegations of ultimate fact; and every fact essential to the cause of action must be pleaded distinctly, definitely, and clearly." <u>Ocala Loan Co.</u>, 155 So. 2d at 715; <u>Abblett v. First Nat'l Bank &Trust Co.</u>, 383 So. 2d 650, 651 (Fla. 4th DCA 1981). The Complaint fails to meet this standard and should be dismissed.

<u>ARGUMENT</u>

**I.**  <u>**All Counts Fail Because New York, Not Florida, Law Applies**</u>

In June 2011, Óleo e Gás Participações S.A. issued bonds in the total amount of $2.563 billion under an indenture (the "Initial Indenture"). <u>See</u> Ex. A. These obligations then were transferred to OGX Austria GMBH, and, in April 2012, an additional $1.063 billion in bonds were issued under a separate indenture, dated March 30, 2012 (<u>see</u> Ex. B) (together with the Initial Indenture, the "Indentures"). Plaintiffs allege that in 2013 they purchased roughly $21 million worth of OGX bonds under the Indentures. Compl. ¶¶ 49, 343-44, 359, 361, 373, 384.  Their claims—pleaded under Florida law—arise from losses suffered on account of the bonds issued under the Indentures. <u>Id.</u> ¶¶ 442-43.  Section 13.08 of the Indentures, however, unequivocally provides that New York law governs any claims arising from or relating to the Indentures. This broad provision clearly encompasses the Plaintiffs' claims.  Plaintiffs' reliance on Florida law is particularly improper because New York does nor allow state civil RICO or civil conspiracy claims.

**a.  Choice-of-Law Provisions are Presumed Valid**

As an initial matter, in Florida, a choice of law provision is presumed to be valid. <u>Southeast</u>

5

Floating Docks, Inc. v. Auto-Owners Ins. Co., 82 So. 3d 73, 80-81 (Fla. 2012) ("[P]arties that enter into commercial contracts reasonably expect choice-of-law provisions to be valid and enforceable, and to disregard a choice-of-law provision in a commercial transaction would destabilize an area of law relied upon for its predictable and uniform application."). The party who wishes to invalidate a choice of law provision bears the burden of proof. Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co., 761 So. 2d 306, 311 (Fla. 2000). The fact that the law of the chosen jurisdiction differs from Florida law is not a basis on which to invalidate the provision.[3] Florida "courts have uniformly enforced choice of law provisions without requiring the parties to brief the law of the chosen forum." Id. Plaintiffs do not address in their Complaint why they ignore the provision.

To invalidate the Indenture's New York choice of law provision, Plaintiffs would have to show that New York law is contrary to a "strong public policy" of the State of Florida. Southeast Floating Docks, 82 So. 3d at 80. The bar is extremely high. See Mazzoni Farms, 761 So. 2d at 311-12 ("Courts . . . should [proceed with] extreme caution when called upon to declare transactions as contrary to public policy and should refuse . . . unless it is made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental policy of . . . freedom of contract []."). The proposition that New York law is contrary to a strong public policy of the State of Florida is absurd, and Defendants have not found a single case in which a Florida court has refused to enforce a choice of law provision which selected New

---

[3] McNamara v. McNamara, 40 So. 3d 78, 80 (Fla. 5th DCA 2010). The Florida Supreme Court has enforced a choice of law clause even though the chosen jurisdiction permitted the parties to agree to a shortened statute of limitations for breach of contract claims, something prohibited under Florida law. Burroughs Corp. v. Suntogs of Miami, Inc., 472 So. 2d 1116 (Fla. 1985). A choice of law provision was enforced even though the chosen jurisdiction allowed interest rates Florida law would prohibit as usurious. Southeast Floating, 82 So. 3d at 81. In two cases, Florida district courts of appeal enforced a choice of law provision even though the chosen jurisdictions prohibited attorney's fees in circumstances when Florida would allow them. Id. at 80-81 (citing Walls v. Quick & Reilly, Inc., 824 So. 2d 1016 (Fla. 5th DCA 2002); Precision Tune Auto Care, Inc. v. Radcliffe, 815 So. 2d 708 (Fla. 4th DCA 2002)).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

York law. Cases where such provisions have been enforced, on the other hand, are abundant.[4]

The Florida Supreme Court has said that "parties that enter into commercial contracts reasonably expect choice-of-law provisions to be valid and enforceable, and to disregard a choice-of-law provision in a commercial transaction would destabilize an area of law relied upon for its predictable and uniform application." Southeast Floating, 82 So. 2d at 81 (citation omitted). "Commercial stability in interstate trade depends on predictability and some degree of uniformity among the states in their willingness to honor commercial agreements." Continental Mortgage Investors v. Sailboat Key, Inc., 395 So. 2d 507, 511 (Fla. 1981) (citation omitted).

The importance of enforcing the choice of law provision is paramount here when Plaintiffs have pled claims that do not exist under New York law. Nine of the Plaintiffs' claims must be dismissed because they explicitly rely on inapplicable Florida statutory provisions. The remaining three must be dismissed because they do not specify New York law. See Turner Murphy Co. v. Specialty Constrs., Inc., 659 So. 2d 1242, 1244 (Fla. 1st DCA 1995) (a party relying on foreign law, including the law of another state, must specifically plead it). Further, at least five of the twelve counts are rooted in conspiracy, but New York does not recognize civil conspiracy as a substantive tort. See McCarthy v. Weaver, 99 A.D.2d 652, 472 N.Y.S.2d 64, 65 (1984). Similarly, Plaintiffs plead a state RICO claim, but New York law does not allow civil RICO claims. See John E. Floyd, *RICO State By State, A Guide to Litigation Under the State Racketeering Statutes*, 826 (2d ed. 2011) ("New York [Organized Crime Control Act] does not provide for a private cause of action."); see also Brittain v. Am. Exp., Inc., No. CIV. A. CV 195-102, 1995 WL 812805, at *4 (S.D. Ga. Nov. 16, 1995) ("Georgia RICO claim cannot stand because the client agreement

---

[4] See, e.g., Great Lakes Reinsurance (U.K.) Plc. v. Branam, 126 So. 3d 297, 303 (Fla. 3d DCA 2013); Gilman + Ciocia, Inc. v. Wetherland, 885 So. 2d 900, 902 (Fla. 4th DCA 2004); Walls v. Quick & Reilly, Inc., 824 So. 2d 1016, 1018-19 (Fla. 5th DCA 2002).

7

between the parties contained a choice of law provision naming New York law as the applicable law."). Plaintiffs cannot be allowed to circumvent the parties' agreed-upon choice-of-law provision to bring claims that do not exist under New York law, and the provision must be enforced.

### b.  The Broad Choice-of-Law Provision Applies to Plaintiffs' Fraud Claims

Section 13.08 of the Indentures provides that New York law governs "**all matters arising out of or relating in any way whatsoever** to this Indenture, the Note Guarantee, and the Securities (**whether in contract, tort, or otherwise**)." Indentures, § 13.08 (emphasis added). This language is all-inclusive, governing all matters, explicitly including tort and statutory claims, as well as contract claims. "Where a contract is clear and unambiguous, it must be enforced pursuant to its plain language." Hahamovitch v. Hahamovitch, 174 So. 3d 983, 986 (Fla. 2015). Moreover, Florida courts interpret the language "arising out of or relating to" broadly.[5] Clearly, losses arising from the alleged artificial inflation of or devaluation of the bonds purchased under the Indentures both "arise out of" and "relate" to the "Indenture[s], the Note Guarantee, and the Securities."

Having purchased the bonds, Plaintiffs are bound by this broad language. Giller v. Cafeteria of South Beach Ltd., LLP, 967 So. 2d 240, 242 (Fla. 3d DCA 2007) ("[o]ne cannot both take advantage of contract provisions to seek to impose liability on an individual professional and at the same time avoid another contract term or provision for which it has no use"). The text of the Indentures includes "all matters"—plural—"arising out of or **relating in any way whatsoever** to this indenture, the note guarantee and the securities (whether in contract, tort, or otherwise)."

---

[5] See Jackson v. The Shakespeare Found., Inc., 108 So. 3d 587, 593 (Fla. 2013) ("an arbitration provision that is considered to be broad in scope typically requires arbitration for claims or controversies 'arising out of _or relating to_' the subject contract") (emphasis in original); Royal Caribbean Cruises, Ltd. v. Universal Employment Agency, 664 So. 2d 1107, 1108-09 (Fla. 3d DCA 1995) (arbitration clause including the language "arising out of or relating to this Agreement" includes intentional torts even where there is no claim for breach of contract).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Indentures, § 13.08 (emphasis added).  By its plain language, it includes tort and other claims. The inclusion of the phrases "in any way whatsoever," and "tort, or otherwise" signify that the Indentures' New York choice of law includes extra-contractual claims—tort and statutory claims—regardless of against whom they are brought, so long as those claims relate in some way to the Indentures and securities. See Razi v. Razavi, 2013 WL 1193005 *2 (M.D. Fla. 2013) (Florida choice-of-law provision in the contract governed fraud and contract claims (even though the fraud claims were brought against nonparties to the contract) because of the broad choice of law provision and the fraud claims were inextricably and factually tied to the transactions at issue).

Faced with a situation directly analogous to the suit here, the Eleventh Circuit enforced New York law under an indenture to the benefit of nonparties.  In Akanthos Capital Management, LLC v. CompuCredit Holdings Corp., 677 F3d 1286 (11th Cir. 2012), the court enforced a "no action" provision of a New York indenture that prohibited lawsuits by noteholders except in limited circumstances.  The plaintiffs sued the company's officers and directors in tort, and argued that—as nonparties to the indenture—the officers and directors could not invoke the "no action" clause.  Id. at 1292. The court rejected that argument.  Because the plain language of the indenture prohibited actions with respect to the Indenture or Securities, the court ruled the "no action" clause to be applicable. The same logic is clearly applicable here. The Indentures include undeniably broad language, encompassing all claims conceivably related to the Indentures. As such, Plaintiffs' Complaint—relying exclusively on Florida law—should be dismissed for failure to state a claim.

## II.   All Counts Fail to State a Claim Under Florida Law

Even if the Court were to find that Florida law applies (it does not), each of the individual counts asserted in the Complaint is defective for failure to state a claim against Werner, the Centennial Companies, or the 63X Companies. Dismissal is required.

### a.   Count I (Fraud) fails to state a claim against Werner

The elements of common law fraud in Florida are (1) a misrepresentation of a material fact, (2) knowledge of falsity by the person making the statement, (3) intent to induce the aggrieved party to rely and act on the false statement, and (4) reliance on the statement to the aggrieved party's detriment. Jackson v. Shakespeare Found., Inc., 108 So. 3d 587, 595 n.2 (Fla. 2013); Lance v. Wade, 457 So. 2d 1008, 1011 (Fla. 1984). The Complaint fails to allege any ultimate facts with sufficient particularity with respect to Werner as to meet these elements.

First, Plaintiffs have not identified *any* statement made by Werner—much less a *false* statement of material fact. The analysis should stop here.

Second, there are no specific allegations that Werner had knowledge of the falsity of any statements made by anyone else, or the intent to induce Plaintiffs to rely on the alleged false statements. At best, the Complaint states that a group of the Defendants, including Werner, allegedly "knew of the fraud from the early days," but stayed quiet (Complaint ¶¶ 57, 208, 220), and it generally avers that a group of Defendants, including Werner, "personally participated in the fraudulent scheme and composed and transmitted material fraudulent misrepresentations," "with actual knowledge that the representations were false" and "with the intention that investors would . . . rely on such representations to their consequent financial loss." Id. ¶¶ 449-50.

Such bare bones allegations that merely restate the elements of fraud are legally insufficient as they lack any particularity. Schopler v. Smilovits, 689 So. 2d 1189, 1189 (Fla. 4th DCA 1997) (affirming dismissal of common law fraud claim for failure to plead with the requisite specificity). This is especially true when it comes to fraud claims, which "must be pleaded with specificity." Id. See Fla. R. Civ. P. 1.120(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

permit."). As put by the Fourth District, a claimant cannot "simply plead[] 'I was defrauded' and then 'flesh[] out' the claim at trial by proof as to precisely what the fraud was." Schopler, 689 So. 2d at 1190. Instead, due process requires that a defendant know what he is accused of having misrepresented. Id. at 1189-90. Here, Werner has no understanding of what he is being accused of from the face of the Complaint. On that basis alone, the pleading is defective.[6]

Yet, the greatest flaw in the Complaint's fraud count is that Plaintiffs rely exclusively on a theory of "fraud-on-the-market" to meet the element of reliance, which has been expressly rejected under Florida common law. Kahler v. E.F. Hutton & Co., Inc., 558 So. 2d 144, 145 (Fla. 3d DCA 1990) (dismissing fraud claim premised on a fraud-on-the-market theory for failure to state a claim). In Kahler, the plaintiffs alleged that defendants "orally, and through their mass mailings, made false representations with the intent to induce [plaintiffs] to purchase stock" "as part of a scheme" "to drive up the price of the stock in order to unload the stock from the brokerage firms' own inventory." Id. The Third District affirmed a dismissal of the common law fraud count because the claim "mimic[ed] a fraud-on-the-market claim" that is exclusive to actions brought under § 10(b) of the Securities Exchange Act of 1934.[7]

Plaintiffs' allegations mirror the facts of Kahler. They allege that the supposed misrepresentations at issue (again, there are none alleged as to Werner, specifically) were directed to the United States via "an international press campaign barraging the international investing public with false promises" and thus somehow "targeted" Plaintiffs' investment agent in Florida,

---

[6] State v. Nunez, 881 So. 2d 658, 661 (Fla. 3d DCA 2004) (dismissing fraud count for lack of "needed particularity"); Hembd v. Dauria, 859 So. 2d 1238, 1239 (Fla. 4th DCA 2003) ("Where a litigant seeks to inject the issue of fraud into a lawsuit, Florida law requires that it be pled with precision, not just flung into the case willy-nilly."); Robertson v. PHF Life Ins. Co., 702 So. 2d 555, 556 (Fla. 1st DCA 1997) (affirming dismissal where "complaint fails to specifically identify misrepresentations or omissions of fact, the time, place or manner in which they were made, and how the representations were false or misleading").

[7] Id.; see also In re Checkers Securities Litig., 858 F. Supp. 1168, 1179 (M.D. Fla. 1994) ("common law claims cannot be based upon the fraud-on-the-market theory"); In re Sahlen & Assocs., Inc. Securities Litig., 773 F. Supp. 342. 371 (S.D. Fla. 1991) (same).

who in turn relied on the public statements (and Google and Bloomberg) in deciding to purchase OGX bonds. Complaint ¶¶ 34, 337-39, 343-44, 348, 359, 451-52. As in Kahler, there is no showing of reliance apart from the fraud-on-the-market theory, and thus the Complaint fails to state a claim for common law fraud against any Defendant, including Werner.

### b. Count IV (Florida RICO) fails to state a claim against Werner or the Companies

Count IV of the Complaint generically alleges that Werner and the Companies were members of a criminal enterprise engaged in a pattern of criminal activity, acting with criminal intent, consisting of securities fraud, wire fraud, money laundering, false advertising,[8] theft, and communications fraud. Complaint ¶¶ 459-73.

To state a claim under Florida RICO, Plaintiffs have to allege they were injured "by reason of" a violation of the provisions of section 772.103, Florida Statutes. See Fla. Stat. § 772.104(1). Courts have interpreted this element as requiring that the claimed damages be proximately caused by the specifically alleged underlying RICO violations. Bortell v. White Mountains Ins. Group, Ltd., 2 So. 3d 1041, 1047 (Fla. 4th DCA 2009) (affirming dismissal of Florida RICO claim for failure to show that the claimed damages were proximately caused by the RICO violations). Thus, when pleading a RICO claim, plaintiffs have to show a "direct relation between the injury asserted and the injurious conduct alleged." Id. at 1047 (citations omitted). In other words, Plaintiffs have to show that their alleged damages flow from their reliance on the particular predicate acts set forth in the Complaint. Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co., Inc., 881 So. 2d 565, 568, 573 (Fla. 3d DCA 2004) (affirming directed verdict on RICO claims because plaintiffs "failed to establish that their injuries were directly caused by the predicate acts [of mail and wire fraud]

---

[8] Except the Centennial Companies are not included in this alleged predicate act.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

proved below," there was no "evidence that they relied on any particular predicate act").

As explained *supra*, Plaintiffs' sole basis for reliance in the instant action is premised on a fraud-on-the-market theory. As with the common-law fraud claim, this is fatal to their RICO claim. Indeed, courts across the country[9] have dismissed RICO claims for failure to sufficiently plead a claim where they rely on a fraud-on-the-market theory to meet reliance and proximate cause.[10]

Here, the Complaint fails to state a claim for Florida RICO because it lacks any allegations showing a direct relation between the alleged predicate acts and any injury. The Complaint generally alleges that "[a]s a result of the . . . pattern of criminal activity, Defendants caused injury and damages to Plaintiffs." Complaint ¶ 475. Plaintiffs have not shown that Werner or the Companies individually made any misrepresentations of material fact, or that Plaintiffs actually relied on any alleged misrepresentation directed to them specifically. See Lawrie, 2013 WL 222258, *6 (dismissing complaint that was "barren of any specific allegations that as a result of any particular alleged fraudulent statement . . . *any* person (plaintiff or nonplaintiff) relied on that statement and paid a higher sales price as a result thereof"). Similarly, there are no allegations tying the alleged money laundering predicate act to any injuries suffered by Plaintiffs.

### c. Count VI (False and Misleading Advertising under Section 817.41, Fla. Stat.) fails to state a claim against Werner

In Count VI, Plaintiffs allege that Werner committed numerous acts of false and misleading

---

[9] "Because the Florida RICO Act is patterned after the federal act, Florida looks to federal authorities in construing its own RICO statute." Bortell, 2 So. 3d at 1047; O'Malley v. St. Thomas Univ., Inc., 599 So. 2d 999, 1000 (Fla. 3d DCA 1992).

[10] See Lawrie v. Ginn Dev. Co., LLC, No. 3:09-cv-446-J-32JBT, 2013 WL 222258, *1 (M. D. Fla. Jan. 9, 2013) (magistrate recommends dismissing federal RICO count "because it is premised on a fraud-on-the-market theory of reliance/causation/injury"); In re Schering-Plough Corp. Intron/Temodar Consumer Class Action, Master File No. 2:06-cv-5774, 2009 WL 2043604, *20 (D. N.J. July 10, 2009) (same, fraud-on-the-market theory "has been resoundingly rejected outside the context of federal securities fraud litigation"); Appletree Sq. I, Ltd. P'ship v. W.R. Grace & Co., 29 F.3d 1283, 1287 (8th Cir. 1994) (same, plaintiff "cannot employ the fraud-on-the-market theory to establish detrimental reliance"); CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d 1076, 1095 (10th Cir. 2014) (same); SE Laborers Health & Welfare Fund v. Bayer Corp., 444 Fed. Appx. 401, *4 (11th Cir. 2011) (same; outside of federal securities fraud litigation, causal nexus between the loss and the unlawful conduct cannot be presumed).

13

advertising contrary to Fla. Stat. § 817.41(1). Complaint ¶ 480.

For a claim to lie under section 817.41, Florida Statutes, "it is not enough to allege a misleading or untrue statement made to the general public." <u>Samuels v. King Motor Co. of Fort Lauderdale</u>, 782 So. 2d 489, 496 (Fla. 4th DCA 2001).  Plaintiffs "must also allege the misleading or untrue statement was made with 'the intent or purpose, either directly or indirectly, of selling or disposing of <u>real or personal property</u>, <u>services of any nature</u> whatever . . . or to induce the public to enter into any obligation relating to <u>such property or services</u>.'" <u>Id.</u> (quoting § 817.40(5)) (emphasis added); <u>Third Party Verification, Inc. v. Signaturelink, Inc.</u>, 492 F. Supp. 2d 1314, 1322 (M.D. Fla. 2007) (to state a claim for misleading advertising, one must plead "that the party relied on some identifiable alleged misleading advertising plus, where appropriate, all of the other elements of the common law tort of fraud in the inducement").

Once again, Plaintiffs have fallen short of the mark and have failed to state a claim for false and misleading advertising as to Werner. As a starting point, Plaintiffs have not alleged a single statement Werner uttered. Thus, the quintessential element for this claim is missing. Without an identifiable misrepresentation, there is no actionable conduct under the statute.  Second, as argued *supra*, the Complaint fails to allege the elements of fraud as to Werner. Accordingly, this count must be dismissed.   Third, section 817.41, Florida Statutes, expressly is limited to actionable advertising related to the "selling or disposing of real or personal property" or "services." The securities that Plaintiffs claim they were induced into purchasing do not fall within the scope of this statute—they are neither real or personal property, nor services.

### d. Count VIII (Civil Theft under 812.014, Fla. Stat.) fails to state a claim against Werner or the Companies

In Count VIII, Plaintiffs attempt to set forth a claim for statutory civil theft. Under section 812.014, Florida Statutes, a person commits theft if he knowingly obtains or uses the property of

14

another with the intent to deprive that person of a right to or benefit from the property, or if he appropriates the property to his own use or to the use of another person not entitled to such use.

"To establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent." Gasparini v. Pordomingo, 972 So. 2d 1053, 1056 (Fla. 3d DCA 2008) (reversing judgment for civil theft). Moreover, "[f]or money to be the object of conversion there must be an obligation to keep intact or deliver the specific money in question, so that money can be identified." Id. at 1056 (citation omitted). "It is well-established law in Florida that a simple debt which can be discharged by the payment of money cannot generally form the basis of a claim for conversion or civil theft." Id.; see also Walker v. Figarola, 59 So. 3d 188, 190 (Fla. 3d DCA 2011) (same, granting judgment on the pleadings).

In addition to the fact that there are no allegations as to the requisite element of criminal intent in the Complaint for Werner or the Companies, there also are no allegations that the funds Plaintiffs paid in exchange for the OGX bonds were supposed to be kept intact or in a separate account. In fact, quite the opposite is true. Once Plaintiffs received the bonds in exchange for their investment in OGX, Plaintiffs have not alleged, nor can they, that they had any control or claim to the specific money invested, and OGX thus was free to comingle it with its other accounts. This claim should be dismissed.

e. **Count XI (Florida Uniform Fraudulent Transfers Act) fails to state a claim against Werner or the Companies**

In yet another count, Plaintiffs allege that all 22 Defendants—including Werner and the Companies—made fraudulent transfers of assets, cash and property in violation of Fla. Stat. § 726.101, *et seq.* ("FUFTA"). Because Plaintiffs fail to specify which statutory fraudulent transfer theory they are traveling under—whether it was a transfer made with actual intent to defraud (Fla. Stat. § 726.105(1)(a)), or a transfer made without receiving reasonable value in exchange (Fla.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Stat. § 726.105(1)(b))—it is unclear what exactly these Defendants are defending against. That ambiguity alone renders the claim defective. See Oginsky v. Paragon Props. of Costa Rica, LLC, 784 F. Supp. 2d 1353, 1370 (S.D. Fla. 2011) ("vague assertions do not give Defendants 'fair notice of what the claim is and the grounds upon which it rests'") (citation omitted). In any event, Plaintiffs fail to plead the elements of either theory sufficiently, and dismissal is required.

As a threshold requirement, relief under FUFTA is premised on being able to identify a specific transfer to be avoided; general allegations of emptying bank accounts do not pave the way for recovery. See Feldkamp v. Long Bay Partners, LLC, 773 F. Supp. 2d 1273, 1286 (M.D. Fla. 2011) (dismissing FUFTA claim for failure to identify the transfers being sought to have set aside, and finding that allegations of general looting of a company are insufficient to bring a claim under FUFTA). In addition to having to identify a specific transfer, "[t]o plead a cause of action for violation of FUFTA, plaintiffs must allege: (1) they were creditors who were defrauded, (2) that defendant intended to commit the fraud, and (3) that the fraud involved a conveyance of property that could have been applicable to the payment of the debt due." Feldkamp, 773 F. Supp. 2d at 1286; Nationsbank, N.A. v. Coastal Utils. Inc., 814 So.2d 1227, 1229 (Fla. 4th DCA 2002) (reversing summary judgment of fraudulent transfer because of fact issues regarding intent).

The Complaint fails to meet the initial element of identifying any allegedly fraudulent transfer to be set aside. It does not identify a single transfer involving Werner, and includes only generalized speculations that money flowed through the 63X Companies.[11] Compl. ¶ 492. Plaintiffs thus have failed to show that Werner or the 63X Companies are either debtors or transferees falling under FUFTA.

---

[11]Plaintiffs claim they need more discovery to provide specificity of the ultimate facts to support their fraudulent transfer claim. Plaintiffs are not permitted to conduct discovery in aid of finding support for this or any of its claims. To rule otherwise would be to turn Rule 1.140(b) on its head. See Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Cap.Co., L.L.C., 00-06410-CIV, 2008 WL 2245726, at *2 (S.D. Fla. May 29, 2008) (fraudulent transfer).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

As for the Centennial Companies, the only specific transfer described in the Complaint does not make clear which of the Centennial Companies was involved, and in any event, it was not a fraudulent transfer based on the face of the allegations. Id. ¶ 362. First, there is no allegation based upon which one could conclude that one or both of the Centennial Companies could be considered debtors under FUFTA. See Oginsky, 784 F. Supp. 2d at 1370 (plaintiffs did not adequately identify debtors under FUFTA where they "fail[ed] to explain which [of the 16 defendants] are 'debtors' as defined by the statute, which [p]laintiffs are creditors of which debtor-entities, and which of the debtors made the transfers to which recipients.").

Even if they are considered debtors, the element of intent to defraud also is missing. None of the badges of fraud provided in Fla. Stat. § 726.105(2) have been pled. The only allegations are that one of the Centennial Companies—again, it is not clear which one—wired $111 million from an account in the Cayman Islands to an account in Panama controlled by Batista "for safekeeping." Complaint ¶ 362. That alone cannot satisfy the pleading burden for a FUFTA claim traveling under either the actual intent or constructive fraudulent transfer theories. See Oginsky, 784 F. Supp. 2d at 1371 (formulaic recitation of the elements will not do). The claim must be dismissed.

### f.   The Conspiracy Counts[12] fail to state a claim against Werner or the Companies

In addition to the five underlying tort claims, Plaintiffs also alleged conspiracy counts against Werner or the Companies. However, given that each of those underlying claims must be dismissed, *see supra*, it necessarily follows that these conspiracy counts also must be dismissed.[13]

---

[12] Counts II (Conspiracy to Defraud), V (Florida RICO Conspiracy), VII (Conspiracy to Commit False and Misleading Advertising), IX (Conspiracy to Commit Civil Theft) and XII (Conspiracy to Commit Fraudulent Transfers).

[13] Ferguson v. Estate of Campana, 47 So. 3d 838, 841 n.2 (Fla. 3d DCA 2010) (noting trial court had dismissed fraud count and conspiracy claim thus was also dismissed); Buckner v. Lower Fla. Keys Hosp. Dist., 403 So. 2d 1025, 1027 (Fla. 3d DCA 1981) (plaintiff must properly allege defamation for conspiracy to defame to lie,); Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997) ("actionable conspiracy requires an actionable underlying tort or wrong").

But even if any of the underlying claims survive, the Complaint still fails to sufficiently plead the elements of conspiracy: it does not (1) specifically identify an agreement entered into by two or more parties to do an unlawful act or a lawful act by unlawful means; (2) identify any overt act in furtherance of the conspiracy; or (3) allege any damage resulting from that overt act. Eagletech Comms., Inc. v. Bryn Mawr Inv. Group, Inc., 79 So. 3d 855, 863 (Fla. 4th DCA 2012). Instead, the Complaint generally states that conspiracies existed, without identifying a single overt act. Plaintiffs even admit that the "ways," "dates" and "places" of such alleged conspiracies "are unknown before discovery." Compl. ¶¶ 455, 488, 493. "A complaint must set forth clear, positive, and specific allegations of civil conspiracy," and bare allegations with no details are insufficient. Eagletech, 79 So. 3d at 863 (internal citations omitted). Absent allegations addressing how, specifically, Werner or the Companies conspired to commit any of these common-law or statutory torts, the conspiracy counts cannot withstand a motion to dismiss.

Furthermore, none of the conspiracy counts alleges sufficient facts from which a reasonable inference can be drawn that Werner actually participated in a conspiracy. Eagletech, 79 So. 3d at 863. The Complaint merely speculates that Werner participated in the alleged conspiracies because he supposedly received some benefits from the challenged actions; it provides no other concrete facts. "But, to assume or speculate that the [Defendants, including Werner] participated in a conspiracy merely because they ultimately received some benefits from the investments is insufficient for the imposition of liability against them." Id. (citing Raimi, 702 So.2d at 1284). By not providing facts specific to Werner, the Complaint speculates that he entered into several unlawful agreements to conspire and that he committed any overt acts in furtherance of those agreements. Thus, dismissal of the conspiracy counts is warranted on the face of the Complaint.

As for the Companies, "[s]ince a corporation must act through its officers, directors, or

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

employees, it is well settled that a corporation cannot conspire with those persons unless the individual has a personal stake in the activity apart from that of the corporation." <u>Buckner v. Lower Florida Keys Hosp. Dist.</u>, 403 So. 2d 1025, 1029 (Fla. 3d DCA 1981). Because Plaintiffs did not allege that Eike Batista had a personal stake separate from any benefit that would inure to the Companies, the conspiracy claims against them also fail. In fact, the Complaint emphasizes just the opposite, claiming that the Companies have "no legitimate corporate business or independent existence separate from Batista." Compl. ¶ 90.

### g. The Aiding and Abetting Counts[14] fail to state a claim against Werner or the Companies

Plaintiffs include two aiding and abetting counts in the Complaint.  Both fail.

To state a claim for aiding and abetting fraud, the plaintiff must plead (1) an actual underlying fraud, (2) knowledge of the fraud, and (3) substantial assistance in advancing the commission of the fraud. <u>ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co.</u>, 917 So. 2d 368, 372 (Fla. 5th DCA 2005).  Here, there is no valid underlying claim for fraud because it is premised on the rejected fraud-on-the-market theory. <u>See</u> <u>supra</u>. Therefore, the aiding and abetting count must fail.

But, even if there were a valid fraud claim, the Complaint lacks any allegation specifying Werner's or the Companies' "substantial assistance" in advancing the alleged fraudulent scheme. Instead, it is replete with generalities and fails to identify any actionable conduct. Thus, Count III for aiding and abetting fraud must be dismissed.

Turning to the final count left to be addressed, as noted in co-defendant Marcus Berto's Motion to Dismiss, no Florida legal authority recognizes a claim for aiding and abetting civil theft. <u>See</u> Berto Motion to Dismiss at 18. Moreover, the civil theft claims all fail for the same reason

---

[14] Counts III (Aiding and Abetting Fraud) and X (Aiding and Abetting Civil Theft under Section 812.014, Fla. Stat.).

they fail for the Movants: they are all premised on a mere nonpayment of money. See supra.

### III.     The Court Lacks Personal Jurisdiction over the Companies

Plaintiffs claim that the Centennial Companies and 63X Companies are subject to this Court's general jurisdiction pursuant to section 48.193(2), Fla. Stat., for allegedly having engaged in substantial and not isolated activity within this State as a result of the imputed actions of agents and co-conspirators. Complaint ¶ 29. Plaintiffs claim that the Companies are subject to this Court's specific jurisdiction pursuant to sections 48.193(1)(a)(1) and 48.193(1)(a)(2), Fla. Stat., also as a result of the imputed actions of agents and co-conspirators, which are the bases for this action. Id. ¶¶ 30-32. Despite their superficial allegation that that all Defendants have sufficient minimum contacts with this State (id. ¶ 33), that is not true for the Companies. They cannot be considered "at home" in Florida for purposes of general jurisdiction, they do not fall under Florida's long-arm statute, and they do not have sufficient contact with Florida to satisfy due process requirements.

The Companies raise and preserve this argument, but in the interest of judicial economy, respectfully request an enlargement of time to more fully brief this ground for dismissal and file affidavits in support. The Companies respectfully submit that the Court can enter a dismissal on the bases of the various legal arguments set forth above, as well as the additional legal motions being filed simultaneously herewith, including the Motion to Dismiss On *Forum Non Conveniens* Grounds and the Motion to Dismiss Plaintiffs' Claims Based on Comity, without having to enter into the fact-driven analysis of personal jurisdiction.

### CONCLUSION

Defendants Werner Batista, the Centennial Companies, and the 63X Companies respectfully request that this Court grant this motion; dismiss the Complaint as against them entirely; and grant such other and further relief as is just and proper under the circumstances.

Dated: April 5, 2017

Respectfully submitted,

ASTIGARRAGA DAVIS
MULLINS & GROSSMAN, P.A.
1001 Brickell Bay Drive, 9th Floor
Miami, FL 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Designated E-Mails for Service:
Primary:
        abarton@astidavis.com
Secondary: bhernandez@astidavis.com

By: */s/ Edward M. Mullins*
    Edward M. Mullins
    Florida Bar No. 863920
    Ana M. Barton
    Florida Bar No.:  85721
    *Counsel for Defendants Werner Batista,*
    *Centennial Asset Mining Fund,*
    *Centennial Asset Brazilian Equity Fund,*
    *63X Master Fund, 63X Investment Ltd.,*
    *and 63X Fund*

    Michael Carlinsky*
    Bar No. 2319440
    michaelcarlinsky@quinnemanuel.com
    Elinor Sutton*
    Bar No. 4615175
    elinorsutton@quinnemanuel.com
    Victor Noskov*
    Bar No. 5087689
    victornoskov@quinnemanuel.com
    **QUINN EMANUEL URQUHART**
    **& SULLIVAN, LLP**
    51 Madison Avenue, 22nd Floor
    New York, NY  10010
    Telephone: (212) 849-7000
    Facsimile: (212) 849-7100
    *Admitted *Pro hac vice*

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Complex Business Litigation Rule 4.3, counsel for Movants hereby certifies that the undersigned has conferred with counsel for Plaintiffs, Hendrik G. Milne, by email on April 5, 2017, and counsel for Plaintiffs advised that his clients oppose the relief requested herein.

*/s/ Edward M. Mullins*
Edward M. Mullins

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2017, a true and correct copy of the foregoing was filed and sent via electronic service using the portal system with the Florida Courts eFiling Portal, which sent e-mail notification of such filing to all counsel of record in accordance with Fla. R. Jud. Admin 2.516.

*/s/ Edward M. Mullins*
Edward M. Mullins

# EXHIBIT A

**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.**
as Issuer

**OGX PETRÓLEO E GÁS LTDA.**
and
**OGX CAMPOS PETRÓLEO E GÁS S.A.**
as Guarantors

**DEUTSCHE BANK TRUST COMPANY AMERICAS**
as Trustee, Registrar, Transfer Agent
and Paying Agent

and

**THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.**
as Principal Paying Agent

———————————

**INDENTURE**

**Dated as of June 3, 2011**

———————————

**U.S.$2,563,000,000**
**8.500% SENIOR NOTES DUE 2018**

## TABLE OF CONTENTS

Page

Article 1 Definitions and Incorporation by Reference ................................................... 1

SECTION 1.01    Definitions .............................................................................................. 1
SECTION 1.02    Incorporation by Reference of Trust Indenture Act ............................ 25
SECTION 1.03    Rules of Construction ........................................................................... 26

Article 2 The Securities ................................................................................................ 27

SECTION 2.01    Form and Dating .................................................................................. 27
SECTION 2.02    Execution and Authentication .............................................................. 27
SECTION 2.03    Registrar and Paying Agent ................................................................ 28
SECTION 2.04    Paying Agent To Hold Money in Trust ................................................ 28
SECTION 2.05    Securityholder Lists ............................................................................. 29
SECTION 2.06    Transfer and Exchange ........................................................................ 29
SECTION 2.07    Replacement Securities ....................................................................... 30
SECTION 2.08    Outstanding Securities ........................................................................ 30
SECTION 2.09    Temporary Securities .......................................................................... 31
SECTION 2.10    Cancellation ......................................................................................... 31
SECTION 2.11    CUSIP Numbers and ISINs ................................................................. 31
SECTION 2.12    Issuance of Additional Securities ....................................................... 31
SECTION 2.13    Open Market Purchases ...................................................................... 32

Article 3 Optional Redemption of Securities ............................................................... 32

SECTION 3.01    Optional Redemption ........................................................................... 32
SECTION 3.02    Notice of Redemption .......................................................................... 32
SECTION 3.03    Selection of Securities to Be Redeemed in Part .................................. 33
SECTION 3.04    Securities Payable on Redemption Date .............................................. 34
SECTION 3.05    Unredeemed Portions of Partially Redeemed Security ....................... 34
SECTION 3.06    Third Party Notice ............................................................................... 34

Article 4 Covenants ...................................................................................................... 34

SECTION 4.01    Performance of Obligations under the Securities ................................ 34
SECTION 4.02    Reports ................................................................................................. 35
SECTION 4.03    Limitation on Debt and Disqualified Stock ........................................ 36
SECTION 4.04    Limitation on Restricted Payments ..................................................... 40
SECTION 4.05    [Reserved] ............................................................................................ 44
SECTION 4.06    Limitation on Sales of Assets .............................................................. 44

SECTION 4.07    Limitation on Transactions with Affiliates ........................................47

SECTION 4.08    Repurchases at the Option of the Holders Upon Change of Control
Offer ...........................................................................................................49

SECTION 4.09    Limitation on Liens...................................................................................51

SECTION 4.10    Limitation on Sale and Leaseback Transactions.......................................51

SECTION 4.11    Maintenance of Corporate Existence .........................................................51

SECTION 4.12    Maintenance of Properties ........................................................................51

SECTION 4.13    Limitation on Guarantees of Debt by Restricted Subsidiaries......................52

SECTION 4.14    [Reserved]...............................................................................................52

SECTION 4.15    [Reserved]...............................................................................................52

SECTION 4.16    [Reserved]...............................................................................................52

SECTION 4.17    [Reserved]...............................................................................................52

SECTION 4.18    Maintenance of Office or Agency in the State of New York ......................53

SECTION 4.19    [Reserved]...............................................................................................53

SECTION 4.20    [Reserved]...............................................................................................53

SECTION 4.21    Additional Amounts..................................................................................53

SECTION 4.22    Payments and Paying Agent ....................................................................55

SECTION 4.23    [Reserved]...............................................................................................56

SECTION 4.24    Limitation on Designation of Unrestricted Subsidiaries...........................56

SECTION 4.25    Ranking ....................................................................................................56

Article 5 Consolidation, Merger, or Sale of Substantially All Assets                        57

SECTION 5.01    Consolidation, Merger, or Sale of Substantially All Assets ........................57

Article 6 Defaults and Remedies                                                             58

SECTION 6.01    Events of Default........................................................................................58

SECTION 6.02    Acceleration ...............................................................................................60

SECTION 6.03    Other Remedies..........................................................................................60

SECTION 6.04    Rescission/Annulment of Acceleration; Waiver of Past Defaults ...............60

SECTION 6.05    Control by Majority ....................................................................................61

SECTION 6.06    Limitation on Suits....................................................................................61

SECTION 6.07    Rights of Holders to Receive Payment .....................................................62

SECTION 6.08    Collection Suit by Trustee.........................................................................62

SECTION 6.09    Trustee May File Proofs of Claim ..............................................................62

SECTION 6.10    Priorities....................................................................................................62

SECTION 6.11    Undertaking for Costs ...............................................................................63

SECTION 6.12    Waiver of Stay or Extension Laws ...........................................................63

Article 7 Trustee                                                                                    63

SECTION 7.01    Duties of Trustee..........................................................................63
SECTION 7.02    Rights of Trustee..........................................................................64
SECTION 7.03    Individual Rights of Trustee. ........................................................65
SECTION 7.04    Trustee's Disclaimer. ...................................................................65
SECTION 7.05    Notice of Defaults.........................................................................66
SECTION 7.06    Compensation and Indemnity. ......................................................66
SECTION 7.07    Replacement of Trustee. ...............................................................67
SECTION 7.08    Successor Trustee by Merger.........................................................68
SECTION 7.09    Eligibility; Disqualification. .........................................................68
SECTION 7.10    Preferential Collection of Claims Against Issuer.............................68
SECTION 7.11    Appointment of Co-Trustee. .........................................................69

Article 8 Discharge of Indenture; Defeasance                                                         70

SECTION 8.01    Satisfaction and Discharge of Liability on Securities......................70
SECTION 8.02    [Reserved]. ..................................................................................71
SECTION 8.03    [Reserved]. ..................................................................................71
SECTION 8.04    Application of Trust Money ...........................................................71
SECTION 8.05    Repayment to Company.................................................................71
SECTION 8.06    Defeasance ..................................................................................71
SECTION 8.07    Reinstatement...............................................................................72

Article 9 Amendments                                                                                 72

SECTION 9.01    Without Consent of Holders ..........................................................72
SECTION 9.02    With Consent of Holders ...............................................................73
SECTION 9.03    Revocation and Effect of Consents and Waivers.............................74
SECTION 9.04    Notation on or Exchange of Securities ...........................................75
SECTION 9.05    Trustee to Sign Amendments.........................................................75

Article 10 Substitution of the Issuer                                                                75

SECTION 10.01   Substitution of the Issuer ..............................................................75
SECTION 10.02   Deemed Substitution......................................................................76
SECTION 10.03   Notice of Substitution ...................................................................77

Article 11 Guarantee by the Guarantors                                                               77

SECTION 11.01   Guarantee .....................................................................................77
SECTION 11.02   Guarantee Unconditional ..............................................................77

SECTION 11.03   Termination, Release and Discharge; Reinstatement ..................................78
SECTION 11.04   Waiver by the Guarantors .............................................................................79
SECTION 11.05   Subrogation and Contribution .......................................................................79
SECTION 11.06   Stay of Acceleration......................................................................................79
SECTION 11.07   Execution and Delivery of Guarantee ...........................................................79
SECTION 11.08   Purpose of Guarantee ...................................................................................79
SECTION 11.09   Central Bank Regulations .............................................................................79

Article 12 Release of Covenants                                                                        80

SECTION 12.01   Release of Covenants....................................................................................80

Article 13 Miscellaneous                                                                                81

SECTION 13.01   Notices .........................................................................................................81
SECTION 13.02   Communication by Holders with Other Holders ...........................................83
SECTION 13.03   Certificate and Opinion as to Conditions Precedent .....................................83
SECTION 13.04   Statements Required in Certificate or Opinion .............................................83
SECTION 13.05   When Securities Disregarded ........................................................................83
SECTION 13.06   Rules by Trustee, Paying Agent and Registrar ..............................................84
SECTION 13.07   Business Days ...............................................................................................84
SECTION 13.08   Governing Law..............................................................................................84
SECTION 13.09   No Recourse Against Others..........................................................................84
SECTION 13.10   Successors .....................................................................................................84
SECTION 13.11   Multiple Originals .........................................................................................84
SECTION 13.12   Table of Contents; Headings..........................................................................85
SECTION 13.13   Consent to Jurisdiction; Appointment of Agent to Accept Service of
                Process; Currency Indemnity ........................................................................85
SECTION 13.14   Waiver of Jury Trial......................................................................................86
SECTION 13.15   Patriot Act ....................................................................................................87
SECTION 13.16   Force Majeure ...............................................................................................87

Rule 144A/Regulation S Appendix I

Exhibit 1 to Rule 144A/Regulation S Appendix
Form of Initial Security

Exhibit 2 to Rule 144A/Regulation S Appendix
Form of Regulation S Transfer Certificate

Exhibit 3 to Rule 144A/Regulation S Appendix
Form of Rule 144A Transfer Certificate

OGX Netherlands Substitution Appendix II

INDENTURE dated as of June 3, 2011 among OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A., a corporation (*sociedade anônima*) organized under the laws of the Federative Republic of Brazil, as issuer (the "Company"), OGX CAMPOS PETRÓLEO E GÁS S.A, a corporation (*sociedade anônima*) organized under the laws of the Federative Republic of Brazil, as a guarantor ("OGX Campos"), OGX PETRÓLEO E GÁS LTDA., a limited liability company (*sociedade limitada*) organized under the laws of the Federative Republic of Brazil, as a guarantor ("OGX Ltda", and, together with OGX Campos., the "Guarantors"), DEUTSCHE BANK TRUST COMPANY AMERICAS, a New York banking corporation, as trustee (in such capacity, the "Trustee"), registrar, paying agent and transfer agent, and THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., as principal paying agent (the "Principal Paying Agent").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as defined below) of the Company's U.S.$2,563,000,000 aggregate principal amount of 8.500% Senior Notes due 2018 (the "Initial Securities"), and any Additional Securities (as defined below):

Article 1

Definitions and Incorporation by Reference

SECTION 1.01    Definitions.

"Acquired Debt" means Debt of a Person existing at the time the Person merges with or into or becomes a Restricted Subsidiary and not Incurred in connection with, or in contemplation of, the Person merging with or into or becoming a Restricted Subsidiary.

"Additional Amounts" has the meaning set forth under Section 4.21.

"Additional Assets" means (i) any property or assets (including Capital Stock or its substantial equivalent or other Investments) that are used or usable by the Company, any of its Restricted Subsidiaries or any joint venture in which the Company or any of its Restricted Subsidiaries is a party in a Permitted Business (or in the case of Capital Stock or its substantial equivalent or other Investments that represent direct, or indirect (via a holding company), ownership or other interests held by the Company or any Restricted Subsidiary in entities engaged in a Permitted Business); and (ii) contracts (including supply, customer and EPC contracts) that are used or usable by the Company, any of its Restricted Subsidiaries or any joint venture in which the Company or any of its Restricted Subsidiaries is a party in a Permitted Business.

"Additional Securities" means 8.500% Senior Notes due 2018, having identical terms and conditions as the Securities (other than the date on which the initial interest accrues from), issued from time to time after the Issue Date under the terms of this Indenture (other than pursuant to Section 2.06, 2.07, or 2.09 of this Indenture).

"Affiliate" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any subsidiary of such specified Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means the Registrar, the Transfer Agent, a Paying Agent, any exchange agent and any listing agent.

"Asset Sale" means any sale, lease, transfer or other disposition (whether in a single transaction or a series of related transactions) of any assets by the Company or any Restricted Subsidiary, including by means of a merger, consolidation or similar transaction or a Sale and Leaseback Transaction and including any sale or issuance of the Equity Interests of any Restricted Subsidiary (each of the above referred to as a "disposition"), *provided* that the following are not included in the definition of "Asset Sale":

(1)    a disposition to the Company or a Restricted Subsidiary, including the sale or issuance by the Company or any Restricted Subsidiary of any Equity Interests of any Restricted Subsidiary to the Company or any Restricted Subsidiary;

(2)    the sale, lease, transfer or other disposition by the Company or any Restricted Subsidiary in the ordinary course of business of (i) cash, Cash Equivalents and Marketable Securities, (ii) inventory, (iii) damaged, worn out or obsolete equipment or other assets, or (iv) rights granted to others pursuant to leases or licenses;

(3)    the lease of assets by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(4)    any sale, lease, transfer, transfer or other disposition of any property or concession to any governmental authority;

(5)    the sale or discount of accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

(6)    a transaction covered by Section 5.01;

(7)    a Restricted Payment permitted under Section 4.04;

(8)    a Sale and Leaseback Transaction otherwise permitted under Section 4.10;

(9)    any issuance of Disqualified Stock otherwise permitted under Section 4.03;

2

(10)     the creation of a Lien not prohibited by this Indenture (but not the sale or disposition of the property subject to such Lien);

(11)     the licensing or sublicensing of intellectual property or other general intangibles, including, without limitation, licenses for seismic data, in the ordinary course of business and which do not materially interfere with the business of the Company and its Restricted Subsidiaries;

(12)     the sale or other disposition of Cash Equivalents;

(13)     the sale or discount of receivables arising in the ordinary course of business in connection with the compromise or collection thereof;

(14)     any surrender or waiver of contract rights pursuant to a settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(15)     a disposition of hydrocarbons or mineral products inventory in the ordinary course of business;

(16)     the farm-out, lease or sublease of developed or undeveloped oil and natural gas properties or license or concession to explore or produce oil and natural gas owned or held by the Company or any Restricted Subsidiary in exchange for either (i) oil and natural gas properties or license or concession to explore or produce oil and natural gas owned or held by another Person or (ii) the assumption by the other Person of any expenditures to explore or produce oil and natural gas in the oil and natural gas properties or license or concession;

(17)     any Production Payments and Reserve Sales; *provided* that any such Production Payments and Reserve Sales, other than incentive compensation programs on terms that are reasonably customary in the Permitted Business for geologists, geophysicists and other providers of technical services to the Company or a Restricted Subsidiary, shall have been created, Incurred, issued, assumed or guaranteed in connection with the financing of, and within 60 days after the acquisition of, the property that is subject thereto; and

(18)     any disposition of an asset or a series of related dispositions of assets with an aggregate Fair Market Value not to exceed the greater of (i) U.S.$100,000,000 and (ii) 1.25% of Consolidated Total Assets.

"Asset Sale Offer" has the meaning set forth under Section 4.06(a)(5).

"Attributable Debt" means, in respect of a Sale and Leaseback Transaction the present value, discounted at the interest rate implicit in the Sale and Leaseback Transaction, of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction.

3

"<u>Average Life</u>" means, with respect to any Debt, the quotient obtained by dividing (i) the sum of the products of (x) the number of years from the date of determination to the dates of each successive scheduled principal payment of such Debt and (y) the amount of such principal payment by (ii) the sum of all such principal payments.

"<u>Board of Directors</u>" means, with respect to any Person, the board of directors or similar governing body of such Person or any duly authorized committee thereof.

"<u>Brazil</u>" means The Federative Republic of Brazil.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in the City of New York and/or São Paulo.

"<u>Capital Lease Obligation</u>" means, with respect to any Person, any obligation which is required to be classified and accounted for as a capital lease on the face of a balance sheet of such person prepared in accordance with GAAP; the amount of such obligation will be the capitalized amount thereof, determined in accordance with GAAP; and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"<u>Capital Stock</u>" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any Preferred Stock, but excluding any debt securities convertible into or exchangeable for such equity.

"<u>Cash Equivalents</u>" means:

(1)    Brazilian *reais*, Colombian pesos, U.S. dollars, or money in other currencies received in the ordinary course of business that are readily convertible into U.S. dollars;

(2)    any evidence of Debt with a maturity of one year or less issued or directly and fully guaranteed or insured by Brazil, Colombia or the United States or any agency or instrumentality thereof, *provided* that the full faith and credit of Brazil, Colombia or the United States is pledged in support thereof;

(3)    (i) demand deposits, (ii) time deposits and certificates of deposit with maturities of one year or less from the date of acquisition, (iii) bankers' acceptances with maturities not exceeding one year from the date of acquisition, and (iv) overnight bank deposits, in each case with any bank or trust company organized or licensed under the laws of Brazil, Colombia or any political subdivision thereof or the United States or any state thereof having capital, surplus and undivided profits in excess of U.S.$500,000,000 whose long-term debt is rated "A-2" or higher by S&P or "P-2" or higher by Moody's (or the equivalent local rating);

4

(4)     repurchase obligations with a term of not more than seven days for underlying securities of the type described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)     commercial paper rated at least P-1 by Moody's or A-1 by S&P (or the equivalent local rating) and maturing no later than one year after the date of acquisition; and

(6)     money market funds at least 95% of the assets of which consist of investments of the type described in clauses (1) through (5) above.

"Change of Control" means:

(1)     the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)) other than to one or more of the Permitted Holders;

(2)     (i) if a Person (other than a Permitted Holder) beneficially owns, directly or indirectly, more than 35% of the outstanding Voting Stock of the Company, measured by voting power rather than number of shares and (ii) a Permitted Holder beneficially owns, directly or indirectly, outstanding Voting Stock of the Company less than such Person; or

(3)     the adoption of a plan or proposal for the liquidation or dissolution of the Company.

"Change of Control Offer" means an offer made by the Company or a third party so designated, following the occurrence of a Change of Control that results in a Rating Decline, to each Holder to repurchase all or any part of such Holder's Securities pursuant to Section 4.08.

"Change of Control Payment" means, in connection with the repurchase of a Holder's Securities pursuant to a Change of Control Offer, the payment by the Company or a third party so designated of 101% of the aggregate principal amount of such Holder's Securities repurchased plus accrued interest and Additional Amounts, if any, on such Securities, to the date of purchase (subject to the right of the Holders of record on the relevant record date to receive interest and Additional Amounts, if any, on the relevant interest payment date).

"Change of Control Payment Date" means the purchase date for the Securities properly tendered in a Change of Control Offer as specified in the notice given by the Company or a third party so designated pursuant to Section 4.08, which date is not more than five Business Days after the Expiration Date.

"Colombia" means the Republic of Colombia.

5

"Company" means OGX Petróleo e Gás Participações S.A., named as such in this Indenture, excluding its Subsidiaries, until a successor replaces it and, thereafter, means the successor.

"Consolidated Net Income" means, for any period, the aggregate net income (or loss) of the Company and its Restricted Subsidiaries for such period determined on a consolidated basis in conformity with GAAP.

"Consolidated Net Total Assets" means Consolidated Total Assets less cash and Cash Equivalents.

"Consolidated Total Assets" means the total amount of assets of the Company and its Restricted Subsidiaries on a consolidated basis calculated (i) based on the most recent balance sheet for which internal financial statements are available, (ii) in accordance with GAAP, (iii) on a pro forma basis to give effect to any acquisition or disposition of companies, divisions, lines of businesses or operations by the Company and its Restricted Subsidiaries subsequent to such date and on or prior to the date of determination and (iv) on a pro forma basis to give effect to any debt or equity issuances by the Company.

"Corporate Trust Office" means the principal office of the Trustee in New York City, New York, which on the Issue Date is 60 Wall Street, Mailstop NYC60-2710, New York, NY 10005, attention: Trust & Securities Services, Corporates Team Deal Manager - OGX, or such other office at such address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (at such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"Credit Facilities" means, one or more debt facilities or commercial paper facilities, in each case with banks, investment banks, insurance companies, mutual funds and/or other institutional lenders providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from (or sell receivables to) such lenders against such receivables) or letters of credit, in each case, as amended, extended, restated, renewed, refunded, replaced (whether contemporaneously or otherwise) or refinanced (in each case with Credit Facilities), supplemented or otherwise modified (in whole or in part and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time.

"CVM" means the Brazilian Securities Commission, or *Comissão de Valores Mobiliários*.

"Debt" means, with respect to any Person, without duplication:

(1)      the principal of and premium, if any, in respect of (a) indebtedness of such Person for money borrowed and (b) indebtedness evidenced by notes, debentures, notes or other similar instruments for the payment of which such person is responsible or liable;

6

(2)      all Capital Lease Obligations of such person;

(3)      all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable or other short-term obligations to suppliers payable within 180 days, in each case arising in the ordinary course of business);

(4)      all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(5)      all obligations of the type referred to in clauses (1) through (4) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any guarantee (other than obligations of other persons that are customers or suppliers of such person for which such person is or becomes so responsible or liable in the ordinary course of business to (but only to) the extent that such person does not, or is not required to, make payment in respect thereof);

(6)      all obligations of the type referred to in clauses (1) through (4) of other persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured;

(7)      all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock of such Person or, with respect to any Preferred Stock of any Subsidiary of such Person that is not held by such Person or a Restricted Subsidiary of such Person, the greater of the maximum liquidation value of such Preferred Stock or the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock (but excluding, in each case, any accrued dividends); and

(8)      any other obligations of such Person which are required to be, or are in such Person's financial statements, recorded or treated as debt under GAAP;

*provided* that (other than Disqualified Stock) the foregoing debt shall be included in this

definition of Debt only if, and to the extent that, the debt would appear as a liability on a balance sheet of such Person or in the notes to the financial statements in accordance with GAAP.

Notwithstanding the foregoing, the term "Debt" shall not include:

(1)     any leases or rentals of equipment related to exploration, production and commercialization activities, including without limitation, leases or rentals of or related to drilling rigs, supply boats, crude oil and LNG carriers, FPSOs (floating production storage and offloading), WHPs (wellhead platforms), TLWPs (tension leg wellhead platforms) and any other equipments or other assets, provided that such leases or rentals do not include a purchase option;

(2)     in connection with the purchase by the Company or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing;

(3)     Production Payments and Reserve Sales;

(4)     any obligations to customers, suppliers or service providers in the ordinary course of business with a maturity less than 90 days;

(5)     any obligation of a Person in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property;

(6)     any obligations under Hedging Agreements; *provided*, that such agreements are entered into for bona fide hedging purposes of the Company or its Restricted Subsidiaries (as determined in good faith by the Board of Directors or senior management of the Company, whether or not accounted for as a hedge in accordance with GAAP) and, in the case of currency hedging agreements or commodity hedging agreements, such agreements are related to business transactions of the Company or its Restricted Subsidiaries entered into in the ordinary course of business and, in the case of interest rate hedging agreements, such agreements substantially correspond in terms of notional amount, duration and interest rates, as applicable, to the Debt of the Company or its Restricted Subsidiaries Incurred without violation of this Indenture;

(7)     any obligation arising from agreements of the Company or a Restricted

8

Subsidiary providing for indemnification, guarantees or letters of credit, surety bonds or performance bonds, adjustment of purchase price, holdbacks, contingency payment obligations or similar obligations (other than guarantees of Debt), in each case, Incurred or assumed in connection with the acquisition or disposition of any business, assets or Capital Stock of a Restricted Subsidiary, provided that such Debt is not reflected on the face of the balance sheet of the Company or any Restricted Subsidiary;

(8)     any obligation arising from the honoring by a bank or other financial institution of a check, draft or similar instrument (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, provided, however, that such Debt is extinguished within five business days of Incurrence;

(9)     in-kind obligations relating to net oil or natural gas balancing positions arising in the ordinary course of business; and

(10)     all contracts and other obligations, agreements, instruments or arrangements described in clauses (18), (19), (20), and (21) of the definition of "Permitted Liens".

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Depositary" means, with respect to the Securities issuable or issued in whole or in part in the form of one or more Global Securities, the Person designated in Section 2.03 hereof as Depositary by the Company pursuant to this Indenture, until a successor shall have been appointed and become such and, thereafter, "Depositary" shall mean or include such Person.

"Designation" has the meanings set forth under Section 4.24.

"Disqualified Equity Interests" means Equity Interests that by their terms or upon the happening of any event are:

(1)     required to be redeemed or redeemable at the option of the holder prior to the Stated Maturity of the Securities for consideration other than Qualified Equity Interests, or

(2)     convertible at the option of the holder into Disqualified Equity Interests or exchangeable for Debt;

provided, that Equity Interests will not constitute Disqualified Equity Interests solely because of provisions giving holders thereof the right to require repurchase or redemption upon an "asset sale" or "change of control that results in a ratings decline" occurring prior to the Stated Maturity of the Securities if those provisions:

(A)     are no more favorable to the Holders than Section 4.06 and Section 4.08 hereof, and

9

(B)      specifically state that repurchase or redemption pursuant thereto will not be required prior to the Company's repurchase of the Securities as required by this Indenture.

"<u>Disqualified Stock</u>" means Capital Stock constituting Disqualified Equity Interests.

"<u>DTC</u>" means the Depository Trust Company.

"<u>EBITDA</u>" means, for any period:

(1)      consolidated net revenue; *minus*

(2)      consolidated costs; *minus*

(3)      consolidated administrative and selling expenses; *plus*

(4)      consolidated other operating income, net and non-operating income, net; *provided* that this clause (4) shall exclude interest income, net; *plus*

(5)      any depreciation, depletion or amortization;

as each such item is reported on the most recent consolidated financial statements delivered by the Company to the Trustee and prepared in accordance with GAAP.

"<u>EBITDA Triggering Event</u>" means when the Company has reported on a consolidated basis at least U.S.$100,000,000 of EBITDA during any fiscal quarter or consecutive fiscal quarters (but not to exceed any four consecutive quarters) for which financial statements are available.

"<u>Equity Interests</u>" means all Capital Stock and all warrants or options with respect to, or other rights to purchase, Capital Stock, but excluding Debt convertible into equity.

"<u>Event of Default</u>" has the meaning set forth under <u>Section 6.01</u>.

"<u>Excess Proceeds</u>" has the meaning set forth under <u>Section 4.06(a)(5)</u>.

"<u>Exchange Act</u>" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"<u>Expiration Date</u>" has the meaning set forth under <u>Section 4.08(2)(B)</u>.

"<u>Fair Market Value</u>" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Company and, unless specified in the relevant provision of this Indenture, if the Fair Market Value exceeds U.S.$10,000,000, by an officer of the Company, whose determination will be conclusive if evidenced by an Officer's Certificate delivered to the Trustee.

10

"Farm-In Agreement" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property.

"Farm-Out Agreement" means a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"Fitch" means Fitch Ratings Inc. and its successors.

"GAAP" means (i) International Financial Reporting Standards, (ii) accounting practices generally accepted in the United States or (iii) accounting practices prescribed by Brazilian Corporation Law, the rules and regulations issued by the CVM and the accounting standards issued by the Brazilian Institute of Independent Accountants (*Instituto dos Auditores Independentes do Brasil*), in each case as in effect from time to time or on the Issue Date, in the Company's discretion.

"guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (b) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part; *provided*, *however*, that the term "guarantee" does not include endorsements for collection or deposit in the ordinary course of business.  The term "guarantee" used as a verb has a corresponding meaning.

"Guarantors" means:

(1)    OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A.; and

(2)    any other Restricted Subsidiary of the Company that becomes a Guarantor in accordance with the provisions of this Indenture,

and their respective successors and assigns, in each case, until the guarantee of such Person has been released in accordance with the provisions of this Indenture.

"Hedging Agreements" means (i) (a) any interest rate swap agreement, interest rate cap agreement or other agreement designed to protect against fluctuations in interest rates or (b) any foreign exchange forward contract, currency swap agreement or other agreement designed to protect against fluctuations in foreign exchange rates or (ii) any commodity or raw material futures contract or any other agreement designed to protect against fluctuations in raw material prices.

"Hedging Obligations" means the obligations of any Person pursuant to Hedging Agreements.

"Holder" or "Securityholder" means the Person in whose name a Security is registered on the Registrar's books.

"Incur" means, with respect to any Debt or Capital Stock, to Incur, create, issue, assume or guarantee such Debt or Capital Stock.  The term "Incurrence" when used as a noun shall have a correlative meaning.  The accretion of original issue discount or payment of interest in kind will not be considered an Incurrence of Debt.

"Indenture" means this Indenture, as it may be amended or supplemented from time to time in accordance with the applicable terms hereof.

"Initial Securities" has the meaning set forth in the preamble to this Indenture.

"Interest Payment Date" means each June 1 and December 1 of each year, commencing on December 1, 2011.

"Investment" means:

(1)     any direct or indirect advance, loan (including guarantees) or other extension of credit to another Person, but excluding (i) any advance, loan or extension of credit to customers in the ordinary course of business and (ii) any advance, loan or extension of credit having a term not exceeding 180 days arising in connection with the sale of inventory, equipment or supplies by that Person in the ordinary course of business,

(2)     any capital contribution to another Person, by means of any transfer of cash or other property or in any other form,

(3)     any purchase or acquisition of Equity Interests, bonds, notes or other Debt, or other instruments or securities issued by another Person, any acquisitions of assets or substantially all the assets of a Person, including the receipt of any of the above as consideration for the disposition of assets or rendering of services, or

(4)     any guarantee of any obligation of another Person.

For purposes of this definition, the term "Person" shall not include the Company or any Restricted Subsidiary or any Person who would become a Restricted Subsidiary as a result of any Investment.  If the Company or any Restricted Subsidiary sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary so that, after giving effect to that sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, all remaining Investments of the Company and the Restricted Subsidiaries in such Person shall be deemed to have been made at such time.

For purposes of Section 4.04, the Company will be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which will be valued at

12

the Fair Market Value of the sum of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Debt of such Unrestricted Subsidiary owed to the Company or any Restricted Subsidiary immediately following such Designation. Any property transferred to or from an Unrestricted Subsidiary will be valued at its Fair Market Value at the time of such transfer.

"Investment Grade Rating" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"Issue Date" means June 3, 2011.

"Issuer" means OGX Petróleo e Gás Participações S.A., named as such in this Indenture, excluding its Subsidiaries, until a successor replaces it and, thereafter, means the successor, or such substituted issuer in accordance with Article 10.

"Lien" means any mortgage, pledge, security interest, conditional sale or other title retention agreement or other similar lien.

"Marketable Securities" means publicly traded debt or equity securities that are listed for trading on a national securities exchange and that were issued by a corporation with debt securities rated at least "AA-" from S&P or "Aa3" from Moody's or the equivalent local rating.

"Maturity Date" means June 1, 2018.

"Minimum Legally Required Dividend" means, for any Brazilian Person and any period, an amount equal to the sum of (a) the minimum dividend required to be distributed under applicable Brazilian law by such Person to holders of its Capital Stock during such period and (b) the minimum dividend required to be distributed to holders of Preferred Stock in such Person during such period so as to avoid such holders from acquiring or maintaining any voting rights under Brazilian law.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds of such Asset Sale in the form of cash or Cash Equivalents (including (i) payments in respect of deferred payment obligations to the extent corresponding to, principal, but not interest, when received in the form of cash, and (ii) proceeds from the conversion of other consideration received when converted to cash), net of:

(1)     brokerage commissions and other fees and expenses related to such Asset Sale, including fees and expenses of counsel, accountants and investment bankers;

(2)     provisions for taxes as a result of such Asset Sale taking into account the consolidated results of operations of the Company and its Restricted Subsidiaries;

13

(3)      payments required to be made to repay Debt (other than revolving credit borrowings) outstanding at the time of such Asset Sale that is secured by a Lien on the property or assets sold; and

(4)      appropriate amounts to be provided as a reserve against liabilities associated with such Asset Sale, including pension and other post-employment benefit liabilities, liabilities related to environmental matters and indemnification obligations associated with such Asset Sale, with any subsequent reduction of the reserve other than by payments made and charged against the reserved amount to be deemed a receipt of cash.

"Net Debt" means, as of any date of determination, the aggregate amount of Debt of the Company and its Restricted Subsidiaries less the sum of consolidated cash and cash equivalents and consolidated marketable securities recorded as current assets in all cases in accordance with GAAP and as set forth in the most recent consolidated balance sheet of the Company.

"Net Debt to EBITDA Ratio" means, on any date (the "transaction date"), the ratio of:

(x)      the aggregate amount of Net Debt at that time to

(y)      EBITDA for the four fiscal quarters immediately prior to the transaction date for which internal financial statements are available (the "reference period").

In making the foregoing calculation,

(1)      pro forma effect will be given to any Debt Incurred (and the application of proceeds thereof) during or after the reference period to the extent the Debt is outstanding or is to be Incurred on the transaction date as if the Debt had been Incurred on the first day of the reference period; and

(2)      pro forma effect will be given to:

(A)      the acquisition or disposition of companies, concessions, Oil and Gas Properties, or businesses by the Company and its Restricted Subsidiaries, including any acquisition or disposition of a company, concessions, Oil and Gas Properties or businesses since the beginning of the reference period by a Person that became a Restricted Subsidiary after the beginning of the reference period, and

(B)      the discontinuation of any discontinued operations that have occurred since the beginning of the reference period as if such events had occurred, and, in the case of any disposition, the proceeds thereof applied, on the first day of the reference period.

To the extent that pro forma effect is to be given to an acquisition or disposition of a company, division or line of business, the pro forma calculation will be (i) based upon the

14

most recent four full fiscal quarters for which the relevant financial information is available and (ii) determined in good faith by the chief financial officer or the treasurer of the Company.

"Non-Recourse Debt" means Debt:

(1)     as to which neither the Company nor any Restricted Subsidiary (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Debt), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender; and

(2)     no default with respect to which would permit upon notice, lapse of time or both any holder of any Debt of the Company or any Restricted Subsidiary to declare a default on such Debt or cause the payment of the Debt to be accelerated or payable prior to its stated maturity.

"Note Guarantee" means the guarantee of the Securities by the Guarantors pursuant to this Indenture.

"Offer Period" means the period for which the Asset Sale Offer remains open, as specified by the Company in its notice delivered pursuant to Section 4.06(c).

"Offering Memorandum" means the offering circular for the Initial Securities, dated May 26, 2011.

"Officer" means with respect to the Company or any Restricted Subsidiary, the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president of the Company or any Restricted Subsidiary, as the case may be.

"Officer's Certificate" means a certificate signed by an Officer of the Company.

"Oil and Gas Properties" means all properties, including without limitation, equity or other ownership interests directly or indirectly therein, and any interests in any concession or license to explore or produce oil and natural gas.

"Opinion of Counsel" means a written opinion of counsel, who may be an employee of or counsel for the Company (except as otherwise provided in this Indenture).

"Outstanding Securities" has the meaning set forth under Section 2.08.

"Paying Agent" means the paying agent or principal paying agent identified in the preamble to this Indenture, until replaced by a successor and, thereafter, means the successor, and any other paying agent appointed by the Company to act as such.

"Permitted Business" means any business which is the same as or related, ancillary or complementary to any of the businesses of the Company and its Restricted Subsidiaries on the Issue Date, including without limitation, (1) the acquisition, exploration,

15

development, production, operation and disposition of interests in oil, gas and other hydrocarbon and mineral properties or products produced in association with the foregoing (including without limitation through operating agreements, joint ventures, partnership agreements, technical evaluation agreements working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements or otherwise), and the utilization of the Company's and its Restricted Subsidiaries' properties or rights to explore or produce oil and gas, (2) the gathering, marketing, treating, processing, storage, distribution, refining, selling and transporting of any production from such interests, properties or rights products produced in association therewith and the marketing of oil, gas and other hydrocarbons and minerals obtained from unrelated Persons, (3) any other related energy business, including power generation and electrical transmission business, (4) oil field sales and services and related activities, (5) development, purchase and sale of real estate and interests therein, and (6) any business or activity related to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (1) through (5) of this definition.

"Permitted Business Investment" means any Investment and expenditure made in or assets or properties (including Capital Stock, Debt or any other security or instrument of a Person) related to a Permitted Business, including without limitation, (1) ownership interests in oil, natural gas, other hydrocarbons and minerals properties or gathering, transportation, processing, storage or related systems (with directly or indirectly through any investment vehicle); (2) any operating agreements, joint ventures, partnership agreements, working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements, contracts for the sale, transportation or exchange of oil, natural gas and other hydrocarbons, unitization agreements, pooling arrangements, joint bidding agreements, service contracts, partnership agreements, limited liability company agreements, subscription agreements, stock purchase agreements, stockholder agreements, area of mutual interest agreements, production sharing agreements or other similar or customary agreements, transactions, properties, interests, or arrangements, and Investments and expenditures in connection therewith or pursuant thereto; and (3) direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment.

"Permitted Debt" has the meaning set forth under Section 4.03.

"Permitted Holders" means Mr. Eike Fuhrken Batista and immediate members of his family thereof and any trust, investment vehicle or other Person beneficially owned by any such Persons.

"Permitted Investment" means:

(1)      any Investment in the Company or any Restricted Subsidiary (including, without limitation, in any Debt, other security or instrument thereof);

(2)      any Investment by the Company or any Restricted Subsidiary in another Person if as a result of such Investment such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, or is liquidated into, the Company or a Restricted Subsidiary or becomes a Restricted Subsidiary;

16

(3)     Investments in cash and cash equivalents and marketable securities as determined in accordance with GAAP;

(4)     stocks, obligations or securities received in settlement of (or foreclosure with respect to) debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor;

(5)     any Investment existing on, or made pursuant to a binding commitments existing on or approved by the Board of Directors as of, the Issue Date and any Investment consisting of an extension, modification or renewal of any Investment existing on the Issue Date;

(6)     Investments represented by Hedging Obligations permitted under this Indenture;

(7)     Investments which are made exclusively with Capital Stock of the Company (other than Disqualified Stock);

(8)     any Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were Incurred in the ordinary course of business of the Company or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes with Persons who are not Affiliates;

(9)     any acquisition and holding of (a) federal, state and municipal tax credits acquired solely to pay amounts owed by the Company or any Restricted Subsidiary to tax authorities and (b) discounted obligations of any governmental authority acquired solely to pay tax amounts owed by the Company or any Restricted Subsidiary to such governmental authority;

(10)     Investments made as a result of the receipt of non-cash consideration from an Asset Sale that was made in compliance with Section 4.06;

(11)     receivables owing to the Company or any of its Restricted Subsidiaries, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; provided, that such trade terms may include such trade terms as the Company or such Restricted Subsidiary deems reasonable under the circumstances;

(12)     surety and performance bonds and workers' compensation, utility, lease, tax, performance and similar deposits and prepaid expenses in the ordinary course of business;

(13)     prepayments and other credits to suppliers made in the ordinary course of business;

(14)     loans and advances pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business;

17

(15)    Investments in connection with pledges, deposits, payments or performance bonds made or given in the ordinary course of business in connection with or to secure statutory, regulatory or similar obligations, including obligations under health, safety or environmental obligations;

(16)    any Investment acquired from a Person which is merged with or into the Company or any of its Restricted Subsidiaries, or any Investment of any Person existing at the time such Person becomes a Restricted Subsidiary of the Company and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction;

(17)    guarantees by the Company or any Restricted Subsidiary of operating leases, in each case entered into by the Company or any Restricted Subsidiary in the ordinary course of business;

(18)    guarantees of performance or other obligations arising in the ordinary course in the Permitted Business, including obligations under oil and natural gas exploration, development, joint operating, and related agreements and licenses, concessions or operating leases related to the Permitted Business;

(19)    payroll, commission, travel, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(20)    loans or grants in respect of community development projects made in the ordinary course of business customary in the Permitted Business as appropriate for the Company's regions of operations and consistent with past practice or counterparty requirement;

(21)    Investments in the Capital Stock of any Person other than a Restricted Subsidiary of the Company that are required to be held pursuant to an involuntary governmental order of consideration, nationalization, seizure or expropriation or other similar order with respect to Capital Stock of such Person (prior to which order such Person was a Subsidiary of the Company);

(22)    Investments in marketable securities or instruments to fund the Company's or its Restricted Subsidiary's pension and other employee-related obligations pursuant to compensation arrangements approved by the Board of Directors or senior management of the Company;

(23)    Investments made pursuant to a commitment that, when entered into, would have complied with the provisions of this Indenture;

(24)    loans or advances made to, or guarantees with respect to loans or advances made to, directors, officers or employees of the Company or any Restricted Subsidiary in respect of travel, entertainment or moving related expense Incurred in the ordinary course of business; in respect of moving related expenses Incurred in connection with any closing or consolidation or any facility or office; or in the ordinary course of business;

18

(25)     repurchases of the Securities and related guarantees;

(26)     any Permitted Business Investment;

(27)     advances made to customers, clients, distributors, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business; and

(28)     additional Investments by the Company or any of its Restricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (28) that are at the time outstanding, not to exceed the greater of (i) U.S.$100,000,000 and (ii) 1.25% of Consolidated Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value).

"Permitted Liens" means:

(1)     any Lien in existence on the Issue Date and any extension, renewal or replacement thereof or of any Lien in clause (6), (7) or (8) below; provided, however, that the total amount of Debt so secured is not increased as a result thereof plus any fees and expenses in connection with such extension, renewal or replacement and the Lien shall be limited to all or part of the same property that secured the original Lien (together with improvements and accessions to such property);

(2)     Liens securing Debt owed by any Restricted Subsidiary of the Company solely to the Company or one or more Restricted Subsidiaries and/or by the Company to one or more such Restricted Subsidiaries;

(3)     Liens or deposits to secure judgments, in each case not giving rise to an Event of Default, so long as any appropriate legal proceedings which may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(4)     Liens encumbering goods and documents of title with respect to such goods and arising in the ordinary course of business in connection with the issue of documentary letters of credit, and Liens arising out of title retention provisions in a supplier's standard condition of supply of goods acquired in the ordinary course of business;

(5)     Liens on the inventory or receivables, including without limitation any future oil and natural gas production, of the Company or any Restricted Subsidiary securing the obligations of such Person; provided that the aggregate amount of receivables securing Debt shall not exceed 80% of the Company's aggregate outstanding receivables from time to time;

(6)     any Lien on any property or assets (including Capital Stock of any person) securing Debt Incurred solely for purposes of financing the acquisition, construction or improvement of such property or assets after the Issue Date; provided, that (a) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the cost

19

(i.e., purchase price) of the property or assets so acquired, constructed or improved and (b) the Lien is Incurred before, or within 365 days after the completion of, such acquisition, construction or improvement and does not encumber any other property or assets of the Company or any Restricted Subsidiary; and provided, further, that to the extent that the property or asset acquired is Capital Stock, the Lien also may encumber other property or assets of the person so acquired;

(7)     any Lien securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project (other than projects related to the Waimea Complex or Waikiki Complex); provided, that the Liens in respect of such Debt are limited to assets (including Capital Stock of the project entity) and/or revenues of such project; provided, further, that the Lien is Incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other property or assets of the Company or any Restricted Subsidiary;

(8)     any Lien existing on any property or assets of any person before that person's acquisition (in whole or in part) by, merger into or consolidation with the Company or any Restricted Subsidiary after the date of this Indenture; provided, that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation;

(9)     any Lien imposed by law that was Incurred in the ordinary course of business, including, without limitation, carriers', warehousemen's and mechanics' liens and other similar encumbrances arising in the ordinary course of business, in each case for sums that are not more than 60 days past due or are being contested in good faith by appropriate proceedings;

(10)     pledges or deposits in connection with workers' compensation laws, unemployment insurance laws or similar legislation, or good faith deposits, letters of credit and performance, bid, surety, appeal or similar bonds in connection with bids, tenders, contracts (other than for the payment of Debt) or leases to which the Company or any of its Restricted Subsidiaries is a party, or deposits for the payment of rent, or deposits to secure public or statutory obligations or for contested taxes or import or customs duties, in each case Incurred in the ordinary course of business;

(11)     any Lien in favor of the issuer of surety bonds or letters of credit issued pursuant to the request of and for the account of the Company or any Subsidiary in the ordinary course of business;

(12)     any Lien securing taxes, assessments and other governmental charges, the payment of which are not more than 60 days past due or are being contested in good faith by appropriate proceedings and for which reserves or other appropriate provisions, if any, have been established as required by GAAP;

(13)     minor defects, easements, rights-of-way, restrictions and other similar encumbrances Incurred in the ordinary course of business and encumbrances consisting of municipal or zoning restrictions, licenses, restrictions on the use of property or assets or minor imperfections in title that do not materially impair the value or use of the property or assets

20

affected thereby, and any leases and subleases of real property that do not interfere with the ordinary conduct of the business of the Company or any Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(14)    any rights of set-off, netting or similar rights and remedies of any person with respect to any deposit account of the Company or any Subsidiary arising in the ordinary course of business;

(15)    any Lien securing Hedging Agreements so long as such Hedging Agreements are entered into for bona fide, non-speculative purposes;

(16)    any Liens granted to secure borrowings from, directly or indirectly, (A) *Banco Nacional de Desenvolvimento Econômico e Social–BNDES*, or any other governmental development bank or credit agency, including but not limited to *FINEP – Financiadora de Estudos e Projetos*, or (B) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer;

(17)    any Lien on the Capital Stock of an Unrestricted Subsidiary;

(18)    any Lien in respect of Production Payments and Reserve Sales;

(19)    any Lien on pipelines and pipeline facilities that arise by operation of law;

(20)    any Lien arising under joint venture agreements, partnership agreements, oil and gas leases or subleases, assignments, purchase and sale agreements, division orders, contracts for the sale, purchasing, processing, transportation or exchange of oil or natural gas, unitization and pooling declarations and agreements, development agreements, technical evaluation agreements, area of mutual interest agreements, licenses, sublicenses, net profits interests, participation agreements, Farm-Out Agreements, Farm-In Agreements, carried working interest, joint operating, unitization, royalty, sales and similar agreements or arrangements relating to the exploration or development of, or production from, Oil and Gas Properties entered into in the ordinary course of business in a Permitted Business;

(21)    any Lien reserved in oil and gas mineral leases for bonus, royalty or rental payments and for compliance with the terms of such leases;

(22)    any Lien on, or related to, properties or assets to secure all or part of the costs Incurred in the ordinary course of a Permitted Business for exploration, drilling, development, production, processing, transportation, marketing, storage, abandonment or operation; and

(23)    in addition to the foregoing Liens set forth in clauses (1) through (22) above, Liens securing Debt of the Company or any Restricted Subsidiary (including, without limitation, guarantees of the Company or any Restricted Subsidiary) which in aggregate principal amount, at any time of determination, do not exceed the greater of (i) U.S.$1,500,000,000 and (ii) 15.0% of Consolidated Total Assets.

Notwithstanding the foregoing, on or prior to the EBITDA Triggering Event, the Liens described in clauses (5), (16) and (23) shall not secure Debt in an aggregate principal amount exceeding the greater of (i) U.S.$1,000,000,000 and (2) 12.5% of the Consolidated Total Assets.

"Permitted Refinancing Debt" has the meaning set forth under Section 4.03.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"Preferred Stock" means, with respect to any Person, any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"Process Agent" has the meaning set forth for such term in Section 13.13(b).

"Production Payments and Reserve Sales" means the grant or transfer by the Company or a Restricted Subsidiary of the Company to any Person of a royalty, overriding royalty, net profits interest, production payment, partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties, including without limitation any such grants or transfers pursuant to incentive compensation programs on terms that are reasonably customary in the oil and gas business for geologists, geophysicists and other providers of technical services to the Company or a Subsidiary of the Company.

"Property" means (i) any land, buildings, machinery and other improvements and equipment located therein, (ii) any intangible assets, including, without limitation, any brand names, trademarks, copyrights and patents and similar rights and (iii) any income (licensing or otherwise), proceeds of sale or other revenues therefrom.

"Protected Purchaser" means a purchaser of a Security, or of an interest therein, who (a) gives value, (b) does not have notice of any adverse claim to the Security, and (c) obtains control of the Security.

"Purchase Date" means, in relation to an Asset Sale Offer, the date of purchase of Securities (or any portion thereof) specified in the notice given by the Company pursuant to Section 4.06(c) in relation to such offer, which date is not less than 30 days nor more than 60 days after the date of the notice of the Asset Sale Offer.

"Qualified Equity Interests" means all Equity Interests of a Person other than Disqualified Equity Interests.

"Qualified Stock" means all Capital Stock of a Person other than Disqualified Stock.

22

"Rating Agency" means S&P or Moody's; or if S&P or Moody's are not making rating of the Securities publicly available, an internationally recognized U.S. rating agency or agencies, as the case may be, selected by the Company, which will be substituted for S&P or Moody's or both, as the case may be.

"Rating Decline" means that at any time within 90 days (which period shall be extended so long as the rating of the Securities is under publicly announced consideration for possible down grade by either Rating Agency) after the earlier of the date of public notice of a Change of Control and of the Company's intention or that of any Person to effect a Change of Control, (i) in the event the Securities are assigned an Investment Grade Rating by at least two of the Rating Agencies prior to such public notice, the rating of the Securities by at least two of the Rating Agencies shall be below an Investment Grade Rating; or (ii) in the event the Securities are rated below an Investment Grade Rating by at least two of the Rating Agencies prior to such public notice, the rating of the Securities by at least two of the Rating Agencies shall be decreased by one or more categories; *provided*, that, in each case, any such Rating Decline is in whole or in part in connection with a Change in Control.

"*real*", "*reais*" or "R$" means the lawful currency of Brazil.

"Redemption Date" means, with respect to any redemption of Securities, the date fixed for such redemption pursuant to this Indenture and the Securities.

"Registrar" has the meaning set forth under Section 2.03.

"Relevant Date" means, with respect to any payment on a Security, whichever is the later of: (i) the date on which such payment first becomes due; and (ii) if the full amount payable has not been received by the Trustee on or prior to such due date, the date on which notice is given to the Holders that the full amount has been received by the Trustee.  The Securities are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation. Except as specifically provided in this Indenture, neither the Company nor any Guarantor shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein..

"Restricted Payment" has the meaning set forth under Section 4.04.

"Restricted Subsidiary" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"Revocation" has the meaning set forth under Section 4.24.

"S&P" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc. and its successors.

"Sale and Leaseback Transaction" means, with respect to any Person, an arrangement whereby such Person enters into a lease of property previously transferred by such Person to the lessor.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities" means the securities issued under this Indenture.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Security Register" means a register of Securities kept at the corporate trust office of the Registrar.

"Significant Subsidiary" of any Person means any Restricted Subsidiary that would be a "significant subsidiary" of such Person within the meaning of Rule 1-02 under Regulation S-X promulgated pursuant to the Securities Act.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"Subordinated Debt" means any Debt of the Company or a Restricted Subsidiary which is subordinated in right of principal payment to the Securities or the Note Guarantee, as applicable, pursuant to a written agreement to that effect.

"Subsidiary" means with respect to any Person, any corporation, limited liability company , partnership, association or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more Subsidiaries of such Person (or a combination thereof).

"Substituted Debtor" has the meaning set forth in Section 10.01.

"TIA" means the Trust Indenture Act of 1939, as amended.

"Transfer Restricted Securities" means Securities that bear or are required to bear the Restricted Securities Legend (as defined in Section 2.1(6) of the Appendix).

"Trust Officer" means any officer in the corporate trust department of the Trustee, including any managing director, director, vice president, assistant vice president, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"United States" means the United States of America.

"Unrestricted Subsidiary" means any Subsidiary of the Company Designated as an Unrestricted Subsidiary pursuant to Section 4.24. Any such Designation may be revoked by a resolution of the Board of Directors of the Company, subject to the provisions of Section 4.24.

"U.S. Bankruptcy Code" means the United States Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 *et seq.*

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States is pledged in support thereof.

"Voting Stock" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Waikiki Complex" means the project located in concessions BM-C-39 and BM-C-40 in the Campos Basin described under the heading "Business–Our Development and Production-Campos Basin Development and Production–Development Plan for Our Existing Discoveries in the Campos Basin-Project 1–Waikiki Complex" of the Offering Memorandum.

"Waimea Complex" means the project located in concession BM-C-41 in the Campos Basin described under the heading "Business–Our Development and Production–Campos Basin Development and Production–Development Plan for Our Existing Discoveries in the Campos Basin–Project 1–Waimea Complex" of the Offering Memorandum.

"Wholly-Owned Subsidiary" means a Restricted Subsidiary of the Company of which at least 95% of the Capital Stock or other ownership interest (other than directors' qualifying shares) is owned by the Company or another Wholly-Owned Subsidiary.

SECTION 1.02    Incorporation by Reference of Trust Indenture Act.  The following TIA terms have the following meanings:

"Commission" means the SEC;

"indenture securities" means the Securities and the Note Guarantee;

"indenture security holder" means a Securityholder;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the Securities and the Note Guarantee, respectively, means the Company and the Guarantors, respectively, and any successor obligor on the Securities and the Note Guarantee, respectively.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.03     Rules of Construction.  Unless the context otherwise requires:

(1)     a term has the meaning assigned to it;

(2)     all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(3)     "or" is not exclusive;

(4)     "including" means including without limitation;

(5)     words in the singular include the plural and words in the plural include the singular;

(6)     unsecured Debt shall not be deemed to be subordinate or junior to secured Debt merely by virtue of its nature as unsecured Debt;

(7)     the principal amount of any Preferred Stock shall be (a) the maximum liquidation value of such Preferred Stock or (b) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(8)     all references to the date the Initial Securities were originally issued shall refer to the Issue Date;

(9)     unless context requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture;

(10)     unless otherwise stated, any agreement, contract or document defined or referred to herein shall mean such agreement, contract or document and all schedules, exhibits and attachments thereto as in effect as of the date hereof, as the same may thereafter be amended, supplemented or otherwise modified from time to time;

(11)     all references in this Indenture and the Securities to interest in respect of any Security shall be deemed to include all Additional Amounts, if any, in respect of such Security, unless the context otherwise requires, and express mention of the payment of Additional Amounts in any provision hereof or thereof shall not be construed, without more, as excluding reference to Additional Amounts in those provisions hereof or thereof where such express mention is not made; and

26

(12)   all references to amounts denominated in "U.S.$" shall be deemed to be the equivalent thereof in any other currency at the time of determination.


## Article 2

## The Securities

SECTION 2.01   Form and Dating.  Provisions relating to the Securities are set forth in the Rule 144A/Regulation S Appendix attached hereto (the "Appendix") which is hereby incorporated in, and expressly made part of, this Indenture.  The Initial Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit 1 to the Appendix which is hereby incorporated in, and expressly made a part of, this Indenture.  The Securities may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer or the Guarantors is subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer or the Guarantors).  Each Security shall be dated the date of its authentication.  The Securities will be issuable in denominations of U.S.$200,000 in principal amount and any multiple of U.S.$1,000 in excess thereof.  The Securities shall be fully and unconditionally guaranteed by the Guarantors in accordance with Article 11.  The terms of the Initial Securities set forth in the Appendix and Exhibit 1 are part of the terms of this Indenture.

SECTION 2.02   Execution and Authentication.  An Officer of the Issuer shall sign the Securities for the Issuer, and an Officer of each Guarantor shall sign the notation in the Securities relating to the Note Guarantee.  Each such signature may be by manual or facsimile signature of such Officer.

If an Officer whose signature is on a Security no longer holds that office at the time the Trustee authenticates the Security, the Security shall be valid nevertheless.

A Security shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Security.  The signature shall be conclusive evidence that the Security has been authenticated under this Indenture.

On the Issue Date, the Trustee shall authenticate and deliver U.S.$2,563,000,000 aggregate principal amount of 8.500% Senior Notes due 2018 and, at any time and from time to time thereafter, the Trustee shall authenticate and deliver Securities for original issue in an aggregate principal amount specified in such order, in each case upon a written order of the Issuer signed by two Officers of the Issuer.  Such order shall specify the amount of the Securities to be authenticated and the date on which the original issue of Securities is to be authenticated and, in the case of an issuance of Additional Securities pursuant to Section 2.12 after the Issue Date, shall certify that such issuance is in compliance with this Indenture and shall state (i) whether such Additional Securities shall be Transfer Restricted Securities and issued in the form of Initial Securities as set forth in the Appendix to this Indenture and (ii) the initial Interest Payment Date.

The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Securities. Unless limited by the terms of such appointment, an authenticating agent may authenticate Securities whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent or agent for service of notices and demands.

SECTION 2.03     Registrar and Paying Agent.  The Issuer shall maintain an office or agency in the Borough of Manhattan, City of New York where Securities may be presented or surrendered for registration of transfer or for exchange (the "Registrar"), where Securities may be presented for payment (the "Paying Agent") and for the service of notices and demands to or upon the Issuer in respect of the Securities and this Indenture. The Registrar shall keep a register of the Securities and of their transfer and exchange. The Issuer may have one or more co-registrars and one or more additional paying agents. The term "Paying Agent" includes any paying agent appointed in this Indenture and any additional paying agent, and the term "Registrar" includes any additional Registrar or co-registrar.

The Issuer shall enter into an appropriate agency agreement with any Registrar, Paying Agent or co-registrar not a party to this Indenture. The agreement shall implement the provisions of this Indenture that relate to such agent. The Issuer shall notify the Trustee of the name and address of any such agent. If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06. The Issuer, the Guarantors or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or transfer agent.

The Issuer initially appoints (i) the Trustee as Registrar, a Paying Agent, and Transfer Agent in connection with the Securities, (ii) the Principal Paying Agent as a Paying Agent and (iii) DTC as Depositary with respect to the Securities.

SECTION 2.04     Paying Agent To Hold Money in Trust.  The Issuer hereby acknowledges and confirms that it is and at all times shall remain absolutely and unconditionally obligated to pay all amounts due and owing by the Issuer hereunder, as the same shall become due and owing. All payments of principal, premium and interest required to be made by the Issuer hereunder (including any Additional Amounts) shall be made in U.S. dollars, pursuant to the terms hereof, by the Issuer to a Paying Agent to the extent appointed hereunder or to the Trustee by 12:00 p.m. (New York City time) one Business Day prior to each Interest Payment Date, redemption date, purchase date, Change of Control Payment Date or Maturity Date on any Securities, unless otherwise provided for in this Indenture. Each Paying Agent shall hold in trust, for the benefit of the Holders or the Trustee, all money held by such Paying Agent for the payment of principal, premium or interest on the Securities. The Issuer at any time may require each Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon complying with this Section 2.04, each Paying Agent shall have no further liability for the money delivered to the Trustee.

The receipt by a Paying Agent or the Trustee from the Issuer of each payment of principal, interest and/or other amounts due in respect of the Securities in the manner specified

herein and on the date on which such amount of principal, interest and/or other amounts are then due, shall satisfy the obligations of the Issuer herein and under the Securities to make such payment to the Holders on the due date thereof.

SECTION 2.05    Securityholder Lists.  The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders.  If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee, in writing at least five Business Days before each Interest Payment Date and at such other times as the Trustee may reasonably request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

SECTION 2.06    Transfer and Exchange.  The Securities shall be issued in registered form and shall be transferable only upon the surrender of a Security for registration of transfer.  When a Security is presented to the Registrar or a co-registrar with a request to register a transfer, the Registrar shall register the transfer as requested if the requirements of this Indenture are met and if the transferee certifies to the Issuer and Registrar that: (i) under the terms of the Security, the Person seeking registration of transfer is eligible to have the Security registered in its name, (ii) the indorsement or instruction is made by the appropriate Person or by an agent who has actual authority to act on behalf of the appropriate Person, (iii) reasonable assurance is given that the indorsement or instruction is genuine and authorized, (iv) any applicable law relating to the collection of taxes has been complied with, (v) the transfer does not violate any restriction on transfer imposed by the Issuer, (vi) a demand that the Issuer not register transfer has not become effective (or, if such a demand has become effective, the Issuer has given notice to the Person making such demand stating that (x) registration of transfer of the Security is sought, (y) a demand that the Issuer not register transfer had previously been received and (z) the Issuer shall withhold registration for 10 days from the date of communication of such notice), and (vii) the transfer is in fact rightful or is to a Protected Purchaser.  When Securities are presented to the Registrar or a co-registrar with a request to exchange them for an equal principal amount of Securities of other denominations, the Registrar shall make the exchange as requested if the same requirements are met.  To permit registration of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate and deliver Securities at the Registrar's or co-registrar's request.  The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to this Section 2.06 (other than any such transfer taxes, assessments or similar governmental charge payable upon exchange or transfer pursuant to Section 4.08 and Section 9.04).  The Issuer shall not be required to make and the Registrar need not register transfers or exchanges of Securities selected and delivered for redemption or any Securities for a period of 15 days before an Interest Payment Date.

Prior to the due presentation for registration of transfer of any Security, the Issuer, the Trustee, any Paying Agent, the Registrar or any co-registrar may deem and treat the person in whose name a Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and interest (and Additional Amounts, if any) on such Security and for all other purposes whatsoever, whether or not presentation of such Security is overdue,

and none of the Issuer, the Trustee, any Paying Agent, the Registrar or any co-registrar shall be affected by notice to the contrary.

All Securities issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Securities surrendered upon such transfer or exchange.

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Security (including any transfers between or among participants in DTC or beneficial owners of interests in any Global Security) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.07    Replacement Securities. If (a) any mutilated Security is surrendered to the Issuer, the Registrar, or the Trustee, or (b) the Issuer, the Registrar and the Trustee receive evidence to their satisfaction of the destruction, loss or left of any Security, and, unless otherwise agreed by the Issuer and the Trustee, there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Issuer or the Trustee that such Security has been acquired by a Protected Purchaser, the Issuer shall execute and the Trustee shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Security has become due and payable, or has been called for redemption by the Issuer pursuant to Article 3 of this Indenture, the Issuer in its discretion (but subject to any conversion rights) may, instead of issuing a new Security, pay or redeem such Security, as the case may be.

Upon the issuance of any new Security under this Section 2.07, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expense (including the fees and expenses of the Trustee or the Registrar) in connection therewith.

Every replacement Security is an additional obligation of the Issuer.

The provisions of this Section 2.07 are exclusive and, to the extent lawful, shall preclude all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 2.08    Outstanding Securities.  Securities outstanding at any time ("Outstanding Securities") are all Securities authenticated by the Trustee except for those canceled by it pursuant to Section 2.10 hereof, those delivered to the Trustee for cancellation or

30

surrendered for transfer or exchange, those reductions in the interest in a Global Security effected by the Trustee in accordance with the provisions hereof and those described in this Section 2.08 as not outstanding.  Except as set forth in Article 9 and Section 13.05, a Security does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Security.

If a Security is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Security is held by a Protected Purchaser.

If any Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal, premium, interest and Additional Amounts (if any) payable on that date with respect to the Securities (or portions thereof) to be redeemed or maturing, as the case may be, then on and after that date, such Securities (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.09    Temporary Securities.  Until definitive Securities are ready for delivery, the Issuer may prepare and execute and the Trustee shall authenticate temporary Securities.  Temporary Securities shall be substantially in the form of definitive Securities but may have variations that the Issuer considers appropriate for temporary Securities.  Without unreasonable delay, the Issuer shall prepare and execute and the Trustee shall authenticate definitive Securities and deliver them in exchange for temporary Securities.

SECTION 2.10    Cancellation.  The Issuer at any time may deliver Securities to the Registrar for cancellation, along with a written notice to the Trustee advising it of the cancellation.  The Registrar shall forward to the Trustee any Securities surrendered to it for registration of transfer, exchange or payment.  The Trustee and no one else shall cancel and dispose of (subject to the record retention requirements of the Exchange Act) all Securities surrendered for registration of transfer, exchange, payment or cancellation in accordance with its procedures for the disposition of canceled securities and deliver a certificate of such disposition to the Issuer unless the Issuer directs the Trustee to deliver canceled Securities to the Issuer.  The Issuer may not issue new Securities to replace Securities it has redeemed, paid or delivered to the Trustee for cancellation.

SECTION 2.11    CUSIP Numbers and ISINs.  The Issuer in issuing the Securities may use "CUSIP" numbers and "ISINs" (if then generally in use) or similar numbers and, if so, the Trustee shall use "CUSIP" numbers, "ISINs" or similar numbers in notices of redemption as a convenience to Holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers.

SECTION 2.12    Issuance of Additional Securities.  The Issuer may, from time to time, subject to compliance with any other applicable provisions of this Indenture, and without

31

the consent of the Securityholders, create and issue Additional Securities under this Indenture having identical terms in all respects as the Initial Securities except that interest may accrue on the Additional Securities from their date of issuance; *provided*, *however*, that unless such Additional Securities shall be treated as part of the same "issue" within the meaning of United States Treasury Regulation Section 1.1275-1(f), including as a result of a "qualified reopening" within the meaning of United States Treasury Regulation Section 1.1275-2(k), such Additional Securities shall be issued under a separate CUSIP. The Initial Securities and any Additional Securities issued under this Indenture will be treated as a single class for all purposes under this Indenture and shall vote together as one class on all matters with respect to the Securities.

SECTION 2.13   Open Market Purchases. The Issuer or any of its Affiliates may at any time purchase Securities in the open market or otherwise at any price. Any such purchased Securities shall not be resold, except in compliance with applicable requirements or exemptions under the relevant securities laws.

Article 3

Optional Redemption of Securities

SECTION 3.01   Optional Redemption. The Issuer may redeem the Securities, at its option, as a whole or from time to time in part, subject to the conditions and at the redemption prices specified in paragraph 5 of the Securities.

SECTION 3.02   Notice of Redemption.

(1)   The Issuer shall give or cause the Trustee to give notice of redemption, in the manner provided for in Section 13.01, not less than 30 nor more than 60 days prior to a date for redemption of Securities. If the Issuer itself gives the notice, it shall also deliver a copy to the Trustee and the Principal Paying Agent.

(2)   If either (i) the Issuer is redeeming the Securities in part only, or (ii) the Issuer elects to have the Trustee give notice of redemption, then the Issuer shall deliver to the Trustee, at least five days (or such shorter period as may be agreed to by the Trustee) before notice of redemption is required to be mailed or caused to be mailed to the Holders (unless the Trustee is satisfied with a shorter period), an Officer's Certificate requesting that the Trustee select the Securities to be redeemed and/or give notice of redemption and setting forth the information required by Section 3.02(3). If the Issuer elects to have the Trustee give notice of redemption, the Trustee shall give the notice in the name of the Issuer and at the Issuer's expense.

(3)   All notices of redemption shall state:

(A)   the Redemption Date;

32

(B)     the redemption price and the amount of any accrued interest payable as provided in Section 3.05 (or the calculation of such redemption price);

(C)     whether or not the Issuer is redeeming all Outstanding Securities;

(D)     if the Issuer is not redeeming all Outstanding Securities, the aggregate principal amount of Securities that the Issuer is redeeming and the aggregate principal amount of Securities that shall be Outstanding Securities after the partial redemption;

(E)     if the Issuer is redeeming only part of a Security, the notice that relates to that Security shall state that on and after the Redemption Date, upon surrender of that Security, the Securityholder shall receive, without charge, a new Security or Securities of authorized denominations for the principal amount of the Security remaining unredeemed;

(F)     that on the Redemption Date the redemption price and any accrued interest payable to, but excluding, the Redemption Date as provided in Section 3.05 shall become due and payable in respect of each Security, or the portion of each Security, to be redeemed, and, unless the Issuer defaults in making the redemption payment, that interest on each Security, or the portion of each Security, to be redeemed, shall cease to accrue on and after the Redemption Date;

(G)     the place or places where a Securityholder must surrender the Securityholder's Securities for payment of the redemption price; and

(H)     the CUSIP or ISIN number, if any, listed in the notice or printed on the Securities, and that no representation is made as to the accuracy or correctness of such CUSIP or ISIN number.

SECTION 3.03     <u>Selection of Securities to Be Redeemed in Part</u>.

(1)     If fewer than all of the Securities are being redeemed, the selection of Securities to be redeemed shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Securities are listed or if such securities exchange has no requirement governing redemption or the Securities are not then listed on a securities exchange, on a pro rata basis or by lot (or, in the case of any Securities issued in global form, based on a method that most nearly approximates a pro rata selection in accordance with the procedures of DTC). The Trustee shall make the selection from the Outstanding Securities not previously called for redemption. The Trustee shall promptly notify the Issuer in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount of the Securities to be redeemed. In the event of a partial redemption by lot, the Trustee shall select the particular Securities to be redeemed not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Securities not previously called for redemption. The Issuer may redeem Securities in denominations of U.S.$200,000 only in whole. The Trustee may select for redemption

33

portions (in any integral multiple of U.S.$1,000) of the principal of Securities that have denominations larger than U.S.$200,000; *provided* that the remaining outstanding amount must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000.

(2)     For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Securities shall relate, in the case of any Security redeemed or to be redeemed only in part, to the portion of the principal amount of that Security which has been or is to be redeemed.

SECTION 3.04     <u>Securities Payable on Redemption Date</u>.  If the Issuer, or the Trustee on behalf of the Issuer, gives notice of redemption in accordance with this Article 3, the Securities, or the portions of Securities, called for redemption, shall, on the Redemption Date, become due and payable at the redemption price specified in the notice (together with accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Redemption Date), and from and after the Redemption Date (unless the Issuer shall default in the payment of the redemption price and accrued interest) the Securities or the portions of Securities shall cease to bear interest, to the extent the Issuer so elects.  Upon redemption of any Securities by the Issuer, such redeemed Securities will be cancelled or, to the extent so requested by the Issuer, remain outstanding.  Upon surrender of any Securities for redemption in accordance with the notice, the Issuer shall pay the Securities at the redemption price, together with accrued interest, if any, to, but excluding, the Redemption Date.  If the Issuer shall fail to pay any Security called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Securities.

SECTION 3.05     <u>Unredeemed Portions of Partially Redeemed Security</u>.  Upon surrender of a Security that is to be redeemed in part, the Issuer shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of the Security at the expense of the Issuer, a new Security or Securities, of any authorized denomination as requested by the Holder, in an aggregate principal amount equal to, and in exchange for, the unredeemed portion of the principal of the Security surrendered; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof.

SECTION 3.06     <u>Third Party Notice</u>.  The Issuer may designate at its option a third party to call the Securities for mandatory purchase in lieu of exercising its right to optional redemption under this Indenture; *provided*, that any call by a third party shall be treated as if such call was made by the Issuer.  Upon such mandatory purchase, the Securities shall remain outstanding unless otherwise indicated by the Company, subject to <u>Section 2.08</u>.


Article 4

Covenants

SECTION 4.01     <u>Performance of Obligations under the Securities</u>.  The Company shall duly and punctually pay the principal of (and premium, if any) and interest and Additional Amounts, if any, on the Securities in accordance with the terms of the Securities and

this Indenture. The principal of (and premium, if any) and interest and Additional Amounts, if any, on the Securities shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds in accordance with this Indenture money sufficient to pay all principal and interest then due.

SECTION 4.02    Reports. (a) The Company will provide the Trustee with the following reports in electronic form for delivery to Holders upon their request thereof:

(1)    an English language version of its annual audited consolidated financial statements in a form substantially similar to the annual audited financial statements included in the Offering Memorandum prepared in accordance with GAAP within 120 days after the close of its fiscal year;

(2)    an English language version of its unaudited quarterly financial statements in a form substantially similar to the unaudited quarterly financial statements included in the Offering Memorandum prepared in accordance with GAAP within 60 days after the close of each fiscal quarter (other than the last fiscal quarter of its fiscal year);

(3)    simultaneously with the delivery of the financial statements referred to in clause (1) above, an Officer's Certificate stating whether a Default or Event of Default exists on the date of such certificate and, if a Default or Event of Default exists, setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto;

(4)    without duplication, English language versions or summaries of such other reports or notices as may be filed or submitted by (and promptly after filing or submission by) the Company with the Irish Stock Exchange or any other stock exchange on which the Securities may be listed (in each case, to the extent that any such report or notice is generally available to its security holders or the public in Brazil); and

(5)    as soon as practicable and in any event within 30 calendar days after any director or executive officer of the Company becomes aware of the existence of a Default or Event of Default, an Officer's Certificate setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto.

(b)    If the Company makes available the reports described in Section 4.02(a)(1), (2) or (4) on the Company's website and notifies the Trustee in writing thereof, it will be deemed to have satisfied the reporting requirement set forth in such applicable clause.

(c)    Delivery of the above reports to the Trustee is for informational purposes only and the Trustee's receipt of such reports will not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants in this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

SECTION 4.03    Limitation on Debt and Disqualified Stock.

(a)    The Company

(1)    shall not, and shall not permit any of its Restricted Subsidiaries to, Incur any Debt; and

(2)    shall not, and shall not permit any Restricted Subsidiary to, Incur any Disqualified Stock (other than Disqualified Stock of Restricted Subsidiaries held by the Company or a Restricted Subsidiary, so long as it is so held);

*provided* that the Company or any of its Restricted Subsidiaries may Incur Debt and Disqualified Stock if, on the date of the Incurrence, after giving pro forma effect to the Incurrence and the receipt and the application of the proceeds therefrom, either:

(1)    the aggregate principal amount of Debt and Disqualified Stock outstanding does not exceed the greater of (i) U.S.$4,000,000,000 and (ii) 30.0% of Consolidated Net Total Assets; or

(2)    the Net Debt to EBITDA Ratio does not exceed 3.5 to 1.0; *provided* that in the case of this clause (B), EBITDA shall equal or be greater than U.S.$1.00 for such reference period.

(b)    Notwithstanding the foregoing, the Company and, to the extent provided below, any Restricted Subsidiary may Incur the following ("Permitted Debt"):

(1)    Debt of the Company or a Restricted Subsidiary so long as such Debt is owed to the Company or a Restricted Subsidiary and which, if the obligor is the Company, is subordinated in right of payment to the Securities; *provided*, *however*, that if such Debt is owed to a Restricted Subsidiary that is not a Guarantor such Debt shall be unsecured and subordinated in right of payment to the Securities;

(2)    Debt of the Company pursuant to the Securities (other than any Additional Securities) and Debt of the Guarantors pursuant to the guarantee (other than with respect to any Additional Securities);

(3)    Subordinated Debt of the Company or a Restricted Subsidiary; *provided*, *however*, that the aggregate principal amount of such Subordinated Debt, and any refinancing thereof that complies with clause (4)(A) below, does not exceed in an aggregate principal amount at any one time outstanding U.S.$500,000,000;

(4)    Debt of the Company or a Restricted Subsidiary ("Permitted Refinancing Debt") constituting an extension or renewal of, replacement of, or substitution for, or issued in exchange for, or the net proceeds of which are used to repay, redeem, repurchase, refinance or refund, including by way of defeasance (all of the above, for purposes of this clause, "refinance")

36

then outstanding Debt in an amount not to exceed the principal amount of the Debt so refinanced, plus premiums, fees and expenses; *provided* that:

> (A)    in case the Debt to be refinanced is subordinated in right of payment to the Securities, the new Debt, by its terms or by the terms of any agreement or instrument pursuant to which it is outstanding, is expressly made subordinate in right of payment to the Securities at least to the extent that the Debt to be refinanced is subordinated to the Securities,

> (B)    the new Debt does not have a Stated Maturity prior to (i) the Stated Maturity of the Debt to be refinanced, and the Average Life of the new Debt is at least equal to the remaining Average Life of the Debt to be refinanced, or (ii) the 91st day after the Stated Maturity of the Securities and does not have any scheduled principal payments prior to such date; and

> (C)    Debt Incurred pursuant to clauses (1), (3), (5), (6), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), (19), (20) and (21) of Section 4.03(b) shall not be refinanced pursuant to this Section 4.03(b)(4);

> (5)    Hedging Agreements of the Company or any Restricted Subsidiary entered into in the ordinary course of business or directly related to Debt permitted to be Incurred by the Company or any Restricted Subsidiary pursuant to this Indenture, and in each case not for speculative purposes;

> (6)    Debt of the Company or any Restricted Subsidiary in respect of performance bonds, customs, reimbursement obligations, letters of credit, bankers' acceptances, deposits, promissory notes, self-insurance obligations, completion guarantees and bid, surety or appeal bonds provided in the ordinary course of business;

> (7)    Acquired Debt of the Company or any Restricted Subsidiary; *provided, however*, that on the date that such transaction is consummated, after giving effect to the Incurrence of such Debt pursuant to this clause, either (A) the Company or any Restricted Subsidiary would have been able to Incur U.S.$1.00 of additional Debt pursuant to either test set forth in clause (a) above; or (B) would not have both a higher percentage and higher ratio set forth in clause (a) above immediately after such Incurrence;

> (8)    Debt of the Company or any Restricted Subsidiary outstanding on the Issue Date;

> (9)    Debt represented by guarantees of pension fund obligations of the Company or any Restricted Subsidiary required by law or regulation;

> (10)    Debt of the Company or any Restricted Subsidiary Incurred through the provision of bonds, guarantees, letters of credit or similar instruments required by any maritime commission or authority or other governmental or regulatory agencies, including, without limitation, customs authorities; in each case, for vessels owned or chartered by, and in the

37

ordinary course of business of, the Company or any of its Restricted Subsidiaries at any time outstanding not to exceed the amount required by such governmental or regulatory authority;

(11)    Debt of any cash pooling or other cash management agreements of the Company or any Restricted Subsidiary in place with a bank or financial institution but only to the extent of offsetting credit balances of the Company or any of its Restricted Subsidiaries pursuant to such cash pooling or other cash management;

(12)    Debt of the Company or any Restricted Subsidiary (and any refinancing thereof) in an aggregate principal amount at any time outstanding not exceeding the greater of (i) U.S.$500,000,000 and (2) 6.25% of Consolidated Net Total Assets under financings provided or guaranteed by, directly or indirectly, (A) *Banco Nacional de Desenvolvimento Econômico e Social–BNDES*, or any other governmental development bank or credit agency, including but not limited to *FINEP – Financiadora de Estudos e Projetos* or (B) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer;

(13)    Debt of the Company or any Restricted Subsidiary, including but not limited to obligations under Capital Leases, mortgage financings or purchase money obligations, Incurred for the purpose of financing all or any part of the purchase price, lease expense, rental payments or cost of design, construction, installation or improvement of property, plant or equipment or other assets, whether through direct purchase of  or the Capital Stock of any Person owning such property, plant or equipment or other assets (including any Debt deemed to be Incurred in connection with such purchase) (it being understood that any such Debt may be Incurred after the acquisition or purchase or the construction, installation or the making of any improvement with respect to any such property, plant or equipment or other assets), or Incurred to refinance any such purchase price or cost of construction or improvement, and refinancings thereof, in an aggregate principal amount not to exceed at any one time outstanding the greater of (i) U.S.$150,000,000 and (ii) 2.0% of Consolidated Net Total Assets;

(14)    Debt of the Company or any Restricted Subsidiary to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Securities in accordance with this Indenture;

(15)    Debt of the Company or any of its Restricted Subsidiaries for taxes levied, assessments due and other governmental charges required to be paid as a matter of law or regulation in the ordinary course of business;

(16)    guarantees by the Company or any Restricted Subsidiary of Debt permitted to be Incurred pursuant to this Section 4.03; *provided* that if such Debt is subordinated in right of payment to the Securities or the guarantee of the Guarantors, any such guarantee with respect to such Debt shall be subordinated in right of payment to such guarantee;

(17)    Debt of the Company or any Restricted Subsidiary in respect of (i) self-insurance obligations or captive insurance companies or consisting of the financing of insurance

premiums or (ii) take-or-pay obligations contained in supply agreements in the ordinary course of business;

(18)     Debt of the Company or any Restricted Subsidiary under one or more Credit Facilities, lines of credit or working capital facilities (and any refinancing thereof); *provided, however*, that the aggregate principal amount of such Debt does not exceed at any one time outstanding the greater of (i) U.S.$1,000,000,000 and (ii) 10% of Consolidated Net Total Assets;

(19)     Debt of the Company or any Restricted Subsidiary with respect to reimbursement type obligations regarding worker's compensation claims and Debt and other obligations in respect of deferred compensation of employees Incurred in the ordinary course of business;

(20)     Debt of the Company or any Restricted Subsidiary in the form of customer deposits and advance payments received in the ordinary course of business from customers for purchasers in the ordinary course of business; and

(21)     Debt of the Company or any Restricted Subsidiary (and any refinancing thereof) not otherwise permitted hereunder in an aggregate principal amount equal to the aggregate Net Cash Proceeds received by the Company (other than from a Subsidiary of the Company) after the Issue Date from (i) the issuance and/or sale of its Qualified Equity Interests or (ii) as a contribution to its common equity to the extent that such Net Cash Proceeds received from such issuance, sale or contribution have not been applied to make Restricted Payments pursuant to Sections 4.04(a)(D)(3)(B) and (c)(4).

(c)     Notwithstanding anything to the contrary in this Section 4.03, the maximum amount of Debt that the Company and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Debt, solely as a result of fluctuations in the exchange rate of currencies.

(d)     For purposes of determining compliance with this Section 4.03, in the event that any proposed Debt meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (21) of Section 4.03(b), or is entitled to be Incurred pursuant to Section 4.03(a), the Company and its Restricted Subsidiaries shall be permitted to classify such item of Debt at the time of its Incurrence in any manner that complies with this Section 4.03 or to later reclassify all or a portion of such item of Debt.

(e)     The Company shall not Incur any Debt that is subordinate in right of payment to other Debt of the Company unless such Debt is also subordinate in right of payment to the Securities or the relevant guarantee on substantially identical terms; *provided, however*, that no Debt will be deemed to be subordinated in right of payment to any other Debt of the Company solely by virtue of being unsecured, by virtue of being secured with different collateral or by virtue of being secured on a junior priority basis or by virtue of the applicable of waterfall or other payment ordering provisions affecting different tranches of Debt.

(f)      The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Debt of the same instrument or the payment of regularly scheduled dividends on Disqualified Stock in the form of additional Disqualified Stock with the same terms shall not be deemed to be an Incurrence of Debt for purposes of this Section 4.03; *provided* that any such outstanding additional Debt or Disqualified Stock paid in respect of Debt Incurred pursuant to any provision of Section 4.03(b) shall be counted as Debt outstanding for purposes of any future Incurrence of Debt pursuant to Section 4.03(a).

(g)      For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Debt, the U.S. dollar-equivalent principal amount of Debt denominated in a non-U.S. currency shall be calculated based on the relevant currency exchange rate in effect on the date such Debt was Incurred or, in the case of revolving credit Debt, first committed; *provided* that if such Debt is Incurred to refinance other Debt denominated in a non-U.S. currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Permitted Refinancing Debt does not exceed the principal amount of such Debt being refinanced. The principal amount of any Debt Incurred to refinance other Debt, if Incurred in a different currency from the Debt being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Permitted Refinancing Debt is denominated that is in effect on the date of such refinancing.

SECTION 4.04      Limitation on Restricted Payments.

(a)      The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly (the payments and other actions described in the following clauses being collectively "Restricted Payments"):

(A)      declare or pay any dividend or make any distribution on its Equity Interests held by Persons other than the Company or any of its Restricted Subsidiaries (other than (i) dividends or distributions paid in the Company's Qualified Equity Interests and (ii) dividends or distributions by a Restricted Subsidiary payable, on a pro rata basis or on a basis more favorable to the Company, to all holders of any class of Capital Stock of such Restricted Subsidiary a majority of which is held, directly or indirectly, by the Company);

(B)      purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Company held by Persons other than the Company or any of its Restricted Subsidiaries;

(C)      repay, redeem, repurchase, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, on or with respect to, any Subordinated Debt, except (i) a payment of interest and (ii) a repayment, redemption, repurchase, defeasance or acquisition or retirement in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case, due within one year

40

of the date of such repayment, redemption, repurchase, defeasance or acquisition or retirement; or

        (D)      make any Investment (other than Permitted Investments);

unless, at the time of, and after giving effect to, the proposed Restricted Payment:

        (1)      no Event of Default has occurred and is continuing,

        (2)      the Company could Incur at least U.S.$1.00 of Debt under Section 4.03(a) and

        (3)      the aggregate amount expended for such Restricted Payment and all other Restricted Payments made on or after the Issue Date would not, subject to Section 4.04(d), exceed the sum of:

        (A)      50% of the cumulative Consolidated Net Income (or, if the Consolidated Net Income is a loss, minus 100% of the amount of the loss) of the Company beginning on the first day of the fiscal quarter in which the Issue Date occurs to the end of the most recently completed fiscal quarter for which financial statements have been provided (or if not timely provided, required to be provided) pursuant to this Indenture, *plus*

        (B)      subject to paragraph (c), the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company ((i) other than Net Cash Proceeds to the extent such Net Cash Proceeds have been used to Incur Debt pursuant to Section 4.03(b)(21) or (ii) other than Net Cash Proceeds and the Fair Market Value of property from a Restricted Subsidiary) after the Issue Date from

        (i)      the issuance and sale of its Qualified Equity Interests, or

        (ii)      as a contribution to its common equity, *plus*

        (C)      the amount by which Debt of the Company or any of its Restricted Subsidiaries is reduced on the Company's balance sheet or the balance sheet of such Restricted Subsidiary, in each case, upon the conversion or exchange (other than from Restricted Subsidiaries) subsequent to the Issue Date of any such Debt for Qualified Equity Interests of the Company (less the amount of any cash or the Fair Market Value of any other property distributed by the Company or any of its Restricted Subsidiaries upon such conversion or exchange); *plus*

        (D)      without duplication of any amount included in the calculation of Consolidated Net Income, an amount equal to the sum of (i) the aggregate amount of cash and the Fair Market Value of any asset received by the Company or any of its Restricted Subsidiaries subsequent to the Issue Date with respect to Investments (other than Permitted Investments) made after the Issue Date by the Company or any of its Restricted

41

Subsidiaries in any Person, proceeds realized on the sale of such Investments and proceeds representing the return of capital and (ii) in the event that the Company re-designates an Unrestricted Subsidiary to be a Restricted Subsidiary of the Company , the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time such Unrestricted Subsidiary is designated a Restricted Subsidiary of the Company; *provided, however*, that the foregoing sum shall not exceed, in the case of any such Person or Unrestricted Subsidiary, the amount of Investments (excluding Permitted Investments) previously made (and treated as a Restricted Payment) by the Company or any of its Restricted Subsidiaries in such Person or Unrestricted Subsidiary; *plus*

(E)    without duplication of any amount included above under this clause, 100% of any dividends received by the Company or any of its Restricted Subsidiaries from an Unrestricted Subsidiary.

The amount expended in any Restricted Payment, if other than in cash, shall be deemed to be the Fair Market Value of the relevant non-cash assets, as determined, with respect to amounts at or below U.S.$50,000,000, by an Officer of the Company, whose determination shall be conclusive and evidenced by an Officer's Certificate, and with respect to amounts above U.S.$50,000,000, as determined by the Board of Directors of the Company, whose determination shall be conclusive and evidenced by a resolution of the Board of Directors.

(b)    Section 4.04(a) shall not prohibit the declaration and payment of dividends, in an amount equivalent to not more than the greater of (i) 25% of the Consolidated Net Income (as defined under Brazilian corporate law) and (ii) the Minimum Legally Required Dividend; *provided*, that the payment of such amounts is in compliance with the Brazilian corporate law and the Company's bylaws and that the Company's Board of Directors, with the approval of the fiscal council, if in existence at such time, has not reported to the general shareholders' meeting that the distribution would not be advisable given the financial condition of the Company or its Subsidiaries.

(c)    Neither Section 4.04(a) nor Section 4.04(b) shall prohibit:

(1)    the payment of any dividend or distribution (including in the form of interest on shareholders' equity) within 60 days after the date of declaration thereof if, at the date of declaration, such dividend or distribution would comply with Section 4.04(a);

(2)    the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt owed to the Company or any of its Restricted Subsidiaries, the Incurrence of which was permitted under Section 4.03(b)(1);

(3)    the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt with the proceeds of, or in exchange for, Permitted Refinancing Debt;

42

(4)      any Restricted Payment made in exchange for, or out of the proceeds of a substantially concurrent offering of, Qualified Equity Interests of the Company or of a cash contribution to the common equity of the Company not representing an interest in Disqualified Stock; *provided*, that such Net Cash Proceeds shall be excluded from the calculation in Section 4.04(a)(D)(3)(B);

(5)      repurchases of Equity Interests of the Company deemed to occur upon exercise of warrants, options or rights to acquire Equity Interests if such Equity Interests represent a portion of the exercise price of such warrants, options or rights or nominal cash payments (or related withholding taxes) in lieu of issuances of fractional shares;

(6)      the payment of dividends, distributions or other amounts to fund the repurchase, redemption or other acquisition or retirement for value of any of the Company's Equity Interests or any Equity Interests of any of its Restricted Subsidiaries held by any then-existing or former director, officer, employee, independent contractor or consultant of the Company or any of its Restricted Subsidiaries or their respective assigns, estates or heirs; *provided, however*, that the price paid for all repurchased, redeemed, acquired or retired Equity Interests in all cases, other than as a result of death, disability or termination of employment or directorship, does not exceed U.S.$5,000,000 in the aggregate in any fiscal year (with unused amounts in any fiscal year being carried over to succeeding fiscal years subject to a maximum payment (without giving effect to the following proviso) of U.S.$10,000,000 in any calendar year); *provided further* that the amounts in any fiscal year may be increased by an amount not to exceed: (i) the cash proceeds received by the Company from the sale of Qualified Equity Interests of the Company to any present or former employees, directors, officers or consultants (or their respective permitted transferees) of the Company or any of its Restricted Subsidiaries following the Issue Date, to the extent that such cash proceeds have not otherwise been applied to the payment of Restricted Payments by virtue of Section 4.04(a)(3), such Net Cash Proceeds shall be excluded from the calculation in 4.04(a)(D)(3)(B); *plus* (ii) the cash proceeds of "key man" life insurance policies received by the Company or any of its Restricted Subsidiaries since the Issue Date;

(7)      repurchases of Subordinated Debt at a purchase price not greater than (i) 101% of the principal amount or accreted value, as applicable, of such Subordinated Debt and accrued and unpaid interest thereon in the event of a Change of Control Offer or (ii) 100% of the principal amount or accreted value, as applicable, of such Subordinated Debt and accrued and unpaid interest thereon in the event of an Asset Sale, in connection with any change of control offer or asset sale offer required by the terms of such Subordinated Debt, but only if: (a) in the case of a Change of Control Offer, the Company has first complied with and fully satisfied its obligations under Section 4.08; or (b) in the case of an Asset Sale, the Company has first complied with and fully satisfied its obligations under Section 4.06;

(8)      payments of dividends on Disqualified Stock issued pursuant to Section 4.03;

(9)      the distribution of the Capital Stock of any Restricted Subsidiary; *provided*, that such entity and any entity formed, created or in receipt of such Capital Stock, if

43

any, simultaneously executes and delivers a supplemental indenture to this Indenture (i) providing for a guarantee of payment of the Company's obligations under this Indenture and the Securities and (ii) pursuant to which such entities shall agree to become subject to the covenants contained in this Indenture as if it were a Restricted Subsidiary of the Company, *mutatis mutandis*; and

(10)   Restricted Payments in an aggregate amount not to exceed U.S.$100,000,000; *provided* that the Company will not, and will not permit any Restricted Subsidiary to, make any Restricted Payment described Section  4.04(a)(A) and (B);

*provided*, *further*, that, in the case of clauses (2), (5), (6), (7), (8), (9) and (10) of this Section 4.04(c) no Event of Default has occurred and is continuing or would occur as a result thereof.

(d)    In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, only amounts expended pursuant to Section 4.04(b), Section 4.04(c)(1), Section 4.04(c)(6) and Section 4.04(c)(7) shall be included in such calculation under Section 4.04(a).

SECTION 4.05    [Reserved].

SECTION 4.06    Limitation on Sales of Assets.

(a)    The Company shall not, and shall not permit any Restricted Subsidiary to, make any Asset Sale unless the following conditions are met:

(1)    The Asset Sale is for Fair Market Value.

(2)    At least 75% of the consideration consists of cash or Cash Equivalents received at closing of such Asset Sale. For purposes of this Section 4.06(a)(2), (i) the assumption by the purchasers of Debt or other obligations (other than Subordinated Debt) of the Company or a Restricted Subsidiary pursuant to a customary novation agreement, (ii) Debt (other than Subordinated Debt) of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Sale, to the extent that the Company and each other Restricted Subsidiary are released from any guarantee of such Debt in connection with such Asset Sale, (iii) consideration consisting of Debt of the Company or any Guarantor received from persons who are not the Company or any Restricted Subsidiary, (iv) instruments, securities or other obligations received by the Company or any of its Restricted Subsidiaries from the purchasers that are converted into cash or Cash Equivalents within 120 days of the closing of such Asset Sale shall be considered to be cash received on the at closing of such Asset Sale.

(3)    Within 365 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds shall be used:

(A)    to purchase the Securities (including any Additional Securities) pursuant to an offer to all holders of Securities at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest and additional amounts, if ay, to, but not including the date of purchase;

44

(B)      to repay Debt (other than Subordinated Debt) of the Company or any Restricted Subsidiary (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company or any Restricted Subsidiary; or

(C)      to acquire or invest in (or within such 365-day period in this Section 4.06(a)(3), the Board of Directors shall have made a good faith determination to acquire or invest, which acquisition or investment shall be consummated prior to the second anniversary of such Asset Sale) (i) Additional Assets, (ii) assets of a Permitted Business (or make capital expenditures in respect of a Permitted Business), (iii) a majority of the Voting Stock of another Person that thereupon becomes a Restricted Subsidiary engaged in a Permitted Business or (iv) a Permitted Business Investment.

(4)      Notwithstanding clauses (2) and (3) above, the Company and its Restricted Subsidiaries will be permitted to consummate an Asset Sale without complying with such clauses to the extent either (A) at least 75% of the consideration for such Asset Sale constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities or (B) in the event of an Asset Sale involving Equity Interests of the Company or a Restricted Subsidiary, at least 30% of the consideration for such Asset Sale constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities received at closing; *provided* that the remaining 45% of the consideration is paid on or prior to the third anniversary of the closing and constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities and in the event existing Equity Interests are sold by the Company that such Equity Interests are pledged in favor of the Company or Restricted Subsidiary until such consideration is paid; *provided* that any consideration not constituting Additional Assets received by the Company or any Restricted Subsidiary in connection with any Asset Sale permitted to be consummated under this clause shall be applied (in the case of cash, Cash Equivalents and Marketable Securities within 365 days after the receipt thereof subject to the proviso above) in accordance with the provisions of clause (3) above.

(5)      The Net Cash Proceeds of an Asset Sale not applied pursuant to Section 4.06(a)(3) (or determined by the Board of Directors to not be applied) pursuant to Section 4.06(a)(3)(c) within 365 days of the Asset Sale constitute "Excess Proceeds." Excess Proceeds of less than U.S.$50,000,000 shall be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds such amount, the Company shall, within 30 days, make an offer to purchase (the "Asset Sale Offer") Securities having a principal amount equal to:

(A)      accumulated Excess Proceeds, multiplied by

(B)      a fraction (i) the numerator of which is equal to the outstanding principal amount of the Securities and (ii) the denominator of which is equal to the outstanding principal amount of the Securities and all *pari passu* Debt similarly required to be repaid, redeemed or tendered for in connection with the Asset Sale, rounded down to the nearest U.S.$1,000.

45

(b)      The purchase price for the Securities shall be 100% of the principal amount plus accrued and unpaid interest and Additional Amounts if any to the date of purchase (the "Offer Amount").  If the Asset Sale Offer is for less than all of the Outstanding Securities and Securities in an aggregate principal amount in excess of the purchase amount are tendered and not withdrawn pursuant to the Asset Sale Offer, the Company shall purchase Securities having an aggregate principal amount equal to the purchase amount on a pro rata basis, with adjustments so that only Securities in multiples of U.S.$1,000 principal amount shall be purchased; *provided*, that after a purchase from a Holder in part, such Holder shall hold U.S.$200,000 in principal amount of Securities or a multiple of U.S.$1,000 in excess thereof.  Upon completion of the Asset Sale Offer, Excess Proceeds shall be reset at zero.

(c)      Promptly, and in any event within 30 days after the Company becomes obligated to make an Asset Sale Offer, the Company shall deliver to the Trustee and each Holder a written notice in accordance with Section 13.01, stating that the Holder may elect to have its Securities purchased by the Company either in whole or in part (subject to prorating as described in Section 4.06(b) in the event the Asset Sale Offer is oversubscribed) in integral multiples of U.S.$1,000 of principal amount, at the applicable purchase price.  The notice shall specify the Purchase Date and shall contain such information concerning the business of the Company which the Company in good faith believes will enable such Holders to make an informed decision and all instructions and materials, as determined in good faith by the Company, necessary to tender Securities pursuant to the Asset Sale Offer.

(1)      Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided below, the Company shall deliver to the Trustee an Officer's Certificate as to (A) the Offer Amount, (B) the intended allocation of the Net Cash Proceeds from the Asset Sale pursuant to which such Asset Sale Offer is being made and (C) the compliance of such allocation with the provisions of Sections 4.06(a)(1) through (5).  The Company shall, to the extent lawful, irrevocably deposit with the Trustee or with any Paying Agent the principal amount of, and accrued and unpaid interest on, all Securities (or portions thereof) which have been validly tendered and accepted by the Company for redemption in accordance with the provisions of Section 2.04 and this Section 4.06.  Upon the expiration of the Offer Period, and in any event no later than one Business Day after the expiration of the Offer Period, each Holder shall deliver to the exchange agent for cancellation the Securities or portions thereof which have been properly tendered (and not withdrawn) and are to be accepted by the Company.  A Paying Agent shall, on the Purchase Date, mail or deliver payment (or cause the delivery of payment) to each Holder of Securities properly tendered the amount of the purchase price for such Securities, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Security equal in principal amount to any unpurchased portion of the Securities surrendered, if any; provided that each new Security shall be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.  In the event that the aggregate purchase price of the Securities delivered by the Company or the Guarantors, as the case may be, to the Trustee or any Paying Agent is more than the Offer Amount applicable to the Securities, the Trustee or any Paying Agent shall deliver the excess to the Company or the Guarantors, as the case may be, immediately after the expiration of the Offer Period for application in accordance with this Section 4.06.

46

(2)     Holders electing to have a Security purchased shall be required to surrender the Security, with an appropriate form duly completed, to the exchange agent at the address specified in the notice at least three Business Days prior to the Purchase Date.  Holders shall be entitled to withdraw their election if each of the exchange agent and the Company receives not later than one Business Day prior to the Purchase Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Security which was delivered for purchase by the Holder and a statement that such Holder is withdrawing his election to have such Security purchased.  Holders whose Securities are purchased only in part shall be issued new Securities equal in principal amount to the unpurchased portion of the Securities surrendered.

(3)     At the time the Holder delivers Securities to the exchange agent for cancellation which are to be accepted for purchase, the Company shall also deliver an Officer's Certificate stating that such Securities are to be accepted for purchase by the Company pursuant to and in accordance with the terms of this Section 4.06.  A Security shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering Holder.

(d)     The Company shall comply, to the extent applicable, with the requirements of Rule 14e-1 under the Exchange Act and any other applicable securities laws or regulations in connection with any repurchase of Securities pursuant to this Section 4.06.  To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this Section 4.06, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.06 by virtue of its compliance with such securities laws or regulations.

(e)     Pending application in accordance with this Section 4.06, Net Cash Proceeds may be applied to temporarily reduce revolving credit borrowings, if any, or invested in Cash Equivalents. The Fair Market Value for any Asset Sale with consideration at or below U.S.$50,000,000 shall be determined by an Officer of the Company, whose determination shall be conclusive and evidenced by an Officer's Certificate, and with consideration above U.S.$50,000,000, as determined by the Board of Directors of the Company, whose determination shall be conclusive and evidenced by a resolution of the Board of Directors.

SECTION 4.07     Limitation on Transactions with Affiliates.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering of any service with any Affiliate of the Company (a "Related Party Transaction"), except upon fair and reasonable terms no less favorable to the Company or the Restricted Subsidiary than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company.

(b)     In any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of U.S.$20,000,000, the Company shall first deliver to the Trustee an Officer's Certificate to the effect that such transaction or series of related transactions are on fair

47

and reasonable terms no less favorable to the Company or such Restricted Subsidiary than could be obtained in a comparable arm's-length transaction and is otherwise compliant with the terms of this Indenture.

(c)     In any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of U.S.$40,000,000, a majority of the Board of Directors (including a majority of the disinterested members thereof, but only to the extent there are disinterested members with respect to such Related Party Transaction) must first approve such transaction or series of related transactions and determine that such transaction or series of related transactions are on fair and reasonable terms no less favorable to the Company or such Restricted Subsidiary than could be obtained in a comparable arm's length transaction and is otherwise compliant with the terms of this Indenture.

(d)     Sections 4.07(a) through (c) shall not apply to:

(1)     any transaction or arrangement between the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(2)     the payment of reasonable and customary regular fees to directors of the Company who are not employees of the Company ;

(3)     Permitted Investments and any Restricted Payments that do not violate the provisions under Section 4.04;

(4)     transactions permitted by and complying with Section 5.01.

(5)     any issuance or sale of Equity Interests (other than Disqualified Stock) of the Company;

(6)     transactions or payments (including loans, advances, grants of securities, stock options and similar rights) pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business;

(7)     transactions pursuant to agreements in effect on the Issue Date and described in the Offering Memorandum, as amended, modified or replaced from time to time so long as the amended, modified or new agreements, taken as a whole, are no less favorable to the Company and its Restricted Subsidiaries than those in effect on the Issue Date;

(8)     any Sale and Leaseback Transaction otherwise permitted under Section 4.10 if such transaction is on market terms; and

(9)     transactions with joint ventures or other similar arrangements pursuant to supply or purchase arrangements (i) in effect on the Issue Date, as amended, modified or replaced from time to time and (ii) as may be entered into after the Issue Date; *provided* that the

amendment, modification, replacement or new arrangement, taken as a whole, is no less favorable to the Company and its Restricted Subsidiaries than those in effect on the Issue Date.

SECTION 4.08    Repurchases at the Option of the Holders Upon Change of Control Offer.

(1)    Upon the occurrence of a Change of Control that results in a Rating Decline, each Holder shall have the right to require the Company or a third party so designated to repurchase all or any part (in integral multiples of U.S.$1,000) of that Holder's Securities pursuant to a Change of Control Offer.  No such purchase in part shall reduce the outstanding principal amount of the Securities held by any Holder to below U.S.$200,000.  In the Change of Control Offer, the Company or a third party so designated shall offer a Change of Control Payment.

(2)    Within 30 days following any Change of Control that results in a Rating Decline, the Company or a third party so designated shall make a Change of Control Offer by notice to each Holder in accordance with the provisions of Section 13.01, stating:

(A)    that a Change of Control that results in a Rating Decline has occurred and that such Holder has the right to require the Company or a third party so designated to purchase such Holder's Securities in exchange for its respective portion of the Change of Control Payment;

(B)    an expiration date (the "Expiration Date") not less than 30 days or more than 60 days after the date of the Change of Control Offer;

(C)    the Change of Control Payment and the Change of Control Payment Date;

(D)    information concerning the business of the Company and its Subsidiaries, including the relevant facts regarding such Change of Control, which the Company in good faith believes shall enable the Holders to make an informed decision with respect to the Change of Control Offer; and

(E)    the instructions, as determined by the Company or a third party so designated, consistent with this Section 4.08, that a Holder must follow in order to have its Securities repurchased.

(3)    Holders electing to have a Security repurchased shall be required to surrender the Security, with an appropriate form duly completed, to the exchange agent at the address specified in the notice at least three Business Days prior to the Change of Control Payment Date.  Holders shall be entitled to withdraw their election if each of the Trustee and the Company receives not later than one Business Day prior to the Change of Control Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Security which was delivered for repurchase by the Holder and a statement that such Holder is withdrawing his election to have such Security repurchased.  Holders whose Securities are

49

purchased only in part shall be issued new Securities equal in principal amount to the unpurchased portion of the Securities surrendered.

(4)     On the Change of Control Payment Date, the Company or the Guarantors shall, to the extent lawful:

(A)     accept for payment all Securities or portions of Securities properly tendered and not validly withdrawn pursuant to the Change of Control Offer;

(B)     deposit with any Paying Agent an amount equal to the Change of Control Payment in respect of all Securities or portions of Securities properly tendered and not validly withdrawn; and

(C)     deliver or cause to be delivered, if applicable, to the Trustee for cancellation the Securities properly accepted together with an Officer's Certificate stating the aggregate principal amount of Securities or portions of Securities being purchased by the Company or the Guarantors.

(5)     The Paying Agent shall promptly mail to each Holder of Securities properly tendered the Change of Control Payment for such Securities, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Security equal in principal amount to any unpurchased portion of the Securities surrendered, if any; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.  A Security shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering Holder.  The Company or a third party so designated shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(6)     Notwithstanding the foregoing, the Company shall not be required to make a Change of Control Offer upon a Change of Control that results in a Rating Decline if (i) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture that are applicable to a Change of Control Offer made by the Company, and such third party purchases all Securities properly tendered and not withdrawn under the Change of Control Offer or (ii) notice of redemption for all Outstanding Securities has been given pursuant to Section 3.02, unless and until there is a default in payment of the applicable redemption price.

(7)     The Company or the third party so designated shall comply, to the extent applicable, with the requirements of Rule 14e-1 of the Exchange Act and any other applicable securities laws or regulations in connection with the repurchase of Securities pursuant to this Section 4.08.  To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this Section 4.08, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.08 by virtue of its compliance with such securities laws or regulations.

50

In the event that the Holders of not less than 90% of the aggregate principal amount of the Outstanding Securities accept a Change of Control Offer and the Company or a third party purchases all the Securities held by such Holders, the Company will have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the purchase pursuant to the Change of Control Offer described above, to redeem all of the Securities that remain outstanding following such purchase at the purchase price equal to that in the Change of Control Offer plus, to the extent not included in the Change of Control Offer payment, accrued and unpaid interest and additional amounts, if any, on the Securities that remain outstanding, to the date of redemption (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

SECTION 4.09   Limitation on Liens.  The Company shall not, and shall not permit any Restricted Subsidiary to, create or suffer to exist any Lien upon any of its property or assets now owned or hereafter acquired by it or on any Capital Stock of any Restricted Subsidiary, in each case securing any Debt unless contemporaneously therewith effective provision is made to secure the Securities equally and ratably with such Debt for so long as such Debt is so secured. This covenant shall not require the Company or any Restricted Subsidiary to equally and ratably secure the Securities if the Lien consists of a Permitted Lien.

SECTION 4.10   Limitation on Sale and Leaseback Transactions.  The Company shall not, and shall not permit any Restricted Subsidiary to, enter into any Sale and Leaseback Transaction with respect to any Property unless the Company or such Restricted Subsidiary would be entitled to:

(A)   Incur Debt in an amount equal to the Attributable Debt with respect to such Sale and Leaseback Transaction pursuant to Section 4.03, and

(B)   create a Lien on such Property securing such Attributable Debt without equally and ratably securing the Securities pursuant to Section 4.09.

in which case, the corresponding Debt and Lien shall be deemed Incurred pursuant to those provisions.

SECTION 4.11   Maintenance of Corporate Existence.  Each of the Company and the Guarantors shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and shall use its reasonable efforts to do or cause to be done all things necessary to preserve and keep in full force and effect its rights (charter and statutory); *provided, however*, that neither the Company nor any Guarantor shall be required to preserve any such existence or right if its Board of Directors or management, respectively, shall determine in its sole discretion that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries taken as a whole; *provided further* that this Section 4.11 does not prohibit any transaction otherwise permitted by Section 4.06, Section 5.01, or Article 10.

SECTION 4.12   Maintenance of Properties.  The Company shall cause all properties used or useful in the conduct of its business or the business of any of its Restricted

51

Subsidiaries to be maintained and kept in good condition, repair and working order as in the judgment of the Company may be necessary so that the business of the Company and its Restricted Subsidiaries may be properly and advantageously conducted at all times; *provided* that nothing shall prevent the Company or any Restricted Subsidiary from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company, desirable in the conduct of the business of the Company and its Restricted Subsidiaries taken as a whole.

SECTION 4.13     Limitation on Guarantees of Debt by Restricted Subsidiaries. The Company will not permit any of its Restricted Subsidiaries that is not a Guarantor to guarantee the payment of any Debt of the Company or any of its Restricted Subsidiaries in an aggregate principal amount in excess of U.S.$10,000,000 unless:

(1)     such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture to this Indenture providing for a guarantee of payment of the Company's obligations under this Indenture and the Securities by such Restricted Subsidiary; except that if such Debt is by its express terms subordinated in right of payment to the Securities, any such guarantee of such Restricted Subsidiary with respect to such Debt will be subordinated in right of payment to such Restricted Subsidiary's guarantee with respect to the Securities substantially to the same extent as such Debt is subordinated to the Securities; and

(2)     such Restricted Subsidiary will deliver to the Trustee an Opinion of Counsel to the effect that:

(A)     such supplemental indenture and guarantee have been duly executed and authorized; and

(B)     such guarantee of the Securities constitutes a valid, binding and enforceable obligation of such Restricted Subsidiary (subject to customary exceptions and limitations), except insofar as enforcement thereof may be limited by bankruptcy, insolvency or similar laws (including, without limitation, all laws relating to fraudulent transfers) and except insofar as enforcement thereof is subject to general principles of equity;

*provided, however*, that the foregoing provisions of this covenant will not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary of the Company and was not Incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary of the Company.

SECTION 4.14     [Reserved].

SECTION 4.15     [Reserved].

SECTION 4.16     [Reserved].

SECTION 4.17     [Reserved].

52

SECTION 4.18    Maintenance of Office or Agency in the State of New York. The Company shall ensure the maintenance in the State of New York an office or agency where Securities may be presented or surrendered for payment, where Securities may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Company in respect of the Securities and this Indenture may be served.  The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Company shall fail to ensure the maintenance of any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and, in such event, the Trustee shall act as the Company's agent to receive all such presentations, surrenders, notices and demands.

The Company may also from time to time designate one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the State of New York for such purposes.  The Company shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

SECTION 4.19    [Reserved].

SECTION 4.20    [Reserved].

SECTION 4.21    Additional Amounts.  (a) All payments by the Company in respect of the Securities or by the Guarantors in respect of the Note Guarantee shall be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of the Company's, a Guarantor's or any successor's jurisdiction of incorporation or the jurisdiction in which central management or control of the Company, such Guarantor or such successor, as applicable, is exercised, or any governmental authority therein, unless the Company, such Guarantor or such successor is compelled by law to deduct or withhold such taxes, duties, assessments, or governmental charges.  In such event, the relevant payor shall make such deduction or withholding, make payment of the amount so withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts receivable by Holders of Securities after such withholding or deduction shall equal the respective amounts of principal and interest which would have been receivable in respect of the Securities in the absence of such withholding or deduction ("Additional Amounts").  No such Additional Amounts shall be payable:

(1)    to, or to a third party on behalf of, a Holder or beneficial owner who is liable for such taxes, duties, assessments or governmental charges in respect of such Security by reason of the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership or a corporation) or beneficial owner and Brazil, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member or shareholder) or

53

beneficial owner being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Security or enforcement of rights and the receipt of payments with respect to the Security;

(2)     in respect of Securities surrendered (if surrender is required) more than 30 days after the Relevant Date (as defined below) except to the extent that payments under such Security would have been subject to withholdings and the Holder or beneficial owner of such Security would have been entitled to such Additional Amounts, on surrender of such note for payment on the last day of such period of 30 days;

(3)     where such Additional Amount is imposed on a payment to an individual and is required to be made pursuant to any law implementing or complying with, or introduced in order to conform to any European Union Directive on the taxation of savings;

(4)     to, or to a third party on behalf of, a Holder or beneficial owner who is liable for such taxes, duties, assessments or other governmental charges by reason of such Holder's or beneficial owner's failure to comply with any certification, identification or other reporting requirement concerning the nationality, residence, identity or connection with  Brazil, or a successor jurisdiction or applicable political subdivision or authority thereof or therein having power to tax, of such holder or beneficial owner, if (a) compliance is required by such jurisdiction, or any political subdivision or authority thereof or therein having power to tax, as a precondition to, exemption from, or reduction in the rate of, the tax, assessment or other governmental charge and (b) the Company or any Guarantor has given the holders at least 30 days' notice that Holders will be required to provide such certification, identification or other requirement;

(5)     in respect of any estate, inheritance, gift, sales, transfer, capital gains, excise or personal property or similar tax, assessment or governmental charge;

(6)     in respect of any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of principal of or interest on the Security or by direct payment by the Company or any Guarantor in respect of claims made against the Company or any Guarantor; or

(7)     in respect of any combination of the above.

All references to principal and interest in respect of the Securities shall be deemed also to refer to any Additional Amounts, unless the context requires otherwise, which may be payable as set forth in this Indenture or in the Securities.

(b)     In addition, no Additional Amounts shall be paid with respect to any payment on a Security to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment would be required by the laws of Brazil, or any political subdivision thereof, to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of that

54

partnership, an interest holder in a limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member or beneficial owner been the Holder.

(c)     Any reference in this Indenture or the Securities to principal, interest or any other amount payable in respect of the Securities by the Company or the guarantees by any Guarantor shall be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section 4.21.

(d)     The foregoing obligation in this Section 4.21 shall survive termination or discharge of this Indenture.

SECTION 4.22    Payments and Paying Agent.  (a) Whenever the Company shall appoint a Paying Agent other than Deutsche Bank Trust Company Americas or The Bank of Tokyo-Mitsubishi UFJ, Ltd. with respect to the Securities, it shall cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.22:

(1)     that it will hold all sums received by it as such agent for the payment of the principal of or interest, as the case may be, on any Securities (whether such sums have been paid to it by or on behalf of the Company or by any other obligor on the Securities) in trust for the benefit of the Holders;

(2)     that it will give the Trustee notice of any failure by the Company (or by any other obligor on the Securities) to make any payment of the principal of or interest on any Securities, as the case may be (including Additional Amounts), and any other payments to be made by or on behalf of the Company under this Indenture or the Securities when the same shall be due and payable; and

(3)     that it will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of the failure referred to in clause (2) above.

(b)     The Trustee shall arrange with a Paying Agent for the payment, from funds furnished by the Company to the Trustee pursuant to this Indenture, of the principal of and interest and other amounts due on the Securities (including Additional Amounts) and of the compensation of such Paying Agent for its services as such.

(c)     Anything in this Section 4.22 to the contrary notwithstanding, the Company may at any time, for the purpose of obtaining a satisfaction and discharge with respect to any Securities hereunder, or for any other reason, pay or cause to be paid to the Trustee all sums held in trust for such Securities by the Company or any Paying Agent hereunder as required by this Section 4.22, such sums to be held by the Trustee upon the trusts herein contained.

(d)      Anything in this <u>Section 4.22</u> to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of <u>Section 8.04</u>.

SECTION 4.23      [Reserved].

SECTION 4.24      <u>Limitation on Designation of Unrestricted Subsidiaries</u>.

(a)      The Company may designate after the Issue Date any Subsidiary of the Company as an "Unrestricted Subsidiary" under this Indenture (a "<u>Designation</u>") only if:

(1)      no Event of Default has occurred and is continuing at the time of or after giving effect to such Designation;

(2)      any transactions between the Company or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are, and after giving effect to such Designation will be, in compliance with <u>Section 4.07</u>;

(3)      such Subsidiary has no Debt other than Non-Recourse Debt; and

(4)      the Company would be permitted to make an Investment in an Unrestricted Subsidiary at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment in an Unrestricted Subsidiary at the time of Designation) as a Restricted Payment pursuant to <u>Section 4.04(a)</u> in an amount equal to the amount of the Company's Investment in such Subsidiary on such date.

(b)      The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "<u>Revocation</u>") only if:

(1)      no Event of Default has occurred and is continuing at the time of and after giving effect to such Revocation; and

(2)      all Debt and Liens of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Indenture.

(c)      The Designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary. All Designations and Revocations must be evidenced by a resolution of the Board of Directors of the Company and an Officer's Certificate delivered to the Trustee certifying compliance with the preceding provisions.

SECTION 4.25      <u>Ranking</u>.  Each of the Company and the Guarantors shall ensure that its respective obligations under this Indenture, the Securities and the Note Guarantee shall at all times constitute direct and unconditional obligations of the Company or the Guarantors, ranking at all times at least *pari passu* in priority of payment among themselves and with all other unsubordinated Debt of such Person, except to the extent any such other Debt

56

ranks above such obligations by reason of Liens permitted under Section 4.09 or pursuant to applicable law.

Article 5

Consolidation, Merger, or Sale of Substantially All Assets

SECTION 5.01    Consolidation, Merger, or Sale of Substantially All Assets.

(a)    The Company will not consolidate with or merge with or into, or sell, convey, transfer, dispose of or lease all or substantially all of its assets to, any person,

unless

(1)    the surviving Person (if not the Company) will be a person organized and existing under the laws of Brazil, Colombia, the United States of America, any state thereof or the District of Columbia, or any other country that is a member country of the European Union or of the Organization for Economic Co-operation and Development on the Issue Date, and such person expressly assumes, by a supplemental indenture to this Indenture, executed and delivered to the Trustee, all the obligations of the Company under the Securities and this Indenture;

(2)    the surviving Person (if not the Company), if not organized and existing under the laws of Brazil, undertakes, in such supplemental indenture, to pay such additional amounts in respect of principal and interest as may be necessary in order that every net payment receivable in respect of the Securities after deduction or withholding for or on account of any present or future tax, duty, assessment or other governmental charge imposed by such other country or any political subdivision or taxing authority thereof or therein will not be less than the amount of principal and interest then due and payable on the Securities, subject to the same exceptions set forth in Section 4.21 but replacing existing references in such clause to Brazil with references to the other country;

(3)    immediately prior to such transaction and immediately after giving effect to such transaction, no Default or Event of Default will have occurred and be continuing;

(4)    immediately after giving effect to the transaction on a pro forma basis, the Company or the surviving Person (i) could Incur at least U.S.$1.00 of Debt under clause (a) of the covenant described under Section 4.03 or (ii) would not have both a higher percentage and higher ratio in clause (a) described under Section 4.03; and

(5)    the surviving Person (if not the Company) will have delivered to the Trustee an Officer's Certificate and an opinion of counsel, stating that such consolidation, merger or transfer and such supplemental indenture, if any, comply with this Indenture.

The Trustee will accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent set forth in this covenant, in which event it will be conclusive and binding on the holders.

Notwithstanding the restriction described in clause (3) and (4), any Restricted Subsidiary may consolidate with, merge into or transfer all or part of its properties and assets to the Company, the Company may merge into a Restricted Subsidiary for the purpose of reincorporating the Company in another jurisdiction, and any Restricted Subsidiary may consolidated with, merge into or transfer all or part of its properties and assets to another Restricted Subsidiary.

(b)     The Company shall not lease all or substantially all of its assets, whether in one transaction or a series of transactions, to one or more other Persons, except to the extent permitted under Section 4.10.

(c)     Upon the consummation of any transaction effected in accordance with these provisions, if the Company is not the continuing Person, the surviving Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Securities with the same effect as if such surviving Person had been named as the Company in this Indenture.

Article 6

Defaults and Remedies

SECTION 6.01     Events of Default.  An "Event of Default" occurs if:

(1)     the Company defaults in any payment of interest (including Additional Amounts, if any) on any Security when the same becomes due and payable, and such default continues for a period of 30 days;

(2)     the Company defaults in the payment of the principal (including Additional Amounts, if any) of any Security when the same becomes due and payable upon acceleration or redemption or otherwise;

(3)     the Company fails to make an Change of Control Offer and thereafter to accept and pay for Securities tendered when and as required pursuant to Section 4.08;

(4)     the Company fails to comply with Section 5.01;

(5)     the Company or any Guarantor, as the case may be, fails to comply with any of its covenants or agreements in the Securities or this Indenture (other than those referred to in clauses (1), (2), (3) and (4) above), and such failure continues for 60 days after the notice specified below;

(6)     the Company or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by the Company or such Significant Subsidiary (or the payment of which is guaranteed by the Company or such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the Issue Date, which default (a) is caused by

58

failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default (a "Payment Default") or (b) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$75,000,000 or more in the aggregate;

(7)     one or more final and non-appealable-judgments for the payment of money are rendered against the Company or any Significant Subsidiary and are not paid or otherwise discharged and there is a period of 60 consecutive days following entry of the final and non-appealable judgment that causes the aggregate amount for all such final and non-appealable judgments outstanding and not paid or discharged against all such Persons to exceed U.S.$75,000,000 or the equivalent thereof at the time of determination (in excess of amounts which the Company's insurance carriers have agreed to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(8)     an involuntary case or other proceeding is commenced against the Company or any Significant Subsidiary with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, *síndico*, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against the Company or any Significant Subsidiary under the federal bankruptcy laws as now or hereafter in effect and such order is not being contested by the Company or such Significant Subsidiary, as the case may be, in good faith or has not been dismissed, discharged or otherwise stayed, in each case within 60 days of being made;

(9)     the Company or any Significant Subsidiary (i) commences a voluntary case or other proceeding seeking the commencement of judicial or extra judicial reorganization, proceedings or bankruptcy proceedings with respect to itself or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, *síndico*, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Company or any Significant Subsidiary or for all or substantially all of the property of the Company or such Significant Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(10)     any event occurs that under the laws of Brazil or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in clause (8) or (9) above;

(11)     any guarantee by a Significant Subsidiary ceases to be in full force and effect, other than in accordance with the terms of this Indenture, or a Guarantor denies or disaffirms its obligations under its guarantee; or

(12)     all or substantially all of the undertaking, assets and revenues of the

59

Company or any Significant Subsidiary is condemned, seized or otherwise appropriated (other than in accordance with its terms) by any Person acting under the authority of any national, regional or local government or the Company or any Significant Subsidiary is prevented by such Person for a period of 60 consecutive days or longer from exercising normal control over all or substantially all of its undertaking, assets and revenues.

A Default under clause (5) above will not constitute an Event of Default until the Trustee or the holders of at least 25% in principal amount of the Outstanding Securities notify the Company and the Trustee of the Default and the Company does not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) a responsible officer of the Trustee with direct responsibility for this Indenture has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to the Trustee at its Corporate Trust Office by the Company , any Guarantor or any Holder, such notice identifying this Indenture and the Company.

SECTION 6.02   Acceleration.  If an Event of Default (other than an Event of Default specified in Section 6.01(8), (9) or (10)) occurs and is continuing under this Indenture, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Securities outstanding, may declare all unpaid principal of and accrued interest on all Securities to be due and payable immediately, by a notice in writing to the Company, and upon any such declaration such amounts will become due and payable immediately. If an Event of Default specified in Section 6.01(8), (9) or (10) above occurs and is continuing, then the principal of and accrued interest on all Securities shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

SECTION 6.03   Other Remedies.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of or interest on the Securities or to enforce the performance of any provision of the Securities or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative.

SECTION 6.04   Rescission/Annulment of Acceleration; Waiver of Past Defaults.  The holders of a majority in aggregate principal amount of the Outstanding Securities by written notice to the Issuer and to the Trustee may waive all past defaults (whether a Default or Event of Default) and rescind and annul an acceleration and its consequences if:

(1)     all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Securities that have become due solely by such acceleration, have been cured or waived, and

(2)     the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.

Except as otherwise provided in Section 6.02 or Section 9.02, the Holders of a majority in principal amount of the outstanding Securities may, by notice in writing to the Trustee, waive an existing Default and Event of Default and its consequences.  Upon such waiver, the Default and Event of Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

SECTION 6.05     Control by Majority.  Subject to the provisions herein relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders, unless such holders will have offered to the Trustee indemnity reasonably satisfactory to the Trustee.  Subject to such provision for the indemnification of, or provision of security to, the Trustee, the Holders of a majority in aggregate principal amount of the outstanding Securities shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

SECTION 6.06     Limitation on Suits.  A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Securities, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Securities, unless:

(1)     the Holder has given to the Trustee written notice of a continuing Event of Default;

(2)     Holders of at least 25% in aggregate principal amount of outstanding Securities have made written request to the Trustee to institute proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(3)     Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against any costs, liabilities or expenses to be incurred in compliance with such request;

(4)     the Trustee within 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(5)     during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Securities have not given the Trustee a written direction that is inconsistent with such written request;

61

it being understood and intended that no one or more of such Holders shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner therein provided and for the equal and ratable benefit of all such Holders (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

SECTION 6.07   Rights of Holders to Receive Payment.  Notwithstanding any other provision of this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and premium, if any and interest and Additional Amounts, if any, on such Security and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

SECTION 6.08   Collection Suit by Trustee.  If an Event of Default specified in Section 6.01(1) or Section 6.01(2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company or the Guarantors for the whole amount then due and owing (together with interest on any unpaid interest to the extent lawful) and the amounts provided for in Section 7.06.

SECTION 6.09   Trustee May File Proofs of Claim.  The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Securityholders allowed in any judicial proceedings relative to the Company, the Guarantors, their creditors or their property and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Bankruptcy Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.06.

SECTION 6.10   Priorities.  If the Trustee collects any money or property pursuant to this Article 6, it shall pay out the money or property in the following order:

FIRST:        to the Trustee and any Agent for amounts due under Section 7.06;

SECOND:     to Securityholders for amounts due and unpaid on the Securities for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities for principal and interest, respectively; and

THIRD:       to the Issuer or, to the extent the Trustee collects any amounts from the Guarantors, to the Guarantors.

The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 6.10 and shall promptly notify the Issuer thereof.  At least 15 days before such record date, the Company shall mail to each Securityholder and the Trustee a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11    Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 or a suit by Holders of more than 10% in principal amount of the Securities.

SECTION 6.12    Waiver of Stay or Extension Laws.  Neither the Issuer nor the Guarantors (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and each of the Issuer and the Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

Article 7

Trustee

SECTION 7.01    Duties of Trustee.

(1)  Except during the continuance of an Event of Default:

(a)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(b)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  Notwithstanding the foregoing, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not, and is under no obligation to, confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

63

(2)     Following the occurrence and continuance of an Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(3)     The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(a)     this Section 7.01(3) does not limit the effect of Section 7.01(1);

(b)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(c)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(4)     Every provision of this Indenture that in any way relates to the Trustee is subject to Sections 7.01(1), (2) and (3).

(5)     The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer or the Guarantors.

(6)     Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(7)     No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity or security, as applicable, against such risk or liability is not reasonably assured to it.

(8)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

SECTION 7.02     Rights of Trustee.  (1)  Subject to Section 7.01 hereof, the Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee need not investigate any fact or matter stated in the document but may, in its discretion, make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer and the Guarantors, personally or by agent or attorney at the sole cost of the Issuer and the Guarantors and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(2)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate and/or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(3)     The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(4)     The Trustee shall not be liable for any action it takes or omits to take in good faith which it reasonably believes to be authorized or within its rights or powers; *provided, however*, that the Trustee's conduct does not constitute willful misconduct or negligence.

(5)     The Trustee may consult with counsel appointed with due care and the advice or Opinion of Counsel of such counsel with respect to legal matters relating to this Indenture and the Securities shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or such opinion of such counsel.

(6)     In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(7)     The Trustee shall not be deemed to have notice of any Default or Event of Default (other than a payment default under Section 6.01(1) or Section 6.01(2)) unless a Trust Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Securities and this Indenture.

(8)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each Agent, custodian and other Person employed to act hereunder.

(9)     The Trustee may request that the Issuer deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture.

SECTION 7.03     Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Issuer, the Guarantors or their Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent, Registrar, co-registrar or co-paying agent may do the same with like rights.  However, the Trustee must comply with Section 7.09 and Section 7.10.

SECTION 7.04     Trustee's Disclaimer.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Note Guarantee or the Securities, it shall not be accountable for the Issuer's use of the proceeds from the

Securities, and it shall not be responsible for any statement of the Issuer or the Guarantors in this Indenture or in any document issued in connection with the sale of the Securities or in the Securities other than the Trustee's certificate of authentication.

SECTION 7.05    Notice of Defaults.  If any Event of Default occurs and is continuing and is known to a responsible officer of the Trustee, the Trustee shall send notice of the Event of Default to each Holder within 90 days after it occurs, unless the Event of Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or interest on any Security, the Trustee may withhold the notice if and so long as a trust committee of trust officers of the Trustee in good faith determines that withholding the notice is in the interest of the Securityholders. The Trustee shall not be charged with knowledge of any Default or Event of Default other than a Default under Section 6.01(1) or Section 6.01(2) hereof unless a Trust Officer in the Corporate Trust Office of the Trustee shall have received written notice thereof from the Issuer or a Securityholder, expressly referencing this Indenture and the Securities.

SECTION 7.06    Compensation and Indemnity.   The Issuer shall pay to the Trustee and each Agent from time to time such compensation for its services and/or otherwise in connection with the Securities hereunder as the parties may from time to time agree in writing. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall indemnify the Trustee or any predecessor Trustee, each Paying Agent, the Registrar and any other Agent  (which for purposes of this Section 7.06 shall be deemed to include their respective directors, officers, agents and employees) (each an "Indemnified Person") against any and all loss, liability or expense (including taxes (other than taxes based upon, measured by or determined by the income of the Trustee) and reasonable and documented attorneys' fees and expenses) Incurred by it in connection with the administration of this trust and/or the performance of its duties hereunder, including the reasonable costs and expenses of defending itself against any claim (whether asserted by the Guarantors, the Issuer, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 7.06, except to the extent that such loss, damage, claim, liability or expense is due to its own willful misconduct, negligence or bad faith.  An Indemnified Person shall notify the Issuer promptly of any claim for which it may seek indemnity.  Failure by an Indemnified Person to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.  The Issuer shall defend the claim and each Indemnified Person may have separate counsel and the Issuer shall pay the reasonable and documented fees and expenses of such counsel; *provided* that the Issuer shall not be required to pay such fees and expenses if they assume an Indemnified Person 's defense and, in an Indemnified Person's reasonable judgment, there is no conflict of interest between the Issuer and such parties in connection with such defense.  In no event shall the Issuer be liable for fees and expenses of more than one counsel (in addition to any local counsel) separate from its own counsel for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstance.  The Issuer need not pay for any settlement made without its consent.

To secure the Issuer's obligations in this Section 7.06, each Indemnified Person shall have a lien prior to the Securities on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest and Additional Amounts, if any, on particular Securities.

The Issuer's payment obligations pursuant to this Section 7.06 shall survive the discharge of this Indenture, final payment on the Securities and resignation or removal of the Trustee or other Indemnified Person.  When the Trustee or other Indemnified Person incurs expenses after the occurrence of an Event of Default specified in Section 6.01(8) or (9) with respect to the Issuer, the expenses are intended to constitute expenses of administration under the U.S. Bankruptcy Code.

SECTION 7.07    Replacement of Trustee.  The Trustee may resign at any time by written notice to the Issuer and the Guarantors.  The Holders of a majority in principal amount of the Outstanding Securities may remove the Trustee by written notice to the Trustee and the Issuer and may appoint a successor Trustee.  The Issuer shall remove the Trustee if:

(1)      the Trustee fails to comply with Section 7.09;

(2)      the Trustee is adjudged bankrupt or insolvent or an order of relief is entered with respect to the Trustee;

(3)      a receiver or other public officer takes charge of the Trustee or its property; or

(4)      the Trustee otherwise becomes incapable of acting as Trustee hereunder.

In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor trustee shall become effective only upon the successor trustee's acceptance of appointment as provided in this Section 7.07.

If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Securities may appoint a successor trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor trustee, *provided, however*, that in case of a bankruptcy, the resigning Trustee shall have the right to appoint a successor trustee within 10 Business Days after giving of such notice of resignation if the Issuer has not already appointed a successor trustee.  If the successor trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the holders of a majority in principal amount of the Outstanding Securities may appoint a successor trustee or may petition any court of competent jurisdiction for the appointment of a successor trustee.

Upon delivery by the successor trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee shall, upon payment of its charges, transfer all property held by it as Trustee to the successor trustee, (ii) the resignation or removal of the retiring Trustee shall become effective, and (iii) the successor trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor trustee, the Issuer shall execute any and all instruments for fully vesting in and confirming to the successor trustee all such rights, powers and trusts.  The Issuer shall give notice of any resignation and any removal of the Trustee and each appointment of a successor trustee to all Holders, and include in the notice the name of the successor trustee and the address of its Corporate Trust Office.

If the Trustee fails to comply with Section 7.09, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of another successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the Issuer's obligations under Section 7.06 shall continue for the benefit of the retiring Trustee.

SECTION 7.08    <u>Successor Trustee by Merger</u>.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Securities shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Securities so authenticated; and in case at that time any of the Securities shall not have been authenticated, any successor to the Trustee may authenticate such Securities either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Securities or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.09    <u>Eligibility; Disqualification</u>.  The Trustee shall at all times satisfy the requirements of TIA § 310(a).  The Trustee shall have a combined capital and surplus of at least U.S.$50,000,000 as set forth in its most recent published annual report of condition. The Trustee shall comply with TIA § 310(b); *provided*, *however*, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

SECTION 7.10    <u>Preferential Collection of Claims Against Issuer</u>.  The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

SECTION 7.11    Appointment of Co-Trustee.

(a)    Notwithstanding any other provisions of this Indenture, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, and to vest in such Person or Persons, in such capacity and for the benefit of the Securityholders, subject to the other provisions of this Section 7.11, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 7.09 and no notice to Holders of the appointment of any co-trustee or separate trustee shall be required under Section 7.07 hereof.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(1)    all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(2)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(3)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article 7.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the rights to compensation, reimbursement and indemnification hereunder) to, the Trustee.  Every such instrument shall be filed with the Trustee.

(d)    Any separate trustee or co-trustee may at any time constitute the Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

69

Article 8

Discharge of Indenture; Defeasance

SECTION 8.01    Satisfaction and Discharge of Liability on Securities.

(a) This Indenture, the Securities and the Note Guarantee shall, subject to Section 8.01(b), cease to be of further effect as to all Securities issued hereunder, when:

(1)    (A)    the Company delivers to the Trustee all Outstanding Securities (other than Securities for whose payment money has theretofore been deposited in trust and thereafter repaid to the Company as provided in Section 8.05) for cancellation; or

(B)    all Outstanding Securities that have not been delivered to the Trustee for cancellation (i) have become due and payable, (ii) will become due and payable at their Stated Maturity within one year, or (iii) are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of a redemption by the Trustee and, in each case, the Company irrevocably deposits or causes to be deposited with the Trustee as funds in trust solely for the benefit of the Holders U.S. dollars or U.S. Government Obligations in an amount as will be sufficient without consideration of any reinvestment of interest, to pay and discharge all principal, premium and Additional Amounts, if any, and accrued and unpaid interest to the date of maturity or redemption on the Securities not delivered to the Trustee for cancellation;

(2)    no Event of Default has occurred and will continue after the date of the deposit or will occur as a result of the deposit and the deposit will not result in a breach or violation of, or constitute a default under, any other material instrument to which the Company or any Restricted Subsidiary is a party or by which the Company or any Restricted Subsidiary is bound;

(3)    the Company or any Restricted Subsidiary has paid or caused to be paid all other sums payable by it hereunder;

(4)    the Company has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Securities at maturity or the redemption date, as the case may be; and

(5)    the Company has delivered to the Trustee an Opinion of Counsel and an Officer's Certificate as to compliance with all conditions precedent provided for in this Indenture relating to the satisfaction and discharge of the Securities.

(b)    Notwithstanding Section 8.01(a), this Article 8 and the Company's obligations in Sections 2.03, 2.04, 2.05, 2.06, 2.07, 2.08, 4.21, 7.06 and 7.07 shall survive until the Securities have been paid in full.  Thereafter, Section 8.05 and the Company's obligations in Sections 4.21, 7.06 and 8.07 shall survive.

70

SECTION 8.02   [Reserved].

SECTION 8.03   [Reserved].

SECTION 8.04   Application of Trust Money.  The Trustee shall hold in trust U.S. dollars or U.S. Government Obligations deposited with it pursuant to this Article 8.  It shall apply the deposited money and the U.S. dollars from U.S. Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest and Additional Amounts, if any, on the Securities.

SECTION 8.05   Repayment to Company.  The Trustee and each Paying Agent shall promptly turn over to the Company upon request any excess money or Securities held by them at any time.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Company upon request any money held by them for the payment of principal and interest and Additional Amounts, if any, that remains unclaimed for two years, and, thereafter, Securityholders entitled to the money must look only to the Company and not to the Trustee or any Paying Agent for payment as general creditors.

SECTION 8.06   Defeasance.  The Company may, at its option, at any time elect to have either Section 8.06(a) or Section 8.06(b) applied to all outstanding Securities and the Note Guarantee upon compliance with the conditions set forth in Section 8.06(c):

(a)   Upon the Company's election of the "legal defeasance" option applicable to this Section 8.06(a), and subject to the satisfaction of the conditions set forth in Section 8.06(c), the Company and the Guarantors shall be discharged from any and all obligations in respect of this Indenture, the Company shall be discharged from any and all obligations in respect of the Securities, and the Guarantors shall be discharged from any and all obligations in respect of the Note Guarantee (except in each case for the obligations to register the transfer or exchange of Securities, replace stolen, lost or mutilated Securities, maintain paying agencies and hold moneys for payment in trust). Subject to compliance with this Section 8.06, the Company may exercise its option under this Section 8.06(a) notwithstanding the prior exercise of its option under Section 8.06(b).  If the Company exercise the "legal defeasance" option, any payment on the Securities may not be accelerated due to an Event of Default with respect thereto.

(b)   Upon the Company's  election of the "covenant defeasance" option applicable to this Section 8.06(b), and subject to the satisfaction of the conditions set forth in Section 8.06(c) hereof, the Company and the Guarantors, as applicable, need not comply with the covenants set forth in Sections 4.02, 4.03, 4.04, 4.06, 4.07, 4.08, 4.09, 4.10,  4.12, 4.13, 4.24 and 4.25 and the requirements of Sections 5.01(a)(4) and (5) and Sections 6.01 (4) (as it applies to Sections 5.01(a)(4) and (5)) and (5) shall not constitute Events of Default.

(c)   In order to exercise the options set forth in Section 8.07(a) or Section 8.07(b) above the Company must irrevocably deposit in trust with the Trustee U.S. dollars or U.S. Government Obligations sufficient to pay principal of and interest on the Securities to maturity

71

or redemption and by meeting certain other conditions, including delivery to the Trustee of either a ruling received from the Internal Revenue Service or an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.  In addition, in the case of any legal defeasance, the Company must deliver to the Trustee an Opinion of Counsel in the Federative Republic of Brazil and any other jurisdiction in which the Company or the Guarantors are organized or incorporated, as applicable, or is resident for tax purposes, and any other jurisdiction in which the Company or the Guarantors are conducting business in a manner which causes the holders of the Securities to be liable for taxes on payments under the Securities for which they would not have been so liable but for such conduct of business in such other jurisdiction, to the effect that Holders of the applicable Securities will not recognize income, gain or loss in the relevant jurisdiction (as applicable) as a result of such deposit and defeasance and will be subject to taxes in the relevant jurisdiction (including withholding taxes) (as applicable) on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred.  In the case of any legal defeasance, the defeasance shall in each case be effective when 90 days have passed since the date of the deposit in trust.

SECTION 8.07   Reinstatement.  If the Trustee or any Paying Agent is unable to apply any U.S. dollars or U.S. Government Obligations in accordance with Section 8.06 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's obligations under this Indenture and the Securities shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.06 until such time as the Trustee or such Paying Agent is permitted to apply all such U.S. dollars or U.S. Government Obligations in accordance with Section 8.06; *provided, however*, that, if the Company has made any payment of interest or Additional Amounts, if any, on or principal of any Securities because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Securities to receive such payment from the U.S. dollars held by the Trustee or such Paying Agent.

Article 9

Amendments

SECTION 9.01   Without Consent of Holders.  Notwithstanding Section 9.02, the Company, the Guarantors and the Trustee may amend or supplement this Indenture, the Note Guarantee or the Securities without notice to or consent of any Securityholder:

(1)     to cure any ambiguity, omission, defect or inconsistency;

(2)     to comply with Section 5.01;

(3)     to provide for a Substituted Debtor as described under Section 10.01;

(4)     add to the covenants of the Company or the Guarantors for the benefit of Securityholders;

(5)     surrender any right conferred upon the Company or the Guarantors;

(6)     to evidence and provide for the acceptance of an appointment by a successor trustee;

(7)     to provide for the issuance of Additional Securities;

(8)     to provide for any guarantee of the Securities, to secure the Securities or to confirm and evidence the release, termination or discharge of any guarantee of or Lien securing the Securities when such release, termination or discharge is permitted by this Indenture; or

(9)     to make any other change that does not materially and adversely affect the rights of any Holder of the Securities or to conform the terms of this Indenture, the Note Guarantee or the Securities with the description thereof set forth in the "Description of Notes" section of the Offering Memorandum.

For the avoidance of doubt, the Company may at any time enter into a supplemental indenture with the Trustee without the consent of Securityholders to provide that any optional redemption can only be exercised by the Company beginning on a date more than 720 days after the Issue Date.

SECTION 9.02    With Consent of Holders.  (a) Except as otherwise provided in Section 6.02 or Section 9.02(b), the Company, the Guarantors and the Trustee may amend or supplement this Indenture, the Note Guarantee and the Securities with the written consent of the Holders of a majority in principal amount of the Outstanding Securities and the Holders of a majority in principal amount of the Outstanding Securities may waive any past Default, Event of Default or future compliance by the Company or the Guarantors with any provision of this Indenture, the Note Guarantee or the Securities.

(b)     Notwithstanding the provisions Section 9.02(a), without the consent of each Holder affected, an amendment or waiver shall not (with respect to any Securities held by a non-consenting Holder):

(1)     reduce the rate of or extend the time for payment of interest on any Security;

(2)     reduce the principal of any Security;

(3)     reduce the amount payable upon redemption of any Security or change the time at which any Security may be redeemed;

(4)     change the currency for payment of principal of, or interest on, any Security;

(5)     impair the right to institute suit for the enforcement of any payment on or with respect to any Security;

(6)     waive certain payment defaults with respect to the Security;

(7)     reduce the principal amount of Securities whose Holders must consent to any amendment or waiver;

(8)     make any change in the amendment or waiver provisions which require each Holder's consent;

(9)     modify or change any provision of this Indenture affecting the ranking of the Securities or the Note Guarantees in a manner adverse to the Holders of the Securities; or

(10)    make any change in the Note Guarantees that would adversely affect the Holders in any material respect;

The Company shall provide prior notice to each Holder pursuant to Section 13.01 of any proposed amendment under this Section 9.02. It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Company shall (or shall cause the Trustee to) mail to Securityholders a notice briefly describing such amendment.  The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03     Revocation and Effect of Consents and Waivers.  (a)  A consent to an amendment or a waiver by a Holder of a Security shall bind the Holder and every subsequent Holder of that Security or portion of the Security that evidences the same debt as the consenting Holder's Security, even if notation of the consent or waiver is not made on the Security.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment or waiver becomes effective.  After an amendment or waiver becomes effective, it shall bind every Securityholder.  An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.

(b)     The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Securityholders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding Section 9.03(a), those Persons who were Securityholders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or

effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

SECTION 9.04     Notation on or Exchange of Securities.  If an amendment changes the terms of a Security, the Trustee may require the Holder of that Security to deliver it to the Trustee.  The Trustee may place an appropriate notation on that Security regarding the changed terms and return it to the Holder.  Alternatively, if the Company or the Trustee so determines, the Company in exchange for that Security shall issue and the Trustee shall authenticate a new Security that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Security shall not affect the validity of such amendment.

SECTION 9.05     Trustee to Sign Amendments.  The Trustee shall sign any amendment authorized pursuant to this Article 9 if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  If it does, the Trustee may but need not sign it.  In signing such amendment the Trustee shall be entitled to receive indemnity or security, as applicable, reasonably satisfactory to it and to receive, and (subject to Section 7.01) shall be fully protected in relying upon, an Officer's Certificate and an Opinion of Counsel, each complying with Section 13.04, and stating that such amendment is authorized or permitted by this Indenture.


Article 10

Substitution of the Issuer

SECTION 10.01     Substitution of the Issuer.  (a) Notwithstanding any other provision in this Indenture, the Issuer may, without the consent of the Holders (and by subscribing for any Securities, each Holder expressly consents to it), be replaced and substituted by (i) any Guarantor or (ii) any Wholly-Owned Subsidiary of the Company, a Guarantor or Guarantors as principal debtors (in such capacity, the "Substituted Debtor") in respect of the Securities; provided that:

(i)     such documents will be executed by the Substituted Debtor, the Issuer, the Guarantor's and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture under which the Substituted Debtor assumes all of the Issuer's obligations under this Indenture and the Securities, a guarantee pursuant to which the Issuer will unconditionally and irrevocably guarantee in favor of each Holder the payment of all sums payable by the Substituted Debtor as such principal debtor, and, unless the Guarantors' then existing guarantees remain in full force and effect, substitute the guarantees issued by the Guarantors in respect of the Securities (collectively, the "Issuer Substitution Documents") and the covenants and events of default will continue to apply to the Issuer in respect of the Securities as if no such substitution had occurred, it being the intent that the rights of Holders in respect of the Securities will be unaffected by such substitution.

(ii)     the Issuer Substitution Documents will contain covenants to ensure that each Holder of the Securities has the benefit of a covenant in terms corresponding to the obligations of

75

the Issuer in respect of the payment of Additional Amounts under Section 4.21, if any (but replacing references to Brazil with references to another jurisdiction in the case that the Substituted Debtor is organized in a jurisdiction other than Brazil).

(iii)    the Issuer will deliver, or cause the delivery, to the Trustee an opinion of recognized counsel in the jurisdiction of organization of the Substituted Debtor and New York as to the validity, legally binding effect and enforceability of the Issuer Substitution Documents and specified other legal matters, as well as an Officer's Certificate as to compliance with the provisions described under this Section 10.01;

(iv)    the Substituted Debtor will appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Securities, this Indenture and the Issuer Substitution Documents;

(v)    any credit rating assigned to the Securities will remain the same or be improved when the Substituted Debtor replaces and substitutes the Issuer in respect of the Securities; *provided*, that, any such change in credit rating is in whole or in part in connection with such substitution;

(vi)    no Event of Default has occurred or is continuing; and

(vii)    the substitution will comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Debtor and Brazil.

Notwithstanding any other provision of this Indenture, each Guarantor will do or cause to be done all acts and things and promptly execute and deliver any documents or instruments, including any substitute guarantee and a legal opinion of internationally recognized counsel in the jurisdiction of such Guarantor, that may be required, or that the Trustee may reasonably request, to ensure that such Guarantor's guarantee is in full force and effect for the benefit of the holders and beneficial owners of the Securities following the substitution.

(b)    Notwithstanding anything to the contrary in Section 10.01(a), the Company may be replaced and substituted as an issuer by its Subsidiary, OGX Netherlands B.V., after the Issue Date upon (i) the execution and delivery of a supplemental indenture substantially in the form of Appendix II and (ii) the delivery to the Trustee of an opinion of recognized counsel in New York as to the validity, legally binding effect and enforceability of the supplemental indenture. The Trustee is hereby authorized to execute and deliver such supplemental indenture. The Company will continue as a Guarantor of the Securities upon such substitution.

SECTION 10.02    Deemed Substitution.  Upon the execution of the Issuer Substitution Documents as referred to in Section 10.01(a) or (b), the Substituted Debtor shall be deemed to be named in the Securities as the principal debtor in place of the Issuer (or of any previous substitute under these provisions) and the Securities shall thereupon be deemed to be amended to give effect to the substitution.  Except as set forth in this Article 10, the execution of the Issuer Substitution Documents shall operate to release the Company (or such previous

76

substitute as aforesaid) from all its obligations in respect of the Securities and its obligation to indemnify the Trustee under this Indenture.

SECTION 10.03   Notice of Substitution.  Not later than 10 Business Days after the execution of the Issuer Substitution Documents, the Substituted Debtor will give notice thereof to the Holders of the Securities in accordance with this Article 10.

Article 11

Guarantee by the Guarantors

SECTION 11.01   Guarantee.  Subject to the provisions of this Article, the Guarantors hereby irrevocably and unconditionally guarantee to each Securityholder and to the Trustee the due and punctual payment (whether at the Maturity Date, upon redemption, purchase pursuant to an offer to purchase or acceleration or otherwise) of the principal, interest, Additional Amounts and all other amounts payable by the Company under this Indenture as they come due. Upon failure by the Company to pay punctually any such amount, the Guarantors shall forthwith pay the amount not so paid at the place and time and in the manner specified in this Indenture. This guarantee constitutes a direct, general and unconditional obligation of the Guarantors which will at all times rank at least *pari passu* with all of their other respective unsubordinated obligations, except for such obligations as may be preferred by mandatory provisions of law.

SECTION 11.02   Guarantee Unconditional.  The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)      any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Company under this Indenture or any Security, by operation of law or otherwise;

(b)      any modification or amendment of or supplement to this Indenture (other than this Article 11) or any Security;

(c)      any change in the corporate existence, structure or ownership of the Company, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Company or its assets or any resulting release or discharge of any obligation of the Company contained in this Indenture or any Security;

(d)      the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Company, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions, *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)      any invalidity or unenforceability relating to or against the Company for any reason of this Indenture or any Security, or any provision of applicable law or regulation

77

purporting to prohibit the payment by the Company of the principal of or interest on any Security or any other amount payable by the Company under this Indenture;

(f)     any other act or omission to act or delay of any kind by the Company, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantor's obligations hereunder; or

(g)     any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms of this Indenture.

SECTION 11.03   <u>Termination, Release and Discharge; Reinstatement</u>.

(a)     The Guarantors' obligations hereunder shall remain in full force and effect until the principal of, premium, if any, and interest on the Securities and all other amounts payable by the Company under this Indenture have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Security or any other amount payable by the Company under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Company or otherwise, the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

(b)     A Guarantor's obligations hereunder shall terminate and be released:

(1)     a sale or disposition (including by way of consolidation or merger) of all or a portion of the Capital Stock of such Guarantor following which such Guarantor is no longer a Subsidiary of the Company;

(2)     a sale or disposition (including by way of consolidation or merger) of all or substantially all of the assets of such Guarantor to a Person that is not the Company or a Restricted Subsidiary of the Company;

(3)     defeasance under <u>Section 8.06</u> or satisfaction and discharge of the Securities under <u>Section 8.01</u>;

(4)     the Designation of such Guarantor as an Unrestricted Subsidiary; and

(5)     the liquidation or dissolution of such Guarantor; *provided* that no Event of Default occurs as a result thereof or has occurred or is continuing;

*provided*, in each case, that the transaction is carried out pursuant to, and in accordance with, all other applicable provisions of this Indenture.

SECTION 11.04   Waiver by the Guarantors.

(a)   The Guarantors unconditionally and irrevocably waive acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Company or any other Person. The Note Guarantee constitutes a guarantee of payment and not of collection.

(b)   The Guarantors unconditionally and irrevocably waive any and all rights provided under the relevant applicable law of Brazil on prior demand and protest.

SECTION 11.05   Subrogation and Contribution.  Upon making any payment with respect to any obligation of the Company under this Article, the Guarantors shall be subrogated to the rights of the payee against the Company with respect to such obligation; *provided*, *however*, that the Guarantors shall not be entitled to enforce, or to receive any payments arising out of or based upon, such right of subrogation until the principal of (and premium, if any), interest, and Additional Amounts on all Securities shall have been paid in full.

SECTION 11.06   Stay of Acceleration.  If acceleration of the time for payment of any amount payable by the Company under this Indenture or the Securities is stayed upon the insolvency, bankruptcy or reorganization of the Company, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Guarantors forthwith on demand by the Trustee.

SECTION 11.07   Execution and Delivery of Guarantee.  The execution by the Guarantors of this Indenture evidences the guarantee of the Guarantors, whether or not the person signing as an officer of the Guarantors still holds that office at the time of authentication of any Security. The delivery of any Security by the Trustee after authentication constitutes due delivery of the guarantee set forth in this Indenture on behalf of the Guarantors.

SECTION 11.08   Purpose of Guarantee.  The Guarantors hereby acknowledge that the purpose and intent of the Guarantors in executing this Indenture and providing the guarantee is to give effect to the agreement of the Guarantors to guarantee the payment of any such amounts due by the Company under the Securities and this Indenture, whether such amounts are in respect of principal, interest or any other amounts (including Additional Amounts).  Therefore, the Guarantors agree that if the Company shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any principal, interest or any other amounts (including Additional Amounts) with respect to this Indenture and the Securities, the Guarantors shall promptly pay the same, without any demand or notice whatsoever.  The Trustee shall promptly deposit in the account designated by the Trustee to receive payments from the Company with respect to the Securities for further payment to the Holders any funds it receives from the Guarantors under or pursuant to this guarantee in respect of the Securities.

SECTION 11.09   Central Bank Regulations.  The Guarantors shall comply with all then-applicable Central Bank regulations to legally effect any payments under the Guarantors' Note Guarantee at the time any such payment is made or required to be made.

Article 12

Release of Covenants

SECTION 12.01   Release of Covenants.

(a)      From and during any time that:

(1)      the Securities have been assigned an Investment Grade Rating by any two Rating Agencies; and

(2)      no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (1) and (2) being collectively referred to as a "Covenant Suspension Event"), the Company and its Restricted Subsidiaries shall not be subject to the following provisions of this Indenture (collectively referred to as the "Suspended Covenants"):

(A)      Section 4.03;

(B)      Section 4.04;

(C)      Section 4.06;

(D)      Section 4.07;

(E)      Section 4.10(A);

(F)      Section 4.13;

and

(G)      Section 5.01(a)(4);

(b)      In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date"), the Securities cease to have an Investment Grade Rating from any two Rating Agencies, then the Company and its Restricted Subsidiaries shall thereafter again be subject to the Suspended Covenants.  The period of time between the occurrence of a Covenant Suspension Event and the Reversion Date is referred to as the "Suspension Period." Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default shall be deemed to have occurred as a result of a failure to comply with any of the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

(c)      On the Reversion Date, all Debt Incurred during the Suspension Period shall be classified to have been Incurred pursuant to Section 4.03(a) or one of clauses (1) through (21) of Section 4.03(b) (to the extent such Debt would be permitted to be Incurred thereunder as of the

80

Reversion Date and after giving effect to the Debt Incurred prior to the Suspension Period and outstanding on the Reversion Date).  To the extent such Debt would not be permitted to be Incurred pursuant to Section 4.03 such Debt shall be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.03(b)(8).

(d)     The Company or the Guarantors shall give the Trustee prompt written notification upon the occurrence of a Covenant Suspension Event or any Reversion Date.

## Article 13

## Miscellaneous

SECTION 13.01   Notices.  (a) Any notice or communication to the Company, the Guarantors, the Trustee or any Paying Agent shall be in writing in the English language or a certified translation, and delivered in person, sent by facsimile or mailed by first-class mail addressed as follows:

if to the Company or any of the Guarantors:

Praia do Flamengo, No. 154 – 7th
Rio de Janeiro, Rio De Janeiro 22210-030 Brazil
Attention: General Counsel
Telephone: +55 21 2555 5200
Facsimile: +55 21 2555 5202

if to the Trustee or Paying Agent:

Deutsche Bank Trust Company Americas
Trust & Securities Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX
Facsimile:  732-578-4635

With a copy to:

Deutsche Bank Trust Company Americas
c/o Deutsche Bank National Trust Company
Trust & Securities Services
100 Plaza One, 6th fl., MSJCY03-0699
Jersey City, New Jersey 07311
Attention:  Corporates Team Deal Manager – OGX
Facsimile:  732-578-4635

if to the Principal Paying Agent:

The Bank of Tokyo-Mitsubishi UFJ, Ltd.
Ropemaker Place
25 Ropemaker Street
London, EC2Y 9AN
United Kingdom
Telephone: 44(0) 20 7577 1593
Facsimile: 44(0) 20 7577 1609

The Company, the Guarantors, the Trustee or any Paying Agent by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)     (1)     As long as Securities in global form are outstanding, notices to be given to Holders shall be given to the Depositary, in accordance with its applicable policies as in effect from time to time.  If the Company issues Securities in certificated form, notices to be given to Holders shall be sent by mail to the respective addresses of the Holders as they appear in the Trustee's records.

(2)     A notice shall be deemed to have been given to a Holder upon the mailing by first class mail, postage prepaid, of such notice to such Holder at its registered addresses as recorded in the Security Register not later than the latest date, and not earlier than the earliest date, prescribed in the Securities for the giving of such notice.  If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

(3)     Failure to mail a notice or communication to a Securityholder or any defect in a notice or communication to a Securityholder shall not affect the sufficiency of such notice or communication with respect to other Securityholders.

(4)     For so long as any Securities are listed on the Global Exchange Market of the Irish Stock Exchange and in accordance with the rules and regulations of the Irish Stock Exchange, the Company shall publish all notices to Holders in a daily newspaper with general circulation in Ireland, which is expected to be the Irish Times, or alternatively the Company may also publish a notice on the website of the Irish Stock Exchange (www.ise.ie).  If publication in Ireland is impracticable, the Company may make the publication elsewhere in Western Europe. For purposes of this Section 13.01(b)(4), a "daily newspaper" is a newspaper that is published on each day, other than a Saturday, Sunday or holiday, in Ireland or, when applicable, elsewhere in Western Europe.  The Holders shall be presumed to have received such notices on the date the Company first publishes them.  If the Company is unable to give notice as described in this Section 13.01(b)(4) because the publication of any newspaper is suspended or it is otherwise impractical for the Company to publish the notice, then the Company, or the Trustee acting on instructions from the Company and at the Company's expense, shall give the Holders notice in another form.  That alternate form of notice shall be sufficient notice to the Holders.

(5)      Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice.

SECTION 13.02   <u>Communication by Holders with Other Holders</u>. Securityholders may communicate pursuant to TIA § 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities.  The Company, the Guarantors, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

SECTION 13.03   <u>Certificate and Opinion as to Conditions Precedent</u>.  Upon any request or application by the Company or the Guarantors to the Trustee to take or refrain from taking any action under this Indenture (other than with respect to the issuance of the Initial Securities), the Company or the Guarantors, as the case may be, shall furnish to the Trustee:

(1)      an Officer's Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to taking the proposed action or to refraining from taking the proposed action have been complied with; and

(2)      an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.04   <u>Statements Required in Certificate or Opinion</u>.  Each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(1)      a statement that the individual making such certification or opinion has read such covenant or condition;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)      a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)      a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

SECTION 13.05   <u>When Securities Disregarded</u>.  In determining whether the Holders of the required principal amount of Securities have concurred in any direction, waiver or consent, Securities owned by the Company, the Guarantors or by any Person directly or

83

indirectly Controlling or Controlled by or under direct or indirect common Control with the Company or the Guarantors shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Securities which a Trust Officer of the Trustee has been informed in writing are so owned shall be so disregarded. Also, subject to the foregoing, only Securities outstanding at the time shall be considered in any such determination.

SECTION 13.06   <u>Rules by Trustee, Paying Agent and Registrar</u>. The Trustee may make reasonable rules for action by or a meeting of Securityholders. The Registrar and each Paying Agent may make reasonable rules for their functions.

SECTION 13.07   <u>Business Days</u>. If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

SECTION 13.08   <u>Governing Law</u>. THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY. THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT HAVE BEEN PROPOSED BY THE COMPANY FOR THE PURPOSES OF ARTICLE 9, PARAGRAPH 2 OF BRAZILIAN DECREE LAW NO. 4,657, DATED SEPTEMBER 4, 1942, AS AMENDED, AND FOR NO OTHER PURPOSE OR REASON WHATSOEVER.

SECTION 13.09   <u>No Recourse Against Others</u>. No past, present or future director, officer, partner, employee, incorporator, quotaholder, shareholder or member of the Company, the Guarantors or any Subsidiary of the Company shall have any liability for any obligations of the Company, the Guarantors or any Subsidiary of the Company under the Securities, this Indenture or the Note Guarantee or for any claim based on, in respect of, or by reason of, such obligations or their creation. By accepting a Security, each Securityholder shall waive and release all such liability. Such waivers and releases shall be part of the consideration for the issuance of the Securities.

SECTION 13.10   <u>Successors</u>. All agreements of the Company and the Guarantors in this Indenture and the Securities shall bind their successors. All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.11   <u>Multiple Originals</u>. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

84

SECTION 13.12   <u>Table of Contents; Headings</u>.  The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.13   <u>Consent to Jurisdiction; Appointment of Agent to Accept Service of Process; Currency Indemnity</u>.  (a) Each of the parties hereto irrevocably consents and agrees that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter arising out of or in connection with this Indenture, the Note Guarantee or the Securities may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Securities have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself and in respect of its properties, assets and revenues.  Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture the Note Guarantee, or the Securities brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum and any right which it may be entitled on account of place of residence or domicile.  To the extent that the Company or the Guarantors has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process with respect to itself or its property, each of the Company and the Guarantors irrevocably waives such immunity in respect of its obligations under this Indenture, any Security or the Note Guarantee.  Each of the parties to this Indenture agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on them and may be enforced in any court to the jurisdiction of which each of them is subject by a suit upon such judgment, *provided* that service of process is effected upon the Company in the manner specified in the following paragraph or as otherwise permitted by law.

(b)   The Company and the Guarantors have validly and effectively appointed National Corporate Research, Ltd. (the "<u>Process Agent</u>"), with offices on the date hereof at 10 East 40th Street, 10th Floor, New York, NY 10016, as its authorized agent upon which process may be served in any action, suit or proceeding referred to in <u>Section 13.13(a)</u>.  If for any reason such agent hereunder shall cease to be available to act as such, each of the Company and the Guarantors agrees to designate a new agent in the Borough of Manhattan, New York City, New York on the terms and for the purposes of this <u>Section 13.13</u> reasonably satisfactory to the Trustee.  Each of the Company and the Guarantors further hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents in any such action, suit or proceeding against the Company or the Guarantors by serving a copy thereof upon the relevant agent for service of process referred to in this <u>Section 13.13</u> (whether or not the appointment of such agent shall for any reason prove to be ineffective or such agent shall accept or acknowledge such service) or by mailing copies thereof by registered or certified air mail,

85

postage prepaid, to each of the Company and the Guarantors at its address specified in or designated pursuant to this Indenture.  Each of the Company and the Guarantors agree that the failure of any such designee, appointee and agent to give any notice of such service to it shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon.  Nothing herein shall in any way be deemed to limit the ability of the Holders and the Trustee to serve any such legal process, summons, notices and documents in any other manner permitted by applicable law or to obtain jurisdiction over the Company and the Guarantors or bring actions, suits or proceedings against the Company or the Guarantors in such other jurisdictions, and in such manner, as may be permitted by applicable law.

(c)     U.S. dollars are the sole currency of account and payment for all sums payable by the Company or the Guarantors under or in connection with the Securities and the guarantees, including damages.  Any amount received or recovered in a currency other than U.S. dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company or otherwise) by any Holder of a Security in respect of any sum expressed to be due to it from the Company or the Guarantors will only constitute a discharge to the Company or the Guarantors, as the case may be, to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any note, the Company will indemnify such Holder against any loss sustained by it as a result; and if the amount of U.S. dollars so purchased is greater than the sum originally due to such holder, such Holder will, by accepting a Security, be deemed to have agreed to repay such excess.  In any event, the Company will indemnify the recipient against the cost of making any such purchase.

For the purposes of the preceding paragraph, it will be sufficient for the Holder of a Security to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).  These indemnities constitute a separate and independent obligation from the other obligations of the Company and the Guarantors, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by any Holder of a Security and will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Security.

(d)     The provisions of this Section 13.13 shall survive any termination of this Indenture, in whole or in part.

SECTION 13.14   Waiver of Jury Trial.  EACH OF THE COMPANY, THE GUARANTORS AND THE TRUSTEE (SOLELY IN ITS CAPACITY AS TRUSTEE, WHICH, FOR THE AVOIDANCE OF DOUBT, SHALL NOT IN ANY WAY AFFECT ANY RIGHT OF ANY HOLDER) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST

EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE SECURITIES OR THE TRANSACTION CONTEMPLATED HEREBY.

SECTION 13.15   <u>Patriot Act</u>.  The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, Deutsche Bank Trust Company Americas, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account.  The parties to this agreement agree that they will provide Deutsche Bank Trust Company Americas with such information as it may request in order for Deutsche Bank Trust Company Americas to satisfy the requirements of the USA Patriot Act.

SECTION 13.16   <u>Force Majeure</u>.  The Trustee and the Agents shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Trustee and the Agents (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.**

By: _____

Name:
Title:

MARCELO TORRES
Diretor Financeiro
OGX PETRÓLEO & GÁS

By: _____

Name:
Title:

José Roberto Faveret Cavalcanti
Diretor Jurídico
OGX Petróleo & Gás

*[Signature Page to Indenture dated June 3, 2011]*

**OGX PETRÓLEO E GÁS LTDA.**

By: _____
Name: 
Title: 

MARCELO TORRES
Diretor Financeiro
OGX PETRÓLEO & GÁS

By: _____
Name: 
Title: 

José Roberto Faveret Cavalcanti
Diretor Jurídico
OGX Petróleo & Gás

**OGX CAMPOS PETRÓLEO E GÁS S.A.**

By: _____
Name: 
Title: 

MARCELO TORRES
Diretor Financeiro
OGX PETRÓLEO & GÁS

By: _____
Name: 
Title: 

José Roberto Faveret Cavalcanti
Diretor Jurídico
OGX Petróleo & Gás



*[Signature Page to Indenture dated June 3, 2011]*

**DEUTSCHE BANK TRUST COMPANY AMERICAS,**
as Trustee, Registrar, Transfer Agent and Paying Agent
By: Deutsche Bank National Trust Company

By: _Wanda Camacho_

Name:    Wanda Camacho

Title:     Vice President

By: _Cynthia J. Powell_

Name:    **Cynthia J. Powell**

Title:     **Vice President**

STATE OF NEW JERSEY    )

                            ) to wit

COUNTY OF HUDSON      )

On this 3rd day of June, 2011, before me, a notary public, personally appeared Wanda Camacho, Vice President and Cynthia Powell, Vice President, to me personally known who being duly sworn, did say that they are the Authorized Signatory(s) of Deutsche Bank National Trust Company, one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person(s).

By: _Jeffrey Schoenfeld_

Notary Public

New Jersey

Jeffrey Schoenfeld

Commission Expiry:  August 17, 2012

*[Signature Page to Indenture]*

THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.,
as Principal Paying Agent

By: _____
Name: NIKOLA MOORE
Title: ASSISTANT VICE PRESIDENT

*[Signature Page to Indenture dated June 3, 2011]*

RULE 144A/REGULATION S APPENDIX

<u>PROVISIONS RELATING TO INITIAL SECURITIES</u>

1.      <u>Definitions</u>

For the purposes of this Appendix the following terms shall have the meanings indicated below.  Other terms used in this Appendix and not defined herein shall have the meanings assigned to them in this Indenture.

"<u>Clearstream</u>" means Clearstream Banking, *société anonyme*, Luxembourg.

"<u>Euroclear</u>" means Euroclear Bank, S.A./N.V.

"<u>Global Securities</u>" means the Regulation S Global Security and Restricted Global Security.

"<u>Issuer Order</u>" means a written request or order signed in the name of the Company by the two of its Officers and delivered to the Trustee.

"<u>Non-U.S. Person</u>" has meaning given to it in Regulation S.

"<u>QIB</u>" means a "qualified institutional buyer" as defined in Rule 144A under the Securities Act.

"<u>Regulation S Global Security</u>" means a single, permanent Restricted Global Security sold outside of the United States in reliance on Regulation S.

"<u>Restricted Global Security</u>" means a single, permanent Security in definitive, fully registered book-entry form without interest coupon, constituting a Restricted Security.

"<u>Restricted Securities Legend</u>" has the meaning set forth in Section 2.1(6) of this Appendix.

"<u>Restricted Security</u>" means a Security that constitutes a "restricted security" within the meaning of Rule 144(a)(3) under the Securities Act and shall bear the Restricted Securities Legend; *provided*, *however*, that the Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Security constitutes a Restricted Security.

"<u>Securities Custodian</u>" means the custodian with respect to a Global Security (as appointed by DTC), or any successor Person thereto and shall initially be Deutsche Bank Trust Company Americas.

2.      <u>The Securities</u>

2.1     Form and Registration.

(1)     Form and Registration.  The certificates representing the Securities shall be issued in fully registered form without interest coupons.

(2)     Regulation S Global Security. Securities offered and sold in reliance on Regulation S under the Securities Act shall initially be represented by one or more Regulation S Global Securities and shall be deposited with the Trustee as custodian for, and registered in the name of a nominee of, DTC for the accounts of Euroclear and Clearstream (as indirect participants in DTC).

(3)     Restricted Global Security. Securities offered and sold in reliance on Rule 144A under the Securities Act shall be represented by one or more Restricted Global Securities and shall be deposited with the Trustee as custodian for, and registered in the name of a nominee of, DTC.  Each Global Security shall be subject to certain restrictions on transfer set forth in Sections 2.3 and 2.4 of this Appendix.

(4)     Ownership. Ownership of beneficial interests in a Global Security shall be limited to persons who have accounts with DTC or Euroclear and Clearstream, as indirect participants in DTC ("participants"), or persons who hold interests through participants. Ownership of beneficial interests in a Global Security shall be shown on, and the transfer of that ownership shall be effected only through, records maintained by DTC or its nominee (with respect to interests of participants) and the records of participants (with respect to interests of persons other than participants).  QIBs may hold their interests in a Restricted Global Security, directly through DTC, if they are participants in such system, or indirectly through organizations which are participants in such system.

Investors may hold their interests in a Regulation S Global Security, directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems.

So long as DTC or its nominee is the registered owner or holder of a Global Security, DTC or such nominee, as the case may be, shall be considered the sole owner or Holder of the Securities represented by such Global Security for all purposes under the Indenture.  No beneficial owner of an interest in a Global Security shall be able to transfer that interest except in accordance with DTC's applicable procedures, in addition to those provided for under the Indenture.  Payments made with respect to a Global Security shall be made to DTC or its nominee, as the registered owner thereof.  None of the Company, the Guarantors, the Trustee or any Paying Agent shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

The Company and the Guarantors expect that DTC or its nominee, upon receipt of any payment in respect of a Global Security, shall credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in such Global Security as shown on its records.  The Company and the Guarantors also expect that payments by participants to

2

owners of beneficial interests in such Global Security held through such participants shall be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers.  Such payments shall be the responsibility of such participants.

(5)     Limitation on Obligations. Although DTC, Euroclear and Clearstream are expected to follow the procedures set forth in the Indenture in order to facilitate transfers of interests in a Global Security among participants of DTC, Euroclear and Clearstream, as the case may be, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time.  None of the Company, the Guarantors, the Trustee or any Paying Agent shall have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

(6)     Successors; Definitive Securities.  If (i) DTC is at any time unwilling or unable to continue as a Depositary for the Global Securities and a successor Depositary or clearing agency is not appointed by the Company within 90 days, or (ii) an Event of Default has occurred and is continuing and the Registrar and the Company have received a written request from a beneficial owner of Securities to issue its proportionate interest in the Global Security, the Company shall issue certificated Securities which may bear the Restricted Securities Legend set forth in Exhibit 1 to this Appendix (the "Restricted Securities Legend") to all beneficial owners, in exchange for their beneficial interests in Global Securities.  Holders of an interest in a Global Security may receive certificated Securities, which may bear the Restricted Securities Legend, in accordance with DTC's rules and procedures in addition to those provided for under the Indenture; provided, however, that if the Company is issuing certificated Securities pursuant to Section 2.1(6)(ii), the Company shall only be required to issue certificated Securities to the beneficial owners of the Securities who request certificated Securities.

(7)     Certificated Securities.  Except as provided in this Section 2.1 or Section 2.3, owners of beneficial interests in Restricted Global Securities shall not be entitled to receive physical delivery of certificated Securities.  The registered Holder of a Global Security shall be entitled to grant proxies and otherwise authorize any Person, including DTC and Persons that may hold interests through DTC, to take any action which a Holder is entitled to take under the Indenture or the Securities.  In the event of transfer of a Restricted Global Security to the beneficial owners thereof in the form of certificated Securities, the Company shall promptly make available to the Trustee a reasonable supply of certificated Securities in definitive, fully registered form without interest coupons.

2.2     Authentication.  The Trustee shall authenticate and deliver:  (1) on the Issue Date, an aggregate principal amount of U.S.$2,563,000,000 of the Company's 8.500% Senior Notes due 2018, and (2) any Additional Securities for an original issue in an aggregate principal amount specified in the written order of the Company pursuant to Section 2.02 of the Indenture.  Such order shall specify the amount of the Securities to be authenticated and the date on which the original issue of Securities is to be authenticated and, in the case of any issuance of Additional Securities pursuant to Section 2.12 of the Indenture, shall certify that such issuance is in compliance with Section 4.03 of the Indenture.

3

2.3    <u>Global Securities</u>.

(1) Any Global Security (i) shall represent, and shall be denominated in an aggregate amount equal to the aggregate principal amount of, all of the outstanding Securities of such series, (ii) shall be registered in the name of DTC or its nominee, (iii) shall be delivered to the Trustee or the Registrar as custodian for DTC and (iv) shall bear a legend substantially to the following effect:

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(2)  Members of, or participants in, DTC, Euroclear or Clearstream shall have no rights under the Indenture with respect to any Global Security held on their behalf by DTC or the Trustee as its custodian, or under the Global Security, and DTC may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner of the Global Security for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its participants, the operation of customary practices governing the exercise of the rights of a Holder of any Security.

(3)  Interests of beneficial owners in the Global Securities may only be transferred or exchanged for certificated Securities in accordance with the rules and procedures of DTC, Euroclear and Clearstream and the provisions of the Indenture, including this Appendix.

(4)  In connection with any transfer or exchange of a portion of the beneficial interest in any Global Security to beneficial owners pursuant to Section 2.3(3) in the form of certificated Securities, the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Security in an amount equal to the principal amount of the beneficial interest in the Global Security to be transferred, and the Company shall execute, and the Trustee shall authenticate and deliver, one or more definitive Securities of like tenor and principal amount of authorized denominations.

(5)  Any beneficial interest in one of the Global Securities that is transferred to a person who takes delivery in the form of an interest in the other corresponding Global Security will, upon transfer, cease to be an interest in such Global Security and become an interest in the other corresponding Global Security and, accordingly, will thereafter be subject to all transfer restrictions, if any, and other procedures applicable to beneficial interest in such other corresponding Global Security for as long as it remains such an interest.

(6)  In connection with the transfer of Global Securities as an entirety to beneficial owners pursuant to Section 2.3(3) in the form of certificated Securities, the Global Securities shall be deemed to be surrendered to the Trustee for cancellation, and the Company shall execute, and the Trustee shall authenticate and deliver, to each beneficial owner identified by DTC, Euroclear or Clearstream in exchange for its beneficial interest in the Global Securities, an equal aggregate principal amount at maturity of definitive Securities of authorized denominations.

(7)  Any definitive Security constituting a Restricted Security delivered in exchange for an interest in a Global Security pursuant to this Section 2.3 shall bear the Restricted Securities Legend.

(8)  The registered Holder of any Global Security may grant proxies and otherwise authorize any person, including participants in DTC and persons that may hold interests through participants in DTC to take any action which a Holder is entitled to take under the Indenture or the Securities.

2.4     Special Transfer Provisions.

The following provisions shall apply with respect to the Securities:

(1)     Transfers to Non-U.S. Persons.  The following provisions shall apply with respect to the registration of any proposed transfer of an Initial Security or an Additional Security to any Non-U.S. Person:

(a)      the Registrar shall register the transfer of any Initial Security or any Additional Security, whether or not such Security bears the Restricted Securities Legend, if the proposed transferor has delivered to the Registrar a certificate substantially in the form of Exhibit 2 to this Appendix;

(b)      if the proposed transferee is a participant in DTC and the Securities to be transferred consist of definitive Securities which after transfer are to be evidenced by an interest in a Regulation S Global Security upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.4(1)(a), the Registrar shall register the transfer and reflect on its books and records the date and an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of definitive Securities to be transferred, and the Trustee and/or the Registrar shall cancel the definitive Securities so transferred or decrease the principal amount of such definitive Security, as the case may be;

(c)      if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security, upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.4(1)(a), the Registrar shall register the transfer and reflect on its books and records the date and (i) a decrease in the principal amount of the Global Security from which such interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (ii) an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of the Global Security to be transferred.

(2)      Transfers to QIBs.  The following provisions shall apply with respect to the registration of any proposed transfer of an Initial Security or an Additional Security to a QIB (excluding Non-U.S. Persons):

(a)      if the Security to be transferred consists of (i) a definitive Security, the Registrar shall register the transfer if such transfer is being made by a proposed transferor who has delivered to the Trustee a certificate substantially in the form set forth in Exhibit 3 to this Appendix or (ii) an interest in the Restricted Global Security, the transfer of such interest may be effected only through the book entry system maintained by DTC;

(b)      if the Security to be transferred consists of a definitive Security, upon receipt by the Registrar of instructions given in accordance with DTC's and the Registrar's procedures therefor, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Restricted Global

6

Security in an amount equal to the principal amount of the definitive Security, to be transferred, and the Trustee shall cancel the definitive Security so transferred; and

(c)      if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security, upon receipt by the Registrar of written instructions given in accordance with DTC's and the Registrar's procedures, the Registrar shall register the transfer and reflect on its books and records the date and (i) a decrease in the principal amount of the Global Security from which interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (ii) an increase in the principal amount of the Restricted Global Security in an amount equal to the principal amount of the Global Security to be transferred.

(3)  Restricted Securities Legend.  Upon the registration of transfer, exchange or replacement of Securities not bearing the Restricted Securities Legend, the Registrar shall deliver Securities that do not bear the Restricted Securities Legend.  Upon the registration of transfer, exchange or replacement of Securities bearing the Restricted Securities Legend, the Registrar shall deliver only Securities that bear the Restricted Securities Legend unless either (i) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Company, the Registrar and the Trustee to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or (ii) such Security has been sold pursuant to an effective registration statement under the Securities Act.

(4)  [Reserved].

(5)  Other Transfers.  If a Holder proposes to transfer a Security constituting a Restricted Security pursuant to any exemption from the registration requirements of the Securities Act other than as provided for by Sections 2.4(1) or 2.4(2), the Registrar shall only register such transfer or exchange if such transferor delivers an Opinion of Counsel reasonably satisfactory to the Company, the Registrar and the Trustee that such transfer is in compliance with the Securities Act and the terms of the Indenture; provided, however, that the Company may, based upon the opinion of its counsel, instruct the Registrar by an Issuer Order not to register such transfer in any case where the proposed transferee is not a QIB or a Non-U.S. person.

(6)  General.  By its acceptance of any Security (or any beneficial interest in any Global Security) bearing the Restricted Securities Legend, each Holder of such a Security or holder of such beneficial interest acknowledges the restrictions on transfer of such Security set forth in the Indenture and in the Restricted Securities Legend and agrees that it will transfer such Security only as provided in the Indenture.  The Registrar shall not register a transfer of any

7

Security unless such transfer complies with the restrictions on transfer of such Security set forth in the Indenture.

    The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.4.  The Company shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable prior written notice to the Registrar.

  2.5  <u>Cancellation or Adjustment of Global Security.</u>

  At such time as all beneficial interests in a Global Security have either been exchanged for certificated Securities, redeemed, purchased or canceled, such Global Security shall be returned to DTC for cancellation or retained and canceled by the Trustee.  At any time prior to such cancellation, if any beneficial interest in a Global Security is exchanged for certificated Securities, redeemed, purchased or canceled, the principal amount of Securities represented by such Global Security shall be reduced and an adjustment shall be made on the books and records of the Trustee (if it is then the Securities Custodian for such Global Security) with respect to such Global Security, by the Trustee or the Securities Custodian, to reflect such reduction.

EXHIBIT 1

to

RULE 144A/REGULATION S APPENDIX

[FORM OF FACE OF INITIAL SECURITY]

[Global Securities Legend]

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

[Restricted Securities Legend]

[THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES ACT, AND THIS SECURITY MAY NOT BE REOFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THIS SECURITY IS HEREBY NOTIFIED THAT THE SELLER OF THIS SECURITY MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

THE HOLDER OF THIS SECURITY AGREES FOR THE BENEFIT OF THE ISSUER OR ANY SUBSIDIARY THAT (A) THIS SECURITY MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (I) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS

DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES TO A PERSON THAT IS NOT A U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) PURSUANT TO ANOTHER AVAILABLE EXEMPTION UNDER THE SECURITIES ACT, (IV) TO THE ISSUER OR ANY SUBSIDIARY OF THE ISSUER OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH OF CASES (I) THROUGH (V) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES; AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS SECURITY FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE. THIS LEGEND MAY ONLY BE REMOVED AT THE OPTION OF THE ISSUER.][1]

[THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION ORIGINALLY EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.][2]

---

[1] Insert for Securities sold in accordance with Rule 144A.

[2] Insert for Securities sold in accordance with Regulation S.

No._____                                                          U.S.$_____

8.500% Senior Notes due 2018

CUSIP No. 144A: 670849AA6/ Reg. S: P7356YAA1
ISIN No. 144A: US670849AA60/ Reg. S: USP7356YAA12

OGX Petróleo e Gás Participações S.A., a corporation (*sociedade anônima*) organized under the laws of the Federative Republic of Brazil, promises to pay to _____, or its registered assigns, the principal sum [of _____ dollars][listed on the Schedule of Increases or Decreases in Global Note attached hereto]* on June 1, 2018.

Interest Payment Dates:  June 1 and  December 1 of each year, commencing on December 1, 2011

Record Dates:  May 15 and November 15

Additional provisions of this Security are set forth on the other side of this Security.

*If the Security is to be issued in global form, add the Schedule of Increases or Decreases in Global Security.

1-3

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.**

By: _____

    Name:

    Title:

By: _____

    Name:

    Title:

Dated:

TRUSTEE'S CERTIFICATE OF
      AUTHENTICATION

Deutsche Bank Trust Company Americas
      as Trustee, certifies
          that this is one of
          the Securities referred
          to in the Indenture described herein

By: Deutsche Bank National Trust Company
By

    _____

    Authorized Signatory


Dated:

1-5

STATE OF NEW JERSEY     )

                               ) to wit

COUNTY OF HUDSON      )


       On this 3rd day of June, 2011, before me, a notary public, personally appeared Wanda Camacho, Vice President, to me personally known who being duly sworn, did say that he/she is the Authorized Signatory of Deutsche Bank National Trust Company, one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person.


By:_____

    Notary Public

    New Jersey

    Jeffrey Schoenfeld

    Commission Expiry:  August 17, 2012

[FORM OF REVERSE SIDE OF INITIAL SECURITY]

8.500% Senior Note due 2018

1.      Interest

OGX Petróleo e Gás Participações S.A., a corporation (*sociedade anônima*) organized under the laws of the Federative Republic of Brazil (such company, and its successors and assigns under the Indenture hereinafter referred to as the "Company"), promises to pay interest on the principal amount of this Security at the rate per annum shown above.

The Company will pay interest semi-annually on June 1 and December 1 of each year, commencing on December 1, 2011 to a Paying Agent, which shall in turn distribute the interest in accordance with the Indenture.  The Securities shall bear interest at the rate per annum of 8.500% from June 3, 2011, the date of issuance, or from the most recent interest payment date to which interest has been paid or provided for.  Interest on the Securities shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.      Method of Payment

The Company will pay interest on the Securities (except defaulted interest) to the Persons who are registered Holders at the close of business on the record date listed on the face of this Security immediately preceding the related interest payment date (whether or not a Business Day) even if Securities are canceled after the record date and on or before the interest payment date.  Holders must surrender Securities to a Paying Agent to collect principal payments.  The Company will pay principal, premium, interest and Additional Amounts, if any, in money of the United States that at the time of payment is legal tender for payment of public and private debts.  Payments in respect of the Securities represented by a Global Security (including principal, premium, interest and Additional Amounts, if any) will be made by wire transfer of immediately available funds to the accounts specified by DTC.   If the Securities are in certificated form, such payments will be made by a Paying Agent by U.S. dollar check drawn on a bank in New York City and mailed to the Holder of such Security at its registered address as it appears in the register.  Upon written application by the Holder of a certificated Security to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Security, such payment may be made by transfer to a U.S. dollar account maintained by the payee with a bank in New York City.

The final payment on any Security in definitive, fully registered form shall be made only upon presentation and surrender of such Security at the office of a Paying Agent on the payment date.

If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period.  If a regular record date is not a Business Day, the record date shall not be affected.

1-7

3.     <u>Registrar and Paying Agent</u>

       Initially, Deutsche Bank Trust Company Americas will act as Paying Agent, The Bank of Tokyo-Mitsubishi UFJ, Ltd. will act as Principal Paying Agent and Deutsche Bank Trust Company Americas will act as Registrar.  The Company may appoint and change any Paying Agent, Registrar or co-registrar without notice.  The Company, the Guarantors or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or transfer agent.

4.     <u>Indenture</u>

       The Company issued the Securities under an Indenture dated as of June 3**,** 2011 (the "<u>Indenture</u>"), among the Company, OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A., as the guarantors (each, a "<u>Guarantor</u>" and, collectively, the "<u>Guarantors</u>"), Deutsche Bank Trust Company Americas, as the Trustee, Registrar, Paying Agent and transfer agent and The Bank of Tokyo-Mitsubishi UFJ, Ltd., as Principal Paying Agent.  The terms of the Securities include those stated in the Indenture.  Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture.  The Securities are subject to all such terms, and Securityholders are referred to the Indenture.

       The Securities are general obligations of the Company.  The Company shall be entitled, subject to its compliance with Section 4.03 of the Indenture, to issue Additional Securities pursuant to Section 2.12 of the Indenture.  The Initial Securities issued on the Issue Date, any Additional Securities and Securities issued in exchange therefor will be treated as a single class for all purposes under the Indenture.  The Indenture contains covenants that limit the ability of the Company and its restricted subsidiaries to Incur additional indebtedness; pay dividends or distributions on, or redeem or repurchase capital stock; make investments; engage in transactions with Affiliates; create liens on assets; transfer or sell assets; guarantee indebtedness; restrict dividends or other payments of subsidiaries; consolidate, merge or transfer all or substantially all of its assets and the assets of its subsidiaries; and engage in sale/leaseback transactions.  These covenants are subject to important exceptions and qualifications.

       To the extent of any conflict between the terms of the Securities and the Indenture, the applicable terms of the Indenture shall govern.

5.     <u>Optional Redemption; Notice of Redemption</u>

    (a)     *Optional Redemption with a Make-Whole Premium*.  At any time prior to June 1, 2015, the Company may on any one or more occasions redeem the Securities, at its option, in whole or in part, at a "make-whole" redemption price equal to 100% of the principal amount of such Securities plus the greater of (1) 1% of the then outstanding principal amount of the Securities and (2) the excess of (a) the present value at such redemption date of (i) the redemption price of the Securities at June 1, 2015 (such redemption price being set forth in the table below in paragraph 5.b) plus (ii) all required interest payments thereon to, but excluding, June 1, 2015 (excluding accrued but unpaid interest to the redemption date) discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points, over (b) the then outstanding principal amount

of the Securities; plus in each case any accrued and unpaid interest and Additional Amounts, if any, on such Securities to, but excluding, the redemption date, as calculated by the Independent Investment Banker.  Any redemption of Securities by the Company pursuant to this paragraph will be subject to either (i) there being at least U.S.$150,000,000 in aggregate principal amount of Securities (including any Additional Securities) outstanding after such redemption or (ii) the Company redeeming all of the then outstanding principal amount of the Securities.

"Comparable Treasury Issue" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Securities to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to the remaining term of such Securities.

"Comparable Treasury Price" means, with respect to any redemption date (1) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotation or (2) if the Independent Investment Banker obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Company.

"Reference Treasury Dealer" means HSBC Securities (USA) Inc., J.P. Morgan Securities LLC and Credit Suisse Securities (USA) LLC, or their respective affiliates which are primary United States government securities dealers, and one other leading primary United States government securities dealers in New York City reasonably designated by the Company; *provided* that if any of the foregoing shall cease to be a primary United States government securities dealer in New York City (a "Primary Treasury Dealer"), the Company will substitute therefor another Primary Treasury Dealer.

"Reference Treasury Dealer Quotation" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Company, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 pm New York time on the third Business Day preceding such redemption date.

"Treasury Rate" means, with respect to any redemption date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

(b)     *Optional Redemption without a Make-Whole Premium.*  On and after June 1, 2015, the Company may on any one or more occasions redeem the Securities, at its option, in

whole or in part, at the following redemption prices (expressed as a percentage of principal amount), plus accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on June 1 of the years set forth below:

| Period | Redemption Price |
| --- | --- |
| 2015 | 104.250 % |
| 2016 | 102.125% |
| 2017 and thereafter | 100.000% |

Any redemption of Securities by the Company pursuant to this paragraph will be subject to either (i) there being at least U.S.$150,000,000 in aggregate principal amount of Securities (including any Additional Securities) outstanding after such redemption or (ii) the Company redeeming all of the then outstanding principal amount of the Securities.

(c)     *Optional Redemption Upon Eligible Equity Offerings.*  At any time on or prior to June 1, 2014, the Company may on any one or more occasions, at its option, use an amount not to exceed the net cash proceeds of one or more Eligible Equity Offerings to redeem up to 35% of the aggregate principal amount of the outstanding Securities (including any Additional Securities) at a redemption price equal to 108.50% of the principal amount of the Securities to be redeemed, plus any accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date; *provided* that:

(i)     after giving effect to any such redemption at least 65% of the aggregate principal amount of the Securities (including any Additional Securities, but excluding Securities held by the Company and its Subsidiaries) issued under the Indenture remains outstanding; and

(ii)     the Company makes such redemption not more than 90 days after the consummation of such Eligible Equity Offering.

"Eligible Equity Offering" means the issuance and sale for cash of Qualified Stock of the Company to any Person (other than a Restricted Subsidiary of the Company) pursuant to (i) a public offering in accordance with any applicable laws, rules and regulations, or (ii) a private offering in accordance with Rule 144A, Regulation S and/or another exemption under the Securities Act or any other applicable law, rules and regulations of any other jurisdiction.

(d)     *Optional Tax Redemption.*  If the Company or any successor is required to pay Excess Additional Amounts on the Securities, or any Guarantor or any successor is required to pay Excess Additional Amounts on the guarantees, it may elect to redeem the Securities, in whole but not in part, at a redemption price equal to 100% of the remaining principal amount plus interest and any additional amounts accrued to the fixed date of redemption.  Neither the Company, a Guarantor nor any successor will be entitled to redeem the Securities pursuant to the previous sentence unless it is required to pay such Excess Additional Amounts due to a change in or amendment to the laws (or any rules or regulations thereunder) of the jurisdiction of its incorporation or any political subdivision or taxing authority thereof or therein, including a

1-10

change in or amendment to an official interpretation, administration or application of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or is announced on or after the Issue Date of the Securities or on or after the date a successor assumes the obligations under the Securities.

"Excess Additional Amounts" means (A) Additional Amounts payable by the Company on the Securities, which such Additional Amounts are greater than the additional amounts the Company would be required to pay on the Securities if withholding or deduction were imposed at a rate of 15.0 percent and (B) Additional Amounts payable by a successor to the Company on the Securities, or by a Guarantor or its successor on the guarantees, which such Additional Amounts are greater than the Additional Amounts such payor would be required to pay on the Securities if withholding or deduction were imposed only by the jurisdiction of its incorporation based on the laws in effect in such jurisdiction on the Issue Date (determined in each case without reference to any interest, fees, penalties or other additions to tax).

In the event that the Company, a Guarantor or any successor elects to so redeem the Securities, it shall deliver to the Trustee: (1) an Officer's Certificate, signed in the name of the Company or any successor, stating that (a) the Company, such Guarantor or such successor is entitled to redeem the Securities pursuant to their terms and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Company or any successor to so redeem have occurred or been satisfied and (b) the payment of Excess Additional Amounts cannot be avoided by the relevant payor taking reasonable measures available to it; *provided however*, that reasonable measures shall not include changing the payor's jurisdiction of incorporation or the location of its principal executive office or registered office; and (2) an Opinion of Counsel, reasonably acceptable to the Trustee, to the effect that the Company, a Guarantor or any successor has or will become obligated to pay Excess Additional Amounts, and that all governmental requirements necessary for the Company, a Guarantor or any successor to effect the redemption have been complied with.

(e)     *Optional Redemption Procedures.*  If fewer than all of the Securities are being redeemed, the selection of Securities to be redeemed shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Securities are listed or if such securities exchange has no requirement governing redemption or the Securities are not then listed on a securities exchange, on a pro rata basis or by lot (or, in the case of Securities issued in global form, based on a method that most nearly approximates a pro rata selection in accordance with the procedures of DTC).  The Trustee shall make the selection from the Outstanding Securities not previously called for redemption.  The Trustee shall promptly notify the Company in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount of the Securities to be redeemed.  In the event of a partial redemption by lot, the Trustee shall select the particular Securities to be redeemed not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Securities not previously called for redemption.  The Company may redeem Securities in denominations of U.S.$200,000 only in whole.  The Trustee may select for redemption portions (in any integral multiple of U.S.$1,000) of the principal of Securities that have denominations larger than U.S.$200,000; *provided* that the remaining

outstanding amount must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000.

The Company shall give or cause the Trustee to give notice of redemption, in the manner provided for in Section 13.01 of the Indenture, not less than 30 nor more than 60 days prior to a date for redemption of Securities by first-class mail, postage prepaid, to each record holder of the Securities to be redeemed at its registered address or otherwise in accordance with the procedures of DTC.  If the Company itself gives the notice, it shall also deliver a copy to the Trustee.

If either (i) the Company is redeeming the Securities in part only, or (ii) the Company elects to have the Trustee give notice of redemption, then the Company shall deliver to the Trustee, at least 35 days prior to the Redemption Date (unless the Trustee is satisfied with a shorter period), an Officer's Certificate requesting that the Trustee select the Securities to be redeemed and/or give notice of redemption and setting forth the information required by Section 3.02(3) of the Indenture.  If the Company elects to have the Trustee give notice of redemption, the Trustee shall give the notice in the name of the Company and at the Company's expense.

If the Company, or the Trustee on behalf of the Company, gives notice of redemption in accordance with Article 3 of the Indenture, the Securities, or the portions of Securities, called for redemption, shall, on the Redemption Date, become due and payable at the redemption price specified in the notice (together with accrued interest, if any, to, but excluding, the Redemption Date), and from and after the Redemption Date (unless the Company shall default in the payment of the redemption price and accrued interest) the Securities or the portions of Securities shall cease to bear interest, to the extent the Company so elects.  Upon surrender of any Securities for redemption in accordance with the notice, the Company shall pay the Securities at the redemption price, together with any accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Redemption Date.  If the Company shall fail to pay any Security called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Securities.

For the avoidance of doubt, the Company may at any time enter into a supplemental indenture with the Trustee without the consent of Securityholders to provide that any optional redemption can only be exercised by the Company beginning on a date more than 720 days after the Issue Date.

6.      Put Provisions

Upon a Change of Control that results in a Ratings Decline, any Holder will have the right to cause the Company and the Guarantors to repurchase all or any part (in any integral multiples of U.S.$1,000) of the Securities of such Holder at a repurchase price equal to 101% of the aggregate principal amount of the Securities to be repurchased plus accrued and unpaid interest and Additional Amounts, if any, to the date of repurchase, as provided in, and subject to the terms of, the Indenture; *provided* that no such repurchase shall reduce the outstanding principal amount of the Securities held by any Holder to below U.S.$200,000 or in integrals of other than U.S.$1,000.

7.    <u>Guarantee</u>

      The payment by the Company of the principal of, and premium and interest on, the Securities will be fully and unconditionally guaranteed by the Guarantors, to the extent set forth in the Indenture.

8.    <u>[Reserved]</u>

9.    <u>Denominations; Transfer; Exchange</u>

      The Securities shall be issued in registered form in denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof and shall be issued as one or more Global Securities.  A Holder may transfer or exchange Securities in accordance with the Indenture.  The Securities may be transferred, combined or divided without payment of any charge other than taxes or other governmental charges. The Registrar may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  The Registrar need not register the transfer of or exchange any Securities selected for redemption or any Securities for a period of 15 days before a selection of Securities to be redeemed or 15 days before an Interest Payment Date.

10.    <u>Persons Deemed Owners</u>

      The registered Holder of this Security may be treated as the owner of it for all purposes.  Payment shall be made to the person in whose name a Security is registered at the close of business on the applicable record date.

11.    <u>Unclaimed Money</u>

      If money for the payment of principal, premium or interest or Additional Amounts, if any, remains unclaimed for two years, the Trustee or the relevant Paying Agent shall pay the money back to the Company at its request unless an applicable abandoned property law designates another Person.  After any such payment, Holders entitled to the money must look only to the Company and not to the Trustee for payment.

12.    <u>Discharge; Defeasance</u>

      Subject to certain conditions set forth in Section 8 of the Indenture, the Company shall be entitled to terminate some or all of its obligations under the Securities and the Indenture if the Company deposits with the Trustee cash or U.S. Government Obligations for the payment of principal and interest on the Securities upon redemption or maturity, as the case may be.

13.    <u>Amendment, Waiver</u>

      Subject to certain exceptions set forth in the Indenture, (a) the Indenture and the Securities may be amended without notice to any Holder but with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Securities and

(b) any default or noncompliance with any provision may be waived with the written consent of the Holders of a majority in aggregate principal amount of the outstanding Securities.

Subject to certain exceptions set forth in the Indenture, without the consent of any Securityholder, the Company, the Guarantors and the Trustee shall be entitled to amend or supplement the Indenture or the Securities to cure any ambiguity, omission, defect or inconsistency, or to correct a manifest error or to comply with Section 5.01 of the Indenture, or to provide for uncertificated Securities in addition to or in place of certificated Securities, or to add guarantees with respect to the Securities, or to secure the Securities or to make any change that does not adversely affect the rights of any Securityholder, or to evidence and provide for the acceptance of appointment of a successor Trustee with respect to the Securities.

14.     Defaults and Remedies

Under the Indenture, Events of Default include (a) default for 30 days in payment of any interest or related Additional Amounts, if any, on the Securities; (b) default in payment of principal of or any related Additional Amounts, if any, or premium, if any, on the Securities, when the same becomes due and payable at maturity, upon acceleration or redemption or otherwise; (c) failure to make a Change of Control Offer and thereafter accept and pay for Securities tendered when and as required pursuant to Section 4.08 of the Indentures; (d) failure by the Company to comply with Section 5.01 of the Indenture; (e) failure by the Company or any Guarantor, as the case may be, to comply with other agreements in the Indenture and such non-compliance continues for a period of 60 consecutive days after written notice is given to Company by the Trustee or to the Company and the Trustee by the Holders of at least 25% in aggregate principal amount of the Securities; (f) certain accelerations of other Indebtedness of the Company or any Significant Subsidiary; (g) certain non-appealable judgments or orders rendered against the Company or any Significant Subsidiary that are not paid or discharged for a period of 60 consecutive days following the entry of the final and non-appealable judgment or order; (h) certain events of bankruptcy or insolvency with respect to the Company, the Guarantors or any Significant Subsidiary; (i) the Note Guarantee of a Significant Subsidiary shall fail to be in full force and effect or is declared null and void; and (j) certain condemnation events affecting all or substantially all of the undertaking, assets and revenues of the Company or any Significant Subsidiaries for a period of 60 consecutive days or longer.

If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Securities, by written notice to the Company and the Guarantors (and to the Trustee if notice is given by the Holders), may declare all the Securities to be due and payable immediately.  Certain events of bankruptcy or insolvency are Events of Default which will result in the Securities being due and payable immediately upon the occurrence of such Events of Default.

Securityholders may not enforce the Indenture or the Securities except as provided in the Indenture.  The Trustee may refuse to enforce the Indenture or the Securities unless it receives indemnity or security reasonably satisfactory to it.  Subject to certain limitations, Holders of a majority in principal amount of the Securities may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Securityholders notice of any

continuing Default (except a Default in payment of principal or interest) if it determines that withholding notice is in the interests of the Holders.

15.      Trustee Dealings with the Company and the Guarantors

The Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with and collect obligations owed to it by the Company, the Guarantors or their Affiliates and may otherwise deal with the Company, the Guarantors or their Affiliates with the same rights it would have if it were not Trustee.

16.      No Recourse Against Others

No past, present or future director, officer, employee, partner, incorporator, quotaholder, member or shareholder, as such, of the Company, the Guarantors or any Subsidiary of the Company, shall not have any liability for any obligations of the Company, the Guarantors or any Subsidiary of the Guarantors under the Securities, the Indenture or the Note Guarantee or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Security, each Securityholder waives and releases all such liability. The waiver and release are part of the consideration for the issue of the Securities.

17.      Authentication

This Security shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Security.

18.      Abbreviations

Customary abbreviations may be used in the name of a Securityholder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

19.      CUSIP Numbers and ISINs

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers or ISINs to be printed on the Securities and has directed the Trustee to use CUSIP numbers or ISINs in notices of redemption as a convenience to Securityholders. No representation is made as to the accuracy of such numbers either as printed on the Securities or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

20.      Governing Law; Consent to Jurisdiction and Service of Process.

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT

GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

Each of the Company and the Guarantors has consented to the jurisdiction of the courts of the State of New York and the United States courts located in the Borough of Manhattan, New York City, New York with respect to any action that may be brought in connection with the Indenture or the Securities and has validly and effectively appointed National Corporate Research, Ltd., Inc. as agent for service of process.

The Company will furnish to any Securityholder upon written request and without charge to the Securityholder a copy of the Indenture which has in it the text of this Security in larger type.  Requests may be made to:

OGX Petróleo e Gás Participações S.A.

Praia do Flamengo, No. 154 – 7th
Rio de Janeiro, Rio De Janeiro 22210-030 Brazil
Attention: General Counsel
Telephone: +55 21 2555 5200
Facsimile: +55 21 2555 5202

## ASSIGNMENT FORM

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

_____

agent to transfer this Security on the books of the Issuer.  The agent may substitute another to act for him or her.

Your Signature: 

Date:_____   _____

(Sign exactly as your name appears on the other side of this Security)

SIGNATURE GUARANTEE:   _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

[TO BE ATTACHED TO GLOBAL SECURITIES]

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY**

The initial principal amount of this Global Security is U.S.$_____. The following increases or decreases in this Global Security have been made:

| Date of Exchange | Amount of decrease in principal amount of this Global Security | Amount of increase in principal amount of this Global Security | Principal amount of this Global Security following such decrease or increase | Signature of authorized signatory of Trustee or Securities Custodian |
|---|---|---|---|---|

1-18

## [FORM OF] OPTION OF SECURITYHOLDER TO ELECT PURCHASE

If you elect to have this Security purchased by the Company pursuant to Section 4.06 or Section 4.08 of the Indenture, check the appropriate box below:

☐ Section 4.06          ☐ Section 4.08

If you elect to have only part of this Security purchased by the Company pursuant to Section 4.06 or Section 4.08 of the Indenture, state the amount (in integral multiples of U.S.$1,000) you elect to have purchased:

U.S.$_____

Dated: _____         Your Name: _____
                                        (Print your name exactly as it appears on the face of this Security)

                                 Your Signature: _____
                                          (Sign exactly as your name appears on the face of this Security)

SIGNATURE GUARANTEE: _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXHIBIT 2

to

RULE 144A/REGULATION S APPENDIX

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS
<u>PURSUANT TO REGULATION S</u>

[Date]

OGX Petróleo e Gás Participações S.A.
Praia do Flamengo, No. 154 – 7th
Rio de Janeiro, Rio De Janeiro 22210-030 Brazil
Attention: General Counsel

Deutsche Bank Trust Company Americas
Trust & Securities Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX

Re:  _____ (the "<u>Transferee</u>")
     8.500% Senior Notes due 2018 (the "<u>Securities</u>")

Ladies and Gentlemen:

In connection with our proposed transfer of U.S.$_____ aggregate principal amount of Securities, we confirm that such transfer has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and, accordingly, we represent that:

(1)     the offer of the Securities was not made to a person in the United States;

(2)     either (a) at the time the buy offer was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

(3)     no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, as applicable;

(4)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

(5)     we have advised the transferee of the transfer restrictions applicable to the Securities;

(6)     if the circumstances set forth in Rule 904(c) under the Securities Act are applicable, we have complied with the additional conditions therein, including (if applicable) sending a confirmation or other notice stating that the Securities may be offered and sold during the restricted period specified in Rule 903(c)(2) or (3), as applicable, in accordance with the provisions of Regulation S; pursuant to registration of the Securities under the Securities Act; or pursuant to an available exemption from the registration requirements under the Securities Act; and

(7)     if the sale is made during a restricted period and the provisions of Rule 903(c)(3) are applicable thereto, we confirm that such sale has been made in accordance with such provisions.

You and the Transferee are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.  Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Transferor]


By:_____
    Authorized Signature

EXHIBIT 3
to
RULE 144A/REGULATION S APPENDIX

FORM OF TRANSFER CERTIFICATE FOR
TRANSFER OF RESTRICTED GLOBAL SECURITY
<u>BEARING A RESTRICTED SECURITIES LEGEND</u>

[Date]

OGX Petróleo e Gás Participações S.A.
Praia do Flamengo, No. 154 – 7th
Rio de Janeiro, Rio De Janeiro 22210-030 Brazil
Attention: General Counsel

Deutsche Bank Trust Company Americas
Trust & Securities Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX

Re:        _____  (the "<u>Transferee</u>")
           8.500% Senior Notes due 2018 (the "<u>Securities</u>")

Ladies and Gentlemen:

          Reference is hereby made to the Indenture dated as of June 3, 2011 in regard of the Securities among OGX Petróleo e Gás Participações S.A., as the Issuer, OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A., as the Guarantors, Deutsche Bank Trust Company Americas, as the Trustee, Registrar, Paying Agent and transfer agent and The Bank of Tokyo-Mitsubishi UFJ, Ltd., as Principal Paying Agent. Capitalized terms used but not defined herein will have the meaning given them in the Indenture.

          This letter relates to U.S.$_____ aggregate principal amount of the Securities which are held in certificated form.

          The undersigned has requested transfer of such Securities to a Person who will take delivery thereof in the form of a beneficial interest in the Restricted Global Security (CUSIP No. _____; ISIN _____).  In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and on the Securities and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

1.      the Securities are being transferred to a transferee that the undersigned reasonably believes is purchasing the Securities for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

2.      the undersigned reasonably believes that transferee and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

[NAME OF TRANSFEROR]


By:_____
    Name:
    Title:


Dated:_____

APPENDIX II

## FORM OF SUPPLEMENTAL INDENTURE
## TO BE DELIVERED BY SUBSTITUTED DEBTOR OGX NETHERLANDS B.V.

This SUPPLEMENTAL INDENTURE (this "Supplemental Indenture"), dated as of _____, among OGX NETHERLANDS B.V. (the "Substituted Debtor"), a wholly-owned subsidiary of OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A. (or its permitted successor), a company incorporated under the laws of the Federative Republic of Brazil (the "Company"), the Guarantors (as defined in the Indenture referred to herein) and Deutsche Bank Trust Company Americas, as trustee under the Indenture referred to below (the "Trustee").

## RECITALS

WHEREAS, the Company has heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of June 3, 2011 providing for the issuance of 8.500% Senior Notes due 2018 (the "Securities");

WHEREAS, the Indenture provides that the Substituted Debtor may execute and deliver to the Trustee a supplemental indenture pursuant to which the Substituted Debtor shall replace and substitute the Company as issuer and assume the Issuer's obligations as principal obligor and issuer of the Securities and the Indenture on the terms and conditions set forth herein; and

WHEREAS, pursuant to Section 10.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Substituted Debtor and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1.    CAPITALIZED TERMS.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.    AGREEMENT TO ASSUME OBLIGATIONS AND UNDERTAKE.  The Substituted Debtor hereby (i) agrees to assume all of the Issuer's obligations as issuer of the Securities on the terms and subject to the conditions set forth in this Supplemental Indenture, and in the Indenture including but not limited to Article 10 and Section 4.21 thereof and (ii) undertakes in favor of each Holder of the Securities to be bound by the terms and conditions of the Securities and the provisions of the Indenture as fully as if the Substituted Debtor had been named in the Securities and the Indenture as the principal debtor in respect of the Securities in place of the Company.

3.      AGREEMENT TO GUARANTEE.  The Company hereby agrees to provide an unconditional Guarantee on the terms and subject to the conditions set forth in the Note Guarantee and in the Indenture, including but not limited to Article 10 thereof.

4.      COMPLIANCE WITH LAWS.  (a) The Substituted Debtor hereby represents and warrants that the execution of this Supplemental Indenture shall not violate any provision of the laws, rules and regulations of The Netherlands.

(b)      The Company hereby represents and warrants that the execution of this Supplemental Indenture shall not violate any provision of the laws, rules and regulations of the Federative Republic of Brazil.

5.      NO RECOURSE AGAINST OTHERS.  No director, officer, employee, incorporator or stockholder of the Issuer or any Guarantor, as such, will have any liability for any obligations of the Issuer or the Guarantors under the Securities, the Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of the Securities by accepting a Security waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Securities.  The waiver may not be effective to waive liabilities under the federal securities laws.

6.      NEW YORK LAW TO GOVERN; CONSENT TO JURISDICTION; APPOINTMENT OF AGENT TO ACCEPT SERVICE OF PROCESS. (a)  Each of the parties hereto irrevocably consents and agrees that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter arising out of or in connection with this Supplemental Indenture, the Indenture, the Note Guarantee or the Securities may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Securities have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court in personam, generally and unconditionally with respect to any action, suit or proceeding for itself and in respect of its properties, assets and revenues.  Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Supplemental Indenture, the Indenture the Note Guarantee, or the Securities brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum and any right which it may be entitled on account of place of residence or domicile.  To the extent that the Substituted Debtor, the Company or the Guarantors has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process with respect to itself or its property, each of the Substituted Debtor, the Company

and the Guarantors irrevocably waives such immunity in respect of its obligations under this Supplemental Indenture, the Indenture, any Security or the Note Guarantee. Each of the parties to this Indenture agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on them and may be enforced in any court to the jurisdiction of which each of them is subject by a suit upon such judgment, provided that service of process is effected upon the Substituted Debtor in the manner specified in the following paragraph or as otherwise permitted by law.

(b)    The Substituted Debtor has validly and effectively appointed National Corporate Research, Ltd. (the "Process Agent"), with offices on the date hereof at 10 East 40th Street, 10th Floor, New York, NY 10016, as its authorized agent upon which process may be served in any action, suit or proceeding referred to in Section 13.13(a) of the Indenture. If for any reason such agent hereunder shall cease to be available to act as such, the Substituted Debtor agrees to designate a new agent in the Borough of Manhattan, New York City, New York. The Substituted Debtor further hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents in any such action, suit or proceeding against the Substituted Debtor by serving a copy thereof upon the relevant agent for service of process referred to in this section (whether or not the appointment of such agent shall for any reason prove to be ineffective or such agent shall accept or acknowledge such service) or by mailing copies thereof by registered or certified air mail, postage prepaid, to the Substituted Debtor at its address specified in or designated pursuant to this Supplement Indenture. The Substituted Debtor agrees that the failure of any such designee, appointee and agent to give any notice of such service to it shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon. Nothing herein shall in any way be deemed to limit the ability of the Holders and the Trustee to serve any such legal process, summons, notices and documents in any other manner permitted by applicable law or to obtain jurisdiction over the Substituted Debtor or bring actions, suits or proceedings against the Substituted Debtor in such other jurisdictions, and in such manner, as may be permitted by applicable law.

7.    COUNTERPARTS. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

8.    EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

9.    THE TRUSTEE. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Substituted Debtor and the Company.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

Dated: _____,

OGX NETHERLANDS B.V.

By: _____
       Name:
       Title:

OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.

By: _____
       Name:
       Title:

OGX PETRÓLEO E GÁS LTDA.

By: _____
       Name:
       Title:

OGX CAMPOS PETRÓLEO E GÁS S.A.

By: _____
       Name:
       Title:

DEUTSCHE BANK TRUST COMPANY
       AMERICAS, as Trustee

By: Deutsche Bank National Trust Company

By: _____
       Authorized Signatory:

By: _____
       Authorized Signatory:

On this      day of                  , 2011, before me, a notary public, personally appeared _____ and _____ to me personally known who being duly sworn, did say that they are Authorized Signatories of Deutsche Bank National Trust Company, the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said persons.

**By:**    _____

**Title:  Notary Public**
No.
Qualified in
Commission Expires

# EXHIBIT B

EXECUTION COPY

**OGX AUSTRIA GMBH**
as Issuer

**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.,**
**OGX PETRÓLEO E GÁS LTDA.**
and
**OGX CAMPOS PETRÓLEO E GÁS S.A.**
as Guarantors

**DEUTSCHE BANK TRUST COMPANY AMERICAS**
as Trustee, Registrar, Transfer Agent
and Paying Agent

and

**DEUTSCHE BANK LUXEMBOURG S.A.**
as Principal Paying Agent

_____

**INDENTURE**

**Dated as of March 30, 2012**

_____

**U.S.$1,063,000,000**

**8.375% SENIOR NOTES DUE 2022**

# TABLE OF CONTENTS

Page

Article 1 Definitions and Incorporation by Reference ............................................................. 1

SECTION 1.01    Definitions ................................................................................................. 1
SECTION 1.02    Incorporation by Reference of Trust Indenture Act .................................. 25
SECTION 1.03    Rules of Construction ................................................................................ 26

Article 2 The Securities ............................................................................................................ 27

SECTION 2.01    Form and Dating ....................................................................................... 27
SECTION 2.02    Execution and Authentication .................................................................. 27
SECTION 2.03    Registrar and Paying Agent ...................................................................... 28
SECTION 2.04    Paying Agent To Hold Money in Trust .................................................... 28
SECTION 2.05    Securityholder Lists .................................................................................. 29
SECTION 2.06    Transfer and Exchange ............................................................................. 29
SECTION 2.07    Replacement Securities ............................................................................ 30
SECTION 2.08    Outstanding Securities .............................................................................. 31
SECTION 2.09    Temporary Securities ............................................................................... 31
SECTION 2.10    Cancellation .............................................................................................. 31
SECTION 2.11    CUSIP Numbers and ISINs ...................................................................... 31
SECTION 2.12    Issuance of Additional Securities ............................................................ 32
SECTION 2.13    Open Market Purchases ............................................................................ 32

Article 3 Optional Redemption of Securities ........................................................................... 32

SECTION 3.01    Optional Redemption ................................................................................ 32
SECTION 3.02    Notice of Redemption ............................................................................... 32
SECTION 3.03    Selection of Securities to Be Redeemed in Part ....................................... 33
SECTION 3.04    Securities Payable on Redemption Date ................................................... 34
SECTION 3.05    Unredeemed Portions of Partially Redeemed Security ............................. 34
SECTION 3.06    Third Party Notice .................................................................................... 34

Article 4 Covenants .................................................................................................................. 35

SECTION 4.01    Performance of Obligations under the Securities ..................................... 35
SECTION 4.02    Reports ...................................................................................................... 35
SECTION 4.03    Limitation on Debt and Disqualified Stock .............................................. 36
SECTION 4.04    Limitation on Restricted Payments .......................................................... 40
SECTION 4.05    [Reserved] ................................................................................................. 44
SECTION 4.06    Limitation on Sales of Assets ................................................................... 44

SECTION 4.07    Limitation on Transactions with Affiliates ........................................47
SECTION 4.08    Repurchases at the Option of the Holders Upon Change of Control
                Offer ...............................................................................................49
SECTION 4.09    Limitation on Liens.......................................................................51
SECTION 4.10    Limitation on Sale and Leaseback Transactions.............................51
SECTION 4.11    Maintenance of Corporate Existence ............................................51
SECTION 4.12    Maintenance of Properties ...........................................................52
SECTION 4.13    Limitation on Guarantees of Debt by Restricted Subsidiaries........52
SECTION 4.14    [Reserved].....................................................................................52
SECTION 4.15    [Reserved].....................................................................................53
SECTION 4.16    [Reserved].....................................................................................53
SECTION 4.17    [Reserved].....................................................................................53
SECTION 4.18    Maintenance of Office or Agency in the State of New York ...........53
SECTION 4.19    [Reserved].....................................................................................53
SECTION 4.20    [Reserved]......................................................................................53
SECTION 4.21    Additional Amounts......................................................................53
SECTION 4.22    Payments and Paying Agent .........................................................55
SECTION 4.23    [Reserved].....................................................................................56
SECTION 4.24    Limitation on Designation of Unrestricted Subsidiaries................56
SECTION 4.25    Ranking .........................................................................................57

Article 5 Consolidation, Merger, or Sale of Substantially All Assets                    57

SECTION 5.01    Consolidation, Merger, or Sale of Substantially All Assets ...........57

Article 6 Defaults and Remedies                                                        58

SECTION 6.01    Events of Default...........................................................................58
SECTION 6.02    Acceleration..................................................................................60
SECTION 6.03    Other Remedies.............................................................................60
SECTION 6.04    Rescission/Annulment of Acceleration; Waiver of Past Defaults..................61
SECTION 6.05    Control by Majority ......................................................................61
SECTION 6.06    Limitation on Suits........................................................................61
SECTION 6.07    Rights of Holders to Receive Payment ..........................................62
SECTION 6.08    Collection Suit by Trustee.............................................................62
SECTION 6.09    Trustee May File Proofs of Claim .................................................62
SECTION 6.10    Priorities........................................................................................62
SECTION 6.11    Undertaking for Costs ...................................................................63
SECTION 6.12    Waiver of Stay or Extension Laws ................................................63

Article 7 Trustee                                                               63

SECTION 7.01   Duties of Trustee.............................................................63
SECTION 7.02   Rights of Trustee.............................................................65
SECTION 7.03   Individual Rights of Trustee. ...........................................66
SECTION 7.04   Trustee's Disclaimer. .......................................................66
SECTION 7.05   Notice of Defaults.............................................................66
SECTION 7.06   Compensation and Indemnity. ..........................................66
SECTION 7.07   Replacement of Trustee. ..................................................67
SECTION 7.08   Successor Trustee by Merger.............................................68
SECTION 7.09   Eligibility; Disqualification. ............................................68
SECTION 7.10   Preferential Collection of Claims Against Issuer................69
SECTION 7.11   Appointment of Co-Trustee. .............................................69

Article 8 Discharge of Indenture; Defeasance                                    70

SECTION 8.01   Satisfaction and Discharge of Liability on Securities.........70
SECTION 8.02   [Reserved].......................................................................71
SECTION 8.03   [Reserved].......................................................................71
SECTION 8.04   Application of Trust Money..............................................71
SECTION 8.05   Repayment to Issuer........................................................71
SECTION 8.06   Defeasance .....................................................................71
SECTION 8.07   Reinstatement..................................................................72

Article 9 Amendments                                                            73

SECTION 9.01   Without Consent of Holders .............................................73
SECTION 9.02   With Consent of Holders ..................................................73
SECTION 9.03   Revocation and Effect of Consents and Waivers................74
SECTION 9.04   Notation on or Exchange of Securities ..............................75
SECTION 9.05   Trustee to Sign Amendments............................................75

Article 10 Substitution of the Issuer                                           75

SECTION 10.01   Substitution of the Issuer ...............................................75
SECTION 10.02   Deemed Substitution......................................................76
SECTION 10.03   Notice of Substitution ....................................................77

Article 11 Guarantee by the Guarantors                                          77

SECTION 11.01   Guarantee .....................................................................77
SECTION 11.02   Guarantee Unconditional ...............................................77

SECTION 11.03  Termination, Release and Discharge; Reinstatement ...................................78
SECTION 11.04  Waiver by the Guarantors ........................................................................79
SECTION 11.05  Subrogation and Contribution ..................................................................79
SECTION 11.06  Stay of Acceleration ................................................................................79
SECTION 11.07  Execution and Delivery of Guarantee ......................................................79
SECTION 11.08  Purpose of Guarantee ..............................................................................79
SECTION 11.09  Central Bank Regulations ........................................................................79

Article 12 Release of Covenants                                                                                      80

SECTION 12.01  Release of Covenants ...............................................................................80

Article 13 Miscellaneous                                                                                              81

SECTION 13.01  Notices ....................................................................................................81
SECTION 13.02  Communication by Holders with Other Holders ........................................83
SECTION 13.03  Certificate and Opinion as to Conditions Precedent ...................................83
SECTION 13.04  Statements Required in Certificate or Opinion ..........................................83
SECTION 13.05  When Securities Disregarded ...................................................................83
SECTION 13.06  Rules by Trustee, Paying Agent and Registrar ..........................................84
SECTION 13.07  Business Days ..........................................................................................84
SECTION 13.08  Governing Law ........................................................................................84
SECTION 13.09  No Recourse Against Others ....................................................................84
SECTION 13.10  Successors ...............................................................................................84
SECTION 13.11  Multiple Originals ....................................................................................84
SECTION 13.12  Table of Contents; Headings .....................................................................84
SECTION 13.13  Consent to Jurisdiction; Appointment of Agent to Accept Service of
               Process; Currency Indemnity ...................................................................85
SECTION 13.14  Waiver of Jury Trial ................................................................................86
SECTION 13.15  Patriot Act ...............................................................................................87
SECTION 13.16  Force Majeure ..........................................................................................87

Rule 144A/Regulation S Appendix I

Exhibit 1 to Rule 144A/Regulation S Appendix
Form of Initial Security

Exhibit 2 to Rule 144A/Regulation S Appendix
Form of Regulation S Transfer Certificate

Exhibit 3 to Rule 144A/Regulation S Appendix
Form of Rule 144A Transfer Certificate

INDENTURE dated as of March 30, 2012 among OGX AUSTRIA GMBH, a company with limited liability (*Gesellschaft mit beschränkter Haftung*) organized under the laws of the Republic of Austria, as issuer (the "Issuer"), OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A., a corporation (*sociedade anônima*) organized under the laws of The Federative Republic of Brazil, as a guarantor (the "Company"), OGX CAMPOS PETRÓLEO E GÁS S.A, a corporation (*sociedade anônima*) organized under the laws of the Federative Republic of Brazil, as a guarantor ("OGX  Campos"), OGX PETRÓLEO E GÁS LTDA., a limited liability company (*sociedade limitada*) organized under the laws of the Federative Republic of Brazil, as a guarantor ("OGX Ltda" and, together with the Company and OGX Campos, the "Guarantors"), DEUTSCHE BANK TRUST COMPANY AMERICAS, a New York banking corporation, as trustee (in such capacity, the "Trustee"), registrar, paying agent and transfer agent, and DEUTSCHE BANK LUXEMBOURG S.A., as principal paying agent (the "Principal Paying Agent").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as defined below) of the Issuer's U.S.$1,063,000,000 aggregate principal amount of 8.375% Senior Notes due 2022 (the "Initial Securities"), and any Additional Securities (as defined below):

Article 1

Definitions and Incorporation by Reference

SECTION 1.01    Definitions.

"Acquired Debt" means Debt of a Person existing at the time the Person merges with or into or becomes a Restricted Subsidiary and not Incurred in connection with, or in contemplation of, the Person merging with or into or becoming a Restricted Subsidiary.

"Additional Amounts" has the meaning set forth under Section 4.21.

"Additional Assets" means (i) any property or assets (including Capital Stock or its substantial equivalent or other Investments) that are used or usable by the Company, any of its Restricted Subsidiaries or any joint venture in which the Company or any of its Restricted Subsidiaries is a party in a Permitted Business (or in the case of Capital Stock or its substantial equivalent or other Investments that represent direct, or indirect (via a holding company), ownership or other interests held by the Company or any Restricted Subsidiary in entities engaged in a Permitted Business); and (ii) contracts (including supply, customer and EPC contracts) that are used or usable by the Company, any of its Restricted Subsidiaries or any joint venture in which the Company or any of its Restricted Subsidiaries is a party in a Permitted Business.

"Additional Securities" means 8.375% Senior Notes due 2022, having identical terms and conditions as the Securities (other than the date on which the initial interest accrues from), issued from time to time after the Issue Date under the terms of this Indenture (other than pursuant to Section 2.06, 2.07, or 2.09 of this Indenture).

"Affiliate" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any subsidiary of such specified Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means the Registrar, the Transfer Agent, a Paying Agent, any exchange agent and any listing agent.

"Asset Sale" means any sale, lease, transfer or other disposition (whether in a single transaction or a series of related transactions) of any assets by the Company or any Restricted Subsidiary, including by means of a merger, consolidation or similar transaction or a Sale and Leaseback Transaction and including any sale or issuance of the Equity Interests of any Restricted Subsidiary (each of the above referred to as a "disposition"), *provided* that the following are not included in the definition of "Asset Sale":

(1)     a disposition to the Company or a Restricted Subsidiary, including the sale or issuance by the Company or any Restricted Subsidiary of any Equity Interests of any Restricted Subsidiary to the Company or any Restricted Subsidiary;

(2)     the sale, lease, transfer or other disposition by the Company or any Restricted Subsidiary in the ordinary course of business of (i) cash, Cash Equivalents and Marketable Securities, (ii) inventory, (iii) damaged, worn out or obsolete equipment or other assets, or (iv) rights granted to others pursuant to leases or licenses;

(3)     the lease of assets by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(4)     any sale, lease, transfer, transfer or other disposition of any property or concession to any governmental authority;

(5)     the sale or discount of accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

(6)     a transaction covered by Section 5.01;

(7)     a Restricted Payment permitted under Section 4.04;

(8)     a Sale and Leaseback Transaction otherwise permitted under Section 4.10;

(9)     any issuance of Disqualified Stock otherwise permitted under Section 4.03;

(10)    the creation of a Lien not prohibited by this Indenture (but not the sale or disposition of the property subject to such Lien);

(11)    the licensing or sublicensing of intellectual property or other general intangibles, including, without limitation, licenses for seismic data, in the ordinary course of business and which do not materially interfere with the business of the Company and its Restricted Subsidiaries;

(12)    the sale or other disposition of Cash Equivalents;

(13)    the sale or discount of receivables arising in the ordinary course of business in connection with the compromise or collection thereof;

(14)    any surrender or waiver of contract rights pursuant to a settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(15)    a disposition of hydrocarbons or mineral products inventory in the ordinary course of business;

(16)    the farm-out, lease or sublease of developed or undeveloped oil and natural gas properties or license or concession to explore or produce oil and natural gas owned or held by the Company or any Restricted Subsidiary in exchange for either (i) oil and natural gas properties or license or concession to explore or produce oil and natural gas owned or held by another Person or (ii) the assumption by the other Person of any expenditures to explore or produce oil and natural gas in the oil and natural gas properties or license or concession;

(17)    any Production Payments and Reserve Sales; *provided* that any such Production Payments and Reserve Sales, other than incentive compensation programs on terms that are reasonably customary in the Permitted Business for geologists, geophysicists and other providers of technical services to the Company or a Restricted Subsidiary, shall have been created, Incurred, issued, assumed or guaranteed in connection with the financing of, and within 60 days after the acquisition of, the property that is subject thereto; and

(18)    any disposition of an asset or a series of related dispositions of assets with an aggregate Fair Market Value not to exceed the greater of (i) U.S.$100,000,000 and (ii) 1.25% of Consolidated Total Assets.

"Asset Sale Offer" has the meaning set forth under Section 4.06(a)(5).

"Attributable Debt" means, in respect of a Sale and Leaseback Transaction the present value, discounted at the interest rate implicit in the Sale and Leaseback Transaction, of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction.

"Austria" means the Republic of Austria.

"Average Life" means, with respect to any Debt, the quotient obtained by dividing (i) the sum of the products of (x) the number of years from the date of determination to the dates of each successive scheduled principal payment of such Debt and (y) the amount of such principal payment by (ii) the sum of all such principal payments.

"Board of Directors" means, with respect to any Person, the board of directors or similar governing body of such Person or any duly authorized committee thereof.

"Brazil" means The Federative Republic of Brazil.

"Business Day" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in the City of New York and/or São Paulo.

"Capital Lease Obligation" means, with respect to any Person, any obligation which is required to be classified and accounted for as a capital lease on the face of a balance sheet of such person prepared in accordance with GAAP; the amount of such obligation will be the capitalized amount thereof, determined in accordance with GAAP; and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"Capital Stock" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any Preferred Stock, but excluding any debt securities convertible into or exchangeable for such equity.

"Cash Equivalents" means:

(1)     Brazilian *reais*, Colombian pesos, U.S. dollars, or money in other currencies received in the ordinary course of business that are readily convertible into U.S. dollars;

(2)     any evidence of Debt with a maturity of one year or less issued or directly and fully guaranteed or insured by Brazil, Colombia or the United States or any agency or instrumentality thereof, *provided* that the full faith and credit of Brazil, Colombia or the United States is pledged in support thereof;

(3)     (i) demand deposits, (ii) time deposits and certificates of deposit with maturities of one year or less from the date of acquisition, (iii) bankers' acceptances with maturities not exceeding one year from the date of acquisition, and (iv) overnight bank deposits, in each case with any bank or trust company organized or licensed under the laws of Brazil, Colombia or any political subdivision thereof or the United States or any state thereof having

capital, surplus and undivided profits in excess of U.S.$500,000,000 whose long-term debt is rated "A-2" or higher by S&P or "P-2" or higher by Moody's (or the equivalent local rating);

        (4)    repurchase obligations with a term of not more than seven days for underlying securities of the type described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

        (5)    commercial paper rated at least P-1 by Moody's or A-1 by S&P (or the equivalent local rating) and maturing no later than one year after the date of acquisition; and

        (6)    money market funds at least 95% of the assets of which consist of investments of the type described in clauses (1) through (5) above.

"Change of Control" means:

        (1)    the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)) other than to one or more of the Permitted Holders;

        (2)    (i) if a Person (other than a Permitted Holder) beneficially owns, directly or indirectly, more than 35% of the outstanding Voting Stock of the Company, measured by voting power rather than number of shares and (ii) a Permitted Holder beneficially owns, directly or indirectly, outstanding Voting Stock of the Company less than such Person; or

        (3)    the adoption of a plan or proposal for the liquidation or dissolution of the Company.

"Change of Control Offer" means an offer made by the Issuer or a third party so designated, following the occurrence of a Change of Control that results in a Rating Decline, to each Holder to repurchase all or any part of such Holder's Securities pursuant to Section 4.08.

"Change of Control Payment" means, in connection with the repurchase of a Holder's Securities pursuant to a Change of Control Offer, the payment by the Issuer or a third party so designated of 101% of the aggregate principal amount of such Holder's Securities repurchased plus accrued interest and Additional Amounts, if any, on such Securities, to the date of purchase (subject to the right of the Holders of record on the relevant record date to receive interest and Additional Amounts, if any, on the relevant interest payment date).

"Change of Control Payment Date" means the purchase date for the Securities properly tendered in a Change of Control Offer as specified in the notice given by the Issuer or a third party so designated pursuant to Section 4.08, which date is not more than five Business Days after the Expiration Date.

"Colombia" means the Republic of Colombia.

"Company" means OGX Petróleo e Gás Participações S.A., named as such in this Indenture, excluding its Subsidiaries, until a successor replaces it and, thereafter, means the successor.

"Consolidated Net Income" means, for any period, the aggregate net income (or loss) of the Company and its Restricted Subsidiaries for such period determined on a consolidated basis in conformity with GAAP.

"Consolidated Net Total Assets" means Consolidated Total Assets less cash and Cash Equivalents.

"Consolidated Total Assets" means the total amount of assets of the Company and its Restricted Subsidiaries on a consolidated basis calculated (i) based on the most recent balance sheet for which internal financial statements are available, (ii) in accordance with GAAP, (iii) on a pro forma basis to give effect to any acquisition or disposition of companies, divisions, lines of businesses or operations by the Company and its Restricted Subsidiaries subsequent to such date and on or prior to the date of determination and (iv) on a pro forma basis to give effect to any debt or equity issuances by the Company.

"Corporate Trust Office" means the principal office of the Trustee in New York City, New York, which on the Issue Date is 60 Wall Street, Mailstop NYC60-2710, New York, NY 10005, Attention: Trust & Agency Services, Corporates Team Deal Manager – OGX Austria, or such other office at such address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the principal corporate trust office of any successor Trustee (at such other address as such successor Trustee may designate from time to time by notice to the Holders and the Issuer).

"Credit Facilities" means, one or more debt facilities or commercial paper facilities, in each case with banks, investment banks, insurance companies, mutual funds and/or other institutional lenders providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from (or sell receivables to) such lenders against such receivables) or letters of credit, in each case, as amended, extended, restated, renewed, refunded, replaced (whether contemporaneously or otherwise) or refinanced (in each case with Credit Facilities), supplemented or otherwise modified (in whole or in part and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time.

"CVM" means the Brazilian Securities Commission, or *Comissão de Valores Mobiliários*.

"Debt" means, with respect to any Person, without duplication:

(1) the principal of and premium, if any, in respect of (a) indebtedness of such Person for money borrowed and (b) indebtedness evidenced by notes, debentures, notes or other similar instruments for the payment of which such person is responsible or liable;

(2)    all Capital Lease Obligations of such person;

(3)    all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable or other short-term obligations to suppliers payable within 180 days, in each case arising in the ordinary course of business);

(4)    all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(5)    all obligations of the type referred to in clauses (1) through (4) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any guarantee (other than obligations of other persons that are customers or suppliers of such person for which such person is or becomes so responsible or liable in the ordinary course of business to (but only to) the extent that such person does not, or is not required to, make payment in respect thereof);

(6)    all obligations of the type referred to in clauses (1) through (4) of other persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured;

(7)    all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock of such Person or, with respect to any Preferred Stock of any Subsidiary of such Person that is not held by such Person or a Restricted Subsidiary of such Person, the greater of the maximum liquidation value of such Preferred Stock or the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock (but excluding, in each case, any accrued dividends); and

(8)    any other obligations of such Person which are required to be, or are in such Person's financial statements, recorded or treated as debt under GAAP;

*provided* that (other than Disqualified Stock) the foregoing debt shall be included in this

definition of Debt only if, and to the extent that, the debt would appear as a liability on a balance sheet of such Person or in the notes to the financial statements in accordance with GAAP.

Notwithstanding the foregoing, the term "Debt" shall not include:

(1)     any leases or rentals of equipment related to exploration, production and commercialization activities, including without limitation, leases or rentals of or related to drilling rigs, supply boats, crude oil and LNG carriers, FPSOs (floating production storage and offloading), WHPs (wellhead platforms), TLWPs (tension leg wellhead platforms) and any other equipments or other assets, provided that such leases or rentals do not include a purchase option;

(2)     in connection with the purchase by the Company or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing;

(3)     Production Payments and Reserve Sales;

(4)     any obligations to customers, suppliers or service providers in the ordinary course of business with a maturity less than 90 days;

(5)     any obligation of a Person in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property;

(6)     any obligations under Hedging Agreements; *provided*, that such agreements are entered into for bona fide hedging purposes of the Company or its Restricted Subsidiaries (as determined in good faith by the Board of Directors or senior management of the Company, whether or not accounted for as a hedge in accordance with GAAP) and, in the case of currency hedging agreements or commodity hedging agreements, such agreements are related to business transactions of the Company or its Restricted Subsidiaries entered into in the ordinary course of business and, in the case of interest rate hedging agreements, such agreements substantially correspond in terms of notional amount, duration and interest rates, as applicable, to the Debt of the Company or its Restricted Subsidiaries Incurred without violation of this Indenture;

(7)     any obligation arising from agreements of the Company or a Restricted

Subsidiary providing for indemnification, guarantees or letters of credit, surety bonds or performance bonds, adjustment of purchase price, holdbacks, contingency payment obligations or similar obligations (other than guarantees of Debt), in each case, Incurred or assumed in connection with the acquisition or disposition of any business, assets or Capital Stock of a Restricted Subsidiary, provided that such Debt is not reflected on the face of the balance sheet of the Company or any Restricted Subsidiary;

(8)     any obligation arising from the honoring by a bank or other financial institution of a check, draft or similar instrument (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, provided, however, that such Debt is extinguished within five business days of Incurrence;

(9)     in-kind obligations relating to net oil or natural gas balancing positions arising in the ordinary course of business; and

(10)     all contracts and other obligations, agreements, instruments or arrangements described in clauses (18), (19), (20), and (21) of the definition of "Permitted Liens".

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Depositary" means, with respect to the Securities issuable or issued in whole or in part in the form of one or more Global Securities, the Person designated in Section 2.03 hereof as Depositary by the Issuer pursuant to this Indenture, until a successor shall have been appointed and become such and, thereafter, "Depositary" shall mean or include such Person.

"Designation" has the meanings set forth under Section 4.24.

"Disqualified Equity Interests" means Equity Interests that by their terms or upon the happening of any event are:

(1)     required to be redeemed or redeemable at the option of the holder prior to the Stated Maturity of the Securities for consideration other than Qualified Equity Interests, or

(2)     convertible at the option of the holder into Disqualified Equity Interests or exchangeable for Debt;

provided, that Equity Interests will not constitute Disqualified Equity Interests solely because of provisions giving holders thereof the right to require repurchase or redemption upon an "asset sale" or "change of control that results in a ratings decline" occurring prior to the Stated Maturity of the Securities if those provisions:

(A)     are no more favorable to the Holders than Section 4.06 and Section 4.08 hereof, and

(B)      specifically state that repurchase or redemption pursuant thereto will not be required prior to the Issuer's repurchase of the Securities as required by this Indenture.

"Disqualified Stock" means Capital Stock constituting Disqualified Equity Interests.

"DTC" means the Depository Trust Company.

"EBITDA" means, for any period:

(1)      consolidated net revenue; *minus*

(2)      consolidated costs; *minus*

(3)      consolidated administrative and selling expenses; *plus*

(4)      consolidated other operating income, net and non-operating income, net; *provided* that this clause (4) shall exclude interest income, net; *plus*

(5)      any depreciation, depletion or amortization;

as each such item is reported on the most recent consolidated financial statements delivered by the Company to the Trustee and prepared in accordance with GAAP.

"EBITDA Triggering Event" means when the Company has reported on a consolidated basis at least U.S.$100,000,000 of EBITDA during any fiscal quarter or consecutive fiscal quarters (but not to exceed any four consecutive quarters) for which financial statements are available.

"Equity Interests" means all Capital Stock and all warrants or options with respect to, or other rights to purchase, Capital Stock, but excluding Debt convertible into equity.

"Event of Default" has the meaning set forth under Section 6.01.

"Excess Proceeds" has the meaning set forth under Section 4.06(a)(5).

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"Expiration Date" has the meaning set forth under Section 4.08(2)(B).

"Fair Market Value" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Company and, unless specified in the relevant provision of this Indenture, if the Fair Market Value exceeds U.S.$10,000,000, by an officer of the Company, whose determination will be conclusive if evidenced by an Officer's Certificate delivered to the Trustee.

"Farm-In Agreement" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property.

"Farm-Out Agreement" means a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"Fitch" means Fitch Ratings Inc. and its successors.

"GAAP" means (i) International Financial Reporting Standards, (ii) accounting practices generally accepted in the United States or (iii) accounting practices prescribed by Brazilian Corporation Law, the rules and regulations issued by the CVM and the accounting standards issued by the Brazilian Institute of Independent Accountants (*Instituto dos Auditores Independentes do Brasil*), in each case as in effect from time to time or on the Issue Date, in the Company's discretion.

"guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (b) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part; *provided*, *however*, that the term "guarantee" does not include endorsements for collection or deposit in the ordinary course of business.  The term "guarantee" used as a verb has a corresponding meaning.

"Guarantors" means:

(1)     OGX Petróleo e Gás Participações S.A.;

(2)     OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A.; and

(3)     any other Restricted Subsidiary of the Company that becomes a Guarantor in accordance with the provisions of this Indenture,

and their respective successors and assigns, in each case, until the Note Guarantee of such Person has been released in accordance with the provisions of this Indenture.

"Hedging Agreements" means (i) (a) any interest rate swap agreement, interest rate cap agreement or other agreement designed to protect against fluctuations in interest rates or (b) any foreign exchange forward contract, currency swap agreement or other agreement designed to protect against fluctuations in foreign exchange rates or (ii) any commodity or raw

material futures contract or any other agreement designed to protect against fluctuations in raw material prices.

"Hedging Obligations" means the obligations of any Person pursuant to Hedging Agreements.

"Holder" or "Securityholder" means the Person in whose name a Security is registered on the Registrar's books.

"Incur" means, with respect to any Debt or Capital Stock, to Incur, create, issue, assume or guarantee such Debt or Capital Stock.  The term "Incurrence" when used as a noun shall have a correlative meaning.  The accretion of original issue discount or payment of interest in kind will not be considered an Incurrence of Debt.

"Indenture" means this Indenture, as it may be amended or supplemented from time to time in accordance with the applicable terms hereof.

"Initial Securities" has the meaning set forth in the preamble to this Indenture.

"Interest Payment Date" means each April 1 and October 1 of each year, commencing on October 1, 2012.

"Investment" means:

(1)      any direct or indirect advance, loan (including guarantees) or other extension of credit to another Person, but excluding (i) any advance, loan or extension of credit to customers in the ordinary course of business and (ii) any advance, loan or extension of credit having a term not exceeding 180 days arising in connection with the sale of inventory, equipment or supplies by that Person in the ordinary course of business,

(2)      any capital contribution to another Person, by means of any transfer of cash or other property or in any other form,

(3)      any purchase or acquisition of Equity Interests, bonds, notes or other Debt, or other instruments or securities issued by another Person, any acquisitions of assets or substantially all the assets of a Person, including the receipt of any of the above as consideration for the disposition of assets or rendering of services, or

(4)      any guarantee of any obligation of another Person.

For purposes of this definition, the term "Person" shall not include the Company or any Restricted Subsidiary or any Person who would become a Restricted Subsidiary as a result of any Investment.  If the Company or any Restricted Subsidiary sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary so that, after giving effect to that sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, all remaining Investments of the Company and the Restricted Subsidiaries in such Person shall be deemed to have been made at such time.

For purposes of Section 4.04, the Company will be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which will be valued at the Fair Market Value of the sum of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Debt of such Unrestricted Subsidiary owed to the Company or any Restricted Subsidiary immediately following such Designation. Any property transferred to or from an Unrestricted Subsidiary will be valued at its Fair Market Value at the time of such transfer.

"Investment Grade Rating" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"Issue Date" means March 30, 2012.

"Issuer" means OGX Austria GmbH, named as such in this Indenture, excluding its Subsidiaries, until a successor replaces it and, thereafter, means the successor, or such substituted issuer in accordance with Article 10.

"Lien" means any mortgage, pledge, security interest, conditional sale or other title retention agreement or other similar lien.

"Marketable Securities" means publicly traded debt or equity securities that are listed for trading on a national securities exchange and that were issued by a corporation with debt securities rated at least "AA-" from S&P or "Aa3" from Moody's or the equivalent local rating.

"Maturity Date" means April 1, 2022.

"Minimum Legally Required Dividend" means, for any Brazilian Person and any period, an amount equal to the sum of (a) the minimum dividend required to be distributed under applicable Brazilian law by such Person to holders of its Capital Stock during such period and (b) the minimum dividend required to be distributed to holders of Preferred Stock in such Person during such period so as to avoid such holders from acquiring or maintaining any voting rights under Brazilian law.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds of such Asset Sale in the form of cash or Cash Equivalents (including (i) payments in respect of deferred payment obligations to the extent corresponding to, principal, but not interest, when received in the form of cash, and (ii) proceeds from the conversion of other consideration received when converted to cash), net of:

(1)     brokerage commissions and other fees and expenses related to such Asset Sale, including fees and expenses of counsel, accountants and investment bankers;

(2)       provisions for taxes as a result of such Asset Sale taking into account the consolidated results of operations of the Company and its Restricted Subsidiaries;

(3)       payments required to be made to repay Debt (other than revolving credit borrowings) outstanding at the time of such Asset Sale that is secured by a Lien on the property or assets sold; and

(4)       appropriate amounts to be provided as a reserve against liabilities associated with such Asset Sale, including pension and other post-employment benefit liabilities, liabilities related to environmental matters and indemnification obligations associated with such Asset Sale, with any subsequent reduction of the reserve other than by payments made and charged against the reserved amount to be deemed a receipt of cash.

"Net Debt" means, as of any date of determination, the aggregate amount of Debt of the Company and its Restricted Subsidiaries less the sum of consolidated cash and cash equivalents and consolidated marketable securities recorded as current assets in all cases in accordance with GAAP and as set forth in the most recent consolidated balance sheet of the Company.

"Net Debt to EBITDA Ratio" means, on any date (the "transaction date"), the ratio of:

(x)       the aggregate amount of Net Debt at that time to

(y)       EBITDA for the four fiscal quarters immediately prior to the transaction date for which internal financial statements are available (the "reference period").

In making the foregoing calculation,

(1)       pro forma effect will be given to any Debt Incurred (and the application of proceeds thereof) during or after the reference period to the extent the Debt is outstanding or is to be Incurred on the transaction date as if the Debt had been Incurred on the first day of the reference period; and

(2)       pro forma effect will be given to:

(A)       the acquisition or disposition of companies, concessions, Oil and Gas Properties, or businesses by the Company and its Restricted Subsidiaries, including any acquisition or disposition of a company, concessions, Oil and Gas Properties or businesses since the beginning of the reference period by a Person that became a Restricted Subsidiary after the beginning of the reference period, and

(B)       the discontinuation of any discontinued operations that have occurred since the beginning of the reference period as if such events had occurred, and, in the case of any disposition, the proceeds thereof applied, on the first day of the reference period.

To the extent that pro forma effect is to be given to an acquisition or disposition of a company, division or line of business, the pro forma calculation will be (i) based upon the most recent four full fiscal quarters for which the relevant financial information is available and (ii) determined in good faith by the chief financial officer or the treasurer of the Company.

"Non-Recourse Debt" means Debt:

(1)     as to which neither the Company nor any Restricted Subsidiary (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Debt), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender; and

(2)     no default with respect to which would permit upon notice, lapse of time or both any holder of any Debt of the Company or any Restricted Subsidiary to declare a default on such Debt or cause the payment of the Debt to be accelerated or payable prior to its stated maturity.

"Note Guarantee" means the guarantee of the Securities by the Guarantors pursuant to this Indenture.

"Offer Period" means the period for which the Asset Sale Offer remains open, as specified by the Issuer in its notice delivered pursuant to Section 4.06(c).

"Offering Memorandum" means the offering circular for the Initial Securities, dated March 27, 2012.

"Officer" means with respect to the Company or any Restricted Subsidiary, the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president of the Company or any Restricted Subsidiary, as the case may be.

"Officer's Certificate" means a certificate signed by an Officer of the Company or of the Issuer, as applicable.

"Oil and Gas Properties" means all properties, including without limitation, equity or other ownership interests directly or indirectly therein, and any interests in any concession or license to explore or produce oil and natural gas.

"Opinion of Counsel" means a written opinion of counsel, who may be an employee of or counsel for the Company (except as otherwise provided in this Indenture).

"Outstanding Securities" has the meaning set forth under Section 2.08.

"Paying Agent" means the paying agent or principal paying agent identified in the preamble to this Indenture, until replaced by a successor and, thereafter, means the successor, and any other paying agent appointed by the Issuer to act as such.

"Permitted Business" means any business which is the same as or related, ancillary or complementary to any of the businesses of the Company and its Restricted Subsidiaries on the Issue Date, including without limitation, (1) the acquisition, exploration, development, production, operation and disposition of interests in oil, gas and other hydrocarbon and mineral properties or products produced in association with the foregoing (including without limitation through operating agreements, joint ventures, partnership agreements, technical evaluation agreements working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements or otherwise), and the utilization of the Company's and its Restricted Subsidiaries' properties or rights to explore or produce oil and gas, (2) the gathering, marketing, treating, processing, storage, distribution, refining, selling and transporting of any production from such interests, properties or rights products produced in association therewith and the marketing of oil, gas and other hydrocarbons and minerals obtained from unrelated Persons, (3) any other related energy business, including power generation and electrical transmission business, (4) oil field sales and services and related activities, (5) development, purchase and sale of real estate and interests therein, and (6) any business or activity related to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (1) through (5) of this definition.

"Permitted Business Investment" means any Investment and expenditure made in or assets or properties (including Capital Stock, Debt or any other security or instrument of a Person) related to a Permitted Business, including without limitation, (1) ownership interests in oil, natural gas, other hydrocarbons and minerals properties or gathering, transportation, processing, storage or related systems (with directly or indirectly through any investment vehicle); (2) any operating agreements, joint ventures, partnership agreements, working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements, contracts for the sale, transportation or exchange of oil, natural gas and other hydrocarbons, unitization agreements, pooling arrangements, joint bidding agreements, service contracts, partnership agreements, limited liability company agreements, subscription agreements, stock purchase agreements, stockholder agreements, area of mutual interest agreements, production sharing agreements or other similar or customary agreements, transactions, properties, interests, or arrangements, and Investments and expenditures in connection therewith or pursuant thereto; and (3) direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment.

"Permitted Debt" has the meaning set forth under Section 4.03.

"Permitted Holders" means Mr. Eike Fuhrken Batista and immediate members of his family thereof and any trust, investment vehicle or other Person beneficially owned by any such Persons.

"Permitted Investment" means:

(1)     any Investment in the Company or any Restricted Subsidiary (including, without limitation, in any Debt, other security or instrument thereof);

(2)      any Investment by the Company or any Restricted Subsidiary in another Person if as a result of such Investment such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, or is liquidated into, the Company or a Restricted Subsidiary or becomes a Restricted Subsidiary;

(3)      Investments in cash and cash equivalents and marketable securities as determined in accordance with GAAP;

(4)      stocks, obligations or securities received in settlement of (or foreclosure with respect to) debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor;

(5)      any Investment existing on, or made pursuant to a binding commitments existing on or approved by the Board of Directors as of, the Issue Date and any Investment consisting of an extension, modification or renewal of any Investment existing on the Issue Date;

(6)      Investments represented by Hedging Obligations permitted under this Indenture;

(7)      Investments which are made exclusively with Capital Stock of the Company (other than Disqualified Stock);

(8)      any Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were Incurred in the ordinary course of business of the Company or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes with Persons who are not Affiliates;

(9)      any acquisition and holding of (a) federal, state and municipal tax credits acquired solely to pay amounts owed by the Company or any Restricted Subsidiary to tax authorities and (b) discounted obligations of any governmental authority acquired solely to pay tax amounts owed by the Company or any Restricted Subsidiary to such governmental authority;

(10)      Investments made as a result of the receipt of non-cash consideration from an Asset Sale that was made in compliance with Section 4.06;

(11)      receivables owing to the Company or any of its Restricted Subsidiaries, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; provided, that such trade terms may include such trade terms as the Company or such Restricted Subsidiary deems reasonable under the circumstances;

(12)      surety and performance bonds and workers' compensation, utility, lease, tax, performance and similar deposits and prepaid expenses in the ordinary course of business;

(13)     prepayments and other credits to suppliers made in the ordinary course of business;

(14)     loans and advances pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business;

(15)     Investments in connection with pledges, deposits, payments or performance bonds made or given in the ordinary course of business in connection with or to secure statutory, regulatory or similar obligations, including obligations under health, safety or environmental obligations;

(16)     any Investment acquired from a Person which is merged with or into the Company or any of its Restricted Subsidiaries, or any Investment of any Person existing at the time such Person becomes a Restricted Subsidiary of the Company and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction;

(17)     guarantees by the Company or any Restricted Subsidiary of operating leases, in each case entered into by the Company or any Restricted Subsidiary in the ordinary course of business;

(18)     guarantees of performance or other obligations arising in the ordinary course in the Permitted Business, including obligations under oil and natural gas exploration, development, joint operating, and related agreements and licenses, concessions or operating leases related to the Permitted Business;

(19)     payroll, commission, travel, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(20)     loans or grants in respect of community development projects made in the ordinary course of business customary in the Permitted Business as appropriate for the Company's regions of operations and consistent with past practice or counterparty requirement;

(21)     Investments in the Capital Stock of any Person other than a Restricted Subsidiary of the Company that are required to be held pursuant to an involuntary governmental order of consideration, nationalization, seizure or expropriation or other similar order with respect to Capital Stock of such Person (prior to which order such Person was a Subsidiary of the Company);

(22)     Investments in marketable securities or instruments to fund the Company's or its Restricted Subsidiary's pension and other employee-related obligations pursuant to compensation arrangements approved by the Board of Directors or senior management of the Company;

(23)     Investments made pursuant to a commitment that, when entered into, would have complied with the provisions of this Indenture;

(24)     loans or advances made to, or guarantees with respect to loans or advances made to, directors, officers or employees of the Company or any Restricted Subsidiary in respect of travel, entertainment or moving related expense Incurred in the ordinary course of business; in respect of moving related expenses Incurred in connection with any closing or consolidation or any facility or office; or in the ordinary course of business;

(25)     repurchases of the Securities and related guarantees;

(26)     any Permitted Business Investment;

(27)     advances made to customers, clients, distributors, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business; and

(28)     additional Investments by the Company or any of its Restricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (28) that are at the time outstanding, not to exceed the greater of (i) U.S.$100,000,000 and (ii) 1.25% of Consolidated Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value).

"Permitted Liens" means:

(1)     any Lien in existence on the Issue Date and any extension, renewal or replacement thereof or of any Lien in clause (6), (7) or (8) below; provided, however, that the total amount of Debt so secured is not increased as a result thereof plus any fees and expenses in connection with such extension, renewal or replacement and the Lien shall be limited to all or part of the same property that secured the original Lien (together with improvements and accessions to such property);

(2)     Liens securing Debt owed by any Restricted Subsidiary of the Company solely to the Company or one or more Restricted Subsidiaries and/or by the Company to one or more such Restricted Subsidiaries;

(3)     Liens or deposits to secure judgments, in each case not giving rise to an Event of Default, so long as any appropriate legal proceedings which may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(4)     Liens encumbering goods and documents of title with respect to such goods and arising in the ordinary course of business in connection with the issue of documentary letters of credit, and Liens arising out of title retention provisions in a supplier's standard condition of supply of goods acquired in the ordinary course of business;

(5)    Liens on the inventory or receivables, including without limitation any future oil and natural gas production, of the Company or any Restricted Subsidiary securing the obligations of such Person; *provided* that the aggregate amount of receivables securing Debt shall not exceed 80% of the Company's aggregate outstanding receivables from time to time;

(6)    any Lien on any property or assets (including Capital Stock of any person) securing Debt Incurred solely for purposes of financing the acquisition, construction or improvement of such property or assets after the Issue Date; provided, that (a) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the cost (i.e., purchase price) of the property or assets so acquired, constructed or improved and (b) the Lien is Incurred before, or within 365 days after the completion of, such acquisition, construction or improvement and does not encumber any other property or assets of the Company or any Restricted Subsidiary; and *provided, further*, that to the extent that the property or asset acquired is Capital Stock, the Lien also may encumber other property or assets of the person so acquired;

(7)    any Lien securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project (other than projects related to the Waimea Complex or Waikiki Complex); provided, that the Liens in respect of such Debt are limited to assets (including Capital Stock of the project entity) and/or revenues of such project; provided, further, that the Lien is Incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other property or assets of the Company or any Restricted Subsidiary;

(8)    any Lien existing on any property or assets of any person before that person's acquisition (in whole or in part) by, merger into or consolidation with the Company or any Restricted Subsidiary after the date of this Indenture; provided, that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation;

(9)    any Lien imposed by law that was Incurred in the ordinary course of business, including, without limitation, carriers', warehousemen's and mechanics' liens and other similar encumbrances arising in the ordinary course of business, in each case for sums that are not more than 60 days past due or are being contested in good faith by appropriate proceedings;

(10)    pledges or deposits in connection with workers' compensation laws, unemployment insurance laws or similar legislation, or good faith deposits, letters of credit and performance, bid, surety, appeal or similar bonds in connection with bids, tenders, contracts (other than for the payment of Debt) or leases to which the Company or any of its Restricted Subsidiaries is a party, or deposits for the payment of rent, or deposits to secure public or statutory obligations or for contested taxes or import or customs duties, in each case Incurred in the ordinary course of business;

(11)    any Lien in favor of the issuer of surety bonds or letters of credit issued pursuant to the request of and for the account of the Company or any Subsidiary in the ordinary course of business;

(12)     any Lien securing taxes, assessments and other governmental charges, the payment of which are not more than 60 days past due or are being contested in good faith by appropriate proceedings and for which reserves or other appropriate provisions, if any, have been established as required by GAAP;

(13)     minor defects, easements, rights-of-way, restrictions and other similar encumbrances Incurred in the ordinary course of business and encumbrances consisting of municipal or zoning restrictions, licenses, restrictions on the use of property or assets or minor imperfections in title that do not materially impair the value or use of the property or assets affected thereby, and any leases and subleases of real property that do not interfere with the ordinary conduct of the business of the Company or any Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(14)     any rights of set-off, netting or similar rights and remedies of any person with respect to any deposit account of the Company or any Subsidiary arising in the ordinary course of business;

(15)     any Lien securing Hedging Agreements so long as such Hedging Agreements are entered into for bona fide, non-speculative purposes;

(16)     any Liens granted to secure borrowings from, directly or indirectly, (A) *Banco Nacional de Desenvolvimento Econômico e Social–BNDES*, or any other governmental development bank or credit agency, including but not limited to *FINEP – Financiadora de Estudos e Projetos*, or (B) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer;

(17)     any Lien on the Capital Stock of an Unrestricted Subsidiary;

(18)     any Lien in respect of Production Payments and Reserve Sales;

(19)     any Lien on pipelines and pipeline facilities that arise by operation of law;

(20)     any Lien arising under joint venture agreements, partnership agreements, oil and gas leases or subleases, assignments, purchase and sale agreements, division orders, contracts for the sale, purchasing, processing, transportation or exchange of oil or natural gas, unitization and pooling declarations and agreements, development agreements, technical evaluation agreements, area of mutual interest agreements, licenses, sublicenses, net profits interests, participation agreements, Farm-Out Agreements, Farm-In Agreements, carried working interest, joint operating, unitization, royalty, sales and similar agreements or arrangements relating to the exploration or development of, or production from, Oil and Gas Properties entered into in the ordinary course of business in a Permitted Business;

(21)     any Lien reserved in oil and gas mineral leases for bonus, royalty or rental payments and for compliance with the terms of such leases;

(22)     any Lien on, or related to, properties or assets to secure all or part of the costs Incurred in the ordinary course of a Permitted Business for exploration, drilling, development, production, processing, transportation, marketing, storage, abandonment or operation; and

(23)     in addition to the foregoing Liens set forth in clauses (1) through (22) above, Liens securing Debt of the Company or any Restricted Subsidiary (including, without limitation, guarantees of the Company or any Restricted Subsidiary) which in aggregate principal amount, at any time of determination, do not exceed the greater of (i) U.S.$1,500,000,000 and (ii) 15.0% of Consolidated Total Assets.

Notwithstanding the foregoing, on or prior to the EBITDA Triggering Event, the Liens described in clauses (5), (16) and (23) shall not secure Debt in an aggregate principal amount exceeding the greater of (i) U.S.$1,000,000,000 and (2) 12.5% of the Consolidated Total Assets.

"Permitted Refinancing Debt" has the meaning set forth under Section 4.03.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"Preferred Stock" means, with respect to any Person, any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"Process Agent" has the meaning set forth for such term in Section 13.13(b).

"Production Payments and Reserve Sales" means the grant or transfer by the Company or a Restricted Subsidiary of the Company to any Person of a royalty, overriding royalty, net profits interest, production payment, partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties, including without limitation any such grants or transfers pursuant to incentive compensation programs on terms that are reasonably customary in the oil and gas business for geologists, geophysicists and other providers of technical services to the Company or a Subsidiary of the Company.

"Property" means (i) any land, buildings, machinery and other improvements and equipment located therein, (ii) any intangible assets, including, without limitation, any brand names, trademarks, copyrights and patents and similar rights and (iii) any income (licensing or otherwise), proceeds of sale or other revenues therefrom.

"Protected Purchaser" means a purchaser of a Security, or of an interest therein, who (a) gives value, (b) does not have notice of any adverse claim to the Security, and (c) obtains control of the Security.

"Purchase Date" means, in relation to an Asset Sale Offer, the date of purchase of Securities (or any portion thereof) specified in the notice given by the Issuer pursuant to Section 4.06(c) in relation to such offer, which date is not less than 30 days nor more than 60 days after the date of the notice of the Asset Sale Offer.

"Qualified Equity Interests" means all Equity Interests of a Person other than Disqualified Equity Interests.

"Qualified Stock" means all Capital Stock of a Person other than Disqualified Stock.

"Rating Agency" means S&P or Moody's; or if S&P or Moody's are not making rating of the Securities publicly available, an internationally recognized U.S. rating agency or agencies, as the case may be, selected by the Company, which will be substituted for S&P or Moody's or both, as the case may be.

"Rating Decline" means that at any time within 90 days (which period shall be extended so long as the rating of the Securities is under publicly announced consideration for possible down grade by either Rating Agency) after the earlier of the date of public notice of a Change of Control and of the Company's intention or that of any Person to effect a Change of Control, (i) in the event the Securities are assigned an Investment Grade Rating by at least two of the Rating Agencies prior to such public notice, the rating of the Securities by at least two of the Rating Agencies shall be below an Investment Grade Rating; or (ii) in the event the Securities are rated below an Investment Grade Rating by at least two of the Rating Agencies prior to such public notice, the rating of the Securities by at least two of the Rating Agencies shall be decreased by one or more categories; *provided*, that, in each case, any such Rating Decline is in whole or in part in connection with a Change in Control.

"*real*", "*reais*" or "R$" means the lawful currency of Brazil.

"Redemption Date" means, with respect to any redemption of Securities, the date fixed for such redemption pursuant to this Indenture and the Securities.

"Registrar" has the meaning set forth under Section 2.03.

"Relevant Date" means, with respect to any payment on a Security, whichever is the later of: (i) the date on which such payment first becomes due; and (ii) if the full amount payable has not been received by the Trustee on or prior to such due date, the date on which notice is given to the Holders that the full amount has been received by the Trustee.  The Securities are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation. Except as specifically provided in this Indenture, neither the Issuer nor any Guarantor shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein.

"Restricted Payment" has the meaning set forth under Section 4.04.

"<u>Restricted Subsidiary</u>" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"<u>Revocation</u>" has the meaning set forth under <u>Section 4.24</u>.

"<u>S&P</u>" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc. and its successors.

"<u>Sale and Leaseback Transaction</u>" means, with respect to any Person, an arrangement whereby such Person enters into a lease of property previously transferred by such Person to the lessor.

"<u>SEC</u>" means the U.S. Securities and Exchange Commission.

"<u>Securities</u>" means the securities issued under this Indenture.

"<u>Securities Act</u>" means the United States Securities Act of 1933, as amended.

"<u>Security Register</u>" means a register of Securities kept at the corporate trust office of the Registrar.

"<u>Significant Subsidiary</u>" of any Person means any Restricted Subsidiary that would be a "significant subsidiary" of such Person within the meaning of Rule 1-02 under Regulation S-X promulgated pursuant to the Securities Act.

"<u>Stated Maturity</u>" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"<u>Subordinated Debt</u>" means any Debt of the Company or a Restricted Subsidiary which is subordinated in right of principal payment to the Securities or the Note Guarantee, as applicable, pursuant to a written agreement to that effect.

"<u>Subsidiary</u>" means with respect to any Person, any corporation, limited liability company , partnership, association or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more Subsidiaries of such Person (or a combination thereof).

"<u>Substituted Debtor</u>" has the meaning set forth in <u>Section 10.01</u>.

"<u>TIA</u>" means the Trust Indenture Act of 1939, as amended.

"<u>Transfer Restricted Securities</u>" means Securities that bear or are required to bear the Restricted Securities Legend (as defined in <u>Section 2.1(6)</u> of the Appendix).

"Trust Officer" means any officer in the corporate trust department of the Trustee, including any managing director, director, vice president, assistant vice president, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"United States" means the United States of America.

"Unrestricted Subsidiary" means any Subsidiary of the Company Designated as an Unrestricted Subsidiary pursuant to Section 4.24. Any such Designation may be revoked by a resolution of the Board of Directors of the Company, subject to the provisions of Section 4.24.

"U.S. Bankruptcy Code" means the United States Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 *et seq.*

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States is pledged in support thereof.

"Voting Stock" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Waikiki Complex" means the project located in concessions BM-C-39 and BM-C-40 in the Campos Basin described under the heading "Business—Our Development and Production-Campos Basin Development and Production—Development Plan for Our Existing Discoveries in the Campos Basin-Project 2 – Waikiki Complex" of the Offering Memorandum.

"Waimea Complex" means the project located in concession BM-C-41 in the Campos Basin described under the heading "Business—Our Development and Production—Campos Basin Development and Production—Development Plan for Our Existing Discoveries in the Campos Basin–Project 1 – Waimea Complex" of the Offering Memorandum.

"Wholly-Owned Subsidiary" means a Restricted Subsidiary of the Company of which at least 95% of the Capital Stock or other ownership interest (other than directors' qualifying shares) is owned by the Company or another Wholly-Owned Subsidiary.

SECTION 1.02     Incorporation by Reference of Trust Indenture Act.  The following TIA terms have the following meanings:

"Commission" means the SEC;

"indenture securities" means the Securities and the Note Guarantee;

"indenture security holder" means a Securityholder;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the Securities and the Note Guarantee, respectively, means the Issuer and the Guarantors, respectively, and any successor obligor on the Securities and the Note Guarantee, respectively.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.03    Rules of Construction.  Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    "including" means including without limitation;

(5)    words in the singular include the plural and words in the plural include the singular;

(6)    unsecured Debt shall not be deemed to be subordinate or junior to secured Debt merely by virtue of its nature as unsecured Debt;

(7)    the principal amount of any Preferred Stock shall be (a) the maximum liquidation value of such Preferred Stock or (b) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(8)    all references to the date the Initial Securities were originally issued shall refer to the Issue Date;

(9)    unless context requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture;

(10)    unless otherwise stated, any agreement, contract or document defined or referred to herein shall mean such agreement, contract or document and all schedules, exhibits and attachments thereto as in effect as of the date hereof, as the same may thereafter be amended, supplemented or otherwise modified from time to time;

(11)     all references in this Indenture and the Securities to interest in respect of any Security shall be deemed to include all Additional Amounts, if any, in respect of such Security, unless the context otherwise requires, and express mention of the payment of Additional Amounts in any provision hereof or thereof shall not be construed, without more, as excluding reference to Additional Amounts in those provisions hereof or thereof where such express mention is not made; and

(12)     all references to amounts denominated in "U.S.$" shall be deemed to be the equivalent thereof in any other currency at the time of determination.

Article 2

The Securities

SECTION 2.01     Form and Dating.  Provisions relating to the Securities are set forth in the Rule 144A/Regulation S Appendix attached hereto (the "Appendix") which is hereby incorporated in, and expressly made part of, this Indenture.  The Initial Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit 1 to the Appendix which is hereby incorporated in, and expressly made a part of, this Indenture.  The Securities may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer or the Guarantors is subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer or the Guarantors).  Each Security shall be dated the date of its authentication.  The Securities will be issuable in denominations of U.S.$200,000 in principal amount and any multiple of U.S.$1,000 in excess thereof.  The Securities shall be fully and unconditionally guaranteed by the Guarantors in accordance with Article 11.  The terms of the Initial Securities set forth in the Appendix and Exhibit 1 are part of the terms of this Indenture.

SECTION 2.02     Execution and Authentication.  An Officer of the Issuer shall sign the Securities for the Issuer, and an Officer of each Guarantor shall sign the notation in the Securities relating to the Note Guarantee.  Each such signature may be by manual or facsimile signature of such Officer.

If an Officer whose signature is on a Security no longer holds that office at the time the Trustee authenticates the Security, the Security shall be valid nevertheless.

A Security shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Security.  The signature shall be conclusive evidence that the Security has been authenticated under this Indenture.

On the Issue Date, the Trustee shall authenticate and deliver U.S.$1,063,000,000 aggregate principal amount of 8.375% Senior Notes due 2022 and, at any time and from time to time thereafter, the Trustee shall authenticate and deliver Securities for original issue in an aggregate principal amount specified in such order, in each case upon a written order of the Issuer signed by one or more Officers of the Issuer.  Such order shall specify the amount of the

Securities to be authenticated and the date on which the original issue of Securities is to be authenticated and, in the case of an issuance of Additional Securities pursuant to Section 2.12 after the Issue Date, shall certify that such issuance is in compliance with this Indenture and shall state (i) whether such Additional Securities shall be Transfer Restricted Securities and issued in the form of Initial Securities as set forth in the Appendix to this Indenture and (ii) the initial Interest Payment Date.

The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Securities.  Unless limited by the terms of such appointment, an authenticating agent may authenticate Securities whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.  An authenticating agent has the same rights as any Registrar, Paying Agent or agent for service of notices and demands.

SECTION 2.03    Registrar and Paying Agent.  The Issuer shall maintain an office or agency in the Borough of Manhattan, City of New York where Securities may be presented or surrendered for registration of transfer or for exchange (the "Registrar"), where Securities may be presented for payment (the "Paying Agent") and for the service of notices and demands to or upon the Issuer in respect of the Securities and this Indenture.  The Registrar shall keep a register of the Securities and of their transfer and exchange.  The Issuer may have one or more co-registrars and one or more additional paying agents.  The term "Paying Agent" includes any paying agent appointed in this Indenture and any additional paying agent, and the term "Registrar" includes any additional Registrar or co-registrar.

The Issuer shall enter into an appropriate agency agreement with any Registrar, Paying Agent or co-registrar not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such agent.  The Issuer shall notify the Trustee of the name and address of any such agent.  If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06.  The Issuer, the Guarantors or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or transfer agent.

The Issuer initially appoints (i) the Trustee as Registrar, a Paying Agent, and Transfer Agent in connection with the Securities, (ii) the Principal Paying Agent as a Paying Agent and (iii) DTC as Depositary with respect to the Securities.

SECTION 2.04    Paying Agent To Hold Money in Trust.  The Issuer hereby acknowledges and confirms that it is and at all times shall remain absolutely and unconditionally obligated to pay all amounts due and owing by the Issuer hereunder, as the same shall become due and owing.  All payments of principal, premium and interest required to be made by the Issuer hereunder (including any Additional Amounts) shall be made in U.S. dollars, pursuant to the terms hereof, by the-Issuer to a Paying Agent to the extent appointed hereunder or to the Trustee by 12:00 p.m. (New York City time) one Business Day prior to each Interest Payment Date, redemption date, purchase date, Change of Control Payment Date or Maturity Date on any Securities, unless otherwise provided for in this Indenture.  Each Paying Agent shall hold in trust, for the benefit of the Holders or the Trustee, all money held by such Paying Agent for the

payment of principal, premium or interest on the Securities.  The Issuer at any time may require each Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it.  Upon complying with this Section 2.04, each Paying Agent shall have no further liability for the money delivered to the Trustee.

The receipt by a Paying Agent or the Trustee from the Issuer of each payment of principal, interest and/or other amounts due in respect of the Securities in the manner specified herein and on the date on which such amount of principal, interest and/or other amounts are then due, shall satisfy the obligations of the Issuer herein and under the Securities to make such payment to the Holders on the due date thereof.

SECTION 2.05    Securityholder Lists.  The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders.  If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee, in writing at least five Business Days before each Interest Payment Date and at such other times as the Trustee may reasonably request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

SECTION 2.06    Transfer and Exchange.  The Securities shall be issued in registered form and shall be transferable only upon the surrender of a Security for registration of transfer.  When a Security is presented to the Registrar or a co-registrar with a request to register a transfer, the Registrar shall register the transfer as requested if the requirements of this Indenture are met and if the transferee certifies to the Issuer and Registrar that: (i) under the terms of the Security, the Person seeking registration of transfer is eligible to have the Security registered in its name, (ii) the indorsement or instruction is made by the appropriate Person or by an agent who has actual authority to act on behalf of the appropriate Person, (iii) reasonable assurance is given that the indorsement or instruction is genuine and authorized, (iv) any applicable law relating to the collection of taxes has been complied with, (v) the transfer does not violate any restriction on transfer imposed by the Issuer, (vi) a demand that the Issuer not register transfer has not become effective (or, if such a demand has become effective, the Issuer has given notice to the Person making such demand stating that (x) registration of transfer of the Security is sought, (y) a demand that the Issuer not register transfer had previously been received and (z) the Issuer shall withhold registration for 10 days from the date of communication of such notice), and (vii) the transfer is in fact rightful or is to a Protected Purchaser.  When Securities are presented to the Registrar or a co-registrar with a request to exchange them for an equal principal amount of Securities of other denominations, the Registrar shall make the exchange as requested if the same requirements are met.  To permit registration of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate and deliver Securities at the Registrar's or co-registrar's request.  The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to this Section 2.06 (other than any such transfer taxes, assessments or similar governmental charge payable upon exchange or transfer pursuant to Section 4.08 and Section 9.04).  The Issuer shall not be required to make and the Registrar need not register transfers or exchanges of Securities selected and delivered for redemption or any Securities for a period of 15 days before an Interest Payment Date.

Prior to the due presentation for registration of transfer of any Security, the Issuer, the Trustee, any Paying Agent, the Registrar or any co-registrar may deem and treat the person in whose name a Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and interest (and Additional Amounts, if any) on such Security and for all other purposes whatsoever, whether or not presentation of such Security is overdue, and none of the Issuer, the Trustee, any Paying Agent, the Registrar or any co-registrar shall be affected by notice to the contrary.

All Securities issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Securities surrendered upon such transfer or exchange.

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Security (including any transfers between or among participants in DTC or beneficial owners of interests in any Global Security) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.07    Replacement Securities. If (a) any mutilated Security is surrendered to the Issuer, the Registrar, or the Trustee, or (b) the Issuer, the Registrar and the Trustee receive evidence to their satisfaction of the destruction, loss or left of any Security, and, unless otherwise agreed by the Issuer and the Trustee, there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Issuer or the Trustee that such Security has been acquired by a Protected Purchaser, the Issuer shall execute and the Trustee shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Security has become due and payable, or has been called for redemption by the Issuer pursuant to Article 3 of this Indenture, the Issuer in its discretion (but subject to any conversion rights) may, instead of issuing a new Security, pay or redeem such Security, as the case may be.

Upon the issuance of any new Security under this Section 2.07, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expense (including the fees and expenses of the Trustee or the Registrar) in connection therewith.

Every replacement Security is an additional obligation of the Issuer.

The provisions of this Section 2.07 are exclusive and, to the extent lawful, shall preclude all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 2.08    Outstanding Securities.  Securities outstanding at any time ("Outstanding Securities") are all Securities authenticated by the Trustee except for those canceled by it pursuant to Section 2.10 hereof, those delivered to the Trustee for cancellation or surrendered for transfer or exchange, those reductions in the interest in a Global Security effected by the Trustee in accordance with the provisions hereof and those described in this Section 2.08 as not outstanding.  Except as set forth in Article 9 and Section 13.05, a Security does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Security.

If a Security is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Security is held by a Protected Purchaser.

If any Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal, premium, interest and Additional Amounts (if any) payable on that date with respect to the Securities (or portions thereof) to be redeemed or maturing, as the case may be, then on and after that date, such Securities (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.09    Temporary Securities.  Until definitive Securities are ready for delivery, the Issuer may prepare and execute and the Trustee shall authenticate temporary Securities.  Temporary Securities shall be substantially in the form of definitive Securities but may have variations that the Issuer considers appropriate for temporary Securities.  Without unreasonable delay, the Issuer shall prepare and execute and the Trustee shall authenticate definitive Securities and deliver them in exchange for temporary Securities.

SECTION 2.10    Cancellation.  The Issuer at any time may deliver Securities to the Registrar for cancellation, along with a written notice to the Trustee advising it of the cancellation.  The Registrar shall forward to the Trustee any Securities surrendered to it for registration of transfer, exchange or payment.  The Trustee and no one else shall cancel and dispose of (subject to the record retention requirements of the Exchange Act) all Securities surrendered for registration of transfer, exchange, payment or cancellation in accordance with its procedures for the disposition of canceled securities and deliver a certificate of such disposition to the Issuer unless the Issuer directs the Trustee to deliver canceled Securities to the Issuer.  The Issuer may not issue new Securities to replace Securities it has redeemed, paid or delivered to the Trustee for cancellation.

SECTION 2.11    CUSIP Numbers and ISINs.  The Issuer in issuing the Securities may use "CUSIP" numbers and "ISINs" (if then generally in use) or similar numbers and, if so, the Trustee shall use "CUSIP" numbers, "ISINs" or similar numbers in notices of redemption as a convenience to Holders; *provided*, *however*, that any such notice may state that

no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers.

SECTION 2.12    Issuance of Additional Securities.  The Issuer may, from time to time, subject to compliance with any other applicable provisions of this Indenture, and without the consent of the Securityholders, create and issue Additional Securities under this Indenture having identical terms in all respects as the Initial Securities except that interest may accrue on the Additional Securities from their date of issuance; *provided*, *however*, that unless such Additional Securities are fungible for U.S. income tax purposes, such Additional Securities shall be issued under a separate CUSIP.  The Initial Securities and any Additional Securities issued under this Indenture will be treated as a single class for all purposes under this Indenture and shall vote together as one class on all matters with respect to the Securities.

SECTION 2.13    Open Market Purchases.  The Issuer or any of its Affiliates may at any time purchase Securities in the open market or otherwise at any price.  Any such purchased Securities shall not be resold, except in compliance with applicable requirements or exemptions under the relevant securities laws.

Article 3

Optional Redemption of Securities

SECTION 3.01    Optional Redemption.  The Issuer may redeem the Securities, at its option, as a whole or from time to time in part, subject to the conditions and at the redemption prices specified in paragraph 5 of the Securities.

SECTION 3.02    Notice of Redemption.

(1)    The Issuer shall give or cause the Trustee to give notice of redemption, in the manner provided for in Section 13.01, not less than 30 nor more than 60 days prior to a date for redemption of Securities.  If the Issuer itself gives the notice, it shall also deliver a copy to the Trustee and the Principal Paying Agent.

(2)    If either (i) the Issuer is redeeming the Securities in part only, or (ii) the Issuer elects to have the Trustee give notice of redemption, then the Issuer shall deliver to the Trustee, at least five days (or such shorter period as may be agreed to by the Trustee) before notice of redemption is required to be mailed or caused to be mailed to the Holders (unless the Trustee is satisfied with a shorter period), an Officer's Certificate requesting that the Trustee select the Securities to be redeemed and/or give notice of redemption and setting forth the information required by Section 3.02(3).  If the Issuer elects to have the Trustee give notice of redemption, the Trustee shall give the notice in the name of the Issuer and at the Issuer's expense.

(3)     All notices of redemption shall state:

(A)     the Redemption Date;

(B)     the redemption price and the amount of any accrued interest payable as provided in <u>Section 3.05</u> (or the calculation of such redemption price);

(C)     whether or not the Issuer is redeeming all Outstanding Securities;

(D)     if the Issuer is not redeeming all Outstanding Securities, the aggregate principal amount of Securities that the Issuer is redeeming and the aggregate principal amount of Securities that shall be Outstanding Securities after the partial redemption;

(E)     if the Issuer is redeeming only part of a Security, the notice that relates to that Security shall state that on and after the Redemption Date, upon surrender of that Security, the Securityholder shall receive, without charge, a new Security or Securities of authorized denominations for the principal amount of the Security remaining unredeemed;

(F)     that on the Redemption Date the redemption price and any accrued interest payable to, but excluding, the Redemption Date as provided in <u>Section 3.05</u> shall become due and payable in respect of each Security, or the portion of each Security, to be redeemed, and, unless the Issuer defaults in making the redemption payment, that interest on each Security, or the portion of each Security, to be redeemed, shall cease to accrue on and after the Redemption Date;

(G)     the place or places where a Securityholder must surrender the Securityholder's Securities for payment of the redemption price; and

(H)     the CUSIP or ISIN number, if any, listed in the notice or printed on the Securities, and that no representation is made as to the accuracy or correctness of such CUSIP or ISIN number.

SECTION 3.03    <u>Selection of Securities to Be Redeemed in Part</u>.

(1)     If fewer than all of the Securities are being redeemed, the selection of Securities to be redeemed shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Securities are listed or if such securities exchange has no requirement governing redemption or the Securities are not then listed on a securities exchange, on a pro rata basis or by lot (or, in the case of Securities issued in global form, based on a method that most nearly approximates a pro rata selection in accordance with the procedures of DTC). The Trustee shall make the selection from the Outstanding Securities not previously called for redemption. The Trustee shall promptly notify the Issuer in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount of the Securities to be redeemed. In the

event of a partial redemption by lot, the Trustee shall select the particular Securities to be redeemed not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Securities not previously called for redemption.  The Issuer may redeem Securities in denominations of U.S.$200,000 or less only in whole.  The Trustee may select for redemption portions (in any integral multiple of U.S.$1,000) of the principal of Securities that have denominations larger than U.S.$200,000; *provided* that the remaining outstanding amount must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000 in excess thereof.

(2)     For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Securities shall relate, in the case of any Security redeemed or to be redeemed only in part, to the portion of the principal amount of that Security which has been or is to be redeemed.

SECTION 3.04    Securities Payable on Redemption Date.  If the Issuer, or the Trustee on behalf of the Issuer, gives notice of redemption in accordance with this Article 3, the Securities, or the portions of Securities, called for redemption, shall, on the Redemption Date, become due and payable at the redemption price specified in the notice (together with accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Redemption Date), and from and after the Redemption Date (unless the Issuer shall default in the payment of the redemption price and accrued interest) the Securities or the portions of Securities shall cease to bear interest, to the extent the Issuer so elects.  Upon redemption of any Securities by the Issuer, such redeemed Securities will be cancelled or, to the extent so requested by the Issuer, remain outstanding.  Upon surrender of any Securities for redemption in accordance with the notice, the Issuer shall pay the Securities at the redemption price, together with accrued interest, if any, to, but excluding, the Redemption Date.  If the Issuer shall fail to pay any Security called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Securities.

SECTION 3.05    Unredeemed Portions of Partially Redeemed Security.  Upon surrender of a Security that is to be redeemed in part, the Issuer shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of the Security at the expense of the Issuer, a new Security or Securities, of any authorized denomination as requested by the Holder, in an aggregate principal amount equal to, and in exchange for, the unredeemed portion of the principal of the Security surrendered; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof.

SECTION 3.06    Third Party Notice.  The Issuer may designate at its option a third party to call the Securities for mandatory purchase in lieu of exercising its right to optional redemption under this Indenture; *provided*, that any call by a third party shall be treated as if such call was made by the Issuer.  Upon such mandatory purchase, the Securities shall remain outstanding unless otherwise indicated by the Issuer, subject to Section 2.08.

Article 4

Covenants

SECTION 4.01    Performance of Obligations under the Securities.  The Issuer shall duly and punctually pay the principal of (and premium, if any) and interest and Additional Amounts, if any, on the Securities in accordance with the terms of the Securities and this Indenture. The principal of (and premium, if any) and interest and Additional Amounts, if any, on the Securities shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds in accordance with this Indenture money sufficient to pay all principal and interest then due.

SECTION 4.02    Reports. (a) The Company will provide the Trustee with the following reports in electronic form for delivery to Holders upon their request thereof:

(1)    an English language version of its annual audited consolidated financial statements in a form substantially similar to the annual audited financial statements included in the Offering Memorandum prepared in accordance with GAAP within 120 days after the close of its fiscal year;

(2)    an English language version of its unaudited quarterly financial statements in a form substantially similar to the unaudited quarterly financial statements included in the Offering Memorandum prepared in accordance with GAAP within 60 days after the close of each fiscal quarter (other than the last fiscal quarter of its fiscal year);

(3)    simultaneously with the delivery of the financial statements referred to in clause (1) above, an Officer's Certificate stating whether a Default or Event of Default exists on the date of such certificate and, if a Default or Event of Default exists, setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto;

(4)    without duplication, English language versions or summaries of such other reports or notices as may be filed or submitted by (and promptly after filing or submission by) the Company with the Irish Stock Exchange or any other stock exchange on which the Securities may be listed (in each case, to the extent that any such report or notice is generally available to its security holders or the public in Brazil); and

(5)    as soon as practicable and in any event within 30 calendar days after any director or executive officer of the Company becomes aware of the existence of a Default or Event of Default, an Officer's Certificate setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto.

(b)    If the Company makes available the reports described in Section 4.02(a)(1), (2) or (4) on the Company's website and notifies the Trustee in writing thereof, it will be deemed to have satisfied the reporting requirement set forth in such applicable clause.

(c)     Delivery of the above reports to the Trustee is for informational purposes only and the Trustee's receipt of such reports will not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants in this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

SECTION 4.03     Limitation on Debt and Disqualified Stock.

(a)     The Company

(1)     shall not, and shall not permit any of its Restricted Subsidiaries to, Incur any Debt; and

(2)     shall not, and shall not permit any Restricted Subsidiary to, Incur any Disqualified Stock (other than Disqualified Stock of Restricted Subsidiaries held by the Company or a Restricted Subsidiary, so long as it is so held);

*provided* that the Company or any of its Restricted Subsidiaries may Incur Debt and Disqualified Stock if, on the date of the Incurrence, after giving pro forma effect to the Incurrence and the receipt and the application of the proceeds therefrom, either:

(1)     the aggregate principal amount of Debt and Disqualified Stock outstanding does not exceed the greater of (i) U.S.$4,000,000,000 and (ii) 30.0% of Consolidated Net Total Assets; or

(2)     the Net Debt to EBITDA Ratio does not exceed 3.5 to 1.0; *provided* that in the case of this clause (B), EBITDA shall equal or be greater than U.S.$1.00 for such reference period.

(b)     Notwithstanding the foregoing, the Company and, to the extent provided below, any Restricted Subsidiary may Incur the following ("Permitted Debt"):

(1)     Debt of the Company or a Restricted Subsidiary so long as such Debt is owed to the Company or a Restricted Subsidiary and which, if the obligor is the Company, is subordinated in right of payment to the Securities; *provided, however*, that if such Debt is owed to a Restricted Subsidiary that is not a Guarantor such Debt shall be unsecured and subordinated in right of payment to the Securities;

(2)     Debt of the Company pursuant to the Securities (other than any Additional Securities) and Debt of the Guarantors pursuant to the Note Guarantee (other than with respect to any Additional Securities);

(3)     Subordinated Debt of the Company or a Restricted Subsidiary; *provided, however*, that the aggregate principal amount of such Subordinated Debt, and any refinancing thereof that complies with clause (4)(A) below, does not exceed in an aggregate principal amount at any one time outstanding U.S.$500,000,000;

(4)     Debt of the Company or a Restricted Subsidiary ("Permitted Refinancing Debt") constituting an extension or renewal of, replacement of, or substitution for, or issued in exchange for, or the net proceeds of which are used to repay, redeem, repurchase, refinance or refund, including by way of defeasance (all of the above, for purposes of this clause, "refinance") then outstanding Debt in an amount not to exceed the principal amount of the Debt so refinanced, plus premiums, fees and expenses; *provided* that:

(A)     in case the Debt to be refinanced is subordinated in right of payment to the Securities, the new Debt, by its terms or by the terms of any agreement or instrument pursuant to which it is outstanding, is expressly made subordinate in right of payment to the Securities at least to the extent that the Debt to be refinanced is subordinated to the Securities,

(B)     the new Debt does not have a Stated Maturity prior to (i) the Stated Maturity of the Debt to be refinanced, and the Average Life of the new Debt is at least equal to the remaining Average Life of the Debt to be refinanced, or (ii) the 91st day after the Stated Maturity of the Securities and does not have any scheduled principal payments prior to such date; and

(C)     Debt Incurred pursuant to clauses (1), (3), (5), (6), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), (19), (20) and (21) of Section 4.03(b) shall not be refinanced pursuant to this Section 4.03(b)(4);

(5)     Hedging Agreements of the Company or any Restricted Subsidiary entered into in the ordinary course of business or directly related to Debt permitted to be Incurred by the Company or any Restricted Subsidiary pursuant to this Indenture, and in each case not for speculative purposes;

(6)     Debt of the Company or any Restricted Subsidiary in respect of performance bonds, customs, reimbursement obligations, letters of credit, bankers' acceptances, deposits, promissory notes, self-insurance obligations, completion guarantees and bid, surety or appeal bonds provided in the ordinary course of business;

(7)     Acquired Debt of the Company or any Restricted Subsidiary; *provided*, *however*, that on the date that such transaction is consummated, after giving effect to the Incurrence of such Debt pursuant to this clause, either (A) the Company or any Restricted Subsidiary would have been able to Incur U.S.$1.00 of additional Debt pursuant to either test set forth in clause (a) above; or (B) would not have both a higher percentage and higher ratio set forth in clause (a) above immediately after such Incurrence;

(8)     Debt of the Company or any Restricted Subsidiary outstanding on the Issue Date;

(9)     Debt represented by guarantees of pension fund obligations of the Company or any Restricted Subsidiary required by law or regulation;

(10)    Debt of the Company or any Restricted Subsidiary Incurred through the provision of bonds, guarantees, letters of credit or similar instruments required by any maritime commission or authority or other governmental or regulatory agencies, including, without limitation, customs authorities; in each case, for vessels owned or chartered by, and in the ordinary course of business of, the Company or any of its Restricted Subsidiaries at any time outstanding not to exceed the amount required by such governmental or regulatory authority;

(11)    Debt of any cash pooling or other cash management agreements of the Company or any Restricted Subsidiary in place with a bank or financial institution but only to the extent of offsetting credit balances of the Company or any of its Restricted Subsidiaries pursuant to such cash pooling or other cash management;

(12)    Debt of the Company or any Restricted Subsidiary (and any refinancing thereof) in an aggregate principal amount at any time outstanding not exceeding the greater of (i) U.S.$500,000,000 and (2) 6.25% of Consolidated Net Total Assets under financings provided or guaranteed by, directly or indirectly, (A) *Banco Nacional de Desenvolvimento Econômico e Social–BNDES*, or any other governmental development bank or credit agency, including but not limited to *FINEP – Financiadora de Estudos e Projetos* or (B) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer;

(13)    Debt of the Company or any Restricted Subsidiary, including but not limited to obligations under Capital Leases, mortgage financings or purchase money obligations, Incurred for the purpose of financing all or any part of the purchase price, lease expense, rental payments or cost of design, construction, installation or improvement of property, plant or equipment or other assets, whether through direct purchase of  or the Capital Stock of any Person owning such property, plant or equipment or other assets (including any Debt deemed to be Incurred in connection with such purchase) (it being understood that any such Debt may be Incurred after the acquisition or purchase or the construction, installation or the making of any improvement with respect to any such property, plant or equipment or other assets), or Incurred to refinance any such purchase price or cost of construction or improvement, and refinancings thereof, in an aggregate principal amount not to exceed at any one time outstanding the greater of (i) U.S.$150,000,000 and (ii) 2.0% of Consolidated Net Total Assets;

(14)    Debt of the Company or any Restricted Subsidiary to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Securities in accordance with this Indenture;

(15)    Debt of the Company or any of its Restricted Subsidiaries for taxes levied, assessments due and other governmental charges required to be paid as a matter of law or regulation in the ordinary course of business;

(16)    guarantees by the Company or any Restricted Subsidiary of Debt permitted to be Incurred pursuant to this Section 4.03; *provided* that if such Debt is subordinated in right of payment to the Securities or the Note Guarantee of the Guarantors, any such guarantee with respect to such Debt shall be subordinated in right of payment to such guarantee;

(17)    Debt of the Company or any Restricted Subsidiary in respect of (i) self-insurance obligations or captive insurance companies or consisting of the financing of insurance premiums or (ii) take-or-pay obligations contained in supply agreements in the ordinary course of business;

(18)    Debt of the Company or any Restricted Subsidiary under one or more Credit Facilities, lines of credit or working capital facilities (and any refinancing thereof); *provided*, *however*, that the aggregate principal amount of such Debt does not exceed at any one time outstanding the greater of (i) U.S.$1,000,000,000 and (ii) 10% of Consolidated Net Total Assets;

(19)    Debt of the Company or any Restricted Subsidiary with respect to reimbursement type obligations regarding worker's compensation claims and Debt and other obligations in respect of deferred compensation of employees Incurred in the ordinary course of business;

(20)    Debt of the Company or any Restricted Subsidiary in the form of customer deposits and advance payments received in the ordinary course of business from customers for purchasers in the ordinary course of business; and

(21)    Debt of the Company or any Restricted Subsidiary (and any refinancing thereof) not otherwise permitted hereunder in an aggregate principal amount equal to the aggregate Net Cash Proceeds received by the Company (other than from a Subsidiary of the Company) after the Issue Date from (i) the issuance and/or sale of its Qualified Equity Interests or (ii) as a contribution to its common equity to the extent that such Net Cash Proceeds received from such issuance, sale or contribution have not been applied to make Restricted Payments pursuant to Sections 4.04(a)(D)(3)(B) and (c)(4).

(c)    Notwithstanding anything to the contrary in this Section 4.03, the maximum amount of Debt that the Company and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Debt, solely as a result of fluctuations in the exchange rate of currencies.

(d)    For purposes of determining compliance with this Section 4.03, in the event that any proposed Debt meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (21) of Section 4.03(b), or is entitled to be Incurred pursuant to Section 4.03(a), the Company and its Restricted Subsidiaries shall be permitted to classify such item of Debt at the time of its Incurrence in any manner that complies with this Section 4.03 or to later reclassify all or a portion of such item of Debt.

(e)    The Company shall not Incur any Debt that is subordinate in right of payment to other Debt of the Company unless such Debt is also subordinate in right of payment to the Securities or the relevant Note Guarantee on substantially identical terms; *provided*, *however*, that no Debt will be deemed to be subordinated in right of payment to any other Debt of the Company solely by virtue of being unsecured, by virtue of being secured with different collateral

or by virtue of being secured on a junior priority basis or by virtue of the applicable of waterfall or other payment ordering provisions affecting different tranches of Debt.

(f)     The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Debt of the same instrument or the payment of regularly scheduled dividends on Disqualified Stock in the form of additional Disqualified Stock with the same terms shall not be deemed to be an Incurrence of Debt for purposes of this Section 4.03; *provided* that any such outstanding additional Debt or Disqualified Stock paid in respect of Debt Incurred pursuant to any provision of Section 4.03(b) shall be counted as Debt outstanding for purposes of any future Incurrence of Debt pursuant to Section 4.03(a).

(g)     For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Debt, the U.S. dollar-equivalent principal amount of Debt denominated in a non-U.S. currency shall be calculated based on the relevant currency exchange rate in effect on the date such Debt was Incurred or, in the case of revolving credit Debt, first committed; *provided* that if such Debt is Incurred to refinance other Debt denominated in a non-U.S. currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Permitted Refinancing Debt does not exceed the principal amount of such Debt being refinanced. The principal amount of any Debt Incurred to refinance other Debt, if Incurred in a different currency from the Debt being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Permitted Refinancing Debt is denominated that is in effect on the date of such refinancing.

SECTION 4.04     Limitation on Restricted Payments.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly (the payments and other actions described in the following clauses being collectively "Restricted Payments"):

(A)     declare or pay any dividend or make any distribution on its Equity Interests held by Persons other than the Company or any of its Restricted Subsidiaries (other than (i) dividends or distributions paid in the Company's Qualified Equity Interests and (ii) dividends or distributions by a Restricted Subsidiary payable, on a pro rata basis or on a basis more favorable to the Company, to all holders of any class of Capital Stock of such Restricted Subsidiary a majority of which is held, directly or indirectly, by the Company);

(B)     purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Company held by Persons other than the Company or any of its Restricted Subsidiaries;

(C)     repay, redeem, repurchase, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, on or with

40

respect to, any Subordinated Debt, except (i) a payment of interest and (ii) a repayment, redemption, repurchase, defeasance or acquisition or retirement in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case, due within one year of the date of such repayment, redemption, repurchase, defeasance or acquisition or retirement; or

(D)    make any Investment (other than Permitted Investments);

unless, at the time of, and after giving effect to, the proposed Restricted Payment:

(1)    no Event of Default has occurred and is continuing,

(2)    the Company could Incur at least U.S.$1.00 of Debt under Section 4.03(a) and

(3)    the aggregate amount expended for such Restricted Payment and all other Restricted Payments made on or after the Issue Date would not, subject to Section 4.04(d), exceed the sum of:

(A)    50% of the cumulative Consolidated Net Income (or, if the Consolidated Net Income is a loss, minus 100% of the amount of the loss) of the Company beginning on the first day of the fiscal quarter in which the Issue Date occurs to the end of the most recently completed fiscal quarter for which financial statements have been provided (or if not timely provided, required to be provided) pursuant to this Indenture, *plus*

(B)    subject to paragraph (c), the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company ((i) other than Net Cash Proceeds to the extent such Net Cash Proceeds have been used to Incur Debt pursuant to Section 4.03(b)(21) or (ii) other than Net Cash Proceeds and the Fair Market Value of property from a Restricted Subsidiary) after the Issue Date from

(i)    the issuance and sale of its Qualified Equity Interests, or

(ii)    as a contribution to its common equity, *plus*

(C)    the amount by which Debt of the Company or any of its Restricted Subsidiaries is reduced on the Company's balance sheet or the balance sheet of such Restricted Subsidiary, in each case, upon the conversion or exchange (other than from Restricted Subsidiaries) subsequent to the Issue Date of any such Debt for Qualified Equity Interests of the Company (less the amount of any cash or the Fair Market Value of any other property distributed by the Company or any of its Restricted Subsidiaries upon such conversion or exchange); *plus*

(D)    without duplication of any amount included in the calculation of Consolidated Net Income, an amount equal to the sum of (i) the aggregate amount of cash

and the Fair Market Value of any asset received by the Company or any of its Restricted Subsidiaries subsequent to the Issue Date with respect to Investments (other than Permitted Investments) made after the Issue Date by the Company or any of its Restricted Subsidiaries in any Person, proceeds realized on the sale of such Investments and proceeds representing the return of capital and (ii) in the event that the Company re-designates an Unrestricted Subsidiary to be a Restricted Subsidiary of the Company , the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time such Unrestricted Subsidiary is designated a Restricted Subsidiary of the Company; *provided*, *however*, that the foregoing sum shall not exceed, in the case of any such Person or Unrestricted Subsidiary, the amount of Investments (excluding Permitted Investments) previously made (and treated as a Restricted Payment) by the Company or any of its Restricted Subsidiaries in such Person or Unrestricted Subsidiary; *plus*

(E)     without duplication of any amount included above under this clause, 100% of any dividends received by the Company or any of its Restricted Subsidiaries from an Unrestricted Subsidiary.

The amount expended in any Restricted Payment, if other than in cash, shall be deemed to be the Fair Market Value of the relevant non-cash assets, as determined, with respect to amounts at or below U.S.$50,000,000, by an Officer of the Company, whose determination shall be conclusive and evidenced by an Officer's Certificate, and with respect to amounts above U.S.$50,000,000, as determined by the Board of Directors of the Company, whose determination shall be conclusive and evidenced by a resolution of the Board of Directors.

(b)     Section 4.04(a) shall not prohibit the declaration and payment of dividends, in an amount equivalent to not more than the greater of (i) 25% of the Consolidated Net Income (as defined under Brazilian corporate law) and (ii) the Minimum Legally Required Dividend; *provided*, that the payment of such amounts is in compliance with the Brazilian corporate law and the Company's bylaws and that the Company's Board of Directors, with the approval of the fiscal council, if in existence at such time, has not reported to the general shareholders' meeting that the distribution would not be advisable given the financial condition of the Company or its Subsidiaries.

(c)     Neither Section 4.04(a) nor Section 4.04(b) shall prohibit:

(1)     the payment of any dividend or distribution (including in the form of interest on shareholders' equity) within 60 days after the date of declaration thereof if, at the date of declaration, such dividend or distribution would comply with Section 4.04(a);

(2)     the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt owed to the Company or any of its Restricted Subsidiaries, the Incurrence of which was permitted under Section 4.03(b)(1);

        (3)     the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt with the proceeds of, or in exchange for, Permitted Refinancing Debt;

        (4)     any Restricted Payment made in exchange for, or out of the proceeds of a substantially concurrent offering of, Qualified Equity Interests of the Company or of a cash contribution to the common equity of the Company not representing an interest in Disqualified Stock; *provided*, that such Net Cash Proceeds shall be excluded from the calculation in Section 4.04(a)(D)(3)(B);

        (5)     repurchases of Equity Interests of the Company deemed to occur upon exercise of warrants, options or rights to acquire Equity Interests if such Equity Interests represent a portion of the exercise price of such warrants, options or rights or nominal cash payments (or related withholding taxes) in lieu of issuances of fractional shares;

        (6)     the payment of dividends, distributions or other amounts to fund the repurchase, redemption or other acquisition or retirement for value of any of the Company's Equity Interests or any Equity Interests of any of its Restricted Subsidiaries held by any then-existing or former director, officer, employee, independent contractor or consultant of the Company or any of its Restricted Subsidiaries or their respective assigns, estates or heirs; *provided*, *however*, that the price paid for all repurchased, redeemed, acquired or retired Equity Interests in all cases, other than as a result of death, disability or termination of employment or directorship, does not exceed U.S.$5,000,000 in the aggregate in any fiscal year (with unused amounts in any fiscal year being carried over to succeeding fiscal years subject to a maximum payment (without giving effect to the following proviso) of U.S.$10,000,000 in any calendar year); *provided further* that the amounts in any fiscal year may be increased by an amount not to exceed: (i) the cash proceeds received by the Company from the sale of Qualified Equity Interests of the Company to any present or former employees, directors, officers or consultants (or their respective permitted transferees) of the Company or any of its Restricted Subsidiaries following the Issue Date, to the extent that such cash proceeds have not otherwise been applied to the payment of Restricted Payments by virtue of Section 4.04(a)(3), such Net Cash Proceeds shall be excluded from the calculation in 4.04(a)(D)(3)(B); *plus* (ii) the cash proceeds of "key man" life insurance policies received by the Company or any of its Restricted Subsidiaries since the Issue Date;

        (7)     repurchases of Subordinated Debt at a purchase price not greater than (i) 101% of the principal amount or accreted value, as applicable, of such Subordinated Debt and accrued and unpaid interest thereon in the event of a Change of Control Offer or (ii) 100% of the principal amount or accreted value, as applicable, of such Subordinated Debt and accrued and unpaid interest thereon in the event of an Asset Sale, in connection with any change of control offer or asset sale offer required by the terms of such Subordinated Debt, but only if: (a) in the case of a Change of Control Offer, the Issuer has first complied with and fully satisfied its obligations under Section 4.08; or (b) in the case of an Asset Sale, the Issuer has first complied with and fully satisfied its obligations under Section 4.06;

(8)      payments of dividends on Disqualified Stock issued pursuant to <u>Section 4.03</u>;

(9)      the distribution of the Capital Stock of any Restricted Subsidiary; *provided*, that such entity and any entity formed, created or in receipt of such Capital Stock, if any, simultaneously executes and delivers a supplemental indenture to this Indenture (i) providing for a guarantee of payment of the Issuer's obligations under this Indenture and the Securities and (ii) pursuant to which such entities shall agree to become subject to the covenants contained in this Indenture as if it were a Restricted Subsidiary of the Company, *mutatis mutandis*; and

(10)     Restricted Payments in an aggregate amount not to exceed U.S.$100,000,000; *provided* that the Company will not, and will not permit any Restricted Subsidiary to, make any Restricted Payment described <u>Section  4.04(a)(A)</u> and <u>(B)</u>;

*provided, further*, that, in the case of clauses (2), (5), (6), (7), (8), (9) and (10) of this <u>Section 4.04(c)</u> no Event of Default has occurred and is continuing or would occur as a result thereof.

(d)      In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, only amounts expended pursuant to <u>Section 4.04(b)</u>, <u>Section 4.04(c)(1)</u>, <u>Section 4.04(c)(6)</u> and <u>Section 4.04(c)(7)</u> shall be included in such calculation under <u>Section 4.04(a)</u>.

SECTION 4.05      [Reserved].

SECTION 4.06      <u>Limitation on Sales of Assets</u>.

(a)      The Company shall not, and shall not permit any Restricted Subsidiary to, make any Asset Sale unless the following conditions are met:

(1)      The Asset Sale is for Fair Market Value.

(2)      At least 75% of the consideration consists of cash or Cash Equivalents received at closing of such Asset Sale. For purposes of this <u>Section 4.06(a)(2)</u>, (i) the assumption by the purchasers of Debt or other obligations (other than Subordinated Debt) of the Company or a Restricted Subsidiary pursuant to a customary novation agreement, (ii) Debt (other than Subordinated Debt) of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Sale, to the extent that the Company and each other Restricted Subsidiary are released from any guarantee of such Debt in connection with such Asset Sale, (iii) consideration consisting of Debt of the Issuer or any Guarantor received from persons who are not the Company or any Restricted Subsidiary, (iv) instruments, securities or other obligations received by the Company or any of its Restricted Subsidiaries from the purchasers that are converted into cash or Cash Equivalents within 120 days of the closing of such Asset Sale shall be considered to be cash received on the at closing of such Asset Sale.

(3)      Within 365 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds shall be used:

(A)     to purchase the Securities (including any Additional Securities) pursuant to an offer to all holders of Securities at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest and additional amounts, if ay, to, but not including the date of purchase;

(B)     to repay Debt (other than Subordinated Debt) of the Company or any Restricted Subsidiary (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company or any Restricted Subsidiary; or

(C)     to acquire or invest in (or within such 365-day period in this Section 4.06(a)(3), the Board of Directors shall have made a good faith determination to acquire or invest, which acquisition or investment shall be consummated prior to the second anniversary of such Asset Sale) (i) Additional Assets, (ii) assets of a Permitted Business (or make capital expenditures in respect of a Permitted Business), (iii) a majority of the Voting Stock of another Person that thereupon becomes a Restricted Subsidiary engaged in a Permitted Business or (iv) a Permitted Business Investment.

(4)     Notwithstanding clauses (2) and (3) above, the Company and its Restricted Subsidiaries will be permitted to consummate an Asset Sale without complying with such clauses to the extent either (A) at least 75% of the consideration for such Asset Sale constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities or (B) in the event of an Asset Sale involving Equity Interests of the Company or a Restricted Subsidiary, at least 30% of the consideration for such Asset Sale constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities received at closing; *provided* that the remaining 45% of the consideration is paid on or prior to the third anniversary of the closing and constitutes Additional Assets, cash, Cash Equivalents and/or Marketable Securities and in the event existing Equity Interests are sold by the Company that such Equity Interests are pledged in favor of the Company or Restricted Subsidiary until such consideration is paid; *provided* that any consideration not constituting Additional Assets received by the Company or any Restricted Subsidiary in connection with any Asset Sale permitted to be consummated under this clause shall be applied (in the case of cash, Cash Equivalents and Marketable Securities within 365 days after the receipt thereof subject to the proviso above) in accordance with the provisions of clause (3) above.

(5)     The Net Cash Proceeds of an Asset Sale not applied pursuant to Section 4.06(a)(3) (or determined by the Board of Directors to not be applied) pursuant to Section 4.06(a)(3)(c) within 365 days of the Asset Sale constitute "Excess Proceeds." Excess Proceeds of less than U.S.$50,000,000 shall be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds such amount, the Issuer shall, within 30 days, make an offer to purchase (the "Asset Sale Offer") Securities having a principal amount equal to:

(A)     accumulated Excess Proceeds, multiplied by

(B)     a fraction (i) the numerator of which is equal to the outstanding principal amount of the Securities and (ii) the denominator of which is equal to the

outstanding principal amount of the Securities and all *pari passu* Debt similarly required to be repaid, redeemed or tendered for in connection with the Asset Sale, rounded down to the nearest U.S.$1,000.

(b)     The purchase price for the Securities shall be 100% of the principal amount plus accrued and unpaid interest and Additional Amounts if any to the date of purchase (the "Offer Amount").  If the Asset Sale Offer is for less than all of the Outstanding Securities and Securities in an aggregate principal amount in excess of the purchase amount are tendered and not withdrawn pursuant to the Asset Sale Offer, the Issuer shall purchase Securities having an aggregate principal amount equal to the purchase amount on a pro rata basis, with adjustments so that only Securities in multiples of U.S.$1,000 principal amount shall be purchased; *provided*, that after a purchase from a Holder in part, such Holder shall hold U.S.$200,000 in principal amount of Securities or a multiple of U.S.$1,000 in excess thereof.  Upon completion of the Asset Sale Offer, Excess Proceeds shall be reset at zero.

(c)     Promptly, and in any event within 30 days after the Issuer becomes obligated to make an Asset Sale Offer, the Issuer shall deliver to the Trustee and each Holder a written notice in accordance with Section 13.01, stating that the Holder may elect to have its Securities purchased by the Issuer either in whole or in part (subject to prorating as described in Section 4.06(b) in the event the Asset Sale Offer is oversubscribed) in integral multiples of U.S.$1,000 of principal amount, at the applicable purchase price.  The notice shall specify the Purchase Date and shall contain such information concerning the business of the Company which the Company in good faith believes will enable such Holders to make an informed decision and all instructions and materials, as determined in good faith by the Company, necessary to tender Securities pursuant to the Asset Sale Offer.

(1)     Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided below, the Issuer shall deliver to the Trustee an Officer's Certificate as to (A) the Offer Amount, (B) the intended allocation of the Net Cash Proceeds from the Asset Sale pursuant to which such Asset Sale Offer is being made and (C) the compliance of such allocation with the provisions of Sections 4.06(a)(1) through (5).  The Issuer shall, to the extent lawful, irrevocably deposit with the Trustee or with any Paying Agent the principal amount of, and accrued and unpaid interest on, all Securities (or portions thereof) which have been validly tendered and accepted by the Issuer for redemption in accordance with the provisions of Section 2.04 and this Section 4.06.  Upon the expiration of the Offer Period, and in any event no later than one Business Day after the expiration of the Offer Period, each Holder shall deliver to the exchange agent for cancellation the Securities or portions thereof which have been properly tendered (and not withdrawn) and are to be accepted by the Issuer.  A Paying Agent shall, on the Purchase Date, mail or deliver payment (or cause the delivery of payment) to each Holder of Securities properly tendered the amount of the purchase price for such Securities, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Security equal in principal amount to any unpurchased portion of the Securities surrendered, if any; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.  In the event that the aggregate purchase price of the Securities delivered by the Issuer or the

Guarantors, as the case may be, to the Trustee or any Paying Agent is more than the Offer Amount applicable to the Securities, the Trustee or any Paying Agent shall deliver the excess to the Issuer or the Guarantors, as the case may be, immediately after the expiration of the Offer Period for application in accordance with this Section 4.06.

(2)     Holders electing to have a Security purchased shall be required to surrender the Security, with an appropriate form duly completed, to the exchange agent at the address specified in the notice at least three Business Days prior to the Purchase Date.  Holders shall be entitled to withdraw their election if each of the exchange agent and the Issuer receives not later than one Business Day prior to the Purchase Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Security which was delivered for purchase by the Holder and a statement that such Holder is withdrawing his election to have such Security purchased.  Holders whose Securities are purchased only in part shall be issued new Securities equal in principal amount to the unpurchased portion of the Securities surrendered.

(3)     At the time the Holder delivers Securities to the exchange agent for cancellation which are to be accepted for purchase, the Issuer shall also deliver an Officer's Certificate stating that such Securities are to be accepted for purchase by the Issuer pursuant to and in accordance with the terms of this Section 4.06.  A Security shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering Holder.

(d)     The Issuer shall comply, to the extent applicable, with the requirements of Rule 14e-1 under the Exchange Act and any other applicable securities laws or regulations in connection with any repurchase of Securities pursuant to this Section 4.06.  To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this Section 4.06, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.06 by virtue of its compliance with such securities laws or regulations.

(e)     Pending application in accordance with this Section 4.06, Net Cash Proceeds may be applied to temporarily reduce revolving credit borrowings, if any, or invested in Cash Equivalents. The Fair Market Value for any Asset Sale with consideration at or below U.S.$50,000,000 shall be determined by an Officer of the Company, whose determination shall be conclusive and evidenced by an Officer's Certificate, and with consideration above U.S.$50,000,000, as determined by the Board of Directors of the Company, whose determination shall be conclusive and evidenced by a resolution of the Board of Directors.

SECTION 4.07     Limitation on Transactions with Affiliates.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering of any service with any Affiliate of the Company (a "Related Party Transaction"), except upon fair and reasonable terms no less

favorable to the Company or the Restricted Subsidiary than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company.

(b)    In any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of U.S.$20,000,000, the Company shall first deliver to the Trustee an Officer's Certificate to the effect that such transaction or series of related transactions are on fair and reasonable terms no less favorable to the Company or such Restricted Subsidiary than could be obtained in a comparable arm's-length transaction and is otherwise compliant with the terms of this Indenture.

(c)    In any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of U.S.$40,000,000, a majority of the Board of Directors (including a majority of the disinterested members thereof, but only to the extent there are disinterested members with respect to such Related Party Transaction) must first approve such transaction or series of related transactions and determine that such transaction or series of related transactions are on fair and reasonable terms no less favorable to the Company or such Restricted Subsidiary than could be obtained in a comparable arm's length transaction and is otherwise compliant with the terms of this Indenture.

(d)    <u>Sections 4.07(a)</u> through <u>(c)</u> shall not apply to:

(1)    any transaction or arrangement between the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(2)    the payment of reasonable and customary regular fees to directors of the Company who are not employees of the Company;

(3)    Permitted Investments and any Restricted Payments that do not violate the provisions under <u>Section 4.04</u>;

(4)    transactions permitted by and complying with <u>Section 5.01</u>.

(5)    any issuance or sale of Equity Interests (other than Disqualified Stock) of the Company;

(6)    transactions or payments (including loans, advances, grants of securities, stock options and similar rights) pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business;

(7)    transactions pursuant to agreements in effect on the Issue Date and described in the Offering Memorandum, as amended, modified or replaced from time to time so long as the amended, modified or new agreements, taken as a whole, are no less favorable to the Company and its Restricted Subsidiaries than those in effect on the Issue Date;

(8)      any Sale and Leaseback Transaction otherwise permitted under <u>Section 4.10</u> if such transaction is on market terms; and

(9)      transactions with joint ventures or other similar arrangements pursuant to supply or purchase arrangements (i) in effect on the Issue Date, as amended, modified or replaced from time to time and (ii) as may be entered into after the Issue Date; *provided* that the amendment, modification, replacement or new arrangement, taken as a whole, is no less favorable to the Company and its Restricted Subsidiaries than those in effect on the Issue Date.

SECTION 4.08      <u>Repurchases at the Option of the Holders Upon Change of Control Offer</u>.

(1)      Upon the occurrence of a Change of Control that results in a Rating Decline, each Holder shall have the right to require the Issuer or a third party so designated to repurchase all or any part (in integral multiples of U.S.$1,000) of that Holder's Securities pursuant to a Change of Control Offer.  No such purchase in part shall reduce the outstanding principal amount of the Securities held by any Holder to below U.S.$200,000.  In the Change of Control Offer, the Issuer or a third party so designated shall offer a Change of Control Payment.

(2)      Within 30 days following any Change of Control that results in a Rating Decline, the Issuer or a third party so designated shall make a Change of Control Offer by notice to each Holder in accordance with the provisions of <u>Section 13.01</u>, stating:

(A)      that a Change of Control that results in a Rating Decline has occurred and that such Holder has the right to require the Issuer or a third party so designated to purchase such Holder's Securities in exchange for its respective portion of the Change of Control Payment;

(B)      an expiration date (the "<u>Expiration Date</u>") not less than 30 days or more than 60 days after the date of the Change of Control Offer;

(C)      the Change of Control Payment and the Change of Control Payment Date;

(D)      information concerning the business of the Company and its Subsidiaries, including the relevant facts regarding such Change of Control, which the Company in good faith believes shall enable the Holders to make an informed decision with respect to the Change of Control Offer; and

(E)      the instructions, as determined by the Issuer or a third party so designated, consistent with this <u>Section 4.08</u>, that a Holder must follow in order to have its Securities repurchased.

(3)      Holders electing to have a Security repurchased shall be required to surrender the Security, with an appropriate form duly completed, to the exchange agent at the address specified in the notice at least three Business Days prior to the Change of Control

Payment Date.  Holders shall be entitled to withdraw their election if each of the Trustee and the Issuer receives not later than one Business Day prior to the Change of Control Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Security which was delivered for repurchase by the Holder and a statement that such Holder is withdrawing his election to have such Security repurchased.  Holders whose Securities are purchased only in part shall be issued new Securities equal in principal amount to the unpurchased portion of the Securities surrendered.

(4)     On the Change of Control Payment Date, the Issuer or the Guarantors shall, to the extent lawful:

(A)     accept for payment all Securities or portions of Securities properly tendered and not validly withdrawn pursuant to the Change of Control Offer;

(B)     deposit with any Paying Agent an amount equal to the Change of Control Payment in respect of all Securities or portions of Securities properly tendered and not validly withdrawn; and

(C)     deliver or cause to be delivered, if applicable, to the Trustee for cancellation the Securities properly accepted together with an Officer's Certificate stating the aggregate principal amount of Securities or portions of Securities being purchased by the Issuer or the Guarantors.

(5)     The Paying Agent shall promptly mail to each Holder of Securities properly tendered the Change of Control Payment for such Securities, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Security equal in principal amount to any unpurchased portion of the Securities surrendered, if any; *provided* that each new Security shall be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.  A Security shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering Holder.  The Issuer or a third party so designated shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(6)     Notwithstanding the foregoing, the Issuer shall not be required to make a Change of Control Offer upon a Change of Control that results in a Rating Decline if (i) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture that are applicable to a Change of Control Offer made by the Issuer, and such third party purchases all Securities properly tendered and not withdrawn under the Change of Control Offer or (ii) notice of redemption for all Outstanding Securities has been given pursuant to Section 3.02, unless and until there is a default in payment of the applicable redemption price.

(7)     The Issuer or the third party so designated shall comply, to the extent applicable, with the requirements of Rule 14e-1 of the Exchange Act and any other applicable securities laws or regulations in connection with the repurchase of Securities pursuant to this

<u>Section 4.08</u>.  To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this <u>Section 4.08</u>, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this <u>Section 4.08</u> by virtue of its compliance with such securities laws or regulations.

In the event that the Holders of not less than 90% of the aggregate principal amount of the Outstanding Securities accept a Change of Control Offer and the Issuer or a third party purchases all the Securities held by such Holders, the Issuer will have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the purchase pursuant to the Change of Control Offer described above, to redeem all of the Securities that remain outstanding following such purchase at the purchase price equal to that in the Change of Control Offer plus, to the extent not included in the Change of Control Offer payment, accrued and unpaid interest and additional amounts, if any, on the Securities that remain outstanding, to the date of redemption (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

SECTION 4.09    <u>Limitation on Liens</u>.  The Company shall not, and shall not permit any Restricted Subsidiary to, create or suffer to exist any Lien upon any of its property or assets now owned or hereafter acquired by it or on any Capital Stock of any Restricted Subsidiary, in each case securing any Debt unless contemporaneously therewith effective provision is made to secure the Securities equally and ratably with such Debt for so long as such Debt is so secured. This covenant shall not require the Company or any Restricted Subsidiary to equally and ratably secure the Securities if the Lien consists of a Permitted Lien.

SECTION 4.10    <u>Limitation on Sale and Leaseback Transactions</u>.  The Company shall not, and shall not permit any Restricted Subsidiary to, enter into any Sale and Leaseback Transaction with respect to any Property unless the Company or such Restricted Subsidiary would be entitled to:

(A)    Incur Debt in an amount equal to the Attributable Debt with respect to such Sale and Leaseback Transaction pursuant to <u>Section 4.03</u>, and

(B)    create a Lien on such Property securing such Attributable Debt without equally and ratably securing the Securities pursuant to <u>Section 4.09</u>.

in which case, the corresponding Debt and Lien shall be deemed Incurred pursuant to those provisions.

SECTION 4.11    <u>Maintenance of Corporate Existence</u>.  Each of the Issuer and the Guarantors shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and shall use its reasonable efforts to do or cause to be done all things necessary to preserve and keep in full force and effect its rights (charter and statutory); *provided, however*, that neither the Issuer nor any Guarantor shall be required to preserve any such existence or right if its Board of Directors or management, respectively, shall determine in its sole discretion that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries taken as a whole; *provided further* that this <u>Section</u>

4.11 does not prohibit any transaction otherwise permitted by Section 4.06, Section 5.01, or Article 10.

SECTION 4.12   Maintenance of Properties.  The Company shall cause all properties used or useful in the conduct of its business or the business of any of its Restricted Subsidiaries to be maintained and kept in good condition, repair and working order as in the judgment of the Company may be necessary so that the business of the Company and its Restricted Subsidiaries may be properly and advantageously conducted at all times; *provided* that nothing shall prevent the Company or any Restricted Subsidiary from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company, desirable in the conduct of the business of the Company and its Restricted Subsidiaries taken as a whole.

SECTION 4.13   Limitation on Guarantees of Debt by Restricted Subsidiaries. The Company will not permit any of its Restricted Subsidiaries that is not a Guarantor or the Issuer to guarantee the payment of any Debt of the Company or any of its Restricted Subsidiaries in an aggregate principal amount in excess of U.S.$10,000,000 unless:

(1)     such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture to this Indenture providing for a guarantee of payment of the Issuer's obligations under this Indenture and the Securities by such Restricted Subsidiary; except that if such Debt is by its express terms subordinated in right of payment to the Securities, any such guarantee of such Restricted Subsidiary with respect to such Debt will be subordinated in right of payment to such Restricted Subsidiary's guarantee with respect to the Securities substantially to the same extent as such Debt is subordinated to the Securities; and

(2)     such Restricted Subsidiary will deliver to the Trustee an Opinion of Counsel to the effect that:

(A)     such supplemental indenture and guarantee have been duly executed and authorized; and

(B)     such guarantee of the Securities constitutes a valid, binding and enforceable obligation of such Restricted Subsidiary (subject to customary exceptions and limitations), except insofar as enforcement thereof may be limited by bankruptcy, insolvency or similar laws (including, without limitation, all laws relating to fraudulent transfers) and except insofar as enforcement thereof is subject to general principles of equity;

*provided, however*, that the foregoing provisions of this covenant will not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary of the Company and was not Incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary of the Company.

SECTION 4.14   [Reserved].

SECTION 4.15     [Reserved].

SECTION 4.16     [Reserved].

SECTION 4.17     [Reserved].

SECTION 4.18     <u>Maintenance of Office or Agency in the State of New York</u>. The Issuer shall ensure the maintenance in the State of New York an office or agency where Securities may be presented or surrendered for payment, where Securities may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Issuer in respect of the Securities and this Indenture may be served.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer shall fail to ensure the maintenance of any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and, in such event, the Trustee shall act as the Issuer's agent to receive all such presentations, surrenders, notices and demands.

The Issuer may also from time to time designate one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency in the State of New York for such purposes.  The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

SECTION 4.19     [Reserved].

SECTION 4.20     [Reserved].

SECTION 4.21     <u>Additional Amounts</u>.  (a) All payments by the Issuer in respect of the Securities or by the Guarantors in respect of the Note Guarantee shall be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of the Issuer's, a Guarantor's or any successor's jurisdiction of incorporation or the jurisdiction in which central management or control of the Issuer, such Guarantor or such successor, as applicable, is exercised (each such jurisdiction a "<u>Relevant Jurisdiction</u>"), or any governmental authority therein, unless the Issuer, such Guarantor or such successor is compelled by law to deduct or withhold such taxes, duties, assessments, or governmental charges.  In such event, the relevant payor shall make such deduction or withholding, make payment of the amount so withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts receivable by Holders of Securities after such withholding or deduction shall equal the respective amounts of principal and interest which would have been receivable in respect of the Securities in the absence of such withholding or deduction ("<u>Additional Amounts</u>").  No such Additional Amounts shall be payable:

(1)     to, or to a third party on behalf of, a Holder or beneficial owner who is subject to such taxes, duties, assessments or governmental charges in respect of such Security by reason of the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership or a corporation) or beneficial owner and a Relevant Jurisdiction, as applicable, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member or shareholder) or beneficial owner being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Security or enforcement of rights and the receipt of payments with respect to the Security;

(2)     in respect of Securities surrendered (if surrender is required) more than 30 days after the Relevant Date (as defined below) except to the extent that payments under such Security would have been subject to withholdings and the Holder or beneficial owner of such Security would have been entitled to such Additional Amounts, on surrender of such note for payment on the last day of such period of 30 days;

(3)     where such Additional Amount is imposed on a payment to an individual and is required to be made pursuant to any law implementing or complying with, or introduced in order to conform to any European Union Directive on the taxation of savings, such as the Austrian EU Withholding Tax Act (*EU-Quellensteuergesetz*);

(4)     to, or to a third party on behalf of, a Holder or beneficial owner who is liable for such taxes, duties, assessments or other governmental charges by reason of such Holder's or beneficial owner's failure to comply with any certification, identification or other reporting requirement concerning the nationality, residence, identity or connection with a Relevant Jurisdiction, as applicable, or a successor jurisdiction or applicable political subdivision or authority thereof or therein having power to tax, of such holder or beneficial owner, if (a) compliance is required by such jurisdiction, or any political subdivision or authority thereof or therein having power to tax, as a precondition to, exemption from, or reduction in the rate of, the tax, assessment or other governmental charge and (b) the Issuer, any Guarantor or successor has given the holders at least 30 days' notice that Holders will be required to provide such certification, identification or other requirement;

(5)     in respect of any estate, inheritance, gift, sales, transfer, capital gains, excise or personal property or similar tax, assessment or governmental charge;

(6)     in respect of any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of principal of or interest on the Security or by direct payment by the Issuer, any Guarantor or successor in respect of claims made against the Issuer, any Guarantor or successor; or

(7)     in respect of any combination of the above.

All references to principal and interest in respect of the Securities shall be deemed also to refer to any Additional Amounts, unless the context requires otherwise, which may be payable as set forth in this Indenture or in the Securities.

(b)     In addition, no Additional Amounts shall be paid with respect to any payment on a Security to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment would be required by the laws of a Relevant Jurisdiction, as applicable, or any political subdivision thereof, to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of that partnership, an interest holder in a limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member or beneficial owner been the Holder.

(c)     Any reference in this Indenture or the Securities to principal, interest or any other amount payable in respect of the Securities by the Issuer or the Note Guarantee by any Guarantor shall be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section 4.21.

(d)     The foregoing obligation in this Section 4.21 shall survive termination or discharge of this Indenture.

SECTION 4.22     Payments and Paying Agent.  (a) Whenever the Issuer shall appoint a Paying Agent other than Deutsche Bank Trust Company Americas or Deutsche Bank Luxembourg S.A. with respect to the Securities, it shall cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.22:

(1)     that it will hold all sums received by it as such agent for the payment of the principal of or interest, as the case may be, on any Securities (whether such sums have been paid to it by or on behalf of the Issuer or by any other obligor on the Securities) in trust for the benefit of the Holders;

(2)     that it will give the Trustee notice of any failure by the Issuer (or by any other obligor on the Securities) to make any payment of the principal of or interest on any Securities, as the case may be (including Additional Amounts), and any other payments to be made by or on behalf of the Issuer under this Indenture or the Securities when the same shall be due and payable; and

(3)     that it will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of the failure referred to in clause (2) above.

(b)     The Trustee shall arrange with a Paying Agent for the payment, from funds furnished by the Issuer to the Trustee pursuant to this Indenture, of the principal of and interest

and other amounts due on the Securities (including Additional Amounts) and of the compensation of such Paying Agent for its services as such.

(c)     Anything in this <u>Section 4.22</u> to the contrary notwithstanding, the Issuer may at any time, for the purpose of obtaining a satisfaction and discharge with respect to any Securities hereunder, or for any other reason, pay or cause to be paid to the Trustee all sums held in trust for such Securities by the Issuer or any Paying Agent hereunder as required by this <u>Section 4.22</u>, such sums to be held by the Trustee upon the trusts herein contained.

(d)     Anything in this <u>Section 4.22</u> to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of <u>Section 8.04</u>.

SECTION 4.23     [Reserved].

SECTION 4.24     <u>Limitation on Designation of Unrestricted Subsidiaries</u>.

(a)     The Company may designate after the Issue Date any Subsidiary of the Company (other than the Issuer) as an "Unrestricted Subsidiary" under this Indenture (a "<u>Designation</u>") only if:

(1)     no Event of Default has occurred and is continuing at the time of or after giving effect to such Designation;

(2)     any transactions between the Company or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are, and after giving effect to such Designation will be, in compliance with <u>Section 4.07</u>;

(3)     such Subsidiary has no Debt other than Non-Recourse Debt; and

(4)     the Company would be permitted to make an Investment in an Unrestricted Subsidiary at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment in an Unrestricted Subsidiary at the time of Designation) as a Restricted Payment pursuant to <u>Section 4.04(a)</u> in an amount equal to the amount of the Company's Investment in such Subsidiary on such date.

(b)     The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "<u>Revocation</u>") only if:

(1)     no Event of Default has occurred and is continuing at the time of and after giving effect to such Revocation; and

(2)     all Debt and Liens of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Indenture.

(c)     The Designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary. All

Designations and Revocations must be evidenced by a resolution of the Board of Directors of the Company and an Officer's Certificate delivered to the Trustee certifying compliance with the preceding provisions.

SECTION 4.25     Ranking.  Each of the Issuer and the Guarantors shall ensure that its respective obligations under this Indenture, the Securities and the Note Guarantee shall at all times constitute direct and unconditional obligations of the Issuer or the Guarantors, ranking at all times at least *pari passu* in priority of payment among themselves and with all other unsubordinated Debt of such Person, except to the extent any such other Debt ranks above such obligations by reason of Liens permitted under Section 4.09 or pursuant to applicable law.

Article 5

Consolidation, Merger, or Sale of Substantially All Assets

SECTION 5.01     Consolidation, Merger, or Sale of Substantially All Assets.

(a)     The Company will not consolidate with or merge with or into, or sell, convey, transfer, dispose of or lease all or substantially all of its assets to, any person,

unless

(1)     the surviving Person (if not the Company) will be a person organized and existing under the laws of Brazil, Colombia, the United States of America, any state thereof or the District of Columbia, or any other country that is a member country of the European Union or of the Organization for Economic Co-operation and Development on the Issue Date, and such person expressly assumes, by a supplemental indenture to this Indenture, executed and delivered to the Trustee, all the obligations of the Company under the Securities, its Note Guarantee and this Indenture;

(2)     the surviving Person (if not the Company), if not organized and existing under the laws of Brazil, undertakes, in such supplemental indenture, to pay such additional amounts in respect of principal and interest as may be necessary in order that every net payment receivable in respect of the Securities after deduction or withholding for or on account of any present or future tax, duty, assessment or other governmental charge imposed by such other country or any political subdivision or taxing authority thereof or therein will not be less than the amount of principal and interest then due and payable on the Securities, subject to the same exceptions set forth in Section 4.21 but replacing existing references in such clause to Brazil with references to the other country;

(3)     immediately prior to such transaction and immediately after giving effect to such transaction, no Default or Event of Default will have occurred and be continuing;

(4)     immediately after giving effect to the transaction on a pro forma basis, the Company or the surviving Person (i) could Incur at least U.S.$1.00 of Debt under clause (a) of the covenant described under Section 4.03 or (ii) would not have both a higher percentage and

higher ratio in clause (a) described under Section 4.03; and

(5)     the surviving Person (if not the Company) will have delivered to the Trustee an Officer's Certificate and an opinion of counsel, stating that such consolidation, merger or transfer and such supplemental indenture, if any, comply with this Indenture.

The Trustee will accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent set forth in this covenant, in which event it will be conclusive and binding on the holders.

Notwithstanding the restriction described in clause (3) and (4), any Restricted Subsidiary may consolidate with, merge into or transfer all or part of its properties and assets to the Company, the Company may merge into a Restricted Subsidiary for the purpose of reincorporating the Company in another jurisdiction, and any Restricted Subsidiary may consolidated with, merge into or transfer all or part of its properties and assets to another Restricted Subsidiary.

(b)     The Company shall not lease all or substantially all of its assets, whether in one transaction or a series of transactions, to one or more other Persons, except to the extent permitted under Section 4.10.

(c)     Upon the consummation of any transaction effected in accordance with these provisions, if the Company is not the continuing Person, the surviving Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Securities with the same effect as if such surviving Person had been named as the Company in this Indenture.


Article 6

Defaults and Remedies

SECTION 6.01     Events of Default.  An "Event of Default" occurs if:

(1)     the Issuer defaults in any payment of interest (including Additional Amounts, if any) on any Security when the same becomes due and payable, and such default continues for a period of 30 days;

(2)     the Issuer defaults in the payment of the principal (including Additional Amounts, if any) of any Security when the same becomes due and payable upon acceleration or redemption or otherwise;

(3)     the Issuer fails to make an Change of Control Offer and thereafter to accept and pay for Securities tendered when and as required pursuant to Section 4.08;

(4)     the Company fails to comply with Section 5.01;

(5)     the Issuer or any Guarantor, as the case may be, fails to comply with any of its covenants or agreements in the Securities or this Indenture (other than those referred to in clauses (1), (2), (3) and (4) above), and such failure continues for 60 days after the notice specified below;

(6)     the Company, any Significant Subsidiary or the Issuer defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by the Company, such Significant Subsidiary or the Issuer (or the payment of which is guaranteed by the Company, such Significant Subsidiary or the Issuer) whether such Debt or guarantee now exists, or is created after the Issue Date, which default (a) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default (a "Payment Default") or (b) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$75,000,000 or more in the aggregate;

(7)     one or more final and non-appealable-judgments for the payment of money are rendered against the Company, any Significant Subsidiary or the Issuer and are not paid or otherwise discharged and there is a period of 60 consecutive days following entry of the final and non-appealable judgment that causes the aggregate amount for all such final and non-appealable judgments outstanding and not paid or discharged against all such Persons to exceed U.S.$75,000,000 or the equivalent thereof at the time of determination (in excess of amounts which the Company's insurance carriers have agreed to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(8)     an involuntary case or other proceeding is commenced against the Company, any Significant Subsidiary or the Issuer with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, *síndico*, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against the Company, any Significant Subsidiary or the Issuer under the federal bankruptcy laws as now or hereafter in effect and such order is not being contested by the Company, any Significant Subsidiary or the Issuer, as the case may be, in good faith or has not been dismissed, discharged or otherwise stayed, in each case within 60 days of being made;

(9)     the Company, any Significant Subsidiary or the Issuer (i) commences a voluntary case or other proceeding seeking the commencement of judicial or extra judicial reorganization, proceedings or bankruptcy proceedings with respect to itself or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, *síndico*, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Company, any Significant Subsidiary or the Issuer or for all or substantially all of the property of the Company, any Significant Subsidiary or the Issuer or (iii) effects any general assignment for the benefit of creditors;

(10)     any event occurs that under the laws of Brazil or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in clause (8) or (9) above;

(11)     any Note Guarantee by the Company or a Significant Subsidiary ceases to be in full force and effect, other than in accordance with the terms of this Indenture, or a Guarantor denies or disaffirms its obligations under its Note Guarantee; or

(12)     all or substantially all of the undertaking, assets and revenues of the Company, any Significant Subsidiary or the Issuer is condemned, seized or otherwise appropriated (other than in accordance with its terms) by any Person acting under the authority of any national, regional or local government or the Company, any Significant Subsidiary or the Issuer is prevented by such Person for a period of 60 consecutive days or longer from exercising normal control over all or substantially all of its undertaking, assets and revenues.

A Default under clause (5) above will not constitute an Event of Default until the Trustee or the holders of at least 25% in principal amount of the Outstanding Securities notify the Issuer and the Trustee of the Default and the Issuer does not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) a responsible officer of the Trustee with direct responsibility for this Indenture has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to the Trustee at its Corporate Trust Office by the Issuer, any Guarantor or any Holder, such notice identifying this Indenture and the Issuer.

SECTION 6.02     Acceleration.  If an Event of Default (other than an Event of Default specified in Section 6.01(8), (9) or (10)) occurs and is continuing under this Indenture, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Securities outstanding, may declare all unpaid principal of and accrued interest on all Securities to be due and payable immediately, by a notice in writing to the Issuer, and upon any such declaration such amounts will become due and payable immediately. If an Event of Default specified in Section 6.01(8), (9) or (10) above occurs and is continuing, then the principal of and accrued interest on all Securities shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

SECTION 6.03     Other Remedies.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of or interest on the Securities or to enforce the performance of any provision of the Securities or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the

Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative.

SECTION 6.04     Rescission/Annulment of Acceleration; Waiver of Past Defaults.  The holders of a majority in aggregate principal amount of the Outstanding Securities by written notice to the Issuer and to the Trustee may waive all past defaults (whether a Default or Event of Default) and rescind and annul an acceleration and its consequences if:

(1)     all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Securities that have become due solely by such acceleration, have been cured or waived, and

(2)     the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.

Except as otherwise provided in Section 6.02 or Section 9.02, the Holders of a majority in principal amount of the outstanding Securities may, by notice in writing to the Trustee, waive an existing Default and Event of Default and its consequences.  Upon such waiver, the Default and Event of Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

SECTION 6.05     Control by Majority.  Subject to the provisions herein relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders, unless such holders will have offered to the Trustee indemnity reasonably satisfactory to the Trustee.  Subject to such provision for the indemnification of, or provision of security to, the Trustee, the Holders of a majority in aggregate principal amount of the outstanding Securities shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

SECTION 6.06     Limitation on Suits.  A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Securities, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Securities, unless:

(1)     the Holder has given to the Trustee written notice of a continuing Event of Default;

(2)     Holders of at least 25% in aggregate principal amount of outstanding Securities have made written request to the Trustee to institute proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(3)     Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against any costs, liabilities or expenses to be incurred in compliance with such request;

(4)     the Trustee within 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(5)     during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Securities have not given the Trustee a written direction that is inconsistent with such written request;

it being understood and intended that no one or more of such Holders shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner therein provided and for the equal and ratable benefit of all such Holders (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

SECTION 6.07     Rights of Holders to Receive Payment.  Notwithstanding any other provision of this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and premium, if any and interest and Additional Amounts, if any, on such Security and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

SECTION 6.08     Collection Suit by Trustee.  If an Event of Default specified in Section 6.01(1) or Section 6.01(2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or the Guarantors for the whole amount then due and owing (together with interest on any unpaid interest to the extent lawful) and the amounts provided for in Section 7.06.

SECTION 6.09     Trustee May File Proofs of Claim.  The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Securityholders allowed in any judicial proceedings relative to the Issuer, the Guarantors, their creditors or their property and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Bankruptcy Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.06.

SECTION 6.10     Priorities.  If the Trustee collects any money or property pursuant to this Article 6, it shall pay out the money or property in the following order:

FIRST:      to the Trustee and any Agent for amounts due under Section 7.06;

SECOND:      to Securityholders for amounts due and unpaid on the Securities for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities for principal and interest, respectively; and

THIRD:      to the Issuer or, to the extent the Trustee collects any amounts from the Guarantors, to the Guarantors.

The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 6.10 and shall promptly notify the Issuer thereof.  At least 15 days before such record date, the Issuer shall mail to each Securityholder and the Trustee a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11      Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 or a suit by Holders of more than 10% in principal amount of the Securities.

SECTION 6.12      Waiver of Stay or Extension Laws.  Neither the Issuer nor the Guarantors (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and each of the Issuer and the Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

Article 7

Trustee

SECTION 7.01      Duties of Trustee.

(1)  Except during the continuance of an Event of Default:

(a)      the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(b)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  Notwithstanding the foregoing, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not, and is under no obligation to, confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(2)      Following the occurrence and continuance of an Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(3)      The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(a)      this Section 7.01(3) does not limit the effect of Section 7.01(1);

(b)      the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(c)      the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(4)      Every provision of this Indenture that in any way relates to the Trustee is subject to Sections 7.01(1), (2) and (3).

(5)      The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer or the Guarantors.

(6)      Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(7)      No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity or security, as applicable, against such risk or liability is not reasonably assured to it.

(8)      Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

SECTION 7.02    Rights of Trustee.  (1)  Subject to Section 7.01 hereof, the Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee need not investigate any fact or matter stated in the document but may, in its discretion, make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer and the Guarantors, personally or by agent or attorney at the sole cost of the Issuer and the Guarantors and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(2)    Before the Trustee acts or refrains from acting, it may require an Officer's Certificate and/or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(3)    The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(4)    The Trustee shall not be liable for any action it takes or omits to take in good faith which it reasonably believes to be authorized or within its rights or powers; *provided, however*, that the Trustee's conduct does not constitute willful misconduct or negligence.

(5)    The Trustee may consult with counsel appointed with due care and the advice or Opinion of Counsel of such counsel with respect to legal matters relating to this Indenture and the Securities shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or such opinion of such counsel.

(6)    In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(7)    The Trustee shall not be deemed to have notice of any Default or Event of Default (other than a payment default under Section 6.01(1) or Section 6.01(2)) unless a Trust Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Securities and this Indenture.

(8)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each Agent, custodian and other Person employed to act hereunder.

(9)    The Trustee may request that the Issuer deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture.

SECTION 7.03    Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Issuer, the Guarantors or their Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent, Registrar, co-registrar or co-paying agent may do the same with like rights.  However, the Trustee must comply with Section 7.09 and Section 7.10.

SECTION 7.04    Trustee's Disclaimer.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Note Guarantee or the Securities, it shall not be accountable for the Issuer's use of the proceeds from the Securities, and it shall not be responsible for any statement of the Issuer or the Guarantors in this Indenture or in any document issued in connection with the sale of the Securities or in the Securities other than the Trustee's certificate of authentication.

SECTION 7.05    Notice of Defaults.  If any Event of Default occurs and is continuing and is known to a responsible officer of the Trustee, the Trustee shall send notice of the Event of Default to each Holder within 90 days after it occurs, unless the Event of Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or interest on any Security, the Trustee may withhold the notice if and so long as a trust committee of trust officers of the Trustee in good faith determines that withholding the notice is in the interest of the Securityholders. The Trustee shall not be charged with knowledge of any Default or Event of Default other than a Default under Section 6.01(1) or Section 6.01(2) hereof unless a Trust Officer in the Corporate Trust Office of the Trustee shall have received written notice thereof from the Issuer or a Securityholder, expressly referencing this Indenture and the Securities.

SECTION 7.06    Compensation and Indemnity.   The Issuer shall pay to the Trustee and each Agent from time to time such compensation for its services and/or otherwise in connection with the Securities hereunder as the parties may from time to time agree in writing. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall indemnify the Trustee or any predecessor Trustee, each Paying Agent, the Registrar and any other Agent  (which for purposes of this Section 7.06 shall be deemed to include their respective directors, officers, agents and employees) (each an "Indemnified Person") against any and all loss, liability or expense (including taxes (other than taxes based upon, measured by or determined by the income of the Trustee) and reasonable and documented attorneys' fees and expenses) Incurred by it in connection with the administration of this trust and/or the performance of its duties hereunder, including the reasonable costs and expenses of defending itself against any claim (whether asserted by the Guarantors, the Issuer, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 7.06, except to the extent that such loss, damage, claim, liability or expense is due to its own willful misconduct, negligence or bad faith.  An Indemnified Person shall notify the Issuer promptly of any claim for which it may seek indemnity.  Failure by an Indemnified Person to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.  The Issuer shall defend the claim and each Indemnified Person may have separate counsel and the Issuer shall pay the reasonable and documented fees and expenses of such counsel; *provided* that the Issuer shall not

be required to pay such fees and expenses if they assume an Indemnified Person 's defense and, in an Indemnified Person's reasonable judgment, there is no conflict of interest between the Issuer and such parties in connection with such defense.  In no event shall the Issuer be liable for fees and expenses of more than one counsel (in addition to any local counsel) separate from its own counsel for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstance.  The Issuer need not pay for any settlement made without its consent.

To secure the Issuer's obligations in this <u>Section 7.06</u>, each Indemnified Person shall have a lien prior to the Securities on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest and Additional Amounts, if any, on particular Securities.

The Issuer's payment obligations pursuant to this <u>Section 7.06</u> shall survive the discharge of this Indenture, final payment on the Securities and resignation or removal of the Trustee or other Indemnified Person.  When the Trustee or other Indemnified Person incurs expenses after the occurrence of an Event of Default specified in <u>Section 6.01(8)</u> or <u>(9)</u> with respect to the Issuer, the expenses are intended to constitute expenses of administration under the U.S. Bankruptcy Code.

SECTION 7.07    <u>Replacement of Trustee</u>.  The Trustee may resign at any time by written notice to the Issuer and the Guarantors.  The Holders of a majority in principal amount of the Outstanding Securities may remove the Trustee by written notice to the Trustee and the Issuer and may appoint a successor Trustee.  The Issuer shall remove the Trustee if:

(1)     the Trustee fails to comply with <u>Section 7.09</u>;

(2)     the Trustee is adjudged bankrupt or insolvent or an order of relief is entered with respect to the Trustee;

(3)     a receiver or other public officer takes charge of the Trustee or its property; or

(4)     the Trustee otherwise becomes incapable of acting as Trustee hereunder.

In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor trustee shall become effective only upon the successor trustee's acceptance of appointment as provided in this <u>Section 7.07</u>.

If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Securities may appoint a successor trustee with the consent of the Issuer. Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for

any reason, the Issuer shall promptly appoint a successor trustee, *provided, however*, that in case of a bankruptcy, the resigning Trustee shall have the right to appoint a successor trustee within 10 Business Days after giving of such notice of resignation if the Issuer has not already appointed a successor trustee.  If the successor trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the holders of a majority in principal amount of the Outstanding Securities may appoint a successor trustee or may petition any court of competent jurisdiction for the appointment of a successor trustee.

Upon delivery by the successor trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee shall, upon payment of its charges, transfer all property held by it as Trustee to the successor trustee, (ii) the resignation or removal of the retiring Trustee shall become effective, and (iii) the successor trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor trustee, the Issuer shall execute any and all instruments for fully vesting in and confirming to the successor trustee all such rights, powers and trusts.  The Issuer shall give notice of any resignation and any removal of the Trustee and each appointment of a successor trustee to all Holders, and include in the notice the name of the successor trustee and the address of its Corporate Trust Office.

If the Trustee fails to comply with <u>Section 7.09</u>, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of another successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this <u>Section 7.07</u>, the Issuer's obligations under <u>Section 7.06</u> shall continue for the benefit of the retiring Trustee.

SECTION 7.08   <u>Successor Trustee by Merger</u>.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Securities shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Securities so authenticated; and in case at that time any of the Securities shall not have been authenticated, any successor to the Trustee may authenticate such Securities either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Securities or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.09   <u>Eligibility; Disqualification</u>.  The Trustee shall at all times satisfy the requirements of TIA § 310(a).  The Trustee shall have a combined capital and surplus of at least U.S.$50,000,000 as set forth in its most recent published annual report of condition. The Trustee shall comply with TIA § 310(b); *provided, however*, that there shall be excluded

from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

SECTION 7.10    Preferential Collection of Claims Against Issuer.  The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

SECTION 7.11    Appointment of Co-Trustee.

(a)     Notwithstanding any other provisions of this Indenture, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, and to vest in such Person or Persons, in such capacity and for the benefit of the Securityholders, subject to the other provisions of this Section 7.11, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 7.09 and no notice to Holders of the appointment of any co-trustee or separate trustee shall be required under Section 7.07 hereof.

(b)     Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(1)     all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(2)     no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(3)     the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)     Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article 7.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or

rights (including the rights to compensation, reimbursement and indemnification hereunder) to, the Trustee.  Every such instrument shall be filed with the Trustee.

(d)      Any separate trustee or co-trustee may at any time constitute the Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.


Article 8

Discharge of Indenture; Defeasance

SECTION 8.01      Satisfaction and Discharge of Liability on Securities.

(a) This Indenture, the Securities and the Note Guarantee shall, subject to Section 8.01(b), cease to be of further effect as to all Securities issued hereunder, when:

(1)      (A)      the Issuer delivers to the Trustee all Outstanding Securities (other than Securities for whose payment money has theretofore been deposited in trust and thereafter repaid to the Issuer as provided in Section 8.05) for cancellation; or

(B)      all Outstanding Securities that have not been delivered to the Trustee for cancellation (i) have become due and payable, (ii) will become due and payable at their Stated Maturity within one year, or (iii) are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of a redemption by the Trustee and, in each case, the Issuer irrevocably deposits or causes to be deposited with the Trustee as funds in trust solely for the benefit of the Holders U.S. dollars or U.S. Government Obligations in an amount as will be sufficient without consideration of any reinvestment of interest, to pay and discharge all principal, premium and Additional Amounts, if any, and accrued and unpaid interest to the date of maturity or redemption on the Securities not delivered to the Trustee for cancellation;

(2)      no Event of Default has occurred and will continue after the date of the deposit or will occur as a result of the deposit and the deposit will not result in a breach or violation of, or constitute a default under, any other material instrument to which the Company or any Restricted Subsidiary is a party or by which the Company or any Restricted Subsidiary is bound;

(3)      the Company or any Restricted Subsidiary has paid or caused to be paid all other sums payable by it hereunder;

(4)      the Company has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Securities at maturity or the redemption date, as the case may be; and

(5)      the Issuer has delivered to the Trustee an Opinion of Counsel and an Officer's Certificate as to compliance with all conditions precedent provided for in this Indenture relating to the satisfaction and discharge of the Securities.

(b)      Notwithstanding Section 8.01(a), this Article 8 and the Issuer's obligations in Sections 2.03, 2.04, 2.05, 2.06, 2.07, 2.08, 4.21, 7.06 and 7.07 shall survive until the Securities have been paid in full.  Thereafter, Section 8.05 and the Issuer's obligations in Sections 4.21, 7.06 and 8.07 shall survive.

SECTION 8.02      [Reserved].

SECTION 8.03      [Reserved].

SECTION 8.04      Application of Trust Money.  The Trustee shall hold in trust U.S. dollars or U.S. Government Obligations deposited with it pursuant to this Article 8.  It shall apply the deposited money and the U.S. dollars from U.S. Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest and Additional Amounts, if any, on the Securities.

SECTION 8.05      Repayment to Issuer.  The Trustee and each Paying Agent shall promptly turn over to the Issuer upon request any excess money or Securities held by them at any time.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer upon request any money held by them for the payment of principal and interest and Additional Amounts, if any, that remains unclaimed for two years, and, thereafter, Securityholders entitled to the money must look only to the Issuer and not to the Trustee or any Paying Agent for payment as general creditors.

SECTION 8.06      Defeasance.  The Issuer may, at its option, at any time elect to have either Section 8.06(a) or Section 8.06(b) applied to all outstanding Securities and the Note Guarantee upon compliance with the conditions set forth in Section 8.06(c):

(a)      Upon the Issuer's election of the "legal defeasance" option applicable to this Section 8.06(a), and subject to the satisfaction of the conditions set forth in Section 8.06(c), the Issuer and the Guarantors shall be discharged from any and all obligations in respect of this Indenture, the Issuer shall be discharged from any and all obligations in respect of the Securities, and the Guarantors shall be discharged from any and all obligations in respect of the Note Guarantee (except in each case for the obligations to register the transfer or exchange of Securities, replace stolen, lost or mutilated Securities, maintain paying agencies and hold moneys for payment in trust). Subject to compliance with this Section 8.06, the Issuer may exercise its option under this Section 8.06(a) notwithstanding the prior exercise of its option under Section

8.06(b).  If the Issuer exercise the "legal defeasance" option, any payment on the Securities may not be accelerated due to an Event of Default with respect thereto.

(b)  Upon the Issuer's election of the "covenant defeasance" option applicable to this Section 8.06(b), and subject to the satisfaction of the conditions set forth in Section 8.06(c) hereof, the Issuer and the Guarantors, as applicable, need not comply with the covenants set forth in Sections 4.02, 4.03, 4.04, 4.06, 4.07, 4.08, 4.09, 4.10,  4.12, 4.13, 4.24 and 4.25 and the requirements of Sections 5.01(a)(4) and (5) and Sections 6.01 (4) (as it applies to Sections 5.01(a)(4) and (5)) and (5) shall not constitute Events of Default.

(c)  In order to exercise the options set forth in Section 8.07(a) or Section 8.07(b) above the Issuer must irrevocably deposit in trust with the Trustee U.S. dollars or U.S. Government Obligations sufficient to pay principal of and interest on the Securities to maturity or redemption and by meeting certain other conditions, including delivery to the Trustee of either a ruling received from the Internal Revenue Service or an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.  In addition, in the case of any legal defeasance, the Issuer must deliver to the Trustee an Opinion of Counsel in Austria and any other jurisdiction in which the Issuer or the Guarantors are organized or incorporated, as applicable, or is resident for tax purposes, and any other jurisdiction in which the Issuer or the Guarantors are conducting business in a manner which causes the holders of the Securities to be liable for taxes on payments under the Securities for which they would not have been so liable but for such conduct of business in such other jurisdiction, to the effect that Holders of the applicable Securities will not recognize income, gain or loss in the relevant jurisdiction (as applicable) as a result of such deposit and defeasance and will be subject to taxes in the relevant jurisdiction (including withholding taxes) (as applicable) on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred.  In the case of any legal defeasance, the defeasance shall in each case be effective when 90 days have passed since the date of the deposit in trust.

SECTION 8.07   Reinstatement.  If the Trustee or any Paying Agent is unable to apply any U.S. dollars or U.S. Government Obligations in accordance with Section 8.06 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Securities shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.06 until such time as the Trustee or such Paying Agent is permitted to apply all such U.S. dollars or U.S. Government Obligations in accordance with Section 8.06; *provided, however*, that, if the Issuer has made any payment of interest or Additional Amounts, if any, on or principal of any Securities because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Securities to receive such payment from the U.S. dollars held by the Trustee or such Paying Agent.

Article 9

Amendments

SECTION 9.01    Without Consent of Holders.  Notwithstanding Section 9.02, the Issuer, the Guarantors and the Trustee may amend or supplement this Indenture, the Note Guarantee or the Securities without notice to or consent of any Securityholder:

(1)    to cure any ambiguity, omission, defect or inconsistency;

(2)    to comply with Section 5.01;

(3)    to provide for a Substituted Debtor as described under Section 10.01;

(4)    add to the covenants of the Issuer or the Guarantors for the benefit of Securityholders;

(5)    surrender any right conferred upon the Issuer or the Guarantors;

(6)    to evidence and provide for the acceptance of an appointment by a successor trustee;

(7)    to provide for the issuance of Additional Securities;

(8)    to provide for any guarantee of the Securities, to secure the Securities or to confirm and evidence the release, termination or discharge of any guarantee of or Lien securing the Securities when such release, termination or discharge is permitted by this Indenture; or

(9)    to make any other change that does not materially and adversely affect the rights of any Holder of the Securities or to conform the terms of this Indenture, the Note Guarantee or the Securities with the description thereof set forth in the "Description of the Notes" section of the Offering Memorandum.

For the avoidance of doubt, the Issuer may at any time enter into a supplemental indenture with the Trustee without the consent of Securityholders to provide that any optional redemption can only be exercised by the Issuer beginning on a date more than 720 days after the Issue Date.

SECTION 9.02    With Consent of Holders.  (a) Except as otherwise provided in Section 6.02 or Section 9.02(b), the Issuer, the Guarantors and the Trustee may amend or supplement this Indenture, the Note Guarantee and the Securities with the written consent of the Holders of a majority in principal amount of the Outstanding Securities and the Holders of a majority in principal amount of the Outstanding Securities may waive any past Default, Event of Default or future compliance by the Issuer or the Guarantors with any provision of this Indenture, the Note Guarantee or the Securities.

(b)      Notwithstanding the provisions Section 9.02(a), without the consent of each Holder affected, an amendment or waiver shall not (with respect to any Securities held by a non-consenting Holder):

(1)      reduce the rate of or extend the time for payment of interest on any Security;

(2)      reduce the principal of any Security;

(3)      reduce the amount payable upon redemption of any Security or change the time at which any Security may be redeemed;

(4)      change the currency for payment of principal of, or interest on, any Security;

(5)      impair the right to institute suit for the enforcement of any payment on or with respect to any Security;

(6)      waive certain payment defaults with respect to the Security;

(7)      reduce the principal amount of Securities whose Holders must consent to any amendment or waiver;

(8)      make any change in the amendment or waiver provisions which require each Holder's consent;

(9)      modify or change any provision of this Indenture affecting the ranking of the Securities or the Note Guarantee in a manner adverse to the Holders of the Securities; or

(10)     make any change in the Note Guarantee that would adversely affect the Holders in any material respect;

The Issuer shall provide prior notice to each Holder pursuant to Section 13.01 of any proposed amendment under this Section 9.02. It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Issuer shall (or shall cause the Trustee to) mail to Securityholders a notice briefly describing such amendment.  The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03    Revocation and Effect of Consents and Waivers.  (a)  A consent to an amendment or a waiver by a Holder of a Security shall bind the Holder and every subsequent Holder of that Security or portion of the Security that evidences the same debt as the consenting Holder's Security, even if notation of the consent or waiver is not made on the

Security.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment or waiver becomes effective.  After an amendment or waiver becomes effective, it shall bind every Securityholder.  An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.

(b)     The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Securityholders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding Section 9.03(a), those Persons who were Securityholders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

SECTION 9.04     Notation on or Exchange of Securities.  If an amendment changes the terms of a Security, the Trustee may require the Holder of that Security to deliver it to the Trustee.  The Trustee may place an appropriate notation on that Security regarding the changed terms and return it to the Holder.  Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for that Security shall issue and the Trustee shall authenticate a new Security that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Security shall not affect the validity of such amendment.

SECTION 9.05     Trustee to Sign Amendments.  The Trustee shall sign any amendment authorized pursuant to this Article 9 if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  If it does, the Trustee may but need not sign it.  In signing such amendment the Trustee shall be entitled to receive indemnity or security, as applicable, reasonably satisfactory to it and to receive, and (subject to Section 7.01) shall be fully protected in relying upon, an Officer's Certificate and an Opinion of Counsel, each complying with Section 13.04, and stating that such amendment is authorized or permitted by this Indenture.

## Article 10

## Substitution of the Issuer

SECTION 10.01     Substitution of the Issuer.  Notwithstanding any other provision in this Indenture, the Issuer may, without the consent of the Holders (and by subscribing for any Securities, each Holder expressly consents to it), be replaced and substituted by (i) any Guarantor or (ii) any Wholly-Owned Subsidiary of a Guarantor or Guarantors as principal debtors (in such capacity, the "Substituted Debtor") in respect of the Securities; *provided* that:

(i)     such documents will be executed by the Substituted Debtor, the Issuer, the Guarantors and the Trustee as may be necessary to give full effect to the substitution, including a

supplemental indenture under which the Substituted Debtor assumes all of the Issuer's obligations under this Indenture and the Securities, and, unless the Guarantors' then existing Note Guarantee remains in full force and effect, substitute the Note Guarantee issued by the Guarantors in respect of the Securities (collectively, the "Issuer Substitution Documents") and the covenants and events of default will continue to apply to the Issuer in respect of the Securities as if no such substitution had occurred, it being the intent that the rights of Holders in respect of the Securities will be unaffected by such substitution.

(ii)     the Issuer Substitution Documents will contain covenants to ensure that each Holder of the Securities has the benefit of a covenant in terms corresponding to the obligations of the Issuer in respect of the payment of Additional Amounts under Section 4.21, if any (but replacing references to Austria with references to another jurisdiction in the case that the Substituted Debtor is organized in a jurisdiction other than Austria).

(iii)     the Issuer will deliver, or cause the delivery, to the Trustee an opinion of recognized counsel in New York as to the validity, legally binding effect and enforceability of the Issuer Substitution Documents, as well as an Officer's Certificate as to compliance with the provisions described under this Section 10.01;

(iv)     the Substituted Debtor will appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Securities, this Indenture and the Issuer Substitution Documents;

(v)     any credit rating assigned to the Securities will remain the same or be improved when the Substituted Debtor replaces and substitutes the Issuer in respect of the Securities; *provided*, that, any such change in credit rating is in whole or in part in connection with such substitution;

(vi)     no Event of Default has occurred or is continuing; and

(vii)     the substitution will comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Debtor, Austria and Brazil.

Notwithstanding any other provision of this Indenture, each Guarantor will do or cause to be done all acts and things and promptly execute and deliver any documents or instruments, including any substitute guarantee and a legal opinion of internationally recognized counsel in the jurisdiction of such Guarantor, that may be required, or that the Trustee may reasonably request, to ensure that such Guarantor's Note Guarantee is in full force and effect for the benefit of the holders and beneficial owners of the Securities following the substitution.

SECTION 10.02   Deemed Substitution.  Upon the execution of the Issuer Substitution Documents as referred to in Section 10.01, the Substituted Debtor shall be deemed to be named in the Securities as the principal debtor in place of the Issuer (or of any previous substitute under these provisions) and the Securities shall thereupon be deemed to be amended to give effect to the substitution.  Except as set forth in this Article 10, the execution of the Issuer

Substitution Documents shall operate to release the Issuer (or such previous substitute as aforesaid) from all its obligations in respect of the Securities and this Indenture.

SECTION 10.03   Notice of Substitution.   Not later than 10 Business Days after the execution of the Issuer Substitution Documents, the Substituted Debtor will give notice thereof to the Holders of the Securities in accordance with this Article 10.

Article 11

Guarantee by the Guarantors

SECTION 11.01   Guarantee.   Subject to the provisions of this Article, the Guarantors hereby irrevocably and unconditionally guarantee to each Securityholder and to the Trustee the due and punctual payment (whether at the Maturity Date, upon redemption, purchase pursuant to an offer to purchase or acceleration or otherwise) of the principal, interest, Additional Amounts and all other amounts payable by the Issuer under this Indenture as they come due. Upon failure by the Issuer to pay punctually any such amount, the Guarantors shall forthwith pay the amount not so paid at the place and time and in the manner specified in this Indenture.  This guarantee constitutes a direct, general and unconditional obligation of the Guarantors which will at all times rank at least *pari passu* with all of their other respective unsubordinated obligations, except for such obligations as may be preferred by mandatory provisions of law.

SECTION 11.02   Guarantee Unconditional.   The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)       any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture or any Security, by operation of law or otherwise;

(b)       any modification or amendment of or supplement to this Indenture (other than this Article 11) or any Security;

(c)       any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture or any Security;

(d)       the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Issuer, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions, *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)       any invalidity or unenforceability relating to or against the Issuer for any reason of this Indenture or any Security, or any provision of applicable law or regulation purporting to

prohibit the payment by the Issuer of the principal of or interest on any Security or any other amount payable by the Issuer under this Indenture;

(f)      any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantor's obligations hereunder; or

(g)      any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms of this Indenture.

SECTION 11.03   Termination, Release and Discharge; Reinstatement.

(a)      The Guarantors' obligations hereunder shall remain in full force and effect until the principal of, premium, if any, and interest on the Securities and all other amounts payable by the Issuer under this Indenture have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Security or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

(b)      A Guarantor's obligations hereunder shall terminate and be released:

(1)      a sale or disposition (including by way of consolidation or merger) of all or a portion of the Capital Stock of such Guarantor (other than the Company) following which such Guarantor is no longer a Subsidiary of the Company;

(2)      a sale or disposition (including by way of consolidation or merger) of all or substantially all of the assets of such Guarantor to a Person that is not the Company or a Restricted Subsidiary of the Company;

(3)      defeasance under Section 8.06 or satisfaction and discharge of the Securities under Section 8.01;

(4)      the Designation of such Guarantor as an Unrestricted Subsidiary; and

(5)      the liquidation or dissolution of such Guarantor; *provided* that no Event of Default occurs as a result thereof or has occurred or is continuing;

*provided*, in each case, that the transaction is carried out pursuant to, and in accordance with, all other applicable provisions of this Indenture.

SECTION 11.04    Waiver by the Guarantors.

(a)    The Guarantors unconditionally and irrevocably waive acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person.  The Note Guarantee constitutes a guarantee of payment and not of collection.

(b)    The Guarantors unconditionally and irrevocably waive any and all rights provided under the relevant applicable law of Brazil on prior demand and protest.

SECTION 11.05    Subrogation and Contribution.  Upon making any payment with respect to any obligation of the Issuer under this Article, the Guarantors shall be subrogated to the rights of the payee against the Issuer with respect to such obligation; *provided*, *however*, that the Guarantors shall not be entitled to enforce, or to receive any payments arising out of or based upon, such right of subrogation until the principal of (and premium, if any), interest, and Additional Amounts on all Securities shall have been paid in full.

SECTION 11.06    Stay of Acceleration.  If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Securities is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Guarantors forthwith on demand by the Trustee.

SECTION 11.07    Execution and Delivery of Guarantee.  The execution by the Guarantors of this Indenture evidences the Note Guarantee of the Guarantors, whether or not the person signing as an officer of the Guarantors still holds that office at the time of authentication of any Security. The delivery of any Security by the Trustee after authentication constitutes due delivery of the guarantee set forth in this Indenture on behalf of the Guarantors.

SECTION 11.08    Purpose of Guarantee.  The Guarantors hereby acknowledge that the purpose and intent of the Guarantors in executing this Indenture and providing the Note Guarantee is to give effect to the agreement of the Guarantors to guarantee the payment of any such amounts due by the Issuer under the Securities and this Indenture, whether such amounts are in respect of principal, interest or any other amounts (including Additional Amounts). Therefore, the Guarantors agree that if the Issuer shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any principal, interest or any other amounts (including Additional Amounts) with respect to this Indenture and the Securities, the Guarantors shall promptly pay the same, without any demand or notice whatsoever.  The Trustee shall promptly deposit in the account designated by the Trustee to receive payments from the Issuer with respect to the Securities for further payment to the Holders any funds it receives from the Guarantors under or pursuant to this Note Guarantee in respect of the Securities.

SECTION 11.09    Central Bank Regulations.  The Guarantors shall comply with all then-applicable Central Bank regulations to legally effect any payments under the Guarantors' Note Guarantee at the time any such payment is made or required to be made.

Article 12

Release of Covenants

SECTION 12.01   Release of Covenants.

(a)      From and during any time that:

(1)      the Securities have been assigned an Investment Grade Rating by any two Rating Agencies; and

(2)      no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (1) and (2) being collectively referred to as a "Covenant Suspension Event"), the Company and its Restricted Subsidiaries shall not be subject to the following provisions of this Indenture (collectively referred to as the "Suspended Covenants"):

(A)      Section 4.03;

(B)      Section 4.04;

(C)      Section 4.06;

(D)      Section 4.07;

(E)      Section 4.10(A);

(F)      Section 4.13;

and

(G)      Section 5.01(a)(4);

(b)      In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date"), the Securities cease to have an Investment Grade Rating from any two Rating Agencies, then the Company and its Restricted Subsidiaries shall thereafter again be subject to the Suspended Covenants.  The period of time between the occurrence of a Covenant Suspension Event and the Reversion Date is referred to as the "Suspension Period." Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default shall be deemed to have occurred as a result of a failure to comply with any of the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

(c)      On the Reversion Date, all Debt Incurred during the Suspension Period shall be classified to have been Incurred pursuant to Section 4.03(a) or one of clauses (1) through (21) of Section 4.03(b) (to the extent such Debt would be permitted to be Incurred thereunder as of the

Reversion Date and after giving effect to the Debt Incurred prior to the Suspension Period and outstanding on the Reversion Date).  To the extent such Debt would not be permitted to be Incurred pursuant to <u>Section 4.03</u> such Debt shall be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under <u>Section 4.03(b)(8)</u>.

(d)    The Issuer or the Guarantors shall give the Trustee prompt written notification upon the occurrence of a Covenant Suspension Event or any Reversion Date.

## Article 13

## <u>Miscellaneous</u>

SECTION 13.01   <u>Notices</u>.  (a) Any notice or communication to the Issuer, the Guarantors, the Trustee or any Paying Agent shall be in writing in the English language or a certified translation, and delivered in person, sent by facsimile or mailed by first-class mail addressed as follows:

if to the Issuer or any of the Guarantors:

Praça Mahatma Gandhi, 14-19th Floor
Rio de Janeiro, Rio De Janeiro 20031-100 Brazil
Attention: General Counsel
Telephone: +55 21 2555 4666
Facsimile: +55 21 2555 5200

if to the Trustee or Paying Agent:

Deutsche Bank Trust Company Americas
Trust & Agency Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX Austria
Facsimile:  732-578-4635

With a copy to:

Deutsche Bank Trust Company Americas
c/o Deutsche Bank National Trust Company
Trust & Agency Services
100 Plaza One, 6th Fl., MSJCY03-0699
Jersey City, New Jersey 07311
Attention:  Corporates Team Deal Manager – OGX Austria
Facsimile:  732-578-4635

if to the Principal Paying Agent:

Deutsche Bank Luxembourg S.A.
2, Boulevard Konrad Adenauer, 1115 Luxembourg
Luxembourg
Attention: Serge Pereira
Telephone: +00(352) 42122-643
Facsimile: +00(352) 473136

The Issuer, the Guarantors, the Trustee or any Paying Agent by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)      (1)      As long as Securities in global form are outstanding, notices to be given to Holders shall be given to the Depositary, in accordance with its applicable policies as in effect from time to time.  If the Issuer issues Securities in certificated form, notices to be given to Holders shall be sent by mail to the respective addresses of the Holders as they appear in the Trustee's records.

(2)      A notice shall be deemed to have been given to a Holder upon the mailing by first class mail, postage prepaid, of such notice to such Holder at its registered addresses as recorded in the Security Register not later than the latest date, and not earlier than the earliest date, prescribed in the Securities for the giving of such notice.  If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

(3)      Failure to mail a notice or communication to a Securityholder or any defect in a notice or communication to a Securityholder shall not affect the sufficiency of such notice or communication with respect to other Securityholders.

(4)      For so long as any Securities are listed on the Global Exchange Market of the Irish Stock Exchange and in accordance with the rules and regulations of the Irish Stock Exchange, the Issuer shall publish all notices to Holders in a daily newspaper with general circulation in Ireland, which is expected to be the Irish Times, or alternatively the Issuer may also publish a notice on the website of the Irish Stock Exchange (www.ise.ie).  If publication in Ireland is impracticable, the Issuer may make the publication elsewhere in Western Europe.  For purposes of this Section 13.01(b)(4), a "daily newspaper" is a newspaper that is published on each day, other than a Saturday, Sunday or holiday, in Ireland or, when applicable, elsewhere in Western Europe.  The Holders shall be presumed to have received such notices on the date the Issuer first publishes them.  If the Issuer is unable to give notice as described in this Section 13.01(b)(4) because the publication of any newspaper is suspended or it is otherwise impractical for the Issuer to publish the notice, then the Issuer, or the Trustee acting on instructions from the Issuer and at the Issuer's expense, shall give the Holders notice in another form.  That alternate form of notice shall be sufficient notice to the Holders.

(5)      Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice.

SECTION 13.02   <u>Communication by Holders with Other Holders</u>. Securityholders may communicate pursuant to TIA § 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities.  The Issuer, the Guarantors, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

SECTION 13.03   <u>Certificate and Opinion as to Conditions Precedent</u>.  Upon any request or application by the Issuer or the Guarantors to the Trustee to take or refrain from taking any action under this Indenture (other than with respect to the issuance of the Initial Securities), the Issuer or the Guarantors, as the case may be, shall furnish to the Trustee:

(1)     an Officer's Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to taking the proposed action or to refraining from taking the proposed action have been complied with; and

(2)     an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.04   <u>Statements Required in Certificate or Opinion</u>.  Each Officer's Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(1)     a statement that the individual making such certification or opinion has read such covenant or condition;

(2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)     a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)     a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

SECTION 13.05   <u>When Securities Disregarded</u>.  In determining whether the Holders of the required principal amount of Securities have concurred in any direction, waiver or consent, Securities owned by the Issuer, the Guarantors or by any Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with the Issuer or the Guarantors shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Securities which a Trust Officer of the Trustee has been informed in writing are so

owned shall be so disregarded.  Also, subject to the foregoing, only Securities outstanding at the time shall be considered in any such determination.

SECTION 13.06   <u>Rules by Trustee, Paying Agent and Registrar</u>.  The Trustee may make reasonable rules for action by or a meeting of Securityholders.  The Registrar and each Paying Agent may make reasonable rules for their functions.

SECTION 13.07   <u>Business Days</u>.  If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period.  If a regular record date is not a Business Day, the record date shall not be affected.

SECTION 13.08   <u>Governing Law</u>.  THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS INDENTURE, THE NOTE GUARANTEE AND THE SECURITIES (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY. THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT HAVE BEEN PROPOSED BY THE COMPANY FOR THE PURPOSES OF ARTICLE 9, PARAGRAPH 2 OF BRAZILIAN DECREE LAW NO. 4,657, DATED SEPTEMBER 4, 1942, AS AMENDED, AND FOR NO OTHER PURPOSE OR REASON WHATSOEVER.

SECTION 13.09   <u>No Recourse Against Others</u>.  No past, present or future director, officer, partner, employee, incorporator, quotaholder, shareholder or member of the Issuer, the Guarantors or any Subsidiary of the Company shall have any liability for any obligations of the Issuer, the Guarantors or any Subsidiary of the Company under the Securities, this Indenture or the Note Guarantee or for any claim based on, in respect of, or by reason of, such obligations or their creation. By accepting a Security, each Securityholder shall waive and release all such liability.  Such waivers and releases shall be part of the consideration for the issuance of the Securities.

SECTION 13.10   <u>Successors</u>.  All agreements of the Issuer and the Guarantors in this Indenture and the Securities shall bind their successors.  All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.11   <u>Multiple Originals</u>.  The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Indenture.

SECTION 13.12   <u>Table of Contents; Headings</u>.  The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of

reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.13    Consent to Jurisdiction; Appointment of Agent to Accept Service of Process; Currency Indemnity.  (a)  Each of the parties hereto irrevocably consents and agrees that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter arising out of or in connection with this Indenture, the Note Guarantee or the Securities may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Securities have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself and in respect of its properties, assets and revenues.  Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture the Note Guarantee, or the Securities brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum and any right which it may be entitled on account of place of residence or domicile.  To the extent that the Issuer or the Guarantors has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process with respect to itself or its property, each of the Issuer and the Guarantors irrevocably waives such immunity in respect of its obligations under this Indenture, any Security or the Note Guarantee.  Each of the parties to this Indenture agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on them and may be enforced in any court to the jurisdiction of which each of them is subject by a suit upon such judgment, *provided* that service of process is effected upon the Issuer in the manner specified in the following paragraph or as otherwise permitted by law.

(b)        The Issuer and the Guarantors have validly and effectively appointed National Corporate Research, Ltd. (the "Process Agent"), with offices on the date hereof at 10 East 40th Street, 10th Floor, New York, NY 10016, as its authorized agent upon which process may be served in any action, suit or proceeding referred to in Section 13.13(a).  If for any reason such agent hereunder shall cease to be available to act as such, each of the Issuer and the Guarantors agrees to designate a new agent in the Borough of Manhattan, New York City, New York on the terms and for the purposes of this Section 13.13 reasonably satisfactory to the Trustee.  Each of the Issuer and the Guarantors further hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents in any such action, suit or proceeding against the Issuer or the Guarantors by serving a copy thereof upon the relevant agent for service of process referred to in this Section 13.13 (whether or not the appointment of such agent shall for any reason prove to be ineffective or such agent shall accept or acknowledge such service) or by mailing copies thereof by registered or certified air mail, postage prepaid, to each of the Issuer and the Guarantors at its address specified in or designated pursuant to this Indenture.  Each of the Issuer and the Guarantors agree that the failure of any such designee,

appointee and agent to give any notice of such service to it shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon. Nothing herein shall in any way be deemed to limit the ability of the Holders and the Trustee to serve any such legal process, summons, notices and documents in any other manner permitted by applicable law or to obtain jurisdiction over the Issuer and the Guarantors or bring actions, suits or proceedings against the Issuer or the Guarantors in such other jurisdictions, and in such manner, as may be permitted by applicable law.

(c)     U.S. dollars are the sole currency of account and payment for all sums payable by the Issuer or the Guarantors under or in connection with the Securities and the Note Guarantee, including damages. Any amount received or recovered in a currency other than U.S. dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer or otherwise) by any Holder of a Security in respect of any sum expressed to be due to it from the Issuer or the Guarantors will only constitute a discharge to the Issuer or the Guarantors, as the case may be, to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any note, the Issuer will indemnify such Holder against any loss sustained by it as a result; and if the amount of U.S. dollars so purchased is greater than the sum originally due to such holder, such Holder will, by accepting a Security, be deemed to have agreed to repay such excess. In any event, the Issuer will indemnify the recipient against the cost of making any such purchase.

For the purposes of the preceding paragraph, it will be sufficient for the Holder of a Security to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above). These indemnities constitute a separate and independent obligation from the other obligations of the Issuer and the Guarantors, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by any Holder of a Security and will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Security.

(d)     The provisions of this <u>Section 13.13</u> shall survive any termination of this Indenture, in whole or in part.

SECTION 13.14   <u>Waiver of Jury Trial</u>. EACH OF THE ISSUER, THE GUARANTORS AND THE TRUSTEE (SOLELY IN ITS CAPACITY AS TRUSTEE, WHICH, FOR THE AVOIDANCE OF DOUBT, SHALL NOT IN ANY WAY AFFECT ANY RIGHT OF ANY HOLDER) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE SECURITIES OR THE TRANSACTION CONTEMPLATED HEREBY.

SECTION 13.15   <u>Patriot Act</u>.  The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, Deutsche Bank Trust Company Americas, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account.  The parties to this agreement agree that they will provide Deutsche Bank Trust Company Americas with such information as it may request in order for Deutsche Bank Trust Company Americas to satisfy the requirements of the USA Patriot Act.

SECTION 13.16   <u>Force Majeure</u>.  The Trustee and the Agents shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Trustee and the Agents (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**OGX AUSTRIA GMBH**

By: _____
    Name:  José Roberto Faveret Cavalcanti
    Title: Officer

(Indenture)



**OGX PETRÓLEO E GÁS PARTICIPAÇÕES S.A.**

By: _____
Name: José Roberto Faveret Cavalcanti
Title: General Counsel

By: _____
Name: Marcelo Faber Torres
Title: Chief Financial Officer

**OGX PETRÓLEO E GÁS LTDA.**

By: _____
Name: José Roberto Faveret Cavalcanti
Title: General Counsel

By: _____
Name: Marcelo Faber Torres
Title: Chief Financial Officer

**OGX CAMPOS PETRÓLEO E GÁS S.A.**

By: _____
Name: José Roberto Faveret Cavalcanti
Title: General Counsel

By: _____
Name: Marcelo Faber Torres
Title: Chief Financial Officer

(Indenture)



**DEUTSCHE BANK TRUST COMPANY AMERICAS,**
as Trustee, Registrar, Transfer Agent and Paying Agent
By: Deutsche Bank National Trust Company

By: _____

Name:      Jacqueline Bartnick
Title:       Director

By: _____

Name:      Wanda Camacho
Title:       Vice President

(Indenture)

STATE OF _New Jersey_ )

                 ) to wit

COUNTY OF _Hudson_ )


       On this _30th_ day of _March_ , 2012, before me, a notary public, personally appeared _Jacqueline Bartnick_, _Director_ and _Wanda Camacho_ , _Vice President_ to me personally known each who being duly sworn, did say that he/she is the Authorized Signatory of Deutsche Bank National Trust Company, one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person.

By: _____

Notary Public

Name: _Michele H. Y. Voon_

No: _2288315_

Commission Expiry: _June 4, 2012_

(Indenture)

**DEUTSCHE BANK LUXEMBOURG S.A.,**
**as Principal Paying Agent**

By: _____

Name:
Title:
        Jacqueline Bartnick
        Director

By: _____

Name:
Title:
        Wanda Camacho
        Vice President

(Indenture)

STATE OF _New Jersey_ )
                 ) to wit
COUNTY OF _Hudson_ )

    On this 30th day of _March_ , 2012, before me, a notary public, personally appeared _Jacqueline Bartnick_ and _Wanda Camacho_ to me personally known who being duly sworn, did say that, pursuant to a power of attorney, he/she is the Authorized Signatory of Deutsche Bank Luxembourg S.A., one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person.

By: _____

Notary Public
Name: _Michele H. Y. Voon_
No: _2288315_
Commission Expiry: _June 4, 2012_

RULE 144A/REGULATION S APPENDIX

<u>PROVISIONS RELATING TO INITIAL SECURITIES</u>

1.    <u>Definitions</u>

For the purposes of this Appendix the following terms shall have the meanings indicated below.  Other terms used in this Appendix and not defined herein shall have the meanings assigned to them in this Indenture.

"<u>Clearstream</u>" means Clearstream Banking, *société anonyme*, Luxembourg.

"<u>Euroclear</u>" means Euroclear Bank, S.A./N.V.

"<u>Global Securities</u>" means the Regulation S Global Security and Restricted Global Security.

"<u>Issuer Order</u>" means a written request or order signed in the name of the Issuer by the one or more of its Officers and delivered to the Trustee.

"<u>Non-U.S. Person</u>" has meaning given to it in Regulation S.

"<u>QIB</u>" means a "qualified institutional buyer" as defined in Rule 144A under the Securities Act.

"<u>Regulation S Global Security</u>" means a single, permanent Restricted Global Security sold outside of the United States in reliance on Regulation S.

"<u>Restricted Global Security</u>" means a single, permanent Security in definitive, fully registered book-entry form without interest coupon, constituting a Restricted Security.

"<u>Restricted Securities Legend</u>" has the meaning set forth in Section 2.1(6) of this Appendix.

"<u>Restricted Security</u>" means a Security that constitutes a "restricted security" within the meaning of Rule 144(a)(3) under the Securities Act and shall bear the Restricted Securities Legend; *provided*, *however*, that the Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Security constitutes a Restricted Security.

"<u>Securities Custodian</u>" means the custodian with respect to a Global Security (as appointed by DTC), or any successor Person thereto and shall initially be Deutsche Bank Trust Company Americas.

2.    The Securities

2.1    Form and Registration.

(1)    Form and Registration.  The certificates representing the Securities shall be issued in fully registered form without interest coupons.

(2)    Regulation S Global Security. Securities offered and sold in reliance on Regulation S under the Securities Act shall initially be represented by one or more Regulation S Global Securities and shall be deposited with the Trustee as custodian for, and registered in the name of a nominee of, DTC for the accounts of Euroclear and Clearstream (as indirect participants in DTC).

(3)    Restricted Global Security. Securities offered and sold in reliance on Rule 144A under the Securities Act shall be represented by one or more Restricted Global Securities and shall be deposited with the Trustee as custodian for, and registered in the name of a nominee of, DTC.  Each Global Security shall be subject to certain restrictions on transfer set forth in Sections 2.3 and 2.4 of this Appendix.

(4)    Ownership. Ownership of beneficial interests in a Global Security shall be limited to persons who have accounts with DTC or Euroclear and Clearstream, as indirect participants in DTC ("participants"), or persons who hold interests through participants. Ownership of beneficial interests in a Global Security shall be shown on, and the transfer of that ownership shall be effected only through, records maintained by DTC or its nominee (with respect to interests of participants) and the records of participants (with respect to interests of persons other than participants).  QIBs may hold their interests in a Restricted Global Security, directly through DTC, if they are participants in such system, or indirectly through organizations which are participants in such system.

Investors may hold their interests in a Regulation S Global Security, directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems.

So long as DTC or its nominee is the registered owner or holder of a Global Security, DTC or such nominee, as the case may be, shall be considered the sole owner or Holder of the Securities represented by such Global Security for all purposes under the Indenture.  No beneficial owner of an interest in a Global Security shall be able to transfer that interest except in accordance with DTC's applicable procedures, in addition to those provided for under the Indenture.  Payments made with respect to a Global Security shall be made to DTC or its nominee, as the registered owner thereof.  None of the Issuer, the Guarantors, the Trustee or any Paying Agent shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

The Issuer and the Guarantors expect that DTC or its nominee, upon receipt of any payment in respect of a Global Security, shall credit participants' accounts with payments in

amounts proportionate to their respective beneficial interests in such Global Security as shown on its records.  The Issuer and the Guarantors also expect that payments by participants to owners of beneficial interests in such Global Security held through such participants shall be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers.  Such payments shall be the responsibility of such participants.

(5)     Limitation on Obligations.  Although DTC, Euroclear and Clearstream are expected to follow the procedures set forth in the Indenture in order to facilitate transfers of interests in a Global Security among participants of DTC, Euroclear and Clearstream, as the case may be, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time.  None of the Issuer, the Guarantors, the Trustee or any Paying Agent shall have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

(6)     Successors; Definitive Securities.  If (i) DTC is at any time unwilling or unable to continue as a Depositary for the Global Securities and a successor Depositary or clearing agency is not appointed by the Issuer within 90 days, or (ii) an Event of Default has occurred and is continuing and the Registrar and the Issuer have received a written request from a beneficial owner of Securities to issue its proportionate interest in the Global Security, the Issuer shall issue certificated Securities which may bear the Restricted Securities Legend set forth in Exhibit 1 to this Appendix (the "Restricted Securities Legend") to all beneficial owners, in exchange for their beneficial interests in Global Securities.  Holders of an interest in a Global Security may receive certificated Securities, which may bear the Restricted Securities Legend, in accordance with DTC's rules and procedures in addition to those provided for under the Indenture; provided, however, that if the Issuer is issuing certificated Securities pursuant to Section 2.1(6)(ii), the Issuer shall only be required to issue certificated Securities to the beneficial owners of the Securities who request certificated Securities.

(7)     Certificated Securities.  Except as provided in this Section 2.1 or Section 2.3, owners of beneficial interests in Restricted Global Securities shall not be entitled to receive physical delivery of certificated Securities.  The registered Holder of a Global Security shall be entitled to grant proxies and otherwise authorize any Person, including DTC and Persons that may hold interests through DTC, to take any action which a Holder is entitled to take under the Indenture or the Securities.  In the event of transfer of a Restricted Global Security to the beneficial owners thereof in the form of certificated Securities, the Issuer shall promptly make available to the Trustee a reasonable supply of certificated Securities in definitive, fully registered form without interest coupons.

2.2     Authentication.  The Trustee shall authenticate and deliver:  (1) on the Issue Date, an aggregate principal amount of U.S.$1,063,000,000 of the Company's 8.375% Senior Notes due 2022, and (2) any Additional Securities for an original issue in an aggregate principal amount specified in the written order of the Issuer pursuant to Section 2.02 of the Indenture.  Such order shall specify the amount of the Securities to be authenticated and the date on which the original issue of Securities is to be authenticated and, in the case of any issuance of

Additional Securities pursuant to Section 2.12 of the Indenture, shall certify that such issuance is in compliance with Section 4.03 of the Indenture.

2.3    <u>Global Securities</u>.

(1) Any Global Security (i) shall represent, and shall be denominated in an aggregate amount equal to the aggregate principal amount of, all of the outstanding Securities of such series, (ii) shall be registered in the name of DTC or its nominee, (iii) shall be delivered to the Trustee or the Registrar as custodian for DTC and (iv) shall bear a legend substantially to the following effect:

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(2)  Members of, or participants in, DTC, Euroclear or Clearstream shall have no rights under the Indenture with respect to any Global Security held on their behalf by DTC or the Trustee as its custodian, or under the Global Security, and DTC may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of the Global Security for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its participants, the operation of customary practices governing the exercise of the rights of a Holder of any Security.

(3)  Interests of beneficial owners in the Global Securities may only be transferred or exchanged for certificated Securities in accordance with the rules and procedures of DTC, Euroclear and Clearstream and the provisions of the Indenture, including this Appendix.

(4)  In connection with any transfer or exchange of a portion of the beneficial interest in any Global Security to beneficial owners pursuant to Section 2.3(3) in the form of certificated Securities, the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Security in an amount equal to the principal amount of the beneficial interest in the Global Security to be transferred, and the Issuer shall execute, and the Trustee shall authenticate and deliver, one or more definitive Securities of like tenor and principal amount of authorized denominations.

(5)  Any beneficial interest in one of the Global Securities that is transferred to a person who takes delivery in the form of an interest in the other corresponding Global Security will, upon transfer, cease to be an interest in such Global Security and become an interest in the other corresponding Global Security and, accordingly, will thereafter be subject to all transfer restrictions, if any, and other procedures applicable to beneficial interest in such other corresponding Global Security for as long as it remains such an interest.

(6)  In connection with the transfer of Global Securities as an entirety to beneficial owners pursuant to Section 2.3(3) in the form of certificated Securities, the Global Securities shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall authenticate and deliver, to each beneficial owner identified by DTC, Euroclear or Clearstream in exchange for its beneficial interest in the Global Securities, an equal aggregate principal amount at maturity of definitive Securities of authorized denominations.

(7)  Any definitive Security constituting a Restricted Security delivered in exchange for an interest in a Global Security pursuant to this Section 2.3 shall bear the Restricted Securities Legend.

(8)  The registered Holder of any Global Security may grant proxies and otherwise authorize any person, including participants in DTC and persons that may hold interests through participants in DTC to take any action which a Holder is entitled to take under the Indenture or the Securities.

2.4    Special Transfer Provisions.

The following provisions shall apply with respect to the Securities:

(1)    Transfers to Non-U.S. Persons.  The following provisions shall apply with respect to the registration of any proposed transfer of an Initial Security or an Additional Security to any Non-U.S. Person:

(a)      the Registrar shall register the transfer of any Initial Security or any Additional Security, whether or not such Security bears the Restricted Securities Legend, if the proposed transferor has delivered to the Registrar a certificate substantially in the form of Exhibit 2 to this Appendix;

(b)      if the proposed transferee is a participant in DTC and the Securities to be transferred consist of definitive Securities which after transfer are to be evidenced by an interest in a Regulation S Global Security upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.4(1)(a), the Registrar shall register the transfer and reflect on its books and records the date and an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of definitive Securities to be transferred, and the Trustee and/or the Registrar shall cancel the definitive Securities so transferred or decrease the principal amount of such definitive Security, as the case may be;

(c)      if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security, upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.4(1)(a), the Registrar shall register the transfer and reflect on its books and records the date and (i) a decrease in the principal amount of the Global Security from which such interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (ii) an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of the Global Security to be transferred.

(2)      Transfers to QIBs.  The following provisions shall apply with respect to the registration of any proposed transfer of an Initial Security or an Additional Security to a QIB (excluding Non-U.S. Persons):

(a)      if the Security to be transferred consists of (i) a definitive Security, the Registrar shall register the transfer if such transfer is being made by a proposed transferor who has delivered to the Trustee a certificate substantially in the form set forth in Exhibit 3 to this Appendix or (ii) an interest in the Restricted Global Security, the transfer of such interest may be effected only through the book entry system maintained by DTC;

(b)      if the Security to be transferred consists of a definitive Security, upon receipt by the Registrar of instructions given in accordance with DTC's and the Registrar's procedures therefor, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Restricted Global

Security in an amount equal to the principal amount of the definitive Security, to be transferred, and the Trustee shall cancel the definitive Security so transferred; and

(c)     if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security, upon receipt by the Registrar of written instructions given in accordance with DTC's and the Registrar's procedures, the Registrar shall register the transfer and reflect on its books and records the date and (i) a decrease in the principal amount of the Global Security from which interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (ii) an increase in the principal amount of the Restricted Global Security in an amount equal to the principal amount of the Global Security to be transferred.

(3)  Restricted Securities Legend.  Upon the registration of transfer, exchange or replacement of Securities not bearing the Restricted Securities Legend, the Registrar shall deliver Securities that do not bear the Restricted Securities Legend.  Upon the registration of transfer, exchange or replacement of Securities bearing the Restricted Securities Legend, the Registrar shall deliver only Securities that bear the Restricted Securities Legend unless either (i) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Issuer, the Registrar and the Trustee to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or (ii) such Security has been sold pursuant to an effective registration statement under the Securities Act.

(4)  [Reserved].

(5)  Other Transfers.  If a Holder proposes to transfer a Security constituting a Restricted Security pursuant to any exemption from the registration requirements of the Securities Act other than as provided for by Sections 2.4(1) or 2.4(2), the Registrar shall only register such transfer or exchange if such transferor delivers an Opinion of Counsel reasonably satisfactory to the Issuer, the Registrar and the Trustee that such transfer is in compliance with the Securities Act and the terms of the Indenture; *provided, however*, that the Issuer may, based upon the opinion of its counsel, instruct the Registrar by an Issuer Order not to register such transfer in any case where the proposed transferee is not a QIB or a Non-U.S. person.

(6)  General.  By its acceptance of any Security (or any beneficial interest in any Global Security) bearing the Restricted Securities Legend, each Holder of such a Security or holder of such beneficial interest acknowledges the restrictions on transfer of such Security set forth in the Indenture and in the Restricted Securities Legend and agrees that it will transfer such Security only as provided in the Indenture.  The Registrar shall not register a transfer of any Security unless such transfer complies with the restrictions on transfer of such Security set forth in the Indenture.

The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.4.  The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable prior written notice to the Registrar.

2.5    Cancellation or Adjustment of Global Security.

At such time as all beneficial interests in a Global Security have either been exchanged for certificated Securities, redeemed, purchased or canceled, such Global Security shall be returned to DTC for cancellation or retained and canceled by the Trustee.  At any time prior to such cancellation, if any beneficial interest in a Global Security is exchanged for certificated Securities, redeemed, purchased or canceled, the principal amount of Securities represented by such Global Security shall be reduced and an adjustment shall be made on the books and records of the Trustee (if it is then the Securities Custodian for such Global Security) with respect to such Global Security, by the Trustee or the Securities Custodian, to reflect such reduction.

EXHIBIT 1

to

RULE 144A/REGULATION S APPENDIX

[FORM OF FACE OF INITIAL SECURITY]

[Global Securities Legend]

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

[Restricted Securities Legend]

[THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES ACT, AND THIS SECURITY MAY NOT BE REOFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THIS SECURITY IS HEREBY NOTIFIED THAT THE SELLER OF THIS SECURITY MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

THE HOLDER OF THIS SECURITY AGREES FOR THE BENEFIT OF THE ISSUER OR ANY SUBSIDIARY THAT (A) THIS SECURITY MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (I) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS

DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES TO A PERSON THAT IS NOT A U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) PURSUANT TO ANOTHER AVAILABLE EXEMPTION UNDER THE SECURITIES ACT, (IV) TO THE ISSUER OR ANY SUBSIDIARY OF THE ISSUER OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH OF CASES (I) THROUGH (V) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES; AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS SECURITY FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE. THIS LEGEND MAY ONLY BE REMOVED AT THE OPTION OF THE ISSUER.][1]

[THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION ORIGINALLY EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, PRIOR TO EXPIRATION OF THE 40-DAY DISTRIBUTION COMPLIANCE PERIOD, MAY NOT BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.][2]

---

[1] Insert for Securities sold in accordance with Rule 144A.

[2] Insert for Securities sold in accordance with Regulation S.

No._____                                                U.S.$_____
                                                           [or such other amount as listed
                                                           on the Schedule of Increases or
                                                Decreases in Global Note attached hereto]


                              8.375% Senior Notes due 2022


                              CUSIP No. 144A: 67089WAA0/ Reg. S: A6111FAA6
                              ISIN No. 144A: US67089WAA09/ Reg. S: USA6111FAA69


          OGX Austria GmbH, a company with limited liability (*Gesellschaft mit
beschränkter Haftung*) organized under the laws of the Republic of Austria, promises to pay to
_____, or its registered assigns, the principal sum of _____ dollars [or
such other amount as listed on the Schedule of Increases or Decreases in Global Note attached
hereto]* on April 1, 2022.


          Interest Payment Dates:  April 1 and  October 1 of each year, commencing on
                              October 1, 2012

          Record Dates:  March 15 and September 15

          Additional provisions of this Security are set forth on the other side of this
Security.


* If the Security is to be issued in global form, add the Schedule of Increases or Decreases in
  Global Security.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

**OGX AUSTRIA GMBH**

By: _____
     Name:
     Title:

Dated:

1-4

TRUSTEE'S CERTIFICATE OF
    AUTHENTICATION

Deutsche Bank Trust Company Americas
    as Trustee, certifies that this is one of
      the Securities referred to
      in the Indenture described herein


By: Deutsche Bank National Trust Company


By: _____
     Authorized Signatory


Dated:

STATE OF _____    )

                             ) to wit

COUNTY OF _____    )


       On this _____ day of _____, 20____, before me, a notary public, personally appeared _____, [Title], to me personally known who being duly sworn, did say that he/she is the Authorized Signatory of Deutsche Bank National Trust Company, one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said person.


By:_____
Notary Public
Name:
Notary No:
Commission Expiry:

[FORM OF REVERSE SIDE OF INITIAL SECURITY]

8.375% Senior Note due 2022

1.      Interest

OGX Austria GmbH, a company with limited liability (*Gesellschaft mit beschränkter Haftung*) organized under the laws of the Republic of Austria (such company, and its successors and assigns under the Indenture hereinafter referred to as the "Issuer"), promises to pay interest on the principal amount of this Security at the rate per annum shown above.

The Issuer will pay interest semi-annually on April 1 and October 1 of each year, commencing on October 1, 2012 to a Paying Agent, which shall in turn distribute the interest in accordance with the Indenture.  The Securities shall bear interest at the rate per annum of 8.375% from March 30, 2012, the date of issuance, or from the most recent interest payment date to which interest has been paid or provided for.  Interest on the Securities shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.      Method of Payment

The Issuer will pay interest on the Securities (except defaulted interest) to the Persons who are registered Holders at the close of business on the record date listed on the face of this Security immediately preceding the related interest payment date (whether or not a Business Day) even if Securities are canceled after the record date and on or before the interest payment date.  Holders must surrender Securities to a Paying Agent to collect principal payments.  The Issuer will pay principal, premium, interest and Additional Amounts, if any, in money of the United States that at the time of payment is legal tender for payment of public and private debts.  Payments in respect of the Securities represented by a Global Security (including principal, premium, interest and Additional Amounts, if any) will be made by wire transfer of immediately available funds to the accounts specified by DTC.   If the Securities are in certificated form, such payments will be made by a Paying Agent by U.S. dollar check drawn on a bank in New York City and mailed to the Holder of such Security at its registered address as it appears in the register.  Upon written application by the Holder of a certificated Security to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Security, such payment may be made by transfer to a U.S. dollar account maintained by the payee with a bank in New York City.

The final payment on any Security in definitive, fully registered form shall be made only upon presentation and surrender of such Security at the office of a Paying Agent on the payment date.

If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period.  If a regular record date is not a Business Day, the record date shall not be affected.

3.      <u>Registrar and Paying Agent</u>

Initially, Deutsche Bank Trust Company Americas will act as Paying Agent, Deutsche Bank Luxembourg S.A. will act as Principal Paying Agent and Deutsche Bank Trust Company Americas will act as Registrar.  The Issuer may appoint and change any Paying Agent, Registrar or co-registrar without notice.  The Issuer, the Guarantors or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or transfer agent.

4.      <u>Indenture</u>

The Issuer issued the Securities under an Indenture dated as of March 30, 2012 (the "<u>Indenture</u>"), among the Issuer, OGX Petróleo e Gás Participações S.A. (the "<u>Company</u>"), OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A., as the guarantors (each, a "<u>Guarantor</u>" and, collectively, the "<u>Guarantors</u>"), Deutsche Bank Trust Company Americas, as the Trustee, Registrar, Paying Agent and transfer agent, and Deutsche Bank Luxembourg S.A., as Principal Paying Agent.  The terms of the Securities include those stated in the Indenture. Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture.  The Securities are subject to all such terms, and Securityholders are referred to the Indenture.

The Securities are general obligations of the Issuer.  The Issuer shall be entitled, subject to its compliance with Section 4.03 of the Indenture, to issue Additional Securities pursuant to Section 2.12 of the Indenture.  The Initial Securities issued on the Issue Date, any Additional Securities and Securities issued in exchange therefor will be treated as a single class for all purposes under the Indenture.  The Indenture contains covenants that limit the ability of the Company and its Restricted Subsidiaries to Incur additional indebtedness; pay dividends or distributions on, or redeem or repurchase capital stock; make investments; engage in transactions with Affiliates; create liens on assets; transfer or sell assets; guarantee indebtedness; restrict dividends or other payments of subsidiaries; consolidate, merge or transfer all or substantially all of its assets and the assets of its subsidiaries; and engage in sale/leaseback transactions.  These covenants are subject to important exceptions and qualifications.

To the extent of any conflict between the terms of the Securities and the Indenture, the applicable terms of the Indenture shall govern.

5.      <u>Optional Redemption; Notice of Redemption</u>

(a)      *Optional Redemption with a Make-Whole Premium*.  At any time prior to April 1, 2017, the Issuer may on any one or more occasions redeem the Securities, at its option, in whole or in part, at a "make-whole" redemption price equal to 100% of the principal amount of such Securities plus the greater of (1) 1% of the then outstanding principal amount of the Securities and (2) the excess of (a) the present value at such redemption date of (i) the redemption price of the Securities at April 1, 2017 (such redemption price being set forth in the table below in paragraph 5.b) plus (ii) all required interest payments thereon to, but excluding, April 1, 2017 (excluding accrued but unpaid interest to the redemption date) discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the

Treasury Rate plus 50 basis points, over (b) the then outstanding principal amount of the Securities; plus in each case any accrued and unpaid interest and Additional Amounts, if any, on such Securities to, but excluding, the redemption date, as calculated by the Independent Investment Banker. Any redemption of Securities by the Issuer pursuant to this paragraph will be subject to either (i) there being at least U.S.$150,000,000 in aggregate principal amount of Securities (including any Additional Securities) outstanding after such redemption or (ii) the Issuer redeeming all of the then outstanding principal amount of the Securities.

"Comparable Treasury Issue" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Securities to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to the remaining term of such Securities.

"Comparable Treasury Price" means, with respect to any redemption date (1) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotation or (2) if the Independent Investment Banker obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Issuer.

"Reference Treasury Dealer" means BTG Pactual US Capital Corp., Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC or their respective affiliates which are primary United States government securities dealers, and one other leading primary United States government securities dealers in New York City reasonably designated by the Issuer; *provided* that if any of the foregoing shall cease to be a primary United States government securities dealer in New York City (a "Primary Treasury Dealer"), the Issuer will substitute therefor another Primary Treasury Dealer.

"Reference Treasury Dealer Quotation" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Issuer, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 pm New York time on the third Business Day preceding such redemption date.

"Treasury Rate" means, with respect to any redemption date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

1-9

(b)     *Optional Redemption without a Make-Whole Premium.*  On and after April 1, 2017, the Issuer may on any one or more occasions redeem the Securities, at its option, in whole or in part, at the following redemption prices (expressed as a percentage of principal amount), plus accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on April 1 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2017 | 104.188% |
| 2018 | 102.792% |
| 2019 | 101.396% |
| 2020 and thereafter | 100.000% |

Any redemption of Securities by the Issuer pursuant to this paragraph will be subject to either (i) there being at least U.S.$150,000,000 in aggregate principal amount of Securities (including any Additional Securities) outstanding after such redemption or (ii) the Issuer redeeming all of the then outstanding principal amount of the Securities.

(c)     *Optional Redemption Upon Eligible Equity Offerings.*  At any time on or prior to April 1, 2015, the Issuer may on any one or more occasions, at its option, use an amount not to exceed the net cash proceeds of one or more Eligible Equity Offerings to redeem up to 35% of the aggregate principal amount of the outstanding Securities (including any Additional Securities) at a redemption price equal to 108.375% of the principal amount of the Securities to be redeemed, plus any accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date; *provided* that:

(i)     after giving effect to any such redemption at least 65% of the aggregate principal amount of the Securities (including any Additional Securities, but excluding Securities held by the Company and its Subsidiaries) issued under the Indenture remains outstanding; and

(ii)     the Issuer makes such redemption not more than 90 days after the consummation of such Eligible Equity Offering.

"Eligible Equity Offering" means the issuance and sale for cash of Qualified Stock of the Company to any Person (other than a Restricted Subsidiary of the Company) pursuant to (i) a public offering in accordance with any applicable laws, rules and regulations, or (ii) a private offering in accordance with Rule 144A, Regulation S and/or another exemption under the Securities Act or any other applicable law, rules and regulations of any other jurisdiction.

(d)     *Optional Tax Redemption.*  If the Issuer or any successor is required to pay Excess Additional Amounts on the Securities, or any Guarantor or any successor is required to pay Excess Additional Amounts on the Note Guarantee, it may elect to redeem the Securities, in whole but not in part, at a redemption price equal to 100% of the remaining principal amount plus interest and any additional amounts accrued to, but excluding, the fixed date of redemption.  Neither the Issuer, a Guarantor nor any successor will be entitled to redeem the

Securities pursuant to the previous sentence unless it is required to pay such Excess Additional Amounts due to a change in or amendment to the laws (or any rules or regulations thereunder) of the jurisdiction of its incorporation or any political subdivision or taxing authority thereof or therein, including a change in or amendment to an official interpretation, administration or application of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or is announced on or after the Issue Date of the Securities or on or after the date a successor assumes the obligations under the Securities.

"Excess Additional Amounts" means (A) Additional Amounts payable by the Issuer on the Securities, which Additional Amounts are greater than the additional amounts the Issuer would be required to pay on the Securities if withholding or deduction were imposed at a rate of 0% and (B) Additional Amounts payable by a successor to the Issuer on the Securities, or by a Guarantor or its successor on the Note Guarantee, which Additional Amounts are greater than the Additional Amounts such payor would be required to pay on the Securities if withholding or deduction were imposed only by the jurisdiction of its incorporation based on the laws in effect in such jurisdiction on the Issue Date (determined in each case without reference to any interest, fees, penalties or other additions to tax).

In the event that the Issuer, a Guarantor or any successor elects to so redeem the Securities, it shall deliver to the Trustee: (1) an Officer's Certificate, signed in the name of the Issuer, such Guarantor or any successor, stating that (a) the Issuer, such Guarantor or such successor is entitled to redeem the Securities pursuant to their terms and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Issuer, such Guarantor or any successor to so redeem have occurred or been satisfied and (b) the payment of Excess Additional Amounts cannot be avoided by the relevant payor taking reasonable measures available to it; *provided however*, that reasonable measures shall not include changing the payor's jurisdiction of incorporation or the location of its principal executive office or registered office; and (2) an Opinion of Counsel, reasonably acceptable to the Trustee, to the effect that the Issuer, a Guarantor or any successor has or will become obligated to pay Excess Additional Amounts, and that all governmental requirements necessary for the Issuer, a Guarantor or any successor to effect the redemption have been complied with.

(e)     *Optional Redemption Procedures.*  If fewer than all of the Securities are being redeemed, the selection of Securities to be redeemed shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Securities are listed or if such securities exchange has no requirement governing redemption or the Securities are not then listed on a securities exchange, on a pro rata basis or by lot (or, in the case of Securities issued in global form, based on a method that most nearly approximates a pro rata selection in accordance with the procedures of DTC).  The Trustee shall make the selection from the Outstanding Securities not previously called for redemption.  The Trustee shall promptly notify the Issuer in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount of the Securities to be redeemed.  In the event of a partial redemption by lot, the Trustee shall select the particular Securities to be redeemed not less than 30 nor more than 60 days prior to the relevant

Redemption Date from the Outstanding Securities not previously called for redemption. The Issuer may redeem Securities in denominations of U.S.$200,000 or less only in whole. The Trustee may select for redemption portions (in any integral multiple of U.S.$1,000) of the principal of Securities that have denominations larger than U.S.$200,000; *provided* that the remaining outstanding amount must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000 in excess thereof.

   The Issuer shall give or cause the Trustee to give notice of redemption, in the manner provided for in Section 13.01 of the Indenture, not less than 30 nor more than 60 days prior to a date for redemption of Securities by first-class mail, postage prepaid, to each record holder of the Securities to be redeemed at its registered address or otherwise in accordance with the procedures of DTC. If the Issuer itself gives the notice, it shall also deliver a copy to the Trustee.

   If either (i) the Issuer is redeeming the Securities in part only, or (ii) the Issuer elects to have the Trustee give notice of redemption, then the Issuer shall deliver to the Trustee, at least 35 days prior to the Redemption Date (unless the Trustee is satisfied with a shorter period), an Officer's Certificate requesting that the Trustee select the Securities to be redeemed and/or give notice of redemption and setting forth the information required by Section 3.02(3) of the Indenture. If the Issuer elects to have the Trustee give notice of redemption, the Trustee shall give the notice in the name of the Issuer and at the Issuer's expense.

   If the Issuer, or the Trustee on behalf of the Issuer, gives notice of redemption in accordance with Article 3 of the Indenture, the Securities, or the portions of Securities, called for redemption, shall, on the Redemption Date, become due and payable at the redemption price specified in the notice (together with accrued interest, if any, to, but excluding, the Redemption Date), and from and after the Redemption Date (unless the Issuer shall default in the payment of the redemption price and accrued interest) the Securities or the portions of Securities shall cease to bear interest, to the extent the Issuer so elects. Upon surrender of any Securities for redemption in accordance with the notice, the Issuer shall pay the Securities at the redemption price, together with any accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Redemption Date. If the Issuer shall fail to pay any Security called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Securities.

   For the avoidance of doubt, the Issuer may at any time enter into a supplemental indenture with the Trustee without the consent of Securityholders to provide that any optional redemption can only be exercised by the Issuer beginning on a date more than 720 days after the Issue Date.

6.  <u>Put Provisions</u>

   Upon a Change of Control that results in a Ratings Decline, any Holder will have the right to cause the Issuer and the Guarantors to repurchase all or any part (in any integral multiples of U.S.$1,000) of the Securities of such Holder at a repurchase price equal to 101% of the aggregate principal amount of the Securities to be repurchased plus accrued and unpaid

interest and Additional Amounts, if any, to the date of repurchase, as provided in, and subject to the terms of, the Indenture; *provided* that no such repurchase shall reduce the outstanding principal amount of the Securities held by any Holder to below U.S.$200,000 or in integrals of other than U.S.$1,000 in excess thereof.

7.      Guarantee

        The payment by the Issuer of the principal of, and premium and interest on, the Securities will be fully and unconditionally guaranteed by the Guarantors, to the extent set forth in the Indenture.

8.      [Reserved]

9.      Denominations; Transfer; Exchange

        The Securities shall be issued in registered form in denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof and shall be issued as one or more Global Securities.  A Holder may transfer or exchange Securities in accordance with the Indenture.  The Securities may be transferred, combined or divided without payment of any charge other than taxes or other governmental charges. The Registrar may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  The Registrar need not register the transfer of or exchange any Securities selected for redemption or any Securities for a period of 15 days before a selection of Securities to be redeemed or 15 days before an Interest Payment Date.

10.     Persons Deemed Owners

        The registered Holder of this Security may be treated as the owner of it for all purposes.  Payment shall be made to the person in whose name a Security is registered at the close of business on the applicable record date.

11.     Unclaimed Money

        If money for the payment of principal, premium or interest or Additional Amounts, if any, remains unclaimed for two years, the Trustee or the relevant Paying Agent shall pay the money back to the Issuer at its request unless an applicable abandoned property law designates another Person.  After any such payment, Holders entitled to the money must look only to the Issuer and not to the Trustee for payment.

12.     Discharge; Defeasance

        Subject to certain conditions set forth in Section 8 of the Indenture, the Company and its Restricted Subsidiaries shall be entitled to terminate some or all of their obligations under the Securities and the Indenture if the Issuer deposits with the Trustee cash or U.S. Government

Obligations for the payment of principal and interest on the Securities upon redemption or maturity, as the case may be.

13.   Amendment, Waiver

        Subject to certain exceptions set forth in the Indenture, (a) the Indenture and the Securities may be amended without notice to any Holder but with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Securities and (b) any default or noncompliance with any provision may be waived with the written consent of the Holders of a majority in aggregate principal amount of the outstanding Securities.

        Subject to certain exceptions set forth in the Indenture, without the consent of any Securityholder, the Issuer, the Guarantors and the Trustee shall be entitled to amend or supplement the Indenture or the Securities to cure any ambiguity, omission, defect or inconsistency, or to correct a manifest error or to comply with Section 5.01 of the Indenture, or to provide for uncertificated Securities in addition to or in place of certificated Securities, or to add guarantees with respect to the Securities, or to secure the Securities or to make any change that does not adversely affect the rights of any Securityholder, or to evidence and provide for the acceptance of appointment of a successor Trustee with respect to the Securities.

14.   Defaults and Remedies

        Under the Indenture, Events of Default include (a) default for 30 days in payment of any interest or related Additional Amounts, if any, on the Securities; (b) default in payment of principal of or any related Additional Amounts, if any, or premium, if any, on the Securities, when the same becomes due and payable at maturity, upon acceleration or redemption or otherwise; (c) failure to make a Change of Control Offer and thereafter accept and pay for Securities tendered when and as required pursuant to Section 4.08 of the Indentures; (d) failure by the Company to comply with Section 5.01 of the Indenture; (e) failure by the Issuer or any Guarantor, as the case may be, to comply with other agreements in the Indenture and such non-compliance continues for a period of 60 consecutive days after written notice is given to Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in aggregate principal amount of the Securities; (f) certain accelerations of other Indebtedness of the Company, any Significant Subsidiary or the Issuer; (g) certain non-appealable judgments or orders rendered against the Company, any Significant Subsidiary or the Issuer that are not paid or discharged for a period of 60 consecutive days following the entry of the final and non-appealable judgment or order; (h) certain events of bankruptcy or insolvency with respect to the Company, any Significant Subsidiary or the Issuer; (i) the Note Guarantee of the Company or a Significant Subsidiary shall fail to be in full force and effect or is declared null and void; and (j) certain condemnation events affecting all or substantially all of the undertaking, assets and revenues of the Company, any Significant Subsidiary or the Issuer for a period of 60 consecutive days or longer.

        If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Securities, by written notice to the Issuer and the Guarantors (and to the Trustee if notice is given by the Holders), may declare all the Securities to

be due and payable immediately.  Certain events of bankruptcy or insolvency are Events of Default which will result in the Securities being due and payable immediately upon the occurrence of such Events of Default.

Securityholders may not enforce the Indenture or the Securities except as provided in the Indenture.  The Trustee may refuse to enforce the Indenture or the Securities unless it receives indemnity or security reasonably satisfactory to it.  Subject to certain limitations, Holders of a majority in principal amount of the Securities may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Securityholders notice of any continuing Default (except a Default in payment of principal or interest) if it determines that withholding notice is in the interests of the Holders.

15.     Trustee Dealings with the Issuer and the Guarantors

The Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with and collect obligations owed to it by the Issuer, the Guarantors or their Affiliates and may otherwise deal with the Issuer, the Guarantors or their Affiliates with the same rights it would have if it were not Trustee.

16.     No Recourse Against Others

No past, present or future director, officer, employee, partner, incorporator, quotaholder, member or shareholder, as such, of the Issuer, the Guarantors or any Subsidiary of the Company, shall not have any liability for any obligations of the Issuer, the Guarantors or any Subsidiary of the Company under the Securities, the Indenture or the Note Guarantee or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Security, each Securityholder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Securities.

17.     Authentication

This Security shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Security.

18.     Abbreviations

Customary abbreviations may be used in the name of a Securityholder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

19.     CUSIP Numbers and ISINs

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers or ISINs to be printed

on the Securities and has directed the Trustee to use CUSIP numbers or ISINs in notices of redemption as a convenience to Securityholders. No representation is made as to the accuracy of such numbers either as printed on the Securities or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

20. <u>Governing Law; Consent to Jurisdiction and Service of Process</u>.

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

Each of the Issuer and the Guarantors has consented to the jurisdiction of the courts of the State of New York and the United States courts located in the Borough of Manhattan, New York City, New York with respect to any action that may be brought in connection with the Indenture or the Securities and has validly and effectively appointed National Corporate Research, Ltd., Inc. as agent for service of process.

The Issuer will furnish to any Securityholder upon written request and without charge to the Securityholder a copy of the Indenture which has in it the text of this Security in larger type. Requests may be made to:

OGX Austria GmbH
c/o OGX Petróleo e Gás Participações S.A.
Praça Mahatma Gandhi, 14-19th Floor
Rio de Janeiro, Rio De Janeiro 20031-100 Brazil
Attention: General Counsel
Telephone: +55 21 2555 4666
Facsimile: +55 21 2555 5200

# ASSIGNMENT FORM

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

_____

agent to transfer this Security on the books of the Issuer.  The agent may substitute another to act for him or her.

Your Signature:

Date:_____        _____

(Sign exactly as your name appears on the other side of this Security)

SIGNATURE GUARANTEE:   _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

[TO BE ATTACHED TO GLOBAL SECURITIES]

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY**

The initial principal amount of this Global Security is U.S.$_____. The following increases or decreases in this Global Security have been made:

| Date of Exchange | Amount of decrease in principal amount of this Global Security | Amount of increase in principal amount of this Global Security | Principal amount of this Global Security following such decrease or increase | Signature of authorized signatory of Trustee or Securities Custodian |
|---|---|---|---|---|
| | | | | |

## [FORM OF] OPTION OF SECURITYHOLDER TO ELECT PURCHASE

If you elect to have this Security purchased by the Issuer pursuant to Section 4.06 or Section 4.08 of the Indenture, check the appropriate box below:

☐ Section 4.06          ☐ Section 4.08

If you elect to have only part of this Security purchased by the Issuer pursuant to Section 4.06 or Section 4.08 of the Indenture, state the amount (in integral multiples of U.S.$1,000) you elect to have purchased:

U.S.$_____

Dated: _____          Your Name: _____
                         (Print your name exactly as it appears on the face of this Security)

                         Your Signature: _____
                         (Sign exactly as your name appears on the face of this Security)

SIGNATURE GUARANTEE: _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXHIBIT 2

to

RULE 144A/REGULATION S APPENDIX

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS
<u>PURSUANT TO REGULATION S</u>

[Date]

OGX Austria GmbH
c/o OGX Petróleo e Gás Participações S.A.
Praça Mahatma Gandhi, 14-19th Floor
Rio de Janeiro, Rio De Janeiro 20031-100 Brazil
Attention: General Counsel

Deutsche Bank Trust Company Americas
Trust & Agency Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention: Corporates Team Deal Manager – OGX Austria

Re: _____ (the "<u>Transferee</u>")
    8.375% Senior Notes due 2022 (the "<u>Securities</u>")

Ladies and Gentlemen:

In connection with our proposed transfer of U.S.$_____ aggregate principal amount of Securities, we confirm that such transfer has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and, accordingly, we represent that:

(1)     the offer of the Securities was not made to a person in the United States;

(2)     either (a) at the time the buy offer was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

(3)     no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, as applicable;

(4)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

(5)     we have advised the transferee of the transfer restrictions applicable to the Securities;

(6)     if the circumstances set forth in Rule 904(c) under the Securities Act are applicable, we have complied with the additional conditions therein, including (if applicable) sending a confirmation or other notice stating that the Securities may be offered and sold during the restricted period specified in Rule 903(c)(2) or (3), as applicable, in accordance with the provisions of Regulation S; pursuant to registration of the Securities under the Securities Act; or pursuant to an available exemption from the registration requirements under the Securities Act; and

(7)     if the sale is made during a restricted period and the provisions of Rule 903(c)(3) are applicable thereto, we confirm that such sale has been made in accordance with such provisions.

You and the Transferee are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.  Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Transferor]


By:_____
        Authorized Signature

EXHIBIT 3

to

RULE 144A/REGULATION S APPENDIX

FORM OF TRANSFER CERTIFICATE FOR
TRANSFER OF RESTRICTED GLOBAL SECURITY
<u>BEARING A RESTRICTED SECURITIES LEGEND</u>

[Date]

OGX Austria GmbH
c/o OGX Petróleo e Gás Participações S.A.
Praça Mahatma Gandhi, 14-19th Floor
Rio de Janeiro, Rio De Janeiro 20031-100 Brazil
Attention: General Counsel

Deutsche Bank Trust Company Americas
Trust & Agency Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Attention:  Corporates Team Deal Manager – OGX Austria

Re: _____ (the "<u>Transferee</u>")
8.375% Senior Notes due 2022 (the "<u>Securities</u>")

Ladies and Gentlemen:

Reference is hereby made to the Indenture, dated as of March 30, 2012, in regard of the Securities among OGX Austria GmbH, as the Issuer, Petróleo e Gás Participações S.A., OGX Petróleo e Gás Ltda. and OGX Campos Petróleo e Gás S.A., as the Guarantors, Deutsche Bank Trust Company Americas, as the Trustee, Registrar, Paying Agent and transfer agent, and Deutsche Bank Luxembourg S.A., as Principal Paying Agent.  Capitalized terms used but not defined herein will have the meaning given them in the Indenture.

This letter relates to U.S.$_____ aggregate principal amount of the Securities which are held in certificated form.

The undersigned has requested transfer of such Securities to a Person who will take delivery thereof in the form of a beneficial interest in the Restricted Global Security (CUSIP No. _____; ISIN _____).  In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and on the Securities and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

1.      the Securities are being transferred to a transferee that the undersigned reasonably believes is purchasing the Securities for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

2.      the undersigned reasonably believes that transferee and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

[NAME OF TRANSFEROR]

By:_____

   Name:
   Title:

Dated:_____