**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:17-CV-23051-KMW**

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

                Plaintiffs,

v.

EIKE BATISTA, WERNER BATISTA, *et al.,*

                Defendants.
_____/

## FIRST FEDERAL AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, MERIDIAN TRUST COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD., sue Defendants, EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, ERICK MAGNO, ERICK MAGNO, PL, BANCO ITAÚ INTERNATIONAL, EFG CAPITAL INTERNATIONAL CORP., EFG BANK AG, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, AUX LLC, OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA, and say as follows:

### Case Capsule - Requires No Response

A Brazilian con man, Eike Batista, induced investors from around the U.S. - including many State employee pension funds, such as the Florida Retirement System Trust Fund - to invest billions of dollars in his oil exploration company OGX and its satellite companies in the EBX

Group on the basis of fraudulent promises of the discovery of a trillion dollars of offshore oil. He promised to plough in a billion dollars of his own money if the business needed it to come into production.

When the truth was finally discovered, that there was virtually no oil, Batista welshed on his billion-dollar promise; OGX and its satellite companies in the EBX Group collapsed; and the investors lost their money in what is currently Latin America's largest corporate default, ever.

Batista and a few others were indicted for market manipulation, insider trading, and bribery of government officials, and he has been fined and banned from heading up public companies for five years in Brazil. However, the conspirators all made many hundreds of millions of dollars from the scheme. Batista stashed much of his share in the names of family members and shell companies and behind trustees in Miami, Florida, and offshore.



The Plaintiffs - investment vehicles for an elderly disabled beneficiary (now deceased) and his Florida family members - invested over $21 million in worthless OGX bonds through their Florida investment adviser on the basis of Batista and his accomplices' fraudulent misrepresentations. They seek to recover their losses against Batista and his co-conspirators and aiders and abettors; including treble damages pursuant to Florida's racketeering statutes; and, pursuant to Florida's fraudulent transfer statute, to freeze the proceeds of the fraudulent scheme in

the hands of the various recipients and secure the return of assets fraudulently transferred out of

Florida by Miami private bankers and Miami trustees, pending judgment.

## **TABLE OF CONTENTS**

Case Capsule - Requires no Response ........................................................................................ ii

Parties and Jurisdiction .......................................................................................................... 1

    Jurisdiction ....................................................................................................................... 1

    Plaintiffs .......................................................................................................................... 1

    Defendants ....................................................................................................................... 2

    Personal Jurisdiction in Florida ..................................................................................... 6

    The Fraudulent Scheme – Overview ............................................................................. 7

    Organizational Layout of the Complaint ...................................................................... 13

**Section I - Inflating the OGX Oil Bubble** ......................................................................... 14

    The Roles played by the Defendants ............................................................................ 14

    The EBX Group - Overview ......................................................................................... 14

    The Individual Co-Conspirators and Accomplices ....................................................... 17

    Eike Batista .................................................................................................................... 17

    Eliezer Batista ................................................................................................................ 20

    Werner Batista ............................................................................................................... 20

    Thor Batista ................................................................................................................... 21

    Paulo Mendonça ............................................................................................................ 22

    Flavio Godinho .............................................................................................................. 23

    Paulo Gouvea ................................................................................................................. 24

    Marcus Berto ................................................................................................................. 25

    Luiz Carneiro ................................................................................................................. 26

Aziz Ben Ammar ........................................................................................27

**The Corporate Co-Conspirators and Accomplices:** ......................................28

The CENTENNIAL, WRM, 63X, 3BX, and AUX Companies ..............................28

The Private Bankers..................................................................................30

Banco Itaú Miami ....................................................................................31

EFG Miami and EFG Switzerland ..............................................................35

**Florida Fraudulent Transfer Receipients:**...................................................37

Erick Magno, Magno PL, and Marcus Berto: ..............................................37

Olin Batista, Flavia Sampaio, and Luma De Oliveira ...................................39

**The Scheme – in Detail** ............................................................................40

The Brazilian Deepwater "Pre-Salt" Discoveries .........................................40

The Start of OGX .....................................................................................40

OGX Wins Rights to 21 Exploratory Blocks ................................................41

OGX Raises Additional Capital – Initial Public Offering  ...............................42

The Fraudulent Misrepresentations Start ...................................................43

Technical Terminology – PRMS  .................................................................46

The First OGX "Oil Strike"  ........................................................................47

The Second OGX "Oil Strike".....................................................................50

OGX Strikes "Even More" Oil  ...................................................................51

The OSX Public Offering  ..........................................................................52

Promoting OGX in Miami  .........................................................................57

"Interest from the Chinese"  .....................................................................59

The 10.8 Billion Barrel Lie  .......................................................................62

D&M Secretly Protests  ............................................................................65

iv

Insiders Sell Their OGX Stock in Miami ..................................................................67

The Lies Continue – OGX "Cash Rich" .................................................................68

The Mubadala "Investment" ...................................................................................69

Keeping the Balls in the Air ...................................................................................72

"The Brazilian Dream" ...........................................................................................74

OGX Secretly Bankrupt ..........................................................................................76

The Exit Strategy ...................................................................................................78

**The Miami Asset Protection Lawyer** ...................................................................79

Banco Itaú Miami ..................................................................................................80

The Fake Billion Dollar "Put Option" ...................................................................83

**Section II – The Plaintiffs Invest** .......................................................................87

The EBX/BTG "Strategic Partnership" ..................................................................89

TAG Bank and Government Bribes .........................................................................93

The $850 Million "Investment" by Petronas ..........................................................94

Meridian Invests in More OGX Bonds ...................................................................96

Batista Secretly Cashes Out ...................................................................................97

Batista Makes Further Fraudulent Transfers .........................................................99

Mubadala Secretly Pulls Out ...............................................................................100

The 10.8 Billion Barrel Lie – Recap ....................................................................101

**Section III – The OGX Oil Bubble Bursts** .......................................................104

Batista's "Brazilian Dream" Turns to Nightmare ................................................106

Batista's Silver Lining ..........................................................................................107

The Plaintiffs' Claim ............................................................................................108

Cayman and Bahamas Proceedings ......................................................................108

**Count I – Fraud** .................................................................................................109

**Count II – Conspiracy to Defraud** ......................................................................110

**Count III – Aiding and Abetting Fraud** ..............................................................111

**Count IV – Florida Civil Remedies for Criminal Practices Act (f/k/a "Florida RICO")** ..111

    The Criminal Enterprise ...............................................................................112

    The Pattern of Criminal Activity ..................................................................112

    The Predicate Acts of Criminal Activity .....................................................112

    **Predicate Act I - Florida Securities Fraud** ................................................113

    **Predicate Act II - Federal Wire Fraud** ....................................................114

    **Predicate Act III - Federal Money Laundering** .......................................114

    **Predicate Act IV - Florida False Advertising** ..........................................115

    **Predicate Act V - Florida Theft** ...............................................................115

    **Predicate Act VI - Florida Communications Fraud** .................................115

    Civil Remedy ...............................................................................................116

**Count V – Florida Civil Remedies for Criminal Practices Act Conspiracy (f/k/a "Florida RICO Conspiracy")** ...........................................118

**Count VI – False and Misleading Advertising** ...................................................119

**Count VII – Conspiracy to Commit False and Misleading Advertising** .............120

**Count VIII – Civil Theft** .....................................................................................120

**Count IX – Conspiracy to Commit Theft** ...........................................................121

**Count X – Aiding and Abetting Theft** ................................................................122

**Count XI – Florida Uniform Fraudulent Transfer Act** .......................................123

    The Swiss Trust.............................................................................................124

    The Miami Trust ...........................................................................................125

The Banco Itaú Miami Transfers .......................................................................................126

**Count XII – Conspiracy to Commit Fraudulent Transfers** .................................................127

**Demand for Jury Trial** ...............................................................................................129

**Parties and Jurisdiction**

**Jurisdiction:**

1.      This is an action for actual damages in excess of $20 million and statutory damages in excess of $60 million dollars, and therefore far in excess of the minimal jurisdictional damages requirements of this Court.

2.      This is further an action for injunctive and other equitable relief and therefore further within the equitable jurisdiction of this Court.

**Plaintiffs:**

3.      Plaintiff, MERIDIAN TRUST COMPANY ("MERIDIAN"), is and was at all times material hereto, a trust company incorporated under the laws of Nevis and located in Nevis.

4.      MERIDIAN, as trustee, is and was at all material times the holder of legal title to the assets of a family trust fund termed "The Chrisly Trust" held and administered for the benefit of: (a) a very elderly, disabled beneficiary, now deceased, whose affairs were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by his son, a Miami-Dade County, Florida resident and; (b) his Florida family members. The investments at issue were made through the Plaintiff's Florida investment adviser, as agent.

5.      Plaintiff, AMERICAN ASSOCIATED GROUP, LTD. ("AMERICAN"), is and was at all times material hereto a corporation incorporated in the Cayman Islands which held investments on behalf of the same very elderly disabled individual, now deceased, and his Florida family, through the trust outlined above. The investments at issue were made through the same Florida investment adviser, as agent.

1

**Defendants:**

6.      Defendant, EIKE BATISTA ("EIKE BATISTA" or "BATISTA"), is and was at all times material hereto an individual who is resident in Brazil, doing business directly and through agents in Miami-Dade County, Florida.

7.      Defendant, ELIEZER BATISTA ("ELIEZER BATISTA" or "ELIEZER"), is and was at all times material hereto an individual who is resident in Brazil, the father of EIKE BATISTA, doing business directly and through agents in Miami-Dade County, Florida.

8.      Defendant, WERNER BATISTA ("WERNER BATISTA" or "WERNER"), is and was at all material times an individual who is resident in Palm Beach, Florida and the brother of EIKE BATISTA, doing business directly and through agents in Miami-Dade County, Florida.

9.      Defendant, THOR BATISTA ("THOR BATISTA" or "THOR"), is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA, doing business directly and through agents in Miami-Dade County, Florida.

10.     Defendant, PAULO MENDONÇA ("PAULO MENDONÇA" or "MENDONÇA"), is and was at all material times an individual who is resident in Brazil, doing business directly and through agents in Miami-Dade County, Florida.

11.     Defendant, FLAVIO GODINHO ("FLAVIO GODINHO" or "GODINHO"), is and was at all material times an individual resident in both Fisher Island, Florida and in Brazil, a Brazilian attorney and the long-time "right-hand man" of EIKE BATISTA, doing business directly and through agents in Miami-Dade County, Florida.

12.     Defendant, PAULO GOUVEA ("PAULO GOUVEA" or "GOUVEA"), is and was at all material times an individual resident in Brazil, doing business directly and through agents in Miami-Dade County, Florida.

2

13.     Defendant, MARCUS BERTO ("MARCUS BERTO" or "BERTO"), is and was at all material times a resident of Key Biscayne, Florida, doing business directly and through agents in Miami-Dade County, Florida.

14.     Defendant, LUIZ CARNEIRO ("LUIZ CARNEIRO" or "CARNEIRO"), is and was at all material times an individual resident in Brazil, doing business directly and through agents in Miami-Dade County, Florida.

15.     Defendant, AZIZ BEN AMMAR ("AZIZ BEN AMMAR" or "BEN AMMAR"), is and was at all material times a resident of New York, doing business directly and through agents in Miami-Dade County, Florida.

16.     Defendant, ERICK MAGNO ("MAGNO"), is and was at all material times a resident of Miami, Florida, doing business directly and through agents in Miami-Dade County, Florida.

17.     Defendant, ERICK MAGNO, PL ("MAGNO PL"), is and was at all material times a Miami, Florida professional limited liability services company, resident in Florida, owned and controlled by MAGNO, and doing business directly and through agents in Miami-Dade County, Florida.

18.     Defendant, BANCO ITAÚ INTERNATIONAL ("BANCO ITAÚ MIAMI"), also known under the trade name "Itaú Private Bank," is and was at all material times an Edge Act corporation created under the laws of the United States and regulated by the Federal Reserve Bank of Atlanta, providing services as a "private bank," with its principal place of business in Miami, Florida.

19.     Defendant, EFG CAPITAL INTERNATIONAL CORP., d/b/a "EFG CAPITAL" ("EFG MIAMI"), is and was at all material times, a Delaware corporation, authorized to transact

3

business in the State of Florida, with its principal place of business in Miami, Florida, where it provides private banking services.

20.     Defendant, EFG BANK AG ("EFG SWITZERLAND") is a Swiss banking corporation with its principal place of business in Zurich, Switzerland, doing business directly and through its affiliate and agent, EFG MIAMI, in Miami-Dade County, Florida.

21.     Defendant, 63X INVESTMENTS LTD. ("63X INVESTMENTS"), is and was at material times a corporation organized under the laws of the Cayman Islands, doing business directly and through agents in Miami-Dade County, Florida.

22.     Defendant, 63X MASTER FUND, LTD. ("63X MASTER FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands, doing business directly and through agents in Miami-Dade County, Florida.

23.     Defendant, 63X FUND ("63X FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands (with the two companies above sometimes referred to collectively as "the 63X Companies"), doing business directly and through agents in Miami-Dade County, Florida.

24.     Defendant, CENTENNIAL ASSET MINING FUND, LLC ("CENTENNIAL NEVADA"), is and was at material times a limited liability company organized under the laws of Nevada, doing business directly and through agents in Miami-Dade County, Florida.

25.     Defendant, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC ("CENTENNIAL DELAWARE") is and was at material times a limited liability company organized under the laws of Delaware, doing business directly and through agents in Miami-Dade County, Florida.

26.     Defendant, CENTENNIAL ASSET LTD. ("CENTENNIAL BVI") is and was at material times a limited liability company organized under the laws of the British Virgin Islands

(with the companies referred to immediately above, sometimes referred to collectively as "the CENTENNIAL Companies"), doing business directly and through agents in Miami-Dade County, Florida.

27.    Defendant, WRM1 LLC ("WRM DELAWARE 1"), is and was at material times a limited liability company organized under the laws of Delaware, doing business directly and through agents in Miami-Dade County, Florida.

28.    Defendant, WRM2 LLC ("WRM DELAWARE 2"), is and was at material times a limited liability company organized under the laws of Delaware, doing business directly and through agents in Miami-Dade County, Florida.

29.    Defendant, 3BX INVESTMENTS, LLC, ("3BX DELAWARE") is and was at material times a limited liability company organized under the laws of Delaware, doing business directly and through agents in Miami-Dade County, Florida.

30.    Defendant, 3BX INVESTMENT FUND I, LLC ("3BX NEVADA"), is and was at material times a limited liability company organized under the laws of Nevada, doing business directly and through agents in Miami-Dade County, Florida.

31.    Defendant, AUX LUXEMBOURG SARL ("AUX LUXEMBOURG"), is and was at material times a limited liability company organized under the laws of Luxembourg, doing business directly and through agents in Miami-Dade County, Florida.

32.    Defendant, AUX LLC ("AUX DELAWARE"), is and was at material times a limited liability company organized under the laws of Delaware, doing business directly and through agents in Miami-Dade County, Florida.

33.    Defendant, OLIN BATISTA, is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA, doing business directly and through agents in Miami-Dade County, Florida.

34.     Defendant, FLAVIA SAMPAIO, is and was at all material times an individual who is resident in Brazil, the girlfriend of EIKE BATISTA, and the mother of his minor son, Balder Batista, doing business directly and through agents in Miami-Dade County, Florida.

35.     Defendant, LUMA DE OLIVEIRA, is and was at all material times an individual who is resident in Brazil, the ex-wife of EIKE BATISTA, and the mother of his adult sons, the Defendants, THOR BATISTA and OLIN BATISTA, doing business directly and through agents in Miami-Dade County, Florida.

**Personal Jurisdiction in Florida:**

36.     Defendants, WERNER BATISTA, MARCUS BERTO, FLAVIO GODINHO and ERICK MAGNO are ordinarily residents in Florida and are therefore subject to the general jurisdiction of its Courts.

37.     Defendant, BANCO ITAÚ MIAMI is a U.S. Edge Act bank chartered in the U.S. and regulated by the Federal Reserve Bank of Atlanta with its principal places of business in Miami, Florida and is therefore subject to the general jurisdiction of this Court.

38.     Defendant, EFG MIAMI, is chartered in Delaware and authorized to do business in Florida, with its princiupal place of business in Miami-Dade County, Florida and is therefore subject to the general jurisdiction of this Court.

39.     Further, Defendant, EFG SWITZERLAND uses its affiliate EFG MIAMI, on Brickell Avenue, Miami, Florida, as its agent to sign up clients for its Swiss banking services and therefore has, in truth and in fact, a place of business in Miami-Dade County, Florida and is subject to the general jurisdiction of this Court.

40.     Further, every Defendant is subject to the general jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(2) as having engaged in substantial and not isolated activity

within this State, both individually and directly and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

41.    Each Defendant is subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(1) as having operated, conducted, engaged in or carried on a business or business venture in this state, or having an agency in this state, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

42.    This is an action brought in connection with that business. Brazil is not a party to the Hague Service Convention. The non-resident Defendants may therefore be served through the Florida Secretary of State pursuant to Fla. Stat. § 48.181(1) with notice of service given by certified or registered mail pursuant to Fla. Stat. § 48.161(1).

43.    Each Defendant is further subject to the specific jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(1)(a)(2) as having committed tortious acts within this State, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

44.    As a result of each of their individual and direct actions and further as a result of the actions of their agents and co-conspirators which are imputed to each of them, all Defendants have sufficient minimum contacts with this State that haling them before the courts of this State would not offend Constitutional due process requirements.

**The Fraudulent Scheme – Overview:**

45.    EIKE BATISTA is a scion of the hugely wealthy, politically tied-in Batista clan in Rio de Janeiro, Brazil. His father ELIEZER BATISTA, was a past Minister of Mining and Energy and past CEO of the massive Vale mineral exploration conglomerate in Brazil, through which he made the family fortune.

46.     Between 2008 and 2013 BATISTA and his father, ELIEZER, his brother, WERNER, and other co-conspirators and accomplices in the EBX Group, described below, raised close to $10 billion dollars from investors in stocks and bonds, overwhelmingly in the U.S., on the basis of an international press campaign barraging the international investing public with false promises of a trillion dollars of recoverable oil off the coast of Brazil pursuant to drilling leases from the Brazilian government owned by BATISTA's oil exploration company, EBX Group member, OGX.

47.     The principal target for these fraudulent misrepresentations were investors across the United States. Accordingly, the American Depository Receipts or "ADRs" - a way of trading foreign stocks in the U.S. - were listed in New York and the bond trustee was, likewise, in New York. The lies were promulgated in English via the OGX standing website, via English language interviews to U.S. financial reporters and analysts such as Bloomberg,[1] via English language interviews to American TV reporters which were broadcast by TV stations in the U.S., by pitches made directly to investors, face-to-face, in the U.S., and via OGX financial results, earnings presentations, management reports and quarterly earnings calls, which were all in English.

48.     BATISTA and his co-conspirators and accomplices had OGX commission huge multimillion-dollar oil production platforms – tanker vessels equipped with drill rigs – from his satellite ship-building company, and EBX Group member, OSX, which he paid for with investor money. He trumpeted plans for a satellite port city in Brazil to be run by his logistics company,

---

[1] "Bloomberg" refers to the New York-based financial software, data, and media company which provides the international investment industry with financial software tools and news through the Bloomberg Terminal (via its Bloomberg Professional Service), wire service (Bloomberg News), global TV network (Bloomberg Television), websites, radio station [WBBR], newsletters and magazines. (*Bloomberg Businessweek*, *Bloomberg Markets* and *Bloomberg Pursuit*.)

and EBX Group member, LLX, that would blossom as the tankers offloaded a "trillion dollars" of oil.[2]

49.     But all the vast production and transport paraphernalia was just window dressing. As BATISTA and his co-conspirators and accomplices knew, there was in fact virtually no recoverable oil, no need for the massive production machinery to pump and transport it, and no need for a dedicated port to offload it.

50.     The core business, the OGX oil business, was actually an abysmal failure. It stayed alive only as long as there was an inflow of fresh capital from duped investors and lenders and as long as BATISTA and his co-conspirators and accomplices could maintain the illusion of a huge eventual payoff.

51.     Start to finish, from 2012 to 2017, the OGX venture discovered and pumped approximately 19.7 million barrels of oil. That was the equivalent of only *fourteen days* of production at its promised target rate of 1.4 million barrels per day.

52.     Necessarily, all the billions of dollars that BATISTA and his co-conspirators and accomplices took and kept for theirselves was skimmed off the top of what came in from investor contributions, leaving an ever-deepening chasm of debt beneath.

53.     The exit strategy was for the EBX Group co-conspirators to sell whatever stock and assets they could, trust to local corruption to safeguard the wealth trapped within Brazil, and trust to the complicity of professional co-conspirators, accomplices, bankers, and bribed politicians, to hide the vast mass of their takings safely abroad in solid investments or secret bank accounts,

---

[2] As part of building his brand, BATISTA typically dubbed his companies by a pair of initials that described the core business, followed by an "X," the multiplication sign, indicating burgeoning wealth. Thus, for instance, "OG" stood for "Oil and Gas." "OS" was "Offshore Services." "EB," BATISTA's initials, and "63," his lucky number (he is notoriously superstitious) indicated personal wealth-holding companies.

where toothless local Brazilian government processes and their victims, they hoped, would be unable to touch them.

54.     By the start of 2013, through thousands of fraudulent misrepresentations spanning the years since 2009, BATISTA and his co-conspirators and accomplices had built an impression in the minds of money managers and investors across the United States and worldwide, that OGX was sitting on enormous reserves of recoverable oil, when in reality there was virtually none.

55.     These accumulated fraudulent misrepresentations were at all times available to financial analysts in 2013. No BATISTA co-conspirator or accomplice took any steps to correct that fraudulently-created belief then or at any time after.

56.     In 2013, OGX bonds were returning high yields. The unchallenged, oft-repeated public boast by BATISTA and his co-conspirators and accomplices was that there was a "trillion dollars of oil" in the ground. The only real concern to investors in OGX bonds was whether the company was sufficiently capitalized to bring that oil into production.

57.     To reassure investors, BATISTA and his co-conspirators and accomplices, via further fraudulent misrepresentations in the course of 2013, detailed below, created an illusion of great interest by sophisticated oil industry players in buying stakes in OGX, and an illusion of deep financial resources, ultimately backed by BATISTA's personal pledge through the "Put Option" (also detailed below) to inject a billion dollars into OGX, personally through his EBX company CENTENNIAL NEVADA, if and when needed. For good measure, BATISTA pledged a further billion dollars to capitalize OSX, also if and when needed.

58.     On the basis of these fraudulent misrepresentations, the Plaintiffs invested in OGX bonds in the course of 2013.

59.     In October 2013, when BATISTA and his co-conspirators and accomplices had secretly cashed out the last of their stakes – and when the wealth had been secreted in the names

10

of BATISTA's various willing family members, joined as Defendants here, or under Miami trusts held by the Miami trustees, BERTO and MAGNO, or in shell companies and bank accounts outside Brazil, in Miami, Florida, and around the world – BATISTA reneged on that billion dollar pledge and OGX declared bankruptcy, swiftly followed by the bankruptcy of the satellite EBX Group companies OSX and MMX.

60.     Even after the bankruptcy of OGX – with BATISTA and his father ELIEZER still at the helm of the reorganizing company (now dubbed "OGPar") – BATISTA continued to secretly loot the corpse, for instance by having one of the 63X Companies send $15 million from its Cayman account to the trust account of MAGNO in Miami, where MAGNO, "as trustee," fronted a DIP loan to OGPar on behalf of unnamed beneficiaries at effectively 120% interest. The loan was repaid in full months later, plus $3 million interest.  The truth behind this, and other similar transactions, was not disclosed to investors in the reorganization.

61.     The fraudulent scheme depended, overwhelmingly, on defrauding North Americans. Something like 70% of all the money came from United States investors. Most of the rest came from Europe. Less than 10% came from Latin America as a whole. Brazilian investment was minimal. So, the U.S. was where the lies were directed and had their major impact, where the vast majority of the victims are and where the vast majority of the losses were suffered. Brazil was notionally where the assets were. But the fraud was overwhelmingly an American fraud, perpetrated on Americans.

62.     Between the OGX and OSX public offerings, Batista raised $9.8 billion on this scam, most of which was lost. The massive investment houses, Pimco from California and BlackRock from New York, lost billions of dollars apiece. American government employee pension plans across the U.S.A. lost, collectively, hundreds of millions – perhaps billions – of dollars through investments made by their pension plan trustees.

