**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:17-CV-23051-KMW**

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

      Plaintiffs,

v.

EIKE BATISTA, *et al.,*

      Defendants.

_____/

**PLAINTIFFS' RESPONSE TO BATISTA DEFENDANTS' AND PAULO MENDONCA'S**
**MOTION TO DISMISS ON *FORUM NON CONVENIENS* GROUNDS [D.E. 85]**

      Plaintiffs respond to the Batista Defendants' and Paulo Mendonça's Motion To Dismiss On Forum Non Conveniens Grounds [D.E. 85] (the "FNC Motion" or "FNC"), and state:

**Summary of Claims, Movants and Non-Movants**

      As detailed in our combined response on the motions to dismiss [D.E. 91] this case has two interlocking parts: (1) racketeering and other "fraud-based claims," and (2) claims under FUFTA. FUFTA claims cannot be brought in Brazil because they deal with Florida acts, assets transferred out of Florida, the avoidance of such transfers at Florida banks, and relief under a Florida statute. Thus, a Brazilian court could not grant the relief that is requested in Florida and to that extent a FNC motion cannot lie. In reading down the list of parties it is well to bear that in mind.

      The following ten Defendants do not join in the motion. Banco Itaú International, an Edge Act bank incorporated under U.S. law with its sole place of business, records and employees in Miami. It is sued on both the fraud-based claims and the FUFTA claims. It removed the case here under a statute whose rationale is that the body of law concerning Edge Act banks should be

developed by U.S. courts.[1] It does not move to dismiss for FNC. The Swiss bank, EFG Bank AG, is alleged to be doing business in Miami through its local affiliate, EFG Capital International Corp., a Delaware corporation, which has all of its records and employees here in Miami. Both are sued exclusively on the "non-removable" FUFTA claims. They do not move. The Miami lawyer and his firm, Eric Magno and Eric Magno PL, are likewise only sued on the FUFTA claims and do not move. Marcus Berto is a Brazilian who lives in Miami. He is sued on the fraud-based claims and also under the FUFTA claims and does not move. Aziz Ben Ammar is an ex-OGX director that lives in New York who is sued only on the fraud-based claims and does not move for FNC.[2] Three Brazilian residents, Godinho, Carneiro and Gouvea, who are sued on only the fraud-based claims also do not join in the motion to dismiss for FNC.

While they do not "join" in the motion these ten Defendants do not "oppose" Eike Batista's attempt to get the case out of Miami. In other words, they are willing to let him try, but none apparently think it worth the expense or loss of credibility of actively joining in. Not actually joining in also preserves future defenses and objections, as is further dealt with below.

Of the movants, five are time-barred from making this motion for failure to file an FNC motion in State court within 60 days of service. They are Eike, Thor and Olin Batista, Luma de Oliveira and Paulo Mendonça.[3] Further Olin Batista, Luma de Oliveira and Flavia Sampaio, are

---

[1] *See* American *Intern. Group, Inc. v. Bank of America Corp.,* 712 F. 3d 775, 775 (2nd Cir. 2013); *Dexia SA/NV v. Bear, Stearns & Co., Inc.,* 924 F. Supp. 2d 555, 555 (S.D.N.Y. 2013); *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.,* 62 F.3d 1454, 1462–63 (D.C.Cir.1995); *New Mexico ex rel. Foy v. Vanderbilt Capital Advisors, LLC,* 2009 WL 3672921 (D. N.M. 2009).

[2] He contends that he is a Tunisian Citizen and was a Tunisian resident when his wife was served in their New York apartment. That issue has been briefed but not yet resolved.

[3] Eike Batista was served on January 24, 2017, Olin Batista and Luma de Oliveira on March 9, 2017, Paulo Mendonça on March 13, 2017 and Thor Batista on May 31, 2017. Under Fla. R. Civ. P. 1.061(g) they had 60 days to file an FNC motion regardless of whether they were challenging

joined *solely* because they are upon information and belief trust beneficiaries under the FUFTA

claims. Further, Eike, Eliezer, Thor and Werner Batista, and all of the corporate movants, are also

defendants to the FUFTA claims. And the FUFTA claims cannot be brought in Brazil.

Further, none of the corporate movants are from Brazil and none have shown Miami to be

an inconvenient forum. Seven were formed in the United States, either in Delaware or Nevada.

(Two of the top modern secrecy jurisdictions now being used for international frauds).[4] Four were

formed in the Caribbean: three in the Cayman Islands and one in the British Virgin Islands.[5] And

one company was formed in the prime European secrecy jurisdiction of Luxemburg, of which it

has been said: "Luxemburg sometimes resembles a criminal enterprise with a country attached."[6]

The only function of these companies appears to have been, as is alleged in the complaint, to hide

assets outside Brazil and facilitate international money-laundering through foreign banks,

principally Bank Itaú International and EFG in Miami.[7] There is no attempt made to explain on a

---

service. *See Wedge Hotel Mgmt., (Bahamas), Ltd. v. Meier*, 868 So. 2d 552, 553 (Fla. 3d DCA 2004) (Held that the motion to quash service did not toll the FNC filing period). This case was removed on August 11, 2017. Elapsed State deadlines are enforced in the later federal action. *See Zorn v. McNeil*, 2016 WL 5476195, at *4 (M.D. Fla. Sept. 29, 2016), and cases cited therein.

[4] *See, e.g.*, re: Delaware: "[W]here extreme corporate secrecy enables corrupt people, shady companies, drug traffickers, embezzlers and fraudsters to cover their tracks when shifting dirty money from one place to another . . . a haven for transnational crime." https://www.transparency.org/news/feature/delaware_the_us_corporate_secrecy_haven; Re: Nevada:https://www.nytimes.com/2016/04/08/business/need-to-hide-some-income-you-dont-have-to-go-to-panama.html ("Mossack Fonseca, the Panama law firm, set up offices in Nevada . . .").

[5] Also secrecy jurisdictions but, unfortunately for Batista, with strong anti-fraud laws, as we shall see in the discussion of the Cayman proceedings, below.

[6] https://ftalphaville.ft.com/2017/03/09/2185786/more-evidence-in-the-case-against-luxembourg.

[7] Miami is a top destination for dirty money: "[Members] of Global Financial Integrity said that American banks are awash in money from foreign investors using shell corporations to conceal money from their own governments and law enforcement. 'Where is that money going? . . . New York, Miami and Los Angeles banks.'" https://www.nytimes.com/2016/04/08/business/need-to-hide-some-income-you-dont-have-to-go-to-panama.html.

company-specific basis why it would be more convenient for any of these to litigate in Rio rather

than Miami. It seems particularly bizarre for the seven American companies and the four

Caribbean companies, which are all in English-speaking common-law jurisdictions, to want to be

in Brazil rather than the U.S. – unless of course, as we show below, it is because that is where they

will be insulated from liability.[8]

### The Standard on Forum Non Conveniens

Dismissal for *forum non conveniens* is not appropriate unless:

1. The trial court finds that an adequate alternate forum exists which possesses jurisdiction over the whole case, including all of the parties;[9]

2. The trial court finds that all relevant factors of private interest favor the alternate forum, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice;[10]

3. If the balance of private interests is at or near equipoise, the court further finds that factors of public interest tip the balance in favor of trial in the alternate forum;[11] and

---

[8] *See Lony v. E.I. Du Pont de Nemours & Co.*, 935 F. 2d 604, 608 (3d Cir. 1991) (finding it puzzling that a Delaware corporate defendant sought to move the action to a forum more than 3,000 miles away); *Manu Intern, S.A. v. Avon Products, Inc.*, 641 F. 2d 62, 67 (2d Cir. 1981) ("It is almost a perversion of the forum non conveniens doctrine to remit a plaintiff, in the name of expediency, to a forum in which, realistically, it will be unable to bring suit when the defendant would not be genuinely prejudiced by having to defend at home in the plaintiff's chosen forum"); *Carijano v. Occidental Petroleum Corp.*, 643 F. 3d 1216, 1229 (9th Cir. 2011) (same); *Publicadad Vepaco, C.A. v. Mezerhane*, 176 So. 3d 273, 279 (Fla. 3d DCA 2015) (same); *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 75 (2d Cir. 2001).

[9] *New Life Mgmt. Co. v. Sandy Lane Hotel Co., Ltd.*, 13-CV-60566, 2013 WL 12152494, at *7 (S.D. Fla. Aug. 20, 2013) ("To be available, the foreign court must be able to assert jurisdiction over the litigation sought to be transferred").

[10] *Id.* ("The private interest factors … include: (a) ease of access to sources of proof; (b) the availability of compulsory process for attendance of unwilling witnesses, and associated costs; (c) the ability to view the premises, if necessary; and (d) any other practical problems associated with the expeditious conduct of the trial") (citations omitted).

[11] *Id.* at *8 ("even though the private factors are generally considered more important than the public factors, the better rule is to consider both factors in all cases. The public interest factors to be considered are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the interest in having the trial of a

4. The trial judge ensures that plaintiffs can reinstate their suit in the alternate forum without undue inconvenience or prejudice.[12]

As shown below, the burden is in all respects on the movants and they fail completely on any ground to justify dismissal to Brazil.

### The History of the Related Cases in Cayman, The Bahamas and Florida

We have represented the Tien family since 2003. The family fortune stemmed from the operations of the American University of the Caribbean, a medical school originally founded in the 1970s by Paul and latterly run by his elder son, Yife Tien, until its sale in 2011.[13] Yife and his wife, Dr. Lucy Chua, and their son, Chris, have lived in Coral Gables for decades. After the sale of AUC, Yife founded Rocky Vista University, a medical school with campuses in Colorado and Utah. For most of her professional life, Lucy was a hematologist-oncologist at the Miami V.A. Hospital. Chris was born in Miami and grew up and lives and works here.

When the OGX investments were made, Paul was seriously incapacitated and his affairs were being run by Yife under a Florida durable power of attorney. Much of the family wealth was held in trust for the benefit of Paul for life with Yife, Lucy and Chris as contingent beneficiaries. The trust portfolio had been managed by Judith Neiwirth at Gables Capital in Miami for many years and it was through her that the $21 million investments in OGX bonds was made. Yife and the trustee consulted us after the OGX bankruptcy as to this near-total loss.

Upon investigation, it became apparent that this had been a colossal fraud perpetrated

---

diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflicts of law, or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty") (internal quotations omitted).

[12] *Id.* at *7; *see also Wilson v. Island Seas Investments, Ltd.*, 590 F.3d 1264, 1269 (11th Cir. 2009).

[13] As to this and the following paragraph see generally the Affidavit of Ernest Dover, Exhibit "A."

primarily on American investors. The Lava Jato investigation was then just beginning and the depth of Brazilian corruption was not yet evident. But even so, after taking Brazilian advice it was clear that there was no practical recourse in Brazil, for reasons which we explore below. The eventual game plan was to try to freeze Batista's hidden offshore assets while we sought a judgment in Florida, where the fraud had been perpetrated and the loss suffered.

**Cayman and The Bahamas:**

We put together an international team of lawyers, forensic accountants, oil experts, and fraud investigators and assembled a mountain of evidence. After a two-day *ex parte* hearing in the Grand Court in Cayman, on October 27th and 28th, 2016, Judge Ingrid Mangatal entered a treble-damages $63 million Worldwide Freezing Order ("WFO") against Batista and his three Cayman wealth-management companies, the 63X Companies, and an order to disclose their worldwide assets.[14] She also ordered financial disclosure from banks in the Cayman Islands under a temporary gagging order that prevented them from alerting Batista to what was going on while we sought and obtained a similar disclosure order as to a number of banks in The Bahamas. (This was the source of information for many of the transactions we were eventually able to detail in the Florida complaint). The Cayman order was conditioned on the applicants posting $1.5 million with Cayman counsel to recompense the respondents for any harm resulting from a wrongful order.

In January 2017, Batista and the 63X Companies were served with the WFO and the worldwide asset disclosure orders. This coincided with the announcement of a Brazilian indictment against Eike Batista, Flavio Godinho and Eduardo Carneiro for bribery of a Brazilian government minster to award Petrobras ship-building contracts to OSX. In early 2017, Eike

---

[14] Exhibit "B."

6

Batista briefly went on the run from Interpol on the bribery charges but eventually returned to Brazil where he is awaiting the determination of his criminal case.

Batista and the 63X companies fought the Cayman WFO and asset disclosure orders through most of 2017 on many grounds, including whether the treble damage amount frozen pursuant to the Florida RICO action was properly "remedial" or "punitive" and if the latter, whether the amount of the WFO should be reduced.[15] Judge Mangatal determined on the basis of U.S. Supreme Court authority on the federal RICO statute, that the Florida statute on which it was modeled was similarly "remedial" in nature and the treble damages amount stood.[16] The respondents never argued that the proper forum for the Miami case was Brazil.

Throughout the year, Batista and the 63X Companies steadfastly refused to obey the Court's repeated Orders to disclose their worldwide assets. Eventually, on October 12, 2017, the Grand Court debarred them from further contesting the WFO for their persistent refusal to comply with its orders.[17] Batista, who occasionally denied that he had acted fraudulently, failed to submit any evidence beyond his bald assertion of innocence.

The $63 million dollar Cayman WFO therefore stands. It was entered by the Cayman Court to deter fraud and the abuse of its own financial system and in aid of the rule of law in the U.S. Given Batista's and the 63X Companies' refusal to disclose assets we do not know how many banks around the world have frozen funds in their names or in what amount. We know of an absolute minimum of $6.5 million frozen in the Cayman Islands for the payment of an eventual judgment here. If this case were to be dismissed to Brazil, that injunction would likely disappear.

---

[15] Miami attorneys, Kevin Murray, Esq. and Judge Gerald Cope were the rival experts on that issue.
[16] Exhibit "C."
[17] Exhibit "D."

Plaintiffs have also applied in the Cayman Islands for the appointment of a receiver over the 63X Companies in order to pursue the assets as yet undisclosed which will be heard on May 14.[18]

**Florida:**

In early 2017, we filed the first version of the RICO/FUFTA complaint in Florida State court. When Eike Batista went on the run from Interpol on bribery charges we requested an emergency FUFTA injunction to prevent assets from being removed from Florida. Judge Beatrice Butchko entered the injunction against the 22 defendants then in the case.[19]

Of the 22 defendants, only Werner Batista and Berto appealed the injunction, and the Third DCA discharged the order as to both of them for certain facial defects and for want of sufficient record evidence.[20] None of the other defendants have ever challenged the injunction and, as to them, it therefore stands. We do not yet know how much remains frozen at Banco Itaú Miami or at EFG or at other banks in Florida for other Defendants, but our information is that there is money there.[21] If this case were dismissed to Brazil, that injunction, too, would disappear.

<u>**Proving the Plaintiffs' Miami Case**</u>

**The Fraud-Based Claims:**

As described in the complaint and supported by the record evidence, the principal targets of

---

[18] *See* Cayman Receivership Application attached as Exhibit "E." (It is likely that the suggested designation of receiver will be amended).
[19] *See* Exhibit "F." (Magno, Magno PL, EFG Miami, EFG AG, and Banco Itaú Miami were not yet parties).
[20] *See* Exhibit "G," *Marcus Berto and Werner Batista v. Meridian Trust Co., etc., et al*., No. 3D-17-284 (Fla. 3d DCA, June 14, 2017).
[21] The Batista Defendants ask us, periodically, to approve the release of funds from Banco Itaú Miami for payment of their legal fees (which is an allowed expenditure under the injunction). We have so far approved the release of more than $500,000. The issue of the continuing effect of this injunction will be taken up in due course, separately.

the fraud were investors in the U.S.[22] OGX stock was traded in the U.S. as an ADR and the SEC required OGX to translate into English and publish all information that was published, or required to be published in Brazil or filed with the CVM (the "Brazilian SEC"). All this evidence is available online.[23] Furthermore, in the Amended and Restated OGX Deposit Agreement, OGX committed to publishing reports and communications in English to comply with U.S. statutes and to facilitate investment by U.S. individuals.[24] English translations of all material documents were further made available at www.ogx.com.br. There is basically an English-language mirror image of everything which OGX promulgated in Portuguese, available online.

The fraud against the American investors was committed in the United States.[25] As detailed in the complaint, Batista and his cohorts generated a blizzard of English language misrepresentations targeting American money. The main lies were that there were 10.8 billion barrels of recoverable oil and that Batista was willing to put up a billion dollars of his own money to pump it out. There were a host of satellite lies designed to bolster the main lies. These were fed to the financial press in English to be reported to North American investment professionals like Ms. Neiwirth, who saw them on the dedicated Bloomberg server at her desk, thus:

---

[22] *See, e.g.*, Exhibit "H," de Araujo, Second Affidavit, filed in State Court, paras. 16-39. Voluminous exhibits omitted; will be provided upon request.

[23] http://ri.ogpar.com.br/conteudo_en.asp?tipo=50984&id=0&idioma=1&conta=44&submenu=0&img=0&ano=2013.

[24] https://www.sec.gov/Archives/edgar/data/1201935/000101915509000895/ardepagmt122309.htm#_Toc214707775

[25] "[I]t is not only the country where the acts leading to the damage took place that has an interest, but also the country where the damage actually occurred which has an interest in the adjudication of the matter." *Shonac Corp. v. Marquesa Int'l Corp.*, 1988 WL 50601, at *6 (D.N.J. May 19, 1988).



Representations like this were what induced Ms. Neiwirth to buy the OGX bonds for the plaintiffs.[26] All of the representations are available, in English, on Bloomberg, here. We do not need to travel to Brazil to show that these misrepresentations were made to investors in America, that Ms. Neiwirth was within the target audience, and that she invested $21 million of the plaintiffs' money in OGX bonds in reliance on their truth.[27]

Nor do we need to travel to Brazil, translate Brazilian documents or talk to Brazilian witnesses to show that there was never any basis to believe that there was more than a trickle of commercially recoverable oil. Brian Windham, a Texas oil industry expert, testified in Cayman

---

[26] "There is no requirement that the false statement be made directly to the party who is consequently injured by relying on the false statement," *Dresser v. HealthCare Services, Inc.*, 2013 WL 82155 at * 4 (M.D. Fla. 2013), "provided it be made with the intent that it shall reach him and be acted on by the injured party." *Harrell v. Branson*, 344 So. 2d 604, 606 (Fla. 1st DCA 1977); *see also Joseph v. Normal LaPorte Realty, Inc.,* 508 So. 2d 496, 497 (Fla. 3d DCA 1987) (Plaintiff satisfied reliance element of fraud and misrepresentation where defendant's fraudulent misrepresentations were made to plaintiff's agent); *In re Vivendi Universal, S.A*, 381 F. Supp. 2d 158, 184 (S.D. D.Y. 2003) ("It defies common sense to argue that defendants may not be held accountable for their quotes and statements, solely because they were published by a third party").
[27] We briefed this issue in response to the combined motions to dismiss [DE 91] at pp. 2-4; 8-13; 29-31.

10

and in support of the FUFTA injunction that the OGX oil representations were fraudulent.[28] He stated that all of the OGX oil production data is accessible electronically here and that OGX's oil reserve evaluation consultants, Schlumberger and DeGolyer & McNaughten ("D&M"), both also from Texas - which is widely regarded as the oil capital of the world - would also have all the data and reports. We know that D&M dealt with OGX in English. They wrote to OGX demanding that they retract their public representations that D&M had vouched for their projections.[29] We have sent "litigation hold" letters to Schlumberger and D&M in anticipation of record requests.[30]

The same goes for proving the fact that there was never any "Billion Dollar Put Option," or "Mubadala Investment," or any of the other lies, all of which were made to the world in English.[31] Ultimately, it really does not take much more than having a jury watch "Dr. Oil" and the others try to explain how they could possibly have in good faith stated that there was 10.8 billion barrels of commercially recoverable oil in the ground when there was virtually none, and why they promised that there was a billion dollars of the owner's money available to bring that oil into production when there was not.

Thomas de Araujo, of Yip & Associates, a forensic accountant, gave a series of affidavits in Cayman and in the State court where he summarized the Miami money flow as appeared from the Cayman and Bahamas disclosure orders.[32] He confirmed that this was overwhelmingly a fraud perpetrated on North Americans, and showed the massive financial impact that it had on investors in the U.S. He confirmed that the mass of relevant financial evidence on money-laundering,

---

[28] Composite Exhibit "I."
[29] Exhibit "J."
[30] Composite Exhibit "K."
[31] The Mubadala workout was done in Cayman, in English, by Cayman lawyers. The $6.5 frozen in Cayman came into the Cayman bank as a payout from foreign funds under that deal.
[32] As to this paragraph, *see generally*, Exhibit "H," de Araujo, Second Affidavit.

FUFTA and the other financial issues would be accessible through Miami discovery mechanisms without any need for financial experts to visit Brazil. Just the records at Banco Itau Miami will likely be a massive treasure trove of evidence. The evidence regarding EFG's U.S. and Miami operations is already assembled and awaiting discovery requests.[33] (The language of international banking is first, numbers, and secondly English). Further, if a U.S. bank has access to the records of a foreign affiliate, even when separately incorporated, they must produce them here.[34]

In our Rule 26(a)(1) disclosures we identified the principal witnesses and the nature of their evidence.  Most of the non-party witnesses are here in America.[35] One of them, Luiz Arthur Correa ("Zartha") is facing the same Brazilian bribery indictment as Batista, Godinho and Carneiro. Zartha managed Batista's international wealth for years through the group of financial professionals known as "TMF."[36] He lives in Coconut Grove, speaks fluent English and we doubt that he plans to set foot in Brazil anytime soon. His testimony and records are accessible in Miami and should be hugely valuable to the Plaintiffs' case.

---

[33] In connection with claims that they assisted in massive U.S. tax evasion, the EFG Group entered into an agreement with the DOJ in the Southern District of Florida to assemble and make available all the records and relevant witnesses regarding their operations in the U.S. *See* Exhibit "L."

[34] *See, e.g. Sergeeva v. Tripleton Int'l Ltd.,* 834 F.3d 1194 (11th Cir. 2016).

[35] We identified witnesses in Florida, Texas, New York, Delaware, Nevada and abroad, with addresses and a detailed description of the materiality of their evidence. See Exhibit "M." The non-movants largely did the same, identifying mainly witnesses in Florida. The only movant who listed witnesses was Werner Batista. He basically "shotgunned" categories of ex-OGX personnel and others (including even the ex-President of the Republic, Dilma Rousseff!) without addresses and with the disclaimer: "the names listed above should not be construed as an admission that any or all of the facts known to the individuals listed are legally relevant or admissible."[!] The other Batista defendants adopted his list. As this Court has instructed, "In considering the availability of witnesses in the context of a *forum non conveniens* motion, a court 'must examine the materiality and importance of the anticipated witnesses' testimony and then determine their accessibility and convenience to the forum…. It is the defendant's burden to present these facts to the court by way of affidavit or other information.'" *New Life Management Company v. Sandy Lane Hotel Company, Ltd.*, 2013 WL 12152494 at *6 (S.D. Fla. 2013) (citations omitted).

[36] *See* Complaint [D.E. 75], para. 236.

Since our initial disclosure, we learned that in addition to Werner on the East coast, Eike Batista also has a "West coast brother," Harald Batista, in California, who was a manager of the Delaware and Nevada Centennial companies. Right now, though that may change, we regard him as a witness rather than a Defendant.[37] However, as with all U.S.-based defendants and witnesses, his testimony and records are accessible here through regular U.S. discovery. Furthermore, regardless of where foreign witnesses are located, if they are _defendants_, then they are also effectively "here" for evidentiary purposes.

As for proving bribery, nobody is likely to confess to that, whether in Brazil or here. But we believe that we will be able to show it to the jury by our forensic examiners presenting their conclusions from the bank records and cross-examination of the defendants and other U.S. witnesses. We can already see over $100 million flowing through from Cayman to the TAG bank account in Panama used for the alleged bribes on the charges that Batista, Zartha, Carneiro and Godinho are facing.[38] Even here we doubt that we will need much assistance in Portuguese, since Eike Batista has recently challenged the bribery proceedings against him in Brazil on the basis that the critical documents are all in English and they were not translated into Portuguese![39]

Further, we have taken depositions in Brazil over the years without a problem. We note that the State Department advises against doing so, but without citation, and our own experts know of no law in Brazil that would forbid such. Failing to use Brazilian evidentiary processes may vitiate an eventual enforcement of a judgment in Brazil, but that is not the objective here.[40] Defendants

---

[37] We attach a letter to his counsel on the topic of his involvement as Exhibit "N."
[38] _See_ Complaint [DE 75], para. 451; Exhibit "H," de Araujo, Second Affidavit, para. 60.
[39] _See_ Exhibit "O." (Document will be translated and filed with the Court.)
[40] _See_ Exhibit "P," Declaration of Marcello Agusto Lima de Oliveira ("Oliveira Dec.") paras. 58-62.

may agree to, or even be ordered to, come here for deposition, at the Plaintiffs' cost. That frequently makes more economic sense than the parties paying for all the lawyers to travel abroad.[41] It is done all the time, even in domestic litigation when there are witnesses around the country. Modern telecommunications, too, such as Skype, have eliminated much of the need for foreign travel for depositions and have made evidence globally accessible. All that is required is local court rules that conduce to its use: and we have that here. In sum, the fraud was perpetrated here in the United States and there is no need for us to go to Brazil to prove it.

### Defense Evidence on the Fraud-Based Claims

We now turn to the evidence needed for the defense of these claims. The movants, without providing any specific details, say it is "all in Brazil," but have not identified the materiality of the testimony of a single unavailable Brazilian witness, and they admit that they have relevant documents here.[42] But more to the point, this begs the basic question: what are the substantive defenses which the witnesses would be needed to prove? The short answer is that they do not apparently have any. They do not deny that there is a late 2012 secret Schlumberger report stating that OGX was a billion dollars in debt and going deeper in the hole every day. They give no reason for the repeated promises of 10.8 billion barrels of commercially recoverable oil which turned out not to be true. They give no explanation for the fact that there was in fact no Billion Dollar Put Option. They make no attempt to identify any substantive defenses to any of the many claims of fraud made against them, let alone explain what Brazilian documents or witnesses would support them.

---

[41] As happened in regard to Mr. Carpenter's recent deposition, which was taken in Miami.

[42] Werner Batista, who lives here, in Florida, devotes eight paragraphs in his Rule 26 initial disclosures to relevant documents in his possession, custody or control. See, [D.E. 71] at p. 3. The Batista Defendants adopt his position. *See* Exhibit "Q."

This is because they do not actually have any real factual defenses. They just want to move this case to Brazil where, as we show below, they face no real prospect of liability. On the sworn evidence already on file, there is already a *prima facie* case of fraud proven against *at a minimum* Eike Batista, Eliezer Batista and Aziz Ben Ammar, the OGX directors during the final year of OGX, when the plaintiffs invested and the company collapsed. The movants needed to show a pressing need for a Brazilian forum to defend against these claims, which they have completely failed to do. We turn now to the FUFTA claims.

**The FUFTA Claims:**

The core witnesses here are in Florida, namely: Erick Magno, his law firm, Magno PL, Marcus Berto, and representatives of the two Miami banks. Defendants, Eike and Thor Batista, and the Swiss bank's representatives are likely to be the only foreign witnesses on these claims. The various shell companies are joined here because they figure in the money movements. The other Batista family members are joined here *only* because they are believed to be trust beneficiaries and, as such, necessary parties.[43] As long as Batista refuses to produce a copy of the trust we cannot rule them out. Since all of them are parties, we have access to all their evidence. These claims cannot be moved to Brazil.

<u>**The Plaintiffs' Choice of Forum is Entitled to Great Deference:**</u>

Any plaintiff's choice of forum is entitled to "deference" and that of an American plaintiff

---

[43] *See Slyvester v. Slyvester*, 557 So. 2d 599, 600 (Fla. 4th DCA 1990) ("the court did not have the trust before it and could not have absent the joinder of the trustee and the contingent remainder beneficiaries … all of whom, in the case of an 'irrevocable' trust, are indispensable parties") (*citing Hanson v. Denckla*, 357 U.S. 235 (1958), as further discussed in our response to the motions to dismiss).

"great deference,"[44] and the degree of deference "moves on a sliding scale depending on the degree of convenience reflected by the choice in a given case."[45] A defendant has the burden of proof to overcome a plaintiff's choice of forum.[46]

Here, movants argue that the lower standard applies because the trustee is foreign and Yife, Lucy and Chris did not become the sole beneficiaries until after death of Paul, shortly after the State court action was filed. However, this is a specious argument that elevates form over substance. The plaintiffs are investment vehicles, a trust and a corporation whose stock is held by the trust. A trust is not an *entity*, it is an arrangement or relationship which splits legal and equitable title to property.[47] Ordinarily an action must be prosecuted in the name of the real party in interest. However, in the case of a trust, the trustee may file in a representative capacity without joining the persons for whom the action is brought.[48] This exception reflects the fact that the "real parties in interest" are not the trustee but the beneficiaries.

Paul's choice of trustee was a professional trust company in Nevis. Florida law governs the

---

[44] *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255 (1981); *New Life Management Company v. Sandy Lane Hotel Company, Ltd.*, 2013 WL 12152494 at *7 (S.D. Fla. 2013); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F. 3d 88, 102-103 (2d Cir. 2000).

[45] *Norex Petroleum Ltd. V. Access Industries, Inc.*, 416 F. 3d 146, 154 (2d Cir. 2005); *see also Iragorri v. United Techs. Corp.,* 274 F. 3d 65, 71 (2d Cir. 2001) ("The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice").

[46] *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 430 (2007); *Deb v. SIRVA, Inc.*, 832 F. 3d 800, 806 (7th Cir. 2016).

[47] Restatement (Third) of Trusts § 2 (2003); *see also Cohen v. Friedland*, 450 So. 2d 905, 906 (Fla. 3d DCA 1984) ("A trustee . . . holds legal title to property which he administers for the named beneficiary in accordance with the terms of the instrument creating the trust"). Thus, in a trust relationship, "the beneficiary possesses an equitable ownership in the trust property, while the trustee possesses legal title to the property." *Imagine Ins. Co., Ltd. v. State ex rel. Dept. of Financial Services*, 999 So. 2d 693, 700 (Fla. 1st DCA 2008).

[48] Fed. R. Civ. P. 17(a)(1)(E) "The following may sue in their own names without joining the person for whose benefit the action is brought: . . . (E) a trustee of an express trust."

actions of a trustee under any trust in regard to Florida beneficiaries regardless where situated.[49] There is nothing wrong or unusual in any of this. The whole point of having a trust was for succession planning for the family. In determining diversity of citizenship, federal courts look past the trustee to the beneficiaries[50] and in the FNC context they look past the citizenship of the corporate plaintiff to the ultimate shareholder.[51] In sum, they take the common-sense approach and look to substance over form. And that should be the analysis here.

When the State court action was filed, Paul was close to death but Yife, Lucy and Chris were contingent beneficiaries. Before removal, Paul had died and they were vested beneficiaries. And certainly, for purposes of a fresh action to be filed in Brazil, they would be the only beneficiaries. The fact is that as the American real parties in interest in this action, their choice of forum is entitled to great deference.

## <u>Litigating in Brazil</u>

It has taken the plaintiffs several years and many millions of dollars to get to this point. But most of that has been "front-end loading," to make sure that there would be money to levy on at the end of the road. The English-style processes in the Caribbean courts required as a condition for *ex parte* relief that we supply evidence for a "good and arguable case" and that we make "full and frank disclosure" of all likely factual and legal defenses which Batista might raise. That means we are much further ahead in amassing evidence than is usual at this stage in a case like this. And so

---

[49] *See, e.g.* Fla. Stat. §§ 736.1001, 736.1002, 736.0202.
[50] *Ventures Trust 2013-I-H-R v. Shore Villas Condominium Assoc., Inc.*, 2016 WL 4542160 at *2 (S.D. Fla. 2016).
[51] *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp*, 494 F. Supp. 1139, 1152 (D. Del. 1980) ("The indirect but ultimate beneficiary of the action, if successful, is John Rollins, a resident of Delaware. He owns all of the stock of Rollins Jamaica, Ltd., a Delaware corporation, which in turn owns all of the stock of [Plaintiff], a Cayman Islands corporation").

far we have seen *nothing* to indicate that there is anything in the way of substantive defenses. Let us now contrast the situation if we had to litigate this case in Brazil.

**The Movant's Only Expert is Batista's Brazilian Defense Lawyer:**

To try to carry their burden, the movants rely exclusively on the testimony of their Brazilian defense lawyer, Mr. Carpenter, who is hardly unbiased. The primary independent expert they relied on for FNC purposes in the State court, Professor Jose Rogerio Tucci, has been dropped. This is probably, as we explore below, because of the part he played in defeating a recent attempt by the Brazilian State oil company, Petrobras, to remove a case from the U.S. to Brazil.[52]

**The Injunctions Would Vanish:**

The Cayman WFO was entered in aid of the Miami case and we believe that it has frozen assets around the world. But given Batista's defiance of the Cayman court's orders we will not know before appointment of the Cayman receiver, or "net worth" discovery on the punitive damages claim, how much is frozen and where. If this case were dismissed, there would be an immediate attack on the Cayman injunction which, if successful, would be vacated and Eike Batista and the 63X Companies would be entitled to apply for their fees and whatever damages they might claim out of the $1.5 million posted. Simultaneously, the FUFTA injunction, which is in aid only of a Florida judgment would vanish. All money now frozen would move.

---

[52] *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52 (D. D.C. 2017) (Oil fraud action against Petrobras. Dismissal for FNC was refused for failure to show that the action would not be statute-barred and that Brazilian processes for obtaining foreign evidence were adequate, where the U.S. interest in retaining jurisdiction was equal to or greater than any Brazilian interest).

**A $4.2 Million Non-Resident Cost Bond:**[53]

In Brazil, in addition to a filing fee, a foreign Plaintiff would also have to post a non-resident cash bond with the Court of 10% to 20% of the damages claimed to pay the fees and costs of the defendants if the case were lost. The likely bond in a complex multi-defendant case would be at the top end of the range, or $4.2 million. As is explained below, if we filed in Brazil, this would basically be money thrown away.[54]

**Secret *Ex Parte* Communications with Judges:**[55]

In Brazil, some proceedings are public. However, it is a "tradition" and completely legal for a party to meet with the judge in chambers, or even at his or her home, to discuss the case privately. This is a completely secret process. There is no notice given of the fact of meeting either before or after, or any record kept of what was said. The judge may rule on the basis of what he was told privately without disclosing that fact.

This is completely antithetical to any notion of a fair judicial system. Such conduct in an American court would lead to recusal of the judge and disciplinary proceedings against both the judge and the attorneys involved.[56] This practice leads to corruption and undue influence. Foreign plaintiffs in particular, up against a defendant group who, as here, number among the social and

---

[53] *See generally*, Exhibit "P," Oliveira Dec. at paras. 39-42.

[54] *Henderson v. Metropolitan Bank & Trust Co.*, 502 F. Supp. 2d 372 (S.D. N.Y. 2007) (Excessive cost bonds or filing fees against foreign litigants may tilt the balance of private interest factors towards the United States).

[55] *See generally*, Exhibit "P," Oliveira Dec. at paras. 34-38.

[56]*See* Rule Regulating the Florida Bar 4-3.5(b); Code of Judicial Conduct for the State of Florida section 3B (7); *see also In re Holder*, 195 So. 3d 1133 (Fla. 2016) (Judge sanctioned for engaging in *ex parte* communications); *The Florida Bar v. Mason*, 334 So. 2d 1 (Fla. 1976) (Attorney suspended for one year for engaging in *ex parte* communications with Justices of the Florida Supreme Court and where attorney refused to reveal the communications when asked by opposing counsel); *Wilson v. Armstrong*, 686 So. 2d 647, 648-649 (Fla. 1st DCA 1996) (Trial court's order overturned where judge engaged in *ex parte* communications).

financial elite, deeply tied into such a system, would be at an extreme disadvantage.

**No Reasonably Similar Claims Available:**[57]

This is a case involving a complex multi-party international fraud and money laundering. The U.S. forum offers ample theories of claim which extend liability to aiders and abettors and co-conspirators, and forum-specific relief to prevent the fraudulent transfer of funds out of the jurisdiction while the litigation is conducted. Nothing like that is available in Brazil.

First of all, the FUFTA claims relate to transfers of property into and out of *Florida* and cannot be maintained in Brazil. Further, nothing like the RICO claims, which are virtually unique to the U.S. are available in Brazil. With regard to all the Florida statutory claims, they have exact domestic definitions and condemn forms of behavior in Florida or the U.S. that harm persons here. Even where Brazil may have similarly *labeled* statutes, they would be different in their content and would condemn different conduct occurring in Brazil or having some nexus to Brazil.

In sum, what would be theoretically available in Brazil would be nothing like the case plead in Florida. It would be some basic claim of fraud, as defined under Brazilian law, which would lie against only a few individuals who were officers or directors of OGX, only. Dismissal is not appropriate where the alternative forum has no reasonably equivalent cause of action and does not therefore permit litigation of the subject matter of the dispute.[58]

---

[57] *See generally*, Exhibit "P," Oliveira Dec. at paras. 43-53.

[58] *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22 (1981); *see also, e.g., Shonac Corp. v. Marquesa Intern. Corp.*, 1988 WL 50601 at *3 (D. N.J. 1988) ("[P]laintiff has raised several legitimate concerns over . . . the ability to litigate its civil fraud and conversion claims in the Brazilian courts. Certainly if such claims are unavailable as a matter of law in Brazil, plaintiff's remedies in the Brazilian courts appear inadequate, if not illusory"); *Parex Bank v. Russian Sav. Bank*, 116 F. Supp. 2d 415, 427 (S.D.N.Y. 2000); *Ceramic Corp. of America v. Inka Maritime Corp. Inc*., 1 F. 3d 947, 949-50 (9th Cir. 1993).

**No Jurisdiction Over Most Defendants:**[59]

The FNC doctrine requires that *all* defendants must be able to be sued in the foreign forum. If only some of them are subject to suit, "it cannot be considered an available forum."[60] As Mr. Oliveira explains, the only defendants who could be sued in Brazil for some form of fraud would be the ex-managers of OGX: none of the other individual and corporate defendants could be sued in Brazil on any claim whatsoever. He details the situation as to each defendant, meticulously, and points out, as appropriate where Batista's lawyer, Mr. Carpenter, mistakes the alleged facts.

**All Claims Are Probably Statute-Barred:**[61]

The statute of limitations in Brazil is three years and time will keep running until suit is filed. We quote here from the declaration of Professor Tucci, the movants' erstwhile expert, in *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52 (D.D.C. 2017):

> While the filing of a lawsuit in Brazil followed by due service of process would clearly interrupt the flow of the relevant statute of limitation period under Brazilian law as per Section 202 of the Brazilian Civil Code, it is not clear whether this term (of 3 years) should be counted as of the date of the fraudulent action itself, from the date the aggrieved party first acquired knowledge of it, or only after conclusion of the respective investigation.[62]

---

[59] *See generally*, Exhibit "P," Oliveira at paras. 54-57.

[60] *See, e.g., Shonac Corp. v. Marquesa Intern. Corp.*, 1988 WL 50601 (D.N.J. 1988) ("[T]his Court is left with a sense of uncertainty regarding the adequacy of Brazil as an alternative forum in this action for several reasons. First, . . . the experts do not agree on whether or not [the Defendant] is in fact amenable to suit . . ."); *Ravelo Monegro v. Rosa*, 211 F. 3d 509, 513-14 (9th Cir. 2000) ("[U]nlike *Piper,* there are no possible co-defendants or third-party defendants who could not be made to appear in the American forum. Indeed, quite the opposite problem exits in this case: If this suit were dismissed in favor of a suit in the Dominican Republic, it is not clear that defendant Rosa would appear, or could be compelled to appear, in that forum").

[61] *See generally*, Exhibit "P," Oliveira Dec. at paras. 19-27; *Carijano v. Occidental Petroleum Corp.*, 643 F. 3d 1216, 1234-35 (9th Cir. 2011) ("The danger that the statute of limitations might serve to bar an action is one of the primary reasons for the limitation on the court's discretion with respect to the application of the doctrine of *forum non conveniens*").

[62] Meaning "criminal investigation."

These are, therefore, real uncertainties that do not recommend the acceptance of the *forum non conveniens* argument presented by the defendants, there being a risk that a potential claim brought at this moment to the Brazilian courts on the referred subject could be barred by relevant statute of limitation.

Mr. Oliveira agrees with Professor Tucci. He suggests that there is a grave risk that the statute may even have started running before the collapse of OGX in July, 2013, when OGX announced that its projections might no longer be relied on. It is now 4 ½ years since OGX crashed. Movants needed to show that time has not run and that all defendants will waive the statute if the case is dismissed to Brazil.[63] Not only have they not done so, but they plainly intend to argue that the case *is* statute barred if it were sent to Brazil. This alone is fatal to their motion.

**All Claims Are Allegedly Barred by the OGX Reorganization Plan:**

We located an opinion of Mr. Carpenter in a New York case, *Huxley Capital Corp. v. OAS S.A., et al.,* No. 15–cv–01637, 2015 WL 971722 (S.D.N.Y. filed Mar. 5, 2015), where he said:

> As a practical matter, the Brazilian bankruptcy law does not make provision for creditors to assert claims in Reorganization Proceedings seeking to claw back property that the debtor has fraudulently transferred. This is because reorganization proceedings . . . do not provide for discovery, the presentation of any evidence, or even hearings, including hearings prior to deciding critical issues in the reorganization. . . .
>
> Nor is it feasible for a creditor to try to avoid a transfer as fraudulent by filing a separate lawsuit for that purpose. Such lawsuits typically take years to resolve, and therefore, it is virtually certain that the reorganization will be resolved long before the lawsuit is, thus mooting the lawsuit. In addition, as a practical matter, a party is unable to obtain an early injunction in such a lawsuit suspending the effects of the fraudulent transfer until the lawsuit can be resolved. The court that is hearing the

---

[63] *Chang v. Baxter Healthcare Corp.,* 599 F.3d 728, 736 (7th Cir. 2010) ("[I]f the plaintiff's suit would be time-barred in the alternative forum, his remedy there is inadequate ... and in such a case dismissal on grounds of *forum non conveniens* should be denied unless the defendant agrees to waive the statute of limitations in that forum..."); *Carijano v. Occidental Petroleum Corp.,* 643 F. 3d 1216, 1234-35 (9th Cir. 2011) ("District courts are not required to impose conditions on *forum non conveniens* dismissals, but it is an abuse of discretion to fail to do so when 'there is a justifiable reason to doubt that a party will cooperate with the foreign forum'").

lawsuit would not issue an injunction without the presentation of evidence, and by the time the lawsuit progresses to the point where evidence will be presented, it is virtually certain that the reorganization proceedings already will have been resolved.[64]

In the present case, Mr. Carpenter opines that all creditors in the reorganization are barred by the final decree from asserting fraud claims against *anyone*, anywhere in the world, including every defendant here, regardless of whether they had any connection to OGX or Brazil.[65] In other words, Brazil gave no redress to victims of fraud inside or outside of the reorganization, and they are now barred from raising fraud claims against anyone in the world! This last proposition, particularly, would be treated as absurd under our law[66] and Mr. Oliveira states that it is not an accurate statement of Brazilian law.[67] However, this is what Mr. Carpenter says, and in doing so he is arguing that Brazil is not, in fact, an adequate forum.

**Inadequate Evidentiary Processes:**[68]

This is a complex international case. The U.S. has modern laws and court processes well-equipped to get to the truth in cases such as this. By contrast, the Brazilian laws are very limited in terms of available theories of recovery, archaic, unwieldy, and its courts are very limited in their mechanisms of access to foreign evidence, and very slow. There is no discovery of any kind, a broad range of objections available to thwart production, and no judicial power to compel production. Moreover, most of the documents which could be theoretically obtained would be only

---

[64] *See generally*, Exhibit "P," Oliveira Dec. at para 29.

[65] *See* Exhibit "P," Oliveira Dec. at para 28 n. 1 (citing Carpenter deposition pp. 145:19 – 146:3).

[66] *In re Seven Seas Petroleum, Inc*., 522 F.3d 575, 587 (5th Cir. 2008) (Fraud claims belong to creditors and not the bankruptcy estate). *In re NC12, Inc*., 478 B.R. 820 (Bankr. S.D. Tex. 2012).

[67] Mr. Oliveira agrees with the first two propositions but disagrees with the third: he states that the claims stated against all defendants are all "live" and has detailed why that is, exhaustively. Exhibit "P," Oliveira Dec. at paras. 28-33.

[68] *See generally*, Exhibit "P," Oliveira Dec. at paras. 70-74;

those within Brazil, and that would exclude the vast bulk of the relevant foreign evidence.[69]

In this connection we again note the opinion of the movants' erstwhile expert, Professor Tucci in *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52 (D.D.C. 2017). He states that: "one cannot ignore that the distribution of justice in Brazil is not yet duly prepared to deal with more complex claims, especially those where actions for procedural communications abroad are necessary."[70] He goes on to explain the great delay caused by the letters rogatory process for the summoning of the many foreign defendants; the inability of Brazilian courts to require the production of foreign evidence without the assistance of foreign government processes; and the length of Brazilian proceedings[71] and concludes that "I have no doubt that the [U.S. District Court] for all of the reasons stated above, is the one most convenient to process and judge the claim filed by the plaintiffs. [The Brazilian court] does not fulfill these premises." Mr. Oliveira agrees.

### A Grossly Corrupt and Inefficient Forum:

Every case is time, party, and fact specific, and depends for its resolution on the evidence placed before the court. What other litigants were able to show in cases many years ago about the

---

[69] *New Life Management Company v. Sandy Lane Hotel Company, Ltd.*, 2013 WL 12152494 at *5 (S.D. Fla. 2013) ("When considering the alleged inconvenience of a forum, the litigants' access to evidence is considered the most important interest of the affected parties.… To assess the potential effect of the forum state's exercise of jurisdiction on a party's ability to produce evidence, the court must consider the necessary evidence required to prove or disprove the elements of the claims at issue, and make a reasoned assessment of the availability of that evidence"); *City Pension Fund for Firefighters and Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1410 (S.D. Fla. 2011) (FNC denied: most Brazilian documents were electronically stored and transferable, the claims did not turn on Brazilian law, and the U.S. had a strong interest in protecting the choice of American plaintiffs).

[70] *See* Exhibit "P," Oliveira Dec. para. 72 and Exhibit "E" thereto.

[71] Which he estimates at over 10 years. But here note the much longer time-frames identified by Professor Henderson in the discussion below.

adequacy of Brazil as a forum, in routine cases, or against adverse parties with little or no influence in Brazil, gives no guidance as to the correct result here. The old Brazil FNC cases on which movants depend are cited as if they are in a time-warp and that present day Brazil and its very recent epic corruption scandals do not exist.

Professor Keith E. Henderson, J.D., LL.M is a world-renowned expert on corruption. He gave his first declaration in the FNC context in the State court.[72] He states that the extent of Brazilian corruption was long secret. However, the recent and developing "Lava Jato" or "Car Wash" corruption investigation has cracked a window, shedding light on the depth and extent of corruption in all of Brazil's governmental processes, including its judiciary. Now the floodgates have opened. He states that Lava Jato is already being seen by many global corruption observers as perhaps **"*the biggest corruption scandal in the history of the world*."** He opines that Brazil's judiciary are riven by corruption and deeply vulnerable to bribery and influence by the Brazilian elites, of which the prime defendants here are members, and that its court processes are among the slowest in the world with enormous backlogs and cases lasting decades. One case out of the 102 million lawsuits pending in the Brazilian courts took 38 years to resolve. A decision on the winner of a 1987 soccer championship was finally rendered thirty years later, in 2017. Cases may take years to proceed to even an initial hearing and statutes of limitation often run in the interim and cases are dismissed. There are 100,000 cases pending on the Supreme Court docket alone.[73]

Professor Manuel A. Gomez is an expert on comparative law, international law, Latin American laws and court systems. He further opines why the subject matter of this dispute could

---

[72] *See*, *generally*, Exhibit "R," Second Declaration of Professor Keith E. Henderson, J.D., LL.M ("Second Henderson Dec."), Exhibit "B" thereto.
[73] *See* Exhibit "R," Second Henderson Dec., Exhibit "B" thereto at paras. 33-37.

not be fairly litigated in Brazil and the extent to which the remedies which are theoretically available are, in truth and fact, by dint of pervasive judicial corruption, influence, and inefficiency, only remedies on paper. He opines that Brazil is neither an available nor adequate forum.[74]

Professor Henderson has given a further declaration in which he describes how the corruption investigations in Brazil are metastasizing and that even deeper and more wide-spread corruption is now being seen to pervade all sectors of Brazilian society. New investigations are now focusing on the banking sector and money-laundering in particular, with its top financial conglomerates, like Unibanco Itaú, in prime focus.[75]

Courts are reluctant to criticize foreign legal systems for their inadequacies. There is a degree of courtesy inherent in the notion of international comity. But criticizing Brazilian systems and processes in the current climate is not impolite; it is exactly what Brazil is itself doing and openly declaring to the world: its public and private sectors are absolutely riddled with corruption and it is faced with a gargantuan multi-generational task in eradicating it. A foreign legal system is inadequate if it is "given to extreme levels of partiality"[76] or "grossly inefficient."[77] We are in the

---

[74] *See* Exhibit "S," Gomez at paras. 13-23. When Batista's Brazilian assets were seized, the judge in charge was found driving his confiscated Porsche. Exhibit "R," Second Henderson Dec., Exhibit "B" at para. 45(f); Reuters 2-25-15. When Batista was arrested, one of Mr. Carpenter's law partners persuaded a single Supreme Court Justice to release him to house "arrest" in his palatial home - over the objections of the Attorney-General and the rest of the Court. That Justice was married to another of Mr. Carpenter's law partners. See, Exhibit "S," Gomez at para. 16 and articles cited therein.
[75] *See generally*, Exhibit "R," Second Henderson Dec.
[76] *Cortez v. Palace Resorts, Inc.*, 123 So. 3d 1085, 1092 (Fla. 2013). And *see*, to same effect, *Cellnet 7, Inc. v. Lainez*, 215 So. 3d 137, 140 (Fla. 3d DCA 2017) (citations omitted); *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078 (S.D. Fla. 1997) (Bolivia was held to be an inadequate forum because of endemic judicial corruption and the defendants' ability to manipulate the judicial system to their advantage).
[77] *See also Cellnet 7, Inc.*, 215 So. 3d at 140 (citations omitted). Similarly, in *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F. 3d 1220, 1226-27 (3rd Cir. 1995) (Regarding Indian proceedings:

26

*unique* situation where it is the proposed forum State which has declared to the world that its systems are rotten to the core. It is appropriate for the Court to recognize that obvious fact.

**Problems With Brazilian Judgment Enforcement:**

Let us now imagine the unimaginable - that we sued all the defendants in Brazil and none were dismissed; our $4.2 million cost bond was not exhausted in payouts; we survived all the technical defenses; surmounted all the influence and private lobbying of judges that the defendants could bring to bear; survived the endless appeals; and that on some far-off day, maybe twenty years hence, we got a final judgment against everybody. The chance that there would be anything to levy on in Brazil would obviously be zero. We would then have to figure out where the money was and chase it internationally.

So, let us suspend our disbelief a little longer and imagine that the individuals are all still alive and the companies are all in good standing and have kept their Miami bank accounts for us to collect against. (This is so clearly just a dream). It is now that we hit the next hurdle and this is where the strategy of "not objecting" comes in: none of the non-movants would have waived their right to object to foreign enforcement of the Brazilian judgment.  In Florida they would obviously do so on the grounds that: "[t]he judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering court with respect to the judgment," and that "[t]he specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law."[78] At a minimum, all the foreigners who never did anything in

---

"While delays of a few years are of no legal significance . . . [a]t some point … the prospect of judicial remedy becomes so temporally remote that it is no remedy at all").
[78] Fla. Stat. Sec. 55.605(i)-(j).

Brazil would have fundamental, well-taken "minimum contacts" and due process objections.[79] They would point to everything we are now writing in this memorandum as Exhibit 1. At least one Florida court has recognized the absurdity and undue prejudice to the plaintiffs inherent in sending a case abroad when the obvious source of collection for the eventual judgment is right here in Florida.[80] That rationale emphatically applies here.

**Public Interest Factors Mandate Retaining Jurisdiction:**

Finally, the public interest mandates retention of the case. First, it was removed here by an Edge Act defendant which is not moving to dismiss for FNC. The rationale of the statute is to ensure uniform domestic rulings concerning the liabilities of Edge Act banks.[81] Further, the United States "has a strong interest in policing fraudulent misrepresentations made within this country in connection with the purchase and sale of securities regardless of the nationality of the victim, the tortfeasor or the issuer."[82] Moreover, this case is under Florida law and Florida's interest in enforcing its own remedial legislation, such as Florida RICO,[83] should not be forgotten, particularly given that the federal predicate acts of wire-fraud and money-laundering dovetail into the proper interests of the U.S.[84]

---

[79] *See Server v. Department of Revenue*, 189 So. 3d 997, 998-99 (Fla. 4th DCA 2016); *EOS Transport Inc. v. Agri-Source Fuels, LLC*, 37 So. 3d 349, 352 (Fla. 1st DCA 2010).

[80] See, *Publicadad Vepaco, C.A. v. Mezerhane*, 176 So. 3d 273, 279 (Fla. 3d DCA 2015).

[81] *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp*, 494 F. Supp. 1139, 1152-53 (D. Del. 1980); *see also*, *supra*, n. 1.

[82] *Manela v. Garantia,* 940 F. Supp. 584, 596 (S.D.N.Y. 1996) (Refusing to relinquish jurisdiction in favor of Brazil); *see also DiRienzo v. Philip Services Corp*., 294 F. 3d 21, 33 (2d Cir. 2002) ("[T]he public interest factors favor an American forum for the trial of this securities fraud litigation to a greater degree than recognized by the district court"); *Carney v. Beracha*, 996 F. Supp. 2d 56, 72-73 (D. Conn. 2014).

[83] We briefed the remedial nature of Florida RICO in our combined response to the motions to dismiss [DE 91] at pp. 33-34.

[84] *New Life Management Company v. Sandy Lane Hotel Company, Ltd.*, 2013 WL 12152494 at *9

Finally, there is the extremely strong declared purpose of the United States in eliminating international financial crime and the scourge of money-laundering.[85] This is an international problem which cannot be effectively combatted without international cooperation. The Bahamas and the Cayman Islands have both lent their judicial efforts towards our maintaining this case in the U.S. because of that shared concern. Brazil is in the throes of the greatest corruption challenge in the history of the world and is taking its first baby steps towards dealing with this gargantuan task, but has neither the resources nor the systems yet in place to do so. The request to dismiss this case in favor of Brazil's broken court system under the guise of thereby furthering that country's interests in bringing its own criminals to justice is cynical in the extreme. The best action this Court could take to assist Brazil in its quest to root out its massive, endemic corruption, which would be in the identical interest of the United States, would be to refuse to dismiss this international fraud and money-laundering case to Brazil, and to continue to lend its processes towards determining, in a fair and public forum, with ample tools afforded to all parties to obtain and present all the relevant evidence, where the truth lies.

## REQUEST FOR ORAL ARGUMENT

This is a complex case with many intricate legal issues discussed in the current moving papers, where the Court may benefit from oral argument and we so request the same.

---

(S.D. Fla. 2013) (citations omitted) ("[A] sovereign has a very strong interest when its citizens are allegedly victims and the injury occurs on home soil");  *see also Lexington Ins. Co. v. Forrest*, 263 F. Supp. 3d 986, 1001-02 (E.D. Penn. 2003) ("RICO's availability within this forum testifies to its commitment to providing legal redress for victims of racketeering conspiracies. If the defendants did indeed use the U.S. mails and phone lines to perpetuate an elaborate fraud … then it stands to reason that the United States would have an interest in regulating such conduct and in indemnifying its citizens for their losses").

[85] *See* Exhibit "R," Second Henderson Dec., paras. 12, 14, 23, 24.

Respectfully submitted,

ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282
Joshua D. Poyer
Florida Bar No.: 653349

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 4th day of May 2018 a true and correct copy of the foregoing was electronically filed via ECMF filing Portal, which will serve this document on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne