UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 17-23051-WILLIAMS

MERIDIAN TRUST COMPANY, as Trustee,
and AMERICAN ASSOCIATED GROUP, LTD.

      Plaintiffs,

vs.

EIKE BATISTA, *et al*.

      Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court on defendants, EFG Capital International Corp.

("EFG"), and Banco Itau International's ("Itau") (collectively, the "Bank Defendants")

motion to dismiss (DE 83) Plaintiffs' complaint (DE 75) (the "Complaint")[1] to which

Plaintiffs, Meridian Trust Company ("Meridian") and American Associated Group, Ltd.

("AAG") filed a response (DE 91) and the Bank Defendants filed a reply (DE 96).  For the

reasons set forth below, EFG and Itau's motion to dismiss (DE 83) is **GRANTED.**

I.      **BACKGROUND**

      This case arises out of a dispute over several investments that Plaintiffs made in

Eike Batista's oil exploration company OGX.   Plaintiffs are foreign entities that held

investments on behalf of an elderly Floridian and his family members.  (DE 75 ¶¶ 3-5).

---

[1] Plaintiffs originally filed this action on January 12, 2017, in state court.  On July 11, 2017, Plaintiffs' amended their state court complaint to add the Bank Defendants.  After the Bank Defendants removed the case to this Court, Plaintiffs filed the Complaint, which is the subject of this motion.  (DE 1 ¶¶ 2-3).

Defendants are Eike Batista, a Brazilian national and owner of several companies incorporated for the purpose of developing an oil exploration venture in Brazil; Batista's oil-exploration related companies ("EBX Group"); certain of Batista's family members; certain of Batista's business associates; and the Bank Defendants which held some of Batista's accounts.  (DE 75 ¶¶ 6-35).

In 2007, the Brazilian government announced it would auction off drilling leases to companies that wished to explore for oil in what was promised to be "some of the richest deep-water oil fields" off the Brazilian coast.  (DE 75 ¶ 189).  According to the Complaint, Batista raised approximately $1.3 billion dollars in private equity to bid for the project but just before the auction the Brazilian government withdrew the deep-water fields from play and, instead, auctioned some old shallow-water fields that were generally viewed as "worthless."  (DE 75 ¶¶ 190-191).  Nonetheless, Batista moved forward with the bid and was awarded the exploratory concession for twenty-one exploratory blocks.  (DE 75 ¶¶ 192-194).  In order to carry out this undertaking, Batista, through the EBX Group, had to raise millions of dollars in capital from the investing public through both private and public security offerings.  (DE 75 ¶¶ 200, 203, 253, 341, 427, 431, 432, 445, 455).  Thus, between 2008 and 2013, Batista and other co-defendants ran a targeted campaign to induce investors (mainly U.S. investors) to invest in OGX, even though they knew that the project would ultimately fail.  (DE 75 ¶ 202).  Throughout the campaign, Batista and some of his co-defendants made a number of statements that were either misleading or false to induce investors into financing the project.  (*Id.*).  Some of these representations included:

- False statements set forth in the "Material Facts"[2] of EBX Group companies, indicating, for example, that (i) OGX was sitting on as much as 4.8 billion barrels of oil; (ii) OGX had struck oil in the Vesuvio oilfield, which was expected to produce between 500 million and 1.5 billion barrels of recoverable oil; (iii) OGX discovered between 400 million and 500 million barrels of oil in the "Pipeline Formation" oilfield; and (iv) OGX set a production target of 1.4 million barrels per day by 2019, based on the discovery of a new oil field.   (DE 75 ¶¶ 222, 226, 239, 257).

- Statements made during an appearance on the Charlie Rose TV show that he had discovered "a hundred billion barrels of recoverable oil." (DE 75 ¶ 264).

- Statements made during video interview broadcasted in XPTV where Batista claimed that OGX had "the best exploratory blocks in the world" with "one trillion dollars-worth" of oil and that the company was worth up to "$100 billion dollars." (DE 75 ¶ 269).

- Announcement of significant oil discoveries during a private meeting in Miami with group of high-net-worth investors. (DE 75 ¶ 286).

- Statement made by Batista to reporters (published by Bloomberg) that major Chinese oil companies were bidding for OGX assets.  (DE 75 ¶ 289).

- Statement made by defendant Mendonca in a press release that OGX's net potential resources in "recoverable oil" were 10.8 billion barrels. (DE 75 ¶ 303).

Batista and some of his co-defendants knew that these statements were untrue. An internal OGX Joint Task Force had concluded in September 2012 that very little oil was recoverable, and that most of the oil was contaminated, which would make its extraction difficult. (DE 75 ¶ 377).  The Task Force had also concluded, "that even in the best-case scenario, the company had a negative value of about one billion dollars."  (DE 75 ¶ 377).   Nevertheless, Defendants failed to disclose this information and in 2013, through an investment adviser, Plaintiffs invested in these OGX bonds.  (DE 75 ¶ 58).

---

[2] Material Facts are public disclosures required by Brazilian law whereby directors of public companies are required to disclose any events, which might affect equity and debt investor decisions to buy or sell stock in that company.  (DE 75 ¶ 205).

Confronted with this dire economic reality, Batista began to sell chunks of OGX shares in May 2013.  (DE 75 ¶ 468).  On July 1, 2013, OGX finally announced that a number of its wells were unproductive and that none of its prior projections should be relied upon by prospective investors.  (DE 75 ¶ 476).  Meanwhile, Batista and some of his co-defendants were moving assets from their EBX Group companies to other companies, through bank accounts held with the Bank Defendants (DE 75 ¶¶ 496, 518):

- On September 24, 2012, defendant 63X Master Fund transferred $1.7 million from its account at Itau to 63X Master Fund at Morgan Stanley & Co.;

- On February 4, 2013, 63X defendant Master Fund transferred $1.5 million from its account at Itau to 63X Master Fund at JP Morgan Chase, N.A.;

- On February 12, 2013, defendant 63X Master Fund transferred $6.4 million from its account at Itau to defendant Aux Luxembourg at Itau Unibanco S.A. – Nassau Branch;

- On June 24, 2013, defendant 63X Master Fund transferred $30.8 million from its account at Itau to defendant Centennial Delaware also at Itau; and

- On November 21, 2014, defendant 63X Master Fund transferred $13 million from its account at Itau to defendant Aux LLC also at Itau.

(DE 75 ¶ 476).  Additionally, according to the Complaint, in August 2013, Batista and his co-defendant family members set up a family trust in Miami with the assistance of Marcus Berto, Erick Magno and Erick Magno PL.  (DE 75 ¶¶ 169-174).  More than $70 million flowed through the trust, some of which was transferred to trust accounts at EFG. (DE 75 ¶ 168).  Based on these facts, Plaintiffs brought the instant lawsuit against the Bank Defendants.[3]

---

[3] Eike Batista and some of his co-defendants have been the subject of indictments, investigations and bankruptcy proceedings in Brazil.  While those proceedings are not relevant to the issues of this particular motion, the Parties have referenced the broad landscape of litigation attendant to the matters at hand, and the Court notes this backdrop.

## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   The Court's consideration is limited to the allegations presented. *See GSW, Inc. v. Long Cty.*, 999 F.2d 1508, 1510 (11th Cir. 1993).   All factual allegations are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010); *see also Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1307 (11th Cir. 1998).   Nevertheless, while a plaintiff need not provide "detailed factual allegations," the allegations must consist of more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted). "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.'" *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).   The "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 545).

In addition to the requirements of *Twombly*, *Iqbal*, and Federal Rule of Civil Procedure 12(b), causes of action sounding in fraud are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007).   That rule provides that "[i]n alleging of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other conditions

of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  Consequently, "[t]o satisfy the Rule 9(b) standard, [fraud claims] must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." *Ambrosia Coal*, 482 F.3d at 1316-17 (citing *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)).

## III.  DISCUSSION

The Bank Defendants move to dismiss on several grounds.  First, Itau argues that Counts 3 and 10 for aiding and abetting fraud and civil theft should be dismissed because Plaintiffs have failed to allege (i) the existence of an underlying tort, (ii) that Itau had actual knowledge of the fraud or theft and (iii) that Itau engaged in substantial assistance of the alleged fraud or civil theft.  Second, Itau argues that Counts 2 and 9 for conspiracy to defraud and commit theft should be dismissed for the same reasons as Counts 3 and 10, and because Plaintiffs did not plead these claims with sufficient particularity.  Third, Itau argues that Counts 4 and 5 for RICO and RICO conspiracy should be dismissed because (i) Plaintiffs cannot allege any predicate criminal acts as to Itau and (ii) Plaintiffs lack standing to bring RICO claims.  Finally, the Bank Defendants move to dismiss Count 12 for conspiracy to violate FUFTA because (i) there is no private cause of action under FUFTA against a non-transferee, (ii) the transactions between Batista and his entities are not transfers under FUFTA, (iii) there is no private action for money laundering, and (iv) the conspiracy allegations are non-specific, conclusory and insufficient.

## A. Counts 3 and 10 for Aiding and Abetting Fraud and Civil Theft Against Itau

A cause of action for aiding and abetting under Florida law requires "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by alleged aider and abetter [*sic*]; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013). "In order for a claim of aiding and abetting to survive a motion to dismiss, the plaintiff must allege that the defendant had actual knowledge of the underlying wrongdoing." *Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012), aff'd sub nom. *Lamm v. State St. Bank & Tr.*, 749 F.3d 938 (11th Cir. 2014). "[W]hile the element of actual knowledge may be alleged generally, the plaintiff still must accompany that general allegation with allegations of specific 'facts that give rise to a strong inference of actual knowledge regarding the underlying fraud.'" *Id.* "Conclusory statement[s] that a defendant 'actually knew' [is] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest[ ] that the defendant 'should have known that something was amiss.'" *Platinum Estates, Inc. v. TD Bank, N.A.*, No. 11-60670-CIV, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012).

Itau first argues that its only purported wrongful conduct was the execution of customer transfers, which do not constitute a tort under Florida law. Second, Itau argues that Plaintiffs did not sufficiently allege that Itau had actual knowledge of the underlying violation. Finally, Itau argues that it could not have engaged in substantial assistance of the alleged fraud or civil theft because it owed no duty to Plaintiffs, who are third-party, non-customers. Plaintiffs do not respond to the Bank Defendants' argument that Plaintiffs

failed to allege the existence of an underlying tort.  *See Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("[w]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned"); *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n. 1 (5th Cir. 2006) (finding that plaintiff abandoned claim by failing to defend it in response to a motion to dismiss). However, the Court need not address this issue because Plaintiffs have not pled sufficient facts to support a finding of actual knowledge or a finding that Itau engaged in substantial assistance of the alleged fraud.[4]

The Complaint does not allege sufficient facts regarding actual knowledge, only facts that Itau "should have known" about the alleged fraud.  Plaintiffs allege throughout the Complaint that Itau worked closely with Batista, that Itau "would have" access to all relevant information and that Itau "must have known" that Batista was broke after the OGX Joint Task Force concluded in 2012 that the fields had virtually no oil.  Plaintiffs also suggest that the large amounts of money that Batista was moving in 2013 were atypical

---

[4] Before discussing the merits of the motion, the Court is compelled to comment on Plaintiffs' briefing.  In responding to a motion to dismiss, Plaintiffs have "the responsibility [to] inform [] the ... court" of the basis for its position and "[to] identify those portions of the pleadings," which they believe demonstrate that they have stated a claim. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).  Particularly, in cases like this one, with a complaint consisting of over 100 pages and 600 paragraphs, Plaintiffs need to reference particular paragraphs or pages of the complaint that supported their arguments.  Instead, Plaintiffs' brief is a condensed version of the Complaint that fails to respond to numerous arguments made by the Bank Defendants and is replete with conclusory statements that a claim has "been clearly pleaded" or was "sufficiently pled." However, "[j]udges are not like pigs, hunting for truffles buried in briefs," and this Court is not responsible for "ferreting out" the salient facts needed to support Plaintiffs' arguments. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) (Posner, J.); *see also Chavez v. Sec'y Florida Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("district court judges are not required to ferret out delectable facts buried in a massive record.").

and therefore created an inference of fraud.[5]  But courts in this district have rejected these types of "should have known" arguments.  For example, in *Lamm*, the court found that plaintiffs had insufficiently pled actual knowledge where the allegations established, at most, that the bank defendant disregarded "obvious red flags" and should have known of the underlying torts.  *Lamm*, 889 F. Supp. 2d at 1332.  Similarly, in *Platinum Estates*, the court rejected plaintiff's claim that the bank "should have known" about the alleged fraud, stating that "red flags or aroused suspicions do not constitute actual awareness of one's role in a fraudulent scheme."  *Platinum Estates*, 2012 WL 760791, at *4.  Finally, in *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014), the Eleventh Circuit plainly rejected the notion that a series of atypical banking transactions constitute actual knowledge on the part of the bank.  There, the Court stated:

> Florida does not require banking institutions that conduct routine banking services to investigate transactions involving its demand deposit accounts; therefore, merely alleging that a bank should have known of a Ponzi scheme based solely on a series of purportedly atypical transactions is not sufficient to survive *Twombly*.
>
> ***
>
> Perlman alleges a multitude of atypical transactions and procedural oddities, including: Theodule's opening of various accounts, numerous transfers amongst the accounts within short time periods, thousands of deposits of even dollar amounts, large cash deposits and withdrawals, the absence of any investment activity, and Wells Fargo's lifting of the freeze on the Wealth Builders account without further investigation. These allegations fall short of raising a plausible inference that Wells Fargo actually knew that Theodule was engaging in fraudulent activity. At most they list facts that could arouse suspicions, and are not sufficient to trigger any obligation by Wells Fargo to investigate. While these "red flags" may

---

[5] Plaintiffs also include allegations detailing some of the transactions that Batista and several of his co-defendants engaged in with the corporate parent and other affiliates of Itau.  (DE 75 ¶¶ 154-160)  Plaintiffs have failed to sufficiently allege, however, that the corporate parent had actual knowledge of the underlying torts, or that such purported knowledge could be imputed to Itau.  *See Davidson v. Wilson*, 763 F. Supp. 1470, 1472 n. 8 (D. Minn.1991) (alleging mere affiliation between corporate defendants is insufficient to establish agreement), aff'd, 973 F.2d 1391 (8th Cir.1992)

> have put the bank[ ] on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge. The district court properly concluded that Perlman's Complaint failed to state claims for relief for aiding and abetting.

*Id.* (internal citations omitted).

As in *Perlman*, Plaintiffs here have alleged "atypical transactions and procedural oddities" which are insufficient to state a claim premised on actual knowledge. For these reasons, Plaintiffs' claim that Itau had actual knowledge of the purported fraud does not withstand the motion to dismiss.

Moreover, even if the Complaint had properly pled actual knowledge, Plaintiffs cannot establish that Itau engaged in substantial assistance of the underlying torts because Itau had no duty to protect a third party, non-customer, from alleged fraud or theft. Plaintiffs have not alleged that Itau owed any particular duties to them, and, "as a matter of law, a bank does not owe a duty of care to non-customers regarding the opening or maintenance of its accounts." *Megaval Enterprises, Ltd. v. Bank of Am., N.A.*, No. 14-20909-CIV, 2014 WL 12609318, at *4 (S.D. Fla. Oct. 8, 2014). "When no duty of disclosure is alleged, an alleged aider-abettor may be found liable only if scienter of the high conscious intent variety can be shown." *Platinum Estates*, 2012 WL 760791, at *4. Moreover, "[m]ere inaction constitutes substantial assistance only if the defendant owes a fiduciary duty directly to plaintiff." *Chang v. JP Morgan Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017).

Although Plaintiffs point to *Chang* for the proposition that a bank can be found to have engaged in substantial assistance of fraud against a non-customer, the Court finds that *Chang* is inapposite. *Chang* involved a fraudulent scheme where the owner of a title company stole money from his client's escrow funds. The Eleventh Circuit found that

10

plaintiff had stated a claim for aiding and abetting because the bank (i) owed a fiduciary duty to the plaintiff and (ii) knew of the ongoing fraud. *Id.* The Court found that the bank had actual knowledge of the fraud because, among other things, one of its bank officers had been bribed to open the escrow account without using the proper procedures. *Id.* at 1091. Under those "particular circumstances," the bank's conduct was sufficient to constitute substantial assistance. *Id.*

No such circumstances exist here. Instead, like *Platinum Estates*, Plaintiffs have failed to sufficiently allege the requisite degree of scienter because "red flags or aroused suspicions do not constitute actual awareness of one's role in a fraudulent scheme." *Platinum Estates*, 2012 WL 760791, at *4. Additionally, no duty – fiduciary or otherwise – has been alleged or established in the Complaint. Consequently, Counts 3 and 10 against Itau also fail under the substantial assistance prong of aiding and abetting.

## B. Counts 2 and 9 for Conspiracy to Defraud and Commit Theft Against Itau

To state a claim for civil conspiracy under Florida law, Plaintiffs must allege: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009). "Conspiracy claims [sounding in fraud] must also meet Rule 9(b)'s heightened particularity requirements." *Cont'l 332 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124 (M.D. Fla. 2018). "General allegations of conspiracy are inadequate. A complaint must "set forth clear, positive, and specific allegations of civil conspiracy." *Eagletech Commc'ns, Inc. v. Bryn Mawr Inv. Grp., Inc.*, 79 So. 3d 855, 863 (Fla. 4th DCA 2012).

Itau contends that Plaintiffs' claims for conspiracy must be dismissed because there is no tort underlying the conspiracy.  Again, Plaintiffs do not respond directly to this argument but merely re-recite the allegations in the Complaint and point to several cases that discuss the elements for civil conspiracy under Florida law.  The Court, however, need not consider Plaintiffs' unresponsiveness because the Court finds that Plaintiffs did not plead sufficient facts that an agreement existed between Itau and the other defendants to commit a wrongful act.  To illustrate, the Court cites some of the relevant allegations:

- Upon information and belief, each of the three banks named above had extremely close relationships with BATISTA and his co-conspirators and accomplices and different divisions and subsidiaries within those groups assisted BATISTA and his co-conspirators and his accomplices in routing funds internationally to ultimate repository accounts in secrecy jurisdictions around the world.  (DE 75 ¶ 390)

- It is unknown before discovery whether the degree of knowledge and complicity of Citibank and BTG's U.S. operations would justify joining these banks in this action as defendants. However, it is known that BANCO ITAÚ MIAMI provided banking facilities and hosted accounts in Miami and, upon information and belief, knowingly laundered money and assisted BATISTA and his co-conspirators and accomplices to fraudulently evade creditors in Florida.  (DE 75 ¶ 392)

- Starting in September 2012, BATISTA and his co-conspirators and accomplices had 63X MASTER FUND make the following transfers out of its accounts at BANCO ITAÚ MIAMI. Some transfers moved money out of Florida.  Others shuffled money between titular owners and accounts at the same bank. It is believed that these transactions were a small part of a much greater and more complex set of transfers that were achieved with BANCO ITAÚ MIAMI's willing assistance, in an effort to defraud, hinder, or delay creditors... (DE 75 ¶ 395)

Aside from Plaintiffs' conclusory and unsupported assertions of an agreement, nowhere in the allegations cited above or in the Complaint do Plaintiffs provide any factual predicate to demonstrate that Itau "agreed" with other defendants to defraud Plaintiffs.

12

First, most of Plaintiffs' allegations against Itau are based "upon information and belief," which the Court need not take as true. *See Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 551, 557, 127 S. Ct. 1955, 1962-63, 1966, 167 L. Ed.  2d 929 (2007)).  Second, even taking all allegations as true, Plaintiffs failed to specify the "numerous times," "various dates" and "various places," where and when Itau allegedly agreed and conspired with other defendants to defraud Plaintiffs. (*See* DE 75 ¶¶ 544, 579).  At most, the Complaint alleges that Batista and his companies moved money to and from his accounts at Itau.  But that alone is insufficient to state a claim for civil conspiracy against Itau with particularity.  Finally, Plaintiffs' allegations regarding the Itau affiliates also fail to establish an agreement to defraud. (*See* DE 75 ¶¶ 154-160) (listing loans that Itau's corporate parent and affiliates made to Batista and his companies); *Davidson*, 763 F. Supp. at 1472 n. 8  (alleging mere affiliation between corporate defendants is insufficient to establish agreement), aff'd, 973 F.2d 1391 (8th Cir.1992).  Thus, Counts 2 and 9 of the Complaint against Itau must also be dismissed.

### C. Counts 4 and 5 for RICO and RICO Conspiracy Against Itau

The Complaint alleges that Itau engaged in three predicate RICO acts: federal wire fraud, Florida communications fraud and federal money laundering.  Itau moves to dismiss the RICO claims arguing that Plaintiffs did not sufficiently allege predicate criminal acts and that, in any event, Plaintiffs lack standing to bring a RICO claim because they did not suffer a direct injury from the acts of Itau.  In response, Plaintiffs argue that the RICO statute should be interpreted liberally and that they have properly pled the predicate

acts and the conspiracy.  Plaintiffs do not respond to Itau's argument that Plaintiffs lack standing.

The Florida RICO Act makes it "unlawful for any person ... [e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity...." Fla. Stat. § 772.103(3).  Thus, to recover under RICO, a civil plaintiff must establish that defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts. *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016).[6]  Additionally, plaintiff must show "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *See id*; *O'Malley*, 599 So. 2d at 1000 ("We hold, therefore, that indirect injuries, that is, injuries sustained not as a direct result of predicate acts under the Florida Racketeer Influenced and Corrupt Organizations Act, Chapter 895, Florida Statutes (1991), will not allow recovery under Florida RICO").  Moreover, to state a claim for civil conspiracy Plaintiffs must allege: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009).

Further, because each of the three predicate acts alleged by Plaintiffs require proof of scienter, in order to survive the motion to dismiss, Plaintiffs "must allege either that

---

[6] "Since Florida RICO is patterned after federal RICO, Florida courts have looked to the federal courts for guidance in interpreting and applying the act. Therefore, federal decisions should be accorded great weight." *O'Malley v. St. Thomas Univ., Inc.*, 599 So. 2d 999, 1000 (Fla. 3d DCA 1992).

[Itau] had fraudulent intent when committing the banking transactions outlined in the complaint or, at a minimum, knew that the money involved in these transactions derived from unlawful activity." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 949 (11th Cir. 1997) (stating that federal wire fraud and money laundering require proof of scienter); Fla. Stat. § 817.034(4)(b) ("Any person who engages in a scheme to defraud and, in furtherance of that scheme, communicates with any person with intent to obtain property from that person is guilty, for each such act of communication, of communications fraud..."). "A RICO plaintiff's allegations of scienter cannot be "merely conclusory and unsupported by any factual allegations." *Republic of Panama*, 119 F.3d at 949. Importantly, "[b]ankers do not become racketeers by acting like bankers." *Terry A. Lambert Plumbing, Inc. v. W. Sec. Bank*, 934 F.2d 976, 981 (8th Cir.1991); *see also Republic of Panama,* 119 F. 3d at 950 (noting policy concerns in holding banks liable for knowing the source of transferred funds); *Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1338 (S.D. Fla. 2008).

As a preliminary matter, Plaintiffs have not pled the elements of the predicate acts with sufficient particularity. Plaintiffs generally state that the Defendants have committed "numerous acts" of wire fraud, money laundering and Florida communications fraud but they have failed to specify the "who," the "when," the "where," and the "how" of these crimes. Moreover, the Court has already found that Plaintiffs failed to properly plead that Itau had actual knowledge of the alleged fraud or the requisite degree of scienter, because "red flags or aroused suspicions do not constitute actual awareness of one's role in a fraudulent scheme." *See* section 3(A) supra. Accordingly, Plaintiffs' RICO claims against Itau cannot survive the motion to dismiss because Plaintiffs have not pled factual

allegations that would give rise to a "strong inference" that Itau possessed the requisite factual intent. *See id*; *see also Levitan v. Patti*, No. 3:09CV321 MCR MD, 2011 WL 1299947, at *10 (N.D. Fla. Feb. 8, 2011), report and recommendation adopted, No. 3:09CV321 MCR MD, 2011 WL 1215364 (N.D. Fla. Mar. 31, 2011) ("When a plaintiff's § 1962(c) claim consists entirely of the predicate acts of mail and wire fraud, the substantive RICO allegations must comply with the *Twombly, Iqbal*, and Federal Rule 9(b) regarding allegations of fraud or mistake.").

In addition, Plaintiffs lack standing to bring RICO claims against Itau.  To be able to bring a RICO claim, a plaintiff must have suffered a direct injury because of defendant's commission of the predicate act. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 279 (1992).  "The connection between the racketeering activity and the injury can be neither remote, purely contingent, nor indirect." *Ray*, 836 F.3d at 1349.  Thus, to establish proximate cause, the injury involved in fraud cases must be caused by reliance on the defendant's fraudulent misrepresentations. *Super Vision Int'l, Inc.,* 534 F. Supp. 2d at 1339.

Here, Plaintiffs do not identify in the Complaint any misrepresentations made by Itau, much less any reliance on those alleged misrepresentations.  The injury suffered by Plaintiffs was the loss of their investment in OGX and that loss was not directly caused by Itau's actions. *See Super Vision Int'l, Inc.* 534 F. Supp. 2d at 1339 (dismissing wire fraud RICO claim where plaintiff failed to allege that the injury was caused by plaintiff's reliance on defendant's alleged misrepresentations).  At most, Itau's actions may be construed as an impediment to Plaintiffs collecting a as yet undetermined favorable judgment, but that type of injury is not sufficiently direct to state a claim for RICO

16

violations. *Levitan*, 2011 WL 1299947, at *14 (recommending dismissal of RICO claims where plaintiff's alleged injury was the possibility of a future favorable judgment). Accordingly, Plaintiffs' Complaint fails to state a claim for RICO and RICO conspiracy violations against Itau.

### D. Count 12 for Conspiracy to Commit Fraudulent Transfers Against Itau and EFG

In Count 12, Plaintiffs allege that Defendants "in ways, upon dates, and in places that are unknown before discovery, beyond what is set forth above, conspired … to make fraudulent transfers." Specifically, Count 12 alleges that "upon information and belief, [Itau] … and other Defendants as discovery may reveal, agreed and conspired … to defraud creditors by assisting in the transfer of funds…" The Bank Defendants advance several arguments in support of their motion to dismiss this claim. First, the Bank Defendants argue that there is no private cause of action under FUFTA against a non-transferee, like the Banks in this case. Second, they argue that the transactions between Batista and his entities are not transfers under FUFTA. Third, they contend that there is no private action for money laundering. Finally, the Bank Defendants argue that the conspiracy allegations in the Complaint are non-specific, conclusory and insufficient. Plaintiffs do not respond to each argument specifically, but generally respond that Florida courts have found that there can be conspiracy liability for damages under FUFTA against non-transferees.[7]

---

[7] In their response to the motion to dismiss, Plaintiffs also attempt to justify the primary FUFTA violation claims against the Bank Defendants by asserting that the Bank Defendants were transferees. (DE 91 at 43-49). However, not only did Plaintiffs fail to plead that the Bank Defendants were transferees, but also they failed to name the Bank Defendants in Count 11 for FUFTA violations. Therefore, there is no claim for primary FUFTA violations against the Bank Defendants.

The Court finds that the claim for conspiracy to commit fraudulent transfers fails because Plaintiffs have failed to properly allege a conspiracy.  As stated before, "[g]eneral allegations of conspiracy are inadequate.  A complaint must "set forth clear, positive, and specific allegations of civil conspiracy." *Eagletech Commc'ns, Inc.,* 79 So. 3d at 863.  Here, Plaintiffs do not provide any factual statements to support a finding that Itau or EFG "agreed" with other defendants to commit fraudulent transfers.  Just as with the other conspiracy claims that Plaintiffs have brought against Itau, the allegations in the Complaint are either wholly conclusory or based "upon information and belief."

The Complaint's pleading insufficiency is particularly egregious because Plaintiffs advanced their FUFTA conspiracy claim by a general suggestion of fraud, thereby implicating Rule 9.  *See Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co.,* Case No. 06–61055–CIV, 2007 WL 2826603 *5 (S.D. Fla. Sept. 25, 2007) (applying 9(b) standard to fraudulent transfers claims under Fla. Stat. § 726.105(1)(a)).   Nonetheless, Plaintiffs have failed to provide any detail as to the alleged conspiracy, let alone the who, the what, the when, the where and the how of Defendants' agreement and participation in this conspiracy.  To satisfy the heightened pleading standard for conspiracy claims based in fraud, Plaintiffs must at least "show some evidence of agreement between the defendants." *Prestige Restaurants & Entm't, Inc. v. Bayside Seafood Rest., Inc.,* 2010 WL 680905, at *4 (S.D. Fla. Feb. 23, 2010) (quoting *Albra v. City of Fort Lauderdale,* 232 Fed. Appx. 885, 890–91 (11th Cir. 2007)).   They

have not.  For this reason, Plaintiffs' claim for conspiracy to commit FUFTA violations is dismissed.[8]

Moreover, the Court agrees with Florida's Eleventh Judicial Circuit Court and other courts in this District, which have opined: "FUFTA seems inappropriate as applied to a bank.  It does not appear from a plain reading of the statute that it was intended to be used in this manner." *See Isaiah v. Wells Fargo Bank, N.A.*, Case No. 14-15246-CA-40, at *1 (Fla. 11th Cir. Ct. 2015). "There does not appear to be any set of facts that could support a FUFTA claim against a bank, particularly if that bank was only providing routine banking services to an alleged FUFTA debtor and not taking control and dominion over the funds in question." *Isaiah v. JPMorgan Chase Bank, N.A.*, No. 16-CIV-21771, 2017 WL 5514370, at *2 (S.D. Fla. Nov. 15, 2017).

## IV.    CONCLUSION

Plaintiffs' claims against the Bank Defendants are premised on several transfers that Batista and his companies made, allegedly to defraud creditors of his failed oil venture.  Essentially, Plaintiffs argue that the Bank Defendants should have known that these transfer were fraudulent because: (1) the Bank Defendants were private banks and therefore, had a close relationship with their clients, (2) the transactions at issue were

---

[8] The Court recognizes that "there is a split within this Circuit as to whether fraudulent transfer claims must be pled with the particularity required by Rule 9(b)." *Oginsky v. Paragon Properties of Costa Rica LLC*, 784 F. Supp. 2d 1353, 1369 (S.D. Fla. 2011). However, as cited above, the Court agrees with the line of cases finding that claims of actual fraudulent transfers need to be pled with particularity. *See Special Purpose Accounts Receivable Co-op. Corp.*, 2007 WL 2826603 at *5; *see also Ben-Yishay v. Mastercraft Dev., LLC*, No. 08-14046-CIV, 2009 WL 6387928, at *4 (S.D. Fla. Dec. 14, 2009) (applying 9(b) standard to fraudulent transfers claims).

atypical and should have raised red flags, and (3) the corporate parents of the Bank Defendants worked closely with the other defendants and must have been aware of what was going on.  As explained above, these allegations are not sufficient to hold the Bank Defendants liable for conspiracy or aiding and abetting claims for fraud, theft, RICO violations, or FUFTA violations where Plaintiffs cannot show actual knowledge, a high degree of scienter or the Banks' status as transferees.   "Bankers do not become racketeers by acting like bankers."  *Super Vision Int'l, Inc.*, 534 F. Supp. 2d at 1338. Accordingly, the Bank Defendants' motion to dismiss (DE 83) is **GRANTED** and the claims against the Bank Defendants are **DISMISSED WITH PREJUDICE**.

**DONE AND ORDERED** in chambers in Miami, Florida, this day of September 2018.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE