## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:17-CV-23051-KMW

MERIDIAN TRUST COMPANY, as trustee,
and AMERICAN ASSOCIATED GROUP, LTD.,

        Plaintiffs,

v.

EIKE BATISTA, FLAVIO GODINHO, *et al.,*

        Defendants.

_____/

### SECOND FEDERAL AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, MERIDIAN TRUST COMPANY, as trustee, and AMERICAN ASSOCIATED GROUP, LTD., sue Defendants, EIKE BATISTA, FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX INTERNATIONAL, S.A., CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD., 63X FUND, ERICK MAGNO and ERICK MAGNO, PL, and say as follows:

### Parties and Jurisdiction

**Jurisdiction:**

1.      This is an action for actual compensatory damages in excess of $21 million and statutory damages in excess of $63 million dollars, and is therefore in excess of the minimal jurisdictional damages requirements of this Court.

1

2.      This is further an action for injunctive relief, an accounting, the avoidance of fraudulent transfers, the vacation of sham trusts and other equitable relief and is therefore further within the equitable jurisdiction of this Court.

3.      This action was removed here from the Florida Circuit Court under The Edge Act, 12 U.S.C. 611 et seq., but the sole Edge Act Defendant was, on September 30, 2018, dismissed with prejudice.

**Plaintiffs:**

4.      Plaintiff, MERIDIAN TRUST COMPANY ("MERIDIAN"), is and was at all times material hereto, a trust company incorporated under the laws of Nevis and located in Nevis.

5.      MERIDIAN, as trustee, is and was at all material times the holder of legal title to the assets of a family trust fund termed "The Chrisly Trust" held and administered for the benefit of: (a) Paul Tien, a very elderly, disabled beneficiary, now deceased, whose affairs were at all times handled for his benefit in Miami-Dade County, Florida, under a Florida durable power of attorney by his son, Yife Tien, a Miami-Dade County, Florida resident and; (b) his Florida family members, Yife Tien, his wife Lucy and their son, Christopher. The investments at issue were made through the Plaintiffs' Florida investment adviser, as agent.

6.      MERIDIAN brings this action in a representative capacity, as permitted by Fed.R.Civ.P. 17(1)(E), as the holder of technical legal title to the trust assets, on behalf of the beneficiaries of the trust who are entitled to their enjoyment.

7.      Paul Tien died on May 31, 2017 and Yife, Lucy and Christopher Tien and their Florida family trusts are the sole beneficiaries of the trust and such are the sole equitable and beneficial owners of the assets of the trust and entitled to their enjoyment.

8.      Plaintiff, AMERICAN ASSOCIATED GROUP, LTD. ("AMERICAN"), is and was at all times material hereto a corporation incorporated in the Cayman Islands which held

investments on behalf of Paul Tien, now deceased, and his Florida family and their Florida trusts, as outlined above. The investments at issue were made through the same Florida investment adviser, as agent. The persons equitably entitled are as above.

**Defendants:**

9.     Defendant, EIKE BATISTA ("EIKE BATISTA" or "BATISTA"), is and was at all times material hereto an individual who is resident in Brazil, doing business directly and through agents in Miami-Dade County, Florida.

10.     Defendant, FLAVIO GODINHO ("GODINHO"), is and was at all material times an individual resident in both Fisher Island, Florida and in Brazil, doing business directly and through agents in Miami-Dade County, Florida.

11.     Defendant, PAULO MENDONÇA ("MENDONÇA"), is and was at all material times an individual who is resident in Brazil, doing business directly and through agents in Miami-Dade County, Florida.

12.     Defendant, PAULO GOUVEA ("GOUVEA"), is and was at all material times an individual resident in Brazil, doing business directly and through agents in Miami-Dade County, Florida.

13.     Defendant, LUIZ CARNEIRO ("CARNEIRO"), is and was at all material times an individual resident in Brazil, doing business directly and through agents in Miami-Dade County, Florida.

14.     Defendant, AZIZ BEN AMMAR ("BEN AMMAR"), is and was at all material times a resident of New York, doing business directly and through agents in Miami-Dade County, Florida.

15.     Defendant, MARCUS BERTO ("BERTO"), is and was at all material times a resident of Key Biscayne, Florida, doing business directly and through agents in Miami-Dade County, Florida.

16.     Defendant, THOR BATISTA (sometimes "THOR"), is and was at all material times an individual who is resident in Brazil and the son of EIKE BATISTA, doing business directly and through agents in Miami-Dade County, Florida.

17.     Defendant, EBX INTERNATIONAL, S.A., ("EBX INVESTMENTS") is and was at material times a corporation organized under the laws of Panama doing business directly and through agents in Miami-Dade County, Florida.

18.     Defendant, CENTENNIAL ASSET MINING FUND, LLC ("CENTENNIAL NEVADA"), is and was at material times a limited liability company organized under the laws of Nevada, doing business directly and through agents in Miami-Dade County, Florida.

19.     Defendant, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC ("CENTENNIAL DELAWARE") is and was at material times a limited liability company organized under the laws of Delaware, doing business directly and through agents in Miami-Dade County, Florida. (Sometimes described together with CENTENNIAL NEVADA as "the CENTENNIAL Companies").

20.     Defendant, 63X MASTER FUND ("63X MASTER FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands, doing business directly and through agents in Miami-Dade County, Florida.

21.     Defendant, 63X INVESTMENTS LTD. ("63X INVESTMENTS"), is and was at material times a corporation organized under the laws of the Cayman Islands, doing business directly and through agents in Miami-Dade County, Florida.

4

22.      Defendant, 63X FUND ("63X FUND"), is and was at material times a corporation organized under the laws of the Cayman Islands (with the two companies above sometimes referred to collectively as "the 63X Companies"), doing business directly and through agents in Miami-Dade County, Florida.

23.      Defendant, ERICK MAGNO ("MAGNO"), is and was at all material times a resident of Miami, Florida, and an attorney, doing business directly and through agents in Miami-Dade County, Florida.

24.      Defendant, ERICK MAGNO, PL ("MAGNO PL"), is and was at all material times a Florida professional limited liability service company, owned and controlled by MAGNO, and doing business directly and through agents in Miami-Dade County, Florida.

**Personal Jurisdiction in Florida:**

25.      Defendants, MARCUS BERTO, ERICK MAGNO and MAGNO PL are domiciled and ordinarily resident in Florida and were personally served in Florida and are subject to the general jurisdiction of its Courts.

26.      Further, every Defendant is subject to the general jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(2) as having engaged in substantial and not isolated activity within this State, both individually and directly and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

27.      Each Defendant is subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(1) as having operated, conducted, engaged in or carried on a business or business venture in this state, or having an agency in this state, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

28.     Each Defendant is further subject to the specific jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(1)(a)(2) as having committed tortious acts within this State, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

29.     As a result of each of their individual and direct actions and further as a result of the actions of their agents and co-conspirators which are imputed to each of them, all Defendants have sufficient minimum contacts with this State that haling them before the courts of this State would not offend Constitutional due process requirements.

## OVERVIEW

30.     What is described here is a complex international fraud conducted through electronic transmissions across the wires, principally targeting Americans, and causing billions of dollars of loss to thousands of U.S. investors.

31.     The facts are set forth extensively to satisfy the heightened pleading and plausibility requirements for several of the fraud-based causes of action alleged and particularly for the "enterprise," "pattern" and "predicate act" requirements of Florida RICO.

### Proximate Cause of the Plaintiffs' Loss

32.     However, the aspects of the fraud that proximately caused the Plaintiffs' loss are relatively simple and are alleged in detail below[1] but are summarized here.

33.     In sum, starting in 2008 and continuing up until the collapse in October 2013, BATISTA and his co-conspirators and accomplices issued multiple false representations, which were disseminated online and through other means of electronic communication, principally targeting investors in the U.S., that the EBX Group's flagship oil-exploration company, OGX, had discovered massive commercially recoverable reserves of oil.

---

[1] See paragraphs 325-456.

34.     BATISTA and his co-conspirators had always known that there was virtually no oil. But in September 2012 it was confirmed, not only that there was no oil to speak of, but also that OGX was over a billion dollars in debt and stood no chance of profitable operation, and that if BATISTA were to pay his legitimate debts, he would be bankrupt, since he was then worth a negative half billion dollars.

35.     However, BATISTA had no intention of paying his legitimate debts. Despite his knowledge of the foregoing facts, on October 24, 2012, BATISTA publicly announced that he had pledged to buy a billion dollars of OGX shares at a price higher than the then market price if the company needed the operating capital.

36.     This was termed the "Billion Dollar Put Option." Made against a backdrop of the multiple assurances of huge oil reserves at OGX, this statement of confidence in the future profitability of OGX by the company's owner was repeated over the following months with the intention of spurring continued investment and achieved its desired effect.

37.     The Plaintiffs' Miami investment adviser, noting that the ultimate majority owner of OGX was prepared to put a billion dollars of his own money into the company if needed to bring its supposed vast reserves of oil into production, relied on the Billion Dollar Put Option representation, which was repeated over several months, and was thereby induced to buy $21 million in OGX bonds on the Plaintiffs' behalf in six tranches between January 15, 2013 and July 20, 2013.

38.     In fact the Billion Dollar Put Option was a lie. BATISTA had made no such pledge and had no intention of paying any money into a company that he knew was secretly bankrupt. Instead, he spent the months intervening until the inevitable bankruptcy of OGX in siphoning off as much capital as possible and hiding it abroad in secrecy jurisdictions.

39.     OGX declared bankruptcy on October 31, 2013, after which it was discovered that there was virtually no oil and no billion dollars from BATISTA for distribution in the bankruptcy estate. Corporate cash, which had stood at $2.9 billion just a year before had mostly evaporated, with just $300,000 left. The Plaintiffs, thus, lost essentially all of their investment.

40.     An overview of the people and companies involved follows.

### The EBX Group – Overview

41.     Below is an extremely simplified introductory schematic of how ownership and control within the – deliberately complex – EBX Group was purportedly structured, for ease of understanding of what follows:



42.     The word, "purportedly" is used advisedly, because formal structures fluctuated

over time or were ignored by the conspirators for the purposes of particular transactions.

43.     EIKE BATISTA, shown at the apex of the schematic above, is an extremely accomplished Brazilian con-man who first started in the business of stock promotion in mineral exploration companies in Brazil in the 1980's. The events described here cover the period from 2007 onwards.

44.     The Brazilian "operating companies" which BATISTA started were typically labeled by initials denoting the industry in which they were engaged and ending in "X" to denote the supposed multiplication of profit. They were sometimes referred to as "the X Companies." These are shown at the lower right.[2]

45.     There were six main start-up "operating" X Companies all of which BATISTA took public through IPOs, retaining a controlling interest in each. OGX ("oil and gas") was by far the biggest in terms of public investment, by many multiples, and this was the one in which Plaintiffs would buy the bonds in 2013. But there was also OSX ("off-shore," engaged in shipbuilding), LLX ("port logistics"), MMX ("minerals and metals"), MPX ("power") and CCX ("coal mining").

46.     None of BATISTA's operating companies were run on any expectation of legitimate profit. From their inception they were intended to be vehicles for investment fraud. They operated like Pyramid schemes. The share prices in all these companies would be inflated by false promises of non-existent assets, and they would eventually crash or be revealed as worth a fraction of what had been promised, after BATISTA and his co-conspirators and accomplices had looted them of their capital and sold off their stakes in each of them, secretly and illegally, for a profit.

---

[2] The formal names of the corporations were as shown in the schematic. They are referred to herein generally by their common abbreviations. Thus, "OGX Petroleo e Gas Participacoes S.A." is referred to as OGX, "OSX Brasil S.A." is referred to as OSX, "LLX Logistica S.A." is referred to as LLX, "MMX Mineração e Metalicos S.A." is referred to as MMX, "MPX Energia S.A." is referred to as MPX, and "CCX Carvão da Colômbia S.A." is referred to as CCX.

47.     Therefore none of the huge transfers of money detailed below, transmitted by BATISTA and his co-conspirators through the various corporate bank accounts, had any legitimate origin. All the money transferred consisted of plundered corporate capital or were the proceeds of fraud.

### The Symbiotic Relationship between OGX, OSX and LLX

48.     Three of these X Companies, OGX, OSX and LLX, had a particularly close symbiotic relationship. The "trillion dollars of oil" which would supposedly be discovered by OGX would be the prime rationale for the huge OSX shipbuilding and oil-transportation program. OGX was, thus, the anchor client of OSX. The huge OSX shipbuilding and oil-transportation program would be the prime rationale for the LLX "Super-port," which was to have OSX as its anchor tenant. Since the fortunes of all were built on a promise of OGX oil reserves that never existed in reality, all three companies were always just dominoes waiting to topple.

49.     From start to finish, there was no reason for any of the directors, controlling officers and Investment Relations officers (whose task was to prompty and constantly publicly disclose all adverse information) within the companies in the EBX Group, who were all privy to the exploration data and the independent Texas assayers' reports, to believe that OGX had more than a trickle of recoverable oil or could *ever* be profitably operated.

50.     BATISTA therefore staffed OGX, OSX and LLX and his other EBX companies, from the beginning, with loyal henchmen who would assist in the fraudulent schemes by keeping up the pretense of being engaged in business for profit and who would agree with him to breach their duty of disclosure to the public and keep secret the fact that OGX had discovered no more than a tiny fraction of the oil which was being represented to the public.

51.     By false public representations as to the resources and future profitability of these three symbiotically-linked companies, OGX, OSX and LLX, BATISTA and his co-conspirators and other accomplices intentionally induced continuing investment into all three companies.

## Corporate naming convention within the EBX Group

52.     The X Companies which nominally managed the overall operation of the fraudulent scheme were labeled with BATISTA's initials, "EB," as was the case with the Defendant, EBX INVESTMENTS, S.A., incorporated in Panama.

53.     Companies which nominally held and transferred money which BATISTA had illegally extracted from corporate capital and profits that he had illegally made by market manipulation and insider trading on fraudulently inflated stock, were labeled with BATISTA's lucky number, "63," such as the 63X Companies - 63X MASTER FUND, 63X INVESTMENTS LTD and 63X FUND - which were incorporated in the Cayman Islands. Their principal function was to hold and operate foreign bank accounts, in various countries, which were not disclosed to the Brazilian government. This was illegal under Brazilian law.

54.     The main exceptions from this naming convention were the CENTENNIAL Companies. CENTENNIAL NEVADA and CENTENNIAL DELAWARE were incorporated in two of North America's prime secrecy jurisdictions. These held BATISTA's controlling block of shares in the various public operating companies and also held foreign bank accounts which were not disclosed to the Brazilian regulators and which contained part of the the proceeds from his fraudulent scheme.

## The EBX Group

55.     The corporate conglomerate was termed by the individuals involved and represented to the public as "Grupo EBX," or "the EBX Group," and often just "EBX." The EBX

Group was not a separately incorporated entity but was functionally a partnership of commonly owned and operated businesses run by a cadre of individuals working in adjacent offices.

56.     The EBX Group had its own logo: "EBX." The public operating companies within the group shared that logo, subtitled as being members of "Grupo EBX," as shown here:



57.     The top controlling individuals within the EBX Group were represented to the public as holding "EBX Group" or "EBX" positions. These positions were fluid and were not reflected on any public register.

58.     Multiple press releases were issued in the name of "the EBX Group." EIKE BATISTA was regarded internally and announced publicly in press releases as being "the Chairman of the Board of the EBX Group." In July 2013, it was publicly announced that MENDONÇA was leaving his position as CEO of OGX to become "Special Adviser to the Chairman of the Board of EBX." The Chief Financial Officer for the EBX Group was until August 2012, Nicolau Ferreira Chacur. He was replaced in that position as CFO of the EBX Group by Otavio Lazcano until July 2013. Werner Batista, EIKE BATISTA's brother, who worked as an administrative manager in EBX Headquarters on behalf of all the companies was announced publicy on occasion as the Managing Director of the EBX Group. From the start of 2013 until when he left Rio for Miami, right before the crash of OGX, BERTO was regarded internally at

EBX Headquarters as the Chief Executive Officer of EBX, second in authority only to EIKE BATISTA himself. All the individuals joined here as Defendants were, throughout the times of their respective involvement, Directors in the EBX Group.

### EBX Group Headquarters

59.     The EBX Group headquarters were in an eye-catching historic Art Deco office building at Praça Mahatma Gandhi, overlooking the water in Rio de Janeiro. That building, the Serrador Building, shown here, was leased by BATISTA and entirely occupied by the employees of his companies.



60.     All the various individual Defendants had offices in the building, with EIKE BATISTA and all but one of the EBX Group Directors being in the luxurious Penthouse suites on the 23rd floor.

61.     These EBX Group Directors were all in constant communication, face-to-face, by telephone, by the EBX Group VPN,[3] and otherwise electronically with each other via e-mail and texts regarding the affairs of the various companies during the course of the events described.

62.     The EBX Group Directors were all in continuing agreement from their entry into BATISTA's confidence and each other to engage in and further the fraudulent scheme below for

---

[3] VPN: "virtual private network."

their personal and mutual profit. They all knew of the material adverse developments as detailed below, in real time, as they happened, and routinely and continually collaborated with each other to hide them from the public and keep the scheme going. And they kept what they knew secret after they left.

63.     To maintain an illusion of corporate formality, the individual Defendants and other employees in the Group would be assigned various positions in the myriad companies which were eventually set up, but much of the time these were paper corporations and that particular individuals might hold particular positions was not even notified to the various position-holders.

64.     Sometimes individuals were given a title, such as an officer or director. Or they were given temporary proxy powers to vote on corporate resolutions, or were given temporary powers of attorney to enable the signature of fake contracts such as a front for bribery or to make paperwork look "right," or to authorize bank transfers which may have looked suspicious if authorized by others.

65.     However, none of the companies was in reality managed separately. The theoretical reporting structures were not followed. There was no compartmentalization of information between them. There was routine commingling of funds between various company bank accounts. Comingled company money was used for bribery and other illegal purposes. Often, inter-company transfers were made for the sole purpose of obscuring the trail between initial recipients and ultimate depositors.

66.     There was no regard for corporate formalities unless the pretense of formality was needed to further the fraud. The corporate form was routinely abused for the commission of crimes and other wrongful acts. The companies had no separate proper corporate purpose and were the alter egos of BATISTA.

67.     Although the EBX Group was, on the surface, a partnership of companies in related businesses, run by a group of individuals. It was, in actual fact, a partnership for illegal purposes: a racketeering enterprise composed of individuals who were engaged in a scheme to defraud for their own mutual profit. The enterprise had BATISTA at the top and his co-conspirators and other accomplices playing their various parts in the fraudulent scheme, as detailed below, acting at his ultimate direction, beneath him.

68.     That the EBX Group was the umbrella fraudulent operation, under which a number of separate but interrelated fraudulent investment schemes were carried out has now been recognized in judicial proceedings in Brazil. On May 2, 2017, a Court supervising the bankruptcy of MMX, pointed extensively to the facts in the present case regarding OGX as emblematic of a common *modus operandi* pursued by BATISTA in all the public companies in the EBX Group.

69.     That court pierced the corporate veil of MMX and held CENTENNIAL NEVADA and BATISTA liable for the approximate $300 million shortfall caused to MMX investors and froze all their assets in Brazil. The Court held that there would need to be complete discovery of all of BATISTA's finances and an accounting to identify which of the funds that BATISTA had stolen were from which of the fraudulently conducted companies and their various creditors. See Exhibit "A."

70.      That the EBX Group was an umbrella fraudulent operation under which a number of separate but interrelated fraudulent investment schemes were carried out has also been recognized in judicial proceedings in the United States. On June 9, 2017, the United States Bankruptcy Court for the Southern District of Florida, at the request of the MMX Trustee in Brazil, adopted the findings of the Brazilian Court as a U.S. judgment and froze all of CENTENNIAL NEVADA's and BATISTA's assets in the U.S. See, Exhibit "B." Broad financial discovery is proceeding in that Court, primarily in Miami but also throughout the U.S. Numerous BATISTA

family members and BATISTA controlled companies have appeared as interested parties in that case, including BATISTA personally.[4]

## The Men on the Penthouse Floor at EBX

71.     The best indicator of connection of the individuals within the EBX Group to the conspiracy was not the formal corporate positions that they held – corporate positions were used or abused as was convenient – but by the proximity of their offices to those of BATISTA on the Penthouse Floor at EBX Headquarters. All but one of the individual Defendant EBX Directors listed below, CARNEIRO, made it to the Penthouse Floor.

**Eike Batista:**

72.     EIKE BATISTA was the prime mover in the conspiracy and active within the EBX Group frauds from the beginning. He was the ultimate owner of most of the shares in the public companies and received by far the lion's share of the proceeds of the frauds. His primary title was as Chairman of the Board of the EBX Group and he occupied the grandest suite on the Penthouse floor of EBX Headquarters with a conference room, balcony and verandah, and stunning view of the water.

73.     EIKE BATISTA was also the ultimate controlling shareholder and director or manager of CENTENNIAL NEVADA, CENTENNIAL DELAWARE, EBX INVESTMENTS, and many companies in the Group, including: MPX, MMX, OGX, OSX, CCX, AUX, EBX Capital Partners S.A., Centennial Asset Participacoes Acu S.A., Centennial Asset Participacoes Amapa S.A., Centennial Ltd., EBX Holding Ltda., EBX Automotiva S.A., EBX Capital Partners S.A.,

---

[4] Eike Batista, Werner Batista, Luma de Oliveira, Olin Batista, Flavia Sampaio, Thor Batista, Centennial Asset Mining Fund LLC, EBX Capital Partners, Centennial Asset Brazilian Equity Fund LLC, Thorque1 Fund Ltd, Thorque Investment Management Ltd., 63X Investments Ltd., 63X Master Fund, Green Lane Capital Corp, 3BX Investments LLC, 3BX Investment Fund I LLC, WRM1 LLC, WRM2 LLC, EBX Panama S.A., MMX Minereia e Metalicos de Boliva S.A., Ardpoint Holdings Inc., and AUX LLC.

63X MASTER FUND, 63X INVESMENTS LTD., 63X FUND, WRM1 LLC., WRM2 LLC, NRX – Newrest Servicos de Catering, S.A. and others. BATISTA made many hundreds of millions of dollars from the OGX fraud.

74.    During 2018, BATISTA was convicted of the bribery of the Governor of Rio de Janeiro in connection with EBX business interests and sentenced to 30 years in prison. He was charged by the CVM[5] with market manipulation and insider trading but has escaped penalties apart from being banned from running a public company for five years.

75.    BATISTA's personal assets have been frozen by injunctions in Brazil and in the United States in connection with the sister fraud on MMX creditors[6] and, up to $63 million, in connection with a companion brought by the current Plaintiffs in the Cayman Islands.

**Flavio Godinho:**

76.    FLAVIO GODINHO was BATISTA's earliest prime co-conspirator and also agreed with BATISTA and GOUVEA to participate in the EBX Group frauds from the beginning and was in until the end. He is a Brazilian attorney by profession and has been close to BATISTA for decades. He was a full-time Director in the EBX Group throughout the years at issue. He was BATISTA's most trusted adviser and regarded as his right-hand-man until BEN AMMAR and BERTO became rivals for that position in late 2012.

77.    GODINHO occupied an office on the Penthouse floor next to BATISTA. He helped develop the legal structures through which the frauds were accomplished and he advised BATISTA throughout the course of the scheme on how to best conduct it. He split his time between his homes in Rio de Janeiro and Fisher Island, in Miami, but was in constant contact with BATISTA and the other prime co-conspirators.

---

[5] An extremely anemic Brazilian version of the SEC in the United States with limited powers to exact administrative penalties.
[6] See Exhibits "A" and "B."

78.     GODINHO held numerous formal positions in companies within the EBX Group including: Director and President of OSX (2007 – when OSX was called Centennial Asset Corumba Participao em Mineracao S.A.); Director of EBX INVESTMENTS (2008 – 2015), Executive Director of OGX (as of 2009), Manager of CENTENNIAL NEVADA (as of February 2010), Director of LLX (as of December 2009), Manager of CENTENNIAL DELAWARE (as of February 2010), Shareholder of Centennial Asset Participacoes Amapa S.A. (as of October 2011), Shareholder of EBX Automotiva S.A. (as of March 2011), Director of Centennial Asset Participacoes Acu S.A. (as of March 2012), Director of MPX (as of February 2013), Director of OSX (as of March 2013), Shareholder of EBX Brasil S.A. (as of September 2013), Director of EBX Capital Partners S.A. (as of 2017).[7] GODINHO, like BATISTA, made hundreds of millions of dollars from the fraud.

79.     During 2018, GODINHO was convicted alongside BATISTA of the bribery of the Governor of Rio de Janeiro in connection with EBX business interests and was sentenced to 22 years in prison. Other criminal proceedings are pending.

80.     He was charged by the CVM, along with BATISTA, BEN AMMAR, BERTO and other directors of LLX, for not reporting the negotiations between EIG Management Co. and LLX as a Material Fact to the market. However, GODINHO appealed and was acquitted.

**Paulo Mendonça:**

81.     PAULO MENDONÇA is a geologist and was the former head of exploration at Brazil's national oil company, Petroleo Brasileiro S.A. ("Petrobras"). He had been integral to its deep water discoveries. He was conscripted by BATISTA in 2007 because of his background and reputation.

---

[7] All formal corporate positions given in regard to the individual defendants are as are currently reflected in Brazilian public records, but the actual timeframe in which positions were held may begin earlier and end later than the dates indicated.

82.     As BATISTA's so-called "Dr. Oil," MENDONÇA agreed with BATISTA, GODINHO and GOUVEA to build what was publicized as a "Dream Team" of ex-Petrobras oil engineers who would help create a false belief in the investing public that OGX had discovered massive reserves of immensely valuable oil in shallow water as a result of their expertise coupled with new technology.

83.     MENDONÇA and the Dream Team would promulgate and maintain the vast bed-rock public lie as to the existence of vast shallow-water oil reserves on which the rise of OGX and its interdependent satellite companies, OSX and LLX, would depend.

84.     MENDONÇA also had his offices on the Penthouse Floor as a Group Director at the EBX Group building. He held numerous formal positions in the EBX Group companies over the years, including Director of OGX (as of September 2007), General Executive Officer of OGX (as of April 2009), Chief Executive Officer of OGX (through June 2012), Director of OSX (as of January 2010), and Director of MPX Energia S.A. (as of May 2012). In July 2012, MENDONÇA left his position as CEO of OGX and became Special Adviser to the Chairman of the Board of Grupo EBX. MENDONÇA was active in the conspiracy from 2007 until 2013 and made many millions of dollars from the fraud that he helped perpetrate.

**Paulo Gouvea:**

85.     PAULO GOUVEA was regarded by BATISTA and his co-conspirators in the EBX Group as a brilliant legal and financial mind. He joined the conspiracy as an EBX Group Director at its start in 2007 and was the architect of the various initial public offerings that the EBX Group companies would make.

86.     He knew from the start that oil exploration, ship-building, port expansion and the other "industries" were just the façade for intended stock frauds because he was a prime architect of the scheme. He occupied an office on the Penthouse Floor and held numerous formal positions

including: Director of OGX (as of 2008); Director of OSX (as of 2009); Director of MPX (as of April 2009); Director of EBX INVESTMENTS (2008 – 2011), Director of MMX (as of 2005); and General Counsel to the EBX Group.

87.     GOUVEA reportedly made $150 million from illegal insider sales of stock in the EBX Group companies but left after a fight with MENDONÇA in mid-2011. However, GOUVEA laid the base of the continuing OGX fraud with his co-conspirators, kept the secrets after he left, and has continuing liability for the damages that ensued. GOUVEA, moreover, remains involved in the Group as a Director of EBX Capital Partners S.A. (as of September 2017) and Partner at EBX Participacoes Ltda. (as of October 2018).

**Luiz Carneiro:**

88.     LUIZ CARNEIRO was recruited by BATISTA in 2009 from a 30-year career at Petrobras where he had held high-level positions in its various Exploration, Engineering, and Production divisions. BATISTA appointed him Chief Executive Officer of OSX during 2009 and he became a director of OGX in August 2010. CARNEIRO knew that OGX had no significant oil reserves and that the future of OSX was pegged to the success of OGX, and was therefore always in peril. CARNEIRO nevertheless assisted in maintaining the public lie as to the viability of OSX where his duties included the bribery of government officials to procure shipbuilding contracts for which there was no actual commercial demand.

89.     CARNEIRO moved over to become Chief Executive Officer of OGX in July 2012, taking over from MENDONÇA, when the latter was appointed Special Adviser to the Chairman of EBX, BATISTA. The pretense for this change, as announced in a July 13, 2012 press release by BATISTA, as Chairman of the Board of EBX, was because the company was now supposedly moving out of its initial "exploratory" phase (MENDONÇA's forte) into its "production" phase

(CARNEIRO's forte). This in itself was a lie: there was known to be virtually no oil and therefore no prospects of profitable operation.

90.     As CEO and Director of OGX, CARNEIRO was privy to all developments in 2012 and 2013, including the $2 billion Mubadala loan and asset-stripping, the Joint Task Force report that the company was worth a negative billion dollars and that the Billion Dollar Put Option was fraudulent and which BATISTA never intended to honor. CARNEIRO's real job was therefore to keep silent on all of this and help maintain the illusion of a profitable future for OGX as long as possible. He agreed with BATISTA and his co-conspirators to do so for millions of dollars in payments.

91.     CARNEIRO was also appointed Director of OSX in February 2013 and was active in the conspiracy until the final days of OGX in October 2013. His offices were on a lower floor at EBX Headquarters.

92.     During 2016, CARNEIRO was indicted on charges of paying $2.3 million in bribes to Brazil's Finance Minister, and Chairman of Petrobras, Guido Mantega, to procure a $922 million State shipbuilding contract for OSX during the time he headed that company.

93.     CARNEIRO made many millions of dollars off the fraud and has recently been compelled to return several million dollars from his illegal, undisclosed foreign accounts. Other criminal proceedings are pending.

**Aziz Ben Ammar:**

94.     In 2012, AZIZ BEN AMMAR, was a young man in his thirties domiciled in New York. He had no relevant experience in any of the related industries in the EBX Group, but BATISTA liked his brash attitude and his ruthless thinking.

95.     BEN AMMAR joined the EBX Group in the summer of 2012 and very rapidly rose in BATISTA's confidence and in power and influence. As evidence of BATISTA's rapidly

growing confidence in him, by August of 2012 he had been appointed a director of OGX. In September 2012 he joined the boards of LLX, OSX and CCX. He was made a director of MPX in February 2013, NRX - Newrest Serviços de Catering S.A. in May 2013 and MMX in July 2013.

96.     BEN AMMAR came in to OGX just before the secret internal Joint Task Force concluded, in September 2012, that OGX was a billion dollars in debt and had no chance of profitable operation. He was completely unfazed by the fact and focused on ways to keep the balls in the air for as long as possible, regardless of how many more people lost money.

97.     It was BEN AMMAR who came up with the idea of the fraudulent Billion Dollar Put Option in October 2012 whereby BATISTA would publicly pledge to put in a billion dollars of his own money for shares if OGX needed it to bring what were supposed to be its massive oil reserves into production, but with no intention of doing so. This was the lie which was the proximate cause of the Plaintiffs' loss.

98.     From August 2012 until the crash of OGX in October 2013, when he fled for New York, BEN AMMAR's offices were on the Penthouse floor at EBX Headquarters. The CVM has brought numerous charges against BEN AMMAR based on his position as a director in various EBX companies, often being charged alongside BATISTA, CARNEIRO, GODINHO and BERTO. Two CVM charges against BEN AMMAR in regard to his actions as director in OGX and CCX have concluded with no result publicly announced. The CVM proceeding against BEN AMMAR for his failure to report the negotiations between EIG Management Co. and LLX as a Material Fact, in his capacity as a director of LLX is still pending.

**Marcus Berto:**

99.     MARCUS BERTO came in from outside the EBX Group and entered the conspiracy towards the end of 2012 when OGX, OSX and LLX were sure to collapse in the coming months. He became one of BATISTA's closest advisers at EBX, overtaking BEN AMMAR and

GODINHO in power and influence. BERTO also had his offices as a Director of the EBX Group on the Penthouse floor of EBX Headquarters.

100.    BERTO knew that the $2 billion Mubadala "investment" was really a loan and that Mubadala was secretly realizing on its collateral, that the OGX internal Joint Task Force had concluded in September 2012 that the company was worth a negative billion dollars, had virtually no recoverable oil and stood no chance of profitable operation. He also knew that the Billion Dollar Put Option which BATISTA had issued in October 2012 was a fraudulent misrepresentation issued in order to induce investment and postpone the collapse of OGX, OSX and LLX.

101.    From early 2013 until the crash of OGX in October 2013, BERTO was the Chief Executive Officer of the EBX Group, second in authority only to BATISTA, and he agreed with BATISTA to manage the slowest coordinated collapse possible, to ensure maximum profit to BATISTA and to ensure that BATISTA's assets were protected from creditors as well as possible.

102.    One of BERTO's particular tasks in the conspiracy was to agree to occupy the Director, President, CEO and Investor Relations positions at LLX, which he took over in March 2013. In the latter position his legal responsibility was to disclose all adverse facts to the public. He agreed with BATISTA and his co-conspirators to keep all the disastrous news regarding OGX and OSX secret and not disclose it to CVM and the LLX investing public and he coordinated the misleading responses to CVM from the other public companies.

103.    Particular facts which BERTO knew that he was legally obligated to publicly disclose via Material Facts as Investor Relations Officer at LLX during 2013 included that: (a) the supposed "investment of $2 billion dollars from Mubadala was actually a loan secured by all of BATISTA's most valuable assets; (b) Mubadala had been asset stripping for many months to redeem the loan; (c) OGX was secretly bankrupt; (d) the Billion Dollar Put Option was a lie; (e) the OSX shipbuilding program (which depended on OGX oil and the bribery of government

officials) was not viable; (f) OSX, on whose viability the future of LLX depended would shortly delare bankruptcy; (g) LLX would thus lose its anchor tenant, with no equivalent replacement; and (h) that the monstrous LLX port facility, currently just a huge stretch of undeveloped seafront, was therefore worth a fraction of what investors thought.

104.    BERTO agreed to keep all this secret, in part to enable BATISTA's shares in LLX to be secretly sold off before the crash of OGX. But the main reason was to prop up the lies about OGX and keep the balls in the air on OGX a while longer, allowing BATISTA to continue to siphon off capital and hide it abroad.

105.    BERTO actively assisted in doing so, including by failing, from March 2013 onwards to disclose any of the adverse developments detailed immediately above to CVM and the public; affirmatively lying to CVM when tasked on his omission in July 2013; and coordinating identical lies for the other public companies.

106.    BERTO's breach of his duties of disclosure in the Investment Officer slot at LLX helped to enable BATISTA to maintain his Billion Dollar Put Option ruse until late 2013, through the period during which the Plaintiffs invested in OGX bonds. Had BERTO complied with his legal duties of disclosure, BATISTA's entire empire would have collapsed at the end of 2012 and the Plaintiffs would not have lost a cent.

107.    BERTO knew that he would in all probability be sanctioned by the CVM for insider trading and market manipulation but the likely fine would be dwarfed by the profit he would make from his participation in the fraud. The price that he agreed with BATISTA for his illegal assistance, $10 million, made it worthwhile. BERTO, in any event planned to leave Rio for Miami as soon as OGX crashed, to minimize the practical risk of suffering possible criminal penalties as a result of his actions.

108.   During 2013, while BERTO was managing the coordinated collapse of the EBX Group companies he was also tasked with laundering money for BATISTA and fraudulently transferring BATISTA's money out to secrecy jurisdictions before the collapse and he worked with MAGNO, his own asset-protection lawyer in Florida, to achieve these ends as is further detailed in Count XII below. In the course of 2013, BERTO became so close to BATISTA that BATISTA appointed him as the trustee of BATISTA's Family Trust, thereby becoming the legal owner of the funds with complete control and power of disposition.

109.   In October 2013, immediately before the crash of OGX, BERTO resigned from his formal positions in the X companies and the EBX Group generally and fled Brazil for Florida where he was paid the $10 million promised, which he invested in a $9.5 million mansion on Key Biscayne. The foregoing summary of facts regarding BERTO are alleged in more detail below.

**Thor Batista:**

110.   EIKE BATISTA's eldest son, THOR BATISTA, who was at the time in his early twenties, joined his father's EBX Group in the latter part of 2012 just before the disastrous Joint Task Force Report in September 2012 and the development and announcement of the fraudulent Billion Dollar Put option in October 2012. He had attended directors' meetings at MPX as early as 2011, and became a director of LLX in 2012, CCX in September 2012 and CENTENNIAL DELAWARE in March 2013.

111.   THOR's father intended that he learn the business and become his trusted right arm and he was in his father's total confidence. He occupied huge offices on the Penthouse floor alongside his father, GODINHO, BEN AMMAR, and BERTO, and was given the title of a Director of the EBX Group. He had already, in April 2012 become the Director and sole shareholder of Thorque Investment Management, and the Director of Thorque1 Fund Ltd., both incorporated in the Bahamas to be used for the international transmission of funds.

25

112.    As described below, THOR BATISTA's duties included assisting his father to launder the proceeds of the scheme and cheat creditors. As is further detailed below, in Count XII, on July 18, 2013, THOR BATISTA personally received at least $40,000,000 as a supposed "gift" from his father, which he transferred onwards to Miami to fund a "Family Trust" of which BERTO was the trustee and his father was the principal beneficiary. BATISTA explained to his son that such fraudulent actions would be necessary if he intended to continue his life of extreme luxury where, for instance, he could fly from Rio to Miami by private jet simply to buy a new Apple iPhone.

113.    In 2015, THOR BATISTA joined his father, EIKE BATISTA, and FLAVIO GODINHO as a director of EBX INTERNATIONAL, S.A., the manager of the CENTENNIAL COMPANIES and the sole registered director of the 63X Companies, (all companies further described below) at the control apex of the wealth structure described above, where he continues to assist in the laundering of money and fraudulent transfers to cheat creditors. He further became Administrator of EBX Holding Ltda., in September 2017.

**EBX International S.A.:**

114.    As limited liability companies, CENTENNIAL NEVADA and CENTENNIAL DELAWARE were technically run by a manager. This was, in both cases, a corporation, EBX INTERNATIONAL, S.A., incorporated in Panama, again, for opacity and secrecy purposes. As stated above, this company also owned the shares of and controlled the 63X Companies in the Cayman Islands and their various bank accounts in Miami and elsewhere.

115.    This Panamanian company was in turn controlled by a board of directors. Upon incorporation in December 2008 the directors, named as defendants, were EIKE BATISTA, FLAVIO GODINHO and PAULO GOUVEA. THOR BATISTA was eventually appointed as a director in 2015.

116.     These individual Defendants were therefore at the formal control apex of the corporate structures through which the fraudulent scheme was operated.

**Centennial Nevada:**

117.     CENTENNIAL NEVADA was incorporated in Nevada to take advantage of that State's generous secrecy laws. One of CENTENNIAL NEVADA's main functions was to hold the shares of the various public companies in the EBX Group outside Brazil and hide its technical ownership structure.

118.     Another function was to hold hundreds of millions of dollars in proceeds of the frauds in secret accounts, illegally, outside Brazil. These accounts were used, variously, as slush funds for the bribery of government officials, to launder the proceeds of crime, and to make fraudulent transfers to cheat creditors. The funds of this company have been frozen by injunctions in Brazil and in the United States in connection with the sister fraud on MMX creditors.[8]

**Centennial Delaware:**

119.     CENTENNIAL DELAWARE was the sister company to CENTENNIAL NEVADA. It was incorporated in Delaware to take advantage of that State's similarly generous secrecy laws. Delaware LLCs are completely opaque, since neither their managers nor their members are required to be registered, or publicly disclosed, under Delaware law.

120.     CENTENNIAL DELAWARE had equivalent functions to its sister Nevada company within the conspiracy, namely: to hold the shares of the various public companies in the EBX Group outside Brazil; to hold hundreds of millions of dollars in proceeds of the frauds in secret accounts, illegally, outside Brazil, as slush funds for the bribery of government officials, to launder the proceeds of crime, and to make fraudulent transfers to cheat creditors.

---

[8] See Exhibits "A" and "B."

**The 63X Companies:**

121.    63X MASTER FUND, 63X INVESTMENTS LTD. and 63X FUND, were incorporated in the Cayman Islands, again for secrecy purposes. They held shares in other BATISTA companies, not joined here but their main function was to hold hundreds of millions of dollars in proceeds of the frauds in secret accounts, illegally, outside Brazil, as slush funds for the bribery of government officials, to launder the proceeds of crime, and to make fraudulent transfers to cheat creditors. Their funds in the Cayman Islands, up to the treble damage amount sought here of approximately $63 million, have been frozen by a Mareva Injunction in aid of this case.

**Magno and Magno, PL:**

122.    MAGNO is a Florida asset protection attorney and MAGNO, PL is his Miami law firm. MAGNO and his firm were involved in setting up fraudulent transfers for BATISTA and BERTO in 2013. He and his law firm are parties only to the Fraudulent Transfer claim, Count XII.

123.    MAGNO and MAGNO, PL are not presently believed to have played a part in the active fraud. Plaintiffs reserve the right to amend to add such claims if discovery reveals that they had a greater involvement than is presently known.

### Other Principal EBX Group Employees

124.    The roles played by certain other individuals within the EBX Group of companies is necessary to an understanding of the claims:

**"Zartha:"**

125.    Luiz Arthur Andrade Correia. ("Zartha") had been a financial adviser in New York. He had known BATISTA and managed money for him for several decades. In 2008, he accepted FLAVIO GODINHO's invitation to move to Rio and work at EBX Headquarters as an internal financial consultant.

126.    Zartha did so shortly thereafter and was part of a small group of four financial

consultants, separately incorporated as "TMF," within the EBX Group Headquarters who handled BATISTA's personal money. (The structure was dictated by the fact that as EBX Group employees they would pay a higher rate of tax than they would pay as corporate dividends).

127.     Zartha occupied a number of trusted positions in the Group at various times. He was a witness to many cardinal events, such as those alleged at paragraphs 325-328 (the firing of Chacur) and 338-343 (the Billion Dollar Put Option meeting). And he would eventually be indicted but acquitted on the same government bribery charges on which BATISTA and GODINHO were convicted.

128.     Shortly before the crash of OGX, Zartha moved to Miami, where he now lives.

**Werner Batista:**

129.     BATISTA's brother, Werner Batista had been living in Florida for twenty years when the OGX scheme started in 2007. EIKE BATISTA and Werner had over those prior decades invested in Florida real estate together.

130.     In 2008, at his brother, EIKE BATISTA's request, Werner moved his family to Rio and took up a position in the EBX Group, with offices at EBX Headquarters, where he ran the centralized administration of all, the companies in the Group as a whole. Werner Batista held numerous formal positions within the EBX Group including as a director of OSX in 2009, director of EBX Investimentos Ltda. as of 2010, and director of EBX Brasil as of August 2013 (and continuing presently). He was announced publicly on at least one occasion as the Managing Director of the EBX Group and spoke at events and seminars on behalf of the EBX Group.

131.     As the top EBX Group administrator, Werner Batista was privy to much of the information being developed by the conspirators and others within the companies and was a witness to many material developments.

132.    After the crash of OGX and the other operating X Companies, Werner Batista moved back to Palm Beach, Florida. He has retained in his possession, in Florida, copies of many of the internal and inter-company communications.[9]

133.    On the basis of all information developed to date, however, it is unclear whether Werner Batista had sufficient *scienter* to have played a part in the active fraud to retain him as a Defendant. Plaintiffs reserve the right to amend to add him if discovery reveals that he had a greater involvement than is presently known.

**Harald Batista:**

134.    Harald Batista is another of EIKE BATISTA's brothers. He lives in Los Altos Hills, California. As early as 2010, he was a manager of both CENTENNIAL NEVADA and CENTENNIAL DELAWARE alongside FLAVIO GODINHO and was involved in its offshore banking activities in the Bahamas, the Cayman Islands and Panama.

135.    In late 2012, after OGX was known to be insolvent, Harald Batista, started the "KYC" account opening process at TAG Bank in Panama for CENTENNIAL DELAWARE and on March 12, 2013, BATISTA and GODINHO signed a corporate resolution authorizing the Company to open bank accounts there.

---

[9] He was made a party to the earlier version of this action and listed in his Rule 26 disclosures [D.E. 71] that he had numerous documents material to these proceedings: "including: (a) any reports identied in the First Federal Amended Complaint [D.E. 75], whether issued by the Brazilian government or private entites; (b) documents showing the on-going oil exploration and oil drilling operations of OGX, including any oil extraction; (c) internal communications of OGX, OSX, LLX, EBX Investimentos Ltda., MPX Energia S.A., and MMX Mineracao e Metalicos S.A. personnel and executives; (d) Communications between personnel and executives of OGX, OSX, LLX, EBX Investimentos Ltda., MPX Energia S.A., and MMX Mineracao e Metalicos S.A. and any of the Parties to this action and/or non-party entities and individuals identified in the First Federal Amended Complaint [D.E. 75]; (e) Reports that have been filed before the National Oil and Gas Regulatory Agency (Agencia Nacional de Petroleo, Gas Natural e Biocumbustiveis – ANP); (f) documents and communications demonstrating the information that was disclosed to the public; and (g) documents relating to the reorganization of OGX in Brazil; (h) Documents relating to the criminal proceedings in Brazil relating to OGX.

136.    An account was shortly thereafter opened for CENTENNIAL DELAWARE at TAG Bank and in early March 2013 over $111 million was transferred into that Panamanian account from a CENTENNIAL DELAWARE account in the Cayman Islands. An account of CENTENNIAL DELAWARE's Panamanian subsidiary at TAG Bank in Panama was used as a source of bribes to government officials, as is further detailed below.

137.    On the basis of all information developed to date, however, since he lived in California, and may have been accommodating his brother EIKE BATISTA's requests without deep inquiry, it is unclear whether Harald Batista had sufficient *scienter* to have played a part in the active fraud to join him as a Defendant. Plaintiffs reserve the right to amend to add him if discovery reveals that he had a greater involvement than is presently known.

## **DETAILED FACTS**

## **The Start of OGX**

138.    Some of the world's largest oil discoveries in recent years have been in Brazil's offshore, pre-salt basins. "Pre-salt" oil is generally characterized as oil reserves situated exceptionally deeply, under thick layers of rock and salt, and requiring substantial investment to extract.

139.    In November 2007, Petrobras announced that it had discovered between five and eight billion barrels of recoverable pre-salt oil off the coast of Brazil, thereby generating significant global attention on the apparent great promise of the Brazilian oil and gas industry.

140.    In 2007, the Brazilian government announced it would auction off-shore drilling leases to companies who wished to explore for oil, and it scheduled what promised to be some of the richest new deep-water oil fields off its coast for auction on November 27, 2007.

141.    BATISTA and his brothers, Werner, Harald and Lars, were scions of the hugely wealthy, politically tied-in Batista clan in Rio de Janeiro, Brazil. Their father, Eliezer, was a past

Minister of Mining and Energy and past CEO of the massive Vale mineral exploration conglomerate in Brazil, through which he had made the family fortune.

142.    None of the Batista brothers had any experience in the oil-exploration business. But EIKE BATISTA had a lengthy background in stock promotion and mineral exploration and he raised approximately $1.3 billion in private equity to acquire some of these deep water drilling leases through a company he started and named OGX. He owned OGX through two North American holding companies which he had formed for the purpose: CENTENNIAL DELAWARE and CENTENNIAL NEVADA.

143.    However, just before the auction, the Brazilian authorities withdrew the deep water fields from auction deeming them "too valuable" and left in play old shallow-water fields that had been picked over by Petrobras for decades and generally viewed as worthless.

144.    That put BATISTA in a quandary. He had raised approximately $1.3 billion from investors to spend on deep water oil fields. Now there were no deep-water fields to buy. No one wanted the shallow-water fields.

145.    But, rather than refund the money, which was the only honest option, BATISTA resolved to press forward and acquire these rejects of the industry and on November 27, 2007, BATISTA's OGX was the winning bidder on 21 exploratory oil leases.

146.    The fact that BATISTA had bought these worthless leases made him an internal laughing stock at Petrobras, where they had exhaustively explored the sea-bed and found nothing commercially recoverable. But BATISTA had no thought of profitable operation. He intended to use these leases as the basis of a colossal investment fraud. This is where the OGX fraud started.

147.    Having committed nearly all of OGX's cash to pay for the licenses and fees associated with the exploratory concessions, BATISTA needed to raise additional capital to

conduct exploration. It sought those funds via an initial public offering ("IPO") of approximately five million of its common shares.

148.     However, persuading the investing public that these fields were unrecognized treasures rather than the worthless money-pits that the industry believed them to be, and which they would eventually prove to be, would require enormous promotion.

149.     There was from beginning to end no reasonable basis for any belief that the shallow-water leases had any chances of yielding commercially recoverable oil in any quantity likely to be profitable. This did not stop BATISTA and his co-conspirators and accomplices from knowingly generating a series of lies to investors starting then and built on over the next six years to convince them that the OGX wells would produce unimaginably vast quantities of oil.

150.     In actual fact, from the first dry wells drilled to the last, the OGX drilling operation was a waste of OGX corporate capital. This was a fraudulent scheme from its inception involving a number of co-conspirators who were all necessary to its accomplishment.

151.     BATISTA therefore selected and clustered around him a core of trusted close family members, oil industry executives and trusted counselors. These were people who were willing to serve on the boards of OGX and its related companies under the Grupo EBX umbrella where they would necessarily know the truth, but would agree with BATISTA and each other to help maintain a public lie that there had been massive discoveries of oil and likely huge future profits.

152.     The reward for all those involved in the scheme was to be a share of the billions of dollars that BATISTA planned to raise from the public. The scheme was then to devote as little of the capital as possible to the pretense of (probably pointless) exploration, but to illegally extract the rest of the corporate capital and distribute it between the conspirators and their accomplices.

The co-conspirators would all make further money from the grant of OGX stock options and the sale of stock at fraudulently inflated prices.

153.    The scheme would necessarily involve the breach of many Brazilian laws, including the bribery of government officials, and would risk sanctions from CVM and perhaps even criminal prosecution.

154.    However, no one in Brazilian history had ever gone to jail for securities fraud and at the time there was virtually no risk that the bribery would be found out or, much less, prosecuted. The worst risk seemed to be, back then, the relatively minor monetary fines likely to be levied after the event by CVM -- that would be dwarfed by the money to be made.

155.    The plan for OGX was to run it as long as possible as a vehicle for fraud and then eventually request judicial reorganization. BATISTA and his lieutenants would continue to run the company until a plan was accepted, which is in fact what happened in OGX and in other companies in the EBX Group.

156.    The investors, bondholders as well as stockholders, would be cheated of any recovery by the fact that the corporate capital would have been illegally extracted ahead of time. All co-conspirators involved would hope to be shielded from pursuit by the final discharge in bankruptcy. Furthermore, all lawsuits were subject to endless appeals and the BATISTA family wielded heavy influence. Therefore, in Brazil's prevailing culture of business, political and judicial corruption, the risk of anyone involved incurring serious penalties seemed small.

157.    The OGX fraud proved over the years to be so successful that BATISTA built other companies on the same *modus operandi*: issuing false promises of vast natural resources to raise investment, stripping out the capital and making money off insider trading and eventually bankrupting the company.

158.    BATISTA granted his family members and his other co-conspirators and accomplices, generous stock options in OGX and other companies in what became known as "the EBX Group" to ensure that they were personally invested in the value of the stock and incentivized to spread any good news and to contain or minimize the bad.

### Collaborative Group Action

159.    The frauds described here were conducted through a web of corporations and could not be achieved without the constant collaboration and concurrence of numerous individuals to pull them off.

160.    For instance, when a material fraudulent misrepresentation was issued in the name of "OGX" or "the EBX Group," or false or misleading statements were made, or material facts were omitted, in annual reports, reports to investors, in news releases and otherwise, as is detailed below, there were many individuals who had to agree before that false statement could be released. That included the EBX Group Directors, the directors and officers of the company or companies involved, and not least of all, in the case of the public companies, the "Investor Relations Officers" of the companies, who were legally responsible to release all material information to the investing public promptly and accurately, and who were liable to fines and other penalties from CVM if they failed to do so.

161.    To perform corporate financial transactions of any magnitude required similar authority and inter-company and inter-individual cooperation. For "BATISTA" to sell his stock in OGX, for instance, required corporate action by the CENTENNIAL Companies through the individuals who managed it at EBX INTERNATIONAL. For "BATISTA" to make offshore financial transfers, corporate action was required on the part of either the CENTENNIAL or the 63X Companies, or other companies. For "BATISTA" to pledge his stock to Mubadala, or issue the Billion Dollar Put Option, similarly required the concurrence of multiple corporations and their

controlling individuals.

162.    With the exception of personal interviews and conversations, when it is said below that "BATISTA" issued particular fraudulent misrepresentaions or made particular financial pledges, it is therefore implict that it was through the medium of concerted corporate action authorized by boards of directors and executive officers acting collectively.

163.    In other words, all the false representations detailed herein were "group published information," and were a result of the collective actions of the Directors of the EBX Group and the officers and directors of the subordinate companies involved. Thus, where it is alleged that "BATISTA" made or disseminated particular fraudulent misrepresentations, it was always with the agreement and concurrence of Defendants who were involved in the management of the various corporations involved, without whose concurrence the representations could not have been disseminated.

### Electronic Transfer of Communications – Wire Fraud

164.    The fraudulent misrepresentations detailed herein were all intentionally published for onward electronic transmission to a class of people, international investors and their professional advisers, particularly in the United States, among whom the Plaintiffs and their Miami investment adviser were numbered, with the intent that they justifiably rely on the same to their pecuniary loss.

### Criminal Intent

165.    Wherever below it is alleged that one or more of the Defendants committed a criminal act, it is specifically alleged that such was done with criminal intent.

### Principal Targets of the EBX Group - American Investors

166.    The principal targets of the scheme were investors in the United States. Accordingly, the American Depository Receipts or "ADRs" (a way of trading foreign stocks in the U.S.) were listed in New York and the bond trustee was, likewise, in New York.

167.    Pitches to buy tranches of OGX stock were made directly to investors by BATISTA and others in the conspiracy, face-to-face, in the U.S. However the lies detailed below were overwhelmingly transmitted electronically.

168.    They were promulgated in English via the OGX standing website; via English language interviews to U.S. financial reporters and analysts such as Bloomberg[10] for online dissemination; via English language interviews to American TV reporters to be broadcast by TV stations in the U.S., and via OGX financial results, earnings presentations, management reports and quarterly earnings calls, which were all in English.

### "The Dream Team"

169.    To garner credibility for the OGX exploratory operation, BATISTA built a roster of senior executives at OGX from Petrobras that he termed his "Dream Team."  These were individuals who had been integral to that company's deep water discoveries. The team was headed by MENDONÇA, a geologist and former Petrobras head of exploration, who BATISTA would announce to the public as "Dr. Oil." MENDONÇA would create and support the lies about the massive shallow-water oil "discoveries" which OGX would announce.

---

[10] "Bloomberg" refers to the New York-based financial software, data, and media company which provides the international investment industry with financial software tools and online news through dedicated Bloomberg Terminals (via its Bloomberg Professional Service), wire service (Bloomberg News), global TV network (Bloomberg Television), websites, radio station [WBBR], newsletters and magazines. (*Bloomberg Businessweek*, *Bloomberg Markets* and *Bloomberg Pursuit*.)

170.     BATISTA's publicized rationale for exploring the shallow-water fields was to be that modern technology in the hands of his "Dream Team" would ensure better, more accurate detection. If there was oil to be found, they would find it. Plus, when they found it, the much lower extraction costs in shallow water than in deep water meant much greater profitability. This "One-Two punch" of state-of-the-art technology in the hands of the best oil gurus in Brazil, coupled with the low-cost lifting BATISTA boasted, promised to be a sure-fire winning combination.

## D&M – The Texas Auditors

171.     It is common for oil exploration ventures seeking to raise finance from international investors to retain the services of an independent consultancy firm of specialists to appraise its oil discoveries. They essentially act as auditors. The world's center for such specialists is Texas.

172.     OGX therefore retained the prestigious Dallas, Texas-based firm of DeGoyler & McNaughton ("D&M") for this purpose in 2008. BATISTA announced that D&M would be independently assessing the OGX exploration date, knowing that this would provide additional assurance to American investors. (D&M, in Texas, was to receive and maintain records of all seismic studies and communications detailing the true course of OGX's exploratory work).

## OGX Starts Drilling

173.     In its November 2008 Management Presentation, OGX announced online that it had entered into contracts for 3D seismic surveys for all of its exploratory blocks; had acquired various logistical transport vessels, including seven boats and two helicopters; and had secured four off-shore drilling rigs with "world-class contractors." It stated that it expected to conduct an "intense drilling campaign" beginning in the second half of 2009 and reach "first oil" by the end of 2011. And that year, BATISTA's OGX raised $4.1 billion in the biggest initial public offering in Brazilian stock market history.

**The Lies About Oil Discoveries Start**

174.     BATISTA and his co-conspirators and accomplices now embarked on a relentless online propaganda campaign that would last for six years boosting the promise of the OGX oil-fields, completely untethered to any basis of reasonable fact, and contrary to what D&M, in Texas, was telling them, in order to attract investment capital and boost the stock and bond prices in OGX and other satellite companies soon to be launched. These knowingly false representations were all made with the intent of inducing investors to buy stocks and bonds in OGX (and what would soon be its satellite companies, OSX and LLX).

175.     The prime target of the misrepresentations were U.S. investors; necessarily those in its four most populous states which are, in order, California, Texas, Florida, and New York. American investors were to account for the vast majority of the sales of OGX shares and bonds, including many American government pension funds such as the Florida Retirement System Trust Fund and other huge institutional investment funds.[11]

---

[11] The Florida Retirement System Trust Fund lost $24 million through its investment in OGX. It lost an unknown further amount in the bankruptcy of MMX. Dozens of other North American pension funds also invested, including The Public School Retirement System of Missouri, the Evangelical Lutheran Church in America Board of Pensions, Alaska Permanent Fund, AT&T Union Welfare Benefit Trust, City of New York Group Trust, Ford Motor Company Defined Benefit Master Trust, Hewlett Packard Company Master Fund, IBM 401(K) Plus Plan, Illinois State Board of Investment, Johnson & Johnson Pension and Savings Plans Master Trust, JP Morgan Chase Retirement Plan, Kansas Public Employees Retirement System, Microsoft Corporation Savings Plus 401(K) Plan, Municipal Employees Retirement System of Michigan, Public Employee Retirement System of Idaho, Public Employees Retirement System of Ohio, Shell Pension Trust, Southern California Edison Retirement Plan, State of California Public Employees Retirement System, State of New Jersey Common Pension Fund D, State of Oregon, Teacher Retirement System of Texas, Teachers Retirement System of Louisiana, The Regents of the University of Michigan, The State Teachers Retirement System of Ohio, and Treasurer of the State of North Carolina Equity Investment Fund Pooled Trust. Huge American institutional investors such as Blackrock, Pacific Investment Management Co. (Pimco), and Fidelity made multi-billion dollar investments in OGX alone.

176.    This barrage of fraudulent representations took various forms, all of which was intended to induce investment and succeeded in inducing stock and bond sales on the primary and secondary markets to maintain the illusion of OGX as a valuable business for as long as possible.

177.    One was by way of what are termed in Brazil "Material Facts." These are public disclosures required by Brazilian law as to events which might impact equity and debt investor decisions to buy or sell. The directors of any public company are legally bound to timely disclose such facts to the investing public by way of a report to the relevant stock exchange and to the press.

178.    Material Facts are intended to be reserved for consequential announcements and not abused to trumpet inconsequential news to induce investment based on fraudulent misrepresentation. They are conventionally posted online and accessed via the internet, as they were here.

179.    BATISTA also gave American television interviews in English, for the same reason: to attract American investment. For that reason too, OGX financial results, earnings presentations, management reports and quarterly earnings calls, were also all in English.

180.    Following the precept that "a picture is worth a thousand words," BATISTA and his accomplices and co-conspirators also seeded the internet press with management report graphics and news photographs bolstering the illusion of the great success and anticipated fabulous wealth of OGX.

181.    Additional fraudulent misrepresentations were contained in thousands of "tweets" sent via BATISTA's internet Twitter feed to what eventually topped one million followers, including many American financial journalists.

182.    Further, BATISTA personally made face-to-face promotional pitches to high-net-worth investors in Florida and elsewhere around the U.S.

183.    It is not possible to list every one of the many thousands of fraudulent misrepresentations but a selection is given below. All the examples given, save where stated or the context requires otherwise, were posted online and accessible from and accessed via the internet by investors in the U.S. and the financial press in the U.S. and further reported.

**The Vesuvio Announcement – "Half a Billion to One and a Half Billion Barrels"**

184.    As early as June 2008, OGX had released a Material Fact online that its auditors, described as "world-renowned D&M," believed that OGX might be sitting on as much as 4.8 billion barrels of oil. This was not true. This lie was intended to prepare the way for further Material Facts announcing further lies. Predictably, OGX share prices jumped.

185.    The following year, on September 18, 2009, OGX announced via Material Fact that it had started to drill in what was termed the "Vesuvio formation."

186.    On October 7, 2009, OGX announced via Material Fact that it had struck oil. MENDONÇA stated publicly that this was "a milestone in the industry, which was only possible due to the motivation and talent of our unique team."

187.    On October 14, 2009, OGX released a Material Fact that declared in bold type, intended to generate excitement that from a single exploratory well in the Vesuvio oilfield there was: "**Recoverable Oil Volume Expected to be between 500 Million and 1.5 Billion Barrels.**" ("the Vesuvio Announcement").With oil trading at around $75 a barrel, this was a public representation that OGX was sitting on commercially recoverable reserves worth between $37 billion and $111 billion from a single well, with many more wells yet to go.

188.    This announcement was important to validate the idea that the "One Two Punch" approach – i.e. "New Technology + The Dream Team = Pay Dirt." It was intended to convince the public that, contrary to all prior scientific belief and decades of failed effort, the shallow-water oil-

fields were not barren, but, with the right techniques and led by the right people, were massively profitable.

189.     As MENDONÇA announced at the time, this find validated the OGX team's scientific methodology and the "high petrolific (*sic*) potential" of the company's underwater leases. However, this was all a lie. The OGX drill test results submitted to D&M in Texas showed that there was no reason to believe that the Vesuvio Announcement was true.

190.     The Vesuvio Announcement was not retracted until shortly before the OGX bankruptcy. It was a bedrock misrepresentation to the public that OGX had vast reserves of recoverable oil and it was relied on by investors in OGX right up through the crash in 2013.

**Looting OGX - Bribery**

191.     BATISTA, who had not hitherto been known for his largesse, now became very conspicuous for his apparently generous public gifts. These were enabled not by profit, but by the torrent of inflowing investment capital and consisted of corporate funds illegally extracted, to the ultimate detriment of all shareholders and bondholders on the eventual bankruptcy of the company. To be clear, neither OGX, nor OSX nor LLX ever turned a profit. There was no legitimate source of funds. BATISTA was looting the corporate capital that was coming in.

192.     The point of such apparently "generous" charitable gifts was to keep BATISTA in the public eye and to help paint a picture of multiplying wealth – as the "X" in BATISTA's company names was intended to signify – such that he could afford such acts of generosity. In fact, the only real "generosity" was on the part of the investing public, because it was their money being given away.

193.     Through his business and such "charitable" activities, and through his father's political and business contacts, BATISTA became close to many of Brazil's top politicos whom he bribed from his various offshore corporate bank accounts to award companies in his EBX Group

government contracts, and ensure that governmental regulators were as supportive and as "hands-off" on him and his enterprises as possible.

## Miami – Principal EBX Offshore Financial Hub

194.    BATISTA and his co-conspirators needed safe bank accounts outside Brazil to use in order to stash and launder money from their Enterprise.

195.    The EBX Group of companies were major customers of the huge Brazilian Itaú banking group. Candido Bracher, who since 2005 had been a major shareholder in and the President of the Itaú Group's corporate investment bank (and who is now the President of the entire Itaú group) was a close personal friend of BATISTA's and introduced him to Itaú's Private Bank in Miami.

196.    Banco Itaú Miami was ideally placed to help BATISTA and his co-conspirators hide and launder money from the fraudulent scheme. The only regulators likely to be interested in Batista's financial operations were Brazilian. However, Banco Itaú Miami was a U.S. bank, separately incorporated and not subject to Brazilian regulatory oversight. It was permitted to open accounts for foreigners and perform international bank transfers for them.[12] Money could therefore be sent in to Miami from accounts around the world and held there, split up and swapped around internally, and held in new names or sent back out to other names in other secrecy jurisdictions, freshly laundered, and the transactions would be completely opaque to Brazilian regulatory scrutiny.

197.    BATISTA and his co-conspirators opened accounts at Banco Itaú Private Bank in the names of the Defendants, CENTENNIAL NEVADA, CENTENNIAL DELAWARE and 63X MASTER FUND and other off-shore companies used in the scheme. Other accounts were opened

---

[12] 12 U.S.C. § 611.

at Itaú entities and other banking entities in the Caribbean. Transfers between Banco Itaú Private Bank Miami and the offshore banks would remain unknown to the Brazilian regulators.

198.   Prior to being represented, AZIZ BEN AMMAR confirmed to the Plaintiffs that Miami was the principal offshore hub for the banking operations of the EBX Group and that he intended to sue EBX in Miami for a million dollars which he said he was owed for his services. The transfers outlined on Exhibit "C" indicate that more than $400,000,000 was run through Banco Itaú in Miami. It is unknown how much remains there frozen under the injunction issued by Judge Robert Mark, of the U.S. Bankruptcy Court for the Southern District of Florida, on all of BATISTA's and CENTENNIAL NEVADA's assets.

**The Pipeline Announcement – "400,000,000 – 500,000,000 More Barrels"**

199.   On November 16, 2009, OGX released a Material Fact announcing a new major oil strike captioned, in bold type: "**OGX Announces Discovery of Oil . . . Estimated Volume of 400 Million – 500 million barrels – Drilling still in progress and new objectives to be reached.**" This oilfield was later dubbed the "Pipeline Formation." ("The Pipeline Announcement").

200.   With oil then around $79 a barrel, this equated to statement that there was something like another $30-40 billion in value in OGX. The range of expected revenues for OGX was now cumulatively somewhere between $70+ and $158+ billion and there was apparently yet more to come from just this well. But this was a fraudulent misrepresentation, designed to attract investment. Investors reacted predictably. OGX stock prices rose and trades jumped.[13]

201.   In December 2009, MENDONÇA secretly sold 10,000 of his own OGX shares, realizing a profit of approximately $5,000,000 and from now on MENDONÇA and his fifteen or so Dream Team members started regularly selling off tranches of stock.

---

[13] On December 18, 2009, OGX shares were split 100:1. Share prices in this complaint are reflected in their nominal value as reported at the time.

202.     It became a standing joke within the EBX Group that every time there was a fraudulent Material Fact or press release issued, share prices would rise, the Dream Team members would secretly sell off stock and they would strut off down Ipanema Beach the next morning, in a gaggle, giggling and "high-fiving" each other, giddy at their growing wealth.

203.     In fact most of the directors and officers in the companies were secretly selling off stock during the years that the X Companies were active. These sales were insider trades and the result of stock manipulation. None of it was reported to the CVM and if the CVM knew, they did nothing.

### Pipeline Announcement 2 – "Between One and Two Billion Barrels"

204.     With the success of the earlier lies, BATISTA and his co-conspirators and accomplices became ever bolder. On December 22, 2009, OGX announced via Material Fact that completed drilling had revealed that the oil strike declared in November was now estimated at being two to four times greater. As the Material Fact stated, now the: "**Recoverable Oil Volume Expected to be between 1 and 2 Billion Barrels.**"

205.     BATISTA's announcements to investors by now equated to a cumulative promise that OGX was sitting on at least 1.5 billion and maybe as much as 3.5 billion barrels in recoverable oil. At a December 2009 price of around $75 a barrel that translated to a promise of between roughly $112.5 billion and $262.5 billion in value. But this was all lies, designed to attract investment and investors reacted predictably favorably to the cumulative promises.

### The Truth

206.     In fact, as the internal D&M reports in Texas confirmed, the OGX seismic studies and drill test results did not indicate that _any_ oil was necessarily technologically recoverable at any cost, let alone at a profit.

207.     Moreover, very high concentrations of hydrogen sulphide gas (nicknamed "Death Gas" in Portuguese) had been detected. This is very poisonous, corrosive, flammable and explosive.

208.     This contaminant greatly increased the danger and the cost of extraction and greatly decreased the likely commercial viability of an extraction operation. None of this was disclosed by Material Fact or otherwise by any of the companies and constituted a fraudulent misrepresentation by omission. Everyone within the conspirator group knew this.

### OSX and LLX

209.     To cope with the huge gushers of oil that he had promised, BATISTA announced that he would start a shipyard to build a number of huge Floating Production Storage and Offloading vessels, or "FPSOs" through his company, OSX, and his employees began scouting a coastal site for a "Super-Port" to be managed by his logistics company, LLX, where these monsters could dock to unload OGX oil, eventually settling on a location at Açu, near Rio de Janeiro. This port was said to be planned to be one-and-a-half times the size of Manhattan.

210.     OSX went public in 2010 and raised $1.58 billion through its initial public offering on the São Paulo Stock Exchange. The rationale for the OSX ships was to transport OGX oil. BATISTA also took LLX public on the idea that LLX would run a "Super-Port" where the OSX ships could dock and offload OGX oil and carry on a massive ship-building operation. But OGX had found virtually no oil and in all its existence, right up to its bankruptcy in 2013, would pump virtually no oil.

211.     The ships were massive and inspired investor confidence - but that was a prime purpose. (The other being to provide BATISTA with another corporate vehicle to hype shares in and loot). No responsible businessman would have commissioned such monsters without a predictable source of supply, and they were complete overkill for the tiny trickle of OGX oil.

46

212.    But the point of the ships was not to actually *transport* oil: they were window dressing, intended to mask the fact that *there was no oil*. They were visible support for BATISTA's lies. In essence, in themselves, they were huge floating fraudulent misrepresentations, boasts to the world of the existence of vast quantities of commercially recoverable OGX oil. And like his other public companies, OSX presented BATISTA and the EBX Group a wider opportunity to siphon off corporate capitral and perpetrate stock fraud.

213.    Eventually, OSX would have six ships commissioned, with the assistance of bribes to government ministers. But in its entire future, OGX would not pump enough oil to fill those six multi-million dollar OSX ships even three times.

214.    Nevertheless, on January 26, 2010, OGX released a Material Fact captioned: "**OGX Signs Agreements with OSX to Secure Production Equipment – OGX Sets Production Target of 1.4 Million barrels per Day by 2019 – Initial Production Expected to Begin in Early 2011, Ahead of Schedule.**" In the body of the Statement, BATISTA was quoted as stating:

> Our drilling results have revealed a new oil province in the southern part of the Campos Basin and broken paradigms regarding the quality and potential of the reservoirs in this area. At this moment, OGX is entering into a new phase in its history, with a focus on reaching our production target of 1.4 million barrels per day by 2019. We have an unparalleled 10 year growth story, based on world-class assets of extraordinary quality.

215.    The inference was that these were realistic projections founded on the discovery of a "new province" of commercially recoverable oil. But in truth, there was nothing to support it. Moreover, nothing that OGX had discovered constituted an "asset." Nothing in the data indicated that it had significant quantities of oil that could be recovered at all, let alone at a profit. These were just more lies designed to attract investment.

**"600 Million to 1,100 Million More Barrels"**

216.    On February 1, 2010, OGX announced another volume of "recoverable oil of 100

to 200 million boe"[14] in the Vesuvio formation and on February 3, 2010, released a Material Fact

that 500 to 900 million barrels of good quality oil had been found in what was to be called the

Tubarão Azul ("Blue Shark") field. This latter strike was said to be extractable at a rate of

approximately 3,000 barrels per day by vertical drilling, but at perhaps five times that rate, or

15,000 barrels a day, by horizontal drilling, as OGX proclaimed that it planned to do.

217.    This was all untrue but equated to a statement at then prevailing prices that OGX

was sitting on close to another half-billion dollars of commercially recoverable oil, annually.

**Charlie Rose Show – "A Hundred Billion Barrels"**

218.    On February 8, 2010, BATISTA appeared on the "Charlie Rose" TV show,

nationally syndicated in the U.S., including throughout Florida, boasting of the fact that he had

discovered "a hundred billion barrels of recoverable oil" and that Brazil was destined to be the

world's fifth largest economy by 2015. [*See* Charlie Rose, *Interview with Eike Batista*, (Feb. 8,

2010), https://charlierose.com/videos/21203]. This was a fraudulent misrepresentation, designed

to attract investment, and investors in the Unites States took note.

**"The New Oil Province"**

219.    On March 5, 2010, OGX released a Material Fact captioned: "**OGX Announces**

**the Presence of Hydrocarbons in the Albian Section of Well OGX-6 – Rock Cores and Logs**

**Indicate Strong Correlation Between OGX-6, OGX-3 and OGX-2 Reservoirs.**"

220.    MENDONÇA, was quoted by the financial press, online, as stating in relation to

this new "discovery" that: "this data indicates that these accumulations may be connected and that

---

[14] A BOE ("barrel of oil equivalent") refers to a unit of energy based on the approximate energy
released by burning one barrel (42 U.S. gallons or 158.9873 litres) of crude oil.

the recently discovered oil province may, in fact, extend to the north of the BM-C-41 block, confirming its very significant petroliferous potential."

221.    This was all pure nonsense. The "presence of hydrocarbons" was of no intrinsic relevance to commerciality. As MENDONÇA well knew, publication of the existence of "hydrocarbons" to investors could be highly misleading and industry practice was not to do so. Indeed, when at Petrobras he had helped promulgate guidelines forbidding the practice.

222.    The "oil province" described was a grand, non-technical term designed to convey an impression of a huge undersea reservoir of commercially recoverable oil. "Connected" accumulations indicated that a single well might tap the totality. But the aggregate description was just not true. This was just a further fraudulent misrepresentation, designed to attract investment.

### **"A Trillion Dollars of Oil – OGX Worth Up to 100 Billion Dollars"**

223.    On April 14, 2010, BATISTA gave a video interview that was broadcast on the internet on XPTV, a video channel maintained by the XP brokerage firm, in which he further claimed that OGX had discovered "a new oil province in Brazil," that OGX had "the best exploratory blocks in the world" with "one trillion dollars-worth" of oil, that the company was worth up to "$100 billion dollars," and warned investors not to miss out on the opportunity to buy OGX stock. (*See* XPTV, *Entrevista Eike Batista OGX - A Grande Fraude - Entrevista Completa*, https://www.youtube.com/watch?v=6e_huuUsdH4).    This    was    a    further    fraudulent misrepresentation, designed to attract investment.

224.    Around this time BATISTA orally disseminated other such false statements through audio and video conferences with financial institutions via the internet, as with all such internet publications described above and below, accessible and accessed by investors across the United States, including in Florida. The intended message to American and other foreign investors

was that OGX had "one trillion dollars-worth of oil," and was worth $100 billion. This led to an extraordinary increase in OGX's share price which soared from R$1555.00 to R$2327.00.

225.    There was no reasonable basis for BATISTA and his accomplices and co-conspirators to believe that more than a tiny fraction of that amount of oil actually existed, let alone that it was commercially recoverable. These representations were fraudulently made with the intent of inducing investors to rely on them in purchasing and trading OGX shares and bonds.

### "Recoverable Volume of 1.4 to 2.6 Billion Barrels"

226.    On May 13, 2010, OGX released a Material Fact captioned: "**OGX Concludes Drilling of Wells OGX-6 [and] OGX-8 – Identified Connection Between OGX-2 and OGX-6 Prospects with Estimated Recoverable Volume Totaling 1.4 to 2.6 Billion Barrels.**"

227.    Again, the use of the words "recoverable volume" was deliberately intended to convey the sense that this was equivalent to "money in the bank," but it was untrue. With oil trading at $80.44 per barrel, this was equivalent to a statement that there was between $112 billion and $209 billion of value in OGX; but there was no reasonable basis on the OGX drilling test results to believe in any such numbers. This was a fraudulent misrepresentation, designed to attract investment.

### "Net Pay of 40 Meters"

228.    On May 27, 2010, OGX released a Material Fact captioned: "**OGX Detects the Presence of Hydrocarbons in Wells OGX-10 and OGX-13 – Net Pay of Approximately 40 meters in the Aptian Section of Well OGX-10.**"

229.    As noted above, the discovery of "hydrocarbons" is inconclusive of any recoverable oil. However, in the oil and gas industry, *Net Pay* refers to the thickness of rock that can deliver hydrocarbons to the well bore. This statement was intended to convey an overall impression,

50

untruthfully, that new bores had discovered new fields of profitable reserves. This was a fraudulent misrepresentation, designed to attract investment.

### "MPX – 10-15 Trillion Cubic Feet of Natural Gas"

230.    On August 12, 2010, BATISTA and MENDONÇA participated in a Bloomberg conference call broadcast over the internet during which MENDONÇA stated that, following a new discovery, OGX expected a "significant" increase in its potential oil and natural gas resources. BATISTA expanded on this, stating that wells in the Parnaiba Basin in northern Brazil might hold 10 to 15 trillion cubic feet of natural gas and that MPX, his energy company, planned to build power plants nearby.

231.    These estimates were fraudulent misrepresentations, designed to attract investment, and had their intended effect: OGX stock prices rose 2.2% and MPX stock prices rose by 6.8%.

### Promoting OGX in Miami

232.    America was BATISTA's prime target for money and he had his prime focus on the country's most populous States, particularly California, New York and Florida.

233.    He had always had close ties to Florida. He had had real estate investments in Florida with his brother Werner for decades and was now running huge amounts of the corporate capital he was looting from the public companies in Brazil through his trusted private bankers in Miami.

234.    He now developed close social and business ties with Jeffrey Soffer, the Florida-based real estate and resort developer and was a frequent visitor to Soffer's Miami, Florida, home.

235.    During 2010, BATISTA solicited Soffer in Florida to partner with him to develop office buildings and hotels in the Port of Rio de Janeiro and in "City X," BATISTA's planned mega-project for 250,000 residents in Fluminense, Brazil (which like everything else BATISTA touched came to nothing).

236.    Such gambits were designed by BATISTA to generate the impression that other high-performing, highly respected businessmen trusted his business acumen, and such associations lent BATISTA business credibility in the public mind.

237.    He also directly pitched investment in OGX to high-rollers in Florida. Thus, in September 2010, BATISTA met with a group of foreign investors in Miami at a star-studded dinner party hosted by Jeffrey Soffer and worked the crowd, one-on-one, to buy OGX stock on insider information, because, as he said, the company was about to announce further significant oil discoveries. These were fraudulent misrepresentations, designed to attract investment.

238.    Among the party guests were baseball star Alexander Rodriguez ("A-Rod"), and his then girlfriend, the film star, Cameron Diaz. Rodriguez called his financial advisor who "told me to forget about it and never mention it again, because I could go to jail for a transaction like this."[15] (Insider trading standards between the U.S. and Brazil are demonstrably different).

### "Interest from the Chinese"

239.    On September 13, 2010, BATISTA spoke to reporters on a conference call that was published in an article online by Bloomberg in which he stated that all the major oil companies in the world including the major Chinese oil companies, Cnooc Ltd. and China Petrochemical Corp., were among bidders for OGX assets. In response to the reporter's comment that his sources had revealed an offered price of $7 billion for the company, BATISTA said that that amount would only buy a "tiny" stake in OGX.

240.    However, this was another fraudulent misrepresentation, intended to boost the price for OGX shares. In reality no energy company with access to the actual OGX drilling data would

---

[15] Anderson Antunes, *Even Alex Rodriguez Reportedly Almost Fell Victim to Eike Batista's Financial Collapse*, Forbes (Apr. 20, 2014), available at: http://www.forbes.com/sites/andersonantunes/2014/04/20/even-alex-rodriguez-reportedly-almost-fell-victim-to-eike-batistas-financial-collapse/#1add8bc51ee5.

have had an interest in OGX for more than a tiny fraction of its then supposed market price. This, again, was a fraudulent misrepresentation, designed to attract investment. Predictably, the OGX share price rose. This time by 2%, to put OGX stock at 20% up overall for the year.

## EBX International – New York Office

241.    On January 26, 2011, BATISTA announced that he would open an office in New York under the name "EBX International."

242.    Reuters relayed the announcement via the internet that: "EBX, the mining and energy conglomerate controlled by Brazilian billionaire Eike Batista, created an international division as it seeks to attract investors from the world's wealthiest financial centers. EBX, a closely-held investment holding company, said late on Tuesday it will base EBX International in New York to "step up relations with investors from the United States, Europe, Asia and the Middle East." Peter Nathanial, a former Royal Bank of Scotland executive, would serve as president. (Nathaniel presently lives in Palm Beach, Florida). Another banker, Marcello Horcades Coutinho, was to be a director.

## "The World's Eighth Richest Man"

243.    By this time, as the cumulative effect of the barrage of fraudulent misrepresentations that BATISTA and his co-conspirators had churned out over the preceding years, the financial press were hailing BATISTA as the world's eighth richest man with a net worth of $27 billion.

244.    BATISTA, for his part, was playing up his supposed position as one of the world's top billionaires by announcing a new series of grand initiatives, including a partnership with sports goliath, IMG Worldwide, Inc., forming "IMX" to engage in the sports and entertainment business in Brazil, and a foray into consumer electronics by building an Apple computer factory on vacant

LLX land. A Forbes article remarked on the "enormously valuable oil and gas empire that Batista has built in recent years," as reflecting the global understanding.

245.    On March 15, 2011, Bloomberg summarized the information on OGX stemming from the cumulative effect of BATISTA's lies over the three preceding years. It reported that OGX, BATISTA's main source of wealth, was worth $37.1 billion, with 6.7 billion barrels of potential reserves. BATISTA was quoted online as stating that despite having fielded five purchase offers from other oil companies he did not need to sell because OGX had $3 billion in cash and the extraction costs in its shallow-water fields were extremely low.

246.    Bloomberg further reported OGX as claiming a one hundred percent success rate in the Campos Basin where it planned to drill three additional wells and that higher-than-expected production would allow it to use fewer wells per production platform, thereby further cutting production costs. OGX had stated that it anticipated that production would ramp up from 20,000 barrels a day to 730,000 barrels a day by 2015, and 1.38 million barrels a day by 2018. In a video interview with Bloomberg BATISTA said "It's a bonanza" and "these are bonanza assets."

247.    But this was all untrue. The "enormously valuable oil and gas empire" and "the bonanza assets" were all fraudulent misrepresentations. For behind the scenes, everything that Brazil's King Midas touched was not turning to gold – not even black gold. LLX depended on OSX for its value. OSX depended on OGX for its value. And OGX had virtually no oil.

## The 10.8 Billion Barrel Lie

248.    On March 31, 2011, D&M submitted confidential reports to BATISTA and OGX on the Prospective OGX Resources in Brazil failing to identify more than a tiny trickle of commercially recoverable oil. When the D&M Reports became public there would be an obvious, hugely depressive effect on OGX stock prices.

249.    BATISTA needed a preemptive strike. He therefore had "Dr. Oil" mix-and-match numbers from the D&M reports, adding apples to oranges, completely contrary to the accepted industry methodology, to use as the basis for the most colossal lie to date.

250.    On April 15, 2011, MENDONÇA issued a fraudulent press release to investors in which OGX claimed its net potential resources in "recoverable oil" were 10.8 billion barrels and that these figures were not just based just on OGX's own calculations but, referring to D&M, that "[t]hese results, presented by an independent, internationally renowned consulting group, confirm the extraordinary success of our business strategy and execution."

251.    To come up with the 10.8 billion barrel figure, MENDONÇA took D&M's *most optimistic* estimate of "contingent resources" (*i.e.* oil that was not necessarily commercially extractable in *any* amount) of 3.1 billion barrels. He then jumbled together three different categories of "prospective resources" (*i.e.* oil that had not yet even been discovered and was deemed currently unrecoverable) to come up with another 6.8 billion barrels. He then threw in D&M's figure of 1 billion barrels, which was an upper, outside guess of what might be possible from the geology, and which did not even meet the probability level of actual "resources" of any kind.

252.    This was completely fraudulent. The 10.8 billion number was basically just made up out of thin air. But it was published under the imprimatur of "Dr. Oil" and supposedly based on the analysis of world-renowned outside auditors, D&M.

253.    Despite BATISTA and MENDONÇA's preemptive strike, when the D&M Report was released on April 15, 2011, investors reacted with concern and the OGX share price dropped sharply.

254.    Nevertheless, on the basis of Dr. Oil's reputation and his $10.8 billion prediction, BATISTA and MENDONÇA managed to spark a debate on the reliability of the D&M numbers.

255.    In a conference call on April 19, 2011, with market analysts, reported by The Wall Street Journal, among other media outlets, online, BATISTA and MENDONÇA defended the OGX data, describing D&M, dismissively, as "the most conservative certifier in the world." BATISTA stated that it was time that people started to trust the OGX team which he had brought over from Petrobras, headed up by his fabled "Dr. Oil." BATISTA contended that "it's time for the market to accept the company's numbers," and pledged to hire additional consultants to prove OGX's claims.

256.    The New York based multinational investment banking firm, Goldman Sachs, was among those reassured. It stressed publicly that investors should consider the D&M reports as just a part of a larger mosaic, and, "[w]hen considering the scope and underlying assumptions, we think that the D&M report generally adds confidence to our assumptions" and reiterated its "Buy" rating on OGX shares.

257.    What OGX had successfully managed to do by its fraudulent press releases and press conferences, intentionally disseminated across the phone lines and the internet to the world, was to confuse the issue and maintain a continuing belief in investors that OGX was sitting on vast commercially profitable oilfields and that all it needed was enough cash to stay in business to get the oil flowing.

258.    Maintaining a public story of 10.8 billion barrels in "recoverable oil" as BATISTA was to do for the next two years was a fraud, designed to keep the balls in the air as long as possible and attract continuing trading in the stocks and bonds of OGX and BATISTA's other companies, while he and his accomplices continued to siphon off as much of the incoming corporate capital as possible and sell off their shares in the rest before the bottom fell out.

**Paulo Gouvea Exits**

259.    PAULO GOUVEA decided not to wait further, however. After a fight with MENDONÇA, in mid-2011 he cashed out. He sold his stake in the various X companies, reportedly realizing over $150 million which he reinvested in assets with real value, including real estate in New York and Paris. However, he played a prime role as a co-conspirator in the development of the frauds between 2007 and 2011. He made his fortune out of the scheme and kept the secrets when he left. He therefore has continuing liability for the damage continuing to be caused by the fraudulent scheme he put in motion.

**D&M Protest Meeting in Texas**

260.    Behind the scenes, in Texas, D&M was furious that its name was being used to mislead investors and on April 29, 2011, it demanded that BATISTA and OGX issue a corrective press release.

261.    On May 3, 2011, OGX sent D&M a placatory response, attempting to negotiate a compromise that would allow it to maintain both the 10.8 billion-barrel figure and the D&M imprimatur for its probity.

262.    BATISTA sent a team to Texas to wheedle D&M into keeping quiet and letting BATISTA and his co-conspirators go ahead with their plans and on May 16, 2011, there was a meeting between OGX and D&M in Texas.

263.    D&M was making huge fees for its analysis of the OGX data. An agreement was reached whereby OGX would not need to retract its 10.8 billion barrel lie and D&M, having voiced its concerns to OGX, to protect its own exposure, would make no public fuss and kept quiet.

264.    BATISTA thus embroidered further on the lie. In May of 2011, at the Michael Milken conference in California, which was broadcast to investors across America, including Florida, and worldwide, BATISTA, then said to be worth roughly $30 billion, stated to CNBC that

he was going to be richer than Carlos Slim, Warren Buffett, and Bill Gates because "I have created five companies that have in them embedded resources worth $2 trillion at a very low cost of producing." He went on to call them "idiot-proof assets."

## The Lies Continue through 2011

265.     In July 2011, OGX released a Management Presentation to investors trumpeting a resolutely upbeat picture, throughout which it consistently described its resources as being "10.8 billion of recoverable boe" and claiming to have all the needed cash, equipment, and skill in place to achieve massive success.

266.     However, the truth was that OGX had found virtually no commercially recoverable oil and BATISTA had no convincing data to show any savvy oil industry investor to convince it to buy into OGX. These were just continuing fraudulent misrepresentations.

267.     But now BATISTA needed a cover story for why his rumored sale to the Chinese was not going through. He therefore told the online press that it was because he did not need the cash and wanted to reap the profits himself. This was a complete lie.

268.     Thus, on September 23, 2011, in an article published by Reuters U.S. Edition on the wires under the title, "*Cashed-up Eike Batista won't sell oil stakes*," Reuters reported that BATISTA said he had abandoned talks to sell stakes in his offshore oil prospects because he had billions in hand and did not need the cash.

269.     Oil was then trading at roughly $80 per barrel and BATISTA claimed that the low production cost of his shallow-water wells meant that he could break even if the per-barrel price fell as low as $24. In the Reuters article, he said that OGX was close to signing a long-term deal to supply oil to one of the world's largest refiners – which he declined to identify, citing securities regulations – and that a recent bond issue had "brought in exactly what we needed to live off our own spoils." This was a fraudulent misrepresentation designed to attract investment.

270.     When asked about a decline in OGX share prices, he responded, "I have to laugh. My companies are all going to be massive cash flow machines. I'm going to pump money to my shareholders and dividends to my sons and my grandsons."

271.     Part of that claim would prove true: he would pump money to his co-conspirators through their sales of fraudulently hyped stock, and would pump OGX money directly to his sons and other family members (mainly in order to get assets out of his own name to defeat creditors) but by plundering the corporate capital of OGX and the sale of shares in his worthless companies, and not from profits.

**Incentivizing the Fraud**

272.     OGX had in place a company stock option plan which incentivized fraud, which it made doubly attractive at the end of 2011 by halving the subscription price.

273.     The plan granted the right to the administrators, executives and "other collaborators" – every senior management individual – in the company to acquire shares at predetermined prices.

274.     On December 15, 2011 the Company approved a decrease of 50% (fifty percent) in the subscription prices for the shares established for all the stock purchase option agreements associated with the Company Plan.

275.     The sole condition imposed by the Company in order for its administrators, executives and other collaborators to be able to exercise their options is that they remained with the Company until the end of the vesting period.

276.     In addition, in order to encourage the principal executives of the Company and its subsidiaries and "collaborators" and motivate them to achieve long-term results, the Controlling Shareholder, BATISTA, also granted options in favor of all officers and other principal collaborators for purchase of the shares of OGX stock that he, personally, owned.

277.    The sole condition imposed by BATISTA in order for participants to be able to exercise their options is that they stuck with the Company until such time as they acquire their exercise rights, that is to say through the end of the vesting period.

278.    As a result, the beneficiaries of these plans, which included the officers and directors of the related entities, were incentivized to stay with the companies and to do and say what was necessary to keep the stock price above the exercise price of their options.

### Insiders Sell Their OGX Stock in Miami

279.    Many of them did not want to wait, however. But a major problem that the EBX Group insiders had in selling stock in OGX was that to do so was illegal under Brazilian law and that the public disclosure of large sales would likely cause panic among investors.

280.    J.P. Morgan Securities in Miami offered a structure to avoid this problem. The idea was to disguise a sale to the financial institution by "borrowing" money, using the stock as collateral and then defaulting on the "loan." The insiders would then default on the "loans," the "lender" would foreclose on the collateral, and both sides would be happy: the "lender" would have OGX stock which it hoped that it could sell on at a profit and the insiders would have cash, thus achieving the equivalent of a sale of the stock without disclosure to the market.

### TAG Bank Bribes

281.    BATISTA's 63X Companies and CENTENNIAL DELAWARE maintained bank accounts at a small Brazilian-owned bank, TAG Bank, in Panama, in the names of several subsidiary Panamanian foundations, including The Golden Rock Foundation and The Blue Diamond Foundation. TAG Bank also hosted one of the TMF accounts from which BATISTA's wealth managers were paid. (TAG Bank's Brazilian owner has been indicted on government corruption charges in Brazil).

282.     In 2011, BATISTA directed the payment of $16.5 million in bribes to Sergio Cabral, the Governor of the State of Rio de Janeiro from 2007 to 2014, from the Golden Rock account at TAG Bank in Panama in connection with necessary permissions to build the "Super-Port" at Açu, to be managed by LLX. This bribe would eventually result in criminal convictions for BATISTA and GODINHO – not for stock fraud, but for involvement in government corruption.

## 2012 – Batista is "Cash Rich"

283.     As the cumulative result of BATISTA's lies, by 2012, there was general acceptance in the American and international investment community and among financial analysts that OGX had access to massive amounts of recoverable oil and that BATISTA was fabulously wealthy.

284.     However, investors and analysts were beginning to question when OGX would start to deliver and whether the company was sufficiently well-capitalized to stay in business until it could start production. To keep the balls in the air, BATISTA now had to engender a belief in investors that OGX was cash rich and had sufficient operating capital until oil started to flow.

285.     In January 2012, the initial OGX production report on the first well showed flows of just 15,000 barrels a day. These extremely modest results nevertheless had Batista and "Dr. Oil" putting on a show of huge success, popping champagne corks while technicians opened the valves remotely from Rio de Janeiro and webcams delivered pictures to the world.

286.     On January 16, 2012, OGX released a Material Fact announcing the discovery of evidence of "hydrocarbons" in the Santos Basin, in the Fortaleza field. "This discovery is important for its huge hydrocarbon column and net pay identified in the Albian section, as well as by the quality of the Aptian reservoir and its behavior," commented PAULO MENDONÇA, General Executive Officer and Exploration Officer of OGX.

287.     This was a mishmash of technical jargon intended to convey an overall impression, untruthfully, that new bores had discovered new fields of profitable, recoverable oil.

288.     And BATISTA continued boasting of his "success." On January 20, 2012, he gave an in-person interview from Rio de Janeiro with The New York Times, for an online article entitled, "A Brazilian Magnate Points to Himself for Inspiration."

289.     The article remarked admiringly on BATISTA's trappings of apparent success, his 1,000,000 Twitter followers, and the fact that OGX was expected to begin producing crude oil from an estimated 10 billion barrels of offshore discoveries. "Brazil today has the wealth that America had at the turn of the century," said BATISTA. Regarding his ostentatious display of wealth: "I want to help a whole generation of Brazilians to be proud. I am rich, yes. I have built it myself. I have not stolen it," he quipped.

290.     Regardless of the accuracy of the wealth of his country, his final statement regarding the source of his personal wealth was certainly untrue. The idea that there was ten billion barrels of recoverable OGX oil offshore was a fraudulent misrepresentation.

291.     On March 2, 2012, BATISTA gave a telephone interview from Rio de Janeiro to Bloomberg in New York. During the interview, BATISTA stated that he still had plans to overtake Carlos Slim as the world's richest person by 2015 and boasted that his companies would post close to $1 billion in earnings before interest, taxes, depreciation and amortization in 2012, and double that in 2013. With an estimated net worth of $30 billion, BATISTA, still ranking eighth in the Bloomberg Billionaires Index, said, "I am probably, among the billionaires, the least indebted guy of all of them."

292.     At this time, behind the scenes, BATISTA was, on any analysis, massively in debt. His "Empire" was, as he knew, a house of cards, and the collapse was just a matter of time.

### The Mubadala "Investment" in the EBX Group

293.     The Mubadala Development Company ("Mubadala"), based in Abu Dhabi, is the strategic investment and development company of the oil-rich United Arab Emirates.

294.    On March 26, 2012, BATISTA and his EBX Group published a Notice to the Market under the headline "Mubadala invests $2 billion in the EBX Group as part of the Strategic Partnership with Eike Batista." In it they announced that Mubadala had signed a "strategic partnership agreement" with the EBX Group whereby Mubadala would invest $2 billion in exchange for a 5.63% preferred equity interest in the Defendant, CENTENNIAL DELAWARE and other BATISTA offshore companies including the 63X and EBX companies giving Mubadala an indirect interest in the public companies, OGX, OSX, MMX, LLX, MPX, and privately-held AUX, REX and IMX.

295.    BATISTA and the EBX Group further announced: "[t]his is the first time we have invited a strategic partner to invest at our holding company level. The investment considerably strengthens the entire group and its ability to successfully implement current and future projects. Mubadala, after conducting thorough due diligence of our companies recognizes the great potential of our Latin American assets."

296.    BATISTA announced the agreement as a "framework for further collaboration between the two organizations" and that the Mubadala cash was to be used to "reinforce the group's already strong capital structure so as to help fund new enterprises across multiple business areas."

297.    An attached "Legal Notice" stated that this "strategic partnership constitutes a minority investment by Mubadala in Centennial Asset Brazilian Equity Fund with no changes to the control, management or day-to-day activities of Mr. Eike Batista's publicly listed vehicles: OGX, OSX, MMX, LLX and MPX." Mubadala went along with the phrasing of this announcement.

298.    On the surface, as projected to the investing world, a highly experienced and well-financed sovereign company from the oil sector, after conducting "thorough due diligence," had

seen sufficient value in the prospects of BATISTA's oil-based EBX empire to accept an "invitation" - the first extended to any outside player - to buy a tiny minority equity stake in BATISTA's holding company, CENTENNIAL DELAWARE, giving it no control, for $2 billion. (By extrapolation, on the raw math, without factoring in the value of control shares, the company must have a value as a whole of at least $40 billion).

299.    The subtext of the EBX Group message was that EIKE BATISTA's strongly-capitalized EBX Group did not need the cash, but that this contribution would enable it to expand into new areas.

300.    The news about the Mubadala "investment" was distributed to and further disseminated electronically by many financial news organizations including Bloomberg.

301.    As BATISTA later explained in a Milken Conference interview broadcast to the investment world by Bloomberg, described below, he entered into this transaction in order to convey a message to the world that a savvy outsider had "audited" his operation and placed its "stamp of approval" on it. In other words, if one of the world's great players in the oil industry believed in him to the tune of $2 billion for a tiny stake, so should all investors.

302.    In actual fact, this was a fraudulent misrepresentation. This was actually a $2 billion *loan*, with BATISTA's entire worldly wealth, including shares in companies within the group and outside, such as his substantial holding in Florida's Burger King and other treasured plum assets, pledged as collateral. The deal was structured and implemented in the Cayman Islands and involved the agreement of the EBX, 63X and CENTENNIAL Companies.

303.    This fraudulent misrepresentation was primarily intended to bolster investors' confidence in OGX, on which the success of the group depended. Had this "investment" been truthfully disclosed to the public by BATISTA as the $2 billion loan based on a pledge of all his assets that it truly was, OGX would have collapsed and Plaintiffs would not have lost a cent.

64

**The LLX Photo-Op**

304.    In April 2012, BATISTA staged a photo-op to be transmitted online via the world press at his planned LLX "Super-Port."

305.    With him onstage were a roster of Brazil's political and business elite: his father (now deceased), President Dilma Rousseff (now impeached and deposed), Rio Governor Sérgio Cabral (now serving a lengthy prison sentence for corruption), Mines and Energy Minister Edison Lobão (now under federal investigation for corruption) and BATISTA himself, (convicted of bribery of Cabral and sentenced to 30 years). The audience of 400 included foreign corporate luminaries from around the world.

306.    Showing off his port, which he predicted would be the largest port in the Americas, BATISTA announced that OGX had begun production on what he described as a "new frontier" of petroleum 37 miles off the Brazilian coast. "This is a historical moment," said BATISTA. "It's the first time an independent Brazilian company has produced offshore oil."

307.    President Rousseff did her bit to boost the illusion, announcing resolutely that the state-run oil company Petrobras would go into deep partnership with Batista's firm: "Eike is our standard, our expectation and, above all, the pride of Brazil when it comes to a businessman in the private sector," Rousseff told those in attendance, as she stood by his one side, Cabral flanking him on the other, all three clad in orange OGX jumpsuits for the photo-op. BATISTA – his jacket sporting a black, oily hand-print, symbolizing "first oil," flashed a two-fisted victory sign while his father (now deceased, but who was also a director in the EBX Group) smiled in the background at what he knew was the huge, secret joke – that there just was no oil to speak of:



308.    BATISTA and his co-conspirators and accomplices knew that the trickle of oil they were witnessing was pretty much all there was. The block would later to be returned to the government as worthless.

309.    Around this time insider members of the executive group in Grupo EBX quietly sold off approximately $103 million in stock in OGX. If CVM knew, it did nothing.

### BATISTA – "Brazil's Richest Man"

310.    By 2012, BATISTA was a familiar name worldwide in financial circles as one of the world's richest men. On April 18, 2012, Time magazine named BATISTA one of the 100 Most Influential People of 2012.

311.    On April 30, 2012, Bloomberg Television aired an 11-minute video interview of BATISTA on its online show, "Money Moves with Deirdre Bolton." The interview took place at the Milken Institute's 2012 Global Conference in Los Angeles, California, where BATISTA was a featured panelist in four different panels during the five-day conference.

312.    After Bloomberg broadcast the interview on television, it published the interview on Youtube.com with the description, "Brazilian billionaire Eike Batista talks about the potential benefits of OGX Petroleo e Gas Participacoes SA forming project partnerships with Petroleo Brasileiro SA and Vale SA."

313.    In the Bloomberg interview, correspondent Stephanie Ruhle introduced BATISTA as the "tenth richest man in the world - the goal is to get to number one." Ms. Ruhle then noted that a week earlier, the President of Brazil had visited BATISTA's oil port in northern Rio de Janeiro, where she called BATISTA a special kind of entrepreneur and a hero to Brazil. Bloomberg accompanied this anecdote with broadcast footage of BATISTA and President Rousseff getting off a helicopter together, surrounded by press.

314.    BATISTA then utilized this broadcasted English-language news segment to repeat his colossal lies about his companies to American investors. He spoke of "a trillion and a half dollars in assets: oil, gas, iron ore, gold, coal" and projects with "eighty percent margins." He spoke of the prospects of collaboration between OGX (which he knew had virtually no oil) and the (huge) Vale and Petrobras companies as being a "win-win for everybody."

315.    BATISTA also explained his rationale for the sale of a "small stake" in EBX to Mubadala (which was secretly, in reality, a loan). As he said:

> We just wanted to have, maybe an extra stamp by investors. Because you know the market is funny. Sometimes they demand, well, we like to have the structure audited. And when somebody like Mubadala comes in, the world knows how deep they go into the auditing process. And I love to be audited. I love transparency. So in a way, it's an extra way to show transparency to what we do.

He said that he was just spreading hope in "The Brazilian Dream."

### 2012 – Second Half – OGX behind Schedule

316.    But by June of 2012, OGX was unable to hide the fact that the wells at its main field in the Campos Basin were not producing as promised and OGX share prices fell steeply by the end of June.

317.    However, by means of a barrage of international online press articles and a blizzard of tweets through the course of 2012, BATISTA fraudulently maintained an image of burgeoning

wealth through publicized plans for massive investment into an ever-expanding series of business ventures, from shipyards and ports, to sports and entertainment ventures.

318.    Thus, on July 18, 2012, BATISTA tweeted that OSX and OGX had negotiated the construction of drill ships; on July 19, 2012, he sent out a video on the synergy between OGX and MPX for gas exploitation in the Paraiba Basin; and on August 29, 2012, he boasted online that his port at Açu would be one-and-a-half times bigger than Manhattan Island, New York.

319.    However, the OSX shipbuilding business and the plans for the LLX port at Açu were dependent on OGX oil, and there was virtually no oil. Nor were there continuing orders to build ships from the general market. BATISTA did not disclose that OSX had only been awarded the recent $922 million ship-building contract as a result of a $2.3 million bribe that CARNEIRO had negotiated with Brazil's Finance Minister, and Chairman of Petrobras, Guido Mantega.

### Carneiro replaces Mendonça as CEO of OGX

320.    On June 13, 2012, MENDONÇA moved out of his position as CEO of OGX and CARNEIRO, who had until then headed up OSX as its CEO, stepped up as CEO of OGX in MENDONÇA's place. MENDONÇA thenceforth became Special Advisor to the Chairman of EBX Group, BATISTA.

321.    The reason for this shuffle in personnel as given to the public via an online press release that day, was that OGX was moving out of its exploratory phase (MENDONÇA's forte) and into its production phase, (CARNEIRO's forte): Thus: "'I thank Paulo Mendonça for his significant contribution to OGX's historical exploratory achievements. As we take this next important step towards the consolidation of OGX's oil production, we are pleased to have the solid experience of Luiz Carneiro to lead the organization,' commented Mr. Eike Batista, Chairman of the Board of Directors of OGX." This was nonsense, of course, for the reasons given above.

### Aziz Ben Ammar Becomes a Director of Every Public EBX Group Company

322.    AZIZ BEN AMMAR was domiciled in New York. In the summer of 2012, BATISTA had met BEN AMMAR by chance on the beach in St. Tropez, had been taken by his aggressive financial ideas and quick-thinking and had flown him back to Rio with him on his private jet. From then on, BEN AMMAR and BATISTA were virtually inseparable, even accompanying BATISTA on his private plane to Omaha to pitch investment in OGX (unsuccessfully) face-to-face to Warren Buffet at his home.

323.    BEN AMMAR started with the loose title of BATISTA's "entertainment director," but rocketed in power and influence until he rivaled GODINHO and BERTO. It was so bizarre that this young fast-talker with no relevant industry background was so quickly rising in the organization that EBX Group employees joked that he must have a blackmail video of EIKE.

324.    On August 6, 2012, at a general meeting of OGX shareholders, many of them large North American pension plans, including the Florida Retirement System Trust Fund, attending by proxy, BEN AMMAR was proposed and elected as a director of OGX. Within days he had also been elected to the boards of every other public Company in the EBX Group namely: OSX, MMX, MPX, CCX and LLX, and joined BATISTA and the others on the Penthouse Floor.

### Batista fires EBX Group CFO

325.    In 2011, the EBX Group had established a New York company EBX International Inc., with offices in New York, at 660 Madison Avenue, Suite 1663, New York. EIKE BATISTA had an office there in New York as well and in Rio.

326.    In August 2012, BATISTA and BEN AMMAR flew to New York on BATISTA's private jet. While there they set up a video-conference on the EBX VPN between themselves, at the EBX Group's offices in New York, and Nicolau Ferreira Chacur, the Chief Financial Officer of the EBX Group and Zartha, at EBX Headquarters in Rio. The purpose of the call was an

ambitious plan, proposed by BEN AMMAR to BATISTA to take LLX private via an "Offer of Private Auction" for $3 billion. BATISTA and BEN AMMAR were both very excited.

327.    Chacur, however, poured cold water on the proposition. He told BATISTA that it would be impossible to find investors and that if he tried it he would have to reveal that he just did not have the money, because he owed $2 billion to Mubadala and $1.6 billion dollars to everybody else, and that he was actually worth a negative $600 million dollars.

328.    BATISTA was furious. He did not want the facts if they did not fit with the story. That was not what he wanted to hear and he fired Chacur, via the EBX VPN, on the spot.

### September 2012 - OGX Secretly Bankrupt

329.    In September 2012, an internal OGX task force and Schlumberger, the world-renowned energy consultant, essentially forming between themselves a Joint Task Force, presented reports on their conclusions as to OGX's prospects to BATISTA and his co-conspirators.

330.    The Joint Task Force concluded that a negligible amount of the promised 10.8 billion barrels of oil were "recoverable" at any expense and that, even so, they were contaminated with such high levels of $H_2S$ "Death Gas" that most of what was technically recoverable could not be extracted economically even if (which was doubtful, because of the environmental impact) licenses for decontamination could be obtained. This should not have been surprising since these shallow-water tracts had been regarded as worthless by the industry for decades.

331.    The Joint Task Force concluded that even in a best-case scenario, OGX had a negative value of about one billion dollars, making the commercial production of oil from any of the fields absolutely impossible.

332.    As the internal and external experts now confirmed, every day of additional exploration was a complete waste of money. OGX was insolvent, and digging an even bigger financial hole for itself every day that it stayed in operation. The further exploration for oil was a

pointless quest. Moreover, even the *pretense* of oil exploration for profit could not continue without fresh massive injections of cash.

333. One of the conditions of the OGX oil exploration leases required that the company continue to explore for oil until it declared a field to be commercial or return it to the government. BATISTA and the co-conspirators had therefore been having OGX declare fields where they had discovered no oil to be, in fact, "commercial," in order to avoid incurring the continuing cost of exploration, or suffer the blow to investor confidence by returning it to the government as worthless.

334. BATISTA and all his co-conspirators within the EBX Group at that time, which included GODINHO, MENDONÇA, BEN AMMAR, BERTO, CARNEIRO and THOR BATISTA, knew from these devastating audits that the whole house of cards that depended on OGX oil – the OSX ship-building operation, the LLX-run "Super-Port," and so on - would collapse as soon as the truth was known.

335. BATISTA and his co-conspirators knew that there was no reason for any investor, who knew what they knew, to invest another penny in OGX, OSX or LLX stocks or bonds and to dump them as quickly as possible. These reports should have been disclosed to the public immediately as Statements of Material Fact in OGX, OSX and LLX. However, BATISTA and his co-conspirators deliberately suppressed the news.

336. BATISTA and his co-conspirators knew that it was now just a matter of time before OGX, OSX and LLX, were seen by the public to be worthless. Their focus was now to keep up the illusion of eventual profitability long enough for them to loot as much of the remaining cash out of the companies as possible, sell off their remaining stock as quietly and profitably as possible, and for BATISTA to hide as much as he could from creditors before the bubble burst.

71

337.    It was BEN AMMAR who came up with the idea of a stratagem to delay the end a while yet: this was the "Billion Dollar Put Option." It worked for close to a year and resulted in much greater profit to the conspirators and much greater loss to the investor victims, including the Plaintiffs.

## The Billion Dollar Put Option

338.    Zartha was EIKE BATISTA's private financial consultant who worked in TMF at EBX Group Headquarters. He was often used by BATISTA to judge the probable market reaction to planned announcements and decisions.

339.    Shortly before October 24, 2012, EIKE BATISTA called Zartha to join him in his conference room on the Penthouse Floor at EBX Headquarters. When Zartha arrived he found GODINHO, BEN AMMAR and Marcelo Horcades, director of EBX International in New York, seated around the conference table. BATISTA told BEN AMMAR and GODINHO to explain the idea of the Billion Dollar Put Option to Zartha, for his opinion as to investor reaction.

340.    They explained that BATISTA would announce that he, through his companies, would enter into a "put option" for a billion dollars. The idea was that he would pledge to buy a billion dollars' worth of OGX shares at a price higher than the current market price, if called upon by OGX management to do so, for operating capital.

341.    They explained that this would send an extremely strong message to investors that EIKE BATISTA believed in the future profitability of OGX, since he would hardly pay a billion dollars of cash for an equity investment in the company unless he was confident that OGX would pump enough oil to pay off all the billions of dollars of debt owed to bondholders – who had the priority claim – and enough to stockholders that he would recoup his investment. EIKE BATISTA said that if he put his own money in, people would believe. They sat back and waited for Zartha's response.

342.     Zartha replied that there were several problems with the idea. One was that he doubted people would believe BATISTA. The second was that BATISTA did not have a billion dollars to pay in even if he wanted to. The third was that no amount of money could fix the fundamental problem, which was that there was no oil.

343.     The group of individuals, who had no intention that he, BATISTA, actually ever pay any money into OGX, laughed Zartha out of the room and told him to go back to his computer. BATISTA said that they had called him up just to hear what he would say and they had predicted it exactly: "it was like trying to talk business with your mother."

344.     In fact, the Billion Dollar Put Option was not an honest promise, it was just a stratagem created by AZIZ BEN AMMAR and adopted by the co-conspirators to delay the inevitable and to allow BATISTA and them all to get as much money as possible *out* of OGX before it collapsed.

345.     The entire group of co-conspirators at that time, which was EIKE BATISTA, PAULO MENDONÇA, FLAVIO GODINHO, LUIZ CARNEIRO, MARCUS BERTO, AZIZ BEN AMMAR and THOR BATISTA, were all privy to the fact that this was to be a fraudulent misrepresentation, intended to induce continued investment in a company they all knew was insolvent. And they all agreed to keep silent for their own continued mutual profit.

346.     On October 24, 2012, BATISTA announced to investors in the United States and internationally, as was duly reported by Bloomberg and the rest of the online financial press, that, through companies in his EBX Group he had entered into a billion dollar "put option" with OGX – essentially a contract between CENTENNIAL NEVADA and others of EIKE BATISTA's companies including the 63X Companies and EBX - to pay a billion dollars into OGX, as additional working capital, upon demand, in return for shares at R$6.3 when they were currently trading at R$4.75.

347.     In fact, unknown to the public, BATISTA did not even execute a document embodying any such promise. Two of the OGX executives kept pressing BATISTA for months thereafter to sign *something*, since the only document evidencing any sort of put option was the press release.

348.     Only much later, and only under pressure, did BATISTA ever apparently even sign some form of obligation, and even then it was apparently conditioned on an "out clause" designed to give him some "cover" in backing out which, as we shall see below, is exactly what he did.

349.     However, the announcement of the Put Option was effective in slowing the fall in the price of OGX stock during the fourth quarter of 2012 and fed its rise in January 2013.

### Berto – CEO of The EBX Group

350.     By the end of 2012, the eventual collapse of the whole EBX Group was assured. BERTO had by that time become BATISTA's most trusted advisor up on the Penthouse Floor and was the Chief Executive Officer of the entire EBX Group. At this point he was giving BATISTA the most aggressive ideas on how to save as much as possible out of the mess, which is what he wanted to hear.

351.     From that point on BERTO eclipsed even BEN AMMAR in influence and became a "chief among equals" with GODINHO and BEN AMMAR in coordinating initiatives and public pronouncements to postpone the inevitable collapse of OGX, OSX and LLX for as long as possible. BERTO now became the second in command to EIKE BATISTA.

352.     The plan with OGX and OSX was to continue to loot corporate capital and sell off blocks of shares quietly, but to remain in control to manage the ensuing bankruptcy "reoganizations." The plan for LLX was different. BATISTA planned to secretly sell off all his stock to a purchaser and cash out completely. This meant that he needed someone to step in at LLX and manage this process and keep the sale secret.

353.     In November 2012, BERTO agreed to step in as CEO and Investor Relations Officer of LLX to help corral any bad news and get BATISTA's controlling stake in LLX sold off before the OGX bubble burst. The other LLX directors, and co-conspirators EIKE BATISTA, FLAVIO GODINHO and AZIZ BEN AMMAR, were present at the meeting where BERTO was voted in.

354.     As CEO of LLX, BERTO ran LLX. As the Investor Relations Officer at LLX he had prime responsibility for reporting to the public on material developments affecting investment in the company. BERTO knew that the $2 billion Mubadala "investment" was really a loan, and Mubadala had been secretly realizing on its collateral for months. BERTO knew that OGX was insolvent and close to bankruptcy and that the Billion Dollar Put Option was a fraud. BERTO also knew that OSX had no future and would likely declare bankruptcy after OGX. He knew that LLX would consequently be without an anchor tenant and that the planned "Super-Port" was likely to remain undeveloped wasteland on the waterfront. In sum, the companies would fall like dominoes if the news about OGX was made public.

355.     In breach of his duty to the investing public, BERTO failed to disclose any of this. Had he done so, he would have torpedoed all credibility in the Billion Dollar Put Option, pushed OGX, OSX and LLX into bankruptcy, and the Plaintiffs would not have invested a cent.

**Harald Batista - TAG Bank**

356.     In late 2012, Harald Batista started the "Know Your Customer" account-opening process at TAG Bank, in Panama, as Director of CENTENNIAL DELAWARE, to open new accounts for the Company. He submitted a Brazilian Passport, proof of residence in California and proof of his *bona fides*. This account, when opened, would shortly be funded by a massive infusion of more than $100 million in offshore cash stashed in the Cayman Islands.

357.    TAG Bank accounts in Panama, in the names of The Golden Rock Foundation and The Blue Diamond Foundation, wholly-owned Panamanian subsidiaries of CENTENNIAL DELAWARE, were the source of funds for the bribes on which BATISTA and GODINHO have been convicted and CARNEIRO has been indicted.

**The Plaintiffs Invest**

358.    Gables Capital, Inc. is a registered investment adviser based in downtown Miami, Florida, and at all times material hereto acted as investment adviser to the Plaintiffs and was their agent for the purchase and sale of stocks and bonds.

359.    The individual responsible for the MERIDIAN and AMERICAN accounts was Ms. Judith Neiwirth, Gables Capital's co-founder and Chief Investment Officer, who had over thirty years of experience in the financial services industry.

360.    Ms. Neiwirth researched stocks and bonds via the dedicated Bloomberg terminal on her desk, where moment by moment financial reports were transmitted via the internet to professional investment advisers across America.

361.    In January 2013, on her Bloomberg terminal screen, Ms. Neiwirth read that BATISTA had announced the Billion Dollar Put Option. She understood it exactly as BATISTA and his co-conspirators had intended that it be understood, as stated above.

362.    Ms. Neiwirth knew that BATISTA had made multiple pronouncements over the years as to the massive OGX oil reserves and that all that was needed was the time and money to bring them into production.

363.    Ms. Neiwirth took the Billion Dollar Put Option to be an assurance by one of the world's richest men - and one of the very few whose promise to invest a billion dollars could be considered viable - that he had such total confidence in the future of OGX that he was willing to put a billion dollars of his own money into the company in return for shares, with the knowledge

that if the company should fail and did not have enough funds to fully satisfy all outstanding bonds, he would lose his entire investment. This was, as staed above, exactly the understanding which BATISTA had intended to create.

364.     In direct reliance on this massive expression of confidence in the future of OGX by the owner of the company, Ms. Neiwirth at Gables Capital, was induced to buy bonds in OGX for the Plaintiffs' account in six tranches over the next six months, for a total of approximately $21 million.

### The First Tranche – January 15, 2013

365.     On January 15, 2013, in direct reliance on BATISTA's promise to inject a billion dollars of capital into OGX via the Billion Dollar Put Option, if and when needed, Judith Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 6,000 OGX bonds for the sum of $5,849,354.17 on the secondary market on behalf of its client, MERIDIAN, and 3,500 OGX bonds for the sum of $3,412,123.26 on behalf of its client, AMERICAN.

### The Second Tranche – January 22, 2013

366.     On January 22, 2013, in direct continued reliance on BATISTA's promise to inject a billion dollars of capital into OGX via the Billion Dollar Put Option, if and when needed, Judy Neiwirth at Gables Capital in Miami, Florida, directed the purchase of another 4,325 OGX bonds for the sum of $4,234,265.10 on the secondary market on behalf of its client, MERIDIAN.

### The EBX/BTG "Strategic Partnership"

367.     Meanwhile the conspirator group at EBX continued churning out press intended to bolster the credibility of the Billion Dollar Put Option.

368.     On March 6, 2013, prnewswire.com relayed the following EBX Group announcement:

> The EBX Group and BTG Pactual announce the signing of a novel strategic cooperation agreement.  The agreement contemplates financial advisory services,

credit facilities and future long-term capital investments for the transformational projects currently being developed by the EBX Group in its segments. "This cooperation represents, above all, a partnership for the success of Brazil", said Eike Batista, EBX Group's CEO and Chairman.

This new cooperation will have a Strategic and Financial Management Committee comprising of senior executives from the EBX Group and of senior partners of BTG Pactual. The Committee will be led by Eike Batista and Andre Esteves and will meet on a weekly basis to discuss overall strategies relating to EBX Group's capital structure and investments for the short, medium and long-term projects and activities of the group's portfolio of companies. The agreement does not grant any exclusivity for BTG Pactual to render financial services to the EBX Group.

BTG Pactual's remuneration will be solely based on the performance of the EBX Group's public companies.  Andre Esteves, BTG Pactual's CEO, stated that:  "This cooperation shows once again our firm willingness to support unique projects and national entrepreneurship, areas in which Eike Batista is an icon."

369.    This EBX Group announcement, broadcast online to investors across America and worldwide was intended to convey the underlying message that BTG Pactual, one of the largest and most sophisticated players in the Brazilian financial market, saw enough value in BATISTA's empire that it was willing to "partner" with EBX, without any promise of exclusivity, and plough in cash to finance "short, medium and long-term projects," with its own profits completely contingent on the success of the EBX ventures.

370.    Predictably, OGX share prices shot upwards, closed up 16%, and rallyied as much as 27.7% in the day following the announcement.

### Centennial Delaware authorizes EBX to operate the new TAG Bank account

371.    On March 12, 2013, the directors of CENTENNIAL DELAWARE,  namely EIKE BATISTA, THOR BATISTA, and Harald Batista, passed a resolution authorizing the company to open or continue bank accounts at TAG Bank in Panama and authorized EBX INVESTMENTS, as sole manager of CENTENNIAL DELAWARE, to operate them.

### OGX Announces Further Commercial Oil Accumulations

372.     On March 13, 2013, BATISTA and his co-conspirators had OGX release another Material Fact to investors declaring that oil recovery from the Pipeline, Fuji and Ilimani formations was commercially feasible, announcing an on-site amount between a half billion and 1.3 billion barrels of oil, and conveying the impression that commercial production was imminent. This was a complete lie intended to bolster belief in the viability of OGX and the credibility of the Billion Dollar Put Option.

373.     On March 22, 2013, BATISTA tweeted that OGX had eight acknowledged oil commercial accumulations: three onshore, in Maranhao, and five offshore. This was a further fraudulent misrepresentation intended to bolster the credibility of the Billion Dollar Put Option.

### OGX publishes its 2012 Financial Statement

374.     On March 26, 2013, OGX published its financial statement for 2012 online in which it confirmed the Billion Dollar Put Option, and the fact that it was intended to reflect BATISTA's "confidence in the technical expertise and quality assets of the Company," as follows:

> 6.3 Controlling Shareholder Put Option In October 24, 2012, OGX's controlling shareholder, Eike Batista, granted the Company the right to demand his subscription of up to US$1.0 billion new common shares of OGX at a price of R$6.30 per share (the "Option"). The Option, which expires after April 30, 2014, is conditional upon the Company's additional capital requirement and the absence of more favorable alternatives, which will be determined by the majority of the independent board members on the Company´s Board of Directors. The option reflects Mr. Batista's confidence in the technical expertise and quality assets of the Company, as well as the new opportunities that the oil and gas industry offer to OGX.

375.     Under "Message from the Management," LUIZ CARNEIRO, CEO of OGX, stated "we made further advances in our exploration campaign, resulting in important oil discoveries . . . . . We recently declared three more fields commercial . . . and we continue our studies on how to best develop them."

376.     This was also a lie. As stated above, fields were being declared commercial solely to avoid the cost of further pointless exploration and to avoid returning them to the government as

worthless, which would have destroyed investor confidence. This was a further fraudulent misrepresentation intended to bolster the credibility of the Billion Dollar Put Option.

### Berto declares Intention to "Double Investment in LLX"

377.    On March 27, 2013, BERTO declared on a conference call with analysts, which was reported via the internet, that LLX planned to double its investment in the Super-Port development at Açu from R$675,000,000 the previous year to R$1.19 billion during 2013.

378.    This was a lie. The port at Açu had no likelihood of significant development in the near future since OGX had already been over a billion dollars in debt in September the previous year, and had been digging the hole deeper every day since then by drilling dry holes, and would declare bankruptcy before the year was out. OSX, which was supposed to be the anchor tenant for the port, occupying huge amounts of space for ship-building and dockage would fold behind it. And LLX, with no further rationale would become largely worthless.

379.    The announcement of doubled investment in LLX was to help prop up the credibility of the Billion Dollar Put Option, and thus confidence in LLX while BERTO cashed out BATISTA's stake.

### The Third Tranche – March 28, 2013

380.    On March 28, 2013, in continued direct reliance on BATISTA's promise to inject a billion dollars of capital into OGX via the Billion Dollar Put Option, if and when needed, Judy Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of another 2,000 OGX bonds for the sum of $1,520,930.56 on the secondary market on behalf of its client, MERIDIAN.

381.    On April 1, 2013, as expected, MERIDIAN received its first interest payment of $432,359.38 on its OGX bonds and AMERICAN received its first interest payment of $146,562.50.

## The Fourth Tranche – April 12, 2013

382.     On April 12, 2013, in continued direct reliance on BATISTA's promise to inject a billion dollars of capital into OGX via the Billion Dollar Put Option, if and when needed, Judy Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of another 4,000 OGX bonds for the sum of $2,676,888.89 on the secondary market on behalf of its client, MERIDIAN and 1,000 OGX bonds for the sum of $669,222.22 on behalf of its client, AMERICAN.

## TAG Bank - $111 Million from Cayman - Bribes

383.     In April, 2013, CENTENNIAL DELAWARE wired $111,798,818.97 million from an account at BTG Pactual in the Cayman Islands to the account that EIKE BATISTA, his son, THOR BATISTA, and EIKE's brother and THOR's uncle, Harald Batista, had just authorized be opened for the company at TAG Bank in Panama.

384.     That same month CENTENNIAL DELAWARE directed its wholly-owned Panamanian subsidiary, The Golden Rock Foundation, to pay a $2.3 million kickback, from its account at TAG Bank in Panama, to Brazilian officials who had been instrumental in awarding the $922 million OSX shipbuilding contract in mid-2012. CARNEIRO would eventually be indicted for arranging this bribe.

## The $850 Million "Investment" by Petronas

385.     On March 27, 2013, AZIZ BEN AMMAR traveled to Kuala Lumpur to talk to the Malaysian State-owned oil company Petronas, and on May 8, 2013, BATISTA announced publicly that Petronas had agreed to buy an $850 million stake in two OGX oil fields in the Tubarão Martelo field in the Campos Basin. The news of the $850 million Petronas deal was picked up and reported online across the world.

386.     OGX was widely quoted online as stating: "OGX's partnership with Petronas underscores the quality of our asset and the potential of the Tubarão Martelo field, where

production is expected to commence by the end of the year," OGX chief executive CARNEIRO said, "[w]ith more than 32Bb of recoverable resources and a production of about 2Mboe/d, Petronas' expertise will enhance the continued development of oil production in these areas."

387.    However, there was, in fact, no "Petronas deal" as portrayed to the public. The "deal" had many contingencies, including OGX restructuring its debt and reaching certain production targets. It was merely another fraudulent misrepresentation intended to bolster the credibility of the Billion Dollar Put Option and it had that effect.

### The Fifth Tranche – May 20, 2013

388.    On May 20, 2013, in continued direct reliance on BATISTA's promise to inject a billion dollars of capital into OGX via the Billion Dollar Put Option, if and when needed, Judy Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 3,000 OGX bonds for the sum of $1,798,791.67 on the secondary market on behalf of its client, MERIDIAN.

### Batista Secretly Cashes Out

389.    On June 7, 2013, in an attempt to keep the balls in the air a little longer, BATISTA and the board of OGX released an OGX Management Presentation that highlighted the great supposed success of the OGX exploratory campaign.

390.    However, while doing his best to encourage confidence in OGX investors, between May and June, 2013, BATISTA had secretly sold off 126.65 million OGX shares. This was not disclosed to the Brazilian regulators or publicly because, as the co-conspirators knew, it would have created a crisis of investor confidence in OGX. This was a misrepresentation by omission.

391.    When the news later hit the financial press in June 2013 that BATISTA's EBX had sold a big chunk of its stock in OGX, investors reacted with alarm.

392.    BATISTA responded by reassuring the Brazilian regulators, on June 13, 2013, that this had been just "a one-off adjustment, a divestiture made in the process of concluding the

restructuring of the group which was now complete that same month of June" and that no further shares would be sold. (This was a lie. Between June 30, 2013 and September 30, 2013, BATISTA's holding companies, the CENTENNIAL Companies, quietly sold off a further 227,000,000 shares in OGX). But bond investors, including Judy Neiwirth in Miami, were reassured. After all, the Billion Dollar Put Option stood.

393.    In fact, BATISTA was also secretly siphoning off OGX capital in huge amounts. In June, 2013, BATISTA wired $450 million of OGX corporate capital out of OGX's bank accounts to an unknown ultimate destination without any legal obligation or justification.

394.    On the date of the announcement of the Billion Dollar Put Option on October 24, 2012, OGX was publicly announcing that it had approximately $2.9 billion in cash. By September 2013, shortly before bankruptcy, it had just $326 million left. Somewhere between the cost of pointless drilling and sucking the cash out of the company to safe locations abroad, BATISTA had managed to waste and abstract some $2.6 billion that would not be there for bondholders like the Plaintiffs when the company crashed.

## Zartha leaves for Miami

395.    From mid-2012 through mid-2013, Zartha had been trying to get BATISTA to see sense. Zartha kept telling BATISTA that, in reality, he had a negative net worth and that the way that he was going was leading to financial ruin.

396.    Zartha repeatedly told BATISTA that the only realistic plan would be for all the stakeholders in the EBX Group – banks, shareholders, management and top employees – to come together on an agreed course of action to find buyers for the assets, and then everybody in the EBX Group could avoid getting sued - and maybe some of them even going to jail. Everybody would be invested in cooperating on a common strategy: nobody wanted financial disaster. There was no guarantee that BATISTA could save billions of dollars, but maybe he could save some hundreds

of millions.

397.    However, BATISTA did not want to listen. He preferred to follow BERTO's plan, which was to keep pedaling as hard as possible on the lies and stash as much as possible away before OGX and the other companies went over the cliff.

398.    In mid-June 2013, Zartha and BATISTA had their final argument and Zartha quit along with several of the other TMF employees and they closed the company, TMF, down.

399.    Zartha left Rio for Miami the following year, where he now lives.

### The Sixth and Final Tranche – June 20, 2013

400.    On June 20, 2013, in continued direct reliance on BATISTA's promise to inject a billion dollars of capital into OGX via the Billion Dollar Put Option, if and when needed, Judy Neiwirth at Gables Capital, in Miami, Florida, directed the purchase of 3,175 OGX bonds for the sum of $1,070,107.29 on the secondary market on behalf of its client, MERIDIAN, as trustee.

401.    MERIDIAN's investment in OGX bonds now totaled $16,717,978.30 and AMERICAN's investment in OGX bonds now totaled $3,934,782.98, for $20,652.761.28.

### The Final Months of OGX

402.    On July 1, 2013, OGX was finally forced to admit by a Material Fact, transmitted online, that a number of its wells in the Campos Basin were unproductive and, cryptically, that none of its projections should be relied upon, which resulted in a plunge in OGX share prices.

403.    However, almost immediately, OGX sent out a contradiction. On July 3, 2013, Bloomberg relayed the news that OGX had declared the Remora field in the Campos Basin to be commercially viable.

404.    This was, unfortunately, just another lie. As noted above, fields were being declared commercial to avoid the cost of pointless exploration and to avoid the blow to investor confidence that would result from turning them in to the government as worthless.

## Batista Makes Further Fraudulent Transfers

405.    During these months, BATISTA was moving his Brazilian assets into the names of family members, leaving himself, he hoped, immune from collection in Brazil.

406.    BATISTA thus transferred two buildings in Rio with an aggregate value of approximately $20 million into the names of his sons THOR BATISTA and Olin Batista; he moved $40 million from an account in Brazil to a Citibank account in the name of THOR BATISTA; and he made further fraudulent transfers to his girlfriend, his ex-wife and his father.

407.    BATISTA and his co-conspirators, primarily BERTO, were now directing the movement of BATISTA's liquid assets, which were largely held abroad, into other names and countries to defraud creditors. Some of these transactions in Miami are described particularly below in the fraudulent transfer count, Count XII.

## Mubadala Secretly Pulls Out

408.    During early July, 2013, news began to leak out that the Mubadala deal, which had been announced as an equity investment by a major global sovereign wealth fund, may have been more in the nature of a loan.

409.    Behind the scenes, Mubadala, which had inside knowledge as to the true state of affairs in BATISTA's companies had been over the course of many months demanding and receiving partial payments and the surrender of collateral to reduce its exposure to the greatest extent possible in a deal worked out with EBX INTERNATIONAL and BATISTA's CENTENNIAL Companies, and his 63X COMPANIES in the Cayman Islands. This should have been publicly released as a Material Fact, but was not, and was a material misrepresentation by omission.

410.    BATISTA and his co-conspirators publicly lied, characterizing the OGX payments to Mubadala as the partial redemption of an "investment" rather than the repayment of a loan.

**Berto Lies Directly to CVM**

411.    On July 10, 2013, alarmed by an online press report that morning that BATISTA
had been re-structuring the Mubadala deal and that there would be a "diluted stake in logistics
company LLX, because the new investors will be brought in who will complete the port (LLX),"
CVM demanded that BERTO, as Investor Relations Officer:

> (i) clarify the details of the mentioned restructuring as well as the impacts thereof
> on this publicly-traded company; (ii) explain the reasons why such matter was not
> deemed to be a Material Fact and (iii) obtain from the controlling shareholder a
> statement why he did not cause the mentioned restructuring to be disclosed by the
> publicly-held companies . . . further clarifying the reasons why the controlling
> shareholder believes that "the new agreement further reinforces the stability of the
> EBX Group."

412.    BERTO knew that the candid answer to this was that the Mubadala deal had not
been an investment but a massive $2 billion loan and that Mubadala had been stripping assets out
of the EBX Group for many months; that there was virtually no oil and OGX was about to collapse,
and OSX with it; that LLX would lose its anchor tenant; and that he was trying to sell off
BATISTA's stake in LLX, secretly, and illegally, before the crash.

413.    But what he wrote back the following day, July 11, 2013, was none of this. It was
a tongue-in-cheek series of evasions which taken together amounted to a complete lie. What he
said was:

> The Company again clarifies that it is not a party, directly or indirectly, to the
> agreements entered into between the Company's controlling shareholder, Mr. Eike
> Fuhrken Batista, and Mubadala Development Company.

> Therefore, the transaction in question in no way affects the Company and its
> corporate interests, and does not in itself have the ability to cause any change in the
> control, development, or management of its activities.

> Finally, the Company informs that, at CVM's request, it has received the following
> information from the Company's controlling shareholder:

> *"The restructuring of my agreement with Mubadala, one of the world's largest and
> most respected sovereign wealth funds, provides even greater stability to holding
> company EBX, as it shows confidence on the part of an investor that is of great*

*prominence in the financial community in my holding's ability to move forward with its ongoing search for an increasingly robust capital structure that is able to fully meet its best corporate interests"*

With assurances of highest consideration, we remain at your disposal for any further clarification.

414.    In fact BERTO ghost-wrote word-for-word identical letters in response to the identical query from CVM to the Investor Relations Officers for MMX and MPX. It is unknown what responses BERTO made on behalf of OGX and OSX.

415.    On July 11, 2013, EBX declared (as was reported by Miami-based, LatinFinance, online): "EBX has redeemed a significant portion of Mubadala's initial investment. EBX and Mubadala have also entered into a new agreements ensuring enhanced protection vis-avis the remaining portion of the investment from Mubadala." This was intended to bolster the Billion Dolar Put Option by suggesting that Mubadala's interest in OGX was as an investor – apparently with money yet to be paid in - and not as a lender who was realizing on its collateral and stripping money out.

## The 10.8 Billion Barrel Lie Continues

416.    Despite the fact that OGX was now on a very fast countdown to collapse, BATISTA and his accomplices kept on publicly trumpeting a rosy vision for its future, completely disconnected from any shred of reality.

417.    Thus, on July 19, 2013, BATISTA once again blared out reassurances for distribution through the internet press [Bloomberg Businessweek, Financial Times, Fox Business, San Francisco Chronicle] that, as D&M had stated in a 2011 Report, OGX had reserves amounting to 10.8 billion barrels and that regardless of all else, he would stand by the company and honor all of his obligations. This was a lie.

418.    On July 22, 2013, D&M in Texas again demanded of BATISTA and OGX, privately, that he retract the 10.8 billion barrel lie and detach the D&M name from it. BATISTA

and his accomplices refused to do so, thus allowing the fraudulent misrepresentation to stand. D&M let the lie stand.

419.    On August 16, 2013, the Tubarão Azul oilfield was closed down, having produced roughly five million barrels throughout its life, or just 1% of the minimum estimate announced in 2010. This was OGX's best field. There would be a later attempt to operate this field commercially post-bankruptcy. This attempt, however, would prove futile and the field was eventually returned to the Brazilian government.

### Berto belatedly tells CVM that Batista has sold his stake in LLX

420.    On August 15, 2013, in a filing with CVM, BATISTA belatedly confirmed that BATISTA's controlling stake in LLX had been sold for $560 million to U.S.-based EIG Global Energy Partners. Much later, BERTO would be fined $70,000 by CVM for this omission as a breach of his duty as Investor Relations Officer.

### MMX

421.    Disastrous news was also now emerging about BATISTA's MMX, iron ore "producing" company, which had been fined R$1.8 billion for unpaid taxes, equivalent to nearly 80% of its market value. BATISTA's hand-picked managers at MMX were trying to sell off this company, too, before the others crashed all around it.

422.    This is the company, discussed above, which declared bankruptcy in October 2014 where a Brazilian court later realized, in May 2017, that BATISTA had followed the same fraudulent *modus operandi* there as in the case of OGX and the other companies under the EBX Group umbrella, freezing BATISTA's and CENTENNIAL NEVADA's assets in Brazil.[16]

---

[16] See Exhibit "A."

423.    This was then adopted by Judge Mark, in the Southern District Bankruptcy Court on June 9, 2017 and enforced as a freezing injunction over the assets of BATISTA and CENTENNIAL NEVADA in the United States.[17]

### Batista secretly sells more OGX shares

424.    In August and September 2013, BATISTA secretly sold another 227 million OGX shares for approximately $35 million which he routed through his foreign accounts.

### OGX Executives Leave and Strip More Cash out of OGX

425.    At least ten OGX executives left OGX during these final months, with parting payments ranging from $46 million and $92 million, further stripping cash out of the company.

### Aziz Ben Ammar leaves for New York

426.    On September 4, 2013, just two days before the call on the Billion Dollar Put Option – which would be refused - AZIZ BIN AMMAR abruptly resigned as a director from the Boards of OGX, OSX, LLX, MMX, MPX and CCX and returned to New York.

### Last Hopes

427.    Equity investors and bond holders in the United States and worldwide were still relying on the fact that there was value in OGX. This belief was due to the fact that as recently as May, 2013, a foreign oil company, Petronas, had apparently invested close to a billion dollars of its own money in the OGX oil fields.

428.    On top of that, BATISTA himself was obliged to inject a billion dollars in cash into OGX, if and when needed, through the Put Option. All that was needed apparently was for OGX to have enough cash to stay in business until the oil started to flow. Nobody suspected that there was just no oil.

---

[17] See Exhibit "B."

429.     The fraudulent OGX Put Option misrepresentation was repeated as the stock and bond prices fell. On July 19, 2013, BATISTA stated to the press that he would stand by the company and "honor all of [his] obligations," which, the Plaintiffs' investment adviser, Ms. Neiwirth, at Gables Capital in Miami, took to include the Put Option, and that he would not "leave a single penny unpaid for each one of [his] debts," which she believed to be true.

### The OGX Oil Bubble Bursts

430.     On September 6, 2013, OGX's Controller, formally demanded from BATISTA the first $100 million under the Put Option.

431.     BATISTA, who had never had any intention of paying a single penny *into* OGX, shocked investors by refusing to pay a cent under the Put Option, claiming the benefit of an "out clause," which he was said to have inserted for that exact purpose. (It is unknown when this was drafted or whether it even existed).

432.     The arrival of OSX III, yet another massive floating production, storage and offloading vessel at the Tubarão Martelo field, on October 1, 2013, raised momentary hopes that OGX might soon start producing offshore oil from the field. But by close of business that same day, OGX missed a bond payment in the amount of $45 million.

### Marcus Berto leaves for Miami

433.     On October 28, 2013, two days before OGX declared bankruptcy, swiftly to be followed by OSX, and with BATISTA's stake in LLX secretly sold off, BERTO left his Penthouse Office at EBX Headquarters for Miami, Florida.

434.     As a "thank you" for his services to date and in anticipation of services as trustee yet to come, as further described below, in July 2013, BATISTA had 63X MASTER FUND send BERTO the agreed-upon $10 million.

435.    This payment originated from 63X MASTER FUND's BTG account in the Cayman Islands and was wired to an account at Merrill Lynch in Florida in the name of an Arizona company, LIN LLC, wholly-owned and controlled by BERTO.

436.    BERTO invested his pay-off in a $9.5 million Key Biscayne, Florida, mansion, which is titled in the names of two trusts, LIN KB and LIN MB, of which he and his wife, Melissa Mason Berto, are the respective trustees.

### OGX declares Bankruptcy

437.    On October 30, 2013, OGX filed for bankruptcy in Rio de Janeiro disclosing debts of $5.1 billion, of which roughly $3.6 billion was owed to U.S. and other foreign bondholders.

438.    Pimco, the world's largest bond investor, based in California, and BlackRock, the world's largest asset manager, from New York, had front-row seats for the collapse.

439.    Bondholders like the Plaintiffs and other investors from Florida, such as the Florida Retirement System Trust Fund, and government retirement pension funds across the United States were among the horde of other investors that were basically wiped out.

440.    In November 2013, Petronas announced that it would not pay the $850 million, which investors had expected under the alleged "deal" that BATISTA had broadcast in May of that year, disclosing that the deal had been contingent on OGX being able to re-structure its debt.

441.    By February, 2014, virtually all of the blocks which OGX had leased had been returned to the Brazilian Government as worthless.

442.    OGX's satellite company, OSX, filed for bankruptcy on November 11, 2013.

### Subsequent Admission of Secret Stock Sales

443.    On November 25, 2013, OGX released its interim financial statement for the period ending on September 30, 2013. The notes to the interim statement disclosed that BATISTA's holding companies, CENTENNIAL DELAWARE and CENTENNIAL NEVADA

(referred to as "the Centennial Asset Funds") managed by EBX INTERNATIONAL, of which the

Directors were at that time BATISTA and GODINHO, had sold 353,650,500 shares in OGX in

the nine months ending September 30, 2013, just days before the default on the bonds and a month

before the bankruptcy filing, as shown below:

**OGX Petróleo e Gás Participações S.A.**
**(Publicly-held company)**

Notes to the intereim financial information as of September 30, 2013 -- Continued
(Amounts expressed in thousands of Brazilian Reais - R$, except as indicated otherwise)

**19. Shareholders' Equity**

a) Paid-in capital

In the nine-month period ended September 31, 2013 there were no exercises of stock purchase options or paying in of capital in the Company.

During the year ended December 31, 2012, stock purchase options were exercised (see Note 20), with capital being paid in as shown below:

| Date | Number of shares | Amount in R$ |
|---|---|---|
| January 3, 2012 | 62,500 | 209 |
| February 15, 2012 | 1,520,990 | 7,788 |
| March 15, 2012 | 180,000 | 1,307 |
| May 15, 2012 | 385,300 | 1,316 |
| June 15, 2012 | 48,000 | 67 |
| September 19, 2012 | 55,000 | 140 |
| November 14, 2012 | 14,500 | 21 |
| | 2,266,290 | 10,848 |

The two tables that follow break down the ownership structure of the Company's paid-in capital as of September 30, 2013 and December 31, 2012:

| 09/30/2013 - Shareholders | No. of common shares | % stake |
|---|---|---|
| Centennial Asset Funds (*) | 1,623,333,735 | 50.17 |
| Itau | 182,078,338 | 5.63 |
| Others (shareholders with individual stake under 5%) | 1,430,604,717 | 44.20 |
| | 3,236,016,790 | 100.00 |

| 12/31/2012 – Shareholders | No. of common shares | % stake |
|---|---|---|
| Centennial Asset Funds (*) | 1,976,984,235 | 61.09 |
| Others (shareholders with individual stake under 5%) | 1,259,032,555 | 38.91 |
| | 3,236,016,790 | 100.00 |

(*) Centennial Asset Mining Fund LLC and Centennial Asset Brazilian Equity Fund, both controlled by Mr. Eike Fuhrken Batista.

**<u>Thor's Subsequent Admission of an Attempted $100 Million Fraudulent Transfer</u>**

444.    That Batista was attempting to orchestrate fraudulent transfers just prior to the collapse of OGX has been expressly admitted by THOR BATISTA. In the Cayman Islands proceedings, as noted above, the Grand Court has entered a freezing injunction over the assets of BATISTA and the 63X Companies, in the sum of $63 million.

445.    In those proceedings, the Plaintiffs contended that, among his other efforts at improperly secreting and dissipating assets, in July or August of 2013 EIKE BATISTA had attempted to transfer USD $100,000,000 from an account in The Bahamas in the name of one of the 63X Companies, into an account at Citibank in Miami, Florida in the name of "the Thorque Fund," ostensibly as a gift to his son THOR BATISTA, but in reality as a nominee to obfuscate ownership which would remain in EIKE BATISTA.

446.    In response, THOR BATISTA, as Director of EBX INTERNATIONAL, the corporate Director of the 63X Companies swore an affidavit in which he did not deny that the transfer was attempted, but as a "defense" attempted to justify the effort, by claiming that the EBX Group was $22 billion in debt, and that in trying to get $100 million of his personal cash out of the Bahamas his father was only trying to avoid a *different creditor's* ability to seize the funds, thus:

> The Attempted Transfer was not an attempt to dissipate Mr Batista's assets. Rather, by the second semester of 2013 Mr Batista anticipated that the EBX group would need to be fully restructured, as the EBX group companies had debts amounting to approximately USD 22 billion. Mr Batista intended to transfer USD 100 million of his personal cash to an account outside BTG, which was a significant creditor of the EBX group, to enable this cash to be applied to the EBX group restructuring process and benefit all of the creditors equally. . ."[18]

447.    When juxtaposed against the fact that THOR's father was secretly selling off his stock in OGX at exactly this time, the idea that EIKE BATISTA was attempting a fraudulent

---

[18] Fifth Affidavit of Thor Batista, para. 45, Feb 22, 2017, filed in the Grand Court of the Cayman Islands.

transfer to try to put aside cash for any creditors, whoever they were, is completely incredible.

### Batista's "Brazilian Dream" Turns to Nightmare

448.    For everybody with an interest in OGX and its satellite companies - except for BATISTA, his co-conspirators, and accomplices - the "Brazilian Dream" BATISTA had boasted of on April 30, 2012, had now turned to a nightmare.

449.    The shareholders and ordinary bondholders, predominantly from the United States, who had invested billions of dollars in OGX, had now been basically wiped out in what is currently the largest default in Latin American history.

450.    To give a sense of the magnitude of the lies about OGX's supposed "oil reserves," from the start of the Company, through its filing for bankruptcy protection in 2013, and thereafter continuing in reorganization, OGX actually produced just 0.18% of the 10.8 billion barrels promised. A valid local Miami comparison would be to promise to build the 764 foot Southeast Financial Center but actually deliver a building 16 inches high.

451.    Through "restructuring" in the OGX bankruptcy, MERIDIAN's close to $17 million dollars in bonds has been translated into shares in a new version of OGX – dubbed "OGPar" - with a face value of $279,746 for which credit is given. It is not liquid and has not generated any return. MERIDIAN's net loss is **$16,438,233.00**, plus interest.

452.    Similarly, AMERICAN's close to $4 million in bonds has been translated into shares in OGPar with a face value of $62,166, for which credit is given. It is not liquid and has not generated any return. AMERICAN's net loss is **$3,872,616.00**, plus interest.

453.    The Plaintiffs have retained the undersigned attorneys to prosecute this action and are obliged to pay them a reasonable fee.

## Batista's Silver Lining

454.    By 2010 BATISTA was being hailed as "the richest man in Brazil" and the "seventh" or "eighth richest man in the world." After the crash of OGX in late 2013, he was described as a "negative billionaire." None of that, however, is actually true.

455.    None of the companies ever actually engaged in business for profit. None of them ever made a profit. BATISTA therefore had no legitimate source of funds from the companies. The money which the world counted as forming part of BATISTA's fortune was not legally "his." It consisted of capital illegally siphoned off out of OGX and the other EBX Group companies and profits from market manipulation and insider trading. It was all just the proceeds of fraud.

456.    Further, his "negative billionaire" status merely describes his technical legal debts, which he had no intention of paying. It takes no account of the money that he has stashed outside Brazil, in Miami and in offshore secrecy jurisdictions. In practical fact, BATISTA is likely richer now than when he began this series of frauds.

## Lava Jato

457.    It would beggar belief that, in the United States, any fraudster would be able to get away with such a massive scheme for so long; that the insiders would between them make many hundreds of millions of dollars from market manipulation and insider trading, and that when found out that there would be so little in the way of penalties. Nobody, though, has **_ever_** gone to prison in Brazil for stock fraud. Nor are the administrative penalties more than minimal.

458.    Thus, the penalties from the CVM, in the context of the scheme, have been derisory. BATISTA was fined $6.3 million for insider trading of OSX stock (which he has appealed) and banned from running a public company for five years. He was fined an unknown amount by CVM in connection with OGX charges and successfully appealed. GODINHO was fined an unknown amount in connection with OGX and successfully appealed. BERTO was fined $70,000 in

95

connection with LLX – which was well worth it given his $10 million payoff – which he has appealed. There are still CVM proceedings pending against BEN AMMAR.

459.   BATISTA and the others might have run all their schemes to the end and gotten off with no more than such taps on the wrist from the CVM, had it not been for the fact of the now internationally notorious "Lava Jato" or "Car Wash" operation which began in 2014.

460.   This probe, which was started by a small group of enthusiastic, idealistic young prosecutors began to reveal the depth and pervasiveness of corruption throughout the Brazilian business, social, political and judicial cultures.

461.   The Lava Jato investigation and its offshoots now includes more than a hundred Brazilian politicians under indictment for corruption. One Brazilian President was convicted of money laundering and corruption in 2017 and recently sentenced to 12 years in prison, and his successor was impeached and removed in 2016.

462.   That the historically corrupt, toothless and glacially slow Brazilian criminal justice system is now beginning to catch up with some of the co-conspirators as can be seen by the fact that BATISTA has been sentenced to 30 years and GODINHO to 22 years. Charges against CARNEIRO are also pending.

463.   However, neither they nor anyone else has been criminally charged with anything in connection with their massive stock frauds. The main focus of the Lava Jato investigation is on government corruption, and the reason for these EBX Directors' criminal problems are that they were found out in the Lava Jato investigation to have bribed government officials.

464.   However, BATISTA and GODINHO are both appealing their sentences and living at their luxurious homes in Rio while awaiting the outcome. It remains to be seen, in the end, whether they will face any real consequences for their crimes.

**COUNT I**
**FRAUD**

Plaintiffs re-allege paragraphs 1 through 464 against EIKE BATISTA and say as follows:

465.    Against a backdrop of multiple public fraudulent misrepresentations that OGX had massive reserves of commercially recoverable oil, between October 24, 2012 and continuing through July 2013, EIKE BATISTA publicly fraudulently mis represented, on multiple occasions, that he had entered into the Billion Dollar Put Option contract with OGX.

466.    BATISTA did so with the intent that the fraudulent misrepresentation be relayed by the financial press, online, to prospective investors, primarily in the United States, including in Florida.

467.    BATISTA intended by this fraudulent misrepresentation to convey a message to such prospective investors that he, as the majority owner of OGX, had such enormous confidence in the future of his company, that he was willing to risk the loss of a billion dollars of his own money in order to bring its oil reserves into production, if called upon by OGX management to do so, as is further more particularly described above.

468.    In justifiable reliance on this fraudulent misrepresentation, which was repeated on several occasions, as detailed above, BATISTA induced the Plaintiffs'' investment adviser in Miami to invest a total of approximately $21 million in OGX bonds, in six tranches between January and July 2013.

469.    In fact, as BATISTA knew, OGX had virtually no oil reserves and was more than a billion dollars in debt. BATISTA had not entered into any Billion Dollar Put Option and did not intend to enter into any agreement which would legally oblige him to pay any money into the company, let alone a billion dollars.

470.    On September 6, 2013 OGX made a demand upon BATISTA to honor the Put Option, exercising the total option but requesting an initial disbursement of $100,000,000, which

would have provided sufficient liquidity to make the next payment on the bonds, including those held by the Plaintiffs and on September 9, 2013 BATISTA refused.

471.    On October 1, 2013, in response to, *inter alia*, BATISTA's refusal to honor the Put Option, OGX announced that it had decided not to make the required payment of approximately $45 million due that day on the outstanding bonds, noting that it then had a 30 day grace period before the bonds would be accelerated.

472.    The fraudulent misrepresentation regarding the Put Option was therefore the proximate cause of the Plaintiffs' loss.

473.    The Billion Dollar Put Option was made in the course of an overall fraudulent scheme by which BATISTA willfully and maliciously caused his thousands of victims, including retirement funds investing the pensions of their beneficiaries, to lose many billions of dollars for his own personal gain. Such outrageous actions shock the conscience and merit an award of punitive damages in an amount sufficient to hurt but not bankrupt and to deter such conduct in others in future.

WHEREFORE, Plaintiffs demand damages, including punitive damages, together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

### COUNT II
### CONSPIRACY TO DEFRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 464 and 465 through 473 against EIKE BATISTA, FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX INTERNATIONAL, S.A., CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD. and 63X FUND, and say as follows:

474.    By reason of the matters alleged in detail above, the foregoing Defendants conspired and agreed together to participate in the fraudulent scheme and achieve its objectives, as alleged. Each such Defendant performed the overt acts detailed above in furtherance of the conspiracy.

475.    While conspiring to participate in the fraudulent scheme, these Defendants had actual knowledge of the wrongfulness of the scheme and the high probability that the scheme would damage the Plaintiffs and, despite that knowledge, intentionally pursued the conspiracy, damaging the Plaintiffs.

476.    The corporate defendants actively and knowingly conspired to participate in the fraudulent scheme to the same extent as the individual defendants. Further, the employees and directors of the corporate defendants knowingly condoned and consented to the corporate defendants' participation in the conspiracy, damaging the Plaintiffs.

477.    The Defendants willingly participated in a fraudulent scheme by which they willfully and maliciously caused their thousands of victims, including retirement funds investing the pensions of their beneficiaries, to lose many billions of dollars, solely for their own personal gain. Such outrageous actions shock the conscience and merit an award of punitive damages in an amount sufficient to hurt but not bankrupt and to deter such conduct in others in future.

WHEREFORE, Plaintiffs demand damages, including punitive damages, together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT III
## AIDING AND ABETTING FRAUD

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 464 and 465 through 473 against FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX INTERNATIONAL, S.A.,

CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD. and 63X FUND, and say as follows:

478.   By reason of the facts alleged in detail above, the foregoing Defendants aided and abetted BATISTA and his co-conspirators and accomplices and rendered substantial, material assistance to him and them, to achieve the objectives of the fraudulent scheme.

479.   While aiding and abetting the fraudulent scheme, these Defendants had actual knowledge of the wrongfulness of the scheme and the high probability that the scheme would damage the Plaintiffs and, despite that knowledge, intentionally aided and abetted fraudulent scheme, damaging the Plaintiffs.

480.   The corporate defendants actively and knowingly aided and abetted the fraudulent scheme to the same extent as the individual defendants. Further, the employees and directors of the corporate defendants knowingly condoned and consented to the corporate defendants' aiding and abetting in the fraudulent scheme, damaging the Plaintiffs.

481.   The Defendants willingly assisted in a fraudulent scheme by which they willfully and maliciously caused their thousands of victims, including retirement funds investing the pensions of their beneficiaries, to lose many billions of dollars, solely for their own personal gain. Such outrageous actions shock the conscience and merit an award of punitive damages in an amount sufficient to hurt but not bankrupt and to deter such conduct in others in future.

WHEREFORE, Plaintiffs demand damages, including punitive damages, together with interest, and such further and other legal and equitable relief as may appear just, plus the costs of this action.

## COUNT IV
## FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 473 against EIKE BATISTA and state as follows:

482.    Against a backdrop of multiple public fraudulent misrepresentations that OGX had massive reserves of commercially recoverable oil, between October 24, 2012 and July 2013, EIKE BATISTA knowingly made and disseminated numerous false advertisements before the general public of the State of Florida regarding his entry into the Billion Dollar Put Option with OGX, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1), and that they caused such loss in fact to Plaintiffs.

483.    BATISTA intended by these false and misleading advertisements to convey a message to prospective investors in the State of Florida that he, as the majority owner of OGX, had such enormous confidence in the future of his company, that he was willing to risk the loss of a billion dollars of his own money in order to bring its oil reserves into production, if called upon by OGX management to do so.

484.    In justifiable reliance on this false and fraudulent advertisement, which was repeated on several occasions, as detailed above, BATISTA induced the Plaintiffs' investment adviser in Miami to invest a total of more than $21 million in OGX bonds, in six tranches between January and July 2013, as is described above.

485.    In fact, as BATISTA knew, OGX had virtually no oil reserves and was more than a billion dollars in debt. BATISTA had not entered into any Billion Dollar Put Option and did not intend to enter into any agreement which would legally oblige him to pay any money into the company, let alone a billion dollars.

486.     On September 6, 2013 OGX made a demand upon BATISTA to honor the Put Option, exercising the total option but requesting an initial disbursement of $100,000,000, which would have provided sufficient liquidity to make the next payment on the bonds, including those held by the plaintiffs and on September 9, 2013 BATISTA refused.

487.     On October 1, 2013, in response to, *inter alia*, BATISTA's refusal to honor the Put Option, OGX announced that it had decided not to make the required payment of approximately $45 million due that day on the outstanding bonds, noting that it then had a 30-day grace period before the bonds would be accelerated.

488.     The false and misleading advertisement regarding the Billion Dollar Put Option was therefore the proximate cause of the Plaintiffs loss.

489.     The false and misleading advertisement of the Billion Dollar Put Option was made in the course of an overall fraudulent scheme by which BATISTA willfully and maliciously caused his thousands of victims, including retirement funds investing the pensions of their beneficiaries, to lose many billions of dollars, solely for his own personal gain. Such outrageous actions shock the conscience and merit an award of punitive damages in an amount sufficient to hurt but not bankrupt and to deter such conduct in others in future.

490.     Accordingly, Plaintiffs have a statutory cause of action for actual damages, punitive damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

WHEREFORE, Plaintiffs demand damages, including punitive damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

## COUNT V
## CONSPIRACY TO COMMIT FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 477 and 482 through 490 against EIKE BATISTA, FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX

INTERNATIONAL, S.A., CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD., 63X FUND, and say as follows:

491.    As a result of the facts detailed above, each of the foregoing Defendants knew of the underlying fraudulent scheme and the plan to make and disseminate the alleged false and fraudulent advertisements regarding the Billion Dollar Put Option pursuant to the fraudulent scheme before the people of the State of Florida.

492.    As a result of the facts detailed above, each of the foregoing Defendants agreed and conspired with each other, with criminal intent to further such scheme, and each one assisted in it by the commission of the overt acts detailed above and is therefore jointly and severally liable for the loss caused to the Plaintiffs.

493.    Defendants thereby conspired and agreed together to commit and did substantially assist in the commission of numerous acts of false and misleading advertising in that they made or disseminated or caused to be made or disseminated before the general public of the state misleading advertisements, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

494.    While conspiring to participate in the false and misleading advertising scheme, these Defendants had actual knowledge of the wrongfulness of the scheme and the high probability that the scheme would damage the Plaintiffs and, despite that knowledge, intentionally pursued the conspiracy, damaging the Plaintiffs.

495.    The false and fraudulent advertisement of the Billion Dollar Put Option was made in the course of an overall fraudulent conspiracy by which the Defendants willfully and maliciously caused their thousands of victims, including retirement funds investing the pensions of their beneficiaries, to lose many billions of dollars, solely for their own personal gain. Such

outrageous actions shock the conscience and merit an award of punitive damages in an amount sufficient to hurt but not bankrupt and to deter such conduct in others in future.

496.    Accordingly, Plaintiffs have a statutory cause of action for actual damages, punitive damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

WHEREFORE, Plaintiffs demand damages, including punitive damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

## COUNT VI
## AIDING AND ABETTING FALSE AND MISLEADING ADVERTISING

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 473 and 478 through 490 against FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX INTERNATIONAL, S.A., CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD. and 63X FUND, and say as follows:

497.    As a result of the facts detailed above, each defendant knew of the intent to make and disseminate such false and misleading advertisements and rendered substantial assistance in the making and dissemination of such false and misleading advertisements before the people of the State of Florida, which were fraudulent and unlawful, and were designed and intended for obtaining money or property under false pretenses, contrary to Fla. Stat. § 817.41(1).

498.    The false and fraudulent advertisement of the Billion Dollar Put Option was made in the course of an overall fraudulent scheme whereby Defendants willfully and maliciously assisted in causing thousands of victims, including retirement funds investing the pensions of their beneficiaries, to lose many billions of dollars, solely for their own personal gain. Such outrageous actions shock the conscience and merit an award of punitive damages in an amount sufficient to hurt but not bankrupt and to deter such conduct in others in future.

499.     Accordingly, Plaintiffs have a statutory cause of action for actual damages, punitive damages, attorneys' fees and costs, pursuant to Fla. Stat. § 817.41(6).

WHEREFORE, Plaintiffs demand damages, including punitive damages, interest, attorneys' fees, costs, and such further and other relief as may seem fit.

## COUNT VII
## CIVIL THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 464 against BATISTA and say as follows:

500.     By reason of the false representations detailed above, BATISTA knowingly induced the Plaintiffs, with criminal intent, to buy approximately $21 million of worthless bonds issued by OGX.

501.     These were debt instruments of the company.[19] The obligation on the face of the bonds was payable out of the corporate capital.

502.     BATISTA deliberately and with criminal intent (a) wasted OGX corporate capital in continued pointless drilling to maintain the illusion that there was oil to be found and (b) further illegally abstracted enormous amounts of OGX capital which he tramsnitted through bank accounts of his controlled alter ego corporations and ultimately to himself.

503.     BATISTA therefore stole the value of the Plaintiffs' $21 million investment:

(a)     By means of fraud, false pretenses and deception inducing the Plaintiffs to part with approximately $21 million that they paid for worthless bonds. [Tangible personal property may be the subject of theft, *see* Fla. Stat. § 812.012(4)(b)] and;

(b)     By wasting and siphoning off the corporate capital and thereby converting

---

[19] Corporate bonds are debt obligations of the issuer—the company that issued the bond. With a bond, the company promises to return the face value of the bond, also known as principal, on a specified maturity date. Fast Answers, U.S. Securities and Exchange Commission, https://www.sec.gov/fast-answers/answers-bondcrphtm.html.

the value of the chose in action represented by the bonds. (Intangible personal property may be the subject of theft, [*see* Fla. Stat. § 812.012(4)(b)].

504.    The offense of theft consists in "obtaining" or "using" the property of another which is defined, disjunctively, as any and all of the following:

(a)    Taking or exercising control over property. [see Fla. Stat. § 812.012(3)(a)].

(b)    Making any unauthorized use, disposition, or transfer of property. [see Fla. Stat. § 812.012(3)(b)].

(c)    Obtaining property by fraud, willful misrepresentation of a future act, or false promise. [see Fla. Stat. § 812.012(3)(c)].

(d)    Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception. [see Fla. Stat. § 812.012(3)(d)(1)].

(e)    Other conduct similar in nature. [see Fla. Stat. § 812.012(3)(d)(2)].

505.    By reason of the matters aforesaid, BATISTA committed theft under Florida law in that he knowingly, and with criminal intent, obtained or used the property of the Plaintiffs with the intent of depriving them of a right to the property or a benefit from the property contrary to Fla. Stat. § 812.014(1)(a).

506.    Further or alternatively, by reason of the matters aforesaid, BATISTA committed theft under Florida law in that he appropriated the property of the Plaintiffs to his own use or to the use of persons not entitled to the use thereof, contrary to Fla. Stat. § 812.014(1)(b).

507.    By reason of the foregoing matters alleged, Plaintiffs are entitled to the civil remedies set forth in Florida State § 772.11, including treble damages, attorneys' fees and the expenses of this action.

508.    All conditions precedent to this action, including statutory notice, have been

complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT VIII
## CONSPIRACY TO COMMIT THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 464 and 500 through 508 against  EIKE BATISTA, FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX INTERNATIONAL, S.A., CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD. and 63X FUND,  and say as follows:

509.    As a result of the facts detailed above, each of the foregoing Defendants knew of the underlying fraudulent scheme and agreed and conspired with each other to further such scheme, and each one assisted in it by the commission of the overt acts detailed above and is therefore jointly and severally liable for the loss caused to the Plaintiffs.

510.    As detailed above, the foregoing Defendants with criminal intent, conspired and agreed together to commit theft by the terms of Fla. Stat. § 812.014, and so committed theft, and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

511.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

## COUNT IX
## AIDING AND ABETTING THEFT

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 464 and 500 through 508 against FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX INTERNATIONAL, S.A., CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD. and 63X FUND, and say as follows:

512.    As a result of the facts detailed above, each defendant knew of the underlying fraudulent scheme and rendered substantial assistance to BATISTA in advancing its commission by concealing its existence and by affirmatively assisting in its furtherance and each is therefore jointly and severally liable as an aider and abettor for the loss caused to the Plaintiffs.

513.    Under Florida law, aiders and abettors are principal violators.[20] For the foregoing reasons, each of the stated Defendants, by aiding and abetting BATISTA, committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

514.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants, jointly and severally, three times the damage suffered, namely $60,932,547.00, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

---

[20] Fla. Stat. § 777.011 Principal in first degree — "Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed . . . is a principal in the first degree . . ."

**COUNT X**
**FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT**
**(f/k/a "FLORIDA RICO")**

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 464 and 500 through 514 against EIKE BATISTA, FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX INTERNATIONAL, S.A., CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD. and 63X FUND,  and say as follows:

**The EBX Criminal Enterprise:**

515.    Upon the basis of the facts alleged, BATISTA is and was the prime directing and controlling force at the head of a criminal enterprise within the meaning of Fla. Stat. § 772.102(3) comprised of himself, Defendants FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX INTERNATIONAL, S.A., CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD., and 63X FUND, and many other individual and corporate co-conspirators, aiders and abettors, and accomplices not joined. ("the EBX Criminal Enterprise").

516.    The EBX Criminal Enterprise was a continuous, ongoing criminal organization, consisting of both formal and informal relationships. It consisted of an assemblage of individuals, sham corporations, legally formed corporations, officers and directors of those corporations, and associations in fact which functioned as one continuing unit.

517.    The EBX Criminal Enterprise was the vehicle through which numerous predicate crimes were committed constituting a pattern of criminal activity. This primarily consisted of a

scheme to defraud thousands of investors, principally in the United States, of their money and to launder the proceeds to put them out of reach of recovery.

518.    The crimes committed by the EBX Criminal Enterprise were not isolated, unconnected incidents. Rather, they were planned and systematic and executed with criminal intent throughout. The criminal incidents, as alleged below, occurred with great frequency and followed on each other within days, weeks and months, with the last such incident occurring within five years of many of the prior incidents of criminal activity.

519.    The EBX Criminal Enterprise had as its common purpose the criminal aspirations and ambitions of BATISTA and his co-conspirators and other accomplices ("members of the EBX Criminal Enterprise") for the accumulation of wealth through a pattern of racketeering and criminal activity.

520.    All members of the EBX Criminal Enterprise acted in regard to each listed predicate act described below and as to the overall pattern of racketeering and criminal activity, with criminal intent.

521.    In the following paragraphs, predicate acts which proximately caused loss to the Plaintiffs are identified as "**Proximate Cause Allegations**" and additional predicate acts which formed part of the pattern of racketeering activity, but which are not relied on as proximately causing loss to these Plaintiffs are separately identified as "**Pattern Allegations**." (That said, the "Proximate Cause Allegations" also qualify as additional "Pattern Allegations").

522.    Collectively, the Proximate Cause Allegations and Pattern Allegations are sometimes referred to as the "Predicate Acts" or "Predicate Acts of Criminal Activity."

523.    The Predicate Acts enumerated within this Count occurred predominantly between 2007 and 2013, with multiple predicate acts occurring in each year. This activity was all intended to contribute to, and did indeed contribute to, the operation of a continuous racketeering and

criminal practice enterprise, the EBX Criminal Enterprise, which existed to further one common, criminal purpose: to steal as much money and hide as much money as possible.

524.    Under Florida law, aiders and abettors are principal violators[21] and under federal law, aiders and abettors are equally principal violators.[22]

**The Predicate Acts of Criminal Activity:**

525.    The stated Defendants actively participated in the EBX Criminal Enterprise through the prohibited activities as set forth below, contrary to Fla. Stat. § 772.103, through a pattern of criminal activity. The Defendants further conspired to violate the provisions Fla. Stat. § 772.103(1), (2), and (3) contrary to Fla. Stat. § 772.102(4).

526.    The Plaintiffs have been directly injured, which injury was proximately caused by reason of several of the Defendants' violations of Fla. Stat. § 772.103, entitling Plaintiffs to civil remedies under Fla. Stat. § 772.104. Section 772.104(1) provides, in part, "[a]ny person who proves by clear and convincing evidence that he or she has been injured by reason of _**any**_ violation of the provisions of s. 772.103 shall have a cause of action for threefold the actual damages sustained . . . ."

**Predicate Act I - Florida Securities Fraud – Scheme to Defraud**

**Proximate Cause Allegations:**

527.    By their actions in fraudulently inducing Plaintiffs to buy bonds in OGX in six tranches between January and July 2013 as a result of the publication of the fraudulent Billion Dollar Put Option, the EBX Criminal Enterprise committed multiple violations of the Florida Securities Fraud statute, in that in connection with the offer, sale, or purchase of bonds [specifically

---

[21] Fla. Stat. § 777.011 Principal in first degree — "Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed . . . is a principal in the first degree . . ."

[22] 18 U.S.C. § 2 (a) "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

included as "securities" under Fla. Stat. § 517.021(22)(d)] they directly or indirectly employed a device, scheme, or artifice to defraud, contrary to Fla. Stat. § 517.301(1)(a)(1). This constituted six predicate acts proximately causing loss to the Plaintiffs and forming part of a pattern of racketeering activity.

**Pattern Allegations:**

528.   Further, by reason of the multiple fraudulent misrepresentations detailed throughout the Complaint that were intended to and did successfully defraud thousands of investors in OGX of billions of dollars of their investment, including the Florida Retirement System Trust Fund, the EBX Criminal Enterprise committed multiple violations of the Florida Securities Fraud statute, in that in connection with the offer, sale, or purchase of bonds [specifically included as "securities" under Fla. Stat. § 517.021(22)(d)] they directly or indirectly employed a device, scheme, or artifice to defraud, contrary to Fla. Stat. § 517.301(1)(a)(1). This constituted multiple predicate acts forming part of a pattern of racketeering activity.

## Predicate Act II - Florida Securities Fraud – Obtaining

**Proximate Cause Allegations:**

529.   By their actions in fraudulently inducing Plaintiffs to buy bonds in OGX in six tranches between January and July 2013 as a result of the publication of the fraudulent Billion Dollar Put Option, the EBX Criminal Enterprise committed multiple violations of the Florida Securities Fraud statute, in that in connection with the offer, sale, or purchase of bonds, *i.e.* the OGX Bonds [specifically included as "securities" under Fla. Stat. § 517.021(22)(d)] they directly or indirectly obtained money or property by means of untrue statements of material facts and the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, contrary to Fla. Stat. §

112

517.301(1)(a)(2). This constitutes six predicate acts proximately causing loss to the Plaintiffs and forming part of a pattern of racketeering activity.

**Pattern Allegations:**

530.     Further by reason of the multiple fraudulent misrepresentations detailed throughout the Complaint that were intended to and did successfully defraud thousands of investors in OGX of billions of dollars of their investment, including the Florida Retirement System Trust Fund, the EBX Criminal Enterprise committed multiple violations of the Florida Securities Fraud statute, in that in connection with the offer, sale, or purchase of bonds, *i.e.* the OGX Bonds [specifically included as "securities" under Fla. Stat. § 517.021(22)(d)] they directly or indirectly obtained money or property by means of untrue statements of material facts and the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, contrary to Fla. Stat. § 517.301(1)(a)(2). This constitutes multiple predicate acts forming part of a pattern of racketeering activity.

**Predicate Act III - Florida Securities Fraud – Fraudulent Practices**

**Proximate Cause Allegations:**

531.     By their actions in fraudulently inducing Plaintiffs to buy bonds in OGX in six tranches between January and July 2013 as a result of the publication of the fraudulent Billion Dollar Put Option, the EBX Criminal Enterprise committed multiple violations of the Florida Securities Fraud statute, in that in connection with the offer, sale, or purchase of bonds [specifically included as "securities" under Fla. Stat. § 517.021(22)(d)] they directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon persons, including Plaintiffs, contrary to Fla. Stat. § 517.301(1)(a)(3). This constitutes six predicate acts proximately causing loss to the Plaintiffs and forming part of a pattern of racketeering activity.

**Pattern Allegations:**

532.     Further by reason of the multiple fraudulent misrepresentations detailed throughout the Complaint that were intended to and did successfully defraud thousands of investors in OGX of billions of dollars of their investment, the EBX Criminal Enterprise committed multiple violations of the Florida Securities Fraud statute, in that in connection with the offer, sale, or purchase of bonds [specifically included as "securities" under Fla. Stat. § 517.021(22)(d)] they directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon persons, including Plaintiffs, contrary to Fla. Stat. § 517.301(1)(a)(3). This constitutes multiple predicate acts forming part of a pattern of racketeering activity.

**Predicate Act IV - Federal Wire Fraud**

**Proximate Cause Allegations:**

533.     The EBX Criminal Enterprise knew that the use of the wires was a necessary and foreseeable part of the EBX Criminal Enterprise's criminal activity. The communications over the wires were transmitted with the knowledge and authorization of the Defendants and were made in in the ordinary course of business, *i.e.* racketeering and criminal activity, with the intent of executing the EBX Enterprise's scheme to defraud, in furtherance of the criminal purpose of the EBX Enterprise. By so doing, the EBX Criminal Enterprise "caused" the interstate and foreign transmissions by use of the wires.

534.     By their actions in fraudulently inducing Plaintiffs to buy bonds in OGX in six tranches between January and July 2013 as a result of the publication of the fraudulent Billion Dollar Put Option over the wires, the EBX Criminal Enterprise committed numerous acts of wire fraud in that they, having devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or

foreign commerce, writings, signs, signals, pictures, and sounds with the intention of, and for the purpose of, executing such scheme or artifice, contrary to 18 U.S.C. § 1343.

535.    The object and intent of the scheme to defraud was to defraud investors of money. The Defendants knowingly used the mails and wires the specific intent to further the scheme to defraud. This constitutes six predicate acts proximately causing loss to the Plaintiffs and forming part of a pattern of racketeering activity.

**Pattern Allegations:**

536.    Further by reason of the multiple fraudulent misrepresentations detailed throughout the Complaint that were intended to and did successfully defraud thousands of investors in OGX of billions of dollars of their investment, transmitted by the wires, the EBX Criminal Enterprise committed multiple violations of wire fraud in that they, having devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, contrary to 18 U.S.C. § 1343.

537.    The object and intent of the scheme to defraud was to defraud investors of money. The Defendants knowingly used the wires with the specific intent to further the scheme to defraud. This constitutes multiple predicate acts forming part of a pattern of racketeering activity.

**<u>Predicate Act V - Florida False Advertising</u>**

**Proximate Cause Allegations:**

538.    By their actions in fraudulently inducing Plaintiffs to buy bonds in OGX in six tranches between January and July 2013 as a result of the publication of the fraudulent Billion Dollar Put Option, the EBX Criminal Enterprise committed numerous acts of misleading and deceptive advertising within the meaning of Fla. Stat. § 817.40(5), in that they made or

disseminated or caused to be made or disseminated before the general public of the state, or a portion thereof, misleading advertisements, which were fraudulent and unlawful, which the Defendants knew were false and were designed and intended to induce the purchase of stock and bonds in the EBX companies so that they could obtain money or property from investors.

539.     In direct reliance on the false, misleading, and deceptive advertisements alleged, the Plaintiffs were caused direct harm contrary to Fla. Stat. § 817.41(1). This constitutes six predicate acts proximately causing loss to the Plaintiffs and forming part of a pattern of racketeering activity.

**Pattern Allegations:**

540.     Further by reason of the multiple fraudulent misrepresentations detailed throughout the Complaint that were intended to and did successfully defraud thousands of investors in OGX of billions of dollars of their investment, the EBX Criminal Enterprise committed numerous acts of misleading and deceptive advertising within the meaning of Fla. Stat. § 817.40(5), in that they made or disseminated or caused to be made or disseminated before the general public of the state, or a portion thereof, misleading advertisements, which were fraudulent and unlawful, which the Defendants knew were false and were designed and intended to induce the purchase of stock and bonds in the EBX companies so that they could obtain money or property from investors, contrary to Fla. Stat. § 817.41(1). This constitutes multiple predicate acts forming part of a pattern of racketeering activity.

**<u>Predicate Act VI - Florida Theft</u>**

**Proximate Cause Allegations:**

541.     For the reasons specifically alleged in Count VII for Civil Theft, Count VIII for Conspiracy to Commit Theft and Count IX for Aiding and Abetting Civil Theft, which are reincorporated and re-alleged here, the EBX Criminal Enterprise knowingly obtained or used the

Plaintiffs' property through fraud, deceit, false pretenses and/or conduct of similar nature, with the intent to permanently deprive the Plaintiffs of their right to their property or the benefit of their property, and thereby committed six offenses against the Florida Theft Act, Fla. Stat. § 812.014, which constitutes six predicate acts proximately causing loss to the Plaintiffs and forming part of a pattern of racketeering activity.

**Pattern Allegations:**

542.     Further by reason of the multiple fraudulent misrepresentations detailed throughout the Complaint that were intended to and did successfully defraud thousands of investors in OGX of billions of dollars of their investment, including multiple investors in this State, among them the Florida Retirement System Trust Fund, the EBX Criminal Enterprise committed multiple offenses under the Florida Theft Act, Fla. Stat. § 812.014, which constitute multiple predicate acts forming part of a pattern of racketeering activity.

**Predicate Act VI – Engaging in Florida Communications Fraud:**

**Proximate Cause Allegations:**

543.     By their actions in fraudulently inducing Plaintiffs to buy bonds in OGX in six tranches between January and July 2013 as a result of the publication of the fraudulent Billion Dollar Put Option, the EBX Criminal Enterprise engaged in a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, which resulting in depriving the Plaintiffs, of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto contrary to Fla. Stat § 817.034(4)(a), 817.034(3)(b), 817.034(3)(c), and 817.034(3)(d). This constitutes six predicate acts proximately causing loss to the Plaintiffs and forming part of a pattern of racketeering activity.

**Pattern Allegations:**

544.    Further by reason of the multiple fraudulent misrepresentations detailed throughout the Complaint that were intended to and did successfully defraud thousands of investors in OGX of billions of dollars of their investment, including the Florida Retirement System Trust Fund, the EBX Criminal Enterprise engaged in a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, resulting in depriving persons, including of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto contrary to Fla. Stat § 817.034(4)(a), 817.034(3)(b), 817.034(3)(c), and 817.034(3)(d). This constitutes multiple predicate acts forming part of a pattern of racketeering activity.

**Predicate Act VII – Furthering Florida Communications Fraud:**

**Proximate Cause Allegations:**

545.    By their actions in fraudulently inducing Plaintiffs to buy bonds in OGX in six tranches between January and July 2013 as a result of the publication of the fraudulent Billion Dollar Put Option, the EBX Criminal Enterprise furthered a scheme to defraud, in that they furthered a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, including the Billion Dollar Put Option, resulting in depriving persons, including the Plaintiffs, of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto, and in the course thereof communicated with persons with the intent to obtain property from such persons contrary to Fla. Stat § 817.034(4)(b).

**Pattern Allegations:**

546.     Further by reason of the multiple fraudulent misrepresentations detailed throughout the Complaint that were intended to and did successfully defraud thousands of investors in OGX of billions of dollars of their investment, including the Florida Retirement System Trust Fund, the EBX Criminal Enterprise furthered a scheme to defraud, in that they furthered a systematic, ongoing course of conduct with an intent to defraud, or intent to obtain property by false or fraudulent pretenses, representations, or promises, or willful misrepresentations of a future act, including the Billion Dollar Put Option, resulting in depriving persons, including the Plaintiffs, of the right to property or a benefit therefrom, or appropriating the property to their own use or to the use of another person not entitled thereto, and in the course thereof communicated with persons with the intent to obtain property from such persons contrary to Fla. Stat § 817.034(4)(b).

**Predicate Act VIII - Federal Money Laundering 18 U.S.C. 1957**

**Pattern Allegations:**

547.     Plaintiffs attach as Exhibit "C" a chronological list of some of the financial transactions that were carried out through Banco Itaú Private Bank in Miami by the EBX Criminal Enterprise. Over $400 million came into and was sent out of Miami to foreign banks.

548.     The transactions set forth on Exhibit "C" detail numerous acts of money laundering where members of the EBX Criminal Enterprise knowingly engaged in monetary transactions in criminally derived property of a value greater than $10,000 derived from wire fraud, contrary to 18 U.S.C. § 1957.

549.     Banco Itaú Private Bank is a federally chartered Edge Act bank with its sole place of business in Miami, Florida. These transactions all therefore constituted acts of money laundering which took place in the United States pursuant to 18 U.S.C. § 1957(d).

550.    Further, certain transactions detailed above were performed outside the U.S. by "U.S. persons," which includes corporations formed in the U.S., such as CENTENNIAL NEVADA, and CENTENNIAL DELAWARE, and foreign subsidiaries of such U.S. corporations which are deemed U.S persons pursuant to 18 U.S.C. § 3077, and further render such transactions money laundering contrary to 18 U.S.C. § 1957.

551.    All such instances constitute additional predicate acts forming part of a pattern of racketeering activity.

**Predicate Act IX - Federal Money Laundering 18 U.S.C. 1956(a)(1)(A)(i)**

**Pattern Allegations:**

552.    As is alleged above, BATISTA, GODINHO and CARNEIRO paid bribes to government officials in Brazil from accounts in the names of foreign subsidiaries of U.S. corporations at TAG Bank in Panama, which represented the proceeds of wire fraud carried out by the EBX Criminal Enterprise, constituting an offense against a foreign nation involving the bribery of a public official.

553.    Their acts were further to promote and/or carry on specified unlawful activity as defined at 18 U.S.C. 1956(7)(B)(iv) and constituted the offense of money laundering contrary to 18 U.S.C. § 1956(a)(1)(A)(i). Such instances constitute additional predicate acts forming part of a pattern of racketeering activity.

**Predicate Act X - Federal Money Laundering 18 U.S.C. 1956(a)(1)(B)(i)**

**Pattern Allegations:**

554.    As is detailed in the complaint the entire "business" of the EBX Criminal Enterprise was to carry out an international criminal fraudulent scheme, predominantly by wire fraud. The proceeds of that scheme were intentionally held outside Brazil and beyond the scrutiny of Brazilian regulators and were routed to and through foreign banks where the co-conspirators had close

personal relationships, including at Banco Itaú Private Bank, in Miami. These were the proceeds of specified unlawful activity and affected interstate commerce.

555.     The EBX Criminal Enterprise knowingly and intentionally designed these various transfers in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, particularly wire fraud.

556.     The members of the EBX Criminal Enterprise therefore knew that the property involved in such financial transactions represented the proceeds of unlawful activity. Further, the property in fact involved the proceeds of wire fraud. The EBX Criminal Enterprise knowingly conducted or attempted to conduct the financial transactions in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of such specified unlawful activity, and thereby violated 18 U.S.C. § 1956(a)(1)(B)(i). All such instances constitute additional predicate acts forming part of a pattern of racketeering activity.

**The Pattern of Criminal Activity**:

557.     By reason of the commission of the Predicate Acts stated above the members of the EBX Criminal Enterprise engaged in a pattern of criminal activity contrary to Fla. Stat. § 772.102(4) and 772.013.

**Civil Remedy**:

558.     As a result of the Defendants' participation in the criminal enterprise and its perpetration of the aforesaid pattern of criminal activity, Defendants proximately caused damage to Plaintiffs.

559.     By reason of the foregoing, the members of the EBX Criminal Enterprise have, with criminal intent, received proceeds derived directly or indirectly from a pattern of criminal activity and have used or invested the same, or a part thereof, directly or indirectly, or the proceeds derived from the investment or use thereof, in the acquisition of title to, or a right, interest, or

equity in, real property or in the establishment or operation of an enterprise, contrary to Fla. Stat. § 772.103.

560.    By reason of the foregoing, the members of the EBX Criminal Enterprise have, through a pattern of criminal activity, acquired or maintained, directly or indirectly, any interest in or control of any enterprise or real property.

561.    By reason of the foregoing, the members of the EBX Criminal Enterpirse, who were associated with the EBX Criminal Enterpirse conducted and participated, directly and indirectly, in such enterprise through a pattern of criminal activity.

562.    By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorneys' fees and court costs in the trial and appellate courts pursuant to Fla. Stat. § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, statutory treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

**COUNT IX**
**FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT CONSPIRACY**
**(f/k/a "FLORIDA RICO CONSPIRACY")**

Further or alternatively, Plaintiffs re-allege paragraphs 1 through 464 and 515 through 562 against EIKE BATISTA, FLAVIO GODINHO, PAULO MENDONÇA, PAULO GOUVEA, LUIZ CARNEIRO, AZIZ BEN AMMAR, MARCUS BERTO, THOR BATISTA, EBX INTERNATIONAL, S.A., CENTENNIAL ASSET MINING FUND, LLC, CENTENNIAL ASSET BRAZILIAN EQUITY FUND LLC, 63X MASTER FUND, 63X INVESTMENTS LTD. and 63X FUND, and say as follows:

563.    By reason of the foregoing, the members of the EBX Criminal Enterprise conspired and agreed together to participate in the criminal scheme and in the affairs of the criminal

enterprise through a pattern of racketeering activity, agreeing and conspiring to violate Florida Statutes § 772.103(1), (2), and (3), contrary to Florida Statutess § 772.103(4), by reason of which Plaintiffs were damaged and are consequently entitled to civil remedies under Florida Statute § 772.104.

564.    By reason of the foregoing, Plaintiffs have a cause of action for threefold the actual damages sustained, minimum damages as provided by statute, and reasonable attorney's fees and court costs in the trial and appellate courts pursuant to Florida Statutes § 772.104.

WHEREFORE, Plaintiffs demand minimum damages, treble damages in the amount of $60,932,547.00, together with interest, attorneys' fees and costs, and such further and other legal and equitable relief as may appear just.

## COUNT XII
## FLORIDA UNIFORM FRAUDULENT TRANSFER ACT

Further or alternatively, Plaintiffs allege paragraphs 1 through 564 against EIKE BATISTA, THOR BATISTA, MARCUS BERTO, 63X MASTER FUND, ERICK MAGNO and MAGNO, PL, and further allege as follows:

### The Statutory Basis for the Claims

565.    By reason of the foregoing, the Plaintiffs are creditors of EIKE BATISTA, THOR BATISTA, and 63X MASTER FUND within the meaning of Fla. Stat. § 726.102(5).

566.    Plaintiffs bring this claim against EIKE BATISTA, THOR BATISTA, and 63X MASTER FUND as debtors within the meaning of Fla. Stat. § 726.102(7) and fraudulent transferors within the meaning of the statute.

567.    Plaintiffs further bring this claim against THOR BATISTA, 63X MASTER FUND, BERTO, MAGNO and MAGNO, PL as fraudulent transferees within the meaning of the statute.

568.    For the reasons given, the debtors made the transfers alleged with the actual intent to hinder, delay, or defraud their creditors contrary to Fla. Stat. § 726.105(1)(a).

**Facts**

569.     During 2013, as EIKE BATISTA, THOR BATISTA, MARCUS BERTO, and 63X MASTER FUND all knew, EIKE BATISTA's EBX Group was in very serious trouble. Two of BATISTA's biggest companies, OGX and OSX, were close to bankruptcy and owed billions of dollars that they could not pay. He knew that his own personal net worth was approximately minus $600 million and he was insolvent.

570.     BATISTA knew that creditors were after him and he resolved to hide as much money as possible. He asked BERTO to help him with the problem and BERTO agreed. As noted above, BERTO had already been paid $10 million by BATISTA in July 2013 for his help in the larger fraud.

571.     During 2013, and probably in the later months, after the collapse of OGX and OSX, when he had moved to Miami, BERTO introduced EIKE BATISTA to his own asset-protection lawyer in Miami, ERICK MAGNO, who had a small law firm, MAGNO, PL, on Brickell Avenue. The purpose of meeting was to consult MAGNO for his advice in forming a scheme to defraud creditors.

572.     MAGNO proposed the use of a trust to BATISTA and BERTO. This is an "arrangement" which is unknown to the civil law. Unlike a corporation, a trust is private and not chartered by the government. It is not an entity and does not need to be publicly registered anywhere and is therefore completely secret.

573.     Further, the person who acts as trustee, the technical legal owner, is the only one whose name appears publicly in most transactions on behalf of the trust while the beneficiary, the equitable owner, need not in most cases be disclosed. Moreover the beneficiary may retain very broad powers of direction as to how the trustee should invest and distribute the funds. Indeed, a trust need not be a permanent arrangement but can be stated to be freely revocable by the settlor.

574.     BATISTA, BERTO and MAGNO discussed the fact that if MAGNO were to create a trust for BATISTA, with BERTO as trustee, BERTO could then open a bank account outside Brazil and it could be used to hold money abroad and BERTO, who was or soon would be a Miami resident, as well as MAGNO could operate it in Miami without BATISTA being visibly the owner.

575.     Furthermore, as MAGNO explained to BATISTA and BERTO, attorney trust accounts are routinely used to receive money in the U.S. on behalf of foreign clients and make further transfers on their behalf without those clients having to open bank accounts in the U.S. themselves, with all the problems attendant on foreigners having to pass "Know Your Customer" background checks and reporting the fact to their home governments. MAGNO's trust account, held by his law firm MAGNO, PL at Citibank in Miami, Florida could be used as a way-station for incoming and outgoing payments and as a place to "park" funds.

576.     MAGNO further explained that he had a good relationship with a private banker, EFG Capital International Corp. ("EFG") on Brickell Avenue, which is an affiliate of a Swiss bank, EFG AG. The Swiss bank uses this local affiliate as its agency in Miami.

577.     MAGNO explained that the local EFG affiliate could open an account for the trust locally, in Miami, and "book it" as if it were in Switzerland. But the control over the account would be through the relationship manager in Miami and the legal name on the account would be just "BERTO as trustee."

578.     BATISTA was most taken by this idea and he retained MAGNO and MAGNO, PL, on the spot to do his asset protection work. BATISTA commissioned a "Family Trust" to be drafted and set up as to which BERTO would be the trustee and BATISTA and other family members he might designate would be the beneficiaries. The idea was to fund the trust with at least $70 million from abroad.

579.     BATISTA said he would have a lot of other work for MAGNO to do and they

agreed on an initial flat fee of $200,000.00 per year. During the relationship BATISTA paid MAGNO at least $300,000.00 in fees. MAGNO then drafted a "Family Trust" for BATISTA as beneficiary and with BERTO as trustee and arranged an introduction with EFG. This was in fact intended to be a sham trust where BATISTA would retain all power of direction of the trust assets.

580.    Most Miami banks opening new accounts for new foreign customers have stringent "Know Your Customer" rules. They need to know the reason for opening the account, the names and background of the beneficiaries as well as the trustee, the amount of funds anticipated to flow thorough the account and their provenance, and other due diligence information.

581.    BATISTA was at the time red-hot in banking circles. The fact that his companies were collapsing was then evident. The fact that he was opening a new account at a new bank in a foreign country in the name of a trust, with a business colleague as trustee, should have raised suspicion. The amount estimated to run through the account, $70 million, was not small. The idea that funds were being hidden to defraud creditors should have been suspected.  MAGNO knew at the time of account opening that OGX was in bankruptcy.  EFG was initially reluctant to take the money, but regardless, EFG opened the account.

582.    The EFG account was then funded with an initial transfer of $40 million. This originated with a transfer of R$130 million ($40 million) in Brazil from BATISTA's local personal account to THOR's local personal account.  At this point THOR BATISTA became a fraudulent transferee.

583.    The $40 million is then believed to have been wired by THOR BATISTA to MAGNO's IOTA trust account at Citibank in Miami, in the name of the MAGNO PL law firm. (MAGNO has stated that he received $70 million in all for deposit to the Family Trust, $30 million from EIKE BATISTA and $40 million from THOR BATISTA. Bank records in Plaintiffs' possession show the $30 million being wired in from the Cayman Islands in two $15 million

tranches, as detailed below).

584.     Under Florida law, attorney trust accounts are truly trusts, and the lawyer takes legal title to such funds. At this point MAGNO and MAGNO PL therefore became fraudulent transferees of that $40 million.

585.     Upon the basis of MAGNO's voluntary admissions, made before he was respresented, it is believed that MAGNO then transferred that $40 million to EFG for deposit into the account for the Family Trust, with BERTO as trustee, whereupon BERTO took legal title to the funds as trustee and became a further fraudulent transferee as to that $40 million.

586.     On December 24, 2013, MAGNO received another $15 million into his trust account at MAGNO, PL, at Citibank in Miami, Florida from an account of 63X MASTER FUND at Banco BTG Pactual SA in the Cayman Islands, sent via Citibank, New York as intermediary. These funds were also to be held on behalf of the Family Trust, with BERTO as trustee. A copy of the transfer is attached in Composite Exhibit "D."

587.     At this point MAGNO and MAGNO PL therefore became fraudulent transferees of that $15 million. Upon further transfer to the account at EFG, BERTO became a further fraudulent transferee of that $15 million.

588.     On December 27, 2013, MAGNO received another $15 million into his trust account at MAGNO, PL, at Citibank in Miami, Florida from an account of 63X MASTER FUND at Banco BTG Pactual, SA in the Cayman Islands, sent via Citibank, New York as intermediary. These funds were also to be held on behalf of the Family Trust, with BERTO as trustee. A copy of the transfer is attached in Composite Exhibit "D."

589.     At this point MAGNO and MAGNO PL therefore became fraudulent transferees of that additional $15 million. Upon further transfer to the account at EFG, BERTO became a fraudulent transferee of that additional $15 million.

590.    By the end of 2013, (a) THOR BATISTA had received a fraudulent transfer as from his father in the sum of $40 million and had further transferred the same and is liable to the Plaintiffs for that sum, and (b) MAGNO, MAGNO PL and BERTO had taken legal title, as trustees, of a total sum of $70 million in fraudulent transfers and were and are liable to the Plaintiffs, jointly and severally, in that sum.

## Further Fraudulent Transactions and Dissipation

591.    The $70 million in funds that were transferred to Miami were intended to be further used, as MAGNO has described it, for "private equity investments." MAGNO did not regard 63X MASTER FUND as an entity separate from BATISTA but essentially as the holder of BATISTA funds in its name.

592.    One of these "private equity investments" involved further looting of the corporate capital of OGX - now called "OGPar"- which was in attempted reorganization in Brazil and where BATISTA and a number of his accomplices had remained at the helm.

593.    OGPar needed additional capital to continue attempted oil exploration. However, independent capital was only available at very high rates of interest and would take time to arrange.

594.    BATISTA saw an opportunity to further loot the corpse of OGX – and incidentally whatever was left for bondholders such as the Plaintiffs in the bankruptcy estate - by lending money to OGPar to be repaid to him at a high rate of interest.

595.    BATISTA then had many very upset investors asking questions as to what had happened in OGX. He had reneged on the Billion Dollar Put Option and refused the injection of capital into OGPar that he had repeatedly promised to make. He was pretending that he was broke and obviously could not personally make a loan to OGPar without showing that he had available funds and revealing their offshore location.

596.    BATISTA had his attorneys at the law firm of Sergio Bermudes, in Rio de Janeiro,

who were handling all the bankruptcies of all his companies and his criminal problems and issues with CVM, work with MAGNO in drawing up a "Loan Agreement" stated to be between OGPar and "MR. ERICK S. MAGNO as representative of a trust", so that BATISTA could anonymously lend money from his Family Trust in Miami to OGPar at an annualized 120% interest rate.

597.    On December 26, 2013, MAGNO in Miami signed the loan agreement, stated to be in a representative capacity on behalf of a trust for undisclosed beneficiaries, to lend OGPar in Brazil $15 million for three months with an interest charge of $3,000,000.

598.    The loan was accepted by the management of the company, which included BATISTA, who knew the truth behind the transaction, and who directed that it be repaid with $3 million in interest three months later, but signed by Paulo Narcello Amaral and Reinaldo Bellot on behalf of OGPar to further obscure BATISTA's involvement.

599.    MAGNO transferred $15 million on or about December 26, 2013 from his trust account at Citibank in Miami, Florida through Citibank, New York as intermediary to an account of Banco BTG Pactual S.A., Cayman Branch, to the same account from which the two $15 million dollar transfers to his trust account on behalf of Batista were sent.

600.    MAGNO received received back $18 million into his TRUST account at Citibank, in Miami on or about March 29, 2014, which he held for BATISTA's Family Trust, thereby becoming a fraudulent transferee for an additional $3 million.

601.    The loan was refelected on the 2013 year-end financial statement of OGPar as follows:

> US$ 15 million – Magno law financing
> On December 26, 2013 OGPar obtained funding of US$ 15 million. The agreement signed calls for a premium of US$ 3 million to be paid upon maturity, which is scheduled for March 29, 2014. In March of 2014 the loan was settled.

602.    Nowhere in the OGX financial statements or the judicial reorganization proceedings of OGX was it disclosed that this loan was actually being fronted for EIKE BATISTA,

whose refusal to honor the Billion Dollar Put Option had caused OGX to miss its scheduled October 1, 2013 bond payment of approximately $45 million and which led to the request for judicial recovery sought on October 30, 2013.

603.    Had MAGNO disclosed the true identity of the lender, the extraction of an additional $3,000,000.00 from OGX – now "OGPar" - further impairing its ability to pay its creditors, would not have been possible.

604.    Details of further "private equity investments" with the Family Trust funds in Miami are unknown before discovery but it appears that there may have been more.

605.    It is unknown before discovery whether the $40 million transferred into the EFG account as part of BATISTA's Family Trust with BERTO as trustee has been maintained here under the name of a trustee or has been further transferred abroad.

606.    What is known is that between 2014 and 2015 MAGNO and MAGNO PL transferred approximately $37 million out of trust in Miami to foreign accounts at Banco BTG Pactual SA in the Cayman Islands in the name of 63X MASTER FUND. Those funds have now been transferred to an unknown location.

607.    There were no contracts or other legal obligations which would have compelled the transfer of BATISTA's personal funds to a truly separate corporation. Moreover, 63X MASTER FUND was, as MAGNO has confirmed, merely BATISTA's pocket-book. These transfers were therefore to further obscure the source and ownership of BATISTA's funds and to defraud creditors.

## **Claims for Relief**

608.    A trust is a creature of equity. It is not valid unless it is formed for a purpose that is lawful and not contrary to public policy and may be declared invalid by the Court. *See* Fla. Stat. § 736.0404; § 736.0105(2)(c)-(d); § 736.0201(4)(a).

609.    The essential equitable nature of a trust was consistently abused by the Defendants in order to perpetrate a series of fraudulent transfers with actual intent to hinder, delay, or defraud creditors contrary to Fla. Stat. § 726.101(1).

WHEREFORE, Plaintiffs demand in the alternative: (a) an avoidance of such transfers; (b) that the trusts here involved be set aside as shams and contrary to public purpose; (c) an accounting in equity of all sums had and received and how they were disposed of and that the transferees be surcharged for all sums that have been dissipated or disposed of; (c) a prohibitory injunction in equity against further fraudulent dispositions; (d) a mandatory injunction in equity ordering the re-payment of funds fraudulently transferred; (e) the appointment of a receiver to pursue cash transferred; and (f) such further and other relief as the Court deems just, including damages or equitable compensation for such sums as are not returned, plus interest, costs in equity and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable, including liability for, and amount of, punitive damages on all applicable counts.

Respectfully submitted,
ABALLI MILNE KALIL, P.A.
*Counsel for Plaintiffs*
2250 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131
Phone: (305) 373–6600
Fax: (305) 373–7929

*s/ Hendrik G. Milne*
Hendrik G. Milne
Florida Bar No.: 335886
Craig P. Kalil
Florida Bar No.: 607282

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY, that on this 15th day of October 2018, a true and correct copy of the foregoing was electronically filed via ECMF filing Portal, which will serve this document on all counsel of record via this Court's e-service system.

*s/ Hendrik G. Milne*
Hendrik G. Milne