63.     Thus, the Florida Retirement System Trust Fund lost $24 million.[3] The California Public Employees' Retirement System lost $26 million. Other State and local funds across the U.S.A., from Alaska, Connecticut, Fresno, Idaho, Illinois, Indiana, Iowa, Louisiana, Michigan, Missouri, New Hampshire, New Jersey, New Mexico, the City of New York, Ohio, Oregon, Pennsylvania, San Diego, Texas, and West Virginia, invested in this scam and took a bath. The current Plaintiffs alone lost in excess of $20 million.

64.     BATISTA and his co-conspirators and accomplices gambled that they could make immense amounts of money with no real comebacks. For the most part that is how it has worked out. BATISTA and a few others were eventually criminally indicted in Brazil for insider trading, stock manipulation and market fraud. What was probably unanticipated was that Brazil would finally start to take baby steps to tackle its endemic corruption problem. As part of the fall-out from the "Lava-Jato" corruption probe, BATISTA, GODINHO and CARNEIRO were eventually indicted on corruption and bribery charges involving government officials.

65.     However, in Brazil's glacially slow, toothless, corrupt legal system, it is highly unlikely that there will eventually be any serious consequences for any of them. BATISTA was released from preventative detention in jail to "house arrest" at his palatial domestic compound on the unilateral order of a willing Brazilian Supreme Court justice – who is married to BATISTA's attorney's law partner. In doing so, he overruled the lower courts and refused to recuse himself, ignoring the protests of the prosecutor, the Attorney General and the rest of the Supreme Court as to the glaring conflict of interest.

---

[3] The Florida Retirement System Trust Fund is an approximately $150 billion pension fund that pays retirement benefits for over a million state, county, school system and higher-education teachers and other employees, managed by the Florida State Board of Administration of which the trustees are Florida Governor, Richard Scott, Florida Chief Financial Officer, Jeffrey Atwater, and Florida Attorney General, Pamela Bondi.

66.     BATISTA and his family still wield great social, political and financial clout in Brazil, and BATISTA and GODINHO, reportedly, anticipate that they will be able to plea-bargain for minimal penalties in exchange for fingering other corrupt government officials.

67.     Millions of dollars of the domestic Brazilian assets that BATISTA had stashed at the last minute in the names of his willing family members in anticipation of the collapse were frozen on his home turf, in Rio de Janeiro. But, all in all, apart from what are, in the scheme of things, survivable inconveniences, with most of the wealth that he and his co-conspirators and accomplices garnered from the scheme stashed in Florida and elsewhere abroad, the fraud has been a complete success.

**Organizational Layout of the Complaint:**

68.     The allegations are divided into three sections. The first – "**Section I - Inflating the OGX Oil Bubble" -** covers the period from 2009 through early 2013, during which, as the cumulative effect of a series of fraudulent misrepresentations, BATISTA and his co-conspirators and accomplices in the EBX Group built a belief in the minds of American and other foreign investors that OGX was sitting on massive reserves of recoverable oil when there was in fact virtually none. This was the foundational, accepted understanding by financial analysts and investors of OGX's assets and likely profitability at the time that the Plaintiffs made their investments in OGX bonds through their Florida investment adviser in 2013.

69.     The continuing fraudulent misrepresentations and how they induced the successive purchases of more than $21 million in OGX bonds by their Florida investment adviser on Plaintiffs' behalf during 2013 is covered in "**Section II - The Plaintiffs Invest."**

70.     The account of the collapse of the whole house of cards in late 2013 and the continuing efforts to move funds out of the reach of creditors is detailed in "**Section III - The OGX Oil Bubble Bursts."**

## Section I - Inflating the OGX Oil Bubble

### The Roles played by the Defendants

### The EBX Group - Overview:

71.     OGX was part of what BATISTA and his accomplices and co-conspirators termed "Groupo EBX," or "the EBX Group." This was not a formal separate entity, legally, but an informal designation to cover a growing roster of companies under the same financial umbrella whose success ultimately depended on the success of OGX. It was therefore in the nature of a joint venture and - as the fraudulent misrepresentations began to be generated in 2008 - a conspiracy between a number of companies and the individuals who controlled them.

72.     One set of members of the EBX Group were public operating companies. These included OGX (oil exploration), OSX (oil platform construction and oil transport and processing), LLX (port logistics and operation), MMX, (minerals and mining), MPX (thermo-electric power generation) and CCX (coal mining in Colombia). There were also privately held operating companies, AUX (gold mining) and REX (real estate). Theses are sometimes referred to as the "operating companies."

73.     Some of the various logos under which fraudulent misrepresentations were generated are shown below, with each of the company logos also noting membership in the EBX Group.

14



74.     Behind the public operating companies, there were a number of private, wealth-management companies which directly and indirectly, through layers of holding companies, held the shares in and exercised control over the operating companies. These all led up to BATISTA at the top and included the three 63X Companies, the CENTENNIAL Companies, the WRM Companies, the 3BX Companies and the AUX Companies, as well as various other EBX companies such as EBX Holding Ltda., EBX Brasil S.A. and EBX Investimentos Ltda. (Sometimes referred to as the "wealth-management companies").

75.     On a formal level, there were extensive interlocking directorships between the public operating companies and the private wealth-management companies, as is further described below. On a pragmatic level there were no barriers to information flow between the top executives and directors and other individuals who ran the various public and private companies.[4] As family members and close friends and confidants, there was a keen mutual understanding between the

---

[4] Moreover, many of the companies' were headquareterd in the same office building and often entered into contracts with each other to share administrative costs. For example, OGX and EBX Investimentos Ltda. had a long-term contract to share millions of dollars in quarterly administrative costs.

individuals that the fortunes of the companies in the group, and their own personal fortunes, depended on the wealth generated by OGX and its satellite companies.

76.     Accordingly, the decisions as to whether to generate fraudulent misrepresentations or to withhold relevant information, constituting fraudulent misrepresentations by omission, was a collective, collaborative effort in which all such individuals took part. For the scheme to work, all had to toe the line and back up the active fraudulent misrepresentations. If a single member disclosed what he knew, all would fail.

77.     There were formal board memberships taken by the various individual co-conspirators in various companies in the EBX Group and the membership positions were frequently announced publicly. For example, a press release in May 2010 – which, translated into English, stated "Notice of Clarification by the Directors of the Companies of the EBX Group" – listed GODINHO, GOUVEA and WERNER BATISTA as directors of EBX Investimentos, Ltda.; MENDONÇA as a director of OGX; and CARNEIRO as a director of OSX. The top and bottom of that press release is shown here:

# NOTA DE ESCLARECIMENTO DOS DIRETORES DAS COMPANHIAS DO GRUPO EBX

| EBX Investimentos Ltda. | OGX Petróleo e Gás Participações S.A. | MPX Energia S.A. | MMX Mineração e Metálicos S.A. | LLX Logística S.A. | OSX Brasil S.A. |
|---|---|---|---|---|---|
| Flavio Godinho | Paulo Mendonça | Eduardo Karrer | Roger Downey | Otavio Lazcano | Luiz Carneiro |
| Paulo Gouvea | Marcelo Torres | Rudolph Ihns | Luis Eduardo Fischman | Leonardo Gadelha | Roberto Monteiro |
| Luiz Arthur Correia | Reinaldo Belotti | Xisto Vieira Filho | Chequer Bou Habib | Luis Osório de Castro | Eduardo Musa |
| Leonardo Moretzsohn | José Roberto | Paulo Monteiro | | José Salomão Fadlalah | Luciano Porto |
| Werner Batista | Faveret Cavalcanti | Marcus Temke | | Claudio Lampert | |
| Lars Batista | | Bruno Chevalier | | | |
| Luiz Figueiredo | | | | | |

78.     But membership in what was termed the EBX Group was fluid, both at the corporate and the board level, and fluctuated widely over time. Whether the publicly stated formal memberships were accurate at any particular time will need to await discovery, as much about the EBX Group was made up by the participants to suit their purpose at any particular time and many documents cannot be taken at face value.

79.     However, the *de facto* managing agents who controlled the companies in the EBX Group stayed constant. They were, from the inception of the fraud, onwards, EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA and LUIZ CARNEIRO. From at least late 2012, onwards, the group included THOR BATISTA, MARCUS BERTO and AZIZ BEN AMMAR.

80.     The fraudulent misrepresentations generated between 2008 and 2013, as are detailed below, were therefore all generated with the knowledge, approval participation and consent of the controlling individual Defendants of the companies in the EBX Group. These were, as noted immediately above, from 2008 onwards, EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA and LUIZ CARNEIRO. From late 2012, onwards, the group included THOR BATISTA, MARCUS BERTO and AZIZ BEN AMMAR. More detail on the individuals follows:

### The Individual Co-Conspirators and Accomplices

**Eike Batista:**

81.     BATISTA was the prime mover in the EBX Group of companies and in the fraudulent scheme. At all material times, he was the controlling shareholder and top managing agent of all members of the EBX Group, both the public operating companies and the private wealth-management companies, through whose financial dealings and routing of money he accomplished the objective of the fraud.

82.     BATISTA also paid the Miami trustees, MARCUS BERTO and ERICK MAGNO, who agreed to act as legal owners of many tens of millions of dollars that he siphoned off out of the operating companies, and routed through the wealth-management companies, for them to act as "fronts" or "blinds" to provide anonymity for money movement from abroad, into Florida, and ultimately out again, while he and his family members and accomplices retained full equitable ownership and control behind the scenes.

83.     Through his control position in OGX and as the overall head of the EBX Group, BATISTA directly disseminated, ordered, or knowingly permitted the thousands of fraudulent communications, of which only a fraction are described below, constituting a colossal barrage of hype, inducing investors to contribute money to his enterprise in the expectation of gain.

84.     Through his control positions in all the Defendant companies, BATISTA appointed directors and managers who acted as his agents and who were his co-conspirators and accomplices in accomplishing the fraudulent scheme.

85.     References to BATISTA, OGX, the EBX Group or others having "made," "stated," "published," "announced" and the like as to the fraudulent misrepresentations described below refer to the fact that BATISTA either directly made, or ordered or knowingly permitted to be made such fraudulent communications through accomplices and co-conspirators.

86.     It is not known how much money BATISTA made off the scheme, but at the bottom end of the range it is believed to be in the many hundreds of millions of dollars and at the top end, possibly billions. He is presently under indictment in Brazil stemming from an investigation into government bribery by the EBX Group of companies, dubbed the "The X-Files."

87.     BATISTA had numerous individual co-conspirators and accomplices within the EBX Group, who conspired with him and aided and abetted him in effectuating his scheme. Some OGX directors and officers, such as the top oil engineer MENDONÇA who generated

18

misrepresentations from the early days in 2009 onwards, knew about the scheme from its inception.

88.     Similarly, trusted advisers such as his father, ELIEZER BATISTA, his brother, WERNER BATISTA, his right-hand-man for three decades, GODINHO, his close confidants, GOUVEA, MENDONÇA and CARNEIRO, upon information and belief, knew of the fraud and also participated in the generation of fraudulent misrepresentations from the early days.

89.     But all of BATISTA's confidants, co-conspirators and accomplices and all of the board members of OGX and the other companies in the EBX Group were, by some time in 2011, or by at the latest during 2012, privy to the fact that the core oil exploration company, OGX, on which the success of all largely depended, was actually insolvent. This included THOR BATISTA, MARCUS BERTO and AZIZ BEN AMMAR.

90.     Indeed, when BERTO and BEN AMMAR accepted their board position in EBX Group Companies in late 2012, they did so with full knowledge of the fact that OGX was worthless, and accepted their positions specifically to help monetize BATISTA's and his accomplices' interests in OGX and its satellite companies before the crash in October 2013. They willingly played along with the plan and failed to disclose the insolvency of OGX, on which the success of the group depended, to the investing public.

91.     Further, since corporations act through their human agents, references to OGX, the companies in the EBX Group, and other companies having "made," "stated," "published," "announced" and the like as to the fraudulent misrepresentations described below refer to the fact that the formal and *de facto* board members of the respective companies at the time of the communication in question approved of such actions and either agreed that such misrepresentations should be made, or permitted them to be made and by their silence committed fraudulent misrepresentations by omission.

19

92.     All such directors and insiders failed to tell investors the truth and allowed the barrage of baselessly optimistic, fraudulent hype to continue, in order to continue looting the companies and making money from their salaries and the sale of the stock and corporate assets. Only a few of these have been joined as Defendants.  These are as follows:

**Eliezer Batista:**

93.     Defendant ELIEZER BATISTA, EIKE BATISTA's father, was a board member of OGX from its early days, in 2007, through the end, and into the reorganized entity OGPar until 2014. He was also on the board of MMX from 2005 to 2014; OSX from 2009 to 2014; LLX from 2007 to 2013 as well as on the boards of MPX, CCX and various other EBX companies including EBX Brasil S.A. He served as honorary chairman of MMX and vice chairman for MPX and CCX.

94.     Defendant ELIEZER BATISTA is and was at all material times, a formal and *de facto* managing agent, co-conspirator and accomplice in the EBX Group. The fraudulent misrepresentations generated between 2008 and 2013, as are detailed below, were generated with his knowledge, approval, participation and consent.

**Werner Batista:**

95.     Defendant WERNER BATISTA was a director of OSX from its inception in Fall 2009. He served as director of EBX Holding Ltda. from September 2009 until December 2013, even after the crash of OGX, OSX and MMX, and also served as a director of other EBX Group companies including EBX Brasil S.A. and EBX Investimentos Ltda. from 2009 onwards. He was publicly described as the "Managing Director of the EBX Group" and would appear at conferences and chamber of commerce meetings in the United States and Canada, billed in this capacity.

96.     WERNER BATISTA was, at all material times, a formal and *de facto* managing agent, co-conspirator and accomplice in the EBX Group. The fraudulent misrepresentations generated between 2008 and 2013, as are detailed below, were generated with his knowledge,

20

approval, participation and consent.

97.    WERNER BATISTA is and was at all material times a Florida resident and has invested part of his profits from the fraudulent scheme into Florida real estate and a Florida business.

**Thor Batista:**

98.    Defendant THOR BATISTA is the eldest son of EIKE BATISTA. Upon information and belief, during the final two years leading up to the collapse of OGX and the satellite companies, his father introduced him to the fact that the business was heading for certain failure and unless he wished to give up his life of luxury - which had hitherto included being able to fly from Rio to Miami, Florida, by private jet for his routine shopping - he should assist him in sheltering proceeds of the fraud in offshore companies and foreign bank accounts, to which his son agreed.

99.    To this end, in or about April 2012, THOR BATISTA, joined the board of EBX Brasil S.A., a member of the EBX Group, under the tutelage of GODINHO to learn the state of the family business and to that end he also attended board meetings of the operating companies.

100.    THOR BATISTA agreed with his father to shelter hundreds of millions of dollars in his own name and in the name of foreign shell companies, including Thorque1 Fund Ltd., and Thorque Investment Management Ltd. in The Bahamas and in accounts under various names at BANCO ITAÚ MIAMI and at other banks in Miami and abroad to which he and his father and their co-conspirators routed many hundreds of millions of dollars in proceeds from the scheme during 2012 and thereafter.

101.    THOR BATISTA was, from 2012 onward, a formal and *de facto* managing agent, co-conspirator, and accomplice in the EBX Group.

**Paulo Mendonça:**

102.     Before joining OGX, Defendant PAULO MENDONÇA had been the chief geologist at Petrobras (the massive Brazilian state run oil company) for 34 years, throughout its successful exploratory campaign. As such, he enjoyed a respected position in the industry. As BATISTA's supposed "Dr. Oil," MENDONÇA was constantly touted to the press and to the investing public in the U.S. and world-wide as the head of a supposed "Dream Team" of oil industry experts who would find oil where none had been found before.

103.     Given MENDONÇA's background and reputation in the oil industry, his pronouncements on recoverable oil volumes were regarded as reliable and his imprimatur was seen as a solid assurance of the probity of the company's predictions.

104.     However, BATISTA had incentivized MENDONÇA with a big block of OGX stock to use his name for their mutual profit in hyping the promise of OGX's exploratory wells which was contrary to industry practice.

105.     In his position as a board member and top executive in OGX, as detailed below, MENDONÇA created and published numerous fraudulent public announcements of supposed massive "discoveries" of oil while disposing of his own OGX shares at consequently inflated prices for many tens of millions of dollars, and enabling the rest of the group to take and squirrel away many hundreds of millions or even billions of dollars as their own proceeds of the scheme.

106.     MENDONÇA was elected as a director of OGX while it was being formed in September 2007. He was elected General Executive Officer of OGX in April 2009 and served in that capacity until June 2012. He also served as a director of OSX from January 2010 through September, 2012. During 2012 he took on the role of "Special Advisor to the Chairman of the EBX Group," BATISTA.

107.     MENDONÇA was, at all material times, a formal and *de facto* managing agent, co-conspirator and accomplice in the EBX Group. The fraudulent misrepresentations generated between 2008 and 2013, as are detailed below, were generated with his knowledge, approval, participation and consent.

**Flavio Godinho:**

108.     Defendant, FLAVIO GODINHO, is a Brazilian lawyer and has been a close, long-time confidant of BATISTA's since the 1980's.

109.     Over three decades, GODINHO has served in an array of capacities in BATISTA's companies, was regarded as his "Right Hand Man" and helped create the corporate structures. GODINHO further helped form OGX and OSX, serving as President and director at their inception, and was one of the earliest shareholders of those companies.

110.     GODINHO served as a director of nearly all of the EBX Group companies, including OSX from 2009 to 2013; MMX from 2006 to 2009; and LLX from 2009 to 2013, as well as MPX and CCX. From 2010 to 2013, he served as the Brazilian representative for foreign board members of OGX, OSX, LLX, MMX and MPX.

111.     In addition, GODINHO was at one time or another a director and shareholder of Defendants, WRM DELAWARE 1 and WRM DELAWARE 2; a director of Defendants, 3BX DELAWARE and 3BX NEVADA; a director and beneficial owner of Defendant, CENTENNIAL NEVADA; a director and Vice President of Defendant CENTENNIAL BVI; Chairman and Chief Executive Officer of EBX Brasil S.A.; and General Counsel, Corporate Development Officer and a member of the Executive Board of the EBX Group and its private subsidiaries.

112.     Through his top positions in BATISTA's companies and as a close friend, confidant and legal adviser, GODINHO was aware of the material developments in the scheme and conspired with and counseled BATISTA and their co-conspirators in how to achieve its success, including,

23

upon information and belief, the movement of procceeds of the fraud through complex offshore structures, and the bribery of government ministers in order to secure an economic advantage.

113.    He was, at all material times, a formal and *de facto* managing agent, co-conspirator and accomplice in the EBX Group. The fraudulent misrepresentations generated between 2008 and 2013, as are detailed below, were generated with his knowledge, approval, participation and consent.

114.    GODINHO is believed to have made over R$200 million from the scheme and fled Rio de Janeiro for his home in Fisher Island, Florida, in the wake of the OGX collapse. He is presently under indictment in Brazil stemming from an investigation into government bribery by BATISTA's companies, dubbed the "The X-Files."

**Paulo Gouvea:**

115.    Defendant PAULO GOUVEA, like GODHINO, is a lawyer admitted in Brazil only, and is a long term confidant of BATISTA who served on the Board of OGX and as head of corporate finance in the EBX Group of companies, who conspired with and assisted BATISTA and the others in achieving the objectives of the fraudulent scheme.

116.    GOUVEA, at one time or another, served as director of various EBX Group entities, including OGX, MPX, LLX, CCX and OSX. He was also General Counsel and Secretary of MMX, and secretary of OGX at its inception. Likewise, he served as head of Corporate Finance and Investor Relations for the EBX Group.

117.    GOUVEA was also at one time or another a director and shareholder of Defendants WRM DELAWARE 1 and WRM DELAWARE 2; a director of Defendants 3BX DELAWARE and 3BX NEVADA; a director and beneficial owner of Defendant, CENTENNIAL NEVADA; and director and Secretary of Defendant CENTENNIAL BVI.

118.    GOUVEA is believed to have reaped in excess of R$150 million from the fraud. Through his subsequent position as a partner in, and Director of Capital Markets at, Brazil's biggest brokerage house, XP Investimentos, he continued to do business in Florida through its Miami, Florida, office.

119.    GOUVEA was, at all material times, a formal and *de facto* managing agent, co-conspirator and accomplice in the EBX Group. The fraudulent misrepresentations generated between 2008 and 2013, as are detailed below, were generated with his knowledge, approval, participation and consent.

**Marcus Berto:**

120.    Defendant, MARCUS BERTO, was a long-standing BATISTA confidant who was, in December 2012, appointed CEO and Investor Relations Officer of EBX Group member LLX, BATISTA's allied port-logistics company, to help secretly sell off the company ahead of the crash of OGX.

121.    BERTO knew that OGX was insolvent by the end of 2012 and conspired with BATISTA and the other co-conspirators in the EBX Group to sell off LLX without disclosing the dire straits of the port's anchor tenant. This he managed to do, and was fined by the Brazilian regulators for having failed to make timely disclosure of the deal.

122.    MARCUS BERTO also helped set up the BATISTA family trust in Miami through MAGNO (as detailed below) to assist in funneling tens of millions of dollars of BATISTA's personal wealth out from Florida to Switzerland and acted as its trustee.

123.    After OGX collapsed, BERTO left Rio de Janeiro for Key Biscayne, Florida, where he is believed to have invested part of the proceeds he realized from his part in the fraud, which was at least $10 million, in a $9.5 million mansion.

124.     BERTO was, at all material times from late 2012 onwards, a formal and *de facto* managing agent, co-conspirator and accomplice in the EBX Group. The fraudulent misrepresentations generated between late 2012 and 2013, as are detailed below, were generated with his knowledge, approval, participation and consent.

**Luiz Carneiro:**

125.     Defendant LUIZ CARNEIRO joined the EBX Group after 30 years of experience in the oil industry, serving on several high-level positions in Petrobras with a background in mechanical and petroleum engineering.

126.     CARNEIRO served as Chief Executive Officer of OSX from 2009 to 2012. In April 2012, he was appointed to concurrently occupy the positions of interim CFO and Investor Relations Officer of OSX. He stepped down as CEO of OSX in June 2012 to become CEO of OGX, in which position he served from June 2012 through October 15, 2013.

127.     CARNEIRO also served as a director of OGX from September 2010 to August 2012. Then again, in September 2013, he agreed to help fill out the OGX board following the resignation of five board members who were unwilling to continue.

128.     Upon information and belief, in his position as head of OSX, CARNEIRO handled the bribery of government officials, which included the payment of a $2.3 million bribe to Brazil's Finance Minister, Guido Mantega, Chairman of the government-run oil behemoth, Petrobras, to secure in excess of $922 million in shipbuilding contracts, for which there was no actual commercial demand, in order to continue the illusion that OSX was a viable entity. The contracted vessels were not completed by the time of the OSX bankruptcy in October 2013.

129.     CARNEIRO was a close confidant of BATISTA and conspired with him and assisted him in achieving the objectives of the fraudulent scheme. He was, at all material times, a formal and *de facto* managing agent, co-conspirator and accomplice in the EBX Group. The

26

fraudulent misrepresentations generated between 2008 and 2013, as are detailed below, were generated with his knowledge, approval, participation and consent.

**Aziz Ben Ammar:**

130.    The Defendant, AZIZ BEN AMMAR, was a New York resident who BATISTA had done business with through his participation in an EBX Group company, NRX-Newrest. He was recruited by BATISTA as a board member of OGX and satellite companies in mid-2012, in order to help keep the balls in the air as long as possible, for BATISTA and the others to get their stakes monetized and out of Brazil before the crash.

131.    During 2012, BEN AMMAR was elected to the boards of OGX, LLX, OSX, CCX, MMX and MMX by a cadre of unsuspecting victims, including a number of American retirement funds who had bought shares or bonds in BATISTA's companies on the basis of his fraudulent promises, among them the Florida Retirement System Trust Fund.

132.    BEN AMMAR was intimately involved in generating stories for the press during 2013, regarding the supposed massive capitalization of OGX and the fact that it was impossible for it to fail. He was a prime architect of the fraudulent billion-dollar "Put Option" and the cover story regarding the fictitious $850 million "sale" to Petronas, both described below.

133.    During his tenure, BEN AMMAR flew down to Brazil from New York frequently, staying for a month or so at a time. On September 4, 2013, having milked as much as he could out of the scheme, BEN AMMAR resigned from the Board of OGX, weeks before its bankruptcy, and reportedly returned to New York where he continues to reside.

134.    BEN AMMAR was, at all material times from mid-2012 onwards, a formal and *de facto* managing agent, co-conspirator and accomplice in the EBX Group. The fraudulent misrepresentations generated between 2012 and 2013, as are detailed below, were generated with his knowledge, approval, participation and consent.

**The Corporate Co-Conspirators and Accomplices**

**The CENTENNIAL, WRM, 63X, 3BX, and AUX Companies:**

135.     There were also many wealth management companies that BATISTA and his accomplices owned and controlled that they used in executing the fraud. A few have been joined here. Some, such as the CENTENNIAL Companies, acted as holding companies for his stock in the operating companies. Others, such as the AUX Companies, were set up for specific acquisitions. Still others, such as the WRM Companies, acted primarily as building blocks in pyramids of holding companies, structured to put distance between bank accounts and other assets and the ultimate owners.

136.     Thus, for instance, BATISTA held his interest in the publicly traded Brazilian companies through the WRM Companies and the CENTENNIAL Companies, diagrammed (as of 2013) as follows:



137.     Others, such as the 63X and 3BX companies were set up for the primary purpose of being the name on a bank account for the transmission of funds to accomplish the fraudulent

scheme. They also acted as "cut-outs," to obscure the trail between the origin and the destination of funds and facilitate the transmissions of funds to achieve the ends of the fraudulent scheme. BATISTA's ownership of the 63X and 3BX companies is diagrammed below:



138.     These corporations, all of which were incorporated in secrecy jurisdictions, had no legitimate corporate business or real independent existence separate from BATISTA and his co-conspirators and accomplices and were no more than fictitious names.

139.     In all these companies, BATISTA and his co-conspirators and accomplices failed to observe the required corporate formalities and the entities were used as engines of fraud, such that their separate corporate existence should be disregarded.

140.     Alternatively, to the extent that any of these entities are found to have had true separate corporate existence, they should be treated as additionally liable, as being co-conspirators, agents and constructive trustees of proceeds of the fraudulent scheme.

141.     In addition to the foregoing, but not joined, was TMF Consultoria Financeira, Ltda., or "TMF." This was the name of a group of highly skilled financial advisers who acted as an internal money management and investment unit or "family office." Funds transferred to bank accounts in the name of this entity – which was also ultimately controlled by BATISTA and his

accomplices – were primarily for payment to the individual managers, but also used to park cash abroad, owned by BATISTA and his accomplices.

142.    There are many other companies that also fall into this category of aiders and abettors, accomplices and co-conspirators whose involvement is less clear and have therefore not yet been joined as parties, but which may be joined later after discovery.

**The Private Bankers**

143.    The Defendants BANCO ITAÚ MIAMI and EFG MIAMI were among the Miami private banks which provided financial services integral to the fraudulent scheme.

144.    "Private banking" is a form of banking that is far removed from the impersonal service performed by the retail commercial banks in regard to processing the mass of anonymous deposits and withdrawals, as is experienced by the ordinary customer.

145.    To be a client of a "private bank" typically requires a minimum net worth of millions of dollars, but the ideal target client has a net worth in many multiples of that amount, at least tens of millions and preferably hundreds of millions or even billions of dollars.

146.    Such huge fortunes attract and pay for correspondingly close and informed attention from the "private bankers," the "relationship managers" who have personal relationships with their valued "high-net-worth" and "ultra-high-net-worth" clients.

147.    Private banks often bill themselves as "partners" in the management and preservation of their clients' wealth and vie with each other in emphasizing the closeness of the attention that their clients can expect in growing and protecting their money.[5]

---

[5] For instance, Itaú's website states that it is "[p]repared to be more than a bank, _**a real partner**_ in all of your initiatives" to "ensure growth and _**preservation**_ of wealth, throughout the various stages of your life." Similarly, EFG's website states, "At EFG, we are pleased to be _**your partner**_ for all your private banking needs and to be able to build a long-term relationship with you." And "[w]ith our entrepreneurial spirit, we offer you a unique private banking experience. We carefully monitor developments as part of _**our role as a reliable partner**_. And we act decisively so that you remain on course to reach your long-term objectives."

148.    In sum, "private banking" is not what is generally recognized as "banking" in the American statutes or case law, which describes the ordinary impersonal relationship that exists between the individual of ordinary means and their retail bank.

149.    Private banking is a highly personalized service offered by a select cadre of financial professionals to multi-millionaires and billionaires.

150.    Typically, private banks are divisions or subsidiaries of major international banks, which trade on the brand recognition and substantiality of the parent entity or the group as a whole, and its global ties and entrees, to attract this high-net-worth client base.

151.    Typically, also, private banks attempt to disavow the unity of the group and try to stand on their technically separate corporate personalities when it comes time to be sued or render disclosure of information or legal discovery in cases involving their clients.

152.    Indeed, part of the rationale for their (typically) separate incorporation from other members of the parent banking group is to provide a (hoped for) technical legal barrier against the disclosure of information.

153.    Further, private banks trade on being afforded the level of legal protection afforded to retail banks in the ordinary conduct of anonymous client transactions and assume that their very-different, personalized, client-involved, asset protection schemes will attract the same degree of "hands-off" treatment. This is not and should not be so in the law.

**Banco Itaú Miami:**

154.    The Defendant, BANCO ITAÚ MIAMI, d/b/a "Itaú Private Bank," is a part of the multinational Itaú group, headquartered in Brazil. Members of the group, particularly in Miami and The Bahamas, had over the years developed an extremely close relationship with BATISTA. The Itaú group provided enormous loans to BATISTA's operations and the Itaú group's own finances were tied in to the success or failure of the EBX Group. For example:

31

(a)     On December 17, 2007 Banco Itaú BBA, Nassau Branch loaned CENTENNIAL BVI $370 million.  The purpose of this loan and the ultimate use of its proceeds are currently unknown.

(b)     In June of 2008, Banco Itaú BBA served as a "Global Coordinator and Joint Bookrunner" for the OGX IPO. Also, in connection with the OGX IPO, Itaú USA Securities, LLC served as an "international agent" appointed by OGX to facilitate the placement of shares outside of Brazil.

(c)     Banco Itaú BBA SA, Nassau Branch extended loans in the aggregate amount of **$1.28 billion** to BATISTA and his holding companies during the period September 14, 2009 through January 25, 2013, as follows:

(i)     On September 14, 2009, CENTENNIAL NEVADA borrowed $280 million to purchase shares of OGX from the Ontario Teacher's Pension Plan, an early investor in OGX, CENTENNIAL NEVADA pledged shares of OGX as collateral. BATISTA personally guaranteed the loan.

(ii)     On February 10, 2011, AUX LUXEMBOURG borrowed $500 million to purchase Ventana Gold, a Canadian company that held gold mines in Colombia, later to be known as "AUX." CENTENNIAL NEVADA pledged additional shares of OGX as collateral.  BATISTA personally guaranteed the loan.

(iii)     On August 22, 2011, CENTENNIAL NEVADA borrowed $200 million.  The purpose of this loan and the ultimate disposition of the loan proceeds are currently unknown. BATISTA personally guaranteed the loan.  It is currently unclear whether CENTENNIAL NEVADA pledged any collateral for this loan.

(iv)     On January 25, 2013, AUX LUXEMBOURG borrowed $300 million, which was sometimes referred to within the BATISTA group as "the Galway Loan."

AUX LUXEMBOURG had purchased Galway Resources, another Canadian company that held gold concessions in Colombia, in December of 2012. It is believed that the proceeds of this $300 million loan were used in connection with the Galway purchase.

(v)     Also on January 25, 2013, BATISTA, CENTENNIAL NEVADA, and CENTENNIAL DELAWARE entered into additional agreements with Itaú whereby BATISTA, CENTENNIAL NEVADA, and CENTENNIAL DELAWARE pledged shares of OGX and shares of MPX amounting to approximately 49% of that company's shares.

(d)     In October of 2011, OSX borrowed $850 million from an international syndicate led by Itaú BBA, ING Bank and Banco Santander for the construction of its oil platform, OSX-2 FPSO. As of December 31, 2013, the outstanding amount of this debt was $432.2 million.

(e)     Furthermore, in April 2012, Itaú BBA Nassau Branch granted a separate loan, in the amount of $250 million to OSX. As of December 31, 2013 the balance of this loan was $112.1 million.

(f)     BATISTA transferred at least $563 million from numbered accounts in the Bahamas and the Cayman Islands to bank accounts controlled by BATISTA in the United States between August 2009 and July of 2014. More specifically, BATISTA transferred at least $494 million, in aggregate, to accounts he controlled at BANCO ITAÚ MIAMI.

(g)     Of particular note, BATISTA transferred a total amount of $76.7 million from a CENTENNIAL DELAWARE account in the Cayman Islands to a CENTENNIAL DELAWARE account at BANCO ITAÚ MIAMI in June and July of 2013 as the OGX scheme was collapsing. The ultimate disposition of those funds is currently unknown.

(h)      In addition, Batista transferred $8.7 million from a 63X Master Fund account in the Cayman Islands to an account of AUX, LLC at BANCO ITAÚ MIAMI in 2014 after the collapse of his scheme.

155.      Accordingly, members of the Itaú Group were among BATISTA's and the EBX Group's major creditors as BATISTA's empire collapsed. Members of the Itaú Group were in a unique position with respect to knowledge of BATISTA's financial position and had specific knowledge of BATISTA's ability to repay creditors.  The group members also had a vested interest in assisting BATISTA to move assets out of the reach of competing creditors and maintaining them within the confines of its affiliated banks.

156.      Many members of the Itaú Group had, by 2013, played a part in various countries in assisting BATISTA and his accomplices in moving the profits of the fraudulent scheme internationally to ultimate repository accounts in secrecy jurisdictions around the world.

157.      By July 2014, BATISTA's companies had moved at least $494 million through BANCO ITAÚ MIAMI. It is unknown before discovery all of the names on the accounts at the Miami private bank, but they are believed to have included many of the Defendant wealth-management companies and other accounts of which members of the BATISTA family were beneficial owners.

158.      Through the intimate knowledge that the Itaú group members had developed in the course of their relationship with BATISTA and the EBX Group, all of which was accessible in Miami to BANCO ITAÚ MIAMI, and known to the relationship managers in Miami, the Miami bank knew by sometime in 2012, and well in advance of the crash in October 2013 that a financial disaster for the EBX Group was impending.

159.      BANCO ITAÚ MIAMI further knew by 2012 that BATISTA and the EBX Group had colossal debts which they were unable to pay, and that the money movements that it was

34

conducting and is still continuing to conduct on behalf of BATISTA and his co-conspirators was and is essentially money laundering for them to avoid the payment of their legitimate debts.

160.    However, the Miami bank was and is motivated to ensure that debts to other members of the group were and are re-paid rather than other creditors. Therefore, with full knowledge of the foregoing facts, BANCO ITAÚ MIAMI, continued to launder money and help shield assets for the BATISTA conspirators and so became an aider and abettor and a part of the conspiracy to defraud investors and creditors.

**EFG Miami and EFG Switzerland:**

161.    Defendant, EFG Miami, was introduced to EIKE BATISTA, THOR BATISTA and the 63X Companies by MAGNO and MAGNO PL at the end of 2013 or early 2014. At that time, the crash of OGX, OSX and MMX in October 2013 had already happened and it was notorious that BATISTA and his group had debts in the billions of dollars that they were unable to pay. BATISTA was publicly claiming that he had a negative net worth.

162.    By late 2013, therefore, BATISTA and his associates were radioactive in banking circles and no bank in the U.S. that actually followed its "Know Your Customer" rules and the law would move significant private funds for BATISTA and his family members because of the very legitimate fear that they would be laundering money and assisting in defrauding creditors.

163.    This was, upon information and belief, a brand new relationship for EFG MIAMI. Its private bankers were reportedly extremely reluctant to open an account for a trust set up by MAGNO, of which MARCUS BERTO – a past top executive in LLX – was to be the trustee, and of which the beneficiaries were to be BATISTA and his family members, funded by money held in a bank in the Cayman Islands, in the names of a Cayman island company, 63X MASTER FUND, and undeclared to the Brazilian authorities. This raised all sorts of red flags that the transactions contemplated were illegal.

35

164.    However, the amounts intended to be transferred were substantial and the future relationship likely to be lucrative, and the request was to "book" the account as if the funds were held in Switzerland, at the Miami bank's Swiss parent, EFG SWITZERLAND.

165.    Thus, EFG MIAMI gambled that BATISTA's problems were all in Brazil and that the details of the deal would never come out. EFG MIAMI did the deal at its offices on Brickell Avenue, where the account was actually opened, but the funds were "booked" as if in Switzerland with its Swiss parent.

166.    EFG SWITZERLAND had set up its Florida subsidiary as its agent to do deals like this, primarily for Latin Americans looking for a safe place to bank their funds. Had it done any due diligence on this new account, which would be ordinary prudent banking practice, it would not have opened the account. It either did no due diligence – which in light of the persons and the amounts involved would equate to "willful blindness," equivalent to actual intent, or it actually knew the details that its subsidiary knew.

167.    In either event, both EFG entities knew that they were laundering money and helping shield assets for the BATISTA conspirators, and so a part of the conspiracy to defraud investors and creditors.

168.    It is unknown how much was ultimately transferred out of Florida to Switzerland in this way, but more than $70 million flowed through the MAGNO PL Citibank trust account in Miami and out to other repositories. It is believed that a substantial fraction of this, and perhaps much more, was transferred from MAGNO's trust account to EFG MIAMI and then to EFG SWITZERLAND.

**Florida Fraudulent Transfer Recipients**

**Erick Magno, Magno PL, and Marcus Berto:**

169.    During the course of 2013 MARCUS BERTO introduced BATISTA to an attorney in Miami named ERICK MAGNO and his firm MAGNO PL, who were skilled in international asset protection. MAGNO and his firm already acted for BERTO and agreed to act for EIKE BATISTA, THOR BATISTA, their other family members, the 63X Companies and other companies and individuals in the conspirator group to help them shield assets from creditors.

170.    In August 2013, in advance of the impending financial collapse of the EBX Group operating companies, and with full knowledge that such collapse was imminent, BATISTA, through the 63X Companies paid BERTO at least $10 million for his assistance in getting EBX Group member LLX sold off under the radar as (detailed below).

171.    The technical recipient of the funds was Lin, LLC, a nominally Arizona company, but in fact a wealth-management company owned and controlled by MARCUS BERTO in Miami.

172.    As of 2013, BATISTA and his family members could not pay off the billions of dollars in losses that they had caused to investors across the U.S. and worldwide. This $10 million payment to BERTO was also in consideration of his agreement to act as trustee, and therefore facial legal owner, of many millions of dollars to be transferred into his name and held for BATISTA and his family members.

173.    The purpose of this "Batista Family Trust" (its real name is unknown before discovery) was so that the BATISTA family members could deny ownership and fraudulently avoid creditors. The total amount of additional consideration paid to BERTO for his assistance is unknown before discovery.

174.    In the late summer of 2013 through to 2015, with full knowledge that BATISTA and his EBX GROUP were in serious financial trouble and unable to pay their debts, and that the

structures he was being asked by BERTO and BATISTA to help set up were to defraud creditors, MAGNO and his firm, MAGNO PL agreed to take, and took, a number of steps to assist in furtherance of the fraudulent conspiracy and to defraud creditors.

175.    These included: (a)  the creation in 2013 of the Batista Family trust with BERTO as trustee; (b) using the MAGNO PL Citibank trust account in Miami, between 2013 and 2015, to hold, park and distribute in excess of $70 million from EIKE BATISTA, THOR BATISTA and the 63X Companies; (c) providing an introduction to the Private Banker EFG MIAMI, to persuade it to move funds from the MAGNO PL Florida trust account to an account at EFG SWITZERLAND; (d) MAGNO's acting personally as trustee for undisclosed beneficiaries, to enable EIKE BATISTA, THOR BATISTA and the 63X Companies to lend $15 million to OGPar at 120% interest, repaid within months with $3 million in interest, as a way of further looting the corpse of OGX and further defrauding creditors; (e) allowing EIKE BATISTA, THOR BATISTA and the 63X Companies to park at least $33 million in the MAGNO PL Miami, Florida, trust account for a year and a half, to obscure the whereabouts of funds, before remitting it out of Florida in 2015 to defraud creditors.

176.    MAGNO and MAGNO PL were paid at least $300,000.00. The total amount of additional consideration paid to them for their assistance is unknown before discovery.

177.    The trustees who acquired the legal estate in such funds, and therefore received the property, MAGNO and BERTO, who are believed to have between them received over $70 million, should be compelled to return such funds to Florida under the Florida Uniform Fraudulent Transfer Act ("FUFTA"), or if such is beyond their power, they should be held liable to pay an equivalent sum as damages.

**Olin Batista, Flavia Sampaio, and Luma De Oliveira:**

178.    EIKE BATISTA's family members ELIEZER BATISTA, WERNER BATISTA and THOR BATISTA were active participants in the fraudulent scheme. Other family members, namely the Defendants, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA, are not presently known to have had any substantial involvement in the active fraud committed within the various BATISTA companies.

179.    However, a number of such BATISTA family members knowingly received multimillion-dollar transfers of real estate and cash within Brazil in the months immediately prior to the collapse of the three EBX Group companies, for no consideration, as a means of cheating creditors in Brazil.

180.    Upon information and belief, during 2013, BATISTA wired hundreds of millions of dollars of the proceeds of the fraudulent scheme to a number of banks outside Brazil in order to fraudulently evade creditors.

181.    Following the template of BATISTA's actions in Brazil, it is believed that much of that wealth has been transferred into the names of the Defendant family members, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, OLIN BATISTA, FLAVIA SAMPAIO, and LUMA DE OLIVEIRA, directly, or into structures beneficially held by those family members, including at the Defendant Miami private banks and other banks in Miami.

182.    None of these family members gave value for such transfers but served knowingly as mere nominees for BATISTA in order to park assets, and accepted the equitable estate in such assets and therefore received them. Accordingly, they should be held, as constructive trustees, to return such funds to Florida for the payment of the Plaintiffs' claims pursuant to FUFTA or alternatively be held liable in damages in such sum.

183.    Having described the scheme in general and the general involvement of the various Defendants, a detailed account follows.

## The Scheme – in Detail

**The Brazilian Deepwater "Pre-Salt" Discoveries:**

184.    The world's largest oil discoveries in recent years have been in Brazil's offshore, pre-salt basins. "Pre-salt" oil is generally characterized as oil reserves situated exceptionally deeply, under thick layers of rock and salt, and requiring substantial investment to extract.

185.    In 2005, Brazil's national oil company, Petroleo Brasileiro S.A. ("Petrobras"), drilled a wildcat well in the ultra-deep waters of the Santos basin off the coast of São Paulo state and discovered the presence of hydrocarbon condensate under a thick layer of salt. This discovery confirmed a previously untested geologic model that indicated the potential for large recoverable oil deposits.

186.    In 2006, Petrobras confirmed the presence of potentially recoverable petroleum in the discovery of the Tupi oil field in the so-called pre-salt layer in the Santos Basin.

187.    Additional drilling and testing led to an announcement by Petrobras in November 2007 that the Tupi oil field (now known as the Lula oil field) contained between five billion and eight billion barrels of oil.

188.    Given these discoveries, there was significant global attention to the oil and gas industry in Brazil. The pre-salt discoveries showed great promise.

**The Start of OGX:**

189.    In 2007, the Brazilian government announced it would auction off-drilling leases to companies who wish to explore for oil, and it scheduled what promised to be some of the richest new deep-water oil fields off its coast for auction on November 27, 2007.

190.    BATISTA had no experience in the oil-exploration business but had a lengthy background in stock promotion and mineral exploration and he raised approximately $1.3 billion in private equity to acquire some of these deepwater drilling leases through a company he named OGX, which he owned through his personal asset vehicle, CENTENNIAL NEVADA.

191.    However, just before the auction, based in part on the very recent Tupi oil field discovery, the Brazilian authorities withdrew the deepwater fields from auction, deeming them "too valuable" and left in play old shallow-water fields that had been picked over by Petrobras for decades and generally viewed as worthless.

192.    That put BATISTA in a quandary. He had raised approximately $1.3 billion from investors to spend on deepwater oil fields. Now there were no deep-water fields to buy. No one wanted the shallow-water fields. But, rather than refund the money, BATISTA resolved to press forward and acquire these rejects of the industry.

**OGX Wins Rights to 21 Exploratory Blocks:**

193.    On 27 November 2007, OGX submitted the winning bid on twenty-one exploratory blocks (seven of them in consortia with other operators) and committed significant funds for licensing fees as follows: seven blocks in the Campos Basin off the coast of Rio de Janeiro (two of them in consortia with Maersk); four blocks in the Santos Basin; five blocks in the Para-Maranhao Basin; and five blocks in the Espirito Santo Basin (in consortia with Perenco S.A.), all as shown below:



**OGX Raises Additional Capital – Initial Public Offering:**

194.    Having committed nearly all of its cash to pay for the licenses and fees associated with the exploratory concessions, OGX needed to raise additional capital to conduct exploration. It would seek those funds from the capital markets via an initial public offering ("IPO") of approximately five million of its common shares.

195.    However, persuading the investing public that these fields were unrecognized treasures rather than the worthless money-pits that they would eventually prove to be would require enormous promotion.

196.    To garner credibility for OGX, BATISTA built a roster of senior executives from Petrobras; individuals who had been integral to that company's deepwater discoveries, headed by the Defendant, PAULO MENDONÇA, a geologist and former Petrobras head of exploration, who BATISTA dubbed "Dr. Oil."

197.    He also clustered around him a core of family members and trusted counselors who could be trusted to help hype the OGX discoveries to investors across the U.S. and world-wide, including his father, ELIEZER BATISTA, his brother, WERNER BATISTA, and his trusted long-time counsellors and confidants, GODINHO, GOUVEA and CARNEIRO, who became directors and top executives in his companies.

42

198.    BATISTA granted his family members and his other co-conspirators and accomplices generous stock options in OGX and other companies in what became the EBX Group, to ensure that they were personally invested in the value of the stock and incentivized to spread any good news and to contain or minimize the bad.

199.    BATISTA's publicized rationale for exploring the shallow-water fields was that modern technology in the hands of his "dream team" ensured better, more accurate detection. If there was oil to be found, they would find it. Plus, when they found it, the much lower extraction costs in shallow water than in deepwater meant much greater profitability. This one-two punch of state-of-the-art technology in the hands of the best oil gurus in Brazil, coupled with low-cost lifting, BATISTA boasted, promised to be a sure-fire winning combination.

200.    In 2008, BATISTA's OGX raised $4.1 billion in the biggest initial public offering in Brazilian stock market history.

201.    In its November 2008 Management Presentation, OGX announced that it had entered into contracts for 3D seismic surveys for all of its exploratory blocks; acquired various logistical transport vessels, including seven boats and two helicopters; and secured four off-shore drilling rigs with "world-class contractors." It stated that it expected to conduct an "intense drilling campaign" beginning in the second half of 2009 and reach "first oil" by the end of 2011.

**The Fraudulent Misrepresentations Start:**

202.    BATISTA and his co-conspirators and accomplices now embarked on a relentless propaganda campaign boosting the promise of the OGX oil-fields, completely untethered to any basis of reasonable fact, in order to attract investment capital and boost the stock and bond prices in OGX and other satellite companies soon to be launched. These knowingly false representations were all made with the intent of inducing investors to buy stocks and bonds in OGX and its satellite companies.

203.    The prime target of the misrepresentations were U.S. investors necessarily and primarily those in its most populous states, California, Texas, Florida, and New York. Indeed, American investors were to account for the vast majority of the sales of OGX shares and bonds, including many American government pension funds such as, as noted above, the Florida Retirement System Trust Fund.[6]

204.    This barrage of fraudulent hype took various forms, all of which was intended to induce investment and succeeded in inducing stock and bond sales on the primary and secondary markets to maintain the illusion of OGX as a valuable business for as long as possible.

205.    One was by way of what are termed in Brazil, "Material Facts." ("Statements of Material Fact" or "Material Facts"). These are public disclosures required by Brazilian law as to events which might impact equity and debt investor decisions to buy or sell. The directors of any public company are legally bound to disclose such facts to the investing public by way of a report to the relevant stock exchange and to the press.

206.    There were many Statements of Material Fact, as detailed below, that contained serious fraudulent misrepresentations of promising developments in OGX.

207.    Further, the medium of the "Statement of Material Fact," which is intended to be reserved for consequential announcements, was abused to trumpet inconsequential news, such as the "discovery of hydrocarbons," to give it undeserved significance and whet market appetite.

---

[6] The size of the Florida Retirement System Trust Fund investment into BATISTA's companies, is unknown, though greater than its losses, which equal $24 million. Such institutional investors typically invest in very large tranches and the Fund's stake was large enough for it to vote at extraordinary shareholders' meetings. It is listed online as having voted, *inter alia*, for instance: at an OGX shareholders' meeting on December 18, 2009; at an OGX shareholders' meeting (*inter alia* to elect the Defendant, AZIZ BEN AMMAR to the Board) on August 6, 2012; at an OSX shareholders' meeting (inter alia to elect the Defendant, AZIZ BEN AMMAR to the Board) on September 6, 2012; and at an MMX shareholders' meeting to vote on a proposed merger and Board re-shuffle following that company's October 2013 declaration of bankruptcy.

208.     Finally, there were many instances where information as to material adverse developments should have been published by way of Statements of Material Fact, but was not, leaving investors internationally to rely on the continuing validity of prior positive announcements. These instances of failure to announce negative news constituted misrepresentations by omission.

209.     BATISTA and his accomplices and co-conspirators also gave many press interviews and held press conferences in which he and they promoted the story of OGX's great success and its supposedly fabulously valuable oilfields. These fraudulent misrepresentations were disseminated live or by video recordings to the international financial press, particularly Bloomberg, typically in English for the benefit of American investors, to be relayed via the internet to the worldwide investment community. He also gave American television interviews in English, for the same reason – to attract American investment. For that reason too, OGX financial results, earnings presentations, management reports and quarterly earnings calls, were also all in English.

210.     Following the precept that "a picture is worth a thousand words," BATISTA and his accomplices and co-conspirators also seeded the press with management report graphics and news photographs bolstering the illusion of the great success and fabulous wealth of OGX.

211.     Additional fraudulent misrepresentations were contained in thousands of "tweets" sent via BATISTA's internet Twitter feed to what eventually topped one million followers, including many American financial journalists.

212.     Further, BATISTA personally made face-to-face promotional pitches to high-net-worth investors in Florida and elsewhere around the U.S.

213.     It is not possible to list every one of the many thousands of fraudulent misrepresentations but a selection is given below.

**Technical Terminology – PRMS:**

214.     To understand the quality of the misrepresentations, a very brief primer on oil industry jargon is in order.

215.     The detection of oil is done by way of seismic and other remote studies and the drilling of test wells. The exact volume of oil contained in any underground reservoir cannot be known exactly until it has been pumped to the surface.

216.     Moreover a volume of oil may exist but there may be no technological means of recovering any of it. Even if some volume may be "technologically recoverable" it may not be "commercially recoverable," *i.e.* the cost of extraction will exceed its selling price.

217.     To try to lend some precision to the description of underground oil estimates and the likelihood they can be extracted profitably, the oil industry found it necessary to develop an agreed set of technical terms.

218.     Accordingly, the international oil industry developed the Petroleum Resource Management System (the "PRMS"), a universal language used for estimating and classifying quantities of oil (and gas) discovered in any given reservoir according to their recoverability.

219.     The PRMS distinguishes between "technological" and "commercial" recoverability and further distinguishes between "reserves" and "resources." "Reserves" refers to oil that is reasonably certain to be commercially recoverable. "Resources" is a much wider term, and refers to all quantities of oil which is predicted to possibly exist within discovered or undiscovered reservoirs. "Resources" therefore encompasses discovered and undiscovered, recoverable and unrecoverable, and commercial and non-commercial quantities of petroleum.

220.     There are internal gradations within these categories running from "proved" to "probable" to "possible" underline reserves and from "contingent" (either "low", "best" or "high" estimates)

to "prospective" <u>resources</u>. Quantities are expressed in "barrels" or "boe" – "barrels of oil equivalent."[7]

**The First OGX "Oil Strike:"**

221.    It is common for oil exploration ventures seeking to raise finance from international investors to retain the services of an independent consultancy firm of specialists to appraise its oil discoveries. They essentially act as auditors. OGX retained the prestigious Dallas, Texas-based firm of DeGoyler & McNaughton ("D&M") for this purpose in or around 2008.

222.    In June 2008, OGX released a Statement of Material Fact that its auditors, described as "world-renowned D&M," believed that OGX might be sitting on as much as 4.8 billion barrels of oil. However, at this point these were, at most, very preliminary seismic studies. The unstated inference was that this was "recoverable" oil or it was of no moment - *i.e.* not "material" - and not worthy of publication as a Statement of Material Fact. This was a fraudulent misrepresentation designed to attract investment. Predictably, OGX share prices jumped.

223.    On September 18, 2009, OGX announced the commencement of its drilling campaign with the drilling of well "OGX-1, block BM-C-43" in a prospect area dubbed the "Vesuvio" formation.

224.    On October 7, 2009 OGX issued a Statement of Material Fact that it had struck oil in the Vesuvio oilfield about 85 kilometers offshore, in 140 meters of water. MENDONÇA was quoted as stating that this was "a milestone in the industry, which was only possible due to the motivation and talent of our unique team."

225.    Both the issuance of this news via the medium of a Statement of Material Fact – to be reserved for announcements that should materially impact investment - and the quoted

---

[7] BOE refers to a unit of energy based on the approximate energy released by burning one barrel (42 U.S. gallons or 158.9873 litres) of crude oil.

statement were intended to convey the impression that *recoverable* oil had been discovered. However, there was no reason for anyone with access to the OGX drilling test results to believe that this was true. This was a fraudulent misrepresentation designed to attract investment.

226.    On October 14, 2009, OGX released a Statement of Material Fact that declared in bold type that from a single exploratory well in the Vesuvio oilfield: "**Recoverable Oil Volume Expected to be between 500 Million and 1.5 Billion Barrels.**" MENDONÇA was quoted as saying this find validated the OGX team's scientific methodology and the "high petrolific (*sic*) potential" of the company's underwater leases.

227.    The implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable at any cost – even at a loss – but that it was likely to be commercially recoverable.

228.    With oil trading at around $75 a barrel, this was a representation to investors that OGX was sitting on minimum oil reserves worth between $37 billion and $111 billion from a single well, with many more yet to go. However, there was no reason for anyone with access to the OGX drilling test results to believe that any of this was true. This was a fraudulent misrepresentation designed to attract investment.

229.    This core Vesuvio announcement, which was not retracted until shortly before the OGX bankruptcy, was a bed-rock misrepresentation for investor confidence in OGX right up through the crash in 2013, despite the fact that BATISTA and his co-conspirators and accomplices knew the field was worthless long before it was eventually returned as valueless to the Brazilian government.

230.    BATISTA, who had not hitherto been known for his largesse, now became very conspicuous for his apparently generous public gifts which were enabled not by profit, but by the torrent of inflowing investment capital and consisted of corporate funds skimmed off the top.

231.    The point of such apparently "generous" charitable gifts was to keep BATISTA in the public eye and to help paint a picture of multiplying wealth – as the "X" in BATISTA's company names was intended to signify – such that he could afford such acts of generosity.

232.    In fact, the only real "generosity" was on the part of the investing public, because it was their money being given away.

233.    Through his business and such "charitable" activities, and through his father, ELIEZER BATISTA's political and business contacts, BATISTA became close to many of Brazil's top politicos whom he bribed from his various offshore corporate bank accounts to ensure that governmental regulators were as supportive and as "hands-off" on him and his enterprises as possible.

234.    Some of the recipients are also now on the long list of government officials who are under investigation or indicted by the Brazilian government for accepting bribes in connection with the huge Petrobras scandal, dubbed "Lava-Jato," or "Car-Wash," that would ultimately break in 2014.

235.    The investigation, which is still in its infancy and is ever-widening, now includes more than a hundred Brazilian politicians under indictment for corruption, and led to the impeachment and removal of the President, Dilma Roussef, in 2016.

236.    Little is yet known before discovery of the full extent to which the BATISTA group bribed government officials in order to pull off the OGX scam alleged here. But during 2011, Sergio Cabral, ex-governor of Rio de Janeiro, was paid $16.5 million in bribes by BATISTA, for which Cabral, BATISTA, GODINHO, and Luis Andreas Correa – "Zartha," (an ex-director of TMF, now living in Miami), have all been indicted on corruption and money laundering charges in Brazil.

237.     Further, during 2013, CARNEIRO paid $2.3 million in bribes to Brazil's Finance Minister, and Chairman of Petrobras, Guido Mantega, to procure a $922 million State shipbuilding contract for OSX, for which both have been indicted in Brazil.

238.     Given that CENTENNIAL NEVADA maintained more than $100 million in its slush fund under the names of wholly-owned Panamanian subsidiaries at TAG Bank in Panama for the purpose of bribing government officials, these two indictments are likely to represent just the emerging tip of the iceberg.

**The Second OGX "Oil Strike:"**

239.     On November 16, 2009, OGX released a Statement of Material Fact announcing a new major oil strike captioned, in bold type: "**OGX Announces Discovery of Oil . . . Estimated Volume of 400 Million – 500 million barrels – Drilling still in progress and new objectives to be reached.**" This oilfield was later dubbed the "Pipeline Formation."

240.     Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just technically recoverable but was likely to be commercial.

241.     At a market price then around $79 a barrel, this was a representation to investors internationally that there was something like another $30-40 billion in value in OGX. The range of expected revenues for OGX was now cumulatively somewhere between $70+ and $158+ billion – and apparently there was more to come in the same well. This was a fraudulent misrepresentation, designed to attract investment.

242.     Investors reacted predictably. The OGX stock price rose steadily through November 2009 to a high of R$1570.00 while the numbers of trades swelled from over 16 million to over 22 million in just two days between November 16 and 18, 2009.[8]

---

[8] On December 18, 2009, OGX shares were split 100:1. Share prices in this complaint are reflected in their nominal value as reported at the time.

243.    Fully realizing that the figures that he had authored were completely baseless and were fraudulent misrepresentations, intentionally used to generate a dramatic increase in stock prices, and probably not believing that he would be able to prop the prices up much longer, in December 2009, MENDONÇA secretly sold 10,000 of his own OGX shares, realizing a profit of approximately $5,000,000.

244.    Upon information and belief, contrary to Brazilian law, this was not disclosed to CVM, the Brazilian Securities and Exchange Commission and was a misrepresentation by omission.

**OGX Strikes "Even More" Oil:**

245.    On December 22, 2009, OGX announced via Statement of Material Fact that completed drilling had revealed that the oil strike declared in November was now estimated at being two to four times greater. As the Statement of Material Fact stated, now the: "**Recoverable Oil Volume Expected to be between 1 and 2 Billion Barrels."**

246.    Again, the implication of releasing this news via a Statement of Material Fact was that this volume was not just "technologically recoverable" but was likely to be "commercial."

247.    BATISTA's announcements to investors by now equated to a cumulative promise that OGX was sitting on at least 1.5 billion and maybe as much as 3.5 billion barrels in recoverable oil. At a December 2009 price of around $75 a barrel that translated to a promise of between roughly $112.5 billion and $262.5 billion in value and investors reacted predictably favorably to the cumulative promises. This was a fraudulent misrepresentation, designed to attract investment.

248.    In fact, the OGX seismic studies and drill test results had failed to indicate that a single barrel of oil was necessarily even technologically recoverable at any cost, let alone at a profit. Indeed, the internal D&M reports confirmed exactly that.

249.    But beyond that, from the very beginning, upon information and belief, very high concentrations of hydrogen sulphide gas had been detected. This compound, nicknamed "Death Gas" in Portuguese, is very poisonous, corrosive, flammable and explosive. Striking oil is no cause for celebration if it kills the drill-crew.

250.    The presence of this contaminant greatly increases the danger and the cost and therefore greatly decreases the commercial viability of an extraction operation. This fact was not disclosed and constituted a fraudulent misrepresentation by omission.

251.    The promulgation of these statements to investors internationally and the continuing failure to retract them constituted fraudulent misrepresentations that were intended to induce and did successfully induce a belief in and among investors that OGX, and the satellite entities that depended on its success, had huge intrinsic commercial value.

**The OSX Public Offering:**



252.    To cope with the huge gushers of oil that he had promised, BATISTA announced that he would start a shipyard to build a number of huge Floating Production Storage and Offloading vessels, or "FPSOs" - floating offshore production facilities that house both processing equipment and storage for produced hydrocarbons - through his company, OSX, and began scouting a coastal site for a "Super-Port" to be managed by his logistics company, LLX, where

these monsters could dock to unload OGX oil, eventually settling on a location at Açu, near Rio de Janeiro.

253.     OSX went public in 2010 and raised $1.58 billion through its initial public offering on the São Paulo Stock Exchange. The rationale for the OSX ships was to transport OGX oil. A principal point of the plan for the LLX "Super-Port" was for the OSX ships to dock and offload OGX oil. But OGX had found virtually no oil and in all its existence, right up to its bankruptcy in 2013, would pump virtually no oil.

254.     The ships were massive and inspired investor confidence - but that was their sole point. No responsible businessman would have commissioned such monsters without a predictable source of supply, but they were complete overkill for the tiny trickle of OGX oil.

255.     But their point was not to actually *transport* oil: they were window dressing, intended to mask the fact that *there was no oil*. They were visible support for BATISTA's lies. In essence, in themselves, they were huge floating fraudulent misrepresentations, boasts to the world of the existence of vast quantities of commercially recoverable OGX oil.

256.     Eventually, OSX would have six ships commissioned, with the assistance of bribes to government ministers. But in its entire future, OGX and OGPar would not pump enough oil to fill those six multi-million dollar OSX ships even three times.

257.     Nevertheless, on January 26, 2010, OGX released a Material Fact captioned: "**OGX Signs Agreements with OSX to Secure Production Equipment – OGX Sets Production Target of 1.4 Million barrels per Day by 2019 – Initial Production Expected to Begin in Early 2011, Ahead of Schedule.**" In the body of the Statement, BATISTA was quoted as stating:

> Our drilling results have revealed a new oil province in the southern part of the Campos Basin and broken paradigms regarding the quality and potential of the reservoirs in this area. At this moment, OGX is entering into a new phase in its history, with a focus on reaching our production target of 1.4 million barrels per day by

2019. We have an unparalleled 10 year growth story, based on world-class assets of extraordinary quality.

258.     The inference was that these were realistic projections founded on the discovery of a "new province" of commercially recoverable oil. But in truth, there was nothing to support it.

259.     BATISTA's reference to "world class assets" also resonated with investors in America and internationally. In financial accounting, an "asset" is an economic resource that can produce value.

260.     However, nothing that OGX had yet discovered constituted an "asset." All the data available to it indicated that it might have "resources" of various categories, but how much could be recovered at *any cost* remained to be seen let alone what could be recovered *at a profit*. This, then, was a fraudulent misrepresentation, designed to attract investment.

261.     On February 1, 2010, OGX announced an estimated volume of "recoverable oil of 100 to 200 million boe" in the Vesuvio formation at well OGX-4. This was a fraudulent misrepresentation, designed to attract investment.

262.     On February 3, 2010, OGX released a Statement of Material Fact that the drill-stem test at the 1-OGX-3-RJS well in block BM-C-41 (later named the Tubarão Azul - "Blue Shark" - field) had revealed an estimated total recoverable volume of between 500 and 900 million barrels of good quality oil. This was represented to be extractable at a rate of approximately 3,000 barrels per day by vertical drilling, but at perhaps five times that rate, or 15,000 barrels a day, by horizontal drilling, as OGX proclaimed that it planned to do.

263.     This was untrue. There was no reasonable basis to believe in any such numbers. But a possible 15,000 barrels a day, which equated to roughly 5.5 million barrels a year, at a then per barrel rate of $87.21, constituted a fraudulent representation to the investors that OGX was sitting on close to another half-billion dollars of commercially recoverable oil, annually. This was a fraudulent misrepresentation, designed to attract investment.

264.   On February 8, 2010, BATISTA appeared on the "Charlie Rose" TV show, nationally syndicated in the U.S., including throughout Florida, boasting of the fact that he had discovered "a hundred billion barrels of recoverable oil" and that Brazil was destined to be the world's fifth largest economy by 2015. [*See* Charlie Rose, *Interview with Eike Batista*, (Feb. 8, 2010), https://charlierose.com/videos/21203]. This was a fraudulent misrepresentation, designed to attract investment, and investors in the Unites States took note.

265.   On March 5, 2010, OGX released a Statement of Material Fact captioned: "**OGX Announces the Presence of Hydrocarbons in the Albian Section of Well OGX-6 – Rock Cores and Logs Indicate Strong Correlation Between OGX-6, OGX-3 and OGX2 Reservoirs.**"

266.   BATISTA's "Dr. Oil," MENDONÇA, was quoted as stating in relation to this new "discovery" that, "Ourre [sic] view of this data indicates that these accumulations may be connected and that the recently discovered oil province may, in fact, extend to the north of the BM-C-41 block, confirming its very significant petroliferous potential."

267.   This was all pure nonsense. The "presence of hydrocarbons" was of no intrinsic relevance to commerciality. As MENDONÇA well knew, publication of the existence of "hydrocarbons" to investors could be highly misleading and industry practice was not to do so. Indeed, when at Petrobras he had helped promulgate guidelines forbidding the practice.

268.   The "oil province" described was a grand, non-technical term designed to convey an impression of a huge undersea reservoir of commercially recoverable oil. "Connected" accumulations indicated that a single well might tap the totality. But the aggregate description was just not true and was intended to whet investment appetite. This, then, was a fraudulent misrepresentation, designed to attract investment.

269.   On April 14, 2010, BATISTA gave a video interview that was broadcast on the internet on XPTV, a video channel maintained by the XP brokerage firm, in which he further

claimed that OGX had discovered "a new oil province in Brazil," that OGX had "the best exploratory blocks in the world" with "one trillion dollars-worth" of oil, that the company was worth up to "$100 billion dollars," and warned investors not to miss out on the opportunity to buy OGX stock. (*See* XPTV, *Entrevista Eike Batista OGX - A Grande Fraude - Entrevista Completa*, https://www.youtube.com/watch?v=6e_huuUsdH4). This was a fraudulent misrepresentation, designed to attract investment.

270.    At or about this time, BATISTA orally disseminated other such false statements through audio and video conferences with financial institutions via the internet, as with all such internet publications described above and below, accessible and accessed by investors across the United States, including in Florida.

271.    The intended message to American and other foreign investors was that OGX had "one trillion dollars-worth of oil," and was worth $100 billion. This led to an extraordinary increase in OGX's share price which soared from R$1555.00 $2327.00.

272.    There was no reasonable basis for BATISTA and his accomplices and co-conspirators to believe that more than a tiny fraction of that amount of oil actually existed, let alone that it was commercially recoverable. These representations were fraudulently made with the intent of inducing investors to rely on them in purchasing and trading OGX stock and bonds.

273.    On May 13, 2010, OGX released a Material Fact captioned: "**OGX Concludes Drilling of Wells OGX-6 [and] OGX-8 – Identified Connection Between OGX-2 and OGX-6 Prospects with Estimated Recoverable Volume Totaling 1.4 to 2.6 Billion Barrels.**"

274.    Again, the use of the words "recoverable volume" was deliberately intended to convey the sense that this was money in the bank, but it was untrue. With oil trading at $80.44 per barrel, this was equivalent to a statement that there was between $112 billion and $209 billion of value in OGX; but there was no reasonable basis for anyone with access to the OGX drilling test

results to believe in any such numbers. This was a fraudulent misrepresentation, designed to attract investment.

275.    On May 27, 2010, OGX released a Statement of Material Fact captioned: "**OGX Detects the Presence of Hydrocarbons in Wells OGX-10 and OGX-13 – Net Pay of Approximately 40 meters in the Aptian Section of Well OGX-10.**"

276.    As noted above, the discovery of "hydrocarbons" is inconclusive of any recoverable oil. However, in the oil and gas industry, *Net Pay* refers to the thickness of rock that can deliver hydrocarbons to the well bore. This statement was intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable reserves, to further stimulate market appetite. This was a fraudulent misrepresentation, designed to attract investment.

277.    On August 12, 2010, BATISTA and MENDONÇA participated in a Bloomberg conference call broadcast over the internet during which MENDONÇA stated that, following a new discovery, OGX expected a "significant" increase in its potential oil and natural gas resources. BATISTA expanded on this, stating that wells in the Parnaiba Basin in northern Brazil might hold 10 to 15 trillion cubic feet of natural gas and that MPX, his energy company, planned to build power plants nearby.

278.    These estimates were pure speculation, and were fraudulent misrepresentations, designed to attract investment, and had their intended effect: OGX stock prices rose 2.2% and MPX stock prices rose by 6.8 %.

**Promoting OGX in Miami:**

279.    BATISTA had always had close ties to Florida including close social and business ties with Jeffrey Soffer, the Florida-based real estate and resort developer (then married to super-model Elle Macpherson) and was a frequent visitor to Soffer's Miami, Florida, home.

280.     During August 2010, BATISTA solicited Soffer in Florida to partner with him to develop office buildings and hotels in the Port of Rio de Janeiro and in "City X," BATISTA's mega-project for 250,000 residents in Fluminense, Brazil.

281.     Soffer traveled down from Miami, Florida, to Rio de Janeiro to meet with BATISTA and explore the prospects. The meeting was, as BATISTA intended, reported in the press with speculation as to the future plans of the prospective "partners."

282.     Such well-publicized gambits were designed by BATISTA to generate the impression that other high-performing, highly respected businessmen trusted his business acumen, and such associations lent BATISTA business credibility in the public mind.

283.     Jeffrey Soffer was the owner and operator of the Fontainebleau Miami Beach Hotel in Miami Beach which he had revamped to the tune of a billion dollars and where he envisioned creating a perpetual event marketing space. To this end he had partnered with David Grutman and his Miami Marketing Group, who established and operated the premiere Miami nightclub, LIV, at the Fontainebleau Miami Beach.

284.     MMG Nightlife took Miami's synergistic marketing environment to a new level. It created events at the Fontainebleau Miami Beach's many spaces. The property's restaurants hosted Grutman's huge 30-50 guest, "A-List" celebrity-studded dinner parties, five nights a week, and LIV provided the late-night environment where paparazzi and press could create "buzz" around their doings.

285.     BATISTA - then a member of the international A-List as Bloomberg's putative "Eighth Richest Man in the world" - used his Soffer/Grutman connections to pitch investment in OGX stock directly to celebrities in Miami, Florida.

286.     Thus, in September 2010, BATISTA met with a group of foreign investors in Miami at a star-studded dinner party hosted by Jeffrey Soffer and worked the crowd of high-net-

worth investors, one-on-one, to buy OGX stock on insider information, because the company was about to announce further significant oil discoveries. These were fraudulent misrepresentations, designed to attract investment.

287.    Among the party guests were baseball star Alexander Rodriguez ("A-Rod"), and his then girlfriend, the film star, Cameron Diaz. Rodriguez reportedly called his financial advisor for advice on the investment who, because it was insider trading, "told me to forget about it and never mention it again, because I could go to jail for a transaction like this."[9]

288.    It is unknown before discovery how many other people in Florida BATISTA pitched the investment prospects of OGX to at this time and over the years, or how many of them were less prudent than A-Rod and actually bought stock as a result of such face-to-face pitches. But it is believed that, given the fact that BATISTA wasted no opportunity to boost the value of his companies, the face-to-face pitch he made to A-Rod was characteristic of the approach he made to many other high rollers in Florida.

**"Interest from the Chinese:"**

289.    On September 13, 2010, BATISTA spoke to reporters on a conference call that was published in an article online by Bloomberg in which he stated that all the major oil companies in the world including the major Chinese oil companies, Cnooc Ltd. and China Petrochemical Corp., were among bidders for OGX assets. In response to the reporter's comment that his sources had revealed an offered price of $7 billion for the company, BATISTA said that that amount would only buy a "tiny" stake in OGX.

---

[9] Anderson Antunes, *Even Alex Rodriguez Reportedly Almost Fell Victim to Eike Batista's Financial Collapse*, Forbes (Apr. 20, 2014), available at: http://www.forbes.com/sites/andersonantunes/2014/04/20/even-alex-rodriguez-reportedly-almost-fell-victim-to-eike-batistas-financial-collapse/#1add8bc51ee5.

290.    However, this was just more spin, intended to boost the price for OGX shares. In reality no energy company with access to the actual OGX drilling data would have had an interest in OGX for more than a tiny fraction of its then supposed market price. This, then, was a fraudulent misrepresentation, designed to attract investment.

291.    Predictably, the OGX share price rose. This time by 2%, to put OGX stock at 20% up overall for the year.

292.    By this time, as the cumulative effect of the barrage of fraudulent hype that BATISTA and his co-conspirators and accomplices had churned out over the preceding years, the financial press were hailing BATISTA as the world's eighth richest man with a net worth of $27 billion, and BATISTA was playing up his supposed position as one of the world's top billionaires by announcing a new series of grand initiatives, including a partnership with sports goliath, IMG Worldwide, Inc., forming "IMX" to engage in the sports and entertainment business in Brazil, and a foray into consumer electronics by building an Apple computer factory on vacant LLX land.

293.    As the Forbes article concluded regarding the Apple initiative - reflecting the understanding of the American investment community as to the value of OGX - "Whether that will come to pass is hard to say. Given the enormously valuable oil and gas empire that Batista has built in recent years, he might have a chance."

294.    But the "enormously valuable oil and gas empire" was nothing more than smoke and mirrors. None of these initiatives came to pass and the prime "X" group of operating companies, OGX, OSX and MMX, were to come crashing down in late 2013.

295.    Nevertheless, because of their own personal stakes in the success of OGX, BATISTA and his co-conspirators, including OGX Board members and top executives, ELIEZER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, and PAULO GOUVEA, and LUIZ CARNEIRO, who was also a top executive and board member in OSX, WERNER BATISTA,

who was the managing director of the EBX group of companies, CENTENNIAL NEVADA and CENTENNIAL DELAWARE, who were the controlling shareholders in OGX, failed to make any corrective announcement to the investing public – now or at any time thereafter - and continued to assist BATISTA by their silence and by actively, fraudulently assisting in fraudulently hyping the value of the OGX oilfields.

296.    On November 26, 2010, Bloomberg reported the news online, sponsored by BATISTA, that OGX was delaying its planned sale of a minority stake in its Campos oilfield until the D&M report was in by the end of the first quarter of 2011. Bloomberg repeated the BATISTA comments from September about selling a $7 billion minority stake to the Chinese; reiterated the fact of OGX's supposed 3.69 billion barrels of potential reserves in the Campos Basin, as estimated by D&M in 2009; and reported that the additional recent discoveries were expected to boost those numbers. This reflected the illusion that BATISTA and his co-conspirators had successfully created. But it was all untrue: these were fraudulent misrepresentations, designed to attract investment.

297.    On March 15, 2011, Bloomberg summarized the information on OGX stemming from the cumulative effect of BATISTA's lies over the three preceding years. It reported that OGX, BATISTA's main source of wealth, was worth $37.1 billion, with 6.7 billion barrels of potential reserves. BATISTA was quoted as stating that despite having fielded five purchase offers from other oil companies he did not need to sell because OGX had $3 billion in cash and the extraction costs in its shallow-water fields were extremely low.

298.    Bloomberg further reported OGX as claiming a hundred percent success rate in the Campos Basin where it planned to drill three additional wells and that higher-than-expected production would allow it to use fewer wells per production platform, thereby further cutting production costs. OGX had stated that it anticipated that production would ramp up from 20,000

barrels a day to 730,000 barrels a day by 2015, and 1.38 million barrels a day by 2018. In a video interview with Bloomberg BATISTA said "It's a bonanza" and "these are bonanza assets."

299.    But this was all untrue. For behind the scenes, everything that Brazil's King Midas touched was not turning to gold – not even black gold. These were fraudulent misrepresentations, designed to attract investment. But none of the co-conspirators made any attempt to correct the public record, even though they all knew the truth.

**The 10.8 Billion Barrel Lie:**

300.    On March 31, 2011, D&M submitted its confidential Report to BATISTA and OGX on the Prospective OGX Resources in Brazil. It painted a depressing picture of OGX's future. Out of many billions of barrels of oil and gas that might possibly exist in the OGX fields, D&M failed to identify more than a tiny amount, less than 1%, that might constitute "reserves" – *i.e.* commercially recoverable oil.

301.    When the D&M reports became public there would be an obvious, hugely depressive effect on OGX stock prices. The only alternative BATISTA and his co-conspirators and accomplices decided, to try to keep the price up, was to lie.

302.    BATISTA, therefore, had MENDONÇA mix-and-match numbers from the D&M Reports, adding apples to oranges, completely contrary to the accepted industry methodology, to use as the basis for the most colossal lie to date.

303.    As a preventive strike to defuse the effect of the impending release of the D&M reports, on April 15, 2011, MENDONÇA, "Dr. Oil," issued a press release to investors in which OGX claimed its net potential resources in "recoverable oil" were 10.8 billion barrels and that these figures were based on the assessment of its world-renowned oil auditors, D&M.

304.    In it, BATISTA announced that the 10.8 billion-barrel number was not based just on OGX's own calculations, but that, "[t]hese results, presented by an independent, internationally

renowned consulting group, confirm the extraordinary success of our business strategy and execution," he said. This obviously referred to D&M.

305.    To come up with the 10.8 billion barrel figure, MENDONÇA took D&M's *most optimistic* estimate of "contingent resources" (*i.e.* oil that was not necessarily commercially extractable in *any* amount) of 3.1 billion barrels. He then jumbled together three different categories of "prospective resources" (*i.e.* oil that had not yet even been discovered and was deemed currently unrecoverable) to come up with another 6.8 billion barrels. He then threw in D&M's figure of 1 billion barrels, which was an upper, outside guess of what might be possible from the geology, and which did not even meet the probability level of "resources" of any kind.

306.    What BATISTA and his co-conspirators and accomplices were doing was completely fraudulent. The 10.8 billion number was basically just made up out of thin air. But it was published under the imprimatur of "Dr. Oil" and supposedly based on the analysis of world-renowned outside auditors, D&M.

307.    Everybody on the Board at OGX, and everybody within BATISTA's confidence, including the directors of OGX, OSX, LLX and the 63X, EBX, CENTENNIAL, WRM, 3BX and AUX companies knew by now that the entire "X" group of companies, whose success was predicated on massive oil strikes by OGX, was a massive pump-and-dump scheme. The list of individuals included EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, and LUIZ CARNEIRO. Their legal obligation was to expose the 10.8 billion barrel lie. But they were incentivized by their stock options to keep quiet. And they kept quiet.

308.    Despite the BATISTA and MENDONÇA's preemptive strike, when the D&M Report was released on April 15, 2011, investors reacted with concern and the OGX share price dropped sharply.

309.    Nevertheless, on the basis of Dr. Oil's reputation and his $10.8 billion prediction, BATISTA and MENDONÇA managed to spark a debate on the reliability of the D&M numbers.

310.    In a conference call on April 19, 2011, with market analysts, reported by The Wall Street Journal, among other media outlets, BATISTA and MENDONÇA defended the OGX data, describing D&M, dismissively, as "the most conservative certifier in the world." BATISTA stated that it was time that people started to trust the OGX team which he had brought over from Petrobras, headed up by his fabled "Dr. Oil."  BATISTA contended that "it's time for the market to accept the company's numbers," and pledged to hire additional consultants to prove OGX's claims.

311.    The New York based multinational investment banking firm, Goldman Sachs, was among those reassured. It stressed publicly that investors should consider the D&M reports as just a part of a larger mosaic, and, "[w]hen considering the scope and underlying assumptions, we think that the D&M report generally adds confidence to our assumptions" and reiterated its "Buy" rating on OGX shares.

312.    What OGX had successfully managed to do by its fraudulent press releases and press conferences, intentionally disseminated across the phone lines and the internet to the world, was to confuse the issue and maintain a continuing belief in investors that OGX was sitting on vast commercially profitable oilfields and that all it needed was enough cash to stay in business to get the oil flowing.

313.    Maintaining a public story of OGX reserves of 10.8 billion barrels in "recoverable oil" as BATISTA was to do for the next two years was a complete fraud, designed to keep the balls in the air as long as possible and attract continuing trading in the stocks and bonds of BATISTA's companies, while he and his accomplices siphoned off as much as possible from the top and tried to sell off the rest before the bottom fell out.

314.    PAULO GOUVEA, however, decided that the writing was on the wall for OGX. While his duty was to blow the whistle on the scheme to the regulators and to investors, PAULO GOUVEA decided, instead, to cash in his chips and he sold his stake in the various X companies, reportedly realizing over $150 million which he reinvested in assets with real value, including real estate in New York and Paris. But he continued on in BATISTA's confidence and as a prime adviser in the fraud.

**D&M Secretly Protests:**

315.    Not surprisingly, behind the scenes, D&M was furious that their name was being used to mislead investors and on April 29, 2011, they privately stated their "great concern" on this point to BATISTA and OGX and demanded a corrective press release.

316.    On May 3, 2011, OGX sent D&M a placatory response, attempting to negotiate a compromise that would allow it to maintain both the 10.8 billion-barrel figure and the D&M imprimatur for its probity.

317.    On May 16, 2011, there was a meeting between OGX and D&M, with a presently unknown result. Whatever was agreed, D&M did not make its privately expressed "great concern" public and OGX did not retract its 10.8 billion barrel lie.

318.    Indeed, BATISTA embroidered further on the lie. In May of 2011, at the Michael Milken conference in California, which was broadcast to investors across America, including Florida, and worldwide, BATISTA, then said to be worth roughly $30 billion, stated to CNBC that he was going to be richer than Carlos Slim, Warren Buffett, and Bill Gates because "I have created five companies that have in them embedded resources worth $2 trillion at a very low cost of producing." He went on to call them "idiot-proof assets."

319.    MENDONÇA, fully realizing that BATISTA's boasts to the public were nonsense, since he had created the underpinnings for the fraudulent hype, between June 9 and June 16, 2011,

65

secretly and improperly sold 321,200 of his own shares in OGX, realizing a profit of approximately $2,900,000 without disclosing the transaction to the Brazilian regulators. Publicity as to the fact that "Dr. Oil" was unloading his OGX stock would have undermined investor confidence in OGX. His failure to disclose the sale was therefore a fraudulent misrepresentation by omission.

320.     In July 2011, OGX released a Management Presentation to investors trumpeting a resolutely upbeat picture, throughout which it consistently described its resources as being "10.8 billion of recoverable boe" and claiming to have all the needed cash, equipment, and skill in place to achieve massive success.

321.     However, the truth was that OGX had found virtually no commercially recoverable oil and BATISTA had no convincing data to show any savvy oil industry investor to convince it to buy into OGX. These were continuing fraudulent misrepresentations.

322.     BATISTA needed a cover story for why his rumored sale to the Chinese was not going through and he resolved to tell the press that it was because he did not need the cash and wanted to reap the profits himself.

323.     Thus, on September 23, 2011, in an article published by Reuters U.S. Edition on the wires under the title, "*Cashed-up Eike Batista won't sell oil stakes*," Reuters reported that BATISTA said he had abandoned talks to sell stakes in his offshore oil prospects because he had billions in hand and did not need the cash.

324.     Oil was then trading at roughly $80 per barrel and BATISTA claimed that the low production cost of his shallow-water wells meant that he could break even if the per barrel price fell as low as $24. In the Reuters article, he said that OGX was close to signing a long-term deal to supply oil to one of the world's largest refiners – which he declined to identify, citing securities regulations – and that a recent bond issue had "brought in exactly what we needed to live off our own spoils." This was a fraudulent misrepresentation designed to attract investment.

325.    When asked about a decline in OGX share prices, he responded, "I have to laugh. My companies are all going to be massive cash flow machines. I'm going to pump money to my shareholders and dividends to my sons and my grandsons."

326.    Part of that claim would prove true: he would pump money to his co-conspirator shareholders through their sales of fraudulently hyped stock, and would pump OGX money directly to his sons and other family members in order to defraud creditors – but not from profits.

**Insiders Sell Their OGX Stock in Miami:**

327.    BATISTA had a number of operating companies in the EBX Group from which he could directly siphon money and which he hoped he would be able to flip at a profit. However, BATISTA's co-directors and other insiders at OGX had their fortunes pegged directly to the value of their stock options in just that one company. They could see that the picture that BATISTA was painting for the public, that they were helping him color in, was false, and they wanted to dump their shares before the bottom fell out.

328.    The problem was that stock sales by insiders would have to be disclosed publicly and there would be a high risk of creating panic among investors if they sold. BATISTA had therefore placed restrictions on their ability to do so.

329.    Upon information and belief, however, several OGX executives who were within the circle of BATISTA's confidants and who knew that OGX was a massive fraud, entered into transactions to circumvent the prohibition and dispose of their stock without alarming investors through "creative thinking" on the part of J.P. Morgan Securities in Miami, Florida.

330.    One of J.P. Morgan Securities' wealth-management executives in Miami, Florida, reportedly proposed extending the insiders "loans" with their stock standing as collateral and the sole recourse for repayment. The idea was that the insiders would default on the "loans," J.P. Morgan would foreclose on the collateral, and both sides would be happy: J.P. Morgan would have

OGX stock at what it hoped would be a profit and the insiders would have cash, thus achieving the equivalent of a sale of the stock without disclosure to investors.

**The Lies Continue – OGX "Cash Rich:"**

331.     As the cumulative result of BATISTA's lies, by 2012, there was general acceptance in the American and international investment community and among financial analysts that OGX had access to massive amounts of recoverable oil. However, investors and analysts were beginning to question when OGX would start to deliver and whether the company was sufficiently well-capitalized to stay in business until it could start production.

332.     Accordingly, if his fraudulent scheme was to work, BATISTA's task was now to engender a belief in investors that OGX was cash rich and that the oil would soon start to flow.

333.     In January 2012, the initial OGX production report on the first well showed flows of just 15,000 barrels a day. These extremely modest results nevertheless had Batista and "Dr. Oil" putting on a show of huge success, popping champagne corks while technicians opened the valves remotely from Rio de Janeiro and webcams delivered pictures to the world.

334.     On January 16, 2012, OGX released a Statement of Material Fact announcing the discovery of evidence of "hydrocarbons" in the Santos Basin, in the Fortaleza field, in well OG-63, stating, "[t]his discovery is important for its huge hydrocarbon column and net pay identified in the Albian section, as well as by the quality of the Aptian reservoir and its behavior," commented PAULO MENDONÇA, General Executive Officer and Exploration Officer of OGX.

335.     This was a mishmash of technical jargon intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable, recoverable oil, to further whet market appetite. In other words, this was yet another fraudulent misrepresentation.

336.     And BATISTA continued boasting of his "success." On January 20, 2012, he gave an in-person interview from Rio de Janeiro with The New York Times, for an article entitled, "A

Brazilian Magnate Points to Himself for Inspiration." The article remarked admiringly on BATISTA's trappings of apparent success, his 1,000,000 Twitter followers, and the fact that OGX was expected to begin producing crude oil from an estimated 10 billion barrels of offshore discoveries. "Brazil today has the wealth that America had at the turn of the century," said BATISTA. Regarding his ostentatious display of wealth: "I want to help a whole generation of Brazilians to be proud. I am rich, yes. I have built it myself. I have not stolen it," he quipped.

337.    Regardless of the accuracy of the wealth of his country, his final statement regarding the source of his personal wealth was certainly untrue. Again, the idea that there were ten billion barrels of recoverable OGX oil offshore was a fraudulent misrepresentation.

338.    On March 2, 2012, BATISTA gave a telephone interview from Rio de Janeiro to Bloomberg. During the interview, BATISTA stated that he still had plans to overtake Carlos Slim as the world's richest person by 2015 and boasted that his companies would post close to $1 billion in earnings before interest, taxes, depreciation and amortization in 2012, and double that in 2013. With an estimated net worth of $30 billion, BATISTA, still ranking eighth in the Bloomberg Billionaires Index, said, "I am probably, among the billionaires, the least indebted guy of all of them." At this time, behind the scenes, BATISTA, personally, owed members of the Itaú banking group close to a billion dollars.

339.    No reasonable person, knowing what BATISTA knew at that time, could have made any such statement truthfully. He was playing games with investors with smoke and mirrors. His "Empire" was, as he knew, a house of cards, and the collapse was just a matter of time.

**The Mubadala "Investment:"**

340.    The Mubadala Development Company ("Mubadala"), based in Abu Dhabi, is the strategic investment and development company of the oil-rich United Arab Emirates.

341.    On March 26, 2012, BATISTA and his EBX Group publicly announced that Mubadala had signed a "strategic partnership agreement" with the EBX Group whereby Mubadala would invest $2 billion in exchange for a 5.63% preferred equity interest in the Defendant, CENTENNIAL DELAWARE and other BATISTA offshore holding companies (believed to include the 63X and EBX Defendants), giving Mubadala an indirect interest in the public companies, OGX, OSX, MMX, LLX, MPX, and privately-held AUX, REX and IMX.

342.    The BATISTA and the EBX Group further announced: "[t]his is the first time we have invited a strategic partner to invest at our holding company level. The investment considerably strengthens the entire group and its ability to successfully implement current and future projects. Mubadala, after conducting thorough due diligence of our companies recognizes the great potential of our Latin American assets."

343.    BATISTA announced the agreement as a "framework for further collaboration between the two organizations" and that the Mubadala cash was to be used to "reinforce the group's already strong capital structure so as to help fund new enterprises across multiple business areas."

344.    An attached "Legal Notice" stated that this "strategic partnership constitutes a minority investment by Mubadala in Centennial Asset Brazilian Equity Fund with no changes to the control, management or day-to-day activities of Mr. Eike Batista's publicly listed vehicles: OGX, OSX, MMX, LLX and MPX." Mubadala went along with the phrasing of this announcement.

345.    On the surface, as projected to the investing world, a highly experienced and well-financed sovereign company from the oil sector, after conducting "thorough due diligence," had seen sufficient value in the prospects of BATISTA's oil-based EBX empire to accept an "invitation" - the first extended to any outside player - to buy a tiny minority equity stake in

BATISTA's holding company, giving it no control, for $2 billion. (By extrapolation, on the raw math, without factoring in the value of control shares, the company must have a value as a whole of at least $40 billion).

346. The subtext of the EBX Group message was that EIKE Batista's strongly-capitalized EBX group did not need the cash, but this contribution would enable it to expand into new areas.

347. All members of executive management and the boards of directors of the EBX Group members at that time were complicit in this announcement. That included EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA and LUIZ CARNEIRO,

348. The news about the Mubadala "investment" was disseminated by many financial news organizations including Bloomberg.

349. As BATISTA later explained in a Milken Conference interview broadcast to the investment world by Bloomberg, described below, he entered into this transaction in order to convey a message to the world that a savvy outsider had "audited" his operation and placed its "stamp of approval" on it. In other words, if one of the world's great players believed in him to the tune of $2 billion for a tiny stake, so should all investors.

350. The actual Mubadala "strategic partnership agreement" has not yet been seen. But later events described below make it clear that this $2 billion "stock purchase" was far from a simple purchase of a tiny non-control block of stock, but was structured far more like a $2 billion *loan*, with BATISTA's entire worldly wealth, including shares in companies within the group and outside, such as his substantial holding in Florida's Burger King and other treasured plum assets, pledged as collateral. The deal was structured and implemented in the Cayman Islands and involved the EBX, 63X and CENTENNIAL Companies.

351.    This fraudulent presentation was primarily intended to bolster investors' confidence in OGX, on which the success of the group depended.

352.    Had this "strategic partnership" been declared to investors by the boards of the companies involved as the desperately-needed "loan" it truly was, investor confidence in OGX would have evaporated, its end hastened by perhaps as much as a year, and Plaintiffs would not have lost a cent.

**Keeping the Balls in the Air:**

353.    In April 2012, BATISTA staged a photo-op for the world press at his planned LLX "Super-Port." With him onstage were a roster of Brazil's political and business elite: his father, ELIEZER BATISTA, President Dilma Rousseff (now impeached and deposed), Rio Governor Sérgio Cabral (now under arrest and indictment for corruption), and Mines and Energy Minister Edison Lobão (now also under federal investigation for corruption). The audience of 400 included foreign corporate luminaries from around the world.

354.    Showing off his port, which he predicted would be the largest port in the Americas, BATISTA announced that OGX had begun production on what he described as a "new frontier" of petroleum 37 miles off the Brazilian coast. "This is a historical moment," said Batista. "It's the first time an independent Brazilian company has produced offshore oil."

355.    President Rousseff did her bit to boost the illusion, announcing resolutely that the state-run oil company Petrobras would go into deep partnership with Batista's firm: "Eike is our standard, our expectation and, above all, the pride of Brazil when it comes to a businessman in the private sector," Rousseff told those in attendance, as she stood by his one side, Cabral flanking him on the other, all three clad in orange OGX jumpsuits for the photo-op. BATISTA – his jacket sporting a black, oily hand-print, symbolizing "first oil," flashed a two-fisted victory sign while

his father, ELIEZER BATISTA grimly smiled in the background at what he knew was the huge,

secret joke – that there just was no oil to speak of:



356.    BATISTA and his co-conspirators and accomplices knew that the trickle of oil they

were witnessing was pretty much all there was. The block was later to be returned to the

government as worthless.

357.    On April 18, 2012, roughly a year before the eventual crash, as the result of the

aggregate lies detailed above, Times magazine named BATISTA one of the 100 Most Influential

People of 2012. The short supporting puff-piece on BATISTA was written by then-mayor of Rio

de Janeiro, Eduardo Paes (a key BATISTA ally, now under investigation for corruption).

358.    In it, Paes spoke of BATISTA as one of Rio's "most treasured adopted sons" who

had "helped us shape the renaissance" of Rio, citing his status as "Brazil's richest man and the

world's seventh richest, bringing vital investment to our city from oil and mining," and boasting

of his charitable largesse.

359.    Puff pieces like these were contributed from time to time by BATISTA's rich and

powerful friends whose own careers were symbiotically tied to his and were intended to bolster

the impression of BATISTA's success and sustain his position with investors.

360.    However, the insiders could see that the writing was now truly on the wall.

361.     In April 2012, OGX board member Marcelo Faber Torres figured that he had better dump his OGX stock before the truly bad news came out and he reportedly sold 9 million OGX shares in staggered batches so as not to alarm investors.

362.     Other insiders, co-conspirators, and accomplices started to do the same and reportedly, at or about this time, the executive group quietly sold off 17 million shares, realizing over $103 million.

**"The Brazilian Dream:"**

363.     On April 30, 2012, Bloomberg Television aired an 11-minute video interview of BATISTA on its show, "Money Moves with Deirdre Bolton." The interview took place at the Milken Institute's 2012 Global Conference in Los Angeles, California, where BATISTA was a featured panelist in four different panels during the five-day conference. After Bloomberg broadcast the interview on television, it published the interview on youtube.com with the description, "Brazilian billionaire Eike Batista talks about the potential benefits of OGX Petroleo e Gas Participacoes SA forming project partnerships with Petroleo Brasileiro SA and Vale SA."

364.     In the Bloomberg interview, correspondent Stephanie Ruhle introduced BATISTA as the "tenth richest man in the world - the goal is to get to number one." Ms. Ruhle then noted that a week earlier, the President of Brazil had visited BATISTA's oil port in northern Rio de Janeiro, where she called BATISTA a special kind of entrepreneur and a hero to Brazil. Bloomberg accompanied this anecdote with broadcast footage of BATISTA and President Rousseff getting off a helicopter together, surrounded by press. All of this, of course, fed into BATISTA's artificial narrative of himself to lure in American investors.

365.     BATISTA then utilized this broadcasted English-language news segment to repeat his colossal lies about his companies to American investors. He spoke of "a trillion and a half dollars in assets: oil, gas, iron ore, gold, coal" and projects with "eighty percent margins." He

74

spoke of the prospects of collaboration between OGX (which he knew had virtually no oil) and the (huge) Vale and Petrobras companies as being a "win-win for everybody."

366.    BATISTA also explained his rationale for the sale of a small stake in EBX to Mubadala (which was secretly, in reality, a loan) as being to inspire investor confidence:

> We just wanted to have, maybe an extra stamp by investors. Because you know the market is funny. Sometimes they demand, well, we like to have the structure audited. And when somebody like Mubadala comes in, the world knows how deep they go into the auditing process. And I love to be audited. I love transparency. So in a way, it's an extra way to show transparency to what we do.

He said that he was just spreading hope in "The Brazilian Dream."

367.    But by June of 2012, OGX was unable to hide the fact that the wells at its main field in the Campos Basin were not as productive as first believed and that it had cut production estimates by two-thirds. OGX share prices fell steeply by the end of June.

368.    Continuing to believe in the aggregate BATISTA-generated hype, however, on July 19, 2012, the Financial Times in London, England published an article entitled, "It is too soon to write off Eike Batista." The article quoted BATISTA's boast at an OGX investor meeting from earlier in the year, that his companies were "80 per cent ebitda- [earnings before interest, taxes, depreciation, and amortization] margin businesses. I search for the truffles."

369.    It also quoted a supportive statement from one of BATISTA's biggest and closest bankers, BTG Pactual – who should be in the position to know – that the stock could recover within the next twelve months and that "OGX has enough cash to support its business."

370.    Nobody listening thought that BATISTA, who continued to boast about his "trillions of dollars" of oil, would be prepared to flat out lie. They were to be proved wrong.

371.    Through a barrage of international press articles and a blizzard of tweets, in the course of 2012, BATISTA fraudulently maintained an image of burgeoning wealth through

publicized plans for massive investment into an ever-expanding series of business ventures, from shipyards and ports, to sports and entertainment ventures.

372.    Thus, on July 18, 2012, BATISTA tweeted that OSX and OGX had negotiated the construction of drill ships; on July 19, 2012, he sent out a video on the synergy between OGX and MPX for gas exploitation in the Paraiba Basin; on August 29, 2012, he boasted that his port at Açu would be one-and-a-half times bigger than Manhattan Island, New York; and on September 25, 2012, he re-tweeted an IMX photo regarding his IMX deal with Cirque du Soleil.

373.    However, as stated above, the OSX shipbuilding business was largely dependent on OGX oil and there was no oil. Nor were there continuing orders to build ships from the general market. However, corrupt government Ministers controlled the purse at Brazil's Petrobras and were a source of funding – at a price.

374.    What BATISTA did not include in his tweets was that OSX had been awarded this $922 million ship-building contract as a result of a $2.3 million bribe that CARNEIRO had agreed to with Brazil's Finance Minister, and Chairman of Petrobras, Guido Mantega.

375.    By now the illusion of spectacular reserves of oil had been created. MENDONÇA was no longer needed as "Dr. Oil," and he was promoted out of OGX to the Board of EBX, BATISTA's investment vehicle, presided over by WERNER BATISTA, which was focusing on siphoning off as much as possible.

**OGX Secretly Bankrupt:**

376.    Upon information and belief (from the Brazilian indictments) an internal OGX task force which had started work in 2011 and Schlumberger, the world-renowned energy consultant, essentially a Joint Task Force, presented reports on their conclusions as to OGX's prospects to the OGX Executive Committee, presided over by BATISTA, in September, 2012.

377.     Upon information and belief (from the Brazilian indictments) the Joint Task Force concluded that a negligible amount of the promised 10.8 billion barrels of oil were "recoverable" at any expense and that, even so, they were contaminated with such high levels of $H_2S$ "Death Gas" that most of what was technically recoverable could not be extracted economically even if (which was doubtful, because of the environmental impact) licenses for decontamination could be obtained.

378.     The Joint Task Force concluded that even in a best-case scenario, the company had a negative value of about one billion dollars, making the commercial production of oil from any of the fields absolutely impossible. This was completely devastating news. In sum, every day of additional exploration was a complete waste of money and was creating more debt that could not be repaid.

379.     Thus, by September, 2012, at the very latest, BATISTA, the board members of OGX and his other co-conspirators and accomplices, including the board of OSX, knew that OGX was insolvent, and digging an even bigger financial hole for itself every day that it stayed in operation. The further exploration for oil was a pointless quest. Moreover, even the *pretense* of oil exploration for profit could not continue without fresh massive injections of cash.

380.     BATISTA, the board members of OGX, the board members of the EBX Group, and his other co-conspirators and accomplices, knew from these devastating audits that the whole house of cards that depended on OGX oil (the OSX FPSOs, the LLX-run Super-Port, and so on) would collapse as soon as the truth was known.

381.     BATISTA, the board members of OGX, the board members of the EBX Group, and his other co-conspirators and accomplices, knew that there was no reason for any investor, who knew what they knew, to invest another penny in OGX or OSX stocks, or buy OGX or OSX

bonds, and indeed that anyone who had OGX/OSX stocks or bonds who knew what they knew would dump them as quickly as possible.

382.    These reports should have been disclosed to the public immediately as Statements of Material Fact. However, BATISTA and his co-conspirators, and the Boards of OGX and OSX and the rest of the EBX Group, including ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA and LUIZ CARNEIRO, illegally refused to disclose this information and deliberately suppressed it. This constituted a massive fraudulent misrepresentation by omission.

383.    BATISTA and his co-conspirators and accomplices knew that it was now just a matter of time before OGX and the satellite companies were seen by the public to be worthless. Their focus was now to keep up the illusion of eventual profitability long enough for them to liquidate as much of their remaining stock in OGX and the satellite companies in the EBX Group at the highest price possible and route the proceeds out to secret foreign bank accounts before the bubble burst. And by continued outright lies, BATISTA and his co-conspirators and accomplices, including the boards of OGX and OSX and the other companies in the EBX Group, managed to stave off the realization among investors that OGX, and by extension OSX, were bankrupt for close to another year.

**The Exit Strategy:**

384.    Upon information and belief, BATISTA's exit strategy - which was integral to the fraud as a whole, since the entire exercise would have been pointless if the money stolen had not been put out of the reach of creditors when the bubble burst - is believed to have been largely structured and executed in Miami, Florida. It was basically a money-laundering operation intended to defraud creditors. The complete details are unknown before discovery, but, to the extent known, the ultimate facts are as outlined below.

385.     As a part of his own exit plan, BATISTA had for years maintained bank accounts in the names of his various Defendant family members, the Defendant companies, and numerous other Batista companies not joined here, including the Bahamian "Thorque" companies, in various countries outside Brazil, principally in Miami at BANCO ITAÚ MIAMI, and in banks in the Cayman Islands and the Bahamas, where he kept much of the proceeds of the fraudulent scheme

**The Miami Asset Protection Lawyer:**

386.     Upon information and belief, one architect of the international asset protection scheme was an asset protection attorney, MAGNO, based in Miami, and his firm MAGNO PL. MAGNO and MAGNO PL created and implemented the international structures for BATISTA to transfer funds internationally and hide proceeds of the fraud. As noted above, they were introduced to EIKE BATISTA and THOR BATISTA by BERTO, who served as the trustee of the Batista Family Trust, created by MAGNO to hold proceeds of the scheme on behalf of BATISTA and his family members. This is further detailed below.

387.     Upon information and belief, from at least early 2013 onwards, MAGNO and MAGNO PL, essentially, had no other client but BATISTA and his various co-conspirators, accomplices, corporations, trusts and other interests, and his offices were in fact an agency office for BATISTA and his co-conspirators and accomplices.

388.     Upon information and belief, no professional privilege attaches to MAGNO's or MAGNO PL's files, as being excluded by the crime-fraud exception and to destroy them or move them would constitute furtherance of the conspiracy, spoliation of evidence and cause for disciplinary action.

**Banco Itaú Miami:**

389.     BATISTA's prime banking relationships were with three massive international banking groups: Citibank, BTG Pactual (and its predecessor UBS) and the Bank Itaú group, all of whom have presences in Miami and licenses to operate in Florida.

390.     Upon information and belief, each of the three banks named above had extremely close relationships with BATISTA and his co-conspirators and accomplices and different divisions and subsidiaries within those groups assisted BATISTA and his co-conspirators and his accomplices in routing funds internationally to ultimate repository accounts in secrecy jurisdictions around the world.

391.     Upon information and belief, the messaging to effect such transfers would have necessarily been routed through the SWIFT server maintained in Virginia and otherwise through the United States.

392.     It is unknown before discovery whether the degree of knowledge and complicity of Citibank and BTG's U.S. operations would justify joining these banks in this action as defendants. However, it is known that BANCO ITAÚ MIAMI provided banking facilities and hosted accounts in Miami and, upon information and belief, knowingly laundered money and assisted BATISTA and his co-conspirators and accomplices to fraudulently evade creditors in Florida.

393.     To the extent known before discovery, prior to 2012, BATISTA and the 63X Companies had transferred at least $400 million to a 63X MASTER FUND account at BANCO ITAÚ MIAMI in Miami, Florida.

394.     By September 2012, BATISTA and his co-conspirators and accomplices knew that OGX was essentially worthless. BANCO ITAÚ MIAMI, with its inside knowledge from the Itau group members, also knew that the EBX Group was in a perilous state.

395.     Starting in September 2012, BATISTA and his co-conspirators and accomplices had 63X MASTER FUND make the following transfers out of its accounts at BANCO ITAÚ MIAMI. Some transfers moved money out of Florida. Others shuffled money between titular owners and accounts at the same bank. It is believed that these transaction were a small part of a much greater and more complex set of transfers that were achieved with BANCO ITAÚ MIAMI's willing assistance, in an effort to defraud, hinder, or delay creditors:

(a)  On September 5, 2012 63X MASTER FUND transferred $1,000,050.00 from its account at BANCO ITAÚ MIAMI to an account in the name of TMF at an unknown institution.

(b)  On September 18, 2012 63X MASTER FUND transferred $50,270,050.00 from its account at BANCO ITAÚ MIAMI to an account in the name of 63X MASTER FUND at an unknown institution.

(c)  On September 24, 2012 63X MASTER FUND transferred $1,700,050.00 from its account at BANCO ITAÚ MIAMI to in the name of 63X MASTER FUND at Morgan Stanley & Co.

(d)  On October 9, 2012 63X MASTER FUND transferred $15,000,050.00 from its account at BANCO ITAÚ MIAMI to an account in the name of 63X MASTER FUND at an unknown institution.

(e)  On February 4, 2013 63X MASTER FUND transferred $1,500,050.00 from its account at BANCO ITAÚ MIAMI to an account in the name of 63X MASTER FUND at JP Morgan Chase, N.A.

(f)  On February 12, 2013 63X MASTER FUND transferred $6,419,200.00 from its account at BANCO ITAÚ MIAMI to an account in the name of AUX LUXEMBOURG at Itaú Unibanco SA - Nassau Branch.

(g) On March 21, 2013 63X MASTER FUND transferred $500,000.00 from its account at BANCO ITAÚ MIAMI to an account in the name of TMF at TAG Bank in Panama.

(h) On April 8, 2013 63X MASTER FUND transferred $2,000,000.00 from its account at BANCO ITAÚ MIAMI to an account in the name of CENTENNIAL NEVADA at BANCO ITAÚ MIAMI.

(i) On June 24, 2013 63X MASTER FUND transferred $30,890,000.00 from its account at BANCO ITAÚ MIAMI to an account in the name of CENTENNIAL DELAWARE at BANCO ITAÚ MIAMI.

(j) On June 25, 2013 63X MASTER FUND transferred $2,850,000.00 from its account at BANCO ITAÚ MIAMI to an account in the name of CENTENNIAL DELAWARE at BANCO ITAÚ MIAMI.

(k) On October 17, 2014 63X MASTER FUND transferred $1,700,000.00 from its account at BANCO ITAÚ MIAMI to an account in the name of AUX LLC at BANCO ITAÚ MIAMI.

(l) On November 21, 2014 63X MASTER FUND transferred $13,000,000.00 from its account at BANCO ITAÚ MIAMI to an account in the name of AUX LLC at BANCO ITAÚ MIAMI.

(m) On April 11, 2016 Thorque1 Fund Ltd. transferred $592,690.96 from its account at BANCO ITAÚ MIAMI to an account in the name of THOR BATISTA at BANCO ITAÚ MIAMI.

(n) On January 11, 2017 63X MASTER FUND transferred $60,973.63 from its account at BANCO ITAÚ MIAMI to an account in the name of CENTENNIAL NEVADA at BANCO ITAÚ MIAMI.

396.     In addition, other BATISTA-controlled EBX Group members made the following listed transfers from their accounts in the Cayman Islands directly to accounts held by other BATISTA-controlled entities at BANCO ITAÚ MIAMI. It is believed that these transaction were another part of a much greater and more complex set of transfers that were achieved with BANCO ITAU MIAMI's willing assistance, in an effort to defraud, hinder, or delay creditors:

(a) On June 24, 2013 CENTENNIAL DELAWARE transferred $50,000,000.00 from its account at Banco BTG Pactual S.A. – Cayman Branch to an account in the name of CENTENNIAL DELAWARE at BANCO ITAÚ MIAMI.  The ultimate disposition of these funds is currently unknown.

(b) On July 2, 2013 CENTENNIAL DELAWARE transferred $26,710,000.00 from its account at Banco BTG Pactual S.A. – Cayman Branch to an account in the name of CENTENNIAL DELAWARE at BANCO ITAÚ MIAMI. The ultimate disposition of these funds is currently unknown.

(c) On July 15, 2014 63X MASTER FUND transferred $8,000,000.00 from its account at Banco BTG Pactual S.A. – Cayman Branch to an account in the name of AUX LLC at BANCO ITAÚ MIAMI. The ultimate disposition of these funds is currently unknown.

(d) On October 28, 2014 63X MASTER FUND transferred $700,000.00 from its account at Banco BTG Pactual S.A. – Cayman Branch to an account in the name of AUX LLC at BANCO ITAÚ MIAMI. The ultimate disposition of these funds is currently unknown.

**The Fake Billion Dollar "Put Option:"**

397.     To give himself time to implement his exit strategy, BATISTA needed more than tweets and boasts and he devised other fraudulent stratagems to bolster investor confidence and stimulate further public investment.

398.    However, directors in OGX now started getting cold feet about staying on in the company at the board level, given the likely civil and possible criminal liability they would face when the bubble burst, and several of them resigned. None of them, however, imperiled their reputations or their pocket-books by blowing the whistle on the OGX fraud.

399.    BATISTA was meanwhile searching for less squeamish candidates for the board of OGX for whom the lure of money would be greater than their fear of consequences and on August 6, 2012, at a general meeting of OGX shareholders, many of them large North American pension plans, including the Florida Retirement System Trust Fund, one such individual was proposed and elected: the Defendant AZIZ BEN AMMAR.

400.    BEN AMMAR was likewise elected to the public boards of OSX, MMX, MPX, CCX and LLX.

401.    Upon information and belief, AZIZ BEN AMMAR was a prime mover in the "Put Option" stratagem described immediately below.

402.    On October 24, 2012, BATISTA announced to investors in the United States and internationally, as was duly reported by Bloomberg and the other organs of the financial press that, through companies in his EBX Group he had entered into a billion dollar "Put Option" with OGX. This was, in essence, a contract between EBX Company, CENTENNIAL NEVADA, BATISTA and OGX for BATISTA, through CENTENNIAL NEVADA, to inject a billion dollars of his personal wealth from the other EBX companies into OGX, as additional working capital upon demand.

403.    BATISTA similarly announced that he would be ploughing a billion dollars of his own wealth held by EBX Companies into OSX, buying stock at three-times market price if and when needed, although that might have to be delayed until 2014 because, as BATISTA said, Brazilian stock exchange rules required a minimum amount of "free float" time.

404.     The announcement that Brazil's golden boy with the Midas touch had a billion dollars-worth of confidence in his oil exploration company, and another billion in his prime satellite ship-building company resulted in an expected boost in share and bond prices.

405.     However, there were at least three fundamental problems with this announcement. The first was that BATISTA had no intention of paying in any money whatsoever and there would be no practicable way of compelling him to do so. The second was that he did not have a billion – let alone two billion - dollars in cash that he could pay in even if he wanted to. The third was that no amount of money could fix the fundamental problem, which was that there was no oil.

406.     In sum, the OGX Put Option was just another lie, a stratagem created by AZIZ BEN AMMAR and adopted by the co-conspirators to delay the inevitable and allow BATISTA and them all to get as much money as possible *out* of OGX before it collapsed.

407.     The boards of OGX and OSX and the other companies in the EBX Group were all party to the promulgation of these fraudulent misrepresentations, including EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO, MARCUS BERTO and AZIZ BEN AMMAR.

408.     In fact, upon information and belief, BATISTA may not have even actually entered into any such commitment on paper. Only much later, and only under pressure from insider creditors, did he ever actually sign such an obligation, and even then it was conditioned on an "out clause" designed to give him some "cover" in backing out which, as we shall see below, is exactly what he did.

409.     That the Put Option was non-binding was not told to the public. Nor was the fact that BATISTA did not intend to honor it. Nor was the fact that the company was insolvent. Nor

was the fact that there just was no oil, and that no amount of money, however long it might be squandered on pointless drilling, could put oil in the ground where no oil existed.

410.    All of this should have been announced to investors via Statements of Material Fact, but was not. The failure to do so constituted fraudulent misrepresentations by omission by OGX and OSX and the other companies in the EBX group, and their directors and top executives including EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO, MARCUS BERTO and AZIZ BEN AMMAR.

411.    However, the announcement of the Put Option was effective in slowing the fall in price of OGX stock during the fourth quarter of 2012 and fed its rise in January, 2013.

412.    The value of LLX - BATISTA's allied logistics company and member of the EBX Group, which was building the port at Açu where OSX ships were to offload OGX oil - was conspicuously pegged to the value of OGX and therefore OSX.

413.    Defendant MARCUS BERTO was a close confidant of BATISTA's in 2012, with whom BATISTA shared the insoluble problems being faced by OGX and OSX. They knew that when the news became public, BATISTA's port logistics company, LLX, whose prime value lay in the need to offload OGX oil from OSX ships, would certainly crash in value.

414.    BERTO therefore agreed to assist in the fraudulent scheme by helping delay the emergence of the news that both companies were effectively bankrupt. Consequently, in November, 2012, MARCUS BERTO was appointed CEO and Investor Relations Officer of LLX to help corral emerging bad news and get the company sold off before the OGX bubble burst. Present at the board meeting to elect BERTO were LLX directors EIKE BATISTA, ELIEZER BATISTA, FLAVIO GODINHO and AZIZ BEN AMMAR.

415.    As CEO, BERTO ran LLX. As Investor Relations Officer, he had prime responsibility for reporting to the public on material developments affecting investment in the company. Upon information and belief, BERTO fully understood that OGX was insolvent and the mission was to cash BATISTA out as fully as possible before the crash rendered everything valueless. In breach of his duty to the investing public, throughout his tenure, BERTO failed to report anything about the dire financial straits that OGX and OSX were in or that he was helping find a buyer so that BATISTA could dump LLX.

416.    To further boost investor confidence, on November 13, 2012, BATISTA tweeted to the world that the Group X operations in the Campos Basin were in an area responsible for 80% of Brazil's oil production. The statement was intended to bolster his previous fraudulent misrepresentations and maintain confidence among investors.

### Section II - The Plaintiffs Invest

417.    At the start of 2013, no one apart from the insiders in the EBX Group, not even the Brazilian regulators, and certainly not the many American investors and analysts, suspected that OGX was a colossal bubble scheme. The consistent, massive lies, spawned by BATISTA, his co-conspirators and his accomplices, repeated over the previous years, had generated an overall base-line impression among investors across the United States and world-wide of OGX as an oil company with enormous oil reserves and enormous likely margins of profit, whose only impediment to spectacular success was its cash needs until it could come into full production.

418.    That the BATISTA-generated spin was continuing to work in early 2013 was exemplified by announcements such as one published online by Highbeam Reports in January, 2013 that London's financial house Barclay's was convinced that "[OGX] presents better opportunities for investors than its federally-owned peer Petrobras . . ." (This was well before the massive Petrobras "Lava Jato" or "Car Wash" corruption scandal broke).

419.   As noted above, Gables Capital, Inc. is a registered investment adviser based in downtown Miami, Florida, and at all times material hereto acted as investment adviser to the Plaintiffs and was their agent for the purchase and sale of stocks and bonds.

420.   The individual responsible for the MERIDIAN and AMERICAN accounts was Ms. Judith Neiwirth, Gables Capital's co-founder and Chief Investment Officer, who had over thirty years of experience in the financial services industry.

421.   Ms. Neiwirth had available to her the aggregate spin disseminated by BATISTA and his co-conspirators and accomplices to the international financial market via the usual "lay" internet sources such as Google, telephone conferences with others and, most importantly, the Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers across America and world-wide.

422.   As a result of the hype generated by BATISTA, described above, the general base-line impression among American and international investors and analysts at this time was that OGX was a company that was sitting on spectacular reserves, as evidenced in part by the fact that savvy industry player, Mubadala, had recently bought a 5.63% stake in its holding company for $2 billion.

423.   To investment advisers like Ms. Neiwirth, reviewing the aggregate information available on Bloomberg, it looked like all that OGX needed was sufficient operating capital to get to the point when it came into full production and the trillion-dollar "bonanza," which BATISTA and his accomplices had consistently promised, started to gush.

424.   It seemed, moreover, that OGX was in no danger of running out of cash, given that BATISTA's EBX had pledged an additional billion dollars of operating capital, if and when needed. (The subtext was further that although there was a trillion dollars of oil to be had, if a billion was not quite enough to bring the gushers online, there would be more cash to come).

425.    BATISTA had further announced a pledge to inject another billion dollars from EBX into OSX, if and when needed. Since the future of OSX depended heavily on the future of OGX, this pledge of cash for OSX reinforced the public impression of the value of OGX.

426.    This was therefore a particularly attractive opportunity for purchasers in the bond market. OGX appeared to be asset rich with plenty of operating capital and OGX bonds were at that time yielding above an 8.375% interest rate.

427.    On January 15, 2013, in reliance on the overall picture painted by BATISTA and his co-conspirators and accomplices, his intentional misstatements made via his publications on the internet and material omissions, reinforced in her decision to invest by BATISTA's announcement of the Put Option, and not suspecting that OGX was just a colossal fraud, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17 on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN.

428.    On January 22, 2013, in continued reliance on the vaunted future profitability of OGX as aforesaid, and BATISTA's commitment to inject a billion dollars if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN.

**The EBX/BTG "Strategic Partnership:"**

429.    In 2013, BTG Pactual was Brazil's biggest private investment bank, and its Chairman, Andre Esteves, was an iconic Brazilian billionaire on a level with BATISTA.

430.    PR Newswire was a top global English internet service dedicated to helping public relations, marketing, corporate communications, and investor relations entities build awareness with new audiences, gain media pickup, manage reputation and inspire investor confidence.

431.   On March 6, 2013, prnewswire.com relayed the following EBX Group announcement:

> The EBX Group and BTG Pactual announce the signing of a novel strategic cooperation agreement.  The agreement contemplates financial advisory services, credit facilities and future long-term capital investments for the transformational projects currently being developed by the EBX Group in its segments. "This cooperation represents, above all, a partnership for the success of Brazil", said Eike Batista, EBX Group's CEO and Chairman.
>
> This new cooperation will have a Strategic and Financial Management Committee comprising of senior executives from the EBX Group and of senior partners of BTG Pactual. The Committee will be led by Eike Batista and Andre Esteves and will meet on a weekly basis to discuss overall strategies relating to EBX Group's capital structure and investments for the short, medium and long-term projects and activities of the group's portfolio of companies. The agreement does not grant any exclusivity for BTG Pactual to render financial services to the EBX Group.
>
> BTG Pactual's remuneration will be solely based on the performance of the EBX Group's public companies.  Andre Esteves, BTG Pactual's CEO, stated that: "This cooperation shows once again our firm willingness to support unique projects and national entrepreneurship, areas in which Eike Batista is an icon."

432.   This EBX Group announcement to investors across America and world-wide was intended to convey the underlying message that BTG Pactual, one of the largest and most sophisticated players in the Brazilian financial market, saw enough value in BATISTA's empire that it was willing to "partner" with EBX, without any promise of exclusivity, and plough in cash to finance "short, medium and long-term projects," with its own profits completely contingent on the success of the EBX ventures.

433.   The phrasing of this release was another BATISTA stratagem intended to dress up the fact that OGX desperately needed money to delay its inevitable financial collapse by using the language of opportunity and the purported confidence of savvy bankers in the worth of his operation. Complicit in this fraudulent misrepresentation were the top executives and directors in the EBX Group, which by that time included EIKE BATISTA, ELIEZER BATISTA, WERNER

BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR and MARCUS BERTO.

434.    Predictably, OGX share prices shot upwards, closed up 16%, and rallying as much as 27.7% in the day following the announcement. On March 7, 2013, the announcement came across on the Bloomberg terminal on Ms. Neiwirth's desk at Gables Capital in Miami, Florida, coupled with a report that BTG Pactual was willing to extend BATISTA's EBX another billion dollars for liquidity.

435.    On March 13, 2013, BATISTA had OGX release another Statement of Material Fact to investors declaring that oil recovery from the Pipeline, Fuji and Ilimani formations was commercially feasible, announcing an on-site amount between a half billion and 1.3 billion barrels of oil, and conveying the impression that commercial production was imminent.

436.    However, as BATISTA knew, the truth was that only a tiny percent of the oil detected was recoverable and commercial feasibility was impossible. This was a fraudulent misrepresentation intended to spur investor confidence.

437.    On March 22, 2013, BATISTA tweeted that OGX had eight acknowledged oil commercial accumulations: three onshore, in Maranhao, and five offshore. This was a fraudulent misrepresentation intended to spur investor confidence.

438.    But, despite BATISTA's continuing fraudulent misrepresentations, the stock price began to fall.

439.    On March 23, 2013, Bloomberg reported that BATISTA via Twitter had warned short sellers wagering against his companies that they would regret their bets. Asked by other Twitter users about the companies' falling stock prices, BATISTA had written that "rumors and gossip are tools of short sellers" who will be "caught with their pants down," and he directed his readers to an interview with BTG Pactual President, Andre Esteves.

440.    In that March 23, 2013, interview BTG Pactual President, Andre Esteves, had stated that BATISTA's companies were in no danger of failing and that BATISTA remained one of the best capitalized business men in Brazil.

441.    Well before the "strategic partnership" announced on March 6, 2013, BTG Pactual had been doing due diligence on OGX, supposed prime asset and lynch-pin of the EBX Group, in order to act as its financial consultant and potential provider of long-term financing. BTG Pactual must therefore have known how precarious a position OGX was in. The public, however, took its Chairman's statement as being true.

442.    Upon information and belief, Mr. Esteves' statement on behalf of BTG Pactual was intentionally false and was issued pursuant to an agreement with BATISTA. It is unknown what the consideration for the deal may have been. (In late 2015 Mr. Esteves was arrested in Rio, stepping off a plane from Miami, Florida, in connection with charges of obstruction of justice in the Petrobras corruption investigation and was placed under house arrest).

443.    On March 26, 2013, OGX released its financial statement for 2012. Under "Message from the Management," Defendant LUIZ CARNEIRO, Chief Executive Officer of OGX, stated, "In parallel to the development of our fields, we made further advances in our exploration campaign, resulting in important oil discoveries such as Tulum and Viedma, also in the Campos Basin. We recently declared three more fields commercial: Tubarão Tigre, Tubarão Gato and Tubarão Areia, respectively in the Pipeline and Fuji-Illimani accumulations, and we continue our studies on how to best develop them."

444.    However, as BATISTA, CARNEIRO, and the other co-conspirators knew, none of these fields were commercially viable and OGX was insolvent. These were deliberately fraudulent misrepresentations and were issued with the knowledge and consent of the top executives and board members of the EBX Group companies, which by then included EIKE BATISTA, ELIEZER

BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR and MARCUS BERTO.

445. On March 28, 2013, in continued reliance on the vaunted future profitability of OGX as aforesaid and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN.

446. On April 1, 2013, as expected, MERIDIAN received its first interest payment of $432,359.38 on its OGX bonds and AMERICAN received its first interest payment of $146,562.50. On the surface, these appeared to be good, performing investments.

447. On April 12, 2013, in continued reliance on the vaunted future profitability of OGX as aforesaid and on BATISTA's commitment to inject a billion dollars if and when needed, Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN.

**TAG Bank and Government Bribes:**

448. Unknown at the time was the fact that BATISTA and his accomplices, the 63X companies and CENTENNIAL DELAWARE, maintained several slush funds in accounts at a small Brazilian-owned bank, TAG Bank, in Panama for the purpose of paying of bribes to government officials.

449. These TAG Bank accounts were in the names of several Panamanian foundations, including The Golden Rock Foundation and The Blue Diamond Foundation. TAG Bank also hosted one of the TMF accounts from which BATISTA's wealth managers were paid. (TAG Bank's owner has been indicted on corruption charges in Brazil).

450.     In 2011, BATISTA had directed the payment of $16.5 million in bribes to Sergio Cabral, the Governor of Rio, from the Golden Rock account at TAG Bank in Panama, to secure political favors for his businesses.

451.     In April, 2013, CENTENNIAL DELAWARE wired $111,798,818.97 million from an account at BTG Pactual in the Cayman Islands to top off its slush fund, held in its own name at an account at TAG Bank, to be used as needed by distribution to one or another of the Foundation accounts and thenceforward to be used for bribes to politicians in Brazil.

452.     During April, 2013, CENTENNIAL DELAWARE directed its Panamanian affiliate, The Golden Rock Foundation, to pay a $2.3 million kickback, from its account at TAG Bank in Panama, to Brazilian officials who had been instrumental in awarding the $922 million OSX shipbuilding contract in mid-2012.

**The $850 Million "Investment" by Petronas:**

453.     BATISTA knew that the sale of supposed oil "assets" to other supposedly savvy players in the oil industry would create confidence in OGX and in its other dependent enterprises since it would reflect the fact that the buyer, after doing due diligence, saw value in the OGX asset, and therefore so should other investors; and OGX would have yet more working capital, so nobody invested in its future should worry that it could not pay its way until coming into full production.

454.     Defendant AZIZ BEN AMMAR was charged by BATISTA with attempting to close an asset purchase deal with the Malaysian State-owned oil company Petronas. Upon information and belief, BATISTA authorized BEN AMMAR to spend in excess of $10 million to help "grease the wheels" of the process by bribing Brazilian and Malaysian government officials. AZIZ BEN AMMAR was directly involved in the negotiations and travelled to Kuala Lumpur on March 27, 2013 and was in direct contact with BATISTA.

455.    On or about May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Basin. The news of the $850 million Petronas deal was picked up and reported across the world and had its intended effect.

456.    Thus, on May 8, 2013, London's Financial Times reported online that BATISTA had sold an $850 million stake in OGX assets to Malaysia's state-run Petronas. The article noted that shares in OGX were the biggest risers of Brazil's stock exchange that day. The good news came across the Bloomberg terminal screen on Ms. Neiwirth's desk.

457.    That same day, The Wall Street Journal reported online, "Petronas's purchase of stakes in the two Tubarão Martelo blocks, with *reserves* estimated at 145 billion barrels of oil, will give OGX much-needed cash to fund fresh investments. The Malaysian and Brazilian companies announced the deal in separate statements." (Emphasis added)

458.    Similarly, BNAmericas announced online, "Brazil's OGX has confirmed an US $850 mm farm-out deal with Malaysian giant Petronas for a share of two oil and gas blocks off the coast of Rio de Janeiro. The deal hands the Kuala Lumpur-based firm a 40% non-operating working interest in the Campos basin's BM-C-39 and BM-C-40 blocks, OGX said in a statement. In addition, Petronas has an option to purchase 5% of OGX's capital stock at a price of 6.30 reais until April 2015."

459.    The quote from OGX in the article continued, "OGX's partnership with Petronas underscores the quality of our asset and the potential of the Tubarão Martelo field, where production is expected to commence by the end of the year," OGX chief executive CARNEIRO said, "[w]ith more than 32Bb of recoverable resources and a production of about 2Mboe/d, Petronas' expertise will enhance the continued development of oil production in these areas."

95

460.     However, as CARNEIRO and the other co-conspirators in the EBX Group knew, this was a lie: a fraudulent misrepresentation intended to allay fears among investors in America and world-wide. In truth, there was virtually no commercially recoverable oil. OGX was a complete bust and would soon collapse.

461.     In later regulatory proceedings in Brazil concerning the late release of news of the Petronas deal, which had been under negotiation since February, 2013 (in which BEN AMMAR was fined R$200,000 and BATISTA was fined R$300,000), the Defendants admitted that OGX was in a "crisis situation, and the consummation of the Petronas sale – which might have been imperiled by public announcement of the negotiations - was essential to OGX's ability to continue as a viable business, as part of their defense.

462.     None of the Derfendants had deemed it necessary to inform the investing public of that crucial fact at the time. Had they done so, Plaintiffs would have not made the majority of their investment.

**Meridian Invests in More OGX Bonds:**

463.     The news of the supposed Petronas purchase came across the Bloomberg terminal screen on Judy Neiwirth's desk in Miami, Florida, on May 8, 2013. The Bloomberg report also recited a supposed quote from the buyer, "Petronas views the acquisition as a highly attractive investment opportunity in terms of asset quality and for strategic future growth in Brazil."

464.     Investors in OGX bonds were spurred to make greater purchases by this news. According to Reuters News Agency, investment in OGX bonds by the massive U.S. investment fund, Pimco, climbed as high as $800 million during May, 2013.

465.     On May 20, 2013, in continued reliance on the vaunted future profitability of OGX, as aforesaid and BATISTA's commitment to inject a billion dollars if and when needed, and further encouraged by the announcement of the Petronas deal, Gables Capital, in Miami, Florida, directed

the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN.

466.    However, the truth was, in fact, that there was no actual "Petronas deal" as portrayed to the public. The "deal" had many contingencies, including OGX restructuring its debt and reaching certain production targets. It was merely another fraudulent misrepresentation designed to convey the message that sophisticated investors saw great value in the future of OGX.

467.    Why Petronas – currently wracked by its own massive corruption scandal - did not correct the OGX presentation or investor perception at that time is unknown before discovery, but it is believed that the Malaysian government officials had been personally financially "incentivized" by BATISTA accomplices to play along with the lie.

**Batista Secretly Cashes Out:**

468.    While doing his best to encourage confidence in OGX among investors in America and world-wide, between May and June, 2013, BATISTA secretly instructed EBX to sell off 126.65 million OGX shares. The sale was facilitated by Bank Itaú in Brazil. WERNER and the rest of the controlling insiders failed to announce the fact to the Brazilian regulators or to the investing public, because, as they knew, to do so would have created a crisis of investor confidence in OGX. This was a misrepresentation by omission.

469.    BATISTA was also siphoning off cash in huge amounts. According to a much later released confidential letter from the Cleary Gottlieb law firm in New York, representing a cadre of large insider creditors in June, 2013, BATISTA funneled out $450,000,000 to an affiliate without justification just that month.

470.    It is not known before discovery where that money went, but it is believed that a substantial amount was routed directly or intermediately through the corporate co-conspirators and

accomplices, including the 63X companies, members of the EBX group and the CENTENNIAL companies, to bank accounts at BANCO ITAÚ MIAMI and to banks in other countries.

471.   On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA and the board of OGX released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign.

472.   However, when the news later hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm.

473.   BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the restructuring of the group which was now complete that same month of June" and that no further shares would be sold. However, this would prove to be a lie.

474.   On June 20, 2013, in continued reliance on the vaunted future profitability of OGX as aforesaid and BATISTA's commitment to inject a billion dollars if and when needed, and reassured by BATISTA's news of his stock sale being just a "one-off adjustment," Gables Capital, in Miami, Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the secondary market on behalf of its client, MERIDIAN, as trustee.

475.   MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98.

476.   However, on July 1, 2013, OGX was finally forced to admit by a Statement of Material Fact that a number of its wells in the Campos Basin were unproductive and, cryptically, that none of its projections should be relied upon, which resulted in a plunge in OGX share prices.

477.   Critically, however, BATISTA, the board of OGX, and the directors and top executives in the EBX Group failed to announce: (a) that OGX had virtually no commercially recoverable oil; (b) that the Mubadala "investment" had been a massive loan, collateralized on the

plum assets of the EBX Group; (c) that behind the scenes Mubadala, who knew the exact state of affairs, was realizing on its securities and stripping the value out of the group; (d) that the Petronas "investment" had been just another massive intended loan, and that Petronas was not obliged to perform unless OGX was re-structured; (e) that there was no viable "EBX/BTG Strategic Partnership," and lastly; (f) that BATISTA and EBX Company CENTENNIAL NEVADA had no intention of honoring the obligation under the billion dollar Put Option, if and when demanded.

478.    In fact, in the face of certain knowledge that OGX was insolvent and had no oilfields likely to generate significant recoverable oil, BATISTA and the board of OGX, and the directors and top executives in the EBX Group, continued to spawn lies about projected future profitability of OGX.

479.    Thus, on July 3, 2013, Bloomberg relayed the news that OGX had declared the Remora field in the Campos Basin commercially viable. Unfortunately, this was just another lie.

**Batista Makes Further Fraudulent Transfers:**

480.    Upon information and belief, during these months, in line with his overall game-plan, BATISTA was moving the assets still in Brazil that were the most vulnerable to attachment out of his name and into the names of family members, leaving himself immune from collection.

481.    Upon information and belief (according to the Brazilian indictments) BATISTA transferred two buildings in Rio with an aggregate value of approximately $20 million into the names of his sons THOR BATISTA and OLIN BATISTA; he moved $60 million from an account in Brazil to a Citibank account in the name of THOR BATISTA; and he transferred approximately $7 million in cash plus a $2 million apartment in Ipanema to FLAVIA SAMPAIO, his girlfriend and mother of his infant son, Balder. Recent press reports indicate that BATISTA sheltered additional assets in the name of his father, ELIEZER BATISTA.

482.     Upon information and belief, BATISTA, his co-conspirators, and accomplices had by this time moved the bulk of his and their liquid assets out of Brazil and off to secrecy jurisdictions, where they were held in cash, or reinvested in stock in ventures likely to actually prove to be profitable, or in real estate and other more secure investments in other countries, typically through the medium of shell companies to act as "blinds" between the asset and the ultimate beneficial owners. Much of the money was held in accounts in their various names and in the names of other controlled companies at BANCO ITAÚ MIAMI, in an account under BERTO's name as trustee at EFG SWITZERLAND and in MAGNO's trust account.

**Mubadala Secretly Pulls Out:**

483.     During early July, 2013, news began to leak out that the Mubadala deal, which had been announced as an equity investment and seen as BATISTA's, OGX's and the EBX Group's ultimate stamp of approval by the investment community, providing important backing for BATISTA's ambitions by a major global sovereign wealth fund, may have been more in the nature of a loan than a true equity stake.

484.     Moreover, behind the scenes, Mubadala, which had inside knowledge as to the true state of affairs in BATISTA's companies and was not prepared to wait for the impending disaster to arrive and lose its shirt, had over the course of many months been demanding and receiving the surrender of collateral and the partial repayment of its loan to reduce its exposure to the greatest extent possible. The fact that Mubadala was pulling out should have been released to the investment community as a material fact, but was not. This was a material misrepresentation by omission.

485.     BATISTA and the EBX Group publicly tried to put the best spin possible on the leaked news, characterizing the OGX payments to Mubadala as the partial redemption of an "investment" rather than the repayment of a loan. Mubadala – who wanted to get as much out

before the crash as possible, and therefore had an interest in such a characterization - did not publicly deny this account. However, neither the EBX Group nor Mubadala provided details of the restructuring, and the deal documents have not been made public.

486.    Upon information and belief, the process of asset stripping was carried out by lawyers at Maples & Calder in the Cayman Islands working with members of the EBX Group. According to the online version of The Legal 500 regarding Maples & Calder, "[o]ther major instructions included Simon Firth advising Eike Batista's EBX Group on the ongoing restructuring of its strategic partnership with Mubadala Development Company." Cayman Islands, Corporate and Commercial, *Maples and Calder*, The Legal 500 (last visited Oct. 11, 2016), http://www.legal500.com/c/cayman-islands/corporate-and-commercial.

**The 10.8 Billion Barrel Lie – Recap:**

487.    Despite the fact that OGX was now on a very fast countdown to collapse, BATISTA and his accomplices resolutely kept on publicly trumpeting a rosy vision for its future, completely disconnected from any shred of reality.

488.    Thus, on July 19, 2013, BATISTA once again blared out reassurances for distribution through the internet press [Bloomberg Businessweek, Financial Times, Fox Business, San Francisco Chronicle] that, as D&M had stated in a 2011 Report, OGX had reserves amounting to 10.8 billion barrels and that regardless of all else, he would stand by the company and honor all of his obligations.

489.    However, BATISTA and his accomplices had always known that the various OGX projections had been lies. That had been confirmed by the internal OGX Task Force and Schlumberger Task Force Reports in late 2012 and all the evidence since then had reinforced the point. BATISTA had neither the capacity nor the intention to make good on all his debts, let alone compensate all of the many victims of his fraud. None of the directors and top executives of OGX

of OSX or the EBX Group made any attempt to correct these fraudulent misrepresentations to the investing public.

490.    On July 22, 2013, D&M again demanded of BATISTA and OGX, privately, that he retract the 10.8 billion barrel lie and detach the D&M name from it. BATISTA and his accomplices refused to do so, thus allowing the fraudulent misrepresentation to stand.

491.    On August 14, 2013, Luciano Coutinho, the President of the Brazilian development bank, BNDES, which had loaned BATISTA billions of dollars and must have done due diligence that showed otherwise, announced that BATISTA's OGX had "high-quality assets with which it can rebalance itself." It is unknown before discovery what inducement BATISTA and his accomplices supplied for him to state this lie. (Mr. Coutinho has had his assets in the hundreds of millions of dollars frozen in Brazil and is currently under investigation by the government).

492.    On August 16, 2013, the Tubarão Azul oilfield was closed down, having produced roughly five million barrels throughout its life, or just 1% of the minimum estimate announced in 2010. This was OGX's best field. There would be a later attempt to operate this field commercially post-bankruptcy. This attempt, however, would prove futile and the field was eventually returned to the Brazilian government.

493.    As noted above, the task BATISTA had set for MARCUS BERTO was to get the EBX stake in LLX secretly monetized before the OGX crash, and the crash of OSX which would follow on its heels, leaving the LLX port project without its anchor tenant.

494.    On August 15, 2013, in a filing with the Brazilian Securities and Exchange Commission, BATISTA belatedly confirmed that he was selling a controlling stake in LLX for $560 million to U.S.-based EIG Global Energy Partners. This was therefore "mission accomplished" for MARCUS BERTO and he left Rio for Miami.

495.    Disastrous news was also now emerging about BATISTA's MMX, iron ore "producing" company, which had been fined $1.8 billion for unpaid taxes, equivalent to nearly 80% of its market value. BATISTA's hand-picked managers at MMX were trying to sell off this company, too, before the others crashed all around it.

496.    In August and September, 2013, BATISTA secretly sold another 227 million shares in OGX, which earned him approximately $35 million and which, upon information and belief, he routed to one of his foreign accounts.

497.    Though not discovered until near the end of the year, and then reported by the journalist Elio Gaspari in the Rio de Janeiro daily paper, O Globo, at least ten OGX executives left the company during these final months, with parting payments ranging between $46 million and $92 million each, further stripping cash out of the company.

498.    On September 4, 2013, having milked as much as he could out of OGX, AZIZ BIN AMMAR resigned from the Board and returned to New York, where he resides.

499.    With the OGX bankruptcy just days away, upon information and belief, BATISTA attempted to transfer another $100 million in corporate funds from a BTG Pactual correspondent account in the Caribbean to a Miami, Florida, account at Citibank.

500.    Upon information and belief, Andre Esteves, billionaire Chairman of BTG Pactual, initially refused to make this transfer, however, because he feared that BTG Pactual would become liable as an accomplice to BATISTA's fraud on creditors.

501.    It is unknown whether those funds remain "stranded" in the Caribbean or have been routed out on BATISTA's instructions to one of his other accounts.

502.    Equity investors and bond holders in the United States and world-wide were still relying on the fact that there was value in OGX. This belief was due to the fact that as recently as

May, 2013, a foreign oil company, Petronas, had apparently invested close to a billion dollars of its own money in the OGX oil fields.

503.    On top of that, BATISTA himself was obliged to inject a billion dollars in cash into OGX, if and when needed, through the Put Option. (And in 2014, into OSX through a similar Put Option). All that was needed apparently was for OGX to have enough cash to stay in business until the oil started to flow.

504.    The fraudulent OGX Put Option misrepresentation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which, the Plaintiffs' investment adviser, Ms. Neiwirth took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true.

## Section III - The OGX Oil Bubble Bursts

505.    On September 6, 2013, OGX's Controller, desperate for cash, formally demanded from BATISTA the first $100 million under the Put Option.

506.    BATISTA, who had never had any intention of paying a single penny *into* OGX, shocked investors by refusing to pay this or any other obligation under the Put Option, claiming the benefit of an "out clause," which he had inserted for that purpose.

507.    The arrival of OSX III, yet another massive floating production, storage and offloading vessel at the Tubarão Martelo field, on October 1, 2013, raised momentary hopes that OGX might soon start producing offshore oil from the field. But by close of business that same day, OGX missed a bond payment in the amount of $45 million.

508.    On October 28, 2013, MARCUS BERTO formally stepped down at LLX, resigning as President and Director of Investor Relations and handed over to the new owners' appointed management and left for Miami, Florida.

509.    As a "thank you" for his services to date and in anticipation of services as trustee yet to come (as described above), in July 2013, 63X Master Fund sent Berto $10 million from its BTG account in the Cayman Islands to an account at Merrill Lynch in Florida in the name of a nominally Arizona company, named LIN LLC, wholly-owned and controlled by BERTO in Miami, Florida.

510.    It is believed that MARCUS BERTO invested his pay-off in a $9.5 million Key Biscayne, Florida, mansion, which is titled in the names of two trusts, LIN KB and LIN MB, of which he and his wife Melissa Mason Berto are the trustees.

511.    On October 30, 2013, OGX filed for bankruptcy in Rio de Janeiro disclosing debts of $5.1 billion, of which roughly $3.6 billion was owed to U.S. and other foreign bondholders.

512.    Pimco, the world's largest bond investor, based in California, and BlackRock, the world's largest asset manager, from New York, had front-row seats for the collapse.

513.    Bondholders like the Plaintiffs and, upon information and belief, other investors from Florida, such as the Florida Retirement System Trust Fund, and government funds across the United States were among the horde of other investors that were basically wiped out.

514.    OGX's satellite company, MMX, filed for bankruptcy on October 22, 2013.

515.    OGX's satellite company, OSX, filed for bankruptcy on November 11, 2013.

516.    In November 2013, Petronas announced that it would not pay the $850 million, which investors had expected under the alleged "deal" that BATISTA had broadcast in May of that year, disclosing that the deal had been contingent on OGX being able to re-structure its debt.

517.    By February, 2014, virtually all of the blocks which OGX had leased had been returned to the Brazilian Government as worthless.

518.    Meanwhile, as detailed above, EIKE BATISTA and THOR BATISTA, through their controlled company accounts at BANCO ITAÚ MIAMI; and at banks internationally; and

through trusts administered by BERTO and MAGNO in Miami with accounts at EFG MIAMI and EFG SWITZERLAND, had stashed away huge amounts of the cash they had looted from the companies. Indeed, through stratagems such as the DIP loan at 120% interest to the reorganizing entity, OGPar, fronted by MAGNO as trustee in Miami, BATISTA and his son continued to loot the corpse.

**Batista's "Brazilian Dream" Turns to Nightmare:**

519.    For everybody with an interest in OGX and its satellite companies - except for BATISTA, his co-conspirators, and accomplices - the "Brazilian Dream" BATISTA had boasted of in the April 30, 2012, during the Deirdre Bolton interview, had now turned to a nightmare.

520.    The shareholders and ordinary bondholders, predominantly from the United States, who had invested billions of dollars in OGX, had now been essentially wiped out in what is currently the largest default in Latin American history.

521.    BATISTA and a number of his co-conspirators and accomplices were thereafter indicted in Brazil for market manipulation, insider trading, money laundering, and corruption. These proceedings are expected to last a decade or more, with no real hope of securing punishment of the perpetrators of the fraud or restitution for the victims.

522.    As one of his "defenses" in the criminal proceedings in Brazil, BATISTA has contended that the conditions of the oil exploration leases required that OGX continue to explore for oil until it declared a field to be commercial or return it to the government. BATISTA therefore had OGX declare fields to be commercial to avoid incurring the cost of exploration or having to return them as worthless, trusting that some future technological advance would allow OGX to commercially recover what were presently unrecoverable resources. In other words, BATISTA has admitted that those representations to investors were false.

523.    In November 2015, Brazil's market regulator, the CVM, banned BATISTA from managing a publicly traded company for a derisory five years.

**Batista's Silver Lining:**

524.    BATISTA and his co-conspirators, however, are all believed to have done well out of the scheme, having received sums ranging from tens of millions of dollars to hundreds of millions of dollars apiece.

525.    All the lies about BATISTA being listed somewhere in the league of the world's richest men can now be seen to have *always* been a lie. The number on which that supposed position ranking was predicated was the sum total of money paid in by investors in expectation of profits from oil that never existed.

526.    In actual fact, BATISTA's original net worth before the OGX fiasco was probably in the hundreds of millions of dollars, and his actual current assets, mainly squirreled away abroad, are probably significantly more than what he began with.

527.    Thus, BATISTA and his family continue to live an untouchable life of luxury in Brazil. It is reported that he believes that he has "zeroed his debts" through the bankruptcies. Apparently the billions of dollars of which he bilked his victims does not count.

528.    That BATISTA has massive wealth remaining is shown by the fact that in March 2016, he threw $130,000.00 in gold coins from the deck of his yacht into the Atlantic Ocean to propitiate the "Queen of The Sea," and turn the course of his luck for his next enterprise.

529.    As previously mentioned, the Tubarão Azul oilfield had been OGX's best prospect. Under BATISTA it had achieved less than 1% of the flow promised. On September 20, 2016, three years post-bankruptcy, after the successor entity had ploughed many more millions into its exploration, the Tubarão Azul oilfield was returned to the Brazilian government as worthless.

**The Plaintiffs' Claim:**

530.    Through restructuring in the OGX bankruptcy, MERIDIAN's close to $17 million

dollars in bonds has been translated into shares in a new version of OGX with a face value of

$279,746 for which credit is given. MERIDIAN's net loss is $16,438,233, plus interest.

531.    Through restructuring in the OGX bankruptcy, AMERICAN's close to $4 million

in bonds has been translated into shares in a new version of OGX with a face value of $62,166, for

which credit is given. AMERICAN's net loss is $3,872,616, plus interest.

532.    The Plaintiffs have retained the undersigned attorneys to prosecute this action and

are obliged to pay them a reasonable fee.

**Cayman and Bahamas Proceedings:**

533.    As of the date of filing the initial Complaint, the Plaintiffs had already commenced

proceedings ancillary to this action in the Cayman Islands, restricting Batista and the 63X

Companies from dissipating assets and to obtain information relating to transfers of money and

accounts owned and controlled by Batista and the 63X Companies.

534.    In the Cayman Islands, after a multi-day hearing, the Judge, consistent with

Cayman Islands law, entered an Order freezing the assets of Batista and the 63X Companies

worldwide and ordered disclosures for information regarding accounts and transfers owned and

controlled by Batista and the 63X Companies.

535.    In the Bahamas, consistent with Bahamian law, the Judge similarly entered an order

for the disclosure of information relating to transfers of money and accounts owned and controlled

by Batista and the 63X Companies.

536.    BATISTA and the 63X Companies are currently in default of numerous court

orders in the Cayman Islands to make disclosure as to their worldwide assets and historical money

transfers. Those proceedings are continuing. BANCO ITAÚ MIAMI has steadfastly refused to disclose the accounts beneficially held by BATISTA and his controlled companies.

## COUNT I
## FRAUD

Plaintiffs re-allege paragraphs 1-536 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO AZIZ BEN AMMAR, CENTENNIAL ASSET MINING FUND, LLC, and CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, as follows:

537. Each of the above named Defendants personally participated in the fraudulent scheme and composed and transmitted material fraudulent misrepresentations, and assisted each other in maintaining the credibility of material misrepresentations as detailed above.

538. As detailed above, each of them issued and assisted in issuing false statements concerning specific material facts, with actual knowledge that the representations were false, with the intention that investors in the United States would thereby be induced to rely on such representations to their consequent financial loss.

539. In directing their individual and collaborative misrepresentations to the United States, the named Defendants necessarily targeted investors in the most populous States of the United States, of which Florida is the third, behind only California and Texas. They did so in the expectation of personal gain and of causing loss to their targets.

540. Plaintiffs' investment agent, Gables Capital Management, in Miami, Florida, was a target of such misrepresentations and relied on the same and was thereby induced by such fraudulent misrepresentations to buy OGX bonds on behalf of the Plaintiffs in the total amount of $21,231,683.00.

541.    The OGX bonds were and are virtually worthless, as a result of which Plaintiffs have been damaged in the sums alleged.

542.    While participating in the fraudulent scheme, these Defendants had actual knowledge of the wrongfulness of the scheme and the high probability that the scheme would damage the Plaintiffs and, despite that knowledge, intentionally pursued the fraudulent scheme, damaging the Plaintiffs.

543.    The corporate defendants actively and knowingly participated in the fraudulent scheme to the same extent as the individual defendants. Further, the employees and directors of the corporate defendants knowingly condoned and consented to the corporate defendants' participation in the fraudulent scheme, damaging the Plaintiffs.

WHEREFORE, Plaintiffs demand damages, including punitive damages, together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT II
## CONSPIRACY TO DEFRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-541 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, BANCO ITAÚ INTERNATIONAL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC, and say as follows:

544.    As is detailed above, the foregoing Defendants conspired and agreed together at numerous times and on various dates and in various places to participate in the fraudulent scheme

and achieve its objectives, as alleged, and to hide the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors. Each such Defendant performed the overt acts detailed above in furtherance of the conspiracy.

545.    While conspiring to participate in the fraudulent scheme, these Defendants had actual knowledge of the wrongfulness of the scheme and the high probability that the scheme would damage the Plaintiffs and, despite that knowledge, intentionally pursued the conspiracy, damaging the Plaintiffs.

546.    The corporate defendants actively and knowingly conspired to participate in the fraudulent scheme to the same extent as the individual defendants. Further, the employees and directors of the corporate defendants knowingly condoned and consented to the corporate defendants' participation in the conspiracy, damagin the Plaintiffs.

WHEREFORE, Plaintiffs demand damages, including punitive damages, together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT III
## AIDING AND ABETTING FRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1-541 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, BANCO ITAÚ INTERNATIONAL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC, and say as follows:

547.    As detailed above, with knowledge of the underlying fraud, the foregoing

Defendants aided and abetted BATISTA and his co-conspirators and accomplices and rendered substantial, material assistance to him and them, to achieve the objectives of the fraudulent scheme and to assist in secreting the proceeds in false names and in jurisdictions where they would not be available for the satisfaction of the legitimate debts of creditors, wherefore they are additionally liable as aiders and abettors.

548.     While aiding and abetting the fraudulent scheme, these Defendants had actual knowledge of the wrongfulness of the scheme and the high probability that the scheme would damage the Plaintiffs and, despite that knowledge, intentionally aided and abetted fraudulent scheme, damaging the Plaintiffs.

549.     The corporate defendants actively and knowingly aided and abetted the fraudulent scheme to the same extent as the individual defendants. Further, the employees and directors of the corporate defendants knowingly condoned and consented to the corporate defendants' aiding and abetting in the fraudulent scheme, damaging the Plaintiffs.

WHEREFORE, Plaintiffs demand damages, including punitive damages, together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT IV
## FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT
### (f/k/a "FLORIDA RICO")

Further or alternatively, Plaintiffs re-allege paragraphs 1-541 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, BANCO ITAÚ INTERNATIONAL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX

INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC, and say as follows:

**The Criminal Enterprise:**

550.    Upon the basis of the facts alleged, BATISTA is and was the prime directing and controlling force at the head of a criminal enterprise within the meaning of Fla. Stat. § 772.102(3) comprised of himself, the joined Defendants, and many other co-conspirators, aiders, abettors, and accomplices not joined.

551.    The enterprise had as its common purpose the criminal aspirations and ambitions of BATISTA for the accumulation of wealth through a pattern of racketeering activity for further investment, enjoyment and transmission down through the generations of his relatives, friends co-conspirators and accomplices.

552.    Such enterprise is referred to collectively as "the Batista Crime Family" and the Defendant individuals and entities comprising such as "members of the Batista Crime Family" or "members of the enterprise."

553.    All members of The Batista Crime Family acted, in regard to each listed predicate act as described below and as to the overall pattern of racketeering activity, with criminal intent.

**The Pattern of Criminal Activity:**

554.    By reason of the allegations made herein, the members of the enterprise engaged in a pattern of criminal activity as stated in Fla. Stat. § 772.102(4).

**The Predicate Acts of Criminal Activity:**

555.    The Defendants actively participated in the enterprise, the Batista Crime Family, through the stated prohibited activities contrary to Fla. Stat. § 772.103 in the course of a pattern of criminal activity under Fla. Stat. § 772.102(4) which entitle Plaintiffs to civil remedies under Fla. Stat. § 772.104.

**Predicate Act I - Florida Securities Fraud - Alleged Against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC**

556.     As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly employed a device, scheme, or artifice to defraud, contrary to Fla. Stat. § 517.301(1)(a)(1).

557.     As set forth above, the stated Defendants have further committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly obtained money or property by means of untrue statements of material facts or any omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, contrary to Fla. Stat. § 517.301(1)(a)(2).

558.     As set forth above, the stated Defendants have committed multiple violations of the Florida Securities Fraud statute, in that in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of investments or securities, which latter term includes "bonds" pursuant to Fla. Stat. § 517.02(22), they directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon persons, including Plaintiffs, contrary to Fla. Stat. § 517.301(1)(a)(3).

**Predicate Act II - Federal Wire Fraud - Alleged Against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, BANCO ITAÚ INTERNATIONAL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC**

559.    As set forth above, the stated Defendants have committed numerous acts of wire fraud in that they, having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, contrary to 18 U.S.C. § 1343.

**Predicate Act III - Federal Money Laundering - Alleged Against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, BANCO ITAÚ INTERNATIONAL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC**

560.    As set forth above, the stated Defendants committed numerous acts of money laundering in that they knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from unlawful activity contrary to 18 U.S.C. § 1957. As stated above, the acts of money laundering variously took place in the United States pursuant to 18 U.S.C. § 1957(d), or was committed outside the U.S. by "U.S. persons" including U.S. nationals, U.S. permanent residents, corporations formed in the U.S. and foreign subsidiaries of such persons as defined in 18 U.S.C. § 3077.

**Predicate Act IV - Florida False Advertising - Alleged Against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ**

115

**CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC**

561.    As set forth above, the stated Defendants committed numerous acts of misleading and deceptive advertising, contrary to Fla. Stat. § 817.40(5), in that they made or disseminated or caused to be made or disseminated before the general public of the state, or a portion thereof, misleading advertisements, which were fraudulent and unlawful, which the Defendants knew or should have known were false, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

**Predicate Act V - Florida Theft - Alleged Against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC**

562.    By reason of the foregoing the stated Defendants, with criminal intent, knowingly obtained or used, or endeavored to obtain or use, the Plaintiffs' property and the property of others through fraud, deceit, false pretenses and/or conduct of similar nature, with the intent to permanently deprive the Plaintiffs and such others of their right to their property or their benefit of their property, and further, knowingly and with criminal intent appropriated such property to their own use contrary to Fla. Stat. § 812.014.

**Predicate Act VI - Florida Communications Fraud: Alleged Against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, BANCO ITAÚ INTERNATIONAL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC**

563.     As set forth above, the stated Defendants engaged in a scheme to defraud, in that they engaged in a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto contrary to Fla. Stat § 817.034(4)(a), 817.034(3)(b), 817.034(3)(c), and 817.034(3)(d).

564.     Further by reason of the matters set forth above, the stated Defendants furthered a scheme to defraud, in that they furthered a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto, and in the course thereof communicated with persons with the intent to obtain property from such persons contrary to Fla. Stat § 817.034(4)(b).

**Civil Remedy:**

565.     As a result of the Defendants' participation in the criminal enterprise and its perpetration of the aforesaid pattern of criminal activity, Defendants caused injury and damage to Plaintiffs.

566.     By reason of the foregoing, Defendants have, with criminal intent, received proceeds derived directly or indirectly from a pattern of criminal activity and have used or invested the same, or a part thereof, directly or indirectly, or the proceeds derived from the investment or use thereof, in the acquisition of title to, or a right, interest, or equity in, real property or in the establishment or operation of an enterprise, contrary to Fla. Stat. § 772.103.

567.     By reason of the foregoing, Defendants have, with criminal intent, through a pattern of criminal activity acquired or maintained, directly or indirectly, an interest in or control of

enterprises or real property; have been employed by of associated with an enterprise to conduct or participate, directly or indirectly, in a pattern of criminal activity; conspired or have endeavored to violate provisions of subsection (1), subsection (2), or subsection (3) of Fla. Stat. § 772.103.

568. By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Fla. Stat. § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, statutory treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

## COUNT V
## FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT CONSPIRACY
### (f/k/a "FLORIDA RICO CONSPIRACY")

Further or alternatively, Plaintiffs re-allege paragraphs 1-536 and 550-567 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, BANCO ITAÚ INTERNATIONAL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC, and say as follows:

569. The members of the Batista Crime Family conspired and agreed together at numerous times and on various dates and in various places to participate in the fraudulent scheme and in the affairs of the criminal enterprise through a pattern of racketeering activity contrary to Florida Statute § 772.103(4), by reason of which Plaintiffs were damaged and are consequently entitled to civil remedies under Florida Statute § 772.104.

118

570.    By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Florida Statutes § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

## COUNT VI
## FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1-536, against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR, and say as follows:

571.    Defendants committed numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1), and that they caused such loss in fact to Plaintiffs.

572.    While participating in this false and misleading advertising scheme, these Defendants had actual knowledge of the wrongfulness of the scheme and the high probability that the scheme would damage the Plaintiffs and, despite that knowledge, intentionally pursued the false and misleading advertising scheme, damaging the Plaintiffs.

573.    Accordingly, Plaintiffs have a statutory cause of action for actual damages, punitive damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

WHEREFORE, Plaintiffs demand damages, including punitive damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

**COUNT VII**
**CONSPIRACY TO COMMIT FALSE AND MISLEADING ADVERTISING**

Further or alternatively, Plaintiffs re-allege paragraphs 1-536 and 571-573, against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, and AZIZ BEN AMMAR, and say as follows:

574.    Defendants conspired and agreed together to commit and did substaintail assist in the commission of numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state, or any portion thereof, misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

575.    While conspiring to participate in the false and misleading advertising scheme, these Defendants had actual knowledge of the wrongfulness of the scheme and the high probability that the scheme would damage the Plaintiffs and, despite that knowledge, intentionally pursued the conspiracy, damaging the Plaintiffs.

576.    Accordingly, Plaintiffs have a statutory cause of action for actual damages, punitive damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

WHEREFORE, Plaintiffs demand damages, including punitive damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

**COUNT VIII**
**CIVIL THEFT**

Further or alternatively, Plaintiffs re-allege paragraphs 1-536 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO

120

GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO and AZIZ BEN AMMAR, and say as follows:

577. By reason of the foregoing acts alleged, the Defendants committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Florida State § 772.11, including treble damages, attorneys' fees and the expenses of this action.

578. All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT IX
## CONSPIRACY TO COMMIT THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-536 and 577 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, BANCO ITAÚ INTERNATIONAL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC, and say as follows:

579. As detailed above, the foregoing Defendants with criminal intent, conspired and agreed together at numerous times and on various dates and in various places to participate in the fraudulent scheme ways, to achieve the fraudulent scheme alleged and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and performed the stated acts in pursuance of such agreement in so doing

committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

580.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT X
## AIDING AND ABETTING THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1-536 and 577 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, PAULO GOUVEA, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, BANCO ITAÚ INTERNATIONAL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC, and say as follows:

581.    As detailed above, the foregoing Defendants, with criminal intent, at numerous times and on various dates and in various places, with knowledge of the fraudulent scheme, provided substantial assistance to advance the commission of the fraud and so aided and abetted BATISTA and his co-conspirators in achieving the fraudulent scheme alleged, and to secret the proceeds in false names and in jurisdictions where they would not be available for satisfaction of the legitimate debts of creditors, and in so doing committed theft by the terms of Fla. Stat. §

812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

582.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT XI
## FLORIDA UNIFORM FRAUDULENT TRANSFER ACT

Further or alternatively, Plaintiffs allege paragraphs 1-536 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, MARCUS BERTO, ERICK MAGNO, ERICK MAGNO, PL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, AUX LLC, and FLAVIA SAMPAIO, OLIN BATISTA, and LUMA DE OLIVEIRA and say as follows:

583.    The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth herein, made fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and each of the other liable Defendants were engaged in or were about to; engage in a business or a transaction for which his and their remaining assets were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he or they would incur, debts beyond his or their ability to pay as they became due, contrary to Fla. Stat. § 726.101, *et seq*.

**The Swiss Trust:**

584.    In particular, between 2013 and 2015, the Defendants MAGNO and MAGNO PL received funds in Florida from the defendants EIKE BATISTA and THOR BATISTA.

585.    Part or all of the funds were sent from a Cayman Islands account of 63X MASTER FUND. Two tranches of $15 million each, for a total of $30 million, were received in late December 2013. The total received is believed to have been in excess of $70 million.

586.    The funds were received into the MAGNO PL trust account which was owned and controlled by MAGNO and over which he had a responsibility as trustee to his firm's clients.

587.    MAGNO and his client BERTO both knew that EIKE BATISTA's EBX Group was in financial crisis, and they knew or should have known that BATISTA and his family members and companies were unable to pay the billions of dollars in debt that they owed.

588.    MAGNO and BERTO further knew or should have known that the request from EIKE BATISTA, THOR BATISTA and 63X MASTER FUND was for the purpose of fraudulently evading such creditors. With such knowledge, both agreed to help transfer the funds out of Florida.

589.     Accordingly, BERTO agreed to act as the trustee of a trust set up by MAGNO for the benefit of EIKE BATISTA, THOR BATISTA and their family members.

590.    As trustee, BERTO was vested with legal title to the funds placed in his name and was a transferee.

591.    As the legal owner, BERTO then transferred or permitted the transfer of such funds abroad, out of Florida, to Switzerland, for the purpose of fraudulently avoiding creditors of the beneficiaries of the trust, EIKE BATISTA, THOR BATISTA and their family members.

592.    It is believed that such sum was in excess of $40 million. It is unknown before discovery how much more money was so transferred.

593.    As trustee, MAGNO received legal title to the funds, was a transferee, and should be bound to return them to Florida, or an equivalent value.

594.    It is believed that the beneficiaries of the two trusts were BATISTA and his family members, which would include one, more, all of the Defendants, EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.

595.    As beneficiaries they received equitable title to the funds for no consideration and as transferees should be bound to return them to Florida, or an equivalent value.

**The Miami Trust:**

596.    There was at least another $30 million received into the MAGNO PL trust account. In early 2014, MAGNO used $15 million of that sum, at BATISTA's request, to make a loan at 120% interest to OGX, then in reorganization as OGPar, as a trustee for undeclared beneficiaries.

597.    The loan was accepted by the management of the company, which included BATISTA, who knew the truth behind the transaction, and who directed that it be repaid with $3 million in interest a couple of months later. This was a mode of further looting the bankrupt company without notice to creditors that BATISTA was behind the transcation.

598.    The $18 million joined the $15 million in the MAGNO PL trust account, for a total of $33 million. Such sum, and perhaps more, was "parked" there between 2013 and 2015 in order for BATISTA to hide it from creditors.

599.    MAGNO had legal title to such funds as trustee, and was a transferee. He thereafter sent such funds out of Florida at BATISTA's request, to fraudulently evade creditors.

600.    As trustee, MAGNO received legal title to the funds, was a transferee, and should be bound to return them to Florida, or an equivalent value.

601.    It is believed that the beneficiaries of the two trusts were BATISTA and his family members, which would include one, more, all of the Defendants, EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, OLIN BATISTA, FLAVIA SAMPAIO and LUMA DE OLIVEIRA.

602.    As beneficiaries they received equitable title to the funds for no consideration and as transferees should be bound to return them to Florida, or an equivalent value.

603.    It is unknown before discovery how many more such transacations were carried out in Florida and Plaintiffs reserve the right to amend to add such additional claims as discovery may reveal.

**The Banco Itaú Miami Transfers:**

604.    Further, upon information and belief, EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, MARCUS BERTO, ERICK MAGNO, ERICK MAGNO, PL, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC, and other Defendants as discovery may reveal, defrauded creditors by assisting in the transfer of funds from accounts held at BANCO ITAÚ MIAMI into other names at that same bank, and to accounts in their own and other names outside Florida, as is set forth above.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferees in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the assets transferred or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of

other property of the transferee; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

**COUNT XII**
**CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS**

Further or alternatively, Plaintiffs re-allege paragraphs 1-536 and paragraphs 583-604 against EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, FLAVIO GODINHO, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, ERICK MAGNO, ERICK MAGNO, PL, BANCO ITAÚ INTERNATIONAL, EFG CAPITAL INTERNATIONAL CORP., EFG BANK AG, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, AUX LLC, FLAVIA SAMPAIO, OLIN BATISTA, and LUMA DE OLIVEIRA and say as follows:

605.     The foregoing Defendants, in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, conspired with BATISTA and others among themselves, to make fraudulent transfers of assets, cash, and property: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, when BATISTA and such other liable Defendants were: engaged or were about to engage in a business or a transaction for which his or their remaining assets were unreasonably small in relation to the business or transaction; intended to incur, or believed or reasonably should have believed that he and they would incur, debts beyond his and their ability to pay as they became due, contrary to Fla. Stat. § 726.101, *et seq.*

606.    In particular, EIKE BATISTA, THOR BATISTA, MARCUS BERTO, ERICK MAGNO, ERICK MAGNO, PL, EFG MIAMI, EFG BANK AG, 63X MASTER FUND and FLAVIA SAMPAIO, OLIN BATISTA, and LUMA DE OLIVEIRA, agreed and conspired together to defraud creditors by assisting in the transfer of in excess of $40 million out of Florida to Switzerland, as is set forth above.

607.    Further, EIKE BATISTA, THOR BATISTA, ERICK MAGNO, ERICK MAGNO, PL, and 63X MASTER FUND, agreed and conspired together to defraud creditors by assisting in the transfer of in excess of $33 million out of Florida to accounts in other countries, as is set forth above.

608.    Further, upon information and belief, EIKE BATISTA, ELIEZER BATISTA, WERNER BATISTA, THOR BATISTA, FLAVIO GODINHO, MARCUS BERTO, LUIZ CARNEIRO, AZIZ BEN AMMAR, ERICK MAGNO, ERICK MAGNO, PL, BANCO ITAÚ INTERNATIONAL, EFG CAPITAL INTERNATIONAL CORP., EFG BANK AG, 63X INVESTMENTS LTD., 63X MASTER FUND, 63X FUND, CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, CENTENNIAL ASSET LTD., WRM1 LLC, WRM2 LLC, 3BX INVESTMENTS, LLC, 3BX INVESTMENT FUND I, LLC, AUX LUXEMBOURG SARL, and AUX LLC, and other Defendants as discovery may reveal, agreed and conspired together to defraud creditors by assisting in the transfer of funds out of accounts held in their names to accounts in other names at BANCO ITAÚ MIAMI and further to accounts outside Florida, as is set forth above.

WHEREFORE, Plaintiffs demand: (a) avoidance of such transfers or obligations to the extent necessary to satisfy their claims; (b) an attachment or other provisional remedy against the assets transferred or other property of the transferees in accordance with applicable law; (c) an injunction against further disposition by the debtors or transferees, or both, of the assets transferred

or of other property; (d) the appointment of a receiver to take charge of the assets transferred or of other property of the transferees; and (d) such further and other relief as the Court deems just, including a mandatory injunction ordering the re-payment of any funds transferred, an accounting as to all sums had and transferred, damages or equitable compensation for such sums as are not returned, plus interest, costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable, including liability for, and amount of, punitive damages on all applicable counts.

Respectfully submitted,
ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 4th day of December, 2017 a true and correct copy of the foregoing was electronically filed via ECMF filing Portal, which will serve this document on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne